7.     Both the CCAA proceedings, in respect of the Applicants, and the English Proceedings, in respect of the EMEA Debtors, have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.     Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdictions in which they are located.

**BACKGROUND AND PURPOSE**

9.     In response to a call for EMEA claims as authorized by this Court, 84 Proofs of Claim have recently been filed by the EMEA Debtors containing hundreds of broad ranging claims, including a number of large priority claims, set out with limited specificity.  The total of just the quantified EMEA claims is approximately CAD$9.8 billion.  As described more fully below, unliquidated claims filed by EMEA include claims based on various alternative theories of mismanagement and breach of fiduciary duties.

10.    In addition to the Pension Guarantee Claims (described below), which total approximately CAD$1.05 billion, the UK Pension claimants have filed Amended UK Pension Claims (described below) which include not only an estimated claim of CAD$3.7 billion in respect of an alleged deficit in the UK Pension Plan based on a UK regulatory process, but also broad alternative claims based in oppression and breach of fiduciary duty.

11.    As has been reported, the Monitor and the Applicants have participated in confidential mediation sessions with the US Debtors, the EMEA Debtors and representatives of the major creditor groups of each estate with a view to settling the allocation of certain sale proceeds and claims among the various participants.

12.    Unfortunately, on April 13, 2011 the mediation ended without resolution of any of these matters.

13.    For reasons outlined in this Report, the Monitor is of the view that, absent a consensual resolution of these EMEA and UK Pension claims, it is now necessary

for this Court to resolve these claims before any further steps are taken in relation to the allocation of proceeds among the estates.

14.    The purpose of this Sixty-Fifth Report of the Monitor (the "Sixty-Fifth Report") is to provide information to this Honourable Court with respect to the following:

(a)    Claims filed in the CCAA proceedings by the UK Pension Trustee and PPF (as defined below);

(b)    Claims filed in the CCAA proceedings by the EMEA Debtors;

(c)    Claims filed by the EMEA Debtors and the Joint Administrators in the Chapter 11 Proceedings and objections filed by the US Debtors;

and to provide the Monitor's observations in respect thereof.

**TERMS OF REFERENCE**

15.    In preparing this Sixty-Fifth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.  EYI has not audited, reviewed nor otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Sixty-Fifth Report.

16.    Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.  Where amounts claimed arose in a currency other than Canadian dollars, such claims have been converted into Canadian dollars using the Reuters closing rate on January 13, 2009 pursuant to the provisions of the Amended and Restated Claims Procedure Order dated July 30, 2009 and the EMEA Claims Procedure Order dated January 14, 2011.

17.    Capitalized terms not defined in this Sixty-Fifth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report and previous Reports of the Monitor.

18.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.  The Monitor's website also contains a

dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## THE UK PENSION TRUSTEE/PPF CLAIMS

### *Background*

19.     NNUK participated in a pension plan in the United Kingdom for its employees and employees of its predecessors known as the Nortel Networks UK Pension Plan (the "UK Pension Plan").

20.     The Amended and Restated Claims Procedure Order dated July 30, 2009 and the Claims Resolution Order dated September 16, 2010 established a general claims process for the calling for and determination of claims against the Applicants (the "General Claims Process").

21.     On September 30, 2009, the bar date of the General Claims Process, joint claims (the "Original UK Pension Claims") were filed by Nortel Networks UK Pension Trust Limited (being the trustee of the UK Pension Plan) (the "UK Pension Trustee") and the Board of the Pension Protection Fund (a regulatory body in the UK) (the "PPF", and together with the UK Pension Trustee, the "UK Pension Claimants") against each of the Applicants.

22.     Four of the Original UK Pension Claims consisted entirely of placeholder claims referring to potential liabilities under so-called financial support direction proceedings ("FSD Proceedings") that were being contemplated by The Pensions Regulator ("The UK Pensions Regulator") under the (UK) Pensions Act 2004.

23.     The other Original UK Pension Claim, which was filed against NNL, included the placeholder claims relating to the FSD Proceedings and also contained claims in respect of two guarantees entered into by NNL in favour of the UK Pension Trustee (the "Pension Guarantee Claims").

24.     The UK Pensions Regulator did not proceed with FSD Proceedings against NNTC, NNIC or NNGC.  In breach of the CCAA stay of proceedings, The UK Pensions

Regulator sent a Warning Notice to NNC and NNL and commenced FSD Proceedings against those two Applicants. In an order dated February 26, 2010, this Honourable Court ordered that:

> [3. ]... for the purposes of these proceedings all acts taken by The UK Pensions Regulator in the purported exercise of rights and in commencing any proceedings against any of the Applicants, without the consent of those Applicants and the Monitor or without leave of this Court having been first obtained, are null and void and shall be given no force or effect in these proceedings, nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertakings in Canada.

25.    The UK Pensions Regulator appealed this decision and on June 16, 2010, the Ontario Court of Appeal upheld the Order of this Honourable Court, including paragraph 3 set out above, subject to a clarification that:

> Paragraph 3 should not operate so as to preclude the U.K. Trustee and/or the Pension Protection Fund from seeking to assert, by way of amendment of the Proof of Claim, if necessary, a claim in the Companies' Creditors Arrangement Act process for pension contribution shortfalls, including for the relief they assert they would have been able to establish in the U.K. Financial Support Direction process.

26.    The UK Pensions Regulator's application for leave to appeal to the Supreme Court of Canada was denied on January 27, 2011.

*Amended UK Pension Claims*

27.    Following the release of the Court of Appeal's decision, the UK Pension Claimants were given the opportunity to amend their Original UK Pension Claims.

28.    On November 30, 2010, the UK Pension Claimants filed amended proofs of claim against each of NNC and NNL (the "Amended UK Pension Claims").

29.    The Amended UK Pension Claims: (i) elaborated upon purported claims based on the FSD Proceedings as if the UK Pension Claimants had the right and ability to enforce the outcome of those FSD Proceedings (the "FSD Claim"); (ii) alleged in the

alternative, that remedies were available to them under section 241 of the *Canada Business Corporations Act* (the "Oppression Remedy"); and, also in the alternative, (iii) alleged that NNUK had breached an alleged duty to the UK Pension Plan of good faith or fair dealing under English law and that NNL and NNC had assumed that same duty.

30.     The alternative claims in the Amended UK Pension Claims all seek the same result – holding NNC and NNL jointly and severally liable for the full extent of an alleged deficit in the UK Pension Plan.   These claims have not been expressed as a liquidated amount but the UK Pension Claimants allege the deficit is estimated at GBP£2.1 billion (approximately CAD$3.7 billion).

