## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
                        :

*In re*                      :        Chapter 11
                      :

Nortel Networks Inc., *et al.*,[1]  :        Case No. 09-10138 (KG)
                      :

           Debtors.     :        Jointly Administered
                      :

                      :        **Hearing date: June 7, 2011 at 9:30 a.m. (ET)**
                      :        **Re: D.I. 5307 and 5444**
---------------------------------------------------------X

## REPLY MEMORANDUM OF U.S. DEBTORS AND COMMITTEE IN FURTHER SUPPORT OF JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND FOR RELATED RELIEF, AND IN RESPONSE TO THE EMEA DEBTORS' CROSS-MOTION TO COMPEL ARBITRATION

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "U.S. Debtors"), and the Official Committee of Unsecured Creditors

(the "Committee" and together with the U.S. Debtors, the "Movants"), hereby submit this

memorandum in further support of their Joint Motion for Entry of an Order Establishing an

Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related

Relief [D.I. 5307] (the "Motion" or "Opening Brief"),[2] and in response to, inter alia, the EMEA

---

[1]       The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]       The following responses and objections have been served: (1) The Joint Administrators' (I) Memorandum of Law in Support of Their (i) Objection to Joint Motion for Entry of an Order Establishing An Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and (ii) Cross-Motion to Compel Arbitration and (II) Declaration of Kevin Francis Lloyd in Opposition to Joint Motion for Entry of an Order Establishing an Allocation Protocol and in Support of Cross Motion to Compel Arbitration, May 19, 2011 [D.I. 5531]; (2) Informal Bondholder

Debtors' Objection to the Joint Motion and Cross-Motion to Compel Arbitration

(the "Objection" or "Cross-Motion").[3]  In support of the Motion and in response to the Cross-

Motion, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

Having reaped the benefits of the IFSA, which made possible the global sales processes

that to date have generated over $ 3 billion in Sale Proceeds,[4] the EMEA Debtors, in their

Objection to the Motion and their Cross-Motion, now seek to rewrite the unambiguous terms of

the IFSA.  But, contrary to the EMEA Debtors' arguments, the U.S. and Canadian Courts have

jurisdiction to resolve allocation disputes under the IFSA, as well as under the Escrow

Agreements and the Cross-Border Protocol incorporated into both the IFSA and Escrow

Agreements.

The IFSA, inter alia, extensively addresses allocation of Sale Proceeds.  It also contains a

broad jurisdiction clause providing that the U.S. and Canadian Courts have exclusive jurisdiction

over any proceeding by any party "seeking any relief whatsoever . . . related to the matters

agreed in this Agreement."  In each of eight Escrow Agreements – the documents that govern the

release of Sale Proceeds from escrow – executed on eight separate occasions spanning a two-

year period, the parties agreed to submit to the exclusive jurisdiction of the U.S. and Canadian

Courts for all disputes "arising under or out of, in respect of, or in connection with" the Escrow

---

Group's Response to Joint Motion to Establish an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, May 19, 2011 [D.I.5448]; (3) Limited Objection of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund to Joint Motion For Entry of an Order Establishing An Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and For Related Relief, May 19, 2011 [D.I. 5440]; (4) Limited Response of the Fourth Estate With Respect to Debtors' Joint Motion of An Order Establishing An Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and For Related Relief [Docket No. 5307], May 31, 2011 [D.I. 5529].

[3]      Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Movants' Motion.

[4]      This figure has the prospect to increase materially over the next several weeks, as the sale of Nortel's patent portfolio moves to auction.

Agreement.  And, in one additional Escrow Agreement, the parties agreed to the exclusive

jurisdiction of the U.S. Court.  In short, the EMEA Debtors, have agreed, over and over again, to

the exclusive jurisdiction of the U.S. and Canadian Courts with respect to matters relating to

allocation and the Sale Proceeds.  Accordingly, the EMEA Debtors' argument that these Courts

lack jurisdiction to resolve the allocation dispute must be rejected.

  The EMEA Debtors argue that these forum selection clauses should be ignored because

the parties agreed in the IFSA to binding arbitration.  This argument is without merit.  Had these

sophisticated parties wished to bind themselves to an arbitration agreement, they would have

done so explicitly in the IFSA.  They did not.  The IFSA nowhere refers to arbitration, nor does it

say that the parties have entered into any binding non-judicial procedure.   In fact, the IFSA says

the exact opposite.  The IFSA provides that the parties "will <u>negotiate in good faith</u> and <u>attempt</u>

<u>to reach agreement</u> on a timely basis on a protocol" for resolving allocation disputes, which

protocol "shall provide binding procedures" (emphasis added).  The U.S. IFSA Order, moreover,

provides, as it must, that any protocol later agreed upon by the parties would be subject to

approval of the U.S. Court upon notice to all interested parties.  Plainly, there was no binding

agreement in the IFSA on a protocol for resolving allocation disputes, much less one that

required arbitration.

  The EMEA Debtors' argument that, because the parties tried to negotiate a protocol that

would involve arbitration they had in fact agreed to arbitration, defies logic.  Of course

arbitration was one option that the parties envisioned could be agreed upon – the term "dispute

resolver" in the IFSA is unambiguously a broad term encompassing both a court and an

arbitrator.  But this does not mean that arbitration was the only option or that the parties had

bound them themselves to arbitrate.  The parties' extensive negotiations of an allocation protocol

based on an arbitral forum – all of which were conducted on a without prejudice, for settlement purposes only, basis – are instead relevant only to put to rest the EMEA Debtors' false accusations of bad faith negotiations.  At bottom, the parties did try to negotiate an allocation protocol.  Those negotiations, despite the parties' extensive, good-faith efforts, failed, and therefore, under Section 16 of the IFSA and the Escrow Agreements, the U.S. and Canadian Courts can and must resolve the parties' allocation dispute.  The Courts, however, have no authority to compel arbitration where there is no arbitration agreement or to "fill in the gaps" of a non-existent arbitration agreement.

Finally, the EMEA Debtors' suggestion that having the U.S. and Canadian Courts hear and resolve the allocation dispute pursuant to the IFSA and Cross-Border Protocol would lead to "chaos" is nonsense.  The Movants anticipate that after conducting a joint hearing, the U.S. and Canadian Courts would each issue a decision on the merits, the same process that has been followed to great success on more than 20 occasions to date under the Cross-Border Protocol. And, apparently, it is only the Joint Administrators of the EMEA Debtors that have concerns about the U.S. and Canadian Courts resolving the merits of the allocation dispute.  Notably, the UK Pension Trust and the Board of the UK Pension Protection Fund – the largest creditors of the EMEA Debtors, having made claims in excess of $3 billion – do not object to having the allocation dispute decided by the Courts.  Their principal objections are that they wish to participate in the process and that the process be transparent, goals that could only be accomplished in public court proceedings, as opposed to a closed arbitration process.  Further, the ad hoc group of bondholders – with over $4 billion in claims against the Canadian and U.S. estates, fully supports the motion to have the U.S. and Canadian Courts hear and determine the allocation dispute.  Moreover, since filing the Joint Motion, the Movants have reached agreement

with the Canadian Debtors, the Monitor and the ad hoc group of major Canadian creditors on an

amended protocol (attached hereto as Exhibit A).  This amended protocol not only shows a clear

path forward, but also addresses many of the concerns raised by the EMEA Debtors.

For all of the reasons set forth in the Movants' opening submission and herein, the

Movants respectfully submit that it is critical that the U.S. and Canadian Courts, with their

unsurpassed understanding of the intricacies of Nortel, take control of the allocation process.

Instead of "chaos," the Movants believe that the Courts' determination of the allocation disputes

among the worldwide Nortel parties will provide clarity to all creditors of the Nortel estates, and

the transparency that such creditors deserve and is mandated by the applicable law of all

jurisdictions.  Not only is it critical that this occur, it is precisely what the parties to the IFSA

agreed would occur where, as here, they were unable to reach agreement on either allocation or

an allocation protocol.

**ARGUMENT**

**I.**
**THE U.S. AND CANADIAN COURTS HAVE**
**JURISDICTION OVER THE ALLOCATION DISPUTE**

**A.      The EMEA Debtors Have Consented to Jurisdiction.**

In June 2009, the U.S. Debtors, Canadian Debtors and EMEA Debtors entered into the

IFSA, which addresses, inter alia, the allocation of the Sale Proceeds.  As discussed in more

detail in the Opening Brief, the IFSA established a framework under which the Sale Proceeds

would be placed in escrow accounts and subsequently released.  See IFSA § 12; see also

Opening Brief ¶¶ 11-13.

Crucially, for the purposes of this Motion, these debtors also agreed "to submit to the

non-exclusive jurisdiction of the U.S. and Canadian Courts (in a joint hearing conducted under

the Cross-Border Protocol . . .), for purposes of all legal proceedings to the extent relating to the

5

matters agreed in this Agreement . . . ."  IFSA § 16(b)(i) (emphasis added); see also IFSA

§ 16(b)(ii) (providing that the parties "agree[] that any claim, action or proceeding by such Party

seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must

be commenced in . . . a joint hearing of both the Canadian and U.S. Courts conducted under the

Cross-Border Protocol . . . .") (emphasis added).  Recognizing the breadth of this provision, the

IFSA explicitly carved out two matters, which are not at issue here, from the scope of the broad

jurisdictional provision.  IFSA §§ 16-17 (excluding matters relating to the Transfer Agreement

generally and any claims against the Joint Administrators solely "in their personal capacities").

