**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
----------------------------------------------------------X
                                          :
                                          :    Chapter 11
                                          :
In re                                     :
                                          :    Case No. 09-10138 (KG)
Nortel Networks Inc., et al., [1]         :
                                          :    Jointly Administered
                        Debtors.          :
                                          :
                                          :
                                          :
                                          :
----------------------------------------------------------X
```

**DECLARATION OF CRAIG B. BROD IN SUPPORT OF
JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN
ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING
AND SETTLEMENT AGREEMENT, AND FOR RELATED RELIEF,
AND IN RESPONSE TO THE EMEA DEBTORS' OBJECTION TO THE
JOINT MOTION AND CROSS-MOTION TO COMPEL ARBITRATION**

I, Craig B. Brod, do hereby declare as follows:

1.      I am a partner at the law firm of Cleary Gottlieb Steen & Hamilton LLP

("Cleary Gottlieb"), co-counsel to Nortel Networks Inc. and its affiliated debtors, as respective

debtors and debtors in possession (collectively, the "U.S. Debtors"), in the above-captioned

proceeding. I am admitted to the bars of the States of New York and New Jersey and have been

a member in good standing of such bars since 1981. I respectfully submit this declaration in

support of the Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. ("NNI") (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems
Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera
Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel
Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel
Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. ("NN CALA") (4226) (collectively, the
"Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://chapter11.epiqsystems.com/nortel.

the Interim Funding and Settlement Agreement, and for Related Relief (the "Joint Motion"),

dated April 25, 2011, and in response to the EMEA Debtors' Objection to the Joint Motion and

Cross-Motion to Compel Arbitration (the "Objection") and the supporting declaration of Kevin

Francis Lloyd (the "Lloyd Decl."), both dated May 19, 2011. Unless otherwise stated, the facts

set forth below are based upon my personal knowledge.[2]  With this declaration, I do not intend to

and do not waive any attorney-client, work product or other similar privilege.

A.      **Negotiations of a Draft Protocol**

2.      On or about June 9, 2009, the Canadian, U.S. and EMEA Debtors

executed the Interim Funding and Settlement Agreement (the "IFSA"). Attached hereto as

Exhibit A is a true and correct copy of the IFSA. Throughout the IFSA negotiations, all the

parties were represented and advised by sophisticated counsel, some parties by more than one set

of counsel from more than one country.

3.      Section 12(c) of the IFSA provides that "the Debtors shall, as soon as

reasonably practicable following the execution of this Agreement, negotiate in good faith and

attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the

allocation of Sale Proceeds from Sale Transactions (the 'Interim Sales Protocol'), which Protocol

shall provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors in

such Sale Transaction have been unable to reach agreement regarding such allocation."

4.      Accordingly, after execution of the IFSA, the parties to the IFSA

embarked upon good faith negotiations on "a protocol for resolving disputes concerning the

allocation" (such draft protocol, a "Protocol"). Along with other attorneys at Cleary Gottlieb, I

represented the U.S. Debtors in these negotiations.

---

[2]      Capitalized terms used herein and not otherwise defined shall have the same meaning as ascribed to them in
the Joint Motion.

5.      The negotiations were extremely complex for several reasons, not the least of which was the number of parties involved and the number of issues that needed to be resolved. During the Protocol negotiations, the principal parties and their lead counsel were: the Canadian Debtors, represented by the Canadian law firm Ogilvy Renault LLP (now Norton Rose OR LLP); the Monitor, Ernst & Young Inc., represented by the Canadian law firm Goodmans LLP; the EMEA Debtors and the Joint Administrators, Ernst & Young LLP, represented by the English law firm Herbert Smith LLP; the U.S. Debtors, represented by their principal officer John Ray and Cleary Gottlieb; the Committee, represented by Akin Gump Strauss Hauer & Feld LLP, the Canadian law firm Fraser Milner Casgrain LLP, and the English law firm Ashurst LLP; and the Bondholder Group, represented by Milbank, Tweed, Hadley & McCloy LLP and the Canadian law firm Bennett Jones LLP.

6.      The process of creating a draft Protocol was extremely complex. The U.S. Debtors, acting through Cleary Gottlieb, volunteered to take the lead on receiving and incorporating the negotiating parties' proposals and comments into successive drafts of a Protocol.

