**EXHIBIT 1**



Ernst & Young LLP
1 More London Place
London SE1 2AF

Tel. 020 7951 2000
Fax: 020 7951 1345
www.ey.com/uk

TO ALL KNOWN CREDITORS

11 February 2011

Ref: MLP/7E/DM/TF/LO3547

Tara Felton
Direct line: 020 7951 8151
Direct fax: 020 7951 1345
Email: tfelton@uk.ey.com

Dear Sirs

## Nortel Networks UK Limited (In Administration) ("the Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court Case number 536 of 2009

We write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a fourth report on the progress of the Administration (the "**Report**"). This Report covers the period from 14 July 2010 to 13 January 2011 and should be read in conjunction with the Joint Administrators' previous reports dated 13 August 2009, 13 February 2010 and 12 August 2010, as well as the Joint Administrators' Statement of Proposals dated 23 February 2009. Additional copies of this Report, and the previous reports referred to, can be made available on request or can be obtained at the following;

www.nortel.com/corporate/adminprogreports.html

The Company entered administration (the "**Administration**") on 14 January 2009 when AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "**Joint Administrators**") by an order (the "**Order**") of the High Court of Justice of England and Wales (the "**Court**"), following an application made by the Company's directors.

This was part of a wider restructuring of the Nortel group of companies. Nortel Networks Corporation ("**NNC**"), the ultimate parent company of the Nortel group, Nortel Networks Limited ("**NNL**") and certain of its other Canadian subsidiaries filed an application for creditor protection under the Companies' Creditors Arrangement Act ("**CCAA**") in Canada to facilitate a comprehensive business and financial restructuring under the CCAA. Nortel Networks Inc ("**NNI**"), Nortel Networks Capital Corporation and a number of other US Nortel group companies filed petitions in the United States under Chapter 11 of the US Bankruptcy Code.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office

**ᕟ ERNST & YOUNG**

On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region (**"EMEA"**). Article 3 of the EC Regulation on Insolvency Proceedings 1346/2000 (the **"EC Regulation"**), states that the court of the EC member state in which the centre of main interests (**"COMI"**) of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the **"EMEA Companies"**), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company. Details of the 19 companies are provided at Appendix 1.

The Nortel group of companies (the **"Group"**) reports in US dollars (**"US$"**), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

Please refer to the disclaimer at the end of the principal section of this report.

**ΞΙΙ ERNST & YOUNG**

## 1. Executive Summary of Progress of the Administration

### *Purpose of the Administration*

The Joint Administrators continued to trade the Company's businesses with a view to achieving either a rescue of the Company as a going concern or a better result for the Company's creditors as a whole than would be likely if the Company were wound up. In 2009, it became clear that, owing to the financial and market pressures facing the Nortel businesses, the sale of all businesses would be necessary and a rescue of the Company as a going concern would not be possible.

The Joint Administrators considered that the decision to continue to trade, even at a carefully monitored loss, in order to achieve going concern values for the businesses and business assets, and to avoid contingent claims, would be to the benefit of creditors as a whole. Now that the sale process is near completion, this decision is justified by the realisations achieved (subject to a final apportionment of those proceeds to the Company) and contingent claims avoided.

### *Sale of Businesses and Assets*

The Group principally operated in four business segments: Enterprise Solutions ("**Enterprise**"); Metro Ethernet Networks ("**MEN**"); Carrier Networks, which comprises Global System for Mobile Communications ("**GSM**"), Carrier VoIP Application Solutions ("**CVAS**") and the Multi Service Switch business ("**MSS**"); and Code Division Multiple Access ("**CDMA**").

With the exception of MSS all businesses had been sold by 30 June 2010. The total global sales proceeds, which are held in escrow pending allocation within the Group (as further explained below), now exceed US$3 billion. Since our last report the MSS business has continued to operate across Europe whilst a sale was explored.

A sale of the MSS business was agreed on 24 September 2010 with Telefonaktiebolaget Ericsson for a headline price of $65 million, but has not yet completed.

Owing to the integrated nature of the Group's business, it is necessary for some EMEA Companies to provide transitional services to the purchasers for a period of one year post sale completion. Such services include the provision of various back office functions, infrastructure support and other assistance to enable each purchaser to integrate the business with their own. The purchasers will meet the direct cost of these services.

Nortel Networks International Finance & Holdings B.V. ("**NNIFH**"), a fully owned subsidiary of the Company, completed a share transfer agreement for its shareholding in Networks Netas Telekomunikasyon A.S. ("**Netas**") on 22 December 2010.

Buyers are being sought, and other options are being considered, for the Group's remaining intellectual property portfolio.

**ᴣ ERNST & YOUNG**                                                                 4

### Next Steps

The Joint Administrators, having completed the principal trading phase of the Administration, are now focused on winding down the Company's affairs and resolving outstanding issues with the other Group companies.

The key remaining issues for the EMEA companies are to deal with the post sale arrangements, including; the continuation of the transitional services currently being provided; the resolution of intra-Group issues such as Purchase Price Allocation ("**PPA**") and related claims; the Financial Support Directions ("**FSD**") claims by the UK Pensions Regulator ("**TPR**") on certain EMEA companies (but not the Company); and the development of an appropriate process to agree creditors' claims and distribute available funds to them.

In addition, the Joint Administrators are currently finalising the Company's trading operations, settling post appointment liabilities and collecting working capital assets.

Since our last report, we have held detailed discussions with the representatives of other Group estates and key stakeholders (e.g. US Bondholders and The Pensions Regulator) in order to progress a negotiated settlement in respect of most of these issues.

Owing to the complexities of the various estate claims this is, by nature, a gradual process. However, the Joint Administrators have continually attempted to drive the process forward and maintain momentum so that an appropriate return may be achieved for creditors and a distribution to creditors can be made as early as possible.

It is possible, however, that differences may not be reconciled and that a more formal approach to settling disputes may be required, which would inevitably delay any distribution.

The Joint Administrators have continued to hold confidential meetings with the Company's creditors' committee ("**the Committee**") in order to update it on events and the strategy adopted.

Further information is contained in the sections that follow.

**ΞII ERNST & YOUNG**                                                     5

## 2.  Business Disposal Strategy

The Joint Administrators have now completed the disposal of the majority of businesses.  The Joint Administrators consider that this has achieved a better return for creditors of the Company than would otherwise have been possible, owing to likely higher levels of realisations, the preservation of jobs through the transfer of employees to new entities, and the orderly transfer of contracts to purchasers.

All sales of the major businesses were dealt with on a global basis in conjunction with the rest of the Group. The disposals, excluding the GSM transaction, followed a stalking horse auction process under Section 363 of the US Bankruptcy Code.  The Joint Administrators were actively involved in these auction processes and in setting the auction parameters subsequently approved by the US and Canadian courts.

