**EXHIBIT 2**



**Ernst & Young LLP**
1 More London Place
London SE1 2AF

Tel: 020 7951 2000
Fax: 020 7951 1345
www.ey.com/uk

TO ALL KNOWN CREDITORS

12 February 2010

Ref:   MLP/7E/CH/NA/CC/LO3538

Chris Coley
Direct line: 0121 535 2394
Direct fax: 0121 535 2448
Email: ccoley@uk.ey.com

Dear Sirs

# Nortel Networks UK Limited (In Administration) (the "Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court Case number 536 of 2009

I write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a second report on the progress of the Administration (the "**Report**"). This Report covers the period from 14 July 2009 to 13 January 2010 and should be read in conjunction with my first report dated 13 August 2009 and the Administrators' Statement of Proposals dated 23 February 2009. A copy of this Report can be made available on request or can be obtained at the following;

www.nortel.com/corporate/adminprogreports.html

The Company entered administration on 14 January 2009 when AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "**Joint Administrators**") by an order (the "**Order**") of the High Court of Justice of England and Wales (the "**Court**"), following an application made by the Company's directors. Under the terms of the Order, any act required or authorised to be done by the Joint Administrators can be done by any of them. Further information on the Company and details of the Administrators' appointment are set out in Appendix 1.

On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region ("**EMEA**"). Details of the 19 companies are provided at Appendix 1. In accordance with Article 3 of the EC Regulation number 1346/2000 on Insolvency Proceedings 2000 (the "**EC Regulation**"), the court of the EC member state in which the centre of main interests ("**COMI**") of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the "**EMEA Companies**"), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company.

The Nortel group of companies (the "**Group**") reports in US dollars ("**US$**"), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office.

## 1. Executive Summary of Progress of the Administration

In early 2009, the Joint Administrators stabilised the businesses, continued to trade, maintained client and supplier relationships and implemented restructuring plans in certain entities as necessary. The Joint Administrators' proposals for the Administration were approved without modification by creditors of each of the EMEA Companies at meetings held in March 2009.

The Joint Administrators have continued to trade the Company's businesses with a view to achieving a rescue of the Company as a going concern or a better result for the Company's creditors as a whole than would be likely if the Company were wound up. Over time it has become clear that, owing to the financial and market pressures facing the Nortel businesses, the sale of all businesses would be necessary. The Group principally operates in three business segments: Enterprise Solutions ("**Enterprise**"), Metro Ethernet Networks ("**MEN**") and Carrier Networks, which comprises Global System for Mobile Communications ("**GSM**"), Carrier VoIP Application Solutions ("**CVAS**") and Code Division Multiple Access ("**CDMA**").

As at the date of this Report, the Joint Administrators are pleased to report that sales agreements have been reached in respect of all the Group's major global businesses with the exception of the smaller Multiservice Switch ("**MSS**") business, with global realisations before transaction costs of US$2.9 billion. All major disposals are being conducted on a Group-wide basis, following a "stalking horse" procedure in line with Section 363 of the US Bankruptcy Code unless otherwise stated.

The Group continues to seek the sale of the MSS business, residual intellectual property and other remaining assets. It is anticipated that all sales processes will be completed by the end of Q1 2010 or shortly thereafter. However, in the interim period, the Joint Administrators continue to work closely with the North American entities to maintain the value of the businesses up to the dates of completion, when they will transition to purchasers.

Owing to the integrated nature of the Group's business, it will be necessary for some Group companies to provide transitional services to the purchasers for a period of one year post sale completion. Such services include the provision of various back office functions, infrastructure support and the general allowance of lead time to enable each purchaser to integrate the business with their own. The purchaser will meet the direct cost of these services.

The proceeds of the global sale transactions will be placed into escrow until the allocation of proceeds between individual Group companies is determined. The mechanism of allocating disposal proceeds between Group companies is currently under negotiation. It is likely that any allocation process would need to be sanctioned by the US and Canadian Courts and the English High Court.

In accordance with the above, the Joint Administrators continue to pursue a better result for the Company's creditors as a whole than would be likely if the Company were wound up. The Joint Administrators believe that the businesses will be sold to the advantage of creditors and this remains the ultimate basis for the decision to continue to trade.

Further information is contained in the sections that follow.

## 2. Business Disposal Strategy

As outlined in our previous report, the Joint Administrators believe that a sale of the business will result in an enhanced realisation for creditors of the Company through capital receipts from the sales of businesses, the preservation and transfer of employment, and the transfer of contracts to purchasers.

All sales of the major businesses are intended to be dealt with on a global basis. The disposals follow a stalking horse auction process under Section 363 of the US Bankruptcy Code unless otherwise stated. Under this process, a bidder is selected and contractually committed to purchase the business, unless a better offer is made in a subsequent auction process. After a winning bidder is selected there is a period during which certain conditions need to be met (e.g. competition clearances) before the sale completes. If the conditions are not met, then the sale will not complete. The process provides relative certainty whilst maintaining competitive tension in the procedure, thereby maximising value. The auction process is conducted in accordance with US and Canadian court-approved auction parameters and is a common process in North America. The Joint Administrators have been, and remain, actively involved in these auction processes and the auction parameters subsequently approved by the US and Canadian courts. They are also fully involved in negotiating the EMEA sales agreements with purchasers and assisting in moving sales towards completion.

### Announced Disposals

The following stalking horse transactions have been entered into at the date of this Report. The sales values reported are headline global values and are stated before possible transaction costs and deductions.

### *Sale of Layer 4-7 Business*

On 31 March 2009, certain Group companies concluded the divestiture for US$18 million of certain parts of the Group's Virtual Service Switches business to Radware Ltd. The proceeds of sale remain in escrow for distribution once an allocation process has been agreed between the Group.

The Company is a party to this agreement.

### *Sale of CDMA Business*

On 19 June 2009, the Group announced that it had entered into a stalking horse asset sale agreement with Nokia Siemens Networks B.V. for the sale of substantially all of its North American CDMA business and parts of its LTE Access assets. Subsequently, on 25 July 2009 and following an auction process, the Group announced that Ericsson AB would purchase these assets for US$1.13 billion subject to approval by the US and Canadian Bankruptcy courts. The sale was concluded on 13 November 2009.

This transaction covers only the North American CDMA business and as such the modest EMEA CDMA business is excluded from the scope of the transaction. The EMEA entities, including the Company, will nevertheless rank for a share of the sale consideration.

