**EXHIBIT 4**

CITATION: Nortel Networks Corporation (Re), 2011 ONSC 1091
COURT FILE NO.: 09-CL-7950
DATE: 20110217

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:** IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:** MORAWETZ J.

**COUNSEL:** Alan Mark, Derrick Tay, and Tony Reyes, for Nortel Networks Corporation et al.

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Barry Wadsworth, for the CAW-Canada

Sharon Kour, for Morneau Sobeco, Plan Administrator

Arthur Jacques, for the Nortel Continuing Canada Employees

Alex MacFarlane, for the Official Committee of Unsecured Creditors

Kevin Zych, for the Nortel Notcholder Group

Lyndon Barnes, for the Board of Directors of Nortel

Mark Zigler, for the Former and Disabled Employees

Andrew Gray, for Nortel Networks Inc. and Chapter 11 Debtors

M. Starnino, for the Pension Benefits Guarantee Fund

M. P. Gottlieb and R. Schwill, for the Joint Administrators of Nortel Networks (UK) Limited

**HEARD &**
**DECIDED:** JANUARY 14, 2011

**REASONS:** February 17, 2011

## **ENDORSEMENT**

[1]     The motion was heard on January 14, 2011. At the conclusion of argument, the motion was granted with reasons to follow. These are the reasons.

[2]     Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") brought this motion for an order granting an "EMEA Claims Procedure Order".

[3]     By way of background, on January 14, 2009, Nortel Networks (UK) Limited ("NNUK") and certain subsidiaries of the Nortel Group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators from the High Court of England and Wales under the *Insolvency Act 1986*. These debtors, together with Nortel Networks Israel (Sales and Marketing) Limited, are defined in the proposed EMEA Claims Procedure Order as the "EMEA Companies", and are listed on Schedule "A" to the proposed draft order.

[4]     On July 30, 2009, the "2009 Claims Procedure Order" was granted, establishing a process for the proving of "Claims".

[5]     Certain categories of claims were excluded from the definition of "Claims" as defined in the 2009 Claims Procedure Order; among the excluded categories of claims were inter-company claims.

[6]     A Claims Resolution Order was granted on September 16, 2010, establishing the resolution process for "Claims" as defined in the 2009 Claims Procedure Order. The Claims Procedure Order did not establish resolution procedures for inter-company claims.

[7]     The Applicants are of the view that some of the largest claims to be filed in these proceedings will be inter-company claims, and among the largest inter-company claims are likely to be claims of the EMEA Companies ("EMEA Claims"). In addition, the Applicants are of the view that some of the EMEA Claims against some of the Applicants will likely be based on alleged facts and liabilities similar to those already asserted against NNC and NNL pursuant to the 2009 Claims Procedure Order.

[8]     The Applicants are of the view that it is appropriate to implement a "call for claims" procedure that will require the EMEA Companies to file their claims by a specified date, and to establish a process for the proving and resolution of the EMEA Claims.

[9]     The Applicants' stated intention is to establish a claims process that will ensure that the most significant claims against the Applicants can be dealt with in an orderly process, to avoid future delays in the administration of the Canadian estates, and delays in determining claims for voting and distribution purposes.

[10]    The Monitor filed its 58th Report and its Supplemental 58th Report in support of the relief sought by the Applicants.

[11]   Counsel to the Nortel Bondholder Group, the Unsecured Creditors' Committee, the Former and Disabled Employees, the Pension Benefit Guarantee Fund, the NCCE, the CAW, Morneau Sobeco, and the Board supported the motion. The motion was opposed by the Joint Administrators of NNUK.

[12]   Nortel has sold substantially all of its operating businesses in the course of insolvency proceedings in Canada, England and the United States. The proceeds are being held in escrow pending determination of how they are to be allocated among the various Nortel Companies. The EMEA Companies claim a significant entitlement to those proceeds. In addition, counsel submits that the EMEA Companies have significant inter-company claims against the Applicants. Counsel submits that the EMEA Claims and their claims for entitlement to the sale proceeds are inextricably intertwined and complex.

[13]   Counsel to the Joint Administrators further submitted that the proposed process is premature and flawed and that any effort to determine and resolve inter-company claims must be undertaken in a coordinated procedure that will also determine the proper allocation of the proceeds of the sale of Nortel's assets and businesses as between all the Nortel parties. Further, counsel submits that the determination of the EMEA Claims must be determined in coordinated proceedings, where all of those claims and corresponding claims of set-off and claims over as against other Nortel parties that may arise as a consequence can be determined in an appropriate forum under the appropriate law.

