**EXHIBIT A**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**SIXTY-EIGHTH REPORT OF THE MONITOR**
**DATED JUNE 3, 2011**

## INTRODUCTION

1. On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to June 30, 2011 by this Honourable Court in its Order dated February 25, 2011.

2. Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an

official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group").  In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel were appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries.  Each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries and affiliates located in EMEA (collectively the "EMEA Debtors") were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (the "English Proceedings").  The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited ("NNIreland"), to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.    Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

- 3 -

7.      Both the CCAA proceedings, in respect of the Applicants, and the English Proceedings, in respect of the EMEA Debtors, have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.      Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdictions in which they are located.

## PURPOSE

9.      The purpose of this Sixty-Eighth Report of the Monitor ("Sixty-Eighth Report") is to update this Honourable Court in respect of:

(a)      certain relief being sought by the Applicants with respect to Nortel Networks de Colombia S.A. ("Nortel Colombia") and its status in connection with the escrow agreement established to hold the sale proceeds of the Metro Ethernet Networks ("MEN") transaction; and

(b)      the settlement of certain matters among Nortel Networks Israel (Sales and Marketing) Limited, Nortel Communications Holdings (1997) Ltd. (collectively, "Nortel Israel"), NNI and NNUK as well as NNL's limited participation in ancillary matters related to the settlement,

and to provide the Monitor's recommendations in respect thereof.

## TERMS OF REFERENCE

10.      In preparing this Sixty-Eighth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.  EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Sixty-Eighth Report.

11.      Unless otherwise stated, all monetary amounts contained herein are expressed in United States dollars.

12.    Capitalized terms not defined in this Sixty-Eighth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous Reports of the Monitor.

13.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.  The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## NORTEL COLOMBIA

14.    Nortel Colombia's operations consisted primarily of distributing Nortel products in Colombia.  It is owned jointly by NN CALA (19.94%) and two of the Applicants: NNL (75.37%) and NNIC (4.69%) (collectively, the "Colombia Shareholders").

15.    On October 7, 2009, the Applicants and certain of their affiliates, including Nortel Colombia (the "MEN Sellers"), entered into an asset sale agreement (as amended and restated from time to time, the "MEN Sale Agreement") for the sale of Nortel's MEN business to Ciena Corporation ("Ciena").  A copy of the MEN Sale Agreement is attached as Appendix "B" to the Twenty-Eight Report of the Monitor dated November 27, 2009.

16.    Pursuant to the terms of the MEN Sale Agreement as well as a Side Agreement among the MEN Sellers dated February 26, 2010, any and all purchase price amounts due by Ciena were to be deposited into an escrow account pending resolution of the allocation of such amounts among the various MEN Sellers. The escrow account was established pursuant to a MEN Distribution Escrow Agreement dated March 19, 2010 among the MEN Sellers, the Monitor, the Committee and J.P. Morgan Chase Bank, N.A., as escrow agent (the "MEN Escrow Agreement"). A copy of the MEN Escrow Agreement, which was approved by this Honourable Court on March 15, 2009, is attached as Appendix "A" hereto. Pursuant to the terms of the MEN Escrow Agreement, amounts can only be released upon a written direction to the escrow agent signed by all of the various "Depositors" thereunder (i.e. the MEN

Sellers) as well as the Monitor and the Committee, or upon the presentation of a binding decision of a relevant dispute resolver under the allocation protocol as contemplated to be negotiated in good faith pursuant to the Interim Funding and Settlement Agreement.

17.     Pursuant to the MEN Sale Agreement, Nortel Colombia transferred to Ciena certain surplus inventory situated in Colombia.   This inventory consisted of product originally shipped to Colombia in 2009 to fulfill a particular contract which as a result of a customer change order became surplus.   The surplus inventory had little or no resale value outside of the MEN transaction and was recorded in Nortel Colombia's financial statements at a zero value at the time of the MEN transaction closing.   On or about March 19, 2010, the MEN Sellers entered into a fifth amendment to the MEN Sale Agreement with Ciena (the "MEN Fifth Amendment") which provided, among other things, that in order to comply with applicable local laws, a certain portion of the MEN Sale proceeds was to be paid directly to Nortel Colombia rather than deposited into the escrow account established pursuant to the MEN Escrow Agreement.   In particular, the Fifth Amendment provides that on or before March 26, 2010, a Colombian affiliate of Ciena ("Ciena Colombia") was to pay to Nortel Colombia an aggregate amount of cash equal to COP221,506,740 (approximately $117,000) (the "Colombia Allocation"), which amount was based upon the duties imposed on the inventory by the Colombian customs authorities when it was imported into Colombia.   A copy of the Fifth Amendment is attached as Appendix "B" hereto. The Fifth Amendment further provides that if additional tangible assets of Nortel Colombia are identified and transferred to Ciena Colombia after closing, Ciena Colombia will pay Nortel Colombia the net book value of those assets and the MEN Sellers (other than Nortel Colombia) will reimburse Ciena for any such payment, including certain associated transaction fees or expenses.

18.     As detailed in the Affidavit of Allan Bifield sworn May 26, 2011, a liquidator was appointed with respect to Nortel Colombia and it commenced liquidation proceedings on April 15, 2010.  As a result of the Colombia Shareholders refusing to indemnify the liquidator for, among other things, significant potential tax liabilities

of Nortel Colombia, the liquidator has now resigned.  As a result, the liquidation remains unfinished and Nortel Colombia continues to exist as a corporate entity, although it has no active business operations or controlling mind.

19.    Resignation of the liquidator has created a significant practical problem with respect to the funds escrowed under the MEN Escrow Agreement insofar as the signatures of all Depositors, including Nortel Colombia, are required to direct a release of funds from escrow.[1]  Although the parties to the MEN Escrow Agreement contemplated that Depositors could be removed as a result of their full liquidation and wind-up, the MEN Escrow Agreement does not contemplate a method for removing a Depositor absent its full liquidation or consent, neither of which is possible in the present circumstances. As a result, the MEN sale proceeds are effectively "stuck" within the escrow account.

20.    Pursuant to the terms of the MEN Side Agreement, the various Nortel parties have agreed that certain transaction costs related to the MEN transaction would be paid directly from the MEN sale proceeds. These include, among other things, the fees of Lazard in relation to the MEN transaction as well as the reimbursement to NNL of significant expenses incurred in having carve-out financial statements prepared in connection with the MEN transaction.  In the absence of a mechanism to deal with the issue described above, these amounts (along with any other amounts that will need to be paid at appropriate times in the future) cannot presently be paid from escrow.

21.    The Applicants seek this Honourable Court's intervention to assist in remedying this issue. As noted above, Nortel Colombia has already received payments for the transfer of its inventory. Further, the vast majority of the MEN sale proceeds will remain in escrow pending resolution of the allocation dispute and the remedy proposed by the Applicants and the U.S. Debtors would not prejudice Nortel Colombia's entitlement, if any, to a share of those proceeds.

---

[1] Or the decision of a dispute resolver, which, for the reasons noted in the Sixty-Seventh Report, is exceedingly unlikely to occur.

22.     The relief sought also deals with the practical reality that any other steps in respect of the MEN Escrow Agreement requiring the consent or participation of Nortel Columbia, such as amendments to the MEN Escrow Agreement, would be frustrated by Nortel Colombia's current state of affairs.  The relief sought seeks to eliminate any such consent or participation requirements.  This issue will become increasingly applicable if, as with Nortel Israel (discussed below), the Nortel estates seek to further amend the various distribution escrow agreements.

23.     Accordingly, the Monitor supports the relief sought by the Applicants as regards Nortel Colombia and the MEN Escrow Agreement.

## NORTEL ISRAEL

24.     On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of Nortel Israel under the Israeli Companies Law (the "Israeli Administrators").

25.     Nortel Israel was a participant in the Enterprise, CVAS, MEN, Radware and MSS sale transactions.  Pursuant to those sale agreements and as contemplated by the Interim Funding and Settlement Agreement, Nortel Israel may be entitled to a portion of the proceeds from each of those sales.

26.     The proceeds from these sales are currently held in escrow accounts governed by distribution escrow agreements that may not be amended (save in very limited circumstances) without consent of all parties thereto and approval of both this Honourable Court and the U.S. Court.

27.     Nortel Israel, NNI and NNUK have agreed to a transaction whereby Nortel Israel will assign all its rights, if any, to the proceeds of the sale of any Nortel business or assets (the "Nortel Israel Rights") to NNI and NNUK (the "Israeli Assignment"). A copy of the Israeli Assignment is attached as Appendix "C" hereto.

28.     The Israeli Assignment will remove Nortel Israel from the allocation dispute.

29. In connection with the Israeli Assignment, NNL executed an acknowledgement (the "Acknowledgment") which provides that upon the Israeli Assignment becoming effective, NNL will have no rights or entitlements in or to the Nortel Israel Rights (while at the same time preserving all of NNL's rights and claims against Nortel Israel or its successors or assigns). A copy of the Acknowledgment is attached as Appendix "D" hereto.

30. Pursuant to the Acknowledgment, Nortel Israel releases NNL (including, among others, all Canadian affiliates of NNL) from any and all claims it may have had, may now have, or may in the future have against those releasees.

31. In furtherance of the Israeli Assignment, the parties to the distribution escrow agreements agreed to in connection with the Enterprise, CVAS, MEN, Radware and MSS transactions will, among other things, execute escrow amendments which will remove Nortel Israel as a party to same such that the consent of Nortel Israel will no longer be required for any purpose thereunder (the "Israeli Escrow Amendments"). Copies of the Israeli Escrow Amendments are attached as Appendix "E" hereto. Pursuant to the terms of the various distribution escrow agreements, any amendments to such agreements require approval of this Court and the U.S. Court.

32. None of the Applicants will relinquish any material benefits as a result of the Israeli Assignment, Acknowledgment or the Israeli Escrow Amendments. Furthermore, certain tangible benefits will be realized (including the simplification of the allocation process and receipt of the releases contained in the Acknowledgment).

33. The Israeli Assignment and the Israeli Escrow Amendments will have no impact on the eventual allocation of sale proceeds to the Applicants (with the exception of any cost savings realized from the elimination of Nortel Israel from the allocation discussions).

34. Accordingly, the Monitor supports the relief sought by the Applicants as regards the Israeli Escrow Amendments.

## MONITOR'S RECOMMENDATIONS

35.    For the reasons outlined herein, the Monitor supports the granting of the Orders sought by the Applicants in connection with the Colombia Motion and the Israel Motion.

All of which is respectfully submitted this 3rd day of June, 2011.

**ERNST & YOUNG INC.**
in its capacity as Monitor of the Applicants
and not in its personal capacity

Per:

Murray A. McDonald

President

\5972907

**APPENDIX "A"**

**[ATTACHED]**

**Execution Copy**

# MEN DISTRIBUTION ESCROW AGREEMENT

among

## NORTEL NETWORKS CORPORATION

## NORTEL NETWORKS LIMITED

## NORTEL NETWORKS INC.

and

## THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

and

## THE EMEA SELLERS AND CERTAIN OF THEIR AFFILIATES AS IDENTIFIED HEREIN

and

## THE ISRAELI COMPANY

and

## NORTEL NETWORKS S.A.

and

## THE ESTATE FIDUCIARIES

and

## JPMorgan Chase Bank, N.A., as Distribution Agent

dated as of March 19, 2010

**This DISTRIBUTION ESCROW AGREEMENT** (this "**Agreement**"), dated as of March 19, 2010, by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"); (iv) the Additional U.S. Debtors (as defined below) and the other affiliates of the Main Sellers listed in Schedule A (collectively, the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"); (v) the entities set out in Schedule B (the "**EMEA Sellers**"), which in the case of the EMEA Debtors (as defined below) are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited (In Administration) for which David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom serve as joint administrators) (collectively the "**Joint Administrators**") who act as agents of the EMEA Debtors without any personal liability as set forth in Paragraph 20 below and, in the case of the Israeli Company (as defined below), is acting by its joint administrators Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") who act as agents of the Israeli Company without any personal liability as set forth in Paragraph 20 below; (vi) Nortel Networks S.A. (In Administration) ("**NNSA**") acting by the NNSA Office Holders (as defined below), who act as agents for NNSA without any personal liability as set forth in Paragraph 20 below; (vii) each affiliate of the Main Sellers listed in Schedule C (each such entity a "**North American ALT Selling Debtor**"); (viii) each affiliate of the EMEA Sellers listed in Schedule D (each such entity, an "**EMEA ALT Selling Debtor**" and, together with the Sellers, the EMEA Sellers, NNSA and the North American ALT Selling Debtors, the "**Depositors**"); (ix) the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Paragraph 28; and (x) JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America ("**JPMorgan**") and acting through its TS/Escrow Services Division and solely in its capacity as escrow and distribution agent under this Agreement, and any successors appointed pursuant to the terms hereof (JPMorgan in such capacity, the "**Distribution Agent**"). Capitalized terms used and not otherwise defined herein shall have the meaning given to them in the North American ASA (as defined below). In this Agreement the term "**EMEA Debtors**" means those entities listed in Schedule 3 of the EMEA ASA, each party listed in Schedule D hereto that is an EMEA ALT Selling Debtor and NNSA.

