**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**


IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED


AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and
NORTEL NETWORKS TECHNOLOGY CORPORATION


APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED


**FACTUM OF THE CANADIAN DEBTORS**
**Allocation Protocol**
**(Motion returnable June 7, 2011)**

June 3, 2011

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay  LSUC: 21152A**
Tel:  (416) 216-4832
Email:  derrick.tay@nortonrose.com

**Alan Mark  LSUC#: 18772U**
Tel: (416) 216-4865
Email: alan.mark@nortonrose.com

**Jennifer Stam  LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com
Fax: (416) 216-3930

Lawyers for the Applicants

TO:     The Service List

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**FACTUM OF THE CANADIAN DEBTORS**
**ALLOCATION PROTOCOL**
**(MOTION RETURNABLE JUNE 7, 2011)**

**PART I - OVERVIEW**

1.      In June 2009, the Canadian Debtors,[1] certain of the U.S. Debtors,[2] and certain of the EMEA Debtors[3] ("**Debtors**") entered into an Interim Funding and Settlement Agreement ("**IFSA**") which provided for the parties to cooperate in the global sales of Nortel's business units. Under the IFSA, they agreed to negotiate in good faith and "attempt" to reach agreement on a protocol for resolving disputes concerning the allocation of sale proceeds ("**Protocol**").

2.      The parties agreed, under the IFSA, to the "fullest extent permitted by applicable law", that any "claim, action or proceeding" seeking "any relief whatsoever to the extent relating to

---

[1] Collectively, Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.
[2] Certain of NNC's United States subsidiaries including Nortel Networks Inc. ("**NNI**").
[3] Nortel Networks UK Limited ("**NNUK**") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East and Africa.

the matters agreed in the IFSA" must be commenced in the U.S. Court[4] and the Canadian Court[5], in a joint hearing of both Courts under the Cross-Border Protocol, if such claim, action or proceeding would affect the Canadian Debtors and the U.S. Debtors or the EMEA Debtors.

3.      In the two years since the parties entered into the IFSA, they have concluded several sales of global Nortel businesses.  In connection with these sales, they entered into escrow agreements ("**Escrow Agreements**") providing for the deposit of sale proceeds into escrow and the distribution of the proceeds pursuant to the Escrow Agreements.  Under each Escrow Agreement, the parties irrevocably submitted to the exclusive jurisdiction of the U.S. Court and the Canadian Court and agreed to be bound by any judgment arising "under or out of in respect of or in connection with" the Escrow Agreement.

4.      After a year of negotiations, the parties were unable to agree on the fundamental terms of a Protocol.  The most significant disagreement concerned the scope of the question to be resolved pursuant to a Protocol.  The EMEA Debtors wished to use a Protocol to determine not just ownership and value of assets, but also to advance a vast array of allegations of wrongdoing and misconduct against the other estates.  These allegations already are the subject of claims processes that are underway in the U.S. and Canadian Courts.

5.      The parties also left unsettled who the dispute resolver(s) would be, how they would be selected, which parties would be entitled to participate, the dispute resolution process itself (including whether the dispute resolver(s) should give reasons for decision) and whether the resolution should take the form of an arbitral award. Contrary to the EMEA Debtors' assertion, the parties did not conclude any agreement to submit a dispute to arbitration.

6.      As a result of the parties' impasse, negotiations toward a Protocol were suspended. The parties attempted to reach a consensual resolution through mediation which failed.

---

[4] United States Bankruptcy Court for the District of Delaware.
[5] Ontario Superior Court of Justice.

- 3 -

7.     The U.S. Debtors and the Committee[6] filed a Joint Motion in this Court and in the U.S. Court. They seek orders approving an Allocation Protocol to establish procedures and an expedited schedule for the Courts to conduct a joint hearing and determine the allocation of sale proceeds.

8.     The Canadian Debtors also have filed a Motion seeking approval of a proposed Allocation Protocol which they have developed in conjunction with the Monitor[7] the U.S. Debtors, the Committee and others. The Allocation Protocol proposes that the Canadian and U.S. Courts conduct a joint hearing to determine the allocation of sale proceeds. In addition, the Allocation Protocol contemplates, among other things, the appointment of "core parties" in the Allocation Protocol hearings; procedures for determining EMEA Debtors' claims ("**EMEA Claims**") against the Canadian Debtors ("**EMEA Canadian Claims**") and the U.S. Debtors ("**EMEA U.S. Claims**"); and the hearing of motions to dismiss EMEA Claims. The Allocation Protocol proposes that the Canadian and U.S. Courts hold the allocation and EMEA Claims hearings simultaneously.

9.     The Canadian Debtors also are of the view that the pension claims advanced by the UK Pension Trustee[8] and the PPF[9] ("**UK Pension Claims**") should be resolved in the same manner as the EMEA Claims.

10.     Most of the Nortel asset sales have been monetized but cannot be distributed until these issues have been resolved. The proposed Allocation Protocol presents the only realistic, timely and fair proposal. There is significant factual overlap between the theories of allocation put forth by the EMEA Debtors and the causes of action asserted in their proofs of claim. In the absence of an Allocation Protocol, there is a real risk of multiple hearings in multiple jurisdictions resulting in potentially inconsistent decisions made out of context.

11.     As there is no agreement to arbitrate, this Court has no authority to compel the parties to arbitrate their disputes. On the other hand, the parties have submitted to the jurisdiction of both the Canadian and the U.S. Courts to resolve the allocation dispute and the EMEA

---

[6] Official committee of unsecured creditors established in January 2009 as required by U.S. law.
[7] Ernst & Young Inc. as monitor appointed by the Canadian Court for purposes of these CCAA proceedings.
[8] Nortel Networks UK Pension Trust Limited.
[9] Board of the Pension Protection Fund.

Claims, and it is these Courts that have jurisdiction to do so. The Allocation Protocol has the support of a significant number of parties. It is the only fair, efficient, and practical means of moving the administration of these estates forward in a meaningful way.

