**<u>EXHIBIT B</u>**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE ***COMPANIES' CREDITORS ARRANGEMENT ACT,***
**R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE ***COMPANIES' CREDITORS ARRANGEMENT ACT,***
**R.S.C. 1985, c. C-36, AS AMENDED**

**BRIEF OF AUTHORITIES OF THE CANADIAN DEBTORS**

**(Allocation Protocol)**
**(returnable June 7, 2011)**

June 3, 2011

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Alan Mark LSUC#: 18772U**
Tel: (416) 216-4865
Email: alan.mark@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**I N D E X**

| **TAB** | **DESCRIPTION** |
|---|---|
| 1. | *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 45 C.B.R. (5th) 163 (Ont. C.A.), leave to appeal refused, [2008] S.C.C.A. No. 337 |
| 2. | *Babcock & Wilcox Canada Ltd. (Re)* [2000] O.J. No. 786 (S.C.J.) |
| 3. | *Benner and Associates Ltd. V. Northern Lights Distribution Inc.* [1995] O.J. No. 626 (Gen. Div.) |
| 4. | *Century Services Inc. v. Canada (Attorney General)*, [2010] S.C.J. No. 60 |
| 5. | *Citibank Canada v. Chase Manhattan Bank of Canada* (1991), 5 C.B.R. (3d) 165 (Ont. Gen. Div.) |
| 6. | *Coldmatic Refridgeration of Canada Ltd. v. P.U.M.A.s.r.* [1998] O.J. No. 1697 (Gen. Div.) |
| 7. | *Consumers Packaging Inc. (Re)* (2001) , 91 B.C.L.R. (3d)27 C.B.R. (4th) 197 (Ont. C.A.) |
| 8. | *Expedition Helicopters Inc. v. Honeywell Inc.,* [2010] O.J. No. 1998 (C.A.) leave to appeal to S.C.C. denied [2010] S.C.C.A. No. 258 |
| 9. | *Grace Canada Inc. (Re)*, [2005] O.J. No. 4868 (S.C.J.) |
| 10. | *Killough v. Canadian Red Cross Society* (2001), 91 B.C.L.R. (3d) 309 (B.C.S.C.) |
| 11. | *Microbiz Corp. v. Classic Software Systems Inc.,* [1996] O.J.. No. 5094 (Gen. Div.) |

- 2 -

| TAB | DESCRIPTION |
|-----|-------------|
| 12. | *Muscletech Research and Development Inc (Re)* [2006] O.J. No. 167 (S.C.J) |
| 13. | *Nortel Networks Corp. (Re),* [2009] O.J. No. 3169 |
| 14. | *Roberts v. Picture Butte Municipal Hospital,* [1998] A.J. No. 87 (Q.B.) |
| 15. | *ScoZinc Ltd. (Re)*, [2009] N.S.J. No. 187 (S.C.) |
| 16. | *Z. I. Pompey Industrie v. ECU-Line N.V.,* [2003] 1 S.C.R. 450 |

# TAB 1

DOCSTOR: 2191401\1

*Case Name:*

## ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.

**IN THE MATTER OF the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a Plan of Compromise and
Arrangement involving Metcalfe & Mansfield Alternative
Investments II Corp., Metcalfe & Mansfield Alternative
Investments III Corp., Metcalfe & Mansfield
Alternative Investments V Corp., Metcalfe & Mansfield
Alternative Investments XI Corp., Metcalfe & Mansfield
Alternative Investments XII Corp., 4446372 Canada Inc.
and 6932819 Canada Inc., Trustees of the Conduits
Listed In Schedule "A" Hereto
Between
The Investors represented on the Pan-Canadian
Investors Committee for Third-Party Structured
Asset-Backed Commercial Paper listed in Schedule "B"
hereto, Applicants (Respondents in Appeal), and
Metcalfe & Mansfield Alternative Investments II Corp.,
Metcalfe & Mansfield Alternative Investments III
Corp., Metcalfe & Mansfield Alternative Investments V
Corp., Metcalfe & Mansfield Alternative Investments XI
Corp., Metcalfe & Mansfield Alternative Investments
XII Corp., 6932819 Canada Inc. and 4446372 Canada
Inc., Trustees of the Conduits listed in Schedule "A"
hereto, Respondents (Respondents in Appeal), and
Air Transat A.T. Inc., Transat Tours Canada Inc., The
Jean Coutu Group (PJC) Inc., Aéroports de Montréal
Inc., Aéroports de Montréal Capital Inc., Pomerleau
Ontario Inc., Pomerleau Inc., Labopharm Inc., Domtar
Inc., Domtar Pulp and Paper Products Inc., GIRO Inc.,
Vêtements de sports R.G.R. Inc., 131519 Canada Inc.,
Air Jazz LP, Petrifond Foundation Company Limited,
Petrifond Foundation Midwest Limited, Services
hypothécaires la patrimoniale Inc., TECSYS Inc.,
Société générale de financement du Québec, VibroSystM**

**Inc., Interquisa Canada L.P., Redcorp Ventures Ltd., Jura Energy Corporation, Ivanhoe Mines Ltd., WebTech Wireless Inc., Wynn Capital Corporation Inc., Hy Bloom Inc., Cardacian Mortgage Services, Inc., West Energy Ltd., Sabre Enerty Ltd., Petrolifera Petroleum Ltd., Vaquero Resources Ltd. and Standard Energy Inc., Respondents (Appellants)**

[2008] O.J. No. 3164

2008 ONCA 587

45 C.B.R. (5th) 163

296 D.L.R. (4th) 135

2008 CarswellOnt 4811

168 A.C.W.S. (3d) 698

240 O.A.C. 245

47 B.L.R. (4th) 123

92 O.R. (3d) 513

Docket: C48969 (M36489)

Ontario Court of Appeal
Toronto, Ontario

**J.I. Laskin, E.A. Cronk and R.A. Blair JJ.A.**

Heard: June 25-26, 2008.
Judgment: August 18, 2008.

(121 paras.)

*Bankruptcy and insolvency law -- Proceedings in bankruptcy and insolvency -- Practice and procedure -- General principles -- Legislation -- Interpretation -- Courts -- Jurisdiction -- Federal -- Companies' Creditors Arrangement Act -- Application by certain creditors opposed to a Plan of Compromise and Arrangement for leave to appeal sanctioning of that Plan -- Pan-Canadian Investors Committee was formed and ultimately put forward the creditor-initiated Plan of*

*Compromise and Arrangement that formed the subject matter of the proceedings -- Plan dealt with liquidity crisis threatening Canadian market in Asset Backed Commercial Paper -- Plan was sanctioned by court -- Leave to appeal allowed and appeal dismissed -- CCAA permitted the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court -- Companies' Creditors Arrangement Act, ss. 4, 6.*

Application by certain creditors opposed to a Plan of Compromise and Arrangement for leave to appeal the sanctioning of that Plan. In August 2007, a liquidity crisis threatened the Canadian market in Asset Backed Commercial Paper (ABCP). The crisis was triggered by a loss of confidence amongst investors stemming from the news of widespread defaults on US sub-prime mortgages. By agreement amongst the major Canadian participants, the $32 billion Canadian market in third-party ABCP was frozen on August 13, 2007, pending an attempt to resolve the crisis through a restructuring of that market. The Pan-Canadian Investors Committee was formed and ultimately put forward the creditor-initiated Plan of Compromise and Arrangement that formed the subject matter of the proceedings. The Plan was sanctioned on June 5, 2008. The applicants raised an important point regarding the permissible scope of restructuring under the Companies' Creditors Arrangement Act: could the court sanction a Plan that called for creditors to provide releases to third parties who were themselves insolvent and not creditors of the debtor company? They also argued that if the answer to that question was yes, the application judge erred in holding that the Plan, with its particular releases (which barred some claims even in fraud), was fair and reasonable and therefore in sanctioning it under the CCAA.

HELD: Application for leave to appeal allowed and appeal dismissed. The appeal raised issues of considerable importance to restructuring proceedings under the CCAA Canada-wide. There were serious and arguable grounds of appeal and the appeal would not unduly delay the progress of the proceedings. In the circumstances, the criteria for granting leave to appeal were met. Respecting the appeal, the CCAA permitted the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court where the releases were reasonably connected to the proposed restructuring. The wording of the CCAA, construed in light of the purpose, objects and scheme of the Act, supported the court's jurisdiction and authority to sanction the Plan proposed in this case, including the contested third-party releases contained in it. The Plan was fair and reasonable in all the circumstances.

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3,

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 4, s. 6

Constitution Act, 1867, R.S.C. 1985, App. II, No. 5, s. 91(21), s. 92(13)

**Appeal From:**

On appeal from the sanction order of Justice Colin L. Campbell of the Superior Court of Justice, dated June 5, 2008, with reasons reported at [2008] O.J. No. 2265.

**Counsel:**

See Schedule "A" for the list of counsel.

---

The judgment of the Court was delivered by

**R.A. BLAIR J.A.**:--

## A. INTRODUCTION

**1**    In August 2007 a liquidity crisis suddenly threatened the Canadian market in Asset Backed Commercial Paper ("ABCP"). The crisis was triggered by a loss of confidence amongst investors stemming from the news of widespread defaults on U.S. sub-prime mortgages. The loss of confidence placed the Canadian financial market at risk generally and was reflective of an economic volatility worldwide.

**2**    By agreement amongst the major Canadian participants, the $32 billion Canadian market in third-party ABCP was frozen on August 13, 2007 pending an attempt to resolve the crisis through a restructuring of that market. The Pan-Canadian Investors Committee, chaired by Purdy Crawford, C.C., Q.C., was formed and ultimately put forward the creditor-initiated Plan of Compromise and Arrangement that forms the subject-matter of these proceedings. The Plan was sanctioned by Colin L. Campbell J. on June 5, 2008.

**3**    Certain creditors who opposed the Plan seek leave to appeal and, if leave is granted, appeal from that decision. They raise an important point regarding the permissible scope of a restructuring under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 as amended ("CCAA"): can the court sanction a Plan that calls for creditors to provide releases to third parties who are themselves solvent and not creditors of the debtor company? They also argue that, if the answer to this question is yes, the application judge erred in holding that this Plan, with its particular releases (which bar some claims even in fraud), was fair and reasonable and therefore in sanctioning it under the CCAA.

### Leave to Appeal

**4**    Because of the particular circumstances and urgency of these proceedings, the court agreed to collapse an oral hearing for leave to appeal with the hearing of the appeal itself. At the outset of argument we encouraged counsel to combine their submissions on both matters.

**5**    The proposed appeal raises issues of considerable importance to restructuring proceedings under the CCAA Canada-wide. There are serious and arguable grounds of appeal and -- given the expedited time-table -- the appeal will not unduly delay the progress of the proceedings. I am satisfied that the criteria for granting leave to appeal in CCAA proceedings, set out in such cases as *Re Cineplex Odeon Corp.* (2001), 24 C.B.R. (4th) 21 (Ont. C.A.), and *Re Country Style Food Services* (2002), 158 O.A.C. 30, are met. I would grant leave to appeal.

Appeal

**6**    For the reasons that follow, however, I would dismiss the appeal.

## B. FACTS

### The Parties

**7**    The appellants are holders of ABCP Notes who oppose the Plan. They do so principally on the basis that it requires them to grant releases to third party financial institutions against whom they say they have claims for relief arising out of their purchase of ABCP Notes. Amongst them are an airline, a tour operator, a mining company, a wireless provider, a pharmaceuticals retailer, and several holding companies and energy companies.

**8**    Each of the appellants has large sums invested in ABCP -- in some cases, hundreds of millions of dollars. Nonetheless, the collective holdings of the appellants -- slightly over $1 billion -- represent only a small fraction of the more than $32 billion of ABCP involved in the restructuring.

**9**    The lead respondent is the Pan-Canadian Investors Committee which was responsible for the creation and negotiation of the Plan on behalf of the creditors. Other respondents include various major international financial institutions, the five largest Canadian banks, several trust companies, and some smaller holders of ABCP product. They participated in the market in a number of different ways.

## The ABCP Market

**10**    Asset Backed Commercial Paper is a sophisticated and hitherto well-accepted financial instrument. It is primarily a form of short-term investment -- usually 30 to 90 days -- typically with a low interest yield only slightly better than that available through other short-term paper from a government or bank. It is said to be "asset backed" because the cash that is used to purchase an ABCP Note is converted into a portfolio of financial assets or other asset interests that in turn provide security for the repayment of the notes.

**11**    ABCP was often presented by those selling it as a safe investment, somewhat like a guaranteed investment certificate.

**12**    The Canadian market for ABCP is significant and administratively complex. As of August

2007, investors had placed over $116 billion in Canadian ABCP. Investors range from individual pensioners to large institutional bodies. On the selling and distribution end, numerous players are involved, including chartered banks, investment houses and other financial institutions. Some of these players participated in multiple ways. The Plan in this proceeding relates to approximately $32 billion of non-bank sponsored ABCP the restructuring of which is considered essential to the preservation of the Canadian ABCP market.

**13**    As I understand it, prior to August 2007 when it was frozen, the ABCP market worked as follows.

**14**    Various corporations (the "Sponsors") would arrange for entities they control ("Conduits") to make ABCP Notes available to be sold to investors through "Dealers" (banks and other investment dealers). Typically, ABCP was issued by series and sometimes by classes within a series.

**15**    The cash from the purchase of the ABCP Notes was used to purchase assets which were held by trustees of the Conduits ("Issuer Trustees") and which stood as security for repayment of the notes. Financial institutions that sold or provided the Conduits with the assets that secured the ABCP are known as "Asset Providers". To help ensure that investors would be able to redeem their notes, "Liquidity Providers" agreed to provide funds that could be drawn upon to meet the demands of maturing ABCP Notes in certain circumstances. Most Asset Providers were also Liquidity Providers. Many of these banks and financial institutions were also holders of ABCP Notes ("Noteholders"). The Asset and Liquidity Providers held first charges on the assets.

**16**    When the market was working well, cash from the purchase of new ABCP Notes was also used to pay off maturing ABCP Notes; alternatively, Noteholders simply rolled their maturing notes over into new ones. As I will explain, however, there was a potential underlying predicament with this scheme.

### The Liquidity Crisis

**17**    The types of assets and asset interests acquired to "back" the ABCP Notes are varied and complex. They were generally long-term assets such as residential mortgages, credit card receivables, auto loans, cash collateralized debt obligations and derivative investments such as credit default swaps. Their particular characteristics do not matter for the purpose of this appeal, but they shared a common feature that proved to be the Achilles heel of the ABCP market: because of their long-term nature there was an inherent timing mismatch between the cash they generated and the cash needed to repay maturing ABCP Notes.

**18**    When uncertainty began to spread through the ABCP marketplace in the summer of 2007, investors stopped buying the ABCP product and existing Noteholders ceased to roll over their maturing notes. There was no cash to redeem those notes. Although calls were made on the Liquidity Providers for payment, most of the Liquidity Providers declined to fund the redemption of the notes, arguing that the conditions for liquidity funding had not been met in the circumstances.

Hence the "liquidity crisis" in the ABCP market.

**19**    The crisis was fuelled largely by a lack of transparency in the ABCP scheme. Investors could not tell what assets were backing their notes -- partly because the ABCP Notes were often sold before or at the same time as the assets backing them were acquired; partly because of the sheer complexity of certain of the underlying assets; and partly because of assertions of confidentiality by those involved with the assets. As fears arising from the spreading U.S. sub-prime mortgage crisis mushroomed, investors became increasingly concerned that their ABCP Notes may be supported by those crumbling assets. For the reasons outlined above, however, they were unable to redeem their maturing ABCP Notes.

<u>The Montreal Protocol</u>

**20**    The liquidity crisis could have triggered a wholesale liquidation of the assets, at depressed prices. But it did not. During the week of August 13, 2007, the ABCP market in Canada froze -- the result of a standstill arrangement orchestrated on the heels of the crisis by numerous market participants, including Asset Providers, Liquidity Providers, Noteholders and other financial industry representatives. Under the standstill agreement -- known as the Montréal Protocol -- the parties committed to restructuring the ABCP market with a view, as much as possible, to preserving the value of the assets and of the notes.

**21**    The work of implementing the restructuring fell to the Pan-Canadian Investors Committee, an applicant in the proceeding and respondent in the appeal. The Committee is composed of 17 financial and investment institutions, including chartered banks, credit unions, a pension board, a Crown corporation, and a university board of governors. All 17 members are themselves Noteholders; three of them also participated in the ABCP market in other capacities as well. Between them, they hold about two thirds of the $32 billion of ABCP sought to be restructured in these proceedings.

**22**    Mr. Crawford was named the Committee's chair. He thus had a unique vantage point on the work of the Committee and the restructuring process as a whole. His lengthy affidavit strongly informed the application judge's understanding of the factual context, and our own. He was not cross-examined and his evidence is unchallenged.

**23**    Beginning in September 2007, the Committee worked to craft a plan that would preserve the value of the notes and assets, satisfy the various stakeholders to the extent possible, and restore confidence in an important segment of the Canadian financial marketplace. In March 2008, it and the other applicants sought CCAA protection for the ABCP debtors and the approval of a Plan that had been pre-negotiated with some, but not all, of those affected by the misfortunes in the Canadian ABCP market.

**The Plan**

a)    Plan Overview

**24**    Although the ABCP market involves many different players and kinds of assets, each with their own challenges, the committee opted for a single plan. In Mr. Crawford's words, "all of the ABCP suffers from common problems that are best addressed by a common solution." The Plan the Committee developed is highly complex and involves many parties. In its essence, the Plan would convert the Noteholders' paper -- which has been frozen and therefore effectively worthless for many months -- into new, long-term notes that would trade freely, but with a discounted face value. The hope is that a strong secondary market for the notes will emerge in the long run.

**25**    The Plan aims to improve transparency by providing investors with detailed information about the assets supporting their ABCP Notes. It also addresses the timing mismatch between the notes and the assets by adjusting the maturity provisions and interest rates on the new notes. Further, the Plan adjusts some of the underlying credit default swap contracts by increasing the thresholds for default triggering events; in this way, the likelihood of a forced liquidation flowing from the credit default swap holder's prior security is reduced and, in turn, the risk for ABCP investors is decreased.

**26**    Under the Plan, the vast majority of the assets underlying ABCP would be pooled into two master asset vehicles (MAV1 and MAV2). The pooling is designed to increase the collateral available and thus make the notes more secure.

**27**    The Plan does not apply to investors holding less than $1 million of notes. However, certain Dealers have agreed to buy the ABCP of those of their customers holding less than the $1-million threshold, and to extend financial assistance to these customers. Principal among these Dealers are National Bank and Canaccord, two of the respondent financial institutions the appellants most object to releasing. The application judge found that these developments appeared to be designed to secure votes in favour of the Plan by various Noteholders, and were apparently successful in doing so. If the Plan is approved, they also provide considerable relief to the many small investors who find themselves unwittingly caught in the ABCP collapse.

b)    The Releases

**28**    This appeal focuses on one specific aspect of the Plan: the comprehensive series of releases of third parties provided for in Article 10.

**29**    The Plan calls for the release of Canadian banks, Dealers, Noteholders, Asset Providers, Issuer Trustees, Liquidity Providers, and other market participants -- in Mr. Crawford's words, "virtually all participants in the Canadian ABCP market" -- from any liability associated with ABCP, with the exception of certain narrow claims relating to fraud. For instance, under the Plan as approved, creditors will have to give up their claims against the Dealers who sold them their ABCP Notes, including challenges to the way the Dealers characterized the ABCP and provided (or did not provide) information about the ABCP. The claims against the proposed defendants are mainly in

tort: negligence, misrepresentation, negligent misrepresentation, failure to act prudently as a dealer/advisor, acting in conflict of interest, and in a few cases fraud or potential fraud. There are also allegations of breach of fiduciary duty and claims for other equitable relief.

**30**    The application judge found that, in general, the claims for damages include the face value of the Notes, plus interest and additional penalties and damages.

**31**    The releases, in effect, are part of a *quid pro quo*. Generally speaking, they are designed to compensate various participants in the market for the contributions they would make to the restructuring. Those contributions under the Plan include the requirements that:

> a)    Asset Providers assume an increased risk in their credit default swap contracts, disclose certain proprietary information in relation to the assets, and provide below-cost financing for margin funding facilities that are designed to make the notes more secure;
>
> b)    Sponsors -- who in addition have cooperated with the Investors' Committee throughout the process, including by sharing certain proprietary information -- give up their existing contracts;
>
> c)    The Canadian banks provide below-cost financing for the margin funding facility and,
>
> d)    Other parties make other contributions under the Plan.

**32**    According to Mr. Crawford's affidavit, the releases are part of the Plan "because certain key participants, whose participation is vital to the restructuring, have made comprehensive releases a condition for their participation."

### The CCAA Proceedings to Date

**33**    On March 17, 2008 the applicants sought and obtained an Initial Order under the CCAA staying any proceedings relating to the ABCP crisis and providing for a meeting of the Noteholders to vote on the proposed Plan. The meeting was held on April 25th. The vote was overwhelmingly in support of the Plan -- 96% of the Noteholders voted in favour. At the instance of certain Noteholders, and as requested by the application judge (who has supervised the proceedings from the outset), the Monitor broke down the voting results according to those Noteholders who had worked on or with the Investors' Committee to develop the Plan and those Noteholders who had not. Re-calculated on this basis the results remained firmly in favour of the proposed Plan -- 99% of those connected with the development of the Plan voted positively, as did 80% of those Noteholders who had not been involved in its formulation.

**34**    The vote thus provided the Plan with the "double majority" approval -- a majority of creditors representing two-thirds in value of the claims -- required under s. 6 of the CCAA.

**35**    Following the successful vote, the applicants sought court approval of the Plan under s. 6.

Hearings were held on May 12 and 13. On May 16, the application judge issued a brief endorsement in which he concluded that he did not have sufficient facts to decide whether all the releases proposed in the Plan were authorized by the CCAA. While the application judge was prepared to approve the releases of negligence claims, he was not prepared at that point to sanction the release of fraud claims. Noting the urgency of the situation and the serious consequences that would result from the Plan's failure, the application judge nevertheless directed the parties back to the bargaining table to try to work out a claims process for addressing legitimate claims of fraud.

**36**    The result of this renegotiation was a "fraud carve-out" -- an amendment to the Plan excluding certain fraud claims from the Plan's releases. The carve-out did not encompass all possible claims of fraud, however. It was limited in three key respects. First, it applied only to claims against ABCP Dealers. Secondly, it applied only to cases involving an express fraudulent misrepresentation made with the intention to induce purchase and in circumstances where the person making the representation knew it to be false. Thirdly, the carve-out limited available damages to the value of the notes, minus any funds distributed as part of the Plan. The appellants argue vigorously that such a limited release respecting fraud claims is unacceptable and should not have been sanctioned by the application judge.

**37**    A second sanction hearing -- this time involving the amended Plan (with the fraud carve-out) -- was held on June 3, 2008. Two days later, Campbell J. released his reasons for decision, approving and sanctioning the Plan on the basis both that he had jurisdiction to sanction a Plan calling for third-party releases and that the Plan including the third-party releases in question here was fair and reasonable.

**38**    The appellants attack both of these determinations.

## C. LAW AND ANALYSIS

**39**    There are two principal questions for determination on this appeal:

> 1)    As a matter of law, may a CCAA plan contain a release of claims against anyone other than the debtor company or its directors?
>
> 2)    If the answer to that question is yes, did the application judge err in the exercise of his discretion to sanction the Plan as fair and reasonable given the nature of the releases called for under it?

### (1) Legal Authority for the Releases

**40**    The standard of review on this first issue -- whether, as a matter of law, a CCAA plan may contain third-party releases -- is correctness.

**41**    The appellants submit that a court has no jurisdiction or legal authority under the CCAA to sanction a plan that imposes an obligation on creditors to give releases to third parties other than the

directors of the debtor company.[1] The requirement that objecting creditors release claims against third parties is illegal, they contend, because:

 a) on a proper interpretation, the CCAA does not permit such releases;

 b) the court is not entitled to "fill in the gaps" in the CCAA or rely upon its inherent jurisdiction to create such authority because to do so would be contrary to the principle that Parliament did not intend to interfere with private property rights or rights of action in the absence of clear statutory language to that effect;

 c) the releases constitute an unconstitutional confiscation of private property that is within the exclusive domain of the provinces under s. 92 of the *Constitution Act*, 1867;

 d) the releases are invalid under Quebec rules of public order; and because

 e) the prevailing jurisprudence supports these conclusions.

**42**   I would not give effect to any of these submissions.

<u>Interpretation, "Gap Filling" and Inherent Jurisdiction</u>

**43**   On a proper interpretation, in my view, the CCAA permits the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court where those releases are reasonably connected to the proposed restructuring. I am led to this conclusion by a combination of (a) the open-ended, flexible character of the CCAA itself, (b) the broad nature of the term "compromise or arrangement" as used in the Act, and (c) the express statutory effect of the "double-majority" vote and court sanction which render the plan binding on <u>all</u> creditors, including those unwilling to accept certain portions of it. The first of these signals a flexible approach to the application of the Act in new and evolving situations, an active judicial role in its application and interpretation, and a liberal approach to that interpretation. The second provides the entrée to negotiations between the parties affected in the restructuring and furnishes them with the ability to apply the broad scope of their ingenuity in fashioning the proposal. The latter afford necessary protection to unwilling creditors who may be deprived of certain of their civil and property rights as a result of the process.

**44**   The CCAA is skeletal in nature. It does not contain a comprehensive code that lays out all that is permitted or barred. Judges must therefore play a role in fleshing out the details of the statutory scheme. The scope of the Act and the powers of the court under it are not limitless. It is beyond controversy, however, that the CCAA is remedial legislation to be liberally construed in accordance with the modern purposive approach to statutory interpretation. It is designed to be a flexible instrument and it is that very flexibility which gives the Act its efficacy: *Canadian Red Cross Society (Re)* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div.). As Farley J. noted in *Re Dylex Ltd.* (1995), 31 C.B.R. (3d) 106 at 111 (Ont. Gen. Div.), "[t]he history of CCAA law has been an evolution of judicial interpretation."

**45**    Much has been said, however, about the "evolution of judicial interpretation" and there is some controversy over both the source and scope of that authority. Is the source of the court's authority statutory, discerned solely through application of the principles of statutory interpretation, for example? Or does it rest in the court's ability to "fill in the gaps" in legislation? Or in the court's inherent jurisdiction?

**46**    These issues have recently been canvassed by the Honourable Georgina R. Jackson and Dr. Janis Sarra in their publication "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters,"[2] and there was considerable argument on these issues before the application judge and before us. While I generally agree with the authors' suggestion that the courts should adopt a hierarchical approach in their resort to these interpretive tools -- statutory interpretation, gap-filling, discretion and inherent jurisdiction -- it is not necessary in my view to go beyond the general principles of statutory interpretation to resolve the issues on this appeal. Because I am satisfied that it is implicit in the language of the CCAA itself that the court has authority to sanction plans incorporating third-party releases that are reasonably related to the proposed restructuring, there is no "gap-filling" to be done and no need to fall back on inherent jurisdiction. In this respect, I take a somewhat different approach than the application judge did.

**47**    The Supreme Court of Canada has affirmed generally -- and in the insolvency context particularly -- that remedial statutes are to be interpreted liberally and in accordance with Professor Driedger's modern principle of statutory interpretation. Driedger advocated that "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament": *Re Rizzo & Rizzo Shoes Ltd.*, [1998] 1 S.C.R. 27 at para. 21, quoting E.A. Driedger, *Construction of Statutes*, 2nd ed. (Toronto: Butterworths, 1983); *Bell Expressvu Ltd. Partnership v. R.*, [2002] 2 S.C.R. 559 at para. 26.

**48**    More broadly, I believe that the proper approach to the judicial interpretation and application of statutes -- particularly those like the CCAA that are skeletal in nature -- is succinctly and accurately summarized by Jackson and Sarra in their recent article, *supra*, at p. 56:

> The exercise of a statutory authority requires the statute to be construed. The plain meaning or textualist approach has given way to a search for the object and goals of the statute and the intentionalist approach. This latter approach makes use of the purposive approach and the mischief rule, including its codification under interpretation statutes that every enactment is deemed remedial, and is to be given such fair, large and liberal construction and interpretation as best ensures the attainment of its objects. This latter approach advocates reading the statute as a whole and being mindful of Driedger's "one principle", that the words of the Act are to be read in their entire context, in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the

> intention of Parliament. It is important that courts first interpret the statute before them and exercise their authority pursuant to the statute, before reaching for other tools in the judicial toolbox. Statutory interpretation using the principles articulated above leaves room for gap-filling in the common law provinces and a consideration of purpose in *Québec* as a manifestation of the judge's overall task of statutory interpretation. Finally, the jurisprudence in relation to statutory interpretation demonstrates the fluidity inherent in the judge's task in seeking the objects of the statute and the intention of the legislature.

**49**    I adopt these principles.

**50**    The remedial purpose of the CCAA -- as its title affirms -- is to facilitate compromises or arrangements between an insolvent debtor company and its creditors. In *Chef Ready Foods Ltd. v. Hongkong Bank of Canada* (1990), 4 C.B.R. (3d) 311 at 318 (B.C.C.A.), Gibbs J.A. summarized very concisely the purpose, object and scheme of the Act:

> Almost inevitably, liquidation destroyed the shareholders' investment, yielded little by way of recovery to the creditors, and exacerbated the social evil of devastating levels of unemployment. The government of the day sought, through the C.C.A.A., to create a regime whereby the principals of the company and the creditors could be brought together under the supervision of the court to attempt a reorganization or compromise or arrangement under which the company could continue in business.

**51**    The CCAA was enacted in 1933 and was necessary -- as the then Secretary of State noted in introducing the Bill on First Reading -- "because of the prevailing commercial and industrial depression" and the need to alleviate the effects of business bankruptcies in that context: see the statement of the Hon. C.H. Cahan, Secretary of State, *House of Commons Debates (Hansard)* (April 20, 1933) at 4091. One of the greatest effects of that Depression was what Gibbs J.A. described as "the social evil of devastating levels of unemployment". Since then, courts have recognized that the Act has a broader dimension than simply the direct relations between the debtor company and its creditors and that this broader public dimension must be weighed in the balance together with the interests of those most directly affected: see, for example, *Elan Corp. v. Comiskey (Trustee of)* (1990), 1 O.R. (3d) 289 (C.A.), *per* Doherty J.A. in dissent; *Re Skydome Corp.* (1998), 16 C.B.R. (4th) 125 (Ont. Gen. Div.); *Re Anvil Range Mining Corp.* (1998), 3 C.B.R. (4th) 93 (Ont. Gen. Div.).

**52**    In this respect, I agree with the following statement of Doherty J.A. in *Elan, supra,* at pp. 306-307:

> ... [T]he Act was designed to serve a "broad constituency of investors, creditors and employees".[3] Because of that "broad constituency" the court must, when considering applications brought under the Act, *have regard not only to the*

> *individuals and organizations directly affected by the application, but also to the wider public interest*. [Emphasis added.]


### Application of the Principles of Interpretation

**53**    An interpretation of the CCAA that recognizes its broader socio-economic purposes and objects is apt in this case. As the application judge pointed out, the restructuring underpins the financial viability of the Canadian ABCP market itself.

**54**    The appellants argue that the application judge erred in taking this approach and in treating the Plan and the proceedings as an attempt to restructure a financial market (the ABCP market) rather than simply the affairs between the debtor corporations who caused the ABCP Notes to be issued and their creditors. The Act is designed, they say, only to effect reorganizations between a corporate debtor and its creditors and not to attempt to restructure entire marketplaces.

**55**    This perspective is flawed in at least two respects, however, in my opinion. First, it reflects a view of the purpose and objects of the CCAA that is too narrow. Secondly, it overlooks the reality of the ABCP marketplace and the context of the restructuring in question here. It may be true that, in their capacity as ABCP *Dealers*, the releasee financial institutions are "third-parties" to the restructuring in the sense that they are not creditors of the debtor corporations. However, in their capacities as *Asset Providers* and *Liquidity Providers*, they are not only creditors but they are prior secured creditors to the Noteholders. Furthermore -- as the application judge found -- in these latter capacities they are making significant contributions to the restructuring by "foregoing immediate rights to assets and ... providing real and tangible input for the preservation and enhancement of the Notes" (para. 76). In this context, therefore, the application judge's remark at para. 50 that the restructuring "involves the commitment and participation of all parties" in the ABCP market makes sense, as do his earlier comments at paras. 48-49:

> Given the nature of the ABCP market and all of its participants, it is more appropriate to consider all Noteholders as claimants and the object of the Plan to restore liquidity to the assets being the Notes themselves. The restoration of the liquidity of the market necessitates the participation (including more tangible contribution by many) of all Noteholders.

> In these circumstances, *it is unduly technical to classify the Issuer Trustees as debtors and the claims of the Noteholders as between themselves and others as being those of third party creditors*, although I recognize that the restructuring structure of the CCAA requires the corporations as the vehicles for restructuring. [Emphasis added.]

**56**    The application judge did observe that "[t]he insolvency is of the ABCP market itself, the

restructuring is that of the market for such paper ..." (para. 50). He did so, however, to point out the uniqueness of the Plan before him and its industry-wide significance and not to suggest that he need have no regard to the provisions of the CCAA permitting a restructuring as between debtor and creditors. His focus was on *the effect* of the restructuring, a perfectly permissible perspective, given the broad purpose and objects of the Act. This is apparent from his later references. For example, in balancing the arguments against approving releases that might include aspects of fraud, he responded that "what is at issue is a liquidity crisis that affects the ABCP market in Canada" (para. 125). In addition, in his reasoning on the fair-and-reasonable issue, he stated at para. 142: "Apart from the Plan itself, there is a need to restore confidence in the financial system in Canada and this Plan is a legitimate use of the CCAA to accomplish that goal."

**57**    I agree. I see no error on the part of the application judge in approaching the fairness assessment or the interpretation issue with these considerations in mind. They provide the context in which the purpose, objects and scheme of the CCAA are to be considered.

*The Statutory Wording*

**58**    Keeping in mind the interpretive principles outlined above, I turn now to a consideration of the provisions of the CCAA. Where in the words of the statute is the court clothed with authority to approve a plan incorporating a requirement for third-party releases? As summarized earlier, the answer to that question, in my view, is to be found in:

   a)   the skeletal nature of the CCAA;
   b)   Parliament's reliance upon the broad notions of "compromise" and "arrangement" to establish the framework within which the parties may work to put forward a restructuring plan; and in
   c)   the creation of the statutory mechanism binding all creditors in classes to the compromise or arrangement once it has surpassed the high "double majority" voting threshold and obtained court sanction as "fair and reasonable".

Therein lies the expression of Parliament's intention to permit the parties to negotiate and vote on, and the court to sanction, third-party releases relating to a restructuring.

**59**    Sections 4 and 6 of the CCAA state:

   4.   Where a compromise or an arrangement is proposed between a debtor company and its unsecured creditors or any class of them, the court may, on the application in a summary way of the company, of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of the creditors or class of creditors, and, if the court so determines, of the shareholders of the company, to be summoned in such manner as the court directs.

   6.   Where a majority in number representing two-thirds in value of the creditors, or class of creditors, as the case may be, present and voting either in person or by

proxy at the meeting or meetings thereof respectively held pursuant to sections 4 and 5, or either of those sections, agree to any compromise or arrangement either as proposed or as altered or modified at the meeting or meetings, the compromise or arrangement may be sanctioned by the court, and if so sanctioned is binding

(*a*) on all the creditors or the class of creditors, as the case may be, and on any trustee for any such class of creditors, whether secured or unsecured, as the case may be, and on the company; and

(*b*) in the case of a company that has made an authorized assignment or against which a bankruptcy order has been made under the *Bankruptcy and Insolvency Act* or is in the course of being wound up under the *Winding-up and Restructuring Act*, on the trustee in bankruptcy or liquidator and contributories of the company.

### Compromise or Arrangement

**60**    While there may be little practical distinction between "compromise" and "arrangement" in many respects, the two are not necessarily the same. "Arrangement" is broader than "compromise" and would appear to include any scheme for reorganizing the affairs of the debtor: Houlden and Morawetz, *Bankruptcy and Insolvency Law of Canada*, loose-leaf, 3rd ed., vol. 4 (Toronto: Thomson Carswell) at 10A-12.2, N para. 10. It has been said to be "a very wide and indefinite [word]": *Re Refund of Dues under Timber Regulations*, [1935] A.C. 184 at 197 (P.C.), affirming S.C.C. [1933] S.C.R. 616. See also, *Re Guardian Assur. Co.*, [1917] 1 Ch. 431 at 448, 450; *Re T&N Ltd. and Others (No. 3)*, [2007] 1 All E.R. 851 (Ch.).

**61**    The CCAA is a sketch, an outline, a supporting framework for the resolution of corporate insolvencies in the public interest. Parliament wisely avoided attempting to anticipate the myriad of business deals that could evolve from the fertile and creative minds of negotiators restructuring their financial affairs. It left the shape and details of those deals to be worked out within the framework of the comprehensive and flexible concepts of a "compromise" and "arrangement." I see no reason why a release in favour of a third party, negotiated as part of a package between a debtor and creditor and reasonably relating to the proposed restructuring cannot fall within that framework.

**62**    A proposal under the *Bankruptcy and Insolvency Act*, R.S., 1985, c. B-3 (the "BIA") is a contract: *Employers' Liability Assurance Corp. Ltd. v. Ideal Petroleum* (1959) Ltd. [1978] 1 S.C.R. 230 at 239; *Society of Composers, Authors & Music Publishers of Canada v. Armitage* (2000), 50 O.R. (3d) 688 at para. 11 (C.A.). In my view, a compromise or arrangement under the CCAA is directly analogous to a proposal for these purposes, and therefore is to be treated as a contract between the debtor and its creditors. Consequently, parties are entitled to put anything into such a plan that could lawfully be incorporated into any contract. See *Re Air Canada* (2004), 2 C.B.R.

(5th) 4 at para. 6 (Ont. S.C.J.); *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 12 O.R. (3d) 500 at 518 (Gen. Div.).

**63**    There is nothing to prevent a debtor and a creditor from including in a contract between them a term providing that the creditor release a third party. The term is binding as between the debtor and creditor. In the CCAA context, therefore, a plan of compromise or arrangement may propose that creditors agree to compromise claims against the debtor and to release third parties, just as any debtor and creditor might agree to such a term in a contract between them. Once the statutory mechanism regarding voter approval and court sanctioning has been complied with, the plan -- including the provision for releases -- becomes binding on all creditors (including the dissenting minority).

**64**    *Re T&N Ltd. and Others, supra,* is instructive in this regard. It is a rare example of a court focussing on and examining the meaning and breadth of the term "arrangement". T&N and its associated companies were engaged in the manufacture, distribution and sale of asbestos-containing products. They became the subject of many claims by former employees, who had been exposed to asbestos dust in the course of their employment, and their dependents. The T&N companies applied for protection under s. 425 of the U.K. *Companies Act 1985*, a provision virtually identical to the scheme of the CCAA -- including the concepts of compromise or arrangement.[4]

**65**    T&N carried employers' liability insurance. However, the employers' liability insurers (the "EL insurers") denied coverage. This issue was litigated and ultimately resolved through the establishment of a multi-million pound fund against which the employees and their dependants (the "EL claimants") would assert their claims. In return, T&N's former employees and dependants (the "EL claimants") agreed to forego any further claims against the EL insurers. This settlement was incorporated into the plan of compromise and arrangement between the T&N companies and the EL claimants that was voted on and put forward for court sanction.

**66**    Certain creditors argued that the court could not sanction the plan because it did not constitute a "compromise or arrangement" between T&N and the EL claimants since it did not purport to affect rights as between them but only the EL claimants' rights against the EL insurers. The Court rejected this argument. Richards J. adopted previous jurisprudence -- cited earlier in these reasons -- to the effect that the word "arrangement" has a very broad meaning and that, while both a compromise and an arrangement involve some "give and take", an arrangement need not involve a compromise or be confined to a case of dispute or difficulty (paras. 46-51). He referred to what would be the equivalent of a solvent arrangement under Canadian corporate legislation as an example.[5] Finally, he pointed out that the compromised rights of the EL claimants against the EL insurers were not unconnected with the EL claimants' rights against the T&N companies; the scheme of arrangement involving the EL insurers was "an integral part of a single proposal affecting all the parties" (para. 52). He concluded his reasoning with these observations (para. 53):

> In my judgment it is not a necessary element of an arrangement for the purposes

of s. 425 of the 1985 Act that it should alter the rights existing between the company and the creditors or members with whom it is made. No doubt in most cases it will alter those rights. But, provided that the context and content of the scheme are such as properly to constitute an arrangement between the company and the members or creditors concerned, it will fall within s. 425. It is ... neither necessary nor desirable to attempt a definition of arrangement. The legislature has not done so. To insist on an alteration of rights, or a termination of rights as in the case of schemes to effect takeovers or mergers, is to impose a restriction which is neither warranted by the statutory language nor justified by the courts' approach over many years to give the term its widest meaning. *Nor is an arrangement necessarily outside the section, because its effect is to alter the rights of creditors against another party or because such alteration could be achieved by a scheme of arrangement with that party*. [Emphasis added.]

**67**    I find Richard J.'s analysis helpful and persuasive. In effect, the claimants in *T&N* were being asked to release their claims against the EL insurers in exchange for a call on the fund. Here, the appellants are being required to release their claims against certain financial third parties in exchange for what is anticipated to be an improved position for all ABCP Noteholders, stemming from the contributions the financial third parties are making to the ABCP restructuring. The situations are quite comparable.

### The Binding Mechanism

**68**    Parliament's reliance on the expansive terms "compromise" or "arrangement" does not stand alone, however. Effective insolvency restructurings would not be possible without a statutory mechanism to bind an unwilling minority of creditors. Unanimity is frequently impossible in such situations. But the minority must be protected too. Parliament's solution to this quandary was to permit a wide range of proposals to be negotiated and put forward (the compromise or arrangement) and to bind <u>all</u> creditors by class to the terms of the plan, but to do so only where the proposal can gain the support of the requisite "double majority" of votes[6] <u>and</u> obtain the sanction of the court on the basis that it is fair and reasonable. In this way, the scheme of the CCAA supports the intention of Parliament to encourage a wide variety of solutions to corporate insolvencies without unjustifiably overriding the rights of dissenting creditors.

### The Required Nexus

**69**    In keeping with this scheme and purpose, I do not suggest that any and all releases between creditors of the debtor company seeking to restructure and third parties may be made the subject of a compromise or arrangement between the debtor and its creditors. Nor do I think the fact that the releases may be "necessary" in the sense that the third parties or the debtor may refuse to proceed without them, of itself, advances the argument in favour of finding jurisdiction (although it may well be relevant in terms of the fairness and reasonableness analysis).

**70**    The release of the claim in question must be justified as part of the compromise or arrangement between the debtor and its creditors. In short, there must be a reasonable connection between the third party claim being compromised in the plan and the restructuring achieved by the plan to warrant inclusion of the third party release in the plan. This nexus exists here, in my view.

**71**    In the course of his reasons, the application judge made the following findings, all of which are amply supported on the record:

> a)    The parties to be released are necessary and essential to the restructuring of the debtor;
>
> b)    *The claims to be released are rationally related to the purpose of the Plan and necessary for it*;
>
> c)    The Plan cannot succeed without the releases;
>
> d)    *The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan*; and
>
> e)    The Plan will benefit not only the debtor companies but creditor Noteholders generally.

**72**    Here, then -- as was the case in *T&N* -- there is a close connection between the claims being released and the restructuring proposal. The tort claims arise out of the sale and distribution of the ABCP Notes and their collapse in value, just as do the contractual claims of the creditors against the debtor companies. The purpose of the restructuring is to stabilize and shore up the value of those notes in the long run. The third parties being released are making separate contributions to enable those results to materialize. Those contributions are identified earlier, at para. 31 of these reasons. The application judge found that the claims being released are not independent of or unrelated to the claims that the Noteholders have against the debtor companies; they are closely connected to the value of the ABCP Notes and are required for the Plan to succeed. At paras. 76-77 he said:

> [76] I do not consider that the Plan in this case involves a change in relationship among creditors "that does not directly involve the Company." Those who support the Plan and are to be released are "directly involved in the Company" in the sense that many are foregoing immediate rights to assets and are providing real and tangible input for the preservation and enhancement of the Notes. It would be unduly restrictive to suggest that the moving parties' claims against released parties do not involve the Company, since the claims are directly related to the value of the Notes. The value of the Notes is in this case the value of the Company.
>
> [77] This Plan, as it deals with releases, doesn't change the relationship of the creditors apart from involving the Company and its Notes.

**73**    I am satisfied that the wording of the CCAA -- construed in light of the purpose, objects and

scheme of the Act and in accordance with the modern principles of statutory interpretation -- supports the court's jurisdiction and authority to sanction the Plan proposed here, including the contested third-party releases contained in it.

The Jurisprudence

**74**    Third party releases have become a frequent feature in Canadian restructurings since the decision of the Alberta Court of Queen's Bench in *Re Canadian Airlines Corp.* (2000), 265 A.R. 201, leave to appeal refused by *Resurgence Asset Management LLC v. Canadian Airlines Corp.* (2000), 266 A.R. 131 (C.A.), and [2001] S.C.C.A. No. 60, (2001) 293 A.R. 351 (S.C.C.). In *Re Muscle Tech Research and Development Inc.* (2006), 25 C.B.R (5th) 231 (Ont. S.C.J.) Justice Ground remarked (para. 8):

> [It] is not uncommon in CCAA proceedings, in the context of a plan of compromise and arrangement, to compromise claims against the Applicants and other parties against whom such claims or related claims are made.

**75**    We were referred to at least a dozen court-approved CCAA plans from across the country that included broad third-party releases. With the exception of *Re Canadian Airlines*, however, the releases in those restructurings -- including *Muscle Tech* -- were not opposed. The appellants argue that those cases are wrongly decided, because the court simply does not have the authority to approve such releases.

**76**    In *Re Canadian Airlines* the releases in question were opposed, however. Paperny J. (as she then was) concluded the court had jurisdiction to approve them and her decision is said to be the well-spring of the trend towards third-party releases referred to above. Based on the foregoing analysis, I agree with her conclusion although for reasons that differ from those cited by her.

**77**    Justice Paperny began her analysis of the release issue with the observation at para. 87 that "[p]rior to 1997, the CCAA did not provide for compromises of claims against anyone other than the petitioning company." It will be apparent from the analysis in these reasons that I do not accept that premise, notwithstanding the decision of the Quebec Court of Appeal in *Michaud v. Steinberg,*[7] of which her comment may have been reflective. Paperny J.'s reference to 1997 was a reference to the amendments of that year adding s. 5.1 to the CCAA, which provides for limited releases in favour of directors. Given the limited scope of s. 5.1, Justice Paperny was thus faced with the argument -- dealt with later in these reasons -- that Parliament must not have intended to extend the authority to approve third-party releases beyond the scope of this section. She chose to address this contention by concluding that, although the amendments "[did] not authorize a release of claims against third parties other than directors, [they did] not prohibit such releases either" (para. 92).

**78**    Respectfully, I would not adopt the interpretive principle that the CCAA permits releases because it does not expressly prohibit them. Rather, as I explain in these reasons, I believe the open-ended CCAA permits third-party releases that are reasonably related to the restructuring at

issue because they are encompassed in the comprehensive terms "compromise" and "arrangement" and because of the double-voting majority and court sanctioning statutory mechanism that makes them binding on unwilling creditors.

**79**    The appellants rely on a number of authorities, which they submit support the proposition that the CCAA may not be used to compromise claims as between anyone other than the debtor company and its creditors. Principal amongst these are *Michaud v. Steinberg, supra*; *NBD Bank, Canada v. Dofasco Inc.*, (1999), 46 O.R. (3d) 514 (C.A.); *Pacific Coastal Airlines Ltd. v. Air Canada* (2001), 19 B.L.R. (3d) 286 (B.C.S.C.); and *Re Stelco Inc.* (2005), 78 O.R. (3d) 241 (C.A.) ("*Stelco I*"). I do not think these cases assist the appellants, however. With the exception of *Steinberg*, they do not involve third party claims that were reasonably connected to the restructuring. As I shall explain, it is my opinion that *Steinberg* does not express a correct view of the law, and I decline to follow it.

**80**    In *Pacific Coastal Airlines*, Tysoe J. made the following comment at para. 24:

> [The purpose of the CCAA proceeding] is not to deal with disputes between a creditor of a company and a third party, even if the company was also involved in the subject matter of the dispute. While issues between the debtor company and non-creditors are sometimes dealt with in CCAA proceedings, it is not a proper use of a CCAA proceeding to determine disputes between parties other than the debtor company.

**81**    This statement must be understood in its context, however. Pacific Coastal Airlines had been a regional carrier for Canadian Airlines prior to the CCAA reorganization of the latter in 2000. In the action in question it was seeking to assert separate tort claims against Air Canada for contractual interference and inducing breach of contract in relation to certain rights it had to the use of Canadian's flight designator code prior to the CCAA proceeding. Air Canada sought to have the action dismissed on grounds of *res judicata* or issue estoppel because of the CCAA proceeding. Tysoe J. rejected the argument.

**82**    The facts in *Pacific Coastal* are not analogous to the circumstances of this case, however. There is no suggestion that a resolution of Pacific Coastal's separate tort claim against Air Canada was in any way connected to the Canadian Airlines restructuring, even though Canadian -- at a contractual level -- may have had some involvement with the particular dispute. Here, however, the disputes that are the subject-matter of the impugned releases are not simply "disputes between parties other than the debtor company". They are closely connected to the disputes being resolved between the debtor companies and their creditors and to the restructuring itself.

**83**    Nor is the decision of this Court in the *NBD Bank* case dispositive. It arose out of the financial collapse of Algoma Steel, a wholly-owned subsidiary of Dofasco. The Bank had advanced funds to Algoma allegedly on the strength of misrepresentations by Algoma's Vice-President, James Melville. The plan of compromise and arrangement that was sanctioned by Farley J. in the Algoma

CCAA restructuring contained a clause releasing Algoma from all claims creditors "may have had against Algoma or its directors, officers, employees and advisors." Mr. Melville was found liable for negligent misrepresentation in a subsequent action by the Bank. On appeal, he argued that since the Bank was barred from suing Algoma for misrepresentation by its officers, permitting it to pursue the same cause of action against him personally would subvert the CCAA process -- in short, he was personally protected by the CCAA release.

**84**    Rosenberg J.A., writing for this Court, rejected this argument. The appellants here rely particularly upon his following observations at paras. 53-54:

> 53 In my view, the appellant has not demonstrated that allowing the respondent to pursue its claim against him would undermine or subvert the purposes of the Act. As this court noted in *Elan Corp. v. Comiskey* (1990), 1 O.R. (3d) 289 at 297, the *CCAA* is remedial legislation "intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both". It is a means of avoiding a liquidation that may yield little for the creditors, especially unsecured creditors like the respondent, and the debtor company shareholders. However, the appellant has not shown that allowing a creditor to continue an action against an officer for negligent misrepresentation would erode the effectiveness of the Act.

> 54 In fact, to refuse on policy grounds to impose liability on an officer of the corporation for negligent misrepresentation would contradict the policy of Parliament as demonstrated in recent amendments to the *CCAA* and the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3. Those Acts now contemplate that an arrangement or proposal may include a term for compromise of certain types of claims against directors of the company except claims that "are based on allegations of misrepresentations made by directors". L.W. Houlden and C.H. Morawetz, the editors of *The 2000 Annotated Bankruptcy and Insolvency Act* (Toronto: Carswell, 1999) at p. 192 are of the view that the policy behind the provision is to encourage directors of an insolvent corporation to remain in office so that the affairs of the corporation can be reorganized. I can see no similar policy interest in barring an action against an officer of the company who, prior to the insolvency, has misrepresented the financial affairs of the corporation to its creditors. It may be necessary to permit the compromise of claims against the debtor corporation, otherwise it may not be possible to successfully reorganize the corporation. The same considerations do not apply to individual officers. Rather, it would seem to me that it would be contrary to good policy to immunize officers from the consequences of their negligent statements which might otherwise be made in anticipation of being forgiven under a subsequent corporate proposal or arrangement. [Footnote omitted.]

**85**    Once again, this statement must be assessed in context. Whether Justice Farley had the authority in the earlier Algoma CCAA proceedings to sanction a plan that included third party releases was not under consideration at all. What the Court was determining in *NBD Bank* was whether the release extended by its terms to protect a third party. In fact, on its face, it does not appear to do so. Justice Rosenberg concluded only that not allowing Mr. Melville to rely upon the release did not subvert the purpose of the CCAA. As the application judge here observed, "there is little factual similarity in *NBD* to the facts now before the Court" (para. 71). Contrary to the facts of this case, in *NBD Bank* the creditors had not agreed to grant a release to officers; they had not voted on such a release and the court had not assessed the fairness and reasonableness of such a release as a term of a complex arrangement involving significant contributions by the beneficiaries of the release -- as is the situation here. Thus, *NBD Bank* is of little assistance in determining whether the court has authority to sanction a plan that calls for third party releases.

**86**    The appellants also rely upon the decision of this Court in *Stelco I*. There, the Court was dealing with the scope of the CCAA in connection with a dispute over what were called the "Turnover Payments". Under an inter-creditor agreement one group of creditors had subordinated their rights to another group and agreed to hold in trust and "turn over" any proceeds received from Stelco until the senior group was paid in full. On a disputed classification motion, the Subordinated Debt Holders argued that they should be in a separate class from the Senior Debt Holders. Farley J. refused to make such an order in the court below, stating:

> [Sections] 4, 5 and 6 [of the CCAA] talk of compromises or arrangements between a company and its creditors. There is no mention of this extending by statute to encompass a change of relationship among the creditors vis-à-vis the creditors themselves *and not directly involving the company*. [Citations omitted; emphasis added.]

> See *Re Stelco Inc.* (2005), 15 C.B.R. (5th) 297 (Ont. S.C.J.) at para. 7.

**87**    This Court upheld that decision. The legal relationship between each group of creditors and Stelco was the same, albeit there were inter-creditor differences, and creditors were to be classified in accordance with their legal rights. In addition, the need for timely classification and voting decisions in the CCAA process militated against enmeshing the classification process in the vagaries of inter-corporate disputes. In short, the issues before the Court were quite different from those raised on this appeal.

**88**    Indeed, the Stelco plan, as sanctioned, included third party releases (albeit uncontested ones). This Court subsequently dealt with the same inter-creditor agreement on an appeal where the Subordinated Debt Holders argued that the inter-creditor subordination provisions were beyond the reach of the CCAA and therefore that they were entitled to a separate civil action to determine their rights under the agreement: *Re Stelco Inc.*, (2006), 21 C.B.R. (5th) 157 (Ont. C.A.) ("*Stelco II*").

The Court rejected that argument and held that where the creditors' rights amongst themselves were sufficiently related to the debtor and its plan, they were properly brought within the scope of the CCAA plan. The Court said (para. 11):

> In [*Stelco I*] -- the classification case -- the court observed that it is not a proper use of a CCAA proceeding to determine disputes between parties other than the debtor company ... *[H]owever, the present case is not simply an inter-creditor dispute that does not involve the debtor company; it is a dispute that is inextricably connected to the restructuring process*. [Emphasis added.]

**89**    The approach I would take to the disposition of this appeal is consistent with that view. As I have noted, the third party releases here are very closely connected to the ABCP restructuring process.

**90**    Some of the appellants -- particularly those represented by Mr. Woods -- rely heavily upon the decision of the Quebec Court of Appeal in *Michaud v. Steinberg, supra*. They say that it is determinative of the release issue. In *Steinberg*, the Court held that the CCAA, as worded at the time, did not permit the release of directors of the debtor corporation and that third-party releases were not within the purview of the Act. Deschamps J.A. (as she then was) said (paras. 42, 54 and 58 -- English translation):

> [42] Even if one can understand the extreme pressure weighing on the creditors and the respondent at the time of the sanctioning, a plan of arrangement is not the appropriate forum to settle disputes other than the claims that are the subject of the arrangement. In other words, one cannot, under the pretext of an absence of formal directives in the Act, transform an arrangement into a potpourri.
>
> ...
>
> [54] The Act offers the respondent a way to arrive at a compromise with is creditors. It does not go so far as to offer an umbrella to all the persons within its orbit by permitting them to shelter themselves from any recourse.
>
> ...
>
> [58] The [CCAA] and the case law clearly do not permit extending the application of an arrangement to persons other than the respondent and its creditors and, consequently, the plan should not have been sanctioned as is [that is, including the releases of the directors].

**91**    Justices Vallerand and Delisle, in separate judgments, agreed. Justice Vallerand summarized his view of the consequences of extending the scope of the CCAA to third party releases in this fashion (para. 7):

> In short, the Act will have become the Companies' *and Their Officers and Employees* Creditors Arrangement Act -- an awful mess -- and likely not attain its purpose, which is to enable the company to survive in the face of *its* creditors and through their will, and not in the face of the creditors of its officers. This is why I feel, just like my colleague, that such a clause is contrary to the Act's mode of operation, contrary to its purposes and, for this reason, is to be banned.

**92**    Justice Delisle, on the other hand, appears to have rejected the releases because of their broad nature -- they released directors from all claims, including those that were altogether unrelated to their corporate duties with the debtor company -- rather than because of a lack of authority to sanction under the Act. Indeed, he seems to have recognized the wide range of circumstances that could be included within the term "compromise or arrangement". He is the only one who addressed that term. At para. 90 he said:

> The CCAA is drafted in general terms. It does not specify, among other things, what must be understood by "compromise or arrangement". However, it may be inferred from the purpose of this [A]ct that these terms *encompass all that should enable the person who has recourse to it to fully dispose of his debts*, both those that exist on the date when he has recourse to the statute and *those contingent on the insolvency in which he finds himself* ... [Emphasis added.]

**93**    The decision of the Court did not reflect a view that the terms of a compromise or arrangement should "encompass all that should enable the person who has recourse to [the Act] to dispose of his debts ... and those contingent on the insolvency in which he finds himself," however. On occasion such an outlook might embrace third parties other than the debtor and its creditors in order to make the arrangement work. Nor would it be surprising that, in such circumstances, the third parties might seek the protection of releases, or that the debtor might do so on their behalf. Thus, the perspective adopted by the majority in *Steinberg*, in my view, is too narrow, having regard to the language, purpose and objects of the CCAA and the intention of Parliament. They made no attempt to consider and explain why a compromise or arrangement could not include third-party releases. In addition, the decision appears to have been based, at least partly, on a rejection of the use of contract-law concepts in analysing the Act -- an approach inconsistent with the jurisprudence referred to above.

**94**    Finally, the majority in *Steinberg* seems to have proceeded on the basis that the CCAA cannot interfere with civil or property rights under Quebec law. Mr. Woods advanced this argument before this Court in his factum, but did not press it in oral argument. Indeed, he conceded that if the Act encompasses the authority to sanction a plan containing third-party releases -- as I have concluded it does -- the provisions of the CCAA, as valid federal insolvency legislation, are paramount over provincial legislation. I shall return to the constitutional issues raised by the appellants later in these reasons.

**95**    Accordingly, to the extent *Steinberg* stands for the proposition that the court does not have authority under the CCAA to sanction a plan that incorporates third-party releases, I do not believe it to be a correct statement of the law and I respectfully decline to follow it. The modern approach to interpretation of the Act in accordance with its nature and purpose militates against a narrow interpretation and towards one that facilitates and encourages compromises and arrangements. Had the majority in *Steinberg* considered the broad nature of the terms "compromise" and "arrangement" and the jurisprudence I have referred to above, they might well have come to a different conclusion.

<u>The 1997 Amendments</u>

**96**    *Steinberg* led to amendments to the CCAA, however. In 1997, s. 5.1 was added, dealing specifically with releases pertaining to directors of the debtor company. It states:

> 5.1 (1) A compromise or arrangement made in respect of a debtor company may include in its terms provision for the compromise of claims against directors of the company that arose before the commencement of proceedings under this Act and that relate to the obligations of the company where the directors are by law liable in their capacity as directors for the payment of such obligations.

> <u>Exception</u>

> (2)    A provision for the compromise of claims against directors may not include claims that

> (*a*) relate to contractual rights of one or more creditors; or

> (*b*) are based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors.

> <u>Powers of court</u>

> (3)    The court may declare that a claim against directors shall not be compromised if it is satisfied that the compromise would not be fair and reasonable in the circumstances.

> <u>Resignation or removal of directors</u>

> (4)    Where all of the directors have resigned or have been removed by the
> shareholders without replacement, any person who manages or supervises the
> management of the business and affairs of the debtor company shall be deemed
> to be a director for the purposes of this section.

1997, c. 12, s. 122.

**97**    Perhaps the appellants' strongest argument is that these amendments confirm a prior lack of
authority in the court to sanction a plan including third party releases. If the power existed, why
would Parliament feel it necessary to add an amendment specifically permitting such releases
(subject to the exceptions indicated) in favour of directors? *Expressio unius est exclusio alterius*, is
the Latin maxim sometimes relied on to articulate the principle of interpretation implied in that
question: to express or include one thing implies the exclusion of the other.

**98**    The maxim is not helpful in these circumstances, however. The reality is that there *may* be
another explanation why Parliament acted as it did. As one commentator has noted:[8]

> Far from being a rule, [the maxim *expressio unius*] is not even lexicographically
> accurate, because it is simply not true, generally, that the mere express conferral
> of a right or privilege in one kind of situation implies the denial of the equivalent
> right or privilege in other kinds. Sometimes it does and sometimes its does not,
> and whether it does or does not depends on the particular circumstances of
> context. Without contextual support, therefore there is not even a mild
> presumption here. Accordingly, the maxim is at best a description, after the fact,
> of what the court has discovered from context.

**99**    As I have said, the 1997 amendments to the CCAA providing for releases in favour of
directors of debtor companies in limited circumstances were a response to the decision of the
Quebec Court of Appeal in *Steinberg*. A similar amendment was made with respect to proposals in
the BIA at the same time. The rationale behind these amendments was to encourage directors of an
insolvent company to remain in office during a restructuring, rather than resign. The assumption
was that by remaining in office the directors would provide some stability while the affairs of the
company were being reorganized: see Houlden and Morawetz, vol. 1, *supra*, at 2-144, Es.11A; *Le
Royal Penfield Inc. (Syndic de)*, [2003] R.J.Q. 2157 at paras. 44-46 (C.S.).

**100**    Parliament thus had a particular focus and a particular purpose in enacting the 1997
amendments to the CCAA and the BIA. While there is some merit in the appellants' argument on
this point, at the end of the day I do not accept that Parliament intended to signal by its enactment of
s. 5.1 that it was depriving the court of authority to sanction plans of compromise or arrangement in
all circumstances where they incorporate third party releases in favour of anyone other than the
debtor's directors. For the reasons articulated above, I am satisfied that the court does have the

authority to do so. Whether it sanctions the plan is a matter for the fairness hearing.

### The Deprivation of Proprietary Rights

**101**    Mr. Shapray very effectively led the appellants' argument that legislation must not be construed so as to interfere with or prejudice established contractual or proprietary rights -- including the right to bring an action -- in the absence of a clear indication of legislative intention to that effect: *Halsbury's Laws of England*, 4th ed. reissue, vol. 44 (1) (London: Butterworths, 1995) at paras. 1438, 1464 and 1467; Driedger, 2nd ed., *supra*, at 183; Ruth Sullivan, *Sullivan and Driedger on the Construction of Statutes*, 4th ed., (Markham: Butterworths, 2002) at 399. I accept the importance of this principle. For the reasons I have explained, however, I am satisfied that Parliament's intention to clothe the court with authority to consider and sanction a plan that contains third party releases is expressed with sufficient clarity in the "compromise or arrangement" language of the CCAA coupled with the statutory voting and sanctioning mechanism making the provisions of the plan binding on all creditors. This is not a situation of impermissible "gap-filling" in the case of legislation severely affecting property rights; it is a question of finding meaning in the language of the Act itself. I would therefore not give effect to the appellants' submissions in this regard.

### The Division of Powers and Paramountcy

**102**    Mr. Woods and Mr. Sternberg submit that extending the reach of the CCAA process to the compromise of claims as between solvent creditors of the debtor company and solvent third parties to the proceeding is constitutionally impermissible. They say that under the guise of the federal insolvency power pursuant to s. 91(21) of the *Constitution Act, 1867*, this approach would improperly affect the rights of civil claimants to assert their causes of action, a provincial matter falling within s. 92(13), and contravene the rules of public order pursuant to the *Civil Code of Quebec*.

**103**    I do not accept these submissions. It has long been established that the CCAA is valid federal legislation under the federal insolvency power: *Reference re: Companies' Creditors Arrangement Act (Canada)*, [1934] S.C.R. 659. As the Supreme Court confirmed in that case (p. 661), citing Viscount Cave L.C. in *Royal Bank of Canada v. Larue* [1928] A.C. 187, "the exclusive legislative authority to deal with all matters within the domain of bankruptcy and insolvency is vested in Parliament." Chief Justice Duff elaborated:

> Matters normally constituting part of a bankruptcy scheme but not in their essence matters of bankruptcy and insolvency may, of course, from another point of view and in another aspect be dealt with by a provincial legislature; but, when treated as matters pertaining to bankruptcy and insolvency, they clearly fall within the legislative authority of the Dominion.

**104**    That is exactly the case here. The power to sanction a plan of compromise or arrangement

that contains third-party releases of the type opposed by the appellants is embedded in the wording of the CCAA. The fact that this may interfere with a claimant's right to pursue a civil action -- normally a matter of provincial concern -- or trump Quebec rules of public order is constitutionally immaterial. The CCAA is a valid exercise of federal power. Provided the matter in question falls within the legislation directly or as necessarily incidental to the exercise of that power, the CCAA governs. To the extent that its provisions are inconsistent with provincial legislation, the federal legislation is paramount. Mr. Woods properly conceded this during argument.

<u>Conclusion With Respect to Legal Authority</u>

**105**    For all of the foregoing reasons, then, I conclude that the application judge had the jurisdiction and legal authority to sanction the Plan as put forward.

### (2)    The Plan is "Fair and Reasonable"

**106**    The second major attack on the application judge's decision is that he erred in finding that the Plan is "fair and reasonable" and in sanctioning it on that basis. This attack is centred on the nature of the third-party releases contemplated and, in particular, on the fact that they will permit the release of some claims based in fraud.

**107**    Whether a plan of compromise or arrangement is fair and reasonable is a matter of mixed fact and law, and one on which the application judge exercises a large measure of discretion. The standard of review on this issue is therefore one of deference. In the absence of a demonstrable error an appellate court will not interfere: see *Re Ravelston Corp. Ltd.* (2007), 31 C.B.R. (5th) 233 (Ont. C.A.).

**108**    I would not interfere with the application judge's decision in this regard. While the notion of releases in favour of third parties -- including leading Canadian financial institutions -- that extend to claims of fraud is distasteful, there is no legal impediment to the inclusion of a release for claims based in fraud in a plan of compromise or arrangement. The application judge had been living with and supervising the ABCP restructuring from its outset. He was intimately attuned to its dynamics. In the end he concluded that the benefits of the Plan to the creditors as a whole, and to the debtor companies, outweighed the negative aspects of compelling the unwilling appellants to execute the releases as finally put forward.

**109**    The application judge was concerned about the inclusion of fraud in the contemplated releases and at the May hearing adjourned the final disposition of the sanctioning hearing in an effort to encourage the parties to negotiate a resolution. The result was the "fraud carve-out" referred to earlier in these reasons.

**110**    The appellants argue that the fraud carve-out is inadequate because of its narrow scope. It (i) applies only to ABCP Dealers, (ii) limits the type of damages that may be claimed (no punitive damages, for example), (iii) defines "fraud" narrowly, excluding many rights that would be

protected by common law, equity and the Quebec concept of public order, and (iv) limits claims to representations made directly to Noteholders. The appellants submit it is contrary to public policy to sanction a plan containing such a limited restriction on the type of fraud claims that may be pursued against the third parties.

**111**    The law does not condone fraud. It is the most serious kind of civil claim. There is therefore some force to the appellants' submission. On the other hand, as noted, there is no legal impediment to granting the release of an antecedent claim in fraud, provided the claim is in the contemplation of the parties to the release at the time it is given: *Fotinis Restaurant Corp. v. White Spot Ltd*. (1998), 38 B.L.R. (2d) 251 at paras. 9 and 18 (B.C.S.C.). There may be disputes about the scope or extent of what is released, but parties are entitled to settle allegations of fraud in civil proceedings -- the claims here all being untested allegations of fraud -- and to include releases of such claims as part of that settlement.

**112**    The application judge was alive to the merits of the appellants' submissions. He was satisfied in the end, however, that the need "to avoid the potential cascade of litigation that ... would result if a broader 'carve out' were to be allowed" (para. 113) outweighed the negative aspects of approving releases with the narrower carve-out provision. Implementation of the Plan, in his view, would work to the overall greater benefit of the Noteholders as a whole. I can find no error in principle in the exercise of his discretion in arriving at this decision. It was his call to make.

**113**    At para. 71 above I recited a number of factual findings the application judge made in concluding that approval of the Plan was within his jurisdiction under the CCAA and that it was fair and reasonable. For convenience, I reiterate them here -- with two additional findings -- because they provide an important foundation for his analysis concerning the fairness and reasonableness of the Plan. The application judge found that:

> a)    The parties to be released are necessary and essential to the restructuring of the debtor;
>
> b)    The claims to be released are rationally related to the purpose of the Plan and necessary for it;
>
> c)    The Plan cannot succeed without the releases;
>
> d)    The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan;
>
> e)    The Plan will benefit not only the debtor companies but creditor Noteholders generally;
>
> f)    The voting creditors who have approved the Plan did so with knowledge of the nature and effect of the releases; and that,
>
> g)    The releases are fair and reasonable and not overly broad or offensive to public policy.

**114**    These findings are all supported on the record. Contrary to the submission of some of the

appellants, they do not constitute a new and hitherto untried "test" for the sanctioning of a plan under the CCAA. They simply represent findings of fact and inferences on the part of the application judge that underpin his conclusions on jurisdiction and fairness.

**115**    The appellants all contend that the obligation to release the third parties from claims in fraud, tort, breach of fiduciary duty, etc. is confiscatory and amounts to a requirement that they -- as individual creditors -- make the equivalent of a greater financial contribution to the Plan. In his usual lively fashion, Mr. Sternberg asked us the same rhetorical question he posed to the application judge. As he put it, how could the court countenance the compromise of what in the future might turn out to be fraud perpetrated at the highest levels of Canadian and foreign banks? Several appellants complain that the proposed Plan is unfair to them because they will make very little additional recovery if the Plan goes forward, but will be required to forfeit a cause of action against third-party financial institutions that may yield them significant recovery. Others protest that they are being treated unequally because they are ineligible for relief programs that Liquidity Providers such as Canaccord have made available to other smaller investors.

**116**    All of these arguments are persuasive to varying degrees when considered in isolation. The application judge did not have that luxury, however. He was required to consider the circumstances of the restructuring as a whole, including the reality that many of the financial institutions were not only acting as Dealers or brokers of the ABCP Notes (with the impugned releases relating to the financial institutions in these capacities, for the most part) but also as Asset and Liquidity Providers (with the financial institutions making significant contributions to the restructuring in these capacities).

**117**    In insolvency restructuring proceedings almost everyone loses something. To the extent that creditors are required to compromise their claims, it can always be proclaimed that their rights are being unfairly confiscated and that they are being called upon to make the equivalent of a further financial contribution to the compromise or arrangement. Judges have observed on a number of occasions that CCAA proceedings involve "a balancing of prejudices," inasmuch as everyone is adversely affected in some fashion.

**118**    Here, the debtor corporations being restructured represent the issuers of the more than $32 billion in non-bank sponsored ABCP Notes. The proposed compromise and arrangement affects that entire segment of the ABCP market and the financial markets as a whole. In that respect, the application judge was correct in adverting to the importance of the restructuring to the resolution of the ABCP liquidity crisis and to the need to restore confidence in the financial system in Canada. He was required to consider and balance the interests of <u>all</u> Noteholders, not just the interests of the appellants, whose notes represent only about 3% of that total. That is what he did.

**119**    The application judge noted at para. 126 that the Plan represented "a reasonable balance between benefit to all Noteholders and enhanced recovery for those who can make out specific claims in fraud" within the fraud carve-out provisions of the releases. He also recognized at para.

134 that:

> No Plan of this size and complexity could be expected to satisfy all affected by it. The size of the majority who have approved it is testament to its overall fairness. No plan to address a crisis of this magnitude can work perfect equity among all stakeholders.

**120**    In my view we ought not to interfere with his decision that the Plan is fair and reasonable in all the circumstances.

## D. DISPOSITION

**121**    For the foregoing reasons, I would grant leave to appeal from the decision of Justice Campbell, but dismiss the appeal.

R.A. BLAIR J.A.
 J.I. LASKIN J.A.:-- I agree.
 E.A. CRONK J.A.:-- I agree.

* * * * *

## SCHEDULE "A" - CONDUITS

Apollo Trust

Apsley Trust

Aria Trust

Aurora Trust

Comet Trust

Encore Trust

Gemini Trust

Ironstone Trust

MMAI-I Trust

Newshore Canadian Trust

Opus Trust

Planet Trust

Rocket Trust

Selkirk Funding Trust

Silverstone Trust

Slate Trust

Structured Asset Trust

Structured Investment Trust III

Symphony Trust

Whitehall Trust

\* \* \* \* \*

## SCHEDULE "B" - APPLICANTS

ATB Financial

Caisse de Dépôt et Placement du Québec

Canaccord Capital Corporation

Canada Post Corporation

Credit Union Central of Alberta Limited

Credit Union Central of British Columbia

Credit Union Central of Canada

Credit Union Central of Ontario

Credit Union Central of Saskatchewan

Desjardins Group

Magna International Inc.

National Bank Financial Inc./National Bank of Canada

NAV Canada

Northwater Capital Management Inc.

Public Sector Pension Investment Board

The Governors of the University of Alberta

* * * * *

### SCHEDULE "A" - COUNSEL

1)   Benjamin Zarnett and Frederick L. Myers for the Pan-Canadian Investors Committee.
2)   Aubrey E. Kauffman and Stuart Brotman for 4446372 Canada Inc. and 6932819 Canada Inc.
3)   Peter F.C. Howard and Samaneh Hosseini for Bank of America N.A.; Citibank N.A.; Citibank Canada, in its capacity as Credit Derivative Swap Counterparty and not in any other capacity; Deutsche Bank AG; HSBC Bank Canada; HSBC Bank USA, National Association; Merrill Lynch International; Merrill Lynch Capital Services, Inc.; Swiss Re Financial Products Corporation; and UBS AG.
4)   Kenneth T. Rosenberg, Lily Harmer and Max Starnino for Jura Energy Corporation and Redcorp Ventures Ltd.
5)   Craig J. Hill and Sam P. Rappos for the Monitors (ABCP Appeals).
6)   Jeffrey C. Carhart and Joseph Marin for Ad Hoc Committee and Pricewaterhouse Coopers Inc., in its capacity as Financial Advisor.
7)   Mario J. Forte for Caisse de Dépôt et Placement du Québec.
8)   John B. Laskin for National Bank Financial Inc. and National Bank of Canada.
9)   Thomas McRae and Arthur O. Jacques for Ad Hoc Retail Creditors Committee (Brian Hunter, et al).
10)  Howard Shapray, Q.C. and Stephen Fitterman for Ivanhoe Mines Ltd.
11)  Kevin P. McElcheran and Heather L. Meredith for Canadian Banks, BMO, CIBC RBC, Bank of Nova Scotia and T.D. Bank.
12)  Jeffrey S. Leon for CIBC Mellon Trust Company, Computershare Trust Company of Canada and BNY Trust Company of Canada, as Indenture Trustees.
13)  Usman Sheikh for Coventree Capital Inc.
14)  Allan Sternberg and Sam R. Sasso for Brookfield Asset Management and Partners Ltd. and Hy Bloom Inc. and Cardacian Mortgage Services Inc.
15)  Neil C. Saxe for Dominion Bond Rating Service.
16)  James A. Woods, Sebastien Richemont and Marie-Anne Paquette for Air

                    Transat A.T. Inc., Transat Tours Canada Inc., The Jean Coutu Group (PJC) Inc., Aéroports de Montréal, Aéroports de Montréal Capital Inc., Pomerleau Ontario Inc., Pomerleau Inc., Labopharm Inc., Agence Métropolitaine de Transport (AMT), Giro Inc., Vêtements de sports RGR Inc., 131519 Canada Inc., Tecsys Inc., New Gold Inc. and Jazz Air LP.

17)    Scott A. Turner for Webtech Wireless Inc., Wynn Capital Corporation Inc., West Energy Ltd., Sabre Energy Ltd., Petrolifera Petroleum Ltd., Vaquero Resources Ltd., and Standard Energy Ltd.

18)    R. Graham Phoenix for Metcalfe & Mansfield Alternative Investments II Corp., Metcalfe & Mansfield Alternative Investments III Corp., Metcalfe & Mansfield Alternative Investments V Corp., Metcalfe & Mansfield Alternative Investments XI Corp., Metcalfe & Mansfield Alternative Investments XII Corp., Quanto Financial Corporation and Metcalfe & Mansfield Capital Corp.

cp/e/ln/qlkxl/qllkb/qlltl/qlrxg/qlhcs/qlcas/qlhcs/qlhcs

1 Section 5.1 of the CCAA specifically authorizes the granting of releases to directors in certain circumstances.

2 Justice Georgina R. Jackson and Dr. Janis P. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters" in Sarra, ed., *Annual Review of Insolvency Law, 2007* (Vancouver: Thomson Carswell, 2007).

3 Citing Gibbs J.A. in *Chef Ready Foods, supra,* at pp. 319-320.

4 The Legislative Debates at the time the CCAA was introduced in Parliament in April 1933 make it clear that the CCAA is patterned after the predecessor provisions of s. 425 of the *Companies Act 1985* (U.K.): see *House of Commons Debates (Hansard), supra.*

5 See *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, s. 192; *Ontario Business Corporations Act,* R.S.O. 1990, c. B.16, s. 182.

6 A majority in number representing two-thirds in value of the creditors (s. 6).

7 *Steinberg* was originally reported in French: [1993] R.J.Q. 1684 (C.A.). All paragraph references to *Steinberg* in this judgment are from the unofficial English translation available

at 1993 CarswellQue 2055.

8 Reed Dickerson, *The Interpretation and Application of Statutes* (1975) at pp. 234-235, cited in Bryan A. Garner, ed., Black's Law Dictionary, 8th ed. (West Group, St. Paul, Minn., 2004) at 621.

# TAB 2

DOCSTOR: 2191401\1

*Indexed as:*

# Babcock & Wilcox Canada Ltd. (Re)

**IN THE MATTER OF Section 18.6 of the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, As Amended
AND IN THE MATTER OF Babcock & Wilcox Canada Ltd.**

[2000] O.J. No. 786

[2000] O.T.C. 135

5 B.L.R. (3d) 75

18 C.B.R. (4th) 157

95 A.C.W.S. (3d) 608

Court File No. 00-CL-3667

Ontario Superior Court of Justice
Commercial List

**Farley J.**

Heard: February 25, 2000.
Judgment: February 25, 2000.

(24 paras.)

*Creditors and debtors -- Debtors' relief legislation -- Companies' creditors arrangement legislation
-- Purpose of -- Stay of proceedings against debtor.*

Application by Babcock & Wilcox Canada for an interim order for a stay of proceedings under sec-
tion **18.6** of the Companies' Creditors Arrangement Act. Babcock's parent corporation in the United
States had applied for protection under Chapter 11 of the U.S. Bankruptcy Code in connection with
mass asbestos claims. The U.S. Bankruptcy Court issued a temporary restraining order against
plaintiffs in the asbestos litigation, preventing them from bringing actions against non-debtor affili-
ates of the parent company, which would include Babcock. Babcock argued that this constituted a
foreign proceeding which could be recognized in Canada.

HELD: Application allowed. The Act was to be given a liberal interpretation in order to facilitate its objectives. The Act did not require that a company be insolvent in order to seek the protection of section **18.6.** The U.S. proceedings constituted foreign proceedings under the Act. There was an interdependence between Babcock and the parent company such that a stay was merited to allow the companies to work out a global solution within the context of the proceedings in the United States. The principles of **comity** and cooperation between jurisdictions were applicable.

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, ss. 267, 268, 269, 270, 271, 272, 273, 274, 275.

Business Corporations Act (Ontario).

Companies' Creditors Arrangement Act, ss. 2, 3, 4, 5, **18.6, 18.6**(1), **18.6**(2), **18.6**(3), **18.6**(4), **18.6**(8).

U.S. Bankruptcy Code, s. 524(g).

**Counsel:**

Derrick Tay, for Babcock & Wilcox Canada Ltd.
Paul Macdonald, for Citibank North America Inc. Lenders under the Post-Petition Credit Agreement.

---

**1    FARLEY J.**:-- I have had the opportunity to reflect on this matter which involves an aspect of the recent amendments to the insolvency legislation of Canada, which amendments have not yet been otherwise dealt with as to their substance. The applicant, Babcock & Wilcox Canada Ltd. ("BW Canada"), a solvent company, has applied for an interim order under s. **18.6** of the Companies' Creditors Arrangement Act ("**CCAA**"):

> (a)    that the proceedings commenced by BW Canada's parent U.S. corporation and certain other U.S. related corporations (collectively "BWUS") for protection under Chapter 11 of the U.S. Bankruptcy Code in connection with mass asbestos claims before the U.S. Bankruptcy Court be recognized as a "foreign proceeding" for the purposes of s. **18.6;**
>
> (b)    that BW Canada be declared a company which is entitled to avail itself of the provisions of s. **18.6;**
>
> (c)    that there be a stay against suits and enforcements until May 1, 2000 (or such later date as the Court may order) as to asbestos related proceedings against BW Canada, its property and its directors;
>
> (d)    that BW Canada be authorized to guarantee the obligations of its parent to the DIP Lender (debtor in possession lender) and grant security therefor in favour of the DIP Lender; and
>
> (e)    and for other ancillary relief.

**2**    In Chapter 11 proceedings under the U.S. Bankruptcy Code, the U.S. Bankruptcy Court in New Orleans issued a temporary restraining order on February 22, 2000 wherein it was noted that BW Canada may be subject to actions in Canada similar to the U.S. asbestos claims. U.S. Bankruptcy Court Judge Brown's temporary restraining order was directed against certain named U.S. resident plaintiffs in the asbestos litigation:

> ... and towards all plaintiffs and potential plaintiffs in Other Derivative Actions, that they are hereby restrained further prosecuting Pending Actions or further prosecuting or commencing Other Derivative Actions against Non-Debtor Affiliates, until the Court decides whether to grant the Debtors' request for a preliminary injunction.

Judge Brown further requested the aid and assistance of the Canadian courts in carrying out the U.S. Bankruptcy Court's orders. The "Non-Debtor Affiliates" would include BW Canada.

**3**    Under the 1994 amendments to the U.S. Bankruptcy Code, the concept of the establishment of a trust sufficient to meet the court determined liability for a mass torts situations was introduced. I am advised that after many years of successfully resolving the overwhelming majority of claims against it on an individual basis by settlement on terms BWUS considered reasonable, BWUS has determined, as a result of a spike in claims with escalating demands when it was expecting a decrease in claims, that it is appropriate to resort to the mass tort trust concept. Hence its application earlier this week to Judge Brown with a view to eventually working out a global process, including incorporating any Canadian claims. This would be done in conjunction with its joint pool of insurance which covers both BWUS and BW Canada. Chapter 11 proceedings do not require an applicant thereunder to be insolvent; thus BWUS was able to make an application with a view towards the 1994 amendments (including s. 524(g)). This subsection would permit the U.S. Bankruptcy Court on confirmation of a plan of reorganization under Chapter 11 with a view towards rehabilitation in the sense of avoiding insolvency in a mass torts situation to:

> enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claims or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust.

**4**    In 1997, ss. 267-275 of the Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 as amended ("BIA") and s. **18.6** of the **CCAA** were enacted to address the rising number of international insolvencies ("1997 Amendments"). The 1997 Amendments were introduced after a lengthy consultation process with the insolvency profession and others. Previous to the 1997 Amendments, Canadian courts essentially would rely on the evolving common law principles of **comity** which permitted the Canadian court to recognize and enforce in Canada the judicial acts of other jurisdictions.

**5**    LaForest J. in Morguard Investments Limited v. De Savoye (1990), 76 D.L.R. (4th) 256 (S.C.C.) at p. 269 described the principle of **comity** as:

> "**Comity**" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and goodwill, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and con-

venience, and to the rights of its own citizens or of other persons who are under
the protections of its laws ...

**6**    In ATL Industries Inc. v. Han Eol Inc. Co. (1995), 36 C.P.C. (3d) 288 (Ont. Gen. Div.) at pp.
302-3 I noted the following:

> Allow me to start off by stating that I agree with the analysis of MacPherson J. in
> Arrowmaster Inc. v. Unique Forming Ltd. (1993), 17 O.R. (3d) 407 (Gen. Div.)
> when in discussing Morguard Investments Ltd. v. De Savoye, [1990] 3 S.C.R.
> 1077, 76 D.L.R. (4th) 256, 52 B.C.L.R. (2d) 160, 122 N.R. 81, [1991] 2 W.W.R.
> 217, 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, he states at p. 411:
>
>> The leading case dealing with the enforcement of "foreign" judg-
>> ments is the decision of the Supreme Court of Canada in Morguard In-
>> vestments, supra. The question in that case was whether, and the circum-
>> stances in which, the judgment of an Alberta court could be enforced in
>> British Columbia. A unanimous court, speaking through La Forest J.,
>> held in favour of enforceability and, in so doing, discussed in some detail the
>> doctrinal principles governing inter-jurisdictional enforcement of orders. I
>> think it fair to say that the overarching theme of La Forest J.'s reasons is
>> the necessity and desirability, in a mobile global society, for governments
>> and courts to respect the orders made by courts in foreign jurisdictions
>> with comparable legal systems, including substantive laws and rules of
>> procedure. He expressed this theme in these words, at p. 1095:
>>
>>> "Modern states, however, cannot live in splendid isolation and
>>> do give effect to judgments given in other countries in certain cir-
>>> cumstances. Thus a judgment in rem, such as a decree of divorce
>>> granted by the courts of one state to persons domiciled there, will be
>>> recognized by the courts of other states. In certain circumstances, as
>>> well, our courts will enforce personal judgments given in other
>>> states. Thus, we saw, our courts will enforce an action for breach of
>>> contract given by the courts of another country if the defendant was
>>> present there at the time of the action or has agreed to the foreign
>>> court's exercise of jurisdiction. This, it was thought, was in confor-
>>> mity with the requirements of **comity,** the informing principle of
>>> private international law, which has been stated to be the deference
>>> and respect due by other states to the actions of a state legitimately
>>> taken within its territory. Since the state where the judgment was
>>> given has power over the litigants, the judgments of its courts should
>>> be respected." (emphasis added in original)
>>
>> Morguard Investments was, as stated earlier, a case dealing with the
>> enforcement of a court order across provincial boundaries. However, the
>> historical analysis in La Forest J.'s judgment, of both the United Kingdom

> and Canadian jurisprudence, and the doctrinal principles enunciated by the
> court are equally applicable, in my view, in a situation where the judgment
> has been rendered by a court in a foreign jurisdiction. This should not be
> an absolute rule - there will be some foreign court orders that should not be
> enforced in Ontario, perhaps because the substantive law in the foreign
> country is so different from Ontario's or perhaps because the legal process
> that generates the foreign order diverges radically from Ontario's process.
> (my emphasis added)

Certainly the substantive and procedural aspects of the U.S. Bankruptcy Code including its 1994
amendments are not so different and do not radically diverge from our system.

**7**    After reviewing LaForest J.'s definition of **comity,** I went on to observe at p. 316:

> As was discussed by J.G. Castel, Canadian Conflicts of Laws, 3rd ed. (Toronto:
> Butterworths, 1994) at p. 270, there is a presumption of validity attaching to a
> foreign judgment unless and until it is established to be invalid. It would seem
> that the same type of evidence would be required to impeach a foreign judgment
> as a domestic one: fraud practiced on the court or tribunal: see Sun Alliance In-
> surance Co. v. Thompson (1981), 56 N.S.R. (2d) 619, 117 A.P.R. 619 (T.D.),
> Sopinka, supra, at p. 992.

LaForest J. went on to observe in Morguard at pp. 269-70:

> In a word, the rules of private international law are grounded in the need in mod-
> ern times to facilitate the flow of wealth, skills and people across state lines in a
> fair and orderly manner.
>
> ...
>
> Accommodating the flow of wealth, skills and people across state lines has now
> become imperative. Under these circumstances, our approach to the recognition
> and enforcement of foreign judgments would appear ripe for reappraisal.

See also Hunt v. T&N Plc (1993), 109 D.L.R. (4th) 16 (S.C.C.) at p. 39.

**8**    While Morguard was an interprovincial case, there is no doubt that the principles in that case
are equally applicable to international matters in the view of MacPherson J. and myself in Arrow-
master and ATL respectively. Indeed the analysis by LaForest J. was on an international plane. As a
country whose well-being is so heavily founded on international trade and investment, Canada of
necessity is very conscious of the desirability of invoking **comity** in appropriate cases.

**9**    In the context of cross-border insolvencies, Canadian and U.S. Courts have made efforts to
complement, coordinate and where appropriate accommodate the proceedings of the other. Exam-
ples of this would include Olympia & York Developments Ltd., Everfresh Beverages Inc. and The
Loewen Group Inc. Other examples involve the situation where a multi-jurisdictional proceeding is
specifically connected to one jurisdiction with that jurisdiction's court being allowed to exercise
principal control over the insolvency process: see Roberts v. Picture Butte Municipal Hospital,
[1998] A.J. No. 817 (Q.B.) at pp. 5-7; Microbiz Corp v. Classic Software Systems Inc. (1996), 45

C.B.R. (3d) 40 (Ont. Gen. Div.) at p. 4; Tradewell Inc. v. American Sensors Electronics, Inc. 1997 W.L. 423075 (S.D.N.Y.).

**10**    In Roberts, Forsythe J. at pp. 5-7 noted that steps within the proceedings themselves are also subject to the dictates of **comity** in recognizing and enforcing a U.S. Bankruptcy Court stay in the Dow Corning litigation as to a debtor in Canada so as to promote greater efficiency, certainty and consistency in connection with the debtor's restructuring efforts. Foreign claimants were provided for in the U.S. corporation's plan. Forsyth J. stated:

> **Comity** and cooperation are increasingly important in the bankruptcy context. As internationalization increases, more parties have assets and carry on activities in several jurisdictions. Without some coordination there would be multiple proceedings, inconsistent judgments and general uncertainty.
>
> ... I find that common sense dictates that these matters would be best dealt with by one court, and in the interest of promoting international **comity** it seems the forum for this case is in the U.S. Bankruptcy Court. Thus, in either case, whether there has been an attornment or not, I conclude it is appropriate for me to exercise my discretion and apply the principles of **comity** and grant the Defendant's stay application. I reach this conclusion based on all the circumstances, including the clear wording of the U.S. Bankruptcy Code provision, the similar philosophies and procedures in Canada and the U.S., the Plaintiff's attornment to the jurisdiction of the U.S. Bankruptcy Court, and the incredible number of claims outstanding ... (emphasis added)

**11**    The **CCAA** as remedial legislation should be given a liberal interpretation to facilitate its objectives. See Re Chef Ready Foods Ltd. (1990), 4 C.B.R. (3d) 311 (B.C.C.A.) at p. 320; Re Lehndorff General Partners Ltd. (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div.).

**12**    David Tobin, the Director General, Corporate Governance Branch, Department of Industry in testifying before the Standing Committee on Industry regarding Bill C-5, An Act to amend the BIA, the **CCAA** and the Income Tax Act, stated at 1600:

> Provisions in Bill C-5 attempt to actually codify, which has always been the practice in Canada. They include the Court recognition of foreign representatives; Court authority to make orders to facilitate and coordinate international insolvencies; provisions that would make it clear that foreign representatives are allowed to commence proceedings in Canada, as per Canadian rules - however, they clarify that foreign stays of proceedings are not applicable but a foreign representative can apply to a court for a stay in Canada; and Canadian creditors and assets are protected by the bankruptcy and insolvency rules.

The philosophy of the practice in international matters relating to the **CCAA** is set forth in Olympia & York Developments Limited v. Royal Trust Co. (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.) at p. 167 where Blair J. stated:

> The Olympia & York re-organization involves proceedings in three different jurisdictions: Canada, the United States and the United Kingdom. Insolvency dis-

putes with international overtones and involving property and assets in a multi-
plicity of jurisdictions are becoming increasingly frequent. Often there are differ-
ences in legal concepts - sometimes substantive, sometimes procedural - between
the jurisdictions. The Courts of the various jurisdictions should seek to co-
operate amongst themselves, in my view, in facilitating the trans-border resolu-
tion of such disputes as a whole, where that can be done in a fashion consistent
with their own fundamental principles of jurisprudence. The interests of interna-
tional co-operation and **comity,** and the interests of developing at least some de-
gree of certitude in international business and commerce, call for nothing less.

Blair J. then proceeded to invoke inherent jurisdiction to implement the Protocol between the U.S.
Bankruptcy Court and the Ontario Court. See also my endorsement of December 20, 1995 in Re
Everfresh Beverages Inc. where I observed: "I would think that this Protocol demonstrates the es-
sence of **comity'** between the Courts of Canada and the United States of America." Everfresh was
an example of the effective and efficient use of the Cross-Border Insolvency Concordat, adopted by
the Council of the International Bar Association on May 31, 1996 (after being adopted by its Sec-
tion on Business Law Council on September 17, 1995), which Concordat deals with, inter alia, prin-
cipal administration of a debtor's reorganization and ancillary jurisdiction. See also the UNCITRAL
Model Law on Cross-Border Insolvency.

**13**    Thus it seems to me that this application by BW Canada should be reviewed in light of (i) the
doctrine of **comity** as analyzed in Morguard, Arrowmaster and ATL, supra, in regard to its interna-
tional aspects; (ii) inherent jurisdiction; (iii) the aspect of the liberal interpretation of the **CCAA**
generally; and (iv) the assistance and codification of the 1997 Amendments.

"Foreign proceeding" is defined in s. **18.6**(1) as:

In this Section,

"foreign proceeding" means a judicial or administrative proceeding commenced
outside Canada in respect of a debtor under a law relating to bankruptcy or insol-
vency and dealing with the collective interests of creditors generally.

Certainly a U.S. Chapter 11 proceeding would fit this definition subject to the question of "debtor".
It is important to note that the definition of "foreign proceeding" in s. **18.6** of the **CCAA** contains no
specific requirement that the debtor be insolvent. In contrast, the BIA defines a "debtor" in the con-
text of a foreign proceeding (Part XIII of the BIA) as follows:

s. 267 In this Part,

"debtor means an insolvent person who has property in Canada, a bankrupt who
has property in Canada or a person who has the status of a bankrupt under for-
eign law in a foreign proceeding and has property in Canada (emphasis added).

I think it a fair observation that the BIA is a rather defined code which goes into extensive detail.
This should be contrasted with the **CCAA** which is a very short general statute which has been util-
ized to give flexibility to meet what might be described as the peculiar and unusual situation cir-
cumstances. A general categorization (which of course is never completely accurate) is that the BIA
may be seen as being used for more run of the mill cases whereas the **CCAA** may be seen as facili-

tating the more unique or complicated cases. Certainly the **CCAA** provides the flexibility to deal with the thornier questions. Thus I do not think it unusual that the draftees of the 1997 Amendments would have it in their minds that the provisions of the **CCAA** dealing with foreign proceedings should continue to reflect this broader and more flexible approach in keeping with the general provisions of the **CCAA,** in contrast with the corresponding provisions under the BIA. In particular, it would appear to me to be a reasonably plain reading interpretation of s. **18.6** that recourse may be had to s. **18.6** of the **CCAA** in the case of a solvent debtor. Thus I would conclude that the aspect of insolvency is not a condition precedent vis-a-vis the "debtor" in the foreign proceedings (here the Chapter 11 proceedings) for the proceedings in Louisiana to be a foreign proceeding under the definition of s. **18.6.** I therefore declare that those proceedings are to be recognized as a "foreign proceeding" for the purposes of s. **18.6** of the **CCAA.**

**14**    It appears to me that my conclusion above is reinforced by an analysis of s. **18.6**(2) which deals with concurrent filings by a debtor under the **CCAA** in Canada and corresponding bankruptcy or insolvency legislation in a foreign jurisdiction. This is not the situation here, but it would be applicable in the Loewen case. That subsection deals with the coordination of proceedings as to a "debtor company" initiated pursuant to the **CCAA** and the foreign legislation.

> s.    **18.6**(2). The court may, in respect of a debtor company, make such orders and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a coordination of proceedings under the Act with any foreign proceeding. (emphasis added).

**15**    The definition of "debtor company" is found in the general definition section of the **CCAA,** namely s. 2 and that definition incorporates the concept of insolvency. Section **18.6**(2) refers to a "debtor company" since only a "debtor company" can file under the **CCAA** to propose a compromise with its unsecured or secured creditors: ss. 3, 4 and 5 **CCAA.** See also s. **18.6**(8) which deals with currency concessions "[w]here a compromise or arrangement is proposed in respect of a debtor company ...". I note that "debtor company" is not otherwise referred to in s. **18.6;** however "debtor" is referred to in both definitions under s. **18.6**(1).

**16**    However, s. **18.6**(4) provides a basis pursuant to which a company such as BW Canada, a solvent corporation, may seek judicial assistance and protection in connection with a foreign proceeding. Unlike s. **18.6**(2), s. **18.6**(4) does not contemplate a full filing under the **CCAA.** Rather s. **18.6**(4) may be utilized to deal with situations where, notwithstanding that a full filing is not being made under the **CCAA,** ancillary relief is required in connection with a foreign proceeding.

> s.    **18.6**(4) Nothing in this section prevents the court, on the application of a foreign representative or any other interested persons, from applying such legal or equitable rules governing the recognition of foreign insolvency orders and assistance to foreign representatives as are not inconsistent with the provisions of this Act. (emphasis added).

BW Canada would fit within "any interested person" to bring the subject application to apply the principles of **comity** and cooperation. It would not appear to me that the relief requested is of a nature contrary to the provisions of the **CCAA.**

**17**    Additionally there is s. **18.6**(3) whereby once it has been established that there is a foreign proceeding within the meaning of s. **18.6**(1) (as I have concluded there is), then this court is given

broad powers and wide latitude, all of which is consistent with the general judicial analysis of the **CCAA** overall, to make any order it thinks appropriate in the circumstances.

> s.    **18.6**(3) An order of the court under this Section may be made on such terms and conditions as the court considers appropriate in the circumstances.

This subsection reinforces the view expressed previously that the 1997 Amendments contemplated that it would be inappropriate to pigeonhole or otherwise constrain the interpretation of s. **18.6** since it would be not only impracticable but also impossible to contemplate the myriad of circumstances arising under a wide variety of foreign legislation which deal generally and essentially with bankruptcy and insolvency but not exclusively so. Thus the Court was entrusted to exercise its discretion, but of course in a judicial manner.

**18**    Even aside from that, I note that the Courts of this country have utilized inherent jurisdiction to fill in any gaps in the legislation and to promote the objectives of the **CCAA.** Where there is a gap which requires bridging, then the question to be considered is what will be the most practical common sense approach to establishing the connection between the parts of the legislation so as to reach a just and reasonable solution. See Re Westar Mining Ltd. (1992), 14 C.B.R. (3d) 88 (B.C.S.C.) at pp. 93-4; Pacific National Leaseholding Corp. v. Sun Life Trust Co. (1995), 34 C.B.R. (3d) 4 (B.C.C.A.) at p. 2; Lehndorff at p. 30.

**19**    The Chapter 11 proceedings are intended to resolve the mass asbestos related tort claims which seriously threaten the long term viability of BWUS and its subsidiaries including BW Canada. BW Canada is a significant participant in the overall Babcock & Wilcox international organization. From the record before me it appears reasonably clear that there is an interdependence between BWUS and BW Canada as to facilities and services. In addition there is the fundamental element of financial and business stability. This interdependence has been increased by the financial assistance given by the BW Canada guarantee of BWUS' obligations.

**20**    To date the overwhelming thrust of the asbestos related litigation has been focussed in the U.S. In contradistinction BW Canada has not in essence been involved in asbestos litigation to date. The 1994 amendments to the U.S. Bankruptcy Code have provided a specific regime which is designed to deal with the mass tort claims (which number in the hundreds of thousands of claims in the U.S.) which appear to be endemic in the U.S. litigation arena involving asbestos related claims as well as other types of mass torts. This Court's assistance however is being sought to stay asbestos related claims against BW Canada with a view to this stay facilitating an environment in which a global solution may be worked out within the context of the Chapter 11 proceedings trust.

**21**    In my view, s. **18.6**(3) and (4) permit BW Canada to apply to this Court for such a stay and other appropriate relief. Relying upon the existing law on the recognition of foreign insolvency orders and proceedings, the principles and practicalities discussed and illustrated in the Cross-Border Insolvency Concordat and the UNCITRAL Model Law on Cross-Border Insolvencies and inherent jurisdiction, all as discussed above, I would think that the following may be of assistance in advancing guidelines as to how s. **18.6** should be applied. I do not intend the factors listed below to be exclusive or exhaustive but merely an initial attempt to provide guidance:

> (a)    The recognition of **comity** and cooperation between the courts of various jurisdictions are to be encouraged.

(b)    Respect should be accorded to the overall thrust of foreign bankruptcy and insolvency legislation in any analysis, unless in substance generally it is so different from the bankruptcy and insolvency law of Canada or perhaps because the legal process that generates the foreign order diverges radically from the process here in Canada.

(c)    All stakeholders are to be treated equitably, and to the extent reasonably possible, common or like stakeholders are to be treated equally, regardless of the jurisdiction in which they reside.

(d)    The enterprise is to be permitted to implement a plan so as to reorganize as a global unit, especially where there is an established interdependence on a transnational basis of the enterprise and to the extent reasonably practicable, one jurisdiction should take charge of the principal administration of the enterprise's reorganization, where such principal type approach will facilitate a potential reorganization and which respects the claims of the stakeholders and does not inappropriately detract from the net benefits which may be available from alternative approaches.

(e)    The role of the court and the extent of the jurisdiction it exercises will vary on a case by case basis and depend to a significant degree upon the court's nexus to that enterprise; in considering the appropriate level of its involvement, the court would consider:

    (i)    the location of the debtor's principal operations, undertaking and assets;

    (ii)    the location of the debtor's stakeholders;

    (iii)    the development of the law in each jurisdiction to address the specific problems of the debtor and the enterprise;

    (iv)    the substantive and procedural law which may be applied so that the aspect of undue prejudice may be analyzed;

    (v)    such other factors as may be appropriate in the instant circumstances.

(f)    Where one jurisdiction has an ancillary role,

    (i)    the court in the ancillary jurisdiction should be provided with information on an ongoing basis and be kept apprised of developments in respect of that debtor's reorganizational efforts in the foreign jurisdiction;

    (ii)    stakeholders in the ancillary jurisdiction should be afforded appropriate access to the proceedings in the principal jurisdiction.

(g)    As effective notice as is reasonably practicable in the circumstances should be given to all affected stakeholders, with an opportunity for such stakeholders to come back into the court to review the granted order with a view, if thought desirable, to rescind or vary the granted order or to obtain any other appropriate relief in the circumstances.

**22**    Taking these factors into consideration, and with the determination that the Chapter 11 proceedings are a "foreign proceeding" within the meaning of s. **18.6** of the **CCAA** and that it is appropriate to declare that BW Canada is entitled to avail itself of the provisions of s. **18.6,** I would also grant the following relief. There is to be a stay against suits and enforcement as requested; the initial time period would appear reasonable in the circumstances to allow BWUS to return to the U.S. Bankruptcy Court. Assuming the injunctive relief is continued there, this will provide some additional time to more fully prepare an initial draft approach with respect to ongoing matters. It should also be recognized that if such future relief is not granted in the U.S. Bankruptcy Court, any interested person could avail themselves of the "comeback" clause in the draft order presented to me and which I find reasonable in the circumstances. It appears appropriate, in the circumstances that BW Canada guarantee BWUS' obligations as aforesaid and to grant security in respect thereof, recognizing that same is permitted pursuant to the general corporate legislation affecting BW Canada, namely the Business Corporations Act (Ontario). I note that there is also a provision for an "Information Officer" who will give quarterly reports to this Court. Notices are to be published in the Globe & Mail (National Edition) and the National Post. In accordance with my suggestion at the hearing, the draft order notice has been revised to note that persons are alerted to the fact that they may become a participant in these Canadian proceedings and further that, if so, they may make representations as to pursuing their remedies regarding asbestos related claims in Canada as opposed to the U.S. As discussed above the draft order also includes an appropriate "comeback" clause. This Court (and I specifically) look forward to working in a cooperative judicial way with the U.S. Bankruptcy Court (and Judge Brown specifically).

**23**    I am satisfied that it is appropriate in these circumstances to grant an order in the form of the revised draft (a copy of which is attached to these reasons [Quicklaw note: See [2000] O.J. No. 787] for the easy reference of others who may be interested in this area of s. **18.6** of the **CCAA)**.

**24**    Order to issue accordingly.

FARLEY J.

cp/d/qlrme/qlkra

# TAB 3

DOCSTOR: 2191401\1

*Indexed as:*

# Benner and Associates Ltd.
# v. Northern Lights Distribution Inc.

**Between**
**Benner and Associates Ltd., plaintiff, and**
**Northern Lights Distribution Inc., defendant**

**[1995] O.J. No. 626**

22 B.L.R. (2d) 79

53 A.C.W.S. (3d) 929

No. 94-CQ-57097

Ontario Court of Justice (General Division)

**Hoilett J.**

Heard: January 27, 1995.
Judgment: March 9, 1995.

(11 pp.)

*Arbitration -- Stay of proceedings -- Arbitration clause, enforcement of.*

The defendant moved to stay an action on the grounds that the parties had agreed to resort to arbitration. The plaintiff had terminated a dealership agreement with the defendant in May, 1994. Neither party had ever taken any initiative to invoke the arbitration clause in the agreement. The plaintiff issued its statement of claim in October, 1994.

HELD: The motion to stay was dismissed. It was not clear from the language employed that all disputes were to be submitted to arbitration, or whether arbitration was to be invoked only in those circumstances where a dealer was in breach of the contract. There was no clarity in the language of the arbitration clause concerning who should take the initiative in the joint appointment of the arbitrator. Therefore, the arbitration clause had to fail for uncertainty.

**Statutes, Regulations and Rules Cited:**

Arbitration Act, S.O. 1991, ss. 2(4), 7(1), 7(2).

**Counsel:**

Robert C. Harason, for the plaintiff/responding party.
Joseph M. Gottli, for the defendant/moving party.

---

**1    HOILETT J.**:-- This is a motion by the defendant to stay the within action on the grounds that it is inconsistent with a Dealership Agreement entered into by the parties, a term of which contemplates a resort to arbitration in certain circumstances set out in the Agreement.

**2**    Before briefly setting out the general purport of the Agreement and the circumstances precipitating the dispute between the parties, it may be useful to reproduce for ease of reference the specific term of the Agreement relied on by the moving party. Clause 8 of the Agreement provides as follows:

> 8.    Terms and Termination:
>
> A dealership agreement shall remain in place for a period of 1 (one) year which barring any 30 day advance notice by either party will be automatically renewed. If for any reason, and without cause written notice is given 30 days prior to renewal, this contract will cease on the renewal date. Should a Dealer be in breach of this contract, written notice will be given by Northern Lights Distributing, Inc. If the breach is not corrected within 15 days of receiving the written notice, such dispute shall be submitted to a single arbitrator jointly appointed. The chosen arbitrator shall agree to schedule the hearing within 30 days of their appointment and to proceed with arbitration without delay. The appointed arbitrator shall make an award within 15 days of the conclusion of the hearing. This is in accordance with the Arbitration Act of Ontario. A Dealer must meet the specific performance requirements agreed to in Schedule C hereto.

The following handwritten addition was made to the pre-printed text of the Agreement and initialled by the parties:

> Such award shall be binding by (sic) both parties.

**3**    Stated very briefly, under the Agreement entered into by the parties, the plaintiff was appointed

the defendant's agent, or "dealer", for the purpose of distributing in Metropolitan Toronto a skylighting device sold under the label of "Solatube". The Agreement was dated July 29, 1993. Among other things, the Agreement in Clause 6, dealt with the respective marketing and advertising obligations of the parties and Clauses 12 and 13 of the Agreement dealt, respectively, with the issue of non-competition and the matter of trade secrets.

**4**    It is common ground that in early 1994 the plaintiff commenced working on the development of a device described as an "aluminum flat-top flashing" which was intended to be used as a part of the assembly necessary for the installation of the Solatube skylight. The aluminum flashing was intended to be an alternative to a fibreglass product that was part of the original Solatube assembly. An exchange of correspondence between the parties, of which a letter of May 18, 1994 from the defendant to the plaintiff marks a watershed, makes it clear that ultimate approval of the aluminum flashing had to come from "Solatube North America Limited", the defendant's principal. Equally clear, indeed, counsel for the defendant conceded as much, was that the defendant condoned the plaintiff's efforts at developing the aluminum flashing; albeit pointing out to the plaintiff that Solatube North America Limited had to approve the flashing and that solatube North America Limited's warranty would not cover the aluminum flashing.

**5**    The defendant's letter of May 18, 1994, referred to earlier, accused the plaintiff of breaching the terms of the Agreement, and in particular Clauses 12 and 13, dealing, respectively, with "noncompetition" and with "trade secrets". The particular violation complained of was the plaintiff's involvement in the development of the aluminum flashing. The concluding paragraph of the letter sounded the following alarm to the plaintiff:

> Within fifteen (15) days of receiving this notice, Northern Lights requires a letter from Benner and Associates stating that it will cease all actions regarding the aluminum flat roof flashing immediately. Should we not receive the above written notice by close of business (5:00 pm E.S.T.) Thursday, June 2, 1994, the Metro Toronto Dealership is terminated.

**6**    Subsequent letters from the defendant, dated, respectively, May 27, 1994; June 1, 1994; June 1, 1994 and June 2, 1994, echoed the defendant's concern about the alleged breach.

**7**    The plaintiff's first response to the defendant's May 18, 1994 letter of ultimatum was a letter dated June 3, 1994, the day following the 15 days the plaintiff was given to correct the alleged breach. Distilling to its essence the plaintiff's letter of June 3, it indicated that "[o]n the basis of your letter of May 18, 1994, we consider our Dealership Agreement formally terminated at this time" and went on to set out its own allegation of breaches of the Agreement. Appended was a schedule setting out the plaintiff's assessment of its alleged damages.

**8**    The defendant, in a letter dated June 10, 1994, acknowledged receipt of the plaintiff's letter of June 3, 1994, supra, and repeated its allegations of breaches of the Agreement.

**9**    Neither party to the Agreement has ever taken any initiative to invoke the so-called arbitration clause in the agreement. The plaintiff issued its Statement of Claim in this action on October 27, 1994.

**10**    Following the termination of the Agreement, the defendant created a new dealership to assume the role that it was assumed the plaintiff would have played under the terms of the Dealership Agreement had its original intent been realized. It then sought a transfer of the yellow-page listing that the plaintiff had acquired.

**11**    Central to the issues raised on this motion is the need to determine whether or not there is a valid arbitration clause in the Dealership Agreement and, if so, what interpretation should reasonably be placed on it. It must also be determined whether or not, assuming there is a valid arbitration clause, the clause falls prey to any of the exceptions contemplated by Section 7 of the Arbitration Act, S.O. 1991, and, particularly, subsection 2. For ease of reference subsections (1) and (2) of Section 7 are hereafter reproduced:

> 7.-(1) If a party to an arbitration agreement commences a proceeding in respect of a matter to be submitted to arbitration under the agreement, the court in which the proceeding is commenced shall, on the motion of another party to the arbitration agreement, stay the proceeding.

> (2)    However, the court may refuse to stay the proceeding in any of the following cases:

>> 1.    A party entered into the arbitration agreement while under a legal incapacity.
>> 2.    The arbitration agreement is invalid
>> 3.    The subject-matter of the dispute is not capable of being the subject of arbitration under Ontario law.
>> 4.    The motion was brought with undue delay.
>> 5.    The matter is a proper one for default or summary judgment.

**12**    In order to place this motion in jurisprudential context, reference might usefully be made to the recent decision (unreported) of Blair J. in Ontario Hydro v. Denison Mines Limited, released June 3, 1992 (Ontario Court of Justice (General Division)). The decision of Blair J. is a thorough and thoughtful discussion of the role of arbitration in the spectrum of means of dispute resolution. Referring to "The Legislative Framework", the following excerpt from the reasons of Blair J. epitomises the philosophy that inspired the new arbitration legislation:

> The Arbitration Act, 1991 came into effect on January 1, 1992. It repealed the former Arbitrations Act, R.S.O. 1980 c. 25, and enacted a new regime for the

conduct of arbitrations in Ontario. This new regime is more sophisticated than that of the former Act and more consistent with international commercial arbitration practices. It is designed, in my view, to encourage parties to resort to arbitration as a method of resolving their disputes in commercial and other matters, and to require them to hold to that course once they have agreed to do so.

In this latter respect, the new Act entrenches the primacy of arbitration proceedings over judicial proceedings, once the parties have entered into an arbitration agreement, by directing the court, generally, not to intervene, and by establishing a 'presumptive' stay of court proceedings in favour of arbitration.

**13**    At the risk of simplifying the argument of the defendant herein, what it is asking the court to do is to give effect to the principle enunciated in the judgment of Blair J. in Ontario Hydro v. Denison Mines Limited, supra. The defendant has cited as well the decision of the Ontario Court of Justice (General Division) in Mind Star Toys Inc. v. Samsung Co. Ltd. (1992), 6 C.P.C. (3rd), 241, (Zelinski J.) and the judgment of the Alberta Court of Appeal in Kaverit Steel and Crane Ltd. v. Kone Corp. (1992), 4 C.P.C. (3rd), 99.

**14**    There is no point in dissecting any of the cases cited because there is a general consistency in the interpretation of the law. As is often the case, the ultimate question is the proper construction to be placed on a particular clause.

**15**    The point should be made that in each of the three cases cited on behalf of the defendant, the language of the arbitration clause arguably possesses a clarity that, in my view, is absent from the language of the arbitration clause in the case at bar. The point is best made by reference to the actual text of the arbitration clause in the three cases cited. The text of the Ontario Hydro v. Denison Mines case, supra, provides, in Article XI:

Except as otherwise specifically provided in this agreement or expressly otherwise agreed to by the parties, all disputes arising in connection with this agreement shall be finally settled under the provisions of The Arbitration Act of Ontario by three arbitrators. Each of the parties hereto shall appoint one arbitrator and the two arbitrators so appointed shall appoint the third arbitrator. The proceedings before the arbitrators shall taken place in Toronto, Ontario or such other place as the arbitrators may determine.

**16**    The relevant arbitration provision in the Mind Star v. Samsung case, supra, is Article 14.4, sub-paragraph (a) of which provides:

(a)    All disputes in connection with this Agreement shall be finally settled under the Rules of Conciliation of Arbitration on the International Chamber of Commerce

> hereinafter the ('ICC Rules'). In accordance with Article 8(1) of the ICC Rules, SAMSUNG and MSTI acknowledge that they have to hereby submit ipso facto and in all respects to the present ICC Rules.

**17**    The arbitration clause in the Kaverit Steel v. Kone case, supra, is to the same general effect as in the two cases above, and provides as follows:

> Any dispute arising out of or in connection with this Agreement shall be finally settled without recourse to the courts, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more arbitrators designated in conformity with those Rules. The arbitrator or arbitrators shall have power to rule on their own competence and on the validity of the agreement to submit to arbitration. The place of arbitration shall be Stockholm, Sweden.

**18**    A cursory review of the arbitration clauses in cases cited in the plaintiff's book of authorities makes it clear that, while not uniform, language in the general form of that reproduced above is quite commonly employed. I am of the view that in each case the language employed appears to express much more clearly the intent of the parties than is the case in the instant motion. In the instant motion it is not clear from the language of Clause 8 that all disputes are to be submitted to arbitration or whether arbitration is to be invoked only in those circumstances in which, as the clause suggests, "... a Dealer [is] in breach of his contract ...". There is no clarity in the language of the arbitration clause concerning who should take the initiative in the joint appointment of an arbitrator. Prima facie, it would appear that the obligation should rest on the defendant. There is nothing in the language of the arbitration clause that obliges the Dealer to submit to arbitration any breaches of contract on the part of Northern. It is trite to say that the interpretation of contracts is one of the roles of the court, and in so doing it will often imply a clause in order to render efficacious, from a business point of view, a contract. It is not, however, the role of the court to write a contract that the parties themselves have failed, through some default, to write. The Agreement in issue was drafted by the defendant and had it been the defendant's intention to have all breaches and disputes submitted to arbitration, that intent could have been couched in plain and simple language.

**19**    The final determination of the issues raised in this motion must, in my view, turn on the proper construction to be placed on the language of the arbitration clause as well as the surrounding circumstances which include the conduct of the parties. As I indicated earlier, there is nothing in the language of the clause which obliges the Dealer to submit to arbitration where the defendant, allegedly, is in breach of contract. The language requiring the parties to arbitrate where the Dealer is in breach is itself vague. I am of the view, therefore, that the arbitration clause must fail for uncertainty.

**20**    The foregoing conclusion is a sufficient reason for dismissing this motion. I am impelled to

that conclusion, however, for one other reason. The course of conduct of the defendant following its allegation of breach on the part of the Dealer demonstrated scant regard for the provisions of the arbitration clause which it now seeks to assert as a shield. The totality of the defendant's conduct constitutes such undue delay as to warrant a dismissal of motion to stay, as contemplated by Section (2) 4 of the Arbitration Act.

**21**    In the result, the motion is dismissed subject to the condition that the defendant shall have leave to deliver its statement of defence (and counterclaim, if intended) within ten (10) days of the entry of this order.

**22**    The plaintiff shall have its cost of this motion fixed in the amount of $1,250.00, plus G.S.T.

HOILETT J.

qp/s/mii/DRS

# TAB 4

DOCSTOR: 2191401\1

*** Preliminary Version ***

*Case Name:*

# Century Services Inc. v. Canada (Attorney General)

**Century Services Inc., Appellant;**
**v.**
**Attorney General of Canada on behalf of Her Majesty The Queen**
**in Right of Canada, Respondent.**

[**2010**] **S.C.J. No. 60**

[2010] A.C.S. no 60

2010 SCC 60

[2010] 3 S.C.R. 379

[2010] 3 R.C.S. 379

2011 D.T.C. 5006

409 N.R. 201

296 B.C.A.C. 1

12 B.C.L.R. (5th) 1

2010 CarswellBC 3419

326 D.L.R. (4th) 577

EYB 2010-183759

2011EXP-9

J.E. 2011-5

2011 G.T.C. 2006

[2011] 2 W.W.R. 383

72 C.B.R. (5th) 170

[2010] G.S.T.C. 186

File No.: 33239.

Supreme Court of Canada

Heard: May 11, 2010;
Judgment: December 16, 2010.

**Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish,
Abella, Charron, Rothstein and Cromwell JJ.**

(136 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters --
Application of Act -- Compromises and arrangements -- Where Crown affected -- Effect of related
legislation -- Bankruptcy and Insolvency Act -- Appeal by Century Services Inc. from judgment of
British Columbia Court of Appeal reversing a judgment dismissing a Crown application for
payment of unremitted GST monies allowed -- Section 222(3) of the Excise Tax Act evinced no
explicit intention of Parliament to repeal s. 18.3 of CCAA -- Parliament's intent with respect to GST
deemed trusts was to be found in the CCAA -- Judge had the discretion under the CCAA to continue
the stay of the Crown's claim for enforcement of the GST deemed trust while otherwise lifting it to
permit debtor company to make an assignment in bankruptcy.*

Appeal by Century Services Inc. from a judgment of the British Columbia Court of Appeal
reversing a judgment dismissing a Crown application for payment of unremitted GST monies. The
debtor company commenced proceedings under the Companies' Creditors Arrangement Act
(CCAA), obtaining a stay of proceedings with a view to reorganizing its financial affairs. Among
the debts owed by the debtor company at the commencement of the reorganization was an amount
of GST collected but unremitted to the Crown. The Excise Tax Act (ETA) created a deemed trust in
favour of the Crown for amounts collected in respect of GST. The ETA provided that the deemed
trust operated despite any other enactment of Canada except the Bankruptcy and Insolvency Act
(BIA). However, the CCAA also provided that subject to certain exceptions, none of which

mentioned GST, deemed trusts in favour of the Crown did not operate under the CCAA. In the context of the CCAA proceedings, a chambers judge approved a payment not exceeding $5 million to the debtor company's major secured creditor, Century Services. The judge agreed to the debtor company's proposal to hold back an amount equal to the GST monies collected but unremitted to the Crown and place it in the Monitor's trust account until the outcome of the reorganization was known. After concluding that reorganization was not possible, the debtor company sought leave to partially lift the stay of proceedings so it could make an assignment in bankruptcy under the Bankruptcy and Insolvency Act (BIA). The Crown sought an order that the GST monies held by the Monitor be paid to the Receiver General of Canada. The judge denied the Crown's motion, and allowed the assignment in bankruptcy. The Court of Appeal found two independent bases for allowing the Crown's appeal. First, the court's authority under s. 11 of the CCAA was held not to extend to staying the Crown's application for immediate payment of the GST funds subject to the deemed trust after it was clear that reorganization efforts had failed and that bankruptcy was inevitable. As restructuring was no longer a possibility, staying the Crown's claim to the GST funds no longer served a purpose under the CCAA and the court was bound under the priority scheme provided by the ETA to allow payment to the Crown. Second, the Court of Appeal concluded that by ordering the GST funds segregated in the Monitor's trust account, the judge had created an express trust in favour of the Crown from which the monies in question could not be diverted for any other purposes.

HELD: Appeal allowed. Section 222(3) of the ETA evinced no explicit intention of Parliament to repeal CCAA s. 18.3. Had Parliament sought to give the Crown a priority for GST claims, it could have done so explicitly, as it did for source deductions. There was no express statutory basis for concluding that GST claims enjoyed a preferred treatment under the CCAA or the BIA. Parliament's intent with respect to GST deemed trusts was to be found in the CCAA. With respect to the scope of a court's discretion when supervising reorganization, the broad discretionary jurisdiction conferred on the supervising judge had to be interpreted having regard to the remedial nature of the CCAA and insolvency legislation generally. The question was whether the order advanced the underlying purpose of the CCAA. The judge's order staying Crown enforcement of the GST claim ensured that creditors would not be disadvantaged by the attempted reorganization under the CCAA. The effect of his order was to blunt any impulse of creditors to interfere in an orderly liquidation. His order was thus in furtherance of the CCAA's objectives to the extent that it allowed a bridge between the CCAA and BIA proceedings. The order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that was common to both statutes. The breadth of the court's discretion under the CCAA was sufficient to lift the stay to allow entry into liquidation. No express trust was created by the judge's order because there was no certainty of object inferrable from his order. Further, no deemed trust was created.

**Statutes, Regulations and Rules Cited:**

An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and

Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts, S.C. 2005, c. 47, s. 69, s. 128, s. 131

Bank Act, S.C. 1991, c. 46,

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-, s. 67, s. 86

Canada Pension Plan, R.S.C. 1985, c. C-8, s. 23

Cities and Towns Act, R.S.Q., c. C-19,

Civil Code of QuÚbec, S.Q. 1991, c. 64, art. 2930

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11, s. 11.4, s. 18.3, s. 18.4, s. 20, s. 21

Companies' Creditors Arrangement Act, 1933, S.C. 1932-33, c. 36,

Employment Insurance Act, S.C. 1996, c. 23, s. 86(2), s. 86(2.1)

Excise Tax Act, R.S.C. 1985, c. E-15, s. 222

Income Tax Act, R.S.C. 1985, c. 1 (5th Supp.), s. 227(4), s. 227(4.1)

Interpretation Act, R.S.C. 1985, c. I-21, s. 2, s. 44(f)

Personal Property Security Act, S.A. 1988, c. P-4.05,

Winding-up and Restructuring Act, R.S.C. 1985, c. W-11,

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

**Court Catchwords:**

*Bankruptcy and Insolvency -- Priorities -- Crown applying on eve of bankruptcy of debtor company to have GST monies held in trust paid to Receiver General of Canada -- Whether deemed trust in favour of Crown under Excise Tax Act prevails over provisions of Companies' Creditors Arrangement Act purporting to nullify deemed trusts in favour of Crown -- Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 18.3(1) -- Excise Tax Act, R.S.C. 1985, c. E-15, s. 222(3).*

*Bankruptcy and insolvency -- Procedure -- Whether chambers judge had authority to make order*

*partially lifting stay of proceedings to allow debtor company to make assignment in bankruptcy and to stay Crown's right to enforce GST deemed trust -- Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11.*

*Trusts -- Express trusts -- GST collected but unremitted to Crown -- Judge ordering that GST be held by Monitor in trust account -- Whether segregation of Crown's GST claim in Monitor's account created an express trust in favour of Crown.*

## Court Summary:

The debtor company commenced proceedings under the *Companies' Creditors Arrangement Act* ("*CCAA*"), obtaining a stay of proceedings to allow it time to reorganize its financial affairs. One of the debtor company's outstanding debts at the commencement of the reorganization was an amount of unremitted Goods and Services Tax ("GST") payable to the Crown. Section 222(3) of the *Excise Tax Act* ("*ETA*") created a deemed trust over unremitted GST, which operated despite any other enactment of Canada except the *Bankruptcy and Insolvency Act* ("*BIA*"). However, s. 18.3(1) of the *CCAA* provided that any statutory deemed trusts in favour of the Crown did not operate under the *CCAA*, subject to certain exceptions, none of which mentioned GST.

Pursuant to an order of the *CCAA* chambers judge, a payment not exceeding $5 million was approved to the debtor company's major secured creditor, Century Services. However, the chambers judge also ordered the debtor company to hold back and segregate in the Monitor's trust account an amount equal to the unremitted GST pending the outcome of the reorganization. On concluding that reorganization was not possible, the debtor company sought leave of the court to partially lift the stay of proceedings so it could make an assignment in bankruptcy under the *BIA*. The Crown moved for immediate payment of unremitted GST to the Receiver General. The chambers judge denied the Crown's motion, and allowed the assignment in bankruptcy. The Court of Appeal allowed the appeal on two grounds. First, it reasoned that once reorganization efforts had failed, the chambers judge was bound under the priority scheme provided by the *ETA* to allow payment of unremitted GST to the Crown and had no discretion under s. 11 of the *CCAA* to continue the stay against the Crown's claim. Second, the Court of Appeal concluded that by ordering the GST funds segregated in the Monitor's trust account, the chambers judge had created an express trust in favour of the Crown.

*Held* (Abella J. dissenting): The appeal should be allowed.

*Per* McLachlin C.J., Binnie, LeBel, **Deschamps**, Charron, Rothstein and Cromwell JJ.: The apparent conflict between s. 222(3) of the *ETA* and s. 18.3(1) of the *CCAA* can be resolved through an interpretation that properly recognizes the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by Parliament and the principles for interpreting the *CCAA* that have been recognized in the jurisprudence. The history of the *CCAA* distinguishes it from the *BIA* because although these statutes share the same remedial purpose of avoiding the social and economic costs of liquidating a debtor's assets, the *CCAA* offers more flexibility and greater judicial

discretion than the rules-based mechanism under the *BIA*, making the former more responsive to complex reorganizations. Because the *CCAA* is silent on what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily provides the backdrop against which creditors assess their priority in the event of bankruptcy. The contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the *CCAA* and the *BIA*, and one of its important features has been a cutback in Crown priorities. Accordingly, the *CCAA* and the *BIA* both contain provisions nullifying statutory deemed trusts in favour of the Crown, and both contain explicit exceptions exempting source deductions deemed trusts from this general rule. Meanwhile, both Acts are harmonious in treating other Crown claims as unsecured. No such clear and express language exists in those Acts carving out an exception for GST claims.

When faced with the apparent conflict between s. 222(3) of the *ETA* and s. 18.3(1) of the *CCAA*, courts have been inclined to follow *Ottawa Senators Hockey Club Corp.(Re)* and resolve the conflict in favour of the *ETA*. *Ottawa Senators* should not be followed. Rather, the *CCAA* provides the rule. Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so expressly and elaborately. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. The internal logic of the *CCAA* appears to subject a GST deemed trust to the waiver by Parliament of its priority. A strange asymmetry would result if differing treatments of GST deemed trusts under the *CCAA* and the *BIA* were found to exist, as this would encourage statute shopping, undermine the *CCAA*'s remedial purpose and invite the very social ills that the statute was enacted to avert. The later in time enactment of the more general s. 222(3) of the *ETA* does not require application of the doctrine of implied repeal to the earlier and more specific s. 18.3(1) of the *CCAA* in the circumstances of this case. In any event, recent amendments to the *CCAA* in 2005 resulted in s. 18.3 of the Act being renumbered and reformulated, making it the later in time provision. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*. The conflict between the *ETA* and the *CCAA* is more apparent than real.

The exercise of judicial discretion has allowed the *CCAA* to adapt and evolve to meet contemporary business and social needs. As reorganizations become increasingly complex, *CCAA* courts have been called upon to innovate. In determining their jurisdiction to sanction measures in a *CCAA* proceeding, courts should first interpret the provisions of the *CCAA* before turning to their inherent or equitable jurisdiction. Noteworthy in this regard is the expansive interpretation the language of the *CCAA* is capable of supporting. The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. The requirements of appropriateness, good faith and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. The question is whether the order will usefully further efforts to avoid the social and economic losses resulting from liquidation of an insolvent company, which extends to both the purpose of the order and the means it employs. Here, the chambers judge's order staying the Crown's GST claim was in furtherance of the *CCAA*'s objectives because it blunted the impulse

of creditors to interfere in an orderly liquidation and fostered a harmonious transition from the *CCAA* to the *BIA*, meeting the objective of a single proceeding that is common to both statutes. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA* to allow commencement of *BIA* proceedings, but no gap exists between the two statutes because they operate in tandem and creditors in both cases look to the *BIA* scheme of distribution to foreshadow how they will fare if the reorganization is unsuccessful. The breadth of the court's discretion under the *CCAA* is sufficient to construct a bridge to liquidation under the *BIA*. Hence, the chambers judge's order was authorized.

No express trust was created by the chambers judge's order in this case because there is no certainty of object inferrable from his order. Creation of an express trust requires certainty of intention, subject matter and object. At the time the chambers judge accepted the proposal to segregate the monies in the Monitor's trust account there was no certainty that the Crown would be the beneficiary, or object, of the trust because exactly who might take the money in the final result was in doubt. In any event, no dispute over the money would even arise under the interpretation of s. 18.3(1) of the *CCAA* established above, because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount.

*Per* Fish J.: The GST monies collected by the debtor are not subject to a deemed trust or priority in favour of the Crown. In recent years, Parliament has given detailed consideration to the Canadian insolvency scheme but has declined to amend the provisions at issue in this case, a deliberate exercise of legislative discretion. On the other hand, in upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, courts have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In the context of the Canadian insolvency regime, deemed trusts exist only where there is a statutory provision *creating* the trust and a *CCAA* or *BIA* provision explicitly *confirming* its effective operation. The *Income Tax Act*, the *Canada Pension Plan Act* and the *Employment Insurance Act* all contain deemed trust provisions that are strikingly similar to that in s. 222 of the *ETA* but they are all also confirmed in s. 37 of the *CCAA* and in s. 67(3) of the *BIA* in clear and unmistakeable terms. The same is not true of the deemed trust created under the *ETA*. Although Parliament created a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it did not *confirm* the continued operation of the trust in either the *BIA* or the *CCAA*, reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

*Per* Abella J (dissenting): Section 222(3) of the *ETA* gives priority during *CCAA* proceedings to the Crown's deemed trust in unremitted GST. This provision unequivocally defines its boundaries in the clearest possible terms and excludes only the *BIA* from its legislative grasp. The language used reflects a clear legislative intention that s. 222(3) would prevail if in conflict with any other law except the *BIA*. This is borne out by the fact that following the enactment of s. 222(3), amendments to the *CCAA* were introduced, and despite requests from various constituencies, s. 18.3(1) was not amended to make the priorities in the *CCAA* consistent with those in the *BIA*. This indicates a

deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

The application of other principles of interpretation reinforces this conclusion. An earlier, specific provision may be overruled by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails. Section 222(3) achieves this through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" *other than the BIA*. Section 18.3(1) of the *CCAA* is thereby rendered inoperative for purposes of s. 222(3). By operation of s. 44(f) of the *Interpretation Act*, the transformation of s. 18(3) into s. 37(1) after the enactment of s. 222(3) of the *ETA* has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision. This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding-up Act,* that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes *other* than the *BIA* and the *Winding-up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request for payment of the GST funds during the *CCAA* proceedings.

## Cases Cited

By Deschamps J.

**Overruled:** *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; **distinguished:** *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862; **referred to:** *Reference re Companies' Creditors Arrangement Act*, [1934] S.C.R. 659; *Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny*, 2009 SCC 49, [2009] 3 S.C.R. 286; *Deputy Minister of Revenue v. Rainville*, [1980] 1 S.C.R. 35; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta. L.R. (4) 192; *Komunik Corp. (Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), leave to appeal granted, 2010 QCCA 183 (CanLII); *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411; *First Vancouver Finance v. M.N.R.*, 2002 SCC 49, [2002] 2 S.C.R. 720; *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4) 219; *Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513; *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106; *Elan Corp. v. Comiskey* (1990), 41 O.A.C. 282; *Chef Ready Foods Ltd. v. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84; *Pacific National Lease Holding Corp, Re* (1992), 19 B.C.AC. 134; *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9; *Air Canada, Re* (2003), 42 C.B.R. (4) 173; *Air Canada, Re*, 2003 CanLII 49366; *Canadian Red Cross Society/Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4) 158; *Skydome Corp., Re* (1998), 16 C.B.R. (4) 118; *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, aff'g (1999), 12 C.B.R. (4) 144; *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4) 236; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25; *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108.

By Fish J.

**Referred to**: *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737.

By Abella J. (dissenting)

*Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; *Tele-Mobile Co. v. Ontario*, 2008 SCC 12, [2008] 1 S.C.R. 305; *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862; *Attorney General of Canada v. Public Service Staff Relations Board*, [1977] 2 F.C. 663.

**Statutes and Regulations Cited**

*An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47, ss. 69, 128, 131.

*Bank Act*, S.C. 1991, c. 46.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, ss. 67, 86 [am. 2005, c. 47, s. 69].

*Canada Pension Plan*, R.S.C. 1985, c. C-8, s. 23.

*Cities and Towns Act*, R.S.Q., c. C-19.

*Civil Code of Québec*, S.Q. 1991, c. 64.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, ss. 11, 11.4, 18.3, 18.4, 20 [am. 2005, c. 47, ss. 128, 131], 21 [am. 1997, c. 12, s. 126].

*Companies' Creditors Arrangement Act, 1933*, S.C. 1932-33, c. 36 [am. 1952-53, c. 3].

*Employment Insurance Act*, S.C. 1996, c. 23, ss. 86(2), (2.1).

*Excise Tax Act*, R.S.C. 1985, c. E-15, s. 222.

*Income Tax Act*, R.S.C. 1985, c. 1 (5 Supp.), ss. 227(4), (4.1).

*Interpretation Act*, R.S.C. 1985, c. I-21, ss. 2, 44(*f*).

*Personal Property Security Act*, S.A. 1988, c. P-4.05.

*Winding-up and Restructuring Act*, R.S.C. 1985, c. W-11.

**Authors Cited**

Canada. Advisory Committee on Bankruptcy and Insolvency. *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency*. Ottawa: Minister of Supply and Services Canada, 1986.

Canada. House of Commons. *Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, October 3, 1991, p. 15:15.

Canada. Industry Canada. Marketplace Framework Policy Branch. *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Corporate and Insolvency Law Policy Directorate, 2002.

Canada. Senate. *Debates of the Senate*, vol. 142, 1 Sess., 38 Parl., November 23, 2005, p. 2147.

Canada. Senate. Standing Committee on Banking, Trade and Commerce. *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Senate of Canada, 2003.

Canada. Study Committee on Bankruptcy and Insolvency Legislation. *Bankruptcy and Insolvency: Report of the Study Committee on Bankruptcy and Insolvency Legislation*. Ottawa: Information Canada, 1970.

Côté, Pierre-André. *The Interpretation of Legislation in Canada*, 3 ed. Scarborough, Ont.: Carswell, 2000.

Côté, Pierre-André, avec la collaboration de Stéphane Beaulac et Mathieu Devinat. *Interprétation des lois*, 4e éd. Montréal: Thémis, 2009.

Driedger, Elmer A. *Construction of Statutes*, 2 ed. Toronto: Butterworths, 1983.

Edwards, Stanley E. "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587.

Insolvency Institute of Canada and Canadian Association of Insolvency and Restructuring Professionals. Joint Task Force on Business Insolvency Law Reform. *Report*. (2002).

Insolvency Institute of Canada and Canadian Association of Insolvency and Restructuring Professionals. Legislative Review Task Force (Commercial). *Report on the Commercial Provisions of Bill C-55*. (2005).

Jackson, Georgina R. and Janis Sarra. "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2007*. Toronto: Thomson Carswell, 2008, 41.

Jones, Richard B. "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2005*. Toronto: Thomson Carswell, 2006, 481.

Lamer, Francis L. *Priority of Crown Claims in Insolvency*. Toronto: Thomson Reuters, 1996 (loose-leaf updated 2010, release 1).

Morgan, Barbara K. "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bank. L.J.* 461.

Sarra, Janis. *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations*. Toronto: University of Toronto Press, 2003.

Sarra, Janis P. *Rescue! The Companies' Creditors Arrangement Act*. Toronto: Thomson Carswell, 2007.

Sullivan, Ruth. *Sullivan on the Construction of Statutes*, 5 ed. Markham, Ont.: LexisNexis, 2008.

Waters, Donovan W. M., Mark R. Gillen and Lionel D. Smith, eds. *Waters' Law of Trusts in Canada*, 3 ed. Toronto: Thomson Carswell, 2005.

Wood, Roderick J. *Bankruptcy and Insolvency Law*. Toronto: Irwin Law, 2009.

**History and Disposition:**

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Tysoe and Smith JJ.A.), 2009 BCCA 205, 98 B.C.L.R. (4) 242, 270 B.C.A.C. 167, 454 W.A.C. 167, [2009] 12 W.W.R. 684, [2009] G.S.T.C. 79, [2009] B.C.J. No. 918 (QL), 2009 CarswellBC 1195, reversing a judgment of Brenner C.J.S.C., 2008 BCSC 1805, [2008] G.S.T.C. 221, [2008] B.C.J. No. 2611 (QL), 2008 CarswellBC 2895, dismissing a Crown application for payment of GST monies. Appeal allowed, Abella J. dissenting.

**Counsel:**

*Mary I.A. Buttery*, *Owen J. James* and *Matthew J.G. Curtis*, for the appellant.

*Gordon Bourgard*, *David Jacyk* and *Michael J. Lema*, for the respondent.

---

The judgment of McLachlin C.J. and Binnie, LeBel, Deschamps, Charron, Rothstein and Cromwell JJ. was delivered by

**1**    **DESCHAMPS J.**:-- For the first time this Court is called upon to directly interpret the provisions of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). In that respect, two questions are raised. The first requires reconciliation of provisions of the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*"), which lower courts have held to be in conflict with one another. The second concerns the scope of a court's discretion when supervising reorganization. The relevant statutory provisions are reproduced in the Appendix. On the first question, having considered the evolution of Crown priorities in the context of insolvency and the wording of the various statutes creating Crown priorities, I conclude that it is the *CCAA* and not the *ETA* that provides the rule. On the second question, I conclude that the broad discretionary jurisdiction conferred on the supervising judge must be interpreted having regard to the remedial nature of the *CCAA* and insolvency legislation generally. Consequently, the court had the discretion to partially lift a stay of proceedings to allow the debtor to make an assignment under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*"). I would allow the appeal.

    1.   <u>Facts and Decisions of the Courts Below</u>

**2**    Ted LeRoy Trucking Ltd. ("LeRoy Trucking") commenced proceedings under the *CCAA* in the Supreme Court of British Columbia on December 13, 2007, obtaining a stay of proceedings with a view to reorganizing its financial affairs. LeRoy Trucking sold certain redundant assets as authorized by the order.

**3**    Amongst the debts owed by LeRoy Trucking was an amount for Goods and Services Tax ("GST") collected but unremitted to the Crown. The *ETA* creates a deemed trust in favour of the Crown for amounts collected in respect of GST. The deemed trust extends to any property or proceeds held by the person collecting GST and any property of that person held by a secured creditor, requiring that property to be paid to the Crown in priority to all security interests. The *ETA* provides that the deemed trust operates despite any other enactment of Canada except the *BIA*. However, the *CCAA* also provides that subject to certain exceptions, none of which mentions GST, deemed trusts in favour of the Crown do not operate under the *CCAA*. Accordingly, under the *CCAA* the Crown ranks as an unsecured creditor in respect of GST. Nonetheless, at the time LeRoy Trucking commenced *CCAA* proceedings the leading line of jurisprudence held that the *ETA* took precedence over the *CCAA* such that the Crown enjoyed priority for GST claims under the *CCAA*, even though it would have lost that same priority under the *BIA*. The *CCAA* underwent substantial amendments in 2005 in which some of the provisions at issue in this appeal were renumbered and reformulated (S.C. 2005, c. 47). However, these amendments only came into force on September 18, 2009. I will refer to the amended provisions only where relevant.

**4**    On April 29, 2008, Brenner C.J.S.C., in the context of the *CCAA* proceedings, approved a payment not exceeding $5 million, the proceeds of redundant asset sales, to Century Services, the debtor's major secured creditor. LeRoy Trucking proposed to hold back an amount equal to the GST monies collected but unremitted to the Crown and place it in the Monitor's trust account until the outcome of the reorganization was known. In order to maintain the *status quo* while the success of

the reorganization was uncertain, Brenner C.J.S.C. agreed to the proposal and ordered that an amount of $305,202.30 be held by the Monitor in its trust account.

**5**    On September 3, 2008, having concluded that reorganization was not possible, LeRoy Trucking sought leave to make an assignment in bankruptcy under the *BIA*. The Crown sought an order that the GST monies held by the Monitor be paid to the Receiver General of Canada. Brenner C.J.S.C. dismissed the latter application. Reasoning that the purpose of segregating the funds with the Monitor was "to facilitate an ultimate payment of the GST monies which were owed pre-filing, but only if a viable plan emerged", the failure of such a reorganization, followed by an assignment in bankruptcy, meant the Crown would lose priority under the *BIA* (2008 BCSC 1805, [2008] G.S.T.C. 221).

**6**    The Crown's appeal was allowed by the British Columbia Court of Appeal (2009 BCCA 205, 270 B.C.A.C. 167). Tysoe J.A. for a unanimous court found two independent bases for allowing the Crown's appeal.

**7**    First, the court's authority under s. 11 of the *CCAA* was held not to extend to staying the Crown's application for immediate payment of the GST funds subject to the deemed trust after it was clear that reorganization efforts had failed and that bankruptcy was inevitable. As restructuring was no longer a possibility, staying the Crown's claim to the GST funds no longer served a purpose under the *CCAA* and the court was bound under the priority scheme provided by the *ETA* to allow payment to the Crown. In so holding, Tysoe J.A. adopted the reasoning in *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), which found that the *ETA* deemed trust for GST established Crown priority over secured creditors under the *CCAA*.

**8**    Second, Tysoe J.A. concluded that by ordering the GST funds segregated in the Monitor's trust account on April 29, 2008, the judge had created an express trust in favour of the Crown from which the monies in question could not be diverted for any other purposes. The Court of Appeal therefore ordered that the money held by the Monitor in trust be paid to the Receiver General.

　　2.　Issues

**9**    This appeal raises three broad issues which are addressed in turn:

> (1)    Did s. 222(3) of the *ETA* displace s. 18.3(1) of the *CCAA* and give priority to the Crown's *ETA* deemed trust during *CCAA* proceedings as held in *Ottawa Senators*?
>
> (2)    Did the court exceed its *CCAA* authority by lifting the stay to allow the debtor to make an assignment in bankruptcy?
>
> (3)    Did the court's order of April 29, 2008 requiring segregation of the Crown's GST claim in the Monitor's trust account create an express trust in favour of the Crown in respect of those funds?

3.    Analysis

**10**    The first issue concerns Crown priorities in the context of insolvency. As will be seen, the *ETA* provides for a deemed trust in favour of the Crown in respect of GST owed by a debtor "[d]espite ... any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)" (s. 222(3)), while the *CCAA* stated at the relevant time that "notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be [so] regarded" (s. 18.3(1)). It is difficult to imagine two statutory provisions more apparently in conflict. However, as is often the case, the apparent conflict can be resolved through interpretation.

**11**    In order to properly interpret the provisions, it is necessary to examine the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by Parliament, and the principles that have been recognized in the jurisprudence. It will be seen that Crown priorities in the insolvency context have been significantly pared down. The resolution of the second issue is also rooted in the context of the *CCAA*, but its purpose and the manner in which it has been interpreted in the case law are also key. After examining the first two issues in this case, I will address Tysoe J.A.'s conclusion that an express trust in favour of the Crown was created by the court's order of April 29, 2008.

3.1 *Purpose and Scope of Insolvency Law*

**12**    Insolvency is the factual situation that arises when a debtor is unable to pay creditors (see generally, R. J. Wood, *Bankruptcy and Insolvency Law* (2009), at p. 16). Certain legal proceedings become available upon insolvency, which typically allow a debtor to obtain a court order staying its creditors' enforcement actions and attempt to obtain a binding compromise with creditors to adjust the payment conditions to something more realistic. Alternatively, the debtor's assets may be liquidated and debts paid from the proceeds according to statutory priority rules. The former is usually referred to as reorganization or restructuring while the latter is termed liquidation.

**13**    Canadian commercial insolvency law is not codified in one exhaustive statute. Instead, Parliament has enacted multiple insolvency statutes, the main one being the *BIA*. The *BIA* offers a self-contained legal regime providing for both reorganization and liquidation. Although bankruptcy legislation has a long history, the *BIA* itself is a fairly recent statute -- it was enacted in 1992. It is characterized by a rules-based approach to proceedings. The *BIA* is available to insolvent debtors owing $1000 or more, regardless of whether they are natural or legal persons. It contains mechanisms for debtors to make proposals to their creditors for the adjustment of debts. If a proposal fails, the *BIA* contains a bridge to bankruptcy whereby the debtor's assets are liquidated and the proceeds paid to creditors in accordance with the statutory scheme of distribution.

**14**    Access to the *CCAA* is more restrictive. A debtor must be a company with liabilities in excess of $5 million. Unlike the *BIA*, the *CCAA* contains no provisions for liquidation of a debtor's assets if reorganization fails. There are three ways of exiting *CCAA* proceedings. The best outcome is

achieved when the stay of proceedings provides the debtor with some breathing space during which solvency is restored and the *CCAA* process terminates without reorganization being needed. The second most desirable outcome occurs when the debtor's compromise or arrangement is accepted by its creditors and the reorganized company emerges from the *CCAA* proceedings as a going concern. Lastly, if the compromise or arrangement fails, either the company or its creditors usually seek to have the debtor's assets liquidated under the applicable provisions of the *BIA* or to place the debtor into receivership. As discussed in greater detail below, the key difference between the reorganization regimes under the *BIA* and the *CCAA* is that the latter offers a more flexible mechanism with greater judicial discretion, making it more responsive to complex reorganizations.

**15**    As I will discuss at greater length below, the purpose of the *CCAA* -- Canada's first reorganization statute -- is to permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets. Proposals to creditors under the *BIA* serve the same remedial purpose, though this is achieved through a rules-based mechanism that offers less flexibility. Where reorganization is impossible, the *BIA* may be employed to provide an orderly mechanism for the distribution of a debtor's assets to satisfy creditor claims according to predetermined priority rules.

**16**    Prior to the enactment of the *CCAA* in 1933 (S.C. 1932-33, c. 36), practice under existing commercial insolvency legislation tended heavily towards the liquidation of a debtor company (J. Sarra, *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations* (2003), at p. 12). The battering visited upon Canadian businesses by the Great Depression and the absence of an effective mechanism for reaching a compromise between debtors and creditors to avoid liquidation required a legislative response. The *CCAA* was innovative as it allowed the insolvent debtor to attempt reorganization under judicial supervision outside the existing insolvency legislation which, once engaged, almost invariably resulted in liquidation (*Reference re Companies' Creditors Arrangement Act*, [1934] S.C.R. 659, at pp. 660-61; Sarra, *Creditor Rights*, at pp. 12-13).

**17**    Parliament understood when adopting the *CCAA* that liquidation of an insolvent company was harmful for most of those it affected -- notably creditors and employees -- and that a workout which allowed the company to survive was optimal (Sarra, *Creditor Rights*, at pp. 13-15).

**18**    Early commentary and jurisprudence also endorsed the *CCAA*'s remedial objectives. It recognized that companies retain more value as going concerns while underscoring that intangible losses, such as the evaporation of the companies' goodwill, result from liquidation (S. E. Edwards, "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587, at p. 592). Reorganization serves the public interest by facilitating the survival of companies supplying goods or services crucial to the health of the economy or saving large numbers of jobs (*ibid.*, at p. 593). Insolvency could be so widely felt as to impact stakeholders other than creditors and employees. Variants of these views resonate today, with reorganization justified in terms of rehabilitating companies that are key elements in a complex web of interdependent economic relationships in order to avoid the negative consequences of liquidation.

**19**    The *CCAA* fell into disuse during the next several decades, likely because amendments to the Act in 1953 restricted its use to companies issuing bonds (S.C. 1952-53, c. 3). During the economic downturn of the early 1980s, insolvency lawyers and courts adapting to the resulting wave of insolvencies resurrected the statute and deployed it in response to new economic challenges. Participants in insolvency proceedings grew to recognize and appreciate the statute's distinguishing feature: a grant of broad and flexible authority to the supervising court to make the orders necessary to facilitate the reorganization of the debtor and achieve the *CCAA*'s objectives. The manner in which courts have used *CCAA* jurisdiction in increasingly creative and flexible ways is explored in greater detail below.

**20**    Efforts to evolve insolvency law were not restricted to the courts during this period. In 1970, a government-commissioned panel produced an extensive study recommending sweeping reform but Parliament failed to act (see *Bankruptcy and Insolvency: Report of the Study Committee on Bankruptcy and Insolvency Legislation* (1970)). Another panel of experts produced more limited recommendations in 1986 which eventually resulted in enactment of the *Bankruptcy and Insolvency Act* of 1992 (S.C. 1992, c. 27) (see *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)). Broader provisions for reorganizing insolvent debtors were then included in Canada's bankruptcy statute. Although the 1970 and 1986 reports made no specific recommendations with respect to the *CCAA*, the House of Commons committee studying the *BIA*'s predecessor bill, C-22, seemed to accept expert testimony that the *BIA*'s new reorganization scheme would shortly supplant the *CCAA*, which could then be repealed, with commercial insolvency and bankruptcy being governed by a single statute (*Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, October 3, 1991, at pp. 15:15-15:16).

**21**    In retrospect, this conclusion by the House of Commons committee was out of step with reality. It overlooked the renewed vitality the *CCAA* enjoyed in contemporary practice and the advantage that a flexible judicially supervised reorganization process presented in the face of increasingly complex reorganizations, when compared to the stricter rules-based scheme contained in the *BIA*. The "flexibility of the *CCAA* [was seen as] a great benefit, allowing for creative and effective decisions" (Industry Canada, Marketplace Framework Policy Branch, *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act* (2002), at p. 41). Over the past three decades, resurrection of the *CCAA* has thus been the mainspring of a process through which, one author concludes, "the legal setting for Canadian insolvency restructuring has evolved from a rather blunt instrument to one of the most sophisticated systems in the developed world" (R. B. Jones, "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2005* (2006), 481, at p. 481).

**22**    While insolvency proceedings may be governed by different statutory schemes, they share some commonalities. The most prominent of these is the single proceeding model. The nature and purpose of the single proceeding model are described by Professor Wood in *Bankruptcy and*

*Insolvency Law*:

> They all provide a collective proceeding that supersedes the usual civil process available to creditors to enforce their claims. The creditors' remedies are collectivized in order to prevent the free-for-all that would otherwise prevail if creditors were permitted to exercise their remedies. In the absence of a collective process, each creditor is armed with the knowledge that if they do not strike hard and swift to seize the debtor's assets, they will be beat out by other creditors. [pp. 2-3]

The single proceeding model avoids the inefficiency and chaos that would attend insolvency if each creditor initiated proceedings to recover its debt. Grouping all possible actions against the debtor into a single proceeding controlled in a single forum facilitates negotiation with creditors because it places them all on an equal footing, rather than exposing them to the risk that a more aggressive creditor will realize its claims against the debtor's limited assets while the other creditors attempt a compromise. With a view to achieving that purpose, both the *CCAA* and the *BIA* allow a court to order all actions against a debtor to be stayed while a compromise is sought.

**23**    Another point of convergence of the *CCAA* and the *BIA* relates to priorities. Because the *CCAA* is silent about what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a *CCAA* reorganization is ultimately unsuccessful. In addition, one of the important features of legislative reform of both statutes since the enactment of the *BIA* in 1992 has been a cutback in Crown priorities (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, ss. 73 and 125; S.C. 2000, c. 30, s. 148; S.C. 2005, c. 47, ss. 69 and 131; S.C. 2009, c. 33, ss. 25 and 29; see also *Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny*, 2009 SCC 49, [2009] 3 S.C.R. 286; *Deputy Minister of Revenue v. Rainville*, [1980] 1 S.C.R. 35; *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)).

**24**    With parallel *CCAA* and *BIA* restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation (see *An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta. L.R. (4th) 192, at para. 19).

**25**    Mindful of the historical background of the *CCAA* and *BIA*, I now turn to the first question at issue.

3.2 *GST Deemed Trust Under the CCAA*

**26**    The Court of Appeal proceeded on the basis that the *ETA* precluded the court from staying the

Crown's enforcement of the GST deemed trust when partially lifting the stay to allow the debtor to enter bankruptcy. In so doing, it adopted the reasoning in a line of cases culminating in *Ottawa Senators*, which held that an *ETA* deemed trust remains enforceable during *CCAA* reorganization despite language in the *CCAA* that suggests otherwise.

**27**    The Crown relies heavily on the decision of the Ontario Court of Appeal in *Ottawa Senators* and argues that the later in time provision of the *ETA* creating the GST deemed trust trumps the provision of the *CCAA* purporting to nullify most statutory deemed trusts. The Court of Appeal in this case accepted this reasoning but not all provincial courts follow it (see, e.g., *Komunik Corp. (Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), leave to appeal granted, 2010 QCCA 183 (CanLII)). Century Services relied, in its written submissions to this Court, on the argument that the court had authority under the *CCAA* to continue the stay against the Crown's claim for unremitted GST. In oral argument, the question of whether *Ottawa Senators* was correctly decided nonetheless arose. After the hearing, the parties were asked to make further written submissions on this point. As appears evident from the reasons of my colleague Abella J., this issue has become prominent before this Court. In those circumstances, this Court needs to determine the correctness of the reasoning in *Ottawa Senators*.

**28**    The policy backdrop to this question involves the Crown's priority as a creditor in insolvency situations which, as I mentioned above, has evolved considerably. Prior to the 1990s, Crown claims largely enjoyed priority in insolvency. This was widely seen as unsatisfactory as shown by both the 1970 and 1986 insolvency reform proposals, which recommended that Crown claims receive no preferential treatment. A closely related matter was whether the *CCAA* was binding at all upon the Crown. Amendments to the *CCAA* in 1997 confirmed that it did indeed bind the Crown (see *CCAA*, s. 21, as am. by S.C. 1997, c. 12, s. 126).

**29**    Claims of priority by the state in insolvency situations receive different treatment across jurisdictions worldwide. For example, in Germany and Australia, the state is given no priority at all, while the state enjoys wide priority in the United States and France (see B. K. Morgan, "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bank. L.J.* 461, at p. 500). Canada adopted a middle course through legislative reform of Crown priority initiated in 1992. The Crown retained priority for source deductions of income tax, Employment Insurance ("EI") and Canada Pension Plan ("CPP") premiums, but ranks as an ordinary unsecured creditor for most other claims.

**30**    Parliament has frequently enacted statutory mechanisms to secure Crown claims and permit their enforcement. The two most common are statutory deemed trusts and powers to garnish funds third parties owe the debtor (see F. L. Lamer, *Priority of Crown Claims in Insolvency* (loose-leaf), at s. 2).

**31**    With respect to GST collected, Parliament has enacted a deemed trust. The *ETA* states that every person who collects an amount on account of GST is deemed to hold that amount in trust for

the Crown (s. 222(1)). The deemed trust extends to other property of the person collecting the tax equal in value to the amount deemed to be in trust if that amount has not been remitted in accordance with the *ETA*. The deemed trust also extends to property held by a secured creditor that, but for the security interest, would be property of the person collecting the tax (s. 222(3)).

**32**    Parliament has created similar deemed trusts using almost identical language in respect of source deductions of income tax, EI premiums and CPP premiums (see s. 227(4) of the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*"), ss. 86(2) and (2.1) of the *Employment Insurance Act*, S.C. 1996, c. 23, and ss. 23(3) and (4) of the *Canada Pension Plan*, R.S.C. 1985, c. C-8). I will refer to income tax, EI and CPP deductions as "source deductions".

**33**    In *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411, this Court addressed a priority dispute between a deemed trust for source deductions under the *ITA* and security interests taken under both the *Bank Act*, S.C. 1991, c. 46, and the Alberta *Personal Property Security Act*, S.A. 1988, c. P-4.05 ("*PPSA*"). As then worded, an *ITA* deemed trust over the debtor's property equivalent to the amount owing in respect of income tax became effective at the time of liquidation, receivership, or assignment in bankruptcy. *Sparrow Electric* held that the *ITA* deemed trust could not prevail over the security interests because, being fixed charges, the latter attached as soon as the debtor acquired rights in the property such that the *ITA* deemed trust had no property on which to attach when it subsequently arose. Later, in *First Vancouver Finance v. M.N.R.*, 2002 SCC 49, [2002] 2 S.C.R. 720, this Court observed that Parliament had legislated to strengthen the statutory deemed trust in the *ITA* by deeming it to operate from the moment the deductions were not paid to the Crown as required by the *ITA*, and by granting the Crown priority over all security interests (paras. 27-29) (the "*Sparrow Electric* amendment").

**34**    The amended text of s. 227(4.1) of the *ITA* and concordant source deductions deemed trusts in the *Canada Pension Plan* and the *Employment Insurance Act* state that the deemed trust operates notwithstanding any other enactment of Canada, except ss. 81.1 and 81.2 of the *BIA*. The *ETA* deemed trust at issue in this case is similarly worded, but it excepts the *BIA* in its entirety. The provision reads as follows:

>    **222...** .

>                                    ...

>            (3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed ... .

**35**    The Crown submits that the *Sparrow Electric* amendment, added by Parliament to the *ETA* in 2000, was intended to preserve the Crown's priority over collected GST under the *CCAA* while subordinating the Crown to the status of an unsecured creditor in respect of GST only under the *BIA*. This is because the *ETA* provides that the GST deemed trust is effective "despite" any other enactment except the *BIA*.

**36**    The language used in the *ETA* for the GST deemed trust creates an apparent conflict with the *CCAA*, which provides that subject to certain exceptions, property deemed by statute to be held in trust for the Crown shall not be so regarded.

**37**    Through a 1997 amendment to the *CCAA* (S.C. 1997, c. 12, s. 125), Parliament appears to have, subject to specific exceptions, nullified deemed trusts in favour of the Crown once reorganization proceedings are commenced under the Act. The relevant provision reads:

> **18.3** (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

This nullification of deemed trusts was continued in further amendments to the *CCAA* (S.C. 2005, c. 47), where s. 18.3(1) was renumbered and reformulated as s. 37(1):

> **37.** (1) Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**38**    An analogous provision exists in the *BIA*, which, subject to the same specific exceptions, nullifies statutory deemed trusts and makes property of the bankrupt that would otherwise be subject to a deemed trust part of the debtor's estate and available to creditors (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, s. 73; *BIA*, s. 67(2)). It is noteworthy that in both the *CCAA* and the *BIA*, the exceptions concern source deductions (*CCAA*, s. 18.3(2); *BIA*, s. 67(3)). The relevant provision of the *CCAA* reads:

> **18.3** ...

> (2) Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*... .

Thus, the Crown's deemed trust and corresponding priority in source deductions remain effective both in reorganization and in bankruptcy.

**39**    Meanwhile, in both s. 18.4(1) of the *CCAA* and s. 86(1) of the *BIA*, other Crown claims are treated as unsecured. These provisions, establishing the Crown's status as an unsecured creditor, explicitly exempt statutory deemed trusts in source deductions (*CCAA*, s. 18.4(3); *BIA*, s. 86(3)). The *CCAA* provision reads as follows:

> **18.4** ...
>
> ...
>
> > (3) Subsection (1) [Crown ranking as unsecured creditor] does not affect the operation of
> >
> > (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,
> >
> > (*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution ... .

Therefore, not only does the *CCAA* provide that Crown claims do not enjoy priority over the claims of other creditors (s. 18.3(1)), but the exceptions to this rule (i.e., that Crown priority is maintained for source deductions) are repeatedly stated in the statute.

**40**    The apparent conflict in this case is whether the rule in the *CCAA* first enacted as s. 18.3 in 1997, which provides that subject to certain explicit exceptions, statutory deemed trusts are ineffective under the *CCAA*, is overridden by the one in the *ETA* enacted in 2000 stating that GST deemed trusts operate despite any enactment of Canada except the *BIA*. With respect for my colleague Fish J., I do not think the apparent conflict can be resolved by denying it and creating a rule requiring both a statutory provision enacting the deemed trust, and a second statutory provision confirming it. Such a rule is unknown to the law. Courts must recognize conflicts, apparent or real, and resolve them when possible.

**41**    A line of jurisprudence across Canada has resolved the apparent conflict in favour of the *ETA*, thereby maintaining GST deemed trusts under the *CCAA*. *Ottawa Senators*, the leading case, decided the matter by invoking the doctrine of implied repeal to hold that the later in time provision of the *ETA* should take precedence over the *CCAA* (see also *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219 (Alta. Q.B.); *Gauntlet*).

**42**    The Ontario Court of Appeal in *Ottawa Senator s* rested its conclusion on two considerations.

First, it was persuaded that by explicitly mentioning the *BIA* in *ETA* s. 222(3), but not the *CCAA*, Parliament made a deliberate choice. In the words of MacPherson J.A.:

> The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

**43**     Second, the Ontario Court of Appeal compared the conflict between the *ETA* and the *CCAA* to that before this Court in *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862, and found them to be "identical" (para. 46). It therefore considered *Doré* binding (para. 49). In *Doré*, a limitations provision in the more general and recently enacted *Civil Code of Québec*, S.Q. 1991, c. 64 ("*C.C.Q.*"), was held to have repealed a more specific provision of the earlier Quebec *Cities and Towns Act*, R.S.Q., c. C-19, with which it conflicted. By analogy, the Ontario Court of Appeal held that the later in time and more general provision, s. 222(3) of the *ETA*, impliedly repealed the more specific and earlier in time provision, s. 18.3(1) of the *CCAA* (paras. 47-49).

**44**     Viewing this issue in its entire context, several considerations lead me to conclude that neither the reasoning nor the result in *Ottawa Senators* can stand. While a conflict may exist at the level of the statutes' wording, a purposive and contextual analysis to determine Parliament's true intent yields the conclusion that Parliament could not have intended to restore the Crown's deemed trust priority in GST claims under the *CCAA* when it amended the *ETA* in 2000 with the *Sparrow Electric* amendment.

**45**     I begin by recalling that Parliament has shown its willingness to move away from asserting priority for Crown claims in insolvency law. Section 18.3(1) of the *CCAA* (subject to the s. 18.3(2) exceptions) provides that the Crown's deemed trusts have no effect under the *CCAA*. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so explicitly and elaborately. For example, s. 18.3(2) of the *CCAA* and s. 67(3) of the *BIA* expressly provide that deemed trusts for source deductions remain effective in insolvency. Parliament has, therefore, clearly carved out exceptions from the general rule that deemed trusts are ineffective in insolvency. The *CCAA* and *BIA* are in harmony, preserving deemed trusts and asserting Crown priority only in respect of source deductions. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. Unlike source deductions, which are clearly and expressly dealt with under both these insolvency statutes, no such clear and express language exists in those Acts carving out an exception for GST claims.

**46**     The internal logic of the *CCAA* also militates against upholding the *ETA* deemed trust for GST. The *CCAA* imposes limits on a suspension by the court of the Crown's rights in respect of source deductions but does not mention the *ETA* (s. 11.4). Since source deductions deemed trusts

are granted explicit protection under the *CCAA*, it would be inconsistent to afford a better protection to the *ETA* deemed trust absent explicit language in the *CCAA*. Thus, the logic of the *CCAA* appears to subject the *ETA* deemed trust to the waiver by Parliament of its priority (s. 18.4).

**47**    Moreover, a strange asymmetry would arise if the interpretation giving the *ETA* priority over the *CCAA* urged by the Crown is adopted here: the Crown would retain priority over GST claims during *CCAA* proceedings but not in bankruptcy. As courts have reflected, this can only encourage statute shopping by secured creditors in cases such as this one where the debtor's assets cannot satisfy both the secured creditors' and the Crown's claims (*Gauntlet*, at para. 21). If creditors' claims were better protected by liquidation under the *BIA*, creditors' incentives would lie overwhelmingly with avoiding proceedings under the *CCAA* and not risking a failed reorganization. Giving a key player in any insolvency such skewed incentives against reorganizing under the *CCAA* can only undermine that statute's remedial objectives and risk inviting the very social ills that it was enacted to avert.

**48**    Arguably, the effect of *Ottawa Senators* is mitigated if restructuring is attempted under the *BIA* instead of the *CCAA*, but it is not cured. If *Ottawa Senators* were to be followed, Crown priority over GST would differ depending on whether restructuring took place under the *CCAA* or the *BIA*. The anomaly of this result is made manifest by the fact that it would deprive companies of the option to restructure under the more flexible and responsive *CCAA* regime, which has been the statute of choice for complex reorganizations.

**49**    Evidence that Parliament intended different treatments for GST claims in reorganization and bankruptcy is scant, if it exists at all. Section 222(3) of the *ETA* was enacted as part of a wide-ranging budget implementation bill in 2000. The summary accompanying that bill does not indicate that Parliament intended to elevate Crown priority over GST claims under the *CCAA* to the same or a higher level than source deductions claims. Indeed, the summary for deemed trusts states only that amendments to existing provisions are aimed at "ensuring that employment insurance premiums and Canada Pension Plan contributions that are required to be remitted by an employer are fully recoverable by the Crown in the case of the bankruptcy of the employer" (Summary to S.C. 2000, c. 30, at p. 4a). The wording of GST deemed trusts resembles that of statutory deemed trusts for source deductions and incorporates the same overriding language and reference to the *BIA*. However, as noted above, Parliament's express intent is that only source deductions deemed trusts remain operative. An exception for the *BIA* in the statutory language establishing the source deductions deemed trusts accomplishes very little, because the explicit language of the *BIA* itself (and the *CCAA*) carves out these source deductions deemed trusts and maintains their effect. It is however noteworthy that no equivalent language maintaining GST deemed trusts exists under either the *BIA* or the *CCAA*.

**50**    It seems more likely that by adopting the same language for creating GST deemed trusts in the *ETA* as it did for deemed trusts for source deductions, and by overlooking the inclusion of an exception for the *CCAA* alongside the *BIA* in s. 222(3) of the *ETA*, Parliament may have

inadvertently succumbed to a drafting anomaly. Because of a statutory lacuna in the *ETA*, the GST deemed trust could be seen as remaining effective in the *CCAA*, while ceasing to have any effect under the *BIA*, thus creating an apparent conflict with the wording of the *CCAA*. However, it should be seen for what it is: a facial conflict only, capable of resolution by looking at the broader approach taken to Crown priorities and by giving precedence to the statutory language of s. 18.3 of the *CCAA* in a manner that does not produce an anomalous outcome.

**51**    Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. It merely creates an apparent conflict that must be resolved by statutory interpretation. Parliament's intent when it enacted *ETA* s. 222(3) was therefore far from unambiguous. Had it sought to give the Crown a priority for GST claims, it could have done so explicitly as it did for source deductions. Instead, one is left to infer from the language of *ETA* s. 222(3) that the GST deemed trust was intended to be effective under the *CCAA*.

**52**    I am not persuaded that the reasoning in *Doré* requires the application of the doctrine of implied repeal in the circumstances of this case. The main issue in *Doré* concerned the impact of the adoption of the *C.C.Q.* on the administrative law rules with respect to municipalities. While Gonthier J. concluded in that case that the limitation provision in art. 2930 *C.C.Q.* had repealed by implication a limitation provision in the *Cities and Towns Act*, he did so on the basis of more than a textual analysis. The conclusion in *Doré* was reached after thorough contextual analysis of both pieces of legislation, including an extensive review of the relevant legislative history (paras. 31-41). Consequently, the circumstances before this Court in *Doré* are far from "identical" to those in the present case, in terms of text, context and legislative history. Accordingly, *Doré* cannot be said to require the automatic application of the rule of repeal by implication.

**53**    A noteworthy indicator of Parliament's overall intent is the fact that in subsequent amendments it has not displaced the rule set out in the *CCAA*. Indeed, as indicated above, the recent amendments to the *CCAA* in 2005 resulted in the rule previously found in s. 18.3 being renumbered and reformulated as s. 37. Thus, to the extent the interpretation allowing the GST deemed trust to remain effective under the *CCAA* depends on *ETA* s. 222(3) having impliedly repealed *CCAA* s. 18.3(1) because it is later in time, we have come full circle. Parliament has renumbered and reformulated the provision of the *CCAA* stating that, subject to exceptions for source deductions, deemed trusts do not survive the *CCAA* proceedings and thus the *CCAA* is now the later in time statute. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*.

**54**    I do not agree with my colleague Abella J. that s. 44(*f*) of the *Interpretation Act*, R.S.C. 1985, c. I-21, can be used to interpret the 2005 amendments as having no effect. The new statute can hardly be said to be a mere re-enactment of the former statute. Indeed, the *CCAA* underwent a substantial review in 2005. Notably, acting consistently with its goal of treating both the *BIA* and the *CCAA* as sharing the same approach to insolvency, Parliament made parallel amendments to both statutes with respect to corporate proposals. In addition, new provisions were introduced

regarding the treatment of contracts, collective agreements, interim financing and governance agreements. The appointment and role of the Monitor was also clarified. Noteworthy are the limits imposed by *CCAA* s. 11.09 on the court's discretion to make an order staying the Crown's source deductions deemed trusts, which were formerly found in s. 11.4. No mention whatsoever is made of GST deemed trusts (see Summary to S.C. 2005, c. 47). The review went as far as looking at the very expression used to describe the statutory override of deemed trusts. The comments cited by my colleague only emphasize the clear intent of Parliament to maintain its policy that only source deductions deemed trusts survive in *CCAA* proceedings.

**55**    In the case at bar, the legislative context informs the determination of Parliament's legislative intent and supports the conclusion that *ETA* s. 222(3) was not intended to narrow the scope of the *CCAA*'s override provision. Viewed in its entire context, the conflict between the *ETA* and the *CCAA* is more apparent than real. I would therefore not follow the reasoning in *Ottawa Senators* and affirm that *CCAA* s. 18.3 remained effective.

**56**    My conclusion is reinforced by the purpose of the *CCAA* as part of Canadian remedial insolvency legislation. As this aspect is particularly relevant to the second issue, I will now discuss how courts have interpreted the scope of their discretionary powers in supervising a *CCAA* reorganization and how Parliament has largely endorsed this interpretation. Indeed, the interpretation courts have given to the *CCAA* helps in understanding how the *CCAA* grew to occupy such a prominent role in Canadian insolvency law.

### 3.3 *Discretionary Power of a Court Supervising a CCAA Reorganization*

**57**    Courts frequently observe that "[t]he *CCAA* is skeletal in nature" and does not "contain a comprehensive code that lays out all that is permitted or barred" (*Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513, at para. 44, *per* Blair J.A.). Accordingly, "[t]he history of CCAA law has been an evolution of judicial interpretation" (*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Ct. (Gen. Div.)), at para. 10, *per* Farley J.).

**58**    *CCAA* decisions are often based on discretionary grants of jurisdiction. The incremental exercise of judicial discretion in commercial courts under conditions one practitioner aptly describes as "the hothouse of real-time litigation" has been the primary method by which the *CCAA* has been adapted and has evolved to meet contemporary business and social needs (see Jones, at p. 484).

**59**    Judicial discretion must of course be exercised in furtherance of the *CCAA*'s purposes. The remedial purpose I referred to in the historical overview of the Act is recognized over and over again in the jurisprudence. To cite one early example:

> The legislation is remedial in the purest sense in that it provides a means whereby the devastating social and economic effects of bankruptcy or creditor initiated termination of ongoing business operations can be avoided while a

court-supervised attempt to reorganize the financial affairs of the debtor
company is made.

(*Elan Corp. v. Comiskey*  (1990), 41 O.A.C. 282
, at para. 57, *per* Doherty J.A., dissenting)

**60**    Judicial decision making under the *CCAA* takes many forms. A court must first of all provide
the conditions under which the debtor can attempt to reorganize. This can be achieved by staying
enforcement actions by creditors to allow the debtor's business to continue, preserving the *status
quo* while the debtor plans the compromise or arrangement to be presented to creditors, and
supervising the process and advancing it to the point where it can be determined whether it will
succeed (see, e.g., *Chef Ready Foods Ltd. v. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84
(C.A.), at pp. 88-89; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134, at para.
27). In doing so, the court must often be cognizant of the various interests at stake in the
reorganization, which can extend beyond those of the debtor and creditors to include employees,
directors, shareholders, and even other parties doing business with the insolvent company (see, e.g.,
*Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9, at para. 144, *per* Paperny J. (as
she then was); *Air Canada, Re* (2003), 42 C.B.R. (4th) 173 (Ont. S.C.J.), at para. 3; *Air Canada, Re*,
2003 CanLII 49366 (Ont. S.C.J.), at para. 13, *per* Farley J.; Sarra, *Creditor Rights*, at pp. 181-92
and 217-26). In addition, courts must recognize that on occasion the broader public interest will be
engaged by aspects of the reorganization and may be a factor against which the decision of whether
to allow a particular action will be weighed (see, e.g., *Canadian Red Cross Society/Société
Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158 (Ont. S.C.J.), at para. 2, *per* Blair J.
(as he then was); Sarra, *Creditor Rights*, at pp. 195-214).

**61**    When large companies encounter difficulty, reorganizations become increasingly complex.
*CCAA* courts have been called upon to innovate accordingly in exercising their jurisdiction beyond
merely staying proceedings against the debtor to allow breathing room for reorganization. They
have been asked to sanction measures for which there is no explicit authority in the *CCAA*. Without
exhaustively cataloguing the various measures taken under the authority of the *CCAA*, it is useful to
refer briefly to a few examples to illustrate the flexibility the statute affords supervising courts.

**62**    Perhaps the most creative use of *CCAA* authority has been the increasing willingness of courts
to authorize post-filing security for debtor in possession financing or super-priority charges on the
debtor's assets when necessary for the continuation of the debtor's business during the
reorganization (see, e.g., *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118 (Ont. Ct. (Gen. Div.));
*United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, aff'g (1999), 12
C.B.R. (4th) 144 (S.C.); and generally, J. P. Sarra, *Rescue! The Companies' Creditors Arrangement
Act* (2007), at pp. 93-115). The *CCAA* has also been used to release claims against third parties as
part of approving a comprehensive plan of arrangement and compromise, even over the objections
of some dissenting creditors (see *Metcalfe & Mansfield*). As well, the appointment of a Monitor to
oversee the reorganization was originally a measure taken pursuant to the *CCAA*'s supervisory

authority; Parliament responded, making the mechanism mandatory by legislative amendment.

**63**    Judicial innovation during *CCAA* proceedings has not been without controversy. At least two questions it raises are directly relevant to the case at bar: (1) what are the sources of a court's authority during *CCAA* proceedings? (2) what are the limits of this authority?

**64**    The first question concerns the boundary between a court's statutory authority under the *CCAA* and a court's residual authority under its inherent and equitable jurisdiction when supervising a reorganization. In authorizing measures during *CCAA* proceedings, courts have on occasion purported to rely upon their equitable jurisdiction to advance the purposes of the Act or their inherent jurisdiction to fill gaps in the statute. Recent appellate decisions have counselled against purporting to rely on inherent jurisdiction, holding that the better view is that courts are in most cases simply construing the authority supplied by the *CCAA* itself (see, e.g., *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236, at paras. 45-47, *per* Newbury J.A.; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (C.A.), paras. 31-33, *per* Blair J.A.).

**65**    I agree with Justice Georgina R. Jackson and Professor Janis Sarra that the most appropriate approach is a hierarchical one in which courts rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding (see G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2007* (2008), 41, at p. 42). The authors conclude that when given an appropriately purposive and liberal interpretation, the *CCAA* will be sufficient in most instances to ground measures necessary to achieve its objectives (p. 94).

**66**    Having examined the pertinent parts of the *CCAA* and the recent history of the legislation, I accept that in most instances the issuance of an order during *CCAA* proceedings should be considered an exercise in statutory interpretation. Particularly noteworthy in this regard is the expansive interpretation the language of the statute at issue is capable of supporting.

**67**    The initial grant of authority under the *CCAA* empowered a court "where an application is made under this Act in respect of a company ... on the application of any person interested in the matter ..., subject to this Act, [to] make an order under this section" (*CCAA*, s. 11(1)). The plain language of the statute was very broad.

**68**    In this regard, though not strictly applicable to the case at bar, I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary authority of the court under the *CCAA*. Thus in s. 11 of the *CCAA* as currently enacted, a court may, "subject to the restrictions set out in this Act, ... make any order that it considers appropriate in the circumstances" (S.C. 2005, c. 47, s. 128). Parliament appears to have endorsed the broad reading of *CCAA* authority developed by the jurisprudence.

**69**    The *CCAA* also explicitly provides for certain orders. Both an order made on an initial application and an order on subsequent applications may stay, restrain, or prohibit existing or new proceedings against the debtor. The burden is on the applicant to satisfy the court that the order is appropriate in the circumstances and that the applicant has been acting in good faith and with due diligence (*CCAA*, ss. 11(3), (4) and (6)).

**70**    The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* -- avoiding the social and economic losses resulting from liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.

**71**    It is well-established that efforts to reorganize under the *CCAA* can be terminated and the stay of proceedings against the debtor lifted if the reorganization is "doomed to failure" (see *Chef Ready*, at p. 88; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25 (B.C.C.A.), at paras. 6-7). However, when an order is sought that does realistically advance the *CCAA*'s purposes, the ability to make it is within the discretion of a *CCAA* court.

**72**    The preceding discussion assists in determining whether the court had authority under the *CCAA* to continue the stay of proceedings against the Crown once it was apparent that reorganization would fail and bankruptcy was the inevitable next step.

**73**    In the Court of Appeal, Tysoe J.A. held that no authority existed under the *CCAA* to continue staying the Crown's enforcement of the GST deemed trust once efforts at reorganization had come to an end. The appellant submits that in so holding, Tysoe J.A. failed to consider the underlying purpose of the *CCAA* and give the statute an appropriately purposive and liberal interpretation under which the order was permissible. The Crown submits that Tysoe J.A. correctly held that the mandatory language of the *ETA* gave the court no option but to permit enforcement of the GST deemed trust when lifting the *CCAA* stay to permit the debtor to make an assignment under the *BIA*. Whether the *ETA* has a mandatory effect in the context of a *CCAA* proceeding has already been discussed. I will now address the question of whether the order was authorized by the *CCAA*.

**74**    It is beyond dispute that the *CCAA* imposes no explicit temporal limitations upon proceedings commenced under the Act that would prohibit ordering a continuation of the stay of the Crown's GST claims while lifting the general stay of proceedings temporarily to allow the debtor to make an assignment in bankruptcy.

**75**    The question remains whether the order advanced the underlying purpose of the *CCAA*. The Court of Appeal held that it did not because the reorganization efforts had come to an end and the *CCAA* was accordingly spent. I disagree.

**76**    There is no doubt that had reorganization been commenced under the *BIA* instead of the *CCAA*, the Crown's deemed trust priority for the GST funds would have been lost. Similarly, the Crown does not dispute that under the scheme of distribution in bankruptcy under the *BIA*, the deemed trust for GST ceases to have effect. Thus, after reorganization under the *CCAA* failed, creditors would have had a strong incentive to seek immediate bankruptcy and distribution of the debtor's assets under the *BIA*. In order to conclude that the discretion does not extend to partially lifting the stay in order to allow for an assignment in bankruptcy, one would have to assume a gap between the *CCAA* and the *BIA* proceedings. Brenner C.J.S.C.'s order staying Crown enforcement of the GST claim ensured that creditors would not be disadvantaged by the attempted reorganization under the *CCAA*. The effect of his order was to blunt any impulse of creditors to interfere in an orderly liquidation. His order was thus in furtherance of the *CCAA*'s objectives to the extent that it allowed a bridge between the *CCAA* and *BIA* proceedings. This interpretation of the tribunal's discretionary power is buttressed by s. 20 of the *CCAA*. That section provides that the *CCAA* "may be applied together with the provisions of any Act of Parliament ... that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them", such as the *BIA*. Section 20 clearly indicates the intention of Parliament for the *CCAA* to operate *in tandem* with other insolvency legislation, such as the *BIA*.

**77**    The *CCAA* creates conditions for preserving the *status quo* while attempts are made to find common ground amongst stakeholders for a reorganization that is fair to all. Because the alternative to reorganization is often bankruptcy, participants will measure the impact of a reorganization against the position they would enjoy in liquidation. In the case at bar, the order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that is common to both statutes.

**78**    Tysoe J.A. therefore erred in my view by treating the *CCAA* and the *BIA* as distinct regimes subject to a temporal gap between the two, rather than as forming part of an integrated body of insolvency law. Parliament's decision to maintain two statutory schemes for reorganization, the *BIA* and the *CCAA*, reflects the reality that reorganizations of differing complexity require different legal mechanisms. By contrast, only one statutory scheme has been found to be needed to liquidate a bankrupt debtor's estate. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA* to allow commencement of the *BIA* proceedings. However, as Laskin J.A. for the Ontario Court of Appeal noted in a similar competition between secured creditors and the Ontario Superintendent of Financial Services seeking to enforce a deemed trust, "[t]he two statutes are related" and no "gap" exists between the two statutes which would allow the enforcement of property interests at the conclusion of *CCAA* proceedings that would be lost in bankruptcy (*Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108, at paras. 62-63).

**79**    The Crown's priority in claims pursuant to source deductions deemed trusts does not undermine this conclusion. Source deductions deemed trusts survive under both the *CCAA* and the *BIA*. Accordingly, creditors' incentives to prefer one Act over another will not be affected. While a court has a broad discretion to stay source deductions deemed trusts in the *CCAA* context, this discretion is nevertheless subject to specific limitations applicable only to source deductions deemed trusts (*CCAA*, s. 11.4). Thus, if *CCAA* reorganization fails (e.g., either the creditors or the court refuse a proposed reorganization), the Crown can immediately assert its claim in unremitted source deductions. But this should not be understood to affect a seamless transition into bankruptcy or create any "gap" between the *CCAA* and the *BIA* for the simple reason that, regardless of what statute the reorganization had been commenced under, creditors' claims in both instances would have been subject to the priority of the Crown's source deductions deemed trust.

**80**    Source deductions deemed trusts aside, the comprehensive and exhaustive mechanism under the *BIA* must control the distribution of the debtor's assets once liquidation is inevitable. Indeed, an orderly transition to liquidation is mandatory under the *BIA* where a proposal is rejected by creditors. The *CCAA* is silent on the transition into liquidation but the breadth of the court's discretion under the Act is sufficient to construct a bridge to liquidation under the *BIA*. The court must do so in a manner that does not subvert the scheme of distribution under the *BIA*. Transition to liquidation requires partially lifting the *CCAA* stay to commence proceedings under the *BIA*. This necessary partial lifting of the stay should not trigger a race to the courthouse in an effort to obtain priority unavailable under the *BIA*.

**81**    I therefore conclude that Brenner C.J.S.C. had the authority under the *CCAA* to lift the stay to allow entry into liquidation.

3.4 *Express Trust*

**82**    The last issue in this case is whether Brenner C.J.S.C. created an express trust in favour of the Crown when he ordered on April 29, 2008, that proceeds from the sale of LeRoy Trucking's assets equal to the amount of unremitted GST be held back in the Monitor's trust account until the results of the reorganization were known. Tysoe J.A. in the Court of Appeal concluded as an alternative ground for allowing the Crown's appeal that it was the beneficiary of an express trust. I disagree.

**83**    Creation of an express trust requires the presence of three certainties: intention, subject matter, and object. Express or "true trusts" arise from the acts and intentions of the settlor and are distinguishable from other trusts arising by operation of law (see D. W. M. Waters, M. R. Gillen and L. D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005), at pp. 28-29 especially fn. 42).

**84**    Here, there is no certainty to the object (i.e. the beneficiary) inferrable from the court's order of April 29, 2008, sufficient to support an express trust.

**85**    At the time of the order, there was a dispute between Century Services and the Crown over

part of the proceeds from the sale of the debtor's assets. The court's solution was to accept LeRoy Trucking's proposal to segregate those monies until that dispute could be resolved. Thus there was no certainty that the Crown would actually be the beneficiary, or object, of the trust.

**86**    The fact that the location chosen to segregate those monies was the Monitor's trust account has no independent effect such that it would overcome the lack of a clear beneficiary. In any event, under the interpretation of *CCAA* s. 18.3(1) established above, no such priority dispute would even arise because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount. However, Brenner C.J.S.C. may well have been proceeding on the basis that, in accordance with *Ottawa Senators*, the Crown's GST claim would remain effective if reorganization was successful, which would not be the case if transition to the liquidation process of the *BIA* was allowed. An amount equivalent to that claim would accordingly be set aside pending the outcome of reorganization.

**87**    Thus, uncertainty surrounding the outcome of the *CCAA* restructuring eliminates the existence of any certainty to permanently vest in the Crown a beneficial interest in the funds. That much is clear from the oral reasons of Brenner C.J.S.C. on April 29, 2008, when he said: "Given the fact that [*CCAA* proceedings] are known to fail and filings in bankruptcy result, it seems to me that maintaining the status quo in the case at bar supports the proposal to have the monitor hold these funds in trust." Exactly who might take the money in the final result was therefore evidently in doubt. Brenner C.J.S.C.'s subsequent order of September 3, 2008, denying the Crown's application to enforce the trust once it was clear that bankruptcy was inevitable, confirms the absence of a clear beneficiary required to ground an express trust.

> 4.    Conclusion

**88**    I conclude that Brenner C.J.S.C. had the discretion under the *CCAA* to continue the stay of the Crown's claim for enforcement of the GST deemed trust while otherwise lifting it to permit LeRoy Trucking to make an assignment in bankruptcy. My conclusion that s. 18.3(1) of the *CCAA* nullified the GST deemed trust while proceedings under that Act were pending confirms that the discretionary jurisdiction under s. 11 utilized by the court was not limited by the Crown's asserted GST priority, because there is no such priority under the *CCAA*.

**89**    For these reasons, I would allow the appeal and declare that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada is not subject to deemed trust or priority in favour of the Crown. Nor is this amount subject to an express trust. Costs are awarded for this appeal and the appeal in the court below.

The following are the reasons delivered by

FISH J.:--

I

**90**    I am in general agreement with the reasons of Justice Deschamps and would dispose of the appeal as she suggests.

**91**    More particularly, I share my colleague's interpretation of the scope of the judge's discretion under s. 11 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). And I share my colleague's conclusion that Brenner C.J.S.C. did not create an express trust in favour of the Crown when he segregated GST funds into the Monitor's trust account (2008 BCSC 1805, [2008] G.S.T.C. 221).

**92**    I nonetheless feel bound to add brief reasons of my own regarding the interaction between the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*").

**93**    In upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), and its progeny have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In my respectful view, a clearly marked departure from that jurisprudential approach is warranted in this case.

**94**    Justice Deschamps develops important historical and policy reasons in support of this position and I have nothing to add in that regard. I do wish, however, to explain why a comparative analysis of related statutory provisions adds support to our shared conclusion.

**95**    Parliament has in recent years given detailed consideration to the Canadian insolvency scheme. It has declined to amend the provisions at issue in this case. Ours is not to wonder why, but rather to treat Parliament's preservation of the relevant provisions as a deliberate exercise of the legislative discretion that is Parliament's alone. With respect, I reject any suggestion that we should instead characterize the apparent conflict between s. 18.3(1) (now s. 37(1)) of the *CCAA* and s. 222 of the *ETA* as a drafting anomaly or statutory lacuna properly subject to judicial correction or repair.

II

**96**    In the context of the Canadian insolvency regime, a deemed trust will be found to exist only where two complementary elements co-exist: first, a statutory provision *creating* the trust; and second, a *CCAA* or *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*") provision *confirming* -- or explicitly preserving -- its effective operation.

**97**    This interpretation is reflected in three federal statutes. Each contains a deemed trust provision framed in terms strikingly similar to the wording of s. 222 of the *ETA*.

**98**    The first is the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*") where s. 227(4) *creates* a deemed trust:

> (4) Every person who deducts or withholds an amount under this Act <u>is</u>

<u>deemed</u>, notwithstanding any security interest (as defined in subsection 224(1.3)) in the amount so deducted or withheld, <u>to hold the amount separate and apart</u> from the property of the person and from property held by any secured creditor (as defined in subsection 224(1.3)) of that person that but for the security interest would be property of the person, <u>in trust for Her Majesty and for payment to Her Majesty in the manner and at the time provided under this Act.</u> [Here and below, the emphasis is of course my own.]

**99**    In the next subsection, Parliament has taken care to make clear that this trust is unaffected by federal or provincial legislation to the contrary:

> (4.1) <u>Notwithstanding</u> any other provision of this Act, <u>the *Bankruptcy and Insolvency Act*</u> (except sections 81.1 and 81.2 of that Act), <u>any other enactment of Canada</u>, any enactment of a province or any other law, <u>where</u> at any time <u>an amount deemed by subsection 227(4) to be held by a person in trust</u> for Her Majesty <u>is not paid to Her Majesty</u> in the manner and at the time provided under this Act, <u>property of the person</u> ... equal in value to the amount so deemed to be held in trust <u>is deemed</u>

> (*a*) <u>to be held</u>, from the time the amount was deducted or withheld by the person, separate and apart from the property of the person, <u>in trust for Her Majesty</u> whether or not the property is subject to such a security interest, ...

> ...

> ... and the proceeds of such property shall be paid to the Receiver General in priority to all such security interests.

**100**    The continued operation of this deemed trust is expressly *confirmed* in s. 18.3 of the *CCAA*:

> **18.3** (1) <u>Subject to subsection (2)</u>, notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

> (2) <u>Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*</u>, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* ... .

**101**    The operation of the *ITA* deemed trust is also confirmed in s. 67 of the *BIA*:

> (2) <u>Subject to subsection (3)</u>, notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

> (3) <u>Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*</u>, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* ... .

**102**    Thus, Parliament has first *created* and then *confirmed the continued operation of* the Crown's *ITA* deemed trust under *both* the *CCAA* and the *BIA* regimes.

**103**    The second federal statute for which this scheme holds true is the *Canada Pension Plan*, R.S.C. 1985, c. C-8 ("*CPP*"). At s. 23, Parliament creates a deemed trust in favour of the Crown and specifies that it exists despite all contrary provisions in any other Canadian statute. Finally, and in almost identical terms, the *Employment Insurance Act*, S.C. 1996, c. 23 ("*EIA*"), creates a deemed trust in favour of the Crown: see ss. 86(2) and (2.1).

**104**    As we have seen, the survival of the deemed trusts created under these provisions of the *ITA*, the *CPP* and the *EIA* is confirmed in s. 18.3(2) the *CCAA* and in s. 67(3) the *BIA*. In all three cases, Parliament's intent to enforce the Crown's deemed trust through insolvency proceedings is expressed in clear and unmistakable terms.

**105**    The same is not true with regard to the deemed trust created under the *ETA*. Although Parliament creates a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it does not *confirm* the trust -- or expressly provide for its continued operation -- in either the *BIA* or the *CCAA*. The second of the two mandatory elements I have mentioned is thus absent reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

**106**    The language of the relevant *ETA* provisions is identical in substance to that of the *ITA*, *CPP*, and *EIA* provisions:

> **222**. (1) Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II <u>is deemed</u>, for all purposes and despite any security interest in the amount, <u>to hold the amount in trust for Her Majesty</u> in right of Canada, <u>separate and apart</u> from the property of the person and from

property held by any secured creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

...

(3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

(*a*) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, ...

...

... and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

**107**    Yet no provision of the *CCAA* provides for the continuation of this deemed trust after the *CCAA* is brought into play.

**108**    In short, Parliament has imposed *two* explicit conditions, or "building blocks", for survival under the *CCAA* of deemed trusts created by the *ITA*, *CPP*, and *EIA*. Had Parliament intended to likewise preserve under the *CCAA* deemed trusts created by the *ETA*, it would have included in the *CCAA* the sort of confirmatory provision that explicitly preserves other deemed trusts.

**109**    With respect, unlike Tysoe J.A., I do not find it "inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception" (2009 BCCA 205, 98 B.C.L.R. (4th) 242, at para. 37). *All* of the deemed trust provisions excerpted above make explicit reference to the *BIA*. Section 222 of the *ETA* does not break the pattern. Given the near-identical wording of the four deemed trust provisions, it would have been surprising indeed had Parliament not addressed the *BIA* at all in the *ETA*.

**110**    Parliament's evident intent was to render GST deemed trusts inoperative upon the institution of insolvency proceedings. Accordingly, s. 222 mentions the *BIA* so as to *exclude* it from its ambit

-- rather than to *include* it, as do the *ITA*, the *CPP*, and the *EIA*.

**111**    Conversely, I note that *none* of these statutes mentions the *CCAA* expressly. Their specific reference to the *BIA* has no bearing on their interaction with the *CCAA*. Again, it is the confirmatory provisions *in the insolvency statutes* that determine whether a given deemed trust will subsist during insolvency proceedings.

**112**    Finally, I believe that chambers judges should not segregate GST monies into the Monitor's trust account during *CCAA* proceedings, as was done in this case. The result of Justice Deschamps's reasoning is that GST claims become unsecured under the *CCAA*. Parliament has deliberately chosen to nullify certain Crown super-priorities during insolvency; this is one such instance.

III

**113**    For these reasons, like Justice Deschamps, I would allow the appeal with costs in this Court and in the courts below and order that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada be subject to no deemed trust or priority in favour of the Crown.

The following are the reasons delivered by

**114**    ABELLA J. (dissenting):-- The central issue in this appeal is whether s. 222 of the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*"), and specifically s. 222(3), gives priority during *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"), proceedings to the Crown's deemed trust in unremitted GST. I agree with Tysoe J.A. that it does. It follows, in my respectful view, that a court's discretion under s. 11 of the *CCAA* is circumscribed accordingly.

**115**    Section 11[1] of the *CCAA* stated:

> **11.** (1) Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

To decide the scope of the court's discretion under s. 11, it is necessary to first determine the priority issue. Section 222(3), the provision of the *ETA* at issue in this case, states:

> (3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under

this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

> (*a*) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

> (*b*) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

**116**    Century Services argued that the *CCAA*'s general override provision, s. 18.3(1), prevailed, and that the deeming provisions in s. 222 of the *ETA* were, accordingly, inapplicable during *CCAA* proceedings. Section 18.3(1) states:

> **18.3** (1) ... <u>[N]otwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty,</u> property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**117**    As MacPherson J.A. correctly observed in *Ottawa Senators Hockey Club Corp.* (*Re*) (2005), 73 O.R. (3d) 737 (C.A.), s. 222(3) of the *ETA* is in "clear conflict" with s. 18.3(1) of the *CCAA* (para. 31). Resolving the conflict between the two provisions is, essentially, what seems to me to be a relatively uncomplicated exercise in statutory interpretation: does the language reflect a clear legislative intention? In my view it does. The deemed trust provision, s. 222(3) of the *ETA*, has unambiguous language stating that it operates notwithstanding any law except the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*").

**118**    By expressly excluding only one statute from its legislative grasp, and by unequivocally stating that it applies despite any other law anywhere in Canada *except* the *BIA*, s. 222(3) has defined its boundaries in the clearest possible terms. I am in complete agreement with the following comments of MacPherson J.A. in *Ottawa Senators*:

The legislative intent of s. 222(3) of the *ETA* is clear. If there is a conflict with "any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)", s. 222(3) prevails. In these words Parliament did two things: it decided that s. 222(3) should trump all other federal laws and, importantly, it addressed the topic of exceptions to its trumping decision and identified a single exception, the *Bankruptcy and Insolvency Act*... . The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

**119**    MacPherson J.A.'s view that the failure to exempt the *CCAA* from the operation of the *ETA* is a reflection of a clear legislative intention, is borne out by how the *CCAA* was subsequently changed after s. 18.3(1) was enacted in 1997. In 2000, when s. 222(3) of the *ETA* came into force, amendments were also introduced to the *CCAA*. Section 18.3(1) was not amended.

**120**    The failure to amend s. 18.3(1) is notable because its effect was to protect the legislative *status quo*, notwithstanding repeated requests from various constituencies that s. 18.3(1) be amended to make the priorities in the *CCAA* consistent with those in the *BIA*. In 2002, for example, when Industry Canada conducted a review of the *BIA* and the *CCAA*, the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals recommended that the priority regime under the *BIA* be extended to the *CCAA* (Joint Task Force on Business Insolvency Law Reform, *Report* (March 15, 2002), Sch. B, proposal 71, at pp. 37-38). The same recommendations were made by the Standing Senate Committee on Banking, Trade and Commerce in its 2003 report, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*; by the Legislative Review Task Force (Commercial) of the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals in its 2005 *Report on the Commercial Provisions of Bill C-55*; and in 2007 by the Insolvency Institute of Canada in a submission to the Standing Senate Committee on Banking, Trade and Commerce commenting on reforms then under consideration.

**121**    Yet the *BIA* remains the only exempted statute under s. 222(3) of the *ETA*. Even after the 2005 decision in *Ottawa Senators* which confirmed that the *ETA* took precedence over the *CCAA*, there was no responsive legislative revision. I see this lack of response as relevant in this case, as it was in *Tele-Mobile Co. v. Ontario*, 2008 SCC 12, [2008] 1 S.C.R. 305, where this Court stated:

While it cannot be said that legislative silence is necessarily determinative of legislative intention, in this case the silence is Parliament's answer to the consistent urging of Telus and other affected businesses and organizations that there be express language in the legislation to ensure that businesses can be reimbursed for the reasonable costs of complying with evidence-gathering orders. I see the legislative history as reflecting Parliament's intention that

compensation not be paid for compliance with production orders. [para. 42]

**122**    All this leads to a clear inference of a deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

**123**    Nor do I see any "policy" justification for interfering, through interpretation, with this clarity of legislative intention. I can do no better by way of explaining why I think the policy argument cannot succeed in this case, than to repeat the words of Tysoe J.A. who said:

> I do not dispute that there are valid policy reasons for encouraging insolvent companies to attempt to restructure their affairs so that their business can continue with as little disruption to employees and other stakeholders as possible. It is appropriate for the courts to take such policy considerations into account, but only if it is in connection with a matter that has not been considered by Parliament. Here, Parliament must be taken to have weighed policy considerations when it enacted the amendments to the *CCAA* and *ETA* described above. As Mr. Justice MacPherson observed at para. 43 of *Ottawa Senators*, it is inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception. I also make the observation that the 1992 set of amendments to the *BIA* enabled proposals to be binding on secured creditors and, while there is more flexibility under the *CCAA*, it is possible for an insolvent company to attempt to restructure under the auspices of the *BIA*. [para. 37]

**124**    Despite my view that the clarity of the language in s. 222(3) is dispositive, it is also my view that even the application of other principles of interpretation reinforces this conclusion. In their submissions, the parties raised the following as being particularly relevant: the Crown relied on the principle that the statute which is "later in time" prevails; and Century Services based its argument on the principle that the general provision gives way to the specific (*generalia specialibus non derogant*).

**125**    The "later in time" principle gives priority to a more recent statute, based on the theory that the legislature is presumed to be aware of the content of existing legislation. If a new enactment is inconsistent with a prior one, therefore, the legislature is presumed to have intended to derogate from the earlier provisions (Ruth Sullivan, *Sullivan on the Construction of Statutes* (5th ed. 2008), at pp. 346-47; Pierre-André Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 358).

**126**    The exception to this presumptive displacement of pre-existing inconsistent legislation, is the *generalia specialibus non derogant* principle that "[a] more recent, general provision will not be construed as affecting an earlier, special provision" (Côté, at p. 359). Like a Russian Doll, there is also an exception within this exception, namely, that an earlier, specific provision may in fact be

"overruled" by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails (*Doré v. Verdun (City)*, [1997] 2 S.C.R. 862).

**127**    The primary purpose of these interpretive principles is to assist in the performance of the task of determining the intention of the legislature. This was confirmed by MacPherson J.A. in *Ottawa Senators*, at para. 42:

> [T]he overarching rule of statutory interpretation is that statutory provisions should be interpreted to give effect to the intention of the legislature in enacting the law. This primary rule takes precedence over all maxims or canons or aids relating to statutory interpretation, including the maxim that the specific prevails over the general (*generalia specialibus non derogant*). As expressed by Hudson J. in *Canada v. Williams*, [1944] S.C.R. 226, ... at p. 239 ... :
>
>> The maxim *generalia specialibus non derogant* is relied on as a rule which should dispose of the question, but the maxim is not a rule of law but a rule of construction and bows to the intention of the legislature, if such intention can reasonably be gathered from all of the relevant legislation.

(See also Côté, at p. 358, and Pierre-Andre Côté, with the collaboration of S. Beaulac and M. Devinat, *Interprétation des lois* (4th ed. 2009), at para. 1335.)

**128**    I accept the Crown's argument that the "later in time" principle is conclusive in this case. Since s. 222(3) of the *ETA* was enacted in 2000 and s. 18.3(1) of the *CCAA* was introduced in 1997, s. 222(3) is, on its face, the later provision. This chronological victory can be displaced, as Century Services argues, if it is shown that the more recent provision, s. 222(3) of the *ETA*, is a general one, in which case the earlier, specific provision, s. 18.3(1), prevails (*generalia specialibus non derogant*). But, as previously explained, the prior specific provision does not take precedence if the subsequent general provision appears to "overrule" it. This, it seems to me, is precisely what s. 222(3) achieves through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" *other than the BIA*. Section 18.3(1) of the *CCAA*, is thereby rendered inoperative for purposes of s. 222(3).

**129**    It is true that when the *CCAA* was amended in 2005,[2] s. 18.3(1) was re-enacted as s. 37(1) (S.C. 2005, c. 47, s. 131). Deschamps J. suggests that this makes s. 37(1) the new, "later in time" provision. With respect, her observation is refuted by the operation of s. 44(f) of the *Interpretation Act*, R.S.C. 1985, c. I-21, which expressly deals with the (non) effect of re-enacting, without significant substantive changes, a repealed provision (see *Attorney General of Canada v. Public Service Staff Relations Board*, [1977] 2 F.C. 663, dealing with the predecessor provision to s. 44(f)). It directs that new enactments not be construed as "new law" unless they differ in substance from the repealed provision:

> **44.** Where an enactment, in this section called the "former enactment", is repealed and another enactment, in this section called the "new enactment", is substituted therefor,
>
> ...
>
> (*f*) <u>except to the extent that the provisions of the new enactment are not in substance the same as those of the former enactment, the new enactment shall not be held to operate as new law</u>, but shall be construed and have effect as a consolidation and as declaratory of the law as contained in the former enactment;

Section 2 of the *Interpretation Act* defines an enactment as "an Act or regulation or <u>any portion of an Act or regulation</u>".

**130**    Section 37(1) of the current *CCAA* is almost identical to s. 18.3(1). These provisions are set out for ease of comparison, with the differences between them underlined:

> **37.** (1) Subject to subsection (2), <u>despite</u> any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as <u>being</u> held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

> **18.3** (1) Subject to subsection (2), <u>notwithstanding</u> any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**131**    The application of s. 44(*f*) of the *Interpretation Act* simply confirms the government's clearly expressed intent, found in Industry Canada's clause-by-clause review of Bill C-55, where s. 37(1) was identified as "a technical amendment to re-order the provisions of this Act". During second reading, the Hon. Bill Rompkey, then the Deputy Leader of the Government in the Senate, confirmed that s. 37(1) represented only a technical change:

> On a technical note relating to the treatment of deemed trusts for taxes, the bill [*sic* ] makes no changes to the underlying policy intent, despite the fact that in the case of a restructuring under the CCAA, sections of the act [*sic* ] were repealed and substituted with renumbered versions due to the extensive reworking of the CCAA.

(*Debates of the Senate*, vol. 142, 1st Sess., 38th Parl., November 23, 2005, at p. 2147)

**132**    Had the substance of s. 18.3(1) altered in any material way when it was replaced by s. 37(1), I would share Deschamps J.'s view that it should be considered a new provision. But since s. 18.3(1) and s. 37(1) are the same in substance, the transformation of s. 18.3(1) into s. 37(1) has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision (Sullivan, at p. 347).

**133**    This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. The question then is how that priority affects the discretion of a court under s. 11 of the *CCAA*.

**134**    While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding-up Act*, R.S.C. 1985, c. W-11, that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes *other* than the *BIA* and the *Winding-up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request for payment of the GST funds during the *CCAA* proceedings.

**135**    Given this conclusion, it is unnecessary to consider whether there was an express trust.

**136**    I would dismiss the appeal.

*Appeal allowed with costs,* ABELLA J. *dissenting.*

\* \* \* \* \*

# APPENDIX

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at December 13, 2007)

**11.** (1) [Powers of court] Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

...

(3) [Initial application court orders] A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

    (*a*) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

    (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

    (*c*) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

(4) [Other than initial application court orders] A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

    (*a*) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

    (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

    (*c*) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

...

(6) [Burden of proof on application] The court shall not make an order under subsection (3) or (4) unless

    (*a*) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

    (*b*) in the case of an order under subsection (4), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

**11.4** (1) [Her Majesty affected] An order made under section 11 may provide that

    (*a*) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or

of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for such period as the court considers appropriate but ending not later than

(i)     the expiration of the order,

(ii)    the refusal of a proposed compromise by the creditors or the court,

(iii)   six months following the court sanction of a compromise or arrangement,

(iv)    the default by the company on any term of a compromise or arrangement, or

(v)     the performance of a compromise or arrangement in respect of the company; and

(*b*) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company where the company is a debtor under that legislation and the provision has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for such period as the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) may apply.

(2) [When order ceases to be in effect] An order referred to in subsection (1) ceases to be in effect if

(*a*) the company defaults on payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i)     subsection 224(1.2) of the *Income Tax Act*,

(ii)    any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)   under any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(A)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(*b*) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i)     subsection 224(1.2) of the *Income Tax Act*,

(ii)    any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)   any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

    (A)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (B)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

(3) [Operation of similar legislation] An order made under section 11, other than an order referred to in subsection (1) of this section, does not affect the operation of

    (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

    (*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

    (*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

    (i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**18.3** (1) [Deemed trusts] Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

(2) [Exceptions] Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

> (*a*) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

> (*b*) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**18.4** (1) [Status of Crown claims] In relation to a proceeding under this Act, all claims, including secured claims, of Her Majesty in right of Canada or a province or any body under an enactment respecting workers' compensation, in this section and in section 18.5 called a "workers' compensation body", rank as unsecured claims.

...

(3) [Operation of similar legislation] Subsection (1) does not affect the operation of

> (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

   (i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

  (ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**20.** [Act to be applied conjointly with other Acts] The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legislature of any province, that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at September 18, 2009)

**11.** [General power of court] Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

**11.02** (1) [Stays, etc. -- initial application] A court may, on an initial application in respect of a debtor company, make an order on any terms that it may impose, effective for the period that the

court considers necessary, which period may not be more than 30 days,

> (*a*) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*;

> (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

> (*c*) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

(2) [Stays, etc. -- other than initial application] A court may, on an application in respect of a debtor company other than an initial application, make an order, on any terms that it may impose,

> (*a*) staying, until otherwise ordered by the court, for any period that the court considers necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in paragraph (1)(*a*);

> (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

> (*c*) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

(3) [Burden of proof on application] The court shall not make the order unless

> (a)   the applicant satisfies the court that circumstances exist that make the order appropriate; and
> (b)   in the case of an order under subsection (2), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

...

**11.09** (1) [Stay -- Her Majesty] An order made under section 11.02 may provide that

> (*a*) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the

*Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for the period that the court considers appropriate but ending not later than

(i)     the expiry of the order,
(ii)    the refusal of a proposed compromise by the creditors or the court,
(iii)   six months following the court sanction of a compromise or an arrangement,
(iv)    the default by the company on any term of a compromise or an arrangement, or

(v) the performance of a compromise or an arrangement in respect of the company; and

(*b*) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company if the company is a debtor under that legislation and the provision has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(i)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or
(ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for the period that the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) that may apply.

(2) [When order ceases to be in effect] The portions of an order made under section 11.02 that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*) cease to be in effect if

(*a*) the company defaults on the payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i)    subsection 224(1.2) of the *Income Tax Act*,

(ii)    any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)    any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

    (A)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (B)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(*b*) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i)    subsection 224(1.2) of the *Income Tax Act*,

(ii)    any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)    any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax

imposed on individuals under the *Income Tax Act*, or

(B)  is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

(3) [Operation of similar legislation] An order made under section 11.02, other than the portions of that order that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*), does not affect the operation of

(*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(*c*) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(i)  has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)  is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**37.** (1) [Deemed trusts] Subject to subsection (2), despite any provision in federal or

provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

(2) [Exceptions] Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision"), nor does it apply in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province if

> (*a*) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

> (*b*) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

*Excise Tax Act*, R.S.C. 1985, c. E-15 (as at December 13, 2007)

**222.** (1) [Trust for amounts collected] Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II is deemed, for all purposes and despite any security interest in the amount, to hold the amount in trust for Her Majesty in right of Canada, separate and apart from the property of the person and from property held by any secured creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

(1.1) [Amounts collected before bankruptcy] Subsection (1) does not apply, at or after the time a person becomes a bankrupt (within the meaning of the *Bankruptcy and Insolvency Act*), to any amounts that, before that time, were collected or became collectible by the person as or on account of tax under Division II.

...

    (3) [Extension of trust] Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

        (*a*) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

        (*b*) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 (as at December 13, 2007)

    **67.** (1) [Property of bankrupt] The property of a bankrupt divisible among his creditors shall not comprise

        (*a*) property held by the bankrupt in trust for any other person,

        (*b*) any property that as against the bankrupt is exempt from execution or seizure under any laws applicable in the province within which the property is situated and within which the bankrupt resides, or

        (*b*.1) such goods and services tax credit payments and prescribed payments relating to the essential needs of an individual as are made in prescribed circumstances and are not property referred to in paragraph (*a*) or (*b*),

but it shall comprise

        (*c*) all property wherever situated of the bankrupt at the date of his bankruptcy or

that may be acquired by or devolve on him before his discharge, and

(*d*) such powers in or over or in respect of the property as might have been exercised by the bankrupt for his own benefit.

(2) [Deemed trusts] Subject to subsection (3), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

(3) [Exceptions] Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

(*a*) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(*b*) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**86.** (1) [Status of Crown claims] In relation to a bankruptcy or proposal, all provable claims, including secured claims, of Her Majesty in right of Canada or a province or of any body under an Act respecting workers' compensation, in this section and in section 87 called a "workers' compensation body", rank as unsecured claims.

...

(3) [Exceptions] Subsection (1) does not affect the operation of

> (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*;

> (*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts; or

> (*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

>> (i)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

>> (ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**Solicitors:**

*Solicitors for the appellant: Fraser Milner Casgrain, Vancouver.*

*Solicitor for the respondent: Department of Justice, Vancouver.*

cp/e/qlecl/qlcal/qlced/qljyw/qlhcs/qljyw/qlhcs/qlana/qlcas/qlcas

1 Section 11 was amended, effective September 18, 2009, and now states:

> **11.** Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

2 The amendments did not come into force until September 18, 2009.

# TAB 5

DOCSTOR: 2191401\1

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

**c**

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

Citibank Canada v. Chase Manhattan Bank of Canada

CITIBANK CANADA, as agent, CITIBANK CANADA, ABN AMRO BANK CANADA, HONGKONG BANK OF CANADA, PARIBAS BANK OF CANADA, TORONTO-DOMINION BANK, SWISS BANK CORPORATION (CANADA), BANK OF TOKYO CANADA, DAI-ICHI KANGYO BANK (CANADA), CREDIT LYONNAIS (CANADA), BANCA COMMERCIALE ITALIANA OF CANADA, MONTREAL TRUST COMPANY, BALL PACK-AGING PRODUCTS, INC. through its receiver, ERNST & YOUNG INC., and BANCO CENTRALE OF CANADA v. CHASE MANHATTAN BANK OF CANADA, BALL PACKAGING PRODUCTS HOLDINGS INC., BALL CORPOR-ATION, LA CAISSE CENTRALE DESJARDINS DU QUEBEC, and UNION BANK OF SWITZERLAND (CANADA)

Ontario Court of Justice (General Division)

Rosenberg J.

Judgment: June 12, 1991
Docket: Doc. 879/91Q

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Peter Howard* and *Sean Dunphy*, for receiver, Ernst & Young Inc., and applicants.

*Barbara Grossman*, for Ball Packaging Products Inc.

*Randy A. Pepper*, for Ball Corporation (a U.S. corporation).

*James H. Grout*, for La Caisse Desjardins.

*Dana B. Fuller* and *W.J. Demers*, for Chase Manhattan Bank of Canada and Union Bank of Switzerland.

*Charles F. Scott*, for Veriteck.

Subject: Corporate and Commercial; Insolvency; Property

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangements Act — Application of Act.

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangements Act.

Debtors' relief legislation — Companies' Creditors Arrangement Act — Jurisdiction of court under Act given large and liberal interpretation — Purpose of Act being remedial — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

Proposals — Effect of proposal — Companies' Creditors Arrangement Act — Plan approved although ordinary creditors paid in full while secured creditors receiving only part payment — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Proposals — Meeting of creditors — Companies' Creditors Arrangement Act — Entitlement to vote — "Holder" including beneficial holders — "Creditor" including those with real economic interest in debt and security — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

The company "Ball Canada" manufactured cans and other packaging for food and beverages. Its economic position deteriorated to the point where it was not able to survive as an ongoing entity with its debt load and scope of operations.

Ball U.S. owned 50 per cent of Ball Canada. In the course of restructuring discussions, Ball U.S. offered to purchase the debt of the term secured creditors and the shares of Ball Canada held by the banks pursuant to a share pledge agreement. Negotiations took place between the agent for the lenders, Citibank Canada, and Ball U.S. to formulate an acceptable proposal. One of the secured creditors, Chase Manhattan, opposed the Ball U.S. offer.

Ball Canada applied for a declaration that it was a corporation to which the *Companies' Creditors Arrangement Act* ("CCAA") applied. The agent for the lenders brought a cross-application for the appointment of a receiver. The application was dismissed and the cross-application was granted. The fact that negotiations with Ball U.S. had not reached any finality was considered by the Judge in refusing to allow further time to attempt to finalize the deal.

After appointment of the receiver, Ball U.S. provided further offers. All term secured creditors except Chase were in favour of the Ball U.S. offer. According to the receiver, there was little or no prospect of a going-concern sale of Ball Canada to a party other than Ball U.S., and a liquidation of assets would provide far less to the secured creditors than the Ball U.S. offer. The agent for the lenders applied under the CCAA to have Ball Canada recognized as a corporation to which the CCAA applied and either waiving a meeting of secured creditors or ordering a meeting to vote on the term secured compromise.

**Held:**

The *Companies' Creditors Arrangement Act* applied to Ball Canada; a meeting of secured creditors was ordered; the compromise plan was approved and authorized.

The CCAA applied to Ball Canada, since it had an outstanding issue of secured bonds issued under a trust deed and the compromise or arrangement that was proposed included a compromise or arrangement between the debtor company and the holders of an issue of secured bonds. The CCAA authorized the court to order a meeting of any class of the company's secured creditors where a compromise or arrangement was proposed between the debtor company and such class of secured creditors. The term secured creditors and Chase, except as to amount, had an identical economic interest in the debtor company, justifying their classification as a single class of creditors, as the amounts owing to each were due under the same loan agreement and secured by the same debentures.

The banks participating in the loan by Chase to Ball Canada were secured "creditors" of Ball Canada. "Secured creditors", as defined in s. 2 of the CCAA, included a "holder" of certain securities. "Holder" must be given a liberal interpretation in keeping with the broad remedial nature of the CCAA and included beneficial holders of any bond or proprietary interest. "Creditors" was to be interpreted to include those with a real economic interest in the debtor company. Since the banks had an equitable proprietary interest in the property of Ball Canada as security for that company's indebtedness, they were entitled to vote on the proposed compromise. The proposal was, therefore, approved by the necessary percent-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

age of voters in both number and value.

The jurisdiction of the Court under the CCAA should be given a large and liberal interpretation consistent with the re-medial nature of the legislation. The purpose of the CCAA was to facilitate arrangements that might avoid liquidation of the company and allow it to continue in business to the benefit of the whole economic community, including shareholders, creditors and employees.

The compromise plan was approved, although it provided that ordinary creditors be paid in full while secured creditors received only part payment. The evidence demonstrated overwhelmingly that it was in the interest of all the creditors that the proposal be approved and the proposal received the support of all the creditors except Chase.

**Cases considered:**

*Hongkong Bank of Canada v. Chef Ready Foods Ltd.*, 51 B.C.L.R. (2d) 84, [1991] 2 W.W.R. 136 (C.A.) — *applied*

*Northland Properties Ltd., Re* (1988), 73 C.B.R. (N.S.) 175 (B.C. S.C.), affirmed *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 73 C.B.R. (N.S.) 195, 34 B.C.L.R. (2d) 122, [1989] 3 W.W.R. 363 (C.A.) — *referred to*

*Nova Metal Products Inc. v. Comiskey (Trustee of)*, 1 C.B.R. (3d) 101, 41 O.A.C. 282, 1 O.R. (3d) 289 (C.A.) — *followed*

*Ultracare Management Inc. v. Zevenberger (Trustee of)* (1990), 3 C.B.R. (3d) 151, *(sub nom. Ultracare Management Inc. v. Gammon)* 1 O.R. (3d) 321 (Gen. Div.) — *applied*

**Statutes considered:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 —

s. 2 "secured creditors"

s. 3

s. 5

s. 6

s. 8

Personal Property Security Act, 1989, S.O. 1989, c. 16 —

Pt. V

s. 63(4)

s. 67

s. 70

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

**Words and phrases considered:**

holder — as used in s. 2 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, should be given a liberal interpretation in keeping with the broad remedial nature of the Act and, therefore, includes the beneficial holders of any bond or proprietary interest.

creditors — as used in the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, is to be interpreted so that the voice of the persons with the real economic interest in the debtor company is heard.

Application for a declaration that Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, applied to a corporation and for an order directing a meeting of secured creditors to vote on a compromise proposal.

*Rosenberg J.*:

**Preamble**

1      In the months of March and April 1991, I dealt with a number of urgent matters regarding Ball Packaging Products Canada Inc. In some cases the time restrictions were such that there was not time to give oral reasons for my decisions. In one case the matter was finalized within a few minutes of a 12 noon deadline, which will be explained in my reasons.

2      After finalizing the matters and now having finally discharged the receiver, counsel involved requested that I give reasons. I have determined that it is appropriate to do so in case the matter is taken further or in case there are other actions arising out of the various steps taken in the appointment of a receiver and the receivership proceedings. I also felt that it would be advisable to have my reasons recorded for whatever value they may have as a precedent for similar proceedings in the future.

**Proceedings**

3      In the first application heard on March 28, 1991, Ball Packaging Products Canada Inc. ("Ball Canada") asked for the following relief:

4      (a) A declaration that the applicant is a corporation to which the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA") applies, notwithstanding the existence of a waiver dated December 9, 1988 excluding the CCAA;

5      (b) An order authorizing the applicant to file a formal plan of compromise or arrangement (the "reorganization plan");

6      (c) An order that the applicant call meetings of classes of its creditors and shareholders (the "meetings");

7      (d) An order that the applicant may file the reorganization plan and the notices of meetings by way of affidavit;

8      (e) An order staying all proceedings that have been or might be taken under the *Bankruptcy Act*, R.S.C. 1985, c. B-3;

9      (f) An order restraining other proceedings in existing actions;

10      (g) An order restraining future proceedings against the applicant;

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

11      (h) An order suspending and postponing the rights of any person, firm, corporation, company or other entity to realize upon or deal with any property of the applicant or security in respect of such property;

12      (i) An order enjoining creditors from making demand for payment on the applicant;

13      (j) An order preventing creditors from exercising any right of set-off against debts owed to the applicant;

14      (k) An order that all parties having agreements with the applicant for the supply of goods or services to the applicant be enjoined until further order of the Court from terminating, determining or cancelling such agreements and, in particular, that the applicant continue to be supplied goods, services and utilities so long as the applicant pays the prices or charges incurred in accordance with the terms negotiated by the applicant from time to time;

15      (l) An order that all parties having other agreements with the applicant be enjoined from terminating, determining or cancelling such agreements without the written consent of the applicant or the Court;

16      (m) An order that the respondents which are parties (or assignees of such parties) to the loan agreement dated November 16, 1988 be enjoined from reducing the credit originally made available to the applicant and that such respondents continue to extend such credit, as is required by the applicant, and as would be available if the applicant were not in default;

17      (n) An order permitting all obligations to unsecured creditors together with all obligations incurred by the applicant after this order to be paid or otherwise satisfied by the applicant;

18      (o) An order permitting the applicant to serve this notice of application, the supporting affidavit, the order requested, the reorganization plan, and notices of meetings by mailing copies thereof to each of the applicant's creditors;

19      (p) An order that the applicant shall render an affidavit to the Court verifying the action taken and decisions reached at the meetings;

20      (q) An order that the applicant shall remain in possession of its undertaking and shall continue to carry on its business and, upon approval, to implement the reorganization plan.

21      Ball Canada also asked for other provisions in the order sought that are not relevant to this decision.

22      The applicants referred to in the style of cause in these present reasons were the respondents in that application. Those respondents brought a cross-application for the appointment of a receiver. The application was dismissed and the cross-application for the appointment of a receiver was allowed. At that time I gave oral reasons for my decision, and there is no need to repeat those at this time except to note that it was clear from the affidavit material submitted on behalf of Ball Canada that:

> Unless there is a restructuring and unless operating funds are made available to the applicant during the restructuring agreement, the applicant cannot continue to carry on business and will have to cease operations immediately. Given the magnitude of the applicant's operations across Canada, this would have a significant adverse effect on a large number of suppliers, customers and employees.

23      At that time the evidence indicated that Ball Corporation ("Ball U.S.") owned 50 per cent of the issued and outstanding common preferred shares of Ball Canada and that negotiations had been continuing with Ball U.S. to finance an arrangement with creditors and invest sufficient capital to allow Ball Canada to continue to operate. The fact that the ne-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

gotiations had not reached any finality after many months of negotiating was considered by me in refusing to allow further time to attempt to finalize a deal with Ball U.S. The evidence of Ball Canada indicated that they could not carry on without the respondent financial institutions advancing more money, which they were not contractually obliged to do in view of Ball Canada's default. After the receiver took possession on April 10, 1991, I heard an application by Citibank, which applied amongst other things for:

24      (a) A declaration that the applicant Ball Packaging Products Canada, Inc. is a corporation to which the CCAA applies;

25      (b) An order waiving the requirement for a meeting approving the term secured compromise dated April 9, 1991, annexed hereto as Schedule "A" (the "term secured compromise") on the basis of the consents of the applicants who are term secured creditors filed;

26      (c) In the alternative to (b) above, an order that a meeting of the term secured creditors to vote on the term secured compromise pursuant to s. 5 of the CCAA take place forthwith in the courtroom at which meeting to be chaired by the agent, Citibank Canada, the principal value of term secured debt will be $197,004,139.48 as at March 27, 1991, and the term secured creditors present in person or by proxy will be entitled to vote in the manner and proportionate percentage of value as hereinafter set forth:

```
 1. ABN Amro Bank of Canada                         4.16%
 2. Citibank Canada                                22.90%
 3. La Caisse Centrale Desjardins du Quebec          4.17%
 4. Hongkong Bank of Canada                          4.17%
 5. Paribas Bank of Canada                           4.17%
 6. The Chase Manhattan Bank of Canada              12.50%
 7. The Toronto-Dominion Bank                        7.92%
 8. Swiss Bank Corporation (Canada)                 10.42%
 9. Banco Centrale of Canada                         2.50%
10. Bank of Tokyo Canada                             2.08%
11. Dai-Ichi Kangyo Bank (Canada)                    4.17%
12. Credit Lyonnais (Canada)                         4.17%
13. Banca Commerciale Italiana of Canada             4.17%
14. Union Bank of Switzerland (Canada)               6.25%
15. Montreal Trust Company                           4.17%
16. Trust Generale du Canada (per La Caisse
    Centrale Desjardins du Quebec)                   2.08%
                                                   ------
                                                    100%
```

27      At that time I endorsed the application record as follows:

Application for a meeting pursuant to CCAA ordered for 6:00 p.m. April 10th at the offices of Davies, Ward & Beck, 44th floor, First Canadian Place to consider a proposal as set out in the application or as modified at the meeting. Meeting to be chaired by Gregory Daniels of Citibank. A verbatim record of the meeting to be kept. A record shall be kept of how all participants vote but no determination of the tabulation of the vote or percentage in favour of any proposal shall be made until the matter is argued in court. Meeting results to be submitted to the court for con-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

sideration at 9:00 a.m. April 11th.

28    The CCAA applies to Ball Canada since it has an outstanding issue of secured bonds issued under a trustee and the compromise or arrangement that is proposed included a compromise or arrangement between the debtor company and the holders of an issue of secured bonds. (CCAA, ss. 2, 3.)

29    I also relied on CCAA s. 5, which provides that the Court can order a meeting of any class of the company's secured creditors where a compromise or arrangement is proposed between the debtor company and such class of secured creditors.

30    In determining that a meeting should be called, I considered the case of *Ultracare Management Inc. v. Zevenberger (Trustee of) (1990), 3 C.B.R. (3d) 151, (sub nom. Ultracare Management Inc. v. Gammon) 1 O.R. (3d) 321* (Gen. Div.), where it was held that when there is a reasonable chance that the debtor company can carry on its business as a going concern, the Court should order a meeting of creditors.

31    Further, the term secured creditors and Chase, except as to amount, have an identical economic interest in the debtor company, justifying their classification as a single class of creditors. The amounts owing to each are owing pursuant to the same loan agreement and the security for the obligations is that secured by the same debenture.

*Nova Metal Products Inc. v. Comiskey (Trustee of) (1990), 1 C.B.R. (3d) 101, 41 O.A.C. 282, 1 O.R. (3d) 289* (C.A.).

*Re Northland Properties Ltd. (1988), 73 C.B.R. (N.S.) 175* (B.C. S.C.) per Trainor J. at 191-192, affirmed (sub nom *Northland Properties Ltd. v. Exelsior Life Insurance Co. of Canada, 73 C.B.R. (N.S.) 195, 34 B.C.L.R. (2d) 122, [1989] 3 W.W.R. 363* (C.A.).

32    The authority to abridge the time period for the calling of the meeting was exercised by me pursuant to ss. 67 and 70 of the *Personal Property Security Act, 1989*, S.O. 1989, c. 16 ("PPSA").

33    Pursuant to s. 67 of the PPSA, I relieved compliance with Pt. V of the PPSA since it was, in my view, just and reasonable for all concerned parties.

34    The position of the applicants is summarized in the affidavit of Gregory M. Daniels as follows:

As hereinafter described in greater detail, the Applicants and La Caisse Centrale Desjardins du Quebec and Trust Generale are 15 of the 16 Term Secured Creditors to Ball Canada holding $172,382,104.29 or 87.5% of the total principal of Term Secured Debt of $197,004,139.48 outstanding as at March 27, 1991. The balance is held by the lone dissenting Term Secured Creditor The Chase Manhattan Bank of Canada ('Chase'). An offer for the Term Secured Debt has been made by Ball Corporation ('Ball U.S.') in the amount of $120,000,000.00. Ball U.S. is unwilling to allow any person other than itself to hold any of the Term Secured Debt and has made its offer conditional upon the acquisition by it of the Term Secured Debt or the elimination of the Term Secured Debt at a discount to the face amount thereof. *The offer is also conditional upon the acquisition by Ball U.S. of all of the shares of Ball Canada which are pledged to Citibank Canada as collateral for a guarantee of the Term Secured Debt given by Ball Packaging Product Holdings Inc. ('Ball Holdings')*. The Applicants want to accept the offer, Chase does not. This Application under the Companies' Creditors Arrangement Act (the 'CCAA') is made to impose the Ball U.S. offer on Chase for the good of the Applicants, Ball Canada and its employees, suppliers, customers and others affected by the liquidation of Ball Canada. [Emphasis added.]

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

Ball Canada is a wholly owned subsidiary of Ball Holdings. To the best of my knowledge, Ball Holdings is owned 50% by Ball Corporation and 50% by Onex Corporation ('Onex').

Certain of the original term lenders, including the Agent and Chase, have sold interests in their loans from time to time. These sales have been effected by participation agreements under which certain of the lenders have agreed to share a beneficial interest in the right to receive payments from Ball Canada in respect of the Term Secured Debt and in effect, to share any risk of the failure of Ball Canada to repay the loan in full. At present, to the knowledge of the Agent, the Term Secured Debt is now beneficially held in the following percentages as follows:

```
 1. ABN Amro Bank of Canada                      4.16%
 2. Citibank Canada                             22.90%
 3. La Caisse Centrale Desjardins du Quebec      4.17%
 4. Hongkong Bank of Canada                      4.17%
 5. Paribas Bank of Canada                       4.17%
 6. The Chase Manhattan Bank of Canada          12.50%
 7. The Toronto-Dominion Bank                    7.92%
 8. Swiss Bank Corporation (Canada)             10.42%
 9. Banco Centrale of Canada                     2.50%
10. Bank of Tokyo Canada                         2.08%
11. Dai-Ichi Kangyo Bank (Canada)               4.17%
12. Credit Lyonnais (Canada)                     4.17%
13. Banca Commerciale Italiana of Canada         4.17%
14. Union Bank of Switzerland (Canada)           6.25%
15. Montreal Trust Company                       4.17%
16. Trust Generale                               2.08%
                                                 -----
                                                  100%
```

(the 'Term Secured Creditors'). A list of the Term Secured Creditors as at March 29, 1991 and the percentages and dollar amounts held prepared by the Agent is appended hereto as Exhibit 'A' to this my affidavit.

All Term Secured Creditors have received notice of the several meetings to discuss the various offers of Ball Canada and Ball U.S. and have had the opportunity to participate fully and vote at such meetings.

Ball Canada makes cans and other packaging for food and beverages. For the reasons detailed by the President of Ball Canada, William A. Lincoln in his Affidavit dated March 26, 1991, the business of Ball Canada, has suffered considerably in the last few years to the point where it is clear that the capital structure of Ball Canada no longer makes sense. In the foreseeable future, under any reasonable assumptions, Ball Canada will not be capable of servicing the level of debt held by the Applicants and Chase. It was the recognition of this fact that led all parties to the course of negotiations that are described in the paragraphs that follow. The Affidavit of William A. Lincoln is appended hereto as Exhibit 'B' to this my Affidavit.

Beginning in or around the Summer of 1990, Ball Canada approached the Agent with a view towards restructuring its debt obligations in light of Ball Canada's changing circumstances. In June, 1990 Ball Canada became aware of the fact that it did not comply with certain of the financial covenants contained in the Loan Agreement. Discussions between Ball Canada and the Agent on behalf of all the lenders continued throughout the balance of 1990 and into

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

1991 on a periodic basis with no success. Without assigning any responsibility for the lack of success, it became clear that Ball U.S. and Onex had differing interests and priorities and similarly each of the Term Secured Creditors had their own interests, views of the appropriate type of restructuring and the value of Ball Canada.

Throughout the course of all discussions and negotiations, Chase has consistently taken the position that it was not prepared to accept any compromise that was effectively a recognition that its loan participation as a Term Secured Creditor was significantly less valuable than the face amount of that participation or which did not permit it to participate in any possible future increase in the value of Ball Canada.

As the economic position of Ball Canada worsened throughout the Winter 1990 and into 1991, it became apparent that Ball Canada would not be able to survive as an on-going entity with its present debt load and scope of operations. Ball Canada began to sell assets and closed certain plants. However, the financial situation of Ball Canada was obviously such as to require a massive restructuring of the Term Secured Debt. In December, 1990 Ball Canada suspended its scheduled loan payment to the lenders. Beginning in early March 1991, the restructuring discussions took the form of an offer by Ball U.S. to purchase the debt of the Term Secured Creditors and the shares of Ball Canada held by the banks pursuant to the Share Pledge Agreement. Again there was a course of discussions throughout March between the Agent and Ball U.S. to attempt to formulate an acceptable proposal. In this respect, the position of Chase was again consistent and it continually took the position that the offers of Ball U.S. were unacceptable to it.

Throughout March, the operating position of Ball Canada continued to deteriorate to the extent that it became apparent that matters were coming to a head. The operating line of Ball Canada had been capped and cheques were being returned NSF. The projections of the company showed that it was in a substantial deficit position and unable to fund its operations through cashflow. After providing some operating advances, Ball U.S. and Onex refused to provide further operating funds.

On March 22, 1991, the Agent provided Notice of Default to Ball Canada in respect of the Term Secured Debt. Although the Operating Loan was in default and the Agent in a position to demand at any time, this five day notice apparently triggered the Companies' Creditors Arrangement Application brought by Ball Canada returnable on March 27, 1991.

On the morning of the court application the Agent had discussions with Ball U.S. setting forth the terms on which the Agent would be prepared to recommend a proposal by Ball U.S. to all the other Term Secured Creditors. No offer was forthcoming from Ball U.S. until after the court proceedings.

The Companies' Creditors Arrangement Act application application by Ball Canada and the cross-motion by the Agent for the appointment of a Receiver were heard by the Honourable Mr. Justice Rosenberg on March 27 and 28, 1991. In the result, the application by Ball Canada was dismissed and Ernst & Young Inc. appointed as Receiver of Ball Canada. A copy of the endorsement and Order of the Honourable Mr. Justice Rosenberg is appended hereto as Exhibit 'C' to this my Affidavit.

After the appointment of the Receiver, Ball U.S. provided further offers. A copy of the last offer is appended hereto as Exhibit 'D' to this my Affidavit. The Agent convened a meeting of the Term Secured Creditors to consider the offer of Ball U.S. and invited Ball U.S. to make a presentation at the meeting. Eventually 15 of the 16 Term Secured Creditors deter mined that they were prepared to enter into the compromise suggested by Ball U.S. provided that there was no slippage in price and the terms of the agreement were made certain.

Following presentation of the offer to lenders, Chase and Ball U.S. entered into negotiations with a view to allowing

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

Chase to maintain a debtor-creditor relationship with Ball Canada. On April 5, 1991, Citibank was advised that Ball U.S. had not entered into a deal with Chase and that negotiations were at an end.

Chase was asked to participate with the other Term Secured Creditors for the good of the majority, if not all of the Term Secured Creditors, but refused. On or about April 5, 1991, Chase confirmed that it was not prepared to accept the deal proposed by Ball U.S. The Agent advised Chase that it intended to proceed with an application under the CCAA if all the other Term Secured Creditors so instructed it and the deal with Ball U.S. could be made certain. Chase further confirmed that Ball U.S. had terminated negotiations.

La Caisse Centrale Desjardins du Quebec ('Caisse') has to date voted and participated on behalf of Trust Generale who has not attended the meetings. Caisse is a respondent in this application but has indicated that it will not contest the order being sought and will vote in favour of the Term Secured Compromise at any meeting to be held and sign the required Purchase Agreement if the Order is granted.

A meeting of the Term Secured Creditors was held on April 8, 1991. At that time all Term Secured Creditors, save and except Chase, indicated that they were in the process of obtaining the approvals necessary to accept the Ball U.S. offer subject to final documentation and to proceed with the Application. This Affidavit is provided prior to the receipt of these final approvals because of the urgency involved.

All the participants in the term debt have been advised by the Receiver on April 4 and again on April 8, 1991 of its estimation of the likely realization if there is no deal with Ball U.S. It is fair to say that the affairs and business of Ball Canada are interwoven and inter-dependent on Ball U.S. and that there is little or no prospect of a going concern sale of Ball Canada to a party other than Ball U.S. Ball U.S. of course is interested in the going concern and for that reason is prepared to make arrange ments to continue Ball Canada in the ordinary course of business including allowing Ball Canada to meet its liabilities as they come due. I verily believe the information provided by the Receiver to be accurate and it played an important basis for the Agent and the other applicants seeking approval of the Term Secured Compromise.

For these reasons the Secured Creditors find themselves in the somewhat unusual position of accepting an offer which will see unsecured creditors being paid in full when the Term Secured Creditors are not being paid in full. Based on the estimates of the Receiver, and the realities of the situation, a liquidation of the assets will provide far less to secured creditors than the Ball U.S. offer. In addition, the Applicants are mindful of the benefit achieved by the maintenance of Ball Canada as a going concern to its employees, suppliers and customers.

Chase has indicated its adamant opposition to the Ball U.S. offer and its unwillingness to abide by the determination of the 15 other Term Secured Creditors. For this reason, an Application under the CCAA is the only means available to the Applicants.

**Personal Property Security Act, 1989**

Part of the Term Secured Compromise is the transfer of the shares of Ball Canada to Ball U.S. The Agent sent a notice pursuant to Section 63 of the PPSA on April 4, 1991. A copy of the said Notice and proof of service is appended hereto as Exhibit 'E' to this my Affidavit.

Onex has taken the position that its consent is necessary to any transfer of the shares. I am informed by Ian Douglas, a partner of Stikeman, Elliott, counsel to the Agent and verily believe that he received letters dated April 3 and 4, 1991 from counsel to Onex to this effect. Appended hereto as Exhibit 'F' to this my Affidavit are copies of the said

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

letters. I am further informed by Ian Douglas and verily believe that the position of Onex is completely untenable as against the Agent and a copy of his response by letter dated April 4, 1991 is appended hereto as Exhibit 'G' to this my Affidavit. As set out in the letter, Onex has indicated that it does not wish to redeem with Onex so the transfer to Ball U.S. will not have any impact on the issues as between Ball U.S. and Onex.

35      Accordingly, and pursuant to my order of April 10, a meeting was held and the hearing resumed on the morning of April 11. At that time the affidavit evidence disclosed that the offer of Ball U.S. was open for acceptance and court approval only until 12 noon on that date and the reasons for the urgency and the deadline were explained by further affidavit. At that time the further affidavit of William R. Beavers, a vice-president of Ernst & Young Inc. (the "receiver"), attested to the following:

Since its appointment pursuant to the receivership order, the Receiver has had to deal with a number of critical issues in order to ensure the integrity of the business with a view to maximizing the possibility of a sale of all or part of the business as a going concern. For the reasons expressed below, I am of the view that the passage of even a very short time in the absence of a resolution with Ball Canada's 50% parent, Ball Corporation of Muncie, Indiana ('Ball Corp.') will considerably diminish if not preclude the ability of the Receiver to maintain the going-concern value of Ball Canada.

The Receiver has had a number of problems ensuring the supply of raw materials necessary to the continuation of the business. Ball Canada's business is largely a seasonal one. At this phase of its annual business cycle, Ball Canada is primarily in the phase of building up inventories to fulfil sales contracts for delivery in the summer and early fall to the beverage industry and the food packing industry.

Two principal suppliers of Ball Canada have indicated a reluctance to continue supplying the raw materials necessary to continue production unless arrears for previously delivered material are settled. [...] was the primary supplier of aluminium [sic] to Ball Canada. [...] has taken steps to seize certain aluminium [sic] inventories stored in the United States as a result of the default by Ball Canada in paying for such inventories. Other supplies such as [...] have indicated that they are reviewing their commitments to Ball Canada.

In the medium to long term, unless arrangements can be made with [...] to continue the supply of these essential raw materials, the ability of Ball Canada to continue to produce sufficient product to meet sales obligations will be seriously jeopardized. While alternative sources of supply of these materials is possible, it would take time to make arrangements with such suppliers and the terms of supply may be more onerous than those previously enjoyed by Ball Canada.

In addition to supplier problems, the Receiver has had to deal with key customers of Ball Canada in order to reassure them as to the continuity of their supply. Five key customers of Ball Canada accounted for 58% of Ball Canada's 1990 sales. The loss of any one of these accounts would have a devastating effect upon the going concern value of the business of Ball Canada. Some customers account for such a significant portion of production from certain plants that a loss of the customer could result in an immediate plant closure. I have spoken with three of these customers. They have indicated to the Receiver that, unless they receive satisfactory assurances or guarantees of product supply in the next few days, they will have no alternative but to seek alternate sources of supply for their can requirements. In view of the lead time necessary to secure product for these accounts, customers such as [...] require assurances of supply as soon as possible for they may be otherwise unable to obtain product in time for the crucial summer selling season.

The case of [...] has become especially critical. [...] utilizes steel cans in Ontario, one of the few large markets for

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

steel cans remaining in North America. I attach as Exhibit 'B' and 'C' respectively to this my affidavit letters which the Receiver has received from [...] dated April 2 and April 5, 1991. As appears from these letters [...] has been extremely nervous about the continuity of its supply. [...] has reluctantly extended its deadlines in order to hear from the Receiver and Ball Corp. as to whether Ball Corp's plans to purchase Ball Canada will be proceeding. Another key food industry customer of Ball Canada is taking a similar position.

36        The letter attached as Exhibit "C" contains the following statement:

In an effort to ensure that the [...] system does not experience any supply shortages, please be advised that we will consider the possibility of enacting an alternative supply contingency plan should a positive response from you or your parent corporation not be received by Monday, April 8th, 12 noon E.S.T.

William R. Beavers in his affidavit further stated:

Although I have attempted to assure these three customers that the Term Secured Compromise has received wide support and is progressing quickly, I have been advised by [...] Director of Purchasing at [...] and verily believe that [...] has determined that it must award its contract for supply of cans by April 10, 1991 or April 11 at the very latest and cannot delay any longer. If Ball Canada loses the [...] contract, its Ontario business would be devastated and plant closures would ensue, resulting in significant job losses and eliminating any chance of proceeding with the Term Secured Compromise.

Ball Canada currently owes approximately $1.4 million to certain of its major customers in respect of volume discounts arising out of pre-receivership sales to such customers. In view of the current over-supply in the Canadian and North American can market, the Receiver will be required to honour this unsecured commitment in order to retain the business of these key customers.

The operations of Ball Canada are also largely dependent upon the cooperation of Ball Corp. The two businesses have become interconnected in the last two years. Some of the principal areas of dependency of Ball Canada upon Ball Corp. are as follows:

a. Ball Canada and Ball Corp. are parties to three agreements dated as of December 8, 1988 (the Joint Venture Management and Technical Services Agreement, the Proprietary Technology Licence Agreement and the Metal Container Product Technology Cross-Licence Agreement) pursuant to which Ball Corp. has provided senior management, technical personnel and technology to Ball Canada.

b. Ball Canada currently obtains supply as required of certain finished goods from Ball Corp. in order to meet its supply obligations to customers while production line conversion projects (described below) in Whitby, Ontario and Richmond, British Columbia are in progress. In addition, Ball Corp. supplies any surplus requirements of Molson that the Bay d'Urfe plant is not able to supply. The continuation of these conversion projects is also dependant [sic] upon Ball Corp. technical personnel.

c. Ball Corp. currently supplies all Information Systems used by Ball Canada to manage all of its accounting, purchasing, inventory control, invoicing and operating systems from Ball Corp.'s computer facilities in Indiana. I attach as Exhibit 'D' to this my affidavit a copy of a list which the Receiver has prepared outlining the Ball Canada information systems cur rently being run from Ball Corp.'s computers in Indiana. Continued access to these systems is critical to the continuation of the business of Ball Canada.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

d. Ball Canada has been benefiting from volume discounts by joining with Ball Corp. for the purpose of procuring its requirements in aluminium [sic].

As mentioned above, the Whitby and Richmond plants are currently in the midst of line conversion projects designed to enhance the competitiveness of these two plants and the ability of Ball Canada to compete in the North American marketplace. At the Richmond plant, the line conversion project is designed to increase the line speed to North American standards while the Whitby project is designed to convert to 12 oz can production to meet market demands. Both of these projects are important to the restructuring of Ball Canada to ensure its ability to compete in the North American market which has been largely opened as a result of the Free Trade Agreement and will enhance the value of the business as a whole. In order to continue these projects in the receivership, the Receivership will have to negotiate terms with the contractors on the project who claim lien rights totalling approximately $2 million for arrears of contract fees due but not paid. As previously indicated, the Receiver will also require the cooperation of Ball Corp. in the United States in order to continue to supply its customers while the conversion projects are completed.

The Receiver has been required to deal with a number of other suppliers of goods and services who have been seeking to assert lien claims or to obtain concessions regarding pre-receivership accounts as a condition of future dealing. A customs broker has been refusing to release certain goods imported by Ball Canada from a customs warehouse unless account arrears are settled.

The employees and unions dealing with Ball Canada are naturally extremely anxious about the receivership and the effect that it will have upon their future employment and on their statutory and collective agreement rights to severance and termination amounts. I enclose as Exhibit 'E' correspondence sent to the Receiver by various unions expressing their concerns. These unions are aware that Ball Corp. is endeavouring to acquire Ball Canada on terms which would permit Ball Canada to honour all of its obligations to employees.

We have also prepared preliminary cash flow projections for Ball Canada in receivership for the period ending on April 28, 1991. This cash flow projection and notes, which is attached and marked as Exhibit 'F' to this my affidavit, shows that the Receiver will be required to spend a total of $27.54 million in respect of ongoing operation plus a further possible $6.62 million in respect of arrears which may have to be paid in order to continue operations for a total of $34.16 million. As a result of the receivership and the seasonal nature of the business, cash inflows for this same period are estimated to total $15 million, resulting in a net funding requirement of up to $19.16 million. The Receiver is currently only able to borrow up to $20 million secured by Receiver's Certificates pursuant to the Order of March 28, 1991. The Receiver has arranged temporary funding up to that level, but this arrangement expires on April 30, 1991. In view of the risks and contingencies associated with continuing to run the business, there is considerable doubt as to the ability of the Receiver to access further funds from a bank even if permitted to do so by an amendment to the Order.

While the Receiver is making every effort to stabilize the business and mitigate the risks to the going concern value of the business posed by the difficulties and risk factors mentioned above, it is my view that the ability of the Receiver to maintain that value is uncertain and decreases daily. If the Receiver is not able to provide the marketplace with concrete assurances as to the future direction of Ball Canada, there is a serious risk that the value of the business will decline dramatically in the next few days or weeks.

**Term Secured Compromise**

I have reviewed the Term Secured Compromise referred to in the Notice of Application under the *Companies' Creditors Arrangement Act* (Canada). The Receiver has been asked to seek certain amendments to the March 28 receiver-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

ship order in order to implement the Term Secured Compromise. The Receiver unreservedly and unequivocally believes this is the best possible deal in the present circumstances for the reasons outlined below.

The Receiver has reviewed the assets and business of Ball Canada for the purpose of preparing for a possible sale of Ball Canada. The Receiver has not as of yet completed the preparation of an information package for potential purchasers of the business of Ball Canada for the purpose of preparing for a possible sale of Ball Canada. The Receiver has not as yet completed the preparation of an information package for potential purchasers of the business of Ball Canada or commenced any such negotiations. Based upon its review, the price of $120 million for the term debt of Ball Canada proposed on the Term Secured Compromise represents *in excess of the high end* of the Receiver's estimates of the realizable value of the assets of Ball Canada in liquidation even if the Receiver is able successfully to maintain the going concern value of the business. It is the opinion of the Receiver that the business of Ball Canada has special value to Ball Corp. and that Ball Corp. is willing to make this offer for tax and other benefits that are unique to it. Since the Term Secured Compromise does not contemplate any other debt of Ball Canada being compromised, its economic value is far higher than $120 million. In my view, recoveries upon the assets would be considerably lower if the business begins to decline as a result of the loss of significant customer accounts or in the event of production interruptions or other difficulties which may be experienced in the coming days and weeks in view of the risk factors outlined above.

The Term Secured Compromise provides a means for the Receiver to obtain a secure source of operating credit for Ball Canada. As indicated above, the ability of the Receiver to raise the operating funds required to maintain the stability of the business of Ball Canada for the time required to seek out buyers for the business is uncertain. The current financing which the Receiver has negotiated expires at the end of April, 1991.

In the opinion of the Receiver, the Term Secured Compromise is in the best interests of Ball Canada and all of its creditors. As indicated above, it is my opinion that the term secured creditors will receive more under the Term Secured Compromise than they would under a liquidation supervised by the Receiver. Furthermore, as a result of the Term Secured Compromise, Ball Canada will be able to come out of receivership. This will provide a means for the trade creditors, customers, suppliers and employees to be ensured that their claims will be satisfied by Ball Canada in the ordinary course of business. This is in the best interests of the communities in which Ball Canada carries on business and its 1700 employees. An example of these types of concerns, which the Receiver believes are something the Receiver should keep in mind, is articulately expressed in the letter of Bob Speller, the member of Parliament for Haldimand- Norfolk that I attach hereto as Exhibit 'G' to this my affidavit.

If the Term Secured Compromise is approved by this Honourable Court, the Receiver will be required to take the steps outlined below in the interim period between approval of the agreement and its completion expected before April 25, 1991. It is anticipated that Ball Corp. will move to have the Receiver discharged immediately following completion of the Term Secured Compromise and that Ball Canada will resume business in the ordinary course under the control and direction of Ball Corp. thereafter.

In order to implement the Term Secured Compromise, the order appointing the Receiver must be varied in several respects. Firstly, the authority of the Receiver to borrow funds pursuant to paragraph 18 of the Order is required to be increased from $20 million to $30 million. This is required pursuant to clause 9(b)(iii)(A) of the Purchase Agreement contemplated by the Term Secured Compromise in order to ensure that the Receiver and Ball Canada will have authority to access sufficient working capital until closing. As indicated above, the Receiver's current forecasts indicate that the full authorized financing will be utilized in the coming weeks with very little margin of error if no amendment is made. An additional level of borrowing will be required to fund the requirements of Ball Canada on

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

closing of the Purchase Agreement as referred to in section 10 thereof.

A second required amendment is for this Court to direct and permit the Receiver (i) to permit Ball Corp. to manage Ball Canada and its business in accordance with the existing Joint Venture Management and Technical Services Agreement (the 'Management Agreement') dated December 8, 1988 (a copy of which I attach as Exhibit 'H') to this my affidavit); (ii) to cooperate with officers of Ball Canada to operate the business of Ball Canada in the ordinary course of business as an on-going business with a view to avoiding any material reduction in the value of the business; (iii) not to sell any asset of Ball Canada except in the ordinary course of the business of Ball Canada; and (iv) not to terminate voluntarily the employment of an employee of Ball Canada or any material contract of Ball Canada. This amendment has been required by Ball Corp. in order to provide them with some degree of comfort concerning and control over the occurrence of any material adverse change in the business between the date of the approval of the Term Secured Compromise and the closing of the Purchase Agreement contemplated thereby.

37    Since the hearing of April 11, the orders in accordance with the above two paragraphs were granted.

38    Although the affidavit evidence at the time of the preparation of the applications for April 10 and April 11 indicated that the only dissenting participant was Chase Manhattan, at the hearing there were some other participants who indicated that they were not prepared to approve the proposed plan. However, the necessary percentage in amount and number approved.

**Decision**

39    The first issue to be determined in assessing the vote at the meeting on the night of April 10 is whether the banks participating in the loan by Chase to Ball Canada (the "participants"), are secured "creditors" of Ball Canada.

40    The CCAA authorizes the court to order a meeting of "unsecured creditors" or "secured creditors" or any class of them for the purpose of voting on a proposed compromise or arrangement between them and the debtor company (see ss. 5 and 6). "Secured creditors" is defined in s. 2 (in part) as meaning:

> *a holder of a mortgage, hypothec, pledge, charge, lien or privilege on or against, or any assignment, cession or transfer of, all or any property of a debtor company as security for indebtedness of the debtor company, or a holder of any bond of a debtor company* secured by a mortgage, hypothec, pledge, charge, lien or privilege on or against, or any assignment, cession or transfer of, or a trust in respect of, all or any property of the debtor company, whether the holder or beneficiary is resident or domiciled within or outside Canada, *and a trustee under any trust deed or other instrument securing any of those bonds shall be deemed to be a secured creditor for all purposes of this Act except for the purpose of voting at a creditors' meeting in respect of any of those bonds.*

[Emphasis added.]

41    The participants are the beneficial "holders" of a proprietary interest in Ball Canada which secures the indebtedness of Ball Canada and which the participants have purchased pursuant to the terms of the master participation agreements.

42    The word "holder" as used in this definition should be given a liberal interpretation in keeping with the broad remedial nature of the CCAA and therefore includes the *beneficial* holders of any bond or proprietary interest. As with judicial interpretation relating to the determination of a "class of creditors", the statute's reference to "creditors" is to be interpreted so that the voice of the persons with the real economic interest in the debtor company is heard. The exception of

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

the trustee under a trust deed from the class of creditors entitled to vote confirms this proposition. The fact that a trustee under a trust deed, although the holder of the legal title to the obligation under the bond and the security is not a secured creditor for the purpose of voting, favours the view that those with the beneficial or real economic interest in the debt and security are the creditors entitled to vote.

43       Section 4(b) of the master participation agreement recognizes that a participant is entitled to "its share" of any amounts received by Chase in a realization by it (or presumably its agent) of its collateral. The participant's share is its percentage ownership interest in the underlying loan obligation purchased. This provision recognizes that the participant has an equitable proprietary interest in the property of the borrower as security for that borrower's indebtedness, and is, therefore, a secured creditor of Ball Canada.

44       The relevant part of s. 4(b) reads:

> Further, the Participant shall not have any rights to or in any collateral, other property or right (including any right of set-off) which may be or becomes available for the payment of any Participated Loan, *except that if any such right is exercised by the Bank ... and the amounts recovered thereby are applied on account of any amount in which the Participant is entitled to share as provided in Section 4(a), the Bank will promptly pay to the Participant its share thereof as provided therein.*

[Emphasis added.]

45       That the participant pursuant to the terms of the master purchase agreement waives vis-à-vis Chase some of the rights that would normally accompany such an assignment (such as the right to give the debtor notice of the assignment) is not of significance in the CCAA proceedings. Section 8 of the CCAA provides that relief under the CCAA is available notwithstanding the terms of any agreement.

> 8. This Act extends and does not limit the provisions of any instrument now or hereafter existing that governs the rights of creditors of any class of them and has full force and effect notwithstanding anything to the contrary contained in that instrument.

46       The Court's power to deal with the interests of the participants in the debt owed by Ball Canada is, therefore, unaffected by the master participation agreement or any other instrument.

47       Having accordingly ruled the vote was 86.67 per cent in favour in number and 80.85 per cent in favour on the basis of value and, accordingly, the proposal was approved by the necessary percentage in both number and value.

48       The jurisdiction of the Court under the CCAA should be given a large and liberal interpretation consistent with the remedial nature of the legislation. As recently stated by Doherty J.A. in the Ontario Court of Appeal in his dissenting reasons in the case of *Nova Metal Products Inc. v. Comiskey (Trustee of)*, supra, at p. 306 [O.R.]:

> The legislation is remedial in its pures sense in that it provides a means whereby the devastating social and economic effects of bankruptcy or creditor-initiated termination of ongoing business operations can be avoided while a court-supervised attempt to reorganize the financial affairs of the debtor company is made.

In the same case Finlayson J.A., with whom Krever J.A. concurred, stated at p. 297 [O.R.]:

> It is well established that the *CCAA* is intended to provide a structured environment for the negotiation of compromises between a debtor company an its creditors for the benefit of both. Such a resolution can have significant benefits

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

for the company, its shareholders and employees. For this reason the debtor companies ... are entitled to a broad and liberal interpretation of the jurisdiction of the court under the *CCAA*.

49      The purpose of the CCAA is to facilitate arrangements that might avoid liquidation of the company and allow it to continue in business to the benefit of the whole economic community, including the shareholders, the creditors (both secured and unsecured) and the employees. That this is its fundamental purpose is emphasized by the following passage from the reasons of Gibbs J.A. of the British Columbia Court of Appeal in *Hongkong Bank of Canada v. Chef Ready Foods Ltd.*, 51 B.C.L.R. (2d) 84, [1991] 2 W.W.R. 136 (C.A.) at p. 91:

> The C.C.A.A. was enacted by Parliament in 1933 when the nation and the world were in the grip of an economic depression. When a company became insolvent liquidation followed because that was the consequence of the only insolvency legislation which then existed — the Bankruptcy Act and the Winding-up Act. Almost inevitably liquidation destroyed the shareholders' investment, yielded little by way of recovery to the creditors, and exacerbated the social evil of devastating levels of unemployment. The government of the day sought, through the C.C.A.A., to create a regime whereby the principals of the company and the creditors could be brought together under the supervision of the court to attempt a reorganization or compromise or arrangement under which the company could continue in business.

**The Position of Onex Inc.**

50      Onex Inc. held shares in a holding company with Ball U.S. that in effect gave it a 50 per cent interest in the shares of Ball Canada. These shares as previously stated were pledged as part of the loan agreement. Ball U.S.'s offer was conditional upon it obtaining 100 per cent of the shares of Ball Canada. Ordinarily, in an arrangement of this kind, the shares of the company making the arrangement have little or no value. In this case, however, other creditors were being paid in full and the business was to be carried on. It was understandable and appropriate that Ball U.S., in assuming all of the responsibilities and putting in the funds that it was obligated to do under its offer, would want to be in full control of the company. The rights of Onex as against Ball U.S. are not affected by my approving the compromise plan and ordering the shares to be transferred to Ball U.S., since any rights that Onex has under any agreements with Ball U.S. are not being altered, amended or considered as part of these proceedings. In order to comply with the terms of the proposal and the Ball U.S. offer, it was necessary to have the shares conveyed immediately and to implement this conveyance of the collateral security held, I made an order abridging the notice period provided in s. 63(4) of the PPSA. On the date of closing of the term secured compromise with respect to the transfer of the shares of Ball Canada held as security for the guarantee of Ball Holdings pursuant to s. 70 of the PPSA, and pursuant to s. 67 of the PPSA, I authorized and approved the transfer by Citibank Canada as agent of all the right, title to, and interest in the shares of Ball Canada to Ball Corp. pursuant to the term secured compromise. I also relieved the agent from further compliance with Pt. V of the PPSA.

51      I endorsed the record on April 11 as follows:

> In my view the beneficial owners of the security are each entitled to vote their percentage interest. On that basis the vote in favour of the proposal has exceeded the necessary number and value required. Accordingly, the order is to issue in the form approved.

52      The evidence before me demonstrated overwhelmingly that it was in the interest of all of the creditors that the proposal be approved. While it was extraordinary that ordinary creditors be paid in full while secured creditors received only part payment, there was no alternative. This was confirmed by the overwhelming support of the proposal from the creditors, with the notable exception of Chase Manhattan. The evidence put before me with regard to the proposal and the fact that the proposal was in the best interests of all of the creditors was confirmed by the large number of represent-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

atives of financial institutions, officers and directors of same who attended the meeting and voted so overwhelmingly in favour of the compromise. The wishes of these sophisticated financiers should not lightly be discarded by the Court. Accordingly, the compromise plan was approved and implemented even under the most unusual circumstances and time constraints that existed.

*Order accordingly.*

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 6

DOCSTOR: 2191401\1

*Indexed as:*
# Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A. s.r.

**Between**
**Coldmatic Refrigeration of Canada Ltd., plaintiff, and**
**P.U.M.A. s.r. 1, defendant**

[1998] O.J. No. 1697

64 O.T.C. 157

21 C.P.C. (4th) 267

78 A.C.W.S. (3d) 1110

Court File No. 97-CV-127075

Ontario Court of Justice (General Division)
Motions Court - Toronto, Ontario

**Sharpe J.**

Heard: April 17, 1998.
Oral judgment: April 24, 1998.

(7 pp.)

*Conflict of Laws -- Contracts -- Choice of law -- General -- By parties -- Jurisdiction -- Choice of forum by parties.*

Motion for summary judgment by the defendant, PUMA. The defendant was a manufacturer of equipment. The defendant sold equipment to the plaintiff. The written contract contained an clause which provided for arbitration of disputes and the location where disputes were to be settled. In June 1997, the plaintiff commenced proceedings in an Ontario court. In September 1997, the defendant launched a claim in an Italian court. The defendant also filed a statement of defence and counter-claim to the Ontario action. In the statement of defence, the defendant alleged that the contract governed the place of jurisdiction, which the parties had agreed to as Padua, Italy. The defendant indicated that it did not wish to litigate, but to pursue the matter in arbitration in Italy.

HELD: Motion dismissed. The defendant made no attempt, other than to file the statement of defence, to dispute the jurisdiction of the Ontario court. The defendant failed to comply with the provision of the International Commercial Arbitration Act of Ontario. The pleadings did not ask for arbitration and a letter written prior to the commencement of the action did not constitute a request for arbitration. Ontario law required clarity in an arbitration or jurisdiction clause and such clarity was not present in the contract under dispute. Such an unclear clause could not oust the jurisdiction of the Ontario court. The defendant's statement of defence and counter-claim were a clear attornment to the jurisdiction of the Ontario court.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, s.106.
International Commercial Arbitration Act, R.S.O.  1990, c.I.9, Article 8.

**Counsel:**

Cynthia Amsterdam, for the plaintiff.
Inga B. Andriessen, for the defendant.

---

**1   SHARPE J.** (orally):-- This is a motion for Summary Judgment by the defendant to dismiss the action on the ground that Ontario is not the proper jurisdiction. The dispute arises from a contract for the manufacture and supply of certain equipment. The plaintiff purchaser is an Ontario corporation. The defendant manufacturer is an Italian corporation. I need not go into the details of the dispute. Some equipment has been supplied. The plaintiff takes the position that what has been supplied is damaged or defective and there is a dispute as to respective obligations of the parties at the present time to carry the contract forward to execution. The written contract contains the following provision which is relied on by the defendant. It is Cause "N" and it is headed "Arbitration Clause": "For possible disputes the place of jurisdiction will be that of Padua."

**2**   The procedural history is as follows. The statement of claim was issued on June 27, 1997 and served in Italy. On September 15th the Italian defendant took proceedings in an Italian court claiming return of the equipment that it had supplied. On September 19th the Italian defendant filed a statement of defence and counterclaim in this action. Paragraph 23 of the statement of defence states as follows:

> Pursuant to the Contract, at paragraph N, where there is a dispute, the place of jurisdiction is Padua, Italy accordingly, the proper forum for the hearing of this action is Padua, Italy.

The defendant took no other steps to dispute the jurisdiction of this court and on October 15th filed this motion for Summary Judgment to dismiss the claim.

**3**    There is also before me a cross-motion by the plaintiff which takes the position that if the court finds the jurisdictional arguments are well founded the appropriate remedy is a stay of the action rather than a dismissal.

**4**    During argument, counsel for the defendant made it clear that it was her client's position that Clause N should be treated as an arbitration clause and that her client had no intention to litigate the dispute in the Italian courts but rather intended to submit the dispute to arbitration in Italy. In effect, she conceded that if her arguments were successful the appropriate remedy would be a stay rather than a dismissal of the action.

**5**    In my view the defendant's motion must be dismissed in its entirety, both on procedural and on substantive grounds. With respect to procedure and on the assumption for these purposes only that we are dealing with an enforceable and valid arbitration clause, I find that the defendant has failed to take the appropriate steps to have this action stayed and referred to arbitration. The International Commercial Arbitration Act, R.S.O. 1990, c. I.9, Article 8, provides as follows:

> (1)    A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed.

**6**    I find that the defendant has failed to comply with the statutory requirements stipulated by that provision. First of all, in my view, the defendant has still not made a request to this court to refer the matter to arbitration. The only explicit reference to arbitration was contained in a letter to the plaintiff from the defendant's Italian counsel dated June 23, 1997. It is clear on the authorities that a letter written prior to the initiation of the action does not constitute a request within the meaning of the Act: See, Ruhrkohle Handel Inter GmbH v. Fednav Ltd. (1992), 42 C.P.R. (3d) 414, and ABN Amro Bank Canada v. Krupp MaK Maschinenbau (1994), 21 O.R. (3d) 511.

**7**    The pleading in the statement of defence does not ask for arbitration. It simply states that the proper forum for the hearing of the action is Padua, Italy. This motion is not a motion for a stay of the action to refer the matter to arbitration but rather a motion for summary judgment to dismiss the claim. As I have mentioned, it was only during oral argument that the point was conceded that if any remedy was available it would be that of arbitration. Moreover, even if the statement of defence does constitute a request for arbitration, it is not at all clear that it constitutes a timely request for arbitration. The ABN Amro Bank Canada case already referred to holds that pleading and arbitration clause in a statement of defence and counterclaim is not a timely request for arbitration and that the appropriate procedure is to bring a motion for a stay. While leave to appeal from that decision was granted: 24 O.R. (3d) 450, it does not appear that the appeal to the Divisional Court

has ever been heard. In any event, the statement of defence was not the first statement of substance on the dispute presented by the defendant. As I have indicated, the defendant took proceedings in Italy after receiving the statement of claim and only a few days before submitting the statement of defence. It would appear that before the Italian court, it took the position that Clause N in the agreement was a jurisdiction clause conferring jurisdiction on the Italian court rather than an arbitration clause. That position was accepted by the Italian court. The translation of the reasons of the Italian court states as follows:

> Notwithstanding the title "Arbitration Clause" it must be considered as a jurisdiction clause and not as a mere arbitration clause in consideration of the literal meaning of the words and also because it does not contain reference to an arbitration proceeding.

**8**    Accordingly for these procedural reasons, I find that the motion must be dismissed. I would add that in substance I would also reject the submission of the defendant on the ground that Clause N in the agreement falls well short of what is required under Ontario law to constitute a valid arbitration clause. While I note at this point that no submissions were made as to the appropriate law of this contract nor is there any evidence of Italian law as to how this clause would be interpreted. However, as noted above, it would appear that the Italian court regarded it as a jurisdiction clause. In the absence of contrary evidence, I must assess that Ontario law applies and interpret the clause in light of the law of Ontario. That law is summarized in the judgment of Justice Hoillett in Benner and Associates v. Northern Lights Distribution Inc. (1995), 22 B.L.R. (2d) 79. Justice Hoillett makes it clear that the established principles in Ontario require clarity in an arbitration clause and in particular that it must be clear that all disputes are to be submitted to arbitration and some indication of the appropriate procedure must be set out. It is not at all clear, here, that all disputes are referable to arbitration and, indeed, the conduct of the defendant itself would suggest that it does not so regard the clause for it took proceedings in Italy. The clause does not stipulate a process or procedure nor does it indicate who is to conduct the arbitration. It falls well short of the degree of precision required for such clauses to oust the jurisdiction of an Ontario court. I note the following passage from Justice Hoilett's decision at page 85 which is apposite to the circumstances here. He states:

> The agreement in issue was drafted by the defendant and had it been the defendant's intention to have all breaches and disputes submitted to arbitration, that intent could have been couched in plain and simple language.

**9**    I would add finally that while the defendant does not press the argument that this is a jurisdiction clause conferring jurisdiction on the Italian courts but rather requests arbitration, I find to the extent that argument was advanced, that the statement of defence and counterclaim here constitutes attornment to the jurisdiction of Ontario. The defendant chose not to avail itself of the established procedure to contest jurisdiction prescribed by Rule 17 but by section 106 of the Courts of Justice Act, but rather chose to invoke the jurisdiction of this court, not just to defend the action

but to assert a counterclaim. Such action plainly does not constitute an appearance or attornment under duress to protect property but rather amounts to attornment plain and simple. See, Gourmet Resources International Inc. (Trustee of) v. Paramount Capital Corp. (1991), 5 C.P.C. (3d) 140; Clinton v. Ford (1982), 37 O.R. (2d) 448; Boissiere v. Brockner (1889), 6 T.L.R. 85.

**10**    For those reasons I dismiss the motion.

SHARPE J.

qp/d/mii/DRS

# TAB 7

DOCSTOR: 2191401\1

*Indexed as:*
# Consumers Packaging Inc. (Re)


**IN THE MATTER OF The Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C.36, as amended
AND IN THE MATTER OF a plan of compromise or arrangement of
Consumers Packaging Inc., Consumers International Inc. and
64489 Canada Inc.**

**[2001] O.J. No. 3908**

150 O.A.C. 384

27 C.B.R. (4th) 197

12 C.P.C. (5th) 208

108 A.C.W.S. (3d) 765

Docket No. M27743


Ontario Court of Appeal
Toronto, Ontario

**McMurtry C.J.O., Finlayson and Austin JJ.A.**

Heard: September 27, 2001.
Judgment: October 10, 2001.

(10 paras.)

*Bankruptcy -- Companies' Creditors Arrangement Act -- Sale of assets -- Appeals.*


Motion by Ardagh PLC for leave to appeal and appeal from a decision that approved a sale of assets of Consumers Packaging Inc. to Owens-Illinois Inc. Consumers filed for protection under the Companies' Creditors Arrangement Act. Consumers was authorized, through an independent restructuring committee and its chief restructuring officer to fix a date upon which interested third parties were to submit firm, fully financed offers to purchase all or any part of its business. Ardagh

and Owens participated in the bid process. Owens was the preferred bid since it provided more cash to Consumers' creditors, had the least completion risk, was not conditional on financing, was likely to close in a reasonable period of time, resulted in the continuation of Consumers' business and retained a vast majority of its employees. Ardagh's restructuring proposal was not backed by financing commitments, required further due diligence by its lenders and offered less by way of recovery to Consumers' creditors. It was the unanimous view of the monitor, the Committee and the Officer that Ardagh's proposal was not viable and would, if pursued, result in its liquidation causing a lower return to creditors, the loss of jobs and cessation of business operations. The judge approved Owens' bid on the basis that it was the only presently viable option better than a liquidation with substantially reduced realization of value.

HELD: Motion for leave to appeal dismissed. Granting leave to appeal would be prejudicial to the prospects of restructuring the business for the benefit of the stakeholders in light of the significant time and financial constraints faced by Consumers and was contrary to the objectives of the Act. The sale of certain of Consumers' assets to Owens allowed the preservation of its business and was consistent with the purposes of the Act.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11.7.

**Appeal From:**

On appeal from the order of Justice James M. Farley dated August 31, 2001.

**Counsel:**

Peter F.C. Howard, Patrick O'Kelly and Craig Martin, for Ardagh PLC.
Robert S. Harrison and Carole J. Hunter, for the Ad Hoc Noteholders Committee.
Daniel V. MacDonald and Paul G. Macdonald, for Consumers Packaging Inc., Consumers International Inc. and 164489 Canada Inc.
L. Joseph Latham and Elizabeth Moore, for the Toronto-Dominion Bank Syndicate.
Lily I. Harmer, for the United Steelworkers of America.
Marc Lavigne, for Anchor Glass Container Corp.
Dale Denis, for Owens-Illinois, Inc.
Terrence J. O'Sullivan, for KPMG Inc.

---

The following judgment was delivered by

**1**    THE COURT:-- Ardagh PLC ("Ardagh"), seeks leave to appeal and if leave is granted appeals

the Order of The Honourable Mr. Justice Farley dated August 31, 2001 which approved a sale of certain assets of Consumers Packaging Inc. and Consumers International Inc. and 164489 Canada Inc. (hereinafter collectively "Consumers") to Owens-Illinois, Inc. ("Owens-Illinois").

**2**    Consumers had filed for protection under the Companies' Creditors Arrangement Act (the "CCAA") on May 23, 2001 and Farley J. made an initial order on that date approving an amendment and forbearance agreement between Consumers and its institutional lenders and arranging interim credit. KPMG Inc. was appointed Monitor under s. 11.7 of the CCAA. On June 18, 2001 Farley J. authorized Consumers through an Independent Restructuring Committee and its Chief Restructuring Officer to fix a date upon which interested third parties were to submit firm, fully financed offers to purchase all or any part of Consumers' business. Both Ardagh and Owens-Illinois participated in the bid process. The Independent Restructuring Committee, the Chief Restructuring Officer and the Monitor agreed on behalf of Consumers that Owens-Illinois was the preferred bid. On the sale approval motion heard August 31, 2001, Farley J. found as a fact that Consumers was "quite sick" and "financially fragile" and that there "exists a material risk that [Consumers] will be destabilized by a withdrawal of funding by the [consortium of lenders] which have been continuously adamant about a September 2001 deadline for pay out."

**3**    On the evidence before us, the Owens-Illinois bid approved by Farley J. on August 31, 2001 was the result of a fair and open process developed by Consumers and its professional advisors and carried out, after May 23, 2001, under the supervision of the court and with the participation of Ardagh. The Owens-Illinois bid provides more cash to Consumers' creditors than a proposal from Ardagh, has the least completion risk, is not conditional on financing, is likely to close in a reasonable period of time, is made by a credible purchaser (the largest glass bottle manufacturing company in the world) and will result in the continuation of Consumers' Canadian business, the retention of a vast majority of Consumers' 2,400 Canadian employees and the assumption by the purchaser of significant obligations under Consumers' employee pension plan. It is supported by all parties before this court with the exception of Ardagh.

**4**    The respondents on this motion submit that the restructuring proposals put forward by Ardagh were not backed by financing commitments, required further due diligence by Ardagh and its lenders, could not be completed in a timely way, offered less by way of recovery to Consumers' creditors and were no more than proposals to negotiate. It appears to have been the unanimous view of the Monitor, Consumers' Independent Restructuring Committee and Consumers' Chief Restructuring Officer that Ardagh's proposals were not viable and would, if pursued, result in the liquidation of Consumers, resulting in lower return to creditors, loss of jobs and cessation of business operations. This view was accepted by Farley J. who stated in his endorsement approving the Owens-Illinois bid that it was the "only presently viable option better than a liquidation with substantially reduced realization of value".

**5**    In our opinion, leave to appeal should not be granted. The authorities are clear that, due to the nature of CCAA proceedings, leave to appeal from orders made in the course of such proceedings

should be granted sparingly: see Algoma Steel Inc. (Re), a judgment of the Ontario Court of
Appeal, delivered May 25, 2001, [2001] O.J. No. 1943 at p. 3. Leave to appeal should not be
granted where, as in the present case, granting leave would be prejudicial to the prospects of
restructuring the business for the benefit of the stakeholders as a whole, and hence would be
contrary to the spirit and objectives of the CCAA. The sale of Consumers' Canadian glass
operations as a going concern pursuant to the Owens-Illinois bid allows the preservation of
Consumers' business (albeit under new ownership), and is therefore consistent with the purposes of
the CCAA. There is a real and substantial risk that granting leave to appeal in the present case will
result in significant prejudice to Consumers and its stakeholders, in light of the significant time and
financial constraints currently faced by Consumers. Both Farley J. and KPMG Inc., the
court-appointed Monitor in the CCAA proceedings, have concluded that the Owens-Illinois bid
represents the only presently viable option available to Consumers, which would be better than a
liquidation.

**6**    The transactions contemplated by the Owens-Illinois bid are expected to close on September
28, 2001. If the Owens-Illinois bid does not close before the end of September, 2001, it is uncertain
if, and for how long, Consumers would be able to continue its operations. The financial institutions
that are prepared to finance these transactions have appeared before this court and have advised,
both before and throughout the CCAA proceedings, that they will not fund the operations of
Consumers beyond the end of September, the time at which Consumers' credit requirements
seasonally increase on an annual basis. There is no evidence on the record, and certainly none from
Ardagh, as to the manner in which the operations of Consumers would be funded until the Ardagh
proposal contained in its bid, if successful, could be implemented.

**7**    Further, despite its protestations to the contrary, it is evident that Ardagh is a disappointed
bidder that obtained its security interest in the assets of Consumers in order to participate in their
restructuring and obtain a controlling equity position in the restructured entity. There is authority
from this court that an unsuccessful bidder has no standing to appeal or to seek leave to appeal. As a
general rule, unsuccessful bidders do not have standing to challenge a motion to approve a sale to
another bidder (or to appeal from an order approving the sale) because the unsuccessful bidders
"have no legal or proprietary right as technically they are not affected by the order": see the
statement of Farley J., dealing with a receiver's motion to approve a sale, that is quoted with
approval by O'Connor J.A. of this court in Skyepharma plc v. Hyal Pharmaceutical Corp. (2000), 47
O.R. (3d) 234 at 238 (C.A.). O'Connor J.A. went on to say at p. 242:

> There is a sound policy reason for restricting, to the extent possible, the
> involvement of prospective purchasers in sale approval motions. There is often a
> measure of urgency to complete court approved sales. This case is a good
> example. When unsuccessful purchasers become involved, there is a potential for
> greater delay and additional uncertainty. This potential may, in some situations,
> create commercial leverage in the hands [of] a disappointed would be purchaser
> which could be counterproductive to the best interests of those for whose benefit

the sale is intended.

**8**    The position of Ardagh is not advanced by the fact that it did not challenge the order of Farley J. of June 18, 2001 which set out the parameters for the bidding. Instead it participated in the bidding process which it now attacks as being ultra vires the CCAA.

**9**    Finally, while we do not propose to become involved in the merits of the appeal, we cannot refrain from commenting that Farley J.'s decision to approve the Owens-Illinois bid is consistent with previous decisions in Ontario and elsewhere that have emphasized the broad remedial purpose and flexibility of the CCAA and have approved the sale and disposition of assets during CCAA proceedings prior to a formal plan being tendered.

**10**    Accordingly, leave to appeal is refused with costs.

McMURTRY C.J.O.
 FINLAYSON J.A.
 AUSTIN J.A.

cp/e/nc/qlrme

# TAB 8

DOCSTOR: 2191401\1

*Case Name:*
# Expedition Helicopters Inc. v. Honeywell Inc.

**Between**
**Expedition Helicopters Inc., Plaintiff (Respondent), and**
**Honeywell Inc., Defendant (Appellant)**

**[2010] O.J. No. 1998**

2010 ONCA 351

70 B.L.R. (4th) 60

100 O.R. (3d) 241

262 O.A.C. 195

319 D.L.R. (4th) 316

2010 CarswellOnt 3091

87 C.P.C. (6th) 210

Docket: C51719

Ontario Court of Appeal
Toronto, Ontario

**D.R. O'Connor A.C.J.O., E.E. Gillese and R.G. Juriansz JJ.A.**

Heard: April 21, 2010.
Judgment: May 14, 2010.

(26 paras.)

*Civil litigation -- Civil procedure -- Disposition without trial -- Stay of action -- Courts -- Jurisdiction -- Appeal by Honeywell from dismissal of its motion for a stay of Expedition's action allowed -- Order set aside and proceedings stayed -- Honeywell leased a helicopter engine to Expedition and agreement contained forum selection clause -- After helicopter crash caused by catastrophic failure of Honeywell engine, Expedition sued Honeywell -- Honeywell sought stay on*

*basis of forum selection clause -- Motion judge did not state or apply correct test for enforceability of forum selection clause and reached wrong result.*

*Conflict of laws -- Jurisdiction -- Forum conveniens -- Choice of forum by parties -- Appeal by Honeywell from dismissal of its motion for a stay of Expedition's action allowed -- Order set aside and proceedings stayed -- Honeywell leased a helicopter engine to Expedition and agreement contained forum selection clause -- After helicopter crash caused by catastrophic failure of Honeywell engine, Expedition sued Honeywell -- Honeywell sought stay on basis of forum selection clause -- Motion judge did not state or apply correct test for enforceability of forum selection clause and reached wrong result.*

Appeal by Honeywell from the dismissal of its motion to enforce a forum selection clause in a bailment agreement by staying Expedition Helicopter's action. Honeywell leased a helicopter engine to Expedition and the engine was installed in one of Expedition's helicopters. The lease agreement contained a forum selection clause which stated that Arizona courts would have exclusive jurisdiction to hear any proceeding arising in connection with the agreement. The helicopter in which the Honeywell engine was installed crashed into a lake in Saskatchewan and the Transportation Safety Board of Canada determined that the crash was caused by the catastrophic failure of a turbine shaft bearing of the Honeywell engine. Consequently, Expedition commenced an action against Honeywell claiming damages for the loss of its helicopter. Expedition also commenced separate lawsuits against Honeywell in Arizona. Honeywell argued that Expedition could not take the position that the action should proceed in Ontario as a result of the forum selection clause. Expedition argued that neither party gave any consideration to the forum selection clause, and that virtually all of the evidence was located in Canada. The motion judge held that practically all of the evidence related to liability was in Canada. Furthermore, Expedition had its headquarters in Ontario, the helicopter pilot was residing in Canada and the agreement was executed on Expedition's behalf in Canada. Therefore, it would not be just or reasonable to require Expedition to be bound by the forum selection clause.

HELD: Appeal allowed. The order was set aside and the proceedings were stayed. The motion judge did not state or apply the correct test for enforceability of a forum selection clause and reached the wrong result. It was not enough for the plaintiff to establish a strong case that Ontario was the more convenient forum. The plaintiff had to show strong cause that the case was exceptional and the forum selection clause should not be enforced. The motion judge did not give full weight to the forum selection clause, and she did not consider the effect it had on the factors relevant to the forum non conveniens analysis. The motion judge also failed to accord sufficient weight to Expedition's commencement of an action in Arizona. Clearly, Expedition had conceded that the Arizona court had jurisdiction and that it was feasible that the claim proceed in Arizona. The motion judge should have at least considered whether a judgment obtained in Ontario would be enforced by the court in Arizona if that court concluded that the action should have proceeded in Arizona.

**Appeal From:**

On appeal from the decision of Justice L.L. Gauthier of the Superior Court of Justice dated January 21, 2010, with reasons reported at 2010 ONSC 732.

**Counsel:**

Susan M. Brown, for the appellant.

Paul J. Pape and David S. Steinberg, for the respondent.

---

[Editor's note: An amended judgment was released by the Court June 29, 2010. The changes were not indicated. This document contains the amended text.]

The judgment of the Court was delivered by

R.G. JURIANSZ J.A.:--

## A. INTRODUCTION

**1**    Honeywell Inc. ("Honeywell") appeals from the decision of Gauthier J. dismissing its motion to enforce a forum selection clause in a Bailment Agreement (the "Agreement") by staying the action of Expedition Helicopter Inc ("Expedition"). The Agreement related to a helicopter engine that Honeywell provided to Expedition. The Expedition helicopter in which the engine was installed crashed in northern Saskatchewan, resulting in the death of the pilot and a passenger, as well as the complete loss of the helicopter. Expedition commenced an action in Ontario for damages arising out of the crash. Honeywell brought a motion to stay the Ontario action because the Agreement provided that the courts of Arizona have exclusive jurisdiction over all proceedings "arising out of or in connection with this Agreement."

**2**    I would allow the appeal. The motion judge did not state or apply the correct test for enforceability of a forum selection clause and reached the wrong result.

## B. ANALYSIS

**3**    Expedition is incorporated in Ontario and has its head office in Cochrane, Ontario. It operates a fleet of eleven helicopters for charter. Honeywell is a Delaware corporation which operates globally. The leased engine was manufactured in Williamsport, Pennsylvania and converted to the specific configurations required by Expedition at Honeywell's facility in Greer, South Carolina. The Greer facility is managed by a Honeywell division based in Phoenix, Arizona.

**4**    The relationship between the two companies is such that the replacement engine was shipped, installed and in use before the Agreement was signed.

**5**    The forum selection clause in the Agreement provided as follows:

> CHOICE OF LAW. THIS AGREEMENT SHALL BE GOVERNED,
> CONTROLLED AND INTERPRETED UNDER THE LAW OF THE STATE
> OF ARIZONA, EXCLUDING ITS CONFLICT OR CHOICE OF LAW
> PROVISIONS. The parties (i) agree that any state or federal court located in
> Phoenix, Arizona shall have exclusive jurisdiction to hear any suit, action or
> proceeding arising out of or in connection with this Agreement, and consent and
> submit to the exclusive jurisdiction of any such court in any such suit, action or
> proceeding and (ii) hereby waive, and agree not to assert, by way of motion, as a
> defense, or otherwise, in any such suit, action or proceeding to the extent
> permitted by the applicable law, that the suit, action or proceeding is brought in
> an inconvenient forum, that the venue of the suit, action or proceeding is
> improper, or that this Agreement or any of the transactions contemplated hereby
> may not be enforced in or by such courts.

### 1) The test for enforceability of forum selection clauses

**6**    The motion judge recognized that the Supreme Court of Canada's decision in *Z.I. Pompey Industrie v. ECU-Line N.V.*, [2003] 1 S.C.R. 450, is the governing authority regarding the enforcement of a forum selection clause. *Pompey* confirmed the exercise of the court's discretion not to enforce a forum selection clause is governed by the "strong cause" test first stated in the British case *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237 (Adm. Div.). The test in *The "Eleftheria"* as quoted in *Pompey* at para. 19, is as follows:

> 1)    Where plaintiffs sue in England in breach of an agreement to refer disputes
> to a foreign Court, and the defendants apply for a stay, the English Court,
> assuming the claim to be otherwise within the jurisdiction, is not bound to
> grant a stay but has a discretion whether to do so or not. (2) The discretion
> should be exercised by granting a stay unless strong cause for not doing so
> is shown. (3) The burden of proving such strong cause is on the plaintiffs.
> (4) In exercising its discretion the Court should take into account all the
> circumstances of the particular case. (5) In particular, but without prejudice
> to (4), the following matters, where they arise, may be properly regarded:
> (a) In what country the evidence on the issues of fact is situated, or more
> readily available, and the effect of that on the relative convenience and
> expense of trial as between the English and foreign Courts. (b) Whether the
> law of the foreign Court applies and, if so, whether it differs from English
> law in any material respects. (c) With what country either party is
> connected, and how closely. (d) Whether the defendants genuinely desire
> trial in the foreign country, or are only seeking procedural advantages. (e)
> Whether the plaintiffs would be prejudiced by having to sue in the foreign

> Court because they would (i) be deprived of security for that claim; (ii) be
> unable to enforce any judgment obtained; (iii) be faced with a time-bar not
> applicable in England; or (iv) for political, racial, religious or other reasons
> be unlikely to get a fair trial.

**7**    This 1969 British test is best appreciated by what Bastarache J., writing for the Supreme Court, said about it in *Pompey* in 2003. Bastarache J. provided clear guidance as to how it should be understood and applied in Canada.

**8**    The central thrust of the *Pompey* decision is that the law favours the enforcement of forum selection clauses. In a brief overview of the law, Bastarache J. observed "[f]orum selection clauses are common components of international commercial transactions", they have, "been applied for ages in the industry and by the courts", they "are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law", and "[i]t is essential that courts give full weight to the desirability of holding contracting parties to their agreements."

**9**    Bastarache J. noted that there is a similarity between a number of the factors of the test in *The "Eleftheria"* and those considered when applying the *forum non conveniens* doctrine in ordinary cases without a forum selection clause. He then went on to clearly reject the approach of considering the forum selection clause as but one factor of a conventional *forum non conveniens* analysis. He described that kind of analysis as the "unified approach to *forum non conveniens*". He explained that a "different test" and "separate approach" were required. The "starting point", he said, should be "that parties should be held to their bargain". Bastarache J. adopted the view of E. Peel in "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] L.M.C.L.Q. 182, at pp. 189-90, that the unified approach would not:

> ... ensure that full weight is given to the jurisdiction clause since not only should
> the clause itself be taken into account, but also the effect which it has on the
> factors which are relevant to the determination of the natural forum. Factors
> which may otherwise be decisive may be less so if one takes into account that the
> parties agreed in advance to a hearing in a particular forum and must be deemed
> to have done so fully aware of the consequences which that might have on, for
> example, the transportation of witnesses and evidence, or compliance with
> foreign procedure etc.

**10**    Therefore, Bastarache J. rejected the "unified approach to *forum non conveniens*" in favour of a "separate approach" that "ensures that these considerations are properly taken into account and that the parties' agreement is given effect in all but exceptional circumstances." He observed that:

> The "strong cause" test reflects the desirability that parties honour their
> contractual commitments and is consistent with the principles of order and
> fairness at the heart of private international law, as well as those of certainty and

security of transaction at the heart of international commercial transactions.

**11**    Thus, even though the literal wording of the test in *The "Eleftheria"* may imply a conventional *forum non conveniens* analysis, *Pompey* makes clear that such an analysis is not to be used. Rather, the forum selection clause pervades the analysis and must be given full weight in the consideration of other factors. It is not enough for the plaintiff to establish a "strong" case that Ontario is the more convenient forum. The plaintiff must show "strong cause" that the case is exceptional and the forum selection clause should not be enforced.

### 2)    *The motion judge's approach*

**12**    The motion judge in this case conducted a *forum non conveniens* analysis in which she regarded the forum selection clause as but one factor to be considered, and a subsidiary one at that. She did not give full weight to the clause, and she did not consider the effect it had on the factors relevant to the *forum non conveniens* analysis. For example, she considered the location of witnesses and the procedures of the Arizona courts without taking into account that Expedition, by agreeing to the clause, had accepted at the time it entered into the contract that it would have to transport its witnesses to Arizona and resolve any claim it might bring according to the law and procedures of Arizona. In *Pompey*, Bastarache J. was not satisfied that even litigation costs disproportionate to the amount of the claim was reason enough to refuse to enforce a forum selection clause.

**13**    The marginal weight the motion judge placed on the clause is most evident in that part of her reasons where she sets out the argument in favour of enforcing it. There she discusses only factors relevant to *forum non conveniens* and does not even mention the clause. She alludes to the public policy that parties honour their contractual commitments and the principles of order and fairness at the heart of private international law only in setting out Honeywell's position and not in her analysis of the factors.

**14**    The motion judge's failure to use the proper overall approach in applying the test is sufficient reason to set aside her decision. However, it may be of assistance to future cases to discuss the analysis she did conduct.

**15**    The motion judge did not mention that the forum selection clause provided that "THIS AGREEMENT SHALL BE GOVERNED, CONTROLLED AND INTERPRETED UNDER THE LAW OF THE STATE OF ARIZONA". Quite to the contrary, it seems the motion judge may have assumed the case would be governed by the law of the jurisdiction in which it proceeded. She observed that the plaintiff's claim in Arizona might be dismissed because under the law of Arizona the issue would arise as to whether it had been "timely filed", and noted that in Ontario such an issue would not arise. There was no basis for the motion judge's apparent assumption that, if the case proceeded in Ontario, the law of Ontario would apply. The motion judge should have considered that the clause provided that the law of Arizona would apply.

**16**    As it happens, the fresh evidence shows there is no issue of "timely filing" under the law of Arizona. Counsel for Expedition acknowledged that the expert evidence about Arizona law that Expedition filed before the motion judge was directed only to the applicable limitations period in Arizona. In any event, as counsel for Expedition recognized during argument, a party should not be able to take advantage of its own failure to bring an action in the proper jurisdiction in a timely way to create prejudice that would justify excusal from the forum selection clause.

**17**    The motion judge also failed to accord sufficient weight to Expedition's commencement of an action in Arizona. She observed that Expedition's action in Arizona "was instituted to preserve the claim within the limitation period." Be that as it may, instituting an action in Arizona was an act of attornment. Clearly, Expedition has conceded that the Arizona court has jurisdiction and that it is feasible that the claim proceed in Arizona.

**18**    Expedition's institution of an action in Arizona raises the factor of the multiplicity of proceedings. The motion judge discounted this factor because of Expedition's undertaking to abandon the Arizona action if the Ontario action were allowed to proceed. The motion judge should have at least considered whether a judgment obtained in Ontario would be enforced by the court in Arizona if that court concluded that the action should have proceeded in Arizona. Expedition filed no evidence on this issue.

**19**    The motion judge erred by attaching weight to Honeywell's concession that Ontario was the appropriate and convenient forum for the trial of the wrongful death action of the passenger in the helicopter. That action was not governed by the forum selection clause. As explained above, whether Ontario is the convenient forum is not the proper question in a case with a forum selection clause.

**20**    In her analysis, the motion judge should have contrasted the jurisdictions of Arizona and Ontario. Instead, she considered the appropriateness and convenience of the claim proceeding in Arizona on the one hand and Canada on the other. For example, the fact the helicopter crashed in Saskatchewan provides little support for trying the case in Ontario.

**21**    The motion judge considered significant expert evidence indicating that Canadian witnesses were beyond the reach of the Arizona court's subpoena power. She could have made the equivalent observation about the reach of the Ontario court's subpoena power in relation to American witnesses. Given the cross-border methods of obtaining evidence from friendly jurisdictions, this factor was not deserving of weight one way or the other.

**22**    Finally, the motion judge set out only a portion of the test in *The "Eleftheria"*. She omitted the portion of the test that asks whether the plaintiff would be prejudiced by having to sue in a foreign country. While some of her discussion touched on aspects of prejudice to the plaintiff, she did not consider the main concern -- whether the plaintiff could expect a fair trial in the selected forum.

**23**    In this case, there is no reason to depart from the presumption that Expedition should be held

to the bargain that it made. A departure is only justified in "exceptional circumstances", as Bastarache J. stressed in *Pompey*. There is nothing exceptional about this case. As discussed above, the analysis of whether there is "strong cause" to decline to enforce a forum selection clause is not an analysis of the *forum conveniens* in the conventional sense. In this case Expedition may have established that it will experience some inconvenience in the conventional sense in having to assert its claim in Arizona. That inconvenience does not justify permitting it to resile from its agreement in this commercial contract to tolerate that inconvenience.

**24**    A forum selection clause in a commercial contract should be given effect. The factors that may justify departure from that general principle are few. The few factors that might be considered include the plaintiff was induced to agree to the clause by fraud or improper inducement or the contract is otherwise unenforceable, the court in the selected forum does not accept jurisdiction or otherwise is unable to deal with the claim, the claim or the circumstances that have arisen are outside of what was reasonably contemplated by the parties when they agreed to the clause, the plaintiff can no longer expect a fair trial in the selected forum due to subsequent events that could not have been reasonably anticipated, or enforcing the clause in the particular case would frustrate some clear public policy. Apart from circumstances such as these, a forum selection clause in a commercial contract should be enforced.

**25**    None of these factors has been shown in this case. There was no basis to refuse the stay of proceedings.

## C. CONCLUSION

**26**    I would allow the appeal, set aside the order of the motion judge, and enter a stay of proceedings. The appellant's costs of the appeal are fixed in the amount of $25,000.00 inclusive of disbursements and GST. The appellant is entitled to its costs before the motion judge. Those costs shall be in the amount that the motion judge awarded to the respondent.

R.G. JURIANSZ J.A.
 D.R. O'CONNOR A.C.J.O.:-- I agree.
 E.E. GILLESE J.A.:-- I agree.

cp/e/qllxr/qljxr/qljxh/qlhcs/qljyw/qlced/qlana

# TAB 9

DOCSTOR: 2191401\1

*Case Name:*

# Grace Canada Inc. (Re)

**IN THE MATTER OF s. 18.6 of the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF Grace Canada, Inc.**

**[2005] O.J. No. 4868**

17 C.B.R. (5th) 275

2005 CarswellOnt 6648

Court File No. 01-CL-4081

Ontario Superior Court of Justice
Commercial List

**J.M. Farley J.**

Heard: November 14, 2005.
Judgment: November 14, 2005.

(18 paras.)

*Insolvency law -- Practice -- Proceedings in bankruptcy -- Stay of other proceedings -- Stay order
extended upon application of company in bankruptcy protection -- Opposing creditors not entitled
to order that stay did not apply to their claims -- One group of creditors not allowed to get leg up
on others.*

Grace, company in bankruptcy protection, sought extension of stay of three class actions against it
-- Plaintiffs in two actions did not oppose extension -- Plaintiffs in third action did not oppose stay
as long as it did not apply to their action -- Stay extended to April 1, 2006 -- Plaintiffs in third
action not entitled to leg up on other plaintiffs -- Stay was in interest of plaintiffs in all actions in
that it would prevent them from fighting amongst themselves -- Plaintiffs entitled to return to court
if prejudice resulted from extension of stay, or circumstances otherwise changed.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 s. 18.6

**Counsel:**

D. Tay, O. Pasparakis, J. Stam, for the Plaintiffs, Grace Canada Inc.

E. Merchant, for Merv Nordick and Ernest Spencer, et al.

K. Ferbers, for Raven Thundersky

Ian Dick, for the Attorney General of Canada

Michel Bélanger, Jean-Philippe Lincourt and Matt Moloci, for the Association Des Consommatuers Pour La Qualité Dans La Construction and Jean-Charles Dextras, Viviane Brosseau and Léotine Roberge-Turgeon

---

ENDORSEMENT

**1    J.M. FARLEY J.** (endorsement):-- This endorsement applies to the 3 motions of Grace, the Quebec class proceeding and the Manitoba class proceeding.

**2**    The Quebec plaintiffs in their putative class proceedings have worked out an arrangement with the Federal Government. As a result they are not proceeding with their request to lift the stay and other ancillary relief, but without prejudice to it or similar relief being sought if the insolvency/CCAA recognition proceedings get bogged down. The Grace relief was then supported by the Quebec plaintiffs.

**3**    The "Sask" plaintiffs (represented by the Merchant firm) were not opposed to the Grace relief.

**4**    The Manitoba plaintiffs represented by the Atkins firm took the position that the Grace relief was all right so long as it did not apply to their proceedings except that judgment would not be enforced without leave of this court.

**5**    It would seem to me that the various class proceedings would benefit from cooperation and coordination - using the 3 Cs of the Commercial List (communication, cooperation and common sense). Otherwise they will be faced with the practical problem of fighting amongst themselves as to a turf war and running the risk of being divided and therefore susceptible to being conquered.

**6**    The stay is extended to April 1, 2006, and includes proceedings against the Federal Crown related to the Grace proceedings in these class actions. As well the Modified Preliminary Injunction

granted on January 22, 2002, by the US Bankruptcy Court is recognized pending further order of this Court.

**7**    The foregoing does not prevent any of the parties entering into consensual resolutions with the Federal Crown.

**8**    I note that the Grace interests represented before me today indicated that it was their goal to emerge from their insolvency proceedings as soon as reasonably possible but under the guidelines that there be justice for all affected persons.

**9**    I also note that there has been recognition in the US Bankruptcy Court that Canadian proceedings will be governed by Canadian substantive law.

**10**    The foregoing relief granted is pursuant to the principles set out in Babcock & Wilcox Canada Ltd. (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J.) and is in furtherance of the long standing respect for comity extended by the courts of this country for the courts of the US and vice versa.

**11**    It would seem to me that the insolvency adjudicative proceedings would, at least under presently anticipated circumstances, result in a more effective efficient process than would a full-blown class action proceeding.

**12**    I concur with the views of the US court in Maryland Casualty Re respect to the necessity/desirability of a stay against the Federal Crown as a "3rd party" given the interrelated aspects of the claims against the Crown and Grace. There would in my mind be a considerable risk of record taint if the action against the Crown were allowed to proceed on its own without direct Grace evidence and counsel. See also Campeau v. Olympia & York (1992), 14 C.B.R. (3d) 303 (Ont. Gen. Div.); Canada Systems Group (EST) Ltd. v. Allendale Mutual Insurance Co. (1982), 137 D.L.R. (3d) 287 (Ont. H.C.J.), aff'd (1983), 145 D.L.R. (3d) 266 (Ont. Div. Ct.); Re Noma Co., [2004] O.J. No. 4914 (S.C.J.); Re Lehndorff General Partner Ltd. (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div).

**13**    The stay does not affect the ability of the plaintiffs from coming back to court if they feel that there is foot dragging or other elements of prejudice.

**14**    I note that the Federal Crown may accept service of the Sask claim without that being an infringement of the stay now imposed (and previously requested). This is without prejudice to the Crown moving for relief on, say, a limitations point.

**15**    What the Manitoba plaintiffs are in essence requesting is that they obtain a leg up on all other Canadian plaintiffs (and US plaintiffs) and that there be by this court somewhat of a quasi-certification, although indicating that the actual certification would be dealt with by the Manitoba court.

**16**    This would result in a lack of single control in insolvency proceedings which was cautioned against in Sam Levy & Associés v. Azco Mining Inc., [2001] 3 S.C.R. 978. It would also fragment and possibly destabilize the other proceedings by other affected persons (including those claiming for personal injury including serious personal injury). In saying that I in no way wish to or intend to be taken as minimizing the terrible tragedy which has befallen the Thundersky/Bruce family.

**17**    I look forward to seeing that continued timely progress is being made with respect to this insolvency proceeding including the effective efficient way of dealing with personal injury and property damage claims. The information officer should ensure that this court and affected parties including these class action plaintiffs are kept abreast of proposed material developments and their outcome. That is the report on the regular time period basis should be the minimum.

**18**    The motion of the Manitoba plaintiffs is dismissed, but without prejudice to similar or other relief being sought in the future based on a change in circumstances.

J.M. FARLEY J.

cp/e/qw/qlmxf

# TAB 10

DOCSTOR: 2191401\1

*Indexed as:*

**Killough v. Canadian Red Cross Society**


**Between**
**Edward Killough, Patricia Nicholson, Irene Fead,**
**Daphne Martin, Deborah Lutz, and Melanie Crehan,**
**plaintiffs, and**
**The Canadian Red Cross Society, Her Majesty the**
**Queen in Right of the Province of British**
**Columbia, and the Attorney General of**
**Canada, defendants**

**[2001] B.C.J. No. 1481**

2001 BCSC 1060

91 B.C.L.R. (3d) 309

106 A.C.W.S. (3d) 787

Vancouver Registry No. C976108


British Columbia Supreme Court
Vancouver, British Columbia

**K.J. Smith J.**

Heard: February 12 and 13, 2001.
Judgment: July 19, 2001.

(42 paras.)


*Practice -- Persons who can sue and be sued -- Individuals and corporations, status or standing --*
*Class or representative actions -- Class actions, certification, considerations (incl. when class*
*action appropriate) -- Settlements -- Court approval.*


Application by the plaintiffs for an order certifying the action against the Canadian Red Cross
Society as a class action and approving partial settlements reached with the Red Cross and the

provincial Crown. The Public Guardian and Trustee applied for standing to make submission in relation to an application for approval of class-action legal fees. The action concerned the contamination of the Canadian blood supply with the Hepatitis C virus. The plaintiffs argued that the defendants failed to implement tests that could have detected the virus in the blood supply. The action was certified as a class action against the other defendants. The Red Cross was exempted from the order because of a reorganization under the Companies Creditors Arrangement Act. It provided a plan for compensation of persons infected with the virus, which plan was sanctioned by the court in other related applications. The proposed settlements provided an opting out provision for those class members who wished to pursue their own claims, and a bar order with respect to plaintiffs who accepted the settlement.

HELD: The applications by the plaintiffs and by the Public Trustee and Guardian were allowed. The action was certified for settlement purposes. The proposed settlements were fair and reasonable and in the best interests of the class members. The plaintiffs had to face the prospect of lengthy and complex litigation. Some of the plaintiffs were ill and in immediate financial need.

**Statutes, Regulations and Rules Cited:**

British Columbia Supreme Court Rules, Rule 15.

Class Proceedings Act, R.S.B.C. 1996, c. 50, ss. 4, 12, 13, 15, 35.

Companies' Creditors Arrangement Act, R.S.C. 1985, C-36.

Ontario Family Law Act.

**Counsel:**

David A. Klein and David M. Rosenberg, for the plaintiffs.
Ward K. Branch, for the defendant, the Canadian Red Cross Society.
D. Clifton Prowse and Keith L. Johnston, for the defendant, Her Majesty the Queen in Right of the Province of British Columbia.
Paul Vickery and Wendy J.A. Divoky, for the defendant, the Attorney General of Canada.
Duncan J. Manson, for the Public Guardian and Trustee of British Columbia.
Mark G. Underhill, for the Canadian Hemophilia Society.

---

**1    K.J. SMITH J.**:-- This hearing concerned, among other things, applications by the plaintiff Deborah Lutz for orders certifying this action against the defendant The Canadian Red Cross Society ("the Red Cross") as a class action pursuant to the provisions of the Class Proceedings Act, R.S.B.C. 1996, c. 50 (the "Act") and approving partial settlements reached with the Red Cross and

with Her Majesty the Queen In Right of British Columbia ("the provincial government"). The action will continue against the Attorney General of Canada, who is not a party to the proposed settlements.

**2**    As well, the hearing concerned Mr. Manson's application on behalf of the Public Guardian and Trustee for standing to make submissions in relation only to the application for approval of plaintiffs' class-counsel legal fees and disbursements, which will be heard at a date yet to be fixed. Mr. Underhill advised that he appeared on a watching brief for his client, the Canadian Hemophilia Society, and that he anticipated that the issues with which his client is concerned would be worked out by agreement. I assume that they have been.

**3**    The action arises out of the now notorious contamination of the Canadian blood supply with Hepatitis C virus in the last three decades of the twentieth century.

**4**    By order made November 24, 1998, this action was certified as a class action against the defendants other than the Red Cross, which was exempted from the order because, on July 29, 1998, all proceedings against it were stayed or suspended by order of the Ontario Court (General Division) in a proceeding taken in that Court pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, C-36 ("the CCAA proceeding"). As a result of the reorganization of the affairs of the Red Cross in that proceeding, a fund of approximately $63 million was offered for settlement of all claims against the Red Cross made in this action and in parallel actions in Ontario and Quebec arising out of Hepatitis C infections contracted from the Canadian blood supply before January 1, 1986, and between July 1, 1990, and September 28, 1998, which is when the management of the blood supply was transferred from the Red Cross to the Canadian Blood Services and to Hema-Quebec. The offer has been accepted, subject to Court approval in each jurisdiction concerned. The stay of proceedings was lifted by order made in the CCAA proceeding to permit this and the concurrent applications.

**5**    As well, an offer by the provincial government to settle all claims against it in this action for approximately $6.5 million has been presented for approval. This proposed settlement affects only the plaintiffs in this action and is subject to approval by this Court only.

**6**    The class of plaintiffs in this action does not include those who were similarly infected between January 1, 1986, and July 1, 1990, as their claims were settled in separate proceedings: see, for this province, Endean v. Canadian Red Cross Society (1999), 68 B.C.L.R. (3d) 350 (S.C.).

**7**    Hepatitis C is a virus that produces an inflammation of the liver in those infected with it. It can be transmitted through transfusions of blood and blood products, and those infected with it can transmit it to others through sexual contact. As well, it can be transmitted by an infected mother to her fetus. The virus causes no symptoms in some recipients, but its effects on others range from chronic fatigue to death caused by cirrhosis or by heptocellular cancer. There is no known cure for the disease.

**8**    Until 1998, control and management of the Canadian blood supply lay with the Red Cross. For several years, including the material periods of time, it was funded by the federal, provincial, and territorial governments, who formed a committee to oversee the administration of the blood supply and to establish policies for the collection and distribution of blood.

**9**    In the 1970's and 1980's, American scientists developed surrogate, or indirect, tests for Hepatitis C virus in the American blood supply. Studies done in the early 1980's concluded that these tests were effective in identifying the presence of the virus in donated blood. As a result, American blood banks began to employ these tests as early as 1982 and, by about August 1, 1986, they were routinely used by the American Association of Blood Banks and the American Red Cross. However, they were never implemented in the Canadian blood system.

**10**    In the late 1980's, scientists developed a specific test for Hepatitis C that was put into use in the United States, in conjunction with the surrogate tests, to good effect. However, while the Red Cross implemented the specific test in Canada on July 1, 1990, it continued to ignore the surrogate tests. Finally, with the implementation by the Red Cross of a second, more-sensitive specific test in 1992, the Canadian blood system came into harmony with the testing regime in the United States.

**11**    The essence of the plaintiffs' case is that they became infected with the Hepatitis C virus as a result of the failure of the three defendants to implement the surrogate tests and to seasonably introduce the more effective testing regime.

**12**    The purpose of the Companies' Creditors Arrangement Act is to allow insolvent but viable businesses to avoid the precipitate distribution of their assets amongst their creditors by permitting them time to work out a reorganization that will enable them to continue as going concerns. Faced with an overwhelming number of claims arising out of the contaminated blood system, the Red Cross sought protection in the CCAA proceeding to allow it time to attempt to negotiate settlements of all outstanding claims against it, to facilitate the sale of its blood-collection assets to the Canadian Blood Services and to Hema-Quebec, and to enable it thereafter to continue to carry on its humanitarian activities unrelated to the collection and management of the blood supply.

**13**    The Red Cross ultimately filed a plan of compromise and arrangement in the CCAA proceeding that described four classes of creditors, all of whom voted in favour of accepting the plan. On September 14, 2000, Mr. Justice Blair, the judge presiding in the CCAA proceeding, endorsed the plan, describing it as "fair and reasonable" in the context of the Companies Creditors Arrangement Act. He observed that the plan was the culmination of "two years of intense and complex negotiations", and he commended counsel for their efforts in what he characterized as a "difficult and sensitive case."

**14**    The plan provides for a trust fund of approximately $79 million to compensate persons infected with disease as a result of the transfusion of blood or blood products. It is proposed that it be divided as follows:

1. $600,000 for claimants with Creutzfeld-Jacob Disease;
2. $1 million for claimants infected with Hepatitis C from blood collected from prisons in the United States;
3. approximately $63 million (the "HCV Fund") for claimants in this action and the parallel actions in Ontario and Quebec;
4. approximately $13.7 million for those infected with HIV; and
5. $500,000 for transfusion claimants not otherwise provided for.

Mr. Justice Blair's reasons for sanctioning the plan are published in Re Canadian Red Cross Society (2000), 19 C.B.R. (4th) 158; [2000] O.J. No. 3421 (O.S.C.J.).

**15**    The trust fund is comprised, in part, of $8.975 million contributed by what are described as "Plan Participants", that is, certain pharmaceutical companies, hospitals, physicians, and insurers who are exposed to potential liability through claims made against them in litigation by infected claimants. Although the relative merit of their contribution was not apparent, counsel advised that no information was available as to the composition of the contribution or of the reasons motivating the contributors. However, on February 20, 2001, while I had this matter under reserve, Mr. Justice Winkler of the Ontario Superior Court of Justice dismissed the parallel application for settlement approval in Ontario, in McCarthy v. Canadian Red Cross Society, [2001] O.J. No. 567 (O.S.C.J.), with liberty to renew the application on further evidence of the fairness and reasonableness of the contribution to be made by the Plan Participants. As well, he concluded that the initial proposal to pay nothing to family members and relatives of infected persons - described as "derivative claimants" - was not satisfactory.

**16**    As a result, counsel asked me to withhold judgment on this application until those issues should be resolved in Ontario. Further evidence was filed and submissions made in Ontario and, as well, the proposed settlement was amended to provide for modest payments to derivative claimants. Consequently, on June 22, 2001, Winkler J. approved the proposed settlement: see McCarthy v. Canadian Red Cross Society, [2001] O.J. No. 2474 (O.S.C.J.).

**17**    Counsel advise that the proposed settlement has also been approved by Tingley J. of the Quebec Superior Court, on July 10, 2001, with reasons to follow.

**18**    Recently, counsel filed further materials in this action to address the contribution of the Plan Participants, which included the evidence that was placed before Winkler J. in connection with that issue. They also filed a motion to add the Plan Participants as parties for purposes of this application. Since then, further materials have been filed. After being advised by all counsel that none take any issue with the materials filed, and that none oppose the joinder of the Plan Participants or the approval of the proposed settlement, I have concluded that I can give judgment without a further oral hearing.

**19**    The proposed settlement with the provincial government has a different genesis than that with the Red Cross. During the CCAA proceeding it came to the attention of counsel for the

representative plaintiffs in this action that the provincial government had asserted a claim of lien for approximately $6.5 million against a building in Vancouver owned by the Red Cross. Plaintiffs' counsel were subsequently able to negotiate an agreement with the provincial government for the contribution of that lien claim in full settlement of claims against it in this action. On September 26, 2000, Blair J. approved the proof of claim for the lien and ordered the monitor in the CCAA proceeding to hold the amount of the lien and accrued interest in trust, on the basis that the money would ultimately be paid to the plaintiffs in this action which, he observed, "is consistent with the whole philosophy of the Red Cross Plan." If the settlement with the provincial government is approved, that fund, including accrued interest, will be paid to the credit of plaintiffs in this action. If the settlement is not approved, the money will be paid to the provincial government.

**20**    By virtue of s. 35 of the Act, these two settlements must be approved by this Court to be effective. The proper approach to the applications for approval is now well-settled and is set out in Dabbs v. Sun Life Assurance Co. of Canada (1998), 40 O.R. (3d) 429 (O.C.(G.D.)), flld. in Endean v. Canadian Red Cross, supra, at paras. 13, 14. The Court must be satisfied that the proposed settlement is fair, reasonable, and in the best interests of those affected by it and, in that exercise, must be concerned with the interests of the class as a whole rather than the interests of particular members of the class. The Court should consider such factors as the likelihood of recovery or success in the action; the amount and nature of discovery evidence obtained; the terms of the proposed settlement; the recommendations and experience of counsel; the cost and likely duration of the litigation if the settlement should not be approved; the recommendations of neutral parties, if any; the number and nature of objections; and the presence of good faith and absence of collusion. In short, the court should weigh the competing positions of the parties in the lawsuit, consider the risks and costs of a trial, and exercise "an objective, impartial and independent assessment of the fairness of the settlement in all the circumstances": Dabbs, para. 15.

**21**    I will deal first with the proposed settlement with the Red Cross.

**22**    As counsel advise that it is urgent that a decision be made in this matter because the settlement offers will lapse if not accepted by July 31, 2001, I will not take the time to set out in detail the results of my deliberations on the evidence. The proposal is described and analyzed by Mr. Justice Winkler in paragraphs 12 to 14 of his reasons for judgment in McCarthy v. Canadian Red Cross Society, [2001] O.J. No. 2474. After considering the evidence filed and the submissions of counsel, I agree with and adopt his remarks. As well, the additional evidence filed in relation to the contribution of the Plan Participants satisfies me, as it satisfied Winkler J. at paragraphs 16-17 of his reasons, that it is fair and reasonable in the circumstances.

**23**    I would add that the issue relating to derivative claims does not have the same prominence in British Columbia as it does in Ontario because of statutory provisions of the Ontario Family Law Act that have no counterpart in this province. The payments to claimants in this category will be modest but the claims, even if successful at trial, would be modest as well, and it is sensible in the circumstances to maximize the settlement benefits to the primary claimants. Such an approach has

received judicial approbation in similar circumstances: see Knowles v. Wyeth-Ayerst Canada Inc., [2001] O.J. No. 1812 (O.S.C.J.) at para. 20.

**24**    It is very likely that the settlement funds offered by the provincial government are all that will be available to the class plaintiffs from that source, short of a successful lawsuit. The settlement plan provides that there will be a single administrator of the HCV Fund for this action and the actions in Ontario and Quebec and it is proposed that it will also administer the $6.5 million on behalf of the claimants in this action. The settlement funds contributed by the provincial government will be distributed equally to entitled claimants in this action. Thus, every member of the class in this action who qualifies for payment from the settlement with the Red Cross will receive an additional payment from these funds and the cost of administration of this settlement has been minimized.

**25**    The litigation risks facing the class plaintiffs in this case are daunting, and the chances of a successful outcome against the Red Cross and the province are not high. Although no discoveries have been conducted, the plaintiffs have had the benefit of the results of the Krever Inquiry into the Canadian blood supply, which thoroughly canvassed the events material to this lawsuit. Thus, counsel's recommendation of the settlement has a firm foundation in fact, and is enhanced by the extensive experience of counsel in personal-injury litigation generally and in blood-related litigation and class actions.

**26**    Moreover, the costs of litigating this action in a typical case would be out of all proportion to the risk and the reasonably anticipated reward, both in terms of monetary expenditures and in terms of the intangible costs of delay in receipt of payment. On the other hand, the settlement provides that those class members who wish to pursue their claims individually may opt out of the settlement and do so.

**27**    Further, the representative plaintiff, after consultation with a committee comprised of other members of the class, urges the Court to approve the settlement. As stated by plaintiffs' counsel, their reasons include the high risk of losing at trial; the fact that many class members are ill and dying and are in immediate financial need; the uncertainty of achieving a better settlement and the risk of losing this settlement entirely if it should be rejected at this point; the fact that this is a partial settlement and that there is still the prospect of additional recovery from the Attorney General of Canada; and the fact that some class members are tired of the fight and want to bring it to an end. In my view, these reasons provide cogent support for their desire to accept the settlement offers.

**28**    A term of the proposed settlement is that there will be "bar orders" granted to prohibit class members from asserting claims in future against the settling defendants, Plan Participants, or any other person who might claim contribution or indemnity or otherwise claim over against the settling defendants or the Plan Participants. The latter category includes any claims made or to be made against the Attorney General of Canada that assert vicarious liability for the fault of the Canadian Red Cross. Without such a bar order, the settlement will fail, since the settling parties will not have

the security of a cap on their potential liability.

**29**    Jurisdiction to grant a bar order is given by s. 12 and s. 13 of the Act: Sawatzky v. Societe Chirurgicale Instrumentarium Inc. (1999), 71 B.C.L.R. (3d) 51 (S.C.) at paras. 38-45. The circumstances are such here that a bar order in the terms sought is appropriate.

**30**    Several written submissions were received from objectors, some of whom were class members and others of whom were interested in the matter for various reasons. The gist of their objections is that the provincial government is not contributing sufficient compensation. In particular, they object that British Columbia, unlike some other provinces, has not made no-fault benefits available to infected persons as was recommended by the Krever Inquiry. These are extra-judicial, political concerns. My function on this application is to assess the settlement proposal that has been presented. I have no power or jurisdiction to amend it; I may only approve it or reject it.

**31**    Considering all of the factors that I am bound to consider, I am satisfied that the proposed settlement with the Red Cross and with the provincial government is fair and reasonable and in the best interests of the class members, and I approve it.

**32**    Further, I am satisfied that the requirements for certification under s. 4 of the Act have been met and I certify the action for settlement purposes, as requested and as consented to by all parties.

**33**    As well, I am satisfied that the Plan Participants should be added as defendants on their motion for that purpose, and that application is granted.

**34**    Finally, I am satisfied that KPMG Inc. is suitable to be the administrator of the settlement plan and I approve its appointment in that capacity.

**35**    The application to approve class counsel's legal fees is the subject of a concurrent application to be heard on a date to be fixed. In that regard, Mr. Manson, counsel for the Public Guardian and Trustee filed a motion seeking:

      1.    an order pursuant to Rule 15 of the Rules of Court adding his client as a party representing class members who are infants or mentally incapable adults;

      2.    alternatively, an order pursuant to s. 15 of the Act permitting his client to participate in this proceeding as a representative of class members who are infants or mentally incapable adults;

      3.    alternatively, an order that his client be appointed amicus curiae or be granted intervener status to represent the interests of class members who are infants or mentally incapable adults.

**36**    Mr. Manson made no submission on his application pursuant to Rule 15 of the Rules of Court.

**37**    Section 15 of the Act provides:

> (1)    In order to ensure the fair and adequate representation of the interests of
>         the class or any subclass or for any other appropriate reason, the court may,
>         at any time in a class proceeding, permit one or more class members to
>         participate in the proceeding.
>
> (2)    Participation under subsection (1) must be in the manner and on the terms,
>         including terms as to costs, that the court considers appropriate.

**38**    While there may be cases where the Public Guardian and Trustee should be given some sort of formal standing, pursuant to s. 15 or otherwise, on an application for approval of class-counsel fees, there is no evidence of anything unique or unusual about this case that would warrant the granting of orders such as those sought by Mr. Manson.

**39**    Some comments of Winkler J. in *McCarthy v. Canadian Red Cross Society*, [2001] O.J. No. 2474, at para. 21, are apt, however, in this context. He said:

> ... a class proceeding by its very nature involves the issuance of orders or judgments that affect persons who are not before the Court. These absent class members are dependent on the Court to protect their interests. . . . The Court is not equipped, nor should it be required, to engage in a forensic investigation into the material or to mine the record to inform itself. Counsel must direct the Court to all relevant information that would impact on the Court's determination. This is especially important where the motion is for the approval of settlement agreements, class counsel fees or consent certifications for the purpose of settlement.

**40**    Counsel have an inherent conflict of interest on applications for approval of their own fees and disbursements. While those of us who are trained in the workings of the legal system understand that counsel put aside their own self-interest in such matters, as they are ethically bound to do, decisions that take into account the objective, perhaps adversarial, submissions of other interested parties will generally better withstand scrutiny. Accordingly, if the Public Guardian and Trustee wishes to address the Court on behalf of legally incapable persons in the class, it is my view that the Court should hear those submissions.

**41**    Section 12 of the Act clothes the Court with a very broad discretion. It provides:

12

> The court may at any time make any order it considers appropriate respect-
> ing the conduct of a class proceeding to ensure its fair and expeditious de-
> termination and, for that purpose, may impose on one or more of the parties
> the terms it considers appropriate.

It would assist the Court to have the perspectives of the Public Guardian and Trustee on the

proposed class-counsel fees. Therefore, it would be appropriate in this case, in order to ensure the fair and expeditious determination of this issue, to order that counsel for the Public Guardian and Trustee may be heard on the application to approve class-counsel fees. Counsel may speak to terms, if necessary.

**42**     There will be orders accordingly. I would add that payment of benefits to claimants should not be delayed simply to permit the approval of class-counsel fees. If necessary, the administrator should hold back a proportionate part of each benefit payment pending resolution of that issue.

K.J. SMITH J.

cp/i/qldrk/qlcmk

# TAB 11

DOCSTOR: 2191401\1

*Indexed as:*
# Microbiz Corp. v. Classic Software Systems Inc.

**Between**
**Microbiz Corporation, respondent/plaintiff, and**
**Classic Software Systems Incorporated, applicant/defendant**

**[1996] O.J. No. 5094**

45 C.B.R. (3d) 40

Doc. Toronto 95-CU-93753

Ontario Court of Justice (General Division)

**Lederman J.**

October 9, 1996.

*Bankruptcy -- Proposals -- Effect of proposal -- Stay of proceedings, what proceedings stayed.*

Motion respecting two actions by creditors Classic and Haggerty against the bankrupt Microbiz. Microbiz was a New Jersey corporation and it filed for bankruptcy in the U.S. Microbiz's plan of reorganization was approved by the U.S. Bankruptcy Court and confirmed by judgment. Both Haggerty and Classic recognized the judgment and filed proofs of claim in the U.S. proceedings.

HELD: Motion allowed. The Haggerty and Classic actions were stayed until further order. It was beneficial that Haggerty and Classic participate in the U.S. proceedings rather than obtain judgment in separate proceedings in Ontario and in New Jersey. By filing their proofs of claim, Classic and Haggerty attorned to the jurisdiction of the U.S. court in New Jersey. Multiplicity of proceedings in different jurisdictions should be avoided.

**Counsel:**

Peter J. Lukasiewicz, for the plaintiff, Microbiz Corporation.
No other counsel mentioned.

**1    LEDERMAN J.**:-- Mr. Peter Lukasiewicz for MicroBiz, Ms. Julia Scatz for Haggerty, Ms. I. Sutherland (not a lawyer) for Classic, with leave of the court. Ms. Sutherland served yesterday with volumes of documents requested adjournment of this action and 95-CU-102723. On consent, both actions adjourned to October 9, 1996, a date set by the Registrar of Motions.

**2**    Costs of today reserved to the Judge who disposes of these motions.

**3**    MicroBiz is a New Jersey corporation with its headquarters in that State. It carries on business in the U.S. It carries on business in Ontario only through its distributor, Classic Software. MicroBiz has no assets in Ontario. When it filed for bankruptcy in the U.S. on March 12, 1996 pursuant to the U.S. Bankruptcy Code, an automatic stay of all proceedings against it went into effect (as is the case under Canadian bankruptcy laws). MicroBiz's plan of reorganization was confirmed by judgment of Justice Winfield of the U.S. Bankruptcy Court on September 3, 1996. The plan of reorganization provides for distribution to all creditors whose claims are accepted, after adjudication if necessary, of 17.5% of their claims. There is no doubt that under the principles laid down in the Morguard Investments case, that judgment of the U.S. Court should be recognized in Canada as there is a real and substantial connection between the U.S. Court's judgment and the subject matter of the proceeding. More importantly, both Classic Software and Haggerty have recognized the judgment and in fact have filed Proofs of Claim in the U.S. proceeding to take advantage of the mechanism provided therein for adjudication of their claims and recovery to the extent of 17.5% of their proven claims. To participate in the U.S. proceedings is beneficial in that it allows Classic and Haggerty to prove their claims and obtain collection in one proceeding rather than obtain judgment on their claims in Ontario and in a separate proceeding in New Jersey seek to effect recovery against the estate of MicroBiz. By filing their Proofs of Claim, Classic and Haggerty have thereby altorned to the jurisdiction of the U.S. Court in New Jersey.

**4**    Multiplicity of proceedings in two different jurisdictions should be avoided.

**5**    Accordingly, there must be an order staying both Haggerty action and the Classic action in Ontario until further order of the court.

**6**    Costs of the motions are fixed at $750.00 payable by Classic and Haggerty forthwith.

LEDERMAN J.

qp/s/aaa

# TAB 12

DOCSTOR: 2191401\1

*Case Name:*

# Muscletech Research and Development Inc. (Re)

**IN THE MATTER OF the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF Muscletech Research and
Development Inc. and those entities listed on Schedule
"A" hereto\***
**[\* Editor's note: Schedule A was not attached to
the copy received from the Court and therefore is not
included in the judgment.]**

[**2006] O.J. No. 167**

19 C.B.R. (5th) 54

2006 CarswellOnt 264

Court File No. 06-CL-6241

Ontario Superior Court of Justice
Commercial List

**J.M. Farley J.**

Heard: January 18, 2006.
Judgment: January 18, 2006.

(6 paras.)

*Creditors and debtors -- Legislation -- Debtors' relief -- Companies' Creditors Arrangement Act --
Application by Muscletech Research and Development for stay of litigation proceedings against it
allowed -- Muscletech met threshold of Companies' Creditors Arrangement Act -- All related
actions stayed, as it was practical to deal with entire litigation at once -- Stay facilitated entering
into of discussions to lay foundation for a reorganization plan.*

Application by Muscletech Research and Development for stay of litigation proceedings against it --
Muscletech's assets exceeded determined and contingent liabilities and debt of Muscletech's

corporate group exceeded $5 million -- HELD: Application allowed -- Muscletech met threshold under Companies' Creditors Arrangement Act -- As product liability situation of third parties derived from claims against Muscletech, all proceedings were stayed as it was practical to deal with entire situation at once -- Stay facilitated entering into of discussions to lay foundation for a reorganization plan.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36

United States Bankruptcy Code Chapter 15

**Counsel:**

Jay Carfagnini, for MuscleTech Research and Development Inc. et al.

Derrick Tay, for Paul Gardiner and Lovate Health Sciences Inc.

Natasha MacParland, for RSM Richter Inc., proposed Monitor

---

ENDORSEMENT

**1    J.M. FARLEY J.** (endorsement):-- This is a short endorsement which may be elaborated upon.

**2**    I am satisfied that the applicants are insolvent given their imbalance of assets to debt (both determined and contingent liability as to product liability suits) and that the debt of the applicant group is over the $5 million threshold as to the CCAA test.

**3**    The product liability situation vis-à-vis the non-applicants appears to be in essence derivative of claims against the applicants and it would neither be logical nor practical/functional to have that product liability litigation not be dealt with on an all encompassing basis: see Re Lehndorff General Partners Ltd. (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div.); Re T. Eaton Co. (1997), 46 C.B.R. (3d) 293 (Ont. Gen. Div.); Campeau v. Olympia & York Development Ltd. (1993), 14 C.B.R. (3d) 303 (Ont. Gen. Div.). It is understood that this stay will likely facilitate the entering into of overall bona fide resolution meetings/discussions which would form the foundation of a plan of reorganization and compromise.

**4**    I further understand that the applicants, all of which are Canadian companies registered in Ontario and with the substantial connections to this jurisdiction as set out a paragraph 67 of the applicants' factum:

67.   In addition to the location of each Applicant's registered office, it is respectfully submitted that the following factors further support a finding that each Applicant's COMI is Ontario, Canada:

(a) each of the Applicants was incorporated in Ontario;

(b)   each Applicant's mailing address is an Ontario address;

(c)   the principals, directors and officers of the Applicants are residents of Ontario;

(d)   all decision-making and control in respect of the Applicants, including product development, takes place at the Applicants' premises located in Ontario;

(e)   the Applicants' principal banking arrangements have been conducted in Ontario through the Canadian Imperial Bank of Commerce; and

(f)   all administrative functions associated with the Applicants and all of the employees that perform such functions, including general accounting, financial reporting, budgeting and cash management, are conducted and situated in Ontario.

will be making an application later today in the Southern District of New York U.S. Bankruptcy Court for recognition, pursuant to Chapter 15 of the US Bankruptcy Code, of the Initial Order which I am granting. In that respect, I would observe that as I discussed in Re Babcock & Wilcox Ltd. (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J.), the courts of Canada and of the US have long enjoyed a firm and ongoing relationship based on comity and commonalities of principles as to, inter alia, bankruptcy and insolvency.

**5**   As this order today is being requested without notice to persons who may be affected, I would stress that these persons are completely at liberty and encouraged to use the comeback clause found at paragraph 59 of the Initial Order. In that respect, notwithstanding any order having previously been given, the onus rests with the applicants (and the applicants alone) to justify ab initio the relief requested and previously granted. Comeback relief, however, cannot prejudicially affect the position of parties who have relied bona fide on the previous order in question. This endorsement is to be provided to the creditors and others receiving notice.

**6**   Order to issue as per my fiat.

J.M. FARLEY J.

cp/e/qw/qlesm

# TAB 13

DOCSTOR: 2191401\1

*Case Name:*

# Nortel Networks Corp. (Re)


**RE:IN THE MATTER OF the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a Plan of Compromise or Arrangement of
Nortel Networks Corporation, Nortel Networks Limited, Nortel
Networks Global Corporation, Nortel Networks International
Corporation and Nortel Networks Technology Corporation,
Applicants
APPLICATION UNDER the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36, as amended**

**[2009] O.J. No. 3169**

55 C.B.R. (5th) 229

2009 CarswellOnt 4467

Court File No. 09-CL-7950


Ontario Superior Court of Justice
Commercial List

**G.B. Morawetz J.**

Heard: June 29, 2009.
Judgment: June 29, 2009.
Released: July 23, 2009.

(59 paras.)

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters --
Application of Act -- Debtor company -- Motion by applicants for approval of bidding procedure
and Sale Agreement allowed -- Applicants had been granted CCAA protection and were involved in
insolvency procedures in four other countries -- Bidding procedures set deadline for entry and
involved auction -- Sale Agreement was for some of applicants' business units -- Neither proposal
involved formal plan of compromise with creditors or vote, but CCAA was flexible and could be
broadly interpreted to ensure objective of preserving business was met -- Proposal was warranted,*

*beneficial and there was no viable alternative.*

Motion by the applicants for the approval of their proposed bidding process and Sale Agreement. The applicants had been granted CCAA protection and were involved in insolvency proceedings in four other countries. The Monitor approved of the proposal. The bidding process set a deadline for bids and involved an auction. The Sale Agreement was for some of the applicants' business units. The applicants argued the proposal was the best way to preserve jobs and company value. The purchaser was to assume both assets and liabilities. There was no formal plan for compromise with creditors or vote planned.

HELD: Motion allowed. The CCAA was flexible and could be broadly interpreted to ensure that its objectives of preserving the business were achieved. The proposal was warranted and beneficial and there was no viable alternative. A sealing order was also made with respect to Appendix B, which contained commercially sensitive documents.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11(4)

**Counsel:**

Derrick Tay and Jennifer Stam, for Nortel Networks Corporation, et al.

Lyndon Barnes and Adam Hirsh, for the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited.

J. Carfagnini and J. Pasquariello, for Ernst & Young Inc., Monitor.

M. Starnino, for the Superintendent of Financial Services and Administrator of PBGF.

S. Philpott, for the Former Employees.

K. Zych, for Noteholders.

Pamela Huff and Craig Thorburn, for MatlinPatterson Global Advisors LLC, MatlinPatterson Global Opportunities Partners III L.P. and Matlin Patterson Opportunities Partners (Cayman) III L.P.

David Ward, for UK Pension Protection Fund.

Leanne Williams, for Flextronics Inc.

Alex MacFarlane, for the Official Committee of Unsecured Creditors.

Arthur O. Jacques and Tom McRae, for Felske and Sylvain (de facto Continuing Employees' Committee).

Robin B. Schwill and Matthew P. Gottlieb, for Nortel Networks UK Limited.

A. Kauffman, for Export Development Canada.

D. Ullman, for Verizon Communications Inc.

G. Benchetrit, for IBM.

---

### ENDORSEMENT

G.B. MORAWETZ J.:--

## INTRODUCTION

**1**   On June 29, 2009, I granted the motion of the Applicants and approved the bidding procedures (the "Bidding Procedures") described in the affidavit of Mr. Riedel sworn June 23, 2009 (the "Riedel Affidavit") and the Fourteenth Report of Ernst & Young, Inc., in its capacity as Monitor (the "Monitor") (the "Fourteenth Report"). The order was granted immediately after His Honour Judge Gross of the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") approved the Bidding Procedures in the Chapter 11 proceedings.

**2**   I also approved the Asset Sale Agreement dated as of June 19, 2009 (the "Sale Agreement") among Nokia Siemens Networks B.V. ("Nokia Siemens Networks" or the "Purchaser"), as buyer, and Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks, Inc. ("NNI") and certain of their affiliates, as vendors (collectively the "Sellers") in the form attached as Appendix "A" to the Fourteenth Report and I also approved and accepted the Sale Agreement for the purposes of conducting the "stalking horse" bidding process in accordance with the Bidding Procedures including, the Break-Up Fee and the Expense Reimbursement (as both terms are defined in the Sale Agreement).

**3**   An order was also granted sealing confidential Appendix "B" to the Fourteenth Report containing the schedules and exhibits to the Sale Agreement pending further order of this court.

**4**   The following are my reasons for granting these orders.

**5**   The hearing on June 29, 2009 (the "Joint Hearing") was conducted by way of video conference with a similar motion being heard by the U.S. Court. His Honor Judge Gross presided over the

hearing in the U.S. Court. The Joint Hearing was conducted in accordance with the provisions of the Cross-Border Protocol, which had previously been approved by both the U.S. Court and this court.

**6**    The Sale Agreement relates to the Code Division Multiple Access ("CMDA") business Long-Term Evolution ("LTE") Access assets.

**7**    The Sale Agreement is not insignificant. The Monitor reports that revenues from CDMA comprised over 21% of Nortel's 2008 revenue. The CDMA business employs approximately 3,100 people (approximately 500 in Canada) and the LTE business employs approximately 1,000 people (approximately 500 in Canada). The purchase price under the Sale Agreement is $650 million.

## BACKGROUND

**8**    The Applicants were granted CCAA protection on January 14, 2009. Insolvency proceedings have also been commenced in the United States, the United Kingdom, Israel and France.

**9**    At the time the proceedings were commenced, Nortel's business operated through 143 subsidiaries, with approximately 30,000 employees globally. As of January 2009, Nortel employed approximately 6,000 people in Canada alone.

**10**    The stated purpose of Nortel's filing under the CCAA was to stabilize the Nortel business to maximize the chances of preserving all or a portion of the enterprise. The Monitor reported that a thorough strategic review of the company's assets and operations would have to be undertaken in consultation with various stakeholder groups.

**11**    In April 2009, the Monitor updated the court and noted that various restructuring alternatives were being considered.

**12**    On June 19, 2009, Nortel announced that it had entered into the Sale Agreement with respect to its assets in its CMDA business and LTE Access assets (collectively, the "Business") and that it was pursuing the sale of its other business units. Mr. Riedel in his affidavit states that Nortel has spent many months considering various restructuring alternatives before determining in its business judgment to pursue "going concern" sales for Nortel's various business units.

**13**    In deciding to pursue specific sales processes, Mr. Riedel also stated that Nortel's management considered:

   (a)    the impact of the filings on Nortel's various businesses, including deterioration in sales; and
   (b)    the best way to maximize the value of its operations, to preserve jobs and to continue businesses in Canada and the U.S.

**14**    Mr. Riedel notes that while the Business possesses significant value, Nortel was faced with the reality that:

(a)  the Business operates in a highly competitive environment;
(b)  full value cannot be realized by continuing to operate the Business through a restructuring; and
(c)  in the absence of continued investment, the long-term viability of the Business would be put into jeopardy.

**15**  Mr. Riedel concluded that the proposed process for the sale of the Business pursuant to an auction process provided the best way to preserve the Business as a going concern and to maximize value and preserve the jobs of Nortel employees.

**16**  In addition to the assets covered by the Sale Agreement, certain liabilities are to be assumed by the Purchaser. This issue is covered in a comprehensive manner at paragraph 34 of the Fourteenth Report. Certain liabilities to employees are included on this list. The assumption of these liabilities is consistent with the provisions of the Sale Agreement that requires the Purchaser to extend written offers of employment to at least 2,500 employees in the Business.

**17**  The Monitor also reports that given that certain of the U.S. Debtors are parties to the Sale Agreement and given the desire to maximize value for the benefit of stakeholders, Nortel determined and it has agreed with the Purchaser that the Sale Agreement is subject to higher or better offers being obtained pursuant to a sale process under s. 363 of the U.S. Bankruptcy Code and that the Sale Agreement shall serve as a "stalking horse" bid pursuant to that process.

**18**  The Bidding Procedures provide that all bids must be received by the Seller by no later than July 21, 2009 and that the Sellers will conduct an auction of the purchased assets on July 24, 2009. It is anticipated that Nortel will ultimately seek a final sales order from the U.S. Court on or about July 28, 2009 and an approval and vesting order from this court in respect of the Sale Agreement and purchased assets on or about July 30, 2009.

**19**  The Monitor recognizes the expeditious nature of the sale process but the Monitor has been advised that given the nature of the Business and the consolidation occurring in the global market, there are likely to be a limited number of parties interested in acquiring the Business.

**20**  The Monitor also reports that Nortel has consulted with, among others, the Official Committee of Unsecured Creditors (the "UCC") and the bondholder group regarding the Bidding Procedures and is of the view that both are supportive of the timing of this sale process. (It is noted that the UCC did file a limited objection to the motion relating to certain aspects of the Bidding Procedures.)

**21**  Given the sale efforts made to date by Nortel, the Monitor supports the sale process outlined in the Fourteenth Report and more particularly described in the Bidding Procedures.

**22**  Objections to the motion were filed in the U.S. Court and this court by MatlinPatterson Global Advisors LLC, MatlinPatterson Global Opportunities Partners III L.P. and Matlin Patterson

Opportunities Partners (Cayman) III L.P. (collectively, "MatlinPatterson") as well the UCC.

**23**     The objections were considered in the hearing before Judge Gross and, with certain limited exceptions, the objections were overruled.

## ISSUES AND DISCUSSION

**24**     The threshold issue being raised on this motion by the Applicants is whether the CCAA affords this court the jurisdiction to approve a sales process in the absence of a formal plan of compromise or arrangement and a creditor vote. If the question is answered in the affirmative, the secondary issue is whether this sale should authorize the Applicants to sell the Business.

**25**     The Applicants submit that it is well established in the jurisprudence that this court has the jurisdiction under the CCAA to approve the sales process and that the requested order should be granted in these circumstances.

**26**     Counsel to the Applicants submitted a detailed factum which covered both issues.

**27**     Counsel to the Applicants submits that one of the purposes of the CCAA is to preserve the going concern value of debtors companies and that the court's jurisdiction extends to authorizing sale of the debtor's business, even in the absence of a plan or creditor vote.

**28**     The CCAA is a flexible statute and it is particularly useful in complex insolvency cases in which the court is required to balance numerous constituents and a myriad of interests.

**29**     The CCAA has been described as "skeletal in nature". It has also been described as a "sketch, an outline, a supporting framework for the resolution of corporate insolvencies in the public interest". *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp*. (2008), 45 C.B.R. (5th) 163 (Ont. C.A.), at paras. 44, 61, leave to appeal refused, [2008] S.C.C.A. No. 337. ("ATB Financial").

**30**     The jurisprudence has identified as sources of the court's discretionary jurisdiction, *inter alia*:

> (a)     the power of the court to impose terms and conditions on the granting of a stay under s. 11(4) of the CCAA;
>
> (b)     the specific provision of s. 11(4) of the CCAA which provides that the court may make an order "on such terms as it may impose"; and
>
> (c)     the inherent jurisdiction of the court to "fill in the gaps" of the CCAA in order to give effect to its objects. *Re Canadian Red Cross Society* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div.) at para. 43; *Re PSINet Ltd.* (2001), 28 C.B.R. (4th) 95 (Ont. S.C.J.) at para. 5, *ATB Financial, supra*, at paras. 43-52.

**31**     However, counsel to the Applicants acknowledges that the discretionary authority of the court

under s. 11 must be informed by the purpose of the CCAA.

> Its exercise must be guided by the scheme and object of the Act and by the legal principles that govern corporate law issues. *Re Stelco Inc.* (2005), 9 C.B.R. (5th) 135 (Ont. C.A.) at para. 44.

**32**    In support of the court's jurisdiction to grant the order sought in this case, counsel to the Applicants submits that Nortel seeks to invoke the "overarching policy" of the CCAA, namely, to preserve the going concern. *Re Residential Warranty Co. of Canada Inc*. (2006), 21 C.B.R. (5th) 57 (Alta. Q.B.) at para. 78.

**33**    Counsel to the Applicants further submits that CCAA courts have repeatedly noted that the purpose of the CCAA is to preserve the benefit of a going concern business for all stakeholders, or "the whole economic community":

> The purpose of the CCAA is to facilitate arrangements that might avoid liquidation of the company and allow it to continue in business to the benefit of the whole economic community, including the shareholders, the creditors (both secured and unsecured) and the employees. *Citibank Canada v. Chase Manhattan Bank of Canada* (1991), 5 C.B.R. (3rd) 165 (Ont. Gen. Div.) at para. 29. *Re Consumers Packaging Inc*. (2001) 27 C.B.R. (4th) 197 (Ont. C.A.) at para. 5.

**34**    Counsel to the Applicants further submits that the CCAA should be given a broad and liberal interpretation to facilitate its underlying purpose, including the preservation of the going concern for the benefit of all stakeholders and further that it should not matter whether the business continues as a going concern under the debtor's stewardship or under new ownership, for as long as the business continues as a going concern, a primary goal of the CCAA will be met.

**35**    Counsel to the Applicants makes reference to a number of cases where courts in Ontario, in appropriate cases, have exercised their jurisdiction to approve a sale of assets, even in the absence of a plan of arrangement being tendered to stakeholders for a vote. In doing so, counsel to the Applicants submits that the courts have repeatedly recognized that they have jurisdiction under the CCAA to approve asset sales in the absence of a plan of arrangement, where such sale is in the best interests of stakeholders generally. *Re Canadian Red Cross Society, supra*, *Re PSINet, supra*, *Re Consumers Packaging, supra*, *Re Stelco Inc*. (2004), 6 C.B.R. (5th) 316 (Ont. S.C.J.) at para. 1, *Re Tiger Brand Knitting Co*. (2005) 9 C.B.R. (5th) 315, *Re Caterpillar Financial Services Ltd. v. Hardrock Paving Co*. (2008), 45 C.B.R. (5th) 87 and *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3rd) 24 (Ont. Gen. Div.).

**36**    In *Re Consumers Packaging, supra*, the Court of Appeal for Ontario specifically held that a sale of a business as a going concern during a CCAA proceeding is consistent with the purposes of the CCAA:

The sale of Consumers' Canadian glass operations as a going concern pursuant to the Owens-Illinois bid allows the preservation of Consumers' business (albeit under new ownership), and is therefore consistent with the purposes of the CCAA.

... we cannot refrain from commenting that Farley J.'s decision to approve the Owens-Illinois bid is consistent with previous decisions in Ontario and elsewhere that have emphasized the broad remedial purpose of flexibility of the CCAA and have approved the sale and disposition of assets during CCAA proceedings prior to a formal plan being tendered. *Re Consumers Packaging, supra, at paras. 5, 9.*

**37**    Similarly, in *Re Canadian Red Cross Society, supra*, Blair J. (as he then was) expressly affirmed the court's jurisdiction to approve a sale of assets in the course of a CCAA proceeding before a plan of arrangement had been approved by creditors. *Re Canadian Red Cross Society, supra*, at paras. 43, 45.

**38**    Similarly, in *PSINet Limited, supra*, the court approved a going concern sale in a CCAA proceeding where no plan was presented to creditors and a substantial portion of the debtor's Canadian assets were to be sold. Farley J. noted as follows:

[If the sale was not approved,] there would be a liquidation scenario ensuing which would realize far less than this going concern sale (which appears to me to have involved a transparent process with appropriate exposure designed to maximize the proceeds), thus impacting upon the rest of the creditors, especially as to the unsecured, together with the material enlarging of the unsecured claims by the disruption claims of approximately 8,600 customers (who will be materially disadvantaged by an interrupted transition) plus the job losses for approximately 200 employees. *Re PSINet Limited, supra*, at para. 3.

**39**    In *Re Stelco Inc.*, *supra*, in 2004, Farley J. again addressed the issue of the feasibility of selling the operations as a going concern:

I would observe that usually it is the creditor side which wishes to terminate CCAA proceedings and that when the creditors threaten to take action, there is a realization that a liquidation scenario will not only have a negative effect upon a CCAA applicant, but also upon its workforce. Hence, the CCAA may be employed to provide stability during a period of necessary financial and operational restructuring - and if a restructuring of the "old company" is not feasible, then there is the exploration of the feasibility of the sale of the operations/enterprise as a going concern (with continued employment) in whole or in part. *Re Stelco Inc, supra*, at para. 1.

**40**    I accept these submissions as being general statements of the law in Ontario. The value of equity in an insolvent debtor is dubious, at best, and, in my view, it follows that the determining factor should not be whether the business continues under the debtor's stewardship or under a structure that recognizes a new equity structure. An equally important factor to consider is whether the case can be made to continue the business as a going concern.

**41**    Counsel to the Applicants also referred to decisions from the courts in Quebec, Manitoba and Alberta which have similarly recognized the court's jurisdiction to approve a sale of assets during the course of a CCAA proceeding. *Re Boutique San Francisco Inc.* (2004), 7 C.B.R. (5th) 189 (Quebec S. C.), *Re Winnipeg Motor Express Inc.* (2008), 49 C.B.R. (5th) 302 (Man. Q.B.) at paras. 41, 44, and *Re Calpine Canada Energy Limited* (2007), 35 C.B.R. (5th) 1, (Alta. Q.B.) at para. 75.

**42**    Counsel to the Applicants also directed the court's attention to a recent decision of the British Columbia Court of Appeal which questioned whether the court should authorize the sale of substantially all of the debtor's assets where the debtor's plan "will simply propose that the net proceeds from the sale ... be distributed to its creditors". In *Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.* (2008), 46 C.B.R. (5th) 7 (B.C.C.A.) ("*Cliffs Over Maple Bay*"), the court was faced with a debtor who had no active business but who nonetheless sought to stave off its secured creditor indefinitely. The case did not involve any type of sale transaction but the Court of Appeal questioned whether a court should authorize the sale under the CCAA without requiring the matter to be voted upon by creditors.

**43**    In addressing this matter, it appears to me that the British Columbia Court of Appeal focussed on whether the court should grant the requested relief and not on the question of whether a CCAA court has the jurisdiction to grant the requested relief.

**44**    I do not disagree with the decision in *Cliffs Over Maple Bay*. However, it involved a situation where the debtor had no active business and did not have the support of its stakeholders. That is not the case with these Applicants.

**45**    The *Cliffs Over Maple Bay* decision has recently been the subject of further comment by the British Columbia Court of Appeal in *Asset Engineering L.P. v. Forest and Marine Financial Limited Partnership*, 2009 BCCA 319.

**46**    At paragraphs 24-26 of the *Forest and Marine* decision, Newbury J.A. stated:

> 24.    In *Cliffs Over Maple Bay*, the debtor company was a real estate developer whose one project had failed. The company had been dormant for some time. It applied for CCAA protection but described its proposal for restructuring in vague terms that amounted essentially to a plan to "secure sufficient funds" to complete the stalled project (Para. 34). This court, per Tysoe J.A., ruled that although the Act can apply to single-project companies, its purposes are unlikely to be engaged in such instances, since mortgage priorities are fully straight forward and there will

be little incentive for senior secured creditors to compromise their interests (Para. 36). Further, the Court stated, the granting of a stay under s. 11 is "not a free standing remedy that the court may grant whenever an insolvent company wishes to undertake a "restructuring" ... Rather, s. 11 is ancillary to the fundamental purpose of the CCAA, and a stay of proceedings freezing the rights of creditors should only be granted in furtherance of the CCAA's fundamental purpose". That purpose has been described in Meridian Developments Inc. v. Toronto Dominion Bank (1984) 11 D.L.R. (4th) 576 (Alta. Q.B.):

> The legislation is intended to have wide scope and allow a judge to make orders which will effectively maintain the status quo for a period while the insolvent company attempts to gain the approval of its creditors for a proposed arrangement which will enable the company to remain in operation for what is, hopefully, the future benefit of both the company and its creditors. [at 580]

25.    The Court was not satisfied in *Cliffs Over Maple Bay* that the "restructuring" contemplated by the debtor would do anything other than distribute the net proceeds from the sale, winding up or liquidation of its business. The debtor had no intention of proposing a plan of arrangement, and its business would not continue following the execution of its proposal - thus it could not be said the purposes of the statute would be engaged ...

26.    In my view, however, the case at bar is quite different from *Cliffs Over Maple Bay*. Here, the main debtor, the Partnership, is at the centre of a complicated corporate group and carries on an active financing business that it hopes to save notwithstanding the current economic cycle. (The business itself which fills a "niche" in the market, has been carried on in one form or another since 1983.) The CCAA is appropriate for situations such as this where it is unknown whether the "restructuring" will ultimately take the form of a refinancing or will involve a reorganization of the corporate entity or entities and a true compromise of the rights of one or more parties. The "fundamental purpose" of the Act - to preserve the *status quo* while the debtor prepares a plan that will enable it to remain in business to the benefit of all concerned - will be furthered by granting a stay so that the <u>means</u> contemplated by the Act - a compromise or arrangement - can be developed, negotiated and voted on if necessary ...

**47**    It seems to me that the foregoing views expressed in *Forest and Marine* are not inconsistent with the views previously expressed by the courts in Ontario. The CCAA is intended to be flexible and must be given a broad and liberal interpretation to achieve its objectives and a sale by the debtor which preserves its business as a going concern is, in my view, consistent with those

objectives.

**48**    I therefore conclude that the court does have the jurisdiction to authorize a sale under the CCAA in the absence of a plan.

**49**    I now turn to a consideration of whether it is appropriate, in this case, to approve this sales process. Counsel to the Applicants submits that the court should consider the following factors in determining whether to authorize a sale under the CCAA in the absence of a plan:

> (a)    is a sale transaction warranted at this time?
> (b)    will the sale benefit the whole "economic community"?
> (c)    do any of the debtors' creditors have a *bona fide* reason to object to a sale of the business?
> (d)    is there a better viable alternative?

I accept this submission.

**50**    It is the position of the Applicants that Nortel's proposed sale of the Business should be approved as this decision is to the benefit of stakeholders and no creditor is prejudiced. Further, counsel submits that in the absence of a sale, the prospects for the Business are a loss of competitiveness, a loss of value and a loss of jobs.

**51**    Counsel to the Applicants summarized the facts in support of the argument that the Sale Transaction should be approved, namely:

> (a)    Nortel has been working diligently for many months on a plan to reorganize its business;
> (b)    in the exercise of its business judgment, Nortel has concluded that it cannot continue to operate the Business successfully within the CCAA framework;
> (c)    unless a sale is undertaken at this time, the long-term viability of the Business will be in jeopardy;
> (d)    the Sale Agreement continues the Business as a going concern, will save at least 2,500 jobs and constitutes the best and most valuable proposal for the Business;
> (e)    the auction process will serve to ensure Nortel receives the highest possible value for the Business;
> (f)    the sale of the Business at this time is in the best interests of Nortel and its stakeholders; and
> (g)    the value of the Business is likely to decline over time.

**52**    The objections of MatlinPatterson and the UCC have been considered. I am satisfied that the issues raised in these objections have been addressed in a satisfactory manner by the ruling of Judge

Gross and no useful purpose would be served by adding additional comment.

**53**    Counsel to the Applicants also emphasize that Nortel will return to court to seek approval of the most favourable transaction to emerge from the auction process and will aim to satisfy the elements established by the court for approval as set out in *Royal Bank v. Soundair* (1991), 7 C.B.R. (3rd) 1 (Ont. C.A.) at para. 16.

## DISPOSITION

**54**    The Applicants are part of a complicated corporate group. They carry on an active international business. I have accepted that an important factor to consider in a CCAA process is whether the case can be made to continue the business as a going concern. I am satisfied having considered the factors referenced at [49], as well as the facts summarized at [51], that the Applicants have met this test. I am therefore satisfied that this motion should be granted.

**55**    Accordingly, I approve the Bidding Procedures as described in the Riedel Affidavit and the Fourteenth Report of the Monitor, which procedures have been approved by the U.S. Court.

**56**    I am also satisfied that the Sale Agreement should be approved and further that the Sale Agreement be approved and accepted for the purposes of conducting the "stalking horse" bidding process in accordance with the Bidding Procedures including, without limitation the Break-Up Fee and the Expense Reimbursement (as both terms are defined in the Sale Agreement).

**57**    Further, I have also been satisfied that Appendix B to the Fourteenth Report contains information which is commercially sensitive, the dissemination of which could be detrimental to the stakeholders and, accordingly, I order that this document be sealed, pending further order of the court.

**58**    In approving the Bidding Procedures, I have also taken into account that the auction will be conducted prior to the sale approval motion. This process is consistent with the practice of this court.

**59**    Finally, it is the expectation of this court that the Monitor will continue to review ongoing issues in respect of the Bidding Procedures. The Bidding Procedures permit the Applicants to waive certain components of qualified bids without the consent of the UCC, the bondholder group and the Monitor. However, it is the expectation of this court that, if this situation arises, the Applicants will provide advance notice to the Monitor of its intention to do so.

G.B. MORAWETZ J.

cp/e/qllxr/qlpxm/qlltl/qlaxw/qlced

# TAB 14

DOCSTOR: 2191401\1

*Indexed as:*

**Roberts v. Picture Butte Municipal Hospital**


**Between**
**Wanda Mae Roberts, a.k.a. Wanda Mae Lichuk, and Alan Roberts,**
**plaintiffs, and**
**Picture Butte Municipal Hospital, St. Michael's General**
**Hospital, Dr. Tom Melling, McGhan Medical Corporation and Dow**
**Corning Corporation, defendants**

**[1998] A.J. No. 817**

1998 ABQB 636

[1999] 4 W.W.R. 443

64 Alta. L.R. (3d) 218

227 A.R. 308

23 C.P.C. (4th) 300

81 A.C.W.S. (3d) 47

Action No. 8901-12679


Alberta Court of Queen's Bench
Judicial District of Calgary

**Forsyth J.**

July 10, 1998.

(14 pp.)

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, ss. 2(1), 69(1).
U.S. Bankruptcy Code, s. 362.

*Bankruptcy -- Practice -- Stay of proceedings -- Proceeding for the recovery of a claim against the bankrupt.*

Application by the defendant, Dow, for a permanent stay of the proceedings against it by the plaintiff, Roberts. Roberts brought a claim against Dow and four other parties for problems with her breast implants manufactured by Dow that had been surgically implanted in 1983. Dow was the only remaining defendant as the actions against the other four parties had been dismissed. There was a class action against Dow in the U.S. which was discontinued when Dow filed for bankruptcy under the U.S. Bankruptcy Code in May 1995. This automatically stayed all claims against Dow which arose before the bankruptcy. Dow's bankruptcy plan set out a process whereby the breast implant claims would be resolved by a series of common issue trials or settlements. This included foreign claimants like Roberts. Roberts had filed a proof of her claim against Dow in the U.S. Bankruptcy Court.

HELD: Application allowed. The imposition of a stay on all claims once bankruptcy proceedings were begun was common to the Canadian bankruptcy legislation as well. The philosophy was to ensure a fair distribution of assets among all creditors and not just those who happen to have begun proceedings prior to the initiation of bankruptcy. Foreign claimants were provided for in Dow's bankruptcy plan. Roberts submitted to the jurisdiction of the U.S. by filing a proof of claim. Therefore, the appropriate forum to deal with all claims concerning Dow was the U.S. Bankruptcy Court.

**Counsel:**

G.J. Bigg, for the plaintiffs.
K.M. Eidsvik, for the defendant, McGhan Medical Corporation.
F. Foran, Q.C., for the defendant, Dow Corning Corporation.
J. Shriar, for the defendants, Picture Butte Municipal Hospital and St. Michael's General Hospital.
P. Leveque, for the defendant, Dr. Tom Melling.

---

REASONS FOR JUDGMENT

FORSYTH J.:--

APPLICATION

**1**    This is an application by the Defendant Dow Corning Corporation ("DCC") for a permanent stay of proceedings against it. DCC is now the only remaining Defendant in this action, as the actions against the other four Defendants were dismissed on the basis of having been commenced

outside of the applicable limitation periods. DCC applies for a permanent stay of these proceedings on the grounds that this Court should recognize the jurisdiction of the United States Bankruptcy Court for the Eastern District of Michigan, Northern Division. The Plaintiffs, Wanda and Alan Roberts, argue that a stay is inappropriate.

BACKGROUND

**2**    The female Plaintiff underwent surgery in 1981 for bilateral fibrocystic disease and mammary dysplasia in both breasts. Also in 1981, she received silicone gel breast implants manufactured by McGhan Medical Corporation ("McGhan"), a former Defendant. After problems with those implants, they were replaced in June 1983 with silicone gel implants manufactured by DCC. Soon after, one implant was found to have ruptured, necessitating surgery to clean up as much silicone as possible from her system.

**3**    Since that time, the female Plaintiff alleges widespread pain and problems, which she blames on the silicone gel released into her body. For this application, it is not necessary nor appropriate for me to comment on her symptoms or their cause.

**4**    The Plaintiffs started this action on August 31, 1989. There was also class action litigation in the U.S which coordinated all claims arising out of the failure of both McGhan and DCC implants. That class action collapsed when DCC sought bankruptcy protection on May 15, 1995 under Chapter 11 of the United States Bankruptcy Code (the "U.S. Bankruptcy Code"). Section 362 of the U.S. Bankruptcy Code imposes an automatic stay on all actions or proceedings against DCC to recover claims that arose before the claims bar date.

**5**    The U.S. Bankruptcy Court set February 14, 1997 as the foreign claims bar date (the deadline for filing claims in the bankruptcy proceedings). The Plaintiffs filed proofs of claim in that U.S. proceeding on January 17, 1997. More than 700,000 proofs of claim were filed from many countries, including more than 30,000 by Canadian residents.

LEGISLATION

**6**    DCC is asking that this Court recognize the proceedings in the U.S. Bankruptcy Court. The U.S. Bankruptcy Code provides for an automatic stay once bankruptcy proceedings are commenced in the U.S.:

> 362 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title...operates as a stay, applicable to all entities, of
>
> > (1)    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action

> or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> ...
>
> (3)    any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

Section 541 provides that "property of the estate" is comprised of various types of property "wherever located and by whomever held".

**7**    Therefore, the stay purports to be extra-territorial, applying, for example, in Alberta. It is then up to this Court to decide whether the principles of comity favour upholding the stay in this jurisdiction. As the Plaintiffs emphasize, comity is a discretionary matter. I am not bound by the stay imposed by the U.S. Bankruptcy Act.

**8**    I note that the Canadian legislation has a similar provision (Bankruptcy and Insolvency Act ("BIA"), R.S.C. 1985, c.B-3):

> 69(1) Subject to subsections (2) and (3) and sections 69.4 and 69.5 on the filing of a notice of intention under section 50.4 by an insolvent person,
>
> (a)    no creditor has any remedy against the insolvent person or the insolvent person's property, or shall commence or continue any action, execution or other proceedings, for the recovery of a claim provable in bankruptcy,

Under s. 2(1) "property" of the BIA:

> "property" includes money, goods, things in action, land and every description of property, whether real or personal, legal or equitable, and whether situated in Canada or elsewhere, ...

**9**    The Plaintiffs accept that the U.S. Bankruptcy Code governs DCC's estate, and that the Plaintiffs are creditors under the jurisdiction of the U.S. Bankruptcy Court.

PLAN OF REORGANIZATION

**10**    DCC filed a Plan of Reorganization (the "Plan") with the Bankruptcy Court on August 25,

1997. The Bankruptcy Court rejected this Plan, and an amended plan was presented on February 17, 1998. The Bankruptcy Court approved that Plan, which now has to be voted upon by the various classes of creditors. DCC's proposed Plan would allow it to pay most creditors and continue operating. To manage product liability claims, DCC would establish and fund two trusts with up to $2.4 billion U.S. DCC would separately pay approximately $1 billion to commercial creditors over seven years.

**11**    Breast implant claimants would have four settlement paths, based on their history, symptoms and past and proposed treatment. Any claims not settled by agreement under the Plan process would go to common issue trials. Any claims remaining after common issue trials would undergo individual claims review and mediation. The last resort would be individual litigation. These individual trials would be held in the U.S., dismissed in favour of litigation in the claimant's home jurisdiction, or held in the U.S. using the law of the claimant's home jurisdiction. The Plan is designed to solve as many claims as possible in an orderly and expeditious manner.

**12**    The U.S. procedure provides that once the Bankruptcy Court approves a Plan, it is sent to the creditors for a vote. The creditors vote by class. All of the Canadian breast implant claimants are in the foreign claimants' class of creditors. If more than two-thirds of those voting in a class approve, the Plan is considered approved by the class. After the vote, the Bankruptcy Court holds a confirmation hearing. It may confirm the Plan if it meets the U.S. Bankruptcy Code requirements. In DCC's words, the Bankruptcy Court must conclude:

> (i)    that the Plan was proposed in good faith;
>
> (ii)    that each class of creditors that does not vote to accept the Plan will receive at least as great a recovery as such creditors would have received had the debtor been liquidated under the liquidation procedures provided in Chapter 7 of the Bankruptcy Code; and
>
> (iii)    that the Plan does not discriminate unfairly against any class of creditors that does not vote to accept the Plan.

Therefore, the Bankruptcy Court may approve a Plan even if all classes of creditors do not vote to accept it, as long as that Court finds the Plan does not discriminate unfairly against the rejecting class.

**13**    The originally proposed Plan did not make it to the creditor review stage. The Bankruptcy Court apparently had a number of concerns, one of which was the treatment of the foreign claimants. The Plaintiffs raise that concern in this Court also. The proposed settlement payments for foreign claimants would range from 35 to 60 per cent of those offered to U.S. claimants, on the theory that product liability litigation yields lower damage awards in non-U.S. jurisdictions. The proposed settlement for Canadian claimants is 60 per cent of the payments offered to U.S. claimants. According to DCC's affidavit (by Craig J. Litherland, dated December 12, 1997), some of the differing factors among U.S. and foreign jurisdictions are:

a.   the absence of contingency fee arrangements;

b.   the responsibility of judges rather than juries to asses [sic] liability and damages;

c.   the award of costs to prevailing litigants;

d.   limitations on theories of liability and recovery;

e.   limited pretrial procedures;

f.   the absence of the 'deep pocket expectation' prevalent in the United States resulting in lower damage awards;

g.   lower damage awards for pain and suffering;

h.   less or no punitive damages; and

i.   nationalized health care insurance and other benefits that are either directly deducted from an award or operate to reduce the likelihood of a large damage award.

Of course, not all of these factors would apply in any one non-U.S. jurisdiction.

**14**    The Plaintiffs claim the foreign discount is discriminatory and inequitable. Not all of the factors are applicable in Alberta. Moreover, some simply try to shift the burden from DCC to other entities (such as the Canadian medicare system). In addition, the Plaintiffs claim that taking 40 per cent away from foreign claimants leaves that much more for U.S. claimants. DCC argues that the procedure is fair, not necessarily equal. It also emphasizes that the foreign discount only applies to settlements. Any claims that proceed to individual trials would not be discounted.

**15**    The amended Plan will be put to the creditors. It may be that the Plan will be confirmed, even if the foreign claimants' class rejects it.

ANALYSIS

General Principles

**16**    Where an appropriate forum must be chosen, the Courts may grant a stay of proceedings. In the words of the Supreme Court of Canada: "This enables the court of the forum selected by the Plaintiffs (the domestic forum) to stay the action at the request of the Defendant if persuaded that the case should be tried elsewhere." (Amchem Products Inc. v. British Columbia (Workers' Compensation Board), [1993] 1 S.C.R. 897 at 912).This decision is completely discretionary. I am not bound to defer to the U.S. bankruptcy proceedings.

**17**    Amchem also discusses the vital principle of comity (at 913-14, citing Morguard Investments Ltd. v. De Savoye, [1990] 3 S.C.R. 1077 at 1096):

'Comity' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to

> international duty and convenience, and to the rights of its own citizens or of
> other persons who are under the protection of its laws....

**18**    After cautioning against abusing the power to enjoin foreign litigation, the S.C.C. in Amchem outlined the test for restraining foreign proceedings. Although a case on anti-suit injunctions, the first part of the test also relates to stays. The Court must determine if there is a forum other than the domestic forum which is "clearly more appropriate" (at 931). If not, the domestic forum should refuse to stay the domestic proceedings. At 931-32, the S.C.C. continued:

> In this step of the analysis, the domestic court as a matter of comity must take
> cognizance of the fact that the foreign court has assumed jurisdiction. If,
> applying the principles relating to forum non conveniens outlined above, the
> foreign court could reasonably have concluded that there was no alternative
> forum that was clearly more appropriate, the domestic court should respect that
> decision and the application should be dismissed. When there is a genuine
> disagreement between the courts of our country and another, the courts of this
> country should not arrogate to themselves the decision for both jurisdictions. In
> most cases it will appear from the decision of the foreign court whether it acted
> on principles similar to those that obtain here, but, if not, then the domestic court
> must consider whether the result is consistent with those principles.

**19**    As La Forest J. stated in Morguard Investments Ltd. v. De Savoye (1990), 76 D.L.R. (4th) 256 (S.C.C.) at 268, modern states "cannot live in splendid isolation". They must follow comity, which is "the deference and respect due by other states to the actions of a state legitimately taken within its own territory."

**20**    Comity and cooperation are increasingly important in the bankruptcy context. As internationalization increases, more parties have assets and carry on activities in several jurisdictions. Without some coordination, there would be multiple proceedings, inconsistent judgments and general uncertainty. See, for example, comments in Olympia & York Developments Ltd. v. Royal Trust Co. (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.); Re Antwerp Bulkcarriers N.V. (1996), 43 C.B.R. (3d) 284 (Que.S.C.); and J.D. Honsberger, "Canadian Recognition of Foreign Judicially Supervised Arrangements" (1989), 76 D.B.R. (N.S.) 86.

**21**    I also note that U.S. Courts have shown themselves willing to grant comity in similar circumstances. For example, a Bankruptcy Court granted comity in In re American Sensors Inc. (Bkrtcy. S.D.N.Y., 1997). In that case, all proceedings against the Defendant Canadian corporation were stayed under the Companies' Creditors Arrangement Act. The Defendant successfully applied to the U.S. Bankruptcy Court for a stay in the U.S. based on comity. That Court stated that U.S. public policy should recognize the foreign proceedings, thus facilitating the "orderly and systematic distribution" of the debtor's assets. This was especially true for Canada, which has similar procedures and procedural safeguards.

Discussion

**22**    The U.S. Bankruptcy Code provision imposing a stay once bankruptcy proceedings have begun is comparable to Canada's BIA provision. They also both have the same underlying philosophy - to ensure a fair distribution of assets among all creditors, not just those who happen to have begun proceedings prior to the initiation of bankruptcy. In a situation such as DCC's, there is another motive - if all matters can be stayed, there is a better chance that the DCC will be able to restructure successfully.

**23**    The number of claims is significant. The U.S. Bankruptcy Court has decided that it is impractical and unfair to have thousands of individual claims going through the adversarial court system. Instead, it agrees with DCC's proposal to settle as many as possible, hold common issue trials as appropriate, then have as many individual trials as still necessary. This appears logical and in the interests of all creditors as a group.

**24**    An additional consideration is that the Plaintiffs have filed proofs of claim in the U.S. bankruptcy proceedings. The Plaintiffs have, therefore, attorned to the jurisdiction of the U.S. Bankruptcy Court. As stated in In re Neese, 12 B.R. 968 (Bkrtcy.W.D.Va., 1981) at 971:

> ... [the] defendants voluntarily availed themselves of the jurisdiction of this Court when they filed, by counsel, proofs of claim in the underlying title 11 bankruptcy case....Having filed their proofs of claim in the underlying bankruptcy case, the defendants cannot now deny this Court's personal jurisdiction over them in a proceeding directly related to that case.

The same principles apply in Canada - see, for example, Microbiz Corp. v. Classic Software Systems Inc. (1996), 45 C.B.R. (3d) 40 (Ont. Gen. Div.); and Pitts v. Hill & Hill Truck Line, Inc. (1987), 66 C.B.R. 273 (Alta.Q.B., Master).

**25**    The Plaintiffs argue that foreign claimants are not treated fairly by the proposed Plan because their settlement package would be at a discount from that given to U.S. claimants. However, there are several safeguards to prevent unfairness. First, the Plaintiffs, along with the rest of the class, have the opportunity to vote against the Plan. If, as a class, they vote against it, the U.S. Bankruptcy Court can only confirm the Plan if it feels the Plan does not "discriminate unfairly" against classes which rejected it. I understand this to mean that treatment can be fair across classes without being equal, as long as there is equality within the class itself. Second, the Plaintiffs are not obliged to settle under the Plan. They may proceed to trial. Third, this Plan actually protects creditors. If there were no stay and no Plan, only the first to trial and judgment would receive any compensation at all, and trials could potentially drag on for many years. Under the Plan, each creditor will receive something and will receive it much sooner.

**26**    I do not comment on the factors used to assess the discount rate for foreign claimants, except to say that they were not all intended to relate to each foreign jurisdiction. If these factors are

accepted by the U.S. Bankruptcy Court in the exercise of its jurisdiction, a jurisdiction to which it is appropriate for me to grant comity and to which the Plaintiffs have attorned, then it is not for me to decide if I would have accepted the factors.

27    The Plaintiffs also argue that the recent Australian case Taylor v. Dow Corning Australia Pty. Ltd. (19 December 1997), No. 8438/95 (Vict.S.C.) should persuade me to dismiss this stay application. There, the Australian Court denied Dow Corning Australia's ("DCA's") application for a stay of proceedings in an action by an Australian plaintiff against DCA. While not binding on me in any event, the reasons in Taylor are clearly distinguishable.

28    DCA is a solvent subsidiary of DCC. DCC was initially a defendant, but that plaintiff discontinued against DCC. The Court ruled that any judgment against DCA would not disadvantage creditors of DCC. Further, the plaintiff was entitled to be treated as a creditor of DCA, not DCC.

29    In addition, that plaintiff did not file a proof of claim in the U.S. bankruptcy proceedings. This is extremely significant. In the present case, the Plaintiffs deliberately attorned to the U.S. jurisdiction by filing proofs of claim. In Taylor, the plaintiff deliberately did not. There is obiter in Taylor, as the Court held attornment was not relevant where a solvent subsidiary, not the insolvent parent, asks for the stay.

30    Finally, the Plaintiffs argue that I should not grant a stay when the U.S. Bankruptcy Court has not been asked to grant an injunction against non-U.S. proceedings such as this. For example, the Australian Court in Taylor queried why DCC had not requested such an injunction and concluded one would have been denied in any event. In the present case, however, an injunction is not necessary. The U.S. Bankruptcy Code itself provides for a stay of all proceedings against DCC. This is not comparable to Taylor, where the defendant was DCA, not DCC itself.

ORDER

31    In the circumstances of this case, the U.S. Bankruptcy Court has apparently decided that fairness among creditors is achieved without having complete equality across all classes of creditors. The Plaintiffs attorned to that jurisdiction. However, even had there been no attornment, I find that common sense dictates that these matters would be best dealt with by one Court, and in the interest of promoting international comity it seems the forum for this case is in the U.S.Bankruptcy Court. Thus, in either case, whether there has been an attornment or not, I conclude it is appropriate for me to exercise my discretion and apply the principles of comity and grant the Defendant's stay application. I reach this conclusion based on all the circumstances, including the clear wording of the U.S. Bankruptcy Code provision, the similar philosophies and procedures in Canada and the U.S., the Plaintiffs' attornment to the jurisdiction of the U.S. Bankruptcy Court, and the incredible number of claims outstanding. Lastly, while not determinative, I found it significant that there has been acceptance of the Plan in Ontario and Quebec. This not only suggests that the Plan proposes a reasonable offer, but it also suggests that the parties affected in these provinces have accepted the principle that international comity should be recognized in these proceedings.

FORSYTH J.

cp/d/drk/DRS

# TAB 15

DOCSTOR: 2191401\1

*Case Name:*

# ScoZinc Ltd. (Re)

**IN THE MATTER OF the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a Plan of Compromise or Arrangement of
ScoZinc Ltd., Applicant**

**[2009] N.S.J. No. 187**

2009 NSSC 136

277 N.S.R. (2d) 251

53 C.B.R. (5th) 96

2009 CarswellNS 229

Docket: Hfx No. 305549

Registry: Halifax

Nova Scotia Supreme Court
Halifax, Nova Scotia

**D.R. Beveridge J.**

Heard: April 3, 2009.
Oral judgment: April 3, 2009.
Released: April 28, 2009.

(49 paras.)

!!INV1339.010 !!INV1339.028 !!INV00

[QL:QLKEYWORDS/]

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters --
Compromises and arrangements -- Directions -- Monitors -- Powers, duties and functions -- Upon*

*motion by monitor in proceedings under the Companies' Creditors Arrangement Act, the monitor was held to have the necessary authority to allow a revision of a claim after the claim's bar date but before the date set for the monitor to complete its assessment of claims -- To suggest the monitor did not have the authority to receive evidence and submissions and to consider them was to say it did not have any real authority to carry out its court-appointed role to assess the claims that had been submitted.*

Motion by monitor in proceedings under the Companies' Creditors Arrangement Act seeking directions from the court on whether it had the necessary authority to allow a revision of a claim after the claim's bar date but before the date set for the monitor to complete its assessment of claims. On Dec. 22, 2008, ScoZinc Ltd. had been granted protection by means of a stay of proceedings of all claims against it. The determination of creditors' claims was set by a claims procedure order of Feb. 18, 2009 setting dates for the submission of claims to the monitor, and for the monitor to assess the claims. The monitor was directed to review all proofs of claim filed on or before March 16, 2009 and accept, revise or disallow the claims. In three cases, revised proofs of claim were filed after this date.

HELD: Order granted. The monitor had the necessary authority. The Act gave no specific guidance to the court on how to determine the existence, nature, validity or extent of a claim against a debtor company. The determination that the claims must initially be identified and assessed by the monitor, and heard first by a claims officer, was a valid exercise of the court's inherent jurisdiction. It was not only logical, but eminently practical that the monitor, as an officer of the court, be directed by court order to fulfil the analogous role to that of the trustee under the Bankruptcy and Insolvency Act. The Feb. 18, 2009 order accomplished this. It did not matter that revised claims were submitted after the claims bar date. In essence, the monitor simply acted to revise the proofs of claim already submitted to conform with the evidence elicited by the monitor, or submitted to it. The monitor had the necessary authority to revise the claims, either as to classification or amount. To suggest the monitor did not have the authority to receive evidence and submissions and to consider them was to say it did not have any real authority to carry out its court-appointed role to assess the claims that had been submitted.

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3,

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11, s. 11.7, s. 12

Probate Act, R.S.N.S. 1900, c. 158,

**Counsel:**

John G. Stringer, Q.C., and Mr. Ben R. Durnford, for the applicant.

Robert MacKeigan, Q.C., for Grant Thornton.

---

**1**    **D.R. BEVERIDGE J.** (orally):-- On December 22, 2008, ScoZinc Ltd. was granted protection by way of a stay of proceedings of all claims against it pursuant to s. 11 of the *Companies' Creditors Arrangement Act* R.S.C. 1985, c. C-36. The stay has been extended from time to time. Grant Thornton was appointed as the Monitor of the business and financial affairs of ScoZinc pursuant to s. 11.7 of the *CCAA*.

**2**    The determination of creditors' claims was set by a Claims Procedure Order. This order set dates for the submission of claims to the Monitor, and for the Monitor to assess the claims. The Monitor brought a motion seeking directions from the court on whether it has the necessary authority to allow a revision of a claim after the claim's bar date but before the date set for the Monitor to complete its assessment of claims.

**3**    The motion was heard on April 3, 2009. At the conclusion of the hearing of the motion I concluded that the Monitor did have the necessary authority. I granted the requested order with reasons to follow. These are my reasons.

BACKGROUND

**4**    The procedure for the identification and quantification of claims was established pursuant to my order of February 18, 2009. Any persons asserting a claim was to deliver to the Monitor a Proof of Claim by 5:00 p.m. on March 16, 2009, including a statement of account setting out the full details of the claim. Any claimant that did not deliver a Proof of Claim by the claims bar date, subject to the Monitor's agreement or as the court may otherwise order, would have its claim forever extinguished and barred from making any claim against ScoZinc.

**5**    The Monitor was directed to review all Proofs of Claim filed on or before March 16, 2009 and to accept, revise or disallow the claims. Any revision or disallowance was to be communicated by Notice of Revision or Disallowance, no later than March 27, 2009. If a creditor disagreed with the assessment of the Monitor, it could dispute the assessment before a Claims Officer and ultimately to a judge of the Supreme Court.

**6**    The three claims that have triggered the Monitor's motion for directions were submitted by Acadian Mining Corporation, Royal Roads Corp., and Komatsu International (Canada) Inc.

**7**    ScoZinc is 100% owned by Acadian Mining Corp. These two corporations share office space, managerial staff, and have common officers and directors. Acadian Mining is a substantial shareholder in Royal Roads and also have some common officers and directors.

**8**    Originally Royal Roads asserted a claim as a secured creditor on the basis of a first charge security held by it on ScoZinc's assets for a loan in the amount of approximately $2.3 million. Acadian Mining also claimed to be a secured creditor due to a second charge on ScoZinc's assets securing approximately $23.5 million of debt. Both Royal Roads and Acadian Mining have released their security. Each company submitted Proofs of Claim dated March 4, 2009 as unsecured creditors.

**9**    Royal Roads claim was for $579,964.62. The claim by Acadian Mining was for $23,761.270.20. John Rawding, Financial Officer for Acadian Mining and ScoZinc, prepared the Proofs of Claim for both Royal Roads and Acadian Mining. It appears from the affidavit and materials submitted, and the Monitor's fifth report dated March 31, 2009 that there were errors in each of the Proofs of Claim.

**10**    Mr. Rawding incorrectly attributed $1,720,035.38 as debt by Acadian Mining to Royal Roads when it should have been debt owed by ScoZinc to Royal Roads. In addition, during year end audit procedures for Royal Roads, Acadian Mining and ScoZinc, other erroneous entries were discovered. The total claim that should have been advanced by Royal Roads was $2,772,734.19.

**11**    The appropriate claim that should have been submitted by Acadian Mining was $22,041,234.82, a reduction of $1,720,035.38. Both Royal Roads and Acadian Mining submitted revised Proofs of Claim on March 25, 2009 with supporting documentation.

**12**    The third claim is by Komatsu. Its initial Proof of Claim was dated March 16, 2009 for both secured and unsecured claims of $4,245,663.78. The initial claim did not include a secured claim for the equipment that had been returned to Komatsu, nor include a claim for equipment that was still being used by ScoZinc. A revised Proof of Claim was filed by Komatsu on March 26, 2009.

**13**    The Monitor, sets out in its fifth report dated March 31, 2009, that after reviewing the relevant books and records, the errors in the Proofs of Claim by Royal Roads, Acadian Mining and Komatsu were due to inadvertence. For all of these claims it issued a Notice of Revision or Disallowance on March 27, 2009, allowing the claims as revised "if it is determined by the court that the Monitor has the power to do so".

**14**    The request for directions and the circumstances pose the following issue:

ISSUE

**15**    Does the Monitor have the authority to allow the revision of a claim by increasing it based on evidence submitted by a claimant within the time period set for the monitor to carry out its assessment of claims?

ANALYSIS

**16**    The jurisdiction of the Monitor stems from the jurisdiction of the court granted to it by the *CCAA*. Whenever an order is made under s. 11 of the *CCAA* the court is required to appoint a monitor. Section 11.7 of the *CCAA* provides:

> 11.7 (1) When an order is made in respect of a company by the court under section 11, the court shall at the same time appoint a person, in this section and in section 11.8 referred to as "the monitor", to monitor the business and financial affairs of the company while the order remains in effect.

> (2)    Except as may be otherwise directed by the court, the auditor of the company may be appointed as the monitor.

> (3)    The monitor shall

> > (a)    for the purposes of monitoring the company's business and financial affairs, have access to and examine the company's property, including the premises, books, records, data, including data in electronic form, and other financial documents of the company to the extent necessary to adequately assess the company's business and financial affairs;

> > (b)    file a report with the court on the state of the company's business and financial affairs, containing prescribed information,

> > > (i)    forthwith after ascertaining any material adverse change in the company's projected cash-flow or financial circumstances,

> > > (ii)    at least seven days before any meeting of creditors under section 4 or 5, or

> > > (iii)    at such other times as the court may order;

> > (c)    advise the creditors of the filing of the report referred to in paragraph (b) in any notice of a meeting of creditors referred to in section 4 or 5; and

> > (d)    carry out such other functions in relation to the company as the court may direct.

> ...

**17**    It appears that the purpose of the *CCAA* is to grant to an insolvent company protection from its creditors in order to permit it a reasonable opportunity to restructure its affairs in order to reach a compromise or arrangement between the company and its creditors. The court has the power to order a meeting of the creditors or class of creditors for them to consider a compromise or arrangement proposed by the debtor company (s. 4, 5). Where a majority of the creditors

representing two thirds value of the creditors or class of creditors agree to a compromise or arrangement, the court may sanction it and thereafter such compromise or arrangement is binding on all creditors, or class of creditors (s. 6).

**18**    Section 12 of the *Act* defines a claim to mean "any indebtedness, liability or obligation of any kind that, if unsecured, would be a debt provable in bankruptcy within the meaning of the *Bankruptcy and Insolvency Act*." However, as noted by McElcheran in *Commercial Insolvency in Canada* (LexisNexis Canada Inc., Markham, Ontario, 2005 at p. 279-80) the *CCAA* does not set out a process for identification or determination of claims; instead, the Court creates a claims process by court order.

**19**    The only guidance provided by the *CCAA* is that in the event of a disagreement the amount of a claim shall be determined by the court on summary application by the company or by the creditor. Section 12(2) of the *Act* provides:

> Determination of amount of claim

> (2)    For the purposes of this Act, the amount represented by a claim of any secured or unsecured creditor shall be determined as follows:

>> (a)    the amount of an unsecured claim shall be the amount

>>> (i)    in the case of a company in the course of being wound up under the Winding-up and Restructuring Act, proof of which has been made in accordance with that Act,
>>> (ii)    in the case of a company that has made an authorized assignment or against which a bankruptcy order has been made under the Bankruptcy and Insolvency Act, proof of which has been made in accordance with that Act, or
>>> (iii)    in the case of any other company, proof of which might be made under the Bankruptcy and Insolvency Act, but if the amount so provable is not admitted by the company, the amount shall be determined by the court on summary application by the company or by the creditor; and

>> (b)    the amount of a secured claim shall be the amount, proof of which might be made in respect thereof under the Bankruptcy and Insolvency Act if the claim were unsecured, but the amount if not admitted by the company shall, in the case of a company subject to pending proceedings under the

> Winding-up and Restructuring Act or the Bankruptcy and Insolvency Act, be established by proof in the same manner as an unsecured claim under the Winding-up and Restructuring Act or the Bankruptcy and Insolvency Act, as the case may be, and in the case of any other company the amount shall be determined by the court on summary application by the company or the creditor.

**20**    The only parties who appeared on this motion were the Monitor, ScoZinc and Komatsu. No specific submissions were requested nor made by the parties with respect to the nature of the court's jurisdiction to determine the mechanism and time lines to classify and quantify claims against the debtor company.

**21**    Under the *Bankruptcy and Insolvency Act* the Trustee is the designated gatekeeper who first determines whether a Proof of Claim submitted by a creditor is valid. The trustee may admit the claim or disallow it in whole or in part (s. 135(2) *BIA)*. A creditor who is dissatisfied with a decision by the trustee may appeal to a judge of the Bankruptcy Court.

**22**    In contrast, the *CCAA* does not set out the procedure beyond the language in s. 12. The language only accomplishes two things. The first is that the debtor company can agree on the amount of a secured or unsecured claim; and secondly, if there is a disagreement, then on application of either the company or the creditor, the amount shall be determined by the court on "summary application".

**23**    The practice has arisen for the court to create by order a claims process that is both flexible and expeditious. The Monitor identifies, by review of the debtor's records, all potential claimants and sends to them a claim package. To ensure that all creditors come forward and participate on a timely basis, there is a provision in the claims process order requiring creditors to file their claims by a fixed date. If they do not, subject to further relief provided by the claims process order, or by the court, the creditor's claim is barred.

**24**    If the Monitor disagrees with the claim, and the disagreement cannot be resolved, then a claimant can present its case to a claims officer who is usually given the power to adjudicate disputed claims, with the right of appeal to a judge of the court overseeing the *CCAA* proceedings.

**25**    The establishment of a claims process utilizing the monitor and or a claims officer by court order appears to be a well accepted practice (See for example *Federal Gypsum Co., (Re)* 2007 NSSC 384; *Olympia & York Developments Ltd. (Re)* (1993), 17 C.B.R. (3d) 1 (Ont. S.C.J.); *Air Canada, (Re)* (2004) 2 C.B.R. (5th) 23 (Ont. S.C.J.); *Triton Tubular Components v. Steelcase Inc*., [2005] O.J. No. 3926 (Ont. S.C.J.); *Muscletech Research & Development Inc.,(Re)*, [2006] O.J. No. 4087 (Ont. S.C.J.); *Pine Valley Mining Corp., (Re)* 2008 BCSC 356; *Blue Range Resource Corp.*, Re 2000 ABCA 285; *Carlen Transport Inc. v. Juniper Lumber Co. (Monitor of)* (2001), 21 C.B.R. (4th) 222 ( N.B.Q.B.).)

**26**    I could find no reported case that doubt the authority of the court to create a claims process. Kenneth Kraft in his article "The CCAA and the Claims Bar Process", (2000), 13 <u>Commercial Insolvency Reporter</u> 6, endorsed the utilization of a claims process on the basis of reliance on the court's inherent jurisdiction, provided the process adhered to the specific mandates of the *CCAA*. In unrelated contexts, caution has been expressed with respect to reliance on the inherent jurisdiction of the superior court as the basis for dealing with the myriad issues that can arise under the *CCAA* (See: *Clear Creek Contracting v. Skeena Cellulous Inc.*,(2003), 43 C.B.R (4th) 187) (B.C.C.A.) and *Stelco Inc.(Re)*, [2005] O.J. No. 1171 (CA.)).

**27**    Sir J.H. Jacob, Q.C. in his seminal article "The Inherent Jurisdiction of the Court", (1970) <u>Current Legal Problems</u> 23, concluded that it has been clear law from the earliest times that superior courts of justice, as part of their inherent jurisdiction, have the power to control their own proceedings and process. He wrote:

> Under its inherent jurisdiction, the court has power to control and regulate its process and proceedings, and it exercises this power in a great variety of circumstances and by many different methods. Some of the instances of the exercise of this power have been of far-reaching importance, others have dealt with matters of detail or have been of transient value. Some have involved the exercise of administrative powers, others of judicial powers. Some have been turned into rules of law, others by long usage or custom may have acquired the force of law, and still others remain mere rules of practice. The exercise of this power has been pervasive throughout the whole legal machinery and has been extended to all stages of proceedings, pre-trial, trial and post-trial. Indeed, it is difficult to set the limits upon the powers of the court in the exercise of its inherent jurisdiction to control and regulate its process, for these limits are coincident with the needs of the court to fulfil its judicial functions in the administration of justice.

> p. 32-33

**28**    The *CCAA* gives no specific guidance to the court on how to determine the existence, nature, validity or extent of a claim against a debtor company. As noted earlier, the only reference is in s. 12 of the *Act* that if there is a dispute as to the amount of a claim, then the amount shall be determined by the court "on summary application". In *Re Freeman Estate*, [1922] N.S.J. No. 15, [1923] 1 D.L.R. 378 (en banc) the court considered the words "on summary application" as they appeared in the *Probate Act* R.S.N.S. 1900 c. 158. Harris C.J. wrote:

> [17] The words "summary application" do not mean without notice, but simply imply that the proceedings before the Court are not to be conducted in the ordinary way, but in a concise way.

[18] The Oxford Dictionary p. 140 gives as one of the meanings of "summary" dispensing with needless details or formalities -- done with despatch.

[19] In the case of the Western &c R. Co. v. Atlanta (1901), 113 Ga. 537, the meaning of the words "summary proceeding" is discussed at some length and the Court held at pp. 543-544:--

"In a summary manner does not at all mean that they may be abated without notice or hearing, but simply that it may be done without a trial in the ordinary forms prescribed by law for a regular judicial procedure."

[20] I cite this not because it is a binding authority, but because its reasoning commends itself to my judgment and I adopt it.

**29**    In my opinion, whatever process may be appropriate and necessary to adjudicate disputed claims that ultimately end up before a judge of the superior court, the determination by the court that claims must initially be identified and assessed by the Monitor, and heard first by a Claims Officer, is a valid exercise of the court's inherent jurisdiction.

**30**    The *CCAA* gives to the court the express and implied jurisdiction to do a variety of things. They need not all be enumerated. The court is required to appoint a monitor (s. 11.7). Once appointed, the monitor is required to monitor the company's business and financial affairs. The *Act* mandates that the monitor have access to and examine the company's property including all records. The monitor must file a report with the court on the state of the company's business and financial affairs and contain prescribed information. In addition, the monitor shall carry out such other functions in relation to the company as the court may direct (s. 11.7(3)(d)).

**31**    In these circumstances, it is not only logical, but eminently practical that the monitor, as an officer of the court, be directed by court order to fulfil the analogous role to that of the trustee under the *BIA*. The Claims Procedure Order of February 18, 2009 accomplishes this.

POWER OF THE MONITOR

**32**    The Monitor was required by the Order to publish a notice to claimants in the newspaper regarding the claims procedure. It was also required to send a claims package to known potential claimants identified by the Monitor through its review of the books and records of ScoZinc. The claims bar date was set as March 16, 2009, or such later date as may be ordered by the court.

**33**    The duties of the Monitor, once a claim was received by it, were set out in paragraphs 9 and 10 of the Claims Procedure Order. They provide as follows:

> 9.    Upon receipt of a Proof of Claim:
>
>> a.    The Monitor is hereby authorized and directed to use reasonable discretion as to the adequacy of compliance as to the manner in which Proofs of Claim are completed and executed and may, where it is satisfied that a Claim has been adequately proven, waive strict compliance with the requirements of this Order as to the completion and the execution of a Proof of Claim. A Claim which is accepted by the Monitor shall constitute a Proven Claim;
>> b.    the Monitor and ScoZinc may attempt to consensually resolve the classification and amount of any Claim with the claimant prior to accepting, revising or disallowing such Claim; and
>
>> ...
>
> 10.    The Monitor shall review all Proofs of Claim filed on or before the Claims Bar Date. The Monitor shall accept, revise or disallow such Proofs of Claim as contemplated herein. The Monitor shall send a Notice of Revision or Disallowance and the form of Notice of Dispute to the Claimant as soon as the Claim has been revised or disallowed but in any event no later than 11:59 p.m. (Halifax time) on March 27, 2009 or such later date as the Court may order. Where the Monitor does not send a Notice of Revision or Disallowance by the aforementioned date to a Claimant who has submitted a Proof of Claim, the Monitor shall be deemed to have accepted such Claim.

**34**    Any person who wished to dispute a Notice of Revision or Disallowance was required to file a notice to the monitor and to the Claims Officer no later than April 6, 2009. The Claims Officer was designated to be Richard Cregan, Q.C., serving in his personal capacity and not as Registrar in Bankruptcy. Subject to the direction of the court, the Claims Officer was given the power to determine how evidence would be brought before him and any other procedural matters that may arise with respect to the claim. A claimant or the Monitor may appeal the Claims Officer's decision to the court.

**35**    The Monitor suggests that the power given to it under paragraph 9(a) and 10 is sufficient to permit it to accept the revised Proofs of Claim filed after the claim's bar date of March 16, 2009, but before its assessment date of March 27, 2009.

**36**     Reliance is also placed on the decision of the Alberta Court of Appeal in *Blue Range Resource Corp.* 2000 ABCA 285. As noted by the Monitor, the decision in *Blue Range* did not directly deal with the issue on which the Monitor here seeks directions. In *Blue Range*, the claims procedure established by the court set the claims bar date of June 15, 1999. Claims of creditors not proven in accordance with the procedures set out were deemed to be forever barred. Some creditors filed their Notice of Claim after the claims bar date. The monitor disallowed their claims. There were a second group of creditors who filed their Notice of Claim prior to the applicable claims bar date, but then sought to amend their claims after the claims bar date had passed. The monitor also disallowed these claims as late. What is not clear from the reported decisions is whether this second group of creditors requested amendments of their claims during the time period granted to the Monitor to carry out its assessment.

**37**     The chambers judge allowed the late and amended claims to be filed, [1999] A.J. No. 1308. Enron Capital Corp. and the creditor's committee sought leave to appeal that decision. Leave to appeal was granted on January 14, 2000 with respect to the following question:

> What criteria in the circumstances of these cases should the Court use to exercise its discretion in deciding whether to allow late claimants to file claims which, if proven, may be recognized, notwithstanding a previous claims bar order containing a claims bar date which would otherwise bar the claim of the late claimants, and applying the criteria to each case, what is the result?

> *Re Blue Range Resources Corp.*, 2000 ABCA 16

**38**     Wittmann J.A. delivered the judgment of the court. He noted that all counsel conceded that the court had the authority to allow the late filing of claims and that the appeal was really a matter of what criteria the court should use in exercising that power. Accordingly, a Claims Procedure Order that contains a claims bar date should not purport to forever bar a claim without a saving provision. Wittmann J.A. set out the test for determining when a late claim may be included to be as follows:

> [26] Therefore, the appropriate criteria to apply to the late claimants is as follows:

> 1.     Was the delay caused by inadvertence and if so, did the claimant act in good faith?
> 2.     What is the effect of permitting the claim in terms of the existence and impact of any relevant prejudice caused by the delay?
> 3.     If relevant prejudice is found can it be alleviated by attaching appropriate conditions to an order permitting late filing?
> 4.     If relevant prejudice is found which cannot be alleviated, are there any other considerations which may nonetheless warrant an order

permitting late filing?

[27] In the context of the criteria, "inadvertent" includes carelessness, negligence, accident, and is unintentional. I will deal with the conduct of each of the respondents in turn below and then turn to a discussion of potential prejudice suffered by the appellants.

2000 ABCA 285

**39**    The appellants claimed that they would be prejudiced if the late claims were allowed because if they had known the late claims would be allowed they would have voted differently. This assertion was rejected by the chambers judge. With respect to what is meant by prejudiced, Wittmann J.A. wrote:

> 40 In a CCAA context, as in a BIA context, the fact that Enron and the other Creditors will receive less money if late and late amended claims are allowed is not prejudice relevant to this criterion. Re-organization under the CCAA involves compromise. Allowing all legitimate creditors to share in the available proceeds is an integral part of the process. A reduction in that share can not be characterized as prejudice: Re Cohen (1956), 36 C.B.R. 21 (Alta. C.A.) at 30-31. Further, I am in agreement with the test for prejudice used by the British Columbia Court of Appeal in 312630 British Columbia Ltd., [1995] B.C.J. No. 1600. It is: did the creditor(s) by reason of the late filings lose a realistic opportunity to do anything that they otherwise might have done? Enron and the other creditors were fully informed about the potential for late claims being permitted, and were specifically aware of the existence of the late claimants as creditors. I find, therefore, that Enron and the Creditors will not suffer any relevant prejudice should the late claims be permitted.

**40**    In considering how the Monitor should carry out its duties and responsibilities under the Claims Procedure Order it is important to note that the Monitor is an officer of the court and is obliged to ensure that the interests of the stakeholders are considered including all creditors, the company and its shareholders ( See *Laidlaw Inc. Re* (2002), 34 C.B.R. (4th) 72 (Ont. S.C.J.).

**41**    In a different context Turnball J.A. in *Siscoe & Savoie v. Royal Bank* (1994), 29 C.B.R. (3d) 1 commented that the monitor is an agent of the court and as a result is responsible and accountable to the court, owing a fiduciary duty to all of the parties (para. 28).

**42**    In my opinion, para. 9(a) is not of assistance in determining the authority of the Monitor to revise upward a claim filed after the claim's bar date but before the assessment date. Paragraph 9(a) authorizes the Monitor to use reasonable discretion as to the adequacy of compliance as to **the**

**manner** to which Proofs of Claim are completed and executed. If it satisfied that the claim has been adequately proven it may waive strict compliance with the requirements of the order as to **completion** and the **execution** of a Proof of Claim.

**43**    Paragraph 10 of the Claims Procedure Order mandates the Monitor shall review all Proofs of Claim filed on or before the claims bar date. It shall "accept, revise or disallow such Proofs of Claim as contemplated herein". While normally a monitor's revision would be to reduce a Proof of Claim, there is in fact nothing in the Claims Procedure Order that so restricts the Monitor's authority. It is obviously contemplated by para. 10 that the monitor is to carry out some assessment of the claims that are submitted.

**44**    In my view, the Proofs of Claim that are filed act both as a form of pleading and an opportunity for the claimant to provide supporting documents to evidence its claim. In the case before me, the creditors discovered that the claims they had submitted were inaccurate and further evidence was tendered to the Monitor to demonstrate. The Monitor, after reviewing the evidence, accepted the validity of the claims.

**45**    Courts in a general way are engaged in dispensing justice. They do so by setting up and applying procedural rules to ensure that litigants are afforded a fair hearing. The resolution of disputes through the litigation process, including the ultimate hearing, is fundamentally a truth-seeking process to determine the facts and to apply the law to those facts. Can it be any different where the process is not in the court but under its supervision pursuant to a claims process under the *CCAA.?*

**46**    To suggest that the monitor does not have the authority to receive evidence and submissions and to consider them is to say that it does not have any real authority to carry out its court appointed role to assess the claims that have been submitted. The notion that the monitor cannot look at documentary evidence on its own initiative or at the instance of a claimant, and even consider submissions, is to deny it any real power to consider and make a preliminary determination of the merits of a claim.

**47**    The Claims Procedure Order contains a number of provisions that anticipate the exchange of information between the Monitor, the company and a creditor. Paragraph 9(b) authorizes the Monitor and ScoZinc to attempt to consensually resolve the classification and the amount of any claim with a claimant prior to accepting, revising or disallowing such claim. Paragraph 17 of the Claims Procedure Order directs that the Monitor shall at all times be authorized to enter into negotiations with claimants and settle any claim on such terms as the Monitor may consider appropriate.

**48**    In my opinion, it does not matter that revised claims were submitted after the claims bar date. In essence, the Monitor simply acted to revise the Proofs of Claim already submitted to conform with the evidence elicited by the Monitor, or submitted to it. The Monitor had the necessary authority to revise the claims, either as to classification or amount.

**49**    If a claimant seeks to revise or amend its claim after the assessment date set out in the Claims Procedure Order, different considerations may come into play. The appropriate procedure will depend on the provisions of the Claims Procedure Order. In addition, the court, as the ultimate arbiter of disputed claims under s. 12 of the *CCAA*, should always be viewed as having the jurisdiction to permit appropriate revision of claims.

D.R. BEVERIDGE J.

cp/e/qlrxg/qlpxm/qlaxw/qlced/qlaxr/qlced

# TAB 16

DOCSTOR: 2191401\1

*Indexed as:*
# Z.I. Pompey Industrie v. ECU-Line N.V.

**ECU-Line N.V., appellant;**

**v.**

**Z.I. Pompey Industrie, Société lyonnaise de messageries
nationales, John S. James Co., Polyfibron Technologies
Inc., Ellehammer Packaging Inc., and all others having
an interest in the cargo laden on board the M.V. "Canmar
Fortune", respondents.**

[**2003**] **1 S.C.R. 450**

[2003] S.C.J. No. 23

2003 SCC 27

File No.: 28472.

Supreme Court of Canada

Heard: October 2, 2002;
Judgment: May 1, 2003.

**Present: McLachlin C.J. and Gonthier, Iacobucci, Major,
Bastarache, Binnie and LeBel JJ.**

(42 paras.)

**Appeal From:**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

**Catchwords:**

*Conflict of laws -- Courts -- Jurisdiction -- Bills of lading -- Forum selection clauses -- Stay of
proceedings -- Arrangements made with appellant for carriage of cargo by sea -- Respondents
filing action against appellant in Federal Court alleging that cargo was damaged while in transit
by rail -- Appellant seeking stay of proceedings on basis that bill of lading contained forum*

*selection clause giving courts in Antwerp, Belgium exclusive jurisdiction -- Proper test for stay of proceedings to enforce forum selection clause in bill of lading -- Whether "strong cause" test is proper test -- Whether proper test should contemplate inquiry into whether there was fundamental breach or deviation -- Federal Court Act, R.S.C. 1985, c. F-7, s. 50(1).*

## Summary:

The respondents filed an action for damages against the appellant in the Federal Court, alleging that cargo was damaged while in transit by rail. Under the bill of lading Antwerp, Belgium was designated as the port of loading and Seattle was designated as the port of discharge. The cargo was transported from Antwerp to Montréal, where it was unloaded and carried by train to Seattle. The bill [page451] of lading contained a forum selection clause stating that "[t]he contract evidenced by or contained in this bill of Lading is governed by the law of Belgium, and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts in Antwerp and no other Courts." The appellant brought a motion seeking a stay of proceedings on the basis that the bill of lading required disputes to be determined exclusively by the courts of Antwerp. A prothonotary denied the motion. The Federal Court, Trial Division dismissed the appellant's motion to set aside the prothonotary's order. The Federal Court of Appeal upheld the decision.

*Held*: The appeal should be allowed and a stay of proceedings issued in favour of the appellant.

In the absence of applicable legislation, such as s. 46(1) of the *Marine Liability Act*, the proper test for a stay of proceedings pursuant to s. 50 of the *Federal Court Act* to enforce a forum selection clause in a bill of lading is the "strong cause" test. Once a court is satisfied that a validly concluded bill of lading otherwise binds the parties, it must grant the stay unless the plaintiff can show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause. In exercising its discretion, the court should take into account all of the circumstances of the particular case. The tripartite test for interlocutory injunctions is an inappropriate test for a stay of proceedings to enforce a forum selection clause in a bill of lading. First, the tripartite test would render most forum selection clauses unenforceable, creating commercial uncertainty by unduly minimizing the importance of contractual undertakings. Second, the tripartite test is also problematic because the first part of the test requires the court to evaluate the likelihood of success on the merits of the case -- which would be impossible because there is normally no determination on the merits. Finally, the tripartite test would make it difficult to establish irreparable harm in the context of a stay application based on a forum selection clause.

On an application for a stay to uphold a forum selection clause in a bill of lading, a court must not delve into [page452] whether one party has deviated from or fundamentally breached an otherwise validly formed contract. Such inquiries would render forum selection clauses illusory since most disputes will involve allegations which, if proved, will make the agreement terminable or voidable by the aggrieved party. Issues respecting an alleged fundamental breach of contract or deviation

therefrom should generally be determined under the law and by the court chosen by the parties in the bill of lading. Once it is determined that the bill of lading binds the parties, the "strong cause" test constitutes an inquiry into questions such as the convenience of the parties, fairness between the parties and the interests of justice, not of the substantive legal issues underlying the dispute.

The decisions of the prothonotary, the motions judge and the Court of Appeal in this case are clearly wrong. The prothonotary, to the extent he applied the "tripartite test", erred in law, as did the Court of Appeal in concluding that the appropriate test for a stay of proceedings involving a bill of lading with a forum selection clause was the "tripartite test" for interlocutory injunctions. The "strong cause" test remains relevant and effective and no social, moral or economic changes justify the departure advanced by the Court of Appeal. Further, the prothonotary erred in law when he determined that the forum selection clause was void as a result of the alleged deviation stemming from the discharge of the cargo in Montréal. It is unnecessary to determine whether there has been a fundamental breach or deviation because the forum selection clause clearly covers such a dispute.

## Cases Cited

Applied: The "Eleftheria", [1969] 1 Lloyd's Rep. 237; distinguished: Manitoba (Attorney General) v. Metropolitan Stores Ltd., [1987] 1 S.C.R. 110; considered: Guarantee Co. of North America v. Gordon Capital Corp., [1999] 3 S.C.R. 423; referred to: American Cyanamid Co. v. Ethicon Ltd., [1975] 1 All E.R. 504; Captain v. Far Eastern SS. Co. (1978), 7 B.C.L.R. 279; Canada v. Aqua-Gem Investments Ltd., [1993] 2 F.C. 425; Jian Sheng Co. v. Great Tempo S.A., [1998] 3 F.C. 418, leave to appeal refused, [1998] 3 S.C.R. vi; Morguard Investments Ltd. v. De Savoye, [1990] 3 S.C.R. 1077; Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of), [2001] 3 S.C.R. 907, 2001 SCC 90; Amchem Products Inc. v. British Columbia (Workers' Compensation Board), [1993] 1 S.C.R. 897; RJR--MacDonald [page453] Inc. v. Canada (Attorney General), [1994] 1 S.C.R. 311; The "Seapearl" v. Seven Seas Dry Cargo Shipping Corp., [1983] 2 F.C. 161; Anraj Fish Products Industries Ltd. v. Hyundai Merchant Marine Co. (2000), 262 N.R. 270; Sarabia v. "Oceanic Mindoro" (The) (1996), 26 B.C.L.R. (3d) 143, leave to appeal refused, [1997] 2 S.C.R. xiv; Maritime Telegraph and Telephone Co. v. Pre Print Inc. (1996), 131 D.L.R. (4th) 471; Morrison v. Society of Lloyd's (2000), 224 N.B.R. (2d) 1, leaves to appeal refused, [2000] 2 S.C.R. viii and xi; Trendtex Trading Corp. v. Credit Suisse, [1982] A.C. 679; The Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972); Advanced Cardiovascular Systems Inc. v. Universal Specialties Ltd., [1997] 1 N.Z.L.R. 186; Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585 (1991); Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528 (1995); Mackender v. Feldia A.G., [1966] 3 All E.R. 847; Fairfield v. Low (1990), 71 O.R. (2d) 599; Ash v. Lloyd's Corp. (1992), 9 O.R. (3d) 755, leave to appeal refused, [1992] 3 S.C.R. v; Drew Brown Ltd. v. The "Orient Trader", [1974] S.C.R. 1286; Hunter Engineering Co. v. Syncrude Canada Ltd., [1989] 1 S.C.R. 426; Incremona-Salerno Marmi Affini Siciliani (I.S.M.A.S.) s.n.c. v. Ship Castor (2002), 297 N.R. 151, 2002 FCA 479.

## Statutes and Regulations Cited

Federal Court Act, R.S.C. 1985, c. F-7, s. 50(1).

Marine Liability Act, S.C. 2001, c. 6, s. 46(1).

**Authors Cited**

Michell, M. Paul. "Forum Selection Clauses and Fundamental Breach: Z.I. Pompey Industrie v. ECU-Line N.V., The Canmar Fortune" (2002), 36 Can. Bus. L.J. 453.

Peel, Edwin. "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] L.M.C.L.Q. 182.

Tetley, William. Marine Cargo Claims, 3rd ed. Montréal: Yvon Blais, 1988.

**History and Disposition:**

APPEAL from a judgment of the Federal Court of Appeal (2001), 268 N.R. 364, [2001] F.C.J. No. 96 (QL), dismissing an appeal from a decision of the Trial Division (1999), 182 F.T.R. 112, [1999] F.C.J. No. 2017 (QL), dismissing a motion to set aside the order of Prothonotary Hargrave denying a stay of proceedings (1999), 179 F.T.R. 254, [1999] F.C.J. No. 1584 (QL). Appeal allowed.


[page454]


**Counsel:**

H. Peter Swanson, for the appellant.

George J. Pollack and Jean-Marie Fontaine, for the respondents.

---

The judgment of the Court was delivered by

**1    BASTARACHE J.**:-- The appellant submits that the appropriate test on a motion for a stay of proceedings to uphold a forum selection clause in a bill of lading is the "strong cause" test, as set out by Brandon J. in *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237 (Adm. Div.). The respondents, however, contend that the Federal Court of Appeal was correct in applying the tripartite test for interlocutory injunctions established in *American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504 (H.L.). In my view, there is no legal or policy justification for setting aside the "strong cause" test in the context of a stay of proceedings to uphold a forum selection clause in a bill of lading. The

dispute in this case arises under or in connection with the bill of lading. Its broad, unambiguous and unqualified forum selection clause was clearly intended to cover the dispute that gave rise to this appeal.

  I.  <u>Facts</u>

**2** The respondent Polyfibron Technologies Inc. purchased a photo processor and four "sub-assemblies" located in France from the respondent Z.I. Pompey Industrie for resale to its customer, the respondent Ellehammer Packaging Inc. The cargo was to be delivered directly to Ellehammer in Seattle, Washington. Polyfibron retained the services of the respondent John S. James Co., a freight forwarder, to arrange for the importation of the cargo. John S. James Co., in turn, retained the services of the respondent Société lyonnaise de messageries nationales ("S.L.M.N. Shipping"), which made arrangements with ECU-Line France, a division of the appellant ECU-Line N.V., a Belgian company, for carriage of the cargo by sea.

 [page455]

**3** The respondent John S. James Co. was aware that the cargo could not be transported by rail without there being a significant risk of it sustaining damage and communicated this fact to the respondent S.L.M.N. Shipping.

**4** Under a clean on-board bill of lading executed at Lyon, France on January 23, 1997, the appellant was to carry the cargo from Antwerp, Belgium, to Seattle. The bill of lading designates John S. James Co. as the "consignee", Antwerp as the "port of loading", and Seattle as the "port of discharge". It bears the following forum selection clause:

> The contract evidenced by or contained in this bill of Lading is governed by the law of Belgium, and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts in Antwerp and no other Courts.

The back of the bill of lading contains, among other provisions, the following clause:

   12. METHODS AND ROUTE OF TRANSPORTATION

> (1) The Carrier may ant [*sic*] any time and without notice to the Merchant: use any means of transport or storage whatsoever; load or carry the Goods on any vessel whether named on the front hereof or not; transfer the Goods from one conveyance to another including transshipping or carrying the same on another vessel than that named on the front hereof or by any other means of transport whatsoever; at any place unpack and remove Goods which have been stuffed in

or on a Container and forward the same in any manner whatsoever; proceed at any speed and by any route in his discretion (whether or not the nearest or most or customary or advertised route) and proceed to or stay at any place whatsoever once or more often and in any order; load or unload the Goods from any conveyance at any place (whether or not the place is a port named on the front hereof as the intended Port of Loading or intended Port of Discharge); ...

(2)   The liberties set out in (1) above be [*sic*] invoked by the Carrier for any purposes whatsoever whether or not connected with the Carriage of the Goods. Anything done accordance [*sic*] with (1) above or any delay arising therfrom [*sic*] shall be deemed to be within the contractual Carriage and shall not be a deviation or whatsoever nature or degree.

[page456]

**5**   The appellant transported the cargo from Antwerp to Montréal, where it was unloaded. From there the cargo was carried by train to Seattle. The respondents filed an action for damages of $60,761.74 in the Federal Court of Canada, alleging that the cargo was damaged while in transit by rail. The appellant denied the cargo had been damaged, arguing in the alternative that any damage had been caused by the respondents, third parties, or events for which it was not responsible. The appellant also brought a motion seeking a stay of proceedings on the basis that the bill of lading required disputes to be determined exclusively by the courts of Antwerp.

II.   Relevant Statutory Provisions

**6**   The following statutory provisions are central to this appeal:

*Federal Court Act*, R.S.C. 1985, c. F-7

**50.** (1) The Court may, in its discretion, stay proceedings in any cause or matter,

(*a*) on the ground that the claim is being proceeded with in another court or jurisdiction; or

(*b*) where for any other reason it is in the interest of justice that the proceedings be stayed.

*Marine Liability Act*, S.C. 2001, c. 6

**46.** (1) If a contract for the carriage of goods by water to which the Hamburg Rules do not apply provides for the adjudication or arbitration of claims arising under the contract in a place other than Canada, a claimant may institute judicial or arbitral proceedings in a court or arbitral tribunal in Canada that would be competent to determine the claim if the contract had referred the claim to Canada, where

(*a*) the actual port of loading or discharge, or the intended port of loading or discharge under the contract, is in Canada;

(*b*) the person against whom the claim is made resides or has a place of business, branch or agency in Canada; or

(*c*) the contract was made in Canada.

[page457]

III.    Judicial History

A. *Federal Court of Canada, Trial Division* (1999), 179 F.T.R. 254

**7**    The appellant sought a stay of proceedings before the Federal Court, pursuant to s. 50 of the *Federal Court Act*, arguing that the courts of Antwerp were the proper jurisdiction to deal with any disputes arising from the bill of lading. The prothonotary held that the appellant had moved for a stay within reasonable time given the implementation of new court rules and had therefore not attorned to its jurisdiction. The prothonotary accepted and applied the "strong cause" test as set out in the *The "Eleftheria"* characterizing its finding in the following way, at paras. 4-5:

> ... I accept that ECU-Line prefers to litigate in a familiar jurisdiction and does not bring up the Antwerp jurisdiction merely to seek procedural advantage. Other factors favouring the upholding of the jurisdiction clause include reasonable connections with Belgium, Belgian and French witnesses, that any time bar which might preclude the plaintiffs from bringing their case in Antwerp has been waived, that no security has been posted and that enforcement of a Belgian judgment against the carrier, a Belgian company, should present no particular

difficulties.

I accept, from the Plaintiffs' point of view, that there will be Canadian and American witnesses, including from the American east-coast freight forwarder through whom the Plaintiff, Polyfibron Technologies Inc., arranged the carriage. Certainly the Tribunal of Commerce in [Antwerp], which would decide the case under the jurisdiction clause, conducts its proceedings in Flemish and decides cases on the basis of documents and statements, a procedure precluding witnesses and cross-examination. There may also be considerably more delay in most instances than in the Federal Court and all the more so in the case of an appeal. There are also some lesser factors which favour litigation in Vancouver.

[page458]

The prothonotary concluded, at para. 5, that the factors raised by the respondents, while "substantial", were "just short [in this instance] of the strong case" which, by *The "Eleftheria"*, the respondents had to present in order to override the forum selection clause.

**8**    However, the prothonotary added that the respondents had presented a persuasive case that the bill of lading had come to an end in Montréal. For that reason, there was no forum selection clause to apply to the dispute. Notwithstanding clause 12 of the bill of lading, the prothonotary, relying on Professor W. Tetley's *Marine Cargo Claims* (3rd ed. 1988), accepted the presumption that a serious and willful breach or deviation of a contract of carriage may bring into question exclusion or limitation clauses in the contract. The prothonotary's response to the appellant's contention that issues of fundamental breach or deviation should be determined on the merits by the trial judge was the following, at para. 8 :

The answer to this is not complex. An interim injunction, obtained on an interlocutory application, which requires a testing of the waters by looking at the strength of the case, the harm being caused and the balance of convenience, is analogous to denial of a stay of the basis of a strong case that the jurisdiction clause is just not applicable. The interim injunction does not handicap the trial judge, nor should the denial of a stay on the basis that the jurisdiction clause is in all likelihood not available. Any prejudice to ECU-Line in having to litigate in Canada can be compensated by costs.

The prothonotary stated that it was common knowledge that rail carriage is usually accompanied by vibration, bumps and jolts, though considered this to be immaterial to the present case in which the intent to deviate was the sole issue. The prothonotary concluded that the appellant's deviation from the bill of lading was both unreasonable and voluntary. Relying on *Captain v. Far Eastern SS. Co.*

(1978), 7 B.C.L.R. 279 (S.C.), the prothonotary concluded that there was no contract at the time the appellant [page459] discharged the cargo in Montréal and thus no forum selection clause upon which it could rely.

**9**     The motion for a stay of proceedings to uphold the forum selection clause was therefore denied.

B. *Federal Court of Canada, Trial Division* (1999), 182
 F.T.R.
 112

**10**     The court concluded that the prothonotary was obliged to take into account all the circumstances of the case in determining whether the respondent had demonstrated a "strong cause" in favour of denying a stay, pursuant to the test set out in *The "Eleftheria"*, an inquiry that did not preclude him from concluding that the bill of lading ended in Montréal and that its forum selection clause did not apply thereafter. The court added that in any event the appellant would have the opportunity to raise its arguments regarding the existence of the bill of lading and its forum selection clause before a trial judge.

**11**     The court dismissed with costs the motion to set aside the order of the prothonotary.

C.     *Federal Court of Appeal* (2001), 268 N.R. 364

**12**     The Court of Appeal held that the test for reviewing decisions of a prothonotary is whether the prothonotary's exercise of discretion was clearly wrong and that the test for reviewing the exercise of discretion of a motions judge is whether sufficient weight was given to all relevant considerations.

**13**     The Court of Appeal concluded that *The "Eleftheria"* did not govern the case, stating, at para. 27:

> The burden of the appellant's submission is that when, as here, a contract contains a jurisdiction clause requiring that all disputes, wherever they arise, are to be dealt with by the Courts of a particular jurisdiction, Anglo-American and Anglo-Canadian jurisprudence both conclude that the dispute must be dealt with by the [page460] Courts of the jurisdiction the parties have agreed to. The appellant says that since *The Eleftheria* no case in Anglo-Canadian or Anglo-American jurisprudence has held otherwise. I disagree. *Jian Sheng Co.* [*v. Great Tempo S.A.*, [1998] 3 F.C. 418 (C.A.)] is a case where this Court held that a prothonotary was right to refuse a stay in circumstances where the appellant had not led sufficient evidence to support the existence of jurisdiction elsewhere than Canada.

**14**     The Court of Appeal emphasized *The "Eleftheria"* was decided in 1969 and the House of

Lords had since decided *American Cyanamid, supra*, thereby relaxing the requirements for an interlocutory injunction to a tripartite test: first, a preliminary and tentative assessment of the merits of the case must show there is a serious issue to be tried; second, consideration must be given to whether the party seeking the interlocutory injunction would suffer irreparable harm unless the injunction is granted; and third, there must be a determination as to which party would suffer the greater harm as a result of the granting or refusing of an interlocutory injunction.

**15**    The Court of Appeal quoted with approval Beetz J., writing for a unanimous Supreme Court, in *Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1 S.C.R. 110, at p. 127:

> A stay of proceedings and an interlocutory injunction are remedies of the same nature. In the absence of a different test prescribed by statute, they have sufficient characteristics in common to be governed by the same rules and the courts have rightly tended to apply to the granting of interlocutory stay the principles which they follow with respect to interlocutory injunctions ... .

The Court of Appeal reasoned that although the prothonotary had not referred to either *American Cyanamid* or *Metropolitan Stores*, it was likely what he had in mind when he concluded, at para. 8:

> An interim injunction, obtained on an interlocutory application, which requires a testing of the waters by looking at the strength of the case, the harm being caused and the balance of convenience, is analogous to denial of a stay of the basis of a strong case that the jurisdiction clause is just not applicable.

[page461]

The Court of Appeal concluded that given the evolution of English and Canadian jurisprudence, the proper test to apply in stay applications is the tripartite test employed for the purposes of obtaining interlocutory injunctions.

**16**    The Court of Appeal dismissed the appeal with costs.

IV.    Issues

**17**    1. What is the proper test on a motion brought for a stay of proceedings to enforce the forum selection clause in a bill of lading?

2.    Does that test contemplate an inquiry into whether there was a fundamental breach or deviation, or should such an inquiry be left to the decision maker in the agreed forum?

V. Analysis

**18**    Discretionary orders of prothonotaries ought to be disturbed by a motions judge only where (a) they are clearly wrong, in the sense that the exercise of discretion was based upon a wrong principle or a misapprehension of the facts, or (b) in making them, the prothonotary improperly exercised his or her discretion on a question vital to the final issue of the case: *Canada v. Aqua-Gem Investments Ltd.*, [1993] 2 F.C. 425 (C.A.), *per* MacGuigan J.A., at pp. 462-63. An appellate court may interfere with the decision of a motions judge where the motions judge had no grounds to interfere with the prothonotary's decision or, in the event such grounds existed, if the decision of the motions judge was arrived at on a wrong basis or was plainly wrong: *Jian Sheng Co. v. Great Tempo S.A.*, [1998] 3 F.C. 418 (C.A.), *per* Décary J.A., at pp. 427-28, leave to appeal refused, [1998] 3 S.C.R. vi. For the reasons below, I conclude that the decisions of the prothonotary, the motions judge and the Court of Appeal are clearly wrong.

   A.    *Stays of Proceedings to Enforce a Forum Selection Clause*

**19**    Pursuant to s. 50(1) of the *Federal Court Act*, the court has the discretion to stay proceedings in any [page462] cause or matter on the ground that the claim is proceeding in another court or jurisdiction, or where, for any other reason, it is in the interest of justice that the proceedings be stayed. For some time, the exercise of this judicial discretion has been governed by the "strong cause" test when a party brings a motion for a stay of proceedings to enforce a forum selection clause in a bill of lading. Brandon J. set out the test as follows in *The "Eleftheria"*, at p. 242:

> (1)    Where plaintiffs sue in England in breach of an agreement to refer disputes to a foreign Court, and the defendants apply for a stay, the English Court, assuming the claim to be otherwise within the jurisdiction, is not bound to grant a stay but has a discretion whether to do so or not. (2) The discretion should be exercised by granting a stay unless strong cause for not doing so is shown. (3) The burden of proving such strong cause is on the plaintiffs. (4) In exercising its discretion the Court should take into account all the circumstances of the particular case. (5) In particular, but without prejudice to (4), the following matters, where they arise, may be properly regarded: (a) In what country the evidence on the issues of fact is situated, or more readily available, and the effect of that on the relative convenience and expense of trial as between the English and foreign Courts. (b) Whether the law of the foreign Court applies and, if so, whether it differs from English law in any material respects. (c) With what country either party is connected, and how closely. (d) Whether the defendants genuinely desire trial in the foreign country, or are only seeking procedural advantages. (e) Whether the plaintiffs would be prejudiced by having to sue in the foreign Court because they would (i) be deprived of security for that claim; (ii) be unable to enforce any judgment obtained; (iii) be faced with a time-bar not applicable in England; or (iv) for political, racial, religious or other reasons be unlikely to get a fair trial.

**20**    Forum selection clauses are common components of international commercial transactions,

and are particularly common in bills of lading. They have, in short, "been applied for ages in the industry and [page463] by the courts": Décary J.A. in *Jian Sheng, supra*, at para. 7. These clauses are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law: La Forest J. in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, at pp. 1096-97; *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC 90, at paras. 71-72. The "strong cause" test remains relevant and effective and no social, moral or economic changes justify the departure advanced by the Court of Appeal. In the context of international commerce, order and fairness have been achieved at least in part by application of the "strong cause" test. This test rightly imposes the burden on the plaintiff to satisfy the court that there is good reason it should not be bound by the forum selection clause. It is essential that courts give full weight to the desirability of holding contracting parties to their agreements. There is no reason to consider forum selection clauses to be non-responsibility clauses in disguise. In any event, the "strong cause" test provides sufficient leeway for judges to take improper motives into consideration in relevant cases and prevent defendants from relying on forum selection clauses to gain an unfair procedural advantage.

**21**    There is a similarity between the factors which are to be taken into account when considering an application for a stay based on a forum selection clause and those factors which are weighed by a court considering whether to stay proceedings in "ordinary" cases applying the *forum non conveniens* doctrine: E. Peel in "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] *L.M.C.L.Q.* 182, at pp. 189-90. The latter inquiry is well settled in Canada: *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897 . In the latter inquiry, the burden is normally on the defendant to show why a stay should be granted, but the presence of a forum selection clause in the former is, in my view, sufficiently [page464] important to warrant a different test, one where the starting point is that parties should be held to their bargain, and where the plaintiff has the burden of showing why a stay should not be granted. I am not convinced that a unified approach to *forum non conveniens*, where a choice of jurisdiction clause constitutes but one factor to be considered, is preferable. As Peel, *supra*, notes, at p. 190, I fear that such an approach would not

> ensure that full weight is given to the jurisdiction clause since not only should the clause itself be taken into account, but also the effect which it has on the factors which are relevant to the determination of the natural forum. Factors which may otherwise be decisive may be less so if one takes into account that the parties agreed in advance to a hearing in a particular forum and must be deemed to have done so fully aware of the consequences which that might have on, for example, the transportation of witnesses and evidence, or compliance with foreign procedure etc.

In my view, a separate approach to applications for a stay of proceedings involving forum selection clauses in bills of lading ensures that these considerations are properly taken into account and that

the parties' agreement is given effect in all but exceptional circumstances. See also M. P. Michell, "Forum Selection Clauses and Fundamental Breach: *Z.I. Pompey Industrie v. ECU-Line N.V., The Canmar Fortune*" (2002), 36 *Can. Bus. L.J.* 453, at pp. 471-72.

      B.   *The Inappropriateness of the Tripartite Test*

**22**    T he respondents adopted the Court of Appeal's holding in favour of extending the tripartite test for interlocutory injunction to motions for a stay of proceedings to enforce a forum selection clause in a bill of lading. The tripartite test was set out as follows by this Court in *RJR--MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311, at p. 334:

[page465]

> First, a preliminary assessment must be made of the merits of the case to ensure that there is a serious question to be tried. Secondly, it must be determined whether the applicant would suffer irreparable harm if the application were refused. Finally, an assessment must be made as to which of the parties would suffer greater harm from the granting or refusal of the remedy pending a decision on the merits.

In support of the move to the tripartite test, the Court of Appeal quoted, at para. 29, with approval this Court's statement in *Metropolitan Stores*, at p. 127:

> A stay of proceedings and an interlocutory injunction are remedies of the same nature. In the absence of a different test prescribed by statute, they have sufficient characteristics in common to be governed by the same rules and the courts have rightly tended to apply to the granting of interlocutory stay the principles which they follow with respect to interlocutory injunctions.

While a stay of proceedings to enforce a forum selection clause may be of the same nature as an interlocutory injunction, I must respectfully disagree with the conclusion of the Court of Appeal.

**23**    The conclusion of the Court of Appeal is not supported by this Court's decision in *Metropolitan Stores*. The two main issues in that case were whether the Court of Appeal erred in failing to recognize a presumption of constitutional validity where legislation is challenged under the *Charter*, and what principles govern the exercise of a Superior Court judge's discretionary power to order a stay until the constitutionality of impugned legislation has been determined. The context of a constitutional challenge has little in common with the case at bar. Indeed, *Metropolitan Stores* did not involve forum selection clauses, and the underlying desirability of holding contracting parties to their bargain was not at issue. That case did not concern private international

law; consequently, considerations of comity, uniformity of law, forum shopping and related issues were neither canvassed nor addressed by the Court.

[page466]

**24**    As recently as 1998, Décary J.A., for a unanimous Federal Court of Appeal in *Jian Sheng*, confirmed at para. 10 the appropriateness of the "strong cause" test in Canada, a case in which the issue was whether the forum selection clause in a bill of lading was void for uncertainty:

> Where, in admiralty matters before this Court, a defendant applies for a stay pursuant to section 50 of the *Federal Court Act* ... on the basis of a jurisdiction clause found in a bill of lading, the defendant has the burden of persuading the Court that the conditions of application of the clause have been met. Once the Court is satisfied that the clause applies, the burden of proof then shifts to the plaintiff to show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to keep the plaintiff to the terms of the contract ... . These "strong reasons" have been summarized in the often-quoted reasons of Brandon J. (as he then was) in *The "Eleftheria"* ... .

In *Jian Sheng*, the forum selection clause contained in the bill of lading required the defendant to show it was the carrier and what was its principal place of business. *Jian Sheng* does not, as the Court of Appeal held in the case at bar, undermine in any way the "strong cause" test. Indeed, the tripartite test adopted by the Court of Appeal in this case constitutes a significant and unjustified departure from the jurisprudence not only of the Federal Court, but also of provincial courts, and those of other jurisdictions. See for instance: *The "Seapearl" v. Seven Seas Dry Cargo Shipping Corp.*, [1983] 2 F.C. 161 (C.A.), *per* Pratte J.A., at pp. 176-77, and *per* Lalande D.J., at p. 180; *Anraj Fish Products Industries Ltd. v. Hyundai Merchant Marine Co.* (2000), 262 N.R. 270 (F.C.A.), at para. 5; *Sarabia v. "Oceanic Mindoro" (The)* (1996), 26 B.C.L.R. (3d) 143 (C.A.), at paras. 37-38, leave to appeal refused, [1997] 2 S.C.R. xiv; *Maritime Telegraph and Telephone Co. v. Pre Print Inc.* (1996), 131 D.L.R. (4th) 471 (N.S.C.A.), at p. 483; *Morrison v. Society of Lloyd's* (2000), 224 N.B.R. (2d) 1 (C.A.), at para. 14, leaves to appeal refused, [2000] 2 S.C.R. viii and xi; *Trendtex [page467] Trading Corp. v. Credit Suisse*, [1982] A.C. 679 (H.L.); *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), at p. 15; *Advanced Cardiovascular Systems Inc. v. Universal Specialties Ltd.*, [1997] 1 N.Z.L.R. 186 (C.A.), at p. 190.

**25**    There are also compelling public policy reasons in favour of upholding the "strong cause" test. If the tripartite test were employed to deal with situations like the case at bar, most forum selection clauses would be rendered unenforceable, creating commercial uncertainty by unduly minimizing the importance of contractual undertakings. Instead of requiring a plaintiff to demonstrate a "strong cause" to not enforce a forum selection clause, the burden would be on the applicant to establish the

elements of the tripartite test. The "strong cause" test rightly places the onus on the plaintiff who commences suit contrary to the terms of a forum selection clause.

**26**    Applying the tripartite test to a situation of this nature is also problematic because the first part of the test requires the court to evaluate the likelihood of success on the merits of the case. This part of the test is designed to allow a motions judge the opportunity to deal with legal issues in preliminary proceedings without prejudice to the final adjudication of their merits. In the case of motions to stay proceedings based on a forum selection clause in a bill of lading, such a process would be impossible because there is normally no determination on the merits. Either the stay will be granted, and the proceedings in Canada will come to an end, or the stay will be denied and the defendant will have to defend the case on the merits in Canada, losing the benefit of the jurisdiction clause. For this reason the rule governing such stay applications cannot be based on a test that relies on the likelihood of success on the merits.

[page468]

**27**    The test propounded by the Court of Appeal would make it difficult to establish harm in the context of a stay application based on a forum selection clause. Indeed, I can think of no instance where a defendant would suffer irreparable harm by being required to defend a lawsuit in a Canadian court. I am not satisfied that litigation costs disproportionate to the amount of the claim would constitute irreparable harm, as the respondents have argued. The "strong cause" test reflects the desirability that parties honour their contractual commitments and is consistent with the principles of order and fairness at the heart of private international law, as well as those of certainty and security of transaction at the heart of international commercial transactions. I see no reason to depart from the traditional approach for a stay of proceedings when the applicability of a forum selection clause is at issue. The Court of Appeal in effect read the choice of jurisdiction clause out of the contract. This approach is, in my view, untenable.

**28**    The respondents submit we ought to accord little weight to the forum selection clause in the bill of lading because bills of lading are, as a general rule, contracts of adhesion, devised unilaterally by the appellant. This submission is without merit despite the fact that bills of lading are often issued on pre-printed forms. See *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), at pp. 593-94.

**29**    Bills of lading are typically entered into by sophisticated parties familiar with the negotiation of maritime shipping transactions who should, in normal circumstances, be held to their bargain. See *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995). The parties in this appeal are corporations with significant experience in international maritime commerce. The respondents were aware of industry practices and could have reasonably expected that the bill of lading would contain a forum selection clause. A forum selection clause could very well have been

negotiated with the appellant, in light of the respondent John S. James Co.'s [page469] insistence that S.L.M.N. Shipping transport the cargo solely by sea. There is no evidence that this bill of lading is the result of grossly uneven bargaining power that would invalidate the forum selection clause contained therein.

C.    *Fundamental Breach and Deviation*

**30**    Having concluded that the "strong cause" test governs whether to grant a stay in the context of a bill of lading with a forum selection clause, I turn to whether, in taking into account all the circumstances of the particular case, the Court should consider issues arising under the contract. The respondents submit the Court should do just that, relying in part on the following passage from Professor Tetley in *Marine Cargo Claims, supra*, at p. 99:

> When however the breach is so serious, usually the result of a fraudulent or wilful act, the courts have questioned whether the carrier may rely on the terms of the contract or the law, and in particular, whether the carrier may rely on the exclusion or limitation clauses in the contract and the law because he has seemingly placed himself outside of the contract and the law.

In my view, the prothonotary erred in law when he determined the forum selection clause was void as a result of the alleged deviation stemming from the discharge of the cargo in Montréal.

**31**    Issues respecting an alleged fundamental breach of contract or deviation therefrom should generally be determined under the law and by the court chosen by the parties in the bill of lading. The "strong cause" test, once it is determined that the bill of lading otherwise binds the parties (for instance, that the bill of lading as it relates to jurisdiction does not offend public policy, was not the product of fraud or of grossly uneven bargaining positions), constitutes an inquiry into questions such as the convenience of the parties, fairness between the parties and the interests of justice, not of the substantive legal issues underlying the dispute. See *Mackender v. Feldia A.G.*, [1966] 3 All E.R. 847 (C.A.), *per* Lord Denning, at pp. 849-50, and *per* Lord Diplock, at p. 852. Put [page470] differently, a court, in the context of an application for a stay to uphold a forum selection clause in a bill of lading, must not delve into whether one party has deviated from, or fundamentally breached an otherwise validly formed contract. Such inquiries would render forum selection clauses illusory since most disputes will involve allegations which, if proved, will make the agreement terminable or voidable by the aggrieved party. Moreover, while the choice of forum for the determination of the existence of the agreement would be made without reference to the forum selection clause in the contract, if the agreement were found to remain intact, resort to the said clause would presumably be necessary to decide the appropriate forum in which to settle the rights of the parties under the agreement.

**32**    The position adopted by the Court of Appeal would remove many disputes from the reach of a widely framed forum selection clause by the mere allegation of various types of wrongful conduct. In my view, where, as here, the parties agree that claims or disputes arising under or in connection

with a bill of lading are to "be determined by the courts in Antwerp and no other Courts", a proceeding in which one party contends that the other party deviated from the agreement such as to give the former the right to terminate or void the contract remains a proceeding in respect of a claim or dispute arising under or in connection with the bill of lading: *Fairfield v. Low* (1990), 71 O.R. (2d) 599 (H.C.), at pp. 605-8; *Ash v. of Lloyd's Corp.* (1992), 9 O.R. (3d) 755 (C.A.), at p. 758, leave to appeal refused, [1992] 3 S.C.R. v; *Morrison, supra*, at paras. 13 and 19. See also *Drew Brown Ltd. v. The "Orient Trader"*, [1974] S.C.R. 1286, *per* Ritchie J., at p. 1288, and *per* Laskin J., at p. 1318, where an alleged deviation was found not to displace an otherwise valid choice of law clause.

33    The conclusion that allegations of deviation or fundamental breach are matters arising under the contract that should not be considered in [page471] determining whether to give effect to a forum selection clause is supported by the construction approach to fundamental breach considered by our Court in *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423, a case concerning the use of fundamental breach in the context of time limitation provisions. Discussing *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426 (a case involving fundamental breach in the context of clauses excluding liability), the Court said this, at para. 52:

> [W]hether fundamental breach prevents the breaching party from continuing to rely on an exclusion clause is a matter of construction rather than a rule of law. The only limitation placed upon enforcing the contract as written in the event of a fundamental breach would be to refuse to enforce an exclusion of liability in circumstances where to do so would be unconscionable, according to Dickson C.J., or unfair, unreasonable or otherwise contrary to public policy, according to Wilson J.

In my view, the policy rationale in support of the construction approach applied to exclusion and time limitation clauses is equally applicable to forum selection clauses in bills of lading.

34    In the case at bar, it is unnecessary to determine whether there has been a fundamental breach or deviation because the forum selection clause clearly covers such a dispute. The language of the clause is unambiguous and not subject to any qualifications, and the parties' bargain was not unconscionable or unreasonable. The clause becomes relevant precisely in disputes such as this one, as it regulates the way in which liability for deviation or breach of contract is to be established.

35    This approach is sound for policy reasons. Stay applications in the Federal Court should be brought quickly after commencement of the suit and consequently, the parties will have limited knowledge and information regarding the strength or weakness [page472] of their opponent's case. Issues regarding whether there has been, for instance, an unreasonable deviation raise complicated questions of fact that require a consideration of all the circumstances giving rise to the alleged deviation.

36    Given my conclusions, I do not consider it necessary to address the issue of the relationship

between deviation and fundamental breach. Suffice it to say that, in this case, either allegation concerns a dispute arising under or in connection with the bill of lading. There is no need to consider the applicability of the doctrine of separability.

D.    *Section 46 of the Marine Liability Act*

**37**    Section 46(1) of the *Marine Liability Act*, which entered into force on August 8, 2001, has the effect of removing from the Federal Court its discretion under s. 50 of the *Federal Court Act* to stay proceedings because of a forum selection clause where the requirements of s. 46(1)(*a*), (*b*), or (*c*) are met. This includes where the actual port of loading or discharge is in Canada. In this case, there would be no question that the Federal Court is an appropriate forum to hear the respondents' claim but for the fact that s. 46 does not apply to judicial proceedings commenced prior to its coming into force: *Incremona-Salerno Marmi Affini Siciliani (I.S.M.A.S.) s.n.c. v. Ship Castor* (2002), 297 N.R. 151, 2002 FCA 479, at paras. 13-24. Section 46 of the *Marine Liability Act* is therefore irrelevant in this appeal.

**38**    Indeed, s. 46(1) would appear to establish that, in select circumstances, Parliament has deemed it appropriate to limit the scope of forum selection clauses by facilitating the litigation in Canada of claims related to the carriage of goods by water having a minimum level of connection to this country. Such a legislative development does not, however, provide support for the fundamental jurisprudential shift made by the Court of Appeal in the case at bar. To the contrary, s. 46(1) indicates Parliament's intent to broaden the jurisdiction of the Federal Court only in very particular instances that [page473] can easily be ascertained by a prothonotary called upon to grant a stay of proceedings pursuant to the forum selection clause of a bill of lading. Section 46(1) in no way mandates a prothonotary to consider the merits of the case, an approach in line with the general objectives of certainty and efficiency, which underlie this area of the law.

E.    *Application of the Law to the Facts of this Case*

**39**    I am of the view that, in the absence of applicable legislation, for instance s. 46(1) of the *Marine Liability Act*, the proper test for a stay of proceedings pursuant to s. 50 of the *Federal Court Act* to enforce a forum selection clause in a bill of lading remains as stated in *The "Eleftheria"*, which I restate in the following way. Once the court is satisfied that a validly concluded bill of lading otherwise binds the parties , the court must grant the stay unless the plaintiff can show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause. In exercising its discretion, the court should take into account all of the circumstances of the particular case. See *The "Eleftheria"*, at p. 242; *Amchem*, at pp. 915-22; *Holt Cargo*, at para. 91. Disputes arising under or in connection with a contract may not be regarded by a court in determining whether "strong cause" has been shown that a stay should not be granted.

**40**    In this case, the bill of lading and its forum selection clause have been entered into and are otherwise binding on the parties. The prothonotary began by properly applying the "strong cause"

test. In so doing the prothonotary weighed the fact that the appellant prefers to litigate in a familiar jurisdiction and does not bring up the jurisdiction clause merely to seek a procedural advantage; there are reasonable connections with Belgium; there are Belgian and French witnesses; any time bar which may preclude the respondents from bringing their case in Belgium has been waived; no security has been posted; and the enforcement of a Belgian judgment against the [page474] appellant should present no particular difficulties. The prothonotary also accepted the respondents' arguments that there will be Canadian and American witnesses in these proceedings; the Tribunal de commerce in Antwerp conducts its proceedings in Flemish and decides cases on the basis of documents and statements, a procedure precluding witnesses and cross-examination; and, there may be more delay in Belgium than in Canada, especially if there is an appeal. The prothonotary concluded that the factors in favour of denying a stay, while substantial, were just short of the "strong cause" test which the respondents had the burden of meeting. I see no reason why the prothonotary's conclusion on this point should be set aside. However, the prothonotary erred by subsequently turning his attention to a dispute arising under the bill of lading and in effect extending the tripartite test for interlocutory injunctions to motions for a stay of proceedings involving forum selection clauses contained in bills of lading.

     VI.   <u>Disposition</u>

**41**    The prothonotary, to the extent he applied the "tripartite test", erred in law, as did the Court of Appeal in concluding that the appropriate test for a stay of proceedings involving a bill of lading with a forum selection clause was the "tripartite test" for interlocutory injunctions. The "strong cause" test does not contemplate an inquiry into the question of establishing whether the surrounding contract is voidable. Such questions are best left to the decision maker in the forum agreed upon.

**42**    Accordingly, I would allow the appeal, overturn the judgments of the courts below, and issue a stay of proceedings in favour of the appellant, with costs throughout to the appellant.

**Solicitors:**

Solicitors for the appellant: Bernard & Partners, Vancouver.


 [page475]

Solicitors for the respondents: Davies, Ward, Phillips and Vineberg, Montreal.


cp/e/qw/qllls

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br>Proceeding commenced at TORONTO |
| | **BRIEF OF AUTHORITIES OF**<br>**THE CANADIAN DEBTORS**<br>**Allocation Approval**<br>**(returnable June 7, 2011)** |
| | **NORTON ROSE OR LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street, P.O. Box 84<br>Toronto, Ontario  M5J 2Z4<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel: (416) 216-4832<br>Email: derrick.tay@nortonrose.com<br><br>**Alan Mark LSUC#: 18772U**<br>Tel: (416) 216-4865<br>Email: alan.mark@nortonrose.com<br><br>**Jennifer Stam LSUC#: 46735J**<br>Tel: (416) 216-2327<br>Email: jennifer.stam@nortonrose.com<br><br>Fax: (416) 216-3930<br>Lawyers for the Applicants |

DOCSTOR: 2191143\2

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**BRIEF OF AUTHORITIES OF THE CANADIAN DEBTORS**

**(Allocation Protocol)**
**(returnable June 7, 2011)**

June 3, 2011

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Alan Mark LSUC#: 18772U**
Tel: (416) 216-4865
Email: alan.mark@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**


**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**


**I N D E X**

| TAB | DESCRIPTION |
|-----|-------------|
| 1. | *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 45 C.B.R. (5th) 163 (Ont. C.A.), leave to appeal refused, [2008] S.C.C.A. No. 337 |
| 2. | *Babcock & Wilcox Canada Ltd. (Re)* [2000] O.J. No. 786 (S.C.J.) |
| 3. | *Benner and Associates Ltd. V. Northern Lights Distribution Inc.* [1995] O.J. No. 626 (Gen. Div.) |
| 4. | *Century Services Inc. v. Canada (Attorney General)*, [2010] S.C.J. No. 60 |
| 5. | *Citibank Canada v. Chase Manhattan Bank of Canada* (1991), 5 C.B.R. (3d) 165 (Ont. Gen. Div.) |
| 6. | *Coldmatic Refridgeration of Canada Ltd. v. P.U.M.A.s.r.* [1998] O.J. No. 1697 (Gen. Div.) |
| 7. | *Consumers Packaging Inc. (Re)* (2001) , 91 B.C.L.R. (3d)27 C.B.R. (4th) 197 (Ont. C.A.) |
| 8. | *Expedition Helicopters Inc. v. Honeywell Inc.,* [2010] O.J. No. 1998 (C.A.) leave to appeal to S.C.C. denied [2010] S.C.C.A. No. 258 |
| 9. | *Grace Canada Inc. (Re)*, [2005] O.J. No. 4868 (S.C.J.) |
| 10. | *Killough v. Canadian Red Cross Society* (2001), 91 B.C.L.R. (3d) 309 (B.C.S.C.) |
| 11. | *Microbiz Corp. v. Classic Software Systems Inc.,* [1996] O.J.. No. 5094 (Gen. Div.) |

- 2 -

| TAB | DESCRIPTION |
| --- | --- |
| 12. | *Muscletech Research and Development Inc (Re)* [2006] O.J. No. 167 (S.C.J) |
| 13. | *Nortel Networks Corp. (Re),* [2009] O.J. No. 3169 |
| 14. | *Roberts v. Picture Butte Municipal Hospital,* [1998] A.J. No. 87 (Q.B.) |
| 15. | *ScoZinc Ltd. (Re)*, [2009] N.S.J. No. 187 (S.C.) |
| 16. | *Z. I. Pompey Industrie v. ECU-Line N.V.,* [2003] 1 S.C.R. 450 |

# TAB 1

*Case Name:*

## ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.

**IN THE MATTER OF the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a Plan of Compromise and
Arrangement involving Metcalfe & Mansfield Alternative
Investments II Corp., Metcalfe & Mansfield Alternative
Investments III Corp., Metcalfe & Mansfield
Alternative Investments V Corp., Metcalfe & Mansfield
Alternative Investments XI Corp., Metcalfe & Mansfield
Alternative Investments XII Corp., 4446372 Canada Inc.
and 6932819 Canada Inc., Trustees of the Conduits
Listed In Schedule "A" Hereto
Between
The Investors represented on the Pan-Canadian
Investors Committee for Third-Party Structured
Asset-Backed Commercial Paper listed in Schedule "B"
hereto, Applicants (Respondents in Appeal), and
Metcalfe & Mansfield Alternative Investments II Corp.,
Metcalfe & Mansfield Alternative Investments III
Corp., Metcalfe & Mansfield Alternative Investments V
Corp., Metcalfe & Mansfield Alternative Investments XI
Corp., Metcalfe & Mansfield Alternative Investments
XII Corp., 6932819 Canada Inc. and 4446372 Canada
Inc., Trustees of the Conduits listed in Schedule "A"
hereto, Respondents (Respondents in Appeal), and
Air Transat A.T. Inc., Transat Tours Canada Inc., The
Jean Coutu Group (PJC) Inc., Aéroports de Montréal
Inc., Aéroports de Montréal Capital Inc., Pomerleau
Ontario Inc., Pomerleau Inc., Labopharm Inc., Domtar
Inc., Domtar Pulp and Paper Products Inc., GIRO Inc.,
Vêtements de sports R.G.R. Inc., 131519 Canada Inc.,
Air Jazz LP, Petrifond Foundation Company Limited,
Petrifond Foundation Midwest Limited, Services
hypothécaires la patrimoniale Inc., TECSYS Inc.,
Société générale de financement du Québec, VibroSystM**

**Inc., Interquisa Canada L.P., Redcorp Ventures Ltd., Jura Energy Corporation, Ivanhoe Mines Ltd., WebTech Wireless Inc., Wynn Capital Corporation Inc., Hy Bloom Inc., Cardacian Mortgage Services, Inc., West Energy Ltd., Sabre Enerty Ltd., Petrolifera Petroleum Ltd., Vaquero Resources Ltd. and Standard Energy Inc., Respondents (Appellants)**

**[2008] O.J. No. 3164**

2008 ONCA 587

45 C.B.R. (5th) 163

296 D.L.R. (4th) 135

2008 CarswellOnt 4811

168 A.C.W.S. (3d) 698

240 O.A.C. 245

47 B.L.R. (4th) 123

92 O.R. (3d) 513

Docket: C48969 (M36489)

Ontario Court of Appeal
Toronto, Ontario

**J.I. Laskin, E.A. Cronk and R.A. Blair JJ.A.**

Heard: June 25-26, 2008.
Judgment: August 18, 2008.

(121 paras.)

*Bankruptcy and insolvency law -- Proceedings in bankruptcy and insolvency -- Practice and procedure -- General principles -- Legislation -- Interpretation -- Courts -- Jurisdiction -- Federal -- Companies' Creditors Arrangement Act -- Application by certain creditors opposed to a Plan of Compromise and Arrangement for leave to appeal sanctioning of that Plan -- Pan-Canadian Investors Committee was formed and ultimately put forward the creditor-initiated Plan of*

*Compromise and Arrangement that formed the subject matter of the proceedings -- Plan dealt with liquidity crisis threatening Canadian market in Asset Backed Commercial Paper -- Plan was sanctioned by court -- Leave to appeal allowed and appeal dismissed -- CCAA permitted the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court -- Companies' Creditors Arrangement Act, ss. 4, 6.*

Application by certain creditors opposed to a Plan of Compromise and Arrangement for leave to appeal the sanctioning of that Plan. In August 2007, a liquidity crisis threatened the Canadian market in Asset Backed Commercial Paper (ABCP). The crisis was triggered by a loss of confidence amongst investors stemming from the news of widespread defaults on US sub-prime mortgages. By agreement amongst the major Canadian participants, the $32 billion Canadian market in third-party ABCP was frozen on August 13, 2007, pending an attempt to resolve the crisis through a restructuring of that market. The Pan-Canadian Investors Committee was formed and ultimately put forward the creditor-initiated Plan of Compromise and Arrangement that formed the subject matter of the proceedings. The Plan was sanctioned on June 5, 2008. The applicants raised an important point regarding the permissible scope of restructuring under the Companies' Creditors Arrangement Act: could the court sanction a Plan that called for creditors to provide releases to third parties who were themselves insolvent and not creditors of the debtor company? They also argued that if the answer to that question was yes, the application judge erred in holding that the Plan, with its particular releases (which barred some claims even in fraud), was fair and reasonable and therefore in sanctioning it under the CCAA.

HELD: Application for leave to appeal allowed and appeal dismissed. The appeal raised issues of considerable importance to restructuring proceedings under the CCAA Canada-wide. There were serious and arguable grounds of appeal and the appeal would not unduly delay the progress of the proceedings. In the circumstances, the criteria for granting leave to appeal were met. Respecting the appeal, the CCAA permitted the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court where the releases were reasonably connected to the proposed restructuring. The wording of the CCAA, construed in light of the purpose, objects and scheme of the Act, supported the court's jurisdiction and authority to sanction the Plan proposed in this case, including the contested third-party releases contained in it. The Plan was fair and reasonable in all the circumstances.

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3,

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 4, s. 6

Constitution Act, 1867, R.S.C. 1985, App. II, No. 5, s. 91(21), s. 92(13)

**Appeal From:**

On appeal from the sanction order of Justice Colin L. Campbell of the Superior Court of Justice, dated June 5, 2008, with reasons reported at [2008] O.J. No. 2265.

**Counsel:**

See Schedule "A" for the list of counsel.

---

The judgment of the Court was delivered by

**R.A. BLAIR J.A.**:--

## A. INTRODUCTION

**1**    In August 2007 a liquidity crisis suddenly threatened the Canadian market in Asset Backed Commercial Paper ("ABCP"). The crisis was triggered by a loss of confidence amongst investors stemming from the news of widespread defaults on U.S. sub-prime mortgages. The loss of confidence placed the Canadian financial market at risk generally and was reflective of an economic volatility worldwide.

**2**    By agreement amongst the major Canadian participants, the $32 billion Canadian market in third-party ABCP was frozen on August 13, 2007 pending an attempt to resolve the crisis through a restructuring of that market. The Pan-Canadian Investors Committee, chaired by Purdy Crawford, C.C., Q.C., was formed and ultimately put forward the creditor-initiated Plan of Compromise and Arrangement that forms the subject-matter of these proceedings. The Plan was sanctioned by Colin L. Campbell J. on June 5, 2008.

**3**    Certain creditors who opposed the Plan seek leave to appeal and, if leave is granted, appeal from that decision. They raise an important point regarding the permissible scope of a restructuring under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 as amended ("CCAA"): can the court sanction a Plan that calls for creditors to provide releases to third parties who are themselves solvent and not creditors of the debtor company? They also argue that, if the answer to this question is yes, the application judge erred in holding that this Plan, with its particular releases (which bar some claims even in fraud), was fair and reasonable and therefore in sanctioning it under the CCAA.

### Leave to Appeal

**4**    Because of the particular circumstances and urgency of these proceedings, the court agreed to collapse an oral hearing for leave to appeal with the hearing of the appeal itself. At the outset of argument we encouraged counsel to combine their submissions on both matters.

**5**    The proposed appeal raises issues of considerable importance to restructuring proceedings under the CCAA Canada-wide. There are serious and arguable grounds of appeal and -- given the expedited time-table -- the appeal will not unduly delay the progress of the proceedings. I am satisfied that the criteria for granting leave to appeal in CCAA proceedings, set out in such cases as *Re Cineplex Odeon Corp.* (2001), 24 C.B.R. (4th) 21 (Ont. C.A.), and *Re Country Style Food Services* (2002), 158 O.A.C. 30, are met. I would grant leave to appeal.

Appeal

**6**    For the reasons that follow, however, I would dismiss the appeal.

## B. FACTS

### The Parties

**7**    The appellants are holders of ABCP Notes who oppose the Plan. They do so principally on the basis that it requires them to grant releases to third party financial institutions against whom they say they have claims for relief arising out of their purchase of ABCP Notes. Amongst them are an airline, a tour operator, a mining company, a wireless provider, a pharmaceuticals retailer, and several holding companies and energy companies.

**8**    Each of the appellants has large sums invested in ABCP -- in some cases, hundreds of millions of dollars. Nonetheless, the collective holdings of the appellants -- slightly over $1 billion -- represent only a small fraction of the more than $32 billion of ABCP involved in the restructuring.

**9**    The lead respondent is the Pan-Canadian Investors Committee which was responsible for the creation and negotiation of the Plan on behalf of the creditors. Other respondents include various major international financial institutions, the five largest Canadian banks, several trust companies, and some smaller holders of ABCP product. They participated in the market in a number of different ways.

## The ABCP Market

**10**    Asset Backed Commercial Paper is a sophisticated and hitherto well-accepted financial instrument. It is primarily a form of short-term investment -- usually 30 to 90 days -- typically with a low interest yield only slightly better than that available through other short-term paper from a government or bank. It is said to be "asset backed" because the cash that is used to purchase an ABCP Note is converted into a portfolio of financial assets or other asset interests that in turn provide security for the repayment of the notes.

**11**    ABCP was often presented by those selling it as a safe investment, somewhat like a guaranteed investment certificate.

**12**    The Canadian market for ABCP is significant and administratively complex. As of August

2007, investors had placed over $116 billion in Canadian ABCP. Investors range from individual pensioners to large institutional bodies. On the selling and distribution end, numerous players are involved, including chartered banks, investment houses and other financial institutions. Some of these players participated in multiple ways. The Plan in this proceeding relates to approximately $32 billion of non-bank sponsored ABCP the restructuring of which is considered essential to the preservation of the Canadian ABCP market.

**13**     As I understand it, prior to August 2007 when it was frozen, the ABCP market worked as follows.

**14**     Various corporations (the "Sponsors") would arrange for entities they control ("Conduits") to make ABCP Notes available to be sold to investors through "Dealers" (banks and other investment dealers). Typically, ABCP was issued by series and sometimes by classes within a series.

**15**     The cash from the purchase of the ABCP Notes was used to purchase assets which were held by trustees of the Conduits ("Issuer Trustees") and which stood as security for repayment of the notes. Financial institutions that sold or provided the Conduits with the assets that secured the ABCP are known as "Asset Providers". To help ensure that investors would be able to redeem their notes, "Liquidity Providers" agreed to provide funds that could be drawn upon to meet the demands of maturing ABCP Notes in certain circumstances. Most Asset Providers were also Liquidity Providers. Many of these banks and financial institutions were also holders of ABCP Notes ("Noteholders"). The Asset and Liquidity Providers held first charges on the assets.

**16**     When the market was working well, cash from the purchase of new ABCP Notes was also used to pay off maturing ABCP Notes; alternatively, Noteholders simply rolled their maturing notes over into new ones. As I will explain, however, there was a potential underlying predicament with this scheme.

### The Liquidity Crisis

**17**     The types of assets and asset interests acquired to "back" the ABCP Notes are varied and complex. They were generally long-term assets such as residential mortgages, credit card receivables, auto loans, cash collateralized debt obligations and derivative investments such as credit default swaps. Their particular characteristics do not matter for the purpose of this appeal, but they shared a common feature that proved to be the Achilles heel of the ABCP market: because of their long-term nature there was an inherent timing mismatch between the cash they generated and the cash needed to repay maturing ABCP Notes.

**18**     When uncertainty began to spread through the ABCP marketplace in the summer of 2007, investors stopped buying the ABCP product and existing Noteholders ceased to roll over their maturing notes. There was no cash to redeem those notes. Although calls were made on the Liquidity Providers for payment, most of the Liquidity Providers declined to fund the redemption of the notes, arguing that the conditions for liquidity funding had not been met in the circumstances.

Hence the "liquidity crisis" in the ABCP market.

**19**    The crisis was fuelled largely by a lack of transparency in the ABCP scheme. Investors could not tell what assets were backing their notes -- partly because the ABCP Notes were often sold before or at the same time as the assets backing them were acquired; partly because of the sheer complexity of certain of the underlying assets; and partly because of assertions of confidentiality by those involved with the assets. As fears arising from the spreading U.S. sub-prime mortgage crisis mushroomed, investors became increasingly concerned that their ABCP Notes may be supported by those crumbling assets. For the reasons outlined above, however, they were unable to redeem their maturing ABCP Notes.

<u>The Montreal Protocol</u>

**20**    The liquidity crisis could have triggered a wholesale liquidation of the assets, at depressed prices. But it did not. During the week of August 13, 2007, the ABCP market in Canada froze -- the result of a standstill arrangement orchestrated on the heels of the crisis by numerous market participants, including Asset Providers, Liquidity Providers, Noteholders and other financial industry representatives. Under the standstill agreement -- known as the Montréal Protocol -- the parties committed to restructuring the ABCP market with a view, as much as possible, to preserving the value of the assets and of the notes.

**21**    The work of implementing the restructuring fell to the Pan-Canadian Investors Committee, an applicant in the proceeding and respondent in the appeal. The Committee is composed of 17 financial and investment institutions, including chartered banks, credit unions, a pension board, a Crown corporation, and a university board of governors. All 17 members are themselves Noteholders; three of them also participated in the ABCP market in other capacities as well. Between them, they hold about two thirds of the $32 billion of ABCP sought to be restructured in these proceedings.

**22**    Mr. Crawford was named the Committee's chair. He thus had a unique vantage point on the work of the Committee and the restructuring process as a whole. His lengthy affidavit strongly informed the application judge's understanding of the factual context, and our own. He was not cross-examined and his evidence is unchallenged.

**23**    Beginning in September 2007, the Committee worked to craft a plan that would preserve the value of the notes and assets, satisfy the various stakeholders to the extent possible, and restore confidence in an important segment of the Canadian financial marketplace. In March 2008, it and the other applicants sought CCAA protection for the ABCP debtors and the approval of a Plan that had been pre-negotiated with some, but not all, of those affected by the misfortunes in the Canadian ABCP market.

**The Plan**

a)    Plan Overview

**24**    Although the ABCP market involves many different players and kinds of assets, each with their own challenges, the committee opted for a single plan. In Mr. Crawford's words, "all of the ABCP suffers from common problems that are best addressed by a common solution." The Plan the Committee developed is highly complex and involves many parties. In its essence, the Plan would convert the Noteholders' paper -- which has been frozen and therefore effectively worthless for many months -- into new, long-term notes that would trade freely, but with a discounted face value. The hope is that a strong secondary market for the notes will emerge in the long run.

**25**    The Plan aims to improve transparency by providing investors with detailed information about the assets supporting their ABCP Notes. It also addresses the timing mismatch between the notes and the assets by adjusting the maturity provisions and interest rates on the new notes. Further, the Plan adjusts some of the underlying credit default swap contracts by increasing the thresholds for default triggering events; in this way, the likelihood of a forced liquidation flowing from the credit default swap holder's prior security is reduced and, in turn, the risk for ABCP investors is decreased.

**26**    Under the Plan, the vast majority of the assets underlying ABCP would be pooled into two master asset vehicles (MAV1 and MAV2). The pooling is designed to increase the collateral available and thus make the notes more secure.

**27**    The Plan does not apply to investors holding less than $1 million of notes. However, certain Dealers have agreed to buy the ABCP of those of their customers holding less than the $1-million threshold, and to extend financial assistance to these customers. Principal among these Dealers are National Bank and Canaccord, two of the respondent financial institutions the appellants most object to releasing. The application judge found that these developments appeared to be designed to secure votes in favour of the Plan by various Noteholders, and were apparently successful in doing so. If the Plan is approved, they also provide considerable relief to the many small investors who find themselves unwittingly caught in the ABCP collapse.

b)    The Releases

**28**    This appeal focuses on one specific aspect of the Plan: the comprehensive series of releases of third parties provided for in Article 10.

**29**    The Plan calls for the release of Canadian banks, Dealers, Noteholders, Asset Providers, Issuer Trustees, Liquidity Providers, and other market participants -- in Mr. Crawford's words, "virtually all participants in the Canadian ABCP market" -- from any liability associated with ABCP, with the exception of certain narrow claims relating to fraud. For instance, under the Plan as approved, creditors will have to give up their claims against the Dealers who sold them their ABCP Notes, including challenges to the way the Dealers characterized the ABCP and provided (or did not provide) information about the ABCP. The claims against the proposed defendants are mainly in

tort: negligence, misrepresentation, negligent misrepresentation, failure to act prudently as a dealer/advisor, acting in conflict of interest, and in a few cases fraud or potential fraud. There are also allegations of breach of fiduciary duty and claims for other equitable relief.

**30**    The application judge found that, in general, the claims for damages include the face value of the Notes, plus interest and additional penalties and damages.

**31**    The releases, in effect, are part of a *quid pro quo*. Generally speaking, they are designed to compensate various participants in the market for the contributions they would make to the restructuring. Those contributions under the Plan include the requirements that:

> a)    Asset Providers assume an increased risk in their credit default swap contracts, disclose certain proprietary information in relation to the assets, and provide below-cost financing for margin funding facilities that are designed to make the notes more secure;
>
> b)    Sponsors -- who in addition have cooperated with the Investors' Committee throughout the process, including by sharing certain proprietary information -- give up their existing contracts;
>
> c)    The Canadian banks provide below-cost financing for the margin funding facility and,
>
> d)    Other parties make other contributions under the Plan.

**32**    According to Mr. Crawford's affidavit, the releases are part of the Plan "because certain key participants, whose participation is vital to the restructuring, have made comprehensive releases a condition for their participation."

### The CCAA Proceedings to Date

**33**    On March 17, 2008 the applicants sought and obtained an Initial Order under the CCAA staying any proceedings relating to the ABCP crisis and providing for a meeting of the Noteholders to vote on the proposed Plan. The meeting was held on April 25th. The vote was overwhelmingly in support of the Plan -- 96% of the Noteholders voted in favour. At the instance of certain Noteholders, and as requested by the application judge (who has supervised the proceedings from the outset), the Monitor broke down the voting results according to those Noteholders who had worked on or with the Investors' Committee to develop the Plan and those Noteholders who had not. Re-calculated on this basis the results remained firmly in favour of the proposed Plan -- 99% of those connected with the development of the Plan voted positively, as did 80% of those Noteholders who had not been involved in its formulation.

**34**    The vote thus provided the Plan with the "double majority" approval -- a majority of creditors representing two-thirds in value of the claims -- required under s. 6 of the CCAA.

**35**    Following the successful vote, the applicants sought court approval of the Plan under s. 6.

Hearings were held on May 12 and 13. On May 16, the application judge issued a brief endorsement in which he concluded that he did not have sufficient facts to decide whether all the releases proposed in the Plan were authorized by the CCAA. While the application judge was prepared to approve the releases of negligence claims, he was not prepared at that point to sanction the release of fraud claims. Noting the urgency of the situation and the serious consequences that would result from the Plan's failure, the application judge nevertheless directed the parties back to the bargaining table to try to work out a claims process for addressing legitimate claims of fraud.

**36**    The result of this renegotiation was a "fraud carve-out" -- an amendment to the Plan excluding certain fraud claims from the Plan's releases. The carve-out did not encompass all possible claims of fraud, however. It was limited in three key respects. First, it applied only to claims against ABCP Dealers. Secondly, it applied only to cases involving an express fraudulent misrepresentation made with the intention to induce purchase and in circumstances where the person making the representation knew it to be false. Thirdly, the carve-out limited available damages to the value of the notes, minus any funds distributed as part of the Plan. The appellants argue vigorously that such a limited release respecting fraud claims is unacceptable and should not have been sanctioned by the application judge.

**37**    A second sanction hearing -- this time involving the amended Plan (with the fraud carve-out) -- was held on June 3, 2008. Two days later, Campbell J. released his reasons for decision, approving and sanctioning the Plan on the basis both that he had jurisdiction to sanction a Plan calling for third-party releases and that the Plan including the third-party releases in question here was fair and reasonable.

**38**    The appellants attack both of these determinations.

## C. LAW AND ANALYSIS

**39**    There are two principal questions for determination on this appeal:

    1)    As a matter of law, may a CCAA plan contain a release of claims against anyone other than the debtor company or its directors?

    2)    If the answer to that question is yes, did the application judge err in the exercise of his discretion to sanction the Plan as fair and reasonable given the nature of the releases called for under it?

### (1) Legal Authority for the Releases

**40**    The standard of review on this first issue -- whether, as a matter of law, a CCAA plan may contain third-party releases -- is correctness.

**41**    The appellants submit that a court has no jurisdiction or legal authority under the CCAA to sanction a plan that imposes an obligation on creditors to give releases to third parties other than the

directors of the debtor company.[1] The requirement that objecting creditors release claims against third parties is illegal, they contend, because:

a)    on a proper interpretation, the CCAA does not permit such releases;

b)    the court is not entitled to "fill in the gaps" in the CCAA or rely upon its inherent jurisdiction to create such authority because to do so would be contrary to the principle that Parliament did not intend to interfere with private property rights or rights of action in the absence of clear statutory language to that effect;

c)    the releases constitute an unconstitutional confiscation of private property that is within the exclusive domain of the provinces under s. 92 of the *Constitution Act*, 1867;

d)    the releases are invalid under Quebec rules of public order; and because

e)    the prevailing jurisprudence supports these conclusions.

**42**    I would not give effect to any of these submissions.

<u>Interpretation, "Gap Filling" and Inherent Jurisdiction</u>

**43**    On a proper interpretation, in my view, the CCAA permits the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court where those releases are reasonably connected to the proposed restructuring. I am led to this conclusion by a combination of (a) the open-ended, flexible character of the CCAA itself, (b) the broad nature of the term "compromise or arrangement" as used in the Act, and (c) the express statutory effect of the "double-majority" vote and court sanction which render the plan binding on <u>all</u> creditors, including those unwilling to accept certain portions of it. The first of these signals a flexible approach to the application of the Act in new and evolving situations, an active judicial role in its application and interpretation, and a liberal approach to that interpretation. The second provides the entrée to negotiations between the parties affected in the restructuring and furnishes them with the ability to apply the broad scope of their ingenuity in fashioning the proposal. The latter afford necessary protection to unwilling creditors who may be deprived of certain of their civil and property rights as a result of the process.

**44**    The CCAA is skeletal in nature. It does not contain a comprehensive code that lays out all that is permitted or barred. Judges must therefore play a role in fleshing out the details of the statutory scheme. The scope of the Act and the powers of the court under it are not limitless. It is beyond controversy, however, that the CCAA is remedial legislation to be liberally construed in accordance with the modern purposive approach to statutory interpretation. It is designed to be a flexible instrument and it is that very flexibility which gives the Act its efficacy: *Canadian Red Cross Society (Re)* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div.). As Farley J. noted in *Re Dylex Ltd.* (1995), 31 C.B.R. (3d) 106 at 111 (Ont. Gen. Div.), "[t]he history of CCAA law has been an evolution of judicial interpretation."

**45**    Much has been said, however, about the "evolution of judicial interpretation" and there is some controversy over both the source and scope of that authority. Is the source of the court's authority statutory, discerned solely through application of the principles of statutory interpretation, for example? Or does it rest in the court's ability to "fill in the gaps" in legislation? Or in the court's inherent jurisdiction?

**46**    These issues have recently been canvassed by the Honourable Georgina R. Jackson and Dr. Janis Sarra in their publication "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters,"[2] and there was considerable argument on these issues before the application judge and before us. While I generally agree with the authors' suggestion that the courts should adopt a hierarchical approach in their resort to these interpretive tools -- statutory interpretation, gap-filling, discretion and inherent jurisdiction -- it is not necessary in my view to go beyond the general principles of statutory interpretation to resolve the issues on this appeal. Because I am satisfied that it is implicit in the language of the CCAA itself that the court has authority to sanction plans incorporating third-party releases that are reasonably related to the proposed restructuring, there is no "gap-filling" to be done and no need to fall back on inherent jurisdiction. In this respect, I take a somewhat different approach than the application judge did.

**47**    The Supreme Court of Canada has affirmed generally -- and in the insolvency context particularly -- that remedial statutes are to be interpreted liberally and in accordance with Professor Driedger's modern principle of statutory interpretation. Driedger advocated that "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament": *Re Rizzo & Rizzo Shoes Ltd.*, [1998] 1 S.C.R. 27 at para. 21, quoting E.A. Driedger, *Construction of Statutes*, 2nd ed. (Toronto: Butterworths, 1983); *Bell Expressvu Ltd. Partnership v. R.*, [2002] 2 S.C.R. 559 at para. 26.

**48**    More broadly, I believe that the proper approach to the judicial interpretation and application of statutes -- particularly those like the CCAA that are skeletal in nature -- is succinctly and accurately summarized by Jackson and Sarra in their recent article, *supra*, at p. 56:

> The exercise of a statutory authority requires the statute to be construed. The plain meaning or textualist approach has given way to a search for the object and goals of the statute and the intentionalist approach. This latter approach makes use of the purposive approach and the mischief rule, including its codification under interpretation statutes that every enactment is deemed remedial, and is to be given such fair, large and liberal construction and interpretation as best ensures the attainment of its objects. This latter approach advocates reading the statute as a whole and being mindful of Driedger's "one principle", that the words of the Act are to be read in their entire context, in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the

intention of Parliament. It is important that courts first interpret the statute before them and exercise their authority pursuant to the statute, before reaching for other tools in the judicial toolbox. Statutory interpretation using the principles articulated above leaves room for gap-filling in the common law provinces and a consideration of purpose in *Québec* as a manifestation of the judge's overall task of statutory interpretation. Finally, the jurisprudence in relation to statutory interpretation demonstrates the fluidity inherent in the judge's task in seeking the objects of the statute and the intention of the legislature.

**49**    I adopt these principles.

**50**    The remedial purpose of the CCAA -- as its title affirms -- is to facilitate compromises or arrangements between an insolvent debtor company and its creditors. In *Chef Ready Foods Ltd. v. Hongkong Bank of Canada* (1990), 4 C.B.R. (3d) 311 at 318 (B.C.C.A.), Gibbs J.A. summarized very concisely the purpose, object and scheme of the Act:

> Almost inevitably, liquidation destroyed the shareholders' investment, yielded little by way of recovery to the creditors, and exacerbated the social evil of devastating levels of unemployment. The government of the day sought, through the C.C.A.A., to create a regime whereby the principals of the company and the creditors could be brought together under the supervision of the court to attempt a reorganization or compromise or arrangement under which the company could continue in business.

**51**    The CCAA was enacted in 1933 and was necessary -- as the then Secretary of State noted in introducing the Bill on First Reading -- "because of the prevailing commercial and industrial depression" and the need to alleviate the effects of business bankruptcies in that context: see the statement of the Hon. C.H. Cahan, Secretary of State, *House of Commons Debates (Hansard)* (April 20, 1933) at 4091. One of the greatest effects of that Depression was what Gibbs J.A. described as "the social evil of devastating levels of unemployment". Since then, courts have recognized that the Act has a broader dimension than simply the direct relations between the debtor company and its creditors and that this broader public dimension must be weighed in the balance together with the interests of those most directly affected: see, for example, *Elan Corp. v. Comiskey (Trustee of)* (1990), 1 O.R. (3d) 289 (C.A.), *per* Doherty J.A. in dissent; *Re Skydome Corp.* (1998), 16 C.B.R. (4th) 125 (Ont. Gen. Div.); *Re Anvil Range Mining Corp.* (1998), 3 C.B.R. (4th) 93 (Ont. Gen. Div.).

**52**    In this respect, I agree with the following statement of Doherty J.A. in *Elan, supra,* at pp. 306-307:

> ... [T]he Act was designed to serve a "broad constituency of investors, creditors and employees".[3] Because of that "broad constituency" the court must, when considering applications brought under the Act, *have regard not only to the*

*individuals and organizations directly affected by the application, but also to the wider public interest.* [Emphasis added.]

### Application of the Principles of Interpretation

**53**     An interpretation of the CCAA that recognizes its broader socio-economic purposes and objects is apt in this case. As the application judge pointed out, the restructuring underpins the financial viability of the Canadian ABCP market itself.

**54**     The appellants argue that the application judge erred in taking this approach and in treating the Plan and the proceedings as an attempt to restructure a financial market (the ABCP market) rather than simply the affairs between the debtor corporations who caused the ABCP Notes to be issued and their creditors. The Act is designed, they say, only to effect reorganizations between a corporate debtor and its creditors and not to attempt to restructure entire marketplaces.

**55**     This perspective is flawed in at least two respects, however, in my opinion. First, it reflects a view of the purpose and objects of the CCAA that is too narrow. Secondly, it overlooks the reality of the ABCP marketplace and the context of the restructuring in question here. It may be true that, in their capacity as ABCP *Dealers*, the releasee financial institutions are "third-parties" to the restructuring in the sense that they are not creditors of the debtor corporations. However, in their capacities as *Asset Providers* and *Liquidity Providers*, they are not only creditors but they are prior secured creditors to the Noteholders. Furthermore -- as the application judge found -- in these latter capacities they are making significant contributions to the restructuring by "foregoing immediate rights to assets and ... providing real and tangible input for the preservation and enhancement of the Notes" (para. 76). In this context, therefore, the application judge's remark at para. 50 that the restructuring "involves the commitment and participation of all parties" in the ABCP market makes sense, as do his earlier comments at paras. 48-49:

> Given the nature of the ABCP market and all of its participants, it is more appropriate to consider all Noteholders as claimants and the object of the Plan to restore liquidity to the assets being the Notes themselves. The restoration of the liquidity of the market necessitates the participation (including more tangible contribution by many) of all Noteholders.

> In these circumstances, *it is unduly technical to classify the Issuer Trustees as debtors and the claims of the Noteholders as between themselves and others as being those of third party creditors*, although I recognize that the restructuring structure of the CCAA requires the corporations as the vehicles for restructuring. [Emphasis added.]

**56**     The application judge did observe that "[t]he insolvency is of the ABCP market itself, the

restructuring is that of the market for such paper ..." (para. 50). He did so, however, to point out the uniqueness of the Plan before him and its industry-wide significance and not to suggest that he need have no regard to the provisions of the CCAA permitting a restructuring as between debtor and creditors. His focus was on *the effect* of the restructuring, a perfectly permissible perspective, given the broad purpose and objects of the Act. This is apparent from his later references. For example, in balancing the arguments against approving releases that might include aspects of fraud, he responded that "what is at issue is a liquidity crisis that affects the ABCP market in Canada" (para. 125). In addition, in his reasoning on the fair-and-reasonable issue, he stated at para. 142: "Apart from the Plan itself, there is a need to restore confidence in the financial system in Canada and this Plan is a legitimate use of the CCAA to accomplish that goal."

**57**    I agree. I see no error on the part of the application judge in approaching the fairness assessment or the interpretation issue with these considerations in mind. They provide the context in which the purpose, objects and scheme of the CCAA are to be considered.

*The Statutory Wording*

**58**    Keeping in mind the interpretive principles outlined above, I turn now to a consideration of the provisions of the CCAA. Where in the words of the statute is the court clothed with authority to approve a plan incorporating a requirement for third-party releases? As summarized earlier, the answer to that question, in my view, is to be found in:

> a)    the skeletal nature of the CCAA;
> b)    Parliament's reliance upon the broad notions of "compromise" and "arrangement" to establish the framework within which the parties may work to put forward a restructuring plan; and in
> c)    the creation of the statutory mechanism binding all creditors in classes to the compromise or arrangement once it has surpassed the high "double majority" voting threshold and obtained court sanction as "fair and reasonable".

Therein lies the expression of Parliament's intention to permit the parties to negotiate and vote on, and the court to sanction, third-party releases relating to a restructuring.

**59**    Sections 4 and 6 of the CCAA state:

> 4.    Where a compromise or an arrangement is proposed between a debtor company and its unsecured creditors or any class of them, the court may, on the application in a summary way of the company, of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of the creditors or class of creditors, and, if the court so determines, of the shareholders of the company, to be summoned in such manner as the court directs.
> 6.    Where a majority in number representing two-thirds in value of the creditors, or class of creditors, as the case may be, present and voting either in person or by

proxy at the meeting or meetings thereof respectively held pursuant to sections 4 and 5, or either of those sections, agree to any compromise or arrangement either as proposed or as altered or modified at the meeting or meetings, the compromise or arrangement may be sanctioned by the court, and if so sanctioned is binding

(*a*) on all the creditors or the class of creditors, as the case may be, and on any trustee for any such class of creditors, whether secured or unsecured, as the case may be, and on the company; and

(*b*) in the case of a company that has made an authorized assignment or against which a bankruptcy order has been made under the *Bankruptcy and Insolvency Act* or is in the course of being wound up under the *Winding-up and Restructuring Act*, on the trustee in bankruptcy or liquidator and contributories of the company.

*Compromise or Arrangement*

**60**    While there may be little practical distinction between "compromise" and "arrangement" in many respects, the two are not necessarily the same. "Arrangement" is broader than "compromise" and would appear to include any scheme for reorganizing the affairs of the debtor: Houlden and Morawetz, *Bankruptcy and Insolvency Law of Canada*, loose-leaf, 3rd ed., vol. 4 (Toronto: Thomson Carswell) at 10A-12.2, N para. 10. It has been said to be "a very wide and indefinite [word]": *Re Refund of Dues under Timber Regulations*, [1935] A.C. 184 at 197 (P.C.), affirming S.C.C. [1933] S.C.R. 616. See also, *Re Guardian Assur. Co.*, [1917] 1 Ch. 431 at 448, 450; *Re T&N Ltd. and Others (No. 3)*, [2007] 1 All E.R. 851 (Ch.).

**61**    The CCAA is a sketch, an outline, a supporting framework for the resolution of corporate insolvencies in the public interest. Parliament wisely avoided attempting to anticipate the myriad of business deals that could evolve from the fertile and creative minds of negotiators restructuring their financial affairs. It left the shape and details of those deals to be worked out within the framework of the comprehensive and flexible concepts of a "compromise" and "arrangement." I see no reason why a release in favour of a third party, negotiated as part of a package between a debtor and creditor and reasonably relating to the proposed restructuring cannot fall within that framework.

**62**    A proposal under the *Bankruptcy and Insolvency Act*, R.S., 1985, c. B-3 (the "BIA") is a contract: *Employers' Liability Assurance Corp. Ltd. v. Ideal Petroleum* (1959) Ltd. [1978] 1 S.C.R. 230 at 239; *Society of Composers, Authors & Music Publishers of Canada v. Armitage* (2000), 50 O.R. (3d) 688 at para. 11 (C.A.). In my view, a compromise or arrangement under the CCAA is directly analogous to a proposal for these purposes, and therefore is to be treated as a contract between the debtor and its creditors. Consequently, parties are entitled to put anything into such a plan that could lawfully be incorporated into any contract. See *Re Air Canada* (2004), 2 C.B.R.

(5th) 4 at para. 6 (Ont. S.C.J.); *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 12 O.R. (3d) 500 at 518 (Gen. Div.).

**63**    There is nothing to prevent a debtor and a creditor from including in a contract between them a term providing that the creditor release a third party. The term is binding as between the debtor and creditor. In the CCAA context, therefore, a plan of compromise or arrangement may propose that creditors agree to compromise claims against the debtor and to release third parties, just as any debtor and creditor might agree to such a term in a contract between them. Once the statutory mechanism regarding voter approval and court sanctioning has been complied with, the plan -- including the provision for releases -- becomes binding on all creditors (including the dissenting minority).

**64**    *Re T&N Ltd. and Others, supra,* is instructive in this regard. It is a rare example of a court focussing on and examining the meaning and breadth of the term "arrangement". T&N and its associated companies were engaged in the manufacture, distribution and sale of asbestos-containing products. They became the subject of many claims by former employees, who had been exposed to asbestos dust in the course of their employment, and their dependents. The T&N companies applied for protection under s. 425 of the U.K. *Companies Act 1985*, a provision virtually identical to the scheme of the CCAA -- including the concepts of compromise or arrangement.[4]

**65**    T&N carried employers' liability insurance. However, the employers' liability insurers (the "EL insurers") denied coverage. This issue was litigated and ultimately resolved through the establishment of a multi-million pound fund against which the employees and their dependants (the "EL claimants") would assert their claims. In return, T&N's former employees and dependants (the "EL claimants") agreed to forego any further claims against the EL insurers. This settlement was incorporated into the plan of compromise and arrangement between the T&N companies and the EL claimants that was voted on and put forward for court sanction.

**66**    Certain creditors argued that the court could not sanction the plan because it did not constitute a "compromise or arrangement" between T&N and the EL claimants since it did not purport to affect rights as between them but only the EL claimants' rights against the EL insurers. The Court rejected this argument. Richards J. adopted previous jurisprudence -- cited earlier in these reasons -- to the effect that the word "arrangement" has a very broad meaning and that, while both a compromise and an arrangement involve some "give and take", an arrangement need not involve a compromise or be confined to a case of dispute or difficulty (paras. 46-51). He referred to what would be the equivalent of a solvent arrangement under Canadian corporate legislation as an example.[5] Finally, he pointed out that the compromised rights of the EL claimants against the EL insurers were not unconnected with the EL claimants' rights against the T&N companies; the scheme of arrangement involving the EL insurers was "an integral part of a single proposal affecting all the parties" (para. 52). He concluded his reasoning with these observations (para. 53):

> In my judgment it is not a necessary element of an arrangement for the purposes

of s. 425 of the 1985 Act that it should alter the rights existing between the company and the creditors or members with whom it is made. No doubt in most cases it will alter those rights. But, provided that the context and content of the scheme are such as properly to constitute an arrangement between the company and the members or creditors concerned, it will fall within s. 425. It is ... neither necessary nor desirable to attempt a definition of arrangement. The legislature has not done so. To insist on an alteration of rights, or a termination of rights as in the case of schemes to effect takeovers or mergers, is to impose a restriction which is neither warranted by the statutory language nor justified by the courts' approach over many years to give the term its widest meaning. *Nor is an arrangement necessarily outside the section, because its effect is to alter the rights of creditors against another party or because such alteration could be achieved by a scheme of arrangement with that party*. [Emphasis added.]

**67**    I find Richard J.'s analysis helpful and persuasive. In effect, the claimants in *T&N* were being asked to release their claims against the EL insurers in exchange for a call on the fund. Here, the appellants are being required to release their claims against certain financial third parties in exchange for what is anticipated to be an improved position for all ABCP Noteholders, stemming from the contributions the financial third parties are making to the ABCP restructuring. The situations are quite comparable.

### The Binding Mechanism

**68**    Parliament's reliance on the expansive terms "compromise" or "arrangement" does not stand alone, however. Effective insolvency restructurings would not be possible without a statutory mechanism to bind an unwilling minority of creditors. Unanimity is frequently impossible in such situations. But the minority must be protected too. Parliament's solution to this quandary was to permit a wide range of proposals to be negotiated and put forward (the compromise or arrangement) and to bind all creditors by class to the terms of the plan, but to do so only where the proposal can gain the support of the requisite "double majority" of votes[6] and obtain the sanction of the court on the basis that it is fair and reasonable. In this way, the scheme of the CCAA supports the intention of Parliament to encourage a wide variety of solutions to corporate insolvencies without unjustifiably overriding the rights of dissenting creditors.

### The Required Nexus

**69**    In keeping with this scheme and purpose, I do not suggest that any and all releases between creditors of the debtor company seeking to restructure and third parties may be made the subject of a compromise or arrangement between the debtor and its creditors. Nor do I think the fact that the releases may be "necessary" in the sense that the third parties or the debtor may refuse to proceed without them, of itself, advances the argument in favour of finding jurisdiction (although it may well be relevant in terms of the fairness and reasonableness analysis).

**70**    The release of the claim in question must be justified as part of the compromise or arrangement between the debtor and its creditors. In short, there must be a reasonable connection between the third party claim being compromised in the plan and the restructuring achieved by the plan to warrant inclusion of the third party release in the plan. This nexus exists here, in my view.

**71**    In the course of his reasons, the application judge made the following findings, all of which are amply supported on the record:

> a)    The parties to be released are necessary and essential to the restructuring of the debtor;
>
> b)    *The claims to be released are rationally related to the purpose of the Plan and necessary for it*;
>
> c)    The Plan cannot succeed without the releases;
>
> d)    *The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan*; and
>
> e)    The Plan will benefit not only the debtor companies but creditor Noteholders generally.

**72**    Here, then -- as was the case in *T&N* -- there is a close connection between the claims being released and the restructuring proposal. The tort claims arise out of the sale and distribution of the ABCP Notes and their collapse in value, just as do the contractual claims of the creditors against the debtor companies. The purpose of the restructuring is to stabilize and shore up the value of those notes in the long run. The third parties being released are making separate contributions to enable those results to materialize. Those contributions are identified earlier, at para. 31 of these reasons. The application judge found that the claims being released are not independent of or unrelated to the claims that the Noteholders have against the debtor companies; they are closely connected to the value of the ABCP Notes and are required for the Plan to succeed. At paras. 76-77 he said:

> [76] I do not consider that the Plan in this case involves a change in relationship among creditors "that does not directly involve the Company." Those who support the Plan and are to be released are "directly involved in the Company" in the sense that many are foregoing immediate rights to assets and are providing real and tangible input for the preservation and enhancement of the Notes. It would be unduly restrictive to suggest that the moving parties' claims against released parties do not involve the Company, since the claims are directly related to the value of the Notes. The value of the Notes is in this case the value of the Company.

> [77] This Plan, as it deals with releases, doesn't change the relationship of the creditors apart from involving the Company and its Notes.

**73**    I am satisfied that the wording of the CCAA -- construed in light of the purpose, objects and

scheme of the Act and in accordance with the modern principles of statutory interpretation -- supports the court's jurisdiction and authority to sanction the Plan proposed here, including the contested third-party releases contained in it.

### The Jurisprudence

**74**    Third party releases have become a frequent feature in Canadian restructurings since the decision of the Alberta Court of Queen's Bench in *Re Canadian Airlines Corp.* (2000), 265 A.R. 201, leave to appeal refused by *Resurgence Asset Management LLC v. Canadian Airlines Corp.* (2000), 266 A.R. 131 (C.A.), and [2001] S.C.C.A. No. 60, (2001) 293 A.R. 351 (S.C.C.). In *Re Muscle Tech Research and Development Inc.* (2006), 25 C.B.R (5th) 231 (Ont. S.C.J.) Justice Ground remarked (para. 8):

> [It] is not uncommon in CCAA proceedings, in the context of a plan of compromise and arrangement, to compromise claims against the Applicants and other parties against whom such claims or related claims are made.

**75**    We were referred to at least a dozen court-approved CCAA plans from across the country that included broad third-party releases. With the exception of *Re Canadian Airlines*, however, the releases in those restructurings -- including *Muscle Tech* -- were not opposed. The appellants argue that those cases are wrongly decided, because the court simply does not have the authority to approve such releases.

**76**    In *Re Canadian Airlines* the releases in question were opposed, however. Paperny J. (as she then was) concluded the court had jurisdiction to approve them and her decision is said to be the well-spring of the trend towards third-party releases referred to above. Based on the foregoing analysis, I agree with her conclusion although for reasons that differ from those cited by her.

**77**    Justice Paperny began her analysis of the release issue with the observation at para. 87 that "[p]rior to 1997, the CCAA did not provide for compromises of claims against anyone other than the petitioning company." It will be apparent from the analysis in these reasons that I do not accept that premise, notwithstanding the decision of the Quebec Court of Appeal in *Michaud v. Steinberg,*[7] of which her comment may have been reflective. Paperny J.'s reference to 1997 was a reference to the amendments of that year adding s. 5.1 to the CCAA, which provides for limited releases in favour of directors. Given the limited scope of s. 5.1, Justice Paperny was thus faced with the argument -- dealt with later in these reasons -- that Parliament must not have intended to extend the authority to approve third-party releases beyond the scope of this section. She chose to address this contention by concluding that, although the amendments "[did] not authorize a release of claims against third parties other than directors, [they did] not prohibit such releases either" (para. 92).

**78**    Respectfully, I would not adopt the interpretive principle that the CCAA permits releases because it does not expressly prohibit them. Rather, as I explain in these reasons, I believe the open-ended CCAA permits third-party releases that are reasonably related to the restructuring at

issue because they are encompassed in the comprehensive terms "compromise" and "arrangement" and because of the double-voting majority and court sanctioning statutory mechanism that makes them binding on unwilling creditors.

**79**    The appellants rely on a number of authorities, which they submit support the proposition that the CCAA may not be used to compromise claims as between anyone other than the debtor company and its creditors. Principal amongst these are *Michaud v. Steinberg, supra*; *NBD Bank, Canada v. Dofasco Inc.*, (1999), 46 O.R. (3d) 514 (C.A.); *Pacific Coastal Airlines Ltd. v. Air Canada* (2001), 19 B.L.R. (3d) 286 (B.C.S.C.); and *Re Stelco Inc.* (2005), 78 O.R. (3d) 241 (C.A.) ("*Stelco I*"). I do not think these cases assist the appellants, however. With the exception of *Steinberg*, they do not involve third party claims that were reasonably connected to the restructuring. As I shall explain, it is my opinion that *Steinberg* does not express a correct view of the law, and I decline to follow it.

**80**    In *Pacific Coastal Airlines*, Tysoe J. made the following comment at para. 24:

> [The purpose of the CCAA proceeding] is not to deal with disputes between a creditor of a company and a third party, even if the company was also involved in the subject matter of the dispute. While issues between the debtor company and non-creditors are sometimes dealt with in CCAA proceedings, it is not a proper use of a CCAA proceeding to determine disputes between parties other than the debtor company.

**81**    This statement must be understood in its context, however. Pacific Coastal Airlines had been a regional carrier for Canadian Airlines prior to the CCAA reorganization of the latter in 2000. In the action in question it was seeking to assert separate tort claims against Air Canada for contractual interference and inducing breach of contract in relation to certain rights it had to the use of Canadian's flight designator code prior to the CCAA proceeding. Air Canada sought to have the action dismissed on grounds of *res judicata* or issue estoppel because of the CCAA proceeding. Tysoe J. rejected the argument.

**82**    The facts in *Pacific Coastal* are not analogous to the circumstances of this case, however. There is no suggestion that a resolution of Pacific Coastal's separate tort claim against Air Canada was in any way connected to the Canadian Airlines restructuring, even though Canadian -- at a contractual level -- may have had some involvement with the particular dispute. Here, however, the disputes that are the subject-matter of the impugned releases are not simply "disputes between parties other than the debtor company". They are closely connected to the disputes being resolved between the debtor companies and their creditors and to the restructuring itself.

**83**    Nor is the decision of this Court in the *NBD Bank* case dispositive. It arose out of the financial collapse of Algoma Steel, a wholly-owned subsidiary of Dofasco. The Bank had advanced funds to Algoma allegedly on the strength of misrepresentations by Algoma's Vice-President, James Melville. The plan of compromise and arrangement that was sanctioned by Farley J. in the Algoma

CCAA restructuring contained a clause releasing Algoma from all claims creditors "may have had against Algoma or its directors, officers, employees and advisors." Mr. Melville was found liable for negligent misrepresentation in a subsequent action by the Bank. On appeal, he argued that since the Bank was barred from suing Algoma for misrepresentation by its officers, permitting it to pursue the same cause of action against him personally would subvert the CCAA process -- in short, he was personally protected by the CCAA release.

**84**    Rosenberg J.A., writing for this Court, rejected this argument. The appellants here rely particularly upon his following observations at paras. 53-54:

> 53 In my view, the appellant has not demonstrated that allowing the respondent to pursue its claim against him would undermine or subvert the purposes of the Act. As this court noted in *Elan Corp. v. Comiskey* (1990), 1 O.R. (3d) 289 at 297, the *CCAA* is remedial legislation "intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both". It is a means of avoiding a liquidation that may yield little for the creditors, especially unsecured creditors like the respondent, and the debtor company shareholders. However, the appellant has not shown that allowing a creditor to continue an action against an officer for negligent misrepresentation would erode the effectiveness of the Act.

> 54 In fact, to refuse on policy grounds to impose liability on an officer of the corporation for negligent misrepresentation would contradict the policy of Parliament as demonstrated in recent amendments to the *CCAA* and the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3. Those Acts now contemplate that an arrangement or proposal may include a term for compromise of certain types of claims against directors of the company except claims that "are based on allegations of misrepresentations made by directors". L.W. Houlden and C.H. Morawetz, the editors of *The 2000 Annotated Bankruptcy and Insolvency Act* (Toronto: Carswell, 1999) at p. 192 are of the view that the policy behind the provision is to encourage directors of an insolvent corporation to remain in office so that the affairs of the corporation can be reorganized. I can see no similar policy interest in barring an action against an officer of the company who, prior to the insolvency, has misrepresented the financial affairs of the corporation to its creditors. It may be necessary to permit the compromise of claims against the debtor corporation, otherwise it may not be possible to successfully reorganize the corporation. The same considerations do not apply to individual officers. Rather, it would seem to me that it would be contrary to good policy to immunize officers from the consequences of their negligent statements which might otherwise be made in anticipation of being forgiven under a subsequent corporate proposal or arrangement. [Footnote omitted.]

**85**    Once again, this statement must be assessed in context. Whether Justice Farley had the authority in the earlier Algoma CCAA proceedings to sanction a plan that included third party releases was not under consideration at all. What the Court was determining in *NBD Bank* was whether the release extended by its terms to protect a third party. In fact, on its face, it does not appear to do so. Justice Rosenberg concluded only that not allowing Mr. Melville to rely upon the release did not subvert the purpose of the CCAA. As the application judge here observed, "there is little factual similarity in *NBD* to the facts now before the Court" (para. 71). Contrary to the facts of this case, in *NBD Bank* the creditors had not agreed to grant a release to officers; they had not voted on such a release and the court had not assessed the fairness and reasonableness of such a release as a term of a complex arrangement involving significant contributions by the beneficiaries of the release -- as is the situation here. Thus, *NBD Bank* is of little assistance in determining whether the court has authority to sanction a plan that calls for third party releases.

**86**    The appellants also rely upon the decision of this Court in *Stelco I*. There, the Court was dealing with the scope of the CCAA in connection with a dispute over what were called the "Turnover Payments". Under an inter-creditor agreement one group of creditors had subordinated their rights to another group and agreed to hold in trust and "turn over" any proceeds received from Stelco until the senior group was paid in full. On a disputed classification motion, the Subordinated Debt Holders argued that they should be in a separate class from the Senior Debt Holders. Farley J. refused to make such an order in the court below, stating:

> [Sections] 4, 5 and 6 [of the CCAA] talk of compromises or arrangements between a company and its creditors. There is no mention of this extending by statute to encompass a change of relationship among the creditors vis-à-vis the creditors themselves *and not directly involving the company*. [Citations omitted; emphasis added.]

> See *Re Stelco Inc.* (2005), 15 C.B.R. (5th) 297 (Ont. S.C.J.) at para. 7.

**87**    This Court upheld that decision. The legal relationship between each group of creditors and Stelco was the same, albeit there were inter-creditor differences, and creditors were to be classified in accordance with their legal rights. In addition, the need for timely classification and voting decisions in the CCAA process militated against enmeshing the classification process in the vagaries of inter-corporate disputes. In short, the issues before the Court were quite different from those raised on this appeal.

**88**    Indeed, the Stelco plan, as sanctioned, included third party releases (albeit uncontested ones). This Court subsequently dealt with the same inter-creditor agreement on an appeal where the Subordinated Debt Holders argued that the inter-creditor subordination provisions were beyond the reach of the CCAA and therefore that they were entitled to a separate civil action to determine their rights under the agreement: *Re Stelco Inc.*, (2006), 21 C.B.R. (5th) 157 (Ont. C.A.) ("*Stelco II*").

The Court rejected that argument and held that where the creditors' rights amongst themselves were sufficiently related to the debtor and its plan, they were properly brought within the scope of the CCAA plan. The Court said (para. 11):

> In [*Stelco I*] -- the classification case -- the court observed that it is not a proper use of a CCAA proceeding to determine disputes between parties other than the debtor company ... *[H]owever, the present case is not simply an inter-creditor dispute that does not involve the debtor company; it is a dispute that is inextricably connected to the restructuring process*. [Emphasis added.]

**89**    The approach I would take to the disposition of this appeal is consistent with that view. As I have noted, the third party releases here are very closely connected to the ABCP restructuring process.

**90**    Some of the appellants -- particularly those represented by Mr. Woods -- rely heavily upon the decision of the Quebec Court of Appeal in *Michaud v. Steinberg, supra*. They say that it is determinative of the release issue. In *Steinberg*, the Court held that the CCAA, as worded at the time, did not permit the release of directors of the debtor corporation and that third-party releases were not within the purview of the Act. Deschamps J.A. (as she then was) said (paras. 42, 54 and 58 -- English translation):

> [42] Even if one can understand the extreme pressure weighing on the creditors and the respondent at the time of the sanctioning, a plan of arrangement is not the appropriate forum to settle disputes other than the claims that are the subject of the arrangement. In other words, one cannot, under the pretext of an absence of formal directives in the Act, transform an arrangement into a potpourri.
>
> ...
>
> [54] The Act offers the respondent a way to arrive at a compromise with is creditors. It does not go so far as to offer an umbrella to all the persons within its orbit by permitting them to shelter themselves from any recourse.
>
> ...
>
> [58] The [CCAA] and the case law clearly do not permit extending the application of an arrangement to persons other than the respondent and its creditors and, consequently, the plan should not have been sanctioned as is [that is, including the releases of the directors].

**91**    Justices Vallerand and Delisle, in separate judgments, agreed. Justice Vallerand summarized his view of the consequences of extending the scope of the CCAA to third party releases in this fashion (para. 7):

> In short, the Act will have become the Companies' *and Their Officers and Employees* Creditors Arrangement Act -- an awful mess -- and likely not attain its purpose, which is to enable the company to survive in the face of *its* creditors and through their will, and not in the face of the creditors of its officers. This is why I feel, just like my colleague, that such a clause is contrary to the Act's mode of operation, contrary to its purposes and, for this reason, is to be banned.

**92**    Justice Delisle, on the other hand, appears to have rejected the releases because of their broad nature -- they released directors from all claims, including those that were altogether unrelated to their corporate duties with the debtor company -- rather than because of a lack of authority to sanction under the Act. Indeed, he seems to have recognized the wide range of circumstances that could be included within the term "compromise or arrangement". He is the only one who addressed that term. At para. 90 he said:

> The CCAA is drafted in general terms. It does not specify, among other things, what must be understood by "compromise or arrangement". However, it may be inferred from the purpose of this [A]ct that these terms *encompass all that should enable the person who has recourse to it to fully dispose of his debts*, both those that exist on the date when he has recourse to the statute and *those contingent on the insolvency in which he finds himself* ... [Emphasis added.]

**93**    The decision of the Court did not reflect a view that the terms of a compromise or arrangement should "encompass all that should enable the person who has recourse to [the Act] to dispose of his debts ... and those contingent on the insolvency in which he finds himself," however. On occasion such an outlook might embrace third parties other than the debtor and its creditors in order to make the arrangement work. Nor would it be surprising that, in such circumstances, the third parties might seek the protection of releases, or that the debtor might do so on their behalf. Thus, the perspective adopted by the majority in *Steinberg*, in my view, is too narrow, having regard to the language, purpose and objects of the CCAA and the intention of Parliament. They made no attempt to consider and explain why a compromise or arrangement could not include third-party releases. In addition, the decision appears to have been based, at least partly, on a rejection of the use of contract-law concepts in analysing the Act -- an approach inconsistent with the jurisprudence referred to above.

**94**    Finally, the majority in *Steinberg* seems to have proceeded on the basis that the CCAA cannot interfere with civil or property rights under Quebec law. Mr. Woods advanced this argument before this Court in his factum, but did not press it in oral argument. Indeed, he conceded that if the Act encompasses the authority to sanction a plan containing third-party releases -- as I have concluded it does -- the provisions of the CCAA, as valid federal insolvency legislation, are paramount over provincial legislation. I shall return to the constitutional issues raised by the appellants later in these reasons.

**95**    Accordingly, to the extent *Steinberg* stands for the proposition that the court does not have authority under the CCAA to sanction a plan that incorporates third-party releases, I do not believe it to be a correct statement of the law and I respectfully decline to follow it. The modern approach to interpretation of the Act in accordance with its nature and purpose militates against a narrow interpretation and towards one that facilitates and encourages compromises and arrangements. Had the majority in *Steinberg* considered the broad nature of the terms "compromise" and "arrangement" and the jurisprudence I have referred to above, they might well have come to a different conclusion.

The 1997 Amendments

**96**    *Steinberg* led to amendments to the CCAA, however. In 1997, s. 5.1 was added, dealing specifically with releases pertaining to directors of the debtor company. It states:

> 5.1 (1) A compromise or arrangement made in respect of a debtor company may include in its terms provision for the compromise of claims against directors of the company that arose before the commencement of proceedings under this Act and that relate to the obligations of the company where the directors are by law liable in their capacity as directors for the payment of such obligations.

> Exception

> (2)    A provision for the compromise of claims against directors may not include claims that

> (*a*) relate to contractual rights of one or more creditors; or

> (*b*) are based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors.

> Powers of court

> (3)    The court may declare that a claim against directors shall not be compromised if it is satisfied that the compromise would not be fair and reasonable in the circumstances.

> Resignation or removal of directors

> (4)    Where all of the directors have resigned or have been removed by the shareholders without replacement, any person who manages or supervises the management of the business and affairs of the debtor company shall be deemed to be a director for the purposes of this section.

1997, c. 12, s. 122.

**97**    Perhaps the appellants' strongest argument is that these amendments confirm a prior lack of authority in the court to sanction a plan including third party releases. If the power existed, why would Parliament feel it necessary to add an amendment specifically permitting such releases (subject to the exceptions indicated) in favour of directors? *Expressio unius est exclusio alterius*, is the Latin maxim sometimes relied on to articulate the principle of interpretation implied in that question: to express or include one thing implies the exclusion of the other.

**98**    The maxim is not helpful in these circumstances, however. The reality is that there *may* be another explanation why Parliament acted as it did. As one commentator has noted:[8]

> Far from being a rule, [the maxim *expressio unius*] is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds. Sometimes it does and sometimes its does not, and whether it does or does not depends on the particular circumstances of context. Without contextual support, therefore there is not even a mild presumption here. Accordingly, the maxim is at best a description, after the fact, of what the court has discovered from context.

**99**    As I have said, the 1997 amendments to the CCAA providing for releases in favour of directors of debtor companies in limited circumstances were a response to the decision of the Quebec Court of Appeal in *Steinberg*. A similar amendment was made with respect to proposals in the BIA at the same time. The rationale behind these amendments was to encourage directors of an insolvent company to remain in office during a restructuring, rather than resign. The assumption was that by remaining in office the directors would provide some stability while the affairs of the company were being reorganized: see Houlden and Morawetz, vol. 1, *supra*, at 2-144, Es.11A; *Le Royal Penfield Inc. (Syndic de)*, [2003] R.J.Q. 2157 at paras. 44-46 (C.S.).

**100**    Parliament thus had a particular focus and a particular purpose in enacting the 1997 amendments to the CCAA and the BIA. While there is some merit in the appellants' argument on this point, at the end of the day I do not accept that Parliament intended to signal by its enactment of s. 5.1 that it was depriving the court of authority to sanction plans of compromise or arrangement in all circumstances where they incorporate third party releases in favour of anyone other than the debtor's directors. For the reasons articulated above, I am satisfied that the court does have the

authority to do so. Whether it sanctions the plan is a matter for the fairness hearing.

### The Deprivation of Proprietary Rights

**101**    Mr. Shapray very effectively led the appellants' argument that legislation must not be construed so as to interfere with or prejudice established contractual or proprietary rights -- including the right to bring an action -- in the absence of a clear indication of legislative intention to that effect: *Halsbury's Laws of England*, 4th ed. reissue, vol. 44 (1) (London: Butterworths, 1995) at paras. 1438, 1464 and 1467; Driedger, 2nd ed., *supra*, at 183; Ruth Sullivan, *Sullivan and Driedger on the Construction of Statutes*, 4th ed., (Markham: Butterworths, 2002) at 399. I accept the importance of this principle. For the reasons I have explained, however, I am satisfied that Parliament's intention to clothe the court with authority to consider and sanction a plan that contains third party releases is expressed with sufficient clarity in the "compromise or arrangement" language of the CCAA coupled with the statutory voting and sanctioning mechanism making the provisions of the plan binding on all creditors. This is not a situation of impermissible "gap-filling" in the case of legislation severely affecting property rights; it is a question of finding meaning in the language of the Act itself. I would therefore not give effect to the appellants' submissions in this regard.

### The Division of Powers and Paramountcy

**102**    Mr. Woods and Mr. Sternberg submit that extending the reach of the CCAA process to the compromise of claims as between solvent creditors of the debtor company and solvent third parties to the proceeding is constitutionally impermissible. They say that under the guise of the federal insolvency power pursuant to s. 91(21) of the *Constitution Act, 1867*, this approach would improperly affect the rights of civil claimants to assert their causes of action, a provincial matter falling within s. 92(13), and contravene the rules of public order pursuant to the *Civil Code of Quebec*.

**103**    I do not accept these submissions. It has long been established that the CCAA is valid federal legislation under the federal insolvency power: *Reference re: Companies' Creditors Arrangement Act (Canada)*, [1934] S.C.R. 659. As the Supreme Court confirmed in that case (p. 661), citing Viscount Cave L.C. in *Royal Bank of Canada v. Larue* [1928] A.C. 187, "the exclusive legislative authority to deal with all matters within the domain of bankruptcy and insolvency is vested in Parliament." Chief Justice Duff elaborated:

> Matters normally constituting part of a bankruptcy scheme but not in their essence matters of bankruptcy and insolvency may, of course, from another point of view and in another aspect be dealt with by a provincial legislature; but, when treated as matters pertaining to bankruptcy and insolvency, they clearly fall within the legislative authority of the Dominion.

**104**    That is exactly the case here. The power to sanction a plan of compromise or arrangement

that contains third-party releases of the type opposed by the appellants is embedded in the wording of the CCAA. The fact that this may interfere with a claimant's right to pursue a civil action -- normally a matter of provincial concern -- or trump Quebec rules of public order is constitutionally immaterial. The CCAA is a valid exercise of federal power. Provided the matter in question falls within the legislation directly or as necessarily incidental to the exercise of that power, the CCAA governs. To the extent that its provisions are inconsistent with provincial legislation, the federal legislation is paramount. Mr. Woods properly conceded this during argument.

<u>Conclusion With Respect to Legal Authority</u>

**105**    For all of the foregoing reasons, then, I conclude that the application judge had the jurisdiction and legal authority to sanction the Plan as put forward.

## (2)    The Plan is "Fair and Reasonable"

**106**    The second major attack on the application judge's decision is that he erred in finding that the Plan is "fair and reasonable" and in sanctioning it on that basis. This attack is centred on the nature of the third-party releases contemplated and, in particular, on the fact that they will permit the release of some claims based in fraud.

**107**    Whether a plan of compromise or arrangement is fair and reasonable is a matter of mixed fact and law, and one on which the application judge exercises a large measure of discretion. The standard of review on this issue is therefore one of deference. In the absence of a demonstrable error an appellate court will not interfere: see *Re Ravelston Corp. Ltd.* (2007), 31 C.B.R. (5th) 233 (Ont. C.A.).

**108**    I would not interfere with the application judge's decision in this regard. While the notion of releases in favour of third parties -- including leading Canadian financial institutions -- that extend to claims of fraud is distasteful, there is no legal impediment to the inclusion of a release for claims based in fraud in a plan of compromise or arrangement. The application judge had been living with and supervising the ABCP restructuring from its outset. He was intimately attuned to its dynamics. In the end he concluded that the benefits of the Plan to the creditors as a whole, and to the debtor companies, outweighed the negative aspects of compelling the unwilling appellants to execute the releases as finally put forward.

**109**    The application judge was concerned about the inclusion of fraud in the contemplated releases and at the May hearing adjourned the final disposition of the sanctioning hearing in an effort to encourage the parties to negotiate a resolution. The result was the "fraud carve-out" referred to earlier in these reasons.

**110**    The appellants argue that the fraud carve-out is inadequate because of its narrow scope. It (i) applies only to ABCP Dealers, (ii) limits the type of damages that may be claimed (no punitive damages, for example), (iii) defines "fraud" narrowly, excluding many rights that would be

protected by common law, equity and the Quebec concept of public order, and (iv) limits claims to representations made directly to Noteholders. The appellants submit it is contrary to public policy to sanction a plan containing such a limited restriction on the type of fraud claims that may be pursued against the third parties.

**111**    The law does not condone fraud. It is the most serious kind of civil claim. There is therefore some force to the appellants' submission. On the other hand, as noted, there is no legal impediment to granting the release of an antecedent claim in fraud, provided the claim is in the contemplation of the parties to the release at the time it is given: *Fotinis Restaurant Corp. v. White Spot Ltd.* (1998), 38 B.L.R. (2d) 251 at paras. 9 and 18 (B.C.S.C.). There may be disputes about the scope or extent of what is released, but parties are entitled to settle allegations of fraud in civil proceedings -- the claims here all being untested allegations of fraud -- and to include releases of such claims as part of that settlement.

**112**    The application judge was alive to the merits of the appellants' submissions. He was satisfied in the end, however, that the need "to avoid the potential cascade of litigation that ... would result if a broader 'carve out' were to be allowed" (para. 113) outweighed the negative aspects of approving releases with the narrower carve-out provision. Implementation of the Plan, in his view, would work to the overall greater benefit of the Noteholders as a whole. I can find no error in principle in the exercise of his discretion in arriving at this decision. It was his call to make.

**113**    At para. 71 above I recited a number of factual findings the application judge made in concluding that approval of the Plan was within his jurisdiction under the CCAA and that it was fair and reasonable. For convenience, I reiterate them here -- with two additional findings -- because they provide an important foundation for his analysis concerning the fairness and reasonableness of the Plan. The application judge found that:

> a)    The parties to be released are necessary and essential to the restructuring of the debtor;
>
> b)    The claims to be released are rationally related to the purpose of the Plan and necessary for it;
>
> c)    The Plan cannot succeed without the releases;
>
> d)    The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan;
>
> e)    The Plan will benefit not only the debtor companies but creditor Noteholders generally;
>
> f)    The voting creditors who have approved the Plan did so with knowledge of the nature and effect of the releases; and that,
>
> g)    The releases are fair and reasonable and not overly broad or offensive to public policy.

**114**    These findings are all supported on the record. Contrary to the submission of some of the

appellants, they do not constitute a new and hitherto untried "test" for the sanctioning of a plan under the CCAA. They simply represent findings of fact and inferences on the part of the application judge that underpin his conclusions on jurisdiction and fairness.

**115**   The appellants all contend that the obligation to release the third parties from claims in fraud, tort, breach of fiduciary duty, etc. is confiscatory and amounts to a requirement that they -- as individual creditors -- make the equivalent of a greater financial contribution to the Plan. In his usual lively fashion, Mr. Sternberg asked us the same rhetorical question he posed to the application judge. As he put it, how could the court countenance the compromise of what in the future might turn out to be fraud perpetrated at the highest levels of Canadian and foreign banks? Several appellants complain that the proposed Plan is unfair to them because they will make very little additional recovery if the Plan goes forward, but will be required to forfeit a cause of action against third-party financial institutions that may yield them significant recovery. Others protest that they are being treated unequally because they are ineligible for relief programs that Liquidity Providers such as Canaccord have made available to other smaller investors.

**116**   All of these arguments are persuasive to varying degrees when considered in isolation. The application judge did not have that luxury, however. He was required to consider the circumstances of the restructuring as a whole, including the reality that many of the financial institutions were not only acting as Dealers or brokers of the ABCP Notes (with the impugned releases relating to the financial institutions in these capacities, for the most part) but also as Asset and Liquidity Providers (with the financial institutions making significant contributions to the restructuring in these capacities).

**117**   In insolvency restructuring proceedings almost everyone loses something. To the extent that creditors are required to compromise their claims, it can always be proclaimed that their rights are being unfairly confiscated and that they are being called upon to make the equivalent of a further financial contribution to the compromise or arrangement. Judges have observed on a number of occasions that CCAA proceedings involve "a balancing of prejudices," inasmuch as everyone is adversely affected in some fashion.

**118**   Here, the debtor corporations being restructured represent the issuers of the more than $32 billion in non-bank sponsored ABCP Notes. The proposed compromise and arrangement affects that entire segment of the ABCP market and the financial markets as a whole. In that respect, the application judge was correct in adverting to the importance of the restructuring to the resolution of the ABCP liquidity crisis and to the need to restore confidence in the financial system in Canada. He was required to consider and balance the interests of <u>all</u> Noteholders, not just the interests of the appellants, whose notes represent only about 3% of that total. That is what he did.

**119**   The application judge noted at para. 126 that the Plan represented "a reasonable balance between benefit to all Noteholders and enhanced recovery for those who can make out specific claims in fraud" within the fraud carve-out provisions of the releases. He also recognized at para.

134 that:

> No Plan of this size and complexity could be expected to satisfy all affected by it. The size of the majority who have approved it is testament to its overall fairness. No plan to address a crisis of this magnitude can work perfect equity among all stakeholders.

**120**    In my view we ought not to interfere with his decision that the Plan is fair and reasonable in all the circumstances.

## D. DISPOSITION

**121**    For the foregoing reasons, I would grant leave to appeal from the decision of Justice Campbell, but dismiss the appeal.

R.A. BLAIR J.A.
 J.I. LASKIN J.A.:-- I agree.
 E.A. CRONK J.A.:-- I agree.

* * * * *

## SCHEDULE "A" - CONDUITS

Apollo Trust

Apsley Trust

Aria Trust

Aurora Trust

Comet Trust

Encore Trust

Gemini Trust

Ironstone Trust

MMAI-I Trust

Newshore Canadian Trust

Opus Trust

Planet Trust

Rocket Trust

Selkirk Funding Trust

Silverstone Trust

Slate Trust

Structured Asset Trust

Structured Investment Trust III

Symphony Trust

Whitehall Trust

\* \* \* \* \*

## SCHEDULE "B" - APPLICANTS

ATB Financial

Caisse de Dépôt et Placement du Québec

Canaccord Capital Corporation

Canada Post Corporation

Credit Union Central of Alberta Limited

Credit Union Central of British Columbia

Credit Union Central of Canada

Credit Union Central of Ontario

Credit Union Central of Saskatchewan

Desjardins Group

Magna International Inc.

National Bank Financial Inc./National Bank of Canada

NAV Canada

Northwater Capital Management Inc.

Public Sector Pension Investment Board

The Governors of the University of Alberta

\* \* \* \* \*

## SCHEDULE "A" - COUNSEL

1)  Benjamin Zarnett and Frederick L. Myers for the Pan-Canadian Investors Committee.
2)  Aubrey E. Kauffman and Stuart Brotman for 4446372 Canada Inc. and 6932819 Canada Inc.
3)  Peter F.C. Howard and Samaneh Hosseini for Bank of America N.A.; Citibank N.A.; Citibank Canada, in its capacity as Credit Derivative Swap Counterparty and not in any other capacity; Deutsche Bank AG; HSBC Bank Canada; HSBC Bank USA, National Association; Merrill Lynch International; Merrill Lynch Capital Services, Inc.; Swiss Re Financial Products Corporation; and UBS AG.
4)  Kenneth T. Rosenberg, Lily Harmer and Max Starnino for Jura Energy Corporation and Redcorp Ventures Ltd.
5)  Craig J. Hill and Sam P. Rappos for the Monitors (ABCP Appeals).
6)  Jeffrey C. Carhart and Joseph Marin for Ad Hoc Committee and Pricewaterhouse Coopers Inc., in its capacity as Financial Advisor.
7)  Mario J. Forte for Caisse de Dépôt et Placement du Québec.
8)  John B. Laskin for National Bank Financial Inc. and National Bank of Canada.
9)  Thomas McRae and Arthur O. Jacques for Ad Hoc Retail Creditors Committee (Brian Hunter, et al).
10) Howard Shapray, Q.C. and Stephen Fitterman for Ivanhoe Mines Ltd.
11) Kevin P. McElcheran and Heather L. Meredith for Canadian Banks, BMO, CIBC RBC, Bank of Nova Scotia and T.D. Bank.
12) Jeffrey S. Leon for CIBC Mellon Trust Company, Computershare Trust Company of Canada and BNY Trust Company of Canada, as Indenture Trustees.
13) Usman Sheikh for Coventree Capital Inc.
14) Allan Sternberg and Sam R. Sasso for Brookfield Asset Management and Partners Ltd. and Hy Bloom Inc. and Cardacian Mortgage Services Inc.
15) Neil C. Saxe for Dominion Bond Rating Service.
16) James A. Woods, Sebastien Richemont and Marie-Anne Paquette for Air

Transat A.T. Inc., Transat Tours Canada Inc., The Jean Coutu Group (PJC) Inc., Aéroports de Montréal, Aéroports de Montréal Capital Inc., Pomerleau Ontario Inc., Pomerleau Inc., Labopharm Inc., Agence Métropolitaine de Transport (AMT), Giro Inc., Vêtements de sports RGR Inc., 131519 Canada Inc., Tecsys Inc., New Gold Inc. and Jazz Air LP.

17)   Scott A. Turner for Webtech Wireless Inc., Wynn Capital Corporation Inc., West Energy Ltd., Sabre Energy Ltd., Petrolifera Petroleum Ltd., Vaquero Resources Ltd., and Standard Energy Ltd.

18)   R. Graham Phoenix for Metcalfe & Mansfield Alternative Investments II Corp., Metcalfe & Mansfield Alternative Investments III Corp., Metcalfe & Mansfield Alternative Investments V Corp., Metcalfe & Mansfield Alternative Investments XI Corp., Metcalfe & Mansfield Alternative Investments XII Corp., Quanto Financial Corporation and Metcalfe & Mansfield Capital Corp.

cp/e/ln/qlkxl/qllkb/qlltl/qlrxg/qlhcs/qlcas/qlhcs/qlhcs

1 Section 5.1 of the CCAA specifically authorizes the granting of releases to directors in certain circumstances.

2 Justice Georgina R. Jackson and Dr. Janis P. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters" in Sarra, ed., *Annual Review of Insolvency Law, 2007* (Vancouver: Thomson Carswell, 2007).

3 Citing Gibbs J.A. in *Chef Ready Foods, supra,* at pp. 319-320.

4 The Legislative Debates at the time the CCAA was introduced in Parliament in April 1933 make it clear that the CCAA is patterned after the predecessor provisions of s. 425 of the *Companies Act 1985* (U.K.): see *House of Commons Debates (Hansard), supra.*

5 See *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, s. 192; *Ontario Business Corporations Act,* R.S.O. 1990, c. B.16, s. 182.

6 A majority in number representing two-thirds in value of the creditors (s. 6).

7 *Steinberg* was originally reported in French: [1993] R.J.Q. 1684 (C.A.). All paragraph references to *Steinberg* in this judgment are from the unofficial English translation available

at 1993 CarswellQue 2055.

8 Reed Dickerson, *The Interpretation and Application of Statutes* (1975) at pp. 234-235, cited in Bryan A. Garner, ed., Black's Law Dictionary, 8th ed. (West Group, St. Paul, Minn., 2004) at 621.

# TAB 2

DOCSTOR: 2191401\1

*Indexed as:*

**Babcock & Wilcox Canada Ltd. (Re)**


**IN THE MATTER OF Section 18.6 of the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, As Amended
AND IN THE MATTER OF Babcock & Wilcox Canada Ltd.**

[2000] O.J. No. 786

[2000] O.T.C. 135

5 B.L.R. (3d) 75

18 C.B.R. (4th) 157

95 A.C.W.S. (3d) 608

Court File No. 00-CL-3667


Ontario Superior Court of Justice
Commercial List

**Farley J.**

Heard: February 25, 2000.
Judgment: February 25, 2000.

(24 paras.)

*Creditors and debtors -- Debtors' relief legislation -- Companies' creditors arrangement legislation
-- Purpose of -- Stay of proceedings against debtor.*


Application by Babcock & Wilcox Canada for an interim order for a stay of proceedings under sec-
tion **18.6** of the Companies' Creditors Arrangement Act. Babcock's parent corporation in the United
States had applied for protection under Chapter 11 of the U.S. Bankruptcy Code in connection with
mass asbestos claims. The U.S. Bankruptcy Court issued a temporary restraining order against
plaintiffs in the asbestos litigation, preventing them from bringing actions against non-debtor affili-
ates of the parent company, which would include Babcock. Babcock argued that this constituted a
foreign proceeding which could be recognized in Canada.

HELD: Application allowed. The Act was to be given a liberal interpretation in order to facilitate its objectives. The Act did not require that a company be insolvent in order to seek the protection of section **18.6.** The U.S. proceedings constituted foreign proceedings under the Act. There was an interdependence between Babcock and the parent company such that a stay was merited to allow the companies to work out a global solution within the context of the proceedings in the United States. The principles of **comity** and cooperation between jurisdictions were applicable.

### Statutes, Regulations and Rules Cited:

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, ss. 267, 268, 269, 270, 271, 272, 273, 274, 275.

Business Corporations Act (Ontario).

Companies' Creditors Arrangement Act, ss. 2, 3, 4, 5, **18.6, 18.6**(1), **18.6**(2), **18.6**(3), **18.6**(4), **18.6**(8).

U.S. Bankruptcy Code, s. 524(g).

### Counsel:

Derrick Tay, for Babcock & Wilcox Canada Ltd.
Paul Macdonald, for Citibank North America Inc. Lenders under the Post-Petition Credit Agreement.

---

**1    FARLEY J.**:-- I have had the opportunity to reflect on this matter which involves an aspect of the recent amendments to the insolvency legislation of Canada, which amendments have not yet been otherwise dealt with as to their substance. The applicant, Babcock & Wilcox Canada Ltd. ("BW Canada"), a solvent company, has applied for an interim order under s. **18.6** of the Companies' Creditors Arrangement Act ("**CCAA**"):

> (a)    that the proceedings commenced by BW Canada's parent U.S. corporation and certain other U.S. related corporations (collectively "BWUS") for protection under Chapter 11 of the U.S. Bankruptcy Code in connection with mass asbestos claims before the U.S. Bankruptcy Court be recognized as a "foreign proceeding" for the purposes of s. **18.6;**
>
> (b)    that BW Canada be declared a company which is entitled to avail itself of the provisions of s. **18.6;**
>
> (c)    that there be a stay against suits and enforcements until May 1, 2000 (or such later date as the Court may order) as to asbestos related proceedings against BW Canada, its property and its directors;
>
> (d)    that BW Canada be authorized to guarantee the obligations of its parent to the DIP Lender (debtor in possession lender) and grant security therefor in favour of the DIP Lender; and
>
> (e)    and for other ancillary relief.

**2**    In Chapter 11 proceedings under the U.S. Bankruptcy Code, the U.S. Bankruptcy Court in New Orleans issued a temporary restraining order on February 22, 2000 wherein it was noted that BW Canada may be subject to actions in Canada similar to the U.S. asbestos claims. U.S. Bankruptcy Court Judge Brown's temporary restraining order was directed against certain named U.S. resident plaintiffs in the asbestos litigation:

> ... and towards all plaintiffs and potential plaintiffs in Other Derivative Actions, that they are hereby restrained further prosecuting Pending Actions or further prosecuting or commencing Other Derivative Actions against Non-Debtor Affiliates, until the Court decides whether to grant the Debtors' request for a preliminary injunction.

Judge Brown further requested the aid and assistance of the Canadian courts in carrying out the U.S. Bankruptcy Court's orders. The "Non-Debtor Affiliates" would include BW Canada.

**3**    Under the 1994 amendments to the U.S. Bankruptcy Code, the concept of the establishment of a trust sufficient to meet the court determined liability for a mass torts situations was introduced. I am advised that after many years of successfully resolving the overwhelming majority of claims against it on an individual basis by settlement on terms BWUS considered reasonable, BWUS has determined, as a result of a spike in claims with escalating demands when it was expecting a decrease in claims, that it is appropriate to resort to the mass tort trust concept. Hence its application earlier this week to Judge Brown with a view to eventually working out a global process, including incorporating any Canadian claims. This would be done in conjunction with its joint pool of insurance which covers both BWUS and BW Canada. Chapter 11 proceedings do not require an applicant thereunder to be insolvent; thus BWUS was able to make an application with a view towards the 1994 amendments (including s. 524(g)). This subsection would permit the U.S. Bankruptcy Court on confirmation of a plan of reorganization under Chapter 11 with a view towards rehabilitation in the sense of avoiding insolvency in a mass torts situation to:

> enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claims or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust.

**4**    In 1997, ss. 267-275 of the Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 as amended ("BIA") and s. **18.6** of the **CCAA** were enacted to address the rising number of international insolvencies ("1997 Amendments"). The 1997 Amendments were introduced after a lengthy consultation process with the insolvency profession and others. Previous to the 1997 Amendments, Canadian courts essentially would rely on the evolving common law principles of **comity** which permitted the Canadian court to recognize and enforce in Canada the judicial acts of other jurisdictions.

**5**    LaForest J. in Morguard Investments Limited v. De Savoye (1990), 76 D.L.R. (4th) 256 (S.C.C.) at p. 269 described the principle of **comity** as:

> "**Comity**" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and goodwill, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and con-

venience, and to the rights of its own citizens or of other persons who are under the protections of its laws ...

**6**    In ATL Industries Inc. v. Han Eol Inc. Co. (1995), 36 C.P.C. (3d) 288 (Ont. Gen. Div.) at pp. 302-3 I noted the following:

> Allow me to start off by stating that I agree with the analysis of MacPherson J. in Arrowmaster Inc. v. Unique Forming Ltd. (1993), 17 O.R. (3d) 407 (Gen. Div.) when in discussing Morguard Investments Ltd. v. De Savoye, [1990] 3 S.C.R. 1077, 76 D.L.R. (4th) 256, 52 B.C.L.R. (2d) 160, 122 N.R. 81, [1991] 2 W.W.R. 217, 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, he states at p. 411:

>> The leading case dealing with the enforcement of "foreign" judgments is the decision of the Supreme Court of Canada in Morguard Investments, supra. The question in that case was whether, and the circumstances in which, the judgment of an Alberta court could be enforced in British Columbia. A unanimous court, speaking through La Forest J., held in favour of enforceability and, in so doing, discussed in some detail the doctrinal principles governing inter-jurisdictional enforcement of orders. I think it fair to say that the overarching theme of La Forest J.'s reasons is the necessity and desirability, in a mobile global society, for governments and courts to respect the orders made by courts in foreign jurisdictions with comparable legal systems, including substantive laws and rules of procedure. He expressed this theme in these words, at p. 1095:

>>> "Modern states, however, cannot live in splendid isolation and do give effect to judgments given in other countries in certain circumstances. Thus a judgment in rem, such as a decree of divorce granted by the courts of one state to persons domiciled there, will be recognized by the courts of other states. In certain circumstances, as well, our courts will enforce personal judgments given in other states. Thus, we saw, our courts will enforce an action for breach of contract given by the courts of another country if the defendant was present there at the time of the action or has agreed to the foreign court's exercise of jurisdiction. This, it was thought, was in conformity with the requirements of **comity,** the informing principle of private international law, which has been stated to be the deference and respect due by other states to the actions of a state legitimately taken within its territory. Since the state where the judgment was given has power over the litigants, the judgments of its courts should be respected." (emphasis added in original)

>> Morguard Investments was, as stated earlier, a case dealing with the enforcement of a court order across provincial boundaries. However, the historical analysis in La Forest J.'s judgment, of both the United Kingdom

> and Canadian jurisprudence, and the doctrinal principles enunciated by the
> court are equally applicable, in my view, in a situation where the judgment
> has been rendered by a court in a foreign jurisdiction. This should not be
> an absolute rule - there will be some foreign court orders that should not be
> enforced in Ontario, perhaps because the substantive law in the foreign
> country is so different from Ontario's or perhaps because the legal process
> that generates the foreign order diverges radically from Ontario's process.
> (my emphasis added)

Certainly the substantive and procedural aspects of the U.S. Bankruptcy Code including its 1994
amendments are not so different and do not radically diverge from our system.

**7**    After reviewing LaForest J.'s definition of **comity,** I went on to observe at p. 316:

> As was discussed by J.G. Castel, Canadian Conflicts of Laws, 3rd ed. (Toronto:
> Butterworths, 1994) at p. 270, there is a presumption of validity attaching to a
> foreign judgment unless and until it is established to be invalid. It would seem
> that the same type of evidence would be required to impeach a foreign judgment
> as a domestic one: fraud practiced on the court or tribunal: see Sun Alliance In-
> surance Co. v. Thompson (1981), 56 N.S.R. (2d) 619, 117 A.P.R. 619 (T.D.),
> Sopinka, supra, at p. 992.

LaForest J. went on to observe in Morguard at pp. 269-70:

> In a word, the rules of private international law are grounded in the need in mod-
> ern times to facilitate the flow of wealth, skills and people across state lines in a
> fair and orderly manner.
>
> ...
>
> Accommodating the flow of wealth, skills and people across state lines has now
> become imperative. Under these circumstances, our approach to the recognition
> and enforcement of foreign judgments would appear ripe for reappraisal.

See also Hunt v. T&N Plc (1993), 109 D.L.R. (4th) 16 (S.C.C.) at p. 39.

**8**    While Morguard was an interprovincial case, there is no doubt that the principles in that case
are equally applicable to international matters in the view of MacPherson J. and myself in Arrow-
master and ATL respectively. Indeed the analysis by LaForest J. was on an international plane. As a
country whose well-being is so heavily founded on international trade and investment, Canada of
necessity is very conscious of the desirability of invoking **comity** in appropriate cases.

**9**    In the context of cross-border insolvencies, Canadian and U.S. Courts have made efforts to
complement, coordinate and where appropriate accommodate the proceedings of the other. Exam-
ples of this would include Olympia & York Developments Ltd., Everfresh Beverages Inc. and The
Loewen Group Inc. Other examples involve the situation where a multi-jurisdictional proceeding is
specifically connected to one jurisdiction with that jurisdiction's court being allowed to exercise
principal control over the insolvency process: see Roberts v. Picture Butte Municipal Hospital,
[1998] A.J. No. 817 (Q.B.) at pp. 5-7; Microbiz Corp v. Classic Software Systems Inc. (1996), 45

C.B.R. (3d) 40 (Ont. Gen. Div.) at p. 4; Tradewell Inc. v. American Sensors Electronics, Inc. 1997 W.L. 423075 (S.D.N.Y.).

**10**    In Roberts, Forsythe J. at pp. 5-7 noted that steps within the proceedings themselves are also subject to the dictates of **comity** in recognizing and enforcing a U.S. Bankruptcy Court stay in the Dow Corning litigation as to a debtor in Canada so as to promote greater efficiency, certainty and consistency in connection with the debtor's restructuring efforts. Foreign claimants were provided for in the U.S. corporation's plan. Forsyth J. stated:

> **Comity** and cooperation are increasingly important in the bankruptcy context. As internationalization increases, more parties have assets and carry on activities in several jurisdictions. Without some coordination there would be multiple proceedings, inconsistent judgments and general uncertainty.
>
> ... I find that common sense dictates that these matters would be best dealt with by one court, and in the interest of promoting international **comity** it seems the forum for this case is in the U.S. Bankruptcy Court. Thus, in either case, whether there has been an attornment or not, I conclude it is appropriate for me to exercise my discretion and apply the principles of **comity** and grant the Defendant's stay application. I reach this conclusion based on all the circumstances, including the clear wording of the U.S. Bankruptcy Code provision, the similar philosophies and procedures in Canada and the U.S., the Plaintiff's attornment to the jurisdiction of the U.S. Bankruptcy Court, and the incredible number of claims outstanding ... (emphasis added)

**11**    The **CCAA** as remedial legislation should be given a liberal interpretation to facilitate its objectives. See Re Chef Ready Foods Ltd. (1990), 4 C.B.R. (3d) 311 (B.C.C.A.) at p. 320; Re Lehndorff General Partners Ltd. (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div.).

**12**    David Tobin, the Director General, Corporate Governance Branch, Department of Industry in testifying before the Standing Committee on Industry regarding Bill C-5, An Act to amend the BIA, the **CCAA** and the Income Tax Act, stated at 1600:

> Provisions in Bill C-5 attempt to actually codify, which has always been the practice in Canada. They include the Court recognition of foreign representatives; Court authority to make orders to facilitate and coordinate international insolvencies; provisions that would make it clear that foreign representatives are allowed to commence proceedings in Canada, as per Canadian rules - however, they clarify that foreign stays of proceedings are not applicable but a foreign representative can apply to a court for a stay in Canada; and Canadian creditors and assets are protected by the bankruptcy and insolvency rules.

The philosophy of the practice in international matters relating to the **CCAA** is set forth in Olympia & York Developments Limited v. Royal Trust Co. (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.) at p. 167 where Blair J. stated:

> The Olympia & York re-organization involves proceedings in three different jurisdictions: Canada, the United States and the United Kingdom. Insolvency dis-

putes with international overtones and involving property and assets in a multiplicity of jurisdictions are becoming increasingly frequent. Often there are differences in legal concepts - sometimes substantive, sometimes procedural - between the jurisdictions. The Courts of the various jurisdictions should seek to cooperate amongst themselves, in my view, in facilitating the trans-border resolution of such disputes as a whole, where that can be done in a fashion consistent with their own fundamental principles of jurisprudence. The interests of international co-operation and **comity,** and the interests of developing at least some degree of certitude in international business and commerce, call for nothing less.

Blair J. then proceeded to invoke inherent jurisdiction to implement the Protocol between the U.S. Bankruptcy Court and the Ontario Court. See also my endorsement of December 20, 1995 in Re Everfresh Beverages Inc. where I observed: "I would think that this Protocol demonstrates the essence of **comity'** between the Courts of Canada and the United States of America." Everfresh was an example of the effective and efficient use of the Cross-Border Insolvency Concordat, adopted by the Council of the International Bar Association on May 31, 1996 (after being adopted by its Section on Business Law Council on September 17, 1995), which Concordat deals with, inter alia, principal administration of a debtor's reorganization and ancillary jurisdiction. See also the UNCITRAL Model Law on Cross-Border Insolvency.

**13** Thus it seems to me that this application by BW Canada should be reviewed in light of (i) the doctrine of **comity** as analyzed in Morguard, Arrowmaster and ATL, supra, in regard to its international aspects; (ii) inherent jurisdiction; (iii) the aspect of the liberal interpretation of the **CCAA** generally; and (iv) the assistance and codification of the 1997 Amendments.

"Foreign proceeding" is defined in s. **18.6**(1) as:

In this Section,

> "foreign proceeding" means a judicial or administrative proceeding commenced outside Canada in respect of a debtor under a law relating to bankruptcy or insolvency and dealing with the collective interests of creditors generally.

Certainly a U.S. Chapter 11 proceeding would fit this definition subject to the question of "debtor". It is important to note that the definition of "foreign proceeding" in s. **18.6** of the **CCAA** contains no specific requirement that the debtor be insolvent. In contrast, the BIA defines a "debtor" in the context of a foreign proceeding (Part XIII of the BIA) as follows:

> s. 267 In this Part,

> "debtor means an insolvent person who has property in Canada, a bankrupt who has property in Canada or a person who has the status of a bankrupt under foreign law in a foreign proceeding and has property in Canada (emphasis added).

I think it a fair observation that the BIA is a rather defined code which goes into extensive detail. This should be contrasted with the **CCAA** which is a very short general statute which has been utilized to give flexibility to meet what might be described as the peculiar and unusual situation circumstances. A general categorization (which of course is never completely accurate) is that the BIA may be seen as being used for more run of the mill cases whereas the **CCAA** may be seen as facili-

tating the more unique or complicated cases. Certainly the **CCAA** provides the flexibility to deal with the thornier questions. Thus I do not think it unusual that the draftees of the 1997 Amendments would have it in their minds that the provisions of the **CCAA** dealing with foreign proceedings should continue to reflect this broader and more flexible approach in keeping with the general provisions of the **CCAA,** in contrast with the corresponding provisions under the BIA. In particular, it would appear to me to be a reasonably plain reading interpretation of s. **18.6** that recourse may be had to s. **18.6** of the **CCAA** in the case of a solvent debtor. Thus I would conclude that the aspect of insolvency is not a condition precedent vis-a-vis the "debtor" in the foreign proceedings (here the Chapter 11 proceedings) for the proceedings in Louisiana to be a foreign proceeding under the definition of s. **18.6.** I therefore declare that those proceedings are to be recognized as a "foreign proceeding" for the purposes of s. **18.6** of the **CCAA.**

**14**    It appears to me that my conclusion above is reinforced by an analysis of s. **18.6**(2) which deals with concurrent filings by a debtor under the **CCAA** in Canada and corresponding bankruptcy or insolvency legislation in a foreign jurisdiction. This is not the situation here, but it would be applicable in the Loewen case. That subsection deals with the coordination of proceedings as to a "debtor company" initiated pursuant to the **CCAA** and the foreign legislation.

> s.    **18.6**(2). The court may, in respect of a debtor company, make such orders and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a coordination of proceedings under the Act with any foreign proceeding. (emphasis added).

**15**    The definition of "debtor company" is found in the general definition section of the **CCAA,** namely s. 2 and that definition incorporates the concept of insolvency. Section **18.6**(2) refers to a "debtor company" since only a "debtor company" can file under the **CCAA** to propose a compromise with its unsecured or secured creditors: ss. 3, 4 and 5 **CCAA.** See also s. **18.6**(8) which deals with currency concessions "[w]here a compromise or arrangement is proposed in respect of a debtor company ...". I note that "debtor company" is not otherwise referred to in s. **18.6;** however "debtor" is referred to in both definitions under s. **18.6**(1).

**16**    However, s. **18.6**(4) provides a basis pursuant to which a company such as BW Canada, a solvent corporation, may seek judicial assistance and protection in connection with a foreign proceeding. Unlike s. **18.6**(2), s. **18.6**(4) does not contemplate a full filing under the **CCAA.** Rather s. **18.6**(4) may be utilized to deal with situations where, notwithstanding that a full filing is not being made under the **CCAA,** ancillary relief is required in connection with a foreign proceeding.

> s.    **18.6**(4) Nothing in this section prevents the court, on the application of a foreign representative or any other interested persons, from applying such legal or equitable rules governing the recognition of foreign insolvency orders and assistance to foreign representatives as are not inconsistent with the provisions of this Act. (emphasis added).

BW Canada would fit within "any interested person" to bring the subject application to apply the principles of **comity** and cooperation. It would not appear to me that the relief requested is of a nature contrary to the provisions of the **CCAA.**

**17**    Additionally there is s. **18.6**(3) whereby once it has been established that there is a foreign proceeding within the meaning of s. **18.6**(1) (as I have concluded there is), then this court is given

broad powers and wide latitude, all of which is consistent with the general judicial analysis of the **CCAA** overall, to make any order it thinks appropriate in the circumstances.

> s.    **18.6(**3) An order of the court under this Section may be made on such terms and conditions as the court considers appropriate in the circumstances.

This subsection reinforces the view expressed previously that the 1997 Amendments contemplated that it would be inappropriate to pigeonhole or otherwise constrain the interpretation of s. **18.6** since it would be not only impracticable but also impossible to contemplate the myriad of circumstances arising under a wide variety of foreign legislation which deal generally and essentially with bankruptcy and insolvency but not exclusively so. Thus the Court was entrusted to exercise its discretion, but of course in a judicial manner.

**18**    Even aside from that, I note that the Courts of this country have utilized inherent jurisdiction to fill in any gaps in the legislation and to promote the objectives of the **CCAA.** Where there is a gap which requires bridging, then the question to be considered is what will be the most practical common sense approach to establishing the connection between the parts of the legislation so as to reach a just and reasonable solution. See Re Westar Mining Ltd. (1992), 14 C.B.R. (3d) 88 (B.C.S.C.) at pp. 93-4; Pacific National Leaseholding Corp. v. Sun Life Trust Co. (1995), 34 C.B.R. (3d) 4 (B.C.C.A.) at p. 2; Lehndorff at p. 30.

**19**    The Chapter 11 proceedings are intended to resolve the mass asbestos related tort claims which seriously threaten the long term viability of BWUS and its subsidiaries including BW Canada. BW Canada is a significant participant in the overall Babcock & Wilcox international organization. From the record before me it appears reasonably clear that there is an interdependence between BWUS and BW Canada as to facilities and services. In addition there is the fundamental element of financial and business stability. This interdependence has been increased by the financial assistance given by the BW Canada guarantee of BWUS' obligations.

**20**    To date the overwhelming thrust of the asbestos related litigation has been focussed in the U.S. In contradistinction BW Canada has not in essence been involved in asbestos litigation to date. The 1994 amendments to the U.S. Bankruptcy Code have provided a specific regime which is designed to deal with the mass tort claims (which number in the hundreds of thousands of claims in the U.S.) which appear to be endemic in the U.S. litigation arena involving asbestos related claims as well as other types of mass torts. This Court's assistance however is being sought to stay asbestos related claims against BW Canada with a view to this stay facilitating an environment in which a global solution may be worked out within the context of the Chapter 11 proceedings trust.

**21**    In my view, s. **18.6(**3) and (4) permit BW Canada to apply to this Court for such a stay and other appropriate relief. Relying upon the existing law on the recognition of foreign insolvency orders and proceedings, the principles and practicalities discussed and illustrated in the Cross-Border Insolvency Concordat and the UNCITRAL Model Law on Cross-Border Insolvencies and inherent jurisdiction, all as discussed above, I would think that the following may be of assistance in advancing guidelines as to how s. **18.6** should be applied. I do not intend the factors listed below to be exclusive or exhaustive but merely an initial attempt to provide guidance:

> (a)    The recognition of **comity** and cooperation between the courts of various jurisdictions are to be encouraged.

(b)    Respect should be accorded to the overall thrust of foreign bankruptcy and insolvency legislation in any analysis, unless in substance generally it is so different from the bankruptcy and insolvency law of Canada or perhaps because the legal process that generates the foreign order diverges radically from the process here in Canada.

(c)    All stakeholders are to be treated equitably, and to the extent reasonably possible, common or like stakeholders are to be treated equally, regardless of the jurisdiction in which they reside.

(d)    The enterprise is to be permitted to implement a plan so as to reorganize as a global unit, especially where there is an established interdependence on a transnational basis of the enterprise and to the extent reasonably practicable, one jurisdiction should take charge of the principal administration of the enterprise's reorganization, where such principal type approach will facilitate a potential reorganization and which respects the claims of the stakeholders and does not inappropriately detract from the net benefits which may be available from alternative approaches.

(e)    The role of the court and the extent of the jurisdiction it exercises will vary on a case by case basis and depend to a significant degree upon the court's nexus to that enterprise; in considering the appropriate level of its involvement, the court would consider:

    (i)    the location of the debtor's principal operations, undertaking and assets;

    (ii)    the location of the debtor's stakeholders;

    (iii)    the development of the law in each jurisdiction to address the specific problems of the debtor and the enterprise;

    (iv)    the substantive and procedural law which may be applied so that the aspect of undue prejudice may be analyzed;

    (v)    such other factors as may be appropriate in the instant circumstances.

(f)    Where one jurisdiction has an ancillary role,

    (i)    the court in the ancillary jurisdiction should be provided with information on an ongoing basis and be kept apprised of developments in respect of that debtor's reorganizational efforts in the foreign jurisdiction;

    (ii)    stakeholders in the ancillary jurisdiction should be afforded appropriate access to the proceedings in the principal jurisdiction.

(g)    As effective notice as is reasonably practicable in the circumstances should be given to all affected stakeholders, with an opportunity for such stakeholders to come back into the court to review the granted order with a view, if thought desirable, to rescind or vary the granted order or to obtain any other appropriate relief in the circumstances.

**22**    Taking these factors into consideration, and with the determination that the Chapter 11 proceedings are a "foreign proceeding" within the meaning of s. **18.6** of the **CCAA** and that it is appropriate to declare that BW Canada is entitled to avail itself of the provisions of s. **18.6,** I would also grant the following relief. There is to be a stay against suits and enforcement as requested; the initial time period would appear reasonable in the circumstances to allow BWUS to return to the U.S. Bankruptcy Court. Assuming the injunctive relief is continued there, this will provide some additional time to more fully prepare an initial draft approach with respect to ongoing matters. It should also be recognized that if such future relief is not granted in the U.S. Bankruptcy Court, any interested person could avail themselves of the "comeback" clause in the draft order presented to me and which I find reasonable in the circumstances. It appears appropriate, in the circumstances that BW Canada guarantee BWUS' obligations as aforesaid and to grant security in respect thereof, recognizing that same is permitted pursuant to the general corporate legislation affecting BW Canada, namely the Business Corporations Act (Ontario). I note that there is also a provision for an "Information Officer" who will give quarterly reports to this Court. Notices are to be published in the Globe & Mail (National Edition) and the National Post. In accordance with my suggestion at the hearing, the draft order notice has been revised to note that persons are alerted to the fact that they may become a participant in these Canadian proceedings and further that, if so, they may make representations as to pursuing their remedies regarding asbestos related claims in Canada as opposed to the U.S. As discussed above the draft order also includes an appropriate "comeback" clause. This Court (and I specifically) look forward to working in a cooperative judicial way with the U.S. Bankruptcy Court (and Judge Brown specifically).

**23**    I am satisfied that it is appropriate in these circumstances to grant an order in the form of the revised draft (a copy of which is attached to these reasons [Quicklaw note: See [2000] O.J. No. 787] for the easy reference of others who may be interested in this area of s. **18.6** of the **CCAA)**.

**24**    Order to issue accordingly.

FARLEY J.

cp/d/qlrme/qlkra

# TAB 3

*Indexed as:*

# Benner and Associates Ltd.
# v. Northern Lights Distribution Inc.

**Between**
**Benner and Associates Ltd., plaintiff, and**
**Northern Lights Distribution Inc., defendant**

**[1995] O.J. No. 626**

22 B.L.R. (2d) 79

53 A.C.W.S. (3d) 929

No. 94-CQ-57097

Ontario Court of Justice (General Division)

**Hoilett J.**

Heard: January 27, 1995.
Judgment: March 9, 1995.

(11 pp.)

*Arbitration -- Stay of proceedings -- Arbitration clause, enforcement of.*

The defendant moved to stay an action on the grounds that the parties had agreed to resort to arbitration. The plaintiff had terminated a dealership agreement with the defendant in May, 1994. Neither party had ever taken any initiative to invoke the arbitration clause in the agreement. The plaintiff issued its statement of claim in October, 1994.

HELD: The motion to stay was dismissed. It was not clear from the language employed that all disputes were to be submitted to arbitration, or whether arbitration was to be invoked only in those circumstances where a dealer was in breach of the contract. There was no clarity in the language of the arbitration clause concerning who should take the initiative in the joint appointment of the arbitrator. Therefore, the arbitration clause had to fail for uncertainty.

**Statutes, Regulations and Rules Cited:**

Arbitration Act, S.O. 1991, ss. 2(4), 7(1), 7(2).

**Counsel:**

Robert C. Harason, for the plaintiff/responding party.
Joseph M. Gottli, for the defendant/moving party.

---

**1    HOILETT J.**:-- This is a motion by the defendant to stay the within action on the grounds that it is inconsistent with a Dealership Agreement entered into by the parties, a term of which contemplates a resort to arbitration in certain circumstances set out in the Agreement.

**2**    Before briefly setting out the general purport of the Agreement and the circumstances precipitating the dispute between the parties, it may be useful to reproduce for ease of reference the specific term of the Agreement relied on by the moving party. Clause 8 of the Agreement provides as follows:

> 8.    Terms and Termination:
>
> A dealership agreement shall remain in place for a period of 1 (one) year which barring any 30 day advance notice by either party will be automatically renewed. If for any reason, and without cause written notice is given 30 days prior to renewal, this contract will cease on the renewal date. Should a Dealer be in breach of this contract, written notice will be given by Northern Lights Distributing, Inc. If the breach is not corrected within 15 days of receiving the written notice, such dispute shall be submitted to a single arbitrator jointly appointed. The chosen arbitrator shall agree to schedule the hearing within 30 days of their appointment and to proceed with arbitration without delay. The appointed arbitrator shall make an award within 15 days of the conclusion of the hearing. This is in accordance with the Arbitration Act of Ontario. A Dealer must meet the specific performance requirements agreed to in Schedule C hereto.

The following handwritten addition was made to the pre-printed text of the Agreement and initialled by the parties:

> Such award shall be binding by (sic) both parties.

**3**    Stated very briefly, under the Agreement entered into by the parties, the plaintiff was appointed

the defendant's agent, or "dealer", for the purpose of distributing in Metropolitan Toronto a skylighting device sold under the label of "Solatube". The Agreement was dated July 29, 1993. Among other things, the Agreement in Clause 6, dealt with the respective marketing and advertising obligations of the parties and Clauses 12 and 13 of the Agreement dealt, respectively, with the issue of non-competition and the matter of trade secrets.

**4**    It is common ground that in early 1994 the plaintiff commenced working on the development of a device described as an "aluminum flat-top flashing" which was intended to be used as a part of the assembly necessary for the installation of the Solatube skylight. The aluminum flashing was intended to be an alternative to a fibreglass product that was part of the original Solatube assembly. An exchange of correspondence between the parties, of which a letter of May 18, 1994 from the defendant to the plaintiff marks a watershed, makes it clear that ultimate approval of the aluminum flashing had to come from "Solatube North America Limited", the defendant's principal. Equally clear, indeed, counsel for the defendant conceded as much, was that the defendant condoned the plaintiff's efforts at developing the aluminum flashing; albeit pointing out to the plaintiff that Solatube North America Limited had to approve the flashing and that solatube North America Limited's warranty would not cover the aluminum flashing.

**5**    The defendant's letter of May 18, 1994, referred to earlier, accused the plaintiff of breaching the terms of the Agreement, and in particular Clauses 12 and 13, dealing, respectively, with "noncompetition" and with "trade secrets". The particular violation complained of was the plaintiff's involvement in the development of the aluminum flashing. The concluding paragraph of the letter sounded the following alarm to the plaintiff:

> Within fifteen (15) days of receiving this notice, Northern Lights requires a letter from Benner and Associates stating that it will cease all actions regarding the aluminum flat roof flashing immediately. Should we not receive the above written notice by close of business (5:00 pm E.S.T.) Thursday, June 2, 1994, the Metro Toronto Dealership is terminated.

**6**    Subsequent letters from the defendant, dated, respectively, May 27, 1994; June 1, 1994; June 1, 1994 and June 2, 1994, echoed the defendant's concern about the alleged breach.

**7**    The plaintiff's first response to the defendant's May 18, 1994 letter of ultimatum was a letter dated June 3, 1994, the day following the 15 days the plaintiff was given to correct the alleged breach. Distilling to its essence the plaintiff's letter of June 3, it indicated that "[o]n the basis of your letter of May 18, 1994, we consider our Dealership Agreement formally terminated at this time" and went on to set out its own allegation of breaches of the Agreement. Appended was a schedule setting out the plaintiff's assessment of its alleged damages.

**8**    The defendant, in a letter dated June 10, 1994, acknowledged receipt of the plaintiff's letter of June 3, 1994, supra, and repeated its allegations of breaches of the Agreement.

**9**    Neither party to the Agreement has ever taken any initiative to invoke the so-called arbitration clause in the agreement. The plaintiff issued its Statement of Claim in this action on October 27, 1994.

**10**    Following the termination of the Agreement, the defendant created a new dealership to assume the role that it was assumed the plaintiff would have played under the terms of the Dealership Agreement had its original intent been realized. It then sought a transfer of the yellow-page listing that the plaintiff had acquired.

**11**    Central to the issues raised on this motion is the need to determine whether or not there is a valid arbitration clause in the Dealership Agreement and, if so, what interpretation should reasonably be placed on it. It must also be determined whether or not, assuming there is a valid arbitration clause, the clause falls prey to any of the exceptions contemplated by Section 7 of the Arbitration Act, S.O. 1991, and, particularly, subsection 2. For ease of reference subsections (1) and (2) of Section 7 are hereafter reproduced:

> 7.-(1) If a party to an arbitration agreement commences a proceeding in respect of a matter to be submitted to arbitration under the agreement, the court in which the proceeding is commenced shall, on the motion of another party to the arbitration agreement, stay the proceeding.

> (2)    However, the court may refuse to stay the proceeding in any of the following cases:

>> 1.    A party entered into the arbitration agreement while under a legal incapacity.
>> 2.    The arbitration agreement is invalid.
>> 3.    The subject-matter of the dispute is not capable of being the subject of arbitration under Ontario law.
>> 4.    The motion was brought with undue delay.
>> 5.    The matter is a proper one for default or summary judgment.

**12**    In order to place this motion in jurisprudential context, reference might usefully be made to the recent decision (unreported) of Blair J. in Ontario Hydro v. Denison Mines Limited, released June 3, 1992 (Ontario Court of Justice (General Division)). The decision of Blair J. is a thorough and thoughtful discussion of the role of arbitration in the spectrum of means of dispute resolution. Referring to "The Legislative Framework", the following excerpt from the reasons of Blair J. epitomises the philosophy that inspired the new arbitration legislation:

> The Arbitration Act, 1991 came into effect on January 1, 1992. It repealed the former Arbitrations Act, R.S.O. 1980 c. 25, and enacted a new regime for the

conduct of arbitrations in Ontario. This new regime is more sophisticated than that of the former Act and more consistent with international commercial arbitration practices. It is designed, in my view, to encourage parties to resort to arbitration as a method of resolving their disputes in commercial and other matters, and to require them to hold to that course once they have agreed to do so.

In this latter respect, the new Act entrenches the primacy of arbitration proceedings over judicial proceedings, once the parties have entered into an arbitration agreement, by directing the court, generally, not to intervene, and by establishing a 'presumptive' stay of court proceedings in favour of arbitration.

**13**    At the risk of simplifying the argument of the defendant herein, what it is asking the court to do is to give effect to the principle enunciated in the judgment of Blair J. in Ontario Hydro v. Denison Mines Limited, supra. The defendant has cited as well the decision of the Ontario Court of Justice (General Division) in Mind Star Toys Inc. v. Samsung Co. Ltd. (1992), 6 C.P.C. (3rd), 241, (Zelinski J.) and the judgment of the Alberta Court of Appeal in Kaverit Steel and Crane Ltd. v. Kone Corp. (1992), 4 C.P.C. (3rd), 99.

**14**    There is no point in dissecting any of the cases cited because there is a general consistency in the interpretation of the law. As is often the case, the ultimate question is the proper construction to be placed on a particular clause.

**15**    The point should be made that in each of the three cases cited on behalf of the defendant, the language of the arbitration clause arguably possesses a clarity that, in my view, is absent from the language of the arbitration clause in the case at bar. The point is best made by reference to the actual text of the arbitration clause in the three cases cited. The text of the Ontario Hydro v. Denison Mines case, supra, provides, in Article XI:

Except as otherwise specifically provided in this agreement or expressly otherwise agreed to by the parties, all disputes arising in connection with this agreement shall be finally settled under the provisions of The Arbitration Act of Ontario by three arbitrators. Each of the parties hereto shall appoint one arbitrator and the two arbitrators so appointed shall appoint the third arbitrator. The proceedings before the arbitrators shall taken place in Toronto, Ontario or such other place as the arbitrators may determine.

**16**    The relevant arbitration provision in the Mind Star v. Samsung case, supra, is Article 14.4, sub-paragraph (a) of which provides:

(a)    All disputes in connection with this Agreement shall be finally settled under the Rules of Conciliation of Arbitration on the International Chamber of Commerce

hereinafter the ('ICC Rules'). In accordance with Article 8(1) of the ICC Rules, SAMSUNG and MSTI acknowledge that they have to hereby submit ipso facto and in all respects to the present ICC Rules.

**17**    The arbitration clause in the Kaverit Steel v. Kone case, supra, is to the same general effect as in the two cases above, and provides as follows:

>   Any dispute arising out of or in connection with this Agreement shall be finally settled without recourse to the courts, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more arbitrators designated in conformity with those Rules. The arbitrator or arbitrators shall have power to rule on their own competence and on the validity of the agreement to submit to arbitration. The place of arbitration shall be Stockholm, Sweden.

**18**    A cursory review of the arbitration clauses in cases cited in the plaintiff's book of authorities makes it clear that, while not uniform, language in the general form of that reproduced above is quite commonly employed. I am of the view that in each case the language employed appears to express much more clearly the intent of the parties than is the case in the instant motion. In the instant motion it is not clear from the language of Clause 8 that all disputes are to be submitted to arbitration or whether arbitration is to be invoked only in those circumstances in which, as the clause suggests, "... a Dealer [is] in breach of his contract ...". There is no clarity in the language of the arbitration clause concerning who should take the initiative in the joint appointment of an arbitrator. Prima facie, it would appear that the obligation should rest on the defendant. There is nothing in the language of the arbitration clause that obliges the Dealer to submit to arbitration any breaches of contract on the part of Northern. It is trite to say that the interpretation of contracts is one of the roles of the court, and in so doing it will often imply a clause in order to render efficacious, from a business point of view, a contract. It is not, however, the role of the court to write a contract that the parties themselves have failed, through some default, to write. The Agreement in issue was drafted by the defendant and had it been the defendant's intention to have all breaches and disputes submitted to arbitration, that intent could have been couched in plain and simple language.

**19**    The final determination of the issues raised in this motion must, in my view, turn on the proper construction to be placed on the language of the arbitration clause as well as the surrounding circumstances which include the conduct of the parties. As I indicated earlier, there is nothing in the language of the clause which obliges the Dealer to submit to arbitration where the defendant, allegedly, is in breach of contract. The language requiring the parties to arbitrate where the Dealer is in breach is itself vague. I am of the view, therefore, that the arbitration clause must fail for uncertainty.

**20**    The foregoing conclusion is a sufficient reason for dismissing this motion. I am impelled to

that conclusion, however, for one other reason. The course of conduct of the defendant following its allegation of breach on the part of the Dealer demonstrated scant regard for the provisions of the arbitration clause which it now seeks to assert as a shield. The totality of the defendant's conduct constitutes such undue delay as to warrant a dismissal of motion to stay, as contemplated by Section (2) 4 of the Arbitration Act.

**21**    In the result, the motion is dismissed subject to the condition that the defendant shall have leave to deliver its statement of defence (and counterclaim, if intended) within ten (10) days of the entry of this order.

**22**    The plaintiff shall have its cost of this motion fixed in the amount of $1,250.00, plus G.S.T.

HOILETT J.

qp/s/mii/DRS

# TAB 4

DOCSTOR: 2191401\1

** Preliminary Version **


*Case Name:*

# Century Services Inc. v. Canada (Attorney General)


**Century Services Inc., Appellant;**
**v.**
**Attorney General of Canada on behalf of Her Majesty The Queen**
**in Right of Canada, Respondent.**

[**2010] S.C.J. No. 60**

[2010] A.C.S. no 60

2010 SCC 60

[2010] 3 S.C.R. 379

[2010] 3 R.C.S. 379

2011 D.T.C. 5006

409 N.R. 201

296 B.C.A.C. 1

12 B.C.L.R. (5th) 1

2010 CarswellBC 3419

326 D.L.R. (4th) 577

EYB 2010-183759

2011EXP-9

J.E. 2011-5

2011 G.T.C. 2006

[2011] 2 W.W.R. 383

72 C.B.R. (5th) 170

[2010] G.S.T.C. 186

File No.: 33239.

Supreme Court of Canada

Heard: May 11, 2010;
Judgment: December 16, 2010.

**Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish,
Abella, Charron, Rothstein and Cromwell JJ.**

(136 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters --
Application of Act -- Compromises and arrangements -- Where Crown affected -- Effect of related
legislation -- Bankruptcy and Insolvency Act -- Appeal by Century Services Inc. from judgment of
British Columbia Court of Appeal reversing a judgment dismissing a Crown application for
payment of unremitted GST monies allowed -- Section 222(3) of the Excise Tax Act evinced no
explicit intention of Parliament to repeal s. 18.3 of CCAA -- Parliament's intent with respect to GST
deemed trusts was to be found in the CCAA -- Judge had the discretion under the CCAA to continue
the stay of the Crown's claim for enforcement of the GST deemed trust while otherwise lifting it to
permit debtor company to make an assignment in bankruptcy.*

Appeal by Century Services Inc. from a judgment of the British Columbia Court of Appeal
reversing a judgment dismissing a Crown application for payment of unremitted GST monies. The
debtor company commenced proceedings under the Companies' Creditors Arrangement Act
(CCAA), obtaining a stay of proceedings with a view to reorganizing its financial affairs. Among
the debts owed by the debtor company at the commencement of the reorganization was an amount
of GST collected but unremitted to the Crown. The Excise Tax Act (ETA) created a deemed trust in
favour of the Crown for amounts collected in respect of GST. The ETA provided that the deemed
trust operated despite any other enactment of Canada except the Bankruptcy and Insolvency Act
(BIA). However, the CCAA also provided that subject to certain exceptions, none of which

mentioned GST, deemed trusts in favour of the Crown did not operate under the CCAA. In the context of the CCAA proceedings, a chambers judge approved a payment not exceeding $5 million to the debtor company's major secured creditor, Century Services. The judge agreed to the debtor company's proposal to hold back an amount equal to the GST monies collected but unremitted to the Crown and place it in the Monitor's trust account until the outcome of the reorganization was known. After concluding that reorganization was not possible, the debtor company sought leave to partially lift the stay of proceedings so it could make an assignment in bankruptcy under the Bankruptcy and Insolvency Act (BIA). The Crown sought an order that the GST monies held by the Monitor be paid to the Receiver General of Canada. The judge denied the Crown's motion, and allowed the assignment in bankruptcy. The Court of Appeal found two independent bases for allowing the Crown's appeal. First, the court's authority under s. 11 of the CCAA was held not to extend to staying the Crown's application for immediate payment of the GST funds subject to the deemed trust after it was clear that reorganization efforts had failed and that bankruptcy was inevitable. As restructuring was no longer a possibility, staying the Crown's claim to the GST funds no longer served a purpose under the CCAA and the court was bound under the priority scheme provided by the ETA to allow payment to the Crown. Second, the Court of Appeal concluded that by ordering the GST funds segregated in the Monitor's trust account, the judge had created an express trust in favour of the Crown from which the monies in question could not be diverted for any other purposes.

HELD: Appeal allowed. Section 222(3) of the ETA evinced no explicit intention of Parliament to repeal CCAA s. 18.3. Had Parliament sought to give the Crown a priority for GST claims, it could have done so explicitly, as it did for source deductions. There was no express statutory basis for concluding that GST claims enjoyed a preferred treatment under the CCAA or the BIA. Parliament's intent with respect to GST deemed trusts was to be found in the CCAA. With respect to the scope of a court's discretion when supervising reorganization, the broad discretionary jurisdiction conferred on the supervising judge had to be interpreted having regard to the remedial nature of the CCAA and insolvency legislation generally. The question was whether the order advanced the underlying purpose of the CCAA. The judge's order staying Crown enforcement of the GST claim ensured that creditors would not be disadvantaged by the attempted reorganization under the CCAA. The effect of his order was to blunt any impulse of creditors to interfere in an orderly liquidation. His order was thus in furtherance of the CCAA's objectives to the extent that it allowed a bridge between the CCAA and BIA proceedings. The order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that was common to both statutes. The breadth of the court's discretion under the CCAA was sufficient to lift the stay to allow entry into liquidation. No express trust was created by the judge's order because there was no certainty of object inferrable from his order. Further, no deemed trust was created.

**Statutes, Regulations and Rules Cited:**

An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and

Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts, S.C. 2005, c. 47, s. 69, s. 128, s. 131

Bank Act, S.C. 1991, c. 46,

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-, s. 67, s. 86

Canada Pension Plan, R.S.C. 1985, c. C-8, s. 23

Cities and Towns Act, R.S.Q., c. C-19,

Civil Code of QuÚbec, S.Q. 1991, c. 64, art. 2930

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11, s. 11.4, s. 18.3, s. 18.4, s. 20, s. 21

Companies' Creditors Arrangement Act, 1933, S.C. 1932-33, c. 36,

Employment Insurance Act, S.C. 1996, c. 23, s. 86(2), s. 86(2.1)

Excise Tax Act, R.S.C. 1985, c. E-15, s. 222

Income Tax Act, R.S.C. 1985, c. 1 (5th Supp.), s. 227(4), s. 227(4.1)

Interpretation Act, R.S.C. 1985, c. I-21, s. 2, s. 44(f)

Personal Property Security Act, S.A. 1988, c. P-4.05,

Winding-up and Restructuring Act, R.S.C. 1985, c. W-11,

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

**Court Catchwords:**

*Bankruptcy and Insolvency -- Priorities -- Crown applying on eve of bankruptcy of debtor company to have GST monies held in trust paid to Receiver General of Canada -- Whether deemed trust in favour of Crown under Excise Tax Act prevails over provisions of Companies' Creditors Arrangement Act purporting to nullify deemed trusts in favour of Crown -- Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 18.3(1) -- Excise Tax Act, R.S.C. 1985, c. E-15, s. 222(3).*

*Bankruptcy and insolvency -- Procedure -- Whether chambers judge had authority to make order*

*partially lifting stay of proceedings to allow debtor company to make assignment in bankruptcy and to stay Crown's right to enforce GST deemed trust -- Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11.*

*Trusts -- Express trusts -- GST collected but unremitted to Crown -- Judge ordering that GST be held by Monitor in trust account -- Whether segregation of Crown's GST claim in Monitor's account created an express trust in favour of Crown.*

## Court Summary:

The debtor company commenced proceedings under the *Companies' Creditors Arrangement Act* ("*CCAA*"), obtaining a stay of proceedings to allow it time to reorganize its financial affairs. One of the debtor company's outstanding debts at the commencement of the reorganization was an amount of unremitted Goods and Services Tax ("GST") payable to the Crown. Section 222(3) of the *Excise Tax Act* ("*ETA*") created a deemed trust over unremitted GST, which operated despite any other enactment of Canada except the *Bankruptcy and Insolvency Act* ("*BIA*"). However, s. 18.3(1) of the *CCAA* provided that any statutory deemed trusts in favour of the Crown did not operate under the *CCAA*, subject to certain exceptions, none of which mentioned GST.

Pursuant to an order of the *CCAA* chambers judge, a payment not exceeding $5 million was approved to the debtor company's major secured creditor, Century Services. However, the chambers judge also ordered the debtor company to hold back and segregate in the Monitor's trust account an amount equal to the unremitted GST pending the outcome of the reorganization. On concluding that reorganization was not possible, the debtor company sought leave of the court to partially lift the stay of proceedings so it could make an assignment in bankruptcy under the *BIA*. The Crown moved for immediate payment of unremitted GST to the Receiver General. The chambers judge denied the Crown's motion, and allowed the assignment in bankruptcy. The Court of Appeal allowed the appeal on two grounds. First, it reasoned that once reorganization efforts had failed, the chambers judge was bound under the priority scheme provided by the *ETA* to allow payment of unremitted GST to the Crown and had no discretion under s. 11 of the *CCAA* to continue the stay against the Crown's claim. Second, the Court of Appeal concluded that by ordering the GST funds segregated in the Monitor's trust account, the chambers judge had created an express trust in favour of the Crown.

*Held* (Abella J. dissenting): The appeal should be allowed.

*Per* McLachlin C.J., Binnie, LeBel, **Deschamps**, Charron, Rothstein and Cromwell JJ.: The apparent conflict between s. 222(3) of the *ETA* and s. 18.3(1) of the *CCAA* can be resolved through an interpretation that properly recognizes the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by Parliament and the principles for interpreting the *CCAA* that have been recognized in the jurisprudence. The history of the *CCAA* distinguishes it from the *BIA* because although these statutes share the same remedial purpose of avoiding the social and economic costs of liquidating a debtor's assets, the *CCAA* offers more flexibility and greater judicial

discretion than the rules-based mechanism under the *BIA*, making the former more responsive to complex reorganizations. Because the *CCAA* is silent on what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily provides the backdrop against which creditors assess their priority in the event of bankruptcy. The contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the *CCAA* and the *BIA*, and one of its important features has been a cutback in Crown priorities. Accordingly, the *CCAA* and the *BIA* both contain provisions nullifying statutory deemed trusts in favour of the Crown, and both contain explicit exceptions exempting source deductions deemed trusts from this general rule. Meanwhile, both Acts are harmonious in treating other Crown claims as unsecured. No such clear and express language exists in those Acts carving out an exception for GST claims.

When faced with the apparent conflict between s. 222(3) of the *ETA* and s. 18.3(1) of the *CCAA*, courts have been inclined to follow *Ottawa Senators Hockey Club Corp.(Re)* and resolve the conflict in favour of the *ETA*. *Ottawa Senators* should not be followed. Rather, the *CCAA* provides the rule. Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so expressly and elaborately. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. The internal logic of the *CCAA* appears to subject a GST deemed trust to the waiver by Parliament of its priority. A strange asymmetry would result if differing treatments of GST deemed trusts under the *CCAA* and the *BIA* were found to exist, as this would encourage statute shopping, undermine the *CCAA*'s remedial purpose and invite the very social ills that the statute was enacted to avert. The later in time enactment of the more general s. 222(3) of the *ETA* does not require application of the doctrine of implied repeal to the earlier and more specific s. 18.3(1) of the *CCAA* in the circumstances of this case. In any event, recent amendments to the *CCAA* in 2005 resulted in s. 18.3 of the Act being renumbered and reformulated, making it the later in time provision. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*. The conflict between the *ETA* and the *CCAA* is more apparent than real.

The exercise of judicial discretion has allowed the *CCAA* to adapt and evolve to meet contemporary business and social needs. As reorganizations become increasingly complex, *CCAA* courts have been called upon to innovate. In determining their jurisdiction to sanction measures in a *CCAA* proceeding, courts should first interpret the provisions of the *CCAA* before turning to their inherent or equitable jurisdiction. Noteworthy in this regard is the expansive interpretation the language of the *CCAA* is capable of supporting. The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. The requirements of appropriateness, good faith and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. The question is whether the order will usefully further efforts to avoid the social and economic losses resulting from liquidation of an insolvent company, which extends to both the purpose of the order and the means it employs. Here, the chambers judge's order staying the Crown's GST claim was in furtherance of the *CCAA*'s objectives because it blunted the impulse

of creditors to interfere in an orderly liquidation and fostered a harmonious transition from the *CCAA* to the *BIA*, meeting the objective of a single proceeding that is common to both statutes. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA* to allow commencement of *BIA* proceedings, but no gap exists between the two statutes because they operate in tandem and creditors in both cases look to the *BIA* scheme of distribution to foreshadow how they will fare if the reorganization is unsuccessful. The breadth of the court's discretion under the *CCAA* is sufficient to construct a bridge to liquidation under the *BIA*. Hence, the chambers judge's order was authorized.

No express trust was created by the chambers judge's order in this case because there is no certainty of object inferrable from his order. Creation of an express trust requires certainty of intention, subject matter and object. At the time the chambers judge accepted the proposal to segregate the monies in the Monitor's trust account there was no certainty that the Crown would be the beneficiary, or object, of the trust because exactly who might take the money in the final result was in doubt. In any event, no dispute over the money would even arise under the interpretation of s. 18.3(1) of the *CCAA* established above, because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount.

*Per* Fish J.: The GST monies collected by the debtor are not subject to a deemed trust or priority in favour of the Crown. In recent years, Parliament has given detailed consideration to the Canadian insolvency scheme but has declined to amend the provisions at issue in this case, a deliberate exercise of legislative discretion. On the other hand, in upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, courts have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In the context of the Canadian insolvency regime, deemed trusts exist only where there is a statutory provision *creating* the trust and a *CCAA* or *BIA* provision explicitly *confirming* its effective operation. The *Income Tax Act*, the *Canada Pension Plan Act* and the *Employment Insurance Act* all contain deemed trust provisions that are strikingly similar to that in s. 222 of the *ETA* but they are all also confirmed in s. 37 of the *CCAA* and in s. 67(3) of the *BIA* in clear and unmistakeable terms. The same is not true of the deemed trust created under the *ETA*. Although Parliament created a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it did not *confirm* the continued operation of the trust in either the *BIA* or the *CCAA*, reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

*Per* Abella J (dissenting): Section 222(3) of the *ETA* gives priority during *CCAA* proceedings to the Crown's deemed trust in unremitted GST. This provision unequivocally defines its boundaries in the clearest possible terms and excludes only the *BIA* from its legislative grasp. The language used reflects a clear legislative intention that s. 222(3) would prevail if in conflict with any other law except the *BIA*. This is borne out by the fact that following the enactment of s. 222(3), amendments to the *CCAA* were introduced, and despite requests from various constituencies, s. 18.3(1) was not amended to make the priorities in the *CCAA* consistent with those in the *BIA*. This indicates a

deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

The application of other principles of interpretation reinforces this conclusion. An earlier, specific provision may be overruled by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails. Section 222(3) achieves this through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" *other than the BIA*. Section 18.3(1) of the *CCAA* is thereby rendered inoperative for purposes of s. 222(3). By operation of s. 44(f) of the *Interpretation Act*, the transformation of s. 18(3) into s. 37(1) after the enactment of s. 222(3) of the *ETA* has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision. This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding-up Act,* that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes *other* than the *BIA* and the *Winding-up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request for payment of the GST funds during the *CCAA* proceedings.

## Cases Cited

By Deschamps J.

**Overruled:** *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; **distinguished:** *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862; **referred to:** *Reference re Companies' Creditors Arrangement Act*, [1934] S.C.R. 659; *Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny*, 2009 SCC 49, [2009] 3 S.C.R. 286; *Deputy Minister of Revenue v. Rainville*, [1980] 1 S.C.R. 35; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta. L.R. (4) 192; *Komunik Corp. (Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), leave to appeal granted, 2010 QCCA 183 (CanLII); *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411; *First Vancouver Finance v. M.N.R.*, 2002 SCC 49, [2002] 2 S.C.R. 720; *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4) 219; *Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513; *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106; *Elan Corp. v. Comiskey* (1990), 41 O.A.C. 282; *Chef Ready Foods Ltd. v. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84; *Pacific National Lease Holding Corp, Re* (1992), 19 B.C.AC. 134; *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9; *Air Canada, Re* (2003), 42 C.B.R. (4) 173; *Air Canada, Re*, 2003 CanLII 49366; *Canadian Red Cross Society/Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4) 158; *Skydome Corp., Re* (1998), 16 C.B.R. (4) 118; *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, aff'g (1999), 12 C.B.R. (4) 144; *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4) 236; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25; *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108.

By Fish J.

**Referred to**: *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737.

By Abella J. (dissenting)

*Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; *Tele-Mobile Co. v. Ontario*, 2008 SCC 12, [2008] 1 S.C.R. 305; *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862; *Attorney General of Canada v. Public Service Staff Relations Board*, [1977] 2 F.C. 663.

**Statutes and Regulations Cited**

*An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47, ss. 69, 128, 131.

*Bank Act*, S.C. 1991, c. 46.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, ss. 67, 86 [am. 2005, c. 47, s. 69].

*Canada Pension Plan*, R.S.C. 1985, c. C-8, s. 23.

*Cities and Towns Act*, R.S.Q., c. C-19.

*Civil Code of Québec*, S.Q. 1991, c. 64.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, ss. 11, 11.4, 18.3, 18.4, 20 [am. 2005, c. 47, ss. 128, 131], 21 [am. 1997, c. 12, s. 126].

*Companies' Creditors Arrangement Act, 1933*, S.C. 1932-33, c. 36 [am. 1952-53, c. 3].

*Employment Insurance Act*, S.C. 1996, c. 23, ss. 86(2), (2.1).

*Excise Tax Act*, R.S.C. 1985, c. E-15, s. 222.

*Income Tax Act*, R.S.C. 1985, c. 1 (5 Supp.), ss. 227(4), (4.1).

*Interpretation Act*, R.S.C. 1985, c. I-21, ss. 2, 44(*f*).

*Personal Property Security Act*, S.A. 1988, c. P-4.05.

*Winding-up and Restructuring Act*, R.S.C. 1985, c. W-11.

**Authors Cited**

Canada. Advisory Committee on Bankruptcy and Insolvency. *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency*. Ottawa: Minister of Supply and Services Canada, 1986.

Canada. House of Commons. *Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, October 3, 1991, p. 15:15.

Canada. Industry Canada. Marketplace Framework Policy Branch. *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Corporate and Insolvency Law Policy Directorate, 2002.

Canada. Senate. *Debates of the Senate*, vol. 142, 1 Sess., 38 Parl., November 23, 2005, p. 2147.

Canada. Senate. Standing Committee on Banking, Trade and Commerce. *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Senate of Canada, 2003.

Canada. Study Committee on Bankruptcy and Insolvency Legislation. *Bankruptcy and Insolvency: Report of the Study Committee on Bankruptcy and Insolvency Legislation*. Ottawa: Information Canada, 1970.

Côté, Pierre-André. *The Interpretation of Legislation in Canada*, 3 ed. Scarborough, Ont.: Carswell, 2000.

Côté, Pierre-André, avec la collaboration de Stéphane Beaulac et Mathieu Devinat. *Interprétation des lois*, 4e éd. Montréal: Thémis, 2009.

Driedger, Elmer A. *Construction of Statutes*, 2 ed. Toronto: Butterworths, 1983.

Edwards, Stanley E. "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587.

Insolvency Institute of Canada and Canadian Association of Insolvency and Restructuring Professionals. Joint Task Force on Business Insolvency Law Reform. *Report*. (2002).

Insolvency Institute of Canada and Canadian Association of Insolvency and Restructuring Professionals. Legislative Review Task Force (Commercial). *Report on the Commercial Provisions of Bill C-55*. (2005).

Jackson, Georgina R. and Janis Sarra. "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2007*. Toronto: Thomson Carswell, 2008, 41.

Jones, Richard B. "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2005*. Toronto: Thomson Carswell, 2006, 481.

Lamer, Francis L. *Priority of Crown Claims in Insolvency*. Toronto: Thomson Reuters, 1996 (loose-leaf updated 2010, release 1).

Morgan, Barbara K. "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bank. L.J.* 461.

Sarra, Janis. *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations*. Toronto: University of Toronto Press, 2003.

Sarra, Janis P. *Rescue! The Companies' Creditors Arrangement Act*. Toronto: Thomson Carswell, 2007.

Sullivan, Ruth. *Sullivan on the Construction of Statutes*, 5 ed. Markham, Ont.: LexisNexis, 2008.

Waters, Donovan W. M., Mark R. Gillen and Lionel D. Smith, eds. *Waters' Law of Trusts in Canada*, 3 ed. Toronto: Thomson Carswell, 2005.

Wood, Roderick J. *Bankruptcy and Insolvency Law*. Toronto: Irwin Law, 2009.

**History and Disposition:**

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Tysoe and Smith JJ.A.), 2009 BCCA 205, 98 B.C.L.R. (4) 242, 270 B.C.A.C. 167, 454 W.A.C. 167, [2009] 12 W.W.R. 684, [2009] G.S.T.C. 79, [2009] B.C.J. No. 918 (QL), 2009 CarswellBC 1195, reversing a judgment of Brenner C.J.S.C., 2008 BCSC 1805, [2008] G.S.T.C. 221, [2008] B.C.J. No. 2611 (QL), 2008 CarswellBC 2895, dismissing a Crown application for payment of GST monies. Appeal allowed, Abella J. dissenting.

**Counsel:**

*Mary I.A. Buttery*, *Owen J. James* and *Matthew J.G. Curtis*, for the appellant.

*Gordon Bourgard*, *David Jacyk* and *Michael J. Lema*, for the respondent.

---

The judgment of McLachlin C.J. and Binnie, LeBel, Deschamps, Charron, Rothstein and Cromwell JJ. was delivered by

**1      DESCHAMPS J.**:-- For the first time this Court is called upon to directly interpret the provisions of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). In that respect, two questions are raised. The first requires reconciliation of provisions of the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*"), which lower courts have held to be in conflict with one another. The second concerns the scope of a court's discretion when supervising reorganization. The relevant statutory provisions are reproduced in the Appendix. On the first question, having considered the evolution of Crown priorities in the context of insolvency and the wording of the various statutes creating Crown priorities, I conclude that it is the *CCAA* and not the *ETA* that provides the rule. On the second question, I conclude that the broad discretionary jurisdiction conferred on the supervising judge must be interpreted having regard to the remedial nature of the *CCAA* and insolvency legislation generally. Consequently, the court had the discretion to partially lift a stay of proceedings to allow the debtor to make an assignment under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*"). I would allow the appeal.

1.    Facts and Decisions of the Courts Below

**2**      Ted LeRoy Trucking Ltd. ("LeRoy Trucking") commenced proceedings under the *CCAA* in the Supreme Court of British Columbia on December 13, 2007, obtaining a stay of proceedings with a view to reorganizing its financial affairs. LeRoy Trucking sold certain redundant assets as authorized by the order.

**3**      Amongst the debts owed by LeRoy Trucking was an amount for Goods and Services Tax ("GST") collected but unremitted to the Crown. The *ETA* creates a deemed trust in favour of the Crown for amounts collected in respect of GST. The deemed trust extends to any property or proceeds held by the person collecting GST and any property of that person held by a secured creditor, requiring that property to be paid to the Crown in priority to all security interests. The *ETA* provides that the deemed trust operates despite any other enactment of Canada except the *BIA*. However, the *CCAA* also provides that subject to certain exceptions, none of which mentions GST, deemed trusts in favour of the Crown do not operate under the *CCAA*. Accordingly, under the *CCAA* the Crown ranks as an unsecured creditor in respect of GST. Nonetheless, at the time LeRoy Trucking commenced *CCAA* proceedings the leading line of jurisprudence held that the *ETA* took precedence over the *CCAA* such that the Crown enjoyed priority for GST claims under the *CCAA*, even though it would have lost that same priority under the *BIA*. The *CCAA* underwent substantial amendments in 2005 in which some of the provisions at issue in this appeal were renumbered and reformulated (S.C. 2005, c. 47). However, these amendments only came into force on September 18, 2009. I will refer to the amended provisions only where relevant.

**4**      On April 29, 2008, Brenner C.J.S.C., in the context of the *CCAA* proceedings, approved a payment not exceeding $5 million, the proceeds of redundant asset sales, to Century Services, the debtor's major secured creditor. LeRoy Trucking proposed to hold back an amount equal to the GST monies collected but unremitted to the Crown and place it in the Monitor's trust account until the outcome of the reorganization was known. In order to maintain the *status quo* while the success of

the reorganization was uncertain, Brenner C.J.S.C. agreed to the proposal and ordered that an amount of $305,202.30 be held by the Monitor in its trust account.

**5**    On September 3, 2008, having concluded that reorganization was not possible, LeRoy Trucking sought leave to make an assignment in bankruptcy under the *BIA*. The Crown sought an order that the GST monies held by the Monitor be paid to the Receiver General of Canada. Brenner C.J.S.C. dismissed the latter application. Reasoning that the purpose of segregating the funds with the Monitor was "to facilitate an ultimate payment of the GST monies which were owed pre-filing, but only if a viable plan emerged", the failure of such a reorganization, followed by an assignment in bankruptcy, meant the Crown would lose priority under the *BIA* (2008 BCSC 1805, [2008] G.S.T.C. 221).

**6**    The Crown's appeal was allowed by the British Columbia Court of Appeal (2009 BCCA 205, 270 B.C.A.C. 167). Tysoe J.A. for a unanimous court found two independent bases for allowing the Crown's appeal.

**7**    First, the court's authority under s. 11 of the *CCAA* was held not to extend to staying the Crown's application for immediate payment of the GST funds subject to the deemed trust after it was clear that reorganization efforts had failed and that bankruptcy was inevitable. As restructuring was no longer a possibility, staying the Crown's claim to the GST funds no longer served a purpose under the *CCAA* and the court was bound under the priority scheme provided by the *ETA* to allow payment to the Crown. In so holding, Tysoe J.A. adopted the reasoning in *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), which found that the *ETA* deemed trust for GST established Crown priority over secured creditors under the *CCAA*.

**8**    Second, Tysoe J.A. concluded that by ordering the GST funds segregated in the Monitor's trust account on April 29, 2008, the judge had created an express trust in favour of the Crown from which the monies in question could not be diverted for any other purposes. The Court of Appeal therefore ordered that the money held by the Monitor in trust be paid to the Receiver General.

    2.    Issues

**9**    This appeal raises three broad issues which are addressed in turn:

> (1)    Did s. 222(3) of the *ETA* displace s. 18.3(1) of the *CCAA* and give priority to the Crown's *ETA* deemed trust during *CCAA* proceedings as held in *Ottawa Senators*?
>
> (2)    Did the court exceed its *CCAA* authority by lifting the stay to allow the debtor to make an assignment in bankruptcy?
>
> (3)    Did the court's order of April 29, 2008 requiring segregation of the Crown's GST claim in the Monitor's trust account create an express trust in favour of the Crown in respect of those funds?

3.    <u>Analysis</u>

**10**    The first issue concerns Crown priorities in the context of insolvency. As will be seen, the *ETA* provides for a deemed trust in favour of the Crown in respect of GST owed by a debtor "[d]espite ... any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)" (s. 222(3)), while the *CCAA* stated at the relevant time that "notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be [so] regarded" (s. 18.3(1)). It is difficult to imagine two statutory provisions more apparently in conflict. However, as is often the case, the apparent conflict can be resolved through interpretation.

**11**    In order to properly interpret the provisions, it is necessary to examine the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by Parliament, and the principles that have been recognized in the jurisprudence. It will be seen that Crown priorities in the insolvency context have been significantly pared down. The resolution of the second issue is also rooted in the context of the *CCAA*, but its purpose and the manner in which it has been interpreted in the case law are also key. After examining the first two issues in this case, I will address Tysoe J.A.'s conclusion that an express trust in favour of the Crown was created by the court's order of April 29, 2008.

3.1 *Purpose and Scope of Insolvency Law*

**12**    Insolvency is the factual situation that arises when a debtor is unable to pay creditors (see generally, R. J. Wood, *Bankruptcy and Insolvency Law* (2009), at p. 16). Certain legal proceedings become available upon insolvency, which typically allow a debtor to obtain a court order staying its creditors' enforcement actions and attempt to obtain a binding compromise with creditors to adjust the payment conditions to something more realistic. Alternatively, the debtor's assets may be liquidated and debts paid from the proceeds according to statutory priority rules. The former is usually referred to as reorganization or restructuring while the latter is termed liquidation.

**13**    Canadian commercial insolvency law is not codified in one exhaustive statute. Instead, Parliament has enacted multiple insolvency statutes, the main one being the *BIA*. The *BIA* offers a self-contained legal regime providing for both reorganization and liquidation. Although bankruptcy legislation has a long history, the *BIA* itself is a fairly recent statute -- it was enacted in 1992. It is characterized by a rules-based approach to proceedings. The *BIA* is available to insolvent debtors owing $1000 or more, regardless of whether they are natural or legal persons. It contains mechanisms for debtors to make proposals to their creditors for the adjustment of debts. If a proposal fails, the *BIA* contains a bridge to bankruptcy whereby the debtor's assets are liquidated and the proceeds paid to creditors in accordance with the statutory scheme of distribution.

**14**    Access to the *CCAA* is more restrictive. A debtor must be a company with liabilities in excess of $5 million. Unlike the *BIA*, the *CCAA* contains no provisions for liquidation of a debtor's assets if reorganization fails. There are three ways of exiting *CCAA* proceedings. The best outcome is

achieved when the stay of proceedings provides the debtor with some breathing space during which solvency is restored and the *CCAA* process terminates without reorganization being needed. The second most desirable outcome occurs when the debtor's compromise or arrangement is accepted by its creditors and the reorganized company emerges from the *CCAA* proceedings as a going concern. Lastly, if the compromise or arrangement fails, either the company or its creditors usually seek to have the debtor's assets liquidated under the applicable provisions of the *BIA* or to place the debtor into receivership. As discussed in greater detail below, the key difference between the reorganization regimes under the *BIA* and the *CCAA* is that the latter offers a more flexible mechanism with greater judicial discretion, making it more responsive to complex reorganizations.

**15**   As I will discuss at greater length below, the purpose of the *CCAA* -- Canada's first reorganization statute -- is to permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets. Proposals to creditors under the *BIA* serve the same remedial purpose, though this is achieved through a rules-based mechanism that offers less flexibility. Where reorganization is impossible, the *BIA* may be employed to provide an orderly mechanism for the distribution of a debtor's assets to satisfy creditor claims according to predetermined priority rules.

**16**   Prior to the enactment of the *CCAA* in 1933 (S.C. 1932-33, c. 36), practice under existing commercial insolvency legislation tended heavily towards the liquidation of a debtor company (J. Sarra, *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations* (2003), at p. 12). The battering visited upon Canadian businesses by the Great Depression and the absence of an effective mechanism for reaching a compromise between debtors and creditors to avoid liquidation required a legislative response. The *CCAA* was innovative as it allowed the insolvent debtor to attempt reorganization under judicial supervision outside the existing insolvency legislation which, once engaged, almost invariably resulted in liquidation (*Reference re Companies' Creditors Arrangement Act*, [1934] S.C.R. 659, at pp. 660-61; Sarra, *Creditor Rights*, at pp. 12-13).

**17**   Parliament understood when adopting the *CCAA* that liquidation of an insolvent company was harmful for most of those it affected -- notably creditors and employees -- and that a workout which allowed the company to survive was optimal (Sarra, *Creditor Rights*, at pp. 13-15).

**18**   Early commentary and jurisprudence also endorsed the *CCAA*'s remedial objectives. It recognized that companies retain more value as going concerns while underscoring that intangible losses, such as the evaporation of the companies' goodwill, result from liquidation (S. E. Edwards, "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587, at p. 592). Reorganization serves the public interest by facilitating the survival of companies supplying goods or services crucial to the health of the economy or saving large numbers of jobs (*ibid.*, at p. 593). Insolvency could be so widely felt as to impact stakeholders other than creditors and employees. Variants of these views resonate today, with reorganization justified in terms of rehabilitating companies that are key elements in a complex web of interdependent economic relationships in order to avoid the negative consequences of liquidation.

**19**    The *CCAA* fell into disuse during the next several decades, likely because amendments to the Act in 1953 restricted its use to companies issuing bonds (S.C. 1952-53, c. 3). During the economic downturn of the early 1980s, insolvency lawyers and courts adapting to the resulting wave of insolvencies resurrected the statute and deployed it in response to new economic challenges. Participants in insolvency proceedings grew to recognize and appreciate the statute's distinguishing feature: a grant of broad and flexible authority to the supervising court to make the orders necessary to facilitate the reorganization of the debtor and achieve the *CCAA*'s objectives. The manner in which courts have used *CCAA* jurisdiction in increasingly creative and flexible ways is explored in greater detail below.

**20**    Efforts to evolve insolvency law were not restricted to the courts during this period. In 1970, a government-commissioned panel produced an extensive study recommending sweeping reform but Parliament failed to act (see *Bankruptcy and Insolvency: Report of the Study Committee on Bankruptcy and Insolvency Legislation* (1970)). Another panel of experts produced more limited recommendations in 1986 which eventually resulted in enactment of the *Bankruptcy and Insolvency Act* of 1992 (S.C. 1992, c. 27) (see *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)). Broader provisions for reorganizing insolvent debtors were then included in Canada's bankruptcy statute. Although the 1970 and 1986 reports made no specific recommendations with respect to the *CCAA*, the House of Commons committee studying the *BIA*'s predecessor bill, C-22, seemed to accept expert testimony that the *BIA*'s new reorganization scheme would shortly supplant the *CCAA*, which could then be repealed, with commercial insolvency and bankruptcy being governed by a single statute (*Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, October 3, 1991, at pp. 15:15-15:16).

**21**    In retrospect, this conclusion by the House of Commons committee was out of step with reality. It overlooked the renewed vitality the *CCAA* enjoyed in contemporary practice and the advantage that a flexible judicially supervised reorganization process presented in the face of increasingly complex reorganizations, when compared to the stricter rules-based scheme contained in the *BIA*. The "flexibility of the *CCAA* [was seen as] a great benefit, allowing for creative and effective decisions" (Industry Canada, Marketplace Framework Policy Branch, *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act* (2002), at p. 41). Over the past three decades, resurrection of the *CCAA* has thus been the mainspring of a process through which, one author concludes, "the legal setting for Canadian insolvency restructuring has evolved from a rather blunt instrument to one of the most sophisticated systems in the developed world" (R. B. Jones, "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2005* (2006), 481, at p. 481).

**22**    While insolvency proceedings may be governed by different statutory schemes, they share some commonalities. The most prominent of these is the single proceeding model. The nature and purpose of the single proceeding model are described by Professor Wood in *Bankruptcy and*

*Insolvency Law*:

> They all provide a collective proceeding that supersedes the usual civil process available to creditors to enforce their claims. The creditors' remedies are collectivized in order to prevent the free-for-all that would otherwise prevail if creditors were permitted to exercise their remedies. In the absence of a collective process, each creditor is armed with the knowledge that if they do not strike hard and swift to seize the debtor's assets, they will be beat out by other creditors. [pp. 2-3]

The single proceeding model avoids the inefficiency and chaos that would attend insolvency if each creditor initiated proceedings to recover its debt. Grouping all possible actions against the debtor into a single proceeding controlled in a single forum facilitates negotiation with creditors because it places them all on an equal footing, rather than exposing them to the risk that a more aggressive creditor will realize its claims against the debtor's limited assets while the other creditors attempt a compromise. With a view to achieving that purpose, both the *CCAA* and the *BIA* allow a court to order all actions against a debtor to be stayed while a compromise is sought.

**23**    Another point of convergence of the *CCAA* and the *BIA* relates to priorities. Because the *CCAA* is silent about what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a *CCAA* reorganization is ultimately unsuccessful. In addition, one of the important features of legislative reform of both statutes since the enactment of the *BIA* in 1992 has been a cutback in Crown priorities (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, ss. 73 and 125; S.C. 2000, c. 30, s. 148; S.C. 2005, c. 47, ss. 69 and 131; S.C. 2009, c. 33, ss. 25 and 29; see also *Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny*, 2009 SCC 49, [2009] 3 S.C.R. 286; *Deputy Minister of Revenue v. Rainville*, [1980] 1 S.C.R. 35; *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)).

**24**    With parallel *CCAA* and *BIA* restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation (see *An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta. L.R. (4th) 192, at para. 19).

**25**    Mindful of the historical background of the *CCAA* and *BIA*, I now turn to the first question at issue.

3.2 *GST Deemed Trust Under the CCAA*

**26**    The Court of Appeal proceeded on the basis that the *ETA* precluded the court from staying the

Crown's enforcement of the GST deemed trust when partially lifting the stay to allow the debtor to enter bankruptcy. In so doing, it adopted the reasoning in a line of cases culminating in *Ottawa Senators*, which held that an *ETA* deemed trust remains enforceable during *CCAA* reorganization despite language in the *CCAA* that suggests otherwise.

**27**   The Crown relies heavily on the decision of the Ontario Court of Appeal in *Ottawa Senators* and argues that the later in time provision of the *ETA* creating the GST deemed trust trumps the provision of the *CCAA* purporting to nullify most statutory deemed trusts. The Court of Appeal in this case accepted this reasoning but not all provincial courts follow it (see, e.g., *Komunik Corp. (Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), leave to appeal granted, 2010 QCCA 183 (CanLII)). Century Services relied, in its written submissions to this Court, on the argument that the court had authority under the *CCAA* to continue the stay against the Crown's claim for unremitted GST. In oral argument, the question of whether *Ottawa Senators* was correctly decided nonetheless arose. After the hearing, the parties were asked to make further written submissions on this point. As appears evident from the reasons of my colleague Abella J., this issue has become prominent before this Court. In those circumstances, this Court needs to determine the correctness of the reasoning in *Ottawa Senators*.

**28**   The policy backdrop to this question involves the Crown's priority as a creditor in insolvency situations which, as I mentioned above, has evolved considerably. Prior to the 1990s, Crown claims largely enjoyed priority in insolvency. This was widely seen as unsatisfactory as shown by both the 1970 and 1986 insolvency reform proposals, which recommended that Crown claims receive no preferential treatment. A closely related matter was whether the *CCAA* was binding at all upon the Crown. Amendments to the *CCAA* in 1997 confirmed that it did indeed bind the Crown (see *CCAA*, s. 21, as am. by S.C. 1997, c. 12, s. 126).

**29**   Claims of priority by the state in insolvency situations receive different treatment across jurisdictions worldwide. For example, in Germany and Australia, the state is given no priority at all, while the state enjoys wide priority in the United States and France (see B. K. Morgan, "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bank. L.J.* 461, at p. 500). Canada adopted a middle course through legislative reform of Crown priority initiated in 1992. The Crown retained priority for source deductions of income tax, Employment Insurance ("EI") and Canada Pension Plan ("CPP") premiums, but ranks as an ordinary unsecured creditor for most other claims.

**30**   Parliament has frequently enacted statutory mechanisms to secure Crown claims and permit their enforcement. The two most common are statutory deemed trusts and powers to garnish funds third parties owe the debtor (see F. L. Lamer, *Priority of Crown Claims in Insolvency* (loose-leaf), at s. 2).

**31**   With respect to GST collected, Parliament has enacted a deemed trust. The *ETA* states that every person who collects an amount on account of GST is deemed to hold that amount in trust for

the Crown (s. 222(1)). The deemed trust extends to other property of the person collecting the tax equal in value to the amount deemed to be in trust if that amount has not been remitted in accordance with the *ETA*. The deemed trust also extends to property held by a secured creditor that, but for the security interest, would be property of the person collecting the tax (s. 222(3)).

**32**     Parliament has created similar deemed trusts using almost identical language in respect of source deductions of income tax, EI premiums and CPP premiums (see s. 227(4) of the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*"), ss. 86(2) and (2.1) of the *Employment Insurance Act*, S.C. 1996, c. 23, and ss. 23(3) and (4) of the *Canada Pension Plan*, R.S.C. 1985, c. C-8). I will refer to income tax, EI and CPP deductions as "source deductions".

**33**     In *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411, this Court addressed a priority dispute between a deemed trust for source deductions under the *ITA* and security interests taken under both the *Bank Act*, S.C. 1991, c. 46, and the Alberta *Personal Property Security Act*, S.A. 1988, c. P-4.05 ("*PPSA*"). As then worded, an *ITA* deemed trust over the debtor's property equivalent to the amount owing in respect of income tax became effective at the time of liquidation, receivership, or assignment in bankruptcy. *Sparrow Electric* held that the *ITA* deemed trust could not prevail over the security interests because, being fixed charges, the latter attached as soon as the debtor acquired rights in the property such that the *ITA* deemed trust had no property on which to attach when it subsequently arose. Later, in *First Vancouver Finance v. M.N.R.*, 2002 SCC 49, [2002] 2 S.C.R. 720, this Court observed that Parliament had legislated to strengthen the statutory deemed trust in the *ITA* by deeming it to operate from the moment the deductions were not paid to the Crown as required by the *ITA*, and by granting the Crown priority over all security interests (paras. 27-29) (the "*Sparrow Electric* amendment").

**34**     The amended text of s. 227(4.1) of the *ITA* and concordant source deductions deemed trusts in the *Canada Pension Plan* and the *Employment Insurance Act* state that the deemed trust operates notwithstanding any other enactment of Canada, except ss. 81.1 and 81.2 of the *BIA*. The *ETA* deemed trust at issue in this case is similarly worded, but it excepts the *BIA* in its entirety. The provision reads as follows:

> **222... .**
>
> ...
>
>     (3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed ... .

**35**    The Crown submits that the *Sparrow Electric* amendment, added by Parliament to the *ETA* in 2000, was intended to preserve the Crown's priority over collected GST under the *CCAA* while subordinating the Crown to the status of an unsecured creditor in respect of GST only under the *BIA*. This is because the *ETA* provides that the GST deemed trust is effective "despite" any other enactment except the *BIA*.

**36**    The language used in the *ETA* for the GST deemed trust creates an apparent conflict with the *CCAA*, which provides that subject to certain exceptions, property deemed by statute to be held in trust for the Crown shall not be so regarded.

**37**    Through a 1997 amendment to the *CCAA* (S.C. 1997, c. 12, s. 125), Parliament appears to have, subject to specific exceptions, nullified deemed trusts in favour of the Crown once reorganization proceedings are commenced under the Act. The relevant provision reads:

> **18.3** (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

This nullification of deemed trusts was continued in further amendments to the *CCAA* (S.C. 2005, c. 47), where s. 18.3(1) was renumbered and reformulated as s. 37(1):

> **37.** (1) Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**38**    An analogous provision exists in the *BIA*, which, subject to the same specific exceptions, nullifies statutory deemed trusts and makes property of the bankrupt that would otherwise be subject to a deemed trust part of the debtor's estate and available to creditors (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, s. 73; *BIA*, s. 67(2)). It is noteworthy that in both the *CCAA* and the *BIA*, the exceptions concern source deductions (*CCAA*, s. 18.3(2); *BIA*, s. 67(3)). The relevant provision of the *CCAA* reads:

> **18.3** ...

> (2) Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*... .

Thus, the Crown's deemed trust and corresponding priority in source deductions remain effective both in reorganization and in bankruptcy.

**39**     Meanwhile, in both s. 18.4(1) of the *CCAA* and s. 86(1) of the *BIA*, other Crown claims are treated as unsecured. These provisions, establishing the Crown's status as an unsecured creditor, explicitly exempt statutory deemed trusts in source deductions (*CCAA*, s. 18.4(3); *BIA*, s. 86(3)). The *CCAA* provision reads as follows:

> **18.4** ...

> ...

>> (3) Subsection (1) [Crown ranking as unsecured creditor] does not affect the operation of

>> (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

>> (*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution ... .

Therefore, not only does the *CCAA* provide that Crown claims do not enjoy priority over the claims of other creditors (s. 18.3(1)), but the exceptions to this rule (i.e., that Crown priority is maintained for source deductions) are repeatedly stated in the statute.

**40**     The apparent conflict in this case is whether the rule in the *CCAA* first enacted as s. 18.3 in 1997, which provides that subject to certain explicit exceptions, statutory deemed trusts are ineffective under the *CCAA*, is overridden by the one in the *ETA* enacted in 2000 stating that GST deemed trusts operate despite any enactment of Canada except the *BIA*. With respect for my colleague Fish J., I do not think the apparent conflict can be resolved by denying it and creating a rule requiring both a statutory provision enacting the deemed trust, and a second statutory provision confirming it. Such a rule is unknown to the law. Courts must recognize conflicts, apparent or real, and resolve them when possible.

**41**     A line of jurisprudence across Canada has resolved the apparent conflict in favour of the *ETA*, thereby maintaining GST deemed trusts under the *CCAA*. *Ottawa Senators*, the leading case, decided the matter by invoking the doctrine of implied repeal to hold that the later in time provision of the *ETA* should take precedence over the *CCAA* (see also *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219 (Alta. Q.B.); *Gauntlet*).

**42**     The Ontario Court of Appeal in *Ottawa Senator* s rested its conclusion on two considerations.

First, it was persuaded that by explicitly mentioning the *BIA* in *ETA* s. 222(3), but not the *CCAA*, Parliament made a deliberate choice. In the words of MacPherson J.A.:

> The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

**43**    Second, the Ontario Court of Appeal compared the conflict between the *ETA* and the *CCAA* to that before this Court in *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862, and found them to be "identical" (para. 46). It therefore considered *Doré* binding (para. 49). In *Doré*, a limitations provision in the more general and recently enacted *Civil Code of Québec*, S.Q. 1991, c. 64 ("*C.C.Q.*"), was held to have repealed a more specific provision of the earlier Quebec *Cities and Towns Act*, R.S.Q., c. C-19, with which it conflicted. By analogy, the Ontario Court of Appeal held that the later in time and more general provision, s. 222(3) of the *ETA*, impliedly repealed the more specific and earlier in time provision, s. 18.3(1) of the *CCAA* (paras. 47-49).

**44**    Viewing this issue in its entire context, several considerations lead me to conclude that neither the reasoning nor the result in *Ottawa Senators* can stand. While a conflict may exist at the level of the statutes' wording, a purposive and contextual analysis to determine Parliament's true intent yields the conclusion that Parliament could not have intended to restore the Crown's deemed trust priority in GST claims under the *CCAA* when it amended the *ETA* in 2000 with the *Sparrow Electric* amendment.

**45**    I begin by recalling that Parliament has shown its willingness to move away from asserting priority for Crown claims in insolvency law. Section 18.3(1) of the *CCAA* (subject to the s. 18.3(2) exceptions) provides that the Crown's deemed trusts have no effect under the *CCAA*. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so explicitly and elaborately. For example, s. 18.3(2) of the *CCAA* and s. 67(3) of the *BIA* expressly provide that deemed trusts for source deductions remain effective in insolvency. Parliament has, therefore, clearly carved out exceptions from the general rule that deemed trusts are ineffective in insolvency. The *CCAA* and *BIA* are in harmony, preserving deemed trusts and asserting Crown priority only in respect of source deductions. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. Unlike source deductions, which are clearly and expressly dealt with under both these insolvency statutes, no such clear and express language exists in those Acts carving out an exception for GST claims.

**46**    The internal logic of the *CCAA* also militates against upholding the *ETA* deemed trust for GST. The *CCAA* imposes limits on a suspension by the court of the Crown's rights in respect of source deductions but does not mention the *ETA* (s. 11.4). Since source deductions deemed trusts

are granted explicit protection under the *CCAA*, it would be inconsistent to afford a better protection to the *ETA* deemed trust absent explicit language in the *CCAA*. Thus, the logic of the *CCAA* appears to subject the *ETA* deemed trust to the waiver by Parliament of its priority (s. 18.4).

**47**   Moreover, a strange asymmetry would arise if the interpretation giving the *ETA* priority over the *CCAA* urged by the Crown is adopted here: the Crown would retain priority over GST claims during *CCAA* proceedings but not in bankruptcy. As courts have reflected, this can only encourage statute shopping by secured creditors in cases such as this one where the debtor's assets cannot satisfy both the secured creditors' and the Crown's claims (*Gauntlet*, at para. 21). If creditors' claims were better protected by liquidation under the *BIA*, creditors' incentives would lie overwhelmingly with avoiding proceedings under the *CCAA* and not risking a failed reorganization. Giving a key player in any insolvency such skewed incentives against reorganizing under the *CCAA* can only undermine that statute's remedial objectives and risk inviting the very social ills that it was enacted to avert.

**48**   Arguably, the effect of *Ottawa Senators* is mitigated if restructuring is attempted under the *BIA* instead of the *CCAA*, but it is not cured. If *Ottawa Senators* were to be followed, Crown priority over GST would differ depending on whether restructuring took place under the *CCAA* or the *BIA*. The anomaly of this result is made manifest by the fact that it would deprive companies of the option to restructure under the more flexible and responsive *CCAA* regime, which has been the statute of choice for complex reorganizations.

**49**   Evidence that Parliament intended different treatments for GST claims in reorganization and bankruptcy is scant, if it exists at all. Section 222(3) of the *ETA* was enacted as part of a wide-ranging budget implementation bill in 2000. The summary accompanying that bill does not indicate that Parliament intended to elevate Crown priority over GST claims under the *CCAA* to the same or a higher level than source deductions claims. Indeed, the summary for deemed trusts states only that amendments to existing provisions are aimed at "ensuring that employment insurance premiums and Canada Pension Plan contributions that are required to be remitted by an employer are fully recoverable by the Crown in the case of the bankruptcy of the employer" (Summary to S.C. 2000, c. 30, at p. 4a). The wording of GST deemed trusts resembles that of statutory deemed trusts for source deductions and incorporates the same overriding language and reference to the *BIA*. However, as noted above, Parliament's express intent is that only source deductions deemed trusts remain operative. An exception for the *BIA* in the statutory language establishing the source deductions deemed trusts accomplishes very little, because the explicit language of the *BIA* itself (and the *CCAA*) carves out these source deductions deemed trusts and maintains their effect. It is however noteworthy that no equivalent language maintaining GST deemed trusts exists under either the *BIA* or the *CCAA*.

**50**   It seems more likely that by adopting the same language for creating GST deemed trusts in the *ETA* as it did for deemed trusts for source deductions, and by overlooking the inclusion of an exception for the *CCAA* alongside the *BIA* in s. 222(3) of the *ETA*, Parliament may have

inadvertently succumbed to a drafting anomaly. Because of a statutory lacuna in the *ETA*, the GST deemed trust could be seen as remaining effective in the *CCAA*, while ceasing to have any effect under the *BIA*, thus creating an apparent conflict with the wording of the *CCAA*. However, it should be seen for what it is: a facial conflict only, capable of resolution by looking at the broader approach taken to Crown priorities and by giving precedence to the statutory language of s. 18.3 of the *CCAA* in a manner that does not produce an anomalous outcome.

**51**    Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. It merely creates an apparent conflict that must be resolved by statutory interpretation. Parliament's intent when it enacted *ETA* s. 222(3) was therefore far from unambiguous. Had it sought to give the Crown a priority for GST claims, it could have done so explicitly as it did for source deductions. Instead, one is left to infer from the language of *ETA* s. 222(3) that the GST deemed trust was intended to be effective under the *CCAA*.

**52**    I am not persuaded that the reasoning in *Doré* requires the application of the doctrine of implied repeal in the circumstances of this case. The main issue in *Doré* concerned the impact of the adoption of the *C.C.Q.* on the administrative law rules with respect to municipalities. While Gonthier J. concluded in that case that the limitation provision in art. 2930 *C.C.Q.* had repealed by implication a limitation provision in the *Cities and Towns Act*, he did so on the basis of more than a textual analysis. The conclusion in *Doré* was reached after thorough contextual analysis of both pieces of legislation, including an extensive review of the relevant legislative history (paras. 31-41). Consequently, the circumstances before this Court in *Doré* are far from "identical" to those in the present case, in terms of text, context and legislative history. Accordingly, *Doré* cannot be said to require the automatic application of the rule of repeal by implication.

**53**    A noteworthy indicator of Parliament's overall intent is the fact that in subsequent amendments it has not displaced the rule set out in the *CCAA*. Indeed, as indicated above, the recent amendments to the *CCAA* in 2005 resulted in the rule previously found in s. 18.3 being renumbered and reformulated as s. 37. Thus, to the extent the interpretation allowing the GST deemed trust to remain effective under the *CCAA* depends on *ETA* s. 222(3) having impliedly repealed *CCAA* s. 18.3(1) because it is later in time, we have come full circle. Parliament has renumbered and reformulated the provision of the *CCAA* stating that, subject to exceptions for source deductions, deemed trusts do not survive the *CCAA* proceedings and thus the *CCAA* is now the later in time statute. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*.

**54**    I do not agree with my colleague Abella J. that s. 44(*f*) of the *Interpretation Act*, R.S.C. 1985, c. I-21, can be used to interpret the 2005 amendments as having no effect. The new statute can hardly be said to be a mere re-enactment of the former statute. Indeed, the *CCAA* underwent a substantial review in 2005. Notably, acting consistently with its goal of treating both the *BIA* and the *CCAA* as sharing the same approach to insolvency, Parliament made parallel amendments to both statutes with respect to corporate proposals. In addition, new provisions were introduced

regarding the treatment of contracts, collective agreements, interim financing and governance agreements. The appointment and role of the Monitor was also clarified. Noteworthy are the limits imposed by *CCAA* s. 11.09 on the court's discretion to make an order staying the Crown's source deductions deemed trusts, which were formerly found in s. 11.4. No mention whatsoever is made of GST deemed trusts (see Summary to S.C. 2005, c. 47). The review went as far as looking at the very expression used to describe the statutory override of deemed trusts. The comments cited by my colleague only emphasize the clear intent of Parliament to maintain its policy that only source deductions deemed trusts survive in *CCAA* proceedings.

**55**    In the case at bar, the legislative context informs the determination of Parliament's legislative intent and supports the conclusion that *ETA* s. 222(3) was not intended to narrow the scope of the *CCAA*'s override provision. Viewed in its entire context, the conflict between the *ETA* and the *CCAA* is more apparent than real. I would therefore not follow the reasoning in *Ottawa Senators* and affirm that *CCAA* s. 18.3 remained effective.

**56**    My conclusion is reinforced by the purpose of the *CCAA* as part of Canadian remedial insolvency legislation. As this aspect is particularly relevant to the second issue, I will now discuss how courts have interpreted the scope of their discretionary powers in supervising a *CCAA* reorganization and how Parliament has largely endorsed this interpretation. Indeed, the interpretation courts have given to the *CCAA* helps in understanding how the *CCAA* grew to occupy such a prominent role in Canadian insolvency law.

### 3.3 *Discretionary Power of a Court Supervising a CCAA Reorganization*

**57**    Courts frequently observe that "[t]he *CCAA* is skeletal in nature" and does not "contain a comprehensive code that lays out all that is permitted or barred" (*Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513, at para. 44, *per* Blair J.A.). Accordingly, "[t]he history of CCAA law has been an evolution of judicial interpretation" (*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Ct. (Gen. Div.)), at para. 10, *per* Farley J.).

**58**    *CCAA* decisions are often based on discretionary grants of jurisdiction. The incremental exercise of judicial discretion in commercial courts under conditions one practitioner aptly describes as "the hothouse of real-time litigation" has been the primary method by which the *CCAA* has been adapted and has evolved to meet contemporary business and social needs (see Jones, at p. 484).

**59**    Judicial discretion must of course be exercised in furtherance of the *CCAA*'s purposes. The remedial purpose I referred to in the historical overview of the Act is recognized over and over again in the jurisprudence. To cite one early example:

> The legislation is remedial in the purest sense in that it provides a means
> whereby the devastating social and economic effects of bankruptcy or creditor
> initiated termination of ongoing business operations can be avoided while a

court-supervised attempt to reorganize the financial affairs of the debtor company is made.

(*Elan Corp. v. Comiskey* (1990), 41 O.A.C. 282
, at para. 57, *per* Doherty J.A., dissenting)

**60**    Judicial decision making under the *CCAA* takes many forms. A court must first of all provide the conditions under which the debtor can attempt to reorganize. This can be achieved by staying enforcement actions by creditors to allow the debtor's business to continue, preserving the *status quo* while the debtor plans the compromise or arrangement to be presented to creditors, and supervising the process and advancing it to the point where it can be determined whether it will succeed (see, e.g., *Chef Ready Foods Ltd. v. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84 (C.A.), at pp. 88-89; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134, at para. 27). In doing so, the court must often be cognizant of the various interests at stake in the reorganization, which can extend beyond those of the debtor and creditors to include employees, directors, shareholders, and even other parties doing business with the insolvent company (see, e.g., *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9, at para. 144, *per* Paperny J. (as she then was); *Air Canada, Re* (2003), 42 C.B.R. (4th) 173 (Ont. S.C.J.), at para. 3; *Air Canada, Re*, 2003 CanLII 49366 (Ont. S.C.J.), at para. 13, *per* Farley J.; Sarra, *Creditor Rights*, at pp. 181-92 and 217-26). In addition, courts must recognize that on occasion the broader public interest will be engaged by aspects of the reorganization and may be a factor against which the decision of whether to allow a particular action will be weighed (see, e.g., *Canadian Red Cross Society/Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158 (Ont. S.C.J.), at para. 2, *per* Blair J. (as he then was); Sarra, *Creditor Rights*, at pp. 195-214).

**61**    When large companies encounter difficulty, reorganizations become increasingly complex. *CCAA* courts have been called upon to innovate accordingly in exercising their jurisdiction beyond merely staying proceedings against the debtor to allow breathing room for reorganization. They have been asked to sanction measures for which there is no explicit authority in the *CCAA*. Without exhaustively cataloguing the various measures taken under the authority of the *CCAA*, it is useful to refer briefly to a few examples to illustrate the flexibility the statute affords supervising courts.

**62**    Perhaps the most creative use of *CCAA* authority has been the increasing willingness of courts to authorize post-filing security for debtor in possession financing or super-priority charges on the debtor's assets when necessary for the continuation of the debtor's business during the reorganization (see, e.g., *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118 (Ont. Ct. (Gen. Div.)); *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, aff'g (1999), 12 C.B.R. (4th) 144 (S.C.); and generally, J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), at pp. 93-115). The *CCAA* has also been used to release claims against third parties as part of approving a comprehensive plan of arrangement and compromise, even over the objections of some dissenting creditors (see *Metcalfe & Mansfield*). As well, the appointment of a Monitor to oversee the reorganization was originally a measure taken pursuant to the *CCAA*'s supervisory

authority; Parliament responded, making the mechanism mandatory by legislative amendment.

**63**    Judicial innovation during *CCAA* proceedings has not been without controversy. At least two questions it raises are directly relevant to the case at bar: (1) what are the sources of a court's authority during *CCAA* proceedings? (2) what are the limits of this authority?

**64**    The first question concerns the boundary between a court's statutory authority under the *CCAA* and a court's residual authority under its inherent and equitable jurisdiction when supervising a reorganization. In authorizing measures during *CCAA* proceedings, courts have on occasion purported to rely upon their equitable jurisdiction to advance the purposes of the Act or their inherent jurisdiction to fill gaps in the statute. Recent appellate decisions have counselled against purporting to rely on inherent jurisdiction, holding that the better view is that courts are in most cases simply construing the authority supplied by the *CCAA* itself (see, e.g., *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236, at paras. 45-47, *per* Newbury J.A.; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (C.A.), paras. 31-33, *per* Blair J.A.).

**65**    I agree with Justice Georgina R. Jackson and Professor Janis Sarra that the most appropriate approach is a hierarchical one in which courts rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding (see G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2007* (2008), 41, at p. 42). The authors conclude that when given an appropriately purposive and liberal interpretation, the *CCAA* will be sufficient in most instances to ground measures necessary to achieve its objectives (p. 94).

**66**    Having examined the pertinent parts of the *CCAA* and the recent history of the legislation, I accept that in most instances the issuance of an order during *CCAA* proceedings should be considered an exercise in statutory interpretation. Particularly noteworthy in this regard is the expansive interpretation the language of the statute at issue is capable of supporting.

**67**    The initial grant of authority under the *CCAA* empowered a court "where an application is made under this Act in respect of a company ... on the application of any person interested in the matter ..., subject to this Act, [to] make an order under this section" (*CCAA*, s. 11(1)). The plain language of the statute was very broad.

**68**    In this regard, though not strictly applicable to the case at bar, I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary authority of the court under the *CCAA*. Thus in s. 11 of the *CCAA* as currently enacted, a court may, "subject to the restrictions set out in this Act, ... make any order that it considers appropriate in the circumstances" (S.C. 2005, c. 47, s. 128). Parliament appears to have endorsed the broad reading of *CCAA* authority developed by the jurisprudence.

**69**    The *CCAA* also explicitly provides for certain orders. Both an order made on an initial application and an order on subsequent applications may stay, restrain, or prohibit existing or new proceedings against the debtor. The burden is on the applicant to satisfy the court that the order is appropriate in the circumstances and that the applicant has been acting in good faith and with due diligence (*CCAA*, ss. 11(3), (4) and (6)).

**70**    The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* -- avoiding the social and economic losses resulting from liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.

**71**    It is well-established that efforts to reorganize under the *CCAA* can be terminated and the stay of proceedings against the debtor lifted if the reorganization is "doomed to failure" (see *Chef Ready*, at p. 88; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25 (B.C.C.A.), at paras. 6-7). However, when an order is sought that does realistically advance the *CCAA*'s purposes, the ability to make it is within the discretion of a *CCAA* court.

**72**    The preceding discussion assists in determining whether the court had authority under the *CCAA* to continue the stay of proceedings against the Crown once it was apparent that reorganization would fail and bankruptcy was the inevitable next step.

**73**    In the Court of Appeal, Tysoe J.A. held that no authority existed under the *CCAA* to continue staying the Crown's enforcement of the GST deemed trust once efforts at reorganization had come to an end. The appellant submits that in so holding, Tysoe J.A. failed to consider the underlying purpose of the *CCAA* and give the statute an appropriately purposive and liberal interpretation under which the order was permissible. The Crown submits that Tysoe J.A. correctly held that the mandatory language of the *ETA* gave the court no option but to permit enforcement of the GST deemed trust when lifting the *CCAA* stay to permit the debtor to make an assignment under the *BIA*. Whether the *ETA* has a mandatory effect in the context of a *CCAA* proceeding has already been discussed. I will now address the question of whether the order was authorized by the *CCAA*.

**74**    It is beyond dispute that the *CCAA* imposes no explicit temporal limitations upon proceedings commenced under the Act that would prohibit ordering a continuation of the stay of the Crown's GST claims while lifting the general stay of proceedings temporarily to allow the debtor to make an assignment in bankruptcy.

**75**    The question remains whether the order advanced the underlying purpose of the *CCAA*. The Court of Appeal held that it did not because the reorganization efforts had come to an end and the *CCAA* was accordingly spent. I disagree.

**76**    There is no doubt that had reorganization been commenced under the *BIA* instead of the *CCAA*, the Crown's deemed trust priority for the GST funds would have been lost. Similarly, the Crown does not dispute that under the scheme of distribution in bankruptcy under the *BIA*, the deemed trust for GST ceases to have effect. Thus, after reorganization under the *CCAA* failed, creditors would have had a strong incentive to seek immediate bankruptcy and distribution of the debtor's assets under the *BIA*. In order to conclude that the discretion does not extend to partially lifting the stay in order to allow for an assignment in bankruptcy, one would have to assume a gap between the *CCAA* and the *BIA* proceedings. Brenner C.J.S.C.'s order staying Crown enforcement of the GST claim ensured that creditors would not be disadvantaged by the attempted reorganization under the *CCAA*. The effect of his order was to blunt any impulse of creditors to interfere in an orderly liquidation. His order was thus in furtherance of the *CCAA*'s objectives to the extent that it allowed a bridge between the *CCAA* and *BIA* proceedings. This interpretation of the tribunal's discretionary power is buttressed by s. 20 of the *CCAA*. That section provides that the *CCAA* "may be applied together with the provisions of any Act of Parliament ... that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them", such as the *BIA*. Section 20 clearly indicates the intention of Parliament for the *CCAA* to operate *in tandem* with other insolvency legislation, such as the *BIA*.

**77**    The *CCAA* creates conditions for preserving the *status quo* while attempts are made to find common ground amongst stakeholders for a reorganization that is fair to all. Because the alternative to reorganization is often bankruptcy, participants will measure the impact of a reorganization against the position they would enjoy in liquidation. In the case at bar, the order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that is common to both statutes.

**78**    Tysoe J.A. therefore erred in my view by treating the *CCAA* and the *BIA* as distinct regimes subject to a temporal gap between the two, rather than as forming part of an integrated body of insolvency law. Parliament's decision to maintain two statutory schemes for reorganization, the *BIA* and the *CCAA*, reflects the reality that reorganizations of differing complexity require different legal mechanisms. By contrast, only one statutory scheme has been found to be needed to liquidate a bankrupt debtor's estate. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA* to allow commencement of the *BIA* proceedings. However, as Laskin J.A. for the Ontario Court of Appeal noted in a similar competition between secured creditors and the Ontario Superintendent of Financial Services seeking to enforce a deemed trust, "[t]he two statutes are related" and no "gap" exists between the two statutes which would allow the enforcement of property interests at the conclusion of *CCAA* proceedings that would be lost in bankruptcy (*Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108, at paras. 62-63).

**79**    The Crown's priority in claims pursuant to source deductions deemed trusts does not undermine this conclusion. Source deductions deemed trusts survive under both the *CCAA* and the *BIA*. Accordingly, creditors' incentives to prefer one Act over another will not be affected. While a court has a broad discretion to stay source deductions deemed trusts in the *CCAA* context, this discretion is nevertheless subject to specific limitations applicable only to source deductions deemed trusts (*CCAA*, s. 11.4). Thus, if *CCAA* reorganization fails (e.g., either the creditors or the court refuse a proposed reorganization), the Crown can immediately assert its claim in unremitted source deductions. But this should not be understood to affect a seamless transition into bankruptcy or create any "gap" between the *CCAA* and the *BIA* for the simple reason that, regardless of what statute the reorganization had been commenced under, creditors' claims in both instances would have been subject to the priority of the Crown's source deductions deemed trust.

**80**    Source deductions deemed trusts aside, the comprehensive and exhaustive mechanism under the *BIA* must control the distribution of the debtor's assets once liquidation is inevitable. Indeed, an orderly transition to liquidation is mandatory under the *BIA* where a proposal is rejected by creditors. The *CCAA* is silent on the transition into liquidation but the breadth of the court's discretion under the Act is sufficient to construct a bridge to liquidation under the *BIA*. The court must do so in a manner that does not subvert the scheme of distribution under the *BIA*. Transition to liquidation requires partially lifting the *CCAA* stay to commence proceedings under the *BIA*. This necessary partial lifting of the stay should not trigger a race to the courthouse in an effort to obtain priority unavailable under the *BIA*.

**81**    I therefore conclude that Brenner C.J.S.C. had the authority under the *CCAA* to lift the stay to allow entry into liquidation.

## 3.4 *Express Trust*

**82**    The last issue in this case is whether Brenner C.J.S.C. created an express trust in favour of the Crown when he ordered on April 29, 2008, that proceeds from the sale of LeRoy Trucking's assets equal to the amount of unremitted GST be held back in the Monitor's trust account until the results of the reorganization were known. Tysoe J.A. in the Court of Appeal concluded as an alternative ground for allowing the Crown's appeal that it was the beneficiary of an express trust. I disagree.

**83**    Creation of an express trust requires the presence of three certainties: intention, subject matter, and object. Express or "true trusts" arise from the acts and intentions of the settlor and are distinguishable from other trusts arising by operation of law (see D. W. M. Waters, M. R. Gillen and L. D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005), at pp. 28-29 especially fn. 42).

**84**    Here, there is no certainty to the object (i.e. the beneficiary) inferrable from the court's order of April 29, 2008, sufficient to support an express trust.

**85**    At the time of the order, there was a dispute between Century Services and the Crown over

part of the proceeds from the sale of the debtor's assets. The court's solution was to accept LeRoy Trucking's proposal to segregate those monies until that dispute could be resolved. Thus there was no certainty that the Crown would actually be the beneficiary, or object, of the trust.

**86**    The fact that the location chosen to segregate those monies was the Monitor's trust account has no independent effect such that it would overcome the lack of a clear beneficiary. In any event, under the interpretation of *CCAA* s. 18.3(1) established above, no such priority dispute would even arise because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount. However, Brenner C.J.S.C. may well have been proceeding on the basis that, in accordance with *Ottawa Senators*, the Crown's GST claim would remain effective if reorganization was successful, which would not be the case if transition to the liquidation process of the *BIA* was allowed. An amount equivalent to that claim would accordingly be set aside pending the outcome of reorganization.

**87**    Thus, uncertainty surrounding the outcome of the *CCAA* restructuring eliminates the existence of any certainty to permanently vest in the Crown a beneficial interest in the funds. That much is clear from the oral reasons of Brenner C.J.S.C. on April 29, 2008, when he said: "Given the fact that [*CCAA* proceedings] are known to fail and filings in bankruptcy result, it seems to me that maintaining the status quo in the case at bar supports the proposal to have the monitor hold these funds in trust." Exactly who might take the money in the final result was therefore evidently in doubt. Brenner C.J.S.C.'s subsequent order of September 3, 2008, denying the Crown's application to enforce the trust once it was clear that bankruptcy was inevitable, confirms the absence of a clear beneficiary required to ground an express trust.

### 4.    Conclusion

**88**    I conclude that Brenner C.J.S.C. had the discretion under the *CCAA* to continue the stay of the Crown's claim for enforcement of the GST deemed trust while otherwise lifting it to permit LeRoy Trucking to make an assignment in bankruptcy. My conclusion that s. 18.3(1) of the *CCAA* nullified the GST deemed trust while proceedings under that Act were pending confirms that the discretionary jurisdiction under s. 11 utilized by the court was not limited by the Crown's asserted GST priority, because there is no such priority under the *CCAA*.

**89**    For these reasons, I would allow the appeal and declare that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada is not subject to deemed trust or priority in favour of the Crown. Nor is this amount subject to an express trust. Costs are awarded for this appeal and the appeal in the court below.

The following are the reasons delivered by

FISH J.:--

I

**90**    I am in general agreement with the reasons of Justice Deschamps and would dispose of the appeal as she suggests.

**91**    More particularly, I share my colleague's interpretation of the scope of the judge's discretion under s. 11 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). And I share my colleague's conclusion that Brenner C.J.S.C. did not create an express trust in favour of the Crown when he segregated GST funds into the Monitor's trust account (2008 BCSC 1805, [2008] G.S.T.C. 221).

**92**    I nonetheless feel bound to add brief reasons of my own regarding the interaction between the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*").

**93**    In upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), and its progeny have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In my respectful view, a clearly marked departure from that jurisprudential approach is warranted in this case.

**94**    Justice Deschamps develops important historical and policy reasons in support of this position and I have nothing to add in that regard. I do wish, however, to explain why a comparative analysis of related statutory provisions adds support to our shared conclusion.

**95**    Parliament has in recent years given detailed consideration to the Canadian insolvency scheme. It has declined to amend the provisions at issue in this case. Ours is not to wonder why, but rather to treat Parliament's preservation of the relevant provisions as a deliberate exercise of the legislative discretion that is Parliament's alone. With respect, I reject any suggestion that we should instead characterize the apparent conflict between s. 18.3(1) (now s. 37(1)) of the *CCAA* and s. 222 of the *ETA* as a drafting anomaly or statutory lacuna properly subject to judicial correction or repair.

II

**96**    In the context of the Canadian insolvency regime, a deemed trust will be found to exist only where two complementary elements co-exist: first, a statutory provision *creating* the trust; and second, a *CCAA* or *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*") provision *confirming* -- or explicitly preserving -- its effective operation.

**97**    This interpretation is reflected in three federal statutes. Each contains a deemed trust provision framed in terms strikingly similar to the wording of s. 222 of the *ETA*.

**98**    The first is the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*") where s. 227(4) *creates* a deemed trust:

> (4) Every person who deducts or withholds an amount under this Act is

<u>deemed</u>, notwithstanding any security interest (as defined in subsection 224(1.3)) in the amount so deducted or withheld, <u>to hold the amount separate and apart</u> from the property of the person and from property held by any secured creditor (as defined in subsection 224(1.3)) of that person that but for the security interest would be property of the person, <u>in trust for Her Majesty and for payment to Her Majesty in the manner and at the time provided under this Act</u>. [Here and below, the emphasis is of course my own.]

**99** In the next subsection, Parliament has taken care to make clear that this trust is unaffected by federal or provincial legislation to the contrary:

(4.1) <u>Notwithstanding</u> any other provision of this Act, <u>the *Bankruptcy and Insolvency Act*</u> (except sections 81.1 and 81.2 of that Act), <u>any other enactment of Canada</u>, any enactment of a province or any other law, <u>where</u> at any time <u>an amount deemed by subsection 227(4) to be held by a person in trust</u> for Her Majesty <u>is not paid to Her Majesty</u> in the manner and at the time provided under this Act, <u>property of the person</u> ... equal in value to the amount so deemed to be held in trust <u>is deemed</u>

(*a*) <u>to be held</u>, from the time the amount was deducted or withheld by the person, separate and apart from the property of the person, <u>in trust for Her Majesty</u> whether or not the property is subject to such a security interest, ...

...

... and the proceeds of such property shall be paid to the Receiver General in priority to all such security interests.

**100** The continued operation of this deemed trust is expressly *confirmed* in s. 18.3 of the *CCAA*:

**18.3** (1) <u>Subject to subsection (2)</u>, notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

(2) <u>Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*</u>, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* ... .

**101**    The operation of the *ITA* deemed trust is also confirmed in s. 67 of the *BIA*:

> (2) <u>Subject to subsection (3)</u>, notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

> (3) <u>Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*</u>, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* ... .

**102**    Thus, Parliament has first *created* and then *confirmed the continued operation of* the Crown's *ITA* deemed trust under *both* the *CCAA* and the *BIA* regimes.

**103**    The second federal statute for which this scheme holds true is the *Canada Pension Plan*, R.S.C. 1985, c. C-8 ("*CPP*"). At s. 23, Parliament creates a deemed trust in favour of the Crown and specifies that it exists despite all contrary provisions in any other Canadian statute. Finally, and in almost identical terms, the *Employment Insurance Act*, S.C. 1996, c. 23 ("*EIA*"), creates a deemed trust in favour of the Crown: see ss. 86(2) and (2.1).

**104**    As we have seen, the survival of the deemed trusts created under these provisions of the *ITA*, the *CPP* and the *EIA* is confirmed in s. 18.3(2) the *CCAA* and in s. 67(3) the *BIA*. In all three cases, Parliament's intent to enforce the Crown's deemed trust through insolvency proceedings is expressed in clear and unmistakable terms.

**105**    The same is not true with regard to the deemed trust created under the *ETA*. Although Parliament creates a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it does not *confirm* the trust -- or expressly provide for its continued operation -- in either the *BIA* or the *CCAA*. The second of the two mandatory elements I have mentioned is thus absent reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

**106**    The language of the relevant *ETA* provisions is identical in substance to that of the *ITA*, *CPP*, and *EIA* provisions:

> **222**. (1) Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II <u>is deemed</u>, for all purposes and despite any security interest in the amount, <u>to hold the amount in trust for Her Majesty</u> in right of Canada, <u>separate and apart</u> from the property of the person and from

property held by any secured creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

...

(3) <u>Despite</u> any other provision of this Act (except subsection (4)), <u>any other enactment of Canada (except the *Bankruptcy and InsolvencyAct*)</u>, any enactment of a province or any other law, <u>if at any time an amount deemed</u> by subsection (1) <u>to be held</u> by a person <u>in trust for Her Majesty is not remitted</u> to the Receiver General or withdrawn in the manner and at the time provided under this Part, <u>property of the person</u> and property held by any secured creditor of the person that, but for a security interest, would be property of the person, <u>equal in value to the amount so deemed to be held in trust, is deemed</u>

(*a*) <u>to be held</u>, from the time the amount was collected by the person, <u>in trust for Her Majesty</u>, separate and apart from the property of the person, whether or not the property is subject to a security interest, ...

...

... and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

**107**    Yet no provision of the *CCAA* provides for the continuation of this deemed trust after the *CCAA* is brought into play.

**108**    In short, Parliament has imposed *two* explicit conditions, or "building blocks", for survival under the *CCAA* of deemed trusts created by the *ITA*, *CPP*, and *EIA*. Had Parliament intended to likewise preserve under the *CCAA* deemed trusts created by the *ETA*, it would have included in the *CCAA* the sort of confirmatory provision that explicitly preserves other deemed trusts.

**109**    With respect, unlike Tysoe J.A., I do not find it "inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception" (2009 BCCA 205, 98 B.C.L.R. (4th) 242, at para. 37). *All* of the deemed trust provisions excerpted above make explicit reference to the *BIA*. Section 222 of the *ETA* does not break the pattern. Given the near-identical wording of the four deemed trust provisions, it would have been surprising indeed had Parliament not addressed the *BIA* at all in the *ETA*.

**110**    Parliament's evident intent was to render GST deemed trusts inoperative upon the institution of insolvency proceedings. Accordingly, s. 222 mentions the *BIA* so as to *exclude* it from its ambit

-- rather than to *include* it, as do the *ITA*, the *CPP*, and the *EIA*.

**111**    Conversely, I note that *none* of these statutes mentions the *CCAA* expressly. Their specific reference to the *BIA* has no bearing on their interaction with the *CCAA*. Again, it is the confirmatory provisions *in the insolvency statutes* that determine whether a given deemed trust will subsist during insolvency proceedings.

**112**    Finally, I believe that chambers judges should not segregate GST monies into the Monitor's trust account during *CCAA* proceedings, as was done in this case. The result of Justice Deschamps's reasoning is that GST claims become unsecured under the *CCAA*. Parliament has deliberately chosen to nullify certain Crown super-priorities during insolvency; this is one such instance.

III

**113**    For these reasons, like Justice Deschamps, I would allow the appeal with costs in this Court and in the courts below and order that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada be subject to no deemed trust or priority in favour of the Crown.

The following are the reasons delivered by

**114**    ABELLA J. (dissenting):-- The central issue in this appeal is whether s. 222 of the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*"), and specifically s. 222(3), gives priority during *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"), proceedings to the Crown's deemed trust in unremitted GST. I agree with Tysoe J.A. that it does. It follows, in my respectful view, that a court's discretion under s. 11 of the *CCAA* is circumscribed accordingly.

**115**    Section 11[1] of the *CCAA* stated:

> **11.** (1) Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

To decide the scope of the court's discretion under s. 11, it is necessary to first determine the priority issue. Section 222(3), the provision of the *ETA* at issue in this case, states:

> (3) <u>Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law</u>, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under

this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

> (*a*) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

> (*b*) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

**116**    Century Services argued that the *CCAA*'s general override provision, s. 18.3(1), prevailed, and that the deeming provisions in s. 222 of the *ETA* were, accordingly, inapplicable during *CCAA* proceedings. Section 18.3(1) states:

> **18.3** (1) ... [N]otwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**117**    As MacPherson J.A. correctly observed in *Ottawa Senators Hockey Club Corp.* (*Re*) (2005), 73 O.R. (3d) 737 (C.A.), s. 222(3) of the *ETA* is in "clear conflict" with s. 18.3(1) of the *CCAA* (para. 31). Resolving the conflict between the two provisions is, essentially, what seems to me to be a relatively uncomplicated exercise in statutory interpretation: does the language reflect a clear legislative intention? In my view it does. The deemed trust provision, s. 222(3) of the *ETA*, has unambiguous language stating that it operates notwithstanding any law except the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*").

**118**    By expressly excluding only one statute from its legislative grasp, and by unequivocally stating that it applies despite any other law anywhere in Canada *except* the *BIA*, s. 222(3) has defined its boundaries in the clearest possible terms. I am in complete agreement with the following comments of MacPherson J.A. in *Ottawa Senators*:

> The legislative intent of s. 222(3) of the *ETA* is clear. If there is a conflict with "any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)", s. 222(3) prevails. In these words Parliament did two things: it decided that s. 222(3) should trump all other federal laws and, importantly, it addressed the topic of exceptions to its trumping decision and identified a single exception, the *Bankruptcy and Insolvency Act*... . The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

**119**    MacPherson J.A.'s view that the failure to exempt the *CCAA* from the operation of the *ETA* is a reflection of a clear legislative intention, is borne out by how the *CCAA* was subsequently changed after s. 18.3(1) was enacted in 1997. In 2000, when s. 222(3) of the *ETA* came into force, amendments were also introduced to the *CCAA*. Section 18.3(1) was not amended.

**120**    The failure to amend s. 18.3(1) is notable because its effect was to protect the legislative *status quo*, notwithstanding repeated requests from various constituencies that s. 18.3(1) be amended to make the priorities in the *CCAA* consistent with those in the *BIA*. In 2002, for example, when Industry Canada conducted a review of the *BIA* and the *CCAA*, the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals recommended that the priority regime under the *BIA* be extended to the *CCAA* (Joint Task Force on Business Insolvency Law Reform, *Report* (March 15, 2002), Sch. B, proposal 71, at pp. 37-38). The same recommendations were made by the Standing Senate Committee on Banking, Trade and Commerce in its 2003 report, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*; by the Legislative Review Task Force (Commercial) of the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals in its 2005 *Report on the Commercial Provisions of Bill C-55*; and in 2007 by the Insolvency Institute of Canada in a submission to the Standing Senate Committee on Banking, Trade and Commerce commenting on reforms then under consideration.

**121**    Yet the *BIA* remains the only exempted statute under s. 222(3) of the *ETA*. Even after the 2005 decision in *Ottawa Senators* which confirmed that the *ETA* took precedence over the *CCAA*, there was no responsive legislative revision. I see this lack of response as relevant in this case, as it was in *Tele-Mobile Co. v. Ontario*, 2008 SCC 12, [2008] 1 S.C.R. 305, where this Court stated:

> While it cannot be said that legislative silence is necessarily determinative of legislative intention, in this case the silence is Parliament's answer to the consistent urging of Telus and other affected businesses and organizations that there be express language in the legislation to ensure that businesses can be reimbursed for the reasonable costs of complying with evidence-gathering orders. I see the legislative history as reflecting Parliament's intention that

compensation not be paid for compliance with production orders. [para. 42]

**122**    All this leads to a clear inference of a deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

**123**    Nor do I see any "policy" justification for interfering, through interpretation, with this clarity of legislative intention. I can do no better by way of explaining why I think the policy argument cannot succeed in this case, than to repeat the words of Tysoe J.A. who said:

> I do not dispute that there are valid policy reasons for encouraging insolvent companies to attempt to restructure their affairs so that their business can continue with as little disruption to employees and other stakeholders as possible. It is appropriate for the courts to take such policy considerations into account, but only if it is in connection with a matter that has not been considered by Parliament. Here, Parliament must be taken to have weighed policy considerations when it enacted the amendments to the *CCAA* and *ETA* described above. As Mr. Justice MacPherson observed at para. 43 of *Ottawa Senators*, it is inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception. I also make the observation that the 1992 set of amendments to the *BIA* enabled proposals to be binding on secured creditors and, while there is more flexibility under the *CCAA*, it is possible for an insolvent company to attempt to restructure under the auspices of the *BIA*. [para. 37]

**124**    Despite my view that the clarity of the language in s. 222(3) is dispositive, it is also my view that even the application of other principles of interpretation reinforces this conclusion. In their submissions, the parties raised the following as being particularly relevant: the Crown relied on the principle that the statute which is "later in time" prevails; and Century Services based its argument on the principle that the general provision gives way to the specific (*generalia specialibus non derogant*).

**125**    The "later in time" principle gives priority to a more recent statute, based on the theory that the legislature is presumed to be aware of the content of existing legislation. If a new enactment is inconsistent with a prior one, therefore, the legislature is presumed to have intended to derogate from the earlier provisions (Ruth Sullivan, *Sullivan on the Construction of Statutes* (5th ed. 2008), at pp. 346-47; Pierre-André Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 358).

**126**    The exception to this presumptive displacement of pre-existing inconsistent legislation, is the *generalia specialibus non derogant* principle that "[a] more recent, general provision will not be construed as affecting an earlier, special provision" (Côté, at p. 359). Like a Russian Doll, there is also an exception within this exception, namely, that an earlier, specific provision may in fact be

"overruled" by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails (*Doré v. Verdun (City)*, [1997] 2 S.C.R. 862).

**127**    The primary purpose of these interpretive principles is to assist in the performance of the task of determining the intention of the legislature. This was confirmed by MacPherson J.A. in *Ottawa Senators*, at para. 42:

> [T]he overarching rule of statutory interpretation is that statutory provisions should be interpreted to give effect to the intention of the legislature in enacting the law. This primary rule takes precedence over all maxims or canons or aids relating to statutory interpretation, including the maxim that the specific prevails over the general (*generalia specialibus non derogant*). As expressed by Hudson J. in *Canada v. Williams*, [1944] S.C.R. 226, ... at p. 239 ... :
>
> > The maxim *generalia specialibus non derogant* is relied on as a rule which should dispose of the question, but the maxim is not a rule of law but a rule of construction and bows to the intention of the legislature, if such intention can reasonably be gathered from all of the relevant legislation.

(See also Côté, at p. 358, and Pierre-Andre Côté, with the collaboration of S. Beaulac and M. Devinat, *Interprétation des lois* (4th ed. 2009), at para. 1335.)

**128**    I accept the Crown's argument that the "later in time" principle is conclusive in this case. Since s. 222(3) of the *ETA* was enacted in 2000 and s. 18.3(1) of the *CCAA* was introduced in 1997, s. 222(3) is, on its face, the later provision. This chronological victory can be displaced, as Century Services argues, if it is shown that the more recent provision, s. 222(3) of the *ETA*, is a general one, in which case the earlier, specific provision, s. 18.3(1), prevails (*generalia specialibus non derogant*). But, as previously explained, the prior specific provision does not take precedence if the subsequent general provision appears to "overrule" it. This, it seems to me, is precisely what s. 222(3) achieves through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" *other than the BIA*. Section 18.3(1) of the *CCAA*, is thereby rendered inoperative for purposes of s. 222(3).

**129**    It is true that when the *CCAA* was amended in 2005,[2] s. 18.3(1) was re-enacted as s. 37(1) (S.C. 2005, c. 47, s. 131). Deschamps J. suggests that this makes s. 37(1) the new, "later in time" provision. With respect, her observation is refuted by the operation of s. 44(f) of the *Interpretation Act*, R.S.C. 1985, c. I-21, which expressly deals with the (non) effect of re-enacting, without significant substantive changes, a repealed provision (see *Attorney General of Canada v. Public Service Staff Relations Board*, [1977] 2 F.C. 663, dealing with the predecessor provision to s. 44(f)). It directs that new enactments not be construed as "new law" unless they differ in substance from the repealed provision:

**44.** Where an enactment, in this section called the "former enactment", is repealed and another enactment, in this section called the "new enactment", is substituted therefor,

...

(*f*) <u>except to the extent that the provisions of the new enactment are not in substance the same as those of the former enactment, the new enactment shall not be held to operate as new law</u>, but shall be construed and have effect as a consolidation and as declaratory of the law as contained in the former enactment;

Section 2 of the *Interpretation Act* defines an enactment as "an Act or regulation or <u>any portion of an Act or regulation</u>".

**130**    Section 37(1) of the current *CCAA* is almost identical to s. 18.3(1). These provisions are set out for ease of comparison, with the differences between them underlined:

**37.** (1) Subject to subsection (2), <u>despite</u> any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as <u>being</u> held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**18.3** (1) Subject to subsection (2), <u>notwithstanding</u> any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**131**    The application of s. 44(*f*) of the *Interpretation Act* simply confirms the government's clearly expressed intent, found in Industry Canada's clause-by-clause review of Bill C-55, where s. 37(1) was identified as "a technical amendment to re-order the provisions of this Act". During second reading, the Hon. Bill Rompkey, then the Deputy Leader of the Government in the Senate, confirmed that s. 37(1) represented only a technical change:

On a technical note relating to the treatment of deemed trusts for taxes, the bill [*sic* ] makes no changes to the underlying policy intent, despite the fact that in the case of a restructuring under the CCAA, sections of the act [*sic* ] were repealed and substituted with renumbered versions due to the extensive reworking of the CCAA.

(*Debates of the Senate*, vol. 142, 1st Sess., 38th Parl., November 23, 2005, at p. 2147)

**132**    Had the substance of s. 18.3(1) altered in any material way when it was replaced by s. 37(1), I would share Deschamps J.'s view that it should be considered a new provision. But since s. 18.3(1) and s. 37(1) are the same in substance, the transformation of s. 18.3(1) into s. 37(1) has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision (Sullivan, at p. 347).

**133**    This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. The question then is how that priority affects the discretion of a court under s. 11 of the *CCAA*.

**134**    While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding-up Act*, R.S.C. 1985, c. W-11, that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes *other* than the *BIA* and the *Winding-up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request for payment of the GST funds during the *CCAA* proceedings.

**135**    Given this conclusion, it is unnecessary to consider whether there was an express trust.

**136**    I would dismiss the appeal.

*Appeal allowed with costs,* ABELLA J. *dissenting.*

* * * * *

# APPENDIX

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at December 13, 2007)

**11.** (1) [Powers of court] Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

...

(3) [Initial application court orders] A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

(*a*) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(*c*) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

(4) [Other than initial application court orders] A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

(*a*) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(*c*) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

...

(6) [Burden of proof on application] The court shall not make an order under subsection (3) or (4) unless

(*a*) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

(*b*) in the case of an order under subsection (4), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

**11.4** (1) [Her Majesty affected] An order made under section 11 may provide that

(*a*) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or

of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for such period as the court considers appropriate but ending not later than

(i)     the expiration of the order,

(ii)    the refusal of a proposed compromise by the creditors or the court,

(iii)   six months following the court sanction of a compromise or arrangement,

(iv)    the default by the company on any term of a compromise or arrangement, or

(v)     the performance of a compromise or arrangement in respect of the company; and

(*b*) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company where the company is a debtor under that legislation and the provision has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for such period as the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) may apply.

(2) [When order ceases to be in effect] An order referred to in subsection (1) ceases to be in effect if

(*a*) the company defaults on payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i)      subsection 224(1.2) of the *Income Tax Act*,

(ii)     any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)    under any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(A)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B)     is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(*b*) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i)      subsection 224(1.2) of the *Income Tax Act*,

(ii)     any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)    any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(A)   has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B)   is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

(3) [Operation of similar legislation] An order made under section 11, other than an order referred to in subsection (1) of this section, does not affect the operation of

(*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)   is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**18.3** (1) [Deemed trusts] Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

(2) [Exceptions] Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

> (*a*) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

> (*b*) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**18.4** (1) [Status of Crown claims] In relation to a proceeding under this Act, all claims, including secured claims, of Her Majesty in right of Canada or a province or any body under an enactment respecting workers' compensation, in this section and in section 18.5 called a "workers' compensation body", rank as unsecured claims.

...

(3) [Operation of similar legislation] Subsection (1) does not affect the operation of

> (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

    (i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (ii)   is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**20.** [Act to be applied conjointly with other Acts] The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legislature of any province, that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at September 18, 2009)

**11.** [General power of court] Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

**11.02** (1) [Stays, etc. -- initial application] A court may, on an initial application in respect of a debtor company, make an order on any terms that it may impose, effective for the period that the

court considers necessary, which period may not be more than 30 days,

> (*a*) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*;

> (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

> (*c*) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

(2) [Stays, etc. -- other than initial application] A court may, on an application in respect of a debtor company other than an initial application, make an order, on any terms that it may impose,

> (*a*) staying, until otherwise ordered by the court, for any period that the court considers necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in paragraph (1)(*a*);

> (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

> (*c*) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

(3) [Burden of proof on application] The court shall not make the order unless

> (a) the applicant satisfies the court that circumstances exist that make the order appropriate; and
> (b) in the case of an order under subsection (2), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

...

**11.09** (1) [Stay -- Her Majesty] An order made under section 11.02 may provide that

> (*a*) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the

*Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for the period that the court considers appropriate but ending not later than

    (i)    the expiry of the order,

    (ii)   the refusal of a proposed compromise by the creditors or the court,

    (iii)  six months following the court sanction of a compromise or an arrangement,

    (iv)  the default by the company on any term of a compromise or an arrangement, or

          (v) the performance of a compromise or an arrangement in respect of the company; and

(*b*) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company if the company is a debtor under that legislation and the provision has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

    (i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (ii)   is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for the period that the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) that may apply.

    (2) [When order ceases to be in effect] The portions of an order made under section 11.02 that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*) cease to be in effect if

          (*a*) the company defaults on the payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i)     subsection 224(1.2) of the *Income Tax Act*,

(ii)    any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)   any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

    (A)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (B)     is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(*b*) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i)     subsection 224(1.2) of the *Income Tax Act*,

(ii)    any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)   any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax

        imposed on individuals under the *Income Tax Act*, or

(B)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

(3) [Operation of similar legislation] An order made under section 11.02, other than the portions of that order that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*), does not affect the operation of

(*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(*c*) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**37.** (1) [Deemed trusts] Subject to subsection (2), despite any provision in federal or

provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

(2) [Exceptions] Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision"), nor does it apply in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province if

(*a*) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(*b*) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

*Excise Tax Act*, R.S.C. 1985, c. E-15 (as at December 13, 2007)

**222.** (1) [Trust for amounts collected] Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II is deemed, for all purposes and despite any security interest in the amount, to hold the amount in trust for Her Majesty in right of Canada, separate and apart from the property of the person and from property held by any secured creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

(1.1) [Amounts collected before bankruptcy] Subsection (1) does not apply, at or after the time a person becomes a bankrupt (within the meaning of the *Bankruptcy and Insolvency Act*), to any amounts that, before that time, were collected or became collectible by the person as or on account of tax under Division II.

...

(3) [Extension of trust] Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

> (*a*) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

> (*b*) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 (as at December 13, 2007)

**67.** (1) [Property of bankrupt] The property of a bankrupt divisible among his creditors shall not comprise

> (*a*) property held by the bankrupt in trust for any other person,

> (*b*) any property that as against the bankrupt is exempt from execution or seizure under any laws applicable in the province within which the property is situated and within which the bankrupt resides, or

> (*b*.1) such goods and services tax credit payments and prescribed payments relating to the essential needs of an individual as are made in prescribed circumstances and are not property referred to in paragraph (*a*) or (*b*),

but it shall comprise

> (*c*) all property wherever situated of the bankrupt at the date of his bankruptcy or

that may be acquired by or devolve on him before his discharge, and

> (*d*) such powers in or over or in respect of the property as might have been exercised by the bankrupt for his own benefit.

(2) [Deemed trusts] Subject to subsection (3), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

(3) [Exceptions] Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

> (*a*) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

> (*b*) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**86.** (1) [Status of Crown claims] In relation to a bankruptcy or proposal, all provable claims, including secured claims, of Her Majesty in right of Canada or a province or of any body under an Act respecting workers' compensation, in this section and in section 87 called a "workers' compensation body", rank as unsecured claims.

...

(3) [Exceptions] Subsection (1) does not affect the operation of

> (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*;

> (*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts; or

> (*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

>> (i)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

>> (ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**Solicitors:**

*Solicitors for the appellant: Fraser Milner Casgrain, Vancouver.*

*Solicitor for the respondent: Department of Justice, Vancouver.*

cp/e/qlecl/qlcal/qlced/qljyw/qlhcs/qljyw/qlhcs/qlana/qlcas/qlcas

1 Section 11 was amended, effective September 18, 2009, and now states:

> **11.** Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

2 The amendments did not come into force until September 18, 2009.

# TAB 5

DOCSTOR: 2191401\1

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

**c**

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

Citibank Canada v. Chase Manhattan Bank of Canada

CITIBANK CANADA, as agent, CITIBANK CANADA, ABN AMRO BANK CANADA, HONGKONG BANK OF CANADA, PARIBAS BANK OF CANADA, TORONTO-DOMINION BANK, SWISS BANK CORPORATION (CANADA), BANK OF TOKYO CANADA, DAI-ICHI KANGYO BANK (CANADA), CREDIT LYONNAIS (CANADA), BANCA COMMERCIALE ITALIANA OF CANADA, MONTREAL TRUST COMPANY, BALL PACK-AGING PRODUCTS, INC. through its receiver, ERNST & YOUNG INC., and BANCO CENTRALE OF CANADA v. CHASE MANHATTAN BANK OF CANADA, BALL PACKAGING PRODUCTS HOLDINGS INC., BALL CORPOR-ATION, LA CAISSE CENTRALE DESJARDINS DU QUEBEC, and UNION BANK OF SWITZERLAND (CANADA)

Ontario Court of Justice (General Division)

Rosenberg J.

Judgment: June 12, 1991
Docket: Doc. 879/91Q

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Peter Howard* and *Sean Dunphy*, for receiver, Ernst & Young Inc., and applicants.

*Barbara Grossman*, for Ball Packaging Products Inc.

*Randy A. Pepper*, for Ball Corporation (a U.S. corporation).

*James H. Grout*, for La Caisse Desjardins.

*Dana B. Fuller* and *W.J. Demers*, for Chase Manhattan Bank of Canada and Union Bank of Switzerland.

*Charles F. Scott*, for Veriteck.

Subject: Corporate and Commercial; Insolvency; Property

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangements Act — Application of Act.

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangements Act.

Debtors' relief legislation — Companies' Creditors Arrangement Act — Jurisdiction of court under Act given large and liberal interpretation — Purpose of Act being remedial — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

Proposals — Effect of proposal — Companies' Creditors Arrangement Act — Plan approved although ordinary creditors paid in full while secured creditors receiving only part payment — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Proposals — Meeting of creditors — Companies' Creditors Arrangement Act — Entitlement to vote — "Holder" including beneficial holders — "Creditor" including those with real economic interest in debt and security — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

The company "Ball Canada" manufactured cans and other packaging for food and beverages. Its economic position deteriorated to the point where it was not able to survive as an ongoing entity with its debt load and scope of operations.

Ball U.S. owned 50 per cent of Ball Canada. In the course of restructuring discussions, Ball U.S. offered to purchase the debt of the term secured creditors and the shares of Ball Canada held by the banks pursuant to a share pledge agreement. Negotiations took place between the agent for the lenders, Citibank Canada, and Ball U.S. to formulate an acceptable proposal. One of the secured creditors, Chase Manhattan, opposed the Ball U.S. offer.

Ball Canada applied for a declaration that it was a corporation to which the *Companies' Creditors Arrangement Act* ("CCAA") applied. The agent for the lenders brought a cross-application for the appointment of a receiver. The application was dismissed and the cross-application was granted. The fact that negotiations with Ball U.S. had not reached any finality was considered by the Judge in refusing to allow further time to attempt to finalize the deal.

After appointment of the receiver, Ball U.S. provided further offers. All term secured creditors except Chase were in favour of the Ball U.S. offer. According to the receiver, there was little or no prospect of a going-concern sale of Ball Canada to a party other than Ball U.S., and a liquidation of assets would provide far less to the secured creditors than the Ball U.S. offer. The agent for the lenders applied under the CCAA to have Ball Canada recognized as a corporation to which the CCAA applied and either waiving a meeting of secured creditors or ordering a meeting to vote on the term secured compromise.

**Held:**

The *Companies' Creditors Arrangement Act* applied to Ball Canada; a meeting of secured creditors was ordered; the compromise plan was approved and authorized.

The CCAA applied to Ball Canada, since it had an outstanding issue of secured bonds issued under a trust deed and the compromise or arrangement that was proposed included a compromise or arrangement between the debtor company and the holders of an issue of secured bonds. The CCAA authorized the court to order a meeting of any class of the company's secured creditors where a compromise or arrangement was proposed between the debtor company and such class of secured creditors. The term secured creditors and Chase, except as to amount, had an identical economic interest in the debtor company, justifying their classification as a single class of creditors, as the amounts owing to each were due under the same loan agreement and secured by the same debentures.

The banks participating in the loan by Chase to Ball Canada were secured "creditors" of Ball Canada. "Secured creditors", as defined in s. 2 of the CCAA, included a "holder" of certain securities. "Holder" must be given a liberal interpretation in keeping with the broad remedial nature of the CCAA and included beneficial holders of any bond or proprietary interest. "Creditors" was to be interpreted to include those with a real economic interest in the debtor company. Since the banks had an equitable proprietary interest in the property of Ball Canada as security for that company's indebtedness, they were entitled to vote on the proposed compromise. The proposal was, therefore, approved by the necessary percent-

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

age of voters in both number and value.

The jurisdiction of the Court under the CCAA should be given a large and liberal interpretation consistent with the re-medial nature of the legislation. The purpose of the CCAA was to facilitate arrangements that might avoid liquidation of the company and allow it to continue in business to the benefit of the whole economic community, including sharehold-ers, creditors and employees.

The compromise plan was approved, although it provided that ordinary creditors be paid in full while secured creditors received only part payment. The evidence demonstrated overwhelmingly that it was in the interest of all the creditors that the proposal be approved and the proposal received the support of all the creditors except Chase.

**Cases considered:**

*Hongkong Bank of Canada v. Chef Ready Foods Ltd.*, 51 B.C.L.R. (2d) 84, [1991] 2 W.W.R. 136 (C.A.) — *applied*

*Northland Properties Ltd., Re* (1988), 73 C.B.R. (N.S.) 175 (B.C. S.C.), affirmed *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 73 C.B.R. (N.S.) 195, 34 B.C.L.R. (2d) 122, [1989] 3 W.W.R. 363 (C.A.) — *referred to*

*Nova Metal Products Inc. v. Comiskey (Trustee of)*, 1 C.B.R. (3d) 101, 41 O.A.C. 282, 1 O.R. (3d) 289 (C.A.) — *fol-lowed*

*Ultracare Management Inc. v. Zevenberger (Trustee of)* (1990), 3 C.B.R. (3d) 151, *(sub nom. Ultracare Manage-ment Inc. v. Gammon)* 1 O.R. (3d) 321 (Gen. Div.) — *applied*

**Statutes considered:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 —

s. 2 "secured creditors"

s. 3

s. 5

s. 6

s. 8

Personal Property Security Act, 1989, S.O. 1989, c. 16 —

Pt. V

s. 63(4)

s. 67

s. 70

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

**Words and phrases considered:**

holder — as used in s. 2 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, should be given a liberal interpretation in keeping with the broad remedial nature of the Act and, therefore, includes the beneficial holders of any bond or proprietary interest.

creditors — as used in the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, is to be interpreted so that the voice of the persons with the real economic interest in the debtor company is heard.

Application for a declaration that Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, applied to a corporation and for an order directing a meeting of secured creditors to vote on a compromise proposal.

*Rosenberg J.*:

**Preamble**

1    In the months of March and April 1991, I dealt with a number of urgent matters regarding Ball Packaging Products Canada Inc. In some cases the time restrictions were such that there was not time to give oral reasons for my decisions. In one case the matter was finalized within a few minutes of a 12 noon deadline, which will be explained in my reasons.

2    After finalizing the matters and now having finally discharged the receiver, counsel involved requested that I give reasons. I have determined that it is appropriate to do so in case the matter is taken further or in case there are other actions arising out of the various steps taken in the appointment of a receiver and the receivership proceedings. I also felt that it would be advisable to have my reasons recorded for whatever value they may have as a precedent for similar proceedings in the future.

**Proceedings**

3    In the first application heard on March 28, 1991, Ball Packaging Products Canada Inc. ("Ball Canada") asked for the following relief:

4    (a) A declaration that the applicant is a corporation to which the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA") applies, notwithstanding the existence of a waiver dated December 9, 1988 excluding the CCAA;

5    (b) An order authorizing the applicant to file a formal plan of compromise or arrangement (the "reorganization plan");

6    (c) An order that the applicant call meetings of classes of its creditors and shareholders (the "meetings");

7    (d) An order that the applicant may file the reorganization plan and the notices of meetings by way of affidavit;

8    (e) An order staying all proceedings that have been or might be taken under the *Bankruptcy Act*, R.S.C. 1985, c. B-3;

9    (f) An order restraining other proceedings in existing actions;

10    (g) An order restraining future proceedings against the applicant;

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

11      (h) An order suspending and postponing the rights of any person, firm, corporation, company or other entity to realize upon or deal with any property of the applicant or security in respect of such property;

12      (i) An order enjoining creditors from making demand for payment on the applicant;

13      (j) An order preventing creditors from exercising any right of set-off against debts owed to the applicant;

14      (k) An order that all parties having agreements with the applicant for the supply of goods or services to the applicant be enjoined until further order of the Court from terminating, determining or cancelling such agreements and, in particular, that the applicant continue to be supplied goods, services and utilities so long as the applicant pays the prices or charges incurred in accordance with the terms negotiated by the applicant from time to time;

15      (l) An order that all parties having other agreements with the applicant be enjoined from terminating, determining or cancelling such agreements without the written consent of the applicant or the Court;

16      (m) An order that the respondents which are parties (or assignees of such parties) to the loan agreement dated November 16, 1988 be enjoined from reducing the credit originally made available to the applicant and that such respondents continue to extend such credit, as is required by the applicant, and as would be available if the applicant were not in default;

17      (n) An order permitting all obligations to unsecured creditors together with all obligations incurred by the applicant after this order to be paid or otherwise satisfied by the applicant;

18      (o) An order permitting the applicant to serve this notice of application, the supporting affidavit, the order requested, the reorganization plan, and notices of meetings by mailing copies thereof to each of the applicant's creditors;

19      (p) An order that the applicant shall render an affidavit to the Court verifying the action taken and decisions reached at the meetings;

20      (q) An order that the applicant shall remain in possession of its undertaking and shall continue to carry on its business and, upon approval, to implement the reorganization plan.

21      Ball Canada also asked for other provisions in the order sought that are not relevant to this decision.

22      The applicants referred to in the style of cause in these present reasons were the respondents in that application. Those respondents brought a cross-application for the appointment of a receiver. The application was dismissed and the cross-application for the appointment of a receiver was allowed. At that time I gave oral reasons for my decision, and there is no need to repeat those at this time except to note that it was clear from the affidavit material submitted on behalf of Ball Canada that:

> Unless there is a restructuring and unless operating funds are made available to the applicant during the restructuring agreement, the applicant cannot continue to carry on business and will have to cease operations immediately. Given the magnitude of the applicant's operations across Canada, this would have a significant adverse effect on a large number of suppliers, customers and employees.

23      At that time the evidence indicated that Ball Corporation ("Ball U.S.") owned 50 per cent of the issued and outstanding common preferred shares of Ball Canada and that negotiations had been continuing with Ball U.S. to finance an arrangement with creditors and invest sufficient capital to allow Ball Canada to continue to operate. The fact that the ne-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

gotiations had not reached any finality after many months of negotiating was considered by me in refusing to allow further time to attempt to finalize a deal with Ball U.S. The evidence of Ball Canada indicated that they could not carry on without the respondent financial institutions advancing more money, which they were not contractually obliged to do in view of Ball Canada's default. After the receiver took possession on April 10, 1991, I heard an application by Citibank, which applied amongst other things for:

24      (a) A declaration that the applicant Ball Packaging Products Canada, Inc. is a corporation to which the CCAA applies;

25      (b) An order waiving the requirement for a meeting approving the term secured compromise dated April 9, 1991, annexed hereto as Schedule "A" (the "term secured compromise") on the basis of the consents of the applicants who are term secured creditors filed;

26      (c) In the alternative to (b) above, an order that a meeting of the term secured creditors to vote on the term secured compromise pursuant to s. 5 of the CCAA take place forthwith in the courtroom at which meeting to be chaired by the agent, Citibank Canada, the principal value of term secured debt will be $197,004,139.48 as at March 27, 1991, and the term secured creditors present in person or by proxy will be entitled to vote in the manner and proportionate percentage of value as hereinafter set forth:

```
 1. ABN Amro Bank of Canada                       4.16%
 2. Citibank Canada                              22.90%
 3. La Caisse Centrale Desjardins du Quebec        4.17%
 4. Hongkong Bank of Canada                        4.17%
 5. Paribas Bank of Canada                         4.17%
 6. The Chase Manhattan Bank of Canada            12.50%
 7. The Toronto-Dominion Bank                      7.92%
 8. Swiss Bank Corporation (Canada)               10.42%
 9. Banco Centrale of Canada                       2.50%
10. Bank of Tokyo Canada                           2.08%
11. Dai-Ichi Kangyo Bank (Canada)                  4.17%
12. Credit Lyonnais (Canada)                       4.17%
13. Banca Commerciale Italiana of Canada           4.17%
14. Union Bank of Switzerland (Canada)             6.25%
15. Montreal Trust Company                         4.17%
16. Trust Generale du Canada (per La Caisse
    Centrale Desjardins du Quebec)                 2.08%
                                                 ------
                                                  100%
```

27      At that time I endorsed the application record as follows:

Application for a meeting pursuant to CCAA ordered for 6:00 p.m. April 10th at the offices of Davies, Ward & Beck, 44th floor, First Canadian Place to consider a proposal as set out in the application or as modified at the meeting. Meeting to be chaired by Gregory Daniels of Citibank. A verbatim record of the meeting to be kept. A record shall be kept of how all participants vote but no determination of the tabulation of the vote or percentage in favour of any proposal shall be made until the matter is argued in court. Meeting results to be submitted to the court for con-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

sideration at 9:00 a.m. April 11th.

28      The CCAA applies to Ball Canada since it has an outstanding issue of secured bonds issued under a trustee and the compromise or arrangement that is proposed included a compromise or arrangement between the debtor company and the holders of an issue of secured bonds. (CCAA, ss. 2, 3.)

29      I also relied on CCAA s. 5, which provides that the Court can order a meeting of any class of the company's secured creditors where a compromise or arrangement is proposed between the debtor company and such class of secured creditors.

30      In determining that a meeting should be called, I considered the case of *Ultracare Management Inc. v. Zevenberger (Trustee of)* (1990), 3 C.B.R. (3d) 151, *(sub nom. Ultracare Management Inc. v. Gammon)* 1 O.R. (3d) 321 (Gen. Div.), where it was held that when there is a reasonable chance that the debtor company can carry on its business as a going concern, the Court should order a meeting of creditors.

31      Further, the term secured creditors and Chase, except as to amount, have an identical economic interest in the debtor company, justifying their classification as a single class of creditors. The amounts owing to each are owing pursuant to the same loan agreement and the security for the obligations is that secured by the same debenture.

*Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 1 C.B.R. (3d) 101, 41 O.A.C. 282, 1 O.R. (3d) 289 (C.A.).

*Re Northland Properties Ltd.* (1988), 73 C.B.R. (N.S.) 175 (B.C. S.C.) per Trainor J. at 191-192, affirmed (sub nom *Northland Properties Ltd. v. Exelsior Life Insurance Co. of Canada*, 73 C.B.R. (N.S.) 195, 34 B.C.L.R. (2d) 122, [1989] 3 W.W.R. 363 (C.A.).

32      The authority to abridge the time period for the calling of the meeting was exercised by me pursuant to ss. 67 and 70 of the *Personal Property Security Act, 1989*, S.O. 1989, c. 16 ("PPSA").

33      Pursuant to s. 67 of the PPSA, I relieved compliance with Pt. V of the PPSA since it was, in my view, just and reasonable for all concerned parties.

34      The position of the applicants is summarized in the affidavit of Gregory M. Daniels as follows:

As hereinafter described in greater detail, the Applicants and La Caisse Centrale Desjardins du Quebec and Trust Generale are 15 of the 16 Term Secured Creditors to Ball Canada holding $172,382,104.29 or 87.5% of the total principal of Term Secured Debt of $197,004,139.48 outstanding as at March 27, 1991. The balance is held by the lone dissenting Term Secured Creditor The Chase Manhattan Bank of Canada ('Chase'). An offer for the Term Secured Debt has been made by Ball Corporation ('Ball U.S.') in the amount of $120,000,000.00. Ball U.S. is unwilling to allow any person other than itself to hold any of the Term Secured Debt and has made its offer conditional upon the acquisition by it of the Term Secured Debt or the elimination of the Term Secured Debt at a discount to the face amount thereof. *The offer is also conditional upon the acquisition by Ball U.S. of all of the shares of Ball Canada which are pledged to Citibank Canada as collateral for a guarantee of the Term Secured Debt given by Ball Packaging Product Holdings Inc. ('Ball Holdings')*. The Applicants want to accept the offer, Chase does not. This Application under the Companies' Creditors Arrangement Act (the 'CCAA') is made to impose the Ball U.S. offer on Chase for the good of the Applicants, Ball Canada and its employees, suppliers, customers and others affected by the liquidation of Ball Canada. [Emphasis added.]

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

Ball Canada is a wholly owned subsidiary of Ball Holdings. To the best of my knowledge, Ball Holdings is owned 50% by Ball Corporation and 50% by Onex Corporation ('Onex').

Certain of the original term lenders, including the Agent and Chase, have sold interests in their loans from time to time. These sales have been effected by participation agreements under which certain of the lenders have agreed to share a beneficial interest in the right to receive payments from Ball Canada in respect of the Term Secured Debt and in effect, to share any risk of the failure of Ball Canada to repay the loan in full. At present, to the knowledge of the Agent, the Term Secured Debt is now beneficially held in the following percentages as follows:

```
 1. ABN Amro Bank of Canada                     4.16%
 2. Citibank Canada                            22.90%
 3. La Caisse Centrale Desjardins du Quebec     4.17%
 4. Hongkong Bank of Canada                     4.17%
 5. Paribas Bank of Canada                      4.17%
 6. The Chase Manhattan Bank of Canada         12.50%
 7. The Toronto-Dominion Bank                   7.92%
 8. Swiss Bank Corporation (Canada)            10.42%
 9. Banco Centrale of Canada                    2.50%
10. Bank of Tokyo Canada                        2.08%
11. Dai-Ichi Kangyo Bank (Canada)              4.17%
12. Credit Lyonnais (Canada)                    4.17%
13. Banca Commerciale Italiana of Canada        4.17%
14. Union Bank of Switzerland (Canada)          6.25%
15. Montreal Trust Company                      4.17%
16. Trust Generale                              2.08%
                                               -----
                                                100%
```

(the 'Term Secured Creditors'). A list of the Term Secured Creditors as at March 29, 1991 and the percentages and dollar amounts held prepared by the Agent is appended hereto as Exhibit 'A' to this my affidavit.

All Term Secured Creditors have received notice of the several meetings to discuss the various offers of Ball Canada and Ball U.S. and have had the opportunity to participate fully and vote at such meetings.

Ball Canada makes cans and other packaging for food and beverages. For the reasons detailed by the President of Ball Canada, William A. Lincoln in his Affidavit dated March 26, 1991, the business of Ball Canada, has suffered considerably in the last few years to the point where it is clear that the capital structure of Ball Canada no longer makes sense. In the foreseeable future, under any reasonable assumptions, Ball Canada will not be capable of servicing the level of debt held by the Applicants and Chase. It was the recognition of this fact that led all parties to the course of negotiations that are described in the paragraphs that follow. The Affidavit of William A. Lincoln is appended hereto as Exhibit 'B' to this my Affidavit.

Beginning in or around the Summer of 1990, Ball Canada approached the Agent with a view towards restructuring its debt obligations in light of Ball Canada's changing circumstances. In June, 1990 Ball Canada became aware of the fact that it did not comply with certain of the financial covenants contained in the Loan Agreement. Discussions between Ball Canada and the Agent on behalf of all the lenders continued throughout the balance of 1990 and into

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

1991 on a periodic basis with no success. Without assigning any responsibility for the lack of success, it became clear that Ball U.S. and Onex had differing interests and priorities and similarly each of the Term Secured Creditors had their own interests, views of the appropriate type of restructuring and the value of Ball Canada.

Throughout the course of all discussions and negotiations, Chase has consistently taken the position that it was not prepared to accept any compromise that was effectively a recognition that its loan participation as a Term Secured Creditor was significantly less valuable than the face amount of that participation or which did not permit it to participate in any possible future increase in the value of Ball Canada.

As the economic position of Ball Canada worsened throughout the Winter 1990 and into 1991, it became apparent that Ball Canada would not be able to survive as an on-going entity with its present debt load and scope of operations. Ball Canada began to sell assets and closed certain plants. However, the financial situation of Ball Canada was obviously such as to require a massive restructuring of the Term Secured Debt. In December, 1990 Ball Canada suspended its scheduled loan payment to the lenders. Beginning in early March 1991, the restructuring discussions took the form of an offer by Ball U.S. to purchase the debt of the Term Secured Creditors and the shares of Ball Canada held by the banks pursuant to the Share Pledge Agreement. Again there was a course of discussions throughout March between the Agent and Ball U.S. to attempt to formulate an acceptable proposal. In this respect, the position of Chase was again consistent and it continually took the position that the offers of Ball U.S. were unacceptable to it.

Throughout March, the operating position of Ball Canada continued to deteriorate to the extent that it became apparent that matters were coming to a head. The operating line of Ball Canada had been capped and cheques were being returned NSF. The projections of the company showed that it was in a substantial deficit position and unable to fund its operations through cashflow. After providing some operating advances, Ball U.S. and Onex refused to provide further operating funds.

On March 22, 1991, the Agent provided Notice of Default to Ball Canada in respect of the Term Secured Debt. Although the Operating Loan was in default and the Agent in a position to demand at any time, this five day notice apparently triggered the Companies' Creditors Arrangement Application brought by Ball Canada returnable on March 27, 1991.

On the morning of the court application the Agent had discussions with Ball U.S. setting forth the terms on which the Agent would be prepared to recommend a proposal by Ball U.S. to all the other Term Secured Creditors. No offer was forthcoming from Ball U.S. until after the court proceedings.

The Companies' Creditors Arrangement Act application application by Ball Canada and the cross-motion by the Agent for the appointment of a Receiver were heard by the Honourable Mr. Justice Rosenberg on March 27 and 28, 1991. In the result, the application by Ball Canada was dismissed and Ernst & Young Inc. appointed as Receiver of Ball Canada. A copy of the endorsement and Order of the Honourable Mr. Justice Rosenberg is appended hereto as Exhibit 'C' to this my Affidavit.

After the appointment of the Receiver, Ball U.S. provided further offers. A copy of the last offer is appended hereto as Exhibit 'D' to this my Affidavit. The Agent convened a meeting of the Term Secured Creditors to consider the offer of Ball U.S. and invited Ball U.S. to make a presentation at the meeting. Eventually 15 of the 16 Term Secured Creditors deter mined that they were prepared to enter into the compromise suggested by Ball U.S. provided that there was no slippage in price and the terms of the agreement were made certain.

Following presentation of the offer to lenders, Chase and Ball U.S. entered into negotiations with a view to allowing

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

Chase to maintain a debtor-creditor relationship with Ball Canada. On April 5, 1991, Citibank was advised that Ball U.S. had not entered into a deal with Chase and that negotiations were at an end.

Chase was asked to participate with the other Term Secured Creditors for the good of the majority, if not all of the Term Secured Creditors, but refused. On or about April 5, 1991, Chase confirmed that it was not prepared to accept the deal proposed by Ball U.S. The Agent advised Chase that it intended to proceed with an application under the CCAA if all the other Term Secured Creditors so instructed it and the deal with Ball U.S. could be made certain. Chase further confirmed that Ball U.S. had terminated negotiations.

La Caisse Centrale Desjardins du Quebec ('Caisse') has to date voted and participated on behalf of Trust Generale who has not attended the meetings. Caisse is a respondent in this application but has indicated that it will not contest the order being sought and will vote in favour of the Term Secured Compromise at any meeting to be held and sign the required Purchase Agreement if the Order is granted.

A meeting of the Term Secured Creditors was held on April 8, 1991. At that time all Term Secured Creditors, save and except Chase, indicated that they were in the process of obtaining the approvals necessary to accept the Ball U.S. offer subject to final documentation and to proceed with the Application. This Affidavit is provided prior to the receipt of these final approvals because of the urgency involved.

All the participants in the term debt have been advised by the Receiver on April 4 and again on April 8, 1991 of its estimation of the likely realization if there is no deal with Ball U.S. It is fair to say that the affairs and business of Ball Canada are interwoven and inter-dependent on Ball U.S. and that there is little or no prospect of a going concern sale of Ball Canada to a party other than Ball U.S. Ball U.S. of course is interested in the going concern and for that reason is prepared to make arrange ments to continue Ball Canada in the ordinary course of business including allowing Ball Canada to meet its liabilities as they come due. I verily believe the information provided by the Receiver to be accurate and it played an important basis for the Agent and the other applicants seeking approval of the Term Secured Compromise.

For these reasons the Secured Creditors find themselves in the somewhat unusual position of accepting an offer which will see unsecured creditors being paid in full when the Term Secured Creditors are not being paid in full. Based on the estimates of the Receiver, and the realities of the situation, a liquidation of the assets will provide far less to secured creditors than the Ball U.S. offer. In addition, the Applicants are mindful of the benefit achieved by the maintenance of Ball Canada as a going concern to its employees, suppliers and customers.

Chase has indicated its adamant opposition to the Ball U.S. offer and its unwillingness to abide by the determination of the 15 other Term Secured Creditors. For this reason, an Application under the CCAA is the only means available to the Applicants.

**Personal Property Security Act, 1989**

Part of the Term Secured Compromise is the transfer of the shares of Ball Canada to Ball U.S. The Agent sent a notice pursuant to Section 63 of the PPSA on April 4, 1991. A copy of the said Notice and proof of service is appended hereto as Exhibit 'E' to this my Affidavit.

Onex has taken the position that its consent is necessary to any transfer of the shares. I am informed by Ian Douglas, a partner of Stikeman, Elliott, counsel to the Agent and verily believe that he received letters dated April 3 and 4, 1991 from counsel to Onex to this effect. Appended hereto as Exhibit 'F' to this my Affidavit are copies of the said

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

letters. I am further informed by Ian Douglas and verily believe that the position of Onex is completely untenable as against the Agent and a copy of his response by letter dated April 4, 1991 is appended hereto as Exhibit 'G' to this my Affidavit. As set out in the letter, Onex has indicated that it does not wish to redeem with Onex so the transfer to Ball U.S. will not have any impact on the issues as between Ball U.S. and Onex.

35      Accordingly, and pursuant to my order of April 10, a meeting was held and the hearing resumed on the morning of April 11. At that time the affidavit evidence disclosed that the offer of Ball U.S. was open for acceptance and court approval only until 12 noon on that date and the reasons for the urgency and the deadline were explained by further affidavit. At that time the further affidavit of William R. Beavers, a vice-president of Ernst & Young Inc. (the "receiver"), attested to the following:

Since its appointment pursuant to the receivership order, the Receiver has had to deal with a number of critical issues in order to ensure the integrity of the business with a view to maximizing the possibility of a sale of all or part of the business as a going concern. For the reasons expressed below, I am of the view that the passage of even a very short time in the absence of a resolution with Ball Canada's 50% parent, Ball Corporation of Muncie, Indiana ('Ball Corp.') will considerably diminish if not preclude the ability of the Receiver to maintain the going-concern value of Ball Canada.

The Receiver has had a number of problems ensuring the supply of raw materials necessary to the continuation of the business. Ball Canada's business is largely a seasonal one. At this phase of its annual business cycle, Ball Canada is primarily in the phase of building up inventories to fulfil sales contracts for delivery in the summer and early fall to the beverage industry and the food packing industry.

Two principal suppliers of Ball Canada have indicated a reluctance to continue supplying the raw materials necessary to continue production unless arrears for previously delivered material are settled. [...] was the primary supplier of aluminium [sic] to Ball Canada. [...] has taken steps to seize certain aluminium [sic] inventories stored in the United States as a result of the default by Ball Canada in paying for such inventories. Other supplies such as [...] have indicated that they are reviewing their commitments to Ball Canada.

In the medium to long term, unless arrangements can be made with [...] to continue the supply of these essential raw materials, the ability of Ball Canada to continue to produce sufficient product to meet sales obligations will be seriously jeopardized. While alternative sources of supply of these materials is possible, it would take time to make arrangements with such suppliers and the terms of supply may be more onerous than those previously enjoyed by Ball Canada.

In addition to supplier problems, the Receiver has had to deal with key customers of Ball Canada in order to reassure them as to the continuity of their supply. Five key customers of Ball Canada accounted for 58% of Ball Canada's 1990 sales. The loss of any one of these accounts would have a devastating effect upon the going concern value of the business of Ball Canada. Some customers account for such a significant portion of production from certain plants that a loss of the customer could result in an immediate plant closure. I have spoken with three of these customers. They have indicated to the Receiver that, unless they receive satisfactory assurances or guarantees of product supply in the next few days, they will have no alternative but to seek alternate sources of supply for their can requirements. In view of the lead time necessary to secure product for these accounts, customers such as [...] require assurances of supply as soon as possible for they may be otherwise unable to obtain product in time for the crucial summer selling season.

The case of [...] has become especially critical. [...] utilizes steel cans in Ontario, one of the few large markets for

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

steel cans remaining in North America. I attach as Exhibit 'B' and 'C' respectively to this my affidavit letters which the Receiver has received from [...] dated April 2 and April 5, 1991. As appears from these letters [...] has been extremely nervous about the continuity of its supply. [...] has reluctantly extended its deadlines in order to hear from the Receiver and Ball Corp. as to whether Ball Corp's plans to purchase Ball Canada will be proceeding. Another key food industry customer of Ball Canada is taking a similar position.

36       The letter attached as Exhibit "C" contains the following statement:

In an effort to ensure that the [...] system does not experience any supply shortages, please be advised that we will consider the possibility of enacting an alternative supply contingency plan should a positive response from you or your parent corporation not be received by Monday, April 8th, 12 noon E.S.T.

William R. Beavers in his affidavit further stated:

Although I have attempted to assure these three customers that the Term Secured Compromise has received wide support and is progressing quickly, I have been advised by [...] Director of Purchasing at [...] and verily believe that [...] has determined that it must award its contract for supply of cans by April 10, 1991 or April 11 at the very latest and cannot delay any longer. If Ball Canada loses the [...] contract, its Ontario business would be devastated and plant closures would ensue, resulting in significant job losses and eliminating any chance of proceeding with the Term Secured Compromise.

Ball Canada currently owes approximately $1.4 million to certain of its major customers in respect of volume discounts arising out of pre-receivership sales to such customers. In view of the current over-supply in the Canadian and North American can market, the Receiver will be required to honour this unsecured commitment in order to retain the business of these key customers.

The operations of Ball Canada are also largely dependent upon the cooperation of Ball Corp. The two businesses have become interconnected in the last two years. Some of the principal areas of dependency of Ball Canada upon Ball Corp. are as follows:

a. Ball Canada and Ball Corp. are parties to three agreements dated as of December 8, 1988 (the Joint Venture Management and Technical Services Agreement, the Proprietary Technology Licence Agreement and the Metal Container Product Technology Cross-Licence Agreement) pursuant to which Ball Corp. has provided senior management, technical personnel and technology to Ball Canada.

b. Ball Canada currently obtains supply as required of certain finished goods from Ball Corp. in order to meet its supply obligations to customers while production line conversion projects (described below) in Whitby, Ontario and Richmond, British Columbia are in progress. In addition, Ball Corp. supplies any surplus requirements of Molson that the Bay d'Urfe plant is not able to supply. The continuation of these conversion projects is also dependant [sic] upon Ball Corp. technical personnel.

c. Ball Corp. currently supplies all Information Systems used by Ball Canada to manage all of its accounting, purchasing, inventory control, invoicing and operating systems from Ball Corp.'s computer facilities in Indiana. I attach as Exhibit 'D' to this my affidavit a copy of a list which the Receiver has prepared outlining the Ball Canada information systems currently being run from Ball Corp.'s computers in Indiana. Continued access to these systems is critical to the continuation of the business of Ball Canada.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

d. Ball Canada has been benefiting from volume discounts by joining with Ball Corp. for the purpose of procuring its requirements in aluminium [sic].

As mentioned above, the Whitby and Richmond plants are currently in the midst of line conversion projects designed to enhance the competitiveness of these two plants and the ability of Ball Canada to compete in the North American marketplace. At the Richmond plant, the line conversion project is designed to increase the line speed to North American standards while the Whitby project is designed to convert to 12 oz can production to meet market demands. Both of these projects are important to the restructuring of Ball Canada to ensure its ability to compete in the North American market which has been largely opened as a result of the Free Trade Agreement and will enhance the value of the business as a whole. In order to continue these projects in the receivership, the Receivership will have to negotiate terms with the contractors on the project who claim lien rights totalling approximately $2 million for arrears of contract fees due but not paid. As previously indicated, the Receiver will also require the cooperation of Ball Corp. in the United States in order to continue to supply its customers while the conversion projects are completed.

The Receiver has been required to deal with a number of other suppliers of goods and services who have been seeking to assert lien claims or to obtain concessions regarding pre-receivership accounts as a condition of future dealing. A customs broker has been refusing to release certain goods imported by Ball Canada from a customs warehouse unless account arrears are settled.

The employees and unions dealing with Ball Canada are naturally extremely anxious about the receivership and the effect that it will have upon their future employment and on their statutory and collective agreement rights to severance and termination amounts. I enclose as Exhibit 'E' correspondence sent to the Receiver by various unions expressing their concerns. These unions are aware that Ball Corp. is endeavouring to acquire Ball Canada on terms which would permit Ball Canada to honour all of its obligations to employees.

We have also prepared preliminary cash flow projections for Ball Canada in receivership for the period ending on April 28, 1991. This cash flow projection and notes, which is attached and marked as Exhibit 'F' to this my affidavit, shows that the Receiver will be required to spend a total of $27.54 million in respect of ongoing operation plus a further possible $6.62 million in respect of arrears which may have to be paid in order to continue operations for a total of $34.16 million. As a result of the receivership and the seasonal nature of the business, cash inflows for this same period are estimated to total $15 million, resulting in a net funding requirement of up to $19.16 million. The Receiver is currently only able to borrow up to $20 million secured by Receiver's Certificates pursuant to the Order of March 28, 1991. The Receiver has arranged temporary funding up to that level, but this arrangement expires on April 30, 1991. In view of the risks and contingencies associated with continuing to run the business, there is considerable doubt as to the ability of the Receiver to access further funds from a bank even if permitted to do so by an amendment to the Order.

While the Receiver is making every effort to stabilize the business and mitigate the risks to the going concern value of the business posed by the difficulties and risk factors mentioned above, it is my view that the ability of the Receiver to maintain that value is uncertain and decreases daily. If the Receiver is not able to provide the marketplace with concrete assurances as to the future direction of Ball Canada, there is a serious risk that the value of the business will decline dramatically in the next few days or weeks.

**Term Secured Compromise**

I have reviewed the Term Secured Compromise referred to in the Notice of Application under the *Companies' Creditors Arrangement Act* (Canada). The Receiver has been asked to seek certain amendments to the March 28 receiver-

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

ship order in order to implement the Term Secured Compromise. The Receiver unreservedly and unequivocally believes this is the best possible deal in the present circumstances for the reasons outlined below.

The Receiver has reviewed the assets and business of Ball Canada for the purpose of preparing for a possible sale of Ball Canada. The Receiver has not as of yet completed the preparation of an information package for potential purchasers of the business of Ball Canada for the purpose of preparing for a possible sale of Ball Canada. The Receiver has not as yet completed the preparation of an information package for potential purchasers of the business of Ball Canada or commenced any such negotiations. Based upon its review, the price of $120 million for the term debt of Ball Canada proposed on the Term Secured Compromise represents *in excess of the high end* of the Receiver's estimates of the realizable value of the assets of Ball Canada in liquidation even if the Receiver is able successfully to maintain the going concern value of the business. It is the opinion of the Receiver that the business of Ball Canada has special value to Ball Corp. and that Ball Corp. is willing to make this offer for tax and other benefits that are unique to it. Since the Term Secured Compromise does not contemplate any other debt of Ball Canada being compromised, its economic value is far higher than $120 million. In my view, recoveries upon the assets would be considerably lower if the business begins to decline as a result of the loss of significant customer accounts or in the event of production interruptions or other difficulties which may be experienced in the coming days and weeks in view of the risk factors outlined above.

The Term Secured Compromise provides a means for the Receiver to obtain a secure source of operating credit for Ball Canada. As indicated above, the ability of the Receiver to raise the operating funds required to maintain the stability of the business of Ball Canada for the time required to seek out buyers for the business is uncertain. The current financing which the Receiver has negotiated expires at the end of April, 1991.

In the opinion of the Receiver, the Term Secured Compromise is in the best interests of Ball Canada and all of its creditors. As indicated above, it is my opinion that the term secured creditors will receive more under the Term Secured Compromise than they would under a liquidation supervised by the Receiver. Furthermore, as a result of the Term Secured Compromise, Ball Canada will be able to come out of receivership. This will provide a means for the trade creditors, customers, suppliers and employees to be ensured that their claims will be satisfied by Ball Canada in the ordinary course of business. This is in the best interests of the communities in which Ball Canada carries on business and its 1700 employees. An example of these types of concerns, which the Receiver believes are something the Receiver should keep in mind, is articulately expressed in the letter of Bob Speller, the member of Parliament for Haldimand- Norfolk that I attach hereto as Exhibit 'G' to this my affidavit.

If the Term Secured Compromise is approved by this Honourable Court, the Receiver will be required to take the steps outlined below in the interim period between approval of the agreement and its completion expected before April 25, 1991. It is anticipated that Ball Corp. will move to have the Receiver discharged immediately following completion of the Term Secured Compromise and that Ball Canada will resume business in the ordinary course under the control and direction of Ball Corp. thereafter.

In order to implement the Term Secured Compromise, the order appointing the Receiver must be varied in several respects. Firstly, the authority of the Receiver to borrow funds pursuant to paragraph 18 of the Order is required to be increased from $20 million to $30 million. This is required pursuant to clause 9(b)(iii)(A) of the Purchase Agreement contemplated by the Term Secured Compromise in order to ensure that the Receiver and Ball Canada will have authority to access sufficient working capital until closing. As indicated above, the Receiver's current forecasts indicate that the full authorized financing will be utilized in the coming weeks with very little margin of error if no amendment is made. An additional level of borrowing will be required to fund the requirements of Ball Canada on

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

closing of the Purchase Agreement as referred to in section 10 thereof.

A second required amendment is for this Court to direct and permit the Receiver (i) to permit Ball Corp. to manage Ball Canada and its business in accordance with the existing Joint Venture Management and Technical Services Agreement (the 'Management Agreement') dated December 8, 1988 (a copy of which I attach as Exhibit 'H') to this my affidavit); (ii) to cooperate with officers of Ball Canada to operate the business of Ball Canada in the ordinary course of business as an on-going business with a view to avoiding any material reduction in the value of the business; (iii) not to sell any asset of Ball Canada except in the ordinary course of the business of Ball Canada; and (iv) not to terminate voluntarily the employment of an employee of Ball Canada or any material contract of Ball Canada. This amendment has been required by Ball Corp. in order to provide them with some degree of comfort concerning and control over the occurrence of any material adverse change in the business between the date of the approval of the Term Secured Compromise and the closing of the Purchase Agreement contemplated thereby.

37    Since the hearing of April 11, the orders in accordance with the above two paragraphs were granted.

38    Although the affidavit evidence at the time of the preparation of the applications for April 10 and April 11 indicated that the only dissenting participant was Chase Manhattan, at the hearing there were some other participants who indicated that they were not prepared to approve the proposed plan. However, the necessary percentage in amount and number approved.

**Decision**

39    The first issue to be determined in assessing the vote at the meeting on the night of April 10 is whether the banks participating in the loan by Chase to Ball Canada (the "participants"), are secured "creditors" of Ball Canada.

40    The CCAA authorizes the court to order a meeting of "unsecured creditors" or "secured creditors" or any class of them for the purpose of voting on a proposed compromise or arrangement between them and the debtor company (see ss. 5 and 6). "Secured creditors" is defined in s. 2 (in part) as meaning:

*a holder of a mortgage, hypothec, pledge, charge, lien or privilege on or against, or any assignment, cession or transfer of, all or any property of a debtor company as security for indebtedness of the debtor company, or a holder of any bond of a debtor company* secured by a mortgage, hypothec, pledge, charge, lien or privilege on or against, or any assignment, cession or transfer of, or a trust in respect of, all or any property of the debtor company, whether the holder or beneficiary is resident or domiciled within or outside Canada, *and a trustee under any trust deed or other instrument securing any of those bonds shall be deemed to be a secured creditor for all purposes of this Act except for the purpose of voting at a creditors' meeting in respect of any of those bonds.*

[Emphasis added.]

41    The participants are the beneficial "holders" of a proprietary interest in Ball Canada which secures the indebtedness of Ball Canada and which the participants have purchased pursuant to the terms of the master participation agreements.

42    The word "holder" as used in this definition should be given a liberal interpretation in keeping with the broad remedial nature of the CCAA and therefore includes the *beneficial* holders of any bond or proprietary interest. As with judicial interpretation relating to the determination of a "class of creditors", the statute's reference to "creditors" is to be interpreted so that the voice of the persons with the real economic interest in the debtor company is heard. The exception of

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

the trustee under a trust deed from the class of creditors entitled to vote confirms this proposition. The fact that a trustee under a trust deed, although the holder of the legal title to the obligation under the bond and the security is not a secured creditor for the purpose of voting, favours the view that those with the beneficial or real economic interest in the debt and security are the creditors entitled to vote.

43    Section 4(b) of the master participation agreement recognizes that a participant is entitled to "its share" of any amounts received by Chase in a realization by it (or presumably its agent) of its collateral. The participant's share is its percentage ownership interest in the underlying loan obligation purchased. This provision recognizes that the participant has an equitable proprietary interest in the property of the borrower as security for that borrower's indebtedness, and is, therefore, a secured creditor of Ball Canada.

44    The relevant part of s. 4(b) reads:

Further, the Participant shall not have any rights to or in any collateral, other property or right (including any right of set-off) which may be or becomes available for the payment of any Participated Loan, *except that if any such right is exercised by the Bank ... and the amounts recovered thereby are applied on account of any amount in which the Participant is entitled to share as provided in Section 4(a), the Bank will promptly pay to the Participant its share thereof as provided therein.*

[Emphasis added.]

45    That the participant pursuant to the terms of the master purchase agreement waives vis-à-vis Chase some of the rights that would normally accompany such an assignment (such as the right to give the debtor notice of the assignment) is not of significance in the CCAA proceedings. Section 8 of the CCAA provides that relief under the CCAA is available notwithstanding the terms of any agreement.

8. This Act extends and does not limit the provisions of any instrument now or hereafter existing that governs the rights of creditors of any class of them and has full force and effect notwithstanding anything to the contrary contained in that instrument.

46    The Court's power to deal with the interests of the participants in the debt owed by Ball Canada is, therefore, unaffected by the master participation agreement or any other instrument.

47    Having accordingly ruled the vote was 86.67 per cent in favour in number and 80.85 per cent in favour on the basis of value and, accordingly, the proposal was approved by the necessary percentage in both number and value.

48    The jurisdiction of the Court under the CCAA should be given a large and liberal interpretation consistent with the remedial nature of the legislation. As recently stated by Doherty J.A. in the Ontario Court of Appeal in his dissenting reasons in the case of *Nova Metal Products Inc. v. Comiskey (Trustee of)*, supra, at p. 306 [O.R.]:

The legislation is remedial in its pures sense in that it provides a means whereby the devastating social and economic effects of bankruptcy or creditor-initiated termination of ongoing business operations can be avoided while a court-supervised attempt to reorganize the financial affairs of the debtor company is made.

In the same case Finlayson J.A., with whom Krever J.A. concurred, stated at p. 297 [O.R.]:

It is well established that the *CCAA* is intended to provide a structured environment for the negotiation of compromises between a debtor company an its creditors for the benefit of both. Such a resolution can have significant benefits

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

for the company, its shareholders and employees. For this reason the debtor companies ... are entitled to a broad and liberal interpretation of the jurisdiction of the court under the *CCAA*.

49    The purpose of the CCAA is to facilitate arrangements that might avoid liquidation of the company and allow it to continue in business to the benefit of the whole economic community, including the shareholders, the creditors (both secured and unsecured) and the employees. That this is its fundamental purpose is emphasized by the following passage from the reasons of Gibbs J.A. of the British Columbia Court of Appeal in *Hongkong Bank of Canada v. Chef Ready Foods Ltd.*, 51 B.C.L.R. (2d) 84, [1991] 2 W.W.R. 136 (C.A.) at p. 91:

> The C.C.A.A. was enacted by Parliament in 1933 when the nation and the world were in the grip of an economic depression. When a company became insolvent liquidation followed because that was the consequence of the only insolvency legislation which then existed — the Bankruptcy Act and the Winding-up Act. Almost inevitably liquidation destroyed the shareholders' investment, yielded little by way of recovery to the creditors, and exacerbated the social evil of devastating levels of unemployment. The government of the day sought, through the C.C.A.A., to create a regime whereby the principals of the company and the creditors could be brought together under the supervision of the court to attempt a reorganization or compromise or arrangement under which the company could continue in business.

## The Position of Onex Inc.

50    Onex Inc. held shares in a holding company with Ball U.S. that in effect gave it a 50 per cent interest in the shares of Ball Canada. These shares as previously stated were pledged as part of the loan agreement. Ball U.S.'s offer was conditional upon it obtaining 100 per cent of the shares of Ball Canada. Ordinarily, in an arrangement of this kind, the shares of the company making the arrangement have little or no value. In this case, however, other creditors were being paid in full and the business was to be carried on. It was understandable and appropriate that Ball U.S., in assuming all of the responsibilities and putting in the funds that it was obligated to do under its offer, would want to be in full control of the company. The rights of Onex as against Ball U.S. are not affected by my approving the compromise plan and ordering the shares to be transferred to Ball U.S., since any rights that Onex has under any agreements with Ball U.S. are not being altered, amended or considered as part of these proceedings. In order to comply with the terms of the proposal and the Ball U.S. offer, it was necessary to have the shares conveyed immediately and to implement this conveyance of the collateral security held, I made an order abridging the notice period provided in s. 63(4) of the PPSA. On the date of closing of the term secured compromise with respect to the transfer of the shares of Ball Canada held as security for the guarantee of Ball Holdings pursuant to s. 70 of the PPSA, and pursuant to s. 67 of the PPSA, I authorized and approved the transfer by Citibank Canada as agent of all the right, title to, and interest in the shares of Ball Canada to Ball Corp. pursuant to the term secured compromise. I also relieved the agent from further compliance with Pt. V of the PPSA.

51    I endorsed the record on April 11 as follows:

> In my view the beneficial owners of the security are each entitled to vote their percentage interest. On that basis the vote in favour of the proposal has exceeded the necessary number and value required. Accordingly, the order is to issue in the form approved.

52    The evidence before me demonstrated overwhelmingly that it was in the interest of all of the creditors that the proposal be approved. While it was extraordinary that ordinary creditors be paid in full while secured creditors received only part payment, there was no alternative. This was confirmed by the overwhelming support of the proposal from the creditors, with the notable exception of Chase Manhattan. The evidence put before me with regard to the proposal and the fact that the proposal was in the best interests of all of the creditors was confirmed by the large number of represent-

1991 CarswellOnt 182, 5 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 21, 4 B.L.R. (2d) 147

atives of financial institutions, officers and directors of same who attended the meeting and voted so overwhelmingly in favour of the compromise. The wishes of these sophisticated financiers should not lightly be discarded by the Court. Accordingly, the compromise plan was approved and implemented even under the most unusual circumstances and time constraints that existed.

*Order accordingly.*

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 6

DOCSTOR: 2191401\1

*Indexed as:*
## Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A. s.r.

**Between**
**Coldmatic Refrigeration of Canada Ltd., plaintiff, and**
**P.U.M.A. s.r. 1, defendant**

**[1998] O.J. No. 1697**

64 O.T.C. 157

21 C.P.C. (4th) 267

78 A.C.W.S. (3d) 1110

Court File No. 97-CV-127075

Ontario Court of Justice (General Division)
Motions Court - Toronto, Ontario

**Sharpe J.**

Heard: April 17, 1998.
Oral judgment: April 24, 1998.

(7 pp.)

*Conflict of Laws -- Contracts -- Choice of law -- General -- By parties -- Jurisdiction -- Choice of forum by parties.*

Motion for summary judgment by the defendant, PUMA. The defendant was a manufacturer of equipment. The defendant sold equipment to the plaintiff. The written contract contained an clause which provided for arbitration of disputes and the location where disputes were to be settled. In June 1997, the plaintiff commenced proceedings in an Ontario court. In September 1997, the defendant launched a claim in an Italian court. The defendant also filed a statement of defence and counter-claim to the Ontario action. In the statement of defence, the defendant alleged that the contract governed the place of jurisdiction, which the parties had agreed to as Padua, Italy. The defendant indicated that it did not wish to litigate, but to pursue the matter in arbitration in Italy.

HELD: Motion dismissed. The defendant made no attempt, other than to file the statement of defence, to dispute the jurisdiction of the Ontario court. The defendant failed to comply with the provision of the International Commercial Arbitration Act of Ontario. The pleadings did not ask for arbitration and a letter written prior to the commencement of the action did not constitute a request for arbitration. Ontario law required clarity in an arbitration or jurisdiction clause and such clarity was not present in the contract under dispute. Such an unclear clause could not oust the jurisdiction of the Ontario court. The defendant's statement of defence and counter-claim were a clear attornment to the jurisdiction of the Ontario court.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, s.106.
International Commercial Arbitration Act, R.S.O.  1990, c.I.9, Article 8.

**Counsel:**

Cynthia Amsterdam, for the plaintiff.
Inga B. Andriessen, for the defendant.

---

**1    SHARPE J.** (orally):-- This is a motion for Summary Judgment by the defendant to dismiss the action on the ground that Ontario is not the proper jurisdiction. The dispute arises from a contract for the manufacture and supply of certain equipment. The plaintiff purchaser is an Ontario corporation. The defendant manufacturer is an Italian corporation. I need not go into the details of the dispute. Some equipment has been supplied. The plaintiff takes the position that what has been supplied is damaged or defective and there is a dispute as to respective obligations of the parties at the present time to carry the contract forward to execution. The written contract contains the following provision which is relied on by the defendant. It is Cause "N" and it is headed "Arbitration Clause": "For possible disputes the place of jurisdiction will be that of Padua."

**2    **The procedural history is as follows. The statement of claim was issued on June 27, 1997 and served in Italy. On September 15th the Italian defendant took proceedings in an Italian court claiming return of the equipment that it had supplied. On September 19th the Italian defendant filed a statement of defence and counterclaim in this action. Paragraph 23 of the statement of defence states as follows:

> Pursuant to the Contract, at paragraph N, where there is a dispute, the place of jurisdiction is Padua, Italy accordingly, the proper forum for the hearing of this action is Padua, Italy.

The defendant took no other steps to dispute the jurisdiction of this court and on October 15th filed this motion for Summary Judgment to dismiss the claim.

**3**    There is also before me a cross-motion by the plaintiff which takes the position that if the court finds the jurisdictional arguments are well founded the appropriate remedy is a stay of the action rather than a dismissal.

**4**    During argument, counsel for the defendant made it clear that it was her client's position that Clause N should be treated as an arbitration clause and that her client had no intention to litigate the dispute in the Italian courts but rather intended to submit the dispute to arbitration in Italy. In effect, she conceded that if her arguments were successful the appropriate remedy would be a stay rather than a dismissal of the action.

**5**    In my view the defendant's motion must be dismissed in its entirety, both on procedural and on substantive grounds. With respect to procedure and on the assumption for these purposes only that we are dealing with an enforceable and valid arbitration clause, I find that the defendant has failed to take the appropriate steps to have this action stayed and referred to arbitration. The International Commercial Arbitration Act, R.S.O. 1990, c. I.9, Article 8, provides as follows:

> (1)    A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed.

**6**    I find that the defendant has failed to comply with the statutory requirements stipulated by that provision. First of all, in my view, the defendant has still not made a request to this court to refer the matter to arbitration. The only explicit reference to arbitration was contained in a letter to the plaintiff from the defendant's Italian counsel dated June 23, 1997. It is clear on the authorities that a letter written prior to the initiation of the action does not constitute a request within the meaning of the Act: See, Ruhrkohle Handel Inter GmbH v. Fednav Ltd. (1992), 42 C.P.R. (3d) 414, and ABN Amro Bank Canada v. Krupp MaK Maschinenbau (1994), 21 O.R. (3d) 511.

**7**    The pleading in the statement of defence does not ask for arbitration. It simply states that the proper forum for the hearing of the action is Padua, Italy. This motion is not a motion for a stay of the action to refer the matter to arbitration but rather a motion for summary judgment to dismiss the claim. As I have mentioned, it was only during oral argument that the point was conceded that if any remedy was available it would be that of arbitration. Moreover, even if the statement of defence does constitute a request for arbitration, it is not at all clear that it constitutes a timely request for arbitration. The ABN Amro Bank Canada case already referred to holds that pleading and arbitration clause in a statement of defence and counterclaim is not a timely request for arbitration and that the appropriate procedure is to bring a motion for a stay. While leave to appeal from that decision was granted: 24 O.R. (3d) 450, it does not appear that the appeal to the Divisional Court

has ever been heard. In any event, the statement of defence was not the first statement of substance on the dispute presented by the defendant. As I have indicated, the defendant took proceedings in Italy after receiving the statement of claim and only a few days before submitting the statement of defence. It would appear that before the Italian court, it took the position that Clause N in the agreement was a jurisdiction clause conferring jurisdiction on the Italian court rather than an arbitration clause. That position was accepted by the Italian court. The translation of the reasons of the Italian court states as follows:

> Notwithstanding the title "Arbitration Clause" it must be considered as a jurisdiction clause and not as a mere arbitration clause in consideration of the literal meaning of the words and also because it does not contain reference to an arbitration proceeding.

**8**    Accordingly for these procedural reasons, I find that the motion must be dismissed. I would add that in substance I would also reject the submission of the defendant on the ground that Clause N in the agreement falls well short of what is required under Ontario law to constitute a valid arbitration clause. While I note at this point that no submissions were made as to the appropriate law of this contract nor is there any evidence of Italian law as to how this clause would be interpreted. However, as noted above, it would appear that the Italian court regarded it as a jurisdiction clause. In the absence of contrary evidence, I must assess that Ontario law applies and interpret the clause in light of the law of Ontario. That law is summarized in the judgment of Justice Hoillett in Benner and Associates v. Northern Lights Distribution Inc. (1995), 22 B.L.R. (2d) 79. Justice Hoillett makes it clear that the established principles in Ontario require clarity in an arbitration clause and in particular that it must be clear that all disputes are to be submitted to arbitration and some indication of the appropriate procedure must be set out. It is not at all clear, here, that all disputes are referable to arbitration and, indeed, the conduct of the defendant itself would suggest that it does not so regard the clause for it took proceedings in Italy. The clause does not stipulate a process or procedure nor does it indicate who is to conduct the arbitration. It falls well short of the degree of precision required for such clauses to oust the jurisdiction of an Ontario court. I note the following passage from Justice Hoilett's decision at page 85 which is apposite to the circumstances here. He states:

> The agreement in issue was drafted by the defendant and had it been the defendant's intention to have all breaches and disputes submitted to arbitration, that intent could have been couched in plain and simple language.

**9**    I would add finally that while the defendant does not press the argument that this is a jurisdiction clause conferring jurisdiction on the Italian courts but rather requests arbitration, I find to the extent that argument was advanced, that the statement of defence and counterclaim here constitutes attornment to the jurisdiction of Ontario. The defendant chose not to avail itself of the established procedure to contest jurisdiction prescribed by Rule 17 but by section 106 of the Courts of Justice Act, but rather chose to invoke the jurisdiction of this court, not just to defend the action

but to assert a counterclaim. Such action plainly does not constitute an appearance or attornment under duress to protect property but rather amounts to attornment plain and simple. See, Gourmet Resources International Inc. (Trustee of) v. Paramount Capital Corp. (1991), 5 C.P.C. (3d) 140; Clinton v. Ford (1982), 37 O.R. (2d) 448; Boissiere v. Brockner (1889), 6 T.L.R. 85.

**10**    For those reasons I dismiss the motion.

SHARPE J.

qp/d/mii/DRS

# TAB 7

DOCSTOR: 2191401\1

*Indexed as:*

# Consumers Packaging Inc. (Re)

**IN THE MATTER OF The Companies' Creditors Arrangement Act,**
**R.S.C. 1985, c. C.36, as amended**
**AND IN THE MATTER OF a plan of compromise or arrangement of**
**Consumers Packaging Inc., Consumers International Inc. and**
**64489 Canada Inc.**

**[2001] O.J. No. 3908**

150 O.A.C. 384

27 C.B.R. (4th) 197

12 C.P.C. (5th) 208

108 A.C.W.S. (3d) 765

Docket No. M27743

Ontario Court of Appeal
Toronto, Ontario

**McMurtry C.J.O., Finlayson and Austin JJ.A.**

Heard: September 27, 2001.
Judgment: October 10, 2001.

(10 paras.)

*Bankruptcy -- Companies' Creditors Arrangement Act -- Sale of assets -- Appeals.*

Motion by Ardagh PLC for leave to appeal and appeal from a decision that approved a sale of assets of Consumers Packaging Inc. to Owens-Illinois Inc. Consumers filed for protection under the Companies' Creditors Arrangement Act. Consumers was authorized, through an independent restructuring committee and its chief restructuring officer to fix a date upon which interested third parties were to submit firm, fully financed offers to purchase all or any part of its business. Ardagh

and Owens participated in the bid process. Owens was the preferred bid since it provided more cash to Consumers' creditors, had the least completion risk, was not conditional on financing, was likely to close in a reasonable period of time, resulted in the continuation of Consumers' business and retained a vast majority of its employees. Ardagh's restructuring proposal was not backed by financing commitments, required further due diligence by its lenders and offered less by way of recovery to Consumers' creditors. It was the unanimous view of the monitor, the Committee and the Officer that Ardagh's proposal was not viable and would, if pursued, result in its liquidation causing a lower return to creditors, the loss of jobs and cessation of business operations. The judge approved Owens' bid on the basis that it was the only presently viable option better than a liquidation with substantially reduced realization of value.

HELD: Motion for leave to appeal dismissed. Granting leave to appeal would be prejudicial to the prospects of restructuring the business for the benefit of the stakeholders in light of the significant time and financial constraints faced by Consumers and was contrary to the objectives of the Act. The sale of certain of Consumers' assets to Owens allowed the preservation of its business and was consistent with the purposes of the Act.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11.7.

**Appeal From:**

On appeal from the order of Justice James M. Farley dated August 31, 2001.

**Counsel:**

Peter F.C. Howard, Patrick O'Kelly and Craig Martin, for Ardagh PLC.
Robert S. Harrison and Carole J. Hunter, for the Ad Hoc Noteholders Committee.
Daniel V. MacDonald and Paul G. Macdonald, for Consumers Packaging Inc., Consumers International Inc. and 164489 Canada Inc.
L. Joseph Latham and Elizabeth Moore, for the Toronto-Dominion Bank Syndicate.
Lily I. Harmer, for the United Steelworkers of America.
Marc Lavigne, for Anchor Glass Container Corp.
Dale Denis, for Owens-Illinois, Inc.
Terrence J. O'Sullivan, for KPMG Inc.

---

The following judgment was delivered by

**1**    THE COURT:-- Ardagh PLC ("Ardagh"), seeks leave to appeal and if leave is granted appeals

the Order of The Honourable Mr. Justice Farley dated August 31, 2001 which approved a sale of certain assets of Consumers Packaging Inc. and Consumers International Inc. and 164489 Canada Inc. (hereinafter collectively "Consumers") to Owens-Illinois, Inc. ("Owens-Illinois").

**2**    Consumers had filed for protection under the Companies' Creditors Arrangement Act (the "CCAA") on May 23, 2001 and Farley J. made an initial order on that date approving an amendment and forbearance agreement between Consumers and its institutional lenders and arranging interim credit. KPMG Inc. was appointed Monitor under s. 11.7 of the CCAA. On June 18, 2001 Farley J. authorized Consumers through an Independent Restructuring Committee and its Chief Restructuring Officer to fix a date upon which interested third parties were to submit firm, fully financed offers to purchase all or any part of Consumers' business. Both Ardagh and Owens-Illinois participated in the bid process. The Independent Restructuring Committee, the Chief Restructuring Officer and the Monitor agreed on behalf of Consumers that Owens-Illinois was the preferred bid. On the sale approval motion heard August 31, 2001, Farley J. found as a fact that Consumers was "quite sick" and "financially fragile" and that there "exists a material risk that [Consumers] will be destabilized by a withdrawal of funding by the [consortium of lenders] which have been continuously adamant about a September 2001 deadline for pay out."

**3**    On the evidence before us, the Owens-Illinois bid approved by Farley J. on August 31, 2001 was the result of a fair and open process developed by Consumers and its professional advisors and carried out, after May 23, 2001, under the supervision of the court and with the participation of Ardagh. The Owens-Illinois bid provides more cash to Consumers' creditors than a proposal from Ardagh, has the least completion risk, is not conditional on financing, is likely to close in a reasonable period of time, is made by a credible purchaser (the largest glass bottle manufacturing company in the world) and will result in the continuation of Consumers' Canadian business, the retention of a vast majority of Consumers' 2,400 Canadian employees and the assumption by the purchaser of significant obligations under Consumers' employee pension plan. It is supported by all parties before this court with the exception of Ardagh.

**4**    The respondents on this motion submit that the restructuring proposals put forward by Ardagh were not backed by financing commitments, required further due diligence by Ardagh and its lenders, could not be completed in a timely way, offered less by way of recovery to Consumers' creditors and were no more than proposals to negotiate. It appears to have been the unanimous view of the Monitor, Consumers' Independent Restructuring Committee and Consumers' Chief Restructuring Officer that Ardagh's proposals were not viable and would, if pursued, result in the liquidation of Consumers, resulting in lower return to creditors, loss of jobs and cessation of business operations. This view was accepted by Farley J. who stated in his endorsement approving the Owens-Illinois bid that it was the "only presently viable option better than a liquidation with substantially reduced realization of value".

**5**    In our opinion, leave to appeal should not be granted. The authorities are clear that, due to the nature of CCAA proceedings, leave to appeal from orders made in the course of such proceedings

should be granted sparingly: see Algoma Steel Inc. (Re), a judgment of the Ontario Court of
Appeal, delivered May 25, 2001, [2001] O.J. No. 1943 at p. 3. Leave to appeal should not be
granted where, as in the present case, granting leave would be prejudicial to the prospects of
restructuring the business for the benefit of the stakeholders as a whole, and hence would be
contrary to the spirit and objectives of the CCAA. The sale of Consumers' Canadian glass
operations as a going concern pursuant to the Owens-Illinois bid allows the preservation of
Consumers' business (albeit under new ownership), and is therefore consistent with the purposes of
the CCAA. There is a real and substantial risk that granting leave to appeal in the present case will
result in significant prejudice to Consumers and its stakeholders, in light of the significant time and
financial constraints currently faced by Consumers. Both Farley J. and KPMG Inc., the
court-appointed Monitor in the CCAA proceedings, have concluded that the Owens-Illinois bid
represents the only presently viable option available to Consumers, which would be better than a
liquidation.

**6**    The transactions contemplated by the Owens-Illinois bid are expected to close on September
28, 2001. If the Owens-Illinois bid does not close before the end of September, 2001, it is uncertain
if, and for how long, Consumers would be able to continue its operations. The financial institutions
that are prepared to finance these transactions have appeared before this court and have advised,
both before and throughout the CCAA proceedings, that they will not fund the operations of
Consumers beyond the end of September, the time at which Consumers' credit requirements
seasonally increase on an annual basis. There is no evidence on the record, and certainly none from
Ardagh, as to the manner in which the operations of Consumers would be funded until the Ardagh
proposal contained in its bid, if successful, could be implemented.

**7**    Further, despite its protestations to the contrary, it is evident that Ardagh is a disappointed
bidder that obtained its security interest in the assets of Consumers in order to participate in their
restructuring and obtain a controlling equity position in the restructured entity. There is authority
from this court that an unsuccessful bidder has no standing to appeal or to seek leave to appeal. As a
general rule, unsuccessful bidders do not have standing to challenge a motion to approve a sale to
another bidder (or to appeal from an order approving the sale) because the unsuccessful bidders
"have no legal or proprietary right as technically they are not affected by the order": see the
statement of Farley J., dealing with a receiver's motion to approve a sale, that is quoted with
approval by O'Connor J.A. of this court in Skyepharma plc v. Hyal Pharmaceutical Corp. (2000), 47
O.R. (3d) 234 at 238 (C.A.). O'Connor J.A. went on to say at p. 242:

> There is a sound policy reason for restricting, to the extent possible, the
> involvement of prospective purchasers in sale approval motions. There is often a
> measure of urgency to complete court approved sales. This case is a good
> example. When unsuccessful purchasers become involved, there is a potential for
> greater delay and additional uncertainty. This potential may, in some situations,
> create commercial leverage in the hands [of] a disappointed would be purchaser
> which could be counterproductive to the best interests of those for whose benefit

the sale is intended.

**8**    The position of Ardagh is not advanced by the fact that it did not challenge the order of Farley J. of June 18, 2001 which set out the parameters for the bidding. Instead it participated in the bidding process which it now attacks as being ultra vires the CCAA.

**9**    Finally, while we do not propose to become involved in the merits of the appeal, we cannot refrain from commenting that Farley J.'s decision to approve the Owens-Illinois bid is consistent with previous decisions in Ontario and elsewhere that have emphasized the broad remedial purpose and flexibility of the CCAA and have approved the sale and disposition of assets during CCAA proceedings prior to a formal plan being tendered.

**10**    Accordingly, leave to appeal is refused with costs.

McMURTRY C.J.O.
 FINLAYSON J.A.
 AUSTIN J.A.

cp/e/nc/qlrme

# TAB 8

DOCSTOR: 2191401\1

*Case Name:*

# Expedition Helicopters Inc. v. Honeywell Inc.

**Between**
**Expedition Helicopters Inc., Plaintiff (Respondent), and**
**Honeywell Inc., Defendant (Appellant)**

[2010] O.J. No. 1998

2010 ONCA 351

70 B.L.R. (4th) 60

100 O.R. (3d) 241

262 O.A.C. 195

319 D.L.R. (4th) 316

2010 CarswellOnt 3091

87 C.P.C. (6th) 210

Docket: C51719

Ontario Court of Appeal
Toronto, Ontario

**D.R. O'Connor A.C.J.O., E.E. Gillese and R.G. Juriansz JJ.A.**

Heard: April 21, 2010.
Judgment: May 14, 2010.

(26 paras.)

*Civil litigation -- Civil procedure -- Disposition without trial -- Stay of action -- Courts -- Jurisdiction -- Appeal by Honeywell from dismissal of its motion for a stay of Expedition's action allowed -- Order set aside and proceedings stayed -- Honeywell leased a helicopter engine to Expedition and agreement contained forum selection clause -- After helicopter crash caused by catastrophic failure of Honeywell engine, Expedition sued Honeywell -- Honeywell sought stay on*

*basis of forum selection clause -- Motion judge did not state or apply correct test for enforceability of forum selection clause and reached wrong result.*

 *Conflict of laws -- Jurisdiction -- Forum conveniens -- Choice of forum by parties -- Appeal by Honeywell from dismissal of its motion for a stay of Expedition's action allowed -- Order set aside and proceedings stayed -- Honeywell leased a helicopter engine to Expedition and agreement contained forum selection clause -- After helicopter crash caused by catastrophic failure of Honeywell engine, Expedition sued Honeywell -- Honeywell sought stay on basis of forum selection clause -- Motion judge did not state or apply correct test for enforceability of forum selection clause and reached wrong result.*

Appeal by Honeywell from the dismissal of its motion to enforce a forum selection clause in a bailment agreement by staying Expedition Helicopter's action. Honeywell leased a helicopter engine to Expedition and the engine was installed in one of Expedition's helicopters. The lease agreement contained a forum selection clause which stated that Arizona courts would have exclusive jurisdiction to hear any proceeding arising in connection with the agreement. The helicopter in which the Honeywell engine was installed crashed into a lake in Saskatchewan and the Transportation Safety Board of Canada determined that the crash was caused by the catastrophic failure of a turbine shaft bearing of the Honeywell engine. Consequently, Expedition commenced an action against Honeywell claiming damages for the loss of its helicopter. Expedition also commenced separate lawsuits against Honeywell in Arizona. Honeywell argued that Expedition could not take the position that the action should proceed in Ontario as a result of the forum selection clause. Expedition argued that neither party gave any consideration to the forum selection clause, and that virtually all of the evidence was located in Canada. The motion judge held that practically all of the evidence related to liability was in Canada. Furthermore, Expedition had its headquarters in Ontario, the helicopter pilot was residing in Canada and the agreement was executed on Expedition's behalf in Canada. Therefore, it would not be just or reasonable to require Expedition to be bound by the forum selection clause.

HELD: Appeal allowed. The order was set aside and the proceedings were stayed. The motion judge did not state or apply the correct test for enforceability of a forum selection clause and reached the wrong result. It was not enough for the plaintiff to establish a strong case that Ontario was the more convenient forum. The plaintiff had to show strong cause that the case was exceptional and the forum selection clause should not be enforced. The motion judge did not give full weight to the forum selection clause, and she did not consider the effect it had on the factors relevant to the forum non conveniens analysis. The motion judge also failed to accord sufficient weight to Expedition's commencement of an action in Arizona. Clearly, Expedition had conceded that the Arizona court had jurisdiction and that it was feasible that the claim proceed in Arizona. The motion judge should have at least considered whether a judgment obtained in Ontario would be enforced by the court in Arizona if that court concluded that the action should have proceeded in Arizona.

**Appeal From:**

On appeal from the decision of Justice L.L. Gauthier of the Superior Court of Justice dated January 21, 2010, with reasons reported at 2010 ONSC 732.

**Counsel:**

Susan M. Brown, for the appellant.

Paul J. Pape and David S. Steinberg, for the respondent.

---

[Editor's note: An amended judgment was released by the Court June 29, 2010. The changes were not indicated. This document contains the amended text.]

The judgment of the Court was delivered by

R.G. JURIANSZ J.A.:--

## A. INTRODUCTION

**1**    Honeywell Inc. ("Honeywell") appeals from the decision of Gauthier J. dismissing its motion to enforce a forum selection clause in a Bailment Agreement (the "Agreement") by staying the action of Expedition Helicopter Inc ("Expedition"). The Agreement related to a helicopter engine that Honeywell provided to Expedition. The Expedition helicopter in which the engine was installed crashed in northern Saskatchewan, resulting in the death of the pilot and a passenger, as well as the complete loss of the helicopter. Expedition commenced an action in Ontario for damages arising out of the crash. Honeywell brought a motion to stay the Ontario action because the Agreement provided that the courts of Arizona have exclusive jurisdiction over all proceedings "arising out of or in connection with this Agreement."

**2**    I would allow the appeal. The motion judge did not state or apply the correct test for enforceability of a forum selection clause and reached the wrong result.

## B. ANALYSIS

**3**    Expedition is incorporated in Ontario and has its head office in Cochrane, Ontario. It operates a fleet of eleven helicopters for charter. Honeywell is a Delaware corporation which operates globally. The leased engine was manufactured in Williamsport, Pennsylvania and converted to the specific configurations required by Expedition at Honeywell's facility in Greer, South Carolina. The Greer facility is managed by a Honeywell division based in Phoenix, Arizona.

**4**    The relationship between the two companies is such that the replacement engine was shipped, installed and in use before the Agreement was signed.

**5**    The forum selection clause in the Agreement provided as follows:

> CHOICE OF LAW. THIS AGREEMENT SHALL BE GOVERNED,
> CONTROLLED AND INTERPRETED UNDER THE LAW OF THE STATE
> OF ARIZONA, EXCLUDING ITS CONFLICT OR CHOICE OF LAW
> PROVISIONS. The parties (i) agree that any state or federal court located in
> Phoenix, Arizona shall have exclusive jurisdiction to hear any suit, action or
> proceeding arising out of or in connection with this Agreement, and consent and
> submit to the exclusive jurisdiction of any such court in any such suit, action or
> proceeding and (ii) hereby waive, and agree not to assert, by way of motion, as a
> defense, or otherwise, in any such suit, action or proceeding to the extent
> permitted by the applicable law, that the suit, action or proceeding is brought in
> an inconvenient forum, that the venue of the suit, action or proceeding is
> improper, or that this Agreement or any of the transactions contemplated hereby
> may not be enforced in or by such courts.

### 1) The test for enforceability of forum selection clauses

**6**    The motion judge recognized that the Supreme Court of Canada's decision in *Z.I. Pompey Industrie v. ECU-Line N.V.*, [2003] 1 S.C.R. 450, is the governing authority regarding the enforcement of a forum selection clause. *Pompey* confirmed the exercise of the court's discretion not to enforce a forum selection clause is governed by the "strong cause" test first stated in the British case *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237 (Adm. Div.). The test in *The "Eleftheria"* as quoted in *Pompey* at para. 19, is as follows:

> 1)    Where plaintiffs sue in England in breach of an agreement to refer disputes
>       to a foreign Court, and the defendants apply for a stay, the English Court,
>       assuming the claim to be otherwise within the jurisdiction, is not bound to
>       grant a stay but has a discretion whether to do so or not. (2) The discretion
>       should be exercised by granting a stay unless strong cause for not doing so
>       is shown. (3) The burden of proving such strong cause is on the plaintiffs.
>       (4) In exercising its discretion the Court should take into account all the
>       circumstances of the particular case. (5) In particular, but without prejudice
>       to (4), the following matters, where they arise, may be properly regarded:
>       (a) In what country the evidence on the issues of fact is situated, or more
>       readily available, and the effect of that on the relative convenience and
>       expense of trial as between the English and foreign Courts. (b) Whether the
>       law of the foreign Court applies and, if so, whether it differs from English
>       law in any material respects. (c) With what country either party is
>       connected, and how closely. (d) Whether the defendants genuinely desire
>       trial in the foreign country, or are only seeking procedural advantages. (e)
>       Whether the plaintiffs would be prejudiced by having to sue in the foreign

> Court because they would (i) be deprived of security for that claim; (ii) be
> unable to enforce any judgment obtained; (iii) be faced with a time-bar not
> applicable in England; or (iv) for political, racial, religious or other reasons
> be unlikely to get a fair trial.

**7**   This 1969 British test is best appreciated by what Bastarache J., writing for the Supreme Court, said about it in *Pompey* in 2003. Bastarache J. provided clear guidance as to how it should be understood and applied in Canada.

**8**   The central thrust of the *Pompey* decision is that the law favours the enforcement of forum selection clauses. In a brief overview of the law, Bastarache J. observed "[f]orum selection clauses are common components of international commercial transactions", they have, "been applied for ages in the industry and by the courts", they "are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law", and "[i]t is essential that courts give full weight to the desirability of holding contracting parties to their agreements."

**9**   Bastarache J. noted that there is a similarity between a number of the factors of the test in *The "Eleftheria"* and those considered when applying the *forum non conveniens* doctrine in ordinary cases without a forum selection clause. He then went on to clearly reject the approach of considering the forum selection clause as but one factor of a conventional *forum non conveniens* analysis. He described that kind of analysis as the "unified approach to *forum non conveniens*". He explained that a "different test" and "separate approach" were required. The "starting point", he said, should be "that parties should be held to their bargain". Bastarache J. adopted the view of E. Peel in "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] L.M.C.L.Q. 182, at pp. 189-90, that the unified approach would not:

> ... ensure that full weight is given to the jurisdiction clause since not only should
> the clause itself be taken into account, but also the effect which it has on the
> factors which are relevant to the determination of the natural forum. Factors
> which may otherwise be decisive may be less so if one takes into account that the
> parties agreed in advance to a hearing in a particular forum and must be deemed
> to have done so fully aware of the consequences which that might have on, for
> example, the transportation of witnesses and evidence, or compliance with
> foreign procedure etc.

**10**   Therefore, Bastarache J. rejected the "unified approach to *forum non conveniens*" in favour of a "separate approach" that "ensures that these considerations are properly taken into account and that the parties' agreement is given effect in all but exceptional circumstances." He observed that:

> The "strong cause" test reflects the desirability that parties honour their
> contractual commitments and is consistent with the principles of order and
> fairness at the heart of private international law, as well as those of certainty and

security of transaction at the heart of international commercial transactions.

**11**    Thus, even though the literal wording of the test in *The "Eleftheria"* may imply a conventional *forum non conveniens* analysis, *Pompey* makes clear that such an analysis is not to be used. Rather, the forum selection clause pervades the analysis and must be given full weight in the consideration of other factors. It is not enough for the plaintiff to establish a "strong" case that Ontario is the more convenient forum. The plaintiff must show "strong cause" that the case is exceptional and the forum selection clause should not be enforced.

### 2)    *The motion judge's approach*

**12**    The motion judge in this case conducted a *forum non conveniens* analysis in which she regarded the forum selection clause as but one factor to be considered, and a subsidiary one at that. She did not give full weight to the clause, and she did not consider the effect it had on the factors relevant to the *forum non conveniens* analysis. For example, she considered the location of witnesses and the procedures of the Arizona courts without taking into account that Expedition, by agreeing to the clause, had accepted at the time it entered into the contract that it would have to transport its witnesses to Arizona and resolve any claim it might bring according to the law and procedures of Arizona. In *Pompey*, Bastarache J. was not satisfied that even litigation costs disproportionate to the amount of the claim was reason enough to refuse to enforce a forum selection clause.

**13**    The marginal weight the motion judge placed on the clause is most evident in that part of her reasons where she sets out the argument in favour of enforcing it. There she discusses only factors relevant to *forum non conveniens* and does not even mention the clause. She alludes to the public policy that parties honour their contractual commitments and the principles of order and fairness at the heart of private international law only in setting out Honeywell's position and not in her analysis of the factors.

**14**    The motion judge's failure to use the proper overall approach in applying the test is sufficient reason to set aside her decision. However, it may be of assistance to future cases to discuss the analysis she did conduct.

**15**    The motion judge did not mention that the forum selection clause provided that "THIS AGREEMENT SHALL BE GOVERNED, CONTROLLED AND INTERPRETED UNDER THE LAW OF THE STATE OF ARIZONA". Quite to the contrary, it seems the motion judge may have assumed the case would be governed by the law of the jurisdiction in which it proceeded. She observed that the plaintiff's claim in Arizona might be dismissed because under the law of Arizona the issue would arise as to whether it had been "timely filed", and noted that in Ontario such an issue would not arise. There was no basis for the motion judge's apparent assumption that, if the case proceeded in Ontario, the law of Ontario would apply. The motion judge should have considered that the clause provided that the law of Arizona would apply.

**16**    As it happens, the fresh evidence shows there is no issue of "timely filing" under the law of Arizona. Counsel for Expedition acknowledged that the expert evidence about Arizona law that Expedition filed before the motion judge was directed only to the applicable limitations period in Arizona. In any event, as counsel for Expedition recognized during argument, a party should not be able to take advantage of its own failure to bring an action in the proper jurisdiction in a timely way to create prejudice that would justify excusal from the forum selection clause.

**17**    The motion judge also failed to accord sufficient weight to Expedition's commencement of an action in Arizona. She observed that Expedition's action in Arizona "was instituted to preserve the claim within the limitation period." Be that as it may, instituting an action in Arizona was an act of attornment. Clearly, Expedition has conceded that the Arizona court has jurisdiction and that it is feasible that the claim proceed in Arizona.

**18**    Expedition's institution of an action in Arizona raises the factor of the multiplicity of proceedings. The motion judge discounted this factor because of Expedition's undertaking to abandon the Arizona action if the Ontario action were allowed to proceed. The motion judge should have at least considered whether a judgment obtained in Ontario would be enforced by the court in Arizona if that court concluded that the action should have proceeded in Arizona. Expedition filed no evidence on this issue.

**19**    The motion judge erred by attaching weight to Honeywell's concession that Ontario was the appropriate and convenient forum for the trial of the wrongful death action of the passenger in the helicopter. That action was not governed by the forum selection clause. As explained above, whether Ontario is the convenient forum is not the proper question in a case with a forum selection clause.

**20**    In her analysis, the motion judge should have contrasted the jurisdictions of Arizona and Ontario. Instead, she considered the appropriateness and convenience of the claim proceeding in Arizona on the one hand and Canada on the other. For example, the fact the helicopter crashed in Saskatchewan provides little support for trying the case in Ontario.

**21**    The motion judge considered significant expert evidence indicating that Canadian witnesses were beyond the reach of the Arizona court's subpoena power. She could have made the equivalent observation about the reach of the Ontario court's subpoena power in relation to American witnesses. Given the cross-border methods of obtaining evidence from friendly jurisdictions, this factor was not deserving of weight one way or the other.

**22**    Finally, the motion judge set out only a portion of the test in *The "Eleftheria"*. She omitted the portion of the test that asks whether the plaintiff would be prejudiced by having to sue in a foreign country. While some of her discussion touched on aspects of prejudice to the plaintiff, she did not consider the main concern -- whether the plaintiff could expect a fair trial in the selected forum.

**23**    In this case, there is no reason to depart from the presumption that Expedition should be held

to the bargain that it made. A departure is only justified in "exceptional circumstances", as Bastarache J. stressed in *Pompey*. There is nothing exceptional about this case. As discussed above, the analysis of whether there is "strong cause" to decline to enforce a forum selection clause is not an analysis of the *forum conveniens* in the conventional sense. In this case Expedition may have established that it will experience some inconvenience in the conventional sense in having to assert its claim in Arizona. That inconvenience does not justify permitting it to resile from its agreement in this commercial contract to tolerate that inconvenience.

**24**    A forum selection clause in a commercial contract should be given effect. The factors that may justify departure from that general principle are few. The few factors that might be considered include the plaintiff was induced to agree to the clause by fraud or improper inducement or the contract is otherwise unenforceable, the court in the selected forum does not accept jurisdiction or otherwise is unable to deal with the claim, the claim or the circumstances that have arisen are outside of what was reasonably contemplated by the parties when they agreed to the clause, the plaintiff can no longer expect a fair trial in the selected forum due to subsequent events that could not have been reasonably anticipated, or enforcing the clause in the particular case would frustrate some clear public policy. Apart from circumstances such as these, a forum selection clause in a commercial contract should be enforced.

**25**    None of these factors has been shown in this case. There was no basis to refuse the stay of proceedings.

**C. CONCLUSION**

**26**    I would allow the appeal, set aside the order of the motion judge, and enter a stay of proceedings. The appellant's costs of the appeal are fixed in the amount of $25,000.00 inclusive of disbursements and GST. The appellant is entitled to its costs before the motion judge. Those costs shall be in the amount that the motion judge awarded to the respondent.

R.G. JURIANSZ J.A.
 D.R. O'CONNOR A.C.J.O.:-- I agree.
 E.E. GILLESE J.A.:-- I agree.

cp/e/qllxr/qljxr/qljxh/qlhcs/qljyw/qlced/qlana

# TAB 9

DOCSTOR: 2191401\1

*Case Name:*

# Grace Canada Inc. (Re)

### IN THE MATTER OF s. 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended AND IN THE MATTER OF Grace Canada, Inc.

### [2005] O.J. No. 4868

17 C.B.R. (5th) 275

2005 CarswellOnt 6648

Court File No. 01-CL-4081

Ontario Superior Court of Justice
Commercial List

### J.M. Farley J.

Heard: November 14, 2005.
Judgment: November 14, 2005.

(18 paras.)

*Insolvency law -- Practice -- Proceedings in bankruptcy -- Stay of other proceedings -- Stay order extended upon application of company in bankruptcy protection -- Opposing creditors not entitled to order that stay did not apply to their claims -- One group of creditors not allowed to get leg up on others.*

Grace, company in bankruptcy protection, sought extension of stay of three class actions against it -- Plaintiffs in two actions did not oppose extension -- Plaintiffs in third action did not oppose stay as long as it did not apply to their action -- Stay extended to April 1, 2006 -- Plaintiffs in third action not entitled to leg up on other plaintiffs -- Stay was in interest of plaintiffs in all actions in that it would prevent them from fighting amongst themselves -- Plaintiffs entitled to return to court if prejudice resulted from extension of stay, or circumstances otherwise changed.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 s. 18.6

**Counsel:**

D. Tay, O. Pasparakis, J. Stam, for the Plaintiffs, Grace Canada Inc.

E. Merchant, for Merv Nordick and Ernest Spencer, et al.

K. Ferbers, for Raven Thundersky

Ian Dick, for the Attorney General of Canada

Michel Bélanger, Jean-Philippe Lincourt and Matt Moloci, for the Association Des Consommatuers Pour La Qualité Dans La Construction and Jean-Charles Dextras, Viviane Brosseau and Léotine Roberge-Turgeon

---

ENDORSEMENT

**1    J.M. FARLEY J.** (endorsement):-- This endorsement applies to the 3 motions of Grace, the Quebec class proceeding and the Manitoba class proceeding.

**2**    The Quebec plaintiffs in their putative class proceedings have worked out an arrangement with the Federal Government. As a result they are not proceeding with their request to lift the stay and other ancillary relief, but without prejudice to it or similar relief being sought if the insolvency/CCAA recognition proceedings get bogged down. The Grace relief was then supported by the Quebec plaintiffs.

**3**    The "Sask" plaintiffs (represented by the Merchant firm) were not opposed to the Grace relief.

**4**    The Manitoba plaintiffs represented by the Atkins firm took the position that the Grace relief was all right so long as it did not apply to their proceedings except that judgment would not be enforced without leave of this court.

**5**    It would seem to me that the various class proceedings would benefit from cooperation and coordination - using the 3 Cs of the Commercial List (communication, cooperation and common sense). Otherwise they will be faced with the practical problem of fighting amongst themselves as to a turf war and running the risk of being divided and therefore susceptible to being conquered.

**6**    The stay is extended to April 1, 2006, and includes proceedings against the Federal Crown related to the Grace proceedings in these class actions. As well the Modified Preliminary Injunction

granted on January 22, 2002, by the US Bankruptcy Court is recognized pending further order of this Court.

**7**    The foregoing does not prevent any of the parties entering into consensual resolutions with the Federal Crown.

**8**    I note that the Grace interests represented before me today indicated that it was their goal to emerge from their insolvency proceedings as soon as reasonably possible but under the guidelines that there be justice for all affected persons.

**9**    I also note that there has been recognition in the US Bankruptcy Court that Canadian proceedings will be governed by Canadian substantive law.

**10**    The foregoing relief granted is pursuant to the principles set out in Babcock & Wilcox Canada Ltd. (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J.) and is in furtherance of the long standing respect for comity extended by the courts of this country for the courts of the US and vice versa.

**11**    It would seem to me that the insolvency adjudicative proceedings would, at least under presently anticipated circumstances, result in a more effective efficient process than would a full-blown class action proceeding.

**12**    I concur with the views of the US court in Maryland Casualty Re respect to the necessity/desirability of a stay against the Federal Crown as a "3rd party" given the interrelated aspects of the claims against the Crown and Grace. There would in my mind be a considerable risk of record taint if the action against the Crown were allowed to proceed on its own without direct Grace evidence and counsel. See also Campeau v. Olympia & York (1992), 14 C.B.R. (3d) 303 (Ont. Gen. Div.); Canada Systems Group (EST) Ltd. v. Allendale Mutual Insurance Co. (1982), 137 D.L.R. (3d) 287 (Ont. H.C.J.), aff'd (1983), 145 D.L.R. (3d) 266 (Ont. Div. Ct.); Re Noma Co., [2004] O.J. No. 4914 (S.C.J.); Re Lehndorff General Partner Ltd. (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div).

**13**    The stay does not affect the ability of the plaintiffs from coming back to court if they feel that there is foot dragging or other elements of prejudice.

**14**    I note that the Federal Crown may accept service of the Sask claim without that being an infringement of the stay now imposed (and previously requested). This is without prejudice to the Crown moving for relief on, say, a limitations point.

**15**    What the Manitoba plaintiffs are in essence requesting is that they obtain a leg up on all other Canadian plaintiffs (and US plaintiffs) and that there be by this court somewhat of a quasi-certification, although indicating that the actual certification would be dealt with by the Manitoba court.

**16**    This would result in a lack of single control in insolvency proceedings which was cautioned against in Sam Levy & Associés v. Azco Mining Inc., [2001] 3 S.C.R. 978. It would also fragment and possibly destabilize the other proceedings by other affected persons (including those claiming for personal injury including serious personal injury). In saying that I in no way wish to or intend to be taken as minimizing the terrible tragedy which has befallen the Thundersky/Bruce family.

**17**    I look forward to seeing that continued timely progress is being made with respect to this insolvency proceeding including the effective efficient way of dealing with personal injury and property damage claims. The information officer should ensure that this court and affected parties including these class action plaintiffs are kept abreast of proposed material developments and their outcome. That is the report on the regular time period basis should be the minimum.

**18**    The motion of the Manitoba plaintiffs is dismissed, but without prejudice to similar or other relief being sought in the future based on a change in circumstances.

J.M. FARLEY J.

cp/e/qw/qlmxf

# TAB 10

*Indexed as:*

# Killough v. Canadian Red Cross Society

**Between**
**Edward Killough, Patricia Nicholson, Irene Fead,**
**Daphne Martin, Deborah Lutz, and Melanie Crehan,**
**plaintiffs, and**
**The Canadian Red Cross Society, Her Majesty the**
**Queen in Right of the Province of British**
**Columbia, and the Attorney General of**
**Canada, defendants**

**[2001] B.C.J. No. 1481**

2001 BCSC 1060

91 B.C.L.R. (3d) 309

106 A.C.W.S. (3d) 787

Vancouver Registry No. C976108

British Columbia Supreme Court
Vancouver, British Columbia

**K.J. Smith J.**

Heard: February 12 and 13, 2001.
Judgment: July 19, 2001.

(42 paras.)

*Practice -- Persons who can sue and be sued -- Individuals and corporations, status or standing -- Class or representative actions -- Class actions, certification, considerations (incl. when class action appropriate) -- Settlements -- Court approval.*

Application by the plaintiffs for an order certifying the action against the Canadian Red Cross Society as a class action and approving partial settlements reached with the Red Cross and the

provincial Crown. The Public Guardian and Trustee applied for standing to make submission in relation to an application for approval of class-action legal fees. The action concerned the contamination of the Canadian blood supply with the Hepatitis C virus. The plaintiffs argued that the defendants failed to implement tests that could have detected the virus in the blood supply. The action was certified as a class action against the other defendants. The Red Cross was exempted from the order because of a reorganization under the Companies Creditors Arrangement Act. It provided a plan for compensation of persons infected with the virus, which plan was sanctioned by the court in other related applications. The proposed settlements provided an opting out provision for those class members who wished to pursue their own claims, and a bar order with respect to plaintiffs who accepted the settlement.

HELD: The applications by the plaintiffs and by the Public Trustee and Guardian were allowed. The action was certified for settlement purposes. The proposed settlements were fair and reasonable and in the best interests of the class members. The plaintiffs had to face the prospect of lengthy and complex litigation. Some of the plaintiffs were ill and in immediate financial need.

**Statutes, Regulations and Rules Cited:**

British Columbia Supreme Court Rules, Rule 15.

Class Proceedings Act, R.S.B.C. 1996, c. 50, ss. 4, 12, 13, 15, 35.

Companies' Creditors Arrangement Act, R.S.C. 1985, C-36.

Ontario Family Law Act.

**Counsel:**

David A. Klein and David M. Rosenberg, for the plaintiffs.
Ward K. Branch, for the defendant, the Canadian Red Cross Society.
D. Clifton Prowse and Keith L. Johnston, for the defendant, Her Majesty the Queen in Right of the Province of British Columbia.
Paul Vickery and Wendy J.A. Divoky, for the defendant, the Attorney General of Canada.
Duncan J. Manson, for the Public Guardian and Trustee of British Columbia.
Mark G. Underhill, for the Canadian Hemophilia Society.

---

**1    K.J. SMITH J.**:-- This hearing concerned, among other things, applications by the plaintiff Deborah Lutz for orders certifying this action against the defendant The Canadian Red Cross Society ("the Red Cross") as a class action pursuant to the provisions of the Class Proceedings Act, R.S.B.C. 1996, c. 50 (the "Act") and approving partial settlements reached with the Red Cross and

with Her Majesty the Queen In Right of British Columbia ("the provincial government"). The action will continue against the Attorney General of Canada, who is not a party to the proposed settlements.

**2**    As well, the hearing concerned Mr. Manson's application on behalf of the Public Guardian and Trustee for standing to make submissions in relation only to the application for approval of plaintiffs' class-counsel legal fees and disbursements, which will be heard at a date yet to be fixed. Mr. Underhill advised that he appeared on a watching brief for his client, the Canadian Hemophilia Society, and that he anticipated that the issues with which his client is concerned would be worked out by agreement. I assume that they have been.

**3**    The action arises out of the now notorious contamination of the Canadian blood supply with Hepatitis C virus in the last three decades of the twentieth century.

**4**    By order made November 24, 1998, this action was certified as a class action against the defendants other than the Red Cross, which was exempted from the order because, on July 29, 1998, all proceedings against it were stayed or suspended by order of the Ontario Court (General Division) in a proceeding taken in that Court pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, C-36 ("the CCAA proceeding"). As a result of the reorganization of the affairs of the Red Cross in that proceeding, a fund of approximately $63 million was offered for settlement of all claims against the Red Cross made in this action and in parallel actions in Ontario and Quebec arising out of Hepatitis C infections contracted from the Canadian blood supply before January 1, 1986, and between July 1, 1990, and September 28, 1998, which is when the management of the blood supply was transferred from the Red Cross to the Canadian Blood Services and to Hema-Quebec. The offer has been accepted, subject to Court approval in each jurisdiction concerned. The stay of proceedings was lifted by order made in the CCAA proceeding to permit this and the concurrent applications.

**5**    As well, an offer by the provincial government to settle all claims against it in this action for approximately $6.5 million has been presented for approval. This proposed settlement affects only the plaintiffs in this action and is subject to approval by this Court only.

**6**    The class of plaintiffs in this action does not include those who were similarly infected between January 1, 1986, and July 1, 1990, as their claims were settled in separate proceedings: see, for this province, Endean v. Canadian Red Cross Society (1999), 68 B.C.L.R. (3d) 350 (S.C.).

**7**    Hepatitis C is a virus that produces an inflammation of the liver in those infected with it. It can be transmitted through transfusions of blood and blood products, and those infected with it can transmit it to others through sexual contact. As well, it can be transmitted by an infected mother to her fetus. The virus causes no symptoms in some recipients, but its effects on others range from chronic fatigue to death caused by cirrhosis or by heptocellular cancer. There is no known cure for the disease.

**8**    Until 1998, control and management of the Canadian blood supply lay with the Red Cross. For several years, including the material periods of time, it was funded by the federal, provincial, and territorial governments, who formed a committee to oversee the administration of the blood supply and to establish policies for the collection and distribution of blood.

**9**    In the 1970's and 1980's, American scientists developed surrogate, or indirect, tests for Hepatitis C virus in the American blood supply. Studies done in the early 1980's concluded that these tests were effective in identifying the presence of the virus in donated blood. As a result, American blood banks began to employ these tests as early as 1982 and, by about August 1, 1986, they were routinely used by the American Association of Blood Banks and the American Red Cross. However, they were never implemented in the Canadian blood system.

**10**    In the late 1980's, scientists developed a specific test for Hepatitis C that was put into use in the United States, in conjunction with the surrogate tests, to good effect. However, while the Red Cross implemented the specific test in Canada on July 1, 1990, it continued to ignore the surrogate tests. Finally, with the implementation by the Red Cross of a second, more-sensitive specific test in 1992, the Canadian blood system came into harmony with the testing regime in the United States.

**11**    The essence of the plaintiffs' case is that they became infected with the Hepatitis C virus as a result of the failure of the three defendants to implement the surrogate tests and to seasonably introduce the more effective testing regime.

**12**    The purpose of the Companies' Creditors Arrangement Act is to allow insolvent but viable businesses to avoid the precipitate distribution of their assets amongst their creditors by permitting them time to work out a reorganization that will enable them to continue as going concerns. Faced with an overwhelming number of claims arising out of the contaminated blood system, the Red Cross sought protection in the CCAA proceeding to allow it time to attempt to negotiate settlements of all outstanding claims against it, to facilitate the sale of its blood-collection assets to the Canadian Blood Services and to Hema-Quebec, and to enable it thereafter to continue to carry on its humanitarian activities unrelated to the collection and management of the blood supply.

**13**    The Red Cross ultimately filed a plan of compromise and arrangement in the CCAA proceeding that described four classes of creditors, all of whom voted in favour of accepting the plan. On September 14, 2000, Mr. Justice Blair, the judge presiding in the CCAA proceeding, endorsed the plan, describing it as "fair and reasonable" in the context of the Companies Creditors Arrangement Act. He observed that the plan was the culmination of "two years of intense and complex negotiations", and he commended counsel for their efforts in what he characterized as a "difficult and sensitive case."

**14**    The plan provides for a trust fund of approximately $79 million to compensate persons infected with disease as a result of the transfusion of blood or blood products. It is proposed that it be divided as follows:

1.    $600,000 for claimants with Creutzfeld-Jacob Disease;
2.    $1 million for claimants infected with Hepatitis C from blood collected from prisons in the United States;
3.    approximately $63 million (the "HCV Fund") for claimants in this action and the parallel actions in Ontario and Quebec;
4.    approximately $13.7 million for those infected with HIV; and
5.    $500,000 for transfusion claimants not otherwise provided for.

Mr. Justice Blair's reasons for sanctioning the plan are published in Re Canadian Red Cross Society (2000), 19 C.B.R. (4th) 158; [2000] O.J. No. 3421 (O.S.C.J.).

**15**    The trust fund is comprised, in part, of $8.975 million contributed by what are described as "Plan Participants", that is, certain pharmaceutical companies, hospitals, physicians, and insurers who are exposed to potential liability through claims made against them in litigation by infected claimants. Although the relative merit of their contribution was not apparent, counsel advised that no information was available as to the composition of the contribution or of the reasons motivating the contributors. However, on February 20, 2001, while I had this matter under reserve, Mr. Justice Winkler of the Ontario Superior Court of Justice dismissed the parallel application for settlement approval in Ontario, in McCarthy v. Canadian Red Cross Society, [2001] O.J. No. 567 (O.S.C.J.), with liberty to renew the application on further evidence of the fairness and reasonableness of the contribution to be made by the Plan Participants. As well, he concluded that the initial proposal to pay nothing to family members and relatives of infected persons - described as "derivative claimants" - was not satisfactory.

**16**    As a result, counsel asked me to withhold judgment on this application until those issues should be resolved in Ontario. Further evidence was filed and submissions made in Ontario and, as well, the proposed settlement was amended to provide for modest payments to derivative claimants. Consequently, on June 22, 2001, Winkler J. approved the proposed settlement: see McCarthy v. Canadian Red Cross Society, [2001] O.J. No. 2474 (O.S.C.J.).

**17**    Counsel advise that the proposed settlement has also been approved by Tingley J. of the Quebec Superior Court, on July 10, 2001, with reasons to follow.

**18**    Recently, counsel filed further materials in this action to address the contribution of the Plan Participants, which included the evidence that was placed before Winkler J. in connection with that issue. They also filed a motion to add the Plan Participants as parties for purposes of this application. Since then, further materials have been filed. After being advised by all counsel that none take any issue with the materials filed, and that none oppose the joinder of the Plan Participants or the approval of the proposed settlement, I have concluded that I can give judgment without a further oral hearing.

**19**    The proposed settlement with the provincial government has a different genesis than that with the Red Cross. During the CCAA proceeding it came to the attention of counsel for the

representative plaintiffs in this action that the provincial government had asserted a claim of lien for approximately $6.5 million against a building in Vancouver owned by the Red Cross. Plaintiffs' counsel were subsequently able to negotiate an agreement with the provincial government for the contribution of that lien claim in full settlement of claims against it in this action. On September 26, 2000, Blair J. approved the proof of claim for the lien and ordered the monitor in the CCAA proceeding to hold the amount of the lien and accrued interest in trust, on the basis that the money would ultimately be paid to the plaintiffs in this action which, he observed, "is consistent with the whole philosophy of the Red Cross Plan." If the settlement with the provincial government is approved, that fund, including accrued interest, will be paid to the credit of plaintiffs in this action. If the settlement is not approved, the money will be paid to the provincial government.

**20**    By virtue of s. 35 of the Act, these two settlements must be approved by this Court to be effective. The proper approach to the applications for approval is now well-settled and is set out in Dabbs v. Sun Life Assurance Co. of Canada (1998), 40 O.R. (3d) 429 (O.C.(G.D.)), flld. in Endean v. Canadian Red Cross, supra, at paras. 13, 14. The Court must be satisfied that the proposed settlement is fair, reasonable, and in the best interests of those affected by it and, in that exercise, must be concerned with the interests of the class as a whole rather than the interests of particular members of the class. The Court should consider such factors as the likelihood of recovery or success in the action; the amount and nature of discovery evidence obtained; the terms of the proposed settlement; the recommendations and experience of counsel; the cost and likely duration of the litigation if the settlement should not be approved; the recommendations of neutral parties, if any; the number and nature of objections; and the presence of good faith and absence of collusion. In short, the court should weigh the competing positions of the parties in the lawsuit, consider the risks and costs of a trial, and exercise "an objective, impartial and independent assessment of the fairness of the settlement in all the circumstances": Dabbs, para. 15.

**21**    I will deal first with the proposed settlement with the Red Cross.

**22**    As counsel advise that it is urgent that a decision be made in this matter because the settlement offers will lapse if not accepted by July 31, 2001, I will not take the time to set out in detail the results of my deliberations on the evidence. The proposal is described and analyzed by Mr. Justice Winkler in paragraphs 12 to 14 of his reasons for judgment in McCarthy v. Canadian Red Cross Society, [2001] O.J. No. 2474. After considering the evidence filed and the submissions of counsel, I agree with and adopt his remarks. As well, the additional evidence filed in relation to the contribution of the Plan Participants satisfies me, as it satisfied Winkler J. at paragraphs 16-17 of his reasons, that it is fair and reasonable in the circumstances.

**23**    I would add that the issue relating to derivative claims does not have the same prominence in British Columbia as it does in Ontario because of statutory provisions of the Ontario Family Law Act that have no counterpart in this province. The payments to claimants in this category will be modest but the claims, even if successful at trial, would be modest as well, and it is sensible in the circumstances to maximize the settlement benefits to the primary claimants. Such an approach has

received judicial approbation in similar circumstances: see Knowles v. Wyeth-Ayerst Canada Inc., [2001] O.J. No. 1812 (O.S.C.J.) at para. 20.

**24**    It is very likely that the settlement funds offered by the provincial government are all that will be available to the class plaintiffs from that source, short of a successful lawsuit. The settlement plan provides that there will be a single administrator of the HCV Fund for this action and the actions in Ontario and Quebec and it is proposed that it will also administer the $6.5 million on behalf of the claimants in this action. The settlement funds contributed by the provincial government will be distributed equally to entitled claimants in this action. Thus, every member of the class in this action who qualifies for payment from the settlement with the Red Cross will receive an additional payment from these funds and the cost of administration of this settlement has been minimized.

**25**    The litigation risks facing the class plaintiffs in this case are daunting, and the chances of a successful outcome against the Red Cross and the province are not high. Although no discoveries have been conducted, the plaintiffs have had the benefit of the results of the Krever Inquiry into the Canadian blood supply, which thoroughly canvassed the events material to this lawsuit. Thus, counsel's recommendation of the settlement has a firm foundation in fact, and is enhanced by the extensive experience of counsel in personal-injury litigation generally and in blood-related litigation and class actions.

**26**    Moreover, the costs of litigating this action in a typical case would be out of all proportion to the risk and the reasonably anticipated reward, both in terms of monetary expenditures and in terms of the intangible costs of delay in receipt of payment. On the other hand, the settlement provides that those class members who wish to pursue their claims individually may opt out of the settlement and do so.

**27**    Further, the representative plaintiff, after consultation with a committee comprised of other members of the class, urges the Court to approve the settlement. As stated by plaintiffs' counsel, their reasons include the high risk of losing at trial; the fact that many class members are ill and dying and are in immediate financial need; the uncertainty of achieving a better settlement and the risk of losing this settlement entirely if it should be rejected at this point; the fact that this is a partial settlement and that there is still the prospect of additional recovery from the Attorney General of Canada; and the fact that some class members are tired of the fight and want to bring it to an end. In my view, these reasons provide cogent support for their desire to accept the settlement offers.

**28**    A term of the proposed settlement is that there will be "bar orders" granted to prohibit class members from asserting claims in future against the settling defendants, Plan Participants, or any other person who might claim contribution or indemnity or otherwise claim over against the settling defendants or the Plan Participants. The latter category includes any claims made or to be made against the Attorney General of Canada that assert vicarious liability for the fault of the Canadian Red Cross. Without such a bar order, the settlement will fail, since the settling parties will not have

the security of a cap on their potential liability.

**29**    Jurisdiction to grant a bar order is given by s. 12 and s. 13 of the Act: Sawatzky v. Societe Chirurgicale Instrumentarium Inc. (1999), 71 B.C.L.R. (3d) 51 (S.C.) at paras. 38-45. The circumstances are such here that a bar order in the terms sought is appropriate.

**30**    Several written submissions were received from objectors, some of whom were class members and others of whom were interested in the matter for various reasons. The gist of their objections is that the provincial government is not contributing sufficient compensation. In particular, they object that British Columbia, unlike some other provinces, has not made no-fault benefits available to infected persons as was recommended by the Krever Inquiry. These are extra-judicial, political concerns. My function on this application is to assess the settlement proposal that has been presented. I have no power or jurisdiction to amend it; I may only approve it or reject it.

**31**    Considering all of the factors that I am bound to consider, I am satisfied that the proposed settlement with the Red Cross and with the provincial government is fair and reasonable and in the best interests of the class members, and I approve it.

**32**    Further, I am satisfied that the requirements for certification under s. 4 of the Act have been met and I certify the action for settlement purposes, as requested and as consented to by all parties.

**33**    As well, I am satisfied that the Plan Participants should be added as defendants on their motion for that purpose, and that application is granted.

**34**    Finally, I am satisfied that KPMG Inc. is suitable to be the administrator of the settlement plan and I approve its appointment in that capacity.

**35**    The application to approve class counsel's legal fees is the subject of a concurrent application to be heard on a date to be fixed. In that regard, Mr. Manson, counsel for the Public Guardian and Trustee filed a motion seeking:

    1.    an order pursuant to Rule 15 of the Rules of Court adding his client as a party representing class members who are infants or mentally incapable adults;

    2.    alternatively, an order pursuant to s. 15 of the Act permitting his client to participate in this proceeding as a representative of class members who are infants or mentally incapable adults;

    3.    alternatively, an order that his client be appointed amicus curiae or be granted intervener status to represent the interests of class members who are infants or mentally incapable adults.

**36**    Mr. Manson made no submission on his application pursuant to Rule 15 of the Rules of Court.

**37**    Section 15 of the Act provides:

    (1)    In order to ensure the fair and adequate representation of the interests of the class or any subclass or for any other appropriate reason, the court may, at any time in a class proceeding, permit one or more class members to participate in the proceeding.

    (2)    Participation under subsection (1) must be in the manner and on the terms, including terms as to costs, that the court considers appropriate.

**38**    While there may be cases where the Public Guardian and Trustee should be given some sort of formal standing, pursuant to s. 15 or otherwise, on an application for approval of class-counsel fees, there is no evidence of anything unique or unusual about this case that would warrant the granting of orders such as those sought by Mr. Manson.

**39**    Some comments of Winkler J. in McCarthy v. Canadian Red Cross Society, [2001] O.J. No. 2474, at para. 21, are apt, however, in this context. He said:

> ... a class proceeding by its very nature involves the issuance of orders or judgments that affect persons who are not before the Court. These absent class members are dependent on the Court to protect their interests. . . . The Court is not equipped, nor should it be required, to engage in a forensic investigation into the material or to mine the record to inform itself. Counsel must direct the Court to all relevant information that would impact on the Court's determination. This is especially important where the motion is for the approval of settlement agreements, class counsel fees or consent certifications for the purpose of settlement.

**40**    Counsel have an inherent conflict of interest on applications for approval of their own fees and disbursements. While those of us who are trained in the workings of the legal system understand that counsel put aside their own self-interest in such matters, as they are ethically bound to do, decisions that take into account the objective, perhaps adversarial, submissions of other interested parties will generally better withstand scrutiny. Accordingly, if the Public Guardian and Trustee wishes to address the Court on behalf of legally incapable persons in the class, it is my view that the Court should hear those submissions.

**41**    Section 12 of the Act clothes the Court with a very broad discretion. It provides:

12

> The court may at any time make any order it considers appropriate respecting the conduct of a class proceeding to ensure its fair and expeditious determination and, for that purpose, may impose on one or more of the parties the terms it considers appropriate.

It would assist the Court to have the perspectives of the Public Guardian and Trustee on the

proposed class-counsel fees. Therefore, it would be appropriate in this case, in order to ensure the fair and expeditious determination of this issue, to order that counsel for the Public Guardian and Trustee may be heard on the application to approve class-counsel fees. Counsel may speak to terms, if necessary.

**42**    There will be orders accordingly. I would add that payment of benefits to claimants should not be delayed simply to permit the approval of class-counsel fees. If necessary, the administrator should hold back a proportionate part of each benefit payment pending resolution of that issue.

K.J. SMITH J.

cp/i/qldrk/qlcmk

# TAB 11

DOCSTOR: 2191401\1

*Indexed as:*

# Microbiz Corp. v. Classic Software Systems Inc.

**Between**
**Microbiz Corporation, respondent/plaintiff, and**
**Classic Software Systems Incorporated, applicant/defendant**

**[1996] O.J. No. 5094**

45 C.B.R. (3d) 40

Doc. Toronto 95-CU-93753

Ontario Court of Justice (General Division)

**Lederman J.**

October 9, 1996.

*Bankruptcy -- Proposals -- Effect of proposal -- Stay of proceedings, what proceedings stayed.*

Motion respecting two actions by creditors Classic and Haggerty against the bankrupt Microbiz. Microbiz was a New Jersey corporation and it filed for bankruptcy in the U.S. Microbiz's plan of reorganization was approved by the U.S. Bankruptcy Court and confirmed by judgment. Both Haggerty and Classic recognized the judgment and filed proofs of claim in the U.S. proceedings.

HELD: Motion allowed. The Haggerty and Classic actions were stayed until further order. It was beneficial that Haggerty and Classic participate in the U.S. proceedings rather than obtain judgment in separate proceedings in Ontario and in New Jersey. By filing their proofs of claim, Classic and Haggerty attorned to the jurisdiction of the U.S. court in New Jersey. Multiplicity of proceedings in different jurisdictions should be avoided.

**Counsel:**

Peter J. Lukasiewicz, for the plaintiff, Microbiz Corporation.
No other counsel mentioned.

**1    LEDERMAN J.**:-- Mr. Peter Lukasiewicz for MicroBiz, Ms. Julia Scatz for Haggerty, Ms. I. Sutherland (not a lawyer) for Classic, with leave of the court. Ms. Sutherland served yesterday with volumes of documents requested adjournment of this action and 95-CU-102723. On consent, both actions adjourned to October 9, 1996, a date set by the Registrar of Motions.

**2**    Costs of today reserved to the Judge who disposes of these motions.

**3**    MicroBiz is a New Jersey corporation with its headquarters in that State. It carries on business in the U.S. It carries on business in Ontario only through its distributor, Classic Software. MicroBiz has no assets in Ontario. When it filed for bankruptcy in the U.S. on March 12, 1996 pursuant to the U.S. Bankruptcy Code, an automatic stay of all proceedings against it went into effect (as is the case under Canadian bankruptcy laws). MicroBiz's plan of reorganization was confirmed by judgment of Justice Winfield of the U.S. Bankruptcy Court on September 3, 1996. The plan of reorganization provides for distribution to all creditors whose claims are accepted, after adjudication if necessary, of 17.5% of their claims. There is no doubt that under the principles laid down in the Morguard Investments case, that judgment of the U.S. Court should be recognized in Canada as there is a real and substantial connection between the U.S. Court's judgment and the subject matter of the proceeding. More importantly, both Classic Software and Haggerty have recognized the judgment and in fact have filed Proofs of Claim in the U.S. proceeding to take advantage of the mechanism provided therein for adjudication of their claims and recovery to the extent of 17.5% of their proven claims. To participate in the U.S. proceedings is beneficial in that it allows Classic and Haggerty to prove their claims and obtain collection in one proceeding rather than obtain judgment on their claims in Ontario and in a separate proceeding in New Jersey seek to effect recovery against the estate of MicroBiz. By filing their Proofs of Claim, Classic and Haggerty have thereby altorned to the jurisdiction of the U.S. Court in New Jersey.

**4**    Multiplicity of proceedings in two different jurisdictions should be avoided.

**5**    Accordingly, there must be an order staying both Haggerty action and the Classic action in Ontario until further order of the court.

**6**    Costs of the motions are fixed at $750.00 payable by Classic and Haggerty forthwith.

LEDERMAN J.

qp/s/aaa

# TAB 12

DOCSTOR: 2191401\1

*Case Name:*

# Muscletech Research and Development Inc. (Re)

**IN THE MATTER OF the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF Muscletech Research and
Development Inc. and those entities listed on Schedule
"A" hereto\***
**[\* Editor's note: Schedule A was not attached to
the copy received from the Court and therefore is not
included in the judgment.]**

[**2006] O.J. No. 167**

19 C.B.R. (5th) 54

2006 CarswellOnt 264

Court File No. 06-CL-6241

Ontario Superior Court of Justice
Commercial List

**J.M. Farley J.**

Heard: January 18, 2006.
Judgment: January 18, 2006.

(6 paras.)

*Creditors and debtors -- Legislation -- Debtors' relief -- Companies' Creditors Arrangement Act --
Application by Muscletech Research and Development for stay of litigation proceedings against it
allowed -- Muscletech met threshold of Companies' Creditors Arrangement Act -- All related
actions stayed, as it was practical to deal with entire litigation at once -- Stay facilitated entering
into of discussions to lay foundation for a reorganization plan.*

Application by Muscletech Research and Development for stay of litigation proceedings against it --
Muscletech's assets exceeded determined and contingent liabilities and debt of Muscletech's

corporate group exceeded $5 million -- HELD: Application allowed -- Muscletech met threshold under Companies' Creditors Arrangement Act -- As product liability situation of third parties derived from claims against Muscletech, all proceedings were stayed as it was practical to deal with entire situation at once -- Stay facilitated entering into of discussions to lay foundation for a reorganization plan.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36

United States Bankruptcy Code Chapter 15

**Counsel:**

Jay Carfagnini, for MuscleTech Research and Development Inc. et al.

Derrick Tay, for Paul Gardiner and Lovate Health Sciences Inc.

Natasha MacParland, for RSM Richter Inc., proposed Monitor

---

ENDORSEMENT

**1    J.M. FARLEY J.** (endorsement):-- This is a short endorsement which may be elaborated upon.

**2**    I am satisfied that the applicants are insolvent given their imbalance of assets to debt (both determined and contingent liability as to product liability suits) and that the debt of the applicant group is over the $5 million threshold as to the CCAA test.

**3**    The product liability situation vis-à-vis the non-applicants appears to be in essence derivative of claims against the applicants and it would neither be logical nor practical/functional to have that product liability litigation not be dealt with on an all encompassing basis: see Re Lehndorff General Partners Ltd. (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div.); Re T. Eaton Co. (1997), 46 C.B.R. (3d) 293 (Ont. Gen. Div.); Campeau v. Olympia & York Development Ltd. (1993), 14 C.B.R. (3d) 303 (Ont. Gen. Div.). It is understood that this stay will likely facilitate the entering into of overall bona fide resolution meetings/discussions which would form the foundation of a plan of reorganization and compromise.

**4**    I further understand that the applicants, all of which are Canadian companies registered in Ontario and with the substantial connections to this jurisdiction as set out a paragraph 67 of the applicants' factum:

67.     In addition to the location of each Applicant's registered office, it is respectfully submitted that the following factors further support a finding that each Applicant's COMI is Ontario, Canada:

(a) each of the Applicants was incorporated in Ontario;

(b)     each Applicant's mailing address is an Ontario address;

(c)     the principals, directors and officers of the Applicants are residents of Ontario;

(d)     all decision-making and control in respect of the Applicants, including product development, takes place at the Applicants' premises located in Ontario;

(e)     the Applicants' principal banking arrangements have been conducted in Ontario through the Canadian Imperial Bank of Commerce; and

(f)     all administrative functions associated with the Applicants and all of the employees that perform such functions, including general accounting, financial reporting, budgeting and cash management, are conducted and situated in Ontario.

will be making an application later today in the Southern District of New York U.S. Bankruptcy Court for recognition, pursuant to Chapter 15 of the US Bankruptcy Code, of the Initial Order which I am granting. In that respect, I would observe that as I discussed in Re Babcock & Wilcox Ltd. (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J.), the courts of Canada and of the US have long enjoyed a firm and ongoing relationship based on comity and commonalities of principles as to, inter alia, bankruptcy and insolvency.

**5**     As this order today is being requested without notice to persons who may be affected, I would stress that these persons are completely at liberty and encouraged to use the comeback clause found at paragraph 59 of the Initial Order. In that respect, notwithstanding any order having previously been given, the onus rests with the applicants (and the applicants alone) to justify ab initio the relief requested and previously granted. Comeback relief, however, cannot prejudicially affect the position of parties who have relied bona fide on the previous order in question. This endorsement is to be provided to the creditors and others receiving notice.

**6**     Order to issue as per my fiat.

J.M. FARLEY J.

cp/e/qw/qlesm

# TAB 13

DOCSTOR: 2191401\1

*Case Name:*

# Nortel Networks Corp. (Re)

**RE:IN THE MATTER OF the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a Plan of Compromise or Arrangement of
Nortel Networks Corporation, Nortel Networks Limited, Nortel
Networks Global Corporation, Nortel Networks International
Corporation and Nortel Networks Technology Corporation,
Applicants
APPLICATION UNDER the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36, as amended**

**[2009] O.J. No. 3169**

55 C.B.R. (5th) 229

2009 CarswellOnt 4467

Court File No. 09-CL-7950

Ontario Superior Court of Justice
Commercial List

**G.B. Morawetz J.**

Heard: June 29, 2009.
Judgment: June 29, 2009.
Released: July 23, 2009.

(59 paras.)

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters --
Application of Act -- Debtor company -- Motion by applicants for approval of bidding procedure
and Sale Agreement allowed -- Applicants had been granted CCAA protection and were involved in
insolvency procedures in four other countries -- Bidding procedures set deadline for entry and
involved auction -- Sale Agreement was for some of applicants' business units -- Neither proposal
involved formal plan of compromise with creditors or vote, but CCAA was flexible and could be
broadly interpreted to ensure objective of preserving business was met -- Proposal was warranted,*

*beneficial and there was no viable alternative.*

Motion by the applicants for the approval of their proposed bidding process and Sale Agreement. The applicants had been granted CCAA protection and were involved in insolvency proceedings in four other countries. The Monitor approved of the proposal. The bidding process set a deadline for bids and involved an auction. The Sale Agreement was for some of the applicants' business units. The applicants argued the proposal was the best way to preserve jobs and company value. The purchaser was to assume both assets and liabilities. There was no formal plan for compromise with creditors or vote planned.

HELD: Motion allowed. The CCAA was flexible and could be broadly interpreted to ensure that its objectives of preserving the business were achieved. The proposal was warranted and beneficial and there was no viable alternative. A sealing order was also made with respect to Appendix B, which contained commercially sensitive documents.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11(4)

**Counsel:**

Derrick Tay and Jennifer Stam, for Nortel Networks Corporation, et al.

Lyndon Barnes and Adam Hirsh, for the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited.

J. Carfagnini and J. Pasquariello, for Ernst & Young Inc., Monitor.

M. Starnino, for the Superintendent of Financial Services and Administrator of PBGF.

S. Philpott, for the Former Employees.

K. Zych, for Noteholders.

Pamela Huff and Craig Thorburn, for MatlinPatterson Global Advisors LLC, MatlinPatterson Global Opportunities Partners III L.P. and Matlin Patterson Opportunities Partners (Cayman) III L.P.

David Ward, for UK Pension Protection Fund.

Leanne Williams, for Flextronics Inc.

Alex MacFarlane, for the Official Committee of Unsecured Creditors.

Arthur O. Jacques and Tom McRae, for Felske and Sylvain (de facto Continuing Employees' Committee).

Robin B. Schwill and Matthew P. Gottlieb, for Nortel Networks UK Limited.

A. Kauffman, for Export Development Canada.

D. Ullman, for Verizon Communications Inc.

G. Benchetrit, for IBM.

---

**ENDORSEMENT**

  G.B. MORAWETZ J.:--

## INTRODUCTION

**1**    On June 29, 2009, I granted the motion of the Applicants and approved the bidding procedures (the "Bidding Procedures") described in the affidavit of Mr. Riedel sworn June 23, 2009 (the "Riedel Affidavit") and the Fourteenth Report of Ernst & Young, Inc., in its capacity as Monitor (the "Monitor") (the "Fourteenth Report"). The order was granted immediately after His Honour Judge Gross of the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") approved the Bidding Procedures in the Chapter 11 proceedings.

**2**    I also approved the Asset Sale Agreement dated as of June 19, 2009 (the "Sale Agreement") among Nokia Siemens Networks B.V. ("Nokia Siemens Networks" or the "Purchaser"), as buyer, and Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks, Inc. ("NNI") and certain of their affiliates, as vendors (collectively the "Sellers") in the form attached as Appendix "A" to the Fourteenth Report and I also approved and accepted the Sale Agreement for the purposes of conducting the "stalking horse" bidding process in accordance with the Bidding Procedures including, the Break-Up Fee and the Expense Reimbursement (as both terms are defined in the Sale Agreement).

**3**    An order was also granted sealing confidential Appendix "B" to the Fourteenth Report containing the schedules and exhibits to the Sale Agreement pending further order of this court.

**4**    The following are my reasons for granting these orders.

**5**    The hearing on June 29, 2009 (the "Joint Hearing") was conducted by way of video conference with a similar motion being heard by the U.S. Court. His Honor Judge Gross presided over the

hearing in the U.S. Court. The Joint Hearing was conducted in accordance with the provisions of the Cross-Border Protocol, which had previously been approved by both the U.S. Court and this court.

**6**    The Sale Agreement relates to the Code Division Multiple Access ("CMDA") business Long-Term Evolution ("LTE") Access assets.

**7**    The Sale Agreement is not insignificant. The Monitor reports that revenues from CDMA comprised over 21% of Nortel's 2008 revenue. The CDMA business employs approximately 3,100 people (approximately 500 in Canada) and the LTE business employs approximately 1,000 people (approximately 500 in Canada). The purchase price under the Sale Agreement is $650 million.

## BACKGROUND

**8**    The Applicants were granted CCAA protection on January 14, 2009. Insolvency proceedings have also been commenced in the United States, the United Kingdom, Israel and France.

**9**    At the time the proceedings were commenced, Nortel's business operated through 143 subsidiaries, with approximately 30,000 employees globally. As of January 2009, Nortel employed approximately 6,000 people in Canada alone.

**10**    The stated purpose of Nortel's filing under the CCAA was to stabilize the Nortel business to maximize the chances of preserving all or a portion of the enterprise. The Monitor reported that a thorough strategic review of the company's assets and operations would have to be undertaken in consultation with various stakeholder groups.

**11**    In April 2009, the Monitor updated the court and noted that various restructuring alternatives were being considered.

**12**    On June 19, 2009, Nortel announced that it had entered into the Sale Agreement with respect to its assets in its CMDA business and LTE Access assets (collectively, the "Business") and that it was pursuing the sale of its other business units. Mr. Riedel in his affidavit states that Nortel has spent many months considering various restructuring alternatives before determining in its business judgment to pursue "going concern" sales for Nortel's various business units.

**13**    In deciding to pursue specific sales processes, Mr. Riedel also stated that Nortel's management considered:

> (a)    the impact of the filings on Nortel's various businesses, including deterioration in sales; and
> (b)    the best way to maximize the value of its operations, to preserve jobs and to continue businesses in Canada and the U.S.

**14**    Mr. Riedel notes that while the Business possesses significant value, Nortel was faced with the reality that:

(a)   the Business operates in a highly competitive environment;

(b)   full value cannot be realized by continuing to operate the Business through a restructuring; and

(c)   in the absence of continued investment, the long-term viability of the Business would be put into jeopardy.

**15**   Mr. Riedel concluded that the proposed process for the sale of the Business pursuant to an auction process provided the best way to preserve the Business as a going concern and to maximize value and preserve the jobs of Nortel employees.

**16**   In addition to the assets covered by the Sale Agreement, certain liabilities are to be assumed by the Purchaser. This issue is covered in a comprehensive manner at paragraph 34 of the Fourteenth Report. Certain liabilities to employees are included on this list. The assumption of these liabilities is consistent with the provisions of the Sale Agreement that requires the Purchaser to extend written offers of employment to at least 2,500 employees in the Business.

**17**   The Monitor also reports that given that certain of the U.S. Debtors are parties to the Sale Agreement and given the desire to maximize value for the benefit of stakeholders, Nortel determined and it has agreed with the Purchaser that the Sale Agreement is subject to higher or better offers being obtained pursuant to a sale process under s. 363 of the U.S. Bankruptcy Code and that the Sale Agreement shall serve as a "stalking horse" bid pursuant to that process.

**18**   The Bidding Procedures provide that all bids must be received by the Seller by no later than July 21, 2009 and that the Sellers will conduct an auction of the purchased assets on July 24, 2009. It is anticipated that Nortel will ultimately seek a final sales order from the U.S. Court on or about July 28, 2009 and an approval and vesting order from this court in respect of the Sale Agreement and purchased assets on or about July 30, 2009.

**19**   The Monitor recognizes the expeditious nature of the sale process but the Monitor has been advised that given the nature of the Business and the consolidation occurring in the global market, there are likely to be a limited number of parties interested in acquiring the Business.

**20**   The Monitor also reports that Nortel has consulted with, among others, the Official Committee of Unsecured Creditors (the "UCC") and the bondholder group regarding the Bidding Procedures and is of the view that both are supportive of the timing of this sale process. (It is noted that the UCC did file a limited objection to the motion relating to certain aspects of the Bidding Procedures.)

**21**   Given the sale efforts made to date by Nortel, the Monitor supports the sale process outlined in the Fourteenth Report and more particularly described in the Bidding Procedures.

**22**   Objections to the motion were filed in the U.S. Court and this court by MatlinPatterson Global Advisors LLC, MatlinPatterson Global Opportunities Partners III L.P. and Matlin Patterson

Opportunities Partners (Cayman) III L.P. (collectively, "MatlinPatterson") as well the UCC.

**23**    The objections were considered in the hearing before Judge Gross and, with certain limited exceptions, the objections were overruled.

## ISSUES AND DISCUSSION

**24**    The threshold issue being raised on this motion by the Applicants is whether the CCAA affords this court the jurisdiction to approve a sales process in the absence of a formal plan of compromise or arrangement and a creditor vote. If the question is answered in the affirmative, the secondary issue is whether this sale should authorize the Applicants to sell the Business.

**25**    The Applicants submit that it is well established in the jurisprudence that this court has the jurisdiction under the CCAA to approve the sales process and that the requested order should be granted in these circumstances.

**26**    Counsel to the Applicants submitted a detailed factum which covered both issues.

**27**    Counsel to the Applicants submits that one of the purposes of the CCAA is to preserve the going concern value of debtors companies and that the court's jurisdiction extends to authorizing sale of the debtor's business, even in the absence of a plan or creditor vote.

**28**    The CCAA is a flexible statute and it is particularly useful in complex insolvency cases in which the court is required to balance numerous constituents and a myriad of interests.

**29**    The CCAA has been described as "skeletal in nature". It has also been described as a "sketch, an outline, a supporting framework for the resolution of corporate insolvencies in the public interest". *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 45 C.B.R. (5th) 163 (Ont. C.A.), at paras. 44, 61, leave to appeal refused, [2008] S.C.C.A. No. 337. ("ATB Financial").

**30**    The jurisprudence has identified as sources of the court's discretionary jurisdiction, *inter alia*:

> (a)    the power of the court to impose terms and conditions on the granting of a stay under s. 11(4) of the CCAA;
>
> (b)    the specific provision of s. 11(4) of the CCAA which provides that the court may make an order "on such terms as it may impose"; and
>
> (c)    the inherent jurisdiction of the court to "fill in the gaps" of the CCAA in order to give effect to its objects. *Re Canadian Red Cross Society* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div.) at para. 43; *Re PSINet Ltd.* (2001), 28 C.B.R. (4th) 95 (Ont. S.C.J.) at para. 5, *ATB Financial, supra*, at paras. 43-52.

**31**    However, counsel to the Applicants acknowledges that the discretionary authority of the court

under s. 11 must be informed by the purpose of the CCAA.

> Its exercise must be guided by the scheme and object of the Act and by the legal principles that govern corporate law issues. *Re Stelco Inc.* (2005), 9 C.B.R. (5th) 135 (Ont. C.A.) at para. 44.

**32**    In support of the court's jurisdiction to grant the order sought in this case, counsel to the Applicants submits that Nortel seeks to invoke the "overarching policy" of the CCAA, namely, to preserve the going concern. *Re Residential Warranty Co. of Canada Inc*. (2006), 21 C.B.R. (5th) 57 (Alta. Q.B.) at para. 78.

**33**    Counsel to the Applicants further submits that CCAA courts have repeatedly noted that the purpose of the CCAA is to preserve the benefit of a going concern business for all stakeholders, or "the whole economic community":

> The purpose of the CCAA is to facilitate arrangements that might avoid liquidation of the company and allow it to continue in business to the benefit of the whole economic community, including the shareholders, the creditors (both secured and unsecured) and the employees. *Citibank Canada v. Chase Manhattan Bank of Canada* (1991), 5 C.B.R. (3rd) 165 (Ont. Gen. Div.) at para. 29. *Re Consumers Packaging Inc*. (2001) 27 C.B.R. (4th) 197 (Ont. C.A.) at para. 5.

**34**    Counsel to the Applicants further submits that the CCAA should be given a broad and liberal interpretation to facilitate its underlying purpose, including the preservation of the going concern for the benefit of all stakeholders and further that it should not matter whether the business continues as a going concern under the debtor's stewardship or under new ownership, for as long as the business continues as a going concern, a primary goal of the CCAA will be met.

**35**    Counsel to the Applicants makes reference to a number of cases where courts in Ontario, in appropriate cases, have exercised their jurisdiction to approve a sale of assets, even in the absence of a plan of arrangement being tendered to stakeholders for a vote. In doing so, counsel to the Applicants submits that the courts have repeatedly recognized that they have jurisdiction under the CCAA to approve asset sales in the absence of a plan of arrangement, where such sale is in the best interests of stakeholders generally. *Re Canadian Red Cross Society, supra*, *Re PSINet, supra*, *Re Consumers Packaging, supra*, *Re Stelco Inc*. (2004), 6 C.B.R. (5th) 316 (Ont. S.C.J.) at para. 1, *Re Tiger Brand Knitting Co*. (2005) 9 C.B.R. (5th) 315, *Re Caterpillar Financial Services Ltd. v. Hardrock Paving Co*. (2008), 45 C.B.R. (5th) 87 and *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3rd) 24 (Ont. Gen. Div.).

**36**    In *Re Consumers Packaging, supra*, the Court of Appeal for Ontario specifically held that a sale of a business as a going concern during a CCAA proceeding is consistent with the purposes of the CCAA:

The sale of Consumers' Canadian glass operations as a going concern pursuant to the Owens-Illinois bid allows the preservation of Consumers' business (albeit under new ownership), and is therefore consistent with the purposes of the CCAA.

... we cannot refrain from commenting that Farley J.'s decision to approve the Owens-Illinois bid is consistent with previous decisions in Ontario and elsewhere that have emphasized the broad remedial purpose of flexibility of the CCAA and have approved the sale and disposition of assets during CCAA proceedings prior to a formal plan being tendered. *Re Consumers Packaging, supra, at paras. 5, 9.*

**37**     Similarly, in *Re Canadian Red Cross Society, supra*, Blair J. (as he then was) expressly affirmed the court's jurisdiction to approve a sale of assets in the course of a CCAA proceeding before a plan of arrangement had been approved by creditors. *Re Canadian Red Cross Society, supra*, at paras. 43, 45.

**38**     Similarly, in *PSINet Limited, supra*, the court approved a going concern sale in a CCAA proceeding where no plan was presented to creditors and a substantial portion of the debtor's Canadian assets were to be sold. Farley J. noted as follows:

[If the sale was not approved,] there would be a liquidation scenario ensuing which would realize far less than this going concern sale (which appears to me to have involved a transparent process with appropriate exposure designed to maximize the proceeds), thus impacting upon the rest of the creditors, especially as to the unsecured, together with the material enlarging of the unsecured claims by the disruption claims of approximately 8,600 customers (who will be materially disadvantaged by an interrupted transition) plus the job losses for approximately 200 employees. *Re PSINet Limited, supra*, at para. 3.

**39**     In *Re Stelco Inc., supra*, in 2004, Farley J. again addressed the issue of the feasibility of selling the operations as a going concern:

I would observe that usually it is the creditor side which wishes to terminate CCAA proceedings and that when the creditors threaten to take action, there is a realization that a liquidation scenario will not only have a negative effect upon a CCAA applicant, but also upon its workforce. Hence, the CCAA may be employed to provide stability during a period of necessary financial and operational restructuring - and if a restructuring of the "old company" is not feasible, then there is the exploration of the feasibility of the sale of the operations/enterprise as a going concern (with continued employment) in whole or in part. *Re Stelco Inc, supra*, at para. 1.

**40**    I accept these submissions as being general statements of the law in Ontario. The value of equity in an insolvent debtor is dubious, at best, and, in my view, it follows that the determining factor should not be whether the business continues under the debtor's stewardship or under a structure that recognizes a new equity structure. An equally important factor to consider is whether the case can be made to continue the business as a going concern.

**41**    Counsel to the Applicants also referred to decisions from the courts in Quebec, Manitoba and Alberta which have similarly recognized the court's jurisdiction to approve a sale of assets during the course of a CCAA proceeding. *Re Boutique San Francisco Inc.* (2004), 7 C.B.R. (5th) 189 (Quebec S. C.), *Re Winnipeg Motor Express Inc.* (2008), 49 C.B.R. (5th) 302 (Man. Q.B.) at paras. 41, 44, and *Re Calpine Canada Energy Limited* (2007), 35 C.B.R. (5th) 1, (Alta. Q.B.) at para. 75.

**42**    Counsel to the Applicants also directed the court's attention to a recent decision of the British Columbia Court of Appeal which questioned whether the court should authorize the sale of substantially all of the debtor's assets where the debtor's plan "will simply propose that the net proceeds from the sale ... be distributed to its creditors". In *Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.* (2008), 46 C.B.R. (5th) 7 (B.C.C.A.) ("*Cliffs Over Maple Bay*"), the court was faced with a debtor who had no active business but who nonetheless sought to stave off its secured creditor indefinitely. The case did not involve any type of sale transaction but the Court of Appeal questioned whether a court should authorize the sale under the CCAA without requiring the matter to be voted upon by creditors.

**43**    In addressing this matter, it appears to me that the British Columbia Court of Appeal focussed on whether the court should grant the requested relief and not on the question of whether a CCAA court has the jurisdiction to grant the requested relief.

**44**    I do not disagree with the decision in *Cliffs Over Maple Bay*. However, it involved a situation where the debtor had no active business and did not have the support of its stakeholders. That is not the case with these Applicants.

**45**    The *Cliffs Over Maple Bay* decision has recently been the subject of further comment by the British Columbia Court of Appeal in *Asset Engineering L.P. v. Forest and Marine Financial Limited Partnership*, 2009 BCCA 319.

**46**    At paragraphs 24-26 of the *Forest and Marine* decision, Newbury J.A. stated:

> 24.    In *Cliffs Over Maple Bay*, the debtor company was a real estate developer whose one project had failed. The company had been dormant for some time. It applied for CCAA protection but described its proposal for restructuring in vague terms that amounted essentially to a plan to "secure sufficient funds" to complete the stalled project (Para. 34). This court, per Tysoe J.A., ruled that although the Act can apply to single-project companies, its purposes are unlikely to be engaged in such instances, since mortgage priorities are fully straight forward and there will

be little incentive for senior secured creditors to compromise their interests (Para. 36). Further, the Court stated, the granting of a stay under s. 11 is "not a free standing remedy that the court may grant whenever an insolvent company wishes to undertake a "restructuring" ... Rather, s. 11 is ancillary to the fundamental purpose of the CCAA, and a stay of proceedings freezing the rights of creditors should only be granted in furtherance of the CCAA's fundamental purpose". That purpose has been described in Meridian Developments Inc. v. Toronto Dominion Bank (1984) 11 D.L.R. (4th) 576 (Alta. Q.B.):

> The legislation is intended to have wide scope and allow a judge to make orders which will effectively maintain the status quo for a period while the insolvent company attempts to gain the approval of its creditors for a proposed arrangement which will enable the company to remain in operation for what is, hopefully, the future benefit of both the company and its creditors. [at 580]

25. The Court was not satisfied in *Cliffs Over Maple Bay* that the "restructuring" contemplated by the debtor would do anything other than distribute the net proceeds from the sale, winding up or liquidation of its business. The debtor had no intention of proposing a plan of arrangement, and its business would not continue following the execution of its proposal - thus it could not be said the purposes of the statute would be engaged ...

26. In my view, however, the case at bar is quite different from *Cliffs Over Maple Bay*. Here, the main debtor, the Partnership, is at the centre of a complicated corporate group and carries on an active financing business that it hopes to save notwithstanding the current economic cycle. (The business itself which fills a "niche" in the market, has been carried on in one form or another since 1983.) The CCAA is appropriate for situations such as this where it is unknown whether the "restructuring" will ultimately take the form of a refinancing or will involve a reorganization of the corporate entity or entities and a true compromise of the rights of one or more parties. The "fundamental purpose" of the Act - to preserve the *status quo* while the debtor prepares a plan that will enable it to remain in business to the benefit of all concerned - will be furthered by granting a stay so that the <u>means</u> contemplated by the Act - a compromise or arrangement - can be developed, negotiated and voted on if necessary ...

**47**    It seems to me that the foregoing views expressed in *Forest and Marine* are not inconsistent with the views previously expressed by the courts in Ontario. The CCAA is intended to be flexible and must be given a broad and liberal interpretation to achieve its objectives and a sale by the debtor which preserves its business as a going concern is, in my view, consistent with those

objectives.

**48**    I therefore conclude that the court does have the jurisdiction to authorize a sale under the CCAA in the absence of a plan.

**49**    I now turn to a consideration of whether it is appropriate, in this case, to approve this sales process. Counsel to the Applicants submits that the court should consider the following factors in determining whether to authorize a sale under the CCAA in the absence of a plan:

> (a)    is a sale transaction warranted at this time?
> (b)    will the sale benefit the whole "economic community"?
> (c)    do any of the debtors' creditors have a *bona fide* reason to object to a sale of the business?
> (d)    is there a better viable alternative?

I accept this submission.

**50**    It is the position of the Applicants that Nortel's proposed sale of the Business should be approved as this decision is to the benefit of stakeholders and no creditor is prejudiced. Further, counsel submits that in the absence of a sale, the prospects for the Business are a loss of competitiveness, a loss of value and a loss of jobs.

**51**    Counsel to the Applicants summarized the facts in support of the argument that the Sale Transaction should be approved, namely:

> (a)    Nortel has been working diligently for many months on a plan to reorganize its business;
> (b)    in the exercise of its business judgment, Nortel has concluded that it cannot continue to operate the Business successfully within the CCAA framework;
> (c)    unless a sale is undertaken at this time, the long-term viability of the Business will be in jeopardy;
> (d)    the Sale Agreement continues the Business as a going concern, will save at least 2,500 jobs and constitutes the best and most valuable proposal for the Business;
> (e)    the auction process will serve to ensure Nortel receives the highest possible value for the Business;
> (f)    the sale of the Business at this time is in the best interests of Nortel and its stakeholders; and
> (g)    the value of the Business is likely to decline over time.

**52**    The objections of MatlinPatterson and the UCC have been considered. I am satisfied that the issues raised in these objections have been addressed in a satisfactory manner by the ruling of Judge

Gross and no useful purpose would be served by adding additional comment.

**53**    Counsel to the Applicants also emphasize that Nortel will return to court to seek approval of the most favourable transaction to emerge from the auction process and will aim to satisfy the elements established by the court for approval as set out in *Royal Bank v. Soundair* (1991), 7 C.B.R. (3rd) 1 (Ont. C.A.) at para. 16.

## DISPOSITION

**54**    The Applicants are part of a complicated corporate group. They carry on an active international business. I have accepted that an important factor to consider in a CCAA process is whether the case can be made to continue the business as a going concern. I am satisfied having considered the factors referenced at [49], as well as the facts summarized at [51], that the Applicants have met this test. I am therefore satisfied that this motion should be granted.

**55**    Accordingly, I approve the Bidding Procedures as described in the Riedel Affidavit and the Fourteenth Report of the Monitor, which procedures have been approved by the U.S. Court.

**56**    I am also satisfied that the Sale Agreement should be approved and further that the Sale Agreement be approved and accepted for the purposes of conducting the "stalking horse" bidding process in accordance with the Bidding Procedures including, without limitation the Break-Up Fee and the Expense Reimbursement (as both terms are defined in the Sale Agreement).

**57**    Further, I have also been satisfied that Appendix B to the Fourteenth Report contains information which is commercially sensitive, the dissemination of which could be detrimental to the stakeholders and, accordingly, I order that this document be sealed, pending further order of the court.

**58**    In approving the Bidding Procedures, I have also taken into account that the auction will be conducted prior to the sale approval motion. This process is consistent with the practice of this court.

**59**    Finally, it is the expectation of this court that the Monitor will continue to review ongoing issues in respect of the Bidding Procedures. The Bidding Procedures permit the Applicants to waive certain components of qualified bids without the consent of the UCC, the bondholder group and the Monitor. However, it is the expectation of this court that, if this situation arises, the Applicants will provide advance notice to the Monitor of its intention to do so.

G.B. MORAWETZ J.

cp/e/qllxr/qlpxm/qlltl/qlaxw/qlced

# TAB 14

DOCSTOR: 2191401\1

*Indexed as:*

## Roberts v. Picture Butte Municipal Hospital

**Between**
**Wanda Mae Roberts, a.k.a. Wanda Mae Lichuk, and Alan Roberts,**
**plaintiffs, and**
**Picture Butte Municipal Hospital, St. Michael's General**
**Hospital, Dr. Tom Melling, McGhan Medical Corporation and Dow**
**Corning Corporation, defendants**

[**1998] A.J. No. 817**

1998 ABQB 636

[1999] 4 W.W.R. 443

64 Alta. L.R. (3d) 218

227 A.R. 308

23 C.P.C. (4th) 300

81 A.C.W.S. (3d) 47

Action No. 8901-12679

Alberta Court of Queen's Bench
Judicial District of Calgary

**Forsyth J.**

July 10, 1998.

(14 pp.)

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, ss. 2(1), 69(1).
U.S. Bankruptcy Code, s. 362.

*Bankruptcy -- Practice -- Stay of proceedings -- Proceeding for the recovery of a claim against the bankrupt.*

Application by the defendant, Dow, for a permanent stay of the proceedings against it by the plaintiff, Roberts. Roberts brought a claim against Dow and four other parties for problems with her breast implants manufactured by Dow that had been surgically implanted in 1983. Dow was the only remaining defendant as the actions against the other four parties had been dismissed. There was a class action against Dow in the U.S. which was discontinued when Dow filed for bankruptcy under the U.S. Bankruptcy Code in May 1995. This automatically stayed all claims against Dow which arose before the bankruptcy. Dow's bankruptcy plan set out a process whereby the breast implant claims would be resolved by a series of common issue trials or settlements. This included foreign claimants like Roberts. Roberts had filed a proof of her claim against Dow in the U.S. Bankruptcy Court.

HELD: Application allowed. The imposition of a stay on all claims once bankruptcy proceedings were begun was common to the Canadian bankruptcy legislation as well. The philosophy was to ensure a fair distribution of assets among all creditors and not just those who happen to have begun proceedings prior to the initiation of bankruptcy. Foreign claimants were provided for in Dow's bankruptcy plan. Roberts submitted to the jurisdiction of the U.S. by filing a proof of claim. Therefore, the appropriate forum to deal with all claims concerning Dow was the U.S. Bankruptcy Court.

**Counsel:**

G.J. Bigg, for the plaintiffs.
K.M. Eidsvik, for the defendant, McGhan Medical Corporation.
F. Foran, Q.C., for the defendant, Dow Corning Corporation.
J. Shriar, for the defendants, Picture Butte Municipal Hospital and St. Michael's General Hospital.
P. Leveque, for the defendant, Dr. Tom Melling.

---

REASONS FOR JUDGMENT

FORSYTH J.:--

APPLICATION

**1**    This is an application by the Defendant Dow Corning Corporation ("DCC") for a permanent stay of proceedings against it. DCC is now the only remaining Defendant in this action, as the actions against the other four Defendants were dismissed on the basis of having been commenced

outside of the applicable limitation periods. DCC applies for a permanent stay of these proceedings on the grounds that this Court should recognize the jurisdiction of the United States Bankruptcy Court for the Eastern District of Michigan, Northern Division. The Plaintiffs, Wanda and Alan Roberts, argue that a stay is inappropriate.

BACKGROUND

**2**    The female Plaintiff underwent surgery in 1981 for bilateral fibrocystic disease and mammary dysplasia in both breasts. Also in 1981, she received silicone gel breast implants manufactured by McGhan Medical Corporation ("McGhan"), a former Defendant. After problems with those implants, they were replaced in June 1983 with silicone gel implants manufactured by DCC. Soon after, one implant was found to have ruptured, necessitating surgery to clean up as much silicone as possible from her system.

**3**    Since that time, the female Plaintiff alleges widespread pain and problems, which she blames on the silicone gel released into her body. For this application, it is not necessary nor appropriate for me to comment on her symptoms or their cause.

**4**    The Plaintiffs started this action on August 31, 1989. There was also class action litigation in the U.S which coordinated all claims arising out of the failure of both McGhan and DCC implants. That class action collapsed when DCC sought bankruptcy protection on May 15, 1995 under Chapter 11 of the United States Bankruptcy Code (the "U.S. Bankruptcy Code"). Section 362 of the U.S. Bankruptcy Code imposes an automatic stay on all actions or proceedings against DCC to recover claims that arose before the claims bar date.

**5**    The U.S. Bankruptcy Court set February 14, 1997 as the foreign claims bar date (the deadline for filing claims in the bankruptcy proceedings). The Plaintiffs filed proofs of claim in that U.S. proceeding on January 17, 1997. More than 700,000 proofs of claim were filed from many countries, including more than 30,000 by Canadian residents.

LEGISLATION

**6**    DCC is asking that this Court recognize the proceedings in the U.S. Bankruptcy Court. The U.S. Bankruptcy Code provides for an automatic stay once bankruptcy proceedings are commenced in the U.S.:

> 362 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title...operates as a stay, applicable to all entities, of
>
> > (1)    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action

> or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> ...
>
> (3)    any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

Section 541 provides that "property of the estate" is comprised of various types of property "wherever located and by whomever held".

**7**    Therefore, the stay purports to be extra-territorial, applying, for example, in Alberta. It is then up to this Court to decide whether the principles of comity favour upholding the stay in this jurisdiction. As the Plaintiffs emphasize, comity is a discretionary matter. I am not bound by the stay imposed by the U.S. Bankruptcy Act.

**8**    I note that the Canadian legislation has a similar provision (Bankruptcy and Insolvency Act ("BIA"), R.S.C. 1985, c.B-3):

> 69(1) Subject to subsections (2) and (3) and sections 69.4 and 69.5 on the filing of a notice of intention under section 50.4 by an insolvent person,
>
> (a)    no creditor has any remedy against the insolvent person or the insolvent person's property, or shall commence or continue any action, execution or other proceedings, for the recovery of a claim provable in bankruptcy,

Under s. 2(1) "property" of the BIA:

> "property" includes money, goods, things in action, land and every description of property, whether real or personal, legal or equitable, and whether situated in Canada or elsewhere, ...

**9**    The Plaintiffs accept that the U.S. Bankruptcy Code governs DCC's estate, and that the Plaintiffs are creditors under the jurisdiction of the U.S. Bankruptcy Court.

PLAN OF REORGANIZATION

**10**    DCC filed a Plan of Reorganization (the "Plan") with the Bankruptcy Court on August 25,

1997. The Bankruptcy Court rejected this Plan, and an amended plan was presented on February 17, 1998. The Bankruptcy Court approved that Plan, which now has to be voted upon by the various classes of creditors. DCC's proposed Plan would allow it to pay most creditors and continue operating. To manage product liability claims, DCC would establish and fund two trusts with up to $2.4 billion U.S. DCC would separately pay approximately $1 billion to commercial creditors over seven years.

**11**    Breast implant claimants would have four settlement paths, based on their history, symptoms and past and proposed treatment. Any claims not settled by agreement under the Plan process would go to common issue trials. Any claims remaining after common issue trials would undergo individual claims review and mediation. The last resort would be individual litigation. These individual trials would be held in the U.S., dismissed in favour of litigation in the claimant's home jurisdiction, or held in the U.S. using the law of the claimant's home jurisdiction. The Plan is designed to solve as many claims as possible in an orderly and expeditious manner.

**12**    The U.S. procedure provides that once the Bankruptcy Court approves a Plan, it is sent to the creditors for a vote. The creditors vote by class. All of the Canadian breast implant claimants are in the foreign claimants' class of creditors. If more than two-thirds of those voting in a class approve, the Plan is considered approved by the class. After the vote, the Bankruptcy Court holds a confirmation hearing. It may confirm the Plan if it meets the U.S. Bankruptcy Code requirements. In DCC's words, the Bankruptcy Court must conclude:

> (i)    that the Plan was proposed in good faith;
>
> (ii)    that each class of creditors that does not vote to accept the Plan will receive at least as great a recovery as such creditors would have received had the debtor been liquidated under the liquidation procedures provided in Chapter 7 of the Bankruptcy Code; and
>
> (iii)    that the Plan does not discriminate unfairly against any class of creditors that does not vote to accept the Plan.

Therefore, the Bankruptcy Court may approve a Plan even if all classes of creditors do not vote to accept it, as long as that Court finds the Plan does not discriminate unfairly against the rejecting class.

**13**    The originally proposed Plan did not make it to the creditor review stage. The Bankruptcy Court apparently had a number of concerns, one of which was the treatment of the foreign claimants. The Plaintiffs raise that concern in this Court also. The proposed settlement payments for foreign claimants would range from 35 to 60 per cent of those offered to U.S. claimants, on the theory that product liability litigation yields lower damage awards in non-U.S. jurisdictions. The proposed settlement for Canadian claimants is 60 per cent of the payments offered to U.S. claimants. According to DCC's affidavit (by Craig J. Litherland, dated December 12, 1997), some of the differing factors among U.S. and foreign jurisdictions are:

    a.    the absence of contingency fee arrangements;

    b.    the responsibility of judges rather than juries to asses [sic] liability and damages;

    c.    the award of costs to prevailing litigants;

    d.    limitations on theories of liability and recovery;

    e.    limited pretrial procedures;

    f.    the absence of the 'deep pocket expectation' prevalent in the United States resulting in lower damage awards;

    g.    lower damage awards for pain and suffering;

    h.    less or no punitive damages; and

    i.    nationalized health care insurance and other benefits that are either directly deducted from an award or operate to reduce the likelihood of a large damage award.

Of course, not all of these factors would apply in any one non-U.S. jurisdiction.

**14**    The Plaintiffs claim the foreign discount is discriminatory and inequitable. Not all of the factors are applicable in Alberta. Moreover, some simply try to shift the burden from DCC to other entities (such as the Canadian medicare system). In addition, the Plaintiffs claim that taking 40 per cent away from foreign claimants leaves that much more for U.S. claimants. DCC argues that the procedure is fair, not necessarily equal. It also emphasizes that the foreign discount only applies to settlements. Any claims that proceed to individual trials would not be discounted.

**15**    The amended Plan will be put to the creditors. It may be that the Plan will be confirmed, even if the foreign claimants' class rejects it.

ANALYSIS

    General Principles

**16**    Where an appropriate forum must be chosen, the Courts may grant a stay of proceedings. In the words of the Supreme Court of Canada: "This enables the court of the forum selected by the Plaintiffs (the domestic forum) to stay the action at the request of the Defendant if persuaded that the case should be tried elsewhere." (Amchem Products Inc. v. British Columbia (Workers' Compensation Board), [1993] 1 S.C.R. 897 at 912).This decision is completely discretionary. I am not bound to defer to the U.S. bankruptcy proceedings.

**17**    Amchem also discusses the vital principle of comity (at 913-14, citing Morguard Investments Ltd. v. De Savoye, [1990] 3 S.C.R. 1077 at 1096):

> 'Comity' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to

> international duty and convenience, and to the rights of its own citizens or of
> other persons who are under the protection of its laws....

**18**    After cautioning against abusing the power to enjoin foreign litigation, the S.C.C. in Amchem
outlined the test for restraining foreign proceedings. Although a case on anti-suit injunctions, the
first part of the test also relates to stays. The Court must determine if there is a forum other than the
domestic forum which is "clearly more appropriate" (at 931). If not, the domestic forum should
refuse to stay the domestic proceedings. At 931-32, the S.C.C. continued:

> In this step of the analysis, the domestic court as a matter of comity must take
> cognizance of the fact that the foreign court has assumed jurisdiction. If,
> applying the principles relating to forum non conveniens outlined above, the
> foreign court could reasonably have concluded that there was no alternative
> forum that was clearly more appropriate, the domestic court should respect that
> decision and the application should be dismissed. When there is a genuine
> disagreement between the courts of our country and another, the courts of this
> country should not arrogate to themselves the decision for both jurisdictions. In
> most cases it will appear from the decision of the foreign court whether it acted
> on principles similar to those that obtain here, but, if not, then the domestic court
> must consider whether the result is consistent with those principles.

**19**    As La Forest J. stated in Morguard Investments Ltd. v. De Savoye (1990), 76 D.L.R. (4th) 256
(S.C.C.) at 268, modern states "cannot live in splendid isolation". They must follow comity, which
is "the deference and respect due by other states to the actions of a state legitimately taken within its
own territory."

**20**    Comity and cooperation are increasingly important in the bankruptcy context. As
internationalization increases, more parties have assets and carry on activities in several
jurisdictions. Without some coordination, there would be multiple proceedings, inconsistent
judgments and general uncertainty. See, for example, comments in Olympia & York Developments
Ltd. v. Royal Trust Co. (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.); Re Antwerp Bulkcarriers N.V.
(1996), 43 C.B.R. (3d) 284 (Que.S.C.); and J.D. Honsberger, "Canadian Recognition of Foreign
Judicially Supervised Arrangements" (1989), 76 D.B.R. (N.S.) 86.

**21**    I also note that U.S. Courts have shown themselves willing to grant comity in similar
circumstances. For example, a Bankruptcy Court granted comity in In re American Sensors Inc.
(Bkrtcy. S.D.N.Y., 1997). In that case, all proceedings against the Defendant Canadian corporation
were stayed under the Companies' Creditors Arrangement Act. The Defendant successfully applied
to the U.S. Bankruptcy Court for a stay in the U.S. based on comity. That Court stated that U.S.
public policy should recognize the foreign proceedings, thus facilitating the "orderly and systematic
distribution" of the debtor's assets. This was especially true for Canada, which has similar
procedures and procedural safeguards.

Discussion

**22**    The U.S. Bankruptcy Code provision imposing a stay once bankruptcy proceedings have begun is comparable to Canada's BIA provision. They also both have the same underlying philosophy - to ensure a fair distribution of assets among all creditors, not just those who happen to have begun proceedings prior to the initiation of bankruptcy. In a situation such as DCC's, there is another motive - if all matters can be stayed, there is a better chance that the DCC will be able to restructure successfully.

**23**    The number of claims is significant. The U.S. Bankruptcy Court has decided that it is impractical and unfair to have thousands of individual claims going through the adversarial court system. Instead, it agrees with DCC's proposal to settle as many as possible, hold common issue trials as appropriate, then have as many individual trials as still necessary. This appears logical and in the interests of all creditors as a group.

**24**    An additional consideration is that the Plaintiffs have filed proofs of claim in the U.S. bankruptcy proceedings. The Plaintiffs have, therefore, attorned to the jurisdiction of the U.S. Bankruptcy Court. As stated in In re Neese, 12 B.R. 968 (Bkrtcy.W.D.Va., 1981) at 971:

> ... [the] defendants voluntarily availed themselves of the jurisdiction of this Court when they filed, by counsel, proofs of claim in the underlying title 11 bankruptcy case....Having filed their proofs of claim in the underlying bankruptcy case, the defendants cannot now deny this Court's personal jurisdiction over them in a proceeding directly related to that case.

The same principles apply in Canada - see, for example, Microbiz Corp. v. Classic Software Systems Inc. (1996), 45 C.B.R. (3d) 40 (Ont. Gen. Div.); and Pitts v. Hill & Hill Truck Line, Inc. (1987), 66 C.B.R. 273 (Alta.Q.B., Master).

**25**    The Plaintiffs argue that foreign claimants are not treated fairly by the proposed Plan because their settlement package would be at a discount from that given to U.S. claimants. However, there are several safeguards to prevent unfairness. First, the Plaintiffs, along with the rest of the class, have the opportunity to vote against the Plan. If, as a class, they vote against it, the U.S. Bankruptcy Court can only confirm the Plan if it feels the Plan does not "discriminate unfairly" against classes which rejected it. I understand this to mean that treatment can be fair across classes without being equal, as long as there is equality within the class itself. Second, the Plaintiffs are not obliged to settle under the Plan. They may proceed to trial. Third, this Plan actually protects creditors. If there were no stay and no Plan, only the first to trial and judgment would receive any compensation at all, and trials could potentially drag on for many years. Under the Plan, each creditor will receive something and will receive it much sooner.

**26**    I do not comment on the factors used to assess the discount rate for foreign claimants, except to say that they were not all intended to relate to each foreign jurisdiction. If these factors are

accepted by the U.S. Bankruptcy Court in the exercise of its jurisdiction, a jurisdiction to which it is appropriate for me to grant comity and to which the Plaintiffs have attorned, then it is not for me to decide if I would have accepted the factors.

**27**    The Plaintiffs also argue that the recent Australian case Taylor v. Dow Corning Australia Pty. Ltd. (19 December 1997), No. 8438/95 (Vict.S.C.) should persuade me to dismiss this stay application. There, the Australian Court denied Dow Corning Australia's ("DCA's") application for a stay of proceedings in an action by an Australian plaintiff against DCA. While not binding on me in any event, the reasons in Taylor are clearly distinguishable.

**28**    DCA is a solvent subsidiary of DCC. DCC was initially a defendant, but that plaintiff discontinued against DCC. The Court ruled that any judgment against DCA would not disadvantage creditors of DCC. Further, the plaintiff was entitled to be treated as a creditor of DCA, not DCC.

**29**    In addition, that plaintiff did not file a proof of claim in the U.S. bankruptcy proceedings. This is extremely significant. In the present case, the Plaintiffs deliberately attorned to the U.S. jurisdiction by filing proofs of claim. In Taylor, the plaintiff deliberately did not. There is obiter in Taylor, as the Court held attornment was not relevant where a solvent subsidiary, not the insolvent parent, asks for the stay.

**30**    Finally, the Plaintiffs argue that I should not grant a stay when the U.S. Bankruptcy Court has not been asked to grant an injunction against non-U.S. proceedings such as this. For example, the Australian Court in Taylor queried why DCC had not requested such an injunction and concluded one would have been denied in any event. In the present case, however, an injunction is not necessary. The U.S. Bankruptcy Code itself provides for a stay of all proceedings against DCC. This is not comparable to Taylor, where the defendant was DCA, not DCC itself.

ORDER

**31**    In the circumstances of this case, the U.S. Bankruptcy Court has apparently decided that fairness among creditors is achieved without having complete equality across all classes of creditors. The Plaintiffs attorned to that jurisdiction. However, even had there been no attornment, I find that common sense dictates that these matters would be best dealt with by one Court, and in the interest of promoting international comity it seems the forum for this case is in the U.S.Bankruptcy Court. Thus, in either case, whether there has been an attornment or not, I conclude it is appropriate for me to exercise my discretion and apply the principles of comity and grant the Defendant's stay application. I reach this conclusion based on all the circumstances, including the clear wording of the U.S. Bankruptcy Code provision, the similar philosophies and procedures in Canada and the U.S., the Plaintiffs' attornment to the jurisdiction of the U.S. Bankruptcy Court, and the incredible number of claims outstanding. Lastly, while not determinative, I found it significant that there has been acceptance of the Plan in Ontario and Quebec. This not only suggests that the Plan proposes a reasonable offer, but it also suggests that the parties affected in these provinces have accepted the principle that international comity should be recognized in these proceedings.

FORSYTH J.

cp/d/drk/DRS

# TAB 15

DOCSTOR: 2191401\1

*Case Name:*

# ScoZinc Ltd. (Re)

**IN THE MATTER OF the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a Plan of Compromise or Arrangement of
ScoZinc Ltd., Applicant**

**[2009] N.S.J. No. 187**

2009 NSSC 136

277 N.S.R. (2d) 251

53 C.B.R. (5th) 96

2009 CarswellNS 229

Docket: Hfx No. 305549

Registry: Halifax

Nova Scotia Supreme Court
Halifax, Nova Scotia

**D.R. Beveridge J.**

Heard: April 3, 2009.
Oral judgment: April 3, 2009.
Released: April 28, 2009.

(49 paras.)

!!INV1339.010 !!INV1339.028 !!INV00

[QL:QLKEYWORDS/]

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters --
Compromises and arrangements -- Directions -- Monitors -- Powers, duties and functions -- Upon*

*motion by monitor in proceedings under the Companies' Creditors Arrangement Act, the monitor was held to have the necessary authority to allow a revision of a claim after the claim's bar date but before the date set for the monitor to complete its assessment of claims -- To suggest the monitor did not have the authority to receive evidence and submissions and to consider them was to say it did not have any real authority to carry out its court-appointed role to assess the claims that had been submitted.*

Motion by monitor in proceedings under the Companies' Creditors Arrangement Act seeking directions from the court on whether it had the necessary authority to allow a revision of a claim after the claim's bar date but before the date set for the monitor to complete its assessment of claims. On Dec. 22, 2008, ScoZinc Ltd. had been granted protection by means of a stay of proceedings of all claims against it. The determination of creditors' claims was set by a claims procedure order of Feb. 18, 2009 setting dates for the submission of claims to the monitor, and for the monitor to assess the claims. The monitor was directed to review all proofs of claim filed on or before March 16, 2009 and accept, revise or disallow the claims. In three cases, revised proofs of claim were filed after this date.

HELD: Order granted. The monitor had the necessary authority. The Act gave no specific guidance to the court on how to determine the existence, nature, validity or extent of a claim against a debtor company. The determination that the claims must initially be identified and assessed by the monitor, and heard first by a claims officer, was a valid exercise of the court's inherent jurisdiction. It was not only logical, but eminently practical that the monitor, as an officer of the court, be directed by court order to fulfil the analogous role to that of the trustee under the Bankruptcy and Insolvency Act. The Feb. 18, 2009 order accomplished this. It did not matter that revised claims were submitted after the claims bar date. In essence, the monitor simply acted to revise the proofs of claim already submitted to conform with the evidence elicited by the monitor, or submitted to it. The monitor had the necessary authority to revise the claims, either as to classification or amount. To suggest the monitor did not have the authority to receive evidence and submissions and to consider them was to say it did not have any real authority to carry out its court-appointed role to assess the claims that had been submitted.

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3,

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11, s. 11.7, s. 12

Probate Act, R.S.N.S. 1900, c. 158,

**Counsel:**

John G. Stringer, Q.C., and Mr. Ben R. Durnford, for the applicant.

Robert MacKeigan, Q.C., for Grant Thornton.

---

**1    D.R. BEVERIDGE J.** (orally):-- On December 22, 2008, ScoZinc Ltd. was granted protection by way of a stay of proceedings of all claims against it pursuant to s. 11 of the *Companies' Creditors Arrangement Act* R.S.C. 1985, c. C-36. The stay has been extended from time to time. Grant Thornton was appointed as the Monitor of the business and financial affairs of ScoZinc pursuant to s. 11.7 of the *CCAA*.

**2**    The determination of creditors' claims was set by a Claims Procedure Order. This order set dates for the submission of claims to the Monitor, and for the Monitor to assess the claims. The Monitor brought a motion seeking directions from the court on whether it has the necessary authority to allow a revision of a claim after the claim's bar date but before the date set for the Monitor to complete its assessment of claims.

**3**    The motion was heard on April 3, 2009. At the conclusion of the hearing of the motion I concluded that the Monitor did have the necessary authority. I granted the requested order with reasons to follow. These are my reasons.

BACKGROUND

**4**    The procedure for the identification and quantification of claims was established pursuant to my order of February 18, 2009. Any persons asserting a claim was to deliver to the Monitor a Proof of Claim by 5:00 p.m. on March 16, 2009, including a statement of account setting out the full details of the claim. Any claimant that did not deliver a Proof of Claim by the claims bar date, subject to the Monitor's agreement or as the court may otherwise order, would have its claim forever extinguished and barred from making any claim against ScoZinc.

**5**    The Monitor was directed to review all Proofs of Claim filed on or before March 16, 2009 and to accept, revise or disallow the claims. Any revision or disallowance was to be communicated by Notice of Revision or Disallowance, no later than March 27, 2009. If a creditor disagreed with the assessment of the Monitor, it could dispute the assessment before a Claims Officer and ultimately to a judge of the Supreme Court.

**6**    The three claims that have triggered the Monitor's motion for directions were submitted by Acadian Mining Corporation, Royal Roads Corp., and Komatsu International (Canada) Inc.

**7**    ScoZinc is 100% owned by Acadian Mining Corp. These two corporations share office space, managerial staff, and have common officers and directors. Acadian Mining is a substantial shareholder in Royal Roads and also have some common officers and directors.

**8**    Originally Royal Roads asserted a claim as a secured creditor on the basis of a first charge security held by it on ScoZinc's assets for a loan in the amount of approximately $2.3 million. Acadian Mining also claimed to be a secured creditor due to a second charge on ScoZinc's assets securing approximately $23.5 million of debt. Both Royal Roads and Acadian Mining have released their security. Each company submitted Proofs of Claim dated March 4, 2009 as unsecured creditors.

**9**    Royal Roads claim was for $579,964.62. The claim by Acadian Mining was for $23,761.270.20. John Rawding, Financial Officer for Acadian Mining and ScoZinc, prepared the Proofs of Claim for both Royal Roads and Acadian Mining. It appears from the affidavit and materials submitted, and the Monitor's fifth report dated March 31, 2009 that there were errors in each of the Proofs of Claim.

**10**    Mr. Rawding incorrectly attributed $1,720,035.38 as debt by Acadian Mining to Royal Roads when it should have been debt owed by ScoZinc to Royal Roads. In addition, during year end audit procedures for Royal Roads, Acadian Mining and ScoZinc, other erroneous entries were discovered. The total claim that should have been advanced by Royal Roads was $2,772,734.19.

**11**    The appropriate claim that should have been submitted by Acadian Mining was $22,041,234.82, a reduction of $1,720,035.38. Both Royal Roads and Acadian Mining submitted revised Proofs of Claim on March 25, 2009 with supporting documentation.

**12**    The third claim is by Komatsu. Its initial Proof of Claim was dated March 16, 2009 for both secured and unsecured claims of $4,245,663.78. The initial claim did not include a secured claim for the equipment that had been returned to Komatsu, nor include a claim for equipment that was still being used by ScoZinc. A revised Proof of Claim was filed by Komatsu on March 26, 2009.

**13**    The Monitor, sets out in its fifth report dated March 31, 2009, that after reviewing the relevant books and records, the errors in the Proofs of Claim by Royal Roads, Acadian Mining and Komatsu were due to inadvertence. For all of these claims it issued a Notice of Revision or Disallowance on March 27, 2009, allowing the claims as revised "if it is determined by the court that the Monitor has the power to do so".

**14**    The request for directions and the circumstances pose the following issue:

ISSUE

**15**    Does the Monitor have the authority to allow the revision of a claim by increasing it based on evidence submitted by a claimant within the time period set for the monitor to carry out its assessment of claims?

ANALYSIS

**16**    The jurisdiction of the Monitor stems from the jurisdiction of the court granted to it by the *CCAA*. Whenever an order is made under s. 11 of the *CCAA* the court is required to appoint a monitor. Section 11.7 of the *CCAA* provides:

> 11.7 (1) When an order is made in respect of a company by the court under section 11, the court shall at the same time appoint a person, in this section and in section 11.8 referred to as "the monitor", to monitor the business and financial affairs of the company while the order remains in effect.

> (2)    Except as may be otherwise directed by the court, the auditor of the company may be appointed as the monitor.

> (3)    The monitor shall

>> (a)    for the purposes of monitoring the company's business and financial affairs, have access to and examine the company's property, including the premises, books, records, data, including data in electronic form, and other financial documents of the company to the extent necessary to adequately assess the company's business and financial affairs;

>> (b)    file a report with the court on the state of the company's business and financial affairs, containing prescribed information,

>>> (i)    forthwith after ascertaining any material adverse change in the company's projected cash-flow or financial circumstances,

>>> (ii)    at least seven days before any meeting of creditors under section 4 or 5, or

>>> (iii)    at such other times as the court may order;

>> (c)    advise the creditors of the filing of the report referred to in paragraph (b) in any notice of a meeting of creditors referred to in section 4 or 5; and

>> (d)    carry out such other functions in relation to the company as the court may direct.

> ...

**17**    It appears that the purpose of the *CCAA* is to grant to an insolvent company protection from its creditors in order to permit it a reasonable opportunity to restructure its affairs in order to reach a compromise or arrangement between the company and its creditors. The court has the power to order a meeting of the creditors or class of creditors for them to consider a compromise or arrangement proposed by the debtor company (s. 4, 5). Where a majority of the creditors

representing two thirds value of the creditors or class of creditors agree to a compromise or arrangement, the court may sanction it and thereafter such compromise or arrangement is binding on all creditors, or class of creditors (s. 6).

**18**    Section 12 of the *Act* defines a claim to mean "any indebtedness, liability or obligation of any kind that, if unsecured, would be a debt provable in bankruptcy within the meaning of the *Bankruptcy and Insolvency Act*." However, as noted by McElcheran in *Commercial Insolvency in Canada* (LexisNexis Canada Inc., Markham, Ontario, 2005 at p. 279-80) the *CCAA* does not set out a process for identification or determination of claims; instead, the Court creates a claims process by court order.

**19**    The only guidance provided by the *CCAA* is that in the event of a disagreement the amount of a claim shall be determined by the court on summary application by the company or by the creditor. Section 12(2) of the *Act* provides:

> Determination of amount of claim

> (2)    For the purposes of this Act, the amount represented by a claim of any secured or unsecured creditor shall be determined as follows:

>> (a)    the amount of an unsecured claim shall be the amount

>>> (i)    in the case of a company in the course of being wound up under the Winding-up and Restructuring Act, proof of which has been made in accordance with that Act,
>>> (ii)   in the case of a company that has made an authorized assignment or against which a bankruptcy order has been made under the Bankruptcy and Insolvency Act, proof of which has been made in accordance with that Act, or
>>> (iii)  in the case of any other company, proof of which might be made under the Bankruptcy and Insolvency Act, but if the amount so provable is not admitted by the company, the amount shall be determined by the court on summary application by the company or by the creditor; and

>> (b)    the amount of a secured claim shall be the amount, proof of which might be made in respect thereof under the Bankruptcy and Insolvency Act if the claim were unsecured, but the amount if not admitted by the company shall, in the case of a company subject to pending proceedings under the

> Winding-up and Restructuring Act or the Bankruptcy and Insolvency Act,
> be established by proof in the same manner as an unsecured claim under
> the Winding-up and Restructuring Act or the Bankruptcy and Insolvency
> Act, as the case may be, and in the case of any other company the amount
> shall be determined by the court on summary application by the company
> or the creditor.

**20**    The only parties who appeared on this motion were the Monitor, ScoZinc and Komatsu. No specific submissions were requested nor made by the parties with respect to the nature of the court's jurisdiction to determine the mechanism and time lines to classify and quantify claims against the debtor company.

**21**    Under the *Bankruptcy and Insolvency Act* the Trustee is the designated gatekeeper who first determines whether a Proof of Claim submitted by a creditor is valid. The trustee may admit the claim or disallow it in whole or in part (s. 135(2) *BIA)*. A creditor who is dissatisfied with a decision by the trustee may appeal to a judge of the Bankruptcy Court.

**22**    In contrast, the *CCAA* does not set out the procedure beyond the language in s. 12. The language only accomplishes two things. The first is that the debtor company can agree on the amount of a secured or unsecured claim; and secondly, if there is a disagreement, then on application of either the company or the creditor, the amount shall be determined by the court on "summary application".

**23**    The practice has arisen for the court to create by order a claims process that is both flexible and expeditious. The Monitor identifies, by review of the debtor's records, all potential claimants and sends to them a claim package. To ensure that all creditors come forward and participate on a timely basis, there is a provision in the claims process order requiring creditors to file their claims by a fixed date. If they do not, subject to further relief provided by the claims process order, or by the court, the creditor's claim is barred.

**24**    If the Monitor disagrees with the claim, and the disagreement cannot be resolved, then a claimant can present its case to a claims officer who is usually given the power to adjudicate disputed claims, with the right of appeal to a judge of the court overseeing the *CCAA* proceedings.

**25**    The establishment of a claims process utilizing the monitor and or a claims officer by court order appears to be a well accepted practice (See for example *Federal Gypsum Co., (Re)* 2007 NSSC 384; *Olympia & York Developments Ltd. (Re)* (1993), 17 C.B.R. (3d) 1 (Ont. S.C.J.); *Air Canada, (Re)* (2004) 2 C.B.R. (5th) 23 (Ont. S.C.J.); *Triton Tubular Components v. Steelcase Inc*., [2005] O.J. No. 3926 (Ont. S.C.J.); *Muscletech Research & Development Inc.,(Re)*, [2006] O.J. No. 4087 (Ont. S.C.J.); *Pine Valley Mining Corp., (Re)* 2008 BCSC 356; *Blue Range Resource Corp.*, Re 2000 ABCA 285; *Carlen Transport Inc. v. Juniper Lumber Co. (Monitor of)* (2001), 21 C.B.R. (4th) 222 ( N.B.Q.B.).)

**26**    I could find no reported case that doubt the authority of the court to create a claims process. Kenneth Kraft in his article "The CCAA and the Claims Bar Process", (2000), 13 Commercial Insolvency Reporter 6, endorsed the utilization of a claims process on the basis of reliance on the court's inherent jurisdiction, provided the process adhered to the specific mandates of the *CCAA*. In unrelated contexts, caution has been expressed with respect to reliance on the inherent jurisdiction of the superior court as the basis for dealing with the myriad issues that can arise under the *CCAA* (See: *Clear Creek Contracting v. Skeena Cellulous Inc.*,(2003), 43 C.B.R (4th) 187) (B.C.C.A.) and *Stelco Inc.(Re)*, [2005] O.J. No. 1171 (CA.)).

**27**    Sir J.H. Jacob, Q.C. in his seminal article "The Inherent Jurisdiction of the Court", (1970) Current Legal Problems 23, concluded that it has been clear law from the earliest times that superior courts of justice, as part of their inherent jurisdiction, have the power to control their own proceedings and process. He wrote:

> Under its inherent jurisdiction, the court has power to control and regulate its process and proceedings, and it exercises this power in a great variety of circumstances and by many different methods. Some of the instances of the exercise of this power have been of far-reaching importance, others have dealt with matters of detail or have been of transient value. Some have involved the exercise of administrative powers, others of judicial powers. Some have been turned into rules of law, others by long usage or custom may have acquired the force of law, and still others remain mere rules of practice. The exercise of this power has been pervasive throughout the whole legal machinery and has been extended to all stages of proceedings, pre-trial, trial and post-trial. Indeed, it is difficult to set the limits upon the powers of the court in the exercise of its inherent jurisdiction to control and regulate its process, for these limits are coincident with the needs of the court to fulfil its judicial functions in the administration of justice.

> p. 32-33

**28**    The *CCAA* gives no specific guidance to the court on how to determine the existence, nature, validity or extent of a claim against a debtor company. As noted earlier, the only reference is in s. 12 of the *Act* that if there is a dispute as to the amount of a claim, then the amount shall be determined by the court "on summary application". In *Re Freeman Estate*, [1922] N.S.J. No. 15, [1923] 1 D.L.R. 378 (en banc) the court considered the words "on summary application" as they appeared in the *Probate Act* R.S.N.S. 1900 c. 158. Harris C.J. wrote:

> [17] The words "summary application" do not mean without notice, but simply imply that the proceedings before the Court are not to be conducted in the ordinary way, but in a concise way.

[18] The Oxford Dictionary p. 140 gives as one of the meanings of "summary" dispensing with needless details or formalities -- done with despatch.

[19] In the case of the Western &c R. Co. v. Atlanta (1901), 113 Ga. 537, the meaning of the words "summary proceeding" is discussed at some length and the Court held at pp. 543-544:--

"In a summary manner does not at all mean that they may be abated without notice or hearing, but simply that it may be done without a trial in the ordinary forms prescribed by law for a regular judicial procedure."

[20] I cite this not because it is a binding authority, but because its reasoning commends itself to my judgment and I adopt it.

**29**    In my opinion, whatever process may be appropriate and necessary to adjudicate disputed claims that ultimately end up before a judge of the superior court, the determination by the court that claims must initially be identified and assessed by the Monitor, and heard first by a Claims Officer, is a valid exercise of the court's inherent jurisdiction.

**30**    The *CCAA* gives to the court the express and implied jurisdiction to do a variety of things. They need not all be enumerated. The court is required to appoint a monitor (s. 11.7). Once appointed, the monitor is required to monitor the company's business and financial affairs. The *Act* mandates that the monitor have access to and examine the company's property including all records. The monitor must file a report with the court on the state of the company's business and financial affairs and contain prescribed information. In addition, the monitor shall carry out such other functions in relation to the company as the court may direct (s. 11.7(3)(d)).

**31**    In these circumstances, it is not only logical, but eminently practical that the monitor, as an officer of the court, be directed by court order to fulfil the analogous role to that of the trustee under the *BIA*. The Claims Procedure Order of February 18, 2009 accomplishes this.

POWER OF THE MONITOR

**32**    The Monitor was required by the Order to publish a notice to claimants in the newspaper regarding the claims procedure. It was also required to send a claims package to known potential claimants identified by the Monitor through its review of the books and records of ScoZinc. The claims bar date was set as March 16, 2009, or such later date as may be ordered by the court.

**33**    The duties of the Monitor, once a claim was received by it, were set out in paragraphs 9 and 10 of the Claims Procedure Order. They provide as follows:

> 9.    Upon receipt of a Proof of Claim:
>
> > a.    The Monitor is hereby authorized and directed to use reasonable discretion as to the adequacy of compliance as to the manner in which Proofs of Claim are completed and executed and may, where it is satisfied that a Claim has been adequately proven, waive strict compliance with the requirements of this Order as to the completion and the execution of a Proof of Claim. A Claim which is accepted by the Monitor shall constitute a Proven Claim;
> > b.    the Monitor and ScoZinc may attempt to consensually resolve the classification and amount of any Claim with the claimant prior to accepting, revising or disallowing such Claim; and
> >
> > ...
>
> 10.    The Monitor shall review all Proofs of Claim filed on or before the Claims Bar Date. The Monitor shall accept, revise or disallow such Proofs of Claim as contemplated herein. The Monitor shall send a Notice of Revision or Disallowance and the form of Notice of Dispute to the Claimant as soon as the Claim has been revised or disallowed but in any event no later than 11:59 p.m. (Halifax time) on March 27, 2009 or such later date as the Court may order. Where the Monitor does not send a Notice of Revision or Disallowance by the aforementioned date to a Claimant who has submitted a Proof of Claim, the Monitor shall be deemed to have accepted such Claim.

**34**    Any person who wished to dispute a Notice of Revision or Disallowance was required to file a notice to the monitor and to the Claims Officer no later than April 6, 2009. The Claims Officer was designated to be Richard Cregan, Q.C., serving in his personal capacity and not as Registrar in Bankruptcy. Subject to the direction of the court, the Claims Officer was given the power to determine how evidence would be brought before him and any other procedural matters that may arise with respect to the claim. A claimant or the Monitor may appeal the Claims Officer's decision to the court.

**35**    The Monitor suggests that the power given to it under paragraph 9(a) and 10 is sufficient to permit it to accept the revised Proofs of Claim filed after the claim's bar date of March 16, 2009, but before its assessment date of March 27, 2009.

**36**    Reliance is also placed on the decision of the Alberta Court of Appeal in *Blue Range Resource Corp.* 2000 ABCA 285. As noted by the Monitor, the decision in *Blue Range* did not directly deal with the issue on which the Monitor here seeks directions. In *Blue Range*, the claims procedure established by the court set the claims bar date of June 15, 1999. Claims of creditors not proven in accordance with the procedures set out were deemed to be forever barred. Some creditors filed their Notice of Claim after the claims bar date. The monitor disallowed their claims. There were a second group of creditors who filed their Notice of Claim prior to the applicable claims bar date, but then sought to amend their claims after the claims bar date had passed. The monitor also disallowed these claims as late. What is not clear from the reported decisions is whether this second group of creditors requested amendments of their claims during the time period granted to the Monitor to carry out its assessment.

**37**    The chambers judge allowed the late and amended claims to be filed, [1999] A.J. No. 1308. Enron Capital Corp. and the creditor's committee sought leave to appeal that decision. Leave to appeal was granted on January 14, 2000 with respect to the following question:

> What criteria in the circumstances of these cases should the Court use to exercise its discretion in deciding whether to allow late claimants to file claims which, if proven, may be recognized, notwithstanding a previous claims bar order containing a claims bar date which would otherwise bar the claim of the late claimants, and applying the criteria to each case, what is the result?

> *Re Blue Range Resources Corp.*, 2000 ABCA 16

**38**    Wittmann J.A. delivered the judgment of the court. He noted that all counsel conceded that the court had the authority to allow the late filing of claims and that the appeal was really a matter of what criteria the court should use in exercising that power. Accordingly, a Claims Procedure Order that contains a claims bar date should not purport to forever bar a claim without a saving provision. Wittmann J.A. set out the test for determining when a late claim may be included to be as follows:

> [26] Therefore, the appropriate criteria to apply to the late claimants is as follows:

>> 1.    Was the delay caused by inadvertence and if so, did the claimant act in good faith?
>> 2.    What is the effect of permitting the claim in terms of the existence and impact of any relevant prejudice caused by the delay?
>> 3.    If relevant prejudice is found can it be alleviated by attaching appropriate conditions to an order permitting late filing?
>> 4.    If relevant prejudice is found which cannot be alleviated, are there any other considerations which may nonetheless warrant an order

permitting late filing?

[27] In the context of the criteria, "inadvertent" includes carelessness, negligence, accident, and is unintentional. I will deal with the conduct of each of the respondents in turn below and then turn to a discussion of potential prejudice suffered by the appellants.

2000 ABCA 285

**39**    The appellants claimed that they would be prejudiced if the late claims were allowed because if they had known the late claims would be allowed they would have voted differently. This assertion was rejected by the chambers judge. With respect to what is meant by prejudiced, Wittmann J.A. wrote:

> 40 In a CCAA context, as in a BIA context, the fact that Enron and the other Creditors will receive less money if late and late amended claims are allowed is not prejudice relevant to this criterion. Re-organization under the CCAA involves compromise. Allowing all legitimate creditors to share in the available proceeds is an integral part of the process. A reduction in that share can not be characterized as prejudice: Re Cohen (1956), 36 C.B.R. 21 (Alta. C.A.) at 30-31. Further, I am in agreement with the test for prejudice used by the British Columbia Court of Appeal in 312630 British Columbia Ltd., [1995] B.C.J. No. 1600. It is: did the creditor(s) by reason of the late filings lose a realistic opportunity to do anything that they otherwise might have done? Enron and the other creditors were fully informed about the potential for late claims being permitted, and were specifically aware of the existence of the late claimants as creditors. I find, therefore, that Enron and the Creditors will not suffer any relevant prejudice should the late claims be permitted.

**40**    In considering how the Monitor should carry out its duties and responsibilities under the Claims Procedure Order it is important to note that the Monitor is an officer of the court and is obliged to ensure that the interests of the stakeholders are considered including all creditors, the company and its shareholders ( See *Laidlaw Inc. Re* (2002), 34 C.B.R. (4th) 72 (Ont. S.C.J.).

**41**    In a different context Turnball J.A. in *Siscoe & Savoie v. Royal Bank* (1994), 29 C.B.R. (3d) 1 commented that the monitor is an agent of the court and as a result is responsible and accountable to the court, owing a fiduciary duty to all of the parties (para. 28).

**42**    In my opinion, para. 9(a) is not of assistance in determining the authority of the Monitor to revise upward a claim filed after the claim's bar date but before the assessment date. Paragraph 9(a) authorizes the Monitor to use reasonable discretion as to the adequacy of compliance as to **the**

**manner** to which Proofs of Claim are completed and executed. If it satisfied that the claim has been adequately proven it may waive strict compliance with the requirements of the order as to **completion** and the **execution** of a Proof of Claim.

**43**    Paragraph 10 of the Claims Procedure Order mandates the Monitor shall review all Proofs of Claim filed on or before the claims bar date. It shall "accept, revise or disallow such Proofs of Claim as contemplated herein". While normally a monitor's revision would be to reduce a Proof of Claim, there is in fact nothing in the Claims Procedure Order that so restricts the Monitor's authority. It is obviously contemplated by para. 10 that the monitor is to carry out some assessment of the claims that are submitted.

**44**    In my view, the Proofs of Claim that are filed act both as a form of pleading and an opportunity for the claimant to provide supporting documents to evidence its claim. In the case before me, the creditors discovered that the claims they had submitted were inaccurate and further evidence was tendered to the Monitor to demonstrate. The Monitor, after reviewing the evidence, accepted the validity of the claims.

**45**    Courts in a general way are engaged in dispensing justice. They do so by setting up and applying procedural rules to ensure that litigants are afforded a fair hearing. The resolution of disputes through the litigation process, including the ultimate hearing, is fundamentally a truth-seeking process to determine the facts and to apply the law to those facts. Can it be any different where the process is not in the court but under its supervision pursuant to a claims process under the *CCAA.?*

**46**    To suggest that the monitor does not have the authority to receive evidence and submissions and to consider them is to say that it does not have any real authority to carry out its court appointed role to assess the claims that have been submitted. The notion that the monitor cannot look at documentary evidence on its own initiative or at the instance of a claimant, and even consider submissions, is to deny it any real power to consider and make a preliminary determination of the merits of a claim.

**47**    The Claims Procedure Order contains a number of provisions that anticipate the exchange of information between the Monitor, the company and a creditor. Paragraph 9(b) authorizes the Monitor and ScoZinc to attempt to consensually resolve the classification and the amount of any claim with a claimant prior to accepting, revising or disallowing such claim. Paragraph 17 of the Claims Procedure Order directs that the Monitor shall at all times be authorized to enter into negotiations with claimants and settle any claim on such terms as the Monitor may consider appropriate.

**48**    In my opinion, it does not matter that revised claims were submitted after the claims bar date. In essence, the Monitor simply acted to revise the Proofs of Claim already submitted to conform with the evidence elicited by the Monitor, or submitted to it. The Monitor had the necessary authority to revise the claims, either as to classification or amount.

**49**   If a claimant seeks to revise or amend its claim after the assessment date set out in the Claims Procedure Order, different considerations may come into play. The appropriate procedure will depend on the provisions of the Claims Procedure Order. In addition, the court, as the ultimate arbiter of disputed claims under s. 12 of the *CCAA*, should always be viewed as having the jurisdiction to permit appropriate revision of claims.

D.R. BEVERIDGE J.

cp/e/qlrxg/qlpxm/qlaxw/qlced/qlaxr/qlced

# TAB 16

DOCSTOR: 2191401\1

*Indexed as:*
# Z.I. Pompey Industrie v. ECU-Line N.V.

**ECU-Line N.V., appellant;**

**v.**

**Z.I. Pompey Industrie, Société lyonnaise de messageries
nationales, John S. James Co., Polyfibron Technologies
Inc., Ellehammer Packaging Inc., and all others having
an interest in the cargo laden on board the M.V. "Canmar
Fortune", respondents.**

[**2003] 1 S.C.R. 450**

[2003] S.C.J. No. 23

2003 SCC 27

File No.: 28472.

Supreme Court of Canada

Heard: October 2, 2002;
Judgment: May 1, 2003.

**Present: McLachlin C.J. and Gonthier, Iacobucci, Major,
Bastarache, Binnie and LeBel JJ.**

(42 paras.)

**Appeal From:**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

**Catchwords:**

*Conflict of laws -- Courts -- Jurisdiction -- Bills of lading -- Forum selection clauses -- Stay of
proceedings -- Arrangements made with appellant for carriage of cargo by sea -- Respondents
filing action against appellant in Federal Court alleging that cargo was damaged while in transit
by rail -- Appellant seeking stay of proceedings on basis that bill of lading contained forum*

*selection clause giving courts in Antwerp, Belgium exclusive jurisdiction -- Proper test for stay of proceedings to enforce forum selection clause in bill of lading -- Whether "strong cause" test is proper test -- Whether proper test should contemplate inquiry into whether there was fundamental breach or deviation -- Federal Court Act, R.S.C. 1985, c. F-7, s. 50(1).*

## Summary:

The respondents filed an action for damages against the appellant in the Federal Court, alleging that cargo was damaged while in transit by rail. Under the bill of lading Antwerp, Belgium was designated as the port of loading and Seattle was designated as the port of discharge. The cargo was transported from Antwerp to Montréal, where it was unloaded and carried by train to Seattle. The bill [page451] of lading contained a forum selection clause stating that "[t]he contract evidenced by or contained in this bill of Lading is governed by the law of Belgium, and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts in Antwerp and no other Courts." The appellant brought a motion seeking a stay of proceedings on the basis that the bill of lading required disputes to be determined exclusively by the courts of Antwerp. A prothonotary denied the motion. The Federal Court, Trial Division dismissed the appellant's motion to set aside the prothonotary's order. The Federal Court of Appeal upheld the decision.

*Held*: The appeal should be allowed and a stay of proceedings issued in favour of the appellant.

In the absence of applicable legislation, such as s. 46(1) of the *Marine Liability Act*, the proper test for a stay of proceedings pursuant to s. 50 of the *Federal Court Act* to enforce a forum selection clause in a bill of lading is the "strong cause" test. Once a court is satisfied that a validly concluded bill of lading otherwise binds the parties, it must grant the stay unless the plaintiff can show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause. In exercising its discretion, the court should take into account all of the circumstances of the particular case. The tripartite test for interlocutory injunctions is an inappropriate test for a stay of proceedings to enforce a forum selection clause in a bill of lading. First, the tripartite test would render most forum selection clauses unenforceable, creating commercial uncertainty by unduly minimizing the importance of contractual undertakings. Second, the tripartite test is also problematic because the first part of the test requires the court to evaluate the likelihood of success on the merits of the case -- which would be impossible because there is normally no determination on the merits. Finally, the tripartite test would make it difficult to establish irreparable harm in the context of a stay application based on a forum selection clause.

On an application for a stay to uphold a forum selection clause in a bill of lading, a court must not delve into [page452] whether one party has deviated from or fundamentally breached an otherwise validly formed contract. Such inquiries would render forum selection clauses illusory since most disputes will involve allegations which, if proved, will make the agreement terminable or voidable by the aggrieved party. Issues respecting an alleged fundamental breach of contract or deviation

therefrom should generally be determined under the law and by the court chosen by the parties in the bill of lading. Once it is determined that the bill of lading binds the parties, the "strong cause" test constitutes an inquiry into questions such as the convenience of the parties, fairness between the parties and the interests of justice, not of the substantive legal issues underlying the dispute.

The decisions of the prothonotary, the motions judge and the Court of Appeal in this case are clearly wrong. The prothonotary, to the extent he applied the "tripartite test", erred in law, as did the Court of Appeal in concluding that the appropriate test for a stay of proceedings involving a bill of lading with a forum selection clause was the "tripartite test" for interlocutory injunctions. The "strong cause" test remains relevant and effective and no social, moral or economic changes justify the departure advanced by the Court of Appeal. Further, the prothonotary erred in law when he determined that the forum selection clause was void as a result of the alleged deviation stemming from the discharge of the cargo in Montréal. It is unnecessary to determine whether there has been a fundamental breach or deviation because the forum selection clause clearly covers such a dispute.

## Cases Cited

Applied: The "Eleftheria", [1969] 1 Lloyd's Rep. 237; distinguished: Manitoba (Attorney General) v. Metropolitan Stores Ltd., [1987] 1 S.C.R. 110; considered: Guarantee Co. of North America v. Gordon Capital Corp., [1999] 3 S.C.R. 423; referred to: American Cyanamid Co. v. Ethicon Ltd., [1975] 1 All E.R. 504; Captain v. Far Eastern SS. Co. (1978), 7 B.C.L.R. 279; Canada v. Aqua-Gem Investments Ltd., [1993] 2 F.C. 425; Jian Sheng Co. v. Great Tempo S.A., [1998] 3 F.C. 418, leave to appeal refused, [1998] 3 S.C.R. vi; Morguard Investments Ltd. v. De Savoye, [1990] 3 S.C.R. 1077; Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of), [2001] 3 S.C.R. 907, 2001 SCC 90; Amchem Products Inc. v. British Columbia (Workers' Compensation Board), [1993] 1 S.C.R. 897; RJR--MacDonald [page453] Inc. v. Canada (Attorney General), [1994] 1 S.C.R. 311; The "Seapearl" v. Seven Seas Dry Cargo Shipping Corp., [1983] 2 F.C. 161; Anraj Fish Products Industries Ltd. v. Hyundai Merchant Marine Co. (2000), 262 N.R. 270; Sarabia v. "Oceanic Mindoro" (The) (1996), 26 B.C.L.R. (3d) 143, leave to appeal refused, [1997] 2 S.C.R. xiv; Maritime Telegraph and Telephone Co. v. Pre Print Inc. (1996), 131 D.L.R. (4th) 471; Morrison v. Society of Lloyd's (2000), 224 N.B.R. (2d) 1, leaves to appeal refused, [2000] 2 S.C.R. viii and xi; Trendtex Trading Corp. v. Credit Suisse, [1982] A.C. 679; The Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972); Advanced Cardiovascular Systems Inc. v. Universal Specialties Ltd., [1997] 1 N.Z.L.R. 186; Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585 (1991); Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528 (1995); Mackender v. Feldia A.G., [1966] 3 All E.R. 847; Fairfield v. Low (1990), 71 O.R. (2d) 599; Ash v. Lloyd's Corp. (1992), 9 O.R. (3d) 755, leave to appeal refused, [1992] 3 S.C.R. v; Drew Brown Ltd. v. The "Orient Trader", [1974] S.C.R. 1286; Hunter Engineering Co. v. Syncrude Canada Ltd., [1989] 1 S.C.R. 426; Incremona-Salerno Marmi Affini Siciliani (I.S.M.A.S.) s.n.c. v. Ship Castor (2002), 297 N.R. 151, 2002 FCA 479.

## Statutes and Regulations Cited

Federal Court Act, R.S.C. 1985, c. F-7, s. 50(1).

Marine Liability Act, S.C. 2001, c. 6, s. 46(1).

**Authors Cited**

Michell, M. Paul. "Forum Selection Clauses and Fundamental Breach: Z.I. Pompey Industrie v. ECU-Line N.V., The Canmar Fortune" (2002), 36 Can. Bus. L.J. 453.

Peel, Edwin. "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] L.M.C.L.Q. 182.

Tetley, William. Marine Cargo Claims, 3rd ed. Montréal: Yvon Blais, 1988.

**History and Disposition:**

APPEAL from a judgment of the Federal Court of Appeal (2001), 268 N.R. 364, [2001] F.C.J. No. 96 (QL), dismissing an appeal from a decision of the Trial Division (1999), 182 F.T.R. 112, [1999] F.C.J. No. 2017 (QL), dismissing a motion to set aside the order of Prothonotary Hargrave denying a stay of proceedings (1999), 179 F.T.R. 254, [1999] F.C.J. No. 1584 (QL). Appeal allowed.


[page454]


**Counsel:**

H. Peter Swanson, for the appellant.

George J. Pollack and Jean-Marie Fontaine, for the respondents.

---

The judgment of the Court was delivered by

**1    BASTARACHE J.**:-- The appellant submits that the appropriate test on a motion for a stay of proceedings to uphold a forum selection clause in a bill of lading is the "strong cause" test, as set out by Brandon J. in *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237 (Adm. Div.). The respondents, however, contend that the Federal Court of Appeal was correct in applying the tripartite test for interlocutory injunctions established in *American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504 (H.L.). In my view, there is no legal or policy justification for setting aside the "strong cause" test in the context of a stay of proceedings to uphold a forum selection clause in a bill of lading. The

dispute in this case arises under or in connection with the bill of lading. Its broad, unambiguous and unqualified forum selection clause was clearly intended to cover the dispute that gave rise to this appeal.

     I.     <u>Facts</u>

**2**    The respondent Polyfibron Technologies Inc. purchased a photo processor and four "sub-assemblies" located in France from the respondent Z.I. Pompey Industrie for resale to its customer, the respondent Ellehammer Packaging Inc. The cargo was to be delivered directly to Ellehammer in Seattle, Washington. Polyfibron retained the services of the respondent John S. James Co., a freight forwarder, to arrange for the importation of the cargo. John S. James Co., in turn, retained the services of the respondent Société lyonnaise de messageries nationales ("S.L.M.N. Shipping"), which made arrangements with ECU-Line France, a division of the appellant ECU-Line N.V., a Belgian company, for carriage of the cargo by sea.

  [page455]

**3**    The respondent John S. James Co. was aware that the cargo could not be transported by rail without there being a significant risk of it sustaining damage and communicated this fact to the respondent S.L.M.N. Shipping.

**4**    Under a clean on-board bill of lading executed at Lyon, France on January 23, 1997, the appellant was to carry the cargo from Antwerp, Belgium, to Seattle. The bill of lading designates John S. James Co. as the "consignee", Antwerp as the "port of loading", and Seattle as the "port of discharge". It bears the following forum selection clause:

> The contract evidenced by or contained in this bill of Lading is governed by the law of Belgium, and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts in Antwerp and no other Courts.

The back of the bill of lading contains, among other provisions, the following clause:

> 12. METHODS AND ROUTE OF TRANSPORTATION

> (1)    The Carrier may ant [*sic*] any time and without notice to the Merchant: use any means of transport or storage whatsoever; load or carry the Goods on any vessel whether named on the front hereof or not; transfer the Goods from one conveyance to another including transshipping or carrying the same on another vessel than that named on the front hereof or by any other means of transport whatsoever; at any place unpack and remove Goods which have been stuffed in

or on a Container and forward the same in any manner whatsoever; proceed at any speed and by any route in his discretion (whether or not the nearest or most or customary or advertised route) and proceed to or stay at any place whatsoever once or more often and in any order; load or unload the Goods from any conveyance at any place (whether or not the place is a port named on the front hereof as the intended Port of Loading or intended Port of Discharge); ...

(2)   The liberties set out in (1) above be [*sic*] invoked by the Carrier for any purposes whatsoever whether or not connected with the Carriage of the Goods. Anything done accordance [*sic*] with (1) above or any delay arising therfrom [*sic*] shall be deemed to be within the contractual Carriage and shall not be a deviation or whatsoever nature or degree.

[page456]

**5**   The appellant transported the cargo from Antwerp to Montréal, where it was unloaded. From there the cargo was carried by train to Seattle. The respondents filed an action for damages of $60,761.74 in the Federal Court of Canada, alleging that the cargo was damaged while in transit by rail. The appellant denied the cargo had been damaged, arguing in the alternative that any damage had been caused by the respondents, third parties, or events for which it was not responsible. The appellant also brought a motion seeking a stay of proceedings on the basis that the bill of lading required disputes to be determined exclusively by the courts of Antwerp.

II.   <u>Relevant Statutory Provisions</u>

**6**   The following statutory provisions are central to this appeal:

*Federal Court Act*, R.S.C. 1985, c. F-7

**50.** (1) The Court may, in its discretion, stay proceedings in any cause or matter,

(*a*) on the ground that the claim is being proceeded with in another court or jurisdiction; or

(*b*) where for any other reason it is in the interest of justice that the proceedings be stayed.

*Marine Liability Act*, S.C. 2001, c. 6

**46.** (1) If a contract for the carriage of goods by water to which the Hamburg Rules do not apply provides for the adjudication or arbitration of claims arising under the contract in a place other than Canada, a claimant may institute judicial or arbitral proceedings in a court or arbitral tribunal in Canada that would be competent to determine the claim if the contract had referred the claim to Canada, where

> (*a*) the actual port of loading or discharge, or the intended port of loading or discharge under the contract, is in Canada;

> (*b*) the person against whom the claim is made resides or has a place of business, branch or agency in Canada; or

> (*c*) the contract was made in Canada.

[page457]

III.    Judicial History

A. *Federal Court of Canada, Trial Division* (1999), 179 F.T.R. 254

**7**    The appellant sought a stay of proceedings before the Federal Court, pursuant to s. 50 of the *Federal Court Act*, arguing that the courts of Antwerp were the proper jurisdiction to deal with any disputes arising from the bill of lading. The prothonotary held that the appellant had moved for a stay within reasonable time given the implementation of new court rules and had therefore not attorned to its jurisdiction. The prothonotary accepted and applied the "strong cause" test as set out in the *The "Eleftheria"* characterizing its finding in the following way, at paras. 4-5:

> ... I accept that ECU-Line prefers to litigate in a familiar jurisdiction and does not bring up the Antwerp jurisdiction merely to seek procedural advantage. Other factors favouring the upholding of the jurisdiction clause include reasonable connections with Belgium, Belgian and French witnesses, that any time bar which might preclude the plaintiffs from bringing their case in Antwerp has been waived, that no security has been posted and that enforcement of a Belgian judgment against the carrier, a Belgian company, should present no particular

difficulties.

I accept, from the Plaintiffs' point of view, that there will be Canadian and American witnesses, including from the American east-coast freight forwarder through whom the Plaintiff, Polyfibron Technologies Inc., arranged the carriage. Certainly the Tribunal of Commerce in [Antwerp], which would decide the case under the jurisdiction clause, conducts its proceedings in Flemish and decides cases on the basis of documents and statements, a procedure precluding witnesses and cross-examination. There may also be considerably more delay in most instances than in the Federal Court and all the more so in the case of an appeal. There are also some lesser factors which favour litigation in Vancouver.

[page458]

The prothonotary concluded, at para. 5, that the factors raised by the respondents, while "substantial", were "just short [in this instance] of the strong case" which, by *The "Eleftheria"*, the respondents had to present in order to override the forum selection clause.

**8**    However, the prothonotary added that the respondents had presented a persuasive case that the bill of lading had come to an end in Montréal. For that reason, there was no forum selection clause to apply to the dispute. Notwithstanding clause 12 of the bill of lading, the prothonotary, relying on Professor W. Tetley's *Marine Cargo Claims* (3rd ed. 1988), accepted the presumption that a serious and willful breach or deviation of a contract of carriage may bring into question exclusion or limitation clauses in the contract. The prothonotary's response to the appellant's contention that issues of fundamental breach or deviation should be determined on the merits by the trial judge was the following, at para. 8 :

The answer to this is not complex. An interim injunction, obtained on an interlocutory application, which requires a testing of the waters by looking at the strength of the case, the harm being caused and the balance of convenience, is analogous to denial of a stay of the basis of a strong case that the jurisdiction clause is just not applicable. The interim injunction does not handicap the trial judge, nor should the denial of a stay on the basis that the jurisdiction clause is in all likelihood not available. Any prejudice to ECU-Line in having to litigate in Canada can be compensated by costs.

The prothonotary stated that it was common knowledge that rail carriage is usually accompanied by vibration, bumps and jolts, though considered this to be immaterial to the present case in which the intent to deviate was the sole issue. The prothonotary concluded that the appellant's deviation from the bill of lading was both unreasonable and voluntary. Relying on *Captain v. Far Eastern SS. Co.*

(1978), 7 B.C.L.R. 279 (S.C.), the prothonotary concluded that there was no contract at the time the appellant [page459] discharged the cargo in Montréal and thus no forum selection clause upon which it could rely.

**9**    The motion for a stay of proceedings to uphold the forum selection clause was therefore denied.

B. *Federal Court of Canada, Trial Division* (1999), 182
 F.T.R.
 112

**10**    The court concluded that the prothonotary was obliged to take into account all the circumstances of the case in determining whether the respondent had demonstrated a "strong cause" in favour of denying a stay, pursuant to the test set out in *The "Eleftheria"*, an inquiry that did not preclude him from concluding that the bill of lading ended in Montréal and that its forum selection clause did not apply thereafter. The court added that in any event the appellant would have the opportunity to raise its arguments regarding the existence of the bill of lading and its forum selection clause before a trial judge.

**11**    The court dismissed with costs the motion to set aside the order of the prothonotary.

C.    *Federal Court of Appeal* (2001), 268 N.R. 364

**12**    The Court of Appeal held that the test for reviewing decisions of a prothonotary is whether the prothonotary's exercise of discretion was clearly wrong and that the test for reviewing the exercise of discretion of a motions judge is whether sufficient weight was given to all relevant considerations.

**13**    The Court of Appeal concluded that *The "Eleftheria"* did not govern the case, stating, at para. 27:

> The burden of the appellant's submission is that when, as here, a contract contains a jurisdiction clause requiring that all disputes, wherever they arise, are to be dealt with by the Courts of a particular jurisdiction, Anglo-American and Anglo-Canadian jurisprudence both conclude that the dispute must be dealt with by the [page460] Courts of the jurisdiction the parties have agreed to. The appellant says that since *The Eleftheria* no case in Anglo-Canadian or Anglo-American jurisprudence has held otherwise. I disagree. *Jian Sheng Co.* [*v. Great Tempo S.A.*, [1998] 3 F.C. 418 (C.A.)] is a case where this Court held that a prothonotary was right to refuse a stay in circumstances where the appellant had not led sufficient evidence to support the existence of jurisdiction elsewhere than Canada.

**14**    The Court of Appeal emphasized *The "Eleftheria"* was decided in 1969 and the House of

Lords had since decided *American Cyanamid, supra*, thereby relaxing the requirements for an interlocutory injunction to a tripartite test: first, a preliminary and tentative assessment of the merits of the case must show there is a serious issue to be tried; second, consideration must be given to whether the party seeking the interlocutory injunction would suffer irreparable harm unless the injunction is granted; and third, there must be a determination as to which party would suffer the greater harm as a result of the granting or refusing of an interlocutory injunction.

**15**    The Court of Appeal quoted with approval Beetz J., writing for a unanimous Supreme Court, in *Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1 S.C.R. 110, at p. 127:

> A stay of proceedings and an interlocutory injunction are remedies of the same nature. In the absence of a different test prescribed by statute, they have sufficient characteristics in common to be governed by the same rules and the courts have rightly tended to apply to the granting of interlocutory stay the principles which they follow with respect to interlocutory injunctions ... .

The Court of Appeal reasoned that although the prothonotary had not referred to either *American Cyanamid* or *Metropolitan Stores*, it was likely what he had in mind when he concluded, at para. 8:

> An interim injunction, obtained on an interlocutory application, which requires a testing of the waters by looking at the strength of the case, the harm being caused and the balance of convenience, is analogous to denial of a stay of the basis of a strong case that the jurisdiction clause is just not applicable.

[page461]

The Court of Appeal concluded that given the evolution of English and Canadian jurisprudence, the proper test to apply in stay applications is the tripartite test employed for the purposes of obtaining interlocutory injunctions.

**16**    The Court of Appeal dismissed the appeal with costs.

IV.    <u>Issues</u>

**17**    1. What is the proper test on a motion brought for a stay of proceedings to enforce the forum selection clause in a bill of lading?

2.    Does that test contemplate an inquiry into whether there was a fundamental breach or deviation, or should such an inquiry be left to the decision maker in the agreed forum?

V. <u>Analysis</u>

**18**    Discretionary orders of prothonotaries ought to be disturbed by a motions judge only where (a) they are clearly wrong, in the sense that the exercise of discretion was based upon a wrong principle or a misapprehension of the facts, or (b) in making them, the prothonotary improperly exercised his or her discretion on a question vital to the final issue of the case: *Canada v. Aqua-Gem Investments Ltd.*, [1993] 2 F.C. 425 (C.A.), *per* MacGuigan J.A., at pp. 462-63. An appellate court may interfere with the decision of a motions judge where the motions judge had no grounds to interfere with the prothonotary's decision or, in the event such grounds existed, if the decision of the motions judge was arrived at on a wrong basis or was plainly wrong: *Jian Sheng Co. v. Great Tempo S.A.*, [1998] 3 F.C. 418 (C.A.), *per* Décary J.A., at pp. 427-28, leave to appeal refused, [1998] 3 S.C.R. vi. For the reasons below, I conclude that the decisions of the prothonotary, the motions judge and the Court of Appeal are clearly wrong.

     A.    *Stays of Proceedings to Enforce a Forum Selection Clause*

**19**    Pursuant to s. 50(1) of the *Federal Court Act*, the court has the discretion to stay proceedings in any [page462] cause or matter on the ground that the claim is proceeding in another court or jurisdiction, or where, for any other reason, it is in the interest of justice that the proceedings be stayed. For some time, the exercise of this judicial discretion has been governed by the "strong cause" test when a party brings a motion for a stay of proceedings to enforce a forum selection clause in a bill of lading. Brandon J. set out the test as follows in *The "Eleftheria"*, at p. 242:

> (1)    Where plaintiffs sue in England in breach of an agreement to refer disputes to a foreign Court, and the defendants apply for a stay, the English Court, assuming the claim to be otherwise within the jurisdiction, is not bound to grant a stay but has a discretion whether to do so or not. (2) The discretion should be exercised by granting a stay unless strong cause for not doing so is shown. (3) The burden of proving such strong cause is on the plaintiffs. (4) In exercising its discretion the Court should take into account all the circumstances of the particular case. (5) In particular, but without prejudice to (4), the following matters, where they arise, may be properly regarded: (a) In what country the evidence on the issues of fact is situated, or more readily available, and the effect of that on the relative convenience and expense of trial as between the English and foreign Courts. (b) Whether the law of the foreign Court applies and, if so, whether it differs from English law in any material respects. (c) With what country either party is connected, and how closely. (d) Whether the defendants genuinely desire trial in the foreign country, or are only seeking procedural advantages. (e) Whether the plaintiffs would be prejudiced by having to sue in the foreign Court because they would (i) be deprived of security for that claim; (ii) be unable to enforce any judgment obtained; (iii) be faced with a time-bar not applicable in England; or (iv) for political, racial, religious or other reasons be unlikely to get a fair trial.

**20**    Forum selection clauses are common components of international commercial transactions,

and are particularly common in bills of lading. They have, in short, "been applied for ages in the industry and [page463] by the courts": Décary J.A. in *Jian Sheng, supra*, at para. 7. These clauses are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law: La Forest J. in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, at pp. 1096-97; *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC 90, at paras. 71-72. The "strong cause" test remains relevant and effective and no social, moral or economic changes justify the departure advanced by the Court of Appeal. In the context of international commerce, order and fairness have been achieved at least in part by application of the "strong cause" test. This test rightly imposes the burden on the plaintiff to satisfy the court that there is good reason it should not be bound by the forum selection clause. It is essential that courts give full weight to the desirability of holding contracting parties to their agreements. There is no reason to consider forum selection clauses to be non-responsibility clauses in disguise. In any event, the "strong cause" test provides sufficient leeway for judges to take improper motives into consideration in relevant cases and prevent defendants from relying on forum selection clauses to gain an unfair procedural advantage.

**21**    There is a similarity between the factors which are to be taken into account when considering an application for a stay based on a forum selection clause and those factors which are weighed by a court considering whether to stay proceedings in "ordinary" cases applying the *forum non conveniens* doctrine: E. Peel in "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] *L.M.C.L.Q.* 182, at pp. 189-90. The latter inquiry is well settled in Canada: *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897 . In the latter inquiry, the burden is normally on the defendant to show why a stay should be granted, but the presence of a forum selection clause in the former is, in my view, sufficiently [page464] important to warrant a different test, one where the starting point is that parties should be held to their bargain, and where the plaintiff has the burden of showing why a stay should not be granted. I am not convinced that a unified approach to *forum non conveniens*, where a choice of jurisdiction clause constitutes but one factor to be considered, is preferable. As Peel, *supra*, notes, at p. 190, I fear that such an approach would not

> ensure that full weight is given to the jurisdiction clause since not only should the clause itself be taken into account, but also the effect which it has on the factors which are relevant to the determination of the natural forum. Factors which may otherwise be decisive may be less so if one takes into account that the parties agreed in advance to a hearing in a particular forum and must be deemed to have done so fully aware of the consequences which that might have on, for example, the transportation of witnesses and evidence, or compliance with foreign procedure etc.

In my view, a separate approach to applications for a stay of proceedings involving forum selection clauses in bills of lading ensures that these considerations are properly taken into account and that

the parties' agreement is given effect in all but exceptional circumstances. See also M. P. Michell, "Forum Selection Clauses and Fundamental Breach: *Z.I. Pompey Industrie v. ECU-Line N.V., The Canmar Fortune*" (2002), 36 *Can. Bus. L.J.* 453, at pp. 471-72.

B.    *The Inappropriateness of the Tripartite Test*

**22**    T he respondents adopted the Court of Appeal's holding in favour of extending the tripartite test for interlocutory injunction to motions for a stay of proceedings to enforce a forum selection clause in a bill of lading. The tripartite test was set out as follows by this Court in *RJR--MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311, at p. 334:

[page465]

> First, a preliminary assessment must be made of the merits of the case to ensure that there is a serious question to be tried. Secondly, it must be determined whether the applicant would suffer irreparable harm if the application were refused. Finally, an assessment must be made as to which of the parties would suffer greater harm from the granting or refusal of the remedy pending a decision on the merits.

In support of the move to the tripartite test, the Court of Appeal quoted, at para. 29, with approval this Court's statement in *Metropolitan Stores*, at p. 127:

> A stay of proceedings and an interlocutory injunction are remedies of the same nature. In the absence of a different test prescribed by statute, they have sufficient characteristics in common to be governed by the same rules and the courts have rightly tended to apply to the granting of interlocutory stay the principles which they follow with respect to interlocutory injunctions.

While a stay of proceedings to enforce a forum selection clause may be of the same nature as an interlocutory injunction, I must respectfully disagree with the conclusion of the Court of Appeal.

**23**    The conclusion of the Court of Appeal is not supported by this Court's decision in *Metropolitan Stores*. The two main issues in that case were whether the Court of Appeal erred in failing to recognize a presumption of constitutional validity where legislation is challenged under the *Charter*, and what principles govern the exercise of a Superior Court judge's discretionary power to order a stay until the constitutionality of impugned legislation has been determined. The context of a constitutional challenge has little in common with the case at bar. Indeed, *Metropolitan Stores* did not involve forum selection clauses, and the underlying desirability of holding contracting parties to their bargain was not at issue. That case did not concern private international

law; consequently, considerations of comity, uniformity of law, forum shopping and related issues were neither canvassed nor addressed by the Court.

[page466]

**24**    As recently as 1998, Décary J.A., for a unanimous Federal Court of Appeal in *Jian Sheng*, confirmed at para. 10 the appropriateness of the "strong cause" test in Canada, a case in which the issue was whether the forum selection clause in a bill of lading was void for uncertainty:

> Where, in admiralty matters before this Court, a defendant applies for a stay pursuant to section 50 of the *Federal Court Act* ... on the basis of a jurisdiction clause found in a bill of lading, the defendant has the burden of persuading the Court that the conditions of application of the clause have been met. Once the Court is satisfied that the clause applies, the burden of proof then shifts to the plaintiff to show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to keep the plaintiff to the terms of the contract ... . These "strong reasons" have been summarized in the often-quoted reasons of Brandon J. (as he then was) in *The "Eleftheria"* ... .

In *Jian Sheng*, the forum selection clause contained in the bill of lading required the defendant to show it was the carrier and what was its principal place of business. *Jian Sheng* does not, as the Court of Appeal held in the case at bar, undermine in any way the "strong cause" test. Indeed, the tripartite test adopted by the Court of Appeal in this case constitutes a significant and unjustified departure from the jurisprudence not only of the Federal Court, but also of provincial courts, and those of other jurisdictions. See for instance: *The "Seapearl" v. Seven Seas Dry Cargo Shipping Corp.*, [1983] 2 F.C. 161 (C.A.), *per* Pratte J.A., at pp. 176-77, and *per* Lalande D.J., at p. 180; *Anraj Fish Products Industries Ltd. v. Hyundai Merchant Marine Co.* (2000), 262 N.R. 270 (F.C.A.), at para. 5; *Sarabia v. "Oceanic Mindoro" (The)* (1996), 26 B.C.L.R. (3d) 143 (C.A.), at paras. 37-38, leave to appeal refused, [1997] 2 S.C.R. xiv; *Maritime Telegraph and Telephone Co. v. Pre Print Inc.* (1996), 131 D.L.R. (4th) 471 (N.S.C.A.), at p. 483; *Morrison v. Society of Lloyd's* (2000), 224 N.B.R. (2d) 1 (C.A.), at para. 14, leaves to appeal refused, [2000] 2 S.C.R. viii and xi; *Trendtex [page467] Trading Corp. v. Credit Suisse*, [1982] A.C. 679 (H.L.); *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), at p. 15; *Advanced Cardiovascular Systems Inc. v. Universal Specialties Ltd.*, [1997] 1 N.Z.L.R. 186 (C.A.), at p. 190.

**25**    There are also compelling public policy reasons in favour of upholding the "strong cause" test. If the tripartite test were employed to deal with situations like the case at bar, most forum selection clauses would be rendered unenforceable, creating commercial uncertainty by unduly minimizing the importance of contractual undertakings. Instead of requiring a plaintiff to demonstrate a "strong cause" to not enforce a forum selection clause, the burden would be on the applicant to establish the

elements of the tripartite test. The "strong cause" test rightly places the onus on the plaintiff who commences suit contrary to the terms of a forum selection clause.

**26**    Applying the tripartite test to a situation of this nature is also problematic because the first part of the test requires the court to evaluate the likelihood of success on the merits of the case. This part of the test is designed to allow a motions judge the opportunity to deal with legal issues in preliminary proceedings without prejudice to the final adjudication of their merits. In the case of motions to stay proceedings based on a forum selection clause in a bill of lading, such a process would be impossible because there is normally no determination on the merits. Either the stay will be granted, and the proceedings in Canada will come to an end, or the stay will be denied and the defendant will have to defend the case on the merits in Canada, losing the benefit of the jurisdiction clause. For this reason the rule governing such stay applications cannot be based on a test that relies on the likelihood of success on the merits.


[page468]


**27**    The test propounded by the Court of Appeal would make it difficult to establish harm in the context of a stay application based on a forum selection clause. Indeed, I can think of no instance where a defendant would suffer irreparable harm by being required to defend a lawsuit in a Canadian court. I am not satisfied that litigation costs disproportionate to the amount of the claim would constitute irreparable harm, as the respondents have argued. The "strong cause" test reflects the desirability that parties honour their contractual commitments and is consistent with the principles of order and fairness at the heart of private international law, as well as those of certainty and security of transaction at the heart of international commercial transactions. I see no reason to depart from the traditional approach for a stay of proceedings when the applicability of a forum selection clause is at issue. The Court of Appeal in effect read the choice of jurisdiction clause out of the contract. This approach is, in my view, untenable.

**28**    The respondents submit we ought to accord little weight to the forum selection clause in the bill of lading because bills of lading are, as a general rule, contracts of adhesion, devised unilaterally by the appellant. This submission is without merit despite the fact that bills of lading are often issued on pre-printed forms. See *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), at pp. 593-94.

**29**    Bills of lading are typically entered into by sophisticated parties familiar with the negotiation of maritime shipping transactions who should, in normal circumstances, be held to their bargain. See *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995). The parties in this appeal are corporations with significant experience in international maritime commerce. The respondents were aware of industry practices and could have reasonably expected that the bill of lading would contain a forum selection clause. A forum selection clause could very well have been

negotiated with the appellant, in light of the respondent John S. James Co.'s [page469] insistence that S.L.M.N. Shipping transport the cargo solely by sea. There is no evidence that this bill of lading is the result of grossly uneven bargaining power that would invalidate the forum selection clause contained therein.

C.    *Fundamental Breach and Deviation*

**30**    Having concluded that the "strong cause" test governs whether to grant a stay in the context of a bill of lading with a forum selection clause, I turn to whether, in taking into account all the circumstances of the particular case, the Court should consider issues arising under the contract. The respondents submit the Court should do just that, relying in part on the following passage from Professor Tetley in *Marine Cargo Claims, supra*, at p. 99:

> When however the breach is so serious, usually the result of a fraudulent or wilful act, the courts have questioned whether the carrier may rely on the terms of the contract or the law, and in particular, whether the carrier may rely on the exclusion or limitation clauses in the contract and the law because he has seemingly placed himself outside of the contract and the law.

In my view, the prothonotary erred in law when he determined the forum selection clause was void as a result of the alleged deviation stemming from the discharge of the cargo in Montréal.

**31**    Issues respecting an alleged fundamental breach of contract or deviation therefrom should generally be determined under the law and by the court chosen by the parties in the bill of lading. The "strong cause" test, once it is determined that the bill of lading otherwise binds the parties (for instance, that the bill of lading as it relates to jurisdiction does not offend public policy, was not the product of fraud or of grossly uneven bargaining positions), constitutes an inquiry into questions such as the convenience of the parties, fairness between the parties and the interests of justice, not of the substantive legal issues underlying the dispute. See *Mackender v. Feldia A.G.*, [1966] 3 All E.R. 847 (C.A.), *per* Lord Denning, at pp. 849-50, and *per* Lord Diplock, at p. 852. Put [page470] differently, a court, in the context of an application for a stay to uphold a forum selection clause in a bill of lading, must not delve into whether one party has deviated from, or fundamentally breached an otherwise validly formed contract. Such inquiries would render forum selection clauses illusory since most disputes will involve allegations which, if proved, will make the agreement terminable or voidable by the aggrieved party. Moreover, while the choice of forum for the determination of the existence of the agreement would be made without reference to the forum selection clause in the contract, if the agreement were found to remain intact, resort to the said clause would presumably be necessary to decide the appropriate forum in which to settle the rights of the parties under the agreement.

**32**    The position adopted by the Court of Appeal would remove many disputes from the reach of a widely framed forum selection clause by the mere allegation of various types of wrongful conduct. In my view, where, as here, the parties agree that claims or disputes arising under or in connection

with a bill of lading are to "be determined by the courts in Antwerp and no other Courts", a proceeding in which one party contends that the other party deviated from the agreement such as to give the former the right to terminate or void the contract remains a proceeding in respect of a claim or dispute arising under or in connection with the bill of lading: *Fairfield v. Low* (1990), 71 O.R. (2d) 599 (H.C.), at pp. 605-8; *Ash v. of Lloyd's Corp.* (1992), 9 O.R. (3d) 755 (C.A.), at p. 758, leave to appeal refused, [1992] 3 S.C.R. v; *Morrison, supra*, at paras. 13 and 19. See also *Drew Brown Ltd. v. The "Orient Trader"*, [1974] S.C.R. 1286, *per* Ritchie J., at p. 1288, and *per* Laskin J., at p. 1318, where an alleged deviation was found not to displace an otherwise valid choice of law clause.

33    The conclusion that allegations of deviation or fundamental breach are matters arising under the contract that should not be considered in [page471] determining whether to give effect to a forum selection clause is supported by the construction approach to fundamental breach considered by our Court in *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423, a case concerning the use of fundamental breach in the context of time limitation provisions. Discussing *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426 (a case involving fundamental breach in the context of clauses excluding liability), the Court said this, at para. 52:

> [W]hether fundamental breach prevents the breaching party from continuing to rely on an exclusion clause is a matter of construction rather than a rule of law. The only limitation placed upon enforcing the contract as written in the event of a fundamental breach would be to refuse to enforce an exclusion of liability in circumstances where to do so would be unconscionable, according to Dickson C.J., or unfair, unreasonable or otherwise contrary to public policy, according to Wilson J.

In my view, the policy rationale in support of the construction approach applied to exclusion and time limitation clauses is equally applicable to forum selection clauses in bills of lading.

34    In the case at bar, it is unnecessary to determine whether there has been a fundamental breach or deviation because the forum selection clause clearly covers such a dispute. The language of the clause is unambiguous and not subject to any qualifications, and the parties' bargain was not unconscionable or unreasonable. The clause becomes relevant precisely in disputes such as this one, as it regulates the way in which liability for deviation or breach of contract is to be established.

35    This approach is sound for policy reasons. Stay applications in the Federal Court should be brought quickly after commencement of the suit and consequently, the parties will have limited knowledge and information regarding the strength or weakness [page472] of their opponent's case. Issues regarding whether there has been, for instance, an unreasonable deviation raise complicated questions of fact that require a consideration of all the circumstances giving rise to the alleged deviation.

36    Given my conclusions, I do not consider it necessary to address the issue of the relationship

between deviation and fundamental breach. Suffice it to say that, in this case, either allegation concerns a dispute arising under or in connection with the bill of lading. There is no need to consider the applicability of the doctrine of separability.

D.    *Section 46 of the Marine Liability Act*

**37**    Section 46(1) of the *Marine Liability Act*, which entered into force on August 8, 2001, has the effect of removing from the Federal Court its discretion under s. 50 of the *Federal Court Act* to stay proceedings because of a forum selection clause where the requirements of s. 46(1)(*a*), (*b*), or (*c*) are met. This includes where the actual port of loading or discharge is in Canada. In this case, there would be no question that the Federal Court is an appropriate forum to hear the respondents' claim but for the fact that s. 46 does not apply to judicial proceedings commenced prior to its coming into force: *Incremona-Salerno Marmi Affini Siciliani (I.S.M.A.S.) s.n.c. v. Ship Castor* (2002), 297 N.R. 151, 2002 FCA 479, at paras. 13-24. Section 46 of the *Marine Liability Act* is therefore irrelevant in this appeal.

**38**    Indeed, s. 46(1) would appear to establish that, in select circumstances, Parliament has deemed it appropriate to limit the scope of forum selection clauses by facilitating the litigation in Canada of claims related to the carriage of goods by water having a minimum level of connection to this country. Such a legislative development does not, however, provide support for the fundamental jurisprudential shift made by the Court of Appeal in the case at bar. To the contrary, s. 46(1) indicates Parliament's intent to broaden the jurisdiction of the Federal Court only in very particular instances that [page473] can easily be ascertained by a prothonotary called upon to grant a stay of proceedings pursuant to the forum selection clause of a bill of lading. Section 46(1) in no way mandates a prothonotary to consider the merits of the case, an approach in line with the general objectives of certainty and efficiency, which underlie this area of the law.

E.    *Application of the Law to the Facts of this Case*

**39**    I am of the view that, in the absence of applicable legislation, for instance s. 46(1) of the *Marine Liability Act*, the proper test for a stay of proceedings pursuant to s. 50 of the *Federal Court Act* to enforce a forum selection clause in a bill of lading remains as stated in *The "Eleftheria"*, which I restate in the following way. Once the court is satisfied that a validly concluded bill of lading otherwise binds the parties , the court must grant the stay unless the plaintiff can show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause. In exercising its discretion, the court should take into account all of the circumstances of the particular case. See *The "Eleftheria"*, at p. 242; *Amchem*, at pp. 915-22; *Holt Cargo*, at para. 91. Disputes arising under or in connection with a contract may not be regarded by a court in determining whether "strong cause" has been shown that a stay should not be granted.

**40**    In this case, the bill of lading and its forum selection clause have been entered into and are otherwise binding on the parties. The prothonotary began by properly applying the "strong cause"

test. In so doing the prothonotary weighed the fact that the appellant prefers to litigate in a familiar jurisdiction and does not bring up the jurisdiction clause merely to seek a procedural advantage; there are reasonable connections with Belgium; there are Belgian and French witnesses; any time bar which may preclude the respondents from bringing their case in Belgium has been waived; no security has been posted; and the enforcement of a Belgian judgment against the [page474] appellant should present no particular difficulties. The prothonotary also accepted the respondents' arguments that there will be Canadian and American witnesses in these proceedings; the Tribunal de commerce in Antwerp conducts its proceedings in Flemish and decides cases on the basis of documents and statements, a procedure precluding witnesses and cross-examination; and, there may be more delay in Belgium than in Canada, especially if there is an appeal. The prothonotary concluded that the factors in favour of denying a stay, while substantial, were just short of the "strong cause" test which the respondents had the burden of meeting. I see no reason why the prothonotary's conclusion on this point should be set aside. However, the prothonotary erred by subsequently turning his attention to a dispute arising under the bill of lading and in effect extending the tripartite test for interlocutory injunctions to motions for a stay of proceedings involving forum selection clauses contained in bills of lading.

    VI.  <u>Disposition</u>

**41**    The prothonotary, to the extent he applied the "tripartite test", erred in law, as did the Court of Appeal in concluding that the appropriate test for a stay of proceedings involving a bill of lading with a forum selection clause was the "tripartite test" for interlocutory injunctions. The "strong cause" test does not contemplate an inquiry into the question of establishing whether the surrounding contract is voidable. Such questions are best left to the decision maker in the forum agreed upon.

**42**    Accordingly, I would allow the appeal, overturn the judgments of the courts below, and issue a stay of proceedings in favour of the appellant, with costs throughout to the appellant.

**Solicitors:**

Solicitors for the appellant: Bernard & Partners, Vancouver.

 [page475]

Solicitors for the respondents: Davies, Ward, Phillips and Vineberg, Montreal.

cp/e/qw/qllls

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

| | |
|---|---|
| | ***ONTARIO*** <br> **SUPERIOR COURT OF JUSTICE** <br> **(COMMERCIAL LIST)** <br> Proceeding commenced at TORONTO |
| | **BRIEF OF AUTHORITIES OF** <br> **THE CANADIAN DEBTORS** <br> **Allocation Approval** <br> **(returnable June 7, 2011)** |
| | **NORTON ROSE OR LLP** <br> Suite 3800 <br> Royal Bank Plaza, South Tower <br> 200 Bay Street, P.O. Box 84 <br> Toronto, Ontario  M5J 2Z4 <br><br> **Derrick Tay LSUC#: 21152A** <br> Tel: (416) 216-4832 <br> Email: derrick.tay@nortonrose.com <br><br> **Alan Mark LSUC#: 18772U** <br> Tel: (416) 216-4865 <br> Email: alan.mark@nortonrose.com <br><br> **Jennifer Stam LSUC#: 46735J** <br> Tel: (416) 216-2327 <br> Email: jennifer.stam@nortonrose.com <br><br> Fax: (416) 216-3930 <br> Lawyers for the Applicants |

DOCSTOR: 2191143\2