**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## AFFIDAVIT OF DAVID M. LINDSEY
### (sworn June 3, 2011)

I, David M. Lindsey, of the City of New York, in the State of New York, MAKE OATH AND SAY:

1.      I have been retained jointly by the U.S. Debtors and the Canadian Debtors in the above referenced matter to provide my independent expert opinion on the matters set forth below, as well as to respond to the Affidavit of Tai-Heng Cheng, dated May 31, 2011 (the "Cheng Affidavit").

## I. QUALIFICATIONS

2.      I am a founding partner in the firm of Chaffetz Lindsey LLP ("Chaffetz Lindsey" or the "Firm") in New York.  Chaffetz Lindsey opened in May 2009 and is a boutique law firm specializing in international arbitration, commercial litigation, and reinsurance.

3.      I was admitted to the bar of the State of New York in 1999, and I was previously admitted to the bars of the District of Columbia in 1998 and Florida in 1988.  I have been

- 2 -

practicing law for more than 22 years. I am a U.S. citizen and currently a resident of Manhattan in the City of New York. I am 49 years old.

4.      Before establishing Chaffetz Lindsey, I was a partner at Clifford Chance LLP in New York from late 1999 until 2009. At Clifford Chance, I was head of the firm's International Arbitration Group for the Americas. I began my legal career at the Miami firm Steel Hector & Davis LLP in 1988 as an associate. I became a partner at Steel Hector in late 1994 and remained there until late 1999, when I joined Clifford Chance as a partner. In 1997, I opened the London office of Steel Hector and lived in London through 1998.

5.      I have experience trying cases in both U.S. federal and state courts. However, for most of the last approximately 17 years, my practice has focused primarily on international arbitration and related international litigation matters involving a wide range of business disputes, with emphasis on the energy/power sector. This particular focus was led by the fact that Latin American markets, which until the 1990s generally refused to enforce agreements to arbitrate future disputes, began to amend their laws and allow arbitration as an accepted form of alternative dispute resolution. These events greatly increased the amount of international arbitration work in south Florida during that time. I increased my academic interest in the area while in London and eventually teamed up with a Freshfields partner to publish International Arbitration in Latin America, N. Blackaby, D. Lindsey, A. Spinillo, eds. (Kluwer 2002), the first such English language book of its kind.

6.      Over this period I have acted as counsel in both institutional and *ad hoc* arbitrations under the rules of the ICDR, AAA, ICC, LCIA, SIAC, JCAA, NIA, ICSID and UNCITRAL, as well as under industry rules such as reinsurance arbitrations in the U.S. Some of these cases involved parallel litigation relating to the arbitral proceedings. I am well acquainted with New

York federal and state arbitration law, which has played a prominent part in my practice for more than a decade.  I have also sat as arbitrator in institutional and *ad hoc* proceedings under the ICC, ICDR and UNCITRAL rules.

7.     The other side of my practice involves acting as counsel both for and against sovereigns in investment treaty arbitrations under the ICSID rules.  I also have an active sovereign immunity practice acting as lead counsel for a South Asia sovereign's central bank in the Federal District Court for the Southern District of New York in a case involving the seizure of nearly $2 billion in assets.

8.     I have published articles in the field of international commercial arbitration and recently authored "The Law Applicable to International Arbitration in New York", which appears as chapter one in International Commercial Arbitration in New York, J. Carter and J. Fellas, eds. (Kluwer 2010).  I am currently working on a book addressing recently adopted amendments to the rules of the major international arbitral institutions, scheduled to be published by the ABA in 2012.

9.     I am a member of the Federal District Court for the Southern District of New York and the U.S. Court of Appeals for the Second Circuit, both based in Manhattan.  I am also a member of the Federal District Court for the Southern District of Florida and the United States Supreme Court.  I am a member of the New York State Bar Association's International Arbitration Task Force and the New York State Bar Association's Task Force on the Use of New York Law in International Transactions.  Until recently I was co-Chair of the Dispute Resolution Interest Group of the American Society of International Law.  I am one of six original sponsors of the International Arbitration Club of New York, a group of about 75 New York area practitioners who specialize in international arbitration and meet every month to discuss the significant

- 4 -

arbitration topics of the day.  I have been rated annually by my peers as a leader in the field of international arbitration since 2001 as reported in publications such as Chambers Global, Chambers USA, Chambers Latin America, Best Lawyers, Super Lawyers, Who's Who in Commercial Arbitration, Who's Who in International Arbitration, and PLC's Which Lawyer?. Global Arbitration Review rated me as one of the world's top 45 lawyers under 45, as voted by its subscribers when that poll was first released.  I am invited to speak at 6 to 8 conferences a year on matters concerning international arbitration law in North and South America.

10.    My curriculum vitae is attached as Exhibit B to this affidavit.

## II.  QUESTIONS PRESENTED

11.    I have been asked to express my opinion on the following questions of U.S. federal and/or New York state law:

> (A)    The standards applicable to finding an enforceable agreement to submit to the jurisdiction of a court and for interpreting the scope of such an agreement;
>
> (B)    The standards applicable for finding an enforceable agreement to arbitrate and for determining whether it is appropriate to compel arbitration;
>
> (C)    The admissibility of extrinsic evidence to interpret a contractual provision and the weight that should be accorded to such evidence;
>
> (D)    The factors relevant to determining whether a party has negotiated in good faith.

12.    I have also been asked to comment on the opinion of Professor Cheng on the legal questions he was asked to address.  I understand that the typical role of an expert in Canadian courts is to state legal principles, rather than to apply those legal principles to a particular set of

- 5 -

facts. In this affidavit, in addition to setting forth legal principles, I have provided my opinion of

how U.S. courts would apply these legal principles in interpreting the Interim Funding and

Settlement Agreement ("IFSA"), where it was necessary to do so in order to respond to Professor

Cheng's arguments.

13.    The materials I reviewed in preparing this opinion are listed in Exhibit A to this affidavit.

## III.  PRINCIPLES OF INTERPRETATION APPLICABLE TO DETERMINE WHETHER AN ARBITRATION AGREEMENT EXISTS

14.    Any arbitration agreement arising out of a legal, commercial relationship falls under the

New York Convention ("Convention")[1] unless the relationship is entirely between citizens of the

U.S. and does not have some reasonable relation with a foreign state.[2]  U.S. federal courts have

original jurisdiction over an action based on an arbitration agreement covered by the

Convention.[3]  As a result, the FAA, chapter two of which codifies U.S. ratification of the

Convention, would govern a federal court's determination of whether an agreement to arbitrate

exists within the terms of the IFSA.  In determining the existence of the agreement to arbitrate,

the federal courts most often simply apply the federal common law that has developed under the

FAA, which in turn has it origins in state contract law principles.[4]  Some courts rely more

---

[1]    The 1958 U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

[2]    Federal Arbitration Act, 9 U.S.C. § 202 ("FAA").

