State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the federation and its constituent units in regard to any particular provision of this Convention, showing the extent to which effect has been given to that provision by legislative or other action.

### Article XII

1. This Convention shall come into force on the ninetieth day following the date of deposit of the third instrument of ratification or accession.

2. For each State ratifying or acceding to this Convention after the deposit of the third instrument of ratification or accession, this Convention shall enter into force on the ninetieth day after deposit by such State of its instrument of ratification or accession.

### Article XIII

1. Any Contracting State may denounce this Convention by a written notification to the Secretary-General of the United Nations. Denunciation shall take effect one year after the date of receipt of the notification by the Secretary-General.

2. Any State which has made a declaration or notification under article X may, at any time thereafter, by notification to the Secretary-General of the United Nations, declare that this Convention shall cease to extend to the territory concerned one year after the date of the receipt of the notification by the Secretary-General.

3. This Convention shall continue to be applicable to arbitral awards in respect of which recognition or enforcement proceedings have been instituted before the denunciation takes effect.

### Article XIV

A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention.

### Article XV

The Secretary-General of the United Nations shall notify the States contemplated in article VIII of the following:

($a$) Signatures and ratifications in accordance with article VIII;

($b$) Accessions in accordance with article IX;

($c$) Declarations and notifications under articles I, X and XI;

($d$) The date upon which this Convention enters into force in accordance with article XII;

($e$) Denunciations and notifications in accordance with article XIII.

### Article XVI

1. This Convention, of which the Chinese, English, French, Russian and Spanish texts shall be equally authentic, shall be deposited in the archives of the United Nations.

2. The Secretary-General of the United Nations shall transmit a certified copy of this Convention to the States contemplated in article VIII.

I hereby certify that the foregoing text is a true copy of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York on 10 June 1958, the original of which is deposited with the Secretary-General of the United Nations, as the said Convention was opened for signature, and that it includes the necessary rectifications of typographical errors, as approved by the Parties.

Je certifie que le texte qui précède est une copie conforme de la Convention pour la reconnaissance et l'exécution des sentences arbitrales étrangères, conclue à New York le 10 juin 1958 et dont l'original se trouve déposé auprès du Secrétaire général de l'Organisation des Nations Unies telle que ladite Convention a été ouverte à la signature, et que les rectifications matérielles nécessaires, telles qu'approuvées par les Parties, y ont été incorporées.

For the Secretary-General,
The Legal Counsel:

Pour le Secrétaire général,
Le Conseiller juridique :

Carl-August Fleischhauer

United Nations, New York
6 July 1988

Organisation des Nations Unies
New York, le 6 juillet 1988

Certified true copy XXII-1
Copie certifiée conforme XXII.1
October 2004

# TAB 2

DOCSTOR: 2191401\1

198 F.3d 88
United States Court of Appeals,
Second Circuit.

SMITH/ENRON COGENERATION LIMITED
PARTNERSHIP, INC., Enron International C.V.,
Enron Development Corp., Enron Reserve I
B.V., Atlantic Commercial Financial B.V., and
Travamark Two B.V., Petitioners–Appellees,

v.

SMITH COGENERATION INTERNATIONAL,
INC., Respondent–Appellant.

Docket No. 99–7101.    Argued: Sept.
15, 1999.    Decided: Dec. 8, 1999.

Defendants in lawsuit in Dominican Republic brought suit
to compel arbitration. The United States District Court for
the Southern District of New York, Richard C. Casey, J.,
compelled arbitration, and appeal was taken. The Court
of Appeals, Feinberg, Circuit Judge, held that: (1) district
court had jurisdiction under Convention on the Recognition
and Enforcement of Foreign Arbitral Awards and Federal
Arbitration Act (FAA); (2) assignments did not prevent
enforcement of arbitration clause; and (3) claims asserted
were within scope of agreement.

Affirmed.

West Headnotes (10)

**1**    **Alternative Dispute
Resolution** 🔑 Agreements

**Treaties** 🔑 Construction and Operation of
Particular Provisions

Convention on the Recognition and Enforcement
of Foreign Arbitral Awards and implementing
provisions of Federal Arbitration Act (FAA) set
forth four basic requirements for enforcement
of arbitration agreements under Convention: (1)
there must be written agreement; (2) it must
provide for arbitration in territory of signatory
of convention; (3) subject matter must be
commercial; and (4) it cannot be entirely domestic
in scope. 9 U.S.C.A. § 202.

20 Cases that cite this headnote

**2**    **Alternative Dispute
Resolution** 🔑 Proceedings

District court's scope of inquiry in considering
petition to compel arbitration under Chapter Two
of Federal Arbitration Act (FAA) implementing
Convention on the Recognition and Enforcement
of Foreign Arbitral Awards is very limited. 9
U.S.C.A. § 202.

7 Cases that cite this headnote

**3**    **Alternative Dispute
Resolution** 🔑 Agreements

**Treaties** 🔑 Construction and Operation of
Particular Provisions

Although states where parties to agreements
involving power plant were incorporated and
state where power plant was located were not
signatories to Convention on the Recognition and
Enforcement of Foreign Arbitral Awards, district
court had jurisdiction under Convention and
implementing provisions of Federal Arbitration
Act (FAA), where agreements between parties
provided for arbitration in United States, which
was a signatory. 9 U.S.C.A. § 202.

31 Cases that cite this headnote

**4**    **Treaties** 🔑 Construction and Operation in
General

Starting point in construing treaty is its text.

1 Cases that cite this headnote

**5**    **Alternative Dispute
Resolution** 🔑 Contractual or Consensual Basis

In considering whether particular dispute is
arbitrable, court must first decide whether parties
agreed to arbitrate.

10 Cases that cite this headnote

**6**    **Alternative Dispute
Resolution** 🔑 Enforcement and Recognition
of Awards

**Treaties** 🔑 Construction and Operation of Particular Provisions

In federal question case arising under Chapter Two of Federal Arbitration Act (FAA) implementing Convention on the Recognition and Enforcement of Foreign Arbitral Awards, federal law, rather than law of forum where no party was domiciled and no transactions took place, applied to question whether agreement to arbitrate was enforceable. 9 U.S.C.A. § 203.

16 Cases that cite this headnote

**7    Alternative Dispute Resolution** 🔑 Persons Affected or Bound

Non-signatories to arbitration agreement may nevertheless be bound according to principles of: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.

18 Cases that cite this headnote

**8    Alternative Dispute Resolution** 🔑 Persons Affected or Bound

Non-signatories to arbitration agreement were nevertheless bound according to principles of veil-piercing by virtue of assignments from affiliates which had signed agreement.

7 Cases that cite this headnote

**9    Alternative Dispute Resolution** 🔑 Right to Enforcement and Defenses in General

Signatory to arbitration agreement was estopped from avoiding arbitration with nonsignatories, where signatory treated nonsignatories and affiliated signatories as single unit in its complaint.

28 Cases that cite this headnote

**10    Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

Claims predating agreement to arbitrate were arbitrable, where arbitration clause did not

contain any temporal limitation, and claims related to obligations under the agreement.

17 Cases that cite this headnote

**Attorneys and Law Firms**

*89 Richard N. Chassin, New York, N.Y. (Becker, Glynn, Melamed & Muffly LLP, Joseph D. Becker, Zeb Landsman, of Counsel), for Respondent–Appellant.

Gregory A. Markel, New York, N.Y. (Brobeck Phleger & Harrison LLP, Ronit Setton, of Counsel), for Petitioners–Appellees.

*90 Before: FEINBERG, VAN GRAAFEILAND and SACK, Circuit Judges.

**Opinion**

FEINBERG, Circuit Judge:

Respondent Smith Cogeneration International, Inc. (SCI) appeals from an order of the United States District Court for the Southern District of New York, Richard C. Casey, J., compelling arbitration of claims asserted by SCI in a lawsuit in the Dominican Republic (the Dominican Lawsuit) against petitioners-appellees Smith/Enron Cogeneration Limited Partnership, Inc. (SECLP) and Enron International C.V. (Enron Int'l) and a number of its affiliates (collectively referred to as Enron). SCI's principal arguments on appeal are (1) under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention) the district court did not have jurisdiction over this action; (2) the contracts between the parties containing the arbitration clause are no longer enforceable by Enron; and, (3) SCI's claims in the Dominican Lawsuit are not covered by the arbitration clause. For the reasons stated below, we affirm the order of the district court.

**I. Background**

This case arises out of a number of agreements between SCI and Enron regarding an electrical power plant in the Dominican Republic. In July 1993, SCI signed a Power Purchase Agreement with a state-owned utility, Compañía Dominicana de Electricidad (CDE), to construct, finance and manage the power plant (Power Purchase Agreement). While negotiating this agreement, SCI encountered strong

competition from Enron, which was making its own offers to the Dominican government. After some negotiation, SCI and Enron Int'l agreed to create a joint venture in the construction and operation of the plant as reflected in the Project Agreement they both signed on November 12, 1993 (Project Agreement).

On November 24, 1993, Smith Cogeneration Dominicana (SCD), SCI's affiliate,[1] entered into a limited partnership agreement with Travamark Two B.V. (Travamark), an Enron affiliate (1993 Agreement). The 1993 Agreement created SECLP, a limited partnership organized under the laws of the Turks and Caicos Islands. Pursuant to the 1993 Agreement SCI was to assign its interest in the Power Purchase Agreement to SECLP, which would then take over the construction and operation of the power plant.

[1]    The principal of both SCD and SCI is the same person, Donald Smith.

Thereafter, a series of assignments by both signatories to the 1993 Agreement (SCD and Travamark) took place. SCD assigned part of its interest in SECLP to SCI. Similarly, Travamark assigned its interest in SECLP to two Enron affiliates, Atlantic Commercial Finance B.V. (ACF) and Enron Reserve I B.V. (ER). The 1993 Agreement was amended in December 1994 to reflect these changes (1994 Agreement).

The 1994 Agreement, like the 1993 Agreement and the Project Agreement that preceded it, contained a broad arbitration clause providing for the arbitration of "any dispute ... arising under or relating to any obligation or claimed obligation under the provisions of this Agreement." All three agreements also provided that the arbitration take place in New York and be governed by the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., and Texas law. The 1993 and the 1994 Agreements were identical in all other relevant respects.

Less than a year after SCI, SCD, ACF, and ER entered into the 1994 Agreement, a second series of assignments took place. In July 1995, ER assigned its general partnership interest to Enron Dominican Republic Operations (EDRO), and ACF assigned its limited partnership interest to Enron Dominican Republic (EDR). Neither party disputes that these assignments were permitted under the 1994 Agreement *91 and were made with SCI's knowledge and consent. Enron additionally claims that, as with the previous assignments, these assignees are Enron affiliates with identical economic interests and under common control. In contrast to all the

previously named Enron affiliates (Enron Int'l, Travamark, ACF, and ER), EDR and EDRO—the current Enron partners in SECLP—were not sued by SCI in the Dominican Lawsuit and are not petitioners in this litigation.

The Enron–SCI relationship began to unravel in 1996 when it became clear that SCI was unable to meet its financial obligations to SECLP. As a result, in April 1996 the 1994 Agreement was amended to include the Smith Dominicana Holding Limited Partnership (Holding Partnership). The Holding Partnership, a creation of SCD and another Enron affiliate, Finven, was a mechanism for infusing money into SECLP: SCD would in effect sell 35% of its interest in SECLP to Finven, and either repurchase it by November 1997 or receive $50,000 in consideration from Finven. SCD proved unable to repurchase its interest, and a dispute arose between it and Finven. As a result, the two entities proceeded to arbitration in June 1998.[2] That arbitration took place under the contract creating the Holding Partnership and its result is not the subject of this appeal.

[2]    According to the record before us, that arbitration took place in New York before the Honorable Abraham Sofaer. During the arbitration, SCD conceded Finven's rights under the Holding Partnership. Judge Sofaer awarded Finven $300,000 in attorney's fees which has not yet been paid by SCD.

Shortly after the debacle for SCI in the arbitration with Finven and with SCI's position in SECLP apparently eroding, SCI filed the Dominican Lawsuit in July 1998. In that suit, SCI named all of the petitioners in the instant case as defendants, referring to them throughout the complaint as "Enron," "the Enron Group," "the Enron companies," and describing them as affiliates. In its complaint in that action, SCI alleged that it was coerced into the SECLP partnership by Enron, that all of SCI's Agreements with Enron were fraudulently induced, and that Enron tortiously interfered with SCI's negotiations with CDE. SCI demanded rescission of the Project Agreement, the 1993 Agreement and the 1994 Agreement and approximately $159 million in damages.

Whereupon we arrive at the instant action. In August 1998, SECLP and Enron filed a petition in the Southern District to compel arbitration of the dispute with SCI and to enjoin SCI from prosecuting the Dominican Lawsuit. In the district court, Enron argued that under the broad arbitration clause in the 1993 and 1994 Agreements, SCI is bound to arbitrate its dispute with Enron. After oral argument in November 1998, Judge Casey ruled from the bench, granting Enron's motion

to compel arbitration and enjoining SCI from prosecuting the Dominican Lawsuit. This appeal followed.

## II. Discussion

On appeal, SCI argues that there is no federal subject matter jurisdiction over this action because the 1994 Agreement is not "centered" in a state that is a signatory to the Convention. Next, SCI claims that because none of the petitioners are currently signatories to the 1994 Agreement as a result of the various transactions outlined above, they no longer have the right to compel arbitration of disputes under that Agreement. Finally, SCI argues that its claims in the Dominican Lawsuit are based upon Enron's actions that predate the 1994 Agreement and thus are beyond the scope of the arbitration clause. We treat these claims in separate sections below.

### A. Jurisdiction under the Convention

SCI argues that the district court did not have subject matter jurisdiction over this dispute. SCI and Enron agree that *\*92* the only basis for federal jurisdiction, if it exists, is Chapter Two of the FAA, 9 U.S.C. §§ 201–208. [3] Section 201 provides for the enforcement of the Convention. [4] Section 203 provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." In considering whether the Convention applies to this arbitration, we are mindful that "[t]he goal of the Convention is to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions," *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,* 923 F.2d 245, 250 (2d Cir.), cert. dismissed, 501 U.S. 1267, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991), and to "unify the standards by which agreements to arbitrate are observed." *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). The adoption of the Convention by the United States promotes the strong federal policy favoring arbitration of disputes, particularly in the international context. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 638–40, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

[3]    SCI claims that diversity is lacking and Enron does not contest that point.

[4]    Section 201 provides: "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter." The full text of the Convention may be found immediately following 9 U.S.C. § 201.

[1]   [2]   A district court may compel arbitration under Chapter Two of the FAA pursuant to 9 U.S.C. § 206, which provides:

A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.

Section 202 defines the type of arbitration agreements that fall under Chapter Two of the FAA:

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

The Convention and the implementing provisions of the FAA set forth four basic requirements for enforcement of arbitration agreements under the Convention: (1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope. *Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186–87 (1st Cir.1982); see also *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1018 (2d Cir.1993). We agree with (then Chief) Judge Coffin in *Ledee* that a district court's scope of inquiry in considering a petition to compel arbitration under Chapter Two of the FAA is "very limited." 684 F.2d at 186. Although the various agreements between SCI and Enron satisfy these four requirements, SCI nonetheless claims that the district court lacked jurisdiction.

[3]   SCI invites us to employ a "center of gravity" test to determine whether the instant arbitration falls under the Convention. SCI's "center of gravity" test, which it does not clearly define, apparently would require the subject matter of the arbitration, or the parties to the arbitration, or both, to be located in a State that also is a signatory to the Convention. SCI and *\*93* SECLP are incorporated in the British Virgin Islands and the Turks and Caicos Islands respectively, and the location of the power plant is in the

Dominican Republic, none of which is a signatory to the Convention. [5]  Accordingly, SCI argues, this dispute lies beyond the scope of the Convention. Enron responds that (1) the only State that must be a signatory to the Convention is the State where the arbitration is to take place, the second requirement mentioned in *Ledee;* and (2) as the Agreements between the parties provided for arbitration in the United States (specifically in New York City), which is a signatory to the Convention, there is federal jurisdiction. For the reasons stated below, we agree with Enron and decline to adopt SCI's "center of gravity" test.

[5]     The United Kingdom, a signatory to the Convention, did not extend it to its dependencies, the Turks and Caicos Islands and the British Virgin Islands. See Note 28 to the Convention.

  4    The starting point in construing a treaty is its text. *Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 534, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991). The relevant portion of the Convention is Article II, which governs an action to enforce an arbitration agreement. Article II provides:

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Thus, in Article II the "Contracting State" concept appears only to designate the location of the court where "recognition" of an agreement in writing to arbitrate is sought. The purpose behind this drafting choice is clear: the courts of a signatory to the Convention should abide by its goal of enforcing international agreements to arbitrate disputes. Similarly, the FAA in 9 U.S.C. § 202 makes no mention of a requirement that the arbitration involve parties subject to the jurisdiction of Contracting States or that the location of the dispute be

"centered" in such a State. While 9 U.S.C. § 202 explicitly excludes domestic disputes from Chapter Two of the FAA, it does not make any distinctions among foreign disputes or foreign parties.

SCI's effort to import a "center of gravity" test into application of the Convention is further weakened by the Convention's history. The Convention was drafted to eliminate many of the problems that hindered enforcement of its predecessor, the Geneva Convention of 1927. See Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1055–61 (1961). Most importantly, the Convention eliminated the requirement in the Geneva Convention that the parties be subject to the jurisdiction of Contracting States. See Cindy Silverstein, Comment, Iran Aircraft Industries v. Avco Corporation: Was a Violation of Due Process Due?, 20 Brook. J. Int'l L. 443, 453–54 (1994); see also Albert Jan van den Berg, The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation 8–9 (1994). Under Article II of the Convention, the citizenship of the parties to the agreement and the location of  *94  the disputed subject matter are not controlling.

In *La Societe Nationale Pour La Recherche v. Shaheen Natural Resources Co.,* 733 F.2d 260 (2d Cir.1984)(per curiam), this court affirmed a judgment of the Southern District "for the reasons set forth" in the opinion of the district judge, reported at 585 F.Supp. 57. In that case, Judge Duffy had confirmed an arbitral award in favor of plaintiff, a company owned by the Algerian government, a non-signatory to the Convention. The contract between the parties involved the sale of crude oil by the plaintiff to the defendant, an Illinois company with its principal place of business in New York. The contract provided for arbitration in Geneva, Switzerland (a signatory State) under Algerian law. The defendant in that case argued that the plaintiff could not invoke the Convention against it "because as an arm of the Algerian government," plaintiff was not a party to the Convention. *Id.* at 64. Although the context for the decision was Article I of the Convention, which deals with arbitral *awards* rather than with arbitration *agreements,* the court's reasoning applies with equal force to the rest of the Convention: "The focus of ... the Convention is not on the nationality of the party seeking to enforce an award but on the *situs of the arbitration.* Indeed, arbitration awards rendered by panels sitting in contracting countries have been confirmed consistently when the plaintiff is a national of a country which has not acceded

to the Convention." *Id.* (emphasis added); see also *Imperial Ethiopian Gov't v. Baruch–Foster Corp.,* 535 F.2d 334, 335 (5th Cir.1976)(confirming an arbitral award in favor of the Ethiopian government, a non-signatory); *In re Arbitration Between: Trans Chemical Ltd. and China Nat'l Mach. Import & Export Corp.,* 978 F.Supp. 266 (S.D.Tex.1997), aff'd, 161 F.3d 314 (5th Cir.1998)(confirming arbitral award in favor of Pakistani corporation and against Chinese corporation regarding construction of a plant in Pakistan, a non-signatory); *National Oil Corp. v. Libyan Sun Oil Co.,* 733 F.Supp. 800 (D.Del.1990)(enforcing an arbitration award in favor of a company in Libya, a nonsignatory). We have previously applied the Convention to an arbitration between two foreign companies without commenting at all about the contracting status of any of the states involved. See, e.g., *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928 (2d Cir.1983)(confirming award between two foreign companies); see also *Jain v. de Mere,* 51 F.3d 686 (7th Cir.1995)(compelling arbitration between French and Indian citizens).

The Convention's sweeping approach toward arbitral agreements in Article II and arbitral awards in Article I led many of the signatory states, including the United States, to adopt certain reservations to its implementation. One such reservation, the exclusion from the Convention of arbitral agreements and awards that are entirely domestic in scope, see *Ledee,* 684 F.2d at 187, has already been mentioned. The United States also adopted the reservation provision in Article I(3) of the Convention, governing arbitral *awards,* which provides that "any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State." See Note 29 to the Convention. SCI relies on this "reciprocity" provision to bolster its argument that the United States cannot enforce SCI's Agreements with Enron unless there is another "Contracting State" involved in the dispute.

SCI's reliance on the "reciprocity" provision is misplaced. First, it is questionable whether that provision, which is found only in Article I of the Convention, even applies to Article II. But even if it did, the reciprocity provision does not contemplate the "center of gravity" test suggested by SCI. All that the reciprocity provision requires is that the award be granted in a "Contracting State." In this case, the arbitration agreements between SCI and Enron **\*95** contemplated arbitration in the United States—a signatory to the Convention. If the arbitration results in an award, it will have been granted in a signatory State and will be enforceable

either here or in another Contracting State. *Bergesen,* 710 F.2d at 933–34 (awards rendered in the United States under the Convention may be enforced in the United States as long as there is substantial foreign nexus to the arbitration).

To support its "center of gravity" test, SCI also relies on the refusal of the Fifth Circuit to compel arbitration in Mississippi in *National Iranian Oil Co. v. Ashland Oil, Inc.,* 817 F.2d 326 (5th Cir.1987). However, the contract in *National Iranian* provided for arbitration in Iran, a non-signatory to the Convention. This is a far cry from holding that an Iranian company could not be compelled to arbitrate a claim in the United States, if it has contracted to do so. Indeed, in dicta, *National Iranian* suggested it could be so compelled. 817 F.2d at 334.

Thus, since the 1993 and the 1994 Agreements satisfied all the requirements set forth in *Ledee*—particularly as they call for arbitration in New York—we conclude that the district court had jurisdiction under the Convention and the implementing provisions of the FAA.

## B. Do the Enron Petitioners Have the Right to Compel SCI to Arbitrate?

SCI's second principal argument on appeal is that there is no valid and enforceable agreement to arbitrate between the parties to this proceeding. SCI argues that (1) the only valid agreement respecting SECLP currently in effect is the 1994 Agreement, because it superseded the earlier Agreements; [6] (2) the only Enron signatories to the 1994 Agreement, ACF and ER, have assigned their rights under that Agreement to EDR and EDRO (who are not petitioners here); (3) therefore, none of the Enron petitioners have the right to enforce a contract to arbitrate to which they are not now parties.

[6]   In *McAllister Bros., Inc. v. A&S Transp. Co.,* 621 F.2d 519, 523 (2nd Cir.1980), we held that a claim of "abandonment" of a contract that had concededly been made between the parties should be decided by the arbitrator. It is thus arguable that SCI's claim that the 1994 Agreement superseded the previous Agreements is for the arbitrator to decide. However, the Enron petitioners do not press that contention, and we need not reach it as we find that Enron may compel arbitration under the 1994 Agreement.

[5]   In considering whether "a particular dispute is arbitrable," a court must first decide "whether the parties agreed to arbitrate." *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.,* 189 F.3d 289, 294 (2d Cir.1999); see also *Deloitte*

*Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1063 (2d Cir.1993). We have held that whether an entity is a party to the arbitration agreement also is included within the broader issue of whether the parties agreed to arbitrate. *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 677 (2d Cir.1972); *McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980).

Unquestionably, there were a number of enforceable contracts between SCI (and its affiliate, SCD) and various Enron entities, each of which contained an agreement to arbitrate. The assignments of rights under the 1994 Agreement from one set of affiliates to another set of affiliates do not negate the prior existence of a contract to arbitrate between the parties, and thus do not fall comfortably within the inquiry into the making of an agreement. The question before us is not whether SCI and the Enron petitioners entered into an agreement to arbitrate—they did (and more than once) —but whether subsequent events deprived all of the Enron petitioners of the right to compel SCI to live up to that agreement.

**1. Choice of Law**

6   Before we turn to that question, we must first resolve a threshold issue concerning **\*96** applicable law. SCI argues that state contract law principles generally apply in an inquiry into the making of the agreement. See *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686–87, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996); *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). SCI suggests that we must use New York's choice of law to determine the applicable body of contract law, and that New York's choice of law points to the Turks and Caicos Islands. Alternatively, SCI argues that the 1994 Agreement itself provides that "matters relating to the formation and organization of the Partnership shall be governed by the [Turks and Caicos] Act." However, neither approach has merit on this record. First, as this is a federal question case under 9 U.S.C. § 203 and not a diversity case, we see no persuasive reason to apply the law of New York simply because it is the forum of this litigation. See *Corporacion Venezolana de Fomento v. Vintero Sales Corp. et al.,* 629 F.2d 786, 795 (2d Cir.1980); *Filanto, S.p.A v. Chilewich Int'l Corp.,* 789 F.Supp. 1229, 1235–37 (S.D.N.Y.1992)(applying federal law to the question of whether a contract is enforceable in a case arising under the Convention); cf. *Pescatore v. Pan Am. World Airways,* 97 F.3d 1, 12 (2d Cir.1996)(noting that the law is unsettled when it comes to applying federal common law or state common law in non-diversity cases). Second, the contractual provision

on which SCI relies relates to "the formation and organization of the Partnership." But the partnership here—SECLP—was formed and organized well before the assignments, so that language does not apply. Rather, the primary question before us relates to the effect of the assignments on rights and duties flowing from the arbitration clause in the 1994 Agreement.

When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable. See *David L. Threlkeld & Co.,* 923 F.2d at 249–50 (holding Convention and FAA preempt Vermont statute); *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 845–46 (2d Cir.1987)(applying federal common law in case arising under the Convention); *Borsack v. Chalk & Vermilion Fine Arts, Ltd.,* 974 F.Supp. 293, 299 n. 5 (S.D.N.Y.1997)("[W]here jurisdiction is alleged under chapter 2 of the Federal Arbitration Act the issue of enforceability and validity of the arbitration clause is governed by federal law.") Under the circumstances here, where there is little connection to the forum and the Agreements between the parties state an intention to be governed by the FAA, proceeding otherwise would introduce a degree of parochialism and uncertainty into international arbitration that would subvert the goal of simplifying and unifying international arbitration law.

In this case, the 1994 Agreement's dispute resolution provision provided that arbitration "shall for all purposes be governed by, and construed and enforced in accordance with, the Federal Arbitration Act ("FAA"), and matters of interpretation of the provisions of this Agreement shall be governed by Texas law in any such arbitration." It is thus clear that neither party intended New York law, procedural or otherwise, to govern any aspect of their dispute. As no party is domiciled in New York, and no transactions have taken place here, New York has no connection to this litigation other than it is the location of the arbitration. While the language quoted immediately above might justify looking to Texas law on assignments, neither party argued that it applied. Thus, we will apply the body of federal law under the FAA.[7]

7    We doubt our result would be any different were we to look at Texas law. The Texas Supreme Court has several times announced its pro-arbitration policy and the primacy of the FAA where an arbitration agreement provides that it is governed by both Texas law and the FAA. See, e.g., *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90–91 (Tex.1996)(applying the FAA to question of waiver of arbitration).

**\*97** **2. Enron's Right to Compel Arbitration.**

**7**    Having determined that federal law applies, we turn now to the effect of the assignments on the right of the Enron petitioners to compel arbitration under the 1994 Agreement. Even if we accept arguendo SCI's claim that the Enron petitioners are not signatories to the 1994 Agreement, that does not end the matter. [8] In this circuit, we have repeatedly found that non-signatories to an arbitration agreement may nevertheless be bound according to "ordinary principles of contract and agency." *McAllister Bros.,* 621 F.2d at 524; *Deloitte Noraudit A/S,* 9 F.3d at 1064. These principles include "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995). We believe that a number of these concepts justify allowing the Enron petitioners to compel SCI to arbitrate its claims asserted against them in the Dominican Lawsuit.

[8]    Of course, two of the Enron petitioners (ACF and ER) *did* sign the 1994 Agreement, but later assigned their interests to two other Enron affiliates, EDR and EDRO.

**8**    In applying these concepts, we note, as we did in *Thomson–CSF* with respect to "veil-piercing," that such determinations are often "fact specific" and differ with "the circumstances of each case." 64 F.3d at 777–78 (citation omitted). More importantly, while a court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party, we do not face that concern here. SCI is the party trying to escape its obligation to arbitrate, but it (and/or its affiliate SCD) was a signatory to all three arbitration Agreements with Enron—that is, the Project Agreement, the 1993 Agreement and, most importantly, the 1994 Agreement. [9] Normally, it is the signatory to an arbitration agreement that urges us to apply a veil-piercing doctrine, see, e.g., *Thomson–CSF,* 64 F.3d at 777–78, to require the non-signatory to arbitrate because of the special circumstances that apply. In this case, however, it is the Enron petitioners (the alleged "non-signatories" to the contract) that invite us to pierce their own corporate veil because of claimed special circumstances.

[9]    SCD was the only "Smith Cogeneration" signatory on the 1993 Agreement. SCI was a signatory on the Project Agreement and the 1994 Agreement.

Enron argues that the corporate relationship among the various Enron affiliates justifies allowing the Enron

petitioners to invoke the arbitration clause in the 1994 Agreement. The identity of interests between petitioners and the current Enron signatories to the 1994 Agreement (EDR and EDRO) is nowhere more apparent than on the assignment instruments themselves: the signatures of the assignors in the assignments from ACF and ER to EDR and EDRO are the same as the signatures for the assignees. Similarly, virtually all the correspondence between SCI and the various Enron petitioners is mailed to the same address in Texas, "c/o Enron Development Corp." Perhaps most telling is SCI's own reference to the various Enron companies in its complaint in the Dominican Lawsuit as the "Enron Group," "affiliates," and "Enron." In the Dominican Lawsuit, SCI treated a group of related companies as though they were interchangeable, but now it asks for strict adherence to the corporate form in its opposition to arbitration. On this record, that is not called for. We believe that all the circumstances here justify piercing the corporate veil.

**9**    In addition, Enron's claim that SCI should be estopped from resisting arbitration is equally, if not more, compelling. In *Thomson–CSF* we set forth two types of estoppel cases. 64 F.3d at 778–79. The **\*98** more typical case, as we have already noted, arises when a signatory to an arbitration agreement seeks to bind a non-signatory to it. We have held that the non-signatory may be compelled to arbitrate when it has derived other benefits under the agreement containing the arbitration clause. See *American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999); *Deloitte Noraudit A/S,* 9 F.3d at 1064. But even when a non-signatory seeks to compel arbitration with a signatory, we pointed out that the Fourth and Eleventh Circuits "have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Thomson–CSF,* 64 F.3d at 779 (referring to *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757–58 (11th Cir.1993); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988)). We find that this case falls within the latter category.

In the Dominican Lawsuit, SCI asked for the "nullification or rescission of all of the agreements entered into between [SCI] and its related companies and persons related to [Enron] and any other entity or person of the Enron Group," and sued all the Enron signatories to the Project Agreement, 1993 Agreement and the 1994 Agreement except for EDR and EDRO, the most recent signatories to the 1994 Agreement. It is clear that the Enron defendants in the Dominican Lawsuit

are the ones entitled to relief, as the subject matter of that lawsuit arises under all of those Agreements, particularly the 1994 Agreement. Further, as already stated, by treating the Enron entities as a single unit in its complaint in the Dominican Lawsuit, SCI is estopped from claiming that the current signatories to the 1994 Agreement are distinct from the defendants in the Dominican Lawsuit. Therefore, we conclude that SCI cannot now shield itself from arbitration by arguing that only the 1994 Agreement contains an enforceable arbitration clause, and that only EDR and EDRO—the parties SCI intentionally did not sue in the Dominican Lawsuit—would have the right to invoke it. Cf. *IDS Life Ins. Co. v. SunAmerica, Inc.,* 103 F.3d 524, 530 (7th Cir.1996)(Posner, C.J.)(where a party to an arbitration agreement attempts to avoid that agreement by suing a "related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration. Such a maneuver should not be allowed to succeed....").

For these reasons, we affirm the district court's ruling that the Enron petitioners have the right to compel SCI to arbitrate.

## C. Are SCI's Claims in the Dominican Lawsuit within the Scope of the 1994 Arbitration Agreement?

Finally, SCI argues that the claims it asserted against Enron in the Dominican Lawsuit are not arbitrable because they are not covered by the arbitration provision in the 1994 Agreement. These claims are that SCI was coerced into the SECLP partnership by Enron, that all of SCI's Agreements with Enron were fraudulently induced, and that Enron tortiously interfered with SCI's negotiations with CDE.

The 1994 Agreement provides in relevant part:

> 11.14 *Dispute Resolution* (a) In the event of any dispute, disagreement, controversy or claim arising under or relating to any obligation or claimed obligation under the provisions of this Agreement (a "*Dispute*" which term shall include any tort claim relating to or in connection with this Agreement ... ), the party seeking resolution of such Dispute shall give notice to the other party....

> ....

> (c) Any Dispute that is not resolved by the parties shall be finally settled by arbitration.

 ***99** Despite this broad language and the explicit reference to "any tort claim," SCI contends that its claims in the

Dominican Lawsuit fall outside the scope of this language. SCI argues that because Enron's alleged improper actions took place in 1993, prior to the signing of the 1994 Agreement, the arbitration provision does not cover them.

We have stated previously that in light of "the strong federal policy in favor of arbitration, the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997) (citations and internal quotation marks omitted). We stated in *Genesco* that when we consider "whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims 'touch matters' covered by the parties' ... agreements, then those claims must be arbitrated, whatever the legal labels attached to them." 815 F.2d at 846 (citation omitted).

 **10** SCI's argument that its claims against Enron concern events that predate the 1994 Agreement does not persuade us that the district court erred here in ordering arbitration. In *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1212 (2d Cir.1972), we held that arbitration under the New York Stock Exchange Rules applied to actions predating the signing of the contract by the petitioner because the contract stated that it governed "any controversy" between the parties. As the arbitration clause here similarly does not contain any temporal limitation, the relevant inquiry is whether SCI's claims "relat[e] to any obligation or claimed obligation under" the 1994 Agreement, not when they arose. We think it is evident that SCI's claims in the Dominican Lawsuit fall within this broad language. Further, as fraudulent inducement claims necessarily involve actions that predate the signing of a contract, taking SCI's argument to its logical extreme would mean that such claims are generally non-arbitrable. Yet, the Supreme Court in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), held that claims of fraudulent inducement of a contract generally, as opposed to fraudulent inducement of the arbitration clause specifically, are arbitrable. SCI's claims in the Dominican Lawsuit relate to the inducement of the 1994 Agreement as a whole. Thus, resolving any doubt with respect to the scope of the arbitration clause in favor of arbitration, we find that SCI's claims in the Dominican Lawsuit are arbitrable.

### III. Conclusion

We affirm the decision of the district court to compel arbitration and enjoin SCI from prosecuting the action in the Dominican Republic. We conclude that there is federal jurisdiction under the Convention and the FAA. The assignments under the 1994 Agreement do not prevent Enron from invoking the arbitration clause in that Agreement; in any event, we find that SCI is estopped from raising this claim. Finally, SCI's claims in the Dominican Lawsuit fall within the scope of the arbitration clause in the 1994 Agreement. We have considered all of SCI's claims and find them without merit.

---

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

DOCSTOR: 2191401\1

585 F.2d 39
United States Court of Appeals,
Third Circuit.

BECKER AUTORADIO U.S.A., INC.

v.

BECKER AUTORADIOWERK GmbH and
Max Egon Becker and Becker Electronics,
Inc. and Lothar Amanda and Roland Becker
and Mercedes-Benz of North America, Inc.,
Appeal of BECKER AUTORADIOWERK
GmbH, Becker Electronics, Inc., Max Egon
Becker and Roland Becker, in No. 77-2566.
Appeal of MERCEDES BENZ OF NORTH
AMERICA, INC., in No. 77-2567.

Nos. 77-2566, 77-2567.    Argued
June 7, 1978.    Decided July 17, 1978.

Pennsylvania corporation which was exclusive American
distributor of automobile radios and accessories
manufactured by West German company brought diversity
action against the West German company, its Delaware
subsidiary and others, alleging that defendants had breached
a promise to renew a prior exclusive distribution agreement.
All defendants moved under the federal Arbitration Act to
stay the action and to compel arbitration. The United States
District Court for the Eastern District of Pennsylvania, Joseph
L. McGlynn, Jr., J., denied the motion, and appeal was
taken. The Court of Appeals, Garth, Circuit Judge, held
that: (1) federal law governed the question whether there
was an agreement to arbitrate the dispute that gave rise
to the litigation, and (2) given the broad language of the
arbitration clause in the exclusive distribution agreement
and the fact that the dispute concerned the continuation
or termination of the agreement and the agreement itself
included provisions relevant to renewal and where the issue
arose in the course of and during the continuing relationship
between the parties created by the agreement, the dispute
arose out of the exclusive distribution agreement and was,
therefore, arbitrable under the agreement's arbitration clause.

Reversed and remanded with direction.

West Headnotes (12)

**1**    **Federal Courts**   🔑   Injunction and Provisional
Remedies

In an action for money damages, an order denying
a stay of judicial proceedings pending arbitration
and refusing to compel arbitration is appealable
as an order denying injunctive relief. 28 U.S.C.A.
§ 1292(a)(1).

8 Cases that cite this headnote

**2**    **Federal Courts**   🔑   Arbitration

When a contract involves commerce, whether
a suit or proceeding is referable to arbitration
under an agreement to arbitrate pursuant to
federal Arbitration Act or to the Convention
on Recognition and Enforcement of Foreign
Arbitral Awards is a matter of federal substantive
law; therefore, question whether, in contracts
involving commerce, there is an agreement to
arbitrate an issue or dispute upon which suit
has been brought is governed by federal law. 9
U.S.C.A. §§ 3, 206.

9 Cases that cite this headnote

**3**    **Federal Courts**   🔑   Arbitration

Questions of interpretation and construction of
arbitration agreements contained in contracts
involving commerce are to be determined by
reference to federal law.

6 Cases that cite this headnote

**4**    **Federal Courts**   🔑   Arbitration

Once a dispute is covered by the federal
Arbitration Act, federal law applies to
all questions of the arbitration agreement's
interpretation, construction, validity, revocability
and enforceability. 9 U.S.C.A. § 3.

12 Cases that cite this headnote

**5**    **Federal Courts**   🔑   Arbitration

If parties to a contract involving commerce
agree that certain disputes will be submitted
to arbitration and that the law of a particular
jurisdiction will govern the resolution of those
disputes, federal courts must effectuate that
agreement; however, whether a particular dispute
is within the class of those disputes governed by

the arbitration and choice of law clause is a matter of federal law.

9 Cases that cite this headnote

**6    Federal Courts**   🔑   Arbitration

Where a contract containing an arbitration clause provides that the law of a certain state shall govern the agreement and where the law of that state will not enforce or gives very limited effect to arbitration clauses, so that under the law of the designated state the dispute would not be submitted to arbitration, and if one party thereafter brings suit on the contract in federal court and the contract involves commerce, federal district court, in deciding a motion to stay the proceedings and compel arbitration, would look to federal law in determining the scope of the arbitration clause. 9 U.S.C.A. § 3.

16 Cases that cite this headnote

**7    Alternative Dispute Resolution**   🔑   Arbitrability of Dispute

Question of the arbitrability of a dispute is a question for the court to decide.

**8    Alternative Dispute Resolution**   🔑   Arbitration Favored; Public Policy

There is a strong policy in the federal courts favoring arbitration, especially in the context of international agreements.

**9    Alternative Dispute Resolution**   🔑   Liberal or Strict Construction

Arbitration clauses are to be liberally construed.

1 Cases that cite this headnote

**10    Alternative Dispute Resolution**   🔑   Construction in Favor of Arbitration

Any doubts as to whether an arbitration clause may be interpreted to cover an asserted dispute

should be resolved in favor of arbitration unless court can state with positive assurance that the dispute was not meant to be arbitrated.

14 Cases that cite this headnote

**11    Alternative Dispute Resolution**   🔑   Disputes and Matters Arbitrable Under Agreement

Where issues presented by breach of contract action against West German manufacturer and others chiefly concerned whether the West German company had agreed to extend a prior exclusive distribution agreement beyond its expiration date and where the prior exclusive distribution agreement, which contained a broad arbitration clause, itself included provisions concerning renewal of the agreement and the issues in the suit derived from the relationship between the parties that was created and governed by the agreement, the dispute "arose out of" the prior exclusive distribution agreement and was, therefore, within the scope of that agreement's arbitration clause.

29 Cases that cite this headnote

**12    Alternative Dispute Resolution**   🔑   Right to Enforcement and Defenses in General

Under the New York arbitration statute, New York courts are empowered to enforce only contracts to arbitrate. CPLR N.Y. 7501 et seq.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*\*40*   Norman R. Bradley, Philadelphia, Pa., William Schurtman, Peter R. Engelhardt, New York City, for appellants Becker Autoradiowerk GmbH, Becker Electronics, Inc., Max Egon Becker and Roland Becker; Saul, Ewing, Remick & Saul, Philadelphia, Pa., Walter, Conston, Schurtman & Gumpel, P. C., New York City, of counsel. Robert J. Spiegel, Spencer Ervin, Jr., R. Mark Armbrust, Philadelphia, Pa., for appellant Mercedes-Benz of North America, Inc.; Gratz, Tate, Spiegel, Ervin & Ruthrauff, Philadelphia, Pa., of counsel.

*41* Samuel P. Lavine, John P. Quinn, Carl T. Bogus, Steinberg, Greenstein, Gorelick & Price, Philadelphia, Pa., for appellee.

Before ADAMS, WEIS and GARTH, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal concerns the arbitrability of a dispute between defendant Becker Autoradiowerk GmbH ("BAW"), a West German manufacturer of automobile radios and accessories, and plaintiff Becker Autoradio U.S.A., Inc. ("Becker U.S.A."), a Pennsylvania corporation and BAW's exclusive American distributor. The district court denied BAW's motion to stay judicial proceedings and compel arbitration. We reverse.

### I

On July 1, 1974, BAW entered into a written, two-year Exclusive Distribution Agreement (the "1974 Agreement") with Becker U.S.A. [1] This contract, written in German and subscribed to in Ittersbach, West Germany, granted Becker U.S.A. the exclusive right to sell Becker automobile radios and accessories (art. 1). The 1974 Agreement provided for termination on June 30, 1976 (art. 11(1)). The contract also provided in article 11(5) that:

[1]     In 1961, BAW granted exclusive distribution rights to another corporation organized by Louis von Witte. When von Witte became ill, his business was run primarily by Grida Kriese, a long time employee. Von Witte died in 1973. On June 21, 1974, Kriese purchased von Witte's business from the executor of his estate. On June 27, 1974, Kriese formed the plaintiff Becker Autoradio U.S.A. Kriese executed the 1974 Agreement acting for Becker U.S.A.

In the event that the parties to the agreement should wish to extend the collaboration beyond June 30, 1976, this shall be subject to negotiations not later than 6 months prior to the expiration of the agreement.

Becker U.S.A. and BAW engaged in extensive negotiations concerning renewal of the 1974 Agreement, but were unable to agree on terms, and the contract apparently expired on June 30, 1976.

On February 1, 1977, Becker U.S.A. commenced this diversity action against BAW, Becker Electronics, Inc. (a Delaware subsidiary of BAW), Max Egon Becker and Roland Becker (representatives of BAW), Lothar Amanda (Executive Vice President of Becker Electronics), and Mercedes Benz of North America, Inc. (a customer of BAW). Count II of the amended complaint (the only count directly relevant to this appeal) alleged that BAW, through its representatives Max Egon Becker and Roland Becker, orally promised that BAW would renew the 1974 Agreement "on the same terms as the existing (I. e., the 1974) Agreement" for a five year term, provided that plaintiff fulfill certain conditions, Viz (1) continue to promote satisfactorily the sales of BAW radios; (2) open a branch office in Chicago; (3) establish at its expense Becker radio exhibits during 1975 and thereafter; and (4) perform without compensation certain administrative functions for Becker Electronics' avionics division in Paramus, New Jersey. Becker U.S.A. further alleged that, relying on these assurances, it performed these tasks, but that its distribution rights were not renewed. [2]

[2]     Count II is an alternative pleading to Count I, which is asserted against Max Egon Becker and Roland Becker as individuals, and which alleged the same facts as Count II. Count I asserted that the two Beckers did Not have the authority to make the representations which plaintiff claims they made.
    Count II, on the other hand, presumed that the Beckers did have such authority, and sought relief against BAW. Count II, therefore, sounds in promissory estoppel or breach of an oral contract.
    Count III of the amended complaint, asserted against all the defendants, alleged that the defendants permitted certain fraudulent practices to be perpetrated against owners of Mercedes automobiles in the United States, and that Mercedes Benz of North America, Lothar Amanda, and Becker Electronics (BAW's subsidiary) induced BAW to breach its promise to continue plaintiff's exclusive distribution rights.

All the defendants moved, under the federal Arbitration Act, 9 U.S.C. ss 3 and 206, to stay Becker U.S.A.'s action in the district *42* court and to compel arbitration. BAW relied on article 13(2) of the 1974 Agreement, which provided:

The Arbitration Court domiciled in Karlsruhe (Federal Republic of Germany) shall have sole jurisdiction with regard to all disputes arising out of and about this agreement. The Arbitration Court shall determine its procedures according to the Rules of Procedure of the International Chamber of

Commerce, Paris. The arbitral award shall have the effect, with respect to the parties, of a legally valid court judgment. [3]

3    The Agreement also provided that it was to be governed by German law. Art. 13(1).

Article 13(2) also gave BAW (but not Becker U.S.A.) the option of suing in court for breach instead of submitting the dispute to arbitration. Under this provision if BAW elected to sue in court, it was required to do so in a court in the United States and subject to American law. Additionally, article 13(2) contains an express covenant by Becker U.S.A. not to "bring suit against BAW, based on any alleged claim whatsoever under this agreement before any court other than the arbitration court in Karlsruhe."

The other defendants have contended that if a stay pending arbitration were granted as to BAW on Count II, the proceedings on Counts I and III should be stayed as well. On appeal Becker U.S.A. "does not take issue with the request of all defendants that should the action against BAW be stayed pending arbitration, the entire action be stayed." Appellee's Brief at 16 n.5.

1    In support of their motion, the defendants argued before the district court that the dispute was one "arising out of and about" the 1974 Agreement and was therefore governed by the arbitration clause, and that consequently they were entitled to a stay by reason of s 9 and s 206 of the Arbitration Act. [4]   The district court disagreed. In an opinion and order dated October 5, 1977, the district court denied the motion for a stay, [5] ruling that BAW's alleged obligation to renew the distribution agreement arose not from the 1974 Agreement, but rather from a separate and distinct oral agreement. [6] The court held that disputes arising out of this independent oral contract were not subject to the arbitration clause of the 1974 Agreement. All the defendants except Amanda have appealed. [7]

4    Those provisions provide:
    Stay of proceedings where issue therein referable to arbitration
    If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement,

providing the applicant for the stay is not in default in proceeding with such arbitration.
9 U.S.C. s 3.
Order to compel arbitration; appointment of arbitrators
A Court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.
9 U.S.C. s 206.

5    In the same opinion and order, the district court denied the individual Beckers' motion to dismiss, and granted Amanda's motion to dismiss. These aspects of the order are, of course, not appealable at this time, as they are not final, and no Fed. R. Civ. P. 54(b) certification was made.

6    The district court recognized that if the controversy were governed by the arbitration clause in the 1974 Agreement, the court would have been compelled to stay the proceedings.

7    In an action for money damages, an order denying a stay of judicial proceedings pending arbitration and refusing to compel arbitration is appealable pursuant to 28 U.S.C. s 1292(a)(1) as an order denying injunctive relief. Gavlik Construction Co. v. H. F. Campbell Co., 526 F.2d 777 (3d Cir. 1975); McCreary Tire & Rubber Co. v. CEAT, SpA, 501 F.2d 1032, 1034-35 (3d Cir. 1974). See, e. g., Ettelson v. Metropolitan Life Ins. Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942); Enelow v. New York Life Ins. Co., 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935); Zell v. Jacoby-Bender, Inc., 542 F.2d 34 (7th Cir. 1976); Kavit v. A. L. Stamm & Co., 491 F.2d 1176, 1181 (2d Cir. 1974); Warren Bros. Co. v. Cardi Corp., 471 F.2d 1304 (1st Cir. 1973).

*43   II

A

2    3    4    There has been much discussion by the parties concerning the applicability of German law or Pennsylvania law in the resolution of this dispute. It may well be that the question of which law is to be applied will have to be answered in deciding the merits of the underlying controversy. However the case before us presents only the issue of the Arbitrability of that controversy. When a contract involves "commerce", as this one does, whether a "suit or proceeding is referable to arbitration . . . under an agreement

(to arbitrate)" pursuant to the federal Arbitration Act, 9 U.S.C. s 3, or to the Convention on Recognition and Enforcement of Foreign Arbitral Awards, Art. II, P 3 and 9 U.S.C. s 206, is clearly a matter of federal substantive law. Thus, the question of whether, in contracts involving commerce, there is an agreement to arbitrate an issue or dispute upon which suit has been brought is governed by federal law. Concomitantly, questions of interpretation and construction of such arbitration agreements are similarly to be determined by reference to federal law. See Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos, 553 F.2d 842, 845 n.4 (2d Cir. 1977); Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402, 404-05 (2d Cir. 1959), Cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, Cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); Singer Co. v. Tappan Co., 403 F.Supp. 322, 328-29 (D.N.J.1975); Litton, RCS, Inc. v. Pennsylvania Turnpike Commission, 376 F.Supp. 579, 585 (E.D.Pa.1974), Aff'd, 511 F.2d 1394 (3d Cir. 1975); Bigge Crane and Rigging Co. v. Docutel Corp., 371 F.Supp. 240 (E.D.N.Y.1973); Aberthaw Construction Co. v. Centre County Hospital, 366 F.Supp. 513, 514 (M.D.Pa. 1973), Aff'd, 503 F.2d 1398 (3d Cir. 1974). As the court in Coenen v. R. W. Pressprich & Co., 453 F.2d 1209, 1211 (2d Cir. 1972), stated, "(o)nce a dispute is covered by the (federal Arbitration) Act, federal law applies to all questions of (the arbitration agreement's) interpretation, construction, validity, revocability, and enforceability." Cf. The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 97 S.Ct. 1907, 32 L.Ed.2d 513 (1970); Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

**5    6**    It is true that, if the parties agree that certain disputes will be submitted to arbitration and that the law of a particular jurisdiction will govern the resolution of those disputes, federal courts must effectuate that agreement. See Scherk v. Alberto-Culver, Inc., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Cf. The Bremen v. Zapata Off-Shore Co., supra. However, whether a particular dispute is within the class of those disputes governed by the arbitration and choice of law clause is a matter of federal law. [8] See Coenen v. R. W. Pressprich & Co., supra, at 1211. [9]

[8]    For example, consider the case where a contract containing an arbitration clause provides that the law of state X shall govern the agreement. Assume that the law of state X will not enforce, or gives very limited effect to arbitration clauses, such that under X law the dispute would not be submitted to arbitration. If one

party sues on the contract in federal court, and the contract involves "commerce", the federal district court, in deciding a motion to stay the proceedings and compel arbitration under 9 U.S.C. s 3, would look to federal law in determining the scope of the arbitration clause.

[9]    Becker U.S.A. cites Cook v. Kuljian Corp., 201 F.Supp. 531 (E.D.Pa.), Supplementary op., 209 F.Supp. 478 (E.D.Pa.1962), Aff'd, 317 F.2d 412 (3d Cir. 1963) (per curiam), for the contrary proposition. In that diversity case the court held that the question of the enforceability of an arbitration award in a contract made and performed in India was a choice of law question governed by Pennsylvania's choice of law rules. Klaxon v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under those rules, the court held that Indian law (the locus contractus) governed the arbitration clause. Significantly, however, the court in Cook held that the arbitration agreement before it did "Not relate to a maritime transaction or involve interstate or foreign commerce" and that consequently the federal Arbitration Act was "without application." 201 F.Supp. at 535 (emphasis added).
Here the parties do not dispute that their contract involves "commerce", or that the federal Arbitration Act applies to article 13(2) of that contract. Thus Cook is clearly distinguishable from this case.

### *44 B

**7**    We now turn to the central issue in this case: whether the dispute between plaintiff and BAW concerning an alleged renewal of the 1974 Agreement is a dispute "arising out of and about" that Agreement, and is therefore arbitrable under article 13 of the Agreement. [10] According to Becker U.S.A. (with whom the district court agreed), this case does not involve any breach of the 1974 Agreement, or any right or obligation stemming from that Agreement. Becker U.S.A. argues that the 1974 Agreement terminated on June 30, 1976, and has no effect upon the dispute in issue here. Instead, Becker U.S.A. asserts that its claim in this case is wholly independent of the 1974 Agreement, and is based on certain parol representations. These parol representations form the basis for its complaint that BAW has breached its oral contract.

[10]    The question of the arbitrability of a dispute is, of course, a question for the court to decide. See, e. g., International Bhd. of Teamsters v. Western Pennsylvania Motor Carriers Assn., No. 77-1764, 574

F.2d 783 (3d Cir. 1978); Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32 (3d Cir. 1968).

Becker U.S.A. looks to Korody Marine Corp. v. Minerals & Chemicals Philipp Corp., 300 F.2d 124 (2d Cir. 1962) (per curiam), for support. In that diversity case the plaintiff claimed damages for breach of a contract under which the defendant had become its sales and shipping agent. The initial contract, which expired by its terms on December 31, 1960, contained an arbitration clause. The matter in issue was whether or not the defendant Thereafter i. e., at some time subsequent to the expiration of the contract agreed to continue the contract in effect, so that the arbitration clause would apply to the disputed transactions, all of which occurred after December 31, 1960. The district court found that the parties had Not agreed to renew the contract, and the Second Circuit accepted that factual conclusion, holding that arbitration under the agreement was not available. In so holding, the court stated that the "fact that the parties continued to deal under some sort of informal arrangement does not mean that the terms of the expired formal contract continued to apply." 300 F.2d at 125. Thus the court of appeals affirmed the district court's denial of a stay pending arbitration.

We believe that Korody is distinguishable. Korody concerned transactions which occurred subsequent to the expiration of the agreement, which the district court had expressly found had Not been renewed. Thus it is clear that the terms of that expired agreement including its arbitration clause could have no application to the disputed transactions. See Sears, Roebuck & Co. v. Herbert H. Johnson Association, Inc., 325 F.Supp. 1338 (D.P.R.1971). In this case, however, we are dealing with an alleged oral agreement which, if made, was clearly made Prior [11] to the expiration of the 1974 Agreement, and which relates to a term of that Agreement I. e., its provisions governing renewal or expiration.

[11]    See Amended Complaint PP 13, 14, 16, Appendix at 104a-105a.

8    9    10    There is, of course, a strong policy in the federal courts favoring arbitration, especially in the context of international agreements. See, e. g., Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); McCreary v. CEAT, SpA, supra. Arbitration clauses are to be liberally construed, See Prima Paint Corp. v. Flood & Conklin Manufacturing Co., supra; Singer Co. v. Tappan Co., supra. Moreover, any "doubts as to whether an arbitration clause may be interpreted to cover the asserted dispute should be resolved in favor of arbitration unless a

court can state with 'positive assurance' that this dispute was not meant to be arbitrated."    *45    Hussey Metal Division v. Lectromelt Furnace Division, 471 F.2d 556, 558 (3d Cir. 1972) (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). See also Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); International Brotherhood of Teamsters v. Western Pennsylvania Motor Carriers Association, 574 F.2d 783 (3d Cir. 1978); Ludwig Honold Manufacturing Co. v. Fletcher, 405 F.2d 1123 (3d Cir. 1969). Given this policy, and this standard of arbitrability, we are obliged to disagree with the district court's conclusion that Becker U.S.A.'s claimed contract renewal is not arbitrable, inasmuch as we do not think it can be said with "positive assurance" that this dispute does not "arise out of" the 1974 Agreement.

11    The controversy in this case centers on whether BAW agreed to extend the 1974 Agreement beyond its 1976 expiration date. This purported extension promise was made while the 1974 Agreement was in effect, and was allegedly conditioned on the performance of various tasks, all but one of which related to the subject matter of the 1974 Agreement (I. e., the distribution in the United States of Becker radios). [12] The extension was alleged to have been on the same terms as the 1974 Agreement. [13] Indeed, accepting Becker U.S.A.'s version of the existence and terms of the oral agreement, it would appear that the only change required in the 1974 Agreement would be the substitution of the expiration date in article 11(1). As we understand Becker U.S.A.'s position, the alleged oral agreement would substitute the date of June 30, 1981, for the expiration date of June 30, 1976. All other terms of the 1974 Agreement would be carried forward and would continue in effect until 1981, including, we surmise, the arbitration clause itself. In this context, where the entire original agreement would be included "lock, stock and barrel" in the extended agreement, we find it difficult to understand how a dispute concerning the termination and renewal clause of that agreement (See article 11, paragraphs 1, 2 and 5 of the 1974 Agreement [14] ) did not "arise out of" or is not "about" the 1974 Agreement.

[12]    Of the four "conditions precedent" to the alleged five year extension of the distributorship, only one performance of certain administrative tasks for Becker Electronics was unrelated to the distribution of Becker radios. The other "conditions" continued satisfactory promotion of BAW radio sales, opening a branch office in Chicago, and establishing and financing Becker radio exhibits clearly were so related.

13    Amended Complaint P 20, Appendix at 106a.

14    Those paragraphs of article 11 provide:
      1. The Distribution Agreement is concluded for a firm
      period of 2 years, starting as of July 1, 1974. It thus shall
      terminate as of June 30, 1976.
      2. The Agreement may be terminated without notice, if
      an important (weighty) ground obtains.
      For BAW, an important (weighty) ground for
      termination of the agreement shall be deemed to
      obtain in particular, if composition proceedings are
      instituted (including out-of-court arrangements) against
      the Representative's assets, or bankruptcy proceedings
      are started, or if the Representative suspends payments
      or is in default, or if the Representative should not be
      in a position to fulfill his obligations as set forth in this
      agreement over a longer period of time and for whatever
      reason.
      5. In the event that the parties to the agreement should
      wish to extend the collaboration beyond June 30, 1976,
      this shall be subject to negotiations not later than 6
      months prior to the expiration of the Agreement.

Becker U.S.A.'s complaint, although couched in terms
of "assurances" which purportedly were made by BAW's
representatives, reveals essentially a process of Negotiation
by which BAW allegedly agreed to continue Becker U.S.A.'s
exclusive distribution rights (I. e., the 1974 Agreement)
beyond June 30, 1976, and by which Becker U.S.A. agreed
to perform certain tasks. We are unable to distinguish
this process from that which the parties envisaged when
they agreed to article 11(5) of the 1974 Agreement. In
that provision (which is quoted at note 14) the parties
contemplated that negotiations for renewal, if desire, would
take place prior to the Agreement's *46* termination. Thus
the subject of termination and renewal of the 1974 Agreement
was dealt with in the contract itself. Any dispute with respect
to termination or renewal, therefore, would clearly seem to
arise out of the contract.

The fact that there may have been a separate consideration
for the claimed renewal does not alter our conclusion. We
obviously do not, and should not, decide whether there
was separate consideration, and if so its significance. Nor
should we decide whether in fact BAW made the alleged
representations, or whether Becker U.S.A. performed in
accordance with and in reliance on those representations.
Neither do we decide whether an alleged oral agreement
to extend the contract could be valid under article 14 of
the Agreement (which provides that all amendments and
additions must be in writing). In fact we do not treat with

any matter related to the purported oral agreement because
that task is reserved for the arbitrator. It is for the arbitrator
specified in the parties' agreement, not for a court, to resolve
all such matters between the parties, inasmuch as each of these
disputes is implicated in the 1974 Agreement, and arises out
of, or is about, that Agreement. Thus it is for the arbitrator
and not a court to determine whether that Agreement has been
extended. Our task is completed once we determine that the
dispute "arises out of" or is "about" the 1974 Agreement.

Whatever may be the case in a circumstance where no
provision concerning termination and renewal is found in the
contract, we are satisfied that where the parties have foreseen
and provided for a process for renewing their agreement, a
dispute such as this one relating to renewal "arises out of"
the agreement and is therefore clearly within the scope of
the arbitration clause. There is no question in our minds, for
example, that, had a dispute arisen whereby BAW refused
to extend the Agreement, claiming that negotiations had not
begun "6 months prior to (its) expiration," and Becker U.S.A.
claimed to the contrary, such a dispute would have been
undeniably within the arbitrator's jurisdiction. Just so, in this
dispute concerning the "negotiations" leading to the renewal
asserted by Becker U.S.A. and denied by BAW, the parties
must submit to the arbitrator's jurisdiction.

We conclude, therefore, that the issues here presented "arise
out" of the 1974 Agreement in that they all arose in the
course of and during the on-going relationship between
Becker U.S.A. and BAW, which relationship was created and
governed by the 1974 Agreement. Moreover, those issues
in general concern matters related to the distributorship
of Becker radios, and in particular concern the procedures
contemplated by the parties to extend their relationship.

We find support for our conclusion in two analogous,
although admittedly distinguishable, cases. In Zenol, Inc.
v. Carblox, Inc., 334 F.Supp. 866 (W.D.Pa.1971), Aff'd,
474 F.2d 1338 (3d Cir. 1973), and Kastanias v. Nationwide
Auto Transporters, Inc., 390 F.Supp. 720 (W.D.Pa.1975),
the defendants sought to stay the proceedings and compel
arbitration pursuant to broadly worded arbitration clauses.
Both cases involved exclusive sales agency contracts
which either were automatically renewable (Kastanias ), or
continued beyond the expiration date (Zenol ), unless notice
of termination was given by one of the parties. In both
cases the sales agent sued when the "principal" terminated,
and in both cases the plaintiffs claimed that the termination
was wrongful. Both courts held that the termination did
not destroy the continuing validity of the arbitration clause,

See 334 F.Supp. at 868, and that the dispute (I. e., the wrongfulness Vel non of the termination) was within the scope of the broad language of the arbitration clauses. See Batson Yarn and Fabrics Machinery Group, Inc. v. Saurer-Allma GmbH, 311 F.Supp. 68 (D.S.C.1970). See also Sumaza v. Cooperative Association, 297 F.Supp. 345 (D.P.R.1969). It is true that Zenol and Kastanias dealt with the termination of "automatically renewable" contracts, and thus provide a stronger case than this one for holding that the dispute arose out of the contract. Nonetheless, we view those cases as at least standing for the proposition that disputes involving the termination *47 or continuation of contracts are properly arbitrable when renewal or expiration is the subject of specific contract provisions.

 12    In sum: given the strong federal policy favoring arbitration; given the broad language of the arbitration clause in this case; given the fact that this dispute concerns the continuation or termination of the 1974 Agreement and the Agreement itself includes provisions relevant to renewal; given that the issues here derive from the relationship created from that Agreement; and recognizing that doubts are to be resolved in favor of arbitration unless we can state with "positive assurance" that arbitration of the dispute was not intended by the parties (an assurance which is not present in this case), we conclude that the dispute here presented is arbitrable under article 13 of the 1974 Agreement. [15]

[15]    It is apparent by our disposition that there is no viability to Becker U.S.A.'s argument concerning choice of law. See Part II-A of this opinion, Supra.

Becker U.S.A.'s alternate argument is that, because BAW had the option of bringing suit against Becker U.S.A. in an American court, as well as invoking the arbitration clause and submitting the dispute to arbitration in Germany, while Becker U.S.A. had no such choice, the arbitration clause in the 1974 Agreement is unenforceable and void as contrary to public policy. This argument is without merit. We know of no such doctrine of complete mutuality as a matter of federal law (See Part II-A of this opinion, Supra ), and, because Becker U.S.A.'s argument has no support in logic, reason or precedent, we decline the invitation to adopt such a principle. Moreover, even if such a doctrine requiring complete mutuality existed, we observe that here BAW is not invoking its right to sue, but rather is seeking arbitration.

In any event, even if we were attracted (which we are not) to the concept purportedly found in the New York appellate division cases cited by Becker U.S.A., See Kaye Knitting Mills v. Prime Yarn Co., 37 A.D.2d 951, 326 N.Y.S.2d 361 (1971) (per curiam); Hull Dye & Print Works, Inc. v. Riegel Textile Corp., 37 A.D.2d 946, 325 N.Y.S.2d 782 (1971) (per curiam), those cases are clearly distinguishable from the one Sub judice. Both Kaye and Hull involved contracts which gave one part a unilateral right to invoke arbitration (while the other party could not require arbitration). Under the New York arbitration statute, New York courts are empowered to enforce only contracts to arbitrate. See N.Y. C.P.L.R. ss 7501 Et seq. (McKinney). Contracts to arbitrate, within the meaning of the statute, have been held by the New York courts to exist I. e. to require a party to submit to arbitration only when that party has a Duty to arbitrate. In Hull and Kaye the party resisting arbitration was not required by the contract to submit, nor could it compel, arbitration. Here, in contrast, Becker U.S.A. had the power to invoke arbitration, at least if BAW has not yet exercised its option to sue in an American court.

## III

The order of the district court denying a stay pending arbitration will be reversed, and the case will be remanded with the direction that the district court stay the proceedings before it pending arbitration, and order that the dispute be submitted to the Arbitration Court domiciled in Karlsruhe, Federal Republic of Germany in accordance with the parties' Agreement.

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

DOCSTOR: 2191401\1

Fed. Sec. L. Rep. P 93,335, 1972 Trade Cases P 73,801

453 F.2d 1209
United States Court of Appeals,
Second Circuit.

Dale S. COENEN, Plaintiff-Appellant,

v.

R. W. PRESSPRICH & CO., Inc.,
Defendant-Appellee, and Stirling
Homex Corporation, Defendant.

No. 153, Docket 71-1714.    Submitted
Oct. 20, 1971.    Decided Jan. 12, 1972.

Action by allied member of New York Stock Exchange
against member firm to recover for alleged refusal to permit
plaintiff to transfer his stock free of restrictive legend. The
United States District Court for the Southern District of New
York, Charles M. Metzner, J., 329 F.Supp. 1296, granted
defendant's motion to stay proceedings pending arbitration
under Exchange Constitution, and plaintiff appealed. The
Court of Appeals, Medina, Circuit Judge, held that claim was
arbitrable under Exchange Constitution, notwithstanding that
it arose before plaintiff joined Exchange, and that it alleged
violation of Securities Exchange Act of 1934 and violation of
the Sherman and Clayton Acts.

Affirmed.

West Headnotes (8)

**1**   **Exchanges**   Members' Stockholders or
Partners;  Allied Members

When brokerage house became a member of New
York Stock Exchange, its officers automatically
became allied members and, thus, member, who
had signed pledge that he would abide by
Exchange Constitution, was subject to Exchange
rule that a dispute between parties who are
members of Exchange is subject to arbitration at
insistence of either member.

4 Cases that cite this headnote

**2**   **Alternative Dispute Resolution**   Mutual
Dealings of Exchanges or Dealer Associations

Sale of securities by allied member of New
York Stock Exchange constituted a transaction
relating to commerce for purpose of determining

whether to stay member's action under Securities
Exchange Act of 1934 and Sherman and
Clayton Acts pending arbitration pursuant to
constitution of New York Stock Exchange.
Securities Exchange Act of 1934, § 1 et seq., 15
U.S.C.A. § 78a et seq.; Sherman Anti-Trust Act,
§ 1 et seq., 15 U.S.C.A. § 1 et seq.; Clayton Act,
§ 1 et seq., 15 U.S.C.A. § 12 et seq.; 9 U.S.C.A.
§§ 1 et seq., 2, 3.

4 Cases that cite this headnote

**3**   **Federal Courts**   Arbitration

Once a dispute is covered by the
Arbitration Act, federal law applies to all
questions of interpretation, construction, validity,
revocability, and enforceability. 9 U.S.C.A. § 1 et
seq.

51 Cases that cite this headnote

**4**   **Alternative Dispute
Resolution**   Arbitration Favored;  Public
Policy
**Alternative Dispute Resolution**   Liberal or
Strict Construction
**Alternative Dispute
Resolution**   Construction in Favor of
Arbitration

In deciding question of arbitrability, within
meaning of the Arbitration Act, of a dispute under
arbitration agreement concerning transactions
relating to commerce, the federal policy is to
construe liberally arbitration clauses and to find
that they cover disputes reasonably contemplated
by the language and to resolve doubts in favor of
arbitration. 9 U.S.C.A. § 1 et seq.

20 Cases that cite this headnote

**5**   **Alternative Dispute Resolution**   Mutual
Dealings of Exchanges or Dealer Associations

Provision of New York Stock Exchange
constitution that any controversy between parties
who are members, allied members, member firms
or member corporations shall, at the insistence of
any such party, and any controversy between a
nonmember and specified members, arising out

of business of such specified members, shall, at the insistence of such nonmembers, be submitted for arbitration is consistent with congressional grant of power to Stock Exchanges to govern themselves. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.

31 Cases that cite this headnote

6    **Alternative Dispute Resolution** 👉 Mutual Dealings of Exchanges or Dealer Associations

New York Stock Exchange arbitration clause is not limited in application to future disputes that arise after both parties have become members of the Exchange but includes disputes that have arisen prior to time party pressing claim became a member.

22 Cases that cite this headnote

7    **Alternative Dispute Resolution** 👉 Performance, Breach, Enforcement, and Contest of Agreement

Provision of Securities Exchange Act of 1934 voiding any provision for waiver of statutory rights did not render unarbitrable, under constitution of New York Stock Exchange, allied member's claim, which had arisen prior to his becoming a member of Exchange, which was sought to be asserted against member and which was based on alleged violation of provision of Act prohibiting use of any manipulative or deceptive device or practice in connection with sale or purchase of any security. Securities Act of 1933, § 14, 15 U.S.C.A. § 77n; Securities Exchange Act of 1934, §§ 10(b), 29(a), 15 U.S.C.A. §§ 78j(b), 78cc(a).

13 Cases that cite this headnote

8    **Exchanges** 👉 Members' Stockholders or Partners; Allied Members

Allied member's claim against member firm seeking recovery on ground that member firm's acts in regard to sale of allied member's stock, prior to his having become a member of New York Stock Exchange, constituted combination or conspiracy in restraint of trade in violation

of Sherman Act and an unlawful conspiracy to monopolize the market in trading of subject stock in violation of Sherman Act, was subject to arbitration under Stock Exchange constitution where allied member knew before he became a member that he had a possible antitrust claim. Sherman Anti-Trust Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2; Clayton Act, §§ 4, 12, 15 U.S.C.A. §§ 15, 22.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*1210  Royall, Koegel & Wells, New York City (David F. Dobbins and Thomas W. Towell, Jr., New York City, on the brief), for plaintiff-appellant.

Winthrop, Stimson, Putnam & Roberts, New York City (Stephen A. Weiner and Arnold S. Anderson, New York City, on the brief), for defendant-appellee.

Before MEDINA, MANSFIELD and MULLIGAN, Circuit Judges.

**Opinion**

MEDINA, Circuit Judge:

The question raised by this appeal is the applicability of the arbitration clause contained in the New York Stock Exchange Constitution to a claim which: (1) arose before the plaintiff joined the Stock Exchange; (2) alleges violation of the Securities Exchange Act of 1934; and (3) alleges violation of the Sherman and Clayton Acts. For the reasons that follow we hold that such a claim is subject to arbitration.

In 1968, while a director of Stirling Homex Corporation, Dale S. Coenen purchased 90,000 shares of Stirling Homex stock for investment purposes. The stock certificates bore the standard restriction against transfer unless the shares were registered, or unless Stirling was furnished with an opinion of counsel satisfactory to Stirling, to the effect that such registration was not required. In the Spring of 1970 Coenen, needing capital, desired to sell a substantial portion of the 90,000 shares. He contacted R. W. Pressprich & Co. and asked them to handle the sale of the shares. The sale took place on September 25, 1970.

1    In November, 1970, Coenen & Co., a brokerage house of which Coenen is an officer, applied for membership in the

Fed. Sec. L. Rep. P 93,335, 1972 Trade Cases P 73,801

New York Stock Exchange. The application was approved and Coenen & Co. became a member of the Exchange on December 31, 1970. As an officer, Coenen automatically became an allied member.

On January 6, 1971 Coenen's counsel sent Pressprich a copy of a complaint that Coenen was going to file against Pressprich and Stirling, and asked if there was any chance of settlement. The complaint alleged that Pressprich and Stirling conspired to force Coenen into selling the Stirling stock at an unconscionably low price by refusing to allow the transfer of the shares free of the restrictive legend until the low price was *1211 agreed upon. Coenen's complaint asserted three causes of action: one arising under the common law and the Uniform Commercial Code; another arising under the Securities Exchange Act of 1934; and the third arising under the Sherman and Clayton Acts.

On February 16, 1971, Pressprich demanded, in writing, that the controversy be submitted to arbitration in accordance with the Constitution of the New York Stock Exchange. Coenen replied by commencing the present action, in the United States District Court for the Southern District of New York, on February 18, 1971. Pressprich moved to stay the action, pending arbitration, on March 19, 1971. The motion was granted by Judge Metzner, ruling that by agreeing to abide by the Rules and Constitution of the Stock Exchange, Coenen agreed to submit "any controversy" with a member firm to arbitration, and that this controversy is a proper one for arbitration. Reported in 329 F.Supp. 1296 (S.D.N.Y.1971). For the reasons that follow, we agree with this conclusion.

## I

### *Coenen Agreed to Arbitrate*

### A

We turn our attention first to the question of whether Coenen agreed to arbitrate. This issue is governed by federal law by virtue of the Arbitration Act, Title 9 of the United States Code.

**2   3**   Section 2 of the Act, 9 U.S.C. Section 2 (1970), makes enforceable all arbitration agreements concerning transactions relating to commerce. Section 3 of the Act, 9 U.S.C. Section 3 (1970), authorizes a Federal District Court to stay proceedings pending arbitration when there is an arbitration agreement that is validated by Section 2. The sale of securities here constitutes a transaction

relating to commerce for the purposes of the Arbitration Act. Once a dispute is covered by the Act, federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability. Robert Lawrence Company v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir.1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed under Rule 60, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960).

Article VIII, Section 1 of the New York Stock Exchange Constitution provides:

Any controversy between parties who are members, allied members, member firms or member corporations shall, at the instance of any such party, and any controversy between a nonmember and a member or allied member or member firm or member corporation arising out of the business of such member, allied member, member firm or member corporation, * * * shall, at the instance of such nonmember, be submitted for arbitration, in accordance with the provisions of the Constitution and the rules of the Board of Governors.

An examination of the applicable federal law on the subject convinces us that Coenen is bound by these terms.

The constitution and rules of a stock exchange constitute a contract between all members of the exchange with each other and with the exchange itself * * *.

Since the rules of the Exchange "constitute a contract between the members, the arbitration provisions which they embody have contractual validity." * * * The Exchange provisions requiring arbitration constitute an agreement to arbitrate which is binding upon both [parties]. Brown v. Gilligan, Will & Co., 287 F.Supp. 766, 769-770 (S.D.N.Y.1968). See also Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838 (2d Cir. 1971).

Coenen, moreover, signed a pledge, in his application for membership, that he would "abide by the Constitution [of the Exchange] as the same has been or shall be from time to time amended, and by all rules adopted pursuant to the Constitution *1212 * * *." Accordingly, we have no doubt that Coenen agreed to arbitrate.

In thus agreeing to arbitrate "[a]ny controversy between * * * members * * *," did Coenen agree to arbitrate the present dispute with Pressprich?

**4**   "The issue of arbitrability, i.e., whether a particular dispute is covered by an arbitration clause, being a question of

Fed. Sec. L. Rep. P 93,335, 1972 Trade Cases P 73,801

'interpretation and construction,"' is governed by federal law. Metro Industrial Painting Corp. v. Terminal Construction Co., 287 F.2d 382, 385 (2d Cir.1961). In deciding the question of arbitrability, the "federal policy [is] to construe liberally arbitration clauses, to find that they cover disputes reasonably contemplated by this language, and to resolve doubts in favor of arbitration * * *." Metro Industrial Painting Corp. v. Terminal Construction Co., *supra,* 287 F.2d 382, 385 (2d Cir.1961). With this liberal federal policy in mind, we turn to an examination of the clause at issue in this case.

5  The drafters of the New York Stock Exchange arbitration clause intended it to be very broad. This is evident when it is compared to the Stock Exchange provision governing the arbitration of disputes between a member and a non-member, which must arise out of the business of the member. The purpose behind the drafting of such a broad arbitration clause was, as much as possible, to keep disputes between members out of the courts. This policy is entirely consistent with the congressional grant of power to Stock Exchanges to govern themselves, contained in the Securities Exchange Act of 1934. See Axelrod & Co. v. Kordich, Victor & Neufeld, *supra,* 451 F.2d at 840 (2d Cir. 1971); Brown v. Gilligan, Will & Co., *supra,* 287 F.Supp. 766, 773 (S.D.N.Y.1968). To hold that the present dispute is not arbitrable would frustrate this policy by making two Stock Exchange members settle their dispute in court. In fact, we see no substantial difference between this case and the countless others where parties have agreed to arbitrate an existing controversy. Coenen agreed to arbitrate "[a]ny controversy between * * * members * * *," with full knowledge that he had a claim against Pressprich and that Pressprich was a Stock Exchange member.

One desiring the benefits of membership in the New York Stock Exchange must be willing to live up to the responsibilities of such membership.

**B**

6  Coenen's argument that the New York Stock Exchange arbitration clause only applies to "future" disputes that arise after both parties have become members of the Exchange need not detain us long. As an implementation of the statutory policy of self-regulation, we think the clause is clear on its face. It reads "any controversy" between members. And that is precisely what it must mean if controversies between members are to be kept out of the courts. Had those who drafted the clause intended otherwise they doubtless would have used language plainly stating that "any future controversy" or any controversy between members "arising

after both parties to the dispute have become" members. Moreover, the two clauses referring to disputes between members and disputes between members and non-members must be read together. In the one clause the reference is to "any controversy," and in the other the reference is to any controversy "arising out of the business of such member." The purpose of each clause is to keep "any controversy" between members and any controversy "between members and non-members * * * arising out of the business of such member" out of the courts. This purpose would be frustrated and in effect nullified if we were to construe such clause as applicable only to "future" disputes.

**II**

**The Section 10(b) Claim**

7  Coenen also contends that because one of his claims for relief is *\*1213* based upon an alleged violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78j(b) (1970), the claim is not arbitrable. To support this assertion, he relies upon Section 29(a) of the 1934 Act, 15 U.S.C. Section 78cc(a) (1970), which voids any provision for waiver of statutory rights.

The Supreme Court, in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), held that Section 14 of the 1933 Act, 15 U.S.C. Section 77n (1970) (which is virtually identical to Section 29(a) of the 1934 Act) made an agreement to arbitrate a claim arising under the 1933 Act unenforceable. The rationale of the decision was that the agreement was made before the existence of any controversy, thus restricting plaintiff in his choice of forum before there was any dispute. "While the Securities Act does not require a petitioner to sue, a waiver in advance of a controversy stands upon a different footing." 346 U.S. at 438, 74 S.Ct. at 188. The present case, however, differs from *Wilko* in two important respects.

First of all, Coenen agreed to arbitrate *after* the dispute had arisen. This question was left open by the Court in *Wilko,* 346 U.S. at 438, 74 S.Ct. 182 (concurring opinion of Jackson, J.). In subsequent decisions, however, courts have held that agreements to arbitrate made after a dispute has arisen are valid. Gardner v. Shearson, Hammill & Co., 433 F.2d 367 (5th Cir.1970); Moran v. Paine, Webber, Jackson & Curtis, 389 F.2d 242 (3d Cir.1968).

Secondly, *Wilko* involved a dispute between an investor and a member of a national securities exchange, not a dispute "between members." It has been held that:

The 1933 Act was designed to protect investors by requiring "issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale." Wilko v. Swan, * * * 346 U.S. at 431, [74 S.Ct. 182 * * *. Its determined purpose was not to furnish protection to dealers from the improprieties of fellow dealers, although such might be an incidental benefit of the Act's passage. It was assumed that dealers could fend for themselves; it was the investing public that was in need of protection.

Brown v. Gilligan, Will & Co., *supra,* 287 F.Supp. 766, 771-772 (S.D.N.Y.1968). This interpretation of *Wilko* was recently endorsed by this Court in Axelrod & Co. v. Kordich, Victor & Neufeld, *supra,* 451 F.2d 842, 843 (2d Cir. 1971), where Judge Timbers, writing for a unanimous panel, observed:

[T]he policy considerations relied on by the Supreme Court in *Wilko* are inapposite here. The Supreme Court found that the non-waiver provision there involved was designed to protect investors. 346 U.S. at 431, 74 S.Ct. 182. Without such provision, financial houses might escape statutory liability by taking advantage of the inferior bargaining position of customers. But the legislative policy of protecting investors will not be thwarted by compelling an exchange member to arbitrate * * *.

The 1934 Act, moreover, contains a provision that the 1933 Act does not (and it was only the 1933 Act which was at issue in *Wilko*). Section 28(b) of the 1934 Act, 15 U.S.C. Section 78bb(b) (1970), provides:

Nothing in this chapter shall be construed to modify existing law (1) with regard to the binding effect on any member of any exchange of any action taken by the authorities of such exchange to settle disputes between its members * * *.

The Court in *Axelrod, supra,* reconciled Sections 29(a) and 28(b) of the 1934 Act by saying that Section 28(b) creates an exception to Section 29(a) and permits the arbitration of a dispute, involving the 1934 Act, pursuant to the New York Stock Exchange arbitration clause. See also ***1214** Brown, supra,* 287 F.Supp. 766, 774. Judge Timbers went on to say, in *Axelrod,* that this interpretation of the 1934 Act is entirely

consistent with the Congressional purpose of giving securities exchanges the power of self-regulation.

The 1934 Act established a statutory scheme of "supervised self-regulation" for stock exchanges. "This involves control of exchange markets by requiring or permitting national securities exchanges to adopt rules governing their practices and procedures and the business conduct of the members, and in each case imposes the responsibility for enforcement of these rules on the exchanges themselves." SEC, Report of Special Study of Securities Markets, H.R.Doc. No. 95, 88th Cong., 1st Sess., pt. 1, at 3 (1963). See Colonial Realty Corporation v. Bache & Co., 358 F.2d 178, 181 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); Silver v. New York Stock Exchange, 373 U.S. 341, 352 (1963).

*Axelrod, supra,* 451 F.2d at 838, 840 (2d Cir. 1971). See also *Brown, supra,* 287 F.Supp. 766, 773 (S.D.N.Y.1968).

Pursuant to this self-regulatory scheme, the exchanges have promulgated rules to govern the conduct of members. The 1934 Act requires that such rules be "just and adequate to insure fair dealing and to protect investors * * *." Section 6(d), 15 U.S.C. Section 78f(d) (1970). Furthermore, Section 6(c), 15 U.S.C. Section 78f(c) (1970) provides:

Nothing in this chapter shall be construed to prevent any exchange from adopting and enforcing any rule not inconsistent with this chapter and the rules and regulations thereunder * * *.

See also *Axelrod, supra,* 451 F.2d 840 (2d Cir. 1971); *Brown, supra,* 287 F.Supp. 766, 773-774 (S.D.N.Y.1968).

We fully agree with the reasoning in *Brown* and *Axelrod* that the arbitration clause contained in the New York Stock Exchange Constitution is precisely the kind of self-regulatory provision called for by the 1934 Act. Instead of violating the policy behind the Act, as appellant contends, arbitration in this case furthers that policy.

### III

### *The Antitrust Claims*

**8** Coenen's final contention is that his Third Count is not arbitrable because it alleges violation of Sections 1 and 2 of the Sherman Act and Sections 4 and 12 of the Clayton Act.

At this point we must examine the allegations of the complaint more closely. Pressprich as an investment banker and stockbroker is alleged to make "a market in the over-the-counter trading of the common stock of Stirling Homex Corporation." At a time when he was a director of Stirling and in August 1968 Coenen bought 90,000 shares of Stirling and the certificates of stock issued to him bore the legend that they were "acquired for investment" and would not be transferred unless registered under the 1933 Act or Stirling was furnished with an opinion of counsel satisfactory to Stirling to the effect that no registration was required. In February, 1970 underwriters represented by Pressprich sold 1,175,000 shares to the public "pursuant to a registration statement" under the 1933 Act. In the Spring of 1970, it is alleged, Coenen and his firm were being pressed by banks for additional collateral on its loans and they decided "to sell a substantial portion of [Coenen's] 90,000 shares in Stirling." Pressprich and Stirling, however, were alleged to have agreed to "maintain or increase" the price of Stirling stock on the market by "limiting or reducing" the supply of Stirling stock on the open market and hence decided to keep Coenen's 90,000 shares off the market by representing to Coenen that his 90,000 shares could not legally be sold without having been registered. The allegations concern attempts to obtain letters from various counsel and Stirling's position that "such opinions were unsatisfactory." **\*1215** Without an order from Stirling the First National City Bank in New York, the transfer agent, would not transfer the stock containing the legend. This led to what appears to be the central feature of the dispute, an alleged sale of the 90,000 shares by Coenen through Pressprich to an institutional buyer at $10 a share. A "purported" confirmation of this sale was sent by Pressprich to Coenen on August 26, 1970 but Coenen "disavowed the purported sale" before the delivery date of September 2, 1970. The complaint alleges various misrepresentations by Pressprich which resulted in the "coercion" which caused Coenen to give in and on September 25, 1970 to direct "that his shares be delivered to Pressprich at a price of $10 per share." All this is alleged in Count One, a diversity claim, repeated in the Fourth Count as a breach of duty under the common law and Section 8-401 of the Uniform Commercial Code. The same allegations are repeated in Count Two as constituting a scheme to defraud Coenen within the meaning of Rule 10b-5 promulgated in implementation of Section 10(b) of the 1934 Act. And the same allegations are repeated in Count Three, coupled with the purely conclusory statement that this is a claim based upon Sections 4 and 12 of the Clayton Act, 15 U.S.C. Sections 15 and 22, and that the acts alleged constitute a combination and conspiracy in restraint

of trade in the common stock of Stirling, in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1, and an unlawful conspiracy to monopolize the market in the trading of the stock of Stirling, in violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2. In this Count Three Coenen demands triple damages in the total amount of $4,725,000 and attorneys' fees.

There have been many statements in court opinions to the general effect that antitrust claims are not proper subjects for arbitration. See *e. g.,* American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821 (2d Cir. 1968); Matter of Aimcee Wholesale Corp., 21 N.Y.2d 621, 289 N.Y.S.2d 968, 237 N.E.2d 223 (1968); Power Replacements, Inc. v. Air Preheater Co., 426 F.2d 980 (9th Cir. 1970); A. & E. Plastik Pak Co. v. Monsanto Co., 396 F.2d 710 (9th Cir. 1968).

The court below, however, ruled that arbitration is proper in this case because the agreement to arbitrate was made after the dispute arose. This is consistent with the language in several cases recognizing this exception to the general rule. See *e. g.,* American Safety Equipment Corp. v. J. P. Maguire & Co., *supra,* 391 F.2d 821, 827 (2d Cir. 1968); Power Replacements, Inc. v. Air Preheater Co., *supra,* 426 F.2d 980, 984 (9th Cir. 1970); Pitofsky, Arbitration and Antitrust Enforcement, 44 N.Y.U.L.Rev. 1072, 1079-80, n. 31 (1969). We base our affirmance squarely on this ground. The courts give as reasons for this that the parties already know just what they are agreeing to arbitrate, and also that, as a claimant is not required to sue and is always free to settle a private tripledamage antitrust case, his agreement to arbitrate is in effect an agreement to settle the dispute. So here the agreement to arbitrate may be regarded as an agreement to arbitrate a specific existing dispute.

We think it proper to add, however, that, except for what appear to be no more than perfunctory and formal allegations of an antitrust claim, this complaint asserts what looks like the common, garden variety of alleged scheme to defraud in a security transaction. This is precisely the sort of breeder of illfeeling between members of the Exchange it was intended to keep out of the courts. It will be a pity if it should ever be held that any member of the Stock Exchange can frustrate the arbitration clause of the Stock Exchange Constitution, the most significant of the measures taken to implement the selfregulation contemplated by the 1934 Act, by merely tossing into a complaint involving a dispute that arose after both **\*1216** parties to the dispute had become members of the Exchange, a few conclusory phrases to give the illusion of a tripledamage antitrust claim.

**Coenen v. R. W. Pressprich & Co., 455 F.2d 1209 (1972)**

Fed. Sec. L. Rep. P 93,335, 1972 Trade Cases P 73,801

Accordingly, the arbitration may proceed. And, after it is concluded, hopefully in a few days, these stockbrokers can get back to work.

Affirmed.

Parallel Citations

Fed. Sec. L. Rep. P 93,335, 1972 Trade Cases P 73,801

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

DOCSTOR: 2191401\1

2005 WL 1216227
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

In the Matter of the Arbitration between
COIMEX TRADING (SUISSE) S .A., Petitioner,
and
CARGILL INTERNATIONAL S.A. Repondent.

No. 05 Civ. 2630(LLS).    May 20, 2005.

**Opinion**

**Memorandum Opinion**

STANTON, J.

*\*1* Cargill's application for leave to seek an award of attorneys' fees against Coimex for bringing its petition for arbitration (now dropped because of my April 15, 2005 ruling that there was no written agreement to arbitrate) relies upon Swiss law, and thus fails for two reasons: Swiss law did not apply to the determination whether there was an agreement to arbitrate, and Swiss law does not apply to the decision whether to award attorneys' fees.

**1.**

In this non-diverse action under the Federal Arbitration Act and Convention (9 U.S.C. §§ 2, 202), the determination whether there is an agreement to arbitrate depends on federal, not state, law. Thus, there is no wholesale adoption (as there might be in a diversity case) of New York's choice of law provisions. The body of federal law is "already well-developed" and there is no need to refer to New York State principles of contract law which, if needed, would be only used as rules of decision. *See Smith/Enron Cogeneration v.. Smith Cogeneration,* 198 F.3d 88, 95-96 (2d Cir.1999) ("as this is a federal question case under 9 U.S.C. § 203 and not a diversity case, we see no persuasive reason to apply the law of New York simply because it is the forum of this litigation"). As that court stated, *ibid:*

> When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable. See *David L.*

*Threlkeld & Co.,* 923 F.2d at 249-50 (holding Convention and FAA preempt Vermont statute); *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 845-46 (2d Cir.1987) (applying federal common law in case arising under the Convention); *Borsack v. Chalk & Vermilion Fine Arts, Ltd.,* 974 F.Supp. 293, 299 n. 5 (S.D.N.Y.1997) ("[W]here jurisdiction is alleged under chapter 2 of the Federal Arbitration Act the issue of enforceability and validity of the arbitration clause is governed by federal law.")

**2.**

This court never reached the merits of the underlying contract dispute, so it is immaterial whether the winner of that dispute (by trial or arbitration) could then recover attorneys' fees under Swiss law.

Swiss law has no application to an award of attorneys' fees on the separate ground that Coimex's petition was frivolous. It is well established that "in non-diversity cases the right to attorneys' fees is procedural and thus determined under the law of the forum hearing the suit," [citing cases], *Brautigam v. Bratt,* No. 98 Civ. 9060, 2000 U.S. Dist. LEXIS 12774, at \*2 (S.D.N.Y. Sept. 5, 2000), *aff'd,* No. 00-9395, 2001 U.S.App. LEXIS 20559 (2d Cir. June 19, 2001). As stated by Judge Friendly in *Conte v. Flota Mercante Del Estado,* 277 F.2d 664, 672 (2d Cir.1960):

> ... no authority is needed for the proposition that a court will tax ordinary court costs in accordance with its own practice rather than that of the state where the claim arose.... We think the same rule should govern with respect to the fees of counsel, also officers of the court. As pointed out in Goodhart, Costs, 38 Yale L.J. 849, 872-77 (1929), the American practice of generally not including counsel fees in costs was a deliberate departure from the English practice, stemming initially from the colonies' distrust of lawyers and continued because of a belief that the English system favored the wealthy and unduly penalized the losing party. On a matter so intimately related to judicial administration the forum will follow its own policy.

**3.**

*\*2* In the parties' competition to file unpersuasive applications, the honors are about equal. Coimex sought arbitration, with no written agreement to arbitrate. Cargill sought attorneys' fees under Swiss law, which does not apply.

No costs will be allowed to either side.

So ordered.

**End of Document**                                      © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

DOCSTOR: 2191401\1

974 F.Supp. 293
United States District Court,
S.D. New York.

Ronald BORSACK, a/k/a Ron Bell, Plaintiff,
v.
CHALK & VERMILION FINE ARTS, LTD.,
Sevenarts, Ltd., Chalk & Vermilion Fine
Arts, LLC., and David Rogath, Defendants.

No. 96 CV 6587 (BDP).    Aug. 7, 1997.

Alleged provider of assistance to licensee in obtaining license to cast and sell limited edition sculptures brought breach of contract action against licensor, licensee, licensee's president, and licensee's successor, alleging entitlement to "finder's fee." Defendants removed action. On defendants' motion to stay action pending arbitration and plaintiff's cross-motion to remand action to state court, the District Court, Parker, J., held that: (1) for purposes of diversity jurisdiction, plaintiff was domiciled in New York when action was removed; (2) court had jurisdiction pursuant to Convention for Recognition and Enforcement of Foreign Arbitration Awards; and (3) scope of arbitration agreement encompassed plaintiff's claims.

Defendants' motion granted, and plaintiff's motion denied.

West Headnotes (18)

**1    Removal of Cases** 👈 Evidence

Defendants, having invoked federal jurisdiction by removing action, had burden of proving that case was properly in federal court. 28 U.S.C.A. §§ 1441, 1446.

**2    Removal of Cases** 👈 Evidence

If removing party's allegations of jurisdiction are challenged by its adversary in any appropriate manner, removing party must support them by competent proof. 28 U.S.C.A. §§ 1441, 1446.

**3    Federal Courts** 👈 What Constitutes Citizenship;  Domicile and Residence Distinguished;  Change of Domicile

For purposes of diversity jurisdiction, person's citizenship is determined by his "domicile,"

which requires two elements: party's physical presence in state, and intent to remain in state indefinitely. 28 U.S.C.A. § 1332(a).

1 Cases that cite this headnote

**4    Federal Courts** 👈 What Constitutes Citizenship;  Domicile and Residence Distinguished;  Change of Domicile

For purposes of diversity jurisdiction, although person may have more than one residence, he may only have one domicile at any one time; where there is evidence that party has more than one residence, court should focus on where party intends to remain. 28 U.S.C.A. § 1332(a).

1 Cases that cite this headnote

**5    Removal of Cases** 👈 Residence of Party Removing Case

For purposes of diversity jurisdiction, plaintiff was domiciled in New York at time action was removed, even though his wife owned property in Florida, against which Internal Revenue Service (IRS) had filed tax lien naming plaintiff as taxpayer, and plaintiff had Florida driver's license; plaintiff lived for majority of year in New York and had lived at same address in New York for 17 years, he worked in New York, and his attorney, accountant, dentist and doctor all resided or practiced in New York. 28 U.S.C.A. § 1332(a).

**6    Alternative Dispute Resolution** 👈 Enforcement and Recognition of Awards

For district court to find jurisdiction under Convention on Recognition and Enforcement of Foreign Arbitration Awards, three basic requirements must be met: award must arise out of a legal relationship; relationship must be commercial in nature; and relationship must not be entirely domestic in scope. 9 U.S.C.A. § 202, 203.

**7** **Alternative Dispute Resolution** 🔑 Agreements

**Treaties** 🔑 Construction and Operation of Particular Provisions

Breach of contract claims asserted by plaintiff claiming right to "finder's fee" for aiding licensee in obtaining license to cast and sell limited edition sculptures arose out of written addendum to license agreement, which contained arbitration clause, rather than from any separate oral agreement, as urged in support of claim that action did not fall under Convention on Recognition and Enforcement of Foreign Arbitration Awards; terms of addendum were substantially the same as those of alleged oral agreement, and complaint made special reference to addendum. 9 U.S.C.A. § 202, 203.

1 Cases that cite this headnote

**8** **Frauds, Statute Of** 🔑 Possibility of Discharge or Other Termination Without Performance

For purposes of New York statute of frauds, contract is not "to be performed within a year" if it is terminable within that time only upon breach of one of parties. N.Y.McKinney's General Obligations Law § 5-701, subd. a, par. 1.

**9** **Frauds, Statute Of** 🔑 Statutory Provisions

Where alleged contract is indefinite as to duration and does not, by its terms, permit defendant to discharge its performance obligations in less than one year, New York statute of frauds requires writing setting forth essential terms of agreement. N.Y.McKinney's General Obligations Law § 5-701, subd. a, par. 1.

3 Cases that cite this headnote

**10** **Evidence** 🔑 Completeness of Writing and Presumption in Relation Thereto; Integration

Under New York law, where written agreement is reduced to writing which, in view of its completeness and specificity, reasonably appears to be complete agreement, it is to be taken to be integrated agreement which discharges prior agreements to extent they are within its scope.

**11** **Alternative Dispute Resolution** 🔑 Persons Affected or Bound

Plaintiff was intended third-party beneficiary of license agreement for casting and selling of limited edition sculptures, as amended by addendum, and could thus be compelled to abide by arbitration provision therein regarding his breach of contract claim; addendum stated that parties to contract "shall divide the cost for the additional five casts and they shall be distributed to [plaintiff]," such that no one other than plaintiff was entitled to recover if parties failed to distribute additional casts. 9 U.S.C.A. § 203.

**12** **Alternative Dispute Resolution** 🔑 Contractual or Consensual Basis

Under New York law, parties to contract will not be held to have chosen arbitration in absence of express, unequivocal agreement to that effect.

**13** **Federal Courts** 🔑 Arbitration

Where jurisdiction is alleged under Federal Arbitration Act, issue of enforceability and validity of arbitration clause is governed by federal law. 9 U.S.C.A. §§ 201-208.

3 Cases that cite this headnote

**14** **Federal Courts** 🔑 Matters of General Jurisprudence; Federal Common Law

In general, federal courts developing federal common law are free to borrow from state law, unless there is either demonstrated need for uniform national rule or significant conflict between state law and some discernable federal policy.

**15** **Alternative Dispute Resolution** 🔑 Persons Affected or Bound

**Alternative Dispute Resolution** 🔑 As Condition Precedent to Action; Exhaustion or Prior Resort

Under general contract principles, non-signatories fall within scope of arbitration agreement where that is intent of parties, and thus, when plaintiff who acquires rights under contract as agent, third-party beneficiary, or assignee subsequently bases his right to sue on contract itself, provision requiring arbitration as condition precedent to recovery must be observed.

**16    Contracts** 🔑 Agreement for Benefit of Third Person

Third-party beneficiary exists only if parties to contract intended to confer benefit on third party when contracting; it is not enough that some benefit incidental to performance of contract may accrue to third party, but rather, it must appear that no one other than third party can recover if promisor breaches contract, or contract language should otherwise clearly evidence intent to permit enforcement by third party. Restatement (Second) of Contracts § 308 comment.

**17    Alternative Dispute Resolution** 🔑 Agreements

**Treaties** 🔑 Construction and Operation of Particular Provisions

License agreement's arbitration clause, as applied to third-party beneficiary, satisfied "agreement in writing" requirement of Convention on Recognition and Enforcement of Foreign Arbitration Awards, even though beneficiary was not signatory to agreement or addendum allegedly breached. 9 U.S.C.A. § 203.

1 Cases that cite this headnote

**18    Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

Agreement to arbitrate contained in license agreement for casting and selling of limited edition sculptures encompassed third-party beneficiary's claims of breach of contract in denial of "finder's fee," despite his claim that application

of arbitration clause, which referred to claim or dispute between "parties," was strictly limited to parties to license agreement, and did not extend to him as nonsignatory. 9 U.S.C.A. § 203.

1 Cases that cite this headnote

**Attorneys and Law Firms**

***295** Steven J. Popkin, Brooklyn, NY, for Plaintiff. Guy Fairstein, Kurzman & Eisenberg, White Plains, NY, for Defendants.

**Opinion**

**MEMORANDUM DECISION AND ORDER**

PARKER, District Judge.

Plaintiff Ronald Borsack a/k/a Ron Bell ("Borsack") brings this breach of contract action against defendants Chalk & Vermilion Fine Arts, Ltd. ("Chalk & Vermilion"), Sevenarts, Ltd. ("Sevenarts"), [1] Chalk & Vermilion Fine Arts, LLC. ("Chalk & Vermilion-CT"), and David Rogath. Defendants removed this action, which was commenced in New York Supreme Court, County of New York, to this Court, pursuant to 28 U.S.C. §§ 1441, 1446, based on diversity jurisdiction. *See* 28 U.S.C. § 1332(a). Defendants subsequently asserted that in addition to diversity jurisdiction, the Court has jurisdiction over this action pursuant to the Convention for the Recognition and Enforcement of Foreign Arbitration Awards. *See* 9 U.S.C. §§ 203, 205. Presently before the Court are defendants' motion to stay the action pending arbitration and plaintiff's cross-motion to remand the action to state court. For the reasons stated below, defendants' motion for a stay pending arbitration is granted and plaintiff's motion to remand is denied.

[1]    Sevenarts, though named as a defendant in plaintiff's complaint, had not been served with process at the time of the filing of this motion. Plaintiff is directed to inform the Court within ten days by letter of his intent to pursue his claims against Sevenarts.

***296** **BACKGROUND**

On September 23, 1987, Sevenarts and Chalk & Vermilion Fine Arts, Ltd. [2] entered into an agreement ("the License Agreement") pursuant to which Sevenarts licensed Chalk &

Vermilion to cast and sell limited edition sculptures from models created by Romain de Tirtoff, the artist known as Erte ("Erte sculptures"). The License Agreement contains the following arbitration clause: "In the event of any claim or dispute between the parties concerning this Agreement, the parties irrevocably agree to submit to binding arbitration to take place in London before a single arbitrator."

2    Sometime after 1987, the assets of Chalk & Vermilion Fine Arts, Ltd. were acquired and its obligations were assumed by defendant Chalk & Vermilion Fine Arts, LLC., a Connecticut limited liability company.

On September 27, 1987, Sevenarts and Chalk & Vermilion modified the Agreement through a handwritten document ("the Addendum") that reads:

### Addendum

Sevenarts and Chalk & Vermilion agree to modify their contract of 9/23/87 as follows:

35 artists proofs shall be created rather than 30 artists proofs as previously indicated by clause 11. The parties shall divide the cost for the additional five casts and they shall be distributed to Ron Bell [a/k/a Ronald Borsack].

Clause 11 of the License Agreement states that "[t]hirty (30) 'artists' proofs' shall be produced within each edition of sculpture and the License warrants that no more than 30 'artists' proofs' will be produced within each edition." The Addendum was signed by David Rogath, president of Chalk & Vermilion, and Eric Estorick, then managing director of Sevenarts. Borsack did not sign either the License Agreement or the Addendum.

Borsack claims that before the execution of the License Agreement, he had, at the request of Rogath, helped convince the principals of Sevenarts to grant the exclusive licensing rights for the Erte sculpture to Chalk & Vermilion. According to Borsack, Rogath, over a series of discussions, promised to pay him a finders fee if his "efforts culminated in their [sic] being granted additional licensing agreements with Sevenarts.... Rogath agree[d] on behalf of [Chalk & Vermilion] to provide me with five Erte artist proof sculptures each time a new Erte sculpture was produced. It was further agreed that such five sculptures would be provided to me free of cost for resale purposes." Borsack Aff. ¶ 14. Borsack claims that he asked Rogath for written memorialization of their agreement and that Rogath subsequently delivered to him a photocopy of the Addendum. Borsack asserts that

the Addendum was evidence of Chalk & Vermilion's oral agreement to pay him a "finders fee" of five artists proofs each time a new Erte sculpture was produced. Rogath denies having entered into any such agreement.

Borsack contends that after approximately six and a half years of receiving his "finders fee," defendants ceased to deliver the five proofs each time a new sculpture was produced. On July 16, 1996, plaintiff initiated this litigation in Supreme Court of the State of New York, County of New York, asserting, *inter alia*, breach of contract claims against Chalk & Vermilion and Sevenarts and a fraudulent conveyance claim against Chalk & Vermilion-CT.

On August 29, 1996, defendants removed the action to this Court claiming diversity jurisdiction under 28 U.S.C. § 1332(a). Defendants subsequently alleged federal question jurisdiction based on 9 U.S.C. § 203. Defendants now move, pursuant to 9 U.S.C. § 203, to stay the action pending arbitration in accordance with the Licence Agreement or, in the alternative, to dismiss the complaint. Borsack cross-moves for an order remanding the action to Supreme Court of the State of New York on the ground that this Court lacks subject jurisdiction over plaintiff's claims under both 28 U.S.C. § 1332(a) and 9 U.S.C. § 203. The parties have since stipulated that defendants' motion to dismiss would be held in abeyance pending the Court's resolution of the jurisdictional question.

***297** DISCUSSION

**A. Subject Matter Jurisdiction**

1    2    Defendants, having invoked federal jurisdiction by removing the action to this Court, have the burden of proving that the case is properly in federal court. *See United Food & Commercial Workers Union v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994). If the removing party's "allegations of jurisdiction are challenged by [its] adversary in *any appropriate* manner, the removing party must support them by competent proof." *Id.* (emphasis in original) (citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936)). The Court addresses both of defendant's asserted grounds for jurisdiction in turn.

Defendants initially removed this action based on diversity jurisdiction alleging that plaintiff is a citizen of Florida, while defendant Chalk & Vermilion is a citizen of New York, defendants Chalk & Vermilion-CT and Rogath are citizens of Connecticut, and Sevenarts is a citizen of England.

Under 28 U.S.C. § 1332(a), a federal court has subject matter jurisdiction over cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant. *See Caterpillar Inc. v. Lewis,* 519 U.S. 61, ----, 117 S.Ct. 467, 472, 136 L.Ed.2d 437 (1996); *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.,* 87 F.3d 44, 47 (2d Cir.1996).

**3   4**   For the purposes of diversity jurisdiction, a person's citizenship is determined by his domicile. *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 828, 109 S.Ct. 2218, 2220-21, 104 L.Ed.2d 893 (1989). Domicile requires two elements: the party's physical presence in the state and the intent to remain in the state indefinitely. *See National Artists Management Co. v. Weaving,* 769 F.Supp. 1224, 1227 (S.D.N.Y.1991) (citing *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989); *Gutierrez v. Fox,* 966 F.Supp. 214, 217 (S.D.N.Y.1997)). "Although a person may have more than one residence, [he] may only have one domicile at any one time." *National Artists,* 769 F.Supp. at 1227. Where there is evidence that the party has more than one residence, a court should focus on where the party intends to remain. *See id.* When determining whether a party has the intent to remain indefinitely in a state, a court should consider the following factors: voting registration; place of employment; current residence; location of real and personal property; location of spouse and family; driver's license; automobile registration; location of bank account; payment of taxes; tax return address; and location of a person's physician. *See* 3 Moore's Federal Practice ¶ 102.36[1]; *see also National Artists,* 769 F.Supp. at 1228; *Boston Safe Deposit & Trust Co. v. Morse,* 779 F.Supp. 347 (S.D.N.Y.1991).

**5**   Although plaintiff's opposition papers are notably silent as to a number of those factors, the weight of the objective indicia suggests that, at the time the action was removed, plaintiff intended to remain in New York indefinitely. Plaintiff lives for the majority of the year in New York and has lived at the same address in New York City for the past seventeen years. He works in New York, operating and managing an art gallery in New York City. His attorney, accountant, dentist and doctor all reside or practice in the New York City metropolitan area. Meanwhile, the only factors asserted by defendants in support of their contention that Borsack is a domiciliary of Florida is Borsack's wife's ownership of property in Florida, against which the Internal Revenue Service filed a tax lien naming Borsack as taxpayer, and Borsack's possession of a Florida driver's license.

On balance, considering the totality of the evidence, I conclude that plaintiff was domiciled in New York when this action was filed and at the time of removal. Because defendant Chalk & Vermilion was incorporated in New York and had its principal place of business in New York, the citizenship of the parties was not diverse. *See United Food,* 30 F.3d at 302 ("a corporate entity['s][ ] citizenship is determined by its place of incorporation or its principal place of business").

**6**   Defendants, however, further contend that federal question jurisdiction also exists under chapter 2 of the Federal Arbitration **\*298** Act ("the Act"), 9 U.S.C. §§ 201-208. Chapter 2 of the Act affords district courts original jurisdiction, regardless of the amount in controversy, over any "action or proceeding falling under the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards]." 9 U.S.C. § 203. An action will fall "under the Convention" for the purposes of establishing federal question jurisdiction if it involves an

> arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial.... An agreement or award arising out of such a relationship, which is entirely between citizens of the United States, shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.... A corporation is a citizen of the United States if it is a incorporated or has its principal place of business in the United States.

9 U.S.C. § 202. Thus, three basic requirements must be met for a district court to find jurisdiction under the Convention: "the award (1) must arise out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope." *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1018 (2d Cir.1993); *see Cheshire Place Assocs. v. West of England Ship Owners Mut. Ins. Ass'n,* 815 F.Supp. 593, 595 (E.D.N.Y.1993).

**7**   Here, the parties do not contest that the underlying License Agreement between Chalk & Vermilion, a New York corporation, and Sevenarts, a corporation organized under the laws of England, satisfies those three requirements. Rather, Borsack contends that his claims against the defendants do not allege a breach of the License Agreement, but rather a breach of a verbal agreement into which he had entered with Rogath prior to the execution of the License Agreement. Borsack thus

argues that the action does not fall under the purview of the Convention.

**8    9    10**    Borsack, however, concedes that the alleged verbal agreement, pursuant to which Rogath would pay him five artist proof sculptures upon the production of each new edition of the Erte sculpture, is documented in the Addendum. *See* Complaint ¶ 4. Borsack further does not dispute that the alleged verbal agreement was incapable of performance within one year and would fail to satisfy the Statute of Frauds absent such memorialization. See Restatement § 110(1)(2); *see also* New York General Obligations Law § 5-701(a) (1). [3] Here, the terms of the Addendum are substantially the same as those of the alleged oral agreement, identifying the parties, describing the subject matter-the five artists proofs-and stating the essential terms of that agreement. Where a written agreement is reduced to a writing which, "in view of its completeness and specificity reasonably appears to be a complete agreement, it is to be taken to be an integrated agreement" which discharges prior agreements to the extent they are within its scope. Restatement §§ 209, 213; *see* Moloney v. Weingarten, 118 A.D.2d 836, 500 N.Y.S.2d 320, 322 (2d Dep't 1986).

[3]    "A contract is not 'to be performed within a year' if it is terminable within that time only upon the breach of one of the parties." *Ohanian v. Avis Rent A Car, Inc.,* 779 F.2d 101, 105 (2d Cir.1985). Where an alleged contract, as here, is indefinite as to duration and does not, by its terms, permit the defendant to discharge its performance obligations in less than one year, the statute requires a writing setting forth the essential terms of the agreement. *See City of Yonkers v. Otis Elevator Co.,* 649 F.Supp. 716, 727 (S.D.N.Y.1986).

Moreover, an examination of the Complaint belies Borsack's contention that his breach of contract claims arise out of the oral agreement and not the written Addendum. Both the first and second causes of action in Borsack's complaint allege the violation of the terms of the Addendum, making specific reference to the written document itself. [4] In **\*299** addition, Borsack charges Sevenarts with breach of contract although, according to Borsack, Sevenarts was not a party to the oral agreement but was a party to the License Agreement and Addendum. In essence, Borsack seeks enforcement of one portion of the License Agreement, while seeking to avoid another provision of the Agreement, namely the arbitration clause. "This situation is relatively unknown in the context of arbitration agreements." *Filanto, S.p.A v. Chilewich Int'l Corp.,* 789 F.Supp. 1229, 1240

(S.D.N.Y.1992), *app. dismissed,* 984 F.2d 58 (2d Cir.1993) (citing *Tepper Realty Co. v. Mosaic Tile Co.,* 259 F.Supp. 688, 692 (S.D.N.Y.1966)). "[T]he plaintiff[ ] cannot have it both ways. [He] cannot rely on the contract, when it works to [his] advantage, and repudiate it when it works to [his] disadvantage." *Tepper,* 259 F.Supp. at 692. Thus, it is to the language of the Addendum to which the Court must look to determine the rights, if any, of the respective parties.

[4]    The Complaint charges that
    # "no less than 15 different new versions of Erte sculptures have been produced by defendant CHALK and sold to the general public, without the requisite five Artist Proofs per version of Erte sculpture being distributed to plaintiff as required pursuant to the terms of Supplemental Agreement." Complaint ¶ 17.
    # "defendants have produced an additional number of versions of Erte sculpture [sic] for future distribution to the public without providing the required five Artist Proofs per version to plaintiff, in violation of the express terms of the Supplemental Agreement."
    # "the number of additional versions of Erte sculptures produced and sold privately by defendants without sale to the general public and without turnover of the 5 Artist Proofs per version as required by the Supplemental Agreement is approximately 40."
    The Court's review of plaintiff's Complaint reveals no specific allegations of breach of the alleged oral agreement.

**11**    Under the Addendum, Sevenarts and Chalk and Vermilion explicitly agree to "modify their contract of 9/23/87, [the License Agreement]." Insofar as the Addendum was clearly intended to be read with the contract and hence constituted a modification of the original contract the agreement to arbitrate in the original License Agreement extends to the Addendum. *See Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.,* 527 F.2d 966, 970 (2d Cir.1975); *American Home Assurance Co. v. American Fidelity & Casualty Co.,* 356 F.2d 690, 691-92 (2d Cir.1966).

Borsack nonetheless contends that even if the Court finds that his claims arise out of the License Agreement, he is not bound by the arbitration clause because he "has not signed any document or in any fashion consented to or agreed to have this matter arbitrated instead of heard by a Court of law." Borsack Reply Aff. ¶ 3. Defendants, in turn, argue that because plaintiff seeks to enforce the License Agreement as a

Borsack v. Chalk & Vermilion Fine Arts, Ltd., 974 F.Supp. 293 (1997)

third-party beneficiary, plaintiff is bound by the Agreement's arbitration clause.

**12**   **13**   **14**   Our Court of Appeals has rejected the proposition that only signatories to an arbitration agreement can be bound by its terms, applying instead ordinary principles of contract and agency to determine which parties are bound by an agreement to arbitrate. [5]   *See Spear, Leeds & Kellogg v. Central Life* ***300*** *Assurance Co.,* 85 F.3d 21, 26 (2d Cir.1996) (insurer could invoke arbitration provisions in stock exchange's constitution as thirdparty beneficiary of agreement between member of stock exchange and stock exchange); *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 845 (2d Cir.1987); *McAllister Bros. Inc. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980); *see also Lippus v. Dahlgren Mfg. Co.,* 644 F.Supp. 1473, 1482 (E.D.N.Y.1986).

[5]   Plaintiff urges that the Court apply New York law, which arguably imposes a heavier burden on a party seeking to compel arbitration than does its federal counterpart, *see Filanto,* 789 F.Supp. at 1235, to determine whether he is bound by the License Agreement's arbitration clause. Under New York law, parties to a contract will not be held to have chosen arbitration "in the absence of an express, unequivocal agreement to that effect." *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 46 (2d Cir.1993). Our Court of Appeals, however, has explicitly held that section 2 of the Arbitration Act preempts that rule, and has instead applied the preponderance of the evidence standard to determine whether an arbitration agreement exists. See *Progressive Casualty,* 991 F.2d at 46; *Filanto,* 789 F.Supp. at 1234 (applying federal law to issue of whether an "agreement in writing" existed between the parties).

Thus, where jurisdiction is alleged under chapter 2 of the Federal Arbitration Act the issue of enforceability and validity of the arbitration clause is governed by federal law. See *Beromun,* 471 F.Supp. at 1169; *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353-54, 87 L.Ed.2d 444 (1985) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)) (in determining whether the parties agreed to arbitrate a dispute, the court is to apply the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [Federal Arbitration] Act").

The Court notes, however, that the application of federal law does not render state law irrelevant to the present analysis. "In general, federal courts

developing federal common law are free to borrow from state law, unless there is either a demonstrated need for uniform national rule or a significant conflict between state law and some discernable federal policy." *McCarthy v. Azure,* 22 F.3d 351, 356 (1st Cir.1994); *see United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728-30, 99 S.Ct. 1448, 1458-60, 59 L.Ed.2d 711 (1979).

**15**   Under general contract principles, "non-signatories [ ] fall within the scope of an arbitration agreement where that is the intent of the parties." *McPheeters v. McGinn, Smith & Co.,* 953 F.2d 771, 772 (2d Cir.1992) (per curiam); *see Cargill,* 991 F.2d at 1019. Thus, when a plaintiff who acquires rights under a contract as an agent, third-party beneficiary, or assignee subsequently "bases [his] right to sue on the contract itself the provision requiring arbitration as a condition precedent to recovery must be observed." *Cheshire Place Assocs.,* 815 F.Supp. at 597; *see Speer. Leeds,* 85 F.3d at 26 (third-party beneficiary to contract) *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1359 (2d Cir.1993) (agents of an entity party to an arbitration agreement are protected by that agreement); *Banque de Paris et des Pays-Bas v. Amoco Oil Co.,* 573 F.Supp. 1464, 1469 (S.D.N.Y.1983) (assignee of party to contract).

**16**   A third-party beneficiary exists "only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him." *McPheeters,* 953 F.2d at 773. It must appear " 'that no one other than the third party can recover if the promisor breaches the contract' or the contract language should otherwise clearly evidence 'an intent to permit enforcement by the third party.' " *Artwear, Inc. v. Hughes,* 202 A.D.2d 76, 615 N.Y.S.2d 689, 692 (1st Dep't 1994) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 495 N.Y.S.2d 1, 5, 485 N.E.2d 208, 211-12 (1985)); *see* Restatement (Second) of Contracts § 308 cmt. a (1981).

Here, the Addendum specifically names Borsack, stating that the parties to the contract "shall divide the cost for the additional five casts and they shall be distributed to Ron Bell [a/k/a Ronald Borsack]." It is clear from that language that no one other than Borsack would be entitled to recover if the parties failed to distribute the additional five casts. Accordingly, I find that Borsack is an intended third-party beneficiary of the License Agreement, as amended, and can be compelled to abide by the arbitration provision therein.

**17** In a final attempt to defeat jurisdiction under 9 U.S.C. § 203, Borsack argues that the License Agreement's arbitration clause, as applied to him, fails to satisfy the Convention's requirement of an "agreement in writing" to arbitrate because he was not a signatory to the License Agreement or the Addendum.

The Convention provides that contracting states "shall recognize an agreement in writing under which the parties undertake to submit to arbitration." Convention Art. II § 1. The Convention defines "agreement in writing" as including "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." Convention, Article II § 2; *see Sphere Drake Ins. PLC v. Marine Towing, Inc.,* 16 F.3d 666, 669 (5th Cir.1994); *Filanto,* 789 F.Supp. at 1235. Borsack postulates that the written agreement requirement mandates that the agreement be an "actual written arbitration agreement entered into by the parties" to the litigation.

Although our Court of Appeals has not yet had occasion to interpret the Convention's writing requirement, other courts that have addressed the issue have not read the requirement as narrowly as plaintiff would suggest. The Fifth Circuit, the only Court of Appeals that has directly interpreted the phrase, explicitly rejected a reading that defined "agreement in writing" only as "(1) a contract or other written agreement signed by the parties or (2) an exchange of correspondence between the parties demonstrating consent to arbitrate." *Sphere Drake Ins. PLC v. Marine Towing Inc.,* 16 F.3d 666, 669 (5th Cir.1994). The court instead found that the phrase followed by the comma–"signed by the parties or contained in an exchange of *\*301* letters or telegrams"–modified only "arbitration agreement" and not "arbitration clause in a contract." Thus, the Fifth Circuit construed the Convention's definition to include either (1) an arbitral clause in a contract or (2) an arbitration agreement that is either (a) signed by the parties or (b) contained in an exchange of letters' or telegrams. *See Sphere Drake,* 16 F.3d at 669; *see also Beromun Aktiengesellschaft v. Societa Industriale Agricola "Tresse" Di Dr. Domenico E Dr. Antonio Dal Ferro,* 471 F.Supp. 1163, 1170 (S.D.N.Y.1979) (holding that while the Convention "requires a writing[,][i]t need not be signed [ ] and ordinary contract principles dictate when the parties are bound by a written arbitration provision absent their signatures"). Under that construction, because the License Agreement contains an arbitral clause, the qualifications applicable to "arbitration agreements" do not apply, and a signature is not required. *See Sphere Drake,* 16 F.3d at 670.

Yet, a more restrictive reading of the writing requirement would not warrant a different result in this case. In *Sen Mar, Inc. v. Tiger Petroleum Corp.,* 774 F.Supp. 879 (S.D.N.Y.1991), the court construed the "agreement in writing" requirement to mean that an arbitration clause is enforceable only if it is found either in (1) a signed writing or (2) an exchange of letters. *See Sen Mar,* 774 F.Supp. at 882.[6] Plaintiff, relying on the construction articulated in *Sen Mar,* argues that since defendants do not allege that the arbitration clause can be found in an exchange of letters, the clause must be found in a writing that plaintiff himself signed.

6   In *Sen Mar,* unlike the case at hand, court was faced with the threshold question of whether a series of letters satisfied the writing requirement, and thus whether an agreement to arbitrate even existed. Here, as noted earlier, the parties do not contest that the Licences Agreement falls squarely under the reach of the Convention.

The *Sen Mar* court, however, did not impose a requirement that only signatories to an arbitration agreement can be bound by such agreement, but rather held that the arbitration clause to be enforceable had to appear in a signed writing. Thus, under Sen Mar, once a party establishes that, indeed, a signed writing reflecting the agreement to arbitrate exists, the general rules of contract law apply to determine which parties are subject to arbitration. As discussed earlier, courts applying those general contract principles have held third-party beneficiaries to the arbitration provisions in contracts under which they sue. The writing requirement does not foreclose the application of the well-established contract and agency principles under which nonsignatories sometimes can be obligated by, or benefit from agreements signed by others. *See Roby,* 996 F.2d at 1360 (arbitration clause applicable to nonsignatory agent of signatory corporate entity); *Fisser v. International Bank,* 282 F.2d 231, 233-34 (2d Cir.1960); *cf. McCarthy,* 22 F.3d at 356. Indeed, our Court of Appeals, in addressing the question of subject matter jurisdiction under the Convention, has stated that where a plaintiff "is found to be a third party beneficiary to the [contract containing the arbitration clause], it may be proper for the district court to enforce the arbitration agreement against the [defendant]." *Cargill Int'l,* 991 F.2d at 1020. *Cf. Recold, S.A. v. Monfort of Colorado, Inc.,* 893 F.2d 195, 197 (8th Cir.1990). I therefore find that the License Agreement, as applied to Borsack, satisfies the Convention's writing requirement and that this Court has jurisdiction over plaintiff's claims under 9 U.S.C. § 203.

## B. Scope of the Arbitration Clause

**18**    Having determined that Borsack was a third-party beneficiary of the License Agreement and that this Court has jurisdiction over the action under 9 U.S.C. § 203, the Court must next determine whether the scope of the agreement to arbitrate encompasses the claims raised in Borsack's complaint. As our Court of Appeals has recently noted, "certain understandings govern any discussion of arbitrability. First and most importantly, 'as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' " *Spear, Leeds,* 85 F.3d at 28 (quoting *Moses H. Cone Memorial Hospital,* 460 U.S. at 24-25, 103 S.Ct. at 941-42). That is, arbitration "must not be denied unless a court is positive that the clause it is examining ***\*302*** does not cover the asserted dispute." *Spear, Leeds,* 85 F.3d at 28; *see Progressive Casualty,* 991 F.2d at 48. Second, because the Court is interpreting a contract, the Court's construction "must ascertain and implement the reasonable expectations of the parties who undertake to be bound by its provisions ... Despite the presumption of arbitrability, the strong federal policy favoring arbitration may not extend the reach of the arbitration beyond the intended scope of the clause providing for it." *Id.* (citations omitted). Third, the Court's analysis should not be influenced by the merits of Borsack's claims against the defendants. *See id.*

Here, the arbitration clause states, in relevant part, that "[i]n the event of any claim or dispute between the parties concerning this Agreement, the parties irrevocably agree to submit to binding arbitration to take place in London." Borsack contends that, as that provision reads, its application is strictly limited to the "parties" to the License Agreement, namely Sevenarts and Chalk & Vermillion, and does not extend to him as a nonsignatory.

This argument simply repeats his contention that nonsignatories are not bound by an arbitration agreement. "The right of a third person for whose benefit a promise is made is affected with all the infirmities of the agreement as between the parties thereto." Samuel Williston, A Treatise on the Law of Contracts § 364A (Walter H.E. Jaeger ed., 3d Ed. 1959) [hereinafter Williston on Contracts]. Thus, language limiting application of an arbitration clause to the parties to the contract has not precluded application of such clauses to nonsignatories so long as such persons were intended beneficiaries of the contract. *See McAllister,* 621 F.2d at 524; *McEntee v. Ormes Capital Markets, Inc.,* 1995 WL 716734 *\*4-\*5; see also* Williston on Contracts § 364A ("Where the contract contains an arbitration clause which is legally enforceable, the general view is that the beneficiary is bound thereby to the same extent that the promisee is bound."). I therefore find that plaintiff's breach of contract claims, which certainly involve a dispute that "concerns th [e] Agreement," fall within the scope of the clause.

## CONCLUSION

For the reasons stated above, defendants' motion for a stay pending arbitration is granted and plaintiff's motion for remand is denied.

SO ORDERED.

---

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

DOCSTOR: 2191401\1

107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832...

107 S.Ct. 2520
Supreme Court of the United States

Barclay PERRY and James Johnston, Appellants

v.

Kenneth Morgan THOMAS.

No. 86-566.    Argued April 28,
1987.    Decided June 15, 1987.

Former employee of securities brokerage firm brought action against his former employer and two of his coemployees alleging breach of contract, conversion, civil conspiracy to commit conversion, and breach of fiduciary duty, for which former employee sought compensation and punitive damages, in connection with dispute over commissions on sale of securities. Coemployees filed petition to compel arbitration. The California Superior Court denied petition to compel arbitration, and appeal was taken. The California Court of Appeal, Second Appellate District, affirmed. Following denial of petition for review by the California Supreme Court, the Supreme Court noted probable jurisdiction. The Supreme Court, Justice Marshall, held that under the Supremacy Clause, the Federal Arbitration Act pre-empted provision of California Labor Law which stated that wage collection actions may be maintained without regard to existence of any private agreement to arbitrate.

Reversed.

Justices Stevens and O'Connor filed dissenting opinions.

West Headnotes (7)

**1    Courts**    Exclusive or Concurrent Jurisdiction

Federal Arbitration Act, enacted pursuant to Commerce Clause, is body of substantive law enforceable in both state and federal courts. 9 U.S.C.A. § 1 et seq.; U.S.C.A. Const. Art. 1, § 8, cl. 3.

26 Cases that cite this headnote

**2    Alternative Dispute Resolution**    Constitutional and Statutory Provisions and Rules of Court

Federal Arbitration Act embodies clear federal policy of requiring arbitration unless agreement

to arbitrate is not part of contract evidencing interstate commerce or is revocable upon such grounds as exist at law or equity for revocation of any contract. 9 U.S.C.A. § 2.

54 Cases that cite this headnote

**3    Labor and Employment**    What Law Governs

**States**    Labor and Employment

Under Supremacy Clause, provision of Federal Arbitration Act governing enforcement of arbitration agreements preempts provision of California Labor Code which states that wage collection actions may be maintained without regard to existence of any private agreement to arbitrate. U.S.C.A. Const. Art. 6, cl. 2; 9 U.S.C.A. § 2; West's Ann.Cal.Labor Code § 229.

184 Cases that cite this headnote

**4    Federal Courts**    Time and Manner of Raising Federal Question in State Court

Contention that parties seeking enforcement of arbitration agreement lack standing to enforce agreement would not be considered by Supreme Court, where courts below did not address that argument for refusing to compel arbitration.

1 Cases that cite this headnote

**5    Federal Courts**    Right of Review and Parties

Resolution in favor of parties seeking to compel arbitration that they had standing to enforce arbitration agreement was not prerequisite to parties' having constitutional standing to maintain appeal to United States Supreme Court; rather, standing argument presented straight forward issue of contract interpretation of whether arbitration provision inured to benefit of parties in question, and whether agreement could be construed to cover dispute that arose between them. U.S.C.A. Const. Art. 3, § 1 et seq.

296 Cases that cite this headnote

107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832...

**6    Federal Courts** 🔑 **Time and Manner of Raising Federal Question in State Court**

Question of whether arbitration agreement constituted unconscionable, unenforceable contracts of adhesion would not be addressed by Supreme Court, where issue was not decided by lower courts.

8 Cases that cite this headnote

**7    Alternative Dispute Resolution** 🔑 **Unconscionability**

**Alternative Dispute Resolution** 🔑 **Construction**

Court may not, in assessing rights of litigants to enforce arbitration agreement, construe that agreement in matter different from that in which it otherwise construes nonarbitration agreement under state law; nor may court rely on uniqueness of agreement to arbitrate as basis for state-law holding that enforcement would be unconscionable. 9 U.S.C.A. § 1 et seq.

149 Cases that cite this headnote

**\*\*2521  Syllabus** *

---

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

*\*483*  Appellee brought suit in California Superior Court against his former employer *\*\*2522* and appellants, two of its employees, alleging breach of contract and related causes of action arising from a dispute over commissions on securities sales. After appellee refused to arbitrate, appellants filed a petition to compel arbitration under §§ 2 and 4 of the Federal Arbitration Act, which respectively provide that contractual arbitration provisions are valid and enforceable and mandate their judicial enforcement. The demand for arbitration was based on a provision in a form appellee executed in connection with his employment application, whereby he agreed to arbitrate any dispute with his employer.

Appellee opposed arbitration on the ground that his suit was authorized by California Labor Code § 229, which provides that wage collection actions may be maintained without regard to the existence of any private agreement to arbitrate. The court refused to compel arbitration, characterizing as "controlling authority" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 which upheld § 229 in the face of a Supremacy Clause preemption challenge premised on an arbitration requirement in a New York Stock Exchange rule, which was promulgated pursuant to § 6 of the Securities & Exchange Act of 1934 (1934 Act). The State Court of Appeals affirmed. Both lower courts refused to consider appellee's argument that appellants lacked "standing" to enforce the arbitration agreement since they were not parties to it.

*Held:*

1. Under the Supremacy Clause, § 2 of the Federal Arbitration Act pre-empts § 229 of the California Labor Code. In enacting § 2, Congress declared a national policy favoring arbitration and withdrew the States' power to require a judicial forum for the resolution of claims that contracting parties agreed to resolve by arbitration. *Ware* is distinguishable on the ground that the language and policies of the 1934 Act and the regulations promulgated thereunder evidenced no clear federal intent to require arbitration. The oblique reference to the Federal Arbitration Act in footnote 15 of *Ware* cannot fairly be read as a definitive holding that that Act does not pre-empt § 229, since the footnote was concerned with *federally created* rights and did not address the issue of federal pre-emption of *state-created* rights. Pp. 2525-2526.

*\*484*  2. Appellee's contention that resolving in appellants' favor the question of their "standing" to enforce the agreement to arbitrate is a prerequisite under Article III of the Constitution to their maintenance of this appeal is rejected. Appellee's "standing" argument-which this Court does not reach because the lower courts did not address it-simply presents the straightforward contract interpretation issue whether the arbitration provision inures to appellants' benefit and may be construed to cover the present dispute. That issue may be resolved on remand, and its status as an alternative ground for denying arbitration does not prevent this Court from reviewing the lower courts' holdings on the pre-emption question. Pp. 2526-2527.

Reversed and remanded.

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and BRENNAN, WHITE,

107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832...

BLACKMUN, POWELL, and SCALIA, JJ., joined. STEVENS, J., *post,* p. ----, and O'CONNOR, J., *post,* p. ----, filed dissenting opinions.

Attorneys and Law Firms

*Peter Brown Dolan* argued the cause for appellants. With him on the briefs was *Maren E. Nelson.*

*Bruce Gelber* argued the cause and filed a brief for appellee.

Opinion

Justice MARSHALL delivered the opinion of the Court.

In this appeal we decide whether § 2 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* which mandates enforcement of arbitration agreements, pre-empts **\*\*2523** § 229 of the California Labor Code, which provides that actions for the collection of wages may be maintained "without regard to the existence of any private agreement to arbitrate." Cal.Lab.Code Ann. § 229 (West 1971).

**I**

Appellee, Kenneth Morgan Thomas, brought this action in California Superior Court against his former employer, Kidder, Peabody & Co. (Kidder, Peabody), and two of its employees, appellants Barclay Perry and James Johnston. His complaint arose from a dispute over commissions on the sale of securities. Thomas alleged breach of contract, conversion, civil conspiracy to commit conversion, and breach of **\*485** fiduciary duty, for which he sought compensatory and punitive damages. After Thomas refused to submit the dispute to arbitration, the defendants sought to stay further proceedings in the Superior Court. Perry and Johnston filed a petition in the Superior Court to compel arbitration; Kidder, Peabody invoked diversity jurisdiction and filed a similar petition in Federal District Court. Both petitions sought arbitration under the authority of §§ 2 and 4 of the Federal Arbitration Act. [1]

[1]    Section 2 provides, in relevant part:
    "A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Section 4 mandates judicial enforcement of arbitration agreements where a party has failed, neglected, or refused to arbitrate. 9 U.S.C. § 4.

The demands for arbitration were based on a provision found in a Uniform Application for Securities Industry Registration form, which Thomas completed and executed in connection with his application for employment with Kidder, Peabody. That provision states:

    "I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions or by-laws of the organizations with which I register...." App. 33a.

Rule 347 of the New York Stock Exchange, Inc. (1975), with which Thomas registered, provides that

    "[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party...." App. 34a.

 **\*486**  Kidder, Peabody sought arbitration as a member organization of the New York Stock Exchange (NYSE). Perry and Johnston relied on Thomas' allegation that they had acted in the course and scope of their employment and argued that, as agents and employees of Kidder, Peabody, they were beneficiaries of the arbitration agreement.

Thomas opposed both petitions on the ground that § 229 of the California Labor Code authorized him to maintain an action for wages, defined to include commissions, [2] despite the existence of an agreement to arbitrate. He relied principally on this Court's decision in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973), which had also considered the validity of § 229 in the face of a pre-emption challenge under the Supremacy Clause, U.S. Const., Art. VI, cl. 2. Thomas maintained that the decision in *Ware* stood for the proposition that the State's interest in protecting **\*\*2524** wage earners outweighs the federal interest in uniform dispute resolution.

[2]    Section 200(a) of the California Labor Code defines "wages" to include amounts earned on a "commission basis." Cal.Lab.Code Ann. § 200(a) (West 1971). The California Superior Court and the California Court of Appeal held below that the commissions at issue in

WestlawNext® © 2011 Thomson Reuters. No claim to original U.S. Government Works.

107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832...

this case fall within the statutory definition. App. 128a, 140a.

The Superior Court denied appellants' petition to compel arbitration. [3] *Thomas v. Kidder Peabody & Co.,* Civ.Action No. C529105 (Los Angeles County, Apr. 23, 1985) (reprinted at App. 128a-129a). The court characterized *Ware* as "controlling authority" which held that, "in accordance with California Labor Code Section 229, actions to collect wages may be pursued without regard to private arbitration agreements." *Id.,* at 129a. It further concluded that since Thomas' claims for conversion, civil conspiracy, and breach of fiduciary duty were ancillary to his claim for breach of **\*487** contract and differed only in terms of the remedies sought, they should also be tried and not severed for arbitration. *Id.,* at 128a-129a. The Superior Court did not address Thomas' contention that Perry and Johnston were "not parties" to the arbitration agreement, *id.,* at 78a, and therefore lacked a contractual basis for asserting the right to arbitrate, an argument Thomas characterizes as one of "standing." [4]

[3]  The Federal District Court gave this ruling preclusive effect and entered a final order dismissing Kidder, Peabody's petition in the parallel proceeding. *Kidder, Peabody & Co. v. Thomas,* Civ.Action No. 85-1257RJK (CD Cal., Sept. 29, 1986) (reprinted at App. 245a); *id.,* at 235a.

[4]  Having concluded that this Court's decision in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973), was dispositive, the California Superior Court also did not address Thomas' alternative argument that the arbitration agreement in this case constitutes an unconscionable, unenforceable contract of adhesion because "(a) the selection of arbitrators is made by the New York Stock Exchange and is presumptively biased in favor of management; and (b) the denial of meaningful ... discovery is unduly oppressive and frustrates an employee's claim for relief." App. 74a.

Before the California Court of Appeal, appellants argued that *Ware* resolved only the narrow issue whether § 229 was pre-empted by Rule 347's provision for arbitration, given the promulgation of that Rule by the NYSE pursuant to § 6 of the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 885, as amended, 15 U.S.C. § 78f, and the authority of the Securities and Exchange Commission (SEC) to review and modify the NYSE Rules pursuant to § 19 of the 1934 Act, 15 U.S.C. § 78s. [5] See 414 U.S., at 135. It was appellants' contention that, despite an indirect reference to the Federal Arbitration **\*488**

Act in footnote 15 of the *Ware* opinion, the pre-emptive effect of § 2 of the Act was not at issue in that case.

[5]  The Court of Appeal rejected appellants' contention that amendments to the 1934 Act since this Court's decision in *Ware* removed the theoretical underpinnings of that decision by expanding the scope of the SEC's authority under § 19 to review and modify NYSE rules. See 15 U.S.C. § 78s(c). Appellants continue to make this argument, in their appeal before this Court, as an alternative basis for distinguishing *Ware.* Brief for Appellants 17-20 (citing S.Rep. No. 94-75, pp. 22-38 (1975), U.S.Code Cong. & Admin.News 1975, p. 179; *Drayer v. Krasner,* 572 F.2d 348, 356-359 (CA2), cert. denied, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978)). However, because we rest our decision exclusively on the Federal Arbitration Act, we decline to consider the pre-emptive effect of the amended 1934 Act as it relates to Thomas' agreement to be bound by NYSE Rule 347.

In an unpublished opinion, the Court of Appeal affirmed. *Thomas v. Perry,* 2d Civ. No. B014485 (2d Dist., Div. 5, Apr. 10, 1986) (reprinted at App. 139a-142a). It read *Ware* 's single reference to the Federal Arbitration Act to imply that the Court had refused to hold § 229 pre-empted by that Act and the litigants' agreement to arbitrate disputes pursuant to Rule 347. Thus, the Court of Appeal held that a claim for unpaid wages brought under § 229 was not subject to compulsory arbitration, notwithstanding the existence of an arbitration agreement. App. 140a-141a. Like the Superior Court, the Court of Appeal also rejected appellants' argument, based on this Court's decision in *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), that the ancillary claims for conversion, civil conspiracy, and breach of fiduciary duty were severable from the breach-of-contract claim and should be arbitrated. App. 142a. Finally, **\*\*2525** the Court of Appeal refused to consider Thomas' argument that Perry and Johnston lacked "standing" to enforce the arbitration agreement. The court concluded that Thomas had raised this argument for the first time on appeal. [6] *Id.,* at 140a, n. 1.

[6]  Objecting to appellants' request for a formal Statement of Decision from the Superior Court following summary denial of their motion to compel, Thomas argued that appellants had "no standing" to seek an order compelling arbitration. App. 120a. Perry and Johnston replied that their "standing" to seek arbitration inhered in their status as agents and employees of Kidder, Peabody, and as beneficiaries of the agreement between Kidder, Peabody and Thomas. *Id.,* at 124a.

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 50 of 142

Perry v. Thomas, 482 U.S. 483 (1987)
107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832...

In response, Thomas simply argued that Perry and Johnston had submitted no supporting evidence to show they had acted as agents for Kidder, Peabody. *Id.,* at 132a. The Superior Court did not amend a Proposed Statement of Decision, see *id.,* at 128a-129a, to address these arguments, and it was formally adopted as the Statement of Decision from which Perry and Johnston appealed. *Id.,* at 135a.

Having based its decision "squarely on *Ware,*" the Court of Appeal also declined to reach Thomas' alternative ground for supporting the Superior Court's decision not to compel arbitration: his contention that the arbitration provision constitutes an unconscionable, unenforceable contract of adhesion. *Id.,* at 141a, n. 3; see n. 4, *supra.*

**\*489** The California Supreme Court denied appellants' petition for review. *Id.,* at 144a. We noted probable jurisdiction,[7] 479 U.S. 982, 107 S.Ct. 567, 93 L.Ed.2d 572 (1986), and now reverse.

7    Jurisdiction over this appeal is provided by 28 U.S.C. § 1257(2). See *Southland Corp. v. Keating,* 465 U.S. 1, 6-8, 104 S.Ct. 852, 856-857, 79 L.Ed.2d 1 (1984).

## II

**1  2**    "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Enacted pursuant to the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, this body of substantive law is enforceable in both state and federal courts. *Southland Corp. v. Keating,* 465 U.S. 1, 11-12, 104 S.Ct. 852, 858-859, 79 L.Ed.2d 1 (1984) (§ 2 held to pre-empt a provision of the California Franchise Investment Law that California courts had interpreted to require judicial consideration of claims arising under that law). As we stated in *Keating,* "[i]n enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Id.,* at 10, 104 S.Ct. 858. "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." *Id.,* at 16, 104 S.Ct. 861 (footnote

omitted). Section 2, therefore, embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "We see nothing in the Act indicating that the broad principle of enforceability **\*490** is subject to any additional limitations under state law." *Keating, supra,* at 11, 104 S.Ct., 858.

In *Ware,* which also involved a dispute between a securities broker and his former employer, we rejected a Supremacy Clause challenge to § 229 premised in part on the contention that, because the 1934 Act had empowered the NYSE to promulgate rules and had given the SEC authority to review and modify these rules, a private agreement to be bound by the arbitration provisions of NYSE Rule 347 was enforceable as a matter of federal substantive law, and pre-empted state laws requiring resolution of the dispute in court. But the federal substantive law invoked in *Ware* emanated from a specific federal regulatory statute **\*\*2526** governing the securities industry-the 1934 Act. We examined the language and policies of the 1934 Act and found "no Commission rule or regulation that specifie[d] arbitration as the favored means of resolving employer-employee disputes," 414 U.S., at 135, 94 S.Ct., at 393, or that revealed a necessity for "nationwide uniformity of an exchange's housekeeping affairs." *Id.,* at 136, 94 S.Ct., at 394. The fact that NYSE Rule 347 was outside the scope of the SEC's authority of review militated against finding a clear federal intent to require arbitration. *Id.,* at 135-136, 94 S.Ct., at 393-94. Absent such a finding, we could not conclude that enforcement of California's § 229 would interfere with the federal regulatory scheme. *Id.,* at 139-140, 94 S.Ct., at 395-96.

**3**    By contrast, the present appeal addresses the pre-emptive effect of the Federal Arbitration Act, a statute that embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause. Its general applicability reflects that "[t]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered...." *Byrd,* 470 U.S., at 221, 105 S.Ct., at 1242. We have accordingly held that these agreements must be "rigorously enforce [d]." *Ibid.;* see *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, ----, 96 L.Ed.2d 185 (1987); **\*491** *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,* 473 U.S. 614, 625-626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). This clear federal policy places § 2 of the Act in unmistakable conflict with California's § 229 requirement that litigants be provided a judicial forum for resolving wage

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 51 of 142

Perry v. Thomas, 482 U.S. 483 (1987)

107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832...

disputes. Therefore, under the Supremacy Clause, the state statute must give way.

The oblique reference to the Federal Arbitration Act in footnote 15 of the *Ware* decision, 414 U.S., at 135, 94 S.Ct., at 393, cannot fairly be read as a definitive holding to the contrary. There, the Court noted a number of decisions as having "endorsed the suitability of arbitration to resolve *federally created* rights." *Ibid.* (emphasis added). Footnote 15 did not address the issue of federal pre-emption of *state-created* rights. Rather, the import of the footnote was that the reasoning-and perhaps result-in *Ware* might have been different if the 1934 Act "itself ha[d] provided for arbitration." *Ibid.* [8]

[8]    First among the decisions cited in footnote 15 was *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), in which the Court resolved a conflict between the Federal Securities Act of 1933 and the Federal Arbitration Act by holding that the policies of the former prevailed and that an arbitration agreement, for which enforcement was sought under the latter, was invalid. No federal pre-emption question was presented.

    Only the unexplained citation to *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), could be construed as a reference to principles of federal pre-emption. However, that case provides no support for Thomas' position. It arose as a diversity action in which one party to a contract containing an arbitration clause asserted a right under state law to judicial resolution of his claim of fraud in the inducement of the contract. The Court held that, while § 2 of the Federal Arbitration Act authorized judicial determination of a claim that the arbitration clause itself had been procured through fraud, a court could not decide whether fraud had induced the making and performance of the contract generally since this claim fell within the broad scope of the agreement to arbitrate. *Id.,* at 404, 87 S.Ct., at 1806. The Court dismissed the argument that the asserted right to judicial resolution adhered in state substantive law which a federal court sitting in diversity was bound to follow under the rule of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). It reasoned instead that Congress had enacted the substantive provisions of the Federal Arbitration Act pursuant, in part, to its constitutional power to regulate interstate commerce, 388 U.S., at 404-405, 87 S.Ct., at 1806, a distinction which endows these provisions with pre-emptive force under the Supremacy Clause.

**4  5  6  7    *492** Our holding that § 2 of the Federal Arbitration Act preempts § 229 of the California Labor Code obviates any need to consider whether our decision in **\*\*2527** *Byrd, supra,* 470 U.S., at 221, 105 S.Ct., at 1242, would have required severance of Thomas' ancillary claims for conversion, civil conspiracy, and breach of fiduciary duty from his breach-of-contract claim. We likewise decline to reach Thomas' contention that Perry and Johnston lack "standing" to enforce the agreement to arbitrate any of these claims, since the courts below did not address this alternative argument for refusing to compel arbitration. However, we do reject Thomas' contention that resolving these questions in appellants' favor is a prerequisite to their having standing under Article III of the Constitution to maintain the present appeal before this Court. As we perceive it, Thomas' "standing" argument simply presents a straightforward issue of contract interpretation: whether the arbitration provision inures to the benefit of appellants and may be construed, in light of the circumstances surrounding the litigants' agreement, to cover the dispute that has arisen between them. This issue may be resolved on remand; its status as an alternative ground for denying arbitration does not prevent us from reviewing the ground exclusively relied upon by the courts below. [9]

[9]    We also decline to address Thomas' claim that the arbitration agreement in this case constitutes an unconscionable, unenforceable contract of adhesion. This issue was not decided below, see nn. 4 and 6, *supra,* and may likewise be considered on remand.

    We note, however, the choice-of-law issue that arises when defenses such as Thomas' so-called "standing" and unconscionability arguments are asserted. In instances such as these, the text of § 2 provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of that statute: An agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law,* see *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), "save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. See *Prima Paint, supra,* 388 U.S., at 404, 87 S.Ct., at 1806;

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 52 of 142

Perry v. Thomas, 482 U.S. 483 (1987)

107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832...

*Southland Corp. v. Keating,* 465 U.S., at 16-17, n. 11, 104 S.Ct., at 861, n. 11. A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot.

### *493 III

The judgment of the California Court of Appeal is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice STEVENS, dissenting.

Despite the striking similarity between this case and *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973), the Court correctly concludes that the precise question now presented was not decided in *Ware.* Even though the Arbitration Act had been on the books for almost 50 years in 1973, apparently neither the Court nor the litigants even considered the possibility that the Act had pre-empted state-created rights. It is only in the last few years that the Court has effectively rewritten the statute to give it a pre-emptive scope that Congress certainly did not intend. See *Southland Corp. v. Keating,* 465 U.S. 1, 18-21, 104 S.Ct. 852, 862-864, 79 L.Ed.2d 1 (1984) (STEVENS, J., concurring in part and dissenting in part). The dicta in some of these recent cases are admittedly broad enough to cover this case, see *ante,* at 2525-2526, but since none of our prior holdings is on point, the doctrine of *stare decisis* is not controlling. Cf. *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, ----, 107 S.Ct. 2332, ----, 96 L.Ed.2d 185 (1987) (STEVENS, J., concurring in part and dissenting in part). Accordingly, **2528 because I share *494 Justice O'CONNOR's opinion that the States' power to except certain categories of disputes from arbitration should be preserved unless Congress decides otherwise, I would affirm the judgment of the California Court of Appeal.

Justice O'CONNOR, dissenting.

The Court today holds that § 2 of the Federal Arbitration Act (Act), 9 U.S.C. § 1 *et seq.,* requires the arbitration of appellee's

claim for wages despite clear state policy to the contrary. This Court held in *Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), that the Act applies to state court as well as federal court proceedings. Because I continue to believe that this holding was "unfaithful to congressional intent, unnecessary, and in light of the [Act's] antecedents and the intervening contraction of federal power, inexplicable," *id.,* at 36, 104 S.Ct., at 871 (O'CONNOR, J., dissenting), I respectfully dissent.

Even if I were not to adhere to my position that the Act is inapplicable to state court proceedings, however, I would still dissent. We have held that Congress can limit or preclude a waiver of a judicial forum, and that Congress' intent to do so will be deduced from a statute's text or legislative history, or "from an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 227, 107 S.Ct. 2332, ----, 96 L.Ed.2d 185 (1987). As Justice STEVENS has observed, the Court has not explained why state legislatures should not also be able to limit or preclude waiver of a judicial forum:

> "We should not refuse to exercise independent judgment concerning the conditions under which an arbitration agreement, generally enforceable under the Act, can be held invalid as contrary to public policy simply because the source of the substantive law to which the arbitration agreement attaches is a State rather than the Federal Government. I find no evidence that Congress intended such a double standard to apply, and I would not lightly impute such an intent to the 1925 Congress *495 which enacted the Arbitration Act." *Southland Corp. v. Keating, supra,* 465 U.S., at 21, 104 S.Ct. at 863.

Under the standards we most recently applied in *Shearson/ American Express Inc. v. McMahon, supra,* there can be little doubt that the California Legislature intended to preclude waiver of a judicial forum; it is clear, moreover, that this intent reflects an important state policy. Section 229 of the California Labor Code specifically provides that actions for the collection of wages may be maintained in the state courts "without regard to the existence of any private agreement to arbitrate." Cal.Lab.Code Ann. § 229 (West 1971). The California Legislature thereby intended "to protect the worker from the exploitative employer who would demand that a prospective employee sign away in advance his right to resort to the judicial system for redress of an employment grievance," and § 229 has "manifested itself as an important state policy through interpretation by the California courts."

107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832...

*Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U.S. 117, 131, 132-133, 94 S.Ct. 383, 391, 392, 38 L.Ed.2d 348 (1973).

In my view, therefore, even if the Act applies to state court proceedings, California's policy choice to preclude waivers of a judicial forum for wage claims is entitled to respect.

Accordingly, I would affirm the judgment of the California Court of Appeal.

Parallel Citations

107 S.Ct. 2520, 28 Wage & Hour Cas. (BNA) 137, 96 L.Ed.2d 426, 55 USLW 4832, 106 Lab.Cas. P 55,735

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

DOCSTOR: 2191401\1

22 F.3d 351
United States Court of Appeals,
First Circuit.

Walton W. McCARTHY, Plaintiff, Appellee,

v.

Leo L. AZURE, Jr., Defendant, Appellant.

No. 93–1842.    Heard Jan. 5,
1994.    Decided April 28, 1994.

Seller of corporation brought action against an officer of corporation which purchased corporation who signed purchase agreement containing arbitration clause alleging breach of contract, wrongful discharge, fraud, negligent misrepresentation, intentional infliction of emotional distress, unfair trade practices, federal and state securities violations, and racketeering. The United States District Court for the District of New Hampshire, Shane Devine, Senior District Judge, refused to order arbitration. Corporate officer appealed. The Court of Appeals, Selya, Circuit Judge, held that corporate officer, who signed agreement containing arbitration clause in his official capacity, could not compel arbitration of claims lodged against him as an individual.

Affirmed.

West Headnotes (19)

**1**    **Federal Courts** 🔑 Review Dependent on Whether Questions Are of Law or of Fact

Appellate review is plenary when appeal presents a question of law.

9 Cases that cite this headnote

**2**    **Alternative Dispute Resolution** 🔑 Contractual or consensual basis

**Alternative Dispute Resolution** 🔑 Evidence

Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit; thus, party seeking to substitute in arbitral forum or judicial forum must show, at a bare minimum, that protagonists have agreed to arbitrate some claims.

30 Cases that cite this headnote

**3**    **Alternative Dispute Resolution** 🔑 Evidence

Federal policy favoring arbitration presumes proof of preexisting agreement to arbitrate disputes arising between protagonists.

3 Cases that cite this headnote

**4**    **Alternative Dispute Resolution** 🔑 Arbitration favored; public policy

**Alternative Dispute Resolution** 🔑 Construction in favor of arbitration

If contract language chosen by parties is unclear as to nature of claims to which agreement to arbitrate extends, a "healthy regard" for federal policy favoring arbitration requires that any doubts concerning scope of arbitrable issue be resolved in favor of arbitration.

6 Cases that cite this headnote

**5**    **Alternative Dispute Resolution** 🔑 Arbitration favored; public policy

Federal policy favoring arbitration does not extend to situations in which identity of parties who have agreed to arbitrate is unclear.

8 Cases that cite this headnote

**6**    **Alternative Dispute Resolution** 🔑 Formal Requisites

Although Federal Arbitration Act permits a person, by contract, to waive his or her right to adjudication, there can be no waiver in the absence of agreement signifying assent. 9 U.S.C.A. § 2.

2 Cases that cite this headnote

**7**    **Federal Courts** 🔑 Arbitration

Question of whether seller of corporation, in executing purchase agreement, agreed to arbitrate disputes he might have had with corporate officer of buying corporation personally concerning sale

involved interpretation of arbitration provision touching upon matters of interstate commerce and, accordingly, had to be resolved according to federal law. 9 U.S.C.A. § 2.

12 Cases that cite this headnote

**8    Alternative Dispute Resolution** 🔑 Construction

As under general principles of contract law, final answer to whether dispute is covered by arbitration clause is ordinarily a function of parties' intent as expressed in language of contract documents.

11 Cases that cite this headnote

**9    Federal Courts** 🔑 Matters of general jurisdiction; federal common law

In general, federal courts developing federal common law are free to borrow from state law, unless there is either a demonstrated need for a uniform national rule or significant conflict between state law and some discernible federal policy.

2 Cases that cite this headnote

**10    Federal Courts** 🔑 Conflict of Laws

When state law is likely to prove appropriate model, but different states have interest in claim, it is reasonable for federal court to apply choice-of-law principles of forum in order to ascertain what state's substantive law should be consulted.

2 Cases that cite this headnote

**11    Contracts** 🔑 Agreements relating to actions and other proceedings in general

A reasonable choice-of-law provision in a contract generally should be respected. Restatement (Second) of Conflict of Laws § 187.

6 Cases that cite this headnote

**12    Corporations and Business Organizations** 🔑 Acting in corporate capacity as opposed to acting in personal capacity

A person signing a contract only in a corporate capacity, and unambiguously indicating that fact on face of contract documents, does not thereby become a party to the agreement.

4 Cases that cite this headnote

**13    Alternative Dispute Resolution** 🔑 Persons entitled to enforce

Corporate officer who signed agreement in his official capacity to buy a corporation containing an arbitration clause could not compel arbitration of claims launched against him as an individual by seller of corporation; intent to limit arbitration rights to signatories was made manifest by inclusion of integration clause in purchase agreement.

12 Cases that cite this headnote

**14    Alternative Dispute Resolution** 🔑 Writing, signature, and acknowledgment

**Alternative Dispute Resolution** 🔑 Persons affected or bound

Signing arbitration agreement as agent for disclosed principal is not sufficient to bind agent to arbitrate claims against him personally. Restatement (Second) of Agency § 320.

7 Cases that cite this headnote

**15    Alternative Dispute Resolution** 🔑 Persons entitled to enforce

Corporate officer who, in his official capacity, signed agreement to purchase a corporation was not a third-party beneficiary of purchase agreement's arbitration clause and could not compel seller of corporation to arbitrate claims seller lodged against officer in his individual capacity.

24 Cases that cite this headnote

**16**  **Contracts** 🔑 Agreement for Benefit of Third Person

As is generally the case in matters of contract interpretation, crux in third-party beneficiary analysis is intent of parties.

8 Cases that cite this headnote

**17**  **Contracts** 🔑 Agreement for Benefit of Third Person

Because third-party beneficiary status constitutes exception to general rule that a contract does not grant enforceable rights to nonsignatories, a person aspiring to such status must show with special clarity that contracting parties intended to confer a benefit on him.

12 Cases that cite this headnote

**18**  **Corporations and Business Organizations** 🔑 Alter ego in general

Alter ego doctrine is equitable in nature; as such, doctrine can be invoked only where equity requires the action to assist a third party.

10 Cases that cite this headnote

**19**  **Corporations and Business Organizations** 🔑 Contracts in general

Corporate officer, who was sued by seller of a corporation in officer's individual capacity, could not invoke alter ego doctrine to hide behind corporate entity and avail himself of buying corporation's right to arbitration as contained in purchase agreement.

7 Cases that cite this headnote

**Attorneys and Law Firms**

*\*353* David R. Goodnight, with whom Patrick D. McVey, Howard A. Coleman, Riddell, Williams, Bullitt & Walkinshaw, Seattle, WA, D. Donald Dufresne, and Devine, Millimet & Branch, Manchester, NH, were on brief, for appellant.

Charles A. Szypszak, with whom Richard B. Couser and Orr and Reno, P.A., Concord, NH, were on brief, for appellee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

**Opinion**

SELYA, Circuit Judge.

This appeal presents intriguing questions anent the rights of a corporate officer who, having signed an agreement containing an arbitration clause in his official capacity, seeks to compel arbitration of claims lodged against him as an individual. The district court refused to order arbitration under these circumstances. We affirm.

**I. BACKGROUND**

For purposes of this appeal, the facts can be taken essentially as alleged. In 1987, plaintiff-appellee Walton W. McCarthy, a renowned inventor of underground shelter technology, incorporated T.H.E.T.A. Technologies, Inc. (Theta I), a New Hampshire corporation, for the purpose of manufacturing underground storage tanks and personal shelters. McCarthy owned fifty percent of the corporation's stock and served as its principal operating officer. Three passive investors held the remaining shares.

In the fall of 1989, McCarthy met defendant-appellant Leo L. Azure, Jr., a member of a Montana-based religious organization, Church Universal & Triumphant (C.U.T.). Azure soon entered into negotiations for the acquisition of both McCarthy's company and patented technology. Azure formed a Washington corporation, Theta Corporation (Theta II), to serve as a vehicle for the planned purchase.

On December 29, 1989, McCarthy, Theta II, and others entered into a contract (the Purchase Agreement). [1] Azure signed the Purchase Agreement on behalf of Theta II, but he did not sign it in his personal capacity. Leaving to one side special arrangements with various creditors, *see supra* note 1, this contract delineated a two-phase transaction: McCarthy was to sell his equity interest, including the patents, to the passive investors, and transfer certain residual rights to Theta II; then, Theta II was to buy all the outstanding stock of Theta I for cash, payable over a period of no more than three years. The Purchase Agreement expressly provided that "[d]isputes arising under this Agreement shall be resolved by arbitration...." Though not mentioned in the Purchase Agreement, the parties apparently understood that Theta II, in addition to paying McCarthy a prescribed sum of money for

the transferred rights, would offer him employment under a separate long-term contract.

1     Apart from McCarthy and Theta II, other parties to the Purchase Agreement included the passive investors and three major creditors of Theta I. For present purposes, nothing turns on the involvement of the other parties.

On January 11, 1990, McCarthy and Theta II executed a second agreement (the Confidentiality Agreement). Azure signed the Confidentiality Agreement, as he had signed the Purchase Agreement, on behalf of Theta II, but not otherwise; indeed, neither document contained a line for Azure's personal signature. Pursuant to the Confidentiality Agreement, McCarthy promised to keep all past and future information pertaining to the patents in the bosom of the lodge, and to take certain related actions on behalf of Theta II. This agreement included a somewhat more expansive arbitration clause, which *354 stated that "[a]ny controversy or claim arising out of or relating to this Agreement, or breach hereof, shall be settled by arbitration...." At a closing held the next day, Theta II delivered a letter (the Employment Letter) engaging McCarthy as its president, chief engineer, and chief executive officer at a stipulated annual salary. The Employment Letter also provided for stock options. It did not include an arbitration clause.

A little over two weeks after the closing, matters took a turn for the bizarre (or, at least, for the mystical). On January 28, 1990, Elizabeth Clare Prophet, Azure's spiritual leader, informed him, on the advice of a "dead ascended master" of C.U.T., that his newly acquired business was incompatible with his "divine plan" and that he should not devote further energy to the enterprise. Azure dutifully directed McCarthy to cashier all the employees of Theta II, and then proceeded to terminate McCarthy's employment. McCarthy never obtained any ownership interest in Theta II, notwithstanding the promises contained in the Employment Letter.

Apparently, Azure's religious convictions took him so far, and no further. He not only continued operating the Theta corporations, but also formed a third company, Omega Corporation. In October of 1990, after Azure merged Theta I into Theta II, Omega acquired the surviving entity. The following July, it began selling shares to the public. For all intents and purposes, Omega's business seemed indistinguishable from that of Theta I and Theta II; Omega styled itself as a leader in underground storage and marketed tanks manufactured pursuant to McCarthy's patented technology.

Unwilling to turn the other cheek, McCarthy sued Azure, Theta II, Omega, C.U.T., and Prophet in the United States District Court for the District of New Hampshire. [2] Azure, Theta II, and Omega filed a motion to stay proceedings pending arbitration, contending that the serial agreements obligated plaintiff to arbitrate all claims. The district court granted the motion with respect to Theta II, but denied it as to the remaining movants. Azure appeals the district court's order refusing to stay the action against him. We have jurisdiction by virtue of 9 U.S.C. § 16(a)(1) (Supp.1992).

2     The complaint asserted claims against Azure, Theta II, and Omega for, *inter alia,* breach of contract, wrongful discharge, fraud, negligent misrepresentation, intentional infliction of emotional distress, unfair trade practices, federal and state securities violations, and racketeering. It also asserted claims against Azure, C.U.T., and Prophet for tortious interference with contractual relationships. Jurisdiction was premised on the existence of both federal questions, 28 U.S.C. § 1331 (1988), and diversity of citizenship, 28 U.S.C. § 1332(a)(1) (1988).

## II. DISCUSSION

1   The court below reasoned that the source of appellant's purported right to compel arbitration must be found, if at all, in the Purchase Agreement. [3] It then denied appellant's motion to stay on the ground that he was not a party to the Purchase Agreement and, therefore, could not compel arbitration of claims lodged against him personally, whether or not those claims related to that agreement. Azure's appeal tests this thesis. Because the appeal presents a question of law, appellate review is plenary. *See United States v. Gifford,* 17 F.3d 462, 471 (1st Cir.1994); *Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.,* 978 F.2d 750, 757 (1st Cir.1992).

3     Because the Confidentiality Agreement granted legal rights only to Theta II and not to McCarthy, we agree with the district court's conclusion that it could not furnish a basis for precluding access to a judicial forum in respect to claims asserted by McCarthy against Azure. For that reason, and for the added reason that appellant, individually, was not a signatory to the Confidentiality Agreement, our analysis revolves around the Purchase Agreement.

### A. *General Principles.*

2   We start with bedrock: "arbitration is a matter of contract and a party cannot be required to submit to arbitration any

dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), *quoting United Steelworkers v. Warrior & Gulf Navig. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 1409 (1960). Thus, a party seeking *355 to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate *some* claims.

3  4  5  This imperative is in no way inconsistent with the acknowledged "federal policy favoring arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); *see also Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). The federal policy presumes proof of a preexisting agreement to arbitrate disputes arising between the protagonists. Once that agreement has been proven and the protagonists identified, cases such as *Cone* and *McMahon* instruct courts to use a particular hermeneutical principle for interpreting the breadth of the agreement; that is, if the contract language chosen by the parties is unclear as to the nature of the claims to which an agreement to arbitrate extends, a "healthy regard" for the federal policy favoring arbitration requires that "any doubts concerning the scope of an arbitrable issue be resolved in favor of arbitration." *Moses H. Cone,* 460 U.S. at 24-25, 103 S.Ct. at 941. The federal policy, however, does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear. *See Painewebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990) (holding that "[a]s a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so"). Thus, requiring that arbitration rest on a consensual foundation is wholly consistent with federal policy.

6  The requirement also makes perfect sense. Subject matter jurisdiction over an action or series of claims can be conceptualized as asserting a personal right on the parties to have that action, or those claims, adjudicated in a judicial forum. *See, e.g., Pacemaker Diag. Clinic of America, Inc. v. Instromedix, Inc.,* 725 F.2d 537, 541 (9th Cir.1984) (en banc) (recognizing that the "federal litigant has a personal right, subject to exceptions in certain classes of cases, to demand Article III adjudication of a civil suit"); *accord Glidden Co. v. Zdanok,* 370 U.S. 530, 536, 82 S.Ct. 1459, 1465, 8 L.Ed.2d 671 (1962). Though a person may, by contract, waive his or her right to adjudication, *see* 9 U.S.C. § 2, there can be no waiver in the absence of an agreement signifying an assent.

## B. *Framing the Issue.*

7  8  Viewed against this backdrop, the question before us reduces to a matter of contract interpretation: Did plaintiff, in executing the Purchase Agreement, agree to arbitrate disputes he might have *with Azure personally* concerning Theta-related transactions?[4] This question, which involves the interpretation of an arbitration provision touching upon matters of interstate commerce, must be resolved according to federal law. *See McGregor v. Industrial Excess Landfill, Inc.,* 856 F.2d 39, 46 n. 2 (6th Cir.1988); *Letizia v. Prudential Bache Securities, Inc.,* 802 F.2d 1185, 1187 (9th Cir.1986); *see also* 9 U.S.C. § 2. As under general principles of contract law, the final answer to such a question is ordinarily a function of the parties' intent as expressed in the language of the contract documents. *See NRM Corp. v. Hercules, Inc.,* 758 F.2d 676, 681 (D.C.Cir.1985) (explaining that contract interpretation, under federal law, "dovetails precisely with general principles of contract law," such that, under both, "the judicial task in construing a contract is to give effect to the mutual intentions of the parties"); *see also Local 1199 v. Brooks Drug Co.,* 956 F.2d 22, 25 (2d Cir.1992) (determining the parties' intent is the essential inquiry); *S.A. Mineracao da Trinidade-Samitri v. Utah Int'l, Inc.,* 745 F.2d 190, 193 (2d Cir.1984) (similar).

4   Although plaintiff originally sued Azure in two capacities (individual and official), plaintiff agreed, following oral argument in this court, to abandon his "official capacity" claims against Azure. Given this agreement, plaintiff henceforth will be disabled from pursuing any such claims. *See United States v. Levasseur,* 846 F.2d 786, 792-93 (1st Cir.) (explicating doctrine of judicial estoppel), *cert. denied,* 488 U.S. 894, 109 S.Ct. 232, 102 L.Ed.2d 222 (1988); *Patriot Cinemas Inc. v. General Cinema, Corp.,* 834 F.2d 208, 211-15 (1st Cir.1987) (similar). Consequently, we deal in this opinion only with plaintiff's "individual capacity" claims against Azure.

*356 9  10  11  This does not mean that state law is an irrelevancy. In general, federal courts developing federal common law are free to borrow from state law, unless there is either a demonstrated need for a uniform national rule or a significant conflict between state law and some discernible federal policy.[5] *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728-30, 99 S.Ct. 1448, 1458-59, 59 L.Ed.2d 711 (1979).

5    When state law is likely to prove an appropriate model, but different states have an interest in the claim, it is reasonable for a federal court to apply the choice-of-law principles of the forum in order to ascertain what state's substantive law should be consulted. *Cf., e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); *Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 4-5 (1st Cir.1994). Here, our task is simplified: the Purchase Agreement contains a provision directing the reader to New Hampshire law. Because a reasonable choice-of-law provision in a contract generally should be respected, *see* Restatement (Second) of the Conflict of Laws § 187 (1971); *see also Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,* 968 F.2d 1463, 1467 (1st Cir.1992) (applying New Hampshire choice-of-law principles); *Allied Adjustment Serv. v. Heney,* 125 N.H. 698, 484 A.2d 1189, 1190-91 (1948) (stating that the parties' selection of the law of a particular jurisdiction will be honored so long as "the contract bears any significant relationship to that jurisdiction"), we will from time to time consult New Hampshire law for guidance. Where New Hampshire law is recondite, we will turn to the types of materials that we believe the New Hampshire Supreme Court would look to in formulating new law. *See Moores v. Greenberg,* 834 F.2d 1105, 1107 (1st Cir.1987) (describing materials); *see also Kathios v. General Motors Corp.,* 862 F.2d 944, 949 (1st Cir.1988).

12    In this case, there is no overt indication that the parties intended to commit claims against appellant, *as an individual,* to an arbitral forum. After all, appellant signed the Purchase Agreement solely in his capacity as an agent for a disclosed principal-that is, as "Chairman" of Theta II-and not in his personal capacity; and it is settled beyond peradventure that a person signing a contract only in a corporate capacity, and unambiguously indicating that fact on the face of the contract documents, does not thereby become a party to the agreement. *See, e.g., New York Ass'n for Retarded Children, Inc. v. Keator,* 606 N.Y.S.2d 784, 785 (App.Div.1993) (finding corporation, but not individual, bound when president of corporation signed contract only on a line indicating his official capacity); *Central Ill. Pub. Serv. Corp. v. Molinarolo,* 223 Ill.App.3d 471, 165 Ill.Dec. 803, 807, 585 N.E.2d 199, 203 (1992) (holding company, but not individual, liable "[w]hen an agent signs a document and indicates next to his signature his corporation affiliation"); *Salzman Sign Co. v. Back,* 10 N.Y.2d 63, 217 N.Y.S.2d 55, 56-58, 176 N.E.2d 74, 76 (1961) (finding no individual liability where defendant signed only as president of corporation and did not otherwise explicitly indicate in the contract an intent to be bound personally); *cf. Dulik v. Amante,* 173 A.D.2d 674, 570 N.Y.S.2d 590, 591 (1991) (finding that a party, by signing the agreement twice, intended to bind both his corporation and himself).

To be sure, the law recognizes certain contract and agency principles under which nonsignatories sometimes can be obligated by, or benefit from, agreements signed by others, and these principles can apply to arbitration provisions. *See, e.g., In re Oil Spill by Amoco Cadiz,* 659 F.2d 789, 795-96 (7th Cir.1981); *Fisser v. International Bank,* 282 F.2d 231, 233-34 (2d Cir.1960) (collecting cases). Thus, appellant's failure to sign the Purchase Agreement individually does not in and of itself settle the somewhat different question of whether he can invoke the arbitration clause contained therein. Seizing on this possibility, appellant charts three routes by which he, as a nonsignatory, might achieve the sanctuary he desires. In the succeeding sections, we trace these routes and explain why we find them to be blind alleys.

### C. *Appellant's Agency Theory.*

13    Appellant's most heralded claim is that, as a disclosed agent of Theta II, he is entitled to enforce the arbitration provision included in his principal's agreement with the plaintiff. He buttresses this claim by citation to authority from several other courts of appeals. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,* 7 F.3d 1110, 1121 (3d Cir.1993); *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1360 (2d Cir.), *cert.* **\*357** *denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); *Arnold v. Arnold Corp.,* 920 F.2d 1269, 1282 (6th Cir.1990); *Letizia,* 802 F.2d at 1188. We think appellant's reading of these cases is overly sanguine and that his claim is insupportable for several reasons.

**1. *Comparing Apples to Oranges.*** To put appellant's theorem into focus, we first must clarify the animating principles that drive the cases on which the theorem rests. Doing so persuades us that appellant is comparing apples to oranges.

To be sure, there is a superficial similarity between the precedents on which appellant relies and the situation at hand. In each of the four cited cases, the court gave a nonsignatory the benefit of an arbitration clause signed by the corporate entity for which he or she worked. In three of these cases, however, the defendant was sued *qua* employee and the court specifically found that, as a matter of contract interpretation, the parties intended the arbitration provision to cover employees. *See Roby,* 996 F.2d at 1360 (observing that

"the parties fully intended to protect the individual Chairs to the extent they are charged with misconduct within the scope of the agreements"); *Arnold,* 920 F.2d at 1282 (explaining that "the language of the arbitration agreement indicates that the parties' basic intent was to provide a single arbitral forum to all disputes arising under the stock purchase agreement"); *Letizia,* 802 F.2d at 1188 (determining that the company "clearly indicated its intention to protect its employees" by means of the arbitration provision). The fourth case also rested largely on contract language. *See Pritzker,* 7 F.3d at 1114 (noting the breadth of language used in formulating the arbitration clause).

Here, however, as opposed to the cases marshalled by appellant, the arbitration clause fails to indicate the corporate signatory's intention to protect employees through arbitration, *see Letizia,* 802 F.2d at 1188, and the very nature of the Purchase Agreement, as contrasted to the agreements underlying the other cases, explains why, in this situation, one would naturally expect such protection to be absent.

For the most part, the cases hawked by appellant involve disputes growing out of service contracts between individuals and financial institutions. [6] *See Pritzker,* 7 F.3d at 1114 (involving handling of cash management account); *Roby,* 996 F.2d at 1357 (involving insurance underwriting); *Letizia,* 802 F.2d at 1186 (involving handling of securities account). The claims diverted to arbitration in those cases-and in other cases that appellant could have, but did not, rely upon, *see, e.g., Lee v. Chica,* 983 F.2d 883, 887 (8th Cir.1993); *Scher v. Bear Stearns & Co.,* 723 F.Supp. 211, 216 (S.D.N.Y.1989)-were, without exception, in the nature of professional malpractice. Thus, each related directly to the essence of the service contract that the consumer-plaintiff had signed. [7] The Purchase Agreement is at a considerable remove; it is primarily concerned with a transfer of assets. [8] The distinction is an important one. A person who enters into a service contract with a firm contemplates an ongoing relationship in which the firm's promises only can be fulfilled by future (unspecified) acts of its employees or agents stretching well into an uncertain future. A person who contracts to transfer assets to a company faces a much different prospect: a one-shot transaction in which the purchaser's obligations are specified and are, essentially, performed in full at the closing, or soon thereafter. So it is here. And because the Purchase Agreement cannot *\*358* easily be construed to refer to the operations of, or services rendered by, Theta II, that company's employees cannot

plausibly be included by implication within the ambit of either the agreement or its arbitration clause. [9]

[6] The solitary exception is *Arnold.* Yet, as we point out subsequently, *see infra* note 10, that case is distinguishable on other grounds and, in all events, does not possess great persuasive force.

[7] This is not to suggest that similarity of claims alone suffices to clear the decks for arbitration. As we have made pellucid, *see supra* p. 355, the basic prerequisite is the parties' agreement to arbitrate, or, put another way, the existence of an actual waiver of the right to litigate. But similarity of claims sometimes may help to clarify what the parties intended when they included an arbitration provision in an instrument.

[8] While one section of the Purchase Agreement describes the sellers' retention of a right to purchase products from Theta II at preferential prices and to distribute those products in New England, appellant has not argued that any of McCarthy's claims implicate this distribution provision.

[9] Although we do not decide the point, we note that even an implied reference likely would not suffice as a predicate for enforced arbitration. *See Salzman Sign,* 217 N.Y.S.2d at 56-58, 176 N.E.2d at 76 (requiring "direct and explicit evidence of actual intent" as a prerequisite to finding an obligation to arbitrate).

**2.** *The Scope of the Arbitration Clause.* Close textual analysis supports the conclusion that the Purchase Agreement's arbitration clause should be read more narrowly than the clauses in the cases upon which appellant relies. The Purchase Agreement provides that disputes "arising under" the agreement will be subject to arbitration. This language is considerably more confining than that employed in other contracts to which appellant alludes. [10] *See Pritzker,* 7 F.3d at 1114 (agreeing to arbitrate "all controversies which may arise between us, including but not limited to ... this or any other agreement between us, whether entered into prior, or subsequent to the date hereof"); *Roby,* 996 F.2d at 1361 (agreeing to arbitrate any "dispute, difference, question or claim *relating to* " the agreements for "all purposes of and *in connection with* " them) (emphasis in original); *Letizia,* 802 F.2d at 1186 (agreeing to arbitrate disputes "arising out of or relating to" plaintiff's securities account).

[10] Once again, the sole exception is *Arnold,* a case in which the arbitration clause is virtually identical to the provision contained in the Purchase Agreement. *See Arnold,* 920 F.2d at 1271. But in *Arnold,* unlike in this

case, the stated clause comprised the only arbitration provision at issue, thus making it much easier to read the language broadly. *See infra* pp. 358-59 (discussing interpretive significance of dual agreements) and cases cited. At any rate, to the extent that *Arnold* can be read to support a result at odds with the result that we reach today, we respectfully decline to follow it.

The circumscribed nature of the Purchase Agreement's arbitration provision stands out in bold relief when one compares it with the arbitration provision in the Confidentiality Agreement. Whereas the former directs arbitration only of "[d]isputes arising *under* [the agreement]" (emphasis supplied), the latter directs arbitration of "*[a]ny* controversy or claim *arising out of or relating to* [the agreement]" (emphasis supplied). Although the Purchase Agreement's arbitration clause might arguably be read more broadly if it were the only provision extant, *see, e.g., Arnold,* 920 F.2d at 1271; *Martin Marietta Alum., Inc. v. General Elec. Co.,* 586 F.2d 143, 145, 147-48 (9th Cir.1978), the use of significantly different language in two clauses, sculpted by the same parties during the same negotiations as part of the same overall transaction, strongly suggests that the signatories intended the arbitration provisions to be of different scope. *See Appalachian Ins. Co. v. McDonnell Douglas Corp.,* 214 Cal.App.3d 1, 262 Cal.Rptr. 716, 725 (Ct.App.1989) (holding that "[t]o ignore the differences in language used in the two agreements would violate a fundamental rule of contract interpretation, that is, the words of a contract, if clear, must govern its interpretation"); *see also Triple-A Baseball Club Assoc. v. Northeastern Baseball, Inc.,* 832 F.2d 214, 221-22 (1st Cir.1987) (adopting narrow construction where a contract did not include relatively broad language found in the parties' earlier drafts), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *C & M Realty Trust v. Wiedenkeller,* 133 N.H. 470, 578 A.2d 354, 357 (1990) (declaring that a court's role is to interpret contracts in accordance with the parties' intent discernible at the time of agreement, as measured by objective criteria).

The intent to limit arbitral rights to signatories is also made manifest by the inclusion of an integration clause in the Purchase Agreement. The integration clause states that the written agreement "represents the entire understanding of the parties" and "supersedes all other understandings, arrangements and negotiations." We, and other courts, routinely have declined to read unwritten terms into agreements containing similar declarations. *See, e.g., Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 608 (7th Cir.) (explaining that an integration clause is an "indication of the

parties' desire to limit a *\*359* free-ranging judicial discretion to interpolate terms"), *cert. denied,* 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); *Northern Heel Corp. v. Compo Indus., Inc.,* 851 F.2d 456, 466 (1st Cir.1988) (similar). Applying that time-honored principle here, it would be wrong to widen the arbitration clause to include the signatories' agents and employees.

In short, the Purchase Agreement itself is the best indicator of the parties' intent. We must honor that intent-an intent which, for our purposes, translates into a direction to read the arbitration clause set forth in the Purchase Agreement straightforwardly rather than expansively. Operating in this mode, it is difficult to see how a lawsuit between the seller and a nonsignatory who is not a successor in interest to the buyer's rights can be said to "aris[e] under" the Purchase Agreement.[11] Thus, appellant's effort to compel plaintiff to arbitrate cannot succeed, for, "as a matter of contract, no party can be forced to arbitrate unless that party has entered an agreement to do so." *Painewebber,* 921 F.2d at 511.

[11]    By its terms, the Purchase Agreement "shall be binding upon and inure to the benefit of the [parties'] successors and assigns...." There is no comparable provision anent the parties' agents, servants, or employees. We think the omission is telling.

**3. *The Individual Capacity/Official Capacity Schism.*** For present purposes, we regard the distinction between Azure, in his personal capacity, and Azure, in his representative capacity, as possessing decretory significance.[12] Not coincidentally, in each of the four cases relied on by appellant the court confronted a situation in which the claim asserted related to actions undertaken by a corporate representative in his or her official, rather than personal, capacity; and each of the courts based its holding on this circumstance. *See Roby,* 996 F.2d at 1360 (concluding that the "complaints against the individual Chairs are completely dependent on the complaints against the [principals] ... [and] arise[ ] out of the same misconduct charged against the [principals]"); *Arnold,* 920 F.2d at 1282 (similar); *see also Pritzker,* 7 F.3d at 1114 (reciting facts demonstrating that the nonsignatory was being sued for acts within the scope of her role as an agent of the signatory corporation); *Letizia,* 802 F.2d at 1188 (finding that all the individual defendants' allegedly wrongful acts related to their employment responsibilities).

[12]    We use the terms "individual capacity" and "personal capacity" interchangeably, and we use the terms "official capacity," "representative capacity," and "corporate capacity" in the same manner.

Here, in contradistinction, plaintiff asserts claims against Azure in his personal, rather than his corporate, capacity. *See supra* note 4. This is no mere semantic quibble. An official capacity suit is, in essence, "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (citations omitted). Consequently, such a suit "is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166, 105 S.Ct. at 3105. By contrast, personal capacity suits proceed against the individual, not against the entity with which the individual is affiliated.

In the corporate context, personal capacity actions can take several forms, including by way of illustration claims alleging *ultra vires* conduct, *see, e.g., Expomotion, Ltd. v. Heidepriem-Santandrea Inc.,* 101 Misc.2d 593, 421 N.Y.S.2d 520, 521 (Civ.Ct.1979); tort suits in which a corporate officer or agent, though operating within the scope of corporate authorization, "through his or her own fault injures another to whom he or she owes a personal duty," 3A William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1135, at 66-67 (1986 ed. & Supp.1992); [13] and, of more immediate applicability, suits alleging that a person affiliated with a corporation created or manipulated it as part of a larger (fraudulent) scheme, *see, e.g., Dietel v. Day,* 16 Ariz.App. 206, 492 P.2d 455, 457-58 (1972) (explaining that "[i]f a corporation was formed or is employed for ***360** fraudulent purposes," personal liability may be imposed).

[13]   In this type of situation, the "officer or agent is personally liable to the injured third party regardless of whether the act resulting in injury is committed by or for the corporation." 3A Fletcher, *supra,* § 1135, at 67.

It is, therefore, apparent that drawing a distinction between individual capacity and representative capacity claims is to draw a distinction that portends a meaningful legal difference. Indeed, the distinction between claims aimed at a defendant in his individual as opposed to representative capacity can be found across the law. *See, e.g., Stafford v. Briggs,* 444 U.S. 527, 544, 100 S.Ct. 774, 784-85, 63 L.Ed.2d 1 (1980) (distinguishing between individual and official capacity claims for purposes of venue determination); *Ex Parte Young,* 209 U.S. 123, 159, 28 S.Ct. 441, 453-54, 52 L.Ed. 714 (1908) (distinguishing between individual and official capacity acts for Eleventh Amendment purposes); *Northeast Fed. Credit Union v. Neves,* 837 F.2d 531, 534 (1st Cir.1988) (distinguishing between individual and official capacity claims for jurisdictional purposes); *Pelkoffer v.*

*Deer,* 144 B.R. 282, 285-86 (W.D.Pa.1992) (applying same distinction in bankruptcy context); *see also Graham,* 473 U.S. at 165, 105 S.Ct. at 3104-05 (indicating differences between individual and official capacity claims for purposes of suit under 42 U.S.C. § 1983); *Estabrook v. Wetmore,* 129 N.H. 520, 529 A.2d 956, 958 (1987) (applying doctrine that acts of a corporate employee performed in his corporate capacity generally do not form the basis for personal jurisdiction over him in his individual capacity). The ubiquity of the distinction is a reflection of the reality that individuals in our complex society frequently act on behalf of other parties-a reality that often makes it unfair to credit or blame the actor, individually, for such acts. At the same time, the law strikes a wise balance by refusing automatically to saddle a principal with total responsibility for a representative's conduct, come what may, and by declining mechanically to limit an injured party's recourse to the principal alone, regardless of the circumstances.

Appellant suggests that policy considerations counsel against giving credence to the distinction between a corporate officer's personal and representative capacities. He asserts that, by honoring the distinction, we will enable wily plaintiffs to circumvent arbitration provisions to which they previously had agreed. To prevent such end runs, appellant says, agents and employees must be allowed to stand in the principal's stead for the purpose of invoking arbitration clauses. *See Arnold,* 920 F.2d at 1281. We believe that policy considerations, placed in proper perspective, tilt in the opposite direction.

For one thing, to the extent that appellant's professed fear of artful pleading is genuine, the best preventative is to act *before,* rather than *after,* the fact; to be blunt, judicial juggling is a far less effective anodyne than skillful drafting of contract documents in the first instance. A corporation that wishes to bring its agents and employees into the arbitral tent can do so by writing contracts in general, and arbitration clauses in particular, in ways that will specify the desired result. *See, e.g., Roby,* 996 F.2d at 1361.

For another thing, whether a claim properly lies against a party in his personal capacity or in his official capacity is ultimately a function of the facts, not of pleading techniques alone. Mechanisms exist for dealing with groundless, overstated, or elliptical claims. *See, e.g.,* Fed.R.Civ.P. 11; 28 U.S.C. § 1927 (1988) (granting courts the power to charge "excess costs, expenses, and attorneys' fees reasonably incurred" due to "unreasonabl [e] and vexatious[ ]" conduct); *Cruz v. Savage,* 896 F.2d 626, 631-32 (1st Cir.1990); *see*

also *Chambers v. NASCO, Inc.,* 501 U.S. 32, 41-55, 111 S.Ct. 2123, 2131-38, 115 L.Ed.2d 27 (1991) (discussing federal court's inherent power to impose sanctions for abusive litigation practices); *Foster v. Mydas Assocs., Inc.,* 943 F.2d 139, 141-45 (1st Cir.1991) (discussing range of sanctions available for prosecution of frivolous claims).

Third, we are doubtful that the incentive to plead deceitfully exists at all. Arbitration is almost invariably a creature of contract, and an agent is not ordinarily liable for his principal's breach of contract. *See, e.g., Mastropieri v. Solmar Constr. Co.,* 159 A.D.2d 698, 553 N.Y.S.2d 187, 188 (1990) ("It is well settled that when an agent acts on behalf of a disclosed principal, the agent will not be personally liable for a breach of the contract, *\*361* unless there is clear and explicit evidence of the agent's intention to be bound."); *see also* Restatement (Second) of Agency § 328 (1958) ("An agent, by making a contract only on behalf of a competent disclosed ... principal whom he has power so to bind, does not thereby become liable for its nonperformance."). Thus, manipulating the reality of events in order to bring suit against the agent holds only marginal promise of financial reward.

**14**   Perhaps most important from a policy standpoint, adopting appellant's proposal would introduce a troubling asymmetry into the law. It is common ground that "[s]igning an arbitration agreement as agent for a disclosed principal is not sufficient to bind the agent to arbitrate claims against him personally." *Flink v. Carlson,* 856 F.2d 44, 46 (8th Cir.1988); [14] *accord Interocean Ship. Co. v. Nat'l Ship. & Trading Corp.,* 523 F.2d 527, 538 (2d Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *see also* Restatement (Second) of Agency § 320. In appellant's scenario, then, the agent, though he could not be compelled to arbitrate, nonetheless could compel the claimant to submit to arbitration. In other words, an agent for a disclosed principal would enjoy the benefits of the principal's arbitral agreement, but would shoulder none of the corresponding burdens. He would have found a way, contrary to folklore, to run with the hare and hunt with the hounds. In our view, judges should think long and hard before endorsing a rule that will allow a party to use the courts to vindicate his rights while at the same time foreclosing his adversary from comparable access.

14   We reject Azure's contention that the Eighth Circuit significantly narrowed *Flink*'s rule in *Lee,* 983 F.2d at 887. As we read these cases, an agent's signature on behalf of a disclosed principal "is not *sufficient* " to bind the agent to arbitrate claims against him personally. *Flink,* 856 F.2d at 46 (emphasis supplied). *Lee* left that legal rule fully intact. *Lee,* unlike *Frank,*

merely involved the by-now routine investment service contract context, a situation where *additional* factors, including "the plain language of the arbitration clause," showed that claims against the agent appropriately were subject to arbitration. *Lee,* 983 F.2d at 887.

Here, for instance, appellant insists that the law empowers him to shunt McCarthy's claims into an arbitral forum, despite the fact that, if the shoe were on the other foot, McCarthy could not force appellant to arbitrate those claims-or any other claims, for that matter. Though the law is not always perfectly proportional, this lack of mutuality of obligation is disturbing, particularly as it arises in a contractual context. *See generally Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 7 (1st Cir.1994) (discussing rule that mutuality of obligation is a prerequisite to a binding bilateral contract; citing numerous cases and other authorities); *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310, 1312 (1979).

**4.** ***The Nature of the Claims.*** It is also worth noting, for the sake of completeness, that the bulk of plaintiff's claims are litigable in any event simply because they fall outside the ambit of the Purchase Agreement's closely tailored arbitration clause. For example, the claims for breach of contract and wrongful discharge concern plaintiff's employment rights. Those rights are not mentioned at all in the Purchase Agreement. To the contrary, they come within the purview of the Employment Letter-a document that conspicuously omits any arbitration provision. Similarly, many aspects of plaintiff's claims of fraud, misrepresentation, emotional distress, unfair trade practices, and racketeering relate to his employment rights, and, to that extent, also do not implicate the Purchase Agreement's arbitration provision. And while the remaining claims touch upon the Purchase Agreement, they do not uniformly "aris [e] under" it.

No useful purpose would be served by reciting book and verse. It suffices to say that, even if Azure were a party to the contract that contains the operative arbitration provision, he would not be entitled as of right to an order staying litigation of all-or even most of-McCarthy's claims. *See* 9 U.S.C. § 3. [15]

15   Of course, the district court in its discretion could stay litigation of nonarbitrable claims pending the outcome of an arbitration proceeding. *See Moses H. Cone,* 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23; *see also Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 856 (2d Cir.1987) (recommending stay of nonarbitrable claim when the arbitrable claim predominates and the nonarbitrable claim is of questionable merit).

*362 **D. Appellant's Third-Party Beneficiary Theory.**

15    Appellant next posits that, as a third-party beneficiary of the Purchase Agreement's arbitration clause, he can compel plaintiff to arbitrate. This claim also fails.

16    17    As is generally the case in matters of contract interpretation, "[t]he crux in third-party beneficiary analysis ... is the intent of the parties." *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden,* 795 F.2d 1111, 1117 (1st Cir.1986). Because third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories, *see, e.g., Arlington Trust Co. v. Estate of Wood,* 123 N.H. 765, 465 A.2d 917, 918 (1993), a person aspiring to such status must show with special clarity that the contracting parties intended to confer a benefit on him. *See Mowbray,* 795 F.2d at 1117; *Arlington Trust,* 465 A.2d at 918; *Tamposi Assocs. v. Star Mkt. Co.,* 119 N.H. 630, 406 A.2d 132, 134 (1979); *see generally* 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 10.3, at 22-23 (1990); 4 Arthur Corbin, *Contracts* § 776 (1951).

In this instance, we are unable to discern any indication in the Purchase Agreement that the parties meant to make their respective agents or employees third-party beneficiaries. Neither Azure nor any other employee of Theta II is mentioned explicitly in the Purchase Agreement; there are no meaningful categorical references; the critical provision in the contract, *see supra* note 11, omits any mention of agents and employees; and we can find no principled basis for including Azure by necessary implication (especially since the contract contains an integration clause). These facts strongly militate against conferring third-party beneficiary status upon a corporate officer with respect to arbitration rights. *See Shaffer v. Stratton Oakmont, Inc.,* 756 F.Supp. 365, 369 (N.D.Ill.1991) (refusing to find a third-party beneficiary relationship generating an obligation to arbitrate in analogous circumstances); *Lester v. Basner,* 676 F.Supp. 481, 484-85 (S.D.N.Y.1987) (refusing to find an obligation to arbitrate under a third-party beneficiary theory when the contract itself "is silent as to whether [its] terms" apply to the purported third-party beneficiaries).

The record is equally devoid of anything that might intimate a course of dealing between McCarthy, Theta II, and Azure from which an intent to create third-party beneficiaries plausibly could be inferred. *See Mowbray,* 795 F.2d at 1117. And, finally, the Purchase Agreement neither calls for any performance by the promisor (McCarthy) that will satisfy some obligation owed by the promisee (Theta II) to the putative third party, nor is it "so expressed as to give the promisor reason to know that a benefit to a third party is contemplated by the promisee as one of the motivating causes of his making the contract." *Tamposi,* 406 A.2d at 134. [16]

[16]    These requirements are not satisfied merely because a third party will benefit from performance of the contract. *See Arlington Trust,* 465 A.2d at 918-19.

To say more would be to polish a star. For the reasons indicated, appellant's thrust for relief on the ground that he is a third-party beneficiary of Theta II's agreement to arbitrate falls short. *See Mowbray,* 795 F.2d at 1117; *Shaffer,* 756 F.Supp. at 369; *Lester,* 676 F.Supp. at 485; *Tamposi,* 406 A.2d at 134.

**E. Appellant's Alter Ego Theory.**

McCarthy's complaint alleges, at one point, that Azure is the alter ego of Theta II. The last shot in appellant's sling derives from this allegation: he asseverates that he should be accorded the right to demand arbitration based on the asserted equivalence between him and his corporate principal. This shot exhibits a basic misunderstanding of the weapon appellant has selected. Not surprisingly, it misses the mark.

18    The alter ego doctrine is equitable in nature. *See, e.g., Harrell v. DCS Equip. Leasing Corp.,* 951 F.2d 1453, 1458 (5th Cir.1992); *St. Paul Fire & Marine Ins. Comp. v. Pepsico, Inc.,* 884 F.2d 688, 697 (2d Cir.1989); 1 Fletcher, *supra,* § 41.25. As such, the *363 doctrine can be invoked "only where equity requires the action to assist a third party." 1 Fletcher, *supra,* at § 41.10; *see also In re Rehabilitation of Centaur Ins. Co.,* 238 Ill.App.3d 292, 179 Ill.Dec. 459, 464, 606 N.E.2d 291, 296 (1992) (barring a subsidiary from piercing its own corporate veil in order to reach its parent because "the equitable remedy lies with third parties"), *aff'd,* 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015 (1994); *Village Press, Inc. v. Stephen Edward Comp., Inc.,* 120 N.H. 469, 416 A.2d 1373, 1375 (1980) (holding that, to employ the alter ego doctrine, "the plaintiff must establish that the corporate entity was used to promote an injustice or fraud").

The case law that appellant touts earns him no indulgence. Without exception, these cases involve instances in which an allegedly aggrieved party has sought to compel a person or entity thought to be a corporate signatory's alter ego to abide by an arbitration clause. Typical of the genre is *Fisser,* a case holding that "if the parent is bound to the contract, then

its marionette [the alleged alter ego] is bound to submit to arbitration." 282 F.2d at 234-35.

**19**    We are confronted with a much different situation. In this case, the supposed wrongdoer seeks to invoke the alter ego doctrine in order to hide behind the corporate entity, that is, to avail himself of the corporation's right to repair to an arbitral forum and thereby avoid a jury trial. As appellant is not even arguably an innocent third party disadvantaged by someone else's blurring of the line between a corporation and the person who controls it, but, rather, is himself the one who is claimed to have obscured the line, he cannot be permitted to use the alter ego designation to his own behoof. [17]

[17]    We note that, although plaintiff has alleged that appellant is the alter ego of Theta II, appellant has never admitted the truth of the allegation. While not necessary to our decision, we are impelled to remark the obvious: it would be strange if an equitable doctrine could be construed to allow a party, on one hand, to resist the characterization that he is a corporation's alter ego, and, on the second hand, to allow him simultaneously to use that characterization as a device to sidetrack the characterizer's suit.

## III. CONCLUSION

We need go no further. Although the Purchase Agreement does contain an arbitration clause, it is narrow in scope and does not extend the right to compel arbitration to agents or employees of the corporate signatory. By like token, the Purchase Agreement does not make manifest an intention to confer third-party beneficiary status on any such agents or employees. And, finally, appellant cannot rely on plaintiff's alter ego claim to draw an equivalence between himself and his corporate principal for his own benefit. In sum, there is no contractual or other legal lever by which appellant can force plaintiff to arbitrate the "individual capacity" claims that are the subject of the underlying suit. Because this is so, the district court appropriately refused to grant the relief that appellant requested. [18]

[18]    On remand, the district court, by appropriate order, should conform plaintiff's complaint to the representations made in this court, *see supra* note 4, dismissing any claims asserted against Azure in a representative capacity and striking all related references from the complaint.

*The order appealed from is affirmed and the case is remanded to the district court for further proceedings. The motions pending in this court are denied without prejudice to their renewal below. Costs in favor of appellee.*

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

 © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

DOCSTOR: 2191401\1

1961 A.M.C. 306

282 F.2d 231
United States Court of Appeals Second Circuit.

Carl FISSER and Martha Fisser, co-partners doing
business under the firm name and style of Fisser &
v.
Doornum, Libelants-Appellants, v.
INTERNATIONAL BANK, Respondent-Appellee.

No. 274, Docket 25914.    Argued
April 5, 1960.    Decided Aug. 1, 1960.

German coal importers brought libel against the International Bank charging breach of a maritime contract and filed a petition to enforce arbitration pursuant to the Federal Arbitration Act in accordance with contract of affreightment, which was signed solely by importers and Liberian corporation, on ground that the Liberian corporation was the alter ego of the International Bank. The United States District Court for the Southern District of New York, in admiralty, Edmund L. Palmieri, J., rendered a decree dismissing the libel and the petition, and the importers appealed. The Court of Appeals, Hincks, Circuit Judge, held that the District Court erred in ruling that International Bank was not bound by the arbitration provisions merely because the International Bank had not signed the contract, and that amenability of International Bank to arbitration could be solved only by determining whether Liberian corporation entered into the contract as the alter ego of the International Bank, and that evidence was insufficient to establish that the Liberian corporation acted as the alter ego of the International Bank.

Judgment affirmed.

See also 164 F.Supp. 826.

West Headnotes (12)

1    **Alternative Dispute Resolution** 🗝 Persons
affected or bound

Under Federal Arbitration Act a written provision in any maritime transaction to settle by arbitration a controversy thereafter arising out of such transaction is the sine qua non of enforceable arbitration agreement, but it does not follow that under the Act an obligation to arbitrate attaches only to one who has personally signed written arbitration provision, since the Act contains no built-in statute of frauds provision but merely

requires that arbitration provision itself be in writing. 9 U.S.C.A. §§ 1-14, 2, 4.

35 Cases that cite this headnote

2    **Alternative Dispute Resolution** 🗝 Persons
affected or bound

Ordinary contract principles determine who is bound under Federal Arbitration Act by written provisions in contract for arbitration, and parties can become contractually bound absent their signatures. 9 U.S.C.A. §§ 1-14, 2, 4.

57 Cases that cite this headnote

3    **Assignments** 🗝 On contract assigned

Assignees of written contracts containing arbitration provisions may become parties to such provisions so as to be bound under Federal Arbitration Act. 9 U.S.C.A. §§ 1-14, 2, 4.

17 Cases that cite this headnote

4    **Alternative Dispute Resolution** 🗝 Formal
Requisites

Optionee, by exercising option, may create a mutually binding contract to arbitrate under Federal Arbitration Act. 9 U.S.C.A. §§ 1-14, 2, 4.

5    **Alternative Dispute Resolution** 🗝 Persons
affected or bound
**Alternative Dispute Resolution** 🗝 Mode and
course of proceedings in general
**Novation** 🗝 Operation and effect

When a party is added to a contract by novation, he can enforce arbitration provision therein, even though he is not a signatory to the contract,and enforcement can be had against another nonsignatory who is merely the instrumentality of a party bound by the arbitration clause. 9 U.S.C.A. §§ 1-14, 2, 4.

29 Cases that cite this headnote

**6**  **Corporations and Business Organizations** 🔑 Rights of corporation on contracts of incorporators and promoters

A corporate beneficiary may enforce an arbitration provision which was executed when corporate beneficiary was still inchoate. 9 U.S.C.A. §§ 1-14, 2, 4.

2 Cases that cite this headnote

**7**  **Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

**Specific Performance** 🔑 Contracts for submission to arbitration

Even if damages are sole issue for arbitration, that issue is within clause of general arbitration, and under Federal Arbitration Act the clause will be specifically enforced against all those bound by it. 9 U.S.C.A. §§ 1-14, 2, 4.

1 Cases that cite this headnote

**8**  **Corporations and Business Organizations** 🔑 Contracts in general

Consequence of applying "alter ego doctrine" is that corporation and those who have controlled it without regard to its separate entity are treated as but one entity, and, at least in area of contracts, acts of one are the acts of all.

25 Cases that cite this headnote

**9**  **Corporations and Business Organizations** 🔑 Contracts in general

If parent corporation is bound to its marionette's contract containing arbitration provision, then, like its marionette, the corporation is bound to submit to arbitration. 9 U.S.C.A. §§ 1-14, 2, 4.

4 Cases that cite this headnote

**10**  **Alternative Dispute Resolution** 🔑 Persons affected or bound

Where German coal importers, who entered into contract of affreightment with Liberian corporation, contended that Liberian corporation

was the alter ego of the International Bank and that International Bank was required to submit to arbitration under arbitration provision of the contract, District Court erred in ruling that International Bank was not bound by arbitration provision merely because International Bank did not sign the contract, and International Bank's amenability to arbitration could be solved only by determining whether Liberian corporation entered into contract as alter ego of International Bank. 9 U.S.C.A. §§ 1-14, 2, 4.

20 Cases that cite this headnote

**11**  **Corporations and Business Organizations** 🔑 Combinations, pools, and associations

In order to justify application of "instrumentality rule", making parent corporation responsible for acts of subsidiary corporation, three elements must be proved, in absence of express agency, estoppel, or direct tort, namely control of subsidiary by parent, that control was used by parent to commit fraud or worse, to perpetrate violation of statutory or other positive legal duty, or a dishonest and unjust act in contravention of legal rights, and that control and breach of duty proximately caused injury or unjust loss complained of.

54 Cases that cite this headnote

**12**  **Corporations and Business Organizations** 🔑 Separate corporations

On petition by German coal importers to enforce against the International Bank under the Federal Arbitration Act the arbitration provisions of contract of affreightment, which was signed solely by importers and a Liberian corporation, on ground that the Liberian corporation was the alter ego of the International Bank, evidence was insufficient to establish that the International Bank was the alter ego of the Liberian corporation. 9 U.S.C.A. §§ 1-14, 2, 4.

9 Cases that cite this headnote

**Attorneys and Law Firms**

 *232 George L. Varian, of Crowell, Rouse & Varian, New York, City, for libelants-appellants.

Emanuel Becker, of Becker & Martin, New York City, for respondent-appellee.

Before LUMBARD, Chief Judge, and HINCKS and FRIENDLY, Circuit Judges.

**Opinion**

HINCKS, Circuit Judge.

The immediate issue for decision is whether the respondent-appellee, International Bank, may be directed to submit to arbitration the determination and *233 measure of any liability it may owe to libelants-appellants, [1] German coal importers, [2] by reason of the conceded breach of a written contract of affreightment signed solely by the libelants and Allied Transportation Corporation, a Liberian corporation which libelants charge was the alter ego of the respondent. The court below answered this question in the negative. It reasoned that whatever liability might ultimately attach to the respondent growing out of the contract default of Allied, its alleged instrumentality or adjunct, the respondent could not be compelled to arbitrate the issue of its liability or the measure thereof because it had not signed the formal charter-party and hence as to it there was no 'written provision' for arbitration within the meaning of the Federal Arbitration Act of 1952, 9 U.S.C. §§ 1-14. Accordingly, the court dismissed the libel with its accompanying petition for the enforcement of arbitration.

 1   2   3   4   5   6   It is true that under the Act, a 'written provision in any maritime transaction * * * to settle by arbitration a controversy thereafter arising out of such * * * transaction' is the sine qua non of an enforceable arbitration agreement. 9 U.S.C. §§ 2, 4. It does not follow, however, that under the Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision. [3] For the Act contains no built-in Statute of Frauds provision [4] but merely requires that the arbitration provision itself be in writing. Ordinary contract principles determine who is bound by such written provisions [5] and of course parties can become contractually bound absent their signatures. It is not surprising then to find a long series of decisions which recognize that the variety of ways in which a party may

become bound by a written arbitration provision is limited only by generally operative principles of contract law. [6]

 *234 7   The charter-party here under consideration clearly contains a written provision in which it is agreed that a controversy such as that now presented shall be submitted to arbitration, [7] and the sole issue for determination is whether the respondent, as well as the formal signatories to the charter-party, is bound by the arbitration provision. Libelants argue that if in fact Allied was the respondent's mere alter ego, making this a proper case to pierce the corporate veil of Allied and to hold those controlling it as one with it, then consistency and the alter ego doctrine itself require that the respondent be obligated not only to respond in damages for Allied's breach of contract but to specifically perform Allied's other contractual obligations, including that of arbitration.

 8   We agree. While we discover no authority on this precise point, it is clear that the consequence of applying the alter ego doctrine is that the corporation and those who have controlled it without regard to its separate entity are treated as but one entity, and at least in the area of contracts, the acts of one are the acts of all. Weisser v. Mursam Shoe Corporation, supra; Shamrock Oil and Gas Co. v. Ethridge, D.C.Colo., 159 F.Supp. 693; Chilean Nitrate Sales Corp. v. The Nortuna, supra; Powell, Parent and Subsidiary Corporations, Chpt. I. There is no reasonable basis for distinguishing between the parent's obligation to respond in damages for its instrumentality's breach of contract and its obligation to arbitrate the measure of those damages. In neither instance does the parent consent to a contractual obligation; to the contrary it carefully avoids any such agreement, express or implied in fact. Farm Security Administration, Department of Agriculture v. Herren, 8 Cir., 165 F.2d 554.

 9   10   We have heretofore held that the obligation to respond in damages arises from a contract to which the alter ego theory binds that parent which as 'puppeteer' has 'directed his marionnette' to sign. Weisser v. Mursam Shoe Corporation, supra. We hold now that if the parent is bound to the contract *235 then like its marionette it is bound to submit to arbitration. [8] It follows that the judge erred in ruling that the respondent was not bound by the arbitration clause merely because it had not signed the charter. The respondent's amenability to arbitration could be solved only by determining whether Allied in entering into the charter did so as the respondent's alter ego. [9] The judge below thought it unnecessary to deal with that issue and so did not attempt to make comprehensive findings of the facts upon which it

depends. We must, therefore, turn to the evidence and make our own findings.

We find the facts to have been as follows. On October 24, 1955 Mr. Lawn, who stated he represented a financial group, requested Phs. van Ommeren Shipping (U.S.A.), Inc., a firm of maritime brokers, to negotiate for ship charters and maritime contracts of affreightment. On that occasion and at later meetings on October 27 and 31 Lawn received general information about the incidents of such business from Mr. Solleveld and Mr. Vincent, the president and vice-president, respectively, of van Ommeren. At the latter meeting van Ommeren's representatives insisted that they could proceed no further with such business until authorized by a principal with a satisfactory credit rating. Lawn disclosed the respondent as principal, stating that it would operate through a Liberian company. On November 3 Lawn presented as evidence of his authority a letter dated November 2 from the respondent signed by Vreeland, its president. The letter stated, in part:

'We have in principle accepted a proposal to finance and conduct a shipping business which includes time chartering two Liberty dry cargo type ships to carry cargo generally between Mexico, the United States and certain foreign countries.

'The business would be operated through a corporation to be formed by us and to which we would supply the financial resources.

'We advise you of the foregoing so that the initiation of contracts may be expedited pending prompt formalization of the necessary corporate and financial arrangements. * * *'

The letter also referred van Ommeren to respondent's correspondent banks and listed respondent's officers and directors and their business connections. Prior thereto the respondent had been engaged in the business of financing ventures but never in operating ventures.

Thereafter, van Ommeren canvassed the market to discover available ships and cargoes. It secured an offer on two ships and so advised respondent by letter dated November 9 in which it requested authorization to negotiate and finalize the charters. No response was forthcoming until November 16 when Vreeland accompanied by Lawn and a Mr. Simonson discussed the project thoroughly with the van Ommeren representatives who told him that $100,000 to $150,000 would be necessary to start the venture. Vreeland gave van Ommeren authority to bid for charters on the two vessels and

to continue negotiations on an available coal contract which van Ommeren had discovered. Also, Vreeland concededly told van Ommeren that the respondent would neither appear on nor guarantee the coal contract; that the contract would be performed by a Liberian corporation to be created for that purpose.

At this point, a conflict of testimony developed. Solleveld and Vincent testified *236 that Vreeland's explanation to them for operating through a foreign subsidiary was to avoid the payment of United States income taxes; this explanation they accepted since such was common procedure for shipping ventures. These van Ommeren officers also testified that Vreeland assured them the respondent would furnish Allied with all necessary financial resources and that as responsible principal it would stand behind the performance of the operating company which it had nominated. There was, however, no evidence that these representations to van Ommeren were passed along to the libelants. And that such representations had been made was denied in Vreeland's testimony. He testified that the respondent's sole interest in the maritime venture, either expressed or otherwise, was the making of a secured loan to Allied. In his testimony he characterized as 'unfortunate' his language in the November 2 letter stating that respondent was 'prepared to conduct a shipping business.'

Whatever representations were in fact made to van Ommeren that firm successfully negotiated by November 28 a three-year coal contract with the libelants which was to commence April 1, 1957. In the course of these negotiations van Ommeren informed libelants that it was acting on behalf of Allied, a company 'nominated and controlled by International Bank who will not appear in Charter Party'; that the respondent had numerous companies available for a variety of purposes. The libelants informed van Ommeren that they had been unable to obtain a financial report on Allied and therefore requested a more detailed report on the respondent. In response van Ommeren forwarded a list of the respondent's officers and directors and their business connections. Neither van Ommeren nor the respondent ever made additional representations to the libelants relative to the relationship between Allied and the respondent.

At a conference on November 28, in response to Vincent's request for formal authorization to confirm the coal contract, Vreeland orally replied: 'I give you that authority.' (Now on appeal it is sharply disputed whether he gave this authority on behalf of respondent, as its president, or on behalf of Allied, as its president.) On that same day van Ommeren confirmed

the contract with the libelants and simultaneously sent a letter to the respondent, attention Vreeland, in part as follows:

'We have pleasure in confirming herewith the fixture, made with your authority on behalf of Allied * * * which Corporation is understood to be controlled by you, as Owners and/or Charter Owners and/or Disponent Owners, with * * *.'

Vreeland acknowledged this letter in a letter of his own which was both written on respondent's letterhead and signed by Vreeland, as its president. He therein informed van Ommeren that a Mr. Becker had been retained by Allied to supervise its shipping activities. The letter stated, in part:

'From time to time Mr. Becker will be in touch with you regarding the operations of Allied Transportation Corporation which will be under your management and we want you to know that he is authorized to discuss with you all and any matters pertaining to these operations. We also authorize you to turn over to Mr. Becker, upon his request, any reports, contracts or other documents which concern such operations.'

On December 21, the contract was formally approved by Allied's directors and on December 28, Vreeland signed the formal contract in the name of Allied after it had been carefully scrutinized by the respondent's attorneys. It was subsequently signed by the libelants. Allied completely breached the contract: it took no steps by way of performance. Indeed, it was wholly without financial ability to perform, never having had capital in excess of the $500 paid by Simonson for one half of the capital stock, as will presently appear.

*237* The relationship between the respondent, Allied, Simonson and Lawn was in fact as follows. The latter two men first became associated with the respondent in connection with the shipping venture. It was agreed that they were to act as Allied's managers in developing cargo contracts. Vreeland testified that the respondent agreed only to finance Allied through a secured loan but Lawn testified that at some time prior to November 16 it was agreed that respondent would own 50% Of Allied's stock and that the remaining 50% Would belong to Simonson but would be held by respondent as collateral until the operation resulted in a profit sufficient to repay $100,000 of the $150,000 loan which respondent agreed to advance Allied.

Meanwhile, Allied had been organized by one of respondent's subsidiaries on November 18. At that time the organization dummies executed proxies, two of which ran to Vreeland and one to Simonson who was not connected with the

respondent. The subscriptions of the three dummies to one share each were assigned to respondent but no certificates of stock were then or thereafter ever issued. At the first stockholders' meeting on December 21, Vreeland, Simonson and Meyer, who was respondent's treasurer, were elected directors together with a lawyer, Wasson, who had previously represented certain of respondent's subsidiaries. These four men were also elected president, vice-president, treasurer and secretary, respectively. At the first directors' meeting it was voted that checks signed by the president or treasurer (who held corresponding offices in the respondent) must also be signed by Simonson, vice-president, or Lawn, agent (neither of who was an officer or employee of the respondent). At the trial, none of these mem could say who had paid Allied's organization fees and the cost of such items as its minute book and stock ledgers.

On December 28, Allied, Simonson and respondent [10] entered into a written agreement defining their relations. Under this agreement, Simonson agreed to purchase the 500 authorized shares of Allied's common stock at $1 per share. These shares were to be issued to respondent, however, and it was to have full voting power until such time as Allied repaid respondent's $100,000 loan. Allied agreed to repay the loan not later than February 1, 1957 and respondent on its part agreed to purchase or secure a purchaser for $50,000 of convertible preferred stock and to vote to retain Simonson as a member of the board and as vice-president as long as it remained holder of record of Simonson's shares.

Thereafter, Vreeland made contact with Gevers, an officer of the Bankers Trust Company, and inquired into the possibility of discounting Allied's $100,000 note if it were endorsed by respondent. Gevers testified that Vreeland stated that respondent planned to enter the shipping field for which purpose it had created Allied. Vreeland in his testimony categorically denied making such a statement. It is agreed, however, that Bankers Trust Company consented to the proposed loan. Shortly thereafter the loan request was withdrawn and Allied never received any funds. For unexplained reasons respondent never purchased Allied's convertible preferred stock and Meyer never deposited Simonson's $500 check in payment for the common stock. Nor did respondent ever loan Allied any money. Vreeland testified that it was the respondent's intention to make the loan only if Allied could carry out the business it had undertaken and this became impossible because Allied could not procure ships.

11    The foregoing facts, we hold, do not justify disregard of Allied's separate existence. An examination of all the cases which the parties cite and of many others dealing with this problem  *238  has left us with the conviction that nowhere is there a better statement of the generally applicable principles than that found in Lowendahl v. Baltimore & Ohio R.R. Co., 247 App.Div. 144, 287 N.Y.S. 62, affirmed 272 N.Y. 360, 6 N.E.2d 56. There, borrowing heavily from a leading text on this subject, [11] the court said:

'Restating the instrumentality rule, we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:

'(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

'(2) Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

'(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.' (247 App.Div. 144, 287 N.Y.S. 76.)

12    We incline to think that the libelants have failed to prove such control over Allied by the respondent as to bring its case within the first requirement of the rule as above-stated. For aught that appears, Vreeland in authorizing van Ommeren to confirm the contract may have been acting as Allied's president- not as an executive of the respondent. Likewise, as to the arrangements for the loan from the Bankers Trust Company, and the subsequent withdrawal of the request therefor; also the arrangements whereby Becker was employed to supervise Allied's activity.

The proofs do not show that in doing these things, or others transpiring subsequent to Allied's organization, executives of the respondent were directly meddling with the management of Allied's affairs: it is equally plausible to ascribe the acts to the same individuals as Allied's executives participating in a manner normal and usual for stockholders and directors of an independent corporation. [12] It would, of course, be a complete disregard of the basic structure of corporation law to hold that Allied, merely because it elected the respondent's officers to be its officers, forfeited its entity and deprived

its parent-stockholder of immunity from liability for its contracts. [13]

Moreover, there were outsiders on Allied's Board of Directors whose signature was required on checks signed by Vreeland and Meyer (officers of both Allied and the respondent) and who had demonstrated their independence by obtaining an arms-length contract with the respondent for Allied's financial requirements. These same outsiders were to be active in the management of Allied and it might well be said that they were the real entrepreneurs in the entire venture.  *239  Lowendahl v. Baltimore & Ohio R.R. Co., supra. [14] The proofs as to control on which the libelants rely, including the testimony of van Ommeren's officers as to statements made to them by Vreeland, [15] are fairly ascribable to the ordinary and temporary control over an incipient corporation by its incorporators. Such proofs, in our opinion, are not enough to demonstrate that Allied, subsequent to its organization, lacked an independent entity.

But even if on the issue of control the preponderance of the evidence favored the libelants, it is altogether plain that the second stated element of the rule has not been proved. There is no evidence that all the statements allegedly made by Vreeland to van Ommeren's officers had been passed along to libelants: they had been told only that the negotiations were 'on behalf of Allied, a company nominated and controlled by International Bank who will not appear in the charter party.' Surely there was no fraud in this representation, nor did it indicate an identity between respondent and Allied which now justifies a piercing of Allied's corporate veil. [16] It was foursquare with the truth: it misled the libelants not a whit. The caution that the respondent 'will not appear' apparently led them to make inquires as to Allied's financial standing. However, when their inquiries turned up no information as to Allied- a fact which of itself might have been expected to put them on their guard- they made no demand on the respondent for a guarantee or other assurance. Nor did they inquire whether Allied even had the necessary ship-charters for performance. These omissions are perhaps of more significance in view of the earlier efforts in behalf of Allied or the respondent to obtain a guarantee from the libelants. The contract reserved to the libelants a right to cancel if at any time the German government prohibited the importation of American coal. It is plausible to ascribe to this provision, or perhaps to the favorable freight rate, the libelants' readiness to deal with the subsidiary: they may well have felt that a thoroughly responsible principal such as the respondent could not be found which would accept

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 74 of 142

such unfavorable terms. Even if the libelants on the strength of the representation believed that the respondent, because it 'nominated and controlled,' would be liable, its belief was not the product of the respondent's wrongdoing. We may not strip Allied of its separate entity merely because of the libelants' naivete nor because it is now dissatisfied with the bargain it made. New York Trust Co. v. Carpenter, 6 Cir., 250 F. 668; Texas Co. of Mexico S.A. v. Roos, 5 Cir., 43 F.2d 1; North v. Higbee Co., 131 Ohio St. 507, 3 N.E.2d 391; Hanson v. Bradley, 298 Mass. 371, 10 N.E.2d 259; Hooper-Mankin Co. v. Matthew Addy Co., 6 Cir., 4 F.2d 187. Certainly the respondent did not use its control over Allied to perpetrate the violation of any duty, statutory or otherwise, or any act, unjust or otherwise, in contravention of the libelants' legal rights. [17]

*240  The libelants make much of the fact that to carry out the contract Allied was grossly undercapitalized and claims this fact as a sufficient reason to pierce its corporate veil. There may be situations in which the launching of a subsidiary corporation upon the stream of commerce with capital grossly inadequate for its expected activities will be indicative of lack of an independent entity. However that may be, we are pointed to no authorities which justify a disregard of a corporation's separate existence merely because of its undercapitalization when its controlling stockholder has at least regarded the formalities of such existence. In Stark Electric R. Co. v. McGinty Contracting Co., supra, undercapitalization was not the only pertinent factor; the subsidiary was also represented as being one with the parent. And in Luckenbach S.S. Co. v. W. R. Grace & Co., 4 Cir., 267 F. 676, while the subsidiary's disproportionate lack of capital was noted, there was also present the additional element of unconscionably holding the subsidiary out as the apparent owner of valuable assets. [18]

In any event, this record affords no factual basis for such a claim. For aught that appears, the respondent and its associates, who were concededly unfamiliar with shipping ventures, were not unreasonable in their reliance on the predictions of experts that Allied would need no more than $150,000 to successfully handle those operating expenses which would be incurred during the several months before monies would come due on the coal contract. While it is true that the respondent agreed to furnish $100,000 of this sum through a loan rather than as a capital contribution, it also agreed to furnish an additional $50,000 through the purchase of preferred stock. We cannot say that with these funds Allied would have been undercapitalized- still less that its undercapitalization would have been so gross as to be a badge

of fraud or wrong. At most, this was a case of inadequate capitalization, the risk of which under the normal rule the corporate creditors must bear.

Finally, even if we were to assume, as libelants would have us do, that respondent by failing to furnish Allied with the promised capital and loans thereby breached some duty owed to libelants, it is not proved that the libelants' loss was proximately caused thereby. Thus the third element of the above-stated rule is absent. [19]  In fact, the sole explanation for Allied's failure to carry out the coal contract was its inability to charter vessels. And there is nothing to show that this inability was due to a failure of respondent's loan and capital commitments. Such evidence as there is flows in the opposite direction: it suggests that the respondent did not go through with the proposed loan to Allied because even with the loan ship charters could not be obtained. For owners having ships for hire demanded bankable charters which in turn depended upon the guaranty of a responsible United States corporation. This was an obvious risk inherent in dealing with a foreign subsidiary of a United States corporation and one which libelants cannot now claim was in any way caused by the wrongful control of an undercapitalized foreign subsidiary. The language of Judge Learned Hand is here appropriate. 'The libelant has been disappointed, not in failing to get the promise which it supposed, but in its performance, a risk *241  inherent in any contract.' Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 2 Cir., 31 F.2d 265, at p. 267.

And so, not because the contract had not been signed by the respondent but because the libelants failed to prove that Allied was the respondent's alter ego,

The judgment below is affirmed.

1    Throughout this opinion we will refer to the parties by their relation to the controversy below.

2    The libel was filed by Fisser & v. Doornum, a German partnership engaged in the import and wholesale coal business and as shipowners and brokers, on its own behalf as the chartering broker and on behalf of certain named German entities. Judge Palmieri in an earlier opinion ruled that the libel was properly brought by the libelants on their behalf and for the benefit of their named principals. 164 F.Supp. 826.

3    Even assuming, arguendo, that a party can bind himself to a 'written provision' for arbitration only by signing such a provision, still, based upon ample authority in related fields, this would be no obstacle to imputing

to a controlling parent its instrumentality's contractual obligation to arbitrate. Thus we noted in Weisser v. Mursam Shoe Corporation, 2 Cir., 127 F.2d 344, 145 A.L.R. 467, that the better reasoned authorities do not allow a defendant to abuse the privilege of stockholder-immunity by invoking the Statute of Frauds or the sealed instrument rule where its instrumentality, at least, has signed the necessary instrument. See Powell, Parent and Subsidiary Corporations, Chpt. V. and VIII.

4   Compare § 1449 of the New York Civil Practice Act which states that 'every submission to arbitrate an existing controversy is void, unless it or some note or memorandum thereof be in writing and subscribed by the party to be charged therewith or by his lawful agent.' (Emphasis added.) This provision obviously conditions the enforceability of a submission to arbitrate an existing controversy upon the signature of the party to be charged. Bellmore Dress Co. v. Tanbro Fabrics Corp., Sup., 115 N.Y.S.2d 11; In re Exeter Mfg. Co., 254 App.Div. 496, 5 N.Y.S.2d 438. These same authorities hold, however, that under another portion of § 1449, which like the Federal Arbitration Act provides that '(a) contract to arbitrate a controversy thereafter arising between the parties must be in writing,' the liability of a party is determined by the ordinary principles of the law of contracts.

5   American Airlines, Inc. v. Louisville & Jefferson C.A.B., 6 Cir., 269 F.2d 811; Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978; Goldhill Trading & Ship. Co., etc. v. Caribbean Ship. Co., D.C.S.D.N.Y., 56 F.Supp. 31; cf. Corbin on Contracts, Vol. 6, § 1444A.

6   Thus assignees of contracts containing arbitration provisions may become parties to such provisions, Application of Reconstruction Finance Corp., D.C.S.D.N.Y., 106 F.Supp. 358 (and cases cited therein); Instituto Cubano v. The M. V. Driller, D.C.S.D.N.Y., 148 F.Supp. 739; Corbin on contracts, Vol. 4, 892. The same result is reached under the New York Act, Matter of Lippman v. Haeuser Shell Co., 289 N.Y. 76, 43 N.E.2d 817, 142 A.L.R. 1088. Similarly, an optionee by exercising an option may create a mutually binding contract to arbitrate, Calvine Mills, Inc. v. L. A. Slesinger Inc., 2 Cir., 258 F.2d 288. When a party is added to a contract by novation he can enforce an arbitration provision therein even though he is not a signatory to the contract. And enforcement can be had against another nonsignatory who it merely the instrumentality of a party bound by the arbitration clause. Chilean Nitrate Sales Corp. v. The nortuna, D.C.S.D.N.Y., 128 F.Supp. 938. Also, a corporate

beneficiary may enforce an arbitration provision which was executed when it was still inchoate. Application of Jacoby, Sup.Ct.N.Y.Co., N.Y.Co., 33 N.Y.S.2d 621. See also Parry v. Bache, 5 Cir., 125 F.2d 493; In re Exeter Mfg. Co., supra; and Bellemore Dress Co. v. Tanbro Fabrics Corp., supra, for other illustrations of parties being contractually bound to written arbitration provisions absent their signatories to such agreements.

7   Section 3 of the charter-party provided: '* * * If any dispute or difference should arise under this Charter, same to be referred to three parties in the City of New York, one to be appointed by eac h of the parties hereto, the third by the two so chosen, and their decision, or that of any two of them, shall be final and binding, and this agreement may, for enforcing the same, be made a rule of Court. Said three parties to be commercial men.'
It is no longer open to serious question that, even if damages are the sole issue for arbitration, that issue is within a clause of general arbitration and under the Federal Arbitration Act the clause will be specifically enforced against all those bound by it. Shanferoke Coal & Supply Corp. v. Westchester Service Corp., 2 Cir., 70 F.2d 297, affirmed 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583; Kulukundis Shipping Co. v. Amtorg Trading Corp., supra.

8   The libelants relied below upon Lehman v. Ostrovsky, 264 N.Y. 130, 190 N.E. 208; In re Bond and Mortgage Guarantee Co., 288 N.Y. 270, 42 N.E.2d 38; and General Commodities Corp. v. Hyman-Michaels Co., 9 Cir., 224 F.2d 952. But these cases are plainly distinguishable from that now before us. More directly in point and in accord with our conclusion is Judge Dawson's opinion in Chilean Nitrate Sales Corp. v. The Nortuna, supra.

9   The libelants do not claim that Allied in signing the charter was the respondent's authorized agent.

10   In this, the respondent acted through the International Bank of Washington, a New York corporation wholly owned by it, to which it had transferred the operation of its foreign department.

11   Powell, Parent and Subsidiary Corporations (1931), pp. 4-6.

12   See Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 523-524, 61 S.Ct. 675, 85 L.Ed. 982; United States v. Reading Co., 253 U.S. 26, 62, 40 S.Ct. 425, 64 L.Ed. 760; Kingston Dry Dock Co v. Lake Champlain Transp. Co., 2 Cir., 31 F.2d 265 (and cases cited therein); Hollander v. Henry, 2 Cir., 186 F.2d 582; Costan v. Manila Electric Co., 2 Cir., 24 F.2d 383;

Centmont Corporation v. Marsch, 1 Cir., 68 F.2d 460; Hooper-Mankin Co. v. Matthew Addy Co., 6 Cir., 4 F.2d 187; Fish v. East, 10 Cir., 114 F.2d 177.

13  See Taylor v. Standard Gas & Electric Co., 10 Cir., 96 F.2d 693, and the many cases cited therein, reversed on other grounds, 306 U.S. 307; Hooper-Mankin Co. v. Matthew Addy Co., supra; Garden City Co. v. Burden, 10 Cir., 186 F.2d 651; Powell, fn. 11, supra, at p. 10; Fletcher, Cyclopedia of Private Corporations, 43 at pp. 158-159.

15  Although these statements were denied by Vreeland, for purposes of this opinion we take them as true.

16  This representation differed vitally from those in such cases as Weisser v. Mursam Shoe Corporation, supra; Hollander v. Henry, supra; Stark Electric R. Co. v. McGinty Contracting Co., 6 Cir., 238 F. 657.

17  See, e.g., Anderson v. Abbott, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793; Weisser v. Mursam Shoe Corporation, supra; United States v. Morris & Essex R. Co., 2 Cir., 135 F.2d 711; Majestic Co. v. Orpheum Circuit, 8 Cir., 21 F.2d 720 (and many cases cited

therein); Texas Co. of Mexico S.A. v. Roos, supra; New York Trust Co. v. Carpenter, supra; Bartle v. Home Owners Cooperative, 309 N.Y. 103, 127 N.E.2d 832; North v. Higbee Co., supra; United States v. Islip Machine Works, Inc., D.C.E.D.N.Y., 179 F.Supp. 585, Powell, fn. 11, supra, Chpt. III.

18  This fact has led one commentator to classify this case as one growing out of estoppel, and it is of some interest that this same commentator makes no separate classification of mere undercapitalization as an actionable wrong, although he does list it as one persuasive, though not controlling, circumstance indicating improper control over a mere instumentality. Powell, fn. 11, supra, at pp. 14 and 66. Compare Note, 71 Harv.L.Rev. 1122, 1132-1133.

19  See Majestic Co. v. Orpheum Circuit, fn. 17, supra; North v. Higbee Co., supra; Hanson v. Bradley, supra; cf. Powell, fn. 11, supra, Chpt. IV.

Parallel Citations

1961 A.M.C. 306

Footnotes

14  We note also the probability that respondent, as contrasted with Allied, had no power to carry on a shipping venture, i.e., that the held corporation had power to engage in activities without the scope of those authorized for the parent. This is a factor of considerable weight against a piercing of Allied's corporate veil. Fletcher, fn. 13, supra, at 43, fn. 76.

End of Document    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

DOCSTOR: 2191401\1

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 78 of 142

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002)

123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847...

123 S.Ct. 588
Supreme Court of the United States

Karen HOWSAM, Individually and as Trustee
for the E. Richard Howsam, Jr., Irrevocable Life
Insurance Trust Dated May 14, 1982, Petitioner,
v.
DEAN WITTER REYNOLDS, INC.

No. 01-800.    Argued Oct. 9,
2002.    Decided Dec. 10, 2002.

Brokerage firm brought suit seeking to enjoin customer from arbitrating dispute with National Association of Securities Dealers (NASD). The United States District Court for the District of Colorado dismissed suit, but the Court of Appeals for the Tenth Circuit, Ebel, Circuit Judge, 261 F.3d 956, reversed. After granting certiorari, the United States Supreme Court, Justice Breyer, held that: (1) interpretation of NASD rule imposing six-year time limit for arbitration was a matter presumptively for the arbitrator, not for the court, abrogating J.E. Liss & Co. v. Levin, 201 F.3d 848, and (2) parties' contract did not call for judicial determination of whether arbitration was time-barred.

Reversed.

Justice Thomas filed an opinion concurring in the judgment.

Justice O'Connor did not participate.

West Headnotes (5)

**1**    **Alternative Dispute
Resolution**  🔑  Arbitrability of Dispute

The question whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.

291 Cases that cite this headnote

**2**    **Alternative Dispute
Resolution**  🔑  Arbitrability of Dispute

A gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide; similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court.

319 Cases that cite this headnote

**3**    **Alternative Dispute Resolution**  🔑  Matters to
Be Determined by Court

**Alternative Dispute Resolution**  🔑  Waiver,
Laches, or Estoppel

"Procedural" questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide; the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability.

256 Cases that cite this headnote

**4**    **Alternative Dispute Resolution**  🔑  Relations
Between Customer-Investors and Broker-
Dealers

Issue of whether arbitration of dispute between brokerage firm and its customer was time-barred under the National Association of Securities Dealers (NASD) Code of Arbitration Procedure was a gateway procedural dispute that did not present a "question of arbitrability," and thus interpretation of NASD time limit rule was a matter presumptively for the arbitrator, not for the court; NASD arbitrators were comparatively more expert about meaning of their own rule and better able to interpret and apply it; abrogating J.E. Liss & Co. v. Levin, 201 F.3d 848.

150 Cases that cite this headnote

**5**    **Alternative Dispute
Resolution**  🔑  Agreements to Arbitrate

Contract between brokerage firm and its customer, which incorporated the National Association of Securities Dealers (NASD) Code of Arbitration Procedure, did not call for judicial determination of whether arbitration was time-barred under NASD arbitration time limit rule, although rule limited arbitration to "eligible" disputes, where rule's use of term "eligible" did not indicate parties' intent for time limit issue to be

123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847...

resolved by court prior to arbitration, since parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters.

285 Cases that cite this headnote

**\*\*589 Syllabus** \*

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Per respondent Dean Witter Reynolds, Inc.'s standard client agreement, petitioner Howsam chose to arbitrate her dispute with the company before the National Association of Securities Dealers (NASD). NASD's Code of Arbitration Procedure § 10304 states that no dispute "shall be eligible for submission ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute." Dean Witter filed this suit, asking the Federal District Court to declare the dispute ineligible for arbitration because it was more than six years old and seeking an injunction to prohibit Howsam from proceeding in arbitration. The court dismissed the action, stating that the NASD arbitrator should interpret and apply the NASD rule. In reversing, the Tenth Circuit found that the rule's application presented a question of the underlying dispute's "arbitrability"; and the presumption is that a court will ordinarily decide an arbitrability question.

*Held:* An NASD arbitrator should apply the time limit rule to the underlying dispute. Pp. 591–593.

(a) "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409. The question whether parties have submitted a particular dispute to arbitration, *i.e.,* the "*question of arbitrability,*" is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648. The phrase "question of arbitrability" has a limited scope, applicable in the kind of narrow circumstance where contracting parties

would likely have expected a court to have decided the gateway matter. But **\*\*590** the phrase is *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the question-" 'procedural' questions which grow out of the dispute and bear on its final disposition," *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898, and "allegation [s] of waiver, delay, or a like **\*80** defense to arbitration," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765. Following this precedent, the application of the NASD rule is not a "question of arbitrability" but an "aspec[t] of the [controversy] which called the grievance procedures into play." *John Wiley & Sons, Inc., supra,* at 559, 84 S.Ct. 909. NASD arbitrators, comparatively more expert about their own rule's meaning, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure the underlying controversy's fair and expeditious resolution. Pp. 591–593.

(b) Dean Witter's argument that, even without an antiarbitration presumption, the contracts call for judicial determination is unpersuasive. The word "eligible" in the NASD Code's time limit rule does not, as Dean Witter claims, indicate the parties' intent for the rule to be resolved by the court prior to arbitration. Parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters, and any temptation here to place special antiarbitration weight on the word "eligible" in § 10304 is counterbalanced by the NASD rule that "arbitrators shall be empowered to interpret and determine the applicability" of all code provisions, § 10324. P. 593.

261 F.3d 956, reversed.

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and STEVENS, SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment, *post,* p. 593. O'CONNOR, J., took no part in the consideration or decision of the case.

Attorneys and Law Firms

Alan C. Friedberg, Denver, CO, for petitioners.

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 80 of 142

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002)

123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847...

Matthew D. Roberts, for the United States as amicus curiae, by special leave of the Court supporting the petitioners. Kenneth W. Starr, Arlington, VA, for respondent.

Opinion

 *81 Justice BREYER delivered the opinion of the Court.

This case focuses upon an arbitration rule of the National Association of Securities Dealers (NASD). The rule states that no dispute "shall be eligible for submission to arbitration ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute." NASD Code of Arbitration Procedure § 10304 (1984) (NASD Code or Code). We must decide whether a court or an NASD arbitrator should apply the rule to the underlying controversy. We conclude that the matter is for the arbitrator.

I

The underlying controversy arises out of investment advice that Dean Witter Reynolds, Inc. (Dean Witter), provided its client, Karen Howsam, when, some time between 1986 and 1994, it recommended that she buy and hold interests in four limited partnerships. Howsam says that Dean Witter misrepresented the virtues of the partnerships. The resulting controversy **591 falls within their standard Client Service Agreement's arbitration clause, which provides:

 "[A]ll controversies ... concerning or arising from ... any account ..., any transaction ..., or ... the construction, performance or breach of ... any ... agreement between us ... shall be determined by arbitration before any self-regulatory organization or exchange of which Dean Witter is a member." App. 6-7.

 *82 The agreement also provides that Howsam can select the arbitration forum. And Howsam chose arbitration before the NASD.

To obtain NASD arbitration, Howsam signed the NASD's Uniform Submission Agreement. That agreement specified that the "present matter in controversy" was submitted for arbitration "in accordance with" the NASD's "Code of Arbitration Procedure." *Id.*, at 24. And that Code contains the provision at issue here, a provision stating that no dispute "shall be eligible for submission ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute." NASD Code § 10304.

After the Uniform Submission Agreement was executed, Dean Witter filed this lawsuit in Federal District Court. It asked the court to declare that the dispute was "ineligible for arbitration" because it was more than six years old. App. 45. And it sought an injunction that would prohibit Howsam from proceeding in arbitration. The District Court dismissed the action on the ground that the NASD arbitrator, not the court, should interpret and apply the NASD rule. The Court of Appeals for the Tenth Circuit, however, reversed. 261 F.3d 956 (2001). In its view, application of the NASD rule presented a question of the underlying dispute's "arbitrability"; and the presumption is that a court, not an arbitrator, will ordinarily decide an "arbitrability" question. See, *e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

The Courts of Appeals have reached different conclusions about whether a court or an arbitrator primarily should interpret and apply this particular NASD rule. Compare, *e.g.,* 261 F.3d 956 (C.A.10 2001) (case below) (holding that the question is for the court); *J.E. Liss & Co. v. Levin,* 201 F.3d 848, 851 (C.A.7 2000) (same), with *PaineWebber Inc. v. Elahi,* 87 F.3d 589 (C.A.1 1996) (holding that NASD § 15, currently § 10304, is presumptively for the arbitrator); *Smith Barney Shearson, Inc. v. Boone,* 47 F.3d 750 (C.A.5 1995) (same). We  *83 granted Howsam's petition for certiorari to resolve this disagreement. And we now hold that the matter is for the arbitrator.

II

1   This Court has determined that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); see also *First Options, supra,* at 942-943, 115 S.Ct. 1920. Although the Court has also long recognized and enforced a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the "*question of arbitrability,*" is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (emphasis added); *First Options, supra,* at 944, 115 S.Ct. 1920. We must decide here

Case 09-10138-MFW   Doc 5598-3   Filed 06/05/11   Page 81 of 142

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002)
123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847...

whether application of the NASD time limit provision falls into the scope of this last-mentioned interpretive rule.

**\*\*592** Linguistically speaking, one might call any potentially dispositive gateway question a "question of arbitrability," for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase "question of arbitrability" has a far more limited scope. See *514 U.S., at 942, 115 S.Ct. 1920.* The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of *\*84* forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

2  Thus, a gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide. See *id., at 943-946, 115 S.Ct. 1920* (holding that a court should decide whether the arbitration contract bound parties who did not sign the agreement); *John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964)* (holding that a court should decide whether an arbitration agreement survived a corporate merger and bound the resulting corporation). Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. See, *e.g., AT & T Technologies, supra, at 651-652, 106 S.Ct. 1415* (holding that a court should decide whether a labor-management layoff controversy falls within the arbitration clause of a collective-bargaining agreement); *Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241-243, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962)* (holding that a court should decide whether a clause providing for arbitration of various "grievances" covers claims for damages for breach of a no-strike agreement).

3  At the same time the Court has found the phrase "question of arbitrability" *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the gateway matter. Thus " 'procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively *not* for the judge, but for an arbitrator, to decide. *John Wiley, supra, at 557, 84 S.Ct. 909* (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed,

where these steps are prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegation[s] of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital, supra, at 24-25, 103 S.Ct. 927.* Indeed, the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate *\*85* the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c), and comment 2, 7 U.L.A. 12-13 (Supp.2002). And the comments add that "in the absence of an agreement to the contrary, issues of substantive arbitrability ... are for a court to decide and issues of procedural arbitrability, *i.e.,* whether prerequisites such as *time limits,* notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id., § 6,* comment 2, 7 U.L.A., at 13 (emphasis added).

4  Following this precedent, we find that the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be "questions of arbitrability." *E.g.,* **\*\*593** *Moses H. Cone Memorial Hospital, supra, at 24-25, 103 S.Ct. 927* (referring to "waiver, delay, or a like defense"). Such a dispute seems an "aspec[t] of the [controversy] which called the grievance procedures into play." *John Wiley, supra, at 559, 84 S.Ct. 909.*

Moreover, the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. Cf. *First Options, 514 U.S., at 944-945, 115 S.Ct. 1920.* And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy-a goal of arbitration systems and judicial systems alike.

We consequently conclude that the NASD's time limit rule falls within the class of gateway procedural disputes that do not present what our cases have called "questions of arbitrability." *\*86* And the strong pro-court presumption as to the parties' likely intent does not apply.

**III**

Case 09-10138-MFW   Doc 5598-3   Filed 06/05/11   Page 82 of 142

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002)
123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847...

5   Dean Witter argues that, in any event, *i.e.,* even without an antiarbitration presumption, we should interpret the contracts between the parties here as calling for judicial determination of the time limit matter. Howsam's execution of a Uniform Submission Agreement with the NASD in 1997 effectively incorporated the NASD Code into the parties' agreement. Dean Witter notes the Code's time limit rule uses the word "eligible." That word, in Dean Witter's view, indicates the parties' intent for the time limit rule to be resolved by the court prior to arbitration.

We do not see how that is so. For the reasons stated in Part II, *supra,* parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters. And any temptation here to place special antiarbitration weight on the appearance of the word "eligible" in the NASD Code rule is counterbalanced by a different NASD rule; that rule states that "arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code." NASD Code § 10324.

Consequently, without the help of a special arbitration-disfavoring presumption, we cannot conclude that the parties intended to have a court, rather than an arbitrator, interpret and apply the NASD time limit rule. And as we held in Part II, *supra,* that presumption does not apply.

**IV**

For these reasons, the judgment of the Tenth Circuit is

*Reversed.*

Justice O'CONNOR took no part in the consideration or decision of this case.

**\*87**  Justice THOMAS, concurring in the judgment.

As our precedents make clear and as the Court notes, arbitration is a matter of contract. *Ante,* at 591. In *Volt*

*Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), we held that under the Federal Arbitration Act courts must enforce private agreements to arbitrate just as they would ordinary contracts: in accordance with their terms. Under *Volt,* when an arbitration agreement contains a choice-of-law provision, that provision must be honored, and a court interpreting the agreement must follow the law of the jurisdiction selected by the parties. See *id.,* at 478-479, 109 S.Ct. 1248 (enforcing a choice-of-law provision that incorporated a state procedural rule concerning arbitration proceedings); see also **\*\*594** *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 67, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (THOMAS, J., dissenting) (concluding that the choice-of-law provision in question was indistinguishable from the one in *Volt* and, thus, should have been given effect). A straightforward application of these principles easily resolves the question presented in this case.

The agreement now before us provides that it "shall be construed and enforced in accordance with the laws of the State of New York." App. 6. Interpreting two agreements containing provisions virtually identical to the ones in dispute here, the New York Court of Appeals held that issues implicating § 15 (now § 10304) of the National Association of Securities Dealers Code of Arbitration Procedure are for arbitrators to decide. See *Smith Barney Shearson Inc. v. Sacharow,* 91 N.Y.2d 39, 666 N.Y.S.2d 990, 689 N.E.2d 884 (1997). Because the parties agreed to be bound by New York law and because *Volt* requires us to enforce their agreement, I would permit arbitrators to resolve the § 10304 issues that have arisen in this case, just as New York case law provides. The Court follows a different route to reach the same conclusion; accordingly, I concur only in the judgment.

Parallel Citations

123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847, 2002 Daily Journal D.A.R. 13,897, 16 Fla. L. Weekly Fed. S 20

**End of Document**      © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 11

DOCSTOR: 2191401\1

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135 (2001)

2001 A.M.C. 2080

241 F.3d 135
United States Court of Appeals,
Second Circuit.

U.S. TITAN, INC., Petitioner-Appellee,
v.
GUANGZHOU ZHEN HUA SHIPPING
CO., LTD., Respondent-Appellant.

Docket No. 98-9477.   Argued June
24, 1999.   Decided Feb. 15, 2001.

Putative charterer brought action seeking determination that it had entered into valid charter party agreement with corporation owned by People's Republic of China, and seeking to compel arbitration for breach of alleged charter pursuant to Federal Arbitration Act (FAA). After granting charterer's motion for summary determination, 16 F.Supp.2d 326, the United States District Court for the Southern District of New York, William C. Conner, J., 182 F.R.D. 97, clarified scope of arbitration. Corporation appealed. The Court of Appeals, F.I. Parker, Circuit Judge, held that: (1) parties formed valid charter party; (2) arbitration clause contained in charter party satisfied arbitration exception to Foreign Sovereign Immunities Act (FSIA); and (3) corporation was subject to specific jurisdiction in United States.

Affirmed.

West Headnotes (22)

**1**   **Shipping** 👈 Requisites and Validity of Charter Party

"Charter party" is contract by which entire ship or some principal part thereof is let to merchant.

1 Cases that cite this headnote

**2**   **Contracts** 👈 Questions for Jury

Determination of whether there was meeting of the minds sufficient to constitute contract is one of fact.

4 Cases that cite this headnote

**3**   **Shipping** 👈 Arbitration of Controversies

Shipowner waived right under Federal Arbitration Act (FAA) to evidentiary hearing

in charterer's action to compel arbitration of dispute alleging breach of alleged charter, and thus appellate review of district court order compelling arbitration was for clear error, rather than de novo, where parties filed multiple briefs and extensive evidence with court regarding existence of arbitration agreement. 9 U.S.C.A. § 4; Fed.Rules Civ.Proc.Rule 52(a), 28 U.S.C.A.

2 Cases that cite this headnote

**4**   **Federal Courts** 👈 Clearly Erroneous Findings of Court or Jury in General

Clearly erroneous standard of review controls appellate consideration of factual findings of district court even though based upon documentary record. Fed.Rules Civ.Proc.Rule 52(a), 28 U.S.C.A.

1 Cases that cite this headnote

**5**   **Alternative Dispute Resolution** 👈 Agreements

**Treaties** 👈 Construction and Operation of Particular Provisions

"Agreement to arbitrate" exists within meaning of Convention on Recognition and Enforcement of Foreign Arbitral Awards and Federal Arbitration Act (FAA) if: (1) there is written agreement; (2) writing provides for arbitration in territory of signatory of convention; (3) subject matter is commercial; and (4) subject matter is not entirely domestic in scope. 9 U.S.C.A. §§ 201-202.

11 Cases that cite this headnote

**6**   **Alternative Dispute Resolution** 👈 Disputes and Matters Arbitrable Under Agreement

Upon finding that arbitration agreement exists, federal court must compel arbitration of any dispute falling within scope of agreement pursuant to terms of agreement. 9 U.S.C.A. § 201.

4 Cases that cite this headnote

**7**   **Alternative Dispute Resolution** 👈 Construction

Notwithstanding strong federal policy favoring arbitration as alternative means of dispute resolution, courts must treat agreements to arbitrate like any other contract. 9 U.S.C.A. § 201.

7 Cases that cite this headnote

**8    Contracts** 🗝 **Necessity of Assent**

"Contract" is formed when there is meeting of minds of parties on essential terms of agreement.

3 Cases that cite this headnote

**9    Shipping** 🗝 Arbitration of Controversies

District court did not commit clear error in finding that parties did not reach binding ad hoc agreement to arbitrate issue of formation of charter party, independent of arbitration clause in charter party itself, where shipowner stated that there was no need for separate arbitration agreement, and charterer agreed that was acceptable "per the agreement."

4 Cases that cite this headnote

**10    Shipping** 🗝 Requisites and Validity of Charter Party

Shipowner and charterer formed charter party through their respective brokers when charterer's broker confirmed agreement by faxing to shipowner and its broker recap embodying charter party's main terms by incorporating terms of standard form charter.

6 Cases that cite this headnote

**11    Shipping** 🗝 Arbitration of Controversies

Alleged failure of charterer's board to timely approve charter did not prevent or undo formation of charter party, but instead constituted breach of charter party for which arbitrator appointed pursuant to charter party could impose remedy.

2 Cases that cite this headnote

**12    Alternative Dispute Resolution** 🗝 Severability

Sufficiently broad arbitration clause may be separated from contract in which it is embedded to permit arbitration of enforceability of contract itself.

**13    Shipping** 🗝 Arbitration of Controversies

Arbitration clause in charter party covering "[a]ny dispute arising under this charter" was not sufficiently broad to permit separation of clause from underlying agreement, and thus party seeking arbitration had to first establish formation of charter party. 9 U.S.C.A. § 201.

1 Cases that cite this headnote

**14    Federal Courts** 🗝 Trial De Novo
**Federal Courts** 🗝 Particular Issues and Questions

Standard of review applicable to district court decisions regarding subject matter jurisdiction under Foreign Sovereign Immunities Act (FSIA) is clear error for factual findings and de novo for legal conclusions.

9 Cases that cite this headnote

**15    International Law** 🗝 Extent and Effect of Immunity

Arbitration clause contained in charter party between American charterer and Chinese government, which owned ship, satisfied requirements of arbitration exception to Foreign Sovereign Immunities Act (FSIA); China and United States had both signed Convention on Recognition and Enforcement of Foreign Arbitral Awards, and parties had both agreed to charter party containing arbitration clause. 9 U.S.C.A. § 201 et seq.; 28 U.S.C.A. § 1605(a)(6)(B).

3 Cases that cite this headnote

**16    Federal Courts** 🗝 Trial De Novo
**Federal Courts** 🗝 Particular Issues and Questions

Standard of review applicable to district court decisions regarding personal jurisdiction is clear

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135 (2001)

2001 A.M.C. 2080

error for factual findings and de novo for legal conclusions.

9 Cases that cite this headnote

17    **International Law** ⚷ Procedure in Actions in General

In general, subject matter jurisdiction plus service of process equals personal jurisdiction under Foreign Sovereign Immunities Act (FSIA). 28 U.S.C.A. § 1602 et seq.

4 Cases that cite this headnote

18    **Federal Courts** ⚷ Contacts with Forum State

General personal jurisdiction, which does require finding of continuous and systematic contacts, is only necessary when cause of action does not arise from defendant's contacts with forum state.

10 Cases that cite this headnote

19    **Federal Courts** ⚷ Defendant's Activities in Forum State; Cause of Action Arising Therefrom

Where claim arises out of, or relates to, defendant's contacts with forum, plaintiff need only prove limited or specific jurisdiction, and required minimum contacts exist where defendant purposefully availed itself of privilege of doing business in forum and could foresee being haled into court there.

35 Cases that cite this headnote

20    **Federal Courts** ⚷ Aliens or Alien Corporations

In determining whether personal jurisdiction exists over foreign defendant who has been served under federal service of process provision, court should consider defendant's contacts throughout United States and not just those contacts with forum.

14 Cases that cite this headnote

21    **Federal Courts** ⚷ Aliens or Alien Corporations

Chinese shipowner purposely availed itself of United States forum by negotiating and forming charter party with American charterer located in New York, and thus was subject to specific jurisdiction in United States in action to compel arbitration under charter party, where shipowner utilized broker located in Connecticut, which communicated with charterer's personnel in New York via telex and/or facsimile to charterer's broker in Connecticut.

3 Cases that cite this headnote

22    **Federal Courts** ⚷ Contracts and Breach Thereof

United States District Court for the Southern District of New York was proper venue for New York charterer's action against corporation owned by the People's Republic of China to compel arbitration under charter party, even though both parties employed brokers based in Connecticut, where charter party was negotiated by means of facsimiles and telephone calls between New York and Connecticut. 28 U.S.C.A. § 1391(b)(2).

6 Cases that cite this headnote

**Attorneys and Law Firms**

*137 Stanley McDermott III, Piper & Marbury, L.L.P., New York, NY (Leo G. Kailis, Of Counsel) for Petitioner-Appellee.

Lizabeth L. Burrell, Burlingham Underwood LLP, New York, NY (Michael Marks Cohen, Of Counsel) for Respondent-Appellant.

Before: MINER, JACOBS, and F.I. PARKER, Circuit Judges.

**Opinion**

F.I. PARKER, Circuit Judge:

Respondent-Appellant Guangzhou Zhen Hua Shipping Co., Ltd. ("Zhen Hua") appeals from a judgment of the United

States District Court for the Southern District of New York (William C. Conner, **\*138** Judge), entered October 7, 1998, upon an August 5, 1998 opinion and order, as amended September 25, 1998, granting the motion of Petitioner-Appellee to compel arbitration in London and denying the motion of Respondent-Appellant to dismiss on the grounds of lack of subject-matter jurisdiction, lack of personal jurisdiction, and improper venue, *see U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 16 F.Supp.2d 326 (S.D.N.Y.1998), ("*Titan I*"), and upon a September 29, 1998 opinion and order, clarifying the scope of arbitration, *see U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 182 F.R.D. 97 (S.D.N.Y.1998), ("*Titan II*").

**1**   On appeal, Zhen Hua contends principally that the district court exceeded the scope of its jurisdiction under the Federal Arbitration Act, 9 U.S.C. §§ 1-16, (the "FAA") by compelling arbitration of the parties' dispute pursuant to a charter party [1] allegedly negotiated by the parties in September 1995. More specifically, Zhen Hua argues that the court should not have determined whether the parties had formed a charter party because the parties had allegedly negotiated an "ad hoc" agreement to arbitrate at that issue and that the court erred in finding that no such "ad hoc" agreement existed. In addition, Zhen Hua asserts that the district court lacked subject-matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603-1611, that the district court lacked personal jurisdiction over Zhen Hua, and that venue in the Southern District of New York was improper. For the reasons set forth below, we affirm.

[1]   A charter party is a contract by which an entire ship or some principal part thereof is let to a merchant. The term "charter party" actually refers to the document in which the terms and conditions of the lease of a vessel by an owner to a charterer are set out.
*Great Circle Lines, Ltd. v. Matheson & Co.,* 681 F.2d 121, 124 (2d Cir.1982) (internal quotation marks and citations omitted).

## I. BACKGROUND

Petitioner-Appellee U.S. Titan, Inc. ("Titan") is a corporation organized under the laws of Texas, with its principal place of business in Pelham, New York. Zhen Hua is a state-owned corporation organized under the laws of the People's Republic of China, engaged primarily in the shipping industry, with its principal place of business in Guangzhou (also known as Canton), China.

### A. The Negotiations

In August 1995, Titan and Zhen Hua began negotiating a time charter [2] of the M/T BIN HE (the "BIN HE"), a ship owned by Zhen Hua. The parties conducted negotiations through two shipbrokers in Connecticut, Seabrokers (representing Titan) and Seagos (representing Zhen Hua). The two Connecticut brokers served as conduits for the transmission of many of the communications from one party to the other. Most of the parties' communications during the negotiations are memorialized in writings transmitted via facsimile or telex between and among the brokers and the parties. These communications establish the following chronology of the negotiations.

[2]   A time charter is one of three principal forms of a charter party and constitutes a contract under which "the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 11-1, at 169 (2d ed.1994).

On September 22, 1995, Zhen Hua offered to charter the BIN HE to Titan for 12 months at $15,250 per day, with an option for an additional 12 months at $15,750 per day. The parties proceeded to negotiate different time periods and rates, as well as several other terms, the details of which are not relevant to the issues before us. On September 26, 1995, Zhen Hua sent Titan a "firm counter [offer]":

Accept/Except:

Period-   6 mos. plus/minus 30 days at CHOPT
          CHOPT next 12 mos.

Rates-    $15,250 first period
          Optional $15,750 second period.

**\*139**   Upon receipt of this telex, Titan informed its broker, Seabrokers, that "Charterers are in agreement and accept Owner[']s last offer." Seabrokers then sent via fax to Seagos

and Titan a fixture "recap," confirming the "Owners and Charterers' agreement." The agreement was based on the "Shelltime 4 Time Charter," a standard time charter, *see* Michael Wilford et. al., *Time Charters* 28-36 (4th ed.1995),

2001 A.M.C. 2080

containing an arbitration clause that provides for arbitration in London at the election of either party. [3] The recap from Seabrokers to Seagos and Titan contained, in part, the following language:

[3]    Clause 41 of the Shell Time 4 Charter reads:

   41. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

   (b) Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree, provided that London arbitration is understood and agreed to be the first form of dispute resolution.

   (c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act of 1950, or any statutory modification or re-enactment thereof for the time being in force.

   WE ARE PLEASED TO RECAP OWNER['']S AND CHARTERERS' AGREEMENT AS FOLLOWS, FOR THE TIMECHARTER OF:
VESSEL:
          MT BIN HE ...
...
PERIOD-    6 MOS. PLUS/MINUS 30 DAYS
          AT CHOPT
          CHOPT NEXT 12 MOS.
          UNDERSTOOD 🔑/30 DAYS
          ONLY TO BE USED ONCE, DURING THE FINAL PERIOD.
RATES-    $15,250 FIRST PERIOD.
          $15,750 FOR OPTIONAL PERIOD[.]
...
SUBJECTS-
          CP DET'LS, SATISFACTORY INSPECTION OF THE VSL AT DD, RELEASE BY OWNERS FROM CAMARO TC, THENCE U.S. TITAN BOD APPROVAL WITHIN 3 DAYS FOLLOWING RECEIPT OF THEIR DENHOLM INSPECTION REPORT. [4]

After Zhen Hua dry-docked the BIN HE in Hong Kong, Denholm Ship Management (Overseas) Ltd. ("Denholm") conducted the inspection contemplated by the parties. Following a preliminary inspection, which revealed several problems with the ship, Zhen Hua apparently began considering a sale of the BIN HE.

On October 19, 1995, Titan received from Denholm an initial summary report on the drydock inspection. On October 23, Titan informed Seabrokers that it had concerns about the seaworthiness of the BIN HE, but would await Denholm's final report. Titan indicated also that it was interested in a "purchase option" and "would like to know what steps the Owner intends to take to bring the vessel up to an acceptable trading standard." Seabrokers relayed this message to Seagos, which, acting through Henry Chen, responded later that day:

   NOW OWNERS HAVE DECIDED TO SELL THE VESSEL ON CASH BASIS. THEY ARE ASKING $27 MILLION ON THE MARKET. BUT I RECKON WILL GO AT $26 MILLIONS [sic]. PROSPECTIVE BUYERS WILL BE INSPECTING THIS WEEK WHILE THE VSL IS STILL IN THE YARD.

   OWNERS THANK TITAN'S INTEREST AND ADVICE. THEY ASK U.S. TO CONVEY THEIR WILLINGNESS TO ENTERTAIN FUTURE BUSINESS PROPOSALS AND LOOK FORWARD *140 TO POSSIBLE COOPERATION.

On October 24, Titan faxed a message to Seabrokers, noting that the final inspection had not yet arrived and remarking:

   It is encouraging that [Zhen Hua is] now in a position to sell the vessel if we do not exercise our option for the time charter. We assume therefore that the vessel has been successfully withdrawn from Camaro. We await Owners [sic] confirmation of this withdrawl [sic] per our $9/26$ Agreement, so we can begin marketing the vessel for voyage and/or consecutive voyage charter.

Titan also asked Seabrokers to determine whether Zhen Hua would "provide a purchase option throughout the period of [its] charter."

On October 25, 1995, Seagos, through Chen, faxed Seabrokers, stating in relevant part:

   WE KNOW THAT AFTER THE VSL FAILED THE SUB WITH U.S. TITAN ON MONDAY, [ZHEN HUA'S]

PREFERENCE IS TO DO A STRAIGHT SALE ..., AND NOT TO GIVE PURCHASE OPTIONS. IF YOU THINK [TITAN] IS STILL INTERESTED IN THE TIME CHARTER OF THE VSL, PLEASE ASCERTAIN IF U.S. TITAN CAN TAKE [DELIVERY] OF THE VSL UPON OWNERS LIFT [sic] THEIR SUBJECT.

On the same day, Titan apparently became concerned that a misunderstanding might have developed between the parties. Consequently, Titan wrote again to Seabrokers, [5] which, in relevant part, states:

[5]   The order of the two faxed communications of October 25, 1995, can not be discerned from the record.

FIRST, LET ME BE PERFECTLY CLEAR WITH HENRY/OWNERS, MY FAX OF OCTOBER 23 WAS *NOT A REJECTION* OF THE VESSEL. IT IS DIFFICULT TO SEE HOW THIS COULD BE SO INTERPRETED. IN FACT IT WAS CLEARLY STATED THAT THE INSPECTION REPORT WAS DUE WEDNESDAY (TODAY) AND "WE ARE SERIOUS ABOUT THIS VESSEL." FRANKLY, OWNERS [sic] RECENT LACK OF RESPONSE CONVEYS THE IMPRESSION OF A RECENT DISINTEREST ON THEIR PART IN TRYING TO CONCLUDE THIS CHARTER....

WE RECEIVED THE FULL DENHOLM REPORT TODAY[, OCTOBER 25,] AND AFTER REVIEW AND ASSUMING OWNERS COOPERATION PER THE AGREED ELIGIBILITY CLAUSE, WE LIFT OUR INSPECTION SUBJECT.

WE NOW LOOK TO OWNERS TO LIFT THEIR CAMARO WITHDRAWL [sic] SUBJECT. THE TITAN BOARD WILL MAKE ITS DECISION WITHIN THE 3 WORKING DAYS AFTER THE LIFTING OF THIS SUBJECT PER OU[R] 9/26 AGREEMENT....

Seabrokers forwarded the fax to Henry Chen of Seagos.

On October 26, Chen informed Seabrokers that the BIN HE had been "WITHDRAWN FROM CAMARO," and stated that "[TITAN] APPROVED THE VSL BELATEDLY. HOWEVER, IF TITAN IS STILL SERIOUS WITH [sic] THE VSL, OWNERS CAN CONSIDER A [TIME CHARTER] ARRANGEMENT FOR THE TIME BEING." In response, on October 26 Titan advised Seabrokers that it was "PLEASED TO FINALLY LEARN ... THAT [THE] VESSEL [HAD BEEN] OFFICIALLY

WITHDRAWN FROM THE CAMARO CHARTER AND [THAT] OWNERS [HAD] LIFTED THIS SUBJECT." Titan stated further that it would respond with its board's approval by the close of business on October 30. In fact, Titan's board of *141* directors approved the charter party on October 27.

On October 30, Titan sent a telex direct to Chen, as well as to Seabrokers, stating, in part, as follows:

CLEARLY, TITAN'S POSITION IS THAT IT HAS DONE WHAT WAS REQUIRED TO CONCLUDE THE 6 MONTH, OPTION 12 MONTH T/C CONTRACT WHICH IT HAD NEGOTIATED, IE. THE $9/26$ AGREEMENT....

THEREFORE, TITAN REQUESTS THAT OWNERS RECONSIDER THEIR WITHDRAWAL OF THE BIN HE AND ADVISE WHEN SHIP WILL BE AVAILABLE IN ITS NEXT POSITION. (REPORTED TO BE HONG KONG).

In response to a suggestion by Chen that the parties pursue expedited resolution of the apparent dispute, Titan faxed Chen directly on November 1, 1995:

Since we firmly believe that we entered into a binding fixture with Owners and therefore have a valid claim, we agree with your suggestion to seek an expedited resolution of this claim. We would suggest submitting this matter to three arbitrators in New York who would have 45 days to take evidence and issue a ruling on the threshold issue of whether the parties entered into a binding agreement on September 26 subject to conditions that were subsequently fulfilled.

Chen faxed Seabrokers on November 2:

PER OUR TELECON THIS MORNING AND SUBSEQUENT DISCUSSION WITH SOUTHERN SHIPPING'S CLAIM DEPT ..., SOUTHERN WILL RESPOND TO U.S. TITAN'S COMMENCEMENT OF ARBITRATION REQUEST. BUT PLS DO NOT DEVIATE BY INTRODUCING NEW FORUM SELECTION. SHELL TIME 4 CAMARO PROFORMA IS VERY CLEAR ON THE SIMPLIFIED ARBITRATION WHICH HAS BEEN AGREED BY U.S. TITAN AND AGREEABLE TO SOUTHERN SHIPPING AS WELL. THERE IS NO NEED FOR A SEPARATE [sic] ARBITRATION AGREEMENT AT AL [sic]

2001 A.M.C. 2080

Later that day, Titan gave Seagos "formal written notice of Arbitration pursuant to the Shell Time 4 clause 41(c) of Camaro/Titan Charter Party."

Titan apparently found the references to Southern Shipping in Seagos's November 2 fax confusing, writing on November 7:

> We refer to our fax of November 2 commencing arbitration pursuant to Clause 41(c) of the Camaro/Titan Charter Party. We want to make clear that Titan has agreed to arbitrate with [Zhen Hua], with whom the Camaro/Titan fixture was negotiated, and not with any other party, including Southern Shipping. Please therefore confirm immediately that [Zhen Hua] has agreed to arbitrate Titan's claims against it in accordance with Clause 41(c) of the Charter.

Replying that same day, Chen faxed Seabrokers:

> ACKNOWLEDGE RECEIPT OF U.S. TITAN'S FAX OF YESTERDAY. HEREWITH CONFIRM THAT ARBITRATION WILL BE BETWEEN ... TITAN ... AND ... ZHEN HUA ... NOT ANY OTHER PARTY INCLUDING SOUTHERN SHIPPING. ACCORDINGLY, LONDON ARBITRATION SHUD [sic] BE COMMENCED IN ACCORDANCE WITH CLAUSE 41(C) OF THE SHELL TIME 4 CAMARO PROFORMA.

On November 9, Titan requested that Seagos, "FOR THE SAKE OF GOOD ORDER, ... *CONFIRM* THAT THE ARBITRATION PROCEEDINGS IN LONDON ARE TO COMMENCE IN ACCORDANCE WITH CLAUSE 41(C) OF THE SHELL TIME 4 [ZHEN HUA]/TITAN PROFORMA, WHICH IS BASED ON *142 THE 'CAMARO' CHARTER." The same day, Chen responded:

> THANX JOHN'S FAX TO WHICH OWNERS REPLY THAT THEY CAN REITERATE THAT BOTH SIDES HAVE AN AGREEMENT TO ARBITRATE IN LONDON VIA SIMPLIFIED PROCEDURE ACCORDING TO SHELL TIME 4 CLAUSE 41(C) CAMARO PROFORMA TO ASCERTAIN WHETHER THERE IS A CHARTER BETWEEN GUANGZHOU ZHEN HUA AND U.S. TITAN.
>
> GUANGZHOU ZHEN HUA WILL WORK WITH U.S. TITAN IN THE ARBITRATOR NOMINATION PROCESS TO EXPEDITE THIS ARBITRATION PROCEDURE.

Titan replied on November 10:

> ACKNOWLEDGE YOUR FAX OF 9TH NOVEMBER.
>
> WE CONFIRM ARBITRATION IN LONDON IS ACCEPTABLE PER THE AGREEMENT.
>
> WE LIST BELOW OUR NAMES OF THREE ARBITRATORS AND REMIND [ZHEN HUA THAT IT] NEED ONLY AGREE ON ONE. SHOULD NONE BE ACCEPTABLE, PLEASE HAVE OWNERS ADVISE U.S. SOONEST [sic] OF THEIR LIST OF THREE ALTERNATIVES.
>
> IF WE ARE UNABLE TO COME UP WITH A SOLE ARBITRATOR THROUGH THIS PROCEDURE, WE RECOMMEND THAT EACH PARTY NOMINATE A SOLE ARBITRATOR AND THEN THEY WOULD AGREE ON A THIRD.

Titan also listed its three nominees in the fax.

On November 24, Zhen Hua sent a fax directly to Titan stating, "WE, AS PRIOR DISOPPONENT OWNER OF BIN HE, HEREBY AGREE TO SUBMIT THIS MATTER TO LONDON ARBITRATOR PURSUANT TO THE SHELL TIME 4 CLAUSE 41. NO DOUBT THIS DISPUTE WILL BE GOVERN [sic] BY ENGLISH LAW." Zhen Hua then listed three nominees of its own, apparently indicating that Titan's nominees were unsatisfactory.

On November 28, 1995, Titan acknowledged that the parties had not reached agreement on a sole arbitrator and suggested a procedure for appointing a panel of three arbitrators. Titan added, "PLEASE ADVISE IF THIS PROCEDURE IS AGREEABLE. WE WILL THEN NOTIFY YOU OF OUR APPOINTED ARBITRATOR." Zhen Hua responded,

> AS TO THE ARBITRATION PROCEDURE, WE PERFER [sic] TO MAINTAIN THAT ONLY ONE LONDON ARBITRATOR WOULD BE APPOINTED BY BOTH PARTIES ACCORDING TO THE AD HOC ARBITRATION CLAUSE. OBVIOUSLY THIS PROCEDURE WILL SAVE YOUR AND OUR TIME AND COST. WE THEREFORE WOULD BE GRATEFUL IF YOU COULD PROVIDE ANOTHER LIST OF ARBITRATOR[S] FOR OUR ELECTION.

Titan never submitted another list of arbitrators. Instead, more than two months later on February 7, 1996, Titan sent a fax to the attention of Chen at Seagos:

AFTER A REVIEW OF OUR FILE INCLUDING THE RECENT CORRESPONDENCE BETWEEN U.S. ON THE ISSUE OF ARBITRATION IN LONDON, IT APPEARS TO U.S. THAT WE DO *NOT* HAVE:

1.) YOUR CLEAR AGREEMENT THAT [ZHEN HUA] IS THE APPROPRIATE PARTY IN DISPUTE WITH U.S. TITAN. OTHERWISE, WHY THE CORRESPONDENCE TO U.S. BY THE "FORMER DISPONENT OWNERS" SOUTHERN SHIPPING WHICH IS IRRELEVANT.

2.) AN ACKNOWLEDGEMENT BY YOU THAT WE HAVE A BINDING CHARTER PARTY AGREEMENT; RATHER, WE HAVE OBLIQUE *143 REFERENCES TO THE "PRO FORMA CAMARO CHARTER" AND AN AD HOC ARBITRATION CLAUSE.

WE WILL *NOT* AGREE TO ARBITRATION OUTSIDE OF THE BINDING TITAN/[ZHEN HUA] CHARTER.

GIVEN THE ABSENCE OF SUCH AN ACKNOWLEDGEMENT, WE SEE NO REASON TO CONCLUDE THAT LONDON IS THE JURISDICTION FOR THIS DISPUTE, AND WE ARE INITIATING LITIGATION AGAINST [ZHEN HUA] IN NEW YORK COURTS.

Later that day, Zhen Hua responded:

1. IT IS VERY CLEAR FROM THE ALLEGED C/P AND THE CORRESPONDENCE REGARDING THE ARBITRATION THAT THE PARTY INVOLVED ON THE PART OF "OWNER" IS [ZHEN HUA]. PLEASE CLARIFY WHY YOU REFER TO "SOUTHERN SHIPPING" MANY TIMES.

2. YOU ARE NOT ALLOWED TO BE IN BREACH OF THE AD HOC ARBITRATION CLAUSE WHICH IS ACTUALLY RUNNING.

3. WE ARE STILL WAITING FOR YOUR ANOTHER [sic] LIST OF LONDON ARBITRATOR[S].

**B. *The Proceedings Below***

On February 7, 1996, Titan filed a petition to compel arbitration pursuant to section 4 of the FAA in the United States District Court for the Southern District of New York. Titan requested "a summary determination of the making of a binding charter party contract between Titan and respondent

[Zhen Hua] and to compel [Zhen Hua] to arbitrate Titan's claim for breach of that charter party." In its petition, Titan argued:

Since the charter contract between [Zhen Hua] and Titan is a condition precedent to the arbitration agreement incorporated into that contract, the Court must determine the threshold issue whether the parties entered into that contract. Therefore, pursuant to 9 U.S.C. § 4, Titan requests that the Court proceed summarily to try the question of whether [Zhen Hua] and Titan agreed to a binding charter contract. Titan further requests that the Court, upon finding that [Zhen Hua] entered into a binding contract with Titan, pursuant to 9 U.S.C. § 4 and § 206, forthwith direct [Zhen Hua] to arbitrate any remaining issues including damages in accordance with the charter party arbitration agreement.

On October 29, 1996, Zhen Hua gave notice of its motion to: (1) dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(2), based on lack of personal jurisdiction over Zhen Hua; (2) dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(1), based on lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603-1611, (the "FSIA"), and based on the existence of an "ad hoc" agreement to arbitrate whether the parties had formed a binding charter party; (3) in the alternative, dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(3) and 28 U.S.C. § 1391(f) for improper venue; and (4) in the alternative, stay the proceedings pursuant to section 3 of the FAA and section 208 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-208, (the "Convention").

On August 5, 1998, the district court issued its first of two opinions, holding that the parties had *not* formed an "ad hoc" arbitration agreement but that they had formed a binding charter party, granting Titan's motion to compel arbitration pursuant to the arbitration clause contained in the charter party, and denying Zhen Hua's cross-motion to dismiss the petition. See *Titan I,* 16 F.Supp.2d at 330, 340. The court also stayed the proceedings pending arbitration in London. See *id.* at 330, 330 n. 1, 340.

Subsequently, Zhen Hua moved to alter or amend the opinion and order pursuant *144 to Fed.R.Civ.P. 59(e) and Local Civil Rule 6.3, on the ground that the court's opinion "did not fully identify the issues left open for consideration by the arbitrators in London." *Titan II,* 182 F.R.D. at 99 (internal quotation marks omitted). Zhen Hua argued that *Titan I* made "unclear to the arbitrators whether they may excuse the parties' performance under the charter if respondent can prove

2001 A.M.C. 2080

that the 'subjects' or conditions were not satisfied." *Id.* at 101. In opposition, Titan argued that the opinion "unambiguously and correctly limited the scope of the arbitrators' authority." *Id.* at 99.

In its second opinion, the district court noted first that "[t]he pivotal issue is whether the arbitrators may excuse the parties from their obligations under the charter in the event that one of the subjects, or conditions[,] has not been satisfied." *Id.* at 99-100 (internal quotation marks omitted). *Id.* Having characterized the issue as such, the district court then held:

> We grant respondent's motion to the extent of specifying that the parties must arbitrate in London all disputes arising under the charter party. Thus, the arbitrators may determine whether the actions of either party, subsequent to the formation of the charter party, have vitiated the agreement. Any parts of our prior Opinion which suggested otherwise are hereby withdrawn.

*Id.* at 101. [6]

[6]   Because the judgment had not yet been entered pursuant to the August 5 opinion, the court found Rule 59(e) to be inapplicable and instead treated Zhen Hua's motion as an attempt to obtain "clarification" of the opinion under Local Rule 6.3. *See id.* at 100-01.

An amended judgment was entered on October 7, 1998. This appeal followed.

## II. DISCUSSION

On appeal, Zhen Hua argues that the district court erred in several regards. First, Zhen Hua asserts that in November 1995 the parties reached an "ad hoc" agreement, separate and distinct from the provisions of the charter party, for the purpose of arbitrating whether they had entered into a charter party. If so, contends Zhen Hua, the FAA cloaked the district court with jurisdiction *only* to order arbitration in accordance with that agreement, leaving the issue of charter party formation to the arbitrator. Second, Zhen Hua contends that the district court lacked subject-matter jurisdiction under the FSIA. Third, Zhen Hua asserts that the district court lacked personal jurisdiction over Zhen Hua because Zhen Hua did not have "substantial" or "continuous and systematic" contacts with the United States. Finally, Zhen Hua claims that venue in the Southern District of New York was improper. For the reasons stated below, we disagree with Zhen Hua and affirm the decision of the district court.

### A. *The Purported Agreements*

The district court held that the parties did not enter into an "ad hoc" agreement to arbitrate whether they had formed a charter party, but did conclude that the parties had formed a charter party that included an arbitration clause requiring the parties to submit charter-related disputes to arbitration in London. As a result, the court granted Titan's motion to compel arbitration pursuant to the charter party and stayed the litigation pending such arbitration. On appeal, Zhen Hua argues that, as a matter of law, the parties' communications established an "ad hoc" arbitration agreement that, under the FAA and the Convention, delegated authority to an arbitrator in London to determine whether the parties had formed a charter party. We disagree.

### 1. *Standard of Review*

Before addressing the merits of Zhen Hua's argument, we must resolve the parties' dispute over the standard of review applicable to the district court's conclusions about the existence, or lack thereof, *\*145* of the two purported agreements. According to Zhen Hua, the district court decided the contractual formation issues as a matter of summary judgment and therefore our review is de novo. In response, Titan contends that the district court appropriately made findings of fact based on the parties' evidentiary submissions and that we review such findings, including the court's factual findings on formation, for clear error.

**2**    The determination of whether there was a meeting of the minds sufficient to constitute a contract is one of fact. *See Interocean Shipping Co. v. National Shipping & Trading Corp.,* 523 F.2d 527, 534 (2d Cir.1975). This remains true regardless of whether the contract at issue is an arbitration agreement, *see Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 845 (2d Cir.1987) ("Based on [written] exchanges and after a detailed review of the voluminous evidentiary submissions, the district court found that [plaintiff] had agreed to arbitrate its disputes under both the signed and unsigned agreements with ... defendants. We see no reason to disturb this factual finding."), or a charter party, *see Great Circle Lines, Ltd. v. Matheson & Co.,* 681 F.2d 121, 125 (2d Cir.1982) ("Whether there was a meeting of the minds resulting in a charter party is a question of fact.").

When parties disagree about whether they entered into an arbitration agreement subject to the FAA, the FAA directs that the "court shall proceed summarily to ... trial" of the issue. 9 U.S.C. § 4. Contrary to Zhen Hua's characterization of the

2001 A.M.C. 2080

proceedings below, the district court's opinion and the record make clear that the district court did try the issue of whether the parties formed an agreement to arbitrate. Although the district court did not hold an evidentiary hearing, the parties filed multiple briefs and extensive evidence with the court over a two-year period. Most significantly, the parties submitted the telex and facsimile communications that were alleged to have formed the "ad hoc" arbitration agreement (according to Zhen Hua) and the charter party (according to Titan). No dispute existed as to the authenticity of these communications. Instead, the parties disagreed over the meaning of the communications.

**3**   In addition, Zhen Hua did not and does not now seek an evidentiary hearing. Nowhere in its briefs does Zhen Hua assert that it requested the district court to hold an evidentiary hearing. Furthermore, Zhen Hua does not contest (or even address) the district court's statement in footnote twelve of its first opinion that notwithstanding "[s]ection 4 of the FAA ..., no such hearing [was] required." *See Titan I,* 16 F.Supp.2d at 337 n. 12 (internal citation omitted). Finally, Zhen Hua explicitly disclaims that the case should be remanded to the district court for such a hearing:

> *Neither Titan nor Zhen Hua seeks remand for a factual trial,* nor is a trial appropriate when the sole issue is whether, as a matter of law and through application of the presumption favoring arbitration, the parties' communications reflect an enforceable agreement to arbitrate the issue of charter formation.

Appellant's Reply Br. at 12-13 (emphasis added). Consequently, under the circumstances of the matter *sub judice,* we hold that the district court tried the issue of formation (of both purported agreements) on the papers and that Zhen Hua has waived any right under the FAA to an evidentiary hearing.

**4**   The correct standard of review of the facts found by the trial court is contained in Rule 52(a) of the Federal Rules of Civil Procedure: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...." As stated in the rule, the "clearly erroneous" standard of review controls our consideration of the factual findings of the district court *even though based upon a documentary record. See Anderson v. City of Bessemer City,* **\*146** *North Carolina,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We are not permitted to find the district court's findings of fact to be clearly erroneous if the findings are one of two permissible views of the evidence. *See id.*

### 2. *Formation of the Purported Agreements*

**5   6**   "The Federal Arbitration Act creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.' " *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir.1996) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Arbitration agreements subject to the Convention are enforced in accordance with Chapter 2 of the FAA. *See* 9 U.S.C. § 201. An agreement to arbitrate exists within the meaning of the Convention and the FAA if: (1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope. *See Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 92 (2d Cir.1999); *see also* 9 U.S.C. § 202. Upon finding that such an agreement exists, a federal court must compel arbitration of any dispute falling within the scope of the agreement pursuant to the terms of the agreement.

**7   8**   Zhen Hua and Titan argue over whether the first requirement, i.e., the existence of a written agreement to arbitrate, has been met with regard to the "ad hoc" agreement and the charter party. Under the Convention a written agreement "include[s] an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." 9 U.S.C. § 201, Convention on the Recognition and Enforcement of Foreign Arbitrable Awards, Art. II(2). [7] Notwithstanding the strong federal policy favoring arbitration as an alternative means of dispute resolution, *see David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London),* 923 F.2d 245, 248 (2d Cir.1991), courts must treat agreements to arbitrate like any other contract, *see Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement. *See Interocean Shipping,* 523 F.2d at 534. A court must therefore examine the parties' written communications to determine whether they have formed an agreement to arbitrate enforceable under the FAA and the Convention.

7      The text of the Convention is found immediately following 9 U.S.C. § 201.

2001 A.M.C. 2080

### a. The "Ad Hoc" Arbitration Agreement

The district court considered Zhen Hua's argument that in November 1995 the parties reached a separate, "ad hoc" agreement to arbitrate whether the parties had *formed* a binding charter party. Preliminarily, the court noted that "the existence of an agreement to arbitrate is a threshold question for a court to resolve, absent a clear and unmistakable delegation of that authority to an arbitrator." *Titan I,* 16 F.Supp.2d at 337 (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). The court also observed that "where the parties contest the formation of an agreement, 'any silence or ambiguity about whether such a question is arbitrable reverses the usual presumption that issues should be resolved in [arbitration's] favor.' " *Id.* at 338 (quoting *Abram Landau Real Estate v. Bevona,* 123 F.3d 69, 72 (2d Cir.1997) (citing *First Options,* 514 U.S. at 943, 115 S.Ct. 1920)). The court *\*147* then found that although the parties had begun negotiating such an "ad hoc" agreement around November 1, Zhen Hua cut off such negotiations on November 2 when it stated, "There is no need for a separate arbitration agreement." *Id.* Therefore, the court concluded, the parties never formed a separate agreement to arbitrate whether they had formed a charter party.

On appeal, Zhen Hua argues that the district court erroneously relied on *First Options* to require evidence that the parties had "clear[ly] and unmistakabl[y]" delegated authority to an arbitrator to decide the question of *charter* formation. Instead, Zhen Hua contends, the district court should have applied the contract formation standards articulated by the Convention to find that the parties had formed an "ad hoc" agreement to arbitrate formation of the charter party.

In *First Options,* the Supreme Court addressed, *inter alia,* the "narrow" issue of the appropriate "standard of review applied to an arbitrator's decision about arbitrability." 514 U.S. at 942, 115 S.Ct. 1920. In defining this issue, the Court delineated the three types of disagreement between the parties: (1) whether the defendants were liable to the plaintiffs; (2) whether the parties agreed to arbitrate the issue of liability; and (3) whether the courts or the arbitrators possess the primary power to decide the second question. *See id.* The issue presented to the Supreme Court was the third question, which the Court reformulated as "Does that power belong primarily to the arbitrators (because the court reviews their arbitrability decision deferentially) or to the court (because the court makes up its mind about arbitrability

independently)?" *Id.* Answering this question, the Supreme Court held that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e] evidence that they did so,' " *id.* at 944, 115 S.Ct. 1920 (second and third alterations in the original), and that any silence or ambiguity about whether such a question is arbitrable reverses the usual presumption that issues should be resolved in favor of arbitration, *see id.* at 944-45, 115 S.Ct. 1920; *Abram Landau,* 123 F.3d at 72-73 (citing, *inter alia, First Options,* 514 U.S. at 943, 115 S.Ct. 1920).

Zhen Hua is correct that the standard articulated by the Supreme Court in *First Options* is not apposite to the precise question presented to the district court. Unlike *First Options,* the instant case required the district court to determine whether the parties formed an "ad hoc" agreement to arbitrate whether they had formed a charter party-an issue analogous to the second of the three disagreements between the litigants in *First Options.* On appeal, neither Zhen Hua nor Titan contends that an arbitrator should resolve this question; instead the parties disagree as to whether the court below correctly answered this question.

Zhen Hua errs, however, in asserting that the district court applied the *First Options* standard in deciding whether the parties had formed an "ad hoc" arbitration agreement. When read in context, the passage of the district court's opinion relying on *First Options* (and *Abram Landau*) makes clear that the district court invoked the standard only to note *preliminarily* that the dispute over formation was properly before it rather than an arbitrator. *See Titan I,* 16 F.Supp.2d at 337-38. Furthermore, the ensuing analysis by the district court reveals that the district court correctly evaluated the written communications under general principles of the law of contract formation (consistent with the Convention) in finding that Zhen Hua had terminated negotiations over an "ad hoc" arbitration agreement. *See Genesco,* 815 F.2d at 845 ("[Under the FAA] whether [a party] is bound by [an] arbitration clause ... is determined under federal law, which comprises generally accepted principles of contract law.").

9    Having determined that the district court did not apply the *First Options* standard, we conclude further that the district *\*148* court did not commit clear error in finding that the parties did not reach a binding "ad hoc" agreement to arbitrate the issue of formation of the charter party. On November 2, 1995, Zhen Hua rejected Titan's proposal to arbitrate the issue of charter formation in New York, stating:

2001 A.M.C. 2080

PLS DO NOT DEVIATE BY INTRODUCING NEW FORUM SELECTION. SHELL TIME 4 CAMARO PROFORMA IS VERY CLEAR ON THE SIMPLIFIED ARBITRATION WHICH HAS BEEN AGREED BY U.S. TITAN AND AGREEABLE TO SOUTHERN SHIPPING AS WELL. THERE IS NO NEED FOR A SEPARATE [sic] ARBITRATION AGREEMENT AT AL [sic].

The district court did not commit clear error in finding this statement to be a rejection of the idea of an arbitration agreement extraneous to the charter party. However, even if *we* were to interpret the statement to constitute an acceptance of the offer to arbitrate charter formation combined with a proposal that the parties employ the procedures set forth in the form agreement serving as the basis for the purported charter party, we could not override the factfinder's interpretation because the November 1 communication is certainly susceptible of both meanings.

Subsequent communications between the parties bolster our conclusion that the district court's findings were not clearly erroneous. The November 7 communication from Zhen Hua acknowledged Titan's notification of arbitration pursuant to Clause 41(c) of the charter party, and removed the confusion over previous references to "Southern Shipping," but failed to specify that the parties were arbitrating the issue of the formation of the charter. Titan then requested confirmation that the parties were agreeing to arbitrate in accordance with the very charter party to which Titan believed Zhen Hua was bound. Although Zhen Hua replied that "[o]wners ... reiterate that both sides have an agreement to arbitrate in London via simplified procedure according to Shell Time 4 Clause 41(c) Camaro Proforma to ascertain whether there is a charter between Guangzhou Zhen Hua and U.S. Titan," Titan never responded to this suggestion that the parties were arbitrating the issue of the existence of the charter party. Instead, Titan responded that arbitration was acceptable "per the agreement," which the district court reasonably construed to mean the charter party itself. *See Titan I,* 16 F.Supp.2d at 338 n. 13. From November 1995 until February 1996, the parties dickered over arbitrators, never clarifying what exactly they were arbitrating or which agreement bound them to arbitrate. As a result, we hold that the district court did not commit clear error by finding that the negotiations never resulted in a "meeting of the minds" sufficient to form a binding "ad hoc" agreement to arbitrate whether they had entered into a charter party.

**b. *The Charter Party***

Although the district court determined that the parties did not form an "ad hoc" arbitration agreement, the district court granted Titan's motion to compel arbitration on the ground that the parties had formed a binding charter party that included an arbitration clause. Specifically, the court concluded that the parties formed a charter party through their respective brokers no later than September 26, 1995, on which date Titan's broker (Seabrokers) confirmed the agreement by faxing both parties a "recap" or "fixture." *See id.* at 339. Relying on this Court's decision in *Great Circle Lines,* the district observed that "[a 'recap' communication, or 'fixture,' is recognized throughout the shipping industry as an agreement to a charter party's essential terms." *Titan I,* 16 F.Supp.2d at 339 (citing *Great Circle Lines,* 681 F.2d at 125, 125 n. 2). In the court's view, the "recap" embodied the charter party's main terms by incorporating the terms of Shell Time 4 Charter, a **\*149** standard form charter, which included an arbitration clause. *See id.*

The court then rejected on two grounds Zhen Hua's argument that the charter party did not come into force due to the alleged failure of one of its "subjects"-the approval of the charter party by Titan's board of directors upon receipt of the inspection report. First, the court found that the weight of the evidence demonstrated that Titan's board did approve the charter party within the agreed time period. *See id.* Second, relying again on *Great Circle Lines,* the court held that "a 'subject detail' does not create a condition subsequent to a charter party." *Id.* As a result, the court ordered that the parties arbitrate in London pursuant to the charter party's arbitration clause any disputes arising under the charter party. *See id.* at 340. In a subsequent opinion the court clarified that the London "arbitrators may determine whether the actions of either party, subsequent to the formation of the charter party, have vitiated the agreement." [8] *Titan II,* 182 F.R.D. at 101.

[8]    In so holding, the court withdrew inconsistent portions of its previous opinion, which would appear to include its factual finding that Titan's board satisfied the post-inspection approval "subject." *See Titan II,* 182 F.R.D. at 102 ("Accordingly, a factual dispute as to whether one of the stated conditions has been satisfied, and the effect of such failure, are issues for the arbitrators, not the Court.")

On appeal, Zhen Hua contends that the district court made an erroneous finding as to the existence of a charter party. Zhen Hua does not contest, however, that the district court's finding was in accordance with the standard set forth in *Great Circle Lines,* which holds that a "recap" communication, such as the

one sent on September 26, 1995 in the instant case, represents "an agreement as to the charter party's main terms," with the "subject details" being no more than an acknowledgment of an intention to continue negotiations. Instead, Zhen Hua calls for the overruling of *Great Circle Lines*, asserting that its holding conflicts with the laws of the United Kingdom and with the trade practices of the shipping industry at large. Unpopular though it may be, *Great Circle Lines* is binding precedent, and we "will not overrule a prior decision of a panel of this Court absent a change in the law by higher authority or by way of an in banc proceeding of this Court." *Samuels v. Mann,* 13 F.3d 522, 526 (2d Cir.1993).

**10    11    12    13**    Given that the district court (as well as this Court) is bound by *Great Circle Lines,* the district court correctly applied *Great Circle Lines* to find that the parties had formed a charter party. Under *Great Circle Lines,* the September 26, 1995 "recap" constituted proof of a binding agreement or "fixture," which is "a commitment that a voyage will be performed," and one which "presupposes a final contract, with main terms set, and final details to be resolved subsequently." 681 F.2d at 125 n. 2. As explicated in *Great Circle Lines,*

> [c]harter parties are formed in two stages. First, significant "main" terms are negotiated through brokers. These terms usually include the name of the charterer, name of owner, ship, and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important. These are considered the "bare-bones" of the contract. The "main" terms when agreed upon are entitled a "fixture." Second, after a "fixture" has been reached, the parties continue to negotiate "details" amending the form contract specified in the "fixture." These minor or side issues "flesh-out" the original agreement or fixture. The "details" include a wide variety of matters, for example: fuel used, speed of vessel, condition of ship's holds, exact time of ship's delivery to charterer, brokerage, breakdown, bunkering, option to extend charter, cargo capacity, demurrage and ***150*** whatever else is deemed by the parties to be of minor importance.

*Id.* at 125 (footnote omitted). In other words, Titan and Zhen Hua formed an enforceable agreement to charter the BIN HE, subject to certain conditions, including: (1) "CP Details," i.e., future agreement between the parties about charter party terms other than those enumerated in the broker's recap; (2) a satisfactory inspection of the ship in drydock; (3) the ship's release from a time charter to a company called

Camaro, to which it was still chartered at the time; and (4) approval by Titan's board of directors of the proposed charter within 3 days of receipt of the drydock inspection report. Consequently, even if Titan's board did fail to timely approve the charter, such failure would not prevent or undo formation of the charter party. Instead, the failure (if any occurred) would constitute a breach of the charter party for which the London arbitrator may impose a remedy consistent with the terms of the charter party and English law (which, under the charter party, controls the interpretation of the agreement). [9]

[9]    Furthermore, although Zhen Hua does not raise the issue, we note that the district court was required under the FAA and the Convention to determine whether the parties had formed the charter party, as a whole, rather than ordering arbitration under the charter party's arbitration clause on the ground that it was separable from the charter party. Although a sufficiently broad arbitration clause may be separated from the contract in which it is embedded to permit arbitration of the enforceability of the contract itself, *see Prima Paint Corp.,* 388 U.S. at 403-05, 87 S.Ct. 1801 (1967); *Genesco,* 815 F.2d at 845 (compelling arbitration of fraudulent inducement claim pursuant to clause providing for arbitration of "[a]ll claims and disputes *of whatever nature* arising under this contract") (emphasis added), the instant clause-covering "[a]ny dispute arising under this charter"-does not rise to the required level of expansiveness, *see In re Kinoshita & Co.,* 287 F.2d 951, 953 (2d Cir.1961) (holding clause that provided for arbitration "[i]f any dispute or difference should arise under this Charter" too narrow to include arbitration of fraudulent inducement claim).

## B. *Subject Matter Jurisdiction under the FSIA*

Zhen Hua moved the trial court to dismiss Titan's petition for lack of subject matter jurisdiction on the ground Zhen Hua was immune from suit under the FSIA. The district court agreed with Zhen Hua, and no dispute exists here, that Zhen Hua qualifies as a "foreign state" under the FSIA because it is a corporation owned by the People's Republic of China. [10] *See Titan I,* 16 F.Supp.2d at 333. Nevertheless, the district court held that Zhen Hua fell within two exceptions to the FSIA's grant of jurisdictional immunity to foreign states: (1) the arbitration exception, *see* 28 U.S.C. § 1605(a)(6)(B); and (2) the commercial activities exception, *see id.* § 1605(a) (2). [11] *See Titan I,* 16 F.Supp.2d at 334, 335. Because we hold the former exception applicable, we do not address the latter.

[10]    The FSIA provides that "[s]ubject to existing international agreements to which the United States is a

party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Under the FSIA a " 'foreign state' ... includes ... an agency or instrumentality of a foreign state," which, in turn, is defined to include "any entity ... which is a separate legal person, corporate or otherwise, and ... a majority of whose shares or other ownership interest is owned by a foreign state." 28 U.S.C. § 1603(a), (b).

11    District courts have

original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of [Title 28] as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of [Title 28] or under any applicable international agreement.

28 U.S.C. § 1330(a).

14    The standard of review applicable to district court decisions regarding subject *151 matter jurisdiction under the FSIA is clear error for factual findings and de novo for legal conclusions. See Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 930 (2d Cir.1998).

The so-called arbitration exception to the FSIA provides in pertinent part:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

...

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if ... (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards ...

28 U.S.C. § 1605(a). The district court found that, because China and the United States were both signatories to the Convention, and because Titan alleged that the parties had entered into a charter party containing an arbitration clause, it had jurisdiction to determine whether the parties formed an agreement to arbitrate so as to vitiate Zhen Hua's immunity under the FSIA. See Titan I, 16 F.Supp.2d at 334.

On appeal, Zhen Hua contends that, because there was an "ad hoc" agreement to arbitrate the issue of whether a charter party existed, the arbitration clause in the "alleged charter" could not form the basis for waiver of immunity by Zhen Hua under § 1605(a)(6)(B). Zhen Hua further asserts that the exception "might have applied if Titan had sought to enforce the 'ad hoc' agreement and to compel [Zhen Hua] to arbitrate in London the question of whether a binding charter had been concluded [but that] Titan ... never asked for such relief, nor did [Zhen Hua], who raised the 'ad hoc' agreement only defensively in seeking dismissal or a stay of the suit." Appellant's Brf. at 20.

15    In light of our ruling above that the district court did not commit clear error in finding that parties did not form an "ad hoc" arbitration agreement, we need not further address Zhen Hua's argument. Instead, we hold simply that the arbitration clause contained in the charter party satisfies the requirements of arbitration exception to the FSIA.

C. Personal Jurisdiction

Zhen Hua also moved the district court to dismiss for lack of personal jurisdiction. After noting that subject matter jurisdiction and personal jurisdiction over foreign sovereigns are nearly coextensive, the court determined that Zhen Hua's contractual negotiations with Titan satisfied constitutional due process requirements. See Titan I, 16 F.Supp.2d at 335-36. On appeal, Zhen Hua attacks the latter conclusion, arguing that (1) its contacts with the United States were not substantial, continuous and systematic, or purposeful in the sense required to satisfy due process concerns, and (2) the actions of Seagos cannot be imputed to Zhen Hua because Seagos served as a broker rather than an agent. We disagree.

16    The standard of review applicable to district court decisions regarding personal jurisdiction is clear error for factual findings and de novo for legal conclusions. See Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1016 (2d Cir.1991).

17    In general, "subject matter jurisdiction plus service of process equals personal jurisdiction" under the FSIA. Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 308 (2d Cir.1981). Zhen Hua does not contend

*152 that service of process was improper. However, the exercise of personal jurisdiction under the FSIA must also comport with the Due Process Clause, *see id.* at 313, which permits a forum to exercise personal jurisdiction over a non-resident defendant who has "certain minimum contacts [with the forum] ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,' " *Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940), and *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

**18   19   20**   In invoking the "continuous and systematic" contacts test of *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), Zhen Hua fails to distinguish between "general personal jurisdiction" and "limited" or "specific" personal jurisdiction. General personal jurisdiction, which does require a finding of "continuous and systematic" contacts, is only necessary when the cause of action does not arise from the defendant's contacts with the forum state. *See Chaiken v. VV Publ'g Corp.,* 119 F.3d 1018, 1027-28 (2d Cir.1997). Where, as here, the claim arises out of, or relates to, the defendant's contacts with the forum, i.e., the negotiation of the charter party with an American corporation located in New York and the use of brokers in Connecticut, [12] the defendant need only prove "limited" or "specific" jurisdiction. *See id.* at 1028. In such a case, the required minimum contacts exist where the defendant "purposefully availed" itself of the privilege of doing business in the forum and could foresee being "haled into court" there. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

[12]   In determining whether personal jurisdiction exists over a foreign defendant who, like Zhen Hua, has been served under a federal service of process provision, *see Titan I,* 16 F.Supp.2d at 335 (noting absence of "dispute that [Zhen Hua] was properly served pursuant to 28 U.S.C. § 1608), a court should consider the defendant's contacts throughout the United States and not just those contacts with the forum." *See Chew v. Dietrich,* 143 F.3d 24, 27-28, 30 (2d Cir.1998) (holding in maritime action that German defendant's contacts with the United States were sufficient to establish personal jurisdiction); *Go-Video, Inc. v. Akai Elec. Co.,* 885 F.2d 1406, 1414-15 (9th Cir.1989); *see also Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 293 (3d Cir.1985).

In addition, a court must determine whether the assertion of personal jurisdiction "comports with 'traditional notions of fair play and substantial justice'-that is, whether it is reasonable under the circumstances of a particular case." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.1996) (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154).

> Whether it is "reasonable" to exercise jurisdiction in a particular case depends on "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."

*Chaiken,* 119 F.3d at 1028 (quoting *Metropolitan Life,* 84 F.3d at 568).

**21**   Here, the record establishes that Zhen Hua "purposely availed itself" of the United States forum by negotiating and forming a contract with an American corporation located in New York. To facilitate the negotiations Zhen Hua utilized a broker located in Connecticut, which communicated with Titan personnel in New York via telex and/or facsimile to Titan's broker *153 in Connecticut. [13] Having engaged in this commercial conduct, [14] Zhen Hua should have foreseen the possibility of being "haled into [an American] court" if a dispute were to arise out of the negotiations. Furthermore, Zhen Hua proffers no reason to believe that litigating in New York for the sole purpose of referring this matter to arbitration in London will impose or has imposed any undue hardship. Given the conduct of Zhen Hua, the nature and purpose of the litigation, and Titan's interest in obtaining an efficient referral to arbitration, the district court's exercise of personal jurisdiction was reasonable. Accordingly, the district court correctly concluded that it possessed personal jurisdiction over Zhen Hua.

[13]   The record also reveals that Zhen Hua sent telex or facsimile communications directly to Titan concerning arbitration.

[14]   Whether Seagos served as Zhen Hua's agent for all purposes is immaterial. Zhen Hua engaged in commercial negotiations with Titan through Seagos, which served as Zhen Hua's agent for the exchange of communications.

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135 (2001)

2001 A.M.C. 2080

### D. *Venue*

Finally, Zhen Hua moved the district court to dismiss the action for improper venue. The district court denied the motion, holding that the facsimile and telephone communications between Titan's offices in Pelham, New York and the brokers' offices in Connecticut constituted a substantial part of the events giving rise to the action. *See Titan I,* 16 F.Supp.2d at 336-37. On appeal, Zhen Hua argues that the court erred by relying on an inapplicable subsection of the venue statute and grounding its conclusion upon the fact that Titan and its broker sent communications between New York and Connecticut.

We have not previously decided whether we review a district court's determination of venue for abuse of discretion or de novo, but we need not resolve the issue here because the district court's decision would be entitled to affirmance under either standard.

Zhen Hua correctly argues that the apposite venue provision is 28 U.S.C. § 1391(f) (concerning civil actions against foreign states) rather than 28 U.S.C. § 1391(b) (concerning civil actions not founded solely on diversity of citizenship). The district court's mis-citation does not, however, vitiate its analysis. The language upon which the district court relied is common to both subsection (b) and subsection (f) of § 1391. *Compare* 28 U.S.C. § 1391(b)(2) ("A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought ... in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ....") *with id.* § 1391(f)(1) ("A civil action against a foreign state as defined in [the FSIA] may be brought ... in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred....").

**22**  As held by the district court, the charter party giving rise to Titan's claim and the purported "ad hoc" arbitration agreement giving rise to Zhen Hua's defense were negotiated between China and Pelham, New York via Connecticut. That many of Zhen Hua's communications reached Titan's offices in New York through the Connecticut brokers does not alter the fact that Zhen Hua directed communications to New York. Accordingly, venue in the Southern District of New York was proper. *Cf. Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 868 (2d Cir.1992) ("We conclude that receipt [within the district] of a collection notice is a substantial part of the events giving rise to a claim under the Fair Debt Collection Practices Act [to establish venue within that district pursuant to § 1391(b)(2)]."); *Sacody Techs., Inc. v. Avant, Inc.,* 862 F.Supp. 1152, 1157 (S.D.N.Y.1994) ("The standard *\*154* set forth in § 1391(a)(2) [which employs the 'substantial part' language,] may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action.").

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court. The parties should proceed to arbitration in London pursuant to the district court's August 5, 1998 opinion and order (as amended September 25, 1998) and September 29, 1998 opinion and order.

Parallel Citations

2001 A.M.C. 2080

Footnotes

4    At the time of the negotiations, the BIN HE was chartered to another party, Camaro. Consequently, Zhen Hua was required to obtain a release of the BIN HE from the "Camaro TC" in order to transfer possession to Titan.

**End of Document**                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 12

129 F.3d 71
United States Court of Appeals,
Second Circuit.

WORLDCRISA CORPORATION and
Crisa Corporation, Plaintiffs-Appellees,

v.

Patrick J. ARMSTRONG, Defendant-Appellant.

No. 302, Docket 97-7053.    Submitted
Sept. 16, 1997.    Decided Oct. 16, 1997.

Wholesaler and its parent corporation brought action against former employee, alleging default of employee's obligations under termination and credit agreement and seeking recovery from employee, as guarantor, for obligations of employee's designee that arose in connection with agreement. Employee filed demand for arbitration, alleging breach of contract and fraud claims against wholesaler, and moved to stay action pending arbitration. The United States District Court for the District of Connecticut, Chatigny, J., denied stay. Employee appealed. The Court of Appeals, Feinberg, Circuit Judge, held that: (1) agreement's arbitration clause was sufficiently broad to justify presumption of arbitrability; (2) agreement's arbitration clause applied to dispute; (3) employee did not waive arbitration rights under agreement when he executed guaranty; and (4) litigation on parent company's claims was properly stayed pursuant to district court's inherent powers to control its docket.

Reversed and remanded with instructions.

West Headnotes (13)

**1    Alternative Dispute Resolution** 🔑 Scope and Standards of Review

Review of district court's arbitrability determination is de novo.

**2    Alternative Dispute Resolution** 🔑 Evidence

Arbitration clause providing that any dispute between parties over terms of agreement, or any claim of breach by either of parties, would be submitted to arbitration was sufficiently broad to justify presumption of arbitrability in action alleging breach of condition of agreement and seeking recovery under related guaranty.

12 Cases that cite this headnote

**3    Alternative Dispute Resolution** 🔑 Evidence

In accordance with strong federal policy in favor of arbitration, existence of broad agreement to arbitrate creates presumption of arbitrability which is only overcome if it may be said with positive assurance that arbitration clause is not susceptible of interpretation that covers asserted dispute, and doubts should be resolved in favor of coverage.

68 Cases that cite this headnote

**4    Alternative Dispute
Resolution** 🔑 Construction in Favor of
Arbitration

Close questions as to whether waiver of arbitration has occurred are to be resolved in favor of arbitration.

**5    Alternative Dispute
Resolution** 🔑 Contractual or Consensual Basis

Arbitration is essentially contractual, and parties may not be forced into arbitration if that was not their true agreement.

1 Cases that cite this headnote

**6    Alternative Dispute Resolution** 🔑 Evidence

If arbitration clause is narrowly worded and dispute concerns matter collateral to contract calling for arbitration, court should test presumption of arbitrability by reviewing allegations underlying dispute and by asking whether claim alleged implicates issues of contract construction.

3 Cases that cite this headnote

**7    Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

If allegations underlying claims touch matters covered by parties' agreements, then those claims must be arbitrated pursuant to agreement to

arbitrate, whatever the legal labels attached to them.

7 Cases that cite this headnote

**8** **Alternative Dispute Resolution** 🔑 Employment Disputes

Arbitration clause in termination agreement between wholesaler and former employee applied to dispute in which wholesaler asserted that former employee defaulted under agreement by failing to acquire controlling equity interest in established independent distributor and sought recovery from former employee as guarantor for obligations of his designee that arose in connection with agreement; claim that former employee defaulted raised issues at least touching on matters covered by agreement, and determination of whether former employee satisfied agreement's conditions necessarily involved dispute over agreement's terms. 9 U.S.C.A. § 3.

4 Cases that cite this headnote

**9** **Alternative Dispute Resolution** 🔑 Waiver or Estoppel

Former employee did not waive arbitration rights under termination agreement, pursuant to which former employer agreed to extend credit to employee's designee, when he executed guaranty of designee's obligations to former employer and its parent company; guaranty did not mention agreement or its arbitration clause, and guaranty's provisions in which former employee consented to jurisdiction and venue and waived defenses available by virtue of valuation, stay, moratorium or similar laws was not express, specific waiver required to defeat agreement's arbitration clause. 9 U.S.C.A. § 3.

5 Cases that cite this headnote

**10** **Alternative Dispute Resolution** 🔑 Particular Cases

Although wholesaler's parent company was not subject to agreement requiring arbitration of wholesaler's claims against former employee,

litigation on parent company's related claims was properly stayed pursuant to district court's inherent powers to control its docket; prejudice to parent arising from stay was minimal, failure to stay action would result in substantial prejudice to former employee, and parent could not be allowed to attempt to defeat arbitration by seeking to have its claims adjudicated first and have preclusive effect in arbitration.

39 Cases that cite this headnote

**11** **Alternative Dispute Resolution** 🔑 Persons Affected or Bound

Ordinary principles of agency and contract law may provide grounds for holding nonsignatory to arbitration agreement.

3 Cases that cite this headnote

**12** **Alternative Dispute Resolution** 🔑 Proceedings

Party that seeks stay of party not bound by arbitration agreement under district court's inherent powers to control its docket, pending completion of required arbitration with related party, bears burden of demonstrating that stay is justified.

31 Cases that cite this headnote

**13** **Alternative Dispute Resolution** 🔑 Stay of Proceedings Pending Arbitration

Stay pending arbitration imposed under court's inherent powers against related party that was not signatory to agreement requiring arbitration could allow for related party to move to vacate stay if party seeking stay impeded arbitration process or if arbitration did not conclude within reasonable time.

7 Cases that cite this headnote

**Attorneys and Law Firms**

*73 Peter R. Reynolds, Hartford, CT (Macdermid, Reynolds & Glissman, P.C., of counsel), for Defendant-Appellant.

Timothy P. Van Dyck, Hartford, CT (Edwards & Angell, Irene E. Bassock, of counsel), for Plaintiffs-Appellees.

Before: FEINBERG and WALKER, Circuit Judges, and REAL, District Judge. *

*    Honorable Manuel L. Real, United States District Judge for the Central District of California, sitting by designation.

**Opinion**

FEINBERG, Circuit Judge:

Defendant Patrick J. Armstrong appeals from an order of the United States District Court for the District of Connecticut, Robert N. Chatigny, J., refusing to grant a stay pursuant to the Federal Arbitration Act (the "FAA") of a suit against Armstrong brought by plaintiffs WorldCrisa Corporation ("WorldCrisa") and its parent Crisa Corporation ("Crisa"), collectively referred to hereafter as the "Crisa Corporations". Armstrong claims that the dispute is arbitrable pursuant to an agreement between him and WorldCrisa. For the reasons stated below, we reverse and direct the district court to grant the stay pending arbitration.

## I. Background

WorldCrisa is a wholesaler of hotel and restaurant supplies. On September 1, 1995, Armstrong and WorldCrisa entered into an agreement (the "Agreement"), under which Armstrong left the employment of WorldCrisa and agreed as a "Closing Condition" of the Agreement to acquire a "controlling equity interest" in an "established" independent distributor of hotel and restaurant supplies (an "HRS Company") in the Southern California or Nevada market within 90 days after November 30, 1995 (the "Termination Date"). In return, WorldCrisa agreed to provide Armstrong or his designee (1) a credit to be used for merchandise, up to a monthly and aggregate maximum (the "Merchandise Credit"), and (2) additional merchandise on specified terms, with the provision of merchandise to commence immediately as of the Termination Date. The Agreement provided that WorldCrisa would have the option to declare the arrangement

"null and void" if Armstrong failed to satisfy the Closing Conditions.

The Agreement contained an arbitration clause which provided that "any dispute between the Parties over the terms of this Agreement, or any claim of breach by either of the Parties" would be submitted to arbitration in California, subject to an express exception for claims involving confidentiality and non-competition issues.

Shortly after execution of the Agreement, WorldCrisa began to furnish merchandise on credit to Armstrong's designee under the Agreement, Hospitality Products, Inc. ("HPI"). In addition, WorldCrisa provided Armstrong with other benefits called for by the Agreement, including payment of compensation, vacation pay and reimbursement of expenses. On November 28, 1995, Armstrong executed a Guaranty, dated as of September 1, 1995, with the Crisa Corporations, under which he agreed to guarantee obligations owed to the Crisa Corporations by HPI. The Guaranty provided that Armstrong's obligation "was in no way conditioned upon any requirement that [the Crisa Corporations] first attempt to collect ... from [HPI]," that Armstrong waived "all defenses which may be available by virtue of any valuation, stay, moratorium law or other *74 similar law," and that Armstrong consented "to the non-exclusive jurisdiction" and venue in the state or federal courts of Connecticut.

From September 1995 to April 1996, WorldCrisa provided HPI with $264,000 in merchandise as part of the Merchandise Credit, and $189,212.47 in additional merchandise. Armstrong allegedly failed to acquire control of an HRS Company, and in May 1996 the Crisa Corporations brought the present lawsuit in the Connecticut district court (the "Connecticut Action"). The complaint alleged that Armstrong was "in default of his obligations under the ... Agreement," which was attached to the complaint, and sought to recover from Armstrong as guarantor of HPI's obligations $453,212.47 plus interest and costs allegedly owed by HPI for the merchandise sent to it under the Agreement.

In July 1996, Armstrong filed a demand for arbitration in California, alleging breach of contract and fraud claims against WorldCrisa. Subsequently, Armstrong filed a motion in the district court to stay the Connecticut Action pending arbitration. The district court denied the motion in October 1996. The court later granted Armstrong's motion for reconsideration, but in December reaffirmed its denial of a stay on the ground that the arbitration clause did not apply to a suit based on the Guaranty. This appeal followed.

## II. Analysis

**1** Under Section 3 of the FAA, 9 U.S.C. § 3, a district court "must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." McMahan Securities Co. L.P. v. Forum Capital Markets L.P., 35 F.3d 82, 85 (2d Cir.1994). The Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (emphasis in original). Review of the district court's arbitrability determination is *de novo.* McMahan Sec. Co., 35 F.3d at 86.

### A. The Stay as to WorldCrisa

**2** The basic issue before us is whether the arbitration clause of the Agreement applies to this dispute. That clause covers "any dispute" between the parties to the Agreement "over the terms" of the Agreement or "any claim of breach" by either of the parties. WorldCrisa contends, among other things, that Armstrong's failure to fulfill the Closing Conditions is not a "breach" of the Agreement because until the Conditions were satisfied neither party owed a duty that could be breached. Likewise, according to WorldCrisa, its claim does not involve any dispute "over the terms" of the Agreement; rather, it simply requires a determination of whether Armstrong fulfilled those terms. Even if the dispute were within the scope of the arbitration clause, WorldCrisa argues that the provisions of the Guaranty described above constitute a waiver of Armstrong's rights under that clause. Armstrong disputes each of these arguments.

**3  4  5  6  7** In accordance with the strong federal policy in favor of arbitration, Collins & Aikman Products Co. v. Building Systems, Inc., 58 F.3d 16, 19 (2d Cir.1995), the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Associated Brick Mason Contractors of Greater New York, Inc. v. Harrington, 820 F.2d 31, 35 (2d Cir.1987) (quoting AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986)). Likewise, close questions as to whether a waiver of arbitration has occurred are to be resolved in favor

of arbitration. Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-42, 74 L.Ed.2d 765 (1983). Arbitration is essentially contractual, however, and parties may not be forced into arbitration if that was not their true agreement. Collins & Aikman Prod. Co., 58 F.3d at 19. If an arbitration clause is narrowly worded and the dispute concerns a matter collateral *75 to the contract calling for arbitration, "a court should test the presumption [of arbitrability] by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction...." Id. at 23. Finally, "[i]f the allegations underlying the claims 'touch matters' covered by the parties' ... agreements, then those claims must be arbitrated, whatever the legal labels attached to them." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir.1987).

**8** The arbitration clause at issue here does not contain the typically broad language that makes arbitrable all disputes "arising out of" or "related to" the contract or its breach. See, e.g., McCowan v. Sears, Roebuck and Co., 908 F.2d 1099, 1106 (2d Cir.1990) ("[A]ny controversy between [the parties] arising out of or relating to this contract or the breach thereof shall be settled by arbitration.") On the other hand, the clause is by no means narrow. It is not necessary to make the nice determination of exactly where in the range between broad and narrow this clause fits. The clause is close enough to the "broad" end of the spectrum to justify a presumption of arbitrability here. Moreover, we believe that even without resort to the presumption the current dispute falls within the scope of the arbitration clause.

Plaintiff WorldCrisa ascribes a very narrow meaning to "breach", i.e., that the term refers only to a failure to fulfill an unconditional duty and not to a failure to satisfy a condition. We think that "breach," for purposes of construing the Agreement, does not have only the specific meaning that WorldCrisa would ascribe to it. Black's Law Dictionary (6th Ed.1990) defines "breach" more generally as "where one party to [a] contract fails to carry out [the] term, promise or *condition* of the contract." Id. at 188 (emphasis supplied). Certainly, the complaint in the Connecticut action flatly alleges that Armstrong defaulted under the Agreement. That sounds to us like a claim of breach, and at the very least raises issues that "touch matters" covered by the Agreement. Genesco, 815 F.2d at 846. Moreover, even if we assume that the Connecticut lawsuit does not allege a breach by Armstrong, determination of whether or not he satisfied the Closing Conditions will necessarily involve dispute "over the terms" of the Agreement in light of the subsequent conduct

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

of the parties. The record before us is sparse as to what actually transpired after Armstrong made his commitment in the Agreement. But a decision-maker may have to determine a number of related issues, e.g., whether WorldCrisa acted reasonably in rejecting any HRS Companies Armstrong may have proposed, which might well require an interpretation of what amounts to a "controlling equity interest" and whether a proposed HRS Company was an "established" one. We conclude that the dispute here is squarely covered by the arbitration clause.

9    WorldCrisa's attempt to rely on the Guaranty as a waiver of Armstrong's arbitration rights must also fail. The Guaranty does not mention the Agreement-much less its arbitration clause-and the Guaranty's provisions as to jurisdiction, venue, and waiver of moratorium and stay laws do not constitute the kind of clear and specific waiver required to defeat the express arbitration provision in the Agreement. The complaint in the Connecticut Action relies on Armstrong's alleged failure to satisfy his obligations (particularly the Closing Conditions) under the Agreement. Armstrong has a right to have issues related to that claim decided in the pending arbitration and is entitled, therefore, to a stay under § 3 of the FAA pending arbitration.

**B. The Stay of Crisa's Suit**

10    11    In addition to joining the arguments raised by plaintiff WorldCrisa, plaintiff Crisa argues that it is not a party to the Agreement and therefore is not bound by the arbitration clause of the Agreement-even if WorldCrisa is. There is authority to the effect that ordinarily such a clause in a contract cannot justify a stay under § 3 of the FAA as to someone who was not a party to the contract. Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S, 943 F.2d 220, 224-25 (2d Cir.1991); Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co., 339 F.2d 440, 441 (2d Cir.1964); cf. *76 McCowan, 908 F.2d at 1107-08; Sierra Rutile Ltd. v. Katz, 937 F.2d 743, 751-52 (2d Cir.1991) (Mahoney, J., concurring). Ordinary principles of agency and contract law may, however, provide grounds for holding a non-signatory to an arbitration agreement, Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir.1995) (citing incorporation by reference, assumption, agency relationship, veil-piercing/alter-ego, and estoppel as possible grounds).

12    It is arguable that Crisa could be bound even under these cases. We do not, however, think it necessary to determine the issue. We have recognized that district courts, despite the inapplicability of the FAA, may stay a case pursuant to the "power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Nederlandse, 339 F.2d at 441 (quoting Landis v. North American Co., 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936)). Armstrong bears the burden of demonstrating that such a stay is justified, but on this record it is clear that he has done so.

The prejudice to Crisa if a stay is granted in this case is minimal. Crisa is not mentioned in the Agreement, and has alleged no other contract with Armstrong or HPI that might support liability under the Guaranty. To the extent that Crisa, even as a non-signatory of the Agreement, might be able to bring an action under the Guaranty based on the unjust enrichment of HPI, Crisa has not alleged that it (rather than WorldCrisa) provided any goods to HPI.

On the other hand, failure to stay this action would result in substantial prejudice to Armstrong, as litigating the Connecticut Action with Crisa alone would involve significant expense and inconvenience and might adversely affect the outcome of his arbitration against WorldCrisa. In IDS Life Ins. Co. v. SunAmerica, Inc., 103 F.3d 524 (7th Cir.1996), Chief Judge Posner noted that where a party to an arbitration agreement attempts to avoid that agreement by suing a related party with which it has no arbitration agreement in the hope that the claim will be adjudicated first and have preclusive effect in the arbitration, "[s]uch a maneuver should not be allowed to succeed, [and] ... is blocked ... by the principles of parallel-proceeding abstention, which ... require the court to stay the proceedings before it and let the arbitration go forward unimpeded." Id. at 530. We think the same principle applies in this case, in which a related non-party to an arbitration agreement has apparently brought a suit with the hope of having a similar effect. On this record, failure to grant a stay as to Crisa would be an abuse of discretion.

13    There is no allegation that Armstrong has done anything to impede the arbitration process, or that the arbitration will not be resolved within a reasonable amount of time. We note, however, that under our precedents the stay may provide that Crisa may move to vacate the stay if Armstrong impedes the arbitration process, or if the arbitration does not conclude within a reasonable time. Nederlandse, 339 F.2d at 442.

For the reasons given above, we reverse the order of the district court and remand with instructions that it stay the suit by WorldCrisa under § 3 of the FAA, and stay the suit by Crisa under its inherent powers.

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

DOCSTOR: 2191401\1

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 108 of 142

131 Heartland Blvd. Corp. v. C.J. Jon Corp., 82 A.D.3d 1188 (2011)

921 N.Y.S.2d 94, 2011 N.Y. Slip Op. 02644

82 A.D.3d 1188, 921 N.Y.S.2d
94, 2011 N.Y. Slip Op. 02644

131 Heartland Blvd. Corp. et al., Respondents-
Appellants, v C.J. Jon Corp., Appellant-Respondent.

Supreme Court, Appellate Division,
Second Department, New York
March 29, 2011

CITE TITLE AS: 131 Heartland
Blvd. Corp. v C.J. Jon Corp.

**HEADNOTES**

Vendor and Purchaser—Contract for Sale of Real
Property—Recovery of Down Payment

In action alleging breach of contract for sale of certain
real estate, plaintiffs were entitled to full amount of down
payment as set forth in contract; defendant was in default
when it cancelled contract, allegedly due to plaintiffs'
delay in obtaining lease modification agreement, which was
contractual contingency that had to be satisfied prior to
closing; defendant's cancellation of contract over month
before closing date constituted wrongful repudiation of
contract; defendant had no grounds under contract to refuse
to consummate purchase.

Contracts—Consideration

Certilman Balin Adler & Hyman, LLP, East Meadow,
N.Y. (Douglas E. Rowe and Yale Pollack of counsel), for
appellant-respondent.

Ruskin Moscou Faltischek, P.C., Uniondale, N.Y. (E.
Christopher Murray and Matthew F. Didora of counsel), for
respondents-appellants.

In an action, inter alia, to recover damages for breach of
contract and for a judgment declaring that the defendant is
required to assume the obligations of the former tenant under
the former tenant's lease with the plaintiff, the defendant
appeals, as limited by its brief, (1) from so much of an
order of the Supreme Court, Suffolk County (Emerson, J.),
dated October 7, 2009, as granted those branches of the
plaintiffs' motion which were for summary judgment on the

first and second causes of action of the complaint and denied
those branches of its cross motion which were for summary
judgment dismissing the first and second causes of action
and on its counterclaim, and (2) from so much of a judgment
of the same court entered November 5, 2009, as, upon the
order, is in favor of the plaintiffs and against it in the principal
sum of $425,000; and the plaintiffs cross-appeal from (1) so
much of the same order as denied that branch of their motion
which was for summary judgment on the third cause of action
and granted that branch of the defendant's motion which was
for summary judgment dismissing the third cause of action,
and (2) so much of the same judgment as, upon the order,
dismissed the third cause of action.

Ordered that the appeal and the cross appeal from the order
are dismissed; and it is further,

Ordered that the judgment is modified, on the law, by adding
a provision thereto declaring that the defendant is not required
to assume the obligations of the former tenant under the
former tenant's lease with the plaintiff; as so modified, the
judgment is affirmed, without costs or disbursements.

The appeal and cross appeal from the intermediate order
must *1189 be dismissed because the right of direct appeal
therefrom terminated with the entry of judgment in the action
(see Matter of Aho, 39 NY2d 241, 248 [1976]). The issues
raised on the appeal and cross appeal from the order are
brought up for review and have been considered on the appeal
and cross appeal from the judgment (see CPLR 5501 [a] [1]).

The parties entered into a contract for the sale of certain real
estate. A rider to the contract provided that the down payment
would be made in two installments of $212,500 each. The
**2 defendant contends that, in the event of its default, the
plaintiffs were only entitled to recover the first installment,
which had already been paid. This contention is without merit.
When the terms of a written contract are clear and
unambiguous, the intent of the parties must be found
within the four corners of the contract, giving practical
interpretation to the language employed and the parties'
reasonable expectations (see Franklin Apt. Assoc., Inc. v
Westbrook Tenants Corp., 43 AD3d 860 [2007]; Correnti v
Allstate Props., LLC, 38 AD3d 588 [2007]). The court's role is
limited to interpretation and enforcement of the terms agreed
to by the parties, and the court may not rewrite the contract or
impose additional terms which the parties failed to insert (see
Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith,
85 NY2d 173, 182 [1995]; Aivaliotis v Continental Broker-
Dealer Corp., 30 AD3d 446 [2006]). Here, the amount of

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 109 of 142

131 Heartland Blvd. Corp. v. C.J. Jon Corp., 82 A.D.3d 1188 (2011)
921 N.Y.S.2d 94, 2011 N.Y. Slip Op. 02644

the down payment as set forth in the contract was $425,000 and, pursuant to the contract, the plaintiffs were permitted to recover that amount in the event of a default by the defendant (*see Elias v Wal-Mart Stores*, 224 AD2d 479 [1996]).

The defendant's contention that it was not in default when it cancelled the contract is without merit. The defendant allegedly cancelled the contract due to the plaintiffs' delay in obtaining a fully executed lease modification agreement, which was a contractual contingency that had to be satisfied prior to closing. The defendant cancelled the contract just over a month before the closing date. Neither the contract nor the rider made time of the essence. Where, as here, the contract did not make time of the essence, a party is entitled to a reasonable adjournment of the closing date to complete performance of its obligations (*see Chappaqua Bldg. Corp. v RGF Dev. Corp.*, 173 AD2d 671 [1991]).

Here, however, the plaintiffs did not require an adjournment, as the defendant cancelled the contract more than one month prior to the closing date. Therefore, the defendant's cancellation of the contract when the deadline for obtaining the lease ***1190*** modification agreement had not yet passed, constituted a wrongful repudiation of the contract (*see American List Corp. v U.S. News & World Report*, 75 NY2d 38, 44 [1989]). The defendant had no grounds under the contract to refuse to consummate the purchase.

The plaintiffs demonstrated their prima facie entitlement to judgment as a matter of law on the first cause of action to recover the portion of the down payment already paid (*see Willsey v Gjuraj*, 65 AD3d 1228 [2009]; *New Colony Homes, Inc. v Long Is. Prop. Group, LLC*, 21 AD3d 1072 [2005]), and the second cause of action to recover the balance of the down payment. The plaintiffs established that the defendant defaulted on the contract, and the defendant failed to raise a triable issue of fact in opposition.

The Supreme Court properly granted that branch of the defendant's motion which was for summary judgment with respect to the plaintiffs' third cause of action for a judgment declaring that the defendant was obligated to assume the tenant's lease obligations. The defendant established its entitlement to judgment as a matter of law, and the plaintiff failed to raise a triable issue of fact in opposition. The contract of sale and the lease modification agreement are not separate, independent agreements. In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances (*see Rudman v Cowles Communications*, 30 NY2d 1, 13 [1972]; *G.K. Alan Assoc. Inc. v Lazzari*, 66 AD3d 830 [2009]). Contracts remain separate unless their history and subject matter show them to be unified (*see Nancy Neale Enters. v Eventful Enters.*, 260 AD2d 453 [1999]; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Williams*, 223 AD2d 395 [1996]). Here, the contract and the lease modification agreement deal with the same subject matter. The lease modification agreement is not supported by independent consideration (*cf. Wattenberg v Wattenberg*, 277 AD2d 69 [2000]). The two documents serve the same purpose and refer to each other. The evidence shows that the parties intended the two documents to be interdependent and to be read together (*cf. Schonfeld v Thompson*, 243 AD2d 343 [1997]; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Clairmont*, 231 AD2d 239 [1997]).

Since this is, in part, a declaratory judgment action, the judgment appealed from should have included an appropriate declaration in favor of the defendant (*see Lanza v Wagner*, 11 NY2d 317, 334 [1962], *appeal dismissed* 371 US 74 [1962], *cert denied* 371 US 901 [1962]). Dillon, J.P., Covello, Florio and Hall, JJ., concur. ***1191***

Copr. (c) 2011, Secretary of State, State of New York

End of Document                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

DOCSTOR: 2191401\1

106 A.F.T.R.2d 2010-6504, 2010-2 USTC P 50,651

741 F.Supp.2d 555
United States District Court,
S.D. New York.

Bertha Elizabeth MANIOLOS, Plaintiff,
v.
UNITED STATES of America, Defendant.
Woodrum C. Boley, Plaintiff,
v.
United States of America, Defendant.

Nos. 10 Civ. 3383(AJP), 10
Civ. 4467(AJP).    Oct. 4, 2010.

**Synopsis**

**Background:** Taxpayers brought action against Internal Revenue Service (IRS), alleging that IRS wrongfully retained their economic stimulus rebates. IRS moved to dismiss for failure to state a claim.

**Holding:** The District Court, Andrew J. Peck, United States Magistrate Judge, held that economic stimulus rebates were subject to retention by IRS under offers in compromise (OIC) entered into by taxpayers.

Motions granted.

West Headnotes (7)

**1**    **Internal Revenue** 🔑  Compromises

Rebate received by taxpayers pursuant to Economic Stimulus Act (ESA) was an advance refund for the constructive overpayment of 2007 taxes, and was thus subject to retention by Internal Revenue Service (IRS) under offers in compromise (OIC) entered into by taxpayers, where OICs stated that IRS would keep any refund for 2007 due to taxpayers because of overpayment of any tax or other liability. 26 U.S.C.A. § 6428.

**2**    **Internal Revenue** 🔑  Compromises

An offer in compromise (OIC) is a settlement agreement between the taxpayer and the Internal Revenue Service (IRS) compromising unpaid

taxes, and as such is construed according to principles of federal contract law.

1 Cases that cite this headnote

**3**    **Contracts** 🔑  Application to Contracts in General

When it comes to general rules of contract interpretation, there is little difference between federal common law and New York law.

1 Cases that cite this headnote

**4**    **Contracts** 🔑  Questions for Jury
**Contracts** 🔑  Ambiguity in general

Under New York law the initial interpretation of a contract is a matter of law for the court to decide; included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous.

1 Cases that cite this headnote

**5**    **Federal Civil Procedure** 🔑  Fact issues

Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on motion to dismiss for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**6**    **Contracts** 🔑  Ambiguity in general
**Federal Civil Procedure** 🔑  Fact issues

When the language of a contract is ambiguous, its construction presents a question of fact, which precludes summary dismissal for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**7**    **Contracts** 🔑  Existence of ambiguity

Contract language is not ambiguous if it has a definite and precise meaning concerning which there is no reasonable basis for a difference of opinion; conversely, a contract is ambiguous if it is reasonably susceptible to more than one meaning.

**Attorneys and Law Firms**

*556 Carlton Malben Smith, Cardozo Immigration Justice Clinic, New York, NY, for Plaintiff.

Jaimie Leeser Nawaday, U.S. Attorney Office SDNY, New York, NY, for Defendant.

**Opinion**

### OPINION AND ORDER

ANDREW J. PECK, United States Magistrate Judge:

Plaintiffs Bertha Elizabeth Maniolos and Woodrum C. Boley bring these actions alleging that the Internal Revenue Service ("IRS") wrongfully retained their economic stimulus rebates issued in 2008. (*E.g.,* Maniolos Dkt. No. 2: Compl. ¶¶ 4–5; Boley Dkt. No. 1: Compl. ¶¶ 4–5.)

Presently before the Court is defendant United States' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (Maniolos Dkt. No. 10: Gov't Notice of Motion; Boley Dkt. No. 6: Gov't Notice of Motion.) The Government contends that the tax offer in compromise plaintiffs entered into with the IRS in 2007 entitle the IRS to keep their economic stimulus rebates. (Maniolos Dkt. No. 11: Gov't Br. at 1; Maniolos Dkt. No. 16: Gov't Reply Br. at 2; Boley Dkt. No. 7: Gov't Br. at 1; Boley Dkt. No. 9: Gov't Reply Br. at 2.)

The parties have consented to decision of these cases by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Maniolos Dkt. No. 8; Boley Dkt. No. 11.)

For the reasons set forth below, the Government's motions to dismiss are *GRANTED.*

### MANIOLOS FACTS

The relevant facts are undisputed.

While suffering through financial difficulties, Maniolos withdrew the contents of her tax-deferred retirement plans over several years without making sufficient *557 provisions for withholding income tax. (Dkt. No. 2: Compl. ¶ 7; Dkt. No. 11: Gov't Br. at 2; Dkt. No. 12: Maniolos Br. at 1–2.) As a result, by early 2007, Maniolos owed the IRS approximately $40,000 in income tax, penalties, and interest

for the tax years 1994, 1996, and 1997. (Compl. ¶ 7; Gov't Br. at 2; Maniolos Br. at 1.)

In mid–2007, Maniolos sought to satisfy her tax liabilities through a Form 656 offer in compromise ("OIC") with the IRS. (Compl. ¶ 8; Gov't Br. at 2; Maniolos Br. at 2.) On October 24, 2007, the IRS accepted Maniolos' OIC, which provided that Maniolos pay a total of $500 in satisfaction of her $40,000 tax liability. (Compl. ¶ 9 & Ex. A: OIC; Gov't Br. at 2; Maniolos Br. at 2.) In addition to the $500 payment, OIC section V(f) provided: "As additional consideration beyond the amount of my/our offer, the IRS will keep any refund, including interest, due to me/us because of overpayment of any tax or other liability, for tax periods extending through the calendar year in which the IRS accepts the offer." (Compl. ¶ 11 & Ex. A: OIC; Gov't Br. at 1; Maniolos Br. at 2.) On November 7, 2007, Maniolos made final payment of the $500 under the compromise. (Compl. ¶ 12; Maniolos Br. at 2.)

In early 2008, Maniolos filed a tax return for 2007 listing gross income of $7,670. (Compl. ¶¶ 13–14; Gov't Br. at 3; Maniolos Br. at 3.) Due to her income level and allowable deductions, Maniolos was not liable for any income tax for 2007. (Compl. ¶ 13; Gov't Br. at 3; Maniolos Br. at 3.) Accordingly, Maniolos requested a refund of $2,097, the amount she had voluntarily withheld for taxes from her 2007 income. (Compl. ¶ 14; Gov't Br. at 3; Maniolos Br. at 3.) The IRS retained the money as it was considered "additional consideration" under OIC section V(f). (Compl. ¶ 14; Gov't Br. at 3; Maniolos Br. at 3.) Maniolos concedes that the IRS properly retained this money. (Compl. ¶ 14; Gov't Br. at 3; Maniolos Br. at 3.)

On February 13, 2008, the Economic Stimulus Act ("ESA") of 2008 was signed into law. (Compl. ¶ 15; Gov't Br. at 3; Maniolos Br. at 3; *see* page 11 below.) Based on her income for 2007, Maniolos was entitled to a $300 refund under the ESA. (Compl. ¶ 15; Gov't Br. at 3; Maniolos Br. at 3.) [1] Rather than issuing Maniolos a check for $300, the IRS credited the money as a payment to Maniolos' unpaid 1997 income tax liability. (Compl. ¶¶ 16–17; Gov't Br. at 3; Maniolos Br. at 3–4.)

[1]    Pursuant to 26 U.S.C. § 6428(a), Maniolos would have been entitled to a credit of the lesser of her net income tax liability for 2007 or $600. 26 U.S.C. § 6428(a) (2008). Since Maniolos did not have any net income tax liability for 2007, she would not have been entitled to any credit. Under the special rule of 26 U.S.C. § 6428(b), however, Maniolos was entitled to the $300

106 A.F.T.R.2d 2010-6504, 2010-2 USTC P 50,651

refund since she had qualifying income of at least $3,000 in 2007. 26 U.S.C. § 6428(b).

On December 1, 2009, Maniolos submitted a claim for the $300 to the IRS. (Compl. ¶ 18; Gov't Br. at 3.) By letter dated February 2, 2010, the IRS notified Maniolos that her claim was "disallow[ed]" because "[o]ne of the terms/conditions of an OIC offer in compromise is that the IRS will keep any refund, including interest, due to the taxpayer because of an overpayment of any tax or other liability, for tax periods extending through the calendar year in which the offer is accepted." (Compl. ¶ 20; Gov't Br. at 3–4.)

### BOLEY FACTS

The relevant facts are undisputed.

Due to the mistaken belief that his agent was filing his tax returns, as of early 2007, Boley owed the IRS approximately $20,000 in income tax, penalties, and interest for tax years 2000, 2001 and 2002. (Boley **\*558** Dkt. No. 1: Compl. ¶¶ 7, 10; Dkt. No. 7: Gov't Br. at 2; Dkt. No. 8: Boley Br. at 1.) In December 2007, Boley sought to satisfy his tax liabilities through an OIC with the IRS. (Compl. ¶ 8; Gov't Br. at 2; Boley Br. at 2.) On June 2, 2008, the IRS accepted Boley's OIC, which provided that Boley pay a total of $3,000 in satisfaction of his $20,000 tax liability. (Compl. ¶ 9 & Ex. A: OIC; Gov't Br. at 2; Boley Br. at 2). In addition to the $3,000 payment, OIC section V(f) provided: "As additional consideration beyond the amount of my/our offer, the IRS will keep any refund, including interest, due to me/us because of overpayment of any tax or other liability, for tax periods extending through the calendar year in which the IRS accepts the offer." (Compl. ¶ 11 & Ex. A: OIC; Gov't Br. at 1, 2; Boley Br. at 2.) On October 7, 2008, Boley made the final payment of the $3,000 under the compromise. (Compl. ¶ 12; Boley Br. at 2.)

In early 2008, Boley filed a tax return for 2007 reporting a gross income of $38,771 (Compl. ¶ 13; Gov't Br. at 3; Boley Br. at 3.) Boley owed $36 for the 2007 tax year, which he paid in April 2008. (Compl. ¶ 13; Gov't Br. at 3; Boley Br. at 3.)

Based on his income for 2007, Boley was entitled to a $600 refund under the ESA. (Compl. ¶ 14; Gov't Br. at 3; Boley Br. at 3–4.) Rather than issuing Boley a check for $600, the IRS credited the money as a payment to Boley's unpaid 2000 income tax liability. (Compl. ¶¶ 15–16; Gov't Br. at 3; Boley Br. at 4.) On December 1, 2009, Boley submitted an administrative claim for the $600, which the IRS has not yet ruled on. (Compl. ¶¶ 17, 19; Gov't Br. at 3; Boley Br. at 4.)

### PLAINTIFFS' COMPLAINTS AND THE GOVERNMENT'S MOTION TO DISMISS

Both Maniolos' and Boley's complaints allege five separate causes of action to recover the ESA amounts. The first cause of action is under 28 U.S.C. § 1346(a)(1) for "recovery of internal-revenue tax alleged to have been erroneously or illegally assessed or collected ... or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." (Maniolos Dkt. No. 2: Compl. ¶ 6; Boley Dkt. No. 1: Compl. ¶ 6.) The second and third causes of action are exactly the same as the first, but relate to the 2007 and 2008 tax years, respectively. (Maniolos Compl. ¶¶ 22, 25; Boley Compl. ¶¶ 21, 24.) The fourth cause of action is under 28 U.S.C. § 1346(a)(2) alleging that the IRS breached the OIC when it retained the ESA amounts. (Maniolos Compl. ¶¶ 28–31; Boley Compl. ¶¶ 27–30.) The fifth cause of action is under 26 U.S.C. § 7433(a), alleging that plaintiff is entitled to the ESA amount for actual damages plaintiff sustained when the IRS "recklessly or intentionally, or by reason of negligence, disregarded the Internal Revenue Code" by applying the ESA amount to plaintiff's tax liability. (Maniolos Compl. ¶¶ 32, 36–37; Boley Compl. ¶¶ 31, 35–36.)

The Government has moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) (Maniolos Dkt. No. 10: Gov't Notice of Motion; Boley Dkt. No. 6: Gov't Notice of Motion) on the ground that, pursuant to the ESA, the ESA amount was deemed a refund for an overpayment of plaintiff's 2007 taxes and therefore the IRS properly retained it under the OIC. (Maniolos Dkt. No. 11: Gov't Br. at 4–11; Maniolos Dkt. No. 16: Gov't Reply Br. at 2–6; Boley Dkt. No. 7: Gov't Br. at 4–9; Boley Dkt. No. 9: Gov't Reply Br. at 2–6.) [2]

2    The parties agree "that if the First Cause of Action is dismissed for failure to state a claim, the remaining causes of action are also properly dismissed." (Maniolos Gov't Br. at 4; Boley Gov't Br. at 4; see Maniolos Br. at 4–5 n. 5; Boley Br. at 5 n. 5.)

### *559 ANALYSIS

## I. THE STANDARDS GOVERNING A MOTION TO DISMISS

### A. The Twombly–Iqbal "Plausibility" Standard

In two decisions in the last few years, the Supreme Court significantly clarified the standard for a motion to dismiss, as follows:

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* the pleading standard Rule 8 announces does not require "detailed factual allegations," but it *demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.* A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

To survive a motion to dismiss, *a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.* Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible *claim for relief survives a motion to dismiss.* Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying

pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft v. Iqbal,* ——— U.S. ———, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (citations omitted & emphasis added) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 1965–66, 1974, 167 L.Ed.2d 929 (2007) (retiring ***560** Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), pleading standard that required denying a Rule 12(b)(6) motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.")).[3]

3    *Accord, e.g., Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009); *Lindner v. Int'l Bus. Machs. Corp.,* 06 Civ. 4751, 2008 WL 2461934 at *3 (S.D.N.Y. June 18, 2008); *Joseph v. Terrence Cardinal Cooke Health Care Ctr.,* 07 Civ. 9325, 2008 WL 892508 at *1 (S.D.N.Y. Apr. 2, 2008); *Elektra Entm't Group, Inc. v. Barker,* 551 F.Supp.2d 234, 237 (S.D.N.Y.2008); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,* 551 F.Supp.2d 210, 216–17 (S.D.N.Y.2008); *Diana Allen Life Ins. Trust v. BP P.L.C.,* 06 Civ. 14209, 2008 WL 878190 at *3 (S.D.N.Y. Mar. 31, 2008).

## B. *Consideration Of Documents Attached To Or Referred To In The Complaint*

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading. Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint." *Vassilatos v. Ceram Tech Int'l, Ltd.,* 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing *Kopec v. Coughlin,* 922 F.2d 152, 154–55 (2d Cir.1991)).[4] The Court, however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference. *E.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) ("For purposes of a motion to

dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference....").[5]

4    *Accord, e.g., Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006); *Aniero Concrete Co. v. N.Y.C. Constr. Auth.,* 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 97 Civ. 5499, 2000 WL 264295 at *12 (S.D.N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").

When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b); *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir.2000); *Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988).

5    *See also, e.g., Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)); *Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

"However, before materials outside the record may become the basis for a dismissal, several conditions must be met. For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document." *Faulkner v. Beer,* 463 F.3d at 134 (citations omitted). In this case, the Court refers only to the OICs between plaintiffs and the IRS, attached to plaintiffs' complaints (as Exhibit A).

## *561 II. THE IRS PROPERLY RETAINED THE ECONOMIC STIMULUS MONEY; PLAINTIFFS' COMPLAINTS ARE DISMISSED

Plaintiffs' claims rely on the assertion that the IRS was not entitled to the ESA rebates under the terms of the OICs. (Maniolos Dkt. No. 2: Compl. ¶¶ 6, 22, 25, 28–31, 36–37; Boley Dkt. No. 1: Compl. ¶¶ 6, 21, 24, 27–30, 35–36.) Maniolos asserts that she is entitled to the ESA rebate since

it was a rebate for the 2008 tax year and not subject to the terms of her 2007 OIC. (Maniolos Dkt. No. 12: Maniolos Br. at 5, 20–25.)[6] Both plaintiffs argue that, even if the rebate was for the constructive overpayment of 2007 taxes, the OIC only entitled the IRS to retain refunds based on an actual overpayment. (Maniolos Br. at 5, 6–20; Boley Dkt. No. 8: Boley Br. at 5–20.) The Government, on the other hand, contends that the ESA provided the rebate as an advance refund for an overpayment of 2007 taxes (Maniolos Dkt. No. 11: Gov't Br. at 5–7, 10–11; Maniolos Dkt. No. 16: Gov't Reply Br. at 5–6)[7] and that the OICs allowed the IRS to retain all refunds based on 2007 overpayments. (Gov't Br. at 7–10; Gov't Reply Br. at 2–5.)

6    Although both plaintiffs are represented by the same counsel, Boley's brief does not raise this argument. (*See generally* Dkt. No. 8: Boley Br.)

7    Because the Government raised the same arguments in both cases, this Opinion only will cite to the Government's briefs in Maniolos' case.

### A. *Background: Passage of the Economic Stimulus Act ("ESA") and Bankruptcy Court Interpretations*

On February 13, 2008, the ESA was enacted to help stimulate the economy through recovery rebates. *See* Economic Stimulus Act of 2008, Pub.L. No. 110–185, 122 Stat. 613, 613 (2008) (codified as amended in scattered subsections of 26 U.S.C.) ("An Act [t]o provide economic stimulus through recovery rebates to individuals, incentives for business investment, and an increase in conforming and FHA loan limits.").

Several bankruptcy courts have ruled that the ESA provided the rebate as an advance refund for an overpayment of 2007 taxes. *See, e.g., In re Smith,* 393 B.R. 205, 208 (Bankr.S.D.Ind.2008) ("Thus, the 2008 Act creates the fiction, that the [taxpayers] overpaid their 2007 taxes in the amount of the [ESA rebate], based on information contained within their 2007 tax return. Consequently, the [ESA rebate] constitutes a tax refund for the [taxpayers'] 2007 taxes.") (emphasis omitted); *In re Lacy,* No. 08–1641–AJM–7A, 2008 WL 4000176 at *3 (Bankr.S.D.Ind. Aug. 28, 2008) (same); *In re Alguire,* 391 B.R. 252, 254 (Bankr.W.D.N.Y.2008) (The ESA "unequivocally ties the checks to the 2007 Income Tax Liability. It declares that what the taxpayer is to receive in the check is to be viewed as an extra payment on the 2007 tax liability.... The incentive amounts are deemed by statute to have been paid, and when Congress wishes to create a

fictional payment or overpayment of 2007 taxes, that is law, not to be questioned by this Court.").

Other bankruptcy courts have found that the ESA rebate was not an advance tax refund or credit. *See, e.g., In re Wooldridge,* 393 B.R. 721, 733 (Bankr.D.Idaho 2008) ("However, it would be nonsensical for the Court to consider payments made under the Act to be advance payments on 2008 tax refunds, when individuals who are not required to even file an income tax return—and are thus not eligible for tax refunds—may receive a stimulus payment under the Act."); *In re Schwenke,* No. 08–60380–7, 2008 WL 4381822 at *5 (Bankr.D.Mont. Sept. 25, 2008) ("This Court adopts the reasoning in *Wooldridge,* with ***562** its references to *Lambert,* and likewise concludes that the economic stimulus payment in the instant case is not an advance on 2008 tax refund....").

### B. *The ESA Rebate Was a Refund of 2007 Taxes*

The language of the ESA provides two possible mechanisms for delivering the recovery rebate to individual taxpayers. Subsection (a) of the ESA entitles eligible individuals to a credit for the 2008 tax year in the "amount equal to the lesser of—(1) net income tax liability, or (2) $600...." 26 U.S.C. § 6428(a)(1)-(2). Section 6428(b) provides for a minimum rebate of $300 by providing that "the amount determined under subsection (a) shall not be less than $300...."

In order to distribute this credit before 2008 taxes were due and thereby stimulate the economy sooner, subsections (f) and (g) provide that those taxpayers who would have been eligible for a 2008 tax credit are deemed to have overpaid their 2007 taxes and are entitled to an advance refund. Specifically, subsection (f)(1) reduces the value of the 2008 tax credit by the amount of the credit or refund allowed under subsection (g):

(f) Coordination with advance refunds of credit.—

(1) In general.—The amount of credit which would (but for this paragraph) be allowable under this section shall be reduced (but not below zero) by the aggregate refunds and credits made or allowed to the taxpayer under subsection (g).

26 U.S.C. § 6428(f)(1). Subsection (g)(1) provides that, if the taxpayer filed taxes for 2007, the ESA treats it as if the taxpayer overpaid the 2007 tax in an amount equal to the advance refund amount:

(g) Advance refunds and credits.—

(1) In general.—Each individual who was an eligible individual for such individual's first taxable year beginning in 2007 shall be treated as having made a payment against the tax imposed by chapter 1 for such first taxable year in an amount equal to the advance refund amount for such taxable year.

26 U.S.C. § 6428(g)(1). The "advance refund amount" is defined in subsection (g)(2) as "the amount that would have been allowed as a credit under this section for such first taxable year if this section (other than subsection (f) and this subsection) had applied to such taxable year." 26 U.S.C. § 6428(g)(2).

In other words, while subsection (a) creates a 2008 tax credit, the value of the credit is reduced in subsection (f) by the allowable refund and credit under subsection (g). In order to calculate this allowable refund and credit, subsection (g)(2) determines what 2007 tax credit would have been available if the ESA had provided for a credit for 2007 taxes. Where the value of this allowable amount is equal to the 2008 tax credit under subsection (a), the tax credit is eliminated. Subsection (g)(1) creates the fiction that the taxpayer overpaid 2007 taxes by the allowable refund and credit amount, and the rebate is treated as an advance refund of this constructive overpayment. *See In re Smith,* 393 B.R. at 208 ("[T]he ESR [*i.e.,* ESA rebate] is a credit towards payment of 2008 tax, but such 2008 credit is reduced by the amount of the ESR if the taxpayer files a 2007 return that qualifies for the full ESR in 2008. In such case, the 2008 credit is eliminated and instead the ESR is treated as payment against 2007 tax.") (emphasis & fn. omitted); *accord, e.g., In re Lacy,* 2008 WL 4000176 at *2.[8] To facilitate ***563** the distribution of this rebate and stimulate the economy, subsection (g)(3) directs that any refund or credit for the overpayment should be made "as rapidly as possible." 26 U.S.C. § 6428(g)(3).

8    The interplay between the 2008 credit and the 2007 advance refund is explained by the Joint Committee on Taxation as follows:

Most taxpayers will receive this credit in the form of a check issued by the Department of the Treasury. The amount of the payment will be computed in the same manner as the credit, except that it will be done on the basis of tax returns filed for 2007 (instead of 2008). It is anticipated that the Department of the Treasury will make every effort to issue all payments as rapidly as possible to taxpayers who timely file their 2007 tax returns....

Taxpayers will reconcile the amount of the credit with the payment they receive in the following manner. They will complete a worksheet calculating the amount of the credit based on their 2008 income tax return. They will then subtract from the credit the amount of the payment they received in 2008. For many taxpayers, these two amounts will be the same. If, however, the result is a positive number (because, for example, the taxpayer paid no tax in 2007 but is paying tax in 2008), the taxpayer may claim that amount as a refundable credit against 2008 tax liability. If, however, the result is negative (because, for example, the taxpayer paid tax in 2007 but owes no tax for 2008), the taxpayer is not required to repay that amount to the Treasury. Otherwise, the checks have no effect on tax returns filed for 2008; the amount is not includible in gross income and it does not otherwise reduce the amount of withholding.

.... Payment of the credit (or the check) is treated, for all purposes of the Code, as a payment of tax. Any resulting overpayment under this provision is subject to the refund offset provisions, such as those applicable to past-due child support under Section 6402 of the Code.

Joint Committee on Taxation, Technical Explanation of the Revenue Provisions of H.R. 5140, the "Economic Stimulus Act of 2008" as passed by the House of Representatives and the Senate on February 7, 2008, at 4–5 (JCX–16–08, Feb. 8, 2008) (fn.omitted) (available at www.jct.gov). While the technical explanation is not legislative history, it is indicative of the intent behind the ESA. See *Hutchinson v. Comm'r, 765 F.2d 665, 669–70 (7th Cir.1985)* (ruling that, while the Joint Committee on Taxation's General Explanation of the Tax Reform Act of 1976 was not legislative history, "[n]evertheless, such explanations are highly indicative of what Congress did, in fact, intend."); *Estate of Wallace v. Comm'r, 965 F.2d 1038, 1050 n. 15 (11th Cir.1992)* ("We cite the General Explanation not as an expression of legislative intent, as it was prepared by committee staff after enactment of the statute, but as a valuable aid to understanding the statute. We accord it no weight as binding authority on legislative intent.").

1    In the present cases, the ESA provided plaintiffs with a tax credit for 2008 taxes. Because, however, plaintiffs filed a tax return for 2007 (*see* pages 3, 5 above), subsections (f) and (g) reduce their tax credit by the value of the allowable refund

and credit for 2007 ($300 for Maniolos [9] and $600 for Boley). Accordingly, plaintiffs' 2008 tax credit was eliminated and the money they received was an advance refund for the constructive overpayment of 2007 taxes.

9    Maniolos did not have any net income tax liability for 2007. (Maniolos Compl. ¶ 13; Maniolos Gov't Br. at 3; Maniolos Br. at 3.) Therefore, had the ESA applied to the 2007 tax year, Maniolos would have received a $300 tax credit under the special rule of 26 U.S.C. § 6428(b) because she had qualifying income of at least $3,000 in 2007.

Maniolos relies on *Sticka v. Lambert (In re Lambert), 283 B.R. 16 (9th Cir. BAP 2002),* for the proposition that subsection (g) does not create an advance refund for 2007 taxes, but rather uses the 2007 tax income to determine the value of the 2008 rebate. (*E.g.,* Maniolos Br. at 20–23.) In *Lambert,* the court addressed the Economic Growth and Tax Relief Reconciliation Act of 2001 ("2001 Tax Act") [10] and found **\*564** that it amended subsection (e) of former 26 U.S.C. § 6428 [11] to allow for a 2001 tax credit based on 2000 tax information:

10    Pub.L. No. 107–16, 115 Stat. 42 (2001) (codified as amended in scattered subsections of 26 U.S.C.).

11    In relevant part, subsection (e) of former 26 U.S.C. § 6428 provided as follows:

(e) Advance refunds of credit based on prior year data.—

(1) In general.—Each individual who was an eligible individual for such individual's first taxable year beginning in 2000 shall be treated as having made a payment against the tax imposed by chapter 1 for such first taxable year in an amount equal to the advance refund amount for such taxable year.

(2) Advance refund amount.—For purposes of paragraph (1), the advance refund amount is the amount that would have been allowed as a credit under this section for such first taxable year if—

(A) this section (other than subsections (b) and (d) and this subsection) had applied to such taxable year, and

(B) the credit for such taxable year were not allowed to exceed the excess (if any) of—

(i) the sum of the regular tax liability (as defined in section 26(b)) plus the tax imposed by section 55, over

(ii) the sum of the credits allowable under part IV of subchapter A of chapter 1 (other than

the credits allowable under subpart C thereof, relating to refundable credits).

26 U.S.C. § 6428(e) (as amended March 9, 2002).

The title of subsection (e) indicates that the Act authorized an advance payment in year–2001 of anticipated tax refund based on year–2000's data. The refund is "advance" because, upon the Act's enactment, year–2001 taxes were not yet due. Sections (e)(1) and (2) then proceed to lay out how the Relief Check amount is to be calculated. Section (e)(1) assumes that each eligible individual in year–2000 has paid his or her taxes, in an amount equal to the refund such individual would have received if the Act had applied in year–2000. Section (e)(2) then treats that year–2000 amount as the year–2001 advance refund amount. By saying that the advance refund amount is the amount that "would have" been allowed as a credit for tax year 2000 if the Act had applied then, Congress implied that the refund does not apply to tax year 2000. The year–2000 tax information is therefore only used as a way to calculate the year–2001 refund. Together, the two sections indicate that Congress intended to use an individual's year–2000 tax liability to calculate the amount of his or her Relief Check issued in 2001.

In re Lambert, 283 B.R. at 19–20 (fn. omitted). Plaintiffs argue that subsection (g) of the current 26 U.S.C. § 6428 should be interpreted to create a 2008 tax refund, albeit based on 2007 tax information. (Maniolos Br. at 20–23).

Maniolos' reliance on Lambert is misplaced. Ninth Circuit precedent is not binding on this Court. See, e.g., Parrish v. Sollecito, 280 F.Supp.2d 145, 157 (S.D.N.Y.2003) ("[A]s this issue has not been resolved by the Second Circuit, such [Eleventh Circuit] precedent is not controlling in this Circuit and this Court is not bound by it."); Consol. Rail Corp. v. Ted Sobiech Farms, 717 F.Supp. 1062, 1063 (S.D.N.Y.1989) ("As a preliminary matter, this court is not bound by the prevailing precedent in the Seventh Circuit.").

Moreover, despite similar language, there is a key difference between the Acts. The 2001 Tax Act was enacted on June 7, 2001 (see Pub.L. No. 107–16, 115 Stat. 42), about two months after the April 16, 2001, deadline for filing 2000 taxes. Consequently, if the 2001 Tax Act rebate was for an overpayment of 2000 taxes, it would not have been called an "advance refund" since the IRS had already started distributing refunds for overpayments of 2000 taxes. Since some of the 2000 tax refunds were already dispensed, the fastest way to deliver **\*565** the new rebate to taxpayers was through an advance refund of the 2001 credit. This

advance payment therefore had to be based on year 2000 tax information because 2001 taxes were not due yet. See 26 U.S.C. § 6428(e) (as amended Mar. 9, 2002) (entitled "Advance refunds of credit based on prior year data.").

The ESA, on the other hand, was enacted on February 13, 2008. See Pub.L. No. 110–185, 122 Stat. 613. As of that date, a refund for 2007 taxes would have been considered advanced since it was two months before 2007 taxes were even due. Therefore, the quickest way to deliver the advance ESA recovery rebate to the taxpayer was through an advance refund of 2007 taxes. Given this distinction between the Acts, Lambert is distinguishable.

## C. The OIC is a Settlement Agreement, Interpreted Under Principles of Contract Law

**2**   An OIC is a settlement agreement between the taxpayer and the IRS compromising unpaid taxes, and as such is construed according to principles of contract law. See, e.g., United States v. Lane, 303 F.2d 1, 4 (5th Cir.1962) ("It has long been settled that an agreement compromising unpaid taxes is a contract and, consequently, that it is governed by the rules applicable to contracts generally."); Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir.1999) (It is well-settled that "[s]ettlement agreements are contracts and must therefore be construed according to general principles of contract law."). [12]

[12]   Accord, e.g., Powell v. Omnicom, 497 F.3d 124, 128 (2d Cir.2007); Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 443 (2d Cir.2005); Torres v. Walker, 356 F.3d 238, 245 (2d Cir.2004); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir.1994); Kowal v. Andy Constr., Inc., No. CV–05–576, 2008 WL 4426996 at *1 (E.D.N.Y. Sept. 25, 2008); Coal. on W. Valley Nuclear Wastes v. Bodman, 625 F.Supp.2d 109, 120 (W.D.N.Y.2007) ("[A] stipulation for settlement is a contract, interpreted under general principles of contract law."), aff'd sub nom. Coal. on W. Valley Nuclear Wastes v. Chu, 592 F.3d 306 (2d Cir.2009).

Because the OIC is a contract involving the United States, its interpretation and construction is governed by federal common law. See, e.g., United States v. Basin Elec. Power Coop., 248 F.3d 781, 796 (8th Cir.2001) ("Federal common law governs the interpretation and construction of a contract between the United States and another party."), cert. denied, 534 U.S. 1115, 122 S.Ct. 924, 151 L.Ed.2d 887 (2002); Up State Fed. Credit Union v. Walker, 198 F.3d 372, 375 n. 4 (2d

Cir.1999)) (" '[C]ontracts with the government are governed by federal common law ...' ").

3    " '[I]n developing federal common law in an area, [a court] may look to state law.' " *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 316 (2d Cir.2006); *accord, e.g., Barnes v. Am. Int'l Life Assurance Co.,* 681 F.Supp.2d 513, 520 (S.D.N.Y.2010) (Chin, D.J.) ("[I]n developing federal common law, the federal courts may look to state law...."); *E.E.O.C. v. Fed. Express Corp.,* 268 F.Supp.2d 192, 204 (E.D.N.Y.2003) ("[C]ontracts with the federal government are governed by federal common law ... which incorporates 'the core principles of the common law of contract[s] that are in force in most states.' "). "When it comes to general rules of contract interpretation, there is little difference between federal common law and New York law...." *Barnes v. Am. Int'l Life Assurance Co.,* 681 F.Supp.2d at 520; *see also, e.g., Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d at 316 (looking to cases interpreting New York contract law in determining *\*566* whether a contract governed by federal common law was ambiguous).

4    "Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.' Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir.1998) (citations omitted); *accord, e.g., W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639 (1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts."); *Sutton v. E. River Sav. Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075 (1982) ("the threshold decision on whether a writing is ambiguous is the exclusive province of the court"). [13]

13    *See, e.g., Law Debenture Trust Co. v. Maverick Tube Corp.,* 595 F.3d 458, 465 (2d Cir.2010); *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 396–97 (2d Cir.2009); *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d at 316; *Augienello v. Coast–to–Coast Fin. Corp.,* 64 Fed.Appx. 820, 821–22 (2d Cir.2003) (citing *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir.2002)); *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 257 (2d Cir.2002); *Mellon Bank v. United Bank Corp.,* 31 F.3d 113, 115 (2d Cir.1994); *Norfolk S. Ry. v. Flexi–Van Leasing, Inc.,* 99 Civ. 0055, 2000 WL 1855112 at \*5 (S.D.N.Y. Dec. 18, 2000); *Checkrite Ltd. v. Ill. Nat. Ins. Co.,* 95 F.Supp.2d 180, 188–89 (S.D.N.Y.2000); *ABC Radio Network, Inc. v. Lens Am., Inc.,* 97 Civ. 9467, 1999 WL 771360 at \*2 (S.D.N.Y. Sept. 28, 1999); *Air Support Int'l, Inc. v. Atlas Air, Inc.,* 54 F.Supp.2d 158, 165 (E.D.N.Y.1999); *see also, e.g., Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190 F.3d 26, 33 (2d Cir.1999); *Haber v. St. Paul Guardian Ins. Co.,* 137 F.3d 691, 695 (2d Cir.1998); *Sayers v. Rochester Tel. Corp.,* 7 F.3d 1091, 1094 (2d Cir.1993); *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir.1992); *First Indem. of Am. Ins. Co. v. Shinas,* 03 Civ. 6634, 2009 WL 3154282 at \*5 (S.D.N.Y. Sept. 30, 2009); *Berman v. Parco,* 986 F.Supp. 195, 209 (S.D.N.Y.1997) (Wood, D.J. & Peck, M.J.); *EJS–ASOC Ticaret ve Danismanlik Ltd. v. AT & T,* 886 F.Supp. 331, 334 (S.D.N.Y.1994); *Chase Manhattan Bank, N.A. v. Keystone Distrib. Inc.,* 873 F.Supp. 808, 811 (S.D.N.Y.1994).

"It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Feifer v. Prudential Ins. Co.,* 306 F.3d 1202, 1210 (2d Cir.2002); *accord, e.g., Rosenblatt v. Christie, Manson & Woods,* 195 Fed.Appx. 11, 12 (2d Cir.2006) ("Where, as here, a contract is unambiguous, it is enforced according to its terms, and the court will generally not look 'outside the four corners of the document' to add to or vary it."); *United States v. Liranzo,* 944 F.2d 73, 77 (2d Cir.1991); *Crowley v. VisionMaker, LLC,* 512 F.Supp.2d 144, 152 (S.D.N.Y.2007); *S. N.J. Rail Group, LLC v. Lumbermens Mut. Cas. Co.,* 06 Civ. 4946, 2007 WL 2296506 at \*7 & n. 9 (S.D.N.Y. Aug. 13, 2007) (Peck, M.J.) (& cases cited therein); *R/ S Assoc. v. N.Y. Job Dev. Auth.,* 98 N.Y.2d 29, 33, 744 N.Y.S.2d 358, 360, 771 N.E.2d 240 (2002) ("Unless the court finds ambiguity, the rules governing the interpretation of ambiguous contracts do not come into play. Thus, when interpreting an unambiguous contract term [e]vidence outside the four corners of the document ... is generally inadmissible to add to or vary the writing. [E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.") (ellipsis & brackets in original, citations & quotations omitted) (quoting *W.W.W. Assoc. Inc. v. Giancontieri,* 77 N.Y.2d at 162–63, 565 N.Y.S.2d at 443, 566 N.E.2d 639); *Weissman v. Sinorm Deli, Inc.,* 88 N.Y.2d 437, 447, 646 N.Y.S.2d 308, 313, 669 N.E.2d 242 (1996) ("[W]hen parties set down their agreement in a clear, complete document, evidence outside the four corners of the *\*567* document as to what was actually intended is generally inadmissible.").

**5**    Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss. *See, e.g., Advanced Mktg. Group, Inc. v. Bus. Payment Sys., LLC,* 300 Fed.Appx. 48, 49 (2d Cir.2008) (" '[J]udgment as a matter of law is appropriate if the contract language is unambiguous.' "); *Rounds v. Beacon Assoc. Mgmt. Corp.,* 09 Civ. 6910, 2009 WL 4857622 at *3 (S.D.N.Y. Dec. 14, 2009) (" 'Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss.' "); *Wurtsbaugh v. Banc of Am. Sec. LLC,* 05 Civ. 6220, 2006 WL 1683416 at *5 (S.D.N.Y. June 20, 2006) (" '[I]f an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms,' and a breach of contract claim may be dismissed on a Rule 12(b)(6) motion.") (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 177 (2d Cir.2004)).

**6**    However, " 'when the language of a contract is ambiguous, its construction presents a question of fact,' which of course precludes summary dismissal" on a Rule 12(b)(6) motion. *Crowley v. VisionMaker, LLC,* 512 F.Supp.2d at 152; *accord, e.g., Psenicska v. Twentieth Century Fox Film Corp.,* 07 Civ. 10972, 08 Civ. 1571, 08 Civ. 1828, 2008 WL 4185752 at *4 (S.D.N.Y. Sept. 3, 2008) ("Where there are alternative, reasonable interpretations of a contract term rendering it ambiguous, the issue should be submitted to the trier of fact and is not suitable for disposition on a motion to dismiss."); *Wurtsbaugh v. Banc of Am. Sec. LLC,* 2006 WL 1683416 at *5 ("Where a contract term is ambiguous and material to the breach of contract claim, the claim may not be dismissed for failure to state a claim."); *see also, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. & Trust Co.,* 375 F.3d at 178 ("Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissable on the pleadings."). In other words, while a court is not "obliged to accept the allegations of the complaint as to how to construe" a contract, it "should resolve any contractual ambiguities in favor of the plaintiff" on a motion to dismiss. *Subaru Distrib. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 122 (2d Cir.2005); *accord, e.g., Gerritsen v. Glob Trading, Inc.,* No. 06–CV–3756, 2009 WL 262057 at *4 (E.D.N.Y. Feb. 4, 2009) ("Where, as here, a court is determining whether a plaintiff has adequately stated a cause of action for breach of contract, all contractual ambiguities should be resolved in favor of the plaintiff."); *D.C. USA Operating Co. v. Indian*

*Harbor Ins. Co.,* 07 Civ. 0116, 2007 WL 945016 at *8 (S.D.N.Y. Mar. 27, 2007) ("[W]hen considering a motion to dismiss, courts should resolve any contractual ambiguities in favor of the plaintiff without resorting to parol evidence.").

**7**    "Contract language is not ambiguous if it has a 'definite and precise meaning ... concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)). [14] Conversely, a contract is ambiguous if it is reasonably susceptible to more than one meaning. *E.g., Chimart* **\*568** *Assoc. v. Paul,* 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231 (1986) (to determine if ambiguity exists in contract court must determine "whether the agreement on its face is reasonably susceptible of more than one interpretation"); *Angelino v. Freedus,* 69 A.D.3d 1203, 1206, 893 N.Y.S.2d 668, 671 (3d Dep't 2010) (" 'A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion.' "); *Fernandez v. Price,* 63 A.D.3d 672, 675, 880 N.Y.S.2d 169, 173 (2d Dep't 2009); *St. Mary v. Paul Smith's Coll. of Arts & Sciences,* 247 A.D.2d 859, 859, 668 N.Y.S.2d 813, 813 (4th Dep't 1998); *Hutzel v. U.S. Aviation Underwriters, Inc.,* 132 A.D.2d 45, 49, 522 N.Y.S.2d 301, 303 (3d Dep't 1987) ("an ambiguity exists ... when a term 'is capable of more than one meaning' "), *appeal denied,* 71 N.Y.2d 804, 528 N.Y.S.2d 829, 524 N.E.2d 149 (1988); *see, e.g., JA Apparel Corp. v. Abboud,* 568 F.3d at 396–97; *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) ("An 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."); *Health–Chem Corp. v. Baker,* 737 F.Supp. 770, 773 (S.D.N.Y.1990) ("[A] term is ambiguous when it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement ....' "), aff'd, 915 F.2d 805 (2d Cir.1990). [15]

**14**    *Accord, e.g., Law Debenture Trust Co. v. Maverick Tube Corp.,* 595 F.3d at 467; *JA Apparel Corp. v. Abboud,* 568 F.3d at 396; *Photopaint Techs., LLC v. Smartlens Corp.,* 335 F.3d 152, 160 (2d Cir.2003) ("Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself,

and concerning which there is no reasonable basis for a difference of opinion.") (internal quotations omitted); *RJE v. Northern Indus. Corp.,* 329 F.3d 310, 314 (2d Cir.2003); *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996); *Sayers v. Rochester Tel. Corp.,* 7 F.3d at 1095; *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d at 428; *Norfolk S. Ry. v. Flexi–Van Leasing, Inc.,* 2000 WL 1855112 at *5; *Checkrite Ltd. v. Ill. Nat. Ins. Co.,* 95 F.Supp.2d at 189; *ABC Radio Network, Inc. v. Lens Am., Inc.,* 1999 WL 771360 at *3; *Air Support Int'l, Inc. v. Atlas Air, Inc.,* 54 F.Supp.2d at 165.

15    *See also, e.g., Law Debenture Trust Co. v. Maverick Tube Corp.,* 595 F.3d at 466 ("An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' "); *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.,* 472 F.3d 33, 42 (2d Cir.2006) ("An ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (internal quotations omitted); *United Air Lines, Inc. v. Ins. Co. of the State of Pa.,* 439 F.3d 128, 134 (2d Cir.2006) (A contract "is ambiguous when it is reasonably susceptible to more than one reading.") (internal quotations omitted); *Liberty Surplus Ins. Corp. v. The Segal Co.,* 142 Fed.Appx. 511, 513 (2d Cir.2005); *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005) ("An ambiguous term is one that is reasonably susceptible to more than one reading, or one as to which reasonable minds could differ."); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d at 86; *Sayers v. Rochester Tel. Corp.,* 7 F.3d at 1095; *Goodheart Clothing Co. v. Laura Goodman Enter., Inc.,* 962 F.2d 268, 272 (2d Cir.1992); *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d at 428; *Norfolk S. Ry. v. Flexi–Van Leasing, Inc.,* 2000 WL 1855112 at *5; *Checkrite Ltd. v. Ill. Nat. Ins. Co.,* 95 F.Supp.2d at 189; *Berman v. Parco,* 986 F.Supp. at 209 & n. 9 (citing cases); *Lipari v. Maines Paper & Food Serv., Inc.,* 245 A.D.2d 1085, 1085, 667 N.Y.S.2d 548, 549 (4th Dep't 1997); *Levey v. A. Leventhal & Sons, Inc.,* 231 A.D.2d 877, 877, 647 N.Y.S.2d 597, 597 (4th Dep't 1996); *Arrow Commc'n Labs., Inc. v. Pico Prods.,*

*Inc.,* 206 A.D.2d 922, 922–923, 615 N.Y.S.2d 187, 188 (4th Dep't 1994); *Am. Express Bank Ltd. v. Uniroyal, Inc.,* 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990) ("A contract should be construed so as to give full meaning and effect to all of its provisions."), *appeal denied,* 77 N.Y.2d 807, 569 N.Y.S.2d 611, 572 N.E.2d 52 (1991).

**\*569**    Clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations. *E.g., Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590 ("Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact."), aff'd, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957); *Slattery Skanska Inc. v. Am. Home Assurance Co.,* 67 A.D.3d 1, 14, 885 N.Y.S.2d 264, 274 (1st Dep't 2009) ("That one party to the agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the term ambiguous."); *Moore v. Kopel,* 237 A.D.2d 124, 125, 653 N.Y.S.2d 927, 929 (1st Dep't 1997) ("[A] contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms."); *see, e.g., Law Debenture Trust Co. v. Maverick Tube Corp.,* 595 F.3d at 467; *JA Apparel Corp. v. Abboud,* 568 F.3d at 396; *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 598 (2d Cir.2005) ("[T]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning.") (quotations omitted); *Photopaint Techs., LLC v. Smartlens Corp.,* 335 F.3d at 160 ("Unambiguous contract language is not rendered ambiguous by competing interpretations of it urged in litigation"). 16

16    *See also, e.g., Sayers v. Rochester Tel. Corp.,* 7 F.3d at 1095; *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d at 428; *Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d at 1277; *CDR–Wantagh, Inc. v. Shell Oil Co.,* No. 07–CV–4497, 2009 WL 936672 at *7 (E.D.N.Y. Mar. 31, 2009); *Norfolk S. Ry. v. Flexi–Van Leasing, Inc.,* 2000 WL 1855112 at *6; *Checkrite Ltd. v. Ill. Nat. Ins. Co.,* 95 F.Supp.2d at 189; *ABC Radio Network, Inc. v. Lens Am., Inc.,* 1999 WL 771360 at *3; *Air*

*Support Int'l, Inc. v. Atlas Air, Inc.,* 54 F.Supp.2d at 165–66; *Berman v. Parco,* 986 F.Supp. at 210; *EJS–ASOC Ticaret v. AT & T,* 886 F.Supp. at 334; *Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.,* 873 F.Supp. at 811; *Broadway Nat'l Bank v. Progressive Cas. Ins. Co.,* 775 F.Supp. 123, 126 (S.D.N.Y.1991), aff'd, 963 F.2d 1522 (2d Cir.1992); *Health–Chem Corp. v. Baker,* 737 F.Supp. at 773.

### D. The Terms of the OIC Entitle the IRS to Retain the ESA Rebate

The Government argues that plaintiffs' complaints should be dismissed because the express language of OIC section V(f) entitled the IRS to "keep any refund ... because of overpayment of any tax or other liability[ ] for tax periods extending through the calendar year in which the IRS accepts the offer." (*See* pages 3, 5 above.) As previously discussed (*see* pages 12–18 above), the ESA rebate was distributed to plaintiffs as a refund for a constructive overpayment of 2007 taxes. Thus, the clear language of the OIC supports the Government's argument.

Plaintiffs, however, argue that the OIC was written in "colloquial English," not the technical terms of the tax code, and that **\*570** the plain meaning of "refund" and "overpayment" would not include the constructive overpayment under the ESA. (Maniolos Dkt. No. 12: Maniolos Br. at 5, 6–20; Boley Dkt. No. 8: Boley Br. at 5–20.) [17] Plaintiffs further contend that, to the extent it is unclear whether the OIC uses the plain meaning or tax code meaning of "overpayment," the OIC is ambiguous and should be construed against the IRS, the drafter. (Maniolos Br. at 14; Boley Br. at 15.)

[17] In support of plaintiffs' "colloquial English" contention, plaintiffs first refer to OIC section V(e), which provides: "I/We waive and agree to the suspension of any statutory periods of limitation (time limits provided by law) for the IRS assessment of the liability for the periods identified in Section II." (Maniolos Br. at 11; Boley Br. at 12; Compl. Ex. A: OIC). Second, plaintiffs refer to section V(i), which provides: "The IRS will not remove the original amount of the liabilities from its records until I/we have met all the terms and conditions of the offer" (Maniolos Br. at 11–12; Boley Br. at 12; Compl. Ex. A: OIC.). Plaintiffs assert that if this provision were written in technical terms it would have stated: "The IRS will not abate any assessment of the liabilities [or post an entry crediting the assessment as paid or no longer enforceable] until I/we have met all the terms and conditions of the offer." (Maniolos Br. at

12; Boley Br. at 12.) Third, plaintiffs refer to section V(f) that allows the IRS to "keep any refund" (Compl. Ex. A: OIC) even though, "[i]n technical Code jargon, the IRS does not 'keep' a refund." (Maniolos Br. at 12; Boley Br. at 12.)

Plaintiffs' arguments are unavailing because the OIC is created and governed by the tax code. Section 7122(a) of the tax code authorizes the IRS to enter into an OIC to resolve tax liabilities. *See* 26 U.S.C. § 7122(a) ("The Secretary may compromise any civil or criminal case arising under the internal revenue laws...."). Section 7122(d) sets the standards for evaluating whether an OIC should be accepted. *See* 26 U.S.C. § 7122(d). Section 7122(e) provides for administrative review and appeal when an OIC is rejected. *See* 26 U.S.C. § 7122(e).

The OIC's text further demonstrates that it is dependant on the tax code, including references to the calculation of interest under § 6601, the required payments under § 7122(c), and the notice of contacting third parties under § 7602. (Compl. Ex. A: OIC §§ IV, V(a), V(d), V(f), V(*l* ), V(n).) Additionally, the OIC's privacy act statement states: "We ask for the information on this form to carry out the internal revenue laws of the United States." (Compl. Ex A: OIC.) Thus, it is clear to anyone who reads it that an OIC is a product of the Code. Moreover, both Maniolos and Boley were represented by their present tax counsel in submitting their OICs. (Compl. Ex. A: OIC § IX.)

Consequently, in determining whether there is any ambiguity, the OIC's terms must be evaluated by the tax code's usages and terms. *See, e.g., Kerin v. U.S. Postal Serv.,* 116 F.3d 988, 992 n. 2 (2d Cir.1997) (Whether a contract is ambiguous "must be considered from the viewpoint of one 'cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' "). [18]

[18] Plaintiffs argue that "[i]t is apparent that the OIC overrides the provisions of the Internal Revenue Code," since the "IRS contractually foregoes using its various Code-provided collection tools" to collect unpaid tax liabilities. (Maniolos Br. at 13; Boley Br. at 14.) As the Government correctly points out, however, "[w]hile an OIC evidences the IRS's decision (with the exception of the 'additional consideration' provision) to forgive past-due taxes, it does not evidence a general waiver of the IRS's statutory rights and definitions or otherwise contain any language overriding the Code." (Boley Dkt. No. 9: Gov't Reply Br. at 2.)

The term "overpayment" in the Code includes constructive overpayments. Pursuant to § 6401(b)(1), where a refundable *571 credit exceeds tax liability, the extra amount is defined as an overpayment. *See* 26 U.S.C. § 6401(b)(1) ("If the amount allowable as credits under subpart C of part IV of subchapter A of chapter 1 (relating to refundable credits) exceeds the tax imposed by subtitle A ... the amount of such excess shall be considered an overpayment."). Section 6402(a) provides for the refunding of overpayments to "the person who made the overpayment" (*see* 26 U.S.C § 6402(a)), even though, with respect to refundable credits, the taxpayer never actually made an overpayment. Thus, the only way a taxpayer receives a refund for a refundable credit, such as the Earned Income Tax Credit ("EITC"), is through a constructive overpayment. *See Sorenson v. Sec'y of Treasury,* 475 U.S. 851, 855, 106 S.Ct. 1600, 1604, 89 L.Ed.2d 855 (1986) ("An individual who is entitled to an earned-income credit that exceeds the amount of tax he owes thereby receives the difference as if he had overpaid his tax in that amount."); *Israel v. United States,* 356 F.3d 221, 223–24 (2d Cir.2004) ( "The only way to understand the [EITC] in the context of the tax code, then, is as a constructive overpayment.").

Additionally, the ESA itself uses "overpayment" to include constructive overpayments. As noted on pages 13–14 above, § 6428(g)(1) creates the fiction that the taxpayer overpaid for 2007 taxes in a specified amount. Even though this amount only was a constructive overpayment, it is distributed to the taxpayer through subsection (g)(3) as an overpayment of taxes. *See* 26 U.S.C. § 6428(g)(3) ("The Secretary shall, subject to the provisions of this title, refund or credit any overpayment attributable to this section as rapidly as possible.").

Given that the precise meaning of overpayment in the tax code includes constructive overpayments, coupled with the OIC's status as a product of the Code, there is no reasonable basis to believe that the OIC's language did not include constructive overpayments. *See, e.g., Law Debenture Trust Co. v. Maverick Tube Corp.,* 595 F.3d 458, 467 (2d Cir.2010) ("[T]he court should not find the contract ambiguous where the interpretation urged by one party would 'strain [ ] the contract language beyond its reasonable and ordinary meaning.' "); *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) ("Contract language is not ambiguous if it has 'a definite and precise meaning ... concerning which there is no reasonable basis for a difference of opinion.' ") (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)).

Moreover, plaintiffs' argument would create the situation where the ESA rebate is distributed as a constructive overpayment under the Code, but not considered an overpayment with regard to "additional consideration" liabilities under the OIC. A similar argument concerning the EITC was raised by taxpayers and rejected by the Supreme Court in *Sorenson v. Secretary of Treasury,* 475 U.S. at 859–61, 106 S.Ct. at 1606–07. The taxpayers in *Sorenson* were entitled to a refund under the EITC since the amount of the credit was greater than their tax liability. *Sorenson v. Sec'y of Treasury,* 475 U.S. at 853–55, 106 S.Ct. at 1603–04. The IRS, however, retained the refund under the § 6402(c) intercept provision since the taxpayers owed money for overdue child support. *Sorenson v. Sec'y of Treasury,* 475 U.S. at 855–57, 106 S.Ct. at 1604–05. Although acknowledging that the EITC refund was considered an overpayment under § 6402(a), the taxpayers argued that the term "overpayment" in § 6402(c) did not include the refund since it was only a constructive overpayment. *Sorenson v. Sec'y of Treasury,* 475 U.S. at 859–61, 106 S.Ct. at 1606–07. The Supreme Court rejected *572 this argument, holding that "identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury,* 475 U.S. at 860, 106 S.Ct. at 1606.

*Sorenson's* rational is persuasive here. To the extent that a term is interpreted as having the same meaning in two different parts of the Code, it also should be interpreted as having the same meaning in the Code and in the OIC, which is a product of the tax code. Since the plaintiffs were only entitled to the ESA rebate because it was considered an overpayment under the tax code, it also should be considered an overpayment under section V(f) of the OIC.

Plaintiffs also argue that allowing the IRS to retain the ESA rebate under the terms of the OIC "defeats the fresh start" that the OIC was intended to give taxpayers. (Maniolos Br. at 17; Boley Br. at 17.) This Court rejects that argument as plaintiffs are hard pressed to explain how, after tens of thousands of dollars of tax liability were satisfied for mere cents on the dollar, the retention of a rebate worth a few hundred dollars somehow "defeats" this fresh start.

Accordingly, this Court finds that OIC section V(f) unambiguously entitled the IRS to retain the ESA rebate.

### CONCLUSION

**Maniolos v. U.S., 741 F.Supp.2d 555 (2010)**

106 A.F.T.R.2d 2010-6504, 2010-2 USTC P 50,651

For the reasons stated above, the Government's motions to dismiss (Maniolos Dkt. No. 11; Boley Dkt. No. 7) are *GRANTED.*

SO ORDERED.

Parallel Citations

106 A.F.T.R.2d 2010-6504, 2010-2 USTC P 50,651

**End of Document**    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 15

DOCSTOR: 2191401\1

105 S.Ct. 3346
Supreme Court of the United States

MITSUBISHI MOTORS CORPORATION, Petitioner
v.
SOLER CHRYSLER-PLYMOUTH, INC.
SOLER CHRYSLER-PLYMOUTH, INC., Petitioner
v.
MITSUBISHI MOTORS CORPORATION.

Nos. 83-1569, 83-1733.    Argued
March 18, 1985.    Decided July 2, 1985

Automobile manufacturer brought action against automobile dealer for nonpayment of stored vehicles, contractual storage penalties, damage to manufacturer's warranties and good will, expiration of distributorship, and other breaches of sales procedure agreement. Dealer counterclaimed for violations of the Sherman Act, the Automobile Dealers' Day in Court Act, Puerto Rico Dealers' Act and Puerto Rico antitrust and unfair competition statutes. The United States District Court for the District of Puerto Rico, Gilberto Gierbolini-Ortiz, J., ordered arbitration of claims and counterclaims, and dealer appealed. The First Circuit Court of Appeals, Kaufman, Circuit Judge, 723 F.2d 155, reversed in part, affirmed in part and remanded, and certiorari was granted. The Supreme Court, Justice Blackmun, held that antitrust dispute was subject to arbitration under the Arbitration Act.

Affirmed in part and reversed in part and remanded.

Justice Stevens with whom Justice Brennan joined, and with whom Justice Marshall joined except as to Part II, filed a dissenting opinion.

Opinion on remand, 814 F.2d 844.

**3347  *614  Syllabus *

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Petitioner-cross-respondent (hereafter petitioner), a Japanese corporation that manufactures automobiles, is the product of a joint venture between Chrysler International, S.A.

(CISA), a Swiss corporation, and another Japanese corporation, aimed at distributing through Chrysler dealers outside the continental United States automobiles manufactured by petitioner. Respondent-cross-petitioner (hereafter respondent), a Puerto Rico corporation, entered into distribution and sales agreements with CISA. The sales agreement (to which petitioner was also a party) contained a clause providing for arbitration by the Japan Commercial Arbitration Association of all disputes arising out of certain articles of the agreement or for the breach thereof. Thereafter, when attempts to work out disputes arising from a slackening of the sale of new automobiles failed, petitioner withheld shipment of automobiles to respondent, which disclaimed responsibility for them. Petitioner then brought an action in Federal District Court under the Federal Arbitration Act and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, seeking an order to compel arbitration of the disputes in accordance with the arbitration clause. Respondent filed an answer and counterclaims, asserting, *inter alia,* causes of action under the Sherman Act and other statutes. The District Court ordered arbitration of most of the issues raised in the complaint and counterclaims, including the federal antitrust issues. Despite the doctrine of **3348  American Safety Equipment Corp. v. J.P. Maguire & Co., 391 F.2d 821 (CA2), uniformly followed by the Courts of Appeals, that rights conferred by the antitrust laws are inappropriate for enforcement by arbitration, the District Court, relying on Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, held that the international character of the undertaking in question required enforcement of the arbitration clause even as to the antitrust claims. The Court of Appeals reversed insofar as the District Court ordered submission of the antitrust claims to arbitration.

*Held:*

1. There is no merit to respondent's contention that because it falls within the class for whose benefit the statutes specified in the counterclaims were *615 passed, but the arbitration clause at issue does not mention these statutes or statutes in general, the clause cannot be properly read to contemplate arbitration of these statutory claims. There is no warrant in the Arbitration Act for implying in every contract within its ken a presumption against arbitration of statutory claims. Nor is there any reason to depart from the federal policy favoring arbitration where a party bound by an arbitration agreement raises claims founded on statutory rights. Pp. 3353-3355.

2. Respondent's antitrust claims are arbitrable pursuant to the Arbitration Act. Concerns of international comity, respect

for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes, all require enforcement of the arbitration clause in question, even assuming that a contrary result would be forthcoming in a domestic context. See *Scherk v. Alberto-Culver Co., supra.* The strong presumption in favor of freely negotiated contractual choice-of-forum provisions is reinforced here by the federal policy in favor of arbitral dispute resolution, a policy that applies with special force in the field of international commerce. The mere appearance of an antitrust dispute does not alone warrant invalidation of the selected forum on the undemonstrated assumption that the arbitration clause is tainted. So too, the potential complexity of antitrust matters does not suffice to ward off arbitration; nor does an arbitration panel pose too great a danger of innate hostility to the constraints on business conduct that antitrust law imposes. And the importance of the private damages remedy in enforcing the regime of antitrust laws does not compel the conclusion that such remedy may not be sought outside an American court. Pp. 3355-3361.

723 F.2d 155 (CA1 1983), affirmed in part, reversed in part, and remanded.

Attorneys and Law Firms

*Wayne A. Cross* argued the cause for petitioner in No. 83-1569 and respondent in No. 83-1733. With him on the briefs were *Robert L. Sills, William I. Sussman, Samuel T. Cespedes,* and *Ana Matilde Nin.*

*Benjamin Rodriguez-Ramon* argued the cause for respondent in No. 83-1569 and petitioner in No. 83-1733. With him on the briefs was *Jerome Murray.*

**\*616** *Jerrold Joseph Ganzfried* argued the cause for the United States as *amicus curiae* supporting respondent in No. 83-1569. With him on the brief were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Wallace, Carolyn F. Corwin, Robert B. Nicholson,* and *Marion L. Jetton.*\*

\* Briefs of *amici curiae* urging reversal were filed for the American Arbitration Association by *Michael F. Hoellering, Joseph T. McLaughlin, Wayne D. Collins, Alfred Ferrer, Rosemary S. Page, Thomas Thacher, John R. Stevenson, Robert B. von Mehren, Gerald Aksen, Henry P. de Vries, Andreas F. Lowenfeld,* and *J. Stewart McClendon;* and for the National Automobile Dealers Association by *Jerry S. Cohen.* Briefs of *amici curiae* were filed for the International Chamber of Commerce by *James S. Campbell* and *Andrew*

*N. Vollmer;* and for the Commonwealth of Puerto Rico by *Hector Rivera Cruz,* Secretary of Justice of Puerto Rico, *E. Edward Bruce,* and *Oscar M. Garibaldi.*

Opinion

Justice BLACKMUN delivered the opinion of the Court.

The principal question presented by these cases is the arbitrability, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention), [1970] 21 U.S.T. 2517, T.I.A.S. No. 6997, of claims arising under the Sherman Act, 15 U.S.C. § 1 *et seq.,* and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction.

I

Petitioner-cross-respondent Mitsubishi Motors Corporation (Mitsubishi) is a Japanese corporation which manufactures automobiles and has its principal place of business in Tokyo, Japan. Mitsubishi is the product of a joint venture between, on the one hand, Chrysler International, S.A. (CISA), a Swiss corporation registered in **\*\*3349** Geneva and wholly owned by Chrysler Corporation, and, on the other, Mitsubishi Heavy Industries, Inc., a Japanese corporation. The *\*617* aim of the joint venture was the distribution through Chrysler dealers outside the continental United States of vehicles manufactured by Mitsubishi and bearing Chrysler and Mitsubishi trademarks. Respondent-cross-petitioner Soler Chrysler-Plymouth, Inc. (Soler), is a Puerto Rico corporation with its principal place of business in Pueblo Viejo, Guaynabo, Puerto Rico.

On October 31, 1979, Soler entered into a Distributor Agreement with CISA which provided for the sale by Soler of Mitsubishi-manufactured vehicles within a designated area, including metropolitan San Juan. App. 18. On the same date, CISA, Soler, and Mitsubishi entered into a Sales Procedure Agreement (Sales Agreement) which, referring to the Distributor Agreement, provided for the direct sale of Mitsubishi products to Soler and governed the terms and conditions of such sales. *Id.,* at 42. Paragraph VI of the Sales Agreement, labeled "Arbitration of Certain Matters," provides:

> "All disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to Articles I-B through V of this Agreement or for the breach

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

thereof, shall be finally settled by arbitration in accordance with the rules and regulations of the Japan Commercial Arbitration Association." *Id.,* at 52-53.

Initially, Soler did a brisk business in Mitsubishi-manufactured vehicles. As a result of its strong performance, its minimum sales volume, specified by Mitsubishi and CISA, and agreed to by Soler, for the 1981 model year was substantially increased. *Id.,* at 179. In early 1981, however, the new-car market slackened. Soler ran into serious difficulties in meeting the expected sales volume, and by the spring of 1981 it felt itself compelled to request that Mitsubishi delay or cancel shipment of several orders. 1 Record 181, 183. About the same time, Soler attempted to arrange for the *\*618* transshipment of a quantity of its vehicles for sale in the continental United States and Latin America. Mitsubishi and CISA, however, refused permission for any such diversion, citing a variety of reasons,[1] and no vehicles were transshipped. Attempts to work out these difficulties failed. Mitsubishi eventually withheld shipment of 966 vehicles, apparently representing orders placed for May, June, and July 1981 production, responsibility for which Soler disclaimed in February 1982. App. 131.

[1] The reasons advanced included concerns that such diversion would interfere with the Japanese trade policy of voluntarily limiting imports to the United States, App. 143, 177-178; that the Soler-ordered vehicles would be unsuitable for use in certain proposed destinations because of their manufacture, with use in Puerto Rico in mind, without heaters and defoggers, *id.,* at 182; that the vehicles would be unsuitable for use in Latin America because of the unavailability there of the unleaded, high-octane fuel they required, *id.,* at 177, 181-182; that adequate warranty service could not be ensured, *id.,* at 176, 182; and that diversion to the mainland would violate contractual obligations between CISA and Mitsubishi, *id.,* at 144, 183.

The following month, Mitsubishi brought an action against Soler in the United States District Court for the District of Puerto Rico under the Federal Arbitration Act and the Convention.[2] Mitsubishi sought an order, pursuant to 9 U.S.C. §§ 4 and 201,[3] to *\*3350* compel arbitration in accord with *\*619* 57 VI of the Sales Agreement. App. 15.[4] Shortly after filing the complaint, Mitsubishi filed a request for arbitration before the Japan Commercial Arbitration Association. *Id.,* at 70.

[2] The complaint alleged that Soler had failed to pay for 966 ordered vehicles; that it had failed to

pay contractual "distress unit penalties," intended to reimburse Mitsubishi for storage costs and interest charges incurred because of Soler's failure to take shipment of ordered vehicles; that Soler's failure to fulfill warranty obligations threatened Mitsubishi's reputation and goodwill; that Soler had failed to obtain required financing; and that the Distributor and Sales Agreements had expired by their terms or, alternatively, that Soler had surrendered its rights under the Sales Agreement. *Id.,* at 11-14.

[3] Section 4 provides in pertinent part:

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."

Section 201 provides: "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter." Article II of the Convention, in turn, provides:

"1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

.

"3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." 21 U.S.T., at 2519. Title 9 U.S.C. § 203 confers jurisdiction on the district courts of the United States over an action falling under the Convention.

[4] Mitsubishi also sought an order against threatened litigation. App. 15-16.

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

Soler denied the allegations and counterclaimed against both Mitsubishi and CISA. It alleged numerous breaches by Mitsubishi of the Sales Agreement, [5] raised a pair of defamation claims, [6] and asserted causes of action under the Sherman *620 Act, 15 U.S.C. § 1 et seq.; the federal Automobile Dealers' Day in Court Act, 70 Stat. 1125, 15 U.S.C. § 1221 et seq.; the Puerto Rico competition statute, P.R.Laws Ann., Tit. 10, § 257 et seq. (1976); and the Puerto Rico Dealers' Contracts Act, P.R.Laws Ann., Tit. 10, § 278 et seq. (1978 and Supp.1983). In the counterclaim premised on the Sherman Act, Soler alleged that Mitsubishi and CISA had conspired to divide markets in restraint of trade. To effectuate the plan, according to Soler, Mitsubishi had refused to permit Soler to resell to buyers in North, Central, or South America vehicles it had obligated itself to purchase from Mitsubishi; had refused to ship ordered vehicles or the parts, such as heaters and defoggers, that would be necessary to permit Soler to make its vehicles suitable for resale outside Puerto Rico; and had coercively attempted to replace Soler and its other Puerto Rico distributors with a wholly owned subsidiary which would serve as the exclusive Mitsubishi distributor in Puerto Rico. App. 91-96.

5    The alleged breaches included wrongful refusal to ship ordered vehicles and necessary parts, failure to make payment for warranty work and authorized rebates, and bad faith in establishing minimum-sales volumes. Id., at 97-101.

6    The fourth counterclaim alleged that Mitsubishi had made statements that defamed Soler's good name and business reputation to a company with which Soler was then negotiating the sale of its plant and distributorship. Id., at 96. The sixth counterclaim alleged that Mitsubishi had made a willfully false and malicious statement in an affidavit submitted in support of its application for a temporary restraining order, and that Mitsubishi had wrongfully advised Soler's customers and the public in its market area that they should no longer do business with Soler. Id., at 98-99.

After a hearing, the District Court ordered Mitsubishi and Soler to arbitrate each of the issues raised in the complaint and in all the counterclaims save two and a portion of a third. [7] With regard to the **3351 federal antitrust issues, it recognized that the Courts of Appeals, following *621 American Safety Equipment Corp. v. J.P. Maguire & Co., 391 F.2d 821 (CA2 1968), uniformly had held that the rights conferred by the antitrust laws were " 'of a character inappropriate for enforcement by arbitration.' " App. to Pet.

for Cert. in No. 83-1569, p. B9, quoting Wilko v. Swan, 201 F.2d 439, 444 (CA2 1953), rev'd, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). The District Court held, however, that the international character of the Mitsubishi-Soler undertaking required enforcement of the agreement to arbitrate even as to the antitrust claims. It relied on Scherk v. Alberto-Culver Co., 417 U.S. 506, 515-520, 94 S.Ct. 2449, 2455-2458, 41 L.Ed.2d 270 (1974), in which this Court ordered arbitration, pursuant to a provision embodied in an international agreement, of a claim arising under the Securities Exchange Act of 1934 notwithstanding its assumption, arguendo, that Wilko, supra, which held nonarbitrable claims arising under the Securities Act of 1933, also would bar arbitration of a 1934 Act claim arising in a domestic context.

7    The District Court found that the arbitration clause did not cover the fourth and sixth counterclaims, which sought damages for defamation, see n. 6, supra, or the allegations in the seventh counterclaim concerning discriminatory treatment and the establishment of minimum-sales volumes. App. to Pet. for Cert. in No. 83-1569, pp. B10-B11. Accordingly, it retained jurisdiction over those portions of the litigation. In addition, because no arbitration agreement between Soler and CISA existed, the court retained jurisdiction, insofar as they sought relief from CISA, over the first, second, third, and ninth counterclaims, which raised claims under the Puerto Rico Dealers' Contracts Act, the federal Automobile Dealers' Day in Court Act, the Sherman Act, and the Puerto Rico competition statute, respectively. Id., at B12. These aspects of the District Court's ruling were not appealed and are not before this Court.

The United States Court of Appeals for the First Circuit affirmed in part and reversed in part. 723 F.2d 155 (1983). It first rejected Soler's argument that Puerto Rico law precluded enforcement of an agreement obligating a local dealer to arbitrate controversies outside Puerto Rico. [8] It also rejected Soler's suggestion that it could not have intended to arbitrate statutory claims not mentioned in the arbitration agreement. Assessing arbitrability "on an allegation-by-allegation basis," id., at 159, the court then read the arbitration *622 clause to encompass virtually all the claims arising under the various statutes, including all those arising under the Sherman Act. [9]

8    Soler relied on P.R. Laws Ann., Tit. 10, § 278b-2 (Supp.1983), which purports to render null and void "[a]ny stipulation that obligates a dealer to adjust, arbitrate or litigate any controversy that comes up regarding his dealer's contract outside of Puerto Rico,

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

or under foreign law or rule of law." See *Walborg Corp. v. Superior Court,* 104 P.R.R. 258 (1975). The Court of Appeals held this provision pre-empted by 9 U.S.C. § 2, which declares arbitration agreements valid and enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 723 F.2d, at 158. See *Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). See also *Ledee v. Ceramiche Ragno,* 684 F.2d 184 (CA1 1982). Soler does not challenge this holding in its cross-petition here.

9    As the Court of Appeals saw it, "[t]he question ... is not whether the arbitration clause mentions antitrust or any other particular cause of action, but whether the factual allegations underlying Soler's counterclaims-and Mitsubishi's bona fide defenses to those counterclaims-are within the scope of the arbitration clause, whatever the legal labels attached to those allegations." 723 F.2d, at 159. Because Soler's counterclaim under the Puerto Rico Dealers' Contracts Act focused on Mitsubishi's alleged failure to comply with the provisions of the Sales Agreement governing delivery of automobiles, and those provisions were found in that portion of Article I of the Agreement subject to arbitration, the Court of Appeals placed this first counterclaim within the arbitration clause. *Id., at 159-160.*

The court read the Sherman Act counterclaim to raise issues of wrongful termination of Soler's distributorship, wrongful failure to ship ordered parts and vehicles, and wrongful refusal to permit transshipment of stock to the United States and Latin America. Because the existence of just cause for termination turned on Mitsubishi's allegations that Soler had breached the Sales Agreement by, for example, failing to pay for ordered vehicles, the wrongful termination claim implicated at least three provisions within the arbitration clause: Article I-D(1), which rendered a dealer's orders "firm"; Article I-E, which provided for "distress unit penalties" where the dealer prevented timely shipment; and Article I-F, specifying payment obligations and procedures. The court therefore held the arbitration clause to cover this dispute. Because the nonshipment claim implicated Soler's obligation under Article I-F to proffer acceptable credit, the court found this dispute covered as well. And because the transshipment claim prompted Mitsubishi defenses concerning the suitability of vehicles manufactured to Soler's specifications for use in different locales and Soler's inability to provide warranty service to transshipped products, it implicated Soler's obligation under Article IV, another covered

provision, to make use of Mitsubishi's trademarks in a manner that would not dilute Mitsubishi's reputation and goodwill or damage its name and reputation. The court therefore found the arbitration agreement also to include this dispute, noting that such trademark concerns "are relevant to the legality of territorially based restricted distribution arrangements of the sort at issue here." 723 F.2d, at 160-161, citing *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

The Court of Appeals read the federal Automobile Dealers' Day in Court Act claim to raise issues as to Mitsubishi's good faith in establishing minimum-sales volumes and Mitsubishi's alleged attempt to coerce Soler into accepting replacement by a Mitsubishi subsidiary. It agreed with the District Court's conclusion, in which Mitsubishi acquiesced, that the arbitration clause did not reach the first issue; it found the second, arising from Soler's payment problems, to restate claims already found to be covered. 723 F.2d, at 161.

Finally, the Court of Appeals found the antitrust claims under Puerto Rico law entirely to reiterate claims elsewhere stated; accordingly, it held them arbitrable to the same extent as their counterparts. *Ibid.*

*623  **3352    Finally, after endorsing the doctrine of *American Safety,* precluding arbitration of antitrust claims, the Court of Appeals concluded that neither this Court's decision in *Scherk* nor the Convention required abandonment of that doctrine in the face of an international transaction. 723 F.2d, at 164-168. Accordingly, it reversed the judgment of the District Court insofar as it had ordered submission of "Soler's antitrust claims" to arbitration. [10] Affirming the remainder of the judgment, [11] the court directed the District Court to consider in the first instance how the parallel judicial and arbitral proceedings should go forward. [12]

10    Soler suggests that the court thereby declared antitrust claims arising under Puerto Rico law nonarbitrable as well. We read the Court of Appeals' opinion to have held only the federal antitrust claims nonarbitrable. See *id., at 157* ("principal issue on this appeal is whether arbitration of federal antitrust claims may be compelled under the Federal Arbitration Act"); *id., at 161* ("major question in this appeal is whether the antitrust issues raised by Soler's third counterclaim [grounded on Sherman Act] are subject to arbitration"). In any event, any contention that the local antitrust claims are nonarbitrable would be foreclosed by this Court's decision in *Southland Corp. v. Keating,* 465

U.S., at 110, 104 S.Ct., at 858, where we held that the Federal Arbitration Act "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."

11   In this Court, Soler suggests for the first time that Congress intended that claims under the federal Automobile Dealers' Day in Court Act be nonarbitrable. Brief for Respondent and Cross-Petitioner 21, n. 12. Because Soler did not raise this question in the Court of Appeals or present it in its cross-petition, we do not address it here.

12   Following entry of the District Court's judgment, both it and the Court of Appeals denied motions by Soler for a stay pending appeal. The parties accordingly commenced preparation for the arbitration in Japan. Upon remand from the Court of Appeals, however, Soler withdrew the antitrust claims from the arbitration tribunal and sought a stay of arbitration pending the completion of the judicial proceedings on the ground that the antitrust claims permeated the claims that remained before that tribunal. The District Court denied the motion, instead staying its own proceedings pending the arbitration in Japan. The arbitration recommenced, but apparently came to a halt once again in September 1984 upon the filing by Soler of a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq.

*624   We granted certiorari primarily to consider whether an American court should enforce an agreement to resolve antitrust claims by arbitration when that agreement arises from an international transaction. 469 U.S. 916, 105 S.Ct. 291, 83 L.Ed.2d 227 (1984).

## II

At the outset, we address the contention raised in Soler's cross-petition that the arbitration clause at issue may not be read to encompass the statutory counterclaims stated in its answer to the complaint. In making this argument, Soler does not question the Court of Appeals' application of ¶ VI of the Sales Agreement to the disputes involved here as a matter of standard contract interpretation. [13] Instead, it argues **3353   *625 that as a matter of law a court may not construe an arbitration agreement to encompass claims arising out of statutes designed to protect a class to which the party resisting arbitration belongs "unless [that party] has expressly agreed" to arbitrate those claims, see Pet. for

Cert. in No. 83-1733, pp. 8, i, by which Soler presumably means that the arbitration clause must specifically mention the statute giving rise to the claims that a party to the clause seeks to arbitrate. See 723 F.2d, at 159. Soler reasons that, because it falls within the class for whose benefit the federal and local antitrust laws and dealers' Acts were passed, but the arbitration clause at issue does not mention these statutes or statutes in general, the clause cannot be read to contemplate arbitration of these statutory claims.

13   We therefore have no reason to review the Court of Appeals' construction of the scope of the arbitration clause in the light of the allegations of Soler's counterclaims. See n. 9, supra; Southland Corp. v. Keating, 465 U.S., at 15, n. 7, 104 S.Ct., at 860, n. 7. Soler does suggest that, because the title of the clause referred only to "certain matters," App. 52, and the clause itself specifically referred only to "Articles I-B through V," ibid., it should be read narrowly to exclude the statutory claims. Soler ignores the inclusion within those "certain matters" of "[a]ll disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to [the specified provisions] or for the breach thereof." Contrary to Soler's suggestion, the exclusion of some areas of possible dispute from the scope of an arbitration clause does not serve to restrict the reach of an otherwise broad clause in the areas in which it was intended to operate. Thus, insofar as the allegations underlying the statutory claims touch matters covered by the enumerated articles, the Court of Appeals properly resolved any doubts in favor of arbitrability. See 723 F.2d, at 159.

1   We do not agree, for we find no warrant in the Arbitration Act for implying in every contract within its ken a presumption against arbitration of statutory claims. The Act's centerpiece provision makes a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce ... valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The "liberal federal policy favoring arbitration agreements," Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the Act simply "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." Id., at 25, n. 32, 103 S.Ct., at 942, n. 32. [14] As this Court recently observed, "[t]he

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered," *626 a concern which "requires that we rigorously enforce agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985).

14    The Court previously has explained that the Act was designed to overcome an anachronistic judicial hostility to agreements to arbitrate, which American courts had borrowed from English common law. See *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 219-221, and n. 6, 105 S.Ct. 1241-1243, and n. 6, 84 L.Ed.2d 158 (1985); *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 510, and n. 4, 94 S.Ct. 2449, 2452, and n. 4, 41 L.Ed.2d 270 (1974).

2  3    Accordingly, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hospital,* 460 U.S., at 24, 103 S.Ct., at 941. See *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 400-404, 87 S.Ct. 1801, 1804-1806, 18 L.Ed.2d 1270 (1967); *Southland Corp. v. Keating,* 465 U.S. 1, 12, 104 S.Ct. 852, 859, 79 L.Ed.2d 1 (1984). And that body of law counsels

"that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself **3354 or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital,* 460 U.S., at 24-25, 103 S.Ct., at 941-942.

See, *e.g., Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-583, 80 S.Ct. 1347, 1352-1353, 4 L.Ed.2d 1409 (1960). Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.

There is no reason to depart from these guidelines where a party bound by an arbitration agreement raises claims founded on statutory rights. Some time ago this Court expressed "hope for [the Act's] usefulness both in controversies based on statutes or on standards otherwise created," *Wilko v. Swan,* 346 U.S. 427, 432, 74 S.Ct. 182, 185, 98 L.Ed.168 (1953) (footnote omitted); see *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 135,

n. 15, 94 S.Ct. 383, 393, n. 15, 38 L.Ed.2d 348 (1973), and we are well past the time *627 when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution. Just last Term in *Southland Corp., supra,* where we held that § 2 of the Act declared a national policy applicable equally in state as well as federal courts, we construed an arbitration clause to encompass the disputes at issue without pausing at the source in a state statute of the rights asserted by the parties resisting arbitration. 465 U.S., at 15, and n. 7, 104 S.Ct., at 860, and n. 7.[15] Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract." 9 U.S.C. § 2; see *Southland Corp.,* 465 U.S., at 16, n. 11, 104 S.Ct., at 861, n. 11; *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972). But, absent such compelling considerations, the Act itself provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability.

15    The claims whose arbitrability was at issue in *Southland Corp.* arose under the disclosure requirements of the California Franchise Investment Law, Cal.Corp.Code Ann. § 31000 *et seq.* (West 1977). While the dissent in *Southland Corp.* disputed the applicability of the Act to proceedings in the state courts, it did not object to the Court's reading of the arbitration clause under examination.

4    That is not to say that all controversies implicating statutory rights are suitable for arbitration. There is no reason to distort the process of contract interpretation, however, in order to ferret out the inappropriate. Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable. *628 See *Wilko v. Swan,* 346 U.S., at 434-435, 74 S.Ct., at 186-187; *Southland Corp.,* 465 U.S., at 16, n. 11, 104 S.Ct., at 861, n.11; *Dean Witter Reynolds Inc.,* 470 U.S., at 224-225, 105 S.Ct., at 1244-1245 (concurring opinion). For that reason, Soler's concern for statutorily protected classes provides no reason to color the lens through which the arbitration clause is read. By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution

in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration. We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. See *Wilko v. Swan, supra.* Having made the bargain to arbitrate, the party should be held to it unless Congress **\*3355** itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. Nothing, in the meantime, prevents a party from excluding statutory claims from the scope of an agreement to arbitrate. See *Prima Paint Corp.,* 388 U.S., at 406, 87 S.Ct., at 1807.

5   In sum, the Court of Appeals correctly conducted a two-step inquiry, first determining whether the parties' agreement to arbitrate reached the statutory issues, and then, upon finding it did, considering whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims. We endorse its rejection of Soler's proposed rule of arbitration-clause construction.

### III

6   We now turn to consider whether Soler's antitrust claims are nonarbitrable even though it has agreed to arbitrate them. In holding that they are not, the Court of Appeals followed the decision of the Second Circuit in *American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821 (1968). Notwithstanding the absence of any explicit support **\*629** for such an exception in either the Sherman Act or the Federal Arbitration Act, the Second Circuit there reasoned that "the pervasive public interest in enforcement of the antitrust laws, and the nature of the claims that arise in such cases, combine to make ... antitrust claims ... inappropriate for arbitration." *Id.,* at 827-828. We find it unnecessary to assess the legitimacy of the *American Safety* doctrine as applied to agreements to arbitrate arising from domestic transactions. As in *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), we conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context.

Even before *Scherk,* this Court had recognized the utility of forum-selection clauses in international transactions. In *The*

*Bremen, supra,* an American oil company, seeking to evade a contractual choice of an English forum and, by implication, English law, filed a suit in admiralty in a United States District Court against the German corporation which had contracted to tow its rig to a location in the Adriatic Sea. Notwithstanding the possibility that the English court would enforce provisions in the towage contract exculpating the German party which an American court would refuse to enforce, this Court gave effect to the choice-of-forum clause. It observed:

> "The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts.... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts." 407 U.S., at 9, 92 S.Ct., at 1912.

**\*630**   Recognizing that "agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting," *id.,* at 13-14, 92 S.Ct., at 1914-1916 the decision in *The Bremen* clearly eschewed a provincial solicitude for the jurisdiction of domestic forums.

Identical considerations governed the Court's decision in *Scherk,* which categorized "[a]n agreement to arbitrate before a specified tribunal [as], in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." 417 U.S., at 519, 94 S.Ct., at 2457. In *Scherk,* the American company Alberto-Culver purchased several interrelated business enterprises, organized under the laws of Germany and Liechtenstein, as well as the rights held by those enterprises in certain trademarks, from a German citizen who at the time of trial resided in Switzerland. **\*3356** Although the contract of sale contained a clause providing for arbitration before the International Chamber of Commerce in Paris of "any controversy or claim [arising] out of this agreement or the breach thereof," Alberto-Culver subsequently brought suit against Scherk in a Federal District Court in Illinois, alleging that Scherk had violated § 10(b) of the Securities Exchange Act of 1934 by fraudulently misrepresenting the status of the trademarks as unencumbered. The District Court denied a motion to stay the proceedings before it and enjoined the parties from going forward before the arbitral tribunal in Paris. The Court of Appeals for the Seventh Circuit affirmed, relying on this Court's holding in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182,

98 L.Ed. 168 (1953), that agreements to arbitrate disputes arising under the Securities Act of 1933 are nonarbitrable. This Court reversed, enforcing the arbitration agreement even while assuming for purposes of the decision that the controversy would be nonarbitrable under the holding of *Wilko* had it arisen out of a domestic transaction. Again, the Court emphasized:

*631 "A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is ... an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction....

"A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.... [It would] damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements." 417 U.S., at 516-517, 94 S.Ct., at 2455-2456.

Accordingly, the Court held Alberto-Culver to its bargain, sending it to the international arbitral tribunal before which it had agreed to seek its remedies.

*The Bremen* and *Scherk* establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions. Here, as in *Scherk,* that presumption is reinforced by the emphatic federal policy in favor of arbitral dispute resolution. And at least since this Nation's accession in 1970 to the Convention, see [1970] 21 U.S.T. 2517, T.I.A.S. 6997, and the implementation of the Convention in the same year by amendment of the Federal Arbitration Act, [16] that federal policy applies with special force in the field of international commerce. Thus, we must weigh the concerns of *American Safety* against a strong belief in the efficacy of arbitral procedures for the resolution of international commercial disputes and an equal commitment to the enforcement of freely negotiated choice-of-forum clauses.

[16] Act of July 31, 1970, Pub.L. 91-368, 84 Stat. 692, codified at 9 U.S.C. §§ 201-208.

*632 At the outset, we confess to some skepticism of certain aspects of the *American Safety* doctrine. As distilled by the First Circuit, 723 F.2d, at 162, the doctrine comprises four ingredients. First, private parties play a pivotal role

in aiding governmental enforcement of the antitrust laws by means of the private action for treble damages. Second, "the strong possibility that contracts which generate antitrust disputes may be contracts of adhesion militates against automatic forum determination by contract." Third, antitrust issues, prone to complication, require sophisticated legal and economic analysis, and thus are "ill-adapted to strengths of the arbitral process, *i.e.,* expedition, minimal requirements of written rationale, simplicity, resort to basic concepts of common sense and simple equity." Finally, just as "issues of war and peace are too important to be vested in the generals, ... decisions as to antitrust regulation of business are too important to be lodged in arbitrators chosen from the business community-particularly those **3357 from a foreign community that has had no experience with or exposure to our law and values." See *American Safety,* 391 F.2d, at 826-827.

7   Initially, we find the second concern unjustified. The mere appearance of an antitrust dispute does not alone warrant invalidation of the selected forum on the undemonstrated assumption that the arbitration clause is tainted. A party resisting arbitration of course may attack directly the validity of the agreement to arbitrate. See *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Moreover, the party may attempt to make a showing that would warrant setting aside the forum-selection clause-that the agreement was "[a]ffected by fraud, undue influence, or overweening bargaining power"; that "enforcement would be unreasonable and unjust"; or that proceedings "in the contractual forum will be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court." *The  *633 Bremen,* 407 U.S., at 12, 15, 18, 92 S.Ct., at 1914, 1916, 1917. But absent such a showing-and none was attempted here-there is no basis for assuming the forum inadequate or its selection unfair.

8   Next, potential complexity should not suffice to ward off arbitration. We might well have some doubt that even the courts following *American Safety* subscribe fully to the view that antitrust matters are inherently insusceptible to resolution by arbitration, as these same courts have agreed that an undertaking to arbitrate antitrust claims entered into *after* the dispute arises is acceptable. See, *e.g., Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1215 (CA2), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972); *Cobb v. Lewis,* 488 F.2d 41, 48 (CA5 1974). See also, in the present cases, 723 F.2d, at 168, n. 12 (leaving question open). And the vertical restraints which most frequently give

birth to antitrust claims covered by an arbitration agreement will not often occasion the monstrous proceedings that have given antitrust litigation an image of intractability. In any event, adaptability and access to expertise are hallmarks of arbitration. The anticipated subject matter of the dispute may be taken into account when the arbitrators are appointed, and arbitral rules typically provide for the participation of experts either employed by the parties or appointed by the tribunal. [17] Moreover, it is often a judgment that streamlined proceedings and expeditious results will best serve their needs that causes parties to agree to arbitrate their disputes; it is typically a desire to keep the effort and expense required to resolve a dispute within manageable bounds that prompts them mutually to forgo access to judicial remedies. In sum, the factor of potential complexity *634 alone does not persuade us that an arbitral tribunal could not properly handle an antitrust matter.

[17] See, *e.g.,* Japan Commercial Arbitration Association Rule 26, reprinted in App. 218-219; L. Craig, W. Park, & J. Paulsson, International Chamber of Commerce Arbitration §§ 25.03, 26.04 (1984); Art. 27, Arbitration Rules of United Nations Commission on International Trade Law (UNCITRAL) (1976), reprinted in 2 Yearbook Commercial Arbitration 167 (1977).

For similar reasons, we also reject the proposition that an arbitration panel will pose too great a danger of innate hostility to the constraints on business conduct that antitrust law imposes. International arbitrators frequently are drawn from the legal as well as the business community; where the dispute has an important legal component, the parties and the arbitral body with whose assistance they have agreed to settle their dispute can be expected to select arbitrators accordingly. [18] We **3358 decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators.

[18] See Craig, Park, & Paulsson, *supra,* § 12.03, p. 28; Sanders, Commentary on UNCITRAL Arbitration Rules § 15.1, in 2 Yearbook Commercial Arbitration, *supra,* at 203.

We are advised by Mitsubishi and *amicus* International Chamber of Commerce, without contradiction by Soler, that the arbitration panel selected to hear the parties' claims here is composed of three Japanese lawyers, one a former law school dean, another a former judge, and the third a practicing attorney with American legal training who has written on Japanese antitrust law. Brief for Petitioner in No. 83-1569, p. 26; Brief for International Chamber of Commerce as *Amicus Curiae* 16, n. 28.

The Court of Appeals was concerned that international arbitrators would lack "experience with or exposure to our law and values." 723 F.2d, at 162. The obstacles confronted by the arbitration panel in this case, however, should be no greater than those confronted by any judicial or arbitral tribunal required to determine foreign law. See, *e.g.,* Fed. Rule Civ.Proc. 44.1. Moreover, while our attachment to the antitrust laws may be stronger than most, many other countries, including Japan, have similar bodies of competition law. See, *e.g.,* 1 Law of Transnational Business Transactions, ch. 9 (Banks, Antitrust Aspects of International Business Operations), § 9.03[7] (V. Nanda ed. 1984); H. Iyori & A. Uesugi, The Antimonopoly Laws of Japan (1983).

We are left, then, with the core of the *American Safety* doctrine–the fundamental importance to American democratic capitalism of the regime of the antitrust laws. See, *635 e.g.,* United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972); Northern Pacific R. Co. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). Without doubt, the private cause of action plays a central role in enforcing this regime. See, *e.g.,* Hawaii v. Standard Oil Co., 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972). As the Court of Appeals pointed out:

" 'A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest.' " 723 F.2d, at 168, quoting American Safety, 391 F.2d, at 826.

The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators. See, *e.g.,* Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138-139, 88 S.Ct. 1981, 1984-1985, 20 L.Ed.2d 982 (1968).

[9] The importance of the private damages remedy, however, does not compel the conclusion that it may not be sought outside an American court. Notwithstanding its important incidental policing function, the treble-damages cause of action conferred on private parties by § 4 of the Clayton Act,

15 U.S.C. § 15, and pursued by Soler here by way of its third counterclaim, seeks primarily to enable an injured competitor to gain compensation for that injury.

"Section 4 ... is in essence a remedial provision. It provides treble damages to '[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws....' Of course, treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we also have frequently observed.... It nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a *636 multiple of the injury actually proved, is designed primarily as a remedy." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 485-486, 97 S.Ct. 690, 695-696, 50 L.Ed.2d 701 (1977).

After examining the respective legislative histories, the Court in Brunswick recognized that when first enacted in 1890 as § 7 of the Sherman Act, 26 Stat. 210, the treble-damages provision "was conceived of primarily as a remedy for '[t]he people of the United States as individuals,' " 429 U.S., at 486, n. 10, 97 S.Ct., at 696, n. 10, quoting 21 Cong.Rec. 1767-1768 (1890) (remarks of Sen. George); when reenacted in 1914 as § 4 of the Clayton Act, 38 Stat. 731, it was still "conceived primarily as **3359 'open [ing] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and giv[ing] the injured party ample damages for the wrong suffered.' " 429 U.S. at 486, n. 10, 97 S.Ct., at 696, n. 10, quoting 51 Cong.Rec. 9073 (1914) (remarks of Rep. Webb). And, of course, the antitrust cause of action remains at all times under the control of the individual litigant: no citizen is under an obligation to bring an antitrust suit, see Illinois Brick Co. v. Illinois, 431 U.S. 720, 746, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977), and the private antitrust plaintiff needs no executive or judicial approval before settling one. It follows that, at least where the international cast of a transaction would otherwise add an element of uncertainty to dispute resolution, the prospective litigant may provide in advance for a mutually agreeable procedure whereby he would seek his antitrust recovery as well as settle other controversies.

There is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism. To be sure, the international arbitral tribunal owes no prior allegiance to the legal norms of particular states; hence, it has no direct obligation to vindicate their statutory dictates. The tribunal, however, is bound to

effectuate the intentions of the parties. Where the parties have agreed that the arbitral body is to decide a defined set of claims which includes, as in these cases, those arising from the application of American antitrust law, the tribunal therefore *637 should be bound to decide that dispute in accord with the national law giving rise to the claim. Cf. Wilko v. Swan, 346 U.S., at 433-434, 74 S.Ct., at 185-186. [19] And so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.

[19]    In addition to the clause providing for arbitration before the Japan Commercial Arbitration Association, the Sales Agreement includes a choice-of-law clause which reads: "This Agreement is made in, and will be governed by and construed in all respects according to the laws of the Swiss Confederation as if entirely performed therein." App. 56. The United States raises the possibility that the arbitral panel will read this provision not simply to govern interpretation of the contract terms, but wholly to displace American law even where it otherwise would apply. Brief for United States as Amicus Curiae 20. The International Chamber of Commerce opines that it is "[c]onceivabl[e], although we believe it unlikely, [that] the arbitrators could consider Soler's affirmative claim of anticompetitive conduct by CISA and Mitsubishi to fall within the purview of this choice-of-law provision, with the result that it would be decided under Swiss law rather than the U.S. Sherman Act." Brief for International Chamber of Commerce as Amicus Curiae 25. At oral argument, however, counsel for Mitsubishi conceded that American law applied to the antitrust claims and represented that the claims had been submitted to the arbitration panel in Japan on that basis. Tr. of Oral Arg. 18. The record confirms that before the decision of the Court of Appeals the arbitral panel had taken these claims under submission. See District Court Order of May 25, 1984, pp. 2-3.

We therefore have no occasion to speculate on this matter at this stage in the proceedings, when Mitsubishi seeks to enforce the agreement to arbitrate, not to enforce an award. Nor need we consider now the effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action on the claimant's capacity to reinitiate suit in federal court. We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy. See, e.g., Redel's Inc. v. General Electric Co., 498 F.2d 95, 98-99 (CA5

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

1974); *Gaines v. Carrollton Tobacco Board of Trade, Inc.,* 386 F.2d 757, 759 (CA6 1967); *Fox Midwest Theatres v. Means,* 221 F.2d 173, 180 (CA8 1955). Cf. *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955). See generally 15 S. Williston, Contracts § 1750A (3d ed. 1972).

*\*638* Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed. The Convention reserves to each signatory country the right to refuse enforcement of an award where the "recognition or enforcement of the award would be contrary to the public policy of that country." Art. **\*\*3360** V(2)(b), 21 U.S.T., at 2520; see *Scherk,* 417 U.S., at 519, n. 14, 94 S.Ct., at 2457, n. 14. While the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them. [20]

> 20    See n. 19, *supra.* We note, for example, that the rules of the Japan Commercial Arbitration Association provide for the taking of a "summary record" of each hearing, Rule 28.1; for the stenographic recording of the proceedings where the tribunal so orders or a party requests one, Rule 28.2; and for a statement of reasons for the award unless the parties agree otherwise, Rule 36.1(4). See App. 219 and 221.
>
>     Needless to say, we intimate no views on the merits of Soler's antitrust claims.

As international trade has expanded in recent decades, so too has the use of international arbitration to resolve disputes arising in the course of that trade. The controversies that international arbitral institutions are called upon to resolve have increased in diversity as well as in complexity. Yet the potential of these tribunals for efficient disposition of legal disagreements arising from commercial relations has not yet been tested. If they are to take a central place in the international legal order, national courts will need to "shake off the old judicial hostility to arbitration," *Kulukundis Shipping Co. v. Amtorg Trading Corp.,* 126 F.2d 978, 985 (CA2 1942), and also their customary and understandable unwillingness to cede jurisdiction of a claim arising under domestic law to a foreign or transnational tribunal. To this extent, at *\*639* least, it will be necessary for national courts to subordinate domestic notions of arbitrability to

the international policy favoring commercial arbitration. See *Scherk, supra.* [21]

> 21    We do not quarrel with the Court of Appeals' conclusion that Art. II(1) of the Convention, which requires the recognition of agreements to arbitrate that involve "subject matter capable of settlement by arbitration," contemplates exceptions to arbitrability grounded in domestic law. See 723 F.2d, at 164-166; G. Gaja, International Commercial Arbitration: New York Convention I. B.2 (1984); A. van den Berg, The New York Convention of 1958: Towards a Uniform Judicial Interpretation 152-154 (1981); Contini, International Commercial Arbitration: The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 8 Am.J.Comp.L. 283, 296 (1959). But see van den Berg, *supra,* at 154, and n. 98 (collecting contrary authorities); Gaja, *supra,* at I.D., n. 43 (same). And it appears that before acceding to the Convention the Senate was advised by a State Department memorandum that the Convention provided for such exceptions. See S.Exec.Doc. E, 90th Cong., 2d Sess., 19 (1968).
>
>     In acceding to the Convention the Senate restricted its applicability to commercial matters, in accord with Art. I(3). See 21 U.S.T., at 2519, 2560. Yet in implementing the Convention by amendment to the Federal Arbitration Act, Congress did not specify any matters it intended to exclude from its scope. See Act of July 31, 1970, Pub.L. 91-368, 84 Stat. 692, codified at 9 U.S.C. §§ 201-208. In *Scherk,* this Court recited Art. II(1), including the language relied upon by the Court of Appeals, but paid heed to the Convention delegates' "frequent[ly voiced] concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements." 417 U.S., at 520, n. 15, 94 S.Ct., at 2457, n. 15, citing G. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference, May/June 1958, pp. 24-28 (1958). There, moreover, the Court dealt, *arguendo,* with an exception to arbitrability grounded in express congressional language; here, in contrast, we face a judicially implied exception. The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own. Doubtless, Congress

Case 09-10138-MFW    Doc 5598-3    Filed 06/05/11    Page 138 of 142

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985)
105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention. But we decline to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so.

*640    Accordingly, we "require this representative of the American business community to honor its bargain," *Alberto-Culver Co. v. Scherk,* 484 F.2d 611, 620 (CA7 1973) (Stevens, J., dissenting), by holding this agreement to arbitrate "enforce[able] ... in accord with the explicit provisions of the **3361 Arbitration Act." *Scherk,* 417 U.S., at 520, 94 S.Ct., at 2457

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice POWELL took no part in the decision of these cases.

Justice STEVENS, with whom Justice BRENNAN joins, and with whom Justice MARSHALL joins except as to Part II, dissenting.

One element of this rather complex litigation is a claim asserted by an American dealer in Plymouth automobiles that two major automobile companies are parties to an international cartel that has restrained competition in the American market. Pursuant to an agreement that is alleged to have violated § 1 of the Sherman Act, 15 U.S.C. § 1, those companies allegedly prevented the dealer from transshipping some 966 surplus vehicles from Puerto Rico to other dealers in the American market. App. 92.

Petitioner denies the truth of the dealer's allegations and takes the position that the validity of the antitrust claim must be resolved by an arbitration tribunal in Tokyo, Japan. Largely because the auto manufacturer's defense to the antitrust allegation is based on provisions in the dealer's franchise agreement, the Court of Appeals concluded that the arbitration clause in that agreement encompassed the antitrust *641 claim. 723 F.2d 155, 159 (CA1 1983). It held, however, as a matter of law, that arbitration of such a claim may not be compelled under either the Federal Arbitration Act [1] or the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. [2] *Id.,* at 161-168.

| 1 | 9 U.S.C. §§ 4, 201. |
| 2 | [1970] 21 U.S.T. 2517, T.I.A.S. No. 6997. |

This Court agrees with the Court of Appeals' interpretation of the scope of the arbitration clause, but disagrees with its conclusion that the clause is unenforceable insofar as it purports to cover an antitrust claim against a Japanese company. This Court's holding rests almost exclusively on the federal policy favoring arbitration of commercial disputes and vague notions of international comity arising from the fact that the automobiles involved here were manufactured in Japan. Because I am convinced that the Court of Appeals' construction of the arbitration clause is erroneous, and because I strongly disagree with this Court's interpretation of the relevant federal statutes, I respectfully dissent. In my opinion, (1) a fair construction of the language in the arbitration clause in the parties' contract does not encompass a claim that auto manufacturers entered into a conspiracy in violation of the antitrust laws; (2) an arbitration clause should not normally be construed to cover a statutory remedy that it does not expressly identify; (3) Congress did not intend § 2 of the Federal Arbitration Act to apply to antitrust claims; and (4) Congress did not intend the Convention on the Recognition and Enforcement of Foreign Arbitral Awards to apply to disputes that are not covered by the Federal Arbitration Act.

I

On October 31, 1979, respondent, Soler Chrysler-Plymouth, Inc. (Soler), entered into a "distributor agreement" to govern the sale of Plymouth passenger cars to be manufactured by petitioner, Mitsubishi Motors Corporation *642 of Tokyo, Japan (Mitsubishi). [3] Mitsubishi, however, was not a **3362 party to that agreement. Rather the "purchase rights" were granted to Soler by a wholly owned subsidiary of Chrysler Corporation that is referred to as "Chrysler" in the agreement. [4] The distributor agreement does not contain an arbitration clause. Nor does the record contain any other agreement providing for the arbitration of disputes between Soler and Chrysler.

| 3 | The distributor agreement provides, in part: "This Agreement is made by and between CHRYSLER INTERNATIONAL S.A., a corporation organized and existing under the laws of the Swiss Confederation with its principal office in Geneva, Switzerland (hereinafter sometimes called CHRYSLER), and SOLER CHRYSLER- |

PLYMOUTH INC., ... (hereinafter sometimes called DISTRIBUTOR), and will govern the sale by CHRYSLER to DISTRIBUTOR of PLYMOUTH PASSENGER CARS AND CAR DERIVATIVES MANUFACTURED BY MITSUBISHI MOTORS CORPORATION OF TOKYO, JAPAN and automotive replacement parts and accessories (said motor vehicles, replacement parts and accessories hereinafter sometimes called Products)." App. 18.

4    "PURCHASE RIGHTS

"Subject to the provisions of this Agreement, CHRYSLER grants to DISTRIBUTOR the non-exclusive right to purchase Products from CHRYSLER, and DISTRIBUTOR agrees to buy Products from CHRYSLER, for resale within the following described territory (hereinafter called Sales Area): METROPOLITAN SAN JUAN, PUERTO RICO...." *Ibid.*

This is the same company that is referred to as "CISA" in the sales purchase agreement and in the Court's opinion.

Paragraph 26 of the distributor agreement authorizes Chrysler to have Soler's orders filled by any company affiliated with Chrysler, that company thereby becoming the "supplier" of the products covered by the agreement with Chrysler. [5] Relying on paragraph 26 of their distributor *643 agreement, [6] Soler, Chrysler, and Mitsubishi entered into a separate Sales Procedure Agreement designating Mitsubishi as the supplier of the products covered by the distributor agreement. [7] The arbitration clause the Court construes today is found in that agreement. [8] As a matter of ordinary contract interpretation, there are at least two reasons why that clause does not apply to Soler's antitrust claim against Chrysler and Mitsubishi.

5    Paragraph 26 of the distributor agreement provides:

"DIRECT SALES

"CHRYSLER and DISTRIBUTOR agree that CHRYSLER may, at its option, forward orders received from DISTRIBUTOR pursuant to this Agreement to its parent company, Chrysler Corporation, or to any subsidiary, associated or affiliated company (hereinafter called 'SUPPLIER') which will then sell the Products covered by such order directly to DISTRIBUTOR, CHRYSLER and DISTRIBUTOR hereby acknowledge and agree that, unless otherwise agreed in writing, any such direct sales between SUPPLIER and DISTRIBUTOR will be governed by the terms and conditions contained on the order form and in

this Agreement and that any such sales will not constitute the basis forming a distributor relationship between SUPPLIER and DISTRIBUTOR. Further, DISTRIBUTOR acknowledges and agrees that any claim or controversy resulting from such direct sales by SUPPLIER will be handled by CHRYSLER as though such sale had been made by CHRYSLER." *Id.,* at 39-40.

6    "WHEREAS, pursuant to Article 26 of the Distributor Agreement, CISA may forward orders received from BUYER to an associated company;

"WHEREAS, MMC and CISA have agreed that MMC, which is an associated company of CISA, may sell such MMC Products directly to BUYER pursuant to Article 26 of the Distributor Agreement." *Id.,* at 43.

7    Mitsubishi is jointly owned by Chrysler and by Mitsubishi Heavy Industries, Ltd., a Japanese corporation. *Id.,* at 200-201.

8    That clause reads as follows:

"ARBITRATION OF CERTAIN MATTERS

"All disputes, controversies or differences which may arise between MMC and BUYER out of or in relation to Articles I-B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association." *Id.,* at 52-53.

First, the clause only applies to two-party disputes between Soler and Mitsubishi. The antitrust violation alleged in Soler's counterclaim is a three-party dispute. Soler has joined both Chrysler and its associated company, Mitsubishi, as counterdefendants. The pleading expressly alleges that *644 both of those companies are "engaged in an unlawful combination and conspiracy to restrain and divide markets in interstate and foreign commerce, in violation of the Sherman Antitrust Act and the Clayton Act." App. 91. It is further alleged that Chrysler authorized and participated in several overt acts directed at Soler. At this stage of the case we must, of course, assume the truth of those allegations. Only by stretching the language of the arbitration clause far beyond its ordinary meaning **3363 could one possibly conclude that it encompasses this three-party dispute.

Second, the clause only applies to disputes "which may arise between MMC and BUYER out of or in relation to Articles I-B through V of this Agreement or for the breach thereof...." *Id.,* at 52. Thus, disputes relating to only 5 out of a total of 15 Articles in the Sales Procedure

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

Agreement are arbitrable. Those five Articles cover: (1) the terms and conditions of direct sales (matters such as the scheduling of orders, deliveries, and payment); (2) technical and engineering changes; (3) compliance by Mitsubishi with customs laws and regulations, and Soler's obligation to inform Mitsubishi of relevant local laws; (4) trademarks and patent rights; and (5) Mitsubishi's right to cease production of any products. It is immediately obviously that Soler's antitrust claim did not arise out of Articles I-B through V and it is not a claim "for the breach thereof." The question is whether it is a dispute "in relation to" those Articles.

Because Mitsubishi relies on those Articles of the contract to explain some of the activities that Soler challenges in its antitrust claim, the Court of Appeals concluded that the relationship between the dispute and those Articles brought the arbitration clause into play. I find that construction of the clause wholly unpersuasive. The words "in relation to" appear between the references to claims that arise under the contract and claims for breach of the contract; I believe all three of the species of arbitrable claims must be predicated on contractual rights defined in Articles I-B through V.

*645  The federal policy favoring arbitration cannot sustain the weight that the Court assigns to it. A clause requiring arbitration of all claims "relating to" a contract surely could not encompass a claim that the arbitration clause was itself part of a contract in restraint of trade. Cf. *Paramount Famous Lasky Corp. v. United States,* 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930); see also *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 176, 68 S.Ct. 915, 938, 92 L.Ed. 1260 (1948). Nor in my judgment should it be read to encompass a claim that relies, not on a failure to perform the contract, but on an independent violation of federal law. The matters asserted by way of defense do not control the character, or the source, of the claim that Soler has asserted. [9]  Accordingly, simply as a matter of ordinary contract interpretation, I would hold that Soler's antitrust claim is not arbitrable.

[9]    Even if Mitsubishi can prove that it did not violate any provision of the contract, such proof would not necessarily constitute a defense to the antitrust claim. In contrast, in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), Prima Paint's claim of fraud in the inducement was asserted to rescind the contract, not as an independent basis of recovery.

## II

Section 2 of the Federal Arbitration Act describes three kinds of arbitrable agreements. [10]  Two-those including maritime transactions and those covering the submission of an existing dispute to arbitration-are not involved in this case. The language of § 2 relating to the Soler-Mitsubishi arbitration clause reads as follows:

[10]    Section 2 provides:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

*646  "A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law **3364  or in equity for the revocation of any contract."

The plain language of this statute encompasses Soler's claims that arise out of its contract with Mitsubishi, but does not encompass a claim arising under federal law, or indeed one that arises under its distributor agreement with Chrysler. Nothing in the text of the 1925 Act, nor its legislative history, suggests that Congress intended to authorize the arbitration of any statutory claims. [11]

[11]    In his dissent in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S., at 415, 87 S.Ct., at 1811 Justice Black quoted the following commentary written shortly after the statute was passed:

"Not all questions arising out of contracts ought to be arbitrated. It is a remedy peculiarly suited to the disposition of the ordinary disputes between merchants as to questions of fact-quantity, quality, time of delivery, compliance with terms of payment, excuses for non-performance, and the like. It has a place also in the determination of the simpler questions of law-the questions of law which arise out of these daily relations between merchants as to the passage of title, the existence of warranties, or

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

the questions of law which are complementary to the questions of fact which we have just mentioned." Cohen & Dayton, The New Federal Arbitration Law, 12 Va.L.Rev. 265, 281 (1926).

In the *Prima Paint* case the Court held that the Act applied to a claim of fraud in the inducement of the contract, but did not intimate that it might also cover federal statutory claims. See n. 9, *supra.*

Until today all of our cases enforcing agreements to arbitrate under the Arbitration Act have involved contract claims. In one, the party claiming a breach of contractual warranties also claimed that the breach amounted to fraud actionable under § 10(b) of the Securities Exchange Act of 1934. *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). [12] ***647** But this is the first time the Court has considered the question whether a standard arbitration clause referring to claims arising out of or relating to a contract should be construed to cover statutory claims that have only an indirect relationship to the contract. [13] In my opinion, neither the Congress that enacted the Arbitration Act in 1925, nor the many parties who have agreed to such standard clauses, could have anticipated the Court's answer to that question.

[12]    "The dispute between these parties over the alleged shortage in defendant's inventory of European trademarks, a matter covered by contract warranties and subject to pre-closing verification, is the kind of commercial dispute for which arbitration is entirely appropriate. In my opinion, the fact that the 'fraud' language of Rule 10(b)(5) has been included in the complaint is far less significant than the desirability of having the Court of Arbitration of the International Chamber of Commerce in Paris, France, decide the various questions of foreign law which should determine the rights of these parties." *Alberto-Culver Co. v. Scherk,* 484 F.2d 611, 619-620 (CA7 1973) (Stevens, J., dissenting), rev'd, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).

[13]    It is interesting to note that in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Court referred to the standard clause describing claims "arising out of, or relating to, this Contract or the breach thereof" as a provision "for resolving disputes arising out of the contract or its breach." *Id.,* at 4-5, 103 S.Ct., at 931-932.

On several occasions we have drawn a distinction between statutory rights and contractual rights and refused to hold

that an arbitration barred the assertion of a statutory right. Thus, in *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), we held that the arbitration of a claim of employment discrimination would not bar an employee's statutory right to damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, notwithstanding the strong federal policy favoring the arbitration of labor disputes. In that case the Court explained at some length why it would be unreasonable to assume that Congress intended to give arbitrators the final authority to implement the federal statutory policy:

"[W]e have long recognized that 'the choice of forums inevitably affects the scope of the substantive right to be vindicated.' ***648** U.S. Bulk Carriers v. Arguelles,* 400 U.S. 351, 359-360 [ ***3365** 91 S.Ct. 409, 413-414, 27 L.Ed.2d 456] (1971) (Harlan, J., concurring). Respondent's deferral rule is necessarily premised on the assumption that arbitral processes are commensurate with judicial processes and that Congress impliedly intended federal courts to defer to arbitral decisions on Title VII issues. We deem this supposition unlikely.

"Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the requirements of enacted legislation.... But other facts may still render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581-583, [80 S.Ct. 1347, 1352-1353, 4 L.Ed.2d 1409] (1960). Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts." 415 U.S., at 56-57, 94 S.Ct., at 1023-1024 (footnote omitted).

In addition, the Court noted that the informal procedures which make arbitration so desirable in the context of contractual disputes are inadequate to develop a record for

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

appellate review of statutory questions. [14] Such review is essential to *649 matters of statutory interpretation in order to assure consistent application of important public rights.

[14] "Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. See *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 203, [76 S.Ct. 273, 276, 100 L.Ed. 199] (1956); *Wilko v. Swan,* 346 U.S., at 435-437, [74 S.Ct., at 186-188]. And as this Court has recognized, '[a]rbitrators have no obligation to the court to give their reasons for an award.' *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. [593], at 598 [80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424]. Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts." 415 U.S., at 57-58, 94 S.Ct., at 1024-1025 (footnote omitted).

In *Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1427, 67 L.Ed.2d 641 (1981), we reached a similar conclusion with respect to the arbitrability of an employee's claim based on the Fair Labor Standards Act, 29 U.S.C. §§ 201-219. We again noted that an arbitrator, unlike a federal judge, has no institutional obligation to enforce federal legislative policy:

"Because the arbitrator is required to effectuate the intent of the parties, rather than to enforce the statute, he may issue a ruling that is inimical to the public policies underlying the FLSA, thus depriving an employee of protected statutory rights.

"Finally, not only are arbitral procedures less protective of individual statutory rights than are judicial procedures, see *Gardner-Denver, supra* [415 U.S.], at 57-58 [94 S.Ct., at 1024-1025], but arbitrators very often are powerless to grant the aggrieved employees as broad a range of relief. Under the FLSA, courts can award actual and liquidated damages, reasonable attorney's fees, and costs. 29 U.S.C. § 216(b). An arbitrator, by contrast, can award only that **3366 compensation authorized by the wage provision of the collective-bargaining agreement.... It is most unlikely that he will be authorized to award liquidated

damages, costs, or attorney's fees." 450 U.S., at 744-745, 101 S.Ct., at 1446-1447 (footnote omitted).

*650 The Court has applied the same logic in holding that federal claims asserted under the Ku Klux Act of 1871, 42 U.S.C. § 1983, and claims arising under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (2), may not be finally resolved by an arbitrator. *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

The Court's opinions in *Alexander, Barrentine, McDonald,* and *Wilko* all explain why it makes good sense to draw a distinction between statutory claims and contract claims. In view of the Court's repeated recognition of the distinction between federal statutory rights and contractual rights, together with the undisputed historical fact that arbitration has functioned almost entirely in either the area of labor disputes or in "ordinary disputes between merchants as to questions of fact," see n. 11, *supra,* it is reasonable to assume that most lawyers and executives would not expect the language in the standard arbitration clause to cover federal statutory claims. Thus, in my opinion, both a fair respect for the importance of the interests that Congress has identified as worthy of federal statutory protection, and a fair appraisal of the most likely understanding of the parties who sign agreements containing standard arbitration clauses, support a presumption that such clauses do not apply to federal statutory claims.

### III

The Court has repeatedly held that a decision by Congress to create a special statutory remedy renders a private agreement to arbitrate a federal statutory claim unenforceable. Thus, as I have already noted, the express statutory remedy provided in the Ku Klux Act of 1871, [15] the express statutory remedy in the Securities Act of 1933, [16] the express statutory remedy in the Fair Labor Standards Act, [17] and the express *651 statutory remedy in Title VII of the Civil Rights Act of 1964, [18] each provided the Court with convincing evidence that Congress did not intend the protections afforded by the statute to be administered by a private arbitrator. The reasons that motivated those decisions apply with special force to the federal policy that is protected by the antitrust laws.

[15] *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984).

[16] *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).