Case 09-10138-MFW   Doc 5598-4   Filed 06/05/11   Page 1 of 302

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985)
105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

17  *Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981).

18  *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

To make this point it is appropriate to recall some of our past appraisals of the importance of this federal policy and then to identify some of the specific remedies Congress has designed to implement it. It was Chief Justice Hughes who characterized the Sherman Antitrust Act as "a charter of freedom" that may fairly be compared to a constitutional provision. See *Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 359-360, 53 S.Ct. 471, 473-474, 77 L.Ed. 825 (1933). In *United States v. Philadelphia National Bank,* 374 U.S. 321, 371, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915 (1963), the Court referred to the extraordinary "magnitude" of the value choices made by Congress in enacting the Sherman Act. More recently, the Court described the weighty public interests underlying the basic philosophy of the statute:

> "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection **\*\*3367** of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete-to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy."

*United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972).

**\*652** The Sherman and Clayton Acts reflect Congress' appraisal of the value of economic freedom; they guarantee the vitality of the entrepreneurial spirit. Questions arising under these Acts are among the most important in public law.

The unique public interest in the enforcement of the antitrust laws is repeatedly reflected in the special remedial scheme enacted by Congress. Since its enactment in 1890, the Sherman Act has provided for public enforcement through criminal as well as civil sanctions. The pre eminent federal interest in effective enforcement once justified a provision for special three-judge district courts to hear antitrust claims on an expedited basis, as well as for direct appeal to this Court bypassing the courts of appeals. [19] See, *e.g., United States v.*

*National Assn. of Securities Dealers, Inc.,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

19  See 32 Stat. 823, 88 Stat. 1708, repealed 98 Stat. 3358 (1984) (*Pub.L. No. 98-620, § 402*(11)). The Act still provides an avenue for directly appealing to this Court from a final judgment in a Government antitrust suit. *15 U.S.C. § 29(b)*.

The special interest in encouraging private enforcement of the Sherman Act has been reflected in the statutory scheme ever since 1890. Section 7 of the original Act, [20] used the broadest possible language to describe the class of litigants who may invoke its protection. "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328, (1948); see also **\*653** Associated *General Contractors of California, Inc. v. Carpenters,* 459 U.S. 519, 529, 103 S.Ct. 897, 904, 74 L.Ed.2d 723 (1983).

20  "Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee." 26 Stat. 210.

> The current version of the private remedy is codified at *15 U.S.C. § 15(a)*.

The provision for mandatory treble damages-unique in federal law when the statute was enacted-provides a special incentive to the private enforcement of the statute, as well as an especially powerful deterrent to violators. [21] What we have described **\*\*3368** as "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955), is buttressed by the statutory mandate that the injured party also recover costs, "including a reasonable attorney's fee." *15 U.S.C. § 15(a)*. The interest in wide and effective enforcement has thus, for almost a century, been vindicated by enlisting the assistance **\*654** of "private Attorneys General"; [22] we have always attached special importance to their role because "[e]very violation of the antitrust laws is a blow to the free-enterprise system

envisaged by Congress." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972).

21    "We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. It was for this reason that we held in *Kiefer-Stewart Co. v. Seagram & Sons,* 340 U.S. 211, [71 S.Ct. 259, 95 L.Ed. 219] (1951), that a plaintiff in an antitrust suit could not be barred from recovery by proof that he had engaged in an unrelated conspiracy to commit some other antitrust violation. Similarly, in *Simpson v. Union Oil Co.,* 377 U.S. 13, [84 S.Ct. 1051, 12 L.Ed.2d 98] (1964), we held that a dealer whose consignment agreement was canceled for failure to adhere to a fixed resale price could bring suit under the antitrust laws even though by signing the agreement he had to that extent become a participant in the illegal, competition-destroying scheme. Both *Simpson* and *Kiefer-Stewart* were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct." *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 138-139, 88 S.Ct. 1981, 1984-1985, 20 L.Ed.2d 982 (1968).

22    Under the Panama Canal Act, any private shipper-in addition to the United States-may also bring an action seeking to bar access to the canal for any vessel owned by a company "doing business" in violation of the antitrust laws. 37 Stat. 567, 15 U.S.C. § 31.

There are, in addition, several unusual features of the antitrust enforcement scheme that unequivocally require rejection of any thought that Congress would tolerate private arbitration of antitrust claims in lieu of the statutory remedies that it fashioned. As we explained in *Blumenstock Brothers Advertising Agency v. Curtis Publishing Co.,* 252 U.S. 436, 440, 40 S.Ct. 385, 386, 64 L.Ed. 649 (1920), an antitrust treble-damages case "can only be brought in a District Court of the United States." The determination that these cases are

"too important to be decided otherwise than by competent tribunals" [23] surely cannot allow private arbitrators to assume a jurisdiction that is denied to courts of the sovereign States.

23    In *University Life Insurance Co. v. Unimarc Ltd.,* 699 F.2d 846 (CA7 1983), Judge Posner wrote:
"The suit brought by Unimarc and Huff ... raises issues of state tort and contract law and federal antitrust law. The tort and contract issues may or may not be within the scope of the arbitration clauses in the coinsurance and second marketing agreements but they are arbitrable in the sense that an agreement to arbitrate them would be enforceable. Federal antitrust issues, however, are nonarbitrable in just that sense. *Applied Digital Technology, Inc. v. Continental Casualty Co.,* 576 F.2d 116, 117 (7th Cir.1978). They are considered to be at once too difficult to be decided competently by arbitrators-who are not judges, and often not even lawyers-and too important to be decided otherwise than by competent tribunals. See *American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821, 826-27 (2d Cir.1968). The root of the doctrine is in the same soil as the principle, announced in *Blumenstock Bros. Adv. Agency v. Curtis Pub. Co.,* 252 U.S. 436, 440-41 [40 S.Ct. 385, 386-387, 64 L.Ed. 649] (1920), that federal antitrust suits may not be brought in state courts." *Id.,* at 850-851.

**\*655** The extraordinary importance of the private antitrust remedy has been emphasized in other statutes enacted by Congress. Thus, in 1913, Congress passed a special Act guaranteeing public access to depositions in Government civil proceedings to enforce the Sherman Act. 37 Stat. 731, 15 U.S.C. § 30. [24] The purpose of that Act plainly was to enable victims of antitrust violations to make evidentiary use of information developed in a public enforcement proceeding. This purpose was further implemented in the following year by the enactment of § 5 of the Clayton Act providing that a final judgment or decree in a Government case may constitute prima facie proof of a violation in a subsequent treble-damages case. 38 Stat. 731, 15 U.S.C. § 16(a). These special remedial provisions attest to the importance that Congress has attached to the private remedy.

24    See *United States v. Procter & Gamble Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958).

In view of the history of antitrust enforcement in the United States, it is not surprising that all of the federal courts that have considered the question have uniformly **\*\*3369** and unhesitatingly concluded that agreements to arbitrate federal

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

antitrust issues are not enforceable. In a landmark opinion for the Court of Appeals for the Second Circuit, Judge Feinberg wrote:

> "A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general which protects the public's interest.... Antitrust violations can affect hundreds of thousands-perhaps millions-of people and inflict staggering economic damage.... We do not believe that Congress intended such claims to be resolved elsewhere than in the courts. We do not suggest that all antitrust litigations attain these swollen proportions; the courts, no less than the public, are thankful *656 that they do not. But in fashioning a rule to govern the arbitrability of antitrust claims, we must consider the rule's potential effect. For the same reason, it is also proper to ask whether contracts of adhesion between alleged monopolists and their customers should determine the forum for trying antitrust violations." *American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821, 826-827 (1968) (footnote omitted).

This view has been followed in later cases from that Circuit [25] and by the First, [26] Fifth, [27] Seventh, [28] Eighth, [29] and Ninth Circuits. [30] It is clearly a correct statement of the law.

[25] *N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.,* 532 F.2d 874, 876 (1976) (*per curiam* ).

[26] 723 F.2d 155, 162 (1983) (Coffin, J., for the court) (opinion below).

[27] *Cobb v. Lewis,* 488 F.2d 41, 47 (1974) (Wisdom, J., for the court).

[28] *University Life Insurance Co. v. Unimarc Ltd.,* 699 F.2d, at 850-851 (1983) (Posner, J., for the court); *Applied Digital Technology, Inc. v. Continental Casualty Co.,* 576 F.2d 116, 117 (1978) (Pell, J., for the court).

[29] *Helfenbein v. International Industries, Inc.,* 438 F.2d 1068, 1070 (Lay, J., for the court), cert. denied, 404 U.S. 872, 92 S.Ct. 63, 30 L.Ed.2d 115 (1971).

[30] *Lake Communications, Inc. v. ICC Corp.,* 738 F.2d 1473, 1477-1480 (1984) (Browning, C.J., for the court); *Varo v. Comprehensive Designers, Inc.,* 504 F.2d 1103, 1104 (1974) (Chambers, J., for the court); *Power Replacements, Inc. v. Air Preheater Co.,* 426 F.2d 980, 983-984 (1970) (Jameson, J., for the court); *A. & E.*

*Plastik Pak Co. v. Monsanto Co.,* 396 F.2d 710, 715-716 (1968) (Merrill, J., for the court).

This Court would be well advised to endorse the collective wisdom of the distinguished judges of the Courts of Appeals who have unanimously concluded that the statutory remedies fashioned by Congress for the enforcement of the antitrust laws render an agreement to arbitrate antitrust disputes unenforceable. Arbitration awards are only reviewable for manifest disregard of the law, 9 U.S.C. §§ 10, 207, and the rudimentary procedures which make arbitration so desirable in the context of a private dispute often mean that the record is so inadequate that the arbitrator's decision is virtually *657 unreviewable. [31] Despotic decisionmaking of this kind is fine for parties who are willing to agree in advance to settle for a best approximation of the correct result in order to resolve quickly and inexpensively any contractual dispute that may arise in an ongoing commercial relationship. Such informality, however, is simply unacceptable when every error may have devastating consequences for important businesses in our national economy and may undermine their ability to compete in world markets. [32] Instead **3370 of "muffling a grievance in the cloakroom of arbitration," the public interest in free competitive markets would be better served by having the issues resolved "in the light of impartial public court adjudication." See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 136, 94 S.Ct. 383, 394, 38 L.Ed.2d 348 (1973). [33]

[31] The arbitration procedure in this case does not provide any right to evidentiary discovery or a written decision, and requires that all proceedings be closed to the public. App. 220-221. Moreover, Japanese arbitrators do not have the power of compulsory process to secure witnesses and documents, nor do witnesses who are available testify under oath. *Id.,* at 218-219. Cf. 9 U.S.C. § 7 (arbitrators may summon witnesses to attend proceedings and seek enforcement in a district court).

[32] The greatest risk, of course, is that the arbitrator will condemn business practices under the antitrust laws that are efficient in a free competitive market. Cf. *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 85 L.Ed.2d ---- (1985), rev'g 715 F.2d 1393 (CA9 1983). In the absence of a reviewable record, a reviewing district court would not be able to undo the damage wrought. Even a Government suit or an action by a private party might not be available to set aside the award.

33    The Court notes that some courts which have held that
      agreements to arbitrate antitrust claims generally are
      unenforceable have nevertheless enforced arbitration
      agreements to settle an existing antitrust claim. *Ante,*
      at 3357. These settlement agreements, made after the
      parties have had every opportunity to evaluate the
      strength of their position, are obviously less destructive
      of the private treble-damages remedy that Congress
      provided. Thus, it may well be that arbitration as a
      means of settling existing disputes is permissible.

## *658* IV

The Court assumes for the purposes of its decision that
the antitrust issues would not be arbitrable if this were a
purely domestic dispute, *ante,* at 3355, but holds that the
international character of the controversy makes it arbitrable.
The holding rests on vague concerns for the international
implications of its decision and a misguided application of
*Scherk v. Alberto-Culver, Co.,* 417 U.S. 506, 94 S.Ct. 2449,
41 L.Ed.2d 270 (1974).

### International Obligations of the United States

Before relying on its own notions of what international comity
requires, it is surprising that the Court does not determine
the specific commitments that the United States has made
to enforce private agreements to arbitrate disputes arising
under public law. As the Court acknowledges, the only treaty
relevant here is the Convention on the Recognition and
Enforcement of Foreign Arbitral Awards. [1970] 21 U.S.T.
2517, T.I.A.S. No. 6997. The Convention was adopted in
1958 at a multilateral conference sponsored by the United
Nations. This Nation did not sign the proposed convention at
that time; displaying its characteristic caution before entering
into international compacts, the United States did not accede
to it until 12 years later.

As the Court acknowledged in *Scherk v. Alberto-Culver Co.,*
417 U.S., at 520, n. 15, 94 S.Ct., at 2457, n. 15, the principal
purpose of the Convention "was to encourage the recognition
and enforcement of commercial arbitration agreements in
international contracts and to unify the standards by which
agreements to arbitrate are observed and arbitral awards
are enforced in the signatory countries." However, the
United States, as *amicus curiae,* advises the Court that the
Convention "clearly contemplates" that signatory nations will
enforce domestic laws prohibiting the arbitration of certain
subject matters. Brief for United States as *Amicus Curiae*
28. This interpretation of the Convention was adopted by the

Court of Appeals, 723 F.2d, at 162-166, and the Court *659*
declines to reject it, *ante,* at 3360, n. 21. The construction is
beyond doubt.

Article II(3) of the Convention provides that the court of a
Contracting State, "when seized of an action in a matter in
respect of which the parties have made an agreement within
the meaning of this article, shall, at the request of one of the
parties, refer the parties to arbitration." This obligation does
not arise, however, (i) if the agreement "is null and void,
inoperative or incapable of being performed," Art. II(3), or
(ii) if the dispute does not concern "a subject matter capable of
settlement by arbitration," Art. II(1). The former qualification
principally applies to matters of fraud, mistake, and duress
in the inducement, or problems of procedural fairness and
feasibility. 723 F.2d, at 164. The latter clause plainly suggests
the possibility **3371** that some subject matters are not
capable of arbitration under the domestic laws of the signatory
nations, and that agreements to arbitrate such disputes need
not be enforced.

This construction is confirmed by the provisions of
the Convention which provide for the enforcement of
international arbitration awards. Article III provides that
each "Contracting State shall recognize arbitral awards as
binding and enforce them." However, if an arbitration award
is "contrary to the public policy of [a] country" called upon
to enforce it, or if it concerns a subject matter which is "not
capable of settlement by arbitration under the law of that
country," the Convention does not require that it be enforced.
Arts. V(2)(a) and (b). Thus, reading Articles II and V together,
the Convention provides that agreements to arbitrate disputes
which are nonarbitrable under domestic law need not be
honored, nor awards rendered under them enforced. [34]

34    Indeed, it has been argued that a state may refuse to
      enforce an agreement to arbitrate a subject matter which
      is nonarbitrable in domestic law under Article II(3)
      as well as under Article II(1). Since awards rendered
      under such agreements need not be enforced under
      Article V(2) the agreement is "incapable of being
      performed." Art. II(3). S.Exec.Doc. E, 90th Cong., 2d
      Sess., 19 (1968) (hereinafter S.Exec.Doc. E); G. Haight,
      Convention on the Recognition and Enforcement of
      Foreign Arbitral Awards 27-28 (1958).

*660* This construction is also supported by the legislative
history of the Senate's advice and consent to the Convention.
In presenting the Convention for the Senate's consideration
the President offered the following interpretation of Article
II(1):

"The requirement that the agreement apply to a matter capable of settlement by arbitration is necessary in order to take proper account of laws in force in many countries which prohibit the submission of certain questions to arbitration. In some States of the United States, for example, disputes affecting the title to real property are not arbitrable." S.Exec.Doc. E, at 19.

The Senate's consent to the Convention presumably was made in light of this interpretation, and thus it is to be afforded considerable weight. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184-185, 102 S.Ct. 2374, 2379-2380, 72 L.Ed.2d 765 (1982).

### International Comity

It is clear then that the international obligations of the United States permit us to honor Congress' commitment to the exclusive resolution of antitrust disputes in the federal courts. The Court today refuses to do so, offering only vague concerns for comity among nations. The courts of other nations, on the other hand, have applied the exception provided in the Convention, and refused to enforce agreements to arbitrate specific subject matters of concern to them. [35]

> 35  For example, the Cour de Cassation in Belgium has held that disputes arising under a Belgian statute limiting the unilateral termination of exclusive distributorships are not arbitrable under the Convention in that country, *Audi-NSU Auto Union A.G. v. S.A. Adelin Petit & Cie.* (1979), in 5 Yearbook Commercial Arbitration 257, 259 (1980), and the Corte di Cassazione in Italy has held that labor disputes are not arbitrable under the Convention in that country, *Compagnia Generale Construzioni v. Piersanti,* [1980] Foro Italiano I 190, in 6 Yearbook Commercial Arbitration 229, 230 (1981).

*\*661* It may be that the subject-matter exception to the Convention ought to be reserved-as a matter of domestic law-for matters of the greatest public interest which involve concerns that are shared by other nations. The Sherman Act's commitment to free competitive markets is among our most important public policies. *Supra,* at 3366-3370. This commitment, shared by other nations which are signatory to the Convention, [36] is hardly the sort of parochial *\*\*3372* concern that we should decline to enforce in the interest of international comity. Indeed, the branch of Government entrusted with the conduct of political relations with foreign governments has informed us that the "United States'

determination that federal antitrust claims are nonarbitrable under the Convention ... is not likely to result in either surprise or recrimination on the part of other signatories to the Convention." Brief for United States as *Amicus Curiae* 30.

> 36  For example, the Federal Republic of Germany has a vigorous antitrust program, and prohibits the enforcement of predispute agreements to arbitrate such claims under some circumstances. See Act Against Restraints of Competition § 91(1), in 1 Organisation for Economic Co-operation and Development, Guide to Legislation on Restrictive Business Practices, Part D, p. 49 (1980). See also 2 G. Delaume, Transnational Contracts § 13.06, p. 31, and n. 3 (1982).

Lacking any support for the proposition that the enforcement of our domestic laws in this context will result in international recriminations, the Court seeks refuge in an obtuse application of its own precedent, *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), in order to defend the contrary result. The *Scherk* case was an action for damages brought by an American purchaser of three European businesses in which it was claimed that the seller's fraudulent representations concerning the status of certain European trademarks constituted a violation of § 10(b) of the Securities Exchange *\*662* Act of 1934, 15 U.S.C. § 78j(b). The Court held that the parties' agreement to arbitrate any dispute arising out of the purchase agreement was enforceable under the Federal Arbitration Act. The legal issue was whether the Court's earlier holding in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed.2d 168 (1953)-"that an agreement to arbitrate could not preclude a buyer of a security from seeking a judicial remedy under the Securities Act of 1933," see 417 U.S., at 510, 94 S.Ct., at 2453-was "controlling authority." *Ibid.*

The Court carefully identified two important differences between the *Wilko* case and the *Scherk* case. First, the statute involved in *Wilko* contained an express private remedy that had "no statutory counterpart" in the statute involved in *Scherk,* see 417 U.S., at 513, 94 S.Ct., at 2454. Although the Court noted that this difference provided a "colorable argument" for reaching a different result, the Court did not rely on it. *Id.,* at 513-514, 94 S.Ct., at 2454-2455.

Instead, it based its decision on the second distinction-that the outcome in *Wilko* was governed entirely by American law whereas in *Scherk* foreign rules of law would control and, if the arbitration clause were not enforced, a host of international conflict of laws problems would arise. The Court explained:

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

"Alberto-Culver's contract to purchase the business entities belonging to Scherk was a truly international agreement. Alberto-Culver is an American corporation with its principal place of business and the vast bulk of its activity in this country, while Scherk is a citizen of Germany whose companies were organized under the laws of Germany and Liechtenstein. The negotiations leading to the signing of the contract in Austria and to the closing in Switzerland took place in the United States, England, and Germany, and involved consultations with legal and trademark experts from each of those countries and from Liechtenstein. Finally, and most significantly, the subject matter of the contract concerned the *663 sale of business enterprises organized under the laws of and primarily situated in European countries, whose activities were largely, if not entirely, directed to European markets.

"Such a contract involves considerations and policies significantly different from those found controlling in Wilko. In Wilko, quite apart from the arbitration provision, there was no question but that the laws of the United States generally, and the federal securities laws in particular, would govern disputes arising out of the stock-purchase agreement. The parties, the negotiations, and the subject matter of the contract were all situated in this country, and no credible claim could have been entertained that any international conflict-of-laws problems would arise. In this case, by contrast, **3373 in the absence of the arbitration provision considerable uncertainty existed at the time of the agreement, and still exists, concerning the law applicable to the resolution of disputes arising out of the contract." 417 U.S., at 515-516, 94 S.Ct., at 2455-2456 (footnote omitted). Thus, in its opinion in Scherk, the Court distinguished Wilko because in that case "no credible claim could have been entertained that any international conflict-of-laws problems would arise." 417 U.S., at 516, 94 S.Ct., at 2455. That distinction fits this case precisely, since I consider it perfectly clear that the rules of American antitrust law must govern the claim of an American automobile dealer that he has been injured by an international conspiracy to restrain trade in the American automobile market. [37]

[37]    Cf. Compagnia Generale Construzioni v. Piersanti, [1980] Foro Italiano I 190 (Corte Cass. Italy), in 6 Yearbook Commercial Arbitration, at 230; Audi-NSU Auto Union A.G. v. S.A. Adelin Petit & Cie. (Cour Cass. Belgium 1979), in 5 Yearbook Commercial Arbitration, at 259.

The critical importance of the foreign-law issues in Scherk was apparent to me even before the case reached this Court. See n. 12, supra. For that reason, it is especially distressing *664 to find that the Court is unable to perceive why the reasoning in Scherk is wholly inapplicable to Soler's antitrust claims against Chrysler and Mitsubishi. The merits of those claims are controlled entirely by American law. It is true that the automobiles are manufactured in Japan and that Mitsubishi is a Japanese corporation, but the same antitrust questions would be presented if Mitsubishi were owned by two American companies instead of by one American and one Japanese partner. When Mitsubishi enters the American market and plans to engage in business in that market over a period of years, it must recognize its obligation to comply with American law and to be subject to the remedial provisions of American statutes. [38]

[38]    Cf. Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) (Japanese general trading company's wholly owned subsidiary which is incorporated in the United States is not exempt under bilateral commercial treaty from obligations under Title VII of the Civil Rights Act of 1964).

The federal claim that was asserted in Scherk, unlike Soler's antitrust claim, had not been expressly authorized by Congress. Indeed, until this Court's recent decision in Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), the federal cause of action asserted by Scherk would not have been entertained in a number of Federal Circuits because it did not involve the kind of securities transaction that Congress intended to regulate when it enacted the Securities Exchange Act of 1934. [39] The fraud claimed in Scherk was virtually identical to the breach of warranty claim; arbitration of such claims arising out of an agreement between parties of equal bargaining strength does not conflict with any significant federal policy.

[39]    The Court's opinion in Landreth Timber, 471 U.S., at 694-695, n. 7, 105 S.Ct., at 2306, n. 7, does not take issue with my assertion, in dissent, that Congress never "intended to cover negotiated transactions involving the sale of control of a business whose securities have never been offered or sold in any public market." Id., at 699, 105 S.Ct., at 2313.

In contrast, Soler's claim not only implicates our fundamental antitrust policies, supra, at 3366-3370, but also should *665 be evaluated in the light of an explicit congressional

finding concerning the disparity in bargaining power between automobile manufacturers and their franchised dealers. In 1956, when Congress enacted special legislation to protect dealers from bad-faith franchise terminations,[40] it recited its intent "to balance the power now heavily weighted in favor of automobile manufacturers." 70 Stat. 1125. The special federal interest in protecting automobile dealers from overreaching by car manufacturers, as well as the policies underlying the Sherman Act, underscore the folly of the Court's decision today.

40    Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221-1225.

## **3374  V

The Court's repeated incantation of the high ideals of "international arbitration" creates the impression that this case involves the fate of an institution designed to implement a formula for world peace.[41] But just as it is improper to subordinate the public interest in enforcement of antitrust policy to the private interest in resolving commercial disputes, so is it equally unwise to allow a vision of world unity to distort the importance of the selection of the proper forum for resolving this dispute. Like any other mechanism for resolving controversies, international arbitration will only succeed if it is realistically limited to tasks it is capable of performing well-the prompt and inexpensive resolution of essentially contractual disputes between commercial partners. As for matters involving the political passions and the fundamental interests of nations, even the multilateral convention adopted under the auspices of the United Nations

recognizes that private international arbitration is incapable of achieving satisfactory results.

41    E.g., Charter of the United Nations and Statute of the International Court of Justice, 59 Stat. 1031, T.S. No. 993 (1945); Constitution of the International Labor Organisation, 49 Stat. 2712, T.S. No. 874 (1934); Treaty of Versailles, S.Doc. 49, 66th Cong., 1st Sess., pt. 1, pp. 8-17 (1919) (Covenant of the League of Nations); Kant, Perpetual Peace, A Philosophical Sketch, in Kant's Political Writings 93 (H. Reiss, ed. 1971).

*666    In my opinion, the elected representatives of the American people would not have us dispatch an American citizen to a foreign land in search of an uncertain remedy for the violation of a public right that is protected by the Sherman Act. This is especially so when there has been no genuine bargaining over the terms of the submission, and the arbitration remedy provided has not even the most elementary guarantees of fair process. Consideration of a fully developed record by a jury, instructed in the law by a federal judge, and subject to appellate review, is a surer guide to the competitive character of a commercial practice than the practically unreviewable judgment of a private arbitrator.

Unlike the Congress that enacted the Sherman Act in 1890, the Court today does not seem to appreciate the value of economic freedom. I respectfully dissent.

Parallel Citations

105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 16

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 9 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)
103 S.Ct. 927, 74 L.Ed.2d 765

103 S.Ct. 927
Supreme Court of the United States

MOSES H. CONE MEMORIAL
HOSPITAL, Petitioner

v.

MERCURY CONSTRUCTION CORPORATION.

No. 81-1203.    Argued Nov. 2,
1982.    Decided Feb. 23, 1983.

Contractor sought arbitration under Federal Arbitration Act of its dispute with hospital. The United States District Court for the Middle District of North Carolina, at Greensboro, Hiram H. Ward, J., denied arbitration pending disposition of a state action, and contractor sought relief both by way of petition for mandamus and by appeal. The Court of Appeals, 656 F.2d 933, Donald Russell, Circuit Judge, reversed and remanded with directions. Rehearing was denied, 664 F.2d 936, and certiorari was granted. The Supreme Court, Justice Brennan, held that: (1) district court's stay order was appealable as a "final decision" to the Court of Appeals; (2) district court abused its discretion in granting stay; and (3) Court of Appeals acted within its authority in deciding legal issues presented in order to facilitate prompt arbitration that Congress envisaged.

Affirmed.

Justice Rehnquist filed dissenting opinion in which Chief Justice Burger and Justice O'Connor joined.

West Headnotes (18)

**1**    **Federal Courts**  🔑  Mandamus

Court of Appeals has no occasion to engage in extraordinary review by mandamus in aid of its jurisdiction, when it can exercise same review by contemporaneous ordinary appeal. 28 U.S.C.A. § 1651.

45 Cases that cite this headnote

**2**    **Federal Courts**  🔑  Injunction or Stay of Proceedings

Order staying action seeking order compelling arbitration under United States Arbitration Act, pending resolution of state court suit was appealable as a "final decision" to Court of Appeals, since arbitrability issue was only issue present, so that stay of federal suit pending resolution of state suit meant that there would be no further litigation in federal forum. 9 U.S.C.A. § 4; 28 U.S.C.A. § 1291.

386 Cases that cite this headnote

**3**    **Federal Courts**  🔑  Injunction or Stay of Proceedings

Stay order is final for appealability purposes when sole purpose and effect of stay is to surrender jurisdiction of federal suit to state court.

105 Cases that cite this headnote

**4**    **Federal Courts**  🔑  Injunction and Stay Orders

If district court order which stayed action seeking order compelling arbitration under United States Arbitration Act, pending resolution of state court suit, were not final for appealability purposes, it would nevertheless be appealable within exception to finality rule, as order that conclusively determined disputed question, that resolved important issue completely separable from merits of action and that was effectively unreviewable on appeal from final judgment.

264 Cases that cite this headnote

**5**    **Courts**  🔑  Scope and Effect of Proceedings Pending in State Court

Decision whether to dismiss federal action because of parallel state court litigation does not rest on mechanical checklist, but on careful balancing of important factors as they apply in given case, with balance heavily weighted in favor of exercise of jurisdiction.

888 Cases that cite this headnote

**6**    **Mandamus**  🔑  Nature and Existence of Rights to Be Protected or Enforced

Party moving for writ of mandamus must show that his right to writ is clear and indisputable. 28 U.S.C.A. § 1651.

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

19 Cases that cite this headnote

**7** **Courts** 🔑 Scope and Effect of Proceedings Pending in State Court

Federal district court may decline to exercise its jurisdiction because of parallel state court litigation only in exceptional circumstances; only clearest of justifications will warrant dismissal.

223 Cases that cite this headnote

**8** **Action** 🔑 Nature and Subject Matter of Actions in General

District court abused its discretion in staying action seeking order compelling arbitration under United States Arbitration Act, pending resolution of state court suit, absent showing of requisite exceptional circumstances; factors of avoidance of piecemeal litigation, order in which current forums obtained jurisdiction, presence of federal issues and probable inadequacy of state court proceeding to protect contractor's rights counseled against stay. 9 U.S.C.A. § 4.

1259 Cases that cite this headnote

**9** **Alternative Dispute Resolution** 🔑 Discretion

Decision whether to stay litigation among nonarbitrating parties pending outcome of arbitration is left to district court, or to state trial court under applicable state procedural rules, as matter of its discretion to control its docket. 9 U.S.C.A. §§ 1 et seq., 4.

357 Cases that cite this headnote

**10** **Action** 🔑 Actions in State and Federal Courts

In determining whether to stay federal suit out of deference to parallel litigation brought in state court, "priority" element of governing balancing test should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.

306 Cases that cite this headnote

**11** **Alternative Dispute Resolution** 🔑 Liberal or Strict Construction

Policy of Arbitration Act requires liberal reading of arbitration agreement. 9 U.S.C.A. § 1 et seq.

807 Cases that cite this headnote

**12** **Federal Courts** 🔑 Arbitration

Effect of section of Arbitration Act declaring liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary, is to create body of federal substantive law of arbitrability, applicable to any arbitration agreement within coverage of Act. 9 U.S.C.A. § 2.

1950 Cases that cite this headnote

**13** **Alternative Dispute Resolution** 🔑 Construction in Favor of Arbitration

Arbitration Act establishes that, as a matter of federal law, any doubts concerning scope of arbitrable issues should be resolved in favor of arbitration, whether problem at hand is construction of contract language itself or allegation of waiver, delay, or like defense to arbitrability. 9 U.S.C.A. § 2.

2898 Cases that cite this headnote

**14** **Courts** 🔑 Scope and Effect of Proceedings Pending in State Court

Presence of federal law issues must always be a major consideration weighing against surrender of federal jurisdiction out of deference to parallel litigation brought in state court.

150 Cases that cite this headnote

**15** **Alternative Dispute Resolution** 🔑 Stay of Proceedings Pending Arbitration

State courts, as much as federal courts, are obliged to grant stays of litigation under section of Arbitration Act referring to suit "in any of the courts of the United States." 9 U.S.C.A. § 3.

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 11 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

118 Cases that cite this headnote

**16** **Action**  🔑  Actions in State and Federal Courts

Fact that district court stayed federal court action rather than dismissing it outright did not render inapplicable exceptional circumstances test for determining propriety of district court decision to defer to parallel litigation brought in state court.

154 Cases that cite this headnote

**17** **Federal Courts**  🔑  Necessity of Presentation in General

Ordinarily, Court of Appeals is not expected to pass on issues not decided in district court.

5 Cases that cite this headnote

**18** **Federal Courts**  🔑  Nature or Subject-Matter of Issues or Questions

Even though only issue formally appealed to Court of Appeals was propriety of district court's order staying action seeking order compelling arbitration under Arbitration Act, pending resolution of state court suit, Court of Appeals acted within its authority in deciding that contractual dispute was arbitrable under Arbitration Act and contract, where court had briefs and evidentiary submissions from both parties on merits of arbitrability. 9 U.S.C.A. § 4.

125 Cases that cite this headnote

**\*\*929  Syllabus** \*

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*1** Petitioner, a hospital located in North Carolina, entered into a contract with respondent contractor, an Alabama corporation, for construction of additions to the hospital building. Contract disputes were to be initially referred to the architect who was hired to design and oversee the construction project. Disputes decided by the architect or not decided within a specified time could be submitted to binding arbitration under an arbitration clause in the contract. Subsequently, during construction, respondent submitted claims to the architect for extended overhead or increase in construction costs due to petitioner's delay or inaction. But the claims were not resolved, and petitioner refused to pay them. Petitioner then filed an action in a North Carolina state court against respondent and the architect, seeking a declaratory judgment that there was no right to arbitration, that petitioner was not liable to respondent, and that if it was liable it would be entitled to indemnity from the architect. A few days later petitioner obtained an *ex parte* injunction from the state court forbidding respondent to take any steps toward arbitration, but when respondent objected the stay was dissolved. Respondent then filed a diversity-of-citizenship action in Federal District Court, seeking an order compelling arbitration under § 4 of the United States Arbitration Act. The District Court stayed the action pending resolution of the state-court suit because the two suits involved the identical issue of the arbitrability of respondent's claims. The Court of Appeals, holding that it had jurisdiction under 28 U.S.C. § 1291, reversed the **\*2** District Court's stay order and remanded the case with instructions to enter an order to arbitrate.

*Held:*

1. The District Court's stay order was appealable as a "final decision" to the Court of Appeals under 28 U.S.C. § 1291. Since the order was based on the conclusion that the federal and state actions involved the identical issue of arbitrability, and this issue was the only substantive issue present in the federal action, a stay of the federal action pending resolution of the state action meant that there would be no further litigation in the federal court. Thus, respondent was "effectively out of court" so that the stay order amounted to a dismissal of the federal action. Moreover, even if the stay order was not final for appealability purposes, it was nevertheless appealable within the finality rule exception that applies where an order conclusively determines the disputed question, resolves an important issue completely separate from the merits, and is effectively unreviewable on appeal from a final judgment. *Cohen v. Beneficial Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528. Pp. 933-935.

2. The District Court abused its discretion in granting the stay. Pp. 935-943.

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 12 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

(a) A federal district court may decline to exercise its jurisdiction because of parallel state-court litigation only in exceptional circumstances; only the clearest of justifications will warrant dismissal. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 818-819, 96 S.Ct. 1236, 1246-47, 47 L.Ed.2d 483. The decision whether to stay or dismiss a federal action on grounds of wise judicial administration does not rest on a mechanical checklist, but on a careful balancing of the important factors (which court first assumed jurisdiction over property involved in the litigation, inconvenience of the federal forum, avoidance of piecemeal litigation, and the order in which the concurrent forums obtained jurisdiction) relevant to the decision as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. *Ibid.* Pp. 935-937.

 **\*\*930** (b) The exceptional-circumstances test set forth in *Colorado River, supra,* was not undermined by *Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504. Pp. 937-938.

(c) There was no showing of the requisite exceptional circumstances to justify the District Court's stay order. Concededly, there was no assumption by either court of jurisdiction over any res or property or any contention that the federal court was any less convenient to the parties than the state court. The other factors-avoidance of piecemeal litigation and the order in which the current forums obtained jurisdiction-rather than supporting the stay, counsel against it. The fact that if respondent obtains an arbitration order, petitioner will be forced to resolve **\*3** the dispute with respondent and the related dispute with the architect in different forums is not the result of any choice between federal and state courts but occurs because the relevant federal law, the Arbitration Act, requires piecemeal resolution when necessary to give effect to an arbitration agreement. Hence, the decision to allow the issue of arbitrability to be decided in the state rather than in the federal court does not cause piecemeal resolution of the parties' underlying disputes. And the fact that the state-court suit was filed before the federal suit is not sufficient reason to justify the stay order, where because petitioner's refusal to arbitrate did not occur until less than a day before it filed its state suit, respondent had no reasonable opportunity to file its federal suit first. Moreover, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. Here, no substantial proceedings had taken place in the state suit at the time of the District Court's stay order, whereas in

the federal suit the parties had taken most of the steps necessary to a resolution of the arbitrability issue. The stay order thus frustrated the Arbitration Act's policy of rapid and unobstructed enforcement of arbitration agreements. Pp. 938-941.

(d) The fact that federal law in the terms of the Arbitration Act governs the issue of the arbitrability of the dispute between petitioner and respondent in either the state or the federal court is another factor militating against the District Court's stay order. See *Calvert, supra.* Pp. 941-942.

(e) Finally, an important reason against allowing a stay is the probable inadequacy of the state suit to protect respondent's rights, since it is doubtful that respondent could obtain from the state court an order compelling petitioner to arbitrate. Pp. 942-943.

(f) The fact that the District Court stayed the federal action rather than dismissing it outright does not render the *Colorado River* exceptional-circumstances test inapplicable. P. 943.

3. The Court of Appeals acted within its authority in deciding that the contractual dispute was arbitrable under the Arbitration Act and the contract, where the court had briefs and evidentiary submissions from both parties on the merits of arbitrability. Pp. 943-944.

656 F.2d 933 (CA4 1981), affirmed.

### Attorneys and Law Firms

 **\*4** *Jack W. Floyd* argued the cause for petitioner. With him on the briefs were *Stephen P. Millikin* and *Douglas W. Ey, Jr.*

*A.H. Gaede, Jr.,* argued the cause for respondent. With him on the brief were *Joseph B. Mays, Jr., Charles Nichols,* and *Frank H. McFadden.*

### Opinion

Justice BRENNAN delivered the opinion of the Court.

This case, commenced as a petition for an order to compel arbitration under § 4 of the United States Arbitration Act of 1925 (Arbitration Act or Act), 9 U.S.C. § 4, presents the question whether, in light of the policies of the Act and of our decisions **\*\*931** in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and *Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), the District Court for the Middle District of North Carolina properly stayed this diversity action pending resolution of

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 13 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

a concurrent state-court suit. The Court of Appeals for the Fourth Circuit reversed the stay. 656 F.2d 933, rehearing denied, 664 F.2d 936 (CA4 1981). We granted certiorari. 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982). We affirm.

## I

Petitioner Moses H. Cone Memorial Hospital ("Hospital") is located in Greensboro, North Carolina. Respondent Mercury Construction Corp. ("Mercury"), a construction contractor, has its principal place of business in Alabama. In July 1975, Mercury and the Hospital entered into a contract for the construction of additions to the Hospital building. The contract, drafted by representatives of the Hospital, included provisions for resolving disputes arising out of the contract or its breach. All disputes involving interpretation of the contract or performance of the construction work were to be referred in the first instance to J.N. Pease Associates ("Architect"), an independent architectural firm hired by the Hospital to design and oversee the construction project. With certain *5 stated exceptions, [1] any dispute decided by the Architect (or not decided by it within a stated time) could be submitted by either party to binding arbitration under a broad arbitration clause in the contract:

1    The Architect was given final say on "matters relating to artistic effect." App. 28-29. The contract also excluded arbitration on any claim waived by the making or acceptance of final payment. App. 29. Neither of these exceptions is asserted to apply in this case.

"All claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof, ... shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." App. 29-30.

The contract also specified the time limits for arbitration demands. [2]

2    The contract provided that no demand for arbitration could be made later than thirty days after the Architect's written final decision. In the case of arbitrable disputes not subject to submission to the Architect, the demand was required to be made "within a reasonable time

after the claim ... has arisen," and in no event after the applicable statute of limitations had run. App. 29-30.

The contract also set a starting time limit for arbitration demands. No demand could be made earlier than ten days after presentation of evidence to the Architect, unless the Architect rendered a written decision before that time. App. 29.

Construction on the project began in July 1975. Performance was to be completed by October 1979. [3] In fact, construction was substantially completed in February 1979, and final inspections were made that June.

3    The completion date, originally set as November 14, 1978, was extended to October 1979 by agreement of the parties.

*6 At a meeting in October 1977 (during construction), attended by representatives of Mercury, the Hospital, and the Architect, Mercury agreed, at the Architect's request, to withhold its claims for delay and impact costs (*i.e.,* claims for extended overhead or increase in construction costs due to delay or inaction by the Hospital) until the work was substantially completed. On this record, the Hospital does not contest the existence of this agreement, although it asserts that the Architect lacked **932 authority to agree to a delay in presentation of claims or to entertain claims after the contract work was completed.

In January 1980, Mercury submitted to the Architect its claims for delay and impact costs. Mercury and the Architect discussed the claims over several months, substantially reducing the amount of the claims. According to the Hospital, it first learned of the existence of Mercury's claims in April 1980; its lawyers assumed active participation in the claim procedure in May. The parties differ in their characterizations of the events of the next few months-whether there were "ongoing negotiations," or merely an "investigation" by the Hospital. In any event, it appears from the record that lawyers for the Hospital requested additional information concerning Mercury's claims. As a result, on August 12, 1980, Mercury gave a detailed presentation of its claims at a meeting attended by Mercury's representatives and lawyers, the Hospital's representatives and lawyers, and representatives of the Architect. Mercury agreed to send copies of its files to an expert hired by the Hospital, and the parties agreed to meet again on October 13.

On October 6, Mercury's counsel telephoned the Hospital's counsel to confirm that the scheduled meeting would go forward. The Hospital's counsel said he would call back the

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 14 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

next day. When he did, he informed Mercury's counsel that the Hospital would pay nothing on Mercury's claim. He also said that the Hospital intended to file a declaratory judgment action in North Carolina state court.

*7 True to its word, the Hospital filed an action on the morning of October 8 in the Superior Court of Guilford County, North Carolina, naming Mercury and the Architect as defendants. The complaint alleged that Mercury's claim was without factual or legal basis and that it was barred by the statute of limitations. It alleged that Mercury had lost any right to arbitration under the contract due to waiver, laches, estoppel, and failure to make a timely demand for arbitration. The complaint also alleged various delinquencies on the part of the Architect. As relief, the Hospital sought a declaration that there was no right to arbitration; a stay of arbitration; a declaration that the Hospital bore no liability to Mercury; and a declaration that if the Hospital should be found liable in any respect to Mercury, it would be entitled to indemnity from the Architect. The complaint was served on Mercury on October 9. On that same day, Mercury's counsel mailed a demand for arbitration.

On October 15, without notice to Mercury, the Hospital obtained an *ex parte* injunction from the state court forbidding Mercury to take any steps directed toward arbitration. Mercury objected, and the stay was dissolved on October 27. As soon as the stay was lifted, Mercury filed the present action in the District Court, seeking an order compelling arbitration under § 4 of the Arbitration Act, 9 U.S.C. § 4. [4] Jurisdiction was based on diversity of citizenship. On the Hospital's motion, the District Court stayed Mercury's federal-court suit pending resolution of the state-court suit because the two suits involved the identical issue of the arbitrability of Mercury's claims. App. to Pet. for Cert. A-38.

[4]  Simultaneously, Mercury filed a petition for removal of the Hospital's state-court action. The District Court remanded the removed case on the ground that, because the Hospital and the Architect are both North Carolina corporations, there was no complete diversity. The propriety of the removal or remand is not before this Court.

*8 Mercury sought review of the District Court's stay by both a notice of appeal and a petition for mandamus. A panel of the Court of Appeals for the Fourth Circuit heard argument in the case, but before the panel issued any decision, the Court informed the parties that it would consider the case en banc. After reargument, the en banc Court held that it had appellate jurisdiction over the case under 28 U.S.C. § 1291. It reversed

the District Court's stay order and remanded the case to the **933 District Court with instructions for entry of an order to arbitrate.

## II

Before we address the propriety of the District Judge's stay order, we must first decide whether that order was appealable to the Court of Appeals under 28 U.S.C. § 1291. [5]

[5]  Section 1291 provides in relevant part:

"The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, ... except where a direct review may be had in the Supreme Court."

[1] [2] Mercury sought appellate review through two alternative routes-a notice of appeal under § 1291, and a petition for mandamus under the All Writs Act, 28 U.S.C. § 1651. [6] Mercury expressly stated that its appeal was based only on § 1291, and not on 18 U.S.C. § 1292 (relating to interlocutory appeals). The Hospital contends that the order appealed from was not a "final decision" within § 1291. We *9 disagree and hold that the stay order was final for purposes of appellate jurisdiction.

[6]  The Hospital argues that because Mercury's filing in the Court of Appeals was styled a petition for mandamus first and a notice of appeal only "in the alternative," the Hospital was somehow entitled to have the Court of Appeals apply the stricter standards of review that obtain under the mandamus procedure before considering any appeal. Brief for Petitioner 30-31. We do not understand why this order of proceeding would be of any benefit to the Hospital; but in any event the contention is frivolous. In the first place, Mercury also filed a proper notice of appeal in the District Court, see Fed.Rule App.Proc. 3(a). More fundamentally, a court of appeals has no occasion to engage in extraordinary review by mandamus "in aid of [its] jurisdictio[n]," 28 U.S.C. § 1651, when it can exercise the same review by a contemporaneous ordinary appeal. See, *e.g., Hines v. D'Artois,* 531 F.2d 726, 732, and n. 10 (CA5 1976).

*Idlewild Liquor Corp. v. Epstein,* 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962), is instructive in this regard. There the plaintiff brought a federal suit challenging the constitutionality of a state statute. The District Judge declined to convene a three-judge court and stayed the federal suit under the *Pullman* abstention doctrine. [7] We held that the

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 15 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

District Court's action was final and therefore reviewable by the Court of Appeals, stating:

7    *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

"The Court of Appeals properly rejected the argument that the order of the District Court 'was not final and hence unappealable under 28 U.S.C. §§ 1291, 1292,' pointing out that '[a]ppellant was effectively out of court.' " *Id.,* at 715, n. 2, 82 S.Ct., at 1296, n. 2. [8]

8    The plaintiff in *Idlewild* had requested injunctive relief against enforcement of the state statute. Nevertheless, it is clear that neither the Court of Appeals nor this Court based the holding of appealability on the argument that the District Court had effectively denied injunctive relief. See generally 28 U.S.C. § 1292(a)(1); *Carson v. American Brands, Inc.,* 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). Section 1292 in terms applies only to *interlocutory* orders, and therefore could hardly have been the basis for a holding that the orders were "final."

There is no basis for the dissent's attempt, *post,* at 945-946, to distinguish *Idlewild* on the basis that in that case there was no pending state-court action when the District Court's stay issued. Neither the Court of Appeals nor this Court suggested in *Idlewild* that the state court's doors were anything but wide open to the plaintiff. "[E]ffectively out of court" means effectively out of *federal* court-in keeping with the fact that the decision under appeal is the refusal to exercise *federal* jurisdiction.

Moreover, the dissent's resolution of the appealability issue would yield the odd result that *Pullman* abstention orders would be immediately appealable in Texas but not in the other 49 states. Compare *American Trial Lawyers Assn. v. New Jersey Supreme Court,* 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973) (stays appropriate in *Pullman* cases), with *Harris County Commissioners Court v. Moore,* 420 U.S. 77, 88-89, and n. 14, 95 S.Ct. 870, 877-78, and n. 14, 43 L.Ed.2d 32 (1975) (dismissal permissible to accommodate Texas jurisdictional requirements). This oddity illustrates the artificiality of resting appealability on an otherwise substanceless distinction between stays and dismissals in the present context. See *infra,* at Part IV E.

3    *10 Here, the argument for finality of the District Court's order is even clearer.    **934 A district court stay pursuant to *Pullman* abstention is entered with the expectation that the federal litigation will resume in the event that the plaintiff does not obtain relief in state court on state-law

grounds. [9] Here, by contrast, the District Court predicated its stay order on its conclusion that the federal and state actions involved "the identical issue of arbitrability of the claims of Mercury Construction Corp. against the Moses H. Cone Memorial Hospital." App. to Pet. for Cert. A-38. That issue of arbitrability was the only substantive issue present in the federal suit. Hence, a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata. [10] Thus, here, even more surely than in *Idlewild,* Mercury was "effectively out of court." Hence, as the Court of Appeals held, this stay order amounts to a dismissal of the suit. [11]

9    See *England v. Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

10    See, *e.g., Ultracashmere House, Ltd. v. Meyer,* 664 F.2d 1176, 1183-1184 (CA11 1981); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 637 F.2d 391, 397-398 (CA5 1981).

11    See *In re Mercury Construction Corp.,* 656 F.2d 933, 937-938, and n. 6 (CA4 1981), citing as dispositive *Amdur v. Lizars,* 372 F.2d 103, 105-106 (CA4 1967). See also *Federman v. Empire Fire & Marine Insurance Co.,* 597 F.2d 798, 808, and n. 15 (CA2 1979); *Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative,* 583 F.2d 104, 108-109 (CA3 1978); *Sun Oil Co. v. FEA,* 572 F.2d 867 (Em.App.1978); *Rancho Palos Verdes Corp. v. Laguna Beach,* 547 F.2d 1092, 1093, n. 1 (CA9 1976); *Hines v. D'Artois,* 531 F.2d 726, 730-732 (CA5 1976); *Drexler v. Southwest Dubois School Corp.,* 504 F.2d 836, 838 (CA7 1974) (en banc); *Druker v. Sullivan,* 458 F.2d 1272, 1274, n. 3 (CA1 1972). But see *Acton Corp. v. Borden, Inc.,* 670 F.2d 377, 380-382 (CA1 1982); *State Farm Mutual Automobile Insurance Co. v. Scholes,* 601 F.2d 1151, 1153-1154 (CA10 1979); *Frederick L. v. Thomas,* 578 F.2d 513, 515-516 (CA3 1978) (dictum).

Of course, as these cases recognize, *Idlewild* does not disturb the usual rule that a stay is not ordinarily a final decision for purposes of § 1291, since most stays do not put the plaintiff "effectively out of court." See, *e.g., Amdur,* 372 F.2d, at 105-106. *Idlewild* 's reasoning is limited to cases where (under *Colorado River,* abstention, or a closely similar doctrine) the object of the stay is to require all or an essential part of the federal suit to be litigated in a state forum. This answers the dissent's argument, *post,* at 945-946, that *Idlewild* was overruled by that part of *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469-477, 98 S.Ct. 2454, 2458-62, 57 L.Ed.2d 351 (1978), which

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 16 of 302

103 S.Ct. 927, 74 L.Ed.2d 765

rejected the "death knell" doctrine of appealability. The death knell doctrine rested on the argument that in some situations an interlocutory decision (such as a refusal to certify a class) might terminate a suit as a practical matter because the named plaintiff would lack an economic incentive to pursue his individual claim. In a death knell case, however, the order sought to be appealed had no *legal* effect on the named plaintiff's ability to proceed with his individual claim in federal court. There is an obvious difference between a case in which the plaintiff himself *may choose* not to proceed, and a case in which the district court *refuses to allow* the plaintiff to litigate his claim in federal court. Appeal from a stay on abstention or *Colorado River* grounds, therefore, presents no prospect of "appeals of right that turn on the facts of a particular case," as in *Coopers & Lybrand,* 437 U.S., at 476, 98 S.Ct., at 2462. We foresee no great difficulty in determining when a district court has surrendered jurisdiction over a federal lawsuit.

For much the same reason, the dissent errs in likening the stay in this case to an ordinary delay in the interest of docket control, *post,* at 944-945. We do not hold that an order becomes final merely because it may have the practical effect of allowing a state court to be the first to rule on a common issue. We hold only that a stay order is final when the sole purpose and effect of the stay is precisely to surrender jurisdiction of a federal suit to a state court.

4    *11  In any event, if the District Court order were not final for appealability purposes, it would nevertheless be appealable within the exception to the finality rule under *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The factors required to show finality under this exception have been summarized as follows:

"To come within the 'small class' of decisions excepted from the final-judgment rule by *Cohen,* the order must conclusively determine the disputed question, resolve an important issue completely **935** separate from the merits of the action, and be effectively unreviewable on appeal *12* from a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (footnote omitted). [12]

12    Accord, *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 375, 101 S.Ct. 669, 674, 66 L.Ed.2d 571 (1981); *United States v. MacDonald,* 435 U.S. 850, 854-855, 98 S.Ct. 1547, 1549-50, 56 L.Ed.2d 18 (1978);

*Abney v. United States,* 431 U.S. 651, 658-659, 97 S.Ct. 2034, 2039-40, 52 L.Ed.2d 651 (1977).

There can be no dispute that this order meets the second and third of these criteria. An order that amounts to a refusal to adjudicate the merits plainly presents an important issue separate from the merits. [13]  For the same reason, this order would be entirely unreviewable if not appealed now. Once the state court decided the issue of arbitrability, the federal court would be bound to honor that determination as res judicata.

13    The "completely separate from the merits" requirement is a distillation of the principle that there should not be piecemeal review of "steps towards final judgment in which they will merge." *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). In this case, of course, there is no step towards final judgment, but a refusal to proceed at all.

The Hospital contends nevertheless that the District Court's stay order did not meet the first of the criteria, namely that it "conclusively determine the disputed question." But this is true only in the technical sense that every order short of a final decree is subject to reopening at the discretion of the district judge. [14]  In this case, however, there is *13* no basis to suppose that the District Judge contemplated any reconsideration of his decision to defer to the parallel state-court suit. He surely would not have made that decision in the first instance unless he had expected the state court to resolve all relevant issues adequately. See *infra,* at Part IV E. It is not clear why the Judge chose to stay the case rather than to dismiss it outright; for all that the record shows, there was no reason other than the form of the Hospital's motion. Whatever the reason, however, the practical effect of his order was entirely the same for present purposes, and the order was appealable.

14    See Fed.Rule Civ.Proc. 54(b); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4478, at 788-792 (1981).

*Coopers & Lybrand* held that the *Cohen* rule did not apply to a class decertification order because, among other reasons, such an order is "inherently tentative" under Federal Rule of Civil Procedure 23(c)(1), which provides that such an order may be "altered or amended before the decision on the merits." 437 U.S., at 469, and n. 11, 98 S.Ct., at 2458, and n. 11. Of course, as Rule 54(b) provides, virtually all interlocutory orders may be altered or amended before final judgment if sufficient cause is shown; yet that does not make all pretrial orders "inherently tentative" in the sense of that phrase in *Coopers &*

103 S.Ct. 927, 74 L.Ed.2d 765

*Lybrand.* The rationale behind Rule 23(c)(1) is that a certification decision should be made "[a]s soon as practicable," even though later events or discoveries may mandate a different result. Many other orders, by contrast, are made with the expectation that they will be the final word on the subject addressed. Certainly that was true of the order at issue in this case. The reasoning of *Coopers & Lybrand* does not reach all pretrial orders that are formally subject to revision, but only those as to which some revision might reasonably be expected in the ordinary course of litigation.

### III

We turn now to the principal issue to be addressed, namely the propriety of the District Court's decision to stay this federal suit out of deference to the parallel litigation brought in state court. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), provides persuasive guidance in deciding this question.

### A

*Colorado River* involved the effect of the McCarran Amendment, 66 Stat. 560, 43 U.S.C. § 666, on the existence and exercise of federal-court jurisdiction to adjudicate federal water rights, 28 U.S.C. § 1345. The Amendment waives the Government's **\*\*936** sovereign immunity to permit the joinder of the United States in some state-court suits for the adjudication of water rights. In *Colorado River,* however, the Government proceeded in Federal District Court, bringing suit against some 1,000 nonfederal water users, seeking a declaration of the water rights of certain federal entities and Indian tribes. Shortly thereafter, a defendant in that suit **\*14** sought to join the United States in a state-court proceeding for the comprehensive adjudication and administration of all water rights within the river system that was the subject of the federal-court suit. The District Court dismissed the federal suit, holding that the abstention doctrine required deference to the state-court proceedings. The Court of Appeals for the Tenth Circuit reversed, holding that the suit of the United States was within the District Court's jurisdiction under 28 U.S.C. § 1345 and that abstention was inappropriate. We reversed the judgment of the Court of Appeals and affirmed the judgment of the District Court dismissing the complaint.

We began our analysis by examining the abstention doctrine in its various forms. We noted:

"Abstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.' " [15]

[15]   *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188-189, 79 S.Ct. 1060, 1062-63, 3 L.Ed.2d 1163 (1959).

After canvassing the three categories of abstention, we conclude that none of them applied to the case at hand. 424 U.S., at 813-817, 96 S.Ct., at 1244-46. [16]

[16]   There is no contention here that any of the categories of the abstention doctrine apply to this case.

Nevertheless, we held that the District Court's dismissal was proper on another ground-one resting not on considerations of state-federal comity or on avoidance of constitutional **\*15** decisions, as does abstention, but on "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.' " [17] We noted that " 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction,' " and that the federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." [18] We continued:

[17]   *Colorado River,* 424 U.S., at 817, 96 S.Ct., at 1246, quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952).

[18]   *Colorado River,* 424 U.S., at 817, 96 S.Ct., at 1246, quoting *McClellan v. Carland,* 217 U.S. 268, 282, 30 S.Ct. 501, 504, 54 L.Ed. 762 (1910).

"Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the

103 S.Ct. 927, 74 L.Ed.2d 765

circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist." *Id.,* at 818, 96 S.Ct., at 1246. We declined to prescribe a hard and fast rule for dismissals of this type, but instead described some of the factors relevant to the decision.

"It has been held, for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to **\*\*937** the exclusion of other courts.... In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction **\*16** and the combination of factors counselling against that exercise is required. *Only the clearest of justifications will warrant dismissal.*" *Id.,* at 818-819, 96 S.Ct., at 1246-47 (emphasis added; citations omitted).

5    As this passage makes clear, the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case. *Colorado River* itself illustrates this principle in operation. By far the most important factor in our decision to approve the dismissal there was the "clear federal policy ... [of] avoidance of piecemeal adjudication of water rights in a river system," *id.,* at 819, 96 S.Ct., at 1247, as evinced in the McCarran Amendment. We recognized that the Amendment represents Congress's judgment that the field of water rights is one peculiarly appropriate for comprehensive treatment in the forums having the greatest experience and expertise, assisted by state administrative officers acting under the state courts. *Id.,* at 819-820, 96 S.Ct., at 1247-48. In addition, we noted that other factors in the case tended to support dismissal-the absence of any substantial progress in the federal-court litigation; the presence in the suit of extensive rights governed by state law; the geographical inconvenience of the federal forum; and the Government's previous willingness to litigate similar suits in state court. *Id.,* at 820, 96 S.Ct., at 1247.

**B**

Before discussing the application of *Colorado River* 's exceptional-circumstances test, we must address the Hospital's argument that that test was undermined by our subsequent decision in *Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978). We find no merit in this argument for at least two reasons.

*\*17*   The Hospital relies on the opinion of Justice REHNQUIST, announcing the judgment of the Court. The Hospital argues that Justice REHNQUIST's opinion, if not expressly overruling *Colorado River,* at least modifies its holding substantially. But it is clear that a majority of the Court reaffirmed the *Colorado River* test in *Calvert.* Justice REHNQUIST's opinion commanded only four votes. It was opposed by the dissenting opinion, in which four Justices concluded that the *Calvert* District Court's stay was impermissible under *Colorado River.* 437 U.S., at 668-669, 672-674, 98 S.Ct., at 2560, 2562-63 (BRENNAN, J., dissenting). Justice BLACKMUN, although concurring in the judgment, agreed with the dissent that *Colorado River* 's exceptional-circumstances test was controlling; he voted to remand to permit the District Court to apply the *Colorado River* factors in the first instance. [19] *Id.,* at 667-668, 98 S.Ct., at 2559-60. On remand, the Court of Appeals correctly recognized that the four dissenting Justices and Justice BLACKMUN formed a majority to require application of the *Colorado River* test. *Calvert Fire Insurance Co. v. Will,* 586 F.2d 12 (CA7 1978). [20]

19    Our decision in *Colorado River* came down after the District Court's stay order in *Calvert* but before the Court of Appeals issued its mandamus in that case.

20    On remand from our decision in *Calvert,* the District Court and Court of Appeals concluded that the stay should be continued, but rested that decision on a ground not addressed in the prior Court of Appeals decision (*Calvert Fire Insurance Co. v. Will,* 560 F.2d 792 (CA7 1977)) or in any of this Court's opinions in the case. They concluded that the filing of the federal suit was a "defensive tactical maneuver" based on a contrived federal claim; hence, a stay was called for as "a means to deter vexatious use of the federal courts." The courts also noted that, in the interim, the basis for the plaintiff's assertion of exclusive federal jurisdiction had vanished. *Calvert Fire Insurance Co. v. American Mutual Reinsurance Co.,* 600 F.2d 1228, 1234-1236 (CA7 1979), aff'g 459 F.Supp. 859 (ND Ill.1978). The

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 19 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

case did not come before this Court for review a second time.

The Court of Appeals in this case relied on similar reasoning. It concluded that, despite chronological priority of filing, the Hospital's state-court suit was a contrived, defensive reaction to Mercury's expected claim for relief and for arbitration. 656 F.2d, at 944-945.

The reasoning of the Courts of Appeals in this case and in *Calvert* -that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River* -has considerable merit. We need not rely on such reasoning here, however, for we conclude *infra* that even if the Hospital acted in complete good faith there were no exceptional circumstances warranting the District Court's stay.

**\*\*938**  6   **\*18**  Even on the basis of Justice REHNQUIST's opinion, however, there is an obvious distinction between *Calvert* and this case. The key to *Calvert* was the standard for issuance of a writ of mandamus under 28 U.S.C. § 1651.[21] As Justice REHNQUIST stressed, such extraordinary writs are used in aid of appellate jurisdiction only to confine an inferior court to a lawful exercise of its prescribed authority, or to compel it to exercise its authority when it is its duty to do so. The movant must show that his right to the writ is clear and indisputable. 437 U.S., at 661-662, 664, 665-666, 98 S.Ct., at 2556-57, 2558, 2559 (opinion of REHNQUIST, J.). Justice REHNQUIST concluded that the movant in *Calvert* had failed to meet this burden. At the same time, he noted that the movant might have succeeded on a proper appeal. *Id.,* at 665, 98 S.Ct., at 2558. In this case we have held that the Court of Appeals did have appellate jurisdiction; it properly exercised that jurisdiction to find that the District Court's stay was impermissible under *Colorado River.*

21    The Court of Appeals in *Calvert* had held that it lacked jurisdiction to entertain an ordinary appeal, apparently because a portion of the federal litigation was the subject of exclusive federal jurisdiction and would therefore remain to be disposed of in federal court after the conclusion of state-court proceedings. *Calvert Fire Insurance Co. v. Will,* 560 F.2d 792, 794 (CA7 1977), citing *Cotler v. Inter-County Orthopaedic Assn.,* 526 F.2d 537, 540 (CA3 1975). Cf. *Drexler v. Southwest Dubois School Corp.,* 504 F.2d 836, 838 (CA7 1974) (en banc) (stay of litigation pending exhaustion of state remedies is final under *Idlewild* ). The issue of appellate jurisdiction was not presented to this Court in *Calvert.*

7   The Hospital further contends that *Calvert* requires reversal here because the opinions of Justice REHNQUIST and  **\*19**  Justice BLACKMUN require greater deference to the discretion of the District Court than was given by the Court of Appeals in this case. Under both *Calvert* and *Colorado River,* of course, the decision whether to defer to the state courts is necessarily left to the discretion of the district court in the first instance. Yet to say that the district court has discretion is not to say that its decision is unreviewable; such discretion must be exercised under the relevant standard prescribed by this Court. In this case, the relevant standard is *Colorado River* 's exceptional-circumstances test, as elucidated by the factors discussed in that case. As we shall now explain, we agree with the Court of Appeals that the District Court in this case abused its discretion in granting the stay.

IV

8   Applying the *Colorado River* factors to this case, it is clear that there was no showing of the requisite exceptional circumstances to justify the District Court's stay.

The Hospital concedes that the first two factors mentioned in *Colorado River* are  **\*\*939**  not present here. There was no assumption by either court of jurisdiction over any res or property, nor is there any contention that the federal forum was any less convenient to the parties than the state forum. The remaining factors-avoidance of piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums-far from supporting the stay, actually counsel against it.

A

There is no force here to the consideration that was paramount in *Colorado River* itself-the danger of piecemeal litigation.

9   The Hospital points out that it has two substantive disputes here-one with Mercury, concerning Mercury's claim for delay and impact costs, and the other with the Architect, concerning the Hospital's claim for indemnity for any liability it may have to Mercury. The latter dispute cannot be sent *\*20* to arbitration without the Architect's consent, since there is no arbitration agreement between the Hospital and the Architect. It is true, therefore, that if Mercury obtains an arbitration order for its dispute, the Hospital will be forced to resolve these related disputes in different forums. That misfortune, however, is not the result of any choice between the federal

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 20 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

and state courts; it occurs because the relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement.[22] Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.[23] If the dispute between Mercury and the Hospital *is* arbitrable under the Act, then the Hospital's two disputes will be resolved separately-one in arbitration, and the other (if at all) in state-court litigation. Conversely, if the dispute between Mercury and the Hospital *is not* arbitrable, then both disputes will be resolved in state court. But neither of those two outcomes depends at all on *which court* decides the question of arbitrability. Hence, a decision to allow that issue to be decided in federal rather than state court does not cause piecemeal resolution of the parties' underlying disputes. Although *\*21* the Hospital will have to litigate the arbitrability issue in federal rather than state court, that dispute is easily severable from the merits of the underlying disputes.

22    This provides a sharp contrast with the key statute at issue in *Colorado River* -the McCarran Amendment. There, as we stressed, the primary policy of the statute was the *avoidance* of piecemeal litigation. 424 U.S., at 819-820, 96 S.Ct., at 1247.

23    *E.g., C. Itoh & Co. v. Jordan International Co.,* 552 F.2d 1228, 1231-1232 (CA7 1977); *Acevedo Maldonado v. PPG Industries, Inc.,* 514 F.2d 614, 617 (CA1 1975); *Hamilton Life Insurance Co. v. Republic National Life Insurance Co.,* 408 F.2d 606, 609 (CA2 1969).

      In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket. See generally *Landis v. North American Co.,* 299 U.S. 248, 254-255, 57 S.Ct. 163, 165-66, 81 L.Ed. 153 (1936).

## B

The order in which the concurrent tribunals obtained and exercised jurisdiction cuts against, not for, the District Court's stay in this case. The Hospital argues that the stay was proper because the state-court suit was filed some 19 days before the federal suit. In the first place, this argument disregards the obvious reason for the Hospital's priority in filing. An indispensable element of Mercury's cause of action under § 4 for an arbitration order is the Hospital's refusal to arbitrate.

See n. 27, *infra.* That refusal did not occur until less than a day before the Hospital filed its state suit. Hence, Mercury simply had no reasonable opportunity to file its § 4 petition **\*\*940** first. Moreover, the Hospital succeeded in obtaining an *ex parte* injunction from the state court forbidding Mercury from taking any steps to secure arbitration.[24] Mercury filed its § 4 petition the same day that the injunction was dissolved.[25]

24    Of course we do not mean to say that the state court's injunction could properly have been applied to prevent Mercury from filing or prosecuting a federal lawsuit. See *General Atomic Co. v. Felter,* 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977); *Donovan v. City of Dallas,* 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964). Mercury was not obliged, however, to put itself in danger of contempt sanctions merely in order to cut short the period of the Hospital's priority of filing.

25    See also n. 20, *supra.*

10    That aside, the Hospital's priority argument gives too mechanical a reading to the "priority" element of the *Colorado River* balance. This factor, as with the other *Colorado River* factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. *Colorado River* illustrates *\*22* this point well. There, the federal suit was actually filed first. Nevertheless, we pointed out as a factor favoring dismissal "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss." 424 U.S., at 820, 96 S.Ct., at 1248. Here, the opposite was true. It was the state-court suit in which no substantial proceedings (excepting only the abortive temporary injunction) had taken place at the time of the decision to stay. In the federal suit, by contrast, the parties had taken most of the steps necessary to a resolution of the arbitrability issue.[26] In realistic terms, the federal suit was running well ahead of the state suit at the very time that the District Court decided to refuse to adjudicate the case.

26    Under § 6 of the Arbitration Act, 9 U.S.C. § 6, Mercury's application for a § 4 order was properly treated procedurally as a motion. Mercury submitted affidavits, legal briefs, and documentary evidence in support of the order sought. The Hospital responded with full briefing and extensive evidentiary submissions on the arbitrability issue, and it requested oral argument and a jury trial. At the same time, it made its successful motion for a stay. It is readily apparent that if the District

103 S.Ct. 927, 74 L.Ed.2d 765

Court had denied the stay, it doubtless could and should have gone on to decide the arbitrability point in very short order.

**11** This refusal to proceed was plainly erroneous in view of Congress's clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible. The Act provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4. Both of these sections call for an expeditious and summary hearing, with only restricted inquiry into factual issues. [27] Assuming that the state ***941** court would ***23** have granted prompt relief to Mercury under the Act, [28] there still would have been an inevitable delay as a result of the District Court's stay. The stay thus frustrated the statutory policy of rapid and unobstructed enforcement of arbitration agreements.

27    Section 3 provides that if a suit is brought on the merits of a dispute covered by an arbitration agreement,

"the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.

Section 4 provides that a district court must enter an order to arbitrate "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." If either of these points is in issue, § 4 provides that "the court shall proceed summarily" to a trial on that point. Section 6 further provides that a request for relief under either § 3 or § 4 is to be treated procedurally as a motion. Moreover, the policy of the Arbitration Act requires a liberal reading of arbitration agreements, see *infra,* at 941. As a result, some issues that might be thought relevant to arbitrability are themselves arbitrable—further speeding the procedure under §§ 3 and 4. See, e.g., *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

28    See n. 34, *infra;* but cf. nn. 35-36, *infra.*

**C**

Besides the four factors expressly discussed in *Colorado River,* there is another that emerges from *Calvert* -the fact that federal law provides the rule of decision on the merits. The state-versus-federal-law factor was of ambiguous relevance in *Colorado River.* [29] In *Calvert,* however, both the four-vote dissenting opinion and Justice BLACKMUN's opinion concurring in the judgment pointed out that the case involved issues of federal law. 437 U.S., at 667, 98 S.Ct., at 2559 (BLACKMUN, J., concurring in the judgment); *24 id.,* at 667-668, 98 S.Ct., at 2560-64 (BRENNAN, J., dissenting). See also *Colorado River,* 424 U.S., at 815, n. 21, 96 S.Ct., at 1245, n. 21. It is equally apparent that this case involves federal issues.

29    Although the dissenting Justices in *Colorado River* relied on this point, see 424 U.S., at 825-826, 96 S.Ct., at 1250, the majority concluded that the federal/state law point was not controlling for two reasons. First, there was an affirmative policy in federal law expressly approving litigation of federal water rights in state court-the McCarran Amendment. Second, although the water rights of the United States and the Indian tribes were governed in part by federal law, the bulk of the litigation would necessarily revolve around the state-law water rights of the thousand nonfederal parties in the case-a factor on which we expressly relied in approving the District Court's stay. 424 U.S., at 820, 96 S.Ct., at 1247.

**12**   **13** The basic issue presented in Mercury's federal suit was the arbitrability of the dispute between Mercury and the Hospital. Federal law in the terms of the Arbitration Act governs that issue in either state or federal court. Section 2 is the primary substantive provision of the Act, declaring that a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. [30] Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act. In *Prima Paint Corp. v. Flood & Conklin Mfg. Corp.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), for example, the parties had signed a contract containing an arbitration clause, but one party alleged that there had been fraud in the inducement of the entire contract (although the alleged fraud did not go to the arbitration clause in particular).

103 S.Ct. 927, 74 L.Ed.2d 765

The issue before us was whether the issue of fraud in the inducement was itself an arbitrable controversy. We held that the language and policies of the Act required the conclusion that the fraud issue was arbitrable. *Id.,* at 402-404, 87 S.Ct., at 1805-06. Although our holding in *Prima Paint* extended only to the specific issue presented, the courts of appeals have since consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree. The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues *\*25* should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability. [31]

30 "Maritime transaction" and "commerce" are defined in § 1 of the Arbitration Act, 9 U.S.C. § 1.

31 *E.g., Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638, 643 (CA7 1981); *Wick v. Atlantic Marine, Inc.,* 605 F.2d 166, 168 (CA5 1979); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH,* 585 F.2d 39, 43-45 (CA3 1978); *Hanes Corp. v. Millard,* 174 U.S.App.D.C. 253, 266, 531 F.2d 585, 598 (1976); *Acevedo Maldonado v. PPG Industries, Inc.,* 514 F.2d 614, 616-617 (CA1 1975); *Germany v. River Terminal R. Co.,* 477 F.2d 546, 547 (CA6 1973); *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1211-1212 (CA2 1972); *Hart v. Orion Insurance Co.,* 453 F.2d 1358, 1360-1361 (CA10 1971).

*\*\*942* **14** To be sure, the source-of-law factor has less significance here than in *Calvert,* since the federal courts' jurisdiction to enforce the Arbitration Act is concurrent with that of the state courts. [32] But we emphasize that our task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under *Colorado* *\*26 River* to justify the *surrender* of that jurisdiction. Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender, see n. 29, *supra,* the presence of federal-law issues must always be a major consideration weighing against surrender. [33]

32 See n. 34, *infra.*

The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question

jurisdiction under 28 U.S.C. § 1331 (1976 ed., Supp. IV) or otherwise. Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue. *E.g., Commercial Metals Co. v. Balfour, Guthrie, & Co.,* 577 F.2d 264, 268-269 (CA5 1978), and cases cited. Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence. Nevertheless, although enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate.

We need not address whether a federal court might stay a state-court suit pending arbitration under 28 U.S.C. § 2283.

33 Cf. n. 20, *supra.*

**D**

**15** Finally, in this case an important reason against allowing a stay is the probable inadequacy of the state-court proceeding to protect Mercury's rights. We are not to be understood to impeach the competence or procedures of the North Carolina courts. Moreover, state courts, as much as federal courts, are obliged to grant stays of litigation under § 3 of the Arbitration Act. [34] It is less clear, however, whether the same is true of an order to compel arbitration under § 4 of the Act. [35] We need not resolve that question here; it suffices to say that there was, at a minimum, substantial room for doubt that Mercury could obtain from the state court an order compelling *\*27* the Hospital to arbitrate. [36] In many cases, no doubt, a § 3 stay is quite *\*\*943* adequate to protect the right to arbitration. But in a case such as this, where the party opposing arbitration is the one from whom payment or performance is sought, a stay of litigation alone is not enough. It leaves the recalcitrant party free to sit and do nothing-neither to litigate nor to arbitrate. If the state court stayed litigation pending arbitration but declined to compel the Hospital to arbitrate, Mercury would have no sure way to proceed with its claims except to return to federal court to obtain a § 4 order-a pointless and wasteful burden on the supposedly summary and speedy procedures prescribed by the Arbitration Act.

34 Although § 3 refers ambiguously to a suit "in any of the courts of the United States," the state courts have almost unanimously recognized that the stay provision

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 23 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

of § 3 applies to suits in state as well as federal courts, requiring them to issue the same speedy relief when a dispute is referable to arbitration. (The North Carolina Supreme Court has so held, although not until after the District Court ordered this stay. *Burke County Public Schools Board of Education v. Shaver Partnership,* 303 N.C. 408, 279 S.E.2d 816 (1981).) This is necessary to carry out Congress's intent to mandate enforcement of all covered arbitration agreements; Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court. See also *Prima Paint,* 388 U.S., at 404, 87 S.Ct., at 1806.

35    Section 4, unlike § 3, speaks only of a petition to "any United States district court." Nonetheless, at least one state court has held that § 4 does require state courts to issue § 4 orders to arbitrate where the section's conditions are met. *Main v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 67 Cal.App.3d 19, 24-25, 136 Cal.Rptr. 378, 380-381 (1977).

36    As a historical matter, there was considerable doubt at the time of the District Court's stay that the North Carolina court would have granted even a § 3 stay of litigation. The then-controlling precedent in North Carolina was to the effect that a contract such as that between Mercury and the Hospital was not subject to the Arbitration Act at all, on the reasoning that a construction project is not "commerce" within the meaning of §§ 1 and 2 of the Act. *Burke County Public Schools Board of Education v. Shaver Partnership,* 46 N.C.App. 573, 265 S.E.2d 481 (1980); *Bryant-Durham Electric Co. v. Durham County Hospital Corp.,* 42 N.C.App. 351, 256 S.E.2d 529 (1979). The North Carolina Supreme Court has, however, since repudiated those decisions. *Burke County Public Schools Board of Education v. Shaver Partnership,* 303 N.C. 408, 279 S.E.2d 816 (1981).

**E**

16    The Hospital argues that the *Colorado River* test is somehow inapplicable because in this case the District Court merely stayed the federal litigation rather than dismissing the suit outright, as in *Colorado River.* It contends that Mercury remains free to seek to reopen the federal suit on a showing that the state suit has failed to adjudicate its rights, and that a stay is less onerous than a dismissal. We have already rejected this distinction, for purposes of this case, in

discussing appellate jurisdiction. *Supra,* at 935. We reject it in this context for the same reasons.

*28   We have no occasion in this case to decide whether a dismissal or a stay should ordinarily be the preferred course of action when a district court properly finds that *Colorado River* counsels in favor of deferring to a parallel state-court suit. [37] We can say, however, that a stay is as much a refusal to exercise federal jurisdiction as a dismissal. When a district court decides to dismiss or stay under *Colorado River,* it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all. See *supra,* at Part IV D; *McNeese v. Board of Education,* 373 U.S. 668, 674-676, 83 S.Ct. 1433, 1437-38, 10 L.Ed.2d 622 (1963). Thus, the decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses. See *17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4247, at 517-519 (1978).*

37    This reservation, of course, applies only to cases under *Colorado River.* Cf., *e.g., American Trial Lawyers Assn. v. New Jersey Supreme Court,* 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973) (stay rather than dismissal in *Pullman* abstention).

Moreover, assuming that for some unexpected reason the state forum does turn out to be inadequate in some respect, the Hospital's argument fails to make out any genuine difference between a stay and a dismissal. It is true that Mercury could seek to return to federal court if it proved necessary; but that would be equally true if the District Court had dismissed the case. It is highly questionable whether this Court would have approved a dismissal of a federal suit in *Colorado River* (or in any of the abstention cases, see *supra,* at 936-937) if the federal courts did not remain open to a dismissed plaintiff who later demonstrated the inadequacy of the state forum.

*29   V

In addition to reversing the District Court's stay, the Court of Appeals held that the underlying contractual dispute between **944 Mercury and the Hospital is arbitrable under the Arbitration Act and the terms of the parties' arbitration agreement. It reversed the District Court's judgment and remanded the case "with instructions to proceed in conformity

103 S.Ct. 927, 74 L.Ed.2d 765

herewith." 656 F.2d, at 946. In effect, the Court of Appeals directed the District Court to enter a § 4 order to arbitrate.

**17   18**   In this Court, the Hospital does not contest the substantive correctness of the Court of Appeals's holding on arbitrability. It does raise several objections to the procedures the Court of Appeals used in considering and deciding this case. In particular, it points out that the only issue formally appealed to the Court of Appeals was the propriety of the District Court's stay order. Ordinarily, we would not expect the Court of Appeals to pass on issues not decided in the District Court. In the present case, however, we are not disposed to disturb the Court's discretion in its handling of the case in view of the special interests at stake and the apparent lack of any prejudice to the parties. 28 U.S.C. § 2106 gives a court of appeals some latitude in entering an order to achieve justice in the circumstances. The Arbitration Act calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses. The Court of Appeals had in the record full briefs and evidentiary submissions from both parties on the merits of arbitrability, and held that there were no disputed issues of fact requiring a jury trial before a § 4 order could issue. Under these circumstances, the Court acted within its authority in deciding the legal issues presented in order to facilitate the prompt arbitration that Congress envisaged.

*Affirmed.*

 **\*30**   Justice REHNQUIST, with whom THE CHIEF JUSTICE and Justice O'CONNOR join, dissenting.

In its zeal to provide arbitration for a party it thinks deserving, the Court has made an exception to established rules of procedure. The Court's attempt to cast the District Court's decision as a final judgment fails to do justice to the meaning of the word "final", to the Act of Congress that limits the jurisdiction of the courts of appeals, or to the district judges who administer the laws in the first instance.

If the District Court had not stayed the proceeding, but had set a trial date two months away, there would be no doubt that its order was interlocutory, subject to review only by mandamus or pursuant to 28 U.S.C. § 1292(b). This would be true even though § 4 of the Arbitration Act provides that "the court shall proceed summarily" to trial, because an order setting a trial date only guides the course of litigation, and does not, of its own force, dispose of it on the merits. Such an order is tentative; that is, it is subject to change at any time on the motion of a party or by the court, *sua sponte.*

The order the District Court actually entered is no more final. It delayed further proceedings until the completion of pending litigation in the state courts. This order was also tentative; it was subject to change on a showing that the state proceedings were being delayed, either by the Hospital or by the court, or that the state courts were not applying the federal act, or that some other reason for a change had arisen. This order did not dispose of the case on the merits. If the state court had found that there was no agreement to arbitrate within the meaning of the Federal Arbitration Act, the District Court would have been bound by that finding. But res judicata or collateral estoppel would apply if the state court reached a decision before the District Court in the absence of a stay. The likelihood that a state court of competent jurisdiction may enter a judgment that may determine some issue in a case does not render final a federal district court's decision to take a two day recess, or to order additional   **\*31**   briefing by the parties in five days or five months, or to take a case under advisement rather than render an immediate decision   **\*\*945**   from the bench. Such a possibility did not magically change that character of the order the district judge entered in this case.

Section 1291 of the Judicial Code is a Congressional command to the federal courts of appeals not to interfere with the district courts' management of ongoing proceedings. Unless the high standards for a writ of mandamus can be met, or the district court certifies an interlocutory appeal pursuant to § 1292(b), Congress has directed that the district courts be permitted to conduct their cases as they see fit. The reason for this rule is simple:

> "Since the right to a judgment from more than one court is a matter of grace and not a necessary ingredient of justice, Congress from the very beginning has, by forbidding piecemeal disposition on appeal of what for practical purposes is a single controversy, set itself against enfeebling judicial administration. Thereby is avoided the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment. To be effective, judicial administration must not be leaden-footed. Its momentum would be arrested by permitting separate reviews of the component elements in a unified cause." *Cobbledick v. United States,* 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940) (Frankfurter, J., for a unanimous court).

Case 09-10138-MFW   Doc 5598-4   Filed 06/05/11   Page 25 of 302

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983)

103 S.Ct. 927, 74 L.Ed.2d 765

The Court's decision places an unwarranted limitation upon the power of district courts to control their own cases. The Court's opinion does not establish a broad exception to § 1291, see *ante,* at 934, n. 11, but it does create uncertainty about when a district court order in a pending case can be appealed. This uncertainty gives litigants opportunities to disrupt or delay proceedings by taking colorable appeals from interlocutory *\*32* orders, not only in cases nearly identical to this but in cases which the ingenuity of counsel disappointed by a district court's ruling can analogize to this one. Section 1291 established a policy that district judges should conduct their own cases from beginning to end. The occasional injustice to a litigant that results from an erroneous district court decision is far outweighed by the far greater systemic disruption created by encouraging parties to attempt interlocutory appeals. The former attracts the Court's attention because the legal error it perceives is apparent on the surface of the case. The latter receives inadequate attention because it does not appear in published decisions or in petitions for certiorari. It is, rather, obscured by the "merits" of cases and hidden among statistics on the cost and seeming interminable nature of litigation. Both respect for district judges and concern for the course of litigation generally should make the Court hesitate before creating another exception, however narrow, to § 1291.

The Court has acknowledged the importance of the rule of finality as recently as *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), which rejected the so called "death-knell" exception to § 1291. In *Coopers,* a putative representative plaintiff whose motion for class certification had been denied by the district court sought to appeal under § 1291. We accepted his argument that this order effectively put him out of court, *id.,* at 470, 98 S.Ct., at 2458, but held that this circumstance did not justify an exception to the statute. "[A]llowing appeals of right from non-final orders that turn on the facts of a particular case thrusts appellate courts indiscriminately into the trial process and thus defeats one vital purpose of the final-judgment rule-'that of maintaining the appropriate relationship between the respective courts.... This goal, in the absence of most compelling reasons to the contrary, is very much worth preserving.' " *Id.,* at 476, 98 S.Ct., at 2462 (quoting *Parkinson v. April Industries, Inc.,* 520 F.2d 650, 654 (CA2 1975) (concurring opinion) ).

*\*33* The Court has not given any sound, principled justification for permitting the Court of Appeals to thrust itself into the trial process in this case. It begins by citing *\*\*946*

*Idlewild Liquor Corp. v. Epstein,* 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962). There the District Court had stayed an action challenging the constitutionality of a state statute "to give the state courts an opportunity to pass upon the constitutional issues presented, although there was no relevant litigation then pending in the state courts." *Id.,* at 714, 82 S.Ct., at 1296. This court held that the order was appealable because the plaintiff "was effectively out of court." *Id.,* at 715, n. 2, 82 S.Ct., at 1296, n. 2. *Idlewild* does not control this case.

First, Mercury is less "effectively out of court" than was Idlewild. There was no pending state proceeding that might have resolved the issues in the case, and Idlewild might well have been obliged to take the risk of violating the statute and challenging it in an enforcement proceeding in state court.

More importantly, however, the decision in *Idlewild* cannot be good law after *Coopers, supra.* The Court describes *Coopers* as holding only that the collateral-order doctrine of *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), does not apply to a class decertification order under Fed.R.Civ.P. 23(c)(1). *Ante,* at 935, n. 14. We did not hold that "the collateral-order doctrine is not applicable to" a decertification order. 437 U.S., at 468-469, 98 S.Ct., at 2458. We then went on to reject the argument that the decertification order was final under the so-called "death-knell" doctrine, holding that an order does not become final simply because the plaintiff will be unable to pursue his claim if the order stands. *Id.,* at 469-477, 98 S.Ct., at 2458-62. We declined to attach any importance to the fact that the plaintiff in *Coopers* was just as "effectively out of court" as Idlewild or Mercury. We noted that "if the 'death knell' doctrine has merit, it would apply equally to the many interlocutory orders in ordinary litigation ... that may have such tactical economic significance that a defeat is tantamount to a 'death knell' for the entire case." *Id.,* at 470, 98 S.Ct., at 2459. We also noted that 28 U.S.C. § 1292(b) provides for review *\*34* of certain nonfinal orders, and that the "death knell" doctrine circumvents its restrictions. *Id.,* at 474-475, 98 S.Ct., at 2460-61. By ignoring this discussion and holding from *Coopers,* the Court has created an unjustified exception to § 1291.

The Court also states that the stay order in this case is appealable under *Cohen, supra.* It quotes the formulation of the *Cohen* collateral order doctrine from *Coopers* :

"[T]he order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively

103 S.Ct. 927, 74 L.Ed.2d 765

unreviewable on appeal from a final judgment." 437 U.S., at 468, 98 S.Ct., at 2458, quoted, *ante,* at 935.

The District Court's order did not "conclusively determine the disputed question" for the reasons stated above. The Court's assertion to the contrary, *ante,* at 935, is nothing short of sheer speculation about the state of mind of the District Judge. Such speculation is hardly the "practical rather than ... technical construction" [*] of § 1291 contemplated by *Cohen, supra,* 337 U.S., at 546, 69 S.Ct., at 1225. In *Cohen* itself, the District Court denied the defendant's motion to require the plaintiff to post a bond on the ground that the statute requiring the bond did not apply. That order "conclusively determined" the question whether a bond was required because no conceivable change of circumstances could affect the basis of the District Court's decision. In this case, any number of plausible events might have convinced the District Court that a necessary basis of its decision-that the state court would proceed promptly and fairly to adjudicate the issue **947 of the existence of an agreement to arbitrate-no longer applied.

> [*]    As a practical matter, it is not at all clear to me that the Court of Appeals's course would have provided arbitration more quickly than that of the District Court, even if this Court had not granted certiorari. If the Court of Appeals was correct that this dispute is plainly arbitrable, there is no reason to expect that the state courts would not have resolved that issue in the 11 months during which the case was before the Court of Appeals.

*35  Furthermore, I am not as certain as is the Court that by staying this case the District Court resolved "an important issue." An issue should not be deemed "important" for these purposes simply because the court of appeals or this Court thinks the appellant should prevail. The issue here was whether the factual question whether there was an agreement to arbitrate should be adjudicated in a state or federal court. Unless there is some reason to believe that the state court will resolve this factual question wrongly, which the Court quite rightly disclaims, *ante,* at 942, I do not see how this issue is more important than any other interlocutory order that may place a litigant at a procedural disadvantage.

For these reasons, I do not believe the District Court's order was appealable. Interlocutory orders are committed by statute to the judgment of the District Courts, and this Court ill-serves the judges of those courts and the overwhelming majority of litigants by devising exceptions to the statute when it believes a particular litigant has been wronged.

Given my view of appealability, I do not find it necessary to decide whether the District Court's order was proper in this case. I am disturbed, however, that the Court has sanctioned an extraordinary departure from the usual and accepted course of judicial proceedings by affirming the Court of Appeals decision on an issue that was not decided in the District Court.

The Court of Appeals ordered the District Court to enter an order compelling arbitration, even though that issue was not considered by the District Court. This Court has maintained the difference between appellate jurisdiction and original jurisdiction at least since *Marbury v. Madison,* 1 Cranch 137, 174-176, 2 L.Ed. 60 (1803) ("It is the essential criterion of appellate jurisdiction that it revises and corrects the proceedings in a case already instituted."). I do not understand how the Court can say that the Court of Appeals had discretion to perform a non-appellate act.

*36  The Court relies on 28 U.S.C. § 2106, which provides that a court of appeals:

> "may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the case and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

This statute does not grant the courts of appeals authority to constitute themselves as trial courts. Section 4 of the Arbitration Act gives the Hospital a right to a jury trial. See *ante,* at 940, n. 27. By deciding that there were no disputed issues of fact, the Court of Appeals seems to have decided a motion for summary judgment that was not before it. This is the kind of issue that district judges decide every day in the ordinary course of business. It is not the kind of issue that Courts of Appeals determine. The Court of Appeals did have before it the memoranda filed in the District Court but, contrary to the Court's intimation, *ante,* at 943, this issue was not argued in the Court of Appeals. See 656 F.2d 933, 948, n. 1 (Hall, J., dissenting) ("No one argued that this court should decide that issue.").

There was no reason to believe that the District Court would not have acted promptly to resolve the dispute on the merits after being reversed on the stay. That judges of a court of appeals believe they know how a case should be decided is no reason for them to substitute their own judgment for that of a district judge without regard to the normal course of appellate procedure.

103 S.Ct. 927, 74 L.Ed.2d 765

The judgment below should be vacated and the case remanded to the Court of Appeals with directions to dismiss the appeal for want of jurisdiction. Failing that, even if the Court is correct that the stay order was an error, the judgment should be reversed, insofar as it decides the question of arbitrability, and remanded to the district court for further proceedings under the Arbitration Act.

Parallel Citations

103 S.Ct. 927, 74 L.Ed.2d 765

**End of Document**                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 17

DOCSTOR: 2191401\1

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

130 S.Ct. 1758
Supreme Court of the United States

STOLT-NIELSEN S.A. et al., Petitioners,

v.

ANIMALFEEDS INTERNATIONAL CORP.

No. 08-1198.    Argued Dec. 9,
2009.    Decided April 27, 2010.

**Synopsis**

**Background:** In consolidated actions, owners of parcel tankers moved to vacate arbitration award imposing class arbitration on charterers' class antitrust claims. The United States District Court for the Southern District of New York, Jed S. Rakoff, J., 435 F.Supp.2d 382, vacated the arbitration award, and charterer appealed. The United States Court of Appeals for the Second Circuit, Sack, Circuit Judge, 548 F.3d 85, reversed and remanded with instructions to deny the petition to vacate. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Alito, held that:

1 challenge to arbitration award was ripe for judicial review;

2 arbitration panel exceeded its powers under the Federal Arbitration Act (FAA) by imposing its policy choice;

3 vessel owners did not waive challenge to arbitration panel's award; and

4 the parties could not be compelled to submit antitrust claims to class arbitration.

Reversed and remanded.

Justice Ginsburg filed a dissenting opinion in which Justice Stevens and Justice Breyer joined.

Justice Sotomayor took no part in the consideration or decision of the case.

West Headnotes (24)

**1    Shipping** 🔑 Arbitration of controversies

Question of whether arbitration panel's award imposing class arbitration on charterers and vessel owners, whose arbitration clauses were "silent" on that issue, was consistent with the Federal Arbitration Act (FAA) was ripe for judicial review; the panel's award meant that owners had to submit to class determination

proceedings before arbitrators who, if owners were correct, had no authority to require class arbitration absent the parties' agreement to resolve their disputes on that basis, and should owners refuse to proceed with what they maintained was essentially an ultra vires proceeding, they would almost certainly be subject to a petition to compel arbitration under the FAA. 9 U.S.C.A. § 1 et seq.

19 Cases that cite this headnote

**2    Federal Courts** 🔑 Questions not presented below or in petition for certiorari

Argument that the question on which certiorari was granted, namely whether arbitration panel's award imposing class arbitration on charterers and vessel owners, whose arbitration clauses were "silent" on that issue, was consistent with the Federal Arbitration Act (FAA), was prudentially unripe was waived before the Supreme Court, where argument was not pressed in, or considered by, the courts below. 9 U.S.C.A. § 1 et seq.

15 Cases that cite this headnote

**3    Federal Courts** 🔑 Case or Controversy Requirement

"Ripeness" reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction.

3 Cases that cite this headnote

**4    Administrative Law and Procedure** 🔑 Finality; ripeness

In evaluating a claim to determine whether it is ripe for judicial review, Supreme Court considers both the fitness of the issues for judicial decision and the hardship of withholding court consideration.

4 Cases that cite this headnote

**5    Alternative Dispute Resolution** 🔑 Mistake or Error

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

**Alternative Dispute Resolution** 🔑 Grounds
for Impeachment or Vacation

In order to obtain relief vacating decision of
arbitration panel, a party must clear a high hurdle,
and it is not enough for the party to show that the
panel committed an error, or even a serious error.
9 U.S.C.A. § 1 et seq.

26 Cases that cite this headnote

**6**    **Alternative Dispute
Resolution** 🔑 Consistency and
reasonableness; lack of evidence

It is only when an arbitrator strays from
interpretation and application of the agreement
and effectively dispenses his own brand of
industrial justice that his decision may be
unenforceable under the Federal Arbitration Act
(FAA). 9 U.S.C.A. § 10(a)(4).

11 Cases that cite this headnote

**7**    **Alternative Dispute Resolution** 🔑 Nature and
Extent of Authority

The task of an arbitrator is to interpret and enforce
a contract, not to make public policy. 9 U.S.C.A.
§ 1 et seq.

2 Cases that cite this headnote

**8**    **Shipping** 🔑 Arbitration of controversies

Arbitration panel exceeded its powers under the
Federal Arbitration Act (FAA) by imposing its
own policy choice in concluding that arbitration
clauses in charter party agreements between
charterers and vessel owners allowed for class
arbitration of charterers' antitrust claims, despite
the fact that the clauses were silent as to class
arbitration; rather than inquiring whether the
FAA, maritime law, or New York law contained
a default rule under which an arbitration
clause would be construed as allowing class
arbitration in the absence of express consent, the
panel perceived an emerging consensus among
arbitrators that class arbitration was beneficial in
a wide variety of settings, and the panel then
considered only whether there was any good

reason not to follow that consensus in this dispute.
9 U.S.C.A. § 10(a)(4).

17 Cases that cite this headnote

**9**    **Customs and Usages** 🔑 Explanation of
Contract

Under both New York law and general maritime
law, evidence of custom and usage is relevant to
determining the parties' intent when an express
agreement is ambiguous.

**10**    **Shipping** 🔑 Arbitration of controversies

Vessel owners, who sought to overturn arbitration
panel's award imposing class arbitration on
antitrust claims brought against them by
charterers, did not waive, in the parties'
supplemental agreement, any claim that the
arbitrators could not construe the arbitration
agreement to permit class arbitration, where the
supplemental agreement expressly provided that
it did not alter the scope of the parties' arbitration
agreements in any charter party agreement, and it
provided that neither the supplemental agreement
itself, nor any of its terms, could be used to
support or oppose any argument in favor of
a class action arbitration, and nothing in the
supplemental agreement conferred authority on
the arbitrators to exceed the terms of the charter
party agreements. 9 U.S.C.A. § 1 et seq.

11 Cases that cite this headnote

**11**    **Alternative Dispute
Resolution** 🔑 Construction

Courts are obliged to enforce the parties'
agreement to arbitrate according to its terms. 9
U.S.C.A. § 1 et seq.

1 Cases that cite this headnote

**12**    **Federal Courts** 🔑 Arbitration

While the interpretation of an arbitration
agreement is generally a matter of state law, the
Federal Arbitration Act (FAA) imposes certain
rules of fundamental importance, including the

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

basic precept that arbitration is a matter of consent, not coercion. 9 U.S.C.A. § 1 et seq.

9 Cases that cite this headnote

**13**  **Alternative Dispute Resolution**  Constitutional and statutory provisions and rules of court

The central or primary purpose of the Federal Arbitration Act (FAA) is to ensure that private agreements to arbitrate are enforced according to their terms. 9 U.S.C.A. § 1 et seq.

11 Cases that cite this headnote

**14**  **Alternative Dispute Resolution**  Construction

**Contracts**  Intention of Parties

Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties, and in this endeavor, as with any other contract, the parties' intentions control. 9 U.S.C.A. § 1 et seq.

7 Cases that cite this headnote

**15**  **Alternative Dispute Resolution**  Agreement or submission as determinative

An arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution. 9 U.S.C.A. § 1 et seq.

**16**  **Alternative Dispute Resolution**  Contractual or consensual basis

Parties may specify with whom they choose to arbitrate their disputes. 9 U.S.C.A. § 1 et seq.

1 Cases that cite this headnote

**17**  **Alternative Dispute Resolution**  Construction

**Alternative Dispute Resolution**  Disputes and Matters Arbitrable Under Agreement

It falls to courts and arbitrators to give effect to the parties' contractual limitations on arbitration, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties. 9 U.S.C.A. § 1 et seq.

3 Cases that cite this headnote

**18**  **Shipping**  Arbitration of controversies

Charterer and vessel owners could not be compelled to submit charterer's class action antitrust claims to class arbitration, where the charterers and owners had not reached an agreement on class arbitration, and the arbitration clauses in their charter party agreements were silent on the question of class arbitration. 9 U.S.C.A. § 1 et seq.

21 Cases that cite this headnote

**19**  **Alternative Dispute Resolution**  Contractual or consensual basis

A party may not be compelled under the Federal Arbitration Act (FAA) to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so. 9 U.S.C.A. § 1 et seq.

30 Cases that cite this headnote

**20**  **Alternative Dispute Resolution**  Contractual or consensual basis

The foundational Federal Arbitration Act (FAA) principle is that arbitration is a matter of consent. 9 U.S.C.A. § 1 et seq.

13 Cases that cite this headnote

**21**  **Alternative Dispute Resolution**  Construction

In certain contexts, it is appropriate under the Federal Arbitration Act (FAA) to presume that parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement; this recognition is grounded in the background principle that when the parties

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 32 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)
2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court. 9 U.S.C.A. § 1 et seq.; Restatement (Second) of Contracts § 204.

10 Cases that cite this headnote

**22    Alternative Dispute Resolution** 🔑 Construction

Under the Federal Arbitration Act (FAA), an implicit agreement to authorize class-action arbitration is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate, because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator, and the relative benefits of class-action arbitration are much less assured than the benefits of bilateral arbitration, giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration. 9 U.S.C.A. § 1 et seq.

41 Cases that cite this headnote

**23    Alternative Dispute Resolution** 🔑 Nature, purpose, and right to arbitration in general

In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. 9 U.S.C.A. § 1 et seq.

3 Cases that cite this headnote

**24    Alternative Dispute Resolution** 🔑 Construction

The differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the Federal Arbitration Act (FAA), that the parties' mere silence on the issue of class-

action arbitration constitutes consent to resolve their disputes in class proceedings. 9 U.S.C.A. § 1 et seq.

6 Cases that cite this headnote

### *1761  Syllabus *

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Petitioner shipping companies serve much of the world market for parcel tankers-seagoing vessels with compartments that are separately chartered to customers, such as respondent (AnimalFeeds), who wish to ship liquids in small quantities. AnimalFeeds ships its goods pursuant to a standard contract known in the maritime trade as a charter party. The charter party that AnimalFeeds uses contains an arbitration clause. AnimalFeeds brought a class action antitrust suit against petitioners for price fixing, and that suit was consolidated with similar suits brought by other charterers, including one in which the Second Circuit subsequently reversed a lower court ruling that the charterers' claims were not subject to arbitration. As a consequence, the parties in this case agree that they must arbitrate their antitrust dispute. AnimalFeeds sought arbitration on behalf of a class of purchasers of parcel tanker transportation services. The parties agreed to submit the question whether their arbitration agreement allowed for class arbitration to a panel of arbitrators, who would be bound by rules (Class Rules) developed by the American Arbitration Association following *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414. One Class Rule requires an arbitrator to determine whether an arbitration clause permits class arbitration. The parties selected an arbitration panel, designated New York City as the arbitration site, and stipulated that their arbitration clause was "silent" on the class arbitration issue. The panel determined that the arbitration clause allowed for class arbitration, but the District Court vacated the award. It concluded that the arbitrators' award was made in "manifest disregard" of the law, for had the arbitrators conducted a choice-of-law analysis, they would have applied the rule of federal maritime law requiring contracts to be interpreted in light of custom and usage.

The Second Circuit reversed, holding that because petitioners had cited no authority applying a maritime rule of custom and usage *against* class arbitration, the arbitrators' decision was not in manifest disregard of maritime law; and that the arbitrators had not manifestly **\*1762** disregarded New York law, which had not established a rule against class arbitration.

*Held:*  Imposing class arbitration on parties who have not agreed to authorize class arbitration is inconsistent with the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*  Pp. ---- - ----.

(a) The arbitration panel exceeded its powers by imposing its own policy choice instead of identifying and applying a rule of decision derived from the FAA or from maritime or New York law. Pp. ---- - ----.

(1) An arbitration decision may be vacated under FAA § 10(a)(4) on the ground that the arbitrator exceeded his powers, "only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice,' " *Major League Baseball Players Assn. v. Garvey,* 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 *(per curiam),* for an arbitrator's task is to interpret and enforce a contract, not to make public policy. P. ----.

(2) The arbitration panel appears to have rested its decision on AnimalFeeds' public policy argument for permitting class arbitration under the charter party's arbitration clause. However, because the parties agreed that their agreement was "silent" on the class arbitration issue, the arbitrators' proper task was to identify the rule of law governing in that situation. Instead, the panel based its decision on post-*Bazzle* arbitral decisions without mentioning whether they were based on a rule derived from the FAA or on maritime or New York law. Rather than inquiring whether those bodies of law contained a "default rule" permitting an arbitration clause to allow class arbitration absent express consent, the panel proceeded as if it had a common-law court's authority to develop what it viewed as the best rule for such a situation. Finding no reason to depart from its perception of a post-*Bazzle* consensus among arbitrators that class arbitration was beneficial in numerous settings, the panel simply imposed its own conception of sound policy and permitted class arbitration. The panel's few references to intent do not show that the panel did anything other than impose its own policy preference. Thus, under FAA § 10(b), this Court must either "direct a rehearing by the arbitrators" or decide the question originally referred to the panel. Because there can be only one possible outcome

on the facts here, there is no need to direct a rehearing by the arbitrators. Pp. ---- - ----.

(b) *Bazzle* did not control resolution of the question whether the instant charter party permits arbitration to proceed on behalf of this class. Pp. ---- - ----.

(1) No single rationale commanded a majority in *Bazzle,* which concerned contracts between a commercial lender and its customers that had an arbitration clause that did not expressly mention class arbitration. The plurality decided only the question whether the court or arbitrator should decide whether the contracts were "silent" on the class arbitration issue, concluding that it was the arbitrator. Justice STEVENS' opinion bypassed that question, resting instead on his resolution of the questions of what standard the appropriate decisionmaker should apply in determining whether a contract allows class arbitration, and whether, under whatever standard is appropriate, class arbitration had been properly ordered in the case at hand. Pp. ---- - ----.

(2) The *Bazzle* opinions appear to have baffled these parties at their arbitration proceeding. For one thing, the parties appear to have believed that *Bazzle* requires an arbitrator, not a court, to decide whether a contract permits class arbitration, **\*1763** a question addressed only by the plurality. That question need not be revisited here because the parties expressly assigned that issue to the arbitration panel, and no party argues that this assignment was impermissible. Both the parties and the arbitration panel also seem to have misunderstood *Bazzle* as establishing the standard to be applied in deciding whether class arbitration is permitted. However, *Bazzle* left that question open. Pp. ---- - ----.

(c) Imposing class arbitration here is inconsistent with the FAA. Pp. ---- - ----.

(1) The FAA imposes rules of fundamental importance, including the basic precept that arbitration "is a matter of consent, not coercion." *Volt v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488. The FAA requires that a "written provision in any maritime transaction" calling for the arbitration of a controversy arising out of such transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and permits a party to an arbitration agreement to petition a federal district court for an order directing that arbitration proceed "in the manner provided for in such agreement," § 4. Thus, this Court has said that the FAA's central purpose is to ensure that "private agreements to

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

arbitrate are enforced according to their terms." *Volt,* 489 U.S., at 479, 109 S.Ct. 1248. Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must "give effect to the [parties'] contractual rights and expectations." *Ibid.* The parties' "intentions control," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444, and the parties are "generally free to structure their arbitration agreements as they see fit," *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76. They may agree to limit the issues arbitrated and may agree on rules under which an arbitration will proceed. They may also specify *with whom* they choose to arbitrate their disputes. See *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755. Pp. ---- - ----.

(2) It follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so. Here, the arbitration panel imposed class arbitration despite the parties' stipulation that they had reached "no agreement" on that issue. The panel's conclusion is fundamentally at war with the foundational FAA principle that arbitration is a matter of consent. It may be appropriate to presume that parties to an arbitration agreement implicitly authorize the arbitrator to adopt those procedures necessary to give effect to the parties' agreement. See *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491. But an implicit agreement to authorize class action arbitration is not a term that the arbitrator may infer solely from the fact of an agreement to arbitrate. The differences between simple bilateral and complex class action arbitration are too great for such a presumption. Pp. ---- - ----.

548 F.3d 85, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS and BREYER, JJ., joined. SOTOMAYOR, J., took no part in the consideration or decision of the case.

Attorneys and Law Firms

*1764 Seth P. Waxman, Washington, DC, for petitioners. Cornelia T.L. Pillard, Washington, DC, for respondent. Christopher M. Curran, J. Mark Gidley, Peter J. Carney, Eric Grannon, Charles C. Moore, White & Case LLP, Washington, DC, for Stolt-Nielsen petitioners.

Seth P. Waxman, Counsel of Record, Edward C. DuMont, Steven F. Cherry, Leon B. Greenfield, Christopher E. Babbitt,

Daniel S. Volchok, Francesco Valentini, Wilmer Cutler Pickering, Hale and Dorr LLP, Washington, DC, for Odfjell petitioners.

Richard J. Rappaport, Amy B. Manning, Tammy L. Adkins, Angelo M. Russo, McGuireWoods LLP, Chicago, IL, Richard L. Jarashow, McGuireWoods LLP, New York, NY, for Jo Tankers petitioners.

Richard C. Siefert, Garvey Schubert Barer, Seattle, WA, Richard D. Gluck, Paul S. Hoff, Garvey Schubert Barer, Washington, DC, for petitioner Tokyo Marine Co., Ltd.

Bernard Persky, Kellie Lerner, Labaton Sucharow LLP, New York, NY, Cornelia T.L. Pillard, Counsel of Record, c/o Georgetown University Law Center, Washington, DC, J. Douglas Richards, Benjamin D. Brown, Christopher J. Cormier, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Michael J. Freed, Steven A. Kanner, William H. London, Michael E. Moskovitz, Freed Kanner London & Millen LLC, Bannockburn, IL, Michael D. Hausfeld, Hilary K. Ratway, Hausfeld LLP, Washington, DC, Solomon B. Cera, Thomas C. Bright, Gold Bennett Cera & Sidener LLP, San Francisco, CA, W. Joseph Bruckner, Lockridge Grindal Nauen PLLP, Minneapolis, MN, Aaron F. Biber Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, for respondent.

Opinion

Justice ALITO delivered the opinion of the Court.

We granted certiorari in this case to decide whether imposing class arbitration on parties whose arbitration clauses are "silent" on that issue is consistent with the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*

I

A

Petitioners are shipping companies that serve a large share of the world market for parcel tankers-seagoing vessels with compartments that are separately chartered to customers wishing to ship liquids in small quantities. One of those customers is AnimalFeeds International Corp. (hereinafter AnimalFeeds), which supplies raw ingredients, such as fish oil, to animal-feed producers around the world. AnimalFeeds ships its goods pursuant to a standard contract known in the maritime trade as a charter party. [1] Numerous charter parties are in regular use, and the charter party that AnimalFeeds uses is known as the "Vegoilvoy" charter party. Petitioners assert, without contradiction, that charterers like AnimalFeeds, or

their agents-not the shipowners-typically select the particular *1765 charter party that governs their shipments. Accord, Trowbridge, Admiralty Law Institute: Symposium on Charter Parties: The History, Development, and Characteristics of the Charter Concept, 49 Tulane L.Rev. 743, 753 (1975) ("Voyage charter parties are highly standardized, with many commodities and charterers having their own specialized forms").

1    "[C]harter parties are commonly drafted using highly standardized forms specific to the particular trades and business needs of the parties." Comment, A Comparative Analysis of Charter Party Agreements "Subject to" Respective American and British Laws and Decisions ... It's All in the Details, 26 Tulane Mar. L.J. 291, 294 (2001-2002); see also 2 T. Schoenbaum, Admiralty and Maritime Law § 11-1, p. 200 (3d ed.2001).

Adopted in 1950, the Vegoilvoy charter party contains the following arbitration clause:

"Arbitration. Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act [i.e., the FAA], and a judgment of the Court shall be entered upon any award made by said arbitrator." App. to Pet. for Cert. 69a.

In 2003, a Department of Justice criminal investigation revealed that petitioners were engaging in an illegal price-fixing conspiracy. When AnimalFeeds learned of this, it brought a putative class action against petitioners in the District Court for the Eastern District of Pennsylvania, asserting antitrust claims for supracompetitive prices that petitioners allegedly charged their customers over a period of several years.

Other charterers brought similar suits. In one of these, the District Court for the District of Connecticut held that the charterers' claims were not subject to arbitration under the applicable arbitration clause, but the Second Circuit reversed. See JLM Industries, Inc. v. Stolt-Nielsen S.A., 387 F.3d 163, 183 (2004). While that appeal was pending, the Judicial Panel on Multidistrict Litigation ordered the consolidation of then-pending actions against petitioners, including AnimalFeeds'

action, in the District of Connecticut. See In re Parcel Tanker Shipping Services Antitrust Litigation, 296 F.Supp.2d 1370, 1371, and n. 1 (JPML 2003). The parties agree that as a consequence of these judgments and orders, AnimalFeeds and petitioners must arbitrate their antitrust dispute.

**B**

In 2005, AnimalFeeds served petitioners with a demand for class arbitration, designating New York City as the place of arbitration and seeking to represent a class of "[a]ll direct purchasers of parcel tanker transportation services globally for bulk liquid chemicals, edible oils, acids, and other specialty liquids from [petitioners] at any time during the period from August 1, 1998, to November 30, 2002." 548 F.3d 85, 87 (C.A.2 2008) (internal quotation marks omitted). The parties entered into a supplemental agreement providing for the question of class arbitration to be submitted to a panel of three arbitrators who were to "follow and be bound by Rules 3 through 7 of the American Arbitration Association's Supplementary Rules for Class Arbitrations (as effective Oct. 8, 2003)." App. to Pet. for Cert. 59a. These rules (hereinafter Class Rules) were developed by the American Arbitration Association (AAA) after our decision in Green Tree Financial Corp. v. Bazzle, 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), and Class Rule 3, in accordance with the plurality opinion in that case, requires an arbitrator, as a threshold matter, to determine "whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class." App. 56a.

*1766 The parties selected a panel of arbitrators and stipulated that the arbitration clause was "silent" with respect to class arbitration. Counsel for AnimalFeeds explained to the arbitration panel that the term "silent" did not simply mean that the clause made no express reference to class arbitration. Rather, he said, "[a]ll the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue." Id., at 77a.

After hearing argument and evidence, including testimony from petitioners' experts regarding arbitration customs and usage in the maritime trade, the arbitrators concluded that the arbitration clause allowed for class arbitration. They found persuasive the fact that other arbitrators ruling after Bazzle had construed "a wide variety of clauses in a wide variety of settings as allowing for class arbitration," but the panel acknowledged that none of these decisions was "exactly comparable" to the present dispute. See App. to Pet. for Cert. 49a-50a. Petitioners' expert evidence did not

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 36 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

show an "inten[t] to preclude class arbitration," the arbitrators reasoned, and petitioners' argument would leave "no basis for a class action absent express agreement among all parties and the putative class members." *Id.,* at 51a.

The arbitrators stayed the proceeding to allow the parties to seek judicial review, and petitioners filed an application to vacate the arbitrators' award in the District Court for the Southern District of New York. See 9 U.S.C. § 10(a)(4) (authorizing a district court to "make an order vacating the award upon the application of any party to the arbitration ... where the arbitrators exceeded their powers"); Petition to Vacate Arbitration Award, No. 1:06-CV-00420-JSR (SDNY) in App. in No. 06-3474-cv (CA2), p. A-17, ¶ 16 (citing § 10(a)(4) as a ground for vacatur of the award); see also *id.,* at A-15 to A-16, ¶ 9 (invoking the District Court's jurisdiction under 9 U.S.C. § 203 and 28 U.S.C. §§ 1331 and 1333). The District Court vacated the award, concluding that the arbitrators' decision was made in "manifest disregard" of the law insofar as the arbitrators failed to conduct a choice-of-law analysis. 435 F.Supp.2d 382, 384-385 (S.D.N.Y.2006). See *Wilko v. Swan,* 346 U.S. 427, 436-437, 74 S.Ct. 182, 98 L.Ed. 168 (1953) ("[T]he interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation"); see also Petition to Vacate Arbitration Award, *supra,* at A-17, ¶ 17 (alleging that the arbitration panel "manifestly disregarded the law"). Had such an analysis been conducted, the District Court held, the arbitrators would have applied the rule of federal maritime law requiring that contracts be interpreted in light of custom and usage. 435 F.Supp.2d, at 385-386.

AnimalFeeds appealed to the Court of Appeals, which reversed. See 9 U.S.C. § 16(a)(1)(E) ("An appeal may be taken from ... an order ... vacating an award"). As an initial matter, the Court of Appeals held that the "manifest disregard" standard survived our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), as a "judicial gloss" on the enumerated grounds for vacatur of arbitration awards under 9 U.S.C. § 10. 548 F.3d, at 94. Nonetheless, the Court of Appeals concluded that, because petitioners had cited no authority applying a federal maritime rule of custom and usage *against* class arbitration, the arbitrators' decision was not in manifest disregard of federal maritime law. *Id.,* at 97-98. Nor had the arbitrators manifestly disregarded New York law, the Court of Appeals continued, since nothing in New York case law *\*1767* established a rule against class arbitration. *Id.,* at 98-99.

1  2  3  4   We granted certiorari. 557 U.S. ----, 129 S.Ct. 2793, 174 L.Ed.2d 289 (2009). [2]

2    Invoking an argument not pressed in or considered by the courts below, the dissent concludes that the question presented is not ripe for our review. See *post,* at ----, ---- - ---- (opinion of GINSBURG, J.). In so doing, the dissent offers no clear justification for now embracing an argument "we necessarily considered and rejected" in granting certiorari. *United States v. Williams,* 504 U.S. 36, 40, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). Ripeness reflects constitutional considerations that implicate "Article III limitations on judicial power," as well as "prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 57, n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). In evaluating a claim to determine whether it is ripe for judicial review, we consider both "the fitness of the issues for judicial decision" and "the hardship of withholding court consideration." *National Park Hospitality Assn. v. Department of Interior,* 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). To the extent the dissent believes that the question on which we granted certiorari is constitutionally unripe for review, we disagree. The arbitration panel's award means that petitioners must now submit to class determination proceedings before arbitrators who, if petitioners are correct, have no authority to require class arbitration absent the parties' agreement to resolve their disputes on that basis. See Class Rule 4(a) (cited in App. 57a); Brief for American Arbitration Association as *Amicus Curiae* 17. Should petitioners refuse to proceed with what they maintain is essentially an ultra vires proceeding, they would almost certainly be subject to a petition to compel arbitration under 9 U.S.C. § 4. Cf. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect"). We think it is clear on these facts that petitioners have demonstrated sufficient hardship, and that their question is fit for our review at this time. To the extent the dissent believes that the question is prudentially unripe, we reject that argument as waived, *Sprietsma v. Mercury Marine,* 537 U.S. 51, 56, n. 4, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002), and we see no reason to disregard the waiver. We express no view as to whether, in a similar case, a federal court may consider a question of prudential ripeness on its own motion. See *National Park Hospitality Assn., supra,* at 808, 123 S.Ct. 2026

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 37 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

("[E]ven in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion").

## II

### A

**5    6    7**    Petitioners contend that the decision of the arbitration panel must be vacated, but in order to obtain that relief, they must clear a high hurdle. It is not enough for petitioners to show that the panel committed an error-or even a serious error. See *Eastern Associated Coal Corp. v. Mine Workers,* 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000); *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Major League Baseball Players Assn. v. Garvey,* 532 U.S. 504, 509, 1015, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) *(per curiam)* (quoting *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). In that situation, an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator "exceeded [his] powers," for the task of an arbitrator is to interpret and enforce a contract, not to make public policy. In this case, we must conclude that what the arbitration panel did was simply to impose its own view of sound ***\*1768*** policy regarding class arbitration.[3]

3    We do not decide whether " 'manifest disregard' " survives our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 585, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10. AnimalFeeds characterizes that standard as requiring a showing that the arbitrators "knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." Brief for Respondent 25 (internal quotation marks omitted). Assuming, *arguendo,* that such a standard applies, we find it satisfied for the reasons that follow.

### B

### 1

**8**    In its memorandum of law filed in the arbitration proceedings, AnimalFeeds made three arguments in support of construing the arbitration clause to permit class arbitration:

"The parties' arbitration clause should be construed to allow class arbitration because (a) the clause is silent on the issue of class treatment and, without express prohibition, class arbitration is permitted under *Bazzle*; *(b) the clause should be construed to permit class arbitration as a matter of public policy*; and (c) the clause would be unconscionable and unenforceable if it forbade class arbitration." App. in No. 06-3474-cv (CA2), at A-308 to A-309 (emphasis added).

The arbitrators expressly rejected AnimalFeeds' first argument, see App. to Pet. for Cert. 49a, and said nothing about the third. Instead, the panel appears to have rested its decision on AnimalFeeds' public policy argument. Because the parties agreed their agreement was "silent" in the sense that they had not reached any agreement on the issue of class arbitration, the arbitrators' proper task was to identify the rule of law that governs in that situation. Had they engaged in that undertaking, they presumably would have looked either to the FAA itself or to one of the two bodies of law that the parties claimed were governing, *i.e.,* either federal maritime law or New York law. But the panel did not consider whether the FAA provides the rule of decision in such a situation; nor did the panel attempt to determine what rule would govern under either maritime or New York law in the case of a "silent" contract. Instead, the panel based its decision on post-*Bazzle* arbitral decisions that "construed a wide variety of clauses in a wide variety of settings as allowing for class arbitration." App. to Pet. for Cert. 49a-50a. The panel did not mention whether any of these decisions were based on a rule derived from the FAA or on maritime or New York law.[4]

4    The panel's reliance on these arbitral awards confirms that the panel's decision was not based on a determination regarding the parties' intent. All of the arbitral awards were made under the AAA's Class Rules, which were adopted in 2003, and thus none was available when the parties here entered into the Vegoilvoy charter party during the class period ranging from 1998 to 2002. See 548 F.3d 85, 87 (C.A.2 2008) (defining the class period). Indeed, at the hearing before the panel, counsel for AnimalFeeds conceded that "[w]hen you talk about expectations, virtually every one of the arbitration clauses that were the

Case 09-10138-MFW   Doc 5598-4   Filed 06/05/11   Page 38 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

subject of the 25 AAA decisions were drafted before *[Bazzle].* So therefore, if you are going to talk about the parties' intentions, pre-*[Bazzle]* class arbitrations were not common, post *[Bazzle]* they are common." App. 87a. Moreover, in its award, the panel appeared to acknowledge that none of the cited arbitration awards involved a contract between sophisticated business entities. See App. to Pet. for Cert. 50a.

**9**   Rather than inquiring whether the FAA, maritime law, or New York law contains ***1769*** a "default rule" under which an arbitration clause is construed as allowing class arbitration in the absence of express consent, the panel proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation. Perceiving a post-*Bazzle* consensus among arbitrators that class arbitration is beneficial in "a wide variety of settings," the panel considered only whether there was any good reason not to follow that consensus in this case. App. to Pet. for Cert. 49a-50a. The panel was not persuaded by "court cases denying consolidation of arbitrations,"[5] by undisputed evidence that the Vegoilvoy charter party had "never been the basis of a class action," or by expert opinion that "sophisticated, multinational commercial parties of the type that are sought to be included in the class would never intend that the arbitration clauses would permit a class arbitration."[6] *Id.,* at 50a-51a. Accordingly, finding no convincing ground for departing from the post-*Bazzle* arbitral consensus, the panel held that class arbitration was permitted in this case. App. to Pet. for Cert. 52a. The conclusion is inescapable that the panel simply imposed its own conception of sound policy.[7]

5    See *Government of United Kingdom v. Boeing Co.,* 998 F.2d 68, 71, 74 (C.A.2 1993); see also *Glencore, Ltd. v. Schnitzer Steel Prods. Co.,* 189 F.3d 264, 268 (C.A.2 1999); *Champ v. Siegel Trading Co.,* 55 F.3d 269, 275 (C.A.7 1995). Unlike the subsequent arbitration awards that the arbitrators cited, these decisions were available to the parties when they entered into their contracts.

6    Petitioners produced expert evidence from experienced maritime arbitrators demonstrating that it is customary in the shipping business for parties to resolve their disputes through bilateral arbitration. See, *e.g.,* App. 126a (expert declaration of John Kimball) ("In the 30 years I have been practicing as a maritime lawyer, I have never encountered an arbitration clause in a charter party that could be construed as allowing class action arbitration"); *id.,* at 139a (expert declaration of Bruce Harris) ("I have been working as a maritime

arbitrator for thirty years and this matter is the first I have ever encountered where the issue of a class action arbitration has even been raised"). These experts amplified their written statements in their live testimony, as well. See, *e.g.,* App. 112a, 113a (Mr. Kimball) (opining that the prospect of a class action in a maritime arbitration would be "quite foreign" to overseas shipping executives and charterers); *id.,* at 111a-112a (Mr. Harris) (opining that in the view of the London Corps of International Arbitration, class arbitration is "inconceivable").

Under both New York law and general maritime law, evidence of "custom and usage" is relevant to determining the parties' intent when an express agreement is ambiguous. See *Excess Ins. Co. v. Factory Mut. Ins. Co.,* 3 N.Y.3d 577, 590-591, 789 N.Y.S.2d 461, 822 N.E.2d 768, 777 (2004) ("Our precedent establishes that where there is ambiguity in a reinsurance certificate, the surrounding circumstances, including industry custom and practice, should be taken into consideration"); *Lopez v. Consolidated Edison Co. of N. Y.,* 40 N.Y.2d 605, 609, 389 N.Y.S.2d 295, 357 N.E.2d 951, 954-955 (1976) (where contract terms were ambiguous, parol evidence of custom and practice was properly admitted to show parties' intent); *407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.,* 23 N.Y.2d 275, 281, 296 N.Y.S.2d 338, 244 N.E.2d 37, 41 (1968) (contract was "not so free from ambiguity to preclude extrinsic evidence" of industry "custom and usage" that would "establish the correct interpretation or understanding of the agreement as to its term"). See also *Great Circle Lines, Ltd. v. Matheson & Co.,* 681 F.2d 121, 125 (C.A.2 1982) ("Certain long-standing customs of the shipping industry are crucial factors to be considered when deciding whether there has been a meeting of the minds on a maritime contract"); *Samsun Corp. v. Khozestan Mashine Kar Co.,* 926 F.Supp. 436, 439 (S.D.N.Y.1996) ("[W]here as here the contract is one of charter party, established practices and customs of the shipping industry inform the court's analysis of what the parties agreed to"); Hough, Admiralty Jurisdiction-Of Late Years, 37 Harv. L.Rev. 529, 536 (1924) (noting that "maritime law is a body of sea customs" and the "custom of the sea ... includes a customary interpretation of contract language").

7    The dissent calls this conclusion "hardly fair," noting that the word " 'policy' is not so much as mentioned in the arbitrators' award." *Post,* at 1780. But just as merely saying something is so does not make it so, cf. *United States v. Morrison,* 529 U.S. 598,

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 39 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

614, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the arbitrators need not have said they were relying on policy to make it so. At the hearing before the arbitration panel, one of the arbitrators recognized that the body of post-*Bazzle* arbitration awards on which AnimalFeeds relied involved "essentially consumer non-value cases." App. 82a. In response, counsel for AnimalFeeds defended the applicability of those awards by asserting that the "vast majority" of the claimants against petitioners "have negative value claims ... meaning it costs more to litigate than you would get if you won." *Id.,* at 82a-83a. The panel credited this body of awards in concluding that petitioners had not demonstrated the parties' intent to preclude class arbitration, and further observed that if petitioners' anticonsolidation precedents controlled, then "there would appear to be no basis for a class action absent express agreement among all parties and the putative class members." App. to Pet. for Cert. 50a, 51a.

### *1770  2

It is true that the panel opinion makes a few references to intent, but none of these shows that the panel did anything other than impose its own policy preference. The opinion states that, under *Bazzle,* "arbitrators must look to the language of the parties' agreement to ascertain the parties' intention whether they intended to permit or to preclude class action," and the panel added that "[t]his is also consistent with New York law." App. to Pet. for Cert. 49a. But the panel had no occasion to "ascertain the parties' intention" in the present case because the parties were in complete agreement regarding their intent. In the very next sentence after the one quoted above, the panel acknowledged that the parties in this case agreed that the Vegoilvoy charter party was "silent on whether [it] permit[ted] or preclude[d] class arbitration," but that the charter party was "not ambiguous so as to call for parol evidence." *Ibid.* This stipulation left no room for an inquiry regarding the parties' intent, and any inquiry into that settled question would have been outside the panel's assigned task.

The panel also commented on the breadth of the language in the Vegoilvoy charter party, see *id.,* at 50a, but since the only task that was left for the panel, in light of the parties' stipulation, was to identify the governing rule applicable in a case in which neither the language of the contract nor any other evidence established that the parties had reached any agreement on the question of class arbitration, the particular wording of the charter party was quite beside the point.

In sum, instead of identifying and applying a rule of decision derived from the FAA or either maritime or New York law, the arbitration panel imposed its own policy choice and thus exceeded its powers. As a result, under § 10(b) of the FAA, we must either "direct a rehearing by the arbitrators" or decide the question that was originally referred to the panel. Because we conclude that there can be only one possible outcome on the facts before us, we see no need to direct a rehearing by the arbitrators.

### III

### A

The arbitration panel thought that *Bazzle* "controlled" the "resolution" of the question whether the Vegoilvoy charter party "permit[s] this arbitration to proceed on behalf of a class," App. to Pet. for Cert. 48a-49a, but that understanding was incorrect.

*1771 *Bazzle* concerned contracts between a commercial lender (Green Tree) and its customers. These contracts contained an arbitration clause but did not expressly mention class arbitration. Nevertheless, an arbitrator conducted class arbitration proceedings and entered awards for the customers.

The South Carolina Supreme Court affirmed the awards. *Bazzle v. Green Tree Financial Corp.*, 351 S.C. 244, 569 S.E.2d 349 (2002). After discussing both Seventh Circuit precedent holding that a court lacks authority to order classwide arbitration under § 4 of the FAA, see *Champ v. Siegel Trading Co.,* 55 F.3d 269 (1995), and conflicting California precedent, see *Keating v. Superior Court of Alameda Cty.,* 31 Cal.3d 584, 183 Cal.Rptr. 360, 645 P.2d 1192 (1982), the State Supreme Court elected to follow the California approach, which it characterized as permitting a trial court to "order class-wide arbitration under adhesive but enforceable franchise contracts," 351 S.C., at 259, 266, 569 S.E.2d, at 357, 360. Under this approach, the South Carolina court observed, a trial judge must "[b]alanc[e] the potential inequities and inefficiencies" of requiring each aggrieved party to proceed on an individual basis against "resulting prejudice to the drafting party" and should take into account factors such as "efficiency" and "equity." *Id.,* at 260, and n. 15, 569 S.E.2d, at 357, and n. 15.

Applying these standards to the case before it, the South Carolina Supreme Court found that the arbitration clause in the Green Tree contracts was "silent regarding class-

wide arbitration." *Id.,* at 263, 569 S.E.2d, at 359 (emphasis deleted). The Court described its holding as follows:

> "[W]e ... hold that class-wide arbitration may be ordered when the arbitration agreement is silent if it would serve efficiency and equity, and would not result in prejudice. If we enforced a mandatory, adhesive arbitration clause, but prohibited class actions in arbitration where the agreement is silent, the drafting party could effectively prevent class actions against it without having to say it was doing so in the agreement." *Id.,* at 266, 569 S.E.2d, at 360 (footnote omitted).

When *Bazzle* reached this Court, no single rationale commanded a majority. The opinions of the Justices who joined the judgment–that is, the plurality opinion and Justice STEVENS' opinion–collectively addressed three separate questions. The first was which decision maker (court or arbitrator) should decide whether the contracts in question were "silent" on the issue of class arbitration. The second was what standard the appropriate decision maker should apply in determining whether a contract allows class arbitration. (For example, does the FAA entirely preclude class arbitration? Does the FAA permit class arbitration only under limited circumstances, such as when the contract expressly so provides? Or is this question left entirely to state law?) The final question was whether, under whatever standard is appropriate, class arbitration had been properly ordered in the case at hand.

The plurality opinion decided only the first question, concluding that the arbitrator and not a court should decide whether the contracts were indeed "silent" on the issue of class arbitration. The plurality noted that, "[i]n certain limited circumstances," involving "gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy," it is assumed "that the parties intended courts, not arbitrators," to make the decision. 539 U.S., at 452, 123 S.Ct. 2402. But the plurality opined that the question whether  *1772  a contract with an arbitration clause forbids class arbitration "does not fall into this narrow exception." *Ibid.* The plurality therefore concluded that the decision of the State Supreme Court should be vacated and that the case should be remanded for a decision by the arbitrator on the question whether the contracts were indeed "silent." The plurality did not decide either the second or the third question noted above.

Justice STEVENS concurred in the judgment vacating and remanding because otherwise there would have been "no controlling judgment of the Court," but he did not endorse the plurality's rationale. *Id.,* at 455, 123 S.Ct. 2402 (opinion concurring in judgment and dissenting in part). He did not take a definitive position on the first question, stating only that *"[a]rguably* the interpretation of the parties' agreement should have been made in the first instance by the arbitrator." *Ibid.* (emphasis added). But because he did not believe that Green Tree had raised the question of the appropriate decision maker, he preferred not to reach that question and, instead, would have affirmed the decision of the State Supreme Court on the ground that "the decision to conduct a class-action arbitration was correct as a matter of law." *Ibid.* Accordingly, his analysis bypassed the first question noted above and rested instead on his resolution of the second and third questions. Thus, *Bazzle* did not yield a majority decision on any of the three questions.

**B**

Unfortunately, the opinions in *Bazzle* appear to have baffled the parties in this case at the time of the arbitration proceeding. For one thing, the parties appear to have believed that the judgment in *Bazzle* requires an arbitrator, not a court, to decide whether a contract permits class arbitration. See App. 89a (transcript of argument before arbitration panel) (counsel for Stolt-Nielsen states: "What *[Bazzle]* says is that the contract interpretation issue is left up to the arbitrator, that's the rule in *[Bazzle]* "). In fact, however, only the plurality decided that question. But we need not revisit that question here because the parties' supplemental agreement expressly assigned this issue to the arbitration panel, and no party argues that this assignment was impermissible.

**10    11**    Unfortunately, however, both the parties and the arbitration panel seem to have misunderstood *Bazzle* in another respect, namely, that it established the standard to be applied by a decision maker in determining whether a contract may permissibly be interpreted to allow class arbitration. The arbitration panel began its discussion by stating that the parties "differ regarding *the rule of interpretation* to be gleaned from [the *Bazzle* ] decision." App. to Pet. for Cert. 49a (emphasis added). The panel continued:

> "Claimants argue that *Bazzle* requires clear language that forbids class arbitration in order to bar a class action. The Panel, however, agrees with Respondents that the test is a more general one-arbitrators must look to the

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 41 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

language of the parties' agreement to ascertain the parties' intention whether they intended to permit or to preclude class action." *Ibid.*

As we have explained, however, *Bazzle* did not establish the rule to be applied in deciding whether class arbitration is permitted.[8] The decision in *Bazzle* left that question open, and we turn to it now.

8    AnimalFeeds invokes the parties' supplemental agreement as evidence that petitioners "waived" any claim that the arbitrators could not construe the arbitration agreement to permit class arbitration. Brief for Respondent 15. The dissent concludes, likewise, that the existence of the parties' supplemental agreement renders petitioners' argument under § 10(a)(4) "scarcely debatable." *Post,* at 1780. These arguments are easily answered by the clear terms of the supplemental agreement itself. The parties expressly provided that their supplemental agreement "*does not alter* the scope of the Parties' arbitration agreements in any Charter Party Agreement," and that "[n]either the fact of this Agreement nor any of its terms may be used to support or oppose *any argument in favor of a class action arbitration* ... and may not be relied upon by the Parties, any arbitration panel, *any court,* or any other tribunal for such purposes." App. to Pet. for Cert. 62a-63a (emphasis added). As with any agreement to arbitrate, we are obliged to enforce the parties' supplemental agreement "according to its terms." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 58, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). The question that the arbitration panel was charged with deciding was whether the arbitration clause in the Vegoilvoy charter party allowed for class arbitration, and nothing in the supplemental agreement conferred authority on the arbitrators to exceed the terms of the charter party itself. Thus, contrary to AnimalFeeds' argument, these statements show that petitioners did *not* waive their argument that *Bazzle* did not establish the standard for the decision maker to apply when construing an arbitration clause.

## *1773 IV

12    While the interpretation of an arbitration agreement is generally a matter of state law, see *Arthur Andersen LLP v. Carlisle,* 556 U.S. ----, ----, 129 S.Ct. 1896, 1901-02, 173 L.Ed.2d 832 (2009); *Perry v. Thomas,* 482 U.S. 483, 493, n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration "is a matter of consent, not coercion,"

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

### A

13    In 1925, Congress enacted the United States Arbitration Act, as the FAA was formerly known, for the express purpose of making "valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations." 43 Stat. 883. Reenacted and codified in 1947, see 61 Stat. 669,[9] the FAA provides, in pertinent part, that a "written provision in any maritime transaction" calling for the arbitration of a controversy arising out of such transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. Under the FAA, a party to an arbitration agreement may petition a United States district court for an order directing that "arbitration proceed in the manner provided for in such agreement." § 4. Consistent with these provisions, we have said on numerous occasions that the central or "primary" purpose of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms." *Volt, supra,* at 479, 109 S.Ct. 1248; *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 58, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); see also *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 688, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). See generally 9 U.S.C. § 4.

9    See generally Sturges & Murphy, Some Confusing Matters Relating to Arbitration Under the United States Arbitration Act, 17 Law & Contemp. Prob. 580, 580-581, n. 1 (1952) (recounting the history of the United States Arbitration Act and its 1947 reenactment and codification).

14    15    Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must *1774 "give effect to the contractual rights and expectations of the parties." *Volt, supra,* at 479, 109 S.Ct. 1248. In this endeavor, "as with any other contract, the parties' intentions control." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). This is because an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution. See *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 648-649, 106 S.Ct. 1415, 89 L.Ed.2d

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 42 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)
2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

648 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration"); *Mitsubishi Motors, supra,* at 628, 105 S.Ct. 3346 ("By agreeing to arbitrate ..., [a party] trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration"); see also *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 581, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (an arbitrator "has no general charter to administer justice for a community which transcends the parties" but rather is "part of a system of self-government created by and confined to the parties" (internal quotation marks omitted)).

Underscoring the consensual nature of private dispute resolution, we have held that parties are " 'generally free to structure their arbitration agreements as they see fit.' " *Mastrobuono, supra,* at 57, 115 S.Ct. 1212; see also *AT & T Technologies, supra,* at 648-649, 106 S.Ct. 1415. For example, we have held that parties may agree to limit the issues they choose to arbitrate, see *Mitsubishi Motors, supra,* at 628, 105 S.Ct. 3346, and may agree on rules under which any arbitration will proceed, *Volt, supra,* at 479, 109 S.Ct. 1248. They may choose who will resolve specific disputes. *E.g.,* App. 30a; *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 57, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Burchell v. Marsh,* 58 U.S. 344, 17 How. 344, 349, 15 L.Ed. 96 (1855); see also *International Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548, 552(CA2) ("The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose"), cert. denied, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981).

**16    17**    We think it is also clear from our precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes. See *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) ("[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, *or by any parties,* that are not already covered in the agreement" (emphasis added)); *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 20, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[A]n arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement"); *Steelworkers, supra,* at 581, 80 S.Ct. 1358 (an arbitrator "has no general charter to administer justice for a community which transcends the parties" (internal quotation marks omitted)); accord, *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d

985 (1995) ("[A]rbitration is simply a matter of contract *between the parties*; it is a way to resolve those disputes- but only those disputes-that the *parties* have agreed to submit to arbitration" (emphasis added)). It falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the **\*1775** exercise: to give effect to the intent of the parties. *Volt,* 489 U.S., at 479, 109 S.Ct. 1248.

**B**

**18    19    20**    From these principles, it follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so. In this case, however, the arbitration panel imposed class arbitration even though the parties concurred that they had reached "no agreement" on that issue, see App. 77a. The critical point, in the view of the arbitration panel, was that petitioners did not "establish that the parties to the charter agreements intended to *preclude* class arbitration." App. to Pet. for Cert. 51a. Even though the parties are sophisticated business entities, even though there is no tradition of class arbitration under maritime law, and even though AnimalFeeds does not dispute that it is customary for the shipper to choose the charter party that is used for a particular shipment, the panel regarded the agreement's silence on the question of class arbitration as dispositive. The panel's conclusion is fundamentally at war with the foundational FAA principle that arbitration is a matter of consent.

**21**    In certain contexts, it is appropriate to presume that parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement. Thus, we have said that " ' "procedural" questions which grow out of the dispute and bear on its final disposition' are presumptively not for the judge, but for an arbitrator, to decide." *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quoting *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964)). This recognition is grounded in the background principle that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1979).

**22    23**    An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 43 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

solely from the fact of the parties' agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator. In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. See *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Mitsubishi Motors,* 473 U.S., at 628, 105 S.Ct. 3346; see also *14 Penn Plaza LLC v. Pyett,* 556 U.S. ----, ----, 129 S.Ct. 1456, 1463-65, 173 L.Ed.2d 398 (2009) ("Parties generally favor arbitration precisely because of the economics of dispute resolution") (citing *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 123, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)); *Gardner-Denver, supra,* at 57, 94 S.Ct. 1011 ("Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations"). But the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve disputes through class- *\*1776* wide arbitration. Cf. *First Options, supra,* at 945, 115 S.Ct. 1920 (noting that "one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate" contrary to their expectations).

24    Consider just some of the fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration. An arbitrator chosen according to an agreed-upon procedure, see, *e.g., supra,* at ----, no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties. See App. 86a ("[W]e believe domestic class members could be in the hundreds" and that "[t]here could be class members that ship to and from the U.S. who are not domestic who we think would be covered"); see also, *e.g., Bazzle,* 351 S.C., at 251, 569 S.E.2d, at 352-353 (involving a class of 1,899 individuals that was awarded damages, fees, and costs of more than $14 million by a single arbitrator). Under the Class Rules, "the presumption of privacy and confidentiality" that applies in many bilateral arbitrations "shall not apply in class arbitrations," see Addendum to Brief for American Arbitration Association as *Amicus Curiae* 10a (Class Rule 9(a)), thus potentially frustrating the parties' assumptions when they agreed to arbitrate. The arbitrator's award no longer purports to bind just the parties to a single

arbitration agreement, but adjudicates the rights of absent parties as well. Cf. *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 846, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (noting that "the burden of justification rests on the exception" to the general rule that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process" (internal quotation marks omitted)). And the commercial stakes of class-action arbitration are comparable to those of class-action litigation, cf. App. in No. 06-3474-cv (CA2), at A-77, A-79, ¶¶ 30, 31, 40, even though the scope of judicial review is much more limited, see *Hall Street,* 552 U.S., at 588, 128 S.Ct. 1396. We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings. [10]

[10]    We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration. Here, as noted, the parties stipulated that there was "no agreement" on the issue of class-action arbitration. App. 77a.

The dissent minimizes these crucial differences by characterizing the question before the arbitrators as being merely what "procedural mode" was available to present AnimalFeeds' claims. *Post,* at 1781. If the question were that simple, there would be no need to consider the parties' intent with respect to class arbitration. See *Howsam, supra,* at 84, 123 S.Ct. 588 (committing "procedural questions" presumptively to the arbitrator's discretion (internal quotation marks omitted)). But the FAA requires more. Contrary to the dissent, but consistent with our precedents emphasizing the consensual basis of arbitration, we see the question as being whether the parties *agreed to authorize* class arbitration. Here, where the parties stipulated that there was "no agreement" on this question, it follows that the parties cannot be compelled to submit their dispute to class arbitration.

*\*1777* V

For these reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

Justice GINSBURG, with whom Justice STEVENS and Justice BREYER join, dissenting.

When an arbitration clause is silent on the question, may arbitration proceed on behalf of a class? The Court prematurely takes up that important question and, indulging in *de novo* review, overturns the ruling of experienced arbitrators. [1]

[1]    All three panelists are leaders in the international-dispute-resolution bar. See Brief for Respondent 8-9.

The Court errs in addressing an issue not ripe for judicial review. Compounding that error, the Court substitutes its judgment for that of the decisionmakers chosen by the parties. I would dismiss the petition as improvidently granted. [2] Were I to reach the merits, I would adhere to the strict limitations the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.,* places on judicial review of arbitral awards. § 10. Accordingly, I would affirm the judgment of the Second Circuit, which rejected petitioners' plea for vacation of the arbitrators' decision.

[2]    Alternatively, I would vacate with instructions to dismiss for lack of present jurisdiction. See Reply to Brief in Opposition 12, n. 6.

## I

As the Court recounts, *ante,* at ---- - ----, this case was launched as a class action in federal court charging named ocean carriers (collectively, Stolt-Nielsen) with a conspiracy to extract supracompetitive prices from their customers (buyers of ocean-transportation services). That court action terminated when the Second Circuit held, first, that the parties' transactions were governed by contracts (charter parties) with enforceable arbitration clauses, and second, that the antitrust claims were arbitrable. *JLM Industries, Inc. v. Stolt-Nielsen S.A.,* 387 F.3d 163, 175, 181 (2004).

Cargo-shipper AnimalFeeds International Corp. (AnimalFeeds) thereupon filed a demand for class arbitration of the antitrust-conspiracy claims. [3] Stolt-Nielsen contested AnimalFeeds' right to proceed on behalf of a class, but agreed to submission of that threshold dispute to a panel of arbitrators. Thus, the parties entered into a supplemental agreement to choose arbitrators and instruct them to "follow ... Rul[e] 3 ... of the American Arbitration Association's Supplementary Rules for Class Arbitrations." App. to Pet. for Cert. 59a. Rule 3, in turn, directed the panel

to "determine ... whether the applicable arbitration clause permits the arbitration to proceed on behalf of ... a class." App. 56a.

[3]    Counsel for AnimalFeeds submitted in arbitration that "[i]t would cost ... the vast majority of absent class members, and indeed the current claimants, ... more to litigate the matter on an individual basis than they could recover. An antitrust case, particularly involving an international cartel[,] ... is extraordinarily difficult and expensive to litigate." App. 82a (paragraph break omitted).

After receiving written submissions and hearing arguments, the arbitration panel rendered a clause-construction award. It decided unanimously-and-only that the "arbitration claus[e] [used in the parties' standard-form shipping contracts] permit[s] this ... arbitration to proceed as a class arbitration." App. to Pet. for Cert. 52a. Stolt-Nielsen petitioned for court review urging vacatur of the clause-construction *1778 award on the ground that "the arbitrators [had] exceeded their powers." § 10(a)(4). The Court of Appeals upheld the award: "Because the parties specifically agreed that the arbitration panel would decide whether the arbitration claus[e] permitted class arbitration," the Second Circuit reasoned, "the arbitration panel did not exceed its authority in deciding that issue-irrespective of whether it decided the issue correctly." 548 F.3d 85, 101 (2008).

## II

I consider, first, the fitness of the arbitrators' clause-construction award for judicial review. The arbitrators decided the issue, in accord with the parties' supplemental agreement, "as a threshold matter." App. 56a. Their decision that the charter-party arbitration clause permitted class arbitration was abstract and highly interlocutory. The panel did not decide whether the particular claims AnimalFeeds advanced were suitable for class resolution, see App. to Pet. for Cert. 48a-49a; much less did it delineate any class or consider whether, "if a class is certified, ... members of the putative class should be required to 'opt in' to th[e] proceeding," *id.,* at 52a.

The Court, *ante,* at ----, n. 2, does not persuasively justify judicial intervention so early in the game or convincingly reconcile its adjudication with the firm final-judgment rule prevailing in the federal court system. See, *e.g.,* 28 U.S.C. § 1257 (providing for petitions for certiorari from "[f]inal judgments or decrees" of state courts); § 1291 (providing for Court of Appeals review of district court "final decisions");

*Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945) (describing "final decision" generally as "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment").

We have equated to "final decisions" a slim set of "collateral orders" that share these characteristics: They "are conclusive, [they] resolve important questions separate from the merits, and [they] are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Industries, Inc. v. Carpenter,* 558 U.S. ----, ----, 130 S.Ct. 599, 601, ---L.Ed.2d ---- (2009) (quoting *Swint v. Chambers County Comm'n,* 514 U.S. 35, 42, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995)). "[O]rders relating to class certification" in federal court, it is settled, do not fit that bill. *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 470, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). [4]

> 4    Federal Rule of Civil Procedure 23(f), adopted in response to *Coopers & Lybrand,* gives Courts of Appeals discretion to permit an appeal from an order granting or denying class-action certification. But the rule would not permit review of a preliminary order of the kind at issue here, *i.e.,* one that defers decision whether to grant or deny certification.

Congress, of course, can provide exceptions to the "final-decision" rule. Prescriptions in point include § 1292 (immediately appealable "[i]nterlocutory decisions"); § 2072(c) (authorizing promulgation of rules defining when a district court ruling is final for purposes of appeal under § 1291); Fed. Rule Civ. Proc. 23(f) (pursuant to § 1292(e), accords Courts of Appeals discretion to permit appeals from district court orders granting or denying class-action certification); Fed. Rule Civ. Proc. 54(b) (providing for "entry of a final judgment as to one or more, but fewer than all, of the claims or parties"). Did Congress provide for immediate review of the preliminary ruling in question here?

*\*1779*  Section 16 of the FAA, governing appellate review of district court arbitration orders, lists as an appealable disposition a district court decision "confirming or denying confirmation of an award or partial award." 9 U.S.C. § 16(a)(1)(D). Notably, the arbitrators in the matter at hand labeled their decision "Partial Final Clause Construction Award." App. to Pet. for Cert. 45a. It cannot be true, however, that parties or arbitrators can gain instant review by slicing off a preliminary decision or a procedural order and declaring its resolution a "partial award." Cf. *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 588, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) (FAA §§ 9-11, which provide for

expedited review to confirm, vacate, or modify arbitration awards, "substantiat[e] a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway.").

Lacking this Court's definitive guidance, some Courts of Appeals have reviewed arbitration awards "finally and definitely dispos[ing] of a separate independent claim." *E.g., Metallgesellschaft A.G. v. M/V Capitan Constante,* 790 F.2d 280, 283 (C.A.2 1986). [5] Others have considered "partial award [s]" that finally "determin[e] liability, but ... not ... damages." *E.g., Hart Surgical, Inc. v. Ultracision, Inc.,* 244 F.3d 231, 234 (C.A.1 2001). [6] Another confirmed an interim ruling on a "separate, discrete, independent, severable issue." *Island Creek Coal Sales Co. v. Gainesville,* 729 F.2d 1046, 1049 (C.A.6 1984) (internal quotation marks omitted), abrogated on other grounds by *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.,* 529 U.S. 193, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000).

> 5    See *Metallgesellschaft A.G.,* 790 F.2d, at 283, 284 (Feinberg, C.J., dissenting) (describing exception for separate and independent claims as "creat[ing], in effect, an arbitration analogue to [Fed. Rule Civ. Proc.] 54(b)").

> 6    But see *Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (district court order determining liability but reserving decision on damages held not immediately appealable).

Receptivity to review of preliminary rulings rendered by arbitrators, however, is hardly universal. See *Dealer Computer Servs., Inc. v. Dub Herring Ford,* 547 F.3d 558 (C.A.6 2008) (arbitration panel's preliminary ruling that contract did not bar class proceedings held not ripe for review; arbitrators had not yet determined that arbitration *should* proceed on behalf of a class); *Metallgesellschaft A.G.,* 790 F.2d, at 283, 285 (Feinberg, C.J., dissenting) ("[Piecemeal review] will make arbitration more like litigation, a result not to be desired. It would be better to minimize the number of occasions the parties to arbitration can come to court; on the whole, this benefits the parties, the arbitration process and the courts.").

While lower court opinions are thus divided, this much is plain: No decision of this Court, until today, has ever approved immediate judicial review of an arbitrator's decision as preliminary as the "partial award" made in this case. [7]

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 46 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

7    The parties agreed that the arbitrators would issue a "partial final award," and then "stay all proceedings ... to permit any party to move a court of competent jurisdiction to confirm or to vacate" the award. App. 56a. But an arbitration agreement, we have held, cannot "expand judicial review" available under the FAA. *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 587, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008).

### III

Even if Stolt-Nielsen had a plea ripe for judicial review, the Court should reject it on the merits. Recall that the parties *\*1780* jointly asked the arbitrators to decide, initially, whether the arbitration clause in their shipping contracts permitted class proceedings. See *supra*, at ----. The panel did just what it was commissioned to do. It construed the broad arbitration clause (covering "[a]ny dispute arising from the making, performance or termination of this Charter Party," App. to Pet. for Cert. 47a) and ruled, expressly and only, that the clause permitted class arbitration. The Court acts without warrant in allowing Stolt-Nielsen essentially to repudiate its submission of the contract-construction issue to the arbitration panel, and to gain, in place of the arbitrators' judgment, this Court's *de novo* determination.

### A

The controlling FAA prescription, § 10(a), 8 authorizes a court to vacate an arbitration panel's decision "only in very unusual circumstances." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The four grounds for vacatur codified in § 10(a) restate the longstanding rule that, "[i]f [an arbitration] award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court ... will not set [the award] aside for error, either in law or fact." *Burchell v. Marsh,* 58 U.S. 344, 349, 17 How. 344, 349, 15 L.Ed. 96 (1855).

8    Title 9 U.S.C. § 10(a) provides:
      "In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration-
      "(1) where the award was procured by corruption, fraud, or undue means;
      "(2) where there was evident partiality or corruption in the arbitrators, or either of them;

      "(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
      "(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

The sole § 10 ground Stolt-Nielsen invokes for vacating the arbitrators' decision is § 10(a)(4). The question under that provision is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 824 (C.A.2 1997); *Comprehensive Accounting Corp. v. Rudell,* 760 F.2d 138, 140 (C.A.7 1985). The parties' supplemental agreement, referring the class-arbitration issue to an arbitration panel, undoubtedly empowered the arbitrators to render their clause-construction decision. That scarcely debatable point should resolve this case.

### B

The Court's characterization of the arbitration panel's decision as resting on "policy," not law, is hardly fair comment, for "policy" is not so much as mentioned in the arbitrators' award. Instead, the panel tied its conclusion that the arbitration clause permitted class arbitration, App. to Pet. for Cert. 52a, to New York law, federal maritime law, and decisions made by other panels pursuant to Rule 3 of the American Arbitration Association's Supplementary Rules for Class Arbitrations. *Id.,* at 49a-50a.

At the outset of its explanation, the panel rejected the argument, proffered by AnimalFeeds, that this Court's decision in *\*1781 Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), settled the matter by "requir[ing] clear language that *forbids* class arbitration in order to bar a class action." App. to Pet. for Cert. 49a (emphasis added). Agreeing with Stolt-Nielsen in this regard, the panel said that the test it employed looked to the language of the particular agreement to gauge whether the parties "intended to permit or to preclude class action[s]." *Ibid.* Concentrating on the wording of the arbitration clause, the panel observed, is "consistent with New York law as

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 47 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

articulated by the [New York] Court of Appeals ... and with federal maritime law." *Ibid.*[9]

> [9]    On New York law, the panel referred to *Evans v. Famous Music Corp.,* 1 N.Y.3d 452, 775 N.Y.S.2d 757, 807 N.E.2d 869 (2004).

Emphasizing the breadth of the clause in question-" 'any dispute arising from the making, performance or termination of this Charter Party' shall be put to arbitration," *id.,* at 50a-the panel noted that numerous other partial awards had relied on language similarly comprehensive to permit class proceedings "in a wide variety of settings." *Id.,* at 49a-50a. The panel further noted "that many of the other panels [had] rejected arguments similar to those advanced by [Stolt-Nielsen]." *Id.,* at 50a.

The Court features a statement counsel for AnimalFeeds made at the hearing before the arbitration panel, and maintains that it belies any argument that the clause in question permits class arbitration: "All the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue." *Ante,* at 1766 (quoting App. 77a); see *ante,* at ----, ---- - ----, ----, ----, and n. 10. The sentence quoted from the hearing transcript concluded: "therefore there has been *no agreement to bar class arbitrations.*" App. 77a (emphasis added). Counsel quickly clarified his position: "It's also undisputed that the arbitration clause here contains broad language and this language should be interpreted to permit class arbitrations." *Id.,* at 79a. See also *id.,* at 80a (noting consistent recognition by arbitration panels that "a silent broadly worded arbitration clause, just like the one at issue here, should be construed to permit class arbitration"); *id.,* at 88a ("[B]road ... language ... silent as to class proceedings should be interpreted to permit a class proceeding.").

Stolt-Nielsen, the panel acknowledged, had vigorously argued, with the support of expert testimony, that "the bulk of international shippers would never intend to have their disputes decided in a class arbitration." App. to Pet. for Cert. 52a. That concern, the panel suggested, might be met at a later stage; "if a class is certified," the panel noted, class membership could be confined to those who affirmatively " 'opt in' " to the proceeding. *Ibid.*

The question properly before the Court is not whether the arbitrators' ruling was erroneous, but whether the arbitrators "exceeded their powers." § 10(a)(4). The arbitrators decided a threshold issue, explicitly committed to them, see *supra,* at ----, about the procedural mode available for presentation of

AnimalFeeds' antitrust claims. Cf. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.,* 559 U.S. ----, ----, 130 S.Ct. 1431, 1443, 176 L.Ed.2d 311 (2010) (plurality opinion) ("[R]ules allowing multiple claims (and claims by or against multiple parties) to be litigated together ... neither change plaintiffs' separate entitlements to relief nor abridge defendants' rights; they alter ***1782** only how the claims are processed."). That the arbitrators endeavored to perform their assigned task honestly is not contested. "Courts ... do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The arbitrators here not merely "arguably," but certainly, "constru[ed] ... the contract" with fidelity to their commission. *Ibid.* This Court therefore, may not disturb the arbitrators' judgment, even if convinced that "serious error" infected the panel's award. *Ibid.*

### C

The Court not only intrudes on a decision the parties referred to arbitrators. It compounds the intrusion by according the arbitrators no opportunity to clarify their decision and thereby to cure the error the Court perceives. Section 10(b), the Court asserts, invests in this tribunal authority to "decide the question that was originally referred to the panel." *Ante,* at 1770. The controlling provision, however, speaks of nothing of the kind. Section 10(b) reads, in full: "If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, *direct a rehearing by the arbitrators.*" (Emphasis added.) Just as § 10(a)(4) provides no justification for the Court's disposition, see *supra,* at ---- - ---- and this page, so, too, § 10(b) provides no grounding for the Court's peremptory action.

### IV

#### A

For arbitrators to consider whether a claim should proceed on a class basis, the Court apparently demands contractual language one can read as affirmatively authorizing class arbitration. See *ante,* at ---- ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."); *ante,* at ----. The breadth of the arbitration clause, and the absence of any provision waiving or banning class proceedings,[10] will not do. *Ante,* at ---- - ----.

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 48 of 302

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S.Ct. 1758 (2010)

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

10    Several courts have invalidated contractual bans on, or waivers of, class arbitration because proceeding on an individual basis was not feasible in view of the high costs entailed and the slim benefits achievable. See, *e.g.*, *In re American Express Merchants' Litigation,* 554 F.3d 300, 315-316, 320 (C.A.2 2009); *Kristian v. Comcast Corp.,* 446 F.3d 25, 55, 59 (C.A.1 2006); *Discover Bank v. Superior Court,* 36 Cal.4th 148, 162-163, 30 Cal.Rptr.3d 76, 113 P.3d 1100, 1110 (2005); *Leonard v. Terminix Int'l Co., LP,* 854 So.2d 529, 539 (Ala.2002). Were there no right to proceed on behalf of a class in the first place, however, a provision banning or waiving recourse to this aggregation device would be superfluous.

The Court ties the requirement of affirmative authorization to "the basic precept that arbitration 'is a matter of consent, not coercion.' " *Ante,* at ---- (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). Parties may "specify *with whom*" they choose to arbitrate," the Court observes, just as they may "limit the issues they choose to arbitrate." *Ante,* at 1774. But arbitrators, in delineating an appropriate class, need not, and should not, disregard such contractual constraints. In this case, for example, AnimalFeeds proposes to pursue, on behalf of a class, only "claims ... arising out of any [charter party agreement] ... *that provides for arbitration.*" App. to Pet. for Cert. 56a (emphasis added). Should the arbitrators certify the proposed class, they would adjudicate only the rights of persons "with whom" *\*1783* Stolt-Nielsen agreed to arbitrate, and only "issues" subject to arbitration. *Ante,* at ---- (emphasis omitted).

The Court also links its affirmative-authorization requirement to the parties' right to stipulate rules under which arbitration may proceed. See *ibid.* The question, however, is the proper default rule when there is no stipulation. Arbitration provisions, this Court has noted, are a species of forum-selection clauses. See *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Suppose the parties had chosen a New York *judicial forum* for resolution of "any dispute" involving a contract for ocean carriage of goods. There is little question that the designated court, state or federal, would have authority to conduct claims like AnimalFeeds' on a class basis. Why should the class-action prospect vanish when the "any dispute" clause is contained in an arbitration agreement? Cf. *Connecticut General Life Ins. Co. v. Sun Life Assurance Co. of Canada,* 210 F.3d 771, 774-776 (C.A.7 2000) (reading contract's authorization

to arbitrate "[a]ny dispute" to permit consolidation of arbitrations). If the Court is right that arbitrators ordinarily are not equipped to manage class proceedings, see *ante,* at ---- -----, then the claimant should retain its right to proceed in that format in court.

### B

When adjudication is costly and individual claims are no more than modest in size, class proceedings may be "the thing," *i.e.*, without them, potential claimants will have little, if any, incentive to seek vindication of their rights. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (C.A.7 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."). Mindful that disallowance of class proceedings severely shrinks the dimensions of the case or controversy a claimant can mount, I note some stopping points in the Court's decision.

First, the Court does not insist on express consent to class arbitration. Class arbitration may be ordered if "there is a contractual basis for concluding that the part[ies] *agreed*" "to submit to class arbitration". *Ante,* at ----; see *ante,* at ----, n. 10 ("We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration."). Second, by observing that "the parties [here] are sophisticated business entities," and "that it is customary for the shipper to choose the charter party that is used for a particular shipment," the Court apparently spares from its affirmative-authorization requirement contracts of adhesion presented on a take-it-or-leave-it basis. *Ante,* at ----. While these qualifications limit the scope of the Court's decision, I remain persuaded that the arbitrators' judgment should not have been disturbed.

\* \* \*

For the foregoing reasons, I would dismiss the petition for want of a controversy ripe for judicial review. Were I to reach the merits, I would affirm the Second Circuit's judgment confirming the arbitrators' clause-construction decision.

Parallel Citations

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328, 2010-1 Trade Cases P 76,982, 10 Cal.

2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605, 78 USLW 4328...

Daily Op. Serv. 5144, 2010 Daily Journal D.A.R. 6107, 22
Fla. L. Weekly Fed. S 269

**End of Document**                                      © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 18

DOCSTOR: 2191401\1

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515...

560 F.3d 156
United States Court of Appeals,
Third Circuit.

Alyson J. KIRLEIS, Appellee,
v.
DICKIE, McCAMEY & CHILCOTE, P.C., Appellant.

No. 07-3504.   Argued May 22,
2008.   Filed March 24, 2009.

**Synopsis**

**Background:** Shareholder/director at law firm brought action against firm alleging sex discrimination, retaliation, and hostile work environment. The United States District Court for the Western District of Pennsylvania, Gary L. Lancaster, J., 2007 WL 2142397, denied firm's motion to compel arbitration. Firm appealed.

**Holding:** The Court of Appeals, Hardiman, Circuit Judge, held that, as a matter of first impression under Pennsylvania law, shareholder could not be compelled to arbitrate claims against firm pursuant to corporate bylaws to which she did not explicitly assent.

Affirmed.

West Headnotes (16)

**1**   **Alternative Dispute Resolution** 🔑 Existence and Validity of Agreement

The standard for determining whether a genuine issue of material fact exists regarding the existence of an agreement to arbitrate is the standard used by district courts in resolving summary judgment motions. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

13 Cases that cite this headnote

**2**   **Alternative Dispute Resolution** 🔑 Scope and Standards of Review

Appellate review of the District Court's order denying a motion to compel arbitration is plenary.

1 Cases that cite this headnote

**3**   **Alternative Dispute Resolution** 🔑 Scope and Standards of Review

The Court of Appeals applies the same standard as the District Court, compelling arbitration only where there is no genuine issue of fact concerning the formation of the agreement to arbitrate.

11 Cases that cite this headnote

**4**   **Alternative Dispute Resolution** 🔑 Scope and Standards of Review

When reviewing a motion to compel arbitration, the party opposing arbitration is entitled to the benefit of all reasonable doubts and inferences that may arise.

3 Cases that cite this headnote

**5**   **Federal Courts** 🔑 Arbitration

To determine whether the parties agreed to arbitrate, the Court of Appeals turns to ordinary state-law principles that govern the formation of contracts.

3 Cases that cite this headnote

**6**   **Alternative Dispute Resolution** 🔑 Validity
**Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

Because arbitration is a matter of contract, before compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement. 9 U.S.C.A. § 1 et seq.

8 Cases that cite this headnote

**7**   **Alternative Dispute Resolution** 🔑 Evidence

The presumption in favor of arbitration in the Federal Arbitration Act (FAA) does not apply to the determination of whether there is a valid agreement to arbitrate between the parties. 9 U.S.C.A. § 1 et seq.

6 Cases that cite this headnote

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515...

**8**    **Contracts** 🔑 Certainty as to Subject-Matter

**Contracts** 🔑 Necessity of Assent

**Contracts** 🔑 Necessity in General

Under Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration.

1 Cases that cite this headnote

**9**    **Alternative Dispute Resolution** 🔑 Employment Disputes

Under Pennsylvania law, in the employment context, arbitration agreements will be upheld when they are specific enough (i.e. unambiguous) to cover the employee's claims and the employee has expressly agreed to abide by the terms of the agreement.

**10**    **Alternative Dispute Resolution** 🔑 Remedies and Proceedings for Enforcement in General

On law firm's motion to compel arbitration of shareholder/director's employment related claims, shareholder's affidavit stating she never agreed to arbitrate, which detailed the specific circumstances that rendered the information of an agreement to arbitrate impossible, created genuine issue of material fact regarding existence of arbitration agreement.

2 Cases that cite this headnote

**11**    **Federal Civil Procedure** 🔑 Sufficiency of Showing

Conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment; instead, the affiant must set forth specific facts that reveal a genuine issue of material fact. Fed.Rules Civ.Proc.Rule 56(e)(2), 28 U.S.C.A.

17 Cases that cite this headnote

**12**    **Alternative Dispute Resolution** 🔑 Requisites and Validity

Under Pennsylvania law, explicit agreement is essential to the formation of an enforceable arbitration contract.

2 Cases that cite this headnote

**13**    **Alternative Dispute Resolution** 🔑 Requisites and Validity

Under Pennsylvania law, shareholder/director at law firm could not be compelled to arbitrate her employment related claims against firm pursuant to corporate bylaws to which she did not explicitly assent.

1 Cases that cite this headnote

**14**    **Estoppel** 🔑 Nature and Application of Estoppel in Pais

Under Pennsylvania law, equitable estoppel precludes a party from doing an act differently than the manner in which he induced another party to expect.

**15**    **Estoppel** 🔑 When Estoppel Arises

Under Pennsylvania law, equitable estoppel arises when a party intentionally or through culpable negligence induces another to believe certain facts to exist and the other party rightfully relies and acts on such belief to its detriment.

2 Cases that cite this headnote

**16**    **Estoppel** 🔑 Essential Elements

Under Pennsylvania law, the essential elements of equitable estoppel are inducement and detrimental reliance.

**Attorneys and Law Firms**

***158** Edward B. Friedman, (Argued), Gloria A. Aiello Friedman & Friedman, Pittsburgh, PA, Attorneys for Appellee.

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515...

Martin J. Saunders, (Argued), Sunshine R. Fellows, Donna
J. Geary, Jackson Lewis, Pittsburgh, PA, Attorneys for
Appellant.

Before: SMITH, HARDIMAN and NYGAARD, Circuit
Judges.

**Opinion**

## OPINION OF THE COURT

HARDIMAN, Circuit Judge.

In this appeal we consider a question of first impression
under Pennsylvania law: whether a shareholder/director
may be compelled to arbitrate her civil rights claims
pursuant to corporate bylaws to which she has not explicitly
assented. When first presented with this issue, we petitioned
the Pennsylvania Supreme Court to certify the question
because we found that it exposed tension between corporate
law principles and arbitration contract principles. The
Pennsylvania Supreme Court denied the petition, so we shall
answer the question.

## I.

Alyson J. Kirleis practices law with the Pittsburgh firm of
Dickie, McCamey & Chilcote, P.C. (Firm). She worked at the
Firm as a summer associate in 1987 and became a full-time
associate the following year. In 1998, Kirleis became a Class
B shareholder and was promoted to Class A shareholder/
director in 2001. Since she became a shareholder/director,
Kirleis's relationship with the Firm has been governed by the
Firm's corporate bylaws.

Kirleis filed two complaints against the Firm in the United
States District Court for the Western District of Pennsylvania
alleging sex discrimination, retaliation, and hostile work
environment in violation of *159 federal and state law. [1]
The Firm filed a motion to compel arbitration pursuant to
9 U.S.C. § 4, citing a mandatory arbitration provision in its
bylaws. The District Court denied the motion and the Firm
filed this timely appeal. [2]

[1]  Kirleis's claims arose under the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq., the Fair Labor
Standards Act of 1938, 29 U.S.C. § 201 et seq., and the
Pennsylvania Human Relations Act, 43 Pa. Stat. Ann.
§ 951 et seq.

[2]  The Firm also filed a motion to dismiss for lack
of jurisdiction pursuant to Rule 12(b) of the Federal
Rules of Civil Procedure. Therein, the Firm challenged
Kirleis's averment that she is an employee of the Firm.
The District Court denied the motion without prejudice
to the Firm's ability to raise it following discovery and
this decision is not at issue on appeal.

## II.

**1   2   3   4**   The District Court had jurisdiction under 28
U.S.C. § 1331. We have jurisdiction pursuant to 9 U.S.C. §
16(a)(1)(B). Our review of the District Court's order denying
the motion to compel arbitration is plenary. First Liberty Inv.
Group v. Nicholsberg, 145 F.3d 647, 649 (3d Cir.1998). We
apply the same standard as the District Court, compelling
arbitration only where there is "no genuine issue of fact
concerning the formation of the agreement" to arbitrate. See
Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d
51, 54 (3d Cir.1980). [3] In making this determination, the
party opposing arbitration is entitled to "the benefit of all
reasonable doubts and inferences that may arise." Id.

[3]  The standard for determining whether a genuine issue
of material fact exists regarding the existence of an
agreement to arbitrate is "quickly recognized as the
standard used by district courts in resolving summary
judgment motions pursuant to Fed.R.Civ.P. 56(c)."
Par-Knit Mills, 636 F.2d at 54 n. 9.

## III.

The Firm's motion to compel arbitration was based on the
following provision of its bylaws:

Section 9.01. ARBITRATION.

(a) General Rule: Any dispute arising under these By-Laws
including disputes related to the right to indemnification,
contribution or advancement of expenses as provided
under these By-Laws, shall be decided only by arbitration
in Pittsburgh, Pennsylvania, in accordance with the
commercial arbitration rules of the American Arbitration
Association, before a panel of three arbitrators, one of
whom shall be selected by the corporation, the second of
whom shall be selected by the shareholder, director, officer,
or indemnified representative and the third of whom shall
be selected by the other two arbitrators.

As relevant to this appeal, Kirleis averred in her affidavit:

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 54 of 302

Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156 (2009)

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515...

15. I was never provided with a copy of the By-Laws of defendant Firm at the time that I was made a Class B shareholder or at anytime thereafter. In fact, I only saw the documents which Mr. Wiley purports to be Firm's By-Laws for the first time when I received Mr. Wiley's Affidavit in connection with this case, approximately 9 years after being made a Class B shareholder-employee and 19 years after commencing the practice of law with the firm.

16. I was never informed of the presence of the arbitration provision in the By-Laws which Firm is now seeking to enforce against me.

17. I never signed any agreement or document which refers to or incorporates the arbitration provision in the By-Laws.

**\*160** 18. I never agreed to arbitrate my claims against Firm.

At this stage of the litigation, the Firm has not challenged the veracity of Kirleis's averments. Instead, the Firm argues that her status as a shareholder/director charged Kirleis with constructive knowledge of the terms of the bylaws and manifested her acceptance of the arbitration provision. In support of this argument, the Firm notes that Kirleis accepted compensation and perquisites pursuant to the bylaws. For example, Section 3.08(g) of the bylaws provided Kirleis with, *inter alia,* a car allowance of $600 per month, a parking lease at the Firm's PPG Place office complex, an annual trip to a legal seminar or convention with airfare included,[4] reimbursement of 70% of her annual dues at St. Clair Country Club, and a life insurance policy with a death benefit of $800,000. In addition, Kirleis accepted: (1) compensation pursuant to Section 4.03(h) of the bylaws; (2) a position on the Board of Directors pursuant to Section 2.02; and (3) a right to vote on all Firm matters reserved to the Board, pursuant to Section 1.03(b). Finally, Kirleis held various management positions, including: chairperson of the Associate Review Committee, member of an *ad hoc* committee charged with administering an Executive Committee election, and member of the Shareholder Review Committee.

[4]    Kirleis traveled to Rome, Italy in 2006 for a continuing legal education seminar sponsored by Duquesne University Law School. The Firm paid for her conference registration and airfare and provided her with $2,000 in spending money.

In sum, the Firm argues, as it did before the District Court, that Kirleis "cannot have it both ways" by selectively accepting

the benefits of the bylaws under Sections 1, 2, 3, and 4 while refusing to be bound by the arbitration clause of Section 9.

### IV.

**5  6**    To determine whether the parties agreed to arbitrate, we turn to "ordinary state-law principles that govern the formation of contracts." *First Options of Chic., Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). *See also Blair v. Scott Specialty Gases,* 283 F.3d 595, 603 (3d Cir.2002). Kirleis and the Firm agree that Pennsylvania law applies here. Because arbitration is a matter of contract, *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), before compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement. *Trippe Mfg. Co. v. Niles Audio Corp.,* 401 F.3d 529, 532 (3d Cir.2005); *Quiles v. Fin. Exch. Co.,* 879 A.2d 281, 283 n. 3 (Pa.Super.2005).

**7**    It is well established that the Federal Arbitration Act (FAA), reflects a "strong federal policy in favor of the resolution of disputes through arbitration." *Alexander v. Anthony Int'l, L.P.,* 341 F.3d 256, 263 (3d Cir.2003). But this presumption in favor of arbitration "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Fleetwood Enters., Inc. v. Gaskamp,* 280 F.3d 1069, 1073 (5th Cir.2002).

**8  9**    Under Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration. *Blair,* 283 F.3d at 603. In the employment context, arbitration agreements will be upheld when they are "specific enough (*i.e.* unambiguous) to cover the employee's claims" and "the employee has *expressly agreed* to **\*161** abide by the terms of [the] agreement." *Quiles,* 879 A.2d at 285 (emphasis added). The Pennsylvania Supreme Court has held that an agreement to arbitrate must be "clear and unmistakable" and cannot arise "by implication." *Emmaus Mun. Auth. v. Eltz,* 416 Pa. 123, 204 A.2d 926, 927 (1964). Likewise, we have held that "[b]efore a party to a lawsuit can be ordered to arbitrate ... there should be an *express, unequivocal* agreement to that effect." *Par-Knit Mills,* 636 F.2d at 54 (emphasis added).

In support of her argument that no arbitration contract was formed, Kirleis relied heavily on the Pennsylvania Superior Court's decision in *Quiles,* which held:

Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156 (2009)

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 55 of 302

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515...

Because [the employee] was never given the handbook that included the information explaining the company's policy to exclusively arbitrate any workplace disputes, she was unable to accept the terms of the agreement to arbitrate. Without her acceptance, there was no agreement formed between the parties and, thus, no grounds to compel arbitration.

879 A.2d at 283. The District Court agreed and held that the Firm's argument that Kirleis " 'must have known' or 'should have asked' falls short of the standard required by Pennsylvania law that plaintiff *actually agree* to arbitrate her claims." *Kirleis v. Dickie, McCamey & Chicolte, PC,* 2007 WL 2142397, at *7 (W.D.Pa. July 24, 2007). Because the bylaws were not distributed to Kirleis, she could not have agreed to arbitrate her claims. *Id.*

The Firm claims that the District Court erred by: (1) finding Kirleis's "self-serving and conclusory affidavit" sufficient to establish a genuine issue of fact as to the existence of an agreement to arbitrate; (2) ignoring the "well-settled" corporate law principle that members of the corporation are "presumed to know and understand" the bylaws; (3) relying on *Quiles*; and (4) allowing Kirleis to accept benefits of the bylaws without honoring her responsibilities thereunder. We consider these arguments *seriatim.*

### A.

**10**    The Firm first argues that Kirleis's "self-serving and conclusory" affidavit cannot create a genuine issue of material fact regarding the existence of an arbitration agreement.

**11**    It is true that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Blair,* 283 F.3d at 608. Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact. *Id.* (collecting cases); *Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir.1985); *see also* FED.R.CIV.P. 56(e)(2) ( "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial.").

Contrary to the Firm's assertion, Kirleis's affidavit satisfies this standard. Far from a conclusory statement that she never agreed to arbitrate, Kirleis details the specific circumstances that rendered the formation of an agreement to arbitrate

impossible. For example, she swore under oath that she "was never provided with a copy of the By-Laws of defendant Firm," "never signed any agreement or document which refers to or incorporates the arbitration provision in the By-Laws," and "never agreed to arbitrate ... claims against Firm." Not only are these allegations sufficiently specific, they are uncontested by the Firm. Had the Firm submitted contradictory evidence showing that Kirleis had received the bylaws or had signed them, **\*162** its argument regarding the sufficiency of Kirleis's affidavit would merit further discussion. Even then, the task of weighing the evidence and choosing which side to believe would have been for a jury. *Par-Knit Mills,* 636 F.2d at 54.

The cases cited by the Firm do not suggest a different conclusion. The Firm cites a Southern District of Indiana case for the proposition that an employee's own "self-serving affidavit" attesting to the fact that she "was not given the opportunity to read [an arbitration] agreement" before signing it was not "sufficient evidence to show a triable issue as to the validity and enforceability of [that] agreement." Firm Br. 14-15 (citing *Ortiz v. Winona Mem. Hosp.,* 2003 WL 21696524 at *9 (S.D.Ind. June 4, 2003)). Even were we to accept this proposition, it does not control this appeal.

Here, the averments in Kirleis's affidavit go well beyond those alleged by the employee in *Ortiz.* For example, Kirleis alleges that she was neither aware of nor received the arbitration provision contained in the Firm's bylaws. *A fortiori,* she was never given the opportunity to read or consent to it. Moreover, Kirleis was never asked to sign any document that included an arbitration agreement. Cf. *Ortiz,* 2003 WL 21696542, at *2 (without reading them, employee signed two employee acknowledgment forms that, unbeknownst to her, contained arbitration agreements). Unlike Ortiz's allegations, which reflected her own failure to read her employment contract before signing it, Kirleis's allegations reflect the Firm's failure to obtain her consent to be bound. *See Blair,* 283 F.3d at 603. Accordingly, Kirleis's allegations create a genuine issue of fact as to the existence of an agreement to arbitrate.

The Firm also relies on a case in which an employer distributed to its employees in paycheck envelopes a brochure entitled "Pinkerton's Arbitration Program." *Tinder v. Pinkerton Sec.,* 305 F.3d 728, 731, 736 (7th Cir.2002). In *Tinder,* the Court of Appeals for the Seventh Circuit held that an employee's affidavit stating that she "[did] not recall seeing or reviewing the Arbitration Program brochure" was insufficient to create a triable issue as to whether "the

Case 09-10138-MFW    Doc 5598-4    Filed 06/05/11    Page 56 of 302

Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156 (2009)

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515...

brochure was distributed to her" in light of the employer's assertion to the contrary. *Id.* at 735-36.

This appeal differs significantly from *Tinder.* First, Kirleis averred that she "was never provided with a copy of the By-Laws of defendant Firm," not that she merely could not "recall seeing or reviewing" them. Second, the material issue here is whether Kirleis agreed to be bound by the Firm's arbitration provision, not whether a document containing that provision was ever distributed to her. Even had she received such a document-which the uncontroverted evidence indicates she did not-a mere offer is insufficient to create a triable issue as to the existence of a contract to arbitrate. *See Blair,* 283 F.3d at 603. For these reasons, *Tinder* is inapposite.

Kirleis submitted specific, undisputed evidence that she never agreed to arbitrate her claims against the Firm. The District Court did not err in finding that this evidence creates a genuine issue of material fact.

**B.**

The Firm next argues that Kirleis's status as a shareholder/director of the Firm put her on constructive notice of the arbitration provision in the bylaws and implied her intent to be bound thereby. This argument has persuasive force as it highlights the tension between corporate law principles-which generally impute to *\*163* members of the corporation knowledge and acceptance of corporate bylaws-and the law of contracts, which requires consent to be bound. *Compare Morris v. Metalline Land Co.,* 164 Pa. 326, 30 A. 240, 241 (1894) (member of corporation "is subject to its constitution, and bound by its by-laws ... which he is presumed to know and understand") *with Eltz,* 204 A.2d at 927 (agreement to arbitrate must be "clear and unmistakable" and cannot arise "by implication").

Seizing on this tension, the Firm cites two cases for the proposition that a court may compel arbitration because of "arbitration provisions contained within corporate bylaws." Firm Br. 15 (citing *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141 (1st Cir.1998) and *Rushing v. Gold Kist, Inc.,* 256 Ga.App. 115, 567 S.E.2d 384 (2002)).

In *Bercovitch,* plaintiffs sued a private school for discrimination pursuant to the Americans with Disabilities Act. The school moved to compel arbitration because plaintiffs signed an agreement that manifested their intention to "abide by the By-Laws of the School ... [c]opies [of which] [were] available for review at the school main

office." *Bercovitch,* 133 F.3d at 147. The school bylaws, in turn, provided for "final and binding arbitration of any dispute regarding the school's rules, regulations, or policies." *Id.* Based on these facts, the court compelled plaintiffs to arbitrate. *Id.*

*Bercovitch* is distinguishable for two reasons. First, unlike the plaintiffs in that case, Kirleis never signed any arbitration agreement or other document that incorporated the arbitration provision in the bylaws. Even more fundamentally, the *Bercovitch* plaintiffs never challenged the existence of an agreement to arbitrate between themselves and the school. *Bercovitch,* 133 F.3d at 147. Rather, they argued that their ADA claim did not fall within the scope of that agreement. *Id.* Here, by contrast, Kirleis asserts that she never agreed to arbitrate any claims against the Firm.

The Firm's reliance on *Rushing* is likewise misplaced. Apart from the fact that it is an out-of-jurisdiction intermediate state court decision, the party seeking to avoid arbitration in that case signed an agreement in which he "expressly consented to be bound by the [cooperative's] By-Laws" and any By-Laws "hereafter in effect." *Rushing,* 567 S.E.2d at 388. In light of this written promise, the court held that the party was bound by an amendment to the bylaws that mandated arbitration of disputes. *Id.* Here, Kirleis never signed an agreement that subjected her to arbitration.

**12** In sum, under Pennsylvania law, explicit agreement is essential to the formation of an enforceable arbitration contract. *Eltz,* 204 A.2d at 927. *See also Quiles,* 879 A.2d at 285; *Philmar Mid-Atl., Inc., v. York St. Assoc. II,* 389 Pa.Super. 297, 566 A.2d 1253, 1255 (1989) ("A mutual manifestation of intent to be bound is an essential element of a contract."). Thus, the Firm's argument that Kirleis impliedly agreed to arbitrate her claims must fail under Pennsylvania law.

**C.**

The Firm next argues that the District Court erred in relying on *Quiles v. Financial Exchange Co.,* 879 A.2d 281 (Pa.Super.Ct.2005). We review *Quiles* in some detail because, like the District Court, we find it apposite here.

In *Quiles,* Dollar Financial Group petitioned to compel its former employee, Luz Quiles, to arbitrate her defamation claim as required by the company's employee handbook. *Id.* at 283. Quiles claimed that *\*164* she never received the handbook, although she admitted to signing an

Case 09-10138-MFW   Doc 5598-4   Filed 06/05/11   Page 57 of 302

Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156 (2009)

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515...

employee acknowledgment form that required her to affirm that she "carefully read the Handbook" and the "DISPUTE RESOLUTION PROGRAM and provisions relating to arbitration" contained therein. *Id.* at 283-84. The handbook further provided that by accepting employment, all employees agreed to be bound by the dispute resolution program. *Id.* at 284. The Court of Common Pleas denied Dollar's petition to compel arbitration, concluding that "because Quiles never received the Handbook, she could not have been fully informed of the arbitration policy and provisions." *Id.* at 284.

On appeal, the Pennsylvania Superior Court framed the question as "whether an employee is bound to arbitration provisions found in an employee handbook (when that employee was never given a copy of the handbook containing the actual arbitration provisions and had signed an acknowledgment form stating she read such handbook under suspect circumstances)." *Id.* at 285. Beginning with the general rule that arbitration agreements are presumptively enforceable if they are "specific enough" and "the employee has *expressly* agreed to abide by [their] terms," the court turned to the specifics of the case. *Id.* at 285 (emphasis added) (citing *Cohn v. Penn Beverage Co.,* 313 Pa. 349, 169 A. 768, 768-69 (1934) and *Parsons Bros. Slate Co. v. Commonwealth,* 418 Pa. 389, 211 A.2d 423, 424 (1965)).

The court declined to apply case law suggesting that "a party's failure to *read* a contract will not justify nullification or avoidance," because "without a copy of the Handbook, Quiles was not even given the opportunity to read the terms of the arbitration agreement; there was no arbitration clause in the [employee acknowledgment form] signed by Quiles." *Id.* at 286, 211 A.2d 423. Indeed, the court viewed the fact that Quiles never received the handbook as dispositive: "Quiles could not validly agree to arbitrate her claims without first having been given a copy of the Handbook, the only document that detailed and explained ... the company's proposed arbitration process." *Id.* at 288, 211 A.2d 423. To bolster this conclusion, the court added that "Quiles was unfamiliar with the English language and had not even received a high school diploma," and that she was pressured by her supervisor to sign the employee acknowledgment form. *Id.*

The Firm attempts to distinguish *Quiles* on two principal grounds: (1) the arbitration provision in *Quiles* was set forth in an employee handbook while the provision here was in the corporate bylaws, which Kirleis is "presumed to know and understand," and (2) the employee in *Quiles* "was from

Puerto Rico, had difficulty with the English language, had never completed high school and was unfamiliar with the term 'arbitration.' " Firm Br. 17.

**13** The Firm claims that employee handbooks are different from corporate bylaws because members of a corporation are presumed to understand bylaws in a way that employees are not presumed to understand handbooks. We find this argument persuasive to a point. A shareholder/director of a professional corporation who has had the benefit of advanced education and training and who has been involved in law firm management typically would be more knowledgeable regarding corporate bylaws than an entry-level worker would be likely to know about an employee handbook. But this factual distinction, as cogent as it may be, is immaterial to the fact that Pennsylvania law requires arbitration agreements to be explicit. To the extent the Firm argues that this rule of law does not apply to a corporate shareholder **\*165** /director, we have rejected that argument in Part IV.B., *supra.*

We also note that Quiles signed an employee acknowledgment form that expressly bound her to arbitrate under her company's terms. By accepting employment with Dollar, Quiles "agree[d] to be bound by the terms of the [dispute resolution procedures]." *Quiles,* 879 A.2d at 284. Despite this explicit agreement to submit to the terms of a handbook that included arbitration, the Superior Court found no agreement to arbitrate. Here, by contrast, there was no explicit agreement; rather, the Firm seeks to derive one from corporate law principles, making its implied acceptance argument even more tenuous than the one rejected in *Quiles.*

The Firm's second distinction is even less persuasive because the Superior Court's observations about Quiles's background were classic *dicta.* After concluding that "Quiles could not validly agree to arbitrate her claims without first having been given a copy of the Handbook," the court wrote: "*[i]n addition* ... the facts that Quiles was unfamiliar with the English language and had not even received a high school diploma, *further* invalidated any such agreement to arbitrate." *Id.* at 288 (emphasis added). These observations cannot fairly be read as essential to the court's holding in *Quiles.*

Contrary to the Firm's arguments, *Quiles* is analogous to the present case in at least one critical respect: like Quiles, Kirleis never received a copy of the only document containing the firm's arbitration provision. Without this document, Kirleis could not have explicitly agreed to arbitrate her claims.

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515...

### D.

Finally, the Firm argues that Kirleis should be estopped from arguing that she is not bound to arbitrate pursuant to the bylaws because she has availed herself of other benefits provided thereunder.

**14**  **15**  **16**  Equitable estoppel precludes a party from doing an act differently than the manner in which he induced another party to expect. *Zitelli v. Dermatology Educ. & Research Found.,* 534 Pa. 360, 633 A.2d 134, 139 (1993). It arises when a party "intentionally or through culpable negligence induces another to believe certain facts to exist" and the other party "rightfully relies and acts on such belief" to its detriment. *Id.* The essential elements of equitable estoppel are thus inducement and detrimental reliance. *See id.*

The Firm cites numerous cases that stand for the unremarkable proposition that a party to a contract cannot enforce favorable terms while disavowing others. Firm Br. 19-21. These cases miss the mark. As we have explained, Kirleis could not have explicitly agreed to arbitrate her claims because she never received a copy of the bylaws and was unaware of the existence of the arbitration provision contained therein. To the extent the Firm argues that Kirleis impliedly agreed to arbitrate, this is a legal impossibility under *Quiles* for the reasons we explained in Section IV.C., *supra.* Accordingly, the District Court did not err in rejecting the Firm's equitable estoppel argument.

### V.

We conclude by citing the Pennsylvania Supreme Court's Order denying our petition to certify the question presented in this case. Therein, the Court chose not to decide the issue, but indicated clearly enough that we have chosen the proper course in resolving the tension between Pennsylvania corporate law and arbitration contract law. The Pennsylvania Supreme Court reasoned:

> ***\*166*** With regard to the corporate law principle, the Third Circuit quotes a statement in *Morris* that a member of a corporation "is subject to its constitution, and bound by its by-laws ... which he is presumed to know and understand[.]" On its face, that statement could be seen as being in conflict with the arbitration law precept that an agreement to arbitrate cannot rise by implication. A close review of *Morris,* however, reveals that the brief passage quoted by the Third Circuit is obiter dicta. *Morris* did not address the issue of whether a shareholder is bound by bylaws even when that shareholder has no actual knowledge of the bylaws. Rather, the specific relevant question that concerned the *Morris* Court was whether the company had provided the *notice required by the bylaws* prior to taking action to the shareholders' detriment. The phrase stating that a shareholder is presumed to know and understand the bylaws is part of a lengthy quote of an 1877 New Jersey Court of Errors and Appeals decision.... The 'presumed to know and understand' phrase which concerns the Third Circuit, on the other hand, had no bearing on the resolution in *Morris* .... *Morris* has been quoted only three times and not for the proposition that shareholders are presumed to know the contents of the bylaws.

*Kirleis v. Dickie, McCamey & Chilcote, P.C.,* No. 50 WM 2008 (Pa. Oct. 22, 2008) (internal citations omitted; emphasis in original).

For all the foregoing reasons, we will affirm the judgment of the District Court.

Parallel Citations

105 Fair Empl.Prac.Cas. (BNA) 1464, 92 Empl. Prac. Dec. P 43,515, 157 Lab.Cas. P 60,775

---

**End of Document**                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 19

DOCSTOR: 2191401\1

872 F.2d 534
United States Court of Appeals,
Second Circuit.

In the Matter of the Arbitration between
CHEVRON U.S.A. INC., a Pennsylvania
corporation, by and through its agent CHEVRON
RESOURCES COMPANY, Petitioner-Appellant,
v.
CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC., Respondent-Appellee.
CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC., Petitioner-Appellee,
v.
CHEVRON U.S.A. INC., Respondent-Appellant.

No. 636, Docket 88-7581.    Argued
Jan. 5, 1989.    Decided April 14, 1989.

Seller appealed from final judgment entered in the United
States District Court for the Southern District of New
York, Mary Johnson Lowe, J., denying arbitration of dispute
concerning price seller was to charge buyer. The Court of
Appeals, Kearse, Circuit Judge, held that dispute did not
fall within terms of limited arbitration clause in parties'
agreement.

Affirmed.

West Headnotes (1)

**1**    **Alternative Dispute Resolution** 🔑 Sales
Contracts Disputes

Dispute between buyer and seller as to price seller
was to charge for its product was not subject to
arbitration because limited arbitration clause in
parties' agreement provided that arbitration was
available if industry publisher whose "exchange
value" was to serve as parties' "market price"
ceased publication of exchange value, while
dispute arose after publisher began publishing
second figure as well as exchange value.

38 Cases that cite this headnote

**Attorneys and Law Firms**

*\*534* James N. Roethe, San Francisco, Cal. (Gerald Aksen,
Christopher Connolly, Reid & Priest, New York City, David
W. Trotter, Pillsbury, Madison & Sutro, San Francisco, Cal.,
on the brief), for petitioner-respondent-appellant.

Charles E. McTiernan, Jr., New York City (Richard J. Giglio,
New York City, on the brief), for respondent-petitioner-
appellee.

Before KEARSE, CARDAMONE, and WINTER, Circuit
Judges.

**Opinion**

KEARSE, Circuit Judge:

Chevron U.S.A. Inc. ("Chevron"), petitioner in one of these
consolidated actions and respondent in the other, appeals
from a final judgment of the United States District Court
for the Southern District of New York, Mary Johnson Lowe,
*Judge,* denying its petition pursuant to 9 U.S.C. § 4 (1982)
to compel Consolidated Edison Company of New York, Inc.
("Con Edison"), to submit to arbitration with respect to the
price at which Chevron is contractually obligated to supply
uranium to Con Edison, and granting Con Edison's petition to
stay arbitration permanently. The district court found *\*535*
the dispute not subject to arbitration because it was not
within the parties' agreement to arbitrate. On appeal, Chevron
contends principally that the district court failed to give due
deference to the federal presumption in favor of arbitration.
For the reasons below, we affirm the judgment.

**I. BACKGROUND**

The underlying facts do not appear to be in dispute. In 1980,
Con Edison entered into an agreement with Westinghouse
Electric Corporation ("Westinghouse"), pursuant to which
Westinghouse was to supply Con Edison with 350,000
pounds of uranium concentrate ($U_3O_8$) each year from
March 1985 through February 1990 (the "Agreement"). In
1986, with Con Edison's consent, Westinghouse assigned
its rights, interests, and obligations under the Agreement to
Chevron. The Agreement permitted Chevron to supply Con
Edison with uranium concentrate obtained from any source,
domestic or foreign, unless Con Edison's use of foreign-
source uranium became "restricted," in which case, Chevron
would be required to supply only domestic uranium.

## A. *The Price and Arbitration Terms of the Agreement*

To the extent pertinent to the present controversy, Article IV of the Agreement linked the price at which the uranium concentrate was to be sold to the "Market Price," which was defined as

> the Exchange Value published by the Nuclear Exchange Corporation ("Nuexco") in its Monthly Report to the Nuclear Industry the month immediately prior to the month of invoicing Con Edison for the U308.

Nuexco publications defined "Exchange Value" as "Nuexco's judgment of the price at which transactions for significant quantities of natural uranium concentrates could be concluded" as of the date indicated.

Article IV also contained a limited arbitration clause, stating as follows:

> In the event Nuexco ceases publication of the Exchange Value, Con Edison and [Chevron] shall enter into good faith negotiations to establish a replacement method for establishing the Market Price. If Con Edison and [Chevron] cannot agree upon a replacement method within two (2) months, the replacement method will be established through the process of arbitration.... Until a replacement method for determining the Market Price is established, the Market Price shall be the last published Exchange Value and the price paid or to be paid will later be adjusted, as necessary....

## B. *The Dispute and the Decision Below*

In 1986, the market for uranium concentrate was affected by a legal development. In *Western Nuclear, Inc. v. Huffman,* Civ. No. 84-C-2315 (D.Colo. June 20, 1986) ("*Western Nuclear* "), *aff'd,* 825 F.2d 1430 (10th Cir.1987), *rev'd,* 486 U.S. 663, 108 S.Ct. 2087, 100 L.Ed.2d 693 (1988), the United States Department of Energy, which was responsible for "enriching" uranium, *i.e.,* causing certain of its natural properties to become more highly concentrated so that it may be used in nuclear reactors, was ordered to curtail the enrichment of uranium obtained from foreign sources. Though this decision was initially stayed by the Tenth Circuit and was eventually overturned by the Supreme Court some two years later, *see Huffman v. Western Nuclear, Inc.,* 486 U.S. 663, 108 S.Ct. 2087, 100 L.Ed.2d 693 (1988), the effect during the intervening period was to increase the demand for domestic

uranium and to raise its price above the price of foreign uranium.

Nuexco continued to publish its Exchange Value, but as a result of this new two-tier market structure, in December 1986 it began to publish a second figure as well. Thus, along with the Exchange Value, still defined as it had been in 1980, Nuexco reported the "premium" paid for domestic uranium, *i.e.,* the amount by which the price per pound of domestic uranium exceeded the Exchange Value.

Following announcement of the decision of the district court in *Western Nuclear,* **\*536** Con Edison promptly advised Chevron that it viewed that decision as restricting Con Edison's use of foreign uranium, and it demanded that all uranium delivered thereafter be of domestic origin. Although Chevron contested Con Edison's interpretation of the *Western Nuclear* decision, it nonetheless commenced to supply Con Edison with domestic uranium. In March 1987, Chevron began to bill Con Edison at a price reflecting the Nuexco Exchange Value plus the Nuexco reported premium, stating as follows:

> It is now clear that there are *two* Exchange Values being published by Nuexco, one for foreign concentrates and the other for domestic-origin concentrates. "*The* " Exchange Value previously reflecting Nuexco's judgement of the price at which sales of significant quantities of natural uranium concentrates could be concluded *from all sources world-wide* is no longer being published.

> ... Chevron believes that the price should reflect the premium that Nuexco indicates domestic-origin concentrates command over concentrates from foreign sources.

(Chevron letter to Con Edison dated March 18, 1987 (emphasis in original).) Con Edison disagreed and refused to pay the portions of the bills reflecting the Nuexco premium.

Chevron demanded arbitration of the dispute. Con Edison, contending that the Agreement did not provide for arbitration in the existing circumstances because Nuexco had not "cease[d] publication of the Exchange Value," filed a petition in state court seeking an order permanently enjoining arbitration. Chevron commenced its own action in the district court, seeking an order pursuant to 9 U.S.C. § 4 compelling arbitration. Chevron removed Con Edison's state proceeding to the district court, where it was consolidated with Chevron's action.

In support of its petition to compel arbitration, Chevron submitted, _inter alia,_ affidavits from an economist and from a Westinghouse employee who had participated in the negotiation of the Agreement. The economist stated his opinion that Nuexco no longer published "the Exchange Value" referred to in the Agreement, because "[t]he 'Exchange Value' no longer serves as a reliable indicator of the spot market price for _domestic-origin_ U₃O₈ concentrates." (Affidavit of Richard J. Gilbert ¶¶ 7, 10 (emphasis in original).) The Westinghouse employee stated that the principal purposes of the Agreement had included providing Con Edison with uranium at a price linked to the "fair market value" and "provid[ing] for arbitration of a new market price method under certain circumstances." (Affidavit of Donald R. Marcucci ¶ 7.) The Marcucci affidavit stated that there had been no "contemporaneous discussions between Con Edison and Westinghouse as to how the 'Market Price' provisions of Article IV would be applied if a two-tiered market for uranium emerged in the future." (_Id._ ¶ 12.)

In opposition to the Chevron petition and in support of its own request for a stay of arbitration, Con Edison submitted the affidavit of its employee who had negotiated the Agreement on behalf of Con Edison, pointing out, _inter alia,_ differences between Article IV and other provisions of the Agreement and differences between Article IV and the arbitration provisions of other Westinghouse uranium supply agreements. This affidavit noted that the Agreement made reference to a variety of third-party indices other than the Nuexco Exchange Value and made provision for negotiation of replacement of those other indices "[s]hould the indices specified ... be discontinued, _or should the basis of their calculation be substantially modified._" (Affidavit of Henri M. Gueron ¶ 7 (emphasis added).) In addition, the Gueron affidavit appended copies of two Westinghouse contracts with other utility companies, one entered into roughly contemporaneously with the Con Edison Agreement and the other entered into a few months earlier. These contracts also had price terms linked to the Nuexco Exchange Value, but each contained an arbitration clause that was broader than the clause of the present Agreement in one significant respect: In addition to providing for arbitration *537 in the event that Nuexco ceased to publish the Exchange Value, these other contracts provided for arbitration if "either party reasonably believes" (_id._ Exhibit C), or if both parties "agree" (_id._ Exhibit D), "that the Nuexco Exchange Value does not fairly represent the market price." (_Id._ Exhibits C, D.)

In an opinion dated June 9, 1988 ("Opinion"), the district court denied Chevron's petition to compel arbitration and granted Con Edison's petition to enjoin arbitration. After discussing the pertinent legal principles, the court observed that the Nuexco "Exchange Value is fundamentally different now than it was eight years ago when the Agreement was negotiated," and indicated that at first blush, arbitration would seem to be appropriate. The court was persuaded, however, in light of Westinghouse's explicitly broader contracts with other utility companies, that Westinghouse and Con Edison had not intended the arbitration term of the present Agreement to be triggered merely because the Exchange Value published by Nuexco might have ceased to be a fair reflection of the market price. The court concluded that the language of the other contracts,

> if it were present in the Agreement, would clearly require this Court to compel arbitration. The fact that this language is not present in the Agreement, while it is present in contracts negotiated at the same time and prior to the Agreement, leads this Court to conclude "with positive assurance" ... that the arbitration clause in the Agreement is not triggered where, as here, the Exchange Value is still being published, even though its meaning has been altered.

This appeal followed.

## II. DISCUSSION

On appeal, Chevron contends principally (1) that the district court failed to pay due deference to the federal presumption in favor of arbitration by refusing to order arbitration unless it was "clearly require[d]" by the Agreement, (2) that the court failed to consider the affidavits submitted by Chevron, and (3) that proper deference to the presumption and proper consideration of the affidavits would have required an order compelling arbitration. We disagree.

It is well-established that federal policy favors resolution of disputes through arbitration rather than through litigation. Thus, " 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration....' " _Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,_ 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (quoting _Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,_ 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-42, 74 L.Ed.2d 765 (1983)); _see Genesco, Inc. v. T. Kakiuchi & Co.,_ 815

F.2d 840, 847 (2d Cir.1987). Accordingly, the district court should compel arbitration " 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *McAllister Brothers, Inc. v. A & S Transp. Co.,* 621 F.2d 519, 522 (2d Cir.1980) ("*McAllister Brothers* ") (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 1409 (1960)).

Application of the presumption, however, is constrained by the fact that the source of any obligation to arbitrate is the contract between the parties: "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. at 582, 80 S.Ct. at 1352. Where the parties have entered into a limited agreement to arbitrate, the district court must determine whether the dispute at hand falls within that agreement. "When 'dealing with a narrower arbitration clause, ... it will be proper to consider whether the conduct in issue is on its face within the purview of the clause.' " *McAllister Brothers,* 621 F.2d at 522 (quoting *Rochdale Village, Inc. v. Public Serv. Employees Union,* 605 F.2d 1290, 1295 (2d Cir.1979)). Thus, though even a narrow *538 arbitration clause must be construed in light of the presumption in favor of arbitration, the court is not free to disregard the explicit boundaries set by the agreement between the parties. *See, e.g., McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825, 832 (2d Cir.1988). The district court properly applied these principles to the record before it.

Though Chevron argues that the court erred "by insisting on language in the Agreement that would 'clearly require' arbitration of this dispute," we have searched the Opinion in vain for such insistence. The only portion of the Opinion that Chevron cites in support of this argument is the discussion of the other uranium supply contracts entered into by Westinghouse, which the court said would "clearly require" arbitration. That portion of the Opinion, however, followed the court's clear and correct exposition of the legal principles governing judicial interpretation of arbitration clauses. We think it plain that, in comparing the present Agreement with the other agreements, the court was simply attempting to fathom the parties' intent with respect to what type of price dispute the arbitration clause in the present Agreement would cover, in order to determine whether the straightforward language, "ceases publication," could at all reasonably be read to mean "ceases publication *or* continues publication

under different circumstances." Given the court's discussion of the law, including its explicit recognition that "[a]rbitration must be compelled 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' " Opinion at 7 (quoting *McAllister Brothers* ), we are not persuaded that the court's observation that certain disputes could be made clearly arbitrable bespoke a belief that any dispute not clearly arbitrable was *ipso facto* nonarbitrable.

As to Chevron's contention that the arbitration clause can reasonably be viewed as sufficiently broad to cover the present dispute, we disagree. The Agreement was explicit in its definition of "Market Price" as "the Exchange Value published by [Nuexco] in its Monthly Report to the Nuclear Industry." It was equally explicit-and quite narrow-in its description of the event that could trigger arbitration. Though the parties could have made provision for action if either (a) the Exchange Value ceased to be published or (b) the basis for its calculation changed, as they did with respect to other indices, instead Article IV provided only that the obligation to arbitrate would arise "[i]n the event Nuexco cease[d] publication of the Exchange Value." It is indisputable that Nuexco continued to publish "the Exchange Value" in its monthly reports to the nuclear industry and that its definition of that term did not change. What Nuexco did, in effect, was to expand its monthly report to show, as Chevron stated to Con Edison in its March 1987 letter, "*two* " values (emphasis in original). Thus, the present controversy is not the result of any cessation of publication of the Exchange Value; we have no doubt that if Chevron had continued to supply Con Edison with foreign uranium, there would be no contention that the Exchange Value no longer existed. We think it clear that the publication of the Exchange Value plus another value is not a discontinuation of publication of the Exchange Value, and that an agreement to arbitrate where no such value is published by Nuexco cannot reasonably be interpreted as an agreement to arbitrate where there are two such published values.

We reject Chevron's contention that the affidavits it presented to the district court require the contrary conclusion. Those affidavits, like most of Chevron's contentions on this appeal, largely argue the merits of the underlying price dispute and draw from Chevron's view of the merits the conclusion that the dispute must be arbitrable. To the extent that these affidavits make any factual presentation as to the parties' intent, they reach only that intent as it relates to who should prevail in the underlying dispute rather than the parties' intent to select arbitration as the forum in which that dispute should

be resolved. For example, the Marcucci affidavit argued that an intent *539 to arbitrate the present dispute should be inferred from the parties' goal of assuring that the price of uranium delivered in the future would be fair. That argument, however, goes to the merits of the underlying dispute, not to its arbitrability. As to arbitrability, the affidavit as a whole provides greater support for the inference that the parties had no thought that their phrase "ceases to publish" would be interpreted to cover the publication of two values. Though the Marcucci affidavit stated that the parties intended "arbitration of a new market price method under certain circumstances," it did not state what "circumstances" the parties discussed, and it did state that there were no contemporaneous discussions as to how the provisions of Article IV would be applied if a two-tiered market for uranium emerged in the future.

We conclude that neither the language of Article IV nor the record can reasonably be read to support Chevron's interpretation that the parties intended to make arbitrable a dispute resulting from Nuexco's publication of two values for $U_3O_8$.

This conclusion does not mean that Chevron is without means to obtain an adjudication of the merits of its price dispute with Con Edison. It is free to pursue that dispute in a court action. We of course express no view as to the merits.

## CONCLUSION

We have considered all of Chevron's arguments in support of arbitrability and have found them to be without merit. The judgment of the district court is affirmed.

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 20

DOCSTOR: 2191401\1

233 N.Y.S.2d 488
Supreme Court, Appellate Division,
First Department, New York.

Application of DOUGHBOY INDUSTRIES,
INC., Petitioner-Appellant, To stay the
arbitration proceedings initiated by The
Pantasote Company, Respondent-Respondent.

Nov. 13, 1962.

Proceeding on a motion to stay arbitration proceedings. The Supreme Court, Special Term, Samuel M. Gold, J., denied the motion, and an appeal was taken. The Supreme Court, Appellate Division, Breitel, J., held that buyer and seller did not agree in writing to submit future disputes to arbitration so as to be bound by statute to arbitration where buyer's order form and seller's acknowledgment form each memorialized purchase and sale of goods, seller's form had general arbitration provision and stated that silence or failure to object in writing would be acceptance of its terms and conditions, while buyer's form, containing no arbitration provision, stated that only signed consent would bind buyer to any terms thereafter transmitted, and similar forms were used in prior transactions between parties.

Order reversed and motion granted.

West Headnotes (6)

1    **Alternative Dispute Resolution** 🗝 Writing, Signature, and Acknowledgment

Buyer and seller did not agree in writing to submit future disputes to arbitration so as to be bound by statute to arbitration where buyer's order form and seller's acknowledgment form each memorialized purchase and sale of goods, seller's form had general arbitration provision and stated that silence or failure to object in writing would be acceptance of its terms and conditions, while buyer's form, containing no arbitration provision, stated that only signed consent would bind buyer to any terms thereafter transmitted and similar forms were used in prior transactions between parties. Civil Practice Act, §§ 1448, 1449; Laws 1962, c. 553.

17 Cases that cite this headnote

2    **Alternative Dispute Resolution** 🗝 Requisites and Validity

Agreement to arbitrate must be direct and intention made clear, without implication, inveiglement or subtlety.

23 Cases that cite this headnote

3    **Contracts** 🗝 Entire or Severable Contracts

Severability of arbitration clauses from other provisions of commercial documentation may be effected when threshold for clarity of agreement to arbitrate is greater than with respect to other contractual terms.

5 Cases that cite this headnote

4    **Sales** 🗝 Acceptance of Offer

Contract for sale came into existence when seller made partial shipment.

5    **Sales** 🗝 Validity of Assent in General

There is constructive knowledge and acceptance of contractual terms, based on prior transactions involving them and duty to read contractual instruments, but such constructive knowledge applies not only to a seller's forms but to a buyer's forms as well.

2 Cases that cite this headnote

6    **Alternative Dispute Resolution** 🗝 Agreements to Arbitrate

Existence of agreement to arbitrate should not depend solely on conflicting fine print of commercial forms which cross one another but never meet. Civil Practice Act, §§ 1448, 1449; Laws 1962, c. 553.

10 Cases that cite this headnote

Application of Doughboy Industries, Inc., 17 A.D.2d 216 (1962)

233 N.Y.S.2d 488, 1 UCC Rep.Serv. 77

**Attorneys and Law Firms**

 **\*\*489**   **\*216**  Edwin H. Baker, New York City, of counsel
(Gilbert & Segall, New York City, attorneys), for appellant.
Charles H. Cohen, New York City, of counsel (Kaye, Scholer,
Fierman, Hays & Handler, New York City, attorneys), for
respondent.

Before  **\*223**  BOTEIN, P. J., and BREITEL, VALENTE,
McNALLY, and EAGER, JJ.

**Opinion**

BREITEL, Justice.

 **1**   This case involves a conflict between a buyer's order form
and a seller's acknowledgment form, each memorializing a
purchase and sale  **\*\*490**  of goods. The issue arises on
whether the parties agreed to arbitrate future disputes. The
seller's form had a general arbitration provision. The buyer's
form did not. The buyer's form contained a provision that
only a signed consent would bind the buyer to any terms thereafter
transmitted in any commercial form of the seller. The seller's
form, however, provided that silence or a failure to object in
writing would be an acceptance of the terms and conditions
of its acknowledgment form. The buyer never objected to the
seller's acknowledgment, orally or in writing. In short, the
 **\*217**  buyer and seller accomplished a legal equivalent to the
irresistible force colliding with the immovable object.

Special Term denied the buyer's motion to stay arbitration
on the ground that there was no substantial issue whether the
parties had agreed to arbitrate. For the reasons to be stated,
the order should be reversed and the buyer's motion to stay
arbitration should be granted. As a matter of law, the parties
did not agree in writing to submit future disputes to arbitration
(Civil Practice Act, §§ 1448, 1449).

Of interest in the case is that both the seller and buyer are
substantial businesses-a 'strong' buyer and a 'strong' seller.
This is not a case of one of the parties being at the bargaining
mercy of the other.

The facts are:

During the three months before the sale in question the parties
had done business on two occasions. On these prior occasions
the buyer used its purchase order form with its insulating
conditions, and the seller used its acknowledgment form with
its self-actuating conditions. Each ignored the other's printed
forms, but proceeded with the commercial business at hand.

The instant transaction began with the buyer, on May 6,
1960, mailing from its office in Wisconsin to the seller in
New York City two purchase orders for plastic film. Each
purchase order provided that some 20,000 pounds of film
were to be delivered in the future on specified dates. In
addition, further quantities were ordered on a 'hold basis',
that is, subject to 'increase, decrease, or cancellation' by
the buyer. On May 13, 1960 the seller orally accepted both
purchase orders without change except to suggest immediate
shipment of the first part of the order. The buyer agreed to the
request, and that day the seller shipped some 10,000 pounds
of film in partial fulfillment of one purchase order. On May
16, 1960, the buyer received the seller's first acknowledgment
dated May 13, 1960, and on May 19, 1960 the seller's second
acknowledgment dated May 16, 1960. Although the purchase
orders called for written acceptances and return of attached
acknowledgments by the seller no one paid any attention
to these requirements. Neither party, orally or in writing,
objected to the conditions printed on the other's commercial
form. Later, the buyer sent change orders with respect to so
much of the orders as had been, according to the buyer, on a
'hold basis'.

 **\*\*491**  The dispute, which has arisen and which the parties
wish determined, the seller by arbitration, and the buyer by
court litigation, is whether the buyer is bound to accept all the
goods ordered on a 'hold basis'. The arbitration would take
place in  **\*218**  New York City. The litigation might have to
be brought in Wisconsin, the buyer's home state.

The buyer's purchase order form had on its face the usual
legends and blanks for the ordering of goods. On the reverse
was printed a pageful of terms and conditions. The grand
defensive clause reads as follows:

'ALTERATION OF TERMS-None of the terms and
conditions contained in this Purchase Order may be added to,
modified, superseded or otherwise altered except by a written
instrument signed by an authorized representative of Buyer
and delivered by Buyer to Seller, and each shipment received
by Buyer from Seller shall be deemed to be only upon the
terms and conditions contained in this Purchase Order except
as they may be added to, modified, superseded or otherwise
altered, notwithstanding any terms and conditions that may be
contained in any acknowledgment, invoice or other form of
Seller and notwithstanding Buyer's act of accepting or paying
for any shipment or similar act of Buyer.'

The buyer's language is direct; it makes clear that no variant
seller's acknowledgment is to be binding. But the seller's

acknowledgment form is drafted equally carefully. On its front in red typography one's attention is directed to the terms and conditions on the reverse side; and it advises the buyer that he, the buyer, has full knowledge of the conditions and agrees to them unless within 10 days he objects in writing.

The seller's clause reads:

### 'IMPORTANT

'Buyer agrees he has full knowledge of conditions printed on the reverse side hereof; and that the same are part of the agreement between buyer and seller and shall be binding if either the goods referred to herein are delivered to and accepted by buyer, or if buyer does not within ten days from date hereof deliver to seller written objection to said conditions or any part thereof.'

On the reverse side the obligations of the buyer set forth above are carefully repeated. Among the conditions on the reverse side is the general arbitration clause.

**2   3**   This case involves only the application of the arbitration clause. Arguably, a different principle from that applied here might, under present law [1], govern other of the terms and conditions in either **\*\*492** of the commercial forms. The reason is the special rule that the courts have laid down with respect to arbitration clauses, namely, that the agreement to arbitrate must be direct and the intention made clear, without implication, inveiglement *\*219* or subtlety (Matter of Riverdale Fabrics Corp. [Tillinghast-Stiles Co.], 306 N.Y. 288, 289, 291, 118 N.E.2d 104, 105, 41 A.L.R.2d 867; Matter of Lehman v. Ostrovsky, 264 N.Y. 130, 132, 190 N.E. 208, 209; see, also, Matter of American Rail & Steel Co. [India Supply Mission], 308 N.Y. 577, 579-580, 127 N.E.2d 562, 563; Matter of Princeton Rayon Corp. [Gayley Mill Corp.], 309 N.Y. 13, 127 N.E.2d 729, involving conflicting forms). The severability of arbitration clauses from other provisions in commercial documentation would, of course, follow, if it be true that the threshold for clarity of agreement to arbitrate is greater than with respect to other contractual terms (see Matter of General Silk Importing Co., Inc., 198 App.Div. 16, 189 N.Y.S. 391; s. c. 200 App.Div. 786, 194 N.Y.S. 15, aff'd 234 N.Y. 513, 138 N.E. 427; see also, Matter of Arthur Philip Exp. Corp. [Leathertone, Inc.], 275 App.Div. 102, 104-105, 87 N.Y.S.2d 665, 666; but cf. Matter of Albrecht Chemical Co. [Anderson Trad. Corp.], 298 N.Y. 437, 440-441, 84 N.E.2d 625, 626).

[1]   See, as to future law, discussion, *infra*, of applicable provisions of the Uniform Commercial Code, effective in this state on September 27, 1964.

**4**   It should be evident, as the buyer argues, that a contract for the sale of goods came into existence on May 13, 1960 when the seller made a partial shipment, especially when following upon its oral acceptance of the buyer's purchase order (Restatement, Contracts, § 63; Williston on Sales [rev. ed.] § 5b; Personal Property Law, § 85, subd. 1[b]). The contract, at such time, was documented only by the buyer's purchase order form. However, that is not dispositive. It is equally evident from the prior transactions between these parties, and general practices in trade, that more documents were to follow. Such documents may help make the contract, or modify it (12 Am.Jur., Contracts, § 405; 10 N.Y.Jur., Contracts, § 403). Whether the subsequent documents were necessary to complete the making of the contract (as would be true if there had been no effective or valid acceptance by partial shipment), or whether they served only to modify or validate the terms of an existing contract (as would be true if there had been a less formal written acceptance, merely an oral acceptance, or an acceptance by partial shipment of goods) is not really too important once the commercial dealings have advanced as far as they had here. By that time, there is no question whether there was a contract, but only what was the contract.

**5**   Recognizing, as one should, that the business men in this case acted with complete disdain for the 'lawyer's content' of the very commercial forms they were sending and receiving, the question is what obligation ought the law to attach to the arbitration clause. And in determining that question the traditional theory is applicable, namely, that of constructive knowledge and acceptance of contractual terms, based **\*\*493** on prior transaction and the duty to read contractual instruments to which one is a party *\*220* (Matter of Level Export Corp. [Wolz, Aiken & Co.], 305 N.Y. 82, 86-87, 111 N.E.2d 218, 221; Matter of Wachusett Spinning Mills [Blue Bird Silk], 7 A.D.2d 382, 183 N.Y.S.2d 601, aff'd 6 N.Y.2d 948, 190 N.Y.S.2d 1011, 161 N.E.2d 222; cf. Matter of Riverdale Fabrics Corp. [Tillinghast-Stiles Co.], 306 N.Y. 288, 118 N.E.2d 104, 41 A.L.R.2d 867, supra).

But, and this is critical, it is not only the seller's form which should be given effect, but also the buyer's form, for it too was used in the prior transactions, and as to it too, there was a duty to read. Of course, if the two commercial forms are given effect, they cancel one another. (Certainly, the test is not which is the later form, because here the prior

233 N.Y.S.2d 488, 1 UCC Rep.Serv. 77

form said the buyer would not be bound by the later form unless it consented in writing. It needs little discussion that silence, a weak enough form of acceptance, effective only when misleading and there is a duty to speak, can be negatived as a misleading factor by announcing in advance that it shall have no effect as acceptance (Restatement, Contracts, § 72; Corbin on Contracts, §§ 72-75; 9 N.Y.Jur., Contracts, §§ 34, 45].)

6    As pointed out earlier, an agreement to arbitrate must be clear and direct, and must not depend upon implication, inveiglement or subtlety (Matter of Riverdale Fabrics Corp. [Tillinghast-Stiles Co.], 306 N.Y. 288, 289, 291, 118 N.E.2d 104, 105, 41 A.L.R.2d 867, supra; Matter of Lehman v. Ostrovsky, 264 N.Y. 130, 132, 190 N.E. 208, 209, supra). It follows then that the existence of an agreement to arbitrate should not depend solely upon the conflicting fine print of commercial forms which cross one another but never meet (cf. Matter of Princeton Rayon Corp. [Gayley Mill Corp.], 309 N.Y. 13, 127 N.E.2d 729, supra; Mtr. of American Rail & Steel Co. [India Supply Mission], 308 N.Y. 577, 127 N.E.2d 562, supra).

Matter of Wachusett Mills [Blue Bird Silk], 7 A.D.2d 382, 183 N.Y.S.2d 601, aff'd 6 N.Y.2d 948, 190 N.Y.S.2d 1011, 161 N.E.2d 222, supra, provides no applicable rule. There the seller's acknowledgment of the buyer's purchase order (which included an arbitration clause) expressly accepted the purchase order by reference and designation. Although the acknowledgment contained additional terms, the specific reference to the purchase order was held determinative that the acknowledgment was an acceptance of the purchase order with all its terms. Thus, it was said (per Rabin, J.):

'The position of the petitioners might be sound if the confirmation orders made no reference to the original orders containing the arbitration clause. On the contrary however, the confirmation orders were in such form as to show an intent to incorporate all the terms of the original orders-except, of **494 course, as to specific changes stated.' (7 A.D.2d at 383, 183 N.Y.S.2d at 603.)

In this case, the supposed condition happened, the acknowledgment made no reference to the purchase order, and, moreover, the prior purchase order disavowed the *221 future application of any subsequent differing acknowledgment. And, the arbitration clause was one of the 'specific changes' from the purchase order, which even under the rule in the Wachusett case would not be binding on the other party.

Consequently, as a matter of law there was no agreement to arbitrate in this case, if one applies existing principles. [2]

[2]    The parties have not argued which law, that of New York or elsewhere, should be applied in this case, but have assumed that it is the law of New York. This assumption is followed here, in the absence of contrary suggestion by either of the parties. The assumption, moreover, is supported by the fact that the arbitration clause provided for arbitration in the City of New York; required the parties' consent to jurisdiction of the State and Federal courts sitting in the State of New York; the buyer's offer was orally accepted in New York; and, assuredly, the arbitration agreement, if effective, would be governed by the law of New York (Matter of Marchant v. Mead-Morrison M. Co., 252 N.Y. 284, 293-294, 169 N.E. 386, 388). There were, of course, other loci in the case. While not said of the 'making' of an agreement to arbitrate, it has been generalized: 'It is widely held that the parties who have chosen the place of arbitration have thus impliedly agreed on the applicability of both the procedural and substantive law of that place' (Ehrenzweig, Conflict of Laws, p. 540. To the same effect see, Lorenzen, Selected Articles on the Conflict of Laws, 496-505; Lorenzen, Interstate Commercial Arbitration, 43 Yale L.J. 716; also see Ehrenzweig, op. cit., 158 et seq.).

But the problem of conflicting commercial forms is one with which there has been much concern before this, and a new effort at rational solution has been made. The new solution would yield a similar result. The Uniform Commercial Code (L.1962, ch. 553) takes effect in this State September 27, 1964 (§ 10-105). It reflects the latest legislative conclusions as to what the law ought to be. It provides:

'§ 2-207 Additional Terms in Acceptance or Confirmation

'(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

'(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

'(a) the offer expressly limits acceptance to the terms of the offer;

233 N.Y.S.2d 488, 1 UCC Rep.Serv. 77

'(b) they materially alter it; or

'(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

'(3) Conduct by both parties which recognizes the existence *222 of a contract is sufficient to establish a contract for sale although the writings **495 of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.'

While this new section is not in its entirety in accordance with New York law in effect when the events in suit occurred (see 1 Report of N.Y.Law Rev.Comm. on Uniform Commercial Code [1955] p. 627 et seq.), in its particular application to the problem at hand it is quite useful.[3] The draftsmen's comments to section 2-207 are in precise point (Uniform Commercial Code [U.L.A.] § 2-207, comments 3 and 6). Thus, it is said:

[3]   See, also, Pers. Prop. L. § 84-a, enacted by L.1960, ch. 360, effective September 1, 1960, which reads:
' § 84- a.  Immaterial variance between offer and acceptance.
'An expression of acceptance of an offer to make a contract to sell or a sale of goods, including an offer to buy goods, shall not be insufficient as an acceptance of the offer merely because it states additional or different terms which do not materially vary the terms of the offer unless the acceptance is expressly made conditional on assent to the additional or different terms. Where the expression of acceptance is not insufficient as an acceptance of the offer, the additional or different terms which it states shall be deemed an offer for addition to or modification of the contract.'
This section too was not in effect when the events in suit occurred.

'3. Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party. If, however, they are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time. * * *

'6. If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to. Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2).'

On this exposition, the arbitration clause, whether viewed as a material alteration under subsection (2), or as a term nullified by a conflicting provision in the buyer's form, would fail to survive as a contract term. In the light of the New York cases, at least, there can be little question **496 that an agreement to arbitrate is a material term, one not to be injected by implication, subtlety or inveiglement. And the conclusion is also the same if the limitation contained in the offer (the buyer's purchase order) is given effect, as required by subsection 2(a) of the new section.

Accordingly, the order denying petitioner-appellant buyer's motion to stay arbitration should be reversed, on the law, with costs to petitioner-appellant and the motion should be granted.

Order, entered on April 13, 1962, denying petitioner-appellant buyer's motion to stay arbitration, unanimously reversed, on the law, with $20 costs and disbursements to appellant, and the motion granted. All concur.

Parallel Citations

17 A.D.2d 216, 1 UCC Rep.Serv. 77

End of Document                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 21

DOCSTOR: 2191401\1

658 N.Y.S.2d 322
Supreme Court, Appellate Division,
Second Department, New York.

COMPUTER ASSOCIATES
INTERNATIONAL, INC., Appellant,

v.

COM-TECH ASSOCIATES, Respondent.

May 12, 1997.

Action was brought for a judgment declaring rights of parties under a settlement agreement. The Supreme Court, Suffolk County, Stark, J., granted defendant's motion to compel arbitration and denied plaintiff's cross-motion for summary judgment. Appeal was taken. The Supreme Court, Appellate Division, held that: (1) dispute as to collections and royalties did not fall within scope of arbitration clause of settlement agreement, and (2) marketing and settlement agreements, both of which defined "collections" upon which royalties were to be based as payments received by plaintiff, did not support defendant's contention that parties intended that royalties would be calculated based upon all fees collected for licensing and maintenance of product, regardless of whether fees were collected by plaintiff or plaintiff's distributors.

Order reversed, motion to compel arbitration denied, plaintiff's cross-motion for summary judgment granted, and matter remitted.

West Headnotes (5)

**1**   **Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

In the commercial context generally, unless agreement to arbitrate expressly and unequivocally encompasses subject matter of particular dispute, a party cannot be compelled to forego right to seek judicial relief and instead submit to arbitration.

2 Cases that cite this headnote

**2**   **Alternative Dispute Resolution** 🔑 Arbitration Favored; Public Policy

**Alternative Dispute Resolution** 🔑 Formal Requisites

While arbitration is favored and encouraged by state policy as a means of expediting resolution of disputes and conserving judicial resources, these considerations must be reconciled with equally strong policy considerations that a party who agrees to arbitration waives in large part many of his normal rights under procedural and substantive law, and it would be unfair to infer such a significant waiver on the basis of anything less than a clear indication of intent.

4 Cases that cite this headnote

**3**   **Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

Dispute as to collections and royalties did not fall within scope of settlement agreement section which gave defendant right to have its representative examine plaintiff's books to verify collections and royalties earned pursuant to agreement and which provided that if defendant's representative found that collections or royalties had been understated or underpaid, parties were to confer to resolve dispute, and if they could not agree, a third party would be appointed to inspect books and records and render a decision on amounts owed, which decision would be binding on all the parties.

4 Cases that cite this headnote

**4**   **Judgment** 🔑 Matters of Fact or Conclusions

**Judgment** 🔑 Contracts

Where written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that writing did not express his own understanding of oral agreement reached during negotiations.

**5**   **Compromise and Settlement** 🔑 Construction of Agreement

Marketing and settlement agreements, both of which defined "collections" upon which royalties were to be based as payments received by plaintiff, did not support defendant's contention that parties intended that royalties would be

calculated based upon all fees collected for licensing and maintenance of product, regardless of whether fees were collected by plaintiff or plaintiff's distributors.

**Attorneys and Law Firms**

**\*\*323**  Weil, Gotshal & Manges, LLP, New York City (Kevin P. Hughes, of counsel), for appellant.
Leventhal & Slade, New York City (Jeffrey C. Slade and Joel Berger, of counsel), for respondent.

Before MANGANO, P.J., and ROSENBLATT, SANTUCCI and JOY, JJ.

**Opinion**

MEMORANDUM BY THE COURT.

**\*379**  In an action for a judgment declaring the rights of the parties under a settlement agreement, the plaintiff appeals from an order of the Supreme Court, Suffolk County (Stark, J.), dated May 15, 1996, which granted the defendant's motion to compel arbitration and denied its cross motion for summary judgment.

**\*380**  ORDERED that the order is reversed, on the law, with costs, the defendant's motion to compel arbitration is denied, the plaintiff's cross motion for summary judgment is granted, **\*\*324**  and the matter is remitted to the Supreme Court, Suffolk County, for the entry of a judgment declaring that royalties are to be calculated based only upon the amounts collected by the plaintiff.

Pursuant to a marketing agreement entered into between the parties, the plaintiff was given the exclusive right to license and distribute the defendant's software product in exchange for a promise to pay the defendant royalties "on all payments collected by [the plaintiff] for licenses and maintenance of the Product". The marketing agreement expressly gave the plaintiff the right to appoint distributors and subdistributors to market the product.

In resolving a prior Federal lawsuit, the parties entered into a settlement agreement in 1991, which, among other things, gave the defendant the right to have its representative "examine [the plaintiff's] books for the purpose of verifying the Collections and Royalties earned pursuant to [the]

agreement". The settlement agreement further provided that if the defendant's representative found that "Collections or Royalties ha[d] been understated or underpaid", the parties were to confer to resolve the dispute, and if they could not agree, a third party would be appointed to "inspect the books and records and render a decision on any amounts owed which decision shall be binding on all the parties".

The defendant exercised its right to examine the plaintiff's books and records for the quarterly reporting periods ending June 30, 1991, through September 30, 1992, and contested the manner in which the plaintiff was computing the royalties due it. The plaintiff had only been remitting royalties based upon the amounts it collected directly and the royalties it received from its distributors and subdistributors for their marketing of the product. The defendant claimed that it was entitled to royalties based upon total fees collected from the end-users of the product. Rather than submit the dispute to arbitration, the plaintiff commenced the present action seeking a judgment declaring that royalties were due only on amounts collected by the plaintiff and "[did] not include any higher amounts which may have been received by distributors or sub-distributors of [the plaintiff]". The Supreme Court granted the defendant's motion to compel arbitration of the dispute and denied the plaintiff's cross motion for summary judgment.

**1**  **2**  **3**  "[I]n the commercial context generally the rule is clear that **\*381**  unless the agreement to arbitrate expressly and unequivocally encompasses the subject matter of the particular dispute, a party cannot be compelled to forego the right to seek judicial relief and instead submit to arbitration" (Bowmer v. Bowmer, 50 N.Y.2d 288, 293-294, 428 N.Y.S.2d 902, 406 N.E.2d 760). Thus, while arbitration is favored and encouraged by the policy of this State "as a means of expediting the resolution of disputes and conserving judicial resources" (Rio Algom v. Sammi Steel Co., 168 A.D.2d 250, 251, 562 N.Y.S.2d 486), these considerations must be reconciled with the equally strong policy considerations that a party who agrees to arbitration "waives in large part many of his normal rights under the procedural and substantive law of the State, and it would be unfair to infer such a significant waiver on the basis of anything less than a clear indication of intent" (Matter of Marlene Inds. Corp. v. Carnac Textiles, 45 N.Y.2d 327, 333-334, 408 N.Y.S.2d 410, 380 N.E.2d 239). The scope of the arbitration clause at issue is narrow and equivocal, and as such it must be read conservatively (see, Shuffman v. Rudd Plastic Fabrics Corp., 64 A.D.2d 699, 407 N.Y.S.2d 565). With these principles in mind, we cannot conclude that the present dispute falls clearly

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

658 N.Y.S.2d 322

and unequivocally within the class of claims agreed to be submitted to arbitration. Accordingly, the defendant's motion to compel arbitration should have been denied.

**4  5**   Furthermore, the plaintiff's cross motion for summary judgment declaring that royalties are to be calculated based only upon amounts collected by the plaintiff should have been granted. "Where a written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that * * * the writing did not express his own understanding of the oral agreement reached during negotiations" **\*\*325** (*Chimart Assoc. v. Paul,* 66 N.Y.2d 570, 571, 498 N.Y.S.2d 344, 489 N.E.2d 231). The agreements at issue, both of

which define the "collections" upon which royalties are to be based as payments received by the plaintiff, do not support the defendant's contention that the parties intended that royalties would be calculated based upon all of the fees collected for the licensing and maintenance of the product, regardless of whether such fees were collected by the plaintiff or the plaintiff's distributors. Furthermore, inasmuch as the agreements are clear and unambiguous on their face on this issue, extrinsic evidence cannot be considered to create an ambiguity (*see,* *Intercontinental Planning v. Daystrom, Inc.,* 24 N.Y.2d 372, 379, 300 N.Y.S.2d 817, 248 N.E.2d 576).

Parallel Citations

239 A.D.2d 379

End of Document                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 22

DOCSTOR: 2191401\1

Schubtex, Inc. v. Allen Snyder, Inc., 49 N.Y.2d 1 (1979)

399 N.E.2d 1154, 424 N.Y.S.2d 133, 27 UCC Rep.Serv. 1166

399 N.E.2d 1154
Court of Appeals of New York.

SCHUBTEX, INC., Appellant,

v.

ALLEN SNYDER, INCORPORATED, Respondent.

Nov. 27, 1979.

Controversy arose concerning arbitrability of disputes between buyer and seller. The Supreme Court, Trial Term, New York County, Nathaniel T. Helman, J., adjudged that a valid agreement to arbitrate had been made, and appeal was taken. The Supreme Court, Appellate Division, First Judicial Department, 63 A.D.2d 868, 405 N.Y.S.2d 622, affirmed. On appeal, the Court of Appeals, Jasen, J., held that reference to arbitration in prior dealing between parties appearing in written confirmation of order form sent to buyer after negotiations of oral contract was insufficient to affirmatively establish that parties expressly agreed to arbitrate their disputes.

Reversed.

Gabrielli, J., concurred and filed opinion in which Cooke, C. J., and Wachtler, J., concurred.

West Headnotes (5)

**1**    **Appeal and Error**    Affirmance by Intermediate Court

Although scope of review of Court of Appeals is limited when issues of fact have been resolved by affirmance at Appellate Division, such findings are conclusive on Court only if there is evidence in record to support them.

**2**    **Alternative Dispute Resolution**    Contractual or Consensual Basis

Unless it can be shown that parties contemplated use of arbitration, they will not be held to have relinquished their right to litigate their disputes in court.

16 Cases that cite this headnote

**3**    **Alternative Dispute Resolution**    Evidence

Although evidence of prior course of dealing is relevant in determining whether parties have agreed to submit their dispute to arbitration and determination that oral agreements included provision of arbitration could in proper case be implied from course of past conduct or custom and practice in the industry, such determination must be supported by evidence which affirmatively establishes that parties expressly agree to arbitrate their disputes.

52 Cases that cite this headnote

**4**    **Customs and Usages**    Adding to Terms of Contract

Evidence of trade usage or of prior course of dealings may normally be utilized to supplement express terms of contract for sale of goods.

8 Cases that cite this headnote

**5**    **Alternative Dispute Resolution**    Formal Requisites

Reference to arbitration in prior dealing between parties appearing in written confirmation of order form sent to buyer after negotiations of oral contract was insufficient to affirmatively establish that parties expressly agreed to arbitrate their disputes.

42 Cases that cite this headnote

**Attorneys and Law Firms**

*3  ***134  **1155  Myron J. Meadow and Michael K. Stanton, New York City, for appellant.
*4  Cecil A. Citron and Michael Wexelbaum, New York City, for respondent.

**Opinion**

**OPINION OF THE COURT**

JASEN, Judge.

The significant issue on this appeal is the applicability of this court's decision in Matter of Marlene Inds. Corp. (Carnac

Textiles), 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239, to the arbitration case before us.

Respondent Allen Snyder, Inc., a converter of yarn, had various dealings with petitioner, Schubtex, Inc., a jobber, in connection with the sale and purchase of certain synthetic textiles. The orders were taken orally at petitioner's place of business, typed at respondent's office on its printed order/ contract form, and mailed to petitioner. The confirmation of order form used in all of these dealings, including the one in controversy, contained the statement that the "contract is subject to the terms on the * * * reverse side hereof, including the provisions for arbitration".

*5  Pursuant to the terms of the agreement in controversy, respondent shipped some of the textiles to petitioner and requested that the latter assort the remaining goods. Petitioner refused to do so. A demand for arbitration and notice of intention to arbitrate respondent's claim for damages arising out of the alleged breach of contract was served upon petitioner, who thereupon sought a stay of arbitration, denying the existence of an express agreement to arbitrate. A temporary stay of arbitration was issued, pending the outcome of a trial which was ordered to resolve the issues of fact involved.

Following trial, Supreme Court determined that a valid agreement to arbitrate was made. The court found that on the basis of the history of the parties' relationships, petitioner was aware that the agreement to purchase textiles would be subject to the arbitration clause contained in the written confirmation of order and that petitioner "adopted it, accepted it and undertook to be bound by it with full knowledge of its provisions and with full knowledge of the obligations which it entailed." As a result, Supreme Court vacated the previous stay of arbitration. On appeal, the Appellate Division unanimously affirmed the judgment of Supreme Court, without opinion, but granted leave to appeal to this court. We would reverse.

1  Although our scope of review is limited when issues of fact have been resolved by affirmance at the Appellate Division (see Matter of Hofbauer, 47 N.Y.2d 648, 654, 419 N.Y.S.2d 936, 939, 393 N.E.2d 1009, 1012; Estate of Canale v. Binghamton Amusement Co., 37 N.Y.2d 875, 378 N.Y.S.2d 362, 340 N.E.2d 729; CPLR 5501, subd. (b); see, also, Cohen and Karger, Powers of the New ***135 York Court of Appeals, s 108, pp. 453-455), such findings are conclusive on this court only if there is evidence in the record to support them. In our opinion, the evidence adduced at trial

is insufficient as a matter of law to support a finding of an express agreement to arbitrate.

2  In Matter of Marlene Inds. Corp. (Carnac Textiles) (supra), we held that an **1156 arbitration clause printed on the back of a written acknowledgment of order was a material alteration of the proposed purchase order and that it, therefore, could not be binding upon the prospective purchaser merely by virtue of the prospective purchaser's retention, without objection, of the acknowledgment of order form containing the clause. (See Uniform Commercial Code, s 2-207, subd. (2), par. (b).) The rationale underlying Marlene was that a litigant *6 ought not to be forced into arbitration and, thus, denied the procedural and substantive rights otherwise available in a judicial forum, absent evidence of an express intention to be so bound. In other words, unless it can be shown that the parties contemplated the use of arbitration, they will not be held to have relinquished their right to litigate their disputes in the courts.

3   4   Applying this rule to the case before us, we conclude that there has been no such showing. The trial court, in determining that a valid agreement to arbitrate was made, based its finding solely upon the prior dealings of the parties. Although evidence of a prior course of dealing is relevant in determining whether the parties have agreed to submit their dispute to arbitration and a determination that their oral agreement included a provision for arbitration could in a proper case be implied from a course of past conduct or the custom and practice in the industry, such a determination must be supported by evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes. As the concurring members of the court concede, "evidence of a trade usage or of a prior course of dealings may normally be utilized to supplement the express terms of a contract for the sale of goods" (p. --, p. -- of -- N.Y.S.2d, p. -- of -- N.E.2d). We would note also that this doctrine has been held to be applicable to arbitration agreements. (E. g., Matter of Acadia Co. (Edlitz), 7 N.Y.2d 348, 197 N.Y.S.2d 457, 165 N.E.2d 411; Matter of Helen Whiting, Inc. (Trojan Textile Corp.), 307 N.Y. 360, 121 N.E.2d 367.) However, a determination that a written provision for arbitration has, in fact, been incorporated in the oral agreement of the parties in consequence of either trade usage or a prior course of dealings must be supported by evidence in the record. We conclude that there was no such evidence in this case.

5   Here, in each of the two prior dealings relied upon by the courts below, the only reference to arbitration appears

in the written confirmation of order form sent to the buyer after the negotiation of an oral contract. There is no evidence that in their prior dealings the parties ever arbitrated any dispute pursuant to the arbitration clause or that the clause was material in their negotiations. In this situation, as our decision in Marlene clearly indicates, no binding agreement to arbitrate could have arisen. Moreover, inasmuch as the mere retention by the buyer of the form containing the arbitration clause failed to create such an agreement in the first instance, *7 repeated use of the same ineffective form should not be held to have done so in subsequent transactions. Therefore, the trial court's finding that the prior dealings of the parties created an express agreement to arbitrate is unsupported by the evidence and the stay of arbitration, sought by petitioner, was improperly denied.

Accordingly, the order of the Appellate Division should be reversed, with costs, and petitioner's application for a stay of arbitration granted. The question certified is not answered as unnecessary.

***136 GABRIELLI, Judge (concurring).

I concur in result, but am unable to join in the majority opinion because of the erroneous suggestion contained therein, in dicta, that a court may impose an agreement to arbitrate upon the parties to a contract, despite the absence of any express agreement, solely on the basis of past dealings or a trade custom. I consider such a rule to be an abrupt departure from prior settled law in this State, and am especially disturbed by the fact that the majority has apparently chosen to adopt this principle without any expressed justification.

**1157 Petitioner Schubtex, Inc. (Schubtex), appeals to this court, pursuant to leave granted by the Appellate Division, from an order of that court which affirmed a judgment of Supreme Court vacating a stay of arbitration. The order of the Appellate Division should be reversed, for there exists no agreement to arbitrate this dispute.

The controversy between these parties is based on an alleged breach by Schubtex of a contract to purchase fabrics from respondent Allen Snyder, Inc. (Snyder). Schubtex initiated the transaction by placing an oral order for fabrics with Snyder. Subsequently, Snyder mailed Schubtex a printed "confirmation of order" form containing an arbitration agreement. Schubtex simply retained that form and neither objected to its contents nor signed it. At no time did the parties discuss the inclusion of an arbitration agreement. When Schubtex subsequently refused to accept certain fabrics, Snyder sought to arbitrate the dispute. Schubtex then

commenced this proceeding seeking to stay the arbitration, on the ground there was no agreement to arbitrate.

Upon the trial of this issue, Snyder presented evidence of several similar prior transactions between it and Schubtex. In each of those transactions, as here, Schubtex had verbally *8 placed an order, Snyder had sent Schubtex a form containing an arbitration provision, and Schubtex had retained that form in silence. It was Snyder's contention that by failing to object to the arbitration clause contained in the form in this instance, and in light of the prior course of dealings between the parties, this contract should be deemed to include an agreement to arbitrate. Supreme Court appears to have adopted this analysis, concluding in an oral decision that "on the basis of the history of their relationships with the respondent, the petitioners were fully aware of the arbitration clause. They adopted it, accepted it and undertook to be bound by it with the full knowledge of its provisions and with full knowledge of the obligations which it entailed". The Appellate Division affirmed the judgment of Supreme Court without opinion, and petitioner appeals to this court by permission of the Appellate Division.

The majority of this court has concluded that there must be a reversal because there is no evidence to support a finding either that the parties had entered into a consistent course of past dealings including the use of arbitration as their normal method of dispute resolution, or that arbitration is so prevalent in the textile industry as to constitute a trade usage. I agree that such evidence was lacking, but deem that largely irrelevant, since I strongly disagree with the majority's suggestion that the existence of an arbitration agreement could "in a proper case be implied from a course of past conduct or the custom and practice in the industry" (p. --, p. -- of -- N.Y.S.2d, p. -- of -- N.E.2d) despite the absence of an express agreement to arbitrate.

In Matter of Marlene Inds. Corp. (Carnac Textiles), 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239, we concluded that the inclusion of an arbitration clause in a contract constitutes a material alteration of that contract as a matter of law. Accordingly, we there held that an arbitration clause is not made a part of a contract simply by the retention without objection by one party to that contract of an unsigned and unaccepted form, sent it by the other party, which contains an arbitration clause (see ***137 Uniform Commercial Code, s 2-207). Applying Marlene to the instant case, it is evident that this contract must be deemed to contain no arbitration clause unless Snyder has been able to prove

the existence of such an agreement by sufficient evidence independent of the form itself. [1]

[1]  An agreement to arbitrate is enforceable only if it is in writing (CPLR 7501), although that writing need not be signed as long as it does embody the agreement between the parties (Crawford v. Merrill Lynch, Pierce, Fenner & Smith, 35 N.Y.2d 291, 299, 361 N.Y.S.2d 140, 146, 319 N.E.2d 408, 412). Since I would hold that there exists no arbitration agreement between these parties, I express no opinion as to whether a unilateral form not accepted by the other party may serve as the necessary writing (cf. Uniform Commercial Code, s 2-201, subd. (2)).

*9  **1158  The conclusion reached by the courts below is premised upon the belief, apparently accepted by the majority of this court today, that an arbitration clause may be incorporated into a contract simply because arbitration may be the prevalent means of resolving disputes in an industry and has in fact been provided for by the parties in prior agreements, despite the absence of any express agreement to arbitrate disputes arising from the object contract. Unfortunately, this approach to determining the existence of an agreement to arbitrate runs counter to the settled law of this State.

It is true, of course, that evidence of a trade usage or of a prior course of dealings may normally be utilized to supplement the express terms of a contract for the sale of goods (Uniform Commercial Code, s 2-202, subd. (a); see, also, s 1-205). General rules of contract law, however, are not always applicable to arbitration clauses because of overriding policy considerations. A purported agreement to arbitrate is severable from the other provisions of a contract (Matter of Weinrott (Carp), 32 N.Y.2d 190, 198, 344 N.Y.S.2d 848, 855, 298 N.E.2d 42, 46), and it has long been true, if it were ever in doubt, that "the threshold for clarity of agreement to arbitrate is greater than with respect to other contractual terms" (Matter of Doughboy Inds. (Pantasote Co.), 17 A.D.2d 216, 219, 233 N.Y.S.2d 488, 492 (Breitel, J.)). There obviously exists good reason to proceed cautiously in determining whether a particular contract contains an arbitration agreement. As we stated in Matter of Marlene Inds. Corp. (Carnac Textiles), 45 N.Y.2d, at pp. 333-334, 408 N.Y.S.2d, at pp. 413-14, 380 N.E.2d, at pp. 242-43, Supra):

"It has long been the rule in this State that the parties to a commercial transaction 'will not be held to have chosen arbitration as the forum for the resolution of their disputes in the absence of an express, unequivocal agreement to that

effect; absent such an explicit commitment neither party may be compelled to arbitrate' (Matter of Acting Supt. of Schools of Liverpool Cent. School Dist. (United Liverpool Faculty Assn.), 42 N.Y.2d 509, 512, 399 N.Y.S.2d 189, 191, 369 N.E.2d 746, 748; accord Gangel v. De Groot, 41 N.Y.2d 840, 841, 393 N.Y.S.2d 698, 362 N.E.2d 249; Matter of Riverdale Fabrics Corp. (Tillinghast-Stiles Co.), 306 N.Y. 288, 289, 118 N.E.2d 104, 105;  *10  Matter of Lehman v. Ostrovsky, 264 N.Y. 130, 132, 190 N.E. 208, 209). The reason for this requirement, quite simply, is that by agreeing to arbitrate a party waives in large part many of his normal rights under the procedural and substantive law of the State and it would be unfair to infer such a significant waiver on the basis of anything less than a clear indication of intent (see Matter of Riverdale Fabrics Corp. (Tillinghast-Stiles Co.), supra, 306 N.Y. p. 289, 118 N.E.2d pp. 104-105; Siegel, New York Practice, s 588, p. 835).

"Since an arbitration agreement in the context of a commercial transaction 'must be clear and direct, and must not depend upon implication, inveiglement or subtlety * * * (its) existence * * * should not depend solely upon the conflicting fine print of commercial forms which cross one another but never meet' (  ***138  Matter of Doughboy Inds. (Pantasote Co.), 17 A.D.2d 216, 220, 233 N.Y.S.2d 488, 493). Thus, at least under this so-called 'New York Rule' (Squillante, General Provisions, Sales, Bulk Transfers and Documents of Title, 33 Business Law 1875, 1881), it is clear that an arbitration clause is a material addition which can become part of a contract only if it is expressly assented to by both parties (see Matter of Doughboy Inds. (Pantasote Co.), supra ; accord Frances Hosiery Mills v. Burlington Inds., 285 N.C. 344, 204 S.E.2d 834; see, also, Duesenberg, General Provisions, Sales, Bulk Transfers, and Documents of Title, 30 Business Law 847, 853)."

It may be argued that our decision in Marlene does not entirely and specifically control the instant case. In Marlene, we determined that the inclusion of an arbitration clause in a contract constitutes a material alteration of that contract as a matter of law. We were not then directly faced  **1159  with the issue of the nature and quality of evidence necessary to prove the existence of an agreement to arbitrate. However, the rationale upon which a court rests its holding is as much a part of the law as the specific holding itself, and the same reasons which mandated the result reached in Marlene are equally applicable to this case. [2]  Our decision in Marlene was premised upon what we recognized to be the requirement imposed by New York law that an agreement to arbitrate

399 N.E.2d 1154, 424 N.Y.S.2d 133, 27 UCC Rep.Serv. 1166

can be found to exist *11 only where there is an "express, unequivocal agreement" and "an explicit commitment" to submit disputes to the arbitral forum. In light of this plain statement of policy, it makes little sense to now hold that the existence of such an agreement may be proven Solely upon the basis of trade usage and prior dealings. Such evidence is used to incorporate into contracts certain provisions which the parties have failed to expressly include, but which the law assumes they would have included had they considered the matter. Where there exists good reason to require an explicit agreement, however, it would seem most imprudent to allow a presumption of intent to supplant the need for such an agreement.

2    It should be noted that the determinations in this case by both Supreme Court and the Appellate Division were made prior to our decision in Matter of Marlene Inds. Corp. (Carnac Textiles), 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239, Supra. Since our decision in Marlene Mr. Justice Nathaniel T. Helman, the author of the decision in the instant case at Trial Term, has reached the opposite result in light of Marlene in a case involving facts similar to those in this case (Matter of Kayser-Roth Corp. (Gould Fabrics), Supreme Ct., New York County, April 10, 1979).

This is especially true since there exists no prior decision by this court impelling such a result. In Matter of Acadia Co. (Edlitz), 7 N.Y.2d 348, 197 N.Y.S.2d 457, 165 N.E.2d 411, we held only that an arbitration clause contained in a written contract continues in existence when the parties orally agree to renew the written agreement. Since we were concerned with the renewal of an existing contract containing a valid arbitration agreement, our decision in Acadia Co. is not relevant to the instant dispute. Similarly, Matter of Helen Whiting, Inc. (Trojan Textile Corp.), 307 N.Y. 360, 121 N.E.2d 367, provides no guidance in resolving this case, for

there we held only that a written arbitration agreement need not be signed if there exists sufficient proof that the parties actually agreed to submit their disputes to arbitration. We have never held that the existence of an arbitration clause may be implied in the absence of proof of an express agreement, and I cannot concur in the majority's decision to adopt such a rule today.

This is not to say, of course, that evidence of a trade usage or a prior course of dealings is irrelevant in determining whether the parties have agreed to submit their dispute to arbitration. For example, if there exists Conflicting testimony as to whether the parties did in fact enter into an explicit agreement to arbitrate, evidence of the customs of the industry and the prior dealings of the parties might well be relevant in assessing that testimony. Such evidence alone, however, does not serve to ***139 prove the existence of an arbitration agreement where there simply exists no evidence or claim that an express agreement to arbitrate was in fact entered into.

Since the record in this case contains no evidence of an express agreement to arbitrate, I would reverse the order *12 appealed from and grant a stay of arbitration on that ground alone.

JONES, FUCHSBERG and MEYER, JJ., concur with JASEN, J.

GABRIELLI, J., concurs in result in a separate opinion in which COOKE, C. J., and WACHTLER, J., concur.

Order reversed, etc.

Parallel Citations

49 N.Y.2d 1, 399 N.E.2d 1154, 27 UCC Rep.Serv. 1166

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 23

DOCSTOR: 2191401\1

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

122 S.Ct. 754
Supreme Court of the United States

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Petitioner,
v.
WAFFLE HOUSE, INC.

No. 99–1823.   Argued Oct. 10,
2001.   Decided Jan. 15, 2002.

Equal Employment Opportunity Commission (EEOC) brought enforcement action against former employer on behalf of former employee under Americans with Disabilities Act (ADA). The United States District Court for the District of South Carolina, Matthew J. Perry, Jr., Senior District Judge, denied employer's petition to stay litigation and compel arbitration under Federal Arbitration Act (FAA), or to dismiss action. Employer filed interlocutory appeal. The United States Court of Appeals for the Fourth Circuit, 193 F.3d 805, held that arbitration agreement did not foreclose enforcement action but precluded EEOC from seeking victim-specific relief in court. Certiorari was granted. The Supreme Court, Justice Stevens, held that arbitration agreement did not bar EEOC from pursuing victim-specific judicial relief on behalf of employee, abrogating *EEOC v. Kidder, Peabody & Co.* and *Merrill, Lynch, Pierce, Fenner and Smith, Inc. v. Nixon.*

Reversed and remanded.

Justice Thomas filed dissenting opinion in which Chief Justice Rehnquist and Justice Scalia joined.

West Headnotes (16)

**1**   **Civil Rights** 🗝 Administrative Agencies and Proceedings

Congress has directed the Equal Employment Opportunity Commission (EEOC) to exercise the same enforcement powers, remedies, and procedures that are set forth in Title VII when it is enforcing the ADA's prohibitions against employment discrimination on the basis of disability. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act of 1990, § 107(a), 42 U.S.C.A. § 12117(a).

23 Cases that cite this headnote

**2**   **Alternative Dispute Resolution** 🗝 As Ousting Jurisdiction of or Precluding Resort to Courts

**Civil Rights** 🗝 Existence of Other Remedies; Exclusivity

An agreement between an employer and an employee to arbitrate employment-related disputes does not bar the Equal Employment Opportunity Commission (EEOC) from pursuing victim-specific judicial relief, such as backpay, reinstatement, and damages, in an enforcement action alleging that the employer has violated the ADA; abrogating *EEOC v. Kidder, Peabody & Co.,* 156 F.3d 298; *Merrill, Lynch, Pierce, Fenner and Smith, Inc. v. Nixon,* 210 F.3d 814. 9 U.S.C.A. §§ 3, 4; 42 U.S.C.A. § 1981a(a)(1, 2), (d)(1)(A, B); Civil Rights Act of 1964, §§ 706(g)(1), 707(a), as amended, 42 U.S.C.A. §§ 2000e–5(g)(1), 2000e–6(a); Americans with Disabilities Act of 1990, § 107(a), 42 U.S.C.A. § 12117(a).

81 Cases that cite this headnote

**3**   **Alternative Dispute Resolution** 🗝 Constitutional and Statutory Provisions and Rules of Court

The purpose of the Federal Arbitration Act (FAA) was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements on the same footing as other contracts. 9 U.S.C.A. § 1 et seq.

51 Cases that cite this headnote

**4**   **Alternative Dispute Resolution** 🗝 Constitutional and Statutory Provisions and Rules of Court

Employment contracts, except for those covering workers engaged in transportation, are covered by the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

E.E.O.C. v. Waffle House, Inc., 534 U.S. 279 (2002)

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

23 Cases that cite this headnote

**5**    **Alternative Dispute Resolution** 🔑 Right to Enforcement and Defenses in General

**Alternative Dispute Resolution** 🔑 Stay of Proceedings Pending Arbitration

The sections of the Federal Arbitration Act (FAA) providing for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement, manifest a liberal federal policy favoring arbitration agreements. 9 U.S.C.A. §§ 3, 4.

40 Cases that cite this headnote

**6**    **Alternative Dispute Resolution** 🔑 Agreement or Submission as Determinative

Absent some ambiguity in the agreement at issue, it is the language of the contract that defines the scope of disputes subject to arbitration pursuant to the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

37 Cases that cite this headnote

**7**    **Alternative Dispute Resolution** 🔑 Contractual or Consensual Basis

Nothing in the Federal Arbitration Act (FAA) authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement at issue. 9 U.S.C.A. § 1 et seq.

28 Cases that cite this headnote

**8**    **Alternative Dispute Resolution** 🔑 Contractual or Consensual Basis

The Federal Arbitration Act (FAA) directs courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so. 9 U.S.C.A. § 1 et seq.

95 Cases that cite this headnote

**9**    **Alternative Dispute Resolution** 🔑 Contractual or Consensual Basis

Because Federal Arbitration Act (FAA) was at bottom a policy guaranteeing enforcement of private contractual arrangements, Court of Appeals would look first to whether parties agreed to arbitrate dispute, not to general policy goals, to determine scope of agreement. 9 U.S.C.A. § 1 et seq.

131 Cases that cite this headnote

**10**    **Alternative Dispute Resolution** 🔑 Construction

While ambiguities in the language of an agreement should be resolved in favor of arbitration pursuant to the Federal Arbitration Act (FAA), the Court of Appeals does not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated. 9 U.S.C.A. § 1 et seq.

112 Cases that cite this headnote

**11**    **Alternative Dispute Resolution** 🔑 Contractual or Consensual Basis

Arbitration under the Federal Arbitration Act (FAA) is a matter of consent, not coercion. 9 U.S.C.A. § 1 et seq.

14 Cases that cite this headnote

**12**    **Contracts** 🔑 Duties and Liabilities of Third Persons

A contract cannot bind a nonparty.

39 Cases that cite this headnote

**13**    **Alternative Dispute Resolution** 🔑 Statutory Rights and Obligations

Federal statutory claims may be the subject of arbitration agreements that are enforceable pursuant to the Federal Arbitration Act (FAA)

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

because the agreement only determines the choice of forum. 9 U.S.C.A. § 1 et seq.

19 Cases that cite this headnote

**14    Civil Rights** 🔑 Aggravation, Mitigation, or Reduction of Loss

If employee had failed to mitigate his damages, or had accepted monetary settlement from employer, any recovery by Equal Employment Opportunity Commission (EEOC) on his behalf in enforcement action under ADA would have been limited accordingly. Americans with Disabilities Act, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

33 Cases that cite this headnote

**15    Damages** 🔑 Nature and Theory of Compensation

The courts can and should preclude double recovery by an individual.

30 Cases that cite this headnote

**16    Alternative Dispute Resolution** 🔑 As Ousting Jurisdiction of or Precluding Resort to Courts

**Civil Rights** 🔑 Existence of Other Remedies; Exclusivity

Agreement between employer and employee to arbitrate any employment-related dispute or claim did not bar the Equal Employment Opportunity Commission (EEOC) from pursuing victim-specific judicial relief on behalf of employee in enforcement action under ADA; employee had not engaged in any conduct, such as seeking arbitration of his claim or entering into settlement negotiations with employer, that might have effect of limiting relief that EEOC might obtain in court. 9 U.S.C.A. §§ 3, 4; 42 U.S.C.A. § 1981a(a)(1, 2), (d)(1)(A, B); Civil Rights Act of 1964, §§ 706(g)(1), 707(a), as amended, 42 U.S.C.A. §§ 2000e–5(g)(1), 2000e–6(a); Americans with Disabilities Act of 1990, § 107(a), 42 U.S.C.A. § 12117(a).

127 Cases that cite this headnote

**\*\*756  Syllabus** \*

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Respondent's employees must each sign an agreement requiring employment disputes to be settled by binding arbitration. After Eric Baker suffered a seizure and was fired by respondent, he filed a timely discrimination charge with the Equal Employment Opportunity Commission (EEOC) alleging that his discharge violated Title I of the Americans with Disabilities Act of 1990(ADA). The EEOC subsequently filed this enforcement suit, to which Baker is not a party, alleging that respondent's employment practices, including Baker's discharge "because of his disability," violated the ADA and that the violation was intentional and done with malice or reckless indifference. The complaint requested injunctive relief to "eradicate the effects of [respondent's] past and present unlawful employment practices"; specific relief designed to make Baker whole, including backpay, reinstatement, and compensatory damages; and punitive damages for malicious and reckless conduct. Respondent petitioned under the Federal Arbitration Act (FAA) to stay the EEOC's suit and compel arbitration, or to dismiss the action, but the District Court denied relief. The Fourth Circuit concluded that the arbitration agreement between Baker and respondent did not foreclose the enforcement action because the EEOC was not a party to the contract, but had independent statutory authority to bring suit in any federal district court where venue was proper. Nevertheless, the court held that the EEOC was limited to injunctive relief and precluded from seeking victim-specific relief because the FAA policy favoring enforcement of private arbitration agreements outweighs the EEOC's right to proceed in federal court when it seeks primarily to vindicate private, rather than public, interests.

*Held:* An agreement between an employer and an employee to arbitrate employment-related **\*\*757** disputes does not bar the EEOC from pursuing victim-specific judicial relief,

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

such as backpay, reinstatement, and damages, in an ADA enforcement action. Pp. 759–766.

(a) The ADA directs the EEOC to exercise the same enforcement powers, remedies, and procedures that are set forth in Title VII of the Civil Rights Act of 1964 when enforcing the ADA's prohibitions against employment discrimination on the basis of disability. Following the *280 1991 amendments to Title VII, the EEOC has authority to bring suit to enjoin an employer from engaging in unlawful employment practices, and to pursue reinstatement, backpay, and compensatory or punitive damages, in both Title VII and ADA actions. Thus, these statutes unambiguously authorize the EEOC to obtain the relief that it seeks here if it can prove its case against respondent. Neither the statutes nor this Court's cases suggest that the existence of an arbitration agreement between private parties materially changes the EEOC's statutory function or the remedies otherwise available. Pp. 759–761.

(b) Despite the FAA policy favoring arbitration agreements, nothing in the FAA authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement. The FAA does not mention enforcement by public agencies; it ensures the enforceability of private agreements to arbitrate, but otherwise does not purport to place any restriction on a nonparty's choice of a judicial forum. Pp. 761–762.

(c) The Fourth Circuit based its decision on its evaluation of the "competing policies" implemented by the ADA and the FAA, rather than on any language in either the statutes or the arbitration agreement between Baker and respondent. If the EEOC could prosecute its claim only with Baker's consent, or if its prayer for relief could be dictated by Baker, the lower court's analysis might be persuasive. But once a charge is filed, the exact opposite is true under the ADA, which clearly makes the EEOC the master of its own case, conferring on it the authority to evaluate the strength of the public interest at stake and to determine whether public resources should be committed to the recovery of victim-specific relief. Moreover, the Court of Appeals' attempt to balance policy goals against the arbitration agreement's clear language is inconsistent with this Court's cases holding that the FAA does not require parties to arbitrate when they have not agreed to do so. E.g., *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488. Because the EEOC is not a party to the contract and has not agreed to arbitrate its claims, the FAA's proarbitration policy goals do not require the agency

to relinquish its statutory authority to pursue victim-specific relief, regardless of the forum that the employer and employee have chosen to resolve their disputes. Pp. 762–765.

(d) Although an employee's conduct may effectively limit the relief the EEOC can obtain in court if, for example, the employee fails to mitigate damages or accepts a monetary settlement, see, *e.g., Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–232, 102 S.Ct. 3057, 73 L.Ed.2d 721, Baker has not sought arbitration, nor is there any indication that he has entered into settlement negotiations with respondent. The fact that ordinary principles of res *281 judicata, mootness, or mitigation may apply to EEOC claims does not mean the EEOC's claim is merely derivative. This Court has recognized several situations in which the EEOC does not stand in the employee's shoes, see, *e.g., Occidental Life Ins. Co. of Cal. v. EEOC,* 432 U.S. 355, 368, 97 S.Ct. 2447, 53 L.Ed.2d 402, and, in this context, the statute specifically grants the EEOC exclusive authority over the choice of forum and the prayer for relief once a charge has been filed. Pp. 765–766.

193 F.3d 805, reversed and remanded.

**758 STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C.J., and SCALIA, J., joined, *post,* p. 766.

Attorneys and Law Firms

Paul D. Clement, Atlanta, GA, for petitioner.

David L. Gordon, for respondent.

Opinion

*282 Justice STEVENS delivered the opinion of the Court.

The question presented is whether an agreement between an employer and an employee to arbitrate employment-related disputes bars the Equal Employment Opportunity Commission (EEOC) from pursuing victim-specific judicial relief, such as backpay, reinstatement, and damages, in an enforcement action alleging that the employer has violated Title I of the Americans with Disabilities Act of 1990(ADA), 104 Stat. 328, 42 U.S.C. § 12101 et seq. (1994 ed. and Supp. V).

I

E.E.O.C. v. Waffle House, Inc., 534 U.S. 279 (2002)
122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

In his application for employment with respondent, Eric Baker agreed that "any dispute or claim" concerning his employment would be "settled by binding arbitration." [1] As a *283 condition of employment, all prospective Waffle House employees are required to sign an application containing a similar mandatory arbitration agreement. See App. 56. Baker began working as a grill operator at one of respondent's restaurants on August 10, 1994. Sixteen days later he suffered a seizure at work and shortly thereafter was discharged. *Id.,* at 43–44. Baker did not initiate arbitration proceedings, nor has he in the seven years since his termination, but he did file a timely charge of discrimination with the EEOC alleging that his discharge violated the ADA.

[1]    The agreement states:

> "The parties agree that any dispute or claim concerning Applicant's employment with Waffle House, Inc., or any subsidiary or Franchisee of Waffle House, Inc., or the terms, conditions or benefits of such employment, including whether such dispute or claim is arbitrable, will be settled by binding arbitration. The arbitration proceedings shall be conducted under the Commercial Arbitration Rules of the American Arbitration Association in effect at the time a demand for arbitration is made. A decision and award of the arbitrator made under the said rules shall be exclusive, final and binding on both parties, their heirs, executors, administrators, successors and assigns. The costs and expenses of the arbitration shall be borne evenly by the parties." App. 59.

After an investigation and an unsuccessful attempt to conciliate, the EEOC filed an enforcement action against respondent in the Federal District Court for the District of South Carolina, [2] pursuant to § 107(a) of the ADA, 42 U.S.C. § 12117(a) (1994 ed.) and § 102 of the Civil Rights Act of 1991, as added, 105 Stat. 1072, 42 U.S.C. § 1981a (1994 ed.). Baker is not a party to the case. The EEOC's complaint alleged that respondent engaged in employment practices that violated the ADA, including its discharge of Baker "because of his disability," and that its violation was intentional, and "done with malice or with reckless indifference to [his] federally protected **759 rights." The complaint requested the court to grant injunctive relief to "eradicate the effects of [respondent's] past and present unlawful employment practices," *284 to order specific relief designed to make Baker whole, including backpay, reinstatement, and compensatory damages, and to award punitive damages for malicious and reckless conduct. App. 38–40.

[2]    Because no evidence of the employment practices alleged in the complaint has yet been presented, we of course express no opinion on the merits of the EEOC's case. We note, on the one hand, that the state human rights commission also investigated Baker's claim and found no basis for suit. On the other hand, the EEOC chooses to file suit in response to only a small number of the many charges received each year, see n. 7, *infra.* In keeping with normal appellate practice in cases arising at the pleading stage, we assume, *arguendo,* that the EEOC's case is meritorious.

Respondent filed a petition under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.,* to stay the EEOC's suit and compel arbitration, or to dismiss the action. Based on a factual determination that Baker's actual employment contract had not included the arbitration provision, the District Court denied the motion. The Court of Appeals granted an interlocutory appeal and held that a valid, enforceable arbitration agreement between Baker and respondent did exist. 193 F.3d 805, 808 (C.A.4 1999). The court then proceeded to consider "what effect, if any, the binding arbitration agreement between Baker and Waffle House has on the EEOC, which filed this action in its own name both in the public interest and on behalf of Baker." *Id.,* at 809. After reviewing the relevant statutes and the language of the contract, the court concluded that the agreement did not foreclose the enforcement action because the EEOC was not a party to the contract, and it has independent statutory authority to bring suit in any federal district court where venue is proper. *Id.,* at 809–812. Nevertheless, the court held that the EEOC was precluded from seeking victim-specific relief in court because the policy goals expressed in the FAA required giving some effect to Baker's arbitration agreement. The majority explained:

> "When the EEOC seeks 'make-whole' relief for a charging party, the federal policy favoring enforcement of private arbitration agreements outweighs the EEOC's right to proceed in federal court because in that circumstance, the EEOC's public interest is minimal, as the EEOC seeks primarily to vindicate private, rather than public, interests. On the other hand, when the EEOC is pursuing large-scale injunctive relief, the balance tips in favor of EEOC enforcement efforts in federal court *285 because the public interest dominates the EEOC's action." *Id.,* at 812. [3]

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

3    One member of the panel dissented because he agreed
     with the District Court that, as a matter of fact, the
     arbitration clause was not included in Baker's actual
     contract of employment. 193 F.3d, at 813.

Therefore, according to the Court of Appeals, when an
employee has signed a mandatory arbitration agreement, the
EEOC's remedies in an enforcement action are limited to
injunctive relief.

Several Courts of Appeals have considered this issue
and reached conflicting conclusions. Compare *EEOC v.
Frank's Nursery & Crafts, Inc.,* 177 F.3d 448 (C.A.6 1999)
(employee's agreement to arbitrate does not affect the EEOC's
independent statutory authority to pursue an enforcement
action for injunctive relief, backpay, and damages in federal
court), with *EEOC v. Kidder, Peabody & Co.,* 156 F.3d
298 (C.A.2 1998) (allowing the EEOC to pursue injunctive
relief in federal court, but precluding monetary relief); *Merrill
Lynch, Pierce, Fenner & Smith, Inc. v. Nixon,* 210 F.3d
814(C.A.8), cert. denied, 531 U.S. 958, 121 S.Ct. 383, 148
L.Ed.2d 295 (2000) (same). We granted the EEOC's petition
for certiorari to resolve this conflict, 532 U.S. 941, 121 S.Ct.
1401, 149 L.Ed.2d 344 (2001), and now reverse.

**II**

1    Congress has directed the EEOC to exercise the same
enforcement powers, remedies, and procedures that are set
forth in Title VII of the Civil Rights Act of 1964 when
it is enforcing the ADA's prohibitions against employment
discrimination on the basis of disability.  **\*760** 42 U.S.C.
§ 12117(a) (1994 ed.). 4  Accordingly, the provisions of Title
VII defining  **\*286** the EEOC's authority provide the starting
point for our analysis.

4    Section 12117(a) provides:

     "The powers, remedies, and procedures set forth
     in sections 2000e–4, 2000e–5, 2000e–6, 2000e–
     8, and 2000e–9 of this title shall be the powers,
     remedies, and procedures this subchapter provides
     to the Commission, to the Attorney General, or to
     any person alleging discrimination on the basis of
     disability in violation of any provision of this chapter,
     or regulations promulgated under section 12116 of
     this title, concerning employment."

When Title VII was enacted in 1964, it authorized private
actions by individual employees and public actions by the
Attorney General in cases involving a "pattern or practice"

of discrimination. 42 U.S.C. § 2000e–6(a) (1994 ed.). The
EEOC, however, merely had the authority to investigate
and, if possible, to conciliate charges of discrimination. See
*General Telephone Co. of Northwest v. EEOC,* 446 U.S.
318, 325, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). In 1972,
Congress amended Title VII to authorize the EEOC to bring
its own enforcement actions; indeed, we have observed that
the 1972 amendments created a system in which the EEOC
was intended "to bear the primary burden of litigation,"
*id.,* at 326, 100 S.Ct. 1698. Those amendments authorize
the courts to enjoin employers from engaging in unlawful
employment practices, and to order appropriate affirmative
action, which may include reinstatement, with or without
backpay. 5  Moreover, the amendments specify the judicial
districts in which such actions may be brought. 6  They do not
mention arbitration proceedings.

5    "(g)  Injunctions;  appropriate  affirmative  action;
     equitable relief; accrual of back pay; reduction of back
     pay; limitations on judicial orders

        "(1) If the court finds that the respondent has
        intentionally engaged in or is intentionally engaging
        in an unlawful employment practice charged in the
        complaint, the court may enjoin the respondent from
        engaging in such unlawful employment practice,
        and order such affirmative action as may be
        appropriate, which may include, but is not limited to,
        reinstatement or hiring of employees, with or without
        back pay (payable by the employer, employment
        agency, or labor organization, as the case may be,
        responsible for the unlawful employment practice),
        or any other equitable relief as the court deems
        appropriate. Back pay liability shall not accrue from
        a date more than two years prior to the filing of
        a charge with the Commission. Interim earnings or
        amounts earnable with reasonable diligence by the
        person or persons discriminated against shall operate
        to reduce the back pay otherwise allowable." 42
        U.S.C. § 2000e–5(g)(1) (1994 ed.).

6    Section 2000e–5(f)(3) provides:

        "Each United States district court and each United
        States court of a place subject to the jurisdiction of
        the United States shall have jurisdiction of actions
        brought under this subchapter. Such an action may
        be brought in any judicial district in the State in
        which the unlawful employment practice is alleged to
        have been committed, in the judicial district in which
        the employment records relevant to such practice
        are maintained and administered, or in the judicial
        district in which the aggrieved person would have
        worked but for the alleged unlawful employment

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

practice, but if the respondent is not found within any such district, such an action may be brought in the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought."

2  *287  In 1991, Congress again amended Title VII to allow the recovery of compensatory and punitive damages by a "complaining party." 42 U.S.C. § 1981a(a)(1) (1994 ed.). The term includes both private plaintiffs and the EEOC, § 1981a(d)(1)(A), and the amendments apply to ADA claims as well, §§ 1981a(a)(2), (d)(1)(B). As a complaining party, the EEOC may bring suit to enjoin an employer from engaging in unlawful employment practices, and to pursue reinstatement, backpay, and compensatory or punitive damages. Thus, these statutes unambiguously authorize the EEOC to obtain the relief that it seeks in  **761  its complaint if it can prove its case against respondent.

Prior to the 1991 amendments, we recognized the difference between the EEOC's enforcement role and an individual employee's private cause of action in *Occidental Life Ins. Co. of Cal. v. EEOC,* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), and *General Telephone Co. of Northwest v. EEOC,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). *Occidental* presented the question whether EEOC enforcement actions are subject to the same statutes of limitations that govern individuals' claims. After engaging in an unsuccessful conciliation process, the EEOC filed suit in Federal District Court, on behalf of a female employee, alleging sex discrimination. The court granted the defendant's motion for summary judgment on the ground that the EEOC's claim was time barred; the EEOC filed suit after California's 1–year statute of limitations had run. We reversed because "under the procedural structure created by the 1972 *288 amendments, the EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties," 432 U.S., at 368, 97 S.Ct. 2447. To hold otherwise would have undermined the agency's independent statutory responsibility to investigate and conciliate claims by subjecting the EEOC to inconsistent limitations periods.

In *General Telephone,* the EEOC sought to bring a discrimination claim on behalf of all female employees at General Telephone's facilities in four States, without being certified as the class representative under Federal Rule of Civil Procedure 23. 446 U.S., at 321–322, 100 S.Ct. 1698.

Relying on the plain language of Title VII and the legislative intent behind the 1972 amendments, we held that the EEOC was not required to comply with Rule 23 because it "need look no further than § 706 for its authority to bring suit in its own name for the purpose, among others, of securing relief for a group of aggrieved individuals." *Id.,* at 324, 100 S.Ct. 1698. In light of the provisions granting the EEOC exclusive jurisdiction over the claim for 180 days after the employee files a charge, we concluded that "the EEOC is not merely a proxy for the victims of discrimination and that [its] enforcement suits should not be considered representative actions subject to Rule 23." *Id.,* at 326, 100 S.Ct. 1698.

Against the backdrop of our decisions in *Occidental* and *General Telephone,* Congress expanded the remedies available in EEOC enforcement actions in 1991 to include compensatory and punitive damages. There is no language in the statutes or in either of these cases suggesting that the existence of an arbitration agreement between private parties materially changes the EEOC's statutory function or the remedies that are otherwise available.

### III

3  4  The FAA was enacted in 1925, 43 Stat. 883, and then reenacted and codified in 1947 as Title 9 of the United States Code. It has not been amended since the enactment of Title *289 VII in 1964. As we have explained, its "purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The FAA broadly provides that a written provision in "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Employment contracts, except for those covering workers engaged in transportation, are covered by the FAA. *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001).

5  6  7  The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused  **762  to comply with an arbitration agreement. See 9 U.S.C. §§ 3 and 4. We have read these provisions to "manifest a 'liberal federal

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

policy favoring arbitration agreements.' " *Gilmer, 500 U.S., at 25, 111 S.Ct. 1647* (quoting *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Absent some ambiguity in the agreement, however, it is the language of the contract that defines the scope of disputes subject to arbitration. See *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) ( "[T]he FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties"). For nothing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement. The FAA does not mention enforcement by public agencies; it ensures the enforceability of private agreements to arbitrate, but otherwise does not purport to place any restriction on a nonparty's choice of a judicial forum.

*290  **IV**

The Court of Appeals based its decision on its evaluation of the "competing policies" implemented by the ADA and the FAA, rather than on any language in the text of either the statutes or the arbitration agreement between Baker and respondent. 193 F.3d, at 812. It recognized that the EEOC never agreed to arbitrate its statutory claim, *id., at 811* ("We must also recognize that in this case the EEOC is not a party to any arbitration agreement"), and that the EEOC has "independent statutory authority" to vindicate the public interest, but opined that permitting the EEOC to prosecute Baker's claim in court "would significantly trample" the strong federal policy favoring arbitration because Baker had agreed to submit his claim to arbitration. *Id., at 812.* To effectuate this policy, the court distinguished between injunctive and victim-specific relief, and held that the EEOC is barred from obtaining the latter because any public interest served when the EEOC pursues "make whole" relief is outweighed by the policy goals favoring arbitration. Only when the EEOC seeks broad injunctive relief, in the Court of Appeals' view, does the public interest overcome the goals underpinning the FAA. [7]

[7]    This framework assumes the federal policy favoring arbitration will be undermined unless the EEOC's remedies are limited. The court failed to consider, however, that some of the benefits of arbitration are already built into the EEOC's statutory duties. Unlike individual employees, the EEOC cannot pursue a claim in court without first engaging in a conciliation process. 42 U.S.C. § 2000e–5(b) (1994 ed.). Thus, before the

EEOC ever filed suit in this case, it attempted to reach a settlement with respondent.

The court also neglected to take into account that the EEOC files suit in a small fraction of the charges employees file. For example, in fiscal year 2000, the EEOC received 79,896 charges of employment discrimination. Although the EEOC found reasonable cause in 8,248 charges, it only filed 291 lawsuits. Equal Employment Opportunity Commission, Enforcement Statistics and Litigation (as visited Nov. 18, 2001), http://www.eeoc.gov/stats/enforcement.html. In contrast, 21,032 employment discrimination lawsuits were filed in 2000. See Administrative Office, Judicial Business of the United States Courts 2000, Table C–2A (Sept. 30, 2000). These numbers suggest that the EEOC files fewer than two percent of all antidiscrimination claims in federal court. Indeed, even among the cases where it finds reasonable cause, the EEOC files suit in fewer than five percent of those cases. Surely permitting the EEOC access to victim-specific relief in cases where the employee has agreed to binding arbitration, but has not yet brought a claim in arbitration, will have a negligible effect on the federal policy favoring arbitration.

Justice THOMAS notes that our interpretation of Title VII and the FAA "should not depend on how many cases the EEOC chooses to prosecute in any particular year." See *post, at 775, n. 14* (dissenting opinion). And yet, the dissent predicts our holding will "reduce that arbitration agreement to all but a nullity," *post,* at 772, "discourag[e] the use of arbitration agreements," *post,* at 773, and "discourage employers from entering into settlement agreements," *post,* at 774. These claims are highly implausible given the EEOC's litigation practice over the past 20 years. When speculating about the impact this decision might have on the behavior of employees and employers, we think it is worth recognizing that the EEOC files suit in less than one percent of the charges filed each year.

*291  If it were true that the EEOC could prosecute its claim only with Baker's consent, **763  or if its prayer for relief could be dictated by Baker, the court's analysis might be persuasive. But once a charge is filed, the exact opposite is true under the statute—the EEOC is in command of the process. The EEOC has exclusive jurisdiction over the claim for 180 days. During that time, the employee must obtain a right-to-sue letter from the agency before prosecuting the claim. If, however, the EEOC files suit on its own, the employee has no independent cause of action, although the

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

employee may intervene in the EEOC's suit. 42 U.S.C. § 2000e–5(f)(1) (1994 ed.). In fact, the EEOC takes the position that it may pursue a claim on the employee's behalf even after the employee has disavowed any desire to seek relief. Brief for Petitioner 20. The statute clearly makes the EEOC the master of its own case and confers on the agency the authority to evaluate the strength of the public interest at stake. Absent textual support for a contrary view, it is the public agency's province—not that of the court—to determine **\*292** whether public resources should be committed to the recovery of victim-specific relief. And if the agency makes that determination, the statutory text unambiguously authorizes it to proceed in a judicial forum.

Respondent and the dissent contend that Title VII supports the Court of Appeals' bar against victim-specific relief, because the statute limits the EEOC's recovery to "appropriate" relief as determined by a court. See Brief for Respondent 19, and n. 8; *post,* at 768–769 (THOMAS, J., dissenting). They rely on § 706(g)(1), which provides that, after a finding of liability, "the court may enjoin the respondent from engaging in such unlawful employment practice, and order *such affirmative action as may be appropriate,* which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... *or any other equitable relief as the court deems appropriate.*" 42 U.S.C. § 2000e–5(g)(1) (1994 ed.) (emphasis added). They claim this provision limits the remedies available and directs courts, not the EEOC, to determine what relief is appropriate.

The proposed reading is flawed for two reasons. First, under the plain language of the statute the term "appropriate" refers to only a subcategory of claims for equitable relief, not damages. The provision authorizing compensatory and punitive damages is in a separate section of the statute, § 1981a(a)(1), and is not limited by this language. The dissent responds by pointing to the phrase "may recover" in § 1981a(a)(1), and arguing that this too provides authority for prohibiting victim-specific relief. See *post,* at 769, n. 7. But this contention only highlights the second error in the proposed reading. If "appropriate" and "may recover" can be read to support respondent's position, then any discretionary language would constitute authorization for judge-made, *per se* rules. This is not the natural reading of the text. These terms obviously refer to the trial judge's discretion in a particular case to order reinstatement and award damages in an amount warranted by the facts of that **\*293** case. They do not permit a court to announce a categorical rule precluding an expressly authorized form of relief as inappropriate in all cases in which the employee has signed an arbitration agreement.[8]

[8]   Justice THOMAS implicitly recognizes this distinction by qualifying his description of the EEOC's role as determining appropriate relief "in any given case," or "in a particular case." See *post,* at 768, 769. But the Court of Appeals' holding was not so limited. 193 F.3d 805, 812 (C.A.4 1999) (holding that the EEOC "may not pursue relief in court ... specific to individuals who have waived their right to a judicial forum").

**\*\*764** **8**  **9**  **10**  **11**  **12**  The Court of Appeals wisely did not adopt respondent's reading of § 706(g). Instead, it simply sought to balance the policy goals of the FAA against the clear language of Title VII and the agreement. While this may be a more coherent approach, it is inconsistent with our recent arbitration cases. The FAA directs courts to place arbitration agreements on equal footing with other contracts, but it "does not require parties to arbitrate when they have not agreed to do so." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).[9] See **\*294** also *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) ("[T]he purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so"). Because the FAA is "at bottom a policy guaranteeing the enforcement of private contractual arrangements," *Mitsubishi Motors Corp. v. Soler Chrysler—Plymouth, Inc.,* 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement. *Id.,* at 626, 105 S.Ct. 3346. While ambiguities in the language of the agreement should be resolved in favor of arbitration, *Volt,* 489 U.S., at 476, 109 S.Ct. 1248, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated. "Arbitration under the [FAA] is a matter of consent, not coercion." *Id.,* at 479, 109 S.Ct. 1248. Here there is no ambiguity. No one asserts that the EEOC is a party to the contract, or that it agreed to arbitrate its claims. It goes without saying that a contract cannot bind a nonparty. Accordingly, the proarbitration policy goals of the FAA do not require the agency to relinquish its statutory authority if it has not agreed to do so.

[9]   In *Volt,* the parties to a construction contract agreed to arbitrate all disputes relating to the contract and specified that California law would apply. When one party sought to compel arbitration, the other invoked a California statute that authorizes a court to stay arbitration pending resolution of related litigation

E.E.O.C. v. Waffle House, Inc., 534 U.S. 279 (2002)

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

with third parties not bound by the agreement when inconsistent rulings are possible. We concluded that the FAA did not pre-empt the California statute because "the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed *in the manner provided for in [the parties'] agreement.*'" 489 U.S., at 474–475, 109 S.Ct. 1248 (quoting 9 U.S.C. § 4). Similarly, the FAA enables respondent to compel Baker to arbitrate his claim, but it does not expand the range of claims subject to arbitration beyond what is provided for in the agreement.

Our decision in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), is not inconsistent with this position. In *Mastrobuono,* we reiterated that clear contractual language governs our interpretation of arbitration agreements, but because the choice-of-law provision in that case was ambiguous, we read the agreement to favor arbitration under the FAA rules. *Id.,* at 62, 115 S.Ct. 1212. While we distinguished *Volt* on the ground that we were reviewing a federal court's construction of the contract, 514 U.S., at 60, n. 4, 115 S.Ct. 1212, regardless of the standard of review, in this case the Court of Appeals recognized that the EEOC was not bound by the agreement. When that much is clear, *Volt* and *Mastrobuono* both direct courts to respect the terms of the agreement without regard to the federal policy favoring arbitration.

Even if the policy goals underlying the FAA did necessitate some limit on the EEOC's statutory authority, the line drawn by the Court of Appeals between injunctive and victim-specific relief creates an uncomfortable fit with its avowed purpose of preserving the EEOC's public function while favoring arbitration. For that purpose, the category of victim-specific relief is both overinclusive and underinclusive. For example, it is overinclusive because while **\*295** punitive damages benefit the individual employee, they also serve an obvious public function in deterring future **\*\*765** violations. See *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–270, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor ..., and to deter him and others from similar extreme conduct"); Restatement (Second) of Torts § 908 (1977). Punitive damages may often have a greater impact on the behavior of other employers than the threat of an injunction, yet the EEOC is precluded from seeking this form of relief under the Court of Appeals' compromise scheme. And, it is underinclusive because

injunctive relief, although seemingly not "victim-specific," can be seen as more closely tied to the employees' injury than to any public interest. See *Occidental,* 432 U.S., at 383, 97 S.Ct. 2447 (REHNQUIST, J., dissenting) ("While injunctive relief may appear more 'broad based,' it nonetheless is redress for individuals").

**13** The compromise solution reached by the Court of Appeals turns what is effectively a forum selection clause into a waiver of a nonparty's statutory remedies. But if the federal policy favoring arbitration trumps the plain language of Title VII and the contract, the EEOC should be barred from pursuing any claim outside the arbitral forum. If not, then the statutory language is clear; the EEOC has the authority to pursue victim-specific relief regardless of the forum that the employer and employee have chosen to resolve their disputes. [10] Rather than attempt to split the difference, we are **\*296** persuaded that, pursuant to Title VII and the ADA, whenever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief. To hold otherwise would undermine the detailed enforcement scheme created by Congress simply to give greater effect to an agreement between private parties that does not even contemplate the EEOC's statutory function. [11]

10    We have held that federal statutory claims may be the subject of arbitration agreements that are enforceable pursuant to the FAA because the agreement only determines the choice of forum. "In these cases we recognized that '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' [ *Mitsubishi Motors Corp. v. Soler Chrysler—Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ]." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). To the extent the Court of Appeals construed an employee's agreement to submit his claims to an arbitral forum as a waiver of the substantive statutory prerogative of the EEOC to enforce those claims for whatever relief and in whatever forum the EEOC sees fit, the court obscured this crucial distinction and ran afoul of our precedent.

11    If injunctive relief were the only remedy available, an employee who signed an arbitration agreement would have little incentive to file a charge with the EEOC. As a greater percentage of the work force becomes subject

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

arbitration agreements as a condition of employment, see Voluntary Arbitration in Worker Disputes Endorsed by 2 Groups, Wall Street Journal, June 20, 1997, p. B2 (reporting that the American Arbitration Association estimates "more than 3.5 million employees are covered" by arbitration agreements designating it to administer arbitration proceedings), the pool of charges from which the EEOC can choose cases that best vindicate the public interest would likely get smaller and become distorted. We have generally been reluctant to approve rules that may jeopardize the EEOC's ability to investigate and select cases from a broad sample of claims. Cf. *EEOC v. Shell Oil Co.,* 466 U.S. 54, 69, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984) ("[I]t is crucial that the Commission's ability to investigate charges of systemic discrimination not be impaired"); *Occidental Life Ins. Co. of Cal. v. EEOC,* 432 U.S. 355, 368, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977).

### V

**14  15**  It is true, as respondent and its *amici* have argued, that Baker's conduct may have the effect of limiting the **\*\*766** relief that the EEOC may obtain in court. If, for example, he had failed to mitigate his damages, or had accepted a monetary settlement, any recovery by the EEOC would be limited accordingly. See, *e.g., Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–232, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (Title VII claimant "forfeits his right to backpay **\*297** if he refuses a job substantially equivalent to the one he was denied"); *EEOC v. Goodyear Aerospace Corp.,* 813 F.2d 1539, 1542 (C.A.9 1987) (employee's settlement "rendered her personal claims moot"); *EEOC v. U.S. Steel Corp.,* 921 F.2d 489, 495 (C.A.3 1990) (individuals who litigated their own claims were precluded by res judicata from obtaining individual relief in a subsequent EEOC action based on the same claims). As we have noted, it "goes without saying that the courts can and should preclude double recovery by an individual." *General Telephone,* 446 U.S., at 333, 100 S.Ct. 1698.

**16**  But no question concerning the validity of his claim or the character of the relief that could be appropriately awarded in either a judicial or an arbitral forum is presented by this record. Baker has not sought arbitration of his claim, nor is there any indication that he has entered into settlement negotiations with respondent. It is an open question whether a settlement or arbitration judgment would affect the validity of the EEOC's claim or the character of relief the EEOC may seek. The only issue before this Court is whether the fact that

Baker has signed a mandatory arbitration agreement limits the remedies available to the EEOC. The text of the relevant statutes provides a clear answer to that question. They do not authorize the courts to balance the competing policies of the ADA and the FAA or to second-guess the agency's judgment concerning which of the remedies authorized by law that it shall seek in any given case.

Moreover, it simply does not follow from the cases holding that the employee's conduct may affect the EEOC's recovery that the EEOC's claim is merely derivative. We have recognized several situations in which the EEOC does not stand in the employee's shoes. See *Occidental,* 432 U.S., at 368, 97 S.Ct. 2447 (EEOC does not have to comply with state statutes of limitations); *General Telephone,* 446 U.S., at 326, 100 S.Ct. 1698 (EEOC does not have to satisfy Rule 23 requirements); *Gilmer,* 500 U.S., at 32, 111 S.Ct. 1647 (EEOC is not precluded from seeking classwide and equitable **\*298** relief in court on behalf of an employee who signed an arbitration agreement). And, in this context, the statute specifically grants the EEOC exclusive authority over the choice of forum and the prayer for relief once a charge has been filed. The fact that ordinary principles of res judicata, mootness, or mitigation may apply to EEOC claims does not contradict these decisions, nor does it render the EEOC a proxy for the employee.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, with whom THE CHIEF JUSTICE and Justice SCALIA join, dissenting.

The Court holds today that the Equal Employment Opportunity Commission (EEOC or Commission) may obtain victim-specific remedies in court on behalf of an employee who had agreed to arbitrate discrimination claims against his employer. This decision conflicts with both the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.,* and the basic principle that the EEOC must take a victim of discrimination as it finds him. Absent explicit statutory authorization to the contrary, I cannot agree that the EEOC may do on behalf of an employee that which an employee has agreed not to do for himself. Accordingly, I would affirm the judgment of the Court of Appeals.

E.E.O.C. v. Waffle House, Inc., 534 U.S. 279 (2002)

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

**767 I

Before starting work as a grill operator for respondent Waffle House, Inc., Eric Scott Baker filled out and signed an employment application. This application included an arbitration clause providing that "any dispute or claim concerning Applicant's employment with Waffle House, Inc., or any subsidiary or Franchisee of Waffle House, Inc., or the terms, *299 conditions or benefits of such employment ... will be settled by binding arbitration." App. 59.

The Court does not dispute that the arbitration agreement between Waffle House and Baker falls comfortably within the scope of the FAA, see *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), which provides that "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Neither does the Court contest that claims arising under federal employment discrimination laws, such as Baker's claim that Waffle House discharged him in violation of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101 *et seq.* (1994 ed. and Supp. V), may be subject to compulsory arbitration. See *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 23, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that a claim arising under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.* (1994 ed.), may be subject to compulsory arbitration).[1] The Court therefore does not dispute that *300 Baker, by signing an arbitration agreement, waived his ability either to bring an ADA claim against Waffle House in court or, consequently, to obtain relief for himself in that forum.

[1]   Admittedly, this case involves a claim under the ADA while *Gilmer* addressed compulsory arbitration in the context of the ADEA. Nevertheless, I see no reason why an employee should not be required to abide by an agreement to arbitrate an ADA claim. In assessing whether Congress has precluded the enforcement of an arbitration agreement with respect to a particular statutory claim, this Court has held that a party should be held to an arbitration agreement "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Here, the text of the ADA does not suggest that Congress

intended for ADA claims to fall outside the purview of the FAA. Indeed, the ADA expressly encourages the use of arbitration and other forms of alternative dispute resolution, rather than litigation, to resolve claims under the statute: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under this [Act]." 42 U.S.C. § 12212 (1994 ed.).

The EEOC, in its complaint, sought to obtain the victim-specific relief for Baker that he could not seek for himself, asking a court to make Baker whole by providing reinstatement with backpay and compensatory damages and to pay Baker punitive damages.[2] App. 39–40. In its responses to interrogatories and directives to produce filed the same day as its complaint, the EEOC stated unambiguously: "All amounts recovered from Defendant Employer in this litigation will be received directly by Mr. Baker based on his charge of discrimination against Defendant Employer." *Id.,* at 52. The EEOC also admitted that it was "bring[ing] this action **768 on behalf of Eric Scott Baker."[3] *Id.,* at 51.

[2]   The EEOC, in its prayer for relief, also requested that the court enjoin Waffle House from engaging in any discriminatory employment practice and asked the court to order Waffle House to institute policies, practices, and programs which would provide equal employment opportunities for qualified individuals with disabilities, and which would eradicate the effect of its past and present unlawful employment practices. App. 39. The Court of Appeals concluded that Baker's arbitration agreement did not preclude the EEOC from seeking such broad-based relief, and Waffle House has not appealed that ruling. See 193 F.3d 805, 813, n. 3 (C.A.4 1999).

[3]   Although the EEOC's complaint alleged that Waffle House engaged in "unlawful employment *practices,*" in violation of § 102(a) of the ADA, 42 U.S.C. § 12112(a) (1994 ed.), it mentioned no instances of discriminatory conduct on the part of Waffle House other than its discharge of Baker. App. 38 (emphasis added).

By allowing the EEOC to obtain victim-specific remedies for Baker, the Court therefore concludes that the EEOC may do "on behalf of ... Baker" that which he cannot do for himself. The Court's conclusion rests upon the following premise advanced by the EEOC: An arbitration agreement between an employer and an employee may not limit the remedies

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

that the Commission may determine in court because *301 Title VII "grants the EEOC the right to obtain all statutory remedies in any action it brings." [4] Brief for Petitioner 17. The EEOC contends that "the statute in clear terms authorizes [it] to obtain all of the listed forms of relief," referring to those types of relief set forth in 42 U.S.C. § 2000e–5(g)(1) (1994 ed.) (including injunctive relief and reinstatement with backpay) as well as the forms of relief listed in § 1981a(a)(1) (compensatory and punitive damages). Brief for Petitioner 17–18. Endorsing the EEOC's position, the Court concludes that "these statutes unambiguously authorize the EEOC to obtain the relief that it seeks in its complaint if it can prove its case against respondent." *Ante,* at 760.

[4]    Title I of the ADA expressly incorporates "[t]he powers, remedies, and procedures set forth in [Title VII]." 42 U.S.C. § 12117(a). That includes the procedures applicable to enforcement actions as well as the equitable relief available under § 2000e–5(g).

The Court's position, however, is inconsistent with the relevant statutory provision. For while the EEOC has the statutory right to *bring* suit, see § 2000e–5(f)(1), it has no statutory entitlement to *obtain* a particular remedy. Rather, the plain language of § 2000e–5(g)(1) makes clear that it is a *court's* role to decide whether to "enjoin the respondent ..., and order such affirmative action *as may be appropriate,* which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief *as the court deems appropriate.*" (Emphasis added.) Whether a particular remedy is "appropriate" in any given case is a question for a court and not for the EEOC. [5] See *Albemarle Paper Co.* *302 *v. Moody,* 422 U.S. 405, 415–416, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) ( "The [Title VII] scheme implicitly recognizes that there may be cases calling for one remedy but not another, and ... these choices are, of course, left in the first instance to the district courts"); *Selgas v. American Airlines, Inc.,* 104 F.3d 9, 13, n. 2 (C.A.1 1997) ("It is clear that in a Title VII case, it is the court which has discretion to fashion relief comprised of the equitable remedies it sees as appropriate, and not the parties which may determine which equitable remedies are available").

[5]    The EEOC also points out that Title VII gives the EEOC, and not an individual victim of discrimination, the choice of forum when the EEOC files an enforcement action. See § 2000e–5(f)(3). Since the statute gives the victim no say in the matter, the EEOC argues that an employee, by signing an arbitration agreement, should not be able to effectively negate *ex ante* the EEOC's statutory authority to choose the forum

in which it brings suit. Brief for Petitioner 21–23. The Court, wisely, does not rely heavily on this argument since nothing in the Court of Appeals' decision prevents the EEOC from choosing to file suit in any appropriate judicial district set forth in § 2000e–5(f)(3). Rather, the Court of Appeals' holding only limits the *remedies* that the EEOC may obtain when it decides to institute a judicial action. See 193 F.3d, at 806–807.

Had Congress wished to give the EEOC the authority to determine whether a particular remedy is appropriate under § 2000e–5, it clearly knew how to draft language to that effect. See § 2000e–16(b) (providing that the EEOC shall have the authority to enforce § 2000e–16(a)'s prohibition of employment discrimination within federal agencies "through appropriate remedies, including reinstatement or hiring **769 of employees with or without back pay, as will effectuate the policies of this section"). But Congress specifically declined to grant the EEOC such authority when it empowered the Commission to bring lawsuits against private employers. Both the original House version and the original Senate version of the Equal Employment Opportunity Act of 1972 would have granted the EEOC powers similar to those possessed by the National Labor Relations Board to adjudicate a complaint and implement a remedy. See H.R. 1746, 92d Cong., 1st Sess., § 706(h) (1971), and S. 2515, 92d Cong., 1st Sess., § 4(h) (1971), reprinted in Legislative History of the Equal Employment Opportunity Act of 1972, pp. 7–8, 164–165. These bills were amended, however, once they reached the floor of both Houses of Congress to replace such "cease-and-desist" authority with the power only to prosecute an *303 action in court. See 117 Cong. Rec. 32088–32111 (1971); 118 Cong. Rec. 3965–3979 (1972).

The statutory scheme enacted by Congress thus entitles neither the EEOC nor an employee, upon filing a lawsuit, to obtain a particular remedy by establishing that an employer discriminated in violation of the law. [6] In both cases, 42 U.S.C. § 2000e–5(g)(1) governs, and that provision unambiguously requires a *court* to determine what relief is "appropriate" in a particular case. [7]

[6]    The Court, in fact, implicitly admits as much. Contradicting its earlier assertion that the "statutes unambiguously authorize the EEOC to obtain the relief *that it seeks* in its complaint if it can prove its case against respondent," *ante,* at 760 (emphasis added), the Court later concludes that the statutory scheme gives the trial judge "discretion in a particular case to

order reinstatement and award damages in an amount warranted by the facts of that case." *Ante,* at 763.

7    Similarly, the EEOC's authority to obtain legal remedies is also no greater than that of an employee acting on his own behalf. Title 42 U.S.C. § 1981a(a)(2), which was enacted as part of the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1072, provides that the EEOC or an employee "*may recover* compensatory and punitive damages" in addition to the forms of relief authorized by § 2000e–5(g)(1). (Emphasis added.) Nothing in § 1981a(a), however, alters the fundamental proposition that it is for the judiciary to determine what relief (of all the relief that plaintiffs "may recover" under the statute) the particular plaintiff before the court *is entitled to.* The statutory language does not purport to grant the EEOC or an employee the absolute right to obtain damages in every case of proven discrimination, despite the operation of such legal doctrines as time bar, accord and satisfaction, or (as in this case) binding agreement to arbitrate.

## II

Because Congress has not given the EEOC the authority to usurp the traditional role of courts to determine what constitutes "appropriate" relief in a given case, it is necessary to examine whether it would be "appropriate" to allow the EEOC to obtain victim-specific relief for Baker here, notwithstanding the fact that Baker, by signing an arbitration *304 agreement, has waived his ability to seek such relief on his own behalf in a judicial forum. For two reasons, I conclude it is not "appropriate" to allow the EEOC to do on behalf of Baker that which Baker is precluded from doing for himself.

## A

To begin with, when the EEOC litigates to obtain relief on behalf of a particular employee, the Commission must take that individual as it finds him. Whether the EEOC or an employee files a particular lawsuit, the employee is the ultimate beneficiary of victim-specific relief. The relevance of the employee's circumstances therefore does not change simply because the EEOC, rather than the employee himself, is litigating the case, and a court must consider these circumstances in fashioning an "appropriate" remedy. [8]

8    I agree with the Court that, in order to determine whether a particular remedy is "appropriate," it is necessary to examine the specific facts of the case at hand. See *ante,* at 763. For this reason, the statutory

scheme does not permit us to announce a categorical rule barring lower courts from *ever* awarding a form of relief expressly authorized by the statute. When the same set of facts arises in different cases, however, such cases should be adjudicated in a consistent manner. Therefore, this Court surely may specify particular circumstances under which it would be inappropriate for trial courts to award certain types of relief, such as victim-specific remedies.

**770 As a result, the EEOC's ability to obtain relief is often limited by the actions of an employee on whose behalf the Commission may wish to bring a lawsuit. If an employee signs an agreement to waive or settle discrimination claims against an employer, for example, the EEOC may not recover victim-specific relief on that employee's behalf. See, *e.g., EEOC v. Cosmair, Inc.,* 821 F.2d 1085, 1091 (C.A.5 1987); *EEOC v. Goodyear Aerospace Corp.,* 813 F.2d 1539, 1543 (C.A.9 1987); see also EEOC: Guidance on Waivers Under the ADA and Other Civil Rights Laws, EEOC Compliance Manual (BNA) N:2345, N:2347 (Apr. 10, 1997) (hereinafter EEOC Compliance Manual) (recognizing that a valid waiver or settlement *305 agreement precludes the EEOC from recovering victim-specific relief for an employee). In addition, an employee who fails to mitigate his damages limits his ability to obtain relief, whether he files his own lawsuit or the EEOC files an action on his behalf. See *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–232, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). An employee's unilateral attempt to pursue his own discrimination claim may also limit the EEOC's ability to obtain victim-specific relief for that employee. If a court rejects the merits of a claim in a private lawsuit brought by an employee, for example, res judicata bars the EEOC from recovering victim-specific relief on behalf of that employee in a later action. See, *e.g., EEOC v. Harris Chernin, Inc.,* 10 F.3d 1286, 1291 (C.A.7 1993).

In all of the aforementioned situations, the same general principle applies: To the extent that the EEOC is seeking victim-specific relief in court for a particular employee, it is able to obtain no more relief for that employee than the employee could recover for himself by bringing his own lawsuit. The EEOC, therefore, should not be able to obtain victim-specific relief for Baker in court through its own lawsuit here when Baker waived his right to seek relief for himself in a judicial forum by signing an arbitration agreement.

The Court concludes that the EEOC's claim is not "merely derivative" of an employee's claim and argues that "[w]e have

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

recognized several situations in which the EEOC does not stand in the employee's shoes." *Ante,* at 766. The Court's opinion, however, attacks a straw man because this case does not turn on whether the EEOC's "claim" is wholly derivative of an employee's "claim." Like the Court of Appeals below, I do not question the EEOC's ability to seek declaratory and broad-based injunctive relief in a case where a particular employee, such as Baker, would not be able to pursue such relief in court. Rather, the dispute here turns on whether the EEOC's ability *to obtain victim-specific relief* is dependent upon the victim's ability to obtain such relief for himself.

*\*306* The Court claims that three cases support its argument that the EEOC's claim is not "merely derivative" of an employee's claim. See *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S., at 24, 111 S.Ct. 1647; *General Telephone Co. of Northwest v. EEOC,* 446 U.S. 318, 325, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *Occidental Life Ins. Co. of Cal. v. EEOC,* 432 U.S. 355, 368, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). Once the actual nature of the dispute is properly understood, however, it is apparent that these cases do not support the Court's position, for none of them suggests that the EEOC should be allowed to recover *victim-specific relief* on behalf of an employee who has waived his ability to obtain such relief for himself in court by signing a valid arbitration agreement.

*\*\*771* In *Gilmer,* for example, this Court addressed whether arbitration procedures are inadequate in discrimination cases because they do not allow for "broad equitable relief and class actions." 500 U.S., at 32, 111 S.Ct. 1647. Rejecting this argument, the Court noted that valid arbitration agreements "will not preclude the EEOC from bringing actions seeking class-wide and equitable relief." *Ibid.* Conspicuously absent from the Court's opinion, however, was any suggestion that the EEOC could obtain *victim-specific relief* on behalf of an employee who had signed a valid arbitration agreement. Cf. *ibid.*

Similarly, in *General Telephone,* this Court held only that lawsuits filed by the EEOC should not be considered representative actions under Federal Rule of Civil Procedure 23. In reaching this conclusion, the Court noted that "the EEOC is not merely a proxy for the victims of discrimination." 446 U.S., at 326, 100 S.Ct. 1698. To be sure, I agree that to the extent the EEOC seeks broad-based declaratory and equitable relief in court, the Commission undoubtedly acts both as a representative of a specific employee and to "vindicate the public interest in preventing employment discrimination." *Ibid.* But neither this dual

function nor anything in *General Telephone* detracts from the proposition that when the EEOC seeks to secure *victim-specific relief* in court, it may obtain *\*307* no more relief for an individual than the individual could obtain for himself.

Even the EEOC recognizes the dual nature of its role.[9] See EEOC Compliance Manual N:2346 (citing *General Telephone, supra,* at 326, 100 S.Ct. 1698). In its compliance manual, the EEOC states that "every charge filed with the EEOC carries two potential claims for relief: the charging party's claim for individual relief, and the EEOC's claim to 'vindicate the public interest in preventing employment discrimination.' " EEOC Compliance Manual N:2346. It is for this reason that "a private agreement can eliminate an individual's right to personal recovery, [but] it cannot interfere with EEOC's right to enforce ... the ADA ... by seeking relief that will benefit the public and any victims of an employer's unlawful practices who have not validly waived their claims." *Id.,* at N:2347.[10]

[9] The EEOC has consistently recognized that the Commission represents individual employees when it files an action in court. In this case, for instance, the EEOC stated in its answers to interrogatories that it brought this action "on behalf of Eric Scott Baker." See Part I, *supra.* Moreover, the EEOC has maintained in numerous cases that its attorneys have an attorney-client relationship with charging parties and their communications with charging parties are therefore privileged. See, *e.g., EEOC v. Johnson & Higgins Inc.,* 78 FEP Cases 1127 (SDNY1998); *EEOC v. McDonnell Douglas Corp.,* 948 F.Supp. 54 (E.D.Mo.1996).

[10] This Court has recognized that victim-specific remedies also serve the public goals of antidiscrimination statutes. See, *e.g., McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 357–358, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Nevertheless, when the EEOC is seeking such remedies, it is only serving the public interest to the extent that an employee seeking the same relief for himself through litigation or arbitration would also be serving the public interest. It is when the EEOC is seeking broader relief that its unique role in vindicating the public interest comes to the fore. The Commission's motivation to secure such relief is likely to be greater than that of an individual employee, who may be primarily concerned with securing relief only for himself.

In the final case cited by the Court, *Occidental Life Ins. Co. v. EEOC,* this Court held that state statutes of limitations *\*308* do not apply to lawsuits brought by the EEOC,

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

because "[u]nlike the typical litigant against whom a statute of limitations might appropriately run, the EEOC is required by law to refrain from commencing a civil action until it has discharged its administrative duties." 432 U.S., at 368, 97 S.Ct. 2447. The Court also noted that the 1–year statute of limitations at issue in that case "could under some **772 circumstances directly conflict with the timetable for administrative action expressly established in the 1972 Act." Id., at 368–369, 97 S.Ct. 2447. Precluding the EEOC from seeking victim-specific remedies in court on behalf of an employee who has signed an arbitration agreement, however, would in no way impede the Commission from discharging its administrative duties nor would it directly conflict with any provision of the statute. In fact, such a result is entirely consistent with the federal policy underlying the Court's decision in Occidental: that employment discrimination claims should be resolved quickly and out of court. See id., at 368, 97 S.Ct. 2447.

### B

Not only would it be "inappropriate" for a court to allow the EEOC to obtain victim-specific relief on behalf of Baker, to do so in this case would contravene the "liberal federal policy favoring arbitration agreements" embodied in the FAA. See Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

Under the terms of the FAA, Waffle House's arbitration agreement with Baker is valid and enforceable. See Part I, supra. The Court reasons, however, that the FAA is not implicated in this case because the EEOC was not a party to the arbitration agreement and "[i]t goes without saying that a contract cannot bind a nonparty." Ante, at 764. The Court's analysis entirely misses the point. The relevant question here is not whether the EEOC should be bound by Baker's agreement to arbitrate. Rather, it is whether a court should give effect to the arbitration agreement between *309 Waffle House and Baker or whether it should instead allow the EEOC to reduce that arbitration agreement to all but a nullity. I believe that the FAA compels the former course. [11]

[11] The Court also reasons that "the FAA enables respondent to compel Baker to arbitrate his claim, but it does not expand the range of claims subject to arbitration beyond what is provided for in the agreement." Ante, at 764, n. 9. The Court does not explain, however, how the EEOC's ADA claim on Baker's behalf differs in any meaningful respect from the ADA claim that Baker would have been compelled to submit to arbitration.

By allowing the EEOC to pursue victim-specific relief on behalf of Baker under these circumstances, the Court eviscerates Baker's arbitration agreement with Waffle House and liberates Baker from the consequences of his agreement. Waffle House gains nothing and, if anything, will be worse off in cases where the EEOC brings an enforcement action should it continue to utilize arbitration agreements in the future. This is because it will face the prospect of defending itself in two different forums against two different parties seeking precisely the same relief. It could face the EEOC in court and the employee in an arbitral forum.

The Court does not decide here whether an arbitral judgment would "affect the validity of the EEOC's claim or the character of relief the EEOC may seek" in court. [12] Ante, at 766. Given the reasoning in the Court's opinion, however, the proverbial handwriting is on the wall. If the EEOC indeed is "the master of its own case," ante, at 763, I do not see how an employee's independent decision to pursue arbitral proceedings could affect the validity of the "EEOC's claim" *310 in court. Should this Court in a later case determine that an unfavorable arbitral judgment against an employee precludes the EEOC from seeking similar relief for that employee in **773 court, then the Court's jurisprudence will stand for the following proposition: The EEOC may seek relief for an employee who has signed an arbitration agreement unless that employee decides that he would rather abide by his agreement and arbitrate his claim. Reconciling such a result with the FAA, however, would seem to be an impossible task and would make a mockery of the rationale underlying the Court's holding here: that the EEOC is "the master of its own case." Ibid.

[12] In the vast majority of cases, an individual employee's arbitral proceeding will be resolved before a parallel court action brought by the EEOC. See Maltby, Private Justice: Employment Arbitration and Civil Rights, 30 Colum. Human Rights L.Rev. 29, 55 (1998) (reporting that in arbitration the average employment discrimination case is resolved in under nine months while the average employment discrimination case filed in federal district court is not resolved for almost two years).

Assuming that the Court means what it says, an arbitral judgment will not preclude the EEOC's claim for victim-specific relief from going forward, and courts will have to adjust damages awards to avoid double recovery. See ante, at

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

766. If an employee, for instance, is able to recover $20,000 through arbitration and a court later concludes in an action brought by the EEOC that the employee is actually entitled to $100,000 in damages, one assumes that a court would only award the EEOC an additional $80,000 to give to the employee. Suppose, however, that the situation is reversed: An arbitrator awards an employee $100,000, but a court later determines that the employee is only entitled to $20,000 in damages. Will the court be required to order the employee to return $80,000 to his employer? I seriously doubt it.

The Court's decision thus places those employers utilizing arbitration agreements at a serious disadvantage. Their employees will be allowed two bites at the apple—one in arbitration and one in litigation conducted by the EEOC—and will be able to benefit from the more favorable of the two rulings. This result, however, discourages the use of arbitration agreements and is thus completely inconsistent with the policies underlying the FAA.

### *311  C

While the Court explicitly decides today only "whether the fact that Baker has signed a mandatory arbitration agreement limits the remedies available to the EEOC," *ibid.,* its opinion sets this Court on a path that has no logical or principled stopping point. For example, if "[t]he statute clearly makes the EEOC the master of its own case," *ante,* at 763, and the filing of a charge puts the Commission "in command of the process," *ibid.,* then it is likely after this decision that an employee's decision to enter into a settlement agreement with his employer no longer will preclude the EEOC from obtaining relief for that employee in court.

While the Court suggests that ordinary principles of mootness "may apply to EEOC claims," *ante,* at 766, this observation, given the reasoning in the Court's opinion, seems largely beside the point. It should go without saying that mootness principles apply to EEOC claims. For instance, if the EEOC settles claims with an employer, the Commission obviously cannot continue to pursue those same claims in court. An employee's settlement agreement with an employer, however, does not "moot" an action brought by the EEOC nor does it preclude the EEOC from seeking broad-based relief. Rather, a settlement may only limit the EEOC's ability to obtain victim-specific relief for the employee signing the settlement agreement. See, *e.g., Goodyear Aerospace Corp.,* 813 F.2d, at 1541–1544.

The real question addressed by the Court's decision today is whether an employee can enter into an agreement with an employer that limits the relief the EEOC may seek in court on that employee's behalf. And if, in the Court's view, an employee cannot compromise the EEOC's ability to obtain particular remedies by signing an arbitration agreement, then I do not see how an employee may be permitted to do the exact same thing by signing a settlement agreement. See *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)  *312  noting that one purpose of the FAA is to place arbitration agreements " 'upon the same footing as other contracts' " (citation **774 omitted)). The Court's reasoning, for example, forecloses the argument that it would be inappropriate under 42 U.S.C. § 2000e–5(g)(1) for a court to award victim-specific relief in any case where an employee had already settled his claim. If the statutory provision, according to the Court, does not "permit a court to announce a categorical rule precluding an expressly authorized form of relief as inappropriate in all cases in which the employee has signed an arbitration agreement," then it surely does not "constitute authorization for [a] judge-made, *per se* rul[e]" barring the EEOC from obtaining victim-specific remedies on behalf of an employee who has signed a valid settlement agreement. *Ante,* at 763.

Unfortunately, it is therefore likely that under the logic of the Court's opinion the EEOC *now will be able* to seek victim-specific relief in court on behalf of employees who have already settled their claims. Such a result, however, would contradict this Court's suggestion in *Gilmer* that employment discrimination disputes "can be settled ... without any EEOC involvement." 500 U.S., at 28, 111 S.Ct. 1647. More importantly, it would discourage employers from entering into settlement agreements and thus frustrate Congress' desire to expedite relief for victims of discrimination, see *Ford Motor Co. v. EEOC,* 458 U.S., at 221, 102 S.Ct. 3057; *Occidental Life,* 432 U.S., at 364–365, 97 S.Ct. 2447, and to resolve employment discrimination disputes out of court. See 42 U.S.C. § 12212 (encouraging alternative means of dispute resolution, including settlement negotiations, to avoid litigation under the ADA).

### III

Rather than allowing the EEOC to undermine a valid and enforceable arbitration agreement between an employer and an employee in the manner sanctioned by the Court today, I would choose a different path. As this Court has stated,  *313  courts are "not at liberty to pick and choose among

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Pittsburgh & Lake Erie R. Co. v. Railway Labor Executives' Assn.,* 491 U.S. 490, 510, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989). In this case, I think that the EEOC's statutory authority to enforce the ADA can be easily reconciled with the FAA.

Congress has not indicated that the ADA's enforcement scheme should be interpreted in a manner that undermines the FAA. Rather, in two separate places, Congress has specifically encouraged the use of arbitration to resolve disputes under the ADA. First, in the ADA itself, Congress stated: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and *arbitration, is encouraged to resolve disputes arising under this chapter.*" 42 U.S.C. § 12212 (emphasis added). Second, Congress used virtually identical language to encourage the use of arbitration to resolve disputes under the ADA in the Civil Rights Act of 1991. See Pub.L. 102–166, § 118, 105 Stat. 1081. [13]

[13]    This provision states: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." Among "the Acts or provisions of Federal law" amended by the Civil Rights Act of 1991 was the ADA. See Pub.L. 102–166, § 118, 105 Stat. 1081.

The EEOC contends that these provisions do not apply to this dispute because the Commission has not signed an arbitration agreement with Waffle House and the provisions encourage arbitration "only when the parties have consented to arbitration." Reply Brief for Petitioner 17. Remarkably, the EEOC at the same time **775 questions whether it even has the statutory authority to take this step. See Brief *314 for Petitioner 22, n. 7. As a result, the EEOC's view seems to be that Congress has encouraged the use of arbitration to resolve disputes under the ADA only in situations where the EEOC does not wish to bring an enforcement action in court. This limiting principle, however, is nowhere to be found in § 12212. The use of arbitration to resolve all disputes under the ADA is clearly "authorized by law." See Part I, *supra.* Consequently, I see no indication that Congress intended to

grant the EEOC authority to enforce the ADA in a manner that undermines valid and enforceable arbitration agreements. [14]

[14]    I do not see the relevance of the Court's suggestion that its decision will only "have a negligible effect on the federal policy favoring arbitration" because the EEOC brings relatively few lawsuits. *Ante,* at 762, n. 7. In my view, either the EEOC has been authorized by statute to undermine valid and enforceable arbitration agreements, such as the one at issue in this case, or one should read the Commission's enforcement authority and the FAA in a harmonious manner. This Court's jurisprudence and the proper interpretation of the relevant statutes should not depend on how many cases the EEOC chooses to prosecute in any particular year. I simply see no statutory basis for the Court's implication that the EEOC has the authority to undermine valid and enforceable arbitration agreements so long as the Commission only opts to interfere with a relatively limited number of agreements.

In the last 20 years, this Court has expanded the reach and scope of the FAA, holding, for instance, that the statute applies even to state-law claims in state court and pre-empts all contrary state statutes. See *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). I have not always agreed with this Court's jurisprudence in this area, see, *e.g., Allied–Bruce, supra,* at 285–297, 115 S.Ct. 834 (THOMAS, J., dissenting), but it seems to me that what's good for the goose is good for the gander. The Court should not impose the FAA upon States in the absence of any indication that Congress intended such a result, see *Southland, supra,* at 25–30, 104 S.Ct. 852 (O'CONNOR, J., dissenting), yet refuse to interpret a *federal* statute in a manner *315 compatible with the FAA, especially when Congress has expressly encouraged that claims under that federal statute be resolved through arbitration.

Given the utter lack of statutory support for the Court's holding, I can only conclude that its decision today is rooted in some notion that employment discrimination claims should be treated differently from other claims in the context of arbitration. I had thought, however, that this Court had decisively repudiated that principle in *Gilmer.* See 500 U.S., at 27–28, 111 S.Ct. 1647 (holding that arbitration agreements can be enforced without contravening the "important social policies" furthered by the ADEA).

For all of these reasons, I respectfully dissent.

E.E.O.C. v. Waffle House, Inc., 534 U.S. 279 (2002)

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001...

Parallel Citations

122 S.Ct. 754, 81 Empl. Prac. Dec. P 40,850, 151 L.Ed.2d 755, 12 A.D. Cases 1001, 22 NDLR P 129, 02 Cal. Daily Op. Serv. 369, 2002 Daily Journal D.A.R. 485, 15 Fla. L. Weekly Fed. S 63

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 24

DOCSTOR: 2191401\1

109 S.Ct. 1248
Supreme Court of the United States

VOLT INFORMATION SCIENCES, INC., Appellant,
v.
BOARD OF TRUSTEES OF the LELAND
STANFORD JUNIOR UNIVERSITY.

No. 87-1318.    Argued Nov. 30,
1988.    Decided March 6, 1989.

University brought action against contractor for fraud and breach of contract, and sought indemnity from two companies involved in design and management of project. Contractor filed petition to compel arbitration and stay prosecution of suit. The Superior Court, Santa Clara County, Charles Gordon, J., granted contractor's motion to stay arbitration, and contractor appealed. The Court of Appeal, Brauer, J., 240 Cal.Rptr. 558, affirmed, and appeal was taken. The Supreme Court, Chief Justice Rehnquist, held that Federal Arbitration Act did not preempt California law which permits court to stay arbitration pending resolution of related litigation involving third parties not bound by arbitration agreement where parties agreed in contract to abide by state rules of arbitration.

Affirmed.

Justice Brennan filed a dissenting opinion in which Justice Marshall joined.

Justice O'Connor took no part in the consideration or decision of the case.

West Headnotes (5)

**1**    **Alternative Dispute
Resolution** 🗝 Contractual or Consensual Basis
**Alternative Dispute
Resolution** 🗝 Arbitration Favored; Public
Policy

Federal Arbitration Act was designed to overrule judiciary's long-standing refusal to enforce agreements to arbitrate and place such agreements upon same footing as other contracts, but Act does not confer right to compel arbitration of any dispute at any time; Act confers only right to obtain order directing arbitration proceeding

in manner provided for by parties' agreement. 9 U.S.C.A. §§ 2, 4.

733 Cases that cite this headnote

**2**    **Federal Courts** 🗝 Arbitration

In applying general state-law principles of contract interpretation to interpretation of arbitration agreement within scope of Federal Arbitration Act, due regard must be given to federal policy favoring arbitration, and ambiguities as to scope of arbitration clause itself resolved in favor of arbitration. 9 U.S.C.A. § 1 et seq.

571 Cases that cite this headnote

**3**    **Alternative Dispute
Resolution** 🗝 Preemption

**States** 🗝 Particular Cases, Preemption or
Supersession

Federal Arbitration Act contains no express preemptive provision nor does it reflect congressional intent to occupy entire field of arbitration. 9 U.S.C.A. § 1 et seq.

118 Cases that cite this headnote

**4**    **Federal Courts** 🗝 Nature of Decisions or
Questions Involved

Supreme Court had appellate jurisdiction to review decision of California Court of Appeal which had upheld validity of California statute permitting stay of arbitration pending resolution of related litigation involving third parties not bound by arbitration agreement; even though state court's decision may have been premised on its interpretation of contract between parties, decision also rejected argument made by party opposing stay of arbitration that California statute was preempted by Federal Arbitration Act. 28 U.S.C.A. § 1257(2); West's Ann.Cal.C.C.P. § 1281.2(c); 9 U.S.C.A. § 1 et seq.

365 Cases that cite this headnote

**5**    **Commerce** 🗝 Arbitration

109 S.Ct. 1248, 103 L.Ed.2d 488, 57 USLW 4295, 51 Ed. Law Rep. 725

Federal Arbitration Act did not preclude application of California statute that permits stay of arbitration pending resolution of related litigation also involving third parties not bound by arbitration agreement, even though dispute between university and contractor involved interstate commerce; parties had expressly agreed in arbitration clause to abide by California rules of arbitration. West's Ann.Cal.C.C.P. § 1281.2(c); 9 U.S.C.A § 1 et seq.

328 Cases that cite this headnote

**1249   *468   Syllabus*

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

A construction contract between appellant and appellee contained an agreement to arbitrate all disputes arising out of the contract and a choice-of-law clause providing that the contract would be governed by the law of "the place where the Project is located." When a dispute arose under the contract, appellant made a formal demand for arbitration. In response, appellee filed an action against appellant in the California Superior Court alleging fraud and breach of contract; in the same action, appellee sought indemnity from two other parties involved in the construction project, with whom it did not have arbitration agreements. The trial court denied appellant's motion to compel arbitration and granted **1250 appellee's motion to stay arbitration under Cal.Civ.Proc.Code Ann. § 1281.2(c), which allows such a stay pending resolution of related litigation between a party to the arbitration agreement and third parties not bound by it. The State Court of Appeal affirmed, holding that (1) by specifying that the contract would be governed by "the law of the place where the Project is located," the choice-of-law clause incorporated the California rules of arbitration, including § 1281.2(c), into the parties' arbitration agreement, and (2) application of § 1281.2(c) was not preempted by the Federal Arbitration Act (FAA or Act), even though the contract involved interstate commerce.

*Held:*

1. The Court of Appeal's conclusion that the parties intended the choice-of-law clause to incorporate the California arbitration rules into their arbitration agreement is a question of state law, which this Court will not set aside. Pp. 1252-1254.

(a) Appellant's contention that the state court's construction of the choice-of-law clause was in effect a finding that appellant had "waived" its federally guaranteed right to compel arbitration, a waiver whose validity must be judged by reference to federal rather than state law, fundamentally misconceives the nature of the rights created by the FAA. Section 4 of that Act does not confer an absolute right to compel arbitration, but only a right to obtain an order directing that "arbitration proceed *in the manner provided for in [the parties'] agreement.*" (Emphasis *469 added.) Here, the state court found that, by incorporating California arbitration rules into their agreement, the parties had agreed that arbitration would not proceed in situations within the scope of § 1281.2(c). This was not a finding that appellant had "waived" an FAA-guaranteed right to compel arbitration, but a finding that it had no such right in the first place, because the parties' agreement did not require arbitration to proceed in this situation. P. 1253.

(b) Also without merit is appellant's argument that the state court's construction of the choice-of-law clause must be set aside because it violates the settled federal rule that questions of arbitrability in contracts subject to the FAA must be resolved with a healthy regard for the federal policy favoring arbitration. See *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-942, 74 L.Ed.2d 765. There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate. Interpreting a choice-of-law clause to make applicable the California arbitration rules-which are manifestly designed to encourage resort to the arbitral process-does not offend *Moses Cone* 's rule of liberal construction. Pp. 1253-1254.

2. Application of § 1281.2(c) to stay arbitration under the parties' contract is not preempted by the FAA. The FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. Moreover, since the FAA's principal purpose is to ensure that private arbitration agreements are enforced according to their terms, it cannot be said that application of § 1281.2(c) here would undermine the Act's goals and policies. Arbitration

109 S.Ct. 1248, 103 L.Ed.2d 488, 57 USLW 4295, 51 Ed. Law Rep. 725

under the Act in a matter of consent, not coercion, and the parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444, so too may they specify by contract the rules under which the arbitration will be conducted. Where, as here, the parties have agreed to abide by state arbitration rules, enforcing those rules according to the terms of the agreement is fully consistent with the FAA's goals, even if the result is that arbitration is stayed when the Act would **\*\*1251** otherwise permit it to go forward. Pp. 1254-1256.

Affirmed.

REHNQUIST, C.J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. ----. O'CONNOR, J., took no part in the consideration or decision of the case.

Attorneys and Law Firms

*\*470* James E. Harrington* argued the cause for appellant. With him on the briefs were *Robert B. Thum* and *Deanne M. Tully.*
*David M. Heilbron* argued the cause for appellee. With him on the brief was *Leslie G. Landau.*

Opinion

Chief Justice REHNQUIST delivered the opinion of the Court.

Unlike its federal counterpart, the California Arbitration Act, Cal.Civ.Proc.Code Ann. § 1280 *et seq.* (West 1982), contains a provision allowing a court to stay arbitration pending resolution of related litigation. We hold that application of the California statute is not pre-empted by the Federal Arbitration Act (FAA or Act), 9 U.S.C. § 1 *et seq.,* in a case where the parties have agreed that their arbitration agreement will be governed by the law of California.

Appellant Volt Information Sciences, Inc. (Volt), and appellee Board of Trustees of Leland Stanford Junior University (Stanford) entered into a construction contract under which Volt was to install a system of electrical conduits on the Stanford campus. The contract contained an agreement to arbitrate all disputes between the parties "arising out of

or relating to this contract or the breach thereof." [1] The contract also contained a choice-of-law clause providing that "[t]he Contract shall be governed by the law of the place where the Project is located." App. 37. During the course of the project, a dispute developed regarding compensation for extra work, and Volt made a formal demand for arbitration. Stanford responded by filing an action against Volt *\*471* in California Superior Court, alleging fraud and breach of contract; in the same action, Stanford also sought indemnity from two other companies involved in the construction project, with whom it did not have arbitration agreements. Volt petitioned the Superior Court to compel arbitration of the dispute. [2] Stanford in turn moved to stay arbitration pursuant to Cal.Civ.Proc.Code Ann. § 1281.2(c) (West 1982), which permits a court to stay arbitration pending resolution of related litigation between a party to the arbitration agreement and third parties not bound by it, where "there is a possibility of conflicting rulings on a common issue of law or fact." [3] The Superior Court denied **\*\*1252** Volt's motion to compel arbitration and stayed the arbitration proceedings pending the outcome of the litigation on the authority of § 1281.2(c). App. 59-60.

[1]    The arbitration clause read in full as follows:
        "All claims, disputes and other matters in question between the parties to this contract, arising out of or relating to this contract or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then prevailing unless the parties mutually agreed *[sic]* otherwise.... This agreement to arbitrate ... shall be specifically enforceable under the prevailing arbitration law." App. 40.

[2]    Volt's motion to compel was apparently brought pursuant to § 4 of the FAA, 9 U.S.C. § 4, and the parallel provision of the California Arbitration Act, Cal.Civ.Proc.Code Ann. § 1281.2 (West 1982); the motion cited both Acts as authority, but did not specify the particular sections upon which reliance was placed. App. 45-46. Volt also asked the court to stay the Superior Court litigation until the arbitration was completed, presumably pursuant to § 3 of the FAA, 9 U.S.C. § 3, and the parallel provision of the California Arbitration Act, Cal.Civ.Proc.Code Ann. § 1281.2(c)(3) (West 1982). App. 45-46.

[3]    Section 1281.2(c) provides, in pertinent part, that when a court determines that "[a] party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of

109 S.Ct. 1248, 103 L.Ed.2d 488, 57 USLW 4295, 51 Ed. Law Rep. 725

the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact [,] ... the court (1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action or special proceeding; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action or special proceeding."

The California Court of Appeal affirmed. The court acknowledged that the parties' contract involved interstate *472 commerce, that the FAA governs contracts in interstate commerce, and that the FAA contains no provision permitting a court to stay arbitration pending resolution of related litigation involving third parties not bound by the arbitration agreement. App. 64-65. However, the court held that by specifying that their contract would be governed by " 'the law of the place where the project is located,' " the parties had incorporated the California rules of arbitration, including § 1281.2(c), into their arbitration agreement. *Id.,* at 65. Finally, the court rejected Volt's contention that, even if the parties had agreed to arbitrate under the California rules, application of § 1281.2(c) here was nonetheless pre-empted by the FAA because the contract involved interstate commerce. *Id.,* at 68-80.

The court reasoned that the purpose of the FAA was " 'not [to] mandate the arbitration of all claims, but merely the enforcement ... of privately negotiated arbitration agreements.' " *Id.,* at 70 (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 219, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)). While the FAA therefore pre-empts application of state laws which render arbitration agreements unenforceable, "[i]t does not follow, however, that the federal law has preclusive effect in a case where the parties have chosen in their [arbitration] agreement to abide by state rules." App. 71. To the contrary, because "[t]he thrust of the federal law is that arbitration is strictly a matter of contract," *ibid.,* the parties to an arbitration agreement should be "at liberty to choose the terms under which they will arbitrate." *Id.,* at 72. Where, as here, the parties have chosen in their agreement to abide by the state rules of arbitration, application of the FAA to prevent enforcement of those rules would actually be "inimical to the policies underlying state and federal arbitration law," *id.,* at 73, because it would "force the parties to arbitrate in a manner contrary to their

agreement." *Id.,* at 65. The California Supreme *473 Court denied Volt's petition for discretionary review. *Id.,* at 87. We postponed consideration of our jurisdiction to the hearing on the merits. 485 U.S. 976, 108 S.Ct. 1268, 99 L.Ed.2d 480 (1988). We now hold that we have appellate jurisdiction [4] and affirm.

[4]  Under 28 U.S.C. § 1257(2), this Court has appellate jurisdiction to review a final judgment rendered by the highest court of a State in which a decision could be had "where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity." Here appellant explicitly drew in question the validity of Cal.Civ.Proc.Code Ann. § 1281.2(c) (West 1982) on federal grounds, contending that the statute, as applied to stay arbitration of this dispute, was pre-empted by the FAA and thus invalid under the Supremacy Clause. Because the California Court of Appeal upheld application of the statute against this challenge, our appellate jurisdiction would seem to be assured. See *Longshoremen v. Davis,* 476 U.S. 380, 387, n. 8, 106 S.Ct. 1904, 1910, n. 8, 90 L.Ed.2d 389 (1986) ( § 1257(2) jurisdiction exists when a state statute is upheld against a claim that its application to a particular set of facts is pre-empted by federal law); *McCarty v. McCarty,* 453 U.S. 210, 219-220, n. 12, 101 S.Ct. 2728, 2734-2735, n. 12, 69 L.Ed.2d 589 (1981) (same). Appellee contends, however, that § 1257(2) jurisdiction does not exist because the Court of Appeal's decision did not directly address the validity of the statute itself, but "simply uph[eld] the validity of the parties' agreement," which in turn required application of the statute. Brief for Appellee 4. Because an agreement is not a "statute," appellee argues, the Court of Appeal's decision is not one from which an appeal under § 1257(2) will lie. *Id.,* at 4-5.

    We disagree. Our decisions establish that "a state statute is sustained within the meaning of § 1257(2) when a state court holds it applicable to a particular set of facts as against the contention that such application is invalid on federal grounds." *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 441, 99 S.Ct. 1813, 1817, 60 L.Ed.2d 336 (1979) (citing *Cohen v. California,* 403 U.S. 15, 17-18, 91 S.Ct. 1780, 1784-1785, 29 L.Ed.2d 284 (1971); *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 686, and n. 1, 85 S.Ct. 1242, 1243, and n. 1, 14 L.Ed.2d 165 (1965); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 61, n. 3, 83 S.Ct. 631, 634, n. 3, 9 L.Ed.2d 584 (1963); *Dahnke-Walker Milling Co. v. Bondurant,* 257 U.S. 282, 288-290, 42

109 S.Ct. 1248, 103 L.Ed.2d 488, 57 USLW 4295, 51 Ed. Law Rep. 725

S.Ct. 106, 107-108, 66 L.Ed. 239 (1921)), regardless of "the particular grounds or reasons on which the [state court's] decision is put." *Id.,* at 289, 42 S.Ct., at 108. In this case, appellant contended before the Court of Appeal that even if the contract required application of Cal.Civ.Proc.Code Ann. § 1281.2(c) (West 1982), the California statute, as applied to stay arbitration under this contract in interstate commerce, so conflicted with the FAA that it was invalid under the Supremacy Clause. The Court of Appeal upheld application of the statute against this challenge, and under *Dahnke-Walker* and its progeny, that was sufficient to bring the case within the terms of § 1257(2), even though the court's decision may have been premised on its interpretation of the contract.

**\*474  \*\*1253**  Appellant devotes the bulk of its argument to convincing us that the Court of Appeal erred in interpreting the choice-of-law clause to mean that the parties had incorporated the California rules of arbitration into their arbitration agreement. See Brief for Appellant 66-96. Appellant acknowledges, as it must, that the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review. See *id.,* at 26, 29. But appellant nonetheless maintains that we should set aside the Court of Appeal's interpretation of this particular contractual provision for two principal reasons.

**1**    Appellant first suggests that the Court of Appeal's construction of the choice-of-law clause was in effect a finding that appellant had "waived" its "federally guaranteed right to compel arbitration of the parties' dispute," a waiver whose validity must be judged by reference to federal rather than state law. *Id.,* at 17, 30-36. This argument fundamentally misconceives the nature of the rights created by the FAA. The Act was designed "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," *Byrd, supra,* 470 U.S., at 219-220, 105 S.Ct., at 1241-1242, and place such agreements " 'upon the same footing as other contracts,' " *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)). Section 2 of the Act therefore declares that a written agreement to arbitrate in any contract involving interstate commerce or a maritime transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and § 4 allows a party to such an arbitration agreement to "petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement."

But § 4 of the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the **\*475** right to obtain an order directing that "arbitration proceed *in the manner provided for in [the parties'] agreement.*" 9 U.S.C. § 4 (emphasis added). Here the Court of Appeal found that, by incorporating the California rules of arbitration into their agreement, the parties had agreed that arbitration would not proceed in situations which fell within the scope of Calif.Code Civ.Proc.Ann. § 1281.2(c) (West 1982). This was not a finding that appellant had "waived" an FAA-guaranteed right to compel arbitration of this dispute, but a finding that it had no such right in the first place, because the parties' agreement did not require arbitration to proceed in this situation. Accordingly, appellant's contention that the contract interpretation issue presented here involves the "waiver" of a federal right is without merit.

**2**    Second, appellant argues that we should set aside the Court of Appeal's construction of the choice-of-law clause because it violates the settled federal rule that questions of arbitrability in contracts subject to the FAA must be resolved with a **\*\*1254** healthy regard for the federal policy favoring arbitration. Brief for Appellant 49-52; *id.,* at 92-96, citing *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-942, 74 L.Ed.2d 765 (1983) (§ 2 of the FAA "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act," which requires that "questions of arbitrability ... be addressed with a healthy regard for the federal policy favoring arbitration," and that "any doubts concerning the scope of arbitrable issues ... be resolved in favor of arbitration"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (in construing an arbitration agreement within the coverage of the FAA, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability"). These cases of course establish that, in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act, see *Perry v. Thomas,* 482 U.S. 483, 493, n. 9, 107 S.Ct. 2520, 2527, n. 9, 96 L.Ed.2d 426 (1987), **\*476** due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.

But we do not think the Court of Appeal offended the *Moses H. Cone* principle by interpreting the choice-of-law provision to mean that the parties intended the California

rules of arbitration, including the § 1281.2(c) stay provision, to apply to their arbitration agreement. There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate. Interpreting a choice-of-law clause to make applicable state rules governing the conduct of arbitration-rules which are manifestly designed to encourage resort to the arbitral process-simply does not offend the rule of liberal construction set forth in *Moses H. Cone,* nor does it offend any other policy embodied in the FAA. [5]

[5]    Unlike the dissent, see *post* at 1259-1260, we think the California arbitration rules which the parties have incorporated into their contract generally foster the federal policy favoring arbitration. As indicated, the FAA itself contains no provision designed to deal with the special practical problems that arise in multiparty contractual disputes when some or all of the contracts at issue include agreements to arbitrate. California has taken the lead in fashioning a legislative response to this problem, by giving courts authority to consolidate or stay arbitration proceedings in these situations in order to minimize the potential for contradictory judgments. See Calif.Civ.Proc.Code Ann. § 1281.2(c).

3    4    5    The question remains whether, assuming the choice-of-law clause meant what the Court of Appeal found it to mean, application of Cal.Civ.Proc.Code Ann. § 1281.2(c) is nonetheless pre-empted by the FAA to the extent it is used to stay arbitration under this contract involving interstate commerce. It is undisputed that this contract falls within the coverage of the FAA, since it involves interstate commerce, and that the FAA contains no provision authorizing a stay of arbitration in this situation. Appellee contends, however, that §§ 3 and 4 of the FAA, which are the specific sections *477 claimed to conflict with the California statute at issue here, are not applicable in this state-court proceeding and thus cannot pre-empt application of the California statute. See Brief for Appellee 43-50. While the argument is not without some merit, [6] we need not resolve it to decide **1255 this case, for we conclude that even if §§ 3 and 4 of the FAA are fully applicable in state-court proceedings, they do not prevent application of Cal.Civ.Proc.Code Ann. § 1281.2(c) to stay arbitration where, as here, the parties have agreed to arbitrate in accordance with California law.

[6]    While we have held that the FAA's "substantive" provisions-§§ 1 and 2-are applicable in state as well as federal court, see *Southland Corp. v. Keating,* 465 U.S. 1, 12, 104 S.Ct. 852, 859, 79 L.Ed.2d 1 (1984), we

have never held that §§ 3 and 4, which by their terms appear to apply only to proceedings in federal court, see 9 U.S.C. § 3 (referring to proceedings "brought in any of the courts of the United States"); § 4 (referring to "any United States district court"), are nonetheless applicable in state court. See *Southland Corp. v. Keating, supra,* at 16, n. 10, 104 S.Ct., at 861 n. 10 (expressly reserving the question whether "§§ 3 and 4 of the Arbitration Act apply to proceedings in state courts"); see also *id.,* at 29, 104 S.Ct., at 867 (O'CONNOR, J., dissenting) (§§ 3 and 4 of the FAA apply only in federal court).

The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. See *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956) (upholding application of state arbitration law to arbitration provision in contract not covered by the FAA). But even when Congress has not completely displaced state regulation in an area, state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law-that is, to the extent that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). The question before us, therefore, is whether application of Cal.Civ.Proc.Code Ann. § 1281.2(c) to stay arbitration under this contract in interstate commerce, in accordance with the terms of the arbitration agreement itself, *478 would undermine the goals and policies of the FAA. We conclude that it would not.

The FAA was designed "to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate," *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S., at 219-220, 105 S.Ct., at 1241-1242, and to place such agreements " 'upon the same footing as other contracts,' " *Scherk v. Alberto-Culver Co.,* 417 U.S., at 511, 94 S.Ct., at 2453 (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess. 1, 2 (1924)). While Congress was no doubt aware that the Act would encourage the expeditious resolution of disputes, its passage "was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered." *Byrd,* 470 U.S., at 220, 105 S.Ct., at 1242. Accordingly, we have recognized that the FAA does not require parties to arbitrate when they have not agreed to do so, see *id.,* at 219, 105 S.Ct., at 1241 (the Act "does not mandate the arbitration of all claims"), nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement, see *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S., at 628, 105 S.Ct., at 3354 (citing *Prima Paint*

109 S.Ct. 1248, 103 L.Ed.2d 488, 57 USLW 4295, 51 Ed. Law Rep. 725

*Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 406, 87 S.Ct. 1801, 1807, 18 L.Ed.2d 1270 (1967)). It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms. See *Prima Paint, supra,* at 404, n. 12, 87 S.Ct., at 1806 n. 12 (the Act was designed "to make arbitration agreements as enforceable as other contracts, but not more so").

In recognition of Congress' principal purpose of ensuring that private arbitration agreements are enforced according to their terms, we have held that the FAA pre-empts state laws which "require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984). See, *e.g., id.,* at 10-16, 104 S.Ct., at 858-861 (finding pre-empted a state statute which rendered agreements to arbitrate certain franchise claims unenforceable); *Perry v. Thomas,* 482 U.S., at 490, 107 S.Ct., at 2525 (finding pre-empted a state statute which rendered unenforceable private ***479** agreements to arbitrate certain wage collection claims). But it does not follow that the FAA prevents the enforcement of agreements ****1256** to arbitrate under different rules than those set forth in the Act itself. Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, see *Mitsubishi, supra,* 473 U.S., at 628, 105 S.Ct., at 3353, so too may they specify by contract the rules under which that arbitration will be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward. By permitting the courts to "rigorously enforce" such agreements according to their terms, see *Byrd, supra,* 470 U.S., at 221, 105 S.Ct., at 1242, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind the FAA.

The judgment of the Court of Appeals is

*Affirmed.*

Justice O'CONNOR took no part in the consideration or decision of this case.

Justice BRENNAN, with whom Justice MARSHALL joins, dissenting.

The litigants in this case were parties to a construction contract which contained a clause obligating them to arbitrate disputes and making that obligation specifically enforceable. The contract also incorporated provisions of a standard form contract prepared by the American Institute of Architects and endorsed by the Associated General Contractors of America; among these general provisions was § 7.1.1: "The ***480** Contract shall be governed by the law of the place where the Project is located." [1] When a dispute arose between the parties, Volt invoked the arbitration clause, while Stanford attempted to avoid it (apparently because the dispute also involved two other contractors with whom Stanford had no arbitration agreements).

[1]    American Institute of Architects Document A201, General Conditions of the Contract for Construction § 7.1.1 (1976). See App. 40.

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.,* requires courts to enforce arbitration agreements in contracts involving interstate commerce. See *ante,* at 1253. The California courts nonetheless rejected Volt's petition to compel arbitration in reliance on a provision of state law that, in the circumstances presented, permitted a court to stay arbitration pending the conclusion of related litigation. Volt, not surprisingly, suggested that the Supremacy Clause compelled a different result. The California Court of Appeal found, however, that the parties had agreed that their contract would be governed solely by the law of the State of California, to the exclusion of federal law. [2] ****1257** In reaching this ***481** conclusion the court relied on no extrinsic evidence of the parties' intent, but solely on the language of the form contract that the " 'law of the place where the project is located' " would govern. App. 66-67. [3]

[2]    The California Court of Appeal correctly assumed that the FAA, were it applicable, would pre-empt the provisions of Cal.Civ.Proc.Code Ann. § 1281.2(c) (West 1982): "[I]t is apparent that were the federal rules to apply, Volt's petition to compel arbitration would have to be granted." App. 65.

    Stanford nonetheless attempts to cast doubt on this conclusion by arguing that §§ 3 and 4 of the FAA, which provide for court orders to stay litigation and to compel arbitration, are not applicable in state court. Brief for Appellee 43-50. While we have stated that "state courts, as much as federal courts, are

obliged to grant stays of litigation under § 3 of the Arbitration Act," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 26, 103 S.Ct. 927, 942, 74 L.Ed.2d 765 (1983); see also *id.,* at 26, nn. 34-35, 103 S.Ct., at 942, nn. 34-35, it is immaterial to the resolution of this case whether §§ 3 and 4 actually "apply." The parties here not only agreed to arbitrate, but they also agreed that that agreement would be specifically enforceable. See *ante,* at 1251, n. 1. FAA § 2-which indisputably does apply in state court, *Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984)-requires the court to enforce the parties' agreement. (Indeed, *Southland Corp.* can be read to stand for the proposition that § 2 makes *all* arbitration agreements specifically enforceable. See *id.,* at 31, and n. 20, 104 S.Ct., at 868 and n. 20 (O'CONNOR, J., dissenting).) To stay the arbitration proceedings pending litigation of the same issues, as § 1281.2(c) provides, is not compatible with specific enforcement of the agreement to arbitrate-which is what the FAA requires here. Section 1281.2(c) therefore cannot be given effect unless-as the California Court of Appeal held-the parties somehow agreed that federal law was to play no role in governing their contract.

3    The court held that "the word 'place' was intended to mean the forum state." App. 66. It added: "We do not find reasonable Volt's interpretation that the 'place' where the project is located be construed to mean not only the state of California but also the nation of the United States of America." *Id.,* at 67.

This Court now declines to review that holding, which denies effect to an important federal statute, apparently because it finds no question of federal law involved. I can accept neither the state court's unusual interpretation of the parties' contract, nor this Court's unwillingness to review it. I would reverse the judgment of the California Court of Appeal. 4

4    I do not disagree with the Court's holding, *ante,* at 1254-1255, that the FAA does not pre-empt state arbitration rules, even as applied to contracts involving interstate commerce, when the parties have agreed to arbitrate by those rules to the exclusion of federal arbitration law. I would not reach that question, however, because I conclude that the parties have made no such agreement.

I

Contrary to the Court's view, the state court's construction of the choice-of-law clause is reviewable for two independent reasons.

A

The Court's decision not to review the state court's interpretation of the choice-of-law clause appears to be based on the principle that "the interpretation of private contracts is ordinarily a question of state law, which this Court does *\*482* not sit to review." *Ante,* at 1252. I have no quarrel with the general proposition that the interpretation of contracts is a matter of state law. By ending its analysis at that level of generality, however, the Court overlooks well-established precedent to the effect that, in order to guard against arbitrary denials of federal claims, a state court's construction of a contract in such a way as to preclude enforcement of a federal right is not immune from review in this Court as to its "adequacy."

Many of our cases that so hold involve, understandably enough, claims under the Contract Clause. In *Appleby v. City of New York,* 271 U.S. 364, 46 S.Ct. 569, 70 L.Ed. 992 (1926), for example, petitioners alleged that the city had unconstitutionally impaired their rights contained in a contract deeding them certain submerged lands in the city harbor. Chief Justice Taft stated the issue for the Court as follows:

"The questions we have here to determine are, first, was there a contract, second, what was its proper construction and effect, and, third, was its obligation impaired by subsequent legislation as enforced by the state court? These questions we must answer independently of the conclusion of [the state] court. Of course we should give all proper weight to its judgment, but we can not perform our duty to enforce the guaranty of the Federal Constitution as to the inviolability of contracts by state legislative action unless we give the questions independent consideration." *Id.,* at 379-380, 46 S.Ct., at 573.

Similarly, in *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938), the question was whether the State's repeal of a teacher tenure law had impaired petitioner's contract of employment. We reversed the judgment of the State Supreme Court, notwithstanding that it rested on the state ground that petitioner had had no contractual right to continued employment: "On such a question, one primarily of state law, we accord respectful consideration and great weight to the views **\*\*1258** of the

109 S.Ct. 1248, 103 L.Ed.2d 488, 57 USLW 4295, 51 Ed. Law Rep. 725

State's highest court but, in order that the constitutional *483 mandate may not become a dead letter, we are bound to decide for ourselves whether a contract was made, what are its terms and conditions, and whether the State has, by later legislation, impaired its obligation." *Id.,* at 100, 58 S.Ct., at 446. See also *Phelps v. Board of Education of West New York,* 300 U.S. 319, 322-323, 57 S.Ct. 483, 484-485, 81 L.Ed. 674 (1937); *Irving Trust Co. v. Day,* 314 U.S. 556, 561, 62 S.Ct. 398, 401, 86 L.Ed. 452 (1942).

The issue has not arisen solely in cases brought under the Contract Clause. *Memphis Gas Co. v. Beeler,* 315 U.S. 649, 62 S.Ct. 857, 86 L.Ed. 1090 (1942), was a Commerce Clause case where appellant's constitutional challenge to a state tax was dependent on a particular interpretation of a contract under which appellant operated. While we sustained the Tennessee court's construction of that contract (and thus did not reach the federal issue), we emphasized that the "meaning and effect of the contract" were "local questions conclusively settled by the decision of the state court save only as this Court, in the performance of its duty to safeguard an asserted constitutional right, may inquire whether the decision of the state question rests upon a fair or substantial basis." *Id.,* at 654, 62 S.Ct., at 861.

Indeed, our ability to review state-law decisions in such circumstances is not limited to the interpretation of contracts. In *Rogers v. Alabama,* 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417 (1904), we noted the

> "necessary and well settled rule that the exercise of jurisdiction by this court to protect constitutional rights cannot be declined when it is plain that the fair result of a decision is to deny the rights. It is well known that this court will decide for itself whether a contract was made as well as whether the obligation of the contract has been impaired. But that is merely an illustration of a more general rule." *Id.,* at 230, 24 S.Ct., at 258 (citation omitted).

We accordingly reversed the state court's dismissal, on grounds of "prolixity," of petitioner's motion to quash an *484 indictment returned against him by a grand jury from which all blacks had been excluded.[5]

[5]    As in *Rogers,* we have frequently declined to be bound by state procedural rulings that would have prevented us from reaching the federal issue. See, *e.g., Davis v. Wechsler,* 263 U.S. 22, 24, 44 S.Ct. 13, 14, 68 L.Ed. 143 (1923); *Brown v. Western R. Co. of Ala.,* 338 U.S. 294, 295-296, 70 S.Ct. 105, 106-107, 94 L.Ed. 100 (1949); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449,

454-458, 78 S.Ct. 1163, 1167-1170, 2 L.Ed.2d 1488 (1958); *James v. Kentucky,* 466 U.S. 341, 348-349, 104 S.Ct. 1830, 1835-1836, 80 L.Ed.2d 346 (1984). While in recent years we may have been more willing to examine state procedural rulings, see *e.g., Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), one study of our cases has concluded that we have historically shown less deference to state *substantive* decisions on ancillary questions than to similar procedural decisions. Hill, The Inadequate State Ground, 65 Colum.L.Rev. 943, 991 (1965); cf. *Davis, supra,* 263 U.S., at 25, 44 S.Ct., at 14.

While in this case the federal right at issue is a statutory, not a constitutional, one, the principle under which we review the antecedent question of state law is the same. Where "the existence or the application of a federal right turns on a logically antecedent finding on a matter of state law, it is essential to the Court's performance of its function that it exercise an ancillary jurisdiction to consider the state question. Federal rights could otherwise be nullified by the manipulation of state law." Wechsler, The Appellate Jurisdiction of the Supreme Court: Reflections on the Law and the Logistics of Direct Review, 34 Wash. & Lee L.Rev. 1043, 1052 (1977). See also Hill, The Inadequate State Ground, 65 Colum.L.Rev. 943 (1965).

No less than in the cited cases, the right of the instant parties to have their arbitration agreement enforced pursuant to the FAA could readily be circumvented by a state-court construction of their contract as having intended to exclude the applicability of federal law. It is therefore essential that, while according due deference to the **1259 decision of the state court, we independently determine whether we "clearly would have judged the issue differently if [we] were the state's highest court." Wechsler, *supra,* at 1052.[6]

[6]    While the principle of independent review by this Court of the adequacy of the state court's ruling is clear, the proper standard for such review poses a more difficult question. Indeed, our cases have employed a wide range of standards, ranging from *de novo* review, *e.g., Appleby v. City of New York,* 271 U.S. 364, 380, 46 S.Ct. 569, 573, 70 L.Ed. 992 (1926) ("[W]e must give our own judgment ... and not accept the present conclusion of the state court without inquiry"), to inquiring whether the state judgment rested on a "fair or substantial basis," *Memphis Gas Co. v. Beeler,* 315 U.S. 649, 654, 62 S.Ct. 857, 861, 86 L.Ed. 1090 (1942); *Demorest v. City Bank Co.,* 321 U.S. 36, 42, 64 S.Ct. 384, 388, 88 L.Ed. 526 (1944), to determining whether the state court's decision was "palpably erroneous," *Phelps v. Board of*

*Education of West New York,* 300 U.S. 319, 323, 57 S.Ct. 483, 485, 81 L.Ed. 674 (1937). I have no doubt that the proper standard of review is a narrow one, but I see no need for purposes of the present case to settle on a precise formulation. As will appear below, the state court's construction of the choice-of-law clause cannot be sustained regardless of the standard employed.

### *485  B

Arbitration is, of course, "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). I agree with the Court that "the FAA does not require parties to arbitrate when they have not agreed to do so." *Ante,* at 1254. Since the FAA merely requires enforcement of what the parties have agreed to, moreover, they are free if they wish to write an agreement to arbitrate outside the coverage of the FAA. Such an agreement would permit a state rule, otherwise pre-empted by the FAA, to govern their arbitration. The substantive question in this case is whether or not they have done so. And that question, we have made clear in the past, is a matter of federal law.

Not only does the FAA require the enforcement of arbitration agreements, but we have held that it also establishes substantive federal law that must be consulted in determining whether (or to what extent) a given contract provides for arbitration. We have stated this most clearly in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-942, 74 L.Ed.2d 765 (1983):

"Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, *486  notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.... [T]he Courts of Appeals have ... consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree. The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

More recently, in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444

(1985), we stated that a court should determine whether the parties agreed to arbitrate a dispute "by applying the 'federal substantive law of arbitrability.' " *Id.,* at 626, 105 S.Ct., at 3353, quoting *Moses H. Cone, supra,* 460 U.S., at 24, 103 S.Ct., at 941. See also *Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).

The Court recognizes the relevance of the *Moses H. Cone* principle but finds it unoffended by the Court of Appeal's decision, which, the Court suggests, merely determines what set of procedural rules **1260  will apply. *Ante,* at 1254. [7]  I agree fully with the Court that "the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate," *ibid.,* but I disagree emphatically *487  with its conclusion that that policy is not frustrated here. Applying the California procedural rule, which stays arbitration while litigation of the same issue goes forward, means simply that the parties' dispute will be litigated rather than arbitrated. Thus, interpreting the parties' agreement to say that the California procedural rules apply rather than the FAA, where the parties arguably had no such intent, implicates the *Moses H. Cone* principle no less than would an interpretation of the parties' contract that erroneously denied the existence of an agreement to arbitrate. [8]

[7]  Some of the Court's language might be read to suggest that the *Moses H. Cone* principle applies only to construction of the arbitration clause itself. *Ante,* at 1254 ("[A]mbiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration"). Such a reading is flatly contradicted by *Moses H. Cone.* In language the Court omits from its quotation, *ante,* at 1253-1254, we made clear that the liberal rule of construction in favor of arbitrability applies "whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital,* 460 U.S., at 25, 103 S.Ct., at 941.

[8]  Whether or not "the California arbitration rules ... generally foster the federal policy favoring arbitration," *ante,* at 1254, n. 5, is not the relevant question. Section 2 of the FAA requires courts to enforce agreements to arbitrate, and in *Moses H. Cone* we held that doubts as to whether the parties had so agreed were to be resolved in favor of arbitration. Whether California's arbitration rules are more likely than federal law to foster arbitration, *i.e.,* to induce parties to agree to arbitrate disputes, is another matter entirely. On that question it is up to Congress, not this Court, to "fashio[n] a legislative response," *ante,* at ---, n. 5, and

in the meantime we are not free to substitute our notions of good policy for federal law as currently written.

While appearing to recognize that the state court's interpretation of the contract does raise a question of federal law, the Court nonetheless refuses to determine whether the state court misconstrued that agreement. There is no warrant for failing to do so. The FAA requires that a court determining a question of arbitrability not stop with the application of state-law rules for construing the parties' intentions, but that it also take account of the command of federal law that "those intentions [be] generously construed as to issues of arbitrability." *Mitsubishi Motors, supra,* 473 U.S., at 626, 105 S.Ct., at 3354. Thus, the decision below is based on both state and federal law, which are thoroughly intertwined. In such circumstances the state-court judgment cannot be said to rest on an "adequate and independent state ground" so as to bar review by this Court. See *Enterprise Irrigation Dist. v. Farmers Mutual Canal Co.,* 243 U.S. 157, 164, 37 S.Ct. 318, 320, 61 L.Ed. 644 (1917) ("But where the non-federal **\*488** ground is so interwoven with the other as not to be an independent matter ... our jurisdiction is plain"). With a proper application of federal law in this case, the state court's judgment might have been different, and our review is therefore not barred. Cf. *Ake v. Oklahoma,* 470 U.S. 68, 74-75, 105 S.Ct. 1087, 1091-1092, 84 L.Ed.2d 53 (1985) ("[W]hen resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded").

## II

Construed with deference to the opinion of the California Court of Appeal, yet "with a healthy regard for the federal policy favoring arbitration," *Moses H. Cone,* 460 U.S., at 24, 103 S.Ct., at 941, it is clear that the choice-of-law clause cannot bear the interpretation the California court assigned to it.

Construction of a contractual provision is, of course, a matter of discerning the parties' intent. It is important to recall, in the first place, that in this case there is no extrinsic evidence of their intent. We must **\*\*1261** therefore rely on the contract itself. But the provision of the contract at issue here was not one that these parties drafted themselves. Rather, they incorporated portions of a standard form contract commonly used in the construction industry. That makes it most unlikely that their intent was in any way at variance with the purposes

for which choice-of-law clauses are commonly written and the manner in which they are generally interpreted.

It seems to me beyond dispute that the normal purpose of such choice-of-law clauses is to determine that the law of one State rather than that of another State will be applicable; they simply do not speak to any interaction between state and federal law. A cursory glance at standard conflicts texts confirms this observation: they contain no reference at all to the relation between federal and state law in their discussions of contractual choice-of-law clauses. See, *e.g.,* **\*489** R. Weintraub, Commentary on the Conflict of Laws § 7.3C (2d ed. 1980); E. Scoles & P. Hay, Conflict of Laws 632-652 (1982); R. Leflar, L. McDougal, & R. Felix, American Conflicts Law § 147 (4th ed. 1986). The same is true of standard codifications. See Uniform Commercial Code § 1-105(1) (1978); Restatement (Second) of Conflict of Laws § 187 (1971). Indeed the Restatement of Conflicts notes expressly that it does not deal with "the ever-present problem of determining the respective spheres of authority of the law and courts of the nation and of the member States." *Id.,* § 2, Comment *c.* Decisions of this Court fully bear out the impression that choice-of-law clauses do not speak to any state-federal issue. On at least two occasions we have been called upon to determine the applicability *vel non* of the FAA to contracts containing choice-of-law clauses similar to that at issue here. Despite adverting to the choice-of-law clauses in other contexts in our opinions, we ascribed no significance whatever to them in connection with the applicability of the FAA. *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956).[9] The great weight of lower court authority similarly rejects the notion that a choice-of-law clause renders the FAA inapplicable.[10] **\*490** Choice-of-law clauses simply **\*\*1262** have never been used for the purpose of dealing with the relationship between state and federal law. There is no basis whatever for believing that the parties in this case intended their choice-of-law clause to do so.

[9]  In *Scherk,* the contract contained the following clause: "The laws of the State of Illinois, U.S.A. shall apply to and govern this agreement, its interpretation and performance." 417 U.S., at 509, n. 1, 94 S.Ct., at 2452, n. 1. Despite discussing the effect of that clause in a different context, *id.,* at 519, n. 13, 94 S.Ct., at 2457, n. 13, we did not consider the possibility that the FAA might not apply because of the parties' choice of the law of Illinois. Similarly, in *Bernhardt* the contract provided for arbitration under New York law. While we

recognized a choice-of-law problem as to whether New York or Vermont law was applicable, 350 U.S., at 205, 76 S.Ct., at 277, we resolved the question of arbitrability under the FAA without any reference to the choice-of-law clause.

10    See, *e.g.,* Huber, Hunt & Nichols, Inc. v. Architectural Stone Co., 625 F.2d 22, 25-26, n. 8 (CA5 1980); Commonwealth Edison Co. v. Gulf Oil Corp., 541 F.2d 1263, 1268-1271 (CA7 1976); Burke County Public Schools Board of Education v. The Shaver Partnership, 303 N.C. 408, 420-424, 279 S.E.2d 816, 823-825 (1981); Episcopal Housing Corp. v. Federal Ins. Co., 269 S.C. 631, 637, n. 1, 239 S.E.2d 647, 650, n. 1 (1977); Tennessee River Pulp & Paper Co. v. Eichleay Corp., 637 S.W.2d 853, 857-858 (Tenn.1982); Mamlin v. Susan Thomas, Inc., 490 S.W.2d 634, 636-637 (Tex.Civ.App.1973); see also Liddington v. The Energy Group, Inc., 192 Cal.App.3d 1520, 238 Cal.Rptr. 202 (1987) (reversing trial court ruling that had applied § 1281.2(c) rather than the FAA because choice-of-law clause specified contract would be construed under California law). But see Garden Grove Community Church v. Pittsburgh-Des Moines Steel Co., 140 Cal.App.3d 251, 262, 191 Cal.Rptr. 15, 20 (1983); Standard Co. of New Orleans, Inc. v. Elliott Construction Co., 363 So.2d 671, 677 (La.1978).

Stanford contends that because the *Garden Grove* decision antedated the conclusion of the present contract, it must have informed the language the parties used. Brief for Appellee 31-32; Tr. of Oral Arg. 35. This argument might have greater force if the clause had been one the parties actually negotiated, rather than one they incorporated from an industry-wide form contract. In any case it is impossible to believe that, had they actually intended that a result so foreign to the normal purpose of choice-of-law clauses flow from their agreement, they would have failed to say so explicitly.

Moreover, the literal language of the contract-"the law of the place"-gives no indication of any intention to apply only state law and exclude other law that would normally be applicable to something taking place at that location. By settled principles of federal supremacy, the law of any place in the United States includes federal law. See Claflin v. Houseman, 93 U.S. 130, 136, 23 L.Ed. 833 (1876); Hauenstein v. Lynham, 100 U.S. 483, 490, 25 L.Ed. 628 (1880) ("[T]he Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution"). As the dissenting judge below noted, "under California law, federal law governs

matters cognizable in California courts upon which the United States has definitively spoken." App. 82 (opinion *491 of Capaccioli, J.). Thus, "the mere choice of California law is not a selection of California law over federal law...." *Id.,* at 84. In the absence of any evidence to the contrary it must be assumed that this is what the parties meant by "the law of the place where the Project is located."

Indeed, this is precisely what we said when we once previously confronted virtually the same question. In *Fidelity Federal Savings & Loan Assn. v. De la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), a contract provision stated: "This Deed of Trust shall be governed by the law of the jurisdiction in which the Property is located." *Id.,* at 148, n. 5, 102 S.Ct., at 3020, n. 5. Rejecting the contention that the parties thereby had agreed to be bound solely by local law, we held: "Paragraph 15 provides that the deed is to be governed by the 'law of the jurisdiction' in which the property is located; but the 'law of the jurisdiction' includes federal as well as state law." *Id.,* at 157, n. 12, 102 S.Ct., at 3024, n. 12. We should similarly conclude here that the choice-of-law clause was not intended to make federal law inapplicable to this contract.

### III

Most commercial contracts written in this country contain choice-of-law clauses, similar to the one in the Stanford-Volt contract, specifying which State's law is to govern the interpretation of the contract. See Scoles & Hay, Conflict of Laws, at 632-633 ("Party autonomy means that the parties are free to select the law governing their contract, subject to certain limitations. They will usually do so by means of an express choice-of-law clause in their written contract"). Were every state court to construe such clauses as an expression of the parties' intent to exclude the application of federal law, as has the California Court of Appeal in this case, the result would be to render the Federal Arbitration Act a virtual nullity as to presently existing contracts. I cannot believe that the parties to contracts intend such consequences to flow from their insertion of a standard choice-of-law *492 clause. Even less can I agree that we are powerless to review decisions of state courts that effectively nullify a vital piece of federal legislation. I respectfully dissent.

Parallel Citations

109 S.Ct. 1248, 103 L.Ed.2d 488, 57 USLW 4295, 51 Ed. Law Rep. 725

**Volt Information Sciences, Inc. v. Board of Trustees of Leland..., 489 U.S. 468 (1989)**

109 S.Ct. 1248, 103 L.Ed.2d 488, 57 USLW 4295, 51 Ed. Law Rep. 725

**End of Document**                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 25

DOCSTOR: 2191401\1

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

87 S.Ct. 1801
Supreme Court of the United States

PRIMA PAINT CORPORATION, Petitioner,

v.

FLOOD & CONKLIN MFG. CO.

No. 343.    Argued March 16,
1967.    Decided June 12, 1967.

Action to rescind contract, wherein plaintiff moved to stay arbitration and defendant moved to stay action pending arbitration. The United States District Court for the Southern District of New York, 262 F.Supp. 605, granted defendant's motion, and plaintiff appealed. The United States Court of Appeals for the Second Circuit, 360 F.2d 315, dismissed the appeal, and plaintiff obtained certiorari. The Supreme Court, Mr. Justice Fortas, held that under United States Arbitration Act, claim of fraud in inducement of entire contract was for arbitrators under arbitration clause providing for reference of any controversy or claim arising out of or relating to agreement or breach thereof, in absence of evidence that contracting parties intended to withhold that issue from arbitration.

Affirmed.

Mr. Justice Black, Mr. Justice Douglas, and Mr. Justice Stewart dissented.

West Headnotes (8)

**1**    **Alternative Dispute
Resolution** 🔑   Constitutional and Statutory
Provisions and Rules of Court

**Commerce** 🔑   Arbitration

Agreement whereunder defendant sold paint business, serving at least 175 wholesale clients in a number of states, and plaintiff secured defendant's assistance in arranging transfer of manufacturing and selling operations from New Jersey to Maryland, with defendant to render consultation services, was a transaction in "commerce", within United States Arbitration Act. 9 U.S.C.A. §§ 1, 2.

390 Cases that cite this headnote

**2**    **Alternative Dispute
Resolution** 🔑   Constitutional and Statutory
Provisions and Rules of Court

**Commerce** 🔑   Arbitration

Transactions in "commerce", within United States Arbitration Act, are not limited to contracts between merchants for interstate shipment of goods. 9 U.S.C.A. §§ 1, 2.

261 Cases that cite this headnote

**3**    **Alternative Dispute
Resolution** 🔑   Proceedings

In passing on application for stay pending arbitration, federal court may consider only issues relating to making and performance of agreement to arbitrate. 9 U.S.C.A. § 3.

727 Cases that cite this headnote

**4**    **Federal Courts** 🔑   State Court Decisions in
General

Federal courts are bound in diversity cases to follow state rules of decision in matters which are "substantive" rather than "procedural" or where matter is "outcome determinative."

7 Cases that cite this headnote

**5**    **Constitutional Law** 🔑   Remedies and
Procedure in General

Congress may prescribe how federal courts are to conduct themselves with respect to subject matter of which Congress plainly has power to legislate.

2 Cases that cite this headnote

**6**    **Admiralty** 🔑   Effect of United States
Constitution;  Powers of Congress

**Commerce** 🔑   Arbitration

United States Arbitration Act is constitutional as based upon and confined to federal foundations of control over interstate commerce and over admiralty. 9 U.S.C.A. §§ 1-14.

41 Cases that cite this headnote

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

**7    Constitutional Law** 👈 Nature and Scope in General

Federal courts are bound to apply rules enacted by Congress with respect to matters over which it has legislative power.

10 Cases that cite this headnote

**8    Alternative Dispute Resolution** 👈 Disputes and Matters Arbitrable Under Agreement

Under United States Arbitration Act, claim of fraud in inducement of entire contract was for arbitrators under arbitration clause providing for reference of any controversy or claim arising out of or relating to agreement or breach thereof, in absence of evidence that contracting parties intended to withhold that issue from arbitration. 9 U.S.C.A. §§ 1-14.

1560 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*1802    \*396**  Robert P. Herzog, New York City, for petitioner.
Martin A. Coleman, New York City, for respondent.
Gerald Aksen, New York City, for the American Arbitration Assn., as amicus curiae.

**Opinion**

Mr. Justice FORTAS delivered the opinion of the Court.

This case presents the question whether the federal court or an arbitrator is to resolve a claim of 'fraud in **\*397** the inducement,' under a contract governed by the United States Arbitration Act of 1925, [1] where there is no evidence that the contracting parties intended to withhold that issue from arbitration.

[1]    9 U.S.C. ss 1-14.

The question arises from the following set of facts. On October 7, 1964, respondent, Flood & Conklin Manufacturing Company, a New Jersey corporation, entered into what was styled a 'Consulting Agreement,' with petitioner, Prima Paint Corporation, a Maryland corporation.

This agreement followed by less than three weeks the execution of a contract pursuant to which Prima Paint purchased F & C's paint business. The consulting agreement provided that for a six-year period F & C was to furnish advice and consultation 'in connection with the formulae, manufacturing operations, sales and servicing of Prima Trade Sales accounts.' These services were to be performed personally by F & C's chairman, Jerome K. Jelin, 'except in the event of his death or disability.' F & C bound itself for the duration of the contractual period to make no 'Trade Sales' of paint or paint products in its existing sales territory or to current customers. To the **\*\*1803** consulting agreement were appended lists of F & C customers, whose patronage was to be taken over by Prima Paint. In return for these lists, the covenant not to compete, and the services of Mr. Jelin, Prima Paint agreed to pay F & C certain percentages of its receipts from the listed customers and from all others, such payments not to exceed $225,000 over the life of the agreement. The agreement took into account the possibility that Prima Paint might encounter financial difficulties, including bankruptcy, but no corresponding reference was made to possible financial problems which might be encountered by F & C. The agreement stated that it 'embodies the entire understanding of the parties **\*398** on the subject matter.' Finally, the parties agreed to a broad arbitration clause, which read in part:

'Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the rules then obtaining of the American Arbitration Association * * *.'

The first payment by Prima Paint to F & C under the consulting agreement was due on September 1, 1965. None was made on that date. Seventeen days later, Prima Paint did pay the appropriate amount, but into escrow. It notified attorneys for F & C that in various enumerated respects their client had broken both the consulting agreement and the earlier purchase agreement. Prima Paint's principal contention, so far as presently relevant, was that F & C had fraudulently represented that it was solvent and able to perform its contractual obligations, where as it was in fact insolvent and intended to file a petition under Chapter XI of the Bankruptcy Act, 52 Stat. 905, 11 U.S.C. s 701 et seq., shortly after execution of the consulting agreement. Prima Paint noted that such a petition was filed by F & C on October 14, 1964, one week after the contract had been signed. F & C's response, on October 25, was to serve a 'notice of intention to arbitrate.' On November 12, three days before expiration

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

of its time to answer this 'notice,' Prima Paint filed suit in the United States District Court for the Southern District of New York, seeking rescission of the consulting agreement on the basis of the alleged fraudulent inducement.[2] The complaint asserted that the federal court had diversity jurisdiction.

2    Although the letter to F & C's attorneys had alleged breaches of both consulting and purchasing agreements, and the fraudulent inducement of both, the complaint did not refer to the earlier purchase agreement, alleging only that Prima Paint had been 'fraudulently induced to accelerate the execution and closing date of the (consulting) agreement herein, from October 21, 1964 to October 7, 1964. * * *'

*399  Contemporaneously with the filing of its complaint, Prima Paint petitioned the District Court for an order enjoining F & C from proceeding with the arbitration. F & C cross-moved to stay the court action pending arbitration. F & C contended that the issue presented-whether there was fraud in the inducement of the consulting agreement-was a question for the arbitrators and not for the District Court. Cross-affidavits were filed on the merits. On behalf of Prima Paint, the charges in the complaint were reiterated. Affiants for F & C attacked the sufficiency of Prima Paint's allegations of fraud, denied that misrepresentations had been made during negotiations, and asserted that Prima Paint had relied exclusively upon delivery of the lists, the promise not to compete, and the availability of Mr. Jelin. They contended that Prima Paint had availed itself of these considerations for nearly a year without claiming 'fraud,' noting that Prima Paint was in no position to claim ignorance of the bankruptcy proceeding since it had participated therein in February of 1965. They added that F & C was revested with its assets in March of 1965.

The District Court, 262 F.Supp. 605, granted F & C's motion to stay the action  **1804  pending arbitration, holding that a charge of fraud in the inducement of a contract containing an arbitration clause as broad as this one was a question for the arbitrators and not for the court. For this proposition it relied on Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (C.A.2d Cir. 1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed under Rule 60, 364 U.S. 801 (1960). The Court of Appeals for the Second Circuit dismissed Prima Paint's appeal, 2 Cir., 360 F.2d 315. It held that the contract in question evidenced a transaction involving interstate commerce; that under the controlling  *400  Robert Lawrence Co. decision a claim of fraud in the inducement of the contract generally-as opposed to the arbitration clause

itself-is for the arbitrators and not for the courts; and that this rule-one of 'national substantive law'-governs even in the face of a contrary state rule.[3] We agree, albeit for somewhat different reasons, and we affirm the decision below.

3    Whether a party seeking rescission of a contract on the ground of fraudulent inducement may in New York obtain judicial resolution of his claim is not entirely clear. Compare Exercycle Corp. v. Maratta, 9 N.Y.2d 329, 334, 214 N.Y.S.2d 353, 174 N.E.2d 463, 465 (1961), and Amerotron Corp. v. Maxwell Shapiro Woolen Co., 3 A.D.2d 899, 162 N.Y.S.2d 214 (1957), aff'd, 4 N.Y.2d 722, 148 N.E.2d 319 (1958), with Fabrex Corp. v. Winard Sales Co., 23 Misc.2d 26, 200 N.Y.S.2d 278 (1960). In light of our disposition of this case, we need not decide the status of the issue under New York law.

The key statutory provisions are ss 2, 3, and 4 of the United States Arbitration Act of 1925. Section 2 provides that a written provision for arbitration 'in any maritime transaction or a contract evidencing a transaction involving commerce * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'[4] Section 3 requires a federal court in which suit has been brought 'upon any issue referable to arbitration under an agreement in writing for such arbitration' to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement. Section 4 provides a federal remedy for a party 'aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration,' and directs the federal court to order arbitration once it is satisfied that an agreement for arbitration has been made and has not been honored.[5]

4    The meaning of 'maritime transaction' and 'commerce' is set forth in s 1 of the Act.

5    See, infra, at 1806.

*401   1    2   In Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), this Court held that the stay provisions of s 3, invoked here by respondent F & C, apply only to the two kinds of contracts specified in ss 1 and 2 of the Act, namely those in admiralty or evidencing transactions in 'commerce.' Our first question, then, is whether the consulting agreement between F & C and Prima Paint is such a contract. We agree with the Court of Appeals that it is. Prima Paint acquired a New Jersey paint business serving at least 175 wholesale clients in a number of States, and secured F & C's assistance in arranging the

Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967)

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

transfer of manufacturing and selling operations from New Jersey to Maryland. [6] The consulting agreement **1805 was inextricably tied to this interstate transfer and to the continuing operations of an interstate manufacturing and wholesaling business. There could not be a clearer case of a contract evidencing a transaction in interstate commerce. [7]

6 This conclusion is amply supported by an affidavit submitted to the District Court by Prima Paint's own president, which read in part:

'The agreement entered into between the parties on October 7, 1964, contemplated and intended an orderly transfer of the assets of the defendant to the plaintiff, and further contemplated and intended that the defendant would consult, advise, assist and help the plaintiff so as to insure a smooth transition of manufacturing operations to Maryland from New Jersey, together with the sales and servicing of customer accounts and the retention of the said customers.'

The affidavit's references to a 'transfer of the assets' cannot fairly be read to mean only 'expertise and know-how * * * and a covenant not to compete,' as argued by counsel for petitioner.

7 It is suggested in dissent that, despite the absence of any language in the statute so indicating, we should construe it to apply only to 'contracts between merchants for the interstate shipment of goods.' Not only have we neither the desire nor the warrant so to amend the statute, but we find persuasive and authoritative evidence of a contrary legislative intent. See, e.g., the House Report on this legislation which proclaims that '(t)he control over interstate commerce (one of the bases for the legislation) reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce.' H.R.Rep.No.96, 68th Cong., 1st Sess., 1 (1924). We note, too, that were the dissent's curious narrowing of the statute correct, there would have been no necessity for Congress to have amended the statute to exclude certain kinds of employment contracts. See s 1. In any event, the anomaly urged upon us in dissent is manifested by the present case. It would be remarkable to say that a contract for the purchase of a single can of paint may evidence a transaction in interstate commerce, but that an agreement relating to the facilitation of the purchase of an entire interstate paint business and its re-establishment and operation in another State is not.

*402 Having determined that the contract in question is within the coverage of the Arbitration Act, we turn to the central issue in this case: whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators. The courts of appeals have differed in their approach to this question. The view of the Court of Appeals for the Second Circuit, as expressed in this case and in others, [8] is that-except where the parties otherwise intend-arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud. [9] The Court of Appeals for the First *403 Circuit, on the other hand, has taken the view that the question of 'severability' is one of state law, and that where a State regards such a clause as inseparable a claim of fraud in the inducement must be decided by the court. Lummus Co. v. Commonwealth Oil Ref. Co., 280 F.2d 915, 923-924 (C.A.1st Cir.), cert. denied, 364 U.S. 911, 81 S.Ct. 274, 15 L.Ed.2d 225 (1960). [10]

8 In addition to Robert Lawrence Co., supra, see In re Kinoshita & Co., 287 F.2d 951 (C.A.2d Cir. 1961). With respect to claims other than from fraud in the inducement, the court has followed a similar process of analysis. See, e.g., Metro Industrial Painting Corp. v. Terminal Constr. Co., 287 F.2d 382 (C.A.2d Cir. 1961) (dispute over performance); El Hoss Engineer. & Transport Co. v. American Ind. Oil Co., 289 F.2d 346 (C.A.2d Cir. 1961) (where, however, the court found an intent not to sumbit the issue in question to arbitration).

9 The Court of Appeals has been careful to honor evidence that the parties intended to withhold such issues from the arbitrators and to reserve them for judicial resolution. See El Hoss Engineer. & Transport Co. v. American Ind. Oil Co., supra. We note that categories of contracts otherwise within the Arbitration Act but in which one of the parties characteristically has little bargaining power are expressly excluded from the reach of the Act. See s 1.

10 These cases and others are discussed in a recent Note, Commercial Arbitration in Federal Courts, 20 Vand.L.Rev. 607, 622-625 (1967).

**1806 3 With respect to cases brought in federal court involving maritime contracts or those evidencing transactions in 'commerce,' we think that Congress has provided an explicit answer. That answer is to be found in s 4 of the Act, which provides a remedy to a party seeking to compel compliance with an arbitration agreement. Under s 4, with respect to a matter within the jurisdiction of the federal courts

save for the existence of an arbitration clause, the federal court is instructed to order arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration or the failure to comply (with the arbitration agreement) is not in issue.' [11] Accordingly, if the claim is fraud in the inducement of the arbitration clause itself-an issue which *404 goes to the 'making' of the agreement to arbitrate-the federal court may proceed to adjudicate it. [12] But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. Section 4 does not expressly relate to situations like the present in which a stay is sought of a federal action in order that arbitration may proceed. But it is inconceivable that Congress intended the rule to differ depending upon which party to the arbitration agreement first invokes the assistance of a federal court. We hold, therefore, that in passing upon a s 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.

[11]  Section 4 reads in part: 'The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. * * * If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.'

[12]  This position is consistent both with the decision in Moseley v. Electronic & Missile Facilities, 374 U.S. 167, 171, 172, 83 S.Ct. 1815, 1817, 1818, 10 L.Ed.2d 818 (1963), and with the statutory scheme. As the 'saving clause' in s 2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so. To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract-a situation inconsistent with the 'saving clause.'

 4    5    6    There remains the question whether such a rule is constitutionally permissible. The point is made that, whatever the nature of the contract involved here, this case is in federal court solely by reason of diversity of citizenship, and that since the decision in Erie R. Co. v. Tompkins, 304 U.S. 64,

58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal courts are bound in diversity cases to follow state rules of decision in matters which are 'substantive' rather than 'procedural,' *405 or where the matter is 'outcome determinative.' Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The question in this case, however, is not whether Congress may fashion federal substantive rules to govern questions arising in simple diversity cases. See Bernhardt v. Polygraphic Co., supra, 350 U.S. at 202, and concurring opinion, at 208, 76 S.Ct. at 275 and at 279. Rather, the question is whether Congress may prescribe how federal courts are to conduct themselves with respect to subject matter over which Congress plainly has power to legislate. The answer to that can only be in the affirmative. And it is clear beyond dispute that the federal arbitration statute **1807 is based upon and confined to the incontestable federal foundations of 'control over interstate commerce and over admiralty.' H.R.Rep.No.96, 68th Cong., 1st Sess., 1 (1924); S.Rep.No.536, 68th Cong., 1st Sess., 3 (1924). [13]

[13]    It is true that the Arbitration Act was passed 13 years before this Court's decision in Erie R. Co. v. Tompkins, supra, brought to an end the regime of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865 (1842), and that at the time of enactment Congress had reason to believe that it still had power to create federal rules to govern questions of 'general law' arising in simple diversity cases-at least, absent any state statute to the contrary. If Congress relied at all on this 'oft-challenged' power, see Erie R. Co., 304 U.S., at 69, 58 S.Ct., at 818, it was only supplementary to the admiralty and commerce powers, which formed the principal bases of the legislation. Indeed, Congressman Graham, the bill's sponsor in the House, told his colleagues that it 'only affects contracts relating to interstate subjects and contracts in admiralty.' 65 Cong.Rec. 1931 (1924). The Senate Report on this legislation similarly indicated that the bill '(relates) to maritime transactions and to contracts in interstate and foreign commerce.' S.Rep.No.536, 68th Cong., 1st Sess., 3 (1924).

Non-congressional sponsors of the legislation agreed. As Mr. Charles L. Bernheimer, chairman of the Arbitration Committee of the New York Chamber of Commerce, told the Senate subcommittee, the proposed legislation 'follows the lines of the New York arbitration law, applying it to the fields wherein there is Federal jurisdiction. These fields are in admiralty and in foreign and interstate commerce.' Hearing on S. 4213 and S. 4214, before the Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 2 (1923). In the joint House and Senate hearings, Mr. Bernheimer answered 'Yes; entirely,' to

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

the statement of the chairman, Senator Sterling, that 'What you have in mind is that this proposed legislation relates to contracts arising in interstate commerce.' Joint Hearings on S. 1005 and H.R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 7 (1924). Mr. Julius Henry Cohen, draftsman for the American Bar Association of the proposed bill, said the sponsor's goals were: '(F)irst * * * to get a State statute, and then to get a Federal law to cover interstate and Foreign commerce and admiralty, and, third, to get a treaty with Foreign countries.' Joint Hearings, supra, at 16 (emphasis added). See also Joint Hearings, supra, at 27-28 (statement of Mr. Alexander Rose). Mr. Cohen did submit a brief to the Subcommittee urging a jurisdictional base broader than the commerce and admiralty powers, Joint Hearings, supra, at 37-38, but there is no indication in the statute or in the legislative history that this invitation to go beyond those powers was accepted, and his own testimony took a much narrower tack.

*406 **7** **8** In the present case no claim has been advanced by Prima Paint that F & C fraudulently induced it to enter into the agreement to arbitrate '(a)ny controversy or claim arising out of or relating to this Agreement, or the breach thereof.' This contractual language is easily broad enough to encompass Prima Paint's claim that both execution and acceleration of the consulting agreement itself were procured by fraud. Indeed, no claim is made that Prima Paint ever inteded that 'legal' issues relating to the contract be excluded from arbitration, or that it was not entirely free so to contract. Federal courts are bound to apply rules enacted by Congress with respect to matters-here, a contract involving commerce-over which it has legislative power. The question which Prima Paint requested the District Court to adjudicate preliminarily to allowing arbitration to proceed is one *407 not intended by Congress to delay the granting of a s 3 stay. Accordingly, the decision below dismissing Prima Paint's appeal is affirmed.

Affirmed.

Mr. Justice HARLAN:

In joining the Court's opinion I desire to note that I would also affirm the judgment below on the basis of Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (C.A.2d Cir. 1959), cert. granted, **1808 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed under Rule 60, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960).

Mr. Justice BLACK, with whom Mr. Justice DOUGLAS and Mr. Justice STEWART join, dissenting.

The Court here holds that the United States Arbitration Act, 9 U.S.C. ss 1-14, as a matter of federal substantive law, compels a party to a contract containing a written arbitration provision to carry out his 'arbitration agreement' even though a court might, after a fair trial, hold the entire contract-including the arbitration agreement-void because of fraud in the inducement. The Court holds, what is to me fantastic, that the legal issue of a contract's voidness because of fraud is to be decided by persons designated to arbitrate factual controversies arising out of a valid contract between the parties. And the arbitrators who the Court holds are to adjudicate the legal validity of the contract need not even be lawyers, and in all probability will be nonlawyers, wholly unqualified to decide legal issues, and even if qualified to apply the law, not bound to do so. I am by no means sure that thus forcing a person to forgo his opportunity to try his legal issues in the courts where, unlike the situation in arbitration, he may have a jury trial and right to appeal, is not a denial of due process of law. I am satisfied, however, that Congress did not impose any such procedures in the Arbitration Act. And I am fully satisfied that a *408 reasonable and fair reading of that Act's language and history shows that both Congress and the framers of the Act were at great pains to emphasize that nonlawyers designated to adjust and arbitrate factual controversies arising out of valid contracts would not trespass upon the courts' prerogative to decide the legal question of whether any legal contract exists upon which to base an arbitration.

I.

The agreement involved here is a consulting agreement in which Flood & Conklin agreed to perform certain services for and not to compete with Prima Paint. The agreement contained an arbitration clause providing that '(a)ny controversy or claim arising out of or relating to this Agreement * * * shall be settled by arbitration in the City of New York.' F & C, contending that Prima had failed to make a payment under the contract, sent Prima a 'Notice of Intention to Arbitrate' pursuant to the New York Arbitration Act. [1] Invoking diversity jurisdiction, Prima brought this action in federal district court to rescind the entire consulting agreement on the ground of fraud. The fraud allegedly consisted of F & C's misrepresentation at the time the contract was made, that it was solvent and able to perform

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

the agreement, while in fact it was completely insolvent. Prima alleged that it would not have made any contract at all with F & C but for this misrepresentation. Prima simply contended that there was never a meeting of minds between the parties. F & C moved to stay Prima's lawsuit for rescission pending arbitration of the fraud issue raised by Prima. The lower courts, relying on the *\*409* Second Circuit's decision in Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402, cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37, held that, as a matter of 'national substantive law,' the arbitration clause in the contract is 'separable' from the rest of the contract and that allegations that go to the validity of the contract in general, as opposed to the arbitration clause in particular, are to be decided by the arbitrator, not the court.

1    N.Y.Civ.Prac. s 7503 (1963) provides that once a party is served with a notice of intention to arbitrate, 'unless the party served applies to stay the arbitration within ten days after such service he shall thereafter be precluded from objecting that a valid agreement was not made * * *.'

The Court today affirms this holding for three reasons, none of which is supported *\*\*1809* by the language or history of the Arbitration Act. First, the Court holds that because the consulting agreement was intended to supplement a separate contract for the interstate transfer of assets, it is itself a 'contract evidencing a transaction involving commerce,' the language used by Congress to describe contracts the Act was designed to cover. But in light of the legislative history which indicates that the Act was to have a limited application to contracts between merchants for the interstate shipment of goods, [2] and in light of the express failure of Congress to use language *\*410* making the Act applicable to all contracts which 'affect commerce,' the statutory language Congress normally uses when it wishes to exercise its full powers over commerce, [3] I am not at all certain that the Act was intended to apply to this consulting agreement. Second, the Court holds that the language of s 4 of the Act provides an 'explicit answer' to the question of whether the arbitration clause is 'separable' from the rest of the contract in which it is contained. Section 4 merely provides that the court must order arbitration if it is 'satisfied that the making of the agreement for arbitration * * * is not in issue.' That language, considered alone, far from providing an 'explicit answer,' merely poses the further question of what kind of allegations put the making of the arbitration agreement in issue. Since both the lower courts assumed that but for the federal Act, New York law might apply and

that under New York law a general allegation of fraud in the inducement puts into issue the making of the agreement to arbitrate (considered inseparable *\*411* under New York law from the rest of the contract), [4] the *\*\*1810* Court necessarily holds that federal law determines whether certain allegations put the making of the arbitration agreement in issue. And the Court approves the Second Circuit's fashioning of a federal separability rule which overrides state law to the contrary. The Court thus holds that the Arbitration Act, designed to provide merely a procedural remedy which would not interfere with state substantive law, authorizes federal courts to fashion a federal rule to make arbitration clauses 'separable' and valid. And the Court approves a rule which is not only contrary to state law, but contrary to the intention of the parties and to accepted principles of contract law—a rule which indeed elevates arbitration provisions above all other contractual provisions. As the Court recognizes, that result was clearly not intended by Congress. Finally, the Court summarily disposes of the problem raised by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, recognized as a serious constitutional problem in Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199, by insufficiently supported assertions that it is 'clear beyond dispute' that Congress based the Arbitration Act on its power to regulate commerce and that '(i)f Congress relied at all on' its power to create federal law for diversity cases, such reliance 'was only supplementary.'

2    The principal support for the Act came from trade associations dealing in groceries and other perishables and from commercial and mercantile groups in the major trading centers. 50 A.B.A.Rep. 357 (1925). Practically all who testified in support of the bill before the Senate subcommittee in 1923 explained that the bill was designed to cover contracts between people in different States who produced, shipped, bought, or sold commodities. Hearing on S. 4213 and S. 4214 before the Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 3, 7, 9, 10 (1923). The same views were expressed in the 1924 hearings. When Senator Sterling suggested, 'What you have in mind is that this proposed legislation relates to contracts arising in interstate commerce,' Mr. Bernheimer, a chief exponent of the bill, replied: 'Yes; entirely. The farmer who will sell his carload of potatoes, from Wyoming, to a dealer in the State of New Jersey, for instance.' Joint Hearings on S. 1005 and H.R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Con., 1st Sess., 7. See also id., at 27.

3    In some Acts Congress uses broad language and defines commerce to include even that which 'affects'

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

commerce. Federal Employers' Liability Act, 35 Stat. 65, s 1, as amended, 45 U.S.C. s 51; National Labor Relations Act, 49 Stat. 450, s 2, as amended, 29 U.S.C. s 152(7). In other instances Congress has chosen more restrictive language. Fair Labor Standards Act of 1938, 52 Stat. 1062, s 6, as amended, 29 U.S.C. s 206. Prior to this case, this Court has always made careful inquiry to assure itself that it is applying a statute with the coverage that Congress intended, so that the meaning in that statute of 'commerce' will be neither expanded nor contracted. The Arbitration Act is an example of carefully limited language. It covers only those contracts 'involving commerce,' and nowhere is there a suggestion that it is meant to extend to contracts 'affecting commerce.' The Act not only uses narrow language, but also is completely without any declaration of some national interest to be served or some nationwide comprehensive scheme of regulation to be created, and this absence suggests that Congress did not intend to exert its full power over commerce.

4    Although F & C requested arbitration pursuant to New York law, n. 1, supra, it is not entirely clear that New York law would apply in absence of the federal Act. And, as the Court points out, it is not entirely clear whether New York courts would consider Prima's promise to arbitrate inseparable from the rest of the contract. But, since Robert Lawrence held and the lower courts here assumed that application of New York law would produce a different result, and since the Court deems the status of state law immaterial in this case, I have assumed throughout this opinion that, in the absence of the Arbitration Act, Prima would have been able to obtain judicial resolution of its fraud allegations under New York law.

*412  II.

Let us look briefly at the language of the Arbitration Act itself as Congress passed it. Section 2, the key provision of the Act, provides that '(a) written provision in * * * a contract * * * involving commerce to settle by arbitration a controversy thereafter arising out of such contract * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' (Emphasis added.) Section 3 provides that '(i)f any suit * * * be brought * * * upon any issue referable to arbitration under an agreement in writing for such arbitration, the court * * * upon being satisfied that the issue involved in such suit * * * is referable to arbitration under such an agreement, shall * * * stay the trial of the action until

such arbitration has been had * * *.' [5] (Emphasis added.) The language of these sections could not, I think, raise doubts about their meaning except to someone anxious to find doubts. They simply mean this: an arbitration agreement is to be enforced by a federal court unless the court, not the arbitrator, finds grounds 'at law or in equity for the revocation of any contract.' Fraud, of course, is one of the most common grounds for revoking a contract. If the contract was procured by fraud, then, unless the defrauded party elects to affirm it, there is absolutely no contract, nothing to be arbitrated. Sections 2 and 3 of the Act assume the existence of a valid contract. They merely provide for enforcement where such a valid contract *413  exists. These provisions were plainly designed to protect a person against whom arbitration is sought to be enforced from having to submit his legal issues as to validity of the contract to the arbitrator. The legislative history of the Act makes this clear. Senator Walsh of Montana, in hearings on the bill in 1923, observed, 'The court has got to hear and determine **1811 whether there is an agreement of arbitration, undoubtedly, and it is open to all defenses, equitable and legal, that would have existed at law * * *.' [6] Mr. Piatt, who represented the American Bar Association which drafted and supported the Act, was even more explicit: 'I think this will operate something like an injunction process, except where he would attack it on the ground of fraud.' [7] And then Senator Walsh replied: 'If he should attack it on the ground of fraud, to rescind the whole thing. * * * I presume that it merely (is) a question of whether he did make the arbitration agreement or not, * * * and then he would possibly set up that he was misled about the contract and entered into it by mistake * * *.' [8] It is evident that Senator Walsh was referring to situations in which the validity of the entire contract is called into question. And Mr. Bernheimer, who represented one of the chambers of commerce in favor of the bill, assured the Senate subcommittee that '(t)he constitutional right to jury trial is adequately safeguarded' by the Act. [9] Mr. Cohen, the American Bar Association's draftsman of the bill, assured the members of Congress that the Act would not impair the right to a jury trial, because it deprives a person of that right only when he has voluntarily and validly waived it by agreeing to submit certain *414  disputes to arbitration. [10] The court and a jury are to determine both the legal existence and scope of such an agreement. The members of Congress revealed an acute awareness of this problem. On several occasions they expressed opposition to a law which would enforce even a valid arbitration provision contained in a contract between parties of unequal bargaining power. Senator Walsh

cited insurance, employment, construction, and shipping contracts as routinely containing arbitration clauses and being offered on a take-it-or-leave-it basis to captive customers or employees. [11] He noted that such contracts 'are really not voluntarily (sic) things at all' because 'there is nothing for the man to do except to sign it; and then he surrenders his right to have his case tried by the court * * *.' [12] He was emphatically assured by the supporters of the bill that it was not their intention to cover such cases. The significant thing is that Senator Walsh was not thinking in terms of the arbitration provisions being 'separable' parts of such contracts, parts which should be enforced without regard to why the entire contracts in which they were contained were agreed to. The issue for him was not whether an arbitration provision in a contract was made, but why, in the context of the entire contract and the circumstances *415 of the parties, the entire contract was made. That is precisely the issue that a general allegation of fraud in the inducement raises: Prima contended that it would not have executed any contract, including the arbitration clause, if it were not for the fraudulent representations of F & C. Prima's agreement to an arbitration clause in a contract obtained by fraud was no more 'voluntary' than an **1812 insured's or employee's agreement to an arbitration clause in a contract obtained by superior bargaining power.

5     This section, unlike s 4, is expressly applicable to situations like the present one where a defendant in a case already pending in federal court moves for a stay of the lawsuit. In finding an 'explicit answer' in a provision 'not expressly' applicable, the Court almost completely ignores the language of s 3 and the proviso to s 2, a section which Bernhardt held to 'define the field in which Congress was legislating.' 350 U.S. at 201, 76 S.Ct. at 275.

6     Senate Hearing, supra, at 5.

7     Ibid.

8     Ibid.

9     Senate Hearing, supra, at 2.

10     'The one constitutional provision we have got is that you have a right of trial by jury. But you can waive that. And you can do that in advance. Ah, but the question whether you waive it or not depends on whether there is your signature to the paper, or whether yu authorized that signature, or whether the paper is a valid paper or not, whether it was delivered properly. So there is a

question there which you have not waived the right of trial by jury on.' Joint Hearings, supra, at 17.
It seems quite clear to me that Mr. Cohen was referring to a jury trial of allegations challenging the validity of the entire contract.

11     Senate Hearing, supra, at 9-11. See also Joint Hearings, supra, at 15.

12     Senate Hearing, supra, at 9.

Finally, it is clear to me from the bill's sponsors' understanding of the function of arbitration that they never intended that the issue of fraud in the inducement be resolved by arbitration. They recognized two special values of arbitration: (1) the expertise of an arbitrator to decide factual questions in regard to the day-to-day performance of contractual obligations, [13] and (2) the speed with which arbitration, as contrasted to litigation, could resolve disputes over performance of contracts and thus mitigate the damages and allow the parties to continue performance under the contracts. [14] Arbitration serves neither of these functions where a contract is sought to be rescinded on the ground of fraud. On the one hand, courts have far more expertise in resolving legal issues which go to the validity of a contract than *416 do arbitrators. [15] On the other hand, where a party seeks to rescind a contract and his allegation of fraud in the inducement is true, an arbitrator's speedy remedy of this wrong should never result in resumption of performance under the contract. And if the contract were not procured by fraud, the court, under the summary trial procedures provided by the Act, may determine with little delay that arbitration must proceed. The only advantage of submitting the issue of fraud to arbitration is for the arbitrators. Their compensation corresponds to the volume of arbitration they perform. If they determine that a contract is void because of fraud, there is nothing further for them to arbitrate. I think it raises serious questions of due process to submit to an arbitrator an issue which will determine his compensation. Tumey v. State of Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749.

13     'Not all questions arising out of contracts ought to be arbitrated. It is a remedy peculiarly suited to the disposition of the ordinary disputes between merchants as to questions of fact-quantity, quality, time of delivery, compliance with terms of payment, excuses for non-performance, and the like. It has a place also in the determination of the simpler questions of law-the questions of law which arise out of these daily relations between merchants as to the passage of title, the existence of warranties, or the questions of law

which are complementary to the questions of fact which we have just mentioned.' Cohen & Dayton, The New Federal Arbitration Law, 12 Va.L.Rev. 265, 281 (1926).

14    See e.g., Senate Hearing, supra, at 3.

15    'It (arbitration) is not a proper remedy for * * * questions with which the arbitrators have no particular experience and which are better left to the determination of skilled judges with a background of legal experience and established systems of law.' Cohen & Dayton, supra, at 281.

### III.

With such statutory language and legislative history, one can well wonder what is the basis for the Court's surprising departure from the Act's clear statement which expressly excepts from arbitration 'such grounds as exist at law or in equity for the revocation of any contract.' Credit for the creation of a rationalization to justify this statutory mutilation apparently must go to the Second Circuit' opinion in Robert Lawrence Co. v. Devonshire Fabrics, Inc., supra. In that decision Judge Medina undertook to resolve the serious constitutional problem which this Court had avoided in Bernhardt by holding the Act inapplicable to a diversity case involving an intrastate contract. That problem was whether the Arbitration *417 Act, passed 13 years prior to Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, could be constitutionally applied in a diversity case even though its application would require the federal court to enforce an agreement to arbitrate which the state court across the street would not enforce. Bernhardt's holding that arbitration is 'outcome determinative,' **1813 350 U.S., at 203, 76 S.Ct., at 276, and its recognition that there would be unconstitutional discrimination if an arbitration agreement were enforceable in federal court but not in the state court, id., at 204, 76 S.Ct., at 276, posed a choice of two alternatives for Judge Medina. If he held that the Arbitration Act rested solely on Congress' power, widely recognized in 1925 but negated in Erie, to prescribe general federal law applicable in diversity cases, he would be compelled to hold the Act unconstitutional as applied to diversity cases under Erie and Bernhardt. 16 If he held that the Act rested on Congress' power to enact substantive law governing interstate commerce, then the Erie-Bernhardt problem would be avoided and the application of the Act to diversity cases involving commerce could be saved.

16    Mr. Justice Frankfurter chose this alternative in his concurring opinion in Bernhardt, 350 U.S., at 208, 76 S.Ct., at 279, and even the Court there suggested that its

pre-Erie decision in Shanferoke Coal & Supply Corp. of Delaware v. Westchester Service Corp., 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583, which applied the Act to an interstate contract in a diversity case, might be decided differently under the Bernhardt holding that arbitration is outcome-determinative, 350 U.S., at 202, 76 S.Ct., at 275.

The difficulty in choosing between these two alternatives was that neither, quite contrary to the Court's position, was 'clear beyond dispute' upon reference to the Act's legislative history. 17 As to the first, it is clear that Congress intended the Act to be applicable in diversity cases involving interstate commerce and maritime *418 contracts, 18 and to hold the Act inapplicable in diversity cases would be severely to limit its impact. As to the second alternative, it is clear that Congress in passing the Act relied primarily on its power to create general federal rules to govern federal courts. Over and over again the drafters of the Act assured Congress: 'The statute establishes a procedure in the Federal courts * * *. It rests upon the constitutional provision by which Congress is authorized to establish and control inferior Federal courts. So far as congressional acts relate to the procedure in the Federal courts, they are clearly within the congressional power.' 19 And again: 'The primary purpose of the statute is to make enforcible in the Federal courts such agreements for arbitration, and for this purpose Congress rests solely upon its power to prescribe *419 the jurisdiction and **1814 duties of the Federal courts.' 20 One cannot read the legislative history without concluding that this power, and not Congress' power to legislate in the area of commerce, was the 'principal basis' of the Act. 21 Also opposed to the view that Congress intended to create substantive law to govern commerce and maritime transactions are the frequent statements in the legislative history that the Act was not intended to be 'the source of * * * substantive law.' 22 As Congressman Graham explained the Act to the House:

17    For an analysis of these alternatives, see generally, Symposium, Arbitration and the Courts, 58 Nw.U.L.Rev. 466 (1963); Note, 69 Yale L.J. 847 (1960).

18    The House Report accompanying the Act expressly stated: 'The purpose of this bill is to make valid and enforcible agreements for arbitration contained in contracts involving interstate commerce * * * or which may be the subject of litigation in the Federal courts.' H.R.Rep. No. 96, 68th Cong., 1st Sess., 1 (1924) (emphasis added). Mr. Cohen, and a colleague,

commenting on the Act after its passage, explained: 'The Federal courts are given jurisdiction to enforce such agreements whenever under the Judicial Code they would have had jurisdiction * * *. Where the basis of jurisdiction is diversity of citizenship, the dispute must involve $3000 as in suits at law.' Cohen & Dayton, supra, at 267. See, e.g., Committee on Commerce, Trade & Commercial Law, The United States Arbitration Law and Its Application, 11 A.B.A.J. 153, 156; Note, 20 Ill.L.Rev. 111 (1925). The bill, as originally drafted by the American Bar Association, 49 A.B.A.Rep. 51-52 (1924), and introduced in the House, H.R. No. 646, 68th Cong., 1st Sess. (1924), 65 Cong.Rec. 11081-11082 (1924), expressly provided in s 8 '(t)hat if the basis of jurisdiction be diversity of citizenship * * * the district court * * * shall have jurisdiction * * * hereunder notwithstanding the amount in controversy is unascertained * * *.' Though that provision was deleted by the Senate, the omission was not intended substantially to alter the law. 66 Cong.Rec. 3004 (1925).

19    Committee on Commerce, Trade & Commercial Law, supra, 11 A.B.A.J., at 154.

20    Joint Hearings, supra, at 38.

21    Although Mr. Cohen, in a brief filed with Congress, suggested that Congress might rely on its power over commerce, he added that there were 'questions which apparently can be raised in this connection,' id., at 38, and expressly denied that 'the proposed law depends for its validity upon the exercise of the interstate-commerce and admiralty powers of Congress,' id., at 37. And when he testified, he made the point clearer:

'So what we have done * * * (in New York) is that we have * * * made it a part of our judicial machinery. That is what we have done. But it can not be done under our constitutional form of government and cover the great fields of commerce until you gentlemen do it, in the exercise of your power to confer jurisdiction on the Federal courts. The theory on which you do this is that you have the right to tell the Federal courts how to proceed.' Id., at 17.

The legislative history which the Court recites to support its assertion that Congress relied principally on its power over commerce consists mainly of statements that the Act was designed to cover only contracts in commerce, and that is certainly true. But merely because the Act was designed to enforce arbitration agreements only in contracts in commerce, does not mean that Congress was primarily relying on its power over commerce in supplying that remedy of enforceability.

22    Cohen & Dayton, supra, at 276.

'It does not involve any new principle of law except to provide a simple method * * * in order to give enforcement * * *. It creates no new legislation, grants no new rights, except a remedy to enforce an agreement in commercial contracts and in *420 admiralty contracts.' 65 Cong.Rec. 1931 (1924). (Emphasis added.)

Finally, there are clear indications in the legislative history that the Act was not intended to make arbitration agreements enforceable in state courts [23] or to provide an independent federal-question basis for jurisdiction in federal courts apart from diversity jurisdiction. [24] The absence of both of these effects-which normally follow from legislation of federal substantive law-seems to militate against the view that Congress was creating a body of federal substantive law.

23    See, e.g., Cohen & Dayton, supra, at 277; Committee on Commerce, Trade & Commercial Law, supra, at 155, 156. Mr. Rose, representing the Arbitration Society of America, suggested that the Act might have the beneficial effect of encouraging States to enact similar laws. Joint Hearings, supra, at 28, but Mr. Cohen assured Congress:

'Nor can it be said that the Congress of the United States, directing its own courts * * *, would infringe upon the provinces or prerogatives of the States. * * * (T)he question of the enforcement relates to the law of remedies and not to substantive law. The rule must be changed for the jurisdiction in which the agreement is sought to be enforced * * *. There is no disposition therefore by means of the Federal bludgeon to force an individual State into an unwilling submission to arbitration enforcement.' Id., at 39-40.

24    This seems implicit in s 3's provision for a stay by a 'court in which such suit is pending' and s 4's provision that enforcement may be ordered by 'any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties.'

Suffice it to say that Judge Medina chose the alternative of construing the Act to create federal substantive law in order to avoid its emasculation under Erie and Bernhardt. But Judge Medina was not content to stop there with a **1815 holding that the Act makes arbitration agreements in a contract involving commerce enforceable in federal court even though the basis of jurisdiction is diversity and state law does not enforce such *421 agreements. The problem

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

in Robert Lawrence, as here, was not whether an arbitration agreement is enforceable, for the New York Arbitration Act, upon which the federal Act was based, enforces an arbitration clause in the same terms as the federal Act. The problem in Robert Lawrence, and here, was rather whether the arbitration clause in a contract induced by fraud is 'separable.' Under New York law, it was not: general allegations of fraud in the inducement would, as a matter of state law, put in issue the making of the arbitration clause. So to avoid this application of state law, Judge Medina went further than holding that the federal Act makes agreements to arbitrate enforceable: he held that the Act creates a 'body of law' that 'encompasses questions of interpretation and construction as well as questions of validity, revocability and enforceability of arbitration agreements affecting interstate commerce or maritime affairs.' 271 F.2d at 409.

Thus, 35 years after the passage of the Arbitration Act, the Second Circuit completely rewrote it. Under its new formulation, s 2 now makes arbitration agreements enforceable 'save upon such grounds as exist at federal law for the revocation of any contract.' And under s 4, before enforcing an arbitration agreement, the district court must be satisfied that 'the making of the agreement for arbitration, as a matter of federal law, is not in issue.' And then when Judge Medina turned to the task of 'the formulation of the principles of federal substantive law necessary for this purpose,' 271 F.2d, at 409, he formulated the separability rule which the Court today adopts-not because s 4 provided this rule as an 'explicit answer,' not because he looked to the intention of the parties, but because of his notion that the separability rule would further a 'liberal policy of promoting arbitration.' 271 F.2d, at 410. [25]

25    It should be noted that the New York courts apparently do not find any inconsistency between application of a nonseparability rule and that State's policy of enforcing arbitration agreements, a policy embodied in a statute from which the federal Act was copied.

*422  Today, without expressly saying so, the Court does precisely what Judge Medina did in Robert Lawrence. It is not content to hold that the Act does all it was intended to do: make arbitration agreements enforceable in federal courts if they are valid and legally existent under state law. The Court holds that the Act gives federal courts the right to fashion federal law, inconsistent with state law, to determine whether an arbitration agreement was made and what it means. Even if Congress intended to create substantive rights by passage of the Act, I am wholly convinced that it did not intend to create

such a sweeping body of federal substantive law completely to take away from the States their power to interpret contracts made by their own citizens in their own territory.

First. The legislative history is clear that Congress intended no such thing. Congress assumed that arbitration agreements were recognized as valid by state and federal law. [26] Courts would give damages for their breach, but would simply refuse to specifically enforce them. Congress thus had one limited purpose in mind: to provide a party to such an agreement 'a remedy formerly denied him.' [27] 'Arbitration under the Federal * * * (statute) is simply a new procedural remedy.' [28] The Act 'creates no new legislation, grants no new rights, except a remedy to enforce * * *.' [29]  **1816  The drafters of the Act were very explicit:

26    S.Rep.No.536, 68th Cong., 1st Sess., 2 (1924); Joint Hearings, supra, at 38.

27    Cohen & Dayton, supra, at 271.

28    Id., at 279.

29    65 Cong.Rec. 1931 (1924).

'A Federal statute providing for the enforcement of arbitration agreements does relate solely to procedure  *423  of the Federal courts. It is no infringement upon the right of each State to decide for itself what contracts shall or shall not exist under its laws. To be sure whether or not a contract exists is a question of the substantive law of the jurisdiction wherein the contract was made.' Committee on Commerce, Trade & Commercial Law, The United States Arbitration Law and Its Application, 11 A.B.A.J. 153, 154. (Emphasis added.)

'Neither is it true that such a statute, declaring arbitration agreements to be valid, is the source of their existence as a matter of substantive law. * * *

'So far as the present law declares simply the policy of recognizing and enforcing arbitration agreements in the Federal courts it does not encroach upon the province of the individual States.' Cohen & Dayton, The New Federal Arbitration Law, 12 Va.L.Rev. 265, 276-277.

All this indicates that the s 4 inquiry of whether the making of the arbitration agreement is in issue is to be determined by reference to state law, not federal law formulated by judges for the purpose of promoting arbitration.

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

Second. The avowed purpose of the Act was to place arbitration agreements 'upon the same footing as other contracts.'[30] The separability rule which the Court applies to an arbitration clause does not result in equality between it and other clauses in the contract. I had always thought that a person who attacks a contract on the ground of fraud and seeks to rescind it has to seek rescission of the whole, not tidbits, and is not given the option of denying the existence of some clauses and affirming the existence of others. Here F & C agreed both to perform consulting services for Prima and not to *424 compete with Prima. Would any court hold that those two agreements were separable, even though Prima in agreeing to pay F & C not to compete did not directly rely on F & C's representations of being solvent? The simple fact is that Prima would not have agreed to the covenant not to compete or to the arbitration clause but for F & C's fraudulent promise that it would be financially able to perform consulting services. As this Court held in United States v. Bethlehem Steel Corp., 315 U.S. 289, 298, 62 S.Ct. 581, 587, 86 L.Ed. 855:

30    H.R.Rep.No.96, 68th Cong., 1st Sess. (1924).

'Whether a number of promises constitute one contract (and are non-separable) or more than one is to be determined by inquiring 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.'' Under this test, all of Prima's promises were part of one, inseparable contract.

Third. It is clear that had this identical contract dispute been litigated in New York courts under its arbitration act, Prima would not be required to present its claims of fraud to the arbitrator if the state rule of nonseparability applies. The Court here does not hold today, as did Judge Medina,[31] that the body of federal substantive law created by federal judges under the Arbitration Act is required to be applied by state courts. A holding to that effect-which the Court seems to leave up in the air-would flout the intention of the framers of the Act.[32] Yet under this Court's opinion today-that the Act supplies not only the remedy of enforcement but a body of federal doctrines to determine the validity **1817

of an arbitration agreement-failure to make the Act *425 applicable in state courts would give rise to 'forum shopping' and an unconstitutional discrimination that both Erie and Bernhardt were designed to eliminate. These problems are greatly reduced if the Act is limited, as it should be, to its proper scope: the mere enforcement in federal courts of valid arbitration agreements.

31    'This is a declaration of national law equally applicable in state or federal courts.' 271 F.2d, at 407.

32    See n. 23, supra.

## IV.

The Court's summary treatment of these issues has made it necessary for me to express my views at length. The plain purpose of the Act as written by Congress was this and no more: Congress wanted federal courts to enforce contracts to arbitrate and plainly said so in the Act. But Congress also plainly said that whether a contract containing an arbitration clause can be rescinded on the ground of fraud is to be decided by the courts and not by the arbitrators. Prima here challenged in the courts the validity of its alleged contract with F & C as a whole, not in fragments. If there has never been any valid contract, then there is not now and never has been anything to arbitrate. If Prima's allegations are true, the sum total of what the Court does here is to force Prima to arbitrate a contract which is void and unenforceable before arbitrators who are given the power to make final legal determinations of their own jurisdiction, not even subject to effective review by the highest court in the land. That is not what Congress said Prima must do. It seems to be what the Court thinks would promote the policy of arbitration. I am completely unable to agree to this new version of the Arbitration Act, a version which its own creator in Robert Lawrence practically admitted was judicial legislation. Congress might possibly have enacted such a version into law had it been able to foresee subsequent legal events, but I do not think this Court should do so.

I would reverse this case.

Parallel Citations

87 S.Ct. 1801, 1969 A.M.C. 222, 18 L.Ed.2d 1270

---

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 26

DOCSTOR: 2191401\1

345 F.3d 347
United States Court of Appeals,
Fifth Circuit.

BRIDAS S.A.P.I.C.; Bridas Energy International,
Ltd.; Intercontinental Oil & Gas Ventures,
Ltd.; Bridas Corporation, Plaintiffs-Appellees,
v.
GOVERNMENT OF
TURKMENISTAN; et al., Defendants,
Government of Turkmenistan; State Concern
Turkmenneft, Defendants-Appellants.

No. 02-20929.    Sept. 9, 2003.

Argentinian corporation brought action to confirm an international arbitration award rendered in its favor against the government of Turkmenistan and oil company wholly owned by government, arising out of joint venture agreement to conduct hydrocarbon operations in Turkmenistan. Defendants moved to dismiss and to vacate and refuse confirmation of arbitration award. The United States District Court for the Southern District of Texas, Vanessa D. Gilmore, J., denied motions, and defendants appealed. The Court of Appeals, Benavides, Circuit Judge, held that: (1) oil company was not an agent of government; (2) District Court erred in determining that government was not alter ego of oil company where Court premised its conclusion solely upon the existence of corporate formalities and an absence of comingling of funds and directors; (3) government could not be compelled to arbitrate claim on basis of equitable estoppel; (4) government could not be compelled to arbitrate claim, on basis of intended third-party beneficiary theory; (5) arbitration award was not subject to vacation on ground of manifest disregard of the law; and (6) award of punitive damages was not embedded in arbitrator's determination of discount rate.

Affirmed in part, and vacated and remanded in part.

West Headnotes (33)

**1**    **Alternative Dispute Resolution** 🔑 Questions of law or fact

In reviewing a district court's refusal to vacate an arbitration award on the ground that one of the parties never agreed to arbitrate the dispute, the district court's findings of fact are reviewed

for clear error, while its conclusions of law are reviewed *de novo*.

1 Cases that cite this headnote

**2**    **Alternative Dispute Resolution** 🔑 Questions of law or fact

District court's interpretation of an arbitration agreement, and whether it bound the parties to arbitrate, is a question of law; factual findings upon which such a determination is based are subject to review only for clear error.

3 Cases that cite this headnote

**3**    **Alternative Dispute Resolution** 🔑 Writing, signature, and acknowledgment

**Alternative Dispute Resolution** 🔑 Persons affected or bound

In order to be subject to arbitral jurisdiction, a party must generally be a signatory to a contract containing an arbitration clause. 9 U.S.C.A. § 1 et seq.

10 Cases that cite this headnote

**4**    **Alternative Dispute Resolution** 🔑 Existence and validity of agreement

Whether a party is bound by an arbitration agreement is generally considered an issue for the courts, not the arbitrator, unless the parties clearly and unmistakably provide otherwise. 9 U.S.C.A. § 1 et seq.

1 Cases that cite this headnote

**5**    **Alternative Dispute Resolution** 🔑 Evidence

The presumption in favor of arbitration concerning the scope of arbitrable issues is not applicable to the question of who should decide arbitrability, because the purpose of the Federal Arbitration Act (FAA) was to make arbitration agreements as enforceable as other contracts, not more so. 9 U.S.C.A. § 1 et seq.

4 Cases that cite this headnote

**6    Alternative Dispute Resolution** 🗝 **Persons affected or bound**

Whether a party is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement. 9 U.S.C.A. § 1 et seq.

8 Cases that cite this headnote

**7    Federal Courts** 🗝 **Waiver of Error in Appellate Court**

Arguments that are insufficiently addressed in the body of an appellate brief are waived.

1 Cases that cite this headnote

**8    International Law** 🗝 **Evidence of immunity, and fact questions**

Instrumentality of foreign state is entitled to a presumption of independent status, and burden is upon party seeking to bind state to agreement executed by instrumentality to demonstrate an agency relationship.

**9    Principal and Agent** 🗝 **Nature of the relation in general**

"Agency" is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. Restatement (Second) of Agency § 1(1).

2 Cases that cite this headnote

**10    Principal and Agent** 🗝 **Express Authority**
**Principal and Agent** 🗝 **Implied and Apparent Authority**

An agency relationship may be demonstrated by written or spoken words or conduct, by the principal, communicated either to the agent or to a third party.

2 Cases that cite this headnote

**11    International Law** 🗝 **Corporations and other instrumentalities**

Oil company wholly owned by the Turkmenistan government was not an agent of the government and lacked authority to bind government to joint venture agreement to conduct hydrocarbon operations in Turkmenistan; although oil company was controlled to an extent by the government subsequent to signing the agreement, it did not have the apparent authority to bind the government at the time the agreement was signed.

**12    Alternative Dispute Resolution** 🗝 **Persons affected or bound**

Typically, a guarantor cannot be compelled to arbitrate on the basis of an arbitration clause in a contract to which it is not a party. 9 U.S.C.A. § 1 et seq.

**13    Corporations and Business Organizations** 🗝 **Contracts in general**

Under the alter ego doctrine, a corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, when their conduct demonstrates a virtual abandonment of separateness.

5 Cases that cite this headnote

**14    Corporations and Business Organizations** 🗝 **Justice and equity in general**
**Corporations and Business Organizations** 🗝 **Fraud or illegal acts in general**
**Corporations and Business Organizations** 🗝 **Domination or control by shareholder**

Corporate veil may be pierced to hold an alter ego liable for the commitments of its instrumentality only if: (1) the owner exercised complete control over the corporation with respect to the transaction at issue, and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil.

7 Cases that cite this headnote

**15    Federal Courts**    Particular Issues and
Questions

District court's finding of alter ego relationship
between corporation and instrumentality is
reviewed for clear error.

**16    Corporations and Business
Organizations**    Alter ego, instrumentality,
or agency in general

District court erred in determining that the
government of Turkmenistan was not the
alter ego of oil company that was wholly
owned by the government, and therefore,
that oil company lacked authority to bind
government to joint venture agreement to conduct
hydrocarbon operations in Turkmenistan, where
Court premised its conclusion solely upon the
existence of corporate formalities and an absence
of comingling of funds and directors; Court failed
to consider the totality of circumstances in which
the oil company functioned.

2 Cases that cite this headnote

**17    Corporations and Business
Organizations**    Instrumentality in general

Determination of whether corporation is alter
ego of instrumentality is highly fact-based
and requires considering the totality of the
circumstances in which the instrumentality
functions; no single factor is determinative.

7 Cases that cite this headnote

**18    Corporations and Business
Organizations**    Parent and subsidiary
corporations in general

**Corporations and Business
Organizations**    Identity of directors,
officers, or shareholders

To determine whether parent corporation may be
bound by agreement entered into by its subsidiary,
factors to consider include whether: (1) parent

and subsidiary have common stock ownership;
(2) parent and subsidiary have common directors
or officers; (3) parent and subsidiary have
common business departments; (4) parent and
subsidiary file consolidated financial statements;
(5) parent finances subsidiary; (6) parent
caused incorporation of subsidiary; (7) subsidiary
operated with grossly inadequate capital; (8)
parent pays salaries and other expenses of
subsidiary; (9) subsidiary receives no business
except that given by parent; (10) parent uses
subsidiary's property as its own; (11) daily
operations of the two corporations are not
kept separate; (12) subsidiary does not observe
corporate formalities; (13) directors of the
subsidiary act in the primary and independent
interest of the parent; (14) others pay or guarantee
debts of the subsidiary; and (15) alleged parent
deals with the subsidiary corporation at arms
length.

1 Cases that cite this headnote

**19    Federal Courts**    State officers or agencies,
actions against

When determining if a state agency is the alter
ego of a state for Eleventh Amendment sovereign
immunity purposes, federal courts consider: (1)
whether state statutes and case law view the entity
as an arm of the state; (2) the source of the entity's
funding; (3) the entity's degree of local autonomy;
(4) whether the entity is concerned primarily
with local, as opposed to statewide, problems; (5)
whether the entity has the authority to sue and be
sued in its own name; and (6) whether the entity
has the right to hold and use property. U.S.C.A.
Const.Amend. 11.

1 Cases that cite this headnote

**20    Estoppel**    Nature and Application of
Estoppel in Pais

Use of equitable estoppel is within a district
court's discretion.

1 Cases that cite this headnote

**21**   **Federal Courts**  ⚷  Allowance of remedy and matters of procedure in general

Court of Appeals reviews the district court's decision to apply equitable estoppel only to ensure that the district court did not abuse its discretion.

**22**   **Alternative Dispute Resolution**  ⚷  Writing, signature, and acknowledgment

**Alternative Dispute Resolution**  ⚷  Persons affected or bound

**Alternative Dispute Resolution**  ⚷  Waiver or Estoppel

Non-signatory Turkmenistan government could not be compelled to arbitrate claim on basis of equitable estoppel in lieu of bringing lawsuit in matter relating to joint venture agreement to conduct hydrocarbon operations in Turkmenistan, in which oil company wholly owned by government was involved as signatory to arbitration agreement; government did not sign the contract containing arbitration provision and never sued on the agreement. 9 U.S.C.A. § 1 et seq.

28 Cases that cite this headnote

**23**   **Alternative Dispute Resolution**  ⚷  Waiver or Estoppel

Direct benefits estoppel applies when a nonsignatory knowingly exploits the agreement containing the arbitration clause. 9 U.S.C.A. § 1 et seq.

41 Cases that cite this headnote

**24**   **Contracts**  ⚷  Presumptions and burden of proof

Parties are presumed to be contracting for themselves only, and presumption may be overcome only if the intent to make someone a third-party beneficiary is clearly written or evidenced in the contract.

3 Cases that cite this headnote

**25**   **Alternative Dispute Resolution**  ⚷  Writing, signature, and acknowledgment

**Alternative Dispute Resolution**  ⚷  Persons affected or bound

Non-signatory Turkmenistan government could not be compelled to arbitrate claim, on basis of intended third-party beneficiary theory, in lieu of bringing lawsuit in matter relating to joint venture agreement to conduct hydrocarbon operations in Turkmenistan, in which oil company wholly owned by government was involved as signatory to arbitration agreement; the joint venture agreement did not evince the requisite clear intent to benefit the government, other than to the degree ordinarily expected when an instrumentality of a sovereign enters into a contract to develop the country's natural resources, and the agreement's integration clause specified that the terms of the agreement applied only to the defined parties. 9 U.S.C.A. § 1 et seq.

39 Cases that cite this headnote

**26**   **Alternative Dispute Resolution**  ⚷  Error of judgment or mistake of law

Only a manifest disregard of the law warrants vacating an arbitration award. 9 U.S.C.A. § 1 et seq.

**27**   **Alternative Dispute Resolution**  ⚷  Error of judgment or mistake of law

To determine whether a manifest disregard of the law warrants vacating an arbitration award requires two-part inquiry: (1) where on the basis of the information available to the court it is not manifest that the arbitrators acted contrary to the applicable law, the award should be upheld, and (2) where on the basis of the information available to the court it is manifest that the arbitrators acted contrary to the applicable law, the award should be upheld unless it would result in significant injustice, taking into account all the circumstances of the case, including powers of arbitrators to judge norms appropriate to the relations between the parties. 9 U.S.C.A. § 1 et seq.

5 Cases that cite this headnote

**28**  **Alternative Dispute Resolution** 🔑 Error of judgment or mistake of law

Manifest disregard of the law test for vacating arbitration awards applies to claims brought pursuant to the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

**29**  **Alternative Dispute Resolution** 🔑 Questions of law or fact

District court's refusal to vacate or modify arbitration award is reviewed under the same standard as any other district court decision, with findings of fact that are not clearly erroneous accepted, and questions of law considered *de novo*.

2 Cases that cite this headnote

**30**  **Damages** 🔑 Computation of amount

Selection of a discount factor for calculating damages is a question of fact to be determined by the trier of fact.

2 Cases that cite this headnote

**31**  **Alternative Dispute Resolution** 🔑 Error of judgment or mistake of law

Arbitrator did not act contrary to applicable law in calculating discount rate used for calculating damages for breach of joint venture agreement to conduct hydrocarbon operations in Turkmenistan, and thus, arbitration award was not subject to vacation on ground of manifest disregard of the law; arbitration panel had considered a variety of evidence and considered the factors that it deemed most appropriate for the particular income stream, including the risk inherent in the venture, potential inflation, and the time-value of money. 9 U.S.C.A. § 1 et seq.

2 Cases that cite this headnote

**32**  **Alternative Dispute Resolution** 🔑 Scope of inquiry in general

Arbitral action contrary to express contractual provisions is not entitled to deference upon review. 9 U.S.C.A. § 10(a).

4 Cases that cite this headnote

**33**  **Damages** 🔑 Nature and Theory of Damages Additional to Compensation

Under English law, "punitive damages" are those that extend beyond mere compensation of the claimant.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*351 Mary L. O'Connor (argued), Jesse Z. Weiss, Akin, Gump, Strauss, Hauer & Feld, Susan L. Hays, Waters & Kraus, Dallas, TX, for Plaintiffs-Appellees.

William H. Knull, III (argued), James E. Tancula, Timothy J. Tyler, Mayer, Brown, Rowe & Maw, Houston, TX, Jeffrey W. Sarles, William H.J. Hubbard, Mayer, Brown, Rowe & Maw, Chicago, IL, for Defendant-Appellant.

Appeal from the United States District Court for the Southern District of Texas.

Before DAVIS and BENAVIDES, Circuit Judges, and RESTANI [*], Judge.

[*]  Judge, U.S. Court of International Trade, sitting by designation.

**Opinion**

BENAVIDES, Circuit Judge:

**I.**

Plaintiffs-appellees, Bridas S.A.P.I.C., Bridas Energy International, Ltd., Intercontinental Oil & Gas Ventures, Ltd., and Bridas Corporation (collectively, "Bridas") originally brought this action to confirm an international arbitration award rendered in Bridas's favor against Defendants-appellants, Government of Turkmenistan ("the Government"

or "Turkmenistan"), Concern Balkannebitgaz-Senegat, and State Concern Turkmenneft (collectively "Turkmenneft").

Bridas, an Argentinian corporation, entered into a joint venture agreement ("JVA" or "the agreement") on February 10, 1993, with a production association, Turkmenneft, formed and owned by the Government at the time that the JVA was signed. The Government itself was not a signatory to the agreement. The JVA designated Bridas as the "Foreign Party," and Turkmenneft as the "Turkmenian Party." Over time, the Government substituted various other entities to serve as the Turkmenian Party, ultimately resting with State Concern Turkmenneft and Concern Balkannebitgaz-Senegat (collectively, "Turkmenneft").

The JVA created a joint venture entity called Joint Venture Keimir ("JVK"). JVK was established "for the purpose of conducting hydrocarbon operations in an area in southwestern Turkmenistan, known generally as Keimir." The relevant part of Article XXIV of the agreement stipulates that "[a]ny dispute, controversy or claim arising out of or in relation to or in connection with th [e][a]greement ... *352 shall be exclusively and finally settled by arbitration, and any Party may submit such a dispute, controversy or claim to arbitration." The parties further agreed that any arbitration would be "conducted in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce as amended from time to time." The law governing the interpretation of the agreement was to be the law of England.

Bridas claims that in November 1995, the Government "ordered Bridas to suspend further work in Keimir, and prohibited Bridas from making imports and exports in or from Turkmenistan." Consequently, on April 16, 1996, Bridas initiated an arbitration proceeding against Appellants with the International Chamber of Commerce ("ICC").

On June 21, 1996, Turkmenistan argued to the ICC Court of Arbitration that it was not a proper party to the arbitration because, among other reasons, it did not sign the JVA and was thus not a party to the arbitration clause contained within it. The ICC Court subsequently confirmed by letter that the arbitrators themselves would determine whether the Government was subject to their jurisdiction. The dispute was subsequently referred to a three-person tribunal. Although the arbitration agreement contemplated that the arbitration proceeding would be held in Stockholm, Sweden, the parties instead agreed to arbitration proceedings in Houston, Texas.

The arbitral proceedings, which began in January 1997, involved 19 days of hearings, various expert reports, testimony concerning damages, and extensive legal briefing. On June 25, 1999, a two-person majority of the Tribunal issued its First Partial Award ("FPA"). The FPA held that (1) the arbitrators had jurisdiction to determine whether they had jurisdiction over the Government, and (2) that "the Government [was] a proper party to the arbitration." The Tribunal also ruled that Appellants had repudiated the JVA. The FPA stated:

[I]f [Bridas] were to accept repudiatory conduct by the [Defendants] and [Turkmenistan] and thus to bring the [joint venture] [a]greement to an end, their damages would be calculated on a loss-of-bargain basis, involving 218,560,935 barrels of oil equivalent at a net-back price of $10.50 per barrel, using a discount rate of 10.446% based on a contract term of 25 years.

In a letter dated July 5, 1999, Bridas formally accepted the Defendant's repudiation of the JVA.

On October 21, 1999, the arbitrators issued their Second Partial Award ("SPA"). In its SPA, the same two-person majority held that the Tribunal had "the jurisdiction to consider and make an award concerning [Bridas's] claim for damages arising out of their acceptance of the repudiatory conduct of the [appellants]."

The Third Partial Award ("TPA") was rendered on September 2, 2000. In the TPA, the same two-person majority clarified its previous rulings in the FPA and calculated damages for Bridas. The majority held that the 10.446% discount rate was the appropriate rate for calculating damages because "[i]t was higher than the non-risk [7.5%] discount factor advanced initially by [Bridas] and takes into account the various risk referred to by the parties in the evidence." The Tribunal then awarded a grand total of $495,000,000 in damages to Bridas. The Final Award was issued on January 26, 2001.

Bridas initiated this lawsuit on July 7, 1999, when it filed its application for confirmation of the FPA. [1] The Government *353 and Turkmenneft, in response, filed motions to dismiss the application for confirmation and to vacate and refuse confirmation of the FPA. On December 22, 2000, Turkmenneft, conditionally joined by the Government, moved to vacate or modify both the TPA and the Final Award.

[1]    Bridas subsequently withdrew its motion to confirm the FPA.

The district court denied Appellants' motions to vacate or modify the FPA, TPA, and Final Award.[2] The Government and Turkmenneft appealed the district court's judgment to this court.

[2]   Bridas withdrew its motion to confirm the FPA in February 2000. Appellants' motions to dismiss the application for confirmation thus became moot. The only motions that remained before the district court, therefore, were Appellants' motions to vacate or modify the FPA, TPA, and Final Award. The district court, therefore, erred in ordering "the arbitration awards in the case ... CONFIRMED."

Appellants ask us to resolve the following issues on appeal: (1) whether the Tribunal had jurisdiction over the Government; (2) whether the arbitral majority's rulings on the merits were in manifest disregard of the law; and (3) whether the arbitral majority exceeded its authority in calculating the damage award.

## II.

United States federal courts have jurisdiction to hear this case under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* We have jurisdiction to hear this appeal under § 16(a)(3) of the Act. 9 U.S.C. § 16(a)(3) *et seq.* (permitting appeal of "a final decision with respect to an arbitration that is subject to this title.").

### A.

[1] [2]   The first issue we address is whether the Tribunal properly exercised jurisdiction over the Government. In reviewing a district court's refusal to vacate an arbitration award on the ground that one of the parties never agreed to arbitrate the dispute, the district court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed *de novo. First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 947-48, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The district court's interpretation of the arbitration agreement, and whether it bound the parties to arbitrate, is a question of law. *R.M. Perez & Assoc., Inc. v. Welch,* 960 F.2d 534, 537 (5th Cir.1992). *See MS Dealer Service Corp., v. Franklin,* 177 F.3d 942, 946 (11th Cir.1999) (noting that a district court's denial of a petition to compel arbitration on the ground that a party was not a signatory to the contract is reviewed *de novo); Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1513 (10th Cir.1995) (same). The factual

findings upon which such a determination is based are, of course, subject to review only for clear error. *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group, LLC,* 268 F.3d 58, 61 (2d Cir.2001). The parties agree that federal common law governs the determination of this issue.

### B.

[3]   In order to be subject to arbitral jurisdiction, a party must generally be a signatory to a contract containing an arbitration clause.[3] Even though the Government **\*354** did not sign the JVA, the Tribunal held that the Government was bound to arbitrate the dispute with Bridas because (1) the Government had not taken any steps to extricate itself from the proceedings and (2) its evaluation of the evidence revealed at least 22 commitments in the JVA "that only the Government could give or fulfill."

[3]   *Westmoreland v. Sadoux,* 299 F.3d 462, 465 (5th Cir.2002)(holding that arbitration agreements "must be in writing and signed by the part[ies]" and may apply to nonsignatories only "in rare circumstances"). *Accord Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000)(noting that "arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement nonsignatory"). *Cf. EEOC v. Waffle House, Inc.,* 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002)("Arbitration under the [FAA] is a matter of consent, not coercion"); *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)("[T]he FAA does not require parties to arbitrate when they have not agreed to do so.").

[4] [5]   The district court, because it did not find "clear and unmistakable" evidence that the parties agreed that the Tribunal would determine its own jurisdiction, undertook an independent review of whether the Government was bound to arbitrate with Bridas. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944-47, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). *Accord AT&T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Whether a party is bound by an arbitration agreement is generally considered an issue for the courts, not the arbitrator, "[u]nless the parties clearly and unmistakably provide otherwise."[4] *AT&T Tech.,* 475 U.S. at 649, 106 S.Ct. 1415. The district court concluded that despite the Government's non-signatory status, principles of agency and equitable estoppel bound the Government to the JVA.

4    This independent review of whether the arbitration panel had jurisdiction over the Government represents a departure from the typically deferential review afforded arbitral decisions pursuant to the federal policy favoring arbitration. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The presumption *in favor* of arbitration concerning the scope of arbitrable issues is not applicable to the question of *who* should decide arbitrability, because the purpose of the FAA was to make arbitration agreements as enforceable as other contracts, not more so. *Id.; Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). *See PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 514 (3d Cir.1990)(stating it is "per se irreparable harm if a court were to abdicate its responsibilities to determine the scope of an arbitrator's jurisdiction and, instead, were to compel a party who has not agreed to do so, to submit to an arbitrator's own determination of his authority."); *Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069 (5th Cir.2002) (noting that ordinary contract principles, rather than the federal policy favoring arbitration, apply to the determination of whether there is a valid agreement to arbitrate).

### C.

As a preliminary matter, we will address Bridas's assertion that the Government waived its right to contest the Tribunal's jurisdiction because: (1) it failed to challenge the Tribunal's Order No. 5; and (2) it voluntarily took part in the arbitration through Turkmenneft.

Both of these arguments are meritless. Under § 172.082(f) of the Texas International Arbitration Act ("TIAA"), Tex. Civ. Prac. & Rem.Code § 172.082(f) (Vernon 1997 & Supp.2003), if a tribunal makes a preliminary ruling *that it has jurisdiction* (not that it has jurisdiction to determine jurisdiction), a party waives any objection to the ruling, unless it requests the district court of the county in which the arbitration is taking place to decide the matter. Tex. Civ. Prac. & Rem.Code § 172.082(f). Order No. 5 states: "[w]e have not yet decided whether the Government is bound by the commitment to arbitrate." The order, thus, did not address whether the Tribunal had jurisdiction over the Government. **\*355** § 172.082(f) of the TIAA is therefore inapplicable.

Second, while it is rare that we are asked to decide a jurisdictional issue such as this one after the proceedings have concluded, neither the fact that the Government "allowed the

proceeding to continue" over its objection, nor its "virtual representation" at the arbitration by Turkmenneft, waive its right to dispute the Tribunal's jurisdiction in court. *See, e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 946-47, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The cases cited by Bridas to the contrary are inapposite.

### D.

6    We begin our review by considering the terms of the JVA. Who is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement. *See Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000)(noting that whether a party is obligated to arbitrate is a matter of contract); *Smith/Enron Cogeneration Limited Partnership, Inc. v. Smith Cogeneration International, Inc.,* 198 F.3d 88, 95 (2d Cir.1999) (noting that whether an entity is a party to the arbitration agreement is included within the broader issue of whether the parties agreed to arbitrate); *McCarthy v. Azure,* 22 F.3d 351, 355 (1st Cir.1994)(noting that federal common law "dovetails precisely with general principles of contract law," and "the judicial task in construing a contract is to give effect to the mutual intentions of the parties") (quoting *NRM Corp. v. Hercules, Inc.,* 758 F.2d 676, 681 (D.C.Cir.1985)).

It is apparent that the four corners of the agreement do not bind the Government to arbitrate this dispute. The Government did not sign the JVA, nor was it defined as a party in the agreement. The agreement describes the framework for the relationship between two parties: the "Foreign Party," defined as Bridas, and the "Turkmenian Party," defined as Turkmenneft. Considering that the purpose of the joint venture was to develop the hydrocarbon resources of a nation whose economy and land is dominated by the Government, the Government itself is not mentioned frequently in the agreement. [5] Corporations commonly elect to establish "liability insulating entities" to enter into particular types of transactions, and the structure of the JVA indicates that this was exactly what the Government intended to do with respect to the JVA. *See Westmoreland v. Sadoux,* 299 F.3d 462, 467 (5th Cir.2002). The agreement itself does not signal an intention to bind the Government to its terms, and thus to arbitrate this dispute.

5    *Article 3.29,* defines "[r]egistration" as "the official registration of the Joint Venture as a legal entity by the government of Turkmenistan." *Article 11.8* provides for the government to receive its royalties from the hydrocarbon production in-kind, subject to

the agreement of the parties, and *Article 11.9* permits JVK to exchange its product for product produced by Government-owned refineries. *Article 22.3* states, "Interests, rights and obligations of Turkmenistan, as represented by Turkmenian Party, and interest, rights and obligations of the Foreign Party under this Agreement, shall be solely governed by the provisions of this Agreement which may be altered or amended only by the mutual written agreement of the Parties to this Agreement...." *Article 27.5* permits JVK to rent property from the Government that may be reasonably necessary for its operations.

## E.

**7**　Nevertheless, federal courts have held that so long as there is *some* written agreement to arbitrate, a third party may be bound to submit to arbitration. Carolyn B. Lamm & Jocelyn A. Aqua, *Defining* **\*356** *the Party-Who is a Proper Party in an International Arbitration Before the American Arbitration Association and Other International Institutions,* 34 Geo. Wash. Int'l L.Rev. 711, 720 (2003).[6] Ordinary principles of contract and agency law may be called upon to bind a nonsignatory to an agreement whose terms have not clearly done so. *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc,* 269 F.3d 187 (3d Cir.2001); *Thomson-C.S.F., S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995). Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/ alter ego; (e) estoppel; and (f) third-party beneficiary. *Thomson-C.S.F., S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995); *DuPont,* 269 F.3d at 195-97 (3d Cir.2001). *Accord Javitch v. First Union Securities, Inc.,* 315 F.3d 619, 629 (6th Cir.2003). Bridas has waived arguments premised upon assumption and incorporation by reference.[7] We address the remaining four theories in turn.

[6]　*See International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416-17 (4th Cir.2000); *Thomson-C.S.F., S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995); *Almria v. Telcor Int'l, Inc.,* 920 F.Supp. 658, 669 (D.Md.1996)(finding "there is no strict requirement that only signatories to an agreement be susceptible to compelled arbitration").

[7]　Bridas did not appeal the district court's holding that Turkmenistan did not assume the obligation to arbitrate. Bridas attempted to appeal, in a footnote, the district court's determination that there was no separate

contractual agreement to incorporate by reference into the JVA. Arguments that are insufficiently addressed in the body of the brief, however, are waived. *See Quick Techs., Inc. v. Sage Group PLC,* 313 F.3d 338, 343 n. 3 (5th Cir.2002); *United States v. Hardman,* 297 F.3d 1116, 1131 (10th Cir.2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived").

### 1. Agency

The district court held that the Government was bound to arbitrate the dispute with Bridas because Turkmenneft signed the JVA as an agent of the Government. The parties dispute whether a finding that the Government is bound to the JVA by principles of agency is a matter of law, subject to plenary review, or a finding of fact that is reviewed merely for clear error. The Second Circuit has held that "[a]gency is a legal concept." *Interocean Shipping Co. v. Nat'l Shipping & Trading,* 523 F.2d 527, 537 (2d Cir.1975); *Accord American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999). This court, however, appears to view the decision as a mixed question of law and fact, dominated by factual determinations and thus subject to review only for clear error. *See American Intern. Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536, 539 (5th Cir.1987); *George v. C.I.R.,* 803 F.2d 144, 147 n. 2 (5th Cir.1986), *vacated by* 485 U.S. 973, 108 S.Ct. 1264, 99 L.Ed.2d 476 (1988)(vacated on independent grounds). *See* 3 Am.Jur.2d Agency § 19 (2002)(noting that existence of agency is a question of fact). We need not decide this question because the district court's holding that Turkmenneft is an agent of the Government does not withstand our review, regardless of the standard applied.

**8　9　10**　Turkmenneft is entitled to a "presumption of independent status." *Hester International Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 176 (5th Cir.1989). Bridas, therefore, carried the burden of proving that Turkmenneft signed the JVA as an agent of the Government. *Id.; Hofherr v. Dart Indust., Inc.,* 853 F.2d 259 (4th Cir.1988). Agency is **\*357** "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). An agency relationship may be demonstrated by "written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority)." *Hester,* 879 F.2d at 181. *See Arriba Limited v. Petroleos Mexicanos,* 962 F.2d 528, 536 (5th Cir.1992). If Turkmenneft indeed signed the JVA in its capacity as the Government's agent,

the Government would be bound by the JVA's arbitration requirement. *See Srivastava v. C.I.R.,* 220 F.3d 353, 369 (5th Cir.2000).

The district court primarily relied upon three pieces of evidence to support its determination that Turkmenneft signed the JVA as the Government's agent. First, it pointed to a letter from Mr. Suyunov, Deputy Chairman of the Council of Ministers of Turkmenistan, and Mr. Ishanov, Chairman of the Turkmenian Party, that confirmed, during negotiation of the JVA, that "all Joint Venture Keimir rights ... established in the organization documents are fully and completely guaranteed by the Government, and there is no additional need for any further decisions, decrees, or approvals."[8] Second, the district court referred to Article 22.3 of the JVA which states that the "[i]nterests, rights and obligation of Turkmenistan" are represented by the Turkmenian Party. *See supra* note 6. Third, the district court relied upon a statement made in a 1996 letter by the Government's Ministry of Oil and Gas to the director general of JVK and JVY (another joint venture with Bridas), that "the Ministry is the Turkmenian Party."[9]

[8]    To the extent that the district court implied that the contents of this letter were contained within the JVA, it clearly erred.

[9]    The letter from the Ministry was addressed to Mr. Schreiterer, the Director General of both JVK and JVY, in reference to both of the joint ventures. The district court distorted the meaning of the statement that "the Ministry is the Turkmenian Party" by inserting a reference in the middle of the quoted statement to JVK. In reality, the statement could easily have been in reference to JVY, not JVK. The district court, however, chose to interpret the statement as referring to JVK, and in the absence of firmer evidence to the contrary, we accept its interpretation.

[11]    [12]    Given the language and structure of the JVA, these evidentiary findings are insufficient to support an agency determination. First, typically a guarantor cannot be compelled to arbitrate on the basis of an arbitration clause in a contract to which it is not a party. *Interocean Shipping Co. v. Nat'l Shipping & Trading Co.,* 523 F.2d 527, 539 (2d Cir.1975). *Accord Hester,* 879 F.2d at 176, 180-81 (holding that an instrumentality of Nigeria was not the government's agent for purposes of an agreement between the instrumentality and an American corporation despite a guarantee by the Nigerian government for all loans necessary for offshore financing). Second, a statement of

representation, such as that in Article 22.3, in the midst of a provision regarding oral modifications of the agreement, is not remarkable. "All corporations to some degree represent their owners," and Turkmenneft is an oil company wholly owned by Turkmenistan. *Hester Intern. Corp v. Federal Republic of Nigeria,* 879 F.2d 170, 180 (5th Cir.1989). As we have held in the past, such a statement does not establish an agency relationship. *Id.* at 180. And third, the 1996 letter from the Ministry, while probative of how the Government conceived of its role in JVK in 1996, does not overcome the fact that the preamble to the JVA defines the *\*358* Turkmenian Party as Turkmenneft-a "legal entity within the meaning of the laws of Turkmenistan"-not the Government or the Ministry. The JVA was signed in 1993, before the Ministry penned the letter that Bridas claims demonstrates that Turkmenneft signed the JVA as an agent.

Arbitration agreements apply to nonsignatories only in rare circumstances. *Westmoreland v. Sadoux,* 299 F.3d 462, 465 (5th Cir.2002).[10] We are simply unable to conclude that the parties, one a multi-national corporation who has negotiated joint venture agreements in the past, and the other, a sovereign nation, both represented by able counsel, intended Turkmenneft to sign the JVA as an agent of the Government in the absence of clearer language to that effect.

[10]    The Government argues that *Westmoreland* does not permit us to use agency principles to bind a nonsignatory to an arbitration agreement. The Government reads *Westmoreland* too broadly. There, we held that a nonsignatory could not compel arbitration merely because he was an agent of one of the signatories. 299 F.3d at 466. This is a distinctly different question from whether a signatory may compel the principal of a signatory agent to arbitrate under an agreement that the agent signed as an authorized representative of the principal. *Westmoreland,* therefore, does not bar us from considering this claim.

The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and, like a railroad crossing, suggests the duty to stop, look, and listen, and he who would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority[.]

*Standard Acc. Ins. Co. v. Simpson,* 64 F.2d 583, 589 (4th Cir.1933). *Accord Racicky v. Farmland Indus. Inc.,* 328 F.3d 389, 393 (8th Cir.2003). Had Bridas truly felt that Turkmenneft was signing the agreement not for itself but on behalf of the Government, it had the obligation

to make that fact clear on the face of the agreement. This could have been accomplished in a myriad of ways. Bridas could have requested that the Government sign the agreement, or inserted a prominent and direct statement as to Turkmenneft's status. Bridas has not presented any evidence that would permit us to excuse such an oversight. Bridas was doubtlessly well aware of the risks inherent in investing in countries of the former Soviet Union in 1993, and the possibility that its investment would be swept away in political turmoil. We will not bind the Government to the agreement, simply because Bridas lost a gamble that it was willing to take. To do otherwise would vitiate the predictability of the legal backdrop against which the parties voluntarily agreed to do business. *See Westmoreland,* 299 F.3d at 467.

Bridas has set forth ample evidence regarding the extent to which Turkmenneft was controlled by the Government *subsequent* to the signing of the JVA. Such evidence, however, does not establish that Turkmenneft had the apparent authority to bind the Government in 1993. Bridas did not satisfy its burden in this regard, and the district court's holding that Turkmenneft signed the JVA as an agent of the Government was clearly erroneous.

### *2. Alter Ego*

**13** Courts occasionally apply the alter ego doctrine and agency principles as if they were interchangeable. *See House of Koscot Dev't Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64 (5th Cir.1972). The two theories are, however, distinct. Under the alter ego doctrine, a corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, ***359** "when their conduct demonstrates a virtual abandonment of separateness." *Thomson-C.S.F.,* 64 F.3d at 777. This is due to the doctrine's strong link to equity. *See Harrell v. DCS Equip. Leasing Corp.,* 951 F.2d 1453, 1458 (5th Cir.1992). *Accord McCarthy v. Azure,* 22 F.3d 351, 362-63 (1st Cir.1994)(holding that the alter ego doctrine can be invoked "only where equity requires the action to assist a third party"). The laws of agency, in contrast, are not equitable in nature, but contractual, and do not necessarily bend in favor of justice. Courts are thus comparatively free from the moorings of the parties' agreements when considering whether an alter ego finding is warranted.

**14** This is not to say that the decision to apply the alter ego doctrine to bind a parent is made routinely. "Courts

do not lightly pierce the corporate veil even in deference to the strong policy favoring arbitration." *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1461 (10th Cir.1995). The corporate veil may be pierced to hold an alter ego liable for the commitments of its instrumentality only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *American Fuel Corp. v. Utah Energy Dev't Co., Inc.,* 122 F.3d 130, 134 (2d Cir.1997). *Accord First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 629-30, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983); *Gardemal v. Westin Hotel Co.,* 186 F.3d 588 (5th Cir.1999). *Cf. Matter of Sims,* 994 F.2d 210 (5th Cir.1993)(holding that an element of fraud must be present before courts will pierce the corporate veil in a case based upon a contract).

The district court held, in a brief paragraph, that the Government was not the alter ego of Turkmenneft. After finding that the evidence reveals that Turkmenneft was controlled by the Government, the court stated,

> [d]espite this control ... Bridas has not offered evidence proving "an absence of corporate formalities." Moreover, there is no indication of "an intermingling of corporate finances and directorship" between Turkmenneft and the government. Thus, Turkmenistan cannot be bound under an alter ego theory.

**15** Alter ego determinations are reviewed in this circuit only for clear error. *Zahra Spiritual Trust v. U.S.,* 910 F.2d 240, 242 (5th Cir.1990). Errors of law, however, are not entitled to deference. *W.H. Scott Const. Co., Inc. v. City of Jackson,* 199 F.3d 206, 219 (5th Cir.1999). *Accord United States v. Delgado-Nunez,* 295 F.3d 494, 496 (5th Cir.2002)(noting that a mistake of law is, by definition, an abuse of discretion); *In re Coastal Plains, Inc.,* 179 F.3d 197, 205 (5th Cir.1999)(same).

**16    17    18    19** The district court erred in premising its conclusion solely upon the existence of corporate formalities and an absence of comingling of funds and directors. Alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions. *Estate of Lisle v. C.I.R.,* 341 F.3d 364, 375-76, 2003 WL 21752801, at *8 (5th Cir.2003). No single factor is determinative. This should be apparent from the extensive list of circumstances that courts have developed to guide alter ego determinations. *See id; Markow v. Alcock,* 356 F.2d 194, 197-98 (5th Cir.1966); *American Fuel Corp.,* 122 F.3d at 134; *MAG Portfolio Consultant, GMBH v. Merlin*

*Biomed. Group LLC,* 268 F.3d 58, 63 (2d Cir.2001). Because the district court failed to take into account all of the aspects of the relationship between the Government and Turkmenneft, it committed  **\*360**  an error of law and must reconsider the issue on remand. [11]

[11]  Once it has been determined that the corporate form was used to effect fraud or another wrong upon a third-party, alter ego determinations revolve around issues of control and use. *See Estate of Lisle,* 341 F.3d at 368, 2003 WL 21752801, at \*8 (5th Cir.2003). On remand, the court should explore the totality of the environment in which Turkmenneft operated, including those factors normally explored in the context of parent-subsidiary alter ego claims, such as whether:

(1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

*Id.* at 375 n. 16 \*8 n. 16 (citing *Oxford Capital Corp. v. United States,* 211 F.3d 280, 284 n. 2 (5th Cir.2000)). Additional factors include: (1) whether the directors of the "subsidiary" act in the primary and independent interest of the "parent,"; (2) whether others pay or guarantee debts of the dominated corporation; and (3) whether the alleged dominator deals with the dominated corporation at arms length. *Markov,* 356 F.2d at 197-98; *American Fuel Corp.,* 122 F.3d at 134.

While the preceding considerations are adaptable to a certain degree to the context of a sovereign government and its instrumentality, the district court should also consider the factors that we take into account when determining if a state agency is the "alter ego" of a state for 11th amendment sovereign immunity purposes:

(1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority

to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property. *Perez v. Region 20 Educ. Service Center,* 307 F.3d 318, 326-27 (5th Cir.2002). *Accord Vogt v. Bd. of Com'rs of Orleans Levee Dist.,* 294 F.3d 684, 688-89 (5th Cir.2002).

### 3. Estoppel

**20**   **21**   The use of equitable estoppel is within a district court's discretion. *Grigson,* 210 F.3d at 528; *Hill v. G.E. Power Systems, Inc.,* 282 F.3d 343, 348 (5th Cir.2002). We, therefore, review the district court's decision to apply equitable estoppel only to ensure that the court did not abuse its discretion. *Id.* "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." *Id.*

The district court, relying on *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527 (5th Cir.2000), held that a nonsignatory may be equitably estopped from asserting that it is not bound by an arbitration agreement when the signatory raises allegations of substantially interdependent and concerted misconduct against both a nonsignatory and one or more of the signatories to the contract.

As the Government correctly points out, the district court misapplied the "intertwined claims" theory of equitable estoppel. *Grigson* does not stand for the proposition stated by the district court. In *Grigson,* we estopped a *signatory* plaintiff from relying upon the defendants' status as a nonsignatory to prevent the *defendants* from compelling arbitration under the agreement. 210 F.3d at 526-28. We justified applying equitable estoppel in *Grigson* in part because to do otherwise would permit the signatory plaintiff to "have it both ways." *Id.* at 528. *See*  **\*361**  *Hill,* 282 F.3d at 349 (5th Cir.2002). "[The plaintiff] cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory." *Grigson,* 210 F.3d at 528. [12]

[12]  *Grigson,* and the 11th Circuit decision that it relied upon, have been referred to as misguided deviations from traditional estoppel theories. *See* J. Douglas Uloth & J. Hamilton Rial, III, Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate-A Bridge Too Far?, 21 Rev. Litig. 593, 603-04 (2002). *See also Grigson,* 210 F.3d at 531 (Dennis, J., dissenting)

("[N]early anything can be called estoppel. When a lawyer or a judge does not know what other name to give for his decision to decide a case in a certain way, he says there is an estoppel.").

The rationale of *Grigson* does not apply to the circumstances of this case. Here, the Government, unlike the estopped party in *Grigson,* did not sign a contract containing an arbitration provision and never sued Bridas on the agreement. The distinction is *not* one without a difference. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 202 (3d Cir.2001). The Second Circuit has expressly stated that the *Grigson* version of estoppel applies only to prevent "a *signatory* from avoiding arbitration with a nonsignatory when the issues *nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.*" *Thomson-CSF, S.A.,* 64 F.3d at 779 (emphasis added). "[B]ecause arbitration is guided by contract principles, the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." *MAG Portfolio Consult, GMBH,* 268 F.3d at 62. The Third Circuit reached the same conclusion in *DuPont,* 269 F.3d at 202.

**22**    As the Government correctly notes, the result in *Grigson* and similar cases makes sense because the parties resisting arbitration had previously agreed to arbitrate claims of the very type that they asserted against the nonsignatory. *See* J. Douglas Uloth & J. Hamilton Rial, III, *Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate-A Bridge Too Far?, 21 Rev. Litig. 593, 633 (2002).* "It is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others." *Id.* The simple fact that *Bridas's* claims against Turkmenneft and the Government are inextricably intertwined (a finding of the district court which is not clearly erroneous) is insufficient, standing alone, to justify the application of equitable estoppel to the *Government's* assertion that it is not subject to the Tribunal's jurisdiction. Were this to become the case, this expanded version of equitable estoppel would "threaten to overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement." *Id.* at 632. The district court thus abused its discretion in applying the intertwined claims theory of equitable estoppel to this case.

**23**    Bridas, however, contends that the district court's decision may nonetheless be affirmed on the basis of the "direct benefits" version of estoppel. [13] Direct *362* benefits estoppel applies when a nonsignatory "knowingly exploits the agreement containing the arbitration clause." *DuPont,* 269 F.3d at 199. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1064 (2d Cir.1993)(holding that non-signatory local affiliate, who used a trade name pursuant to an agreement that it ratified which contained an arbitration clause, was estopped from relying on its nonsignatory status to avoid arbitrating under the agreement); *American Bureau of Shipping v. Tencara Shipyard S.P.A.* 170 F.3d 349, 353 (2d Cir.1999)(binding non-signatory to a contract under which it received direct benefits of lower insurance and the ability to sail under the French flag).

[13]    *See DuPont,* 269 F.3d at 195 (3d Cir.2001); *American Bureau of Shipping v. Tencara Shipyard S.P.A,* 170 F.3d 349, 351-53 (2d Cir.1999); *Deloitte Noraudit A/ S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1062-64 (2d Cir.1993); *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir.2000); *Sam Reisfeld & Son Import Co. v. S.A. Eteco,* 530 F.2d 679, 681 (5th Cir.1976); *Westmoreland,* 299 F.3d at 467.

There is an important distinction, however, between cases where the courts seriously consider applying direct benefits estoppel, and the case at bar. In the former, the nonsignatory had brought suit against a signatory premised in part upon the agreement. *See, e.g., DuPont,* 269 F.3d at 199; *Deloitte,* 9 F.3d at 1064; *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir.2000); *Tencara,* 170 F.3d at 351. Here, it is undisputed that the Government has not sued Bridas under the agreement. The Government has thus not "exploited" the JVA to the degree that the cases that consider applying this version of estoppel require.

#### 4. *Third-Party Beneficiary*

Nor is the third-party beneficiary doctrine availing. While very similar to estoppel, the third-party beneficiary doctrine is distinct:

Under third party beneficiary theory, a court must look to the intentions of the parties at the time the contract was executed. Under the equitable estoppel theory, a court looks to the parties' conduct after the contract was executed. Thus, the snapshot this Court examines under

equitable estoppel is much later in time than the snapshot for third party beneficiary analysis.

*DuPont,* 269 F.3d at 200 n. 7. It is not enough, therefore, that the Government benefitted from the existence of the JVA. "[T]he fact that a person is directly affected by the parties' conduct, or that he may have a substantial interest in a contract's enforcement, does not make him a third-party beneficiary." *Id. See DuPont,* 269 F.3d at 196-97 (noting the fact that a parent derived benefits from a contract executed by its subsidiary is insufficient to make it a third-party beneficiary).

24    Parties are presumed to be contracting for themselves only. *Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069, 1075-76 (5th Cir.2002). This presumption may be overcome only if the intent to make someone a third-party beneficiary is "clearly written or evidenced in the contract." *Id. Accord McCarthy v. Azure,* 22 F.3d 351, 362 (1st Cir.1994)("[t]he crux in third-party beneficiary analysis ... is the intent of the parties.").

25    For the same reasons given *supra,* the JVA simply does not evince the requisite clear intent to benefit the Government, other than to the degree ordinarily expected when an instrumentality of a sovereign enters into a contract to develop the country's natural resources. The JVA's integration clause, moreover, specifies that the terms of the agreement apply only to the parties, defined as the Turkmenian Party (i.e. Turkmenneft) and Bridas. *See, e.g. Lester v. Basner,* 676 F.Supp. 481, 484-85 (S.D.N.Y.1987)(refusing to find a third-party beneficiary relationship generating *\*363* an obligation to arbitrate where the contract itself "is silent as to whether [its] terms" apply to the purported third-party beneficiaries).

Furthermore, we are again reluctant to bind the Government to the terms of the JVA on a third-party beneficiary theory because the Government has never filed a claim against Bridas premised upon the agreement, or otherwise sought to enforce its terms. *See, e.g., DuPont,* 269 F.3d at 192; *Industrial Electronics Corp. of Wisconsin v. iPower Distribution Group, Inc.,* 215 F.3d 677 (7th Cir.2000); *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.,* 915 F.2d 1351, 1354 (9th Cir.1990). Bridas has not brought to our attention a case where a third-party beneficiary has been bound to arbitrate a dispute, arising under an agreement to which it is not a party, that the third-party itself did not initiate in court. We decline to do so for the first time today.

### III.

26    The next question presented in this appeal is whether the district court erred in upholding the Tribunal's award of damages in the TPA for breach of contract. This circuit recognizes the venerable rule announced by the Supreme Court in *Wilko v. Swan,* 346 U.S. 427, 436-37, 74 S.Ct. 182, 98 L.Ed. 168 (1953), in which it was held that only a "manifest disregard of the law" warrants vacating an arbitration award. *Prestige Ford v. Ford Dealer Computer Services, Inc.,* 324 F.3d 391, 395 (5th Cir.2003). In *Prestige Ford,* we expounded the deferential standard first articulated in *Wilko:*

> [m]anifest disregard clearly means more than error or misunderstanding with respect to the law. The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing principle but decides to ignore or pay no attention to it. To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties. Judicial inquiry under the "manifest disregard" standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable.

*Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933-34 (2d Cir.1986)).

27    28    To determine whether the Supreme Court's "manifest disregard of the law" standard has been satisfied, we apply a two-prong inquiry (the "manifest-disregard test"). *Williams v. Cigna Fin. Advisors, Inc.,* 197 F.3d 752, 762 (5th Cir.1999). We held in *Williams* that

> [f]irst, where on the basis of the information available to the court it is not manifest that the arbitrators acted contrary to the applicable law, the award should be upheld. Second, where on the basis of the information available to the court it is manifest that the arbitrators acted contrary to the applicable law, the award should be upheld unless it would result in significant injustice, taking into account all the circumstances of the case, including powers of arbitrators to judge norms appropriate to the relations between the parties.

*Id. See also Harris v. Parker College of Chiropractic,* 286 F.3d 790, 792 n. 1 (5th Cir.2002) (applying the manifest-disregard test articulated in *Williams* ). Furthermore, it is settled in this circuit that this **\*364** "extraordinarily narrow" [14] standard of review applies to claims brought pursuant to the FAA, such as the instant matter. *Id.* at 761; *Williams,* 197 F.3d at 759.

[14] *Gateway Technologies, Inc. v. MCI Telecommunications Corp.,* 64 F.3d 993, 996 (5th Cir.1995). *See also Harris,* 286 F.3d at 792.

**29** The district court's refusal to vacate or modify the arbitration award is reviewed under the same standard as any other district court decision, with findings of fact that are not clearly erroneous accepted and questions of law considered *de novo. Id.* We thus review *de novo* the district court's application of the manifest-disregard test.

We now confront the first prong of the manifest-disregard test and address whether the arbitration panel applied the appropriate discount rate to convert projected lost revenues to present value. As an initial matter, the parties do not dispute that English law governs in determining the proper amount of damages to be awarded for this breach of contract and, accordingly, that is the law that we apply. *See Guaranty Nat. Ins. Co. v. Azrock Industries Inc.,* 211 F.3d 239, 243 (5th Cir.2000) (citing *N.K. Parrish, Inc. v. Southwest Beef Indus. Corp.,* 638 F.2d 1366, 1370 n. 3 (5th Cir.1981)). Turkmenneft argues that the arbitration panel erred by failing to apply what it calls a market-based discount rate, adjusted only by excluding consideration of internal political risk, in determining the present-value equivalent of the estimated future income lost as a result of the breach. In short, Turkmenneft asserts that the arbitrator downplayed or ignored market forces when setting the discount rate. And, because the arbitrator's decision called for a discount rate that resulted in damages ostensibly greater than necessary for full compensation, Turkmenneft argues that the arbitrator's decision runs counter to English law, which limits recovery to actual damages. *See, e.g., Robinson v. Harmon,* 1 Exch. 850, 855 (1848); *Ruxley Electronics & Const. Ltd. v. Forsyth,* [1995] 3 All. E.R. 268 (H.L.1995); *Attorney General v. Blake,* [2001] 1 A.C. 268, 282 (H.L.2000). At bottom, then, Turkmenneft's appeal challenges the merits of the arbitrators' determination of the discount rate, and specifically requests that this court second-guess the arbitrators' determination in that regard.

**30** It has been determined in this circuit that the selection of a discount factor "is a question of fact to be determined by the trier of fact." *Huggs, Inc. v. LPC Energy, Inc.,* 889 F.2d 649, 657 (5th Cir.1989) (citing *Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988)). The force of this language is strengthened by the rigors of the manifest-disregard test, which, as discussed, *supra,* endows arbitrators with wide discretion. *See, e.g., Williams,* 197 F.3d at 762.

**31** Turkmenneft cites no English law that compels the use of a particular discount rate, or establishes a methodology for calculating the same. [15] And, there is simply no merit to Turkmenneft's assertion that the arbitrator's selected discount rate cannot, as a matter of law, possibly establish present-value damages equivalent to the stream of revenues projected to have been lost as a result of the breach. Present-value determinations are not an **\*365** exact science; competent experts and competent arbitrators can adopt highly divergent opinions without being deemed incorrect as a matter of law. Here, the Tribunal considered a variety of evidence and considered the factors that it deemed most appropriate for this particular income stream: the risk inherent in the venture, potential inflation, and the time-value of money. Thus, given that (i) Turkmenneft can cite no legal authority indicating that the arbitrator misapplied the law, (ii) an arbitrator's determination of a discount rate is a question of fact that will depend on the case's unique circumstances and on differing opinions regarding financial or economic theory, and (iii) the high degree of deference we afford arbitral decisions of this kind, it is clear that Turkmenneft cannot satisfy the first-prong of the manifest-disregard test. Because it is clear that the first prong of this test is not satisfied, we need not address the second. Accordingly, the district court's determination upholding the arbitrator's discount rate is affirmed.

[15] Indeed, Turkmenneft cites, only a statement from a treatise that loss-of-the-bargain damages are generally approximated by the market-value of the property, money, or services that the plaintiff was entitled to have received under a contract. *See* Harvey McGregor, *McGregor on Damages* § 26 (16th ed.1997).

**IV.**

The final issue of this appeal is whether the district court correctly refused to vacate the Tribunal's award on the ground that it exceeded its authority by awarding punitive damages. Punitive damages were expressly forbidden by the terms

of the JVA. [16] Acknowledging that (i) discount rates are generally employed to determine compensatory damages, not punitive damages, and (ii) the arbitrator's decision did not explicitly award punitive damages, an undeterred Turkmenneft argues that the Tribunal implicitly awarded punitive damages by setting the discount rate too low, and thus exceeded its authority.

16    Article 24.4(H) of the JVA explicitly limits the damages that may be awarded, stating that "consequential, punitive, or other similar damages shall not be allowed."

**32**    Section 10(a) of the FAA provides that a court may vacate an award if an arbitral tribunal exceeds its powers during the course of arbitration. 9 U.S.C. § 10(a). It is well-settled in this circuit that, as a general proposition, arbitral action contrary to express contractual provisions is not entitled to deference upon review. *See American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Intern.,* 343 F.3d 401, 408, 2003 WL 21940716, at *3 (5th Cir.2003); *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n,* 889 F.2d 599, 602 (5th Cir.1989). Thus, if punitive damages were indeed awarded in this case, it would be incumbent upon us to vacate such an award, in spite of the discretion typically granted to arbitral decisions.

**33**    No plausible argument, however, can be made that the Tribunal awarded punitive damages. Under English law, punitive damages are those that extend "beyond mere compensation of the claimant." 1 Chitty on Contracts § 27-017 (H.G.Beale, gen.ed., 28th ed.1999). *See also Attorney General v. Blake,* [2001] 1 A.C. 268, 282 (H.L.2000). Thus, any award that does not further the goal of compensation is impermissible under the terms of the agreement. Turkmenneft's bald claims to the contrary, there is simply no colorable argument that an award of punitive damages was embedded in the arbitrator's determination of the discount rate, given our conclusion, *supra,* that the arbitrator did not manifestly disregard the law in setting the discount rate. Thus, because there was no explicit award of punitive damages and the discount rate, a device used for setting compensatory damages, was not selected in manifest disregard of the law, we reject Turkmenneft's argument that the arbitrator awarded punitive *\*366* damages. Accordingly, the district court's determination on this issue is also affirmed.

### CONCLUSION

For the foregoing reasons, the district court's decision refusing the vacate the FPA because the Government was subject to the jurisdiction of the Tribunal is VACATED and REMANDED. The district court's refusal to vacate or modify the TPA or Final Award is AFFIRMED.

VACATED and REMANDED in Part, AFFIRMED in Part.

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 27

DOCSTOR: 2191401\1

807 N.E.2d 869, 775 N.Y.S.2d 757, 2004 N.Y. Slip Op. 01146

807 N.E.2d 869
Court of Appeals of New York.

Ray EVANS et al., Appellants,

v.

FAMOUS MUSIC CORPORATION, Respondent.

Feb. 24, 2004.

**Synopsis**

**Background:** Songwriters brought action against music publisher, alleging breach of their music royalty contracts. The Supreme Court, New York County, Richard Lowe, III, J., entered summary judgment in favor of the songwriters as to liability, and publisher appealed. The Supreme Court, Appellate Division, 302 A.D.2d 216, 754 N.Y.S.2d 259, reversed, and songwriters appealed.

**Holding:** The Court of Appeals, G.B. Smith, J., held that contractual provision entitling songwriters to half of publisher's net income from "any other source or right now known or which may hereafter come into existence" did not obligate publisher to share its tax savings resulting from foreign tax credits.

Appellate Division affirmed.

Read, J., filed dissenting opinion.

West Headnotes (3)

**1**    **Contracts** 🔑 **Intention of Parties**

Court's role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract.

32 Cases that cite this headnote

**2**    **Contracts** 🔑 **Language of Contract**

If intent of the parties is discernible from the plain meaning of the language of the contract, there is no need to look further; this may be so even if the contract is silent on the disputed issue.

26 Cases that cite this headnote

**3**    **Copyrights and Intellectual Property** 🔑 **Contracts**

Provision of music royalty contracts entitling songwriters to half of music publisher's net income from "any other source or right now known or which may hereafter come into existence" did not obligate publisher to share its tax savings resulting from foreign tax credits; credit was not income that publisher received in exchange for the right to use the songs, songwriters received royalties under the contracts for up to 59 years without demanding such credits, and industry custom was not to share credits with songwriters without an explicit agreement to do so.

6 Cases that cite this headnote

**Attorneys and Law Firms**

***758  *453  **869 McLaughlin & Stern, LLP, New York City (David Blasband of counsel), for appellants. Loeb & Loeb, LLP, New York City (Jonathan Zavin and Alyson M. Weiss of counsel), for respondent.

*454 Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City (Carey R. Ramos and Lauren A. McMillen of counsel), for National Music Publishers' Association Inc., amicus curiae.

**Opinion**

**OPINION OF THE COURT**

G.B. SMITH, J.

This action involves the interpretation of a provision in six music royalty contracts detailing the manner in which income from the exploitation of songs must be apportioned between the plaintiff songwriters and defendant Famous Music Corporation. Specifically, the question is whether the contract provision obligates Famous to share with plaintiffs certain tax savings resulting from foreign tax credits. We answer the question in the negative.

*455  **870 I.

807 N.E.2d 869, 775 N.Y.S.2d 757, 2004 N.Y. Slip Op. 01146

Ray Evans, Henry Mancini, Johnny Mercer and Richard Whiting are legendary writers of American popular music, particularly music for movies. Famous is a music publisher that Paramount Pictures (Famous's predecessor-in-interest) established in 1928 to market music from its films. Famous today is a subsidiary of Viacom.

On August 9, 1945, plaintiff Ray Evans entered into a six-month employment contract with Paramount as a staff writer, composer and arranger. Paramount also agreed to pay Evans additional income based on the exploitation of any songs or music he composed pursuant to the contract. On August 31, 1960, Henry Mancini entered into a similar contract with Paramount, the second contract in issue in this **\*\*\*759** case. Mancini's services under the contract dealt with the movie "Breakfast At Tiffany's" and its accompanying song, "Moon River," for which Johnny Mercer wrote the lyrics pursuant to the third contract in this action. Mancini entered into two additional contracts-the fourth and fifth at issue-one for the movie "Hatari," the other in 1981 with Paramount for the movie "Mommie Dearest."

Finally, the sixth contract before us, dated November 9, 1959, was entered into between Paramount and the widow and two daughters of Richard Whiting for works he had composed. The contract is a settlement agreement resolving past royalty disputes. The contract is dated November 1959, and covers numerous songs co-authored by Richard Whiting. [1]

[1]    Except for Ray Evans, plaintiffs are successors-in-interest to the songwriters. Famous is the assignee of the rights to exploit the songs under the contracts at issue.

All six contracts contain the following substantially identical provision, which requires that Famous pay the songwriters

> "[f]or both words and music an amount equal to fifty per centum (50%) of all net sums actually received by the Corporation with respect to such song or musical composition from any other source or right now known or which may hereafter come into existence (except small performing rights and except as provided in the next following paragraph hereof), less all expenses and charges in connection with administering said rights or collecting such sums ... and less all deductions for taxes."

**\*456**  Basing their lawsuit on this provision, plaintiffs allege that Famous breached its obligation to reimburse them for their proportional share of tax credits Famous received for the payment of foreign taxes. The complaint alleges that for

the years it realized profit for the overseas exploitation of its music, Famous paid taxes to the foreign governments involved and regularly received the benefit of foreign tax credits on its United States tax returns. Plaintiffs claim that under the above-quoted provision, they are entitled to half of the value of the foreign tax credits Famous received.

Famous moved for summary judgment arguing that (1) the plain meaning of the provision does not support plaintiffs' right to recover the damages they seek; (2) because of past custom and practice in the industry, plaintiffs are not entitled to recovery; and (3) had the parties intended for the plaintiffs to receive such a benefit-which involves a complex calculation dependent on numerous factors-they would have explicitly provided for it in their contracts. In support of the motion, Famous submitted the affidavit of its Executive Vice President of Finance and Administration, highlighting the uncertainty and complexity surrounding the foreign **\*\*871** tax credit, and explaining that it was inconsistent with the performance of the parties and industry practice involving similar contracts for publishing companies to credit or share the benefit of any foreign tax credit.

Plaintiffs cross-moved for partial summary judgment, offering the affidavit of a certified public accountant explaining how foreign tax credits operate. Plaintiffs also submitted the affidavit of the Executive Director of the Songwriters Guild of America (SGA), stating that, in 1997, he wrote to Famous and other companies inquiring about the use of foreign tax credits, but received no adequate answer. Famous then responded with the affidavit of a certified public accountant who specializes in the recording/entertainment industry. The accountant was not aware of any music publishing company that interpreted the standard term "all net sums received" or "all net sums actually received" to include **\*\*\*760** the value or benefit of a foreign tax credit. He opined that, in order for a company to make payments relating to tax credits, it would have to agree specifically to do so. He further stated that the calculation of foreign tax credits on a song-by-song basis "would be extremely difficult and impractical, if not impossible."

Supreme Court granted plaintiffs' motion for partial summary judgment, holding Famous liable under the contracts. The **\*457** court reasoned that since Famous suffers no loss when a tax payment is credited, "there is no justification for deducting the foreign tax payments from the gross receipts when calculating the 'net sums' upon which plaintiffs' royalty payments are based." The court found the contractual provisions at issue unambiguous and saw no need to rely

on extrinsic evidence. In addition, the court held that the complexities surrounding computation of the foreign tax credits did not relieve Famous of its contractual obligation to share the benefits with plaintiffs. The Appellate Division reversed, concluding that "the benefit of any foreign tax credit was not contemplated by the parties" since the contracts identified the payments plaintiffs were entitled to, but omitted any mention of foreign tax credits. (302 A.D.2d 216, 217, 754 N.Y.S.2d 259 [2003].) We now affirm.

## II.

Unlike many of its trading partners, the United States taxes its citizens and residents on their worldwide income. The foreign tax credit was enacted in 1918 to prevent American companies from being taxed both by the United States and by the foreign country in which the income is generated. Without the credit, United States companies doing business abroad would be at a distinct disadvantage with foreign companies that are not taxed on their foreign income. Generally, where the foreign tax liability is lower than the United States tax liability, the taxpayer will still have a United States tax liability. Where the foreign tax liability is higher than the United States tax liability, the taxpayer will have excess credit. Excess credits may also result from limits on the use of credits.

Application of the foreign tax credit is complex, even by tax standards. As Famous and amicus National Music Publishers' Association emphasize, there are numerous technicalities surrounding the use of the credit. For example, the credit cannot be used to decrease United States taxes on United States source income (Internal Revenue Code [IRC] [26 USC] § 904 [a] ). Credits and foreign source income must be categorized into different so-called "baskets" which may not be combined (IRC § 904[d][1] ). The credit is elective, and excess credit may be carried **872 back two years and forward five years. These technicalities make the foreign tax credit "one of the most intricate and convoluted features of the entire U.S. tax system" (Kaplan, Federal Taxation of International Transactions, at 81 [West Publishing 1988]; *see also* Graetz, *The *458 David R. Tillinghast Lecture, Taxing International Income: Inadequate Principles, Outdated Concepts, and Unsatisfactory Policies,* 54 Tax L. Rev. 261, 264 [2001] ). Here, the calculation is even further complicated by inserting Viacom (the entity that would take the credit) into the picture, by classifying royalties as either passive income or general limitation income, by calculating the credit limit allowed under each basket, by carrying over and back excess

credits, by potential redeterminations years later, and by a host of other factors.

While a highly complex tax matter, the law issue before us is a simple and familiar one: how should the parties' contract be interpreted? To phrase it differently, does the obligation to pay half of "all net sums ***761 actually received ... less all deductions for taxes" require Famous to pay half of any tax savings to Famous resulting from the use of the foreign tax credit?

**1   2**   It is well settled that our role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract. If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further. This may be so even if the contract is silent on the disputed issue. Illustrative is *Greenfield v. Philles Records,* 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166 [2002], a case involving a contract between recording artists and their producer. There, the issue was whether the producer could use the master recordings for synchronization and other new technologies even though the contract did not explicitly authorize it. Reading the contract as a whole, and consistent with the rules of contract interpretation, we held that the broad grant of ownership rights, without reservation, included the right to synchronization and other newly developed formats. Had the contract been susceptible to more than one reasonable interpretation, it would have been ambiguous.

**3**   The contractual provision in the case before us establishes a mechanism for calculating the sharing of income received from the exploitation of songs. The calculation begins with "all net sums actually received" by Famous from "any other source or right now known or which may hereafter come into existence." From "all net sums actually received," Famous must deduct certain expenses and taxes, and half of the remainder belongs to the artists.

Plaintiffs argue that the language "from any other source or right now known or which may hereafter come into existence" encompasses a foreign tax credit. This clause addresses the *459 means of exploitation. Yet the credit is not income that Famous receives in exchange for the right to use the songs. The credit is given by the United States government because of a tax policy, not in return for the use of songs. While the credit diminishes tax liability, it is not the same as cash or its equivalent.

Plaintiffs also argue that while the contracts specify certain usages that require no payment to the songwriters as well as expenses that must be deducted, they do not exclude benefits

807 N.E.2d 869, 775 N.Y.S.2d 757, 2004 N.Y. Slip Op. 01146

from the foreign tax credit. The argument is based on the maxim that the expression of one thing is the exclusion of another. The maxim, however, does not fit neatly within plaintiffs' interpretation since it would involve placing into the contract a term that was **\*873** excluded. The argument is a double-edged sword. The contracts provide that the sums specifically provided "represent the total amount which" the songwriters are entitled to. Yet the foreign tax credit is not included. While it is clear that Famous obligated itself to deduct taxes, it is not equally clear that it obligated itself to make payments to the songwriters in the event that the foreign tax credit proved beneficial.

Faced with this ambiguity, we turn to extrinsic evidence for guidance as to which interpretation should prevail. The evidence strongly favors Famous. To begin with, the songwriters have received royalties under these contracts for periods of time ranging from 23 to 59 years, and have never demanded a showing of any credits. When a demand was made, it came in 1997, through a third party, the SGA. [2] The **\*\*\*762** contracts are fully capable of being performed-and have been for decades-without the interpretation now sought by plaintiffs. It is no answer that plaintiffs claim to have been unaware that tax credits were being taken by Famous or that Famous was evasive as to whether there were any. Foreign tax credits have existed since 1918.

[2]   The record contains several letters between the SGA and Famous. In its initial response, Famous stated that "[a]ny foreign taxes incurred by these subpublishers or withheld from payments due these subpublishers by foreign societies will not even support a claim for foreign tax credit by our company, because these foreign taxes have not been directly imposed or withheld in our name." In addition Famous argued that even if it owned the subsidiary, the taxes would not be paid on the songwriter's name so that the songwriter would not be entitled to the credit. The last letter by Famous states that only with respect to Japanese taxes can Famous obtain the foreign tax credit, and even then Famous could not pass along any credit to the songwriters.

Industry custom and practice also favors Famous. Plaintiffs did not refute the accountants' assertions that the language used in the contracts was insufficient to impose on Famous the **\*460** obligation of sharing any benefits resulting from the use of the foreign tax credit with the songwriters. Moreover, when music publishing companies have shared credits with songwriters, they have done so pursuant to an explicit clause.

The industry practice and custom reflects to some extent the generally greater bargaining power of music publishing companies. It also reflects the unlikelihood that a music publisher would assume an onerous obligation without explicitly agreeing to do so, particularly when the obligation is fraught with uncertainty, including how the determination of the benefit should be conducted, how much of the benefit (if any) is attributable to the songwriter, and when and how the benefit would be shared.

In light of the extrinsic evidence, the reasonable interpretation of the contracts before us is that they do not require the sharing of any benefit resulting from defendant's use of the foreign tax credit.

The reasonable expectation of the parties, the wording of the contracts and the industry practice all demonstrate that the foreign tax credits should not result in additional compensation to plaintiffs.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

READ, J. (dissenting).

These form contracts obligate respondent Famous Music Corporation, a major music publisher, to pay appellants, a well-known songwriter and the heirs of other well-known songwriters (collectively Songwriters), specified amounts for identified formats in which their work is published in **\*\*874** the United States and Canada (e.g., regular piano copies) with identified exclusions (e.g., certain television and film synchronization rights), plus 50% of "all net sums actually received by [Famous] ... from any other source or right now known or which may hereafter come into existence ... less all expenses and charges ... and less all deductions for taxes." Thus, Famous agreed to pay the Songwriters listed royalties plus a catchall royalty consisting of half of any net profit actually realized by Famous from exploitation of Songwriters' musical compositions in ways or places neither specifically delineated in nor excluded by the contract. This contractual scheme is absolutely clear and unambiguous.

To exploit Songwriters' compositions abroad, Famous entered into subpublishing contracts with foreign music publishers. The **\*461** foreign subpublishers administer Famous's catalog of songs and collect the royalties; deduct a fee (usually a percentage of the royalties collected) and the **\*\*\*763** taxes imposed by the foreign country; and account to Famous for the balance. Famous pays half of this balance

to Songwriters under the catchall royalty provision. Thus, Famous and Songwriters effectively each pay half of the foreign taxes. In certain instances, however, Famous takes a foreign tax credit on its United States income taxes for the full amount of foreign taxes paid on both its own and Songwriters' behalf. [1]   Songwriters seek their one-half share of any deductions for foreign taxes actually reimbursed to Famous in this way. This case, then, turns on the meaning of the phrase "less all deductions for taxes."

[1]   This occurs when the subpublisher pays the foreign taxes in Famous's name directly, as is most notably the case in Japan.

As we stated in *Greenfield v. Philles Records,* 98 N.Y.2d 562, 571, 750 N.Y.S.2d 565, 780 N.E.2d 166 [2002], "[i]f the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation" (quoting *Boosey & Hawkes Music Publs., Ltd. v. Walt Disney Co.,* 145 F.3d 481, 487 [2d Cir.1998] ). The word "deduction" means "something that is or may be subtracted" (Merriam-Webster's Collegiate Dictionary 301 [10th ed.] ). "[L]ess all deductions for taxes" is therefore more naturally read to encompass subtractions for taxes for which Famous is-and remains-out of pocket. If these subtractions are subsequently reimbursed, they are not, in fact, subtractions at all. By disregarding reimbursed tax payments, Famous is calculating the catchall royalty in contravention of a clear and unambiguous contractual scheme, which calls for the parties to split net profits evenly. That the parties in 1945 (the date of the Evans contract) did not identify precise elements (i.e., foreign tax credits) that might bear on how to calculate "all deductions for taxes" in future decades does not render their intent ambiguous.

Finding the contract ambiguous, though, the majority gleans intent from the parties' course of dealing. Principally, the majority considers it critical that Songwriters did not demand "a showing of any credits" until 1997, and then, only by letter from the Songwriters Guild of America (majority op. at 459, 775 N.Y.S.2d at 761, 807 N.E.2d at 873). For the majority, it is not enough that Famous was being "evasive."

 **\*462  \*\*875**  The availability of foreign tax credits under the Internal Revenue Code long predates these contracts; however, Famous does not contend that it was taking advantage of foreign tax credits in Japan or elsewhere

when these contracts were signed. The record does not establish when Famous first began employing these credits to reimburse itself for foreign taxes effectively paid by Songwriters. The record does, however, show that Songwriters were unaware that Famous was doing this until shortly before the litigation began. Moreover, Famous was not just "evasive"; Famous repeatedly and emphatically denied using foreign tax credits in response to point-blank inquiries made by the Guild on Songwriters' behalf. [2]   As we stated in **\*\*\*764** *Continental Cas. Co. v. Rapid-American Corp.,* 80 N.Y.2d 640, 651, 593 N.Y.S.2d 966, 609 N.E.2d 506 [1993], "[i]f ambiguity exists, '[t]o show a practical construction ... there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision [i.e., Famous], *coupled with knowledge thereof and acquiescence therein, express or implied, by the other* [i.e., Songwriters]' " (citations omitted and emphasis added).

[2]   In answer to letters from the Guild, Famous represented that it did not employ foreign tax credits and was, in fact, legally unable to do so. Only after an audit by the Guild did Famous finally acknowledge its use of foreign tax credits with regard to taxes paid in Japan. Famous's royalty statements to Songwriters did not indicate that Famous was utilizing foreign tax credits and, indeed, did not even show that Songwriters were paying foreign taxes.

Further, "[i]n New York, all contracts imply a covenant of good faith and fair dealing in the course of performance" (*see 511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 [2002] ). The covenant of good faith and fair dealing

"embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' While the duties of good faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship' they do encompass 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included' " (*id.* [citations omitted] ).

This is particularly true in relationships where the parties "do not deal as equals either in terms of access to information or business acumen and thus, ... often lack equal bargaining power" (*id.* at 154, 746 N.Y.S.2d 131, 773 N.E.2d 496).

 **\*463**  Although Songwriters were well-established artists, they were not dealing as equals in terms of access to

Evans v. Famous Music Corp., 1 N.Y.3d 452 (2004)

807 N.E.2d 869, 775 N.Y.S.2d 757, 2004 N.Y. Slip Op. 01146

information with regard to Famous's use of these allegedly extremely complicated foreign tax credits. Famous was therefore under a heightened obligation to honor any promises that Songwriters were justified in relying upon-including the implied promise that "all deductions for taxes" would, in fact, encompass actual, unreimbursed outlays for taxes. The majority, in effect, converts a good faith requirement to account for deductions into a negotiable contract "benefit" that is forfeited if not spelled out in prescient detail and diligently policed.

The majority also contends that the contracts should be construed in accordance with music industry custom and practice by which music publishers apparently now may pay artists a share of foreign tax credits, but only pursuant to an explicit clause. [3] Of course, custom and usage cannot **\*\*876** be used to contradict, alter or vary the terms of an unambiguous contract. Furthermore, Famous cannot establish, as it must, that "the party sought to be bound [Songwriters] [were] aware of the custom, or that the custom's existence was 'so notorious' that [they] should have been aware of it" (*British Intl. Ins. Co. Ltd. v. Seguros La Republica, S.A.,* 342 F.3d 78, 84 [2d Cir.2003] ). Again, there is no suggestion that what might constitute music industry custom and practice today was the same when these

contracts were signed as long as 60 years ago. Further, I agree with Supreme Court that "the fact that defendants have been successful in breaching a material term of their royalty contracts for years hardly justifies a continuation of such behavior based on custom and usage."

3     That the music publishing companies are concededly capable of allocating reimbursed foreign tax payments belies Famous's argument that these calculations are too difficult to make.

Accordingly, I would reverse the order of the Appellate Division.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT and GRAFFEO concur with Judge G.B. SMITH.

**\*\*\*765** Judge READ dissents and votes to reverse in a separate opinion.

Judge R. SMITH taking no part.

Order affirmed, with costs.

Parallel Citations

1 N.Y.3d 452, 807 N.E.2d 869, 2004 N.Y. Slip Op. 01146

**End of Document**     © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 28

DOCSTOR: 2191401\1

933 F.2d 1207
United States Court of Appeals,
Third Circuit.

Constance B. FOSTER, Insurance Commissioner
of the Commonwealth of Pennsylvania,
as Rehabilitator of the Mutual Fire,
Marine & Inland Insurance Company,
v.
CHESAPEAKE INSURANCE
COMPANY, LTD., Appellant.

No. 90-1752.    Argued April
15, 1991.    Decided May 20, 1991.

Pennsylvania Insurance Commissioner, as rehabilitator for insolvent insurer, commenced action against reinsurer in Pennsylvania state court, seeking monies allegedly owed under reinsurance agreement. Reinsurer removed suit to federal district court. The United States District Court for the Eastern District of Pennsylvania, Louis H. Pollak, J., granted Commissioner's motion to remand case to state court, and reinsurer appealed. The Court of Appeals, Greenberg, Circuit Judge, held that: (1) Court had jurisdiction over appeal, despite statute providing that order remanding case to state court from which it was removed is not reviewable on appeal or otherwise, where remand order was not based on statute; (2) motion to remand made on 54th day after notice of removal was filed was not barred by statute providing that motion to remand on basis of any defect in removal procedure must be made within 30 days after filing of notice of removal, where motion to remand was based on forum selection clause in reinsurance agreement; (3) enforcement of forum selection clause was proper ground for remand; (4) forum selection clause waived reinsurer's right to remove; and (5) forum selection clause was enforceable.

Affirmed.

West Headnotes (21)

**1**    **Removal of Cases** 🗝 Review

Order of remand, which was based on forum selection clause in reinsurance contract, was not rendered unappealable by statute providing that order remanding case to state court from which it was removed is not reviewable on appeal or otherwise, where remand on basis of forum

selection clause was not mentioned by that statute. 28 U.S.C.A. § 1447(c, d).

16 Cases that cite this headnote

**2**    **Removal of Cases** 🗝 Review

Statute providing that order remanding case to state court from which it was removed is not reviewable on appeal or otherwise does not apply when district court has reached beyond jurisdictional issues or issues of defective removal, and has remanded for other reasons. 28 U.S.C.A. § 1447(c, d).

4 Cases that cite this headnote

**3**    **Removal of Cases** 🗝 Review

Order remanding case to state court pursuant to forum selection clause was "final," for purposes of appeal under collateral order doctrine. 28 U.S.C.A. § 1291.

21 Cases that cite this headnote

**4**    **Mandamus** 🗝 Modification or Vacation of Judgment or Order

Petition for mandamus is not proper with respect to federal court order remanding case to state court pursuant to forum selection clause, since appeal is proper.

9 Cases that cite this headnote

**5**    **Mandamus** 🗝 Form, Requisites, and Sufficiency in General

Court of Appeals may treat notice of appeal as application for writ of mandamus.

2 Cases that cite this headnote

**6**    **Contracts** 🗝 Legal Remedies and Proceedings

Forum selection clause does not oust court of subject matter jurisdiction.

10 Cases that cite this headnote

**7**  **Removal of Cases** 🔑 **Time for Making Motion to Remand**

Statutory requirement that motion to remand case on basis of any defect in removal procedure must be made within 30 days after filing of notice of removal applies only to motions for remand on basis of any defect in removal procedure, and therefore does not apply to motions for remand grounded upon forum selection clause. 28 U.S.C.A. § 1447(c).

14 Cases that cite this headnote

**8**  **Statutes** 🔑 **Legislative History in General**

Court may not draw upon legislative history without ambiguity appearing in statute.

1 Cases that cite this headnote

**9**  **Removal of Cases** 🔑 **Time for Making Motion to Remand**

District court, in proper exercise of its discretion, may deny as untimely a nonprocedural-defect, nonjurisdictional motion to remand if made at unreasonably late stage of federal litigation.

5 Cases that cite this headnote

**10**  **Removal of Cases** 🔑 **Time for Making Motion to Remand**

Motion to remand to state court on grounds of forum selection clause, which was made on 54th day after removal, was not unreasonably late.

5 Cases that cite this headnote

**11**  **Removal of Cases** 🔑 **Grounds for Remand**

Forum selection clause in reinsurance contract was proper, nonstatutory ground for remand to state court.

2 Cases that cite this headnote

**12**  **Removal of Cases** 🔑 **Want of Jurisdiction or of Cause for Removal**

**Removal of Cases** 🔑 **Defects in Proceedings for Removal**

Either defective removal procedure or lack of subject matter jurisdiction is proper ground for remand. 28 U.S.C.A. § 1447(c).

11 Cases that cite this headnote

**13**  **Removal of Cases** 🔑 **Dismissal of Case**

Once district court determined that forum selection clause barred removal of case, district court would have committed clear error by continuing to hear case, and could have properly eliminated case from its docket by dismissal.

**14**  **Removal of Cases** 🔑 **Power and Duty to Remand**

**Removal of Cases** 🔑 **Dismissal of Case**

Upon determining that forum selection clause barred removal of case, district court had discretion to remand case rather than dismiss case.

**15**  **Removal of Cases** 🔑 **Waiver of Right**

Right to remove may be waived.

2 Cases that cite this headnote

**16**  **Removal of Cases** 🔑 **Waiver of Right**

Reinsurer's consent, under forum selection clause in reinsurance agreement, to "submit" to "any court" of competent jurisdiction "at the request of" insurer, and to comply with all requirements necessary to give "such court" jurisdiction, required reinsurer to go to, and stay in, forum chosen by insurer, and therefore reinsurer was precluded from removing case commenced in state court to federal court, especially where clause went on to provide that matters arising out of agreement were to be determined in accordance with law "and practice of such court," and that reinsurer agreed to "abide by the final decision of such court."

26 Cases that cite this headnote

**17**  **Removal of Cases** 🔑 Waiver of Right

Contractual waivers of right to remove need not be "clear and unequivocal."

5 Cases that cite this headnote

**18**  **Removal of Cases** 🔑 Waiver of Right

Court should determine whether there has been contractual waiver of right to remove by using same benchmarks of construction and, if applicable, interpretation as it employs in resolving all preliminary contractual questions.

4 Cases that cite this headnote

**19**  **Contracts** 🔑 Agreement as to Place of Bringing Suit;  Forum Selection Clauses

Forum selection clause in reinsurance contract was enforceable, where reinsurer made no showing, let alone "strong showing," that forum selected was so greatly difficult and inconvenient that reinsurer would for all practical purposes be deprived of its day in court, or that clause was procured through fraud or overreaching.

55 Cases that cite this headnote

**20**  **Contracts** 🔑 Agreement as to Place of Bringing Suit;  Forum Selection Clauses

Lack of actual negotiations over forum selection clause in reinsurance contract did not affect its validity.

31 Cases that cite this headnote

**21**  **Contracts** 🔑 Agreement as to Place of Bringing Suit;  Forum Selection Clauses

Forum selection clause is a particularly fair provision in reinsurance treaty, since it allows ceding insurer, rather than the many and far-flung retrocessionaires, to select forum when retrocessionaires have refused to pay.

10 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1209**  David M. Zensky (Argued), Steven M. Pesner, Anderson, Kill, Olick & Oshinsky, New York City, Daniel Segal, Charles F. Forer, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, Pa., for appellant.

Gaetan J. Alfano (Argued), Gregory P. Miller, Ann Krasnowiecki, Miller, Alfano & Raspanti, Philadelphia, Pa., for appellee.

Before   STAPLETON,   GREENBERG,   and HIGGINBOTHAM, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

GREENBERG, Circuit Judge.

The appeal in this diversity of citizenship, breach of contract case, primarily involves the interplay between a contract's forum selection clause and 28 U.S.C. § 1447(c) governing remand upon removal. [1]  The district court determined that: (1) a motion to remand based on a such a clause is not governed by the 30-day time limit imposed on motions for remand by section 1447(c); (2) such a clause is a permissible ground for remand; (3) the clause in this case waived the right of removal; and (4) the clause is enforceable. The district court therefore remanded the case to the state court in which it had been commenced. We determine that we have jurisdiction over this appeal, and that the district court's several rulings were correct.

[1]   Provision for remand is also made in 28 U.S.C. § 1441(c) in circumstances not applicable here. A forum selection clause is also called a "service of suit" clause but as a matter of convenience we will use the first designation.

### I.

### FACTS AND PROCEDURAL HISTORY

In July 1982, Mutual Fire, Marine and Inland Insurance Company, a company organized and licensed under the laws of Pennsylvania, entered into a reinsurance agreement with defendant-appellant Chesapeake Insurance Company, Ltd., a Bermuda-based corporation. The agreement-or "treaty"-provided that Mutual Fire would "cede" to Chesapeake, and

others, a portion of the risk that it, Mutual Fire, bore on its policies; Chesapeake would bear the cost of that risk once it became an actual liability; and for this Mutual Fire would pay premiums to Chesapeake. Mutual Fire entered into so many similar treaties that by the mid-1980's between 60% and 70% of its business entailed reinsurance, involving over 8,000 treaties with various insurers worldwide. The agreement between Mutual Fire and Chesapeake included the forum selection clause in issue here which required Chesapeake at Mutual Fire's request in the event of certain disputes to "submit to the jurisdiction of any court of competent jurisdiction within the United States." [2]

[2]    Actually there were several treaties between Mutual Fire and Chesapeake but as the parties do not distinguish among them for purposes of the forum selection clause we refer to them in the singular.

These reinsurance treaties were apparently disadvantageous to Mutual Fire as it became insolvent, partly, it is alleged, due to the refusal of reinsurers like Chesapeake to pay their share of losses to Mutual *1210 Fire. [3] Accordingly, the Pennsylvania Insurance Commissioner (now plaintiff-appellee Constance B. Foster) took over Mutual Fire, and, on December 8, 1986, the Commonwealth Court of Pennsylvania appointed the commissioner Rehabilitator. Because one of Foster's duties as Rehabilitator is to marshal Mutual Fire's assets, she commenced this suit against Chesapeake in the Commonwealth Court seeking the monies allegedly owed by it to Mutual Fire under the agreement. Chesapeake is said to be in breach of its agreement with Mutual Fire in an amount in excess of $4,000,000.

[3]    At year-end 1988, Mutual Fire's deficit was over $400,000,000, constituting the country's third or fourth largest insurer insolvency.

On October 18, 1989, there being diversity of citizenship and an adequate amount in controversy to support district court jurisdiction, Chesapeake-in a manner which was timely and without procedural defect-removed this suit to the United States District Court for the Eastern District of Pennsylvania, but on December 11, 1989-the 54th day after the notice of removal was filed-, Foster moved to remand the case to the Commonwealth Court.

The district court granted the motion in an oral opinion, first holding that section 1447(c) did not bar the motion as untimely. That section provides, in part:

A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.

Then holding that the grounds for remand specified by section 1447(c) were not exclusive, and that waiver of the right to remove constituted a proper ground for remand, the court found that Chesapeake had waived its right to remove pursuant to the forum selection clause in its agreement with Mutual Fire. Finally, holding that the clause was enforceable, the district court ordered the case remanded by order of September 27, 1990. This appeal followed and the district court has stayed its order of remand pending appeal.

## II.

### DISCUSSION

#### A. Appellate Jurisdiction

[1] [2]    Although the parties in their original briefs contended that this court has jurisdiction over the appeal from the district court's order of remand under 28 U.S.C. § 1291, we sua sponte ordered supplemental briefing on this issue in light of 28 U.S.C. § 1447(d), which provides, in part: "An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise...." [4] Having reviewed the supplemental submissions and the authority cited therein, we determine that we have jurisdiction over this appeal.

[4]    An exception is made for civil rights cases remanded to the state court. 28 U.S.C. § 1447(d). Additionally, the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") empowers the Resolution Trust Corporation to remove actions to federal court and also gives it the right to appeal any remand orders issued by a district court. See 12 U.S.C. § 1441a(l )(3).

The Supreme Court in *Thermtron Products, Inc. v. Hermansdorfer,* 423 U.S. 336, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976), held that an order remanding a case for reasons *not* mentioned in the statute governing removal upon remand, 28 U.S.C. § 1447(c), *is* reviewable. In *Thermtron,* the district court remanded a properly removed diversity case because of

the crowded state of its docket, an action the court of appeals held on an application for a writ of mandamus or prohibition unreviewable because of section 1447(d). The Supreme Court, however, held that subsections (c) and (d) of section 1447 are *in pari materia* and must be read accordingly. "This means that only remand orders issued under § 1447(c) and invoking the grounds specified therein ... are immune from review under § 1447(d)." 423 U.S. at 346, 96 S.Ct. at 590. Thus, whereas section 1447(c) then specified as grounds for remand that "the case was *\*1211* removed improvidently and without jurisdiction," and whereas the district court had remanded for a reason *not* mentioned by section 1447(c), the Court held that review of the order of remand was not barred by section 1447(d). The Court then reversed the judgment of the court of appeals, and remanded the case to that court for it to issue a writ of mandamus "to prevent nullification of the removal statutes by remand orders resting on grounds having no warrant in the law." 423 U.S. at 353, 96 S.Ct. at 594.

Accordingly, while section 1447(d) was intended "to prevent delay in the trial of remanded cases by protracted litigation of jurisdictional issues," 423 U.S. at 351, 96 S.Ct. at 593-and the district court is therefore given the last word on whether it has jurisdiction to hear the case-, that policy does not apply when the district court has reached beyond jurisdictional issues or issues of defective removal, and has remanded for other reasons. Accordingly, the order of remand here, based on the forum selection clause in the contract between Mutual Fire and Chesapeake, is not rendered unappealable by section 1447(d). In the words of another court of appeals that has considered this issue:

> [W]here a district court bypasses the jurisdictional arguments and reaches the merits of a contract dispute, the policy [behind section 1447(d) ] is inapplicable. Any delay caused by an appeal of the contract issue is a delay that must be countenanced. To apply section 1447(d) to the district court's decision on the enforceability of the forum selection clause would extend the scope of section 1447(d) far beyond its intended parameters and would leave matters of substantive contract law unreviewable. We refuse to impute such an intent to Congress.

*Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.,* 741 F.2d 273, 277 (9th Cir.1984).

In a similar vein, the Court of Appeals for the Sixth Circuit has stated, in a case also involving remand due to a forum selection clause: "[A] remand order is reviewable on appeal when it is based on a substantive decision on the merits of

a collateral issue as opposed to just matters of jurisdiction." *Regis Associates v. Rank Hotels (Management) Ltd.,* 894 F.2d 193, 194 (6th Cir.1990). *See also Clorox Co. v. United States District Court for the Northern District of California,* 779 F.2d 517, 520 (9th Cir.1985) (same; reviewing on appeal remand due to claimed waiver of removal); *In re Delta America Re Ins. Co.,* 900 F.2d 890, 892 (6th Cir.1990) (following *Regis;* reviewing on appeal remand due to forum selection clause after removal by retrocessionaire); *Karl Koch Erecting Co. v. New York Convention Center Dev. Corp.,* 838 F.2d 656, 658 (2d Cir.1988) (same; reviewing on appeal remand due to forum selection clause). [5]

[5]   Cf. *Air-Shields, Inc. v. Fullam,* 891 F.2d 63, 66 (3d Cir.1989) (more than 30 days after notice of removal filed, district court *sua sponte* remanded case due to procedural defects; as district court's order was therefore not based on section 1447(c), in the sense that it did not comply with the 30-day limitation period therein, this court's review on mandamus was not limited by section 1447(d)).

[3] [4] [5]   Furthermore, an order remanding a case pursuant to a forum selection clause is "final" for the purposes of 28 U.S.C. § 1291 under the collateral order doctrine as it conclusively determines a disputed issue wholly separate from the merits of the litigation, *i.e.,* the legal construction of the clause; it ends the litigation in the federal forum, amounting to a dismissal since its purpose and effect is to surrender jurisdiction to the state court; and if not appealable now the order will be unreviewable. *See Pelleport,* 741 F.2d at 278.

Accordingly, 28 U.S.C. § 1447(d) does not bar review of the order of the district court remanding this case to the Commonwealth Court, and that order is considered "final" so as to vest this court with jurisdiction to hear this appeal under 28 U.S.C. § 1291. [6]

[6]   We note that because the order challenged is collaterally "final" as making a merits determination, an *appeal* is proper here, *not* a petition for mandamus. *See Corcoran v. Ardra Ins. Co.,* 842 F.2d 31, 35 (2d Cir.1988); *Karl Koch Erecting Co. v. New York Convention Center Dev. Corp.,* 838 F.2d at 659 n. 1; *Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.,* 741 F.2d at 277-78. Of course, if we considered that mandamus was required, we could treat the notice of appeal as an application for the writ. We also point out that in *McLaughlin v. ARCO Polymers, Inc.,* 721 F.2d 426, 428 n. 1 (3d Cir.1983), we held, without reliance on the collateral order doctrine, that an order transferring an action commenced in a

district court to a state court on the ground that the district court lacked subject matter jurisdiction was appealable as a final order. While, we recognize that an order remanding for lack of jurisdiction is subject to 28 U.S.C. § 1447(d), it is difficult in principle to distinguish between an order of remand and an order of transfer for purposes of finality as in both situations the order effectively terminates the case in the federal courts. *See Carteret Savings Bank, FA v. Shushan,* 919 F.2d 225, 229 n. 7 (3d Cir.1990).

*1212 **B. The 30-day Time Limit of Section 1447(c)**

6 Foster's motion to remand-made on the 54th day after the notice of removal was filed-was predicated on two grounds: first, that the district court should abstain from hearing the case, and, second, Chesapeake had waived its right to remove by executing the agreement with the forum selection clause. The district court decided the matter solely on the basis of the clause. The parties agree that a stipulation into which they entered before the district court did not address the timeliness of Foster's motion as it merely gave Foster more time to move for remand due to defective removal. Chesapeake claims that the motion for remand was untimely under section 1447(c). That section, again, provides that a motion to remand the case "on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal," and that a motion to remand based on lack of subject matter jurisdiction may be made at any time before final judgment. 28 U.S.C. § 1447(c). Foster, however, claims that the 30-day limit of section 1447(c) is not applicable to her motion for the same reason that the stipulation is not applicable to her motion-*i.e.,* because the motion was not based on "any defect in removal procedure." [7]

[7] A forum selection clause does not oust a court of subject matter jurisdiction, *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972), and abstention is, of course, predicated on the notion that while the federal court *has* subject jurisdiction, it should decline to *exercise* it. Accordingly, neither prong of Foster's motion raised the issue of lack of subject matter jurisdiction.

7 8 9 10 Chesapeake's claim that the 30 day limit nonetheless applies to a motion not grounded on a defect in removal procedure is based on the legislative history of section 1447(c). Prior to the amendments made to section 1447 on November 19, 1988, by the Judicial Improvements and Access to Justice Act, Pub.L. No. 100-702, § 1016, 102 Stat. 4670 (1988), section 1447(c) read:

If at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case, and may order the payment of just costs.

28 U.S.C. § 1447(c) (1982).

The Report of the House Judiciary Committee accompanying the 1988 Act had this to say about old section 1447(c) and the new section as amended:

Section 1447(c) now appears to require remand to state court if at any time before final judgment it appears that the removal was improvident. So long as the defect in removal procedure does not involve a lack of federal subject matter jurisdiction, there is no reason why either State or Federal courts, or the parties, should be subject to the burdens of shuttling a case between the two courts that each have subject matter jurisdiction. There is also some risk that a party who is aware of a defect in removal procedure may hold the defect in reserve as a means of forum shopping if the litigation should take an unfavorable turn. *The amendment provides a period of 30 days within which remand must be sought on any ground other than lack of subject matter jurisdiction.* The amendment is written in terms of a defect in 'removal procedure' in order to avoid any implication that remand is unavailable after disposition of all federal questions leaves only State law questions *1213 that might be decided as a matter of ancillary or pendent jurisdiction or that instead might be remanded.

H.R.Rep. No. 889, 100th Cong., 2d Sess. 72, *reprinted in* 1988 U.S.Code Cong. & Admin.News 5982, 6033. (Emphasis added).

Pointing to the above underscored language in the Report that states that "[t]he amendment provides a period of 30 days within which remand must be sought on *any* ground other than lack of subject matter jurisdiction," *id.* (emphasis added), Chesapeake asserts that all non-jurisdictional motions for remand-including those grounded upon a forum selection clause-must be made within the 30-day period.

We do not agree. As the district court noted, Chesapeake's theory is based on the erroneous principle that "if the statute is clear, one should appeal to the legislative history...." Indeed, section 1447(c) could not be clearer, and to adopt Chesapeake's view by drawing upon legislative history without an ambiguity appearing in the statute would be contrary to the rules of statutory construction. *See Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698,

701, 66 L.Ed.2d 633 (1981) (when language of statute is clear "judicial inquiry is complete"); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (plain meaning of legislation is conclusive except in rare case where literal application of statute will produce result demonstrably at odds with intention of drafters); *Paskel v. Heckler,* 768 F.2d 540, 543 (3d Cir.1985) (while relevant legislative history must be considered, "clear statutory language placed an extraordinarily heavy burden on the party who seeks to vary it by reference to legislative history").

Moreover, the House Report itself recognizes the existence of at least one ground for remand *not* mentioned in section 1447(c) and *not* governed by the 30-day requirement-*i.e.,* when "disposition of all federal questions leaves only State law questions that might be decided as a matter of ancillary or pendent jurisdiction or that instead might be remanded." H.R.Rep. No. 889, 100th Cong., 2d Sess. 72, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 6033. This ground for remand was recognized by the Supreme Court in *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), and has, in turn, been used by at least one court of appeals for the proposition that there are other non-section 1447(c) reasons for remand, *see Corcoran v. Ardra Ins. Co.,* 842 F.2d 31, 33-34 (2d Cir.1988) (abstention was legitimate, non-section 1447(c) ground for remand; citing and discussing *Cohill* ). The very legislative history upon which Chesapeake relies, then, recognizes that not all non-jurisdictional motions for remand are governed by the 30-day time limit section 1447(c).

Accordingly, as the statute is clear on its face and the legislative history ambiguous at best, the district court was correct in holding that section 1447(c)'s requirement that "[a] motion to remand the case *on the basis of any defect in removal procedure* must be made within 30 days after the filing of the notice of removal" applies *only* to motions for remand *on the basis of any defect in removal procedure. See* 28 U.S.C. § 1447(c). *Cf. Air-Shields, Inc. v. Fullam,* 891 F.2d 63, 65 (3d Cir.1989) ("[t]he 1988 version of Section 1447(c) omits the previous 'improvidently removed' grounds for removal and restricts the time for remand motions based on procedural defects"); *State v. Ivory,* 906 F.2d 999, 100 n. 1 (4th Cir.1990) ("The thirty-day limitation applies only to objections to defects in removal procedure"). [8]

[8]    It is true that Chesapeake's position has solid policy reasons behind it. As the House Report recognizes, it is a waste of everyone's time for cases to be shuttled back and forth between two courts that have

jurisdiction, and the waste is exacerbated where the case has been removed, litigated at the federal level for quite some time, and then, due to a late-raised issue of defective removal, remanded. Moreover, the House Report also recognizes the unsavory possibility of a plaintiff keeping a defect in removal on reserve as an escape hatch should the federal litigation begin to bode ill. These policy concerns counselling a short time limit for motions to remand no doubt apply to all non-jurisdictional grounds for remand, including a forum selection clause. However, a district court in the proper exercise of its discretion may deny as untimely a non-procedural-defect, non-jurisdictional motion to remand if made at an unreasonably late stage of the federal litigation. *See* C. Wright, A. Miller, & E. Cooper, *Federal Practice & Procedure* § 3721 at 227-28 (1985). The policy concerns behind this rule, however, simply are not present in this case as Foster's motion was made on the 54th day after removal.

**\*1214  C. Grounds For Remand**

**11**    After determining that the motion to remand was timely, the district court considered whether the forum selection clause-assuming that it did waive Chesapeake's right to remove, and was enforceable-was a proper ground for remand. The district court concluded that the clause was a proper, non-statutory ground for remand.

We agree-although a reasonable argument for the opposing view exists. It is undeniable that in *Cohill* the Court repeatedly stressed that its holding was limited to the context of pendent jurisdiction and was based on the nature of pendent jurisdiction-*i.e.,* that once the district court has *discretion* to decline *to exercise pendent jurisdiction* over the state-law claims by dismissing them, it has the power to remand them too. Here, of course, removal was based on diversity of citizenship, and the district court did *not* have *discretion* to decline to exercise jurisdiction: its *jurisdiction* was *mandatory.* Indeed, *Cohill* itself recognized this difference in distinguishing *Thermtron* when it said: "In *Thermtron,* the District Court had no authority to decline to hear the case. The court had diversity jurisdiction over the case, which is not discretionary. Thus, the District Court could not properly have removed the case from its docket, whether by a remand or a dismissal." 484 U.S. at 356, 108 S.Ct. at 621-22. Arguably, then, *Cohill* and *Thermtron* taken together could stand for the proposition that non-statutory remands are only authorized when the district court has discretion not to exercise pendent jurisdiction over the case. *See Hughes v. Ohio Bell Telephone Co.,* 916 F.2d 367, 372 (6th Cir.1990).

We believe, however, that this interpretation results from too narrow a reading of *Cohill,* the statutory procedures for removal and remand, and the powers of the district court.

First of all, the circumstance that a remand is based on non-statutory grounds, though important post-*Thermtron,* is, post-*Cohill,* of diminished significance. *Cohill* clearly overruled *Thermtron* to the extent that *Thermtron* had held that only statutory grounds for remand are authorized.

The Court's opinion in *Thermtron* contained absolute language to the effect that the *only* grounds available for remand are those specified by section 1447(c). *See* 423 U.S. at 345, 96 S.Ct. at 590 ("the remand was for reasons not authorized by statute"); *id.* n. 9 ("Lower federal courts have uniformly held that cases properly removed from state to federal court within the federal court's jurisdiction may not be remanded for discretionary reasons not authorized by the controlling statute"); *id.* at 351, 96 S.Ct. at 593 ("we are not convinced that Congress ever intended to extend carte blanche authority to the district court to revise the federal statutes governing removal by remanding cases on grounds that seem justifiable to them but which are not recognized by the controlling statute").

Twelve years later, however, in *Cohill,* 484 U.S. 343, 108 S.Ct. 614, the Court found that the language in *Thermtron* "loses controlling force when read against the circumstances of that case." *Id.* at 355, 108 S.Ct. at 621. "The *Thermtron* decision," which, again, involved the *sua sponte* remand of a removed diversity action because of the congested state of the district court's docket, "was a response to a clearly impermissible remand, of a kind very different from that at issue here." *Id.* at 356, 108 S.Ct. at 621. In *Cohill* the district court remanded the pendent claims remaining in a removed federal question case once the federal question counts of the complaint had been eliminated. It had already been settled that once such a situation presented itself the district court could, in the exercise of its discretion, *dismiss* the remaining pendent claims. The *Cohill* court took this rule a step further and concluded that

> a district court has discretion to remand to state court a removed case involving *\*1215* pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate. The discretion to remand enables district courts to deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine. Such discretion

is precluded neither by the removal statute nor by our decision in *Thermtron.*

*Id.* at 357, 108 S.Ct. at 622. [9]

[9]   Chief Justice Rehnquist and Justices White and Scalia dissented and would have held that the *Thermtron* language meant what it said-*i.e.,* "cases may be remanded only for reasons authorized by statute ...," *Cohill,* 484 U.S. at 354, 108 S.Ct. at 623 (White, J., dissenting), since the federal courts do not possess an inherent power to remand, *id.* at 360, 108 S.Ct. at 624.

**12**   Thus, as the Court of Appeals for the Seventh Circuit recognized in *Rothner v. City of Chicago,* 879 F.2d 1402 (7th Cir.1989) (where the main issue was the *reviewability* of the order of remand), "the [*Cohill* ] Court in effect held, contrary to *Thermtron,* that § 1447(c) does not contain *all* of the permissible grounds for remand." 879 F.2d at 1406 (emphasis in original). And, as the dissent in *Rothner* put it in a useful formula with which the majority opinion in *Rothner* was in accord, *Cohill*

> left us with three categories of grounds for remand: (1) those authorized by § 1447(c) and beyond the power of appellate review; (2) those not authorized by § 1447(c) but nonetheless lawful in principle and reviewable for error in execution (the example from [*Cohill* ] is a remand of a pendent state claim after deciding the federal claim that authorized the removal); (3) those not authorized by § 1447(c) or anything else, and subject to automatic reversal (the example from
>
> *Thermtron* is a remand of a suit the district court thinks it is too busy to hear).

*Id.* at 1420. [10]

[10]   In *Rothner,* the district court remanded after having determined that the defendant had waived its right to remove, prior to the expiration of the 30-day period given for removal, by participating in the initial state court proceedings. The court of appeals issued a writ of mandamus directing the district court to entertain the action, finding that the defendant had not waived its right to remove. The dissent argued that the district court's order of remand was made pursuant to section 1447(c), and thus was unreviewable under section 1447(d). Neither the majority nor the dissent, however, appears to have been troubled over whether waiver of removal is a proper ground for remand. Indeed, it seems that no post-*Cohill* forum selection case has addressed the issue.

Section 1447(c), then, tells us that *either* defective removal procedure *or* lack of subject matter jurisdiction is *a* proper ground for remand. It also tells us that motions for remand grounded on the former are, and on the latter are not, governed by a 30-day time limit. Finally, as we have already noted, it tells us, in conjunction with section 1447(d), that remands based on either of these grounds are not reviewable by appeal or otherwise. But that is all. Section 1447(c) neither prohibits nor authorizes the order of remand here, based on a forum selection clause. It simply does not address the issue. Borrowing from the language of *Cohill,* then, as no one doubts the district court's power to *dismiss* pursuant to a properly construed forum selection clause if a plaintiff violates the clause, [11] "Congress's silence in the removal statute does not negate the power to.... *remand*...." 484 U.S. at 354, 108 S.Ct. at 621 (emphasis added). [12]

[11]   *See* most recently *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991).

[12]   We realize that our result may not be consistent with *Cooley v. Pennsylvania Housing Finance Agency,* 830 F.2d 469 (3d Cir.1987), and *Levy v. Weissman,* 671 F.2d 766 (3d Cir.1986), as they support the conclusion that the basis of a remand must be statutory. These cases, however, are not controlling for, as noted in *Cooley,* they are pre-*Cohill,* 830 F.2d at 475.

[13] [14]   That said, we have little doubt that a remand based on a forum selection clause is lawful. Unlike the district court in *Thermtron,* the district court here did not refuse to hear a case properly before it. Indeed, the district court in this case accepted jurisdiction and, in the exercise of that jurisdiction, determined, as a threshold matter on the merits, that Chesapeake had **\*1216** waived its right to remove the case-*i.e.,* that, pursuant to the parties' contract, the case ought not have been in federal court. Thus, while the district court did not have the discretion, as in *Cohill,* to decline to hear the case at all, once it determined that the clause barred Chesapeake from removing, it would have been committing clear error-and violence to the parties' contract-had it nevertheless continued to hear the case. Unlike the district court in *Thermtron,* then, the district court here, upon its view of the clause, *could* "properly have eliminated the case from its docket ... by a dismissal." *Cohill,* 484 U.S. at 356, 108 S.Ct. at 622. Indeed, at that point it had *no* discretion whatsoever *not* to remove the case from its docket. In such a situation, again unlike *Thermtron,* a remand, as opposed to dismissal, does no harm to removal or diversity jurisdiction. Measured against the concerns raised by *Thermtron,* and by

analogy to those raised in *Cohill,* we therefore believe that the district court's remand was lawful.

Moreover, as the passage from the House Report set forth *supra* demonstrates, Congress is concerned that removal procedure be handled in a manner that promotes economy, convenience, and fairness-the very concerns used by the Court to justify the remand in *Cohill.* It is manifest that in giving effect to a forum selection clause by remanding rather than dismissing a case, concerns of economy and convenience are promoted. Fairness, too, is forwarded by a remand for once the district court determines that a defendant has violated a forum selection clause by wrongfully removing a case, justice and common sense warrant that a remand, rather than a dismissal, be ordered. Otherwise a plaintiff proceeding in accordance with the parties' agreement will be penalized for the conduct of a defendant who does not. The district court in remanding merely exercised its powers to fashion a remedy for breach of the clause, giving "effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement, by specifically enforcing the forum clause," *see The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972). The district court also thereby exercised its inherent powers to correct abuses of federal practice and procedure, vindicating the improper use of removal. Thus, if a defendant has removed a case in violation of a forum selection clause, remand is a particularly appropriate and effective remedy for the wrong. In sum, a forum selection clause can properly be the basis of remand. *Cf. Corcoran v. Ardra Ins. Co.,* 842 F.2d at 31 (abstention in removed case was proper ground for remand).

### D. *Forum Selection Clause As Waiver Of Right To Remove*

[15] [16] [17] [18]   The forum selection clause in the reinsurance agreement provides:

In the event the Retrocessionaire [Chesapeake] is not domiciled in the United States of America, and the Retrocessionaire fails to pay any amount claimed to be due hereunder, the Retrocessionaire, at the request of the Company [Mutual Fire], will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction; and all matters arising hereunder shall be determined in accordance with the law and practice of such court. [13]

13    Forum selection clauses are in rather widespread use throughout the insurance industry. *See, e.g., In re Delta Re Ins. Co.,* 900 F.2d 890, 892 (6th Cir.1990).

The district court, engaging in contractual construction over which we exercise plenary review, *see, e.g., John F. Harkins Co. v. Waldinger Corp.,* 796 F.2d 657, 659 (3d Cir.1986), *cert. denied,* 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987); *Ram Constr. Co. v. American States Ins. Co.,* 749 F.2d 1049, 1053 (3d Cir.1984), determined that the legal effect of the clause was to waive Chesapeake's right to remove. The right to remove may be waived, *see generally* J. Moore & B. Ringle, 1A *Moore's Federal Practice* ¶ 0.157[9] at 149 (1990), and we agree with the district court that by consenting to "*submit*" to "*any court*" of competent jurisdiction "*at the **\*1217** request of the Company,*" and to comply with all requirements necessary to give "*such court* " jurisdiction, Chesapeake agreed to go to, *and stay in,* the forum chosen by Mutual Fire.

This construction is in accord with a long line of cases treating similar language which found that the forum selection clauses waived the defendant's right to remove, and which therefore granted the plaintiff's motion to remand. *See West Chestnut Realty of Haverford, Inc. v. First State Ins. Co.,* 1990 WESTLAW 87377 (U.S.D.C., E.D.Pa.1990); *Cessna Aircraft Co. v. Fidelity & Cas. Co. of New York,* 616 F.Supp. 671 (D.N.J.1985); *Capital Bank & Trust Co. v. Associated Int'l Ins. Co.,* 576 F.Supp. 1522 (M.D.La.1984); *Himes v. Admiral Ins. Co.,* 575 F.Supp. 312 (E.D.Ky.1983); *Lavan Petroleum Co. v. Underwriters at Lloyds,* 334 F.Supp. 1069 (S.D.N.Y.1971); *Perini Corp. v. Orion Ins. Co.,* 331 F.Supp. 453 (E.D.Cal.1971); *Oil Well Serv. Co. v. Underwriters at Lloyd's London,* 302 F.Supp. 384 (C.D.Cal.1969); *Euzzino v. London & Edinburgh Ins. Co.,* 228 F.Supp. 431 (N.D.Ill.1964); *General Phoenix Corp. v. Malyon,* 88 F.Supp. 502 (S.D.N.Y.1949). We also note that the clause in this case provides that matters arising out of the reinsurance agreement are to be "be determined in accordance with the law *and practice* of *such* court," and, in a separate paragraph, that Chesapeake agrees to "abide by the final decision of *such court*"-*such* court, of course referring to the court to which Chesapeake agreed to submit at the request of Mutual Fire. Thus, Chesapeake's removal was particularly violative of these portions of the clause, for removal prevents *such* court from rendering a final decision, and while the substantive law to be applied by the federal court upon removal of this diversity action would still be that applied in the state court, the *practice* of the federal courts rather

than that of the Commonwealth Court of Pennsylvania would govern the matter. *See Euzzino,* 228 F.Supp. at 433; *General Phoenix,* 88 F.Supp. at 503. [14] This, together with the rest of the clause's language, convinces us that Chesapeake waived its right to remove the action. [15] *See* C. Wright, A. Miller, & E. **\*1218** Cooper, 14A *Federal Practice & Procedure* § 3721 at 223 (1985) (finding "persuasive" cases which construe this clause as valid waiver of removal). [16]

14    Indeed, in *Roberts v. Lexington Ins. Co.,* 305 F.Supp. 47 (E.D.N.C.1969), concentrating on "*the practice*" portion of "all matters arising hereunder shall be determined in accordance with the law and practice of such court," the court held that this language constituted an *express prohibition* against removal. However, employing a legal theory subsequently rendered outmoded by the Supreme Court in *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513, the *Roberts* court refused to enforce the clause, finding it an illegal attempt to "oust" the federal courts of their jurisdiction. *See also Hasek v. Certain Lloyd's Underwriters,* 228 F.Supp. 754 (W.D.Mo.1963) (clause illegal and void contractual limitation of court's jurisdiction). In *The Bremen,* however, the Court said that forum selection clauses do not "oust" courts of jurisdiction, and held that they are *prima facie* enforceable.

15    We note that in *In re Delta Re Ins. Co.,* 900 F.2d 890, the Court of Appeals for the Sixth Circuit, construing virtually the same clause as that involved here, reversed an order of remand, holding that the clause did not work a waiver of the right to remove. In *Delta,* the defendant, a commercial bank branch of a foreign sovereign, removed a state court action pursuant to 28 U.S.C. § 1441(d), a part of the Foreign Sovereign Immunities Act (FSIA), which extends removal to actions brought against foreign states and which permits the foreign state to demand a non-jury trial once in federal court. The court of appeals turned to the language of the clause and, utilizing a standard it had applied in an earlier forum-selection/waiver-of-removal case-*Regis Assocs. v. Rank Hotels (Management) Ltd.,* 894 F.2d 193 (6th Cir.1990)-, found that the clause did not "clearly and unequivocally" reveal an intent to waive the right to remove. The court then proceeded, however, to explain that this finding was especially bolstered by the language and purpose of section 1441(d). As the section gave foreign sovereigns the unqualified right to remove actions commenced against them in state court, and thus avoid "any local bias or prejudices possibly inherent in state court proceedings and also to avoid trial by jury," 900 F.2d at 893, the court could "conceive of no reason

why a foreign state would waive a right of removal. Since the FSIA allows a foreign state to remain in a state court if sued there and have a jury if desired, there is absolutely nothing to be gained by giving up the option to go to federal court and avoid a jury trial." *Id.* Finally, noting that the FSIA represents a drastic departure from the previously long-standing rule granting foreign sovereigns absolute immunity, and that under the FSIA immunity nevertheless remains an important threshold consideration, the court felt that the purposes behind the FSIA, and section 1441(d) in particular, are best served by the development, *in federal court,* of a uniform body of law on sovereign immunity in the FSIA era. 900 F.2d at 894. Obviously viewing the element of foreign sovereignty of paramount importance, the court concluded: "In order to provide maximum guidance for future cases involving foreign states, we hold that any claimed waiver of the right of removal stemming from contractual language must be explicit." *Id.* at 894 (footnote omitted). Inasmuch as we believe *Delta* was primarily driven by considerations peculiar to the FSIA, we do not find it persuasive here.

Moreover, we do not see why contractual waivers of the right to remove must be "clear and unequivocal." True, no less a commentator than Professor Moore states the proposition broadly: "Waiver of the right to remove is ... possible but defendant's intent must be clear and unequivocal." J. Moore & B. Ringle, 1A *Moore's Federal Practice* ¶ 0.157[9] at 152. *See also* Weltman v. Silna, 879 F.2d 425, 427 (8th Cir.1989) (same; citing *Moore's* ). But Moore makes his statement solely in the context of a discussion of waiver of removal by the defendant's participation in state court proceedings. *See generally Moore's* ¶ 0.157[9] at 149-55. And, indeed, the cases cited by *Moore's,* and by the Court of Appeals for the Sixth Circuit in *Delta* and *Regis,* either involved non-contractual, litigation-based waivers, *see* Kiddie Rides U.S.A., Inc. v. Elektro-Mobiltechnik GMBH, 579 F.Supp. 1476 (C.D.Ill.1984); Carpenter v. Illinois Cent. Gulf R.R. Co., 524 F.Supp. 249 (M.D.La.1981); Hildreth v. General Instrument, Inc., 258 F.Supp. 29 (D.S.C.1966); Champion Brick Co. of Baltimore County v. Signode Corp., 37 F.R.D. 2 (D.Md.1965); Rockwell v. United States Fidelity & Guar. Co., 137 F.Supp. 317 (M.D.Pa.1955); Davila v. Hilton Hotels Int'l, Inc., 97 F.Supp. 32 (D.P.R.1951); or, in turn, cited non-contractual waiver cases or *Moore's, see* Capital Bank & Trust Co. v. Associated Int'l Ins. Co., 576 F.Supp. 1522 (M.D.La.1984); Morgan Dallas Corp. v. Orleans Parish School Bd., 302 F.Supp. 1208 (E.D.La.1969). In the context of litigation-based waiver, the "clear

and unequivocal" standard makes sense. Otherwise, in order not to waive the right to remove defendants would have to remain inactive in the state court, running the peril of being held in default should a remand from the district court later occur. *See Moore's* ¶ 0.157 [9] at 154.

In the context of contractual waiver, however, we do not perceive the need for the "clear and unequivocal" standard. While it is true that removal represents what has somewhat reverently been called "a statutory right to a federal forum" (a right the Supreme Court was obviously willing to vindicate in *Thermtron* ), this talismanic phrase loses much of its fire in light of the fact that for "approximately five score years" the federal courts "have construed the removal statutes *strictly* and, on the whole, *against* the right of removal," *Moore's* ¶ 0.157[1.- 3] at 38 (emphasis added). The "clear and unequivocal" standard, then, fails to consider the *constrictive* rather than *expansive* nature of the right of removal, in addition to serving no meritorious policy of litigation. It probably had its genesis in the notion, now discarded, that forum selection clauses were presumptively *unenforceable* as "contrary to public policy" or as an illegal attempt to "oust" the court's jurisdiction. The Supreme Court has said that this notion is old-fashioned and contrary to freedom of contract. *The* Bremen v. Zapata Off-Shore Co., 407 U.S. at 10-12, 92 S.Ct. at 1913-14.

We think the "clear and convincing" standard so stringent as to be contrary to the right of parties to contract in advance regarding where they will litigate. A court simply should determine contractual waiver of the right to remove using the same benchmarks of construction and, if applicable, interpretation as it employs in resolving all preliminary contractual questions. Indeed, inasmuch as the determination of whether there is a waiver of the right of removal to be derived from a forum selection clause will at least in some cases, such as here, be a matter of construction and thus of law, it seems anamolous to speak of a "clear and unequivocal" standard for we simply make plenary determinations of legal issues.

16    Chesapeake regards *Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc.,* 819 F.2d 400 (3d Cir.1987), as "closely analogous" to this case but we do not. There a customer of a securities dealer sought to arbitrate a claim against the dealer. In a reversal of the usual pattern in such cases, the dealer preferred a judicial tribunal for resolution of the dispute and thus brought an action against the customer in the district court for declaratory relief and, alternatively, for

damages. In the district court the dealer sought an order to compel the customer to discontinue the arbitration contending, *inter alia,* that the customer waived the right to arbitrate by agreeing to a forum selection clause consenting to the jurisdiction of the state and federal courts in New Jersey. We rejected this contention for various reasons including the circumstance that while we regarded arbitration as favored, forum selection clauses must be scrutinized carefully so that "if doubts arise as to whether this dispute is arbitrable or not, such doubts must be resolved in favor of arbitrability." *Id.* at 407. No such consideration of preferred forum is implicated in remanding this case as there is no reason for a preference for a federal over a state court in this action. *See* note 15, *supra.*

### E. *Enforceability of the Forum Selection Clause*

**19    20    21**    Finally, we agree that the ***1219*** clause is enforceable in this case. [17]    In *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, the Supreme Court held that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Id.* at 10, 92 S.Ct. at 1913. A forum selection clause is "unreasonable" where the defendant can make a "strong showing" *id.* at 15, 92 S.Ct. at 1916, *either* that the forum thus selected is "so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court," *id.* at 18, 92 S.Ct. at 1917, *or* that the clause was procured through "fraud or overreaching," *id.* at 15, 92 S.Ct. at 1916. *No* showing-let alone a "*strong* showing"-of either of these elements was made by Chesapeake. Chesapeake admits that by the clause it waived any claim to inconvenience of forum, and the agreement between it and Mutual Fire was clearly an arms'-length deal, between sophisticated

commercial entities, "unaffected by fraud, undue influence, or overweening bargaining power," *cf. id.* at 12, 92 S.Ct. at 1914. That there may not have been actual negotiations over the clause does not affect its validity. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, ----, 111 S.Ct. 1522, 1526, 113 L.Ed.2d 622 (1991). In general, the insurance industry has obviously long found it a convenient and expeditious provision to include in its contracts where it binds the insurer, *see* n. 13, *supra,* and it is a particularly fair provision in a reinsurance treaty, as it allows the ceding company, rather than the many and far-flung retrocessionaries, to select the forum when the retrocessionaires have refused to pay.

[17]    We will assume that our review is plenary on this essentially factual issue as the matter was resolved in the district court on a record developed on a motion. But the standard of review on this point is not critical as Chesapeake's position on it is completely insubstantial.

### III.

### CONCLUSION

In light of the foregoing we conclude that: (1) our jurisdiction over this appeal is not barred by 28 U.S.C. § 1447(d) and the district court's order of remand was "final" for the purposes of 28 U.S.C. § 1291; (2) Foster's motion to remand was not barred by the 30-day time limit of 28 U.S.C. § 1447(c); (3) enforcement of a waiver of the right to remove is a proper ground for remand; (4) Chesapeake waived its right to remove in the forum selection clause of its contract with Mutual Fire; and (5) the clause is enforceable. Accordingly, we will affirm the order of September 27, 1990, of the district court remanding this case to the Commonwealth Court of Pennsylvania.

End of Document    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 29

DOCSTOR: 2191401\1

TradeComet.com LLC v. Google, Inc., 693 F.Supp.2d 370 (2010)

2010-1 Trade Cases P 76,941

693 F.Supp.2d 370
United States District Court,
S.D. New York.

TRADECOMET.COM LLC,

v.

GOOGLE, INC., Defendant.

No. 09 Civ. 1400(SHS).    March 5, 2010.

**Synopsis**

**Background:** Advertiser, who had purchased ads from operator of Internet search engine, filed suit against operator for allegedly monopolizing, or attempting to monopolize, the search advertising market in violation of the Sherman Act. Defendant moved to dismiss.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

1 acceptance of updated contract constituted acceptance of modified forum selection clause;

2 forum selection clause was reasonably communicated to advertiser;

3 forum selection clause was mandatory;

4 advertiser's antitrust claims related to subject matter of contract; and

5 there was no evidence that enforcement of forum selection clause was unreasonable or unjust.

Motion granted.

West Headnotes (14)

1    **Federal Civil Procedure**  👉 Matters considered in general

Even though defendant's reply to motion to dismiss contained exhibits that allegedly presented new material, and should have been submitted with its opening brief, court would consider exhibits in determining motion, where defendant's documents simply responded to allegations plaintiff raised in its papers in opposition.

2    **Federal Courts**  👉 Affidavits and evidence in general

**Federal Courts**  👉 Affidavits and other evidence

In deciding a motion to dismiss for either lack of subject matter or improper venue, court may consider evidentiary matters outside the pleadings, by affidavit or otherwise, regarding the existence of jurisdiction. Fed.Rules Civ.Proc.Rule 12(b)(1, 3), 28 U.S.C.A.

3 Cases that cite this headnote

3    **Contracts**  👉 Presumptions and burden of proof

Party opposing enforcement of contractual forum selection clause is entitled to have facts viewed in light most favorable to that party, and his burden is similar to that imposed on a plaintiff to prove that federal court has subject matter jurisdiction over his suit, or personal jurisdiction over defendant. Fed.Rules Civ.Proc.Rule 12(b)(1, 3), 28 U.S.C.A.

4    **Contracts**  👉 Mutuality of Obligation

Under California law, the fact that one party reserves the implied power to terminate or modify a unilateral contract is not fatal to its enforcement, if the exercise of the power is subject to limitations, such as fairness and reasonable notice.

1 Cases that cite this headnote

5    **Contracts**  👉 Legal remedies and proceedings

Under California law, purchaser of internet advertising services accepted modifications to forum selection clause contained in updated version of contract with advertiser when it agreed to contract; plain language of updated contract indicated that it superseded and replaced "any other agreement, terms and conditions applicable to the subject matter hereof."

6    **Contracts**  👉 Legal remedies and proceedings

Scope of forum selection clause is contractual question that requires court to interpret clause

and, where ambiguous, to consider the intent of the parties.

**7**   **Contracts** 🔑 Agreement as to place of bringing suit;  forum selection clauses
**Contracts** 🔑 Legal remedies and proceedings

To obtain dismissal based on a forum selection clause, party seeking enforcement of clause must demonstrate that: (1) clause was reasonably communicated to the party resisting enforcement, (2) clause was mandatory and not merely permissive, and (3) the claims and parties involved in the suit are subject to the forum selection clause.

1 Cases that cite this headnote

**8**   **Contracts** 🔑 Presumptions and burden of proof

After party seeking enforcement of forum selection clause has established presumption of enforceability, burden shifts to party resisting enforcement to rebut presumption by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that clause was invalid for such reasons as fraud or overreaching.

1 Cases that cite this headnote

**9**   **Contracts** 🔑 Agreement as to place of bringing suit;  forum selection clauses

Seller of internet advertising "reasonably communicated" forum selection clause in its advertising contract to buyer, through use of "clickwrap" agreement, for purposes of establishing enforceability of clause in buyer's later action alleging seller's Sherman Act violations;  buyer manifested agreement to proffered terms of advertising contract, including forum selection clause, by clicking on computer icon prior to being given access to advertiser's product. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

**10**   **Contracts** 🔑 Legal remedies and proceedings

Forum selection clause in advertising contract, which Internet search engine provider required advertiser to sign in order to place targeted ads on search engine, clearly contained compulsory language specifying venue, and thus was "mandatory," for purposes of forum selection in buyer's later action alleging provider violated Sherman Act; language in contract stated claims "shall be litigated exclusively in the federal or state courts of Santa Clara County, California." Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

**11**   **Contracts** 🔑 Legal remedies and proceedings

Advertiser's Sherman Act claims against operator of internet search engine "related to" operator's advertising programs, and thus fell within scope of forum selection clause of advertising agreement between the parties requiring that "all claims arising out of or relating to this agreement" be litigated exclusively in the federal or state courts of Santa Clara County, California; claims stemmed from operator's pricing and administration of its advertising program, and its attempts to monopolize online search market by using pricing metrics within its programs to prevent search traffic to selected entities. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

**12**   **Contracts** 🔑 Presumptions and burden of proof

Party opposing enforcement of forum selection clause bears burden of showing that clause is unreasonable or unjust.

**13**   **Contracts** 🔑 Agreement as to place of bringing suit;  forum selection clauses

There was no evidence that enforcement of forum selection clause, which required New York advertiser to bring his antitrust claims against operator of Internet search engine in California, was unreasonable, as required to support claim that clause was unenforceable.

**14    Contracts** 🔑 Agreement as to place of
bringing suit;  forum selection clauses

There was no evidence that enforcement of
forum selection clause, which required New York
advertiser to bring his antitrust claims against
operator of Internet search engine in California,
would be so difficult as to deprive advertiser of
a fair opportunity to litigate action, as required
to support claim that forum selection clause was
unenforceable as unjust and unreasonable.

**Attorneys and Law Firms**

*372 Joseph J. Bial, Charles F. Rule, Daniel Joseph Howley,
Jr., Jonathan Seth Kanter, Cadwalader, Wickersham & Taft,
LLP, Washington, DC, for Plaintiff.

Chul Pak, Wilson Sonsini Goodrich & Rosati, Jonathan M.
Jacobson, Sara Ciarelli Walsh, Susan Abouchar Creighton,
New York, NY, for Defendant.

**Opinion**

### OPINION & ORDER

SIDNEY H. STEIN, District Judge.

The parties to this action-TradeComet.com LLC and Google,
Inc.-own and operate competing internet search engines.
TradeComet purchased advertising on Google's website
through Google's AdWords program and now alleges that
Google attempted to reduce traffic at TradeComet's own
website both by increasing the cost of TradeComet's
advertising and by entering into exclusive agreements with
other websites, all allegedly in violation of *373 the
Sherman Antitrust Act. Google has now moved to dismiss
the complaint pursuant to Federal Rule of Civil Procedure
12(b)(1) and 12(b)(3) for improper venue based on a forum
selection clause in the parties' advertising contracts. Because
TradeComet's claims fall within the scope of the relevant
forum selection clause that requires that this action be brought
in California, and because enforcing that clause would be
neither unreasonable nor unjust, Google's motion to dismiss
is granted.

### I. Background

The following facts are taken from the complaint; the
declarations of Heather Wilburn, Daniel J. Howley, and Sara
Ciarelli Walsh; and the attachments thereto, and are presumed
to be true for purposes of this motion.

#### A. The Advertising Relationship between TradeComet and Google

TradeComet operates the website SourceTool.com, which
attracts "highly-valued search traffic of businesses seeking
to buy or sell products and service to other businesses,"
and provides what is commonly referred to as a "B2B" (for
"business to business") directory. (Compl. ¶ 4.) TradeComet
alleges that since its start in 2005, its website has experienced
significant growth, in part based on the search traffic
and advertising revenue that it generated as a result of
placing advertisements for its website on Google's competing
website. (Id. ¶¶ 6, 41-44.)

Dan Savage, the founder of TradeComet, met with Google
representatives in December 2005 and May 2006 to discuss
use of Google's AdWords advertising program to maximize
TradeComet's revenue. [1] TradeComet alleges that following
the May 2006 meeting, Google "drastically" increased the
minimum price of the keywords that SourceTool.com had
purchased through the AdWords program, thus making
those keywords effectively unavailable to TradeComet and
depriving its website-SourceTool.com-of traffic that the use
of those keywords would drive to the SourceTool.com
website. This in turn caused a drop in the revenue that
TradeComet derived from advertisements on its website.
(Id. ¶¶ 45-48.) Google claims that it increased the price of
the relevant keywords due to its use of an algorithm that
adjusts advertising prices to reflect the quality of the page to
which the advertisement linked. (Id. ¶¶ 49-52.) TradeComet
contends that Google dominates the market for online search,
and that Google's effective exclusion of SourceTool.com
from its AdWords program starved SourceTool.com of the
traffic it needed to grow, in violation of the Sherman Antitrust
Act. (Id. ¶¶ 3, 21-22, 54-55.)

[1]    The U.S. Court of Appeals for the Second Circuit has
described Google's AdWords program as follows:

AdWords is Google's program through which
advertisers purchase terms (or keywords). When
entered as a search term, the keyword triggers
the appearance of the advertiser's ad and link. An
advertiser's purchase of a particular term causes
the advertiser's ad and link to be displayed on
the user's screen whenever a searcher launches a

Google search based on the purchased search term. Advertisers pay Google based on the number of times Internet users 'click' on the advertisement, so as to link to the advertiser's website. *Rescuecom Corp. v. Google Inc.,* 562 F.3d 123, 125 (2d Cir.2009); *see also* Compl. ¶¶ 31-34.

TradeComet also alleges that Google has entered into exclusive agreements with other popular websites and with rival search engines in a further effort to consolidate online search at Google.com and exclude other search engines-such as SourceTool.com-from the relevant market, also allegedly violating the Sherman Antitrust Act. (*Id.* ¶¶ 68-74, 100-01.)

*\*374* **B. *The Relevant Forum Selection Clauses***

Users of Google's AdWords program must accept a set of terms and conditions in order to activate an AdWords account and they must subsequently accept any additional terms and conditions that Google later implements if the user wants to continue using its existing AdWords account. (Dep. of Heather Wilburn dated April 13, 2009 ("Wilburn Dep.") at 13:9-11, 34:21-35:6, Ex. B to Dec. of Sara Ciarelli Walsh dated April 22, 2009 ("Walsh Dec.").) The terms and conditions that went into effect on April 19, 2005 and May 23, 2006 include provisions stating that "[t]he Agreement must be construed as if both parties jointly wrote it, governed by California law except for its conflicts of laws principles and adjudicated in Santa Clara County, California." (Google Inc. AdWords Program Terms dated April 19, 2005 (the "April 2005 Agreement") ¶ 7, Ex. 2 to Dec. of Daniel J. Howley dated April 15, 2009 ("Howley Dec."); Google Inc. AdWords Program Terms dated May 23, 2006 (the "May 2006 Agreement") ¶ 9, Ex. 3 to Howley Dec.) They also include identical language directing that "Google may modify the [AdWords] Program or these Terms at any time without liability and your use of the Program after notice that Terms have changed indicates acceptance of the Terms." (April 2005 Agreement ¶ 2; May 2006 Agreement ¶ 2.)

Effective August 22, 2006, Google issued a revised set of terms and conditions that contains the same language regarding modifications to the terms along with a broader forum selection clause as follows:

THE AGREEMENT MUST BE CONSTRUED AS IF BOTH PARTIES JOINTLY WROTE IT AND GOVERNED BY CALIFORNIA LAW EXCEPT FOR ITS CONFLICTS OF LAWS PRINCIPLES. ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE GOOGLE PROGRAM(S)

SHALL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA, USA, AND GOOGLE AND CUSTOMER CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS.

(Google Inc. Advertising Program Terms dated August 22, 2006 (the "August 2006 Agreement") ¶ 9, Ex. 1 to Howley Dec. (capitalization in original).) Representatives for TradeComet have accepted those terms and conditions. (*See* Dec. of Heather Wilburn dated March 30, 2009 ("Wilburn Dec.") ¶¶ 6-7; Ex. D-F to Walsh Dec.)

**1**   As noted, Google has now moved to dismiss the complaint on the grounds that the August 2006 forum selection clause requires TradeComet to bring its claims in a court located in Santa Clara County, California, not in the U.S. District Court for the Southern District of New York. TradeComet, on the other hand, contends that the forum selection clause contained in the April 2005 and May 2006 Agreements-not the August 2006 Agreement-governs because it was in effect at the time of Google's alleged violations of the Sherman Antitrust Act. Because Google is correct that the August 2006 forum selection clause governs and because TradeComet's claims "relat[e] to ... the Google Program(s)," Google's motion to dismiss the complaint is granted. [2]

[2]   TradeComet has moved to strike Exhibits D through H of the Walsh Declaration submitted in reply by Google because those exhibits allegedly present new material that Google should have submitted with its opening brief. These exhibits contain screenshots-images that record the visible content displayed on a computer's monitor-on which Google relies to show that TradeComet accepted the August 2006 Agreement for its Google AdWords Accounts. Because these exhibits simply respond to TradeComet's suggestion in its papers in opposition to the motion that it never accepted the August 2006 Agreement, the Court will consider these materials. *See Niv v. Hilton Hotels Corp.,* --- F.Supp.2d ----, ---- n. 4, 2008 WL 4849334, at \*8 n. 4 (S.D.N.Y. Nov. 10, 2008); *see also Ruggiero v. Warner-Lambert Co.,* 424 F.3d 249, 252 (2d Cir.2005).

*\*375* **II. Standard of Review**

**2**   There is a split of authority in the Second Circuit regarding the appropriate procedural mechanism by which to enforce a forum selection clause. The proper vehicle is a motion to dismiss the complaint for either (1) lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), *see AVC Nederland B.V. v. Atrium Inv.*

2010-1 Trade Cases P 76,941

*Partnership,* 740 F.2d 148, 152 (2d Cir.1984); (2) improper venue pursuant to Rule 12(b)(3), *see Phillips v. Audio Active Ltd.,* 494 F.3d 378, 382 (2d Cir.2007); or (3) failure to state a claim pursuant to Rule 12(b)(6), *see Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V.,* 145 F.3d 505, 508 n. 6 (2d Cir.1998). *But see New Moon Shipping Co. v. MAN B & W Diesel AG,* 121 F.3d 24, 29 (2d Cir.1997) ("[T]here is no existing mechanism with which forum selection enforcement is a perfect fit."). Hedging its bet, Google brings its motion pursuant to both Rule 12(b)(1) and 12(b)(3). [3] *See Cfirstclass Corp. v. Silverjet PLC,* 560 F.Supp.2d 324, 327 (S.D.N.Y.2008).

[3]   In deciding a motion to dismiss pursuant to either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(3), a court may consider evidentiary matters outside the pleadings, "by affidavit or otherwise," regarding the existence of jurisdiction. *Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986); *see also State Employees Bargaining Agent Coalition v. Rowland,* 494 F.3d 71, 77 n. 4 (2d Cir.2007); *Altvater Gessler-J.A. Baczewski Intern. (USA) Inc. v. Sobieski Destylarnia S.A.,* 572 F.3d 86, 89 (2d Cir.2009). Accordingly, the Court will consider the several declarations submitted by the parties, along with their attachments-including the three agreements between TradeComet and Google-because they are germane to the question of the Court's subject matter jurisdiction.

**3**   The burden on a plaintiff opposing enforcement of a forum selection clause is similar to that "imposed on a plaintiff to prove that the federal court has subject matter jurisdiction over his suit or personal jurisdiction over the defendant." *New Moon Shipping,* 121 F.3d at 29. Thus, courts apply the standard of review applicable to motions to dismiss for lack of jurisdiction, taking the facts in the light most favorable to the party resisting enforcement of the forum selection clause. *See id.*

## III. Analysis

The parties contest both which forum selection clause applies to this action and whether either forum selection clause requires dismissal or transfer.

### A. *Which Forum Selection Clause Applies*

The parties contest which forum selection clause-i.e., that found in the April 2005 and May 2006 Agreements or the clause found in the August 2006 Agreement-governs this motion. TradeComet contends that, because the conduct alleged in the complaint began in mid-2006, when the

narrower forum selection clause found in the April 2005 and May 2006 Agreements was in effect, that clause governs. Google responds by pointing to the language in those earlier agreements that "Google may modify the [AdWords] Program or these Terms at any time without liability and your use of the Program after notice that Terms have changed indicates acceptance of the Terms" to argue that the forum selection clause in the August 2006 Agreement replaced and superseded those found in the earlier agreements. (April **\*376** 2005 Agreement ¶ 2; May 2006 Agreement ¶ 2.) Google also notes that the August 2006 Agreement specifically states that it "supersedes and replaces any other agreement, terms and conditions applicable to the subject matter hereof." (August 2006 Agreement ¶ 9.) The Court applies California state law to resolve this question, as all agreements between the parties include choice of law provisions requiring the application of California law.

Under California state law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting. Cal. Civ.Code § 1636; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 474, 80 Cal.Rptr.2d 329 (Cal.Ct.App.1998). When a contract is reduced to writing, this intent "is to be ascertained from the writing alone, if possible." Cal. Civ.Code § 1639; *see also Brinton v. Bankers Pension Servs., Inc.,* 76 Cal.App.4th 550, 559, 90 Cal.Rptr.2d 469 (Cal.Ct.App.1999).

**4**   Furthermore, "the fact that one party reserves the implied power to terminate or modify a unilateral contract is not fatal to its enforcement, if the exercise of the power is subject to limitations, such as fairness and reasonable notice." *Asmus v. Pacific Bell,* 23 Cal.4th 1, 16, 96 Cal.Rptr.2d 179, 999 P.2d 71 (2000); *see also MySpace, Inc. v. Globe.com, Inc.,* No. 06 Civ. 3391, 2007 WL 1686966, at *10 (C.D.Cal. Feb. 27, 2007).

**5**   The plain language of the agreements indicates that TradeComet accepted the modifications to the forum selection clause found in the August 2006 Agreement when it accepted that agreement. *See Stute v. Burinda,* 177 Cal.Rptr. 102, 123 Cal.App.3d Supp. 11, 16 (Cal.App. Dep't Super. Ct.1981). Accordingly, the Court assesses whether the forum selection clause found in the August 2006 Agreement requires the dismissal of the complaint or transfer of this action.

### B. *Dismissal Based on a Forum Selection Clause*

**6**   "The scope of the forum selection clause is a contractual question that requires the courts to interpret the clause and, where ambiguous, to consider the intent of the parties." *New*

2010-1 Trade Cases P 76,941

*Moon Shipping,* 121 F.3d at 33. "Plaintiff's choice of forum in bringing his suit in federal court in New York will not be disregarded unless the contract evinces agreement by the parties that his claims cannot be heard there." *Phillips,* 494 F.3d at 387. Thus, the court must "examine the substance of [a plaintiff's] claims as they relate to the precise language" of the specific clause at issue. *Id.* at 389.

**7   8**   To obtain dismissal based on a forum selection clause, the party seeking enforcement of the clause must demonstrate that: (1) the clause was reasonably communicated to the party resisting enforcement, (2) the clause was mandatory and not merely permissive, and (3) the claims and parties involved in the suit are subject to the forum selection clause. *Id.* at 383-84. After the party seeking enforcement has established these three conditions, the burden shifts to the party resisting enforcement to rebut the presumption of enforceability by "making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.' " *Id.* (quoting *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)).

The U.S. Court of Appeals for the Second Circuit has discussed-but not decided-what law to apply to a forum selection clause when the contract also contains a choice of law provision. *See *377 Phillips,* 494 F.3d at 384. In the *Phillips* decision, the court was clear that the first and fourth steps of the analysis-whether the clause was communicated to the non-moving party and whether enforcement would be reasonable-are procedural in nature and should be analyzed under federal law. *See id.*; *see also Diesel Props S.r.L. v. Greystone Business Credit II LLC,* No. 07 Civ. 9580, 2008 WL 4833001, at *7 (S.D.N.Y. Nov. 5, 2008)). However, it was troubled by the application of federal law to the second and third prongs of the inquiry, which concern the meaning and scope of the forum selection clause, noting that it could not "understand why the interpretation of a forum selection clause should be singled out for application of any law other than that chosen to govern the interpretation of the contract as a whole." *Phillips,* 494 F.3d at 385-86 (citing *Yavuz v. 61 MM, Ltd.,* 465 F.3d 418 (10th Cir.2006)). Because the parties here rely on both federal and California state law in their submissions, and because application of either body of law to the second and third *Phillips* prongs results in the same outcome, the Court need not decide that issue at this time.

**1. *The forum selection clause was reasonably communicated to plaintiff.***

The Second Circuit "regularly enforce[s]" forum selection clauses as long as "the existence of the clause was reasonably communicated to the parties." *D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 103 (2d Cir.2006). The agreements at issue here are "clickwrap arrangements" in which users of Google's AdWords program are required to agree to the proffered terms in order to use the program.[4] *See Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 429 (2d Cir.2004); *see also* Wilburn Dep. at 13:9-11, 34:21-35:6.

[4]    A "clickwrap" license is one that

> presents the potential licensee (i.e., the end-user) with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon. Essentially, under a clickwrap arrangement, potential licensees are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product.

> *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 429 (2d Cir.2004) (quotation and citation omitted); *see also Feldman v. Google, Inc.,* 513 F.Supp.2d 229, 236 (E.D.Pa.2007) (describing the clickwrap agreement containing the terms and conditions of Google's AdWords program).

District courts in this Circuit have found that clickwrap agreements that require a user to accept the agreement before proceeding are "reasonably communicated" to the user for purposes of this analysis. *See, e.g., Person v. Google Inc.,* 456 F.Supp.2d 488, 496-97 (S.D.N.Y.2006) (finding that Google's AdWords agreement provided the plaintiff with sufficient notice of the terms of the user agreement to enforce its forum selection clause); *Universal Grading Service v. eBay, Inc.,* No. 08 Civ. 3557, 2009 WL 2029796, at *11 (E.D.N.Y. June 10, 2009); *Novak v. Tucows, Inc.,* No. 06 Civ.1909, 2007 WL 922306, at *7-9 (E.D.N.Y. Mar. 26, 2007).

**9**   Google bears the burden of demonstrating that it reasonably communicated the forum selection provision to TradeComet, *Phillips,* 494 F.3d at 383-84, and the Court must consider the facts in the light most favorable to TradeComet as the party resisting enforcement of the forum selection clause, *New Moon Shipping,* 121 F.3d at 29. Google offers testimony and screenshots showing the status of TradeComet's AdWords accounts to support its contention that TradeComet accepted the August 2006 Agreement and

that it had to click through the text of that agreement to *378 do so. (*See, e.g.,* Wilburn Dep. at 13:9-11, 34:21-35:6; Wilburn Dec. ¶¶ 6-7; Ex. D-F to Walsh Dec.) TradeComet neither denies that its representatives agreed to the user agreement that contained the forum selection clause nor offers any evidence to the contrary. Thus, TradeComet has not overcome Google's prima facie showing that representatives of TradeComet accepted the forum selection clause at issue in this action.

### 2. *The forum selection clause is mandatory.*

 **10**    The relevant forum selection clause requires that claims "shall be litigated exclusively in the federal or state courts of Santa Clara County, California." (August 2006 Agreement ¶ 9.) "A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language." *Phillips,* 494 F.3d at 386; *see also Olinick v. BMG Entertainment,* 138 Cal.App.4th 1286, 1294, 42 Cal.Rptr.3d 268 (2006) ("The clause in question contains express language of exclusivity of jurisdiction, specifying a mandatory location for litigation. This constitutes a mandatory forum selection clause." (citation omitted)).

Here, the forum selection clause clearly contains compulsory language specifying venue, which is sufficient to make the clause mandatory for purposes of this analysis.

### 3. *Plaintiff's claims are subject to the forum selection clause.*

TradeComet contends that its antitrust claims do not fall within the scope of the forum selection clause, whereas Google argues that the claims stem from Google's pricing and administration of its AdWords program, and thus fall within the scope of the Agreement. The August 2006 Agreement provides that "[a]ll claims arising out of or relating to this agreement or the Google Program(s)" shall be litigated in Santa Clara County, California. (August 2006 Agreement ¶ 9.) The Court need not determine whether TradeComet's antitrust claims arise out of or relate to the agreement because they clearly arise out of and relate to Google's AdWords program.

The Second Circuit has held consistently that forum selection clauses are to be interpreted broadly and are not restricted to pure breaches of the contracts containing the clauses. *See, e.g., Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.1993) (finding that a forum selection clause applicable to controversies arising "in connection with" a set of contracts

detailing the rights and duties of investors and marketers encompassed investors' securities and RICO claims); *Bense v. Interstate Battery Sys. of Am., Inc.,* 683 F.2d 718, 720-21 (2d Cir.1982) (finding that a forum selection clause applicable to controversies "arising directly or indirectly" from a franchise agreement encompassed the franchisee's antitrust suit against franchisor); *see also Smith, Valentino & Smith, Inc. v. Superior Court of Los Angeles County,* 17 Cal.3d 491, 495, 131 Cal.Rptr. 374, 551 P.2d 1206 (1976). Nonetheless, this expansive interpretation is not without limits, as the Second Circuit articulated in *Phillips.*

In *Phillips,* the court found that a plaintiff's claim for breach of copyright did not "arise out of" his licensing agreement with the defendant because the rights he sought to enforce did not originate from the recording contract. *Phillips,* 494 F.3d at 390. In reaching this conclusion, the Second Circuit focused on the specific language of the forum selection clause, which directed that "any legal proceedings that may arise out of [this agreement] are to be brought in England." *Id.* at 382. The court found the meaning of "arise out of" to be narrower than "all claims that have some possible relationship with the contract, *379 including claims that may only 'relate to,' be 'associated with,' or 'arise in connection with' the contract," particularly in light of the fact that the parties to the agreement could have used such broader terms if they so chose. *Id.* at 389. Applying this logic, the court found that, because the plaintiff's rights at issue did not originate from the recording contract, his effort to enforce those rights did not "arise out of" the contract. *Id.*

Both the language of the forum selection clause found in the August 2006 Agreement and the factual allegations of the complaint distinguish this action from *Phillips.* As noted above, the agreement here requires that "[a]ll claims arising out of or relating to this agreement or the Google Program(s)" shall be litigated in Santa Clara County, California. (August 2006 Agreement ¶ 9.) Thus, the clause at issue here specifically employs one of the broader terms that the *Phillips* court noted-i.e., "all claims ... that ... 'relate to' "-in contrast to the narrower "aris[ing] out of" provision at issue in that case. *See Phillips,* 494 F.3d at 389. Of even greater significance, this forum selection clause does not limit its reach merely to claims that relate to the agreement, but rather encompasses claims that relate to "the Google Program(s)," which it defines as "Google's advertising Program(s)." (August 2006 Agreement ¶ 9, preamble.) Thus, if TradeComet's antitrust claims "arise out of" or "relate to" either the August 2006 Agreement or Google's advertising programs, they are subject to the forum selection clause.

TradeComet.com LLC v. Google, Inc., 693 F.Supp.2d 370 (2010)

2010-1 Trade Cases P 76,941

11    TradeComet sets forth three counts in its complaint. By their plain language, each claim "relat[es] to" Google's advertising programs. *See generally Universal Grading Serv. v. eBay, Inc.,* No. 08 Civ. 3557, 2009 WL 2029796, at *11 (E.D.N.Y. June 10, 2009) (Plaintiffs' antitrust claims alleging conspiracy to restrain trade arise out of eBay's services and thus fall within the forum selection clause.); *Freedman v. Am. Online, Inc.,* 294 F.Supp.2d 238, 241-42 (D.Conn.2003); *see also Brodsky v. Match.com LLC,* No. 09 Civ. 5328, 2009 WL 3490277 (S.D.N.Y.2009) (finding that the plaintiffs' claims regarding website users' inability to communicate via email on the Match website are subject to a forum selection clause governing "any dispute arising out of the Website and/or the Service").

First, TradeComet alleges that Google has violated Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, by excluding TradeComet from the market for online search in order to protect Google's own monopoly. (Compl. ¶¶ 105-08.) While Count One does not identify the specific behavior that Google engaged in to maintain its purported monopoly and exclude SourceTool.com from the online search market, this count incorporates previous allegations, including those regarding Google's manipulation of the AdWords pricing formula to prevent SourceTool.com from advertising on Google's website. Thus, the facts alleged in support of Count One "relat[e] to" Google's advertising programs.

Second, TradeComet contends that Google has attempted to monopolize the online search market by increasing barriers to entry through the use of preferential agreements and manipulation of its advertising program to starve competitors such as SourceTool.com of search traffic, also in violation of Section 2 of the Sherman Antitrust Act. (*Id.* ¶¶ 110-14.) Count Two specifically alleges that Google has attempted to monopolize the online search market by, *inter alia,* using the pricing metrics within the AdWords program to prevent SourceTool.com from obtaining search traffic. Again, this allegation "relat[es] to" Google's administration of its advertising programs.

*380    Finally, TradeComet alleges that Google has entered into unreasonable agreements that restrain trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by partnering with Business.com. (*Id.* ¶¶ 116-20.) Count Three alleges that Google's agreement with Business.com improperly relaxes requirements that it imposes on SourceTool.com and other competitors, thereby both providing search traffic to Business.com that it denies

to SourceTool.com and effectively selling advertisements for Business.com's own search queries. While TradeComet again does not specify the requirements for which Google gives Business.com preferential treatment, the only interaction that it has alleged between TradeComet and Google-and thus the only requirements imposed on TradeComet that Google could relax for Business.com-stems from the AdWords program, and so this count, too, "relat[es] to" Google's advertising program.

Application of California state law does not dictate a different outcome. State "courts have placed a substantial burden on a plaintiff seeking to defeat [a forum selection] clause, requiring it to demonstrate enforcement of the clause would be unreasonable under the circumstances of the case. That is, that the forum selected would be unavailable or unable to accomplish substantial justice." *CQL Original Prods., Inc. v. Nat'l Hockey League Players' Assn.,* 39 Cal.App.4th 1347, 1354, 46 Cal.Rptr.2d 412 (Cal.Ct.App.1995) (citations omitted). Courts in California-as do those in the Second Circuit-turn first to the objective intent of a written agreement, as evidenced by its plain language. *See Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.,* 164 Cal.App.3d 1122, 1127, 211 Cal.Rptr. 62 (Cal.Ct.App.1985).

Furthermore, in considering whether a plaintiff's claims are subject to a choice of law provision, the California Supreme Court has determined that a clause that "provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement." *Nedlloyd Lines B.V. v. Superior Court,* 3 Cal.4th 459, 470, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992). In reaching this conclusion, the court was skeptical that "any rational businessperson ... would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship." *Id.* at 469, 11 Cal.Rptr.2d 330, 834 P.2d 1148. It wrote that if such a result were desired, the parties should "negotiate and obtain the assent of their fellow parties to explicit contract language specifying what jurisdiction's law applies to what issues." *Id.* at 470, 11 Cal.Rptr.2d 330, 834 P.2d 1148. This logic parallels that of the Second Circuit in *Phillips* and applies here, as the parties agreed to litigate all claims relating to their agreement or to Google's advertising program in Santa Clara County. On its face, such an encompassing forum selection clause demonstrates the parties' objective intent to litigate claims such as those brought by TradeComet in California, rather than in New York.

TradeComet.com LLC v. Google, Inc., 693 F.Supp.2d 370 (2010)
2010-1 Trade Cases P 76,941

**4.** *Enforcement of the forum selection clause is neither unreasonable nor unjust.*

TradeComet contends that the forum selection clause is unconscionable because-it claims-Google enforces it selectively, is found within a contract of adhesion, and it would force TradeComet to litigate its claims in Google's "backyard."

**12    13**    As an initial matter, TradeComet bears the burden of showing that the forum selection clause is unreasonable or unjust. *See* **\*381** *Phillips,* 494 F.3d at 383-84. However, TradeComet offers neither evidence to support its allegation of selective prosecution [5] nor legal authority indicating that such behavior-if true-would make a forum selection clause unconscionable and thus unenforceable. Additionally, the fact that the August 2006 Agreement may or may not be a contract of adhesion does not invalidate its forum selection provision. *See Brodsky,* 2009 WL 3490277, at *7-8 ("[A] forum selection clause is not unenforceable even if it appears in a contract of adhesion, including so-called 'click wrap' contracts ...." (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 593-95, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991))).

5    TradeComet cites to cases that Google has litigated outside of Santa Clara County, California but does not demonstrate that those actions fell within the scope of a forum selection clause similar to the one at issue here.

**14**    Finally, although litigating these claims in California rather than New York likely will be more burdensome for TradeComet, which has its principal place of business in New York, there is no suggestion that it would be so difficult as to deprive TradeComet of a fair opportunity to litigate its claims. *See M/S Bremen,* 407 U.S. at 18, 92 S.Ct. 1907 ("[I]t should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court."); *see also Novak v. Overture Servs., Inc.,* 309 F.Supp.2d 446, 452 (E.D.N.Y.2004) (rejecting the contention that a Google forum selection clause encompassing "any claims or causes of action arising out of or relating to your use of this service" was unconscionable); *Brodsky,* 2009 WL 3490277, at *4

**IV. Conclusion**

Google has demonstrated that the August 2006 Agreement provides the forum selection clause at issue in this action, that the clause was reasonably communicated to TradeComet, that the clause is mandatory, and that TradeComet's antitrust claims are subject to it. TradeComet has not shown that enforcement of the clause would be unconscionable. Accordingly, Google's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(3) is granted. The Court also denies TradeComet's motion to strike Exhibits D through H of the Walsh Declaration.

SO ORDERED.

Parallel Citations

2010-1 Trade Cases P 76,941

**End of Document**                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 30

DOCSTOR: 2191401\1

479 F.Supp.2d 468
United States District Court,
D. New Jersey.

SCHERING CORPORATION, Plaintiff,

v.

FIRST DATABANK, INC., Defendant.

Civil Action No. 06-5079 (PGS).    Jan. 24, 2007.

**Synopsis**

**Background:** Manufacturer of prescription pharmaceutical products sued disseminator of allegedly false information regarding substitutes for the manufacturer's products, asserting that the dissemination of false and defamatory information was intentional, malicious, and/or actionably negligent. Disseminator moved to dismiss based on a forum selection clause in a license agreement governing the manufacturer's use of the disseminator's databases.

**Holdings:** The District Court, Hedges, United States Magistrate Judge, held that:

1 the forum selection clause applied to the action, and

2 transfer of venue was warranted for the convenience of parties and witnesses and in the interest of justice.

Ordered accordingly.

West Headnotes (6)

**1**    **Federal Civil Procedure** 🔑 Improper venue

**Federal Courts** 🔑 In general; convenience and interest of justice

Proper procedure for enforcing a forum selection clause is through a motion to transfer venue, rather than a motion to dismiss. 28 U.S.C.A. § 1404(a).

1 Cases that cite this headnote

**2**    **Federal Courts** 🔑 In general; convenience and interest of justice

**Federal Courts** 🔑 Matters considered

**Federal Courts** 🔑 Plaintiff's choice of forum; forum shopping

In addressing a motion to transfer venue for the convenience of parties and witnesses and in the interest of justice, private interest factors court should consider include: [1] plaintiff's forum preference as manifested in the original choice; [2] the defendant's preference; [3] whether the claim arose elsewhere; [4] the convenience of the parties as indicated by their relative physical and financial condition; [5] the convenience of the witnesses-but only to extent that the witnesses may actually be unavailable for trial in one of the fora; and [6] the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). 28 U.S.C.A. § 1404(a).

**3**    **Federal Courts** 🔑 In general; convenience and interest of justice

**Federal Courts** 🔑 Matters considered

In addressing a motion to transfer venue for the convenience of parties and witnesses and in the interest of justice, public interest factors court should consider include: [1] the enforceability of the judgment; [2] practical considerations that could make the trial easy, expeditious, or inexpensive; [3] the relative administrative difficulty in the two fora resulting from court congestion; [4] the local interests in deciding local controversies at home; [5] the public policies of the fora; and [6] the familiarity of the trial judge with the applicable state law in diversity cases. 28 U.S.C.A. § 1404(a).

**4**    **Contracts** 🔑 Legal remedies and proceedings

Forum selection clause governing claims "related to" or "concerning" the parties' agreement applies to a broader range of claims than a clause governing claims "arising under" the agreement. 28 U.S.C.A. § 1404(a).

1 Cases that cite this headnote

**5**    **Contracts** 🔑 Legal remedies and proceedings

Forum selection clause in a license agreement governing a prescription pharmaceutical product manufacturer's use of an information disseminator's databases, applicable to disputes "concerning this Agreement or the Licensed

Products,"applied to the manufacturer's claims regarding the dissemination of allegedly false information regarding substitutes for the manufacturer's products; the action related to the agreement because the disseminator's defenses were based on the agreement, and the action related to the licensed product, defined in the agreement as the disseminator's database.

3 Cases that cite this headnote

6    **Federal Courts**  📌  **Torts in general**

Transfer of venue to California pursuant to a forum selection clause was warranted for the convenience of parties and witnesses and in the interest of justice in an action brought by a manufacturer of prescription pharmaceutical products against a disseminator of allegedly false information regarding substitutes for the manufacturer's products; the claim arose in California, where the license agreement between the parties was executed and where the disseminator had its principal place of business. 28 U.S.C.A. § 1404(a).

1 Cases that cite this headnote

**Attorneys and Law Firms**

*469 David S. Sager, Pitney Hardin, LLP, Morristown, NJ, for Plaintiff.

Michael Louis Berry, Levine Sullivan Koch & Schulz, Philadelphia, PA, for Defendant.

Opinion

**OPINION & ORDER**

HEDGES, United States Magistrate Judge.

**INTRODUCTION**

This matter comes before me on the motion of defendant First Databank, Inc. ("FDB"), to dismiss for improper venue. Plaintiff Schering Corporation ("Schering") opposes the motion. The motion was referred to me by Judge Sheridan. I have considered the papers submitted in support of and in

opposition to the motion. There was no oral argument. Rule 78.

**BACKGROUND**

FDB disseminates information about pharmaceutical products to pharmacists, physicians, pharmacy benefit managers, and others involved in the business of prescribing, dispensing and paying for prescription pharmaceutical products. FDB is incorporated in Missouri and has its principal place of business in San Bruno, California. Schering is a health care company that discovers, develops, manufactures and markets prescription pharmaceutical products. Schering is incorporated and has its principal place of business in New Jersey.

Schering alleges that FDB disseminated false information regarding its product, Proventil HFA. FDB allegedly represented in its database that Proventil HFA has two potential substitutes, which resulted in decreased Proventil HFA sales. Schering or a Schering entity and FDB executed a license agreement ("Agreement") in San Bruno, California that governs Schering's use of FDB databases. The Agreement contains the following forum selection clause:

> This Agreement shall be governed by and construed in accordance with the laws of the United States and the State of California, as applied to Agreements entered into and to be performed entirely within California between California residents.... In the event of any dispute concerning this Agreement or the Licensed Products, suit may be brought only in a court of competent jurisdiction in the U.S. District Court for the Northern District of California or the California *470 Superior Court for the Court for the County of San Mateo.

On October 23, 2006, Schering filed a Complaint, stating that FDB's dissemination of false and defamatory information has been intentional, malicious, and or actionably negligent. FDB raises the following Agreement provisions in defense to Schering's claims:

1. ¶ 8(b): FDB "does not warrant the accuracy of codes, prices or other data."

2. ¶ 8(d): FDB shall not "be liable to ... [Schering] for any consequential, indirect, incidental, reliance, or special damages, including but not limited to lost profits, even if [FDB] is advised of the possibility of such damages."

3. ¶ 8(a): "The Licensed Products are deemed proper and correct unless, within ten (10) working days after receipt thereof, [Schering] provides [FDB] with written notice and documentation of any error in the licensed Products."

4. ¶¶ 8(b), 9: FDB represents that it is not responsible for the choice of a health care professional to prescribe one medication over another.

## DISCUSSION

**1    2    3**    FDB seeks to dismiss this action based on the forum selection clause. I will not address dismissal because the proper procedure for enforcing a forum selection clause is thought a motion to transfer venue pursuant to 28 U.S.C. § 1404(a) rather than dismiss. Haskel v. FPR Registry, Inc., 862 F.Supp. 909, 913 (E.D.N.Y.1994). Section 1404(a) authorizes transfer to a district where the case could have been brought "for the convenience of parties and witnesses [and] in the interest of justice." The parties' execution of a forum selection clause is a "significant factor that figures centrally into the district court's calculus." Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). However, in deciding Section 1404(a) motions, the court must also evaluate several private and public interest factors. Jumara v. State Farm Ins. Co., 55 F.3d 873, 877-78 (3d Cir.1995). The private interest factors include:

[1] plaintiff's forum preference as manifested in the original choice; [2] the defendant's preference; [3] whether the claim arose elsewhere; [4] the convenience of the parties as indicated by their relative physical and financial condition; [5] the convenience of the witnesses-but only to extent that the witnesses may actually be unavailable for trial in one of the fora; and [6] the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). [55 F.3d at 879-80].

The public interest factors include:

[1] the enforceability of the judgment; [2] practical considerations that could make the trial easy, expeditious, or inexpensive; [3] the relative administrative difficulty in the two fora resulting from court congestion; [4] the local interests in deciding local controversies at home; [5] the public policies o f the fora; and [6] the familiarity of the trial judge with the applicable state law in diversity cases. [55 F.3d at 880].

a. *Applicability of the Forum Selection Clause*

**4**    Courts look to the language of the forum selection clause to determine its scope. "[W]hether or not a forum selection clause applies depends on what the specific clause at issue says." Wyeth & Brother Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1075 (3d Cir.1997). A clause governing claims "related to" or "concerning" the parties' agreement applies to a broader range of claims than a clause governing *\*471* claims "arising under" the agreement. 119 F.3d at 1075; compare J.B. Harris, Inc. v. Razei Bar Industries, Inc., 37 F.Supp.2d 186, 191-92 (E.D.N.Y.1998) (holding clause that mandates arbitration of claims **"concerning** or deriving from the Agreement" was sufficiently broad to encompass claim that Agreement was fraudulently induced) with In Re Kinoshita & Co., 287 F.2d 951, 952-53 (2d Cir.1961) (holding that similar clause that only governs claims **"arising from"** the Agreement was not sufficiently broad to encompass a fraudulent inducement claim.)

In fact, the Third Circuit has held that broadly worded clauses that govern claims "related to" or "concerning" the parties' agreement apply to actions where the agreement is raised only as a defense. Wyeth, 119 F.3d at 1076 (holding a forum selection clause governing any dispute "arising ... in relation to" the parties' agreement "easily encompasses a dispute in which the ... [a]greement is raised as a defense").

**5**    Here, the forum selection clause provides: "In the event of any dispute **concerning this Agreement or the Licensed Products,** suit may be brought only in a court of competent jurisdiction in the U.S. District Court of the Northern District of California or the California Superior Court for the Court for the County of San Mateo." (emphasis added). Schering does not does not contest the validity or enforceability of the forum selection clause. Rather, it argues that the clause does not govern the claims at issue.

The forum selection clause is broadly worded. It utilizes "concerning," as opposed to "arising under" language. "Concerning" is defined as "relating to." BLACK'S LAW DICTIONARY 289 (6th ed.1990). The issue is whether this action relates to either the Agreement or the Licensed Products. I conclude that it relates to both.

This action relates to the Agreement because FDB's defenses are based on the Agreement. Schering alleges that FDB intentionally, maliciously or negligently disseminated defamatory statements about Proventil HFA by representing on its website that Proventil HFA has two potential

substitutes. This allegedly caused a decrease in Proventil HFA sales and a loss of profit for Schering. FDB stated that it intends to rely on various provisions of the Agreement in its defense. These include disclaimers of liability for the accuracy of data posted on FDB's website, for the choices of health care professionals to prescribe one medication over another and for Schering's lost profits. FDB also pointed to a provision that places the burden on Schering to promptly notify FDB, in writing, of any error on the database.

Further, this action relates to the Licensed Product. Under the Agreement, "Licensed Product" is defined as the National Drug Data File database in which FDB publishes information about various pharmaceuticals, including Schering's Proventil HFA. Because the crux of the Complaint is that FDB used its database to disseminate misrepresentations about Proventil HFA, the contents of the database not only relate to, but are central to this action. Therefore, the forum selection clause governs this action.

#### b. *Private Interest Factors*

 6    Even though the forum selection clause governs this action, the private and public interest factors must still be considered. The private interest factors favor a transfer. With respect to the first factor, courts have given great deference to a plaintiff's choice of forum. *Lawrence v. Xerox Corp.,* 56 F.Supp.2d 442, 452 (D.N.J.1999) (holding the plaintiff's choice of forum *\*472* is presumptively correct). Schering chose to litigate in this Court. This factor weighs against a transfer.

Second, FDB prefers to litigate in either the Northern District of California or the California Superior Court for the County of San Mateo. Therefore, this factor favors a transfer.

Third, this claim arose is California. The Agreement was executed in California. Also, FDB's principal place of

business is in California, so it is the place where the database is created and maintained. This factor favors a transfer.

Fourth, Schering is incorporated and has its principal place of business in New Jersey. It is more convenient for it to litigate in this Court. FDB has a principal place of business in California. It is more convenient for FDB to litigate in California. Neither party has alleged that it has inadequate resources to litigate in a distant forum. This factor does not influence the decision to transfer.

Fifth, there is no indication that any witness may be unavailable for trial. This factor does not influence the decision to transfer.

Sixth, there is no indication that the evidentiary records could not be produced in alternate form, such as electronically or by mail. This factor does not influence the decision to transfer.

#### c. *Public interest factors*

The public interest factors are not relevant. There is no evidence that a judgment would be more enforceable in New Jersey, that a trial in New Jersey would be more efficient, that one forum is more congested than the other, or that New Jersey or California have any overriding local interests or public policies. The sixth factor is irrelevant because the applicable State law has not been determined.

In sum, the forum selection clause governs and the majority of relevant factors favor a transfer.

### CONCLUSION

For the reasons set forth above, this action is hereby transferred to the Northern District of California.

**SO ORDERED.**

---

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

 © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 31

DOCSTOR: 2191401\1

View National Reporter System version

196 A.D.2d 579, 601 N.Y.S.2d 496

Kent G. Lui et al., Respondents,

v.

Park Ridge at Terryville Association,
Inc., et al., Appellants, et al., Defendant.
(And a Third-Party Title.)

Supreme Court, Appellate Division,
Second Department, New York

(August 16, 1993)

CITE TITLE AS: Lui v Park Ridge at Terryville Assn.

## SUMMARY

In an action to recover damages for breach of contract, the defendants Park Ridge at Terryville Association, Inc., and Park Ridge Organization appeal from so much of an order of the Supreme Court, Richmond County (Cusick, J.), entered December 6, 1990, as denied their motion for summary judgment dismissing the complaint insofar as it is asserted against them.

Ordered that the order is reversed insofar as appealed from, on the law, without costs or disbursements, the motion is granted, the complaint is dismissed insofar as it is asserted against the appellants, and the action against the remaining defendant is severed. *580

The plaintiffs entered into a contract for the construction and purchase of a new home which was to be built by the defendants Park Ridge at Terryville Association, Inc., and Park Ridge Organization (hereinafter the defendant builders) and made a down payment of $25,200 toward the purchase price of the house. Approximately six months later, the plaintiffs notified the defendant builders that they had chosen to cancel the contract due to the fact that a "sewer hookup" would not be immediately available. Subsequently, the plaintiffs commenced the instant action to recover their down payment, claiming, in essence, that the contract was conditioned upon connection of the house to the county sewer system. After the joinder of issue, the plaintiffs and the defendant builders moved for summary judgment. Both motions were denied, and this appeal by the defendant builders followed.

It is well established that on a motion for summary judgment, the court's role is limited to one of issue-finding and not issue-determination *(see, Rotuba Extruders v Ceppos,* 46 NY2d 223; *Zarr v Riccio,* 180 AD2d 134; *Heller v Trustees of Town of E. Hampton,* 166 AD2d 554). Although the papers should be scrutinized carefully in the light most favorable to the opposing party *(see, Robinson v Strong Mem. Hosp.,* 98 AD2d 976)* and the court should not determine issues of credibility *(see, Capelin Assocs. v Globe Mfg. Corp.,* 34 NY2d 338, 341), "only the existence of a bona fide issue raised by evidentiary facts and not one based on conclusory or irrelevant allegations will suffice to defeat summary judgment" *(Rotuba Extruders v Ceppos, supra,* at 231).

Contrary to the determination of the Supreme Court, we find that the record fails to reveal the existence of any triable issues of fact with respect to the interpretation of the parties' contract of sale which would defeat the defendant builders' motion for summary judgment in their favor. It is settled that the responsibility to interpret a contract falls upon the court, "which must ascertain the intention of the parties from the language which they have employed" *(Carvel Corp. v Rait,* 117 AD2d 485, 487; *see also, Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.,* 32 NY2d 285, 291). The "[i]nterpretation of an unambiguous contract provision is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument" *(Teitelbaum Holdings v Gold,* 48 NY2d 51, 56; *see, Chimart Assocs. v Paul,* 66 NY2d 570, 572-573). Thus, where the parties have set forth their agreement in a clear *581 and complete document, their written agreement should be enforced according to its terms *(see, W.W.W. Assocs. v Giancontieri,* 77 NY2d 157, 162). A court should not, under the guise of contract interpretation, "imply a term which the parties themselves failed to insert" or otherwise rewrite the contract *(Mitchell v Mitchell,* 82 AD2d 849; *see, Ives v Ives,* 96 AD2d 643; *see also, Brands v Urban,* 182 AD2d 287). Here, paragraph (1) (a) of the contract of sale provided, in relevant part, that the purchasers agreed to accept the premises "subject to ... (ii) building restrictions and regulations of all municipal authorities in effect at the date of closing ... (iv) sewer, water, gas, drainage, electric, cable TV and telephone easements, if any ... [and that] it is a condition hereof that none of the above will prohibit the erection, use and maintenance of the dwelling". The contract also provided, in relevant part, as follows:

"4. In the event that any municipal agency having jurisdiction over the premises imposes construction requirements different or in addition to those required at the date of this contract, Purchaser hereby authorizes Seller to comply with such requirements and Purchaser agrees to pay the additional reasonable charge, if any, for same at the time of closing ...

"19. (a) The parties shall apportion at closing, taxes, fuel oil, water and sewer charges (if any). The Purchaser shall make such escrow deposits for taxes, insurance premiums, etc. as required by the lending institution at closing ...

"29. If any minor item in the dwelling or if the environs thereof are not fully completed at closing, Purchaser shall nevertheless close title, provided that a Certificate of Occupancy is issued and Seller agrees in writing to complete such items and the environs (weather permitting) within 30 days after closing. Purchaser will do an inspection 'walk-through' of the premises with Seller's representative no sooner than 48 hours prior to closing of title. Premises will be delivered free of debris and broom swept".

Finally, paragraph 37 (b) of the contract of sale provided that: "In no event will title close prior to June 15, 1988 *[sic]* as the premises will ultimately be connected to the sewer system of Suffolk County Sewer District No. 11-- Selden and certain construction work designed to enhance the capacity of the District's sewer system to facilitate such connection may not be completed before that date".

It is clear from the forgoing provisions that while the  *582 contract of sale makes references to sewer easements, sewer charges, etc., there is nothing in the language of the contract which would indicate that connection to the sewer system was a condition precedent to the contract *(see, Rom Terms. v Scallop Corp.,* 141 AD2d 358).  Indeed, the contractual provisions, particularly paragraph 37 (b), show that the parties clearly contemplated the possibility that the sewer hookup might not be completed prior to the date scheduled for closing. However, there is no provision which indicates that the parties intended to allow the plaintiffs to rescind the contract in the event the sewer hookup could not be made immediately. The general rule is that it must clearly appear from the contract itself that the parties intended a provision to operate as a condition precedent *(see,* 22 NY Jur 2d, Contracts, §234)  and that where there is ambiguity in a contractual term, the law does not favor a construction which creates a condition precedent *(see, Manning v Michaels,* 149

AD2d 897).  If the plaintiffs had intended to make the contract contingent upon the sewer hookup, then they should have expressly provided for such. Thus, the defendant builders' inability to immediately connect the premises with the public sewer system did not constitute a breach of the contract. Furthermore, it is clear from the record that the defendant builders had fully complied with their obligations under the contract up until the time that the plaintiffs attempted to rescind it. Therefore, the plaintiffs had no basis for refusing to proceed with the contract *(see, Pilgrim Homes & Garages v Fiore,* 75 AD2d 846; 22 NY Jur 2d, Contracts, § 319).

Balletta, J. P., Eiber and Ritter, JJ., concur.

Santucci, J.,

Dissents and votes to affirm the order insofar as appealed from, with the following memorandum: In my opinion there are triable issues of fact which prevent the defendants from obtaining summary judgment. The language of the contract does not resolve such issues as whether the agreement initially provided for the contingency of a temporary cesspool system, or whether such a system represented a material deviation which the plaintiffs were required to approve in writing. "When the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment" *(Leon v Lukash,* 121 AD2d 693, 694; *see also, Graepel v County of Nassau,* 119 AD2d 800).

Moreover, it is axiomatic that on a motion for summary judgment the court's role is limited to one of issue-finding and not issue-determination, and even the color of a triable issue  *583  of fact forecloses the remedy *(see, Rotuba Extruders v Ceppos,* 46 NY2d 223; *Matter of Benincasa v Garrubbo,* 141 AD2d 636).  Contrary to the opinion expressed by the majority, I find that the defendants' failure to provide a sewer connection raises triable issues of fact with respect to whether or not the plaintiffs were entitled to rescind the contract. "If material facts are in dispute or if different inferences may reasonably be drawn from facts themselves undisputed, a motion for summary judgment must be denied" *(Supan v Michelfeld,* 97 AD2d 755, 756).  Accordingly, I would affirm the order of the trial court and deny the defendant builders' motion for summary judgment.

Copr. (c) 2011, Secretary of State, State of New York

**End of Document**                                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 32

DOCSTOR: 2191401\1

View National Reporter System version

82 A.D.2d 849, 440 N.Y.S.2d 54

Milton G. Mitchell, Respondent,

v.

Virginia Mitchell, Appellant

Supreme Court, Appellate Division,
Second Department, New York
June 15, 1981

CITE TITLE AS: Mitchell v Mitchell

Appeal by the defendant wife from an order of the Supreme
Court, Dutchess County (Delaney, J.), entered July 15, 1980,
which (1) denied her motion for a judgment for arrears and for
a wage deduction order and (2) granted the plaintiff husband's
cross motion to the extent of reducing support payments to
the level of $1,000 per month, together with a credit for
overpayments of $1,200 due to the unforeseen circumstance
of the emancipation of the parties' daughter Ellen.

Order reversed, on the law, with $50 costs and disbursements,
motion granted, and cross motion denied. The case is remitted
to Special Term for further proceedings consistent herewith.

The parties were married in January, 1952. On July 29, 1978
they entered into a separation agreement which provides that
the respondent would pay the appellant, in fulfillment of
his obligation to support her and their children, the sum of
$1,200 per month. The agreement provides that upon the
emancipation of Nancy the amount would be reduced to
$1,000, upon the emancipation of Carolyn the amount would
be reduced to $900, and upon the emancipation of James (the
parties' youngest child) the amount would be reduced to $500
as alimony for the wife. No mention is made of any reduction
upon the emancipation of either Anne (the parties' eldest
child) or Ellen. In August, 1979 Ellen enlisted in the Navy.
Respondent continued to pay alimony and child support at
the monthly rate of $1,200 until February, 1980, when he
became aware of Ellen's enlistment. Respondent thereupon
reduced his payments to his wife to $1,000 due to Ellen's
enlistment. Respondent contends that the amount of support
specified in the agreement should be reduced by virtue of the
fact that Ellen was now emancipated. We find this contention
to be without merit. When the terms of a written contract
are clear and unambiguous the intent of the parties must be
found therein. The courts will not imply a term which the
parties themselves failed to insert *(Nichols v Nichols*, 306 NY
490). In the present action, the separation agreement provides
that the respondent can reduce his support payments to the
appellant only upon the emancipation of Nancy, Carolyn or
James. Consequently, such emancipation is the only condition
which would permit a reduction (see *Stern v Stern*, 41 AD2d
676; *Craig v Craig*, 24 AD2d 588). We have considered
respondent's other contentions and find them to be without
merit.

Hopkins, J. P., Mangano, Gulotta and Margett, JJ., concur.

Copr. (c) 2011, Secretary of State, State of New York

End of Document    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 33

DOCSTOR: 2191401\1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------X
                                    :
                                    :    Chapter 11
                                    :
In re                               :    Case No. 09-10138 (KG)
                                    :
Nortel Networks Inc., et al.,[1]    :
                                    :    Jointly Administered
                Debtors.            :
                                    :    RE: D.I. 874
                                    :
---------------------------------------------------X
```

## ORDER (A) APPROVING THE INTERIM FUNDING AND
## SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

Upon the motion dated, June _9_, 2009 (the "Motion"),[2] of Nortel Networks Inc. and its

affiliated debtors, as debtors and debtors in possession in the above-captioned cases (the "US

Debtors"), for entry of an order, as more fully described in the Motion, pursuant to sections

105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms

and conditions of the Interim Funding and Settlement Agreement (the "Agreement"), and (b)

granting related relief; and adequate notice of the Motion having been given as set forth in the

Motion; and it appearing that no other or further notice is necessary; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

and 1334; and the Court having determined that consideration of the Motion is a core proceeding

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and factual

bases set forth in the Motion establish just cause for the relief requested in the Motion, and that

such relief is in the best interests of the US Debtors, their estates, their creditors and the parties in

interest; and upon the record in these proceedings; and after due deliberation;

IT IS HEREBY ORDERED THAT:

1.  The Motion is GRANTED.

2.  The US Debtors are authorized, but not directed, to enter into the Interim Funding

Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and to

take any and all actions that may be reasonably necessary or appropriate to perform all

obligations contemplated thereunder.

3.  NNI is authorized to pay NNL $157 million as set forth in the Interim Funding

Agreement as an administrative expense pursuant to sections 503(b) and 363 of the Bankruptcy

Code for the Postpetition Services NNL has provided and the Expenses NNL has paid for the

benefit of NNI subsequent to the Petition Date.

4.  The Total Payment reflects the maximum administrative claim that the Canadian

Debtors may assert against the US Debtors for the Postpetition Services and Expenses, as well as

the maximum amount that NNI could owe under the Master R&D Agreement.

5.  Pursuant to Bankruptcy Rule 9019, the Interim Funding Agreement constitutes a full

and final settlement of any and all NNI Interim Obligations, all of the matters set forth in Part A

of the Interim Funding Agreement whether arising during, or related to the Canada/US Interim

Period, including, without limitation, any relief the Canadian Debtors and the US Debtors

intended to seek from this Court and the Canadian Court on June 29 and 30, 2009 or such later

date or dates as might be agreed or ordered.

2

6.   Each of NNL and the Canadian Debtors shall indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

7.   With respect to any of the matters referred to in Sections 11.c. and 12.a. through 12.f. (inclusive) of the Agreement, as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditor Groups in any negotiations on such issues with the Canadian Debtors and/or the EMEA Debtors, or any related proceedings, and any agreement or determination by the US Debtors shall require the prior consent of the Creditor Groups acting in good faith.

8.   Nothing in this Order or in the Interim Funding Agreement shall determine the allocation of proceeds from a Sale Transaction among the Selling Debtors or shall constitute a Protocol for determining the allocation of proceeds from a Sale Transaction among the Selling Debtors. In any Sale Transaction for which a US Debtor is a Selling Debtor, no Protocol for the allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court after notice to parties in interest with an opportunity to object, and no proceeds from a Sale Transaction may be allocated among the US Debtors and the other Selling Debtors unless such allocation is in accordance with a Protocol approved by this Court after notice to

3

parties in interest with an opportunity to object or upon further order of this Court after notice to parties in interest with an opportunity to object.

9.   The failure to specifically describe or include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be approved in its entirety.

10. Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the US Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the US Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

11. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: __June 29__, 2009
Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

4

# TAB 34

DOCSTOR: 2191401\1

View National Reporter System version

98 N.Y.2d 562, 780 N.E.2d 166, 750
N.Y.S.2d 565, 2002 N.Y. Slip Op. 07324

Ronnie Greenfield et al., Respondents,

v.

Philles Records, Inc., et al.,
Appellants, et al., Defendants.

Court of Appeals of New York
Argued September 5, 2002;
Decided October 17, 2002

CITE TITLE AS: Greenfield v Philles Records

### SUMMARY

Appeal, by permission of the Court of Appeals, from an order of the Appellate Division of the Supreme Court in the First Judicial Department, entered November 13, 2001, which affirmed a judgment of the Supreme Court (Paula Omansky, J.), entered in New York County, following a nonjury trial, awarding plaintiffs damages in the principal amount of $2,971,272.96, and ordering defendants to account to plaintiffs for any exploitation of the Ronettes' master recordings from June 15, 1998 to June 14, 2000 and for any future exploitation of those recordings.

Greenfield v Philles Records, 288 AD2d 59, modified.

### HEADNOTES

Copyrights--Musical Performances--Failure of Artist to Retain Rights
(1) In the absence of an explicit contractual reservation of rights by performing artists, the artists' transfer of full ownership rights to the master recordings of their musical performances carries with it the unconditional right of the producer to redistribute those performances in any technological format. A contract's silence on synchronization (i.e., the use of new recording technologies and licensing of master recordings for use in movie and television productions) and on domestic licensing of recordings to third parties for production and distribution in the United States, does not create an ambiguity which opens the door to the admissibility of extrinsic evidence to determine the intent of the parties. Inasmuch as there is no ambiguity in the parties' contract, defendant producers are entitled to exercise complete ownership rights, subject to payment of applicable

royalties owing to plaintiffs. The unconditional transfer of ownership right to a work of art includes the right to use the work in any manner, unless those rights are specifically limited by the terms of the contract.

Copyrights--Musical Performances--Ownership of Master Recordings--Exploitation of Future Technologies
(2) In a dispute between recording artists and their producer over the latter's rights to synchronization (i.e., the use of new recording technologies and licensing of master recordings for use in movie and television productions) and to domestic licensing of recordings to third parties for production and distribution in the United States, the breadth of the ownership provision granting the producer, who concededly owns the master recordings of the artists' performances, the "right to make phonograph records ... or other reproductions of the performances embodied in such recordings by any *563 method now or thereafter known, and to sell and deal in the same," is not limited by the agreement's introductory paragraph stating that the producers' purpose for purchasing the artists' performances was to make "phonograph records and/or tape recordings and other similar devices." When read in conjunction with the ownership provision, "other similar devices" encompasses defendants' right to reproduce the performances by any current or future technological methods.

Copyrights--Musical Performances--Ownership of Master Recordings--Exploitation of Future Technologies
(3) In a dispute between recording artists and their producer over the latter's right to exploit technologies which were unknown when their agreement was signed, the royalty schedule contained in the agreement does not restrict the scope of the producer's ownership rights of the master recordings of the artists' performances. The royalty schedule provides compensation rights to plaintiffs; it does not inhibit defendants' ability to use the master recordings. Accordingly, the parties' agreement, "read as a whole to determine its purpose and intent," is susceptible to only one reasonable interpretation: defendants are authorized to license the performances for use in visual media, such as movies and television commercials or broadcasts, and for domestic release by third parties in audio formats.

Copyrights--Musical Performances--Failure of Artist to Retain Rights
(4) In resolving a dispute between recording artists and their producer over the extent of the latter's right in his ownership of the master recordings of the artists' performances, *Caldwell*

*v ABKCO Music & Records* (269 AD2d 206 [2000]), which cites a federal case for the proposition that "[r]ights not specifically granted by an artist in an agreement are reserved to the artist and the owner of such property, absent the clearest language, is not free to do with it whatever the owner wishes," is not to be followed.

Release--Scope of Release--California Law

(5) In a dispute between a recording artist and her producer/ex-husband, the artist is not barred from sharing in certain royalties because she executed a general release in connection with her divorce from the producer. California law is applicable to the analysis of the scope of the release because that is the state where the release was executed and the divorce was finalized. In contrast to the "four corners" rule that New York has long applied, California courts preliminarily consider all credible evidence of the parties' intent in addition to the language of the contract. During proceedings in New York, Supreme Court determined that the extrinsic evidence supported the artist's allegation that her right to compensation under the recording contract was not an intended subject of the release. That finding of fact, affirmed by the Appellate Division, is supported by the record, and there is no reason to reverse the Appellate Division's interpretation of California law.

**TOTAL CLIENT SERVICE LIBRARY REFERENCES**

Am Jur 2d, Copyright and Literary Property §§ 16, 70-74, 91, 93-96, 160; Divorce and Separation §§ 1122, 1128, 1184; Release §§ 28-33.  ***564**

Carmody-Wait 2d, Spousal Support, Counsel Fees, Child Support, and Property Distribution in Matrimonial Actions §§ 118:145, 118:218.

NY Jur 2d, Compromise, Accord, and Release §§ 73, 79, 80, 82, 88; Domestic Relations §§ 2469, 2496, 2509, 2518, 2699; Literary and Artistic Property §§ 6-9, 11, 21, 28, 31, 32.

**ANNOTATION REFERENCES**

See ALR Index under Copyright and Literary Property; Discharge or Release; Divorce and Separation.

**POINTS OF COUNSEL**

*Pryor Cashman Sherman & Flynn LLP,* New York City (*Andrew H. Bart* and *David C. Rose* of counsel), for appellants.

I. The decision ignores controlling New York Property Law and improperly creates a subclass of property to be governed by judicially created ad hoc "rules." (*Allen v Trustees of Great Neck Free Church,* 265 NY 570; *Pushman v New York Graphic Socy.,* 287 NY 302; *Burnett v Warner Bros. Pictures,* 113 AD2d 710; *Brady v Smith,* 181 NY 178; *Matter of Rieger,* 60 AD2d 299, 44 NY2d 643; *Minc v Chase Natl. Bank of City of N.Y.,* 263 App Div 141; *Village of E. Rochester v Rochester Gas & Elec. Corp.,* 262 App Div 556, 289 NY 391; *Tysen v Cedar Grove Beach Corp.,* 196 App Div 684; *Matter of 24-52 44th St., Long Is. City,* 176 Misc 249; *Crimi v Rutgers Presbyt. Church in City of N.Y.,* 194 Misc 570.) II. In order to award respondents damages on a theory of unjust enrichment, the courts below jettisoned New York rules of contract interpretation. (*Surge Licensing v Copyright Promotions,* 258 AD2d 257; *Unisys Corp. v Hercules Inc.,* 224 AD2d 365; *Aviv Constr. v Antiquarium, Ltd.,* 259 AD2d 445; *Brooklyn Navy Yard Cogeneration Partners v PMNC,* 277 AD2d 271; *Breed v Insurance Co. of N. Am.,* 46 NY2d 351; *Chimart Assoc. v Paul,* 66 NY2d 570; *W.W.W. Assoc. v Giancontieri,* 77 NY2d 157; *Caldwell v ABKCO Music & Records,* 269 AD2d 206; *Thomas v Gusto Records,* 939 F2d 395; *Best Brands Beverage v Falstaff Brewing Corp.,* 842 F2d 578.) III. The courts below ignored controlling California law in order to relieve Greenfield from the effect of the release. (*McCray v Casual Corner,* 812 F Supp 1046; *Dobler v Story,* 268 F2d 274; *Alexander Sec. v Mendez,* 511 US 1150.) IV. New York Civil Rights Law § 51 confirms that respondents may not recover any damages based on the theory of unjust enrichment. (*Maxwell v N.W. Ayer, Inc.,* 159 Misc 2d 454; ***565** Oliveira v Frito-Lay, Inc.,* 251 F3d 56; *Grodin v Liberty Cable,* 244 AD2d 153; *Hampton v Guare,* 195 AD2d 366, 82 NY2d 659; *Bunnell v Keystone Varnish Co.,* 254 App Div 885.) V. The trial court abused its discretion by sua sponte amending the pleadings after the conclusion of trial. (*Trepuk v Frank,* 104 AD2d 780; *Cowper Co. v Buffalo Hotel Dev. Venture,* 99 AD2d 19; *Rodgers v Roulette Records,* 677 F Supp 731; *Felix v Lettre,* 204 AD2d 679; *Ramsey v Owens,* 159 AD2d 930; *Olden v Bolton,* 137 AD2d 878; *Murray v City of New York,* 43 NY2d 400; *Dittmar Explosives v A.E. Ottaviano, Inc.,* 20 NY2d 498; *Wiener v Lazard Freres & Co.,* 241 AD2d 114; *Collins Tuttle & Co. v Leucadia, Inc.,* 153 AD2d 526.) VI. The trial court could not award damages based on Wolinsky's calculations since his testimony was inconsistent with his calculations. (*Rushford v Facteau,* 280 AD2d 787; *Greenfield v Greenfield,* 234 AD2d 60; *Matter of City of New York [Esam Holding Corp.],* 222 App Div 554, 250 NY 588.)

*Edwards & Angell LLP,* New York City (*Ira G. Greenberg* and *Idelle R. Abrams* of counsel), and *Peltz & Walker* (*Alexander Peltz* of counsel) for respondents.

I. The Appellate Division correctly affirmed the award of damages on account of Philles' licensing the Ronettes' master recordings for synchronization. (*Lynes v Townsend,* 33 NY 558; *Matter of Charles,* 3 AD2d 119; *Matter of Rieger,* 60 AD2d 299; *Brady v Smith,* 181 NY 178; *Matter of Smith,* 90 AD2d 905, 60 NY2d 864; *Loch Sheldrake Assoc. v Evans,* 306 NY 297; *Stock v Mann,* 129 Misc 201; *Pushman v New York Graphic Socy.,* 287 NY 302; *Kramer v Newman,* 749 F Supp 542; *New Era Elec. Range Co. v Serrell,* 252 NY 107.) II. The Appellate Division correctly affirmed the award of damages on account of Philles' licensing the Ronettes' master recordings for manufacture. (*De Winter & Co. v B.N.S. Intl. Sales Corp.,* 16 AD2d 763; *Kasen v Morrell,* 6 AD2d 816; *Federal Express Corp. v Pan Am. World Airways,* 623 F2d 1297; *Thomas v Gusto Records,* 939 F2d 395; *Reape v New York News,* 122 AD2d 29.) III. The Appellate Division correctly held that the release that Ms. Greenfield executed in obtaining a divorce from Mr. Spector did not preclude her recovery. (*67 Wall St. Co. v Franklin Natl. Bank,* 37 NY2d 245; *Matter of Wallace v 600 Partners Co.,* 86 NY2d 543; *B & R Children's Overalls Co. v New York Job Dev. Auth.,* 257 AD2d 368.)

*Owen & Davis P.C.,* New York City (*Henry G. Burnett* and *Mark D. Bradford* of counsel), and *Berliner Corcoran & Rowe, L.L.P.,* Washington, D.C. (*Jay A. Rosenthal* of counsel), for Recording **\*566** Artists' Coalition, amicus curiae.

I. The Appellate Division correctly affirmed the trial court's decision that the 1963 recording agreement did not authorize Spector to license master recordings to unaffiliated third parties in ways not specified in the contract. (*Caldwell v ABKCO Music & Records,* 269 AD2d 206; *Thomas v Gusto Records,* 939 F2d 395, 502 US 984.) II. The Appellate Division correctly affirmed the trial court's award to compensatory damages in the amount of 50% of licensing revenues in accordance with industry custom and practice. (*Thomas v Gusto Records,* 939 F2d 395; *Caldwell v ABKCO Music & Records,* 269 AD2d 206.)

*O'Melveny & Myers LLP,* New York City (*Dale M. Cendali, Diana M. Torres* and *Olivier A. Taillieu* of counsel), *Matthew J. Oppenheim,* Washington, D.C., *Steven Marks, Stanley Pierre-Louis* and *Gary Greenstein* for Recording Industry Association of America, amicus curiae.

The Appellate Division incorrectly interpreted an unambiguous grant of rights. (*Caldwell v ABKCO Music & Records,* 269 AD2d 206; *Warner Bros. Pictures v Columbia Broadcasting Sys.,* 216 F2d 945; *Thomas v Gusto Records,* 939 F2d 395; *Burnett v Warner Bros. Pictures,* 113 AD2d 710; *Pushman v New York Graphic Socy.,* 287 NY 302; *Frohman v Fitch,* 164 App Div 231; *Bartsch v Metro-Goldwyn-Mayer, Inc.,* 391 F2d 150; *Boosey & Hawkes Music Publs., Ltd. v Walt Disney Co.,* 145 F3d 481.)

## OPINION OF THE COURT

Graffeo, J.

In this contract dispute between a singing group and their record producer, we must determine whether the artists' transfer of full ownership rights to the master recordings of musical performances carried with it the unconditional right of the producer to redistribute those performances in any technological format. In the absence of an explicit contractual reservation of rights by the artists, we conclude that it did.

In the early 1960s, Veronica Bennett (now known as Ronnie Greenfield), her sister Estelle Bennett and their cousin Nedra Talley, formed a singing group known as "The Ronettes." They met defendant Phil Spector, a music producer and composer, in 1963 and signed a five-year "personal services" music recording contract (the Ronettes agreement) with Spector's production company, defendant Philles Records, Inc. The plaintiffs agreed to perform exclusively for Philles Records and in exchange, Philles Records acquired an ownership right to the recordings **\*567** of the Ronettes' musical performances.[1] The agreement also set forth a royalty schedule to compensate plaintiffs for their services. After signing with Philles Records, plaintiffs received a single collective cash advance of approximately $15,000.

[1]   Defendants acknowledge that the agreement did not restrict the ability of the Ronettes to earn income from concert performances and appearances on television or in movies, or to sell the reproduction rights to those performances.

The Ronettes recorded several dozen songs for Philles Records, including "Be My Baby," which sold over a million copies and topped the music charts. Despite their popularity, the group disbanded in 1967 and Philles Records eventually went out of business. Other than their initial advance, plaintiffs received no royalty payments from Philles Records.

Beyond their professional relationship, however, was the story of the personal relationship between Spector and plaintiff Ronnie Greenfield. They married in 1968 but separated after a few years. Greenfield initiated a divorce proceeding against Spector in California and a settlement

780 N.E.2d 166, 750 N.Y.S.2d 565, 2002 N.Y. Slip Op. 07324

was reached in 1974. As part of that agreement, Spector and Greenfield executed mutual general releases that purported to resolve all past and future claims and obligations that existed between them, as well as between Greenfield and Spector's companies.

Defendants subsequently began to capitalize on a resurgence of public interest in 1960s music by making use of new recording technologies and licensing master recordings of the Ronettes' vocal performances for use in movie and television productions, a process known in entertainment industry parlance as "synchronization." The most notable example was defendants' licensing of "Be My Baby" in 1987 for use in the motion picture "Dirty Dancing." Defendants also licensed master recordings to third parties for production and distribution in the United States (referred to as domestic redistribution), and sold compilation albums containing performances by the Ronettes. While defendants earned considerable compensation from such licensing and sales, no royalties were paid to any of the plaintiffs.

As a result, plaintiffs commenced this breach of contract action in 1987, alleging that the 1963 agreement did not provide Philles Records with the right to license the master recordings for synchronization and domestic redistribution, and demanded royalties from the sales of compilation albums. Although defendants initially denied the existence of a contract, in 1992 *568 they stipulated that an unexecuted copy of the contract would determine the parties' rights. Defendants thereafter argued that the agreement granted them absolute ownership rights to the master recordings and permitted the use of the recordings in any format, subject only to royalty rights. Following extensive pretrial proceedings (160 AD2d 458; 243 AD2d 353; 248 AD2d 212), Supreme Court ruled in plaintiffs' favor and awarded approximately $3 million in damages and interest.

The Appellate Division affirmed, concluding that defendants' actions were not authorized by the agreement with plaintiffs because the contract did not specifically transfer the right to issue synchronization and third-party domestic distribution licenses. Permitting plaintiffs to assert a claim for unjust enrichment, the Court found that plaintiffs were entitled to the music recording industry's standard 50% royalty rate for income derived from synchronization and third-party licensing. We granted leave to appeal.

We are asked on this appeal to determine whether defendants, as the owners of the master recordings of plaintiffs' vocal performances, acquired the contractual right to issue licenses

to third parties to use the recordings in connection with television, movies and domestic audio distribution. [2] The agreement between the parties consists of a two-page document, which apparently was widely used in the 1960s by music producers signing new artists. Plaintiffs executed the contract without the benefit of counsel. The parties' immediate objective was to record and market the Ronettes' vocal performances and "mak[e] therefrom phonograph records and/or tape recordings and other similar devices (excluding transcriptions)." [3] The ownership rights provision of the contract provides:

"All recordings made hereunder and all records and reproductions made therefrom together with the performances embodied therein, shall be entirely [Philles'] property, free of any claims whatsoever by you or any person deriving any rights of interest from you. Without limitation of the foregoing, [Philles] shall have the right to make phonograph records, tape recordings or other reproductions of *569 the performances embodied in such recordings by any method now or hereafter known, and to sell and deal in the same under any trade mark or trade names or labels designated by us, or we may at our election refrain therefrom."

[2]  Whether defendants were allowed to use the Ronettes' performances on compilation albums and the amount of compensation that Supreme Court awarded for that use have not been raised on appeal.

[3]  "Transcriptions" were large discs used for reproducing musical performances for radio broadcasts.

Plaintiffs concede that the contract unambiguously gives defendants unconditional ownership rights to the master recordings, but contend that the agreement does not bestow the right to exploit those recordings in new markets or mediums since the document is silent on those topics. Defendants counter that the absence of specific references to synchronization and domestic licensing is irrelevant. They argue that where a contract grants full ownership rights to a musical performance or composition, the only restrictions upon the owner's right to use that property are those explicitly enumerated by the grantor/artist.

Despite the technological innovations that continue to revolutionize the recording industry, long-settled common-law contract rules still govern the interpretation of agreements between artists and their record producers. [4] The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent

(see *Slatt v Slatt,* 64 NY2d 966, 967, *rearg denied* 65 NY2d 785 [1985]). "The best evidence of what parties to a written agreement intend is what they say in their writing" (*Slamow v Del Col,* 79 NY2d 1016, 1018 [1992]). Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms (*see e.g. R/S Assoc. v New York Job Dev. Auth.,* 98 NY2d 29, 32, *rearg denied* 98 NY2d 693 [2002]; *W.W.W. Assoc. v Giancontieri,* 77 NY2d 157, 162 [1990]).

4    The dynamics of recording contracts were altered with the extension of federal statutory copyright protections to sound recordings in 1971. All the master recordings involved in this dispute predate that copyright statute.

Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide (see *W.W.W. Assoc. v Giancontieri, supra* at 162). A contract is unambiguous if the language it uses has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion" (*Breed v Insurance Co. of N. Am.,* 46 NY2d 351, 355 [1978], *rearg denied* 46 NY2d 940 [1979]). Thus, if the agreement **\*570** on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity (see *e.g. Teichman v Community Hosp. of W. Suffolk,* 87 NY2d 514, 520 [1996]; *First Natl. Stores v Yellowstone Shopping Ctr.,* 21 NY2d 630, 638, *rearg denied* 22 NY2d 827 [1968]).

⟨1⟩ The pivotal issue in this case is whether defendants are prohibited from using the master recordings for synchronization, and whatever future formats evolve from new technologies, in the absence of explicit contract language authorizing such uses. Stated another way, does the contract's silence on synchronization and domestic licensing create an ambiguity which opens the door to the admissibility of extrinsic evidence to determine the intent of the parties? We conclude that it does not and, because there is no ambiguity in the terms of the Ronettes agreement, defendants are entitled to exercise complete ownership rights, subject to payment of applicable royalties due plaintiffs.

New York has well-established precedent on the issue of whether a grantor retains any rights to artistic property once it is unconditionally transferred. In *Pushman v New York Graphic Socy.* (287 NY 302 [1942]), for example, this Court considered whether the common law permitted an artist who unconditionally sold a painting to enjoin the owner

from making reproductions of the artwork. Citing numerous authorities for the proposition that the unconditional sale of a work of art transfers all property rights to the buyer, we held that the defendants could reproduce the painting because "an artist must, if he wishes to retain or protect the reproduction right, make some reservation of that right when he sells the painting" (*id.* at 308). A broad grant of ownership rights, coupled with the absence of a reservation clause, was similarly dispositive in *Burnett v Warner Bros. Pictures* (67 NY2d 912 [1986], *affg* 113 AD2d 710). In that case, the plaintiffs had assigned all of their rights in a play that was later adapted into a movie, "Casablanca," and subsequently led to the defendant's spinoff television series. We affirmed the Appellate Division's conclusion that if "the plaintiff intended to retain certain rights, specific clauses to that effect should have been included in the agreement" because the parties' contract assigned "all imaginable rights" to Warner Brothers (113 AD2d at 712-713).

In analogous contexts, other courts have recognized that broad contractual provisions, similar to those in the Ronettes agreement, convey virtually unfettered reproduction rights to **\*571** license holders in the absence of specific exceptions to the contrary. In *Boosey & Hawkes Music Publs., Ltd. v Walt Disney Co.* (145 F3d 481 [2d Cir 1998]), the plaintiff granted distribution rights in foreign countries to Igor Stravinsky's musical composition "The Rite of Spring," including the "right, license, privilege and authority to record [the composition] in any manner, medium or form" (*id.* at 484) for use in the motion picture "Fantasia" to the Walt Disney Company. After Disney reproduced the song in videocassette and laser disc versions for foreign distribution, the plaintiff sought breach of contract damages on the basis that the agreement did not explicitly provide for distribution in new technological mediums.

The United States Court of Appeals for the Second Circuit reiterated its precedent that "'licensee[s] may properly pursue any uses which may reasonably be said to fall within the medium as described in the license'" (*id.* at 486, quoting *Bartsch v Metro-Goldwyn-Mayer, Inc.,* 391 F2d 150, 155 [2d Cir], *cert denied* 393 US 826 [1968]). As applied to the facts of *Boosey,* the Second Circuit concluded that the broad language employed in the contract granted Disney the authority to use the musical composition in the videocassette version of the movie in the absence of any contractual indication otherwise. [5] Thus, the language of the contract was the controlling factor in interpreting the agreement:

Greenfield v. Philles Records, Inc., 98 N.Y.2d 562 (2002)

780 N.E.2d 166, 750 N.Y.S.2d 565, 2002 N.Y. Slip Op. 07324

"If the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation" (145 F3d at 487).

5    See also *Batiste v Island Records Inc.,* 179 F3d 217, 223 (5th Cir 1999) (grant of unconditional rights to a musical composition included the licensing of a record containing a digital sample of the song), *cert denied* 528 US 1076 (2000); *Maljack Prods., Inc. v GoodTimes Home Video Corp.,* 81 F3d 881, 885 (9th Cir 1996) (unconditional grant of motion picture music rights included right to synchronize music in videocassette format); *Ingram v Bowers,* 57 F2d 65, 65 (2d Cir 1932) (artist failed to reserve any property interest in recordings of his musical performances); *Chambers v Time Warner, Inc.,* 123 F Supp 2d 198, 200-201 (SD NY 2000) (agreements permitted the conversion of master recordings to digital format), *vacated on other grounds* 282 F3d 147 (2d Cir 2002). *572

We agree with these prevalent rules of contract construction--the unconditional transfer of ownership rights to a work of art includes the right to use the work in any manner (*see generally Pushman,* 287 NY at 308) unless those rights are specifically limited by the terms of the contract (*see Burnett,* 67 NY2d 912; *Boosey & Hawkes Music Publs.,* 145 F3d at 486-487; *see generally, Hellman v Samuel Goldwyn Prods.,* 26 NY2d 175 [1970]). However, if a contract grants less than full ownership or specifies only certain rights to use the property, then other, unenumerated rights may be retained by the grantor (*see e.g., Warner Bros. Pictures v Columbia Broadcasting Sys.,* 216 F2d 945, 948 [9th Cir 1954], *cert denied* 348 US 971 [1955]; *see generally Cohen v Paramount Pictures Corp.,* 845 F2d 851 [9th Cir 1988]).

(2)( 3) In this case, plaintiffs concede that defendants own the master recordings. Notably, the agreement explicitly refers to defendants' "right to make phonograph records, tape recordings or *other reproductions* of the performances embodied in such recordings by *any method now or hereafter known,* and to sell and deal in the same" (emphasis added). Plaintiffs contend that the breadth of the ownership provision is limited by the agreement's introductory paragraph, which states that defendants' purpose for purchasing plaintiffs' performances was to make "phonograph records and/or tape recordings and other similar devices." However, when read in conjunction with the ownership provision, a reasonable meaning emerges--the phrase "other similar devices" refers

to defendants' right to reproduce the performances by any current or future technological methods. We also reject plaintiffs' assertion that the royalty schedule restricts the scope of defendants' ownership rights. That section of the agreement provides compensation rights to plaintiffs; it does not inhibit defendants' ability to use the master recordings. We therefore hold that the Ronettes agreement, "read as a whole to determine its purpose and intent" (*W.W.W. Assoc. v Giancontieri,* 77 NY2d at 162), is susceptible to only one reasonable interpretation--defendants are authorized to license the performances for use in visual media, such as movies and television commercials or broadcasts, and for domestic release by third parties in audio formats.

Plaintiffs' reliance upon *Thomas v Gusto Records, Inc.* (939 F2d 395 [6th Cir], *cert denied* 502 US 984 [1991]) is misplaced. In *Thomas,* the United States Court of Appeals for the Sixth Circuit purportedly applied New York law and held that the *573 parties' agreements were ambiguous regarding the artists' right to royalties from domestic licensing because the contracts were silent on the issue. The dispute in *Thomas*-- whether the contract's compensation clause entitled the plaintiffs to royalties from the issuance of domestic licenses-- is not the same as the question posed in this case, which concerns the scope of owners' rights to use their property. Furthermore, *Thomas'* suggestion that the failure of a contract to address certain categories of royalties allows a court to look beyond the four corners of the document to discern the parties' true intent conflicts with our established precedent that silence does not equate to contractual ambiguity (*see e.g. Reiss v Financial Performance Corp.,* 97 NY2d 195, 199 [2001]; *Trustees of Freeholders & Commonalty of Town of Southampton v Jessup,* 173 NY 84, 90 [1903] ["an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful"]).

(4) It follows that *Caldwell v ABKCO Music & Records* (269 AD2d 206 [2000]), which cites *Thomas* for the proposition that "[r]ights not specifically granted by an artist in an agreement are reserved to the artist and the owner of such property, absent the clearest language, is not free to do with it whatever the owner wishes" (269 AD2d at 207), is not to be followed. Nor does *Warner Bros. Pictures v Columbia Broadcasting Sys.* (216 F2d 945) lead us to a different conclusion since the agreement in that case did not purport to confer full ownership rights--it was restricted to only certain aspects of the "Maltese Falcon" story.

We realize that our conclusion here effectively prevents plaintiffs from sharing in the profits that defendants have received from synchronization licensing. However sympathetic plaintiffs' plight, we cannot resolve the case on that ground under the guise of contract construction. Our guiding principle must be to neutrally apply the rules of contract interpretation because only in this way can we ensure stability in the law and provide guidance to parties weighing the risks and advantages of entering a binding agreement.

Defendants acknowledge that the royalty schedule for domestic sales encompasses the sale of records, compact discs and other audio reproductions by entities holding domestic third-party distribution licenses from Philles Records. In light of that concession, we remit this case to Supreme Court to recalculate plaintiffs' damages for royalties due on all such sales. Damages should be determined pursuant to the applicable *574 schedule incorporated in the agreement rather than based on industry standards.

(5) Defendants further claim that Greenfield is barred from sharing in those royalties because she executed a general release in connection with her divorce from Spector. We look to California law to analyze the scope of Greenfield's release because that is the state where the release was executed and the divorce was finalized. In contrast to the "four corners" rule that New York has long applied (*see e.g. Kass v Kass,* 91 NY2d 554, 566 [1998]; *Benedict v Cowden,* 49 NY 396 [1872])*,* California courts preliminarily consider all credible evidence of the parties' intent in addition to the language of the contract--"[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether

it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible" (*Pacific Gas & Elec. Co. v G.W. Thomas Drayage & Rigging Co.,* 69 Cal 2d 33, 37, 442 P2d 641, 644 [1968])*.*

During proceedings in New York, Supreme Court determined that the extrinsic evidence supported Greenfield's allegation that her right to compensation under the 1963 recording contract was not an intended subject of the release. That finding of fact, affirmed by the Appellate Division, is supported by the record. We find no reason to reverse the Appellate Division's interpretation of California law (*see e.g. Rudman v Cowles Communications,* 30 NY2d 1, 10 [1972])*.* Plaintiff Greenfield is therefore entitled to her share of any damages assessed against defendants.

We have reviewed the parties' remaining contentions; they are either academic or meritless.

Accordingly, the order of the Appellate Division should be modified, without costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed.

Judges Levine, Ciparick, Wesley and Rosenblatt concur; Chief Judge Kaye and Judge Smith taking no part.

Order modified, etc. *575

Copr. (c) 2011, Secretary of State, State of New York

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 35

DOCSTOR: 2191401\1

View National Reporter System version

79 N.Y.2d 1016, 594 N.E.2d 918, 584 N.Y.S.2d 424

Michael Slamow et al., Respondents,

v.

John Del Col, Appellant, et al., Defendant.

Court of Appeals of New York
Argued April 1, 1992;
Decided May 7, 1992

CITE TITLE AS: Slamow v Del Col

### SUMMARY

Appeal, by permission of the Court of Appeals, from an order of the Appellate Division of the Supreme Court in the Second Judicial Department, entered June 24, 1991, which (1) reversed, on the law, an order of the Supreme Court (Gordon W. Burrows, J.), entered in Westchester County, granting a motion by defendant John Del Col for summary judgment dismissing the complaint, and denying a cross motion by plaintiffs for summary judgment, (2) denied defendant's motion, and (3) granted plaintiffs' cross motion.

The parties entered into a residential real estate contract of sale containing a mortgage contingency clause wherein the plaintiffs' obligation to purchase was made contingent upon their obtaining, by a specified date, a written commitment from an institutional lender to make a loan to them "of not less than $201,375." After the purchasers' mortgage application for $241,650 had been rejected and their request pursuant to the terms of the contingency clause for the return of the down payment declined, plaintiffs brought suit to recover the down payment.

Supreme Court concluded that plaintiffs breached the contract by applying for a mortgage that was some $40,000 more than that "required" under the terms of the contingency clause.

The Appellate Division concluded that the lower court ignored the plain meaning of the contract terms and effectively rewrote them in favor of defendant; that the interpretation urged by defendant, viz., that the clause meant that plaintiffs were required to apply for a mortgage "not to exceed $201,375", was contrary to the plain words of the contract; that language to effect that interpretation was readily available had it been the intention of the parties to include such a limitation; that there could be no doubt that if defendant

had intended a more specific meaning for the terms used, then the burden was upon him, as drafter, to so specify, and his failure to do so must not operate to plaintiffs' detriment; that a court may not rewrite a contract under the guise of construction; that, accordingly, plaintiffs had the right to a return of their down payment, and that defendant's allegation that plaintiffs proceeded in bad faith was merely conclusory and insufficient to warrant denial of plaintiffs' cross motion for summary judgment.

Slamow v Del Col, 174 AD2d 725, affirmed.

### HEADNOTES

Vendor and Purchaser--Contract for Sale of Real Property--Mortgage Contingency Clause

(1) In an action to recover a down payment on a contract for the sale of residential real property, an order of the Appellate Division, which reversed an order granting summary judgment to defendant and granted summary judgment to plaintiffs, should be affirmed for the reasons stated by the Appellate Division, which concluded that the lower court ignored the plain  *1018  meaning of the contract terms and effectively rewrote them in favor of defendant; that the interpretation of the mortgage contingency clause, requiring plaintiffs to secure a financing commitment by a certain date in an amount "of not less than $201,375", urged by defendant, viz., that plaintiffs were required to apply for a mortgage "not to exceed $201,375", was contrary to the plain words of the contract; that if defendant had intended a more specific meaning for the terms used, then the burden was upon him, as drafter, to so specify; that, accordingly, plaintiffs, whose application for a mortgage in the amount of $241,650 was rejected, had the right to a return of their down payment, and that defendant's allegation that plaintiffs proceeded in bad faith was merely conclusory and insufficient to warrant denial of plaintiffs' cross motion for summary judgment. Moreover, the best evidence of what parties to a written agreement intend is what they say in their writing, and the words herein are clear and unambiguous, and entitle the purchasers to return of their down payment.

### APPEARANCES OF COUNSEL

*Matthew D. Arkin* for appellant.

*David W. Silverman* for respondents.

### OPINION OF THE COURT

The order of the Appellate Division should be affirmed, with costs, for the reasons stated by the Appellate Division (174 AD2d 725).

We would but add the following, in response to the dissent. The best evidence of what parties to a written agreement intend is what they say in their writing. Here, the words used in the parties' contract are clear and unambiguous, and entitle the purchasers to return of their down payment. That this may be a standard clause in a form for the sale of real property suggests even more strongly that the clause should be *rewritten* if it is indeed inaccurate, rather than for this Court to speculate as to what the parties to a particular transaction could have believed it meant.

Hancock, Jr., J.

(Dissenting). I would reverse and reinstate the order of Supreme Court.

The appeal turns on one issue: the meaning of paragraph 23, the mortgage contingency clause in form M 146--the standard contract of sale for condominiums, prepared by the Committee on Real Property Law of the Association of the Bar of the City of New York. The standard mortgage contingency clause-- with the blank spaces for the date and the amount of the lender's commitment filled in by the parties-- provides in pertinent part: *1019*

"23. Mortgage Contingency: The obligations of Purchaser hereunder are conditioned upon issuance on or before September 1, 1988 of a written commitment from any Institutional Lender pursuant to which such Institutional Lender agrees to make a loan to Purchaser, at Purchaser's sole cost and expense, of not less than $201,375.00 ... Purchaser shall (a) make prompt application to one or more Institutional Lenders for such first mortgage loan"

The purpose of the typical mortgage contingency clause is simply to relieve the purchaser of the obligation of going through with the contract if mortgage financing is not obtainable in a given amount. No one contends otherwise. The commonly understood meaning of a mortgage contingency clause, as described by Justice Burrows at Supreme Court, is this:

"A mortgage contingency clause in a contract of sale of real estate is for the benefit of a purchaser who has *represented that he is only ready, willing and able to purchase if third-party financing is obtainable.* In order to enter into the contract and allow purchaser time to obtain the requisite

financing the contract is made conditional upon fulfilling the very financing requirement represented by purchaser as necessary. Thus, a purchaser, who has made a good faith estimation of his ability to obtain the requisite financing, is protected from conclusively binding himself to an otherwise impossible contract should his good faith estimation prove incorrect" (emphasis added).

It is not suggested that the Committee on Real Property Law which drafted form M 146 intended that the standard mortgage contingency clause should be given any meaning other than the generally accepted meaning--i.e., one which makes the purchaser's obligation depend not on the *purchaser's action in applying for a loan* but on the *willingness of a third party to make a loan.* Yet, here the purchasers and the Appellate Division in reversing Supreme Court and, indeed, the majority of this Court read the standard clause as though it says something quite different. Instead of making the contract contingent on a third party's willingness to make a commitment "of not less than $201,375.00", they make it *1020* contingent upon *action by the purchasers;* i.e., their act of applying for a loan "of not less than $201,375.00". Under this construction, the condition is met if the purchasers *apply for* a loan in any amount equal to or greater than $201,375. In this case, because the purchasers applied unsuccessfully for a loan in the amount of $241,650, the contingency was met and they are relieved of any obligation under the contract. This is so, even though a third party (i.e., any institutional lender) might well have been willing to commit for a loan "of not less than $201,375.00." Thus, the construction adopted is contrary both to the plain language of the mortgage contingency clause and to its commonly accepted meaning.

The practical result of this construction is to convert the standard mortgage contingency clause into a clause which gives the purchasers a unilateral option to cancel--to be effected by the simple expedient of applying unsuccessfully for a loan in an amount higher than the stipulated sum. It can hardly be thought that the parties could have believed that this was the way the clause was intended to operate. No one suggests that the Committee of the Association of the Bar intended to draft a standard contract containing a clause which could be so easily employed to defeat the purchasers' obligation.

Nevertheless--although contrary to the ordinarily accepted meaning of a mortgage contingency clause and to the effect of this clause that the parties and the drafters of the clause must have intended--the majority holds that the construction advanced by the purchasers is correct. The argument is that

the plain meaning of the contract compels this construction. But the plain meaning, I submit, does just the opposite. The obligation of the purchasers is clearly conditioned on the actions and agreement of a third party, i.e., the *"issuance* on or before September 1, 1988 *of a written commitment* from any Institutional Lender pursuant to which such Institutional Lender *agrees to make* a loan" (emphasis added). The contingency does not depend on actions or events within the control of the purchasers. The only reference in clause 23 to an application being made by the purchasers is in the second sentence of the clause, i.e., "[p]urchaser[s] shall (a) make prompt application to one or more Institutional Lenders for such first mortgage loan." The reference to "such first mortgage loan", of course, is to the loan "of not less than $201,375.00" referred to in the first sentence in clause 23 for which the lender has issued its commitment.

No case has been cited where the standard mortgage contingency *\*1021* clause has been given the effect which the purchasers advocate here. This construction is contrary to the commonly understood purpose of a mortgage contingency clause, to what appears to be the commonsense meaning of

the clause intended by the drafters, and to what, I believe, the parties to this must reasonably have intended. To be sure, clause 23 can easily be redrafted to avoid the purchasers' construction and to close what Supreme Court aptly describes as "an unfettered escape hatch for a purchaser who would use it to his advantage." Rejecting the purchasers' meaning and staying with the commonly understood meaning of the standard clause would obviate the need for any such amendment; and it would avoid what may be the resulting confusion and controversy over the rights of parties under existing form M 146 contracts containing clause 23, as it now reads.

Chief Judge Wachtler and Judges Kaye, Titone, Bellacosa and Yesawich, Jr., [*] concur; Judge Hancock, Jr., dissents and votes to reverse in an opinion; Judge Simons taking no part.

[*]   Designated pursuant to NY Constitution, article VI, § 2.

Order affirmed, with costs, in a memorandum.

Copr. (c) 2011, Secretary of State, State of New York

End of Document                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 36

DOCSTOR: 2191401\1

W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157 (1990)

566 N.E.2d 639, 565 N.Y.S.2d 440

View National Reporter System version

77 N.Y.2d 157, 566 N.E.2d 639, 565 N.Y.S.2d 440

W.W.W. Associates, Inc., Respondent,

v.

Frank Giancontieri et al., Appellants.

Court of Appeals of New York
Argued November 19, 1990;
Decided December 27, 1990

CITE TITLE AS: W.W.W. Assoc. v Giancontieri

### SUMMARY

Appeal, by permission of the Court of Appeals, from an order of the Appellate Division of the Supreme Court in the Second Judicial Department, entered December 13, 1989, which (1) reversed, on the law, an order and judgment (one paper) of the Supreme Court (Paul J. Baisley, J.), entered in Suffolk County, granting a motion by defendants for summary judgment, and dismissing the complaint, (2) reinstated the complaint, (3) upon searching the record pursuant to CPLR 3212 (b), granted summary judgment to plaintiff against defendants directing specific performance of a contract for the sale of real property, and (4) remitted the matter to Supreme Court, Suffolk County, for entry of an appropriate judgment.

W.W.W. Assocs. v Giancontieri, 152 AD2d 333, reversed.

### HEADNOTES

Vendor and Purchaser--Contract for Sale of Real Property--Construction of Unambiguous Reciprocal Cancellation Provision--Extrinsic Evidence
(1) In an action for specific performance of a contract to sell real property, an unambiguous reciprocal cancellation provision should not be read in the light of extrinsic evidence, as a contingency clause for the sole benefit of plaintiff purchaser, subject to its unilateral waiver. Clear, complete writings should generally be enforced according to their terms. Here, the contract, read as a whole to determine its purpose and intent, plainly manifests the intention that defendants, as well as plaintiff, should have the right to cancel pursuant to the subject provision, and that all prior understandings be merged into the contract, which expresses the parties' full agreement. Moreover, the face of the contract reveals a logical reason for the explicit provision that the cancellation right should run to the seller as well as to

the purchaser. Extrinsic evidence should not be considered in order to create an ambiguity in the agreement which is complete and clear on its face.

Judgments--Summary Judgment--Action for Specific Performance of Contract to Sell Real Property
(2) In an action for specific performance of a contract to sell real property which was canceled by defendant sellers pursuant to an unambiguous reciprocal cancellation provision stating that either party shall have the right to cancel the contract in the event certain litigation concerning the subject real property is not concluded by or before June 1, 1987, plaintiff's conclusory assertion of bad faith, supported only by its vice-president's statement that one of the defendants told the broker on the transaction, who then told him, that defendants were doing nothing to defend the action, *158 waiting for June 2 to cancel, and suggesting that the broker might resell the property at a higher price, fails to raise a triable issue of fact sufficient to defeat defendants' motion for summary judgment.

### TOTAL CLIENT SERVICE LIBRARY REFERENCES

Am Jur 2d, Summary Judgment, §§ 5, 18, 27; Vendor and Purchaser, §§ 60, 61, 535.

Carmody-Wait 2d, Summary Judgment §§ 39:20, 39:21, 39:34.

NY Jur, Vendor and Purchaser, §§ 29, 32, 125.

### ANNOTATION REFERENCES

See Index to Annotations under Affidavits; Sale and Transfer of Property; Summary Judgment.

### POINTS OF COUNSEL

John G. Poli III for appellants.

I. The record amply demonstrates that this litigation contingency is for the benefit of both the purchaser and seller. (Catholic Foreign Mission Socy. v Oussani, 215 NY 1; Satterly v Plaisted, 52 AD2d 1074, 42 NY2d 933; Bonavita & Sons v Quarry, 126 AD2d 707, 69 NY2d 607; Lieberman Props. v Braunstein, 134 AD2d 55; Praver v Remsen Assocs., 150 AD2d 540.)
II. On this record, the purchaser fails to properly raise a triable issue of fact in opposition to the sellers' motion for summary judgment. (Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065; Accord Farmers Coop. v Levine, 36

W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157 (1990)

566 N.E.2d 639, 565 N.Y.S.2d 440

AD2d 656; *Nichols v Nichols*, 306 NY 490; *Mazzola v County of Suffolk*, 143 AD2d 734; *Long Is. R. R. Co. v Northville Indus. Corp.*, 41 NY2d 455; *Rodolitz v Neptune Paper Prods.*, 22 NY2d 383; *Cream of Wheat Co. v Crist Co.*, 222 NY 487; *Hutchinson v Ross*, 262 NY 381, 643; *Ferlita v Guarneri*, 136 AD2d 680; *Braten v Bankers Trust Co.*, 60 NY2d 155.)

*Matthew Dollinger* and *Michael J. Spithogiannis* for respondent.

I. A party to a real estate contract may waive a condition inserted for its benefit and compel specific performance. *(Catholic Foreign Mission Socy. v Oussani*, 215 NY 1; *South Shore Skate Club v Fatscher*, 17 AD2d 840; *Knight v Kitchin*, 237 App Div 506; *Matter of Liberty Mut. Ins. Co. v Lodha*, 131 Misc 2d 670; *Arndt v Leff*, 14 Misc 2d 677; *Weinprop, Inc. v Foreal Homes*, 79 AD2d 987;  **\*159**  *Satterly v Plaisted*, 52 AD2d 1074, 42 NY2d 933.)

II. Reciprocal cancellation clauses can be waived by the party for whose benefit they were intended. *(De Freitas v Holley*, 93 AD2d 852; *BPL Dev. Corp. v Cappel*, 86 AD2d 591, 56 NY2d 506; *Laxran Constr. Corp. v R.S.C.A. Realty Corp.*, 135 AD2d 685; *Weinprop, Inc. v Foreal Homes*, 79 AD2d 987; *Satterly v Plaisted*, 52 AD2d 1074, 42 NY2d 933; *Poteralski v Colombe*, 84 AD2d 887; *Praver v Remsen Assocs.*, 150 AD2d 540; *Holiday Mgt. Assocs. v New York Inst. of Technology*, 149 AD2d 462; *Oak Bee Corp. v Blankman & Co.*, 154 AD2d 3.)

III. A condition affecting the marketability of title is for the benefit of the purchaser and may be waived by the purchaser. *(Catholic Foreign Mission Socy. v Oussani*, 215 NY 1; *Jandorf v Smith*, 217 App Div 150; *New York Investors v Manhattan Beach Bathing Parks Corp.*, 229 App Div 593, 256 NY 162.)

IV. The determination of the court below was "on the law" and new arguments cannot be considered or findings of fact made. *(Persky v Bank of Am. Natl. Assn.*, 261 NY 212; *Telaro v Telaro*, 25 NY2d 433; *Ostrom v Greene*, 161 NY 353; *Ballen v Potter*, 251 NY 224; *Laxran Constr. Corp. v R.S.C.A. Realty Corp.*, 135 AD2d 685; *BPL Dev. Corp. v Cappel*, 86 AD2d 591, 56 NY2d 506; *Lieberman Props. v Braunstein*, 134 AD2d 55; *Bonavita & Sons v Quarry*, 126 AD2d 707, 69 NY2d 607; *Poquott Dev. Corp. v Johnson*, 104 AD2d 442; *Catholic Foreign Mission Socy. v Oussani*, 215 NY 1.)

V. The record establishes that W.W.W. was the sole beneficiary of the litigation contingency clause and Kenneth S. Weinstein's affidavit was properly considered. *(Oak Bee Corp. v Blankman & Co.*, 154 AD2d 3; *BPL Dev. Corp. v Cappel*, 86 AD2d 591, 56 NY2d 506; *De Freitas v Holley*, 93 AD2d 852; *Laxran Constr. Corp. v R.S.C.A. Realty Corp.*,

135 AD2d 685; *Poteralski v Colombe*, 84 AD2d 887; *Praver v Remsen Assocs.*, 150 AD2d 540.)

VI. Giancontieri's bad faith has never been disputed. *(Austin v Trybus*, 136 AD2d 940; *McKenna v Case*, 123 AD2d 517; *Norgate Homes v Central State Bank*, 82 AD2d 849; *Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62.)

## OPINION OF THE COURT

Kaye, J.

[1] In this action for specific performance of a contract to sell real property, the issue is whether an unambiguous reciprocal cancellation provision should be read in light of extrinsic evidence, as a contingency clause for the sole benefit of plaintiff purchaser, subject to its unilateral waiver. Applying  **\*160**  the principle that clear, complete writings should generally be enforced according to their terms, we reject plaintiff's reading of the contract and dismiss its complaint.

Defendants, owners of a two-acre parcel in Suffolk County, on October 16, 1986 contracted for the sale of the property to plaintiff, a real estate investor and developer. The purchase price was fixed at $750,000--$25,000 payable on contract execution, $225,000 to be paid in cash on closing (to take place "on or about December 1, 1986"), and the $500,000 balance secured by a purchase-money mortgage payable two years later.

The parties signed a printed form Contract of Sale, supplemented by several of their own paragraphs. Two provisions of the contract have particular relevance to the present dispute--a reciprocal cancellation provision (para 31) and a merger clause (para 19). Paragraph 31, one of the provisions the parties added to the contract form, reads: "The parties acknowledge that Sellers have been served with process instituting an action concerned with the real property which is the subject of this agreement. In the event the closing of title is delayed by reason of such litigation it is agreed that closing of title will in a like manner be adjourned until after the conclusion of such litigation provided, *in the event such litigation is not concluded, by or before 6-1-87 either party shall have the right to cancel this contract whereupon the down payment shall be returned and there shall be no further rights hereunder.*" (Emphasis supplied.) Paragraph 19 is the form merger provision, reading: "All prior understandings and agreements between seller and purchaser are merged in this contract [and it] completely expresses their full agreement. It has been entered into after full investigation, neither party relying upon any statements made by anyone else that are not set forth in this contract."

W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157 (1990)

566 N.E.2d 639, 565 N.Y.S.2d 440

The Contract of Sale, in other paragraphs the parties added to the printed form, provided that the purchaser alone had the unconditional right to cancel the contract within 10 days of signing (para 32), and that the purchaser alone had the option to cancel if, at closing, the seller was unable to deliver building permits for 50 senior citizen housing units (para 29).

The contract in fact did not close on December 1, 1986, as originally contemplated. As June 1, 1987 neared, with the litigation still unresolved, plaintiff on May 13 wrote defendants that it was prepared to close and would appear for *161 closing on May 28; plaintiff also instituted the present action for specific performance. On June 2, 1987, defendants canceled the contract and returned the down payment, which plaintiff refused. Defendants thereafter sought summary judgment dismissing the specific performance action, on the ground that the contract gave them the absolute right to cancel.

Plaintiff's claim to specific performance rests upon its recitation of how paragraph 31 originated. Those facts are set forth in the affidavit of plaintiff's vice-president, submitted in opposition to defendants' summary judgment motion.

As plaintiff explains, during contract negotiations it learned that, as a result of unrelated litigation against defendants, a lis pendens had been filed against the property. Although assured by defendants that the suit was meritless, plaintiff anticipated difficulty obtaining a construction loan (including title insurance for the loan) needed to implement its plans to build senior citizen housing units. According to the affidavit, it was therefore agreed that paragraph 31 would be added for plaintiff's sole benefit, as contract vendee. As it developed, plaintiff's fears proved groundless--the lis pendens did not impede its ability to secure construction financing. However, around March 1987, plaintiff claims it learned from the broker on the transaction that one of the defendants had told him they were doing nothing to defend the litigation, awaiting June 2, 1987 to cancel the contract and suggesting the broker might get a higher price.

Defendants made no response to these factual assertions. Rather, its summary judgment motion rested entirely on the language of the Contract of Sale, which it argued was, under the law, determinative of its right to cancel.

The trial court granted defendants' motion and dismissed the complaint, holding that the agreement unambiguously conferred the right to cancel on defendants as well as plaintiff. The Appellate Division, however, reversed and,

after searching the record and adopting the facts alleged by plaintiff in its affidavit, granted summary judgment to plaintiff directing specific performance of the contract. We now reverse and dismiss the complaint.

Critical to the success of plaintiff's position is consideration of the extrinsic evidence that paragraph 31 was added to the contract solely for its benefit. The Appellate Division made clear that this evidence was at the heart of its decision: "review of the record reveals that under the circumstances of *162 this case the language of clause 31 was intended to protect the plaintiff from having to purchase the property burdened by a notice of pendency filed as a result of the underlying action which could prevent the plaintiff from obtaining clear title and would impair its ability to obtain subsequent construction financing." (152 AD2d 333, 336.) In that a party for whose sole benefit a condition is included in a contract may waive the condition prior to expiration of the time period set forth in the contract and accept the subject property "as is" (see, e.g., Satterly v Plaisted, 52 AD2d 1074, affd 42 NY2d 933; Catholic Foreign Mission Socy. v Oussani, 215 NY 1, 8; Born v Schrenkeisen, 110 NY 55, 59), plaintiff's undisputed factual assertions--if material--would defeat defendants' summary judgment motion.

We conclude, however, that the extrinsic evidence tendered by plaintiff is not material. In its reliance on extrinsic evidence to bring itself within the "party benefited" cases, plaintiff ignores a vital first step in the analysis: before looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract.

A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing (see, e.g., Mercury Bay Boating Club v San Diego Yacht Club, 76 NY2d 256, 269-270; Judnick Realty Corp. v 32 W. 32nd St. Corp., 61 NY2d 819, 822; Long Is. R. R. Co. v Northville Indus. Corp., 41 NY2d 455; Oxford Commercial Corp. v Landau, 12 NY2d 362, 365). That rule imparts "stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses ... infirmity of memory ... [and] the fear that the jury will improperly evaluate the extrinsic evidence." (Fisch, New York Evidence § 42, at 22 [2d ed].) Such considerations are all the more compelling in the context of real property transactions, where commercial certainty is a paramount concern.

566 N.E.2d 639, 565 N.Y.S.2d 440

Whether or not a writing is ambiguous is a question of law to be resolved by the courts *(Van Wagner Adv. Corp. v S & M Enters.,* 67 NY2d 186, 191). In the present case, the contract, read as a whole to determine its purpose and intent *(see, e.g., Rentways, Inc. v O'Neill Milk & Cream Co.,* 308 NY 342, 347),  *\*163*  plainly manifests the intention that defendants, as well as plaintiff, should have the right to cancel after June 1, 1987 if the litigation had not concluded by that date; and it further plainly manifests the intention that all prior understandings be merged into the contract, which expresses the parties' full agreement *(see,* 3 Corbin, Contracts § 578, at 402-403). Moreover, the face of the contract reveals a "logical reason" (152 AD2d, at 341) for the explicit provision that the cancellation right contained in paragraph 31 should run to the seller as well as the purchaser. A seller taking back a purchase-money mortgage for two thirds of the purchase price might well wish to reserve its option to sell the property for cash on an "as is" basis if third-party litigation affecting the property remained unresolved past a certain date.

Thus, we conclude there is no ambiguity as to the cancellation clause in issue, read in the context of the entire agreement, and that it confers a reciprocal right on both parties to the contract.

The question next raised is whether extrinsic evidence should be considered in order to *create* an ambiguity in the agreement. That question must be answered in the negative. It is well settled that "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *(Intercontinental Planning v Daystrom, Inc.,* 24 NY2d 372, 379; *see also, Chimart Assocs. v Paul,* 66 NY2d 570, 573.)

Plaintiff's rejoinder--that defendants indeed had the specified absolute right to cancel the contract, but it was subject to plaintiff's absolute prior right of waiver--suffers from a logical inconsistency that is evident in a mere statement of the argument. But there is an even greater problem. Here, sophisticated businessmen reduced their negotiations

to a clear, complete writing. In the paragraphs immediately surrounding paragraph 31, they expressly bestowed certain options on the purchaser alone, but in paragraph 31 they chose otherwise, explicitly allowing both buyer and seller to cancel in the event the litigation was unresolved by June 1, 1987. By ignoring the plain language of the contract, plaintiff effectively rewrites the bargain that was struck. An analysis that begins with consideration of extrinsic evidence of what the parties meant, instead of looking first to what they said and reaching extrinsic evidence only when required to do so because of some identified ambiguity, unnecessarily denigrates the contract and unsettles the law.  *\*164*

(2)  Finally, plaintiff's conclusory assertion of bad faith is supported only by its vice-president's statement that one of the defendants told the broker on the transaction, who then told him, that defendants were doing nothing to defend the action, waiting for June 2 to cancel, and suggesting that the broker might resell the property at a higher price. Where the moving party "has demonstrated its entitlement to summary judgment, the party opposing the motion must demonstrate by admissible evidence the existence of a factual issue requiring a trial of the action or tender an acceptable excuse for his failure so to do." *(Zuckerman v City of New York,* 49 NY2d 557, 560.) Even viewing the burden of a summary judgment opponent more generously than that of the summary judgment proponent, plaintiff fails to raise a triable issue of fact *(see, Friends of Animals v Associated Fur Mfrs.,* 46 NY2d 1065, 1068).

Accordingly, the Appellate Division order should be reversed, with costs, defendants' motion for summary judgment granted, and the complaint dismissed.

Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order reversed, etc.  *\*165*

Copr. (c) 2011, Secretary of State, State of New York

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 37

DOCSTOR: 2191401\1

568 F.3d 390
United States Court of Appeals,
Second Circuit.

JA APPAREL CORP., Plaintiff-
Counterclaim-Defendant-Appellee,

v.

Joseph ABBOUD, Houndstooth Corp.,
Herringbone Creative Services, Inc.,
Defendants-Counterclaimants-Appellants,

v.

Martin Staff, Counterclaim-Defendant-Appellee.

Docket No. 08-3181-cv.    Argued: Oct.
22, 2008.    Decided: June 10, 2009.

**Synopsis**

**Background:** Manufacturer filed action against clothing designer alleging breach of purchase agreement, and trademark infringement, false designation of origin, unfair competition, trademark dilution, and false and deceptive trade practices under Lanham Act and state law. Defendant counterclaimed alleging false endorsement and false advertising in violation of Lanham Act, violation of right of publicity, and false and deceptive trade practices and unfair competition under state law. Parties consented to final disposition by magistrate judge. The United States District Court for the Southern District of New York, Theodore H. Katz, United States Magistrate Judge, 591 F.Supp.2d 306, permanently enjoined defendant from using name "Joseph Abboud" commercially. Defendant appealed.

**Holdings:** The Court of Appeals, Kearse, Circuit Judge, held that:

1 scope of right conveyed by sale agreement to use name of clothing designer commercially was ambiguous;

2 designer did not have intent to confuse; and

3 individualized consideration of various elements in proposed advertisements, as well as likely effect of proposed advertisement as whole, had to be rendered before decision could be made on fair use defense.

Vacated and remanded.

Sack, Circuit Judge, filed concurring opinion.

West Headnotes (17)

**1**    **Evidence**  🔑  Contracts of Sale

Scope of right conveyed by sale agreement to use name of clothing designer commercially was ambiguous under New York law, allowing for submission of extrinsic evidence as to intent with which parties entered into agreement, under designer's agreement to "sell, convey, transfer, assign and deliver all of [his] right, title and interest in and to: (A) The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a) (A) [which included designer's name], and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks")."

1 Cases that cite this headnote

**2**    **Contracts**  🔑  Ambiguity in General

Under New York law, the question of whether a written contract is ambiguous is a question of law for the court.

7 Cases that cite this headnote

**3**    **Contracts**  🔑  Existence of Ambiguity

Under New York law, contractual ambiguity is determined by looking within the four corners of the document, not to outside sources.

5 Cases that cite this headnote

**4**    **Contracts**  🔑  Existence of Ambiguity

Under New York law, contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.

3 Cases that cite this headnote

**5**    **Contracts**  🔑  Existence of Ambiguity

Under New York law, contractual language whose meaning is otherwise plain does not

WestlawNext® © 2011 Thomson Reuters. No claim to original U.S. Government Works.

become ambiguous merely because the parties urge different interpretations in the litigation; rather, ambiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

12 Cases that cite this headnote

**6**   **Federal Courts**   👉   Trial De Novo

A district court's decision as to whether a contract is ambiguous is subject to de novo review.

**7**   **Contracts**   👉   Ambiguity in General

Under New York law, if a contract is unambiguous, its meaning is likewise a question of law for the court to decide.

10 Cases that cite this headnote

**8**   **Contracts**   👉   Construction as a Whole

**Contracts**   👉   Construing Whole Contract Together

**Evidence**   👉   Grounds for Admission of Extrinsic Evidence

Under New York law, when interpreting an unambiguous contract, a court is to consider its particular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby, but the court is not to consider any extrinsic evidence as to the parties' intentions.

5 Cases that cite this headnote

**9**   **Evidence**   👉   Grounds for Admission of Extrinsic Evidence

Under New York law, where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered.

**10**   **Contracts**   👉   Extrinsic Facts

Under New York law, where extrinsic evidence as to the parties' intent is properly considered on the basis that the contract language creates ambiguity, the meaning of the ambiguous contract is a question of fact for the factfinder.

6 Cases that cite this headnote

**11**   **Trademarks**   👉   Use of Own Name

Clothing designer, who had conveyed his rights to trademarks associated with other clothing lines that he had created and promoted, did not have intent to confuse by attempting to distinguish his subsequent clothing lines from that of trademark owner and advise consumers that he was source of his new line of clothing, allowing for application of fair-use defense to claim of trademark infringement, even if consumers would have been confused by designer's proposed use of his name in association with new line of clothing. Lanham Act, § 33(b)(4), 15 U.S.C.A. § 1115(b)(4); Restatement (Third) of Unfair Competition § 28 comment..

**12**   **Trademarks**   👉   Of One's Own Product;  Fair Use

Assessment of the fair use defense under the Lanham Act requires analysis of whether a given use was (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. Lanham Act, § 33(b)(4), 15 U.S.C.A. § 1115(b)(4).

**13**   **Trademarks**   👉   Of One's Own Product;  Fair Use

When making the assessments associated with the assertion of the fair use defense under the Lanham Act, a court focuses on the actual or proposed uses themselves. Lanham Act, § 33(b)(4), 15 U.S.C.A. § 1115(b)(4).

**14**   **Trademarks**   👉   Of One's Own Product;  Fair Use

91 U.S.P.Q.2d 1095

In the analysis of the fair-use defense under the Lanham Act, the inquiry into the defendant's good faith concerns the question whether the user of a mark intended to create consumer confusion as to source or sponsorship. Lanham Act, § 33(b)(4), 15 U.S.C.A. § 1115(b)(4).

**15    Trademarks** 🔑 Use of Own Name

Individualized consideration had to be given to various elements in proposed advertisements, such as size, location, and context of trademarked name in comparison with appearance of other descriptive matter, as well as likely effect of proposed advertisement as whole, before decision could be made on fair use defense as to whether name of clothing designer, who had conveyed his rights to trademarks associated with other clothing lines that he had created and promoted, was being used as trademark, whether consumers likely would have been confused and believed that designer's new line came from trademark owner, and whether particular size and placement of designer's name in advertisement evinced intent to confuse. Lanham Act, § 33(b)(4), 15 U.S.C.A. § 1115(b)(4).

1 Cases that cite this headnote

**16    Trademarks** 🔑 Alphabetical Listing

jaz.

**17    Trademarks** 🔑 Alphabetical Listing

Joseph Abboud.

**Attorneys and Law Firms**

*392 Thomas A. Smart, New York, N.Y. (Phillip A. Geraci, Richard A. De Sevo, Michael Denvir (pending admission), Kaye Scholer, New York, NY, on the brief), for Plaintiff-Counterclaim-Defendant-Appellee and Counterclaim-Defendant-Appellee.

Randy Lipsitz, Kramer Levin Naftalis & Frankel, New York, N.Y. (Louis Ederer, Arnold & Porter, New York, NY, on the brief) for Defendants-Counterclaimants-Appellants.

Before: KEARSE, SACK, and KATZMANN, Circuit Judges.

**Opinion**

Judge SACK concurs, in a separate opinion.

KEARSE, Circuit Judge:

Defendants Joseph Abboud ("Abboud") *et al.* appeal from so much of a final judgment entered in the United States District Court for the Southern District of New York following a bench trial before Theodore H. Katz, *Magistrate Judge,* as permanently enjoined them from using, *inter alia,* the name "Joseph Abboud" to sell, market, or promote, goods, products, or services to the consuming public, and dismissed their counterclaims against plaintiff JA Apparel Corp. ("JA Apparel" or "JA") and counterclaim-defendant Martin Staff alleging improper use of Joseph Abboud's name. The district court found that JA, Abboud, and defendant Houndstooth Corp. ("Houndstooth") had entered into an unambiguous contract pursuant to which Abboud and Houndstooth sold to JA the exclusive rights to the commercial use of the name "Joseph Abboud" and trademarks containing that name, and that Abboud's proposed use of his name in connection with a new line of clothing would breach the terms of that sale agreement and infringe trademarks sold to JA. On appeal, defendants contend principally that the district court misinterpreted the sale agreement, erred in rejecting their defense of fair use, and fashioned an overly broad injunction. For the reasons that follow, we conclude that the district court erred in finding that the sale agreement is unambiguous *393 and in declining therefore to consider extrinsic evidence as to the contracting parties' intent. We also conclude that the judgment cannot be upheld on the basis of the court's rulings on the trademark issues. We thus vacate the judgment and remand for further proceedings on the contract issue and, if necessary, on the trademark issues.

**I. BACKGROUND**

The following facts are taken from the district court's findings after trial, *see JA Apparel Corp. v. Abboud,* 591 F.Supp.2d 306 (S.D.N.Y.2008) ("*JA Apparel*"), and, unless otherwise indicated, are not disputed.

91 U.S.P.Q.2d 1095

## A. The Parties

Abboud is a world-famous fashion designer and philanthropist whose work in both capacities has garnered numerous honors and awards. Defendants Houndstooth and Herringbone Creative Services, Inc. ("Herringbone"), are companies wholly owned by Abboud. Since 1987, Abboud's personal name "Joseph Abboud" has been registered as a trademark with the United States Patent and Trademark Office.

JA is a corporation engaged in the manufacture, marketing, and sale of products using "Joseph Abboud" trademarks; Martin Staff is JA's chief executive officer. JA was formed in 1988 as a joint venture between Houndstooth and GFT International B.V. ("GFT") and operated under a license from Abboud. In 1996, GFT purchased Houndstooth's interest in JA, thereby becoming JA's sole owner. The 1988 license was canceled and Abboud issued new licenses to JA.

## B. *The Sale Agreement*

In 2000, Abboud, Houndstooth, and JA entered into an Agreement of Purchase and Sale dated June 16, 2000, and executed on July 13, 2000 ("Sale Agreement" or "Agreement"), for the sale of certain assets to JA. The Sale Agreement provided in pertinent part that Abboud and Houndstooth would, in exchange for the payment to Abboud of $65.5 million, transfer to JA all of their

right, title and interest in and to:

(A) The names, trademarks, trade names, service marks, logos, insignias, and designations identified on *Schedule 1.1(a)(A),* and all trademark registrations and applications therefor, and the goodwill related thereto (collectively the "Trademarks"), together with all causes of action (and the proceeds thereof) in favor of [Abboud and Houndstooth] heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined).

(B) All licenses to use the Trademarks granted by Houndstooth or Abboud. (collectively, the "License Agreements").

(C) All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto

or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

(D) All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements.

(E) The goodwill of or pertaining to the Trademarks. (The items referred to in clauses (A) through (E) of this Section 1.1(a) are collectively referred to as the "Assets").

*\*394* (Sale Agreement ¶ 1.1(a) (emphasis in original).) The Agreement defined "Intellectual Property," referred to in ¶ 1.1(a)(A), as "all of the trademark registrations, service mark registrations and applications and copyright registrations and applications currently used by [Abboud and Houndstooth] in connection with the Trademarks" listed in "*Schedule 1.1(a) (A).*" (*Id.* ¶ 3.6(a) (emphasis in original).)

Schedule 1.1(a)(A), referred to in ¶¶ 1.1(a)(A) and 3.6(a), bore the title "Joseph Abboud/J.A. Apparel," with a subheading "Trademark Report by Mark." It listed pending and completed trademark and service mark registrations in various countries, grouped largely by type of design, with headings such as "Diamond and Rectangle Design," "Miscellaneous Diamond Design," "Joseph Abboud," "Joseph Abboud & Design," and "Joseph Abboud and Miscellaneous Diamond Design."

In conjunction with their execution of the Sale Agreement on July 13, 2000, Abboud and JA also executed a Personal Services Agreement that was to span a total of seven years. In the Personal Services Agreement, Abboud agreed that for the first five years he would provide personal services to JA (the "personal services period") by, *inter alia,* becoming "Chairman Emeritus" and supplying ideas for the design and marketing of "Joseph Abboud" products. For two additional years, Abboud agreed not to compete with JA (the "non-compete period").

## C. *The Present Action*

During the non-compete period of the Personal Services Agreement, which ended on July 13, 2007, Abboud undertook, in part through Herringbone, preparations for the design and launch of a new collection of high-end men's clothing for sale under the label "jaz" in the fall of 2008. Abboud's plans became public in two articles published on August 6, 2007, one in the *Wall Street Journal*-Ray A.

Smith, *What's in a Name? Not Much, He Hopes, Wall Street Journal,* Aug. 6, 2007, at B1-and the other in *DNR,* the leading magazine of the men's fashion industry. The *DNR* article initially stated that "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials." David Lipke, *All That Jaz: Abboud Unveils His New Label, DNR,* Aug. 6, 2007, at 12. At Abboud's request, however, *DNR* issued a "Clarification" that stated, "according to Abboud and his attorney, ... the designer ... is, in fact, allowed to use his name on marketing and advertising materials for Jaz." *DNR,* Aug. 13, 2007, at 5.

JA commenced the present action on September 4, 2007. Its complaint alleged principally that Abboud's proposed use of his personal name to sell the "jaz" brand breached the Sale Agreement and constituted trademark infringement in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and New York common law. The complaint also contained claims of, *inter alia,* false designation of origin and trademark dilution in violation of §§ 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1125(a) and (c), and New York General Business Law ("N.Y.Gen.Bus.Law") § 360-1, and false and deceptive trade practices in violation of N.Y. Gen. Bus. Law §§ 349-50. JA requested damages and permanent injunctive relief, and it moved for a preliminary injunction.

Abboud, Houndstooth, and Herringbone denied wrongdoing and asserted defenses of, *inter alia,* trademark fair use and unclean hands. They also asserted counterclaims alleging that JA and Staff had improperly used Abboud's name in connection with "Joseph Abboud" products **\*395** following the expiration of the Personal Services Agreement's personal services period. The counterclaims alleged that JA and Staff had thereby engaged in, *inter alia,* false endorsement, false advertising, and unfair competition, and had violated New York civil rights laws. The counterclaims requested injunctive relief and damages.

The parties consented to have the proceedings conducted before a magistrate judge. They also agreed to have the magistrate judge conduct a hearing on JA's preliminary injunction motion consolidated with trial on the merits.

Prior to the trial, JA moved *in limine* to exclude parol evidence as to the meaning of the Sale Agreement. However, as the parties' submissions on that motion were not completed before the eve of trial, the magistrate judge reserved judgment on the motion, stating that he would allow the parties to present parol evidence but that he would not consider that evidence if he found the Sale Agreement to be unambiguous.

At trial, therefore, the parties presented "fairly extensive extrinsic evidence" as to the meaning of the Sale Agreement, *JA Apparel,* 591 F.Supp.2d at 318, including correspondence, meeting minutes, testimony by the negotiating attorneys, and other documentation of the drafting process. In addition, on the trademark issue, the court received, *inter alia,* testimony from Abboud about his proposed use of his name and "mock-ups" of proposed "jaz" advertisements displaying his name in various ways. (*See* Part II.B. below.)

In an opinion issued on June 5, 2008, the court found the Sale Agreement to be unambiguous, and it thus declined to consider the parties' parol evidence. As discussed in Part II.A. below, the court found that the Sale Agreement unambiguously conveyed to JA "all of Abboud's rights to use his name for commercial purposes," *JA Apparel,* 591 F.Supp.2d at 320. The court found that Abboud's planned use of his name to market "jaz" would thus constitute a breach of contract. *Id.* at 326-27.

Although finding that its decision on the contract claim made it largely unnecessary to rule on JA's trademark infringement claims, *see id.* at 327 the court addressed the Lanham Act infringement claim in the interest of completeness and concluded that "Abboud's proposed use of his name in connection with the 'jaz' line would also constitute trademark infringement...." *Id.* The court stated that JA had

> already established that it purchased the exclusive right to use the Joseph Abboud name for commercial purposes, and, therefore, any proposed use by Abboud of his name commercially is improper. Moreover, in this specific case, it is difficult to analyze the trademark claims in isolation from the Agreement because Abboud not only sold the rights to his name, he also sold the rights to use and apply for the registration of, among other things, new trademarks or designations containing the words "Joseph Abboud," "by Joseph Abboud," "designed by Joseph Abboud," and "JOE," or anything similar to or derivative of those phrases. Thus, what may have constituted a permissible use of Abboud's name under the Lanham Act is largely foreclosed by the express terms of the Agreement.

*Id.* The court further explained that Abboud had not met his burden of establishing a trademark defense of fair use, stating, *inter alia,* that

> Abboud is attempting to use his name, and the goodwill associated with it, to identify and distinguish goods, and to advise consumers that he is the source of his

new "jaz" line. Therefore, although **\*396** there is a descriptive component to Abboud's proposed uses, the Court concludes that he is also attempting to use his name, at least in part, as a trademark and that the confusion generated by his proposed uses would be far more than incidental. It is patently obvious that consumers seeing JA Apparel's products, marked or advertised as "Joseph Abboud" or "by Joseph Abboud," would be utterly confused as to whether the "jaz" products advertised as "by designer Joseph Abboud," were derived from the same source.

*Id.* at 331.

In addition, the court rejected defendants' unclean-hands defense and counterclaims, which asserted that JA had used Abboud's name unfairly, after the end of the personal services period, to indicate his personal endorsement of JA products. The court concluded that JA had not acted in bad faith by creatively using the Joseph Abboud name and trademarks it had purchased to promote its brand. *See id.* at 348 & n. 41.

The court entered judgment accordingly and permanently enjoined Abboud from "using his personal name to sell, market, or otherwise promote, goods, products, and services to the consuming public." Judgment, decretal ¶ 3.

## II. DISCUSSION

**1** On appeal, defendants contend principally that the district court misinterpreted the Sale Agreement as evincing Abboud's intent to convey to JA all of his rights to use his name for commercial purposes. They argue that the transactional documents and the surrounding circumstances made it clear that Abboud did not intend to sell his name other than as a brand name, service mark, or trademark. They also contend that the district court erred in rejecting their trademark defense of fair use, in issuing an injunction that is unduly broad, and in rejecting their unclean-hands defense and counterclaims premised on JA's alleged misuse of Joseph Abboud's name and persona. For the reasons that follow, we conclude (a) that the district court erred in ruling that the Sale Agreement unambiguously conveyed all of Abboud's rights to use his name commercially, and (b) that that error affected several of its other rulings, and we therefore remand for further proceedings.

### A. *The Contract Claim*

**2  3  4  5  6** Under New York law, which the parties agree governs their contract dispute, the question of whether

a written contract is ambiguous is a question of law for the court. *See, e.g., Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir.1992) ( "*Seiden*"). "Ambiguity is determined by looking within the four corners of the document, not to outside sources...." *Kass v. Kass,* 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 356, 696 N.E.2d 174 (1998). Contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Insurance Company of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978); *see, e.g., Seiden,* 959 F.2d at 428. "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989). Rather, "[a]mbiguous language is language that is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the **\*397** customs, practices, usages and terminology as generally understood in the particular trade or business.' " *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir.2000) ("*Revson*") (quoting *Seiden,* 959 F.2d at 428 (other internal quotation marks omitted)); *see, e.g., Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996) ("contract is ambiguous where reasonable minds could differ on what a term means"). We review *de novo* the district court's decision as to whether a contract is ambiguous. *See, e.g., Revson,* 221 F.3d at 66; *Tourangeau v. Uniroyal, Inc.,* 101 F.3d 300, 306 (2d Cir.1996); *Seiden,* 959 F.2d at 429.

**7  8** If the contract is unambiguous, its meaning is likewise a question of law for the court to decide. *See, e.g., Revson,* 221 F.3d at 66; *K. Bell & Associates v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir.1996). In interpreting an unambiguous contract, the court is to consider its "[p]articular words" not in isolation "but in the light of the obligation as a whole and the intention of the parties as manifested thereby," *Kass v. Kass,* 91 N.Y.2d at 566, 673 N.Y.S.2d at 356-57, 696 N.E.2d 174, but the court is not to consider any extrinsic evidence as to the parties' intentions, *see, e.g., Seiden,* 959 F.2d at 428; *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990).

**9  10** However, where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered. *See, e.g., Seiden,* 959 F.2d at 426, 429; *In re Consolidated Mutual Insurance Co.,* 77 N.Y.2d

144, 150, 565 N.Y.S.2d 434, 436, 566 N.E.2d 633 (1990); *67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 248, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184 (1975). Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder. *Revson,* 221 F.3d at 66; *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 574 (2d Cir.1993); *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985).

In the present case, addressing the threshold question of ambiguity, we conclude that the scope of the right to use Abboud's name conveyed by the Sale Agreement is ambiguous. In ¶ 1.1(a)(A) of the Agreement, set out in full in Part I.B. above, Abboud and Houndstooth transferred to JA all their right, title, and interest to

> [t]he names, trademarks, trade names, service marks, logos, insignias and designations identified on *Schedule 1.1(a)(A),* and all trademark registrations and applications therefor, and the goodwill related thereto (collectively the "Trademarks").

(Sale Agreement ¶ 1.1(a)(A) (emphasis in original).) JA contended, and the district court agreed, that this language unambiguously conveyed to JA all right to use Joseph Abboud's name commercially. The court reached this conclusion based on the use of the phrase "[t]he names":

> Abboud agreed to sell all rights to, among other things, the "names" on Schedule 1.1(a)(A), and the name Joseph Abboud appears repeatedly on that schedule. Alternatively stated, if Abboud only intended to convey trademarks, then the Agreement could have and should have said: "Abboud agrees to sell ... all of [his] right, title and interest in and to the trademarks identified on Schedule 1.1(a)(A)." But it said more than that, and *in order to give the word "names" due meaning and effect, the Court must interpret the Agreement in a manner that provides JA Apparel with that which it expressly purchased *398 -all of Abboud's rights to use his name for commercial purposes.*

*JA Apparel,* 591 F.Supp.2d at 320 (emphases added).

We cannot agree that the Sale Agreement unambiguously so provided. Preliminarily, we note that although that court stated that JA "expressly" purchased "all of Abboud's rights to use his name for commercial purposes," *id.,* there is in fact no such language in the Agreement. The court may have been influenced by its apparent acceptance of JA's contention that

> it would defy common sense to accept the premise that JA Apparel paid $65.5 million to acquire the ... right to use

"Joseph Abboud" or "by Joseph Abboud" as a trademark, while agreeing to let Abboud use the exact same words with respect to a competing clothing line, but in a non-trademark sense,

*JA Apparel,* 591 F.Supp.2d at 333. However, the fact that JA paid a large price for the Joseph Abboud brand (and existing licensing agreements) does not necessarily mean that JA purchased the right to prohibit Abboud from using his name to refer to himself in a non-trademark sense. There is no provision in the Sale Agreement conveying "all of Abboud's rights to use his name for commercial purposes," *JA Apparel,* 591 F.Supp.2d at 320, and the district court was not entitled to supply such a provision in the name of common sense, much less to call it "express[ ]," *id.*

Nonetheless, the court's interpretation of the Agreement as conveying to JA all commercial right to use Joseph Abboud's name is a plausible reading of the word "names" in ¶ 1.1(a)(A), given that that word is unadorned and that the name "Joseph Abboud" is used many times in Schedule 1.1(a)(A).

Defendants contend, however, that the word "names" in ¶ 1.1(a)(A) was intended to mean only brand names, and their interpretation is reasonable in light of several aspects of the Agreement. First, such an interpretation is reasonable given that brand names are similar to the items immediately following the word "names" in that paragraph, to wit "trade names, service marks, logos [and] insignias." And, indeed, ¶ 1.1(a)(A) itself defined all of these terms-along with the registrations, applications, and associated goodwill-as "(collectively the 'Trademarks')," a term that would seem to connote existing or pending uses. If JA intended to acquire "*all* of Abboud's rights to use his name for commercial purposes," *JA Apparel,* 591 F.Supp.2d at 320 (emphasis added), the Agreement could have said, instead of simply "names," "the names 'Abboud' and 'Joseph Abboud,' " and done so without the accompanying reference to the schedule of existing and pending uses of the names.

Second, given that ¶ 1.1(a)(A) conveyed "[t]he names ... identified on *Schedule 1.1(a)(A)* " (emphasis in original), it is reasonable to read that paragraph as conveying those names in the context in which they were shown in that Schedule. That Schedule listed foreign and domestic trademark and service mark registrations that had been completed or were pending. (*See, e.g.,* Sale Agreement ¶ 3.6(a) (describing Schedule 1.1(a)(A) as a list of "registrations and applications currently used by [Abboud and Houndstooth]").) Registrations and

applications "currently used" plainly did not exhaust Abboud's right to use his name in the future.

Finally, ¶ 1.1(a)(A) is not the only paragraph in which Abboud and Houndstooth conveyed rights. In subparagraph (C) of ¶ 1.1 they also conveyed

> [a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words *399 "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

(Sale Agreement ¶ 1.1(a)(C).) If, as the district court concluded, the word "names" in ¶ 1.1(a)(A) conveyed "*all* of Abboud's rights to use his name for commercial purposes," *JA Apparel,* 591 F.Supp.2d at 320 (emphasis added), there would have been no need for the parties to add subparagraph (C) to give JA the right to use and apply for new registrations of marks "containing the words 'Joseph Abboud.' " Under the district court's interpretation of the Agreement, subparagraph (C) is redundant. Such redundancy itself makes the unadorned word "names" in ¶ 1.1(a)(A) ambiguous.

JA contends that "[s]ection [*sic*] 1.1(a)(C) clearly conveyed the right to use 'Joseph Abboud' and 'designed by Joseph Abboud' 'or anything similar thereto or derivative thereof,' as designations regardless of whether used as a trademark." (JA brief on appeal at 30.) This reading of ¶ 1.1(a)(C) would enhance, rather than eliminate, the redundancy of subparagraph (C) if "names" in ¶ 1.1(a)(A) is interpreted as all rights to use Abboud's name. Further, although JA is correct that the language of subparagraph (C) clearly gave JA the right to use Abboud's name in more than trademarks-given that it conveyed "[a]ll rights to use and apply for registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' " etc. (Sale Agreement ¶ 1.1(a)(C))-it did not clearly grant the right to "use" Abboud's name other than as it would be "contain[ed]" in such new names, marks, and logos, etc.

If, as defendants contend, the word "names" in ¶ 1.1(a)(A) means brand names or those uses of the names "identified on" Schedule 1.1(a)(A) as existing or pending uses, subparagraph (C) is not redundant. Interpreted in this way, ¶ 1.1(a)(A) simply conveyed to JA the right to all existing brands and marks and all marks for which application had been made

(referred to in ¶ 3.6(a) as "current[ ]" "Trademarks"), while ¶ 1.1(a)(C) conveyed to JA the right to use Joseph Abboud's name in applying for new marks (indeed, defined in ¶ 1.1(a)(C) as "(collectively, the 'New Trademarks')"). Nothing in these conveyances of the rights to use Abboud's name in the current marks or in new marks, however, used any form of the word "exclusivity" or stated in words that Abboud could not make non-trademark use of his name in connection with his new creations following the end of the non-compete period.

Given the above conflicting interpretations of the Sale Agreement, we conclude that the intended meaning of the word "names" in ¶ 1.1(a)(A), on which the district court's rulings turned, is ambiguous. Given the ambiguity, the parties were entitled to submit extrinsic evidence as to the intent with which they entered into the Agreement, and the court should have considered that evidence in determining whether JA had met its burden of proving that Abboud breached the Agreement.

### B. *The Lanham Act Trademark Claim*

**11**    The district court also ruled against defendants on the ground that Abboud's proposed use of his name in conjunction with his new "jaz" line of clothing would constitute trademark infringement in violation of the Lanham Act. We note that the issues in the litigation had been limited, with the dispute centering on Abboud's *400 right to use his name in advertising. As the district court described the parties' respective positions, defendants "conceded that they [we]re not seeking to use the Joseph Abboud name on clothes, labels, or hang-tags for the 'jaz' line"; Abboud merely wanted "to be able to use his name in advertising materials ... to be able to identify himself in text as the designer of the ... jaz products that are at issue." *JA Apparel,* 591 F.Supp.2d at 316 n.4 (internal quotation marks omitted). JA, for its part, conceded that it was "not seeking to prevent Abboud from being in business and competing, or personally presenting his new 'jaz' line to prospective purchasers, such as Bloomingdale's," but it sought to prohibit Abboud from using his name in "advertising." *Id.* (" '[O]nce he starts advertising, then he's trading on the same reputation that is, in fact, merged into the goodwill of the brand that he sold to us.' " (quoting counsel for JA)). Both sides introduced mock-ups of Abboud's proposed advertisements.

In the district court, as here, defendants effectively conceded that JA owned valid "Joseph Abboud" trademarks and that it had made a *prima facie* showing under the *Polaroid* test, *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d

492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see, e.g., Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 742 (2d Cir.1998), that the use of his name as a trademark would likely cause confusion, *see, e.g., Mattel, Inc. v. Azrak-Hamway International, Inc.,* 724 F.2d 357, 360-61 (2d Cir.1983) ("*Mattel* ") ("confusion" means whether "consumers [have been] misled into believing that the two [products] came from the same source"). But defendants contended that they were entitled, under the Lanham Act, to the defense of fair use, which is not defeated by the existence of some confusion, *see KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 121-22, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004). Such a defense is available to a defendant who establishes, to the extent pertinent here,

> [t]hat the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party ....

15 U.S.C. § 1115(b)(4).

**12    13**    Assessment of this defense thus requires analysis of whether a given use was "(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 64 (2d Cir.2000) ("*EMI* "). In making these assessments, the court focuses on the actual or proposed uses themselves. *See, e.g., id.* at 66-68 (evaluating both a mock-up and the final version of an allegedly infringing commercial); *see also TCPIP Holding Co. v. Haar Communications, Inc.,* 244 F.3d 88, 104 (2d Cir.2001); *Venetianaire Corp. of America v. A & P Import Co.,* 429 F.2d 1079, 1082 (2d Cir.1970). In addressing defendants' fair-use defense, the district cited the above three elements of the defense, *see JA Apparel,* 591 F.Supp.2d at 329, but its analysis of the first and third elements, discussed below, gives us pause.

With respect to the first element, we have equated "use ... as a mark" with "the use of [a] term as a symbol to attract public attention." *Safeway Stores, Inc. v. Safeway Properties, Inc.,* 307 F.2d 495, 499 (2d Cir.1962). *Compare id.* (term was used as a mark where it was obviously employed "as a symbol to attract public attention"), *with Mattel,* 724 F.2d at 361 ***401***  (phrase was used otherwise than as a mark where it "was located on the package in a place and manner that only

the close reader would notice"). *See also Restatement (Third) of Unfair Competition* § 28 comment *c* (noting the relevance of the "physical nature of the use in terms of size, location, and other characteristics in comparison with the appearance of other descriptive matter or other trademarks," as well as the "presence or absence of precautionary measures such as labeling or other devices designed to minimize the risk that the term will be understood in its trademark sense").

**14**    With respect to the third element of the fair-use defense, the inquiry into the defendant's good faith "concerns the question whether the user of a mark intended to create consumer confusion as to source or sponsorship." *EMI,* 228 F.3d at 66-67; *see also id.* at 66 (noting that in "analyzing the proper scope of fair use good faith, precedents discussing good faith as the sixth Polaroid factor ... are relevant because the focus of the inquiry is the same") *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1339 (2d Cir.1975) (analysis of the sixth *Polaroid* factor requires inquiry as to whether the alleged infringer had a "deliberate intent to infringe").

The district court in the present case indicated that defendants may have established the second element of their fair-use defense, as it noted that "such phrases as 'by the award-winning designer Joseph Abboud' " have "a descriptive component." *JA Apparel,* 591 F.Supp.2d at 330. But it found that defendants had not established the otherwise-than-as-a-mark and good-faith elements. As to the latter, the court stated, *inter alia,* that "in the context of the good faith analysis under the 'fair use' doctrine, it must be noted that Abboud is attempting to use that which he expressly sold to [JA]." *Id.* at 331. As to the former, the court stated that

> Abboud is attempting to use his name, and the goodwill associated with it, to identify and distinguish goods, and to advise consumers that he is the source of his new "jaz" line. Therefore, although there is a descriptive component to Abboud's proposed uses, the Court concludes that he is also attempting to use his name, at least in part, as a trademark and that the confusion generated by his proposed uses would be far more than incidental. It is patently obvious that consumers seeing JA Apparel's products, marked or advertised as "Joseph Abboud" or "by Joseph Abboud," would be utterly confused as to whether the "jaz" products advertised as "by designer Joseph Abboud," were derived from the same source.

*Id.* at 331.

With respect to the good faith issue, we conclude that the district court applied a standard that was erroneous for at least two reasons. First, giving effect, respectively, to the end and the beginning of the above extended passage from page 331, we note that the district court found that consumers would be confused by Abboud's proposed use of his name, but that Abboud was not attempting to confuse. Rather than finding an attempt to confuse, the court found that Abboud was "*attempting* " to "*distinguish* " his clothing from that of JA and to "advise consumers that *he* is the source of his new 'jaz' line' (emphases added). Thus, the court's finding of a lack of good faith could not be premised-as required by our fair-use precedents-on an intent to confuse.

Second, the court's actual premise for finding that Abboud's proposed use of his name was not in good faith was its conclusion that the Sale Agreement unambiguously conveyed to JA all right to use Abboud's *\*402* name commercially. *See, e.g., JA Apparel,* 591 F.Supp.2d at 330 ("in the context of the good faith analysis under the 'fair use' doctrine, it must be noted that Abboud is attempting to use that which he expressly sold to [JA]"); *id.* at 331 (finding it "very difficult, if not improper, to completely ignore the Agreement in the context of Abboud's 'fair use' defense"); *id.* at 327 ("[as JA] established that it purchased the *exclusive* right to the Joseph Abboud name for commercial purposes, ... *any* proposed use by Abboud of his name commercially is improper" (emphases added)); *id.* ("what may have constituted a permissible use of Abboud's name under the Lanham Act is largely foreclosed by the express terms of the Agreement"). As the district court's premise that the Sale Agreement was an unambiguous all-commercial-use-encompassing conveyance was erroneous (*see* Part II.A. above), its rejection of the fair-use defense on the basis that there could be no good-faith use of what the court viewed as having been sold was likewise erroneous.

In sum, given that the district court found that Abboud was attempting to distinguish the "jaz" line from JA products-which is inconsistent with an intent to confuse-and that its finding as to lack of good faith rested on its erroneous view of the Sale Agreement, the court's finding that Abboud's proposed advertising use of his name was not in good faith lacked any proper foundation.

15   With respect to whether Abboud sought to "use" his name "otherwise than as a mark," 15 U.S.C. § 1115(b)(4), our principal difficulty with the district court's conclusion is that the court appears to have resolved this question without considering the proposed uses themselves. Although there is

a sentence in the background section of the court's opinion in which the court, in describing defendants' contentions, mentions the presentation of advertisement mock-ups, *see JA Apparel,* 591 F.Supp.2d at 315, the mock-ups are not mentioned again, and the court gives no indication of having considered such matters as the size, location, or context of the "Joseph Abboud" name in comparison with the appearance of other descriptive matter in any given proposed advertisement, or the likely effect of any given proposed advertisement as a whole.

Our review of the record persuades us that individualized consideration of the various proposed advertisements is needed. For example, in some of the 8 ½-by-11-inch mock-ups, the "jaz" name is displayed prominently in script some three inches high; in others it is about one inch high. In the latter mock-ups, beneath the "jaz" logo are the words-all in type smaller than "jaz"-"A New Composition by JOSEPH ABBOUD" in solid capitals, with the name "JOSEPH ABBOUD" in larger capitals than the rest. (JA Exhibits 41-42.)

On the other hand, in several advertisements in which the "jaz" logo is some three inches high, the tagline below "jaz" does not mention Abboud but rather reads "An american Luxury collection" in letters about ¼ of an inch high. (JA Exhibit 43.) In these mock-ups, a picture of Abboud appears on the far right side, and in the bottom corner, below the image of Abboud, is the following text:

> Designer Joseph Abboud in a 2 Button Super 120 S Charcoal Chalkstripe from His Fall 2008 Jaz Collection

> Designer Joseph Abboud Is No Longer Associated or Affiliated with JA Apparel Corp., the Owner of the Trademark "Joseph Abboud" [TM] .

(*Id.*) This text is in letters approximately 1/16 of an inch high.

*\*403*   As indicated above, resolution of a fair-use defense requires the court to focus on the defendant's (actual or proposed) use. We see no indication that the district court considered the advertisement mock-ups submitted by the parties here, where given mock-ups could lend themselves to divergent conclusions as to, *inter alia,* whether Abboud's name was being used a trademark, whether consumers would likely be confused and believe the "jaz" line comes from JA, and whether a particular size and placement of Abboud's name in a mock-up evinced an intent to confuse.

In the event that the district court does not rule in favor of JA on the contract claim on remand, it will be required to address the trademark issues.

## C. *Other Issues*

Defendants have raised other issues on this appeal, including challenges to the dismissal of their defense of unclean hands, the dismissal of their counterclaims based on the same factual assertions, and the breadth of the permanent injunction issued by the district court. In light of our decision vacating the judgment and remanding for further proceedings on the ground that the district court's principal rationales were erroneous, we decline to address these additional contentions, except to note that an injunction of scope similar to that originally entered would seem to be inappropriately broad if based solely on trademark infringement rather than on breach of contract. The district court is free on remand to revisit that matter, as well as the other appellate issues raised by defendants and the claims of JA that the court dismissed as duplicative of the claims on which JA originally prevailed.

### CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except to the extent indicated above, have found them to be without merit. The judgment of the district court is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.

SACK, Circuit Judge, concurring.

I concur in the panel's opinion with respect to JA Apparel Corp.'s Lanham Act claim. I concur in the result with respect to the contract claim, but depart from the panel's reasoning. While I agree that the term "names"-as it appears in ¶ 1.1(a)(A) of the Agreement of Purchase and Sale dated June 16, 2000 ("Sale Agreement")-is ambiguous, I would, respectfully, reach that conclusion by a different route.

In ¶ 1.1(a), Joseph Abboud promised to "sell, convey, transfer, assign and deliver to [JA Apparel] ... all of [his] right, title and interest in and to," *inter alia,*

(A) The names, trademarks, trade names, service marks, logos, insignias and designations identified on <u>Schedule 1.1(a)(A)</u>, and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the

"Trademarks") ... and all other Intellectual Property (as hereinafter defined).

(B) All licenses to use the Trademarks granted by [Abboud]....

(C) All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar to or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products and services.

*\*404* Sale Agreement ¶ 1.1(a) (underline in original). Schedule 1.1(a)(A) to the Sale Agreement contains a five-page list of trademarks-the words "Trademark Report by Mark" appear at the top left corner of each page-including, for each listed mark, information such as the countries of registration, reference numbers, dates filed, and registration numbers. A sixth page consists of a "Filing Receipt for Trademark Application" for a mark containing "the words JOSEPH ABBOUD." The question before us is whether the term "names" in ¶ 1.1(a)(A) is ambiguous.

JA Apparel asserts that ¶ 1.1(a)(A) unambiguously conveys to it, through that term, rights to Abboud's personal name, at least for commercial purposes. Abboud insists that it unambiguously conveys rights to Abboud's trade and service marks only. The parties have staked the expense of a trial and an appeal on their positions. The district court initially thought both interpretations were plausible enough to warrant a trial on the contract claim. After a bench trial, however, the court decided ¶ 1.1(a)(A) was not ambiguous, agreeing with JA Apparel's interpretation of the words at issue. This rendered the "fairly extensive" extrinsic evidence the court had received "legally irrelevant." *JA Apparel Corp. v. Abboud,* 591 F.Supp.2d 306, 318 & n. 9 (S.D.N.Y.2008).

## I. Applicable New York Law

I would settle the question whether ¶ 1.1(a)(A) is ambiguous by reference to several familiar rules of contract interpretation used to determine "the manifest purpose" of the parties to an agreement. *In re Herzog,* 301 N.Y. 127, 135, 93 N.E.2d 336, 339 (1950). When an agreement is "clear" and "complete," that purpose is determined by reference only to the contract's terms: "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."

*W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990). When a contract term is "reasonably susceptible to more than one interpretation," however, it is ambiguous as to the parties' intent. *Andy Warhol Found., for Visual Arts, Inc. v. Fed. Ins. Co.,* 189 F.3d 208, 215 (2d Cir.1999).

Whether a term is ambiguous is a matter of law for the court to resolve. *W.W.W. Assocs.,* 77 N.Y.2d at 162, 566 N.E.2d at 642, 565 N.Y.S.2d at 443. [1] If the court identifies an ambiguity, the controlling meaning is determined by application of principles of interpretation and construction under the controlling state law. *See, e.g., Wallace v. 600 Partners Co.,* 86 N.Y.2d 543, 548, 658 N.E.2d 715, 717, 634 N.Y.S.2d 669, 671 (1995); *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 347, 126 N.E.2d 271, 273 (1955). Then, only if necessary, extrinsic evidence of the parties' intent is employed. *See W.W.W. Assocs.,* 77 N.Y.2d at 163, 566 N.E.2d at 642, 565 N.Y.S.2d at 443.

[1]    "[C]lear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.,* 869 N.Y.S.2d 511, 517, 60 A.D.3d 61, 67 (1st Dep't 2008).

It is a generally accepted proposition that where the terms of a writing are plain and unambiguous, there is no room for interpretation or construction.... However, this formulation may be technically overbroad, in the sense that the interpretation of a contract requires an initial determination of whether the contract is ambiguous ... and this determination itself involves an assessment of the contract's meaning.

**\*405**  Richard A. Lord, 11 Williston on Contracts § 30:4 (4th ed.2008). At least some principles of interpretation therefore ordinarily guide the inquiry into whether a contract term is ambiguous.

New York courts conducting the inquiry typically apply three rules of interpretation.

First, they determine ambiguity by "examin[ing] the entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed," interpreting "[p]articular words ... not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Kass v. Kass,* 91 N.Y.2d 554, 566, 696 N.E.2d 174, 180-81, 673 N.Y.S.2d 350, 356-57 (1998) (quoting *Atwater & Co. v. Panama R.R. Co.,* 246 N.Y. 519, 524, 159 N.E. 418, 419 (1927)); *see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 173 (2d Cir.2004) ("An ambiguity exists where the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (internal quotation marks omitted)).

Second, the New York courts apply the rule that each term is to be assigned its "fair and reasonable meaning." *Sutton v. E. River Sav. Bank,* 55 N.Y.2d 550, 555, 435 N.E.2d 1075, 1078, 450 N.Y.S.2d 460, 463 (1982) (internal quotation marks omitted); *see also Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459, 141 N.E.2d 590, 593, 161 N.Y.S.2d 90, 93 (1957) ( "reasonable and ordinary meaning").

Third, they apply the rule "that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect," *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599, 176 N.E.2d 37, 38, 217 N.Y.S.2d 1, 3 (1961) (citation, ellipsis, and internal quotation marks omitted), i.e., the rule against surplusage.

For example, in *R/S Associates v. New York Job Development Authority,* 98 N.Y.2d 29, 771 N.E.2d 240, 744 N.Y.S.2d 358 (2002), an opinion by then-New York Court of Appeals Judge Wesley, the Court of Appeals addressed "the interpretation of the term 'effective cost of funds' in a loan agreement" which provided that the rate to be charged by the lender for the loan in question " 'may be revised from time to time but will not exceed one and one half (1 ½%) percent over [the lender's] effective cost of funds.' " *Id.* at 31, 32, 771 N.E.2d at 241, 744 N.Y.S.2d at 359. The purchaser and the lender disputed whether the phrase "effective cost of funds" included-in addition to the interest on the bonds issued to finance the loan and the direct costs of issuance-"the cost of defaults by other borrowers." *Id.* at 32, 771 N.E.2d at 241, 744 N.Y.S.2d at 359. The purchaser argued that the phrase unambiguously excluded the cost of defaults, the lender argued that the phrase unambiguously included it. *See id.*

The Court of Appeals concluded that the phrase was unambiguous and reasonably susceptible to only the lender's proposed meaning. It reached that conclusion by applying the reasonable meaning rule and the rule against surplusage:

> *Under its ordinary usage,* the 'effective' cost of the funds means the 'actual' cost of securing such funds for a specific loan (*see, e.g.,* 5 Oxford English Dictionary 80 [2d ed 1989] ...). Regardless of borrower defaults, the [lender]'s

funding mechanism required it to repay the underlying bond when due. Thus, the 'actual' or 'effective' cost of the funds loaned by *406 the [lender] necessarily included the interest it had to pay to the bondholders, the cost of issuing the bond, and the cost of defaults by the borrowers who received loans from bond proceeds. *Any other interpretation of this agreement would ignore the import of "effective" in modifying "cost of funds."* *Id.* at 33, 771 N.E.2d at 242, 744 N.Y.S.2d at 360 (some emphases added, some emphases in original omitted).

The ambiguity inquiry commonly involves the application of these three rules. *See also Golden Gate Yacht Club v. Societe Nautique De Geneve,* 12 N.Y.3d 248, 257, 907 N.E.2d 276, 879 N.Y.S.2d 363, 369 (2009) ("Taken as a whole, we conclude that the settlor intended to link the annual regatta requirement to the other eligibility requirements.... Any other interpretation would render the annual regatta requirement a nullity.... We conclude there is no ambiguity as to the annual regatta clause at issue."); *S. Road Assocs., LLC v. IBM Corp.,* 4 N.Y.3d 272, 277-78, 826 N.E.2d 806, 809, 793 N.Y.S.2d 835, 838 (2005) (concluding that a lease read "as a whole" reflects that "the term 'premises' refers only to the interior space" of the leased real property, because "[t]he lease repeatedly mentions the 'premises' separately from the water tower, appurtenances, land, parking lot [,] and building," which language "would be superfluous" if the term "premises" covered those exterior areas); *Kass,* 91 N.Y.2d at 568, 696 N.E.2d at 181, 673 N.Y.S.2d at 357 (rejecting appellant's proposed reading of consent clause because "[a]ppellant's construction ignores ... words that also must be given meaning"); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.,* 869 N.Y.S.2d 511, 516-17, 60 A.D.3d 61, 67 (1st Dep't 2008) ("In the instant case, the ordinary and natural meaning of the [contract's] words [is] dispositive.... A plain reading ... makes clear that 10 years is the maximum term of the contract at issue.... We note that clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations."). [2]

[2]     The rule against surplusage is said to be a rule "of preference in interpretation," Restatement (Second) of Contracts § 203 (1981), which applies only *after* it is established that a term has more than one reasonable interpretation, *see id.* cmt. a. As the cited cases illustrate, however, New York courts nonetheless apply the rule in the inquiry whether a term is ambiguous.

## II. Application to ¶ 1.1(a)(A)

Again, ¶ 1.1(a)(A) conveys to the plaintiff

[t]he names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively the "Trademarks") ... and all other Intellectual Property (as hereinafter defined).

Sale Agreement ¶ 1.1(a)(A) (underline in original). The parties each contend that the term "names" in ¶ 1.1(a)(A) means something different. The rules of interpretation applied by the New York courts support both parties' proposed meanings. It is for this reason that I would conclude the term "names," as used in the Sale Agreement, is ambiguous.

### A. JA Apparel's Proposed Meaning

*1. Application of the Rules of Interpretation.* The plaintiff argues that the term "names" in ¶ 1.1(a)(A) denotes Joseph Abboud's personal name itself, not a mark related to his name. As the district court concluded, application of the rule against surplusage makes this interpretation reasonable. Pursuant to that rule, the term *407 "names" must be given a meaning different from the meaning of the other properties listed by ¶ 1.1(a)(A); otherwise the term "would be superfluous." *S. Road Assocs.,* 4 N.Y.3d at 278, 826 N.E.2d at 809, 793 N.Y.S.2d at 838. So the term must refer to intellectual property other than that which is subsequently referred to in the paragraph, i.e., other than a "trademark [ ]," for example, or a "trade name[ ]" or "service mark[ ]." Sale Agreement ¶ 1.1(a)(A). [3] From the ordinary usage of the term "name," it is reasonable to conclude that the other intellectual property in question is Abboud's personal name. *See* The American Heritage Dictionary of the English Language 1167 (4th ed.2000) (defining "name" principally as "[a] word or words by which an entity is designated and distinguished from others"). [4]

[3]     Abboud is therefore wrong to assert that ¶ 1.1(a)(A) "do[es] not mention, manifest or express any intent to sell the exclusive right to use Abboud's name, other than as a trademark." Defs.' Br. 31.

[4]     It also seems to me that although the rule against surplusage is said to apply not only to contract provisions, *see Corhill Corp.,* 9 N.Y.2d at 599, 176 N.E.2d at 38, 217 N.Y.S.2d at 3, but to particular words within a contract provision, *see, e.g., Kass,* 91 N.Y.2d at 568, 696 N.E.2d at 181, 673 N.Y.S.2d at 357, the rule should nonetheless be applied with a grain or two of salt when examining a list of words having similar or

even overlapping meaning in a commercial agreement. Such an itemization of terms may reflect an intent to occupy a field of meaning, not to separate it into differentiated parts. Indeed, this is a common-perhaps all-too-familiar-technique used in drafting agreements, commercial and otherwise. With this technique, words are used more like the brush strokes of a house painter than of those of a portrait painter-each intended principally to ensure that the surface is covered, not to convey a separate piece of information. *See, e.g.,* Sale Agreement ¶ 1.1(a) (providing that "the Sellers shall sell, convey, transfer, assign, and deliver" the "right, title and interest in and to" the properties in question); *In re Luxottica Group S.p.A. Sec. Litig.,* No. CV 01-3285(JBW)(MDG), 2005 WL 3046686, *1, 2005 U.S. Dist. LEXIS 27765, *11 (E.D.N.Y. Nov. 15, 2005)* (in the case of a specified event, "the Stipulation, including any amendment(s) thereof, ... shall be null and void, of no further force or effect, and without prejudice to any party, and may not be introduced as evidence or referred to in any actions or proceedings by any person or entity, and each party shall be restored to his, her or its respective position as it existed prior to the execution of the Stipulation"); *In re Host Am. Corp. Sec. Litig.,* No. 05-CV-1250 (VLB), 2008 U.S. Dist. LEXIS 94194, *17-*18 (D.Conn. Nov. 19, 2008) (similar) (not available on Westlaw). A "house painter" analysis of ¶ 1.1(a)(A) also supports JA Apparel's reading of "names" as meaning something different from "trademarks": listing all possible types of the mentioned intellectual property may be taken to signal an intention not to restrict the denotation of the listed terms to one type only.

Reading the Sale Agreement as a whole supports this result. Paragraph 1.1(a)(C), quoted in full at the outset of this opinion, contains a list of intellectual property strikingly similar to that in ¶ 1.1(a)(A) but omits the term "names" with which the list in ¶ 1.1(a)(A) begins. *See* Sale Agreement ¶ 1.1(a)(C) (conveying "[a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing ['Joseph Abboud' and similar words]"). That "names" appears in one list but not the other suggests that the parties and their counsel took deliberate care to include the term in ¶ 1.1(a)(A) so as to convey an interest in something *other than* trademarks, trade names, and the like.

*2. The Panel Majority's Analysis.* The panel majority concludes that the term "names" is reasonably susceptible to JA Apparel's proposed interpretation because the term "is unadorned and ... the name 'Joseph Abboud' is used many

times in Schedule 1.1(a)(A)." *Supra* at 398. I *\*408* find both reasons problematic. To be sure, the term "names" in ¶ 1.1(a)(A) is "unadorned" in the sense that it has no modifiers. But that does not alone render either party's proposed meaning a reasonable one.

Schedule 1.1(a)(A), attached to the Sale Agreement and referred to in ¶ 1.1(a)(A), does not support JA Apparel's reading, because the name "Joseph Abboud," as a personal name, appears nowhere in the schedule. The schedule is a list of marks. The heading of each page reads: "Trademark Report by Mark." The schedule lists categories of marks by name in bold-face capital letters, with each mark in the category set forth along with its registration information. So, while the schedule contains, among many other things, the words "Joseph Abboud," those words are mentioned only as a mark or a part of a mark, reflecting a trademark property related to "Joseph Abboud," not Joseph Abboud's personal name or whatever property right he may have in it.

### B. Abboud's Proposed Meaning

*1. Application of the Rules of Interpretation.* According to Abboud, the term "names" in ¶ 1.1(a)(A) denotes only trademarks or service marks and therefore does not convey rights to his personal name. The ordinary-meaning rule yields Abboud's interpretation. The interpretation flows not from the ordinary usage of the term "names," which, of course, can be used to refer to personal names and property interests in them, but from the appearance of the term in context: "[t]he names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A)." Sale Agreement ¶ 1.1(a)(A) (underline omitted). Because, as noted, Schedule 1.1(a)(A) appears to identify only marks, not personal names, and the schedule "identifie[s]" what is conveyed by the Sale Agreement in ¶ 1.1(a)(A), it seems to me reasonable to conclude that what is conveyed by ¶ 1.1(a)(A) is only marks, and not the personal name of Joseph Abboud or his property rights in it. The text in ¶ 1.1(a)(A) therefore is reasonably susceptible to Abboud's proposed interpretation.

The rule against surplusage supports this reading. The phrase "Trademark Report by Mark," which is the page heading of the first five pages of Schedule 1.1(a)(A), must be given meaning. And if it is to mean nothing more than, as it says, a set of marks, then it cannot also mean personal names. If, departing from Abboud's interpretation, one does not restrict "names" and its surrounding terms to the property identified by Schedule 1.1(a)(A), and does not interpret that property to include only marks, one thereby "ignore[s] ... words that ...

must be given meaning," *Kass,* 91 N.Y.2d at 568, 696 N.E.2d at 181, 673 N.Y.S.2d at 357, albeit words in a schedule and not the body of the agreement. [5]

> [5]  Thus, the rule against surplusage counsels both in favor of interpreting the term "names" as denoting property other than the trademarks, service marks, and the other types of property in ¶ 1.1(a)(A) and in favor of interpreting the term as merely an instance of the more general category of trademark as set forth in Schedule 1.1(a)(A).

This application of the ordinary-meaning rule and the rule against surplusage is bolstered by ¶ 3.6 of the contract, which states that "Schedule 1.1(a)(A) sets forth a list of all of the trademark registrations, service mark registrations and applications and copyright registrations and applications currently used by [Abboud] in connection with the Trademarks." Sale Agreement ¶ 3.6 (underline omitted). ***409** That list omits any mention of personal names.

*2. The Panel Majority's Analysis.* The panel majority looks to Schedule 1.1(a)(A), as the text of ¶ 1.1(a)(A) instructs, and concludes that its listing "plainly did not exhaust Abboud's right to use his name in the future." *Supra* at 398. I agree. But I am less certain about the panel's view that "brand names [i.e., marks] are similar to the items immediately following the word 'names' in [¶ 1.1(a)(A) ], to wit 'trade names, service marks, logos [and] insignias.' " *Supra* at 398. I think that the rule against surplusage requires the term "names" to have a meaning different from the words in that list. [6] The panel majority also observes that the defined term "the 'Trademarks' "-which collectively identifies property conveyed in ¶ 1.1(a)(A)-"would seem to connote existing or pending uses." *Id.* But I would think that drafters define terms in contracts in order to *avoid* speculative meanings. The term "the 'Trademarks,' " as defined, "connote [s]" nothing more than the set of terms it is defined to mean; it tells us nothing about how to interpret the terms that define it, including the term "names." [7]

> [6]  If the panel is suggesting that Abboud's proposed meaning is supported by application of the canon *noscitur a sociis,* pursuant to which "a word is given more precise content by the neighboring words with which it is associated," *United States v. Williams,* --- U.S. ----, 128 S.Ct. 1830, 1839, 170 L.Ed.2d 650 (2008); *see also Harris v. Allstate Ins. Co.,* 309 N.Y. 72, 76, 127 N.E.2d 816, 818 (1955) (applying canon), I disagree. Even if the canon applies in the ambiguity inquiry, under the majority's reasoning it would stand

for the proposition that the term "names" should denote "trademarks" and therefore have an *identical* denotation to the terms with which it appears. I am aware of no such application of *noscitur a sociis.*

> [7]  Schedule 1.1(a)(A) employs the terms "Trademark" and "Mark," but not the specially defined term "the 'Trademarks.' " Abboud's interpretation of the schedule is therefore unaffected by the defined term.

Finally, the Court finds significance in the language of ¶ 1.1(a)(C), which conveys

> [a]ll rights to use and apply for the registration of *new* trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

Sale Agreement ¶ 1.1(a)(C) (emphasis added). I do not see how this text tells us whether Abboud transferred the rights to his personal name by including the term "names" in ¶ 1.1(a)(A). The term is absent from ¶ 1.1(a)(C). If ¶ 1.1(a)(A) did transfer to JA Apparel the right to use Abboud's personal name along with the listed trademarks, ¶ 1.1(a)(C) would still be necessary-or at least advisable-to ensure the transfer of the separate right to use and apply for "new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud' [and associated combinations]." The rights in question-the right to use a personal name for commercial purposes and the right to apply for and use a new trademark containing the words of that name-are different and independent.

It seems to me that if Joseph Abboud sold the right to use his personal name as a personal name, the purchaser could open and run and advertise a clothing line called "Joseph Abboud Men." And if he already owned the mark "Joseph Abboud Men," and sold it, the purchaser would then have the right to use that term as a mark. But I do not think it necessarily follows from either hypothetical transaction that the ***410** purchaser could then have the exclusive right to apply for and use, as marks, *new* trademarks made up of or derived from the words Joseph Abboud, e.g., "Joseph Abboud Women." Without an explicit sale of the right to apply for and use, as marks, new marks similar to or including his personal name, I should think both Abboud and the purchaser might each apply for such marks, and the rightful owner of that property

91 U.S.P.Q.2d 1095

would be determined by application of ordinary principles of trademark law.

For these reasons, the drafter's decision to cover the use of the name Joseph Abboud in the context of new trademarks in ¶ 1.1(a)(C) does not seem to me to indicate that the parties meant not to transfer the use of the name along with existing trademarks in ¶ 1.1(a)(A).

### *C. The Ambiguity*

In my view, the rules of interpretation do not conclusively establish the reasonableness of one party's interpretation over the other in this case; they yield both interpretations as plausible results. And, as I have suggested, I think that both proposed resolutions do at least some violence to the rules of interpretation. The rules therefore leave us with an ambiguity that they are insufficient to resolve. I therefore agree with the panel majority that the district court should now consider whether extrinsic evidence will shed light on the matter, and if so, employ it to determine the meaning of the language in dispute.

### III. Conclusion

For the foregoing reasons, I concur in the result reached by the panel majority.

Parallel Citations

91 U.S.P.Q.2d 1095

---

**End of Document**          © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 38

DOCSTOR: 2191401\1

50 Employee Benefits Cas. 2249

636 F.3d 69
United States Court of Appeals,
Third Circuit.

Deborah L. BALDWIN, as guardian
of C.L.D., a minor, K.K.D., a minor,
and C.M.D., a minor, Appellant
v.
UNIVERSITY OF PITTSBURGH
MEDICAL CENTER (UPMC); Life
Insurance Company of North America.

No. 10–1673.   Argued Feb. 10,
2011.   Opinion Filed: March 29, 2011.

Synopsis

**Background:** Adoptive mother filed action against employer and plan administrator under Employee Retirement Income Security Act (ERISA) seeking to recover proceeds from life insurance and accidental death and disability insurance policies that had been purchased by children's biological mother. The United States District Court for the Western District of Pennsylvania, Joy Flowers Conti, J., 2010 WL 1007846, dismissed action. Plaintiff appealed.

**Holding:** The Court of Appeals, Garth, Circuit Judge, held that adoptive mother made out colorable claim that children adopted from plan participant were, or may become, entitled to benefit.

Reversed and remanded.

West Headnotes (19)

**1**   **Federal Civil Procedure**  Parties, Defects as to

A dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(1, 6), 28 U.S.C.A.

**2**   **Federal Courts**  Extent of Review Dependent on Nature of Decision Appealed from

Court of Appeals has plenary review over an order dismissing an ERISA claim for lack of standing.

Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**3**   **Federal Civil Procedure**  Clear or certain nature of insufficiency

**Federal Courts**  Affidavits and evidence in general

A complaint may not be dismissed for lack of subject matter jurisdiction or for failure to state a claim merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. Fed.Rules Civ.Proc.Rule 12(b)(1, 6), 28 U.S.C.A.

**4**   **Labor and Employment**  Parties in general; standing

In the context of ERISA claims for benefits, the "zone of interests" inquiry is inexorably tied to the question of whether a plaintiff can meet the definitions of either a participant or beneficiary. Employee Retirement Income Security Act of 1974, § 502(a), 29 U.S.C.A. § 1132(a).

**5**   **Federal Courts**  Presumptions and burden of proof

On a motion to dismiss for lack of subject matter jurisdiction, the burden of persuasion for establishing a colorable claim is less exacting than that needed to establish a likelihood of success on the merits. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**6**   **Federal Courts**  Insurance

**Federal Courts**  Labor and employment; workers' compensation

**Labor and Employment**  Interpretation of Plan

Claims for benefits based on the terms of an ERISA plan are contractual in nature and are governed by federal common law contract principles. Employee Retirement Income

Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**7**    **Contracts**    Intention of Parties

The paramount goal of contract interpretation is to determine the intent of the parties.

**8**    **Contracts**    Intention of Parties

When interpreting a contract, a court should consider not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.

**9**    **Contracts**    Language of contract

**Evidence**    Grounds for admission of extrinsic evidence

When interpreting a contract, the strongest objective manifestation of intent is the language of the contract; thus, where the words of the contract clearly manifest the parties' intent, a court need not resort to extrinsic aids or evidence.

**10**    **Contracts**    Language of contract

The words of the contract clearly manifest the parties' intent if they are capable of only one objectively reasonable interpretation.

**11**    **Contracts**    Existence of ambiguity

If the words of the contract are capable of more than one objectively reasonable interpretation, the words are ambiguous.

**12**    **Contracts**    Existence of ambiguity

Ambiguous terms that appear clear and unambiguous on their face, but whose meaning is made uncertain due to facts beyond the four corners of the contract, suffer from latent ambiguity.

**13**    **Contracts**    Ambiguity in general

A court has the responsibility to determine as a matter of law whether contract terms are clear or ambiguous.

**14**    **Contracts**    Existence of ambiguity

**Contracts**    Preliminary negotiations and agreements

**Contracts**    Construction by Parties

To make the determination of whether contract terms are clear or ambiguous, a court must consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning; the objective, extrinsic evidence proffered may include, for example, the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.

**15**    **Contracts**    Language of contract

When interpreting a contract, extrinsic evidence notwithstanding, the parties remain bound by the appropriate objective definition of the words they use to express their intent.

**16**    **Evidence**    Latent ambiguity

The proper focus of the extrinsic evidence in resolving an instance of latent ambiguity in a contract is the parties' objectively manifested linguistic reference regarding the ambiguous term, not their expectations.

**17**    **Labor and Employment**    Parties in general; standing

Adoptive mother made out colorable claim that children adopted from ERISA plan participant were, or may become, entitled to benefit under life insurance and accidental death and disability plans, and thus she had prudential and statutory standing to bring civil action to recover those benefits from employer, where, among other

things, adoptive mother had adopted children prior to death of biological mother participant, participant, who did not have spouse, paid premiums for those policies after adoption and for years before her death, and participant lived with adoptive mother for years after adoption and participant and children maintained mother-child relationship. Employee Retirement Income Security Act of 1974, §§ 404(a)(1)(A, B), 502(a)(1)(B), 29 U.S.C.A. §§ 1104(a)(1)(A, B), 1132(a)(1)(B).

**18** **Labor and Employment** 👉 Constitutional and Statutory Provisions

ERISA is a remedial statute that should be liberally construed to achieve its ends, which include protecting plan participants and beneficiaries. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**19** **Labor and Employment** 👉 Extrinsic evidence

Under ERISA, when a contract term is reasonably argued to be ambiguous, the parties should be allowed to proffer evidence in support of alternative interpretations of the term so that the court may properly address the purported ambiguity. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**Attorneys and Law Firms**

*71 Patrick W. Murray, Esq., (Argued), Stewart, Murray & Associates, Pittsburgh, PA, for Appellant.

John G. Ferreira, Esq., Stephanie R. Reiss, Esq., (Argued), Morgan Lewis & Bockius, LLP, Pittsburgh, PA, for Appellee Life Insurance Company of North America.

John J. Myers, Esq., Andrew T. Quesnelle, Esq., (Argued), Eckert, Seamans, Cherin & Mellott LLC, Pittsburgh, PA, for Appellee University of Pittsburgh Medical Center (UPMC).

Before: JORDAN, GREENAWAY, JR., and GARTH, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal by the plaintiff-appellant Deborah L. Baldwin as the adoptive mother *72 of three Trent children requires us to decide Baldwin's standing to claim the insurance proceeds of policies subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461, which were purchased by the children's biologic mother. The District Court denied relief to Baldwin, holding that she, as the adoptive mother to Trent's three children, has no standing to receive the insurance proceeds on behalf of the children under ERISA. We hold that Baldwin is entitled to offer evidence as to Trent's intent, i.e., understanding of the terms of her insurance policies, in order to establish the facts she alleges in her complaint. As a consequence, we will reverse the District Court's judgment and remand to the District Court for further proceedings as directed in this opinion.

### I.

In 2001, Victoria Trent, biologic mother of three minor children, C.L.D., K.K.D., and C.M.D., began working for appellee University of Pittsburgh Medical Center (UPMC). On June 6, 2003, at Trent's urging, Trent's lifelong family friend, Deborah Baldwin, adopted the children and became their legal guardian. New birth certificates were issued for the children. Notwithstanding the adoption, Trent maintained a parental relationship with the children, who still referred to her as "Mom": she lived with Baldwin and the children for three years after they were adopted by Baldwin, and Trent spent all holidays and festivals with Baldwin and the children.

Trent was employed at UPMC from 2001 to 2008. Trent enrolled in four insurance plans offered by UPMC for the year 2008. The premiums for these were deducted from her salary each pay period: 1) a $25,000 basic life insurance policy; 2) a $25,000 basic accidental death and dismemberment (AD & D) insurance policy; 3) a $100,000 supplemental group life insurance policy; and 4) a $200,000 supplemental AD & D insurance policy. Trent designated a beneficiary—Baldwin—for the $25,000 basic life policy, but did not designate a beneficiary for the three remaining policies.

50 Employee Benefits Cas. 2249

Each of the life policies, as distinct from the ERISA statute, contains the following language:

> If there is no named beneficiary or surviving beneficiary, Death Benefits will be paid to the first surviving class of the following living relatives: spouse; child or children; mother or father; brothers or sisters; or to the executors or administrators of the Insured's estate.

To similar effect, the AD & D policies provide:

> If there is no named beneficiary or surviving beneficiary, or if the Employee dies while benefits are payable to him, We may make direct payment to the first surviving class of the following classes of persons:
>
> 1) spouse;
>
> 2) child or children;
>
> 3) mother or father;
>
> 4) sisters or brothers;
>
> 5) Estate of the Covered Person.

On December 23, 2008, Trent died in an accident at the age of thirty-four. Following Trent's death, Baldwin timely sought payment under each of Trent's insurance policies in accordance with the applicable claims procedure. The insurer, Life Insurance Company of North America (LINA), paid $25,000 due to Baldwin as the designated beneficiary of Trent's basic life policy. However, LINA rejected Baldwin's claims on behalf of the children for the proceeds from the other three policies. LINA explained that as a result of the adoption, the children were no longer considered Trent's "children" for the purposes *73 of the policies' default-beneficiary provisions.

Baldwin appealed LINA's determination. In a May 15, 2009, letter, LINA, using Cigna Group Insurance (CIGNA) as signatory, detailed the reasons why, after further review, it had again concluded that the insurance proceeds were "not payable" to the children:

> While Mrs. Trent may have maintained a relationship with her biological children, this would not supersede the fact that Ms. Trent waived all legal ties with the children. As a result of the adoption [C.L.D., K.K.D., and C.M.D.] became the legal children of Ms. Baldwin and would no longer be eligible for benefits under these policies as the children of Ms. Trent.

At the time of her death, there was no beneficiary named by Ms. Trent for the [$100,000 supplemental group life policy and accidental death policies]. Therefore, the benefits of these policies would be payable under the facility of payment wording contained in this policy. The facility of payment does not contain provisions that allow for payment of benefits to step-children or any other child which may be in a close familial relationship with the insured. Since [C.L.D., K.K.D., and C.M.D.] were not the children of Victoria Trent at the time of her death, no benefits were payable to them....

> ....

> This policy is a binding contract between Victoria Trent and the insuring company. Therefore, in an effort to provide equitable claims administration to our insureds we must honor all policy provisions. Since Ms. Trent did not designate [C.L.D., K.K.D., and C.M.D.] to receive any proceeds from this policy, we cannot honor payment to them or any other person not designated as beneficiary of record with the employer prior to Ms. Trent's death or the first class of surviving relatives.

Having exhausted all avenues of administrative review of her claim, Baldwin, as guardian of the children, filed a complaint in the District Court for the District of Western Pennsylvania against UPMC and LINA.[1] In the two-count complaint, Count One alleged that UPMC and LINA had breached their fiduciary duty to Trent and the children, in violation of ERISA, 29 U.S.C. § 1104(a)(1)(A) and (B), by failing to act for the exclusive purpose of providing benefits and inadequately managing the enrollment process; and Count Two alleged that the two defendants had arbitrarily and capriciously denied the children benefits, which is a basis for recovery under ERISA, 29 U.S.C. § 1132(a)(1)(B).

[1]    Although CIGNA originally was also named as a defendant, it was removed by stipulation of the parties on November 12, 2009. CIGNA was utilized by LINA as a business name of LINA.

## II.

**1**    The two defendants moved to dismiss the complaint for lack of both subject-matter jurisdiction and statutory standing. The District Court dismissed Baldwin's complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). A dismissal for lack of statutory standing is effectively the same as a dismissal for failure to

state a claim. *See Vaughn v. Bay Envtl. Mgmt., Inc.,* 567 F.3d 1021, 1024 (9th Cir.2009) (citing *Lanfear v. Home Depot, Inc.,* 536 F.3d 1217, 1221–22 (11th Cir.2008), and *Harzewski v. Guidant Corp.,* 489 F.3d 799, 803–04 (7th Cir.2007)). The standard for reviewing dismissals under Rules 12(b)(1) (for lack of subject matter jurisdiction) and 12(b)(6) **\*74** (for failure to state a claim) "is the same: we accept as true plaintiffs' material allegations, and construe the complaint in the light most favorable to them." *Alston v. Countrywide Fin. Corp.,* 585 F.3d 753, 758 (3d Cir.2009) (citation omitted).

In a March 16, 2010, opinion and order, the District Court granted defendants' motion to dismiss with prejudice, holding that Baldwin had neither statutory nor prudential standing to bring her claim under ERISA. ERISA does not specify who is a "beneficiary" beyond "one who is[,] or may become entitled to[,] a benefit," 29 U.S.C. § 1002(8)—a remarkably broad category. The District Court held that the category of default beneficiaries provided in the insurance policies determined who was to obtain the benefits under the policies. The second category of default beneficiaries specified by the insurance plans is "child or children." The definition of "child or children" [2] is relevant to this appeal because that phrase appears in the insurance plans at issue.

> [2] For ease of reference in this opinion, we shorten "child or children" to "children."

To define the term "children" as used in the insurance plans, the District Court rejected Baldwin's request that it consult Pennsylvania contract law. Instead, the District Court sought elucidation from federal common law and the Pennsylvania Intestate Succession Law, 20 Pa. Cons.Stat. Ann. §§ 2103, 2108, which the District Court concluded mandate that adoption severs the legal link between birth parent and child. Under this interpretation, the child becomes the child of the adoptive parent only.

Importing that definition of "children" into the insurance plans' language, the District Court held that the adopted children were not entitled to benefits by default as Trent's "children." Thus, inasmuch as the children could not make out a colorable claim of their entitlement to benefits, neither they, nor Baldwin, their guardian, had standing to bring suit under ERISA, and the District Court was therefore without subject-matter jurisdiction.

This appeal followed.

## III.

**2   3**    This Court has plenary review over an order dismissing an ERISA claim for lack of standing. *See Leuthner v. Blue Cross & Blue Shield of Ne. Pa.,* 454 F.3d 120, 124 (3d Cir.2006); *Miller v. Rite Aid Corp.,* 334 F.3d 335, 340 (3d Cir.2003). We must " 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.' " *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66,* 580 F.3d 185, 192 (3d Cir.2009) (quoting *McTernan v. City of York, Pa.,* 564 F.3d 636, 646 (3d Cir.2009)). " 'A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.' " *Id.* (quoting *McTernan,* 564 F.3d at 646).

## IV.

"To bring a civil action under ERISA, a plaintiff must have constitutional, prudential, and statutory standing." *Leuthner,* 454 F.3d at 125. To ensure that the latter two forms of standing are satisfied in an ERISA case, a court must assure itself that the " 'plaintiff's grievance ... arguably fall[s] within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.' " *Miller,* 334 F.3d at 340 & n. 1 (3d Cir.2003) (quoting *Bennett* **\*75** *v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)); *see also Leuthner,* 454 F.3d at 126 (explaining that "ERISA's statutory standing requirements are a codification of the 'zone of interest' analysis" typically used to determine prudential standing).

**4**    ERISA § 502(a), 29 U.S.C. § 1132(a), entitles only "a participant or beneficiary" to institute a civil action for benefits against a plan administrator. Therefore, in the context of ERISA claims for benefits, the "zone of interests" inquiry "is inexorably tied to the question of whether a plaintiff can meet the definitions of either a participant or beneficiary." *Miller,* 334 F.3d at 340–41.

**5**    Because neither Baldwin nor the children she represents were "participants" in the plans at issue, the only relevant definition is that of a "beneficiary"—that is, "a person designated by a participant, or by the terms of an employee benefit plan, who is[,] or may become entitled to[,] a benefit thereunder." 29 U.S.C. § 1002(8). Alleged beneficiaries such

as the children here must demonstrate that they "may become entitled to a benefit" by presenting " 'a colorable claim that ... [they] will prevail in a suit for benefits.' " *Leuthner,* 454 F.3d at 124 (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 118, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The burden of persuasion for establishing a colorable claim is less exacting than that needed to establish a likelihood of success on the merits. *Id.* (citing *Daniels v. Thomas & Betts Corp.,* 263 F.3d 66, 78–79 (3d Cir.2001)).

### V.

**6** Claims for benefits based on the terms of an ERISA plan are contractual in nature and are governed by federal common law contract principles. *Burstein v. Ret. Account Plan for Emps. of Allegheny Health Educ. & Research Found.,* 334 F.3d 365, 381 (3d Cir.2003) (citing *Feifer v. Prudential Ins. Co. of Am.,* 306 F.3d 1202, 1210 (2d Cir.2002)); *see also Kemmerer v. ICI Ams., Inc.,* 70 F.3d 281, 287 (3d Cir.1995) (noting that disputes arising out of ERISA plan documents are governed by "breach of contract principles, applied as a matter of federal common law"). Accordingly, where claims put at issue the meaning of plan terms, we apply the federal common law of contract to interpret those terms. *See Burstein,* 334 F.3d at 381. Since the claims asserted by Baldwin on behalf of C.L.D., K.K.D., and C.M.D. turn on the meaning of "children" in the subject insurance policies, our task is to interpret that term in accordance with the federal common law, which of course draws heavily on generally established principles of contract interpretation. *See IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118, 124 (3d Cir.1986) (citation omitted).

**7  8** "The paramount goal of contract interpretation is to determine the intent of the parties." *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 587 (3d Cir.2009) (citations and internal quotation marks omitted); *see also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980) ("In construing a contract, a court's paramount consideration is the intent of the parties." (citation and internal quotation marks omitted)). Courts are to consider "not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle,* 584 F.3d at 582 (citations and internal quotation marks omitted); *see also Mellon Bank,* 619 F.2d at 1009 ("[C]ourts must eschew the ideal of ascertaining the parties' subjective intent and *\*76* instead bind parties by the objective manifestations of their intent.").

**9** The strongest objective manifestation of intent is the language of the contract. *Mellon Bank,* 619 F.2d at 1009; *see also Am. Eagle,* 584 F.3d at 587 (acknowledging "the 'firmly settled' principle that 'the intent of the parties to a written contract is contained in the writing itself' " (citation omitted)). Thus, where the words of the contract clearly manifest the parties' intent, a court need not "resort to extrinsic aids or evidence." *Am. Eagle,* 584 F.3d at 587 (citation and internal quotation marks omitted).

**10  11  12** The words of the contract clearly manifest the parties' intent if they are capable of only one objectively reasonable interpretation. *Tamarind Resort Assocs. v. Gov't of the Virgin Islands,* 138 F.3d 107, 110–11 (3d Cir.1998) ("We have consistently embraced the basic common law principle that a contract is unambiguous if it is reasonably capable of only one construction." (citing, *e.g., Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc.,* 81 F.3d 328, 332 (3d Cir.1996), and *Am. Flint Glass Workers Union, AFL–CIO v. Beaumont Glass Co.,* 62 F.3d 574, 581 (3d Cir.1995))). If the words of the contract are capable of more than one objectively reasonable interpretation, the words are ambiguous. *Am. Eagle,* 584 F.3d at 587. Ambiguous terms that appear clear and unambiguous on their face, but whose meaning is made uncertain due to facts beyond the four corners of the contract, suffer from latent ambiguity. *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 614 (3d Cir.1995).

**13  14  15** Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous. *Mellon Bank,* 619 F.2d at 1011 (citation omitted); *see also In re New Valley Corp.,* 89 F.3d 143, 149 (3d Cir.1996) ("Whether a document is ambiguous presents a question of law properly resolved by this court." (citing *Stendardo v. Fed. Nat'l Mortg. Ass'n,* 991 F.2d 1089, 1094 (3d Cir.1993))). To make that determination, a court must consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Mellon Bank,* 619 F.2d at 1011; *see also New Valley,* 89 F.3d at 150 (applying common law contract principles in an ERISA context and noting that, to address potentially ambiguous contract terms, a court must "hear the proffer of the parties and consider extrinsic evidence to determine whether there is an ambiguity"). The objective, extrinsic evidence proffered may include, for example, "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *New Valley,* 89 F.3d at 150 (citing

*Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir.1993)). Extrinsic evidence notwithstanding, "the parties remain bound by the appropriate objective definition of the words they use to express their intent." *Mellon Bank,* 619 F.2d at 1013.

**16**    The proper focus of the extrinsic evidence in resolving an instance of latent ambiguity is the parties' "objectively manifested 'linguistic reference' " regarding the ambiguous term, not their expectations. *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.,* 247 F.3d 79, 94 n. 3 (3d Cir.2001) (quoting *Duquesne Light,* 66 F.3d at 614).

> For example, if the evidence show[s] that the parties normally meant to refer to Canadian dollars when they used the term "dollars," this [is] evidence of the right type. Evidence regarding a party's *\*77* beliefs about the general ramifications of the contract [is not] the right type to establish latent ambiguity.

*Id.* (citations omitted).

### VI.

**17**    The issue here is whether the word "children" presents a latent ambiguity—that is, whether "children," from the objectively manifested linguistic reference point of the parties to the insurance contracts, is susceptible of more than one objectively reasonable meaning. More specifically, is it objectively reasonable to construe "children" to mean "biologic children," or is it only objectively reasonable to construe "children" as "children recognized by state intestacy and adoption law"? On the record before us, we are unable to determine whether both of those interpretations are objectively reasonable, and it does not appear that the District Court attempted such a determination. Arguably, however, there is a latent ambiguity in the term "children." To establish standing, Baldwin is only required to plead "enough fact to raise a reasonable expectation that discovery will reveal evidence" demonstrating that, regardless of any subsequent adoption, Trent and the defendants understood C.L.D., K.K.D., and C.M.D. would be considered to be Trent's "children" as that term is used in the subject contracts, even if it were to appear "that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation and internal quotation marks omitted).

According to the allegations in the complaint, Trent took out four policies, which were set to pay out a total of $350,000 in the event of her death. Trent designated Baldwin, a lifelong family friend and guardian of Trent's biologic children, as beneficiary of the $25,000 basic life policy. Trent had lived together with Baldwin and the children for several years after Trent began working at UPMC. Until her death, Trent maintained a parental relationship with the children. Trent had no spouse and no living parents, yet continued to pay for life insurance more than five years after her children were legally adopted by Baldwin. At oral argument, we learned for the first time that Trent had a half-brother and/or half-sister who were not named as beneficiaries of any of the four insurance policies.

**18**    Those allegations, while insufficient to resolve the potential ambiguity of "children," are sufficient to make out a colorable claim that such an ambiguity exists and that Trent's biologic children are or may become entitled to benefits based on one arguably objectively reasonable meaning of the term. [3] Thus, the children—and Baldwin on their behalves —have ERISA standing. In so concluding, we are guided by the principle that ERISA is a remedial statute that should be liberally construed to achieve its ends, which include protecting plan participants and beneficiaries. *See Firestone,* 489 U.S. at 113, 109 S.Ct. 948; *Barker & Williamson,* 788 F.2d at 127.

3    The allegations are hence also sufficient to state a claim for relief and so can withstand a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**19**    We acknowledge the District Court's thoughtful approach to identifying and applying what it conceived to be the correct governing law. The District Court attempted to resolve the issue before it by seeking to interpret the term "children" in the subject insurance policies. It looked for guidance to *La Bove v. Metropolitan Life Insurance Co.*, in which we examined state law to construe the meaning of "children" in a life insurance policy governed *\*78* by the Federal Employees' Group Life Insurance Act of 1954. 264 F.2d 233, 234–36 (3d Cir.1959). Nonetheless, when a contract term is reasonably argued to be ambiguous, the better approach, and the one that is consistent with the weight of controlling authority, is to allow the parties to proffer evidence in support of alternative interpretations of the term so that the court may properly address the purported ambiguity. [4] That is the approach required by our precedent under ERISA, *New Valley,* 89 F.3d at 150, and it should guide the District Court on remand.

**Baldwin v. University of Pittsburgh Medical Center, 636 F.3d 69 (2011)**
50 Employee Benefits Cas. 2249

4     We recognize that this presents something of a conundrum, because one could say that there can be no standing unless there is actually an ambiguity, which has not yet been determined. We think, however, that this "which came first, the chicken or the egg" problem is best resolved by deciding that the potential ambiguity is sufficient to establish standing.

Because Baldwin has made out a colorable claim that the children are, or may become, entitled to a benefit under the ERISA plans at issue, we hold that she has prudential and statutory standing to bring this civil action. Accordingly, we will vacate the order of March 16, 2010, dismissing the complaint and remand to the District Court for further proceedings consistent with this opinion.

Parallel Citations

50 Employee Benefits Cas. 2249

---

**End of Document**                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 39

DOCSTOR: 2191401\1

2000 WL 1224828
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jill RAPPAPORT, Plaintiff,

v.

Amy BUSKE, Ed Mansfield and
Mansfield Productions, Inc., Defendants.

No. 98 CIV. 5255(BSJ).    Aug. 29, 2000.

Opinion

**OPINION & ORDER**

JONES, District J.

*1  Defendants Amy Buske, Ed Mansfield and Mansfield Productions, Inc., move pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing Jill Rappaport's diversity suit alleging breach of contract, fraud and violation of New York Civil Rights Law § 51. For the reasons set forth below, defendants' motion is granted, and the complaint is dismissed.

**BACKGROUND**

The following facts are undisputed or as alleged by plaintiff. [1] Plaintiff Jill Rappaport is a New York citizen, and for the past eight years has worked as the entertainment reporter for NBC's "Today" show. Defendant Ed Mansfield ("Mansfield"), a Florida citizen, is a television producer. His production company, defendant Mansfield Productions, Inc., is a Georgia corporation. Defendant Amy Buske, a New Jersey citizen, is a self-employed television, motion picture, music and theater producer and composer. In early 1998, Buske and Mansfield teamed up to produce a television series Buske had developed called "Fabulously Fit and Famous" (the "series"). The series was similar to "Lifestyles of the Rich and Famous," but with a focus on fitness; Buske and Mansfield planned to have a host travel to the homes of celebrities and spend a day working out with them and interviewing them about their fitness and beauty habits. In the only promotional flyer they used, Buske and Mansfield pitched the series as "Fabulously Fit and Famous," with no mention of a specific host, from February to August 1998, when Buske and Mansfield abandoned the development and production of the series.

[1]   In setting forward the facts in this Opinion, the Court has relied on the parties' Rule 56.1 Statements and the citations to the record contained in those Statements. Where there are no citations or where the cited materials do not support the factual assertion in the Statements, the Court has disregarded the assertion. *See* Local Civil Rule 56.1(d). Local Rule 56.1 provides that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Plaintiff contests only 17 of the 56 paragraphs in the defendant's 56.1 Statement. However, the Court has made a thorough review of the record and presents all facts in the light most favorable to the plaintiff, notwithstanding the shortcomings of plaintiff's 56.1 Statement.

In February 1998, Mansfield telephoned Rappaport at NBC in New York to tell her of his interest in hiring her as the host of the series. In the number of conversations that followed between Mansfield and Rappaport, Mansfield described the series, emphasized that the host would be required to travel and interview celebrities, and told Rappaport that there would be vitamin and other merchandise tie-ins. Rappaport expressed concerns regarding the travel and wanted assurances that the series would not interfere with her commitments with NBC. In addition, Mansfield proposed that the series title be changed to "Fabulously Fit and Famous with Jill Rappaport."

On March 20, 1998, [2] Rappaport met with Mansfield and Buske at the American Festival Café in New York City. This was the first face-to-face meeting between the parties. According to plaintiff's 56.1 statement, at this meeting the parties "reached a firm oral understanding pursuant to which Ms. Rappaport would be hired as host of the 13-program series, at a per program salary of $10,000.00 ... subject to plaintiff's commitments to NBC." (Pl.'s 56.1 Statement ¶¶ 15, 20.). [3]

[2]   Defendants contend that this meeting took place on or about April 3, 1998.

[3]   Notably, this version of the oral understanding at issue in the lawsuit bears little resemblance to the detailed oral understanding plaintiff originally alleged in her complaint. *See, infra,* p. 6.

It is this alleged oral agreement that plaintiff contends was breached by the defendants. Though not explicitly proffered as an argument in the alternative, implicit in plaintiff's brief is

the contention that an exchange of letters between the parties in May 1998 created a binding preliminary commitment. [4] On May 14, 1998, Mansfield sent Rappaport's agent, Babette Perry, a "letter of intent," which stated in relevant part:

[4]    Needless to say, the defendants contend that at no time was a final agreement ever reached, either in writing or orally.

  *2  As per your request, here is our letter of intent to retain Jill Rappaport as the host of the thirteen-week television series, 'The Fit & Famous.'

    As we discussed, Jill will be paid $10,000/episode for a total of $130,000. The official contracts are being drawn up at this time and when they are ready, we will send them to you for your approval and signature.

(Perry Decl., Ex. A.)

Perry responded by letter dated May 18, 1998, which stated in relevant part:

    This letter is to confirm that Jill Rappaport will be the host of the thirteen-week television series, "The Fit & Famous."

    The other terms and conditions will be negotiated in good faith.

(Perry Decl., Ex. B.)

It is undisputed that Defendants, at plaintiff's explicit instructions, sent a draft of a written employment contract (the "employment contract") to Rappaport's agent, Babette Perry, on June 4, 1998. The contract covered not only Ms. Rappaport's commitment to act as series' host for thirteen (13) episodes, subject to her professional commitments at NBC, and Ms. Rappaport's base salary for her professional services, but also the timing of how the base salary would be paid; payment of Ms. Rappaport's travel and hotel expenses, and the payment of a per diem; Ms Rappaport's percentage of net profits from the program and net merchandising revenue; Ms. Rappaport's obligation to make personal appearances related to the advertising of the program and its merchandising products; and Ms. Rappaport's assignment of all right, title and interest in her program-related services to the program's production company.

In her deposition, Rappaport testified that there were several terms in the employment contract to which she objected because those terms differed from her understanding of the alleged oral agreement. These terms included: (1) that the

employment contract did not state that the series "was based in New York;" (2) that it was drafted in the name of the defendants' newly-formed corporation Fitfam Productions, Inc.; (3) that it provided for profit-sharing with the plaintiff which in her view she could not accept because she is a "newsperson;" (4) that it required plaintiff to make personal appearances in connection with "the series and products" which again she felt she could not do because of her position as a journalist; (5) that it described plaintiff's duties as not just hosting the series but interviewing as well, which plaintiff considered an additional job that merited a higher salary. (Rappaport Dep. at 99-115.)

Specifically, plaintiff testified that she could not agree to the employment contract so long as it contained a profit-sharing provision or required her to make any endorsements, and that such provisions were not part of the alleged oral agreement. This testimony is completely at odds with plaintiff's complaint, however, in which she specifically alleges that the oral agreement itself provided that "plaintiff would receive ten percent of the profits derived from the exploitation of the ... Series ... plus ten percent of merchandising revenues received from exploitation of any products associated with the Series ...." (Compl.¶ 10.) The plaintiff offers no explanation for this serious discrepancy between her complaint and her sworn testimony. For the purposes of this motion, the Court will simply deem the description of the oral agreement in plaintiff's 56.1 statement, which does conform to her deposition testimony, to amend ¶ 10 of the complaint.

  *3  Based upon her myriad objections, Rappaport telephoned Buske in late June or early July and told her that the employment contract was unacceptable. Faced with plaintiff's unwillingness to accept the employment contract, the defendants withdrew the offer and placed an ad in a trade publication for a new host.

In July 1998, plaintiff filed the instant action for breach of contract, fraud, and violation of the New York Civil Rights Act. Believing the series to be irreparably tainted by the lawsuit, the defendants abandoned all production and development of the series.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgement may not be granted unless "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). Nonetheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

## II. Breach of Contract

Plaintiff's primary contention is that the parties reached a final oral employment agreement. While I do not think the plaintiff has properly framed the contract issue presented by this case, *see infra,* I will briefly address her principal argument.

When determining whether an oral contract exists, courts must heed the Second Circuit's admonition that while parties must retain the freedom to enter into oral contracts, "[f]reedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings .... The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 75 (2d Cir.1984).

In her brief, plaintiff argues that there was an oral agreement as "to all the material terms of the contract, *with nothing left for negotiation,*" as of the March 20, 1998 meeting. However, taking all inferences in plaintiff's favor, the letter from Rappaport's agent leaves no room for doubt that this is not a case about a *final* oral contract, but, rather, one about a *preliminary* agreement. Rappaport's agent wrote on May 18, 1998: "This letter is to confirm that Jill Rappaport will

be the host of the thirteen-week television series, 'The Fit & Famous.' *The other terms and conditions will be negotiated in good faith.*" (Perry Decl., Ex. B) (emphasis added).) Plaintiff does not allege that there were any further conversations-let alone negotiations-after this date that finalized the agreement. Therefore, though the plaintiff briefs the case as presenting the issue of whether there was a final oral contract in March (or in May), the case is properly analyzed under the rubric of preliminary agreements. [5]

> [5]  Indeed, plaintiff cannot even give a clear answer as to exactly when the alleged *final* oral contract was formed, that is, when it was allegedly finalized. As noted above, plaintiff contends in her brief that there was an oral agreement as "to all the material terms of the contract, *with nothing left for negotiation,*" as of the March 20, 1998 meeting. Confronted at her deposition with her complaint that alleges the deal was finalized in May, not March, 1998, Rappaport testified, "Well, in May it was finalized to the extent in which I put in for the vacation [from NBC, to shoot the series], that's why I think it was listed [in the complaint] as May.... But in March is when we finalized what the show was going to be, where I was going to shoot it, and what my job responsibilities were. But in May, it was a final deal in terms of me actually taking off time to shoot the shows." (Rappaport Dep. at 47.) When asked again to clarify when the alleged oral contract was finalized, in March or in May, Rappaport testified, "Well, I think the *roadwork* was set in March, and the finalization was in May." (Rappaport Dep. at 48 (emphasis added).)

**\*4** Parties to proposed commercial transactions often enter into preliminary agreements that may provide for the execution of more formal agreements. *Adjustrite Systems v. GAB Business Services,* 145. F.3d 543, 547 (2d Cir.1998). When they do so and the parties fail to execute a more formal agreement, the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree. *Id.*

Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. *See Adjustrite,* 145 F.3d at 548 (citing *Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996)); *see also R.G. Group,* 751 F.2d at 74 ("Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs."). In some circumstances, however, the Second Circuit has recognized that preliminary agreements can create binding obligations.

These "binding preliminary agreements fall into one of two categories." *Adjustre,* 145 F.3d at 548. Type I is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document. *Id.* Such an agreement is *fully* binding; it is " 'preliminary only in form-only in the sense that the parties desire a more elaborate formalization of the agreement." ' *Id.* (quoting *Teachers Insurance & Annuity Association v. Tribune,* 670 F.Supp. 491, 498 (S.D.N.Y.1987)). Despite the anticipation of further formalities, a party to this first type of preliminary agreement may demand performance of the transaction even though the parties fail to produce the "more elaborate formalization of the agreement." *Id.*

A Type II preliminary agreement is binding only to a certain degree. "It is created when the parties agree on certain major terms, but leave other terms open for further negotiation." *Id.* The parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *Id.* (citations omitted). In contrast to a Type I preliminary agreement, a Type II preliminary agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." *Id.* (citations omitted). A party to a Type II preliminary agreement "has no right to demand performance of the transaction." Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary agreement. *Id.*

When confronted with the issue of determining whether a preliminary agreement is binding, the Court must keep two competing interests in mind. "First, courts must be wary of 'trapping parties in surprise contractual obligations that they never intended' to undertake .... Second, 'courts [must] enforce and preserve agreements that were intended [to be] binding, despite a need for further documentation or further negotiation,' for it is 'the aim of contract law to gratify, not to defeat, expectations." ' *Id.* (citations omitted).

*\*5* The key, of course, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent. *See Adjustre,* 145 F.3d at 548-49. "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances."

' *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1986) (citations omitted). Subjective evidence of intent, on the other hand, is generally not considered. *See Rule v. Brine, Inc.,* 85 F .3d 1002, 1010 (2d Cir.1996).

In the instant action, plaintiff contends only that the agreement was a Type I preliminary agreement. Plaintiff alleges that all of the material terms of the transaction were negotiated during the March 20, 1998, meeting and that there was "nothing left for negotiation." (Pl. Mem. of Law at 7.) Hence, as in *Adjustre,* the instant case need only be analyzed as a Type I preliminary agreement. [6]

> [6]  As in *Adjustre,* the parties in the instant action did not explicitly discuss the differences between the two types of preliminary agreements, even though the plaintiff relied upon *Adjustre* in her opposition papers. Like the Circuit in *Adjustre,* I note that the facts arguably could give rise to a claim by plaintiff that the alleged oral agreement was a Type II preliminary agreement, that the defendants were obligated to make a good faith effort to reach a final agreement, and the defendants breached that obligation. Again, as in *Adjustre,* plaintiff made no such argument in her opposition papers, and the complaint does not allege the existence of a Type II preliminary agreement or the breach of any duty to negotiate in good faith. "Hence, such a claim is not before [the Court] now." *Adjustre,* 145 F.3d at 549 n. 9.

The issue thus presented is whether, when the parties reached the alleged oral agreement in March 1998, they had negotiated all the terms of the employment contract and intended to be bound even if a written contract was never executed. *See Adjustre,* 145 F.3d at 549. The Second Circuit has identified four factors to be considered in determining whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *Id.* (citing *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985)).

The first factor, typically an analysis of the language of the preliminary agreement, is the most important. *See, e.g., Adjustre,* 145 F.3d at 549 (analyzing the language of the written agreement for the first factor). Because in this case the

preliminary agreement was not in writing, the Court cannot examine the "language" of that agreement. Instead, the Court will consider the admissions of the plaintiff and the conduct of the parties, which together support only one conclusion: that the alleged oral agreement was not a fully binding, or Type I, agreement.

The following testimony from plaintiff's own deposition testimony is enlightening.

Q: Was there an understanding between you, on the one hand, and the individual Defendants on the other, that there would be a written agreement drafted that would formalize your relationship on the show?

A: Uh-huh, yes.

Q: There was?

A: Uh-huh.

Q: Am I correct in assuming that the understanding further was this agreement was to be sent to your agent, Babette Perry, for review.

*6 A: Yes.

Q: And presumably, Babette Perry, upon receipt of that agreement, would review it, discuss it with you, and contact would be made with the Defendants as to what you thought of the agreement, what further negotiations, if any, would have to made? Am I correct there?

A: In most cases, that's how it's done. But we pretty much had our ideas and stipulations for this show finalized well. This was just the paperwork.

Q: You did, in fact, instruct the Defendants to submit the written contract to your agent, Ms. Perry, correct?

A: That's how it's done. Because I have a contract with my agent, that's just the final thing that you do, yes.

Q: And you specifically told the Defendants to do that, correct?

A: Yes.

Q: ... [W]hen you got to the point where the agreement was being drafted, did you ever say to Mr. Mansfield or Ms. Buske, you don't need to send it to my agent, I want you to send it to me, we can do this ourselves?

A: No. Mr. Mansfield kept saying that to me. That, you know, we really don't need an agent, do we. I said, well, as nice as that would sound if we could do the deal between us, because he and I at that point, that's when we discussed it would be nice. But legally, I have to send the contract to them. Mr. Mansfield's [*sic* ] really didn't want to deal with my agent.

(Rappaport Dep. at 48-50.) The question for the Court is: was plaintiff's insistence that the defendants send the "paperwork" to her agent an express reservation of the right not to be bound absent a writing? The plaintiff's own conduct after the March 20 meeting unequivocally answers that question in the affirmative: the plaintiff expressly reserved the right not to be bound.

When asked at her deposition what purpose her agent served, plaintiff testified as follows:

Q: Do you accept any deals without your agent's involvement?

A: I'm allowed to talk to anybody I want and then tell them about that, but I would always run it past them for the final say.

Q: Before you have a final deal, you run it past your agent, would that be a fair statement?

A: I would just ask them their opinion on something, but no, I mean, I can make decisions for myself as well as-as long as they negotiate the deal.

(Rappaport Dep. at 18-19). Given that Rappaport's agent has the "final say" and will "negotiate the deal" even when Rappaport makes a decision for herself as to whether to take on a job, I find that Rappaport's insistence that the defendants send a written contract to her agent constituted an express reservation not to be bound absent a writing. Moreover, Perry's May 18, 1998, letter supports this conclusion. It is clear from the letter that Rappaport and the defendants had reached agreement on some of the terms, but the "other terms" still needed to "be negotiated in good faith." Perry's letter evidences her role as the ultimate negotiator for Rappaport's services, just as Rappaport testified. Clearly, the alleged oral agreement was expressly contingent on Perry's having the "final say" on a written contract. [7]

---

[7]    The plaintiff's statements to non-party Scott Sassa, while not necessary to the Court's determination, further support the conclusion that plaintiff herself had

expressly reserved the right not to be bound absent a writing. On June 9, 1998, two and a half months after the March 20 meeting and several days after receiving a draft of the *written* employment contract from the defendants, plaintiff told Sassa, then the head of programming at NBC, that she was "thinking about being the talent in the show." Sassa, left unimpressed by the defendants after meeting with them, told plaintiff, "[I]t's my feeling I would get out of [the series] as fast as I could." Asked at his deposition if he had the impression from his conversation with the plaintiff that she had a "firm deal" to do the series, Sassa testified, "No, I didn't have that impression .... I think she characterized it to me that she was talking to them about being involved in the show." (Sassa Dep. at 9, 16.)

**\*7** The second factor, partial performance, has not been satisfied in this case. As an initial matter, for there to be partial performance, Rappaport must have conferred something of value on the defendants, which they accept. *See, e. g., R.G. Group,* 751 F.2d at 75. Mere preparatory acts are not partial performance. *See id.* at 76 (forming a partnership in order to facilitate the transaction is not partial performance).

Plaintiff's putting in for vacation time from NBC to shoot the series did not confer a benefit upon the defendants. Nor did introducing the defendants to plaintiff's industry contacts-Scott Sassa of NBC-or contacting celebrities to interview for the show confer benefits upon the defendants that they accepted. None of these acts satisfied (even partially) obligations imposed on plaintiff by the alleged employment contract. Instead, they are paradigmatic examples of preparatory acts. Therefore, these acts are not evidence of partial performance.

"The third factor is the existence of open terms, *i.e.,* whether any terms of the contract remained open to be negotiated. *Adjustrite,* 145 F.3d at 551." This factor, too, weighs strongly in favor of the defendants for there remained numerous open items, as unequivocally demonstrated by the May 18, 1998, letter from Rappaport's agent to Mansfield. Though plaintiff argues that no material terms remained open,[8] this argument does not survive scrutiny.

> [8]   Again, as of what date, the Court cannot be certain, given that the plaintiff's own papers and testimony at times say March and at other times say May.

On May 14, 1998, Mansfield sent Perry a "letter of intent" to hire Rappaport at $10,000 per episode. Perry responded that Rappaport would do the series and that "[t]he other terms and

conditions will be negotiated in good faith." In fact, because Rappaport does not allege that there were any negotiations after May 18, 1998, that finalized the deal, this letter on its own provides incontrovertible support for the conclusion that the alleged oral agreement was a Type II agreement.[9]

> [9]   Remarkably, plaintiff submits a declaration by Perry in which Perry testifies that as of May 1998 there "were no other material terms to be negotiated." (*See* Perry Decl. ¶ 4.) Perry gives this testimony notwithstanding her own May 18 letter-attached as an exhibit to the declaration-that explicitly states that having agreed on Rappaport's compensation, the "other terms and conditions will be negotiated in good faith." In light of the written record, I am not bound to credit Perry's conclusory declaration.

As noted in *R.G. Group,* "[t]he actual drafting of a written instrument [frequently] will ... reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution." 751 F.2d at 75. In this case, plaintiff reviewed a draft of the employment contract in June 1998, became concerned about a number of the terms, and then discussed those concerns with defendants in late June or early July. "These concerns were not chimerical." *Shearson Lehman CMO, Inc. v. TCF Banking & Savings, F.A.,* 710 F.Supp. 67, 72 (S.D.N.Y.1989) (granting summary judgment dismissing breach of contract claim under the four-factor *Winston* test). Indeed, Rappaport indicated that she could not accept a number of the terms in the written employment contract. Therefore, well after mid-May 1998, terms that both sides understood were crucial to the agreement were still being negotiated. Under these conditions, there is no ambiguity about whether there has been a meeting of the minds. *See Shearson Lehman,* 710 F.Supp. at 72. That agreement may have been reached as to Rappaport's compensation does not change the result. Agreement on terms does not become binding until there is agreement on all terms as to which agreement was anticipated. *See Winston,* 777 F.2d at 82-83; *See R.G. Group,* 751 F.2d at 76-77.

**\*8** Finally, the fourth factor is whether the agreement is the type of contract that is usually reduced to writing. *Adjustrite,* 145 F.3d 551. Plaintiff asserts that in circumstances such as these, the custom in the entertainment industry is to conclude deals orally, not in writing. Plaintiff rests her entire argument on the declaration of her agent Babette Perry in which Perry stated, "It is the custom in the industry that, for individuals and small companies, a formal written agreement is unnecessary and a letter of employment suffices." (Perry Decl. ¶ 5.) Perry further declared that when production is on a tight schedule, as it would have been for the series, written

contracts "are dispensed with." (*Id.*) [10] However, plaintiff's contentions are unavailing.

10     This is, of course, the same declaration in which Perry testified that there were no open terms as of May 1998.

Even accepting Perry's testimony about industry custom as true, there can be no doubt that in *this* instance the parties intended for their agreement to be reduced to writing, and, therefore, Perry's testimony about custom is irrelevant. The plaintiff's own conduct in this transaction conclusively establishes that this agreement was to be reduced to writing. It was the plaintiff who insisted that the defendants send a written contract to her agent. Moreover, the defendants' May 14 "letter of intent" stated that "[t]he official contracts are being drawn up at this time and when they are ready, we will send them to you for your approval and signature." Perry responded that Rappaport would do the series and "[t]he other terms and conditions will be negotiated in good faith." It is telling that in this correspondence, Perry never expressed any surprise that "official contracts" were being prepared. Nor did Perry reply by telling the defendants that "official contracts" were unnecessary under the circumstances. [11]

11     Even if the fourth factor were relevant to this case, it would not accrue to the plaintiff's benefit. Indeed, the evidence is clear that this was the kind of agreement where it *would* have been unusual to rely on an oral understanding. Rappaport herself testified that her employment agreements with every other employer for whom she has worked were in fact reduced to writing, though she sometimes began a project while the written contract "was pending." (Rappaport Dep. at 22-24.) Scott Sassa, now the head of entertainment at NBC, testified that he had no knowledge of talent at NBC ever working without a written contract. (Sassa Dep. at 28.) NBC News Vice-President David Corvo, who has negotiated contracts with on-air talent at NBC, testified that hosts of television programs normally work with written contracts and that it would be "unusual" for on-air talent to work based only on an oral agreement. (Corvo Dep. at 24-25.) In addition, as explained *supra,* the conduct of the parties conclusively establishes that the parties to this particular agreement fully intended to reduce the agreement to writing. Therefore, were the Court to engage in an analysis of the fourth factor, the inescapable conclusion would be that the alleged oral agreement is the type of contract that is usually reduced to writing.

An analysis of the four factors used to determine the existence of a contract, and the evidence adduced in support of the

parties' positions, shows beyond dispute that the parties did not intend a contractual obligation to exist before a signed writing existed. Therefore, even taking all inferences in plaintiff's favor as I must, I find that the alleged oral agreement was a Type II agreement. That is, no reasonable factfinder could conclude, based on this record, that the parties agreed on all material elements of the transaction, intended to be fully bound when they concluded their March 1998 meeting, and considered the formal, written contract that plaintiff herself demanded to be an unnecessary formality. *See Adjustire,* 145 F.3d 551 (affirming grant of summary judgment dismissing breach of contract action even though the partial performance factor favored the plaintiff, where the rest of the factors showed that the parties did not intend to be bound until a final contract was signed). Accordingly, defendants' motion for summary judgment dismissing Rappaport's first claim, alleging breach of contract, is GRANTED.

## III. Fraud

**\*9** The complaint alleges that when the defendants represented that they wanted to hire the plaintiff as host of the series, they never intended to do so but, rather, merely intended to use plaintiff's "industry contacts to generate interest in the Series." (Compl.¶ 22.) In an action to recover damages for fraud under New York law, the plaintiff must prove (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury. *See Lama Holding Co. v. Smith Barney, Inc.,* 668 N.E.2d 1370, 1373 (N.Y.1996). Even assuming for the purposes of this motion that plaintiff has adduced sufficient evidence to create genuine issues of material fact on the first three elements, plaintiff's claim does not satisfy the fourth element.

New York follows the "out-of-pocket" rule of damages for fraud. " 'The true measure of damage is indemnity for the actual *pecuniary* loss sustained as the direct result of the wrong' " or what is known as the 'out-of-pocket' rule. *Lama,* 668 N.E.2d at 1373 (emphasis added) (citing cases); *see also Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 296 (2d Cir.1986) (same). Under this rule, damages are to be calculated to compensate a plaintiff for money she actually lost because of the fraud, not to compensate her for what she might have gained. *Lama,* 668 N.E.2d at 1373.

Accepting all of plaintiff's factual allegations as true, there is no actionable fraud. In the complaint, plaintiff alleges damages from the fraud in the amount of $130,000.00. (Compl.¶ 26.) This amount does not reflect any out-of-pocket pecuniary loss, but rather is the amount plaintiff stood to gain if the parties had gone forward with the series. In her brief, plaintiff contends that she seeks "damages for the fraudulently induced introduction of defendants to her contacts in the industry." (Pl.'s Mem. of Law at 12). Simply put, there was no pecuniary loss to the plaintiff. Because plaintiff has adduced no evidence that she suffered an out-of-pocket loss, defendants' motion for summary judgment dismissing the fraud claim is GRANTED.

## IV. New York Civil Rights Law § 51

Lastly, plaintiff alleges that defendants violated New York Civil Rights Law § 51 by "utiliz[ing] plaintiff's name with potential advertisers and sponsors to solicit interest for the series." (Pl.'s Mem. of Law at 10.) Section 51 provides a cause of action for injunctive relief and damages by "[a]ny person whose name, portrait, picture or voice is used within [New York] state for advertising purposes or for the purposes of trade without [ ] written consent." N.Y. Civ. Rights Law § 51. To state a claim under § 51 based on unauthorized use of a person's identity, the plaintiff must prove that (1) defendants used her name within the state, (2) for purposes of trade or advertising, (3) without her written consent. *See* *Titan Sports, Inc. v. Comics World Corp.,* 870 F.2d 85, 87 (2d Cir.1989); *Cerasani v. Sony Corp.,* 991 F.Supp. 343, 356 (S .D.N.Y.1998). Section 51 must be construed narrowly. *See* *Rand v. Hearst Corp.,* 298 N.Y.S.2d 405, 410 (N.Y.App.Div.1969), *aff'd,* 257 N.E.2d 895 (N.Y.1970).

 *\*10* Here, there is no dispute that plaintiff has satisfied the third element. However, there is no evidence that defendants ever used plaintiff's name for advertising purposes. It is undisputed that defendants produced and disseminated a single promotional flier for the series, and this flier made no mention of the plaintiff. (*See* Mansfield Aff., Ex. A.) Therefore, plaintiff's claim turns on whether defendants violated § 51 by using plaintiff's name within New York "for purposes of trade."

Taking all inferences in favor of the plaintiff, Mansfield "used" plaintiff's name with Castle Hill Productions when he responded to Castle Hill's question as to who would be the host of the series. [12] Mansfield telephoned Castle Hill-presumably in New York, but there is no evidence of that in the record-

and told them that "discussions were underway with Jill Rappaport." (Mansfield Aff. ¶ 11). In response, a Castle Hill vice president wrote to Mansfield on March 19, 1998, "We are very excited about your new series for both for [*sic* ] U.S. and international television sales. Jill Rappaport and Bill Grant are a good team of hosts. They will attract the stars that can give us a hit like 'Lifestyles of the Rich and Famous.' I look forward to the availability of the show." (Mansfield Aff., Ex. D.) However, such an isolated use of plaintiff's name cannot support a § 51 claim. *See, e.g., Man v. Warner Bros., Inc.,* 317 F.Supp. 50, 53 (S.D.N.Y.1970) (citing *Damron v. Doubleday, Doran & Co.,* 231 N.Y.S. 444 (N.Y.Sup.Ct.1928), *aff'd,* 234 N.Y.S. 773 (N.Y.App.Div.1929) ( "It is well established that every incidental mention of some person's name in connection with advertising or trade does not constitute a violation of [§ 51]. The single appearance of plaintiff's name in this book is clearly not a use prohibited by the statute. Were we to take any other view, it is apparent that consequences never contemplated would follow from its enactment.") The diligent efforts of the parties, as well as the Court's own research, has not uncovered a single case in which an analogous isolated use of a complainant's name has been found to be sufficient to state a claim under § 51. Moreover, as § 51 is to be narrowly construed, I will not expand § 51 to prohibit the conduct alleged here.

> 12    The allegations and evidence regarding Mansfield's alleged use of Rappaport's name with MedGen Nutrition and Alliance Press do not support a claim that plaintiff's name was used in New York with those defendants. Therefore, the allegations regarding Mansfield's contact with these two companies do not raise issues of material fact.

Even assuming *arguendo* that Mansfield's single utterance of Rappaport's name over the telephone to a production company located in New York constituted "use" under § 51, such use would not satisfy the "for the purposes of trade" element. As the caselaw reveals, the term "purposes of trade" is "not susceptible to ready definition." *Cerasani,* 991 F.Supp. at 357 (citations omitted). The fact that the publication or use of a name or picture is spurred by a profit motive or included to encourage sales or distribution of the publication is a necessary, but hardly a sufficient, ingredient in determining the existence of a trade purpose. *Id.* While there can be no doubt that defendants sought to produce the series to make a profit, Mansfield used plaintiff's name for a much more limited purpose, namely to obtain a preliminary response from Castle Hill to the series and its prospects for syndication. *See, e.g., Cerasani* 991 F.Supp. at 357 (pre-release screening

of movie was to assess the quality of the film, not for "purposes of trade" because plaintiff could not allege that defendants charged any fee or generated any revenue through the pre-release screening). As in *Cerasani,* notwithstanding defendants' ultimate profit motive, the plaintiff in the instant action cannot allege that defendants generated any revenue through the one-time use of plaintiff's name to Castle Hill. Thus, Mansfield's use of plaintiff's name was not "for the purposes of trade" under the statute, and, therefore, such use is not within the statute's prohibitive provisions. Accordingly, defendants' motion for summary judgment dismissing the New York Civ. Rights Law § 51 claim is GRANTED.

### CONCLUSION

**\*11** For the foregoing reasons, defendants' motion for summary judgment is GRANTED and the complaint is dismissed in its entirety. The Clerk shall mark this action as closed.

SO ORDERED:

**End of Document**                                © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 40

DOCSTOR: 2191401\1

670 F.Supp. 491
United States District Court,
S.D. New York.

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA, Plaintiff,
v.
TRIBUNE COMPANY, Defendant.

No. 83 Civ. 0047 (PNL).    May 27,
1987.    As Amended June 26, 1987.

Institutional lender brought action against prospective borrower, charging it with breach of commitment letter agreement for loan. The District Court, Leval, J., held that commitment letter represented binding preliminary commitment and obligated both parties to seek to conclude final loan agreement upon agreed terms by negotiating in good faith to resolve such additional terms as were customary, and borrower's reservation of right of approval to its board of directors did not leave it free to abandon transaction.

Judgment for plaintiff.

West Headnotes (1)

**1**    **Contracts** 🔑 Agreement to Make Contract in Future

Upon consideration of circumstances and express terms of commitment letter between institutional lender and borrower, as well as context of parties' negotiations, letter represented binding preliminary commitment and obligated both parties to seek to conclude final loan agreement upon agreed terms by negotiating in good faith to resolve additional terms that were customary in agreements of that type, and borrower's reservation of right of approval to its board of directors did not leave it free to abandon transaction.

238 Cases that cite this headnote

**Attorneys and Law Firms**

*491 Fried, Frank, Harris, Shriver & Jacobson, New York City (Marc P. Cherno, Robert E. Gerber, Mary C. Farrington, of counsel), for plaintiff.

Patterson, Belknap, Webb & Tyler, New York City (Eugene L. Girden, Lynn P. Freedman, Blair Axel, Stephen P. Younger, of counsel), for defendant.

**Opinion**

FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVAL, District Judge.

This action is brought by an institutional lender against a prospective borrower charging the borrower with breach of a commitment letter agreement for a 14-year $76 million loan yielding 15.25%. The exchange of letters constituting the commitment agreement stated that the borrower and lender had made a "binding agreement," to borrow and to lend on the agreed terms, subject to the preparation and execution of final documents satisfactory to both sides and the approval of the borrower's Board of Directors. Prior to the preparation of final agreements the borrower broke off negotiations, declining to negotiate further unless the lender agreed that the borrower's obligation to borrow would be contingent on its ability to report the loan on its financial statement by an off-balance-sheet offset. The lender contends the borrower's withdrawal was attributable to an intervening decline in interest rates which permitted the borrower to secure funds at a much lower cost than agreed in the commitment letter. The borrower contends that the change in interest rates had nothing to do with its refusal to go ahead and that the availability of offset accounting had always been understood to be a condition of the loan. It contends also that its acceptance of the commitment reserving *492 right of approval to its Board of Directors left it free to decline to take down the loan if the loan did not serve its interest.

*Facts*

The borrower is Tribune Company, a Chicago communications enterprise which owned the New York Daily News. The lender is Teachers Insurance and Annuity Association of America, a large non-profit tax exempt organization that provides pension annuities and insurance programs to educational institutions. The contemplated loan was an element of a three-cornered arrangement for the sale

by Tribune of the Daily News Building at 220 E. 42nd Street in New York.

For some time, Tribune had been contemplating the possibility of outright sale of the News. The Morgan Guaranty Trust Company of New York prepared a memorandum recommending to Tribune that it structure a deal in which the purchaser's payment would be deferred, and Tribune would borrow equivalent funds from a financial institution under terms that permitted Tribune the right to repay its borrowing by assigning the purchaser's installment note to the lending institution. (DX 1-4.) This device was designed to secure installment tax deferral of Tribune's gain, notwithstanding immediate realization of the full proceeds of the sale through the loan. And because its borrowing could be repaid by tender of the purchaser's note, Tribune's debt could be offset against its receivable and reported off-balance-sheet in the notes to its financial statement.

In the spring of 1982 Tribune dropped the plan to sell the News. Instead, it restructured the News subsidiary, which occasioned a nonrecurring tax loss of $75 million. To raise cash that was needed for a number of purposes including the operations of the News, Tribune decided to sell the News Building which would no longer be needed in the restructured operation.

Tribune entered into negotiations to sell the Building to LaSalle Partners, a Chicago real estate firm, with Tribune retaining an equity interest. It was important that the transaction be accomplished during the calendar year 1982 so that the loss realized from the restructuring of the News could be offset against taxable gain realized from the sale of the News Building. A suggestion was made to adapt to the sale of the Building the proposal which Morgan had made with respect to the contemplated sale of the *News.* A substantial portion of the purchase price would be deferred: LaSalle would deliver to Tribune a non-recourse long-term (35 year) purchase money mortgage note. (As the equity "kicker", this mortgage would give the mortgagee not only conventional interest payments but also a percentage of the operating profits of the building.) Tribune would "match-fund" the mortgage, *i.e.,* it would borrow from a third party in an amount approximately equal to the mortgage note. The loan agreement would give Tribune an unconditional right to satisfy its obligation to repay by putting to the lender the mortgage note which Tribune received for its sale of the building. To compensate the lender for the additional risk inherent in the possible put of the mortgage, Tribune would pay a premium above the market interest rate.

In this manner, Tribune would realize only so much gain as it could set off against its 1982 tax loss. The taxability of the remainder of its gain would be deferred by reason of the installment sale. At the same time, through the loan, Tribune would obtain immediate use of the full purchase price in cash. It would not be obliged to carry the borrowing as a liability on its balance sheet: by reason of its right to put its mortgage receivable to the lender in satisfaction of the debt, it could employ offset accounting, setting off the asset represented by the purchase money notes against the liability to the lending institution, eliminating both from its balance sheet, and describing them rather in the footnotes to the financial statements.

The use of offset accounting was important to Tribune. Up to this point, its common stock had been privately held. It was now contemplating a public offering and believed that the market for its shares would be adversely affected if it were required *493 to carry so large a liability on its balance sheet.

In August, Tribune prepared an offering brochure to be shown to prospective lenders. This was a document of about 50 pages, describing the proposed mortgage and loan, together with financial information about Tribune and the Building. The brochure included two term sheets-one describing the proposed purchase money mortgage Tribune would receive upon the sale of the Building, the other giving the terms of its proposed match-fund borrowing.

Tribune's advisers believed that only a small number of institutions would have the means and flexibility to contemplate a loan of these specifications. Together with LaSalle, Tribune prepared a list of six institutions including Teachers. The other five promptly rejected the deal.

Gary Waterman of LaSalle called Martha Driver of Teachers to discuss the concept. Driver told him that Teachers would be interested in receiving a proposal from Tribune. On August 20 Scott Smith, the Vice President and Treasurer of Tribune, sent Driver the offering circular. (DX 5.) Smith's covering letter stated:

> Our objective is to "match fund" this PMM [purchase money mortgage] so that we can obtain cash equivalent to the PMM's value while maintaining the tax deferral and the upside potential associated with the cash flow participation feature. A second objective is to avoid showing both the PMM and match funding on our balance sheets since

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

conceptually these real estate loans are not related to our basic businesses.

According to our advisers, we can meet these objectives by adding a "put" or alternative payment option to the private placement.... [giving] Tribune Company the unconditional right, at any time, to assign the PMM to the private placement lender in full satisfaction of its obligations under the Notes.

The letter went on to state that "[t]he likelihood of the 'put' being exercised is very low because of the 'penalties' Tribune would incur through loss of the tax deferral and the value of the cash flow participation." Finally, Smith's letter stated, "While we are flexible on funds delivery, our objective is to have a *firm commitment* from a lender by September 15, 1982. Consequently, we need to move the due diligence and negotiation process along very quickly." (Emphasis supplied.)

In the next weeks discussions proceeded promptly between Teachers and Tribune, with Teachers' representatives making due diligence visits to Tribune. Teachers requested and Tribune agreed to an additional ¼% yield. Both sides agree that during these meetings Smith talked about Tribune's desire to use offset accounting. Driver testified that she told Smith Teachers could not make a commitment if the deal were conditioned on Tribune's ability to use a particular method of accounting. Smith denies that Driver made any such statement. Both agree that Smith spoke of Tribune's urgent need for a commitment by September 15. Driver told Smith that the commitment could not be issued before approval by Teachers' Finance Committee which would not meet until September 16. This brief delay was acceptable to Tribune.

The loan had attractive features for Teachers: It was satisfied with Tribune as a credit risk; it would receive a premium over market interest rates to compensate it for the additional risk of being paid by tender of a long-term mortgage rather than in cash; nonetheless, absent catastrophic changes, Tribune was unlikely to exercise the right to tender the mortgage, because by doing so it would give up the tax deferment as well as its participation in the profits of the building; furthermore, an independent appraisal delivered by Tribune to Teachers valued the building at $150 million or nearly double the amount of the loan, providing a comfortable cushion of protection in the mortgaged collateral.

On September 16th, Teachers Finance Committee met and approved the Tribune loan. Driver promptly called Smith, gave him the good news, and told him that Teachers would

issue its commitment letter promptly. Tribune's Assistant Treasurer wrote to Driver, "We look forward to receiving **\*494** your commitment letter next week...." (DX 46.) Driver promptly undertook the drafting of Teacher's commitment letter.

The letter, mailed on September 22, included a two page Summary of Proposed Terms drawn from the term sheet included in Tribune's Offering Circular and the ensuing conversations. Teacher's term sheet covered all the basic economic terms of a loan. Neither the term sheet nor the covering commitment letter made reference to offset accounting. The letter stated that the agreement was "contingent upon the preparation, execution and delivery of documents ... in form and substance satisfactory to TIAA and to TIAA's special counsel ...," and that the transaction documents would contain the "usual and customary" representations and warranties, closing conditions, other covenants, and events of default "as we and our special counsel may deem reasonably necessary to accomplish this transaction." It concluded by inviting Tribune to "evidence acceptance of the conditions of this letter by having it executed below by a duly authorized officer ...," and finally stated:

> Upon receipt by TIAA of an accepted counterpart of this letter, our agreement to purchase from you and your agreement to issue sell and deliver to us ... the captioned securities, shall become a binding agreement between us. (DX 13.)

When Tribune received this commitment letter, the "binding agreement" language caused serious concern to its lawyers. Tribune's outside counsel, Alfred Spada of the firm of Reuben & Proctor, advised Smith not to sign a letter containing "binding agreement" language. [1] But, having been turned down by five other institutions, Smith did not want to risk losing Teacher's commitment. He made no comment orally or in writing to Teachers questioning the "binding agreement" language. He executed and returned the letter on behalf of Tribune Company adding the notation that it was subject to certain modifications outlined in his accompanying letter. In the accompanying letter Smith wrote,

[1]   A few days before Tribune had entered into a letter of intent with LaSalle for the sale of the building which, in contrast, expressly provided that it was "not a binding agreement." (DX 10.)

[O]ur acceptance and agreement is subject to approval by the Company's Board of Directors and the preparation

and execution of legal documentation satisfactory to the Company.[2] (DX 14.)

[2] Smith's acceptance letter also revised the terms of the loan in a cosmetic, economically nonsignificant manner. Reuben & Proctor had advised Tribune that in order to protect the tax deferral, the terms of the match-fund note should not mirror too closely the terms of the purchase money mortgage. Accordingly, Smith had proposed to Driver that certain cosmetic adjustments without economic significance be made to the terms so as to better protect Tribune's tax objective. Teachers agreed. Par amount and term were slightly reduced, while coupon rate was slightly increased so as to leave the effective yield unchanged.

Smith's acceptance letter made no mention of offset accounting.

During October Tribune proceeded with negotiations on two fronts to conclude the sale of the News Building to LaSalle and the consummation of the loan from Teachers. Tribune's lawyers had advised that in order to assure the desired tax deferral these negotiations should be conducted separately and no direct negotiation should occur between Teachers and LaSalle. The document which pertained to both transactions was the purchase money mortgage, which would be given by LaSalle to Tribune to secure its deferred payment, and could eventually be put by Tribune to Teachers in satisfaction of its obligations under the loan. As the negotiations over the mortgage proceeded, Tribune found itself pulled between the conflicting interests of its counterparties. LaSalle, as purchaser of the building, wanted a mortgage that would allow little interference by the mortgagee in the operation of the building; such mortgages are characteristically given in purchase money transactions, and Tribune, as seller, was willing to agree to such loose terms. Teachers, on the other hand, as the possible eventual holder of the mortgage, was interested in terms characteristic of institutional mortgages that give the mortgagee substantial control over the *495 mortgagor's operation of the building. LaSalle and Teachers each served on Tribune adamant objections to the other's position. Tribune ferried these objections from one set of negotiations to the other.

A second subject of controversy in the negotiations between Tribune and Teachers was conditions on Tribune's put of the mortgage. Teachers expressed concern over a variety of problems: First, it worried that the mortgage might already be in default when put to Teachers; it sought to include as a condition of exercise of the put that the mortgage not be in default. Second, because the purchase money mortgage gave the mortgagee an equity participation in the profits of the building, Teachers worried that its possession of such a mortgage might give it "unrelated business income" that would threaten its tax exempt status. It also worried that such a mortgage might not be a legal holding for it at the time of exercise of the put, fourteen years hence. Teachers sought terms that would make Tribune's right to put the mortgage conditional on these issues being resolved to Teachers' satisfaction at the time of exercise. Tribune insisted that its right to put the mortgage to Teachers must be unconditional. Tribune believed that without an unconditional right to tender the mortgage in full satisfaction of the loan, Tribune could not justify offset accounting.

Eventually, because of the urgent need to conclude the sale of the building during the tax loss year, Tribune decided to conclude its negotiations with LaSalle, deferring the issue of Teachers satisfaction. Tribune entered into final binding agreements with LaSalle for the sale of the News Building on November 5. (DX 22.) The agreement was substantially on the terms reflected in the offering circular that Tribune had delivered to Teachers in August.

Tribune's board was scheduled to meet on October 28th. Tribune's negotiators had advised Teachers that formal board approval would be obtained at that meeting. At this meeting, Tribune's board passed resolutions which approved the sale of the Building to LaSalle. With respect to the Teachers loan, the Minutes of the meeting state that the Chairman "requested that the Board authorize the Finance Committee to approve the terms of such borrowing should the loan become available to the Company;" and that, following discussion, resolutions were adopted "that the proper officers of the Company be and they hereby are authorized" to effect the borrowing "with all of the actual terms and conditions to be subject to the prior approval by resolution of the Finance Committee." (DX 19.)

During the month of November, Tribune's accountants Price Waterhouse became worried about the availability of offset accounting. Prior to the delivery of the commitment letter, on September 7, Price Waterhouse had given Tribune an opinion letter that an unconditional option to put the mortgage note to the lender in full satisfaction of Tribune's obligation to repay the borrowing "allows (but does not require)" Tribune to offset its mortgage note receivable against its note payable. (DX 7.) In the meantime, in mid-October, the Financial Accounting Standards Board (FASB) had issued an exposure draft dealing with the appropriateness of offsetting restricted assets against related debt. (DX 25.) The exposure

draft underlined the problem that the conditions Teachers had been seeking to impose on Tribune's exercise on the put were incompatible with offset accounting. In addition, Price Waterhouse began to worry that if Tribune proceded to offer securities to the public, as it was planning, the SEC in passing on Tribune's registration statement might ask Price Waterhouse for an opinion as to whether offset accounting was "preferable." Although Price Waterhouse believed an unconditional put option would make offset accounting "appropriate," it had doubts whether it could give the opinion that such an accounting was "preferable" and whether, without such an opinion, the SEC would permit the liability to be kept off the balance sheet.

Smith called Driver and expressed Tribune's concerns about the accounting issue. Meetings and discussions were held during *496 November concerning Tribune's dissatisfaction with the conditions Teachers had demanded as to the put, the availability of offset accounting, and Teachers' problems with the terms of the mortgage.

In the meantime, interest rates had dropped rapidly, and were now substantially below the rates that prevailed when Teachers and Tribune had entered into the commitment. Driver became concerned that Tribune, which could now make a new deal to borrow at substantially cheaper rates, was seeking to back out of the transaction. Having heard nothing about the actions of Tribune Board at its meeting on October 28, she inquired of Smith whether Board approval had been voted. Smith answered to the effect that the Board had given "general approval" to the transaction.

Around December 2 Smith began to advance proposals varying the form of the transaction. He suggested delaying Tribune's take-down, paying Teachers a commitment fee in the meantime, and specifying that Tribune would not go ahead with the proposed loan if it did not receive assurance as to the availability of offset accounting. Teachers indicated flexibility as to delaying the take-down in return for a commitment fee, but not as to making the deal conditional on Tribune's accounting.

On December 6th Tribune closed with LaSalle on the sale of the building. The mortgage was executed. Teachers began to press Tribune to meet with it to put the loan documents into final form. Teachers dropped its demand for conditions on the exercise of the put that had been unacceptable to Tribune. It asked for Tribune's comments on the draft note which it had circulated on December 1. Driver asked Smith to schedule a meeting to iron out all

open issues. But the drop in interest rates together with doubts as to the availability of offset accounting now made the deal much less attractive to Tribune. Smith responded that there was no point having a meeting unless Teachers were willing to make Tribune's obligation conditional on the availability of offset accounting. Driver told Smith that Tribune's satisfaction as to its accounting was not part of their deal. Teachers sent Tribune an unsolicited letter extending Teachers' commitment for another 30 days. Tribune exhibited no further interest in pursuing the transaction. Teachers then brought the suit.

### Discussion

The primary contested issue is as to the nature of the obligations that arose out of the commitment letter agreement:

Tribune contends that although the commitment letter was an undertaking to negotiate, it did not obligate either side to enter into a loan contract that was adverse to its interest. Pointing out that the commitment letter agreement left many terms open, that both sides had reserved the right of approval of satisfactory documentation, and that Tribune had furthermore made its obligation conditioned on the approval of its Board of Directors, it argues that it had no binding commitment to the loan agreement, especially if it found the terms adverse to its interests.

Teachers argues that although the commitment letter did not constitute a concluded *loan agreement,* it was nonetheless a binding commitment which obligated both sides to negotiate in good faith toward a final contract conforming to the agreed terms; it thus committed both sides not to abandon the deal, nor to break it by a demand that was outside the scope of the agreement. Although Teachers recognizes that the letter agreement left many points unspecified, it argues that the open terms were of minor economic significance and were covered by the provision that "[t]he documents shall contain such representations and warranties, closing conditions, other covenants, events of default and remedies, requirements for delivery of financial statements, and other information and provisions *as are usual and customary in this type of transaction*...." (Emphasis supplied.) (DX 13.) It argues that these minor open terms did not render the contract illusory or unenforceable. Nor did they indicate an intention of the parties not to be bound when taken together with the express language of "binding agreement." *497 Although it was of course possible for the deal to break without liability on either side by reason of inability of the parties to reach agreement on the open terms, Teachers argues that neither

side was free to break the deal over conditions which were either inconsistent with the agreed terms or outside the scope of provisions that would be "usual and customary in this type of transaction." (DX 13.)

There has been much litigation over preliminary agreements. It is difficult to generalize about their legal effect. They cover a broad scope ranging in innumerable forms and variations from letters of intent which presuppose that no binding obligations will be placed upon any party until final contract documents have been signed,[3] to firm binding commitments which, notwithstanding a need for a more detailed documentation of agreement, can bind the parties to adhere in good faith to the deal that has been agreed.[4] As is commonly the case with contract disputes, prime significance attaches to the intentions of the parties and to their manifestations of intent. Labels such as "letter of intent" or "commitment letter" are not necessarily controlling although they may be helpful indicators of the parties' intentions. Notwithstanding the intention of the parties at the time, if the agreement is too fragmentary, in that it leaves open terms of too fundamental importance, it may be incapable of sustaining binding legal obligation.[5] Furthermore, the conclusion that a preliminary agreement created binding obligations does not necessarily resolve disputes because it leaves open the further question of the nature, scope and extent of the binding obligations.

[3] See, e.g., Dunhill Securities Corp. v. Microthermal Applications, Inc., 308 F.Supp. 195 (S.D.N.Y.1969); Brause v. Goldman, 10 A.D.2d 328, 199 N.Y.S.2d 606 (1st Dept.1960), aff'd, 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961).

[4] See e.g., Teachers Insurance Annuity Association v. Butler, 626 F.Supp. 1229 (S.D.N.Y.1986) (Weinfeld, J.); Mid-Continent Telephone Corp. v. Home Telephone Co., 319 F.Supp. 1176 (N.D.Miss.1970); see also Arnold Palmer Golf Co. v. Fuqua Industries, Inc., 541 F.2d 584 (6th Cir.1976); Itek Corp. v. Chicago Aerial Industries, Inc., 248 A.2d 625 (Del.1968); Corbin on Contracts § 29 (1952).

[5] See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 436 N.Y.S.2d 247, 249 (1981); Candid Productions, Inc. v. International Skating Union, 530 F.Supp. 1330, 1333-34 (S.D.N.Y.1982) (Weinfeld, J.).

A primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended. Ordinarily in contract negotiation,

enforceable legal rights do not arise until either the expression of mutual consent to be bound, or some equivalent event that marks acceptance of offer. Contractual liability, unlike tort liability, arises from consent to be bound (or in any event from the manifestation of consent). It is fundamental to contract law that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms. More is needed than agreement on each detail, which is overall agreement (or offer and acceptance) to enter into the binding contract.[6] Nor is this principle altered by the fact that negotiating parties may have entered into letters of intent or preliminary agreements if those were made with the understanding that neither side would be bound until final agreement was reached. The Court of Appeals in several recent cases has stressed the importance of recognizing the freedom of negotiating parties from binding obligations, notwithstanding their having entered into various forms of non-binding preliminary assent.[7] Those decisions have underlined various indicia that can be helpful in making the determination whether a manifestation of preliminary assent amounted to a legally binding agreement.

[6] See Reprosystem v. SCM Corp., 727 F.2d 257 (2d Cir.), cert. denied, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

[7] See Winston v. Mediafare Entertainment Corp., 777 F.2d 78 (2d Cir.1985); R.G. Group v. Horn & Hardart Co., 751 F.2d 69 (2d Cir.1984); Reprosystem, B.V. v. SCM Corp., 727 F.2d 257 (2d Cir.), cert. denied, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

Notwithstanding the importance of protecting negotiating parties from involuntary *498 judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation.[8] It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties.[9]

[8] Cf. Washington Heights-West Harlem-Inwood Mental Health Council, Inc. v. District 1199, 748 F.2d 105 (2d Cir.1984).

[9] See Corbin on Contracts § 29 (1952).

Preliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound)

on all the issues perceived to require negotiation. Such an agreement is preliminary only in form-only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.... Restatement (Second) of Contracts, § 26 (then Tert. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957)."

The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement. [10] To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type-the binding preliminary commitment-does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The

obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

10   *See Channel Home Centers, Division of Grace Retail Corp. v. Grossman,* 795 F.2d 291 (3d Cir.1986); *Butler,* 626 F.Supp. 1229; *Sommer v. Hilton Hotels Corp.,* 376 F.Supp. 297 (S.D.N.Y.1974).

It may often be difficult for a court to determine whether a preliminary manifestation of assent should be found to be a binding commitment. The factors mentioned by the Court of Appeals in *Winston,* 777 F.2d 78, and *R.G. Group,* 751 F.2d 69, as relevant to a determination whether final contracts had been reached in preliminary form are also relevant to determination ***\*499*** whether preliminary commitments are to be considered binding. But, for this different inquiry, the factors must be applied in a different way. For example, in *R.G. Group,* 751 F.2d at 76, the court identified the third factor as "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." The existence of open terms is always a factor tending against the conclusion that the parties have reached a binding agreement. But open terms obviously have a somewhat different significance where, unlike *R.G. Group,* the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms. To consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced. That is not the law.

In seeking to determine whether such a preliminary commitment should be considered binding, a court's task is, once again, to determine the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached. Courts must be particularly careful to avoid imposing liability where binding obligation was not intended. There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents. Nonetheless, if that is what the parties intended, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations.

Giving legal recognition to preliminary binding commitments serves a valuable function in the marketplace, particularly for relatively standardized transactions like loans. It permits borrowers and lenders to make plans in reliance upon their preliminary agreements and present market conditions.

Without such legal recognition, parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms. At the same time, a party that does not wish to be bound at the time of the preliminary exchange of letters can very easily protect itself by not accepting language that indicates a "firm commitment" or "binding agreement."

3

Upon careful consideration of the circumstances and the express terms of this commitment letter, I conclude that it represented a binding preliminary commitment and obligated both sides to seek to conclude a final loan agreement upon the agreed terms by negotiating in good faith to resolve such additional terms as are customary in such agreements. I reject Tribune's contention that its reservation of the right of approval to its Board of Directors left it free to abandon the transaction.

### Expression of Intent

The Court of Appeals' first and most important factor looks to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities. This factor strongly supports Teachers. The exchange of letters constituting the commitment was replete with the terminology of binding contract, for example:

> If the foregoing properly sets forth your understanding of this transaction, please evidence acceptance of the conditions of this letter by having it executed below by a duly authorized officer ... and by returning one executed counterpart....

> Upon receipt by [Teachers] of an accepted counterpart of this letter, our agreement to purchase from you and your agreement to issue, sell and deliver to us ... the captioned securities, shall become a binding agreement between us.

In signing, Tribune used the words "Accepted and agreed to." Tribune's additional letter of acceptance began "Attached is an executed copy of the Commitment Letter ... for a $76 million loan." The intention to create mutually binding contractual obligations is stated with unmistakable clarity, in a manner not comfortably compatible *\*500* with Tribune's contention that either side was free to walk away from the deal if it decided its interests were not served thereby.

Tribune argues that this language of binding agreement was effectively contradicted by its statement that "our acceptance and agreement is subject to approval by the Company's Board of Directors and the preparation and execution of legal documentation satisfactory to the Company," as well as by similar reservations in Teachers' letter.

Contracts of preliminary commitment characteristically contain language reserving rights of approval and establishing conditions such as the preparation and execution of documents satisfactory to the contracting party. Although such reservations, considered alone, undoubtedly tend to indicate an intention not to be finally bound, they do not necessarily require that conclusion. Such terms are not to be considered in isolation, but in the context of the overall agreement. Such terms are by no means incompatible with intention to be bound. Since the parties recognize that their deal will involve further documentation and further negotiation of open terms, such reservations make clear the right of a party, or of its Board, to insist on appropriate documentation and to negotiate for or demand protections which are customary for such transactions. In *Reprosystem,* 727 F.2d at 262, and *R.G. Group,* 751 F.2d at 75, the court reasoned that a term stating the agreement would be effective "when executed" could conclusively establish that no binding force was intended prior to execution. That reasoning is of diminished force, however, where the inquiry is not whether the parties had concluded their deal, but only whether they had entered into a binding preliminary commitment which required further steps. Here, the reservation of Board approval and the expressed "contingen[cy] upon the preparation, execution and delivery of documents" did not override and nullify the acknowledgement that a "binding agreement" had been made on the stated terms; those reservations merely recognized that various issues and documentation remained open which also would require negotiation and approval. If full consideration of the circumstances and the contract language indicates that there was a mutual intent to be bound to a preliminary commitment, the presence of such reservations does not free a party to walk away from its deal merely because it later decides that the deal is not in its interest.

### The Context of the Negotiations

These conclusions are further reinforced by the particular facts of the negotiation. As Smith's proposal letter of August 20 advised Teachers, Tribune wanted "to have a firm commitment from a lender by September 15, 1982." If such

a "firm commitment" meant nothing more than Tribune now contends it does, such a commitment would have been of little value, as the lender would have remained free to abandon the loan if it decided at anytime that the transaction did not suit its purposes, whether because of changed interest rates or for any reason: Tribune wanted a firm commitment because it felt it needed to be sure the transaction would be concluded by the end of the year.

This same thinking governed Tribune's conduct a month later when it received the Teachers' commitment letter. Tribune's lawyers, recognizing that the form of agreement committed Tribune to a "binding" obligation, warned about the consequences of signing it. Tribune, however, wanted Teachers' binding commitment to make the loan. Tribune had been turned down by the five other lenders it considered eligible, and it did not want to risk losing Teachers' commitment. Accordingly, Smith refrained from raising any question about the "binding agreement" language. If he intended by adding the reservation of approval of Tribune's Board of Directors to change the deal fundamentally by freeing Tribune from binding obligations without Teachers noticing the change, he did not accomplish this. Tribune remained committed, as Teachers did. That is to say each was obligated to seek in good faith to conclude a final agreement within the terms specified in the commitment letter, supplemented by such representations, *501 warranties and other conditions as are customary in such transactions. Teachers would not have been free to walk away from the loan by reason of a subsequent decision that the transaction was not in Teachers' interest. Nor could Tribune.

Tribune further contends that, given the uncertainties implicit in the three-cornered deal, neither party could have considered the loan commitment as binding. The agreed terms required Tribune to pay a premium over the prevailing interest rates for the privilege of its option to put the mortgage to Teachers. If Tribune had failed to conclude its deal with LaSalle for the sale of the Building, there would have been no purchase money mortgage and no reason for paying an interest premium.

The argument is not frivolous, but nor is it compelling. If Tribune had failed to sell the News Building and Teachers had nonetheless sought to compel it to take down the loan, Tribune might have succeeded in arguing that the sale of the Building was a mutually agreed implicit condition of the enforceability of the loan agreement. Tribune's argument in those circumstances would have been supported by the

references in the commitment letter to the purchase money mortgage resulting from the Building sale.

But, however that dispute would have been resolved had it arisen, it does not compel the conclusion that there was no binding obligation. The Building sale did not fall through. It was concluded on the anticipated terms. [11] If the sale of the Building was an implicit condition of the borrowing, that condition was fulfilled.

[11]  The purchase money mortgage delivered by LaSalle was substantially in the terms outlined in Tribune's initial offering circular, which terms were incorporated by reference in the commitment letter agreement with Teachers. To the extent there was any change between the term sheet and the final mortgage, such change had no relevance to Tribune's abandonment of its loan commitment.

### Open Terms

Tribune contends that the commitment letter agreement included so many open terms that it could not be deemed a binding contract. [12] It argues also that the numerous open terms indicate a lack of intention on either side to be bound. [13] Neither contention is convincing. Tribune does cite reputable authority to the effect that, notwithstanding language of binding agreement, if a contract fails to include agreement on basic terms of prime importance, it can be considered a nullity. [14] This principle, however, has no application to the present facts. The two page term sheet attached to the commitment letter covered the important economic terms of a loan. The fact that countless pages of relatively conventional minor clauses remained to be negotiated does not render the agreement unenforceable. [15]

[12]  See *Joseph Martin, Jr., Delicatessen Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981); *Kleinschmidt Division of SCM Corp. v. Futuronics Corp.,* 41 N.Y.2d 972, 395 N.Y.S.2d 151, 152, 363 N.E.2d 701 (1977).

[13]  See *Winston,* 777 F.2d at 80, 82-83; *R.G. Group,* 751 F.2d at 76-77.

[14]  See *supra* notes 12 and 13.

[15]  See *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 453 (2d Cir.1977); *V'Soske v. Barwick,* 404 F.2d 495, 500 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

The contention is superficially appealing with respect to the mortgage. The commitment letter, although referring to Tribune's optional right to put a mortgage to Teachers in satisfaction of its obligations, did not specify any of the terms of such a mortgage. Absence of agreement on so important a specification as the basic terms of the mortgage would render this agreement illusory. There was, however, no absence of agreement on the basic terms of the mortgage. The references in the commitment letter to the mortgage were understood by both parties as references to the mortgage term sheet that Tribune had furnished to Teachers in its Offering Circular. [The commitment letter stated that the mortgage to be tendered by Tribune "shall preserve the economics proposed for the present Mortgagee (Tribune Company)."  *502  ] That two-page term sheet described the important economic terms of the proposed LaSalle purchase money mortgage. Notwithstanding its silence as to countless pages of secondary conventional mortgage clauses which remained to be negotiated, it sufficiently specified the important terms to make the commitment letter agreement meaningful and enforceable. [16]

[16]   On the earlier motion for judgment on the pleadings, the absence of specification of terms for the mortgage led this court to express doubt whether the Teachers-Tribune commitment letter could have been intended as binding. At the time, however, having received none of the evidence, I was not aware that a mortgage term sheet had been circulated between the parties and was implicitly incorporated in the commitment letter agreement.

Nor did the existence of open secondary terms compel the conclusion that the parties did not intend to be bound. In support of this argument, Tribune cites the implication of the Court of Appeals in *R.G. Group,* 751 F.2d at 76-77 and *Winston,* 777 F.2d at 80, 82, that the existence of any single open term requires the conclusion that a binding contract had not yet been reached. This takes the Court's observation out of context and distorts its meaning. If the issue is whether the parties have reached final agreement requiring only formal memorialization, the recognized existence of open terms may be a strong indication that they have not. If, on the other hand, as here, the question is whether a preliminary expression of commitment was intended to bind the parties to negotiate the open terms in good faith, the mere fact of the existence of open terms is, of course, far less persuasive. Although the existence of open terms may always be a factor that suggests intention not to be bound, it is by no means conclusive. Where the parties have manifested intention to make a binding

agreement, the mere fact of open terms will not permit them to disavow it.

**Partial Performance**

The factor of partial performance slightly favors Teachers. The evidence shows that for Teachers, its "commitment" to lend involved a budgeting of the funds, albeit somewhat informal. Teachers was in the business of lending its funds. The amount it had available for placement in long-term loans was finite, if large. In its loan budgeting process, Teachers would informally allocate funds which had been so committed. Such allocation reduced the net amount considered available for commitments to new loans. In fact, Teachers advised Tribune that it had only $25 million remaining available to be advanced in 1982 and that the rest would be advanced in 1983.

Tribune argues that because there was no formal segregation, it was of no significance. This misses the point. However informally it was done, the allocation of the loan commitment effectively reserved the funds for the Tribune loan. It reduced the amount of Teachers' funds that it would consider available to competing borrowers. It meant that Teachers would forego opportunities to procure commitments from other borrowers when its own commitments exhausted its available funds.

In urgently seeking Teachers' "firm commitment" by September 15, Tribune well understood that the commitment would involve a partial performance on Teachers' part. By virtue of the commitment given in September, Tribune was assured that when the time came in December for concluding final documents and drawdown, it would not be told that Teachers had nothing left to lend. Tribune was negotiating to reserve those funds. Teachers acceded and issued the commitment. That constituted a partial performance.

A party's partial performance does not necessarily indicate a belief that the other side is bound. A party may make some partial performance merely to further the likelihood of consummation of a transaction it considers advantageous. This factor was not the subject of highly focused evidence. I have not attached great importance to it and mention it primarily because it is listed among the factors suggested by the Court of Appeals in *R.G. Group* and *Winston.* I conclude, however, that this factor favors the conclusion that both sides considered the commitment binding.

*503  **The Customary Form for Such Transactions**

The fourth factor mentioned in *R.G. Group,* and *Winston,* is "whether the agreement at issue is the type of contract that is usually committed to writing." 777 F.2d at 80. *See also* 751 F.2d at 77. Of course, the agreement here, unlike those cases, was in writing, but that does not dispose of the issue. To give this factor a broader application, it would better be put in terms of whether in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue. The evidence on that question tends to favor Teachers.

Of course it is true, as Tribune argues, that $80 million loans involving mortgages are generally not concluded by means of a four-page letter. But that is not the issue. The question is rather whether the customary practices of the relevant financial community include according such binding force as Teachers here advocates to such preliminary commitment agreements. Teachers' expert evidence showed that it is within the recognized practices of the financial community to accept that preliminary commitments can be binding. Not all preliminary commitments are binding. Some are not. Some are binding on only one side: Where, for example, the borrower pays a commitment fee for the purpose of binding the lender, the agreement may be in the nature of an option to the borrower to decide by a specified date whether to go ahead with the transaction. In such cases the seller has been paid for its one-sided commitment. Some such preliminary agreements are properly seen as merely letters of intent which leave both sides free to abandon the transaction. The point is that the practices of the marketplace are not rigid or uniform. They encompass a considerable variety of transactions negotiated to suit the needs of the parties, including mutually binding preliminary commitments. Each transaction must be examined carefully to determine its characteristics.

Tribune has failed to show to the court's satisfaction that such binding commitments are outside the usages of the marketplace.

### Action by Tribune's Board of Directors

The parties disagree as to whether the Teachers' loan was or was not approved by Tribune's Board of Directors. Tribune contends that the resolutions adopted by its Board on October 28th did not involve any approval whatsoever, but merely a delegation of responsibility to the Finance Committee to approve or disapprove the transaction. Teachers contends that the action of the Board did approve the loan in concept, while delegating to the Finance Committee the right and authority

to pass on the particular loan documents. Teachers contends that its interpretation is reinforced by Smith's statement to Driver, when she inquired in late November, that the Board had given "general approval" to the transaction at the October 28 meeting (a statement Smith denies having made).

I need not rule on whether the resolutions adopted by the Board of Directors did or did not constitute approval of the transaction, because nothing turns on this. As noted above, although Tribune had reserved the right of approval of the final transaction to its Board of Directors, this did not mean Tribune could defeat its obligations under the binding agreement of commitment merely by having its Board do nothing. The commitment agreement called for conclusion of the transaction and a $25 million first drawdown before the end of the year. Even if I were to accept Tribune's contention that its Board took no action other than to delegate responsibility to the Finance Committee, that would not justify Tribune's backing out of its binding agreement to negotiate in good faith to reach a complete final contract.

Tribune's argument would construe the commitment letter agreement either as a free option to Tribune to decide over the next three months whether to hold Teachers to its commitment to make the loan, or alternatively as a nonbinding statement of mutual intention. Neither is consistent with either the written agreement or the conduct of the parties. Tribune had requested *504 the "firm commitment" of Teachers to make the loan. Teachers' firm commitment was not given for free but in exchange for Tribune's similarly binding commitment. The reservations as to preparation and execution of documents and as to the satisfaction of Teachers' counsel and Tribune's Board permitted each side to negotiate the implementation of the agreement and to require the inclusion of customary terms in a form which it deemed necessary or appropriate to its protection. But those reservations did not authorize either side to escape its obligation simply by declining to negotiate or to give approval.

In any event, I conclude that Tribune's Board did give approval within the meaning of the agreement. The Minutes reflect that the proper officers were expressly authorized to arrange for the borrowing at a maximum interest rate of 15.25%, "with all of the actual terms and conditions to be subject to the prior approval by resolution of the Finance Committee...." The Resolution went on to say that the "authority granted by this resolution shall expire if not utilized prior to April 30, 1983." (DX 19.) This express authorization to "the proper officers ... to arrange for" the

borrowing (which would expire if not acted on by April 30, 1983), surely went beyond a mere delegation to the Finance Committee of the Board's responsibility to approve or disapprove. The fact that the authorization was "subject to" Finance Committee approval recognized rather that there were terms and documents that remained to be negotiated, calling for Board level approval. It did not mean that the Board had done nothing but delegate. On consideration of the minutes and resolutions, as well as the testimony of Tribune officers and directors who were present at the meeting, I find, as Smith later told Driver, that the Board gave "general approval" to the transaction.

Tribune's October 6 letter reserving approval to Tribune's Board did not specify any particular form of Board approval, nor did it require that approval be of the final loan documents. Indeed, it distinguished between the requirements of "*approval* by the Company's Board of Directors" and "the preparation and execution of legal documentation *satisfactory to the Company*." The general approval given was sufficient under the contract.

### Tribune's Right to Condition the Loan on Offset Accounting

Tribune contends that its right to carry the loan off-balance-sheet by offset accounting was always deemed an essential condition of the deal. It points out that the Offering Circular which it delivered to Teachers, and the Price Waterhouse background memoranda, which also were delivered to Teachers during the early due diligence and discussion phase, all underlined offset accounting as an important Tribune concern. Nor does Teachers deny that in the early discussions, Smith spoke of Tribune's accounting and tax objectives. The witnesses disagree along predictable lines as to whether Driver told Smith that Teachers would not take the risk of Tribune's accounting treatment. The conflict need not be resolved. For regardless whether Driver orally refused to have Teachers assume the risk of Tribune's right to satisfactory accounting, the signed agreement did not provide for any such condition. The written agreement between the parties contains no basis whatever for the proposition that Tribune's obligation was conditioned on satisfactory assurance that it could report the loan off balance sheet. The fact that Tribune considered this significant is not disputed, but it is not determinative.

Both parties were aware of Tribune's objectives as to both the tax and accounting for the proposed deal. Tribune could, of course, have demanded as a condition of its commitment that it receive satisfactory assurances (in the form of opinion letters of counsel and auditors, or otherwise) as to both deferred taxation and offset accounting. It could have offered to pay a fee for Teachers' commitment on terms that would have left Tribune free to proceed with the loan or not, at its option. Alternatively, it could have negotiated for the option to prepay if the Internal Revenue Service or the SEC disallowed the desired tax or accounting consequences. The problem was  *505* that in September of 1982, Tribune believed that it needed an immediate "firm commitment" from Teachers to be sure of its ability to conclude the transaction as planned within 1982. Had Tribune made such demands, Teachers might well have turned down Tribune's proposal (as the five other institutions had done). Indeed, Tribune was so sensitive to its need for Teachers' firm commitment that when its counsel warned of the consequences of signing the commitment letter with its "binding agreement" language, Tribune disregarded this advice so as not to lose the lender's commitment. Neither the language of the agreement, nor the negotiations of the parties give any support to the contention that offset accounting was a condition of the agreement.

There was perhaps an additional reason why Tribune did not negotiate for offset accounting as a condition of the deal, being that in September and early October it did not have the doubts that it later developed as to the availability of offset accounting. It had received a prior opinion of Price Waterhouse to the effect that the unconditional put would make offset accounting appropriate. Only after the FASB's mid-October exposure draft did Price Waterhouse begin to emphasize doubts about offset accounting and about the position the SEC might take in the event Tribune offered public securities under an SEC registration statement.

Whether the reason was that Tribune was afraid to lose Teachers prompt firm commitment, or that Tribune had not yet worried, as it later did, about the availability of its accounting objective, or simply that Tribune was willing to take the risk to secure this important deal, the fact is that Tribune did not negotiate for and did not obtain its right to offset accounting as a condition of its bargain.

By December of 1982 Tribune faced a completely different set of factors. Interest rates had declined very substantially. The loan agreement that it negotiated with Teachers was no longer to its benefit since it could now borrow money at substantially cheaper cost. Price Waterhouse's newly expressed doubts about the availability of offset accounting gave it further reason to question whether the deal it had

made was a good one. With the benefit of two months' hindsight, Tribune most likely would not have entered into the commitment agreement it made in early October. That was, however, the agreement it made.

### Conditions Precedent to Enforcement

Tribune contends that even if the commitment letter constituted a valid, enforceable contract, there were conditions precedent to its enforcement that were never satisfied. Teachers' commitment letter stated that the authorization of the loan was "contingent upon the preparation, execution and delivery of" final contract documents; Tribune's response, likewise, stated that "our acceptance and agreement is subject to ... the preparation and execution of legal documentation satisfactory to the Company." Tribune contends that since final contract documents were never prepared, the conditions precedent to the enforceability of the agreement were never satisfied and, accordingly, Tribune cannot be charged with breach. This argument misconceives the meaning of these clauses. The preliminary agreement envisions and requires further and final contract documents without which the loan will not be made; if, through no fault on either party, no final contract were reached, either because the parties in good faith failed to agree on the open secondary terms, or because, as often happens in business, the parties simply lost interest in the transaction and by mutual tacit consent abandoned it without having reached final contract documents, no enforceable rights would survive based on the preliminary commitment. This does not mean that the language of reservation authorized one party to kill the deal simply by refusing to negotiate or to sign the contract documents. [17] Such an interpretation would render language *506 like "binding agreement" and "firm commitment" meaningless.

[17]    See Butler, 626 F.Supp. 1229; Mid-Continental Telephone Corp. v. Home Telephone Co., 319 F.Supp. 1176 (N.D.Miss.1970).

Tribune's point would be well taken if the negotiations had aborted over inability to reach agreement on the terms of the purchase money mortgage or the put. Indeed, if they had aborted because Teachers had insisted on imposing conditions on the exercise of the put that were incompatible with the initial agreement, Tribune might properly have charged Teachers with breach of the commitment letter agreement.

What in fact happened was the other way around. Tribune broke off contract negotiations by insisting on a condition

(satisfactory accounting) that was not within the scope of the agreement. Although Tribune's refusal to go ahead with the contract may well have been motivated in part by doubts as to the availability of offset accounting, I find that that decline in interest rates also substantially influenced Tribune's decision.

Of course it is true that numerous issues remained open at this time. The basic loan agreement was in draft form, recently circulated by Teachers, without any negotiations having taken place over its form and minor terms. Although I find (as a matter of disputed fact) that Teachers had expressed its agreement to a put on terms that were acceptable to Tribune, it is less clear that Teachers had ever stated its acceptance of the form of mortgage that Tribune had concluded with LaSalle. (Teacher's counsel Tencza of the Debevoise firm had recently sent Tribune a letter specifying 35 problematic points in the LaSalle purchase money mortgage.) But the existence of those open points is of no consequence because they did not break the deal. Teachers offered in mid-December to sit down with Tribune and resolve all open issues so that the first drawdown could be made before the end of the year as contemplated in the commitment letter; Tribune declined stating that such a meeting would be of no value unless Teachers was prepared to agree that Tribune's satisfaction as to its accounting would be a condition of its obligation to draw down the loans.

Whatever Teachers' past posture had been as to the mortgage put and terms, there is every reason to believe that it would have acceded to Tribune's demands so long as they were within the terms of the commitment agreement. Given the fact that interest rates had dropped precipitously from the time of the commitment letter, it would have been bad business judgment for Teachers to lose the deal by refusing to agree on points of minor importance. Driver's testimony that Teachers was prepared to agree to Tribune's terms on the purchase money mortgage and the put is entirely credible. But the issue does not depend on a finding as to the likelihood of Teachers acceding to Tribune's demands on those open issues. The point is simply that Teachers, in conformity with its contract obligations, was asking Tribune to sit down and negotiate in good faith towards agreement on the open points, while Tribune refused to negotiate unless Teachers agreed to add a condition that was outside the scope of the bargain. The existence of open points and the failure of the parties to satisfy the condition of execution of final documentation is, therefore, chargeable to Tribune. It cannot rely on those circumstances to escape its contract obligation.

### The Payment-of-Expenses Clause

Tribune also argues that the provision of the commitment letter for Tribune's payment of Teachers' expenses "whether or not this transaction is consummated" (DX 13) evidences the parties' awareness that the transaction might not be concluded, hence that they did not consider the agreement binding. The argument does not follow. The parties certainly contemplated that the loan might not be concluded. They might, for example, have failed after good faith negotiation to reach final agreement on open terms, or might eventually have decided mutually that the deal was not practical. In such case Tribune would have been required to pay Teachers' expenses and nothing more. But this provision does not contradict the express acknowledgement that the agreement was *507 binding. The recognition of the possibility that the loan might not be concluded did not signify that either side was free to walk away.

### Unaccepted Counteroffer/Untimely Acceptance

Tribune makes two insubstantial further arguments seeking to refute the contention that a contract of commitment was reached:

First it argues that because Teachers' letter specified that its offer would be outstanding only until October 4 and Tribune did not accept until October 6, the acceptance was ineffectual. There is no merit to this argument. Tribune had requested Teachers to hold its commitment offer open and Teachers had agreed to do so. (Driver Aff. as to liability, ¶ 35.)

Second, Tribune argues that by reason of its amendment of terms in its letter of October 6, this letter could not constitute an acceptance of Teachers prior offer, but was rather a counteroffer which was never accepted. This contention is based on incorrect assumption as to the facts. Teachers expressly agreed to Tribune's changes. (Driver Aff. as to liability, ¶¶ 32-38.)

### The Applicability of the Butler Precedent

The parties dispute the pertinence of Judge Weinfeld's recent ruling in *Teachers Insurance and Annuity Assoc. v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986). In *Butler,* the same lender had entered into a commitment letter agreement with a real estate developer within a few days of the commitment letter in this action. It provided for a 35-year loan at a yield of 14.25%, with a "lock-in" provision forbidding prepayment for a specified number of years.

Although the commitment letter was in many ways far more elaborate and detailed than this one, it was, in several respects, similar in that it required the further preparation and execution of contract documents, and reserved approval of counsel as to such documents.

The negotiations between lender and borrower over open terms and documents proceeded during the same period of steep decline in interest rates. In the course of the negotiations, the lender proffered a Default Prepayment Fee clause, which would have attached a substantial penalty to prepayment occasioned by default. The borrower rejected this clause, made no counteroffer and refused to negotiate, or to proceed with the deal. Thereupon the lender brought suit, as here, to recover the benefits of its commitment letter agreement.

Although such a default prepayment fee was not specified in the commitment letter, Judge Weinfeld found it was generally within the intended scope of the specified "lock-in" provision, for without such a clause, the borrower might accomplish by default exactly what it was prohibited from doing by prepayment. Recognizing that the commitment letter did not specify any particular way of dealing with the problem and that the borrower might properly have objected to the particular penalty clause proposed by the lender, Judge Weinfeld nonetheless concluded that the borrower's refusal to counteroffer or negotiate the issue breached its obligations to negotiate in good faith. Judge Weinfeld further found that the breach was primarily attributable to the intervening decline in interest rates. Judgment was awarded for the plaintiff.

The two cases are governed by the same principles, although by somewhat different analysis. In each case, the commitment letter constituted a binding enforceable agreement that obligated both parties to negotiate in good faith to resolve the open terms and documents. In each case, the borrower breached its obligations by refusing to negotiate toward resolution of such open issues. The breaches were of slightly different form. While in *Butler* the borrower breached by refusing to negotiate a clause that was within the scope of the agreed terms, here the borrower breached by refusing to negotiate unless the lender agreed to modify the deal by accepting a new condition. The differences, including the greater complication of this deal, the greater detail of the *Butler* letter, the absence in *Butler* of the clause requiring approval of the borrower's Directors, *508 and the particular forms of the borrowers' refusals to negotiate, are not controlling. In this case, as in *Butler,* the borrower undertook

a binding commitment to negotiate open terms in good faith and breached that commitment.

3

Judgment is granted to the plaintiff.

SO ORDERED.

**End of Document**                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 41

DOCSTOR: 2191401\1

145 F.3d 543
United States Court of Appeals,
Second Circuit.

ADJUSTRITE SYSTEMS, INC., Stuart J.
Orr, and Lu Elliott, Plaintiffs-Appellants,

v.

GAB BUSINESS SERVICES, INC. and Intermodal
Technical Systems, Inc., Defendants-Appellees.

No. 334, Docket No. 96-9715.    Argued
Oct. 9, 1997.    Decided May 29, 1998.

Suit was brought for breach of contract. Defendants' motion for summary judgment was granted by the United States District Court for the Southern District of New York, Charles L. Brieant, J., and plaintiffs appealed. The Court of Appeals, Chin, District Judge, held that preliminary agreement for transfer of intellectual property assets was not binding under New York law.

Affirmed.

West Headnotes (14)

**1**    **Appeal and Error** 🔑  Cases Triable in Appellate Court

   **Appeal and Error** 🔑  Effect of Findings Below

   In reviewing a district court's decision to grant summary judgment, Court of Appeals examines the evidence in the light most favorable to the nonmoving party, and applies a de novo standard of review to ensure that the substantive law was correctly applied.

   17 Cases that cite this headnote

**2**    **Contracts** 🔑  Agreement to Make Contract in Future

   **Contracts** 🔑  Agreements to Be Reduced to Writing

   Ordinarily, under New York law, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract, but in some circumstances preliminary agreements can create binding obligations.

   28 Cases that cite this headnote

**3**    **Contracts** 🔑  Agreement to Make Contract in Future

   **Contracts** 🔑  Agreements to Be Reduced to Writing

   A fully binding preliminary agreement is created under New York law when the parties agree on all the points that require negotiation but agree to memorialize their agreement in a more formal document, and party may demand performance of the transaction even though the parties fail to produce the more elaborate formalization of the agreement.

   24 Cases that cite this headnote

**4**    **Contracts** 🔑  Agreement to Make Contract in Future

   Under New York law, a "binding preliminary commitment" is created when the parties agree on certain major terms, but leave other terms open for further negotiation; the commitment does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith, and if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing.

   53 Cases that cite this headnote

**5**    **Contracts** 🔑  Agreement to Make Contract in Future

   If preliminary writing was not intended to be binding on the parties at all, the writing is a mere proposal, and neither party has an obligation to negotiate further, under New York law.

**6**    **Contracts** 🔑  Agreement to Make Contract in Future

   Courts confronted with the issue of determining whether a preliminary agreement is binding must

be wary of trapping parties in surprise contractual obligations that they never intended to undertake, but also must enforce and preserve agreements that were intended to be binding, despite a need for further documentation or further negotiation.

5 Cases that cite this headnote

**7**     **Contracts** 🔑    Nature and Grounds of Contractual Obligation

It is the aim of contract law to gratify, not to defeat, expectations.

**8**     **Contracts** 🔑    Agreement to Make Contract in Future

The key to determining whether preliminary agreement is binding is the intent of the parties, and to discern that intent, a court must look to the words and deeds of the parties which constitute objective signs in a given set of circumstances.

6 Cases that cite this headnote

**9**     **Contracts** 🔑    Agreement to Make Contract in Future

**Contracts** 🔑    Agreements to Be Reduced to Writing

There are four factors to be considered in determining whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

28 Cases that cite this headnote

**10**     **Contracts** 🔑    Agreement to Make Contract in Future

The factors to be considered in determining whether a preliminary manifestation of assent is a binding preliminary agreement to negotiate open terms and final agreement are: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

6 Cases that cite this headnote

**11**     **Contracts** 🔑    Agreement to Make Contract in Future

The language of the agreement, is the most important factor in determining whether parties intend preliminary agreement to be binding.

1 Cases that cite this headnote

**12**     **Copyrights and Intellectual Property** 🔑    Contracts Relating to Copyrights

Preliminary agreement for transfer of assets was not binding under New York law, even if parties seeking enforcement partially performed; agreement was entitled a "proposal" and was expressly contingent, at least in part, upon the execution of other contracts, there remained numerous open items to be negotiated, including scope and duration of license to be transferred, provision for possibility grantor of license would not agree to assignment, and terms of five-year employment contracts to be offered to principals of transferror, and contract was of type usually committed to writing, involving sale of intellectual property rights.

24 Cases that cite this headnote

**13**     **Contracts** 🔑    Agreement to Make Contract in Future

The fact that preliminary agreement contains no express reservation of the right not to be bound is not dispositive of whether it is binding, under New York law; a reservation of right not to be bound presumes that there is some expression of commitment or agreement in the writing to begin with.

4 Cases that cite this headnote

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

**14    Contracts** 🔑 **Certainty as to Subject-Matter**

In determining whether omitted terms are essential to a contract, New York courts adopt a flexible approach and look at the broad framework of a contract.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*544 Peter K. Ledwith, White, Quinlan, Staley & Ledwith, Garden City, NY, for Plaintiffs-Appellants.

*545 Patrick W. Brophy, McMahon, Martine & Gallagher, William D. Gallagher, of counsel, New York, NY, for Defendants-Appellees.

Before: KEARSE and CABRANES, Circuit Judges, and CHIN, District Judge. *

* The Honorable Denny Chin of the United States District Court for the Southern District of New York, sitting by designation.

**Opinion**

CHIN, District Judge:

In this case, the parties agreed to the transfer of some $1 million in assets and signed an informal two-page document to memorialize their agreement. The two-page document, however, provided for the execution of a "sales agreement contract" as well as other agreements. These additional agreements were never executed.

The issue thus presented is whether, by signing the two-page document, the parties entered into a binding contract or whether they merely signed an unenforceable agreement to agree. The district court held that the parties' preliminary agreement was an unenforceable agreement to agree and granted summary judgment in favor of defendants-appellees dismissing the complaint. We affirm.

**STATEMENT OF THE CASE**

**A. *The Facts***

The following facts are not in dispute. Plaintiffs-appellants Adjustrite Systems, Inc. ("Adjustrite"), Stuart J. Orr, and Lu

Elliott (the "plaintiffs") are the developers of a computer software program for use by insurance companies and others in assessing the cost of repairs to damaged automobiles. The program relied on a database provided to Adjustrite by Motors Publishing Co. ("Motors") pursuant to a licensing agreement dated January 27, 1992.

Some three months after granting the license to Adjustrite, Motors entered into a licensing agreement with one of Adjustrite's competitors, CCC, for the use of the database. The CCC license agreement contained a restrictive covenant that limited Motors' ability to grant new licenses. Because the Adjustrite license preceded the CCC license agreement, however, Adjustrite retained full rights under its license agreement. The Adjustrite-Motors license was a year-to-year license and it was renewed in 1993 and 1994. According to Adjustrite, Motors represented that Adjustrite's license would be renewed as long as Adjustrite did not breach any of its obligations under the license agreement.

Defendants-appellees GAB Business Services, Inc. ("GAB") and its wholly-owned subsidiary, Intermodal Technical Systems, Inc. ("ITS"), purchased the computer program from Adjustrite and were pleased with it. In April 1994, GAB and ITS approached Adjustrite to discuss the possibility of a merger or acquisition. Negotiations ensued over the next few months, during the course of which GAB and ITS expressed their concern that Motors might not continue to renew Adjustrite's license because of the CCC license. Eventually, GAB and ITS asked Adjustrite to seek a long-term extension of its license agreement with Motors. They also inquired as to whether Adjustrite's license could be assigned to them directly.

On November 11, 1994, after further negotiations but before the issue of an extension of the Adjustrite-Motors license agreement could be resolved, ITS sent Adjustrite a two-page proposal, which was signed by its president and chief executive officer and which read in pertinent part as follows:

> **PROPOSAL FOR ASSET PURCHASE**
> **FROM ADJUSTRITE SYSTEMS, INC.**

> GAB desires to purchase certain assets of Adjustrite Systems, Inc., namely proprietary software for adjusting auto physical damage; the license to access the Motors Link Data Base; existing system sales contracts; the continuing professional services of Mr. Stu Orr and Mr. Lu Elliott; and full use of the Adjustrite name. No stock purchase will occur.

In consideration for the above assets and other considerations, GAB offers the following:

*546  1. Nine Hundred Thousand Dollars ($900,000) cash with an immediate payment of Two Hundred Thousand Dollars ($200,000) based upon acceptance of this offer and a mutually signed letter of intent.

2. Seven Hundred Thousand Dollars ($700,000) will be paid upon the execution of a sales agreement contract.

3. Staff position contracts will be generated upon the execution of the sales agreement, which will provide five (5) years of employment for Mr. Stu Orr and Mr. Lu Elliott, said contracts to extend to December 31, 1999....

The proposal was signed by E. Matthew Marks, as "President and CEO" of ITS, under the words: "Offer made this 11th day of November, 1994." At some point, the reference in paragraph 1 to "$900,000" was changed by hand to "$950,000," with the change initialled by Orr and Marks. Orr signed for Adjustrite under the words "Accepted By." [1]  The Agreement was not signed by Orr individually nor was it signed by Elliott at all. Shortly thereafter, Orr and Elliott began working directly for ITS and GAB.

[1]     Hereafter we refer to the signed November 11, 1994 document as the "Agreement." Although it is perhaps more accurately described as a "preliminary manifestation of assent," *see Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989), for ease of reference we will simply call it the "Agreement," with the understanding, of course, that the issue before us is whether it is a binding agreement or merely an unenforceable agreement to agree.

Although the Agreement called for the execution of a letter of intent, a sales agreement, and two employment contracts, no additional documents were ever executed. Drafts of the sales agreement and two employment contracts were prepared but never finalized or signed. The draft sales agreement, which was entitled "Acquisition Agreement," contained provisions not contained in the Agreement. [2]  For example, the draft sales agreement provided for a schedule of all "tangible assets" to be transferred as well as a schedule of all of Orr's and Adjustrite's "rights and interests in the copyrights, software, and tradenames" to be transferred. It provided for a closing date, a bill of sale, assignments, opinion letters, and other documentation. And

it contained numerous representations and warranties as well as confidentiality and indemnification provisions. The draft employment contracts also contained provisions not covered in the Agreement, including: termination provisions; a limit on the total incentive compensation to be paid to Orr during the term of the contract; descriptions of the employee's duties and responsibilities; non-competition provisions; and proprietary information and confidentiality provisions.

[2]     Plaintiffs rely on the affidavit of the attorney who represented them in the transaction, who states that the draft Acquisition Agreement did not contain "any new material elements." In the face of the plain wording of the documents, Judge Brieant correctly held that this conclusory statement was not sufficient to raise an issue of fact.

In the weeks following execution of the Agreement, ITS and GAB again raised concerns about the Adjustrite-Motors license agreement and pressed the issue of whether GAB could enter into a licensing arrangement with Motors directly. Eventually, GAB and ITS asked Motors for a modification of the Adjustrite license agreement. Motors refused to consider any amendment, however, and on February 1, 1995 Adjustrite's license agreement expired and was not renewed by Motors.

In April 1995, GAB and ITS advised Adjustrite, Orr, and Elliott that they were withdrawing from the transaction. At that point, Orr and Elliott were fired.

**B. *The Proceedings Below***

Plaintiffs commenced this diversity action below against defendants on February 5, 1996. The complaint asserted three causes of action for damages for breach of contract, one on behalf of each of the three plaintiffs. In substance, the complaint alleged that the Agreement constituted a contract by which defendants were bound to purchase the assets of Adjustrite for $950,000 and to employ Orr and Elliott for five years each. The complaint alleged further that defendants had breached the Agreement. Defendants *547  asserted two counterclaims against plaintiffs, for fraud and negligence.

Defendants moved for summary judgment, on two grounds. First, they argued that the Agreement was unenforceable as a matter of law because it did not evidence an intent by the parties to be bound. Second, they argued as a factual matter that it was undisputed that Adjustrite was unable to perform its part of the bargain because the "most material part" of the

consideration to be transferred to defendants-the Adjustrite-Motors license-had lapsed.

Ruling from the bench, the district court granted the motion on the basis of defendants' first argument, not reaching the second argument. With respect to the first argument, Judge Brieant made the following observations:

> [T]here is no question in my mind that when Mr. Marks signed [the Agreement] he thought he had a deal, that he wrote to his principals and told them so, and later, for reasons of their own, they became disenchanted with the idea that they bought these assets and they wished to seek through their lawyers a way to exit from their responsibilities....

> . . . . .

> ... [But], regardless of what the [parties to the contract] think, if the contract is not adequate to satisfy the Statute of Frauds or if the contract is a mere agreement to agree, then it's not a contract no matter what the participant businessmen may have thought at the time.

Looking only at the four corners of the Agreement, the district court held that it was not a binding contract, but rather a mere agreement to agree. The court noted that the Agreement made specific reference to several additional agreements required for consummation of the deal, that these agreements had never been executed, and that many material terms had been left open. In light of these facts, the court concluded that despite the parties' subjective understanding that they had a contract, the Agreement did not evidence-objectively-an intent to be bound until all the parties' preliminary negotiations had been memorialized in a set of formal contracts. Because this set of formal contracts was never executed, the district court granted defendants' motion for summary judgment and dismissed the complaint. [3]

[3]   Prior to the district court's ruling, defendants consented to the dismissal of their counterclaims with prejudice, subject to reinstatement in the event the district court denied their motion for summary judgment or plaintiffs successfully appealed from a decision granting the motion.

This appeal followed.

### DISCUSSION

#### A. *Applicable Legal Standards*

#### 1. *Standard of Review*

**1**   In reviewing a district court's decision to grant summary judgment, our initial task is to determine whether the court below properly held that there were no genuine issues of material fact for trial. *See Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation,* 79 F.3d 1298, 1304 (2d Cir.1996). Examining the evidence in the light most favorable to the nonmoving party, we are to "apply a *de novo* standard of review to ensure that the substantive law was correctly applied." *Id.; accord Westport Bank & Trust Co. v. Geraghty,* 90 F.3d 661, 668 (2d Cir.1996); *Fund for Animals v. Babbitt,* 89 F.3d 128, 132 (2d Cir.1996).

#### 2. *Preliminary Agreements*

Parties to proposed commercial transactions often enter into preliminary agreements, which may provide for the execution of more formal agreements. When they do so and the parties fail to execute a more formal agreement, the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree.

A framework under New York law [4] for analyzing the issue of whether a preliminary agreement is a binding contract or an unenforceable agreement to agree was articulated *\*548* by Judge Leval in *Teachers Insurance & Annuity Association v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y.1987), and applied by this Court in *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 71-72 (2d Cir.1989). *See also Shann v. Dunk,* 84 F.3d 73, 77-78 (2d Cir.1996) (Leval, J.).

[4]     It is undisputed that New York law governs this action.

**2**   Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. *Shann,* 84 F.3d at 77; *see also R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) ("Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs."). In some circumstances, however, preliminary agreements can create binding obligations. Usually, binding preliminary agreements fall into one of two categories. *See Arcadian,* 884 F.2d at 72; *Tribune,* 670 F.Supp. at 498.

**3** The first is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document. Such an agreement is fully binding; it is "preliminary only in form-only in the sense that the parties desire a more elaborate formalization of the agreement." *Tribune,* 670 F.Supp. at 498. A binding preliminary agreement binds both sides to their ultimate contractual objective in recognition that, "despite the anticipation of further formalities," a contract has been reached. *Id.* Accordingly, a party may demand performance of the transaction even though the parties fail to produce the "more elaborate formalization of the agreement." *Id.; see generally Arcadian,* 884 F.2d at 72-73.

**4** The second type of preliminary agreement, dubbed a "binding preliminary commitment" by Judge Leval, is binding only to a certain degree. It is created when the parties agree on certain major terms, but leave other terms open for further negotiation. The parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *Tribune,* 670 F.Supp. at 498. In contrast to a fully binding preliminary agreement, a "binding preliminary commitment" "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." *Id.* A party to such a binding preliminary commitment has no right to demand performance of the transaction. Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing. *Id.*

**5** Hence, if a preliminary agreement is of the first type, the parties are fully bound to carry out the terms of the agreement even if the formal instrument is never executed. If a preliminary agreement is of the second type, the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement; if they fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation. Finally, however, if the preliminary writing was not intended to be binding on the parties at all, the writing is a mere proposal, and neither party has an obligation to negotiate further. *See Brause v. Goldman,* 10 A.D.2d 328, 199 N.Y.S.2d 606, 611 (1st Dep't 1960), *aff'd,* 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961).

**6   7** Courts confronted with the issue of determining whether a preliminary agreement is binding, as an agreement of either the first or the second type, must keep two competing interests in mind. First, courts must be wary of "trapping parties in surprise contractual obligations that they never intended" to undertake. *Tribune,* 670 F.Supp. at 497; *accord Arcadian,* 884 F.2d at 72. Second, "courts [must] enforce and preserve agreements that were intended [to be] binding, despite a need for further documentation or further negotiation," for it is "the aim of contract law to gratify, not to defeat, expectations." *Tribune,* 670 F.Supp. at 498.

**8** The key, of course, is the intent of the parties: whether the parties intended to be ***\*549*** bound, and if so, to what extent. "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.' " *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1986) (alteration in original) (quoting *R.G. Group,* 751 F.2d at 74). Subjective evidence of intent, on the other hand, is generally not considered. *See Rule v. Brine, Inc.,* 85 F.3d 1002, 1010 (2d Cir.1996).

**B.** *Application*

In the present case, plaintiffs contend only that the Agreement was a preliminary agreement of the first type, a fully binding preliminary agreement. Plaintiffs allege that all of the material terms of the transaction were negotiated and incorporated into the two-page document and that there was nothing left to negotiate but the "legal phraseology." (Pl. Br. at 18-22). Hence, we limit our discussion to the first type of preliminary agreement-the fully binding preliminary agreement. [5]

[5]   The parties did not explicitly discuss the differences between the two types of preliminary agreements. We note that the facts arguably could give rise to a claim by plaintiffs that the Agreement constituted the second type of preliminary agreement, a binding preliminary commitment, that defendants were obligated to make a good faith effort to reach a final agreement, and that defendants breached that obligation by "renouncing the deal [and] abandoning the negotiations." *Tribune,* 670 F.Supp. at 498. Plaintiffs made no such argument, however, either on appeal or in the district court. Moreover, the complaint did not allege the existence of such a preliminary agreement or the breach of any duty to negotiate in good faith. Hence, such a claim is not before us now.

The issue thus presented is whether, when the parties signed the Agreement, they had negotiated all the terms of the transaction and intended to be bound even if the additional documents referred to in the Agreement were never drafted and executed.

**9**  **10**  We have identified four factors to be considered in determining whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument:

(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 80 (applying factors to oral preliminary manifestation of assent); *see also Arcadian,* 884 F.2d at 72 (applying factors for second type of preliminary agreement to informal memorandum of understanding that called for negotiation and execution of formal sales agreement). [6]

[6]   The factors to be considered in determining whether a "preliminary manifestation of assent" is a binding preliminary agreement of the second type are similar. *See Arcadian,* 884 F.2d at 72("(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions") (citing *Tribune,* 670 F.Supp. at 499-503).

### 1. *The Language of the Agreement*

**11**  **12**  The first factor, the language of the agreement, is "the most important." *Arcadian,* 884 F.2d at 72. Here, the first factor strongly supports the conclusion that the Agreement was not a fully binding preliminary agreement. The Agreement does not expressly state that it was a binding agreement nor does it provide any express manifestation that the parties were bound by its terms. Rather, the document is entitled a "proposal" and it merely states that GAB "desires" to purchase assets and sets forth GAB's offer.

**13**  Although the document contained a line for Adjustrite to sign to manifest its acceptance of the offer, the Agreement nowhere states that it became a binding agreement the moment it was signed. *Cf. Tribune,* 670 F.Supp. at 494,

499 (court held that parties' preliminary writing was binding where writing provided, "[u]pon receipt ... of an accepted counterpart of this letter, our ***550*** agreement to purchase from you and your agreement to issue, sell and deliver to us ... the captioned securities, shall become a *binding agreement* between us") (emphasis added). To the contrary, the Agreement was expressly contingent, at least in part, "upon the execution of a sales agreement contract," and provided for the execution of "[s]taff position contracts." *Cf. Arcadian,* 884 F.2d at 72 (reference in memorandum to a binding sales agreement to be completed at some future date demonstrated defendant's intent not to be to be bound until that time); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 262 (2d Cir.) (reference in informal agreement to future formal agreement held to demonstrate intent of parties not to be bound), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). [7]

[7]   The fact that the Agreement contains no express reservation of the right not to be bound is not dispositive. A reservation of right not to be bound presumes that there is some expression of commitment or agreement in the writing to begin with, which, as already noted, is lacking here. As Judge Leval reasoned in *Tribune,* "a party that does not wish to be bound at the time of the preliminary exchange of letters can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.' " 670 F.Supp. at 499.

### 2. *Partial Performance*

The second factor, partial performance of the contract, favors plaintiffs. Although the parties dispute the extent to which plaintiffs began performing for GAB, for purposes of this appeal from an order granting summary judgment for defendants, we resolve this factual dispute in favor of plaintiffs and assume that they partially performed their obligations under the contract.

### 3. *Open Items*

The third factor is the existence of open items, *i.e.,* whether any terms of the contract remained open to be negotiated. This factor weighs strongly in favor of defendants, for there remained numerous open items, including the following.

First, although the Agreement provided for the purchase of the Adjustrite-Motors license, the Agreement provided no details concerning the contemplated transfer. For example, it contained no representations concerning the scope or duration

of the license and it made no provision for the possibility that Motors would not extend the license or agree to an assignment to GAB. *Cf. Tribune,* 670 F.Supp. at 499 ("There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."). Obtaining a long-term commitment from Motors was important to GAB, as the Adjustrite-Motors license was a year-to-year license that had to be renewed each year.

Second, although the Agreement provided for the "purchase" of Adjustrite's "proprietary software," it did not specify whether the transfer would include collateral rights, such as the copyrights to the software, nor did it address the issue of whether the software had been sold or licensed to anyone else.

Third, the Agreement purported to provide Orr and Elliott with five-year periods of employment, but it was not signed by Orr in his individual capacity and was not signed by Elliott at all. The Agreement did not include any provision for many of the terms usually found in an employment contract, such as a description of the employee's duties and responsibilities and termination, non-competition, and proprietary information provisions. *Compare Shann,* 84 F.3d at 78-79 (noting that "terms of an employment contract and noncompete agreement undoubtedly can be of great importance," but holding that the missing terms of consulting/noncompete agreement in question were unimportant because the allocation of a portion of payments to the consulting/noncompete agreement was a "fiction" intended to secure tax benefits).

14   In determining whether omitted terms are essential to a contract, New York courts adopt a flexible approach and look at the "broad framework" of a contract. *Id.* at 79. The broad framework of the contract here was that GAB was proposing to spend nearly a million dollars to acquire a computer program that was dependent on the database licensed from Motors. Without the Motors database and without full and exclusive *\*551* rights to the Adjustrite software, the transaction would have been of little value to GAB. In addition, the employment agreements here were not a "fiction" as in the *Shann* case; GAB was agreeing to employ Orr and Elliott for five years each and therefore it was critical, from an objective point of view, that the rights and responsibilities of the parties be spelled out in writing. Hence, the omitted provisions were essential to the contract.

### 4. *Type of Contract*

The fourth and final factor is whether the Agreement is the type of contract that is usually committed to writing. Here, this factor also weighs strongly in favor of defendants. The transaction was a million-dollar acquisition. The principal assets being purchased were intellectual property-rights to software and a license to use a database. Five-year periods of employment were contemplated. In view of the size of the transaction, the nature of the assets being purchased, and the length of the contemplated employment contracts, the Agreement clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts.

In sum, three of the four factors strongly point to the conclusion that the parties here did not intend to be bound until the formal documents were negotiated, executed, and delivered. The one factor that arguably supports a contrary conclusion-partial performance-is not sufficient to raise a genuine issue for trial, for no reasonable factfinder could conclude, on this record and in the face of the objective documentary evidence, that the parties agreed on all material elements of the transaction, intended to be fully bound when they signed the Agreement, and considered the formal sales agreement and employment contracts to be unnecessary formalities. *See Arcadian,* 884 F.2d at 72-73 (affirming grant of summary judgment dismissing breach of contract action even though there was "considerable partial performance," where language of memorandum showed that parties did not intend to be bound until final contract was signed); *Winston,* 777 F.2d at 83 (reversing district court and holding that parties were not bound to preliminary settlement agreement where three of four factors indicated parties did not intend to be bound until formal documents were executed and delivered and no such formal documents were ever finalized). Accordingly, the district court's grant of summary judgment was proper.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

# TAB 42

DOCSTOR: 2191401\1

Westlaw.UK

187 A.D.2d 1012                                                                 Page 1

187 A.D.2d 1012
**(Cite as: 187 A.D.2d 1012, 591 N.Y.S.2d 656)**

McGee & Gelman v. Park View Equities, Inc.
187 A.D.2d 1012, 591 N.Y.S.2d 656
N.Y.A.D.,1992.

187 A.D.2d 1012591 N.Y.S.2d 656, 1992 WL
338611

McGee & Gelman, Respondent,
v.
Park View Equities, Inc., et al., Appellants. (Appeal No. 1.)
Supreme Court, Appellate Division, Fourth Department, New York

(November 18, 1992)

CITE TITLE AS: McGee & Gelman v Park View
Equities

Order unanimously modified on the law and as modified affirmed with costs to defendants in accordance with the following Memorandum: Defendants appeal from an order denying their motion for summary judgment and granting plaintiff's cross motion for *1013 summary judgment; awarding plaintiff law firm $34,500 for legal services rendered to defendants in an underlying real property sale dispute and litigation between defendants and Textron; ordering a hearing concerning plaintiff's claim for additional costs and counsel fees incurred in the instant action; and dismissing defendants' answer and five counterclaims alleging plaintiff's malpractice, fraud, and breach of contract in the underlying representation. We conclude that the court properly dismissed defendants' second and third counterclaims alleging plaintiff's negligent pleading. Whether an attorney was negligent in failing to assert particular legal claims depends on whether the claims had any legal merit; an attorney is not guilty of malpractice in failing to assert claims that are not cognizable at law. Here, defendants' second and third counterclaims involve plaintiff's alleged negligent failure, in the underlying representation, to plead a counterclaim seeking damages for Textron's alleged breach of its promise to negotiate in good faith. A promise to negotiate in good faith is a mere promise to agree *(see, Candid Prods. v International Skating Union,* 530 F Supp 1330, 1336 [SD NY] [applying New York law]), which is insufficiently definite to be enforceable either by imposition of damages or by the extraordinary remedy of specific performance *(Martin*

*Delicatessen v Schumacher,* 52 NY2d 105, 109-110;*Willmott v Giarraputo,* 5 NY2d 250, 253). Because the counterclaim that defendants sought to have their attorney assert was patently lacking in merit, the attorney cannot be liable for failing to assert it.

Similarly, we conclude that the court properly dismissed defendants' fourth and fifth counterclaims alleging plaintiff's fraud and breach of contract with respect to legal fees. Defendants allege that the parties agreed, or that defendants were misled to understand, that plaintiff would represent defendants on a contingent fee or partnership basis rather than at an hourly rate. Defendants allege that plaintiff breached that understanding when it later billed defendants on an hourly basis for legal services rendered. The parties' fee arrangement, however, is embodied in two integrated writings, the retainer agreement and the guarantee agreement, which unequivocally provide that Park View would pay plaintiff on an hourly basis for representing it in the Textron litigation and set forth Frank's promise to assume liability for that debt in the event of Park View's nonpayment. Defendants' allegations constitute an impermissible attempt to modify or contradict the clear and unambiguous terms of those integrated writings. Further, insofar as defendants allege that plaintiff breached aprovision*1014 of the guarantee agreement that provided that the parties would "continue to discuss the possibility" of an alternative fee arrangement, the claim is not cognizable at law *(Martin Delicatessen v Schumacher, supra; Candid Prods. v International Skating Union, supra,* at 1336-1338).

We modify the order, however, insofar as it dismissed defendants' first counterclaim alleging that plaintiff was guilty of malpractice in erroneously advising defendants concerning the effect of Textron's agreement to negotiate in good faith. According to defendants' allegations and proof, plaintiff incorrectly advised defendants that Textron's promise to negotiate a sale agreement in good faith would allow defendants, in the event of Textron's refusal to negotiate, to maintain an action to compel Textron to sell the property to defendants. Defendants allege that, in reliance on that incorrect advice, they allowed the "lock-in" option agreement to expire. They allege that they were misled into believing that Textron was obligated to sell them the property on other acceptable terms during

187 A.D.2d 1012

187 A.D.2d 1012
**(Cite as: 187 A.D.2d 1012, 591 N.Y.S.2d 656)**

the remaining negotiation period. Plaintiff denies that such advice was given. Whether such advice was given, and, if it was, whether it amounted to legal malpractice and whether it caused defendants to allow the option to expire, are all questions of fact that preclude summary judgment on the first counterclaim. The same questions of fact also preclude the grant of summary judgment to plaintiff on the complaint and the order is modified accordingly. (Appeal from Order of Supreme Court, Erie County, Francis, J.--Summary Judgment.)

Present--Callahan, J. P., Boomer, Pine, Lawton and Boehm, JJ. [As amended by unpublished order entered Feb. 5, 1993.]

Copr. (c) 2011, Secretary of State, State of New York
N.Y.A.D.,1992.
McGee & Gelman v Park View Equities

187 A.D.2d 1012

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 43

DOCSTOR: 2191401\1

804 N.Y.S.2d 549, 2005 N.Y. Slip Op. 25337

804 N.Y.S.2d 549
Supreme Court, New York County, New York.

CANWEST GLOBAL
COMMUNICATIONS CORP., Petitioner,
v.
MIRKAEI TIKSHORET LIMITED d/b/
a Mirkaei Tikshoret Group, Respondent.

April 1, 2005.

**Synopsis**

**Background:** Party to joint venture agreement brought action against co-venturer for alleged breach of agreement and sought temporary restraining order (TRO) under rule that provided for pre-arbitration injunctive relief in domestic arbitrations.

**Holdings:** The Supreme Court, New York County, Carol Edmead, J., held that:

1 underlying arbitration agreement implicated United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards;

2 parties intended to conduct "domestic" arbitration;

3 injunctive relief carve-out was not attempt to contract out of Convention;

4 New York was proper forum to entertain application for temporary restraining order;

5 co-venturer entered into enforceable agreement to negotiate in good faith with plaintiff;

6 plaintiff demonstrated that it was likely to succeed on its claim that co-venturer breached agreement to negotiate in good faith;

7 person who signed his name as president of non-existent entity was potentially liable in his individual capacity for alleged breach of contract; and

8 plaintiff established sufficient basis for finding irreparable harm.

Motion granted.

West Headnotes (22)

**1      Treaties** 🔑 Construction and operation of particular provisions

Underlying arbitration agreement implicated United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,

where underlying arbitration involved parties from Canada and Israel and pertained to agreement to purchase assets in Israel, agreement to arbitrate provided for arbitration in New York, New York, and United States was signatory to the Convention, and underlying transaction was commercial in that it was for purchase and subsequent transfer of shares in publishing company, among other things. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. I et seq., 9 U.S.C.A. § 201 note; McKinney's CPLR 7502(c).

1 Cases that cite this headnote

**2      Alternative Dispute Resolution** 🔑 Place of arbitration

A foreign arbitration, for purposes of New York rule providing for pre-arbitration injunctive relief, is one whose situs is expressly selected as a country outside of the United States. McKinney's CPLR 7502.

**3      Alternative Dispute Resolution** 🔑 Place of arbitration

Parties intended in international agreement to conduct "domestic" arbitration, for purpose of application of rule that provided for pre-arbitration injunctive relief in domestic arbitrations, where parties clearly anticipated possibility of pre-arbitration applications for injunctive relief in event of dispute, they unambiguously agreed to permit pre-arbitration judicial intervention for purposes of obtaining such relief, parties agreed to New York choice of law provision, and arbitration was to be administered in New York. McKinney's CPLR 7502.

**4      Alternative Dispute Resolution** 🔑 Disputes and Matters Arbitrable Under Agreement

Before a party can be forced to forgo its rights to judicial review and submit its disputes to arbitration, there must be evidence that the parties intended to submit the relevant dispute to arbitration.

**5**   **Alternative Dispute Resolution** 👉 Proceedings

Injunctive relief carve-out, contractually agreed upon by parties to international agreement which contained arbitration clause, was not attempt to contract out of Convention on Recognition and Enforcement of Foreign Arbitral Awards; purpose of Convention was not defeated because provision for injunctive relief was not "contrary to contract." McKinney's General Obligations Law § 5-1402; McKinney's CPLR 327; Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. I et seq., 9 U.S.C.A. § 201 note.

**6**   **Injunction** 👉 Restraining order pending hearing of application

New York was proper forum to entertain application for temporary restraining order, for purpose of New York rule that provided for pre-arbitration injunctive relief in domestic arbitrations, since agreement that required arbitration of disputes included choice of New York law, parties submitted to jurisdiction of New York courts for injunctive relief, and dispute related to obligation of more than one million dollars. McKinney's CPLR 327; McKinney's General Obligations Law § 5-1402.

**7**   **Injunction** 👉 Mandatory injunction

While ordinarily the function of a preliminary injunction is to preserve the status quo until a final determination upon the merits can be made, a trial court has the power as a court of equity to grant a temporary injunction which mandates specific conduct.

**8**   **Injunction** 👉 Discretion of court

The decision whether to grant a motion for preliminary relief is committed to the sound discretion of the trial court.

**9**   **Alternative Dispute Resolution** 👉 Stay of Arbitration

**Injunction** 👉 Grounds and Objections

**Injunction** 👉 Restraining order pending hearing of application

In order for a preliminary injunction or temporary restraining order to be issued in a matter that is subject to arbitration, a petitioner must demonstrate: (1) a likelihood of success on the merits; (2) irreparable injury absent the granting of the preliminary injunction; and (3) a balancing of the equities which favors the issuance of injunctive relief; and (4) that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief. McKinney's CPLR 7502(c).

**10**   **Injunction** 👉 Nature and scope of provisional remedy

Preliminary injunctive relief is a drastic remedy, which will only be granted if it is established that there is a clear right to the relief under the law and the facts. McKinney's CPLR 7502(c).

**11**   **Injunction** 👉 Mandatory injunction

In a matter that is subject to arbitration, where preliminary injunctive relief would upset the status quo and grant some form of the ultimate relief requested, a movant has the heightened burden of showing that extraordinary circumstances warrant the relief. McKinney's CPLR 7502(c).

**12**   **Injunction** 👉 Restraining order pending hearing of application

**Injunction** 👉 Grounds for Continuing, Modifying, Vacating, or Dissolving

A court may vacate or modify a temporary restraining order or preliminary injunction where such injunctive relief would not serve any of the objectives the remedy is designed to achieve, where the party in support is not in danger of suffering any irreparable injury during the

pendency of the suit, or an alternative legal remedy is adequate to protect the interests of the party in support of injunctive relief; further, a temporary restraining order or preliminary injunction may be vacated due to the lack of jurisdiction over the person to be retrained. McKinney's CPLR 6314.

1 Cases that cite this headnote

**13**   **Joint Adventures** 🔑 Mutual Rights, Duties, and Liabilities of Parties

Co-venturer entered into enforceable agreement to negotiate in good faith with party to joint venture, where, inter alia, parties agreed to submit joint bid for purchase assets of publishing company, parties agreed to work toward creating newly formed entity before closing of transaction, parties expressly indicated that they would be "equal 50/50" shareholders in newly formed entity, parties agreed to develop business plan and finalize bid for acceptance, and submission of bid was subject to certain conditions precedent, including completing final structure of newly formed entity and successfully executing shareholders agreement.

**14**   **Contracts** 🔑 Language of contract
**Contracts** 🔑 Language of Instrument

The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing; thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.

**15**   **Injunction** 🔑 Restraining order pending hearing of application

Party to joint venture agreement demonstrated that it was likely to succeed on its claim that co-venturer breached agreement to negotiate in good faith, for purpose of obtaining pre-arbitration temporary restraining order, where co-venturer insisted on terms that were drastically different

than preliminary agreements. McKinney's CPLR 7502(c).

**16**   **Contracts** 🔑 Agreement to make contract in future

Agreements to negotiate in good faith in an effort to reach a final agreement within a certain scope of terms are enforceable.

**17**   **Contracts** 🔑 Agreement to make contract in future

The obligation of good faith requires parties to refrain from insisting on terms that do not conform to a preliminary agreement.

**18**   **Corporations and Business Organizations** 🔑 Defective incorporation or organization

Person who signed his name as president of non-existent entity was potentially liable in his individual capacity for alleged breach of contract by that purported entity.

**19**   **Corporations and Business Organizations** 🔑 Defective incorporation or organization

An action may be maintained against the president of an unincorporated corporation in his individual capacity.

**20**   **Injunction** 🔑 Restraining order pending hearing of application

Party to joint venture agreement that required arbitration of disputes established sufficient basis for finding irreparable harm in event that pre-arbitration temporary restraining order was not granted for co-venturer's likely breach of agreement to acquire publishing company, where co-venturer fired key executives and employees of acquired company, moved printing operations, reduced advertising, and changed printing suppliers which resulted in loss of

804 N.Y.S.2d 549, 2005 N.Y. Slip Op. 25337

customers, revenue, and erosion of its reputation, and party also lost its right to participate in management of that company. McKinney's CPLR 7502(c).

6 Cases that cite this headnote

**21**  **Injunction** 🔑 Restraining order pending hearing of application

Balance of equities tilted in favor of party to joint venture agreement that required arbitration of disputes, as plaintiff alleging breach of that agreement, in its application for temporary restraining order (TRO) under rule that provided for pre-arbitration injunctive relief, since party merely sought to maintain status quo and co-venturer absent TRO would have been free to take additional actions which may have caused party further irreparable injury. McKinney's CPLR 7502(c).

1 Cases that cite this headnote

**22**  **Injunction** 🔑 Restraining order pending hearing of application

Party to joint venture agreement that required arbitration of disputes, as plaintiff alleging breach of that agreement, demonstrated under rule that provided for pre-arbitration injunctive relief that arbitration award to which it may have been entitled could have been rendered ineffectual without temporary restraining order, where co-venturer would have been able to transfer shares of acquired company prior to hearing on preliminary injunction and such transfer would have rendered preliminary injunction ineffectual because it would have constrained co-venturer and not new owners of acquired company. McKinney's CPLR 7502(c).

**Attorneys and Law Firms**

 **\*\*552** Kaye Scholer LLP, New York City (John J.P. Howley of counsel), for petitioner.
Skadden, Arps, Slate, Meagher & Flom LLP, New York City (Henry P. Wasserstein of counsel), for respondent.

**Opinion**

CAROL EDMEAD, J.

 **\*846** **I.** *Procedural History*

This proceeding for injunctive relief arises from an alleged breach of agreement between petitioner CanWest Global Communications Corp. ("CanWest") and respondent Mirkaei Tikshoret Limited d/b/a Mirkaei Tikshoret Group ("MTG"), in which the parties agreed to, *inter alia,* (1) jointly acquire assets of the JPost Group including without limitation the Palestine Post Limited and Jerusalem Post Publications Limited (collectively the "JPost Group") from Hollinger International Inc., (2) transfer such assets to an entity jointly owned by the parties, and (3) permit CanWest to control the Board of such entity and establish editorial policy (the "Agreement").

**A.** *The June Letter Agreement*

By letter agreement dated June 11, 2004, the parties expressed the following:

> This letter ["LOI"] is intended to summarize the principal terms of a proposal being considered by [CanWest] and [MTG] regarding the Parties' ... acquisition ["Possible Acquisition"] of either all of the shares of those corporations operating or owning, or all of the assets comprising [the JPost Group]....

> ....[T]he entity to be established by the parties as the vehicle to acquire the [JPost Group] is sometimes called the "Company"....

[W]e envisage the Parties being equal 50/50 shareholders in the newly-formed Company.... We will jointly work towards establishing a viable business plan for [the JPost Group] that will provide us with the assurance that any Bid (defined below) we submit will lead to a successful re-establishment of a profitable Jerusalem Post and Jerusalem Report.... [W]e have outlined ... the process we suggest be adopted in developing the business plan and finalizing a mutually acceptable Bid and, in Schedule A attached hereto, the terms of a shareholders agreement that would be acceptable once the Bid is submitted to and accepted by [Hollinger]. The process  **\*847** we suggest be adopted is as follows:

1. ... Until the Termination Date (defined below), the Parties will deal with each other only on an exclusive basis in  **\*\*553** connection with the Possible Acquisition

and, accordingly, subject to paragraph 7 hereof, until the Termination Date, the Parties will not ... solicit or entertain any arrangement whereby such Party will ... consider proceeding with, or entertaining any proposal of, any third party relating to the Possible Acquisition.

* * *

4. The Company will be established by the Parties for the purposes of ... submitting an offer for the [JPost Group] and/or all of its assets, and thereby completing the Possible Acquisition.

5. ... the completion and submission of the Bid shall be subject to the following conditions precedent in favour of each Party....:

* * *

(b) Development and acceptance of the initial twelve (12) months business plan in respect of the [JPost Group];

* * *

(d) Successful negotiation and execution of a definitive shareholders agreement in respect of the Company and the [JPost Group] incorporating the provisions of this LOI and Schedule A ...; and

(e) Approval by each Party's board of directors of the final terms of the Bid.

* * *

7. Either party has the right (a) at any time, to withdraw from submitting the Bid if it determines in its absolute discretion that, in its judgment, the conditions precedent in paragraph 5 hereof will not be capable of being fulfilled to its satisfaction.... [T]he party that has provided notice of [withdrawal or decision not to proceed] shall not, directly or indirectly, solicit or entertain any arrangement whereby such Party will, either alone or in conjunction with a third party, submit a bid or offer to acquire the [JPost Group] for a period of twelve (12) months following the [withdrawal or decision not to proceed].

According to CanWest, between June 11 and August 9, 2004, the parties conducted due diligence on the businesses to be acquired, and held discussions of how best to structure their joint bid. CanWest contends that MTG suggested that it was in a better position to "strong-arm" the JPost Group's creditors if **\*848** it alone was seen to be owner and operator of the

JPost Group shares. For this and other reasons, the parties agreed to a purchase of all the shares and securities by MTG pursuant to a jointly developed bid, followed by a sale of all the assets to a new, jointly owned entity.

### B. *The November Letter Agreement*

Subsequently, by letter dated November 10, 2004, the parties entered into a further agreement, in which the parties "confirmed that MTG, with the concurrence of CanWest has today submitted to Hollinger ... an offer to purchase the Shares of the PPL ... in favour of MTG (in either case "SPA")." The letter further provides:

In the event that the SPA is accepted by Hollinger ... then the following shall occur:

1. MTG and CanWest shall negotiate in good faith to finalize, on or before the closing of the transaction described in the SPA, the terms by which MTG shall [sell] ... the assets comprising PPL and its subsidiaries, to a joint venture, limited partnership or similar entity ("Partnership") which will be owned and funded by MTG and CanWest equally (50% each) on the basis that MTG will indemni[f]y and save harmless the Partnership in respect of certain liabilities of, and claim against, PPL and it subsidiaries.

**\*\*554** 2. MTG and CanWest shall negotiate in good faith to finalize the terms of, and complete those agreements and conditions precedent referred to [in] paragraph 5 of the LOI [Agreement], on or before the closing of the transaction described in the SPA....

In the event that the parties are unable to satisfy to their mutual satisfaction, the provisions of paragraph 1 and 2 of this letter agreement, and MTG nevertheless completes the purchase of the PPL in accordance with the SPA ... then (a) CanWest shall have no obligation to participate in the SPA or purchase of the PPL in any manner, and (b) the provisions of paragraph 3 of the LOI shall be deemed to be amended such that each of MTG and CanWest shall be [responsible] for their own costs and expenses incurred at any time in connection with the purchase or attempted purchase of the PPL.

**\*849** On November 15, 2004, the offer was submitted and accepted by Hollinger, who, according to CanWest, set the closing date of no earlier than December 23, 2004.

CanWest contends that with the first step of the acquisition underway, it proposed, again, that the parties form an Israeli limited partnership to acquire the JPost Group assets, with 99% of the limited partnership owned on a 50/50 basis by corporations owned by CanWest and MTG, and the other 1% held by a general partner also owned 50/50 by CanWest and MTG. MTG endorsed this concept and on November 22, 2004, provided a draft Asset Purchase Agreement ("APA"), wherein JPost Group assets were to be purchased by the limited partnership.

On November 28, 2004, CanWest made certain comments concerning the draft APA, and MTG suggested that CanWest take over responsibility for producing the next draft.

On December 9, 2004, CanWest urged MTG to have Hollinger consider setting the closing for December 31, 2004 and resolve accounting and other issues before the closing. CanWest also proposed a date of December 14, 2005 for MTG and CanWest to review the draft agreements and work through their own internal checklist for closing.

On December 10, 2004, MTG indicated that "[w]ith respect to the date of closing, it seems it is now more in the hands of Hollinger than in our hands." In response, CanWest reiterated the reasons for closing on December 31, 2004.

On December 15, 2004, MTG and Hollinger closed on the transaction, without notice to CanWest, and notwithstanding the fact that the parties had not yet established the new entity nor agreed upon the final documents. On the same day, CanWest wrote to MTG expressing their desire to "focus on the next phase, i.e. the establishment of the partnership and the acquisition of the assets" and to have this phase completed by December 31st, to have a clear month-end cut-off and get the assets to their ultimate owners ASAP. In response, MTG advised CanWest that as "discussed earlier tonight, we should focus on two issues ... The main issue for us now is to concentrate on the APA between us. Given the fact that we didn't have the chance to go over it yet, we would prefer to read it over the weekend, ... I do agree that we should target to the end of the year, and I think we would still have enough time."

On December 20, 2004, MTG advised CanWest of its availability for a conference call on December 22nd, and requested a *850 "step memo" that was prepared to "describe the structure of the deal[.] Until we know exactly what is the plan I am not sure that we can be very productive."

In **555 response, CanWest confirmed the meeting and provided the "step memo."

On December 22, 2004, CanWest wrote to MTG requesting, *inter alia,* that they discuss the mechanics of the Asset Purchase, Partnership and General Partnership Agreements.

On December 27, 2004, CanWest advised MTG, *inter alia,* that "without [a final agreement] there is no partnership and we are increasingly frustrated that ... that you are not moving this along."

By email dated December 31, 2004, CanWest accused MTG of not returning calls, to which MTG responded on the same day that MTG was still interested in bridging the existing "gaps" between the parties to "get the agreement signed."

On January 3, 2005, CanWest advised MTG that it appeared that the parties had reached a "crisis stage" and that MTG was "clearly moving without us notwithstanding our agreement" and that if it did not hear from MTG by the following day, it "will assume [MTG does] not intend to honour our partnership, that [MTG] intend[s] to own and operate the Jerusalem Post without [CanWest]."

The next series of emails between the parties reflect CanWest's lack of interest "in changing the deal, to 51-49 in favour of MTG." CanWest contends that at the meetings in Tel Aviv on January 6th and 7th, MTG demanded that the share ownership of the new entity would be weighed in favor of MTG 75%-25% or 51%-49%. Alternatively, MTG insisted that it would accept 50/50 ownership only if substantial terms of the June Agreement were changed in its favor. Further, MTG demanded that, instead of establishing a Board of Directors comprising seven directors, with four, including the Chairman, appointed by CanWest, the Agreement had to be changed to eliminate CanWest's right to appoint a fourth director. All of the alternatives proposed by CanWest were flatly rejected.

Finally, by letter dated January 10, 2005, CanWest stated that based on MTG's failure to discuss and complete the APA and Shareholders agreements, and Mr. Azour's rejection of the terms of the June Agreement, MTG repudiated such Agreement. CanWest expressed its willingness to proceed under the June Agreement, and demanded that MTG confirm its willingness to proceed with the transaction as contemplated by the June Agreement. *851 In response, MTG stated that the demand was unreasonable and made in bad faith, and deemed CanWest's letter "as a clear repudiation and bad faith breach of the agreements between the parties,

and as a notice of termination of the parties' negotiations and relationship." CanWest thereafter advised MTG of its continued willingness to "honor the [ ] Agreement." However, MTG stated outright that it was not willing to give any such assurances.

### C. *Initial Order to Show Cause and Temporary Restraining Order*

Upon application by CanWest, the Court temporarily enjoined MTG from taking certain actions with respect to the JPost Group (the "first TRO"). The TRO was subsequently lifted since service the OSC had not been completed pursuant to the Hague Convention.

### II. *Instant Order to Show Cause and Application for Temporary Restraining Order*

Having effected proper service upon MTG, CanWest now moves by OSC for a TRO, enjoining MTG and its officers, including Eli Azour, and all persons acting **\*\*556** on behalf of MTG from taking certain actions with respect to the JPost Group. [1]

[1]    Specifically, CanWest seeks to enjoin MTG from, *inter alia:* (1) entering into any merger, consolidation, joint venture or adopting or effecting any reorganization of any kind involving the JPost Group; (2) taking any steps to terminate the corporate existence of any entity comprising the JPost Group, (3) selling, transferring, or encumbering any of the shares or other securities, or JPost Group assets acquired by MTG; (4) repaying to MTG any indebtedness, (5) changing the employment status of any executives of any entity comprising the JPost Group, and (6) terminating or entering into any contracts or business relationships.

In support, CanWest contends that it has continued to suffer irreparable harm. According to CanWest, at the time the initial TRO was sought, MTG had already fired senior management executives at the Jerusalem Post, hired a new CEO and CFO, and appointed a new executive to manage the North American components of the JPost business. Further, MTG caused agreements instrumental to the operation of the publication to be amended.

CanWest claims that it recently learned that MTG purports to have transferred its shares in PPL to Eli Azour, the President and principal shareholder of MTG on December 15, 2004. At the same time, Mr. Azour claims to have purchased the Jerusalem Report Publications Limited from PPL. CanWest also **\*852** discovered that there has been a treasury issue

of 12% of the PPL shares to Y.B. Etgarim Ltd. ("YEL"), a company solely owned by Jacob Bardugo, who was recently appointed as manager of PPL. It is argued that the irreparable injury CanWest has already suffered will only continue.

CanWest further avers that as the President and principal shareholder of MTG who signed the Agreement on behalf of MTG, Mr. Azour had actual knowledge of section 9 of the of the Agreement, which provides for binding arbitration in New York of any dispute arising from or relating to the Agreement. [2] Further, the arbitration commenced by CanWest and related proceedings in New York State court were widely publicized in the Israeli press, and CanWest's assertion of its agreement with MTG and CanWest's ownership rights were described in this press coverage. Additional press coverage of the Agreement occurred as a result of a lawsuit commenced in Israel by Mr. Azour, in which he acknowledges both the existence of the Agreement and CanWest's assertion of ownership rights. Similarly, it is argued, Mr. Bardugo had actual knowledge of the Agreement; the Israeli proceedings commenced by Mr. Azour put Mr. Bardugo on notice and created a duty to inquire before he proceeded with his purported acquisition of shares.

[2]    CanWest contends that the Agreement further provides that either party "may apply to any court in the State of New York to seek injunctive relief to maintain the *status quo* until the arbitration award is rendered or the controversy is otherwise resolved." Pursuant to these provisions, CanWest commenced an arbitration with the American Arbitration Association ("AAA") in New York.

CanWest also contends that it is likely to succeed on the merits of its claim that MTG breached the Agreements. In support, CanWest argues that up to the time of MTG's acquisition of the JPost Group on December 15, 2004, the parties were proceeding consistent with the intent of the parties' Agreements, and in anticipation that MTG would consummate the Agreements by, *inter alia,* transferring the JPost Group assets to an entity jointly owned by both parties.

CanWest avers that the November Agreement does not give MTG any right to withdraw, other than on the basis of the **\*\*557** June Agreement, in which event, MTG would be prohibited from seeking ownership of the JPost Group for a period of 12 months. By repudiating the June Agreement, MTG breached the parties' Agreement and unilaterally took over exclusive control, management and ownership of PPL and the JPost Group to the total exclusion of CanWest.

*853  Further, MTG's offer to transfer the assets on the condition that CanWest give up its rights under the June 11 Agreement "was not good faith negotiation" but extortion in order to seize the JPost Group for itself.

### MTG's Opposition and Cross-Motion to Vacate the TRO

MTG opposes injunctive relief, and cross moves to vacate the TRO, arguing that the Court lacks jurisdiction to issue injunctive relief against MTG and that CanWest failed to meet its burden to justify such relief.

MTG argues that the pending arbitration between CanWest and MTG is an "international arbitration" governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "UN Convention") which restricts pre-arbitration judicial action to determinations as to whether an arbitration should be compelled. Relying on *Cooper v. Ateliers de la Motobecane, S.A.,* 57 N.Y.2d 408, 456 N.Y.S.2d 728, 442 N.E.2d 1239 [1982] and its progeny, MTG argues that the UN Convention restricts pre-arbitration judicial action to determinations as to whether an arbitration should be compelled, and as such, this Court lacks jurisdiction to entertain the instant application for injunctive relief.

Furthermore, it is argued that since caselaw holds that parties by consent cannot confer on federal courts subject matter jurisdiction beyond the limitations imposed by the United States Constitution, the limitation by a treaty herein on the Court's jurisdiction similarly cannot be undone by the parties.

In any event, MTG asserts, CanWest failed to make a clear showing of its entitlement to injunctive relief. MTG contends that at the time CanWest brought the instant application, it was advised that MTG transferred its interest in PPL to its principal shareholder, Mr. Azour in December 2004. Therefore, any injunction to bar CanWest's alleged joint venture partner, MTG, which owns neither the shares of PPL nor its underlying assets, is pointless and futile. It is equally ineffective to seek an injunction prohibiting MTG from directing the affairs of PPL.

Further, the TRO is overreaching as to any party other than MTG. CanWest's attempt to add the three additional parties to the arbitration demand is "purely cosmetic," as none of these individuals have signed an arbitration agreement, and nothing in the Federal Arbitration Act ("FAA") requires them to do so. MTG adds that the UN Convention, which applies here, requires an "agreement in writing" between

the parties to an international  *854  arbitration, which does not exist in respect to any of these parties. Since PPL has not entered into any agreement to arbitrate, there is no "arbitrable controversy" between CanWest and PPL, and as such, no basis for seeking to extend the TRO to PPL, the "Jerusalem Post," or any other "affiliates" of MTG. Noting that the TRO is addressed to MTG's directors and officers, including Mr. Azour, MTG also contends that neither YEL nor Bardugo are parties to any " arbitrable controversy." Mr. Azour was not a signatory to any arbitration agreement. And, CanWest's assertion that Mr. Azour had notice of the arbitration agreement is insufficient to overcome the FAA's proscription that the court cannot compel arbitration by any  **558  parties that are not already covered in an agreement.

Likewise, CanWest has no prospect of piercing the corporate veil in order to hold Mr. Azour personally responsible under the arbitration clause of the June Agreement. It is argued that MTG has a separate corporate existence, is duly incorporated, and in good standing under the laws of Israel. Further MTG conducts business in its own name and on its own behalf, holds property in its own name, and has corporate representatives other than Mr. Azour, including Eyal Golan. MTG also points out that CanWest repeatedly recognized MTG, not Mr. Azour, as its potential business partner, and never required Mr. Azour be made a party to the Agreements or personally guaranty MTG's performance. The transfer of shares to Mr. Azour was properly documented and reflected in the tax structure of the acquisition. Further, there was a *bona fide* commercial rationale for the transfer, the transfer was not prohibited by the November Agreement, which does not address post acquisition ownership of PPL shares, and the transfer was made known to CanWest immediately thereafter. [3]

3    MTG asserts that prior to the closing, it kept CanWest apprised of PPL's serious financial condition, and that based on CanWest's reactions, MTG became concerned with its ability to respond to such problems. Mr. Azour took "quick action to stop the bleeding" and appointed a new CEO and CFO to take over management. At the time of these hiring and firing decisions, Mr. Azour held close to 100% of PPL's share capital, having financed the PPL acquisition out of his own personal credit and was therefore not required to gain CanWest's consent. The appointment of the CFO and the firings of the head of marketing and the publisher were approved by CanWest.

In addition, CanWest has not identified any irreparable harm warranting injunctive relief. Since the profitability of PPL and

the Jerusalem Post was impaired by the first and current TRO, such injunction is actually destructive of the asset CanWest *855 seeks to covet. And, CanWest fails to explain what purpose is served by blocking PPL from becoming more profitable by disposing of redundant assets or restructuring its workforce. Moreover, as PPL has already been sold by MTG, the sole remedy available to CanWest is damages, which negates any suggestion of immediate or irreparable harm. MTG also claims that as an additional remedy, CanWest can litigate its right to any PPL stock in Mr. Azour's proceeding to clear title to the shares in Jerusalem Post, pending in Israel.

MTG further contends that CanWest cannot establish the likelihood of success on the merits. At the outset, MTG maintains that CanWest's contention that the June Agreement gives it the right to maintain the *status quo* is without merit, given that the provision at issue merely gives the parties the ability to seek such relief in New York State court, and does not obviate the burden imposed by the CPLR to establish entitlement to injunctive relief.

Also, since the parties failed to agree upon the terms of a common venture to own the "Jerusalem Post," CanWest cannot establish that MTG breached the Agreements. The June Agreement merely creates a framework to agree upon a joint bid, and does not obligate either party to make a joint bid for the "Jerusalem Post" or PPL; rather, it refers to a "Possible Acquisition" and requires that any "Bid," once negotiated, be "subject to the unanimous decision of the Parties." MTG points out that the completion and submission of the Bid was subject to the five "conditions precedent" and that none of these conditions were ever satisfied. Further, although CanWest repeatedly cites to **559 the draft "Shareholders' Agreement" attached as Schedule A to the June Agreement, MTG and CanWest never actually entered into any such agreement and Schedule A was superceded by the November 10 Agreement.

According to MTG, after the June Agreement was executed, it soon emerged that CanWest would not participate in any bid for PPL because it was unwilling to assume the liabilities of PPL and Hollinger was unwilling to enter into any representations or indemnities to cover those losses. CanWest agreed to permit MTG to bid alone for PPL, and that MTG and CanWest subsequently agree to attempt to negotiate a joint venture structure to hold PPL's assets, including the Jerusalem Post on the condition that (1) CanWest would only contribute to such venture once it was insulated from risks associated with PPL's liabilities, and (2) unless and until a revised venture structure *856 was agreed upon, CanWest

would not be financially liable to contribute to the acquisition of PPL. Therefore, the November Agreement was entered into to supply even more opportunities for CanWest to retreat from a future deal.

In this regard, the November Agreement evinces that the parties contemplated to "negotiate in good faith" to try to reach a mutually satisfactory agreement for a joint venture to own certain of PPL's assets. The critical terms of the November 10 Agreement, *i.e.,* the nature and extent of "certain liabilities" to be assumed by MTG, were completely a matter for future negotiation. Thus, the November 10 Agreement contained, at most, an obligation to negotiate until December 15 to form a future possible venture to own some of the assets of PPL, whose structure, liabilities, assets and other critical features were never actually agreed upon prior to the collapse of talks in January 2005.

Nevertheless, MTG still expected to agree on these matters with CanWest and therefore engaged in further discussions, from December 2004 through mid-January 2005, in an effort to reach agreement. But, the parties remained divided on many key issues. MTG points out that on December 27, 2004, CanWest acknowledged that unless the parties reached an agreement on the form and structure of the future venture to own the "Jerusalem Post" no such venture would or could be established. Although the negotiations occurred, they failed to result in any agreement. Therefore, CanWest has no partnership or any other ownership rights in MTG.

According to MTG, after Hollinger and MTG signed the purchase agreement obligating MTG to close the deal by December 23, 2004, MTG tried, but failed to negotiate with CanWest to finalize a venture structure, partnership and asset purchase agreement and to fulfill the other conditions precedent set forth in the November 10 Agreement. MTG asserts that it notified CanWest that the closing was set for December 15, 2004. Although CanWest expressed reservations about an early closing it accepted that a quick transition was necessary since PPL was losing money. In view of CanWest's refusal to participate in the financing of the deal, MTG was forced to pay Hollinger the balance of the sum to which it had committed. Therefore, it is argued, the evidence shows that MTG did participate in negotiations up to the closing of the PPL acquisition, and that CanWest kept refusing to commit to or finance a deal, leaving MTG alone to purchase PPL. Since any obligation to *857 negotiate was fully discharged by MTG, CanWest still has no cognizable proprietary interest in PPL or the Jerusalem Post.

804 N.Y.S.2d 549, 2005 N.Y. Slip Op. 25337

 **\*\*560**  At the closing, MTG acquired, *inter alia,* all but one of the shares of PPL. Also on December 15, 2004, MTG transferred all of its PPL shares to Mr. Azour personally. Mr. Azour's acquisition of PPL, and his direct acquisition from PPL of Jerusalem Report Publications Limited, reflected the tax structure of the acquisition and the fact that he had drawn on his own credit to finance the purchase of PPL. MTG communicated the transfer to Mr. Azour to CanWest, which did not object.

According to MTG, during negotiations in Tel Aviv on January 6 and 7, 2005, it seemed the parties had reached an agreement on a venture structure: (1) PPL's core business assets would be transferred to a MTG/CanWest joint venture vehicle, (2) MTG (or Mr. Azour) would retain PPL's redundant assets and assume certain categories of outstanding PPL liabilities, and (3) the price to CanWest for its investment would be adjusted to US$5 million for 50 percent of the business to reflect the netting of assets being retained and liabilities being assumed by MTG or Mr. Azour. However, CanWest then vetoed this agreement in favor of a "take it or leave it" proposal, accompanied by threats that CanWest would create a "black hole" litigation for MTG in New York, and establish a rival to drive the Jerusalem Post out of business. CanWest insisted on (1) a 3-3 board, with a neutral chair, (2) that it have editorial control over The Jerusalem Post, and (3) that all assets and liabilities of PPL be assigned to the new venture and shared on a 50-50 basis by both parties. MTG took issue with CanWest's proposal because CanWest sought the right (in consultation with MTG) to control the method of operation of the editorial board and not the right to determine editorial content as provided in the Shareholder's Agreement. MTG believed that CanWest would then turn the Jerusalem Post into an extreme right-wing newspaper. When MTG proposed that discussions resume after the approaching Sabbath, CanWest allegedly left the country.

On the following Sunday, MTG attempted to contact CanWest to resume discussion. However, on the following Monday, CanWest retreated to a new proposal different from either of those discussed on January 7; CanWest abandoned negotiations, and insisted that the parties immediately establish a jointly-held company pursuant to the "long-defunct" skeletal draft Shareholders Agreement, ignoring the conditions precedent to the June and November Agreements, and requiring MTG to forego  **\*858**  its right to withhold acceptance of proposals with which it agreed. On February 15, 2005, PPL finalized agreements with YEL in order for PPL for financing to meet its cash flow needs; YEL

subscribed for 137 newly-created shares in PPL and PPL received a loan of $1.6 million.

According to MTG, it negotiated in good faith at all times and only ceased negotiations with CanWest once it became evident that no agreement would ever be reached.

In further opposition to injunctive relief, MTG argues that the balance of equities militates against the continuance of a TRO. The first TRO already caused significant harm to MTG and PPL in lost business, lost advertising, workplace disruption and loss of the ability to raise bank finance, and the requested relief would severely jeopardize the Jerusalem Post.

It is further argued that CanWest's application is barred by the doctrine of laches and unclean hands. CanWest allegedly failed to address its knowledge of the transfer to Mr. Azour in its earlier OSC papers. And, even accepting CanWest's assertion that it recently learned of such transfer on February 11, 2005, CanWest  **\*\*561**  did not bring this application until 24 days thereafter. MTG also claims that the potential hardship to MTG tips the scale against injunctive relief. Any bar on MTG from entering into any contracts effectively puts MTG out of business altogether, and causes reputational damage to MTG and Mr. Azour. MTG states that any TRO will prevent the sale of loss factors within PPL, *i.e.,* the printing press, and harm PPL's goodwill and workplace relations. Also, the TRO presents a direct challenge to the competence of the Jerusalem District Court to hear and determine claims involving Mr. Azour, CanWest, and PPL because the relief contained in the TRO implicates issues before that court.

In response to MTG's cross-motion to vacate the TRO, CanWest asserts that the parties chose a New York Court, not arbitration, as the forum for preliminary injunctive relief. The UN Convention does not apply to every dispute involving foreigners in New York, but only disputes that the parties have agreed to submit to arbitration and then only to the extent the dispute is within the scope of the arbitration agreement. Here, the parties did not agree to arbitration as the forum for preliminary injunctive relief; instead, they agreed that the claim for injunctive relief may be heard in a New York court.

CanWest also asserts that *Cooper* requires enforcement of the parties' Agreements, including the provision authorizing injunctive  **\*859**  relief from a New York Court. Further, this Court has jurisdiction to issue injunctive relief because the parties' choice of New York courts as the forum for same is enforceable under General Obligations Law ("GOL") §

5-1402. It is clear that as a matter of law, respondents have submitted to the jurisdiction of New York courts by agreeing that applications for injunctive relief may be made to a New York court.

Additionally, CanWest has demonstrated a strong likelihood of success on the merits that MTG has breached the Agreements and that the TRO properly applies to Mr. Azour. MTG completed the acquisition on its own, thereby breaching section 7 of the June Agreement, and in January, refused to negotiate in good faith by insisting on an entirely different deal. CanWest also argues that MTG's assertion that it notified CanWest of the transfer to Mr. Azour, which CanWest expressly denies, is unsupported by any documentary evidence. CanWest contends that the documents concerning this purported transfer demonstrate that MTG's transfer of the shares to Mr. Azour before the closing of the transaction with Hollinger was done when respondents were supposed to be negotiating in good faith with CanWest. The minutes of an MTL Board meeting six days before the closing with Hollinger purportedly approving the sale of all shares to Mr. Azour personally contain only Mr. Azour's name and confirm that the purported transfer was not an "arms length transaction" but a mere shifting of the names from MTG to Azour.

CanWest also asserts that MTG is not listed in Israel's Company Registry, and as such, it is not a legal entity incorporated in Israel. Thus, there is no legal distinction between Mr. Azour and MTG. Since an individual is personally bound when he purports to sign on behalf of any entity that does not have a separate legal existence, and Mr. Azour is bound by the obligation to arbitrate and defend against an application for injunctive relief. CanWest also notes that it is puzzling how MTG could have continued to negotiate with CanWest after the shares of PPL had already been transferred to Mr. Azour. Further, where the parties agreed to arbitration, the issue of whether the agreement **562 applied to a non-signatory is to be determined by the arbitrator.

Furthermore, CanWest has demonstrated that severe irreparable harm and the balance of equities are in favor of injunctive relief. The loss of key employees constitutes irreparable harm as a matter of law. Also, respondents are engaged in self-dealing *860 and a fundamental restructuring of business relationships with irreversible consequences, including shutting down the printing plant and transferring the printing business to a company owned by Azour. Independent advertising has declined, and much of the

advertising in The Jerusalem Post now promotes business run by Azour. The resulting erosion of the newspaper's good will and reputation also constitutes irreparable harm as a matter of law. Every day that CanWest is denied its right to participate in the ownership and management of the newspaper also constitutes irreparable harm.

### III. *Analysis*

#### A. *United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*

1   The underlying arbitration agreement implicates the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("UN Convention"). The UN Convention was drafted in New York in 1958 in order to ease "the difficulty in enforcing international arbitration agreements by minimizing uncertainties and shifting the burden of proof to the party opposing enforcement" of such agreements (*Cooper v. Ateliers de la Motobecane, S.A.,* 57 N.Y.2d 408, 456 N.Y.S.2d 728, 442 N.E.2d 1239 [1982] ). As such, the UN Convention provides, that when an action is brought in court and a party asserts the arbitration agreement, the court "shall ... refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed" (USCS Administrative Rules, Foreign Arbitral Awards Conv., Art. II, § 3). [4]

4       Article II provides:

> 1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
>
> * * *
>
> 3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

The UN Convention sets forth basic requirements for enforcement of arbitration agreements under the Convention: (1) there is a written agreement (Convention, Articles II(1), II(2)), (2) the agreement provides for arbitration in the territory of a signatory to *861 the UN Convention

CanWest Global Communications Corp. v. Mirkaei Tikshoret Ltd., 9 Misc.3d 845 (2005)

804 N.Y.S.2d 549, 2005 N.Y. Slip Op. 25337

(Convention, Articles I(1), I(3)), and (3) the subject matter is commercial (Convention, Article I(3); *Burnham v. Ruebsamen,* 139 A.D.2d 323, 531 N.Y.S.2d 547 [1st Dept. 1988]; *see Smith/Enron Cogeneration Limited Partnership, Inc. v. Smith Cogeneration International, Inc.,* 198 F.3d 88, 92 [2d Cir.1999], *citing Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186-87 [1st Cir.1982] ).[5]

5    *Smith,* and *Ledee,* to which the Court in *Smith* cites, adds an additional requirement: that the agreement is not entirely domestic in scope. While citing to the UN Convention in support of the three aforementioned criteria, the *Ledee* Court cites solely to the Federal Arbitration Act, 9 USCA § 202 in support of the fourth requirement. 9 USCA § 201, provides that the UN Convention "shall be enforced in United States courts in accordance with this chapter." USCA Section 202, defines the type of "Agreement or award falling under the Convention": An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement ... An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states....

**\*\*563**   In the instant matter, the underlying arbitration agreement meets all of the above requirements. The underlying arbitration involves parties from Canada and Israel and pertains to an agreement to purchase assets in Israel. Furthermore, the agreement to arbitrate provides for arbitration in New York, New York (June Agreement, par. 9) and the United States is a signatory to the UN Convention. There is no question that the underlying transaction for the purchase of and subsequent transfer of shares in, *inter alia,* PPL is commercial. Therefore, the Agreements at issue between CanWest and MTG satisfy these requirements and are subject to the UN Convention enforcement rules.

**B.** *Cooper and its Progeny*

MTG argues that the Court of Appeals' decision in *Cooper v. Ateliers de la Motobecane, S.A.,* 57 N.Y.2d 408, 456 N.Y.S.2d 728, 442 N.E.2d 1239 [1982] proscribes pre-arbitration injunctive relief in matters governed by the UN Convention. In *Cooper,* the Court of Appeals opined that the purpose of the UN Convention to "minimize the uncertainty of enforcing arbitration agreements and to avoid

the vagaries of foreign law for international traders" would be defeated if, "contrary to contract," parties were permitted to petition a court for **\*862** pre-arbitration injunctive relief (*Cooper,* 57 N.Y.2d at 410, 456 N.Y.S.2d 728, 442 N.E.2d 1239). Therefore, since the underlying dispute between the parties involved their obligations under an agreement which provided that disputes were to be resolved by arbitration in Switzerland, the order of attachment was improper.

After the Court of Appeals decision in *Cooper,* the legislature enacted CPLR 7502(c) to address pre-arbitration injunctive remedies. CPLR 7502(c) confers authority upon New York State courts to "entertain an application for an order of attachment or for a preliminary injunction in connection with an arbitrable controversy." Although the language of CPLR 7502(c) appears to eviscerate *Cooper,* the First Department relied favorably on *Cooper* when it denied attachment pursuant to CPLR 7502 in connection with an arbitration within the purview of the UN Convention in *Drexel Burnham Lambert Inc. v. Ruebsamen,* 139 A.D.2d 323, 531 N.Y.S.2d 547 [1st Dept. 1988].

In *Drexel,* the petitioner sought a pre-arbitration order of attachment pursuant to CPLR 7502(c). The parties agreed that the dispute between them would be resolved in arbitration. Further, the agreement to arbitrate provided for arbitration in either West Germany, Belgium, or the United States. The First Department reaffirmed its previously held position that

in instances in which the UN Convention is applicable, the 'arbitration is governed by the UN Convention, and pursuant to the terms thereof, prejudgment attachment is prohibited. It was the intention of the UN Convention that there should be no significant judicial intervention until *after* an arbitration award is made' (emphasis in original).

**\*\*564**   (*Drexel,* 139 A.D.2d at 330, 531 N.Y.S.2d 547, *citing Shah v. Eastern Silk Indus.,* 112 A.D.2d 870, 871, 493 N.Y.S.2d 150 [1st Dept. 1985] [holding that since the parties selected arbitration in India as the forum in which to resolve "any dispute of claims arising out of" their agreements, the UN Convention applied so as to preclude prejudgment attachment] ). The Court concluded that each of the three requirements for activating the UN Convention were present. Therefore, notwithstanding petitioners' showing of entitlement to an order of attachment under CPLR 7502(c), the Court held that *Cooper* rendered pre-arbitration attachment unavailable to the petitioners therein.

Similarly, in *ContiChem LPG v. Parsons Shipping Co.,* 229 F.3d 426 [2d Cir.2000], the Second Circuit Court of Appeals

also limited pre-arbitration attachment under CPLR 7502 to domestic *863 arbitrations. ContiChem attempted to obtain security in New York for damages resulting from a breach of a "charter party." The issue before the Court was whether ContiChem could avail itself of CPLR 7502 when no arbitration was pending in New York where the parties expressly agreed to arbitrate in London. The Court examined the Advisory Committee's notes to CPLR 7502(c) which state that:

there is no inconsistency between the proposed amendment [7502(c) ] and the decision of the Court of Appeals in *Cooper v. At[e]liers De La [de la] Motobecane, S.A.,* 57 N.Y.2d 408, 456 N.Y.S.2d 728, 442 N.E.2d 1239 (1982), where a pre-arbitration attachment was disallowed in a matter involving international litigants governed by the [UN Convention]. The amendment would not affect proceedings governed by such international agreements [i.e., the Convention].

(*ContiChem,* 229 F.3d at 432 [citing 1985 Report of the Advisory Committee on Civil Practice, *reprinted in* McKinney's 1985 Session Laws at 3432 (footnote omitted) ] ). The *ContiChem* Court also noted that the Advisory Committee explicitly contemplated that 7502(c) was "designed to make the *domestic arbitration* remedy more efficacious" (*id.* at 432 [emphasis added] ). Therefore, it held that although the matter involved maritime attachment, and *Cooper* was not necessarily a bar to relief, ContiChem nevertheless was not entitled to provisional remedies under CPLR 7502(c) "because this [was] not a domestic arbitration" (*id.* at 433). Continuing, the Court stated "The charter party in this case specifically provided for arbitration of disputes in London, and Rule 7502 by its terms applies only to domestic arbitrations." Therefore, the Court refused to expand the scope of CPLR 7502 beyond the limits of its language. The Court also noted that having determined that ContiChem could not bring an application under CPLR 7502 "because it agreed to arbitration in London," it cannot seek attachment under CPLR 6210,[6] "because the court cannot entertain" the CPLR 7502 application. In other words, since CPLR 7502 is limited to domestic arbitrations, and the parties in *ContiChem* explicitly agreed to arbitration in London, CPLR 7502's provisional remedies were not available.

[6]    CPLR 6201 permits the court, upon motion on notice, to grant a temporary restraining order prohibiting the transfer of assets by a garnishee as provided in CPLR 6214(b). A garnishee is defined in CPLR 105(i) as "a person other than the judgment debtor who has property

in his possession or custody in which a judgment debtor has an interest."

*864 **C. Classification as a Domestic or International Arbitration**

[2]  [3]    The Court notes that in *ContiChem,* the Second Circuit equated a foreign situs of arbitration with a non-domestic arbitration, and outside the scope of **565 CPLR 7502 relief. However, the Court therein also stated "if this case involved a domestic arbitration, not governed by the Convention, we would have little trouble concluding that Rule 7502(c) was available to ContiChem...." It is unclear whether the Court, by this latter statement, equated domestic arbitrations to one not subject to the UN Convention. However, the caselaw does support the conclusion that a foreign arbitration for purposes of invoking CPLR 7502 relief is one whose situs is expressly selected as a country outside of the United States (*see Smith/Enron Cogeneration Ltd. Partnership, Inc.,* 198 F.3d 88 [2d Cir.1999] [the "focus of ... the Convention is not on the nationality of the party seeking to enforce an award but on the situs of the arbitration"] ). In this regard, the agreements to arbitrate found in *Cooper, Shah,* and *ContiChem,* expressly provided for arbitrations in Switzerland, India and London, respectively. Similarly, the arbitration in *Drexel* was scheduled to be held in Germany, pursuant to the parties' agreement to hold arbitrations in either West Germany, Belgium, or the United States. Given that the parties herein expressly agreed to hold the arbitration solely in New York, the underlying domestic arbitration renders the instant matter materially distinguishable from *Cooper* and its progeny.

MTG confuses an international "agreement" with an international "arbitration." While the Agreements between the parties are undoubtedly international in nature, the terms of their Agreements provide for a domestic arbitration. In Paragraph 9 of the June Agreement, the parties agree to a New York choice of law provision, arbitration in New York to be administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules, and to designate a member of the New York bar as the arbitrator. All of these factors are indicia of the intent of the parties to conduct a New York "domestic" arbitration. Accordingly, and contrary to MTG's contention, that the Agreements at issue satisfy the three requirements so as to implicate the UN Convention enforcement rules (*supra* at 26-27), *Cooper* and its progeny are no bar to the pre-injunctive relief sought herein.

804 N.Y.S.2d 549, 2005 N.Y. Slip Op. 25337

Moreover, unlike the facts in *Cooper* and its progeny, the parties herein specifically agreed to permit an application "to any **\*865** court in the State of New York to seek injunctive relief to maintain the status quo until the arbitration award is rendered or the controversy is otherwise resolved" (June Agreement, par. 9). CanWest and MTG clearly anticipated the possibility of pre-arbitration applications for injunctive relief in the event of a dispute, and unambiguously agreed to permit pre-arbitration judicial intervention for the purposes of obtaining such relief.

[4] [5] Before a party can be forced to forgo its rights to judicial review and submit its disputes to arbitration, there must be evidence that the parties intended to submit the relevant dispute to arbitration (*see Writers Guild of America East v. Prockter Productions, Inc.,* 1 N.Y.2d 305, 152 N.Y.S.2d 466, 135 N.E.2d 204 [1956]; *Bowmer v. Bowmer,* 50 N.Y.2d 288, 428 N.Y.S.2d 902, 406 N.E.2d 760 [1980]; *Matter of Helmsley,* 173 A.D.2d 280, 569 N.Y.S.2d 672 [1st Dept. 1991]; *see also* 21 UST 2517, Art. II, Par. 1). In *HSBC Bank USA v. National Equity Corp.,* 279 A.D.2d 251, 719 N.Y.S.2d 20 [1st Dept. 2001], (although not involving the UN Convention), the parties' agreement gave the lender, HSBC, the right, "at any time prior to the commencement of a judicial proceeding, to submit any disputes to arbitration, but by so electing the lender is not thereby required to submit all disputes to **\*\*566** arbitration." The agreement further provided that "no provision, nor exercise of rights under, ... shall limit the right of any party ... to obtain from a court ... provisional ... remedies...." In response to HSBC's request for an order of seizure, the defendant argued that the agreement could not confer such a provisional remedy by right since it was not authorized by statute, namely CPLR 7502(c), which only provided for an injunction or an order of attachment. The First Department rejected defendant's contention, and held that HSBC was free, "under the contract, and within the statute" to seek judicial relief while, simultaneously, seeking arbitration of the underlying dispute. Here, the parties specifically excluded any application for injunctive relief from the arbitration, and agreed to submit such applications to a New York court. The parties did not thereby attempt to contract out of the UN Convention; rather, they intentionally excluded injunctive relief from their arbitration agreement. Therefore, CanWest is similarly free under its contract to seek the injunctive relief herein.

This conclusion is not inconsistent with the UN Convention. The UN Convention recognizes that parties have the right to agree to resolve certain disputes outside of arbitration. Indeed,

Article V of the UN Convention provides bases on which a signatory may refuse to recognize or enforce an arbitral award. Section c of paragraph 1 permits refusal if:

> **\*866** The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced.

(21 U.S.T. 2517, Art. V, Par. 1(c)). Such a provision would be unnecessary if all agreements to submit disputes to arbitration required that any dispute between the parties be so submitted. This provision clearly recognizes that disputes may fall outside the scope of the agreement to arbitrate.

Furthermore, as noted in the Court of Appeals decision in *Cooper,* the UN Convention's purpose is to provide parties with certainty when entering into an international contract (*Cooper,* 57 N.Y.2d 408, 456 N.Y.S.2d 728, 442 N.E.2d 1239). When, as here, parties agree to permit application to a court for pre-arbitration injunctive relief, it would be consistent with the letter and spirit of *Cooper* and its progeny to enforce that agreement. Additionally, the provision in the June Agreement which permits applications to New York courts for injunctive relief is separate and distinct from the provision in the June Agreement which permits arbitration, and therefore does not fall within the purview of, and is not inconsistent with, the UN Convention. Therefore, there is no basis to preclude parties to an international agreement from enforcing an agreement to seek the same remedies that CPLR 7502(c) provides to domestic arbitrations. The injunctive relief carve-out, contractually agreed upon by the parties herein, does not frustrate the purpose of the UN Convention, but supports the goal of "minimiz[ing] the uncertainty of enforcing arbitration agreements and to avoid the vagaries of foreign law for international traders." The "international traders" herein avoided any uncertainty in the enforcement of arbitral awards arising from their agreement by expressly providing a mechanism to seek injunctive relief in connection with any arbitration. It cannot be said that the purpose of the UN Convention is defeated, because the application **\*\*567** herein for injunctive relief is not "contrary to contract."

[6] The Court also notes that since the parties' agreement provides that an application for injunctive relief may be made in any New York court, NY Gen. Obl. Law § 5-1402 further

804 N.Y.S.2d 549, 2005 N.Y. Slip Op. 25337

*867* supports the enforcement of such an agreement. NY Gen. Obl. Law § 5-1402 provides, in part:

> 1. Notwithstanding any act which limits or affects the right of a person to maintain an action or proceeding, .... any person may maintain an action or proceeding against a foreign corporation, non-resident, or foreign state where the action or proceeding arises out of or relates to any contract, agreement or undertaking for which a choice of New York law has been made in whole or in part pursuant to section 5-1401 and which (a) is a contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state.

In the instant case, since the June Agreement includes a choice of New York law and the parties' submission to the jurisdiction of New York courts for injunctive relief, and relates to an obligation of more than one million dollars, New York is the proper forum as a matter of law to entertain the injunctive application (CPLR 327(b); GOL § 5-1402; *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Worley,* 257 A.D.2d 228, 230-31, 690 N.Y.S.2d 57 [1st Dept 1999] ).

Accordingly, based on the terms of the June Agreement between CanWest and MTG, this Court concludes that CanWest's application for injunctive relief pursuant to CPLR 7502(c) in connection with the underlying arbitration is not barred by either the UN Convention, or *Cooper* or its progeny. And, GOL § 5-1402 permits CanWest to seek such relief.

## D. *Injunctive Relief*

7    8    While ordinarily the function of a preliminary injunction is to preserve the *status quo* until a final determination upon the merits can be made, "[t]here is no question that in a proper case the Supreme Court has power as a court of equity to grant a temporary injunction which mandates specific conduct ..." (*McCain v. Koch,* 70 N.Y.2d 109, 116, 517 N.Y.S.2d 918, 920, 511 N.E.2d 62 [1987]; *see also, State v. Solil Mgmt. Corp.,* 128 Misc.2d 767, 491 N.Y.S.2d 243 [Sup. Ct. N.Y. Co. 1985] [an injunction may be used to either restrain or compel performance of an act] ). The decision whether to grant a motion for preliminary relief is committed to the sound discretion of *868* the trial court (*see, Doe v. Axelrod,* 73 N.Y.2d 748, 750, 536 N.Y.S.2d 44, 45, 532 N.E.2d 1272 [1988]; *Jiggetts v. Perales,* 202 A.D.2d 341, 342, 609 N.Y.S.2d 222, 223 [1st Dept 1994] ).

9    10    In order for a preliminary injunction or temporary restraining order to be issued pursuant to CPLR 7502(c), the petitioner must demonstrate (1) a likelihood of success on the merits; (2) irreparable injury absent the granting of the preliminary injunction; and (3) a balancing of the equities which favors the issuance of injunctive relief and (4) that "the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief" (*50-09 2nd Street LLC v. Ianvil Associates, Inc.,* 2002 WL 1769973 (N.Y.Sup.); *568* *St. Paul Fire and Marine Ins. Co. v. York Claims Serv., Inc.,* 765 N.Y.S.2d 573, 308 A.D.2d 347 [1st Dept. 2003]; *New York City Off-Track Betting Corp. v. New York Racing Assn., Inc.,* 250 A.D.2d 437, 673 N.Y.S.2d 387 [1st Dept. 1998]; *Grumet v. Cuomo,* 162 Misc.2d 913, 617 N.Y.S.2d 620 [Sup. Ct. N.Y. Co. 1994] ). Preliminary injunctive relief is a drastic remedy, which will only be granted if it is established that there is a clear right to the relief under the law and the facts (*Koultukis v. Phillips,* 285 A.D.2d 433, 728 N.Y.S.2d 440 [1st Dept 2001] ).

11    In addition, where as here, the injunctive relief would upset the *status quo* and grant some form of the ultimate relief requested, the movant has the heightened burden of showing that extraordinary circumstances warrant the relief (*see Rosa Hair Stylists v. Jaber Food Corp.,* 218 A.D.2d 793, 794, 631 N.Y.S.2d 167 [2d Dept. 1995] ).

12    Notwithstanding, CPLR 6314 permits the Court to vacate or modify a temporary restraining order or preliminary injunction where such injunctive relief would not serve any of the objectives the remedy is designed to achieve, where the party in support is not in danger of suffering any irreparable injury during the pendency of the suit or an alternative legal remedy is adequate to protect the interests of the party in support of injunctive relief. Further, a temporary restraining order or preliminary injunction may be vacated due to the lack of jurisdiction over the person to be retrained.

## 1. *Likelihood of Success on the Merits*

13    14    15    CanWest has demonstrated a strong likelihood of success on the merits of its claim that MTG breached the June and November Agreements. The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent (*see Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099, *rearg. denied* 65 N.Y.2d 785, 492 N.Y.S.2d 1026, 482 N.E.2d 568 [1985] ). "The best evidence of what parties to a written agreement intend is what they say *869* in their writing" (*Slamow v. Del Col,* 79 N.Y.2d 1016, 1018, 584 N.Y.S.2d

424, 594 N.E.2d 918 [1992] ). Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms *(see e.g. R/S Assoc. v. New York Job Dev. Auth.,* 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 771 N.E.2d 240, *rearg. denied* 98 N.Y.2d 693, 747 N.Y.S.2d 411, 775 N.E.2d 1291 [2002]; *W.W.W. Assoc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 [1990] ).

**16**    The June Agreement was expressly intended to be a legally enforceable agreement between CanWest and MTG. By its terms, the June Agreement was a proposal to establish, upon agreed material terms, a newly formed entity or partnership, which would acquire the assets of JPost Group from Hollinger. Such agreements to negotiate in good faith in an effort to reach a final agreement within a certain scope of terms are enforceable *(see Teachers Ins. and Annuity Assoc. of America v. Tribune Co.,* 670 F.Supp. 491 [S.D.N.Y. 1987] ). The parties expressly indicated that they would be "equal 50/50" shareholders in this newly formed entity. CanWest and MTG also agreed to develop a business plan and finalize a plan to be accepted by Hollinger. The submission of the bid was subject to certain conditions precedent, including completing the final structure of the newly formed entity and successfully executing a shareholders agreement pursuant to Schedule A of the Agreement. The June Agreement also permitted either party to withdraw from submitting the bid or, if permitted by the bid, to determine not to proceed with the purchase of the JPost Group assets, if such party determined in its own judgment that **\*\*569** the conditions precedent will not be capable of being fulfilled to its satisfaction. Under such circumstance, the party that withdrew from submitting the bid or proceeding with the acquisition was expressly prohibited from proceeding alone or with any third party relating to the acquisition for a period of 12 months after withdrawal.

However, the June Agreement was modified in part by November Agreement. The November Agreement expressly acknowledged MTG's submission to Hollinger of the offer to purchase the JPost Group assets, and that such submission was with the concurrence of CanWest. More importantly, the November Agreement bound the parties to negotiate in good faith to finalize, before the closing of the Hollinger transaction, the terms under which MTG shall sell the assets of PPL and its subsidiaries to the newly formed entity, which will be owned and funded by CanWest and MTG equally (50%), and on the basis that MTG will indemnify and hold the newly formed entity harmless in respect to certain liabilities of the PPL. The **\*870**  November Agreement also obligated MTG and CanWest to negotiate in good faith to finalize,

before the closing of the Hollinger transaction, the terms of the agreements and conditions precedent outlined in the June Agreement, recognizing that the parties have outlined the terms of the shareholders agreement to be applicable to the newly formed entity to be jointly owned by them. More importantly, the November Agreement provided that in the event the parties are unable to negotiate in good faith towards finalizing the terms by which MTG shall sell the JPost Groups assets to a newly formed entity, or complete the conditions precedent outlined in the June Agreement, CanWest would have no further obligation to participate in the purchase of the PPL.

In essence, the June and November Agreements clearly represent an agreement between CanWest and MTG to submit a joint bid for the purchase of the JPost Group's assets from Hollinger, and to work together in creating the newly formed company, to which the assets of the JPost Group would be transferred after the closing of the purchase from Hollinger. The parties agreed to work toward creating the newly formed entity before the closing of the Hollinger transaction, but in the event the newly formed entity was not created by such time and MTG nevertheless completed the transaction, CanWest was no longer obligated to participate in the formation of the newly formed entity or purchase of the PPL in any manner.

Omitted from the November Agreement is any reference to *MTG's* obligation in the event MTG completed the Hollinger transaction, and the newly formed entity was not created by the time of the closing of the Hollinger transaction. However, it appears that from a fair reading of the November Agreement, together with the June Agreement, MTG had a continuing obligation to negotiate toward structuring the newly formed entity to receive the shares of PPL and to finalize the terms of the relevant agreements *until either party served notice of its decision to withdraw from purchasing the JPost Group,* since, pursuant to the November Agreement, "all other respects" of the June Agreement "continued in force and effect."

Contrary to MTG's contention, the obligation to negotiate in good faith to finalize, "on or before the closing date" served as a goal to work toward structuring and finalizing the limited partnership to which MTG was to transfer the shares of PPL, and does not express the moment at which the parties' obligation to negotiate in good faith ended.

 **\*\*570**    **17**    **\*871**  The submissions herein sufficiently demonstrate, for purposes of injunctive relief inquiry, that

MTG breached its duty to negotiate in good faith by drastically altering the terms of the June and November Agreements. The submissions indicate that MTG insisted on terms, *i.e.,* 75%-25% in favor of MTG, that were in direct conflict with those contained in the June and November Agreements. The obligation of good faith requires parties to refrain bars a party from insisting on terms that do not conform to the preliminary agreement (*Teachers, supra; Liberty Env. Sys., Inc. v. Cty. of Westchester,* 2000 WL 1752927, at 4 [S.D.N.Y. 2000] ). Notably, the record indicates that as of December 15, 2004, MTG negotiated with what it knew to be assets owned by Mr. Azour, who, according to MTG, is not subject to either Agreements and thus, not within this Court's jurisdiction. Any measure of good faith with which MTG purports to have negotiated is undermined by the position taken by MTG that Mr. Azour was not obligated to abide by the June Agreement. Therefore, assuming the veracity of MTG's position, that Mr. Azour is not a party to the June Agreement, MTG could not have been in a position to negotiate toward the sale of "Mr. Azour's" assets to a newly formed corporation pursuant to the terms of the June and November Agreements.

18   CanWest argues that it is likely to succeed on the merits against Mr. Azour in an individual capacity because MTG does not have a separate legal existence. Since Mr. Azour signed the June and November agreements on behalf of MTG, an entity without a separate legal existence, CanWest claims that Mr. Azour is personally bound.

19   An action may be maintained against the president of an unincorporated corporation in his individual capacity. Defendant in *Refined Sugars Incorporated v. Hazou,* 1987 WL 19024 [S.D.N.Y. 1987] contracted with plaintiff under the name of an unincorporated entity named American Sahara General Trading Company ("GTC"). Defendant, Hazou, sought to dismiss the breach of contract claims against him in an individual capacity claiming that he conducted business with plaintiff as President of American Sahara, Inc. However, plaintiffs presented a contract which Hazou signed as President on behalf of GTC. The Court denied defendant's motion to dismiss, stating that "[t]he fact that he signed it 'Elias Hazou, President' does not by itself transform the General Trading Company into a corporation" (*Id.* at *3).

*872  Similarly, MTG has established its likelihood of success on the merits of its breach of agreement claim against Mr. Azour. In the instant case, Mr. Azour signed the June Agreement on behalf of MTG. CanWest contends that MTG is a non-existent entity. Although MTG now claims that it

was and is the trade name for MTL, there is no indication in the June or November Agreements that MTG was doing business as MTL. Furthermore, the June Agreement fails to even mention that MTL has any interest in the subject matter. Since Mr. Azour signed the June Agreement on behalf of MTG, a non-existent entity, this Court finds that CanWest has demonstrated its likelihood of success on the merits of asserting it breach of contract claims as against Mr. Azour individually.

**2. *Irreparable Harm***

20   CanWest has also established a sufficient basis for finding irreparable harm in the event that the relief is not granted. Since the closing with Hollinger, MTG and/or Azour have (1) fired key executives and employees, (2) moved printing operations, (3) reduced advertising, and (4) changed printing suppliers, resulting in the **571 loss of customers, revenue and an erosion of its reputation. Furthermore, CanWest has lost the right to participate in the management of the Jerusalem Post. These factors necessitate a finding of irreparable harm (*see Urban Archaeology Ltd. v. Dencorp Investments, Inc.,* 12 A.D.3d 96, 783 N.Y.S.2d 330 [1st Dept. 2004] [finding the loss of important employees to be irreparable injury]; *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393 [2d Cir.2004] [holding that the loss of reputation, good will and business opportunities constitutes irreparable harm]; *Willis of New York, Inc. v. DeFelice,* 299 A.D.2d 240, 750 N.Y.S.2d 39 [1st Dept. 2002] [finding that the loss of business was irreparable damage]; *Wisdom Import Sales Co. v. Labatt Brewing Co.,* 339 F.3d 101 [2d Cir.2003] [holding that the loss of the right to participate in management constituted irreparable harm where such right was essential to preserving an agreed-upon balance of power in management] ).

**3. *Balance of the Equities***

21   Furthermore, since CanWest merely seeks to maintain the *status quo,* the balance of equities tilt in its favor. Absent a TRO, MTG will be free to take additional actions which may cause CanWest further irreparable injury (*see Gramercy Co. v. Benenson,* 223 A.D.2d 497, 637 N.Y.S.2d 383 [1st Dept. 1996] [finding that the balance of equities tilted in favor of plaintiffs who merely sought to maintain the status quo where denial of injunctive relief would have rendered the final judgment ineffectual] ).

*873  **4. *Award Rendered Ineffectual***

22   Finally, absent a temporary restraining order, MTG and/or Mr. Azour will be able to transfer the shares of PPL prior

CanWest Global Communications Corp. v. Mirkaei Tikshoret Ltd., 9 Misc.3d 845 (2005)

804 N.Y.S.2d 549, 2005 N.Y. Slip Op. 25337

to the hearing on the preliminary injunction. Such a transfer would render a preliminary injunction ineffectual since it would only constrain MTG and not the new owners of PPL.

## IV. *Conclusion*

Based on the foregoing, it is hereby

ORDERED that CanWest's order to show cause for a temporary restraining order, pending a hearing of CanWest's petition for a preliminary injunction, enjoining MTG and its subsidiaries, affiliates, and officers, including Eli Azour, and all persons acting on behalf of MTG from taking certain actions with respect to the JPost Group is granted; it is further

ORDERED that the cross-motion by MTG to vacate the temporary restraining order is denied.

This constitutes the decision and order of the Court.

Parallel Citations

9 Misc.3d 845, 2005 N.Y. Slip Op. 25337

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 44

603 N.E.2d 1226
Appellate Court of Illinois,
Second District.

MILEX PRODUCTS, INC., Plaintiff-Appellee,

v.

ALRA LABORATORIES, INC., Defendant-Appellant.

No. 2-91-1411.   Nov. 13,
1992.   Rehearing Denied Dec. 18, 1992.

Drug company sued company which had contracted to manufacture drug for damages for breach of contract and sought declaration that valid contract existed between parties and that manufacturer failed to negotiate price in good faith. The Circuit Court, Lake County, William D. Block, J., entered judgment in favor of drug company and assessed damages for lost profits. Manufacturer appealed. The Appellate Court, Woodward, J., held that: (1) valid contract existed, even though specific price had not been established; (2) manufacturer failed to negotiate price in good faith so as to be liable for damages; and (3) drug company was entitled to damages for lost profits, even though product was new one, in light of evidence showing that product had established market.

Affirmed.

West Headnotes (13)

**1**    **Contracts** 🔑 Certainty as to Subject-Matter

**Contracts** 🔑 Incomplete Instruments

Contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if essential terms are so uncertain that there is no basis for deciding whether agreement has been kept or broken, there is no contract.

1 Cases that cite this headnote

**2**    **Contracts** 🔑 Certainty as to Subject-Matter

Valid contract between drug company and company which agreed to manufacture drug existed even though price had not been established, where contract prepared by manufacturer referred to negotiated price as result of agreement between parties that it would be

difficult to set price at time of contract given inflationary period.

1 Cases that cite this headnote

**3**    **Contracts** 🔑 Acts or Omissions Constituting Breach in General

Defendant who contracted to manufacture drug for plaintiff failed to negotiate price in good faith and was liable for damages, where defendant tried to take advantage of fact that Food and Drug Administration (FDA) certification to manufacture drug specified defendant as manufacturer by forcing plaintiff to accept terms that had not been contemplated in original contract and were not economically feasible for plaintiff.

2 Cases that cite this headnote

**4**    **Contracts** 🔑 Acts or Omissions Constituting Breach in General

Party might breach its obligation to bargain in good faith by unreasonably insisting on conditions outside scope of parties' preliminary agreement, especially where such insistence is thinly disguised pretext for scotching deal because of unfavorable change in market conditions.

5 Cases that cite this headnote

**5**    **Contracts** 🔑 Agreement to Make Contract in Future

Full extent of party's duty to negotiate in good faith can only be determined from terms of letter of intent itself.

6 Cases that cite this headnote

**6**    **Contracts** 🔑 Agreement to Make Contract in Future

Duty to bargain in good faith does not prohibit party from bargaining to its own economic advantage.

**7**    **Damages** 🔑 Effect of Provisions of Contract

Language in contract between drug company and company which agreed to manufacture drug that manufacturer of drug would not be responsible for consequential damages was limited to formula changes or delay in completion due to causes beyond its control and did not apply to breach of entire contract.

**8**    **Damages** 🔑 Loss of Profits

Lost profits will be allowed for breach of contract only if their loss is proved with reasonable degree of certainty; court is satisfied that wrongful act of defendant caused loss of profit; and profits were reasonably within contemplation of defaulting party at time contract was entered into.

10 Cases that cite this headnote

**9**    **Damages** 🔑 Breach of Contract

**Damages** 🔑 Loss of Profits

When profits which are sought are those arising out of breached contract, those profits are considered one of the elements of the contract and are presumed to have been within contemplation of defaulting party at time he entered into contract; they are recoverable if proved with reasonable certainty.

6 Cases that cite this headnote

**10**    **Damages** 🔑 Necessity of Proof as to Damages in General

Company which contracted to manufacture drug failed to rebut presumption that profits were within contemplation of parties at time contract was entered into contemplating manufacture and marketing of drug, and thus, manufacturer was liable for lost profits upon breach of contract.

5 Cases that cite this headnote

**11**    **Damages** 🔑 Loss of Profits

Testimony about plaintiff-drug marketer's lost profits due to defendant's breach of contract

to manufacture drug was based upon fact, not speculation, even though product was new one, where evidence showed that drug had established market.

11 Cases that cite this headnote

**12**    **Damages** 🔑 Breach of Contract

Drug marketer's immediate negotiations with other potential manufacturers of drug after company which contracted to manufacture drug breached its duty to negotiate price in good faith demonstrated marketer's mitigation of damages so as to entitle marketer to damages for lost profits.

4 Cases that cite this headnote

**13**    **Appeal and Error** 🔑 Exclusion of Evidence

Defendant failed to make offer of proof in order to preserve for review question of whether trial court improperly excluded certain evidence in breach of contract action.

**Attorneys and Law Firms**

**\*\*1228    \*179    \*\*\*854** Julian Johnson (argued), Waukegan, Steven M. Kowal, Burditt, Bowles & Radzius, Ltd., Chicago, for Alra Laboratories.

Roger C. Goble (argued), Goble & Axelrod, Highland Park, for Milex Products, Inc.

**Opinion**

Justice WOODWARD delivered the opinion of the court:

Plaintiff, Milex Products, Inc. (Milex), filed a complaint against the defendant, Alra Laboratories, Inc. (Alra), seeking damages for breach of contract and a declaratory judgment. Following a bench trial, the trial court entered judgment in favor of Milex in the amount of $3.27 million plus costs of suit. Alra appeals raising the following issues: whether the contract between the parties was invalid because it lacked an essential term; whether there was an obligation to negotiate price in good faith and a failure to do so by either party; whether the trial court erred in assessing damages; and

whether certain evidence was properly excluded by the trial court.

By way of background, Milex, founded in 1937, originally manufactured contraceptive diaphragms and vaginal jellies. By 1985, its business had expanded to include a comprehensive line of obstetrical and gynecological specialties with a high concentration in the area of infertility. Alra opened officially as a manufacturer of prescription drugs in 1982. It also manufactures some over-the-counter drugs.

Hymen Milgrom, president of Milex, testified that around 1980 Milex became aware that the patent on the drug clomid had or was about to expire. Clomid is a medication that helps induce ovulation. The active ingredient in clomid is clomiphene citrate. Milex was interested in marketing a clomid-type drug and hired Sol Disman of S & D Associates to survey the market that clomid or other infertility drugs had which were coming off patent. Mr. Disman also recommended Alra as the manufacturer of the proposed new product.

Milgrom testified that in order to market the proposed new drug it was necessary to file an Abbreviated New Drug Application (ANDA) with the Food and Drug Administration (FDA). Unlike the innovator of a drug, who must show the effectiveness, as well as the lack of unknown ill effects, an applicant for an ANDA basically only needs to show that the new product contains the equivalent active ingredients and that the product works as well as the innovator's product. *180 Prior to filing for the ANDA, it was necessary to determine who was going to manufacture the product, because the ANDA required specific information as to how the product is made, where it is being made, what equipment is used, and all the controls that go into the manufacturing process.

Milgrom further testified that in the fall of 1984 he and Disman met with Baldev Raj Bhutani, president of Alra, at Alra Laboratories. Bhutani gave a brief history of Alra, and the parties then toured the facilities. Milgrom asked Bhutani if Alra had the capacity to produce two million tablets per year, which was the amount Milex estimated it could sell. Bhutani assured Milgrom that Alra was equipped to produce such an amount. However, Alra was not equipped to do the strip packaging. Milgrom assured Bhutani that there were trade shops that would perform that part of the process. The parties discussed the difficulty of determining a price at that time given the length of time the ANDA procedure took and being

in the midst of an inflationary period. Bhutani told Milgrom that he was very interested in doing business with Milex.

Milgrom testified further that after the decision was made to go with the clomiphene citrate-type product another meeting **1229 ***855 was held at the Alra Laboratories in March 1985. In addition to Milgrom, Disman and Bhutani, Robert Shaw, vice-president of Milex, also attended the meeting. Again Bhutani expressed interest in doing business with Milex and stated he would prepare a letter outlining what services and at what cost he could perform the services for Milex. Although Bhutani questioned Milex's ability to market two million tablets per year, Milgrom assured him that Milex's marketing research confirmed that Milex had that ability and that Bhutani should not be concerned with Milex's ability to take or pay for that amount of tablets.

Milgrom further testified that Alra's research proposal was accepted by Milex on April 2, 1985. The proposal included a confidentiality agreement that forbade disclosure of the formulation work outside of Milex without the written consent of Alra's president. The proposal also provided terms and conditions for Alra's formulation of the product, as well as for the payment for Alra's costs incurred during the formulation process. Paragraph seven provides as follows:

"7. Alra will have the exclusive right to contract manufacture this product for Milex Products Inc. (at a negotiated price) for two years from the initial marketing of this product by Milex;"

(It is useful to note at this time that although Milex originally agreed to pay Alra approximately $20,000 for 6 months' work, Alra took 18 *181 months and billed Milex over $60,000, which Milex did pay. Fortunately, that is not at issue in this case although it does tend to shed some light on the subsequent actions of the parties.)

Milgrom testified that by early 1987 all of the analytical work was finished and submitted to the FDA. In December 1988, Milex received certification from the FDA to manufacture milophene, a clomiphene citrate product. The certification specified Alra as the manufacturer of milophene. At this point in time, Milex had paid all of Alra's invoices which amounted to over $70,000. Up to this point, there had been no discussion of production or pricing.

Milgrom testified further that in December 1988 he met with Bhutani at Bhutani's office to discuss pricing of the product. Bhutani informed Milgrom that it was not economically feasible for Alra to produce two million tablets and that there was a problem of products liability insurance. According

603 N.E.2d 1226, 177 Ill.Dec. 852

to Bhutani, the only way he would undertake production would be if Milex allowed him to sell the tablet through his own marketing setup. Milgrom assured Bhutani that the insurance was not a problem since Milex would pay for the insurance. However, according to Milgrom this was the first time Bhutani had stated that two million tablets were not enough. Milgrom told Bhutani that his proposal was unfair and asked him to reconsider. A second conversation took place on December 28, 1988, at a Chinese restaurant at the Old Orchard Shopping Center. The meeting was attended by Milgrom, Bhutani, Shaw and Disman. Milgrom explained that Milex was anxious to get the product on the market. The insurance was not an issue any more and would be handled separately. He reminded Bhutani that two million tablets was the amount mentioned in all of the previous discussions and that Bhutani had never told them two million was not adequate. Milgrom attempted to get Bhutani to name a price per piece. Bhutani stated that he would send a letter outlining his position.

The January 12, 1989, letter from Bhutani contained the following pertinent paragraphs:

"5. AS PER CONTRACT TO MANUFACTURE ARRANGEMENT, SEVERAL OPTIONS ARE AVAILABLE.

6. (a) MILEX PURCHASE AND/OR MODIFY THE MANUFACTURING EQUIPMENT AND INSTALL AT ALRA. APPROXIMATELY COST $55,000. ALRA WILL DEDUCT 10% FROM EACH INVOICE TOWARD THIS EXPENSE UNTIL ALL $55,000 IS PAID UP.

(b) COST OF MANUFACTURING WILL BE PRICED AS $45/HR.-PRODUCTION; $60/HR-QUALITY CONTROL *182 AND $100/HR-FDA RELATED WORK. THE COST OF SUPPLIES **1230 ***856 WILL BE CHARGED AT COST PLUS 20% FOR OVERHEAD TO COVER HANDLING/ACCOUNTING ETC.

(c) ANOTHER WAY OF PRICING COULD BE $20 PER 1000 TABLETS WHICH COMES TO .60 PER PACK OF 30 TABLETS, PLUS COST OF SUPPLIES AT COST PLUS 20% FOR OVERHEAD TO COVER HANDLING/ ACCOUNTING ETC.

7. ALRA WILL EXPECT A MINIMUM OF $100,000/YR FROM MILEX FOR THIS PRODUCT WHICH COMES TO APPROX. 10 WORK ORDERS PER YEAR. IF MILEX DOES NOT GENERATE THIS MINIMUM BUSINESS. THEY WILL STILL BE BILLED FOR $25,000 PER 3

MONTHS OR $16,667 PER TWO MONTHS PAYABLE IN ADVANCE.

8. THIS MINIMUM REQUIREMENT LISTED IN ITEM 7 AND EQUIPMENT EXPENSES LISTED IN ITEM 6a MAY BE WAIVED IF MILEX WILL ALLOW ALRA TO SELL TO GENERIC DISTRIBUTORS, MILOPHENE UNDER ALRA'S LABEL. ARRANGEMENTS COULD BE MADE SUCH THAT ALRA WILL NOT COMPETE DIRECTLY WITH MILEX. UNDER THIS ARRANGEMENT ALRA WILL NOT PRIVATE LABEL FOR ANYONE ELSE.

9. IF MILEX ALLOWS ALRA TO EXCLUSIVELY DISTRIBUTE MILOPHENE UNDER ALRA'S LABEL AND UNDER OTHER PRIVATE LABELS.

THEN THE MINIMUM REQUIREMENTS LISTED IN ITEM 7 AND EQUIPMENT EXPENSES LISTED IN 6a MAY BE WAIVED. IN ADDITION MILEX WILL RECEIVE UP TO 50% OF ALRA'S GROSS PROFITS FOR THIS PRODUCT. PAYABLE EVERY QUARTER."

On cross-examination, Milgrom testified that the two million tablet figure came as a result of marketing research. Milex was aiming at $3 per tablet. Milgrom had problems with Bhutani's proposal which called for 10 work orders per year or a minimum of $100,000 because at two cents per tablet (Item 6c), five million tablets would have to be sold, not the two million the parties had discussed. Milex never suggested a specific price. According to Milgrom, Milex is not presently marketing milophene or any other clomiphene citrate product.

Robert Shaw testified that he is vice-president and owner of 50% of Milex. He confirmed Milgrom's testimony as to the events leading up to the signing of the research proposal from Alra. He was also *183 present at the meeting with Bhutani at the Chinese restaurant late in December 1988. Approximately two weeks later (January 12, 1989), he received a fax from Bhutani. After speaking to Milgrom, Shaw called Bhutani and informed him that the proposal was unacceptable especially in light of the fact that it contained stipulations which he had already been told very specifically at the December meeting were unacceptable. Shaw demanded that Bhutani give Milex a price per tablet with no "hookers." On or about March 2, 1989, he received another fax from Bhutani; however, it reflected no changes in his position. Shaw again called Bhutani and told him that unless he was willing to give Milex a piece price with no strings attached, Milex would look for another manufacturer. More letters were exchanged, but late in March or early in April 1989 Milex began to seek another manufacturer.

Shaw testified further that late in April Milex reached an agreement with Butler, another manufacturer, to manufacture milophene. However, Butler was purchased by another firm and ceased the work for Milex at the end of 1989. Milex proceeded with Medicopharma, another manufacturer in approximately May 1990. However, both Butler and Medicopharma had difficulty reproducing Alra's results. In order to obtain another ANDA, all of the chemistry work had to be resubmitted. In addition, all of the work originally done by Alra had to be redone by the new manufacturer because they were using different equipment and they might be using different procedures. Shaw denied that Medicopharma had received any information from Alra's master drug file.

 **1231   ***857   On cross-examination, Shaw testified he did not understand Bhutani's proposal to be a piece price because the offer specified other things that had already been rejected by Milex. On the other hand, had Bhutani proposed 10 cents per tablet (what the cost per tablet would have been if Milex had agreed to the entire proposal, which included insurance), Milex might have paid it. One of the major oppositions Milex had to the proposal was Alra's selling the tablets to other people. Shaw understood item nine to present a different option only in that it relieved Milex of certain of the other requirements.

Shaw further testified that in January 1990 he contacted several companies as potential suppliers. One supplier, Korsch, quoted one cent per tablet, and Medicopharma quoted less than one cent per tablet.

Eileen Mele, a vice-president of Marsh McLennan, an insurance brokerage house, testified that in mid-October 1989 she was contacted by Milex to procure products liability insurance for milophene. Mr.  *184  Shaw asked her to name Alra as a named insured on the policy. She was able to obtain a company to place the insurance with and a price quote and so informed Mr. Shaw. Both Milgrom and Shaw asked her to contact Alra, but none of her calls were returned. When she did reach Bhutani, she told him that she had learned from Milex that he was having difficulty securing liability insurance and that she could assist him. However, when she informed Bhutani that she would not know the cost until the application was completed and reviewed, he told her he did not need her.

On cross-examination, Mele testified that she had been unable to obtain any co-insurance and would need to sell Alra a new policy. On redirect examination, she testified that Shaw and Milgrom had told her that Milex would pay Alra's premium.

Over the objection of the defendant, Fredric Price, a consultant to pharmaceutical businesses, testified that he was retained by Milex to assess the damages incurred as a result of not having a clomiphene product on the market. He began by gathering market research on the two clomiphene products presently on the market to determine such things as the prices at which the products were sold, the number of prescriptions in the marketplace, and the average size of a prescription in order to determine the basic economic structure of the clomiphene citrate market. One of the sources he used was an audit put out by IMS, the largest data collection and information business in the pharmaceutical industry. An audit takes a representative sample, and assuming that the sample is done correctly, and that the sample size reflects the same geographic and demographic values as the population at large, the sample size is then projected to a national average. Another source, Price Alert, published by First Data Corporation, provided him with pricing data. Price Alert is considered to be an authoritative source of information in the pharmaceutical industry. The prices in Price Alert are a mixture of manufacturers' and wholesale prices. Price Alert also provides a direct price for 10% to 20% of the products it lists. The direct price is the price at which on an average, including all of the volume discounts that a pharmaceutical company gives to any customer, is its average price to all classes of trade.

Price further testified that in trying to determine Milex's losses he examined what happened in the marketplace when a product loses patent status and competitors come in to the market with generic copies. He looked at a variety of products under many different kinds of scenarios over a wide period of time. According to Price, one pattern in pricing was that the innovator company almost always raised the price of its product prior to the expiration of its patent.

 *185  Using the information from a spread sheet he produced, Price testified that his figures for the two other clomiphene citrate products without Milex in the market for 1986 through one-half of 1990 were based upon audits while his figures for the second half of 1990 and 1991 through 1993 reflected a forecast. Price also determined an average wholesale price and total prescriptions. Using the same methodology and allowing three months following  **1232   ***858   approval of the ANDA to accomplish the administrative things necessary to launch a new product, Price assumed Milex's product would be introduced on April 1, 1989. Thus, his figures for Milex would include three-quarters of 1989 plus 1990 through 1993. He then calculated

the same information for the original two products singly and combined after Milex was in the market. That gave him the impact of Milex on the marketplace. He further took into consideration price discounts that were offered and what he forecast for the other years for all three products. Price further assumed in his calculations that there would be no market growth although some data suggested there would have been. Price calculated Milex's lost sales by taking the number of prescriptions it would have sold times the average wholesale price of a unit of sale, adjusted for the fact that a unit of sale was not in fact three times the size of the prescription. That amount is then reduced by 50% as the pretax margin, which is the cost of sales plus marketing expenses subtracted from sales. Price also added $100,000 in additional expenses (for each year except 1993) which would have been incurred as a result of not having the lost sales, such as the cost of hiring someone like Price. He calculated the loss per year and arrived a cumulative figure for a total loss of $7,481,000 from 1989 through 1993. Based upon the different scenarios he put together, in Price's opinion, Milex lost between $7.5 and $11.5 million. His calculations did take into consideration expenses Milex had already paid out to Alra.

On cross-examination, Price testified that his projections would change if a fourth company entered the marketplace for the years 1991, 1992 and 1993. Price arrived at Milex's 10% of the market share as a result of looking at market share gains made by 20 to 30 other drugs with similar characteristics. He did not have statistical information on the success of Milex's versus its competitors' marketing plans.

Bertrand J. Laprade, director of regulatory affairs at Alra and a pharmacist, testified that he reviewed one of the scenarios put together by Mr. Price and concluded that Price's assessment of damages was overstated. While he verified that Price's average wholesale *186 price was correct, he determined that in fact a pharmacist actually pays 14% less than the average wholesale price or actual acquisition cost. In addition, the distributor generally gets between 17% and 20% for its services. Using Price's figures and the two discounts, Laprade concluded that in 1991 Milex would have sold $808,331 worth of tablets.

On cross-examination, Laprade agreed that Milex's product would have generated sales. He admitted that if Price's wholesale price and prescription figures were accurate, the validity of his (Laprade's) calculations would be called in question. Laprade did not use Price Alert or IMS data. On redirect examination, Laprade testified that he did use the

Annual Pharmacists Reference Book which is a price book and is considered authoritative by pharmacists.

Baldev Raj Bhutani, president of Alra, testified that in the fall of 1984 he was contacted by Sol Disman regarding a clomiphene citrate project. In November or December 1984, Bhutani met with Milgrom and Disman in his office at Alra. According to Bhutani, Milgrom and Disman spent most of the meeting convincing him that Milex was a reliable company and wanting to involve him in the project. After a tour of the plant, Bhutani told Milgrom that he would consider getting involved. In January 1985, a proposal from Alra was sent to Disman. Another meeting at Alra took place late in February or in March 1985 attended by Disman, Milgrom, Shaw and Bhutani. More changes to the proposal were made. Finally, a third proposal was submitted to Milex and signed by both parties.

Bhutani testified that in November 1988 Milgrom came to his office for a meeting. They discussed how Milex wanted to market the tablets but did not discuss pricing. A second meeting was held in December 1988 attended by Milgrom, Shaw, Bhutani, Disman and Arnold Winfield, also of S & D Associates. Several matters were discussed at the meeting. According to Bhutani, two million tablets was brought up as **1233 ***859 a starting point. Bhutani expressed his concern over the insurance issue, which he had brought up several times between 1985 and 1988. Several alternatives on the insurance question were proposed by Milex.

Bhutani further testified that he faxed a proposal to Milex. His proposal contained several options because he did not know what was or was not acceptable on the basis of the December meeting. He also believed that Milex had not as yet come up with a marketing plan. Item 6c of the proposal contained a unit price. It was his understanding that he had given Milex all of the available options. The $55,000 equipment option was for an additional granulation and blending area *187 to keep the clomiphene citrate away from other products being manufactured because of its harmful effects. After two weeks, when he had had no response from Milex, he called Milgrom, who was not available. The call was returned by Shaw, who told him that they did not like the proposal, that it was "highway robbery," and finally hung up on Bhutani. After that telephone call, a series of letters were exchanged between the parties which culminated in Milex requesting the return of certain materials Milex had purchased from Alra and threatening legal action unless they were returned. Alra, on the other hand, questioned Milex's knowledge of the research

aspects of prescription pharmaceuticals and reminded Milex of the confidentiality agreement the parties had signed.

Bhutani further testified that the agreement Milex entered into with Butler called for a higher price for the product than he had quoted. According to Bhutani, he only charged half his normal research fee and was hoping to recoup Alra's cost over the five-year period in the proposal.

Following closing arguments, the trial court found that the parties had entered into a valid contract on or about April 2, 1985; that Alra had an obligation to negotiate a price for the clomiphene citrate product fairly and in good faith; that Alra failed to act in good faith and failed to negotiate a price for manufacturing the product and deliberately rather than inadvertently added unreasonable terms and conditions so as to preclude a reasonable negotiation; and that Milex had acted in good faith in its negotiations with Alra. The trial court also found that Milex had been damaged substantially by Alra's failure to negotiate in good faith and that Price was a very credible witness whose opinion was not based upon guess or conjecture but upon fact. The trial court noted that in assessing damages it had adopted the lowest figure contained in the various ranges presented. Judgement was entered for Milex as stated above. This appeal followed.

 **1**   Alra contends, first, that the trial court erred in finding that the parties entered into a valid contract on April 2, 1985, since, because the contract did not provide a price, it was void and unenforceable. A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract. *Academy Chicago Publishers v. Cheever* (1991), 144 Ill.2d 24, 30, 161 Ill.Dec. 335, 578 N.E.2d 981.

 **2**   Regarding price, the April 2, 1985, contract provided as follows:

"Alra will have the exclusive right to manufacture this product for Milex Products Inc. (*at a negotiated price* ) for two years *\*188*  from the initial marketing of this product by Milex." (Emphasis added.)

*Section 2-305 of the Uniform Commercial Code* (Ill.Rev.Stat.1985, ch. 26, par. 2-305) provides in pertinent part as follows:

"(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

 *\*\*1234  \*\*\*860*  (2) A price is to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(3) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

(4) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is not contract."

Alra argues that since price was never discussed until the ANDA was approved, the evidence established that the parties did not intend to be bound until the price was established. We disagree.

According to the testimony, the question of price had come up at the very beginning of the negotiations which led up to the contract of April 2, 1985. Both Milgrom and Shaw testified that the subject of price was discussed at the two meetings prior to the signing of the April 2, 1985, contract and that the parties agreed that it would be too difficult to set a price at that time. In particular, Shaw testified that Bhutani himself brought up the fact that it would be difficult for him to set a price at that time, to which, given the inflationary period, they had all agreed. Moreover, the contract prepared by Alra refers to a "negotiated price." Thus, we are of the opinion that there was sufficient evidence from which the trial court could conclude that the parties did intend to conclude the contract even in the absence of a settled price.

The cases relied on by Alra are distinguishable: *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.* (7th Cir.1989), 873 F.2d 155 (letter of intent provided that it was subject to concluding an agreement of sale acceptable to the board of directors,  *\*189*  who then refused to approve the sale); *Feldman v. Allegheny International, Inc.* (7th Cir.1988), 850 F.2d 1217 (the letter of intent, sought to be enforce, stated on its face that it was not binding); *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc.* (N.D.Ill.1986), 635 F.Supp.

603 N.E.2d 1226, 177 Ill.Dec. 852

1281 (court determined that there was a complete failure of understanding between the buyer and seller as to the price); and *Academy Chicago Publishers v. Cheever* (1991), 144 Ill.2d 24, 161 Ill.Dec. 335, 578 N.E.2d 981 (the agreement between the parties could not be enforced due to several critical omissions).

We conclude, therefore, that the trial court did not err in determining that there was a valid contract between the parties.

**3**    Alra contends, next, that the trial court's finding that Alra failed to negotiate a price in good faith was against the manifest weight of the evidence.

**4    5**    The obligation to negotiate in good faith has been generally described as preventing one party from renouncing the deal, abandoning the negotiations or insisting on conditions that do not conform to the preliminary agreement. (*A/S Apothekernes Laboratorium*, 873 F.2d at 158.) For instance, a party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside of the scope of the parties' preliminary agreement, especially where such insistence is a thinly disguised pretext for scotching the deal because of an unfavorable change in market conditions. (873 F.2d at 158.) The full extent of a party's duty to negotiate in good faith can only be determined, however, from the terms of the letter of intent itself. 873 F.2d at 158.

**6**    Instead of a letter of intent, we are dealing with the contract between the parties. The contract made no mention of insurance, and there was testimony from both Milgrom and Shaw that the subject of insurance was never raised until the meeting in December 1988. Milgrom testified that Bhutani assured him that Alra's facilities were adequate to manufacture the proposed product. Milgrom also testified that no amount other than two million was ever discussed as far as the number of tablets to be manufactured by Alra yearly. There was no suggestion either written or oral that Alra market the product on its own or in conjunction with Milex unless Milex ceased to do so. We agree that the duty to **\*\*1235  \*\*\*861** bargain in good faith does not prohibit a party from bargaining to its own economic advantage. (*Phoenix Mutual Life Insurance Co. v. Shady Grove Plaza Limited Partnership* (D.Md.1990), 734 F.Supp. 1181, 1190.) However, it is not an unreasonable inference that with Milex "locked in" to Alra as the manufacturer, Bhutani tried to take advantage of the situation to force Milex to accept **\*190**

terms that had not been contemplated in the original contract and were not economically feasible for Milex.

We conclude that the trial court did not err in determining that Alra failed to negotiate in good faith.

Alra contends, next, that the trial court erred in assessing Milex's damages. Alra offers several arguments on this point.

**7**    First, Alra argues that damages should not have been awarded since the contract provide that Alra would not be responsible for consequential damages. The contract specifically provided as follows:

"Alra will complete this project within 6 months after this proposal is accepted and supplies are made available for the work to begin. Alra assumes no liability for any formula changes by Merrell Dow during this period or for any delay in completion of this project due to causes beyond its control, such as acts of God or interruption of services or supplies, and will not be responsible for any consequential damages."

A contract must be interpreted not merely by reference to particular words or isolated phrases but by considering the contract as a whole. (*Shelton v. Andres* (1985), 106 Ill.2d 153, 87 Ill.Dec. 954, 478 N.E.2d 311.) Alra's sole conclusion (unsupported by authority) is that a reasonable inference from the language is that the above-quoted provision applies to the entire contract just as the confidentiality requirement applied at any time during the course of the contract. However, unlike the reference to damages, the confidentiality portion of the agreement was contained in a separate paragraph only dealing with confidentiality whereas the language as to damages was included in the paragraph dealing with the length of the research proposal. We are of the opinion that a more reasonable conclusion would be that the language pertaining to damages was limited to the subject of the paragraph in which it was included.

**8    9**    Secondly, Alra argues that the damages for lost profits were not within the contemplation of the parties. Lost profits will be allowed only if: their loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of the defendant caused the loss of profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into. (*Spangler v. Holthusen* (1978), 61 Ill.App.3d 74, 81, 18 Ill.Dec. 840, 378 N.E.2d 304.) When the profits which are sought are those arising out of the breached contract, those profits are considered one of the elements of the contract and are presumed to have been within the contemplation of the defaulting party at the time

he entered into the contract; they are recoverable if proved with reasonable certainty. ( *191 *Spangler,* 61 Ill.App.3d at 81, 18 Ill.Dec. 840, 378 N.E.2d 304.) " 'However, when the profits sought are those which would have arisen only out of a collateral transaction, not only must these profits be proved with reasonable certainty, but also it must be shown that they were reasonably within the contemplation of the defaulting party when the contract was made.' " 61 Ill.App.3d at 81, 18 Ill.Dec. 840, 378 N.E.2d 304, quoting *Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill.App.3d 536, 538-39, 346 N.E.2d 494.

In *Spangler,* Holthusen, a land developer, entered into an installment contract with Spanglers for the purchase of a farm for $140,000. Holthusen then entered into an agreement with a third party to sell his interest in the farm for $293,250. When the initial transaction failed to be consummated, Holthusen sued the Spanglers seeking the lost profit from the second transaction. This court held that it was not sufficient that the Spanglers knew that Holthusen was in the land development business and that without knowledge of the collateral **1236 ***862 transaction Spanglers could not be held responsible for the lost profit from that transaction.

**10**    The situation in the case at bar does not involve a "collateral" transaction. The contract entered into by the parties in this case clearly contemplated the manufacture and marketing of the clomiphene citrate product. The April 2, 1985, contract which would allow Alra to market the product if Milex chose not to do so and Bhutani's proposal of January 12, 1989, which contemplated Alra's marketing the product in conjunction with Milex certainly indicated that Alra was aware of the profit to be made in the manufacture and marketing of the product. We conclude that Alra has not rebutted the presumption that profits were within the contemplation of the parties.

Alra again argues that there was no valid contract and that Alra was not guilty of bad faith. We have previously addressed both arguments and will not repeat them here.

**11**    Third, Alra argues that damages here were not the result of the interruption of an existing business and were based upon the speculation and conjecture of Milex's expert witness, Price.

The long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative. (*Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.* (1986), 143

Ill.App.3d 168, 174, 96 Ill.Dec. 633, 491 N.E.2d 912.) The reasoning behind the rule is the lack of certainty in showing lost profits for a new business that has yet to show what its profits actually are. In *Drs. Sellke & Conlon,* the plaintiff's orthodontic office was a new business, and his offer of proof consisted solely of profits realized after *192 defendant's tortious interference had ceased. This court found that the proffered evidence was insufficient to establish plaintiff's lost profits with a reasonable degree of certainty.

In the case at bar, the trial court specifically found that Milex's expert, Price, was very credible and that his opinion about Milex's lost profits was based upon fact, not speculation. Price's testimony concerning lost profits was based upon actual products in the marketplace as well as authoritative sources for the data he used. Alra's own expert, Laprade, admitted that Milex would have had lost profits.

In *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill.2d 143, 281 N.E.2d 323, our supreme court upheld a trial court award of damages to a theatre which had lost substantial business as a result of noxious odors emitted by a nearby manufacturing plant. While discussing a case the lower court had relied on to reverse the award on the basis that the damages were speculative, the court stated:

"We do not interpret [*Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 115 N.E. 389,] to hold that evidence of prior profits is the *sine qua non* of proof of damages suffered by a business enterprise. The significant holding found in the opinion is stated on page 289, as follows: 'It is perhaps true that absolute certainty as to the amount of loss or damage in such cases is unattainable, but that is not required to justify a recovery. All the law requires is that it be approximated by competent proof. That proof of the exact amount of loss is impossible will not justify refusing compensation. If that were the law, contracts of the kind here involved could be violated with impunity. All the law requires in cases of this character is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages.' " (*Schatz,* 51 Ill.2d at 147-48, 281 N.E.2d 323.)

In somewhat similar situations to the case at bar, courts have found that the rule that a new business' profits are too speculative did not fit the circumstances before them. *E.g.* *Malatesta v. Leichter* (1989), 186 Ill.App.3d 602, 134 Ill.Dec. 422, 542 N.E.2d 768 (plaintiff prevented from acquiring car dealership; profits of the person who operated the dealership during the time in question held not to be too speculative to prove **1237 ***863 damages); *Fishman v. Estate of*

*Wirtz* (7th Cir.1986), 807 F.2d 520 (plaintiffs who had never owned a sports franchise awarded lost profits based upon the profits made by the team owners); *Rhodes v. Sigler* (1976), 44 Ill.App.3d 375, 2 Ill.Dec. 626, 357 N.E.2d 846 (court found evidence of profits of a person other than the plaintiff in the same period of time plaintiff was seeking damages provided required degree of certainty).

**\*193** Finally, we do not believe that the case of *Drs. Sellke & Conlon, Ltd.* stands for the inviolate rule that a new business can never prove lost profits. That case determined that where lost profits are based solely upon speculation, such proof is inadequate to establish lost profits within a reasonable degree of certainty. However, in the case before us, while the product is a new one, the evidence showed it to have an established market. Given that fact, together with Price's testimony, we conclude that the proof of lost profits was neither speculative nor the product of conjecture but was based upon a reasonable degree of certainty.

**12** Fourth, Alra argues that Milex failed to mitigate damages. However, there is ample proof in the record that immediately after negotiations with Alra were halted Milex sought out other manufacturers. The fact that the product is not yet on the market is due to the necessity of redoing Alra's work as required by the FDA. We are of the opinion that damages for lost profits were properly awarded in this case.

**13** Finally, Alra contends that the trial court erred in excluding certain testimony as to conversations between Sol

Disman and Bhutani. Disman was deceased at the time of trial.

Generally an offer of proof is necessary in order to preserve for review a question of whether the trial court improperly excluded certain evidence. (*Goad v. Evans* (1989), 191 Ill.App.3d 283, 298, 138 Ill.Dec. 523, 547 N.E.2d 690.) In one instance, the attorney for Alra indicated that the testimony of the conversations between Bhutani and Disman was only for the purpose of establishing the fact of the conversations, and the trial court permitted the testimony. In the other instances, Alra made no offer of proof. Unlike the situation in *Goad,* the record does not reflect that the attitude of the trial court prevented Alra from making the appropriate offers of proof. (*Goad,* 191 Ill.App.3d at 299, 138 Ill.Dec. 523, 547 N.E.2d 690.) Alra's argument is waived. See *Healy v. Bearco Management, Inc.* (1991), 216 Ill.App.3d 945, 957, 160 Ill.Dec. 241, 576 N.E.2d 1195.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

UNVERZAGT and GEIGER, JJ., concur.

Parallel Citations

237 Ill.App.3d 177, 603 N.E.2d 1226

---

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
Proceeding commenced at TORONTO

---

**AUTHORITIES CITED IN LINDSEY**
**EXPERT AFFIDAVIT**
**(Allocation Approval)**
**(returnable June 7, 2011)**

---

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Alan Mark LSUC#: 18772U**
Tel: (416) 216-4865
Email: alan.mark@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930
Lawyers for the Applicants