**<u>EXHIBIT A</u>**

**Allocation Factum of the Monitor**

Court File No. 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

## FACTUM OF THE MONITOR

June 5, 2011

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay Carfagnini** LSUC#: 222936
**Fred Myers**  LSUC#: 26301A
**Joseph Pasquariello** LSUC# 37389C

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

2

TO:        **THE SERVICE LIST**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
**TABLE OF CONTENTS**

Page No.

**PART I - OVERVIEW** ........................................................................... 1

**PART II - SUMMARY OF FACTS** ..................................................... 3

**PART III - STATEMENT OF ISSUES, LAW & AUTHORITIES** ...................................... 15

**(A)    THE COURT HAS JURISDICTION TO APPROVE THE ALLOCATION PROTOCOL** ...................................... 15

    (i)    Jurisdiction over Subject Matter .................................................... 16
    (ii)   Jurisdiction over Persons ........................................................... 20
    (iii)  Authority................................................................................ 21

**(B)    THE COURT'S JURISDICTION HAS NOT BEEN OUSTED BY ANY AGREEMENT TO ARBITRATE** ........................... 23

**PART IV - ORDER REQUESTED** ..................................................... 24

Court File No. 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

## FACTUM OF THE MONITOR

**PART I - OVERVIEW**

1.   The Canadian Debtors, being Nortel Networks Corporation ("NNC" and, collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation ("NNGC"), and the U.S. Debtors, being Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates including Nortel Networks (CALA) Inc., have brought motions for the approval of a proposed protocol for the allocation of the proceeds of the sale of their assets and those of Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively the "EMEA Debtors") as well as various other Nortel entities.

2.   Ernst & Young Inc. in its capacity as Monitor respectfully recommends that this Honourable Court approve the Allocation Protocol.

3.   With the exception of the IP transaction, the auction for which will commence later this month, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets. The proceeds of these divestitures – some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related assets transaction – now sit in escrow awaiting the resolution of allocation.

4.   This issue, together with the resolution of the EMEA Claims[1] and the U.K. Pension Claims, lies at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and the U.K. Proceedings. Simply put, they are matters that must be resolved before any creditor of an Applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

5.   It is evident that the parties are unable to resolve these issues on a consensual basis and it therefore falls within the ambit of this Honourable Court to resolve the issues in the insolvency proceeding before it.

6.   To this end, this Honourable Court has already approved of the Canadian Debtors' request to establish a claims process for EMEA Claims. This process complemented the general claims process established by this Honourable Court in September 2009, and, in conjunction with the Canadian Debtors, the Monitor and certain of their stakeholders continued efforts towards establishing a compensation claims process, has provided the

---

[1]   Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Sixty-Seventh Report of the Monitor dated June 2, 2011 ("Monitor's 67th Report").

Canadian Debtors and the Monitor with a sense of the totality of claims against the Canadian Debtors and processes for resolving them.

7.    The time has come to establish a procedure for the resolution of the other key variable: the portion of the global sale proceeds that will be available to the Canadian Debtors to satisfy the claims of their creditors.

8.    As a result of the EMEA Debtors and their creditors comingling allocation theories with their claims against the Canadian Debtors, it is clear that resolving the allocation of proceeds must be and should be coordinated with the procedure for resolving the EMEA Claims and the U.K. Pension Claims. In particular, such claims must be resolved in conjunction with the allocation dispute so as to protect the integrity of the CCAA claims process from being ousted, and to protect from the abuses of multiple proceedings in multiple fora, including the risk of inconsistent verdicts, doubling (or tripling) up of claims, and the additional cost and delay inherent in multiple proceedings.

9.    The Monitor believes the Allocation Protocol proposed by the Canadian Debtors, the U.S. Debtors and the Committee, and supported by the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors (the "CCC"), achieves the foregoing objectives.

**PART II - SUMMARY OF FACTS**

**Allocation and the IFSA**

10.    Over the past two years, the Canadian Debtors, along with the U.S. Debtors, the EMEA Debtors and certain other Nortel entities, have divested themselves of Nortel's various

global operating businesses, which were operated on a worldwide basis across various Nortel legal entities.  The Canadian Debtors held (or hold) legal title to the intellectual property underpinning Nortel's global businesses, and this intellectual property was and is licensed to Nortel's affiliates, in some cases on an exclusive basis and in other cases on a non-exclusive basis.

