**<u>EXHIBIT B</u>**

**Allocation Book of Authorities of the Monitor**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**BOOK OF AUTHORITIES**
**OF THE MONITOR**

June 6, 2011

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay Carfagnini** LSUC # 222936
**Fred Myers**  LSUC#: 26301A
**Joseph Pasquariello** LSUC # 37389C

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

# Index

INDEX

1.  *Canada (Attorney General) v. TeleZone Inc.*, 2010 SCC 62

2.  *80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd.* (1972), 25 D.L.R. (3d) 386 (C.A.)

3.  *Beals v. Saldhana,* 2003 SCC 72

4.  *Z.I. Pompey Industrie v. ECU-Line N.V.*, 2003 SCC 27

5.  *Teck Cominco Metals Ltd. v. Lloyd's Underwriters,* 2009 SCC 11

6.  *Menegon v. Philip Services Corp.*, 1999 CarswellOnt 3240 (S.C.J.—Commercial List)

7.  *Roberts v. Picture Butte Municipal Hospital,* 1998 CarswellAlta 646 (Q.B.)

8.  *In re Morton,* 733 L.R. 20 Eq.

9.  *Re Stelco,* 2005 CarswellOnt 1188 (C.A.)

10. *Re Calpine Canada Energy Ltd,* 2007 CarswellAlta 1050 (Q.B.)

11. J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (Toronto: Thomson Carswell, 2007), page 60

12. *Olympia & York Developments Ltd. v. Royal Trust Co,* 1993 CarswellOnt 182 (Gen. Div.)

13. J. K. McEwan and L.B. Herbst, *Commercial Arbitration in Canada* (Aurora, Ontario: Canada Law Book, 2009), para. 2:30.10

14. *Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A. s.r.,* [1998] O.J. No. 1697 (Gen. Div.)

15. *Benner and Associates Ltd. v. Northern Lights Distribution Inc.,* [1995] O.J. No. 626 (Gen. Div.)

16. *ter Neuzen v. Korn,* [1995] 3 S.C.R. 674





2010 SCC 62 (CanLII)

## SUPREME COURT OF CANADA

**CITATION:** Canada (Attorney General) *v.* TeleZone Inc., 2010 SCC 62

**DATE:** 20101223
**DOCKET:** 33041

**BETWEEN:**

**Attorney General of Canada**
Appellant
and
**TeleZone Inc.**
Respondent

**CORAM:** Binnie, LeBel, Deschamps, Abella, Charron, Rothstein and Cromwell JJ.

**REASONS FOR JUDGMENT:**
(paras. 1 to 81)

Binnie J. (LeBel, Deschamps, Abella, Charron, Rothstein and Cromwell JJ. concurring)

**NOTE:** This document is subject to editorial revision before its reproduction in final form in the *Canada Supreme Court Reports*.

CANADA (ATTORNEY GENERAL) *v.* TELEZONE INC.

**Attorney General of Canada**                                                    *Appellant*

v.

**TeleZone Inc.**                                                                  *Respondent*

**Indexed as:  Canada (Attorney General) *v.* TeleZone Inc.**

**2010 SCC 62**

File No.:  33041.

2010:  January 20, 21; 2010:  December 23.

Present:  Binnie, LeBel, Deschamps, Abella, Charron, Rothstein and Cromwell JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

> *Courts — Jurisdiction — Provincial superior courts — Action brought against federal Crown in Ontario Superior Court of Justice seeking damages for breach of contract, negligence and unjust enrichment arising from decision rejecting*

2010 SCC 62 (CanLII)

*application for telecommunications licence — Whether plaintiff entitled to proceed by way of action in Ontario Superior Court of Justice without first proceeding by way of judicial review in Federal Court — Federal Courts Act, R.S.C. 1985, c. F-7, ss. 17, 18; Crown Liability and Proceedings Act, R.S.C. 1985, c. C-50, s. 21.*

In 1995, Industry Canada issued a call for personal communication services licence applications, and released the policy statement within which potential service providers could shape their applications. The statement provided that Industry Canada would grant up to six licences on the basis of criteria it set out. T submitted an application, but when Industry Canada announced its decision, there were only four successful applicants and T was not among them. T filed an action against the Federal Crown in the Ontario Superior Court of Justice for breach of contract, negligence and unjust enrichment, and sought compensation for claimed losses of $250 million. It claimed that it was an express or implied term of the policy statement that Industry Canada would only issue fewer than six licences if fewer than six applications met the criteria. Since its application satisfied all the criteria, it says, Industry Canada must have considered other undisclosed factors when it rejected T's application. The Attorney General of Canada, relying on *Canada v. Grenier*, 2005 FCA 348, [2006] 2 F.C.R. 287, challenged the jurisdiction of the Superior Court on the ground that the claim constituted a collateral attack on the decision, which is barred by the grant to the Federal Court, by s. 18 of the *Federal Courts Act*, of exclusive judicial review jurisdiction in relation to decisions of all federal boards, commissions or other tribunals. The Superior Court dismissed the objection on the

2010 SCC 62 (CanLII)

ground that it was not plain and obvious that the claim would fail.  The Court of

Appeal upheld the decision, holding that *Grenier* was wrongly decided. In that court's

view s. 17 of the *Federal Courts Act* and s. 21 of the *Crown Liability and*

*Proceedings Act* conferred concurrent jurisdiction on the superior courts and the

Federal Court for claims against the Crown, and s. 18 of the *Federal Courts Act* did

not remove relief by way of an award of damages from the jurisdiction of superior

courts.

             *Held*:  The appeal should be dismissed.


             This appeal is fundamentally about access to justice. People who claim to

be injured by government action should have whatever redress the legal system

permits through procedures that minimize unnecessary costs and complexity.  The

Court's approach should be practical and pragmatic with that objective in mind.

Acceptance of *Grenier* would tend to undermine the effectiveness of the *Federal*

*Courts Act* reforms of the early 1990s by retaining in the Federal Court exclusive

jurisdiction over a key element of many causes of action proceeding in the provincial

courts despite Parliament's promise to give plaintiffs a choice of forum and to make

provincial superior courts available to litigants "in *all* cases in which relief is claimed

against the [federal] Crown" except as otherwise provided.


             Apart from constitutional limitations, none of which are relevant here,

Parliament may by statute transfer jurisdiction from the superior courts to other

2010 SCC 62 (CanLII)

adjudicative bodies including the Federal Court.  However, any derogation from the jurisdiction of the provincial superior courts (in favour of the Federal Court or otherwise) requires clear and explicit statutory language.  Nothing in the *Federal Courts Act* satisfies this test.  The explicit grant to the provincial superior courts of concurrent jurisdiction in claims against the Crown in s. 17 of that Act (as well as s. 21 of the *Crown Liability and Proceedings Act*) directly refutes the Attorney General's argument.  The grant of exclusive jurisdiction to judicially review federal decision makers in s. 18 is best understood as a reservation or subtraction from the more comprehensive grant of concurrent jurisdiction in s. 17 "in all cases in which relief is claimed against the [federal] Crown".  This reservation or subtraction is expressed in s. 18 of the *Federal Courts Act* in terms of particular remedies.  All the remedies listed are traditional administrative law remedies and do not include awards of damages.  If a claimant seeks compensation, he or she cannot get it on judicial review, but must file an action.

The *Federal Courts Act* contains other internal evidence that Parliament could not have intended judicial review to have the gatekeeper function envisaged by *Grenier*.  Section 18.1(2) imposes a 30-day limitation for judicial review applications.  A 30-day cut off for a damages claimant would be unrealistic, as the facts necessary to ground a civil cause of action may not emerge until after 30 days have passed, and the claimant may not be in a position to apply for judicial review within the limitation period.  While the 30-day limit can be extended, the extension is discretionary and would subordinate the fate of a civil suit brought in a superior court to the discretion

2010 SCC 62 (CanLII)

of a Federal Court judge ruling upon a request for an extension of time for reasons that have to do with public law concerns, not civil damages.  Moreover, the grant of judicial review is itself discretionary and may be denied even if the applicant establishes valid grounds for the court's intervention.  This does not align well with the paradigm of a common law action for damages where, if the elements of the claim are established, compensation ought generally to follow as a matter of course.  Further, s. 8 of the *Crown Liability and Proceedings Act*, which codifies the defence of statutory authority, is evidence that Parliament envisaged that the lawfulness of administrative decisions could be assessed by the provincial superior court in the course of adjudicating a claim for damages.

The *Grenier* approach cannot be justified by the rule against collateral attacks.  T's claim is not an attempt to invalidate or render inoperative the Minister's decision; rather, the decision and the financial losses allegedly consequent to it constitute the very foundation of the damages claim.  In any event, given the statutory grant of concurrent jurisdiction in s. 17 of the *Federal Courts Act*, Parliament has stated that provincial superior courts possess the concurrent necessary jurisdiction to dispose of the whole of a claim and this includes any attack on the validity of the Minister's decision where this issue is essential to the cause of action and where adjudicating the matter is a necessary step in disposing of the claim.  While the doctrine of collateral attack may be raised by the Crown in the provincial superior court as a defence, the possible availability of the defence is not an argument against provincial superior court jurisdiction.  Similarly, while it may be open to the Crown,

2010 SCC 62 (CanLII)

by way of defence, to argue that the government decision maker was acting under statutory authority which precludes compensation for consequent losses, this is not a matter of jurisdiction and can be dealt with as well by the provincial superior court as by the Federal Court.

It is true that the provincial superior courts and the Federal Court have a residual discretion to stay a damages claim if, in its essential character, it is a claim for judicial review with only a thin pretence to a private wrong.  However, where a plaintiff's pleading alleges the elements of a private cause of action, the provincial superior court should not in general decline jurisdiction on the basis that the claim looks like a case that could be pursued on judicial review.  If the plaintiff has pleaded a valid cause of action for damages, he or she should generally be allowed to pursue it.

Here, T's claim as pleaded is dominated by private law considerations. It is not attempting to nullify or set aside the decision to issue licences.  Nor does it seek to deprive the decision of any legal effect.  T's causes of action in contract, tort and equity are predicated on the finality of that decision excluding it from participation in the telecommunications market.   The Ontario Superior Court of Justice has jurisdiction over the parties and the subject matter, and has the power to grant the remedy of damages.  There is nothing in the *Federal Courts Act* to prevent the Ontario Superior Court from adjudicating T's claim.

2010 SCC 62 (CanLII)

**Cases Cited**

      **Overruled:**  *Canada v. Grenier*, 2005 FCA 348, [2006] 2 F.C.R. 287;
**referred to:**  *Canada (Attorney General) v. McArthur*, 2010 SCC 63; *Little Sisters Book and Art Emporium v. Canada (Commissioner of Customs and Revenue)*, 2007 SCC 2, [2007] 1 S.C.R. 38; *The Queen in right of Canada v. Saskatchewan Wheat Pool*, [1983] 1 S.C.R. 205; *Agricultural Research Institute of Ontario v. Campbell-High* (2002), 58 O.R. (3d) 321, leave to appeal refused, [2003] 1 S.C.R. vii; *Ryan v. Victoria (City)*, [1999] 1 S.C.R. 201; *Miazga v. Kvello Estate*, 2009 SCC 51, [2009] 3 S.C.R. 339; *Cooper v. Hobart*, 2001 SCC 79, [2001] 3 S.C.R. 537; *Edwards v. Law Society of Upper Canada*, 2001 SCC 80, [2001] 3 S.C.R. 562; *Holland v. Saskatchewan*, 2008 SCC 42, [2008] 2 S.C.R. 551; *R. v. Consolidated Maybrun Mines Ltd.*, [1998] 1 S.C.R. 706; *Hinton v. Canada (Minister of Citizenship and Immigration)*, 2008 FCA 215, [2009] 1 F.C.R. 476; *Parrish & Heimbecker Ltd. v. Canada (Minister of Agriculture and Agri-Food)*, 2008 FCA 362, [2009] 3 F.C.R. 568; *Donovan v. Canada (Attorney General)*, 2008 NLCA 8, 273 Nfld. & P.E.I.R. 116; *Lidstone v. Canada (Minister of Canadian Heritage)*, 2008 PESCTD 6, 286 Nfld. & P.E.I.R. 244; *River Valley Poultry Farm Ltd. v. Canada (Attorney General)*, 2009 ONCA 326, 95 O.R. (3d) 1; *Los Angeles Salad Co. v. Canadian Food Inspection Agency*, 2009 BCSC 109, 92 B.C.L.R. (4th) 379; *Leroux v. Canada Revenue Agency*, 2010 BCSC 865, 2010 D.T.C. 5123; *Fantasy Construction Ltd., Re*, 2007 ABCA 335, 89 Alta. L.R. (4th) 93; *Genge v. Canada (Attorney General)*, 2007 NLCA 60, 270 Nfld. & P.E.I.R. 182; *Gestion Complexe Cousineau (1989) Inc. v.*

2010 SCC 62 (CanLII)

*Canada (Minister of Public Works and Government Services)*, [1995] 2 F.C. 694;

*Irving Shipbuilding Inc. v. Canada (Attorney General)*, 2009 FCA 116, 314 D.L.R.

(4th) 340, leave to appeal refused, [2009] 3 S.C.R. vii; *Martel Building Ltd. v.*

*Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860; *R. v. Al Klippert Ltd.*, [1998] 1 S.C.R.

737; *Ordon Estate v. Grail*, [1998] 3 S.C.R. 437; *Pringle v. Fraser*, [1972] S.C.R.

821; *Canada (Human Rights Commission) v. Canadian Liberty Net*, [1998] 1 S.C.R.

626; *Peacock v. Bell* (1667), 1 Wms. Saund. 73, 85 E.R. 84; *Mills v. The Queen*,

[1986] 1 S.C.R. 863; *R. v. Morgentaler* (1984), 41 C.R. (3d) 262; *R. v. Rahey*, [1987]

1 S.C.R. 588; *R. v. 974649 Ontario Inc.*, 2001 SCC 81, [2001] 3 S.C.R. 575; *R. v.*

*Conway*, 2010 SCC 22, [2010] 1 S.C.R. 765; *Attorney General of Canada v. Law*

*Society of British Columbia*, [1982] 2 S.C.R. 307; *Canada Labour Relations Board v.*

*Paul L'Anglais Inc.*, [1983] 1 S.C.R. 147; *Canada (Citizenship and Immigration) v.*

*Khosa*, 2009 SCC 12, [2009] 1 S.C.R. 339; *Harelkin v. University of Regina*, [1979] 2

S.C.R. 561; *Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326;

*Wilson v. The Queen*, [1983] 2 S.C.R. 594; *Garland v. Consumers' Gas Co.*, 2004

SCC 25, [2004] 1 S.C.R. 629; *R. v. Litchfield*, [1993] 4 S.C.R. 333; *Toronto (City) v.*

*C. U.P.E., Local 79*, 2003 SCC 63, [2003] 3 S.C.R. 77; *Tock v. St. John's*

*Metropolitan Area Board*, [1989] 2 S.C.R. 1181; *City of Manchester v. Farnworth*,

[1930] A.C. 171; *Sutherland v. Canada (Attorney General)*, 2002 BCCA 416, [2002]

10 W.W.R. 1, leave to appeal refused, [2003] 1 S.C.R. xi (*sub nom. Jones v. Attorney*

*General of Canada*); *Lake v. St. John's City*, 2000 NFCA 48, 192 Nfld. & P.E.I.R.

84; *Neuman v. Parkland (County)*, 2004 ABPC 58, 30 Alta. L.R. (4th) 161; *Danco v.*

*Thunder Bay (City)* (2000), 13 M.P.L.R. (3d) 130; *Landry v. Moncton (City)*, 2008

NBCA 32, 329 N.B.R. (2d) 212; *Roy v. Kensington and Chelsea and Westminster Family Practitioner Committee*, [1992] 1 A.C. 624.

**Statutes and Regulations Cited**

*Civil Code of Québec*, R.S.Q., c. C-1991.

*Constitution Act, 1867*, ss. 96, 101.

*Corrections and Conditional Release Act*, S.C. 1992, c. 20.

*Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50, ss. 3, 8, 21.

*Federal Court Act*, S.C. 1970-71-72, c. 1.

*Federal Courts Act*, R.S.C. 1985, c. F-7, ss. 2(1) "federal board, commission or other tribunal", 17, 18, 18.1, 18.4, 39, 50(1).

*Radiocommunication Act*, R.S.C. 1985, c. R-2.

**Authors Cited.**

Brown, Donald J. M., and John M. Evans. *Judicial Review of Administrative Action in Canada.* Toronto: Canvasback, 1998 (loose-leaf updated July 2010).

Canada.    House of Commons.    *Minutes of Proceedings and Evidence of the Legislative Committee on Bill C-38*, No. 1, 2nd Sess., 34th Parl., November 23, 1989, pp. 14-15.

Canada.    *House of Commons Debates*, 2nd Sess., 28th Parl., March 25, 1970, pp. 5470-71.

Canada.    *House of Commons Debates*, 2nd Sess., 34th Parl., November 1, 1989, p. 5414.

Craig, Paul P. *Administrative Law*, 6th ed.  London:  Sweet & Maxwell, 2008.

2010 SCC 62 (CanLII)

Hogg, Peter W., and Patrick J. Monahan.  *Liability of the Crown*, 3rd ed. Scarborough, Ont.: Carswell, 2000.

Horsman, Karen, and Gareth Morley, eds. *Government Liability:  Law and Practice*. Aurora, Ont.: Cartwright Law Group, 2007 (loose-leaf updated 2010).

Mullan, David J.  "Administrative Law Update — 2008-2009", Continuing Legal Education Conference, *Administrative Law Conference 2009*.  Vancouver: Continuing Legal Education Society of British Columbia, 2009.

Woolf, Harry, Jeffrey Jowell and Andrew Le Sueur.  *De Smith's Judicial Review*, 6th ed. London:  Sweet & Maxwell, 2007.

2010 SCC 62 (CanLII)

APPEAL from a judgment of the Ontario Court of Appeal (Laskin, Borins and Feldman JJ.A.), 2008 ONCA 892, 94 O.R. (3d) 19, 303 D.L.R. (4th) 626, 245 O.A.C. 91, 86 Admin L.R. (4th) 163, 40 C.E.L.R. (3d) 183, [2008] O.J. No. 5291 (QL), 2008 CarswellOnt 7826, affirming a decision of Morawetz J. (2007), 88 O.R. (3d) 173, [2007] O.J. No. 4766 (QL), 2007 CarswellOnt 7847.  Appeal dismissed.

*Christopher M. Rupar, Alain Préfontaine* and *Bernard Letarte*, for the appellant.

*Peter F. C. Howard, Patrick J. Monahan, Eliot N. Kolers* and *Nicholas McHaffie*, for the respondent.

The judgment of the Court was delivered by

BINNIE J. —

[1]      TeleZone Inc. claims it was wronged by the decision of the Minister of Industry Canada that rejected its application for a licence to provide telecommunications services.  It seeks compensation in the Ontario Superior Court of Justice against the Federal Crown for its claimed losses of $250 million.  It pleads breach of contract, negligence, and, in the alternative, unjust enrichment arising out of monies it had thrown away on the application.

[2]      The Attorney General challenges the jurisdiction of the Superior Court to proceed with the claim for compensation unless and until TeleZone obtains from the Federal Court of Canada an order quashing the Minister's decision.  TeleZone's claim, he says, constitutes an impermissible collateral attack on the Minister's order. Such a collateral attack is barred, he argues, by the grant to the Federal Court of *exclusive* judicial review jurisdiction in relation to decisions of all federal boards, commissions or other tribunals — *Federal Courts Act*, R.S.C. 1985, c. F-7, s. 18.  The Attorney General relies on a line of cases in the Federal Court of Appeal to this effect, giving particular prominence to *Canada v. Grenier*, 2005 FCA 348, [2006] 2 F.C.R. 287, hence the "*Grenier* principle".

