outcome nevertheless invites close scrutiny of how the Florida proceedings transformed a minor real estate transaction into a major financial bonanza for the respondents.

91      While the notification procedures under the Florida rules may be considered in Florida to be quite adequate for Florida residents with easy access to advice and counsel from Florida lawyers (and there is no doubt that Florida procedures in general conform to a reasonable standard of fairness), nevertheless the question here is whether the appellants *in this proceeding* were sufficiently informed of the case against them, both with respect to liability and the potential financial consequences, to allow them to determine in a reasonable way whether or not to participate in the Florida action, or to let it go by default.

III.  The Initial Aborted Proceedings

92      The Florida action was initially commenced on February 15, 1985 by the two respondents and their then partners (who will collectively be referred to as the respondents) in the Twentieth Judicial Circuit in and for Charlotte County, Florida. The appellants duly filed a defence. Eventually, this first action was "voluntarily dismiss[ed] . . . without prejudice" by the Florida court, apparently on the basis that the respondents had commenced their action in the wrong Circuit. The respondents immediately started a second action in the Twelfth Judicial Circuit and again the appellants filed a defence. This suggests that when the appellants were notified of what pleading had to be done, they did it.

IV.  The Nature of the Complaint Against the Appellants

- 50 -

93   The original plaintiffs, two real estate developers and their wives (including the present respondents), alleged that the appellants misrepresented that they owned building Lot 1, whereas they owned building Lot 2, and that this misrepresentation was "willfully false and fraudulent". The respondents said "they" (i.e., the individual respondents) began building on Lot 1, discovered the error, and "immediately ceased construction". As a result, the respondents incurred the expenses of preparing the lot for construction and lost revenue because they were unable to construct a model home on Lot 1, which was a corner lot.

94   It is not our function to get into the merits of the Florida case but I note the respondent, Frederick Beals III, eventually acknowledged in the Florida proceedings that work terminated in October 1984 not because of an error in the legal description of the lot but because of a falling out among the respondents. At that time, a "Johnny Quick toilet" had been delivered to the work site but the floor slab had not yet been poured. The error with regard to Lot 1 and Lot 2 was not discovered by the respondents until three months later in January 1985.

95   The total expenditures on the project, including the purchase price, the building permits, the survey tests, trusses and some other materials were about US$14,000. The respondent Beals later testified that the average profit experienced on the houses he built in 1984 was about US$5,000 per home. The respondents' eventual award on account of loss of profit was more than ten times that figure.

96   The Complaint, and each subsequent "as amended" Complaint, simply refers to the <u>respondents</u>' damages on "<u>a</u> model home" (emphasis added). "A" model home is expressed in the singular and would not normally be understood, I think, to encompass

- 51 -

an undisclosed and unbuilt residential subdivision which the respondents now say they had in mind.

97          The respondents claimed treble damages, rescission, punitive damages and costs. In the end, the jury seems to have ordered reimbursement of the actual expenditures (about US$14,000) plus loss of profit (about US$56,000), all of which was trebled to make the total of US$210,000, plus punitive damages of US$50,000. The balance of the current million dollar claim consists of accumulated post-judgment interest compounding at the rate of 12 percent, plus the effect of a less favourable U.S. currency exchange rate.

V.  The Complaint Against Other Parties

98          The respondents also alleged in their Complaint that, in August 1984, they — the developers — had initiated contact with a Sarasota real estate firm, O'Neill's Realty, who showed them Lot 1. The respondents go on to state in their Complaint that the realtor was only authorized by the appellants to sell Lot 2 (para. 25). Nevertheless, the realtor (both the corporation and James O'Neill personally), "knowingly and falsely" misrepresented that the appellants owned Lot 1 (para. 27) and "fraudulently" failed to stop the closing of the sale of the wrong lot (paras. 33 and 51). The respondents claimed the same relief against the realtor as they had against the appellants (para. 37). As will be seen, the respondents' allegation in their Complaint against the realtor O'Neill more or less corresponded with the appellants' version of events set out in their Statement of Defence.

- 52 -

99     The respondents subsequently added a complaint against a new defendant, the Commonwealth Land Title Insurance Company, alleging that the title insurer knew or should have known that all of the closing documentation erroneously referred to the appellants' Lot 2, instead of the desired Lot 1, and by "remaining silent" breached its corporate duty of disclosure.

100     With respect to the issue of notice, Florida rules require the written Complaint to expressly warn that "[e]ach defendant is hereby required to serve written defenses . . . within 20 days. . . . If a defendant fails to do so, a default [judgment] will be entered against that defendant for the relief demanded . . . ." This is what the appellants were told. The logical implication of this statement, it seems to me, is that if a written defence were served, the defendants would *not* be in default of the pleading. This also turned out not to be true.

VI. The Statement of Defence

101     The appellants filed, then refiled in the different judicial circuit, a Statement of Defence which pleaded in the relevant part, as follows:

2.    The facts are as follows:

a) At no time did the Sellers engage the services of O'Neill's Realty, Inc., and/or James O'Neill to sell the property above-referred to or any other property whatsoever.

b) On or about 1984, the Defendant, James O'Neill, contacted the Sellers and informed them that he had a client who wished to purchase the above-referred to property. As there had been no previous communication of any kind whatsoever between the Sellers and James O'Neill, the Sellers believed that he, the said James O'Neill, represented the Plaintiffs.

c) During subsequent telephone conversations in or about August, 1984, the Sellers advised James O'Neill that they had never been in Port Charlotte,

Florida, and that the only information in their possession with respect to the above-referred to property was the number allocated to same, that is to say: Lot 2, Block 3694 of Port Charlotte Subdivision, Section 65.

d) James O'Neill assured the Sellers that they were the owners of the lands that <u>his</u> client wished to purchase as he, the said James O'Neill, had perused the Public Records for the property in which <u>his</u> client was interested, and the names of the Sellers appeared thereon as owners. The Sellers were satisfied with his representations and therefore proceeded on that basis.

3. On or about August, 1984, the Sellers received a Contract for Sale of Real Estate which said Contract described the above-referred to property as being Lot 1. The Sellers contacted James O'Neill to advise him of the discrepancy.

4. James O'Neill once again assured the Sellers that they did own the property in which his client was interested and therefore the requisite change to the Contract was made. James O'Neill did not indicate to the Sellers that the change had to be initialled.

5. The Contract was returned to James O'Neill and on or about September 20th, 1984, the Sellers received a Warranty Deed which indicated that the property being sold was Lot 2.

6. As the discrepancy had been discussed with and pointed out to James O'Neill, and as the Warranty Deed specified Lot 2, Block 3694 of Port Charlotte Subdivision, Section 65, the Sellers had no reason to believe that the discrepancy in the Lot Number, that is to say Lot 2 as opposed to Lot 1, had not been discussed with the Plaintiffs and that the matter had not been efficiently and legally resolved. [Emphasis in original.]

102     The respondents never amended their Complaint against the appellants even though, as we will see, there was a good deal of activity in relation to the other defendants (before and after default was noted against the appellants) prior to the Florida court's final judgment against the appellants dated December 13, 1991.

VII.   The Appellants' Dilemma

103     The appellants had to decide how to respond to the Complaint. To make an informed decision, they should have been told in general terms of the case they had to

- 54 -

meet on liability and, more importantly on these facts, an indication of the jeopardy they faced in terms of damages. This is not a case where the plaintiffs were satisfied with the damages implicit in a failed minor real estate transaction. The Complaint, in my view, did not adequately convey to the appellants the importance of the decision that would eventually be made in the Florida court. The appellants were merely told, unhelpfully, that the claim exceeded US$5,000.

104        The appellants were entitled to draw some comfort from the fact that the respondents' guns were trained not on them alone, but on the real estate agent and the title insurer as well. Moreover, the respondent developers' allegations against the realtor O'Neill coincided with their own Statement of Defence, particularly the allegation that the appellants authorized the realtor to sell only Lot 2 — not Lot 1. On September 12, 1991, prior to the damages trial, the respondents settled with the realtor and the title insurer for US$10,750. This radically transformed the potential jeopardy of the appellants. They were never told of the settlement.

VIII.   The Florida Pleadings Rule

105        Under Rule 1.190(a) of the Florida *Rules of Civil Procedure* (Fla. Stat. Ann. R. Civ. P.  § 1.190(a)), the appellants were required to refile their Defence every time the respondents amended their Complaint, even if the amendments were solely directed at other defendants. This was nowhere brought to the appellants' attention. As mentioned earlier, I think the appellants could fairly understand from the "warning" in the original Complaint that only if <u>no</u> defence were filed would there be a pleadings default in the action. Otherwise there would be no pleadings default. The respondents never amended their Complaint against the appellants. There was therefore nothing

- 55 -

further for the appellants "to answer". They were nevertheless noted in default for failing to file a defence.

106        The respondents' Amended Complaint, Second Amended Complaint, Third Amended Complaint and ultimately Fourth Amended Complaint modified the allegations against other parties. In terms of procedural fairness, I think the appellants were entitled to assume that in the absence of any new allegations against them there was no need to refile a defence that had already been filed in the same action. To non-lawyers, a requirement for such apparently useless duplication would come as a surprise.

107        Yet we are told that:

> Under Florida law Dominic Thivy, Rose Thivy, Geoffrey Saldanha and Leueen Saldanha were under a <u>mandatory</u> obligation to deliver a defence to each of the new amended complaints. [Emphasis added.]

It seems to me the appellants were entitled to be told from the outset that their defence would be treated as non-existent if the Complaint were thereafter amended against *other* defendants.

108        When a Canadian resident is served with a legal process from within his or her own jurisdiction, he or she is presumed to know the law and the risks attendant with the notice. There can be no such presumption across different legal systems.

109        As the basis of the respondents' judgment is *default of pleading*, this lack of notification goes to the heart of the present appeal.

2003 SCC 72 (CanLII)

- 56 -

IX. Other Information the Appellants Did not Know

110        It is to be remembered that although the appellants had decided not to have a Florida lawyer, they were very much part of the liability phase of the action until noted in default on July 25, 1990, and very much interested in the assessment of damages phase of the action which did not take place until December 11, 1991. Even a defendant who concedes liability (as opposed to one who merely defaults) might want to contest what may appear to be "breathtaking" damages claimed by the successful party. Liability and assessment of damages are two distinct and separate issues. A defendant may choose to concede the one but contest the other.

111        In administrative law, where issues of notification have been extensively canvassed, albeit in a different context, it is well established that a party must be made aware of "the potential jeopardy faced": D. J. M. Brown and J. M. Evans, *Judicial Review of Administrative Action in Canada* (loose-leaf ed.), at para. 9:5222. One of the criteria determining the stringency of natural justice requirements in particular circumstances is "the importance of the decision to the individual or individuals affected": *Baker v. Canada (Minister of Citizenship and Immigration)*, [1999] 2 S.C.R. 817, at para. 25. There is a difference in "importance" between a minor real estate transaction whose defence is "not worth the candle" and a major claim which the respondents have successfully orchestrated into a million dollar liability.

(a) *During the Liability Phase which Concluded July 25, 1990*

112        The appellants received no notice of the court order dated November 6, 1987, striking out the claim for punitive damages against the realtor and the title

- 57 -

insurance defendant on the basis, apparently, that treble damages are themselves intended to be punitive, and an additional claim for punitive damages is not permitted under Florida law.  Despite this ruling, the appellants, as defaulters, were subsequently held liable for treble damages of US$210,000 *plus* punitive damages of US$50,000.  The punitive damages issue went very much to the appellants' potential jeopardy, yet it seems they were not kept in the picture about court orders made in the same action as between the other parties relevant to the same head of damage alleged against them. This event predated being noted in default.  If the appellants had received the advantage of this ruling, it would potentially have reduced the eventual damages against them by almost 20 percent.  In other words, the oversight, if that is what it was, related to what is now claimed to be worth about a quarter of a million dollars.

113        On June 19, 1990, the appellants were sent a notice that an application would be made to the Florida court to note them in default for failure to file a defence to the Third Amended Complaint or "serve any pleading or other paper as required by law". The appellants had no reason to think that the defence they had already filed was not applicable to the Third Amended Complaint.  (Indeed, there apparently was a Fourth Amended Complaint but it is not in the record before us.)  Unless the appellants were made aware of the Florida pleadings rule, which they were not, such a notice would simply add to their confusion.  It may be obvious to a Florida lawyer that every amended Complaint requires a fresh defence even if there are no changes relevant to the defendant called upon to plead, but such a requirement would not be obvious to an Ontario lawyer, still less to self-represented litigants such as the appellants.

114        The appellants were noted in default on July 25, 1990.

2003 SCC 72 (CanLII)

- 58 -

(b) *After Being Noted in Default but Prior to the Jury Trial on December 11, 1991*

115          In some cases, a court making an assessment of unliquidated damages might think it unnecessary to notify the defaulters of the ongoing proceedings. It would depend on the circumstances. For example, in Ontario, Rule 19.02(3) leaves notice in the discretion of the court (*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194). Whatever may be the minimum requirements in some cases, I believe the circumstances here cried out for notice of the subsequent proceedings because in the period between the noting of default on July 25, 1990, and the damages trial on December 11, 1991, the potential jeopardy changed radically to the appellants' disadvantage.

116          The appellants were not told that by Stipulation dated October 31, 1990, the respondents and realtor (both corporate and individual) made a deal "to delete claims against [the realtor] for treble damages, punitive damages, and statutory violations", leaving the respondents' claim against the realtor (who had been the only contact between the respondents and the appellants) to proceed in simple negligence. The appellants were now the only parties against whom treble damages and punitive damages were sought, but they were not told of that fact. Had they been so advised, they would have been able to consider cross-proceedings against the realtor for indemnification in respect of the more substantial claims now asserted against them alone.

117          Nor were the appellants served with the court order dated March 27, 1991, striking out as improper the respondents' claim for attorney's costs against the realtor and the title insurance company. By way of contrast, the final judgment against the appellants dated December 13, 1991, specifically "reserves jurisdiction to tax costs, prejudgment interest, and attorney's fees" against the appellants.

- 59 -

118        Nor were the appellants served with an order dated June 17, 1991 for mandatory mediation which provided that "[a]ll parties are required to participate" (emphasis added). Even defendants who consider it uneconomical to litigate a US$8,000 building lot deal in a foreign country might well consider it to be in their best interest to participate in a mediation. The respondents say that the appellants were not entitled to notice of the order for mediation but it seems wholly incongruous to have a mediation order requiring "[a]ll parties" to participate when the *only* parties who were now the respondents' target for treble and punitive damages were not even told about it.

119        Nor were the appellants told that on September 12, 1991, the respondents settled with the realtor for US$8,250 and subsequently settled with the title insurers for US$2,500 while still retaining title to Lot 2. This left the appellants as the sole target at the damages trial. According to the documents they had received, the appellants were still entitled to believe that the respondents continued to make against the realtor essentially the same points as those the appellants themselves had set out in their Statement of Defence. This was no longer true. The appellants did not know that they were now on their own.

120        Nor were the appellants served, as required by the Florida rules, with notice of the experts the respondents proposed to call at the damages assessment. This too might have operated as a wake-up call to the appellants, who at this late stage were drifting obliviously toward financial disaster.

121        As mentioned above, the Third Amended Complaint claimed the <u>respondents</u>' damages on <u>a</u> model home. It is true that by their default, the appellants

2003 SCC 72 (CanLII)

- 60 -

admitted the allegations of fact in the Complaint, but the facts thus admitted were specific to the respondents and to a single model home. There is surely a significant difference between damages on a single home (even a "model" home) and damages on a theory of lost profit from the construction of a non-existent residential subdivision. Yet it is a judgment largely based on the latter allegation, not the allegation in the Complaint, that is the basis of the bulk of the million dollar judgment now sought to be enforced against the appellants in Ontario.

122     On December 11, 1991, the Florida court entered a directed verdict for unliquidated damages against the appellants, and assessed the damages at US$210,000 plus US$50,000 punitive damages. It now appears that the out-of-pocket construction costs which formed a substantial part of the award of compensatory damages against the appellants were not incurred by the respondents, as had been alleged in their Complaint, but by Fox Chase Homes of Sarasota, Inc. or Fox Chase Homes of Charlotte County, Inc., whose names appeared nowhere in the pleadings. In the Ontario action, the trial judge found that under Florida law "causes of action of a corporation such as Fox Chase are the property of the corporation and cannot be passed through to its shareholders. Dissolved corporations cannot maintain actions except through their last directors with appropriate description in the Style of Cause not present in this matter." There was no such "appropriate description" in the Florida style of cause. In my view, the intervention of one or two corporate entities could raise a number of potential defences not otherwise available in the assessment of damages. The purpose of a pleading is to give notice. It is certainly not implicit in anything said in the Complaint that the respondents were claiming damages on behalf of corporations in which they had an interest.

2003 SCC 72 (CanLII)

- 61 -

123        The appellants had not even been told that the respondents would be seeking damages for the <u>corporation's</u> lost opportunity to build an undefined number of homes on land to which neither the respondents nor the corporation held title.

124        I do not accept the suggestion that the appellants are the authors of their own misfortune on the basis that if they had hired a Florida lawyer they would have found out about all of these developments. The appellants decided not to defend the case set out against them in the Complaint. That case was subsequently transformed. They never had the opportunity to put their minds to the transformed case because they were never told about it.

125        I do not suggest that any one of the foregoing omissions of notice would necessarily have been fatal to enforcement of the respondents' default judgment in Ontario. Cumulatively, at all events, these continuing omissions seem to me to demonstrate an unfair procedure which in this particular case failed to meet the standards of natural justice.

X.  <u>Availability of an Appeal</u>

126        The appellants had ten days to appeal the default judgment. They did not do so, apparently based on advice from their Ontario solicitor. I agree with Major J. that the appellants cannot be relieved of the consequences of their failure to appeal simply because they acted on legal advice.

127        The failure to exhaust local remedies in the foreign court is ordinarily a factor to be taken into account in determining whether a foreign judgment is enforceable

2003 SCC 72 (CanLII)

- 62 -

in Ontario, but I do not think it is fatal here. We are dealing with a *default* judgment obtained, in my view, without compliance with the rules of natural justice. Morever, even if the appellants had appealed, we are told that no record of the damage assessment proceedings exists. There is no transcript of the evidence heard by the jury. There is similarly no record of the instructions given to the jury by the trial judge. If the respondents complied with the letter of the Florida rules, as they say they did, a Florida appellate court might well uphold the default judgment. The Ontario court is faced with a *different* issue than that which would have confronted a Florida appellate court. Was the notice, notwithstanding presumed compliance with Florida court rules, sufficient to alert the *foreign* defendants to the case they had to meet, and the potential jeopardy they faced?

128      I agree in this respect with the view of the English Court of Appeal in *Adams v. Cape Industries plc*, [1991] 1 All E.R. 929, at pp. 1052-53, that the availability of an appeal in the foreign jurisdiction is not necessarily determinative. *Cape Industries* was also a case of a default judgment.

129      I would also reject the argument that the appeal should be dismissed because the appellants ought to have moved "promptly" to set aside the default judgment for "excusable neglect". Such relief is normally available to a defendant who has formed an intention to defend but for some "excusable" reason had "delayed" in taking appropriate steps. The problem here is that the appellants had in fact filed a Statement of Defence but had decided, based on what they were told about the respondents' action, not to defend it further. The appellants' problem was not that they failed to implement an intention to defend, but that their intention not to further defend was based on a different case.

2003 SCC 72 (CanLII)

- 63 -

130       In these circumstances, I would not enforce a judgment based on (in my view) inadequate notice — and thus violative of natural justice — just because the appellants did not appeal the Florida judgment to the Florida appellate court, or seek the indulgence of the Florida court to set aside for "excusable neglect" a default judgment that rests on such a flawed foundation.

