[7]         On November 23, 2005, Teck commenced an action in the Washington State Superior

Court seeking a declaratory judgment regarding its right to insurance coverage under the Policies

in respect of the U.S. Environmental Action (the "U.S. Coverage Action").  On that same day,

Lloyd's commenced an action in the Supreme Court of British Columbia seeking declaratory orders

regarding their obligation (or lack thereof) to defend or indemnify Teck in respect of the claims or

potential claims concerning the four British Columbia sites.  Seaton, a defendant in the Lloyd's

action, also filed a counterclaim.  Lombard subsequently filed a similar action to Lloyd's.  (The

Insurers' actions are collectively referred to as the "B.C. Coverage Action".)

[8]         The parties have each taken various steps to obtain jurisdictional rulings in order to have

the insurance coverage matter adjudicated in their preferred court.  As a result, the U.S. Coverage

Action was moved from the Washington State Superior Court to the United States District Court for

the Eastern District of Washington ("U.S. District Court"). The Insurers filed a motion in the U.S.

District Court seeking an order to dismiss Teck's claims against them in the U.S. Coverage Action.

Teck filed similar motions in the British Columbia Supreme Court seeking orders staying the B.C.

Coverage Action.

[9]         On May 1, 2006, Suko J. of the U.S. District Court denied the Insurers' applications to

dismiss Teck's claims against them on the basis of *forum non conveniens*.

[10]         By agreement of the parties, the U.S. District Court temporarily stayed the proceedings

in the U.S. Coverage Action pending this Court's disposition of the appeal.

2009 SCC 11 (CanLII)

II.    Judicial History


A.    *Supreme Court of British Columbia (Davies J.)*, 2006 BCSC 1276, 60 B.C.L.R. (4th) 261

[11]      The chambers judge held that s. 11 of the *Court Jurisdiction and Proceedings Transfer Act*, S.B.C. 2003, c. 28 ("*CJPTA*"), is "part of a comprehensive remedial statutory scheme that is intended to codify the determination of jurisdictional issues in British Columbia" (para. 102).  He denied the stay of the B.C. Coverage Action on the grounds that:


•       The convenience and expense of the parties and potential witnesses favoured litigation

        in British Columbia rather than Washington State, having regard to: the residence of the

        parties and where each carries on business; the fact that the issues in the coverage

        actions (disclosure, risk assessment and interpretation issues related to coverage and

        exclusions) have little, if any, connection to Washington State; and the fact that the

        overall cost of litigation would be greater if the coverage action proceeded in

        Washington State.


•       The law to be applied to issues in the action would likely be British Columbia law.

        Washington law would not apply because: the potential Washington victims are not

        beneficiaries to the Policies; the Insurers' obligations are only to Teck; the coverage

        action involves declarations in relation to British Columbia sites; and all of Teck's

        alleged wrongful actions, while affecting foreign residents, occurred solely in British

Columbia.

- The desirability of avoiding multiplicity of legal proceedings and avoiding conflicting decisions in different courts requires a multi-factored analysis, in which the prior assertion of jurisdiction by the U.S. District Court is an important but not determinative factor.

- Any damage award ordered by the U.S. District Court would be enforceable in British Columbia. While enforcement of any declaratory judgment could be more problematic, as a practical matter, it was unlikely that Teck would have to resort to execution proceedings to obtain satisfaction from the Insurers.

- The fair and efficient working of the Canadian legal system as a whole favoured litigation in British Columbia, as it would not be efficient to have contracts of insurance interpreted in accordance with more than one system of law.

[12]      Considering all the factors in s. 11 of the *CJPTA*, the chambers judge found that British Columbia was the jurisdiction with the closest connection to Teck and the subject matter of the coverage action (the Policies).  Consequently, on August 21, 2006, he refused to grant the stays sought by Teck in the B.C. Coverage Action.

B.    *Court of Appeal for British Columbia (Newbury, Mackenzie and Kirkpatrick JJ.A.)*, 2007
       BCCA 249, 67 B.C.L.R. (4th) 101

2009 SCC 11 (CanLII)

[13]      Newbury J.A., writing for the court, found that the chambers judge properly considered and weighed each factor in s. 11(2) of the *CJPTA*.  She agreed with Davies J. that the principle of comity did not require deference to the first court to assert jurisdiction.  Finding no error in Davies J.'s conclusion that British Columbia was the more appropriate forum for the trial of the coverage action, Newbury J.A. dismissed Teck's appeal.

III.   Relevant Statutory Provisions

[14]      Section 11 of the *CJPTA* provides that:

> **11**(1)  After considering the interests of the parties to a proceeding and the ends of justice, a court may decline to exercise its territorial competence in the proceeding on the ground that a court of another state is a more appropriate forum in which to hear the proceeding.
>
> (2)  A court, in deciding the question of whether it or a court outside British Columbia is the more appropriate forum in which to hear a proceeding, must consider the circumstances relevant to the proceeding, including
>
>> (a)  the comparative convenience and expense for the parties to the proceeding and for their witnesses, in litigating in the court or in any alternative forum,
>>
>> (b)  the law to be applied to issues in the proceeding,
>>
>> (c)  the desirability of avoiding multiplicity of legal proceedings,
>>
>> (d)  the desirability of avoiding conflicting decisions in different courts,
>>
>> (e)  the enforcement of an eventual judgment, and
>>
>> (f)  the fair and efficient working of the Canadian legal system as a whole.

IV.   Issues

2009 SCC 11 (CanLII)

[15]      The only issue on this appeal is whether the coverage proceedings commenced in British Columbia should be stayed, in view of the prior parallel proceedings in Washington State and the assertion of jurisdiction by the U.S. District Court.  Resolving this issue requires us to consider the application of s. 11 of the *CJPTA* in circumstances where prior proceedings have been commenced outside British Columbia and the foreign court has refused to stay its action.

[16]      The reasons will go on to consider whether the chambers judge acted properly in rejecting the Teck's application to decline jurisdiction and stay the B.C. Coverage Action, having regard to the appropriate test.

V.    Analysis

A.    *Whether the Section 11 Test Iis Trumped by a Comity-Based Test*

[17]      Teck submits that where a foreign court has assumed jurisdiction in parallel proceedings, the usual multifactored test under s. 11 of the *CJPTA* must give way to a "comity-based" test that respects the foreign court's decision to take jurisdiction.

[18]      In favour of this approach, Teck argues that there is a distinction between a situation where it is submitted that a foreign court *would be* the appropriate forum, and the situation where a foreign court *has in fact asserted jurisdiction*.  A foreign court can be said to have asserted jurisdiction when it has been asked to decline its jurisdiction over the matter and has refused to do

2009 SCC 11 (CanLII)

so, holding that it is the appropriate forum to hear the dispute. Teck argues that where a foreign court has asserted jurisdiction on the basis of factors similar to those found in s. 11 of the *CJPTA*, s. 11 does not apply and the court may decline jurisdiction simply on the basis that the foreign court has asserted jurisdiction, and that comity requires that the domestic court recognize that prior assertion of jurisdiction.

[19]      An alternative, slightly softer version of this argument is that assertion of jurisdiction by the foreign court is a factor of overwhelming significance in the determination of whether the local forum is appropriate (*forum conveniens*) and that, since the U.S. District Court has positively asserted jurisdiction, the British Columbia courts are effectively bound to stay the parallel actions in British Columbia.

[20]      I will consider each of these arguments in turn.

[21]      The first argument is that s. 11 of the *CJPTA* does not apply where a foreign court has asserted jurisdiction. I cannot agree. The *CJPTA* creates a comprehensive regime that applies to all cases where a stay of proceedings is sought on the ground that the action should be pursued in a different jurisdiction (*forum non conveniens*). It requires that in every case, including cases where a foreign judge has asserted jurisdiction in parallel proceedings, all the relevant factors listed in s. 11 be considered in order to determine if a stay of proceedings is warranted. This includes the desirability of avoiding multiplicity of legal proceedings. But the prior assertion of jurisdiction by a foreign court does not oust the s. 11 inquiry.

2009 SCC 11 (CanLII)

[22]        Section 11 of the *CJPTA* was intended to codify the *forum non conveniens* test, not to supplement it.  The *CJPTA* is the product of the Uniform Law Conference of Canada.  In its introductory comments, the Conference identified the main purposes of the proposed Act, which included bringing "Canadian jurisdictional rules into line with the principles laid down by the Supreme Court of Canada in Morguard Investments Ltd. v. De Savoye, [1990] 3 S.C.R. 1077, and Amchem Products Inc. v. British Columbia (Workers' Compensation Board), [1993] 1 S.C.R. 897" (*Uniform Law Conference of Canada — Commercial Law Strategy* (loose-leaf), at p. 3).  Further, the drafters of the model Act confirmed that s. 11 of the *CJPTA* was intended to codify the common law *forum non conveniens* principles in "comments to section 11":

> **11.1**  Section 11 is meant to codify the doctrine of forum non conveniens, which was most recently confirmed by the Supreme Court of Canada in Amchem Products Inc. v. British Columbia (1993). The language of subsection 11(1) is taken from Amchem and the earlier cases on which it was based.  The factors listed in subsection 11(2) as relevant to the court's discretion are all factors that have been expressly or implicitly considered by courts in the past. [p. 11]

Section 11 of the *CJPTA* thus constitutes a complete codification of the common law test for *forum non conveniens*.  It admits of no exceptions.

[23]        Teck submits that the usual multifactored test under s. 11 of the *CJPTA* must give way to a "comity-based" test when a foreign court positively asserts jurisdiction.  To the extent this argument implies that the usual test does not give due comity to foreign courts, it must be rejected.  Section 11 of the *CJPTA* is itself a comity-based approach.  As will be discussed, comity is not necessarily served by an automatic deferral to the first court that asserts jurisdiction.  It follows that Teck's argument, that s. 11 does not apply where a foreign court has already asserted jurisdiction

2009 SCC 11 (CanLII)

over the matter, cannot succeed.

[24]      Alternatively, it is argued that if s. 11 applies, the assertion of jurisdiction by the foreign court is an overriding and determinative factor in the s. 11 analysis.  This argument also must be rejected.

[25]      First, had actual assertion of jurisdiction by a foreign court been seen as a factor that should override all others, one would have expected the legislature to have stated this expressly. Rather, avoidance of multiplicity of proceedings is simply listed along with other factors.  This suggests that the existence of foreign proceedings is only one factor, among many, to be considered in a *forum non conveniens* analysis.

[26]      Second, the authorities are against this contention.  Teck says *472900 B.C. Ltd. v. Thrifty Canada, Ltd.* (1998), 168 D.L.R. (4th) 602 (B.C.C.A.), *Westec Aerospace Inc. v. Raytheon Aircraft Co.*, 1999 BCCA 243, 67 B.C.L.R. (3d) 278, and *Ingenium Technologies Corp. v. McGraw-Hill Cos.*, 2005 BCCA 358, 49 B.C.L.R. (4th) 120, support the fact that a prior assertion of jurisdiction is a factor of overwhelming significance.  In *Thrifty*, the British Columbia Supreme Court declined to stay its proceedings in view of a prior assertion of jurisdiction by the Ontario court over a parallel action.  The Court of Appeal allowed the appeal on the basis that the chambers judge erred by giving no weight to the fact the parties had expressly agreed that the contract would be interpreted in accordance with Ontario law and had agreed to attorn to the jurisdiction of the court of Ontario. Ultimately, it was the various connections to Ontario, not simply the prior assertion of jurisdiction by the Ontario court, that warranted the granting of a stay in the British Columbia proceedings.

2009 SCC 11 (CanLII)

[27]      In *Westec*, the defendant commenced an action in Kansas.  Shortly thereafter, the plaintiff sued in British Columbia.  The Court of Appeal, in determining whether to grant a stay in the British Columbia action, considered a number of factors, including: place of incorporation, place of business, location of assets and the formation and performance of the contract.  (Unlike *Thrifty*, the foreign court had not asserted jurisdiction.)  The Court of Appeal concluded that both fora had "a real and substantial connection to the dispute" (para. 46) and ultimately decided to stay the British Columbia action on the basis that the plaintiff had failed to establish a juridical advantage that would be lost if the proceedings were stayed.

[28]      The final case relied on by Teck is *Ingenium*.  In *Ingenium*, the British Columbia Court of Appeal reviewed the chambers judge's decision not to stay the British Columbia action in the face of a positive assertion of jurisdiction by the U.S. District Court for the Southern District of New York over parallel proceedings in New York.  The Court of Appeal found that the chambers judge was correct in concluding that "the existence of parallel proceedings does not trump all other factors" (para. 9).  However, the court went on to allow the appeal on the basis that the chambers judge erred in attaching no significance to the fact the U.S. District Court had positively asserted jurisdiction in her analysis.  I do not consider that *Ingenium* laid down a new test for the determination of *forum non conveniens* in cases where a foreign court has assumed jurisdiction in parallel proceedings.

[29]      Finally, policy considerations do not support making a foreign court's prior assertion of jurisdiction an overriding and determinative factor in the *forum non conveniens* analysis.  To

2009 SCC 11 (CanLII)

adopt this approach would be to encourage a first-to-file system, where each party would rush to commence proceedings in the jurisdiction which it thinks will be most favourable to it and try to delay the proceedings in the other jurisdiction in order to secure a prior assertion in their preferred jurisdiction. Technicalities, such as how long it takes a particular judge to assert jurisdiction, might be determinative of the outcome. In short, considerations that have little or nothing to do with where an action is most conveniently or appropriately heard, would carry the day. Such a result is undesirable and inconsistent with the language and purpose of s. 11, discussed above.

[30]      Also, the extent to which approaches to the exercise of jurisdiction differ on an international level also weighs in favour of rejecting Teck's approach. A distinction should be made between situations that involve a uniform and shared approach to the exercise of jurisdiction (e.g. interprovincial conflicts) and those, such as the present, that do not. In the latter, blind acceptance of a foreign court's prior assertion of jurisdiction carries with it the risk of declining jurisdiction in favour of a jurisdiction that is not more appropriate. A holistic approach, in which the avoidance of a multiplicity of proceedings is one factor among others to be considered, better serves the purpose of fair resolution of the *forum non conveniens* issue with due comity to foreign courts.

[31]      For the foregoing reasons, I conclude that s. 11 of the *CJPTA* applies to the motions before the British Columbia courts to decline jurisdiction, and that the prior assertion of jurisdiction by the U.S. District Court is merely one factor to be considered, among others.

B.      *Applying the Proper Principles, Did the Chambers Judge Err in Permitting the B.C. Coverage Action to Continue?*

2009 SCC 11 (CanLII)

[32]      As set out earlier, the chambers judge dismissed Teck's motions to stay the B.C. Coverage Action. In arriving at this conclusion, the chambers judge carefully considered all of the factors mandated for consideration by s. 11(2) of the *CJPTA*, namely: the comparative convenience and expense for the parties to the proceeding and for their witnesses, in litigating in the court or in any alternative forum (s. 11(2)(a)); the law to be applied to issues in the proceeding (s. 11(2)(b)); the desirability of avoiding multiplicity of legal proceedings (s. 11(2)(c)); the desirability of avoiding conflicting decisions in different courts (s. 11(2)(d)); the enforcement of an eventual judgment (s. 11(2)(e)); and the fair and efficient working of the Canadian legal system as a whole (s. 11(2)(f)).

[33]      Before this Court, Teck argued that the chambers judge erred in disregarding the fact that the insurance coverage sought was in relation to damages claimed in Washington State. Teck submits that the U.S. District Court's assertion of jurisdiction should be respected because the issues in the environmental action brought by Washington residents under U.S. legislation may impact on the issue of insurance coverage in this action.

[34]      The difficulty with this submission is that the chambers judge carefully considered these arguments and the totality of the evidence before him. Having done so, he determined that the central issues in the coverage actions (disclosure, risk assessment, and policy interpretation) weighed in favour of British Columbia, and that the only coverage issues properly the substance of the U.S. Environmental Action are inconsequential.

[35]      He was alive to the fact that the environmental damage had occurred in Washington

State, but held that that fact alone did not lead to the conclusion that foreign law should apply to the coverage action. On the contrary, he concluded that it would be unreasonable to apply Washington law because, *inter alia*, Teck's alleged wrongful actions occurred solely in Canada, the proceedings involved other British Columbia sites with no connection to Washington State, and the Washington residents are not beneficiaries to the Policies.

[36]     The chambers judge was also alive to the concern that on a *forum non conveniens* application, the court should strive to avoid a situation where two jurisdictions may be dealing with the same subject matter. While finding the U.S. District Court's prior assertion of jurisdiction to be a factor of high importance, he concluded that it could not prevail in view of the fact British Columbia was the forum most closely connected with Teck and the Policies, and that Washington State, a jurisdiction with at best a tenuous connection to the parties and the Policies, was not an appropriate forum.

[37]     I see no error in the reasons or the conclusion of the chambers judge. He considered all the relevant factors under s. 11 of the *CJPTA*. Those factors support his decision to refuse to stay the B.C. Coverage Action.

[38]     Teck argues that a refusal to stay the B.C. Coverage Action places the parties in the difficult position of having legal proceedings on the issue of insurance coverage in two separate jurisdictions. While I am sympathetic to the difficulties presented by parallel proceedings, the desire to avoid them cannot overshadow the objective of the *forum non conveniens* analysis, which is "to ensure, if possible, that the action is tried in the jurisdiction that has the closest connection with the

action and the parties" (*Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897, at p. 912).

[39]      Teck also argues that to allow the coverage action to proceed in British Columbia raises problems with regard to the enforcement of any judgment obtained in the U.S. Coverage Action. If the U.S. District Court proceeding (which has been temporarily stayed pending the outcome of this appeal) were to conclude first, the resultant judgment would ordinarily be enforceable in Canada.  Would the British Columbia court be bound to recognize the judgment, thus effectively nullifying the British Columbia proceeding?  Or would recognition of the foreign judgment be precluded on the basis that there is ongoing litigation on the same subject matter in British Columbia?  Professor Black and Mr. Swan suggest the availability of three approaches to this problem: (1) a race where the first judgment handed down prevails; (2) an absolute preference for local proceedings; or (3) a middle ground that adopts a general first-to-judgment rule but affords additional defences to enforcement that may be engaged in some circumstances: V. Black and J. Swan, "Concurrent Judicial Jurisdiction: A Race to the Court House or to Judgment?" (2008), 46 *Can. Bus. L.J.* 292.

[40]      I do not propose to answer this question, as it was not fully developed in the courts below or before us; nor is the answer necessary in order to dispose of the appeal.  As mentioned above, the enforcement issue was disposed of by the chambers judge on the basis that he was satisfied that it was unlikely that Teck would have to resort to execution proceedings in order to obtain satisfaction from the Insurers.

2009 SCC 11 (CanLII)

VI.    <u>Conclusion</u>

[41]        For the foregoing reasons, I would dismiss the appeal, costs to the respondents.


*Appeal dismissed with costs.*


*Solicitors for the appellant:  Lawson Lundell, Vancouver.*


*Solicitors for the respondent Lloyd's Underwriters: Nicholl, Paskell-Mede, Toronto.*


*Solicitors for the respondent Seaton Insurance Company:  Alexander Holburn Beaudin & Lang, Vancouver.*


*Solicitors for the respondent Lombard General Insurance Co. of Canada:  Branch, MacMaster, Vancouver.*

2009 SCC 11 (CanLII)



1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

Menegon v. Philip Services Corp.

In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of the Courts of Justice Act, R.S.O. 1990 c. C-43, as Amended

In the Matter of a Plan of Compromise or Arrangement of Philip Services Corp. and the Applicants Listed on Schedule "A"

Application Under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36

Joseph Menegon, Plaintiff and Philip Services Corp., Salomon Brothers Canada Inc., Merill Lynch Canada Inc., CIBC Wood Gundy Securities Inc., Midland Walwyn Capital Inc., First Marathon Securities Limited, Gordon Capital Corporation, RBC Dominion Securities Inc., TD Securities Inc., and Deloitte & Touche, Defendants

Ontario Superior Court of Justice [Commercial List]

Blair J.

Judgment: August 27, 1999
Docket: 99-CL-3442, 4166CP/98

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *David R. Byers*, *Sean Dunphy* and *Colleen Stanley*, for Philip Services Corp. et al.

*John McDonald*, for the Class Proceedings plaintiffs.

*J.L. McDougall, Q.C.* and *B.R. Leonard*, for Deloitte & Touche.

*B. Zarnett*, for Merrill Lynch Canada Inc., Midland Walwyn Capital Inc., First Marathon Securities Limited, Gordon Capital Corporation and Salomon Brothers Canada Inc. ("The Underwriters").

*Hilary Clarke*, for Royal Bank of Canada.

*Pamela Huff* and *Susan Grundy*, for lenders under the credit agreement.

*Joseph Groia* and *Subrata Bhattacharjee*, for certain directors.

*E.A. Sellers*, for CIBC as account intermediary.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

*Steven Graff,* for PHH Vehicle Leasing.

Subject: Corporate and Commercial; Civil Practice and Procedure; International; Insolvency

Practice --- Parties — Representative or class actions — Procedural requirements

Class action brought against insolvent corporation, pursuant to Class Proceedings Act, alleging misrepresentation in share offering — Corporation reached proposed settlement with plaintiffs — Settlement was part of plan of compromise and arrangement under Companies' Creditors Arrangement Act — Corporation and plaintiff brought motion for certification of proceeding — Motion granted — Test set out in s. 5(1) of Class Proceedings Act was met — Statement of claim disclosed cause of action based on faulty disclosure, articulated identifiable class and common issue — Proceeding certified against corporation and for settlement purposes only — Notice of certification and of pending motion for approval of settlement to be given to all members of class as certified — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 — Class Proceedings Act, 1992, S.O. 1992, c. 6.

