2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

m. An agreement on the allocation of professional fees relating to the CCAA proceedings amongst the CCAA Debtors and agreement as to the quantum of certain aspects of the Key Employee Retention Plan...;

n. Resolution of all jurisdictional issues between Canada and the U.S.; and

o. An agreement as to the allocation of the proceeds from the sale of Thomassen Turbines Systems, B.V. ("TTS").

8    The Monitor describes and analyzes the terms and effect of the GSA in great detail in the Report. It concludes that the GSA is beneficial to the CCAA Debtors and their creditors, providing a medium for an efficient payout of many of the creditors, resolving all material disputes between the CCAA Debtors and the U.S. Debtors without costly and time-consuming cross-border litigation, settling the complex priority issues of CCRC and providing for the admission by the U.S. Debtors of the validity of guarantees provided to certain creditors of the CCAA Debtors. It is important to note that the Monitor unequivocally endorses the GSA.

**The Applications**

9    The Calpine Applicants sought three orders from this Court. First, they sought an order approving the terms of the GSA and directing the various parties to execute such documents and implement such transactions as might be necessary to give effect to the GSA. Second, they sought an order permitting CCRC and ULC1 to take the necessary steps to sell the CCRC ULC1 Notes. Third, they sought an extension of the stay contemplated by the initial CCAA order to December 20, 2007.

10    The application was made concurrently with an application by the U.S. Debtors to the U.S. Bankruptcy Court in New York state, the two applications proceeding simultaneously by videoconference. No objection was taken to the latter two orders sought from this Court and I have granted both. I also gave approval to the GSA with brief oral reasons. I indicated to counsel at the hearing that these more detailed written reasons would be forthcoming as soon as possible. The applications to the U.S. Court, including an application for approval of the GSA, were also granted.

11    The controversial point in the applications, both to this Court and to the U.S. Court, was approval of the GSA. The parties standing in opposition to the GSA are the Fund, the ULC2 Indenture Trustee and a group referring to itself as the "*Ad Hoc* Committee of Creditors of Calpine Canada Resources Company" (the "Ad Hoc Committee"). (HSBC Bank USA, N.A., as ULC1 Indenture Trustee, also filed a technical objection, but it has since been withdrawn.) The bench brief of the Ad Hoc Committee states that it "is comprised of members of the *Ad Hoc* Committee of Bondholders of Calpine Canada Energy Finance II ULC ... and Calpine Power, L.P.". Thus, the Ad Hoc Committee consists of the Fund and certain unknown ULC2 noteholders. There was some objection to the status of the Ad Hoc Committee to oppose the GSA independently of the Fund, but that objection was not strenuously pursued and I do not need to address it. However, I note that the Fund thus makes its arguments through both the Ad Hoc Committee and its separate counsel, and the ULC2 noteholders make theirs through both the ULC2 Indenture Trustee and the Ad Hoc Committee. I will refer to those parties opposing the GSA collectively as the "Opposing Creditors" hereafter. The Opposing Creditors object to the GSA on a number of grounds and there is much overlap among their positions.

12    The primary objection is that the GSA amounts to a plan of arrangement and, therefore, requires a vote by the Canadian creditors. The Opposing Creditors support their submissions by isolating particular elements of the GSA and characterizing them as either a compromise of their rights or claims or as examples of imprudent concessions made by the CCAA Debtors in the negotiation of the GSA. These specific objections will be analysed in the next part of these reasons, but, taken together, they fail to establish that the GSA is a compromise of the rights of the Opposing Creditors for two major reasons:

a) the GSA must be reviewed as a whole, and it is misleading and inaccurate to focus on one part of the set-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

tlement without viewing the package of benefits and concessions in its overall effect. The Opposing Creditors have discounted the benefits to the Canadian estate of the resolution of $7.4 billion in claims against the CCAA Debtors by arguing that these claims had no value. As the Report notes:

> ...While the Monitor believes it is unlikely that the CCAA Debtors would have been unsuccessful on all the issues [identified earlier in these Reasons as material cross-border issues], there was a real risk of one or more claims being successfully advanced against CCRC by the U. S. Debtors or the ULC1 Trustee and, had this risk materialized, the recovery to the CCRC direct creditors and CESCA creditors would have been materially reduced.

b) the Opposing Creditors blur the distinction between compromises validly reached among the parties to the GSA and the effect of those compromises on creditors who are not parties to the GSA. The Monitor has opined that the GSA allows for the maximum recovery to all the CCAA Debtors' creditors. According to the Monitor's conservative calculations, virtually all the Canadian creditors, including the Opposing Creditors, likely will be paid the full amount of their claims as settled or adjudicated, either from the Canadian estate or as a U.S. guarantee claim. If claims are to be paid in full, they are not compromised. If rights to a judicial determination of an outstanding issue have not been terminated by the GSA, which instead provides a mechanism for their efficient and timely resolution, those rights are not compromised.

**The Ad Hoc Committee's Objections**

13      The Ad Hoc Committee asserts that the GSA expropriates assets with a value of approximately U.S.$650 million to the U.S. Debtors that would otherwise be available to Canadian creditors, leaving insufficient value in the Canadian estates to ensure that the Canadian creditors are paid in full. The Ad Hoc Committee argues that the Canadian creditors will receive less than full recovery and that, therefore, their claims have been compromised.

14      This submission is misleading. The $650 million refers to two elements of the GSA: a payout to the U.S. Debtors of $75 million from CCRC in exchange for the withdrawal of the U.S. Debtors BDCs, settlement of the U.S. Debtors' claims against the Saltend proceeds and the postponement of CCEL's claim against CCRC and the elimination of CCRC's unlimited liability corporation claim against its member contributory, CCEL, which the Opposing Creditors complain effectively denies access to an intercompany claim of $575 million. I do not accept that the GSA "expropriates" assets to the U.S. Debtors, who had both equity and creditor claims against the Canadian estates that they relinquished as part of the GSA. The GSA is a product of negotiation and settlement and required certain sacrifices on the part of both the U.S. Debtors and the CCAA Debtors. The Ad Hoc Committee's piecemeal analysis of the GSA ignores the other considerable benefits flowing to the Canadian estate from the GSA, including the subordination of CCEL's $2.1 billion claim against CCRC. As recognized by the Monitor, this postponement permits the CESCA shortfall claim to participate in the anticipated CCRC net surplus, failing which the recovery by creditors of CESCA (notably including the Fund) would be materially reduced. The Ad Hoc Committee also fails to mention that an additional $50 million of claims against CESCA advanced by the U.S. Debtors have been postponed to the claims of other CESCA creditors.

15      The Ad Hoc Committee argues that the U.S. Debtors' claims that have been withdrawn are "untested" and "unmeritorious". Certainly, the claims have not been tested through litigation. However, it is the very nature of settlement to withdraw claims in order to avoid protracted and costly litigation. While the Ad Hoc Committee may consider the U.S. Debtors' claims unmeritorious, their saying so does not make it so. The fact remains that the U.S. Debtors have agreed, as part of the GSA, to withdraw claims that would otherwise have to be adjudicated, likely at considerable time and expense.

16      As part of the GSA, the U.S. Debtors agree to cooperate in the sale of the CCRC ULC1 Notes. The Ad Hoc Committee is of the view that that cooperation "should have been forthcoming in any event". Nevertheless, the U.S.

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

Debtors previously have not been prepared to accede to such a sale, insisting instead on asserting their BDCs. The sale is acknowledged to be critical to resolution of this insolvency and the present willingness of the U.S. Debtors to co-operate therein is of great value.

17      The Ad Hoc Committee also takes issue with the recovery available under the GSA to the creditors of CESCA, arguing that those creditors face a potential shortfall of at least $175 million. The cited shortfall of $175 million is again misleading, failing to take into account that the Fund, to the extent that its claims are adjudicated to be valid and there is a shortfall in CESCA, will now have the benefit of acknowledged guarantees of these claims by the U.S. Debtors as a term of the GSA. The Monitor thus reports its expectation that the Fund's claims will be paid in full. There exists, therefore, only the potential, under the Monitor's "low" recovery scenario, of a shortfall in CESCA of $25.1 million. Those creditors who may be at risk of such a shortfall are not the Opposing Creditors, but certain trade creditors to the extent of approximately $2 million, who are not objecting to the GSA, and certain gas transportation claimants to the extent of approximately $23 million, who appeared before the Court at the hearing to support the approval of the GSA on the basis that it improves their chances of recovery.

18      The shortfall, if any, to which the creditors of CESCA will be exposed will depend upon the quantum of the CLP Toll Claim. As yet, this claim remains, to use the Ad Hoc Committee's word, untested. Assessments of its value range from $142 million to $378 million. The Monitor's analysis, taking into account the guarantees by the U.S. Debtors contemplated by the GSA, indicates that if this claim is adjudged to be worth $200 million or less, all of the CESCA creditors will be assured of full payment whether under the "high" or "low" scenarios. Alternatively, under the Monitor's "high" recovery scenario, all creditors of CESCA will receive full payment even if the CLP Toll Claim is worth as much as $300 million.

19      Further, as I indicated in my oral reasons, even if the Fund does not receive full payment of the CLP Toll Claim through the Canadian estate, the GSA cannot be said to be a compromise of that claim. The GSA contemplates adjudication of the CLP Toll Claim rather than foreclosing it. While settlements made in the course of insolvency proceedings may, in practical terms, result in a diminution of the pool of assets remaining for division, this is not equivalent to a compromise of substantive rights. This point is discussed further later in these Reasons.

20      The Ad Hoc Committee points out that, according to the Report, the GSA results in recovery for CCPL of only 39% to 65%. As the Fund is CCPL's major creditor, the Ad Hoc Committee argues that this level of anticipated recovery constitutes a compromise of the Fund's claim in this respect.

21      The response to this argument is two-fold. First, the Report indicates that the CCPL recovery range is largely dependent upon the quantum of the Fund's Heat Rate Penalty Claim. The Monitor has taken the conservative approach of estimating the amount of this claim at the amount asserted by the Fund; the actual amount adjudicated may be less, resulting in greater recovery for CCPL. Further, the Monitor notes that, as part of the GSA, CORPX acknowledges its guarantee of the Heat Rate Penalty Claim. Therefore, the Monitor concludes that "[t]o the extent there is a shortfall in CCPL, based again upon the Monitor's expectation that CORPX's creditors should be paid 100% of filed and accepted claims, [the Fund] should be paid in full for the Heat Rate Penalty Claim regardless of whether a shortfall resulted in CCPL". As discussed above, the possibility of a shortfall in the asset pool against which claims may be made is not equivalent to a compromise of those claims. The Monitor reports that only $25,000 of CCPL's creditors may face a risk of less than 100% recovery after consideration of the CORPX guarantees under the "low" scenario, and those only to the extent of a $15,000 shortfall and that the CCAA Debtors are considering options to pay out these nominal creditors in any event.

22      The Ad Hoc Committee argues that CORPX's guarantees are not a satisfactory solution to potential shortfalls because resort to the guarantees may result in the issuance of equity rather than the payment of cash. This, however, is by no means certain at this point. Parties who must avail themselves of CORPX's guarantees will participate in the U.S. bankruptcy proceedings and will be entitled to a say in the ultimate distribution that results from those proceedings. The Opposing Creditors complain that recovery under the guarantees is uncertain as to timing and amount of

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

consideration. However, the GSA removes any hurdle these creditors may have in establishing their rights to guarantees. Without the acknowledgment of guarantees that forms part of the GSA, those creditors who sought to rely on the guarantees faced an inefficient and expensive process to establish their rights in the face of the stay of proceedings in place in the U.S. proceedings. While it is true that the expectation of full payment under the GSA with respect to guarantee claims rests on the Monitor's expectation that these claims will be paid in full, the U. S. Debtors in a disclosure statement released on June 20, 2007 announced their expectation that their plan of reorganization in the U.S. proceedings would provide for the distribution of sufficient value to pay all creditors in full and to make some payment to existing shareholders.

23    The Ad Hoc Committee also argues that the GSA purports to dismiss claims filed by the ULC2 Indenture Trustee on behalf of the ULC2 noteholders without consent or adjudication. They further take the position that this alleged dismissal is to occur prior to any payment of the claims of the ULC2 noteholders, such payment being subject to further Court order and to a reserved ability on the part of the CCAA Debtors to seek to compromise certain of the ULC2 noteholders' claims.

24    Again, this is an inaccurate characterization of the effect of the GSA. First, as noted above, the GSA contemplates setting aside in escrow sufficient funds to satisfy the claims of the ULC2 noteholders pending adjudication. Thus, there is no compromise. With respect to the timing issue, it is important to remember that these claims are not being dismissed as part of the GSA. They remain extant pending adjudication and, if appropriate, payment from the funds held in escrow.

25    Finally, while the Ad Hoc Committee does not object to the sale of the CCRC ULC1 Notes, it argues that there is no urgency to such sale and that it should not occur until after there has been a determination of the various claims. As counsel for the Calpine Applicants pointed out, this is a somewhat disingenuous position for the Ad Hoc Committee to take, given its previous expressions of impatience in respect of the sale.

26    I am satisfied that the potential market for the CCRC ULC1 Notes is volatile and that, now that the impediments to the sale have been removed, it is prudent and indeed necessary for the CCRC ULC1 Notes to be sold as soon as possible. The present state of the market has created an opportunity for a happy resolution of this CCAA filing that should not be allowed to be lost. In addition to alleviating market risk, the GSA will ensure that interest accruing on outstanding claims will be terminated by their earlier payment.. This is not a small benefit. As an example, interest accrues on the ULC2 Notes at a rate of approximately $3 million per month plus costs. The earlier payment of these notes that would result from the operation of the GSA thus increases the probability of recovery to the remaining creditors of CCRC.

27    As the Ad Hoc Committee made clear during the hearing, it wants the right to vote on the GSA but wants to retain the benefit of the GSA terms that it finds advantageous. It suggests that the implementation of the GSA be delayed "briefly" for the calling of a vote and the determination of the ULC2 entitlements and the Fund's claims with certainty, in accordance with a litigation timetable that has been proposed as part of the application. The "brief" adjournment thus suggested amounts to a delay of roughly $3^{1/2}$ months, without regard to allowing this Court a reasonable time to consider the claims after a hearing or the timing considerations of the U. S. Court.

**The Fund's Objections**

28    As noted in its brief, the Fund "fully supports" the position of the Ad Hoc Committee. However, it says it has additional objections.

29    The Fund objects particularly to the settlement of the Greenfield Action. It argues that the GSA contemplates settlement of the Greenfield Action without payment to CESCA and that, as CESCA's major creditor, the Fund is thereby prejudiced.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

30    Firstly, the settlement of this claim under the GSA was between the proper claimant, CCNG and the U.S. Debtors. It was not without consideration as alleged. The GSA provides that $15 million of the possible $90 million priority claim to be paid to the U. S. Debtors out of the Canadian estate will be netted off in consideration for the Greenfield settlement.

31    The Fund submits that there are conflict of interest considerations arising from the settlement of the Greenfield matter between the CCAA Debtors and the U.S. Debtors. This argument might have greater force if the Fund were actually compromised or prejudiced in the GSA. However, as I have already noted, the Fund and the remaining creditors of CESCA benefit from the GSA when it is considered on a global basis. It may be that there is a risk that the Fund will be unable to secure complete recovery. However, as discussed above, this does not represent a compromise of the Fund's claims. Further, as I indicated in my oral reasons, the fact that the Fund may bear some greater risk than other creditors does not, in itself, make the GSA unfair.

32    The Fund also complains of a potential shortfall in respect of its claims against CCPL. They argue that, even if they are able to have recourse to CORPX's guarantee in respect of any shortfall in the Canadian estate, they are prejudiced because they may receive equity rather than cash. I have previously addressed some of the issues relating to the possibility that the Fund may have to have recourse to the now-acknowledged guarantees of their disputed claims as part of the U.S. process to obtain full payment. This possibility existed prior to the negotiation of the GSA and in fact, the possibility of resort to the guarantees may have been of greater likelihood if the $7.4 billion of claims against the Canadian estate that the GSA eliminates had been established as valid to any significant degree. Without the provision of the GSA that enables the claims of the Fund that give rise to the guarantees being resolved in this Court, the Fund would have faced the possibility of adjudication of those claims in the U.S. proceedings. The Fund now will be entitled to participate with other guarantee claimants in the U.S. and will be entitled to a vote on the proposal of the U.S. Debtors to address those claims. I am not satisfied that the Fund is any worse off in its position as a result of the GSA in this regard.

33    The Fund further argues that it is not aware of any CORPX guarantee in respect of its most recent claim. A claim was filed against the Fund in Ontario on May 23, 2007 relating to CCPL's management of the Fund. The Fund made application before me on July 24, 2007 for leave to file a further proof of claim against CCPL. I have reserved my decision on that application. The Fund asserts that since there is no CORPX guarantee in respect of this claim, they face a shortfall of $10.5 million on the "high" scenario basis or $19.5 million on the "low" scenario basis on this claim. This claim has not yet been accepted as a late claim. It arose after the GSA was negotiated and, therefore, could not have been addressed by the negotiating parties in any event. It is highly contingent, opposed by both the Fund and the CCAA Debtors, and raises issues of whether the indemnity between CCPL and the Fund is even applicable. Even if accepted as a late claim, it would not likely be valued by the CCAA Debtors and the Monitor at anything near its face value. This currently unaccepted late claim is not properly a factor in the consideration of the GSA.

**The ULC2 Trustee's Objections**

34    The ULC2 Trustee objects, first, to its exclusion from the negotiation process leading up to the GSA. It states in its brief that "[a]s the ULC2 Trustee was not provided with the ability to participate or seek approval of the proposed resolution of the ULC2 Claims, it cannot support the [GSA] unless and until it is clear that the terms thereof ensure that the ULC2 Claims are provided for in full and the [GSA] does not result in a compromise of any of the ULC2 Claims". Although the ULC2 Trustee may not have participated in the negotiation or drafting of the GSA, it did comment on the issues addressed in the settlement. The problem is that these issues have not been resolved to the satisfaction of the ULC 2 Trustee.

35    The ULC2 Trustee argues that the GSA provides it with one general unsecured claim in the CCAA Proceedings against ULC2 in an amount alleged to satisfy the outstanding principal amount of the ULC 2 Notes, accrued and

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

unpaid interest and professional fees, costs and expenses of both the Ad Hoc ULC2 Noteholders Committee and the ULC2 Trustee and one guarantee claim against CORPX. It argues that the quantum contemplated by the GSA is insufficient to satisfy the amounts owing under the ULC2 Indenture because it does not take proper account of interest on the ULC2 Notes.

36      In addition, the ULC2 Trustee takes the position that the GSA fails to provide for the ULC2 Make-Whole Premium. It objects to being required, under the terms of the GSA, to take this matter to the U.S. Bankruptcy Court rather than to this Court.

37      I am unable to conclude that the GSA compromises the rights of the ULC2 noteholders in the manner complained of by the UCL2 Trustee. First, the GSA contemplates that the ULC2 Trustee will be paid in full, whatever its entitlement is. If the quantum of that entitlement cannot be resolved consensually, the CCAA Debtors have committed to reserve sufficient funds to pay out the claims once they have been resolved.

38      While the GSA reorganizes the formal claims made by the ULC2 Trustee, the reorganization does not prejudice the ULC2 noteholders financially, as the effect of the reorganized claims is the same and the ULC2 Trustee's right to assert the full amount of its claims remains.

39      With respect to the requirement that the ULC2 Trustee take the matter of the ULC2 Make-Whole Premium to the U.S. Court, I am satisfied that the United States Bankruptcy Court of the Southern District of New York is an appropriate forum in which to address that and its related issues, given that New York law governs the Trust Indenture and the Trust Indenture provides that ULC II agrees that it will submit to the non-exclusive jurisdiction of the New York Court in any suit, action or proceedings. Granted, there may be arguments that could be made that this Court has jurisdiction over these issues under CCAA proceedings, but s. 18.6 of the CCAA recognizes that flexibility and comity are important to facilitate the efficient, economical and appropriate resolution of cross-border issues in insolvencies such as this one. I note that the GSA assigns responsibility for a number of unresolved claims which could be argued to have aspects that are within the jurisdiction of the U.S. Court to this Court for resolution. I am satisfied that I have the authority under s. 18.6 of the CCAA to approve the assignment of these issues to the U.S. Court even over the objections of the ULC2 Trustee.