31.     The Amended UK Pension Claims did not include the Pension Guarantee Claims, which remain as asserted in the Original UK Pension Claims.  The Amended UK Pension Claims and the Pension Guarantee Claims are collectively referred to herein as the "UK Pension Claims".

32.     The Pension Guarantee Claims consist of claims based on two guarantees entered into by NNL in favour of the UK Pension Trustee:

(a)     a guarantee in respect of a Funding Agreement between NNUK and the UK Pension Trustee entered into in 2006 (the "Funding Guarantee"); and

(b)     a guarantee entered into in 2007 in connection with an internal Nortel corporate reorganization called Project Swift (described below) (the "Swift Guarantee").

33.     The claim based on the Funding Guarantee alleges that a triggering event has occurred and NNL is thereby liable for amounts owing by NNUK under the Funding Agreement of at least GBP£490 million (CAD$870.9 million).

34.     The claim based on the Swift Guarantee alleges that, although the triggering events for liability under that guarantee have not occurred, they were inevitable under the interpretation of the UK Pension Claimants and therefore, NNL is liable to the UK Pension Trustee in the amount of US$150 million (CAD$183 million).

**THE EMEA INTER-COMPANY CLAIMS PROCESS**

*Background and Summary*

35.  The General Claims Process excluded inter-company claims.  The EMEA Debtors and Joint Administrators nevertheless filed numerous unparticularized claims in September 2009 which are not further addressed in this Report.  By Order dated January 14, 2011, this Court established a procedure (the "EMEA Claims Process") for the filing and resolution of claims by or on behalf of the EMEA Debtors against the Applicants and related claims against present or former directors or officers of the Applicants (the "EMEA Claims"), with a bar date of March 18, 2011.

36.  On March 18, 2011, the Joint Administrators on behalf of 19 EMEA Debtors filed a total of 84 proofs of claim (the "EMEA Proofs of Claim") against the Applicants and unspecified directors and officers of NNL and NNC who are also directors of the EMEA Debtors ("D&Os").  In addition, counsel for 131 former employees of Nortel Networks S.A. ("NNSA") submitted a letter indicating they would file proofs in connection with an action that is currently before the courts in France.

37.  Even absent the significant qualifications and reservations of rights included in the EMEA Proofs of Claim, it would be impossible to quantify the total potential amounts claimed under the EMEA Claims, as many of the claims were submitted as unquantified claims.  For the purpose of relaying the scope and potential impact of the EMEA Claims, the Monitor has set out in the following chart those amounts that have been claimed on a quantified basis, while ignoring duplicate and alternative claims by the same claimant.  Furthermore, it is assumed that any claims filed against a D&O or Applicant other than NNL is considered a duplicative claim if such claim is also filed against NNL.  Since claims were expressed in various currencies, the Monitor has converted amounts into Canadian dollars at the rates as they existed on the Filing Date, in accordance with the EMEA Claims Process.  The total amount claimed by the EMEA Debtors and Joint Administrators against NNL by way of only quantified claims exceeds CAD$9.8 billion.

**Claims against NNL (Converted to CAD)**

| Claimant | Trading Debt | Transfer Pricing | Loan | Other |
|---|---|---|---|---|
| NNUK | $56,505,287 | $1,648,557,750 | $1,083,797,804 | $775,067,260 |
| NNSA | $41,414,592 | $634,285,950 | | $4,394,677,233[1] |
| Ireland | $17,358,719 | $136,668,000 | $315,028,329 | $33,436,918[2] |
| Germany | $203,999 | $5,613,150 | | |
| Austria | | $2,640,621 | | |
| Sweden | | $1,477,060 | | |
| Netherlands | $353,550 | $32,702,700 | | |
| Hungary | | $1,586,325 | | |
| France SAS | $204,071 | | | |
| Spain | $52,650 | $48,810,000 | | |
| Belgium | $18,180 | $17,205,525 | | |
| Finland | | $111,043 | | |
| Poland | $325,000 | $13,909,630 | | |
| Portugal | $33,131 | $6,451,813 | | |
| Romania | | $207,443 | | |
| Czech Republic | | $2,543,001 | | |
| Slovakia | | $2,469,786 | | |
| Italy | $3,079,897 | $63,454,964 | | |
| NNIF | $246,563 | | | $504,854,830 |
| **Total** | **$119,795,637** | **$2,618,694,760** | **$1,398,826,133** | **$5,708,036,241** |
| | | | **Total Quantified Claims** | **$9,845,352,771** |

**Claims against NNTC (Converted to CAD)**

| Claimant | Trading Debt | Transfer Pricing | Loan | Other |
|---|---|---|---|---|
| NNUK | $83,988 | | | |
| NNSA | $581 | | | |
| Ireland | $394,001 | | | |
| Germany | $211,056 | | | |
| France SAS | $4,937 | | | |
| Belgium | $23,853 | | | |
| **Total** | **$718,416** | | | |
| | | | **Total Quantified Claims** | **$718,416** |

---

[1] Includes a claim by the Liquidator for approximately $4.352 billion for alleged mismanagement of NNSA under French law and a claim for approximately $42 million relating to a payment to NNL on a subordinated loan.

[2] Represents a claim for alleged breach of fiduciary duty regarding certain dividend payments to NNL.

**Claims against NNGC (Converted to CAD)**

| Claimant | Trading Debt | Transfer Pricing | Loan | Other |
|---|---|---|---|---|
| NNUK | $488,265 | | | |
| | | | Total Quantified Claims | $488,265 |

### *Description of EMEA Claims as Filed*

38.    As the EMEA Claims are very similar to each other in many respects, it is possible to summarize them under broad headings.  The following is not intended as an all-inclusive description but rather an overview that demonstrates the broad and far-reaching scope of the EMEA Claims.

**(A)    Proprietary Claims**

39.    As has been reported in previous Monitor Reports, proceeds from the post-filing sales of Nortel's business units in which more than one Nortel estate has claimed an economic interest are held in escrow (the "Lockbox") pending resolution of disputes over the allocation of those proceeds among the respective estates.

40.    The EMEA Debtors claim and reserve rights to claim that a substantial number of the allegations in the EMEA Claims give rise to property rights in and to NNL's interest in and allocation from the proceeds in the Lockbox, as well as priority over any other claims against NNL's other assets.

**(B)    Transfer Pricing**

41.    Claims arising out of the Nortel group's transfer pricing arrangements over the last decade were filed in respect of 17 of the EMEA Debtors.