     Additionally, the U.S. Debtors, Canadian Debtors and EMEA Debtors all agreed to

submit to the jurisdiction of the U.S. and Canadian Courts under the separate Escrow

Agreements, which established an escrow account in the United States for the Sale Proceeds for

each Sales Transaction.[5]  The jurisdictional provisions of these agreements provide that the

parties submit to the exclusive jurisdiction of the U.S. and Canadian Courts for all disputes

"arising under or out of, in respect of, or in connection with" the Escrow Agreement to the extent

brought prior to the final decree closing the bankruptcy cases.  MEN Distribution Escrow

Agreement, dated as of March 19, 2010, ¶ 21, attached as Exhibit 3 to the Second Declaration of

Inna Rozenberg in Support of Joint Motion for Entry of an Order Establishing an Allocation

Protocol Pursuant to the Interim Funding and Settlement Agreement, and For Related Relief,

dated June 2, 2011, (the "Rozenberg Decl."); see also Escrow Agreement, dated as of March

2009, ¶ 20; Escrow Agreement, dated as of Nov. 11, 2009, ¶ 21; Escrow Agreement, dated as of

Dec. 1, 2009; Escrow Agreement, dated as of Dec. 18, 2009, ¶ 21; Escrow Agreement, dated as

---

[5]     The limited exception is the jurisdictional provision in the first Escrow Agreement, executed in March of 2009, which provided for exclusive jurisdiction only in this Court.  However, that agreement is otherwise substantively consistent with jurisdictional provisions in the other Escrow Agreements.  See Escrow Agreement, dated as of March 2009, ¶ 20.

of March 31, 2010, ¶ 21; Escrow Agreement, dated as of May 27, 2010, ¶ 20; Escrow

Agreement, dated as of June 3, 2010, ¶ 20; Escrow Agreement, dated as of Mar. 11, 2011, ¶ 20

(together, the "Escrow Agreements").  Thus, the parties agreed no fewer than eight times that

matters – such as this one – relating to the funds placed in escrow accounts in the United States

would be heard by the U.S. and Canadian Courts.

      The EMEA Debtors now seek to avoid the clear import of their agreement to the Courts'

jurisdiction by contending that allocation was not the subject of a contractual consent to

jurisdiction or subject to the Courts' inherent jurisdiction.  EMEA is wrong on both counts.

First, there is no question that forum selection clauses are regularly enforced.  See, e.g., Foster v.

Chesapeake Ins. Co., 933 F.2d 1207, 1216, 1219 (3d Cir. 1991) (noting that forum selection

clauses are prima facie valid and affirming the enforcement of the clause to give effect to the

freely negotiated agreement); Kowalksi v. YellowPages.com, LLC, Civ. No. 09-2382 (PGS),

2010 U.S. Dist. LEXIS 85039, at *8, 10-11 (D.N.J. Aug. 9, 2010) (stating that "[i]n the Third

Circuit, forum selection clauses are presumptively valid and enforceable" and that such clauses

are "routinely upheld"); Tradecomet.com LLC v. Google, Inc., 693 F. Supp. 2d 370, 377

(S.D.N.Y. 2010) (stating that the Second Circuit "regularly enforces" forum selection clauses).

Whether or not a forum selection clause applies "depends on what the specific clause at issue

says."  John Wyeth & Brother Ltd. v. Cigna Int'l Corp., 119 F.3d 1070, 1075 (3d Cir. 1997)

(Alito, J.) (emphasis in original).  That being said, "forum selection clauses are to be interpreted

broadly."  Tradecomet.com, 693 F. Supp. 2d at 378; see also Hodgson v. Gilmartin, Civ. No. 06-

1944, 2006 U.S. Dist. LEXIS 73063, at *43-44 (E.D.Penn. Sep. 18, 2006) (observing that the

Third Circuit has given forum selection clauses similar to those at issue here a "very broad

reading"); <u>Huffington v. T.C. Grp., LLC</u>, 637 F.3d 18, 23 (1st Cir. 2011) ("Forum selection

clauses using embracing language are common and have usually been construed broadly.").

    Both the IFSA and the Escrow Agreements contain broadly worded forum selection

provisions.  The forum selection clause in the IFSA covers "any claim, action or proceeding . . .

relating to the matters agreed in this Agreement" and the forum selection clauses in the Escrow

Agreements similarly extend to any "proceeding arising under or out of, in respect or, or in

connection with this agreement."  <u>See</u> IFSA ¶ 16(b)(ii); MEN Escrow Agreement, dated as of

Mar. 19, 2010, ¶ 21.  Courts consistently acknowledge the breadth of the phrases "relating to,"

"in respect of," and "in connection with."  <u>See, e.g.</u>, <u>Schering Corp. v. First Databank, Inc.</u>, 479

F. Supp. 2d 468, 471 (D.N.J. 2007) (observing that the Third Circuit has found forum selection

clauses governing claims "related to" or "concerning" the parties' agreement to be broadly

worded); <u>Coregis Ins. Co. v. Am. Health Found., Inc.</u>, 241 F.3d 123, 128-29 (2d Cir. 2001)

(finding that "[t]he term 'related to' is typically defined more broadly [than arising out of] and is

not necessarily tied to the concept of a causal connection . . . Courts have [] described the term

'relating to' as equivalent to the phrases 'in connection with' and 'associated with' . . . .");

<u>Huffington</u>, 637 F.3d at 22 (observing that courts describe "with respect to" as synonymous with

"relating to" and "in connection with," and observing that the phrase does not require a causal

connection but simply means "connected by reason of an established or discoverable relation");

<u>Wyeth</u>, 119 F.3d at 1075 (looking to the court's past interpretation of the scope of 28 U.S.C. §

1334(b) in aid of interpretation of forum selection clause and observing that "the reach of

'related to' jurisdiction is extremely broad, extending to any action the outcome of which '<u>could

conceivably have any effect on the estate being administered in bankruptcy</u>'") (quoting <u>Pacor v.

Higgins</u>, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original)).

Here, the Motion requests that this Court enter an order establishing the procedures for determining the allocation of Sale Proceeds from the escrow accounts in coordination with the Canadian Court.  As the IFSA established the framework under which allocation would be decided (including that the Sale Proceeds would be held in escrow accounts pending allocation), this dispute unquestionably "relat[es] to matters agreed" in the IFSA.[6]  IFSA § 16(b).  This dispute also falls squarely within the bounds of the forum selection clause in the Escrow Agreements as an "action or proceeding arising under or out of, in respect of, or in connection with" the escrow accounts.[7]  See, e.g., MEN Escrow Agreement ¶ 21.

Second, contrary to the EMEA Debtors' argument, both this Court and the Canadian Court have inherent jurisdiction to approve the Allocation Protocol.  This, together with the EMEA Debtors' consent to jurisdiction of these Courts as set forth above, is dispositive of these Courts' power to grant the relief now requested.  Specifically, this Court has subject matter jurisdiction over core proceedings within the meaning of 28 U.S.C. § 157(b)(2), which includes matters concerning the administration of the estate and other proceedings affecting the liquidation of the estate.  See 28 U.S.C. § 157(b)(2).  Here, the EMEA Debtors have conceded in

---

[6]    See, e.g., Salovaara v. Jackson Nat'l Life Ins. Co., 246 F.3d 289, 300 (3d Cir. 2001) (stating that it is "quite clear" that the forum selection clause covering "any claim related 'directly or indirectly'" to agreement, including any claim concerning advice provided pursuant to this agreement, governed the suit for fraud and insider trading even though such claims arose before agreement was executed); Huffington, 637 F.3d at 21 (holding that claims that defendants misrepresented the risks associated with an investment fund were claims "with respect to" the underlying subscription agreement); Tradecomet.com, 693 F. Supp. 2d at 378-79 (holding plaintiff's antitrust claims were included within forum selection clause covering "all claims arising out of or relating to this agreement or the Google Program(s)" (internal citations and quotations omitted); Bense v. Interstate Battery Sys. of Am., Inc., 683 F.2d 718, 720 (2d Cir. 1982) (holding that plaintiff's antitrust claim "undoubtedly" arose "directly or indirectly" from the franchise contract); see also Coregis, 241 F.3d at 129 (holding that lawsuits were "unquestionably 'connected to,' 'associated with,' and brought 'with reference to' the insolvency or financial impairment of the Companies" and thus fell within insolvency exclusion in insurance contract).

[7]    The cases cited by the EMEA Debtors on pages 24 and 25 of their brief merely stand for the unremarkable – and inapposite – proposition that an express agreement to arbitrate is not necessarily trumped by a subsequent jurisdictional provision in a related contract between the same parties.  See, e.g., Bank Julius Baer & Co. v. Waxfield, Ltd., 424 F.3d 278, 282-83 (2d Cir. 2005) (interpreting forum selection clauses found in later contracts as complimentary to agreement to arbitrate after having "no trouble concluding" that the parties "agreed to arbitrate all claims" and finding that the subsequent contracts incorporated the agreement to arbitrate).  Here, the IFSA does not contain an arbitration clause, as discussed in more detail in Section II below.

their response and cross-motions that this is a core proceeding pursuant to 28 U.S.C. § 157(b).
See Objection to Joint Motion for Entry of an Order Establishing an Allocation Protocol
Pursuant to the Interim Funding and Settlement Agreement, and (II) Cross-Motion to Compel
Arbitration Proposed Order Denying Joint Motion, Ex. A, Proposed Order Denying Joint Motion
for Entry of an Order, filed May 19, 2011 [D.I. 5444], at 2. Similarly, the Canadian Court has
jurisdiction to resolve matters relating to the foregoing pursuant to Sections 9 and 11 of the
Companies' Creditors Arrangement Act. See Companies' Creditors Arrangement Act, R.S.C.
1985, c. C-36, as amended. As the Canadian Court's jurisdiction springs from substantively
identical provisions, the EMEA Debtors cannot credibly challenge the Canadian Court's inherent
jurisdiction.