7.      On June 14, 2009, the U.S. Debtors distributed a first draft of a Protocol, dated June 13, 2009. Lloyd Decl., Exs. at 802-839. The cover email noted "that this draft has not been reviewed by our client or any other stakeholders and therefore remains subject to further internal review and comments from other parties." It also included a header indicating that "this draft agreement has been produced for discussion and settlement purposes only" and another header stating, "[f]or discussion and contingency purposes only."

8.      Even at this early stage of the negotiations, the blacklined copy of the draft Protocol was 17 pages long. It proposed that the allocation dispute would be resolved by an

3

individual who could engage the services of an accounting firm to assist him or her in resolving the dispute. Id. at 809 § 2.2. However, there was no agreement on the identity of such an individual or the accounting firm who might assist such individual. Id. In addition, as reflected in the bracketed provisions or the notes to draft ("NTD") included in the draft Protocol, the parties recognized that there were many issues requiring discussion. See, e.g., id. at 803 ¶ 1; 815 § 8.5; 817 § 9.3; 818 § 9.7.

9.      Following the circulation of this draft Protocol, the negotiating parties organized an in-person meeting for September 30, 2009, which was held in New York at the offices of Cleary Gottlieb. Multiple representatives from each party or their counsel and advisors attended this meeting, which lasted a full day. The parties discussed numerous substantive issues, and by the end of the meeting, while the parties had moved toward a working consensus on some points, there were many other items as to which there was not yet any common ground.

10.     The U.S. Debtors attempted to incorporate to the greatest extent possible the comments, proposals and suggestions that the parties provided during the September 30, 2009 meeting, as well as through subsequent email and telephone communications, into a new draft Protocol, dated October 9, 2009, the blacklined copy of which by that time was 20 pages long. The cover email to the distribution of this draft noted that "this draft remains subject to further internal review." In addition, the header once again stated that "this draft agreement has been produced for discussion and settlement purposes only." Lloyd Decl., Exs. at 850-888.

11.     New provisions were introduced into the October 9, 2009 draft. For instance, Article II was revised to provide that a three-member panel should hear the allocation dispute, instead of an individual assisted by an accounting firm, the members of which panel

4

would be named in the document and the replacements for which would be listed in an attached

exhibit. Id. at 856-857. Other issues were highlighted, such as: which allocation dispute from

the proposed sale transactions would be addressed first, id. at 855 n.4; whether different

valuation methodologies should be specified in the draft Protocol, id. at 860 n.8; whether the

Committee, Bondholder Group, Monitor and NNSA would be parties to the draft Protocol, id. at

851 n.1 & 852 n.2; and the manner in which aggregate distributions to the estates would be held,

id. at 863 n.14. A variety of procedural issues were raised in the draft as well, such as: whether

second round submissions would include expert reports and witness statements and the potential

unavailability of a witness for cross-examination at the hearing. Id. at 861 n.11 & 862 n.13.

        12.    Following subsequent email and telephone communications, including a

conference call among a number of the parties on October 13, 2009, the U.S. Debtors produced

another draft Protocol, dated October 19, 2009, which was circulated on October 20, 2009. The

cover email to this distribution stated, "We are circulating this draft to you and our clients

simultaneously and therefore it remains subject to further material change." Once again, the

header also indicated that "this draft agreement has been produced for discussion and settlement

purposes only." Lloyd Decl., Exs. at 889-910.

        13.    While the U.S. Debtors attempted to incorporate to the greatest extent

possible the comments, proposals and suggestions that the parties had provided, due to the

complexity of some of the comments received, the October 19, 2009 draft Protocol did not

reflect all of the parties' comments, proposals and suggestions. As specified in the header to the

draft, "this draft does not incorporate Akin Gump's suggestion regarding discovery procedures

or Ogilvy's suggestions regarding access to company employees." Id. at 891. In addition, a

number of issues raised in the footnotes in the October 9, 2009 draft were not answered and a

number of provisions were set forth in brackets for consideration, such as: the conflict of interest standard for panel members, id. at 897 n.11; whether a chair of the panel should be appointed, id. at 896 n.10; whether the decision of the panel should be reasoned, id. at 903 n.28; and the status of the EMEA non-filed entities, id. at 891 n.1.