### Completed Disposals

The following transactions have been completed.   Please see the previous report dated 12 August 2010 for further details.  The proceeds of sale, which now exceed US$3 billion, remain in escrow for distribution once the PPA has been agreed between the Group.

| Business Sale | Date of Completion |
| --- | --- |
| Layer 4-7 | Completed 31 March 2009 |
| CDMA | Completed 14 Nov 2009 |
| Enterprise | Completed 18 Dec 2009 |
| MEN | Completed 19 March 2010 |
| GSM/GSM-R | Completed 1 April 2010 |
| CVAS | Completed 28 May 2010 |
| MSS | Expected Q1 2011 |

### Post Completion Transitional Services

The Group's affairs were organised on a business basis with each legal entity operating a number of businesses.  The purchasers have required ongoing support from the Group, as vendor, to provide transitional services to enable an orderly migration of the business to new ownership. These transitional services have largely been provided in EMEA by Nortel Networks (UK) Limited (**"NNUK"**) and, to a more limited extent, by Nortel Networks (Ireland) Limited.

### Shareholding in Netas

NNIFH, a fully owned subsidiary of the Company, entered into a conditional share transfer agreement on 13 October 2010 with OEP RHEA Turkey Tech B.V. (**"OEP RHEA"**) for the sale of its 53% shareholding in Netas.  Netas is a company registered and trading in Turkey, where it is listed on the Istanbul Stock Exchange. OEP RHEA is a company established by a consortium comprising of One Equity Partners and Rhea Girisim Sermayesi Yatirim Ortakligi

**ᴕ ERNST & YOUNG**

A.S.. The sale was completed on 22 December 2010, once all conditions precedent had been satisfied.

The sale valued NNIFH's shareholding at US$83.7 million, subject to a downward adjustment for dividends paid to NNIFH between 31 December 2009 and the date of completion. The total consideration was received by NNIFH in the form of a dividend of US$4.0 million paid in May 2010 (before withholding tax), a dividend of US$11.7 million paid in December 2010 (before withholding tax) and cash paid on completion of US$68.0 million. Total withholding tax of US$1.6 million was deducted from the two dividend payments received by NNIFH.  The Joint Administrators continue to seek offers for the remaining Intellectual Property portfolio.

**Future Transactions and Disposals**

**_MSS_**

A sale of the MSS business was agreed on 24 September 2010 with Telefonaktiebolaget Ericsson for a headline price of $65 million.  It is currently anticipated that this transaction will complete in the first quarter of 2011.  The sale will transfer substantially all of the MSS assets globally, including customer contracts and employees of which there are 59 across Europe. The sale of MSS concludes the sales of all trading global business lines within the Group.

**_Residual Intellectual Property_**

After the various business sales, the Group will have in excess of 3,500 registered patent families remaining, and is exploring the strategic alternatives available to best optimise the value of the assets.

**Ξ ERNST & YOUNG**

### 3. Trading and Operational Overview

The Joint Administrators concluded that continued trading of the businesses, pending sales as going concerns, was in the best interests of the Company's creditors.

The Joint Administrators balanced the decision of continuing to trade with its impact on creditors. The Joint Administrators continued to trade at a carefully monitored loss in the short term, in order to maximise the value of potential business and asset sales, and to reduce the value of termination claims and other contingent liabilities on the Company in the future. The Joint Administrators considered that the potential realisation values from selling the Company's various businesses as going concerns would result in a better return to creditors than if the businesses had ceased to trade and the assets of the Company were sold on a break-up basis.

The successful completion of the sales of the Group's major global businesses should, once the PPA has been completed, result in the receipt of sales proceeds and other benefits which more than off-set the losses made in the trading period.  In addition the completion of these sales has resulted in the transition of employment contracts, certain supply/ purchase arrangements and most customer contracts, to the respective purchasers. This will facilitate the orderly winding down of the Company's operations.

The headline trading results of the Company (including its Saudi Arabia branch) for the period from 1 January 2009 to 30 September 2010 are set out in the following table.

| Headline Financial Information (US GAAP) | US$ (m) |
|---|---|
| Turnover 2009 | 694.87 |
| Turnover Q1-3 2010 | 118 |
| Trading Profit/ (Loss) 2009 | (46.54) |
| Trading Profit/ (Loss) Q1-3 2010 | (13.91) |
| Net Profit/ (Loss) 2009 | (71.65) |
| Net Profit/ (Loss) Q1-3 2010 | (62.17) |

*ᴱᴵ ERNST & YOUNG*                                                                                 8

### Real Estate

Since the last report the Company has vacated its remaining leasehold properties.  Two short term leases have been entered into for continuing employees at Harlow and Maidenhead at significantly reduced quarterly rental costs.

With regards to the freehold properties, it is likely that the Company will continue to occupy Monkstown until the end of 2011.  The Joint Administrators have sublet part of the surplus space and continue to consider longer term options.

### Employees

Through the various business sales, the Joint Administrators have succeeded in transferring 1,135 employment contracts to the purchasers of the businesses.

| Employee numbers as at 13 January 2011 | |
|---|---|
| Employees at appointment | 1915 |
| Transferred with business sales | 1135 |
| Resignations and other leavers | 235 |
| Redundancies | 397 |
| Employees continuing as at 13 January 2011 | 148 |

The continuing employees are being retained by the Joint Administrators to deliver transitional services to the purchasers of the businesses and to assist with the winding up of the Company's affairs, or are in scope to transfer to the purchaser of the MSS business.

**ᴣ ERNST & YOUNG**

#### 4. Receipts and Payments Account

Attached at Appendix 2 is the Joint Administrators' receipts and payments ("**R & P**") account for the period 14 July 2010 to 13 January 2011 for the Company in the UK and the Saudi Arabia branch. This shows total receipts of US$89,265,448, and payments of US$89,137,442. A trading overview is included in Section 3 above.

The Company in the UK and the Saudi Arabia branch together held cash in various currencies equivalent to US$365.6 million at 13 January 2011.

The R & P account is a statement of cash received and cash paid out, and does not reflect estimated future receipts or payments, including proceeds from the sales of businesses held in escrow pending allocation amongst the Group.

There has been a significant reduction in the receipts and payments activity during the interim period against prior periods, which is representative of the wind down position of the business. For further information, see the detailed notes provided in Appendix 2.

**ᴱᴵ ERNST & YOUNG** 10

## 5. Joint Administrators' Remuneration and Disbursements

The Joint Administrators' remuneration was fixed on a time-costs basis by the Committee and it is the responsibility of the Committee to approve the Joint Administrators' fee. During the period 5 June 2010 to 3 December 2010 the Joint Administrators incurred time costs of GB£5,231,803, of which GB£4,185,443 has been drawn on account in accordance with the court order dated 28 February 2009. An analysis of the time spent is at Appendix 3, which includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

The Joint Administrators are currently in the process of seeking approval for fees totalling GB£7,614,793 in respect of the period 6 February 2010 to 1 October 2010.