It should also be noted, that there are several CDMA contracts held by the Company and other EMEA entities. In order to safeguard the position of the EMEA estates, the Joint Administrators have negotiated necessary 'back to back' supply and licence agreements to allow the EMEA estates to run-off their respective CDMA contracts. This will allow the existing contracts to operate as normal until the expiry of the underlying contracts.

### Sale of Enterprise Business

On 21 July 2009, the Group announced that it had entered into a stalking horse asset and share sale agreement with Avaya Inc for its North American, Caribbean and Latin American ("**CALA**") and Asia Pacific Enterprise Solutions business, and an asset sale agreement with Avaya Inc for the EMEA portion of the Enterprise Solutions business, for a total purchase price of US$475 million. The agreements include the sale of substantially all of the assets of the Group's Enterprise Solutions business globally.

The auction of the business commenced on 9 September 2009 in New York at which there was one other bidder. The auction concluded on 14 September 2009 with Avaya declared as the winning bidder at a headline transaction price of US$900 million.

The transaction was subsequently approved by the US and Canadian courts and completed on 18 December 2009.

This transaction will result in the transfer of many jobs and contracts in EMEA. The proceeds will remain in escrow until an allocation process to the individual Group companies has been agreed.

### Sale of MEN Business

The MEN business was marketed for a stalking horse transaction, consisting of the Optical Networking and the Carrier Ethernet businesses. This excluded the MEN Carrier Data and EFA businesses which are likely to be marketed separately.

The stalking horse sale process was launched in April, led from North America but with heavy involvement by the Joint Administrators' M&A team. A stalking horse bid was announced with Ciena Corporation ("**Ciena**") on 7 October 2009 for headline consideration of US$390 million cash and 10 million shares in the Ciena business. As at the date of the announcement of the stalking horse, Ciena shares opened trading at US$13 per share thus indicating a total headline value of US$520 million (being US$390 million cash plus shares worth US$130 million at close of business on 6 October 2009).

The subsequent auction of the businesses commenced on 20 November 2009 in New York, at which there was one other bidder. Following three days of negotiation, the auction concluded with Ciena declared as the winning bidder at a cash price of US$530 million plus a convertible note for a principal amount of US$239 million – a total consideration of US$769 million.

This transaction was subsequently considered and approved at a joint hearing of the Canadian court and US Bankruptcy court on 2 December 2009. As at the date of this report, Ciena have

**ΞJ ERNST & YOUNG**

already achieved US and Canadian antitrust clearance, which is an important factor in achieving a closure of the transaction.

There are approximately 2,300 Nortel employees in-scope for the transaction globally, of which 325 are based in EMEA. These positions will transfer to the purchaser.

### *Sale of GSM / GSM-R Business*

The GSM business is a global business with c.30% of revenues generated in EMEA (mainly in France and other mainland European countries) and includes the EMEA GSM-R (railway) business (c.15% of the global revenues).

The Group had attempted to obtain expressions of interest for the business through the stalking horse process with limited success. As a result, the decision was taken to seek expressions of interest through a 'naked auction' process (an auction conducted without a stalking horse bidder). It was ultimately necessary to extend the date of the auction until 24 November 2009 to allow more time for bids to be submitted.

The auction commenced on 24 November 2009 in New York and concluded with a joint bid from Kapsch CarrierCom AG ("**Kapsch**") and Telefonaktiebolaget LM Ericsson ("**Ericsson**") declared as the winning bid at a headline price of US$103 million. This is a good outcome for the GSM business, preserving approximately 680 jobs across the Group and including all in-scope EMEA employees.

This transaction was subsequently considered and approved at a joint hearing of the Canadian court and US Bankruptcy court on 2 December 2009.

### Sale of CVAS Business

Nortel entered into a stalking horse sale agreement with Genband Inc. ("**Genband**") on 22 December 2009 for a headline purchase price of US$282 million. In order to finance the transaction, Genband has teamed with one of its existing major shareholders, One Equity Partners III, L.P. ("**OEP**"). OEP manages investments and commitments for JP Morgan Chase & Co. in private equity transactions.

The scope of the stalking horse transaction includes the sale of substantially all of the assets of its CALA, Asia, and the EMEA entities. The purchase price, as is typical, is subject to certain working capital purchase price deductions to be applied pursuant to the terms of the sale agreement at the date of closing the transaction which are expected to have a value of approximately US$100 million, which would result in a net purchase price of approximately US$180 million.

The stalking horse transaction is a material milestone for the EMEA entities, securing the transfer of all 314 EMEA CVAS employees, CVAS contracts (subject to a limited exclusion criteria) and associated contractual liabilities. The proceeds from the transaction, as with other deals, will be subject to a global allocation process, the terms of which are yet to be agreed.



An Order setting the bidding procedures for an auction of the CVAS business was passed by the US Bankruptcy Court and the Canadian Court in January 2010. The auction date has been set for 25 February 2010. Any other qualifying bids are likely to be required to be submitted before that date.

**Future Transactions**

Given the integrated nature of the Group's businesses, the Joint Administrators continue to work closely with the North American management team to explore interests from external parties to acquire the remaining businesses of the Group in which the Company has an interest. Opportunities for the sale of other business units, primarily MSS, are currently being evaluated. In addition, the Group has a substantial residual intellectual property portfolio which is currently under review.

### 3.  Trading and Operational Overview

The Company is the largest EMEA entity being engaged in all five of the global businesses. The Company also provides much of the infrastructure and management functions necessary for the EMEA region.

At an entity level, the Company has traditionally traded at an operating loss. This is a consequence of the levels of research and development activity and other overheads incurred on behalf of the wider EMEA region.

Within the Group itself, the Carrier businesses (GSM, CVAS and CDMA) and the MEN business generate an operating profit. In contrast, the Enterprise business generates an operating loss. All businesses have continued to trade since 14 January 2009 in order to achieve global sales of each business.

As a consequence of the filing, and general economic market conditions, customer orders have fallen since 2008. Despite this, the Company achieved a turnover to 30 September 2009 of US$520.6 million and an operating loss of US$52.5 million before professional fees, restructuring costs and transfer pricing receipts. It is typical for trading performance to improve in the second half of a year due to the nature of customer requirements. This trend is continuing despite the global filings.

As a result of the decrease in customer orders, it has been necessary to implement cost saving measures in order to realign the business to reflect current activity levels. Measures include headcount reduction, property restructuring and a reduction in the level of purchase orders, which have all helped long term asset preservation.

As detailed in our previous report, the Group operates a complex transfer pricing scheme. Typically the Company receives a contribution towards its trading losses under this arrangement. Post filing, the Company will receive up to US$96 million from the Group under this arrangement, which will enable the Joint Administrators to recover some of the trading losses incurred for the full year.