[14]   Counsel to the Joint Administrators also submits that the Interim Funding and Settlement Agreement ("IFSA") (which was entered into among the Applicants, Nortel Networks Inc. and the other U.S. Debtors, the Joint Administrators and the EMEA Companies) specifically contemplates the method for achieving a protocol for resolving the disputes concerning the allocation of the sales proceeds. Counsel further submits that the resolution of disputes concerning the allocation of proceeds will necessarily deal with the same issues as those that will be considered and resolved regarding the EMEA Claims.

[15]   In an effort to settle all outstanding issues, including inter-company claims and allocation of proceeds, the Nortel parties have engaged in a confidential mediation process. Counsel to the Joint Administrators advises that, in accordance with the terms of the mediation, a disclosure exercise was carried out and documents were placed into a central database. However, the use of the documents was limited for the purpose of settlement discussions.

[16]   In summary, counsel submits that the proposed EMEA Claims process is both premature and inapplicable on the basis that:

   (a) the inter-company claims cannot be dealt with separate from or prior to a consideration of the allocation of proceeds;

   (b) pursuant to s. 12.c. of the IFSA, the parties have begun a process of negotiating a protocol for resolving disputes concerning the allocation of proceeds;

   (c) if all issues are not dealt with in a coordinate manner, there will be multiple courts considering the identical issues with the significant risks of inconsistent results.

[17]   Further, they submit that the claims process requested is mainly silent with respect to how issues of jurisdiction, applicable law and the coordination of proceeds will be dealt with and that the proposed claims process does not, in any way, deal with how documentary production is to be made in a context where insufficient documentation has been provided by the Applicants to the EMEA Companies.

[18]   I have not been persuaded by these arguments.

[19]   Section 12.c. of the IFSA references a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions. I am in agreement with the comments of the Monitor that the proposed EMEA Claims Procedure Order does not concern "the allocation of sale proceeds from sale transactions", but rather a process for the calling and resolution of claims that may be advanced by the EMEA Companies against the Applicants. The argument of the Joint Administrators based on section 12.c. of the IFSA is not persuasive.

[20]   With respect to the submission that claims of the EMEA Companies cannot be dealt with separate from or prior to a consideration of the allocation of proceeds, it appears that the linkage between inter-company claims and allocation of proceeds, that is referenced by counsel to the Joint Administrators, may have more to do with achieving maximum leverage in the global distribution negotiations than with the determination of the EMEA Claims. In a claims process, it is reasonable to expect that the Joint Administrators will file what they consider to be the broadest claim allowable and all heads of the claim and the quantum claim will be clearly set out.

[21]   In putting forth the position that a determination of the quantum of the claim cannot be made until the allocation issue is resolved, an indirect question is raised, namely, in formulating the EMEA Claim, will the Joint Administrators be in any way influenced by the allocation process. If the allocation process impacts the methodology to be utilized by the Joint Administrators in the preparation of the EMEA Claim, it follows that the EMEA Claim may not be complete in all respects. In my view, it is not helpful to have an incomplete EMEA Claim.

[22]   If, on the other hand, the objective of the Joint Administrators is to file the broadest claim allowable in these proceedings, I fail to understand why the preparation and submission of that claim has to wait until the allocation process has been resolved.

[23]   Nortel's insolvency proceedings were commenced in January 2009. At this stage, two years later, it is reasonable to expect that the Joint Administrators will have a complete understanding of the basis for filing an EMEA Claim.

[24]   It is also reasonable to expect that there will be a distribution in the CCAA proceedings and, in my view, all meaningful steps to achieve this objective should be implemented. In addition to institutional creditors, it is important to again emphasize that there are thousands of individuals who have claims against Nortel, and for these individuals, time does not stand still.

[25]   The time has come where this matter has to move forward. A full and complete claims process will be required before a distribution in the CCAA proceedings can take place.

[26]   That is not to say that the process issues raised by the Joint Administrators should be ignored. The parties involved in the EMEA Claim are well aware of process issues which

include how claims of set-off are to be dealt with, how documentary production is to be made and the timing of the claims bar date. The Applicants recognize that the EMEA Claim is going to be significant. The process issues raised by the Joint Administrators cannot and should not be ignored.

[27]  Accordingly, the Applicants' motion is granted. The order should reflect that the purpose of the procedure is to fully identify and articulate the EMEA Claims, but the process issues referenced by counsel to the Joint Administrators remain to be addressed. Counsel are to prepare a form of order to give effect to the foregoing. To the extent that there is no agreement over the form of order, counsel should schedule a 9:30 a.m. appointment with me through the Commercial List Office.

_____
MORAWETZ J.

Date: February 17, 2011