**WHEREAS**, on the Petition Date, NNC, NNL and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Canadian Court an application for protection under the CCAA and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of any Depositor that is a Canadian Debtor, the "**Canadian Cases**");

**WHEREAS**, NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**") (the "**U.S. Cases**" and together with the Canadian Cases, the "**Bankruptcy Cases**");

1

**WHEREAS,** the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Cases and as foreign representative for the Canadian Debtors (the "**Monitor**"), and the Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the creditors of the U.S. Debtors (the "**Committee**" and, together with the Monitor, the "**Estate Fiduciaries**"), and in addition, an *ad hoc* group of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

**WHEREAS,** on the Petition Date, the English Court ordered that the EMEA Debtors be placed into administration under the Insolvency Act and European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") and appointed the Joint Administrators (as appropriate) to manage the affairs, business and property of the EMEA Debtors;

**WHEREAS,** the Tel-Aviv-Jaffa District Court (the "**Israeli Court**"), on January 19, 2009, granted Nortel Networks Israel (Sales and Marketing) Limited (In Administration) (the "**Israeli Company**") with a stay of proceedings order and nominated the Joint Israeli Administrators as joint administrators of the Israeli Company and, on November 24, 2009, as part of such stay of proceedings, the Israeli Court approved a creditors' arrangement in connection with the Israeli Company, and further approved at a later date, the continuation of all relevant rights, duties and obligations of the Joint Israeli Administrators pursuant to such stay of proceedings order;

**WHEREAS,** while the administration proceedings in respect of NNSA under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation pursuant to which the Commercial Court of Versailles appointed a liquidator and an administrator (together, the "**NNSA Office Holders**") for NNSA;

**WHEREAS,** NNSA acceded to the IFSA (as defined below) on September 11, 2009 and, notwithstanding that NNSA is not a party to the Sale Agreements (as defined below), NNSA is, pursuant to a letter dated September 28, 2009, a Selling Debtor under the IFSA for the purposes of the Transaction (as defined in the Side Agreement) (as defined below) and, as such, any reference in this Agreement to a Depositor shall be construed as including NNSA;

**WHEREAS,** the Sellers and Ciena Corporation (the "**Purchaser**") have entered into that certain Asset Sale Agreement dated October 7, 2009, as amended October 16, 2009, and amended and restated on November 24, 2009 and further amended on December 3, 2009 and on December 23, 2009 (as the same may be further amended and/or restated from time to time in accordance with its terms, the "**North American ASA**"), whereby the Purchaser and/or certain Designated Purchasers will acquire certain assets and liabilities of the Business from the Sellers;

**WHEREAS,** the Sellers further amended the North American ASA, with approval of such amendment by the U.S. Bankruptcy Court, in order to enable their U.S. debtor affiliates CoreTek, Inc., Qtera Corporation and Xros, Inc. (collectively, the "**Additional U.S. Debtors**") to join the North American ASA;

**WHEREAS**, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser have entered into that certain Asset Sale Agreement dated as of October 7, 2009 and amended by a Deed of Amendment on each of October 20, 2009, November 24, 2009, December 16, 2009 and on January 13, 2010 (as the same may be further amended and/or restated from time to time in accordance with its terms, the "**EMEA ASA**" and, together with the North American ASA, the "**Sale Agreements**"), whereby the Purchaser and/or certain EMEA Designated Purchasers will acquire certain assets and liabilities of the Business from the EMEA Sellers;

**WHEREAS**, the Main Sellers, together with Nortel Networks UK Limited, a limited liability company organized under the laws of England ("**NNUK**"), the Purchaser and Citibank, N.A. ("**Citibank**") have entered into that certain Deposit Escrow Agreement, dated as of November 25, 2009 (as the same may be amended and/or and amended and restated from time to time in accordance with its terms, the "**Deposit Escrow Agreement**") pursuant to which Citibank was appointed as escrow agent to receive the Deposit Amount from the Purchaser pursuant to Section 5.37 of the North American ASA and to hold, administer and deliver such Deposit Amount as contemplated by the Deposit Escrow Agreement and the North American ASA;

**WHEREAS**, on November 25, 2009, pursuant to Section 5.37 of the North American ASA, the Purchaser delivered to Citibank cash in an amount of USD$38,450,000 (being the Deposit Amount);

**WHEREAS**, it is contemplated under Section 5.37 of the North American ASA that, at Closing, the Parties (as such term is defined in the North American ASA) and NNUK shall jointly instruct Citibank to disburse the Deposit Amount to the Distribution Agent;

**WHEREAS**, it is contemplated under the Real Estate Terms and Conditions that certain amounts will be paid into escrow at Closing (the "**RETC Escrow Amounts**") to be held in accordance with the terms thereof;

**WHEREAS**, the Sale Agreements provide that the consideration payable by the Purchaser may include, *inter alia*, $239,000,000 aggregate principal amount of the Purchaser's Senior Notes due June 15, 2017 (together with related rights and securities, the "**Convertible Notes**"), which Convertible Notes, and rights arising in respect thereof, shall be dealt with by the Depositors in accordance with the terms and conditions of the Side Agreement (as defined below);

**WHEREAS**, in order to facilitate decision-making with respect to the disposition of the Convertible Notes or the right to receive Convertible Notes, the Parties (as defined in the Side Agreement) will constitute a committee of five members with each of NNUK and NNL designating two members, and NNI designating one member (the "**Investment Committee**");

**WHEREAS**, on or prior to Closing, the Main Sellers, the EMEA Sellers or an authorized representative of the EMEA Sellers, the Purchaser and Citibank will, pursuant to Section 2.2.5(a) of the North American ASA, enter into an escrow agreement (the "**Transaction Escrow Agreement**") with respect to the deposit, investment and disbursement of certain escrow amounts (collectively, the "**Transaction Escrow Amounts**");

3

**WHEREAS**, it is contemplated under Section 2.3.2(b) of the North American ASA that, at Closing, the Purchaser will deliver or cause to be delivered to Citibank by wire transfer in immediately available funds an aggregate amount equal to the Transaction Escrow Amounts, to be held and disbursed in accordance with the Transaction Escrow Agreement, the North American ASA and the Carling Property Lease Agreements, as appropriate;

**WHEREAS**, it is contemplated under Section 2.3.2(b) of the North American ASA that, at Closing, the Purchaser shall (x) subject to adjustment in accordance with the Sale Agreements, deliver or cause to be delivered to the Distribution Agent as consideration for the collective transactions contemplated by the Sale Agreements an amount (the "**Deposited Purchase Price**"), by wire transfer in immediately available funds, equal to (a) the Base Cash Purchase Price, plus any additional cash component of the Purchase price payable pursuant to the exercise of the Cash Replacement Election and amounts directed by the Sellers pursuant to Section 4(a)(ii) of the Transition Services Agreement, less (b) the sum of (i) the Transaction Escrow Amounts; (ii) the RETC Escrow Amounts; and (iii) USD$117,000 to be paid directly by the Purchaser to Nortel Networks de Columbia S.AS. (the amount referred to in this clause (b)(iii) referred to as the "**Nortel Columbia Local Sales Allocation**"), and (y) subject to the terms and conditions of the North American ASA and the Side Agreement (as defined below), deliver to the Distribution Agent, as agent of the Depositors, those Convertible Notes not sold or otherwise dealt with prior to Closing to be held and dealt with in accordance with the terms and conditions of this Agreement and subsequent instructions given by the Investment Committee relating to the disposition of such Convertible Notes;

**WHEREAS**, it is contemplated under Section 2.3.2(c) of the North American ASA, immediately following delivery of the amounts described in the two immediately preceding recitals above, the Sellers shall deliver or cause to be delivered to Citibank at Closing an amount equal to the Transition Services Escrow Amount to be held and disbursed in accordance with the Transaction Escrow Agreement, the North American ASA and the Transition Services Agreement;

**WHEREAS**, the Sellers, EMEA Sellers, NNSA, the Joint Administrators and the Joint Israeli Administrators have entered into that certain Metro Ethernet Networks Side Agreement dated as of February 26, 2010 (the "**Side Agreement**"), pursuant to which, in accordance with Section 12.b of the IFSA, the Selling Parties (as defined therein) agree to enter into an escrow agreement with the Distribution Agent governing, among other things, the Distribution Agent's collection, holding in escrow and distribution to the Depositors and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules (as defined in the Side Agreement)) of the proceeds of the Transaction (as defined therein) and other payments to be made by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Depositors under or in relation to the Sale Agreements and the formation of the Investment Committee to facilitate decision-making with respect to the disposition of any Convertible Notes or the right to receive Convertible Notes, if any;

**WHEREAS**, the Closing is expected to occur in March, 2010 and the Depositors desire to establish an account prior to Closing for the escrow of the Deposited Purchase Price pursuant to this Agreement, it being understood by the Depositors that this Agreement is subject to amendment in accordance with Paragraph 15(a) to, among other things, reflect further agreement among the Depositors as to the terms of the escrow of the Deposited Purchase Price;

4

WHEREAS, the Depositors and certain other parties (together, the "**IFSA Parties**") have entered into that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties have agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions (the "**Allocation Protocol**"), which shall provide binding procedures for the allocation of sales proceeds where the IFSA Parties are otherwise unable to reach agreement;

WHEREAS, prior to Closing this Agreement will be approved by the Canadian Court and the U.S. Bankruptcy Court will authorize the U.S. Debtors to enter into an agreement with the Distribution Agent on terms and conditions reasonably satisfactory to the Estate Fiduciaries acting in good faith, and the Depositors will, promptly after receiving such approval and authorization, provide the Distribution Agent with evidence of such approval and authorization; and

WHEREAS, the Depositors wish to appoint JPMorgan as escrow and distribution agent and JPMorgan is willing to accept such appointment and to act as escrow and distribution agent, in each case upon the terms and conditions of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors and the Distribution Agent hereto agree as follows:

1.    <u>Appointment of Distribution Agent</u>. The Depositors hereby jointly nominate, constitute and appoint the Distribution Agent as escrow and distribution agent to hold the Escrow Funds (as defined below) in the Distribution Account (as defined below) and the Deposited Notes (as defined below) upon the terms and conditions set forth herein. The Distribution Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Distribution Account (as defined below), or applicable portions thereof, and the release or disposition of the Deposited Notes, shall only be made in accordance with the terms and conditions of this Agreement. The Distribution Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Distribution Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, when taken by all of the Depositors, shall be binding upon each of the Depositors and the Distribution Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.    <u>Deposit of Escrow Property</u>.    Funds and property shall be deposited in the Distribution Account (as defined below) as follows:

(a)    at Closing, the Sellers shall instruct the Purchaser to deposit the Deposited Purchase Price with the Distribution Agent, in immediately available funds, in an account established with the Distribution Agent being account number 865364574 (the "**Distribution Account**");

(b)    at Closing, the Parties (as such term is defined in the North American ASA) and NNUK shall cause Citibank to deposit all amounts of cash including actual earnings thereon then held by Citibank pursuant to the Deposit Escrow Agreement with the Distribution Agent, in immediately available funds, in the Distribution Account;

(c)    at Closing, subject to Section 2.4(d) of the Side Agreement and in accordance with Section 12.b of the IFSA, the Selling Parties shall instruct the Purchaser to deposit any payment due by the Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements that is included in the Total Proceeds (as defined in the Side Agreement) with the Distribution Agent, in immediately available funds, in the Distribution Account; and

(d)    at Closing, the Sellers shall instruct the Purchaser to cause the account of the Distribution Agent with the Depositary (as defined in the Indenture) to be credited with beneficial ownership of the Convertible Notes and/or the Substituted Convertible Notes not sold or otherwise dealt with in accordance with the terms of the North American ASA and the Side Agreement (the "**Deposited Notes**");

(e)    after Closing, subject to Section 2.4(d) of the Side Agreement and in accordance with Section 12.b of the IFSA, all amounts released from escrow pursuant to any escrow agreements provided for in the Sale Agreements or the other Transaction Documents (including without limitation the Transaction Escrow Amounts) and the RETC Escrow Amounts that are included in the Total Proceeds (as defined in the Side Agreement), shall be deposited with the Distribution Agent, in immediately available funds, in the Distribution Account,

(all funds deposited in accordance with sub-paragraphs (a), (b), (c) and (e) above collectively, and together with all interest, sale or redemption proceeds and other income therefrom or from the Deposited Notes received by the Distribution Agent, less any funds distributed or paid in accordance with this Agreement, the "**Escrow Funds**"). The Escrow Funds, together with all Deposited Notes not yet otherwise disposed of in accordance with this Agreement, are collectively referred to herein as "**Escrow Property**". The Distribution Agent shall provide written confirmation to the Depositors, the Estate Fiduciaries and the Bondholder Group upon its receipt of any Escrow Property from the Purchaser, any Designated Purchaser, Citibank or otherwise. Prior to the deposits in accordance with sub-paragraphs (a)-(c) above, there shall be no other funds in the Distribution Account. The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Distribution Agent and shall not be commingled with the other assets held by the Distribution Agent. Each of the Depositors, the Estate Fiduciaries and the Bondholder Group acknowledges and consents to the direct payment of the Nortel Columbia Local Sales Allocation to Nortel Networks de Columbia S.A.S.

3.    Investment of Escrow Funds.

(a)    Until otherwise jointly directed by all of the Depositors and the Estate Fiduciaries, the Distribution Agent shall invest the Escrow Funds in Permitted Investments only. "**Permitted Investments**" means (1) United States Treasury obligations with maturities not in excess of one year, (2) money market funds invested solely in such United States Treasury obligations and (3) the JPMorgan Chase Bank Collateralized Money Market Deposit Account;

6

provided, however, that in no event shall Permitted Investments include investments that are not eligible for the portfolio interest exemption or other similar exception to U.S. withholding tax. The Distribution Agent shall invest the Escrow Funds on the date of deposit so long as the relevant funds are received on or before 11:00 a.m. New York City time. Any written notice to remit payment received by the Distribution Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which the Distribution Agent located at the notice address set forth on Schedule F is authorized or required by law or executive order to remain closed. In the absence of a joint written instruction from the Depositors and the Estate Fiduciaries, the Distribution Agent will invest the Escrow Funds in item (3) referenced above. The parties hereto recognize and agree that the Distribution Agent will not provide supervision, recommendations or advice relating to either the investment of the Escrow Funds or the purchase, sale, retention or other disposition of any investment described herein. The Distribution Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Depositors to give the Distribution Agent instructions to invest or reinvest the Escrow Funds.

(b)     Any investment direction contained herein may be executed through an affiliated broker-dealer of the Distribution Agent, which shall be entitled to such affiliated broker-dealer's usual and customary fee, except neither the Distribution Agent nor its affiliates shall be entitled to any fees for underwriting distributions of the Deposited Notes except as expressly authorized by the Investment Committee in a letter of direction delivered pursuant to Paragraph 5(b). Neither the Distribution Agent nor any of its affiliates assume any duty or liability for monitoring the investment rating of the investments.

(c)     The Distribution Agent shall have the right to liquidate investments as necessary to distribute Escrow Funds pursuant to Paragraph 5.