## PART II - THE FACTS

### A.    Background

12.    On January 14, 2009, the Canadian Debtors were granted protection under the CCAA[10] by Order of the Canadian Court. That same day, most of the U.S. Debtors[11] made voluntary filings in the U.S. Court under Chapter 11 of the United States Bankruptcy Code ("**Code**").

13.    On July 14, 2009, NN CALA[12] filed a voluntary petition in the U.S. Court under Chapter 11 of the Code.

14.    On January 15, 2009, the EMEA Debtors obtained an administration order from the High Court of England and Wales appointing Joint Administrators under the Insolvency Act 1986.

15.    The CCAA proceedings in respect of the Canadian Debtors and the English Administration proceedings in respect of the EMEA Debtors have both been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

16.    Nortel Networks SA commenced secondary insolvency proceedings[13] in the Republic of France and certain other Nortel subsidiaries have filed for creditor protection in the local jurisdictions in which they are located.

---

[10] *Companies' Creditors Arrangement Act* , R.S.C. 1985, c. C-36, as amended to January 14, 2009.
[11] NNI, a U.S. subsidiary of NNL and certain of its U.S. affiliates.
[12] Nortel Networks (CALA) Inc.
[13] Within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings.

## B.    Allocation and the Relevant Agreements

*IFSA*

17.    Over the past two years, the Debtors and certain other Nortel entities have divested themselves of Nortel's global operating businesses. Various Nortel entities were "sellers" under these transactions because the businesses sold were not operated by a single dedicated entity, but rather on a worldwide basis across various legal entities. Among other things, the Canadian Debtors held legal title to the intellectual property underpinning Nortel's global businesses, which it licensed to its affiliates.[14]

18.    To avoid hindering these value-maximizing sales, the Debtors agreed that the proceeds from the global sales would be deposited into escrow pending agreement on allocation.[15]

19.    This agreement was documented in the IFSA (which also dealt with other issues) and was approved by the Canadian and U.S. Courts on June 29, 2009. The English and French courts also authorized the Joint Administrators to enter into the IFSA.[16] Under the IFSA, the parties agreed that the net proceeds of any global sale would be deposited into an escrow account and that each party's execution of sale documentation would not be conditional upon reaching agreement on, or establishing a binding procedure for, the allocation of sale proceeds.[17]

20.    The parties submitted all legal proceedings relating to the matters agreed to in the IFSA which affected parties is more than a single jurisdiction to the exclusive joint jurisdiction of the Canadian and U.S. Courts. In addition, to the extent parties advanced claims that affected solely the U.S. Debtors, the Canadian Debtors, or the EMEA Debtors, the parties submitted those claims to the U.S., Canadian or English Court, respectively:

(a)    _____

---

[14] Sixty-Seventh Report of the Monitor dated June 2, 2011 ("**Monitor's Report**"), para. 14.

[15] Monitor's Report, para. 15; Affidavit of Michael J. Lang sworn June 1, 2011 ("**Lang Affidavit**"), para. 4, Tab 2 of the Canadian Debtors' Motion Record dated June 1, 2011 ("**Motion Record**").

[16] Declaration of Kevin Francis Lloyd in Opposition to Joint Motion for Entry of an order Establishing an Allocation Protocol pursuant to the Interim Funding and Settlement Agreement, and in Support of Cross-Motion to Compel Arbitration sworn May 19, 2011 ("**Lloyd Declaration**"), paras 39, 44.

[17] Monitor's Report, para. 17; IFSA, s. 12. b. and s. 12. a, Appendix A to the Monitor's Report.

> To the fullest extent permitted by applicable law, each Party
> …(ii) agrees that any claim, action or proceeding by such Party
> seeking any relief whatsoever to the extent relating to the
> matters agreed in this Agreement must be commenced in the US
> Court if such claim, action or proceeding would solely affect the
> US Debtors, the Canadian Court if such claim, action or
> proceeding would solely affect the Canadian Debtors, a joint
> hearing of both the Canadian and US Courts conducted under
> the Cross-Border Protocol if such claim, action or proceeding
> would affect the Canadian Debtors and the US Debtors or the
> EMEA Debtors and the English courts if such claim, action or
> proceeding would solely affect the EMEA Debtors…[18]

21.    The IFSA also provides:

> In no case shall there be any distribution from the Escrow
> Account in advance of either (i) agreement of all of the Selling
> Debtors or (ii) in the case where the Selling Debtors fail to
> reach agreement, determination by the relevant dispute
> resolver(s) under the terms of the Protocol (as defined below)
> applicable to the Sale Proceeds, and subject in each case to
> payment of the agreed or determined amount of allocation of
> Sale Proceeds to all Selling Debtors.[19]

22.    The parties agreed to negotiate in good faith and attempt to reach agreement on a
Protocol:

> …the Debtors shall, as soon as reasonably practicable following
> the execution of this Agreement, ***negotiate in good faith and
> attempt to reach agreement on a timely basis*** on a protocol for
> resolving disputes concerning the allocation of Sale Proceeds
> from Sale Transactions (the "Interim Sales Protocol"), which
> Protocol shall provide binding procedures for the allocation of
> Sales Proceeds where the Selling Debtors in such Sale
> Transaction have been unable to reach agreement regarding
> such allocation.[20] **[emphasis added]**

---

[18] IFSA, s. 16 b, Appendix A to the Monitor's Report.
[19] IFSA, s. 12. b, Appendix A to the Monitor's Report.
[20] IFSA, s. 12. c Appendix A to the Monitor's Report.