[3]    9 U.S.C. § 203.

[4]    *See, e.g., Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Intern., Inc.*, 198 F.3d 88, 96 (2d Cir. 1999) ("When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable."); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 43 (3d Cir. 1978) ("the question of whether, in contracts involving commerce, there is an agreement to arbitrate an issue or dispute upon which suit has been brought is governed by federal law. Concomitantly, questions of interpretation and construction of such arbitration agreements are similarly to be determined by reference to federal law."); *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1211 (2d Cir. 1972) ("Once a dispute is covered by the [FAA], federal law applies to all questions of interpretation, construction, validity, revocability and enforceability."), *cert. denied*, 406 U.S. 949 (1972); *In re Coimex Trading (Suisse) S.A.*, No. 05 Civ. 2630 (LLS), 2005 WL 1216227, at *1 (S.D.N.Y. May 20, 2005) ("In this non-diverse action under the Federal Arbitration Act and [New York] Convention (9 U.S.C. §§ 2, 202), the determination whether there is an agreement to arbitrate depends on federal, not state, law."); *Borsack v.*

- 6 -

directly on state contract law in the first instance.[5] Rarely would the result change by applying

federal law or state law to the issue of the existence of the agreement to arbitrate.[6] In my

opinion, the result in the instant case would be the same no matter if federal law or New York

state law were applied. Therefore I discuss both sets of laws in the opinion.

    A. Legal Principles On Which Professor Cheng and I Agree

15.    Professor Cheng and I agree on a number of basic legal principles of interpretation

applicable to the question of whether an enforceable agreement to arbitrate exists.

16.    For example, Professor Cheng and I agree that whether parties have agreed to arbitrate is

a basic question of contract law.[7] The starting point for any contract interpretation is the plain

language of the contract.[8] An agreement to arbitrate requires the parties to the agreement to

express an intent to resolve a dispute by arbitration.[9] The cornerstone of the inquiry, therefore, is

whether the parties' written agreement demonstrates an *intent* to arbitrate.

---

*Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 300 n.5 (S.D.N.Y. 1997) ("where jurisdiction is alleged under chapter 2 of the Federal Arbitration Act the issue of enforceability and validity of the arbitration clause is governed by federal law.").

[5]    *Perry v. Thomas*, 482 U.S., 483, 492 n.9 (1987) ("state-law principles" may be applied to claims asserted under Chapter 2 of the FAA provided they are rules generally applicable to contracts, not only to arbitration agreements).

[6]    Federal common law rules for formation of arbitration agreements "dovetail[] precisely with general principles of contract law." *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994).

[7]    FAA, 9 U.S.C. § 2, states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation for any contract." *See also, e.g., Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960) (under the FAA, "ordinary contract principles determine who is bound by such written provisions").

[8]    Cheng Aff. ¶ 19 ("Where the parties' intent is discernible from the plain meaning of the language of the contract, there is no need to look further.").

[9]    The United States Supreme Court states that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotations omitted); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001) ("[C]ourts must treat agreements to arbitrate like any other contract .... A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement."); *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) ("parties may not be forced into arbitration if that was not their true agreement."); GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION 640 (2009) ("The central issues arising with regard to the formation of international arbitration agreements concern the consent of the parties.").

17.    Under both federal common law and New York state law, where the parties' intent can be discerned from the four corners of the contract, courts will not look to evidence outside of the contract to determine the meaning of any provision.[10]  As Professor Cheng correctly notes, extrinsic evidence of the parties' negotiations or their course of conduct is admissible only if the contract language is ambiguous.[11]  This is a threshold question, to be determined by the court.

B. <u>Principal Areas Of Disagreement With Professor Cheng</u>

18.    While Professor Cheng and I agree on the legal principles discussed above as well as others, my principal disagreement with Professor Cheng's affidavit lies with its underlying assumption that an arbitration agreement indeed exists.

19.    An important example of the confusion this assumption creates is the Cheng Affidavit's incorrect application of the U.S. federal policy favoring the arbitration of disputes to the threshold question of whether an agreement to arbitrate exists at all.  Professor Cheng states:

> *In interpreting whether an agreement evinces an intention to arbitrate, New York law is consistent with the federal presumption in favor of arbitration enacted in the FAA.*[12]

20.    This misstates the federal policy in favor of arbitration set forth in the FAA.  The U.S. Supreme Court has made clear that the federal policy in favor of arbitration only applies to the interpretation of the *scope* of an arbitration clause, not its *existence*.[13]  In other words, under

---

[10]    *See, e.g., 131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (N.Y. App. Div. 2d Dep't 2011). ("The court's role is limited to interpretation and enforcement of the terms agreed to by the parties, and the court may not rewrite the contract or impose additional terms which the parties failed to insert.") (applying New York law) (internal citations omitted); *Maniolos v. United States*, 741 F. Supp. 2d 555, 565 (S.D.N.Y. 2010) (holding that under both New York and federal common law, "[i]t is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence.").

[11]    Cheng Aff. ¶ 48.

[12]    Cheng Aff. ¶ 21.

[13]    *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("any doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration."). Professor Cheng quotes *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) in support of his assertion. Cheng

- 8 -

applicable U.S. law the question of whether an arbitration agreement exists in the first place is not entitled to any presumption in favor of arbitration – nor would such a presumption be appropriate. Basic contract law principles govern whether an arbitration agreement exists,[14] and the U.S. Supreme Court has repeatedly held that, at its core, arbitration is a creature of consent, and should not be foisted upon parties who have not agreed to arbitrate their disputes.[15] Not surprisingly, lower U.S. courts and commentators uniformly reject the application of the federal presumption in favor of arbitration to the determination of the existence of an arbitration agreement.[16]

21.     While some U.S. courts have applied a lower threshold of required proof to arbitration agreements than applicable to other agreements, this certainly does not reflect the majority view, and I am not aware of the U.S. Court of Appeals for the Second Circuit, which sits in New York, having ever endorsed such an approach.