> Monitor's 67th Report, para. 14

11.     At the time of the first significant divestiture to be discussed amongst the three main estates, the sale of Nortel's Enterprise business, in the late spring and early summer of 2009, it became evident to the representatives of the various estates and certain of their stakeholders that it would be difficult to agree on the allocation of sale proceeds amongst the selling parties before entering into a sale transaction.  As a result, the Canadian Debtors, the U.S. debtors, and the EMEA Debtors agreed that the proceeds of any global sale would be deposited in escrow pending agreement as to their allocation.

> Monitor's 67th Report, para. 15

12.     This agreement was documented in the Interim Funding and Settlement Agreement among the Canadian Debtors, certain of the U.S. Debtors and the EMEA Debtors dated June 29, 2009 (the "IFSA").  The IFSA was approved by this Court and the U.S. Court, and the English Court gave a direction that the Joint Administrators were at liberty to enter into the agreement.

> Monitor's 67th Report, para.16
>
> IFSA, Monitor's 67th Report, Appendix "A"
>
> Declaration of Kevin Francis Lloyd executed May 19, 2011, para.  39

13.    In addition to the parties' agreement that the net proceeds of any global sale were to be deposited into an escrow account, that the execution of sale documentation by a party would not be conditioned upon reaching agreement on, or establishing a binding procedure for, the allocation of sale proceeds, and that the U.S. Debtors and the EMEA Debtors would agree to relinquish their license rights under the Master R&D Agreement in furtherance of a sale , the IFSA provides that:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

> Monitor's 67th Report, para. 17

> IFSA, s. 12.b., Monitor's 67th Report, Appendix "A"

14.    With respect to the "Protocol" mentioned above, the parties agreed as follows:

> ...the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, ***negotiate in good faith and attempt to reach agreement on a timely basis*** on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.  [Emphasis added.]

> IFSA, s. 12.c., Monitor's 67th Report, Appendix "A"

15.    Over the course of the past two years, the Canadian Debtors, the U.S. Debtors and EMEA Debtors have entered into and consummated seven significant global transactions with an aggregate value of approximately $3 billion under the framework established by the IFSA, and have entered into a stalking horse agreement to sell Nortel's patent portfolio and related assets to an affiliate of Google Inc. for $900 million. In connection with each

of those transactions, and as will be the case with the patent portfolio transaction, the relevant selling parties, the Monitor, the Committee and JPMorgan Chase Bank, N.A., as distribution agent, have entered into a distribution escrow agreement  that governs the escrow and distribution of the relevant sale proceeds.

> Monitor's 67th Report, para. 19
>
> Distribution Escrow Agreement related to the CDMA/LTE Access transaction dated November 11, 2009 ("CDMA/LTE Distribution Escrow Agreement"), Monitor's 67th Report, Appendix "C"

16.    The distribution escrow agreements reflect the terms of the IFSA in that sale proceeds may only be distributed as follows:

> 5.    <u>Distribution of Escrow Funds</u>. The Depositors, the Estate Fiduciaries and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:
>
> (a)    The Escrow Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of sales proceeds (a "Decision") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.
>
> CDMA/LTE Distribution Escrow Agreement, s. 5, Monitor's 67th Report, Appendix "C"

17.     Further, each of the distribution escrow agreements contains a jurisdiction clause

substantially similar to the following:

> ...EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF [...] THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPERIOR COURT OF JUSTICE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPERIOR COURT OF JUSTICE ON JUNE 29, 2009[...], WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER  OR OUT OF IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT.

> CDMA/LTE Distribution Escrow Agreement, s. 21, Monitor's 67th Report, Appendix "C"

18.     The IFSA contains the following consent to jurisdiction clause:

> To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors...

> IFSA, s. 16.b., Monitor's 67th Report, Appendix "A"

19.    Contemporaneously with the presentation of the IFSA for Court approval, an amended Cross-Border Protocol was presented for approval by the Canadian Debtors and the U.S. Debtors (and approved by both Courts) which provided that:

> "…to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either [the U.S. or Canadian] Court relating to…any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor...",

then certain parties could, among other things, request a joint hearing.