[3]      The definition of "federal board, commission or other tribunal" in the Act is sweeping.  It means "any body, person or persons having, exercising or purporting to exercise jurisdiction or powers conferred by or under an Act of Parliament or by or under an order made pursuant to a prerogative of the Crown" (s. 2), with certain exceptions, not relevant here, e.g., decisions of Tax Court judges.  The federal

2010 SCC 62 (CanLII)

decision makers that are included run the gamut from the Prime Minister and major boards and agencies to the local border guard and customs official and everybody in between. The *Grenier* principle would shield the Crown from private law damages involving any of these people or entities in respect of losses caused by unlawful government decision making without first passing through the Federal Court. Such a bottleneck was manifestly not the intention of Parliament when it enacted the judicial review provisions of the *Federal Courts Act*.

[4]        The *Grenier* principle would undermine s. 17 of the same Act granting concurrent jurisdiction to the provincial superior courts "in all cases in which relief is claimed against the Crown" as well as the grant of concurrent jurisdiction to the superior courts in s. 21 of the *Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50, to deal with tort claims. A central issue in some (but not all) damages claims against the federal Crown will be the "lawfulness" of the government decision said to have caused the loss. *Grenier* would deny the provincial superior courts the jurisdiction to deal with that central issue in a damages claim pending before them. Adoption of the *Grenier* principle would relegate the provincial superior courts in such matters to a subordinate and contingent jurisdiction — not concurrent, i.e., subordinate to the Federal Court's decision on judicial review and contingent on the Federal Court being willing to grant a discretionary order on judicial review in favour of the plaintiff.

2010 SCC 62 (CanLII)

[5]      The Ontario Court of Appeal rejected the Attorney General's position, and in my respectful opinion, it was correct to do so. *Grenier* is based on what, in my respectful view, is an exaggerated view of the legal effect of the grant of judicial review jurisdiction to the Federal Court in s. 18 of the *Federal Courts Act*, which is best understood as a reservation or subtraction from the more comprehensive grant of concurrent jurisdiction in s. 17 "in all cases in which relief is claimed against the [federal] Crown".  The arguments of the Attorney General, lacking any support in the express statutory language of s. 18, are necessarily based on suggested inferences and implications, but it is well established that inferences and implications are not enough to oust the jurisdiction of the provincial superior courts.

[6]      In the present case, the Ontario Superior Court has jurisdiction over the parties, the subject matter and the remedies sought by TeleZone.  That jurisdiction includes the authority to determine every legal and factual element necessary for the granting or withholding of the remedies sought unless such authority is taken away by statute.  The *Federal Courts Act* does not, by clear and direct statutory language, oust the jurisdiction of the provincial superior courts to deal with these common law and equitable claims, including the potential "unlawfulness" of government orders.  That being the case, the Superior Court has jurisdiction to proceed.  The Ontario Superior Court ((2007), 88 O.R. (3d) 173) and the Ontario Court of Appeal (2008 ONCA 892, 94 O.R. (3d) 19) so held.  I agree.  I would dismiss the appeal.

I.  Facts

2010 SCC 62 (CanLII)

[7]      The alleged faults of the Minister of Industry Canada in dealing with the application under the *Radiocommunication Act*, R.S.C. 1985, c. R-2, are detailed in the amended Statement of Claim.  For present purposes, we must take TeleZone's allegations as capable of proof.

[8]      TeleZone was created in 1992 with the ultimate goal of obtaining a licence to provide personal communication services ("PCS") — essentially a cell phone network.  In December 1992, as a preliminary step toward this goal, TeleZone obtained a licence to provide personal cordless telephone service ("PCTS").  Between 1993 and 1995, TeleZone alleges that it kept Industry Canada appraised of its efforts to raise capital and acquire the necessary expertise to provide PCS services. TeleZone says that Industry Canada encouraged it to continue these efforts.

[9]      In June 1995, Industry Canada issued a call for PCS licence applications ("the Call"), and released a document setting out the policy and procedural framework within which potential service providers could shape their applications (the "Policy Statement").  The Policy Statement provided that Industry Canada would grant up to six PCS licences on the basis of criteria it set out.  TeleZone alleges that Industry Canada promoted a general policy in favour of awarding more rather than fewer licences to encourage competition and consumer choice.  TeleZone governed itself accordingly.

[10]     Article 9.1 of the Call created a three-step application process: (1) expressions of interest by potential service providers; (2) detailed applications by

2010 SCC 62 (CanLII)

potential service providers; and (3) the announcement and awarding of PCS licences by Industry Canada. Articles 9.4 to 9.5.6 set out the criteria that would be used to evaluate the applications. The Call did not explicitly reserve to Industry Canada the right to consider additional factors. TeleZone alleges that Industry Canada was prohibited from considering any criteria beyond the factors set out in the Call.

[11]      In September 1995 TeleZone submitted its detailed application for a PCS licence to Industry Canada, which was prepared, it says, at a cost of approximately $20 million. In December 1995, Industry Canada announced its decision regarding the PCS licence applications. There were only four successful applicants. TeleZone was not among them.

[12]      The amended statement of claim pleads that it was either an express or implied term of the Policy Statement that Industry Canada would only issue fewer than six licences if fewer than six applications met the criteria (para. 12). TeleZone says that its application satisfied all the criteria in the Call. Accordingly, it says, the Minister must have considered factors other than those in the Call when it rejected TeleZone's application (para. 17). These other factors were not disclosed to TeleZone.

[13]      On the contractual branch of its case, TeleZone argues that the tendering process gave rise to a tendering contract (Contract A) which imposed an obligation on Industry Canada to act in accordance with the Call and the Policy Statement and to treat all applicants fairly and in good faith in awarding the PCS licences (R.F., at

2010 SCC 62 (CanLII)

para. 133). TeleZone submits that the Crown breached "Contract A" by (1) granting fewer licences than it represented would be awarded; (2) not adhering to the requirements of the Call including the listed criteria (para. 134); and (3) failing to conform to a duty of care and a duty to act in good faith (para. 135).

[14]      In its amended statement of claim, TeleZone does not seek to impugn the Minister's decision to award the licences.  TeleZone does not seek a licence for itself or to remove licences from the successful applicants; it simply seeks damages. Accordingly, TeleZone submits that whether or not the licences were validly issued to the other applicants is irrelevant because under the Call and Policy Statement, there was still room for two more PCS licences and TeleZone only takes issue with the conduct of the Crown *vis-à-vis* TeleZone itself (para.136).

II. <u>Judicial History</u>

A. *Ontario Superior Court of Justice (Morawetz J.), (2007), 88 O.R. (3d) 173*

[15]      On a preliminary motion to dismiss TeleZone's action for want of jurisdiction, the Attorney General argued that TeleZone must first have the Minister's order quashed on judicial review in the Federal Court as a condition precedent to a civil suit against the Crown.  TeleZone countered that its claim is based on causes of action that are distinct from an application for judicial review.  It does not seek to set aside the licences.  It seeks damages for negligence, breach of contract, or unjust

2010 SCC 62 (CanLII)

enrichment.  Morawetz J. dismissed the objection because, in his view, it was not

plain and obvious that TeleZone's claim in the Superior Court would fail.

B. *The Ontario Court of Appeal (Laskin, Borins and Feldman JJ.A.), 2008 ONCA 892, 94 O.R. (3d) 19*

[16]        Borins J.A., writing for a unanimous court, held that s. 17 of the *Federal*

*Courts Act* and s. 21 of the *Crown Liability and Proceedings Act* conferred concurrent

jurisdiction on the superior courts and the Federal Court for claims against the Crown.

The Ontario Superior Court, as a court of general and inherent jurisdiction, may

entertain any cause of action in the absence of legislation or an arbitration agreement

to the contrary.  Section 18 of the *Federal Courts Act* removed from the superior

courts' jurisdiction the prerogative writs and extraordinary remedies listed (para. 94).

Since the relief sought by TeleZone (damages) is not listed in s. 18, he concluded that

the Superior Court continues to have jurisdiction.  The appeal was dismissed.

III.  Relevant Enactments

[17]        *Constitution Act, 1867*

> **101.**  The Parliament of Canada may, notwithstanding anything in this Act, from Time to Time provide for the Constitution, Maintenance, and Organization of a General Court of Appeal for Canada, and for the Establishment of any additional Courts for the better Administration of the Laws of Canada.

*Federal Courts Act*, R.S.C. 1985, c. F-7

**2.** (1) . . .

"federal board, commission or other tribunal" means any body, person or persons having, exercising or purporting to exercise jurisdiction or powers conferred by or under an Act of Parliament or by or under an order made pursuant to a prerogative of the Crown, other than the Tax Court of Canada or any of its judges, any such body constituted or established by or under a law of a province or any such person or persons appointed under or in accordance with a law of a province or under section 96 of the *Constitution Act, 1867*;

**17.** [Relief Against the Crown] (1) Except as otherwise provided in this Act or any other Act of Parliament, the Federal Court has concurrent original jurisdiction in all cases in which relief is claimed against the Crown.

[Cases] (2) Without restricting the generality of subsection (1), the Federal Court has concurrent original jurisdiction, except as otherwise provided, in all cases in which

. . .

(*b*) the claim arises out of a contract entered into by or on behalf of the Crown;

. . .

(*d*) the claim is for damages under the *Crown Liability and Proceedings Act*.

[Relief in favour of Crown or against officer] (5) The Federal Court has concurrent original jurisdiction

. . .

(*b*) in proceedings in which relief is sought against any person for anything done or omitted to be done in the performance of the duties of that person as an officer, servant or agent of the Crown.

**18.** [Extraordinary remedies, federal tribunals] (1) Subject to section 28, the Federal Court has exclusive original jurisdiction

(*a*) to issue an injunction, writ of *certiorari*, writ of prohibition, writ of *mandamus* or writ of *quo warranto*, or grant declaratory relief, against any federal board, commission or other tribunal; and

(*b*) to hear and determine any application or other proceeding for relief in the nature of relief contemplated by paragraph (*a*), including any

2010 SCC 62 (CanLII)

proceeding brought against the Attorney General of Canada, to obtain relief against a federal board, commission or other tribunal.

. . .

[Remedies to be obtained on application] (3) The remedies provided for in subsections (1) and (2) may be obtained only on an application for judicial review made under section 18.1.

**18.1** [Application for judicial review] (1) An application for judicial review may be made by the Attorney General of Canada or by anyone directly affected by the matter in respect of which relief is sought.

[Time limitation] (2) An application for judicial review in respect of a decision or an order of a federal board, commission or other tribunal shall be made within 30 days after the time the decision or order was first communicated by the federal board, commission or other tribunal to the office of the Deputy Attorney General of Canada or to the party directly affected by it, or within any further time that a judge of the Federal Court may fix or allow before or after the end of those 30 days.

[Powers of Federal Court] (3) On an application for judicial review, the Federal Court may

(*a*) order a federal board, commission or other tribunal to do any act or thing it has unlawfully failed or refused to do or has unreasonably delayed in doing; or

(*b*) declare invalid or unlawful, or quash, set aside or set aside and refer back for determination in accordance with such directions as it considers to be appropriate, prohibit or restrain, a decision, order, act or proceeding of a federal board, commission or other tribunal.

**18.4** [Hearings in summary way] (1) Subject to subsection (2), an application or reference to the Federal Court under any of sections 18.1 to 18.3 shall be heard and determined without delay and in a summary way.

[Exception] (2) The Federal Court may, if it considers it appropriate, direct that an application for judicial review be treated and proceeded with as an action.

*Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50

**3.** [Liability] The Crown is liable for the damages for which, if it were a person, it would be liable

(*a*) in the Province of Quebec, in respect of

2010 SCC 62 (CanLII)

> (i) the damage caused by the fault of a servant of the Crown, or
>
> (ii) the damage resulting from the act of a thing in the custody of or owned by the Crown or by the fault of the Crown as custodian or owner; and
>
> (*b*) in any other province, in respect of
>
> > (i) a tort committed by a servant of the Crown, or
> >
> > (ii) a breach of duty attaching to the ownership, occupation, possession or control of property.

**8.** [Saving in respect of prerogative and statutory powers] Nothing in sections 3 to 7 makes the Crown liable in respect of anything done or omitted in the exercise of any power or authority that, if those sections had not been passed, would not have been exercisable by virtue of the prerogative of the Crown, or any power or authority conferred on the Crown by any statute, and, in particular, but without restricting the generality of the foregoing, nothing in those sections makes the Crown liable in respect of anything done or omitted in the exercise of any power or authority exercisable by the Crown, whether in time of peace or of war, for the purpose of the defence of Canada or of training, or maintaining the efficiency of, the Canadian Forces.

**21.** [Concurrent jurisdiction of provincial court] (1) In all cases where a claim is made against the Crown, except where the Federal Court has exclusive jurisdiction with respect to it, the superior court of the province in which the claim arises has concurrent jurisdiction with respect to the subject-matter of the claim.

## IV. Analysis

[18]     This appeal is fundamentally about access to justice. People who claim to be injured by government action should have whatever redress the legal system permits through procedures that minimize unnecessary cost and complexity. The Court's approach should be practical and pragmatic with that objective in mind.

2010 SCC 62 (CanLII)

[19]     If a claimant seeks to set aside the order of a federal decision maker, it will have to proceed by judicial review, as the *Grenier* court held.  However, if the claimant is content to let the order stand and instead seeks compensation for alleged losses (as here), there is no principled reason why it should be forced to detour to the Federal Court for the extra step of a judicial review application (itself sometimes a costly undertaking) when that is not the relief it seeks.  Access to justice requires that the claimant be permitted to pursue its chosen remedy directly and, to the greatest extent possible, without procedural detours.

[20]     The Attorney General argues that a detour to the Federal Court is necessary because the damages action represents a "collateral attack" prohibited by "inferences" derived from s. 18 of the *Federal Courts Act*.  His argument, in a nutshell, is:

> Simply pleading damages, or some other remedy that is not available by way of judicial review in the Federal Court, should not be accepted as a means to bypass the intention of Parliament that review of federal administrative decisions must take place in the Federal Court.

(Attorney General factum[1], at para. 4)

[21]     The Attorney General accepts that judicial review is not required "for all proceedings that in any manner involve a decision or conduct of a federal board, commission or tribunal" (para. 29).  However, the detour is required for claims that

---

[1] The Attorney General's principal argument was filed in the companion case of *Canada (Attorney General) v. McArthur*, 2010 SCC 63, and references herein are to that factum unless otherwise noted.

2010 SCC 62 (CanLII)

engage, directly or indirectly, the "validity and unlawfulness" of such decisions (para.

2). "Lawfulness" is a broad term. The Attorney General uses "invalid" and

"unlawful" conjunctively (e.g., at para. 49). He seems to use the term "unlawful" to

cover virtually any government order that could lay the basis for a finding of fault in

the private law sense although he excludes such bureaucratic actions as providing

erroneous information, performing a "physical task or activity" negligently, or

breaching a duty to warn (Factum, at para. 50).

[22]     The Attorney General's concern is that permitting different damages

claims to proceed in different provinces before a variety of superior court judges

arising out of the same or related federal government decisions would re-introduce

the spectre of inconsistency and uncertainty across Canada which the enactment of

the *Federal Courts Act* was designed to alleviate. However, this concern must have

been considered by Parliament when it granted concurrent jurisdiction in all cases in

which relief is claimed against the federal Crown to the superior courts.

Undoubtedly, the juxtaposition of ss. 17 and 18 of the *Federal Courts Act* creates a

certain amount of subject matter overlap with respect to holding the federal

government to account for its decision making. This degree of overlap is inherent in

the legislative scheme designed to provide claimants with "convenience" and "a

choice of forum" in the provincial courts (see statement of the Minister of Justice in

Parliament, *House of Commons Debates*, 2nd Sess., 34th Parl., November 1, 1989, at

p. 5414), reproduced below, at para. 58).

2010 SCC 62 (CanLII)

[23]      I do not interpret Parliament's intent, as expressed in the text, context and

purposes of the *Federal Courts Act*, to require an awkward and duplicative two-court

procedure with respect to all damages claims that directly or indirectly challenge the

validity or lawfulness of federal decisions.   Such an outcome would have to be

compelled by clear and explicit statutory language.   Neither the *Federal Courts Act*

nor the *Crown Liability and Proceedings Act* do so, in my opinion.   With respect, not

only is such language absent, but the reasonable inferences from both statutes,

especially the concurrent jurisdiction in all cases where relief is claimed against the

Crown granted to the provincial superior courts, leads to the opposite conclusion.

A.  *The Nature of Judicial Review*

[24]      The Attorney General correctly points to "the substantive differences

between public law and private law principles" (Factum, at para. 6).   Judicial review

is directed at the legality, reasonableness, and fairness of the procedures employed

and actions taken by government decision makers.   It is designed to enforce the rule

of law and adherence to the Constitution.   Its overall objective is good governance.

These public purposes are fundamentally different from those underlying contract and

tort cases or causes of action under the *Civil Code of Québec*, R.S.Q., c. C-1991, and

their adjunct remedies, which are primarily designed to right private wrongs with

compensation or other relief.

[25]      Not all invalid government decisions result in financial losses to private

persons or entities.   Not all financial losses that *do* occur will lay the basis for a

2010 SCC 62 (CanLII)

private cause of action. Subordinate legislative and adjudicative functions do not in general attract potential government liability for damages. For practical purposes, the real concern here is with executive decisions by Ministers and civil servants causing losses that may or may not be excused by statutory authority.

[26]     The focus of judicial review is to quash invalid government decisions — or require government to act or prohibit it from acting — by a speedy process. A bookstore, for example, will have a greater interest in getting its foreign books through Canada Customs — despite ill-founded allegations of obscenity — than in collecting compensation for the trifling profit lost on each book denied entry (*Little Sisters Book and Art Emporium v. Canada (Commissioner of Customs and Revenue)*, 2007 SCC 2, [2007] 2 S.C.R. 38). Thus s. 18.1 of the *Federal Courts Act* establishes a summary procedure with a 30-day time limit. There is no pre-hearing discovery, apart from what can be learned through affidavits and cross-examination. The applications judge hears no *viva voce* evidence. Damages are not available. Judicial review suits the litigant who wishes to strike quickly and directly at the action (or inaction) it complains about. A damages claimant, on the other hand, will often be unaware of the nature or extent of its losses in a 30-day time frame, and may need pre-trial discovery to either make its case or find out it has none.

[27]     The question must therefore be asked: What is the practical benefit to a litigant who wants compensation rather than a reversal of a government decision, to undergo the *Grenier* two-court procedure? TeleZone, for example, would acquire no

practical benefit from a judicial review application. Its primary complaint is for damages arising from the breach of an alleged tendering contract. It no longer seeks the benefit of the contract (or the PCS licence). It seeks compensation for substantial costs thrown away and lost profits. The Crown does not argue that the tendering contract (if it was made) was *ultra vires*, or that the alleged breach (if it occurred) was mandated by statutory authority. The argument, instead, is that TeleZone's claim constitutes a collateral attack on the ministerial order under the *Radiocommunication Act* that failed to award it a PCS licence. But in TeleZone's circumstances, judicial review of the Minister's decision would not address the claimed harm and would seem to offer little except added cost and delay.

[28]     Negligence is also alleged by TeleZone. Tort liability, of course, is based on fault, not invalidity. As the Court made clear many years ago in *The Queen in Right of Canada v. Saskatchewan Wheat Pool*, [1983] 1 S.C.R. 205, at pp. 222-25, breach of a statute is neither necessary nor is it sufficient to ground a private cause of action. It is not necessary because a government decision that is perfectly valid may nevertheless give rise to liability in contract. *Agricultural Research Institute of Ontario v. Campbell-High* (2002), 58 O.R. (3d) 321 (C.A.), leave to appeal refused, [2003] 1 S.C.R. vii) or tort (*Ryan v. Victoria (City)*, [1999] 1 S.C.R. 201).