XI. Disposition

131       I would allow the appeal to dismiss the action, with costs throughout to the appellants.

The following are the reasons delivered by

LeBel J. (dissenting) —

I. Introduction

132       The enforcement of this judgment, which has its origins in a straightforward sale of land for US$8,000 and has now grown to well over C$800,000, is unusually harsh. In my view, our law should be flexible enough to recognize and avoid such harshness in circumstances like these, where the respondents' original claim was dubious in the extreme and the appellants are guilty of little more than bad luck. To hold that the appellants are the sole authors of their own misfortune, it seems to me, is to rely heavily on the benefit of hindsight; and to characterize the respondents' case in the original action as merely weak is something of an understatement. The implication of the

2003 SCC 72 (CanLII)

- 64 -

position of the majority is that Canadian defendants will from now on be obliged to participate in foreign lawsuits no matter how meritless the claim or how small the amount of damages in issue reasonably appears to be, on pain of potentially devastating consequences from which Canadian courts will be virtually powerless to protect them.

133        In my opinion, this Court should avoid moving the law of conflicts in such a direction. Thus, I respectfully disagree with the reasons of the majority on two points. I would hold that this judgment should not be enforced because a breach of natural justice occurred in the process by which it was obtained. I also have concerns about the way the "real and substantial connection" test, in its application to foreign-country judgments, is articulated by the majority.

134        Although I agree both that the "real and substantial connection" test should be extended to judgments from outside Canada and that the Florida court properly took jurisdiction over the defendants in this particular case, in my view the test should be modified significantly when it is applied to judgments originating outside the Canadian federation.    Specifically, the assessment of the propriety of the foreign court's jurisdiction should be carried out in a way that acknowledges the additional hardship imposed on a defendant who is required to litigate in a foreign country.

135        Furthermore, the philosophy of *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, which replaces traditional categories with a purposive, principled framework, should not be confined to the question of jurisdiction, but should also be extended to the defences. In my view, liberalizing the jurisdiction side of the analysis while retaining narrow, strictly construed categories on the defence side is not a coherent approach. I would adopt a more flexible approach to the defences than the majority, and

2003 SCC 72 (CanLII)

- 65 -

on that approach it is my view that the appellants have made out the defence of natural justice.

136                The solution that the majority sets out to the question of recognition and enforcement of foreign judgments appears to go further than courts have gone in other Commonwealth jurisdictions or in the United States (as I will discuss below). This discrepancy may place Canadian defendants in a disadvantageous position in international litigation against foreign plaintiffs. As a result, the risks and thus the transaction costs to our citizens of cross-border ventures will be increased, in some cases beyond what commercially reasonable people would consider acceptable. Canadian residents may consequently be deterred from entering into international transactions — an outcome that frustrates, rather than furthers, the purpose of private international law.

II. Background

137                I agree with Major J.'s outline of the facts. I would, however, place additional emphasis on a number of details that emerge from the record.

138                The Saldanhas and the Thivys (to whom I will refer collectively as the "Sellers") purchased the lot in Florida thinking that they might eventually build a vacation home on it. In the meantime, they had little to do with it. They purchased it without having visited it, and they never saw it. They did not think seriously about selling the land until they received the unsolicited offer from the Bealses and Foodys (the "Buyers") in 1984. This was a relatively small investment from which they anticipated no more than modest returns and on which, it seems reasonable to infer, they did not expect to expend much energy.

- 66 -

2003 SCC 72 (CanLII)

139        The Sellers received the Buyers' offer to purchase from a Florida real estate agent, a Mr. O'Neill, in August 1984. They had had no prior dealings with Mr. O'Neill. Mrs. Rose Thivy, who worked in a law office and had done some work as a law clerk as well as some title searching and conveyancing, dealt with Mr. O'Neill on behalf of the group. She testified that she asked Mr. O'Neill how he found her telephone number, and he told her that he had searched the County records to find the owners of the lot his clients wanted to buy.

140        The Buyers' written offer was sent to Mrs. Thivy. She noticed that it erroneously referred to "Lot 1". She assumed that the Buyers were not interested in buying the Sellers' property and that the deal would not proceed. The Sellers did not pursue the matter. Mr. O'Neill then contacted Mrs. Thivy to ask why there had been no response to the offer. Mrs. Thivy pointed out the misidentification of the lot to Mr. O'Neill, who insisted that the Sellers were the registered owners of the lot the Buyers wanted. Mrs. Thivy changed the number on the document to "Lot 2". The Buyers accepted this counteroffer. Subsequently, the Sellers received a deed and other closing documents in the mail. All the documents referred to Lot 2 and not to Lot 1.

141        In January 1985, Mr. Beals telephoned Mrs. Thivy and complained that he had been sold the wrong lot. Mrs. Thivy told him about her conversation with Mr. O'Neill, and suggested that Mr. Beals resolve the problem with him.

142        In March 1985, the Sellers received a copy of a pleading initiating an action by the Buyers in a Florida Circuit Court (the "Complaint"). The Complaint stated that it related to "an action for damages which exceeds $5,000", as was required to give the

- 67 -

Circuit Court monetary jurisdiction over the matter, but otherwise did not specify the quantum of damages claimed.

143         The Complaint alleged that the Sellers had fraudulently induced the Buyers to purchase the wrong lot. The Buyers claimed damages based on the purchase price of the lot, the expenses they had incurred in preparing the lot for construction, and revenue they had lost because they had been unable to build a model home on Lot 1. There were also claims against two other defendants, O'Neill's Realty and the Buyers' title insurance company. Attached to the Complaint was the original offer to purchase referring to Lot 1. The contract of purchase and sale referring to Lot 2 was not attached.

144         Mrs. Thivy and Mr. Saldanha both testified that the Sellers had hoped to "rectify the situation" with the Buyers, perhaps by rescinding the transaction and refunding the Buyers' money.  When they received the Complaint, however, they decided to defend the lawsuit. Mrs. Thivy telephoned the Florida court for instructions on procedure and form.  She then drafted a defence for all the Sellers to sign, and sent it to the court in Florida.  In the defence, the Sellers denied that they had ever represented that they owned Lot 1.

145         In the fall of 1986, the Sellers received notice that the action in Florida had been voluntarily dismissed, without prejudice. Mr. Saldanha testified that he thought the reason the action had been dismissed was that the facts the Sellers had set out in their defence were dispositive. As he put it, "when it went away I said, 'Okay, people know the facts, it's over'."

- 68 -

146          But it was not over.  A short time later, the Buyers commenced a second
action in the Florida court, and the Sellers received a new Complaint in the mail (the
"Amended Complaint").  The Amended Complaint set out essentially the same
allegations as the previous one.  A claim for treble damages was added against the
Sellers, and the language was somewhat different, alleging that "wilfully false and
fraudulent" misrepresentations were made by the Sellers both directly and through
Mr. O'Neill.  The Amended Complaint also said that the Sellers had "willingly and
wilfully" changed the contract of purchase and sale to read "Lot 2", without informing
the Buyers.  The damages claimed were spelled out in more detail than before; the
Buyers claimed three times the amount they had paid for the land, three times their
construction expenses and business losses, rescission of the contract and return of the
purchase price, punitive damages, attorney's fees and court costs.  Again, the original
offer referring to Lot 1, without the Sellers' signatures, was attached, but the contract of
purchase and sale, and the other closing documents which identified Lot 2 as the
property being transferred, were not.

147          Mrs. Thivy prepared a new defence, which was simply a copy of the old one,
and sent it to the Florida court purportedly on behalf of all four defendants.  The trial
judge accepted the evidence of the Saldanhas, which differed from that of the Thivys on
this point, that the Saldanhas chose not to defend the second action and that Mrs. Thivy
signed their names to the new defence without their authorization.  The Saldanhas
therefore did not attorn to the reinstated action, although the Thivys did.

148          Mr. Saldanha testified that when he and his wife learned of the Amended
Complaint, they discussed the matter, and decided that "we were not going to respond
to this, because we had already responded".  Mr. Saldanha thought that the resurrection

of the action was an error of some kind, because the new complaint "seemed to be the same thing regurgitated again" and, in his view, the Sellers had already informed the Florida court of facts that disproved the regurgitated allegations. At this point, as the trial judge put it, "[g]iven their share of the amount at issue, which they assumed to be one-half of $8,000 US, [the Saldanhas] decided the game was not worth the candle, and they would participate no further" ((1998), 42 O.R. (3d) 127, at p. 130).

149        The Thivys seem to have come to the same conclusion not long afterwards. After the action was relaunched, the Amended Complaint was amended three times, and the Sellers duly received copies of each new version. The Thivys sent their initial defence to the Florida court, but did not respond to any of the new versions of the Amended Complaint. Mrs. Thivy testified that they decided "just to forget about it" because defending the action would probably cost them just as much as the lawsuit was worth, and because they thought that the Florida courts had no jurisdiction over them.

150        The successive versions of the Amended Complaint did not change the allegations against the Sellers in any way. The only changes were to claims against other defendants. Mr. Richard Groner, who acted for the respondents in the litigation in Florida, testified at the Ontario trial as an expert in Florida civil procedure. He testified that, under the applicable rules, each amendment to a complaint requires a response from all the parties on whom it is served, even parties to whom the changes in the pleading have no relevance. Such a party may simply resubmit a copy of his or her earlier defence, or may seek the court's permission to let the earlier defence stand over, but if these steps are not taken the defence that has already been filed ceases to have any legal effect. Therefore, the result of the Sellers' failure to respond to new versions of the Amended Complaint was that they were viewed under the Florida rules as not having

2003 SCC 72 (CanLII)

- 70 -

raised any defence at all. There was nothing in the documents served on the Sellers to notify them that this was a potential consequence of failure to refile their defence.

151        The Sellers received notice of a default hearing on July 25, 1990, but did not attend or respond. In due course, they were noted in default. As a result, they were deemed to have admitted all the allegations in the Amended Complaint so far as they related to liability. Damages were still a live issue. A hearing was held before a judge and a jury in Florida to assess damages. The Sellers received notice of this hearing, too, but again they did not respond.

152        We do not know much about what was said in the damages hearing. There is no transcript of that proceeding. Mr. Groner testified that in Florida courts transcripts are not mandatory for civil trials; a reporter is provided at the option of and at the expense of the litigants. In this case, he decided not to incur the expense. There is no record of the judge's instructions to the jury. An expert witness testified on the valuation of the Buyers' business losses. No expert's report was filed. Mr. Groner testified that it is usual in civil litigation in Florida for parties to obtain information about an expert witness's qualifications and proposed testimony through the discovery process. Expert reports are generally not submitted to the court. All that survives to provide some clue as to how a simple $8,000 land transaction turned into the extraordinary amount now at stake in this appeal is a "Memorandum of Lost Profits Damage" prepared by Mr. Groner, which he submitted to the trial judge in Florida to support his submissions on jury instructions.

153        In late December 1991, the Sellers received the judgment of the Florida court in the mail. The total amount of the judgment was slightly over $270,000, of

- 71 -

which $50,000 was punitive damages, with interest set at 12 percent per annum from the date of the judgment, December 12, 1991 (there seems some confusion in the record over the amount awarded, which the trial judge said was $260,000; the copy of the Florida court's judgment filed in the record is for two amounts which together total $270,886.57). The Sellers were surprised and dismayed at the size of this amount. Mr. Saldanha testified that at first he thought it was a joke. Mrs. Saldanha testified that when she read the number in print "it was like a real blow to the stomach".

154        The Sellers realized only at this point that the Florida action was not, as they had assumed, a minor dispute that would be more expensive to defend than to lose. They recognized that they needed to seek legal advice immediately. The Thivys and the Saldanhas separately consulted lawyers. They were advised that the judgment would not be enforced in Ontario because the Florida court did not have jurisdiction over them. Acting on this advice, the Sellers did not avail themselves of the various means available to them in the Florida system to challenge the judgment.

155        Mr. Beals was examined for discovery in the proceedings in Ontario, and his testimony was read in. His deposition in the Florida proceedings was also an exhibit in the Ontario trial. Based on that evidence, the trial judge made findings of fact that included the following:

Mr. Beals signed all the closing documents referring to Lot 2 without reading them.

Construction of the model home on Lot 1 stopped before the Buyers learned that they had bought the wrong lot. Mr. Beals and Mr. Foody decided to

- 72 -

discontinue their business relationship for unrelated reasons, and Mr. Beals bought out his partner's interest in the company.

Mr. Beals's company, Fox Chase Homes, was dissolved before the Florida action was commenced.

There is no suggestion that these factual findings were in error.

156    Mr. David Mulock, a Florida litigator, testified for the appellants as an expert on Florida procedural and substantive law.  He testified that justifiable reliance is one of the essential components of a fraud claim in Florida law.  He stated his opinion that reliance by the Buyers on misrepresentations that they were buying Lot 1 could not have been reasonable, because the ownership of land is a matter of public record which can easily be checked, and routinely is checked in any real estate transaction.  Mr. Mulock said that the allegations in the Complaint, even if true, were therefore insufficient to support damages for fraud.

157    Mr. Mulock also testified that when a corporation that has a claim for damages is dissolved, its last directors can pursue the cause of action as long as they indicate in the pleadings that they do so in the capacity of representatives of the corporation.  None of the many versions of the Complaint in the Florida action made any reference to Fox Chase Homes.

158    The trial judge inferred from the contents of the Memorandum of Lost Profits Damage and from the verdict reached by the Florida jury that the jury had not been informed of several key facts: that the decision to stop construction and the

- 73 -

winding-up of Fox Chase Homes were unrelated to the mistake in the land transaction; that the corporation that had allegedly suffered business losses was not a party to the action; and that there was a contract of purchase and sale signed by both the Buyers and the Sellers referring to Lot 2. This was the basis for his finding that the jury was deliberately misled and the defence of fraud was made out.

III.   The Extension of the "Real and Substantial Connection" Test to Foreign-Country Judgments

A.  *The Need for Clarification*

159           The parties agreed before the trial judge that the Florida court had properly assumed jurisdiction. As a result, it is not strictly necessary to deal with the application of the "real and substantial connection" test to foreign-country judgments to dispose of this appeal. Although the issue is moot between these parties, the Court asked for additional submissions on it. My discussion of the jurisdiction question is more extensive than would ordinarily be necessary in light of the appellants' concession of this point and of my agreement with Major J. on what the result of the jurisdiction analysis should be in this case. I have set out my views on this issue in detail because the principles that ought to shape the jurisdiction analysis should also inform the interpretation of the defences, on which I disagree with the majority.

160           I will follow Major J. in assuming that the relevant laws of other Canadian provinces are substantially the same as those of Ontario. I will be referring to Canada and Ontario interchangeably, except where the context indicates otherwise.

- 74 -

161          *Morguard, supra*, marked the beginning of a new era in Canadian conflicts law, and set out the basic principles and policy objectives underlying that new legal framework. At a practical level, however, it left many questions unanswered. Among them are whether the "real and substantial connection" test applies in international situations, and the precise nature of the connections that support the recognition of jurisdiction. The present appeal is a suitable occasion within which to clarify some of the implications of *Morguard* and to develop its ramifications in the international context. For these reasons, this Court decided to hear submissions on the international application of the test, in the hope of providing some guidance to lower courts on the issues that this case raises although those issues are no longer live between the parties.

162          Under the approach adopted by the majority, the "real and substantial connection" test applies in the international context just as it does within Canada, and if any unfairness results it may be dealt with only by arguing *forum non conveniens* in the foreign forum or invoking defences to the enforcement of the final judgment. My view is different. The jurisdiction test itself should be applied so that the assumption of jurisdiction will not be recognized if it is unfair to the defendant. To do so requires taking into account the differences between the international and interprovincial contexts as well as between the rationales that structure our conflicts law in these two spheres.

B.  *Constitutional Imperatives Versus International Comity*

163          The adoption in *Morguard* of new, liberal and purposive rules governing recognition and enforcement of judgments from one province by the courts of another was based on two underlying rationales: constitutional considerations, particularly the intention of the framers of the Constitution to create an integrated national economy; and

2003 SCC 72 (CanLII)

- 75 -

considerations of international comity, which La Forest J. held should be evaluated anew "in the light of a changing world order" (p. 1097). While the latter rationale extends to foreign-country judgments, the former does not.

164        In *Morguard*, La Forest J. emphasized that the integrated character of the Canadian federation makes a high degree of cooperation between the courts of the various provinces a practical necessity. As this Court later confirmed in *Hunt v. T&N plc*, [1993] 4 S.C.R. 289, it is a "constitutional imperative", inherent in the relationship between the units of our federal state, that each province must recognize the properly assumed jurisdiction of another, and conversely that no court in a province can intermeddle in matters that are without a constitutionally sufficient connection to that province. Provided that a court's assumption of jurisdiction is based on a real and substantial connection to the forum, the matter is within the sphere of provincial authority, and the resulting judgment is entitled to "full faith and credit", to borrow the language of the United States Constitution (Article IV), in all the other provinces.

165        As I observed in *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78, at para. 53, it is clear from the reasoning in both *Morguard* and in *Hunt*, *supra*, "that federalism was the central concern underlying both decisions". At the same time, *Morguard* left little doubt that the old common law rules were as outdated in the international sphere as they were inappropriate in the interprovincial context. La Forest J. noted that international borders are far more permeable, and international travel and communications much easier, than was the case when the traditional rules were developed in the nineteenth century. Business dealings with residents of other states are both commonplace and essential for any sophisticated modern economy. It is contrary to the interests of a modern state to retain rules of

- 76 -

private international law that impede its citizens' participation in the increasingly integrated world economy. La Forest J. endorsed the view of H. E. Yntema that the rules of private international law ought to "promote suitable conditions of interstate and international commerce" ("The Objectives of Private International Law" (1957), 35 *Can. Bar Rev.* 721, at p. 741, cited in *Morguard*, at p. 1097).

166      *Morguard* thus strongly suggested that the recognition and enforcement of foreign-country judgments should be subject to a more liberal test informed by an updated understanding of international comity.  It is equally clear from a reading of *Morguard* and its progeny that the considerations informing the application of the test to foreign-country judgments are not identical to those that shape conflict rules within Canada.  As I observed in *Spar*, *supra*, at para. 51, "it is important to emphasize that *Morguard* and *Hunt* were decided in the context of interprovincial jurisdictional disputes . . . [and that] the specific findings of these decisions cannot easily be extended beyond this context".  See also *Hunt*, *supra*, at p. 328.  Although constitutional considerations and considerations of international comity both point towards a more liberal jurisdiction test, important differences remain between them.

167      One of those differences is that the rules that apply within the Canadian federation are "constitutional imperatives".  Comity as between sovereign nations is not an obligation in the same sense, although it is more than a matter of mere discretion or preference.  In *Morguard*, La Forest J. adopted the definition of comity stated by the United States Supreme Court in *Hilton v. Guyot*, 159 U.S. 113 (1895), at pp. 163-64 (cited in *Morguard*, at p. 1096):

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is

- 77 -

the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

168         The phrase "international duty and convenience" does not refer to a legally enforceable duty.  No super-national legal authority can impose on sovereign states the obligation to honour the principle of comity.  Rather, states choose to cooperate with other states out of self-interest, because it is convenient to do so, and out of "duty" in the sense that it is fair and sensible for State A to recognize the acts of State B if it expects State B to recognize its own acts.

169         The provinces, on the other hand, are constitutionally bound both to observe the limits on their own power to assert jurisdiction over defendants outside the province, and to recognize the properly assumed jurisdiction of courts in sister provinces; for them, this is "a matter of absolute obligation".  This obligation reflects the unity in diversity that is characteristic of our federal state.  In *Morguard, supra*, this Court acknowledged the shared values of the Canadian justice system which, as we know, fully accepts the relevance and importance of its two great legal systems, common law and civil law.  The *Morguard* rule was designed in full awareness that Canada shares two legal systems.