Corporations --- Practice and procedure in actions involving corporations — Miscellaneous issues

Class action brought against insolvent corporation alleging misrepresentation in share offering — Co-defendants included underwriters — Corporation was bound by underwriting agreement to indemnify and hold underwriters harmless against claims based on untrue statements in prospectus — Corporation reached proposed settlement with plaintiffs — Settlement was part of plan of compromise and arrangement under Companies' Creditors Arrangement Act — Corporation and plaintiff brought motion for certification of proceeding and approval of settlement — Motion granted in part — Proceeding certified against corporation and for settlement purposes only — Approval of proposed settlement premature and adjourned to date closer to sanctioning hearing under Act — Proposed settlement affected corporation's relationship not only with class action plaintiffs but also with co-defendants — Under underwriting agreement, company was not entitled to settle action without consent and unconditional release of underwriters — Approval of proposed settlement at that stage would deprive underwriters of contractual right — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Arrangements — Approval by court — "Fair and reasonable"

Insolvent corporation and subsidiaries filed for protection both under Companies' Creditors Arrangement Act ("Act") and U.S. Bankruptcy Code ("Code") — Class actions brought in both United States and Canada, against corporation, subsidiaries, auditors, underwriters and certain directors and officers — Interrelated plans of compromise and reorganization filed in both courts — Plans provided all claims against corporation to be dealt with in U.S. proceedings, including those of Canadian claimants — Bank had claim in relation to equipment leases in Canada — Corporation applied for approval under Act to enter proposed settlement of class action — Co-defendants in class action and bank brought motions for declaration that plan, proposing that claimants be dealt with under Code, was not fair and reasonable — Motions granted in part — Under Canadian plan, co-defendants lost right to pursue indemnity claims in Canadian class action, by dealing with them under Code — Right to vote under Canadian insolvency regime is central counterpart to debtor's right to compromise — Under American regime, Canadian creditors would lose right to vote and corporation was entitled to "reject" Bank's lease claims — Having chosen to proceed under Canadian insolvency regime, corporation could not evade statutory requirements by dealing with claimants under foreign regime which treats claimants less favourably — No issue of comity was involved — Bank's claims to be determined under Canadian law and in Canadian proceeding — Issue of whether plan fair or reasonable was matter for sanctioning hearing, after negotiations concluded and votes counted — Canadian plan, as then constituted, was flawed and declared to fail to comply with Companies' Creditors Arrangement Act regime — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 — Bankruptcy Code, 11 U.S.C. 1982.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

**Cases considered by *Blair J.*:**

*Carom v. Bre-X Minerals Ltd.* (1999), 43 O.R. (3d) 441, 30 C.P.C. (4th) 133 (Ont. Gen. Div.) — referred to

*Nantais v. Telectronics Proprietary (Canada) Ltd.* (1995), 127 D.L.R. (4th) 552, 40 C.P.C. (3d) 245, 25 O.R. (3d) 331 (Ont. Gen. Div.) — referred to

*Nantais v. Telectronics Proprietary (Canada) Ltd.* (1995), 40 C.P.C. (3d) 263, 129 D.L.R. (4th) 110, 25 O.R. (3d) 331 at 347 (Ont. Gen. Div.) — referred to

*Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 17 C.B.R. (3d) 1, *(sub nom. Olympia & York Developments Ltd., Re)* 12 O.R. (3d) 500 (Ont. Gen. Div.) — referred to

*Roberts v. Picture Butte Municipal Hospital* (1998), 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443 (Alta. Q.B.) — referred to

**Statutes considered:**

*Bankruptcy Code*, 11 U.S.C. 1982

Chapter 11 — referred to

*Class Proceedings Act, 1992*, S.O. 1992, c. 6

Generally — referred to

s. 5(1) — considered

s. 17 — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

s. 4 — referred to

s. 5.1(3) [en. 1997, c. 12, s. 122] — pursuant to

s. 6 — referred to

s. 12 — referred to

s. 18.6(2) [en. 1997, c. 12, s. 125] — referred to

s. 18.6(5) [en. 1997, c. 12, s. 125] — referred to

*Courts of Justice Act*, R.S.O. 1990, c. C.43

s. 97 — pursuant to

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

MOTION by insolvent corporation and class action plaintiff for certification of proceeding and for approval of proposed settlement agreement; CROSS-MOTIONS by co-defendants and by unsecured creditor for declaration that plan of compromise and arrangement under *Companies' Creditors Arrangement Act* was not fair and reasonable.

*Blair J.*:

I — Facts

*Background*

1      The issues raised on these Motions touch upon difficult areas in the burgeoning field of cross-border insolvencies.

2      Philip Services Corp. is the ultimate parent company of a network of approximately 200 directly and indirectly owned subsidiaries in Canada, the United States and elsewhere. The operations of this international conglomerate of companies are service oriented, with a primary focus on what are referred to as "Metals Services" and "Industrial Services." The former involves the collection, processing and recycling of scrap metal for steel mills and for the foundry and automotive industries. The latter entails providing such things as cleaning and maintenance services, waste collection and transportation, emergency response services and tank cleaning for major industries ("outsourcing services"), and providing "by-products recovery services," with heavy emphasis on chemicals and fuel and polyurethane recycling, for the same industries.

3      The Philips conglomerate — with consolidated revenues in 1998 of U.S. $2 billion, but a consolidated, net loss of U.S. $1.587 billion for the period ending December 31, 1998 — has fallen into insolvent circumstances. On June 25, 1999, Philip Services Corp. and its Canadian subsidiaries sought and obtained the protection of this Court under the provisions of the CCAA to enable them to attempt to restructure their affairs. On the same date, Philip Service Corp. and its primary subsidiary for its U.S. operations, Philip Services (Delaware) Inc., together with other U.S. subsidiaries, filed for Chapter 11 protection under the U.S.*Bankruptcy Code* in United States Bankruptcy Court (District of Delaware). On July 12, 1999, a "Disclosure Statement and a Plan of Reorganization" was filed in the U.S. Bankruptcy Proceedings ("the U.S. Plan"). On July 15th, a Plan of Compromise and Arrangement was filed in the CCAA Proceedings ("the Canadian Plan").

4      As the parties and counsel have done, I shall refer to Philip Services Corp. as "Philip" and to Philip Services (Delaware) Inc. as "PSI." I shall refer to the conglomerate as a whole as "Consolidated Philip."

5      Philip is an Ontario corporation with head offices in Hamilton, Ontario. It is a public company with stock trading on the Toronto Stock Exchange, the Montreal Exchange, and the New York Stock Exchange. Although trading is suspended at the present time, the bulk of trading occurred on the New York Stock Exchange. Eighty-two percent of Philip's issued and outstanding shares are owned by U.S. residents. Moreover, it appears, the majority of Philip's operating assets, and of its operations, are located in the United States. Consolidated Philip carries on business at more than 260 locations, and employs more than 12,000 employees, primarily in North America. Its customer list includes more than 40,000 industrial and commercial customers world-wide. In Canada, there are 94 locations, about 2,000 employees, and annual revenues in the neighbourhood of U.S. $333 million.

6      Philip expanded very rapidly in the past few years — perhaps too rapidly, as it turns out. Consolidated Philip grew by more than 40 new businesses acquisitions in 1996 and 1997. Associated with this expansion was the negotiation of a U.S. $1.5 billion Credit Agreement between Philip and PSI as borrowers and a syndicate of more than 40 lenders (the "Lenders"). Under the Credit Agreement Philip guaranteed the borrowings of PSI, and PSI guaranteed the borrowings of Philip. In addition, certain subsidiaries of Philip and PSI guaranteed all of the liabilities of Philip and

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

PSI to the lenders, and the guarantees from the subsidiaries were secured by general agreements and specific assignments of assets. In short, the Lenders have security over virtually all of the assets of Consolidated Philip. Moreover, subject to certain specific exceptions, it is first security.

7     During this same period of expansion, Philip raised about U.S. $362 million through a public offering in the U.S. and Canada. Seventy-five percent of these shares were sold in the U.S. As events transpired, these public offerings have led to a series of class actions against Philip both in the U.S. and in Canada. They arose out of certain discrepancies between copper inventory as shown on the books and records of Philip and actual inventory on hand, which were revealed in audits in early 1998. Publicity surrounding the discrepancies led to a drop in the price of Philip shares, which led to various class actions. Eventually, it was determined that Philip's liabilities had been understated by approximately U.S. 35 million. As a result, it was required to file an Amended Form 10-K with the U.S. Securities and Exchange Commission restating its financial results for 1997 to show an additional loss of $35 million. It was also required to revise the amount of pre-tax special and non-recurring charges for that same year.

8     It is said that the unsettling effects of the financial irregularities and the class action proceedings, in conjunction with a general uncertainty in the markets serviced by Consolidated Philip, caused Philip's earnings to drop dramatically. It could not refinance its long-term debt under the Credit Agreement. Its trade credit was curtailed. It lost contracts and, because its bonding capacity was impaired, it was further hampered in its ability to win new contracts. In spite of concerted efforts over a period of nearly a year, Philip was not able to re-finance its debt or to restructure its affairs outside of the court restructuring context. Cash conservation measures in late 1998 led to defaults under the Credit Agreement. Debt restructuring negotiations with *the Lenders* since that time led ultimately to the parallel insolvency proceedings in Canada and the U.S. to which I have referred above.

*The Class Proceedings*

9     Developments in the class action proceedings are what have led specifically to the Motions which are presently before this Court.

10     In February and March of 1998 various class actions were filed in the United States against Philip, certain of its past and present directors and officers, the underwriters of the Company's November 1997 public offering, and the Company's auditors (Deloitte & Touche).[FN1] The actions, now consolidated, alleged that Philip's financial disclosure for various time periods between 1995 and 1997 contained material misstatements or omissions in violation of U.S. federal securities laws.

11     In May, 1998, a class proceeding was also commenced in Ontario, under the *Class Proceedings Act*, 1992 ("the CPA Proceeding"). The plaintiff is Joseph Menegon, a retired school teacher living in Hamilton, who had purchased 300 common shares of Philip on the TSE in November, 1998. The CPA Proceedings is an action for misrepresentation, negligent misrepresentation and recission relating to the purchase of shares of Philip by people in Canada between February 28 and May 7, 1998. The defendants are Philip, the various Underwriters, and Deloitte & Touche.

12     At the instance of Philip and Deloitte & Touche, however, a motion was brought for an order dismissing the U.S. Class Action on the grounds that the United States Court was not the proper Court for the disposition of the claims, but that the Ontario Court was. This motion was successful and on May 4, 1999 the U.S. Class Action was dismissed. A motion to reconsider was also dismissed. Although the U.S. Class Action plaintiffs have appealed, the present status of those proceedings is that they have been dismissed.

13     Nonetheless, the U.S. claims persist, and there have been negotiations between counsel for the U.S. and Canadian Class Action plaintiffs and Philip since early 1999 with a view to arriving at a settlement of the class action claims against Philip. Because of the nature of these claims, and the potential quantum of any judgments that might be obtained, a resolution of the Class Action proceedings, according to Philip, is an essential element of any successful

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

restructuring. On June 23, 1999, the parties to the negotiations entered into a Memorandum of Understanding which outlined a proposed settlement between Philip and the U.S. Class Action and CPA Proceedings plaintiffs.

14      Philip and the CPA Proceeding plaintiff now seek certification of the CPA Proceeding and approval of the Settlement by the Court. Philip, separately, seeks approval of this Court under the CCAA to enter into the proposed Settlement. These motions have triggered the series of matters that are now to be disposed of. Deloitte & Touche not only opposes the Motions, but seeks separate declaratory relief on its own part touching upon the Settlement itself and as well the overall "fairness" and "reasonableness" of the proposed Canadian Plan. I shall return to the specifics of the competing Motions and the relief sought shortly. First, however, some brief reference to the controversial aspects of the Canadian and U.S. Plans, and to the terms of the Settlement, is required.

### The Controversial Aspects of the Plans, and the Settlement

15      The principle terms and conditions of the U.S. and Canadian Plans, as they presently stand, were hammered out in a "Lock-Up Agreement" entered into in April, 1999 and later amended on June 21st, between Philip (as Canadian borrower), PSI (as U.S. borrower), and a Steering Committee representing the Lenders. There were also negotiations with certain of Philip's major unsecured creditors and with counsel for the U.S. and Canadian class action plaintiffs. The Lock-Up Agreement is variously described as the result of "heavy" negotiations and "very hard bargaining." No doubt that is indeed the case.

16      The amended Lock-Up Agreement provides in substance that the Lenders will become the holders of 91% of the equity in the newly restructured Philip, and that they will as well receive U.S. $300 million of senior secured debt (now reduced to $250 million through asset sales) and $100 million of secured "payment in kind" notes. Under the U.S. Plan the remaining 9% of the equity in the restructured Philip is to be made available to other stakeholders, on the following basis: 5% (plus U.S. $60 million in junior notes) is to be for the compromised unsecured creditors; 2% for the existing shareholders; 1.5% for the Canadian and U.S. class action plaintiffs; and, 0.5% for the holders of other securities claims. The formula is conditional upon cross-approvals of the U.S. and Canadian Plans.

17      From Philip's perspective the Plans filed in both the U.S. and in Canada are interdependent and form a single Plan from a "business point of view." The general concept of the overall plan is that each class of stakeholders in the Consolidated Philip with similar characteristics are to be treated similarly whether they are located in the U.S. or in Canada. With this in mind, and having regard to the need for a coordinated restructuring of claims and interests against Philip, PSI, and the Canadian and U.S. subsidiaries, the Plans provide that,

a) creditors with claims against *Philip's Canadian subsidiaries but not against Philip itself* are to file their claims in the CCAA proceedings in Canada, and are to be dealt with in the Canadian Plan; and,

b) creditors with claims *against Philip* or its U.S. subsidiaries are to have their claims processed in the U.S. proceedings and are to be dealt with in the U.S. Plan.

18      The result of this is that the claims of *Philip's* creditors, whether Canadian or U.S., are to be dealt with under the U.S. Plan and governed by Chapter 11 of the *U.S. Bankruptcy Code*. This includes the claims of Deloitte & Touche and of the Underwriters, and of certain former officers and directors, for contribution and indemnity in relation to the U.S. and Canadian class proceedings. It also includes the claims of certain creditors, such as Royal Bank of Canada, in relation to personal property leases.

19      Not surprisingly, those so affected take umbrage at this treatment. They submit that it contravenes the provisions of the CCAA and their substantive rights under Canadian law, and should not be countenanced. It renders the Canadian Plan unfair and unreasonable, in their submission, and should not be sanctioned. Philip argues, on the other hand, that matters relating to whether or not the Plan is fair and reasonable are matters to be dealt with at the sanc-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

tioning hearing, when the Plan is brought before the Court for approval after it has received the earlier approval of the Company's creditors. Counsel for Philip — supported by counsel for the Lenders and counsel for the Canadian class action plaintiff — submits that it is premature at this stage to consider such contentions. Counsel for Deloitte & Touche and for the Underwriters and for Royal Bank counter this argument, however, by asserting that the certification and approval of the Settlement as sought raises the very same issues and that they are so "inextricably linked" that they must be dealt with together. In an earlier endorsement, I agreed with this latter submission. It fails now to consider the two matters together.

### The Proposed Settlement

20     Under the proposed Settlement the Canadian and U.S. class action plaintiffs are to receive 1.5% of the common shares of a restructured Philip, as noted above. The shares are to be distributed *pro rata* amongst the Canadian and U.S. plaintiffs. There is to be, in addition, an amount of up to U.S. $575,000 for costs of counsel for the U.S. and Canadian class action plaintiffs. The Settlement is embodied in the U.S. Plan as "Allowed Class 8B Claims." It includes the right of persons caught by the class proceedings to opt out; however, any member of the class who elects to opt out of the proposed settlement is also to be dealt with in the U.S. Plan as a Class 8B claimant.

21     The proposed Settlement is conditional upon its being approved by the Courts in Canada and in the U.S. and, according to Philip, upon the successful implementation of both the Canadian and the U.S. Plan. Philip has made it clear that it and its professional advisors do not believe that a restructuring of Philip can be accomplished without resolution of the class action claims in Canada and the U.S. Philip, counsel in the Canadian class action, and the Lenders all argue that in the event of liquidation, the plaintiffs will get nothing because — even if they are successful on liability — they will have no chance of recovering a damage award against the insolvent Philip. The Settlement is also recommended by Ernst & Young, the court appointed Monitor for Philip in the CCAA proceedings.

22     What, then, are the specific issues that the Court is asked to determine on the pending Motions?

### II — The Issues Raised

23     The following Motions, as summarized, are before the Court:

1) A Motion by Philip pursuant to the CCAA for authorization and direction to enter into the proposed Settlement of the proceeding pending against it under the *Class Proceeding Act*;

2) A joint Motion by Philip and Mr. Menegon, the representative plaintiff in the CPA Proceedings, for certification of the class proceeding as against the defendant Philip only, and for approval of the Settlement Agreement together with directions regarding notification of members of the proposed class;

3) A cross-Motion by Deloitte & Touche — one of Philip's co-defendants in the CPA Proceedings, supported by the other co-defendant Underwriters — for declaratory relief in the nature of an order:

a) declaring, pursuant to s. 5.1(3) of the CCAA and s. 97 of the *Courts of Justice Act* that the Canadian Plan is not fair and reasonable in the circumstances, having regard to those provisions in the Canadian Plan which compromise the ability of Deloitte & Touche to claim contribution and indemnity against Philip and certain of its directors, officers and employees;

b) precluding the compromise of the Deloitte & Touche claims and amending both the Canadian Plan and the U.S. Plan so that Deloitte & Touche's rights are to be determined under the Canadian Plan alone, and in accordance with Canadian law and without unfairly prejudicing its rights.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

4) A Motion by Royal Bank of Canada for an order,

a) declaring that the claim of Royal Bank against Philip under certain leases shall be determined with reference to Canadian law and in the Canadian proceedings;

b) declaring that the Canadian Plan is not fair and reasonable because it seeks to compromise the Bank's claims in the U.S. Plan, thus adversely affecting the Bank's rights and circumventing Philip's obligations under Canadian law;

c) amending the Canadian Plan so that the Bank's claim is not dealt with in the U.S. Plan; and,

d) amending sub-paragraph 14(d) of the initial Order granted in the CCAA proceeding on June 25, 1999 — which presently permits Philip to terminate any and all arrangements entered into by them — by providing that the sub-paragraph does not apply to leases of personal property; and, finally,

5) A Motion on behalf of certain former officers and directors of Philip seeking to have the Canadian Plan and the U.S. Plan declared not fair and reasonable in the circumstances, having regard to those provisions,

a) which attempt to compromise or otherwise limit the ability of the Moving Parties to claim contribution and indemnity from Philip without compensation whatsoever;

b) which call for releases to be provided to current directors and officers of Philip, but not to former directors and officers;

c) which deprive the Moving Parties of their rights as creditors to vote on the Canadian Plan.

## III — Law and Analysis

### The Class Proceedings

24     There is little difference in substance between the joint Motion of Philip and the Canadian class action plaintiff under the *Class Proceedings Act*, and that of Philip alone, under the CCAA. Both ultimately seek approval and implementation of the proposed Settlement. However, the CCAA proceeding provides the context in which this approval is sought and, indeed — as I have already mentioned — Philip and others are of the view that a successful restructuring of Consolidated Philip is not possible without the implementation of the proposed Settlement, and that the converse is also true. Thus, there *is* a close link between the two, and in my opinion the issue of settlement approval cannot be viewed in isolation from the CCAA/restructuring environment in the context of which it was developed.

### Certification

25     I have little hesitation in certifying — and do certify — the CPA Proceeding as a class proceeding pursuant to subsection 5(1) of the *Class Proceedings Act*, as requested. That is, the proceeding is certified as a class proceeding as against the defendant Philip only and for settlement purposes only. It is without prejudice to any arguments the other defendants to the CPA Proceedings may wish to make in opposition to any element of the plaintiff's claim, including, but not limited to, certification of a class as against them.

26     For those purposes, however, I am satisfied that the tests set out in subsection 5(1) have been met. The statement of claim discloses a cause of action based upon faulty disclosure. There is an identifiable class, as articulated

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

in the materials, and a common issue, as therein very broadly defined.[FN2] A class proceeding makes sense, and is the preferable procedure for the resolution of the common issue in the circumstances, and Mr. Menegon constitutes a representative plaintiff as called for in the subsection. An Ontario Court has jurisdiction pursuant to the *Class Proceedings Act* to certify a Canada-wide opt out class where the action has a "real and substantial" connection to Ontario, as is the case here: see, *Carom v. Bre-X Minerals Ltd.*, February 11, 1999, unreported, Court file No. 99-02614 (Ont. Gen. Div.) [reported at 43 O.R. (3d) 441]; *Nantais v. Telectronics Proprietary (Canada) Ltd. (1995), 25 O.R. (3d) 331* (Ont. Gen. Div.), leave to appeal refused (1995), 25 O.R. (3d) 331 at 347 (Ont. Gen. Div.).