40      The ULC2 Trustee also objects to the timing of the payment of $75 million to the U.S. Debtors and to the withdrawal of certain oppression claims relating to the sale of the Saltend facility, submitting that the payment and withdrawal should not occur prior to the payment of the claims of the ULC2 noteholders. There was some confusion over an apparent disparity between the Canadian form of order and the U.S. form with respect to the order of distributions of claims. The Canadian order, to which the U.S. order has now been conformed, provides that the $75 million payment will not occur until the CCRC ULC1 Notes are sold and a certificate is filed with both Courts advising that all conditions of the GSA have been waived or satisfied. While this does not satisfy the ULC2 Trustee's objection under this heading in full, I accept the submission of the CCAA Applicants that the GSA requires certain matters to take effect prior to others in order to allow the orderly flow of funds as set out in the GSA and that the arrangement relating to the escrow of funds protects the ULC2 noteholders in any event.

**Analysis of Law re: Plan of Arrangement**

41      It is clear that, if the GSA were a plan of arrangement or compromise, a vote by creditors would be necessary. The Court has no discretion to sanction a plan of arrangement unless it has been approved by a vote conducted in accordance with s. 6 of the CCAA: *Royal Bank v. Fracmaster Ltd. (1999), 244 A.R. 93* (Alta. C.A.) at para. 13.

42      The Ad Hoc Committee, the Fund and the ULC2 Trustee rely heavily on *Menegon v. Philip Services Corp. ( 1999), 11 C.B.R. ( 4th) 262* (Ont. S.C.J. [Commercial List]) to support their submissions. As noted by Blair, J. in *Philip* at para. 42, in the context of reviewing a plan of arrangement filed in CCAA proceedings involving Philip

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

Services and its Canadian subsidiaries in Canada where the primary debtor, Philip Services, and its United States subsidiaries had also filed for Chapter 11 protection under U.S. law and had filed a separate U.S. plan, the rights of creditors under a plan filed in CCAA proceedings in Canada cannot be compromised without a vote of creditors followed by Court sanction.

43      The comments made by the Court in *Philip* must be viewed against the context of the specific facts of that case. Philip Services was heavily indebted and had raised equity through public offerings in Canada and the United States. These public offerings led to a series of class actions in both jurisdictions, which, together with Philip Services' debt load and the bad publicity caused by the class actions, led to the CCAA and Chapter 11 filings. At about the same time that plans of arrangement were filed in Canada and the U.S., Philip Services entered into a settlement agreement with the Canadian and U.S. class action plaintiffs that Philip Services sought to have approved by the Canadian Court. The auditors (who were co-defendants with Philip Services in the class action proceedings), former officers and directors of Philip Services who had not been released from liability in the class action proceedings and other interested parties brought motions for relief which included an attack on the Canadian plan of arrangement on the basis that it was not fair and reasonable as it did not allow them their right as creditors to vote on the Canadian plan.

44      The effect of the plans filed in both jurisdictions was that the claims of Philip Services' creditors, whether Canadian or American, were to be dealt with under the U.S. plan, and only claims against Philip Services' Canadian subsidiaries were to be dealt with under the Canadian plan.

45      The Court found that if the settlement and the Canadian and U.S. plans were approved, the auditors and the underwriters who were co-defendants in the class action proceedings would lose their rights to claim contribution and indemnity in the class action. The Court held at para. 35 that this was not a reason to impugn the fairness of the plans, since the ability to compromise claims under a plan of arrangement is essential to the ability of a debtor to restructure. The plans as structured deprived these creditors of the ability to pursue their contribution claims in the CCAA proceedings by carving out the claims from the Canadian proceedings and providing that they be dealt with under the U.S. plan in the U.S. Bankruptcy Court. The Court noted that this was so despite the fact that Philip Services had set in motion CCAA proceedings in Canada in the first place and, by virtue of obtaining a stay, had prevented these creditors from pursuing their claims in Canada. The Canadian plan was stated to be binding upon all holders of claims against Philip Services, including Canadian claimants, without according those Canadian claimants a right to vote on the Canadian plan.

46      In Blair J.'s opinion, it was this loss of the right of Philip Services' Canadian creditors to vote on the Canadian plan that caused the problem. He found at para. 38 that Philip Services, having initiated and taken the benefits of CCAA proceedings in Canada, could not carve out "certain pesky ... contingent claimants, and... require them to be dealt with under a foreign regime (where they will be treated less favourably) while at the same time purporting to bind them to the provisions of the Canadian Plan...without the right to vote on the proposal.".

47      The Court took into account that the auditors, underwriters and former directors and officers of Philip Services would be downgraded to the same status as equity holders under the U.S. plan, rather than having their claims considered as debt claims as they would be in Canada.

48      These facts are not analogous to the facts of the Calpine restructuring. The CCAA Debtors and the U.S. Debtors are separate entities who have filed separate proceedings in Canada and the United States. No plan of arrangement has been filed or proposed in Canada and no attempt has been made to have a Canadian creditor's claims dealt with in another jurisdiction, except to the extent of continuing to require certain guarantee claims that the Fund has against CORPX dealt with as part of the U.S. proceeding, where the guarantee claims properly have been made and the reference of the ULC2 Trustee's issues to the U. S. Court, which I have found acceptable under s. 18.6 of the CCAA. No Canadian creditor has been denied a vote on a filed Canadian plan of arrangement. To the extent that *Philip* repeats the basic proposition that a plan of arrangement that compromises rights of creditors requires a vote by creditors before it is sanctioned by the Court, this principle has been applied to a situation where there were in exis-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

tence clearly identified formal plans of arrangement.

49     Blair J. had different comments to make about the settlement agreement in *Philip*. The settlement agreement was conditional not only upon court approval, but also the successful implementation of both the Canadian and U.S. plans. Philip Services linked the settlement and the plans together and the Court found that the settlement agreement could not be viewed in isolation. Blair J. found that it was premature to approve the settlement which he noted would immunize the class action plaintiffs and Philip Services from the need to have regard to the co-defendants in those actions. He was concerned, for example, that the settlement agreement would deprive the underwriters of certain of their rights under an underwriting agreement. It is interesting that Blair J. commented at para. 31 that what was significant to him in deciding that approval of the settlement was premature was "not the attempt to compromise the claims", but the underwriters' loss of a "bargaining chip" in the restructuring process if the settlement was approved at that point. He also noted at para. 33 that he was not suggesting that the proposed settlement ultimately would not be approved, but only that it was premature at that stage and should be considered at a time more contemporaneous with a sanctioning hearing.

50     It is noteworthy that Blair J. did not characterize the settlement agreement as a plan of arrangement requiring a vote, even though it was clear that it deprived other creditors of rights, thus compromising those rights. Nor did he question the jurisdiction of the Court to approve such a settlement. He merely postponed approval in light of the inter-relationship of the settlement agreement and the plans.

51     The GSA is not linked to or subject to a plan of arrangement. I have found that it does not compromise the rights of creditors that are not parties to it or have not consented to it, and it certainly does not have the effect of unilaterally depriving creditors of contractual rights without their participation in the GSA. The *Philip* case does not aid the creditors who are opposed to the GSA in any suggestion that a Court lacks jurisdiction under the CCAA to approve agreements that may involve resolution of the claims of some but not all of the creditors of a CCAA debtor prior to a vote on a plan of arrangement.

52     The Opposing Creditors rely on *Cable Satisfaction International Inc. v. Richter & Associés inc.* (2004), 48 C.B.R. (4th) 205 (Que. S.C.) at para. 46 for the proposition that a court cannot force on creditors a plan which they have not voted to accept. This comment was made by Chaput, J. in the context of a very different fact situation than the one involved in this application. In *Cable Satisfaction*, creditors voting on a plan of arrangement proposed by the CCAA debtor had rejected the plan and approved instead an amended plan proposed at the creditors' meeting by one of the creditors. The Court's comment was made in response to the CCAA debtor's suggestion that the plan it had tabled should be approved because a majority of proxies filed prior to the amendment of the plan approved the original plan.

53     There is no definition of "arrangement" or "compromise" under the CCAA. In *Cable Satisfaction*, Chaput, J. suggested at para. 35 that, in the context of s. 4 of the CCAA, an arrangement or compromise is not a contract but a proposal, a plan of terms and conditions to be presented to creditors for their consideration. He comments at para. 36 that the binding force of an arrangement or compromise arises from Court sanction, and not from its status as a contract.

54     It is surely not the case that an arrangement or compromise need be labeled as such or formally proposed as such to creditors in order to require a vote of creditors. The issue is whether the GSA is, by its terms and in its effect, such an arrangement or compromise.

55     I am satisfied that the GSA is not a plan of compromise or arrangement with creditors. Under its terms, as agreed among the CCAA Debtors, the U.S. Debtors and the ULC1 Trustee, certain claims of those participating parties are compromised and settled by agreement. Claims of creditors who are not parties to the GSA either will be paid in full (and thus not compromised) as a result of the operation of the GSA, or will continue as claims against the same CCAA Debtor entity as had been claimed previously. Those claims will be adjudicated either under the CCAA pro-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

ceeding or in the U.S. Chapter 11 proceeding and, to the extent they are determined to be valid, the GSA provides a mechanism and a financial framework for their full payment or satisfaction, other than for the possibility of a relatively small deficiency for some creditors of CESCA whose claims are not guaranteed by the U.S. Debtors and an even smaller deficiency of $25,000 in CCPL. The creditors of CESCA who are at real risk of suffering a deficiency have not objected to the approval of the GSA. In fact, counsel for TCPL and Alliance, two of the CES€A gas transportation claimants, and Westcoast, a major creditor of CCRC, appeared at the hearing to support approval of the GSA (or, at least in TCPL's case, not to object to it) on the basis that it improves their chances of recovery, resolving as it does all the major cross-border issues that have impeded the progress of this CCAA proceeding.

56      The Calpine Applicants submit that the GSA can be reviewed and approved by the Court pursuant to its jurisdiction to approve transactions and settlement agreements during the CCAA stay period. They cite *Playdium Entertainment Corp., Re* (2001), 31 C.B.R. (4th) 302 (Ont. S.C.J. [Commercial List]) at paras. 11 and 23 and *Air Canada, Re* (2004), 47 C.B.R. (4th) 169 (Ont. S.C.J. [Commercial List]) at para. 9 in support of their submission that the Court must consider whether such an agreement is fair and reasonable and will be beneficial to the debtor and its stakeholders generally.

57      In *Playdium Entertainment Corp., Re*, a CCAA restructuring in which no viable plan had been arrived at, Spence J. found that the Court could approve the transfer of substantially all of the assets of the CCAA debtor to a new corporation in satisfaction of the claims of the primary secured creditors. Against the objection of a party that had the right under certain critical contracts to withhold consent to such a transfer, the Court found that it had the jurisdiction to approve such a transfer of assets over the objection of creditors or other affected parties, citing *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]), *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div. [Commercial List]) and *T. Eaton Co., Re* (1999), 14 C.B.R. (4th) 298 (Ont. S.C.J. [Commercial List]). Spence J. found at para. 23 that for such an order to be appropriate, it must be in keeping with the purpose and spirit of the regime created by the CCAA. In determining whether to approve the transfer of assets, he considered the factors enumerated in *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re*.

58      Whether the transfer constituted a compromise of creditors' rights was not in issue in *Playdium Entertainment Corp., Re* and the comment was made that the transferees were the only creditors with an economic interest in the CCAA debtor. The case, however, is authority for the proposition that the powers of a supervisory court under the CCAA extend beyond the mere maintenance of the *status quo*, and may be exercised where necessary to achieve the objectives of the statute.

59      In *Air Canada, Re*, Farley J., in the course of the restructuring, was asked to approve Global Restructuring Agreements ("GRAs"). He cited *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* as setting out the appropriate guidelines for determining when an agreement should be approved during a CCAA restructuring prior to a plan of arrangement. He commented at para. 9 that:

> ... I take the requirement under the CCAA is that approval of the Court may be given where there is consistency with the purpose and spirit of that legislation, a conclusion by the Court that as a primary consideration, the transaction is fair and reasonable and will be beneficial to the debtor and its stakeholders generally: see *Northland Properties Ltd....* In *Sammi Atlas Inc., Re* (1998), 3 C.B.R. (4ᵗʰ) 171 (Ont. Gen. Div. [Commercial List]), I observed at p. 173 that in considering what is fair and reasonable treatment, one must look at the creditors as a whole (i.e. generally) and to the objecting creditors (specifically) and see if rights are compromised in an attempt to balance interests (and have the pain of the compromise equitably shared) as opposed to the confiscation of rights. I think that philosophy should be applicable to the circumstances here involving the various stakeholders. As I noted immediately above in *Sammi Atlas Inc.*, equitable treatment is not necessarily equal treatment.

60      The GRA between Air Canada and a creditor, GECC, provided, among other things, for the restructuring of various leasing obligations and provided Air Canada with commitments for financing in return for interim payments

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

on current aircraft rent and specific consideration in a restructured Air Canada. The Monitor noted that the financial benefits provided to Air Canada under the GRA outweighed the costs to Air Canada's estate arising from cross-collateralization benefits provided to GECC under the CCAA Credit Facility and Interfacility Collateralization Agreement. The Monitor therefore recommended approval of the GRA.

61    Another creditor complained at the approval hearing that other creditors were not being given treatment equal to that given to GECC. It appears that part of that unequal treatment was obtained by GECC as part of an earlier DIP financing that was not at issue before Farley J. at the time, but the Court engaged in an analysis of the benefits and costs to Air Canada of the GRA on the basis described above. It is noteworthy that Farley J. considered the suggestion of the objecting creditor that, if the GRA was not approved, GECC would not "abandon the field", but would negotiate terms with Air Canada that the objecting creditor felt would be more appropriate. The Court observed that the delay and uncertainty inherent in such an approach likely would be devastating to Air Canada.

62    This decision illustrates, in addition to the appropriate test to be applied to a settlement agreement, that such agreements almost inevitably will have the effect of changing the financial landscape of the CCAA debtor to some extent. This is so whether the settlement involves the resolution of a simple claim by a single debtor or the kind of complicated claim illustrated in a complex restructuring such as Air Canada (or Calpine). Settling with one or two claimants will invariably have an effect on the size of the estate available for other claimants. The test of whether such an adjustment results in fair and reasonable treatment requires the Court to look to the benefits of the settlement to the creditors as a whole, to consider the prejudice, if any, to the objecting creditors specifically and to ensure that rights are not unilaterally terminated or unjustly confiscated without the agreement or approval of the affected creditor.

63    I am satisfied that no rights are being confiscated under the GSA. Some claims are eliminated, but only with the full consent of the parties directly involved in those specific claims. The existing claims of the ULC2 Trustee are replaced with redesignated claims. However, the financial effect of the redesignated claims is the same, the ULC2 Trustee's right to assert the full amount of its claims remains and the CCAA Debtors and U.S. Debtors have agreed to hold funds in escrow sufficient to satisfy the entirety of those claims, once settled or judicially determined.

64    The fact that this is a cross-border insolvency does not change the essential nature of the test which a settlement must meet, but consideration of the implications of the cross-border aspects of the situation is necessary and appropriate when weighing the benefits of the settlement for the debtors and their stakeholders generally. It cannot be ignored that the cross-border aspects of the insolvency of this inter-related corporate group have created daunting issues which have stymied progress on both sides of the border for many months. The GSA resolves most of those issues in a reasonably equitable and rational manner, provides a mechanism by which a number of the remaining issues may be resolved in the court of one jurisdiction or the other, and, by reason of the release for sale of the CCRC ULC1 Notes and the fortuity of the market, provides the likelihood of greatly enhanced recoveries and the expectation, supported by the Monitor's careful analysis, that an overwhelming majority of the Canadian stakeholders will be paid in full, either from the Canadian estate or through the U.S. Debtor guarantee process.

65    In *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re*, the Red Cross, under the Court's supervision in CCAA proceedings, applied to approve the sale of its blood supply assets and operations to two new agencies. One of the groups of blood transfusion claimants objected and called for a meeting of creditors to consider a counterproposal.

66    Blair J. commented that the assets sought to be transferred were the source of the main value of the Red Cross's assets which might be available to satisfy the claims of creditors. He noted that the pool of funds resulting from the sale would not be sufficient to satisfy all claims, but that the Red Cross and the government were of the opinion that the transfer represented the best hope of maximizing distributions to the claimants. The Court characterized the central question on the motion as being whether the proposed purchase price for the assets was fair and reasonable in the circumstances and as close to maximum as reasonably likely, commenting at para. 16 that "(w)hat is important is that the value of that recovery pool is as high as possible."

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

67      The objecting claimants in *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* asked the Court to order a vote on a proposed plan of arrangement rather than approving the sale. Those supporting the plan argued that approval of the sale transaction in advance of a creditors' vote on a plan of arrangement would deprive the creditors of their statutory right to put forward a plan and vote upon it.

68      Blair J. declined to order a vote on the proposed plan, exercising his jurisdiction under ss. 4 and 5 of the CCAA to refuse to order a vote because of his finding that the proposed plan was unworkable and unrealistic in the circumstances.

69      He then proceeded to consider whether the Court had jurisdiction to make an order approving the sale of substantial assets of a debtor company before a plan has been placed before the creditors for approval.

70      Some of the objecting claimants submitted that the authority under s. 11 of the CCAA was narrow and would not permit such a sale. Others suggested that the sale should be permitted to proceed, but the transaction should be part of the plan of arrangement eventually put forth by the Red Cross, with the question of whether it was appropriate and supportable determined in that context by way of vote. The latter argument is similar in effect to that made by the Opposing Creditors in this case.

71      Blair J. rejected these submissions, finding that, realistically, the sale could not go forward on a conditional basis. He found that he had jurisdiction to make the order sought, noting at para. 43 that the source of his authority was found in the powers allocated to the Court to impose terms and conditions on the granting of a stay under s. 11 of the CCAA and may also be "grounded upon the inherent jurisdiction of the Court, not to make orders which contradict a statute, but to 'fill in the gaps in legislation so as to give effect to the objects of the CCAA'."

72      At para. 45, Blair J. made the following comments, which resonate in this application:

> It is very common in CCAA restructurings for the Court to approve the sale and disposition of assets during the process and before the Plan if formally tendered and voted upon. There are many examples where this has occurred, the recent Eaton's restructuring being only one of them. The CCAA is designed to be a flexible instrument, and it is that very flexibility which gives it its efficacy. As Farley J said in *Dylex Ltd.* supra (p. 111), "the history of CCAA law has been an evolution of judicial interpretation". It is not infrequently that judges are told, by those opposing a particular initiative at a particular time, that if they make a particular order that is requested it will be the first time in Canadian jurisprudence (sometimes in global jurisprudence, depending upon the level of the rhetoric) that such an order has made! Nonetheless, the orders are made, if the circumstances are appropriate and the orders can be made within the framework and in the spirit of the CCAA legislation. Mr. Justice Farley has well summarized this approach in the following passage from his decision in *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]), at p. 31, which I adopt:

>> The CCAA is intended to facilitate compromises and arrangements between companies and their creditors as an alternative to bankruptcy and, as such, is remedial legislation entitled to a liberal interpretation. It seems to me that the purpose of the statute is to enable insolvent companies to carry on business in the ordinary course *or otherwise deal with their assets* so as to enable plan of compromise or arrangement to be prepared, filed and considered by their creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors. See the preamble to and sections 4, 5, 7, 8 and 11 of the CCAA (a lengthy list of authorities cited here is omitted).

>> The CCAA is intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both. Where a debtor company realistically plans to continue operating *or to otherwise deal with its assets* but it requires the protection of the court in order to do so

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

and it is otherwise too early for the court to determine whether the debtor company will succeed, relief should be granted under the CCAA (citations omitted)

[Emphasis in *Red Cross.*]

73      Blair J. then stated that he was satisfied that the Court not only had jurisdiction to make the order sought, but should do so, noting the benefits of the sale and concluding at para. 46 that to forego the favourable purchase price "would in the circumstances be folly".

74      While there are clear differences between the *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* sale transaction and the GSA in this case, what the *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* transaction did was quantify with finality the pool of funds available for distribution to creditors. The GSA does not go that far but, in its adjustments and allocations of inter-corporate debt and settlement of outstanding inter-corporate claims, it has implications for the value of the Canadian estate on an overall basis and implications for the funds available to creditors on an entity-by-entity basis. As recognized in *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re*, *Air Canada, Re* and *Playdium Entertainment Corp., Re*, transactions that occur during the process of a restructuring and before a plan is formally tendered and voted upon often do affect the size of the estate of the debtor available for distribution.

75      That is why settlements and major transactions require Court approval and a consideration of whether they are fair, reasonable and beneficial to creditors as a whole. It is clear from the case law that Court approval of settlements and major transactions can and often is given over the objections of one or more parties. The Court's ability to do this is a recognition of its authority to act in the greater good consistent with the purpose and spirit and within the confines of the legislation.