42.    There are two ways in which Nortel entities were involved in transfer pricing – as an RPS Entity or as an LRE.  Both are explained below.

43.    A small number of Nortel companies carried out the research and development upon which the entire organization depended as a technology-based enterprise.  These companies, referred to as "RPS Entities", entered into a Master Research &

Development Agreement (the "MRDA") effective January 1, 2001 whereby they agreed to share economic profits and losses in a manner referred to as a residual profit sharing method, or "RPSM". The vast majority of the research and development at Nortel was conducted in North America by NNL in Canada and NNI in the United States – both are RPS Entities. In Europe, research was conducted under three RPS Entities – NNUK, NNSA and NNIreland. Each has filed substantial claims related to the transfer pricing system utilized by Nortel.

44.     The transfer pricing related claims of these RPS Entities include allegations that:

(a)     Nortel's RPSM was a flawed transfer pricing mechanism and did not sufficiently compensate NNUK, NNSA or NNIreland for various functions or costs including routine returns and restructuring costs;

(b)     NNL breached the MRDA by failing to allocate appropriate returns to NNUK, NNSA and NNIreland in its position as administrator of the MRDA; and

(c)     NNL breached fiduciary duties and/or conducted itself oppressively towards NNUK, NNSA and NNIreland in connection with Nortel's transfer pricing.

45.     Nortel companies that did not carry out research and development functions were referred to as limited risk entities ("LREs") because they performed only routine functions such as distribution activities relating to the sale of Nortel products and provision of related services under separate distribution agreements or marketing, promotional and consulting services under separate service agreements (collectively, "Distribution Agreements").

46.     Fourteen EMEA Debtors filed transfer pricing claims as LREs. These claims include allegations that:

(a)     the RPSM and the specific Distribution Agreement entered into with NNL did not provide an appropriate rate of return for the routine distribution functions of that LRE and the LRE was not sufficiently reimbursed for restructuring costs;

(b)     NNL was in breach of contract in respect of the Distribution Agreement for failing to provide a greater return; and

(c)    in applying the transfer pricing arrangements NNL acted contrary to the interests of the LRE and its creditors and in favour of its own interests.

47.    Quantified transfer pricing claims by the EMEA RPS Entities total approximately CAD$2.42 billion. The quantified transfer pricing claims of the EMEA LREs total approximately CAD$200 million.

### (C)    Intercompany Loans

48.    Claims were advanced in respect of intercompany loans made to NNL by NNUK and NNIreland. For clarity, the NNUK claim consists of primarily the conversion of ordinary course trading debt rather than the advance of new funds. The two proofs of claim set out various theories why the claimants suffered damage for which NNL should be held liable including: the claimant was harmed because the loans were made on an interest-free basis; NNL caused the claimant to enter into the loan agreements to its detriment; and certain repayments of the loans were not valid.

49.    The quantified claims based on intercompany loans total approximately CAD$1.4 billion.

### (D)    Project Swift

50.    In late December 2007, an internal corporate reorganization was implemented which was referred to within Nortel as Project Swift. In broad terms, this involved transferring ownership of many of the EMEA entities to NNUK from NNL in exchange for cash, a reduction of outstanding loans, the liquidation of a Luxembourg subsidiary, selling certain shareholdings of NNIF to NNL and reducing the capital of NNIF.

51.    NNUK has filed claims totalling approximately CAD$622 million in connection with NNUK's direct involvement in Project Swift and an additional CAD$153 million in relation to alleged harm to NNUK as a result of the NNIF reorganization as part of Project Swift.

52.    NNIF has filed claims totalling approximately CAD$505 million in connection with the NNIF restructuring within Project Swift.

### (E)    Liquidator's Mismanagement Claim

53.    The Liquidator of NNSA has filed a claim against NNL in the amount of €2.691 billion (approximately CAD$4.352 billion), for mismanagement of NNSA under French law.  NNSA's separate Proof of Claim also included mismanagement as a claim but did not quantify the claim.

### (F)    NNSA Claim to Recover a Payment made on a Loan

54.    NNSA claims to recover a payment it made on a subordinated loan from NNL.  The amount claimed is approximately CAD$42.4 million.

### (G)    NNUK Claim for its Pension Deficit

55.    Various theories are advanced by NNUK in its Proof of Claim which allege NNL is liable to NNUK for NNUK's alleged failure to properly fund the UK Pension Plan. The claim is not quantified.  However, in its Proof of Claim the deficit relating to the UK Pension Plan is alleged to be approximately GBP£2.1 billion, or CAD$3.7 billion.

### (H)    Trading Debt

56.    Twelve of the EMEA Debtors have specified amounts owing (by NNL for the most part but there are also claims against NNTC and NNGC) as a result of ordinary course intercompany trading.  No contracts are referred to nor any other evidence provided in the EMEA Proofs of Claim.

57.    The amounts claimed as Trading Debt total approximately CAD$121 million.

### (I)    Claims for other Pension Deficits

58.    Apart from NNUK, each of the other EMEA Debtors included claims for any liability they may have in respect of unparticularized deficits in unspecified pension plans.

### (J)    Claims for FSD Liabilities

59.    Apart from NNUK, which is not a "Target" entity under the FSD Proceedings, the other EMEA Debtors included claims alleging the ability to claim over against NNL for any amounts the EMEA claimant is found to be liable for as a result of the FSD Proceedings in respect of the UK Pension Plan.

### (K)    Claims for Customer Revenues

60.    NNUK, NNSA, NNIreland and all but one of the EMEA Debtors that filed transfer pricing claims as LREs also filed claims for being wrongly deprived of unspecified customer revenues.

### (L)    Claims for Past Disposition of Businesses

61.    All EMEA Debtors included claims based on unspecified past dispositions of businesses having resulted in NNL receiving greater proceeds than it was entitled to.

### (M)    EMEA's Reservations of Rights

62.    The EMEA Proofs of Claim contain extensive qualifications and reservations of rights, including:

(a)    the filing of the claim is not acceptance that this Court is the appropriate forum or that it has jurisdiction to determine the merits of the claims;

(b)    rights to add to and/or modify the claims, the nature of the claims, the facts relied on in support of those claims and their quantum, including as a result of documentary and other information obtained from NNL (or elsewhere) and/or in the light of expert evidence produced in connection with the claims;

(c)    rights to advance any prospective, contingent or future claims which may arise or become crystallized at any time after the date of the proof of claim;

(d)    rights to claim contribution and indemnity if a claim is made against the EMEA Debtor (without conceding that such claims are subject to the bar date under this Court's EMEA Claims Process);

(e)    the filing of the claim is not acceptance that claims by NNL are valid or eligible for set-off;

(f)    the filing of the claim is not acceptance that proprietary claims and claims for breaches of fiduciary duty are subject to the EMEA Claims Process or are required to be filed by the bar date; and

(g)    the claims are without prejudice to claims against other parties.