The EMEA Debtors' argument also ignores that the U.S. and Canadian Courts have
previously recognized their inherent jurisdiction over issues concerning allocation in these cases.
Specifically, the Cross-Border Protocol, which was approved early in these proceedings,
explicitly contemplates that the U.S. and Canadian Courts would be called upon to decide
allocation. See Cross-Border Protocol ¶ 15(ii) (providing that if, as here, "any motion to allocate
sales proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S.
Debtor and one Canadian Debtor are parties to the related sale agreement" is properly heard at a
Joint Hearing if so requested, as here, by the moving party). Thus, from early on, the U.S. and
Canadian Courts acknowledged their jurisdiction to hear allocation disputes.[8]

---

[8]        While the EMEA Debtors were not an original signatory to the Cross-Border Protocol, in all but the first
Escrow Agreement, they agreed to be bound by the terms of the Cross-Border Protocol. See, e.g., MEN Escrow
Agreement, ¶ 21 (providing that, for claims brought prior to a final bankruptcy decree, each party submits and
agrees to the jurisdiction and rules of the U.S. and Canadian Courts, "including that certain cross-border insolvency
protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the Bankruptcy Code in an order
dated January 15, 2009 and by the Canadian Court pursuant to an order dated January 14, 2009, as amended or as
amended and restated from time to time . . . .").

Finally, the U.S. and Canadian Courts each entered IFSA Orders authorizing, respectively, the U.S. Debtors and the Canadian Debtors to enter into the IFSA and the U.S. IFSA Order requires the parties to seek further court approval of any allocation protocol.  See Opening Brief ¶ 13.   Accordingly, the EMEA Debtors' argument that the U.S. and Canadian Courts lack jurisdiction is not only belied by its previous agreements to the contrary in the IFSA and Escrow Agreements, but is also refuted by the U.S. and Canadian Courts' recognition of their jurisdiction over such matters through the IFSA Orders.

**B.      There is No Basis for the Court to Reject the Allocation Protocol Based on Procedural Issues.**

The EMEA Debtors next urge this Court to reject the Allocation Protocol based on a perceived procedural issue.  Specifically, the EMEA Debtors spend several pages attacking the Allocation Protocol because, in their interpretation, it impermissibly mandates a single, "joint decision" from the U.S. and Canadian Courts.  Objection at 34-38.  As an initial matter, the proposed Allocation Order does not require a single, joint decision.  Rather, it simply stands for the unremarkable proposition that, following the completion of discovery and any joint hearings under the Cross-Border Protocol, the U.S. and Canadian Courts would provide a decision or decisions on the merits.  Allocation Protocol ¶ 5.  Moreover, the proposed Revised Allocation Protocol clarifies that the U.S. and Canadian Courts would each issue a decision on the merits. See Exhibit A attached hereto.  The Revised Allocation Protocol, among other provisions, sets up a process by which entities such as the U.K. Pension trustees could seek full rights to participate in the discovery and hearings related to allocation, thus addressing their primary objection to this Motion.

As this Court is well aware, the issuance of separate decisions on the merits has been the procedure followed to date with great success under the Cross-Border Protocol on more than 20

occasions.  Reflecting that the underlying purpose is to allow the U.S. and Canadian Courts to

work effectively and efficiently with each other, the Cross-Border Protocol encourages

communication between the courts to facilitate "consistent" and "coordinat[ed]" rulings.  See

Cross-Border Protocol ¶ 12(d)(vi).  None of the more than 20 joint hearings already held by the

U.S. and Canadian Courts in these proceedings have produced inconsistent or incompatible

rulings.[9]  Despite the EMEA Debtors' protests to the contrary, there is no basis on which these

Courts should decline to exercise their jurisdiction.

Similarly, there is no basis for the EMEA Debtors' concern regarding what they perceive

as additional obstacles that would need to be addressed by the U.S. and Canadian Courts under

the Allocation Protocol.  First, while the EMEA Debtors correctly note that there are different

discovery rules in the United States and Canada, the reality is that the parties have already

exchanged a massive amount of discovery.[10]  Additionally, the EMEA Debtors do not offer any

reason why these sophisticated Courts would be suddenly unable to successfully navigate any

issues arising from differences in discovery and evidentiary procedure.  Indeed, the U.S. and

Canadian Courts have successfully resolved similar procedural differences under the Cross-

Border Protocol over the course of many joint hearings.  Second, as noted above, the U.S. and

---

[9]      See, e.g., Hr'g Tr. in In re Nortel Networks et al., (June 29, 2009) [D.I. 1042]; Hr'g Tr. in In re Nortel
Networks et al., (July 28, 2009) [D.I. 1286]; Hr'g Tr. in In re Nortel Networks et al., (Aug. 4, 2009) [D.I. 1314];
Hr'g Tr. in In re Nortel Networks et al., (Sept. 16, 2009) [D.I. 1594]; Hr'g Tr. in In re Nortel Networks et al., (Oct.
15, 2009) [D.I. 1735]; Hr'g Tr. in In re Nortel Networks et al., (Dec. 2, 2009) [D.I. 2122]; Hr'g Tr. in In re Nortel
Networks et al., (Jan. 6, 2010) [D.I. 2351]; Hr'g Tr. in In re Nortel Networks et al., (Jan. 21, 2010) [D.I. 2393]; Hr'g
Tr. in In re Nortel Networks et al., (Mar. 3, 2010) [D.I. 2842]; Hr'g Tr. in In re Nortel Networks et al., (Mar. 31,
2010) [D.I. 3015]; Hr'g Tr. in In re Nortel Networks et al., (Sept. 16, 2010) [D.I. 3999]; Hr'g Tr. in In re Nortel
Networks et al., (Sept. 30, 2010) [D.I. 4057]; Hr'g Tr. in In re Nortel Networks et al., (Dec. 15, 2010) [D.I. 4618];
Hr'g Tr. in In re Nortel Networks et al., (May 2, 2011) [D.I. 5368].

[10]      By the time of the first mediation sessions in November 2010, there were over 42,000 documents produced
in the data room.  The U.S. and Canadian Debtors had worked together to produce approximately 6,500 documents.
In addition, the U.S. Debtors also produced approximately 14,600 documents, the Canadian Debtors produced
approximately 16,300 additional documents and the EMEA Debtors produced about 4,600 documents.  The figures
show that the U.S. and Canadian Debtors produced the vast majority of the documents in the data room, with the
EMEA Debtors only producing a small fraction (about 11%) of those documents.

Canadian Courts have issued consistent rulings in the joint hearings to date, and there is no reason to conclude this will not be feasible here.  Finally, the EMEA Debtors' statement that "chaos will ensue if any party exercises its right to appeal" is blatant and baseless fear mongering.  Objection at 38.  None of the joint hearings to date has produced such "chaos."  The EMEA Debtors' argument studiously ignores that such "chaos" would be equally likely should allocation be decided through arbitration as they urge, as any arbitral decision would also be subject to confirmation or vacatur proceedings potentially in multiple jurisdictions.  Moreover, the EMEA Debtors' argument ignores the complete standoff that the parties face today.

## II.
## SECTION 12 OF THE IFSA IS NOT AN AGREEMENT TO ARBITRATE

As set forth above, the U.S. and Canadian Courts have jurisdiction to resolve the parties' disputes regarding allocation of sale proceeds.  The EMEA Debtors seek to divest the Courts of their jurisdiction by arguing that the IFSA is a binding arbitration agreement.  The EMEA Debtors, however, cannot sustain their burden of establishing that the parties entered into a binding arbitration agreement.  The IFSA does not state that the parties agree to arbitrate disputes and, indeed, the word "arbitration" is not used in the IFSA.  Section 12 of the IFSA, moreover, makes it clear that the parties have <u>not</u> agreed on a "binding procedure" to determine disputes regarding the allocation of sale proceeds.  Nor has this Court approved any protocol to determine allocation through any binding procedures.  U.S. IFSA Order ¶ 8.  Accordingly, the EMEA Debtors' arbitration argument should be rejected.

### A.    The IFSA Does Not Contain An Arbitration Agreement

1.    <u>Section 12 Of The IFSA Makes It Clear That There Is No Arbitration Agreement</u>

As the United States Supreme Court has recently reaffirmed, the "first principle" of arbitration is that it "is <u>strictly</u> a 'matter of consent' and thus is a way to resolve . . . disputes –

but only those disputes – that the parties have agreed to submit to arbitration." Granite Rock Co.
v. Int'l Bhd. of Teamsters, 130 S.Ct. 2847, 2857-58 (2010) (emphasis in original); see also
AT&T Techs. v. Commc'ns. Workers of Am., 475 U.S. 643, 648 (1986); Cont'l Airlines, Inc. v.
Pilots Merger Comm., Inc. (In re: Continental Airlines, Inc.), 484 F.3d 173, 182 (3d Cir. 2007)
(noting that "[i]t is axiomatic that arbitration is a matter of contract," and "[a]ccordingly, a party
cannot be required to submit to arbitration unless he has agreed so to submit.") (citations and
internal quotations omitted). While there is a strong U.S. federal policy in favor of arbitration,
that policy does not apply to the determination of whether there is a valid agreement to arbitrate
in the first place. Granite Rock Co., 130 S.Ct at 2859-60; see also, e.g., Kirleis v. Dickie,
McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (stating that the "presumption in
favor of arbitration 'does not apply to the determination of whether there is a valid agreement to
arbitrate between the parties'") (quoting Fleetwood Enters., Inc. v. Gaskamp, 280 F.3d 1069,
1073 (5th Cir. 2002)); Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002) ("The
presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration
agreement; however, this presumption disappears when the parties dispute the existence of a
valid arbitration agreement.").[11]  Rather, whether there is a valid agreement to arbitrate in the
first place is determined under ordinary principles of contract formation. See First Options of
Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); Fisser v. Int'l Bank, 282 F.2d 231, 233 (2d
Cir. 1960) (holding that under the FAA, "[o]rdinary contract principles" govern arbitrability)
Kirleis, 560 F.3d at 160; see also Objection at 15. Under both New York law and federal
common law, "[i]t is axiomatic that where the language of a contract is unambiguous, the