14.     The October 19, 2009 draft Protocol was distributed in advance of the second in-person negotiation session among the parties, which took place on October 21, 2009 at Cleary Gottlieb's offices in New York. Again, multiple representatives from each party or their counsel and advisors attended this meeting or participated by conference call, which was a full-day discussion of both big picture issues and more technical and detailed points.

15.     Mr. Lloyd states that "in or around October 2009," the EMEA Debtors had discussions with English counsel to the Committee and English counsel to the Canadian Debtors during which "we agreed the identity of a few suitable Dispute Resolvers on behalf of EMEA." Lloyd Decl. ¶ 53. While some of the parties may have been in discussion on the identity of potential panel members as noted above, to my knowledge, the proposals were not circulated to all of the participants to the draft Protocol negotiations and there was certainly never any consensus on the identity of potential panel members. Moreover, the October 19, 2009 draft Protocol does not identify by name any agreed upon or potential dispute resolvers (nor, for that matter, do any prior or subsequent drafts).

16.     Following the October 21, 2009 meeting, the U.S. Debtors attempted to incorporate to the greatest extent possible the participants' comments into a new draft Protocol, dated November 8, 2009. The relevant cover email explained that "in the interest of time, this draft is being circulated to you and our client simultaneously, and this draft remains subject to further internal review and review by our client." The header also reminded everyone that "this

6

draft agreement has been produced for discussion and settlement purposes only." Lloyd Decl.,
Exs. at 911-932.

17.    In his declaration, Mr. Lloyd asserts that the second October 2009 draft
Protocol and the November 2009 draft Protocol evidence the fact that "by this point substantive
agreement had been reached on the process for arbitration." Lloyd Decl. ¶ 52. I disagree.

18.    As discussed above, the October 19, 2009 draft was not an agreement but
a draft Protocol that was "subject to further material change" and "for discussion and settlement
purposes only." The November 8, 2009 draft, which was the last draft Protocol circulated to the
parties in 2009, likewise was "subject to further internal review" and was "produced for
discussion and settlement purposes only." In short, the *draft* Protocols at this time – and at all
pertinent times – were just that, drafts. It was always the U.S. Debtors' understanding that there
was no binding agreement on any term in the draft Protocol unless and until the parties reached
agreement on all issues and – after obtaining any requisite corporate approval – signed a
Protocol, which in turn would require U.S. Court approval to be binding on the U.S. Debtors.
Both the October 19 and November 8, 2009 drafts also reflected that there were many important
items as to which there was not even a preliminary consensus and that the parties still needed to
discuss.

19.    Importantly, in the November 8, 2009 draft, a key issue arose – whether
intercompany claims, particularly claims of the EMEA Debtors against the Canadian and U.S.
Debtors, would be decided within the same process to be used to resolve the disputes as to the
allocation of the sales proceeds. In particular, additional bracketed language was added to
Section 1.2 (in my recollection, at the request of counsel to the Canadian Debtors and/or counsel
to the Monitor), providing, "[e]ach Basic Allocation Dispute shall be determined without regard

7

to, or adjustment for, any other rights, entitlements, set offs, or adjustment of any nature asserted by or on behalf of any Selling Party against another Selling Party, including, without limiting the generality of the foregoing, claims of beneficial ownership or equitable interests in and to the assets included in the Business that is the subject of an In-Scope Sale (collectively, 'Inter-Party Claims')." The footnote to this proposal indicated that the issue was "TBD" or to be discussed. Lloyd Decl., Exs. at 916 & n.9.

20.    In addition, the November 8, 2009 draft reflected a number of procedural issues on which there was no working consensus and a number of new issues that had been raised, including, without limitation:  which sales would be included in the process, id. at 914 n.4; whether there would be a requirement for panel members to update conflict disclosures, id. at 917 n.12; the status of the Bondholder Group, id. at 912 n.2; whether NNSA would be represented by the Joint Administrators, id. at 932 § 9.10; and the procedure for submission of expert reports, id. at 921-922 § 4.3.