Since our last report, we have conducted a review of the time costs attributed to the Company since 6 February 2010 (being the date up to which fees have been approved by the Committee) with a view to ensuring that only costs relating directly to the Company are billed to the Company. In respect of workstreams that are undertaken for the benefit of all the EMEA entities, we have sought to ensure that a proportionate and reasonable allocation of time billed for this type of work is apportioned and absorbed by the other filed EMEA entities. As a result of our review, we consider that certain costs need to be re-apportioned across EMEA to reflect the end of transfer pricing adjustments at end Q1 2010, which previously reimbursed the Company for costs incurred on behalf of other estates. As a result the Company will receive recharges from the EMEA companies amounting to GB£2,549,965 for work carried out in the period 6 February 2010 to 1 October 2010. Please see Appendix 4 for further details.

### Payments to Other Professionals

The Joint Administrators continue to engage the following professional advisors to assist them in the Administration. These professionals work on a time cost basis and internal review processes are undertaken to assess their invoices. During the period 14 July 2010 to 13 January 2011 the following has been paid:

Herbert Smith LLP – GB£8,218,023 (Legal Advisors)

Local Counsel – US$740,668 (Legal Advisors)

**≡** **ERNST & YOUNG**                                                    11

### 6. Future Conduct of the Administration

#### *Purchase Price Allocation – The Business Disposals*

The proceeds from the business sales, which were placed in escrow accounts on completion, will subsequently be apportioned between the selling companies. The proper allocation of proceeds across each selling entity, including the Company and the other EMEA Companies, is a matter of great importance not only to the Joint Administrators but also to all other Group Companies and, where applicable, the office holders or other fiduciaries responsible for them.

The intention of the Joint Administrators, NNL and NNI (together with the Monitor and the legal advisors to the Unsecured Creditors' Committee) is for the PPA and the settlement of intra-group claims to be determined by way of a consensual agreement between the three principal estates, EMEA, US and Canada.

To further support the estates' ability to reach a consensual agreement, the EMEA, US and Canadian estates undertook to exchange PPA methodologies and heads of intercompany claims that could potentially be made. Such claims have been exchanged but remain confidential at this time.

The Joint Administrators attended an inter-estate meeting in November 2010 to progress the PPA. A further meeting is due to be held in April 2011. Owing to the confidential nature of the meetings we are unable to disclose any further information to creditors at this stage.

If it is not possible for the three estates to reach a consensual agreement, an arbitration or litigation process remains likely.

Whatever mechanism is used to determine the allocation of sale proceeds, the Joint Administrators remain mindful that it is their duty to act in the best interests of the Company's creditors as a whole.

#### *Distributions to Creditors*

The Joint Administrators obtained Court directions to allow them to commence an informal claims process. This informal claims process commenced in July 2010. The Joint Administrators have invited submissions of claim forms so that Nortel accounting personnel can assist with the process of reconciling claims to company records.

On the basis that the remaining business sale process is expected to complete by Q1 2011, and that a consensual agreement is being sought by the Group in respect of the inter-company claims and the PPA, it is possible that a formal creditor claims process will be called for in late 2011. In accordance with the Insolvency Act 1986, the Joint Administrators will be writing to all known creditors and advertising for claims.

Once the trading position has been finalised, but before PPA receipts from the business disposal escrow account (which the Joint Administrators are confident will reflect the value of the businesses sold), and the receipt of intra group dividends, the Joint Administrators anticipate that there will be, absent any unforeseen liabilities arising, in the region of US$318 million available to distribute to the creditors of the Company.

**Ξ Ernst & Young**                                                                 12

The Joint Administrators are, however, still neither able to confirm the quantum of the pre-appointment creditor claims nor the likely return for individual creditors or class of creditor. These will be determined for the most part by the following key factors:

   a.  An analysis of the claims notified to the Joint Administrators following the recent advertising campaign requesting creditors to submit their claims on an informal basis. This process is currently ongoing.

   b.  The impact of any FSD on any subsidiary company of the Company.

   c.  Finalisation of quantum of certain complex liabilities and claim (including the TPR's FSD claims).

   d.  Finalisation of ranking of creditor claims which will be determined as part of the distribution process.

The Company also has a branch in Saudi Arabia which has now ceased trading. A local solvent winding up process is required, even though the Company, as holder of the branch, is in Administration. The proposed liquidator has now petitioned to the Ministry of Commerce in Saudi Arabia for the commencement of the liquidation to be with effect from 1 January 2011. We are currently awaiting confirmation that approval has been granted. The net benefit to the Company will be the recovery of cash to the UK administration bank account of some US$3.4 million, of which US$2.9 million has been received to date and the balance is anticipated at the conclusion of the liquidation.

The Joint Administrators will continue to update the creditors' committee as appropriate of any key issues and their resolution.

### Exit Strategy

The Joint Administrators applied to court in January 2010, and obtained, an extension of the administrations, which will allow for the completion of the M&A processes, transitional services agreements and implementation of an orderly wind down process.

The Joint Administrators continue to explore the most appropriate exit route from the administration process for the Company and the other EMEA companies in administration; that is to say the method by which creditors' claims are agreed, surplus funds are distributed to creditors and the Company's affairs generally brought to a conclusion.

The Joint Administrators will be required to carry out statutory obligations such as formalising the calling of proofs of debt, obtaining creditor agreements, finalising all asset disposals, dealing with all sale proceeds and inter-company claims, agreeing all other creditor claims and establishing the mechanics of distributing funds.

In all of the above scenarios, the distribution process used will be subject to timing implications, cost, the size of entity under review, relevant currencies, local law provisions on claims and local processes of other Group entities in relation to intra group dividends, in addition to UK legislation.

The process of agreeing claims and distributing surplus funds to creditors could be done within the administration process (with the Court's approval), or within a follow-on company voluntary

 **ERNST & YOUNG**

13

arrangement ("**CVA**") or liquidation process.  Each option has merits in different circumstances, and it is not yet clear which option is most beneficial for the Company and its creditors.

**≡Ⅱ ERNST & YOUNG**    14

## 7. Other Matters

### The Committee

The committee of creditors was formed at the creditors' meeting held on 11 March 2009. The Joint Administrators continue to provide detailed information to the members of the Committee as the Administration progresses and matters evolve (including an analysis of their time costs for approval). The Joint Administrators will continue to keep the Committee apprised of developments.

### The Prescribed Part

Section 176A of the Insolvency Act 1986 does not apply to this Administration as there is no qualifying floating charge security, and as such there is no Prescribed Part to be set aside for non-preferential creditors.

### North American Claims Process

The Joint Administrators have filed certain claims on behalf of the Company and the other EMEA Companies in insolvency proceedings, in jurisdictions where a bar date has been imposed.

A bar date of 18 March 2011 has now been set for inter-company claims by the EMEA entities against the Canadian estate.  The Joint Administrators are taking appropriate steps to ensure that the Company's claims are formally lodged by the deadline.