The Joint Administrators continue to trade in order to maximise the value of potential business and asset sales, and to reduce the value of termination claims and other contingent liabilities on the Company. The Joint Administrators balance the decision of continuing to trade with its impact on the interests of creditors. The Joint Administrators consider that the potential realisation values from selling the Company's various businesses as going concerns will result in a better return to creditors than if the businesses ceased to trade and the assets of the Company were sold on a break-up basis. This position is closely monitored by the Joint Administrators who continue to maintain a close dialogue with the unsecured creditors committee on the business disposal and ongoing trading strategy.

**ERNST & YOUNG**

### Customers

The Joint Administrators continue to work with the rest of the Group to assess and stabilise its customer base by working 'hand-in-hand' with Group-wide Nortel customer account teams.

The Group's customer base has to a large extent remained loyal and supportive of the restructuring in a global context. The Group has maintained its market presence and won new customer contracts as well as renewing important existing customer relationships, set against continued challenging trading conditions in the market place.

The Joint Administrators continue to work with the Company's management to ensure the ongoing collection of receivables due from its customers in the normal course of business. Where customers have been slow in making payment the Joint Administrators have entered into discussions with the relevant party to resolve any outstanding issues and speed up payment. Where sales of businesses complete, the Joint Administrators will be reviewing options to incentivise certain customers to accelerate payment and thereby ensure collection of pre and post appointment receivables balances on a timely basis.

### Suppliers

Key suppliers continue to be supportive of the restructuring process, which has facilitated the trading strategy being followed by the Joint Administrators. There has been extensive work carried out to ensure continued supply and to advise suppliers of the sale of each of the business units, including the timing and activities required to migrate the businesses.

### Real Estate

Real estate remains a substantial cost element for the Company as a result of being party to several leases with high rental costs. The Joint Administrators continue to negotiate the surrender in whole or part (i.e. of areas or offices within these leasehold properties) in order to reduce the quarterly rent exposure in the Administration.

Since our last report, the Company has now exited eight sites in the UK. A further eight sites remain occupied, of which a lease assignment for one has been included in a sale agreement. The remaining sites continue to be assessed for potential assignments to the purchasers of the businesses, and the Joint Administrators are working closely with these parties in order to reduce rental costs where possible.

### Restructuring Measures

As previously reported, redundancies were made in the first six months of the Administration. No further redundancies have taken place during the period of this Report. It should be noted however, that 95 employees have resigned.

It should also be noted that, upon completion of sales transactions, the majority of employees will transfer to the respective purchasers therefore preserving future employment.

ERNST & YOUNG

**4.   Receipts and Payments Account**

Attached at Appendix 2 is the Joint Administrators' receipts and payments ("**R & P**") account for the period 14 July 2009 to 13 January 2010 for the Company in the UK and the Saudi Arabia branch, which shows total receipts of US$362.1 million, and payments of US$331.1 million. A trading overview is included in Section 3 above.

The Company held cash in various currencies equivalent to US$365.2 million at 13 January 2010. It should be noted that the transfer pricing contributions received to date for 2009, outlined in our previous report and in Section 3 above, are reflected in the R & P.

The R & P account is a statement of cash received and cash paid out and does not reflect estimated future realisations or costs, including proceeds from the sales of businesses held in escrow pending allocation amongst the Group.

For further information, see the detailed notes provided in Appendix 2.

**ᴲ𝙹 ERNST & YOUNG**

**5.  Joint Administrators' Remuneration and Disbursements**

The Joint Administrators' remuneration was fixed on a time-costs basis by the Committee. During the period 1 June 2009 to 6 November 2009 the Joint Administrators incurred time costs of GB£10,192,922, of which GB£7,705,078 has been drawn on account in accordance with the court order dated 28 February 2009.

It is the responsibility of the Committee to approve fees incurred. GB£4,203,797, out of time costs incurred for the period 28 February 2009 to 1 May 2009 has been approved by a resolution passed by the Committee. The Joint Administrators are in the process of seeking approval from the Committee for fees incurred for the period 2 May 2009 to 4 September 2009. An analysis of the time spent is at Appendix 3, which includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

***Payments to Other Professionals***

The Joint Administrators continue to engage the following professional advisors to assist them in the Administration. These professionals work on a time cost basis and internal review processes are undertaken to review their invoices. As at 13 January 2010 the following has been paid:

Herbert Smith LLP – GB£21,079,656 (Legal Advisors)

Legal Counsel – GB£1,344,160 (Legal Advisors)

 **ERNST & YOUNG**

## 6. Other Matters

### *The Committee*

A committee of the unsecured creditors was formed at the creditors' meeting held on 11 March 2009 (the "**Committee**"). The Joint Administrators continue to provide detailed information to the members of the Committee as the Administration progresses and matters evolve (including an analysis of their time costs for approval). The Joint Administrators will continue to keep the Committee appraised of developments.

### *The Prescribed Part*

Section 176A of the Insolvency Act 1986 does not apply to this Administration as there is no qualifying floating charge security, and as such there is no Prescribed Part to be set aside for non preferential creditors.

### *North American Claims Process*

In North America, the Nortel Canadian Companies under the Companies' Creditors Arrangement Act ("CCAA") proceedings and the US Companies in Chapter 11 proceedings had obtained orders approving formal claims processes in each jurisdiction. In both jurisdictions there was a call for claims, including supplier claims, arising prior to 14 January 2009. The bar date set for such claims was 30 September 2009.

The Joint Administrators have now filed protective claims on behalf of the Company and the EMEA Companies in order to preserve any potential claims falling against Group companies in jurisdictions where bar dates were imposed.

Creditors with claims in either of the jurisdictions outlined above should seek separate legal advice in relation to such claims. Further information on the claims process can be found at:

http://www.nortel.com/corporate/restructuring.html

The Joint Administrators will continue to file protective claims on behalf of the Company and the EMEA Companies in jurisdictions where a bar date is imposed.

### *Company Directors' Disqualification Act 1986*

As part of our statutory duties, the Joint Administrators perform a review of the conduct of all Directors of the Company that have held office in the past three years. This review is a statutory requirement and the resulting report has been sent to the Secretary of State at the Department of Trade and Industry and is confidential.