4.     Ownership of Escrow Property; Taxes.

(a)     The Escrow Property at all times is and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Property shall, as of the end of each calendar year and to the extent required by law, be reported by the Distribution Agent on Form 1099 or Form 1042-S as the income of Depositors or their affiliates, based upon the disbursement of the Escrow Property to Depositors or their affiliates pursuant to Paragraph 5 if such income was disbursed during such calendar year or, with respect to any Escrow Property not disbursed during such calendar year, based upon each Depositor's *pro rata* share of such income, with each Depositor's *pro rata* share being deemed to be equal to such Depositor's interest allocation percentage as set forth on Exhibit 1. The Distribution Agent acknowledges and agrees that the interest percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Property and, accordingly, the Distribution Agent agrees to amend Form 1099 and Form 1042-S upon a joint written request from the Depositors and the Estate Fiduciaries, which request shall set forth the re-allocation of all interest and any other earnings on Escrow Property previously reported on Form 1099 and Form 1042-S; provided, however, that the Distribution Agent shall be permitted to rely at all times upon the interest percentages then set forth on Exhibit 1 delivered to the Distribution Agent and the Distribution Agent shall be entitled to act upon the allocations and interest percentages as then set forth in

7

Exhibit 1 without liability to any Depositor, notwithstanding any subsequent amendment to Exhibit 1 setting forth any new allocation or interest percentage. Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to, any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("**FIRPTA**"). The Depositors acknowledge and agree that the Distribution Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Property or any income earned by the Escrow Property. Each Depositor further acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Funds shall be paid by such Depositor. All proceeds of the Escrow Property shall be retained in the Distribution Account and reinvested from time to time by the Distribution Agent as provided in this Agreement. The Distribution Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities. The parties hereto hereby agree and acknowledge that the Distribution Agent has no ownership interest in the Escrow Property but is serving solely as escrow holder having only possession thereof. This Paragraph 4 shall survive notwithstanding any termination of this Agreement or the resignation of the Distribution Agent. Each Depositor will provide the Distribution Agent with the appropriate form W-9 or W-8 either (x) if any of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2010, as a condition to such Depositor's receipt of such Escrow Funds from the Distribution Agent, prior to the Distribution Agent making such disbursement hereunder or (y) if none of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2010, on or before December 31, 2010. If W-8 or W-9 forms, validated by the Distribution Agent, have not been provided by all of the Depositors prior to December 31, 2010 the Distribution Agent shall report taxes on a disbursement basis in the year they are disbursed.

      (b)     To the extent that the Distribution Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Distribution Agent shall satisfy such liability to the extent possible from the Escrow Funds. The Depositors shall, jointly and severally, indemnify, defend and hold the Distribution Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Distribution Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of the Distribution Agent. Any indemnification payments arising from the indemnification provided by this Paragraph 4(b) shall be initially satisfied out of the Escrow Property to the extent available. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a *pro rata* basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in clause (i) of Paragraph 5, and any Depositor or any of its Respective Affiliates paying in excess of its *pro rata* share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its *pro rata* share of such costs either directly to the Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the

breach or fault of the other Depositors, shall have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Distribution Agent or by payment to another Depositor. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9 and shall survive the resignation or removal of the Distribution Agent and the termination of this Agreement.

5.      Distribution of Escrow Property.

The Depositors, the Estate Fiduciaries and the Distribution Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Distribution Agent shall hold the Escrow Property and not disburse any amounts from the Distribution Account or dispose of any Deposited Notes except in accordance with the following terms and conditions:

(a)      The Distribution Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Distribution Agent), any Depositor's delivery to the Distribution Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of the sales proceeds relating to the Business of the Depositors (a "**Decision**") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision; provided, however, that any amounts owing under Paragraph 4(b) or Paragraph 9 by any Depositor (a "**Debtor Depositor**") to any other Depositor at the time of an intended distribution from the Escrow Account shall be paid out of the share of the Escrow Funds otherwise payable to such Debtor Depositor.

(b)      The Distribution Agent shall deal with the Deposited Notes if and as so instructed pursuant to a letter of direction executed by the Investment Committee, a copy of which shall be provided by the Investment Committee to the Estate Fiduciaries and the Bondholder Group; provided, however, that all interest, sale or redemption proceeds and other income derived from the Deposited Notes shall remain subject to this Agreement including Paragraph 5(a) above.

(c)      The Depositors understand and agree that no payments or reimbursements made pursuant to Section 6.1 of the North American ASA in respect of Transfer Taxes or Section 11 of the EMEA ASA in respect of VAT and Transfer Taxes (as that term is defined in the EMEA ASA) shall constitute any part of the Deposited Purchase Price, the amount transferred from the Deposit Escrow Account (as that term is defined in the Deposit Escrow Agreement) (including any actual earnings thereon) or the Escrow Funds, or shall be required to be paid by the Purchaser into the Distribution Account. In the event, however, that Purchaser or its affiliates make any payments with respect to Transfer Taxes or VAT or Transfer Taxes (as that term is defined in the EMEA ASA), as applicable, that are payable to or intended for the benefit of one or more Sellers or any affiliate or agent thereof pursuant to Section 6.1 of the North American ASA or one or more EMEA Sellers or any affiliate or agent thereof pursuant to Section 11 of the EMEA ASA, but which are deposited into the Distribution Account (any such

9

payment, "**Misdirected Tax Payment**"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing the Distribution Agent with a letter of direction executed by an Authorized Representative of such Depositor identifying the amount that is represented to be a Misdirected Tax Payment(s) and further directing the release of such Misdirected Tax Payment to the appropriate beneficiary in accordance with Paragraph 12 below. The requesting Depositor(s) shall (A) send a copy of such letter of direction to each of the other Depositors, the Estate Fiduciaries and the Bondholder Group at the same time as such letter is sent to the Distribution Agent and (B) attach thereto (i) supporting documentation evidencing the amount of the Transfer Taxes or VAT or Transfer Taxes (as that term is defined in the EMEA ASA), as applicable, payable (it being understood that the Distribution Agent shall have no responsibility for verifying the accuracy, delivery or sufficiency of such supporting documentation) and (ii) a certification of an Authorized Representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Purchaser or its affiliates with respect to Transfer Taxes pursuant to the North American ASA or VAT or Transfer Taxes (as that term is defined in the EMEA ASA) pursuant to the EMEA ASA, as applicable. The Distribution Agent shall on or as soon as reasonably practicable following the tenth (10th) day following receipt of such letter of direction, disburse to such Depositor the amounts requested therein; provided, however, that if the Distribution Agent receives a notice of objection from one or more of the Depositors or an Estate Fiduciary prior to making such disbursement (but in no event later than 3:00 p.m. EST on such release date), the Distribution Agent shall not make such disbursement until the Distribution Agent either (x) receives an order of a court of competent jurisdiction (as provided in Paragraph 21 below), which is not stayed or subject to appeal, instructing it to make such distribution or (y) the objecting Depositor(s) and/or Estate Fiduciary(ies) provide written notice to the Distribution Agent withdrawing such objection. Subject to the proviso to the preceding sentence, the Distribution Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors and/or Estate Fiduciary(ies).

(d)    The Distribution Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Distribution Account. The Distribution Agent shall have the right to withhold an amount equal to the amount due and owing to the Distribution Agent, plus any reasonable costs and expenses incurred by the Distribution Agent in accordance with the terms of this Agreement in connection with the termination of the Distribution Account.

(e)    No Depositor shall submit to the Distribution Agent a certificate that falsely certifies to the finality of a Decision.

(f)    Any request for a distribution pursuant to this Paragraph 5 shall be accompanied by a completed Schedule E with respect to the Depositors participating in such distribution, unless a completed Schedule E with respect to such Depositor has previously been provided to the Distribution Agent (in which case the Schedule E to be provided to the Distribution Agent need only contain the requisite information with respect to the Depositors as to whom no previous Schedule E has been provided to the Distribution Agent). The Depositors

shall comply with any request from another Depositor for information necessary for inclusion in Schedule E.

(g)     The Depositors and the Estate Fiduciaries hereby agree that they shall cause the Distribution Agent to disburse amounts from the Distribution Account in accordance with the procedures set forth in this Paragraph 5 to satisfy (i) any obligations to make the Total Payments (as defined in the Side Agreement) in accordance with the terms of the Side Agreement; and (ii) the obligation of NNI to pay $250,000 to the Pension Benefit Guaranty Corporation at Closing.

6.     Termination of Distribution Account.   The Agreement shall terminate upon the later of the distribution of all Escrow Funds from the Distribution Account established hereunder in accordance with Paragraph 5 hereof and the disposition of all Deposited Notes and any proceeds thereof, subject to the survival of provisions which expressly survive the termination of this Agreement; provided, however, that this Agreement shall not terminate prior to the date on which the Depositors and the Estate Fiduciaries notify the Distribution Agent that (i) all purchase price adjustment amounts owing to the Sellers under the terms of the North American ASA and (ii) all amounts released from escrow pursuant to any escrow agreements provided for in the Sale Agreements or the other Transaction Documents (including without limitation the Transaction Escrow Amounts) and the RETC Escrow Amounts that are included in the total Proceeds (as defined in the Side Agreement), have been deposited in the Distribution Account by the Purchaser in accordance herewith and subsequently distributed hereunder.

7.     Method of Payment.   Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on Schedule E annexed hereto (collectively, the "**Standing Settlement Instructions**"). Any Depositor shall have the right, from time to time, to provide written notice to the Distribution Agent and the other Depositors updating its Standing Settlement Instructions, and the Distribution Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Paragraph 5 until such Standing Settlement Instructions have been further updated pursuant to this Paragraph 7.

The Depositors acknowledge that the Distribution Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Distribution Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if the Distribution Agent has previously authenticated such Standing Settlement Instructions with respect to such Depositor.  The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8.     Monthly Reports.   The Distribution Agent shall, promptly following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Distribution Account and the Deposited Notes, with copies to the Estate Fiduciaries and the Bondholder Group.

11

9.    <u>Liability of Distribution Agent</u>.  The Distribution Agent's sole liability hereunder shall be to hold and invest the Escrow Property and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder.  It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. The Distribution Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it.  The Distribution Agent shall not be liable for anything done, suffered or omitted by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons.  The Distribution Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below) determines that the Distribution Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor.  The Distribution Agent may rely upon and shall not be liable for acting or refraining from acting pursuant to any written notice, document, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind.  The Distribution Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Distribution Agent shall have no duty to solicit any payments which may be due to it or in connection with the Distribution Account, including, without limitation, the Escrow Property, nor shall the Distribution Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder.  The Distribution Agent shall have no duty or obligation to make any calculations of any kind hereunder.  In the event that the Distribution Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the parties pursuant to <u>Paragraph 5</u> which eliminates such ambiguity or uncertainty to the satisfaction of the Distribution Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below).

Anything in this Agreement to the contrary notwithstanding, in no event shall the Distribution Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Distribution Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Property, or any part thereof, at any time, that cannot be settled under other provisions hereof, the Distribution Agent is authorized to retain in its possession, without liability to anyone, all or any part of the Escrow Property, as applicable, or the proceeds from any sale thereof until a distribution is requested in accordance with Paragraph 5.

The Depositors shall, jointly and severally, indemnify and hold harmless the Distribution Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "**Indemnitees**") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively, "**Losses**") arising out of or in connection with (a) the Distribution Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by the Distribution Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except, in the case of any Indemnitee, to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in Paragraph 21 below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of the Distribution Agent or the termination of this Agreement. Any indemnity payments to the Distribution Agent arising from the indemnification provided by this Paragraph 9 shall be initially satisfied from the Escrow Property to the extent available. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a *pro rata* basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in clause (a) of Paragraph 5, and any Depositor or any of their Respective Affiliates paying in excess of its *pro rata* share of the cost of such indemnification shall have rights of contribution *vis-à-vis* any Depositor that has paid less than its *pro rata* share of such costs either directly to the Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall have rights of contribution *vis-à-vis* any Depositor that has paid less than its share of such costs either directly to the Distribution Agent or by payment to another Depositor. The indemnification provided by this Paragraph 9 is in addition to the indemnification provided in Paragraph 4(b) and shall survive the resignation or removal of the Distribution Agent and the termination of this Agreement.

The duties and responsibilities of the Distribution Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. The Distribution Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Sale Agreements, the Side Agreement, the Transaction Documents, the Real Estate Terms and Conditions, the IFSA and the Allocation Protocol, other than as outlined in this Agreement, nor shall the Distribution Agent be required to

13

determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Distribution Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.  In the event of any conflict between the terms and provisions of this Agreement, those of the Sale Agreements, any schedule or exhibit attached to the Sale Agreements, the Side Agreement, the Transaction Documents, the Real Estate Terms and Conditions, the IFSA, the Allocation Protocol, or any other agreement among Depositors, or any of them, the terms and conditions of this Agreement shall control solely to the extent such conflict is with respect to the rights, duties, obligations and liabilities of the Distribution Agent.

      10.    <u>Compensation of Distribution Agent</u>.  The Depositors agree to reimburse the Distribution Agent all reasonable, documented out-of-pocket costs and out-of-pocket expenses, including reasonable attorneys' fees, suffered or incurred by the Distribution Agent in connection with the performance of its duties and obligations hereunder, including but not limited to any suit in interpleader brought by the Distribution Agent (which shall be brought only in a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below)).  The Distribution Agent shall collect amounts due to it under this <u>Paragraph 10</u> from the Distribution Account.

      11.    <u>Resignation or Removal of Distribution Agent</u>.  The Distribution Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon selection of a successor escrow agent pursuant to the provisions of this Agreement.  Similarly, the Distribution Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to the Distribution Agent by the Depositors and the Estate Fiduciaries.  In either event the Distribution Agent shall then deliver the balance of the Escrow Property then in its possession to a successor escrow agent as shall be appointed by the Depositors and the Estate Fiduciaries as evidenced by a written notice sent to the Distribution Agent and signed by the Depositors and the Estate Fiduciaries.

If the Depositors and the Estate Fiduciaries are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. For the avoidance of doubt, the parties hereto acknowledge that under no circumstances shall any party hereto be entitled to obtain a distribution from the Distribution Account as a result of the resignation of the Distribution Agent.

      The successor escrow agent shall be a bank or trust company having assets in excess of US$5,000,000,000.

      Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Property, the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

Any corporation into which the Distribution Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Distribution Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Distribution Agent in its individual capacity may be transferred, shall be the Distribution Agent under this Agreement without further act.