*Escrow Agreements*

23.     Over the past two years, the Debtors have entered into several significant global transactions[21] under the IFSA framework with an aggregate value of about $3 billion and a stalking horse agreement to sell Nortel's patent portfolio to an affiliate of Google Inc. for $900 million. In connection with each of the sales, the selling parties, the Monitor, the Committee and JPMorgan Chase Bank, N.A. as escrow agent have entered into (and, in the case of the patent portfolio sale, will enter into) Escrow Agreements governing the escrow and distribution of the relevant sale proceeds.[22]

24.     Under each Escrow Agreement, the parties irrevocably and unconditionally submitted to the jurisdiction of the Canadian and U.S. Courts and agreed to be bound by any judgment "arising under or out of in respect of or in connection with" the Escrow Agreements.[23]  The jurisdiction clause in each Escrow Agreement is substantially similar to the following:

> ...EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPERIOR COURT OF JUSTICE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPERIOR COURT OF JUSTICE ON JUNE 29, 2009[...] AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF IN

---

[21] CDMA/LTE Access transaction with Telefonaktiebolaget LM Ericsson (publ) ("Ericsson"), Enterprise transaction with Avaya Inc., Next Generation Packet Core transaction with Hitachi Ltd., MEN transaction with Ciena Corporation, GSM/GSM-R transaction with Ericsson and Kapsch CarrierCom AG, CVAS transaction with GENBAND US LLC and MSS (Passport) transaction with Ericsson. Certain of the Canadian Debtors and the U.S. Debtors, and in one case the EMEA Debtors, have completed a number of smaller transactions, the proceeds of which are subject to similar escrow arrangements. Appendix C to the Monitor's Report.

[22] Monitor's Report, para 19.

[23] Monitor's Report, para. 21.

RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT.[24]

25.     The IFSA provides that sale proceeds may only be distributed if instructed jointly by the Depositors and Estate Fiduciaries or, where the parties have entered into a Protocol, pursuant to the Protocol:

>    5.     Distribution of Escrow Funds. The Depositors, the Estate Fiduciaries and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:

>    (a)     The Escrow Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of sales proceeds (a "Decision") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.[25]

---

[24] CDMA/LTE Distribution Escrow Agreement, s. 21, Monitor's Report, Appendix "C"

[25] CDMA/LTE Distribution Escrow Agreement, s. 5. Each of the Approval and Vesting Orders granted by this Honorable Court in connection with the global sale transactions contain provisions which are consistent with the terms of the IFSA and the distribution escrow agreements in that it is ordered that the net sale proceeds will be paid into escrow and such sale proceeds shall not be distributed in advance of either agreement of the relevant parties or determination by a dispute resolver under a Protocol. Footnote 6 to the Monitor's Report, para.20; Appendix E to the Monitor's Report.

26.    The Escrow Agreements also authorize the distribution agent to comply with "any order, judgment or decree" made or entered by any court order "affecting the property deposited under this Agreement" which it is advised by its legal counsel is binding upon it.[26]

27.    Because the parties were not able to successfully negotiate a Protocol, the Canadian Debtors request that the Canadian Court exercise its jurisdiction to determine allocation issues and order the parties to direct payment accordingly from the Escrow Funds.

### Amended Cross-Border Protocol

28.    At the same time the IFSA was presented for approval, the Canadian and U.S. Courts adopted an amended Cross-Border Protocol which stated that certain parties could request a joint hearing of the Courts

> "...to the extent any motion is filed or relief is sought ... in either [the U.S. or Canadian] Court relating to...any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor...",[27]

### Protocol Negotiations

29.    After execution of the IFSA, the Canadian Debtors, the Monitor, the U.S. Debtors, the EMEA Debtors and certain of their respective stakeholders conducted negotiations toward a Protocol.[28] These negotiations took place from the summer of 2009 to the summer of 2010. The parties exchanged multiple drafts, held numerous conference calls and met in person three times in an attempt to resolve Protocol-related issues.[29]

30.    After approximately a year of negotiations toward a Protocol, it was evident that the parties could not agree on a number of key issues. Among these issues were the significantly differing views of the Canadian Debtors and the EMEA Debtors as to the proper scope of the

---

[26] CDMA/LTE Distribution Escrow Agreement, s. 23, Appendix C to the Monitor's Report.
[27] Cross-Border Protocol, s. 15, Appendix F to the Monitor's Report.
[28] Monitor's Report, para 25; Lang Affidavit, para. 6.
[29] Lang Affidavit, paras 6, 8; Monitor's Report, para. 24.

dispute to be determined under a Protocol. Nor was there ever agreement on other important matters such as the identity of the dispute resolver or resolvers and how they would be selected, which parties would be entitled to participate, the process, whether the dispute resolver would provide reasons, and whether the resolution would take the form of an arbitral award.[30]

31.   As a result of these issues, the parties have been unable to conclude any Protocol.

32.   With respect to the scope of a Protocol, the main area of disagreement arose from the EMEA Debtors' contention that, under the Protocol, they should be able to assert claims of alleged wrongful conduct by the Canadian Debtors giving rise to proprietary remedies to or "beneficial ownership" of the Canadian Debtors' share of the sale proceeds. The allegations underlying such claims are already the subject matter of most of the allegations made in the EMEA Canadian Claims delivered pursuant to the EMEA Claims Procedure Order.[31]

33.   The EMEA Debtors now assert that the scope of the Protocol was agreed and that it is clear the Protocol was always intended to be the forum for resolving all such claims. However, that is not the position they asserted during the negotiations.  For example, on April 14, 2010, counsel for EMEA acknowledged that it was never intended for the Protocol to extend to inter-estate claims.[32]

34.   As a result of this fundamental difference of opinion regarding the proper scope of a Protocol and the many other issues still in dispute, the parties are at an impasse.