---

Aff. ¶ 21. However, even the passage he quotes clearly states that the federal presumption applies to the scope, as opposed to the existence, of an arbitration clause: "the federal policy in favor or arbitration [which] requires that any doubts concerning the *scope* of the arbitrable issues should be resolved in favor of arbitration. *Id.* (emphasis added).

[14]     Professor Cheng agrees that the question of whether an arbitration agreement exists is a basic matter of contract interpretation. Cheng Aff. ¶ 18.

[15]     *See, e.g., Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) ("the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion.") (internal quotation omitted); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit").

[16]     *See, e.g., Kirleis v. Dickie, McCamey and Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) ("It is well established that the Federal Arbitration Act (FAA) reflects a strong federal policy in favor of the resolution of disputes through arbitration. But this presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.") (internal quotations omitted); *Chevron U.S.A., Inc. v. Consolidated Edison Co. of New York, Inc.*, 872 F.2d 534, 537 (2d Cir. 1989) ("Application of the [FAA's pro-arbitration] presumption, however, is constrained by the fact that the source of any obligation to arbitrate is the contract between the parties: arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (internal quotation omitted); *see also* GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION 649 (2009) ("it is important under the FAA to distinguish between the standards of proof applicable to the *existence* of an agreement to arbitrate and those applicable to the question whether a particular dispute falls within the *scope* of an existing arbitration agreement.") (emphasis in original).

22.     At the other end of the spectrum, I am also aware of the practice among some courts, including a long-held precedent in New York state courts applying New York state law, to require "clear and unequivocal evidence" of an agreement to arbitrate.[17] Thus, Professor Cheng's assertion that "New York law is consistent with the federal presumption in favor of arbitration" not only misconstrues the object of the federal presumption, but it also misstates New York law.[18] Notwithstanding Professor Cheng's statement to the contrary, New York state courts have historically been skeptical of arbitration. New York's highest court, the Court of Appeals, provides that "a litigant ought not to be forced into arbitration and, thus, denied the procedural and substantive rights otherwise available in a judicial forum, absent evidence of an express intention to be so bound."[19] Thus, New York state law, which Professor Cheng argues applies in this case,[20] arguably sets a high standard of proof for establishing an intent to arbitrate.

23.     The better approach, however, is articulated by the U.S. Supreme Court, which instructs that the FAA requires the same level of proof for the establishment of arbitration agreements as for any other agreement.[21] Lower courts follow this approach.[22] Since the FAA is applicable to

---

[17]     See, e.g., Matter of Doughboy Indus., Inc., 17 A.D.2d 216, 219 (N.Y. App. Div. 1st Dep't 1962) ("the threshold for clarity of agreement to arbitrate is greater than with respect to other contractual terms"); Computer Assoc. Int'l, Inc. v. Com-Tech Assoc., 239 A.D.2d 379, 381 (N.Y. App. Div. 2d Dep't 1997) (requiring "clear indication of intent").

[18]     Cheng Aff. ¶ 21.

[19]     Schubtex Inc. v. Allen Snyder, Inc., 49 N.Y.2d 1, 5-6 (1979)

[20]     Cheng Aff. ¶¶ 16, 17.

[21]     See, e.g., EEOC v. Waffle House, Inc., 534 U.S. 279, 293 (2002) ("The FAA directs courts to place arbitration agreements on equal footing with contracts...") (quoting Volt Info. Sciences, Inc. v. Bd. of Trustees, 489 U.S. 468, 478 (1989); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n.12 (1967) (FAA's purpose "was to make arbitration agreements as enforceable as other contracts but not more so.").

[22]     U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135 (2d Cir. 2001) ("courts must treat agreements to arbitrate like any other contract .... A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement."); see also Bridas S.A.P.I.C. v. Government of Turkmenistan, 345 F.3d 347, 354 n.4 (5th Cir. 2003) ("the purpose of the FAA was to make arbitration agreements as enforceable as other contracts, not more so.").

- 10 -

the purported arbitration clause in this case, my analysis below adopts the Supreme Court's instruction.

## IV.  DOES IFSA SECTION 12(B) REFLECT AN INTENT OF THE PARTIES TO RESOLVE DISPUTES BY ARBITRATION AND NOT BY OTHER MEANS?

### A.  IFSA Section 16 Gives U.S. And Canadian Courts Jurisdiction Over Allocation Disputes

24.     In my judgment, Section 16(b) represents the principal dispute resolution agreement of the IFSA.  In that section, the parties agreed "to submit to the non-exclusive jurisdiction of the U.S. and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol . . .), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement . . . ."[23]  Section 16(b) further provides that the parties "agree[] that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in . . . a joint hearing of both the Canadian and U.S. Courts conducted under the Cross-Border Protocol . . . .")[24]

25.     Section 16(b) is a broadly worded forum selection clause typical of international contracts entered into by sophisticated commercial parties.  In my view, such a clause is enforceable under applicable U.S. law.[25]  Forum selection clauses are typically construed quite broadly to encompass a wide range of disputes, in particular where they use general terms such as "any claim," "relating to" or "any relief whatsoever."[26]

---

[23]     IFSA, § 16(b)(i) (emphasis added).

[24]     IFSA, § 16(b)(ii) (emphasis added).

[25]     *See, e.g., Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1216, 1219 (3d Cir. 1991) (noting that forum selection clauses are prima facie valid and affirming the enforcement of the clause to give effect to the freely negotiated agreement); *Tradecomet.com. LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 377 (S.D.N.Y. 2010) (stating that the Second Circuit "regularly enforce[s]" forum selection clauses).

[26]     *See, e.g., Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468, 470-471 (D.N.J. 2007) (observing that the Third Circuit has found forum selection clauses governing claims "related to" or "concerning" the parties' agreement to be broadly worded).