> Monitor's 67th Report, para. 23
>
> Cross-Border Protocol, s. 15, Monitor's 67th Report, Appendix "F"

## Protocol Negotiations

20.    Subsequent to the execution of the IFSA, the Canadian Debtors, the Monitor, the U.S. Debtors, the EMEA Debtors and certain of their respective stakeholders commenced negotiations on a Protocol. These negotiations took place, off and on, over the course of a year, from the summer of 2009 to the early summer of 2010. During those twelve months, the parties, including the Monitor, exchanged multiple drafts, held numerous conference calls and met in person three times in an attempt to resolve Protocol-related issues.

> Monitor's 67th Report, para. 24

9

21.     At the time negotiations commenced pursuant to s. 12.c. of IFSA, there was no agreement on such basic issues as:

(a)     The scope of the dispute or the question to be resolved through the protocol mechanism;

(b)     Whether the mechanism for dispute resolution would be in the form of an arbitration;

(c)     Who the dispute resolver(s) would be or how they would be selected or replaced; and

(d)     The number of separate interests that could be represented and participate in the dispute resolution process.

> Affidavit of Michael Joseph Lang sworn June 1, 2011 ("Lang Affidavit"), para. 7

22.     Throughout the negotiations, a number of fundamental substantive issues remained unresolved, including:

(a)     Who the participating parties should be;

(b)     Whether legal determinations on intellectual property ownership issues should be decided by the dispute resolver or the courts;

(c)     The scope and application of the Protocol, the parameters of the dispute, and the nature of the dispute to be submitted for determination; and

(d)    The selection of the dispute resolver, whether the dispute resolver should give reasons for its decision, and whether the decision would be an arbitral award.

Lang Affidavit, para. 9

23.    At no point in time were the parties close to reaching consensus on the final terms of a Protocol. The drafts of the Protocol that were circulated during negotiations generally reflected one or another of the parties' views and were proposed for the purpose of advancing and facilitating discussion but did not represent consensus on all issues. It has always been the position of the Canadian Debtors and the Monitor that their agreement to any single provision of the Protocol was conditional upon agreement regarding all aspects of the Protocol including agreement as to the scope of the dispute to be submitted for resolution.

Lang Affidavit, paras. 10-11

24.    The disagreement as regards the scope of a Protocol is based largely on the EMEA Debtors' contention that they should be able to assert claims of alleged wrongful conduct on the part of the Canadian Debtors in the allocation context. The EMEA Debtors have advanced the position that these claims would, among other things, give rise to proprietary claims to, or "beneficial ownership" of, the Canadian Debtors' share of the escrowed proceeds of sale. The claims are premised on substantially the same allegations that underlie the majority of the EMEA Claims; this despite the clear understanding earlier expressed by the Joint Administrators that the Protocol would not cover inter-company claims.

Monitor's 67th Report, para. 26

Lang Affidavit, para. 13, Exhibit "H", e-mail from K. Lloyd stating: "Indeed I
do not believe the Protocol was ever intended to extend to [inter-estate claims],
which will be dealt with in the ordinary way by the various claim processes."

25.    The Monitor is of the view that agreeing to permit the EMEA Debtors to advance these

claims as part of the allocation process would be tantamount to permitting the exclusive

jurisdiction of this Honourable Court to resolve claims against the Canadian Debtors to

be usurped insofar as such claims, in essence, assert the same causes of action as are

contained in the EMEA Claims. Moreover, agreeing to allow the EMEA Debtors to raise

claims in the context of the allocation dispute would also unfairly give the EMEA

Debtors "two kicks at the can" in that they would have the ability to, in effect, prove their

claims twice: first, in the allocation process and then in the EMEA Claims process

established by this Court. The views of the Monitor in this regard are consistent with the

finding of this Honourable Court that the allocation of sale proceeds is distinct from the

resolution of the claims filed by the EMEA Debtors against the Canadian Debtors.

Monitor's 67th Report, para. 27

Endorsement of the Honourable Mr. Justice Morawetz dated February 17, 2011,
para. 19, Monitor's 67th Report, Appendix "H"

26.    As a result of the fundamental difference of opinion regarding the proper scope of a

Protocol and other ancillary issues, it is clear to the Monitor (and has been clear for some

time) that the parties are at an impasse and that no agreement will ever be reached on a

Protocol despite the good faith efforts of the Canadian Debtors and other parties to do so.