[29]     Nor is a breach of statutory power necessarily sufficient. Many losses caused by government decision making do not give rise to any cause of action known to the law. As the Attorney General correctly points out, "[e]ven if a discretionary

2010 SCC 62 (CanLII)

decision of a federal board, commission or tribunal has been declared invalid or unlawful, that in itself does not create a cause of action in tort or under the Quebec regime of civil liability" (Factum, at para. 28).

[30]       In *Miazga v. Kvello Estate*, 2009 SCC 51, [2009] 3 S.C.R. 339, Charron J. wrote that "[a] person accused of a criminal offence enjoys a private right of action when a prosecutor acts maliciously in fraud of his or other prosecutorial duties with the result that the accused suffers damage.  However, the civil tort of malicious prosecution is not an after-the-fact judicial review of a Crown's exercise of prosecutorial discretion" (para. 7 (emphasis added)).  H. Woolf, J. Jowell and A. Le Sueur point out in *De Smith's Judicial Review* (6th ed. 2007), that "[u]nlawfulness (in the judicial review sense) and negligence are conceptually distinct" (pp. 924-25).  Put another way, while Crown liability in tort and the validity of an underlying administrative decision may generate some overlapping considerations, they present distinct and separate justiciable issues.

[31]       The main difficulty in suing government for losses arising out of statutory decisions is often not the public law aspects of the decision but the need to identify a viable private cause of action, and thereafter to meet such special defences as statutory authority.  In *Cooper v. Hobart*, 2001 SCC 79, [2001] 3 S.C.R. 537, for example, it was alleged that the conduct of the Registrar of mortgage brokers contributed significantly to the loss of some claimant investors, but it was held that there was insufficient proximity between the Registrar and the claimants to give rise

2010 SCC 62 (CanLII)

to a duty of care.  See also *Edwards v. Law Society of Upper Canada*, 2001 SCC 80,

[2001] 3 S.C.R. 562; *Holland v. Saskatchewan*, 2008 SCC 42, [2008] 2 S.C.R. 551, at

para. 8.

[32]     The enactment of the *Federal Court Act*, S.C. 1970-71-72, c. 1, and the

subsequent amendments in 1990 were designed to enhance government

accountability as well as to promote access to justice.  The legislation should be

interpreted in such a way as to promote those objectives.  The *Grenier* approach does

not do so, in my respectful opinion, as will now be discussed.

B. *The Grenier Case*

[33]     The shadow of the *Grenier* case perhaps extends beyond what was

intended by the *Grenier* court itself.

[34]     *Grenier* did not concern a conflict between the Federal Court and a

provincial superior court.  It concerned which of two alternative Federal Court modes

of procedure should be pursued by an inmate of a federal penitentiary.   He

complained of the adverse effects of administrative segregation for 14 days pursuant

to the *Corrections and Conditional Release Act*, S.C. 1992, c. 20.  The inmate did not

seek judicial review of the decision of the head of the institution to place him in

administrative segregation.  Instead, after waiting three years, he brought an action

for damages against the federal Crown under s. 17 of the *Federal Courts Act*.  At

2010 SCC 62 (CanLII)

trial, the administrative segregation was found to be arbitrary. He was awarded $5,000 in compensatory and exemplary damages.

[35]     On appeal, the Attorney General objected that the inmate should have sought judicial review of his administrative segregation under s. 18 of the Act before bringing his action for damages under s. 17 of the Act. The argument, in essence, was that the *Federal Courts Act* has several procedural doors and the inmate had tried to enter the wrong one. He knocked on s. 17 whereas he should have gone through s. 18. The Federal Court of Appeal agreed, taking the view that "Parliament assigned the exercise of reviewing the lawfulness of the decisions of federal agencies to a single court, the Federal Court. This review must be exercised under section 18, and only by filing an application for judicial review" (para. 24 (emphasis added)). The court reasoned that even within the same court, the s. 17 action for damages constituted an impermissible collateral attack on the decision of the prison authority (at paras. 32-33) because the trial court "had to review the lawfulness of the institutional head's decision ... and set it aside" (at para. 34), which could only be done under s. 18 of the same Act. It was thought that the judicial review jurisdiction of the Federal Court, with its unique statutory procedure, must be protected from erosion. Such a conclusion, in the *Grenier* court's view, was consistent with *R. v. Consolidated Maybrun Mines Ltd.*, [1998] 1 S.C.R. 706.

[36]     Moreover, according to the *Grenier* court, it made no difference that the administrative segregation Mr. Grenier complained of had long since been served.

2010 SCC 62 (CanLII)

"[A] decision of a federal agency, such as the one by the institutional head in this case", the court reasoned, "retains its legal force and authority, and remains juridically operative and legally effective so long as it has not been invalidated" (para. 19). Accordingly, the prison order, even in its afterlife, was still a complete answer to the s. 17 damages action.

[37]    More recently, the Federal Court of Appeal itself seems to be losing some enthusiasm for *Grenier*'s "separate silos" approach. In *Hinton v. Canada (Minister of Citizenship and Immigration)*, 2008 FCA 215, [2009] 1 F.C.R. 476, the court allowed an application for judicial review to be converted into an action for damages which was also certified as a class action, Sexton J.A. commenting that "[s]ometimes, such as the case at bar, it may prove too cumbersome to initiate a separate action for damages either concurrently with, or subsequent to, an application for judicial review" (para. 50).

[38]    More recently in *Parrish & Heimbecker Ltd. v. Canada (Minister of Agriculture and Agri-Food)*, 2008 FCA 362, [2009] 3 F.C.R. 568 (which, on appeal, was heard concurrently in this Court with the present appeal), Sharlow J.A., dissenting, took the view that "the *Grenier* principle was developed without taking into account certain aspects of the statutory scheme governing federal Crown litigation [including the *Crown Liability and Proceedings Act*] that in my view cast doubt on the *Grenier* analysis" (para. 41).

2010 SCC 62 (CanLII)

[39]     At the same time, some provincial courts have accepted the *Grenier* approach; see, e.g., *Donovan v. Canada (Attorney General)*, 2008 NLCA 8, 273 Nfld. & P.E.I.R. 116, *Lidstone v. Canada (Minister of Canadian Heritage)*, 2008 PESCTD 6, 286 Nfld. & P.E.I.R. 244. Most provincial courts, however, have either not followed *Grenier* or distinguished it: see, e.g., *River Valley Poultry Farm Ltd. v. Canada (Attorney General)*, 2009 ONCA 326, 95 O.R. (3d) 1, at para. 30; *Los Angeles Salad Co. v. Canadian Food Inspection Agency*, 2009 BCSC 109, 92 B.C.L.R. (4th) 379, at para. 24; *Leroux v. Canada Revenue Agency*, 2010 BCSC 865, 2010 D.T.C. 5123, at para. 54; see also *Fantasy Construction Ltd., Re*, 2007 ABCA 335, 89 Alta. L.R. (4th) 93, at para. 43; *Genge v. Canada (Attorney General)*, 2007 NLCA 60, 270 Nfld. & P.E.I.R. 182, at para. 34.

C. *The Attorney General's Expansive View of the Grenier Decision*

[40]     According to the Attorney General, *Grenier* denied the *jurisdiction* of either the Federal Court or a provincial superior court to proceed to adjudicate a damage claim without first passing through the "unique" judicial review procedure set out in s. 18 of the *Federal Courts Act* if the "lawfulness" of an administrative decision or order is in issue. The Attorney General uses the expression "invalidity or lawfulness" which, he points out, may extend even to contract claims. He cites *Gestion Complexe Cousineau (1989) Inc. v. Canada (Minister of Public Works and Government Services)*, [1995] 2 F.C. 694, at pp. 703-706, where the Federal Court of Appeal concluded that the exercise by a Minister of a statutory power to seek tenders

2010 SCC 62 (CanLII)

and to enter into contracts for the lease of land by the Crown could be subject to judicial review.  See also *Irving Shipbuilding Inc. v. Canada (Attorney General)*, 2009 FCA 116, 314 D.L.R. (4th) 340, at paras. 21-25, leave to appeal refused, [2009] 3 S.C.R. vii.  However, in this Court's decision in *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860, a tendering case, although in the end the claim was dismissed, there was no suggestion in the judgment that judicial review was a necessary preliminary step to the recovery of contract damages against the Crown.

[41]    Moreover, I do not think the Attorney General's position is supported by *Consolidated Maybrun* or its companion case of *R. v. Al Klippert Ltd.*, [1998] 1 S.C.R. 737.  Those cases dealt with the narrow issue of whether a person facing penal charges for failing to comply with an administrative order can challenge the validity of the order by way of defence despite failure to take advantage of the appeal process provided for by the law under which the order was issued.  In both cases, the Court paid close attention to the regulatory statute under which an order is made and concluded that to permit such a defence "would encourage conduct contrary to the [regulatory] Act's objectives and would tend to undermine its effectiveness" (*Consolidated Maybrun*, at para. 60).  These cases thus stand for a rather nuanced view of where collateral attack is (or is not) permissible.  The outcome largely depends on the court's view of the statute under which an order is made "and must be answered in light of the legislature's intention as to the appropriate forum" for resolving the dispute (*Consolidated Maybrun*, at para. 52).  In my respectful view, having regard to these policy considerations, it would be adherence to the *Grenier*

approach that "would tend to undermine [the] effectiveness" of the *Federal Courts Act* reforms which had as one of their objectives making the provincial superior courts an equally "appropriate forum" for resolving in an efficient way financial claims against the federal Crown.

D. *The Jurisdiction of the Provincial Superior Courts*

[42]    What is required, at this point of the discussion, is to remind ourselves of the rule that any derogation from the jurisdiction of the provincial superior courts (in favour of the Federal Court or otherwise) requires clear and explicit statutory language: "[The] ouster of jurisdiction from the provincial superior courts in favour of vesting exclusive jurisdiction in a statutory court ... requires clear and explicit statutory wording to this effect": *Ordon Estate v. Grail*, [1998] 3 S.C.R. 437, at para. 46; see also *Pringle v. Fraser*, [1972] S.C.R. 821, at p. 826; *Canada (Human Rights Commission) v. Canadian Liberty Net*, [1998] 1 S.C.R. 626, at para. 38.   The Attorney General's argument rests too heavily on what he sees as the negative implications to be read into s. 18.

[43]    The oft-repeated incantation of the common law is that "nothing shall be intended to be out of the jurisdiction of a Superior Court, but that which specially appears to be so; and, on the contrary, nothing shall be intended to be within the jurisdiction of an Inferior Court but that which is so expressly alleged": *Peacock v. Bell* (1667), 1 Wms. Saund. 73, 85 E.R. 84, at pp. 87-88.   In contrast, the jurisdiction of the Federal Court is purely statutory.

2010 SCC 62 (CanLII)

[44]        The term "jurisdiction" simply is shorthand for the collection of attributes that enables a court or tribunal to issue an enforceable order or judgment. A court has jurisdiction if its authority extends to "the person and the subject matter in question and, in addition, has authority to make the order sought": *Mills v. The Queen*, [1986] 1 S.C.R. 863, *per* McIntyre J., at p. 960, quoting Brooke J.A. in *R. v. Morgentaler* (1984), 41 C.R. (3d) 262, at p. 271, and *per* Lamer J., dissenting, at p. 890; see also *R. v. Rahey*, [1987] 1 S.C.R. 588, at p. 603; *R. v. 974649 Ontario Inc.*, 2001 SCC 81, [2001] 3 S.C.R. 575, at para. 15; *R.v.Conway*, 2010 SCC 22, [2010] 1 S.C.R. 765. The Attorney General does not deny that the Superior Court possesses *in personam* jurisdiction over the parties, or dispute the superior court's authority to award damages. The dispute centres on subject matter jurisdiction.

[45]        It is true that apart from constitutional limitations (see, e.g., *Attorney General of Canada v. Law Society of British Columbia*, [1982] 2 S.C.R. 307, and cases under s. 96 of the *Constitution Act, 1867*, which are not relevant here), Parliament may by statute transfer jurisdiction from the superior courts to other adjudicative bodies including the Federal Court. It did so, for example, with respect to the judicial review of federal decision makers: *Canada Labour Relations Board v. Paul L'Anglais Inc.*, [1983] 1 S.C.R. 147, at p. 154. However, the onus lies here on the Attorney General to establish the existence and extent of such a transfer of jurisdiction in statutory terms that are clear, explicit and unambiguous.

[46]      Nothing in the *Federal Courts Act* satisfies this test.    Indeed, as
mentioned, the explicit grant to the provincial superior courts of concurrent
jurisdiction in claims against the Crown in s. 17 of that Act (as well as s. 21 of the
*Crown Liability and Proceedings Act*) directly refutes it. As Sharlow J.A., dissenting,
pointed out in *Parrish & Heimbecker Ltd.* (appeal allowed and judgment released
concurrently herewith, 2010 SCC 64), s. 8 of the *Crown Liability and Proceedings
Act*, which codifies the defence of statutory authority, is evidence that Parliament
envisaged that the assessment of lawfulness would be made by the provincial superior
court in the course of adjudicating a claim for damages (para. 39).

E.  *Claimed "Inferences" from Section 18 of the Federal Courts Act*

[47]      An application for judicial review under the *Federal Courts Act* combines
an allegation that a federal authority has acted contrary to the substantive principles
of public law, along with a claim for one of the kinds of relief listed in s. 18(1).  It is
only this procedure that is in the exclusive jurisdiction of the Federal Court.   As the
Court recently observed in *Canada (Citizenship and Immigration) v. Khosa*, 2009
SCC 12, [2009] 1 S.C.R. 339, "[t]he genesis of the *Federal Courts Act* lies in
Parliament's decision in 1971 to remove from the superior courts of the provinces the
jurisdiction over prerogative writs, declarations, and injunctions against federal
boards, commissions and other tribunals" (para. 34).  Section 18 does *not* say that a
dispute over the lawfulness of exercise of statutory authority cannot be assessed in the

2010 SCC 62 (CanLII)

course of a trial governed by the *Crown Liability and Proceedings Act* brought in the provincial superior court or pursuant to s. 17 of the *Federal Courts Act* itself.

[48]     The Attorney General argues that a "remedies" oriented approach, similar to the view adopted by the Ontario Court of Appeal in this case, results in "a rigid, formalistic and literal interpretation" of s. 18 (Factum, at para. 66) and gives insufficient weight to context and, in particular, to the intention of Parliament.   I agree that the context and Parliamentary purpose are essential to a proper interpretation of s. 18, but I do not think a broad and contextual approach assists the Attorney General's argument.

(i) The Parliamentary Context

[49]     The Parliamentary debates in 1971 took place in the context of the enormous growth of federal regulatory regimes, the perceived need for a "national perspective" on judicial review, and a concern about inconsistent supervision of federal public bodies by various provincial superior courts across the country (see D. J. M. Brown and J. M. Evans, *Judicial Review of Administrative Action in Canada* (loose-leaf), at para. 2:4100).   Thus, Parliament radically transformed the old Exchequer Court into a new Federal Court and crafted a new procedure which resulted in the Federal Court's supervisory jurisdiction over federal decision makers.

[50]     The Minister of Justice in 1970 emphasized that Parliament's concern was supervision (not compensation) and in particular its concern was about

2010 SCC 62 (CanLII)

fragmented judicial review of federal adjudicative tribunals.  One provincial superior court might uphold as valid an important decision, e.g., by the National Energy Board, which a superior court in a different province might decide to quash.  Thus:

> This multiple supervision [by the provincial courts], with a lack of consistent jurisprudence and application, can work serious hardship not only on the boards and commissions but on those who appear before them. . . .  It is for this reason . . . that the conclusion was reached that this superintending jurisdiction should be vested in a single court that enjoyed the same nation wide jurisdiction as the federal boards, commissions and tribunals themselves. The bill is therefore designed to create a single and uniform basis of superintending jurisdiction in relation to federal boards and commissions and to place them on the same footing in this regard as provincial boards and commissions.
>
> (*House of Commons Debates*, 2nd Sess., 28th Parl. March 25, 1970, at pp. 5470-71; see also Factum, at para. 79; *Khosa*, at para. 34.)

However, the very broad statutory definition in s. 2 of "federal board, commission or other tribunal" goes well beyond what are usually thought of as "boards and commissions" and its very breadth belatedly (and perhaps unintentionally) precipitated the *Grenier* controversy about how to prioritize the overlapping subject matter shared by judicial review and the trial of common law claims for compensation based on fault.  The grant of concurrent jurisdiction in s. 17 does not negate the possibility of inconsistency, but Parliament has agreed to live with the possibility in the interest of easier access to justice.

       (ii) <u>The Statutory Text</u>

[51]     The grant of *exclusive* jurisdiction to judicially review federal decision makers is found in s. 18 of the *Federal Courts Act* and is expressed in terms of particular remedies:

> **18.** (1) Subject to section 28, the Federal Court has <u>exclusive</u> original jurisdiction
>
> > (*a*) to issue an injunction, writ of *certiorari*, writ of prohibition, writ of *mandamus* or writ of *quo warranto*, or grant declaratory relief, against any federal board, commission or other tribunal; and
> >
> > (*b*) to hear and determine any application or other proceeding for relief in the nature of relief contemplated by paragraph (*a*), including any proceeding brought against the Attorney General of Canada, to obtain relief against a federal board, commission or other tribunal.
>
> . . .
>
> (3) The remedies provided for in subsections (1) and (2) may be obtained only on an application for judicial review made under section 18.1.

[52]     All of the remedies listed in s. 18(1)(*a*) are traditional administrative law remedies, including the four prerogative writs — *certiorari*, prohibition, *mandamus* and *quo warranto* — and declaratory and injunctive relief in the administrative law context.   Section 18 does not include an award of damages.   If a claimant seeks compensation, he or she cannot get it on judicial review.   By the same token, the plaintiff in a damages action is not entitled to add a supplementary claim for a declaration or injunction to prevent the government from acting on a decision said to be tainted by illegality.   That is the domain of the Federal Court.

### (iii) Reading the Act as a Whole

[53]      There is much internal evidence in s. 18 and s. 18.1 of the *Federal Courts Act* to indicate that Parliament could not have intended judicial review to have the gatekeeper function envisaged by *Grenier*.

[54]      As mentioned, the 30-day limitation period for judicial review applications under s. 18.1(2) of the *Federal Courts Act* is one such indication. Such a short limitation is consistent with a quick and summary judicial review procedure — but not a damages action. TeleZone's action in Ontario would have a six-year limitation. A 30-day cut off for a damages claimant would be unrealistic. The claimant may not be in a position to apply for judicial review within the limitation period. The facts necessary to ground a civil cause of action may not emerge until after 30 days have passed.

[55]      The 30-day limit can be extended by order of a Federal Court j u d g e (s. 18.1(2)) but the extension is discretionary, and would subordinate the fate of a civil suit brought in a superior court to the discretion of a Federal Court judge ruling upon a request for an extension of time for reasons that have to do with public law concerns, not civil damages. In practical terms, the effect of the *Grenier* argument would be to impose a discretionary limitation period (determined by the Federal Court) on actions for damages against the Crown in a provincial superior court, an outcome which, in my opinion, Parliament cannot have intended. Apart from anything else, it undermines s. 39 of the *Federal Courts Act*, which provides that,

2010 SCC 62 (CanLII)

ordinarily, claims against the Crown in the Federal Court are subject to the limitation period applicable "between subject and subject" in the province where the claim arose, or six years in respect of a "cause of action arising otherwise than in a province".