170         A further point is that there are significant factual differences between the international and interprovincial contexts that should be reflected in the private international law rules applicable to each.  These contextual differences are important because the doctrine of comity should be applied in a context-sensitive manner.  The ultimate purpose of rules based on the idea of comity is to "facilitate the flow of wealth, skills and people across state lines in a fair and orderly manner" (*Morguard, supra*, at

- 78 -

p. 1096).  How this purpose is best to be achieved depends on the context in which the rules operate.

171         A context-sensitive jurisdiction test ought to take into account the difficulty of defending in a foreign jurisdiction and the possibility that the quality of justice there may not meet Canadian standards.  Judgments should travel more easily across provincial borders than across international ones, both because of the relative ease of mobility between the provinces and because of the consistent nationwide standards of the Canadian justice system.  When a judgment comes from a foreign country, the logistical difficulties of defending in the originating forum may be much greater, and the foreign legal system may be different from those with which Canadians are familiar. Canada is a single country with a fully integrated economy, but the world is not.  In *Morguard*, at p. 1095, this Court rightly emphasized that "[m]odern states . . . cannot live in splendid isolation." But we still do not live in a borderless global village; our modern world is "home to widely varied cultures with radically divergent value systems" (*Yahoo!, Inc. v. Ligue contre le racisme et l'antisémitisme*, 169 F.Supp.2d 1181 (N.D. Cal. 2001), at p. 1186).

172         In my view, it follows from the contextual and purpose-driven approach adopted in *Morguard* that the rules for recognition and enforcement of foreign-country judgments should be carefully fashioned to reflect the realities of the international context, and calibrated to further to the greatest degree possible, the ultimate objective of facilitating international interactions.  This means that the rule should be far more liberal than the categorical approach that was followed before *Morguard* (and most influentially stated in *Emanuel v. Symon*, [1908] 1 K.B. 302 (C.A.)), but by no means does it follow that it should be as liberal as the interprovincial rule.

2003 SCC 72 (CanLII)

- 79 -

2003 SCC 72 (CanLII)

173          The traditional rules impeded cross-border commerce by making it difficult

for judgment creditors to obtain effective remedies against defendants resident in other

countries, thus undermining the security of transactions. But an excessively generous

test would be unduly burdensome for defendants and might discourage persons with

assets in Canada from entering into transactions that could eventually get them involved

in international disputes. This result, too, would frustrate the purpose of private

international law. Ideally, the test should represent a balance designed to create the

optimum conditions favouring the flow of commodities and services across state lines.

In our enthusiasm to advance beyond the parochialism of the past, we should be careful

not to overshoot this goal.


174          I would conclude that the "real and substantial connection" test should apply

to foreign-country judgments, but the connections required before such judgments will

be enforced should be specified more strictly and in a manner that gives due weight to

the protection of Canadian defendants without disregarding the legitimate interests of

foreign claimants. In my view, this approach is consistent with both the flexible nature

of international comity as a principle of enlightened self-interest rather than absolute

obligation and the practical differences between the international and interprovincial

contexts.


C. *The Nature of the Requisite Connecting Factors*


175          The "real and substantial connection" test is simply a way of asking whether

it was appropriate for the originating forum to take jurisdiction over the matter. If the

originating court is an appropriate forum, then it is reasonable to expect the defendant

- 80 -

to defend his interests there and to live with the consequences if he decides not to do so. Conversely, if it is not reasonable in the circumstances to expect the defendant to go to the originating court, then it was probably not appropriate for it to take jurisdiction. I would also emphasize at the outset that the requirement that the originating court act "with properly restrained jurisdiction" was expressly recognized by La Forest J. as a means of ensuring fairness to the defendant (*Morguard, supra*, at p. 1103).

176        In my view, it is important to take into account the burdens that defending in the foreign forum would impose on a defendant, in order to determine whether it is reasonable to expect the defendant to accept them. Among the factors that affect the onerousness of defending in a foreign forum are the difficulty and expense of travelling there and the juridical disadvantage that the defendant may face as a result of differences between the foreign legal system and our own. In *Morguard, supra*, this Court recognized the unfairness of forcing a plaintiff to bring an action in the place where the defendant now resides, "whatever the inconvenience and costs this may bring" (p. 1103). Correlatively, defendants should not be compelled to defend in the jurisdiction of the plaintiff's choosing regardless of the inconvenience and expense entailed; all of these factors should be taken into account by the court in arriving at a solution that justly accommodates the legitimate interests of both parties.

177        One question left open in *Morguard* was exactly what must be connected to the forum to satisfy the "real and substantial connection" test. At various points, La Forest J. refers to "significant contacts with the subject-matter of the action" (p. 1103), "contacts . . . to the defendant or the subject-matter of the suit" (p. 1103), "a nexus . . . between the subject-matter of the action and the territory where the action is brought" (p. 1104), a "connection between the damages suffered and the jurisdiction",

2003 SCC 72 (CanLII)

- 81 -

and a "connection with the transaction or the parties" (p. 1108) (see J. Blom, "Conflict of Laws — Enforcement of Extraprovincial Default Judgment — Real and Substantial Connection: *Morguard Investments Ltd.* v. *De Savoye*" (1991), 70 *Can. Bar Rev.* 733; G. D. Watson and F. Au, "Constitutional Limits on Service Ex Juris:  Unanswered Questions from Morguard" (2000), 23 *Advocates' Q.* 167, at p. 200).

178        The justification for requiring a defendant to go to the foreign forum is generally strongest when there is a link to the defendant.  If the defendant has become involved in activities in the jurisdiction, or in activities with foreseeable effects in the jurisdiction, it is hardly reasonable for her to claim that she should be shielded from the process of that jurisdiction's courts.  This reasoning is reflected in *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393, a case relied on in *Morguard*.  In *Moran* it was held that, in a products liability tort case, the place where the victim suffered damages could assume jurisdiction over a foreign defendant manufacturer who knew or ought to have known that the defective product "would be used or consumed where the plaintiff used or consumed it" — i.e., if there was an indirect but substantial connection between the defendant and the forum (*Moran, supra*, at p. 409, cited in *Morguard*, at p. 1106).

179        But there may be good reasons why jurisdiction should be recognized even where there is little or no connection to the defendant, particularly when other considerations, such as fairness to the plaintiff and the importance of administering the justice system in an efficient manner, are taken into account along with the interests of the defendant.  It is not unusual for cross-border litigation to arise out of complex transactions involving a number of parties with connections to several jurisdictions. Watson and Au, *supra*, point out, at p. 200, that when litigation involves "multiple

- 82 -

defendants in different jurisdictions, insisting on a substantial connection between each defendant and the forum can lead to a multiplicity of actions and inconsistent findings". In such circumstances, a test that recognizes jurisdiction based on a connection to the subject matter of the action seems better suited to identifying whether the forum is a reasonable place for the action to be heard.

180          Moreover, the Canadian Constitution does not mandate that the jurisdiction test provide a minimum level of procedural protection to the defendant, regardless of other factors (see Watson and Au, *supra*, at p. 180). In this respect, Canada's Constitution can be contrasted with that of the United States. In the U.S., defendants are protected by the due process clauses of the Fifth and Fourteenth Amendments, which expressly provide that a person cannot be deprived of property without due process of law. Because the defendant in a civil case stands to be deprived of property by an adverse judgment, the court's jurisdiction will not be recognized unless it accords with the defendant's due process rights — a requirement which has been interpreted to mean that there must be certain minimum connections between the defendant and the forum. By contrast, in the *Canadian Charter of Rights and Freedoms*, due process is enshrined in s. 7, which protects "life, liberty and security of the person", but not property rights. As a general rule, the defendant's life, liberty and security of the person are unaffected by the outcome of civil litigation. In Canada, therefore, the defendant's individual constitutional rights are not the starting point for jurisdictional analysis as they are in the U.S. — nor, indeed, would s. 7 rights usually be relevant to jurisdictional issues in civil disputes, although it is possible that there may be situations where fundamental interests of the defendant are implicated and s. 7 could come into play.

- 83 -

181         A broad interpretation of the "real and substantial connection" test, whereby the test may be satisfied even in the absence of a connection to the defendant, seems appropriate given both our constitutional arrangements and the ultimate objective of facilitating the flow of goods and services across borders.  Jurisdiction should be acknowledged as proper where the forum was a reasonable place to hear the action, taking into account all the circumstances, including judicial efficiency and the legitimate interests of both parties.  At the same time, it should not be forgotten that the jurisdiction test is a safeguard of fairness to the defendant.

182         The test should ensure that, considering the totality of the connections between the forum and all aspects of the action, it is not unfair to expect the defendant to litigate in that forum.  It does not follow that there necessarily has to be a connection between the defendant and the forum.  There are situations where, given the other connections between the forum and the proceeding, it is a reasonable place for the action to be heard and the defendant can fairly be expected to go there even though he personally has no link at all to that jurisdiction.

D. *Balancing Hardship to the Defendant Against the Strength of the Connections*

183         The approach outlined above suggests that when a court is asked to recognize and enforce a foreign judgment, and questions whether the originating court's jurisdiction was properly restrained, it should inquire into the connections between the forum and all aspects of the action, on the one hand, and the hardship that litigation in the foreign forum would impose on the defendant, on the other.  The question is how real and how substantial a connection has to be to support the conclusion that the originating court was a reasonable place for the action to be heard.  The answer is that the

- 84 -

connection must be strong enough to make it reasonable for the defendant to be expected to litigate there even though that may entail additional expense, inconvenience and risk. If litigating in the foreign jurisdiction is very burdensome to the defendant, a stronger degree of connection would be required before the originating court's assumption of jurisdiction should be recognized as fair and appropriate.

184        In some respects, this formulation of the jurisdiction test might overlap with the doctrine of *forum non conveniens*, although it is not exactly the same. Certain considerations, such as juridical disadvantage to a defendant required to litigate in the foreign forum, are relevant to both inquiries. When the issue is jurisdiction, however, the court should restrict itself to asking whether the forum was a reasonable place for the action to be heard, and should not inquire into whether another place would have been more reasonable.

185        There is an important difference between the inquiry conducted by a court assuming jurisdiction at the outset of the action and the test applied by a court asked to recognize and enforce a judgment at the end. In the former case, two steps are involved: the court must first determine that it has a basis for jurisdiction, and if it does it must go on to decide whether it should nevertheless decline to exercise that jurisdiction because another forum is clearly more appropriate for the hearing of the action. In the latter case of a receiving court, only the first step in this inquiry is relevant. Provided that the originating court had a reasonable basis for jurisdiction, the defendant had its chance to appear there and argue *forum non conveniens*, and cannot question the originating court's decision on that issue in the receiving court.

186          Nevertheless, the receiving court is not bound to agree with the originating court's opinion that it had a reasonable basis on which to assume jurisdiction. If the connections to the originating forum are tenuous or greatly outweighed by the hardship imposed on the defendant forced to litigate there, the receiving court may conclude that it was not even a reasonable place for the action to be heard. It is no good to say that the defendant should have raised the question of hardship by arguing *forum non conveniens* before the foreign court. If it is unfair to expect the defendant to litigate on the merits in the foreign jurisdiction, it is probably unfair to expect the defendant to appear there to argue *forum non conveniens*.

E.  *The Application of the Test in the Canadian and International Contexts*

187          A test which balances hardship to the defendant (with due regard to the interests of the plaintiff) against the factors connecting the action to the forum — including links to either party or any other aspect of the action — leads to a very generous approach to the recognition and enforcement of judgments originating in other Canadian provinces. The reason for this is that the hardship imposed on a defendant who has to appear in another province within the Canadian federation will generally be minimal and will usually be outweighed by a genuine connection between the forum and the defendant, the subject-matter of the action or the damages suffered — all of which are invoked as bases of jurisdiction in provincial service *ex juris* statutes and in the *Civil Code of Québec*, S.Q. 1991, c. 64, and each of which, as I noted in *Spar*, *supra*, at para. 56, appears to be an example of a real and substantial connection.

188          Litigation outside the defendant's home forum may entail a number of burdens, which vary depending on the context. Those burdens potentially include the

- 86 -

expense and inconvenience of travelling, the need to obtain legal advice in the foreign jurisdiction, the perils of navigating an unfamiliar legal system whose substantive and procedural rules may be quite different from those that apply in the defendant's home jurisdiction, and even the possibility that the foreign court may be biassed against foreign defendants or generally corrupt.

189        Within Canada, most of these problems do not arise.  It is true that physical distances within this country can be significant, and the expense and inconvenience to a defendant in Newfoundland who is required to litigate in British Columbia, for example, would not be inconsiderable.  As a rule, however, the distances involved are manageable for citizens of a modern country with an efficient transportation infrastructure.  In any event, it may not be necessary for the defendant to go to the jurisdiction in person.  Given the relative ease of travel and communications today, it is usually not an extraordinary burden to litigate in another Canadian province.

190        More importantly, there is very little concern that the defendant will be at a disadvantage because she is not familiar with the legal system in the other province, and still less that the legal systems applied in Canada will actually treat her unfairly.  As La Forest J. pointed out in *Morguard, supra*, there can be no genuine concern about "differential quality of justice among the provinces" (p. 1100).  Indeed, *Morguard* establishes that the Canadian justice system should be understood as an integrated whole. Differences exist in both procedural and substantive matters, but the same basic values apply across the country, and our judicial system is basically unitary.  Excessive discrepancies between the provinces will tend to become harmonized under the guidance of the federally appointed judiciary and the overall superintending authority of the Supreme Court of Canada.  Furthermore, interprovincial law firms have become

- 87 -

commonplace and lawyers across the country are required to abide by the same ethical standards (*Morguard*, at p. 1100).

191        It follows that the assumption of jurisdiction by a sister province, provided that it does not exceed the province's constitutional authority over property, civil rights and the administration of justice in the province and is not prompted by unfair forum-shopping tactics on the plaintiff's part, should be entitled to full recognition and enforcement throughout Canada. A connection to the subject matter of the action should usually suffice to meet the "real and substantial connection" test.

192        Exceptions may arise in cases where litigation away from home would involve travel of a particularly arduous nature for the defendant (which might arise, for example, where the defendant resides in the far north) and, at the same time, the connections to the forum are not especially strong (an example might be a case where all the facts giving rise to the cause of action took place outside the jurisdiction and the only connection is that the plaintiff has suffered damages there). Absent such exceptional circumstances, grounds such as a wrong committed in the jurisdiction or damages suffered there would probably support the assumption of jurisdiction by the province in accordance with the requirements of order and fairness.

193        A judgment which comes to a Canadian court from beyond our international borders is another matter altogether. The distances involved and the difficulty of travelling can be considerably greater when litigation is in a foreign country, and a Canadian defendant faced with a lawsuit outside this country will have to deal with an unfamiliar, and in some cases a very different, legal system.

2003 SCC 72 (CanLII)

- 88 -

194          In extreme cases, the foreign legal system itself may be inherently unfair. It is an unfortunate fact that not every country's courts are free of official corruption or systemic bias. In my opinion, it is to this possibility that La Forest J. alluded when he specified that "fairness to the defendant requires that the judgment be issued by a court acting <u>through fair process</u> and with properly restrained jurisdiction" (*Morguard*, at p. 1103 (emphasis added)). If the process that led to the judgment was unfair in itself, it is not fair to the defendant to enforce that judgment in any circumstance, even if the forum has very strong connections to the action and appears in every other respect to be the natural place for the action to be heard.

195          It should therefore be part of the plaintiff's burden in establishing a *prima facie* case of enforceability to prove that the system from which the judgment came is basically fair. When the originating jurisdiction is another democratic country with fair institutions, this burden will be easily met and may call for nothing more than reliance on judicial notice that the judgment emanates from a legitimate and respected legal system.

196          A less troubling but more common situation arises when there is nothing inherently wrong with the foreign legal system, but it is different enough from ours that a Canadian defendant may encounter considerable difficulties understanding her rights and obligations and the steps she needs to take to defend herself. To take a simple example, a defendant from a Canadian common law province may find a civilian system such as that of France or Germany quite unfamiliar. Continental legal systems are, of course, just as fair and sophisticated as the legal system of Ontario. The fact remains that an Ontario defendant who is used to a very different system may suffer prejudice as a result of the foreign system's unfamiliarity. Such a defendant cannot hope to protect

2003 SCC 72 (CanLII)

- 89 -

herself unless she retains local counsel who can both negotiate the process on her behalf and explain it to her in a language she knows. It is not a simple thing to find trustworthy, competent, bilingual counsel in a foreign country; nor is it cheap. The plaintiff, who chose the forum, will presumably not face these difficulties, and therefore the parties will not be on a level playing field. (Conversely, the plaintiff would face the same kind of disadvantage if required to come to Ontario to pursue his case; it is in the nature of international litigation that one party or the other must accept the hardship of litigation in a foreign jurisdiction. The touchstone for an enforcing court in reaching a fair decision as to which of them should bear this burden is the strength of the connections between the action and the originating jurisdiction.)

197         Even legal systems that are relatively similar to Canada's can differ from our system significantly, and in ways that affect a Canadian defendant's ability to make his case effectively and to understand the strengths and weaknesses of his position. The common law system in the United States remains very close in many respects to that of Canada. Yet this action itself provides numerous examples of substantive and procedural differences between the legal system in Florida and that of Ontario which created unforeseen perils for the Ontario defendants. Those differences include the following:

—     Discovery in Florida is even broader in scope than it is in Ontario, and some of the functions of pleadings in Ontario are left to the discovery process. The record in this case indicates that it is standard practice for pleadings to disclose no more than a rough outline of the plaintiff's claim and for the defendant to find out the specifics through discovery. Thus, the Amended Complaint did not set out the amount of damages claimed, but simply stated a minimum amount necessary to support the monetary jurisdiction of the Circuit Court. The expert witness, Mr.

- 90 -

Groner, testified that the Ontario defendants were expected to ascertain the actual amount being sought through the discovery process. This would, of course, involve expense and would probably necessitate retaining local counsel in Florida.

— Under Florida's procedural rules, the defence filed by the appellants ceased to have any effect once a new version of the Amended Complaint was filed, in spite of the fact that the allegations concerning the appellants were unchanged and the lack of any notification to the appellants that they were supposed to file a new defence.

— Even in cases where significant sums of money are at stake, transcripts are not produced in the Florida courts as a matter of course, but at the option and expense of the litigants. In a default case, this effectively means the plaintiff has complete control over whether there will be a record of what is said in the proceedings.

— Punitive damages appear to be available in a wider range of cases and in much larger amounts under Florida law than they are under Ontario law. An Ontario defendant sued in Florida may therefore be at risk of a far higher damage award than would be contemplated in Ontario.

198        These differences illustrate that for an Ontario defendant, litigation in Florida entails greater hardship and risk than litigation in another Canadian province — and of all 'truly foreign' jurisdictions, Florida, which is not very far away and has a legal system essentially similar to Ontario's, is one of the least foreign. In my opinion, therefore, fairness to defendants requires a stronger degree of connection to support Florida's assumption of jurisdiction than would be the case if the originating court were in a sister province. Furthermore, if the judgment had originated from a more 'foreign'

2003 SCC 72 (CanLII)

- 91 -

jurisdiction which involved greater difficulties for the defendant, the requisite degree of connection would be even higher.