*Approval and Notice*

27      I have concluded, however, that Notice should be given at this time to the members of the class as certified, in accordance with the provisions of section 17 of the *Class Proceedings Act*, but that the proposed Settlement ought not to be approved at this time and at this stage of the restructuring proceedings.

28      This conclusion is based not so much on the issue of whether notification under the *Act* may be given jointly for certification *and* approval, and not so much of the question of the merits of the proposed Settlement as between the class action plaintiffs and Philip. The former issue has not yet been settled, but need not be determined in this case. The latter is supported by the recommendations of the Monitor and seasoned U.S. representative counsel, and by the "reality check" that if there is no settlement it is unlikely that the class action plaintiffs will ever recover anything from Philip.

29      Rather, my conclusion is based upon my sense that it is *premature* to approve a settlement of the U.S. and Canadian class action proceedings at this stage of the restructuring process. Philip and the Lenders have made it clear that the settlement of those claims forms a central underpinning to the ability of Consolidated Philip to reorganize successfully. But the reverberations of the class actions extend to more than merely the relations between Philip and the class action plaintiffs. They affect the relations between Philip and the co-defendants in the proceedings, and between the class action plaintiffs and the co-defendants as well. The class action plaintiffs and the co-defendants are all unsecured claimants of Philip in the restructuring process — the claims of the co-defendants for contribution and indemnity against Philip and its former officers and directors arise out of the same "nucleus of operative facts"[FN3] as the claims of the class action plaintiffs against Philip; and one follows from the other. It has frequently been noted that the full name of the CCAA is "An Act to facilitate compromises and arrangements between companies and their creditors." In the bare-knuckled ring of commercial restructuring negotiations, this cannot be accomplished if one group of unsecured claimants is given an unwarranted advantage over another.

30      To grant approval to the proposed Settlement of the class action plaintiffs with Philip at this stage would in effect immunize both those plaintiffs and Philip from the need to have regard to the co-defendants in resolving their dispute. It may well be that a plaintiff in an action with multi-party defendants can settle unilaterally with one of those defendants without creating other repercussions in the lawsuit. It may also be, however, that such a settlement cannot be effected without taking into account some aspects of the "other party" issues — things such as the impact of the settlement on the co-defendants' claims for contribution and indemnity, including the quantum of or a cap on recovery and questions of releases, to take only some examples.

31      For instance, Philip is contractually bound under the terms of its Underwriting Agreement with the Underwriters to indemnify and hold the Underwriters harmless against all claims based on allegations of untrue statements or alleged untrue statements in a prospectus. More to the point, Philip *is not entitled without the consent of the Underwriters*, under the terms of the same Agreement, *to settle* any action in which such claims are made against it and unless the settlement includes an unconditional release in favour of the Underwriters. Approval of the proposed Settlement at this stage of the restructuring proceedings would deprive the Underwriters of that contractual right. What is significant at this point is not the attempt to compromise the claim, including the contractual right to the release, but rather the loss of the bargaining chip on the part of the Underwriters in the process as a result of the *unilateral* settlement as between Philip and the plaintiffs.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

32      Philip, the Lenders, and counsel for the class action plaintiffs have mounted an adamant chorus that if the proposed Settlement is not approved the U.S. and Canadian class action plaintiffs will get nothing because Philip will be liquidated and, in addition, that there is simply no room for the class action plaintiffs to receive anything more than the 1.5% share distribution in the restructured Philip which is currently on the table. The Lenders point out that they are fully secured and that they need not leave available even that 1.5% interest (not to mention the 9% equity interest which they have agreed to leave available to other stakeholders generally). These pronouncements may well reflect the final reality of the situation. However, I am somewhat less inclined to accept them at face value than the parties are to make them, particularly at this stage of the proceedings. It would not be the first time in restructuring negotiations where an adamant chorus turned into a more harmonious melody before the end of the day. Only the final moments of the process will tell the tale. In the meantime, as many negotiating options as possible should be kept open as amongst claimants of equal status in the restructuring, in my view.

33      I do not say that this proposed Settlement, in its present or some other form, will not ultimately be approved. It is simply premature at this stage in the restructuring process to give it that imprimatur, in my opinion — if the imprimatur is to be given — for the reasons I have articulated. Accordingly, the question of approval of the proposed Settlement is adjourned to a date to be fixed which is more contemporaneous with the sanctioning hearing. In the meantime, Notice of certification and of the *pending* motion for approval is to be sent to all members of the class.

### The Fairness Issues Regarding the Canadian Plan.

34      Much of the foregoing reasoning applies to the conclusions I have reached with respect to the issues raised by Deloitte & Touche and others respecting the Canadian Plan and its nexus with the proposed Settlement.

35      The claim of the plaintiffs in the CPA Proceedings as against Deloitte & Touche and the Underwriters includes a claim for the difference between the value received by the plaintiffs as a result of the settlement and their actual loss. If the Settlement and the Canadian and U.S. Plans are approved, however, these co-defendants will lose their rights to claim contribution and indemnity from Philip in the class action. This, in itself, is not a reason for impugning the fairness and reasonableness of the Plans, because the ability to compromise claims against it is essential to the ability of a debtor corporation to restructure its affairs. Nonetheless, where the proposed structure of the reorganization affects the substantive rights of claimants in a fashion which treats them differently than they would otherwise be treated under Canadian law, and where the effect of that treatment is to place the claimants in a position where their ability to engage in full and complete negotiations with the debtor company are impaired, there is cause for concern on the part of the Court. That, in my view, is the case here.

36      The effect of the Canadian Plan, as presently structured, is to deprive Deloitte & Touche, the Underwriters and others such as the former directors and officers of Philip who may have claims of contribution and indemnity as against Philip arising out of the same "nucleus of operative facts" pertaining to the class action claims, from pursuing those contribution claims in the Canadian CCAA proceeding. The same is true, but for different reasons, of the claim of Royal Bank with respect to its equipment leases. This is accomplished by carving out the claims in question from the CCAA proceedings and providing that they are to be dealt with under the U.S. Plan in U.S. Bankruptcy Court in accordance with the provisions of the *U.S. Bankruptcy Code. All claims against Philip* are to be dealt with in that fashion, notwithstanding that it was Philip which set in motion the CCAA proceedings in the first place and which sought and obtained the stay of proceedings preventing these very same claimants from pursuing their claims in Canada against it. At the same time, the Canadian Plan, but its very terms, is to be binding upon all holders of claims against Philip — including those which are subject to the Canadian Plan: see section 9.15 of the Canadian Plan. This is to be accomplished without even according the right to those claimants to vote on the Plan.

37      The binding nature of the Canadian Plan has the effect of requiring the responding claimants to provide releases in favour of Philip while they are at the same time not released by Philip from claims that might be subsequently

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

asserted against them. Furthermore, as the Plan presently stands, Deloitte & Touche and the Underwriters will be deemed to have released former directors and officers from claims for contribution and indemnity. The Class Action plaintiffs have chosen not to pursue the directors and officers, at the present time, and there is apparently upwards of $100 million in insurance that might be available to satisfy such claims. This is a matter of considerable concern for Deloitte & Touche and for the Underwriters. Philip has advised, during the course of these motions and before, that it does not intend the proposed Settlement or the Plan to preclude the ability of Deloitte & Touche and of the Under-writers to pursue the former officers and directors. For the present, however, the Plan is worded in such a way that they will be so precluded. The real point is that all of this is being visited upon the responding claimants without there being entitled to any say in the Canadian proceedings as to their willingness or lack of willingness to be so treated.

38      In my opinion it is the loss of the right to vote in the Canadian Plan which lies at the heart of the present di-lemma. The mere fact that a Canadian creditor's rights are to be dealt with and affected by single or parallel insolvency proceedings in the U.S. Bankruptcy Court — or that the reverse may be the case (U.S. creditor/Canadian Court) — is not necessarily sufficient, in itself, to undermine the fairness and reasonableness of a proposed Plan: see, for example *Roberts v. Picture Butte Municipal Hospital* (1998), 64 Alta. L.R. (3d) 218 (Alta. Q.B.); *Re Starcom Services Corp.*, Bankr. W.D. Wash., case no. M-98-60005, Nov. 20, 1998. In Canadian insolvency proceedings under the CCAA, however, it is the right to vote on the compromise or arrangement which the debtor company proposes to make with them which is the central counterpart, on the part of the creditors, to the debtors right to attempt to make that com-promise or arrangement. In my view, having chosen to initiate and take advantage of the CCAA proceedings, Philip cannot now evade the implications and statutory requirements of those proceedings by seeking to carve out certain pesky — and potentially large — contingent claimants, and to require them to be dealt with under a foreign regime (where they will be treated less favourably) while at the same time purporting to bind them to the provisions of the Canadian Plan. All of this without the right to vote on the proposal.

39      While the fact that their treatment under U.S. Bankruptcy law will apparently be considerably less favourable than their treatment under Canadian law is not determinative, it is certainly a factor for consideration when taken in conjunction with the loss of voting rights in the Canadian Plan. As counsel have presented it, contribution claimants such as Deloitte & Touche, the Underwriters and the directors and officers will have the status equivalent to *equity* holders under the U.S. Plan. Their claims will not be considered as unsecured *debt* claims in terms of priority ranking. Pursuant to the "cram down" provisions of the *U.S. Bankruptcy Code*, the Bankruptcy Court can approve a plan of reorganization even if a class of creditors votes not to accept the plan provided no junior-ranking class receives a distribution and the plan is otherwise fair and reasonable. Moreover, the U.S. Bankruptcy Court may on motion deem such a class of stakeholders to have voted to reject the plan in order to dispense with the necessity of having such a vote amongst its members. While Philip's deponents and counsel have not said as expressly, it is the clear inference from the materials filed that that is precisely the route which Philip proposes to follow *vis à vis* the contribution claimants whose claims have been left to be dealt with under the *U.S. Bankruptcy Code*.

40      For purposes of the CCAA the claim of an unsecured creditor includes a claim in respect of any indebtedness, obligation or liability which would be a claim provable in bankruptcy, and therefore includes a contingent claim for unliquidated damages. Thus, Deloitte & Touche, the Underwriters, the officers and directors, and Royal Bank are all entitled to assert claims in the CCAA proceedings. They are Canadian claimants, asserting claims against a Canadian company in a Canadian proceeding. In respect of the claims for contribution and indemnity those claims arise out of a "nucleus of operating facts" which the U.S. Courts — at the urging of Philip, amongst others — have already deter-mined are more conveniently litigated in Canadian class action proceedings.

41      In respect of the Royal Bank, the claim relates to some 57 equipment leases entered into between the Bank and Philip under lease agreements governed by the laws of Ontario and with respect to equipment located (with one ex-ception) in Ontario. However, under U.S. Bankruptcy laws, Philip would be entitled to "reject" leases, which it is not entitled to do under Ontario law, although it may of course "break" the leases if it is prepared to suffer the legal consequences. Again the attempt by Philip is to treat the claims under a regime which is more favourable to it and less so to the claimant. That attempt may not in itself be objectionable, but to the extent that it is accomplished by depriving

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

the creditor of its right to vote and to participate in the Canadian proceedings which were initiated for the purposes of shielding Philip against the claim, it is troubling.

42      The rights of creditors under the CCAA cannot be compromised unless,

a) the creditor has been given a right to vote, in the appropriate class, on the proposed compromise;

b) the creditor's vote is in accordance with a value ascribed to the claim by a Court approved procedure;

c) the class in which the creditor has been appropriately placed has voted by a majority in number and two-thirds in value in favour of the compromise; and,

d) the Court has sanctioned the compromise on the basis that it is fair and reasonable (with considerable deference being given by the Court in this regard to the votes of the creditors).

43      See CCAA, section 4,6 and 12; *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 12 O.R. (3d) 500 (Ont. Gen. Div.) at p. 510.

44      Here, for the reasons I have outlined, what Philip proposes is inconsistent with the foregoing.

45      Philip and the Lenders argue that the issues raised in this regard by the Respondents go entirely to the fairness find reasonableness of the U.S. and Canadian Plans, and that such considerations should be reserved for determination at the sanctioning hearings. I agree that generally speaking matters relating to fairness and reasonableness are better considered in the overall context of the final sanctioning hearing. Where, as here, however, the debtor company has acted earlier to obtain approval of a step in the restructuring process — in this case, the Class Action Settlement — which gives rise to issues that are inextricably linked to the overall fairness of the proposed Plan, and its compliance with statutory requirements, the consideration of those issues may be called for. This is one of those cases, in my opinion, because the reverberations of approving the proposed Settlement — in conjunction with the manner in which the debtor intends to treat other claimants directly affected by the settlement, have the effect of requiring those claimants to participate in the subsequent restructuring negotiations without a full deck of cards.

46      Philip and the Lenders also argue that "comity" demands that this Court defer to the U.S. Bankruptcy Court in allowing the claims of Deloitte & Touche, the Underwriters, the former directors and officers, and the Royal Bank to be dealt with in the U.S. Plan. They point out that in its Initial Order in the CCAA proceedings this Court approved an international Protocol which provides for co-operation between the U.S. and Canadian Courts, to the extent possible. I do not think that either comity or the question of whether the claims will be dealt with ultimately under the U.S. Plan, are the issues here. In addition, the effect of the Protocol as I read it — given the circumstances outlined above — is to provide some protection to claimants on either side of the border from being swept into the rigours of the other countries regimes where to do so might prevent them from asserting their substantive rights under the applicable laws of their own jurisdiction.

47      In this regard, the following provisions of the Protocol are worthy of note:

**(C) Comity and Independence of the Courts**

7. The approval and implementation of this Protocol shall not divest or diminish the U.S. Court's and the Canadian Court's independent jurisdiction over the subject matter of the U.S. Cases and the Canadian Case, respectively. By approving and implementing the Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any in-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

fringement on the sovereignty of the United States or Canada.

8. The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct and hearing of the U.S. Cases. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct and hearing of the Canadian Cases.

9. In accordance with the principles of comity and independence established in paragraphs 7 and 8 above, nothing contained herein shall be construed to:

> • increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada ...;

> • *preclude any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada* or any other jurisdiction including, without limitation, the rights of interested parties or affected persons to appeal from the decisions taken by one or both of the Courts.

(emphasis added)

**(J) Preservation of Rights**

> 27. *Neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall prejudice or affect the* powers, rights, *claims* and defenses *of* the Debtors and their estates, the Committee, the Estate Representatives, the U.S. Trustee *or any of the Debtors' creditors under applicable law, including the Bankruptcy Code and the CCAA.*

(emphasis added)

48    The extension of comity as between Courts in cross-border insolvency situations, and co-operation generally in such matters, are matters of great importance, to be sure, in order to facilitate the successful and orderly implementation of insolvency arrangements in such circumstances. Nothing I have said in these Reasons is intended to counter that ethic. However, comity and international co-operation do not mean that one Court must cede its authority and jurisdiction over its own process or over the application of the substantive laws of its own jurisdiction, whenever any kind of differences between the two jurisdictions may arise. Both the Protocol and the provisions of subsection 18.6(2) of the CCAA — which gives this Court authority "to make such orders and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a co-ordination of proceedings under [the CCAA] with any foreign proceeding" — confirm this. Subsection 18.6(5) of the CCAA provides that "nothing in this section requires the Court to make any order that is *not in compliance with the laws of Canada* or to enforce any order made by a foreign court" (emphasis added).

49    Here, there is yet no order of the U.S. Court, or treatment of the Claimants or Debtor to which comity may be extended, but there is — as I have outlined above — a failure to comply with the requirements of insolvency laws and procedure of Canada, as stipulated in the CCAA. I conclude, therefore, that the Canadian Plan as it presently stands is flawed because it seeks to exclude Canadian claimants from participation in its process by providing that their claims against Philip itself are to be governed by and treated in the U.S. proceedings while at the same time seeking to bind them to the provisions of the Canadian Plan, all without affording those claimants any right to vote.

50    There was much debate in argument over whether the issue of treatment of the claims in the Canadian or U.S. proceedings was a function of the "real and substantial connection" of Philip with the U.S. jurisdiction, or a function of the "real and substantial connection" of the responding claimants and their claims to the Canadian proceedings. There

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

is no doubt that Philip has a substantial connection with the United States in terms of the residence of the majority of shareholders and the location of the majority of operating assets. This connection certainly justifies the U.S. Chapter 11 proceedings. However, Philip also has a substantial connection to Canada, with its headquarters in Ontario, its Canadian subsidiaries, and its 94 locations and 2,000 employees throughout the country. This connection, together with its array of Canadian creditors, sustains the resort to the CCAA proceedings.

51     I do not think that the analysis falls to be made, in these particular circumstances, on purely *foreign conveniens* grounds. It is not the situation than that. Philip initiated the CCAA proceedings and sought and accepted the benefits flowing from that step. The responding claimants seek to assert claims in the Canadian proceeding against the Canadian company which instituted those proceedings, in relation to matters arising out of a Canadian class proceeding or (in the case of Royal Bank) out of Canadian contracts and equipment largely located in Canada. The substantive law of Canada under the CCAA, and the procedures therein laid down, entitle them to assert those claims in the Canadian proceedings and to have a vote on the "Plan" which is set forth by the debtor company to compromise them. They should not be deprived of those substantive and procedural rights without having any say in the matter. Putting it another way, I am satisfied that the unquestioned "juridical advantage" which Philip seeks to achieve through its proposed treatment of the responding claimants is outweighed by the unquestioned "juridical disadvantage" on the part of the latter, given that the juridical scales would otherwise be tipped towards Philip through the resort to a stratagem which in my view is not sanctioned under the CCAA.

52     Philip and the Lenders argue that there is great urgency to effect the restructuring process, and that requiring Philip to adhere to the procedures relating to classification, the valuation of claims, and voting — with the numerous issues that may have to be determined in that context — may well doom the process from the beginning. The Lenders are truculent, as their secured position leads them to be; they say that if the reorganization is not completed quickly they may simply abandon the process and exercise their rights to realize on their security, and the entire restructuring process will fail, with dire consequences for all concerned. Mr. McDougall, on behalf of Deloitte & Touche, characterized this as "the cry of doom."

53     I am very aware of the need for timeliness in situations such as these — particularly given the sensitive nature of Consolidated Philip's service oriented business. However, I do not think that the need for a timely resolution alone is justification for depriving claimants of their substantive rights under Canadian law, and for abrogating their right to vote which lies at the very heart of the Canadian restructuring process from the creditor's perspective. It is the tool which gives them ultimate leverage in the bargaining process, and without it their practical rights — as well as their substantive and procedural ones — are greatly diminished.

## III — Conclusion

54     An order will therefore go in terms of the foregoing.

### The Class Proceedings

55     As indicated, an Order is granted certifying the CPA Proceeding as a class proceeding, pursuant to subsection 5(1) of the *Class Proceedings Act*, as against Philip only and for settlement purposes only. The certification is without prejudice to any arguments the other defendants in the CPA Proceeding may wish to make in opposition to any element of the plaintiffs' claim including, but not limited to, certification of a class as against them. In addition, notice of the certification and of the pending motion for approval of the proposed Settlement is to given to members of the class as certified, in accordance with the provisions of section 17 of the *Act*. The question of approval of the Settlement, in its present form or some other form as may be advised, is adjourned to a date to be fixed which is more contemporaneous with the sanctioning hearing.

### The Fairness/Substantive Law Issues

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 3240, 11 C.B.R. (4th) 262, 39 C.P.C. (4th) 287

56      Notwithstanding the observations in these Reasons about the Canadian Plan and the treatment of claims in the U.S. proceedings, I am reluctant to grant the sweeping declaratory relief sought by the Respondents. Whether the Plan is ultimately found to be fair and reasonable and in accordance with all necessary requirements remains still a matter for determination in the sanctioning hearing, after all the negotiations have been concluded and the votes counted. As much as is reasonably possible should be left to that process.

57      I am prepared to make an Order, however — and do — declaring that the Canadian Plan as it is presently constituted fails to comply with the procedural and statutory requirement of the CCAA regime in that it seeks to exclude the responding claimants from participation in its process by providing that their claims against Philip itself are to be governed by and treated in the U.S. proceedings while at the same time seeking to bind them to the provisions of the Canadian Plan, all without affording those claimants any right to vote. Anything further in this respect, it seems to me, should be left to the negotiation arena.

58      The position of the Royal Bank is slightly different. It is entitled, in addition, to an order,

   a) declaring that the claim of Royal Bank against Philip under certain leases shall be determined with reference to Canadian law and in the Canadian proceedings;

   b) amending the Canadian Plan so that the Bank's claim is not dealt with in the U.S. Plan; and,

   c) amending sub-paragraph 14(d) of the Initial Order granted in the CCAA proceeding on June 25, 1999 — which presently permits Philip to terminate any and all arrangements entered into by them — by providing that the sub-paragraph does not apply to the Royal Bank leases of personal property.

59      There will be no order as to costs.

60      Order accordingly.

*Orders accordingly.*

FN1 These various actions were eventually consolidated and transferred to the United States District Court, Southern District of New York, by order dated June 2, 1998.

FN2 The common issue is very broadly and vaguely defined, and while such a definition has received approval in other cases, I do not mean to be taken as having approved such a definition for any purposes other than those of this particular case.

FN3 To use the phrase adopted by the parties.

END OF DOCUMENT

\\apps1\users\creerym\Nortel\Menegon.doc

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

### Roberts v. **Picture Butte** Municipal Hospital

Wanda Mae Roberts, a.k.a. Wanda Mae Lichuk, and Alan Roberts, Plaintiffs and **Picture Butte** Municipal Hospital, St. Michael's General Hospital, Dr. Tom Melling, McGhan Medical Corporation and Dow Corning Corporation, Defendants

Alberta Court of Queen's Bench

Forsyth J.