76      In this case, as in *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re*, the Opposing Creditors have suggested that approval of the GSA sets a dangerous precedent. The precedential implications of this approval must be viewed in the context of the unique circumstances that have presented a situation in which all valid claims of Canadian creditors likely will be paid in full. This outcome, particularly with respect to a cross-border insolvency of exceptional complexity, is unlikely to be matched in other insolvencies, and therefore, a decision to approve this settlement agreement will not open any floodgates.

77      The issue of the jurisdiction of supervising judges in CCAA proceedings to make orders that do not merely preserve the *status quo* was considered by the Ontario Court of Appeal in *Stelco Inc., Re* (2005), 78 O.R. (3d) 254 (Ont. C.A.) at para. 18. This was an appeal of an order made by Farley J. approving agreements made by the debtor with two of its stakeholders and a finance provider. One of the agreements provided for a break fee if the plan of arrangement proposed by Stelco failed to be approved by the creditors. The Court noted at para. 20 that the break fee could deplete Stelco's assets. However, Rosenberg, J.A., for the Court, also noted at para. 3 that the Stelco CCAA process had been going on for 20 months, longer than anyone had expected, and that the supervising judge had been managing the process throughout. He then reviewed some of the many obstacles to a successful restructuring and found that the agreements resolved at least a few of the paramount problems.

78      At para. 16, the Court stated that the objecting creditors argued, as they have in this case, that the orders sought would have the effect of substituting the Court's judgment for that of the creditors who have the right under s. 6 of the CCAA to approve a plan. Nevertheless, the Court of Appeal held that Farley J. had the jurisdiction to approve the agreements under s. 11 of the CCAA, which provides a broad jurisdiction to impose terms and conditions on the granting of a stay. The Court commented as follows at paras. 18-9:

In my view, s. 11(4) includes the power to vary the stay and allow the company to enter into agreements to facilitate the restructuring, provided that the creditors have the final decision under s. 6 whether or not to approve

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

> the Plan. The court's jurisdiction is not limited to preserving the *status quo*. The point of the CCAA process is not simply to preserve the *status quo* but to facilitate restructuring so that the company can successfully emerge from the process. ...

> In my view, provided the orders do not usurp the right of the creditors to decide whether to approve the Plan the motions judge had the necessary jurisdiction to make them. The orders made in this case do not usurp the s. 6 rights of the creditors and do not unduly interfere with the business judgment of the creditors. The orders move the process along to the point where the creditors are free to exercise their rights at the creditors' meeting.

79    The CCAA Debtors in this case were faced with challenges similar to those faced by Stelco in its restructuring. This CCAA proceeding is in its nineteenth month. As set out earlier, the process had encountered considerable hurdles relating to the nature of the ULC1 noteholder claims, the inter-corporate debt claims and the BDCs. The same creditors who object to this application were, in previous applications, clamouring for the resolution of the ULC1 noteholder issue and for the sale of the CCRC ULC1 Notes. The GSA resolves these issues and allows the process to move forward with a view to dealing with the remainder of the issues in an orderly and efficient way and with the expectation that this insolvency can be concluded with the determination and payment of virtually all claims by year-end.

**Conclusion**

80    Viewed against the test of whether the GSA is fair, reasonable and beneficial to creditors as a whole, the GSA is a remarkable step forward in resolving this CCAA filing. It eliminates approximately $7.5 billion in claims against the CCAA Debtors. It resolves the major issues between the CCAA Debtors and the U.S. Debtors that had stalled meaningful progress in asset realization and claims resolution. Most significantly, it unlocks the Canadian proceeding and provides the mechanism for the resolution by adjudication or settlement of the remaining issues and significant creditor claims and the clarification of priorities. The Monitor has concluded through careful and thorough analysis that the likely outcome of the implementation of the GSA is payment in full of all Canadian creditors. As the Ad Hoc Committee concedes, the GSA removes the issues that the members of the Committee have recognized for many months as the major impediments to progress. The sale of the CCRC ULC1 Notes is a necessary precondition to resolution of this matter but, contrary to the Ad Hoc Committee's submissions, that sale cannot occur otherwise than in the context of a settlement with those parties whose claims directly affect the Notes themselves. I am satisfied that the GSA is a reasonable, and indeed necessary, path out of the deadlock.

81    I am also persuaded that the GSA provides clear benefits to the Canadian creditors of the CCAA Debtors and that, on an individual basis, no creditor is worse off as a result of the GSA considered as a whole. While it does not guarantee full payment of claims, the GSA substantially reduces the risk that this goal will not be achieved. Crucially, the GSA is supported and recommended unequivocally by the Monitor, who was involved in the negotiations and who has analysed its terms thoroughly. I am mindful that the GSA is not without risk to the Fund. However, that some risk falls upon the Fund does not make the GSA unfair. As the Calpine Applicants point out, particularly in the insolvency context, equity is not always equality. Given the Monitor's assessment that the risk of less than full payment to the CESCA creditors is relatively remote, I am satisfied that such risk does not obviate the fairness of the GSA.

82    The settlement of issues represented by the GSA is without precedent in its breadth and scope. That is perhaps appropriate given the enormous complexity and the highly intertwined nature of the issues in this proceeding. The cross-border nature of many of the issues adds to the delicacy of the matter. Given that complexity, it behooves all parties and this Court to proceed cautiously and with careful consideration. Nevertheless, we must proceed toward the ultimate goal of achieving resolution of the issues. Without that resolution, the Canadian creditors face protracted litigation in both jurisdictions, uncertain outcomes and continued frustration in unravelling the Gordian knot of intercorporate and interjurisdictional complexities that have plagued these proceedings on both sides of the border. In my view, the GSA represents enormous progress, and I approve it.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 33 B.L.R. (4th) 68, 415 A.R. 196, 161 A.C.W.S. (3d) 369

*Application granted.*

<u>FN*</u> Leave to appeal refused *Calpine Canada Energy Ltd., Re* (2007), 2007 ABCA 266, 2007 CarswellAlta 1097, 35 C.B.R. (5th) 27, 33 B.L.R. (4th) 94 (Alta. C.A. [In Chambers]).

END OF DOCUMENT

\\apps1\users\creerym\Nortel\CalpineGSA.doc

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works




Goodmans Library

AUG 3 0 2007

# Rescue! The Companies' Creditors Arrangement Act

**Janis P. Sarra,** B.A., M.A., LL.B., LL.M., S.J.D.

### University of British Columbia Faculty of Law



© 2007 Thomson Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein. No one involved in this publication is attempting herein to render legal, accounting, or other professional advice.

**Library and Archives Canada Cataloguing in Publication**

Sarra, Janis Pearl, 1954-
    Rescue! : the Companies' Creditors Arrangement Act / Janis P. Sarra. — 2007 ed.

Includes text of Companies' Creditors Arrangement Act.
ISBN 978-0-7798-0002-5

    1. Canada. Companies' Creditors Arrangement Act. 2. Bankruptcy—Canada. 3. Debtor and creditor—Canada. I. Canada. Companies' Creditors Arrangement Act II. Title.
KE1518.C6S27 2007      346.7107'8      C2007-900016-9
KF1544.S27 2007

Composition: Computer Composition of Canada Inc.



**THOMSON**
**CARSWELL**

One Corporate Plaza
2075 Kennedy Road
Toronto, Ontario
M1T 3V4

**Customer Relations:**
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5164
Fax 1-416-298-5082
World Wide Web: http://www.carswell.com
E-mail: carswell.orders@thomson.com

usually required to adjudicate liability for prior decisions or actions of the debtor corporation.

The *CCAA* has evolved through judicial interpretation and the courts have held that its design and efficacy is that it is a flexible instrument for the restructuring of insolvent companies.[4] The court's role is one of judicial oversight of the process, a role that creates particular challenges in discerning and balancing the rights of creditors and other stakeholders.

While the court will defer to the business judgment of creditors in their approval of a final plan of arrangement or compromise, the primary function of the courts is to supervise the proceedings and to make rulings that keep the process moving when parties hit a particular impasse or there is a lack of clarity about their rights and responsibilities in the particular circumstance. In this respect, the skeletal framework of the statute and its resultant flexibility facilitate the supervisory role of the court.

There has been some critique that the courts have used their supervisory authority in favour of restructuring, and as a result, have implicitly favoured the interests of particular stakeholders.[5] This criticism ignores the legislative purpose of the statute and the nature of the judiciary's role. The courts have observed that the *CCAA* was designed to serve a "broad constituency of investors, creditors and employees", and thus the court will consider the individuals and organizations directly affected by the plan, as well as the wider public interest.[6] Those interests are generally, but not always, served by permitting a company to attempt a restructuring.[7] Judges adjudicate multiple disputes under a restructuring proceeding, interpreting the *CCAA* and its companion corporations, securities, personal property security, bank and bankruptcy statutes in the specific disputes before them. Hence its exercise of jurisdiction under a skeletal statute such as the *CCAA* must be undertaken within the context of a highly codified statutory regime. While the *CCAA* is primarily a procedural statute, the court is called on to make both substantive and procedural determinations.

---

[4] *Dylex Ltd., Re* (January 23, 1995), Doc. B-4/95 (Ont. Gen. Div. [Commercial List]), at 111; *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* (1998), 5 C.B.R. (4th) 299, 72 O.T.C. 99 (Ont. Gen. Div. [Commercial List]), additional reasons at (1998), 5 C.B.R. (4th) 319 (Ont. Gen. Div. [Commercial List]), further additional reasons at (1998), 5 C.B.R. (4th) 321 (Ont. Gen. Div. [Commercial List]), leave to appeal refused (1998), 1998 CarswellOnt 5967, 32 C.B.R. (4th) 21 (Ont. C.A.), at para. 45.

[5] M. Barrack, "Is Judicial Activism in the Restructuring Field Skewing the Negotiating Process?" in *Corporate Restructurings and Insolvencies, Issues and Perspectives* (Toronto: Carswell, 1995) at 485, 491, 494.

[6] *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 4 C.B.R. (3d) 311 (B.C. C.A.); *Sklar-Peppler Furniture Corp. v. Bank of Nova Scotia* (1991), 8 C.B.R. (3d) 312 (Ont. Gen. Div.) at 314; *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118 (Ont. Gen. Div. [Commercial List]).

[7] *Hongkong Bank, ibid.*




1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

Olympia & York Developments Ltd. v. Royal Trust Co.

Re Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36; Re plan of arrangement of OLYMPIA & YORK DE-
VELOPMENTS LIMITED and all other companies set out in Schedule "A" attached hereto

Ontario Court of Justice (General Division)

R.A. Blair J.

Heard: February 1 and 5, 1993
Oral reasons: February 5, 1993
Written reasons: February 24, 1993
Judgment: February 24, 1993
Docket: Doc. B125/92

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: [List of counsel attached as Schedule "A" hereto.]

Subject: Corporate and Commercial; Insolvency

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangements Act — Arrangements —
Approval by Court — "Fair and reasonable".

Corporations — Arrangements and compromises — Companies' Creditors Arrangement Act — Plan of arrangement —
Sanctioning of plan — Unanimous approval of plan by all classes of creditors not being necessary where plan being fair and
reasonable.

Under the protection of the *Companies' Creditors Arrangement Act* ("CCAA"), O & Y negotiated a plan of arrangement. The
final plan of arrangement was voted on by the numerous classes of creditors: 27 of the 35 classes voted in favour of the plan,
eight voted against it. O & Y applied to the court under s. 6 of the CCAA for sanctioning of its final plan.

**Held:**

The application was allowed.

In considering whether to sanction a plan of arrangement, the court must consider whether: (1) there has been strict compliance
with all statutory requirements; (2) all materials filed and procedures carried out are authorized by the CCAA; and (3) the plan
is fair and reasonable.

The court found that the first two criteria had been complied with. O & Y met the criteria for access to the protection of the
CCAA, the creditors were divided into classes for the purpose of voting and those classes had voted on the plan. All meetings of

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

creditors were duly convened and held pursuant to the court orders pertaining to them. Further, nothing had been done or purported to have been done that was not authorized by the CCAA.

In assessing whether a plan is fair and reasonable, the court must be satisfied that it is feasible and that it fairly balances the interests of all of the creditors, the company and its shareholders. One important measure of whether a plan is fair and reasonable is the parties' approval of the plan and the degree to which approval has been given. With the exception of the eight classes of creditors that did not vote to accept the plan, the plan met with the overwhelming approval of the secured creditors and unsecured creditors.

While s. 6 of the CCAA makes it clear that a plan must be approved by at least 50 per cent of the creditors of a particular class representing at least 75 per cent of the dollar value of the claims in that class, the section does not make it clear whether the plan must be approved by *every* class of creditors before it can be sanctioned by the court. A court would not sanction a plan if the effect of doing so were to impose it upon a class or classes of creditors who rejected it and to bind them by it. However, in this case, the plan provided that the claims of the creditors who rejected the plan were to be treated as "unaffected claims" not bound by its provisions. Further, even if they approved the plan, secured creditors had the right to drop out at any time by exercising their realization rights. Finally, there was no prejudice to the eight classes of creditors that did not approve the plan because nothing was being imposed upon them that they had not accepted and none of their rights were being taken away.

**Cases considered:**

*Alabama, New Orleans, Texas & Pacific Junction Railway Co., Re*, 2 Meg. 377, [1886-90] All E.R. Rep. Ext. 1143, [1891] 1 Ch. at 231 (C.A.) — *referred to*

*Campeau Corp., Re* (1992), 10 C.B.R. (3d) 104 (Ont. Gen. Div.) — *referred to*

*Canadian Vinyl Industries Inc., Re* (1978), 29 C.B.R. (N.S.) 12 (Que. S.C.) — *referred to*

*Dairy Corp. of Canada, Re,* [1934] O.R. 436, [1934] 3 D.L.R. 347 (C.A.) — *referred to*

*École Internationale de Haute Esthétique Edith Serei Inc. (Receiver of) c. Edith Serei Internationale (1987), Inc.* (1989), 78 C.B.R. (N.S.) 36 (C.S. Qué.) — *referred to*

*Keddy Motor Inns Ltd., Re* (1992), 13 C.B.R. (3d) 245, 90 D.L.R. (4th) 175, 6 B.L.R. (2d) 116, 110 N.S.R. (2d) 246, 299 A.P.R. 246 (C.A.) — *referred to*

*Langley's Ltd., Re,* [1938] O.R. 123, [1938] 3 D.L.R. 230 (C.A.) — *referred to*

*Multidev Immobilia Inc. v. S.A. Just Invest,* 70 C.B.R. (N.S.) 91, [1988] R.J.Q. 1928 (S.C.) — *considered*

*NsC Diesel Power Inc.* (1990), 79 C.B.R. (N.S.) 1, 97 N.S.R. (2d) 295, 258 A.P.R. 295 (T.D.) — *referred to*

*Northland Properties Ltd., Re* (1988), 73 C.B.R. (N.S.) 175 (B.C. S.C.), affirmed *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 73 C.B.R. (N.S.) 195, 34 B.C.L.R. (2d) 122, [1989] 3 W.W.R. 363 (C.A.) — *referred to*

*Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 1 C.B.R. (3d) 101, *(*sub nom. *Elan Corp. v. Comiskey)* 41 O.A.C. 282, 1 O.R. (3d) 289 (C.A.) — *considered*

*Quintette Coal Ltd. v. Nippon Steel Corp.* (1990), 2 C.B.R. (3d) 303, 51 B.C.L.R. (2d) 193 (C.A.) [leave to appeal to S.C.C.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

refused (1991), 7 C.B.R. (3d) 164 (note), 55 B.C.L.R. xxxiii (note), 135 N.R. 317 (note)] — *considered*

*Wellington Building Corp., Re*, 16 C.B.R. 48, [1934] O.R. 653, [1934] 4 D.L.R. 626 (S.C.) — *considered*

**Statutes considered:**

Companies Act, The, R.S.O. 1927, c. 218.

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 —

s. 4

s. 5

s. 6

Joint Stock Companies Arrangements Act, 1870 (U.K.), 33 & 34 Vict., c. 104.

Application for sanctioning of plan under *Companies' Creditors Arrangement Act*.

*R.A. Blair J.*:

1    On May 14, 1992, Olympia & York Developments Limited and 23 affiliated corporations ("the Applicants") sought, and obtained an Order granting them the protection of the *Companies' Creditors Arrangement Act* [R.S.C. 1985, c. C-36] for a period of time while they attempted to negotiate a Plan of Arrangement with their creditors and to restructure their corporate affairs. The Olympia & York group of companies constitute one of the largest and most respected commercial real estate empires in the world, with prime holdings in the main commercial centres in Canada, the U.S.A., England and Europe. This empire was built by the Reichmann family of Toronto. Unfortunately, it has fallen on hard times, and, indeed, it seems, it has fallen apart.

2    A Final Plan of Compromise or Arrangements has now been negotiated and voted on by the numerous classes of creditors. 27 of the 35 classes have voted in favour of the Final Plan; 8 have voted against it. The Applicants now bring the Final Plan before the Court for sanctioning, pursuant to section 6 of the *Companies' Creditors Arrangement Act*.

**The Plan**

3    The Plan is described in the motion materials as "the Revised Plans of Compromise and Arrangement dated December 16, 1992, as further amended to January 25, 1993". I shall refer to it as "the Plan" or "the Final Plan". Its purpose, as stated in Article 1.2,

... is to effect the reorganization of the businesses and affairs of the Applicants in order to bring stability to the Applicants for a period of not less than five years, in the expectation that all persons with an interest in the Applicants will derive a greater benefit from the continued operation of the businesses and affairs of the Applicants on such a basis than would result from the immediate forced liquidation of the Applicants' assets.

4    The Final Plan envisages the restructuring of certain of the O & Y ownership interests, and a myriad of individual proposals — with some common themes — for the treatment of the claims of the various classes of creditors which have been established in the course of the proceedings.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

5      The contemplated O & Y restructuring has three principal components, namely:

1. The organization of O & Y Properties, a company to be owned as to 90% by OYDL and as to 10% by the Reichmann family, and which is to become OYDL's Canadian Real Estate Management Arm;

2. Subject to certain approvals and conditions, *and provided the secured creditors do not exercise their remedies against their security*, the transfer by OYDL of its interest in certain Canadian real estate assets to O & Y properties, in exchange for shares; and,

3. A GW reorganization scheme which will involve the transfer of common shares of GWU holdings to OYDL, the privatization of GW utilities and the amalgamation of GW utilities with OYDL.

6      There are 35 classes of creditors for purposes of voting on the Final Plan and for its implementation. The classes are grouped into four different categories of classes, namely by claims of project lenders, by claims of joint venture lenders, by claims of joint venture co-participants, and by claims of "other classes".

7      Any attempt by me to summarize, in the confines of reasons such as these, the manner of proposed treatment for these various categories and classes would not do justice to the careful and detailed concept of the Plan. A variety of intricate schemes are put forward, on a class by class basis, for dealing with the outstanding debt in question during the 5 year Plan period.

8      In general, these schemes call for interest to accrue at the contract or some other negotiated rate, and for interest (and, in some cases, principal) to be paid from time to time during the Plan period if O & Y's cash flow permits. At the same time, O & Y (with, I think, one exception) will continue to manage the properties that it has been managing to date, and will receive revenue in the form of management fees for performing that service. In many, but not all, of the project lender situations, the Final Plan envisages the transfer of title to the newly formed O & Y Properties. Special arrangements have been negotiated with respect to lenders whose claims are against marketable securities, including the Marketable Securities Lenders, the GW Marketable Security and Other Lenders, the Carena Lenders and the Gulf and Abitibi Lenders.

9      It is an important feature of the Final Plan that secured creditors are ceded the right, if they so choose, to exercise their realization remedies at any time (subject to certain strictures regarding timing and notice). In effect, they can "drop out" of the Plan if they desire.

10     The unsecured creditors, of course, are heirs to what may be left. Interest is to accrue on the unsecured loans at the contract rate during the Plan period. The Final Plan calls for the administrator to calculate, at least annually, an amount that may be paid on the O & Y unsecured indebtedness out of OYDL's cash on hand, and such amount, if indeed such an amount is available, may be paid out on court approval of the payment. The unsecured creditors are entitled to object to the transfer of assets to O & Y Properties if they are not reasonably satisfied that O & Y Properties "will be a viable, self-financing entity". At the end of the Plan period, the members of this class are given the option of converting their remaining debt into stock.