63.    In the EMEA Proofs of Claim against the D&Os, the EMEA Debtors indicated they cannot specify the names of the relevant D&Os because the claims are still under investigation.

64.    Despite certifying that complete documentation in support of each claim is attached to their Proofs of Claim, the EMEA Debtors did not provide any supporting documentation, instead indicating it would be provided as part of a yet to be determined further process.

## THE CHAPTER 11 PROCESS FOR EMEA CLAIMS

65.    In September 2009, the EMEA Debtors filed 350 Proofs of Claim in the Chapter 11 Proceedings as placeholder or "protective" claims (the "EMEA US Placeholder Claims").

66.    On April 1, 2011, the US Debtors filed their objection to the EMEA US Placeholder Claims and filed a "Motion for an Order Requiring a More Definitive Statement of Claim and Setting a Deadline for the Filing of any Proofs of Claim by the EMEA Claimants." The Motion seeks a bar date of June 1, 2011 by which the EMEA Debtors are to file more definitive statements of claim (the "US EMEA Bar Date").

67.    Until more definitive claims are filed, the Monitor is unable to determine whether and to what extent there is duplication in EMEA's claims against the U.S. Debtors and the Canadian Applicants.

68.    The EMEA Claimants have filed responding material indicating they object to the filing of the Motion but will abide by the proposed US EMEA Bar Date.

## MONITOR'S OBSERVATIONS

69.   As described in the preceding paragraphs of this Sixty-Fifth Report, the claims filed
      by the UK Pension Claimants and the EMEA Debtors and Joint Administrators are
      numerous and of a material amount.

70.   The quantum of certain of the EMEA Claims and UK Pension Claims has been
      disclosed in the proofs of claim.  However, there remain many heads of claim that
      have not been quantified by the claimants, despite the requirements of the relevant
      claims processes.  The aggregate amount of claims that have been quantified at
      present is approximately CAD$13.5 billion.

71.   Should the EMEA Claims and the UK Pension Claims ultimately be allowed in the
      CCAA proceedings on the basis as filed, even as non-priority ordinary unsecured
      claims, they could have the effect of doubling (or more) the estimated CCAA claims
      pool and accordingly significantly reduce potential distributions to other unsecured
      creditors of the Applicants.

72.   In addition to the extraordinary quantum of the EMEA Claims and UK Pension
      Claims as filed, the various remedies requested with respect to these claims include,
      among other things, a ruling that amounts found owing to certain of the EMEA
      Debtors are held in trust on their behalf.  Furthermore, the amounts held in trust
      would include any assets of the Canadian estates as well as any right to proceeds
      allocated to the Canadian estates from the Lockbox.  On such a theory, the resulting
      priority claim could very likely be greater than all net realizations on assets
      ultimately allocated to the Applicants, thereby leaving no assets for distribution to
      the other unsecured creditors in the CCAA proceedings.

73.   As previously disclosed, these significant EMEA Claims are interwoven into
      allocation theories of the EMEA Debtors.  However, when this Honourable Court
      ordered the EMEA Claims Process it ruled that the EMEA Claims can be determined
      by this Court separate from any consideration or determination of the allocation.  As
      such and especially given the significant amounts claimed by the EMEA Debtors
      coupled with the unsuccessful conclusion of the recent mediation process, the

Monitor is of the view, as previously stated in the Supplemental Fifty-Eighth Report, that it is necessary for this Honourable Court to resolve the EMEA Claims and the UK Pension Claims in an efficient and expedited process before any further steps are taken in relation to the allocation of proceeds among the Canadian, U.S. and EMEA estates. In that regard, the Monitor will continue to work with the Applicants and will discuss with Canadian counsel for the EMEA Debtors and the UK Pension Claimants such a process, with a view to expediting the process in the near term.

All of which is respectfully submitted this 28th day of April, 2011.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald

President

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION et al.

*ONTARIO*
**SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)**

Proceeding commenced at Toronto

SIXTY-FIFTH REPORT
OF THE MONITOR
DATED APRIL 28, 2011

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**APPENDIX "H"**

**[ATTACHED]**

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 1091
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110217

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**  IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**  MORAWETZ J.

**COUNSEL:**  Alan Mark, Derrick Tay, and Tony Reyes, for Nortel Networks Corporation et al.

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Barry Wadsworth, for the CAW-Canada

Sharon Kour, for Morneau Sobeco, Plan Administrator

Arthur Jacques, for the Nortel Continuing Canada Employees

Alex MacFarlane, for the Official Committee of Unsecured Creditors

Kevin Zych, for the Nortel Notcholder Group

Lyndon Barnes, for the Board of Directors of Nortel

Mark Zigler, for the Former and Disabled Employees

Andrew Gray, for Nortel Networks Inc. and Chapter 11 Debtors

M. Starnino, for the Pension Benefits Guarantee Fund

M. P. Gottlieb and R. Schwill, for the Joint Administrators of Nortel Networks (UK) Limited

**HEARD &**
**DECIDED:**  JANUARY 14, 2011

**REASONS:**  February 17, 2011

## ENDORSEMENT

[1]     The motion was heard on January 14, 2011. At the conclusion of argument, the motion was granted with reasons to follow. These are the reasons.

[2]     Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") brought this motion for an order granting an "EMEA Claims Procedure Order".

[3]     By way of background, on January 14, 2009, Nortel Networks (UK) Limited ("NNUK") and certain subsidiaries of the Nortel Group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators from the High Court of England and Wales under the *Insolvency Act 1986*. These debtors, together with Nortel Networks Israel (Sales and Marketing) Limited, are defined in the proposed EMEA Claims Procedure Order as the "EMEA Companies", and are listed on Schedule "A" to the proposed draft order.

[4]     On July 30, 2009, the "2009 Claims Procedure Order" was granted, establishing a process for the proving of "Claims".

[5]     Certain categories of claims were excluded from the definition of "Claims" as defined in the 2009 Claims Procedure Order; among the excluded categories of claims were inter-company claims.

[6]     A Claims Resolution Order was granted on September 16, 2010, establishing the resolution process for "Claims" as defined in the 2009 Claims Procedure Order. The Claims Procedure Order did not establish resolution procedures for inter-company claims.