---

[11]    See also Grunstad v. Ritt, 106 F.3d 201, 205 n.5 (7th Cir. 1997) (stating that the federal policy favoring
arbitration applies to issues of scope, but "it does not serve to extend the reach of an arbitration provision to parties
who never agreed to arbitrate in the first place") (citing McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994) (noting
that the federal policy in favor of arbitration "presumes proof of a preexisting agreement to arbitrate disputes" and
that "requiring that arbitration rest on a consensual foundation is wholly consistent with federal policy")).

parties' intent is determined within the four corners of the contract, without reference to external evidence." Maniolos v. United States, 741 F. Supp. 2d 555, 565 (S.D.N.Y. 2010).[12]   As the EMEA Debtors concede, a court may not compel arbitration unless the parties' written agreement makes it "clear that the parties intend to submit" the disputes in question to arbitration rather than to a court.  Objection at 16.

Section 12 of the IFSA, upon which the EMEA Debtors exclusively rely, does not come close to demonstrating the requisite intent to arbitrate.  The IFSA nowhere says, in words or substance, that the parties have entered into a binding arbitration agreement.  The absence of such an agreement is fatal to EMEA's argument.  Had the parties, all of whom are sophisticated entities represented by experienced counsel, wished to enter into a binding arbitration agreement as part of the IFSA, they would have said so in the IFSA.  Bor Corp. v. ADT Automotive Inc., No. 96 Civ. 1019 (JFK), 1996 WL 689364, at *10 (S.D.N.Y. Nov. 27, 1996).[13]

The IFSA and the U.S. IFSA Order are not silent on this point; they are directly to the contrary.  They require both the parties' subsequent agreement and this Court's approval for any binding allocation protocol, neither of which has occurred.  First, Section 12(c) of the IFSA provides that the parties will "negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation" of Sale Proceeds, which protocol "shall provide binding procedure[s]" for allocating sale proceeds in the event the parties are unable to agree on an allocation (emphasis added).  Similarly, in Section 12(a), the parties agreed not to condition willingness to execute future asset sale agreements on having a "binding procedure" for the allocation of Sale Proceeds.  Second, the U.S. IFSA Order makes express that

---

[12]     See also IDT Corp. v. Tyco Group, 13 N.Y.3d 209, 214 (2009); Vintage, LLC v. Laws Const. Corp., 13 N.Y.3d 847, 849 (2009); Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000).

[13]     The EMEA Debtors concede that all parties to the IFSA "were represented by sophisticated commercial counsel."  Objection at 19 n.7.

nothing therein or in the IFSA itself "shall constitute a protocol for determining the allocation of proceeds from a Sale Transaction." U.S. IFSA Order ¶ 8. Indeed, the Court ordered that "no [such] protocol for allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court after notice to parties in interest with an opportunity to object." Id.

These twin prerequisites for any binding arbitration agreement – (i) stipulated agreement of the parties, and (ii) approval of this Court – come as no surprise, as they flow from the clear mandates of the Bankruptcy Rules. Bankruptcy Rule 9019(c) provides that "on stipulation of the parties to any controversy affecting the estate, the court may authorize the matter to be submitted to final arbitration." Fed. R. Bankr. P.9019(c). As its text makes clear, this provision "authorizes arbitration only where the parties stipulate to the arbitration."[14] Similarly, under Rule 9019(c), once a "controversy affecting the estate" has arisen, that matter can be submitted to arbitration only following authorization by the Court.[15] Here, the parties have not only failed to stipulate to arbitration, but the Court has never authorized such an extra-judicial resolution of what remains the most important dispute in the Debtors' proceedings. The Debtors' motion to approve the IFSA, as well as the U.S. IFSA Order, do not mention Rule 9019(c). Similarly, while this Court's rules impose certain criteria upon any arbitrators selected to decide a contested

---

[14]    In re Sargeant Farms, Inc., 224 B.R. 842, 845 n.3 (Bankr. M.D. Fla. 1998); In re Jorgensen, 66 B.R. 104, 108 (B.A.P. 9th Cir. 1986) (striking provision from confirmation order that provided for appointment of arbitrator, where "a court's appointment of an arbitrator if disputes arise is not a legitimate exercise of its power. The court may appoint an arbitrator only with the stipulation of the parties."); see also Del. Bankr. R 9013-3(b)(i) (permitting matters to "proceed consensually to voluntary arbitration by consent where consent to arbitration is freely and knowingly obtained.").

[15]    While Courts may enforce otherwise-valid pre-existing agreements to arbitrate, see Mintze v. Am. Fin Servs., Inc., (In re Mintze), 434 F.3d 222, 231 (3d Cir. 2006), after a dispute has arisen, it can be referred to binding arbitration only upon compliance with Bankruptcy Rule 9019(c).

matter,[16] and contemplate the Court's establishment of timeframes for selection of arbitrators,[17]

the U.S. IFSA Order is silent on such points.  Instead, the parties intended to return to this Court

for approval (on notice to all parties in interest) of any allocation protocol, as the plain terms of

the U.S. IFSA Order require.  See U.S. IFSA Order ¶ 8.  As no such agreement was reached, no

Court authorization was ever sought or obtained.  The EMEA Debtors simply fail to reconcile

how the U.S. Debtors could have agreed to submit allocation disputes to binding arbitration

without obtaining this Court's approval.

　　　　The EMEA Debtors struggle to explain away the clear language of the IFSA, arguing that

the word "arbitration" need not expressly appear in a binding agreement to arbitrate.  The

absence of any reference to "arbitration," however, is of critical importance where, as here, the

language of the relevant provision falls far short of language revealing an intent to arbitrate.  See

Bor Corp., 1996 WL 689364, at *10.[18]  As the EMEA Debtors themselves acknowledge, where,

as here, the parties do not refer to arbitration, a court may only compel arbitration if the parties'

agreement includes "[l]anguage clearly manifesting an interest by the parties to submit certain

disputes" to binding arbitration.  Objection at 17 (citing 1 MARTIN DOMKE, GABRIEL WILNER &

LARRY E. EDMONSON, DOMKE ON COMMERCIAL ARBITRATION §8:7 (3d ed. 2010)).[19]  The cases

---

[16]　　See Del. Bankr. L.R. 9019-4(c) (providing that, inter alia, "a person qualifying as an arbitrator hereunder must be certified as an arbitrator through a qualifying program that includes a bankruptcy component").

[17]　　See Del. Bankr. L.R. 9019-4(c)  ("an arbitrator shall be appointed (and may be disqualified) in the same manner as in Local Rule  9019-2(e)."); Del. Bankr. L.R. 9019-2(e)(i) ("upon assignment of a matter to mediation or arbitration in accordance with these Local Rules and unless special circumstances exist as determined by the Court, the parties shall select an arbitrator.  If the parties fail to make such a selection within the time frame as set by the Court, then the Court shall appoint an arbitrator.").

[18]　　See also Truck Drivers, Oil Drivers, Filling Station & Platform Workers' Union Local 705, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (AFL-CIO) v. Schneider Tank Lines, Inc., 958 F.2d 171, 175 (7th Cir. 1992) (noting "while we don't think that people who negotiate contracts are omniscient, it does strain credulity to suppose that the employer and the union just forgot to include . . . an arbitration clause," and ruling that the agreement unambiguously omitted those provisions).

[19]　　Indeed, the very treatise cited by the EMEA Debtors elsewhere notes that an "agreement to arbitrate requires a clear and unequivocal manifestation of an intention to arbitrate because it involves the surrender of the

that the EMEA Debtors themselves cite highlight this point.  See Objection at 17-18.  For

example, in McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 826-27,

832-33 (2d Cir. 1988), the court found an agreement to arbitrate because the parties expressly

designated in their agreement "independent tax counsel to resolve the dispute and, if the parties

cannot agree to the appointment of such counsel, said independent tax counsel shall be appointed

by the American Arbitration Association," but even then denied a motion to compel arbitration

because it found that agreement to arbitrate was a narrow arbitration clause and the parties did

not intend to arbitrate the issue that was disputed.