21.    At the end of 2009 and in the early part of 2010, the negotiating parties exchanged further comments via email and telephone, including during a November 10, 2009 conference call. The U.S. Debtors received these comments and attempted to the greatest extent possible to integrate them into a new draft Protocol, which was dated and circulated on February 26, 2010 and again included the header indicating that "this draft agreement has been produced for discussion and settlement purposes only." The blacklined copy of the draft Protocol had grown to 27 pages by that time. This draft reflected significant additional provisions being circulated to the parties for the first time for purposes of further discussion and negotiation. True and correct copies of the blacklined and unmarked February 26, 2010 draft Protocol are attached hereto as Exhibit B.

8

22.    Following the distribution of the February 26, 2010 draft Protocol, the

negotiating parties again exchanged comments via email and telephone, and the U.S. Debtors

attempted to the greatest extent possible to incorporate those comments into a new 28-page

blacklined draft of a Protocol which was dated and circulated on April 7, 2010. Lloyd Decl.,

Exs. at 963-1010. The April 7, 2010 draft, which is described in more detail below, ended up

being the last draft Protocol circulated to the negotiating parties. The first page of the draft also

reminded everyone that "this draft agreement has been produced for discussion and settlement

purposes only."

**B.    Disagreements Over the Protocol Drafts**

23.    Reflecting the fact that a number of the parties' comments could not be

reconciled, the April 7, 2010 draft Protocol included new proposed language at various points

with an identification of the party that was proposing such language, as well as an indication of

other provisions proposed to be deleted by the identified party. Moreover, as stated in the cover

email, "More substantive comments are included in the footnotes, preceded by an indication of

which firm made the comment . . . ." Lloyd Decl., Exs. at 963 (email from Cleary Gottlieb to the

other parties explaining the drafting approach to the April 7, 2010 draft Protocol).

24.    In addition to highlighting the parties' numerous differences, the April 7,

2010 draft Protocol demonstrates the shifts that had occurred over time in the parties' views as

well as the disagreements that existed with respect to some of the most fundamental issues

surrounding the draft Protocol.

25.    In his declaration, Mr. Lloyd asserts that the April 7, 2010 draft "shows

that, so far as the procedural terms of the Protocol went, it was largely agreed." Lloyd Decl. ¶

57. The blacklined copy of the April 7, 2010 draft, as well as the annotations in the text and the

9

footnotes, clearly indicate that this is not the case. At the outset, as noted above, and as reflected

in the headers to the Protocol drafts, it was always the U.S. Debtors' understanding that these

drafts were for discussion and settlement purposes only and no party was bound by any provision

in the draft Protocol unless and until the parties had agreed on all issues and – after obtaining any

required corporate approval – signed a Protocol, which in turn would require U.S. Court

approval to be binding on the U.S. Debtors. The April 7, 2010 draft further shows that the

parties disagreed on and were still discussing numerous procedural, as well as substantive,

issues. For example:

> a.      The Canadian Debtors and Monitor added a more detailed
> provision along the lines of what had been Section 1.2 in the November 8,
> 2009 draft, providing that the allocation decision "shall be determined
> without regard to, or adjustment for, any other claims, entitlements, set-
> offs or adjustment of any nature whatsoever." Id. at 980. As further
> discussed below, this was a major point of disagreement among certain of
> the parties. The Canadian Debtors and Monitor proposed deletion of
> language in Section 10.7 of the draft for similar reasons. Id. at 988 n.32.
>
> b.      The parties contemplated at that time a potential panel of three
> dispute resolvers, but the standard for conflict disclosure was still under
> discussion as was the method of selection of initial and replacement panel
> members (i.e., whether it should be done by each estate or pursuant to
> agreement of all parties). Id. at 969-970 nn.8-10.

c.      The standard by which such a panel should make the allocation
determination was in dispute, namely, whether it should be "fair and
equitable" or "fair and reasonable." Id. at 967 n.6.

d.      The draft text reflected a new proposal that the panel's decision
should be based on a national or state law. Id. at 982 § 8.5.

e.      The parties were still discussing whether the allocation decision
should be expressed as a percentage of the sale proceeds or as a U.S.
dollar amount and whether it should contain a statement of reasons. Id. at
981-982 & n.27.