The Joint Administrators will continue to file claims on behalf of the Company and the other EMEA Companies in jurisdictions where a bar date is imposed.

### French Employee Claims

A number of former employees of the French entity, Nortel Networks SA, have filed claims in the French tribunal court.  The claims have been raised against a number of Nortel entities as the employees are claiming co-employment rights for damages for unfair dismissal and an alleged breach of the obligation of priority hiring against the buyers of the various businesses.

 These claims are being defended and a judgement hearing is scheduled to take place in October 2011.

**ΞII ERNST & YOUNG**                                    15

The Joint Administrators will report to creditors again in six months' time.

Yours faithfully
for Nortel Networks UK Limited (In Administration)



C Hill
Joint Administrator

Enc:    Company information
        Joint Administrators' Receipts and Payments Account
        Summary of Joint Administrators' Time Costs
        Joint Administrators' Policy on Fees and Disbursements
        Form 2.24B Administrators' Progress Report

*For the Companies listed below, The Institute of Chartered Accountants in England and Wales in the UK authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants in the UK authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks S.A.; Nortel GmbH; Nortel Networks France S.A.S.; Nortel Networks N.V.; Nortel Networks S.p.A.; Nortel Networks B.V.; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, S.A.; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal S.A.; Nortel Networks Slovensko s.r.o.; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding B.V.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

*Nortel Networks S.A. was placed into French liquidation judiciaire on 28 May 2009. The business and assets of the company that are situated in France are now under the control of la liquidateur judiciaire.*

*We advise that this report is provided pursuant to our appointments as Joint Administrators of the Company. It is provided solely for the purpose of informing creditors of certain aspects of the current status of the Administration. As this report is only an interim indication of the overall position of the Company, and not a valuation of the current or future value of any particular item of debt, and is liable to change, it should not be relied upon as an indication of the final return to creditors and, in particular, neither we nor the Company shall have any responsibility to any person who relies on our report for the purpose of trading in debt of the Company.*

## Appendix 1

## Nortel Networks UK Limited (In Administration)

### Company Information

| | |
|---|---|
| Registered number: | 3937799 |
| Company name: | Nortel Networks UK Limited |
| Registered office address | Fleming House, 71 King Street, Maidenhead, Berkshire SL6 1DU |
| Previous names: | Nortel Networks Holdings Limited |
| | Nortel Networks Holdings plc |

### Details of the Administrators and of their appointment

| | |
|---|---|
| Administrators: | AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London, SE1 2AF |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors. |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 536 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly. |

### Statement Concerning the EC Regulation on Insolvency Proceedings 2000

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

**Share Capital**

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | Number | £ | Number | £ |
| Ordinary | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 |

**Shareholder**

Nortel Networks Limited - 100%

**Directors (current and for the last three years) and company secretary (current)**

| Name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| William LaSalle | Director | 01/10/2001 | 23/05/2008 | |
| Geoff Lloyd | Director | 01/02/2002 | 17/03/2006 | - |
| Christian Waida | Director | 17/12/2004 | 08/12/2008 | - |
| Henry Birt | Director | 01/09/2005 | 31/03/2007 | - |
| Peter Currie | Director | 01/09/2005 | 10/04/2007 | - |
| Sharon Rolston | Director | 01/04/2006 | 30/09/2010 | - |
| Simon Freemantle | Director | 31/03/2007 | - | - |
| David Quane | Director | 30/09/2010 | - | |
| Brenda Dandridge | Secretary | 01/12/2010 | - | - |

# Summary of Nortel Group Structure



The EMEA Companies in English administration proceedings:

| *Legal Entity* | *Country of Incorporation* |
| --- | --- |
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

**Appendix 2**

## Nortel Networks UK Limited (In Administration)

**Joint Administrators' Abstract of Receipts and Payments**
**from 14 July 2010 to 13 January 2011**

| Currency: USD | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 338,622,958 | | 338,622,958 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Post appointment sales | 373,968,056 | 14,934,596 | 388,902,652 |
| - Post appointment intercompany | 339,332,011 | 27,461,637 | 366,793,647 |
| - Pre-liquidation distribution from NN Saudi | - | 2,900,000 | 2,900,000 |
| - TSA receipts | 20,299,729 | 28,471,042 | 48,770,772 |
| - Asset sales | 5,468,814 | - | 5,468,814 |
| - Property income | 3,494,718 | - | 3,494,718 |
| - Other receipts | 937,166 | 945,024 | 1,882,189 |
| - Overpayment refunds | 22,563 | 16,641 | 39,204 |
| *Other:* | | | |
| - Pre appointment sales | 98,961,782 | 2,352,072 | 101,313,854 |
| - Pre appointment intercompany - Asia Pacific entities | 14,307,188 | - | 14,307,188 |
| - FX translation movement | 9,243,681 | 11,305,722 | 20,549,403 |
| - Bank interest | 2,721,263 | 876,981 | 3,598,244 |
| - Pre appointment intercompany - Nortel Networks Israel | 308,492 | - | 308,492 |
| | 869,065,463 | 89,263,713 | 958,329,176 |
| **Payments** | | | |
| *Trading:* | | | |
| - Accounts payable - Inventory related | (404,459,599) | (37,634,735) | (442,094,334) |
| - Payroll, employee benefits, and payroll taxes | (190,122,407) | (12,511,880) | (202,634,288) |
| - Property costs | (41,978,647) | (6,518,361) | (48,497,008) |
| - Other taxes | (34,019,520) | 5,984,427 | (28,035,093) |
| - Other payments | (18,592,723) | (1,114,169) | (19,706,892) |
| - Pension contributions | (10,356,973) | (633,564) | (10,990,538) |
| - Utilities | (10,196,966) | (1,636,161) | (11,833,126) |
| - Trade payables | (8,954,622) | - | (8,954,622) |
| - Contractors | (3,890,946) | (260,564) | (4,151,510) |
| *Other:* | | | |
| - Legal fees | (60,829,384) | (14,031,397) | (74,860,781) |
| - Joint Administrators' fees and disbursements | (48,587,868) | (13,522,388) | (62,110,256) |
| - Other professional services costs | (8,652,569) | (3,247,831) | (11,900,400) |
| - Restructuring costs | (3,402,957) | (33,790) | (3,436,748) |
| - FX translation movement on FX transactions within the entity | (1,417,152) | (483,524) | (1,900,676) |
| - Bank charges and interest | (665,689) | (227,995) | (893,684) |
| - Capital expenditure | (173,711) | - | (173,711) |
| | (846,301,733) | (85,871,932) | (932,173,665) |
| **Closing balance** | 361,386,688 | | 364,778,469 |
| **Account reconciliations:** | | | |
| **Current accounts** | 29,471,376 | | 26,255,069 |
| **Local deposit accounts** | 5,952,000 | | 171,197,150 |
| **Administration deposit accounts** | 325,963,311 | | 167,326,250 |
| | 361,386,688 | | 364,778,469 |