**ERNST & YOUNG**

## 7.  Future Conduct of the Administration

***Purchase Price Allocation ("PPA") – The Business Disposals***

The proceeds from business disposals, which will be placed in a global escrow account on completion, will subsequently be apportioned across the selling companies. The proper allocation of proceeds across each selling entity, including the Company and the EMEA Companies, is a matter of importance not only to the Joint Administrators, but also to the Court-appointed Monitor of Nortel Networks Ltd (the Canadian company) and the Unsecured Creditors' Committee of Nortel Networks Inc (the US company), as fiduciaries responsible in respect of the Chapter 11 proceedings of the US company.

The Joint Administrators, Nortel Networks Ltd and Nortel Networks Inc (together with the Monitor and the legal advisors to the Unsecured Creditors' Committee) have been negotiating a purchase price allocation framework to agree how the respective entitlement of each of the Nortel entities to the proceeds of the business sales will be determined.

The current intention is for the allocation of sale proceeds to be determined by way of an arbitration process to which all entities with a claim to sale proceeds will subject themselves. That arbitration process would involve an arbitration panel of three independent arbiters, of international repute.

It remains possible that the selling estates could reach a consensual allocation agreement regarding purchase price allocation (without the need for recourse to arbitration) or are simply unable to agree on the form of arbitration proceedings.

In the event that it is not possible to agree an arbitration process with the Canadian and US entities, the process for determining allocation of the sale proceeds is likely to be decided by the courts.

Whatever mechanism is used to determine the allocation of sale proceeds, the Joint Administrators are mindful that in the negotiations that take place, it is their duty to act in the best interests of the Company's creditors.

### *Distributions to Creditors*

It remains too early to be precise on the potential quantum or timing of any dividend payment, owing to the ongoing sales processes in relation to the various businesses operated by the Company, and the fact that the formal process of claims admittance/adjudication has not yet commenced.

The Joint Administrators expect to have a better view not only of the value of the asset realisations, but also of the totality of claims, including contingent claims that might rank for dividend, as business disposals complete, contracts of employment transfer to the purchasers, certain customer and supplier contracts novate to the purchasing parties and progress is made in respect of the PPA.

**☰ ERNST & YOUNG**

With respect to the PPA process and recoveries therefrom, which will form an integral element of any dividend to creditors, the Joint Administrators are mindful of the pending arbitration process and the potential to reach a consensual allocation. The Joint Administrators do not believe that it is in the interests of the Company and its creditors to define and circulate a view on an expected recovery level for the Company; such assertion at this time might prejudice the Company's position in any arbitration proceedings or negotiations between selling estates.

However, as previously reported, the disposals are complex and there will be periods of some months between contracting and completion. In addition, the Administration is likely to need to remain in place for some time (possibly 12 months or more for certain Group companies) to provide transitional services to the purchasers.

On the basis the sales processes are expected to complete by mid 2010, it is likely external creditor claims will be called for in 2010. In accordance with the Insolvency Act 1986, the Joint Administrators' will be writing to all known creditors and advertising for claims.

The Joint Administrators do have a statutory power to agree and pay preferential creditors in this matter, and will be attending to this at an earlier stage.

### Administration Extension

The Joint Administrators applied to the Court on 12 January 2010 for extensions of the Administrations of the Company and the other EMEA Companies. I am pleased to report that the extension applications have been successful and the Administrations have been extended for a further 24 months. The Administrations are now due to expire on 13 January 2012.

### Exit Routes from Administration

Certain exit routes set out in the Proposals remain viable options and continue to be explored by the Joint Administrators as mechanisms to agree creditors' claims and distribute assets to creditors once the Administration has been completed. The Joint Administrators will be in a position to provide further information on these exit routes once administration trading has ceased, assets have been realised and administration liabilities settled.



The Joint Administrators will report to you again in six months' time.

Yours faithfully
For Nortel Networks UK Limited (In Administration)



C Hill
Joint Administrator

Enc:    Company information
        Joint Administrators' Receipts and Payments Account
        Summary of Joint Administrators' Time Costs
        Joint Administrators' Policy on Fees and Disbursements
        Form 2.24B Administrators' Progress Report

*For the Companies listed below, The Institute of Chartered Accountants in England and Wales in the UK authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants in the UK authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

*Nortel Networks SA was placed into French liquidation judiciaire on 28 May 2009. The business and assets of the company that are situated in France are now under the control of an administrateur judiciaire.*

## Appendix 1

## Nortel Networks UK Limited (In Administration)

### Company Information

| | |
|---|---|
| Registered number: | 3937799 |
| Company name: | Nortel Networks UK Limited |
| Registered office address | Maidenhead, Office Park, Westacott Way, Maidenhead, Berkshire, SL6 3QH, UK |
| Previous names: | Nortel Networks Holdings Limited<br>Nortel Networks Holdings plc |

### Details of the Administrators and of their appointment

| | |
|---|---|
| Administrators: | AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London, SE1 2AF |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors. |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 536 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly. |

### Statement Concerning the EC Regulation on Insolvency Proceedings 2000

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

**Share Capital**

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | Number | £ | Number | £ |
| Ordinary | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 |

**Shareholder**

Nortel Networks Limited - 100%

**Directors (current and for the last three years) and company secretary (current)**

| Name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| Bill LaSalle | Director | 01/10/2001 | 23/05/2008 | |
| Geoff Lloyd | Director | 01/02/2002 | 17/03/2006 | - |
| Christian Waida | Director | 17/12/2004 | 08/12/2008 | - |
| Henry Birt | Director | 01/09/2005 | 31/03/2007 | - |
| Peter Currie | Director | 01/09/2005 | 10/04/2007 | - |
| Sharon Rolston | Director | 01/04/2006 | - | - |
| Simon Freemantle | Director | 31/03/2007 | - | - |
| Nir Elbaz | Secretary | 17/12/2008 | - | - |

# Summary of Nortel Group Structure



The EMEA Companies in English administration proceedings:

| *Legal Entity* | *Country of Incorporation* |
| --- | --- |
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