12.    Notices.  All communications hereunder shall be in writing and shall be deemed to be duly given and received:  (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule F or at such other address as any party hereto may have furnished to the other parties hereto in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Distribution Agent pursuant to (i), (ii) or (iii) of this Paragraph 12, such communications shall be deemed to have been given on the date received by an officer of the Distribution Agent or any employee of the Distribution Agent who reports directly to any such officer at the above-referenced office.  In the event that the Distribution Agent, in its sole discretion, shall determine that an emergency exists, the Distribution Agent may use such other means of communication as the Distribution Agent deems appropriate.

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, the Distribution Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule G hereto (each an "**Authorized Representative**" of the applicable Depositor), and the Distribution Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Distribution Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to the Distribution Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a court order of a court of competent jurisdiction (as provided in Paragraph 21 below) to the Distribution Agent designating a successor Authorized Representative.  The Depositors acknowledge that such security procedure is commercially reasonable.

If, at any time prior to the termination of this Agreement, any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Bankruptcy Court or otherwise, any Depositor or Estate Fiduciary may present to the Distribution Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Distribution Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder.  If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed

15

or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If, at any time prior to the termination of this Agreement, any of the Depositors is liquidated or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Bankruptcy Court (or, in the case of the EMEA Sellers, such order of a court of competent jurisdiction or by operation of law) or otherwise, any Depositor, or Estate Fiduciary (as the case may be) shall present to the Distribution Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Distribution Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposes hereunder. If such dissolution or liquidation provides for a successor to such dissolved or liquidated Depositor, then such rights and responsibilities shall pass automatically to such successor entity.

The Depositors represent, warrant and covenant that each document, notice, instruction or request provided by such party to the Distribution Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Depositors to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

13.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Facsimile copies may be deemed originals for the purpose of this Agreement.

14.    Paragraph Headings. The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15.    Amendments; No Waivers.

(a)    Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Paragraph 12 or the liquidation or dissolution of a Depositor as set forth in Paragraph 12, any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Distribution Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees

terminating the Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

(b)     No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

16.     Entire Agreement; No Third Party Beneficiaries.  This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors that are parties thereto) the North American ASA, the EMEA ASA, the Transition Services Agreement, the Side Agreement, the IFSA, the Appropriate License Termination (as defined in the IFSA), the Indenture and the Allocation Protocol to be entered into pursuant thereto (a) constitute the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder; provided, however, that the Joint Administrators and the Joint Israeli Administrators shall be entitled to enforce and take the benefit of Paragraph 20 hereof.

17.     Governing Law.  Subject to Paragraph 20, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the rules of conflict of laws of the State of New York or any other jurisdiction).

18.     Account Opening Information.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  When an account is opened, the Distribution Agent will ask for information that will allow it to identify relevant parties.

19.     Severability.  If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Paragraph 21 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

20.     Exclusion of Liability for the Joint Administrators, the Joint Israeli Administrators and the NNSA Office Holders.

(a)     Subject to Paragraph 20(b) below, the parties hereto agree that the Joint Administrators, the Joint Israeli Administrators and the NNSA Office Holders have negotiated this Agreement both in their respective capacities as administrators, in the case of the Joint Administrators, of the EMEA Debtors, in the case of the Joint Israeli Administrators, of the Israeli Company, and, in the case of the NNSA Office Holders, of NNSA, and for and on behalf

17

of, in the case of the Joint Administrators, the EMEA Debtors, in the case of the Joint Israeli Administrators, the Israeli Company, and, in the case of the NNSA Office Holders, NNSA, and that none of the Joint Administrators, the Joint Israeli Administrators, the NNSA Office Holders or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any EMEA Debtor, NNSA, or the Israeli Company, as applicable, to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Paragraph 99(4) of Schedule B1 to the Insolvency Act, the Israeli Companies Law or otherwise howsoever.

(b)     Nothing in this Section 20 or any other provision of this Agreement shall prevent the Sellers or the Distribution Agent from bringing any action against the EMEA Debtors, NNSA, the Israeli Company, the Joint Administrators, the Joint Israeli Administrators or the NNSA Office Holders for fraud.

(c)     Notwithstanding anything in Paragraph 21, (i) any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtor) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts; (ii) any claim, action or proceeding against the Joint Israeli Administrators (and not as agents for the Israeli Company) under this Agreement shall be governed exclusively by the laws of the State of Israel and subject to the exclusive jurisdiction of the Israeli Courts; and (iii) any claim, action or proceeding against the NNSA Office Holders in their personal capacities (and not as agents for NNSA) under this Agreement shall be governed by the laws of France and subject to the exclusive jurisdiction of the French courts.

21.     JURISDICTION.  SUBJECT TO PARAGRAPH 20, FOR ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT, EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. BANKRUPTCY COURT AND THE CANADIAN COURT, IF SUCH CLAIM, ACTION OR PROCEEDING IS BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THAT CERTAIN CROSS-BORDER INSOLVENCY PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE IN AN ORDER DATED JANUARY 15, 2009 AND BY THE CANADIAN COURT PURSUANT TO AN ORDER DATED JANUARY 14, 2009, AS AMENDED OR AS AMENDED AND RESTATED FROM TIME TO TIME, AND (II) THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF NEW YORK (COLLECTIVELY, THE "NEW YORK COURTS"), IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY

CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE THE US BANKRUPTCY COURT OR THE CANADIAN COURT, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA, CANADA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH CLAIM, ACTION OR PROCEEDING BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY CLAIM, ACTION OR PROCEEDING AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY CLAIM, ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS PARAGRAPH 21 TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN PARAGRAPH 20 SHALL BE BROUGHT EXCLUSIVELY IN THE COURT CONTEMPLATED IN PARAGRAPH 20. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.    Interpretation.  As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.    Compliance with Court Orders.  In the event that any of the Escrow Property shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Paragraph 21 above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Distribution Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Distribution Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.    Force Majeure.  In the event that any party hereto or the Distribution Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Distribution Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Distribution Agent is able to perform substantially.

25.    Patriot Act Disclosure.  Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**") requires the Distribution Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, each Depositor acknowledges that Section 326 of the USA PATRIOT Act and the Distribution Agent's identity verification procedures require the Distribution Agent to obtain information which may be used to confirm such Depositor's identity including without limitation name, address and organizational documents ("**Identifying Information**").  Each Depositor agrees to provide the Distribution Agent with and consent to the Distribution Agent obtaining from third parties any such Identifying Information with respect to it required as a condition of opening an account with or using any service provided by the Distribution Agent.

26.    Taxpayer Identification Numbers ("TIN"). Each Depositor will provide the Distribution Agent with its fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other required documentation as set forth in Paragraph 4(a). Each Depositor providing such documentation represents that its correct TIN assigned by the IRS, or any other taxing authority, shall be set forth in the delivered forms.

27.    Allocation Protocol. The Depositors and the Estate Fiduciaries agree and acknowledge that nothing in this Agreement including, without limitation, Paragraph 5(g), shall prejudice any pre-existing rights or obligations of any of the Depositors and the Estate Fiduciaries to argue the appropriateness of any allocation of the Escrow Property before a dispute resolver(s) appointed pursuant to the Allocation Protocol. Without limitation to the foregoing, the Depositors' interest allocation percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Property and shall not be presented by any of the Depositors and the Estate Fiduciaries in any of their submissions (whether in writing or orally) as to the appropriate allocation of the Escrow Property before the dispute resolver(s) appointed pursuant to the Allocation Protocol. Furthermore, the Depositors and the Estate Fiduciaries agree that (i) the Nortel Columbia Local Sales Allocation was agreed to solely for the purpose of complying with local law requirements and to facilitate the closing of the transactions contemplated by the North American ASA and the EMEA ASA and such allocation shall have no precedential impact on the allocation of the Escrow Property to any other Depositor or any other sales proceeds before a dispute resolver appointed pursuant to the Allocation Protocol and (ii) any consideration paid pursuant to or evidenced by any Local Sale Agreement (other than the Nortel Columbia Local Sales Allocation) or that certain MEN Argentina Side Agreement entered into on March 19, 2010 were agreed to solely for the purpose of complying with local law requirements and to facilitate the closing of the transactions contemplated by the North American ASA and the EMEA ASA and such consideration shall have no precedential impact on the allocation of the Escrow Property to any Depositor of any sales proceeds before a dispute resolver appointed pursuant to the Allocation Protocol.

28.    Exclusion of Liability for Estate Fiduciaries. The Depositors and the Distribution Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Distribution Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

**NORTEL NETWORKS LIMITED**

By:_____
Name:  Anna Ventresca
Title:    General Counsel-Corporate and
Corporate Secretary

By:_____
Name:   John Doolittle
Title:     Senior Vice-President, Finance and
Corporate Services

**NORTEL NETWORKS INC.**

By:_____
Name:  Anna Ventresca
Title:    Chief Legal Officer

**NORTEL NETWORKS CORPORATION**

By:_____
Name:  Anna Ventresca
Title:    General Counsel-Corporate and
Corporate Secretary

By:_____
Name:   John Doolittle
Title:     Senior Vice-President, Finance and
Corporate Services

**DISTRIBUTION AGENT**

JPMorgan Chase Bank, N.A., as Distribution
Agent

By:_____
Name:
Title:

**ERNST & YOUNG INC.** IN ITS
CAPACITY AS THE MONITOR OF
NORTEL NETWORKS CORPORATION ET
AL.,
AND NOT IN ITS PERSONAL CAPACITY

By:____Shar—Hamilt__.____
Name:   Sharon Hamilton
Title:    Senior Vice-President

**THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.**

By:  Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity,

By:_____
Name:
Title:

*[Signature page to Distribution Escrow Agreement]*

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

**NORTEL NETWORKS LIMITED**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL NETWORKS CORPORATION**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL NETWORKS INC.**

By:_____
Name:
Title:

**DISTRIBUTION AGENT**

JPMorgan Chase Bank, N.A., as Distribution Agent

By:_____
Name:    SAVERIO A. LUNETTA
Title:    VICE PRESIDENT

**ERNST & YOUNG INC.** IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET. AL.**

By:  Flextronics Corporation, solely in its capacity as Chair of the Committee and not in its individual capacity,

By:_____
Name:
Title:

By:_____
Name:
Title:

*[Signature page to Distribution Escrow Agreement]*

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

**NORTEL NETWORKS LIMITED**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL NETWORKS CORPORATION**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL NETWORKS INC.**

By:_____
Name:
Title:

**DISTRIBUTION AGENT**

JPMorgan Chase Bank, N.A., as Distribution Agent

By:_____
Name:
Title:

**ERNST & YOUNG INC.** IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY

By:_____
Name:
Title:

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET. AL.**

By: Flextronics Corporation, solely in its capacity as Chair of the Committee and not in its individual capacity

By: *Timothy J. Burling*
Name: TIMOTHY J. BURLING
Title: VP FINANCE

*[Signature page to Distribution Escrow Agreement]*

**ARCHITEL SYSTEMS (U.S.)**
**CORPORATION**

By:_____
Name:  John Doolittle
Title:  President


**NORTEL ALTSYSTEMS INC.**

By:_____
Name:  John Doolittle
Title:  President


**NORTEL ALTSYSTEMS**
**INTERNATIONAL INC.**

By:_____
Name:  John Doolittle
Title:  President


**NORTEL NETWORKS APPLICATIONS**
**MANAGEMENT SOLUTIONS INC.**

By:_____
Name:  John Doolittle
Title:  President


*[Signature page to Distribution Escrow Agreement]*

**NORTEL NETWORKS CABLE
SOLUTIONS INC.**

By:_____
Name:  John Doolittle
Title:   Vice President

**NORTEL NETWORKS CAPITAL
CORPORATION**

By:_____
Name:  John Doolittle
Title:   President

**NORTEL NETWORKS HPOCS INC.**

By:_____
Name:  John Doolittle
Title:   President

**NORTEL NETWORKS INTERNATIONAL
INC.**

By:_____
Name:  John Doolittle
Title:   President

**NORTEL NETWORKS OPTICAL
COMPONENTS INC.**

By:_____
Name:  John Doolittle
Title:   President

*[Signature page to Distribution Escrow Agreement]*

**NORTHERN TELECOM**
**INTERNATIONAL INC.**

By:_____
Name:  John Doolittle
Title:    President


**SONOMA SYSTEMS**

By:_____
Name:  John Doolittle
Title:    President and Treasurer


*[Signatures continue on the following page]*


*[Signature page to Distribution Escrow Agreement]*

SIGNED in the name and on behalf of **NORTEL NETWORKS TECHNOLOGY CORPORATION** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

SIGNED in the name and on behalf of **NORTEL NETWORKS DE COLOMBIA S.A.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE MEXICO S.A. DE C.V.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services


**SIGNED** in the name and on behalf of **NORTEL DE MEXICO S. DE R.L. DE C.V.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **NORTEL NETWORKS PERU S.A.C.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:   Anna Ventresca
Title:    General Counsel-Corporate and
Corporate Secretary

By:_____
Name:   John Doolittle
Title:    Senior Vice-President, Finance and
Corporate Services

**SIGNED** in the name and on behalf of **NORTEL NETWORKS AUSTRALIA PTY. LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:   Anna Ventresca
Title:    General Counsel-Corporate and
Corporate Secretary

By:_____
Name:   John Doolittle
Title:    Senior Vice-President, Finance and
Corporate Services

*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **PT NORTEL NETWORKS INDONESIA** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary


By:_____
Name:  John Doolittle
Title:    Senior Vice-President, Finance and
Corporate Services


**SIGNED** in the name and on behalf of **NORTEL NETWORKS MALAYSIA SDN. BHD.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary


By:_____
Name:   John Doolittle
Title:    Senior Vice-President, Finance and
Corporate Services


*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **NORTEL NETWORKS NEW ZEALAND LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____

Name:   Paviter S. Binning

Title:   Executive Vice President, Chief
         Financial Officer and Chief Restructuring
         Officer

By:_____

Name:   Anna Ventresca

Title:   General Counsel – Corporate and
         Corporate Secretary

**SIGNED** in the name and on behalf of **NORTEL NETWORKS SINGAPORE PTE LTD** by

NORTEL NETWORKS LIMITED, as Representative

By:_____

Name:   Paviter S. Binning

Title:   Executive Vice President, Chief
         Financial Officer and Chief Restructuring
         Officer

By:_____

Name:   Anna Ventresca

Title:   General Counsel – Corporate and
         Corporate Secretary

*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (ASIA) LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Paviter S. Binning
Title:    Executive Vice President,
          Chief Financial Officer and Chief Restructuring Officer