35.   The Monitor has expressed the view that permitting the EMEA Debtors to advance a multitude of such allegations in an allocation process would be tantamount to usurping the Canadian Court's statutory jurisdiction to determine claims against the Canadian Debtors.[33]

36.   The Monitor has also expressed the view that agreeing to allow the EMEA Debtors to raise such claims in the context of the allocation dispute and, subsequently, as inter-estate

---

[30] Lang Affidavit, paras 9. 10, 11.  Monitor's Report, para 25.
[31] Order of the Canadian Court dated January 14, 2011.
[32] Lang Affidavit, para. 13; E-mail of Kevin Lloyd sent April 14, 2010, Exhibit H to the Lang Affidavit.
[33] Monitor's Report, para. 27.

claims would also unfairly give the EMEA Debtors "two kicks at the can" to attempt to prove their claims twice. This would also be costly and inefficient.[34]

***Mediation and Documentary Discovery***

37.     As a result of this impasse, the parties agreed to attempt a mediation of all the issues between them (both allocation and EMEA Claims). They submitted to extensive non-binding mediation sessions over eight days in November 2010 and April 2011 before retired U.S. Judge Layne Phillips. They disclosed a total of about 43,000 documents to each other. The Canadian Debtors, alone, reviewed and posted about 16,000 documents. Despite these good faith efforts, the mediation failed.[35]

38.     It is now time to move forward and resolve not only the allocation dispute, but also the other disputes the outcome of which will have a significant impact on the estates and all their stakeholders – the EMEA Claims and the U.K. Pension Claims.

### C.    Proposed Allocation Protocol

39.     The Canadian Debtors have proposed an Allocation Protocol for which they seek the Canadian Court's approval. The U.S. Debtors and the Committee are also seeking the U.S. Court's approval of the Allocation Protocol. The Canadian Creditors support the Allocation Protocol and the U.K. Pension Claimants do not oppose it.

40.     Essentially, the Allocation Protocol provides for the following:[36]

>    (a)     The Canadian and U.S. Courts would establish binding procedures, including discovery, for determining the allocation of the proceeds of the global sales to the Debtors' estates;

---

[34] Monitor's Report, para. 27.
[35] Monitor's Report, para. 29.
[36] Monitor's Report, para. 32.

(b)     Creditor claims, including but not limited to inter-company claims, shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any inter-company claim is made;

(c)     The relevant Nortel selling entities (including the Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors would be "core parties" in the Allocation Protocol hearings, with full rights of participation. Any other party in interest could seek to establish itself as a core party;

(d)     The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA U.S. Claims. The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Canadian Claims; and

(e)     The Canadian and U.S. Courts will hold, simultaneously, (a) a joint hearing regarding allocation of global sale proceeds and (b) a hearing into unresolved EMEA Canadian Claims and EMEA U.S. Claims, provided that the Courts, in their discretion, may sit separately to hear evidence or argument that is relevant to only the Canadian or U.S. Debtors, respectively. Each Court would then issue its respective decisions.

41.     The Allocation Protocol is urgently needed. Despite the parties' enormous and very costly efforts to negotiate in good faith and attempt to reach an agreement on a Protocol or a mediated settlement, they have clearly reached an impasse.[37] If they do not receive direction from the Canadian and U.S. Courts, the escrow agent may only release the sale proceeds if the relevant Nortel sellers, the Monitor and the Committee agree to issue joint directions, an agreement which appears impossible to reach. The Canadian and U.S. Courts have supervisory authority in these insolvency proceedings with the power and resources to resolve these issues fairly, efficiently and finally. Furthermore, the key interested parties have submitted to the exclusive jurisdiction of these two Courts through the IFSA and the Escrow Agreements.

---

[37] Monitor's Report, para. 34.

42.    The Allocation Protocol also will create a unified process for dealing fairly, efficiently and consistently with multiple proceedings. As admitted under oath by John Whiteoak, counsel for the EMEA Debtors, "the issues to which the EMEA Claims give rise are inextricably linked to the allocation of the sales proceeds. The EMEA Claims arise out of the same facts, issues, and legal principles as the EMEA Debtors' sale proceeds allocation arguments."[38]   This raises the danger of "multiple proceedings dealing with the identical issues and the likelihood of inconsistent results".[39]

43.    The U.K. Pension Claims also should be resolved simultaneously with, and in a similar manner to, the allocation dispute and the EMEA Claims. They represent highly significant amounts, potentially could affect all stakeholders' recoveries, and, perhaps most importantly, are based on factual allegations that overlap with the EMEA Debtors' position in the allocation dispute and the EMEA Claims.  A failure to resolve these claims in conjunction with the allocation dispute, or a failure to consider them without regard to the allocation dispute and the EMEA Claims, would expose the Canadian Debtors to the possibility of the same alleged wrongdoings being asserted, and value being extracted from the estate, in three separate proceedings.  In addition to being unfair, this would lead to inefficiency, wasting of scarce resources to the detriment of all stakeholders, and risk of inconsistent decisions.

44.    The Allocation Protocol recognizes the need for the Canadian and U.S. Courts to establish procedures for the allocation hearings, including documentary and oral discovery. The Canadian Debtors and the Monitor expect to return to the Courts in the near future, hopefully with an agreement in hand, to make submissions in connection with discovery and process issues for the Allocation Protocol, EMEA Claims and U.K. Pension Claims hearings.[40]

45.    In light of the considerable discovery the parties undertook for the mediation and the fact that these are insolvency proceedings, the Allocation Protocol contemplates that discovery and the allocation hearings will proceed in an expeditious manner. An expeditious

---

[38] Affidavit of John Haydn Whiteoak sworn January 12, 2011, para. 19 ("**Whiteoak Affidavit**"), Exhibit to Lloyd Declaration at pp. 1115 to 1144.
[39] Whiteoak Affidavit, para.3, Exhibit to Lloyd Declaration at pp. 1115 to 1144.
[40] Monitor's Report, para. 39.

resolution of these matters is essential before any significant progress can be made towards a plan or distributions to creditors.