26.     Professor Cheng does not dispute that Section 16(b) is a "general jurisdiction provision"[27]

conferring jurisdiction on the courts of Canada and the United States to hear disputes arising

under the IFSA.  He argues, however, that because to his mind Section 12(b) constitutes an

agreement to arbitrate allocation disputes, Section 12(b) limits Section 16(b)'s agreement to the

jurisdiction of Canadian and U.S. courts.  Professor Cheng would read Section 16(b) to limit the

jurisdiction of Canadian and U.S. courts to determining the validity of the arbitration agreement

and to reviewing the arbitration award, at least as to allocation disputes.[28]

27.     With respect, I do not find Professor Cheng's reading of Sections 12(b) and 16(b) to be

persuasive.  First, to ignore almost entirely the undisputedly broad scope of Section 16(b)'s text

is not in keeping with applicable U.S. law of contract interpretation.  Second, while I agree in

principle with Professor Cheng that where a contract contains both general and more specific

forum selection provisions, the more specific will prevail, Professor Cheng assumes that Section

12(b) constitutes an enforceable arbitration agreement, and therefore represents a specific

provision that supersedes the more general Section 16(b).  I disagree with this assumption.  As I

explain below, the better reading of Section 12 is that it does not contain an arbitration

agreement, but merely an "agreement to negotiate in good faith and attempt to reach" a protocol

for the resolution of allocation disputes. If no agreement to arbitrate exists, then Professor

Cheng's principle of contract interpretation is inapplicable, and there is no reason why Section

16(b) should not be read to mean what it says: that all disputes related to the IFSA, including

disputes on allocation, shall be referred to the courts. Read together with Section 12, it is clear

that Section 16(b) provides a "fallback" provision for the resolution of allocation disputes in the

---

[27]     Cheng Aff. ¶ 34.

[28]     Cheng Aff. ¶ 34.

- 12 -

event that the parties fail to reach agreement on some other procedure for resolving their allocation disputes.

28.     Further, I understand that the parties agreed to submit to the exclusive jurisdiction of the U.S. and Canadian courts for disputes relating to the funds placed in escrow accounts in each of eight separate escrow agreements entered into after the IFSA.[29]  This history is consistent with the broadly-worded text of Section 16(b).  The presence of forum selection clauses in the escrow agreements and IFSA Section 16(b) demonstrates that parties to the IFSA possessed both the skill and foresight to draft a well-crafted forum selection clause.  To my mind, the contrast between these fully-drafted forum selection clauses and Section 12(b), which does not even contain the word "arbitration," makes it less likely that the parties intended Section 12(b) to serve as a binding arbitration clause between the parties.

        B.     Section 12(b) Cannot Properly Be Interpreted As An Arbitration Agreement

29.     Professor Cheng's reading of IFSA Section 16(b), as well as many of the other conclusions reached in his opinion, is based entirely on the notion that Section 12(b) is a written agreement evincing the parties' intent to submit disputes regarding allocation to binding arbitration.  Professor Cheng finds this written agreement in the following language of Section 12(b):

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the protocol applicable to the Sale Proceeds.[30]

---

[29]     *See* MEN Escrow Agreement, dated as of March 19, 2010, ¶ 21; Escrow Agreement, dated as of Nov. 11, 2009, ¶ 21; Escrow Agreement, dated as of Dec. 1, 2009; Escrow Agreement, dated as of Dec. 18, 2009, ¶ 21; Escrow Agreement, dated as of March 31, 2010, ¶ 21; Escrow Agreement, dated as of May 27, 2010, ¶ 20; Escrow Agreement, dated as of June 3, 2010, ¶ 20; Escrow Agreement, dated as of Mar. 11, 2011, ¶ 20.

[30]     *See* IFSA §12(b); Cheng Aff. ¶¶ 25-28.

30.    As stated above, any interpretation of Section 12(b) must begin with its plain language. There is simply nothing in the plain language of Section 12(b) that would demonstrate to a court that the parties intended that their disputes be referred to arbitration.  Neither the FAA nor New York law permits courts to read words into a contract that are not there.[31]  While it is true, generally speaking, that an intention to arbitrate may be found even in the absence of the term "arbitration" or its derivatives, courts will not find an agreement to arbitrate in the absence of some clear indicia of their intention to arbitrate.  Here, I see no such indicia.

31.    Section 12(b) is quite obviously devoid of the features typically found in enforceable arbitration agreements.  Section 12 says nothing about the "seat" of the arbitration (an important choice in any international arbitration, but particularly so in a multi-jurisdictional dispute such as this one), the number of arbitrators, the method for appointing arbitrators, the language or governing law of the arbitration, or the procedural rules that would govern the arbitration.

32.    Professor Cheng dismisses the absence of these important elements from the purported arbitration clause.  Although he concedes that Section 12(b) does not adopt the wording typically found in model arbitration clauses, he attributes this to the fact that Section 12(b) is intended to be an "*ad hoc*" arbitration agreement.  He describes an *ad hoc* arbitration agreement as one "where the parties agree to binding resolution of their disagreements, but do not set forth the procedure for such arbitration in the arbitration agreement."[32]  With respect, this is not the commonly understood definition of *ad hoc* arbitration, and Section 12 of the IFSA resembles no

---

[31]    *See, e.g., 131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (N.Y. App. Div. 2d Dep't 2011). ("The court's role is limited to interpretation and enforcement of the terms agreed to by the parties, and the court may not rewrite the contract or impose additional terms which the parties failed to insert.") (applying New York law) (internal citations omitted); *Lui v Park Ridge at Terryville Ass'n., Inc.*, 196 A.D.2d 579, 581 (N.Y. App. Div. 2d Dep't 1993) ("A court should not, under the guise of contract interpretation, 'imply a term which the parties themselves failed to insert' or otherwise rewrite the contract.") (quoting *Mitchell v Mitchell*, 82 A.D.2d 849 (N.Y. App. Div. 2d Dep't 1981)).

[32]    Cheng Aff. ¶ 30.

- 14 -

*ad hoc* arbitration agreement that I have ever seen.  Rather, an *ad hoc* arbitration is one in which

the parties agree to arbitrate their disputes but choose not to have the arbitration administered by

a particular arbitral institution (such as, for example, the International Chamber of Commerce,

the AAA, or the London Court of International Arbitration).[33]  In other words, parties who wish

to refer their disputes to arbitration but do not wish to have their arbitration administered by an

arbitral institution may choose to do so, but this does not mean that U.S. law permits their *intent*

to arbitrate in the first place to be any less clear.[34]

33.     In my view, the absence of the features commonly found in enforceable arbitration

agreements cannot be interpreted as a submission to *ad hoc* arbitration, but is instead further

indication that the parties did not reach any agreement to arbitrate allocation disputes.  As

Section 12(c) of the IFSA makes clear, the parties left the decision of how allocation disputes

would be resolved to be negotiated at a later date.  Section 12(c) clearly states that the parties

"shall . . . negotiate in good faith and attempt to reach agreement on a timely basis on a protocol

---

[33]     For example, one leading treatise on international commercial arbitration defines *ad hoc* arbitrations as those "not conducted under the auspices or supervision of an arbitral institution.  Instead, parties simply agree to arbitrate, without designating any institution to administer their arbitration."  GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION 149 (2009).