Monitor's 67th Report, para. 28

27.    The parties, nearly a year ago, agreed to focus on a consensual resolution of the global issues among them (i.e. both allocation and claims) and subsequently submitted to extensive non-binding mediation sessions over the course of eight days in November 2010 and April 2011 before retired U.S. Judge Layne Phillips.  Notwithstanding the significant good faith efforts of all parties, these mediation sessions ended in failure.  As a result of the parties' inability to reach a consensual global resolution and the impasse outlined above as regards a negotiated Protocol, the time has now come to implement a definitive procedure for the resolution of the allocation dispute.

Monitor's 67th Report, paras. 29-30

## The Proposed Allocation Protocol

28.    The Allocation Protocol proposed by the Canadian Debtors, the U.S. Debtors and Committee, and supported by the CCC, contemplates that the resolution of the allocation dispute will be conducted in parallel with, and in a manner complementary to, the resolution of the two other most significant issues in these CCAA proceedings: the EMEA Claims and the U.K. Pension Claims.

Monitor's 67th Report, paras. 30-31

29.    The fundamental terms of the Allocation Protocol  are as follows:

(a)    This Honourable Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the sale proceeds of the global sales amongst the various Nortel parties;

(b)     Creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("Intercompany Claims"), are not governed by the Allocation Protocol. All Intercompany Claims, with the exception of Intercompany Claims between the U.S. Debtors and the Canadian Debtors , shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made;

(c)     Each of the relevant Nortel selling entities (including the Canadian Debtors, the U.S. Debtors and the EMEA Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the CCC would be established as "core parties" in the Allocation Protocol hearings, with full rights of participation in such hearings and any related discovery. Any other party in interest could seek to establish itself as a core party;

(d)     Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators against (A) the U.S. Debtors (the "EMEA U.S. Claims") and (B) the Canadian Debtors.  The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA U.S. Claims.  The Canadian Debtors may file motions with this Honourable Court to dismiss the EMEA Claims; and

(e)     This Honourable Court and the U.S. Court will (a) hold simultaneously (i) the Allocation Protocol hearings, (ii) hearings before the U.S. Court on the merits of any remaining EMEA US Claims, and (iii) hearings before this Honourable Court on the merits of any remaining EMEA Claims against the Canadian Debtors, provided, however, that the U.S. Court and this Honourable Court, in their

discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims or EMEA Claims against the Canadian Debtors; and (b) issue their respective decisions on (i), (ii) and (iii).

Monitor's 67th Report, para. 32

30.     The Monitor understands the U.K. Pension Trustee and the PPF to be the majority creditors of NNUK and, potentially, certain of the other EMEA Debtors.  Although not expressly contemplated by the Allocation Protocol, the Monitor is of the view that the claims advanced by the U.K. Pension Trustee and the PPF against the Canadian Debtors must be resolved in a manner similar to the EMEA Claims.  These claims are significant and cover much of the same factual territory as the EMEA Claims.  As with the EMEA Claims, a failure to resolve these claims in conjunction with the allocation dispute, or a failure to consider them without regard to the allocation dispute and/or the EMEA Claims, would expose the Canadian Debtors to the possibility of the same alleged wrongdoings being asserted, and extracting value from the Canadian Debtors' estates, in three separate ways. In addition, the concerns outlined above with respect to the EMEA Claims regarding efficiency, preservation of scarce resources and risk of inconsistent decisions apply equally to the U.K. Pension Claims

Monitor's 67th Report, para. 38

**PART III - LAW AND ARGUMENT**

**(A)   THE COURT HAS JURISDICTION TO APPROVE THE ALLOCATION PROTOCOL**

31.    A court has jurisdiction if its authority extends to the person and the subject matter in question and it has authority to make the order sought.  As a Superior Court of general jurisdiction, this Honourable Court's authority extends to all persons within its territory or who have attorned or consented to its jurisdiction and to all subject matter but that which has been specifically excluded from its jurisdiction, and it has, in addition to any powers which may be given to it by statute, a broad remedial authority to make any order necessary to do justice between the parties before it.

>    *Canada (Attorney General) v. TeleZone Inc.*, 2010 SCC 62 at paras. 43-44

>    *80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd.* (1972), 25 D.L.R. (3d) 386 at 388 (C.A.)