[56]      As recently affirmed in *Khosa*, the grant of relief on judicial review is in its nature discretionary and may be denied even if the applicant establishes valid grounds for the court's intervention:

> ... the language of s. 18.1 generally sets out threshold grounds which permit but do not require the court to grant relief.  Whether or not the court should exercise its discretion in favour of the application will depend on the court's appreciation of the respective roles of the courts and the administration as well as the "circumstances of each case". [para. 36]

See also *Harelkin v. University of Regina*, [1979] 2 S.C.R. 561, at pp. 592-93; *Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326, at p. 372. Such an approach does not align well with the paradigm of a common law action for damages where, if the elements of the claim are established, compensation ought generally to follow as a matter of course.  In judicial review, "the discretionary nature of the courts' supervisory jurisdiction reflects the fact that unlike private law, its orientation is not, and never has been, directed exclusively to vindicating the rights of individual" (Brown and Evans, at para. 3:1100).

(iv)  The 1990 Amendments to the *Federal Courts Act*

2010 SCC 62 (CanLII)

2010 SCC 62 (CanLII)

[57]      The current version of s. 17 of the *Federal Courts Act*, which only came into force on February 1, 1992, allows parties to institute civil claims against the Federal Crown in the superior courts of the provinces.  For ease of reference, I repeat the operative language:

> **17.** (1)  Except as otherwise provided in this Act or any other Act of Parliament, the Federal Court has concurrent original jurisdiction in all cases in which relief is claimed against the Crown.

The grant of jurisdiction is thus framed in terms of relief, i.e.,"all cases in which relief is claimed" except as otherwise provided.  Section 18(1) otherwise provides in relation to the specific forms of relief listed therein.  Section 18(3) of the Act expressly provides that *remedies in the nature of judicial review* "may be obtained only on an application for judicial review made under section 18.1".  The *Federal Courts Act* lists no other relevant exclusions from s. 17, and we have not been referred to any other Act of Parliament having a bearing on this subject.

[58]      As the Minister of Justice stated in 1989 before the Legislation Committee examining Bill C-38, which resulted in, among other changes, today's version of s. 17:

> [W]e have made provision in the bill whereby ordinary common law and civil law actions for relief against the federal Crown, which are presently the exclusive jurisdiction of the Federal Court, may also be heard by provincial courts.  Such provision acknowledges the fact that the Federal Court possesses no unique expertise in areas of ordinary contract and tort law.  [The Minister here went on to describe the practical jurisdictional and procedural problems created by the Federal Court's prior exclusive jurisdiction over federal authorities.]

*(Minutes of Proceedings and Evidence of the Legislative Committee on Bill C-38*, No. 1, 2nd Sess., 34th Parl., November 23, 1989, at pp. 14-15)

On second reading of the Bill, the Minister again emphasized that the purpose of the amendments was to allow the plaintiffs to sue the federal Crown in either the provincial superior courts or the Federal Court:

> For example, <u>a person should be able to sue the Crown in a suitably convenient court for breach of contract</u> to purchase goods or for negligent driving by a Crown employee that causes injuries to another motorist. At the moment, such actions can only be brought in the Federal Court. However, it is not as available as provincial courts.
>
> . . .
>
> Moreover, for both citizen and lawyer alike, provincial courts, including their procedures and personnel, are much more familiar.
>
> Therefore, the Federal Court is often not the most convenient one for the private litigant. <u>With this in mind, the government has proposed that both the provincial courts and the Federal Court share jurisdiction with respect to such actions, thereby generally giving a plaintiff a choice of forum.</u> [Emphasis added.]
>
> (*House of Commons Debates*, 2nd Sess., 34th Parl., November 1, 1989, at p. 5414)

[59]    The effect of the argument of the Attorney General, if accepted, would be to undermine the purpose and intended effect of the 1990 amendment by retaining in the Federal Court exclusive jurisdiction over a key element of many causes of action proceeding in the provincial courts despite the promise to give plaintiffs a "choice of forum" and to make available relief in the provincial superior courts that may be more "familiar" to litigants.

2010 SCC 62 (CanLII)

F.  *The Doctrine of Collateral Attack*

2010 SCC 62 (CanLII)

[60]      The Attorney General contends that to permit TeleZone to proceed with its claim in the provincial superior court in the absence of prior judicial review would be to allow an impermissible "collateral attack" on the Minister's decision.  The Court has described a collateral attack as

> an attack made in proceedings other than those whose specific object is the reversal, variation, or nullification of the order or judgment.

> (*Wilson v. The Queen*, [1983] 2 S.C.R. 594, at p. 599)

[61]      The rule is a judicial creation (which must therefore yield to a contrary legislative enactment) based on general considerations related to the administration of justice, as explained in *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629, at para. 72:

> The fundamental policy behind the rule against collateral attack is to "maintain the rule of law and to preserve the repute of the administration of justice" (*R. v. Litchfield,* [1993] 4 S.C.R. 333, at p. 349).  The idea is that if a party could avoid the consequences of an order issued against it by going to another forum, this would undermine the integrity of the justice system.  Consequently, the doctrine is intended to prevent a party from circumventing the effect of a decision rendered against it. [Emphasis added.]

[62]      In *R. v. Litchfield,* [1993] 4 S.C.R. 333, the criminal case referred to in *Garland,* the Court declined to apply the rule against collateral attack.  In *Garland*

itself, class action plaintiffs brought a claim against a gas company seeking restitution on the grounds of unjust enrichment of late payment penalties previously approved by the Ontario Energy Board.  In its defence, the gas company argued that the claim for restitution was a collateral attack on the Board's order.  The defence failed.

[63]    I do not think the Attorney General's collateral attack argument can succeed on this appeal for three reasons.  Firstly, as Borins J.A. pointed out in his scholarly judgment, the doctrine of collateral attack may be raised by the Attorney General in the provincial superior court as a defence if he or she believes that, in the particular circumstances, to do so is appropriate.  However, the possible availability of the defence is not an argument against provincial superior court jurisdiction.  Nor does it justify inserting the Federal Court into every claim for damages predicated on an allegation that the government's decision that caused the loss was "invalid or unlawful".

[64]    Secondly, TeleZone is not seeking  to "avoid the consequences of [the ministerial] order issued against it" (*Garland*, at para. 72).  On the contrary, the ministerial order and the financial losses allegedly consequent on that order constitute the foundation of the damages claim.  This was the result in *Garland* itself, where Iacobucci J. held for the Court:

> Based on a plain reading of this rule, the doctrine of collateral attack does not apply in this case because here the specific object of the appellant's action is not to invalidate or render inoperative the Board's orders, but rather to recover money that was illegally collected by the respondent as

2010 SCC 62 (CanLII)

a result of Board orders.  Consequently, the collateral attack doctrine does not apply.  [Emphasis added; para. 71.]

[65]     Similarly in *Toronto (City) v. C.U.P.E., Local 79*, 2003 SCC 63, [2003] 3 S.C.R. 77, Arbour J. declined to apply the collateral attack doctrine in a case arising out of a grievance arbitration where CUPE sought to challenge the underlying facts of a conviction of one of its members for sexual assault.  Arbour J. reasoned that the Union's argument was "an implicit attack on the correctness of the factual basis of the decision, not a contest about whether that decision has legal force, as clearly it does" (para. 34).

[66]     Thirdly, the Attorney General's argument fails even if one takes a more expansive view of the doctrine of collateral attack, as does Professor David Mullan:

> The cause of action [in *Garland*] depended necessarily on establishing the invalidity of the Board's order on which the utility was relying in collecting interest.  If the order had been valid, there would have been no cause of action.  This was in every sense a collateral attack on the Board's orders.  Collateral attack is not and never has been confined to situations where the challenge is by way of resistance to the enforcement of an order.  <u>It is also implicated in situations where someone, in asserting a civil claim for monetary or other relief, needs to attack a law or order that the defendant is advancing as justification for the actions on which the plaintiff's claim is based</u>. . . .  [Emphasis added.]
>
> (D. J. Mullan, "Administrative Law Update — 2008-2009", Continuing Legal Education Conference, *Administrative Law Conference 2009*, October 2009, at p. 1.1.22)

In Professor Mullan's view, the Court in *Garland* should have taken what he sees as the more principled route of applying the factors in *Consolidated Maybrun* to

2010 SCC 62 (CanLII)

determine whether the collateral attack was of a permissible variety.  In that case, as set out in the judgment of L'Heureux-Dubé J., the appropriate factors to apply in determining whether the Court is confronted with an impermissible collateral attack on an administrative order are (1) the wording of the statute from which the power to issue the order derives; (2) the purpose of the legislation; (3) the availability of an appeal; (4) the nature of the collateral attack in light of the tribunal's expertise and *raison d'être*, (including whether "the legislature intended to confer jurisdiction to hear and determine the question raised"), and (5) the penalty on a conviction for failing to comply with the order (paras. 45, 50-51 and 62).  These factors have also been applied in the civil context; see, generally, K. Horsman and G. Morley, eds., *Government Liability: Law and Practice* (loose-leaf), at p. 11-9.

[67]      Judicial doctrine necessarily yields to a contrary statutory enactment. Accepting, as Professor Mullan puts it, at p. 1.1.22, that the rule against collateral attack may be "implicated in situations where someone, in asserting a civil claim for monetary or other relief, needs to attack a law or order that the defendant is advancing as justification for the actions on which the plaintiff's claim is based", the s. 17 statutory grant of concurrent jurisdiction again defeats the Attorney General's submission.  This is because the claimant's "need to attack a law or order" is essential to its cause of action, and adjudication of that allegation (even if raised by way of reply) is a necessary step in disposing of the claim.  Parliament has stated that provincial superior courts possess the concurrent necessary jurisdiction to dispose of the whole of such a claim, not just part of it.

2010 SCC 62 (CanLII)

[68]    In summary, I agree with Borins J.A. that the *Grenier* approach cannot be justified by the rule against collateral attack.

G.  *The Defence of Statutory Authority*

[69]    It would also be open to the Crown, by way of defence to a damages action, to argue that the government decision maker was acting under a statutory authority which precludes compensation for consequent losses.   This, again, is a matter of defence, not jurisdiction.  It is a hurdle facing any claimant.  Governments make discretionary decisions all the time which will inflict losses on people or businesses without conferring any cause of action known to the law.

[70]    In a case of nuisance, for example, the claimant property owner may have all the elements of a good common law action in nuisance yet be defeated by the defence that the government was authorized to do what it did and that collateral damage to the claimant was an inevitable result of the authority so provided.  See, e.g., P. W. Hogg and P. J. Monahan, *Liability of the Crown* (3rd ed. 2000), at p. 139, and Horsman and Morley, at p. 6-41.

[71]    However, as stated earlier, the defence of "statutory authority" will not always provide a complete answer to a damages claim.  In some cases, the outcome may depend on whether the statute either explicitly or implicitly authorized the act that caused the harm.  In *Tock v. St. John's Metropolitan Area Board*, [1989] 2 S.C.R. 1181, Sopinka J. pointed out, referring to the dictum of Viscount Dunedin in *City of*

2010 SCC 62 (CanLII)

*Manchester v. Farnworth*, [1930] A.C. 171 (H.L.), that there may be "alternate methods of carrying out the work [that would have avoided the loss]. The mere fact that one is considerably less expensive will not avail. If only one method is practically feasible, it must be established that it was practically impossible to avoid the nuisance" (p. 1226). Reference should also be made to the qualifying observation of what is "practically impossible" made by Viscount Dunedin and quoted by Sopinka J., at p. 1224:

> The onus of proving that the result is inevitable is on those who wish to escape liability for nuisance, but the criterion of inevitability is not what is theoretically possible but what is possible according to the state of scientific knowledge at the time, <u>having also in view a certain common sense appreciation, which cannot be rigidly defined, of practical feasibility in view of situation and of expense</u>. [Emphasis added.]

This caveat, also quoted by Wilson J., at p. 1213 of *Tock*, was the subject of some disagreement on the Court, an issue that need not detain us. The issue of statutory authority does not go to the jurisdiction of the provincial superior courts. That is all that needs to be decided here.

[72]    It is sufficient to say that it is always open to the Crown to argue the defence of statutory authority; see, e.g., in s. 8 of the *Crown Liability and Proceedings Act*:

> Nothing in sections 3 to 7 makes the Crown liable in respect of anything done or omitted in the exercise of any power or authority that, if those sections had not been passed, would have been exercisable by

2010 SCC 62 (CanLII)

virtue of the prerogative of the Crown, or any power or authority conferred on the Crown by any statute.

The defence of statutory authority is regularly interpreted and applied by the provincial superior courts, see, e.g., *Sutherland v. Canada (Attorney General)*, 2002 BCCA 416, [2002] 10 W.W.R. 1, leave to appeal refused, [2003] 1 S.C.R. xi (*sub nom. Jones v. Attorney General of Canada*); *Lake v. St. John's City*, 2000 NFCA 48, 192 Nfld. & P.E.I.R. 84; *Neuman v. Parkland (County)*, 2004 ABPC 58, 30 Alta. L.R. (4th) 161; *Danco v. Thunder Bay (City)* (2000), 13 M.P.L.R. (3d) 130 (Ont. S.C.J.); *Landry v. Moncton (City)*, 2008 NBCA 32, 329 N.B.R. (2d) 212.

[73]    I give an example. In *Ryan v. Victoria (City)*, the "inevitable result" defence was tested in a claim for damages arising out of road works. Mr. Ryan, a motorcyclist, sued the municipality and a railway for negligence and nuisance after he was injured while crossing tracks in an urban area. The front wheel of the plaintiff's motorcycle got caught in the flangeway gap of the rail whose width was at the upper end of the allowed range set by the applicable regulation. The defence argued statutory authority. Writing for a unanimous Court, Major J. noted that "[s]tatutory authority provides, at best, a narrow defence to nuisance" (at para. 54), and rejected it on the facts of the case.

[74]    For present purposes, we need go no further than to repeat that "statutory authority" is an argument that goes to defence, not jurisdiction. If the provincial

superior court (or the Federal Court under s. 17) finds that the government has a good

defence based on statutory authority, it will simply dismiss the claimant's action.

H.  *The Concern About "Artful Pleading"*

[75]      The Crown contends that TeleZone's argument would risk putting

judicial review of federal decision makers back in the provincial superior courts

dressed up as damage claims.  On this view the "artful pleader" will forum-shop by

the way the case is framed.  Of course, "artful pleaders" exist and they will formulate

a claim in a way that best suits their clients' interests.  However, no amount of artful

pleading in a damages case will succeed in setting aside the order said to have harmed

the claimant or enjoin its enforcement.  Such relief is not available in the provincial

superior court.   The claimant must, as here, be content to take its money (if

successful) and walk away leaving the order standing.

[76]      Where a plaintiff's pleading alleges the elements of a private cause of

action, I think the provincial superior court should not in general decline jurisdiction

on the basis that the claim looks like a case that should be pursued on judicial review.

If the plaintiff has a valid cause of action for damages, he or she is normally entitled

to pursue it.

[77]      In the U.K., a similar position has been expressed by the House of Lords

in *Roy v. Kensington and Chelsea and Westminster Family Practitioner Committee*,

[1992] 1 A.C. 624, *per* Lord Bridge, at pp. 628-29:

> [W]here a litigant asserts his entitlement to a subsisting right in private law, whether by way of claim or defence, the circumstance that the existence and extent of the private right asserted may incidentally involve the examination of a public law issue cannot prevent the litigant from seeking to establish his right by action commenced by writ or originating summons, any more than it can prevent him from setting up his private law right in proceedings brought against him.

It is generally true here, as it is in the U.K., that a plaintiff is not required to bring an application for judicial review so long as private rights are legitimately engaged by the action.  Under the English authorities, as in Canada, there is a special concern where the availability of judicial review depends on special leave, or is restricted by an abbreviated limitation period, or where the relief available on judicial review is discretionary (*Roy*, *per* Lord Lowry, at p. 654).  See also P. P. Craig, *Administrative Law* (6th ed. 2008), at p. 869.  These considerations echo the concerns already canvassed in rejecting the *Grenier* approach.

[78]      To this discussion, I would add a minor *caveat*.  There is always a residual discretion in the inherent jurisdiction of the provincial superior court (as well as in the Federal Court under s. 50(1) of its Act), to stay the damages claim because in its essential character, it is a claim for judicial review with only a thin pretence to a private wrong.  Generally speaking the fundamental issue will always be whether the claimant has pleaded a reasonable private cause of action for damages.  If so, he or she should generally be allowed to get on with it.

I. *Application to the Facts*

2010 SCC 62 (CanLII)

[79]      TeleZone is not attempting to nullify or set aside the Minister's order.  Its case is that the Minister, in deciding not to issue a licence to TeleZone, acted in breach of his contractual and equitable duties or in breach of a duty of care. TeleZone does not say that the Minister's decision should be quashed.  On the contrary, TeleZone's causes of action in contract, tort and equity are predicated on the finality of that decision excluding TeleZone from participation in the telecommunications market, thereby (it says) causing it financial loss.  Nor does TeleZone seek to deprive the Minister's decision of any legal effect.  It does not challenge the licences issued to its competitors.  It does not seek to undo what was done.  It complains about what was *not* done, namely fulfilment by Industry Canada of its alleged contractual and equitable duties and its duty of care towards TeleZone itself.

[80]      To the extent that TeleZone's claim can be characterized as a collateral attack on the Minister's order (i.e., because the order failed to include TeleZone), I conclude, for the reasons discussed, that the grant of concurrent jurisdiction to determine claims against the Crown to the provincial superior courts negates any inference the Crown seeks to draw that Parliament intended the detour to the Federal Court advocated by *Grenier*.  The TeleZone claim as pleaded is dominated by private law considerations.  In a different case, on different facts, the Attorney General is free to raise "collateral attack" as a defence and the superior court will consider and deal with it.

V. <u>Disposition</u>

[81]    The Superior Court of Ontario has jurisdiction over the parties and the subject matter, and has the power to grant the remedy of damages.  There is nothing in the *Federal Courts Act* to prevent the Ontario Superior Court from adjudicating this claim.  I would dismiss the appeal with costs.


      *Appeal dismissed with costs.*


      *Solicitor for the appellant:  Attorney General of Canada, Ottawa.*


      *Solicitors for the respondent:  Stikeman Elliott, Toronto.*

2010 SCC 62 (CanLII)



DOMINION LAW REPORTS

## 80 WELLESLEY ST. EAST LTD. v. FUNDY BAY BUILDERS LTD. et al.

*Ontario Court of Appeal, MacKay, McGillivray and Brooke, JJ.A.*
*February 25, 1972.*

**Sale of land — Deposit — Purchaser registering assignment of agreement of purchase and sale to secure return of deposit — Vendor now seeking to sell property to third party — Whether Court empowered to order assignment expunged from vendor's title upon the vendor furnishing adequate security in lieu of the assignment — Judicature Act (Ont.), s. 19.**

**Courts — Jurisdiction — Plaintiff seeking mandatory order on an interlocutory application expunging assignment of agreement of purchase and sale registered against title by defendants — Assignment registered to secure return of deposit — Plaintiff seeking to sell to third party and willing to furnish security in lieu of assignment — Whether Court empowered to make such order — Judicature Act (Ont.), s. 19(1).**

Section 19(1) of the *Judicature Act*, R.S.O. 1970, c. 228, empowers the Court to make a mandatory order, even though interlocutory, directed to a party to the action if it is just and convenient to do so. Accordingly, where a plaintiff has agreed to sell real property to a third party, and where an assignment of an earlier agreement of purchase and sale has been registered against the plaintiff's title in an attempt to secure the return of a deposit paid thereunder by the defendants, the Court has jurisdiction to order the expunging of the assignment upon the plaintiff furnishing adequate security in lieu of the interest in land, if any, created by the assignment.