199    In this case, the jurisdictional point is easily dealt with, not only because of the appellants' concession, but also because there were very strong connections between Florida and every component of the action: the plaintiffs, who live there; the land, which is in Florida; and the defendants, who involved themselves in real estate transactions there. Florida was the natural place for the action to be heard. If the connections were less robust, however, the conclusion might be different. For example, in a case where the only connection to Florida is that the plaintiffs are Florida residents and suffer damages there, it would, as a rule, be unfair to Canadian defendants to expect them to face the expense and risks of litigation in Florida.

F.  *Should the Test for Jurisdiction Be Based on "Reciprocity"?*

200    It follows from the propositions set out above that I do not agree with the majority that the notion of "interprovincial reciprocity" is "equally applicable to judgments made by courts outside Canada" (Major J., at para. 29). The argument is that if the circumstances are such that an Ontario court could reasonably take jurisdiction based on equivalent connecting factors to Ontario, then the Ontario court should recognize the jurisdiction of the foreign court. Although there is some initial appeal to this idea, ultimately I do not agree with it. Its effect is to treat a judgment from a foreign country exactly like one that originates within Canada. This approach, in my view, fails to take into account the very real differences between the interprovincial and international contexts.

201        A few preliminary words should be said about the concept of "reciprocity". Some ambiguity is associated with this term. It is sometimes used to refer to the idea that State A should recognize the jurisdiction of State B's courts if State B would do the same for State A in the same circumstances. On the other hand, "reciprocity" sometimes refers to the quite different notion (invoked by the majority here) that State A should recognize the jurisdiction of State B if State A would have assumed jurisdiction in the same circumstances (see *Dicey and Morris on the Conflict of Laws* (13th ed. 2000), vol. 1, at p. 501). Blom has suggested that the latter approach is more properly one of "equivalence of jurisdiction" rather than "reciprocity" (Blom, *supra*, at p. 735).

202        I would note that in *Morguard, supra*, La Forest J. rejected reciprocity in the latter sense (equivalence of jurisdiction) as the basis for a new jurisdiction test in the interprovincial context, and also questioned its usefulness on the international plane (see *Morguard*, at p. 1104; Blom, *supra*, at p. 735). Instead, he espoused an approach whereby the assumption of jurisdiction by a court in a province would be governed by the same principles of order and fairness that guide a court in another province when it determines whether to recognize the first court's jurisdiction. Within Canada, the bases for assuming jurisdiction and the bases for recognizing it should be correlative; as La Forest J. pointed out, "[i]f it is fair and reasonable for the courts of one province to exercise jurisdiction over a subject-matter, it should as a general principle be reasonable for the courts of another province to enforce the resultant judgment" (p. 1094). The logic underlying this statement is not that the forum should recognize a jurisdiction that it claims for itself, but rather that the same principles define when it is reasonable to assume jurisdiction and when it is reasonable to recognize it.

- 93 -

203    It makes sense that the jurisdictional rules on assumption and recognition should dovetail together in a federal state where the justice systems of the various provinces are interconnected parts of a harmonized whole. This reasoning does not extend to the international setting.

204    Nor does the concept of reciprocity in the sense of equivalence of jurisdiction serve the purposes of private international law well. This idea fails to reflect the differences between assuming jurisdiction and enforcing a foreign judgment. When a Canadian court takes jurisdiction over a foreign defendant, it need not inquire into the fairness of its own process, which can be taken for granted. Potential hardship to the defendant can be dealt with under *forum non conveniens*. The ultimate practical effect of the court's judgment will not be determined by its own decision to take jurisdiction, but by the decision of the courts in the defendant's home jurisdiction whether or not to recognize and enforce the Canadian judgment based on that jurisdiction's own domestic law and policy. Conversely, when a foreign judgment arrives in Canada, the enforcing court is the last line of defence for the Canadian defendant. The court should have a discretion to decide that it is not fair to the defendant to recognize the jurisdiction of the foreign court, even if the Canadian court would have decided it was fair to take jurisdiction itself based on the same connecting factors.

G.  *Conclusion on Jurisdiction*

205    In conclusion, I agree with Major J. that considerations of comity, order and fairness support the application of the "real and substantial connection" test to the recognition and enforcement of judgments originating in foreign countries. In my view, however, the application of the test should be purpose-driven and contextual. What

2003 SCC 72 (CanLII)

- 94 -

constitutes a connection sufficient to meet the test will not be the same in every context. The jurisdiction test should reflect the difference between the international and interprovincial contexts and the greater hardship that litigation in a foreign country can entail. There is no good reason why Ontario courts should have to treat a judgment from Florida — or one from China, Turkmenistan or Sierra Leone — exactly like a judgment from another Canadian province.

206        I would also question whether international comity requires us to move as far as the majority does in the direction of openness to foreign judgments when the position of jurisdictions with which we tend to compare ourselves is less generous. In England and Australia, for example, the *Emanuel v. Symon, supra*, framework remains substantially unchanged and the jurisdiction of a foreign court must be based on the presence or residence of the defendant in the foreign jurisdiction or on the defendant's voluntary submission (see, e.g., *Dicey and Morris on the Conflict of Laws, supra*, at pp. 487 and 503; P. E. Nygh, *Conflict of Laws in Australia* (6th ed. 1995), at p. 138). The U.S. position is more liberal, but still does not go as far as the majority does in this case. Generally, U.S. states will apply the "minimum contact test" to foreign-country judgments as they do to judgments of sister states. This test is made out when a non-resident defendant seeking to avail himself of some benefit within a state affirmatively acts in a manner which he knows or should know will result in a significant impact within the forum state (see, e.g., *Mercandino v. Devoe & Raynolds, Inc.*, 436 A.2d 942 (N.J. Super. App. Div. 1981), at p. 943). Thus, a connection between the foreign jurisdiction and the cause of action alone, in the absence of purposive conduct by the defendant establishing a connection between himself and the forum, would be insufficient as a basis for jurisdiction and enforceability in the U.S. In such a case,

2003 SCC 72 (CanLII)

- 95 -

however, the "real and substantial connection" test as it is interpreted by the majority would always be satisfied.

207  Finally, I would note that the logic on which the *Morguard* test is founded suggests that it should supersede, rather than complement, the traditional common law bases of jurisdiction. In my view, it is not necessary to ask whether any of the traditional grounds are present and then go on to ask whether there is a real and substantial connection (as the majority reasons suggest, at para. 37). There should be just one question: is the "real and substantial connection" test made out?

208  This Court noted in *Hunt, supra*, that the traditional grounds were generally sound bases of jurisdiction and were "a good place to start", but also observed that "some of these may well require reconsideration in light of *Morguard*" (p. 325). Such factors as contractual agreement to accept jurisdiction and habitual residence in the foreign forum are usually very clear examples of the kind of connection that reasonably supports the assumption of jurisdiction. Attornment by actively defending the action in the foreign jurisdiction is a slightly different kind of connection; because the defendant has chosen to have his day in court in the foreign forum, no unfairness results from the enforcement of the foreign court's judgment.

209  In some cases, however, the traditional grounds may be more arbitrary and formalistic than they are fair and reasonable. Under the traditional rules, for example, jurisdiction could be acquired by serving a defendant who was present in the jurisdiction, even if her presence was only fleeting and was completely unconnected to the action, and in the absence of any other factor supporting jurisdiction. Another example is the common law rule that an appearance solely for the purpose of challenging the

- 96 -

jurisdiction of the foreign court was an attornment to its jurisdiction, which was argued (but not commented on by the court) in *United States of America v. Ivey* (1995), 26 O.R. (3d) 533 (Gen. Div.). Circumstances such as these may not amount to a real and substantial connection, and in my view they should not continue to be recognized as bases for jurisdiction just because they were under the traditional rules.

IV.  The Impeachment Defences

A.  *The Principle Behind the Defences*

210        Claimants who seek to have foreign judgments recognized or enforced in this country ask for the support and cooperation of Canadian courts. They thus face the initial burden of showing that the judgment is valid on its face and was issued by a court acting through fair process and with properly restrained jurisdiction based on a real and substantial connection to the action. The petitioner must convince the receiving court that the values of international comity require it to exercise its power in favour of enforcing the judgment. Once this burden has been met, the judgment is *prima facie* enforceable by a Canadian court. The common law has long recognized, however, that the defendant can still establish that the judgment should not be enforced by showing that one of a number of defences to recognition and enforcement applies. The defences relevant to this appeal are commonly grouped under the heading of "impeachment" defences, since all are based on the notion that the way the foreign judgment was obtained was in some way tainted or contrary to Canadian notions of justice. (Other potential defences, such as the foreign public law exception to enforceability in Canada, which might apply, for example, to a tax claim, are not implicated by the facts of this case.)

2003 SCC 72 (CanLII)

- 97 -

211        A foreign judgment may be impeached on the basis that its recognition or enforcement would be contrary to public policy, that it was obtained by fraud, or that the foreign proceedings were contrary to natural justice.  The burden is on the party raising one of these defences to prove that it applies; the foreign judgment is presumed to be valid, and there is a basic principle that the domestic court will not permit relitigation of matters tried before the foreign court (J.-G. Castel and J. Walker, *Canadian Conflict of Laws* (5th ed. (loose-leaf)), at p. 14-24).  At the same time, the receiving court has both the authority and the responsibility to uphold the essential values of the domestic legal system and to protect citizens under the protection of its laws from unfairness.  The three impeachment defences are established situations where the domestic court will intervene and refuse to enforce the judgment because the law on which it is based or the way it was obtained is simply too offensive to local notions of what is just and reasonable.

B.    *The Need to Reconsider the Impeachment Defences as a Result of the Change in the Jurisdiction Test*

212        An intrinsic tension arises between the impeachment defences and the principle that the law and facts on which the foreign judgment is based cannot be reargued.  Acknowledging the foreign court's jurisdiction would mean very little if the defences could be routinely used to discredit the legal, factual or procedural basis of its judgment.  On the other hand, the principle of finality of judgments has its limits; it does not and should not mean that the enforcing court can do no more than rubber-stamp the foreign judgment while turning a blind eye to unfairness or impropriety in its provenance.

2003 SCC 72 (CanLII)

213     The impeachment defences represent the balance that the courts have found to be appropriate between security of transactions, on the one hand, and fairness in the individual case, on the other. Traditionally, they have been narrow in scope. The old, strict approach to these defences struck a balance appropriate to the requirements of international comity under the pre-*Morguard* common law, when the jurisdiction test was a difficult threshold for foreign plaintiffs to cross. Nearly all judgments that passed it did so because the defendant had either participated in the action in the foreign forum or selected it by agreement. As J. Walker notes in a comment on this case:

> Under such conditions, defendants resisting the enforcement of foreign judgments could be presumed to have defended the actions against them and to have benefited from the procedural safeguards available in the foreign legal systems. Alternatively, defendants could be presumed to have chosen, on the strength of some familiarity with the foreign legal systems, to let their matters be decided in default.
>
> ("*Beals v. Saldanha*: Striking the Comity Balance Anew" (2002), 5 *Can. Int'l Law*. 28, at p. 30)

In short, the potential for unfairness to the defendant was minimal, and accordingly there was no need for courts to be concerned with shortcomings in the way the judgment was obtained absent "some egregiously bad feature of the process or the result" (Walker, *supra*, at p. 30).

214     The balance that existed under the traditional approach is lacking in the new test set out by the majority. The category of foreign judgments that are *prima facie* enforceable in this country has been greatly expanded by virtue of the adoption of the *Morguard* test for foreign-country judgments. The law as it now stands will admit a default judgment emanating from a forum that the defendant did not consent to and may have been connected to only indirectly or not at all. This is a salutary development in

- 99 -

our law on jurisdiction; if there are sufficient connections between the action and the forum, the judgment should not be shut out on the basis that the forum was inappropriate. But the possibility that the judgment should be unenforceable for some other reason should be considered anew in light of this new context. Castel and Walker, *supra*, have commented that if this Court confirms the application of the *Morguard* test to foreign judgments, "it would seem necessary to revise the defences . . . so as to protect persons in Canada who have been sued in foreign courts from the particular kinds of unfairness that can arise in crossborder litigation, and so as to prevent abuse from occurring as a result of liberal rules for the enforcement of foreign default judgments" (p. 14-26).

215        One example of the kind of unfairness Castel and Walker refer to is the increased vulnerability of Canadian residents to nuisance lawsuits in other countries. A defendant may be confronted with a claim that he knows to be frivolous brought by an overseas claimant. His choices are to defend, to settle, or to ignore the claim. Defending in a foreign country is often expensive and difficult. Many foreign jurisdictions do not award costs to the successful party, so that the defendant will have to bear the expenses of litigation even if his position is fully vindicated. On the other hand, failure to defend brings with it considerable risk. The defendant may have little or no knowledge of the legal system and may be unable to predict with confidence that the foreign court will not be persuaded, or required by the operation of its own rules, to uphold a meritless claim.

216        A defendant faced with this dilemma ought to be afforded some protection by Canadian courts against foreign judgments that are clearly flawed, even if the flaws do not meet the stringent tests that traditionally defined the impeachment defences. If no such protection is available, in many cases the only safe option for defendants will

2003 SCC 72 (CanLII)

- 100 -

be to settle with the claimant despite the fact that the claim is baseless. If the position of the Canadian courts is to be that defendants who fail to defend in the foreign forum do so entirely at their peril, regardless of whether the decision not to defend was based on a rational cost-benefit analysis and irrespective of the frivolousness of the claim and of the use of improper means to persuade the foreign court that it should succeed, Canadian residents may become attractive targets for opportunistic plaintiffs' lawyers in other jurisdictions.

217        In my opinion, the impeachment defences, particularly the defences of fraud and natural justice, ought to be reformulated. The law of conflicts needs to take these new possibilities for abuse into account and to ensure an appropriate recalibration of the balance between respect for the finality of foreign judgments and protection of the rights of Canadian defendants.

218        Furthermore, the nominate defences should be looked at as examples of a single underlying principle governing the exercise of the receiving court's power to recognize and enforce a foreign judgment. The claimant must come before the Canadian court with clean hands, and the court will not accept a judgment whose enforcement would amount to an abuse of its process or bring the administration of justice in Canada into disrepute. Serious consideration should be given to the possibility of a residual category of judgments, beyond those addressed by the defences of public policy, fraud and natural justice, that should not be enforced because they, too, engage this principle — in short, because their enforcement would shock the conscience of Canadians.

C. *Reformulation of the Nominate Defences*

- 101 -

(1) Public Policy

2003 SCC 72 (CanLII)

219        If the enforcement of a foreign judgment in Canada would be contrary to Canadian public policy, the judgment will not be enforced here.  This defence addresses objections to the foreign law on which the judgment was based.  It will be engaged if the foreign law is either contrary to basic morality or contrary to the fundamental tenets of justice recognized by our legal system.

220        The trial judge held that the public policy defence should be expanded to incorporate a "judicial sniff test" that would allow enforcing courts to reject foreign judgments obtained through questionable or egregious conduct (Jennings J., at p. 144). It has also been suggested that excessively high punitive damage awards should be unenforceable in whole or in part as a matter of public policy; see, e.g., J. S. Ziegel, "Enforcement of Foreign Judgments in Canada, Unlevel Playing Fields, and *Beals v. Saldanha*: A Consumer Perspective" (2003), 38 *Can. Bus. L.J.* 294, at pp. 306-7; *Kidron v. Grean* (1996), 48 O.R. (3d) 775 (Gen. Div.) (where the court refused to enforce on summary judgment a foreign judgment for $15 million for emotional distress based on evidence of "hurt feelings").  Ziegel notes that the Preliminary Draft Convention on Jurisdiction and Foreign Judgments in Civil and Commercial Matters adopted in October 1999, and revised in June 2001, by the Special Commission of the Hague Conference on Private International Law, provides that a court asked to enforce an award of non-compensatory damages may, if satisfied that the amount awarded is "grossly excessive", limit enforcement to a lesser amount (Article 33(2)).  The Draft Convention may reflect an international consensus that large punitive damage awards can raise serious concerns, although this idea does not rise to the level of a customary norm.

- 102 -

221        In my view, the better approach is to continue to reserve the public policy defence for cases where the objection is to the law of the foreign forum, rather than the way the law was applied, or the size of the award *per se*.  In other words, this defence should continue to be, as the trial judge put it, "directed at the concept of repugnant *laws*, not repugnant *facts*" (p. 144 (emphasis in original)).  Public policy is potentially an expansive enough concept to subsume the other two defences; it is, of course, contrary to public policy in a broad sense to enforce a judgment that was fraudulently or unfairly obtained.  But it is useful to maintain an analytical distinction between the three defences.  Furthermore, the defence of public policy has long been associated with condemnation of the foreign jurisdiction's law.  To extend it to cover situations where there is nothing objectionable about the foreign law but, rather, a defect in the way the law was applied might send the wrong message, one that conflicts with the norms of international cooperation and respect for other legal systems underlying the doctrine of comity.

222        In *Boardwalk Regency Corp. v. Maalouf* (1992), 88 D.L.R. (4th) 612, the Ontario Court of Appeal held that the public policy defence applies to laws that violate "conceptions of essential justice and morality" (p. 615).  As an example, the court cited a contract relating to the corruption of children (p. 622).  It emphasized that a mere difference between the policy choices reflected in the foreign law and those that prevail in Canada is not enough to engage the defence (pp. 615-16).  This approach reflects the principle that diversity among the legal systems of the world should be respected, while at the same time establishing the limits of that principle.  A law that offends fundamental or essential moral precepts will not be enforced.  While the question is always whether the foreign law violates Canadian ideas of essential justice and morality, the relevant

2003 SCC 72 (CanLII)

- 103 -

precepts of morality and justice are so basic that they can be said to have a universal character and will generally be respected by all fair legal systems.

223            The defence of public policy should not, however, be reserved for such shockingly immoral laws that one would be hard-pressed to find a non-hypothetical example of the kind of law that would engage it. In my opinion, there is more work for this defence to do. It should also apply to foreign laws that offend basic tenets of our civil justice system, principles that are widely recognized as having a quality of essential fairness. Among these, I would include the idea that civil damages should only be awarded when the defendant is responsible for harm to the plaintiff, and the rule that punitive damages are available when the defendant's conduct goes beyond mere negligence and is morally blameworthy in some way. These are basic principles of justice that are reflected in some form in most developed legal systems, although the particular form in which they are expressed may vary.

224            A law which violates these basic tenets of justice would be fundamentally unfair and worthy of condemnation. A Canadian court presented with a judgment from a jurisdiction whose law provides, for example, that punitive damages can be awarded on the basis of simple negligence or strict liability ought to have a discretion to deny or limit the enforceability of the judgment on grounds of public policy.

225            This does not dispose of all the difficulties raised by large punitive damage awards, which in practice seldom result from the application of unjust laws. The most common source of punitive damage awards that are unusually high by international standards is the United States. In that country, it is more common to use punitive damages as an instrument of social engineering than it is in Canada, and American law

- 104 -

tends to permit larger awards as a way of modifying the behaviour of well-funded defendants. There is nothing about that approach that is inherently offensive to Canadian ideas of basic fairness; it is simply a different policy choice, and it affords U.S. plaintiffs a level of protection of which they ought not necessarily to be deprived just because the defendant's assets are here. As far as I know, U.S. federal and state law generally allows for punitive damages only when the defendant's behaviour is morally blameworthy in some way. In this sense, their policy is similar in principle to ours even though the amounts awarded are sometimes startlingly high to Canadian eyes.

226        Serious problems can, however, arise when an exorbitant damage award is granted against a defendant whose actions were merely careless, rather than reprehensible, or where the defendant's actions were blameworthy enough to merit punitive damages in some amount but the amount awarded is so unimaginably large that it would only be justified as a response to the most heinous and despicable conduct. In many such cases, the applicable law does not, in theory at least, support the size of the damage award. Such awards may be fixed by juries or judges who may not apply the law with the utmost scrupulousness, and they are often overturned on appeal.