Judgment: July 10, 1998
Docket: Calgary 8901-12679

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *G.J. Bigg*, for Plaintiffs.

*K.M. Eidsvik*, for Defendant, McGhan Medical Corporation.

*F. Foran, Q.C.*, for Defendant, Dow Corning Corporation.

*J. Shriar*, for Defendants, **Picture Butte** Municipal Hospital and St. Michael's General Hospital.

*P. Leveque*, for Defendant, Dr. Tom Melling.

Subject: Insolvency; Civil Practice and Procedure

Practice --- Disposition without trial — Stay or dismissal of action — Grounds — Another proceeding pending — General

Plaintiffs brought action against manufacturer arising out of failure of its silicone gel implants — Class action had been commenced by other litigants in United States arising out of failure of implants — Manufacturer sought and received protection under United States Bankruptcy Code — Under s. 362 of Code all actions or proceedings against manufacturer to recover claims that arose before claims bar date were automatically stayed — Manufacturer applied for permanent stay of plaintiffs' action against it on grounds that Alberta court should recognize jurisdiction of United States Bankruptcy Court — Application granted — Plaintiffs had attorned to jurisdiction of U.S. Bankruptcy Court by filing proof of claim — Even if there had been no attornment, U.S. Bankruptcy Court was best forum for case in interest of promoting international comity — Clear wording of Code, similar philosophies and procedures in Canada and U.S., number of claims outstanding and fact that Plan of Reorganization filed with U.S. Bankruptcy Court had been accepted in Ontario and Quebec, favoured recognition of U.S. proceedings — United States Bankruptcy Code, 11 U.S.C. 1982, s. 362.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

**Cases considered by *Forsyth J.*:**

*Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 3 W.W.R. 441, 14 C.P.C. (3d) 1, [1993] 1 S.C.R. 897, 150 N.R. 321, 23 B.C.A.C. 1, 39 W.A.C. 1, 102 D.L.R. (4th) 96, 77 B.C.L.R. (2d) 62 (S.C.C.) — applied

*Antwerp Bulkcarriers N.V., Re* (1996), 48 C.B.R (3d) 109, 43 C.B.R. (3d) 284 (Que. S.C.) — referred to

*Microbiz Corp. v. Classic Software Systems Inc.* (1996), 45 C.B.R. (3d) 40 (Ont. Gen. Div.) — applied

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077 (S.C.C.) — applied

*Neese, Re* (1981), 12 B.R. 968 (U.S. Bankr. W.D. Va.) — applied

*Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.) — referred to

*Pitts v. Hill & Hill Truck Line Inc.* (1987), 53 Alta. L.R. (2d) 219, 66 C.B.R. (N.S.) 273, 84 A.R. 333 (Alta. Master) — applied

*Taylor v. Dow Corning Australia Pty. Ltd.* (December 19, 1997), Doc. 8438/95 (Australia Vic. Sup. Ct.) — applied

*Tradewell Inc. v. American Sensors & Electronics Inc.*, 1997 WL 423075 (U.S. S.D. N.Y.) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3

    Generally — referred to

    s. 2(1) "property" — considered

    s. 69(1)(a) [rep. & sub. 1992, c. 27, s. 36(1)] — considered

*Bankruptcy Code*, 11 U.S.C. 1982 (U.S.)

    Generally — considered

    s. 362 — considered

    s. 362(a)(1) — considered

    s. 362(a)(3) — considered

    s. 541 — considered

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

Generally — referred to

APPLICATION by manufacturer for permanent stay of plaintiffs' action for damages arising from faulty product.

*Forsyth J.*:

**Application**

1    This is an application by the Defendant Dow Corning Corporation ("DCC") for a permanent stay of proceedings against it. DCC is now the only remaining Defendant in this action, as the actions against the other four Defendants were dismissed on the basis of having been commenced outside of the applicable limitation periods. DCC applies for a permanent stay of these proceedings on the grounds that this Court should recognize the jurisdiction of the United States Bankruptcy Court for the Eastern District of Michigan, Northern Division. The Plaintiffs, Wanda and Alan Roberts, argue that a stay is inappropriate.

**Background**

2    The female Plaintiff underwent surgery in 1981 for bilateral fibrocystic disease and mammary dysplasia in both breasts. Also in 1981, she received silicone gel breast implants manufactured by McGhan Medical Corporation ("McGhan"), a former Defendant. After problems with those implants, they were replaced in June 1983 with silicone gel implants manufactured by DCC. Soon after, one implant was found to have ruptured, necessitating surgery to clean up as much silicone as possible from her system.

3    Since that time, the female Plaintiff alleges widespread pain and problems, which she blames on the silicone gel released into her body. For this application, it is not necessary nor appropriate for me to comment on her symptoms or their cause.

4    The Plaintiffs started this action on August 31, 1989. There was also class action litigation in the U.S which coordinated all claims arising out of the failure of both McGhan and DCC implants. That class action collapsed when DCC sought bankruptcy protection on May 15, 1995 under Chapter 11 of the *United States Bankruptcy Code* (the "*U.S. Bankruptcy Code*"). Section 362 of the *U.S. Bankruptcy Code* imposes an automatic stay on all actions or proceedings against DCC to recover claims that arose before the claims bar date.

5    The U.S. Bankruptcy Court set February 14, 1997 as the foreign claims bar date (the deadline for filing claims in the bankruptcy proceedings). The Plaintiffs filed proofs of claim in that U.S. proceeding on January 17, 1997. More than 700,000 proofs of claim were filed from many countries, including more than 30,000 by Canadian residents.

**Legislation**

6    DCC is asking that this Court recognize the proceedings in the U.S. Bankruptcy Court. The *U.S. Bankruptcy Code* provides for an automatic stay once bankruptcy proceedings are commenced in the U.S.:

362 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of -

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, ad-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

> ministrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

>       . . . . .

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

Section 541 provides that "property of the estate" is comprised of various types of property "wherever located and by whomever held".

7       Therefore, the stay purports to be extra-territorial, applying, for example, in Alberta. It is then up to this Court to decide whether the principles of comity favour upholding the stay in this jurisdiction. As the Plaintiffs emphasize, comity is a discretionary matter. I am not bound by the stay imposed by the *U.S. Bankruptcy Act.*

8       I note that the Canadian legislation has a similar provision (*Bankruptcy and Insolvency Act ("BIA")*, R.S.C. 1985, c. B-3):

> 69(1) Subject to subsections (2) and (3) and sections 69.4 and 69.5 on the filing of a notice of intention under section 50.4 by an insolvent person,

> (a) no creditor has any remedy against the insolvent person or the insolvent person's property, or shall commence or continue any action, execution or other proceedings, for the recovery of a claim provable in bankruptcy,

Under s. 2(1) "property" of the *BIA*:

> "property" includes money, goods, things in action, land and every description of property, whether real or personal, legal or equitable, and whether situated in Canada or elsewhere, ...

9       The Plaintiffs accept that the *U.S. Bankruptcy Code* governs DCC's estate, and that the Plaintiffs are creditors under the jurisdiction of the U.S. Bankruptcy Court.

**Plan or Reorganization**

10      DCC filed a Plan of Reorganization (the "Plan") with the Bankruptcy Court on August 25, 1997. The Bankruptcy Court rejected this Plan, and an amended plan was presented on February 17, 1998. The Bankruptcy Court approved that Plan, which now has to be voted upon by the various classes of creditors. DCC's proposed Plan would allow it to pay most creditors and continue operating. To manage product liability claims, DCC would establish and fund two trusts with up to $2.4 billion U.S. DCC would separately pay approximately $1 billion to commercial creditors over seven years.

11      Breast implant claimants would have four settlement paths, based on their history, symptoms and past and proposed treatment. Any claims not settled by agreement under the Plan process would go to common issue trials. Any claims remaining after common issue trials would undergo individual claims review and mediation. The last resort would be individual litigation. These individual trials would be held in the U.S., dismissed in favour of litigation in the claimant's home jurisdiction, or held in the U.S. using the law of the claimant's home jurisdiction. The Plan is designed to solve as many claims as possible in an orderly and expeditious manner.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

12    The U.S. procedure provides that once the Bankruptcy Court approves a Plan, it is sent to the creditors for a vote. The creditors vote by class. All of the Canadian breast implant claimants are in the foreign claimants' class of creditors. If more than two-thirds of those voting in a class approve, the Plan is considered approved by the class. After the vote, the Bankruptcy Court holds a confirmation hearing. It may confirm the Plan if it meets the *U.S. Bankruptcy Code* requirements. In DCC's words, the Bankruptcy Court must conclude:

> (i) that the Plan was proposed in good faith;

> (ii) that each class of creditors that does not vote to accept the Plan will receive at least as great a recovery as such creditors would have received had the debtor been liquidated under the liquidation procedures provided in Chapter 7 of the *Bankruptcy Code*; and

> (iii) that the Plan does not discriminate unfairly against any class of creditors that does not vote to accept the Plan.

Therefore, the Bankruptcy Court may approve a Plan even if all classes of creditors do not vote to accept it, as long as that Court finds the Plan does not discriminate unfairly against the rejecting class.

13    The originally proposed Plan did not make it to the creditor review stage. The Bankruptcy Court apparently had a number of concerns, one of which was the treatment of the foreign claimants. The Plaintiffs raise that concern in this Court also. The proposed settlement payments for foreign claimants would range from 35 to 60 per cent of those offered to U.S. claimants, on the theory that product liability litigation yields lower damage awards in non-U.S. jurisdictions. The proposed settlement for Canadian claimants is 60 per cent of the payments offered to U.S. claimants. According to DCC's affidavit (by Craig J. Litherland, dated December 12, 1997), some of the differing factors among U.S. and foreign jurisdictions are:

> a. the absence of contingency fee arrangements;

> b. the responsibility of judges rather than juries to asses [sic] liability and damages;

> c. the award of costs to prevailing litigants;

> d. limitations on theories of liability and recovery;

> e. limited pretrial procedures;

> f. the absence of the 'deep pocket expectation' prevalent in the United States resulting in lower damage awards;

> g. lower damage awards for pain and suffering;

> h. less or no punitive damages; and

> i. nationalized health care insurance and other benefits that are either directly deducted from an award or operate to reduce the likelihood of a large damage award.

Of course, not all of these factors would apply in any one non-U.S. jurisdiction.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

14    The Plaintiffs claim the foreign discount is discriminatory and inequitable. Not all of the factors are applicable in Alberta. Moreover, some simply try to shift the burden from DCC to other entities (such as the Canadian medicare system). In addition, the Plaintiffs claim that taking 40 per cent away from foreign claimants leaves that much more for U.S. claimants. DCC argues that the procedure is fair, not necessarily equal. It also emphasizes that the foreign discount only applies to settlements. Any claims that proceed to individual trials would not be discounted.

15    The amended Plan will be put to the creditors. It may be that the Plan will be confirmed, even if the foreign claimants' class rejects it.

## Analysis

### General Principles

16    Where an appropriate forum must be chosen, the Courts may grant a stay of proceedings. In the words of the Supreme Court of Canada: "This enables the court of the forum selected by the Plaintiffs (the domestic forum) to stay the action at the request of the Defendant if persuaded that the case should be tried elsewhere." (*Amchem Products Inc. v. British Columbia (Workers' Compensation Board), [1993] 1 S.C.R. 897* (S.C.C.), at 912). This decision is completely discretionary. I am not bound to defer to the U.S. bankruptcy proceedings.

17    *Amchem* also discusses the vital principle of comity (at 913-14, citing *Morguard Investments Ltd. v. De Savoye, [1990] 3 S.C.R. 1077* (S.C.C.), at 1096):

'Comity' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws. ...

18    After cautioning against abusing the power to enjoin foreign litigation, the S.C.C. in *Amchem* outlined the test for restraining foreign proceedings. Although a case on anti-suit injunctions, the first part of the test also relates to stays. The Court must determine if there is a forum other than the domestic forum which is "clearly more appropriate" (at 931). If not, the domestic forum should refuse to stay the domestic proceedings. At 931-32, the S.C.C. continued:

In this step of the analysis, the domestic court as a matter of comity must take cognizance of the fact that the foreign court has assumed jurisdiction. If, applying the principles relating to *forum non conveniens* outlined above, the foreign court could reasonably have concluded that there was no alternative forum that was clearly more appropriate, the domestic court should respect that decision and the application should be dismissed. When there is a genuine disagreement between the courts of our country and another, the courts of this country should not arrogate to themselves the decision for both jurisdictions. In most cases it will appear from the decision of the foreign court whether it acted on principles similar to those that obtain here, but, if not, then the domestic court must consider whether the result is consistent with those principles.

19    As La Forest J. stated in *Morguard Investments Ltd. v. De Savoye (1990), 76 D.L.R. (4th) 256* (S.C.C.) at 268, modern states "cannot live in splendid isolation". They must follow comity, which is "the deference and respect due by other states to the actions of a state legitimately taken within its own territory."

20    Comity and cooperation are increasingly important in the bankruptcy context. As internationalization increases, more parties have assets and carry on activities in several jurisdictions. Without some coordination, there would be multiple proceedings, inconsistent judgments and general uncertainty. See, for example, comments in *Olympia & York Developments Ltd. v. Royal Trust Co. (1993), 20 C.B.R. (3d) 165* (Ont. Gen. Div.); *Antwerp Bulk-*

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

*carriers N.V., Re* (1996), 43 C.B.R. (3d) 284 (Que. S.C.); and J.D. Honsberger, "*Canadian Recognition of Foreign Judicially Supervised Arrangements*" (1989), 76 D.B.R. (N.S.) 86.

21      I also note that U.S. Courts have shown themselves willing to grant comity in similar circumstances. For example, a Bankruptcy Court granted comity in *Tradewell Inc. v. American Sensors & Electronics Inc.*, 1997 WL 423075 (U.S. S.D. N.Y. 1997). In that case, all proceedings against the Defendant Canadian corporation were stayed under the *Companies' Creditors Arrangement Act*. The Defendant successfully applied to the U.S. Bankruptcy Court for a stay in the U.S. based on comity. That Court stated that U.S. public policy should recognize the foreign proceedings, thus facilitating the "orderly and systematic distribution" of the debtor's assets. This was especially true for Canada, which has similar procedures and procedural safeguards.

### Discussion

22      The *U.S. Bankruptcy Code* provision imposing a stay once bankruptcy proceedings have begun is comparable to Canada's *BIA* provision. They also both have the same underlying philosophy - to ensure a fair distribution of assets among all creditors, not just those who happen to have begun proceedings prior to the initiation of bankruptcy. In a situation such as DCC's, there is another motive - if all matters can be stayed, there is a better chance that the DCC will be able to restructure successfully.

23      The number of claims is significant. The U.S. Bankruptcy Court has decided that it is impractical and unfair to have thousands of individual claims going through the adversarial court system. Instead, it agrees with DCC's proposal to settle as many as possible, hold common issue trials as appropriate, then have as many individual trials as still necessary. This appears logical and in the interests of all creditors as a group.

24      An additional consideration is that the Plaintiffs have filed proofs of claim in the U.S. bankruptcy proceedings. The Plaintiffs have, therefore, attorned to the jurisdiction of the U.S. Bankruptcy Court. As stated in *Neese, Re,* 12 B.R. 968 (U.S. Bankr. W.D. Va. 1981) at 971:

> ... [the] defendants voluntarily availed themselves of the jurisdiction of this Court when they filed, by counsel, proofs of claim in the underlying title 11 bankruptcy case. ... Having filed their proofs of claim in the underlying bankruptcy case, the defendants cannot now deny this Court's personal jurisdiction over them in a proceeding directly related to that case.

The same principles apply in Canada - see, for example, *Microbiz Corp. v. Classic Software Systems Inc.* (1996), 45 C.B.R. (3d) 40 (Ont. Gen. Div.); and *Pitts v. Hill & Hill Truck Line Inc.* (1987), 66 C.B.R. (N.S.) 273 (Alta. Master).

25      The Plaintiffs argue that foreign claimants are not treated fairly by the proposed Plan because their settlement package would be at a discount from that given to U.S. claimants. However, there are several safeguards to prevent unfairness. First, the Plaintiffs, along with the rest of the class, have the opportunity to vote against the Plan. If, as a class, they vote against it, the U.S. Bankruptcy Court can only confirm the Plan if it feels the Plan does not "discriminate unfairly" against classes which rejected it. I understand this to mean that treatment can be fair across classes without being equal, as long as there is equality within the class itself. Second, the Plaintiffs are not obliged to settle under the Plan. They may proceed to trial. Third, this Plan actually protects creditors. If there were no stay and no Plan, only the first to trial and judgment would receive any compensation at all, and trials could potentially drag on for many years. Under the Plan, each creditor will receive something and will receive it much sooner.

26      I do not comment on the factors used to assess the discount rate for foreign claimants, except to say that they were not all intended to relate to each foreign jurisdiction. If these factors are accepted by the U.S. Bankruptcy Court in the exercise of its jurisdiction, a jurisdiction to which it is appropriate for me to grant comity and to which the Plaintiffs have attorned, then it is not for me to decide if I would have accepted the factors.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 646, 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443, [1998] A.J. No. 817

27      The Plaintiffs also argue that the recent Australian case *Taylor v. Dow Corning Australia Pty. Ltd.* (December 19, 1997), Doc. 8438/95 (Australia Vic. Sup. Ct.) should persuade me to dismiss this stay application. There, the Australian Court denied Dow Corning Australia's ("DCA's") application for a stay of proceedings in an action by an Australian plaintiff against DCA. While not binding on me in any event, the reasons in *Taylor* are clearly distinguishable.

28      DCA is a solvent subsidiary of DCC. DCC was initially a defendant, but that plaintiff discontinued against DCC. The Court ruled that any judgment against DCA would not disadvantage creditors of DCC. Further, the plaintiff was entitled to be treated as a creditor of DCA, not DCC.

29      In addition, that plaintiff did not file a proof of claim in the U.S. bankruptcy proceedings. This is extremely significant. In the present case, the Plaintiffs deliberately attorned to the U.S. jurisdiction by filing proofs of claim. In *Taylor*, the plaintiff deliberately did not. There is obiter in *Taylor*, as the Court held attornment was not relevant where a solvent subsidiary, not the insolvent parent, asks for the stay.

30      Finally, the Plaintiffs argue that I should not grant a stay when the U.S. Bankruptcy Court has not been asked to grant an injunction against non-U.S. proceedings such as this. For example, the Australian Court in *Taylor* queried why DCC had not requested such an injunction and concluded one would have been denied in any event. In the present case, however, an injunction is not necessary. The *U.S. Bankruptcy Code* itself provides for a stay of all proceedings against DCC. This is not comparable to *Taylor*, where the defendant was DCA, not DCC itself.

**Order**

31      In the circumstances of this case, the U.S. Bankruptcy Court has apparently decided that fairness among creditors is achieved without having complete equality across all classes of creditors. The Plaintiffs attorned to that jurisdiction. However, even had there been no attornment, I find that common sense dictates that these matters would be best dealt with by one Court, and in the interest of promoting international comity it seems the forum for this case is in the U.S.Bankruptcy Court. Thus, in either case, whether there has been an attornment or not, I conclude it is appropriate for me to exercise my discretion and apply the principles of comity and grant the Defendant's stay application. I reach this conclusion based on all the circumstances, including the clear wording of the *U.S. Bankruptcy Code* provision, the similar philosophies and procedures in Canada and the U.S., the Plaintiffs' attornment to the jurisdiction of the U.S. Bankruptcy Court, and the incredible number of claims outstanding. Lastly, while not determinative, I found it significant that there has been acceptance of the Plan in Ontario and Quebec. This not only suggests that the Plan proposes a reasonable offer, but it also suggests that the parties affected in these provinces have accepted the principle that international comity should be recognized in these proceedings.

*Application granted.*

END OF DOCUMENT

\\apps1\users\creerym\Nortel\PictureButte.doc

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



## *Ex parte* ROBERTSON.   *In re* MORTON.

C. J. B.
1875
May 24;
June 7.

*Bankruptcy—Jurisdiction—Foreign Creditor resident Abroad—Effect of Proving Debt—Notice of Motion—Service out of Jurisdiction—Waiver of Irregularity —Bankruptcy Act, 1869 (32 & 33 Vict. c. 71), ss. 2, 72–76—Bankruptcy Rules, 1870, r. 50.*

A foreign creditor, residing out of the jurisdiction of the Court of Bankruptcy, by proving a debt in a bankruptcy or liquidation, brings himself within the general jurisdiction of the Court as to the administration of the estate, just as if he were residing within it.  An order can therefore be made on him to restore property of the bankrupt or debtor improperly in his possession.

A notice of motion was served out of the jurisdiction on the Respondent. No order authorizing the service had been obtained from the Court.  The Respondent appeared on the hearing of the motion, and objected to the jurisdiction of the Court.  On his objection being overruled, he asked for and obtained an adjournment to enable him to answer the case on its merits :—

*Held,* that there had been a mere irregularity in the service, and that it had been waived.

THIS was an appeal from a decision of the Judge of the *Newcastle-on-Tyne* County Court.