11     The Final Plan contemplates the eventuality that one or more of the secured classes may reject it. Section 6.2 provides,

a) that if the Plan is not approved by the requisite majority of holders of any Class of Secured Claims before January 16, 1993, the stay of proceedings imposed by the initial CCAA order of May 14, 1992, as amended, shall be automatically lifted; and,

b) that in the event that Creditors (other than the unsecured creditors and one Class of Bondholders' Claims) do not agree to the Plan, any such Class shall be deemed not to have agreed to the Plan and to be a Class of Creditors not affected by the Plan, *and that the Applicants shall apply to the court for a Sanction Order which sanctions the Plan only insofar as it*

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

*affects the classes which have agreed to the Plan.*

12      Finally, I note that Article 1.3 Of the Final Plan stipulates that the Plan document "constitutes a separate and severable plan of compromise and arrangement with respect to each of the Applicants."

**The Principles to be Applied on Sanctioning**

13      In *Nova Metal Products Inc. v. Comiskey (Trustee of)* (sub nom. *Elan Corp. v. Comiskey*) (1990), 1 O.R. (3d) 289 (C.A.), Doherty J.A. concluded his examination of the purpose and scheme of the *Companies' Creditors Arrangement Act*, with this overview, at pp. 308-309:

> Viewed in its totality, the Act gives the court control over the initial decision to put the reorganization plan before the creditors, the classification of creditors for the purpose of considering the plan, conduct affecting the debtor company pending consideration of that plan, and the ultimate acceptability of any plan agreed upon by the creditors. The Act envisions that the rights and remedies of individual creditors, the debtor company, and others may be sacrificed, at least temporarily, in an effort to serve the greater good by arriving at some acceptable reorganization which allows the debtor company to continue in operation: *Icor Oil & Gas Co. v. Canadian Imperial Bank of Commerce (No. 1)* (1989), 102 A.R. 161 (Q.B.), at p. 165.

14      Mr. Justice Doherty's summary, I think, provides a very useful focus for approaching the task of sanctioning a Plan.

15      Section 6 of the CCAA reads as follows:

> 6. Where a majority in number representing three-fourths in value of the creditors, or class of creditors, as the case may be, present and voting either in person or by proxy at the meeting or meetings thereof respectively held pursuant to sections 4 and 5, or either of those sections, agree to any compromise or arrangement either as proposed or as altered or modified at the meeting or meetings, *the compromise or arrangement may be sanctioned by the court, and if so sanctioned is binding*
>
> (*a*) *on all the creditors or the class of creditors*, as the case may be, and on any trustee for any such class of creditors, whether secured or unsecured, as the case may be, *and on the company*; and
>
> (*b*) in the case of a company that has made an authorized assignment or against which a receiving order has been made under the *Bankruptcy Act* or is in the course of being wound up under the *Winding-up Act*, on the trustee in bankruptcy or liquidator and contributories of the company. (Emphasis added)

16      Thus, the final step in the CCAA process is court sanctioning of the Plan, after which the Plan becomes binding on the creditors and the company. The exercise of this statutory obligation imposed upon the court is a matter of discretion.

17      The general principles to be applied in the exercise of the Court's discretion have been developed in a number of authorities. They were summarized by Mr. Justice Trainor in *Re Northland Properties Ltd.* (1988), 73 C.B.R. (N.S.) 175 (B.C.S.C.) and adopted on appeal in that case by McEachern C.J.B.C., who set them out in the following fashion at (1989), 73 C.B.R. (N.S.) 195 (B.C.C.A.), p. 201:

> The authorities do not permit any doubt about the principles to be applied in a case such as this. They are set out over and over again in many decided cases and may be summarized as follows:
>
> (1) there must be strict compliance with all statutory requirements;
>
> (2) all materials filed and procedures carried out must be examined to determine if anything has been done or purported to

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

have been done which is not authorized by the C.C.A.A.;

(3) The plan must be fair and reasonable.

18    In an earlier Ontario decision, *Re Dairy Corp. of Canada*, [1934] O.R. 436 (C.A.), Middleton J.A. applied identical criteria to a situation involving an arrangement under the Ontario *Companies Act*. The N.S.C.A. recently followed *Re North-land Properties Ltd.* in *Re Keddy Motor Inns Ltd.* (1992), 13 C.B.R. (3d) 245 (N.S.C.A.). Farley J. did as well in *Re Campeau Corp.*, [1992] O.J. No. 237 (Ont. Ct. of Justice, Gen. Div.) [now reported at 10 C.B.R. (3d) 104].

### Strict Compliance with Statutory Requirements

19    Both this first criterion, dealing with statutory requirements, and the second criterion, dealing with the absence of any unauthorized conduct, I take to refer to compliance with the various procedural imperatives of the legislation itself, or to compliance with the various orders made by the court during the course of the CCAA process: See *Re Campeau, supra.*

20    At the outset, on May 14, 1992 I found that the Applicants met the criteria for access to the protection of the Act — they are insolvent; they have outstanding issues of bonds issued in favour of a trustee, and the compromise proposed at that time, and now, includes a compromise of the claims of those creditors whose claims are pursuant to the trust deeds. During the course of the proceedings Creditors' Committees have been formed to facilitate the negotiation process, and creditors have been divided into classes for the purposes of voting, as envisaged by the Act. Votes of those classes of creditors have been held, as required.

21    With the consent, and at the request of, the Applicants and the Creditors' Committees, The Honourable David H.W. Henry, a former Justice of this Court, was appointed "Claims Officer" by Order dated September 11, 1992. His responsibilities in that capacity included, as well as the determination of the value of creditors' claims for voting purposes, the responsibility of presiding over the meetings at which the votes were taken, or of designating someone else to do so. The Honourable Mr. Henry, himself, or The Honourable M. Craig or The Honourable W. Gibson Gray — both also former Justices of this Court — as his designees, presided over the meetings of the Classes of Creditors, which took place during the period from January 11, 1993 to January 25, 1993. I have his Report as to the results of each of the meetings of creditors, and confirming that the meetings were duly convened and held pursuant to the provisions of the Court Orders pertaining to them and the CCAA.

22    I am quite satisfied that there has been strict compliance with the statutory requirements of the *Companies' Creditors Arrangement Act.*

### Unauthorized conduct

23    I am also satisfied that nothing has been done or purported to have been done which is not authorized by the CCAA.

24    Since May 14, the court has been called upon to make approximately 60 Orders of different sorts, in the course of exercising its supervisory function in the proceedings. These Orders involved the resolution of various issues between the creditors by the court in its capacity as "referee" of the negotiation process; they involved the approval of the "GAR" Orders negotiated between the parties with respect to the funding of O & Y's general and administrative expenses and restructuring costs throughout the "stay" period; they involved the confirmation of the sale of certain of the Applicants' assets, both upon the agreement of various creditors and for the purposes of funding the "GAR" requirements; they involved the approval of the structuring of Creditors' Committees, the classification of creditors for purposes of voting, the creation and defining of the role of "Information Officer" and, similarly, of the role of "Claims Officer". They involved the endorsement of the information circular respecting the Final Plan and the mailing and notice that was to be given regarding it. The Court's Orders encompassed, as I say, the general supervision of the negotiation and arrangement period, and the interim sanctioning of procedures implemented and steps taken by the Applicants and the creditors along the way.

25    While the court, of course, has not been a participant during the elaborate negotiations and undoubted boardroom

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

brawling which preceded and led up to the Final Plan of Compromise, I have, with one exception, been the Judge who has made the orders referred to. No one has drawn to my attention any instances of something being done during the proceedings which is not authorized by the CCAA.

26    In these circumstances, I am satisfied that nothing unauthorized under the CCAA has been done during the course of the proceedings.

27    This brings me to the criterion that the Plan must be "fair and reasonable".

### Fair and reasonable

28    The Plan must be "fair and reasonable". That the ultimate expression of the Court's responsibility in sanctioning a Plan should find itself telescoped into those two words is not surprising. "Fairness" and "reasonableness" are, in my opinion, the two keynote concepts underscoring the philosophy and workings of the *Companies' Creditors Arrangement Act*. "Fairness" is the quintessential expression of the court's equitable jurisdiction — although the jurisdiction is statutory, the broad discretionary powers given to the judiciary by the legislation make its exercise an exercise in equity — and "reasonableness" is what lends objectivity to the process.

29    From time to time, in the course of these proceedings, I have borrowed liberally from the comments of Mr. Justice Gibbs whose decision in *Quintette Coal Ltd. v. Nippon Steel Corp. (1990), 51 B.C.L.R. (2d) 105* (C.A.) contains much helpful guidance in matters of the CCAA. The thought I have borrowed most frequently is his remark, at p. 116, that the court is "called upon to weigh the equities, or balance the relative degrees of prejudice, which would flow from granting or refusing" the relief sought under the Act. This notion is particularly apt, it seems to me, when consideration is being given to the sanctioning of the Plan.

30    If a debtor company, in financial difficulties, has a reasonable chance of staving off a liquidator by negotiating a compromise arrangement with its creditors, "fairness" to its creditors as a whole, and to its shareholders, prescribes that it should be allowed an opportunity to do so, consistent with not "unfairly" or "unreasonably" depriving secured creditors of their rights under their security. Negotiations should take place in an environment structured and supervised by the court in a "fair" and balanced — or, "reasonable" — manner. When the negotiations have been completed and a plan of arrangement arrived at, and when the creditors have voted on it — technical and procedural compliance with the Act aside — the plan should be sanctioned if it is "fair and reasonable".

31    When a plan is sanctioned it becomes binding upon the debtor company and upon creditors of that company. What is "fair and reasonable", then, must be addressed in the context of the impact of the plan on the creditors and the various classes of creditors, in the context of their response to the plan, and with a view to the purpose of the CCAA.

32    On the appeal in *Re Northland Properties Ltd., supra,* at p. 201, Chief Justice McEachern made the following comment in this regard:

...there can be no doubt about the purpose of the C.C.A.A. It is to enable compromises to be made for the common benefit of the creditors and of the company, particularly to keep a company in financial difficulties alive and out of the hands of liquidators. To make the Act workable, it is often necessary to permit a requisite majority of each class to bind the minority to the terms of the plan, but the plan must be fair and reasonable.

33    In *Re Alabama, New Orleans, Texas & Pacific Junction Railway Co.,* [1891] 1 Ch. at 231 (C.A.), a case involving a scheme and arrangement under the *Joint Stock Companies Arrangements Act, 1870* [(U.K.), 33 & 34 Vict., c. 104], Lord Justice Bowen put it this way, at p. 243:

Now, I have no doubt at all that it would be improper for the Court to allow an arrangement to be forced on any class of

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

creditors, if the arrangement cannot reasonably be supposed by sensible business people to be for the benefit of that class as such, otherwise the sanction of the Court would be a sanction to what would be a scheme of confiscation. The object of this section is not confiscation ... Its object is to enable compromises to be made which are for the common benefit of the creditors as creditors, or for the common benefit of some class of creditors as such.

Again at p. 245:

It is in my judgment desirable to call attention to this section, and to the extreme care which ought to be brought to bear upon the holding of meetings under it. It enables a compromise to be forced upon the outside creditors by a majority of the body, or upon a class of the outside creditors by a majority of that class.

34    Is the Final Plan presented here by the O & Y Applicants "fair and reasonable"?

35    I have reviewed the Plan, including the provisions relating to each of the Classes of Creditors. I believe I have an understanding of its nature and purport, of what it is endeavouring to accomplish, and of how it proposes this be done. To describe the Plan as detailed, technical, enormously complex and all-encompassing, would be to understate the proposition. This is, after all, we are told, the largest corporate restructuring in Canadian — if not, worldwide — corporate history. It would be folly for me to suggest that I comprehend the intricacies of the Plan in all of its minutiae and in all of its business, tax and corporate implications. Fortunately, it is unnecessary for me to have that depth of understanding. I must only be satisfied that the Plan is fair and reasonable in the sense that it is feasible and that it fairly balances the interests of all of the creditors, the company and its shareholders.

36    One important measure of whether a Plan is fair and reasonable is the parties' approval of the Plan, and the degree to which approval has been given.

37    As other courts have done, I observe that it is not my function to second guess the business people with respect to the "business" aspects of the Plan, descending into the negotiating arena and substituting my own view of what is a fair and reasonable compromise or arrangement for that of the business judgment of the participants. The parties themselves know best what is in their interests in those areas.

38    This point has been made in numerous authorities, of which I note the following: *Re Northland Properties Ltd.* (1988), 73 C.B.R. (N.S.) 175, at p. 184 (B.C.S.C.), affirmed (1989), 73 C.B.R. (N.S.) 195, at p. 205 (B.C.C.A.); *Re Langley's Ltd.*, [1938] O.R. 123 (C.A.), at p. 129; *Re Keddy Motor Inns Ltd.* (1992), 13 C.B.R. (3d) 245; *École Internationale de Haute Esthétique Edith Serei Inc. (Receiver of) c. Edith Serei Internationale (1987) Inc.* (1989), 78 C.B.R. (N.S.) 36 (C.S. Qué.).

39    In *Re Keddy Motors Inns Ltd., supra,* the Nova Scotia Court of Appeal spoke of "a very heavy burden" on parties seeking to show that a Plan is not fair and reasonable, involving "matters of substance", when the Plan has been approved by the requisite majority of creditors (see pp. 257-258). Freeman J.A. stated at p. 258:

The Act clearly contemplates rough-and-tumble negotiations between debtor companies desperately seeking a chance to survive and creditors willing to keep them afloat, but on the best terms they can get. What the creditors and the company must live with is a plan of their own design, not the creation of a court. The court's role is to ensure that creditors who are bound unwillingly under the Act are not made victims of the majority and forced to accept terms that are unconscionable.

40    In *École Internationale, supra* at p. 38, Dugas J. spoke of the need for "serious grounds" to be advanced in order to justify the court in refusing to approve a proposal, where creditors have accepted it, unless the proposal is unethical.

41    In this case, as Mr. Kennedy points out in his affidavit filed in support of the sanction motion, the final Plan is "the culmination of several months of intense negotiations and discussions between the applicants and their creditors, [reflects] significant input of virtually all of the classes of creditors and [is] the product of wide-ranging consultations, give and take and

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

compromise on the part of the participants in the negotiating and bargaining process." The body of creditors, moreover, Mr. Kennedy notes, "consists almost entirely of sophisticated financial institutions represented by experienced legal counsel" who are, in many cases, "members of creditors' committees constituted pursuant to the amended order of may 14, 1992." Each creditors' committee had the benefit of independent and experienced legal counsel.

42      With the exception of the 8 classes of creditors that did not vote to accept the Plan, the Plan met with the overwhelming approval of the secured creditors and the unsecured creditors of the Applicants. This level of approval is something the court must acknowledge with some deference.

43      Those secured creditors who have approved the Plan retain their rights to realize upon their security at virtually any time, subject to certain requirements regarding notice. In the meantime, they are to receive interest on their outstanding indebtedness, either at the original contract rate or at some other negotiated rate, and the payment of principal is postponed for a period of 5 years.

44      The claims of creditors — in this case, secured creditors — who did not approve the Plan are specifically treated under the Plan as "unaffected claims" i.e. claims not compromised or bound by the provisions of the Plan. Section 6.2(C) of the Final Plan states that the applicants may apply to the court for a sanction Order which sanctions the Plan only insofar as it affects the classes which have agreed to the Plan.

45      The claims of unsecured creditors under the Plan are postponed for 5 years, with interest to accrue at the relevant contract rate. There is a provision for the administrator to calculate, at least annually, an amount out of OYDL's cash on hand which may be made available for payment to the unsecured creditors, if such an amount exists, and if the court approves its payment to the unsecured creditors. The unsecured creditors are given some control over the transfer of real estate to O & Y Properties and, at the end of the Plan period, are given the right, if they wish, to convert their debt to stock.

46      Faced with the prospects of recovering nothing on their claims in the event of a liquidation, against the potential of recovering something if O & Y is able to turn things around, the unsecured creditors at least have the hope of gaining something if the Applicants are able to become the "self-sustaining and viable corporation" which Mr. Kennedy predicts they will become "in accordance with the terms of the Plan."

47      Speaking as co-chair of the Unsecured Creditors' Committee at the meeting of that Class of Creditors, Mr. Ed Lundy made the following remarks:

> Firstly, let us apologize for the lengthy delays in today's proceedings. It was truly felt necessary for the creditors of this Committee to have a full understanding of the changes and implications made because there were a number of changes over this past weekend, plus today, and we wanted to be in a position to give a general overview observation to the Plan.

> The Committee has retained accounting and legal professionals in Canada and the United States. The Co-Chairs, as well as institutions serving on the Plan and U.S. Subcommittees with the assistance of the Committee's professionals have worked for the past seven to eight months evaluating the financial, economic and legal issues affecting the Plan for the unsecured creditors.

> In addition, the Committee and its Subcommittees have met frequently during the CCAA proceedings to discuss these issues. Unfortunately, the assets of OYDL are such that their ultimate values cannot be predicted in the short term. As a result, the recovery, if any, by the unsecured creditors cannot now be predicted.

> The alternative to approval of the CCAA Plan of arrangement appears to be a bankruptcy. The CCAA Plan of arrangement has certain advantages and disadvantages over bankruptcy. These matters have been carefully considered by the Committee.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

> After such consideration, the members have indicated their intentions as follows ...
>
> Twelve members of the Committee have today indicated they will vote in favour of the Plan. No members have indicated they will vote against the Plan. One member declined to indicate to the committee members how they wished to vote today. One member of the Plan was absent. Thank you.

48      After further discussion at the meeting of the unsecured creditors, the vote was taken. The Final Plan was approved by 83 creditors, representing 93.26% of the creditors represented and voting at the meeting and 93.37% in value of the Claims represented and voting at the meeting.

49      As for the O & Y Applicants, the impact of the Plan is to place OYDL in the position of property manager of the various projects, in effect for the creditors, during the Plan period. OYDL will receive income in the form of management fees for these services, a fact which gives some economic feasibility to the expectation that the company will be able to service its debt under the Plan. Should the economy improve and the creditors not realize upon their security, it may be that at the end of the period there will be some equity in the properties for the newly incorporated O & Y Properties and an opportunity for the shareholders to salvage something from the wrenching disembodiment of their once shining real estate empire.

50      In keeping with an exercise of weighing the equities and balancing the prejudices, another measure of what is "fair and reasonable" is the extent to which the proposed Plan treats creditors equally in their opportunities to recover, consistent with their security rights, and whether it does so in as non-intrusive and as non-prejudicial a manner as possible.

51      I am satisfied that the Final Plan treats creditors evenly and fairly. With the "drop out" clause entitling secured creditors to realize upon their security, should they deem it advisable at any time, all parties seem to be entitled to receive at least what they would receive out of a liquidation, i.e. as much as they would have received had there not been a reorganization: See *Re NsC Diesel Power Inc.* (1990), 97 N.S.R. (2d) 295 (T.D.). Potentially, they may receive more.

52      The Plan itself envisages other steps and certain additional proceedings that will be taken. Not the least inconsiderable of these, for example, is the proposed GW reorganization and contemplated arrangement under the OBCA. These further steps and proceedings, which lie in the future, may well themselves raise significant issues that have to be resolved between the parties or, failing their ability to resolve them, by the Court. I do not see this prospect as something which takes away from the fairness or reasonableness of the Plan but rather as part of grist for the implementation mill.

53      For all of the foregoing reasons, I find the Final Plan put forward to be "fair and reasonable".

54      Before sanction can be given to the Plan, however, there is one more hurdle which must be overcome. It has to do with the legal question of whether there must be unanimity amongst the classes of creditors in approving the Plan before the court is empowered to give its sanction to the Plan.

### *Lack of unanimity amongst the classes of creditors*

55      As indicated at the outset, all of the classes of creditors did not vote in favour of the Final Plan. Of the 35 classes that voted, 27 voted in favour (overwhelmingly, it might be added, both in terms of numbers and percentage of value in each class). In 8 of the classes, however, the vote was either against acceptance of the Plan or the Plan did not command sufficient support in terms of numbers of creditors and/or percentage of value of claims to meet the 50%/75% test of section 6.