[7]     The Applicants are of the view that some of the largest claims to be filed in these proceedings will be inter-company claims, and among the largest inter-company claims are likely to be claims of the EMEA Companies ("EMEA Claims"). In addition, the Applicants are of the view that some of the EMEA Claims against some of the Applicants will likely be based on alleged facts and liabilities similar to those already asserted against NNC and NNL pursuant to the 2009 Claims Procedure Order.

[8]     The Applicants are of the view that it is appropriate to implement a "call for claims" procedure that will require the EMEA Companies to file their claims by a specified date, and to establish a process for the proving and resolution of the EMEA Claims.

[9]     The Applicants' stated intention is to establish a claims process that will ensure that the most significant claims against the Applicants can be dealt with in an orderly process, to avoid future delays in the administration of the Canadian estates, and delays in determining claims for voting and distribution purposes.

[10]    The Monitor filed its 58th Report and its Supplemental 58th Report in support of the relief sought by the Applicants.

[11]   Counsel to the Nortel Bondholder Group, the Unsecured Creditors' Committee, the Former and Disabled Employees, the Pension Benefit Guarantee Fund, the NCCE, the CAW, Morneau Sobeco, and the Board supported the motion. The motion was opposed by the Joint Administrators of NNUK.

[12]   Nortel has sold substantially all of its operating businesses in the course of insolvency proceedings in Canada, England and the United States. The proceeds are being held in escrow pending determination of how they are to be allocated among the various Nortel Companies. The EMEA Companies claim a significant entitlement to those proceeds. In addition, counsel submits that the EMEA Companies have significant inter-company claims against the Applicants. Counsel submits that the EMEA Claims and their claims for entitlement to the sale proceeds are inextricably intertwined and complex.

[13]   Counsel to the Joint Administrators further submitted that the proposed process is premature and flawed and that any effort to determine and resolve inter-company claims must be undertaken in a coordinated procedure that will also determine the proper allocation of the proceeds of the sale of Nortel's assets and businesses as between all the Nortel parties. Further, counsel submits that the determination of the EMEA Claims must be determined in coordinated proceedings, where all of those claims and corresponding claims of set-off and claims over as against other Nortel parties that may arise as a consequence can be determined in an appropriate forum under the appropriate law.

[14]   Counsel to the Joint Administrators also submits that the Interim Funding and Settlement Agreement ("IFSA") (which was entered into among the Applicants, Nortel Networks Inc. and the other U.S. Debtors, the Joint Administrators and the EMEA Companies) specifically contemplates the method for achieving a protocol for resolving the disputes concerning the allocation of the sales proceeds. Counsel further submits that the resolution of disputes concerning the allocation of proceeds will necessarily deal with the same issues as those that will be considered and resolved regarding the EMEA Claims.

[15]   In an effort to settle all outstanding issues, including inter-company claims and allocation of proceeds, the Nortel parties have engaged in a confidential mediation process. Counsel to the Joint Administrators advises that, in accordance with the terms of the mediation, a disclosure exercise was carried out and documents were placed into a central database. However, the use of the documents was limited for the purpose of settlement discussions.

[16]   In summary, counsel submits that the proposed EMEA Claims process is both premature and inapplicable on the basis that:

   (a) the inter-company claims cannot be dealt with separate from or prior to a consideration of the allocation of proceeds;

   (b) pursuant to s. 12.c. of the IFSA, the parties have begun a process of negotiating a protocol for resolving disputes concerning the allocation of proceeds;

   (c) if all issues are not dealt with in a coordinate manner, there will be multiple courts considering the identical issues with the significant risks of inconsistent results.

[17]   Further, they submit that the claims process requested is mainly silent with respect to how issues of jurisdiction, applicable law and the coordination of proceeds will be dealt with and that the proposed claims process does not, in any way, deal with how documentary production is to be made in a context where insufficient documentation has been provided by the Applicants to the EMEA Companies.

[18]   I have not been persuaded by these arguments.

[19]   Section 12.c. of the IFSA references a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions. I am in agreement with the comments of the Monitor that the proposed EMEA Claims Procedure Order does not concern "the allocation of sale proceeds from sale transactions", but rather a process for the calling and resolution of claims that may be advanced by the EMEA Companies against the Applicants. The argument of the Joint Administrators based on section 12.c. of the IFSA is not persuasive.

[20]   With respect to the submission that claims of the EMEA Companies cannot be dealt with separate from or prior to a consideration of the allocation of proceeds, it appears that the linkage between inter-company claims and allocation of proceeds, that is referenced by counsel to the Joint Administrators, may have more to do with achieving maximum leverage in the global distribution negotiations than with the determination of the EMEA Claims. In a claims process, it is reasonable to expect that the Joint Administrators will file what they consider to be the broadest claim allowable and all heads of the claim and the quantum claim will be clearly set out.

[21]   In putting forth the position that a determination of the quantum of the claim cannot be made until the allocation issue is resolved, an indirect question is raised, namely, in formulating the EMEA Claim, will the Joint Administrators be in any way influenced by the allocation process.   If the allocation process impacts the methodology to be utilized by the Joint Administrators in the preparation of the EMEA Claim, it follows that the EMEA Claim may not be complete in all respects. In my view, it is not helpful to have an incomplete EMEA Claim.

[22]   If, on the other hand, the objective of the Joint Administrators is to file the broadest claim allowable in these proceedings, I fail to understand why the preparation and submission of that claim has to wait until the allocation process has been resolved.

[23]   Nortel's insolvency proceedings were commenced in January 2009. At this stage, two years later, it is reasonable to expect that the Joint Administrators will have a complete understanding of the basis for filing an EMEA Claim.

[24]   It is also reasonable to expect that there will be a distribution in the CCAA proceedings and, in my view, all meaningful steps to achieve this objective should be implemented. In addition to institutional creditors, it is important to again emphasize that there are thousands of individuals who have claims against Nortel, and for these individuals, time does not stand still.

[25]   The time has come where this matter has to move forward. A full and complete claims process will be required before a distribution in the CCAA proceedings can take place.

[26]   That is not to say that the process issues raised by the Joint Administrators should be ignored. The parties involved in the EMEA Claim are well aware of process issues which

include how claims of set-off are to be dealt with, how documentary production is to be made and the timing of the claims bar date. The Applicants recognize that the EMEA Claim is going to be significant. The process issues raised by the Joint Administrators cannot and should not be ignored.