   The other cases cited by the EMEA Debtors are no more on point.  In each of these cases,

the parties' agreements clearly demonstrated their intention to submit to binding arbitration.  In

CAE Indus. Ltd. v. Aerospace Holdings Co., 741 F. Supp. 388, 391 (S.D.N.Y. 1989), the

defendants did not deny entering into an agreement to arbitrate, and the only issue was whether

certain claims fell within the scope of that arbitration agreement.  Both Int'l Longshoremen

Ass'n, AFL-CIO v. Hellenic Lines, Ltd., 549 F. Supp. 435 (S.D.N.Y. 1982) and Mencher v. B. &

S. Abeles & Kahn, 274 A.D. 585, 587-88, 84 N.Y.S.2d 718 (1st Dep't 1948) concerned

collective bargaining agreements with grievance procedures mandating arbitration.[20]  All four

cases relied on by the EMEA Debtors involve agreements with a binding procedure established

by the parties to resolve certain disputes.  The courts relied on the parties' clear intent to submit

their disputes to the "chosen instrument for the definite settlement of [certain] grievances under

---

right to resort to the courts" and that the "express intent by both parties to enter into the arbitration agreement is essential to its existence."  Domke on Commercial Arbitration §8.15

[20]    The EMEA Debtors' argument that "failure to specify procedures to be followed does not render an arbitration clause invalid," Objection at 24, completely misses the point.  This argument presupposes that there is a binding arbitration agreement in the first place, which is not the case here.  In the one case the EMEA Debtors cite for this proposition, CAE Industs., 741 F. Supp. at 391-93, the parties did not dispute that they had agreed to submit their post-closing purchase price adjustment dispute to "an independent accounting firm mutually agreeable" to the parties and, accordingly, there was no dispute over which the parties had clearly renounced their right to a judicial forum.

the Agreement" in finding an enforceable arbitration agreement.  McDonnell Douglas Fin.

Corp.,858 F.2d at 830-31 (quoting Int'l Longshoreman's Ass'n. 549 F. Supp. at 437).  The cases

are inapplicable to the IFSA, where the parties only agreed to negotiate in good faith regarding a

procedure for allocation disputes.  Two years after the parties executed the IFSA, the

negotiations of an allocation protocol are at an impasse and the parties cannot agree on a

procedure for allocation disputes.

     Instead of language establishing a clear agreement to arbitrate, the EMEA Debtors rely

solely on Section 12(b)'s reference to "relevant dispute resolver(s) under the terms of the

Protocol."  IFSA §12(b)(ii).  According to the EMEA Debtors, "the commonly understood

meaning [of dispute resolver(s)] would not include a reference to a national court.  Rather, this

terminology is clearly associated with the varieties of proceedings known as alternative dispute

resolution."  Objection at 18.  At bottom, the EMEA Debtors' argument boils down to the

unsustainable proposition that the words "dispute resolver" must mean only "private arbitrator."

Id. at 22-23.

     This argument is both unsupported and insupportable.  The EMEA Debtors do not, and

cannot, show that "dispute resolver(s)" means only "arbitrator."  First, the term "dispute

resolver," in plain English, is a broad term that encompasses either courts or arbitrators.  Not

surprisingly, courts and judges have frequently been referred to as dispute resolvers.   See, e.g.,

Positive Software Solutions, Inc. v. New Century Mortg. Corp., 476 F.3d 278, 292 (5th Cir.

2007) (Wiener, J., dissenting) ("Federal trial judges are full-time dispute resolvers."); Lewis v.

Sullivan, 279 F.3d 526, 528 (7th Cir. 2002) ("Federal courts are subsidized dispute-resolvers.");

Armster v. U.S. Dist. Court for Cent. Dist. of California, 806 F.2d 1347, 1350 n.2 (9th Cir. 1986)

(noting that courts function as "private dispute resolver[s]" as well as "law-declarer[s]");

Fansteel, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, Lodge No. 1777, 708 F. Supp. 891, 899 n.11 (N.D. Ill. 1989) (calling "courts" "labor-dispute resolvers"); Farber v. Job, 467 F. Supp. 163, 170 (D. N.J. 1978) ("Under our system the judicial branch performs the role of the dispute resolver."); Dean v. Nunez, 534 So. 2d 1282, 1292 (La. Ct. App. 1988) (calling a judge "a dispute resolver"); accord The Queen v. Beauregard, [1986] 2 S.C.R. 56, § V.2. ("The role of the courts as resolver of disputes, interpreter of the law and defender of the Constitution requires that they be completely separate in authority and function from all other participants in the justice system.").

Second, at least one court has rejected the very argument that the EMEA Debtors make here regarding the term "dispute resolver" – in the context of a motion to compel arbitration.  In Bor Corp, the parties agreed to "negotiate" to engage Ernst & Young "or another dispute resolver, to resolve" their disputes "under terms and procedures to which the parties agree and which are acceptable to Ernst & Young or such other dispute resolver," and further provided that any determinations by the dispute resolver would "be binding upon the parties." 1996 WL 689364, at *9.  The Court there denied a motion to compel arbitration saying in words equally applicable here:  "The parties are sophisticated business entities.  If they wanted arbitration, they would have used the term or a derivative thereof."  Id.  at *10.

The EMEA Debtors rely upon a single case from the state of Ohio, Palumbo v. Select Mgmt. Holdings, Inc., No. 82900, 2003 WL 22674397 (Ohio Ct. App., Nov. 13, 2003), to assert that "dispute resolver" has "been used to refer to an arbitration."  Objection at 18.  But the Palumbo case does not help the EMEA Debtors.  There, unlike here, the parties in their agreement expressly defined the term "Dispute Resolver" to mean an accounting firm acting as an arbitrator.  Palumbo, 2003 WL 22674397, at *2-4 (parties agreed to submit dispute to

20

specified accounting firm for a final and binding resolution "free of challenge or review in any court" and detailed the procedures to be followed including written submissions, conferences, discovery and timing for decision).[21]  Movants do not dispute that a "dispute resolver" <u>could</u> be an arbitrator.  The point is that the plain and unambiguous meaning of the broad phrase "dispute resolver" refers <u>either</u> to a court or an arbitrator; there is no basis to say it <u>only</u> refers to an arbitrator.

The Declaration of the EMEA Debtors' English lawyer, Kevin Lloyd ("<u>Lloyd Decl.</u>"), boldly asserts the IFSA refers to "private 'dispute resolvers.'"  Lloyd Decl. ¶ 7.  But the word "private" is not included in the IFSA language referring to "dispute resolver(s)."  Similarly, the EMEA Debtors in their brief assert that Section 12(b) refers to dispute resolver(s), "not the courts."  Objection at 17.  The words "not the courts" likewise do not appear in the IFSA as a modifier to "dispute resolver(s)."  The EMEA Debtors cannot add terms to the IFSA which they did not negotiate for at the time of the agreement, on which the parties did not agree, and which do not appear in the text.  <u>See</u> <u>Krumme v. WestPoint Stevens Inc.</u>, 238 F.3d 133, 139 (2d Cir. 2000) ("Under New York law, therefore, a court must enforce that plain meaning, rather than rewrite an unambiguous agreement.") (internal punctuation omitted).

**B.    The EMEA Debtors' Extrinsic Evidence Is Not Admissible To Interpret The IFSA**

To support their argument that the IFSA contains an arbitration agreement, the EMEA Debtors have presented extrinsic evidence in the form of the Lloyd Declaration and attached exhibits.  Under New York law, however, extrinsic evidence may not be considered if there is an

---

[21]    The only other authority cited by the EMEA Debtors to support their reading of the term "dispute resolver" is Black's Law Dictionary.  However, there is no definition for "dispute resolver" in Black's Law Dictionary, and the EMEA Debtors do not cite to one.  Objection at 18 (referring instead to the definition of "dispute resolution" which, in turn, refers to the definition of "alternative dispute resolution").  The IFSA, of course, does not refer to "alternative dispute resolution."

unambiguous contract.[22]  The phrase "dispute resolver(s)" is not ambiguous; its plain meaning is

broad and encompasses <u>both</u> a court and an arbitrator.  The fact that the parties used a broad

phrase like "dispute resolver(s)" does not mean that the broad phrase is ambiguous.  Because

extrinsic evidence may not be used to interpret an unambiguous term in a contract (whether the

unambiguous term is broad or narrow), the Lloyd Declaration and the attached exhibits are

inadmissible and should be disregarded to the extent offered to interpret the IFSA.[23]

        "Where an agreement is unambiguous on its face, it must be enforced in accordance with

the plain meaning of its terms" and extrinsic evidence may not be considered.  <u>Vintage, LLC v.</u>

<u>Laws Constr. Corp.</u>, 13 N.Y.3d 847, 849, 850 (2009).[24]  "[W]hen parties set down their

agreement in a clear, complete document, their writing should be enforced according to its terms.

This principle is particularly important . . . where the instrument was negotiated between

sophisticated, counseled business people negotiating at arm's length.  Extrinsic and parol

---

[22]        The same is true under federal common law.  <u>Maniolos</u>, 741 F. Supp. 2d at 565 (holding that federal common law looks to state law and that "[w]hen it comes to general rules of contract interpretation, there is little difference between federal common law and New York law").

[23]        Moreover, the Lloyd Declaration is inadmissible hearsay.  Mr. Lloyd concedes that he was not present at <u>any</u> of the negotiations of the IFSA which he characterizes and interprets in his declaration.  <u>See</u> Lloyd Decl. ¶¶ 2, 12, 15, 17, 18, 20. He was also not present at any of the hearings approving the entry of the IFSA.  <u>See</u> Lloyd Decl. ¶¶ 33, 37, 41, 46.  The first time Mr. Lloyd was directly involved in any of the events he describes was sometime in late 2009, well after the IFSA had been agreed upon and executed.  <u>See</u> Lloyd Decl. ¶ 47.  Accordingly, Mr. Lloyd's characterizations of the negotiations prior to his involvement should be given no weight.  An "attorney's declaration of facts that could only have come from the [party] is either hearsay or speculation."  <u>Kistler v. Cleveland (In re</u> <u>Cleveland)</u>, 353 B.R. 254, 260 (Bankr. E.D. Cal. 2006) (refusing to admit an attorney declaration in defense to a motion and in support of a counter-motion because the attorney was not a first-hand witness to the facts alleged in the declaration).