f.      There was a disagreement as to whether all Nortel entities or only
"Selling Debtors" could participate in the allocation dispute resolution
process. Id. at 967 ¶ 1.

g.      The Joint Administrators did not know whether they would also
represent the Israeli Nortel entities and the EMEA non-filed entities, and
whether the various constituents within their group would be taking
differing allocation positions. Id. at 964-965 nn.1, 3 & 972-973 § 3.4.

h.      How the Non-Filed Entities' representative would be selected and
how such representative would be paid was unclear. Id. at 970 n.11.

i.      A host of basic procedural issues were still being discussed,
including the process for document disclosure, the scope of cross-
examination at the hearings, third-party discovery, the extent and
admissibility of deposition testimony, the form of witness statements and
the requisite independence of experts. Id. at 974-980 nn.13-26.

11

26.     Mr. Lloyd criticizes the Canadian Debtors for seeking to exclude intercompany claims from the process for the resolution of allocation disputes then under discussion, as the EMEA Debtors appeared to demand. He characterizes the debate, however, as one in which the Canadian Debtors were allegedly seeking to limit the EMEA Debtors' ability to argue in the allocation process that they had "beneficial interests" in "intellectual property assets." Lloyd Decl. ¶ 57. Mr. Lloyd further claims that, based on an April 16, 2010 email from Howard Zelbo, one of my partners at Cleary Gottlieb, "it was clear that the U.S. Debtors agreed with the EMEA Debtors' position" that there should be no attempt "to limit the matters that could be raised at the arbitration." Lloyd Decl. ¶ 58 (citing Exs. at 1013-1014). The statements on this issue must be understood in context.

27.     On April 14, 2010, Mr. Lloyd wrote an email to certain parties, in which he stated, "What I am not clear about is whether the Canadian Debtor and Monitor are still maintaining a point they advanced last year namely, that EMEA (and the other estates) are unable to contend in the Allocation Hearing that they have a beneficial ownership in various assets, including most relevantly intellectual property. . . . It may be that all that is intended by the Canadian Debtor and the Monitor is that the allocation hearing shall not cover inter-estate claims. We are content to discuss that – [sic] Indeed I do not believe the Protocol was ever intended to extend to those types of claims, which will be dealt with in the ordinary way by the various claim processes." Lloyd Decl., Exs. at 1011. Based on this email, the U.S. Debtors therefore believed at that time that the EMEA Debtors' preservation of their "beneficial ownership" arguments did not amount to an attempt to include intercompany claims in the allocation dispute resolution process.

28.     Thus, on April 16, 2010, when Mr. Lloyd sent an email to Mr. Zelbo stating that the U.S. Debtors' position was that there was "no limitation to argue beneficial ownership" in the allocation process, Mr. Zelbo did not dispute the statement. A true and correct copy of the April 16, 2010 email exchange between Messrs. Lloyd and Zelbo, as received and sent by Cleary Gottlieb, is attached hereto as Exhibit C.

29.     Later in the day on April 16, 2010, Michael Lang, partner at Ogilvy Renault LLP, counsel to the Canadian Debtors, wrote to Mr. Lloyd, in response to his April 14, 2010 email described above, stating, "the April 7th draft reflects the position of the Canadian Debtors and the Monitor. Our amendments are intended to clarify, among other things, that the Protocol is not the proper venue for asserting claims or attempting to prioritize claims against any estate that should be asserted and resolved in the applicable bankruptcy proceeding. As to whether EMEA's claim to having, to use your words, 'beneficial ownership in various assets' is or is not such a claim, we cannot comment as we have not had the benefit of an explanation of the basis of your position." A true and correct copy of Mr. Lang's April 16, 2010 email is attached hereto as Exhibit D. This apparent difference continued to be the source of discussion among certain of the parties.

30.     The parties' substantial disagreements over this and other numerous issues in the draft Protocol are also reflected in an agenda circulated by Cleary Gottlieb on May 3, 2010 for a May 4, 2010 meeting to discuss the draft Protocol (the "May 4 Agenda"). True and correct copies of the May 4 Agenda and the accompanying blacklined and unmarked draft Protocol are attached hereto as Exhibit E. The May 4 Agenda was circulated in an effort to make the May 4, 2010 meeting as productive as possible. The purpose of the May 4, 2010 meeting was for the parties to gather in New York at Cleary Gottlieb's offices for another intensive in-person

13

negotiating session (with some representatives also participating by conference call) to discuss

the latest draft Protocol and see whether they could come closer to agreement on the terms of a

draft Protocol.