# Nortel Networks UK Limited (In Administration)

## Joint Administrators' Abstract of Receipts and Payments
## from 14 July 2010 to 13 January 2011

| Currency: GBP | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | **236,900,621** | | **236,900,621** |
| **Receipts** | | | |
| *Trading:* | | | |
| - Post appointment sales | 240,734,251 | 7,918,737 | 248,652,989 |
| - Post appointment intercompany | 218,372,565 | 19,959,578 | 238,332,143 |
| - Pre-liquidation distribution from NN Saudi | - | 1,908,194 | 1,908,194 |
| - TSA receipts | 13,354,356 | 18,732,128 | 32,086,483 |
| - Asset sales | 3,598,898 | - | 3,598,898 |
| - Property income | 2,249,055 | - | 2,249,055 |
| - Other receipts | 599,678 | 621,897 | 1,221,574 |
| - Overpayment refunds | 14,848 | 10,948 | 25,796 |
| *Other:* | | | |
| - Pre appointment sales | 63,251,516 | 1,547,843 | 64,799,359 |
| - Pre appointment intercompany - Asia Pacific entities | 9,217,676 | - | 9,217,676 |
| - FX translation movement | - | 46,863 | 46,863 |
| - Bank interest | 1,754,477 | 577,074 | 2,331,552 |
| - Pre appointment intercompany - Nortel Networks Israel | 203,011 | - | 203,011 |
| | 553,350,332 | 51,323,261 | 604,673,593 |
| **Payments** | | | |
| *Trading:* | | | |
| - Accounts payable - Inventory related | (259,941,373) | (24,765,885) | (284,707,258) |
| - Payroll, employee benefits, and payroll taxes | (122,152,387) | (8,233,775) | (130,386,162) |
| - Property costs | (27,030,485) | (4,289,580) | (31,320,065) |
| - Other taxes | (21,870,014) | 3,938,013 | (17,932,001) |
| - Other payments | (11,922,433) | (733,174) | (12,655,607) |
| - Pension contributions | (6,648,645) | (416,934) | (7,065,579) |
| - Utilities | (6,581,847) | (1,076,615) | (7,658,461) |
| - Trade payables | (5,723,287) | - | (5,723,287) |
| - Contractors | (2,496,200) | (171,403) | (2,667,603) |
| *Other:* | | | |
| - Legal fees | (39,349,439) | (9,233,913) | (48,583,352) |
| - Joint Administrators' fees and disbursements | (31,307,850) | (8,898,767) | (40,206,617) |
| - Other professional services costs | (5,580,222) | (2,137,296) | (7,717,518) |
| - Restructuring costs | (2,210,734) | (22,237) | (2,232,971) |
| - FX translation movement | (5,335,312) | - | (5,335,312) |
| - FX translation movement on FX transactions within the entity | (883,508) | (291,738) | (1,175,246) |
| - Bank charges and interest | (430,431) | (150,036) | (580,467) |
| - Capital expenditure | (111,026) | - | (111,026) |
| | (549,575,192) | (56,483,339) | (606,058,531) |
| **Closing balance** | **240,675,762** | | **235,515,684** |
| **Account reconciliations:** | | | |
| **Current accounts** | 19,627,303 | | 16,951,331 |
| **Local deposit accounts** | 3,963,904 | | 110,531,781 |
| **Administration deposit accounts** | 217,084,555 | | 108,032,572 |
| | 240,675,762 | | 235,515,684 |

**Receipts and payments comments**

**Notes to R & P**

- Account balances have all been reported in a local currency, GBP, in addition to a common currency across all entities, USD.

  Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2010 month end spot rates which have been provided by the Company.  This approach is in line with the Company's internal reporting procedures.

  Transactions that have taken place through the accounts over the course of the reporting period (14 July 2010 to 13 January 2011) have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

  Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates.  These are translation movements only and do not reflect an actual receipt or payment.

  The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited.  Material items have been reviewed for accuracy and reasonableness.
- The amounts reported are inclusive of sales tax where applicable.
- All amounts referred to below are in USD unless stated otherwise.

## RECEIPTS

There was cash on appointment held in GBP, Euro, USD and CAD accounts which totalled $338.6 million.

Total receipts since 13 July 2010 total $78.0 million (net of FX translation).  This primarily relates to intercompany receipts, Transitional Service Agreement receipts and sales receipts.

### *Post appointment intercompany receipts*

Intercompany receipts received since 13 July 2010 total $27.5 million.

The Company was a net receiver during the reporting period through the Nortel group's monthly netting process.  Intercompany receipts were primarily collected from Nortel Networks N.V. (net $17.1 million) as the Company incurs and is later reimbursed the majority of costs in connection with the Alcatel Lucent contract.

### *Pre-liquidation distribution from NN Saudi*

A distribution was made to the Company of $2.9 million in December 2010 as part of the wind up of the Saudi branch.

### *Transitional Service Agreement ("TSA") receipts*

The TSA receipts since 13 July 2010 total $28.5 million.  This represents the reimbursement of costs incurred on behalf of the purchasers under the terms of the respective TSAs.

### *Sales receipts*

Pre appointment sales receipts collected since 13 July 2010 total $2.4 million.

Post appointment sales receipts collected since 13 July 2010 total $14.9 million.

### *Foreign exchange translation movement*

The total FX translation movement to 13 January 2011 is a result of the movement of the USD against the GBP. The translation movement shown since 13 July 2010 is simply the difference between the FX movement for the total period and that reported previously to 13 July 2010. As such the interim FX translation movement does not represent a true FX translation gain for the period.

### PAYMENTS

Total payments made since 13 July 2010 total $85.9 million. This primarily relates to inventory purchases, legal fees, Joint Administrators' fees, payroll related costs, property costs, other professional services costs and utility costs.

### *Accounts payable*

The accounts payable inventory related payments since 13 July 2010 total $37.6 million.

### *Legal fees*

Legal fees since 13 July 2010 total $14.0 million. This relates predominantly to fees paid to Herbert Smith LLP.

### *Joint Administrators' fees*

Joint Administrators' fees paid since 13 July 2010 are $13.5 million. These costs relate to fees and disbursement incurred in the course of the administration.

### *Payroll*

Payroll costs since 13 July 2010 total $12.5 million and include net pay in addition to employee expenses, employee benefits and payroll taxes.

### *Property costs*

Property costs since 13 July 2010 total $6.5 million. This principally relates to rental payments made for the premises at Maidenhead in addition to property management costs.

### *Utilities*

Utilities costs since 13 July 2010 total $1.6 million. This primarily relates to electricity costs at the Maidenhead and Harlow sites.