## Appendix 2

## Nortel Networks UK Limited (In Administration)

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2009 to 13 January 2010**

| Currency: USD | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---:|---:|---:|
| Opening balance | 338,622,958 | - | 338,622,958 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Post appointment sales | 127,722,670 | 155,327,815 | 283,050,485 |
| - Intercompany | 76,522,188 | 195,540,540 | 272,062,728 |
| - Property income | 1,623,241 | 1,056,070 | 2,679,311 |
| - Other receipts | 450,579 | 451,284 | 901,863 |
| *Other:* | | | |
| - Pre appointment sales | 82,580,000 | 16,381,782 | 98,961,782 |
| - FX translation movement | 42,263,155 | (7,574,574) | 34,688,581 |
| - Bank interest | 1,088,526 | 828,135 | 1,916,661 |
| | 332,250,358 | 362,011,052 | 694,261,411 |
| **Payments** | | | |
| *Trading:* | | | |
| - Accounts payable - Inventory related | (169,895,702) | (158,744,602) | (328,640,305) |
| - Payroll, employee benefits, and payroll taxes | (82,513,236) | (73,941,431) | (156,454,667) |
| - Property costs | (15,430,052) | (15,973,711) | (31,403,763) |
| - Other taxes | (13,658,787) | (13,669,258) | (27,328,045) |
| - Other payments | (9,599,248) | (6,933,918) | (16,533,166) |
| - Trade payables | (8,652,726) | (301,897) | (8,954,622) |
| - Pension contributions | (4,146,123) | (4,674,704) | (8,820,827) |
| - Utilities | (2,504,653) | (4,276,559) | (6,781,212) |
| - Contractors | (2,052,190) | (1,347,952) | (3,400,143) |
| *Other:* | | | |
| - Legal fees | (7,668,284) | (28,270,409) | (35,938,693) |
| - Joint Administrators' fees and disbursements | (16,487,245) | (18,718,972) | (35,206,217) |
| - Other professional services costs | (2,735,246) | (3,276,823) | (6,012,069) |
| - FX translation movement on FX transactions within the entity | (3,314,420) | (475,297) | (3,789,717) |
| - Restructuring costs | (1,502,842) | (11,263) | (1,514,105) |
| - Bank charges and interest | (211,764) | (191,797) | (403,562) |
| - Capital expenditure | (166,764) | (6,947) | (173,711) |
| | (340,539,282) | (330,815,541) | (671,354,823) |
| **Closing balance** | 330,334,035 | | 361,529,546 |
| **Account reconciliations:** | | | |
| Current accounts | 33,317,147 | | 29,445,022 |
| Local deposit accounts | - | | - |
| Administration deposit accounts | 297,016,887 | | 332,084,524 |
| | 330,334,035 | | 361,529,546 |

# Nortel Networks UK Limited (In Administration)

## Joint Administrators' Abstract of Receipts and Payments
## from 14 July 2009 to 13 January 2010

| Currency: GBP | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| Opening balance | 236,900,621 | - | 236,900,621 |
| Receipts | | | |
| *Trading:* | | | |
| - Post appointment sales | 85,048,017 | 95,863,966 | 180,911,983 |
| - Intercompany | 51,003,923 | 122,958,888 | 173,962,811 |
| - Property income | 1,080,884 | 631,570 | 1,712,455 |
| - Other receipts | 300,666 | 275,780 | 576,446 |
| *Other:* | | | |
| - Pre appointment sales | 55,173,350 | 8,078,166 | 63,251,516 |
| - Bank interest | 724,871 | 500,159 | 1,225,030 |
| | 193,331,710 | 228,308,530 | 421,640,240 |
| Payments | | | |
| *Trading:* | | | |
| - Accounts payable - Inventory related | (113,470,875) | (96,577,530) | (210,048,404) |
| - Payroll, employee benefits, and payroll taxes | (54,934,480) | (45,061,956) | (99,996,436) |
| - Property costs | (10,272,903) | (9,798,498) | (20,071,401) |
| - Other taxes | (9,093,475) | (8,372,938) | (17,466,412) |
| - Other payments | (6,396,923) | (4,170,241) | (10,567,164) |
| - Trade payables | (5,766,578) | 43,291 | (5,723,287) |
| - Pension contributions | (2,760,346) | (2,877,397) | (5,637,744) |
| - Utilities | (1,668,110) | (2,666,073) | (4,334,183) |
| - Contractors | (1,368,297) | (804,943) | (2,173,240) |
| *Other:* | | | |
| - Joint Administrators' fees and disbursements | (10,976,642) | (11,525,060) | (22,501,701) |
| - Legal fees | (5,104,789) | (17,864,565) | (22,969,355) |
| - FX translation movement | 1,743,716 | (7,298,203) | (5,554,487) |
| - Other professional services costs | (1,823,896) | (2,018,691) | (3,842,587) |
| - FX translation movement on FX transactions within the entity | (2,256,623) | (245,423) | (2,502,046) |
| - Restructuring costs | (1,003,443) | 35,717 | (967,725) |
| - Bank charges and interest | (141,088) | (116,845) | (257,934) |
| - Capital expenditure | (111,026) | - | (111,026) |
| | (225,405,778) | (209,319,354) | (434,725,133) |
| Closing balance | 204,826,553 | | 223,815,729 |
| Account reconciliations: | | | |
| Current accounts | 20,658,593 | | 18,228,826 |
| Local deposit accounts | - | | - |
| Administration deposit accounts | 184,167,959 | | 205,586,903 |
| | 204,826,553 | | 223,815,729 |

## Receipts and payments comments

**Notes to R & P**

### *Note 1*

Account balances have all been converted into a local currency, Sterling, in addition to a common currency across all entities, USD.

Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2009 month end spot rates which have been provided by the Company.  This approach is in line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts over the course of the reporting period have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

### *Note 2*

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

### *Note 3*

All items within the Receipts & Payments analysis are recorded gross of VAT where applicable.

### *Note 4*

All amounts referred to are in US$ unless stated otherwise.


**RECEIPTS**

There was cash on appointment held in Euro, US$, Sterling and Canadian dollar current and deposit accounts which totalled $338.6 million.

Total receipts since 13 July 2009 total $362.0 million. This primarily relates to intercompany receipts and pre and post appointment sales receipts.

### *Intercompany receipts*

Intercompany receipts received since 13 July 2009 total $195.5 million.  $67.4 million of this amount relates to transfer pricing receipts received from other Nortel EMEA filed entities in accordance with the Interim Funding Settlement Agreement.

In addition, the balance relates to net receipts collected through the Citinetting process (majority of funds received from Nortel (Ireland) Limited) and payments to reimburse Nortel Networks Limited and Nortel Networks Inc for payments made to Flextronics and other global business costs.

In addition, $10.0 million has been received from Nortel's Asia Pacific companies in respect of pre-filing intercompany balances.

### Sales receipts

Pre appointment sales receipts relate to amounts collected against balances outstanding at the date of appointment. Since 13 July 2009, an amount of $16.0 million has been collected, bringing total collections to $98.6 million.

Post appointment sales receipts collected since 13 July 2009 total $213.6 million.  There remains an outstanding balance on the post appointment sales ledger of $ 54.2 million as at 13 January 2009.

### Property income

Property income collected since 13 July 2009 totals $1.1 million.  This relates to rental receipts and service charges on sites in Harlow, Maidenhead and Welwyn Garden City.