By:_____
Name:   Anna Ventresca
Title:    General Counsel – Corporate and Corporate Secretary

*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (CHINA) LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name: Paviter S. Binning
Title:  Executive Vice President, Chief
        Financial Officer and Chief Restructuring
        Officer

By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
         Corporate Secretary

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (THAILAND) LTD** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Paviter S. Binning
Title:   Executive Vice President,
         Chief Financial Officer and Chief Restructuring Officer

By:_____
Name:   Anna Ventresca
Title:    General Counsel – Corporate and Corporate Secretary

**SIGNED** in the name and on behalf of **NORTEL VIETNAM LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Paviter S. Binning
Title:   Executive Vice President, Chief
         Financial Officer and Chief Restructuring
         Officer

By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
         Corporate Secretary

*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **NORTEL NETWORKS TELECOMMUNICATIONS EQUIPMENT (SHANGHAI) CO. LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____

Name:  Anna Ventresca
Title:    General Counsel-Corporate and
Corporate Secretary

By:_____

Name:   John Doolittle
Title:     Senior Vice-President, Finance and
Corporate Services


**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE ARGENTINA S.A.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____

Name:  Anna Ventresca
Title:    General Counsel-Corporate and
Corporate Secretary

By:_____

Name:   John Doolittle
Title:     Senior Vice-President, Finance and
Corporate Services

*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE ECUADOR S.A.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  Paviter S. Binning
Title:  Executive Vice President, Chief
        Financial Officer and Chief Restructuring
        Officer

By:_____
Name:  Anna Ventresca
Title:  General Counsel – Corporate and
        Corporate Secretary

*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE GUATEMALA LTDA.** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  Anna Ventresca
Title:   Chief Legal Officer


**SIGNED** in the name and on behalf of **NORTEL NETWORKS (CALA) INC.** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  Anna Ventresca
Title:   Chief Legal Officer


**SIGNED** in the name and on behalf of **NORTEL TRINIDAD & TOBAGO LIMITED** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  Anna Ventresca
Title:   Chief Legal Officer


**SIGNED** in the name and on behalf of **NORTEL NETWORKS KABUSHIKI KAISHA** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  Anna Ventresca
Title:   Chief Legal Officer


*[Signature page to Distribution Escrow Agreement]*

**SIGNED** in the name and on behalf of **QTERA CORPORATION** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  Anna Ventresca
Title:   Chief Legal Officer


**SIGNED** in the name and on behalf of **XROS, INC.** by

NORTEL NETWORKS CORPORATION, as Representative

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary

By:_____
Name:   John Doolittle
Title:    Senior Vice-President, Finance and
Corporate Services


**SIGNED** in the name and on behalf of **CORETEK, INC.** by

NORTEL NETWORKS CORPORATION, as Representative

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary

By:_____
Name:   John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services


*[Signature page to Distribution Escrow Agreement]*

**SIGNED** for and on behalf of **Nortel Networks**
**UK Limited** (in administration) by Christopher
Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

........................................................

Christopher Hill

Witness signature

........................................................

Name: Emma Burnett
Address: Herbert Smith LLP, Exchange House,
London, EC2A 2HS, England

)
)
)

**SIGNED** for and on behalf of **Nortel GmbH** (in
administration) by Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

........................................................

Christopher Hill

Witness signature

........................................................

Name: Emma Burnett
Address: Herbert Smith LLP, Exchange House,
London, EC2A 2HS, England

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**SpA** (in administration) by Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

........................................................

Christopher Hill

Witness signature

........................................................

Name: Emma Burnett
Address: Herbert Smith LLP, Exchange House,
London, EC2A 2HS, England

)
)
)

**SIGNED** for and on behalf of **Nortel Networks** )
**Hispania S.A.** (in administration) by )
Christopher Hill as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of:

................................................................
Christopher Hill

Witness signature

..............................................................  )
Name: Emma Burnett )
Address: Herbert Smith LLP, Exchange House, )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )
**B.V.** (in administration) by Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

................................................................
Christopher Hill

Witness signature

..............................................................  )
Name: Emma Burnett )
Address: Herbert Smith LLP, Exchange House, )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )
**AB** (in administration) by Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

................................................................
Christopher Hill

Witness signature

..............................................................  )
Name: Emma Burnett )
Address: Herbert Smith LLP, Exchange House, )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )
**N.V.** (in administration) by Christopher Hill )  ..............................................
as Joint Administrator (acting as agent and )  Christopher Hill
without personal liability) in the presence of: )

Witness signature

..............................................  )
Name: Emma Burnett )
Address: Herbert Smith LLP, Exchange House, )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )
**(Austria) GmbH** (in administration) by )  ..............................................
Christopher Hill as Joint Administrator (acting )  Christopher Hill
as agent and without personal liability) in the )
presence of: )

Witness signature

..............................................  )
Name: Emma Burnett )
Address: Herbert Smith LLP, Exchange House, )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )
**Portugal S.A.** (in administration) by )  ..............................................
Christopher Hill as Joint Administrator (acting )  Christopher Hill
as agent and without personal liability) in the )
presence of: )

Witness signature

..............................................  )
Name: Emma Burnett )
Address: Herbert Smith LLP, Exchange House, )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )  ............................................
**s.r.o.** (in administration) by Christopher Hill   )   Christopher Hill
                                                     )
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:

Witness signature

...............................................  )
Name: Emma Burnett                               )
Address: Herbert Smith LLP, Exchange House,      )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks**          )
**Polska Sp. z.o.o.** (in administration) by                       )    ......................................................
Christopher Hill as Joint Administrator (acting             )    Christopher Hill
as agent and without personal liability) in the            )
presence of:

Witness signature

..............................................................          )
Name: Emma Burnett                                               )
Address: Herbert Smith LLP, Exchange House,         )
London, EC2A 2HS, England

SIGNED for and on behalf of **Nortel Networks**　　　)
**Engineering Services kft** (in administration)　　　)　.....................................................
by Christopher Hill as Joint Administrator　　　　　)　Christopher Hill
(acting as agent and without personal liability)　　　)
in the presence of:

Witness signature

.....................................................　　　)
Name:  Daniel Eziefula　　　　　　　　　　　　　)
Address: Herbert Smith LLP, Exchange House,　　　)
London, EC2A 2HS

SIGNED for and on behalf of **Nortel Networks**　　　)
**Slovensko s.r.o.** (in administration) by　　　　　)　.....................................................
Christopher Hill as Joint Administrator (acting　　　)　Christopher Hill
as agent and without personal liability) in the　　　)
presence of:

Witness signature

.....................................................　　　)
Name: Daniel Eziefula　　　　　　　　　　　　　)
Address: Herbert Smith LLP, Exchange House,　　　)
London, EC2A 2HS

SIGNED for and on behalf of **Nortel Networks**　　　)
**Romania Srl** (in administration) by Christopher　　)　.....................................................
Hill as Joint Administrator (acting as agent and　　　)　Christopher Hill
without personal liability) in the presence of:　　　)

Witness signature

.....................................................　　　)
Name: Daniel Eziefula　　　　　　　　　　　　　)
Address: Herbert Smith LLP, Exchange House,　　　)
London, EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks**
**Oy** (in administration) by Christopher Hill as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

.............................................................
Christopher Hill

Witness signature

.............................................................
Name: Daniel Eziefula
Address: Herbert Smith LLP, Exchange House,
London, EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**International Finance & Holding B.V.** (in
administration) by Christopher Hill as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)
)

.............................................................
Christopher Hill

Witness signature

.............................................................
Name: Daniel Eziefula
Address: Herbert Smith LLP, Exchange House,
London, EC2A 2HS

)
)
)

SIGNED for and on behalf of **Nortel Networks**
**France S.A.S.** (in administration) by Kerry
Trigg acting as authorised representative for
Christopher Hill as Joint Administrator (acting
as agent and without personal liability) in the
presence of:

)
)
)
)
)
)

Kerry Trigg

Witness signature

Name:    SHARON PERLMUTTER
Address:

**⧓ ERNST & YOUNG LLP**
**1 More London Place**
**London**
**SE1 2AF**

**SIGNED** outside of the Republic of Ireland for
and on behalf of **Nortel Networks (Ireland)**
**Limited** (in administration) by Alan Bloom in
the presence of:

)
)
)
)

..................................................................

Alan Bloom

Location: London

Witness signature

..................................................................

Name: Emma Burnett

Address: Herbert Smith LLP, Exchange House,
London, EC2A 2HS, England

)
)
)

**SIGNED** by John Freebairn                    )
duly authorised for and on behalf of **Nortel**    )        ............................................
**Networks (Northern Ireland) Limited** in the    )        John Freebairn
presence of:                                    )


Witness signature

............................................    )
Name:  TINA McAULEY                          )
Address:  10 KNOCKAGH HEIGHTS)
          CARRICKFERGUS
          BT38 8QZ

**SIGNED** by Maria Stanko                    )
duly authorised for and on behalf of o.o.o.    )
Nortel Networks in the presence of:            )

Witness/signature

Name:    R S BANBURY                           )
Address:                                       )
         NOVINSKI BWR 12/5
         MOSCOW.

**SIGNED** by Sharon Rolston                    )
duly authorised for and on behalf of **Nortel**     )
**Networks AG** in the presence of:                )

Sharon Rolston

Witness signature

B. Scherwath

Name: B. SCHERWATH                    )
Address: C/O NORTEL NETWORKS UK LTD)
       WESTACOTT WAY
       MAIDENHEAD
       SL6 3QH

       UK

SIGNED by Sharon Rolston duly authorised for          )          ....... *Sharon Rolston* ..............................
and on behalf of **Nortel Networks Optical**          )          Sharon Rolston
**Components Limited** in the presence of:            )


Witness signature

.................... *Baifl* .....................................          )
Name: Daniel Eziefula                                                     )
Address: Herbert Smith LLP, Exchange House,                               )
London, EC2A 2HS

**SIGNED** by Alan Bloom                    )
                                            )        .................................................................
                                            )        Alan Bloom
in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:



Witness signature

.........................................................    )
Name: Emma Burnett                          )
Address: Herbert Smith LLP, Exchange House, )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )
**Israel (Sales and Marketing) Limited** (in )
administration) by Yaron Har-Zvi and Avi D. )
Pelossof as Joint Israeli Administrators (acting )
jointly and without personal liability) in )
connection with the Israeli Assets  and )
Liabilities: )
)
)

הנאמן בהקפאת הליכים

...................................................................

Yaron Har-Zvi                הנאמן בהקפאת הליכים

...................................................................

Avi D. Pelossof

Witness signature                אִיתִי מְבִיאָ עו"ד

                                          47867 .מ.ר

...................................................................    )
Name: Itai Lavi                                                     )
Address: 20 Lincoln St. Tel Aviv                          )

יהנאמן בהקפאת הליכים

**SIGNED** by Avi D. Pelossof                     )

)    ...................................................................

)    Avi D. Pelossof

in his own capacity and on behalf of the Joint     )
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or
given to the Joint Israeli Administrators:


Witness signature

...................................................................    )

Name: _Itay_ Lavi                                  )

Address: 20 Lincoln St. Tel-Aviv                   )

הנאמן בהקפאת הליכים

**SIGNED** by Yaron Har-Zvi

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or
given to the Joint Israeli Administrators:

)
)
)

................................................................

Yaron Har-Zvi

Witness signature      איתי לבמאן עו"ד
                       מ.ר. 47667

................................................................

Name: ~~Efat~~ Lavi

Address: 20 Lincoln St. Tel -Aviv

)
)
)

SIGNED for and on behalf of NORTEL
NETWORKS SA (IN
ADMINISTRATION)
by COSME ROGEAU as liquidator
(acting as agent and without personal
liability) and

)
)
)
)

........................................................

Cosme Rogeau

by FRANCK MICHEL as administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

........................................................

Franck Michel

Witness signature

........................................................
Name:
Address:    Nicolas Griccourt
10 Allee Pierre de Coubertin
78007 Versailles France

## SCHEDULE A
## OTHER SELLERS

Nortel Networks Technology Corporation

Nortel Networks (CALA) Inc.

Nortel de Mexico S. de R.L. de C.V.

Nortel Networks de Mexico S.A. de C.V.

Nortel Networks de Guatemala Ltda

Nortel Networks de Argentina S.A.

Nortel Networks de Columbia S.A.S.

Nortel Networks Peru S.A.C.

Nortel Networks de Ecuador S.A.

Nortel Networks Kabushiki Kaisha

Nortel Networks (Asia) Limited

Nortel Networks Singapore Pte. Ltd

Nortel Vietnam Limited

Nortel Networks (Thailand) Limited

Nortel Networks Malaysia Sdn. Bhd

Nortel Networks Australia Pty. Limited

Nortel Networks New Zealand Limited

Nortel Networks (China) Limited

Nortel Networks (Asia) Limited – Pakistan Branch

Nortel Networks Singapore Pte. Ltd – Philippines Branch

Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited

Nortel Trinidad and Tobago Limited

Nortel Networks (Asia) Limited – Taiwan Branch

PT Nortel Networks Indonesia

Qtera Corporation

CoreTek, Inc.

Xros, Inc.

Schedule A

## SCHEDULE B

## EMEA SELLERS

Nortel Networks UK Limited (In Administration)

Nortel GmbH (In Administration)

Nortel Networks S.p.A. (In Administration)

Nortel Networks Hispania, S.A. (In Administration)

Nortel Networks B.V. (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks N.V. (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks Polska Sp. z.o.o. (In Administration)

Nortel Networks Portugal S.A. (In Administration)

Nortel Networks s.r.o. (In Administration)

Nortel Networks France S.A.S. (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks (Northern Ireland) Limited

Nortel Networks o.o.o.

Nortel Networks A.G.