46.     The Canadian Court has already approved the Canadian Debtors' request to establish a an EMEA Claims process.[41] This process together with the general claims process will identify and quantify the universe of claims against the Canadian Debtors. It is time to establish a procedure for resolving the other key variable – which portion of the global sale proceeds will be available to satisfy the claims of the Canadian Debtors' creditors.[42]

47.     As a result of allocation theories becoming, in the words of Mr. Whiteoak, "inextricably intertwined" with the EMEA Claims which, in turn, involve considerable factual overlap with the U.K. Pension Claims, it is clear that the allocation of proceeds must be determined in a coordinated procedure that addresses and resolves all three areas of dispute. The integrity of the CCAA claims process must be preserved, stakeholders must be protected from the cost and potential abuses, including inconsistent decisions being rendered, of multiple proceedings in multiple countries and dispute resolution fora.

48.     For all of the above reasons, the Canadian Debtors seek, supported by the Monitor's recommendation, approval of the Allocation Protocol.

## PART III - ISSUES

49.     This motion requires that the following issues be resolved:

(a)     Does the Canadian Court have jurisdiction over the EMEA Claims, the U.K. Pension Claims, and the allocation dispute?

(b)     Have the Canadian Debtors, the U.S. Debtors and the EMEA Debtors, and other parties to the IFSA and the Escrow Agreements, submitted to the Canadian Court's jurisdiction?

---

[41] The U.S. Debtors have recently commenced a similar process.
[42] Monitor's Report, para. 45.

(c)     Have these parties ousted the Canadian Court's jurisdiction by agreeing to submit their allocation dispute to binding arbitration?

(d)     Have the Canadian Debtors met their obligation to negotiate in good faith and attempt to reach agreement on a Protocol?

(e)     Should the proposed Allocation Protocol be approved as the most fair and efficient way to resolve the impasse amongst the estates?

## PART IV - THE LAW

### A.     Discretionary Power of the Canadian Court

50.     The CCAA is a remedial statute that should be given a broad, purposive interpretation. It has been described as "skeletal in nature." It does not contain a comprehensive code that lays out "all that is permitted or barred".[43]

51.     In order to give the CCAA effect, judges must "flesh out" the bare bones of the statute. The statutory scheme is premised on the exercise of judicial discretion and flexibility.[44] This flexibility is particularly useful in complex insolvency cases in which the Court is required to balance numerous constituents and a myriad of interests. In these cases, CCAA courts have been required to innovate and approve procedures for which there is no explicit authority in the CCAA.[45]

52.     The jurisprudence has identified as sources of the court's discretionary jurisdiction, amongst others:

(a)     the power of the court to impose terms and conditions on the granting of a stay under section 11(4) of the CCAA;

---

[43] *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 45 C.B.R. (5th) 163 (Ont. C.A.) at paras. 44, 61, leave to appeal refused [2008] S.C.C.A. 337 (*"ATB Financial"*); *Century Services Inc. v. Canada (Attorney General)*, [2010] S.C.J. No. 60 at para. 57 (*"Century Services"*).
[44] *Century Services, supra,* at para. 58.
[45] *Century Services, supra,* at para 61.

(b)     the words in the opening of section 11(4) of the CCAA which provide that the court may make an order "on such terms as it may impose"; and

(c)     courts' jurisdiction to "fill in the gaps" of the CCAA in order to give effect to its objects.[46]

53.     Judicial discretion must be exercised in furtherance of the CCAA's purposes.  The overarching objective of the CCAA is to preserve an insolvent debtor's business as a going concern.[47]   As this Court recognized in connection with the sales of Nortel's global businesses, an ultimate objective is to maximize value and preserve the benefit of a going-concern business for all stakeholders, or "the whole economic community".[48]

54.     Another important objective of the CCAA is to promote efficiency and fairness by avoiding a multiplicity of potentially inconsistent proceedings.[49]  This is particularly the case in multi-jurisdictional insolvencies, where the objectives of fairness and efficiency, combined with principles of comity,[50] have resulted in a rapid expansion of cross-border cooperation between the Canadian and U.S. Courts in insolvency proceedings including through the conduct of joint hearings.  The many objectives and benefits of cross-border protocols have been described by Janis Sarra:

> ... Cross-border protocols have reduced the cost of litigation and placed the focus on restructuring issues instead of conflict of laws disputes. These cases involved Canadian debtor corporations with significant operations and asset holdings in the United States, or *vice versa*.  A protocol sets out the ground rules by which concurrent insolvency proceedings can be coordinated; honours the sovereignty of the respective courts; harmonizes activities in multi-jurisdictional insolvency proceedings; promotes the orderly and efficient administration

(a)     ————————————

[46] CCAA s. 11(4); *Re Nortel Networks Corp., supra,* at para 30 and cases cited therein.
[47] *Re Nortel Networks Corp., supra,* at para 32.
[48] *Re Nortel Networks Corp.,* [2009] O.J. No. 3169, at para. 33; *Citibank Canada v. Chase Manhattan Bank of Canada* (1991), 5 C.B.R. (3d) 165 (Ont. Gen. Div.) at para. 29; *Re Consumers Packaging Inc.* (2001), 27 C.B.R. (4th) 197 (Ont. C.A.) at para. 5; *Killough. v. Canadian Red Cross Society* (2001), 91 B.C.L.R. (3d) 309 (B.C.S.C.) at para. 12 (QL).
[49] See, for example, In *Re Grace Canada Inc.,* [2005] O.J. No. 4868 (S.C.J.); *Re Muscletech Research and Development Inc.* [2006] O.J. No. 167 (Ont. S.C.J.).
[50] See, for example, *Babcock & Wilcox Canada Ltd. (Re)* [2000] O.J. No. 786; *Re Muscletech Research and Development Inc.* [2006] O.J. No. 167 (Ont. S.C.J.).

for insolvency proceedings for the benefit of all parties; and implements a framework of general principles to address basic administration issues arising out of cross-border insolvencies.[51]

55.     Consistently with the above principles, the Canadian Court clearly has jurisdiction to approve the Allocation Protocol:

(a)     The determination of the EMEA Canadian Claims and the U.K. Pension Claims, including the process to be employed in making such a determination, is a matter falling squarely within Canadian Court's core jurisdiction under the CCAA. The Canadian Court has express jurisdiction, under section 12 of the CCAA, to determine a dispute about the "amount" of a claim. The Canadian Court's jurisdiction to determine the existence, nature, validity and extent of claims against a debtor company has been clear law from the earliest times. The manner in which it does so falls within the Canadian Court's broad discretion and implied and inherent jurisdiction to control its own procedures and further the objectives of the CCAA.[52]

(b)     The determination of the allocation dispute also falls squarely within the Canadian Court's core jurisdiction.     The Canadian Debtors' entitlement to the escrowed proceeds of sale constitutes most of the assets in the Canadian Debtors' estate.     In determining the allocation dispute, the Canadian Court will be required to determine: (i) which assets belong to the Canadian Debtors and, accordingly, are available for distribution to their respective creditors; and (ii) conversely, which assets belong to other estates and so fall outside the scope of any distribution to the Canadian Debtors' creditors. In making these determinations, the Canadian Court is exercising its supervisory role under the CCAA, consistently with the goals of (i) preserving and maximizing the value of assets for stakeholders; (ii) ensuring fairness amongst all creditors and other interested parties; and (iii) promoting efficiency and avoiding multiplicity of proceedings while respecting principles of comity, particularly through the use of the Cross-Border Protocol to conduct joint hearings with the U.S. Court.

---

[51] Sarra, *Rescue! The Companies' Creditors Arrangement Act*, pp. 288-289.
[52] *ScoZinc Ltd. (Re)*, [2009] N.S.J. No. 187 (S.C.) at paras 25-31.

### B.   Express Attornment by the Parties

56.     In any event, the relevant parties have submitted irrevocably and unconditionally to the exclusive jurisdiction of the Canadian and U.S. Courts.

57.     By filing proofs of claim in the Canadian Court, the EMEA Debtors attorned to the Canadian Court's personal jurisdiction over them in any proceeding directly related to the EMEA Canadian Claims.[53]

58.     By filing proofs of claim with respect to the U.K. Pension Claims, the U.K. Trustee and PPF have similarly attorned to the Canadian Court's personal jurisdiction over them in any proceeding directly related to the U.K. Pension Claims.

59.     Finally, through forum selection clauses in several agreements, the Canadian, U.S. and EMEA Debtors submitted themselves to the exclusive jurisdiction of the Canadian and U.S. Courts with respect to the allocation of sale proceeds held in escrow.

60.     The IFSA addressed, amongst other things, the deposit of sale proceeds in escrow and the release and distribution of those sale proceeds.[54]   In section 16.b., the parties submitted all legal proceedings seeking *"any relief whatsoever"* to the extent *"relating to"* the matters agreed in the IFSA to, where parties in more than a single jurisdiction were affected, the exclusive joint jurisdiction of the Canadian and U.S. Courts:

> To the fullest extent permitted by applicable law, each Party ...(ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in ... a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors ...[55]

---

[53] *Roberts v. Picture Butte Municipal Hospital*, [1998] A.J. No. 817 (Q.B.) at paras. 23-24.
[54] See IFSA, s. 12(b).
[55] IFSA, s. 16 b.

61.     The amended Cross-Border Protocol, which was approved on the same date as the IFSA and which was expressly incorporated by reference into the above forum selection clause, expressly refers to the right of certain parties to request a joint hearing if a motion to allocate sale proceeds exceeding U.S. $30 million is filed in the Canadian Court, and at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or own assets involved in the motion. [56]

62.     Furthermore, the parties again submitted, "irrevocably and unconditionally", to the jurisdiction of the Canadian and U.S. Courts under their many Escrow Agreements, in which they agreed to be bound by any judgment *arising under or out of in respect of or in connection with*" the Escrow Agreements. [57] It is clear that a dispute about the allocation of proceeds would arise "in respect of" or "in connection with" the Escrow Agreements which govern the deposit into escrow, and the release and distribution, of sale proceeds.

63.     In Canada, the law strongly favours the enforcement of forum selection clauses, including clauses that are contained in agreements governed by a foreign law.  The starting point in any application to enforce a forum selection clause is that the parties should be held to their bargain.  The Supreme Court of Canada has reaffirmed that "[i]t is essential that courts give full weight to the desirability of holding contracting parties to their agreements." Forum selection clauses "are common components of international commercial transactions", have "been applied for ages in the industry and by the courts", and "are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law." A party seeking to avoid such a clause bears the weight of proving "strong cause", which requires "exceptional circumstances":[58]

---

[56] Cross-Border Protocol, s. 15. Appendix "F" to the Monitor's Report.

[57] CDMA/LTE Distribution Escrow Agreement, s. 21.

[58] Exceptional circumstances or strong grounds might include, for example, (such as, for example, fraud in contract formation, the forum selection clause not including, in its scope, the circumstances that have arisen which could not have been reasonably foreseen by the contracting parties, frustration of some clear public policy, or the impossibility of obtaining a fair trial which could not have been reasonably anticipated at the time: *Expedition Helicopters Inc. v. Honeywell Inc.*, [2010] O.J. No. 1998 (C.A.) (leave to appeal to the S.C.C. denied [2010] S.C.C.A. No. 258) at para. 24.

> The "strong cause" test reflects the desirability that parties
> honour their contractual commitments and is consistent with the
> principles of order and fairness at the heart of private
> international law, as well as those of certainty and security of
> transaction at the heart of international commercial
> transactions.[59]

64.    The forum selection clause under the IFSA uses very broad language, including "any claim", "relating to" and "any relief whatsoever". The words used in the clauses are given a very broad meaning under the laws of the State of New York,[60] and clearly applies to the allocation and distribution of escrowed sale proceeds.

## C.    No Submission to Binding Arbitration

65.    The parties did not reach any agreement to arbitrate. They merely agreed, in section 12.c. of the IFSA, to "negotiate in good faith" and "*attempt*" to reach agreement on a Protocol for resolving "disputes concerning the allocation" of sale proceeds.