[34]     Some might argue that parties choosing *ad hoc* arbitration would be wise to be even more detailed and explicit in their arbitration clause, because the absence of key features cannot be assumed to have meant to refer to the standard procedures of a particular arbitral institution.  For example, the UNCITRAL Arbitration Rules, which are commonly selected by parties who do not wish to arbitrate under the auspices of any particular arbitration, recommend the following "Model Arbitration Clause" for parties who wish to enter into *ad hoc* arbitration using the UNCITRAL Rules:

> Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules.

The UNCITRAL Rules further recommend that the "Parties should consider adding: (a) The appointing authority shall be ... [name of institution or person]; (b) The number of arbitrators shall be ... [one or three]; (c) The place of arbitration shall be ... [town and country]; (d) The language to be used in the arbitral proceedings shall be . . . ."

*See* 2010 UNCITRAL Arbitration Rules, Annex, *available at* http://www.uncitral.org/pdf/english/texts/arbitration/arb-rules-revised/arb-rules-revised-2010-e.pdf.  Similarly, the IBA Guidelines for Drafting Model Arbitration Clauses include a quite detailed "model" arbitration clause for parties choosing ad hoc arbitration.  *See* IBA Guidelines for Drafting Model Arbitration Clauses, ¶ 13, *available at* http://www.ibanet.org/Publications/publications_IBA_guides_and_free_materials.aspx#drafting.

for resolving disputes concerning the allocation of Sale Proceeds . . . ."[35]  Section 12(b),

particularly when read together with Section 12(c), unambiguously establishes that Section 12

does not contain an agreement to arbitrate, but merely an agreement to negotiate in good faith on

a procedure for resolving allocation disputes.

34.     Professor Cheng relies solely on IFSA Section 12(b) as constituting the parties'

agreement to arbitrate;[36] he does not suggest that any other part of Section 12, including Section

12(c), makes up the arbitration agreement.  Yet of the provisions in Section 12, it is Section 12(c)

that addresses dispute resolution,[37] not Section 12(b).  Professor Cheng argues that the parties'

decision in Section 12(c) to leave the issue of dispute resolution procedures for another day

cannot trump Section 12(b)'s referral of disputes to arbitration.[38]  Here again Professor Cheng

assumes that the parties already chose arbitration in Section 12(b), and left only the arbitration

*procedures* to a later day.  Employing this reasoning, he urges the court to fashion its own

procedures for an *ad hoc* arbitration proceeding and to impose those procedures on the parties.[39]

35.     But Professor Cheng's interpretation of Section 12(b) and 12(c) is entirely inconsistent

with the plain language and the obvious intent of those provisions.  Section 12(b) is not a dispute

resolution clause at all, but a provision addressing the maintenance of the sale proceeds in an

escrow account *until* agreement on allocation can be reached, either through agreement of the

parties or by the relevant "dispute resolver(s)."  It is Section 12(c) that addresses the resolution

of allocation disputes, and unambiguously requires that the parties negotiate in good faith on a

---

[35]     IFSA § 12(c) (emphasis added).

[36]     Cheng Aff. ¶¶ 25, 29.

[37]     *See* IFSA § 12(c) (obligating the parties to "negotiate in good faith and attempt to reach agreement on a
timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale
Transactions.").

[38]     Cheng Aff. ¶ 45.

[39]     Cheng Aff. ¶ 46.

- 16 -

"protocol for resolving disputes."[40]  Thus, far from expanding on any agreement on resolving disputes already found in Section 12(b), Section 12(c) itself addresses the formation of a protocol on resolving allocation disputes – and makes clear that no such protocol has been reached.

<blockquote>

C. <u>The Language Relied Upon By Professor Cheng Does Not Demonstrate An Intent To Arbitrate</u>

1.    *Section 12(b)'s Use of the Term "Dispute Resolver(s)"*

</blockquote>

36.    Professor Cheng relies primarily on a few words found in Sections 12(b) and 12(c) of the IFSA as providing sufficient indicia of the parties' intention to arbitrate.  First, Professor Cheng says that the term "dispute resolver(s)" in Section 12(b) can only mean an arbitrator, and that the use of this term "evinces a clear intention" to have "disputes adjudicated by an alternative form of dispute resolution rather than through the judicial system."[41]

37.    I respectfully disagree.  The term "dispute resolver" does not have any special meaning in international commercial usage, and I note that Professor Cheng does not provide any support for the proposition that it does.  To the contrary, the term "dispute resolver" is a broad, general term that is consistent with an intent to ensure the parties' freedom to agree at a later date on a method for resolving disputes that incorporates any one of a number of different types of decision-makers.  For example, the "dispute resolver" might have been a judge in a particular judicial system, a sole arbitrator or panel of arbitrators, or even a private party with expertise in allocation matters, such as, for example, a major accounting firm.  I do not believe the broad term dispute resolver can properly be read to evince an intention to submit to arbitration or to exclude the possibility of referral of disputes to the judicial system.

<blockquote>

2. *Section 12(c)'s Reference To "Binding Procedures"*

</blockquote>

---

[40]     IFSA § 12(c).

[41]     Cheng Aff. ¶ 28.

38.    The other "indicia" of an intent to arbitrate relied on by Professor Cheng is found in Section 12(c)'s reference to the formation of "binding procedures" for the allocation of sales proceeds.  Professor Cheng argues that, because it is not possible to "bind" a court to a particular procedure, the parties must have intended to submit their allocation disputes to arbitration, and not to a court.[42]

39.    As an initial matter, I disagree with the premise that the parties in a court case are not at liberty to devise binding procedures to govern the resolution of allocation disputes that will be binding as between them, subject to the approval of the court.  Professor Cheng concedes that parties may seek a court's permission to vary the court's procedures.[43]  And in fact, here, any decision on procedures for resolving allocation disputes was ultimately subject to the approval of the court.  The U.S. Bankruptcy Court's Order approving the IFSA states that no protocol on the allocation of proceeds can become effective without the prior approval of the court.[44]  The court's clear expectation that it will monitor the allocation process and approve the procedures for resolving allocation disputes suggests that such disputes might just as well have been referred to the courts instead of to arbitration.