32.    The exercise of the Superior Court's jurisdiction in proceedings involving a foreign element is governed by the principles of order and fairness, which enable the court to assume jurisdiction where there is a real and substantial connection between the jurisdiction and the parties or the subject matter of the action.  Where the parties have by contract selected the court to resolve disputes pertaining to the subject matter of their contract, the forum selection clause will be set aside only where there is "strong cause" to do so.

>    *Beals v. Saldhana,* 2003 SCC 72 at paras. 21-24, 28

>    *Z.I. Pompey Industrie v. ECU-Line N.V.*, 2003 SCC 27 at paras. 1, 19-20

33.   The fact that a foreign court may also assume or even has exercised jurisdiction does not deprive the Canadian court of its jurisdiction over matters that meet the test of real and substantial connection.

> *Teck Cominco Metals Ltd. v. Lloyd's Underwriters,* 2009 SCC 11 at paras. 22-26, 29-30

34.   In accordance with the principle of comity, Canadian courts, in exercising their jurisdiction, will give due regard to the laws and judicial decisions of other nations.  In insolvency proceedings in particular, there is often extensive co-operation with the courts of other countries, including the adoption of mechanisms to co-ordinate the proceedings of the domestic and foreign court.  But in none of these circumstances does the Canadian court lose its jurisdiction.

> *Menegon v. Philip Services Corp.*, 1999 CarswellOnt 3240 (S.C.J.—Commercial List) at para. 48

35.   This Honourable Court's authority extends to the subject matter and the persons at issue here and this Court has the authority to make the order sought approving the Allocation Protocol.  Doing so accords with the principles of order and fairness which govern the exercise of jurisdiction over matters with an extra-territorial dimension, is consistent with the requirements of comity, and advances the objectives of the CCAA.

### (i)    Jurisdiction over Subject Matter

36.   This Court has jurisdiction under the CCAA over the Canadian Debtors and the distribution to their creditors of the proceeds of the sale of their assets in accordance with a plan of arrangement.  This necessarily involves the determination of what the Canadian Debtors' assets were and the allocation to each of the Canadian Debtors, the U.S.

Debtors, the EMEA Debtors and the various other Nortel seller entities of their share of the proceeds of the sale of Nortel's businesses.  These businesses operated as a global concern within a network of agreements licensing intellectual property owned by NNL. There is accordingly a real and substantial connection between the jurisdiction and the subject matter of the motion.

> CCAA, ss. 1 (definition of "court"), 6 and 11

37.    In accordance with the principles of comity and with the authority given by s. 18.6 of the CCAA, this Court has, along with the U.S. Court, approved a cross-border protocol proposed by the Canadian Debtors and the U.S. Debtors which specifically contemplates the holding of joint hearings to address the allocation of proceeds.

> CCAA, s. 18.6
>
> Fifth Amended and Restated Initial Order, Sch. A

38.    By entering into the IFSA and the distribution escrow agreements, the EMEA Debtors have consented to the jurisdiction of the U.S. Court and this Honourable Court, acting under the Cross-Border Protocol, over the subject matter of this motion, namely the allocation of the proceeds of sale of the Debtors' assets and the process by which it will be determined.

> IFSA, s. 16.b.
>
> Distribution escrow agreements, choice of jurisdiction provision

39.    The IFSA, which is an agreement amongst the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors, provided for the depositing in escrow of the proceeds of the sale of the Debtors' assets pending distribution, and required the parties to negotiate in good

faith to "attempt to reach agreement" on a protocol for resolving disputes concerning the allocation of the proceeds.  In the IFSA, the EMEA Debtors specifically agreed to submit to the non-exclusive jurisdiction of the U.S. and Canadian Courts, and agreed that any proceeding seeking "any relief whatsoever to the extent relating to the matters agreed in this Agreement *must* be commenced in ... a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors".  In other words, any proceedings involving all three groups of debtors were to be determined by this Court and the U.S. court under the Cross-Border Protocol.  Only proceedings which would "solely affect the EMEA Debtors" were to be brought in the English courts, corresponding provisions having been made for matters solely affecting the other Debtors to be brought in their respective courts.

      IFSA, paras. 12 b., 12c., and 16.b.