[*Re Michie Estate and City of Toronto et al.*, [1968] 1 O.R. 266, 66 D.L.R. (2d) 213; *Board v. Board* (1919), 48 D.L.R. 13, [1919] A.C. 956, [1919] 2 W.W.R. 940; *Williams and Rees v. Local Union No. 1562 of United Mine Workers of America* (1919), 45 D.L.R. 150, [1919] 1 W.W.R. 217, 14 Alta. L.R. 251 [revd on other grounds 59 S.C.R. 240, 49 D.L.R. 578, [1919] 3 W.W.R. 828], folld]

APPEAL from an order of Wright, J., dismissing an application for an order expunging an assignment of an agreement of purchase and sale from the title of the plaintiff.

*B. Chernos*, for plaintiff, appellant.
*R. G. Lord*, for defendants, respondents.

The judgment of the Court was delivered orally by

BROOKE, J.A.:—This is an appeal from the order of the Honourable Mr. Justice Wright dated January 26, 1972, whereby he dismissed the plaintiff's application for an order expunging or vacating the assignment in writing of an agreement of purchase and sale from the title to the plaintiff's lands upon the plaintiff furnishing adequate security in lieu of the interest in land, if any, created by the assignment.

The action arises out of an agreement of purchase and sale

dated December 3, 1968, between the plaintiff and the defend-
ant Fundy Bay Builders Limited of the plaintiff's lands which
transaction was to close on June 30, 1970, but did not close. By
assignment in writing dated December 30, 1968, the defendant
Fundy Bay Builders Ltd. assigned the agreement to the de-
fendant Cape Jones Securities Limited and this assignment
was registered on the title to the plaintiff's lands on January
10, 1969, in the Registry Office for the Registry Division of
the East and West Riding of the County of York.

On October 2, 1970, the plaintiff commenced this action and
the defendants served their defence and counterclaim on
March 14, 1971. By an agreement in writing dated both
February 25, 1971, and March 1, 1971, the plaintiff agreed to
sell the lands in question for $415,000. The lands are subject to
a first mortgage in the sum of $205,000 and this was so at the
time of the proposed sale to the defendant Fundy Bay Builders
Ltd. As a part of the purchase price in the pending transaction
the plaintiff has agreed to take back a second mortgage of
$130,000 (a sum which is $30,000 in excess of the amount
claimed by the defendant in the pending action as a return of
its deposit).

The material before Wright, J., made it clear that if the
assignment in question is not removed from the title to the
plaintiff's lands, the pending transaction will abort. The
plaintiff proposes then that the second mortgage in the sum of
$130,000 which bears interest at the rate of 8½% per annum
and matures on June 30, 1975, be held in trust pending the
determination of the action in place of, and as security for, the
lien which the defendants contend they are entitled to in the
sum of $100,000 to secure the return of the deposit moneys
which they have paid. It is significant that the lien, if it exists,
was subsequent to the first mortgage above referred to.

Briefly, the action can be described as an action in which
the plaintiff claims for an order to expunge the assignment of
the agreement of purchase and sale from its title and for a
judgment declaring that the defendants have no interest in the
land. The plaintiff claims that the defendants were in default
under the agreement and not entitled to the return of the
deposit moneys and that the plaintiff terminated the contract.
The defendants defend alleging the agreement of purchase
and sale was unenforceable as it was void for uncertainty and,
alternatively, that the plaintiff had failed to fulfil certain of
its covenants in the agreement and, finally, that the defend-
ants were ready, willing and able to carry out the transaction
but that the plaintiff elected to terminate it and the defend-

DOMINION LAW REPORTS

ants are therefore entitled to be repaid the deposit moneys together with interest.

The defendants assert a lien against the property to secure the return of the deposit moneys. By way of counterclaim the defendants claim for the lien and the return of the deposit moneys and interest and damages.

It appears Wright, J., believed that the security which was proposed was adequate but found that he had no jurisdiction to require the defendants to look to such security for satisfaction of their claim in lieu of the assignment. His brief reasons for judgment are as follows:

> Although I agree with Mr. Teplitsky that what he offers is reasonably better than what the defendants now have, I consider that I have no power to force it on an unwilling defendant as trustee.

The plaintiff sought and obtained leave from the Honourable Mr. Justice Lerner to appeal to this Court, who, in his reasons expressly agreed with the view of Wright, J., with respect to the adequacy of the security proposed and after considering some of the authorities, concluded that there was good reason to doubt that there was an absence of jurisdiction to make the order sought.

In our view, Wright, J., was in error. As a superior Court of general jurisdiction, the Supreme Court of Ontario has all of the powers that are necessary to do justice between the parties. Except where provided specifically to the contrary, the Court's jurisdiction is unlimited and unrestricted in substantive law in civil matters. In *Re Michie Estate and City of Toronto et al.*, [1968] 1 O.R. 266 at pp. 268-9, 66 D.L.R. (2d) 213 at pp. 215-6, Stark, J., after considering the relevant provisions of the *Judicature Act* and the authorities, said:

> It appears clear that the Supreme Court of Ontario has broad universal jurisdiction over all matters of substantive law unless the Legislature divests from this universal jurisdiction by legislation in unequivocal terms. The rule of law relating to the jurisdiction of superior Courts was laid down at least as early as 1667 in the case of *Peacock v. Bell and Kendall* (1667), 1 Wms. Saund. 73 at p. 74, 85 E.R. 84:
>
> "... And the rule for jurisdiction is, that nothing shall be intended to be out of the jurisdiction of a Superior Court, but that which specifically appears to be so; and, on the contrary, nothing shall be intended to be within the jurisdiction of an Inferior Court but that which is so expressly alleged."

In *Board v. Board* (1919), 48 D.L.R. 13 at pp. 17-8, [1919] A.C. 956, [1919] 2 W.W.R. 940, Viscount Haldane for the Privy Council in dealing with the question of the nature of jurisdiction of a superior Court said:

If the right exists, the presumption is that there is a Court which can enforce it, for if no other mode of enforcing it is prescribed, that alone is sufficient to give jurisdiction to the King's Courts of justice. In order to oust jurisdiction, it is necessary, in the absence of a special law excluding it altogether, to plead that jurisdiction exists in some other Court. This is the effect of authorities, such as the well-known judgment of Lord Mansfield in *Mostyn v. Fabrigas* (1774), 1 Cowp. 161, 98 E.R. 1021, and the judgment of Lord Hardwicke in *Earl of Derby v. Duke of Athol* (1749), 1 Ves.Sen.201, 27 E.R.982. They are collected in the admirable opinion of Stuart, J., in the Supreme Court in the present case, from whose reasoning, as well as from the arguments employed by the other learned Judges there, their Lordships have derived much assistance. They only desire to add that independently of the rule just referred to, there is another principle of construction which would in their opinion have been by itself sufficient to dispose of the question whether the words of the Act of 1907 excluded matrimonial jurisdiction. That Act set up a superior Court, and it is the rule as regards presumption of jurisdiction in such a Court that, as stated by Willes, J., in *Mayor of London v. Cox* (1867) 2 E. & I. App. 239, at p. 259, nothing shall be intended to be out of the jurisdiction of a superior Court, but that which specially appears to be so.

In addition, and of importance, is that the justice of the situation requires a cause such as this will not fail for want of a remedy. In *Williams and Rees v. Local Union No. 1562 of United Mine Workers of America* (1919), 45 D.L.R. 150 at p. 178, [1919] 1 W.W.R. 217, 14 Alta. L.R. 251 [reversed on other grounds 59 S.C.R. 240, 49 D.L.R. 578, [1919] 3 W.W.R. 828], Beck, J., said, and I agree with his view:

> I believe my brother judges accept the opinion I expressed some time ago as follows:—

> "That every superior court is the master of its own practice is a proposition laid down by Tindal, C.J., in *Scales v. Cheese* (1844), 12 M. & W. 685, 152 E.R. 1374, and adopting this, I think that, without any statutory rules of practice, the court can, should a case arise, even though the law be fixed as to the substantial rights of the parties, award such remedies, though they be new, as may appear to be necessary to work out justice between the parties."

Where the plaintiff is desirous of selling its land and provides adequate security to meet its possible obligations to the defendants, surely it has a right to have its title cleared and proceed, and this Court has the power to make any order necessary in the circumstances. In my opinion, then, the Court had jurisdiction at law to deal with this matter in addition to its powers by reason of its equitable jurisdiction.

In my view, s. 19(1) of the *Judicature Act*, R.S.O. 1970, c. 228, gives to the Court jurisdiction to make a mandatory order, even though interlocutory, directed to a party to the action if it is just and convenient to do so and in this way to require the defendants here to do such acts as may be neces-

DOMINION LAW REPORTS 25 D.L.R. (3d)

sary as to effectively remove the assignment in question from the title to the lands. Here the defendants seek to invoke the Court's equitable jurisdiction by asserting a claim for lien against the lands to secure the return of the moneys which they have paid.

While I have some doubts that the defendants are able to assert such a claim in these circumstances, conceding for the moment that they are entitled to do so and will succeed, if they seek equity — they must do equity. The security offered by the plaintiff is more than adequate and the defendants ought to be required to accept that security in lieu of the lien which they claim. The result to them is the same but the continuation of the registration of the assignment is a cause of loss to the plaintiff which ought to be avoided, if possible. On the face of it, it therefore appears just and convenient that the order sought should be made.

In all the circumstances, then, we think that Mr. Justice Wright was in error — that he had jurisdiction to make the order sought before him and an order should go that upon the providing of the security proposed, which is a second mortgage on the property which matures June 30, 1975, in the sum of $130,000 bearing interest at the rate of 8½% payable to the defendants and assigned to a trustee, to be agreed upon, to abide the outcome of this action, the defendants should remove from the title to the lands the assignment of the agreement of purchase and sale here in question.

The plaintiff is entitled to its costs of the motion before Wright, J., the application for leave to appeal and its costs in this Court.

*Appeal allowed.*

---

### GLINERT v. KOSZTOWNIAK et al.

*Supreme Court of Ontario, Master's Chambers' Senior Master (Rodger)
February 15, 1972.*

Mortgages — Bonus clause requiring payment of three months' interest in the event of default — Bonus payable on any proceedings taken by mortgagee on default of mortgage — Mortgagor not entitled to call for discharge until bonus paid — Clause invalid as creating a penalty under s. 8 of the Interest Act (Can.) — Interest Act, R.S.C. 1970, c. I-18, s. 8.

[*Tapio v. Kajander*, [1965] 1 O.R. 431, 48 D.L.R. (2d) 302; *Levy v. Booksban* (1931), 40 O.W.N. 187, folld; *Warren v. Cairns* (1915), 9 O.W.N. 232, refd to]



Beals *v.* Saldanha, [2003] 3 S.C.R. 416, 2003 SCC 72

**Geoffrey Saldanha, Leueen Saldanha and Dominic Thivy**              *Appellants*

*v.*

**Frederick H. Beals III and Patricia A. Beals**                    *Respondents*

**Indexed as:  Beals *v.* Saldanha**

**Neutral citation:  2003 SCC 72.**

File No.:  28829.

2003:  February 20; 2003:  December 18.

Present:  McLachlin C.J. and Gonthier, Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel and Deschamps JJ.

on appeal from the court of appeal for ontario

       *Conflict of laws — Foreign judgments — Enforcement — Action brought in Florida court over sale of Florida land valued at US$8,000 — Florida court entering default judgment against defendants resident in Ontario — Jury subsequently awarding US$210,000 in compensatory damages and US$50,000 in punitive damages — Defendants not properly defending action according to Florida law and not moving to have default judgment set aside or appealing jury award for damages — Whether "real and substantial connection" test for enforcing interprovincial judgments should be*

2003 SCC 72 (CanLII)

- 2 -

*extended to foreign judgments — Whether defence of fraud, public policy or natural justice established so that foreign judgment should not be enforced by Canadian courts — Whether enforcing foreign judgment constitutes violation of s. 7 of Canadian Charter of Rights and Freedoms.*

*Constitutional law — Charter of Rights — Fundamental justice — Whether s. 7 of Canadian Charter of Rights and Freedoms can shield a Canadian defendant from enforcement of foreign judgment.*

*Judgments and orders — Foreign judgments — Enforcement — Rules relating to recognition and enforcement of foreign judgments by Canadian courts — Nature and scope of defences available to judgment debtor.*

The appellants, residents of Ontario, sold a vacant lot situated in Florida to the respondents. A dispute arose as a result of that transaction and in 1986 the respondents sued the appellants and two other defendants in Florida. A defence was filed but the appellants chose not to defend any of the subsequent amendments to the action. Pursuant to Florida law, the failure to defend the amendments had the effect of not defending the action. The appellants were subsequently noted in default and were served with notice of a jury trial to establish damages. They did not respond to the notice nor did they attend the trial. The jury awarded the respondents US$210,000 in compensatory damages and US$50,000 in punitive damages. Upon receipt of the notice of the monetary judgment against them, the appellants sought legal advice. They were advised by an Ontario lawyer that the foreign judgment could not be enforced in Ontario. Relying on this advice, the appellants took no steps to have the judgment set aside or to appeal the judgment in Florida. The damages were not paid and an action was started

2003 SCC 72 (CanLII)

- 3 -

in Ontario to enforce the Florida judgment. By the time of the hearing in 1998, the foreign judgment with interest had grown to approximately C$800,000. The trial judge dismissed the action for enforcement primarily on the ground that there had been fraud in relation to the assessment of damages. The Court of Appeal allowed the respondents' appeal.

*Held* (Iacobucci, Binnie and LeBel JJ. dissenting): The appeal should be dismissed. The judgment of the Florida court should be enforced.

*Per* McLachlin C.J. and Gonthier, Major, Bastarache, Arbour and Deschamps JJ.: International comity and the prevalence of international cross-border transactions and movement call for a modernization of private international law. Subject to the legislatures adopting a different approach, the "real and substantial connection" test, which has until now only been applied to interprovincial judgments, should apply equally to the recognition and enforcement of foreign judgments. The test requires that a significant connection exist between the cause of action and the foreign court. Here, the "real and substantial connection" test is made out. The appellants entered into a property transaction in Florida when they bought and sold land. As such, there exists both a real and substantial connection between the Florida jurisdiction, the subject matter of the action and the defendants. Since the Florida court properly took jurisdiction, its judgment must be recognized and enforced by a domestic court provided that no defences bar its enforcement.

While fraud going to jurisdiction can always be raised before a domestic court to challenge the judgment, the merits of a foreign judgment can be challenged for fraud only where the allegations are new and not the subject of prior adjudication.

- 4 -

Where material facts not previously discoverable arise that potentially challenge the evidence that was before the foreign court, the domestic court can decline recognition of the judgment. The defendant has the burden of demonstrating that the facts sought to be raised could not have been discovered by the exercise of due diligence prior to the obtaining of the foreign judgment. Here, the defence of fraud is not made out. The appellants have not claimed that there was evidence of fraud that they could not have discovered had they defended the Florida action. In the absence of such evidence, the trial judge erred in concluding that there was fraud. Although the amount of damages awarded may seem disproportionate, it was a palpable and overriding error for the trial judge to conclude on the dollar amount of the judgment alone that the Florida jury must have been misled.

The defence of natural justice is restricted to the form of the foreign procedure and to due process, and does not relate to the merits of the case. If that procedure, while valid there, is not in accordance with Canada's concept of natural justice, the foreign judgment will be rejected. The defendant carries the burden of proof. In the circumstances of this case, the defence does not arise. The appellants failed to raise any reasonable apprehension of unfairness. They were fully informed about the Florida action, were advised of the case to meet and were granted a fair opportunity to do so. They did not defend the action. Once they received notice of the amount of the judgment, the appellants obviously had precise notice of the extent of their financial exposure. Their failure to move to set aside or appeal the Florida judgment when confronted with the size of the award of damages was not due to a lack of notice but due to their reliance upon negligent legal advice. That negligence cannot be a bar to the enforcement of the respondents' judgment.

2003 SCC 72 (CanLII)

- 5 -

The public policy defence prevents the enforcement of a foreign judgment which is contrary to the Canadian concept of justice, and turns on whether a foreign law is contrary to our view of basic morality. The award of damages by the Florida jury does not violate our principles of morality such that enforcement of the monetary judgment would shock the conscience of the reasonable Canadian. The sums involved, although they have grown large, are not by themselves a basis to refuse enforcement of the foreign judgment in Canada. The public policy defence is not meant to bar enforcement of a judgment rendered by a foreign court with a real and substantial connection to the cause of action for the sole reason that the claim in that foreign jurisdiction would not yield comparable damages in Canada.

Finally, the recognition and enforcement of the Florida judgment by a Canadian court would not constitute a violation of s. 7 of the *Canadian Charter of Rights and Freedoms*. Given that s. 7 does not shield a Canadian resident from the financial effects of the enforcement of a judgment rendered by a Canadian court, it should not shield a Canadian defendant from the enforcement of a foreign judgment.

*Per* Iacobucci and Binnie JJ. (dissenting): The "real and substantial connection" test provides an appropriate conceptual basis for the enforcement of final judgments obtained in foreign jurisdictions. While there is no doubt the Florida courts had jurisdiction over the dispute since the land was located in that jurisdiction, the question is whether the appellants in this proceeding were sufficiently informed of the case against them to allow them to determine, in a reasonable way, whether to participate in the Florida action, or to let it go by default. In this case, the appellants come within the traditional limits of the natural justice defence and the Ontario courts ought not to give effect to the Florida judgment.

2003 SCC 72 (CanLII)

- 6 -

2003 SCC 72 (CanLII)

The suggestion that the appellants are the authors of their own misfortune on the basis that if they had hired a Florida lawyer they would have found out about subsequent developments in the action cannot be accepted. The appellants decided not to defend the case set out against them in the complaint. That case was subsequently transformed. They never had the opportunity to put their minds to the transformed case because they were never told about it.

To make an informed decision, they should have been told in general terms of the case they had to meet on liability and been given an indication of the jeopardy they faced in terms of damages. The respondents' complaint did not adequately convey to the appellants the importance of the decision that would eventually be made in the Florida court.

Cumulatively, the events demonstrate an unfair procedure which in this particular case failed to meet the standards of natural justice. Nowhere was it brought to the appellants' attention that, under the Florida *Rules of Civil Procedure*, they were required to refile their defence every time the respondents amended their complaint against other defendants. In terms of procedural fairness, the appellants were entitled to assume that in the absence of any new allegations against them there was no need to refile a defence that had already been filed in the same action. A Canadian resident is not presumed to know the law of another jurisdiction. As the basis of the respondents' judgment is default of pleading, this lack of notification goes to the heart of the present appeal.

Furthermore, a party must be made aware of the potential jeopardy faced. The appellants received no notice of a 1987 court order striking out the claim for

- 7 -

punitive damages against the other defendants — the realtor and the title insurers — on grounds applicable, had they known about it, to the appellants. They were also not told, after being noted in default and before the jury trial, that the respondents had made a deal with the realtor to delete claims against the realtor for treble damages, punitive damages and statutory violations (though these claims were continued on almost identical facts against the appellants). Subsequently, the respondents settled with the realtor and with the title insurers, leaving the appellants as the sole target at the damages trial. They were not told about this. Nor were the appellants served with the court order for mandatory mediation which provided that all parties were required to participate or, as required by the Florida rules, with notice of the experts the respondents proposed to call at the damages assessment. Lastly, the respondents' complaint did not indicate that they were claiming damages on behalf of corporations, whose names appeared nowhere in the pleadings, in which they had an interest, and that they would be seeking damages for a corporation's lost opportunity to build an undefined number of homes on land to which neither the respondents nor the corporation held title.

A judgment based on inadequate notice is violative of natural justice. A default judgment that rests on such an unfair foundation should not be enforced. The fact that the appellants did not appeal the Florida judgment or seek the indulgence of the Florida court to set the default judgment aside for "excusable neglect" is a relevant consideration, but is not necessarily fatal, and in this case does not justify the enforcement in Ontario of the flawed Florida default judgment.