227        Some very large judgments of this kind have gained a certain level of notoriety and are probably the first to come to mind when concerns about the size of punitive damage awards are raised. A well-known example is *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), where the United States Supreme Court overturned a judgment of the Alabama Supreme Court which had awarded $2 million against BMW because they had sold the defendant a car without revealing that it had been repainted.

- 105 -

228        Another example is the *Loewen* case, where a Mississippi jury awarded $500 million (including punitive damages of $400 million) against a funeral company based in British Columbia for anti-competitive behaviour. The Mississippi court rules made the defendant's right to appeal conditional on the posting of a bond worth 125 percent of the damages owed. The defendants settled the case in 1996, and went on to file a NAFTA claim against the United States, arguing that the verdict amounted to an uncompensated appropriation of foreign investors' assets. This claim was ultimately unsuccessful, but the NAFTA tribunal remarked on the unfairness of the verdict and the appearance that improper considerations had played a part in inflating it; the trial judge had allowed the plaintiff's attorney to make irrelevant and prejudicial references to matters of race and class and to the fact that the defendants were foreign nationals (*Loewen Group, Inc. v. United States of America*, International Centre for Settlement of Investment Disputes, Case No. ARB(AF)/98/3, June 26, 2003, at para. 4). See also J. A. Talpis, *"If I am from Grand-Mère, Why Am I Being Sued in Texas?" Responding to Inappropriate Foreign Jurisdiction in Quebec-United States Crossborder Litigation* (2001).

229        In cases like those referred to above, the problem is not that the law of the foreign jurisdiction conflicts with Canadian public policy, but that the facts of the case do not really justify the size of the award even under the foreign law. These are issues that, in my view, engage the defence of natural justice rather than that of public policy.

(2) Fraud

230        Fraud perpetrated on the court that issued the foreign judgment is a defence to its enforcement in Canada. The defence of fraud is hard to reconcile with the principle

- 106 -

that the original court's findings of fact are final and binding.  As Castel and Walker,
*supra*, observe, "[t]he difficulty lies in defining the extent to which the defence of fraud
can be considered without reviewing the deliberations of the foreign court or
reconsidering the merits of the claims or defences adjudicated in the foreign proceeding"
(pp. 14-24 and 14-25).

231          Courts have attempted to resolve this conflict by distinguishing between the
kind of fraud of which evidence will be admitted by the domestic court, and allegations
of fraud which are considered to have been directly or impliedly disposed of by the
foreign judgment and cannot be raised again.  Different courts have drawn the line in
different places.  At one end of the spectrum is the very strict rule followed in *Woodruff
v. McLennan* (1887), 14 O.A.R. 242, admitting only evidence of "extrinsic fraud" (fraud
going to the jurisdiction of the court that issued the judgment, or affecting the
defendant's opportunity to present her case).  At the other is the liberal rule followed by
the English courts in *Abouloff v. Oppenheimer* (1882), 10 Q.B.D. 295 (C.A.), and
recently affirmed by the House of Lords in *Owens Bank Ltd. v. Bracco*, [1992] 2 All
E.R. 193, whereby the judgment will be vitiated by evidence that the foreign court was
deliberately deceived on any matter, including on the merits of the case.  A middle
position was taken by the Ontario Court of Appeal in *Jacobs v. Beaver* (1908), 17 O.L.R.
496, and in this case, where it was held that fraud can only be argued on the basis of
fresh evidence that was not known, and could not have been discovered with reasonable
effort, at the time of the original decision.

232          It should be noted that each of these approaches represents a compromise
between the conflicting propositions that the original judgment is conclusive and that a
judgment obtained by deception or based on false facts should not be enforced.  Even

- 107 -

under the permissive English rule, the foreign court's factual conclusions can only be displaced by proof of conscious and intentional deception; it is not enough to argue that the foreign court drew the wrong conclusion from the evidence. In the *Duchess of Kingston's Case* (1776), 2 Sm. L.C. (8th ed.) 784 (cited in *Aboulof, supra*, at p. 300), de Grey C.J. remarked that "although it is not permitted to show that the [foreign] Court was mistaken, it may be shown that they were misled" (p. 794). None of these compromises has an absolute claim to be the correct solution to the conundrum. What is the best approach depends on the context in which the rule is applied, and the most appropriate rule will be the one that is most conducive in the circumstances to furthering the objectives of private international law.

233        I agree with Major J. that in general the rule that the defence of fraud must be based on previously undiscoverable evidence is a reasonably balanced solution. The distinction between extrinsic and intrinsic fraud is, as Major J. says, an obscure one which creates uncertainty. It is also unduly strict; as Jennings J. noted in the court below, it leaves space for the fraud defence that is not already occupied by a principled jurisdiction test and by the defence of natural justice (p. 140). On the other hand, defendants usually should not be allowed to reargue matters that they already raised before the foreign court, or chose not to raise there. These considerations suggest that the "extrinsic fraud" approach is too narrow and the "intentional fraud" approach too broad; the rule that only fresh evidence of fraud can be looked at by the enforcing court is, generally speaking, a good compromise.

234        I would not, however, rule out the possibility that a broader test should apply to default judgments in cases where the defendant's decision not to participate was a demonstrably reasonable one. If the defendant ignored what it justifiably considered to

- 108 -

be a trivial or meritless claim, and can prove on the civil standard that the plaintiff took advantage of his absence to perpetrate a deliberate deception on the foreign court, it would be inappropriate to insist that a Canadian court asked to enforce the resulting judgment must turn a blind eye to those facts. In *Powell v. Cockburn*, [1977] 2 S.C.R. 218, at p. 234, Dickson J. (as he then was) observed that "[t]he aim of the Courts, in refusing recognition because of fraud, is to prevent abuse of the judicial process." In my opinion, enforcement of a judgment that was obtained by intentionally misleading the foreign court in the kind of circumstances I have outlined could well amount to an abuse of the judicial process. In my opinion, a more generous version of the fraud defence ought to be available, as required, to address the dangers of abuse associated with the loosening of the jurisdiction test to admit a broad category of formerly unenforceable default judgments.

(3) Natural Justice

235        A foreign judgment will not be enforced in Canada if the foreign proceedings were contrary to natural justice. The defence concerns the procedure by which the foreign court reached its decision. The clearest examples of a deprivation of natural justice occur when the defendant lacks notice of the foreign proceedings or an opportunity to present his case to the court.

236        In my opinion, two developments should be recognized in connection with this defence. First, the requirements of notice and a hearing should be construed in a purposive and flexible manner. Secondly, substantive principles of justice should also be included in the scope of the defence. The ultimate inquiry is always whether the

2003 SCC 72 (CanLII)

- 109 -

foreign judgment was obtained in a manner that was fair to the defendant and consistent with basic Canadian notions of justice.

237          The purposive interpretation of the notice requirement was addressed in some detail by Weiler J.A. in her dissenting opinion in the court below ((2001), 54 O.R. (3d) 641). The notice requirement is based on "the underlying fundamental principle of justice that defendants have a right to know the case against them and to make an informed decision as to whether or not to present a defence" (pp. 675-76).

238          Notice is adequate when the defendant is given enough information to assess the extent of his or her jeopardy. This means, among other things, that the defendant should be made aware of the approximate amount sought. Canadian procedural rules require that the amount of damages claimed be stated in the pleadings (Weiler J.A., at p. 676). This is not the rule in all jurisdictions, and notice will still be adequate even where the pleadings do not conform to Canadian standards as long as the defendant is informed in some other way of the amount in issue.

239          A requirement of particular relevance to this appeal is that adequate notice must include alerting the defendant to the consequences of any procedural steps taken or not taken, to the extent that those consequences would not be reasonably apparent to someone in the defendant's position. The claimant bears a certain responsibility for ensuring that a defendant who is not reasonably in a position to understand the particular workings of the foreign process does not inadvertently give up defences or waive rights as a result.

2003 SCC 72 (CanLII)

- 110 -

240        Proper notice also requires alerting the defendant to the allegations that will be adjudicated at trial. The defendant must be informed, by the pleadings or otherwise, of the basis on which damages are sought and the case to be answered. As Weiler J.A. noted, if in fact damages are assessed "beyond the pleadings", then the defendant will not have had true notice of what would take place in the proceedings and will have been deprived of the opportunity to make an informed decision as to whether to participate (p. 676).

241        Authority for the proposition that natural justice comprises substantive principles of justice, as well as minimum procedural standards, is to be found in the judgment of the English Court of Appeal in *Adams v. Cape Industries plc*, [1991] 1 All E.R. 929, the leading English case on the enforcement of foreign judgments. The judgment sought to be enforced in that case originated in Texas and arose from a complex asbestos-poisoning action involving numerous plaintiffs and defendants. Damages were assessed in a rather unconventional way. On the suggestion of plaintiffs' counsel, the judge arrived at a global amount of damages to be distributed among the plaintiffs in fixed amounts which were not based on proof of the damages suffered by each individual plaintiff. This method of calculating damages was held by the English court to be contrary to natural justice because it was "not the result of a judicial assessment of the individual entitlements of the respective plaintiffs" and because no proper judicial hearing had been held on the quantum of damages (*Adams*, *supra*, at p. 1042). Slade L.J. held that it was a principle of substantive justice that unliquidated damages must be assessed "objectively by the independent judge on proof by the plaintiff of the relevant facts" (p. 1050).

- 111 -

242        *Adams* sets out a flexible and pragmatic approach to the natural justice defence which is appropriate for the Canadian context following *Morguard*. I agree with the English Court of Appeal that the defence can be triggered by principles of substantive justice, such as the proposition that damages should be based on objective proof and judicial assessment.  In Weiler J.A.'s words, "the ultimate guidepost in deciding whether the defence of natural justice may be raised is procedural fairness based on underlying fundamental principles of justice" (p. 675).  The category is not closed.  If a defendant can establish that the process by which the foreign judgment was obtained was contrary to the Canadian conception of natural justice — because the process itself is flawed, by reason of the way the plaintiff manipulated the process, or both — then the foreign judgment should not be enforced.

243        Weiler J.A. understood La Forest J.'s allusion to "fair process" in *Morguard* to refer to the rules of natural justice (p. 671).  My colleague Major J. also appears to be of this opinion when he states, under the heading of "The Defence of Natural Justice", that the enforcing court must ensure that the judgment originates from a fair legal system (para. 61).  While these concepts are certainly related, in my view there is a meaningful distinction between the fairness of the legal system from which the judgment came and the fairness of the procedure followed in the particular case.  Slade L.J. underlined this distinction in *Adams*, *supra*, when he observed that the Texas judgment originated from "an unimpeachable system of justice within one of the great common law jurisdictions of the world" (p. 1048).  The defendants in *Adams* argued not that the judgment was a product of an unfair system of justice, but that the judge's method of assessing damages did not comply with the rules of that system.

- 112 -

244       I would also note that La Forest J. expressly stated, in *Morguard, supra*, at p. 1103, that "fair process is not an issue within the Canadian federation". I would not take this to mean that the defence of natural justice can never be available against enforcement of a Canadian judgment. Although the justice system in Canada is fair, it is possible for failures of the system to occur in individual cases. For these reasons, I would hold that the "fair process" referred to in *Morguard* means a legal system that is free from corruption and bias — a requirement which, it seems to me, is relevant to the questions of whether the foreign court's jurisdiction should be recognized at all. The defence of natural justice, on the other hand, is concerned with whether the procedural steps followed in the particular case ensured that the defendant was treated with basic fairness.

245       Finally, the obligation of a defendant to pursue remedies available in the originating jurisdiction must be addressed. In *Adams, supra*, Slade L.J. held that opportunities for correcting a denial of natural justice that existed in the originating jurisdiction should be taken into account in assessing whether the defence of natural justice has been made out. It does not follow that the existence of such remedies automatically cures a failure of natural justice. Slade L.J. also recognized that the significance and weight of the fact that remedies were available in the originating forum must be assessed in light of all the relevant factors, including "the reasonableness in the circumstances of requiring or expecting that [the defendants] made use of the remedy in all the particular circumstances" (pp. 1052-53).

D. *Application of the Impeachment Defences to the Facts of this Case*

(1) <u>Public Policy</u>

- 113 -

246        If the defence of public policy is understood as a bar to enforcing immoral or unjust foreign laws, it is not met here. The enforcement of such a large award in the absence of a connection either to harm suffered by the plaintiffs and caused by the defendants or to conduct deserving of punishment on the part of the defendants would be contrary to basic Canadian ideas of justice. But there is no evidence that the law of Florida offends these principles. On the contrary, the record indicates that Florida law requires proof of damages in the usual fashion. Treble damages are only available by statute to victims of crimes. There is no indication that punitive damages are available where the defendant's conduct is not morally blameworthy.

247        In my view, the defects in the judgment, while severe, do not engage the public policy defence.

(2) Fraud

248        Under the rule that an allegation of fraud can only be considered if based on fresh evidence, the defence of fraud is not made out. All the facts that the appellants raise in this connection were known to them or could have been discovered at the time of the Florida action.

249        A further issue arises as to whether evidence of deliberate deception would be enough to vitiate the judgment. In my opinion, this is the kind of case for which a more lenient interpretation of the fraud defence would, in principle, be appropriate, because the appellants' decision not to attend the Florida proceedings was a reasonable one. Full participation in the Florida action would have been expensive, time-consuming

2003 SCC 72 (CanLII)

- 114 -

and difficult. The appellants' own knowledge of the facts convinced them that the claim was frivolous, to say the least; they were amazed that it even resulted in a lawsuit. They thought, and they had every reason to think, that even if the claim succeeded they would be liable for no more than about US$8,000. Their conclusion that "the game was not worth the candle" was reasonable in the circumstances. Mr. Mulock testified that the defendants' non-participation might well have qualified as "excusable neglect" under Florida law due to the weakness of the claim and the fact that the defendants were foreign residents, among other factors. I see no reason why our law should deem these factors to be irrelevant.

250     If, in these circumstances, the plaintiffs took advantage of the opportunity to deceive the court by putting forward perjured or misleading evidence in order to obtain a higher award of damages, it would be unfair and contrary to the interests of the Canadian justice system for our courts to be obliged to enforce the judgment in spite of the fact that it was obtained by deception. Such conduct by counsel for the Florida plaintiffs would be contrary to the ethical obligations of Ontario lawyers to pursue their clients' interests by fair and honourable means and without misrepresentation of the facts, and Ontario courts should not be put in the position of having to reward that conduct handsomely when the perpetrator is a lawyer in another jurisdiction.

251     The difficulty the appellants face is that there is no evidence that anything of this kind happened, because no record exists of the evidence and arguments put forward in the Florida damages hearing. Given the jury's findings, it is certainly a possibility, perhaps a strong possibility, that they were deliberately misled, but there are other possible explanations — for example, the plaintiffs may have presented only true facts and the jury might have misunderstood how the law applied to those facts. The

2003 SCC 72 (CanLII)

- 115 -

allegation of fraud is a serious one, and the onus remains on the appellants to support it. It is significant that the appellants did not use their opportunity to question Mr. Beals or Mr. Groner, either in discovery or at trial, as to what was said in the damages hearing. Given the lack of evidence, even on the view that this judgment could be vitiated by proof of intentional fraud, the defence has not been made out. I agree with Major J. that the trial judge's findings of fact that the plaintiffs deliberately misled the jury are unsupported by the evidence and should not be upheld. The defence of fraud therefore does not apply. Natural justice, though, is a different matter.

### (3) Natural Justice

252     The Ontario defendants were not given sufficient notice of the extent and nature of the claims against them in the Florida action. The claimants failed to give the defendants proper notice of the true nature of their claim and its potential ramifications. Furthermore, there was no notice as to the serious consequences to the defendants of failure to refile their defence in response to the claimant's repeatedly amended pleadings. As a result, the notice afforded to the defendants did not meet the requirements of natural justice.

253     The amount of damages claimed was not stated in the Amended Complaint. The only mention of a monetary amount was the formulaic reference to damages over $5,000 required to give the Florida Circuit Court monetary jurisdiction. This form of pleading did not give the defendants a clear picture of what was at stake. Indeed, Mr. Groner testified that as a matter of Florida practice they were expected to find out exactly what was being claimed through discovery.

- 116 -

254        Nor did the Amended Complaint set out with any precision the allegations on the basis of which damages, beyond the sale price of the land, were claimed. There is reference to construction costs and lost revenue, but none to the plaintiffs' assertion that the planned model home was to be rented to their company, Fox Chase Homes, and used to obtain further construction contracts. In fact, there is no mention at all of Fox Chase Homes. As Weiler J.A. noted, the plaintiffs could easily have provided the defendants with a copy of Mr. Beals's deposition, where he explained these matters, and thus ensured that the defendants were aware that significant business losses were being claimed (p. 677). But the plaintiffs failed to alert the defendants to the peril they faced in this or any other way.

255        Perhaps the most important failure of natural justice in this case is the fact that the defendants were not given notice of the consequences of failing to continue to file new defences to the repeated changes to the Amended Complaint. There was nothing on the face of the Amended Complaint that would alert them to the need to refile, especially since the allegations against them remained unaltered. The annulment of their defence resulted from a technicality of Florida procedure of which defendants from a foreign jurisdiction could hardly be expected to be aware. Again, the plaintiffs could easily have advised them that a new defence was required, but they did not. The defendants had no warning of the danger in which they placed themselves simply by assuming that their initial defence was, as it appeared to be, an adequate response to the Amended Complaint. Not only did they lack the information they needed to assess whether or not they should defend; their failure to defend was not in any genuine sense a product of their own volition.

- 117 -

2003 SCC 72 (CanLII)

256        A foreign plaintiff who expects to have a judgment in his or her favour enforced by a Canadian court has a responsibility to ensure that the defendant is in a position to make an informed decision about how to respond. If the defendant can show that the plaintiff failed to discharge that responsibility, the court should refuse to enforce the judgment on the basis that the defendant was deprived of proper notice, a basic condition of natural justice. In this case, the Florida claimants should have notified the appellants of the steps they could take after new versions of the Amended Complaint were filed and, more importantly, of the consequences of not taking those steps. Because they failed to do so, the appellants were unaware of the danger that their defence would lapse.

257        I would also note that in this case it appears that the judgment may have offended substantive principles of natural justice of the kind addressed in *Adams, supra*. It seems likely that the quantum of damages was fixed without proof that damages flowed from harm suffered by the plaintiffs as a result of the defendants' actions, and that punitive damages were awarded without demonstration of conduct on the defendants' part that was deserving of punishment. The problem, again, is that we do not know what was offered in evidence in the damages hearing in Florida. The conclusion seems all but inescapable that one of two things happened: either the Florida court was presented with false evidence on the damages issue, or it reached its conclusion without a proper judicial assessment of the conditions required, both by Florida law and as a matter of natural justice, to support an award of unliquidated damages. But because there is no transcript of the damages hearing and no other clear evidence of what took place there, neither scenario has been proven.

- 118 -

258     A deficiency in the fairness of the procedure by which the Florida court reached its decision having been established, the availability of remedies for that deficiency in Florida falls to be considered. The defendants did have options for correcting the problem in Florida. They could have moved for relief based on excusable neglect, or appealed. They did not avail themselves of those remedies.

259     What this means for the appellants' entitlement to rely on the natural justice defence must be ascertained by considering the reasonableness in all the circumstances of requiring them to make use of the remedies available in Florida. We must look at the reasons why they decided not to go to Florida to attack the judgment, but chose instead to trust that the Ontario courts would not enforce it.

260     The defendants' main reason for deciding as they did was that they were following the advice (which turned out to be erroneous) of legal counsel. They were told that if they went to Florida to challenge the judgment, Ontario courts would regard them as having attorned to Florida's jurisdiction and would be more likely to enforce the judgment against them. Given the information they had, the decision not to take steps in Florida was not only understandable but the only sensible option.