*William Morton* and *Edmund Morton,* potato merchants at *Newcastle,* filed a liquidation petition on the 18th of February, 1874, and the same day a receiver and manager of their property and business was appointed.  At the first meeting of the creditors, on the 13th of March, 1874, the creditors resolved on a liquidation by arrangement, and appointed *J. B. Benson* and *J. Greener* trustees of the debtors' property.

The debtors had been in the habit of purchasing potatoes from *Donald Robertson,* a potato merchant, who resided at *Mayfield,* in the parish of *Cupar,* in *Scotland,* and was a domiciled Scotchman. He had no residence or place of abode in *England.*  On the 17th of February, 1874, the debtors owed him £367 2s. 11d. for potatoes, and they sent him by post a cheque for £120, drawn upon Messrs. *Lambton & Co.,* bankers at *Newcastle.*  He received this cheque on the 18th of February, and paid it to his bankers, by whom it was sent the same day back to *Newcastle,* and it was on the 19th of February honoured by *Lambton & Co.,* who were then ignorant of the filing of the liquidation petition.

EQUITY CASES.                      [L. R.

C. J. B.
1875
Ex parte
ROBERTSON.
In re
MORTON.

*Robertson* proved in the liquidation for £247 2s. 11d., the balance remaining due to him after giving credit for the £120 ; the proof was admitted by the trustees, and on the 27th of October, 1874, they paid him a dividend of 4s. 6d. in the pound.

The above-mentioned facts afterwards came to the knowledge of the trustees, and on the 6th of March, 1875, *Robertson* was served at *Mayfield* with a notice of motion on their behalf, stating that an application would be made to the County Court on the 12th of March for an order that he should repay the £120 to the trustees. No order for service on him had been made. On the 12th of March, Mr. *Philipson*, a solicitor at *Newcastle*, appeared on behalf of *Robertson*, and objected that the Court had no jurisdiction over him. The Judge overruled the objection, and Mr. *Philipson* then asked for an adjournment, on the ground that he was not then prepared to go into the merits of the case. The Judge granted an adjournment for a month, on the terms of *Robertson* paying £100 into Court within a fortnight, and also paying the costs of the adjournment. On the subsequent hearing of the motion on the 23rd of April, counsel appeared for *Robertson*, and took the objection as to the jurisdiction. The Judge overruled it, and *Robertson's* counsel withdrew before the evidence on the merits of the case was heard. *Robertson* had filed an affidavit in which he took the objection of want of jurisdiction, on the ground that he was a domiciled Scotchman, having no residence in *England*, and also deposed to facts bearing on the merits of the case. The Judge made an order in the terms of the notice of motion.

*Robertson* appealed.

Mr. *De Gex*, Q.C., and Mr. *Finlay Knight*, for the Appellant :—

An English Court of Bankruptcy has no jurisdiction over a domiciled Scotchman resident in *Scotland*. If this had not been a case of bankruptcy, no action could have been brought in an English Court against the Appellant to recover this money ; he must have been sued in *Scotland*. Sects. 66 and 72 (1) of the

(1) Sect. 65 provides that "the Chief Judge in Bankruptcy shall have all the powers, jurisdiction, and privileges possessed by any Judge of Her Majesty's Superior Courts of Common Law at *Westminster*, or by any Judge of Her Majesty's High Court of Chancery, and the orders of such Judge

*Bankruptcy Act,* 1869, do not give the Court of Bankruptcy a jurisdiction larger than that of the Court of Chancery or one of the superior Courts of Common Law.

Moreover, the notice of motion was not effectually served on the Appellant. In *Ex parte O'Loghlen* (1) it was held that a debtor's summons could not be served out of the jurisdiction, there being no power given by the Act or the Rules to effect a service there, and that such a service, though made under an express order of the Court, was a nullity. This applies equally to service of a notice of motion under Rule 50 of the *Bankruptcy Rules,* 1870 (2), for no power is given to serve the notice out of the jurisdiction, and the shortness of the interval allowed for service shews that the rule could not have contemplated service out of the jurisdiction.

[They were stopped by the Court.]

Mr. *Little,* Q.C., and Mr. *Colt,* for the trustees:—

The Appellant having proved and received a dividend, the Court has complete jurisdiction under sect. 72 to compel him to refund any part of the debtors' estate which is improperly in his hands. Sect. 74 of the Act enables the Scotch Courts, which have jurisdiction in bankruptcy, to enforce in *Scotland* orders made by the English Bankruptcy Courts, and sect. 75 makes the English and Scotch Bankruptcy Courts auxiliary to each other. The order in this case was rightly made by the English Court, but it must be

<div style="margin-right:auto; text-align:right;">

C. J. B.

1875

*Ex parte*
ROBERTSON.

*In re*
MORTON.

</div>

---

shall be of the same force as if they were judgments in the Superior Courts of Common Law, or decrees in the High Court of Chancery."

Sect. 66: "Every Judge of a local Court of Bankruptcy shall, for the purposes of this Act, in addition to his ordinary powers as a County Court Judge, have all the powers and jurisdiction of a Judge of Her Majesty's High Court of Chancery, and the orders of such Judge may be enforced accordingly in manner prescribed."

Sect. 72 provides that, "Subject to the provisions of this Act, every Court having jurisdiction in bankruptcy under this Act shall have full power to decide

all questions of priorities, and all other questions whatsoever, whether of law or fact, arising in any case of bankruptcy coming within the cognizance of such Court, or which the Court may deem it expedient or necessary to decide for the purpose of doing complete justice, or making a complete distribution of property in any such case."

(1) Law Rep. 6 Ch. 406.

(2) Rule 50 provides that a notice of motion must be "served upon the party or parties to be affected thereby four clear days at least before the day named in such notice as the day when the motion is to be made."

EQUITY CASES. [L. R.

C. J. B.
1875
*Ex parte*
ROBERTSON.
*In re*
MORTON.

enforced by the Scotch Court. In *Ex parte Tait* (1) it was held that the Court had jurisdiction to restrain a creditor from suing in *Ireland* in respect of a debt included in a deed which the debtor had executed under the *Bankruptcy Act*, 1861. Under the old bankruptcy law it was held that a creditor who had proved was subject to the jurisdiction of the Court in respect of his proof : *Ex parte Hilton* (2). As to the service of the notice of motion, there has been nothing more than an irregularity, which has been waived by the Appellant's asking for time to answer the case on its merits, and filing an affidavit upon the merits. *Ex parte O'Loghlen* (3) does not apply.

Mr. *De Gex* in reply :—

The service out of the jurisdiction was, as is shewn by the *ratio decidendi* of *Ex parte O'Loghlen*, a complete nullity—not a mere irregularity which could be waived. As to the jurisdiction, my argument is that this proceeding is equivalent to the bringing of any action for money had and received in an English Court against a domiciled Scotchman resident in *Scotland*. That cannot be done. *Davis* v. *Park* (4) and *Cookney* v. *Anderson* (5) shew very clearly what are the principles which govern the territorial jurisdiction of Courts. Sect. 72 of the Act gives the Court of Bankruptcy no higher jurisdiction than that of the Court of Chancery or the Courts of Common Law. *Ex parte Tait* does not apply. Proof of debt does not amount to a complete submission to the jurisdiction of the Court. *Ex parte Hilton* only shews that the dividend on the debt proved for may be retained, or that a dividend paid may be recalled. It is no authority for saying that the Court has jurisdiction to order a creditor who has proved to repay some other fund which he has received from the debtor. *Ex parte Dobson* (6) shews that the Court formerly had no such power, and I say that sect. 72 does not confer it.

SIR JAMES BACON, C.J. :—

Two objections have been taken to this order. The first and

(1) Law Rep. 13 Eq. 311.
(2) 1 Jac. & W. 467.
(3) Law Rep. 6 Ch. 406.
(4) 42 L. J. (Ch.) 204, 208.
(5) 1 D. J. & S. 365.
(6) 1 Mont. & A. 666.

larger one is that the Court has no jurisdiction to make such an order against the Appellant because he is a domiciled Scotchman. The second is that the Court has proceeded erroneously in making the order, even if it had a right in other respects to make it, because there had been no proper service of the notice of motion. The two questions are totally distinct from each other; the first, the larger and more important one, being whether, under the existing Act of Parliament and the existing practice of the Bankruptcy Court, the Court at *Newcastle* had power to make an order directing the Appellant to pay back the £120, part of the debtors' estate, which he had received. Now, that is a question, no doubt, of very great importance. Every question, indeed, of jurisdiction is of vital importance. The question can be decided only by an inspection of the existing Act of Parliament. That there was a valid bankruptcy, or an arrangement which is equivalent to bankruptcy, prosecuted in the proper Court, is not questioned in the slightest degree. Then the 72nd section of the Act provides:— [His Lordship read the section.]

. Now let us inquire, first, whether the subject-matter of this application comes within those words. It is not disputed that on the 18th of February an act of bankruptcy was committed, and after that the Appellant possesses himself, not unnaturally or wrongfully in any other than a legal sense, of £120, part of the debtors' estate. The law is that, from the appointment of the trustee in a liquidation, he shall have all the powers and rights of a trustee in bankruptcy, and therefore, on the 18th of February, and before the receipt by the Appellant of the £120, the whole of the debtors' estate, including that sum, which was part of the debtors' estate before it was received by the Appellant, was vested in the trustee. The Appellant came in under the liquidation proceedings. He made an affidavit, which stated that a certain debt was due to him at the institution of the proceedings, and that it was still justly due and owing. In stating that amount he gave credit to the debtors' estate for the £120, not in terms, but it appears by the result that he excluded it from his proof of debt. He came in under the liquidation, and what is the consequence of creditors coming in under a liquidation or bankruptcy? They come in under what is as much a compact as if each of them had

C. J. B.
1875
*Ex parte*
ROBERTSON.
*In re*
MORTON.

EQUITY CASES.

O. J. B.
1875

Ex parte
ROBERTSON.
In re
MORTON.

signed and sealed and sworn to the terms of it—that the bank-rupt's estate shall be duly administered among the creditors. That being so, the administration of the estate is cast upon the Court, and the Court has jurisdiction to decide all questions of whatever kind, whether of law, fact, or whatever else the Court may think necessary in order to effect complete distribution of the bankrupt's estate. Can there be any doubt that the Court had jurisdiction to get back that £120? I am not touching upon the merits of the case, nor am I expressing any opinion upon them; but can there be any doubt that the Appellant in this case has agreed that, as far as he is concerned, and as far as the whole of the creditors proving are concerned, the law of bankruptcy shall take effect as to him, and under this jurisdiction, to which he is not only subjected, but under which he has become an active party, and of which he has taken the benefit, and is entitled as much as any other creditor, though not more than any other creditor, to insist on the due distribution of the whole of the debtors' estate?

It is said that this Court, being an English Court, has no juris-diction over this gentleman who has entered into this, which I call a compact, who has come in under it, and has been a party to the administration of the estate in the manner I have mentioned, because he lives on the other side of the border. I am of opinion that there is no ground whatever for that, and I think that he is as much bound to perform the conditions of the compact, and to submit to the jurisdiction of the Court, as if he had never been out of the limits of *England*.

The other objection is, that there has not been due service of the notice of the motion by which the Appellant was called upon to account for that £120. It is quite true, as I understand the case, that the service was very defective in point of regularity; but that the notice was actually brought to his attention is not only stated in the affidavit, but, in point of fact, on the very day when the notice of motion was to be heard, the day on which it was returnable, as it is called, he, by his attorney, came into Court and raised his objection that the Court had no jurisdiction. The objection as to irregularity was waived.

What would have happened if it had been taken? *Philipson*

C. J. B.
1875
Ex parte
ROBERTSON.
In re
MORTON.

comes into Court and says, You cannot do anything, for two reasons. One of them is, that you have no jurisdiction; and the other is, that the notice with which my client has been served is not a good one. In that case the learned Judge below would have said, I will make no order upon this notice of motion, but I will allow it to stand over in order that the four days' notice may be properly given. But, in fact, the Appellant comes in and says, You have no jurisdiction; and, besides that, I want time to answer; and asks for further time, when he finds that the Judge is not with him on the subject of jurisdiction. The learned Judge accedes to this request for further time, and does allow the matter to stand over till another day on certain terms. He gave the Appellant time to answer the summons which had been confessedly served upon him, although served irregularly. The adjournment took place as a matter of course, and when the day which had been fixed for the adjourned hearing arrived there was an affidavit by him going into the merits of the case. It was stated in this affidavit that he was a domiciled Scotchman, and he submitted that the Court had no jurisdiction over him. Upon every rule of practice that was a perfect and complete waiver of the technical objection that there had been an inadequate service.

When *Ex parte O'Loghlen* (1) was referred to I told Mr. *De Gex* that I did not agree that the *ratio decidendi* there given was in his favour. The interlocutory proceeding in that case, that is, the service of the debtor's summons, the disobedience to which constitutes an act of bankruptcy, was of the very greatest consequence, and the question raised before the Court was, not whether there had been a due service of the summons, because there was no question that the debtor had been served, and there was no irregularity in the service, but a want of legal efficacy was suggested. I cannot come to the conclusion that on the facts Sir *Coleman O'Loghlen* was amenable to the English process in bankruptcy—the Act having expressly said that it should not apply to *Scotland* or *Ireland*— merely because he was out of *Ireland* by accident, and had been served in *England,* being a Member of Parliament resident in *London,* for the purpose of discharging his Parliamentary duties,

(1) Law Rep. 6 Ch. 406.

O. J. B.
1875
*Ex parte*
ROBERTSON.
*In re*
MORTON.

where they took an opportunity of serving him. But that was no ground for deciding that the Court had jurisdiction to order service of the summons.

I do not agree with Mr. *De Gex* that the *ratio decidendi* there was that the service had been wrong. Lord Justice *Mellish*, in the course of his observations, directs himself to the particular proceeding before him, which was the service of a debtor's summons. It is impossible to read his judgment in any other light, and the Court accordingly decided that Sir *Coleman O'Loghlen* was a person not under any circumstances subject to the jurisdiction of the Court, and therefore that the Court could have no jurisdiction over him. Well, then, what am I to do with respect to this, this being really the point of the case? I find that there was an irregular service of the notice of motion on a man out of the jurisdiction. I find that that man came in with the notice of motion in his hand (as I must assume), and said, This notice has been served on me. I am subject to the laws of *Scotland*. You, as an English Judge, have nothing to do with me; and then the Judge disagrees with him, and tells him that he has. Thereupon his solicitor asks for time, that he may address himself to the merits of the case. That was a waiver of the mere irregularity in form, and there was not an irregularity in substance, as in the case of Sir *Coleman O'Loghlen.* There it was substance, here it was an irregularity of form merely; and it is the practice in this Court, beyond all question, and the practice of every other Court, in all cases to cure irregularity by accepting the waiver of the person affected by it. What is the real gist and reason of this rule which requires a four days' notice of motion? It is that the person who is to be affected by it shall have time to set himself right, and to file his affidavits. He is not to be compelled to come into Court on a shorter notice than four days, nor even then if he can make out any ground for extending the time. The case of *Ex parte Hilton* (1) was plain enough according to the law as it then stood. There was no 72nd section then, and no law by which the Court could compel the delivery up of property of a bankrupt held by a creditor. The case is different now, because the 72nd section supplies the defect, and makes it

(1) 1 Jac. & W. 467.

unnecessary to bring an action, as in *Ex parte Dobson* (1). No necessity exists for it now, for a wiser provision has been made. In my opinion it is wiser and more consistent with justice that the l aw should enable the Court of Bankruptcy to exercise, I was going to say unlimited, jurisdiction over every man who claims the benefit of the process of the Court and who has obtained it, and who has, therefore, in the most formal and explicit manner, subjected himself to the jurisdiction of the Court. I think, therefore, that the judgment of the Court below cannot be assailed on either of the two grounds I have mentioned.

I am much obliged to Mr. *De Gex* for reading the judgment in *Cookney* v. *Anderson* (2), for it is very pleasant to hear so lucid an explanation of the law, conveyed in such choice terms as those in which Lord *Westbury* expressed himself. But if you look at that case closely you will find that it is less favourable to the argument than the general scope of the reasoning seemed to be. You will find that Lord *Westbury* limits what he says to the case of a party who does not appear, or who is absent from the jurisdiction. But I have to deal with a case in which he plainly did appear.

It was directed that the case should be remitted to the County Court to be decided upon the merits, with a declaration that that Court had jurisdiction in the matter.

Solicitors for the Appellant: Messrs. *Williamson, Hill, & Co.,* agents for Mr. *J. A. Philipson, Newcastle-on-Tyne.*

Solicitor for the Trustee: Mr. *G. B. Wheeler,* agent for Mr. *H. S. Sewell, Newcastle-on-Tyne.*

(1) 1 Mont. & A. 666.          (2) 1 D. J. & S. 365.

C. J. B.
1875

*Ex parte*
ROBERTSON.
*In re*
MORTON.



2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

03; 358209562; 358209566; 358209754Stelco Inc., Re

In the Matter of the Companies' Creditors Arrangement Act, R.S.C., c. C-36, as amended

And In the Matter of a proposed plan of compromise or arrangement with respect to Stelco Inc. and the other Applicants listed in Schedule "A"

Application under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

Ontario Court of Appeal

Goudge, Feldman, Blair JJ.A.

Heard: March 18, 2005
Judgment: March 31, 2005
Docket: CA M32289

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: reversed *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 742, [2005] O.J. No. 729, 7 C.B.R. (5th) 307 ((Ont. S.C.J. [Commercial List])); reversed *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 743, [2005] O.J. No. 730, 7 C.B.R. (5th) 310 ((Ont. S.C.J. [Commercial List])); additional reasons to *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 742, [2005] O.J. No. 729, 7 C.B.R. (5th) 307 ((Ont. S.C.J. [Commercial List]))

Counsel: Jeffrey S. Leon, Richard B. Swan for Appellants, Michael Woollcombe, Roland Keiper

Kenneth T. Rosenberg, Robert A. Centa for Respondent, United Steelworkers of America

Murray Gold, Andrew J. Hatnay for Respondent, Retired Salaried Beneficiaries of Stelco Inc., CHT Steel Company Inc., Stelpipe Ltd., Stelwire Ltd., Welland Pipe Ltd.

Michael C.P. McCreary, Carrie L. Clynick for USWA Locals 5328, 8782

John R. Varley for Active Salaried Employee Representative

Michael Barrack for Stelco Inc.

Peter Griffin for Board of Directors of Stelco Inc.

K. Mahar for Monitor

David R. Byers (Agent) for CIT Business Credit, DIP Lender

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

Subject: Corporate and Commercial; Insolvency; Property; Civil Practice and Procedure

Business associations --- Specific corporate organization matters — Directors and officers — Appointment — General principles

Corporation entered protection under Companies' Creditors Arrangement Act — K and W were involved with companies who made capital proposal regarding corporation — Companies held approximately 20 per cent of corporation's shares — K and W, allegedly with support of over 30 per cent of shareholders, requested to fill two vacant directors' positions of corporation, and be appointed to review committee — K and W claimed that their interest as shareholders would not be represented in proceedings — K and W appointed directors by board, and made members of review committee — Employees' motion for removal of K and W as directors was granted and appointments were voided — Trial judge found possibility existed that K and W would not have best interests of corporation at heart, and might favour certain shareholders — Trial judge found interference with business judgment of board was appropriate, as issue touched on constitution of corporation — Trial judge found reasonable apprehension of bias existed, although no evidence of actual bias had been shown — K and W appealed — Appeal allowed — K and W reinstated to board — Court's discretion under s. 11 of Act does not give authority to remove directors, which is not part of restructuring process — Trial judge erred in not deferring to corporation's business judgment — Trial judge erred in adopting principle of reasonable apprehension of bias.

Bankruptcy and insolvency --- Proposal — Companies' Creditors Arrangement Act — Miscellaneous issues

Corporation entered protection under Companies' Creditors Arrangement Act — K and W were involved with companies who made capital proposal regarding corporation — Companies held approximately 20 per cent of corporation's shares — K and W, allegedly with support of over 30 per cent of shareholders, requested to fill two vacant directors' positions of corporation and be appointed to review committee — K and W claimed that their interest as shareholders would not be represented in proceedings — K and W appointed directors by board, and made members of review committee — Employees' motion for removal of K and W as directors was granted and appointments were voided — Trial judge found possibility existed that K and W would not have best interests of corporation at heart, and might favour certain shareholders — Trial judge found interference with business judgment of board was appropriate, as issue touched on constitution of corporation — Trial judge found reasonable apprehension of bias existed, although no evidence of actual bias had been shown — K and W appealed — Appeal allowed — K and W reinstated to board — Court's discretion under s. 11 of Act does not give authority to remove directors, which is not part of restructuring process — Trial judge erred in not deferring to corporation's business judgment — Trial judge erred in adopting principle of reasonable apprehension of bias.