56      The classes of creditors who voted against acceptance of the Plan are in each case comprised of secured creditors who hold their security against a single project asset or, in the case of the Carena claims, against a single group of shares. Those who voted "no" are the following:

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

Class 2 — First Canadian Place Lenders

Class 8 — Fifth Avenue Place Bondholders

Class 10 — Amoco Centre Lenders

Class 13 — L'Esplanade Laurier Bondholders

Class 20 — Star Top Road Lenders

Class 21 — Yonge-Sheppard Centre Lenders

Class 29 — Carena Lenders

Class 33a — Bank of Nova Scotia Other Secured Creditors

57      While section 6 of the CCAA makes the mathematics of the approval process clear — the Plan must be approved by at least 50% of the creditors of a particular class representing at least 75% of the dollar value of the claims in that class — it is not entirely clear as to whether the Plan must be approved by every class of creditors before it can be sanctioned by the court. The language of the section, it will be recalled, is as follows:

> 6. *Where a majority* in number representing three-fourths in value *of the creditors, or class of creditors* ... agree to any compromise or arrangement ... the compromise or arrangement may be sanctioned by the court. (Emphasis added)

58      What does "a majority ... of the ... class of creditors" mean? Presumably it must refer to more than one group or class of creditors, otherwise there would be no need to differentiate between "creditors" and "class of creditors". But is the majority of the "class of creditors" confined to a majority within an individual class, or does it refer more broadly to a majority within each and every "class", as the sense and purpose of the Act might suggest?

59      This issue of "unanimity" of class approval has caused me some concern, because, of course, the Final Plan before me has not received that sort of blessing. Its sanctioning, however, is being sought by the Applicants, is supported by all of the classes of creditors approving, and is not opposed by any of the classes of creditors which did not approve.

60      At least one authority has stated that strict compliance with the provisions of the CCAA respecting the vote is a pre-requisite to the court having jurisdiction to sanction a plan: See *Re Keddy Motor Inns Ltd., supra*, at p. 20. Accepting that such is the case, I must therefore be satisfied that unanimity amongst the classes is not a requirement of the Act before the court's sanction can be given to the Final Plan.

61      In assessing this question, it is helpful to remember, I think, that the CCAA is remedial and that it "must be given a wide and liberal construction so as to enable it to effectively serve this ... purpose": *Elan Corp. v. Comiskey, supra*, per Doherty J.A., at p. 307. Speaking for the majority in that case as well, Finlayson J.A. (Krever J.A., concurring) put it this way, at p. 297:

> It is well established that the CCAA is intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both. Such a resolution can have significant benefits for the company, its shareholders and employees. For this reason the debtor companies ... are entitled to a broad and liberal interpretation of the jurisdiction of the court under the CCAA.

62      Approaching the interpretation of the unclear language of section 6 of the Act from this perspective, then, one must have regard to the purpose and object of the legislation and to the wording of the section within the rubric of the Act as a whole.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

Section 6 is not to be construed in isolation.

63    Two earlier provisions of the CCAA set the context in which the creditors' meetings which are the subject of section 6 occur. Sections 4 and 5 state that where a compromise or an arrangement is proposed between a debtor company and its unsecured creditors (s. 4) or its secured creditors (s. 5), the court may order a meeting of the creditors to be held. The format of each section is the same. I reproduce the pertinent portions of s. 5 here only, for the sake of brevity. It states:

> 5. Where a compromise or an arrangement is proposed between a debtor company and its secured creditors or *any class of* them, the court may, on the application in a summary way of the company or of any such creditor ... order a meeting of the creditors or class of creditors ... (Emphasis added)

64    It seems that the compromise or arrangement contemplated is one with the secured creditors (as a whole) or *any* class — as opposed to *all classes* — of them. A logical extension of this analysis is that, other circumstances being appropriate, the plan which the court is asked to approve may be one involving some, but not all, of the classes of creditors.

65    Surprisingly, there seems to be a paucity of authority on the question of whether a plan must be approved by the requisite majorities in *all* classes before the court can grant its sanction. Only two cases of which I am aware touch on the issue at all, and neither of these is directly on point.

66    In *Re Wellington Building Corp.*, [1934] O.R. 653 (S.C.), Mr. Justice Kingstone dealt with a situation in which the creditors had been divided, for voting purposes, into secured and unsecured creditors, but there had been no further division amongst the secured creditors who were comprised of first mortgage bondholders, second, third and fourth mortgagees, and lienholders. Kingstone J. refused to sanction the plan because it would have been "unfair" to the bondholders to have done so (p. 661). At p. 660, he stated:

> I think, while one meeting may have been sufficient under the Act for the purpose of having all the classes of secured creditors summoned, it was necessary under the Act that they should vote in classes and that three-fourths of the value *of each class* should be obtained in support of the scheme before the Court could or should approve of it. (Emphasis added)

67    This statement suggests that unanimity amongst the classes of creditors in approving the plan is a requirement under the CCAA. Kingstone J. went on to explain his reasons as follows (p. 600):

> Particularly is this the case where the holders of the senior securities' (in this case the bondholders') rights are seriously affected by the proposal, as they are deprived of the arrears of interest on their bonds if the proposal is carried through. It was never the intention under the Act, I am convinced, to deprive creditors in the position of these bondholders of their right to approve as a class by the necessary majority of a scheme propounded by the company; otherwise this would permit the holders of junior securities to put through a scheme inimical to this class and amounting to confiscation of the vested interest of the bondholders.

68    Thus, the plan in *Re Wellington Building Corp.* went unsanctioned, both because the bondholders had unfairly been deprived of their right to vote on the plan as a class and because they would have been unfairly deprived of their rights by the imposition of what amounted to a confiscation of their vested interests as bondholders.

69    On the other hand, the Quebec Superior Court sanctioned a plan where there was a lack of unanimity in *Multidev Immobilia Inc. v. Société Anonyme Just Invest* (1988), 70 C.B.R. (N.S.) 91 (Que. S.C.). There, the arrangement had been accepted by all creditors except one secured creditor, Société Anonyme Just Invest. The company presented an amended arrangement which called for payment of the objecting creditor in full. The other creditors were aware that Just Invest was to receive this treatment. Just Invest, nonetheless, continued to object. Thus, three of eight classes of creditors were in favour of the plan; one, Bank of Montreal was unconcerned because it had struck a separated agreement; and three classes of which Just Invest was a member, opposed.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

70      The Quebec Superior Court felt that it would be contrary to the objectives of the CCAA to permit a secured creditor who was to be paid in full to upset an arrangement which had been accepted by other creditors. Parent J. was of the view that the Act would not permit the Court to ratify an arrangement which had been refused by a class or classes of creditors (Just Invest), thereby binding the objecting creditor to something that it had not accepted. He concluded, however, that the arrangement could be approved *as regards the other creditors who voted in favour of the Plan*. The other creditors were cognizant of the arrangement whereby Just Invest was to be fully reimbursed for its claims, as I have indicated, and there was no objection to that amongst the classes that voted in favour of the Plan.

71      While it might be said that *Multidev, supra,* supports the proposition that a Plan will not be ratified if a class of creditors opposes, the decision is also consistent with the carving out of that portion of the Plan which concerns the objecting creditor and the sanctioning of the balance of the Plan, where there was no prejudice to the objecting creditor in doing so. To my mind, such an approach is analogous to that found in the Final Plan of the O & Y applicants which I am being asked to sanction.

72      I think it relatively clear that a court would not sanction a plan if the effect of doing so were to impose it upon a class, or classes, of creditors who rejected it and to bind them by it. Such a sanction would be tantamount to the kind of unfair confiscation which the authorities unanimously indicate is not the purpose of the legislation. That, however, is not what is proposed here.

73      By the terms of the Final Plan itself, the claims of creditors who reject the Plan are to be treated as "unaffected claims" not bound by its provisions. In addition, secured creditors are entitled to exercise their realization rights either immediately upon the "consummation date" (March 15, 1993) or thereafter, on notice. In short, even if they approve the Plan, secured creditors have the right to drop out at any time. Everyone participating in the negotiation of the Plan and voting on it, knew of this feature. There is little difference, and little different affect on those approving the Plan, it seems to me, if certain of the secured creditors drop out in advance by simply refusing to approve the Plan in the first place. Moreover, there is no prejudice to the eight classes of creditors which have not approved the Plan, because nothing is being imposed upon them which they have not accepted and none of their rights are being "confiscated".

74      From this perspective it could be said that the parties are merely being held to — or allowed to follow — their contractual arrangement. There is, indeed, authority to suggest that a Plan of compromise or arrangement is simply a contract between the debtor and its creditors, sanctioned by the court, and that the parties should be entitled to put anything into such a Plan that could be lawfully incorporated into any contract: See *Re Canadian Vinyl Industries Inc.* (1978), 29 C.B.R. (N.S.) 12 (Que. S.C.), at p. 18; L.W. Houlden & C.H. Morawetz, *Bankruptcy Law of Canada*, vol. 1 (Toronto: Carswell, 1984) pp. E-6 and E-7.

75      In the end, the question of determining whether a plan may be sanctioned when there has not been unanimity of approval amongst the classes of creditors becomes one of asking whether there is any unfairness to the creditors who have not approved it, in doing so. Where, as here, the creditors classes which have not voted to accept the Final Plan will not be bound by the Plan as sanctioned, and are free to exercise their full rights as secured creditors against the security they hold, there is nothing unfair in sanctioning the Final Plan without unanimity, in my view.

76      I am prepared to do so.

77      A draft Order, revised as of late this morning, has been presented for approval. It is correct to assume, I have no hesitation in thinking, that each and every paragraph and subparagraph, and each and every word, comma, semi-colon, and capital letter has been vigilantly examined by the creditors and a battalion of advisors. I have been told by virtually every counsel who rose to make submissions, that the draft as is exists represents a very "fragile consensus", and I have no doubt that such is the case. It's wording, however, has not received the blessing of three of the classes of project lenders who voted against the Final Plan — The First Canadian Place, Fifth Avenue Place and L'Esplanade Laurier Bondholders.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

78      Their counsel, Mr. Barrack, has put forward their serious concerns in the strong and skilful manner to which we have become accustomed in these proceedings. His submission, put too briefly to give it the justice it deserves, is that the Plan does not and cannot bind those classes of creditors who have voted "no", and that the language of the sanctioning Order should state this clearly and in a positive way. Paragraph 9 of his Factum states the argument succinctly. It says:

> 9. It is submitted that if the Court chooses to sanction the Plan currently before it, it is incumbent on the Court to make clear in its Order that the Plan and the other provisions of the proposed Sanction Order apply to and are binding upon only the company, its creditors in respect of claims in classes which have approved the Plan, and trustees for such creditors.

79      The basis for the concern of these "No" creditors is set out in the next paragraph of the Factum, which states:

> 10. This clarification in the proposed Sanction Order is required not only to ensure that the Order is only binding on the parties to the compromises but also to clarify that if a creditor has multiple claims against the company and only some fall within approved classes, then the Sanction Order only affects those claims and is not binding upon and has no effect upon the balance of that creditor's claims or rights.

80      The provision in the proposed draft Order which is the most contentious is paragraph 4 thereof, which states:

> 4. THIS COURT ORDERS that subject to paragraph 5 hereof the Plan be and is hereby sanctioned and approved and will be binding on and will enure to the benefit of the Applicants and the Creditors holding Claims in Classes referred to in paragraph 2 of this Order in their capacities as such Creditors.

81      Mr. Barrack seeks to have a single, but much debated word — "only" — inserted in the second line of that paragraph after the word "will", so that it would read "and will *only* be binding on .... the Applicants and the Creditors Holding Claims in Classes" [which have approved the Plan]. On this simple, single, word, apparently, the razor-thin nature of the fragile consensus amongst the remaining creditors will shatter.

82      In the alternative, Mr. Barrack asks that para. 4 of the draft be amended and an additional paragraph added as follows:

> 35. It is submitted that to reflect properly the Court's jurisdiction, paragraph 4 of the proposed Sanction Order should be amended to state:

> 4. This Court Orders that the Plan be and is hereby sanctioned and approved and is binding only upon the Applicants listed in Schedule A to this Order, creditors in respect of the claims in those classes listed in paragraph 2 hereof, and any trustee for any such class of creditors.

> 36. It is also submitted that an additional paragraph should be added if any provisions of the proposed Sanction Order are granted beyond paragraph 4 thereof as follows:

> This Court Orders that, except for claims falling within classes listed in paragraph 2 hereof, no claims or rights of any sort of any person shall be adversely affected in any way by the provisions of the Plan, this Order or any other Order previously made in these proceedings.

83      These suggestions are vigorously opposed by the Applicants and most of the other creditors. Acknowledging that the Final Plan does not bind those creditors who did not accept it, they submit that no change in the wording of the proposed Order is necessary in order to provided those creditors with the protection to which they say they are entitled. In any event, they argue, such disputes, should they arise, relate to the interpretation of the Plan, not to its sanctioning, and should only be dealt with in the context in which they subsequently arise — if arise they do.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

84      The difficulty is that there may or may not be a difference between the order "binding" creditors and "affecting" creditors. The Final Plan is one that has specific features for specific classes of creditors, and as well some common or generic features which cut across classes. This is the inevitable result of a Plan which is negotiated in the crucible of such an immense corporate re-structuring. It may be, or it may not be, that the objecting Project Lenders who voted "no" find themselves "affected" or touched in some fashion, at some future time by some aspect of the Plan. With a re-organization and corporate re-structuring of this dimension it may simply not be realistic to expect that the world of the secured creditor, which became not-so-perfect with the onslaught of the Applicants' financial difficulties, and even less so with the commencement of the CCAA proceedings, will ever be perfect again.

85      I do, however, agree with the thrust of Mr. Barrack's submissions that the Sanction Order and the Plan can be binding only upon the Applicants and the creditors of the Applicants in respect of claims in classes which have approved the Plan, and trustees for such creditors. That is, in effect, what the Final Plan itself provides for when, in section 6.2(C), it stipulates that, where classes of creditors do not agree to the Plan,

(i) the Applicants shall treat such Class of Claims to be an Unaffected Class of Claims; and,

(ii) the Applicants *shall* apply to the Court "for a Sanction Order which sanctions the Plan *only insofar as it affects the Classes which have agreed to the Plan.*

86      The Final Plan before me is therefore sanctioned on that basis. I do not propose to make any additional changes to the draft Order as presently presented. In the end, I accept the position, so aptly put by Ms. Caron, that the price of an overabundance of caution in changing the wording may be to destroy the intricate balance amongst the creditors which is presently in place.

87      In terms of the court's jurisdiction, section 6 directs me to sanction the Order, if the circumstances are appropriate, and enacts that, once I have done so, the Order "is binding ... on all the creditors or the class of creditors, as the case may be, and on any trustee for any such class of creditors ... and on the company". As I see it, that is exactly what the draft Order presented to me does.

88      Accordingly, an order will go in terms of the draft Order marked "revised Feb. 5, 1993", with the agreed amendments noted thereon, and on which I have placed my fiat.

89      These reasons were delivered orally at the conclusion of the sanctioning Hearing which took place on February 1 and February 5, 1993. They are released in written form today.

*Application allowed.*

### Appendix "A" — Counsel for Sanctioning Hearing Order

| | |
|---|---|
| David A. Brown, Q.C.,<br>Yoine Goldstein, Q.C.,<br>Stephen Sharpe and<br>Mark E. Meland | -- For the Olympia & York<br>   Applicants |
| Ronald N. Robertson, Q.C. | -- For Hong Kong & Shanghai<br>   Banking Corporation |
| David E. Baird, Q.C., and<br>Ms Patricia Jackson | -- For Bank of Nova Scotia |

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

| | |
|---|---|
| Michael Barrack and<br>S. Richard Orzy | -- For the First Canadian<br>Place Bondholders,<br>the Fifth Avenue Place<br>Bondholders and the<br>L'Esplanade Lauriere<br>Bondholders |
| William G. Horton | -- For Royal Bank of<br>Canada |
| Peter Howard and<br>Ms J. Superina | -- For Citibank Canada |
| Frank J. C. Newbould, Q.C. | -- For the Unsecured/Under-<br>Secured Creditors Committee |
| John W. Brown, Q.C., and<br>J.J. Lucki | -- For Canadian Imperial Bank<br>of Commerce |
| Harry Fogul and<br>Harold S. Springer | -- For the Exchange Tower<br>Bondholders |
| Allan Sternberg and<br>Lawrence Geringer | -- For the O & Y Eurocreditco<br>Debenture Holders |
| Arthur O. Jacques and<br>Paul M. Kennedy | -- For Bank of Nova Scotia,<br>Agent for Scotia Plaza<br>Lenders |
| Lyndon Barnes and<br><br>J.E. Fordyce | -- For Credit Lyonnais,<br><br>Credit Lyonnais Canada |
| J. Carfagnini | -- For National Bank of<br>Canada |
| J.L. McDougall, Q.C. | -- For Bank of Montreal |
| Carol V.E. Hitchman | -- For Bank of Montreal<br>(Phase I First Canadian<br>Place) |
| James A. Grout | -- For Credit Suisse |
| Robert I. Thornton | -- For I.B.J. Market Security<br>Lenders |
| Ms C. Carron | -- For European Investment<br>Bank |

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellOnt 182, 17 C.B.R. (3d) 1, (sub nom. Olympia & York Developments Ltd., Re) 12 O.R. (3d) 500

```
W.J. Burden                    -- For some debtholders of
                                  O & Y Commercial Paper II
                                  Inc.

G.D. Capern                    -- For Robert Campeau

Robert S. Harrison and         -- For Royal Trust Co. as
A.T. Little                       Trustee
```

END OF DOCUMENT

\\apps1\users\creerym\Nortel\O&YFairness.doc

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



# Commercial Arbitration in Canada

## A Guide to Domestic and International Arbitrations

**J. Kenneth McEwan, Q.C.**
**Ludmila B. Herbst, B.A., M.A., LL.B.**

**Canada Law Book**
**A Division of The Cartwright Group Ltd.**
**240 Edward Street, Aurora, Ontario, L4G 3S9**
**www.canadalawbook.ca**

December 2009

The Cartwright Group Ltd., 2009

**Printed in Canada**

All rights reserved. No part of this book may be
reproduced in any form by any photographic,
electronic, mechanical or other means, or used in any
information storage and retrieval system, without the
written permission of the publisher.
The paper used in this publication meets the
minimum requirements of American National
Standards for Information Sciences Permanence of
Paper for Printed Library Materials, ANSI Z39.4C6-
1992.

The publisher, and every person involved in the creation of this publication, disclaims any
warranty as to the accuracy, completeness or currency of the contents of this publication. This
publication is intended for information purposes only. The publisher is not engaged in
rendering legal or other professional advice and this publication should not be relied upon as
providing such advice. The publisher, and every person involved in the creation of this
publication, disclaims all liability in respect of the results of any actions taken or not taken in
reliance upon information in this publication.

**Library and Archives Canada Cataloguing in Publication**

McEwan, J. Kenneth (James Kenneth), 1962-
       Commercial arbitration in Canada: a guide to domestic and interna-
tional arbitrations.

Updated annually.
Includes index.

ISSN 1713-6849
ISBN 0-88804-395-3 (loose-leaf)

1. Arbitration and award–Canada.   2. Arbitration and award,
International. 3. Civil procedure–Canada. I. Herbst, Ludmila B. (Ludmila
Barbara), 1973- II. Title.

KE8618.A6M33          347.71'09          C2004-905977-7
KF9085.A6M33

has crystallized because no particular party is readily seen as being favoured by any given choice.

However, that is not to say that parties may not find it convenient to agree on arbitration where a dispute has already arisen due to a shared interest in avoiding litigation.[9] For example, the parties' interests may be aligned in favouring a private resolution. Further, while there may be an element of tension or hostility in the relationship which may make negotiation more difficult, the context of a particular dispute may also provide an opportunity to tailor an agreed procedure more precisely to the actual dispute. However, even in such circumstances, it may be to the advantage of one party (usually a prospective respondent) to delay resolution. As a result of this and other interests involved, negotiation of a submission agreement may be a lengthy process. A successful conclusion may depend on one party, typically the claimant, having some sort of leverage to exert over the other, such as a credible threat of proceeding by other means.[10]

## 2:30 WHAT IS AN ARBITRATION AGREEMENT?

## 2:30.10 General

The existence of an arbitration agreement (whether a *compromis* or a clause *compromissoire*) underpins not only the parties' recourse to arbitration but also, in general, the application of arbitration legislation. It is therefore important to determine whether an arbitration agreement has been entered into and, as will be discussed later in this chapter, by whom.

As a contract, to be enforceable an arbitration agreement must meet the same requirements as any other contract. In this regard there must be an offer, acceptance, and consensus *ad idem*. Consideration may be comprised of the parties' mutual agreement to submit their disputes to the arbitral process.[11] The parties must also have the capacity to enter into contracts. In this regard, it may be necessary for a municipality to have passed a binding by-law or resolution before being authorized to enter into an arbitration agreement.[12]

The existence, scope and applicability of an arbitration clause are questions of contractual interpretation.[13] The court should consider the terms of the arbitration clause, including whether the language is permissive or mandatory, and must have regard to the context in which the agreement

---

[9]   This assumes that the parties are wary of litigation; some parties may prefer it given the disadvantages of arbitration noted earlier.