[27]    Accordingly, the Applicants' motion is granted. The order should reflect that the purpose of the procedure is to fully identify and articulate the EMEA Claims, but the process issues referenced by counsel to the Joint Administrators remain to be addressed. Counsel are to prepare a form of order to give effect to the foregoing. To the extent that there is no agreement over the form of order, counsel should schedule a 9:30 a.m. appointment with me through the Commercial List Office.

MORAWETZ J.

**Date:** February 17, 2011

**APPENDIX "I"**

**[ATTACHED]**

# Goodmans LLP

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416.597.5923
fmyers@goodmans.ca

May 19, 2011

Our File No.: 083800

**Delivered Via Email**

Matthew P. Gottlieb
Davies Ward Phillips & Vineberg LLP
1 First Canadian Place, 44th Floor
PO Box 63, Stn. First Canadian Place
Toronto, ON    M5X 1B1

Dear Mr. Gottlieb:

**Re:    Nortel Networks, et al.**

We have now had the opportunity to review the Proofs of Claim delivered by your clients pursuant to the Order of Morawetz J. dated January 14, 2011. We would like to meet with you, counsel for Nortel Canada and counsel for the NNUK Pension Plan Trustees/PPF (the "Pension Parties") in order to discuss a process for resolving the claims brought by your clients and by the Pension Parties. We therefore invite you to our offices on Wednesday, May 25, 2011 at 9:30 a.m. for that purpose.

In reviewing the Proofs of Claim that your clients have delivered, we note that there are several claims set out that are devoid of any material facts. As you are aware, the forms of Proofs of Claim delivered by your clients generally follow a pattern across different claimants and we are therefore able to advise that generally, the claims that are lacking material facts fall under the headings "Customer Revenues", "Pension Funding Claims", "Claims in respect of Past Dispositions of Business" and "Future and Contingent Claims". Our client is unable to identify any material facts to alert the Court to the transaction or transactions being referred to under these headings. Accordingly, we require particulars of the material facts relied upon in support of these allegations sufficient to plead a valid claim. We have provided a list of the paragraphs of individual Proofs of Claim for which we require these particulars on the schedule appended to this letter. We request delivery of these particulars on or before June 10, 2011.

In addition, many of your clients' claims are set out in the alternative under different countries' laws. We require particulars of which of the alternative laws will be relied upon in each such claim and, where any foreign law is going to be relied upon by your client, we require particulars of the law (including statute and section number or the local citation equivalent).

# Goodmans<sup>LLP</sup>

We can advise you that the Monitor intends to issue a Notice of Disallowance for all claims for which insufficient particulars are provided pursuant to this request and for all of the reservations of rights purportedly maintained in your clients' Proofs of Claims.  The schedule that we will propose will allow an opportunity for those Notices to be disputed and, if they are, for the disputes to be resolved by the Court.

We look forward to working with you to agree upon an schedule for the expeditious hearing of your clients' claims this fall.  Our client is of the view that resolving the claims will advance the Nortel Canada CCAA proceedings.  Therefore, we look forward to working with you and Mr. Ward to agree upon a schedule prior to our Court appearance on June 7, 2011.

Yours very truly,

**Goodmans LLP**

Fred Myers
FLM/krw
c:      Murray A. McDonald
        Jay Carfagnini
        Alan Mark
        Derrick Tay

\5970373.1

Request for Particulars re: CCAA Proofs of Claim
re: Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and Others

| Proof of Claim | Relevant Paragraph Numbers for each Proof of Claim | Request for Particulars |
|---|---|---|
| Nortel GmbH against NNL | Paragraphs 81 and 83 | **Customer Revenues** |
| Nortel Networks (Austria) GmbH against NNL | Paragraphs 87 and 89 | Particulars of all customer contracts under which the creditor alleges it was deprived of revenue and all material facts relied upon by the creditor in support of these claims for liability against NNL. |
| Nortel Networks AB (Sweden) against NNL | Paragraphs 79 and 81 | |
| Nortel Networks BV (Netherlands) against NNL | Paragraphs 87 and 92 | |
| Nortel Networks Engineering Service Kft (Hungary) against NNL | Paragraphs 83 and 85 | |
| Nortel Networks France SAS against NNL | Paragraphs 15 and 17 | |
| Nortel Networks Hispania SA against NNL | Paragraphs 82 and 84 | |
| Nortel Networks International Finance & Holdings BV against NNL | Paragraphs 63 and 66 | |
| Nortel Networks NV (Belgium) against NNL | Paragraphs 91 and 93 | |
| Nortel Networks Oy (Finland) against NNL | Paragraphs 77 and 79 | |
| Nortel Networks Portugal S.A against NNL | Paragraphs 89 and 91 | |
| Nortel Networks Romania Srl against NNL | Paragraphs 75 and 77 | |
| Nortel Networks S.A. against NNL | Paragraphs 157 and 162 | |

| | | |
|---|---|---|
| Nortel Networks s.r.o. (Czech Republic) against NNL | Paragraphs 84 and 86 | |
| Nortel Networks Slovensko s.r.o. against NNL | Paragraphs 73 and 75 | |
| Nortel Networks SpA (Italy) against NNL | Paragraphs 87 and 89 | |
| Nortel Networks UK Limited against NNL | Paragraphs 237 and 242 | |
| Nortel GmbH against NNL | Paragraphs 86 and 89 | **Pension Funding** <br><br> Particulars of all pension schemes in which the creditor claims to have obligations under its local law; particulars of all such pension schemes which the creditor claims are in deficit for which the creditor claims NNL is liable including the amount of the deficit alleged; and all material facts relied upon by the creditor in support of its claims for liability against NNL. |
| Nortel Networks (Austria) GmbH against NNL | Paragraphs 92 and 95 | |
| Nortel Networks (Ireland) Limited against NNL | Paragraphs 181 and 184 | |
| Nortel Networks AB (Sweden) against NNL | Paragraphs 85 and 88 | |
| Nortel Networks BV (Netherlands) against NNL | Paragraphs 81 and 84 | |
| Nortel Networks Engineering Service Kft (Hungary) against NNL | Paragraphs 88 and 91 | |
| Nortel Networks France SAS against NNL | Paragraphs 7 and 10 | |
| Nortel Networks Hispania SA | Paragraphs 87 and 90 | |
| Nortel Networks International Finance & Holdings BV against NNL | Paragraphs 55 and 58 | |
| Nortel Networks NV (Belgium) against NNL | Paragraphs 97 and 100 | |
| Nortel Networks Oy (Finland) against NNL | Paragraphs 83 and 86 | |
| Nortel Networks Polska Sp z.o.o. against NNL | Paragraphs 74 and 77 | |