[24]        <u>See also</u> <u>Int'l Klafter Co. v. Cont'l Cas. Co.</u>, 869 F.2d 96, 100 (2d Cir. 1989) ("It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible."); <u>Slatt v. Slatt</u>, 64 N.Y.2d 966, 967 (1985) ("Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used."); <u>Pavarini McGovern, LLC v. Tag Court Square, LLC</u>, 62 A.D.3d 680, 680, 878 N.Y.S.2d 419, 420 (2d Dep't 2009) ("When interpreting a commercial contract negotiated by and entered into at arm's length between sophisticated business people, represented by an attorney, a court must enforce the agreement according to its terms, and extrinsic and parole evidence is not admissible to create an ambiguity in a written agreement that is complete, clear, and unambiguous on its face.").

evidence is not admissible to create an ambiguity."[25] Madison Ave. Leasehold, LLC v. Madison

Bentley Assocs. LLC, 8 N.Y.3d 59, 66 (2006) (internal punctuation omitted). "[C]ourts should

be extremely reluctant to interpret an agreement as impliedly stating something which the parties

have neglected to specifically include." Vt. Teddy Bear Co. v. 538 Madison Realty Co., 775

N.Y.S.2d 765, 767-68 (N.Y. 2004) (quoting Rowe v. Great Atl. & Pac. Tea Co., 412 N.Y.S.2d

827 (N.Y. 1978)). Finally, ambiguity "is an issue of law for the courts to decide." Greenfield v.

Philles Records, Inc., 98 N.Y.2d 562, 569 (N.Y. 2002).

As discussed above, the plain meaning of the term "dispute resolver(s)" broadly

encompasses both a court and an arbitrator. And the mere fact that a term is broad does not

make it ambiguous. See Krumme, 238 F.3d at 139 (citing Hunt Ltd. v. Lifschultz Fast Freight,

889 F.2d 1274, 1277 (2d Cir. 1989) (finding that the term "dispute" in a contract "although

broad, is 'definite and precise' and 'there is no reasonable basis for a difference of opinion' as to

its meaning," thus ruling that the term cannot be narrowed to include any specific category of

dispute)); see also, e.g., GMA Accessories, Inc. v. BOP LLC, No. 07 Civ. 3219 (LTS) (DCF),

2007 WL 4563433, at *3 (S.D.N.Y. Dec. 20, 2007) (finding that a settlement offer to cease using

any trademarks "similar to or substantially indistinguishable' from the term CHARLOTTE,"

"although broad, is not ambiguous"); MMT Sales, LLC v. Acme Television Holdings, LLC, 30

Misc. 3d 1241(A) at 3-4 (N.Y. Sup. Ct. 2011) (finding the term "with or without cause,"

although "ever so broad, is not ambiguous"). Notably, the EMEA Debtors in their brief nowhere

---

[25]    The EMEA Debtors are wrong to suggest that when parties to an agreement are represented by
sophisticated counsel and the agreement does not contain an integration clause, there is a presumption that the
parties did not intend to preclude reference to extrinsic evidence. See Objection at 19 n.7. As the EMEA Debtors'
own case makes clear, representation by counsel is a factor that supports a finding that a written agreement is fully
integrated. See Adler & Shaykin v. Wachner, 721 F. Supp. 472, 477-78 (S.D.N.Y. 1988) (noting that the parties
were represented by experienced counsel as one factor in holding that the written agreement was fully integrated
despite the lack of an integration clause). Where, as here, the writing fully and accurately embodies the rights and
obligations of the parties and there is no ambiguity, the parol evidence rule precludes the introduction of extrinsic
evidence.

state that the term "dispute resolver(s)" is ambiguous, instead taking the position that the IFSA is "clear." Objection at 18. The EMEA Debtors also acknowledge that this lack of ambiguity precludes the admissibility of extrinsic evidence. Id. (after stating that the IFSA is "clear," acknowledging that extrinsic evidence is only admissible "in the event the Court" nonetheless finds the term "dispute resolver" to be ambiguous).[26]

Even if extrinsic evidence were admissible on the meaning of "dispute resolver(s)," the extrinsic evidence proffered by the EMEA Debtors falls well short of demonstrating a clear intent to arbitrate the allocation dispute. Under the terms of the IFSA, the parties could consider and negotiate any protocol. There is no question that the U.S. Debtors attempted to negotiate an allocation protocol based on an arbitral forum and that they have so stated from time to time. As set forth above, however, there was no obligation to do so.

The parties' discussion of a potential arbitral process does not evidence the parties' agreement to arbitrate, but merely represents the parties' good faith efforts to negotiate an allocation protocol. The extrinsic evidence offered by the EMEA Debtors cannot identify a single instance during the IFSA negotiations where any of the parties expressly agreed that the IFSA was a binding agreement to arbitrate and only now, years after the IFSA's execution, do the EMEA Debtors voice an interpretation of Section 12 as a binding arbitration provision. The Lloyd Declaration does not provide a single piece of extrinsic evidence to corroborate a clear agreement to arbitrate by all the parties to the IFSA.

There is also no question that the various references the EMEA Debtors point to in their Objection regarding a "single cross-jurisdictional forum," Objection at 21, cannot be understood as referring exclusively to a "single cross-jurisdictional arbitral forum," as the EMEA Debtors

---

[26]    While the EMEA Debtors elsewhere in their brief inconsistently state that "the term 'dispute resolver' may be subject to different interpretations," Objection at 18, at bottom, this is just another way of saying that it is a broad term, which as noted does not make it ambiguous.

argue. Quite to the contrary, the EMEA Debtors have themselves repeatedly indicated, in filings with courts and communications to its creditors, that they understood these allocation protocol negotiations might not be successful and litigation, rather than arbitration, could result. See Joint Administrators' fourth progress report to creditors, dated February 11, 2011 at 11, Rozenberg Decl. Ex. 1 ("If it is not possible for the three estates to reach a consensual agreement [on allocation], an arbitration or litigation process remains likely."); Joint Administrators' second progress report to creditors, dated February 12, 2010, at 12, Rozenberg Decl Ex. 2 ("It remains possible that the selling estates could reach a consensual allocation agreement regarding purchase price allocation (without the need for recourse to arbitration) or are simply unable to agree on the form of arbitration proceedings. In the event that it is not possible to agree on an arbitration process with the Canadian and U.S. entities, the process for determining allocation of the sale proceeds is likely to be decided by the courts.").

Nor can the EMEA Debtors' description of the IFSA in the French court be used to vary the language of that agreement, particularly in light of the EMEA Debtors' contrary descriptions as set forth above. Finally, the fact that the parties, after signing the IFSA, attempted to agree on a non-judicial dispute resolution protocol is entirely consistent with the reality that they had not already agreed to one in the IFSA. The history of the parties' subsequent negotiations on an allocation protocol, including any consideration of arbitration, is relevant only to demonstrate that the parties engaged in a good faith effort to agree on such a protocol, as set forth below and as required by the IFSA itself.[27]

---

[27]    The EMEA Debtors' citation to Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118 (1913), and Section 34 of the Restatement (Second) of Contracts with respect to the admissibility of evidence of course of conduct after signing an agreement to interpret contractual terms is entirely irrelevant. Objection at 20 n. 8, 31-33. That law only applies if the parties first have an agreement, in which case their course of conduct might be admissible to interpret an otherwise ambiguous term. Here, there was no agreement to arbitrate, there is no ambiguity in the IFSA, and the EMEA Debtors obviously cannot use the parties' later attempts to negotiate an arbitration agreement as evidence that there was an arbitration agreement. In Old Colony, the parties had performed

C.    **The Courts Must Decline The EMEA Debtors' Invitation To Create An Arbitration Clause For The Parties**

As set forth above, it is well-settled that, absent an agreement to arbitrate by the parties, courts may not compel the parties to arbitrate.  Granite Rock Co., 130 S.Ct. at 2857-58 (2010); AT&T Techs., 475 U.S. at 648; see supra at 14.  Accordingly, the EMEA Debtors' suggestion that the Court should order arbitration and direct each of the U.S., Canadian and EMEA Debtors to appoint an arbitrator, Objection at 25, must be rejected.  The EMEA Debtors cite only Bauhinia Corp. v. China Nat'l Mach. & Equip. Import & Export Corp., 819 F.2d 247, 249-50 (9th Cir. 1987) for the proposition that a court has "discretion with respect to what form of arbitration to order."  Objection at 25.  But a court's ability to resolve certain disputes relating to arbitration procedure or the selection of arbitrators only applies if there is a binding arbitration agreement in the first place.[28]  In Bauhinia, there was no dispute as to the existence of an arbitration clause.  Bauhinia Corp., 819 F.2d at 249 ("The contract here expressly calls for arbitration.").  The only issue in that case was where the arbitration should take place.  In short, the Bauhinia case is irrelevant, except to the extent it establishes that the parties must expressly and clearly agree to arbitration before they can be compelled to arbitrate.

---

for twenty-four years; obviously there was a contract.  230 U.S. at 118.  See also Coliseum Towers Assocs. v. Cnty. of Nassau, 2 A.D.3d 562, 564, 769 N.Y.S.2d 293, 296 (2d Dep't 2003) (performance for seven years); Winston v. Mezzanine Invs., L.P., 170 Misc. 2d 241, 249, 648 N.Y.S.2d 493, 499 (Sup. Ct. N.Y. 1996) (performance for three years).