        31.     The May 4 Agenda did not list all of the items as to which there was no

working consensus but only the most critical and important issues the parties needed to discuss.

The following is an excerpt from the May 4 Agenda, from the section entitled "Principal Issues":

A.     Scope of the Panel's Jurisdiction

     1.     Who is entitled to seek an allocation (Recitals p. 4)

     2.     Standard of Review: "fair and reasonable" vs. "fair and equitable" (Sections 1.1, 8.1)

     3.     Issues that can be raised before the Panel (Sections 8.6, 10.7)

B.     The Panel Members

     1.     Appointment of Panel members (Section 2.2)

     2.     Standard for conflict disclosures (Sections 2.2, 2.3)

     3.     Ongoing disclosures (Section 2.3)

     4.     Replacement Panel members (Section 2.4)

C.     Access to Information

     1.     Pre-petition privileged materials (Sections 5.6, 5.11)

     2.     Use of courts to compel third-party discovery (Article VI)

     3.     Examination of experts (Section 5.9)

D.     Mediation / Negotiation (Sections 1.2, 1.3 and 1.4)

E.     Law and Jurisdiction

     1.     Law applicable to the Panel's allocation decision (Sections 8.5, 10.3)

     2.     Forum for resolution of disputes under the Protocol (Section 10.4)

32.     At the May 4, 2010 meeting, which once again was attended in person or by conference call by multiple representatives from each party or their counsel and advisors and lasted a full day, the parties discussed a variety of matters including the list of issues set forth on the May 4 Agenda. The discussions reflected apparent irreconcilable differences on a number of these central issues. Therefore, certain of the parties generally expressed the view that, in the coming months, the parties should focus on negotiating in good faith to attempt to reach agreement on the allocation of sale proceeds, while at the same time continuing their good faith negotiations on a draft Protocol, as appropriate.

33.     In the spring of 2010, a number of parties were working on setting up and populating an electronic data room, through which they had voluntary agreed to exchange documents relevant to the ongoing discussions.

34.     On July 20, 2010, counsel to the Committee circulated to a variety of parties, including Cleary Gottlieb, comments to the April 7, 2010 draft Protocol as well as a list of 29 points, certain of which included sub-bullet points, reflecting those items upon which the parties still needed to reach agreement before the Protocol could be finalized. The list of issues included such items as:  the scope of disputes to be addressed and resolved; the inclusion in the allocation process of the potential sale of intellectual property assets; the selection and conflict disclosures of the panel members; the content and form of the final decision; the identity of the parties permitted to participate in the process; representation of the parties during the process; information access; examination of witnesses and experts; the treatment of privileged information; and attendance at hearings. A true and correct copy of the Committee's July 20, 2010 email, as received by Cleary Gottlieb, transmitting the issues list and comments to the April 7, 2010 draft Protocol is attached hereto as Exhibit F.

15

35.    Certain of the parties continued to have some discussions about the draft Protocol during the August 17-18, 2010 in-person settlement meeting that took place at Cleary Gottlieb's offices in New York, where the parties principally focused on exchanging their respective positions on how the sale proceeds should be allocated. The parties' attention thereafter shifted to further detailing their positions on how the proceeds should be allocated during a September 21, 2010 in-person settlement meeting at Cleary Gottlieb's offices in New York and during the unsuccessful mediation sessions held in person on November 11-16, 2010 at Cleary Gottlieb's offices and April 11-13, 2011 at The Downtown Conference Center in New York. After the conclusion of the unsuccessful mediation sessions, in light of the failure of the parties to reach agreement on a draft Protocol due to the substantial and fundamental prolonged disagreements that existed concerning its material terms, as described above, the U.S. Debtors and the Committee filed the Joint Motion, requesting that the U.S. and Canadian Courts establish procedures and an expedited schedule for the cross-border resolution of the allocation of the proceeds from the sale transactions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2011.

Craig B. Brod

16