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2010 to 13 January 2011**

| Currency: USD | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 2,554,345 | | 2,554,345 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Other receipts | 1,068 | - | 1,068 |
| *Other:* | | | |
| - Pre appointment sales | 1,884,240 | - | 1,884,240 |
| - FX translation movement | 2,328 | (375) | 1,952 |
| - Bank interest | 32,065 | 2,110 | 34,176 |
| | 1,919,701 | 1,735 | 1,921,436 |
| **Payments** | | | |
| *Trading:* | | | |
| - Trade payables | (229,715) | (172,610) | (402,325) |
| - Payroll, employee benefits, and payroll taxes | (194,830) | - | (194,830) |
| - Other taxes | (104,308) | - | (104,308) |
| - Other professional services costs | (103,627) | (37,246) | (140,873) |
| - Other payments | (78,271) | (36,514) | (114,785) |
| - Property costs | (73,768) | (18,710) | (92,478) |
| - Utilities | (70,228) | (1,562) | (71,790) |
| - Contractors | (29,343) | - | (29,343) |
| *Other:* | | | |
| - Bank charges and interest | (873) | (77) | (950) |
| - Intercompany | 491,886 | (98,791) | 393,095 |
| - Pre-liquidation distribution - NN UK | - | (2,900,000) | (2,900,000) |
| - FX translation movement on FX transactions within the entity | (507) | - | (507) |
| | (393,584) | (3,265,510) | (3,659,094) |
| **Closing balance** | 4,080,461 | | 816,686 |
| **Account reconciliations:** | | | |
| **Current accounts** | 17,718 | | 284,578 |
| **Local deposit accounts** | 31,494 | | - |
| **Administration deposit accounts** | 4,031,249 | | 532,108 |
| | 4,080,461 | | 816,686 |

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2010 to 13 January 2011**

| Currency: SAR | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 9,585,178 | | 9,585,178 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Other receipts | 4,000 | - | 4,000 |
| *Other:* | | | |
| - Pre appointment sales | 7,065,584 | - | 7,065,584 |
| - FX translation movement on FX transactions within the entity | 248 | - | 248 |
| - Bank interest | 120,136 | 7,902 | 128,038 |
| | 7,189,968 | 7,902 | 7,197,870 |
| **Payments** | | | |
| *Trading:* | | | |
| - Trade payables | (860,924) | (646,263) | (1,507,187) |
| - Payroll, employee benefits, and payroll taxes | (729,918) | - | (729,918) |
| - Other taxes | (390,785) | | (390,785) |
| - Other professional services costs | (388,139) | (139,451) | (527,590) |
| - Other payments | (293,158) | (136,712) | (429,870) |
| - Property costs | (276,330) | (70,050) | (346,380) |
| - Utilities | (263,063) | (5,848) | (268,911) |
| - Contractors | (109,931) | | (109,931) |
| *Other:* | | | |
| - Intercompany | 1,854,361 | (369,879) | 1,484,482 |
| - Pre-liquidation distribution - NN UK | - | (10,857,763) | |
| - FX translation movement | (10,420) | (22,558) | (32,978) |
| - Bank charges and interest | (3,274) | (289) | (3,563) |
| | (1,471,579) | (12,248,813) | (13,720,393) |
| **Closing balance** | 15,303,567 | | 3,062,655 |
| **Account reconciliations:** | | | |
| **Current accounts** | 66,452 | | 1,067,197 |
| **Local deposit accounts** | 118,116 | | - |
| **Administration deposit accounts** | 15,118,999 | | 1,995,458 |
| | 15,303,567 | | 3,062,655 |

**Receipts and payments comments**

**Notes to R & P**

- Account balances have all been reported in a local currency, SAR, in addition to a common currency across all entities, USD.

  Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2010 month end spot rates which have been provided by the Company. This approach is in line with the Company's internal reporting procedures.

  Transactions that have taken place through the accounts over the course of the reporting period (14 July 2010 to 13 January 2011) have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

  Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates. These are translation movements only and do not reflect an actual receipt or payment.

- The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

- The amounts reported are inclusive of sales tax where applicable.

- All amounts referred to below are in USD unless stated otherwise.

### RECEIPTS

On appointment $2.6 million in cash was held in local SAR and USD accounts.

Since 13 July 2010 receipts have totalled approximately $2,000 (net of FX translation). This predominantly relates to bank interest.

#### *Foreign exchange translation movement*

The total FX translation movement to 13 January 2011 is a result of the movement of the USD against the SAR. The translation movement shown since 13 July 2010 is simply the difference between the FX movement for the total period and that reported previously to 13 July 2010. As such the interim FX translation movement does not represent a true FX translation gain for the period.

**PAYMENTS**

Total payments of $3.3 million have been made since 13 July 2010, which primarily relates to a pre-liquidation distribution to the Company's UK bank account.

### Pre-liquidation distribution - NNUK

A distribution was made to the Company of $2.9 million in December 2010 as part of the wind up of the Saudi branch.

## Appendix 3

## Nortel Networks UK Limited (In Administration)

**Summary of Joint Administrators' time costs from 5 June 2010 to 3 December 2010 (GB£)**
**Excluding core M&A transaction time**