Property income in the period to 13 July 2009 has been restated from nil to $1.6 million, following a reclassification of this income from post appointment sales receipts to property income.

### Foreign exchange translation movement

The total FX translation movement to 13 January 2009 is a result of the appreciation of the sterling against USD. The translation movement shown since 13 July 2009 is simply the difference between the FX gain/loss for the total period and that for the period to 13 July 2009. As such the interim FX translation movement does not represent a true FX translation gain for the period.


## PAYMENTS

Total payments made since 13 July 2009 total $330.8 million. This primarily relates to inventory purchases and payroll related costs.

### Accounts payable – inventory related

The accounts payable inventory related payments since 13 July 2009 total $158.7 million. Flextronics continues to be the major supplier of inventory to NNUK.

### Payroll

Payroll costs since 13 July 2009 total $73.9 million and include net pay in addition to employee expenses, employee benefits and payroll taxes.

## Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments**
**from 14 July 2009 to 13 January 2010**

| Currency: USD | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| Opening balance | 2,554,345 | - | 2,554,345 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Other receipts | - | - | - |
| *Other:* | | | |
| - Pre appointment sales | 1,749,361 | 134,879 | 1,884,240 |
| - Bank interest | 30,236 | 873 | 31,109 |
| - FX translation movement | 1,878 | 536 | 2,414 |
| | 1,781,475 | 136,288 | 1,917,763 |
| **Payments** | | | |
| *Trading:* | | | |
| - Trade payables | (229,736) | 21 | (229,715) |
| - Payroll, employee benefits, and payroll taxes | (44,478) | (150,351) | (194,830) |
| - Other taxes | (98,585) | (5,724) | (104,308) |
| - Other professional services costs | (23,243) | (40,381) | (63,624) |
| - Property costs | - | (57,407) | (57,407) |
| - Utilities | (21,291) | (30,933) | (52,224) |
| - Other payments | (27,960) | (17,055) | (45,015) |
| - Contractors | - | (29,343) | (29,343) |
| - Intercompany | (3,015) | 180 | (2,835) |
| *Other:* | | | |
| - Bank charges and interest | (349) | (378) | (726) |
| - FX translation movement on FX transactions within the entity | - | (507) | (507) |
| | (448,657) | (331,877) | (780,534) |
| Closing balance | 3,887,163 | | 3,691,574 |
| Account reconciliations: | | | |
| Current accounts | 820,723 | | 44,419 |
| Local deposit accounts | 31,420 | | 31,491 |
| Administration deposit accounts | 3,035,020 | | 3,615,664 |
| | 3,887,163 | | 3,691,574 |

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

## Joint Administrators' Abstract of Receipts and Payments
## from 14 July 2009 to 13 January 2010

| Currency: SAR | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| Opening balance | 9,585,178 | - | 9,585,178 |
| Receipts | | | |
| *Trading:* | | | |
| - Other receipts | - | - | - |
| *Other:* | | | |
| - Pre appointment sales | 6,558,735 | 506,849 | 7,065,584 |
| - Bank interest | 113,267 | 3,291 | 116,558 |
| - FX translation movement | (11,627) | 152 | (11,475) |
| | 6,660,375 | 510,292 | 7,170,667 |
| Payments | | | |
| *Trading:* | | | |
| - Trade payables | (860,923) | - | (860,924) |
| - Payroll, employee benefits, and payroll taxes | (166,617) | (563,301) | (729,918) |
| - Other taxes | (369,300) | (21,485) | (390,785) |
| - Other professional services costs | (87,069) | (151,295) | (238,364) |
| - Property costs | - | (215,073) | (215,073) |
| - Utilities | (79,758) | (115,897) | (195,655) |
| - Other payments | (104,737) | (63,907) | (168,645) |
| - Contractors | - | (109,931) | (109,931) |
| - Intercompany | 2,080 | 16 | 2,096 |
| *Other:* | | | |
| - Bank charges and interest | (1,308) | (1,418) | (2,726) |
| - FX translation movement on FX transactions within the entity | - | 248 | 248 |
| | (1,667,630) | (1,242,044) | (2,909,674) |
| Closing balance | 14,577,923 | | 13,846,171 |
| Account reconciliations: | | | |
| Current accounts | 3,077,876 | | 166,604 |
| Local deposit accounts | 118,116 | | 118,116 |
| Administration deposit accounts | 11,381,931 | | 13,561,452 |
| | 14,577,923 | | 13,846,171 |

## Receipts and payments comments

**Notes to R & P**

### Note 1

Account balances have all been reported in a local currency, SAR, in addition to a common currency across all entities, US$.

Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2009 month end spot rates which have been provided by the Company.  This approach is in line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts have been converted at average spot rates for the period 14 January 2009 to 13 January 2010, which have been sourced from the foreign exchange website Oanda.

Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates. These are translation movements only and do not reflect an actual receipt or payment.

### Note 2

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited.  Material items have been reviewed for accuracy and reasonableness.

### Note 3

All items within the Receipts & Payments analysis are recorded gross of sales tax where applicable.

### Note 4

All amount referred to are in US$ unless stated otherwise.

### Note 5

The receipts and payments to 13 July 2009 have been restated to remove the previous double count of "other receipts" which was later identified as having been accounted for in the opening balance. This restatement has the effect of reducing the closing balance by $68,000.

### RECEIPTS

On appointment $2.6 million in cash was held in SAR current accounts.

During the period 14 July 2009 to 13 January 2010 receipts totalling $136,000 have been received.  This predominantly relates to pre appointment sales receipts.

### Sales receipts

Pre appointment sales receipts relate to amounts collected against balances outstanding at the date of appointment. Since 13 July 2009, an additional $135,000 has been collected bringing total collections to $1.9 million.

## PAYMENTS

Total payments of $332,000 have been made since 13 July 2009. This primarily relates to payroll costs, property costs and other professional service costs.

### Payroll

Payroll costs since 13 July 2009 total $150,000. $112,000 of this value relates to social insurance tax repayments for two employees who were not correctly registered when they commenced employment and as a consequence had not been paying the required income tax. The remaining payroll amount of $38,000 relates to net pay and employee expenses.

### Property

Property costs since 13 July 2009 total $57,000. This relates to rental payments for the Riyadh property which is to be vacated on 31 January 2010 and the deposit for the new offices.

### Other professional services

Other professional services costs since 13 July 2009 total $40,000. These payments primarily relate to BDO for their ongoing account management services.