## ISRAELI COMPANY

Nortel Networks Israel (Sales and Marketing) Limited (In administration)

Schedule B

## SCHEDULE C

## AFFILIATES OF MAIN SELLERS THAT
## ARE DEEMED TO BE "SELLING DEBTORS"

Architel Systems (U.S.) Corporation

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Sonoma Systems

Schedule C

## SCHEDULE D

## AFFILIATES OF THE EMEA SELLERS THAT
## ARE DEEMED TO BE A "SELLING DEBTOR"

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks Optical Components Limited

# SCHEDULE E

## STANDING SETTLEMENT INSTRUCTIONS

Nortel Networks Limited
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 38545364

Nortel Networks Inc.
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30463444

Nortel Networks Corporation
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30428374

Nortel Networks UK Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel GmbH (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SpA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Schedule E-1

Nortel Hispania S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks B.V. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AB (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks N.V. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Austria) GmbH. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Polska Sp z.o.o. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Portugal S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks s.r.o. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks France S.A.S (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Ireland) Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Engineering Services Kft (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Slovensko s.r.o. (In Administration)

Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Romania Srl (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Oy (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks International Finance & Holding BV. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Northern Ireland) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

o.o.o Nortel Networks
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AG
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Israel (Sales and Marketing) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

## SCHEDULE F

## NOTICE ADDRESSES

**Depositors:**

| | |
|---|---|
| **NNC, NNL and the Other Sellers listed on Schedule A (other than Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI), the affiliates of the Main Sellers listed on Schedule C and any other Respective Affiliates of NNC or NNL:** | 5945 Airport Road<br>Suite 360<br>Mississauga, Ontario, Canada  L4V 1R9<br>Attn:  Anna Ventresca<br>Phone: 905.863.1204<br>Facsimile: 905.863.2057 |
| **NNI and Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda, Nortel Networks Kabushiki Kaisha or any other Respective Affiliates of NNI:** | Legal Department<br>220 Athens Way, Suite 300<br>Nashville, Tennessee, USA  37228<br>Attn:  Lynn C. Egan<br>Phone: 615.432.4289<br>Facsimile: 615.432.4067 |
| **The EMEA Sellers and the affiliates of the EMEA Sellers listed on Schedule D:** | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: Stephen Gale and Kevin F Lloyd<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| **NNSA:** | Etude Cosme Rogeau<br>Mandataire Judiciare<br>26 avenue Hoche<br>78000 Versailles (France)<br>Phone: +33 (1) 39 49 52 08<br>Facsimile: +33 (1) 39 49 44 63<br>(with a copy to Antoine Tchekhoff, FTPA<br>1 bis avenue Foch 75116 Paris (France)<br>Phone: +33 (1) 45 00 86 20<br>Facsimile: +33 (1) 45 00 85 81) |
| **The Israeli Company:** | Avi D. Pelossof<br>Zellermayer, Pelossof & Co. |

The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile:        +972 3 6255500

**Distribution Agent:**

JPMorgan Chase Bank, N.A.
TS / Escrow Services
4 New York Plaza, 21st Floor
New York, New York 10004
Attn:  Andy Jacknick
Phone: 212.623. 0241
Facsimile: 212.623.6168

**Estate Fiduciaries:**

**The Official Committee of Unsecured Creditors in connection with the Chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138):**

c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis
Phone: 212.872.1000
Facsimile: 212.872.1002

**Monitor:**

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario, Canada
M5K 1J7
Facsimile: (416) 943-3300
Attn: Murray A. McDonald

**Bondholder Group:**

c/o Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Albert A. Pisa and Roland Hlawaty
Phone: 212.530.5000
Facsimile: 212.822.5735

Schedule F- 2

## SCHEDULE G

### Telephone Number(s) for Call-Backs;
### Person(s) Designated to Give and Confirm Funds Transfer Instructions; and Addresses

**If to NNC, NNL and the Other Sellers listed on <u>Schedule A</u> (other than Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI), the affiliates of the Main Sellers listed on <u>Schedule C</u> or any other Respective Affiliates of NNC or NNL:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Paviter S. Binning | 905.863.1020 | |
| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Anna Ventresca | 905.863.1204 | |
| Address | See <u>Schedule F</u> | |

**If to NNI, Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| John Ray | 239.331.4942 | |
| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Anna Ventresca | 905.863.1204 | |
| Address | See <u>Schedule F</u> | |

## SCHEDULE G

**Telephone Number(s) for Call-Backs;**
**Person(s) Designated to Give and Confirm Funds Transfer Instructions; and Addresses**

**If to NNC, NNL and the Other Sellers listed on Schedule A (other than Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI), the affiliates of the Main Sellers listed on Schedule C or any other Respective Affiliates of NNC or NNL:**

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Paviter S. Binning | 905.863.1020 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule F | |

**If to NNI, Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI:**

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| John Ray | 239.331.4942 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule F | |

**If to the EMEA Sellers (apart from Nortel Networks (Ireland) Limited) and the affiliates of the EMEA Sellers listed on <u>Schedule D</u>:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | |

| <u>Name</u> | <u>Telephone Number</u> | Signature Specimen |
|---|---|---|
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See <u>Schedule F</u> | |

**If to Nortel Networks (Ireland) Limited:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Attn: Stephen Gale and<br>Kevin F Lloyd | |

**If to the Israeli Company:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Yaron Har-Zvi | | |
| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Avi D. Pelossof | | |
| Address | See <u>Schedule F</u> | |

**If to the EMEA Sellers (apart from Nortel Networks (Ireland) Limited) and the affiliates of the EMEA Sellers listed on <u>Schedule D</u>:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | _____ |

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Stephen Harris | +44 (0) 207 951 9835 | _____ |
| Address | See <u>Schedule F</u> | |

**If to Nortel Networks (Ireland) Limited:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | _____ |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | _____ |
| Address | c/o Herbert Smith LLP Exchange House Primrose Street London EC2A 2HS Attn: Stephen Gale and Kevin F Lloyd | |

**If to the Israeli Company:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Yaron Har-Zvi | | הנאמן בהקפאת הליכים |
| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Avi D. Pelossof | | הנאמן בהקפאת הליכים |
| Address | See <u>Schedule F</u> | |

Address                    See <u>Schedule F</u>

**Monitor:**

<u>Name</u>                    <u>Telephone Number</u>            <u>Signature Specimen</u>

Sharon Hamilton            416-943-2153                *Shar— Hamilt—*

<u>Name</u>                    <u>Telephone Number</u>            <u>Signature Specimen</u>

Murray McDonald            416-943-3016                *signature*

Address                    See <u>Schedule F</u>

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Distribution Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual.   Such individual's continued issuance of payment orders to the Distribution Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders.  Moreover, such Party agrees to accept any risk associated with a deviation from the Distribution Agent's policy.

Schedule G-4

**If to NNSA:**

Name                          Telephone Number              Signature Specimen

Stephen Harris                + 44 2079519835

Address                       See Schedule F

.f to the Estate
Fiduciaries:

The Official Committee of
Unsecured Creditors in
connection with the
Chapter 11 cases of Nortel
Networks Inc., et al. (Case
No. 09-10138):

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| Timothy Burling, acting on behalf of Flextronics Corporation as Chair of the Official Committee of Unsecured Creditors and not in his personal capacity | | |

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| Stephen R. Kuhn, Esq. acting on behalf of Akin Gump Strauss Hauer & Feld LLP, as counsel to the Official Committee of Unsecured Creditors and not in his personal capacity | (212) 872-1008 | |

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| David H. Botter, Esq. acting on behalf of Akin Gump Strauss Hauer & Feld LLP, as counsel to the Official Committee of Unsecured Creditors and not in his personal capacity | (212) 872-1055 | |

Address                              See Schedule F

# EXHIBIT 1

## INTEREST ALLOCATION PERCENTAGES(*)

|  | Interest Allocation Percentage |
|---|---|
| NNI | 0% |
| NNL | 100% |
| NNC | 0% |
| Qtera Corporation | 0% |
| CoreTek, Inc. | 0% |
| Xros, Inc. | 0% |
| Nortel Networks Technology Corporation | 0% |
| Nortel Networks (CALA) Inc. | 0% |
| Nortel de Mexico, S. de R.L. de C.V. | 0% |
| Nortel Networks de Mexico, S.A. de C.V. | 0% |
| Nortel Networks de Guatemala Ltda. | 0% |
| Nortel Networks de Argentina S.A. | 0% |
| Nortel Networks de Columbia S.A.S. | 0% |
| Nortel Networks Peru S.A.C. | 0% |
| Nortel Networks de Ecuador S.A. | 0% |
| Nortel Networks Kabushiki Kaisha | 0% |
| Nortel Networks (Asia) Limited | 0% |
| Nortel Networks Singapore Pte. Limited | 0% |
| Nortel Vietnam Limited | 0% |
| Nortel Networks (Thailand) Ltd. | 0% |
| Nortel Networks Malaysia Sdn. Bhd. | 0% |

Exhibit 1

|  | Interest Allocation Percentage |
| --- | --- |
| Nortel Networks Australia Pty Limited | 0% |
| Nortel Networks New Zealand Limited | 0% |
| Nortel Networks (China) Limited | 0% |
| Nortel Networks (Asia) Limited – Pakistan Branch | 0% |
| Nortel Networks Singapore Pte. Limited – Philippines Branch | 0% |
| Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd. | 0% |
| PT Nortel Networks Indonesia | 0% |
| The EMEA Sellers | 0% |
| The Israeli Company | 0% |
| NNSA | 0% |
| Affiliates of Main Sellers that are deemed to be "Selling Debtors" | 0% |
| Affiliates of the EMEA Sellers that are deemed to be a "Selling Debtor" | 0% |

\*   The inclusion of the interest allocation percentages set forth above does not constitute an admission of any Depositor that such interest allocation percentage reflects the percentage of the proceeds to be received by any Depositor or any of its Respective Affiliates under the North American ASA or EMEA ASA, as applicable. The interest allocation percentages are the initial allocation percentages hereunder and are subject to amendment in accordance with Paragraph 15. The interest allocation percentages set forth above shall not be presented by any party hereto as being indicative of the final allocation of proceeds received by the Depositors under the North American ASA and EMEA ASA, as applicable.

Exhibit 1-2

**APPENDIX "B"**

**[ATTACHED]**

## Amendment No. 5 to the Amended and Restated Asset Sale Agreement

This Amendment No. 5 ("Amendment No. 5"), dated as of the 19th day of March 2010, to the Amended and Restated Asset Sale Agreement (the "Agreement"), dated as of November 24, 2009, as amended from time to time, by and among Nortel Networks Corporation, a corporation organized under the laws of Canada ("NNC"), Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("NNI" and, together with NNC and NNL, the "Main Sellers"), and the other entities identified therein as Sellers, and Ciena Corporation, a corporation organized under the laws of Delaware (the "Purchaser"). Unless otherwise specified, capitalized terms used herein and not defined shall have the meaning set forth in the Agreement.

WHEREAS, the Parties agree that no Employee Records shall be transferred or assigned by the Sellers to the Purchaser or any Designated Purchaser pursuant to Section 2.1.1 of the Agreement;

WHEREAS, the Parties agree that the Sellers and the Purchaser shall cooperate following the Closing to identify and convey to the Purchaser those Employee Records of Transferred Employees which the Purchaser determines, in its sole discretion, it requires for any business or legal purposes as provided in Section 5.23(b);

WHEREAS, Section 2.2.1 of the Agreement provides for, among other things, the payment of the Purchase Price by the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers;

WHEREAS, the Parties agree that in order to comply with applicable local Laws, a portion of the Purchase Price shall be paid directly to Nortel Networks de Colombia S.A.S.;

WHEREAS, the Parties agree that Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited, Nortel Networks (China) Limited and Nortel Networks (Asia) Limited shall not transfer their respective right, title or interest in any Owned Inventory held by them respectively, on the Closing Date and the Purchaser shall have the right at any time after the Closing Date to designate one or more third parties (whether or not affiliated with the Purchaser) to which the Sellers shall transfer such Owned Inventory;

WHEREAS, Section 2.3.1 of the Agreement deals with the Closing Date and the transfer of legal title, equitable title and risk of loss with respect to the Assets and the Assumed Liabilities;

WHEREAS, Section 2.2.4 of the Agreement provides for an adjustment to the Purchase Price based upon the actual Net Working Capital Transferred as of the Closing Date;

WHEREAS, the Parties wish to clarify (i) the effective time of the transfer of legal title, equitable title and risk of loss with respect to the Assets and the Assumed Liabilities and (ii) the time as of which the actual Net Working Capital Transferred is calculated;

WHEREAS, the Parties agree that certain Affiliates of the Main Sellers that are not party to the Agreement should be made a party thereto;

2

WHEREAS, the Sellers and the Purchaser agree to amend the form of the Intellectual Property License Agreement as further set forth herein;

WHEREAS, the Sellers and the Purchaser agree to amend the form of the Trademark License Agreement as further set forth herein;

WHEREAS, pursuant to Section 11.4 of the Agreement, the Parties desire to amend certain provisions of the Agreement, including certain Exhibits and Sections of the Sellers Disclosure Schedule, as set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and for other good, valuable and binding consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    The following definitions shall be added in alpha-order to Section 1.1 of the Agreement:

""**Additional Colombian Assets**" has the meaning set forth in Section 2.2.8."

""**Additional Colombian Payment**" has the meaning set forth in Section 2.2.8."

""**Chinese Owned Inventory**" has the meaning set forth in Section 2.1.11(a)."

""**Ciena Colombia**" means together, Ciena International, Inc., a company organized under the laws of Florida, and Ciena Communications, Inc., a company organized under the laws of Delaware."

""**Colombia Allocation**" has the meaning set forth in Section 2.2.1(a)."

""**COP**" means Colombian Pesos."

""**Designated Inventory Purchaser**" has the meaning set forth in Section 2.1.11(a)."

""**Employer Tax**" has the meaning set forth in Section 7.4(h)(iii)."

""**Inventory Designation Notice**" has the meaning set forth in Section 2.1.11(a)."

""**Italian Social Security Documentation**" has the meaning set forth in Section 6.9(e)."

""**Italian Social Security Ruling**" has the meaning set forth in Section 6.9(e)."

""**Italian Social Security Tax**" shall mean any Tax under the administration of INPS (*Istituto Nazionale di Previdenza Sociale*) or INAIL (*Istituto nazionale per le Assicurazioni e gli Infortuni sul lavoro*) or the jurisdiction or supervision of the Italian Ministry of Labour (*Ministero del Lavoro e delle Politiche Sociali*), including its relevant local bodies (*e.g.*, *Direzioni Provinciali del Lavoro, Direzioni Regionali del Lavoro*), including social security taxes, social security contributions and the unpaid portion of any employee contribution for such taxes."

3

""**New Assigned Patents**" has the meaning set forth in Section 5.38."