66.    Accordingly, there is no arbitration agreement in existence that could override, or narrow the expansive scope of, the parties' forum selection clauses.

67.    Under the applicable laws,[61] a valid and enforceable arbitration agreement comes into existence if it is in writing and evinces the parties' intent to submit themselves to binding arbitration.   Whether the parties have evinced such an intent is a matter of contract interpretation, the starting point for which is the plain language of the agreement.[62]

68.    Contrary to statements made by Professor Cheng, U.S. federal policy does not create any presumption in favour of the formation of an arbitration agreement.. The federal policy in favour of arbitration only applies in interpreting the *scope* of an arbitration agreement, not its existence.[63]

---

[59] *Expedition Helicopters Inc. v. Honeywell Inc.*, [2010] O.J. No. 1998 (C.A.), paras 6-11, applying and quoting extensively from *Pompey Industrie v. ECU-Line N.V.*, [2003] 1 S.C.R. 450.
[60] Affidavit of David Lindsey sworn June 3, 2011 ("**Lindsey Affidavit**"), para 26.
[61] The IFSA (and the Escrow Agreements) is governed by the laws of the State of New York, without regard to conflict rules.
[62] Lindsey Affidavit, para 16.
[63] Lindsey Affidavit, para. 20.

69.    Nor does section 12.b. of the IFSA constitute a submission to arbitration. Section 12.b. states:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

70.    First, section 12.b. does not, on its face, speak in terms usually used to submit to arbitration. The conclusion asserted by Professor Cheng is really no more than an unfounded inference.[64]    Furthermore, section 12.b. has none of the features typically found in any enforceable commercial arbitration agreement, particularly one entered into by sophisticated parties with the benefit of legal advice. Section 12.b. does not provide any methodology for an arbitration. It does not provide for the exclusivity of the process. It says nothing about the "seat" of the arbitration, the number of arbitrators, the method of appointing arbitrators, the language or governing law of the arbitration, or the procedural rules that would govern the arbitration.[65]    The absence of these features is particularly telling, given that the parties did not select a particular arbitral institution with its own set of rules to govern the process, and so would have needed to provide their own procedural code had they concluded any agreement to submit to "*ad hoc*" arbitration.

71.    The parties were careful to fully delineate the precise jurisdiction of the courts in section 16.b. of the IFSA. In contrast with section 16.b., it is obvious that section 12.b. is *not* a submission to arbitration. In any event, section 12.b. is followed by section 12.c which indicates the parties' clear intention to "attempt" to reach agreement on a Protocol.

72.    Furthermore, the lack of any reference whatsoever to the word "arbitration", and the use of the generic term "dispute resolver(s)" instead of "arbitrator", are extraordinary features of a purported commercial arbitration agreement between sophisticated parties.

---

[64] Affidavit of Tai-Hen Cheng, sworn May 31, 2011, paras. 25-28.
[65] Lindsey Affidavit, para. 32.

73.    The Ontario law position is similar to that in New York. In discerning the intent of the parties, the courts will examine whether the parties have stipulated, with sufficient certainty, certain key features of arbitration such as the circumstances that would engage the arbitration, the scope of the dispute subject to arbitration, the procedure for initiating and conducting the arbitration, and who would be appointed as arbitrator (or the method for doing so). In the absence of such critical details, courts have concluded that the parties did not conclude a binding arbitration agreement.[66]

74.    Both experts agree that under the applicable laws, an agreement must be enforced according to the plain meaning of its terms without resort to extrinsic evidence. Where an agreement is only susceptible of one meaning, the courts are not at liberty to alter it. Mr. Lindsey has opined that section 12 of the IFSA is so clear and unambiguous on its face that it is not necessary to look to extrinsic evidence to interpret it.

75.    Even if extrinsic evidence were relevant, in this case the evidence overwhelmingly indicates that the parties failed to conclude an arbitration agreement. The Canadian Debtors and the EMEA Debtors fundamentally disagreed as to the proper scope of the dispute to be determined under a Protocol. Nor was there ever agreement on other important matters such as the identity of the dispute resolver or resolvers and how they would be selected, which parties would be entitled to participate, the process, whether the dispute resolver(s) would provide reasons, and whether the resolution would take the form of an arbitral award.[67]

### D.    Canadian Debtors Conducted Negotiations in Good Faith

76.    The parties' agreement to negotiate in good faith and attempt to reach agreement on a Protocol did not require them to conclude an agreement. There was nothing in the language of section 12.c. that would suggest, and it cannot be the case, that the only appropriate outcome of a good faith negotiation would be to agree to binding arbitration.

---

[66] *Benner and* Associates *Ltd. v. Northern Lights Distribution Inc.* [1995] O.J. No. 626 (Gen. Div.); *Coldmatic Refridgeration of Canada Ltd. v. P.U.M.A.s.r.* [1998] O.J. No. 1697 (Gen. Div.).

[67] Lang Affidavit.

77.    All the parties agreed to do was to negotiate in good faith to "attempt" to reach agreement on a Protocol. It is evident from the correspondence between the parties that that is exactly what they did. Despite their protracted and dedicated attempts to negotiate a Protocol, there were many key issues outstanding between them at the conclusion of their year of negotiations.

78.    It is obvious from the correspondence between the parties that the Canadian Debtors acted in good faith in conducting the negotiations, including their position with respect to the scope of the dispute to be resolved by the Protocol. It was the EMEA Debtors' position about the scope of the dispute that changed over time.

79.    All parties understood from the outset that the EMEA Claims were to be determined by the Canadian and U.S. Courts according to a claims procedure. All parties, including the EMEA Debtors, also believed that the allocation dispute would not involve an adjudication of the EMEA Claims.