40.    Second, this is a cross-border insolvency proceeding, in which the procedures for resolving disputes will necessarily be unique and will require the agreement of various parties across various jurisdictions.  The term "binding procedures" can be construed to encompass any agreement of the parties in this cross-border proceeding for resolving disputes – including, for example, the type of procedure decided upon in Section 16(b), which contemplates a joint hearing of the courts in the United States and Canada for any claims that would affect debtors in

---

[42]    Cheng Aff. ¶ 31.

[43]    Cheng Aff. ¶ 31.

[44]    *In re Nortel Networks, Inc.*, No. 09-10138 (KG), at ¶ 8 (Bankr. D. Del. June 29, 2009) (order (A) approving the interim funding and settlement agreement, (B) granting related relief).

more than one jurisdiction. This agreement in Section 16(b) – which of course has nothing to do with arbitration whatsoever – is just such an example of a unique, "binding" procedure already established by the parties for the resolution of disputes.

41.   Stated simply, I do not believe that the reference to binding procedures in Section 12(c) can be interpreted to signify an intent to exclude any possibility of the parties' agreeing to submit disputes to the judicial system. Nor do I believe that the term "dispute resolver(s)" can reasonably be interpreted to require arbitration and exclude the possibility of resort to the courts. In sum, there is simply not sufficient indicia nor any plain language in either Section 12(b) or 12(c) that evinces the parties' intent to arbitrate.

   D.   It Is Inappropriate To Consider Extrinsic Evidence To Vary The Interpretation Of IFSA Section 12

42.   Although Professor Cheng states that he does not believe that Section 12(b) of the IFSA is ambiguous, he was nonetheless asked to opine on what evidence would be relevant to resolve any ambiguity in Section 12(b). His conclusion, after reviewing certain extrinsic evidence, is that if Section 12(b) is found to be ambiguous, the extrinsic evidence "confirms that the parties intended to submit any disputes regarding the distribution of the Sales Proceeds to binding arbitration."[45]

43.   The legal principles applicable to extrinsic evidence are quite straightforward. Under both New York and federal common law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[46] "The best evidence of what parties to a written agreement intend is what they say in their writing,"[47] and therefore, where the parties' intent can be discerned from the four corners of the contract,

---

[45]   Cheng Aff. ¶ 54.

[46]   *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).

[47]   *Id.* (citing *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992) (citations omitted).

courts will not look to evidence outside of the contract to determine the meaning of any provision.[48]    Not only is there no "need" to look further, "if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."[49]    Importantly, extrinsic evidence, including subjective intent and alternative interpretations, cannot be used to create an ambiguity in a written agreement where none otherwise exists.[50]

44.    It is a matter of law whether contract terms are clear or ambiguous.[51]    As discussed above, I believe that a court can discern the true meaning of Section 12 from the four corners of the contract, which unambiguously confirms that the parties did not enter into a binding, enforceable arbitration agreement, and therefore it would be unnecessary for the court to consider extrinsic evidence to vary the interpretation of this Section.    I have not considered the extrinsic evidence identified by Professor Cheng and do not offer any opinion of it.

## V.    PRINCIPLES APPLICABLE TO AN AGREEMENT TO NEGOTIATE IN GOOD FAITH UNDER NEW YORK LAW

45.    Professor Cheng and I are in agreement that Section 12(c) is properly interpreted as an agreement to negotiate in good faith.[52]    Professor Cheng opines that he does not believe, for various reasons, that the U.S. and Canadian Debtors met their obligation to negotiate a protocol for resolving disputes in good faith.    As Professor Cheng recognizes, the question of whether a

---

[48]    *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (N.Y. App. Div. 2d Dep't 2011); *Maniolos v. United States*, 741 F. Supp. 2d 555, 565 (S.D.N.Y. 2010).

[49]    *Greenfield,* 98 N.Y.2d at 569-70 (emphasis added).

[50]    *See, e.g., W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.") (internal quotation and citation omitted); *JA Apparel Corp. v. Abboud,* 682 F. Supp. 2d 294, 306 n.10. (S.D.N.Y. 2010).

[51]    *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).

[52]    Cheng Aff. ¶ 55.

- 20 -

party met its obligation to negotiate in good faith is necessarily a fact-based inquiry, which I do not purport to opine on here.[53] However, I will comment briefly on New York law principles governing an agreement to negotiate in good faith.

46.    Under New York law, "[o]rdinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract."[54] As noted in the cases cited by Professor Cheng, "[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."[55]

47.    An agreement to negotiate in good faith does not require that a party finalize a contract or reach any agreement at all.  In the event no final agreement is reached, "the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing."[56]

48.    I take issue with Professor Cheng's interpretation of Section 12(c) to impose a obligation on the parties "to agree to a protocol setting forth procedures for an *ad hoc* arbitration."[57] Section 12(c) says nothing of the sort. Under New York law, an agreement to negotiate in good faith "is a mere promise to agree, which is insufficiently definite to be enforceable."[58] Such an agreement does not require that the parties reach any particular outcome or even that they are successful in reaching an agreement at all.[59] Rather, the parties were bound by the plain

---

[53]      Cheng Aff. ¶ 56.

[54]      *Rappaport v. Buske*, No. 98 CIV. 5255 (BSJ), 2000 WL 1224828 (S.D.N.Y. Aug. 29, 2000).

[55]      *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987).

[56]      *Adjustrite Sys., Inc. v. GAB Bus. Services, Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).

[57]      Cheng Aff. ¶ 45.

[58]      *McGee & Gelman v. Park View Equities, Inc.*, 187 A.D.2d 1012, 1013, (N.Y. App. Div. 4th Dep't 1992) (internal citations omitted).

[59]      *Adjustrite Sys., Inc. v. GAB Bus. Services, Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).

language of Section 12(c) simply to negotiate in good faith "*to attempt*" to reach agreement on a

procedure for resolving allocation disputes.  There is nothing in the language of Section 12(c)

that would suggest that the only appropriate outcome of a good faith negotiation would be to

agree on *ad hoc* arbitration to resolve their allocation disputes.

49.    The cases cited by Professor Cheng illustrate the rare circumstances under which a New

York court will find that a party violated its obligation to negotiate in good faith.[60]  To my

knowledge, no New York court has found that a failure to negotiate the terms of an arbitration

agreement constituted a breach of an obligation to negotiate in good faith.