40.    As a condition of the IFSA, the Cross-Border Protocol was amended to provide for the joint hearing by this Court and the U.S. Court of any motion filed in either court to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor.

      Fifth Amended and Restated Initial Order, Sch. A, para. 15

      IFSA, s. 13.a.

41.   The distribution escrow agreements under which the proceeds of the various sales are held stipulate that each party irrevocably, generally and unconditionally submits itself and its properties to the exclusive jurisdiction of both the U.S. Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice, including the Cross-Border Protocol, in respect of any proceedings brought prior to the closing of the insolvency cases and agrees to be bound by any judgment rendered by those Courts "arising under or out of in respect of or in connection with this Agreement.".

     Distribution escrow agreements, jurisdiction provision

42.   It is common for parties to cross-border contracts to select a jurisdiction in which disputes amongst them with respect to the matters covered by their contract will be resolved.  The courts readily accept such selection and will displace the parties' choice only where there is "strong cause" to do so.  In this case, there is no cause, let alone strong cause, to disregard the parties' choice of joint jurisdiction of the Ontario and U.S. courts.

     *Z.I. Pompey Industrie v. ECU-Line N.V.*, 2003 SCC 27 at paras. 1, 19-20

43.   The parties, by providing in s. 12 of the IFSA that they would "attempt" to reach agreement on a Protocol and in the distribution escrow agreements that the disbursement of escrow funds would occur either by joint letter of direction or, "*where* the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA ... delivery ... of a duly authenticated copy of the binding decision", must have contemplated that circumstances might arise in which a Protocol was not reached by agreement of the parties.  Furthermore, the concurrent amendment of the Cross Border Protocol, one of the

conditions for the implementation of IFSA, to provide for motions regarding allocation to be brought by way of joint hearing, indicates that the parties anticipated that court intervention could be required with respect to allocation of proceeds.

### (ii)    Jurisdiction over Persons

44.    This Honourable Court is both empowered and required to determine the amount of all claims against the Canadian Debtors in these proceedings:   The Court assumed its exclusive jurisdiction over the determination of creditors' claims by issuing the EMEA Claims Procedure Order dated January 14, 2011 (the "EMEA Claims Procedure Order") and the EMEA Debtors have filed proofs of claim in accordance with that Order.

CCAA, s. 12

45.    By seeking to prove a debt in the CCAA proceedings, the EMEA Debtors have submitted to this Court's full jurisdiction to determine all questions necessary to effect the distribution of the proceeds of the Canadian Debtors' assets.  This includes identifying and valuing those assets.

*Roberts v. Picture Butte Municipal Hospital,* 1998 CarswellAlta 646 (Q.B.) at para. 24

*In re Morton*, 733 L.R. 20 Eq. at 737-738

46.    The EMEA Debtors have asserted proprietary claims against the proceeds which they contend are not amenable to this Court's jurisdiction under the EMEA Claims Procedure Order.  However, the proceeds simply stand in lieu of the assets, and the EMEA Debtors must establish under Canadian law their entitlement to any assets which were in the possession of the Canadian Debtors but which they claim rightfully belonged to them.

47.     In any event, as described above, each of the EMEA Debtors whose assets were sold has attorned, "for itself *and its properties*" (emphasis added) to the exclusive jurisdiction of this Honourable Court and the U.S. Court with respect to all matters connected with the distribution escrow agreements, and the EMEA Debtors as parties to the IFSA consented to the jurisdiction of the U.S. Court and this Honourable Court over legal proceedings relating to the matters agreed in the IFSA.

> Escrow Agreements, jurisdiction provisions
>
> IFSA, s. 16.b.

### (iii)    *Authority*

48.     The allocation of the proceeds of the sale of the assets of the Canadian Debtors, the US Debtors, the EMEA Debtors and the various other Nortel seller entities falls within the broad supervisory jurisdiction of this Court over the Canadian Debtors under s. 11 of the CCAA and its jurisdiction to approve a plan of arrangement under s. 6 of the CCAA by which those proceeds will be distributed to the Canadian Debtors' creditors.    The supervisory powers of the CCAA court extend beyond the mere maintenance of the *status quo* and may be exercised where necessary to achieve the objectives of the statute.

> *Re Stelco,* 2005 CarswellOnt 1188 at paras. 33, 36 (C.A.)
>
> *Re Calpine Canada Energy Ltd,* 2007 CarswellAlta 1050 at para. 58 (Q.B.)