*Per* LeBel J. (dissenting): The "real and substantial connection" test should be modified significantly when it is applied to judgments originating outside the Canadian federation. Specifically, the assessment of the propriety of the foreign court's

- 8 -

jurisdiction should be carried out in a way that acknowledges the additional hardship

imposed on a defendant who is required to litigate in a foreign country. The purposive,

principled framework should not be confined, however, to the question of jurisdiction.

The impeachment defences of public policy, fraud and natural justice ought to be

reformulated. Liberalizing the jurisdiction side of the analysis while retaining narrow,

strictly construed categories on the defence side is not a coherent approach.

The jurisdiction test itself should be applied so that the assumption of

jurisdiction will not be recognized if it is unfair to the defendant. This requires taking

into account the differences between the international and interprovincial contexts. The

integrated character of the Canadian federation makes a high degree of cooperation

between the courts of the various provinces a practical necessity. It is also a

constitutional imperative, inherent in the relationship between the units of our federal

state, that each province must recognize the properly assumed jurisdiction of another,

and conversely that no court in a province can intermeddle in matters that are without

a constitutionally sufficient connection to that province. Comity as between sovereign

nations is not an obligation in the same sense. It follows from the contextual and

purpose-driven approach that the rules for recognition and enforcement of foreign-

country judgments should be carefully fashioned to reflect the realities of the

international context, and calibrated to further to the greatest degree possible, the

ultimate objective of facilitating international interactions. However, this does not mean

that they should be as liberal as the interprovincial rule. Ideally, the "real and substantial

connection" test should represent a balance designed to create the optimum conditions

favouring the flow of commodities and services across state lines. The connections

required before foreign-country judgments will be enforced should be specified more

strictly and in a manner that gives due weight to the protection of Canadian defendants

without disregarding the legitimate interests of foreign claimants. This approach is consistent with both the flexible nature of international comity as a principle of enlightened self-interest rather than absolute obligation, and the practical differences between the international and interprovincial contexts.

While the test should ensure that, considering the totality of the connections between the forum and all aspects of the action, it is not unfair to expect the defendant to litigate in that forum, it does not follow that there necessarily has to be a connection between the defendant and the forum. There are situations where, given the other connections between the forum and the proceeding, it is a reasonable place for the action to be heard and the defendant can fairly be expected to go there even though he or she personally has no link at all to that jurisdiction. Under this approach, the connection must be strong enough to make it reasonable for the defendant to be expected to litigate there even though that may entail additional expense, inconvenience, and risk. If litigating in the foreign jurisdiction is very burdensome to the defendant, a stronger degree of connection would be required before the originating court's assumption of jurisdiction should be recognized as fair and appropriate. In extreme cases, the foreign legal system itself may be inherently unfair. If the process that led to the judgment was unfair in itself, it is not fair to the defendant to enforce that judgment in any circumstance, even if the forum has very strong connections to the action and appears in every other respect to be the natural place for the action to be heard.

It follows from those propositions that the notion of interprovincial reciprocity is not equally applicable internationally. To treat a judgment from a foreign country exactly like one that originates within Canada fails to take into account the differences between the interprovincial and international contexts and fails to reflect the

2003 SCC 72 (CanLII)

- 10 -

differences between assuming jurisdiction and enforcing a foreign judgment. Lastly, s. 7 *Charter* rights are not usually relevant to jurisdictional issues in civil disputes and do not arise in this case, although it is possible that there may be situations where fundamental interests of the defendant are implicated and s. 7 could come into play.

In this case, Florida was the natural place for the action to be heard because there were very strong connections between that state and every component of the action: the plaintiffs, who live there; the land, which is in Florida; and the defendants, who involved themselves in real estate transactions there.

The public policy defence should be reserved for cases where the objection is to the law of the foreign forum, rather than the way the law was applied, or the size of the award *per se*. It should also apply to foreign laws that offend basic tenets of our civil justice system, principles that are widely recognized as having a quality of essential fairness. Here, the defects in the judgment, while severe, do not engage the public policy defence. The enforcement of such a large award in the absence of a connection either to harm suffered by the plaintiffs and caused by the defendants or to conduct deserving of punishment on the part of the defendants would be contrary to basic Canadian ideas of justice. But there is no evidence that the law of Florida offends these principles. On the contrary, the record indicates that Florida law requires proof of damages in the usual fashion and there is no indication that punitive damages are available where the defendant's conduct is not morally blameworthy.

In general, the rule that the defence of fraud must be based on previously undiscoverable evidence is a reasonably balanced solution. However, the possibility that a broader test should apply to default judgments in cases where the defendant's

2003 SCC 72 (CanLII)

- 11 -

decision not to participate was a demonstrably reasonable one should not be ruled out. If the defendant ignored what it justifiably considered to be a trivial or meritless claim, and can prove on the civil standard that the plaintiff took advantage of his absence to perpetrate a deliberate deception on the foreign court, it would be inappropriate to insist that a Canadian court asked to enforce the resulting judgment must turn a blind eye to those facts. Accordingly, a more generous version of the fraud defence ought to be available, as required, to address the dangers of abuse associated with the loosening of the jurisdiction test to admit a broad category of formerly unenforceable default judgments. In the present case, the defence of fraud is not made out. All the facts that the appellants raise in this connection were known to them or could have been discovered at the time of the Florida action. Furthermore, even though this is the kind of case for which a more lenient interpretation of the fraud defence would, in principle, be appropriate, because the appellants' decision not to attend the Florida proceedings was a reasonable one, given the lack of evidence, the defence could not succeed even on the view that the judgment could be vitiated by proof of intentional fraud.

The defence of natural justice concerns the procedure by which the foreign court reached its decision. If a defendant can establish that the process by which the foreign judgment was obtained was contrary to the Canadian conception of natural justice, then the foreign judgment should not be enforced. Two developments should be recognized in connection with this defence: the requirements of notice and a hearing should be construed in a purposive and flexible manner, and substantive principles of justice should also be included in the scope of the defence. Notice is adequate when the defendant is given enough information to assess the extent of his or her jeopardy. This means, among other things, that the defendant should be made aware of the approximate amount sought. Adequate notice must also include alerting the defendant to the

2003 SCC 72 (CanLII)

- 12 -

consequences of any procedural steps taken or not taken, as well as to the allegations that will be adjudicated at trial. In assessing whether the defence of natural justice has been made out, the opportunities for correcting a denial of natural justice that existed in the originating jurisdiction should be assessed in light of all the relevant factors. Here, the Ontario defendants were not given sufficient notice of the extent and nature of the claims against them in the Florida action and its potential ramifications. Furthermore, there was no notice as to the serious consequences to the defendants of failure to refile their defence in response to the plaintiffs' repeatedly amended pleadings. As a result, the notice afforded to the defendants did not meet the requirements of natural justice. Finally, the mere fact that the appellants have received mistaken legal advice and did not avail themselves of the remedies available in Florida should not operate to relieve the respondents entirely of the consequences of a significant or substantial failure to observe the rules of natural justice, and it should not, in itself, bar the appellants from relying on this defence. In the circumstances of this case, when all the relevant factors are considered, the appellants' apprehensiveness about going to Florida to seek relief was understandable.

Even if the natural justice defence did not apply, this judgment should not be enforced. The facts raise very serious concerns about the fairness of enforcing the Florida judgment which do not fit easily into the categories identified by the traditional impeachment defences. The circumstances of this case are such that the enforcement of this judgment would shock the conscience of Canadians and cast a negative light on our justice system. The appellants have done nothing that infringes the rights of the respondents and have certainly done nothing to deserve such harsh punishment. Nor can they be said to have sought to avoid their obligations by hiding in their own jurisdiction or to have shown disrespect for the legal system of Florida. They have acted in good

- 13 -

faith throughout and have diligently taken all the steps that appeared to be required of them, based on the information and advice they had. The plaintiffs in Florida appear to have taken advantage of the defendants' difficult position to pursue their interests as aggressively as possible and to secure a sizeable windfall. The Ontario court should not have to set its seal of approval on the judgment thus obtained without regard for the dubious nature of the claim, the fact that the parties did not compete on a level playing field, and the lack of transparency in the Florida proceedings. The implication of the majority position is that Canadian defendants will from now on be obliged to participate in foreign lawsuits no matter how meritless the claim or how small the amount of damages appears to be, on pain of potentially devastating consequences from which Canadian courts will be virtually powerless to protect them. Moving the law of conflicts in such a direction should be avoided.

**Cases Cited**

By Major J.

   **Applied:** *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; **referred to:** *Moses v. Shore Boat Builders Ltd.* (1993), 106 D.L.R. (4th) 654, leave to appeal refused, [1994] 1 S.C.R. xi; *United States of America v. Ivey* (1996), 30 O.R. (3d) 370; *Old North State Brewing Co. v. Newlands Services Inc.*, [1999] 4 W.W.R. 573; *Muscutt v. Courcelles* (2002), 213 D.L.R. (4th) 577; *Indyka v. Indyka*, [1969] 1 A.C. 33; *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393; *Hunt v. T&N plc*, [1993] 4 S.C.R. 289; *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78; *Woodruff v. McLennan* (1887), 14 O.A.R. 242; *Jacobs v. Beaver*

- 14 -

(1908), 17 O.L.R. 496; *Roglass Consultants Inc. v. Kennedy, Lock* (1984), 65 B.C.L.R. 393; *Powell v. Cockburn*, [1977] 2 S.C.R. 218.

By Binnie J. (dissenting)

      *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Hunt v. T&N plc*, [1993] 4 S.C.R. 289; *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022; *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78; *Baker v. Canada (Minister of Citizenship and Immigration)*, [1999] 2 S.C.R. 817; *Adams v. Cape Industries plc*, [1991] 1 All E.R. 929.

By LeBel J. (dissenting)

      *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Hunt v. T&N plc*, [1993] 4 S.C.R. 289; *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78; *Hilton v. Guyot*, 159 U.S. 113 (1895); *Yahoo!, Inc. v. Ligue contre le racisme et l'antisémitisme*, 169 F.Supp.2d 1181 (2001); *Emanuel v. Symon*, [1908] 1 K.B. 302; *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393; *Mercandino v. Devoe & Raynolds, Inc.*, 436 A.2d 942 (1981); *United States of America v. Ivey* (1995), 26 O.R. (3d) 533; *Kidron v. Grean* (1996), 48 O.R. (3d) 775; *Boardwalk Regency Corp. v. Maalouf* (1992), 88 D.L.R. (4th) 612; *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996); *Loewen Group, Inc. v. United States of America*, International Centre for Settlement of Investment Disputes, Case No. ARB(AF)/98/3, June 26, 2003; *Woodruff v. McLennan* (1887), 14 O.A.R. 242; *Abouloff v. Oppenheimer* (1882), 10 Q.B.D. 295; *Owens Bank Ltd. v. Bracco*, [1992] 2 All E.R. 193; *Jacobs v. Beaver* (1908), 17 O.L.R. 496; *Duchess of Kingston's Case* (1776), 2 Sm. L.C. (8th ed.)

- 15 -

784; *Powell v. Cockburn*, [1977] 2 S.C.R. 218; *Adams v. Cape Industries plc*, [1991] 1 All E.R. 929; *Cité de Pont Viau v. Gauthier Mfg. Ltd.*, [1978] 2 S.C.R. 516.

**Statutes and Regulations Cited**

*Canadian Charter of Rights and Freedoms*, s. 7.

*Civil Code of Québec*, S.Q. 1991, c. 64.

Fla. Stat. Ann. R. Civ. P. § 1.190(a) (West 1967).

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, r. 19.02(3).

*United States Constitution*, Article IV, Amendment V, Amendment XIV.

**Authors Cited**

Blom, Joost. "Conflict of Laws — Enforcement of Extraprovincial Default Judgment — Real and Substantial Connection: *Morguard Investments Ltd.* v. *De Savoye*" (1991), 70 *Can. Bar Rev.* 733.

Blom, Joost. "The Enforcement of Foreign Judgments: *Morguard* Goes Forth Into the World" (1997), 28 *Can. Bus. L.J.* 373.

Brown, Donald J. M., and John M. Evans. *Judicial Review of Administrative Action in Canada*. Toronto: Canvasback, 1998 (loose-leaf updated July 2003).

Castel, Jean-Gabriel, and Janet Walker. *Canadian Conflict of Laws*, 5th ed. Toronto: Butterworths, 2002 (loose-leaf updated May 2003, Issue 5).

*Dicey and Morris on the Conflict of Laws*, vol. 1, 13th ed. Under the general editorship of Lawrence Collins. London: Sweet & Maxwell, 2000.

Nygh, P. E. *Conflict of Laws in Australia*, 6th ed. North Ryde: Butterworths, 1995.

Talpis, Jeffrey A., with the collaboration of Shelley L. Kath. "*If I am from Grand-Mère, Why Am I Being Sued in Texas?*" *Responding to Inappropriate Foreign Jurisdiction in Quebec-United States Crossborder Litigation*. Montréal: Thémis, 2001.

Walker, Janet. "*Beals v. Saldanha*: Striking the Comity Balance Anew" (2002), 5 *Can. Int'l Law.* 28.

- 16 -

Watson, Garry D., and Frank Au.  "Constitutional Limits on Service Ex Juris: Unanswered Questions from Morguard" (2000), 23 *Advocates' Q.* 167.

Yntema, Hessel E.  "The Objectives of Private International Law" (1957), 35 *Can. Bar Rev.* 721.

Ziegel, Jacob S. "Enforcement of Foreign Judgments in Canada, Unlevel Playing Fields, and *Beals v. Saldanha*:  A Consumer Perspective" (2003), 38 *Can. Bus. L.J.* 294.

APPEAL from a judgment of the Ontario Court of Appeal (2001), 54 O.R. (3d) 641, 202 D.L.R. (4th) 630, 148 O.A.C. 1, 10 C.P.C. (5th) 191, [2001] O.J. No. 2586 (QL), reversing a judgment of the Ontario Court (General Division) (1998), 42 O.R. (3d) 127, 27 C.P.C. (4th) 144, [1998] O.J. No. 4519 (QL).  Appeal dismissed, Iacobucci, Binnie and LeBel JJ. dissenting.

*J. Brian Casey, Janet E. Mills* and *Matthew J. Latella,* for the appellants Geoffrey Saldanha and Leueen Saldanha.

*Neal H. Roth,* for the appellant Dominic Thivy.

*Messod Boussidan, Larry J. Levine, Q.C.,* and *Kevin D. Sherkin,* for the respondents.

The judgment of McLachlin C.J. and Gonthier, Major, Bastarache, Arbour and Deschamps JJ. was delivered by

MAJOR J. —

I. Introduction

- 17 -

1          The rules related to the recognition and enforcement of foreign judgments by Canadian courts are the focus of this appeal. "Foreign" in the context of this case refers to a judgment rendered by a court outside Canada, as opposed to an interprovincial judgment.

2          The appellants, residents of Ontario, were the owners of a vacant lot in Sarasota County, Florida. They sold the lot to the respondents. A dispute arose as a result of that transaction. The respondents eventually commenced two actions against the appellants in Florida. Only the second action is relevant to this appeal. The appellants received notice at all stages of the litigation and defended the first action, which was dismissed without prejudice. A defence was filed to the second action without the knowledge of the Saldanhas.

3          The appellants chose not to defend any of the three subsequent amendments to the second action. Pursuant to Florida law, the failure to defend the amendments had the effect of not defending the second action and the appellants were subsequently noted in default. Damages of US$260,000 were awarded by a jury convened to assess damages. The damages were not paid and an action was started in Ontario to enforce the Florida judgment.

4          We have to first determine the circumstances under which a foreign judgment shall be recognized and enforced in Canada. Next, the nature and scope of the defences available to the judgment debtor must be established. For the purposes of these reasons, I assume the laws of other Canadian provinces are substantially the same as in Ontario and for that reason, Canada and Ontario are used interchangeably. A future case

2003 SCC 72 (CanLII)

- 18 -

involving another part of Canada will be considered in light of whatever differences, if any, exist there.

II. Facts

5          The appellants were Ontario residents. In 1981, they and Rose Thivy, who is Dominic Thivy's wife and no longer a party to this action, purchased a lot in Florida for US$4,000. Three years later, Rose Thivy was contacted by a real estate agent acting for the respondents as well as for William and Susanne Foody (who assigned their interest to the Bealses' and are no longer parties to this action) enquiring about purchasing the lot. In the name of her co-owners, Mrs. Thivy advised the agent that they would sell the lot for US$8,000. The written offer erroneously referred to "Lot 1" as the lot being purchased instead of "Lot 2". Rose Thivy advised the real estate agent of the error and subsequently changed the number of the lot on the offer to "Lot 2". The amended offer was accepted and "Lot 2" was transferred to the respondents and the Foodys.

6          The respondents had purchased the lot in question in order to construct a model home for their construction business. Some months later, the respondents learned that they had been building on Lot 1, a lot that they did not own. In February 1985, the respondents commenced what was the first action in Charlotte County, Florida, for "damages which exceed $5,000". This was a customary way of pleading in Florida to give the Circuit Court monetary jurisdiction. The appellants, representing themselves, filed a defence. In September 1986, the appellants were notified that that action had been dismissed voluntarily and without prejudice because it had been brought in the wrong county.

- 19 -

7          In September 1986, a second action ("Complaint") was commenced by the respondents in the Circuit Court for Sarasota County, Florida. That Complaint was served on the appellants, in Ontario, to rescind the contract of purchase and sale and claimed damages in excess of US$5,000, treble damages and other relief authorized by statute in Florida. This Complaint was identical to that in the first action except for the addition of allegations of fraud. Shortly thereafter, an Amended Complaint, simply deleting one of the defendants, was served on the appellants. A statement of defence (a duplicate of the defence filed in the first action) was filed by Mrs. Thivy on behalf of the appellants. The trial judge accepted the evidence of the Saldanhas that they had not signed the document. Accordingly, the Saldanhas were found not to have attorned. As discussed further in these reasons, Dominic Thivy's situation differs.

8          In May 1987, the respondents served a Second Amended Complaint which modified allegations brought against a co-defendant who is no longer a party, but included all the earlier allegations brought against the appellants. No defence was filed. A Third Amended Complaint was served on the appellants on May 7, 1990 and again, no defence was filed. Under Florida law, the appellants were required to file a defence to each new amended complaint; otherwise, they risked being noted in default. A motion to note the appellants in default for their failure to file a defence to the Third Amended Complaint and a notice of hearing were served on the appellants in June 1990. The appellants did not respond to this notice. On July 25, 1990, a Florida court entered "default" against the appellants, the effect of which, under Florida law, was that they were deemed to have admitted the allegations contained in the Third Amended Complaint.

2003 SCC 72 (CanLII)

- 20 -

9          The appellants were served with notice of a jury trial to establish damages. They did not respond to the notice nor did they attend the trial held in December 1991. Mr. Foody, the respondent Mr. Beals, and an expert witness on business losses testified at the trial. The jury awarded the respondents damages of US$210,000 in compensatory damages and US$50,000 in punitive damages, plus post-judgment interest of 12 percent per annum. Notice of the monetary judgment was received by the appellants in late December 1991.

10        Upon receipt of the notice of the monetary judgment against them, the Saldanhas sought legal advice. They were advised by an Ontario lawyer that the foreign judgment could not be enforced in Ontario because the appellants had not attorned to the Florida court's jurisdiction. Relying on this advice, the appellants took no steps to have the judgment set aside, as they were entitled to try and do under Florida law, or to appeal the judgment in Florida. Florida law permitted the appellants ten days to commence an appeal and up to one year to bring a motion to have the judgment obtained there set aside on the grounds of "excusable neglect", "fraud" or "other misconduct of an adverse party".

11        In 1993, the respondents brought an action before the Ontario Court (General Division) seeking the enforcement of the Florida judgment. By the time of the hearing before that court, in 1998, the foreign judgment, with interest, had grown to approximately C$800,000. The trial judge dismissed the action for enforcement on the ground that there had been fraud in relation to the assessment of damages and for the additional reason of public policy. The Ontario Court of Appeal, Weiler J.A. dissenting, allowed the appeal.