261     The majority appears to be of the view that the appellants are not entitled to any relief from the consequences of relying on mistaken legal advice. In my view, the mere fact that a defendant has received mistaken legal advice should not operate to relieve the claimant entirely of the consequences of a significant or substantial failure to observe the rules of natural justice, and it should not, in itself, bar the appellants from relying on this defence. I agree with Weiler J.A. that the reasonableness of expecting a defendant to use a remedy in a foreign jurisdiction must be assessed from that person's

- 119 -

point of view. If the defendants were under a misapprehension as a result of reasonable reliance on the advice of counsel as to the relative risks of the options open to them, their assessment of the risks should not for that reason be discounted. This Court recognized in *Cité de Pont Viau v. Gauthier Mfg. Ltd.*, [1978] 2 S.C.R. 516, that a party should not be penalized for an error which is solely that of counsel, where the party itself has acted with diligence. This is not to say that a lawyer's mistake will always be an excuse for not participating in foreign proceedings. The totality of the circumstances must be examined. In this case, the appellants did their best to deal with the dispute conscientiously. In retrospect, it seems that applying for relief in the Florida court would have been a wiser choice, but no reasonable person in their position would have thought so at the time the choice was made.

262        A second factor relevant to the appellants' decision not to make use of remedies in Florida is their knowledge of the circumstances that would entitle them to such a remedy. In *Adams, supra*, the defendants' failure to appeal the judgment in Texas was not dispositive, because the procedural irregularities that would have formed the basis of an appeal were not apparent on the face of the judgment. The only way that the defendants could have known about those defects was if they had participated in the proceedings. The court did not consider it fair to charge the defendants with knowledge of procedural irregularities that they would have known about had they attended the proceedings. The plaintiffs had the responsibility of avoiding procedural errors that would prevent enforcement in England. I agree with this reasoning, which in my view is also applicable to the present case. When the appellants received the Florida judgment, all they knew was the amount awarded against them. There was nothing to inform them of the method by which the Florida court reached its conclusion or to alert

- 120 -

them to problems with that method that might form the basis of an appeal or a motion to set the judgment aside.

263                Finally, the appellants' perception of the quality of justice they were likely to receive in Florida must be taken into consideration. The evidence at trial was that Florida's legal system provides all the appropriate protections for judgment debtors in the appellants' position, and probably would have afforded them a remedy in these circumstances. But at the relevant time the appellants did not know this; they only knew that Florida's legal system had produced a judgment against them for an astronomical amount, a verdict that was difficult to reconcile with the simple facts they had set out in their defence. Their apprehensiveness about going back to that very legal system to seek relief was, in the circumstances, understandable.

### (4) Residual Concerns

264                The facts of this appeal raise very serious concerns about the fairness of enforcing the Florida judgment which do not fit easily into the categories identified by the traditional impeachment defences. I have stated my conclusion that the facts do trigger the defence of natural justice, if it is interpreted in a purposive and flexible manner. Even if the natural justice defence did not apply, however, I would hold that this judgment should not be enforced.

265                The circumstances of this case are such that the enforcement of this judgment would shock the conscience of Canadians and cast a negative light on our justice system. The appellants have done nothing that infringes the rights of the respondents and have certainly done nothing to deserve such harsh punishment. Nor can

2003 SCC 72 (CanLII)

- 121 -

they be said to have sought to avoid their obligations by hiding in their own jurisdiction or to have shown disrespect for the legal system of Florida. They have acted in good faith throughout and have diligently taken all the steps that appeared to be required of them, based on the information and advice they had. The plaintiffs in Florida appear to have taken advantage of the defendants' difficult position to pursue their interests as aggressively as possible and to secure a sizeable windfall. In an adversarial legal system, it was, of course, open to them to do so, but the Ontario court should not have to set its seal of approval on the judgment thus obtained without regard for the dubious nature of the claim, the fact that the parties did not compete on a level playing field and the lack of transparency in the Florida proceedings.

266         On this last point, I would add that their failure to obtain a record of the proceedings in the Florida court does not reflect well on the respondents. In this case, the appellants, who had the burden of proving that one of the impeachment defences applied, failed to pursue their opportunity to investigate what transpired in the damages hearing by questioning those who were there. As a result, it would be inappropriate to draw any negative inference in their favour from the lack of evidence about the Florida proceedings. But defendants will not always have such an opportunity. When one party entirely controls whether there will be a transcript of the proceedings in the foreign court and chooses not to get one, thus depriving the enforcing court of a full record of what happened and an opportunity to verify that there was no fraud and no procedural irregularities, Canadian courts should be highly circumspect about giving effect to the judgment.

V. <u>Conclusion</u>

- 122 -

267        In my view, this judgment should not be enforced in Canada.  I would allow the appeal with costs to the appellants.


*Appeal dismissed with costs,* IACOBUCCI, BINNIE *and* LEBEL JJ. *dissenting.*


*Solicitors for the appellants Geoffrey Saldanha and Leueen Saldanha: Baker & McKenzie, Toronto.*


*Solicitor for the appellant Dominic Thivy:  Neal H. Roth, Toronto.*


*Solicitors for the respondents:  Levine, Sherkin, Boussidan, North York.*

2003 SCC 72 (CanLII)



Z.I. Pompey Industrie *v.* ECU-Line N.V., [2003] 1 S.C.R. 450, 2003 SCC 27

**ECU-Line N.V.**                                              *Appellant*

*v.*

**Z.I. Pompey Industrie, Société lyonnaise de messageries
nationales, John S. James Co., Polyfibron Technologies Inc.,
Ellehammer Packaging Inc., and all others having an interest in
the cargo laden on board the M.V. "Canmar Fortune"**              *Respondents*

**Indexed as: Z.I. Pompey Industrie *v.* ECU-Line N.V.**

**Neutral citation: 2003 SCC 27.**

File No.: 28472.

2002: October 2; 2003: May 1.

Present: McLachlin C.J. and Gonthier, Iacobucci, Major, Bastarache, Binnie and
LeBel JJ.

on appeal from the federal court of appeal

*Conflict of laws — Courts — Jurisdiction — Bills of lading — Forum*

*selection clauses — Stay of proceedings — Arrangements made with appellant for*

*carriage of cargo by sea — Respondents filing action against appellant in Federal Court*

*alleging that cargo was damaged while in transit by rail — Appellant seeking stay of*

*proceedings on basis that bill of lading contained forum selection clause giving courts*

2003 SCC 27 (CanLII)

- 2 -

*in Antwerp, Belgium exclusive jurisdiction — Proper test for stay of proceedings to enforce forum selection clause in bill of lading — Whether "strong cause" test is proper test — Whether proper test should contemplate inquiry into whether there was fundamental breach or deviation — Federal Court Act, R.S.C. 1985, c. F-7, s. 50(1).*

2003 SCC 27 (CanLII)

The respondents filed an action for damages against the appellant in the Federal Court, alleging that cargo was damaged while in transit by rail. Under the bill of lading Antwerp, Belgium was designated as the port of loading and Seattle was designated as the port of discharge. The cargo was transported from Antwerp to Montréal, where it was unloaded and carried by train to Seattle. The bill of lading contained a forum selection clause stating that "[t]he contract evidenced by or contained in this bill of Lading is governed by the law of Belgium, and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts in Antwerp and no other Courts." The appellant brought a motion seeking a stay of proceedings on the basis that the bill of lading required disputes to be determined exclusively by the courts of Antwerp. A prothonotary denied the motion. The Federal Court, Trial Division dismissed the appellant's motion to set aside the prothonotary's order. The Federal Court of Appeal upheld the decision.

*Held*: The appeal should be allowed and a stay of proceedings issued in favour of the appellant.

In the absence of applicable legislation, such as s. 46(1) of the *Marine Liability Act*, the proper test for a stay of proceedings pursuant to s. 50 of the *Federal Court Act* to enforce a forum selection clause in a bill of lading is the "strong cause" test. Once a court is satisfied that a validly concluded bill of lading otherwise binds the

- 3 -

parties, it must grant the stay unless the plaintiff can show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause.  In exercising its discretion, the court should take into account all of the circumstances of the particular case.  The tripartite test for interlocutory injunctions is an inappropriate test for a stay of proceedings to enforce a forum selection clause in a bill of lading.  First, the tripartite test would render most forum selection clauses unenforceable, creating commercial uncertainty by unduly minimizing the importance of contractual undertakings.  Second, the tripartite test is also problematic because the first part of the test requires the court to evaluate the likelihood of success on the merits of the case — which would be impossible because there is normally no determination on the merits.  Finally, the tripartite test would make it difficult to establish irreparable harm in the context of a stay application based on a forum selection clause.

On an application for a stay to uphold a forum selection clause in a bill of lading, a court must not delve into whether one party has deviated from or fundamentally breached an otherwise validly formed contract.  Such inquiries would render forum selection clauses illusory since most disputes will involve allegations which, if proved, will make the agreement terminable or voidable by the aggrieved party.  Issues respecting an alleged fundamental breach of contract or deviation therefrom should generally be determined under the law and by the court chosen by the parties in the bill of lading.  Once it is determined that the bill of lading binds the parties, the "strong cause" test constitutes an inquiry into questions such as the convenience of the parties, fairness between the parties and the interests of justice, not of the substantive legal issues underlying the dispute.

2003 SCC 27 (CanLII)

- 4 -

The decisions of the prothonotary, the motions judge and the Court of Appeal in this case are clearly wrong.  The prothonotary, to the extent he applied the "tripartite test", erred in law, as did the Court of Appeal in concluding that the appropriate test for a stay of proceedings involving a bill of lading with a forum selection clause was the "tripartite test" for interlocutory injunctions.  The "strong cause" test remains relevant and effective and no social, moral or economic changes justify the departure advanced by the Court of Appeal.  Further, the prothonotary erred in law when he determined that the forum selection clause was void as a result of the alleged deviation stemming from the discharge of the cargo in Montréal.  It is unnecessary to determine whether there has been a fundamental breach or deviation because the forum selection clause clearly covers such a dispute.

**Cases Cited**

**Applied:** *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237; **distinguished:** *Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1 S.C.R. 110; **considered:** *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423; **referred to:** *American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504; *Captain v. Far Eastern SS. Co.* (1978), 7 B.C.L.R. 279; *Canada v. Aqua-Gem Investments Ltd.*, [1993] 2 F.C. 425; *Jian Sheng Co. v. Great Tempo S.A.*, [1998] 3 F.C. 418, leave to appeal refused, [1998] 3 S.C.R. vi; *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC 90; *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897; *RJR—MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311; *The "Seapearl" v. Seven Seas Dry Cargo Shipping Corp.*, [1983] 2 F.C. 161; *Anraj Fish Products Industries Ltd. v.*

2003 SCC 27 (CanLII)

- 5 -

*Hyundai Merchant Marine Co.* (2000), 262 N.R. 270; *Sarabia v. "Oceanic Mindoro" (The)* (1996), 26 B.C.L.R. (3d) 143, leave to appeal refused, [1997] 2 S.C.R. xiv; *Maritime Telegraph and Telephone Co. v. Pre Print Inc.* (1996), 131 D.L.R. (4th) 471; *Morrison v. Society of Lloyd's* (2000), 224 N.B.R. (2d) 1, leaves to appeal refused, [2000] 2 S.C.R. viii and xi; *Trendtex Trading Corp. v. Credit Suisse*, [1982] A.C. 679; *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972); *Advanced Cardiovascular Systems Inc. v. Universal Specialties Ltd.*, [1997] 1 N.Z.L.R. 186; *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995); *Mackender v. Feldia A.G.*, [1966] 3 All E.R. 847; *Fairfield v. Low* (1990), 71 O.R. (2d) 599; *Ash v. Lloyd's Corp.* (1992), 9 O.R. (3d) 755, leave to appeal refused, [1992] 3 S.C.R. v; *Drew Brown Ltd. v. The "Orient Trader"*, [1974] S.C.R. 1286; *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426; *Incremona-Salerno Marmi Affini Siciliani (I.S.M.A.S.) s.n.c. v. Ship Castor* (2002), 297 N.R. 151, 2002 FCA 479.

**Statutes and Regulations Cited**

*Federal Court Act*, R.S.C. 1985, c. F-7, s. 50(1).

*Marine Liability Act*, S.C. 2001, c. 6, s. 46(1).

**Authors Cited**

Michell, M. Paul. "Forum Selection Clauses and Fundamental Breach: *Z.I. Pompey Industrie v. ECU-Line N.V., The Canmar Fortune*" (2002), 36 *Can. Bus. L.J.* 453.

Peel, Edwin. "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] *L.M.C.L.Q.* 182.

Tetley, William. *Marine Cargo Claims*, 3rd ed. Montréal: Yvon Blais, 1988.

2003 SCC 27 (CanLII)

- 6 -

APPEAL from a judgment of the Federal Court of Appeal (2001), 268 N.R. 364, [2001] F.C.J. No. 96 (QL), dismissing an appeal from a decision of the Trial Division (1999), 182 F.T.R. 112, [1999] F.C.J. No. 2017 (QL), dismissing a motion to set aside the order of Prothonotary Hargrave denying a stay of proceedings (1999), 179 F.T.R. 254, [1999] F.C.J. No. 1584 (QL).  Appeal allowed.

*H. Peter Swanson*, for the appellant.

*George J. Pollack* and *Jean-Marie Fontaine*, for the respondents.

The judgment of the Court was delivered by

1          BASTARACHE J. — The appellant submits that the appropriate test on a motion for a stay of proceedings to uphold a forum selection clause in a bill of lading is the "strong cause" test, as set out by Brandon J. in *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237 (Adm. Div.).  The respondents, however, contend that the Federal Court of Appeal was correct in applying the tripartite test for interlocutory injunctions established in *American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504 (H.L.).  In my view, there is no legal or policy justification for setting aside the "strong cause" test in the context of a stay of proceedings to uphold a forum selection clause in a bill of lading. The dispute in this case arises under or in connection with the bill of lading.  Its broad, unambiguous and unqualified forum selection clause was clearly intended to cover the dispute that gave rise to this appeal.

I.    Facts

- 7 -

2003 SCC 27 (CanLII)

2        The respondent Polyfibron Technologies Inc. purchased a photo processor and four "sub-assemblies" located in France from the respondent Z.I. Pompey Industrie for resale to its customer, the respondent Ellehammer Packaging Inc.  The cargo was to be delivered directly to Ellehammer in Seattle, Washington.  Polyfibron retained the services of the respondent John S. James Co., a freight forwarder, to arrange for the importation of the cargo.  John S. James Co., in turn, retained the services of the respondent Société lyonnaise de messageries nationales ("S.L.M.N. Shipping"), which made arrangements with ECU-Line France, a division of the appellant ECU-Line N.V., a Belgian company, for carriage of the cargo by sea.

3        The respondent John S. James Co. was aware that the cargo could not be transported by rail without there being a significant risk of it sustaining damage and communicated this fact to the respondent S.L.M.N. Shipping.

4        Under a clean on-board bill of lading executed at Lyon, France on January 23, 1997, the appellant was to carry the cargo from Antwerp, Belgium, to Seattle.  The bill of lading designates John S. James Co. as the "consignee", Antwerp as the "port of loading", and Seattle as the "port of discharge".  It bears the following forum selection clause:

> The contract evidenced by or contained in this bill of Lading is governed by the law of Belgium, and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts in Antwerp and no other Courts.

The back of the bill of lading contains, among other provisions, the following clause:

12. METHODS AND ROUTE OF TRANSPORTATION

- 8 -

(1) The Carrier may ant [*sic*] any time and without notice to the Merchant: use any means of transport or storage whatsoever; load or carry the Goods on any vessel whether named on the front hereof or not; transfer the Goods from one conveyance to another including transshipping or carrying the same on another vessel than that named on the front hereof or by any other means of transport whatsoever; at any place unpack and remove Goods which have been stuffed in or on a Container and forward the same in any manner whatsoever; proceed at any speed and by any route in his discretion (whether or not the nearest or most or customary or advertised route) and proceed to or stay at any place whatsoever once or more often and in any order; load or unload the Goods from any conveyance at any place (whether or not the place is a port named on the front hereof as the intended Port of Loading or intended Port of Discharge); . . .

(2) The liberties set out in (1) above be [*sic*] invoked by the Carrier for any purposes whatsoever whether or not connected with the Carriage of the Goods. Anything done accordance [*sic*] with (1) above or any delay arising therfrom [*sic*] shall be deemed to be within the contractual Carriage and shall not be a deviation or whatsoever nature or degree.

5        The appellant transported the cargo from Antwerp to Montréal, where it was unloaded. From there the cargo was carried by train to Seattle. The respondents filed an action for damages of $60,761.74 in the Federal Court of Canada, alleging that the cargo was damaged while in transit by rail. The appellant denied the cargo had been damaged, arguing in the alternative that any damage had been caused by the respondents, third parties, or events for which it was not responsible. The appellant also brought a motion seeking a stay of proceedings on the basis that the bill of lading required disputes to be determined exclusively by the courts of Antwerp.

## II.    Relevant Statutory Provisions

6        The following statutory provisions are central to this appeal:

*Federal Court Act*, R.S.C. 1985, c. F-7

2003 SCC 27 (CanLII)

- 9 -

**50.** (1) The Court may, in its discretion, stay proceedings in any cause or matter,

(*a*) on the ground that the claim is being proceeded with in another court or jurisdiction; or

(*b*) where for any other reason it is in the interest of justice that the proceedings be stayed.

*Marine Liability Act*, S.C. 2001, c. 6

**46.** (1) If a contract for the carriage of goods by water to which the Hamburg Rules do not apply provides for the adjudication or arbitration of claims arising under the contract in a place other than Canada, a claimant may institute judicial or arbitral proceedings in a court or arbitral tribunal in Canada that would be competent to determine the claim if the contract had referred the claim to Canada, where

(*a*) the actual port of loading or discharge, or the intended port of loading or discharge under the contract, is in Canada;

(*b*) the person against whom the claim is made resides or has a place of business, branch or agency in Canada; or

(*c*) the contract was made in Canada.

III. Judicial History

A. *Federal Court of Canada, Trial Division* (1999), 179 F.T.R. 254

7          The appellant sought a stay of proceedings before the Federal Court, pursuant to s. 50 of the *Federal Court Act*, arguing that the courts of Antwerp were the proper jurisdiction to deal with any disputes arising from the bill of lading.  The prothonotary held that the appellant had moved for a stay within reasonable time given the implementation of new court rules and had therefore not attorned to its jurisdiction.

2003 SCC 27 (CanLII)

- 10 -

The prothonotary accepted and applied the "strong cause" test as set out in the *The "Eleftheria"* characterizing its finding in the following way, at paras. 4-5:

> . . . I accept that ECU-Line prefers to litigate in a familiar jurisdiction and does not bring up the Antwerp jurisdiction merely to seek procedural advantage. Other factors favouring the upholding of the jurisdiction clause include reasonable connections with Belgium, Belgian and French witnesses, that any time bar which might preclude the plaintiffs from bringing their case in Antwerp has been waived, that no security has been posted and that enforcement of a Belgian judgment against the carrier, a Belgian company, should present no particular difficulties.
>
> I accept, from the Plaintiffs' point of view, that there will be Canadian and American witnesses, including from the American east-coast freight forwarder through whom the Plaintiff, Polyfibron Technologies Inc., arranged the carriage. Certainly the Tribunal of Commerce in [Antwerp], which would decide the case under the jurisdiction clause, conducts its proceedings in Flemish and decides cases on the basis of documents and statements, a procedure precluding witnesses and cross-examination. There may also be considerably more delay in most instances than in the Federal Court and all the more so in the case of an appeal. There are also some lesser factors which favour litigation in Vancouver.