**Cases considered by *Blair J.A.*:**

*Alberta-Pacific Terminals Ltd., Re* (1991), 8 C.B.R. (3d) 99, 1991 CarswellBC 494 (B.C. S.C.) — referred to

*Algoma Steel Inc., Re* (2001), 2001 CarswellOnt 1742, 25 C.B.R. (4th) 194, 147 O.A.C. 291 (Ont. C.A.) — considered

*Algoma Steel Inc. v. Union Gas Ltd.* (2003), 2003 CarswellOnt 115, 39 C.B.R. (4th) 5, 169 O.A.C. 89, 63 O.R. (3d) 78 (Ont. C.A.) — referred to

*Babcock & Wilcox Canada Ltd., Re* (2000), 2000 CarswellOnt 704, 5 B.L.R. (3d) 75, 18 C.B.R. (4th) 157 (Ont. S.C.J. [Commercial List]) — referred to

*Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475, [1976] 1 W.W.R.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

1, 20 C.B.R. (N.S.) 240, 57 D.L.R. (3d) 1, 5 N.R. 515, 1975 CarswellMan 3, 1975 CarswellMan 85 (S.C.C.) — referred to

*Blair v. Consolidated Enfield Corp.* (1995), 128 D.L.R. (4th) 73, 187 N.R. 241, 86 O.A.C. 245, 25 O.R. (3d) 480 (note), 24 B.L.R. (2d) 161, [1995] 4 S.C.R. 5, 1995 CarswellOnt 1393, 1995 CarswellOnt 1179 (S.C.C.) — considered

*Brant Investments Ltd. v. KeepRite Inc.* (1991), 1 B.L.R. (2d) 225, 3 O.R. (3d) 289, 45 O.A.C. 320, 80 D.L.R. (4th) 161, 1991 CarswellOnt 133 (Ont. C.A.) — considered

*Catalyst Fund General Partner I Inc. v. Hollinger Inc.* (2004), 1 B.L.R. (4th) 186, 2004 CarswellOnt 4772 (Ont. S.C.J.) — referred to

*Country Style Food Services Inc., Re* (2002), 2002 CarswellOnt 1038, 158 O.A.C. 30 (Ont. C.A. [In Chambers]) — considered

*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106, 1995 CarswellOnt 54 (Ont. Gen. Div. [Commercial List]) — referred to

*Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84, 4 C.B.R. (3d) 311, (sub nom. *Chef Ready Foods Ltd. v. Hongkong Bank of Canada)* [1991] 2 W.W.R. 136, 1990 CarswellBC 394 (B.C. C.A.) — referred to

*Ivaco Inc., Re* (2004), 3 C.B.R. (5th) 33, 2004 CarswellOnt 2397 (Ont. S.C.J. [Commercial List]) — referred to

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275, 1993 CarswellOnt 183 (Ont. Gen. Div. [Commercial List]) — considered

*London Finance Corp. v. Banking Service Corp.* (1922), 23 O.W.N. 138, [1925] 1 D.L.R. 319 (Ont. H.C.) — referred to

*Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 17 C.B.R. (3d) 1, (sub nom. *Olympia & York Developments Ltd., Re)* 12 O.R. (3d) 500, 1993 CarswellOnt 182 (Ont. Gen. Div.) — considered

*People's Department Stores Ltd. (1992) Inc., Re* (2004), (sub nom. *Peoples Department Stores Inc. (Trustee of) v. Wise)* 244 D.L.R. (4th) 564, (sub nom. *Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Eng.), (sub nom. *Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Fr.), 4 C.B.R. (5th) 215, 49 B.L.R. (3d) 165, 2004 SCC 68, 2004 CarswellQue 2862, 2004 CarswellQue 2863 (S.C.C.) — considered

*R. v. Sharpe* (2001), 2001 SCC 2, 2001 CarswellBC 82, 2001 CarswellBC 83, 194 D.L.R. (4th) 1, 150 C.C.C. (3d) 321, 39 C.R. (5th) 72, 264 N.R. 201, 146 B.C.A.C. 161, 239 W.A.C. 161, 88 B.C.L.R. (3d) 1, [2001] 6 W.W.R. 1, [2001] 1 S.C.R. 45, 86 C.R.R. (2d) 1 (S.C.C.) — referred to

*Richtree Inc., Re* (2005), 2005 CarswellOnt 255, 7 C.B.R. (5th) 294 (Ont. S.C.J. [Commercial List]) — referred to

*Rizzo & Rizzo Shoes Ltd., Re* (1998), 1998 CarswellOnt 1, 1998 CarswellOnt 2, 154 D.L.R. (4th) 193, 36 O.R. (3d) 418 (headnote only), (sub nom. *Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 221 N.R. 241, (sub nom. *Adrien v. Ontario Ministry of Labour)* 98 C.L.L.C. 210-006, 50 C.B.R. (3d) 163, (sub nom. *Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 106 O.A.C. 1, [1998] 1 S.C.R. 27, 33 C.C.E.L. (2d) 173 (S.C.C.) — referred to

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

*Royal Oak Mines Inc., Re* (1999), 1999 CarswellOnt 792, 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]) — considered

*Sammi Atlas Inc., Re* (1998), 1998 CarswellOnt 1145, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]) — referred to

*Skeena Cellulose Inc., Re* (2003), 43 C.B.R. (4th) 187, 184 B.C.A.C. 54, 302 W.A.C. 54, 2003 BCCA 344, 2003 CarswellBC 1399, 13 B.C.L.R. (4th) 236 (B.C. C.A.) — followed

*Stephenson v. Vokes* (1896), 27 O.R. 691 (Ont. H.C.) — referred to

*Westar Mining Ltd., Re* (1992), 70 B.C.L.R. (2d) 6, 14 C.B.R. (3d) 88, [1992] 6 W.W.R. 331, 1992 CarswellBC 508 (B.C. S.C.) — referred to

**Statutes considered:**

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44

Generally — referred to

s. 2(1) "affairs" — considered

s. 102 — referred to

s. 106(3) — referred to

s. 109(1) — referred to

s. 111 — referred to

s. 122(1) — referred to

s. 122(1)(a) — referred to

s. 122(1)(b) — referred to

s. 145 — referred to

s. 145(2)(b) — referred to

s. 241 — referred to

s. 241(3)(e) — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

Generally — referred to

s. 11 — considered

s. 11(1) — considered

s. 11(3) — considered

s. 11(4) — considered

s. 11(6) — considered

s. 20 — considered

APPEAL by potential board members from judgments reported at *Stelco Inc., Re* (2005), 2005 CarswellOnt 742, 7 C.B.R. (5th) 307 (Ont. S.C.J. [Commercial List]) and at *Stelco Inc., Re* (2005), 2005 CarswellOnt 743, 7 C.B.R. (5th) 310 (Ont. S.C.J. [Commercial List]), granting motion by employees for removal of certain directors from board of corporation under protection of *Companies Creditors' Arrangement Act.*

### *Blair J.A.:*

### Part I — Introduction

1        Stelco Inc. and four of its wholly owned subsidiaries obtained protection from their creditors under the *Companies' Creditors Arrangement Act*[FN1] on January 29, 2004. Since that time, the Stelco Group has been engaged in a high profile, and sometimes controversial, process of economic restructuring. Since October 2004, the restructuring has revolved around a court-approved capital raising process which, by February 2005, had generated a number of competitive bids for the Stelco Group.

2        Farley J., an experienced judge of the Superior Court Commercial List in Toronto, has been supervising the CCAA process from the outset.

3        The appellants, Michael Woollcombe and Roland Keiper, are associated with two companies — Clearwater Capital Management Inc., and Equilibrium Capital Management Inc. — which, respectively, hold approximately 20% of the outstanding publicly traded common shares of Stelco. Most of these shares have been acquired while the CCAA process has been ongoing, and Messrs. Woollcombe and Keiper have made it clear publicly that they believe there is good shareholder value in Stelco in spite of the restructuring. The reason they are able to take this position is that there has been a solid turn around in worldwide steel markets, as a result of which Stelco, although remaining in insolvency protection, is earning annual operating profits.

4        The Stelco board of directors ("the Board") has been depleted as a result of resignations, and in January of this year Messrs. Woollcombe and Keiper expressed an interest in being appointed to the Board. They were supported in this request by other shareholders who, together with Clearwater and Equilibrium, represent about 40% of the Stelco common shareholders. On February 18, 2005, the Board appointed the appellants directors. In announcing the appointments publicly, Stelco said in a press release:

> After careful consideration, and given potential recoveries at the end of the company's restructuring process, the Board responded favourably to the requests by making the appointments announced today.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

Richard Drouin, Chairman of Stelco's Board of Directors, said: "I'm pleased to welcome Roland Keiper and Michael Woollcombe to the Board. Their experience and their perspective will assist the Board as it strives to serve the best interests of all our stakeholders. We look forward to their positive contribution."

5    On the same day, the Board began its consideration of the various competing bids that had been received through the capital raising process.

6    The appointments of the appellants to the Board incensed the employee stakeholders of Stelco ("the Employees"), represented by the respondent Retired Salaried Beneficiaries of Stelco and the respondent United Steelworkers of America ("USWA"). Outstanding pension liabilities to current and retired employees are said to be Stelco's largest long-term liability — exceeding several billion dollars. The Employees perceive they do not have the same, or very much, economic leverage in what has sometimes been referred to as 'the bare knuckled arena' of the restructuring process. At the same time, they are amongst the most financially vulnerable stakeholders in the piece. They see the appointments of Messrs. Woollcombe and Keiper to the Board as a threat to their well being in the restructuring process, because the appointments provide the appellants, and the shareholders they represent, with direct access to sensitive information relating to the competing bids to which other stakeholders (including themselves) are not privy.

7    The Employees fear that the participation of the two major shareholder representatives will tilt the bid process in favour of maximizing shareholder value at the expense of bids that might be more favourable to the interests of the Employees. They sought and obtained an order from Farley J. removing Messrs. Woollcombe and Keiper from their short-lived position of directors, essentially on the basis of that apprehension.

8    The Employees argue that there is a reasonable apprehension the appellants would not be able to act in the best interests of the corporation — as opposed to their own best interests as shareholders — in considering the bids. They say this is so because of prior public statements by the appellants about enhancing shareholder value in Stelco, because of the appellants' linkage to such a large shareholder group, because of their earlier failed bid in the restructuring, and because of their opposition to a capital proposal made in the proceeding by Deutsche Bank (known as "the Stalking Horse Bid"). They submit further that the appointments have poisoned the atmosphere of the restructuring process, and that the Board made the appointments under threat of facing a potential shareholders' meeting where the members of the Board would be replaced en masse.

9    On the other hand, Messrs. Woollcombe and Keiper seek to set aside the order of Farley J. on the grounds that (a) he did not have the jurisdiction to make the order under the provisions of the CCAA, (b) even if he did have jurisdiction, the reasonable apprehension of bias test applied by the motion judge has no application to the removal of directors, (c) the motion judge erred in interfering with the exercise by the Board of its business judgment in filling the vacancies on the Board, and (d) the facts do not meet any test that would justify the removal of directors by a court in any event.

10    For the reasons that follow, I would grant leave to appeal, allow the appeal, and order the reinstatement of the applicants to the Board.

**Part II — Additional Facts**

11    Before the initial CCAA order on January 29, 2004, the shareholders of Stelco had last met at their annual general meeting on April 29, 2003. At that meeting they elected eleven directors to the Board. By the date of the initial order, three of those directors had resigned, and on November 30, 2004, a fourth did as well, leaving the company with only seven directors.

12    Stelco's articles provide for the Board to be made up of a minimum of ten and a maximum of twenty directors. Consequently, after the last resignation, the company's corporate governance committee began to take steps to search

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

for new directors. They had not succeeded in finding any prior to the approach by the appellants in January 2005.

13      Messrs. Woollcombe and Keiper had been accumulating shares in Stelco and had been participating in the CCAA proceedings for some time before their request to be appointed to the Board, through their companies, Clearwater and Equilibrium. Clearwater and Equilibrium are privately held, Ontario-based, investment management firms. Mr. Keiper is the president of Equilibrium and associated with Clearwater. Mr. Woollcombe is a consultant to Clearwater. The motion judge found that they "come as a package".

14      In October 2004, Stelco sought court approval of its proposed method of raising capital. On October 19, 2004, Farley J. issued what has been referred to as the Initial Capital Process Order. This order set out a process by which Stelco, under the direction of the Board, would solicit bids, discuss the bids with stakeholders, evaluate the bids, and report on the bids to the court.

15      On November 9, 2004, Clearwater and Equilibrium announced they had formed an investor group and had made a capital proposal to Stelco. The proposal involved the raising of $125 million through a rights offering. Mr. Keiper stated at the time that he believed "the value of Stelco's equity would have the opportunity to increase substantially if Stelco emerged from CCAA while minimizing dilution of its shareholders." The Clearwater proposal was not accepted.

16      A few days later, on November 14, 2004, Stelco approved the Stalking Horse Bid. Clearwater and Equilibrium opposed the Deutsche Bank proposal. Mr. Keiper criticized it for not providing sufficient value to existing shareholders. However, on November 29, 2004, Farley J. approved the Stalking Horse Bid and amended the Initial Capital Process Order accordingly. The order set out the various channels of communication between Stelco, the monitor, potential bidders and the stakeholders. It provided that members of the Board were to see the details of the different bids before the Board selected one or more of the offers.

17      Subsequently, over a period of two and a half months, the shareholding position of Clearwater and Equilibrium increased from approximately 5% as at November 19, to 14.9% as at January 25, 2005, and finally to approximately 20% on a fully diluted basis as at January 31, 2005. On January 25, Clearwater and Equilibrium announced that they had reached an understanding jointly to pursue efforts to maximize shareholder value at Stelco. A press release stated:

> Such efforts will include seeking to ensure that the interests of Stelco's equity holders are appropriately protected by its board of directors and, ultimately, that Stelco's equity holders have an appropriate say, by vote or otherwise, in determining the future course of Stelco.

18      On February 1, 2005, Messrs. Keiper and Woollcombe and others representatives of Clearwater and Equilibrium, met with Mr. Drouin and other Board members to discuss their views of Stelco and a fair outcome for all stakeholders in the proceedings. Mr. Keiper made a detailed presentation, as Mr. Drouin testified, "encouraging the Board to examine how Stelco might improve its value through enhanced disclosure and other steps". Mr. Keiper expressed confidence that "there was value to the equity of Stelco", and added that he had backed this view up by investing millions of dollars of his own money in Stelco shares. At that meeting, Clearwater and Equilibrium requested that Messrs. Woollcombe and Keiper be added to the Board and to Stelco's restructuring committee. In this respect, they were supported by other shareholders holding about another 20% of the company's common shares.

19      At paragraphs 17 and 18 of his affidavit, Mr. Drouin, summarized his appraisal of the situation:

> 17. It was my assessment that each of Mr. Keiper and Mr. Woollcombe had personal qualities which would allow them to make a significant contribution to the Board in terms of their backgrounds and their knowledge of the steel industry generally and Stelco in particular. In addition I was aware that their appointment to the Board was supported by approximately 40% of the shareholders. In the event that these shareholders successfully requisi-

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

tioned a shareholders meeting they were in a position to determine the composition of the entire Board.

> 18. I considered it essential that there be continuity of the Board through the CCAA process. I formed the view that the combination of existing Board members and these additional members would provide Stelco with the most appropriate board composition in the circumstances. The other members of the Board also shared my views.

20    In order to ensure that the appellants understood their duties as potential Board members and, particularly that "they would no longer be able to consider only the interests of shareholders alone but would have fiduciary responsibilities as a Board member to the corporation as a whole", Mr. Drouin and others held several further meetings with Mr. Woollcombe and Mr. Keiper. These discussions "included areas of independence, standards, fiduciary duties, the role of the Board Restructuring Committee and confidentiality matters". Mr. Woollcombe and Mr. Keiper gave their assurances that they fully understood the nature and extent of their prospective duties, and would abide by them. In addition, they agreed and confirmed that:

> a) Mr. Woollcombe would no longer be an advisor to Clearwater and Equilibrium with respect to Stelco;

> b) Clearwater and Equilibrium would no longer be represented by counsel in the CCAA proceedings; and

> c) Clearwater and Equilibrium then had no involvement in, and would have no future involvement, in any bid for Stelco.

21    On the basis of the foregoing — and satisfied "that Messrs. Keiper and Woollcombe would make a positive contribution to the various issues before the Board both in [the] restructuring and the ongoing operation of the business" — the Board made the appointments on February 18, 2005.

22    Seven days later, the motion judge found it "appropriate, just, necessary and reasonable to declare" those appointments "to be of no force and effect" and to remove Messrs. Woollcombe and Keiper from the Board. He did so not on the basis of any actual conduct on the part of the appellants as directors of Stelco but because there was some risk of anticipated conduct in the future. The gist of the motion judge's rationale is found in the following passage from his reasons (at para. 23):

> In these particular circumstances and aside from the Board feeling coerced into the appointments for the sake of continuing stability, I am not of the view that it would be appropriate to wait and see if there was any explicit action on behalf of K and W while conducting themselves as Board members which would demonstrate that they had not lived up to their obligations to be "neutral". They may well conduct themselves beyond reproach. But if they did not, the fallout would be very detrimental to Stelco and its ability to successfully emerge. What would happen to the bids in such a dogfight? I fear that it would be trying to put Humpty Dumpty back together again. The same situation would prevail even if K and W conducted themselves beyond reproach but with the Board continuing to be concerned that they not do anything seemingly offensive to the bloc. The risk to the process and to Stelco in its emergence is simply too great to risk the wait and see approach.

## Part III — Leave to Appeal

23    Because of the "real time" dynamic of this restructuring project, Laskin J.A. granted an order on March 4, 2005, expediting the appellants' motion for leave to appeal, directing that it be heard orally and, if leave be granted, directing that the appeal be heard at the same time. The leave motion and the appeal were argued together, by order of the panel, on March 18, 2005.

24    This court has said that it will only sparingly grant leave to appeal in the context of a CCAA proceeding and will only do so where there are "serious and arguable grounds that are of real and significant interest to the parties":

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

*Country Style Food Services Inc., Re* (2002), 158 O.A.C. 30, [2002] O.J. No. 1377 (Ont. C.A. [In Chambers]), at para. 15. This criterion is determined in accordance with a four-pronged test, namely,

> a) whether the point on appeal is of significance to the practice;
>
> b) whether the point is of significance to the action;
>
> c) whether the appeal is *prima facie* meritorious or frivolous;
>
> d) whether the appeal will unduly hinder the progress of the action.

25    Counsel agree that (d) above is not relevant to this proceeding, given the expedited nature of the hearing. In my view, the tests set out in (a) - (c) are met in the circumstances, and as such, leave should be granted. The issue of the court's jurisdiction to intervene in corporate governance issues during a CCAA restructuring, and the scope of its discretion in doing so, are questions of considerable importance to the practice and on which there is little appellate jurisprudence. While Messrs. Woollcombe and Keiper are pursuing their remedies in their own right, and the company and its directors did not take an active role in the proceedings in this court, the Board and the company did stand by their decision to appoint the new directors at the hearing before the motion judge and in this court, and the question of who is to be involved in the Board's decision making process continues to be of importance to the CCAA proceedings. From the reasons that follow it will be evident that in my view the appeal has merit.

26    Leave to appeal is therefore granted.

**Part IV — The Appeal**

*The Positions of the Parties*

27    The appellants submit that,

> a) in exercising its discretion under the CCAA, the court is not exercising its "inherent jurisdiction" as a superior court;
>
> b) there is no jurisdiction under the CCAA to remove duly elected or appointed directors, notwithstanding the broad discretion provided by s. 11 of that Act; and that,
>
> c) even if there is jurisdiction, the motion judge erred:
>
> > (i) by relying upon the administrative law test for reasonable apprehension of bias in determining that the directors should be removed;
> >
> > (ii) by rejecting the application of the "business judgment" rule to the unanimous decision of the Board to appoint two new directors; and,
> >
> > (iii) by concluding that Clearwater and Equilibrium, the shareholders with whom the appellants are associated, were focussed solely on a short-term investment horizon, without any evidence to that effect, and therefore concluding that there was a tangible risk that the appellants would not be neutral and act in the best interests of Stelco and all stakeholders in carrying out their duties as directors.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

28     The respondents' arguments are rooted in fairness and process. They say, first, that the appointment of the appellants as directors has poisoned the atmosphere of the CCAA proceedings and, secondly, that it threatens to undermine the even-handedness and integrity of the capital raising process, thus jeopardizing the ability of the court at the end of the day to approve any compromise or arrangement emerging from that process. The respondents contend that Farley J. had jurisdiction to ensure the integrity of the CCAA process, including the capital raising process Stelco had asked him to approve, and that this court should not interfere with his decision that it was necessary to remove Messrs. Woollcombe and Keiper from the Board in order to ensure the integrity of that process. A judge exercising a supervisory function during a CCAA proceeding is owed considerable deference: *Algoma Steel Inc., Re* (2001), 25 C.B.R. (4th) 194 (Ont. C.A.), at para. 8.

29     The crux of the respondents' concern is well-articulated in the following excerpt from paragraph 72 of the factum of the Retired Salaried Beneficiaries:

> The appointments of Keiper and Woollcombe violated every tenet of fairness in the restructuring process that is supposed to lead to a plan of arrangement. One stakeholder group — particular investment funds that have acquired Stelco shares during the CCAA itself — have been provided with privileged access to the capital raising process, and voting seats on the Corporation's Board of Directors and Restructuring Committee. No other stakeholder has been treated in remotely the same way. To the contrary, the salaried retirees have been completely excluded from the capital raising process and have no say whatsoever in the Corporation's decision-making process.

30     The respondents submit that fairness, and the perception of fairness, underpin the CCAA process, and depend upon effective judicial supervision: see *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 12 O.R. (3d) 500 (Ont. Gen. Div.); *Ivaco Inc., Re* (2004), 3 C.B.R. (5th) 33 (Ont. S.C.J. [Commercial List]), at para.15-16. The motion judge reasonably decided to remove the appellants as directors in the circumstances, they say, and this court should not interfere.