[10]  A. Redfern and M. Hunter, *Law and Practice of International Commercial Arbitration* (London: Sweet & Maxwell, 1986), at p. 128.

[11]  Casey, *op. cit.*, footnote 5, at para. 3.3.

[12]  *Skea v. Sunshine Coast (Regional District)* (1998), 82 A.C.W.S. (3d) 843 (B.C.S.C.).

[13]  *Thompson General Hospital v. CSL Hospital Services Ltd.* (1996), 112 Man. R. (2d) 211 (Q.B.).



*Indexed as:*
# Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A. s.r.

**Between**
**Coldmatic Refrigeration of Canada Ltd., plaintiff, and**
**P.U.M.A. s.r. 1, defendant**

[1998] O.J. No. 1697

64 O.T.C. 157

21 C.P.C. (4th) 267

78 A.C.W.S. (3d) 1110

Court File No. 97-CV-127075

Ontario Court of Justice (General Division)
Motions Court - Toronto, Ontario

**Sharpe J.**

Heard: April 17, 1998.
Oral judgment: April 24, 1998.

(7 pp.)

*Conflict of Laws -- Contracts -- Choice of law -- General -- By parties -- Jurisdiction -- Choice of forum by parties.*

Motion for summary judgment by the defendant, PUMA. The defendant was a manufacturer of equipment. The defendant sold equipment to the plaintiff. The written contract contained an clause which provided for arbitration of disputes and the location where disputes were to be settled. In June 1997, the plaintiff commenced proceedings in an Ontario court. In September 1997, the defendant launched a claim in an Italian court. The defendant also filed a statement of defence and counter-claim to the Ontario action. In the statement of defence, the defendant alleged that the contract governed the place of jurisdiction, which the parties had agreed to as Padua, Italy. The defendant indicated that it did not wish to litigate, but to pursue the matter in arbitration in Italy.

HELD: Motion dismissed. The defendant made no attempt, other than to file the statement of defence, to dispute the jurisdiction of the Ontario court. The defendant failed to comply with the provision of the International Commercial Arbitration Act of Ontario. The pleadings did not ask for arbitration and a letter written prior to the commencement of the action did not constitute a request for arbitration. Ontario law required clarity in an arbitration or jurisdiction clause and such clarity was not present in the contract under dispute. Such an unclear clause could not oust the jurisdiction of the Ontario court. The defendant's statement of defence and counter-claim were a clear attornment to the jurisdiction of the Ontario court.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, s.106.
International Commercial Arbitration Act, R.S.O.   1990, c.I.9, Article 8.

**Counsel:**

Cynthia Amsterdam, for the plaintiff.
Inga B. Andriessen, for the defendant.

---

**1**   **SHARPE J.** (orally):-- This is a motion for Summary Judgment by the defendant to dismiss the action on the ground that Ontario is not the proper jurisdiction. The dispute arises from a contract for the manufacture and supply of certain equipment. The plaintiff purchaser is an Ontario corporation. The defendant manufacturer is an Italian corporation. I need not go into the details of the dispute. Some equipment has been supplied. The plaintiff takes the position that what has been supplied is damaged or defective and there is a dispute as to respective obligations of the parties at the present time to carry the contract forward to execution. The written contract contains the following provision which is relied on by the defendant. It is Clause "N" and it is headed "Arbitration Clause": "For possible disputes the place of jurisdiction will be that of Padua."

**2**   The procedural history is as follows. The statement of claim was issued on June 27, 1997 and served in Italy. On September 15th the Italian defendant took proceedings in an Italian court claiming return of the equipment that it had supplied. On September 19th the Italian defendant filed a statement of defence and counterclaim in this action. Paragraph 23 of the statement of defence states as follows:

> Pursuant to the Contract, at paragraph N, where there is a dispute, the place of jurisdiction is Padua, Italy accordingly, the proper forum for the hearing of this action is Padua, Italy.

The defendant took no other steps to dispute the jurisdiction of this court and on October 15th filed this motion for Summary Judgment to dismiss the claim.

**3**   There is also before me a cross-motion by the plaintiff which takes the position that if the court finds the jurisdictional arguments are well founded the appropriate remedy is a stay of the action rather than a dismissal.

4    During argument, counsel for the defendant made it clear that it was her client's position that Clause N should be treated as an arbitration clause and that her client had no intention to litigate the dispute in the Italian courts but rather intended to submit the dispute to arbitration in Italy. In effect, she conceded that if her arguments were successful the appropriate remedy would be a stay rather than a dismissal of the action.

5    In my view the defendant's motion must be dismissed in its entirety, both on procedural and on substantive grounds. With respect to procedure and on the assumption for these purposes only that we are dealing with an enforceable and valid arbitration clause, I find that the defendant has failed to take the appropriate steps to have this action stayed and referred to arbitration. The International Commercial Arbitration Act, R.S.O. 1990, c. I.9, Article 8, provides as follows:

> (1)    A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed.

6    I find that the defendant has failed to comply with the statutory requirements stipulated by that provision. First of all, in my view, the defendant has still not made a request to this court to refer the matter to arbitration. The only explicit reference to arbitration was contained in a letter to the plaintiff from the defendant's Italian counsel dated June 23, 1997. It is clear on the authorities that a letter written prior to the initiation of the action does not constitute a request within the meaning of the Act: See, Ruhrkohle Handel Inter GmbH v. Fednav Ltd. (1992), 42 C.P.R. (3d) 414, and ABN Amro Bank Canada v. Krupp MaK Maschinenbau (1994), 21 O.R. (3d) 511.

7    The pleading in the statement of defence does not ask for arbitration. It simply states that the proper forum for the hearing of the action is Padua, Italy. This motion is not a motion for a stay of the action to refer the matter to arbitration but rather a motion for summary judgment to dismiss the claim. As I have mentioned, it was only during oral argument that the point was conceded that if any remedy was available it would be that of arbitration. Moreover, even if the statement of defence does constitute a request for arbitration, it is not at all clear that it constitutes a timely request for arbitration. The ABN Amro Bank Canada case already referred to holds that pleading and arbitration clause in a statement of defence and counterclaim is not a timely request for arbitration and that the appropriate procedure is to bring a motion for a stay. While leave to appeal from that decision was granted: 24 O.R. (3d) 450, it does not appear that the appeal to the Divisional Court has ever been heard. In any event, the statement of defence was not the first statement of substance on the dispute presented by the defendant. As I have indicated, the defendant took proceedings in Italy after receiving the statement of claim and only a few days before submitting the statement of defence. It would appear that before the Italian court, it took the position that Clause N in the agreement was a jurisdiction clause conferring jurisdiction on the Italian court rather than an arbitration clause. That position was accepted by the Italian court. The translation of the reasons of the Italian court states as follows:

> Notwithstanding the title "Arbitration Clause" it must be considered as a jurisdiction clause and not as a mere arbitration clause in consideration of the literal meaning of the words and also because it does not contain reference to an arbitration proceeding.

**8**      Accordingly for these procedural reasons, I find that the motion must be dismissed. I would add that in substance I would also reject the submission of the defendant on the ground that Clause N in the agreement falls well short of what is required under Ontario law to constitute a valid arbitration clause. While I note at this point that no submissions were made as to the appropriate law of this contract nor is there any evidence of Italian law as to how this clause would be interpreted. However, as noted above, it would appear that the Italian court regarded it as a jurisdiction clause. In the absence of contrary evidence, I must assess that Ontario law applies and interpret the clause in light of the law of Ontario. That law is summarized in the judgment of Justice Hoillett in Benner and Associates v. Northern Lights Distribution Inc. (1995), 22 B.L.R. (2d) 79. Justice Hoillett makes it clear that the established principles in Ontario require clarity in an arbitration clause and in particular that it must be clear that all disputes are to be submitted to arbitration and some indication of the appropriate procedure must be set out. It is not at all clear, here, that all disputes are referable to arbitration and, indeed, the conduct of the defendant itself would suggest that it does not so regard the clause for it took proceedings in Italy. The clause does not stipulate a process or procedure nor does it indicate who is to conduct the arbitration. It falls well short of the degree of precision required for such clauses to oust the jurisdiction of an Ontario court. I note the following passage from Justice Hoilett's decision at page 85 which is apposite to the circumstances here. He states:

> The agreement in issue was drafted by the defendant and had it been the defendant's intention to have all breaches and disputes submitted to arbitration, that intent could have been couched in plain and simple language.

**9**      I would add finally that while the defendant does not press the argument that this is a jurisdiction clause conferring jurisdiction on the Italian courts but rather requests arbitration, I find to the extent that argument was advanced, that the statement of defence and counterclaim here constitutes attornment to the jurisdiction of Ontario. The defendant chose not to avail itself of the established procedure to contest jurisdiction prescribed by Rule 17 but by section 106 of the Courts of Justice Act, but rather chose to invoke the jurisdiction of this court, not just to defend the action but to assert a counterclaim. Such action plainly does not constitute an appearance or attornment under duress to protect property but rather amounts to attornment plain and simple. See, Gourmet Resources International Inc. (Trustee of) v. Paramount Capital Corp. (1991), 5 C.P.C. (3d) 140; Clinton v. Ford (1982), 37 O.R. (2d) 448; Boissiere v. Brockner (1889), 6 T.L.R. 85.

**10**      For those reasons I dismiss the motion.

SHARPE J.

qp/d/mii/DRS

\\apps1\users\creerym\Nortel\Coldmatic_Refrigeration_of_Canada_Ltd._v._P..DOC



*Indexed as:*
## Benner and Associates Ltd.
## v. Northern Lights Distribution Inc.

**Between**
**Benner and Associates Ltd., plaintiff, and**
**Northern Lights Distribution Inc., defendant**

[1995] O.J. No. 626

22 B.L.R. (2d) 79

53 A.C.W.S. (3d) 929

No. 94-CQ-57097

Ontario Court of Justice (General Division)

**Hoilett J.**

Heard: January 27, 1995.
Judgment: March 9, 1995.

(11 pp.)

*Arbitration -- Stay of proceedings -- Arbitration clause, enforcement of.*

The defendant moved to stay an action on the grounds that the parties had agreed to resort to arbitration. The plaintiff had terminated a dealership agreement with the defendant in May, 1994. Neither party had ever taken any initiative to invoke the arbitration clause in the agreement. The plaintiff issued its statement of claim in October, 1994.

HELD: The motion to stay was dismissed. It was not clear from the language employed that all disputes were to be submitted to arbitration, or whether arbitration was to be invoked only in those circumstances where a dealer was in breach of the contract. There was no clarity in the language of the arbitration clause concerning who should take the initiative in the joint appointment of the arbitrator. Therefore, the arbitration clause had to fail for uncertainty.

**Statutes, Regulations and Rules Cited:**

Arbitration Act, S.O. 1991, ss. 2(4), 7(1), 7(2).

**Counsel:**

Robert C. Harason, for the plaintiff/responding party.
Joseph M. Gottli, for the defendant/moving party.

---

**1**     **HOILETT J.:**-- This is a motion by the defendant to stay the within action on the grounds that it is inconsistent with a Dealership Agreement entered into by the parties, a term of which contemplates a resort to arbitration in certain circumstances set out in the Agreement.

**2**     Before briefly setting out the general purport of the Agreement and the circumstances precipitating the dispute between the parties, it may be useful to reproduce for ease of reference the specific term of the Agreement relied on by the moving party. Clause 8 of the Agreement provides as follows:

>   8.     Terms and Termination:
>
>   A dealership agreement shall remain in place for a period of 1 (one) year which barring any 30 day advance notice by either party will be automatically renewed. If for any reason, and without cause written notice is given 30 days prior to renewal, this contract will cease on the renewal date. Should a Dealer be in breach of this contract, written notice will be given by Northern Lights Distributing, Inc. If the breach is not corrected within 15 days of receiving the written notice, such dispute shall be submitted to a single arbitrator jointly appointed. The chosen arbitrator shall agree to schedule the hearing within 30 days of their appointment and to proceed with arbitration without delay. The appointed arbitrator shall make an award within 15 days of the conclusion of the hearing. This is in accordance with the Arbitration Act of Ontario. A Dealer must meet the specific performance requirements agreed to in Schedule C hereto.

The following handwritten addition was made to the pre-printed text of the Agreement and initialled by the parties:

>   Such award shall be binding by (sic) both parties.

**3**     Stated very briefly, under the Agreement entered into by the parties, the plaintiff was appointed the defendant's agent, or "dealer", for the purpose of distributing in Metropolitan Toronto a skylighting device sold under the label of "Solatube". The Agreement was dated July 29, 1993. Among other things, the Agreement in Clause 6, dealt with the respective marketing and advertising obligations of the parties and Clauses 12 and 13 of the Agreement dealt, respectively, with the issue of non-competition and the matter of trade secrets.

**4**     It is common ground that in early 1994 the plaintiff commenced working on the development of a device described as an "aluminum flat-top flashing" which was intended to be used as a part of the assembly necessary for the installation of the Solatube skylight. The aluminum flashing was intended to be an alternative to a fibreglass product that was part of the original Solatube assembly.

An exchange of correspondence between the parties, of which a letter of May 18, 1994 from the defendant to the plaintiff marks a watershed, makes it clear that ultimate approval of the aluminum flashing had to come from "Solatube North America Limited", the defendant's principal. Equally clear, indeed, counsel for the defendant conceded as much, was that the defendant condoned the plaintiff's efforts at developing the aluminum flashing; albeit pointing out to the plaintiff that Solatube North America Limited had to approve the flashing and that solatube North America Limited's warranty would not cover the aluminum flashing.

**5**     The defendant's letter of May 18, 1994, referred to earlier, accused the plaintiff of breaching the terms of the Agreement, and in particular Clauses 12 and 13, dealing, respectively, with "non-competition" and with "trade secrets". The particular violation complained of was the plaintiff's involvement in the development of the aluminum flashing. The concluding paragraph of the letter sounded the following alarm to the plaintiff:

> Within fifteen (15) days of receiving this notice, Northern Lights requires a letter from Benner and Associates stating that it will cease all actions regarding the aluminum flat roof flashing immediately. Should we not receive the above written notice by close of business (5:00 pm E.S.T.) Thursday, June 2, 1994, the Metro Toronto Dealership is terminated.

**6**     Subsequent letters from the defendant, dated, respectively, May 27, 1994; June 1, 1994; June 1, 1994 and June 2, 1994, echoed the defendant's concern about the alleged breach.

**7**     The plaintiff's first response to the defendant's May 18, 1994 letter of ultimatum was a letter dated June 3, 1994, the day following the 15 days the plaintiff was given to correct the alleged breach. Distilling to its essence the plaintiff's letter of June 3, it indicated that "[o]n the basis of your letter of May 18, 1994, we consider our Dealership Agreement formally terminated at this time" and went on to set out its own allegation of breaches of the Agreement. Appended was a schedule setting out the plaintiff's assessment of its alleged damages.

**8**     The defendant, in a letter dated June 10, 1994, acknowledged receipt of the plaintiff's letter of June 3, 1994, supra, and repeated its allegations of breaches of the Agreement.

**9**     Neither party to the Agreement has ever taken any initiative to invoke the so-called arbitration clause in the agreement. The plaintiff issued its Statement of Claim in this action on October 27, 1994.

**10**     Following the termination of the Agreement, the defendant created a new dealership to assume the role that it was assumed the plaintiff would have played under the terms of the Dealership Agreement had its original intent been realized. It then sought a transfer of the yellow-page listing that the plaintiff had acquired.

**11**     Central to the issues raised on this motion is the need to determine whether or not there is a valid arbitration clause in the Dealership Agreement and, if so, what interpretation should reasonably be placed on it. It must also be determined whether or not, assuming there is a valid arbitration clause, the clause falls prey to any of the exceptions contemplated by Section 7 of the Arbitration Act, S.O. 1991, and, particularly, subsection 2. For ease of reference subsections (1) and (2) of Section 7 are hereafter reproduced:

> 7.-(1) If a party to an arbitration agreement commences a proceeding in respect of a matter to be submitted to arbitration under the agreement, the court in which the proceeding is commenced shall, on the motion of another party to the arbitration agreement, stay the proceeding.

> (2) However, the court may refuse to stay the proceeding in any of the following cases:

> 1. A party entered into the arbitration agreement while under a legal incapacity.
> 2. The arbitration agreement is invalid
> 3. The subject-matter of the dispute is not capable of being the subject of arbitration under Ontario law.
> 4. The motion was brought with undue delay.
> 5. The matter is a proper one for default or summary judgment.

**12**  In order to place this motion in jurisprudential context, reference might usefully be made to the recent decision (unreported) of Blair J. in Ontario Hydro v. Denison Mines Limited, released June 3, 1992 (Ontario Court of Justice (General Division)). The decision of Blair J. is a thorough and thoughtful discussion of the role of arbitration in the spectrum of means of dispute resolution. Referring to "The Legislative Framework", the following excerpt from the reasons of Blair J. epitomises the philosophy that inspired the new arbitration legislation:

> The Arbitration Act, 1991 came into effect on January 1, 1992. It repealed the former Arbitrations Act, R.S.O. 1980 c. 25, and enacted a new regime for the conduct of arbitrations in Ontario. This new regime is more sophisticated than that of the former Act and more consistent with international commercial arbitration practices. It is designed, in my view, to encourage parties to resort to arbitration as a method of resolving their disputes in commercial and other matters, and to require them to hold to that course once they have agreed to do so.

> In this latter respect, the new Act entrenches the primacy of arbitration proceedings over judicial proceedings, once the parties have entered into an arbitration agreement, by directing the court, generally, not to intervene, and by establishing a 'presumptive' stay of court proceedings in favour of arbitration.

**13**  At the risk of simplifying the argument of the defendant herein, what it is asking the court to do is to give effect to the principle enunciated in the judgment of Blair J. in Ontario Hydro v. Denison Mines Limited, supra. The defendant has cited as well the decision of the Ontario Court of Justice (General Division) in Mind Star Toys Inc. v. Samsung Co. Ltd. (1992), 6 C.P.C. (3rd), 241, (Zelinski J.) and the judgment of the Alberta Court of Appeal in Kaverit Steel and Crane Ltd. v. Kone Corp. (1992), 4 C.P.C. (3rd), 99.

**14**  There is no point in dissecting any of the cases cited because there is a general consistency in the interpretation of the law. As is often the case, the ultimate question is the proper construction to be placed on a particular clause.

**15**    The point should be made that in each of the three cases cited on behalf of the defendant, the language of the arbitration clause arguably possesses a clarity that, in my view, is absent from the language of the arbitration clause in the case at bar. The point is best made by reference to the actual text of the arbitration clause in the three cases cited. The text of the Ontario Hydro v. Denison Mines case, supra, provides, in Article XI:

> Except as otherwise specifically provided in this agreement or expressly otherwise agreed to by the parties, all disputes arising in connection with this agreement shall be finally settled under the provisions of The Arbitration Act of Ontario by three arbitrators. Each of the parties hereto shall appoint one arbitrator and the two arbitrators so appointed shall appoint the third arbitrator. The proceedings before the arbitrators shall taken place in Toronto, Ontario or such other place as the arbitrators may determine.

**16**    The relevant arbitration provision in the Mind Star v. Samsung case, supra, is Article 14.4, sub-paragraph (a) of which provides:

> (a)    All disputes in connection with this Agreement shall be finally settled under the Rules of Conciliation of Arbitration on the International Chamber of Commerce hereinafter the ('ICC Rules'). In accordance with Article 8(1) of the ICC Rules, SAMSUNG and MSTI acknowledge that they have to hereby submit ipso facto and in all respects to the present ICC Rules.

**17**    The arbitration clause in the Kaverit Steel v. Kone case, supra, is to the same general effect as in the two cases above, and provides as follows:

> Any dispute arising out of or in connection with this Agreement shall be finally settled without recourse to the courts, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more arbitrators designated in conformity with those Rules. The arbitrator or arbitrators shall have power to rule on their own competence and on the validity of the agreement to submit to arbitration. The place of arbitration shall be Stockholm, Sweden.