| | | **Disposition of Business** |
|---|---|---|
| Nortel Networks Portugal S.A against NNL | Paragraphs 94 and 97 | Particulars of all of the assets disposed of by the creditor that are being relied upon by the creditor; particulars of all sales in which the creditor alleges it did not receive fair and appropriate allocation of the proceeds of the assets sold; and all material facts relied upon by the creditor in support of these claims against NNL. |
| Nortel Networks Romania Srl against NNL | Paragraphs 80 and 83 | |
| Nortel Networks S.A. against NNL | Paragraphs 151 and 154 | |
| Nortel Networks s.r.o (Czech Republic) against NNL | Paragraphs 89 and 92 | |
| Nortel Networks Slovensko s.r.o. against NNL | Paragraphs 78 and 81 | |
| Nortel Networks SpA (Italy) against NNL | Paragraphs 92 and 95 | |
| Nortel GmbH against NNL | Paragraphs 90 and 93 | |
| Nortel Networks (Austria) GmbH against NNL | Paragraphs 96 and 99 | |
| Nortel Networks (Ireland) Limited against NNL | Paragraphs 185 and 188 | |
| Nortel Networks AB (Sweden) against NNL | Paragraphs 89 and 92 | |
| Nortel Networks BV (Netherlands) against NNL | Paragraphs 95 and 98 | |
| Nortel Networks Engineering Service Kft (Hungary) against NNL | Paragraphs 92 and 95 | |
| Nortel Networks France SAS against NNL | Paragraphs 20 and 23 | |
| Nortel Networks Hispania SA against NNL | Paragraphs 91 and 94 | |
| Nortel Networks International Finance & Holdings BV against NNL | Paragraphs 73 and 76 | |
| Nortel Networks NV (Belgium) against NNL | Paragraphs 101 and 104 | |

| | | |
|---|---|---|
| Nortel Networks Oy (Finland) against NNL | Paragraphs 87 and 90 | **Future and Contingent Claims** |
| Nortel Networks Polska Sp z.o.o. against NNL | Paragraphs 78 and 81 | Particulars of all future and contingent claims for which the creditor seeks indemnity and that the creditor or any office holder or future office holder of the creditor may have, to the extent known as at March 18, 2011; and, if different, as at June 10, 2011; and all material facts relied upon by the creditor in support of these claims against NNL. |
| Nortel Networks Portugal S.A against NNL | Paragraphs 98 and 101 | |
| Nortel Networks Romania Srl against NNL | Paragraphs 84 and 87 | |
| Nortel Networks S.A. against NNL | Paragraphs 165 and 168 | |
| Nortel Networks s.r.o (Czech Republic) against NNL | Paragraphs 93 and 96 | |
| Nortel Networks Slovensko s.r.o. against NNL | Paragraphs 82 and 85 | |
| Nortel Networks SpA (Italy) against NNL | Paragraphs 96 and 99 | |
| Nortel Networks UK Limited against NNL | Paragraphs 245 and 248 | |
| Nortel GmbH against NNL | Paragraphs 95-96 | |
| Nortel Networks (Austria) GmbH against NNL | Paragraphs 101-102 | |
| Nortel Networks (Ireland) Limited against NNL | Paragraph 190 | |
| Nortel Networks AB (Sweden) against NNL | Paragraphs 94-95 | |
| Nortel Networks BV (Netherlands) against NNL | Paragraph 100 | |
| Nortel Networks Engineering Service Kft (Hungary) against NNL | Paragraphs 97-98 | |
| Nortel Networks France SAS against NNL | Paragraph 25 | |
| Nortel Networks Hispania SA against NNL | Paragraphs 96-97 | |

| | | **Future and Contingent Claims re: Tax Claims** |
|---|---|---|
| | | Particulars of any and all claims against the creditor made by any tax authority upon which the creditor is relying and all material facts relied upon by the creditor in support of these claims against NNL. |
| Nortel Networks International Finance & Holdings BV against NNL | Paragraphs 78-79 | |
| Nortel Networks NV (Belgium) against NNL | Paragraphs 106-107 | |
| Nortel Networks Oy (Finland) against NNL | Paragraphs 92-93 | |
| Nortel Networks Polska Sp z.o.o. against NNL | Paragraphs 83-84 | |
| Nortel Networks Portugal S.A against NNL | Paragraphs 105-106 | |
| Nortel Networks Romania Srl against NNL | Paragraphs 89-90 | |
| Nortel Networks S.A. against NNL | Paragraphs 170-171 | |
| Nortel Networks s.r.o (Czech Republic) against NNL | Paragraphs 98-99 | |
| Nortel Networks Slovensko s.r.o. against NNL | Paragraphs 87-88 | |
| Nortel Networks SpA (Italy) against NNL | Paragraphs 101-102 | |
| Nortel Networks UK Limited against NNL | Paragraph 250 | |
| Nortel GmbH against NNL | Paragraph 99 | |
| Nortel Networks (Austria) GmbH against NNL | Paragraph 105 | |
| Nortel Networks (Ireland) Limited against NNL | Paragraph 196 | |
| Nortel Networks AB (Sweden) against NNL | Paragraph 98 | |
| Nortel Networks BV (Netherlands) against NNL | Paragraph 106 | |
| Nortel Networks Engineering Service Kft (Hungary) | Paragraph 101 | |

| | | Future and Contingent Claims re: Revenue Recognition |
|---|---|---|
| against NNL | | Particulars of all claims made against the creditor on the basis of over or under recording of revenue, including the identity |
| Nortel Networks France SAS against NNL | Paragraph 28 | |
| Nortel Networks Hispania SA against NNL | Paragraph 100 | |
| Nortel Networks International Finance & Holdings BV against NNL | Paragraph 83 | |
| Nortel Networks NV (Belgium) against NNL | Paragraph 110 | |
| Nortel Networks Oy (Finland) against NNL | Paragraph 96 | |
| Nortel Networks Polska Sp.z.o.o. against NNL | Paragraph 87 | |
| Nortel Networks Portugal S.A against NNL | Paragraph 109 | |
| Nortel Networks Romania Srl against NNL | Paragraph 93 | |
| Nortel Networks S.A. against NNL | Paragraph 177 | |
| Nortel Networks s.r.o (Czech Republic) against NNL | Paragraph 102 | |
| Nortel Networks Slovensko s.r.o. against NNL | Paragraph 91 | |
| Nortel Networks SpA (Italy) against NNL | Paragraph 105 | |
| Nortel Networks UK Limited against NNL | Paragraph 256 | |
| Nortel GmbH against NNL | Paragraph 101 | |
| Nortel Networks (Austria) GmbH against NNL | Paragraph 107 | |
| Nortel Networks (Ireland) Limited against NNL | Paragraph 198 | |