[28]    The non-arbitration cases the EMEA debtors cite in support of their assertion that the court may fill in the terms here are likewise inapposite.  In Bed, Bath, & Beyond, Inc. v. Ibex Constr., LLC, 860 N.Y.S.2d 107, 108-09 (Sup. Ct. N.Y. 2008), the court found a letter of intent to be binding because it did not "contain an express reservation by either party of the right not to be bound until a more formal agreement is signed and clearly set forth the price, scope of work to be performed, and time of performance."  Similarly, in Marshall Granger & Co., CPA's, P.C. v. Sanossian & Sardis, LLP 792 N.Y.S.2d 498, 500-01 (2d Dep't 2005), the Second Department found a partnership contract was not unenforceable merely because it did not make specific provision for the allocation of assets and liabilities upon dissolution of the partnership.  The Court found that the parties had intended to be bound by the contract and had conducted themselves in accordance with the contract for nine months, including moving to a common location, using common letterhead, and holding themselves out as partners.

Where, as here, however, there is no arbitration agreement, a court lacks authority to force the parties to arbitrate or to fashion arbitration procedures. AT&T Techs., 475 U.S. at 648; Thomas Crimmins Contracting Co. v. City of N.Y., 74 N.Y.2d 166, 171 (N.Y. 1989); Thomson-CSF, S.A., 64 F.3d at 776. For the same reasons, because there is no arbitration agreement here, the cases the EMEA Debtors cite regarding the interpretation of a jurisdiction clause when the contract also contains an arbitration clause are inapposite. See Objection at 24-25. The significance of Section 16 of the IFSA is not, as the EMEA Debtors maintain, to create jurisdiction for the Courts to enforce a non-existent arbitration agreement. Section 16 instead establishes that the Courts retain jurisdiction to resolve allocation disputes.

### III.
### THE PARTIES ENGAGED IN EXTENSIVE GOOD FAITH NEGOTIATIONS TO TRY TO REACH AN AGREEMENT ON AN ALLOCATION PROTOCOL, BUT COULD NOT AGREE

### A.      The Parties Agreed To Negotiate In Good Faith

In Section 12(c) of the IFSA, the parties agreed to:

as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

This provision is a classic example of an agreement to negotiate. The EMEA Debtors agree. Objection at 23, 29 ("Section 12(c) is a binding agreement to negotiate in good faith toward an agreement on the Interim Sales Protocol. . . .   It is true that Section 12(c) does not obligate the parties to actually reach agreement on the Protocol. . . .").

It is well settled under New York law that an agreement to negotiate "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open

issues in good faith in an attempt to reach the objective within the agreed framework."
Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998) (internal

citations and punctuation omitted); see also IDT Corp. v. Tyco Grp., 13 N.Y.3d 209, 212 n. 2,

918 N.E.2d 913, 915 n. 2 (N.Y. 2009) (finding that where an "agreement contemplated the

negotiation of later agreements" then "the consummation of those agreements was a precondition

to a party's performance"); SNC Ltd. v. Kamine Eng'g & Mech. Contracting Co., 238 A.D.2d

146, 146, 655 N.Y.S.2d 47, 47 (1st Dep't 1997); River Glen Assocs., Ltd. v. Merrill Lynch

Credit Corp., 295 A.d.2d 274, 274, 743 N.Y.S.2d 870, 870 (1st Dep't 2002).  It is also well

settled that an agreement to negotiate does not "guarantee that the final contract will be

concluded if both parties comport with their obligation, as good faith differences in the

negotiation of the open issues may prevent a reaching of final contract."  Teachers Ins. &

Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987); see also Madu,

Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 126 (S.D.N.Y. 2010) ("If a

final contract is not agreed upon . . . the parties may abandon the transaction as long as they have

made a good faith effort to close the deal and have not insisted on conditions that do not conform

to the preliminary writing."); Adjustrite, 145 F.3d at 548.  The EMEA Debtors agree with this.

Objection at 29.

Thus, Section 12(c) only obligates the parties to "negotiate in good faith and attempt to

reach agreement" on an Allocation Protocol (emphasis added).  IFSA § 12(c).  It does not require

the parties actually to conclude a protocol, much less a protocol in which arbitration was the only

option, as the EMEA Debtors argue.  Objection at 23.

### B.   The Negotiations Were Conducted in Good Faith, But Reached An Impasse

The Movants' extensive negotiations here more than satisfied their obligations to

negotiate in good faith.  As set forth in the Declaration of Craig B. Brod in Support of Joint

  
Motion For Entry of An Order Establishing An Allocation Protocol Pursuant to The Interim

Funding and Settlement Agreement, and For Related Relief, dated June 2, 2011 (the "Brod

Declaration" or "Brod Decl.") and the Declaration of Fred S. Hodara in Further Support of Joint

Motion for Entry of an Order Establishing An Allocation Protocol Pursuant to the Interim

Funding and Settlement Agreement, and for Related Relief, and Response to the EMEA Debtors'

Cross-Motion to Compel Arbitration, dated June 2, 2011 (the "Hodara Declaration" or "Hodara

Decl."),  the parties spent over one year in extensive negotiations regarding a draft protocol,

exchanging comments and proposals via countless emails and conference calls.  See Brod Decl.

¶¶ 7-35; see also Hodara Decl. at ¶ 4.   In addition, many parties travelled from around the globe

to New York for in-person meetings (with additional parties participating by conference call) in

an attempt to finalize the Protocol, with numerous representatives attending each of these full-

day sessions.   Under New York law, the standard for good faith negotiations has been easily

surpassed, as the exhibits attached to the Lloyd Declaration themselves demonstrate.  See Madu,

265 F.R.D. at 127 (finding no breach of the agreement to agree where "plaintiffs acknowledge

that negotiations . . . took place"); IDT, 13 N.Y.3d at 214 (finding no breach of the agreement to

negotiate where "the parties negotiated various open terms on and off for almost three years");

Snakepit Auto., Inc. v. Superformance Int'l, LLC, 19 Misc. 3d 1114(A), *5, 859 N.Y.S.2d 906

(Sup. Ct. of Nassau Cnty. 2008) (noting "the subsequent efforts by Superformance and Snakepit

to negotiate a dealer agreement").[29]

---

[29]    The only cases the EMEA Debtors cite in support of their assertion that there were bad-faith negotiations
here are easily distinguishable.  For example, in CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd., 9
Misc. 3d 845, 869-71, 804 N.Y.S.2d 549 (Sup. Ct. N.Y. Cnty. 2005), the court found the defendant had breached its
duty to negotiate in good faith where it insisted on terms that were in "direct conflict" with those contained in the
preliminary agreements, such as insisting on a 75% interest in an entity when the parties expressly indicated in the
preliminary agreements that they would be "equal 50/50" shareholders in the newly formed entity.

The EMEA Debtors assert that it was bad faith not to continue negotiations because there are only a "few remaining open points [to] be resolved."  Objection at 4.  This is grossly inaccurate.  The parties substantial disagreements regarding material, and, indeed, fundamental open issues is reflected in an agenda circulated by U.S. Debtors' counsel on May 3, 2010 in preparation for a May 4, 2010 meeting to discuss the draft protocol.  See Brod Decl. ¶ 30.  Furthermore, the parties' substantial disagreements are reflected in the Creditors' Committee comments to the April 7, 2010 draft of the Protocol (which was the last draft of the Protocol before negotiations on the Protocol broke down) and list of twenty-nine material issues (many including sub-issues), as to which there was not even a working consensus, circulated on July 20, 2010.  See Hodara Decl. Ex. A.  The extent of the differences after almost one year of extensive negotiations was stunning.  These included, but were not limited to:

- the scope of the disputes to be addressed and resolved, including whether the intercompany claims should be included in the process;

- the parties permitted to participate in the allocation process;

- the standard by which the panel should make the allocation determination, namely whether it should be "fair and equitable" or "fair and reasonable," and whether it should be based on a national or state law;

- the method of selection of the arbitrators, including initial arbitrators and potential replacement arbitrators;

- the types of conflicts that would or would not disqualify an arbitrator;

- information access;

- the scope of examination of witnesses and experts; and,

- the content and form of the final decision.

<u>See</u> Hodara Decl. Ex. A; Brod Decl. Ex. E.

With such a lengthy list of disputed points, and no indication at the in-person meetings held in May 2010 and August 2010[30] that the parties could resolve their disagreements on these points, it became obvious thereafter that the parties had come to an impasse on the protocol negotiations. <u>See</u> Hodara Decl., ¶ 7. In fact, in a letter sent to counsel for the U.S. Debtors on May 9, 2011, the EMEA Debtors' admitted that an impasse had been reached on the protocol negotiations. <u>See</u> May 9, 2011 Letter From Kevin Lloyd to James L. Bromley, Lloyd Decl. Ex. A, at 7; <u>see also</u> Informal Bondholder Group's Response to Joint Motion to Establish an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, filed May 19, 2011 [D.I. 5448], at 3.

Finally, the EMEA Debtors also assert that the Canadian Debtors did not negotiate in good faith because the Canadian Debtors – quite properly – insisted that intercompany claims should not be included in this proposed arbitral forum for the allocation process being negotiated among the parties. Objection at 27-28. This is wrong. Section 12(c) of the IFSA provides that the parties are to negotiate "a protocol for resolving disputes concerning the allocation of Sale Proceeds . . . which Protocol shall provide binding procedures for the allocation of Sales Proceeds." The EMEA Debtors acknowledge that the scope of the protocol the parties agreed to attempt to negotiate was limited to allocation rather than to claims resolution. <u>See</u> Objection at 26; <u>see also</u> April 14, 2010 Email from Kevin Lloyd to Inna Rozenberg, Lloyd Decl. Ex. A, at 1011 ("It may be that all that is intended by the Canadian Debtor and the Monitor is that the allocation hearing shall not cover inter-estate claims. We are content to discuss that – Indeed, I do not believe the Protocol was ever intended to extend to those types of claims, which will be

---

[30]    Although the August 2010 meetings were not principally focused on the draft protocol, there was some continued discussion regarding it. <u>See</u> Brod. Decl. ¶ 35.

dealt with in the ordinary way by the various claim processes.").  Justice Morawetz also

recognized this distinction in his ruling of February 17, 2011, stating "Section 12.c. of the IFSA

references a protocol for resolving disputes concerning the allocation of sale proceeds… [and

not] a process for the calling and resolution of claims that may be advanced by the EMEA

Companies against [the other Nortel entities]."  <u>Nortel Networks Corp.</u>, Rc, 2011 ONSC 1091, at

¶ 19 (Ont. Sup. Ct. of Justice Feb. 17, 2011), Rozenberg Decl. Ex. 4.