| Activity | Executive Director | Director | Rank Assistant Director | Manager | Executive | Analyst | Total sum of hours | Average hourly rate | Time costs for the period | Time costs for the Administration to date |
|---|---|---|---|---|---|---|---|---|---|---|
| Finance, Accounting & Administration | 2.50 | 3.50 | 572.00 | 558.60 | 525.00 | 1,206.20 | 2,867.80 | 283.85 | 814,037.50 | 5,065,483.50 |
| Trading | 7.50 | - | 53.50 | 55.50 | 280.50 | 161.50 | 578.50 | 270.37 | 156,407.50 | 2,687,134.00 |
| Suppliers | 6.00 | - | 142.00 | 237.60 | 23.20 | 128.00 | 537.00 | 254.45 | 136,639.50 | 2,615,011.92 |
| Employees | 34.60 | 7.70 | 389.00 | 13.50 | 57.30 | - | 502.10 | 359.26 | 180,382.50 | 1,989,024.00 |
| Creditors | 20.60 | 2.00 | 77.60 | 26.30 | 280.50 | 827.10 | 1,234.30 | 167.91 | 207,252.00 | 1,647,487.00 |
| UK Tax / VAT advisory and compliance | 8.30 | 24.20 | 99.50 | 257.50 | 60.60 | 153.80 | 603.90 | 468.39 | 282,858.50 | 1,615,998.50 |
| Customers | 0.90 | 26.00 | - | 66.50 | 179.00 | 2.00 | 274.40 | 317.56 | 87,138.00 | 1,434,461.00 |
| Transfer Pricing | 276.40 | 6.80 | 517.60 | 35.30 | 200.40 | 25.20 | 1,061.70 | 634.63 | 673,791.50 | 1,261,633.00 |
| IT | 59.10 | 8.00 | 1,238.00 | 914.00 | 338.00 | 499.00 | 3,054.10 | 378.09 | 1,154,737.00 | 1,157,387.00 |
| Statutory | 26.50 | 0.80 | 44.50 | 73.70 | 340.50 | 297.20 | 783.20 | 264.81 | 207,400.50 | 1,154,686.50 |
| Case management | 30.30 | 7.80 | 70.50 | 40.50 | 364.00 | 542.20 | 1,055.30 | 120.82 | 127,506.00 | 1,044,825.20 |
| Property | 14.30 | - | 59.20 | 327.00 | 157.00 | - | 557.50 | 341.22 | 190,228.00 | 979,676.50 |
| Canada / USA | 61.30 | 7.50 | 5.00 | - | - | - | 73.80 | 671.56 | 49,561.00 | 929,435.00 |
| Debtors | 15.00 | 18.00 | 25.00 | 162.80 | 849.60 | 138.00 | 1,208.80 | 281.17 | 339,825.00 | 914,667.00 |
| Exit Strategy | 73.70 | 89.60 | 401.00 | 218.00 | 521.70 | 262.90 | 1,566.90 | 354.70 | 555,783.50 | 843,567.00 |
| Strategy | 118.80 | 5.00 | 37.30 | - | - | - | 161.10 | 644.12 | 103,768.00 | 795,833.00 |
| PPF reporting | 69.00 | 16.30 | 204.20 | 216.60 | 220.40 | 281.70 | 1,008.20 | 340.44 | 343,231.00 | 604,076.00 |
| Branches & equity interests | 67.80 | 7.10 | 30.20 | 43.30 | 145.70 | 349.30 | 643.40 | 168.48 | 108,400.66 | 447,761.92 |
| Investigations | 9.90 | - | 79.50 | 31.50 | 2.00 | - | 122.90 | 469.93 | 57,755.00 | 426,104.00 |
| Creditors' Committee | 6.50 | 2.20 | 20.50 | 2.50 | 40.60 | 18.50 | 91.00 | 338.68 | 30,820.00 | 421,192.00 |
| Treasury / Banks | 1.00 | - | - | 99.50 | - | 13.10 | 113.60 | 340.82 | 38,717.00 | 326,044.16 |
| Legal | 13.00 | 2.00 | 7.50 | - | 4.00 | 188.50 | 215.00 | 160.61 | 34,532.00 | 321,622.60 |
| Liaising Directors | 59.40 | 9.70 | 3.00 | - | - | - | 72.10 | 678.55 | 48,931.00 | 283,523.00 |
| Briefing EMEA | - | - | - | 39.60 | - | - | 39.60 | 360.00 | 14,328.00 | 177,622.60 |
| Pensions | 6.60 | - | 1.50 | 2.80 | 5.00 | - | 15.90 | 474.47 | 7,544.00 | 174,760.50 |
| Administration application and planning | - | - | - | - | - | - | - | - | - | 172,741.40 |
| Intellectual Property Portfolio | 47.10 | 45.60 | 15.00 | 11.20 | - | - | 118.90 | 651.52 | 77,466.00 | 161,098.00 |
| Stabilisation | - | - | 0.50 | - | - | - | 0.50 | 350.00 | 175.00 | 143,116.00 |
| Intra Group & Netting | 0.50 | - | - | 7.50 | 81.00 | 69.00 | 158.00 | 195.98 | 30,965.00 | 90,184.00 |
| PR / Media | 0.50 | - | - | - | - | - | 0.50 | 700.00 | 350.00 | 67,645.50 |
| Outcome for Creditors | - | - | - | 9.70 | 0.30 | - | 10.00 | 357.15 | 3,571.50 | 21,534.00 |
| Tax / VAT advisory and compliance | - | - | - | - | - | 5.50 | 5.50 | 195.86 | 1,077.24 | 16,733.13 |
| Retention of title | - | - | 4.50 | - | - | - | 4.50 | 350.00 | 1,575.00 | 3,546.00 |
| Report to Creditors | - | - | - | - | - | 6.50 | 6.50 | 74.37 | 483.42 | 1,744.33 |
| Trading: Cash flow / Forecast | - | - | - | - | 1.00 | - | 1.00 | 258.88 | 258.88 | 1,519.79 |
| **Grand Total** | **1,037.10** | **299.80** | **4,098.50** | **3,451.40** | **4,677.70** | **5,195.20** | **18,747.50** | **12,278.77** | **6,087,498.70** | **29,946,429.86** |
| | | | | | | | | | | |
| Average hourly rate | 746.03 | 661.33 | 467.63 | 389.19 | 243.76 | 133.34 | | | | |
| Time costs for the period | 773,931.94 | 191,652.00 | 1,998,295.48 | 1,270,784.23 | 1,140,330.41 | 692,730.64 | | | | |
| Time costs for the Administration to date | 6,076,912.67 | 2,163,609.34 | 7,751,521.94 | 8,373,621.58 | 5,003,499.99 | 2,587,364.44 | | | | |

## Administration fee analysis (in GB£)

### Summary of total core M&A transactions time costs for all EMEA filed entities from 5 June 2010 to 3 December 2010

| Activity | Partner / Executive Director | Director | Assistant Director | Manager | Executive | Analyst | Total hours | Average hourly rate | Time costs for the period | Time costs for the Administration to date |
|---|---|---|---|---|---|---|---|---|---|---|
| M&A / Transitional Services | 12.0 | 2.0 | 503.0 | 897.0 | 1,365.2 | - | 2,779.2 | 338.77 | 941,506.00 | 7,202,034.50 |
| M&A / Equinox | 63.7 | 50.5 | 8.0 | 1.0 | 22.9 | - | 146.1 | 660.34 | 96,476.00 | 4,350,496.00 |
| Purchase Price Allocation | 925.5 | 212.8 | 811.9 | 1,316.3 | 854.9 | 288.3 | 4,409.7 | 431.67 | 1,903,533.50 | 3,434,697.50 |
| M&A / Netas | 140.4 | 367.5 | 82.0 | 291.5 | 27.0 | 47.2 | 955.6 | 497.39 | 475,306.00 | 2,217,030.21 |
| M&A Snow | 9.0 | 77.6 | 20.0 | 0.3 | 3.3 | - | 110.2 | 752.04 | 82,874.50 | 1,551,313.00 |
| M&A / GSM | 4.0 | 18.5 | 50.7 | 4.1 | 0.1 | - | 77.4 | 573.80 | 44,412.00 | 1,394,016.00 |
| M&A / Carrier | 17.0 | 32.0 | 42.9 | - | - | - | 91.9 | 698.60 | 64,201.50 | 1,135,270.00 |
| M&A / Passport | 67.0 | 357.3 | 621.5 | 88.5 | - | 6.0 | 1,140.3 | 565.96 | 645,364.00 | 875,651.00 |
| Sale and M&A | - | - | - | - | - | - | - | - | - | 563,375.00 |
| Other Assets | 44.3 | - | 7.5 | 8.7 | 1.3 | - | 61.8 | 640.88 | 39,606.50 | 255,952.57 |
| M&A / Velocity | - | 7.0 | - | - | 1.3 | - | 8.3 | 540.24 | 4,484.00 | 97,430.00 |
| **Grand Total** | 1,282.9 | 1,125.2 | 2,147.5 | 2,607.4 | 2,276.0 | 341.5 | 9,780.5 | 5,699.69 | 4,297,764.00 | 23,077,265.78 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Average hourly rate | 685.19 | 643.40 | 504.58 | 361.81 | 286.46 | 179.67 |
| Time costs for the period | 879,032.00 | 723,952.00 | 1,083,577.00 | 943,392.00 | 606,452.00 | 61,359.00 |
| Time costs for the Administration to date | 3,388,248.19 | 4,234,185.91 | 8,791,301.08 | 5,018,619.00 | 3,195,659.81 | 449,251.79 |