### Contractors

Contractor costs since 13 July 2009 total $29,000. This primarily relates to payments to Baud Telecom Company for technical support.

## Appendix 3

## Nortel Networks UK Limited (In Administration)

**Summary of Joint Administrators' time costs from 1 June 2009 to 6 November 2009 (GB£)**
**Excluding core M&A transaction time**

| Activity | Partner / Executive Director | Director | Assistant Director | Manager | Executive | Analyst | Total sum of hours | Average hourly rate | Time costs for period | Time costs for the Adminstration to date |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Rank | | | | | | | |
| Finance, Accounting & Administration | 10.0 | 0.9 | 903.6 | 948.5 | 2,139.1 | 1,249.4 | 5,251.5 | 292.77 | 1,537,494.00 | 2,749,703.50 |
| Trading | 6.5 | 102.7 | 147.8 | 1,098.2 | 909.5 | 344.0 | 2,608.7 | 318.16 | 829,990.50 | 1,992,712.00 |
| Employees | 162.9 | 91.1 | 210.0 | 1,104.7 | 90.1 | 8.0 | 1,666.8 | 336.56 | 560,975.50 | 1,353,754.50 |
| Creditors | 32.7 | 24.1 | 683.1 | 729.1 | 139.8 | 46.3 | 1,655.1 | 317.61 | 525,680.00 | 1,224,634.50 |
| Suppliers | 47.6 | 36.5 | 58.4 | 805.7 | 405.9 | 322.6 | 1,676.7 | 312.91 | 524,663.50 | 1,895,229.42 |
| Canada / USA | 583.9 | 19.6 | 55.7 | 33.5 | - | - | 692.7 | 664.48 | 460,287.50 | 881,488.50 |
| UK Tax / VAT advisory and compliance | 46.5 | 76.3 | 111.8 | 171.9 | 230.5 | 23.6 | 660.6 | 555.34 | 366,855.50 | 983,591.00 |
| Customers | 20.8 | 216.0 | 45.0 | 403.9 | 182.3 | 2.5 | 870.5 | 398.56 | 346,944.50 | 1,005,504.00 |
| Statutory | 88.9 | 20.1 | 27.2 | 342.9 | 62.0 | 534.6 | 1,075.7 | 286.24 | 307,909.00 | 688,789.50 |
| Property | 11.0 | 182.9 | 375.8 | 3.0 | 8.5 | 11.5 | 592.7 | 507.00 | 300,500.00 | 567,728.00 |
| Case management | 30.7 | 73.0 | 45.8 | 150.1 | 382.6 | 183.3 | 865.5 | 235.82 | 204,106.00 | 708,139.50 |
| Creditors' Committee | 47.8 | 52.9 | 34.4 | 70.4 | 202.7 | 22.8 | 431.0 | 342.78 | 147,738.50 | 296,043.00 |
| Strategy | 129.8 | 26.5 | 40.0 | 22.0 | - | - | 218.3 | 591.83 | 129,196.00 | 419,869.50 |
| Transfer Pricing | 40.6 | 8.5 | 129.5 | 15.0 | 27.0 | 7.5 | 228.1 | 555.25 | 126,651.50 | 422,333.50 |
| Legal | 37.5 | 21.8 | 3.5 | 3.3 | 2.3 | 485.8 | 554.2 | 202.55 | 112,254.50 | 229,368.00 |
| Debtors | 35.8 | 27.1 | 6.9 | 7.5 | 117.1 | - | 194.4 | 393.75 | 76,545.50 | 410,964.00 |
| Investigations | 0.5 | - | 15.6 | 33.3 | 150.1 | 97.5 | 297.0 | 224.25 | 66,602.00 | 370,039.00 |
| Branches & equity interests | 7.0 | 35.3 | 16.5 | 80.4 | 14.0 | 5.3 | 158.5 | 415.38 | 65,838.00 | 241,901.89 |
| Liaising Directors | 45.5 | 46.5 | 3.9 | - | - | - | 95.9 | 614.97 | 58,976.00 | 156,743.00 |
| Treasury / Banks | 4.0 | 7.3 | - | 42.0 | 22.5 | 118.1 | 193.9 | 263.09 | 51,013.00 | 207,867.50 |
| Pensions | 45.6 | - | 9.7 | 46.5 | - | - | 101.8 | 469.03 | 47,747.50 | 128,290.50 |
| PR / Media | 6.5 | 25.3 | 5.0 | 13.0 | - | - | 49.8 | 486.97 | 24,251.00 | 52,266.00 |
| Briefing EMEA | - | - | - | 58.4 | - | - | 58.4 | 360.00 | 21,024.00 | 131,934.00 |
| Intra Group & Netting | 17.0 | 1.0 | - | - | - | - | 18.0 | 664.44 | 11,960.00 | 30,040.00 |
| Administration application and planning | - | - | - | - | - | - | - | - | - | 172,741.40 |
| Stablisation | - | - | - | - | - | - | - | - | - | 147,931.00 |
| Retention of title | - | - | - | - | - | - | - | - | - | 1,970.00 |
| **Grand Total** | **1,459.1** | **1,095.4** | **2,929.2** | **6,183.3** | **5,086.0** | **3,462.8** | **20,215.8** | **341.57** | **6,905,203.50** | **17,471,576.72** |
| | | | | | | | | | | |
| Average hourly rate | 694.24 | 593.83 | 456.85 | 341.47 | 246.32 | 155.76 | | | | |
| Time costs for the period | 1,012,961.50 | 650,482.50 | 1,338,217.00 | 2,111,400.00 | 1,252,779.00 | 539,363.50 | | | | |
| Time costs for the Administration to date | 2,692,063.04 | 1,432,812.34 | 4,284,236.54 | 5,019,217.37 | 2,941,208.49 | 1,102,038.94 | | | | |