""**NNAL**" has the meaning set forth in Section 2.1.11(a)."

""**NNCL**" has the meaning set forth in Section 2.1.11(a)."

""**NNTE**" has the meaning set forth in Section 2.1.11(a)."

""**Non-EMEA Transferred Sales Employees**" has the meaning set forth in Section 7.4(h)."

""**Non-Transferred Sales Employees**" has the meaning set forth in Section 7.4(h)."

""**Nortel Colombia**" means Nortel Networks de Colombia S.A.S., a company organized under the laws of Colombia."

""**Nortel Poland**" means Nortel Networks Polska Sp.z.o.o."

"**Polish Excluded Taxes**" has the meaning set forth in Section 6.10(a)."

""**Polish Purchaser Party**" has the meaning set forth in Section 6.10(a)."

""**Polish Tax Claim**" has the meaning set forth in Section 6.10(b)."

""**Polish Tax Claim Notice**" has the meaning set forth in Section 6.10(b)."

""**Polish Tax Escrow Amount**" means $1,000,000, as such amount is adjusted in accordance with Section 6.10, which amount shall secure Nortel Poland's obligations under Section 6.10."

""**Post-Closing Sales Compensation Amount**" has the meaning set forth in Section 7.4(h)(iii)."

""**Pre-Closing Sales Compensation Amount**" has the meaning set forth in Section 7.4(h)(ii)."

""**ReMan Owned Equipment**" has the meaning set forth in Section 5.39.

""**SIC Plan**" has the meaning set forth in Section 7.4(h)."

""**Total Post-Closing Payment**" has the meaning set forth in Section 7.4(h)(iii)."

2.    The definition of "Closing Inventory Amount" in Section 1.1 of the Agreement is hereby deleted and replaced with:

   ""**Closing Inventory Amount**" means, as of the Closing Date, the book value of the Owned Inventory (including, for the avoidance of doubt, the Chinese Owned Inventory) and the EMEA Owned Inventory, net of applicable provisions, that would be required to be reflected on a balance sheet of the Business as of such

4

date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP)."

3.      The definition of "Escrow Amount" in Section 1.1 of the Agreement is hereby deleted and replaced with:

"**"Escrow Amount"** means the portion of the Purchase Price to be paid to the Escrow Agent on the Closing Date in accordance with Section 2.3.2(b) and, subject to adjustment in accordance with Section 2.1.7(b) of the Sellers Disclosure Schedule, such amount will consist of (i) the Working Capital Escrow Amount, (ii) the Carling Property Escrow Amount, (iii) the Tax Escrow Amount, (iv) the EMEA Tax Escrow Amount, (v) the Italian Tax Escrow Amount, (vi) the Polish Tax Escrow Amount and (vii) the FY09 Financial Statements Escrow Amount."

4.      The definition of "Italian Tax Escrow Amount" in Section 1.1 of the Agreement is hereby deleted and replaced with:

"**"Italian Tax Escrow Amount"** means $750,000, as such amount is adjusted in accordance with Section 6.9, which amount shall secure Nortel Italy's obligations under Section 6.9."

5.      The definition of "Transferred Intellectual Property" in Section 1.1 of the Agreement is hereby deleted and replaced with:

"**"Transferred Intellectual Property"** means (i) the Patents listed in Section 1.1(k) of the Sellers Disclosure Schedule and the New Assigned Patents, (ii) the Trademarks set forth in Section 1.1(l) of the Sellers Disclosure Schedule, and (iii) the Intellectual Property (other than Patents and Trademarks) owned by any of the Sellers that is exclusively used in connection with the Business as of the Closing Date, including the Software (including previous versions being utilized or supported as of the date hereof and versions in development) exclusively used in the Business."

6.      Section 2.1.1(h) of the Agreement is hereby deleted and replaced with "the Employee Records of Transferred Employees identified by the Purchaser after the Closing Date in accordance with Section 5.23(b);".

7.      Section 2.1.2(g) of the Agreement is hereby deleted and replaced with:

"(g)      (i) any books, records, files, documentation or sales literature other than the Business Information, (ii) any Employee Records of Transferred Employees other than those identified by Purchaser after the Closing Date in accordance with Section 5.23(b), and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privilege or privacy) to retain (<u>provided</u> that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law or such agreement) and/or not to disclose;"

5

8.    Section 5.23 of the Agreement is hereby deleted and replaced with:

"(a)    After the Closing, the Purchaser shall have the right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature (other than Tax records and Employee Records, each of which are governed by other provisions of this Agreement) in the possession or under control of the Sellers and held or used in the Business (other than records to the extent prohibited by applicable Law), to which the Purchaser in good faith determines it needs access for *bona fide* business or legal purposes.  The Sellers shall use commercially reasonable efforts to, or cause their Respective Affiliates to use commercially reasonable efforts to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable; provided, that the Sellers shall be allowed to redact any such requested document in order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates not included in the Business; provided, further, that nothing herein shall require the Sellers to (i) disclose any information to the Purchaser if such information disclosure would jeopardize any attorney-client or legal privilege or (ii) contravene any applicable Law, fiduciary duty or agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates is a party); it being understood, that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement).

(b)    After the Closing and only for so long as the Transition Services Agreement remains in effect, the Sellers shall cooperate with the Purchaser so that the Purchaser can identify those Employee Records of Transferred Employees which it determines in good faith are necessary or useful for any *bona fide* business or legal purpose and, upon written notice by the Purchaser, the Sellers shall provide to the Purchaser such Employee Records (or copies thereof) except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee obtained or to be obtained by the Purchaser or the Designated Purchaser (including any consent, if required, to transfer Employee Records across geographical boundaries).  Upon written request by the Purchaser to obtain copies of any additional individual Employee Records of Transferred Employees that are not obtained pursuant to the previous sentence that the Purchaser has determined in good faith that it needs for *bona fide* business or legal purpose, the Main Sellers shall, or shall cause their Respective Affiliates to, use commercially reasonable efforts to, provide the Purchaser with copies of such records as soon as reasonably practicable, except to the extent prohibited by applicable data privacy Laws and subject to (i) consent by such employee obtained or to be obtained by the Purchaser or the Designated Purchaser (including any consent, if required, to transfer Employee Records across geographical boundaries) and (ii) the applicable restrictions set forth in Section 5.23(a).  Notwithstanding anything in this Agreement to the contrary, Employee Records shall not be transferred to the Purchaser or any Designated Purchaser except in accordance with this Section 5.23(b) or as required by applicable Law.

6

9.      Section 7.4(d) of the Agreement is hereby deleted and replaced with "[Intentionally Omitted.]"

10.     Section 2.2.1 of the Agreement is hereby deleted and replaced with:

> "Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the purchase, sale, assignment and conveyance of the Sellers' and EMEA Sellers' right, title and interest in, to and under the Assets and the EMEA Assets, respectively, pursuant to the terms hereof and pursuant to the terms of the EMEA Asset Sale Agreement, respectively, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, (A) the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and the EMEA Assumed Liabilities, (B) no later than Friday, March 26, 2010, Ciena Colombia shall pay to Nortel Colombia an aggregate amount of cash equal to COP221,506,740 (the "**Colombia Allocation**"), and (C) subject to adjustment following the Closing in accordance with Section 2.2.4.2, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall pay to the Distribution Agent an amount of cash (the "**Purchase Price**") equal to Seven Hundred Seventy-Three Million Seven Hundred and Eighty Thousand dollars ($773,780,000) (the "**Base Cash Purchase Price**") less (X) the Escrow Amount and as adjusted pursuant to Sections 2.2.2 and 2.2.4 and Section 5.28 of the Sellers Disclosure Schedule or as otherwise expressly provided herein, in the Real Estate Terms and Conditions or in the EMEA Asset Sale Agreement, and (Y) one hundred and seventeen thousand dollars ($117,000) (in respect of the Colombia Allocation)."

11.     The definition of "Cash Purchase Price" in Section 1.1 of the Agreement is hereby deleted and all references thereto in the Agreement shall be replaced with "Purchase Price".

12.     A new Section 11.18 of the Agreement and shall read as follows:

> "**SECTION 11.18.  Acknowledgement of Cash Replacement Election.**  The Parties hereby acknowledge that prior to the date hereof, the Purchaser exercised the Cash Replacement Election (as defined in the Agreement, as amended, prior to the date hereof) in respect of the full principal amount of the Convertible Notes (as defined in the Agreement, as amended, prior to the date hereof) in accordance with the terms hereof and is paying the Purchase Price fully in cash.  The Parties further acknowledge that any and all defined terms, representations, warranties, covenants, Closing conditions, Sections, Articles, or Appendices in or to the Agreement relating to the "Convertible Notes" (including without limitation, Sections 3.7, 4.15, 5.27, 5.33, 5.36 and 9.2(c) and Article VIII) are hereby deleted and the Agreement shall be read and interpreted accordingly."

13.     Section 2.1.1(a) of the Agreement is hereby deleted and replaced with "the Owned Inventory as of the Closing Date other than the Chinese Owned Inventory;"

7

14.    The following new Section 2.1.11 is hereby added to the Agreement:

"**2.1.11.  Assets Not Assigned at Closing.**

(a) Notwithstanding anything in this Agreement, Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited ("**NNTE**"), Nortel Networks (China) Limited ("**NNCL**") and Nortel Networks (Asia) Limited ("**NNAL**") shall not transfer their respective right, title or interest in any Owned Inventory that has been imported into the People's Republic of China (the "**Chinese Owned Inventory**") to the Purchaser or any Designated Purchaser at the Closing, provided, however, that as at and from the Closing Date, the Purchaser shall be responsible and liable for all risk of loss, theft, damage or destruction to the Chinese Owned Inventory.  Following the Closing Date and no later than six (6) months from the Closing Date, the Purchaser or any Designated Purchaser shall provide written notice (the "**Inventory Designation Notice**") to the Main Sellers designating one or more Persons (each a "**Designated Inventory Purchaser**") to purchase the Chinese Owned Inventory (as specified in the Inventory Designation Notice) pursuant to a local asset transfer agreement or such similar document as required by applicable local Law.  No later than five (5) Business Days following the receipt of an Inventory Designation Notice, NNTE, NNCL, and/or NNAL, as the case may be, shall execute such instruments of transfer and take such other actions as are required to sell and convey all of its right, title or interest in the Chinese Owned Inventory specified in the Inventory Designation Notice to the Designated Inventory Purchaser specified therein in consideration for the payment of a nominal purchase price payable in Chinese Renminbi equal to One (1) U.S. dollar ($1.00), plus all applicable Taxes, including VAT, on the value of the Chinese Owned Inventory.  Notwithstanding the foregoing, in the event that NNCL, NNTE or NNAL are liquidating or in the event that they are closing the facility at which the Chinese Owned Inventory is located, NNCL, NNTE or NNAL, as the case may be, may by written notice to the Purchaser terminate such six (6) month period on the date that is the later of (x) three (3) months after Closing and (y) ten (10) Business Days after the date of such written notice.

(b) During the period following the Closing Date, NNTE, NNCL and NNAL shall hold the Chinese Owned Inventory in accordance with the terms of the Transition Services Agreement as if it had been transferred to the Purchaser or a Designated Purchaser at Closing.  The Purchaser shall pay any and all amounts due in connection with the storage, handling and shipment of the Chinese Owned Inventory by the Sellers in accordance with the Transition Services Agreement.  For up to six (6) months from the Closing Date (or until such earlier date as is specified in the last sentence of 2.1.11(a)), none of NNTE, NNCL or NNAL shall transfer its respective right, title or interest in the Chinese Owned Inventory to any Person other than a Designated Inventory Purchaser.

8

(c) If the Chinese Owned Inventory has not been transferred to a Designated Inventory Purchaser by the sixth (6th) month anniversary date of the Closing Date, the Purchaser shall notify NNTE, NNCL and NNAL in writing on or before such date to either (x) at the sole expense of the Purchaser or any Designated Purchaser, ship the Chinese Owned Inventory to the Purchaser or such Designated Purchaser at the Monkstown location unless the Purchaser otherwise provides the Main Sellers with reasonable advance written notice to the contrary, or (y) destroy the Chinese Owned Inventory at the Purchaser's sole cost or expense; provided, however, in the event that the Purchaser fails to deliver such notice, NNTE, NNCL and NNAL may take either such action at its sole discretion.

(d) The Purchaser acknowledges that any Chinese Owned Inventory that is consumed in the course of repair and return work conducted pursuant to the Transition Services Agreement shall not be replenished by NNTE, NNCL or NNAL, as the case may be."

15.   Section 2.2.5 of the Agreement is hereby deleted and replaced with the following:

(a) "At the Closing, each of the Main Sellers, the EMEA Sellers or an authorized representative of the EMEA Sellers and the Purchaser shall enter into the Escrow Agreement with the Escrow Agent in respect of the Working Capital Escrow Amount, the Transition Services Escrow Amount, the Carling Property Escrow Amount, the Tax Escrow Amount, the EMEA Tax Escrow Amount, the Italian Tax Escrow Amount, the Polish Tax Escrow Amount, the FY09 Financial Statements Escrow Amount and the matters set forth on Section 2.1.7(b) of the Sellers Disclosure Schedule.

(b) Each of the Main Sellers, the EMEA Sellers or an authorized representative of the EMEA Sellers and the Purchaser hereby undertake to promptly execute and deliver to the Escrow Agent, in accordance with the Escrow Agreement, instructions to pay to the Sellers, the EMEA Sellers or the Purchaser, as applicable, funds from the escrow account established pursuant to the Escrow Agreement at any time that such Person becomes entitled to such payment from the escrow account pursuant to the terms of the Escrow Agreement and (i) Section 2.2.4.2 in respect of the Working Capital Escrow Amount, (ii) the terms of the Transition Services Agreement in respect of the Transition Services Escrow Amount, (iii) the terms of the Carling Property Lease Agreements in respect of the Carling Property Escrow Amount, (iv) Section 6.7 in respect of the Tax Escrow Amount, (v) Section 6.8 in respect of the EMEA Tax Escrow Amount, (vi) Section 6.9 in respect of the Italian Tax Escrow Amount, (vii) Section 6.10 in respect of the Polish Tax Escrow Amount, (vi) Section 5.26(b) in respect of the FY09 Financial Statements Escrow Amount and (viii) the terms of Section 2.1.7(b) of the Sellers Disclosure Schedule."