80.    The EMEA Debtors subsequently sought to convert most of the EMEA Claims concerning alleged misconduct and wrongdoing by the Canadian and U.S. Debtors over a 20-year period into an allocation Protocol through the device of seeking proprietary remedies. The Canadian Debtors acted in good faith in refusing to accept this attempt to expand the Protocol the parties were seeking to negotiate.[68]

## PART V - ORDER SOUGHT

81.    The Canadian Debtors seek an Order of this Honourable Court approving the proposed Allocation Protocol.

---

[68] Lang Affidavit, para. 13; E-mail of Kevin Lloyd sent April 14, 2010, Exhibit H to the Lang Affidavit; Whiteoak Affidavit, para. 28.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED**

June 3, 2011

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com
Fax: (416) 216-3930

**Alan Mark LSUC#: 18772U**
Tel:  (416) 216-4865
Email: alan.mark@nortonrose.com

**Jennifer Stam LSUC 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com
Fax: (416) 216-3930

Lawyers for the Applicants

# SCHEDULE "A"

# AUTHORITIES

1.   *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 45 C.B.R. (5th) 163 (Ont. C.A.), leave to appeal refused, [2008] S.C.C.A. No. 337

2.   *Babcock & Wilcox Canada Ltd. (Re)* [2000] O.J. No. 786 (S.C.J.)

3.   *Benner and Associates Ltd. V. Northern Lights Distribution Inc.* [1995] O.J. No. 626 (Gen. Div.)

4.   *Century Services Inc. v. Canada (Attorney General)*, [2010] S.C.J. No. 60

5.   *Citibank Canada v. Chase Manhattan Bank of Canada* (1991), 5 C.B.R. (3d) 165 (Ont. Gen. Div.)

6.   *Coldmatic Refridgeration of Canada Ltd. v. P.U.M.A.s.r.* [1998] O.J. No. 1697 (Gen. Div.)

7.   *Consumers Packaging Inc. (Re)* (2001) , 91 B.C.L.R. (3d)27 C.B.R. (4th) 197 (Ont. C.A.)

8.   *Expedition Helicopters Inc. v. Honeywell Inc.,* [2010] O.J. No. 1998 (C.A.) leave to appeal to S.C.C. denied [2010] S.C.C.A. No. 258

9.   *Grace Canada Inc. (Re)*, [2005] O.J. No. 4868 (S.C.J.)

10.   *Killough v. Canadian Red Cross Society* (2001), 91 B.C.L.R. (3d) 309 (B.C.S.C.)

11.   *Microbiz Corp. v. Classic Software Systems Inc.,* [1996] O.J.. No. 5094 (Gen. Div.)

12.   *Muscletech Research and Development Inc (Re)* [2006] O.J. No. 167 (S.C.J)

13.   *Nortel Networks Corp. (Re),* [2009] O.J. No. 3169

14.   *Roberts v. Picture Butte Municipal Hospital,* [1998] A.J. No. 87 (Q.B.)

15.   *ScoZinc Ltd. (Re)*, [2009] N.S.J. No. 187 (S.C.)

16.   *Z. I. Pompey Industrie v. ECU-Line N.V.,* [2003] 1 S.C.R. 450

## SCHEDULE "B"

## STATUTES

## Companies' Creditors Arrangement Act

R.S.C. 1985, c. C-36, s. 11

[eff September 30, 1997 to September 17, 2009](Past Version)

### PART II JURISDICTION OF COURTS

### SECTION 11.

*Powers of court*

(4) A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

(a) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

*R.S.C. 1985, c. C-36, s. 11; S.C. 1992, c. 27, s. 90; S.C. 1996, c. 6, s. 167; S.C. 1997, c. 12, s. 124.*

### SECTION 12.

*Definition of "claim"*

12. (1) For the purposes of this Act, "claim" means any indebtedness, liability or obligation of any kind that, if unsecured, would be a debt provable in bankruptcy within the meaning of the Bankruptcy and Insolvency Act.

*Determination of amount of claim*

(2) For the purposes of this Act, the amount represented by a claim of any secured or unsecured creditor shall be determined as follows:

(a) the amount of an unsecured claim shall be the amount

(i) in the case of a company in the course of being wound up under the Winding-up and Restructuring Act, proof of which has been made in accordance with that Act,

(ii) in the case of a company that has made an authorized assignment or against which a bankruptcy order has been made under the Bankruptcy and Insolvency Act, proof of which has been made in accordance with that Act, or

(iii) in the case of any other company, proof of which might be made under the Bankruptcy and Insolvency Act, but if the amount so provable is not admitted by the company, the amount shall be determined by the court on summary application by the company or by the creditor; and

(b) the amount of a secured claim shall be the amount, proof of which might be made in respect thereof under the Bankruptcy and Insolvency Act if the claim were unsecured, but the amount if not admitted by the company shall, in the case of a company subject to pending proceedings under the Winding-up and Restructuring Act or the Bankruptcy and Insolvency Act, be established by proof in the same manner as an unsecured claim under the Winding-up and Restructuring Act or the Bankruptcy and Insolvency Act, as the case may be, and in the case of any other company the amount shall be determined by the court on summary application by the company or the creditor.

*Admission of claims*

(3) Notwithstanding subsection (2), the company may admit the amount of a claim for voting purposes under reserve of the right to contest liability on the claim for other purposes, and nothing in this Act, the Winding-up and Restructuring Act or the Bankruptcy and Insolvency Act prevents a secured creditor from voting at a meeting of secured creditors or any class of them in respect of the total amount of a claim as admitted.

*R.S.C. 1985, c. C-36, s. 12; S.C. 1992, c. 27, s. 90; S.C. 1996, c. 6, s. 167; S.C. 2004, c. 25, s. 195.*

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

**FACTUM OF THE CANADIAN DEBTORS**
**ALLOCATION PROTOCOL**
**(MOTION RETURNABLE JUNE 7, 2011)**

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P. O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Alan Mark LSUC#: 18772U**
Tel: (416) 216-4865
Email: alan.mark@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930
Lawyers for the Applicants