---

[60]    *See CanWest Global Communications Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549 (N.Y. Sup. Ct. 2005) (finding that the party that breached its duty to negotiate in good faith insisted on terms that were in direct conflict with those contained in the prior agreement); *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987) (finding breach of implied duty under concededly binding preliminary agreement to negotiate formal closing documents in good faith); *Milex Products, Inc. v. Alra Laboratories, Inc.*, 603 N.E.2d 1226 (Ill. App. Ct. 1992) (applying Illinois law) (finding that a party breached its duty to negotiate in good faith by attempting to force the other party to accept terms that were not economically feasible).

- 22 -

## VI.  CONCLUSION

50.      As a matter of U.S. law, the forum selection clause found in Section 16(b) of the IFSA should be enforced.  In my view, Section 16(b) would be interpreted broadly to include allocation disputes in circumstances such as those here, where the parties have not reached an agreement on a protocol for resolving allocation disputes.

51.      As a matter of U.S. federal or New York state law, an agreement to arbitrate exists only where the parties have entered into a written agreement evincing their intent to arbitrate.  I disagree with Professor Cheng's view that Section 12(b) of the IFSA is an enforceable agreement to arbitrate.  I do not believe that IFSA Section 12 evinces the intent of the parties to arbitrate their allocation disputes.

52.      Under both New York and federal common law, where a contract is unambiguous, extrinsic evidence is inadmissible.  It is my view that as a matter of New York and federal common law, IFSA Section 12 unambiguously provides an agreement to negotiate, not an agreement to arbitrate, and therefore extrinsic evidence should not be considered.

53.      Under New York law, the obligation to negotiate in good faith does not require a party to reach any particular agreement, or to reach any agreement at all.  I disagree with Professor Cheng's view that the IFSA requires the parties to negotiate an agreement on *ad hoc* arbitration.

**SWORN** before me at the City of New York in the State of New York, this 3rd day of June 2011.

_____
A Commissioner for taking affidavits.

ANDREW SCHLESINGER
Notary Public, State of New York
No. 01SC6212271
Qualified in New York County
Commission Expires 10/13/2013

_____
David M. Lindsey

This is **EXHIBIT "A"** referred to in the
Affidavit of David M. Lindsey sworn
this 3rd day of June, 2011.

A commissioner for taking affidavits

ANDREW SCHLESINGER
Notary Public, State of New York
No. 01SC6212271
Qualified in New York County
Commission Expires 10/13/2013

## MATERIALS REVIEWED

1.  Interim Funding and Settlement Agreement ("IFSA"), dated June 9, 2009

2.  Order Approving the IFSA and Granting Related Relief, dated June 29, 2009

3.  Selected documents filed in *Re Nortel Networks Corporation, et. al., Court File No. 09-CL-7950*:

    - Joint Motion For The Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, And For Related Relief, dated April 25, 2011
    - Notice of Motion of the Canadian Debtors For Approval Of An Allocation Protocol, dated May 31, 2011
    - Notice of Cross-Motion, dated May 31, 2011
    - Affidavit of Tai-Heng Cheng, dated May 31, 2011

4.  Selected documents filed in *In re Nortel Networks Inc., et al,* Case No. 09-10138 (KG), U.S. Bankr. Ct. Del.:

    - Joint Motion, and Memorandum Of Law In Support Of The Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, and For Related Relief, dated April 25, 2011
    - Joint Administrators' Objection and Cross-Motion, and Memorandum of Law in Support of Their (I) Objection to Joint Motion For Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, And (II) Cross-Motion to Compel Arbitration, dated May 19, 2011
    - Reply Memorandum of U.S. Debtors And Committee In Further Support of Joint Motion For Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, and For Related Relief, And In Response To The EMEA Debtors' Cross-Motion To Compel Arbitration, dated June 2, 2011

5.  Escrow Agreements:

    - CDMA Escrow Agreement, dated November 11, 2009
    - New Gen Packet Core-Seville Purchase Price Escrow Agreement, dated December 1, 2009
    - Full Equinox Distribution Escrow Agreement, dated December 18, 2009
    - GSM Distribution Escrow Agreement, dated March 31, 2010
    - CVAS Full Distribution Escrow Agreement, dated May 27, 2010
    - MEN Distribution Escrow Agreement, dated March 19, 2010
    - GSM Retained Contracts Distribution Escrow Agreement, dated June 3, 2010
    - MSS Distribution Escrow Agreement, dated March 11, 2011

This is **EXHIBIT "B"** referred to in the
Affidavit of David M. Lindsey sworn
this 3rd day of June, 2011.

A commissioner for taking affidavits

ANDREW SCHLESINGER
Notary Public, State of New York
No. 01SC6212271
Qualified in New York County
Commission Expires 10/13/2013

# CHAFFETZ LINDSEY LLP

### DAVID M. LINDSEY I PARTNER

DIRECT: (212) 257-6966 I david.lindsey@chaffetzlindsey.com

## DAVID M. LINDSEY

**CONTACT INFO:**

David M. Lindsey

Partner

CHAFFETZ LINDSEY LLP

1350 Avenue of the Americas

Suite 800

New York, New York 10019

Tel +1.212.257.6966

Fax +1.212.257.6950

Cell +1.917.443.4790

david.lindsey@chaffetzlindsey.com

www.chaffetzlindsey.com

David Lindsey is a founding partner of Chaffetz Lindsey LLP, a boutique international arbitration and commercial litigation firm in midtown Manhattan providing the highest quality work on the most complex disputes. His 22-year career has focused on cross-border disputes tried before international arbitration tribunals and U.S. courts. He has acted as counsel, arbitrator, and expert witness. His experience includes power/energy projects, public international law, sovereign immunity, reinsurance, intellectual property, franchise/distribution agreements, license agreements, joint ventures, post-merger (M&A) disputes, breach of contract, and various other types of commercial disputes in the Americas, the Far East, South Asia, the Middle East, and Europe.

### Peer Ratings, Publications, and Association Memberships

David's clients and peers have consistently rated him as one of the global leaders in the field of international arbitration. He was voted by readers of *Global Arbitration Review* as one of the world's top 45 international arbitration counsel under the age of 45. David regularly speaks at arbitration conferences and is listed annually by *Chambers Global, Chambers USA, Chambers Latin America, The Best Lawyers in America, Super Lawyers, The International Who's Who of Business Lawyers, The International Who's Who of Commercial Arbitration, Benchmark, The Definitive Guide to America's Leading Litigation Firms and Attorneys,* and *Practical Law Company's "Which Lawyer?".*

David has published numerous articles on international arbitration. In 2010, he co-authored chapter one on applicable law in the context of enforcing agreements to arbitrate in New York in a leading text, *International Arbitration in New York* (Kluwer 2010), James Carter and John Fellas, eds. He is co-author and co-editor of Blackaby, Lindsey, and Spinillo on *International Arbitration in Latin America* (Kluwer 2002) (2nd edition anticipated 2013). He is currently working on a new book

on the recently adopted amendments to the arbitration rules of various arbitral institutions, due to be published by the ABA in 2012.