49.     This Honourable Court's supervisory powers under s. 11, and its power under s. 18.6 to implement arrangements that will result in a co-ordination of the CCAA proceedings with any foreign proceeding, give the Court the authority both to determine the mechanism by which the allocation will be decided, and to conduct the allocation in accordance with the

Cross-Border Protocol and the Allocation Protocol proposed by the Canadian and US Debtors.

> CCAA, s. 18.6(3)

50.     At this point, more than two years after the commencement of these proceedings, it is essential that the Court exercise its authority so that the central issue of allocation of proceeds can be resolved and a plan approved for the compromise of creditors' claims in accordance with the objectives of the CCAA.

51.     The parties have been unable to agree on the allocation of the sale proceeds and, despite their good faith efforts, have clearly reached an impasse in their attempt to negotiate a Protocol for the allocation of the proceeds.  This issue must be resolved if the CCAA objective of providing a mechanism for the efficient restructuring or liquidation of insolvent companies is to be met, and a key responsibility of the Court supervising a CCAA proceeding is to resolve precisely such issues.  As Professor Sarra has stated:

> ... the primary function of the courts is to supervise the proceedings and to make rulings that keep the process moving when parties hit a particular impasse or there is a lack of clarity about their rights and responsibilities in the particular circumstances.
>
> > J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (Toronto: Thomson Carswell, 2007) at 60

52.     Significant factual elements are relevant to both the allocation dispute and the claims of the EMEA Debtors.  The CCAA gives this Honourable Court exclusive jurisdiction to resolve those claims and the efficiency objectives of the CCAA mandate the hearing by this Court, together with the U.S. Court, of the overlapping issues in the allocation dispute.

53.     By establishing, in conjunction with the U.S. Court,  procedures including documentary and oral discovery for the expeditious resolution of the allocation dispute, and ensuring that no party gets "two kicks at the can", with potentially inconsistent results, this Honourable Court will advance the principles of reasonableness and fairness underlying its CCAA jurisdiction.

> *Olympia & York Developments Ltd. v. Royal Trust Co,* 1993 CarswellOnt 182
> (Gen. Div.) at para. 28.

**(B)    THE COURT'S JURISDICTION HAS NOT BEEN OUSTED BY ANY AGREEMENT TO ARBITRATE**

54.     Under Ontario law, an arbitration agreement, to be enforceable, must meet the same requirements as any other contract: there must be offer, acceptance, and consensus *ad idem*.  Consideration may be given by the mutual agreements to submit to arbitration.

> J. K. McEwan and L.B. Herbst, *Commercial Arbitration in Canada* (Aurora,
> Ontario: Canada Law Book, 2009) at p. 2-4, para. 2:30.10

55.     Where a purported arbitration clause is not drafted with sufficient clarity and precision, it will fail for uncertainty.  The Court will not write a contract that the parties have themselves failed to create.

> *Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A. s.r.,* [1998] O.J. No. 1697
> at  para. 8 (Gen. Div.)
>
> *Benner and Associates Ltd. v. Northern Lights Distribution Inc.,* [1995] O.J. No.
> 626 at para. 18 (Gen. Div.)
>
> *ter Neuzen v. Korn*, [1995] 3 S.C.R. 674 at para. 81

56.     The IFSA, in which the alleged arbitration agreement is found, is governed by New York law and as a result this Court is called upon to apply that law.  The Monitor relies on the

expert evidence of David M. Lindsey, Esq., submitted by the Canadian Debtors and U.S. Debtors. The law of New York, as set out by Mr. Lindsey, appears consistent with the Ontario law.

## PART IV - ORDER REQUESTED

57.    The Monitor recommends that this Honourable Court approve the Allocation Protocol and grant the Allocation Protocol Order in the form submitted by the Applicants.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED** this 5th day of June, 2011.

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay Carfagnini** LSUC#: 222936
**Fred Myers**  LSUC#: 26301A
**Joseph Pasquariello** LSUC# 37389C

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION *et al.*

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding Commenced At Toronto

**FACTUM**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay Carfagnini** LSUC#: 222936
**Fred Myers**  LSUC#: 26301A
**Joseph Pasquariello** LSUC# 37389C

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5974404.3