2003 SCC 72 (CanLII)

- 21 -

III. Judgments Below

A. *Ontario Court (General Division)* (1998), 42 O.R. (3d) 127

12          The trial judge declared the Florida judgment unenforceable in Ontario.
Having concluded from the verdict of the Florida jury that it had not been made aware
of certain facts, the trial judge dismissed the action on the basis of fraud. He also held
that the judgment was unenforceable on the grounds of public policy. The trial judge
recommended that the defence of public policy be broadened to include a "judicial sniff
test" which would permit a domestic court to refuse enforcement of a foreign judgment
in cases where the facts did not satisfy any of the three existing defences to enforcement
but were nevertheless egregious.

B. *Ontario Court of Appeal* (2001), 54 O.R. (3d) 641

13          A majority of the Ontario Court of Appeal allowed the appeal. Doherty and
Catzman JJ.A. concluded that neither the defence of fraud nor of public policy had
application to this case.

14          As to the defence of fraud, Doherty J.A. held that that defence was only
available where the allegations of fraud rest on "newly discovered facts", that is, facts
that a defendant could not have discovered through the exercise of reasonable diligence
prior to the granting of the judgment. He concluded that the trial judge erred in relying
on assumed facts that conceivably might have been uncovered by the appellants had they
chosen to participate in the Florida proceedings. Even if the trial judge had correctly

- 22 -

defined the defence of fraud, Doherty J.A. held that there was no evidence that the

judgment had been obtained by fraud.

15          On the defence of public policy, Doherty J.A. rejected the need to

incorporate a "judicial sniff test" as part of that defence.  Assuming a "sniff test" was

required, he held that no reasons existed in this appeal for public policy to preclude the

enforcement of the foreign judgment. He stated (at para. 84):

> The Beals and Foodys launched a lawsuit in Florida. Florida was an entirely
> proper court for the determination of the allegations in that lawsuit. The
> Beals and Foodys complied with the procedures dictated by the Florida
> rules. There is no evidence that they misled the Florida court on any matter.
> Rather, it would seem they won what might be regarded as a very weak case
> because the respondents chose not to defend the action. I find nothing in the
> record to support the trial judge's characterization of the conduct of the
> Beals and Foodys in Florida as "egregious". They brought their allegations
> in the proper forum, followed the proper procedures, and were immensely
> successful in no small measure because the respondents chose not to
> participate in the proceedings.

16          Weiler J.A., in dissent, would have dismissed the appeal.  She concluded that

the defences of natural justice and fraud made it inappropriate for a domestic court to

enforce the Florida judgment.  She stated that the appellants were deprived of natural

justice by not having been given sufficient notice to permit them to appreciate the extent

of their jeopardy prior to the judgment for damages against them.  Weiler J.A. also held

that the respondents had concealed certain facts from the Florida jury.

IV.  Analysis

17          It was properly conceded by the parties, as explained below, in both the trial

court and Court of Appeal, that the Florida court had jurisdiction over the respondents'

- 23 -

action pursuant to the "real and substantial connection" test set out in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077. As a result, the issues raised in this appeal were limited to the application and scope of the defences available to a domestic defendant seeking to have a Canadian court refuse enforcement of a foreign judgment.

18          In *Morguard, supra*, the "real and substantial connection" test for the recognition and enforcement of interprovincial judgments was adopted. *Morguard* did not decide whether that test applied to foreign judgments. However, some courts have extended the application of *Morguard* to judgments rendered outside Canada: *Moses v. Shore Boat Builders Ltd.* (1993), 106 D.L.R. (4th) 654 (B.C.C.A.), leave to appeal refused, [1994] 1 S.C.R. xi; *United States of America v. Ivey* (1996), 30 O.R. (3d) 370 (C.A.); *Old North State Brewing Co. v. Newlands Services Inc.*, [1999] 4 W.W.R. 573 (B.C.C.A.).

19          The question arises whether the "real and substantial connection" test, which is applied to interprovincial judgments, should apply equally to the recognition of foreign judgments. For the reasons that follow, I conclude that it should. While there are compelling reasons to expand the test's application, there does not appear to be any principled reason not to do so. In light of this, the parties' concession on the point was appropriate.

20          *Morguard, supra*, altered the old common law rules for the recognition and enforcement of interprovincial judgments. These rules, based on territoriality, sovereignty, independence and attornment, were held to be outmoded. La Forest J. concluded that it had been an error to adopt this approach "even in relation to judgments given in sister-provinces" (p. 1095). Central to the decision to modernize the common

- 24 -

2003 SCC 72 (CanLII)

law rules was the doctrine of comity.  Comity was defined as (at pp. 1095 and 1096, respectively):

> . . . the deference and respect due by other states to the actions of a state legitimately taken within its territory. . . .
>
> . . .
>
> . . . the recognition which one nation allows within its territory to the legislative, executive and judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws. . . .

21       Early common law rules were amended by rules intended to facilitate the flow of wealth, skills and people across boundaries, particularly boundaries of a federal state. *Morguard* established that the determination of the proper exercise of jurisdiction by a court depended upon two principles (relied on by the Ontario Court of Appeal in *Muscutt v. Courcelles* (2002), 213 D.L.R. (4th) 577, at para. 34), the first being the need for "order and fairness".  The second was the existence of a "real and substantial connection" (see also *Indyka v. Indyka*, [1969] 1 A.C. 33 (H.L.); *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393).

22       Modern ideas of order and fairness require that a court must have reasonable grounds for assuming jurisdiction where the participants to the litigation are connected to multiple jurisdictions.

23       *Morguard* established that the courts of one province or territory should recognize and enforce the judgments of another province or territory, if that court had properly exercised jurisdiction in the action, namely that it had a real and substantial connection with either the subject matter of the action or the defendant.  A substantial

- 25 -

connection with the subject matter of the action will satisfy the real and substantial connection test even in the absence of such a connection with the defendant to the action.

2003 SCC 72 (CanLII)

A. *The "Real and Substantial Connection" Test and Foreign Judgments*

24    The question then is whether the real and substantial connection test should apply to the recognition and enforcement of foreign judgments?

25    In *Moran, supra*, at p. 409, it was recognized that where individuals carry on business in another provincial jurisdiction, it is reasonable that those individuals be required to defend themselves there when an action is commenced:

> By tendering his products in the market place directly or through normal distributive channels, a manufacturer ought to assume the burden of defending those products wherever they cause harm as long as the forum into which the manufacturer is taken is one that he reasonably ought to have had in his contemplation when he so tendered his goods.

That reasoning is equally compelling with respect to foreign jurisdictions.

26    Although La Forest J. noted in *Morguard* that judgments from beyond Canada's borders could raise different issues than judgments within the federation, he recognized the value of revisiting the rules related to the recognition and enforcement of foreign judgments (at p. 1098):

> The business community operates in a world economy and we correctly speak of a world community even in the face of decentralized political and legal power. Accommodating the flow of wealth, skills and people across state lines has now become imperative. Under these circumstances, our approach to the recognition and enforcement of foreign judgments would appear ripe for reappraisal. [Emphasis added.]

- 26 -

Although use of the word "foreign" in the above quotation referred to judgments rendered in a sister province, the need to accommodate "the flow of wealth, skills and people across state lines" is as much an imperative internationally as it is interprovincially.

27          The importance of comity was analysed at length in *Morguard, supra*. This doctrine must be permitted to evolve concomitantly with international business relations, cross-border transactions, as well as mobility.  The doctrine of comity is

> grounded in the need in modern times to facilitate the flow of wealth, skills
> and people across state lines in a fair and orderly manner.

(*Morguard, supra*, at p. 1096)

This doctrine is of particular importance viewed internationally.  The principles of order and fairness ensure security of transactions, which necessarily underlie the modern concept of private international law.    Although *Morguard* recognized that the considerations underlying the doctrine of comity apply with greater force between the units of a federal state, the reality of international commerce and the movement of people continue to be "directly relevant to determining the appropriate response of private international law to particular issues, such as the enforcement of monetary judgments" (J. Blom, "The Enforcement of Foreign Judgments:   *Morguard* Goes Forth Into the World" (1997), 28 *Can. Bus. L.J.* 373, at p. 375).

28          International comity and the prevalence of international cross-border transactions and movement call for a modernization of private international law.  The principles set out in *Morguard, supra*, and further discussed in *Hunt v. T&N plc*, [1993] 4 S.C.R. 289, can and should be extended beyond the recognition of interprovincial

- 27 -

judgments, even though their application may give rise to different considerations internationally. Subject to the legislatures adopting a different approach by statute, the "real and substantial connection" test should apply to the law with respect to the enforcement and recognition of foreign judgments.

29        Like comity, the notion of reciprocity is equally compelling both in the international and interprovincial context.   La Forest J. discussed interprovincial reciprocity in *Morguard, supra.* He stated (at p. 1107):

> . . . if this Court thinks it inherently reasonable for a court to exercise jurisdiction under circumstances like those described, it would be odd indeed if it did not also consider it reasonable for the courts of another province to recognize and enforce that court's judgment.

In light of the principles of international comity, La Forest J.'s discussion of reciprocity is also equally applicable to judgments made by courts outside Canada.  In the absence of a different statutory approach, it is reasonable that a domestic court recognize and enforce a foreign judgment where the foreign court assumed jurisdiction on the same basis as the domestic court would, for example, on the basis of a "real and substantial connection" test.

30        Federalism was a central concern underlying the decisions in *Morguard, supra,* and *Hunt, supra.*  In the latter, La Forest J. stated that he did not think that "litigation engendered against a corporate citizen located in one province by its trading and commercial activities in another province should necessarily be subject to the same rules as those applicable to international commerce" (*Hunt, supra,* at p. 323).  Recently, *Spar Aerospace Ltd. v. American Mobile Satellite Corp.,* [2002] 4 S.C.R. 205, 2002 SCC

2003 SCC 72 (CanLII)

- 28 -

78, suggested, in *obiter*, that it may be necessary to afford foreign judgments a different

treatment than that recognized for interprovincial judgments (*per* LeBel J., at para. 51):

> However, it is important to emphasize that *Morguard* and *Hunt* were
> decided in the context of interprovincial jurisdictional disputes. In my
> opinion, the specific findings of these decisions cannot easily be extended
> beyond this context. In particular, the two cases resulted in the enhancing
> or even broadening of the principles of reciprocity and speak directly to the
> context of interprovincial comity within the structure of the Canadian
> federation. . . .

Although La Forest J. and LeBel J. suggested that the rules applicable to interprovincial

versus foreign judgments should differ, they do not preclude the application of the "real

and substantial connection" test to both types of judgments, provided that any unfairness

that may arise as a result of the broadened application of that test be taken into account.

31          The appellants submitted that the recognition of foreign judgments rendered

by courts with a real and substantial connection to the action or parties is particularly

troublesome in the case of foreign default judgments.  If the "real and substantial

connection" test is applied to the recognition of foreign judgments, they argue the test

should be modified in the recognition and enforcement of default judgments.  In the

absence of unfairness or other equally compelling reasons which were not identified in

this appeal, there is no logical reason to distinguish between a judgment after trial and

a default judgment.

32          The "real and substantial connection" test requires that a significant

connection exist between the cause of action and the foreign court.  Furthermore, a

defendant can reasonably be brought within the embrace of a foreign jurisdiction's law

where he or she has participated in something of significance or was actively involved

- 29 -

in that foreign jurisdiction. A fleeting or relatively unimportant connection will not be enough to give a foreign court jurisdiction. The connection to the foreign jurisdiction must be a substantial one.

33          In the present case, the appellants purchased land in Florida, an act that represents a significant engagement with the foreign jurisdiction's legal order. Where a party takes such positive and important steps that bring him or her within the proper jurisdiction of a foreign court, the fear of unfairness related to the duty to defend oneself is lessened. If a Canadian enters into a contract to buy land in another country, it is not unreasonable to expect the individual to enter a defence when sued in that jurisdiction with respect to the transaction.

34          The "real and substantial connection" test is made out for all of the appellants. There exists both a real and substantial connection between the Florida jurisdiction, the subject matter of the action and the defendants. As stated in J.-G. Castel and J. Walker, *Canadian Conflict of Laws* (5th ed. (loose-leaf)), at p. 14-10:

> For the recognition or enforcement in Canada of a foreign judgment *in personam*, the foreign court must have had jurisdiction according to Canadian rules of the conflict of laws.

In light of Canadian rules of conflict of laws, Dominic Thivy attorned to the jurisdiction of the Florida court when he entered a defence to the second action. His subsequent procedural failures under Florida law do not invalidate that attornment. As such, irrespective of the real and substantial connection analysis, the Florida court would have had jurisdiction over Mr. Thivy for the purposes of enforcement in Ontario.

2003 SCC 72 (CanLII)

- 30 -

2003 SCC 72 (CanLII)

35        A Canadian defendant sued in a foreign jurisdiction has the ability to redress any real or apparent unfairness from the foreign proceedings and the judgment's subsequent enforcement in Canada. The defences applicable in Ontario are natural justice, public policy and fraud. In addition, defendants sued abroad can raise the doctrine of *forum non conveniens*. This would apply in the usual way where it is claimed that the proceedings are not, on the basis of convenience, expense and other considerations, in the proper forum.

36        Here, the appellants entered into a property transaction in Florida when they bought and sold land. Having taken this positive step to bring themselves within the jurisdiction of Florida law, the appellants could reasonably have been expected to defend themselves when the respondents started an action against them in Florida. The appellants failed to defend the claim pursuant to the Florida rules. Nonetheless, they were still entitled, within ten days, to appeal the Florida default judgment, which they did not. In addition, the appellants did not avail themselves of the additional one-year period to have the Florida judgment for damages set aside. While their failure to move to set aside or appeal the Florida judgment was due to their reliance upon negligent legal advice, that negligence cannot be a bar to the enforcement of the respondents' judgment.

37        There are conditions to be met before a domestic court will enforce a judgment from a foreign jurisdiction. The enforcing court, in this case Ontario, must determine whether the foreign court had a real and substantial connection to the action or the parties, at least to the level established in *Morguard*, *supra*. A real and substantial connection is the overriding factor in the determination of jurisdiction. The presence of more of the traditional indicia of jurisdiction (attornment, agreement to submit, residence and presence in the foreign jurisdiction) will serve to bolster the real and substantial

- 31 -

connection to the action or parties. Although such a connection is an important factor, parties to an action continue to be free to select or accept the jurisdiction in which their dispute is to be resolved by attorning or agreeing to the jurisdiction of a foreign court.

38          If a foreign court did not properly take jurisdiction, its judgment will not be enforced. Here, it was correctly conceded by the litigants that the Florida court had a real and substantial connection to the action and parties.

B. *Defences to the Enforcement of Judgments*

39          Once the "real and substantial connection" test is found to apply to a foreign judgment, the court should then examine the scope of the defences available to a domestic defendant in contesting the recognition of such a judgment.

40          The defences of fraud, public policy and lack of natural justice were developed before *Morguard, supra*, and still pertain. This Court has to consider whether those defences, when applied internationally, are able to strike the balance required by comity, the balance between order and fairness as well as the real and substantial connection, in respect of enforcing default judgments obtained in foreign courts.

41          These defences were developed by the common law courts to guard against potential unfairness unforeseen in the drafting of the test for the recognition and enforcement of judgments. The existing defences are narrow in application. They are the most recognizable situations in which an injustice may arise but are not exhaustive.

- 32 -

42         Unusual situations may arise that might require the creation of a new defence to the enforcement of a foreign judgment. However, the facts of this case do not justify speculating on that possibility. Should the evolution of private international law require the creation of a new defence, the courts will need to ensure that any new defences continue to be narrow in scope, address specific facts and raise issues not covered by the existing defences.

    (1)  The Defence of Fraud

43         As a general but qualified statement, neither foreign nor domestic judgments will be enforced if obtained by fraud.

44         Inherent to the defence of fraud is the concern that defendants may try to use this defence as a means of relitigating an action previously decided and so thwart the finality sought in litigation. The desire to avoid the relitigation of issues previously tried and decided has led the courts to treat the defence of fraud narrowly. It limits the type of evidence of fraud which can be pleaded in response to a judgment. If this Court were to widen the scope of the fraud defence, domestic courts would be increasingly drawn into a re-examination of the merits of foreign judgments. That result would obviously be contrary to the quest for finality.

45         Courts have drawn a distinction between "intrinsic fraud" and "extrinsic fraud" in an attempt to clarify the types of fraud that can vitiate the judgment of a foreign court. Extrinsic fraud is identified as fraud going to the jurisdiction of the issuing court or the kind of fraud that misleads the court, foreign or domestic, into believing that it has jurisdiction over the cause of action. Evidence of this kind of fraud, if accepted, will

- 33 -

justify setting aside the judgment. On the other hand, intrinsic fraud is fraud which goes to the merits of the case and to the existence of a cause of action. The extent to which evidence of intrinsic fraud can act as a defence to the recognition of a judgment has not been as clear as that of extrinsic fraud.

46          A restrictive application of the defence of fraud was endorsed in *Woodruff v. McLennan* (1887), 14 O.A.R. 242. The Ontario Court of Appeal stated, at pp. 254-55, that the defence could be raised where

> the recovery was collusive, [the] defendant had never been served with process, . . . the suit had been undefended without defendant's default, . . . the defendant had been fraudulently persuaded by plaintiff to let judgment go by default . . . or some fraud to defendant's prejudice committed or allowed in the proceedings of the other Court. . . .

*Woodruff* established that evidence of fraud that went to the merits of the case (intrinsic) was inadmissible. Only evidence of fraud which misled a court into taking jurisdiction (extrinsic) was admissible and could bar the enforcement of the judgment.

47          *Woodruff, supra*, was subsequently modified by the Ontario Court of Appeal. See *Jacobs v. Beaver* (1908), 17 O.L.R. 496, at p. 506:

> . . . the fraud relied on must be something collateral or extraneous, and not merely the fraud which is imputed from alleged false statements made at the trial, which were met by counter-statements by the other side, and the whole adjudicated upon by the Court and so passed on into the limbo of estoppel by the judgment. This estoppel cannot, in my opinion, be disturbed except upon the allegation and proof of new and material facts, or newly discovered and material facts which were not before the former Court and from which are to be deduced the new proposition that the former judgment was obtained by fraud. The burden of that issue is upon the defendant, and until he at least gives *prima facie* evidence in support of it, the estoppel stands. And it may be, as I have before stated, that when such evidence is given,

- 34 -

and in order to fully prove this new issue, the whole case should be re-opened. [Emphasis added.]

The court, in *Jacobs*, acknowledged that in addition to evidence of extrinsic fraud, evidence of intrinsic fraud was admissible where the defendant could establish "proof of new and material facts" that, not being available at the time of trial, were not before the issuing court and demonstrate that the judgment sought to be enforced was obtained by fraud.

48        Contrary to the decision of the Ontario Court of Appeal in *Jacobs*, the courts of British Columbia take a different view. In *Roglass Consultants Inc. v. Kennedy, Lock* (1984), 65 B.C.L.R. 393, the British Columbia Court of Appeal maintained the strict approach to the fraud defence set out in *Woodruff*. It held that only extrinsic fraud could be raised in defence of the enforcement of a foreign judgment.

49        In *Powell v. Cockburn*, [1977] 2 S.C.R. 218, it was clear that the aim in refusing recognition of a judgment because of fraud "is to prevent abuse of the judicial process" (p. 234). In that case, the Court did not address fraud going to the merits of a judgment but did confirm that fraud going to jurisdiction (extrinsic fraud) is always open to impeachment.

50        What should be the scope of the defence of fraud in relation to foreign judgments? *Jacobs*, *supra*, represents a reasonable approach to that defence. It effectively balances the need to guard against fraudulently obtained judgments with the need to treat foreign judgments as final. I agree with Doherty J.A. for the majority in the Court of Appeal that the "new and material facts" discussed in *Jacobs* must be limited

- 35 -

to those facts that a defendant could not have discovered and brought to the attention of the foreign court through the exercise of reasonable diligence.

51          The historic description of and the distinction between intrinsic and extrinsic fraud are of no apparent value and, because of their ability to both complicate and confuse, should be discontinued. It is simpler to say that fraud going to jurisdiction can always be raised before a domestic court to challenge the judgment. On the other hand, the merits of a foreign judgment can be challenged for fraud only where the allegations are new and not the subject of prior adjudication. Where material facts not previously discoverable arise that potentially challenge the evidence that was before the foreign court, the domestic court can decline recognition of the judgment.

52          Where a foreign judgment was obtained by fraud that was undetectable by the foreign court, it will not be enforced domestically. "Evidence of fraud undetectable by the foreign court" and the mention of "new and material facts" in *Jacobs*, *supra*, demand an element of reasonable diligence on the part of a defendant.  To repeat Doherty J.A.'s ruling, in order to raise the defence of fraud, a defendant has the burden of demonstrating that the facts sought to be raised could not have been discovered by the exercise of due diligence prior to the obtaining of the foreign judgment.  See para. 43:

> A due diligence requirement is consistent with the policy underlying the recognition and enforcement of foreign judgments. In the modern global village, decisions made by foreign courts acting within Canadian concepts of jurisdiction and in accordance with fundamental principles of fairness should be respected and enforced. <u>That policy does not, however, extend to protect decisions which are based on fraud that could not, through the exercise of reasonable diligence, have been brought to the attention of the foreign court.</u>  Respect for the foreign court does not diminish when a refusal to enforce its judgment is based on material that could not, through the exercise of reasonable diligence, have been placed before that court. [Emphasis added.]

- 36 -

Such an approach represents a fair balance between the countervailing goals of comity and fairness to the defendant.

53        Although *Jacobs, supra*, was a contested foreign action, the test used is equally applicable to default judgments.  Where the foreign default proceedings are not inherently unfair, failing to defend the action, by itself, should prohibit the defendant from claiming that any of the evidence adduced or steps taken in the foreign proceedings was evidence of fraud just discovered.  But if there is evidence of fraud before the foreign court that could not have been discovered by reasonable diligence, that will justify a domestic court's refusal to enforce the judgment.

54        In the present case, the appellants made a conscious decision not to defend the Florida action against them.  The pleadings of the respondents then became the facts that were the basis for the Florida judgment.  As a result, the appellants are barred from attacking the evidence presented to the Florida judge and jury as being fraudulent.

55        The appellants have not claimed that there was evidence of fraud that they could not have discovered had they defended the Florida action.  In the absence of newly discovered evidence of fraud, I agree with the Court of Appeal that the trial judge erred in admitting evidence he found established fraud.  He erred in law by failing to limit "new and material facts" to facts which could not have been discovered by the appellants by the exercise of reasonable diligence.

56        There was no evidence before the trial judge to support fraud.  In fact, the trial judge, himself, stated (at p. 131):

- 37 -

2003 SCC 72 (CanLII)

No record of the damage assessment proceedings exists, and the evidence heard by the jury is unknown. There is similarly no record of the instructions given to the jury by the trial judge.

In the absence of such evidence, the trial judge erred in concluding that there was fraud. It is impossible to know whether the evidence now sought to be adduced by the appellants had been previously considered by the jury. The respondent Mr. Beals and an expert on business losses both testified before the Florida jury and gave uncontradicted evidence. Before the Ontario court, Mr. Beals was available for questioning but was not called upon by the appellants to address the allegations of fraud. Similarly, the respondents' counsel in the Florida action testified but no questions of fraud were raised with him.

57        No evidence was led to show that the jury was misled (deliberately or not) on the extent of the damages. The admitted facts presented to the jury included allegations of fraudulent misrepresentations and loss of profits. The claim by the respondents was for damages to recoup the purchase price of the land, loss of profits and punitive damages. The nature of the damages sought, as well as the admitted facts presented to the Florida jury, was evidence upon which that jury could reasonably reach the damages that it did. I agree with the majority in the Court of Appeal that, although the amount of damages awarded may seem disproportionate, it was a palpable and overriding error for the trial judge to conclude on the dollar amount of the judgment alone that the Florida jury must have been misled.

58        As the appellants did not provide any evidence of new and previously undiscoverable facts suggestive of fraud, the defence of fraud cannot form the basis of a valid challenge to the application for enforcement of the respondents' judgment.

- 38 -

(2)  The Defence of Natural Justice

59          As previously stated, the denial of natural justice can be the basis of a
challenge to a foreign judgment and, if proven, will allow the domestic court to refuse
enforcement. A condition precedent to that defence is that the party seeking to impugn
the judgment prove, to the civil standard, that the foreign proceedings were contrary to
Canadian notions of fundamental justice.

60          A domestic court enforcing a judgment has a heightened duty to protect the
interests of defendants when the judgment to be enforced is a foreign one.  The domestic
court must be satisfied that minimum standards of fairness have been applied to the
Ontario defendants by the foreign court.

61          The enforcing court must ensure that the defendant was granted a fair
process.  Contrary to the position taken by my colleague LeBel J., it is not the duty of
the plaintiff in the foreign action to establish that the legal system from which the
judgment originates is a fair one in order to seek enforcement.  The burden of alleging
unfairness in the foreign legal system rests with the defendant in the foreign action.

62          Fair process is one that, in the system from which the judgment originates,
reasonably guarantees basic procedural safeguards such as judicial independence and fair
ethical rules governing the participants in the judicial system.  This determination will
need to be made for all foreign judgments.  Obviously, it is simpler for domestic courts
to assess the fairness afforded to a Canadian defendant in another province in Canada.
In the case of judgments made by courts outside Canada, the review may be more

- 39 -

difficult but is mandatory and the enforcing court must be satisfied that fair process was used in awarding the judgment. This assessment is easier when the foreign legal system is either similar to or familiar to Canadian courts.

63       In the present case, the Florida judgment is from a legal system similar, but not identical, to our own. If the foreign state's principles of justice, court procedures and judicial protections are not similar to ours, the domestic enforcing court will need to ensure that the minimum Canadian standards of fairness were applied. If fair process was not provided to the defendant, recognition and enforcement of the judgment may be denied.

64       The defence of natural justice is restricted to the form of the foreign procedure, to due process, and does not relate to the merits of the case. The defence is limited to the procedure by which the foreign court arrived at its judgment. However, if that procedure, while valid there, is not in accordance with Canada's concept of natural justice, the foreign judgment will be rejected. The defendant carries the burden of proof and, in this case, failed to raise any reasonable apprehension of unfairness.

65       In Canada, natural justice has frequently been viewed to include, but is not limited to, the necessity that a defendant be given adequate notice of the claim made against him and that he be granted an opportunity to defend. The Florida proceedings were not contrary to the Canadian concept of natural justice. The appellants concede that they received notice of all the legal procedure taken in the Florida action and that the judge of the foreign court respected the procedure of that jurisdiction. The appellants submit, however, that they were denied natural justice because they were not given sufficient notice to enable them to discover the extent of their financial jeopardy.

- 40 -

66          The appellants claim to have been denied the opportunity to assess the extent

of their financial jeopardy because the respondents' claim failed to specify the exact

dollar amount of damages and types of damages they were seeking.  The Florida claims,

particularly the Third Amended Complaint, made it clear that the damages sought were

potentially significant.  The complaints filed in Florida raised allegations of fraud and

sought punitive damages, both of which allow for the possibility of a substantial award

of damages.  Treble damages were sought.  Repayment of the purchase price, the amount

lost by the respondents due to their inability to construct a model home on the lot, the

expenses incurred in preparing that lot and lost revenue due to the respondents' inability

to construct a model home to be used in their construction business were all sought in

the Third Amended Complaint.  In light of knowing the types of damages claimed, not

being provided with a specific dollar value of the amount of damages sought cannot

constitute a denial of natural justice.  The appellants were mistaken when they presumed

that the damages award would be approximately US$8,000.

67          The respondents did not give notice that an expert on the assessment of

business losses would testify before the Florida jury.  The failure to disclose witnesses

in a notice of assessment is not a denial of natural justice.

68          LeBel J. would expand the defence of natural justice by interpreting the right

to receive notice of a foreign action to include notice of the legal steps to be taken by the

defendant where the legal system differs from that of Canada's and of the consequences

flowing from a decision to defend, or not defend, the foreign action.  Where such notice

was not given, he would deny enforcement of the resulting judgment.  No such burden

should rest with the foreign plaintiff.  Within Canada, defendants are presumed to know

- 41 -

the law of the jurisdiction seized with an action against them. Plaintiffs are not required to expressly or implicitly notify defendants of the steps that they must take when notified of a claim against them. This approach is equally appropriate in the context of international litigation. To find otherwise would unduly complicate cross-border transactions and hamper trade with Canadian parties. A defendant to a foreign action instituted in a jurisdiction with a real and substantial connection to the action or parties can reasonably be expected to research the law of the foreign jurisdiction. The Saldanhas and Thivys owned land in the State of Florida and entered into a real estate transaction in that state. When served with notice of an action against them in the State of Florida, the appellants were responsible for gaining knowledge of Florida procedure in order to discover the particularities of that legal system.

69        My interpretation of the Florida legal system differs from that of LeBel J. in that I am of the opinion that the appellants were fully informed about the Florida action. They were advised of the case to meet and were granted a fair opportunity to do so. They did not defend the action. Once they received notice of the amount of the judgment, the appellants obviously had precise notice of the extent of their financial exposure. Their failure to act when confronted with the size of the award of damages was not due to a lack of notice but due to relying on the mistaken advice of their lawyer.

70        For these reasons, the defence of natural justice does not arise.

(3) The Defence of Public Policy

71        The third and final defence is that of public policy. This defence prevents the enforcement of a foreign judgment which is contrary to the Canadian concept of

- 42 -

justice. The public policy defence turns on whether the foreign <u>law</u> is contrary to our view of basic morality. As stated in Castel and Walker, *supra*, at p. 14-28:

> . . . the traditional public policy defence appears to be directed at the concept of repugnant laws and not repugnant facts. . . .

72      How is this defence of assistance to a defendant seeking to block the enforcement of a foreign judgment? It would, for example, prohibit the enforcement of a foreign judgment that is founded on a law contrary to the fundamental morality of the Canadian legal system. Similarly, the public policy defence guards against the enforcement of a judgment rendered by a foreign court proven to be corrupt or biassed.

73      The appellants submitted that the defence of public policy should be broadened to include the case where neither the defence of natural justice nor the current defence of public policy would apply but where the outcome is so egregious that it justifies a domestic court's refusal to enforce the foreign judgment. The appellants argued that, as a matter of Canadian public policy, a foreign judgment should not be enforced if the award is excessive, would shock the conscience of, or would be unacceptable to, reasonable Canadians. The appellants claimed that the public policy defence provides a remedy where the judgment, by its amount alone, would shock the conscience of the reasonable Canadian. It was argued that, if the respondents and their witnesses were truthful in the Florida proceeding, it must follow that the laws in Florida permit a grossly excessive award for lost profits absent a causal connection between the acts giving rise to liability and the damages suffered. Such a result, the appellants submitted, would shock the conscience of the reasonable Canadian. I do not agree.

- 43 -

74          Blom, *supra*, predicted the appellants' request for the expansion of the

public policy defence (at p. 400):

> The only change that the *Morguard* approach to recognition may bring in
> its wake is a greater temptation to expand the notion of public policy, so as
> to justify refusing a foreign default judgment that meets the *Morguard*
> criteria, but whose enforcement nevertheless appears to impose a severe
> hardship on the defendant.

75          The use of the defence of public policy to challenge the enforcement of a

foreign judgment involves impeachment of that judgment by condemning the foreign law

on which the judgment is based.  It is not a remedy to be used lightly.  The expansion of

this defence to include perceived injustices that do not offend our sense of morality is

unwarranted. The defence of public policy should continue to have a narrow application.

76          The award of damages by the Florida jury does not violate our principles of

morality.  The sums involved, although they have grown large, are not by themselves a

basis to refuse enforcement of the foreign judgment in Canada.  Even if it could be

argued in another case that the arbitrariness of the award can properly fit into a public

policy argument, the record here does not provide any basis allowing the Canadian court

to re-evaluate the amount of the award.  The public policy defence is not meant to bar

enforcement of a judgment rendered by a foreign court with a real and substantial

connection to the cause of action for the sole reason that the claim in that foreign

jurisdiction would not yield comparable damages in Canada.

77          There was no evidence that the  Florida procedure would offend the

Canadian concept of justice.  I disagree for the foregoing reasons that enforcement of the

Florida monetary judgement would shock the conscience of the reasonable Canadian.

- 44 -

C. *Section 7 of the Canadian Charter of Rights and Freedoms*

78          The appellants submitted that the Florida judgment cannot be enforced because its enforcement would force them into bankruptcy.  It was argued that the recognition and enforcement of that judgment by a Canadian court would constitute a violation of s. 7 of the *Charter*.  The appellants submitted that a *Charter* remedy should be recognized to the effect that, before a domestic court enforces a foreign judgment which would result in the defendant's bankruptcy, the court must be satisfied that the foreign judgment has been rendered in accordance with the principles of fundamental justice.  No authority is offered for that proposition with which I disagree but, in any event, the Florida proceedings were conducted in conformity with fundamental justice.  The obligation of a domestic court to recognize and enforce a foreign judgment cannot depend on the financial ability of the defendant to pay that judgment.  As s. 7 of the *Charter* does not shield a Canadian resident from the financial effects of the enforcement of a judgment rendered by a Canadian court, I have difficulty accepting that s. 7 should shield a Canadian defendant from the enforcement of a foreign  judgment.

V. Disposition

79          The parties agreed that the Florida court had a real and substantial connection to the action launched by the respondents.  Having properly taken jurisdiction, the judgment of that court must be recognized and enforced by a domestic court, provided that no defences bar its enforcement.  None of the existing defences of fraud, natural justice or public policy have been supported by the evidence.  Although the damage award may appear disproportionate to the original value of the land in

- 45 -

question, that cannot be determinative.  The judgment of the Florida court should be enforced.

80          The appeal is dismissed with costs.

The reasons of Iacobucci and Binnie JJ. were delivered by

81          BINNIE J. (dissenting) — The question raised by this appeal is the sufficiency of the notice provided to Ontario defendants (the appellants) of Florida proceedings against them by two Sarasota County real estate developers over the sale of an empty residential building lot in 1984 for US$8,000.  The subject matter of their contract turned out to be the wrong lot.  The respondents kept the lot (they say they did not intend to purchase) and sued the appellants for damages.

82          The Florida default judgment now commands payment of over C$1,000,000, an award described by the Ontario trial judge as "breathtaking".  The damages were assessed by a Florida jury in less than half a day.

83          If the notice had been sufficient, I would have agreed reluctantly with the majority of my colleagues that the default judgment against them would be enforceable in Ontario despite the fact the foreign court never got to hear the Ontario defendants' side of the story.  Their failure to participate using the procedures open to them in Florida would have bound them to the result.  However, in my view, the appellants' inactivity in the face of their mushrooming legal problem is explained by the fact they were kept in the dark about the true nature and extent of their jeopardy.  They were not served with some of the more important documents on liability filed in the Florida

2003 SCC 72 (CanLII)

- 46 -

proceeding <u>before</u> they were noted in default, nor were they served with other important documents relevant to the assessment of damages filed after default but <u>prior</u> to the trial at which judgment was entered against them.  Proper notice is a function of the particular circumstances of the case giving rise to the foreign default judgment.  In this case, in my view, there was a failure of notification amounting to a breach of natural justice.  In these circumstances, the Ontario courts ought not to give effect to the Florida judgment.

I.  <u>Real and Substantial Connection</u>

84          I agree with Major J. that the "real and substantial connection" test developed in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, *Hunt v. T&N plc*, [1993] 4 S.C.R. 289, at p. 325, and *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022, at p. 1058, provides an appropriate conceptual basis for the enforcement in Canada of final judgments obtained in foreign jurisdictions as it does for final judgments obtained in other provinces.

85          That said, I recognize that there are significant differences between enforcement of a foreign judgment and enforcement of judgments from one province or territory to another within the Canadian federation.  As La Forest J. observed in *Morguard* (at p. 1098):

> The considerations underlying the rules of comity apply with much greater force between the units of a federal state. . . .

*Morguard* went on to refer to "[t]he integrating character of our constitutional arrangements" (p. 1100), including (1) common citizenship, (2) interprovincial mobility of citizens, (3) the common market among the provinces envisaged by our Constitution,

- 47 -

and (4) the essentially unitary structure of our judicial system presided over by the Supreme Court of Canada. The constitutional flavour of the *Morguard* analysis was picked up and emphasized in *Hunt, supra*, and again in *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78, at para. 53. We should not backtrack on the importance of that distinction.

86          It stands to reason that if the issues posed by the enforcement of foreign judgments differ from the issues encountered in the enforcement of judgments among the provinces and the territories, the legal rules are not going to be identical. Accordingly, while I accept that the *Morguard* test ("real and substantial connection") provides a framework for the enforcement of foreign judgments, it would be prudent at this stage not to be overly rigid in staking out a position on available defences beyond what the facts of this case require. Both Major J. (paras. 39-41) and LeBel J. (paras. 217-18) acknowledge (with varying degrees of enthusiasm) that a greater measure of flexibility may be called for in considering defences to the enforcement of foreign judgments as distinguished from interprovincial judgments. The time will come when such a re-examination of available defences will be necessary. The need for such a re-examination does not arise in this case. The appellants come within the traditional limits of the natural justice defence, and their appeal should be allowed on that ground.

II.  The Foreign Judgment

87          In 1981, the appellants bought an empty lot in a Florida real estate subdivision near Sarasota for US$4,000. It was described as Lot 2. They did not build. They did not even visit it. They just paid the municipal taxes. In 1983, they thought they had sold it to the respondents for US$8,000. Despite the fact that all of the closing

- 48 -

documentation referred to Lot 2, the respondents (who say they did not "catch" the reference to Lot 2 in the closing document) eventually claimed that they had *intended* to purchase the lot next door — Lot 1 — and that they had been falsely and fraudulently induced to buy Lot 2 by the appellants and a Florida real estate agent called O'Neill.

88      No doubt the Florida courts had jurisdiction over the ensuing dispute. The land was located in that jurisdiction. The appellants ought to have anticipated, and probably did anticipate, that disputes over Florida land would be decided by Florida courts. However, they could not fairly have anticipated that this pedestrian real estate deal gone sour would eventually explode into a Florida judgment against them said to be worth in excess of C$800,000 at the time of the trial in Ontario in November 1998 with interest continuing to run for the past five years at 12 percent per annum, producing an ultimate Kafka-esque judgment with an apparent value of over C$1,000,000.

89      It appears that soon after being served with the respondents' Complaint, the appellants decided to tell their story to the Florida court by filing a Statement of Defence, but to forgo the further expense of hiring a Florida lawyer to represent their interests. The costs would likely have exceeded the amount they thought was in issue. As the trial judge in Ontario put it, based on what was disclosed in the Complaint, litigation of an US$8,000 real estate transaction in Florida hardly seemed to be "worth the candle". The fact this evaluation proved to be disastrously wrong is a measure of the inadequacy of what they were told about the Florida proceedings.

90      My colleague Major J. holds, in effect, that the appellants are largely the victims of what he considers to be some ostrich-like inactivity and some poor legal advice from their Ontario solicitor. There is some truth to this, but such a bizarre

2003 SCC 72 (CanLII)