The prothonotary concluded, at para. 5, that the factors raised by the respondents, while "substantial", were "just short [in this instance] of the strong case" which, by *The "Eleftheria"*, the respondents had to present in order to override the forum selection clause.

8        However, the prothonotary added that the respondents had presented a persuasive case that the bill of lading had come to an end in Montréal. For that reason, there was no forum selection clause to apply to the dispute. Notwithstanding clause 12 of the bill of lading, the prothonotary, relying on Professor W. Tetley's *Marine Cargo Claims* (3rd ed. 1988), accepted the presumption that a serious and willful breach or deviation of a contract of carriage may bring into question exclusion or limitation clauses

- 11 -

in the contract. The prothonotary's response to the appellant's contention that issues of

fundamental breach or deviation should be determined on the merits by the trial judge

was the following, at para. 8 :

> The answer to this is not complex. An interim injunction, obtained on an
> interlocutory application, which requires a testing of the waters by looking
> at the strength of the case, the harm being caused and the balance of
> convenience, is analogous to denial of a stay of the basis of a strong case
> that the jurisdiction clause is just not applicable. The interim injunction does
> not handicap the trial judge, nor should the denial of a stay on the basis that
> the jurisdiction clause is in all likelihood not available. Any prejudice to
> ECU-Line in having to litigate in Canada can be compensated by costs.

The prothonotary stated that it was common knowledge that rail carriage is usually

accompanied by vibration, bumps and jolts, though considered this to be immaterial to

the present case in which the intent to deviate was the sole issue.  The prothonotary

concluded that the appellant's deviation from the bill of lading was both unreasonable

and voluntary.  Relying on *Captain v. Far Eastern SS. Co.* (1978), 7 B.C.L.R. 279 (S.C.),

the prothonotary concluded that there was no contract at the time the appellant

discharged the cargo in Montréal and thus no forum selection clause upon which it could

rely.

9          The motion for a stay of proceedings to uphold the forum selection clause

was therefore denied.

B. *Federal Court of Canada, Trial Division* (1999), 182 F.T.R. 112

10          The court concluded that the prothonotary was obliged to take into account

all the circumstances of the case in determining whether the respondent had

demonstrated a "strong cause" in favour of denying a stay, pursuant to the test set out in

2003 SCC 27 (CanLII)

- 12 -

*The "Eleftheria"*, an inquiry that did not preclude him from concluding that the bill of lading ended in Montréal and that its forum selection clause did not apply thereafter. The court added that in any event the appellant would have the opportunity to raise its arguments regarding the existence of the bill of lading and its forum selection clause before a trial judge.

11        The court dismissed with costs the motion to set aside the order of the prothonotary.

C.    *Federal Court of Appeal* (2001), 268 N.R. 364

12        The Court of Appeal held that the test for reviewing decisions of a prothonotary is whether the prothonotary's exercise of discretion was clearly wrong and that the test for reviewing the exercise of discretion of a motions judge is whether sufficient weight was given to all relevant considerations.

13        The Court of Appeal concluded that *The "Eleftheria"* did not govern the case, stating, at para. 27:

> The burden of the appellant's submission is that when, as here, a contract contains a jurisdiction clause requiring that all disputes, wherever they arise, are to be dealt with by the Courts of a particular jurisdiction, Anglo-American and Anglo-Canadian jurisprudence both conclude that the dispute must be dealt with by the Courts of the jurisdiction the parties have agreed to.  The appellant says that since *The Eleftheria* no case in Anglo-Canadian or Anglo-American jurisprudence has held otherwise. I disagree. *Jian Sheng Co.* [*v. Great Tempo S.A.*, [1998] 3 F.C. 418 (C.A.)] is a case where this Court held that a prothonotary was right to refuse a stay in circumstances where the appellant had not led sufficient evidence to support the existence of jurisdiction elsewhere than Canada.

2003 SCC 27 (CanLII)

- 13 -

14        The Court of Appeal emphasized *The "Eleftheria"* was decided in 1969 and

the House of Lords had since decided *American Cyanamid, supra*, thereby relaxing the

requirements for an interlocutory injunction to a tripartite test: first, a preliminary and

tentative assessment of the merits of the case must show there is a serious issue to be

tried; second, consideration must be given to whether the party seeking the interlocutory

injunction would suffer irreparable harm unless the injunction is granted; and third, there

must be a determination as to which party would suffer the greater harm as a result of the

granting or refusing of an interlocutory injunction.

15        The Court of Appeal quoted with approval Beetz J., writing for a unanimous

Supreme Court, in *Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1

S.C.R. 110, at p. 127:

> A stay of proceedings and an interlocutory injunction are remedies of
> the same nature. In the absence of a different test prescribed by statute, they
> have sufficient characteristics in common to be governed by the same rules
> and the courts have rightly tended to apply to the granting of interlocutory
> stay the principles which they follow with respect to interlocutory
> injunctions . . . .

The Court of Appeal reasoned that although the prothonotary had not referred to either

*American Cyanamid* or *Metropolitan Stores*, it was likely what he had in mind when he

concluded, at para. 8:

> An interim injunction, obtained on an interlocutory application, which
> requires a testing of the waters by looking at the strength of the case, the
> harm being caused and the balance of convenience, is analogous to denial
> of a stay of the basis of a strong case that the jurisdiction clause is just not
> applicable.

2003 SCC 27 (CanLII)

- 14 -

The Court of Appeal concluded that given the evolution of English and Canadian jurisprudence, the proper test to apply in stay applications is the tripartite test employed for the purposes of obtaining interlocutory injunctions.

16          The Court of Appeal dismissed the appeal with costs.

IV.   Issues

17   1.   What is the proper test on a motion brought for a stay of proceedings to enforce the forum selection clause in a bill of lading?

2.   Does that test contemplate an inquiry into whether there was a fundamental breach or deviation, or should such an inquiry be left to the decision maker in the agreed forum?

V. Analysis

18          Discretionary orders of prothonotaries ought to be disturbed by a motions judge only where (a) they are clearly wrong, in the sense that the exercise of discretion was based upon a wrong principle or a misapprehension of the facts, or (b) in making them, the prothonotary improperly exercised his or her discretion on a question vital to the final issue of the case: *Canada v. Aqua-Gem Investments Ltd.*, [1993] 2 F.C. 425 (C.A.), *per* MacGuigan J.A., at pp. 462-63.  An appellate court may interfere with the decision of a motions judge where the motions judge had no grounds to interfere with the prothonotary's decision or, in the event such grounds existed, if the decision of the motions judge was arrived at on a wrong basis or was plainly wrong: *Jian Sheng Co. v.*

2003 SCC 27 (CanLII)

- 15 -

*Great Tempo S.A.*, [1998] 3 F.C. 418 (C.A.), *per* Décary J.A., at pp. 427-28, leave to

appeal refused, [1998] 3 S.C.R. vi.  For the reasons below, I conclude that the decisions

of the prothonotary, the motions judge and the Court of Appeal are clearly wrong.

A.    *Stays of Proceedings to Enforce a Forum Selection Clause*

19          Pursuant to s. 50(1) of the *Federal Court Act*, the court has the discretion to

stay proceedings in any cause or matter on the ground that the claim is proceeding in

another court or jurisdiction, or where, for any other reason, it is in the interest of justice

that the proceedings be stayed.  For some time, the exercise of this judicial discretion has

been governed by the "strong cause" test when a party brings a motion for a stay of

proceedings to enforce a forum selection clause in a bill of lading.  Brandon J. set out the

test as follows in *The "Eleftheria"*, at p. 242:

> (1) Where plaintiffs sue in England in breach of an agreement to refer
> disputes to a foreign Court, and the defendants apply for a stay, the English
> Court, assuming the claim to be otherwise within the jurisdiction, is not
> bound to grant a stay but has a discretion whether to do so or not. (2) The
> discretion should be exercised by granting a stay unless strong cause for not
> doing so is shown. (3) The burden of proving such strong cause is on the
> plaintiffs. (4) In exercising its discretion the Court should take into account
> all the circumstances of the particular case.  (5) In particular, but without
> prejudice to (4), the following matters, where they arise, may be properly
> regarded: (a) In what country the evidence on the issues of fact is situated,
> or more readily available, and the effect of that on the relative convenience
> and expense of trial as between the English and foreign Courts. (b) Whether
> the law of the foreign Court applies and, if so, whether it differs from
> English law in any material respects.  (c) With what country either party is
> connected, and how closely.  (d) Whether the defendants genuinely desire
> trial in the foreign country, or are only seeking procedural advantages. (e)
> Whether the plaintiffs would be prejudiced by having to sue in the foreign
> Court because they would (i) be deprived of security for that claim; (ii) be
> unable to enforce any judgment obtained; (iii) be faced with a time-bar not
> applicable in England; or (iv) for political, racial, religious or other reasons
> be unlikely to get a fair trial.

2003 SCC 27 (CanLII)

- 16 -

20          Forum selection clauses are common components of international commercial transactions, and are particularly common in bills of lading. They have, in short, "been applied for ages in the industry and by the courts": Décary J.A. in *Jian Sheng, supra*, at para. 7. These clauses are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law: La Forest J. in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, at pp. 1096-97; *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC 90, at paras. 71-72. The "strong cause" test remains relevant and effective and no social, moral or economic changes justify the departure advanced by the Court of Appeal. In the context of international commerce, order and fairness have been achieved at least in part by application of the "strong cause" test. This test rightly imposes the burden on the plaintiff to satisfy the court that there is good reason it should not be bound by the forum selection clause. It is essential that courts give full weight to the desirability of holding contracting parties to their agreements. There is no reason to consider forum selection clauses to be non-responsibility clauses in disguise. In any event, the "strong cause" test provides sufficient leeway for judges to take improper motives into consideration in relevant cases and prevent defendants from relying on forum selection clauses to gain an unfair procedural advantage.

21          There is a similarity between the factors which are to be taken into account when considering an application for a stay based on a forum selection clause and those factors which are weighed by a court considering whether to stay proceedings in "ordinary" cases applying the *forum non conveniens* doctrine: E. Peel in "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] *L.M.C.L.Q.* 182, at pp. 189-90. The latter inquiry is well settled in Canada: *Amchem*

2003 SCC 27 (CanLII)

- 17 -

*Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897.

In the latter inquiry, the burden is normally on the defendant to show why a stay should

be granted, but the presence of a forum selection clause in the former is, in my view,

sufficiently important to warrant a different test, one where the starting point is that

parties should be held to their bargain, and where the plaintiff has the burden of showing

why a stay should not be granted. I am not convinced that a unified approach to *forum*

*non conveniens*, where a choice of jurisdiction clause constitutes but one factor to be

considered, is preferable. As Peel, *supra*, notes, at p. 190, I fear that such an approach

would not

> ensure that full weight is given to the jurisdiction clause since not only
> should the clause itself be taken into account, but also the effect which it has
> on the factors which are relevant to the determination of the natural forum.
> Factors which may otherwise be decisive may be less so if one takes into
> account that the parties agreed in advance to a hearing in a particular forum
> and must be deemed to have done so fully aware of the consequences which
> that might have on, for example, the transportation of witnesses and
> evidence, or compliance with foreign procedure etc.

In my view, a separate approach to applications for a stay of proceedings involving

forum selection clauses in bills of lading ensures that these considerations are properly

taken into account and that the parties' agreement is given effect in all but exceptional

circumstances. See also M. P. Michell, "Forum Selection Clauses and Fundamental

Breach: *Z.I. Pompey Industrie v. ECU-Line N.V., The Canmar Fortune*" (2002), 36 *Can.*

*Bus. L.J.* 453, at pp. 471-72.

B.    *The Inappropriateness of the Tripartite Test*

22          The respondents adopted the Court of Appeal's holding in favour of

extending the tripartite test for interlocutory injunction to motions for a stay of

2003 SCC 27 (CanLII)

- 18 -

proceedings to enforce a forum selection clause in a bill of lading. The tripartite test was

set out as follows by this Court in *RJR—MacDonald Inc. v. Canada (Attorney General)*,

[1994] 1 S.C.R. 311, at p. 334:

> First, a preliminary assessment must be made of the merits of the case to ensure that there is a serious question to be tried. Secondly, it must be determined whether the applicant would suffer irreparable harm if the application were refused. Finally, an assessment must be made as to which of the parties would suffer greater harm from the granting or refusal of the remedy pending a decision on the merits.

In support of the move to the tripartite test, the Court of Appeal quoted, at para. 29, with

approval this Court's statement in *Metropolitan Stores*, at p. 127:

> A stay of proceedings and an interlocutory injunction are remedies of the same nature. In the absence of a different test prescribed by statute, they have sufficient characteristics in common to be governed by the same rules and the courts have rightly tended to apply to the granting of interlocutory stay the principles which they follow with respect to interlocutory injunctions.

While a stay of proceedings to enforce a forum selection clause may be of the same

nature as an interlocutory injunction, I must respectfully disagree with the conclusion of

the Court of Appeal.

23        The conclusion of the Court of Appeal is not supported by this Court's

decision in *Metropolitan Stores*. The two main issues in that case were whether the

Court of Appeal erred in failing to recognize a presumption of constitutional validity

where legislation is challenged under the *Charter*, and what principles govern the

exercise of a Superior Court judge's discretionary power to order a stay until the

constitutionality of impugned legislation has been determined. The context of a

constitutional challenge has little in common with the case at bar. Indeed, *Metropolitan*

2003 SCC 27 (CanLII)

- 19 -

*Stores* did not involve forum selection clauses, and the underlying desirability of holding

contracting parties to their bargain was not at issue. That case did not concern private

international law; consequently, considerations of comity, uniformity of law, forum

shopping and related issues were neither canvassed nor addressed by the Court.

24            As recently as 1998, Décary J.A., for a unanimous Federal Court of Appeal

in *Jian Sheng*, confirmed at para. 10 the appropriateness of the "strong cause" test in

Canada, a case in which the issue was whether the forum selection clause in a bill of

lading was void for uncertainty:

> Where, in admiralty matters before this Court, a defendant applies for
> a stay pursuant to section 50 of the *Federal Court Act* . . . on the basis of a
> jurisdiction clause found in a bill of lading, the defendant has the burden of
> persuading the Court that the conditions of application of the clause have
> been met. Once the Court is satisfied that the clause applies, the burden of
> proof then shifts to the plaintiff to show sufficiently strong reasons to
> support the conclusion that it would not be reasonable or just in the
> circumstances to keep the plaintiff to the terms of the contract . . . . These
> "strong reasons" have been summarized in the often-quoted reasons of
> Brandon J. (as he then was) in *The "Eleftheria"* . . . .

In *Jian Sheng*, the forum selection clause contained in the bill of lading required the

defendant to show it was the carrier and what was its principal place of business. *Jian*

*Sheng* does not, as the Court of Appeal held in the case at bar, undermine in any way the

"strong cause" test. Indeed, the tripartite test adopted by the Court of Appeal in this case

constitutes a significant and unjustified departure from the jurisprudence not only of the

Federal Court, but also of provincial courts, and those of other jurisdictions. See for

instance: *The "Seapearl" v. Seven Seas Dry Cargo Shipping Corp.*, [1983] 2 F.C. 161

(C.A.), *per* Pratte J.A., at pp. 176-77, and *per* Lalande D.J., at p. 180; *Anraj Fish*

*Products Industries Ltd. v. Hyundai Merchant Marine Co.* (2000), 262 N.R. 270

(F.C.A.), at para. 5; *Sarabia v. "Oceanic Mindoro" (The)* (1996), 26 B.C.L.R. (3d) 143

2003 SCC 27 (CanLII)

- 20 -

(C.A.), at paras. 37-38, leave to appeal refused, [1997] 2 S.C.R. xiv; *Maritime Telegraph and Telephone Co. v. Pre Print Inc.* (1996), 131 D.L.R. (4th) 471 (N.S.C.A.), at p. 483; *Morrison v. Society of Lloyd's* (2000), 224 N.B.R. (2d) 1 (C.A.), at para. 14, leaves to appeal refused, [2000] 2 S.C.R. viii and xi; *Trendtex Trading Corp. v. Credit Suisse*, [1982] A.C. 679 (H.L.); *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), at p. 15; *Advanced Cardiovascular Systems Inc. v. Universal Specialties Ltd.*, [1997] 1 N.Z.L.R. 186 (C.A.), at p. 190.

25        There are also compelling public policy reasons in favour of upholding the "strong cause" test. If the tripartite test were employed to deal with situations like the case at bar, most forum selection clauses would be rendered unenforceable, creating commercial uncertainty by unduly minimizing the importance of contractual undertakings. Instead of requiring a plaintiff to demonstrate a "strong cause" to not enforce a forum selection clause, the burden would be on the applicant to establish the elements of the tripartite test. The "strong cause" test rightly places the onus on the plaintiff who commences suit contrary to the terms of a forum selection clause.

26        Applying the tripartite test to a situation of this nature is also problematic because the first part of the test requires the court to evaluate the likelihood of success on the merits of the case. This part of the test is designed to allow a motions judge the opportunity to deal with legal issues in preliminary proceedings without prejudice to the final adjudication of their merits. In the case of motions to stay proceedings based on a forum selection clause in a bill of lading, such a process would be impossible because there is normally no determination on the merits. Either the stay will be granted, and the proceedings in Canada will come to an end, or the stay will be denied and the defendant will have to defend the case on the merits in Canada, losing the benefit of the jurisdiction

- 21 -

clause.  For this reason the rule governing such stay applications cannot be based on a test that relies on the likelihood of success on the merits.

27          The test propounded by the Court of Appeal would make it difficult to establish harm in the context of a stay application based on a forum selection clause. Indeed, I can think of no instance where a defendant would suffer irreparable harm by being required to defend a lawsuit in a Canadian court.  I am not satisfied that litigation costs disproportionate to the amount of the claim would constitute irreparable harm, as the respondents have argued.  The "strong cause" test reflects the desirability that parties honour their contractual commitments and is consistent with the principles of order and fairness at the heart of private international law, as well as those of certainty and security of transaction at the heart of international commercial transactions.  I see no reason to depart from the traditional approach for a stay of proceedings when the applicability of a forum selection clause is at issue.  The Court of Appeal in effect read the choice of jurisdiction clause out of the contract.  This approach is, in my view, untenable.

28          The respondents submit we ought to accord little weight to the forum selection clause in the bill of lading because bills of lading are, as a general rule, contracts of adhesion, devised unilaterally by the appellant.  This submission is without merit despite the fact that bills of lading are often issued on pre-printed forms.  See *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), at pp. 593-94.

29          Bills of lading are typically entered into by sophisticated parties familiar with the negotiation of maritime shipping transactions who should, in normal circumstances, be held to their bargain.  See *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995).  The parties in this appeal are corporations with

2003 SCC 27 (CanLII)

- 22 -

significant experience in international maritime commerce. The respondents were aware of industry practices and could have reasonably expected that the bill of lading would contain a forum selection clause. A forum selection clause could very well have been negotiated with the appellant, in light of the respondent John S. James Co.'s insistence that S.L.M.N. Shipping transport the cargo solely by sea. There is no evidence that this bill of lading is the result of grossly uneven bargaining power that would invalidate the forum selection clause contained therein.

C.   *Fundamental Breach and Deviation*

30         Having concluded that the "strong cause" test governs whether to grant a stay in the context of a bill of lading with a forum selection clause, I turn to whether, in taking into account all the circumstances of the particular case, the Court should consider issues arising under the contract. The respondents submit the Court should do just that, relying in part on the following passage from Professor Tetley in *Marine Cargo Claims*, *supra*, at p. 99:

> When however the breach is so serious, usually the result of a fraudulent or wilful act, the courts have questioned whether the carrier may rely on the terms of the contract or the law, and in particular, whether the carrier may rely on the exclusion or limitation clauses in the contract and the law because he has seemingly placed himself outside of the contract and the law.

In my view, the prothonotary erred in law when he determined the forum selection clause was void as a result of the alleged deviation stemming from the discharge of the cargo in Montréal.

- 23 -

2003 SCC 27 (CanLII)

31        Issues respecting an alleged fundamental breach of contract or deviation

therefrom should generally be determined under the law and by the court chosen by the

parties in the bill of lading. The "strong cause" test, once it is determined that the bill

of lading otherwise binds the parties (for instance, that the bill of lading as it relates to

jurisdiction does not offend public policy, was not the product of fraud or of grossly

uneven bargaining positions), constitutes an inquiry into questions such as the

convenience of the parties, fairness between the parties and the interests of justice, not

of the substantive legal issues underlying the dispute. See *Mackender v. Feldia A.G.*,

[1966] 3 All E.R. 847 (C.A.), *per* Lord Denning, at pp. 849-50, and *per* Lord Diplock,

at p. 852. Put differently, a court, in the context of an application for a stay to uphold a

forum selection clause in a bill of lading, must not delve into whether one party has

deviated from, or fundamentally breached an otherwise validly formed contract. Such

inquiries would render forum selection clauses illusory since most disputes will involve

allegations which, if proved, will make the agreement terminable or voidable by the

aggrieved party. Moreover, while the choice of forum for the determination of the

existence of the agreement would be made without reference to the forum selection

clause in the contract, if the agreement were found to remain intact, resort to the said

clause would presumably be necessary to decide the appropriate forum in which to settle

the rights of the parties under the agreement.


32        The position adopted by the Court of Appeal would remove many disputes

from the reach of a widely framed forum selection clause by the mere allegation of

various types of wrongful conduct. In my view, where, as here, the parties agree that

claims or disputes arising under or in connection with a bill of lading are to "be

determined by the courts in Antwerp and no other Courts", a proceeding in which one

party contends that the other party deviated from the agreement such as to give the

- 24 -

former the right to terminate or void the contract remains a proceeding in respect of a claim or dispute arising under or in connection with the bill of lading: *Fairfield v. Low* (1990), 71 O.R. (2d) 599 (H.C.), at pp. 605-8; *Ash v. of Lloyd's Corp.* (1992), 9 O.R. (3d) 755 (C.A.), at p. 758, leave to appeal refused, [1992] 3 S.C.R. v; *Morrison, supra*, at paras. 13 and 19.  See also *Drew Brown Ltd. v. The "Orient Trader"*, [1974] S.C.R. 1286, *per* Ritchie J., at p. 1288, and *per* Laskin J., at p. 1318, where an alleged deviation was found not to displace an otherwise valid choice of law clause.

33        The conclusion that allegations of deviation or fundamental breach are matters arising under the contract that should not be considered in determining whether to give effect to a forum selection clause is supported by the construction approach to fundamental breach considered by our Court in *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423, a case concerning the use of fundamental breach in the context of time limitation provisions.  Discussing *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426 (a case involving fundamental breach in the context of clauses excluding liability), the Court said this, at para. 52:

> [W]hether fundamental breach prevents the breaching party from continuing to rely on an exclusion clause is a matter of construction rather than a rule of law.  The only limitation placed upon enforcing the contract as written in the event of a fundamental breach would be to refuse to enforce an exclusion of liability in circumstances where to do so would be unconscionable, according to Dickson C.J., or unfair, unreasonable or otherwise contrary to public policy, according to Wilson J.

In my view, the policy rationale in support of the construction approach applied to exclusion and time limitation clauses is equally applicable to forum selection clauses in bills of lading.

- 25 -

34        In the case at bar, it is unnecessary to determine whether there has been a fundamental breach or deviation because the forum selection clause clearly covers such a dispute.   The language of the clause is unambiguous and not subject to any qualifications, and the parties' bargain was not unconscionable or unreasonable.  The clause becomes relevant precisely in disputes such as this one, as it regulates the way in which liability for deviation or breach of contract is to be established.

35        This approach is sound for policy reasons.  Stay applications in the Federal Court should be brought quickly after commencement of the suit and consequently, the parties will have limited knowledge and information regarding the strength or weakness of their opponent's case.  Issues regarding whether there has been, for instance, an unreasonable deviation raise complicated questions of fact that require a consideration of all the circumstances giving rise to the alleged deviation.

36        Given my conclusions, I do not consider it necessary to address the issue of the relationship between deviation and fundamental breach.  Suffice it to say that, in this case, either allegation concerns a dispute arising under or in connection with the bill of lading.  There is no need to consider the applicability of the doctrine of separability.

D.    *Section 46 of the Marine Liability Act*

37        Section 46(1) of the *Marine Liability Act*, which entered into force on August 8, 2001, has the effect of removing from the Federal Court its discretion under s. 50 of the *Federal Court Act* to stay proceedings because of a forum selection clause where the requirements of s. 46(1)(*a*), (*b*), or (*c*) are met.  This includes where the actual port of loading or discharge is in Canada.  In this case, there would be no question that the

2003 SCC 27 (CanLII)

- 26 -

Federal Court is an appropriate forum to hear the respondents' claim but for the fact that

s. 46 does not apply to judicial proceedings commenced prior to its coming into force:

*Incremona-Salerno Marmi Affini Siciliani (I.S.M.A.S.) s.n.c. v. Ship Castor* (2002), 297

N.R. 151, 2002 FCA 479, at paras. 13-24.  Section 46 of the *Marine Liability Act* is

therefore irrelevant in this appeal.

38        Indeed, s. 46(1) would appear to establish that, in select circumstances,

Parliament has deemed it appropriate to limit the scope of forum selection clauses by

facilitating the litigation in Canada of claims related to the carriage of goods by water

having a minimum level of connection to this country.  Such a legislative development

does not, however, provide support for the fundamental jurisprudential shift made by the

Court of Appeal in the case at bar.  To the contrary, s. 46(1) indicates Parliament's intent

to broaden the jurisdiction of the Federal Court only in very particular instances that can

easily be ascertained by a prothonotary called upon to grant a stay of proceedings

pursuant to the forum selection clause of a bill of lading.  Section 46(1) in no way

mandates a prothonotary to consider the merits of the case, an approach in line with the

general objectives of certainty and efficiency, which underlie this area of the law.

E.    *Application of the Law to the Facts of this Case*

39        I am of the view that, in the absence of applicable legislation, for instance

s. 46(1) of the *Marine Liability Act*, the proper test for a stay of proceedings pursuant to

s. 50 of the *Federal Court Act* to enforce a forum selection clause in a bill of lading

remains as stated in *The "Eleftheria"*, which I restate in the following way.  Once the

court is satisfied that a validly concluded bill of lading otherwise binds the parties, the

court must grant the stay unless the plaintiff can show sufficiently strong reasons to

- 27 -

support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause. In exercising its discretion, the court should take into account all of the circumstances of the particular case. See *The "Eleftheria"*, at p. 242; *Amchem*, at pp. 915-22; *Holt Cargo*, at para. 91. Disputes arising under or in connection with a contract may not be regarded by a court in determining whether "strong cause" has been shown that a stay should not be granted.

40        In this case, the bill of lading and its forum selection clause have been entered into and are otherwise binding on the parties. The prothonotary began by properly applying the "strong cause" test. In so doing the prothonotary weighed the fact that the appellant prefers to litigate in a familiar jurisdiction and does not bring up the jurisdiction clause merely to seek a procedural advantage; there are reasonable connections with Belgium; there are Belgian and French witnesses; any time bar which may preclude the respondents from bringing their case in Belgium has been waived; no security has been posted; and the enforcement of a Belgian judgment against the appellant should present no particular difficulties. The prothonotary also accepted the respondents' arguments that there will be Canadian and American witnesses in these proceedings; the Tribunal de commerce in Antwerp conducts its proceedings in Flemish and decides cases on the basis of documents and statements, a procedure precluding witnesses and cross-examination; and, there may be more delay in Belgium than in Canada, especially if there is an appeal. The prothonotary concluded that the factors in favour of denying a stay, while substantial, were just short of the "strong cause" test which the respondents had the burden of meeting. I see no reason why the prothonotary's conclusion on this point should be set aside. However, the prothonotary erred by subsequently turning his attention to a dispute arising under the bill of lading

2003 SCC 27 (CanLII)

- 28 -

and in effect extending the tripartite test for interlocutory injunctions to motions for a stay of proceedings involving forum selection clauses contained in bills of lading.

VI.    Disposition

41        The prothonotary, to the extent he applied the "tripartite test", erred in law, as did the Court of Appeal in concluding that the appropriate test for a stay of proceedings involving a bill of lading with a forum selection clause was the "tripartite test" for interlocutory injunctions.  The "strong cause" test does not contemplate an inquiry into the question of establishing whether the surrounding contract is voidable.  Such questions are best left to the decision maker in the forum agreed upon.

42        Accordingly, I would allow the appeal, overturn the judgments of the courts below, and issue a stay of proceedings in favour of the appellant, with costs throughout to the appellant.

*Appeal allowed with costs.*

*Solicitors for the appellant:  Bernard & Partners, Vancouver.*

*Solicitors for the respondents:  Davies, Ward, Phillips and Vineberg, Montreal.*



### SUPREME COURT OF CANADA

CITATION: Teck Cominco Metals Ltd. *v.* Lloyd's Underwriters,
2009 SCC 11, [2009] 1 S.C.R. 321

DATE: 20090220
DOCKET: 32116

BETWEEN:

**Teck Cominco Metals Ltd.**
Appellant
and
**Lloyd's Underwriters and Seaton Insurance Company**
Respondents

AND BETWEEN:

**Teck Cominco Metals Ltd.**
Appellant
and
**Lombard General Insurance Company of Canada**
Respondent

CORAM: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Charron and Rothstein JJ.

REASONS FOR JUDGMENT:
(paras. 1 to 41)

McLachlin C.J. (Binnie, LeBel, Deschamps, Fish, Charron
and Rothstein JJ. concurring)

———————————————————

2009 SCC 11 (CanLII)

Teck Cominco Metals Ltd. *v.* Lloyd's Underwriters, 2009 SCC 11, [2009] 1 S.C.R. 321

**Teck Cominco Metals Ltd.**                                             *Appellant*

*v.*

**Lloyd's Underwriters and Seaton Insurance Company**          *Respondents*

- and -

**Teck Cominco Metals Ltd.**                                             *Appellant*

*v.*

**Lombard General Insurance Co. of Canada**                    *Respondent*

**Indexed as:  Teck Cominco Metals Ltd. *v.* Lloyd's Underwriters**

**Neutral citation:  2009 SCC 11.**

File No.:  32116.

2008:  November 17; 2009:  February 20.

2009 SCC 11 (CanLII)

Present:  McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Charron and Rothstein JJ.

on appeal from the court of appeal for british columbia

2009 SCC 11 (CanLII)

*Private international law — Choice of forum — Forum conveniens — Pollution produced by mining company in Canada but environmental damage alleged to occur in U.S. — Environmental action against company commenced in U.S. court — Company suing insurers for coverage in relation to environmental damage in that court — Insurers commencing parallel proceedings in British Columbia — Assertion of jurisdiction by U.S. court — Whether British Columbia proceedings should be stayed given prior assertion of jurisdiction — Court Jurisdiction and Proceedings Transfer Act, S.B.C. 2003, c. 28, s. 11.*

Teck sued its insurers in the U.S. for coverage in relation to environmental damage alleged to have occurred in the U.S., downstream from its British Columbia smelter site. The insurers commenced parallel proceedings in British Columbia seeking declaratory orders regarding their obligation (or lack thereof) to defend or indemnify Teck. The parties each took various steps to obtain jurisdictional rulings in order to have the insurance coverage matter adjudicated in their preferred court: the insurers filed a motion in the U.S. District Court seeking an order to dismiss Teck's claims against them, and Teck filed similar motions in British Columbia seeking orders staying the British Columbia proceedings. The U.S. District Court denied the insurers' applications to dismiss Teck's claims against them on the basis of *forum non conveniens*. The British Columbia Supreme Court refused to grant the stays sought by Teck, and the Court of Appeal upheld that decision.

*Held*: The appeal should be dismissed.

British Columbia's *Court Jurisdiction and Proceedings Transfer Act* creates a comprehensive regime that applies to all cases where a stay of proceedings is sought on the ground that the action should be pursued in a different jurisdiction (*forum non conveniens*). It requires that in every case, including cases where a foreign judge has asserted jurisdiction in parallel proceedings, all the relevant factors listed in s. 11 be considered in order to determine if a stay of proceedings is warranted. This includes the desirability of avoiding multiplicity of legal proceedings. Section 11 is a complete codification of the common law test for *forum non conveniens* admitting of no exceptions. [21-22]

The prior assertion of jurisdiction by a foreign court does not oust the s. 11 inquiry. The usual multifactored test under s. 11 need not give way to a "comity-based" test when a foreign court positively asserts jurisdiction. Section 11 is itself a comity-based approach and gives due comity to foreign courts. Comity is not necessarily served by an automatic deferral to the first court asserting jurisdiction. The assertion of jurisdiction by the foreign court is also not an overriding and determinative factor in the s. 11 analysis. The avoidance of multiplicity of proceedings is only one factor, among many, to be considered. Furthermore, the jurisprudence and policy considerations do not support a conclusion that a foreign court's prior assertion of jurisdiction is an overriding and determinative factor in the *forum non conveniens* analysis. To adopt such an approach would be to encourage a first-to-file system where considerations having little or nothing to do with where an action is most conveniently or appropriately heard would carry the day. Lastly, the exercise of jurisdiction differs on an international level: a distinction should be made between situations

involving a uniform and shared approach to the exercise of jurisdiction, such as interprovincial conflicts, and those, such as here, which do not. Blind acceptance of a foreign court's prior assertion of jurisdiction carries with it the risk of declining jurisdiction in favour of a jurisdiction which is not more appropriate. A holistic approach, in which the avoidance of a multiplicity of proceedings is one factor among others to be considered, better serves the purpose of fair resolution of the *forum non conveniens* issue with due comity to foreign courts. [21] [23-25] [29-30]

In this case, the chambers judge carefully considered all of the factors mentioned in s. 11 and did not err in dismissing Teck's motions to stay the British Columbia proceedings. While a court should strive to avoid parallel proceedings, the desire to avoid them cannot overshadow the objective of the *forum non conveniens* analysis which is to ensure, if possible, that the action is tried in the jurisdiction that has the closest connection with the action and the parties. [32] [38]

**Cases Cited**

**Distinguished:** *472900 B.C. Ltd. v. Thrifty Canada, Ltd.* (1998), 168 D.L.R. (4th) 602; *Westec Aerospace Inc. v. Raytheon Aircraft Co.*, 1999 BCCA 243, 67 B.C.L.R. (3d) 278; *Ingenium Technologies Corp. v. McGraw-Hill Cos.*, 2005 BCCA 358, 49 B.C.L.R. (4th) 120; *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897.

**Statutes and Regulations Cited**

*Comprehensive Environmental Response, Compensation, and Liability Act*, 42 U.S.C. §§ 9601-9675.

*Court Jurisdiction and Proceedings Transfer Act*, S.B.C. 2003, c. 28, s. 11.

**Authors Cited**

Black, Vaughan, and John Swan. "Concurrent Judicial Jurisdiction: A Race to the Court House or to Judgment?" (2008), 46 *Can. Bus. L.J.* 292.

Uniform Law Conference of Canada. *Uniform Law Conference of Canada — Commercial Law Strategy*. Ottawa: The Conference, 2005 (loose-leaf updated 2008).

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Mackenzie and Kirkpatrick JJ.A.), 2007 BCCA 249, 67 B.C.L.R. (4th) 101, 279 D.L.R. (4th) 257, [2007] 7 W.W.R. 281, 240 B.C.A.C. 218, 48 C.C.L.I. (4th) 1, 28 C.E.L.R. (3d) 191, 39 C.P.C. (6th) 20, [2007] B.C.J. No. 841 (QL), 2007 CarswellBC 864, affirming a decision of Davies J., 2006 BCSC 1276, 60 B.C.L.R. (4th) 261, [2006] 12 W.W.R. 486, 40 C.C.L.I. (4th) 182, 24 C.E.L.R. (3d) 1, 31 C.P.C. (6th) 34, [2006] B.C.J. No. 1917 (QL), 2006 CarswellBC 2083.  Appeal dismissed.

*Gordon C. Weatherill*, *Craig A. B. Ferris* and *Lisa A. Peters*, for the appellant.

*Graeme Mew* and *Anna Casemore*, for the respondent Lloyd's Underwriters.

Written submissions only by *Gary M. Nijman*, for the respondent Seaton Insurance Company.

*James H. MacMaster*, *Michael J. Sobkin* and *Christopher A. Rhone*, for the respondent Lombard General Insurance Co. of Canada.

2009 SCC 11 (CanLII)

The judgment of the Court was delivered by

[1]    THE CHIEF JUSTICE — Teck Cominco Metals Ltd. ("Teck") sued the Lombard General Insurance Co. of Canada ("Lombard"), Lloyd's Underwriters ("Lloyd's") and Seaton Insurance Co. ("Seaton") (collectively referred to as the "Insurers") for coverage in relation to environmental damage alleged to have occurred in the United States, downstream from Teck's British Columbia smelter. Teck commenced its action in Washington State. The Insurers commenced parallel coverage proceedings in British Columbia. The issue on this appeal is whether the British Columbia proceedings should be stayed. The courts below ruled they should not be stayed. I agree with that result, and would dismiss the appeal.

I.    Facts

[2]    Teck has various mining and smelting operations in British Columbia. In 2002 and 2003 it gave notice to the Insurers of four claims or potential claims in respect of environmental damage arising from activities of a predecessor company, Cominco Ltd. The claims or potential claims arose from Cominco's operations in four British Columbia sites: Port McNeill, Pinchi Lake, Vancouver and Trail.

[3]      The largest claim arises from the discharge of waste material known as "slag" into the Columbia River adjacent to Teck's smelter in Trail.  Allegedly, the discharge accumulated in the Upper Columbia River and Lake Roosevelt in Washington State.  In an action filed in the U.S. District Court in 2004 (the "U.S. Environmental Action"), numerous private citizens and the State of Washington seek to hold Teck liable under a U.S. statute (the *Comprehensive Environmental Response, Compensation, and Liability Act*, 42 U.S.C. §§ 9601-9675) for environmental property damage allegedly caused by the contamination.

[4]      Teck takes the position that the Insurers are required to defend and indemnify it in the U.S. Environmental Action.  In the period of 1958 to 1985, Cominco Ltd. purchased general and excess liability insurance policies from the Insurers (the "Policies").  Apart from coverage limits, the Policies provide similar coverage, requiring each insurer to defend and indemnify Teck in the event of any alleged liability resulting from an occurrence of property damage taking place during the period of coverage anywhere in the world.  Teck says that the alleged contamination in Washington State is covered by the Policies.

[5]      The Insurers deny that they are obligated to compensate Teck on various grounds.

[6]      The extent of the damages faced by Teck in the U.S. Environmental Action is not known; however, it is expected to exceed the limits underlying each of the policies, which collectively total over $779 million.  (See motions judgment, 2006 BCSC 1276, 60 B.C.L.R. (4th) 261, at paras. 35 and 63, and Court of Appeal judgment, 2007 BCCA 249, 67 B.C.L.R. (4th) 101, at paras. 16-17.)

2009 SCC 11 (CanLII)