*Jurisdiction*

31     The motion judge concluded that he had the power to rescind the appointments of the two directors on the basis of his "inherent jurisdiction" and "the discretion given to the court pursuant to the *CCAA*". He was not asked to, nor did he attempt to rest his jurisdiction on other statutory powers imported into the CCAA.

32     The CCAA is remedial legislation and is to be given a liberal interpretation to facilitate its objectives: *Babcock & Wilcox Canada Ltd., Re*, [2000] O.J. No. 786 (Ont. S.C.J. [Commercial List]), at para. 11. See also, *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 4 C.B.R. (3d) 311 (B.C. C.A.), at p. 320; *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]). Courts have adopted this approach in the past to rely on inherent jurisdiction, or alternatively on the broad jurisdiction under s. 11 of the CCAA, as the source of judicial power in a CCAA proceeding to "fill in the gaps" or to "put flesh on the bones" of that Act: see *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]), *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]); and *Westar Mining Ltd., Re* (1992), 70 B.C.L.R. (2d) 6 (B.C. S.C.).

33     It is not necessary, for purposes of this appeal, to determine whether inherent jurisdiction is excluded for all supervisory purposes under the CCAA, by reason of the existence of the statutory discretionary regime provided in that Act. In my opinion, however, the better view is that in carrying out his or her supervisory functions under the legislation, the judge is not exercising inherent jurisdiction but rather the statutory discretion provided by s. 11 of the CCAA and supplemented by other statutory powers that may be imported into the exercise of the s. 11 discretion from other statutes through s. 20 of the CCAA.

*Inherent Jurisdiction*

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

34    Inherent jurisdiction is a power derived "from the very nature of the court as a superior court of law", permitting the court "to maintain its authority and to prevent its process being obstructed and abused". It embodies the authority of the judiciary to control its own process and the lawyers and other officials connected with the court and its process, in order "to uphold, to protect and to fulfill the judicial function of administering justice according to law in a regular, orderly and effective manner". See I.H. Jacob, "The Inherent Jurisdiction of the Court" (1970) 23 Current Legal Problems 27-28. In Halsbury's Laws of England, 4th ed. (London: Lexis-Nexis UK, 1973 - ) vol. 37, at para. 14, the concept is described as follows:

> In sum, it may be said that the inherent jurisdiction of the court is a virile and viable doctrine, and has been defined as being the reserve or fund of powers, a residual source of powers, which the court may draw upon as necessary whenever it is just or equitable to do so, in particularly to ensure the observation of the due process of law, to prevent improper vexation or oppression, to do justice between the parties and to secure a fair trial between them.

35    In spite of the expansive nature of this power, inherent jurisdiction does not operate where Parliament or the Legislature has acted. As Farley J. noted in *Royal Oak Mines Inc.*, *supra*, inherent jurisdiction is "not limitless; if the legislative body has not left a functional gap or vacuum, then inherent jurisdiction should not be brought into play" (para. 4). See also, *Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475 (S.C.C.) at 480; *Richtree Inc., Re*, [2005] O.J. No. 251 (Ont. S.C.J. [Commercial List]).

36    In the CCAA context, Parliament has provided a statutory framework to extend protection to a company while it holds its creditors at bay and attempts to negotiate a compromised plan of arrangement that will enable it to emerge and continue as a viable economic entity, thus benefiting society and the company in the long run, along with the company's creditors, shareholders, employees and other stakeholders. The s. 11 discretion is the engine that drives this broad and flexible statutory scheme, and that for the most part supplants the need to resort to inherent jurisdiction. In that regard, I agree with the comment of Newbury J.A. in *Skeena Cellulose Inc., Re*, [2003] B.C.J. No. 1335, 43 C.B.R. (4th) 187 (B.C. C.A.) at para. 46, that:

> . . . the court is not exercising a power that arises from its nature as a superior court of law, but is exercising the discretion given to it by the CCAA. . . . This is the discretion, given by s. 11, to stay proceedings against the debtor corporation and the discretion, given by s. 6, to approve a plan which appears to be reasonable and fair, to be in accord with the requirements and objects of the statute, and to make possible the continuation of the corporation as a viable entity. It is these considerations the courts have been concerned with in the cases discussed above,[FN2] rather than the integrity of their own process.

37    As Jacob observes, in his article "The Inherent Jurisdiction of the Court", *supra*, at p. 25:

> The inherent jurisdiction of the court is a concept which must be distinguished from the exercise of judicial discretion. These two concepts resemble each other, particularly in their operation, and they often appear to overlap, and are therefore sometimes confused the one with the other. There is nevertheless a vital juridical distinction between jurisdiction and discretion, which must always be observed.

38    I do not mean to suggest that inherent jurisdiction can never apply in a CCAA context. The court retains the ability to control its own process, should the need arise. There is a distinction, however — difficult as it may be to draw — between the *court's* process with respect to the restructuring, on the one hand, and the course of action involving the negotiations and corporate actions accompanying them, which are the *company's* process, on the other hand. The court simply supervises the latter process through its ability to stay, restrain or prohibit proceedings against the company during the plan negotiation period "on such terms as it may impose".[FN3] Hence the better view is that a judge is generally exercising the court's statutory discretion under s. 11 of the Act when supervising a CCAA proceeding. The order in this case could not be founded on inherent jurisdiction because it is designed to supervise the

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

company's process, not the court's process.

*The Section 11 Discretion*

39      This appeal involves the scope of a supervisory judge's discretion under s. 11 of the CCAA, in the context of corporate governance decisions made during the course of the plan negotiating and approval process and, in particular, whether that discretion extends to the removal of directors in that environment. In my view, the s. 11 discretion — in spite of its considerable breadth and flexibility — does not permit the exercise of such a power in and of itself. There may be situations where a judge in a CCAA proceeding would be justified in ordering the removal of directors pursuant to the oppression remedy provisions found in s. 241 of the CBCA, and imported into the exercise of the s. 11 discretion through s. 20 of the CCAA. However, this was not argued in the present case, and the facts before the court would not justify the removal of Messrs. Woollcombe and Keiper on oppression remedy grounds.

40      The pertinent portions of s. 11 of the CCAA provide as follows:

**Powers of court**

11. (1) Notwithstanding anything in the *Bankruptcy* and Insolvency Act or the Winding-up Act, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

**Initial application court orders**

(3) A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days.

> (a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

> (b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

> (c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

**Other than initial application court orders**

(4) A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose.

> (a) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

> (b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

> (c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

action, suit or proceeding against the company.

**Burden of proof on application**

(6) The court shall not make an order under subsection (3) or (4) unless

(a) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

(b) in the case of an order under subsection (4), the applicant also satisfied the court that the applicant has acted, and is acting, in good faith and with due diligence.

41    The rule of statutory interpretation that has now been accepted by the Supreme Court of Canada, in such cases as *R. v. Sharpe,* [2001] 1 S.C.R. 45 (S.C.C.), at para. 33, and *Rizzo & Rizzo Shoes Ltd., Re,* [1998] 1 S.C.R. 27 (S.C.C.), at para. 21 is articulated in E.A. Driedger, *The Construction of Statutes,* 2nd ed. (Toronto: Butterworths, 1983) as follows:

Today, there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.

See also Ruth Sullivan, *Sullivan and Driedger on the Construction of Statutes,* 4th ed. (Toronto: Butterworths, 2002) at page 262.

42    The interpretation of s. 11 advanced above is true to these principles. It is consistent with the purpose and scheme of the CCAA, as articulated in para. 38 above, and with the fact that corporate governance matters are dealt with in other statutes. In addition, it honours the historical reluctance of courts to intervene in such matters, or to second-guess the business decisions made by directors and officers in the course of managing the business and affairs of the corporation.

43    Mr. Leon and Mr. Swan argue that matters relating to the removal of directors do not fall within the court's discretion under s. 11 because they fall outside of the parameters of the court's role in the restructuring process, in contrast to the company's role in the restructuring process. The court's role is defined by the "on such terms as may be imposed" jurisdiction under subparagraphs 11(3)(a)-(c) and 11(4)(a)-(c) of the CCAA to stay, or restrain, or prohibit proceedings against the company during the "breathing space" period for negotiations and a plan. I agree.

44    What the court does under s. 11 is to establish the boundaries of the playing field and act as a referee in the process. The company's role in the restructuring, and that of its stakeholders, is to work out a plan or compromise that a sufficient percentage of creditors will accept and the court will approve and sanction. The corporate activities that take place in the course of the workout are governed by the legislation and legal principles that normally apply to such activities. In the course of acting as referee, the court has great leeway, as Farley J. observed in *Lehndorff General Partner Ltd., supra,* at para 5, "to make order[s] so as to effectively maintain the status quo in respect of an insolvent company while it attempts to gain the approval of its creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors". But the s. 11 discretion is not open-ended and unfettered. Its exercise must be guided by the scheme and object of the Act and by the legal principles that govern corporate law issues. Moreover, the court is not entitled to usurp the role of the directors and management in conducting what are in substance *the company's* restructuring efforts.

45    With these principles in mind, I turn to an analysis of the various factors underlying the interpretation of the s. 11 discretion.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

46    I start with the proposition that at common law directors could not be removed from office during the term for which they were elected or appointed: *London Finance Corp. v. Banking Service Corp. (1922), 23 O.W.N. 138* (Ont. H.C.); *Stephenson v. Vokes (1896), 27 O.R. 691* (Ont. H.C.). The authority to remove must therefore be found in statute law.

47    In Canada, the CBCA and its provincial equivalents govern the election, appointment and removal of directors, as well as providing for their duties and responsibilities. Shareholders elect directors, but the directors may fill vacancies that occur on the board of directors pending a further shareholders meeting: CBCA, ss. 106(3) and 111.[FN4] The specific power *to remove* directors is vested in the shareholders by s. 109(1) of the CBCA. However, s. 241 empowers the court — where it finds that oppression as therein defined exists — to "make any interim or final order it thinks fit", including (s. 241(3)(e)) "an order appointing directors in place of or in addition to all or any of the directors then in office". This power has been utilized to remove directors, but in very rare cases, and only in circumstances where there has been actual conduct rising to the level of misconduct required to trigger oppression remedy relief: see, for example, *Catalyst Fund General Partner I Inc. v. Hollinger Inc., [2004] O.J. No. 4722* (Ont. S.C.J.).

48    There is therefore a statutory scheme under the CBCA (and similar provincial corporate legislation) providing for the election, appointment, *and removal* of directors. Where another applicable statute confers jurisdiction with respect to a matter, a broad and undefined discretion provided in one statute cannot be used to supplant or override the other applicable statute. There is no legislative "gap" to fill. See *Baxter Student Housing Ltd. v. College Housing Co-operative Ltd., supra*, at p. 480; *Royal Oak Mines Inc. (Re), supra*; and *Richtree Inc. (Re), supra*.

49    At paragraph 7 of his reasons, the motion judge said:

The board is charged with the standard duty of "manage[ing], [*sic*] or supervising the management, of the business and affairs of the corporation": s. 102(1) CBCA. *Ordinarily the Court will not interfere with the composition of the board of directors. However, if there is good and sufficient valid reason to do so, then the Court must not hesitate to do so to correct a problem.* The directors should not be required to constantly look over their shoulders for this would be the sure recipe for board paralysis which would be so detrimental to a restructuring process; thus interested parties should only initiate a motion where it is reasonably obvious that there is a problem, actual or poised to become actual.

[emphasis added]

50    Respectfully, I see no authority in s. 11 of the CCAA for the court to interfere with the composition of a board of directors on such a basis.

51    Court removal of directors is an exceptional remedy, and one that is rarely exercised in corporate law. This reluctance is rooted in the historical unwillingness of courts to interfere with the internal management of corporate affairs and in the court's well-established deference to decisions made by directors and officers in the exercise of their business judgment when managing the business and affairs of the corporation. These factors also bolster the view that where the CCAA is silent on the issue, the court should not read into the s. 11 discretion an extraordinary power — which the courts are disinclined to exercise in any event — except to the extent that that power may be introduced through the application of other legislation, and on the same principles that apply to the application of the provisions of the other legislation.

*The Oppression Remedy Gateway*

52    The fact that s. 11 does not itself provide the authority for a CCAA judge to order the removal of directors does not mean that the supervising judge is powerless to make such an order, however. Section 20 of the CCAA offers a

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

gateway to the oppression remedy and other provisions of the CBCA and similar provincial statutes. Section 20 states:

> The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legis- lature of any province that authorizes or makes provision for the sanction of compromises or arrangements be- tween a company and its shareholders or any class of them.

53    The CBCA is legislation that "makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them". Accordingly, the powers of a judge under s. 11 of the CCAA may be applied together with the provisions of the CBCA, including the oppression remedy provisions of that statute. I do not read s. 20 as limiting the application of outside legislation to the provisions of such legislation dealing specifically with the sanctioning of compromises and arrangements between the company and its shareholders. The grammatical structure of s. 20 mandates a broader interpretation and the oppression remedy is, therefore, available to a supervising judge in appropriate circumstances.

54    I do not accept the respondents' argument that the motion judge had the authority to order the removal of the appellants by virtue of the power contained in s. 145(2)(b) of the CBCA to make an order "declaring the result of the disputed election or appointment" of directors. In my view, s. 145 relates to the procedures underlying disputed elections or appointments, and not to disputes over the composition of the board of directors itself. Here, it is conceded that the appointment of Messrs. Woollcombe and Keiper as directors complied with all relevant statutory require- ments. Farley J. quite properly did not seek to base his jurisdiction on any such authority.

*The Level of Conduct Required*

55    Colin Campbell J. recently invoked the oppression remedy to remove directors, without appointing anyone in their place, in *Catalyst Fund General Partner I Inc. v. Hollinger Inc.*, *supra* The bar is high. In reviewing the appli- cable law, C. Campbell J. said (para. 68):

> Director removal is *an extraordinary remedy* and certainly should be *imposed most sparingly*. As a starting point, I accept the basic proposition set out in Peterson, "Shareholder Remedies in Canada"[FN5]:
>
>> SS. 18.172 *Removing and appointing directors to the board is an extreme form of judicial intervention*. The board of directors is elected by the shareholders, vested with the power to manage the corporation, and ap- points the officers of the company who undertake to conduct the day-to-day affairs of the corporation. [Footnote omitted.] It is clear that the board of directors has control over policymaking and management of the corporation. *By tampering with a board, a court directly affects the management of the corporation*. If a reasonable balance between protection of corporate stakeholders and the freedom of management to conduct the affairs of the business in an efficient manner is desired, altering the board of directors should be *a measure of last resort*. The order could be suitable where the continuing presence of the incumbent directors is harmful to both the company and the interests of corporate stakeholders, and where the appointment of a new director or directors would remedy the oppressive conduct without a receiver or receiver-manager.
>
> [emphasis added]

56    C. Campbell J. found that the continued involvement of the Ravelston directors in the *Hollinger* situation would "significantly impede" the interests of the public shareholders and that those directors were "motivated by putting their interests first, not those of the company" (paras. 82-83). The evidence in this case is far from reaching any such benchmark, however, and the record would not support a finding of oppression, even if one had been sought.

57    Everyone accepts that there is no evidence the appellants have conducted themselves, as directors — in which capacity they participated over two days in the bid consideration exercise — in anything but a neutral fashion, having

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

regard to the best interests of Stelco and all of the stakeholders. The motion judge acknowledged that the appellants "may well conduct themselves beyond reproach". However, he simply decided there was a risk — a reasonable apprehension — that Messrs. Woollcombe and Keiper would not live up to their obligations to be neutral in the future.

58    The risk or apprehension appears to have been founded essentially on three things: (1) the earlier public statements made by Mr. Keiper about "maximizing shareholder value"; (2) the conduct of Clearwater and Equilibrium in criticizing and opposing the Stalking Horse Bid; and (3) the motion judge's opinion that Clearwater and Equilibrium — the shareholders represented by the appellants on the Board — had a "vision" that "usually does not encompass any significant concern for the long-term competitiveness and viability of an emerging corporation", as a result of which the appellants would approach their directors' duties looking to liquidate their shares on the basis of a "short-term hold" rather than with the best interests of Stelco in mind. The motion judge transposed these concerns into anticipated predisposed conduct on the part of the appellants as directors, despite their apparent understanding of their duties as directors and their assurances that they would act in the best interests of Stelco. He therefore concluded that "the risk to the process and to Stelco in its emergence [was] simply too great to risk the wait and see approach".

59    Directors have obligations under s. 122(1) of the CBCA (a) to act honestly and in good faith with a view to the best interest of the corporation (the "statutory fiduciary duty" obligation), and (b) to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances (the "duty of care" obligation). They are also subject to control under the oppression remedy provisions of s. 241. The general nature of these duties does not change when the company approaches, or finds itself in, insolvency: *People's Department Stores Ltd. (1992) Inc., Re, [2004] S.C.J. No. 64* (S.C.C.) at paras. 42-49.

60    In *Peoples* the Supreme Court noted that "the interests of the corporation are not to be confused with the interests of the creditors or those of any other stakeholders" (para. 43), but also accepted "as an accurate statement of the law that in determining whether [directors] are acting with a view to the best interests of the corporation it may be legitimate, given all the circumstances of a given case, for the board of directors to consider, *inter alia*, the interests of shareholders, employees, suppliers, creditors, consumers, governments and the environment" (para. 42). Importantly as well — in the context of "the shifting interest and incentives of shareholders and creditors" — the court stated (para. 47):

> In resolving these competing interests, it is incumbent upon the directors to act honestly and in good faith with a view to the best interests of the corporation. In using their skills for the benefit of the corporation when it is in troubled waters financially, the directors must be careful to attempt to act in its best interests by creating a "better" corporation, and not to favour the interests of any one group of stakeholders.

61    In determining whether directors have fallen foul of those obligations, however, more than some risk of anticipated misconduct is required before the court can impose the extraordinary remedy of removing a director from his or her duly elected or appointed office. Although the motion judge concluded that there was a risk of harm to the Stelco process if Messrs Woollcombe and Keiper remained as directors, he did not assess the level of that risk. The record does not support a finding that there was a sufficient risk of sufficient misconduct to warrant a conclusion of oppression. The motion judge was not asked to make such a finding, and he did not do so.

62    The respondents argue that this court should not interfere with the decision of the motion judge on grounds of deference. They point out that the motion judge has been case-managing the restructuring of Stelco under the CCAA for over fourteen months and is intimately familiar with the circumstances of Stelco as it seeks to restructure itself and emerge from court protection.

63    There is no question that the decisions of judges acting in a supervisory role under the CCAA, and particularly those of experienced commercial list judges, are entitled to great deference: see *Algoma Steel Inc. v. Union Gas Ltd. (2003), 63 O.R. (3d) 78* (Ont. C.A.) at para. 16. The discretion must be exercised judicially and in accordance with the

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

principles governing its operation. Here, respectfully, the motion judge misconstrued his authority, and made an order that he was not empowered to make in the circumstances.

64     The appellants argued that the motion judge made a number of findings without any evidence to support them. Given my decision with respect to jurisdiction, it is not necessary for me to address that issue. ⁻

### The Business Judgment Rule

65     The appellants argue as well that the motion judge erred in failing to defer to the unanimous decision of the Stelco directors in deciding to appoint them to the Stelco Board. It is well-established that judges supervising restructuring proceedings — and courts in general — will be very hesitant to second-guess the business decisions of directors and management. As the Supreme Court of Canada said in *Peoples, supra*, at para. 67:

> Courts are ill-suited and should be reluctant to second-guess the application of business expertise to the considerations that are involved in corporate decision making . . .

66     In *Brant Investments Ltd. v. KeepRite Inc. (1991), 3 O.R. (3d) 289* (Ont. C.A.) at 320, this court adopted the following statement by the trial judge, Anderson J.:

> Business decisions, honestly made, should not be subjected to microscopic examination. There should be no interference simply because a decision is unpopular with the minority.[FN6]

67     McKinlay J.A then went on to say:

> There can be no doubt that on an application under s. 234[FN7] the trial judge is required to consider the nature of the impugned acts and the method in which they were carried out. That does not meant that the trial judge should substitute his own business judgment for that of managers, directors, or a committee such as the one involved in assessing this transaction. Indeed, it would generally be impossible for him to do so, regardless of the amount of evidence before him. He is dealing with the matter at a different time and place; it is unlikely that he will have the background knowledge and expertise of the individuals involved; he could have little or no knowledge of the background and skills of the persons who would be carrying out any proposed plan; and it is unlikely that he would have any knowledge of the specialized market in which the corporation operated. In short, he does not know enough to make the business decision required.

68     Although a judge supervising a CCAA proceeding develops a certain "feel" for the corporate dynamics and a certain sense of direction for the restructuring, this caution is worth keeping in mind. See also *Skeena Cellulose Inc., Re, supra, Sammi Atlas Inc., Re (1998), 3 C.B.R. (4th) 171* (Ont. Gen. Div. [Commercial List]); *Olympia & York Developments Ltd. (Re), supra; Alberta-Pacific Terminals Ltd., Re (1991), 8 C.B.R. (3d) 99* (B.C. S.C.). The court is not catapulted into the shoes of the board of directors, or into the seat of the chair of the board, when acting in its supervisory role in the restructuring.

69     Here, the motion judge was alive to the "business judgment" dimension in the situation he faced. He distinguished the application of the rule from the circumstances, however, stating at para. 18 of his reasons:

> With respect I do not see the present situation as involving the "management of the business and affairs of the corporation", but rather as a quasi-constitutional aspect of the corporation entrusted albeit to the Board pursuant to s. 111(1) of the CBCA. I agree that where a board is actually engaged in the business of a judgment situation, the board should be given appropriate deference. However, to the contrary in this situation, I do not see it as a situation calling for (as asserted) more deference, but rather considerably less than that. With regard to this decision of the Board having impact upon the capital raising process, as I conclude it would, then similarly deference ought

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

not to be given.

70      I do not see the distinction between the directors' role in "the management of the business and affairs of the corporation" (CBCA, s. 102) — which describes the directors' overall responsibilities — and their role with respect to a "quasi-constitutional aspect of the corporation" (i.e. in filling out the composition of the board of directors in the event of a vacancy). The "affairs" of the corporation are defined in s. 1 of the CBCA as meaning "the relationships among a corporation, it affiliates and the shareholders, directors and officers of such bodies corporate but does not include the business carried on by such bodies corporate". Corporate governance decisions relate directly to such relationships and are at the heart of the Board's business decision-making role regarding the corporation's business *and* affairs. The dynamics of such decisions, and the intricate balancing of competing interests and other corporate-related factors that goes into making them, are no more within the purview of the court's knowledge and expertise than other business decisions, and they deserve the same deferential approach. Respectfully, the motion judge erred in declining to give effect to the business judgment rule in the circumstances of this case.

71      This is not to say that the conduct of the Board in appointing the appellants as directors may never come under review by the supervising judge. The court must ultimately approve and sanction the plan of compromise or arrangement as finally negotiated and accepted by the company and its creditors and stakeholders. The plan must be found to be fair and reasonable before it can be sanctioned. If the Board's decision to appoint the appellants has somehow so tainted the capital raising process that those criteria are not met, any eventual plan that is put forward will fail.

72      The respondents submit that it makes no sense for the court to have jurisdiction to declare the process flawed only after the process has run its course. Such an approach to the restructuring process would be inefficient and a waste of resources. While there is some merit in this argument, the court cannot grant itself jurisdiction where it does not exist. Moreover, there are a plethora of checks and balances in the negotiating process itself that moderate the risk of the process becoming irretrievably tainted in this fashion — not the least of which is the restraining effect of the prospect of such a consequence. I do not think that this argument can prevail. In addition, the court at all times retains its broad and flexible supervisory jurisdiction — a jurisdiction which feeds the creativity that makes the CCAA work so well — in order to address fairness and process concerns along the way. This case relates only to the court's exceptional power to order the removal of directors.

### The Reasonable Apprehension of Bias Analogy

73      In exercising what he saw as his discretion to remove the appellants as directors, the motion judge thought it would be useful to "borrow the concept of reasonable apprehension of bias . . .with suitable adjustments for the nature of the decision making involved" (para. 8). He stressed that "there was absolutely no allegation against [Mr. Woollcombe and Mr. Keiper] of any actual 'bias' or its equivalent" (para. 8). He acknowledged that neither was alleged to have done anything wrong since their appointments as directors, and that at the time of their appointments the appellants had confirmed to the Board that they understood and would abide by their duties and responsibilities as directors, including the responsibility to act in the best interests of the corporation and not in their own interests as shareholders. In the end, however, he concluded that because of their prior public statements that they intended to "pursue efforts to maximize shareholder value at Stelco", and because of the nature of their business and the way in which they had been accumulating their shareholding position during the restructuring, and because of their linkage to 40% of the common shareholders, there was a risk that the appellants would not conduct themselves in a neutral fashion in the best interests of the corporation as directors.

74      In my view, the administrative law notion of apprehension of bias is foreign to the principles that govern the election, appointment and removal of directors, and to corporate governance considerations in general. Apprehension of bias is a concept that ordinarily applies to those who preside over judicial or quasi-judicial decision-making bodies, such as courts, administrative tribunals or arbitration boards. Its application is inapposite in the business decision-making context of corporate law. There is nothing in the CBCA or other corporate legislation that envisages the

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

screening of directors in advance for their ability to act neutrally, in the best interests of the corporation, as a prerequisite for appointment.

75      Instead, the conduct of directors is governed by their common law and statutory obligations to act honestly and in good faith with a view to the best interests of the corporation, and to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances (CBCA, s. 122(1)(a) and (b)). The directors also have fiduciary obligations to the corporation, and they are liable to oppression remedy proceedings in appropriate circumstances. These remedies are available to aggrieved complainants — including the respondents in this case — but they depend for their applicability on the director having engaged in conduct justifying the imposition of a remedy.

76      If the respondents are correct, and reasonable apprehension that directors may not act neutrally because they are aligned with a particular group of shareholders or stakeholders is sufficient for removal, all nominee directors in Canadian corporations, and all management directors, would automatically be disqualified from serving. No one suggests this should be the case. Moreover, as Iacobucci J. noted in *Blair v. Consolidated Enfield Corp.*, [1995] 4 S.C.R. 5 (S.C.C.) at para. 35, "persons are assumed to act in good faith unless proven otherwise". With respect, the motion judge approached the circumstances before him from exactly the opposite direction. It is commonplace in corporate/commercial affairs that there are connections between directors and various stakeholders and that conflicts will exist from time to time. Even where there are conflicts of interest, however, directors are not removed from the board of directors; they are simply obliged to disclose the conflict and, in appropriate cases, to abstain from voting. The issue to be determined is not whether there is a connection between a director and other shareholders or stakeholders, but rather whether there has been some conduct on the part of the director that will justify the imposition of a corrective sanction. An apprehension of bias approach does not fit this sort of analysis.

**Part V — Disposition**

77      For the foregoing reasons, then, I am satisfied that the motion judge erred in declaring the appointment of Messrs. Woollcombe and Keiper as directors of Stelco of no force and effect.

78      I would grant leave to appeal, allow the appeal and set aside the order of Farley J. dated February 25, 2005.

79      Counsel have agreed that there shall be no costs of the appeal.

*Goudge J.A.*:

I agree.

*Feldman J.A.*:

I agree.

*Appeal allowed.*

FN1 R.S.C. 1985, c. C-36, as amended.

FN2 The reference is to the decisions in *Dyle, Royal Oak Mines, and Westar*, cited above.

FN3 See paragraph 43, *infra*, where I elaborate on this distinction.

FN4 It is the latter authority that the directors of Stelco exercised when appointing the appellants to the Stelco Board.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellOnt 1188, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 196 O.A.C. 142, 253 D.L.R. (4th) 109, 75 O.R. (3d) 5

FN5 Dennis H. Peterson, Shareholder Remedies in Canada (Markham: LexisNexis — Butterworths — Looseleaf Service, 1989) at 18-47.

FN6 Or, I would add, unpopular with other stakeholders.

FN7 Now s. 241.

END OF DOCUMENT

\\apps1\users\creerym\Nortel\Stelco.doc

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

Calpine Canada Energy Ltd., Re

In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of Calpine Canada Energy Limited, Calpine Canada Power Ltd., Calpine Canada Energy Finance ULC, Calpine Energy Services Canada Ltd., Calpine Canada Resources Company, Calpine Canada Power Services Ltd., Calpine Canada Energy Finance II ULC, Calpine Natural Gas Services Limited, and 3094479 Nova Scotia Company (Applicants)

Alberta Court of Queen's Bench

B.E. Romaine J.

Heard: July 24, 2007
Judgment: July 31, 2007[FN*]
Docket: Calgary 0501-17864

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: Larry B. Robinson, Sean F. Collins, Jay A. Carfagnini, Fred Myers, Brian Empey, Joseph Pasquariello for CCAA Debtors

Patrick McCarthy, Q.C., Josef A. Krueger for Monitor

Robert I. Thornton, John L. Finnigan, Rachelle F. Moncur for Ad Hoc Committee

Sean F. Dunphy, Elizabeth Pillon for ULC2 Trustee

Howard A. Gorman for ULC1 Noteholders Committee

Peter H. Griffin, Peter J. Osborne for U.S. Debtors

Peter T. Linder, Q.C., Emi R. Bossio for Fund

Ken Lenz for HSBC Bank USA, N.A., as ULC1 Indenture Trustee

Jay A. Swartz for Lehman Brothers

Rinus De Waal for Unsecured Creditors' Committee

Neil Rabinovitch for Unofficial Committee of 2nd Lien Debtholders

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

B.A.R. Smith, Q.C. for Alliance Pipelines

Douglas I. McLean for TransCanada Pipelines Limited

Subject: Insolvency

Bankruptcy and insolvency --- Proposal — Companies' Creditors Arrangement Act — Arrangements — Approval by court — "Fair and reasonable"

Applicants obtained order granting them protection from their creditors under Companies' Creditors Arrangement Act ("CCAA") — Order appointed monitor and provided for stay of proceedings against applicants and against CESC Partnership, CCNG Partnership, and CCS Limited Partnership — Applicants and these three parties were together referred to as CCAA debtors — Parties negotiated terms of global settlement agreement ("GSA") — Monitor noted that GSA resolved all material issues that existed between applicants and US debtors — Monitor concluded that GSA was beneficial to CCAA debtors and their creditors and unequivocally endorsed GSA — CCAA applicants and US debtors brought application to this court and to United States Bankruptcy Court in joint hearing for approval of settlement of these major issues — Application granted — GSA was approved — GSA was not plan of compromise or arrangement with creditors and therefore, vote by creditors was not necessary — No rights were being confiscated under GSA — Some claims were eliminated, but only with full consent of parties directly involved in those specific claims — GSA resolved most of cross-border issues in reasonably equitable and rational manner, provided mechanism by which number of remaining issues could be resolved in court of one jurisdiction or other, and provided likelihood of greatly enhanced recoveries and expectation that overwhelming majority of Canadian stakeholders would be paid in full — GSA eliminated substantial amount in claims against CCAA debtors and resolved major issues between CCAA debtors and US debtors that had stalled meaningful process in asset realization and claims resolution — GSA unlocked Canadian proceeding and provided mechanism for resolution by adjudication or settlement of remaining issues and significant creditor claims and clarification of priorities — GSA provided clear benefits to Canadian creditors of CCAA debtors and no creditor was worse off as result of GSA considered as whole — While GSA did not guarantee full payment of claims, it substantially reduced risk that this goal would not be achieved — Some risk did not make GSA unfair.

**Cases considered by *B.E. Romaine J.*:**

*Air Canada, Re* (2004), 2004 CarswellOnt 469, 47 C.B.R. (4th) 169 (Ont. S.C.J. [Commercial List]) — considered

*Cable Satisfaction International Inc. v. Richter & Associés inc.* (2004), 2004 CarswellQue 810, 48 C.B.R. (4th) 205 (Que. S.C.) — considered

*Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* (1998), 1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, 72 O.T.C. 99 (Ont. Gen. Div. [Commercial List]) — considered

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275, 1993 CarswellOnt 183 (Ont. Gen. Div. [Commercial List]) — referred to

*Menegon v. Philip Services Corp.* ( 1999), **11 C.B.R. ( 4th) 262, 1999 CarswellOnt 3240, 39 C.P.C.** ( 4th) 287 (Ont. S.C.J. [Commercial List]) — considered

*Playdium Entertainment Corp., Re* (2001), 2001 CarswellOnt 3893, 18 B.L.R. (3d) 298, 31 C.B.R. (4th) 302 (Ont.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

S.C.J. [Commercial List]) — considered

*Royal Bank v. Fracmaster Ltd.* (1999), *(sub nom. UTI Energy Corp. v. Fracmaster Ltd.)* 244 A.R. 93, *(sub nom. UTI Energy Corp. v. Fracmaster Ltd.)* 209 W.A.C. 93, 11 C.B.R. (4th) 230, 1999 CarswellAlta 539, 1999 ABCA 178 (Alta. C.A.) — referred to

*Stelco Inc., Re* (2005), 204 O.A.C. 216, 78 O.R. (3d) 254, 2005 CarswellOnt 6283, 15 C.B.R. (5th) 288 (Ont. C.A.) — considered

*T. Eaton Co., Re* (1999), 1999 CarswellOnt 4112, 14 C.B.R. (4th) 298 (Ont. S.C.J. [Commercial List]) — referred to

**Statutes considered:**

*Bankruptcy Code*, 11 U.S.C. 1982

Chapter 11 — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

Generally — referred to

s. 4 — referred to

s. 5 — referred to

s. 6 — referred to

s. 11 — referred to

s. 18.6 [en. 1997, c. 12, s. 125] — considered

APPLICATION by debtors for approval of settlement.

***B.E. Romaine J.:***

**Introduction**

1    This application involves the most recent development in the lengthy and complicated Calpine insolvency. That insolvency has required proceedings both in this jurisdiction under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") and in the United States under Chapter 11 of the U.S. Bankruptcy Code. The matter is extremely complex, involving many related corporations and partnerships, highly intertwined legal and financial obligations and a number of cross-border issues. The resolution of these proceedings has been delayed by several difficult issues with implications for the insolvencies on both sides of the border. The above-noted applicants (collectively, the "Calpine Applicants") and the U.S. debtors applied to this Court and to the United States Bankruptcy Court of the Southern District of New York in a joint hearing for approval of a settlement of these major issues, which they say will break the deadlock.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

2    Both Courts approved the settlement. These are my reasons for that approval.

**Background**

3    Given the complexity of the matter, it will be useful to set out some background. On December 20, 2005, the Calpine Applicants obtained an order of this Court granting them protection from their creditors under the CCAA. That order appointed Ernst & Young Inc. as Monitor. It also provided for a stay of proceedings against the Calpine Applicants and against Calpine Energy Services Canada Partnership ("CESCA"), Calpine Canada Natural Gas Partnership ("CCNG") and Calpine Canadian Saltend Limited Partnership ("Saltend LP"). The Monitor's 23rd Report dated June 28, 2007 refers to the latter three parties collectively as the "CCAA Parties" and to those parties together with the Calpine Applicants as the "CCAA Debtors". Where I have quoted terms and definitions from the Report, I adopt those terms and definitions for purposes of these Reasons. On the same day, Calpine Corporation and certain of its direct and indirect U. S. subsidiaries filed voluntary petitions to restructure under Chapter 11 of the U.S. Bankruptcy Code. The Monitor refers to Calpine Corporation ("CORPX"), the primary party in the U. S. insolvency proceedings, and its U.S. subsidiaries collectively as the "U.S. Debtors".

4    During the course of the CCAA proceedings, a number of applications were made relating to the relationship of the CCAA Debtors and Calpine Power L.P. (the "Fund"), leading ultimately to the short and long-term retolling of the Calgary Energy Centre and the sale of the interest of Calpine Canada Power Ltd. ("CCPL") in the Fund to HCP Acquisition Inc. ("Harbinger") in February 2007, a sale that closed simultaneously with Harbinger's takeover of the publicly-held units in the Fund.

5    In addition to these issues, progress in the restructuring and the realization of maximum value for assets was made more difficult by various cross-border issues. The Report sets out the following "material cross-border issues that needed to be resolved between the CCAA Debtors and the U.S. Debtors":

   a. The Hybrid Note Structure ("HNS") and whether Calpine Canada Energy Finance ULC ("ULC1"), including the holders of the 8 2% Senior Notes due 2008 (the "ULC1 Notes") issued by ULC1 and fully and unconditionally guaranteed by CORPX, had multiple guarantee claims against CORPX;

   b. The sale by Calpine Canada Resources Company ("CCRC") of its holdings of U.S.$359,770,000 in ULC1 Notes (the "CCRC ULC1 Notes") and the effect of the U.S. Debtors' so-called Bond Differentiation Claims ("BDCs") on such a sale;

   c. Cross-border intercompany claims between the CCAA Debtors and the U.S. Debtors;

   d. Third party claims made against certain CCAA Debtors that were guaranteed by the U.S. Debtors;

   e. The priority of the claim of Calpine Canada Energy Limited ("CCEL") against CCRC;

   f. A fraudulent conveyance action brought by the CCAA Debtors in this Court (the "Greenfield Action");

   g. Potential claims by the U.S. Debtors to the remaining proceeds repatriated from the sale of the Saltend Energy Centre;

   h. Cross-border marker claims filed by the U.S. Debtors and the CCAA Debtors and the appropriate jurisdiction in which to resolve those claims; and

   i. Marker claims filed by the ULC1 Indenture Trustee.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

6 In the Report, the Monitor describes the settlement process that led to this application as follows:

10. The CCAA Debtors and the U.S. Debtors concluded that the only way to resolve the issues between them was to concentrate on reaching a consensual global agreement that resolved virtually all the issues referred to above. The [CCAA Debtors and the U.S. Debtors] realized that without a global agreement, they could have faced lengthy and costly cross-border litigation.

11. Over the last five months, the Monitor and the CCAA Debtors held numerous discussions with the U.S. Debtors regarding a possible global settlement of the outstanding material and other issues. In addition, during various stages of discussion with the U.S. Debtors, the CCAA Debtors and the Monitor sought input from the major Canadian stakeholders as to the format and terms of a settlement.

12. While the settlement discussions between the U.S. Debtors and the CCAA Debtors were underway, the ad hoc committee of certain holders of ULC1 Notes reached terms of a separate settlement between the holders of the ULC1 Notes and CORPX (the "Preliminary ULC1 Settlement"). The terms of the Preliminary ULC1 Settlement were agreed to on April 13, 2007 and publicly announced by CORPX on April 18, 2007.

13. As a result of the above discussions and negotiations, [a settlement outline (the "Settlement Outline")] was agreed to on May 13, 2007 and publicly announced by CORPX on May 14, 2007. The Settlement Outline incorporates the terms of the Preliminary ULC1 Settlement. ...

14. The parties have negotiated the terms of [a global settlement agreement memorializing the terms of the Settlement Outline (the "GSA")] ...

17. The [GSA] is subject to the following conditions:

 a. The approval of both this Court and the U.S. Bankruptcy Court;

 b. The execution of the [GSA]; and

 c. The CCRC ULC1 Notes being sold.

7 As the Monitor notes, the GSA resolves all of the material issues that exist between the Calpine Applicants and the U. S. Debtors. The Report describes the "key elements" of the GSA as follows:

 a. The [GSA] provides for the ULC1 Note Holders to effectively receive a claim of 1.65x the amount of the ULC1 Indenture Trustee's proof of claim ... against CORPX which results in a total claim against CORPX in the amount of US$3.505 billion (the "ULC1 1.65x Claim"). The 1.65x factor was agreed between the U.S. Debtors and the ad hoc committee of certain holders of the ULC1 Notes. As a result of the [GSA], the terms of the HNS can be honoured with no material adverse economic impact to the U.S. Debtors, CCAA Debtors or their creditors;

 b The withdrawal of the BDCs advanced by the U.S. Debtors...;

 c. An agreement between the U.S. Debtors and the CCAA Debtors as to the cooperation in the sale of the CCRC ULC1 Notes;

 d. The priority of claims against CCRC are clarified, including the claim of CCEL against CCRC being

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

postponed to all other claims against CCRC;

e. The acknowledgement by the U.S. Debtors of certain guarantee claims advanced by creditors in the CCAA proceedings and the agreement by the U.S. Debtors that the quantum of these guarantee claims will be determined by the Canadian Court. The [GSA] contemplates that U.S. Debtors and their official committees will be afforded the right to fully participate in any settlement or adjudication of these guarantee claims. Pursuant to the [GSA], the U.S. Debtors acknowledge their guarantee of the following CCAA Debtors' creditors' claims:

> i. The claims of Alliance Pipeline Partnership, Alliance Pipeline L.P., and Alliance Pipeline Inc. (collectively "Alliance") for repudiation of certain long-term gas transportation contracts held by CESCA;

> ii. The claims of NOVA Gas Transmission Ltd. ("NOVA") for the repudiation of certain long-term gas transportation contracts held by CESCA;

> iii. The claims of TransCanada Pipelines Limited ("TCPL") for the repudiation of certain long-term gas transportation contracts held by CESCA;

> iv. The claims of Calpine Power L.P. [the "Fund"] for the repudiation of the tolling agreement between [the Fund] and CESCA (the "CLP Toll Claim");

> v. The claims of [the Fund] and Calpine Power Income Fund ("CPIF") relating to a potential fee resulting from the alleged transfer of the Island co-generation facility (the "Island Transfer Fee Claim"); and

> vi. The claims of [the Fund] for heat rate indemnity relating to the Island co-generation facility (the "Heat Rate Penalty Claim"); and

f. The withdrawal of virtually all U.S. and CCAA Debtor Marker Claims;

g. The settlement of the Greenfield Action;

h. The withdrawal of the UL1 Indenture Trustee Marker Claim;

i. The withdrawal of the claims filed by the Indenture Trustee of the Second Lien Notes against the CCAA Debtors;

j The resolution of the quantum of the cross-border intercompany claims...;

k. The settlement of the ULC2 Claims as against CCRC (as between the CCAA Debtors and the U.S. Debtors) and also confirmation of the ULC2 guarantee by CORPX;

l. The payment of all liabilities of ULC2, including the amounts due on the ULC2 Notes. For example, the ULC2 Indenture Trustee has advised that it believes a make-whole payment is applicable if ULC2 repays the holders of the ULC2 Notes prior to the final payment date as set out in the Indenture (the "ULC2 Make-Whole Premium"). The CCAA Debtors and the U.S. Debtors dispute that the ULC2 Make-Whole Premium is applicable. However, the [GSA] contemplates that if the issue is not resolved by the date of distribution to the ULC2 direct creditors, an amount sufficient to satisfy the claim may be set aside in escrow pending the determination of the issue;

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works