**18**    A cursory review of the arbitration clauses in cases cited in the plaintiff's book of authorities makes it clear that, while not uniform, language in the general form of that reproduced above is quite commonly employed. I am of the view that in each case the language employed appears to express much more clearly the intent of the parties than is the case in the instant motion. In the instant motion it is not clear from the language of Clause 8 that all disputes are to be submitted to arbitration or whether arbitration is to be invoked only in those circumstances in which, as the clause suggests, "... a Dealer [is] in breach of his contract ...". There is no clarity in the language of the arbitration clause concerning who should take the initiative in the joint appointment of an arbitrator. Prima facie, it would appear that the obligation should rest on the defendant. There is nothing in the language of the arbitration clause that obliges the Dealer to submit to arbitration any breaches of contract on the part of Northern. It is trite to say that the interpretation of contracts is one of the roles of the court, and in so doing it will often imply a clause in order to render efficacious, from a business point of view, a contract. It is not, however, the role of the court to write a contract that the parties themselves have failed, through some default, to write. The Agreement in issue was drafted



by the defendant and had it been the defendant's intention to have all breaches and disputes submitted to arbitration, that intent could have been couched in plain and simple language.

**19**     The final determination of the issues raised in this motion must, in my view, turn on the proper construction to be placed on the language of the arbitration clause as well as the surrounding circumstances which include the conduct of the parties. As I indicated earlier, there is nothing in the language of the clause which obliges the Dealer to submit to arbitration where the defendant, allegedly, is in breach of contract. The language requiring the parties to arbitrate where the Dealer is in breach is itself vague. I am of the view, therefore, that the arbitration clause must fail for uncertainty.

**20**     The foregoing conclusion is a sufficient reason for dismissing this motion. I am impelled to that conclusion, however, for one other reason. The course of conduct of the defendant following its allegation of breach on the part of the Dealer demonstrated scant regard for the provisions of the arbitration clause which it now seeks to assert as a shield. The totality of the defendant's conduct constitutes such undue delay as to warrant a dismissal of motion to stay, as contemplated by Section (2) 4 of the Arbitration Act.

**21**     In the result, the motion is dismissed subject to the condition that the defendant shall have leave to deliver its statement of defence (and counterclaim, if intended) within ten (10) days of the entry of this order.

**22**     The plaintiff shall have its cost of this motion fixed in the amount of $1,250.00, plus G.S.T.

HOILETT J.

qp/s/mii/DRS

\\apps1\users\creerym\Nortel\Benner_and_Associates_Ltd._v._Northern_Light.DOC



ter Neuzen *v.* Korn, [1995] 3 S.C.R. 674

**Kobe ter Neuzen**        *Appellant*

*v.*

**Dr. Gerald Korn**        *Respondent*

and

**HIV-T Group (Blood Transfused), the Canadian
Association of Transfused Hepatitis C Survivors,
the Canadian Hospital Association and
the Canadian Red Cross Society**                *Interveners*

**Indexed as:  ter Neuzen *v.* Korn**

File No.: 23773.

1995: February 2; 1995: October 19.

Present:  La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin and
Iacobucci JJ.

on appeal from the court of appeal for british columbia

> *Torts -- Negligence -- Physicians and surgeons -- Patient undergoing
artificial insemination procedure and contracting HIV through infected semen of
donor -- Whether physician could be found negligent notwithstanding conformity with*

1995 CanLII 72 (SCC)

- 2 -

*standard medical practice -- Whether trial judge erred in instructing jury that prevailing standard of practice could itself be found to be negligent.*

*Contracts -- Sale of goods -- Implied conditions -- Implied warranty -- Patient undergoing artificial insemination procedure and contracting HIV through infected semen of donor -- Whether implied conditions under Sale of Goods Act applicable -- Whether implied warranty exists at common law that semen would be of merchantable quality and fit for its purpose -- Sale of Goods Act, R.S.B.C. 1979, c. 370.*

*Damages -- Non-pecuniary damages -- Limit -- Patient undergoing artificial insemination procedure and contracting HIV through infected semen of donor -- Whether trial judge erred in failing to charge jury on rough upper limit on non-pecuniary damages -- If not, whether damages awarded for non-pecuniary loss ought to be adjusted accordingly.*

The appellant participated in the respondent obstetrician and gynaecologist's artificial insemination ("AI") program from 1981 until January 1985, and became infected by HIV as a result of the final AI procedure she underwent. The respondent had not warned her of the risk of HIV infection. The first documented case in the world of HIV transmission through AI was published in the lay media in July 1985 and in a medical journal in September 1985. None of the obstetric literature mentioned AI as a mode of transmission of HIV and no article summarized the disease risks of AI before 1986. As of January 1985, there was no test available for the detection of HIV in semen or blood in Canada. Although the respondent knew that HIV could be transmitted by heterosexual sex,

1995 CanLII 72 (SCC)

- 3 -

he was not aware that HIV could be transmitted by AI until July 1985. There was expert evidence at trial that the respondent's AI practice was in keeping with general practices across Canada. Specifically, his practice of recruitment and screening of donors and semen accorded with standard practice. The trial judge instructed the jury that it was open to find the respondent negligent on the basis that he failed to comply with the standard medical practice at that time. Alternatively, they could find that the approved practice itself was negligent. With respect to the sale of goods issue, the trial judge instructed the jury to determine first whether the contract between the parties was primarily one for goods or primarily for services. If it was primarily for goods, then the *Sale of Goods Act* with its implied conditions applied. The trial judge also instructed the jury that aside from the Act, they had to consider whether there was a warranty of fitness and merchantability at common law, but that any common law warranty would simply amount to the same thing as negligence. The jury held that the contract between the parties was primarily one for services and therefore the *Sale of Goods Act* did not apply. They found the respondent negligent, however, and awarded damages totalling $883,800, including $460,000 for non-pecuniary damages. The Court of Appeal set aside the verdict and ordered a new trial on the issue of liability as well as damages. With respect to the negligence claim, the court distinguished between two aspects of the respondent's practice: the conduct of the AI procedure, which reflected the current state of knowledge as to the risk of transmission of HIV involved in the use of that procedure, and the screening and follow-up of donors. The court concluded that it was impossible to determine whether the jury found the respondent negligent on the first or second aspects of his practice. On the evidence, it was not available to the jury to find that the respondent ought to have known of the risk of HIV by AI. The trial judge charged

1995 CanLII 72 (SCC)

- 4 -

the jury in this manner, however, and it may have been the basis upon which the jury found negligence. Therefore, the verdict could not stand. The court also concluded that while it was reasonable for the trial judge not to have instructed the jury on the rough upper limit for non-pecuniary damages when neither counsel had asked for such a charge, the award must be corrected to conform with the jurisprudence if the damages exceed the limit.

*Held*: The appeal should be dismissed.

*Per* La Forest, Sopinka, Gonthier, Cory, McLachlin and Iacobucci JJ.: It is well settled that physicians have a duty to conduct their practice in accordance with the conduct of a prudent and diligent doctor in the same circumstances. In the case of a specialist, such as a gynaecologist and obstetrician, the doctor's behaviour must be assessed in light of the conduct of other ordinary specialists, who possess a reasonable level of knowledge, competence and skill expected of professionals in Canada, in that field. The conduct of physicians must be judged in the light of the knowledge that ought to have been reasonably possessed at the time of the alleged act of negligence. It was not possible for a jury acting judicially to have found that, in 1985, the respondent ought to have known of the risk of HIV by AI. While conformity with common practice will generally exonerate physicians of any complaint of negligence, there are certain situations where the standard practice itself may be found to be negligent. However, this will only be where the standard practice is fraught with obvious risks such that anyone is capable of finding it negligent, without the necessity of judging matters requiring diagnostic or clinical expertise. The question as to whether the trier of fact can find that a standard practice is itself negligent is a question of law to be determined by the

1995 CanLII 72 (SCC)

- 5 -

trial judge irrespective of the mode of trial.  The first aspect of the negligence claim was not one that the jury could decide without the aid of expert evidence. Accordingly, the trial judge erred in inviting them to do so.

1995 CanLII 72 (SCC)

With respect to the second aspect of the negligence claim, infection with HIV is within the same class of injury as other sexually transmitted diseases and the respondent could be liable for the damage caused notwithstanding that he did not foresee that a failure to take reasonable steps to protect his patients could result in HIV infection.  It would be sufficient to found liability if it is established that the respondent ought to have foreseen the class of injury.  The evidence as to standard practice with respect to the screening and follow-up of donors was sketchy and it would be open to the jury to find that there was at the relevant time no standard practice.  On the other hand, the jury could also find that the standard practice was not to screen donors or carry out follow-up interviews beyond what the respondent did.  The jury could determine the appropriate standard without reliance on expert evidence.

The Information Sheet provided by the respondent did not amount to a warranty that the donor would not be homosexual or a drug abuser.  There is no indication that there was any intention on the part of either party that there should be contractual liability in respect of the statement in the Information Sheet. Moreover, it appears that the appellant did not raise this issue in either court below.

In order for the *Sale of Goods Act* to apply, a contract must be primarily for the purpose of selling goods.  If the sale of a good is merely incidental to what is primarily a contract for services, then the statute will not imply a warranty.

- 6 -

Assuming that there was in fact a sale of semen between the appellant and respondent, it cannot be contended that the contract was one primarily for the sale of semen such as to attract the application of the *Sale of Goods Act*. Apart from the Act, a court must consider whether a common law warranty of fitness and merchantability should be implied into the contract which includes services as well as the provision of materials. However, such a warranty will not be implied in all circumstances. The court must examine the specific nature of the contract and the relationship between the parties in order to assess whether it was the intention of the parties that such a warranty be implied. Courts must be very cautious in their approach to implying contractual terms. A rationale for implying warranties in contracts of goods and services is that a supplier of goods generally has recourse against the manufacturer under the *Sale of Goods Act* as a result of the statutory conditions imposed. While it is true that the primary purpose of the implied warranty is to hold the supplier of goods liable notwithstanding the absence of negligence, different considerations apply in the context of the medical profession than in the ordinary commercial context. The doctor cannot trace the liability back to the initial manufacturer. Moreover, it must be recognized that biological products such as blood and semen, unlike manufactured products, carry certain inherent risks. It would be inappropriate to imply a warranty of fitness and merchantability in the circumstances of this case. Moreover, any warranty would simply be to take reasonable care.

While the appellant has suffered immensely as a result of this tragedy, and AIDS is a dreadful disease which will eventually take her life prematurely, with respect to non-pecuniary losses this case is no different from other tragedies and the adjusted rough upper limit on non-pecuniary damages should accordingly

- 7 -

apply. The trial judge should instruct the jury as to an upper limit if, after considering the submissions of counsel, he or she is of the opinion that the damages by reason of the type of injury sustained might very well be assessed in the range of or exceeding the upper limit. On the other hand, if the trial judge is of the view that the injuries involved will not likely produce an award approaching the rough upper limit, it is best that the trial judge not charge the jury on the matter. Whether the jury is or is not advised of the upper limit, if the award exceeds the limit the trial judge should reduce it to conform with the "cap" established, adjusted for inflation. In the present case it was reasonable for the trial judge not to give an instruction on the upper limit, but since the damages awarded for non-pecuniary losses far exceeded that limit, he ought to have reassessed the award.

*Per* L'Heureux-Dubé J.: Sopinka J.'s reasons were agreed with, except with respect to the trial judge's instruction to the jury on the upper limit of non-pecuniary damages. The determination of the quantum of damages should be left to the jury without instructions as to the upper limit, subject to the judge's power to reduce excessive awards. It has always been held improper for the trial judge or counsel to express any views as to the quantum of damages. It is well established that the amount of damages is a question of fact for the jury to determine, and not a question of law for the judge. The establishment of an upper limit for non-pecuniary damages only affects the quantum of the awards, not the way in which they are determined. The existence of an upper limit as a matter of law remains consistent with not instructing the jury as to such upper limit. By so instructing the jury, the status quo in novel areas of the law would be institutionalized. There is no evidence as to the inadequacy of the present system.

1995 CanLII 72 (SCC)

- 8 -

Finally, from a pragmatic standpoint, to require the trial judge to charge the jury on the upper limit of non-pecuniary damages may be inviting unmeritorious appeals on that part of the judge's instructions to the jury, given that, when it comes to damages, no figure will ever be "right".

**Cases Cited**

By Sopinka J.

  **Followed:** *Perlmutter v. Beth David Hospital*, 123 N.E.2d 792 (1954); *Fisher v. Sibley Memorial Hospital*, 403 A.2d 1130 (1979); *St. Luke's Hospital v. Schmaltz*, 534 P.2d 781 (1975); **not followed:** *Cunningham v. MacNeal Memorial Hospital*, 266 N.E.2d 897 (1970); **referred to:** *Andrews v. Grand & Toy Alberta Ltd.*, [1978] 2 S.C.R. 229; *Lindal v. Lindal*, [1981] 2 S.C.R. 629; *Wilson v. Swanson*, [1956] S.C.R. 804; *Lapointe v. Hôpital Le Gardeur*, [1992] 1 S.C.R. 351; *McCormick v. Marcotte*, [1972] S.C.R. 18; *Roe v. Ministry of Health*, [1954] 2 All E.R. 131; *Vancouver-Fraser Park District v. Olmstead*, [1975] 2 S.C.R. 831; *Roberge v. Bolduc*, [1991] 1 S.C.R. 374; *Waldick v. Malcolm*, [1991] 2 S.C.R. 456; *Anderson v. Chasney*, [1949] 4 D.L.R. 71 (Man. C.A.), aff'd [1950] 4 D.L.R. 223 (S.C.C.); *R. v. Côté*, [1976] 1 S.C.R. 595; *Gee v. White Spot Ltd.* (1986), 7 B.C.L.R. (2d) 235; *G. H. Myers and Co. v. Brent Cross Service Co.*, [1934] 1 K.B. 46; *Young & Marten Ltd. v. McManus Childs Ltd.*, [1969] 1 A.C. 454; *G. Ford Homes Ltd. v. Draft Masonry (York) Co.* (1983), 43 O.R. (2d) 401; *Arnold v. Teno*, [1978] 2 S.C.R. 287; *Crosby v. O'Reilly*, [1975] 2 S.C.R. 381.

1995 CanLII 72 (SCC)

- 9 -

By L'Heureux-Dubé J.

   **Referred to:** *Gray v. Alanco Developments Ltd.* (1967), 61 D.L.R. (2d) 652; *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130; *Andrews v. Grand & Toy Alberta Ltd.*, [1978] 2 S.C.R. 229; *Thornton v. Board of School Trustees of School District No. 57 (Prince George)*, [1978] 2 S.C.R. 267; *Arnold v. Teno*, [1978] 2 S.C.R. 287.

**Statutes and Regulations Cited**

*Negligence Act*, R.S.B.C. 1979, c. 298, s. 6.

*Sale of Goods Act*, R.S.B.C. 1979, c. 370, ss. 17, 18.

**Authors Cited**

British Columbia. Law Reform Commission. *Report on Compensation for Non-Pecuniary Loss*. Vancouver: The Commission, 1984.

Charles, W. II. R. *Charles Handbook on Assessment of Damages in Personal Injury Cases*, 2nd ed. Toronto: Carswell, 1990.

Fleming, John G. *The Law of Torts*, 7th ed. Sydney: Law Book Co., 1987.

Fridman, G. H. L. *Sale of Goods in Canada*, 2nd ed. Toronto: Carswell, 1979.

   APPEAL from a judgment of the British Columbia Court of Appeal (1993), 81 B.C.L.R. (2d) 39, 103 D.L.R. (4th) 473, [1993] 6 W.W.R. 647, 29 B.C.A.C. 1, 48 W.A.C. 1, 16 C.C.L.T. (2d) 65, setting aside the jury's verdict, which found the respondent negligent and awarded damages to the appellant, and ordering a new trial. Appeal dismissed.

- 10 -

*Sandra J. Harper* and *Kathleen Birney*, for the appellant.

*Christopher E. Hinkson, Q.C.*, and *M. Lynn McBride*, for the respondent.

Written submissions only by *Kenneth Arenson*, for the interveners HIV-T Group (Blood Transfused) and the Canadian Association of Transfused Hepatitis C Survivors.

Written submissions only by *Daniel A. Webster, Q.C.*, for the intervener the Canadian Hospital Association.

Written submissions only by *Peter K. Boeckle* and *Anil Varma*, for the intervener the Canadian Red Cross Society.

*//Sopinka J.//*

The judgment of La Forest, Sopinka, Gonthier, Cory, McLachlin and Iacobucci JJ. was delivered by

1        SOPINKA J. -- This appeal raises issues concerning the liability of the respondent physician for conducting an artificial insemination ("AI") procedure which resulted in his patient, the appellant, contracting the Human Immunodeficiency Virus ("HIV") through the infected semen of the donor. Specifically, this Court must address whether the respondent physician could be found negligent, notwithstanding conformity with standard medical practice, and

1995 CanLII 72 (SCC)

- 11 -

whether the trial judge erred in instructing the jury that the prevailing standard of practice could itself be found to be negligent.

2          As well, this appeal also raises for consideration the issue of whether the implied conditions under the *Sale of Goods Act*, R.S.B.C. 1979, c. 370, are applicable in the present circumstances or whether there exists an implied warranty at common law that the semen would be of merchantable quality and fit for its purpose.

3          Finally, this appeal requires the Court to consider whether the rough upper limit for non-pecuniary damages, established by this Court in *ndrews v. Grand & Toy Alberta Ltd.*, [1978] 2 S.C.R. 229, ought to have been applied by the jury in the present case. First, it must be decided whether the trial judge erred in failing to charge the jury on the rough upper limit. If the trial judge was not in error, this Court must decide whether the damages awarded for non-pecuniary loss, which far exceeded the upper limit established in *Andrews*, ought nonetheless to be adjusted in accordance with those principles.

4          I should note that the interveners HIV-T Group (Blood Transfused) and Canadian Association of Transfused Hepatitis C Survivors also raised the issue of whether the medical profession ought to be held liable for the distribution of defective products, such as semen, based on a theory of strict liability in tort. This approach has been used in some American cases. However, I am in agreement with the respondent that this is not the appropriate case to address this important issue which could have far-reaching implications for the medical profession and the Canadian system of public health insurance in general. The appellant did not

- 12 -

raise this issue in her pleadings at trial, nor at the Court of Appeal. Thus, the issue has been raised for the first time at this Court by the interveners. In these circumstances, the applicability of strict liability in tort is best left for another day.

1995 CanLII 72 (SCC)

I. <u>Facts</u>

5          The facts and the evidence of the expert witnesses at trial were thoroughly summarized in the reasons of the Court of Appeal. I do not intend to review the evidence of each expert individually again in these reasons. However, in order to resolve this appeal, it is necessary to review the relevant facts in some detail and highlight some of the key aspects which emerge from the evidence.

6          The respondent is an obstetrician and gynaecologist and has practised AI since 1974. The appellant was a psychiatric nurse. She participated in the respondent's AI program from 1981 until January 21, 1985, during which time she underwent about 35 AI procedures. It was agreed that the appellant became infected by HIV as a result of the AI procedure on January 21, 1985. The respondent did not warn the appellant of the risk of HIV infection resulting from the AI procedure (also referred to as "the risk").

7          The first report of HIV in female sex partners of men with AIDS appeared in early 1983. At that time, heterosexual intercourse was seen as a potential source of infection. However, there was no link between AI and HIV. In December 1983, for the first time, the risk of contracting AIDS was related to blood transfusions. In October 1983, an important letter was published by Dr. Mascola in the *New England Journal of Medicine* suggesting that there was a risk

- 13 -

of transmitting sexually transmitted diseases ("STDs") through AI. However, this prestigious journal was not widely read by gynaecologists and the respondent did not read this letter. It appears that Dr. Mascola was the first person in the world to express a concern about the possibility of transmitting HIV through AI. The first documented case in the world of HIV transmission through AI was published in the lay media in July 1985 and in a medical journal in September 1985. None of the obstetric literature mentioned AI as a mode of transmission of HIV and no article summarized the disease risks of AI before 1986.

8        The evidence reveals that the knowledge about HIV was rapidly growing in the period of 1984-85; however, it was still quite limited and confusing in the early days. Generally, research scientists and health care officials in the AIDS field were expected to be more up to date on medical developments concerning HIV than clinical practitioners and the general medical community. In 1984, the Elisa test was developed in the United States which enabled doctors to test for HIV in blood and tissues. However, as of January 21, 1985, there was no test available for the detection of HIV in semen or blood in Canada. The Elisa test did not become available in Canada until later in 1985. Therefore, it was impossible to test the semen of donors for HIV at the time the appellant became infected.

9        At this time, it was widely believed that HIV was an STD; however, it was hoped that the atraumatic AI procedure was free of risk. It was believed that the small abrasions caused by intercourse were necessary in order for the virus to get into the bloodstream. Thus, in late 1984, a possibility of the transmission of

- 14 -

HIV through heterosexual intercourse was known, but AI was not seriously considered to put anyone at risk of being infected.

10          Some of the experts testified that an analogy could be drawn between Hepatitis B and HIV, since both were STDs.  It was not until late 1986 that it was recognized that Hepatitis B could be transmitted by AI and it was common ground that there were no published reports of Hepatitis B transmissions by AI until the fall of 1987.

11          In mid-1984, four babies in Australia were found to have acquired AIDS by blood transfusions.  Since it was known that the Elisa test would eventually be available for clinical use, this led to a ministerial decree to impose a moratorium on all body fluid and tissue transfers.  As a result, all AI clinics were closed at this time, although this was not supported by the whole medical profession in Australia.  This event was not widely publicized in North America and the respondent, as well as the general medical community in North America, were unaware of the closures in Australia until later in 1985.  Apparently, there was little exchange of medical information on the subject of HIV between Australia and North America. In September 1985, an article in the British medical journal *Lancet* revealed that four Australian women had contracted HIV from AI.  When the respondent learned of this he immediately discontinued his AI program and recommended that his donors and the appellant be tested.

12          The American Fertility Society published guidelines for the use of semen donor insemination for the first time in 1986 and these guidelines were revised in 1988.  The new guidelines recommended the use of frozen semen only,

1995 CanLII 72 (SCC)

- 15 -

which is stored for at least six months. Blood samples for HIV antibodies are taken at the time of semen donation and six months later. The semen is only to be used if both samples are HIV negative. These guidelines were not published by the American Center for Disease Control until February 1988. The respondent did not start testing for Hepatitis B until sometime in 1987-88, when the guidelines were issued.

13          Although the respondent knew that HIV could be transmitted by heterosexual sex, as well as through blood transfusions, he was not aware that HIV could be transmitted by AI until July 1985, when he heard about the experience in Australia. None of the medical publications he read prior to January 1985 nor any of the medical meetings he attended suggested that there was a risk of contracting HIV through AI. The respondent did not read Dr. Mascola's letter which appeared in the *New England Journal of Medicine*. He did not make any connection between the fact HIV was an STD and the possibility that it could be passed on through AI since there was nothing recorded to this effect.

14          There was expert evidence that the respondent's AI practice was in keeping with general practices across Canada. Specifically, his AI practice of recruitment and screening of donors and semen accorded with standard practice across Canada. The respondent used only fresh semen prior to January 1985. He personally interviewed all his donors instead of using a questionnaire. In the interview, the respondent obtained a complete medical history of the prospective donor including whether the donor was heterosexual or homosexual. The respondent rejected homosexuals because he considered that they had practices that could potentially transmit certain diseases to recipients. The respondent also

- 16 -

inquired into the levels of sexual activity since active donors were more likely to be exposed to STDs.

15      The respondent also conducted a general physical examination. He tested for gonorrhoea, syphilis and other bacteria and conducted blood and semen tests for Rh blood factor. Other than on a random basis, there was no repeat testing of semen nor re-interviewing of donors. Of the 28 active donors used by the respondent in his AI practice, only the donor whose semen was administered to the appellant was infected by HIV. That donor had been asked whether he was heterosexual or homosexual and he replied that he was heterosexual. After the donor tested HIV positive, he told the respondent that he was bisexual.

16      At trial, the trial judge instructed the jury that it was open to find the respondent negligent on the basis that he failed to comply with the standard medical practice at that time. Alternatively, the trial judge stated that the jury could find that the approved practice itself was negligent.

17      With respect to the sale of goods issue, the trial judge instructed the jury to first determine whether the contract between the parties was primarily one for goods or primarily for services. If it was primarily for goods, then the *Sale of Goods Act* applied. However, the jury held that the contract was primarily one for services and therefore the Act did not apply. The trial judge also instructed the jury that aside from the Act, they had to consider whether there was a warranty at common law. However, in this context, the trial judge stated that any common law warranty would simply amount to the same thing as negligence. In other words, under the common law warranty in a contract for medical services, the respondent

1995 CanLII 72 (SCC)

- 17 -

undertakes to meet the standards of a reasonably competent person practising in his field.  The doctor does not warrant that the services will be effective.

18          In the result, the jury found the respondent negligent.  However, it is unknown on what basis the jurors reached their decision.  The damages awarded by the jury totalled $883,800, including $460,000 for non-pecuniary damages.  On appeal, however, the verdict of the jury was set aside and the Court of Appeal ordered a new trial on the issue of liability as well as damages: (1993), 81 B.C.L.R. (2d) 39, 103 D.L.R. (4th) 473, [1993] 6 W.W.R. 647, 29 B.C.A.C. 1, 48 W.A.C. 1, 16 C.C.L.T. (2d) 65.

II.  Relevant Statutory Provisions

*Sale of Goods Act*, R.S.B.C. 1979, c. 370:

**17.**  Where there is a contract for the sale of goods by description, there is an implied condition that the goods shall correspond with the description.  If the sale be by sample, as well as by description, it is not sufficient that the bulk of the goods correspond with the sample if the goods do not also correspond with the description.

**18.**  Subject to this Act and any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract of sale, except as follows:

(a)     where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, so as to show that the buyer relies on the seller's skill or judgment, and the goods are of a description which it is in the course of the seller's business to supply, whether he is the manufacturer or not, there is an implied condition that the goods are reasonably fit for such purpose; except that in the case of a contract for the sale of a specified article under its patent or other trade name, there is no implied condition as to its fitness for any particular purpose;

- 18 -

(b)    where goods are bought by description from a seller who deals in goods of that description, whether he is the manufacturer or not, there is an implied condition that the goods shall be of merchantable quality; but if the buyer has examined the goods there is no implied condition as regards defects which such examination ought to have revealed;

(c)    an implied warranty or condition as to quality or fitness for a particular purpose may be annexed by the usage of trade; and

(d)    an express warranty or condition does not negative a warranty or condition implied by this Act unless inconsistent with it.

III.  <u>Judgment of Court of Appeal</u> (1993), 81 B.C.L.R. (2d) 39

19      After a review of the evidence, including an exhaustive review of the evidence of standard practice, the court noted that the law was well established that "physicians are required to conduct themselves at least in accordance with the standard of their professional peers, but they are not expected to guarantee the success of their procedures or the perfect safety of their patients" (p. 61).

20      With respect to the negligence claim, the Court of Appeal distinguished between two aspects of the defendant's practice:

(1)    the conduct of the AI procedure which reflected the current state of knowledge as to the risk of transmission of HIV involved in the use of that procedure;

(2)    the screening and follow-up of donors.

21      With respect to the first aspect of the case, the court stated (at p. 67):

- 19 -

Thus, it is apparent that for the Defendant to be found liable on this part of the case, it would be necessary for the jury to be satisfied that the Defendant failed to have the knowledge and understanding expected in accordance with the standards of his profession. That, of course, was a question for the jury, and it was essential that the jury be carefully instructed upon the standard they should apply in deciding whether the Defendant was guilty of negligence. [Emphasis added.]

22      The court doubted that it could reasonably be found that the defendant

was negligent in using fresh semen. It found, however, that the instructions to the

jury were deficient in that the trial judge instructed the jury that it was open for

them to find the general practice itself was negligent. In this regard, the court

stated (at p. 73):

The only proper instruction to be given on at least a part of the case was that the jury should decide whether the Defendant conducted himself as a reasonable physician would in similar circumstances. In our judgment, that required the jury to confine itself to prevailing standards of practice.

The Court of Appeal also stated (at p. 74):

It was not possible on the evidence for the jury to find that it was negligent of the Defendant not to have known of the risk of HIV by AI and that he should have ceased performing AI. That was the principal argument of the Plaintiff and it may be the ground upon which the jury based its finding of negligence. If that is the case the verdict cannot stand.

23      With respect to the second aspect of the defendant's practice relating to

the screening and follow-up of donors, the Court of Appeal stated (at p. 69):

What is more significant is that the Defendant made specific enquiries about homosexuality, not out of concern about HIV or AIDS, but because he regarded such persons as higher risks for the more

- 20 -

common STDs.  As a result of his initial enquiry, he felt confident in assuring the Plaintiff that her donor was not a homosexual person.  A follow-up interview, or closer questioning, may or may not have disclosed that the donor was bisexual.

...

Keeping in mind that infection in a donor could be a "day-to-day" thing as described by Dr. Mascola, and that lifestyle changes can occur quickly, it was necessary for the jury to consider whether the Defendant's screening procedures were deficient.  Again, of course, it was essential that the jury be given a proper instruction on the principles governing such matters.  [Emphasis added.]

24          With respect to the instructions on this aspect, the Court of Appeal stated (at p. 73):

On the other part of the case, relating to the screening of donors, and follow-up interviews, the case is not so clear because less scientific questions are involved.  In addition, we have identified some overlap between the two parts of the case.  Screening homosexual persons out of an AI program because of their believed greater risk of infection was recognized by the Defendant as a desirable aim.  The elimination of this particular donor for any reason would have protected the Plaintiff from HIV.  It must be remembered, however, that it was impossible to guarantee safety because an inaccurate answer or a changed lifestyle after one or more follow-up interviews could have left the Plaintiff exposed to infection.  There is no evidence suggesting that donors should be interviewed by the responsible physician before every donation.

On the other hand, if the jury found that the Defendant breached this duty of care to the Plaintiff then she may have an actionable claim against the Defendant because a defendant cannot always escape liability even though he does not foresee all the specific harm his patient may suffer from such a breach.

25          The court concluded that it was impossible to determine whether the jury found the respondent negligent on the first or second aspects of the defendant's practice.  On the evidence, it was not available to the jury to find that the respondent ought to have known of the risk of HIV by AI.  However, the trial

- 21 -

judge charged the jury in this manner and it may have been the basis upon which the jury found negligence.  Therefore, the verdict could not stand.  A new trial was ordered on the issues other than those based on the first aspect of the case.

26          With respect to the sale of goods issue, the court assumed without deciding that there was a sale of semen.  The trial judge instructed the jury to decide whether the contract between the parties was primarily for the sale of a good or whether it was a contract for services.  Since the jury decided that it was not a sale of goods, the *Sale of Goods Act* did not apply.  The court held that there was evidence upon which a jury could conclude that the arrangement was primarily one for professional services.

27          However, that did not resolve the issue of whether there should be an implied warranty at common law for the provision of medical services which included a good.  The jury did not decide this issue because the trial judge instructed the jury that the warranty essentially amounted to the same thing as negligence.  The court did not wish to go as far as to say that a physician would only be liable in warranty at common law if there was negligence in failing to detect or remove a defect in the good.  Instead, the court was of the view that this was not a proper case for the implication of a warranty.  In its opinion, it is a question of fact in each case whether the circumstances are sufficient to exclude common law warranties.  It therefore dismissed this claim.

28          The court next considered the respondent's argument that the award of $460,000 for non-pecuniary damages, in excess of the rough upper limit prescribed by the Supreme Court of Canada, was inordinately high.  It held that it was

- 22 -

reasonable for the trial judge not to have instructed the jury on a rough upper limit when neither counsel had asked for such a charge. However, this did not mean that the appellant's damages should not be properly assessed in light of the jurisprudence. Relying on *Lindal v. Lindal*, [1981] 2 S.C.R. 629, the court concluded (at p. 87):

> While recognizing that the [appellant's] injuries are markedly different in kind from those under consideration in the trilogy, we cannot conclude that the principle adopted by the Supreme Court of Canada, aimed at controlling the social burden of damage awards, should not be applied in this case. It follows, in our view, that the [appellant's] non-pecuniary damages cannot exceed the adjusted rough upper limit.

29      It was held that, although the trial judge did not err in his instruction to the jury, if the damages exceed the rough upper limit, the Court of Appeal must correct the award in conformity with the governing principles. Since there was to be a new trial on liability, the court was of the view that there should also be a new trial ordered on the question of damages generally.

IV. <u>Issues</u>

1.      Did the Court of Appeal err in holding that the trial judge ought not to have charged the jury that, even if the respondent conformed to standard medical practice, it was open to the jury to find that the prevailing medical practice with respect to the AI procedure was negligent?

- 23 -

2.        Did the Court of Appeal err in rejecting the appellant's claim based on a warranty under the *Sale of Goods Act*?

3.        Did the Court of Appeal err in holding that a warranty of quality or fitness should not be implied under the common law, in the circumstances of this case?

4.        Did the Court of Appeal err in holding that the rough upper limit on non-pecuniary damages applies in the present case?

5.        If the rough upper limit of non-pecuniary damages applies in the present case, must the jury be instructed accordingly or should it be left to the Court of Appeal to adjust a jury award which exceeds the limit?

V.  <u>Analysis</u>

A. *Professional Negligence*

30        I agree with the Court of Appeal that there are two aspects to the claim of professional negligence:

(1)        breach of duty arising from the failure to be aware of the risk of HIV infection through the use of AI; and

(2)        breach of duty with respect to the screening and follow-up of donors.

31        The alleged departures from the applicable standard of care were:

- 24 -

(1)     in respect of the first aspect, failure to discontinue the practice of AI or, in the alternative, to warn the patients of the risk;

(2)     in respect of the second aspect, the failure to adequately screen donors so as to eliminate those in a high risk category with relation to the transmission of STDs and to re-interview donors periodically to detect changes in lifestyle.  There is also the claim that frozen semen rather than fresh semen should have been used.

32          In order to properly address the issues relating to professional negligence, it is useful to consider what were the matters which the jury was obliged to decide.  In each aspect of the claim the jury was bound to consider whether the evidence established that a standard of practice existed.  If the answer was in the affirmative, the next question was whether the defendant conformed to that practice.  An affirmative answer to this question would result in a finding of no negligence in favour of the respondent unless the jury was entitled to consider and hold that the standard practice was itself below the required legal standard and that conduct below that standard constituted negligence.  Similarly, if the jury found that no standard practice was established by the evidence, the appellant would have failed to prove her case unless the jury was entitled to fix the standard without the necessity of expert evidence.  Finally, if the respondent failed to comply with the standard of care established by the evidence or by the jury, in the absence of or insufficiency of evidence, then the respondent would be found to be negligent.

(1)  Standard of Care and Evidence of Standard Practice

- 25 -

33        It is well settled that physicians have a duty to conduct their practice in accordance with the conduct of a prudent and diligent doctor in the same circumstances. In the case of a specialist, such as a gynaecologist and obstetrician, the doctor's behaviour must be assessed in light of the conduct of other ordinary specialists, who possess a reasonable level of knowledge, competence and skill expected of professionals in Canada, in that field.   A specialist, such as the respondent, who holds himself out as possessing a special degree of skill and knowledge, must exercise the degree of skill of an average specialist in his field: see *Wilson v. Swanson*, [1956] S.C.R. 804, at p. 817, *Lapointe v. Hôpital Le Gardeur*, [1992] 1 S.C.R. 351, at p. 361, and *McCormick v. Marcotte*, [1972] S.C.R. 18.

34        It is also particularly important to emphasize, in the context of this case, that the conduct of physicians must be judged in the light of the knowledge that ought to have been reasonably possessed at the time of the alleged act of negligence. As Denning L.J. eloquently stated in *Roe v. Ministry of Health*, [1954] 2 All E.R. 131 (C.A.), at p. 137, "[w]e must not look at the 1947 accident with 1954 spectacles".  That is, courts must not, with the benefit of hindsight, judge too harshly doctors who act in accordance with prevailing standards of professional knowledge. This point was also emphasized by this Court in *Lapointe, supra*, at pp. 362-63:

> ... courts should be careful not to rely upon the perfect vision afforded by hindsight.  In order to evaluate a particular exercise of judgment fairly, the doctor's limited ability to foresee future events when determining a course of conduct must be borne in mind.  Otherwise, the doctor will not be assessed according to the norms of the average doctor of reasonable ability in the same circumstances, but rather will be held accountable for mistakes that are apparent only after the fact.

- 26 -

No issue is taken with this proposition which was applied both in the trial judge's charge to the jury and by the Court of Appeal.

35        The Court of Appeal, after a thorough review of the evidence, held that it was not possible for a jury acting judicially to have found that, in 1985, the respondent ought to have known of the risk.  This is a power to review a jury verdict which a court of appeal clearly possesses.  See *Vancouver-Fraser Park District v. Olmstead*, [1975] 2 S.C.R. 831.  I agree with this finding and can find no basis upon which it can be questioned.  Indeed my review of the evidence leads to the same conclusion.  The evidence of standard practice on the first aspect of the case was based entirely on the state of knowledge required of the reasonable practitioner in 1985 and it would have been equally impossible for a jury acting judicially to have found that, given the state of knowledge, the reasonable practitioner ought to either have discontinued AI or warned the patients of the risk. It having been admitted that the respondent continued AI and did not warn his patients, there was no issue concerning his conformity with the standard practice.

36        The appellant, therefore, can only support a favourable finding on this aspect of the case on the basis that the jury was entitled to find that the standard established by the evidence itself departed from that of a prudent and diligent physician and that the respondent, in failing to conform with a higher standard, was guilty of negligence.  This raises the issue as to the correctness of the trial judge's charge to the jury to the effect that the jury was so entitled.

37        With respect to the second aspect of the claim in professional negligence, the Court of Appeal considered that a verdict for the appellant was

- 27 -

open to the jury. It is, however, by no means clear that the evidence establishes a standard practice with respect to the screening and follow-up of donors. This was a matter for the jury to determine. If the jury found that the evidence fell short of establishing the existence of a standard practice, the question arises as to whether the jury could determine the applicable standard without the aid of expert evidence. This is a legal issue upon which the Court of Appeal did not pronounce but which is closely related to the issue raised by the trial judge's instruction referred to above.

38          It is generally accepted that when a doctor acts in accordance with a recognized and respectable practice of the profession, he or she will not be found to be negligent. This is because courts do not ordinarily have the expertise to tell professionals that they are not behaving appropriately in their field. In a sense, the medical profession as a whole is assumed to have adopted procedures which are in the best interests of patients and are not inherently negligent. As L'Heureux-Dubé J. stated in *Lapointe*, in the context of the Quebec *Civil Code* (at pp. 363-64):

> Given the number of available methods of treatment from which medical professionals must at times choose, and the distinction between error and fault, <u>a doctor will not be found liable if the diagnosis and treatment given to a patient correspond to those recognized by medical science at the time, even in the face of competing theories.</u> As expressed more eloquently by André Nadeau in "La responsabilité médicale" (1946), 6 *R. du B.* 153, at p. 155:
>
> > [TRANSLATION] The courts do not have jurisdiction to settle scientific disputes or to choose among divergent opinions of physicians on certain subjects. <u>They may only make a finding of fault where a violation of universally accepted rules of medicine has occurred. The courts should not involve themselves in controversial questions of assessment having to do with diagnosis or the treatment of preference.</u> [Emphasis added.]

1995 CanLII 72 (SCC)

- 28 -

39          In *The Law of Torts* (7th ed. 1987), Professor Fleming observed the

following with respect to the role of standard practice, at p. 109:

> *Conformity* with general practice, on the other hand, usually dispels
> a charge of negligence.  It tends to show what others in the same
> "business" considered sufficient, that the defendant could not have
> learnt how to avoid the accident by the example of others, that most
> probably no other practical precautions could have been taken, and that
> the impact of an adverse judgment (especially in cases involving
> industry or a profession) will be industry-wide and thus assume the
> function of a "test case".  Finally, it underlines the need for caution
> against passing too cavalierly upon the conduct and decision of experts.
>
> All the same, even a common practice may itself be condemned as
> negligent if fraught with obvious risks. [Emphasis added.]

40          With respect to the medical profession in particular, Professor Fleming

noted, at p. 110:

> Common practice plays its most conspicuous role in medical
> negligence actions.  Conscious at once of the layman's ignorance of
> medical science and apprehensive of the impact of jury bias on a
> peculiarly vulnerable profession, courts have resorted to the safeguard
> of insisting that negligence in diagnosis and treatment (including
> disclosure of risks) cannot ordinarily be established without the aid of
> expert testimony or in the teeth of conformity with accepted medical
> practice.  However there is no categorical rule.  Thus an accepted
> practice is open to censure by a jury (nor expert testimony required) at
> any rate in matters not involving diagnostic or clinical skills, on which
> an ordinary person may presume to pass judgment sensibly, like
> omission to inform the patient of risks, failure to remove a sponge, an
> explosion set-off by an admixture of ether vapour and oxygen or injury
> to a patient's body outside the area of treatment.  [Emphasis added.
> Footnotes omitted.]

41          It is evident from the foregoing passage that while conformity with

common practice will generally exonerate physicians of any complaint of

negligence, there are certain situations where the standard practice itself may be

found to be negligent.  However, this will only be where the standard practice is