| | | of the claimant against the creditor and all material facts relied upon by the creditor in support of these claims against NNL. |
|---|---|---|
| Nortel Networks AB (Sweden) against NNL | Paragraph 100 | |
| Nortel Networks BV (Netherlands) against NNL | Paragraph 108 | |
| Nortel Networks Engineering Service Kft (Hungary) against NNL | Paragraph 103 | |
| Nortel Networks France SAS against NNL | Paragraph 30 | |
| Nortel Networks Hispania SA against NNL | Paragraph 102 | |
| Nortel Networks International Finance & Holdings BV against NNL | Paragraph 85 | |
| Nortel Networks NV (Belgium) against NNL | Paragraph 112 | |
| Nortel Networks Oy (Finland) against NNL | Paragraph 98 | |
| Nortel Networks Polska Sp z.o.o. against NNL | Paragraph 89 | |
| Nortel Networks Portugal S.A against NNL | Paragraph 111 | |
| Nortel Networks Romania Srl against NNL | Paragraph 95 | |
| Nortel Networks S.A. against NNL | Paragraph 179 | |
| Nortel Networks s.r.o (Czech Republic) against NNL | Paragraph 104 | |
| Nortel Networks Slovensko s.r.o. against NNL | Paragraph 93 | |
| Nortel Networks SpA (Italy) against NNL | Paragraph 107 | |
| Nortel Networks UK Limited against NNL | Paragraph 258 | |

| | | **Gross Negligence** |
|---|---|---|
| Nortel Networks NV (Belgium) against NNL | Paragraph 76 | Particulars and all material facts relied upon by the creditor in support of these claims against NNL specifically identifying any and all transactions that the creditor alleges amount to an act of manifest gross negligence. |
| | Paragraph 78 | Particulars of whether there exists a receiver in bankruptcy for Nortel Networks NV (Belgium) and, if so, its identity. |
| Nortel GmbH (the office holders) against NNC and NNL | Paragraph 5 (for all) | Particulars of the claims being advanced on behalf of the office holders of the creditor and all material facts relied upon by the office holders of the creditor in support of these claims against NNC and NNL to the extent that such material facts differ from the claims brought by the creditor against NNC and NNL. |
| Nortel Networks (Austria) GmbH (the office holders) against NNC and NNL | | |
| Nortel Networks (Ireland) Ltd. (the office holders) against NNC and NNL | | |
| Nortel Networks AB (the office holders) against NNC and NNL | | |
| Nortel Networks BV (the office holders) against NNC and NNL | | |
| Nortel Networks Engineering Service Kft (Hungary) (the office holders) against NNC and NNL | | |
| Nortel Networks France SAS (the office holders) against NNC and NNL | | |

| |
|---|
| Nortel Networks Hispania SA (the office holders) against NNC and NNL |
| Nortel Networks International Finance & Holdings BV (the office holders) against NNC and NNL |
| Nortel Networks NV (the office holders) against NNC and NNL |
| Nortel Networks Oy (the office holders) against NNC and NNL |
| Nortel Networks Polska Sp z.o.o. (the office holders) against NNC and NNL |
| Nortel Networks Portugal S.A (the office holders) against NNC and NNL |
| Nortel Networks Romania Srl (the office holders) against NNC and NNL |
| Nortel Networks S.A. (the Joint Administrator) against NNC and NNL |
| Nortel Networks s.r.o (the office holders) against NNC and NNL |
| Nortel Networks Slovensko S.r.o. (the office holders) against NNC and NNL |
| Nortel Networks S.p.A. (Italy) (the office holders) against NNC and NNL |
| Nortel Networks UK Limited (the office holders) |

| | | |
|---|---|---|
| against NNC and NNL.<br><br>Nortel GmbH against NNC<br><br>Nortel Networks (Austria) GmbH against NNC<br><br>Nortel Networks (Ireland) Ltd. against NNC<br><br>Nortel Networks AB (Sweden) against NNC<br><br>Nortel Networks BV (Netherlands) against NNC<br><br>Nortel Networks Engineering Service Kft (Hungary) against NNC<br><br>Nortel Networks France SAS against NNC<br><br>Nortel Networks Hispania SA against NNC<br><br>Nortel Networks International Finance & Holdings BV against NNC<br><br>Nortel Networks NV (Belgium) against NNC<br><br>Nortel Networks Oy (Finland) against NNC<br><br>Nortel Networks Polska Sp z.o.o. against NNC<br><br>Nortel Networks Portugal S.A against NNC<br><br>Nortel Networks Romania Srl against NNC<br><br>Nortel Networks S.A. against NNC | Paragraph 6 (for all) | To the extent we seek particulars and material facts relied upon by the creditor in support of its claims against NNL, we seek those same particulars and material facts for claims by such creditor against NNC, if such particulars and/or material facts differ in any respect. |

| | | |
|---|---|---|
| Nortel Networks s.r.o (Czech Republic) against NNC | | **Future and Contingent Claims** |
| Nortel Networks Slovensko s.r.o. against NNC | | Particulars of all future and contingent claims for which the creditor seeks indemnity and that the creditor or any office holder or future office holder of the creditor may have, to the extent known as at March 18, 2011; and if different, as at June 10, 2011; and all material facts relied upon by the creditor in support of these claims against NNL. |
| Nortel Networks SpA (Italy) against NNC | | |
| Nortel Networks UK Limited against NNC | | |
| Nortel GmbH against Nortel Networks Technology Corporation | Paragraph 7 (for all) | |
| Nortel Networks (Ireland) Limited against Nortel Networks Technology Corporation | | |
| Nortel Networks France SAS against Nortel Networks Technology Corporation | | |
| Nortel Networks NV (Belgium) against Nortel Networks Technology Corporation | | |
| Nortel Networks S.A. against Nortel Networks Technology Corporation | | |
| Nortel Networks SpA (Italy) against Nortel Networks Technology Corporation | | |
| Nortel Networks UK Limited against Nortel Networks Technology Corporation | | |
| Nortel Networks UK Limited against Nortel Networks Global Corporation | | **Future and Contingent Claims**<br><br>Particulars of all future and contingent claims for which the creditor seeks indemnity and that the creditor or any office |

holder or future office holder of the creditor may have, to the extent known as at March 18, 2011; and if different, as at June 10, 2011; and all material facts relied upon by the creditor in support of these claims against NNL.

15970049