    The EMEA Debtors try to re-characterize this issue as one in which the Canadian Debtors

were trying to "circumscribe the nature of the arguments another party may advance and to limit

the panel's freedom to take into account such arguments when rendering its [allocation]

decision."  Objection at 28; <u>see also</u> <u>id.</u> at 30.  What in fact happened is that, over time, it became

clear that the EMEA Debtors were attempting to inject their intercompany claims against the

Canadian and U.S. Debtors into the protocol negotiations under the pretext of claiming the right

to "beneficial ownership" of the allocation proceeds.  The Lloyd Declaration refers to an April

16, 2010 email from the U.S. Debtors' counsel, claiming that the U.S. Debtors agreed that so-

called "beneficial ownership" arguments could be raised in the allocation process.  However, that

email was sent on the heels of an email from Mr. Lloyd representing that their "beneficial

ownership" argument would <u>not</u> raise their inter-estate claims. Brod Decl. Ex. C.  But, as

negotiations continued, it became increasingly evident that the overlap of issues could not

exclude an impact on the claims themselves.

    The U.S. Debtors, like the Canadian Debtors, have never agreed to any claims being

arbitrated or decided in any fashion outside the courts having inherent jurisdiction over them.[31]

Nor were they agreeable to having the claims presented in a backdoor fashion via evidence

---

[31]    For this reason, the Movants  propose, in the Revised Allocation Protocol, to present the evidence on the
EMEA claims to the Courts simultaneously with the allocation evidence.

allegedly relevant to the division of sale proceeds.  In any event, the substance of the positions a

party takes during negotiations, as long as they are not contrary to the agreed upon scope of what

is to be negotiated, cannot establish a lack of good faith negotiations.  Warner Theatre Assocs.

Ltd P'ship v. Metro. Life Ins. Co., No. 97 Civ. 4914(SS), 1997 WL 685334, at *6-7 (S.D.N.Y.

Nov. 4, 1997), aff'd, 149 F.3d 134 (2d Cir. 1998); see also Mode Contempo, Inc. v. Raymours

Furniture Co., 80 A.D.3d 464, 465 (1st Dep't 2011) ("The final material term of the promissory

note was left open for negotiation between the parties, and simply because those negotiations

ultimately failed, it cannot be said that the defendant acted in bad faith.").

# IV.
## AN ADVERSARY PROCEEDING IS NOT REQUIRED FOR APPROVAL OF THE ALLOCATION PROTOCOL

The EMEA Debtors' suggestion that this Court cannot approve the Allocation Protocol

absent commencement of an adversary proceeding reflects a fundamental mischaracterization of

the scope of relief sought by the Motion.  Nowhere does the Allocation Protocol or the Movants'

proposed order provide for an injunction, nor provide for a merits "determin[ation of] the

validity, priority, or extent of a lien or other interest in property" so as to trigger Bankruptcy

Rule 7001.  Fed. R. Bankr. P. 7001(2).  Instead, in order to enforce this Court's prior orders

requiring approval of such a protocol, the Motion only seeks entry of a general procedural

framework within which the U.S. and Canadian Courts will later make a final determination on

allocation of the Sale Proceeds.  Nothing in the Allocation Protocol forecloses the EMEA

Debtors from being heard concerning the procedures that should apply to such a decision on the

merits.  To the contrary, the Allocation Protocol leaves for later determination by the U.S. and

Canadian Courts the format and deadlines for all written submissions.  See Revised Allocation

Protocol (Ex. A).

The Court could thus ultimately require filing of an adversary complaint, or exercise its discretion at any time to convert the matter into an adversary proceeding.  See Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn), 401 B.R. 872, 892 (Bankr. S.D. Tex. 2009); Stemple v. Stemple (In re Stemple), 361 B.R. 778, 784 (Bankr. E.D. Va. 2007). While the EMEA Debtors speculate that they may require the protections of Part VII of the Bankruptcy Rules, the Court also has the power – at any stage in a proceeding – to direct that any such rules apply.  See Fed. R. Bankr. P. 9014(c).

The EMEA Debtors also fail to address the governing terms of this Court's prior orders, which the Motion merely seeks to enforce.  First, this Court's IFSA Order expressly contemplates that the Court would approve an allocation protocol, and retains jurisdiction to do so.  U.S. IFSA Order  ¶ ¶ 8, 11 (retaining jurisdiction "with respect to all matters arising from or related to implementation of this Order.").  Second, the Cross-Border Protocol similarly provides that "to the extent . . . any motion to allocate sale proceeds" is filed, that motion will be heard before the U.S. and Canadian Courts.  Cross Border Protocol ¶ 15(ii)(c.) (emphasis added).  In turn, the Court's order approving the Cross-Border Protocol "retains jurisdiction with respect to all matters arising from or related to the implementation of this order."  Cross-Border Protocol Order  ¶ 4.  The Objection fails even to address these provisions,[32] or the Movants' ability to enforce them on motion under Section 105(a) of the Bankruptcy Code.  See In re Navigator Gas Transp. PLC, 358 B.R. 80, 86 n.2 (Bankr. S.D.N.Y. 2006) ("[w]here enforcement of a prior order of the court is at issue, parties are entitled to proceed by motion") (citing In re Worldcorp. Inc., 252 B.R. 890, 895 (Bankr. D. Del. 1999) ("an adversary proceeding is not necessary where the relief sought is the enforcement of an order previously obtained"); see also Konop v. Haw.

---

[32]     Indeed, while the EMEA Debtors cite to other provisions of the Cross-Border Protocol, their failure to address paragraph 15 is particularly telling where its provisions for joint hearings express govern "[n]otwithstanding anything to the contrary herein contained…".  Cross Border Protocol ¶ 15.

Airlines, Inc. (In re Haw. Airlines, Inc.), 355 B.R. 225, 234 n.4 (D. Haw. 2006) ("[debtor]

correctly argued that its request for an offset did not go to the merits of the sanctions claim and

therefore did not trigger an adversary proceeding"). The authorities relied upon by the EMEA

Debtors in urging application of Bankruptcy Rule 7001 are not to the contrary, as they either

involved requests for an adjudication of property rights on the merits,[33] or sought injunctive

relief.[34] The Movants' proposed Allocation Protocol provides for neither.

Finally, the EMEA Debtors' own cross-motion effectively concedes that the Motion is a

proper procedural vehicle for approval of the Allocation Procedures. Specifically, the Objection

asserts that the Allocation Protocol cannot be approved on motion, as it would require a

determination that the U.S. Debtors negotiated in good faith. See Objection at 11. However, the

EMEA Debtors' cross-motion seeks a determination of that same issue (albeit with the opposite

outcome). See Objection at 30 ("the Canadian Debtors failed to comply with their obligation to

negotiate in good faith."). Of course, the EMEA Debtors have not commenced an adversary

proceeding in order to have this issue determined by this Court, nor – as their cross-motion

concedes – is one required. Just as the Court can determine the cross-motion without the filing

of an adversary complaint, the Court can approve the Allocation Protocol on motion.

---

[33]    See In re DBSI, Inc., 432 B.R. 126, 134-35 (Bankr. D. Del. 2010) (adversary proceeding required where declaratory judgment sought determination of "entitlement" to property); In re Whitehall Jewelers Holdings, Inc., No. 08-11261 (KG), 2008 WL 2951974, *6 (Bankr. D. Del. July 28, 2008) (Gross, J.) (adversary proceeding required where debtor sought to invalidate creditors' ownership interest in property); In re Realty Sw. Assocs., 140 B.R. 360, 365 (Bankr. S.D.N.Y. 1992) ("The return of cash collateral is relief that is properly brought by an adversary proceeding"); In re Riding, 44 B.R. 846, 847, 858 (Bankr. D. Utah 1984) (holding that "a proceeding for turnover of property must be instituted by complaint," where "an adversary proceeding involves more complex issues affecting substantial rights").

[34]    See MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Commc'ns, Inc.), 262 B.R. 893, 899-900 (D. Del. 2001) (motion to enjoin utility provider from terminating service should have been brought by adversary proceeding); Baltimore Cnty. v. HIS Liquidating, LLC (In re Integrated Health Servs., Inc.), Nos. 00-389-MFW & 03-1057-GMS, 2006 WL 543876, *3 (D. Del. March 6, 2006) (motion for order prohibiting county from seeking or requiring payment of taxes sought injunctive relief and should have been brought as adversary proceeding).

## **CONCLUSION**

WHEREFORE, for the reasons set forth in the Movants' Motion and herein, the Movants request that the Court (i) enter an order substantially in the form attached hereto as Exhibit A approving the Revised Allocation Protocol, establishing procedures and an expedited schedule for the cross-border resolution by the U.S. and Canadian Courts of the allocation of the Sale Proceeds, (ii) deny the EMEA Debtors' cross-motion to compel arbitration, and (iii) grant such other and further relief as the Court deems just and proper.

Dated:  June 2, 2011
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

- and -

36

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

    - and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee*
*of Unsecured Creditors*