### Total time costs for the Administration from 5 June 2010 to 3 December 2010

| Time costs for the administration during the period 05/06/10 - 03/12/10 | £ |
|---|---|
| Administration time costs excluding transactions for the period | 5,805,616.20 |
| Reallocation of time costs removed from NNUK to be borne by EMEA entities | (2,284,138.58) |
| Transaction time costs seeking approval for the period | 1,710,325.76 |
| **Total time costs for the period 05/06/10 - 03/12/10** | 5,231,803.38 |

**Note**

Time costs in respect of transactions for the period 5 June 2010 to 3 December 2010 have been apportioned on a provisional basis, having regard to the nature of the work done and the extent of progress made in respect of some, but not all, core M&A transactions. The allocation is provisional and will change as the transactions progress and the outcome of the PPA is clear.

Please note the Joint Administrators have only apportioned core M&A transactions time costs in respect of those transactions that have made sufficient progress. Therefore further core M&A transactions time costs will be apportioned in due course to the Company, and reapportioned as the outcome of the PPA process becomes clear.

## Appendix 4

## Nortel Networks UK Limited (In Administration)

### Apportionment

As commented in the report, during the period we have conducted a review of the time being charged to NNUK.

We found that in certain cases (e.g. Finance, Accounting and Administration) the vast majority of time has historically been charged to NNUK with a re-charge to EMEA being made through the transfer pricing arrangements. However, this effectively ended at end Q1 2010.

Therefore a new methodology was required to apportion costs appropriately across EMEA

In addition, certain workstreams (for example Creditors and Exit) have started to attract significant costs in 2010 and we considered that an appropriate apportionment of time was not in place and therefore a method of reapportionment to EMEA again was required for these workstreams.

The workstreams identified for reapportionment along with the apportionment basis used and the effect are summarised in the table below:

| Workstreams | Basis for Apportionment | Apportionment rate Applicable to NNUK |
|---|---|---|
| Finance, Accounting & Administration Trading Exit | Gross assets per Directors Statement of Affairs for all EMEA companies | 49.33% |
| Customers Debtors | Trade receivables per Directors Statement of Affairs for all EMEA companies | 30.99% |
| Outcome for Creditors Creditors | Unsecured creditors (exc. Interco. Debts, pensions & employee claims) per Directors Statement of Affairs. for all EMEA companies. | 62.93% |
| Exit IT costs | Rates used by the Group prior to the Company going into Administration | 45.74% |
| Strategy Canada / USA Transfer Pricing Intellectual Property | Same rate used for M & A cost apportionment | 46.17% |

Time costs have been apportioned retrospectively from 6 February 2010 to date and will be apportioned going forward.

As a result NNUK will receive recharges from the EMEA companies amounting to GB£2,549,965 for work carried out in the period 6 February 2010 to 1 October 2010.

## Nortel Networks UK Limited (In Administration)

### Office Holders' Charging Policy for Fees

The statutory provisions relating to remuneration are set out in Rule 2.106 of the Rules. Further information is given in the Association of Business Recovery Professionals' publication "A Creditors' Guide to Administrators' Fees", a copy of which may be accessed from the web site of the Insolvency Practitioners Association at http://www.insolvency-practitioners.org.uk (follow 'Regulation and Guidance' then 'Creditors' Guides to Fees'), or is available in hard copy upon written request to the Administrators.

The creditors have determined that the Administrators' remuneration should be fixed on the basis of time properly spent by the Administrators and their staff in attending to matters arising in the Administration.

The Administrators have engaged managers and other staff to work on the cases.  The work required is delegated to the most appropriate level of staff taking account of the nature of the work and the individual's experience. Additional assistance is provided by accounting and treasury executives dealing with the Company's bank accounts and statutory compliance diaries, secretaries providing typing and other support services and filing clerks. Work carried out by all staff is subject to the overall supervision of the Administrators.

All time spent by staff working directly on case-related matters is charged to a separate time code established for each case. Each member of staff has a specific hourly rate, which is subject to change over time. The average hourly rate for each category of staff over the period is shown in Appendix 2, as are the current hourly rates used. The current hourly rates may be higher than the average rates, if hourly rates have increased over the period covered by this report.

### Office Holders' Charging Policy for Disbursements

Statement of Insolvency Practice No. 9 ("SIP 9") published by R3 (The Association of Business Recovery Professionals) divides disbursements into two categories.

Category 1 disbursements comprise payments made by the office holders' firm, which comprise specific expenditure relating to the administration of the insolvent's affairs and referable to payment to an independent third party. These disbursements can be paid from the insolvent's assets without approval from the Committee. In line with SIP 9, it is our policy to disclose such disbursements drawn but not to seek approval for their payment.

Category 2 disbursements comprise payments made by the office holders' firm which include elements of shared or overhead costs. Such disbursements are subject to approval from Creditors' Committee as if they were remuneration. It is our policy, in line with SIP 9, to seek approval for this category of disbursement before they are drawn.

Rule 2.47                                                                    Form 2.24B

The Insolvency Act 1986

**Administrator's progress report**                      **2.24B**

| Name of Company | Company number |
|---|---|
| Nortel Networks UK Limited | 3937799 |

| In the | Court case number |
|---|---|
| High Court of Justice of England and Wales, Chancery Division, Companies Court | 536 of 2009 |

We <u>AR Bloom, CJW Hill, SJ Harris and AM Hudson</u>

<u>Ernst & Young LLP, 1 More London Place, London, SE1 2AF</u>

administrators of the above company attach a progress report for the period

From                                              to

| 14 July 2010 | 13 January 2011 |
|---|---|

Signed

Joint Administrator

Dated      <u>11 February 2011</u>

**Contact Details:**

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record

| Tara Felton | |
|---|---|
| Ernst & Young LLP, 1 More London Place, London, SE1 2AF | |
| | Tel: 020 7951 8151 |
| DX Number: | DX Exchange: |

Companies House receipt date barcode

When you have completed and signed this form please send it to the Registrar of Companies at:

**Companies House, Crown Way, Cardiff, CF14 3UZ**     **DX 33050 Cardiff**