## Administration fee analysis (in GB£)

## Summary of total core M&A transactions time costs for all EMEA filed entities from 1 June 2009 to 6 November 2009

| Activity | Partner / Executive Director | Director | Assistant Director | Manager | Executive | Analyst | Total hours | Average hourly rate | Time costs for the period | Time costs for the Administration to date |
|---|---|---|---|---|---|---|---|---|---|---|
| M&A / Transitional Services | 22.5 | 111.1 | 2,042.2 | 1,890.5 | 1,333.5 | 449.5 | 5,849.3 | 428.41 | 2,505,925.00 | 3,243,091.00 |
| M&A / Equinox | 555.4 | 1,186.0 | 662.1 | 509.8 | 611.2 | 156.8 | 3,681.3 | 517.28 | 1,904,263.00 | 3,640,865.50 |
| M&A / Netas | 86.4 | 74.3 | 535.4 | 243.5 | 1,063.0 | 236.5 | 2,239.1 | 351.59 | 787,249.00 | 963,939.00 |
| M&A Snow | 97.4 | 295.4 | 403.9 | 502.0 | 41.9 | 87.8 | 1,428.4 | 464.30 | 663,200.00 | 762,210.50 |
| M&A / GSM | 321.5 | 126.2 | 215.2 | 7.0 | 467.3 | 10.0 | 1,147.2 | 446.06 | 511,716.00 | 693,291.00 |
| Purchase Price Allocation(PPA) | 67.0 | 124.0 | 69.0 | 252.0 | 109.0 | 107.9 | 728.9 | 391.97 | 285,704.00 | 285,704.00 |
| M&A / Carrier | 39.1 | 22.1 | 164.9 | 445.0 | 70.3 | 57.5 | 798.9 | 346.16 | 276,548.50 | 328,086.50 |
| Other Assets | 43.1 | 21.6 | 13.0 | 97.5 | - | 41.0 | 216.2 | 372.14 | 80,456.50 | 93,138.50 |
| M&A / Velocity | 5.0 | 6.5 | 11.2 | - | 19.8 | - | 42.5 | 517.81 | 22,007.00 | 47,535.50 |
| Sale and M&A | - | - | - | - | - | - | - | - | - | 764,968.50 |
| **Grand Total** | **1,237.4** | **1,967.2** | **4,116.9** | **3,947.3** | **3,716.0** | **1,147.0** | **16,131.8** | **436.22** | **7,037,069.00** | **10,822,830.00** |
| | | | | | | | | | | |
| Average hourly rate | 692.91 | 644.47 | 549.47 | 368.23 | 269.64 | 169.31 | | | | |
| Time costs for the period | 857,408.50 | 1,267,811.00 | 2,262,122.50 | 1,453,531.50 | 1,001,991.50 | 194,204.00 | | | | |
| Time costs for the Administration to date | 1,483,719.50 | 1,992,883.50 | 3,611,265.50 | 2,095,921.00 | 1,436,013.00 | 203,027.50 | | | | |

## Total time costs for the Administration from 1 June 2009 to 6 November 2009

| Time costs for the administration during the period 01/06/09 to 06/11/09 | £ |
|---|---|
| Administration time costs excluding transactions | 6,905,203.50 |
| Provisional estimated core M&A transaction time costs (Note) | 3,287,718.64 |
| **Total time costs for administration** | **10,192,922.14** |

## Note

Time costs in respect of transactions for the period 1 June 2009 to 9 November 2009 have been apportioned on a provisional basis, having regard to the nature of the work done and the extent of progress made in respect of some, but not all, core M&A transactions. The allocation is provisional and will change as the transactions progress and the outcome of the PPA is clear.

Please note the Joint Administrators have only apportioned core M&A transactions time costs in respect of those transactions that have made sufficient progress. Therefore further core M&A transactions time costs will be apportioned in due course to the Company, and reapportioned as the outcome of the PPA process becomes clear.

## Nortel Networks UK Limited (In Administration)

***Office Holders' Charging Policy for Fees***

The statutory provisions relating to remuneration are set out in Rule 2.106 of the Rules. Further information is given in the Association of Business Recovery Professionals' publication "*A Creditors' Guide to Administrators' Fees*", a copy of which may be accessed from the web site of the Insolvency Practitioners Association at http://www.insolvency-practitioners.org.uk (follow 'Regulation and Guidance' then 'Creditors' Guides to Fees'), or is available in hard copy upon written request to the Administrators.

The creditors have determined that the Administrators' remuneration should be fixed on the basis of time properly spent by the Administrators and their staff in attending to matters arising in the Administration.

The Administrators have engaged managers and other staff to work on the cases.  The work required is delegated to the most appropriate level of staff taking account of the nature of the work and the individual's experience. Additional assistance is provided by accounting and treasury executives dealing with the Company's bank accounts and statutory compliance diaries, secretaries providing typing and other support services and filing clerks. Work carried out by all staff is subject to the overall supervision of the Administrators.

All time spent by staff working directly on case-related matters is charged to a separate time code established for each case. Each member of staff has a specific hourly rate, which is subject to change over time. The average hourly rate for each category of staff over the period is shown in Appendix 2, as are the current hourly rates used. The current hourly rates may be higher than the average rates, if hourly rates have increased over the period covered by this report.

***Office Holders' Charging Policy for Disbursements***

Statement of Insolvency Practice No. 9 ("**SIP 9**") published by R3 (The Association of Business Recovery Professionals) divides disbursements into two categories.

Category 1 disbursements comprise payments made by the office holders' firm, which comprise specific expenditure relating to the administration of the insolvent's affairs and referable to payment to an independent third party. These disbursements can be paid from the insolvent's assets without approval from the Committee. In line with SIP 9, it is our policy to disclose such disbursements drawn but not to seek approval for their payment.

Category 2 disbursements comprise payments made by the office holders' firm which include elements of shared or overhead costs. Such disbursements are subject to approval from Creditors' Committee as if they were remuneration. It is our policy, in line with SIP 9, to seek approval for this category of disbursement before they are drawn.

Rule 2.47                                                                                    Form 2.24B

The Insolvency Act 1986
**Administrator's progress report**

# 2.24B

| Name of Company | Company number |
|---|---|
| Nortel Networks UK Limited | 3937799 |

| In the | Court case number |
|---|---|
| High Court of Justice of England and Wales, Chancery Division, Companies Court | 536 of 2009 |

(a) Insert full name(s) and address(es) of administrator(s)

I / We (a) <u>AR Bloom, CJW Hill, SJ Harris and AM Hudson</u>
<u>Ernst & Young LLP, 1 More London Place, London, SE1 2AF</u>

administrator(s) of the above company attach a progress report for the period

| From | to |
|---|---|
| (b)     <u>14 July 2009</u> | (b)     <u>13 January 2010</u> |

(b) Insert date

Signed

Joint / Administrator(s)

Dated     <u>12 February 2010</u>

---

**Contact Details:**

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record

| Chris Coley | |
|---|---|
| Ernst & Young LLP, 1 More London Place, London, SE1 2AF | |
| | Tel: 0121 535 2394 |
| DX Number: | DX Exchange: |

Companies House receipt date barcode

When you have completed and signed this form please send it to the Registrar of Companies at:
**Companies House, Crown Way, Cardiff, CF14 3UZ**          **DX 33050 Cardiff**