16.   Section 6.8 of the Agreement is hereby deleted and replaced with the following:

9

(a) "In the event that any Tax Authority shall make any claim against Purchaser or any EMEA Designated Purchaser or any of their Affiliates (an "**EMEA Purchaser Party**") for (A) any Taxes that are EMEA Excluded Liabilities of any EMEA Seller or (B) any Succession Tax Liabilities or (C) any Succession Tax Lien (any Taxes described in (A) and (B) and (C) above hereby are referred to collectively as "**EMEA Excluded Taxes**"), such EMEA Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such EMEA Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the EMEA Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that: (i) the aggregate amount to be recovered under this Section 6.8 in respect of such Losses shall not exceed the EMEA Tax Escrow Amount (plus any accrued interest on the EMEA Tax Escrow Amount); (ii) the only Losses recoverable under this Section 6.8 shall be Losses incurred by an EMEA Purchaser Party after a Tax Authority has made a claim described in (A), (B) or (C) above, as applicable; and (iii) no claim shall be allowed by any EMEA Purchaser Party in respect of Italian Excluded Taxes or Polish Excluded Taxes.

(b) If a claim for Losses under subsection (a) (an "**EMEA Tax Claim**") is to be made by an EMEA Purchaser Party, the Purchaser shall give written notice (an "**EMEA Tax Claim Notice**") on behalf of such EMEA Purchaser Party to the Joint Administrators promptly after such EMEA Purchaser Party becomes aware that a Tax Authority has made a claim against it for any EMEA Excluded Taxes or that such Taxes have given rise to any Succession Tax Lien for which recovery is sought under this Section 6.8, stating, with reasonable specificity, the basis for the EMEA Tax Claim and the amount of EMEA Excluded Taxes claimed, and including a copy of all relevant documents received from the relevant Tax Authority. In the event that any EMEA Purchaser Party is entitled to recover the amount of any such Losses from the EMEA Tax Escrow Amount, the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Loss to such EMEA Purchaser Party and such EMEA Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of such EMEA Excluded Taxes distributed to it from the EMEA Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund, and shall provide the Joint Administrators with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c) On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, any remaining portion of the EMEA Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all EMEA Tax Claims which have been asserted prior to such date evidenced by one or more EMEA Tax Claim

10

Notices and which remain pending and unresolved on such date. Thereafter, as soon as reasonably practicable after the final resolution of all such EMEA Tax Claim(s), the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the EMEA Tax Escrow Amount (including any accrued interest thereon).

(d) In the event that an EMEA Tax Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority. In the event that a payment is made to an EMEA Purchaser Party pursuant to this Section 6.8, and subsequently an EMEA Purchaser Party or any Affiliate becomes entitled to and receives a refund of amounts in respect of EMEA Excluded Taxes, then the Purchaser shall or shall procure that the relevant EMEA Purchaser Party shall promptly pay to Distribution Agent, on behalf of the Sellers and EMEA Sellers, an amount equal to such refund (including any interest paid in connection with such refund), net of reasonable out-of-pocket expenses incurred by the EMEA Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date or (ii) at the time the refund is received, the EMEA Tax Escrow Amount is less than the sum of the EMEA Tax Claims that are evidenced by one or more EMEA Tax Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the EMEA Tax Escrow Amount."

17. Section 6.9 of the Agreement is hereby deleted and replaced with the following:

(a) "In the event that any Tax Authority in Italy shall make any claim against the Purchaser or any EMEA Designated Purchaser or any of their Affiliates (an "**Italian Purchaser Party**") for (A) any Taxes that are EMEA Excluded Liabilities of any EMEA Seller or (B) any Succession Tax Liabilities or (C) any Succession Tax Lien (any such Taxes are hereby are referred as "**Italian Excluded Taxes**"), such Italian Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such Italian Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the Italian Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that: (i) the aggregate amount to be recovered under this Section 6.9 in respect of such Losses shall not exceed the Italian Tax Escrow Amount (plus any accrued interest on the Italian Tax Escrow Amount); and (ii) the only Losses recoverable under this Section 6.9 shall be Losses incurred by an Italian Purchaser Party after a Tax Authority in Italy has made a claim.

(b) If a claim for Losses under subsection (a) (an "**Italian Tax Claim**") is to be made by an Italian Purchaser Party, the Purchaser shall give written notice (an "**Italian Tax Claim Notice**") on behalf of such Italian Purchaser Party to the

Joint Administrators promptly after such Italian Purchaser Party becomes aware that a Tax Authority in Italy has made a claim against it for Italian Excluded Taxes or that such Taxes have given rise to any Succession Tax Lien for which recovery is sought under this Section 6.9, stating, with reasonable specificity, the basis for the Italian Tax Claim and the amount of Italian Excluded Taxes claimed, and including a copy of all relevant documents received from the relevant Tax Authority. In the event that any Italian Purchaser Party is entitled to recover the amount of any such Losses from the Italian Tax Escrow Amount, the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Loss to such Italian Purchaser Party and such Italian Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of such Italian Excluded Taxes distributed to it from the Italian Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund, and shall provide the Joint Administrators with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c) On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, any remaining portion of the Italian Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Italian Tax Claims which have been asserted prior to such date evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date. Thereafter, as soon as reasonably practicable after the final resolution of all such Italian Tax Claim(s), the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the Italian Tax Escrow Amount (including any accrued interest thereon).

(d) In the event that an Italian Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority (including but not limited to disputing and opposing any assessment(s) in respect of Italian Excluded Taxes (other than Italian Social Security Taxes) on the basis of the ruling dated 2 December 2009 in response to the Interpellation addressed to the regional department of the Revenue Office of Lombardy as submitted by Nortel Italy on 4 August 2009). In the event that a payment is made to an Italian Purchaser Party pursuant to this Section 6.9, and subsequently an Italian Purchaser Party or any Affiliate becomes entitled to and receives a refund of amounts in respect of Italian Excluded Taxes, then the Purchaser shall or shall procure that the relevant Italian Purchaser Party shall promptly pay to Distribution Agent, on behalf of the Sellers and EMEA Sellers, an amount equal to such refund (including any interest paid in connection with

12

such refund), net of reasonable out-of-pocket expenses incurred by the Italian Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date (other than where, prior to such refund being received, the provisions at Section 6.9(e) have applied) or (ii) at the time the refund is received, the Italian Tax Escrow Amount is less than the sum of the Italian Tax Claims that are evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the Italian Tax Escrow Amount.

(e) Upon delivery by Nortel Italy to the Purchaser after Closing of either:

(A)    a ruling (so-called *"interpello"*) issued by the Italian Ministry of Labour (*Ministero del Lavoro e delle Politiche Sociali*) (the "**Italian Social Security Ruling**"); or

(B)    any other certificate, ruling, judgement or other written evidence issued by INPS (*Istituto Nazionale di Previdenza Sociale*) and/or INAIL (*Istituto nazionale per le Assicurazioni e gli Infortuni sul lavoro*) and/or the Italian Ministry of Labour (*Ministero del Lavoro e delle Politiche Sociali*), including its relevant local bodies (e.g. *Direzioni Provinciali del Lavoro, Direzioni Regionali del Lavoro*) (the "**Italian Social Security Documentation**"),

which in each case is reasonably satisfactory in form and content to the Purchaser (acting reasonably and in good faith at all times) and, if such certificate, ruling or other documentation does not address Succession Tax Liens, such other written evidence as is reasonably satisfactory in form and content to the Purchaser (acting reasonably and in good faith at all times) addressing Succession Tax Liens, together confirming either:

(i)    that Nortel Italy does not have any liabilities for Italian Social Security Taxes that could become Succession Tax Liabilities or could give rise to Succession Tax Liens; or

(ii)    that it is not possible (whether as a result of Bankruptcy Proceedings or otherwise) for liabilities for Italian Social Security Taxes of Nortel Italy to become Succession Tax Liabilities or give rise to Succession Tax Liens; or

(iii)    that it is not possible (whether as a result of Bankruptcy Proceedings or otherwise) for liabilities for Italian Social Security Taxes of a company that is subject to an Insolvency Procedure governed by EC Regulation 1346/2000/EC to become Succession Tax Liabilities or give rise to Succession Tax Liens;

then the Purchaser and Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Italian Tax Escrow Amount (including any accrued

13

interest thereon) in excess of an amount equal to the aggregate of all Italian Tax Claims which have been asserted prior to such date evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date, provided that as soon as reasonably practicable after the final resolution of each such Italian Tax Claim, the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the Italian Tax Escrow Amount referable to that Italian Tax Claim (including any accrued interest thereon).

(f) The Purchaser and/or any Italian Purchaser Party shall reasonably cooperate with the EMEA Sellers to obtain the Italian Social Security Ruling (including but not limited to (i) being included as an addressee of the Italian Social Security Ruling and (ii) on request by the EMEA Sellers, using good faith efforts to agree to the form and content of any request or application for the Italian Social Security Ruling in advance of such request or application being made; provided, for the avoidance of doubt, that agreeing to the form and content of any request or application shall not compromise or foreclose the Purchaser's or any Italian Purchaser Party's rights under Section 6.9(e) to approve the form and content of the Italian Social Security Ruling actually received from a Tax Authority), or the Italian Social Security Documentation (including but not limited to (i) being included as an addressee of the Italian Social Security Documentation and (ii) on request by the EMEA Sellers, using good faith efforts to agree to the form and content of any request or application for the Italian Social Security Documentation in advance of such request or application being made; provided, for the avoidance of doubt, that agreeing to the form and content of any request or application shall not compromise or foreclose the Purchaser's or any Italian Purchaser Party's rights under Section 6.9(e) to approve the form and content of the Italian Social Security Documentation actually received from a Tax Authority).

(g) For the avoidance of doubt, the Parties acknowledge and agree that where a reasonably satisfactory Italian Social Security Ruling has been provided which satisfies the requirements of Section 6.9(e)(i), (ii) or (iii) above, no Italian Social Security Documentation shall be required to be provided in addition to it."

18. A new Section 6.10 is hereby added and shall read as follows:

(a) "In the event that any Tax Authority in Poland shall make any claim against the Purchaser or any EMEA Designated Purchaser or any of their Affiliates (a "**Polish Purchaser Party**") for (A) any Taxes that are EMEA Excluded Liabilities of any EMEA Seller or (B) any Succession Tax Liabilities or (C) any Succession Tax Lien (any such Taxes are hereby are referred as "**Polish Excluded Taxes**"), such Polish Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such Polish Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the Polish Tax Escrow Amount in an amount equal to the aggregate

14

amount of such Losses, <u>provided</u> that: (i) the aggregate amount to be recovered under this Section 6.10 in respect of such Losses shall not exceed the Polish Tax Escrow Amount (plus any accrued interest on the Polish Tax Escrow Amount); and (ii) the only Losses recoverable under this Section 6.10 shall be Losses incurred by a Polish Purchaser Party after a Tax Authority in Poland has made a claim.

(b) If a claim for Losses under subsection (a) (a "**Polish Tax Claim**") is to be made by a Polish Purchaser Party, the Purchaser shall give written notice (a "**Polish Tax Claim Notice**") on behalf of such Polish Purchaser Party to the Joint Administrators promptly after such Polish Purchaser Party becomes aware that a Tax Authority in Poland has made a claim against it for Polish Excluded Taxes  or that such Taxes have given rise to any Succession Tax Lien for which recovery is sought under this Section 6.10, stating, with reasonable specificity, the basis for the Polish Tax Claim and the amount of Polish Excluded Taxes claimed, and including a copy of all relevant documents received from the relevant Tax Authority.  In the event that any Polish Purchaser Party is entitled to recover the amount of any such Losses from the Polish Tax Escrow Amount, the Purchaser and the Joint Administrators  shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Loss to such Polish Purchaser Party and such Polish Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of such Polish Excluded Taxes distributed to it from the Polish Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund, and shall provide the Joint Administrators with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c) On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, any remaining portion of the Polish Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Polish Tax Claims which have been asserted prior to such date evidenced by one or more Polish Tax Claim Notices and which remain pending and unresolved on such date.  Thereafter, as soon as reasonably practicable after the final resolution of all such Polish Tax Claim(s), the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the Polish Tax Escrow Amount (including any accrued interest thereon).

(d) In the event that a Polish Tax Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority.  In the event that a payment is made to a Polish Purchaser Party pursuant to this Section 6.10, and

15

subsequently a Polish Purchaser Party or any Affiliate becomes entitled to and receives a refund of amounts in respect of Polish Excluded Taxes, then the Purchaser shall or shall procure that the relevant Polish Purchaser Party shall promptly pay to Distribution Agent, on behalf of the Sellers and EMEA Sellers, an amount equal to such refund (including any interest paid in connection with such refund), net of reasonable out-of-pocket expenses incurred by the Polish Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date (other than where, prior to such refund being received, the provisions at Section 6.10(e) have applied) or (ii) at the time the refund is received, the Polish Tax Escrow Amount is less than the sum of the Polish Tax Claims that are evidenced by one or more Polish Tax Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the Polish Tax Escrow Amount.

(e) Upon delivery by Nortel Poland or by the relevant Polish Tax Authority (including, for the avoidance of doubt, the ZUS (*Zakład Ubezpieczeń Społecznych*)) to the Purchaser after Closing of a certificate, ruling or other documentation issued by the Tax Authorities in Poland reasonably satisfactory in form and content to the Purchaser (acting reasonably and in good faith at all times) and, if such certificate, ruling or other documentation does not address Succession Tax Liens, such other written evidence as is reasonably satisfactory in form and content to the Purchaser (acting reasonably and in good faith at all times) addressing Succession Tax Liens, together confirming either:

(i)    that Nortel Poland does not have any liabilities for Tax that could become Succession Tax Liabilities or could give rise to Succession Tax Liens; or

(ii)    that it is not possible (whether as a result of Bankruptcy Proceedings or otherwise) for liabilities for Tax of Nortel Poland to become Succession Tax Liabilities or give rise to Succession Tax Liens,

then the Purchaser and Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Polish Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Polish Tax Claims which have been asserted prior to such date evidenced by one or more Polish Tax Claim Notices and which remain pending and unresolved on such date, provided that as soon as reasonably practicable after the final resolution of each such Polish Tax Claim, the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the Polish Tax Escrow Amount referable to that Polish Tax Claim (including any accrued interest thereon).