David was recently the co-chair of the Dispute Resolution Interest Group of the American Society of International Law. He is a member of the International Commercial Disputes Committee of the New York City Bar, the International Arbitration Task Force of the New York State Bar Association, and the New York Law in International Transactions Task Force of the NYSBA. He is also a member of the American Bar Association's International Law Committee, the International Bar Association's Committee D on international arbitration, the Institute for Transnational Arbitration's Advisory Board, the London Court of International Arbitration, the New York International Arbitration Club, the London International Arbitration Club, and the Swiss Arbitration Association.

### Legal Employment and Law Firm Partnerships

David has been a partner at Chaffetz Lindsey since it was founded in May 2009. He was a partner at Clifford Chance in New York from December 1999 to May 2009, where he led the Americas International Arbitration Group. Before becoming a partner at Clifford Chance, David was a partner at the leading Miami law firm Steel Hector & Davis from December 1994 until December 1999. David was based in London for several years in the late 1990s, where he opened Steel Hector's London office. In 1994-95, he was seconded for six months to Burges Salmon in Bristol, Wragge & Co. in Birmingham, and Norton Rose in London. He was an associate at Steel Hector & Davis from 1988 until he became a partner in late 1994.

### Education and Licenses to Practice Law

David obtained his BA from the University of Texas at Austin with honors in 1985 and his JD from the Florida State University College of Law with honors in 1988.

He is licensed to practice law in Florida (1988), the District of Columbia (1998) and New York (1999).

**Personal**

David is a U.S. citizen.  He was born in Tallahassee, Florida in 1962.

**Examples of Recent Experience**
- representing the central bank of a Middle East sovereign in U.S. federal district court regarding the court's order freezing nearly $2 billion of the bank's securities in a New York account, addressing application of the Foreign Sovereign Immunities Act and OFAC regulations
- representing a European investor in the Venezuelan insurance sector in an ICSID arbitration against the Republic of Venezuela alleging expropriation of more than $200 million in assets
- representing a Swiss pharmaceutical company in a more than $1.3 billion claim against a U.S. pharmaceutical company over the breach of a license agreement
- representing a US power company against an instrumentality of an Indian State Government in an *ad hoc* arbitration seated in India where approximately $400 million damages were claimed
- representing a major European engineering company in an ICC arbitration against its former joint venture partner in a dispute arising out of environmental contamination and claims for indemnity, fraud, misrepresentation, breach of a joint venture agreement, and breach of fiduciary duty, with approximately $70 million at stake
- representing a multinational energy company in a SIAC arbitration in Singapore concerning claims for breach of representations/warranties and fraud arising out of the acquisition of a power plant in Asia and associated parallel litigation
- representing a Jordanian company against its Florida-based joint venture partner in US federal court proceedings in a dispute regarding the delivery of jet fuel to US armed forces in Iraq, and possible related litigation in Jordan and Israel
- representing a Syrian auto dealer in an arbitration in Tokyo against a Japanese manufacturer in a distributorship dispute
- representing a North American energy company in an arbitration seated in Texas regarding rights to an oil and gas concession in Brunei

- representing minority owners in a joint venture dispute regarding a multi-billion dollar concession agreement in Kurdistan
- representing a European energy company in an ICDR arbitration concerning a tax-related dispute arising from an LNG project in the Caribbean
- representing a Brazilian oil and gas company in a post-M&A dispute with an Argentine seller of an oil company
- advising a power company in resolving various arbitrations and litigation proceedings against the Brazilian electricity regulator and other Brazilian government entities as part of restructuring the power company's Brazil operations, involving hundreds of millions of dollars invested in Brazil's power sector
- representing a licensor of luxury goods in an action filed by licensee in federal district court in Manhattan
- representing a power company in an ICSID arbitration against Argentina alleging breaches of the US-Argentina BIT, claiming several hundred million dollars in damages
- representing the Liberian government in an ICSID arbitration brought by foreign investors in the mining sector
- advising a multinational energy company on complex BIT claims and parallel breach of contract claims concerning interference with investments in Kazakhstan, with more than $1 billion at stake
- representing an Italian energy company in Section 1782 proceedings arising from an ICC arbitration in Paris against a Central American state-owned company
- enforcing in US federal courts an arbitration award obtained by a Russian client against a US party in a dispute concerning uranium, with more than $2 billion at stake
- representing a German engineering company in an ICC arbitration concerning a Mexican oil refinery
- advising a Brazilian construction company in the drafting of a fast-track arbitration procedure and in subsequent arbitration proceedings relating to the construction of a power plant
- representing a US company in ICC and AAA arbitrations against Indian and US entities regarding alleged breaches of pharmaceutical marketing agreements

- ♦ recently acting as sole arbitrator and as co-arbitrator in arbitral proceedings in New York and Miami under the ICC, the AAA/ICDR, and UNCITRAL rules regarding transactions involving parties from the Far East, the Middle East, Europe, and Latin America

FORM 53

*Courts of Justice Act*

ACKNOWLEDGMENT OF EXPERT'S DUTY

*(General heading)*

ACKNOWLEDGMENT OF EXPERT'S DUTY

1.   My name is ~~David H. Lindsey~~ *(name).* I live at ~~New York~~ *(city),* in the ~~State~~ *(province/state)* of ~~New York~~ *(name of province/state).*

2.   I have been engaged by or on behalf of ~~Canadian Debtors and U.S. Debtors~~ *(name of party/parties)* to provide evidence in relation to the above-noted court proceeding.

3.   I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   (a)   to provide opinion evidence that is fair, objective and non-partisan;

   (b)   to provide opinion evidence that is related only to matters that are within my area of expertise; and

   (c)   to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.   I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date ~~June 3, 2011~~                          _____
                                                              *Signature*

**NOTE:**  This form must be attached to any report signed by the expert and provided for the purposes of subrule 53.03(1) or (2) of the *Rules of Civil Procedure.*

RCP-E 53 (November 1, 2008)

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

**AFFIDAVIT OF DAVID M. LINDSEY**
**(SWORN JUNE 3, 2011)**

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants