Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD**
(returnable June 7, 2011)

| | |
|---|---|
| Torys LLP | Fraser Milner Casgrain LLP |
| 79 Wellington St. W., Suite 3000 | 77 King Street West |
| Box 270, TD Centre | Toronto-Dominion Centre, Suite 400 |
| Toronto, Ontario | Toronto, Ontario |
| M5K 1N2  Canada | M5K 0A1 Canada |
| | |
| Tony DeMarinis (LSUC #: 29451Q) | Alex MacFarlane (LSUC# 28133Q) |
| Scott Bomhof (LSUC #: 37006F) | Michael Wunder (LSUC # 46626V) |
| Sheila Block (LSUC #: 14089N) | Ryan Jacobs (LSUC# 59510J) |
| Andrew Gray (LSUC #: 46626N) | |
| | Email: alex.macfarlane@fmc-law.com |
| Email: tdemarinis@torys.com |        michael.wunder@fmc-law.com |
|        sbomhof@torys.com |        ryan.jacobs@fmc-law.com |
|        sblock@torys.com | |
|        agray@torys.com | Tel: 416.863.4511 |
| | Fax: 416/863.4592 |
| Tel: 416.865.0040 | |
| Fax: 416.865.7380 | Lawyers for The Official Committee of |
| | Unsecured Creditors of Nortel Networks Inc., |
| Lawyers for Nortel Networks Inc. | et al. |
| and the other US Debtors | |

## **Table of Contents**

Tab 1          Notice of Motion

Tab 2          Draft Order

Tab 3          Affidavit of Natasha De Cicco

# TAB 1

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**

Nortel Networks Inc. and certain of its affiliates (collectively, the "U.S. Debtors") and the Official Committee of Unsecured Creditors appointed in the chapter 11 cases of the U.S. Debtors (the "UCC") (collectively, the "Movants") will make a motion to the Honourable Mr. Justice Morawetz on June 7, 2011, or such other date as this Honourable Court may set, at 10:00 a.m., or as soon after that time as the motion can be heard, at the court house, 393 University Avenue, Toronto, Ontario.

1.    **PROPOSED METHOD OF HEARING**: The motion is to be heard orally.

2.    **THE MOTION IS FOR** an order substantially in the form attached hereto:

(a)    approving an Allocation Protocol in the form attached as Schedule "A" to the proposed order, establishing procedures and an expedited schedule for the cross-border resolution by the U.S. and Canadian Courts (as defined below) of the allocation of the Sale Proceeds from the Sale Transactions (each as defined below), pursuant to the Interim Funding and Settlement Agreement, dated June 9, 2009 by and between the parties listed on Schedules 1, 2 and 3 thereto; and,

(b)    such further and other relief as this Honourable Court may deem just.

- 2 -

The Movants have filed a motion in the U.S. Court seeking the same relief pursuant to a joint hearing.

3. **THE GROUNDS FOR THE MOTION ARE**

(a) *Background.* On January 14, 2009, Nortel Networks Corporation, Nortel Networks Limited, and certain of their Canadian affiliates (collectively, the "Canadian Debtors", together with their affiliates, including the U.S. Debtors, "Nortel") commenced a proceeding in this Court (the "Canadian Court") under the *Companies' Creditors Arrangement Act* (the "CCAA") seeking relief from their creditors. Ernst & Young Inc. was appointed as Monitor by the Canadian Court.

(b) Also on January 14, 2009, the U.S. Debtors (other than Nortel Networks (CALA) Inc.), filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), which cases are consolidated for procedural purposes only. The U.S. Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the U.S. Bankruptcy Code.

(c) Also on January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors") into administration under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators"). Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

(d) On January 15, 2009 the U.S. and Canadian Courts each approved the Cross-Border Court-To-Court Protocol, which was later amended by order of both courts (as amended, the "Cross-Border Protocol").

(e) On or about June 9, 2009, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors, excluding Nortel Networks S.A. and Nortel Networks AG entered into the Interim Funding and Settlement Agreement (the "IFSA"). Nortel Networks

S.A. and Nortel Networks AG acceded to the IFSA on or about September 11, 2009.

(f)     The IFSA addressed several issues facing the parties at that time, including liquidity issues at NNL.  Furthermore, in order to ensure that the planned sale of Nortel's businesses and assets ("Sale Transactions", and each a "Sale Transaction") could progress unimpeded by intercompany disputes, the IFSA also addressed the allocation of sale proceeds (the "Sale Proceeds").  In particular, the parties in s. 12(a) of the IFSA agreed not to condition the execution of any sale agreement upon reaching agreement with other IFSA parties proposed to be a party to such Sale Transaction regarding the allocation (or a binding procedure for allocation) of the ultimate Sale Proceeds.

(g)     The IFSA provides, in s. 12(a), that all Sale Proceeds shall be held in escrow accounts corresponding to each Sale Transaction (each, an "Escrow Account"), and not distributed "in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the [Interim Sales ] Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors."

(h)     The parties to the IFSA also agreed in s. 12(c) "negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which [Interim Sales ] Protocol shall provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation."

(i)     The parties to the IFSA further agreed in s. 16(b) that any disputes relating to the IFSA and the matters addressed therein that affected the U.S. Debtors, Canadian Debtors and EMEA Debtors must be resolved in a joint hearing of the U.S. and Canadian Courts under the Cross-Border Protocol.

- 4 -

(j)        After conducting a joint hearing on June 29, 2009, the U.S. and Canadian Courts
           both entered orders authorizing the U.S. Debtors and the Canadian Debtors
           respectively to enter into the IFSA.

(k)        On June 23, 2009, the English High Court provided directions to the Joint
           Administrators on behalf of the EMEA Debtors, stating that the Joint
           Administrators were "at liberty" to enter into the IFSA on behalf of the EMEA
           Debtors.

(l)        *The sale process.*  On June 19, 2009, Nortel announced that it was advancing in
           discussions with external parties to sell its businesses and that it would assess
           other restructuring alternatives for its businesses in the event that it was unable to
           maximize value through sales.  Since then, Nortel has sold most of its business
           units and assets to various purchasers, and after completion of the sale of Nortel's
           remaining patent portfolio and related assets Nortel will have sold substantially
           all of its business units and assets.

(m)        The U.S. and Canadian Courts have authorized the U.S. Debtors and Canadian
           Debtors to enter into the Sale Transactions in their respective jurisdictions, in
           most cases after conducting a joint cross-border hearing.  The sale orders made by
           the U.S. Court and the approval and vesting orders entered by the Canadian Court
           order the Sale Proceeds to be held in Escrow Accounts pursuant to the IFSA.

(n)        Pursuant to the IFSA and the U.S. and Canadian Courts' orders, the Selling
           Debtors have therefore entered into escrow agreements along with the Non-Filed
           Entities on or before the time each Sale Transaction closed (the "Escrow
           Agreements").[1]  To date, approximately US$2.7 billion has been deposited in
           accounts managed by JPMorgan Chase Bank, N.A., as third party escrow agent,
           pursuant to the Escrow Agreements.  All such accounts are maintained in the
           United States.  The Sale Proceeds generated by the sale of Nortel's remaining

---

[1] In this Notice of Motion, the term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA
or that signed one or more of the Escrow Agreements (as defined below), and the term "Non-Filed Entities" refers to
any non-debtor Nortel company that signed one or more of the Escrow Agreements.

patent portfolio and related assets will be treated in a substantially similar fashion.

(o)    *The proposed Allocation Protocol.*  Representatives of the Selling Debtors, together with the Monitor, the Joint Administrators, the UCC and ad hoc group of bondholders (the "Bondholder Group"), have unsuccessfully attempted since June 2009 to negotiate a protocol to govern how the allocation of the Sale Proceeds would be resolved in the event they were unable to reach an agreement on allocation.  Despite these efforts, the parties were not able to reach a consensus on an acceptable allocation protocol, and at least one draft protocol swelled to 26 single-spaced pages.

(p)    Representatives of the Selling Debtors, together with the Monitor, the Joint Administrators, the Non-Filed Entities, the UCC, the Bondholder Group and certain other key creditor constituencies, have also unsuccessfully attempted to negotiate an agreement on the allocation of the Sale Proceeds, including by engaging in an extensive mediation process on two separate occasions.

(q)    The Movants therefore seek an order approving the proposed Allocation Protocol in order to permit the allocation of the Sale Proceeds to be resolved by the U.S. and Canadian Courts as contemplated by the parties pursuant to the IFSA and to allow these proceedings to be advanced.

(r)    The approval of an Allocation Protocol and the resulting allocation of Sale Proceeds are matters covered by the IFSA, and the parties under that agreement have submitted themselves to the jurisdiction of the Canadian and U.S. Courts for the adjudication those matters. The Canadian and U.S. Courts have the authority, and jurisdiction, to enforce the IFSA and approve an Allocation Protocol to allocate the Sale Proceeds in accordance therewith.

(s)    The lack of a final resolution of the allocation of the Sale Proceeds is a significant hurdle currently preventing the Canadian and U.S. estates from moving forward with plans that will allow them to distribute assets to their creditors.

- 6 -

(t)   The proposed Allocation Protocol incorporates a process that will ensure a timely and fair resolution of the allocation of the Sale Proceeds in accordance with the previous orders made by the U.S. and Canadian Courts and in accordance with the agreement of the parties under the IFSA. Importantly, the Allocation Protocol provides the Courts with great latitude to craft specific procedures to resolve the allocation of proceeds and will provide a final and full resolution of the allocation process on an expedited basis in a manner designed to protect the interests of all of the interested parties.

(u)   The Movants, accordingly, respectfully request that the Canadian and U.S. Courts jointly approve the Allocation Protocol attached as Schedule "A" to the proposed order.

(v)   Claims against the Canadian Debtors, including EMEA's intercompany claims, are subject to a claims process and are not part of the allocation process.

(w)   *Joint hearing.* As interested parties, the Movants hereby request that the relief in this Motion, and the companion relief to be sought before the U.S. Court and any objections thereto, be considered at a joint hearing between the U.S. and Canadian Courts pursuant to section 15 of the Cross-Border Protocol.

(x)   *Statutes, Rules, Agreements and Protocols relied on.* The Movants rely on:

    (i)   the provisions of the CCAA;

    (ii)   sections 96 and 97 of the *Courts of Justice Act* and Rules 38 and 39 of the *Rules of Civil Procedure*;

    (iii)   the provisions of the Cross-Border Protocol;

    (iv)   the provisions of the IFSA;

    (v)   this Court's inherent jurisdiction to manage its own processes; and

    (vi)   such further and other grounds as the lawyers for the Movants may advise.

4.   **THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

(a)   the affidavit of Natasha De Cicco, sworn April 25, 2011; and

- 7 -

(b)    such further and other evidence as the lawyers may advise and this Honourable
        Court may permit.

April 25, 2011                                    Torys LLP
                                                  79 Wellington St. W., Suite 3000
                                                  Box 270, TD Centre
                                                  Toronto, Ontario
                                                  M5K 1N2  Canada

                                                  Tony DeMarinis (LSUC #: 29451Q)
                                                  Scott Bomhof (LSUC #: 37006F)
                                                  Sheila Block (LSUC #: 14089N)
                                                  Andrew Gray (LSUC #: 46626N)

                                                  Email: tdemarinis@torys.com
                                                         sbomhof@torys.com
                                                         sblock@torys.com
                                                         agray@torys.com

                                                  Tel: 416.865.0040
                                                  Fax: 416.865.7380

                                                  Lawyers for Nortel Networks Inc.
                                                  and the other US Debtors


                                                  Fraser Milner Casgrain LLP
                                                  77 King Street West
                                                  Toronto-Dominion Centre, Suite 400
                                                  Toronto, Ontario
                                                  M5K 0A1  Canada

                                                  Alex MacFarlane (LSUC# 28133Q)
                                                  Michael Wunder (LSUC # 46626V)
                                                  Ryan Jacobs (LSUC# 59510J)

                                                  Email: alex.macfarlane@fmc-law.com
                                                         michael.wunder@fmc-law.com
                                                         ryan.jacobs@fmc-law.com

                                                  Tel: 416.863.4511
                                                  Fax: 416/863.4592

                                                  Lawyers for The Official Committee of Unsecured
                                                  Creditors of Nortel Networks Inc., et al.

Court File No: 09-CL-7951

*ON*

**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF NORTEL NETWORKS INC. AND THE
OTHER COMPANIES LISTED ON SCHEDULE "A" HERETO WITH
RESPECT TO CERTAIN PROCEEDINGS TAKEN IN THE UNITED
STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

**APPLICATION UNDER Section 18.6 of the *Companies' Creditors Arrangement Act*,
R.S.C. 1985, c. C-36, as amended**

**SERVICE LIST**

TO:    **OGILVY RENAULT LLP**
       Royal Bank Plaza, South Tower
       200 Bay Street, Suite 3800
       Toronto, ON M5J 2Z4

       Derrick Tay
       Tony Reyes
       Jennifer Stam

       Email:    dtay@ogilvyrenault.com
                 treyes@ogilvyrenault.com
                 jstam@ogilvyrenault.com

       Tel:    416.216.4000
       Fax:    416.216.3930

       Lawyers for the Applicants

- 2 -

TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:    nortel.monitor@ca.ey.com

Tel:      416.943.3016
Fax:      416.943.3300

AND **GOODMANS LLP**
TO:   Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:    jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
fmyers@goodmans.ca
carmstrong@goodmans.ca

Tel:      416.597.4107
Fax:      416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND **OSLER HOSKIN AND HARCOURT**
TO:   **LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:    lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
ahirsh@osler.com

Tel:      416.362.2111
Fax:      416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND **FASKEN MARTINEAU DUMOULIN LLP**
TO:   66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:    dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:      416.868.3538
Fax:      416.364.7813

Lawyers for Export Development Canada

- 3 -

AND TO: **EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:   jsullivan@edc.ca

Tel:     613.597.8651
Fax:     613.598.3113


AND TO: **McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:   john.stringer@mcinnescooper.com
         stephen.kingston@mcinnescooper.com

Tel:     902.425.6500
Fax:     902.425.6350

Lawyers for Convergys EMEA Limited


AND TO: **CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:   barry.wadsworth@caw.ca
         lewis.gottheil@caw.ca

Tel.:    416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada


AND TO: **THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific
Tower
Toronto, ON  M5K 1K7

Leanne M. Williams

Email:   lwilliams@tgf.ca

Tel:     416.304.1616
Fax:     416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.


AND TO: **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart

Email:   jcarhart@millerthomson.com

Tel:     416.595.8615/8577
Fax:     416.595.8695

Lawyers for Toronto-Dominion Bank


AND TO: **BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:   hharrison@boughton.ca

Tel:     604.687.6789
Fax:     604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.,
in its capacity as duly authorized agent for
Holdings 1506 Enterprises Ltd.

- 4 -

AND
TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:   mmacnaughton@blgcanada.com
Tel:     416. 367.6646
Fax:     416. 682.2837

Email:   rjaipargas@blgcanada.com
Tel:     416.367.6266
Fax:     416.361.7067

Email:   srappos@blgcanada.com
Tel:     416.367.6033
Fax:     416.361.7306

Lawyers for Bell Canada

AND
TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein
Emilie E. M. Maxwell

Email:   ray.leach@siskinds.com
         dimitri.lascaris@siskinds.com
         monique.radlein@siskinds.com
         emilie.maxwell@siskinds.com

Tel:     519.672.2121
Fax:     519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND
TO:

**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

John Contini
Aaron Rousseau

Email     jcontini@langmichener.ca
Tel:      416.307.4148
Fax:      416.304.3767

Email     arousseau@langmichener.ca
Tel:      416.307.4081
Fax:      416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson
Richard Swan

Email:    zychk@bennettjones.com
Tel:      416.777.5738
Fax:      416.863.1716

Email:    orzyr@bennettjones.com
Tel:      416.777.5737
Fax:      416.863.1716

Email:    finlaysong@bennettjones.com
Tel:      416.777.5762
Fax:      416.863.1716

Email:    swanr@bennettjones.com
Tel:      416.777.7479
Fax:      416.863.1716
Canadian Lawyers for The Informal Nortel
Noteholder Group

11511305.2
35873-2001

- 5 -

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:      416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:      416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:      416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:      416.595.2150
Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:      416.595.2701
Fax:     416.204.2909

Lawyers for the Former Employees of Nortel

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:      416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:      416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:      416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:      416.595.2150
Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:      416.595.2701
Fax:     416.204.2909

Lawyers for the LTD Beneficiaries

- 6 -

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:    jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email:    msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Email:    jmklotz@millerthomson.com
Tel:      416.595.4373
Fax:      416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:    jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email    msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:    joseph.kim@lge.com

Tel:      +82.2.3777.3171
Fax:      +82.2.3777.5345

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:    harvey@chaitons.com

Tel:      416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

- 7 -

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:    ken.rosenberg@paliareroland.com
Tel:       416.646.4304
Fax:      416.646.4301

Email:    max.starnino@paliareroland.com
Tel:       416.646.7431
Fax:      416.646.4301

Email:    lily.harmer@paliareroland.com
Tel:       416.646.4326
Fax:      416.646.4301

Email:    tina.lie@paliareroland.com
Tel:       416.646.4332
Fax:      416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:    Shayne.kukulowicz@fmc-law.com
             Alex.macfarlane@fmc-law.com
             Michael.wunder@fmc-law.com
             ryan.jacobs@fmc-law.com

Tel:       416.863.4511
Fax:      416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:    patrick.shea@gowlings.com

Tel:       416.369.7399
Fax:      416.862.7661

Lawyers for Westcon Group

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:    rslattery@mindengross.com
             dullmann@mindengross.com
Tel:       416.369.4149
Fax:      416.864.9223

Lawyers for Verizon Communications Inc.

- 8 -

AND
TO:

**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:   hfogul@airdberlis.com
Tel:      416.865.7773
Fax:      416.863.1515

Email:   pczegledy@airdberlis.com
Tel:      416.865.7749
Fax:      416.863.1515

Lawyers for Microsoft Corporation

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:      416.865.6636

Email:   vdare@foglers.com
Tel:      416.865.6641
Fax:      416.865.6636

Lawyers for Andrew, LLC

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:   renglish@airdberlis.com
             smitra@airdberlis.com

Tel:      416.863.1500
Fax:      416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:

**ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:   surquhart@ahbl.ca
Tel:      604.484.1757
Fax:      604.484.1957

Lawyers for Algo Communication Products Ltd.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:   mfleming@millerthomson.com
Tel:      416.595.8686
Fax:      416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

- 9 -

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:     416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:     416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:      416.865.7286
Fax:     416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:      416.865.7262
Fax:     416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Perot Systems Corporation

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:   lawrence.crozier@mcmillan.ca
Tel:      416.865.7178
Fax:     416.865.7048

Email:   adam.maerov@mcmillan.ca
Tel:      416.865.7285
Fax:     416.865.7048

Lawyers for Citibank

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, ON  M5H 3C2

Deborah S. Grieve

Email:   dgrieve@casselsbrock.com
Tel:      416.860.5219
Fax:     416.350.6923

Lawyers for Alvarion Ltd.

AND
TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, ON  M5C 3G5

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:      416.593.2996
Fax:     416.593.5437

Lawyers for Expertech Network Installation Inc.

- 10 -

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:  vdare@foglers.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Amphenol Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Sanjeev P.R. Mitra

Email:  smitra@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, ON  M5J 2T7

Aaron Rousseau

Email:     arousseau@langmichener.ca
Tel:          416.307.4081
Fax:         416.365.1719

Lawyer for Right Management Inc.

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, ON  M5H 3C2

E. Bruce Leonard
David S. Ward
Michael Casey

Email:     bleonard@casselsbrock.com
                 dward@casselsbrock.com
                 mcasey@casselsbrock.com

Tel:          416.860.6455
Fax:         416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

- 11 -

AND
TO:

**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, ON  K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:      613.233.2679
Fax:     613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management,
Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, ON  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:      416.601.7627
Fax:     416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:      416.601.7750
Fax:     416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:

**IRVING MITCHELL KALICHMAN LLP**
Place Alexis Nihon, Tour 2
3500 Boulevard De Maisonneuve Ouest
Bureau 1400
Montreal, Quebec  H3Z 3C1

Kurt A. Johnson

Email:   kjohnson@imk.ca
Tel:      514.935.5755
Fax:     514.935.2999

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND
TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, ON  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
             steven.levitt@nelligan.ca
             christopher.rootham@nelligan.ca

Tel:      613.231.8245
Fax:     613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

- 12 -

| | | | | |
|---|---|---|---|---|
| AND TO: | **BAKER & McKENZIE LLP**<br>Brookfield Place, P.O. Box 874<br>181 Bay Street, Suite 2100<br>Toronto, ON  M5J 2T3 | | AND TO: | **BENNETT JONES LLP**<br>1 First Canadian Place<br>Suite 3400<br>Toronto, ON  M5X 1A4 |

**BAKER & McKENZIE LLP**

AND TO:

Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, ON  M5J 2T3

Chris Besant
Lydia Salvi

Email:    chris.besant@bakernet.com

Tel:      416.865.2318
Fax:      416.863.6275

Email:    lydia.salvi@bakernet.com

Tel:      416.865.6944
Fax:      416.863.6275

Lawyers for Jabil Circuit Inc.

AND TO:

**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:    dgoldstein@schneidergaggino.com
          mgaggino@schneidergaggino.com

Tel:      514.631.8787
Fax:      514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND TO:

**EURODATA**
2574 Sheffield Road
Ottawa, ON  K1B 3V7

Nanci Shore

Email:    nanci@eurodata.ca
Tel:      613.745.0921
Fax:      613.745.1172

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:    ryanbellr@bennettjones.com
          laugesenm@bennettjones.com

Tel:      416.863.1200
Fax:      416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Timothy R. Dunn

Email:    tdunn@mindengross.com
Tel:      416.369.4335
Fax:      416.864.9223

Lawyers for 2748355 Canada Inc.

AND TO:

**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, ON K8N 5J2

Ian W. Brady

Email:    lbrady@baldwinlaw.ca
Tel:      613.771.9991
Fax:      613.771.9998

Lawyers for Sydney Street Properties Corp.

- 13 -

AND
TO:

**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email:   thomas.mcrae@shibleyrighton.com
Tel:      416.214.5206
Fax:     416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email:   thomas.mcrae@shibleyrighton.com
Tel:      416.214.5206
Fax:     416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND
TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, ON  M5J 2Z9

Jeffrey K. Spiegelman

Email:   jspiegelman@foglers.com
Tel:      416.864.9700
Fax:     416.941.8852

Lawyers for Apex Logistics Inc.

AND
TO:

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351

- 14 -

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:    david.cohen@gowlings.com

Tel:      416.369.6667
Fax:      416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:    bdarlington@davis.ca
Tel:      416.365.3529
Fax:      416.369.5210

Email:    jdavissydor@davis.ca
Tel:      416.941.5397
Fax:      416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND
TO:

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:    rschwill@dwpv.com
Tel:      416.863.0900
Fax:      416.863.0871

Email:    mgottlieb@dwpv.com
Tel:      416.863.0900
Fax:      416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, ON  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

Email:    tosullivan@counsel-toronto.com
Tel:      416.598.1744
Fax:      416.598.3730

Email:    slaubman@counsel-toronto.com
Tel:      416.598.1744
Fax:      416.598.3730

Lawyers for William A. Owens

AND  **BAKER & McKENZIE LLP**
TO:   Brookfield Place, P.O. Box 874
      181 Bay Street, Suite 2100
      Toronto, ON  M5J 2T3

      Lydia Salvi

      Email:   lydia.salvi@bakernet.com

      Tel:   416.865.6944
      Fax:   416.863.6275

      Lawyers for Wipro Limited

AND  **AIRD & BERLIS LLP**
TO:   Barristers & Solicitors
      Brookfield Place, P.O. Box 754
      181 Bay Street, Suite 1800
      Toronto, ON  M5J 2T9

      Steven L. Graff
      Ian E. Aversa

      Email:   sgraff@airdberlis.com
      Tel:   416.865.7726
      Fax:   416.863.1515

      Email:   iaversa@airdberlis.com
      Tel:   416.865.3082
      Fax:   416.863.1515

      Lawyers for the Current and Former Employees
      of Nortel Networks Inc. who are or were
      Participants in the Long-Term Investment Plan
      Sponsored by Nortel Networks Inc.

AND  **McCARTHY TETRAULT LLP**
TO:   Suite 5300, TD Bank Tower
      Toronto Dominion Centre
      Toronto, ON  M5K 1E6

      Heather Meredith

      Email:   hmeredith@mccarthy.ca
      Tel:   416.601.8342
      Fax:   416.868.0673

      Lawyers for Hitachi Communications
      Technologies, Ltd.

AND  **TORYS LLP**
TO:   79 Wellington Street West, Suite 3000
      Box 270, TD Centre
      Toronto, ON  M5K 1N2

      Scott Bomhof

      Email:   sbomhof@torys.com
      Tel:   416.865.7370
      Fax:   416.865.7380

      Lawyers for Nokia Siemens Networks B.V.

AND  **DEPARTMENT OF JUSTICE**
TO:   ON Regional Office
      The Exchange Tower, Box 36
      130 King Street W., Suite 3400
      Toronto, ON  M5X 1K6

      Diane Winters

      Email:   dwinters@justice.gc.ca
      Tel:   416.973.3172
      Fax:   416.973.0810

AND  **LANG MICHENER LLP**
TO:   Brookfield Place
      181 Bay Street, Suite 2500
      Toronto, ON, M5J 2T7

      Sheryl E. Seigel

      Email:   sseigel@langmichener.ca
      Tel:   416.307.4063
      Fax:   416.365.1719

      Lawyers for The Bank of New York Mellon

AND TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:    416.863.2572
Fax:    416.863.2653

Email:  marc.flynn@blakes.com
Tel:    416.863.2685
Fax:    416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson (publ)

AND TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:    416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:    416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:    416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers LLC, MatlinPatterson Global Opportunities Partners III L.P. and MatlinPatterson Opportunities Partners (Cayman) III L.P.

AND TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, ON  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:  kmcelcheran@mccarthy.ca
Tel:    416.601.7730
Fax:    416.868.0673

Email:  rstabile@mccarthy.ca
Tel:    416.601.8335
Fax:    416.868.0673

Lawyers for Avaya Inc.

AND TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, ON  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:    416.979.6425
Fax:    416.591.7333

Email:  dbrown@sgmlaw.com
Tel:    416.979.4050
Fax:    416.591.7333

Lawyers for Edmund Fitzgerald

11511305.2
35873-2001

AND
TO:
**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, ON  M5J 2Z9

Jeffrey K. Spiegelman

Email:   jspiegelman@foglers.com
Tel:      416.864.9700
Fax:      416.941.8852

Lawyers for Belden (Canada) Inc.


AND
TO:
**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:   sdunphy@stikeman.com
Tel:      416.869.5662
Fax:      416.947.0866

Lawyers for GENBAND Inc.


AND
TO:
**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

Email:   thomas.wallis@vdg.ca
Tel:      613.241.2701
Fax:      613.241.2599

Lawyers for La Regie des Rentes du Quebec


AND
TO:
**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:   gncameron@stikeman.com
Tel:      212.845.7464
Fax:      212.371.7087

Email:   rferguson@stikeman.com
Tel:      212.845.7477
Fax:      212.371.7087

Lawyers for GENBAND Inc.


AND
TO:
**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:   jmarshall@blgcanada.com
Tel:      416.367.6024
Fax:      416.361.2763

Email:   chill@blgcanada.com
Tel:      416.367.6156
Fax:      416.631.7301

Lawyers for the U.K. Pensions Regulator


AND
TO:
**ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON  M5H 2K1

Joel P. Rochon

Email:   jrochon@rochongenova.com
Tel:      416.363.1867
Fax:      416.363.0263

Lawyers for the Opposing LTD Employees

AND TO:   **BLAKE, CASSELS & GRAYDON**
Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, ON  M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email:  pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  jeremy.forgie@blakes.com
Tel:    416.863.3888
Fax:    416.863.2653

Lawyers for The Northern Trust Company, Canada

AND TO:   **CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer

Email:  lschweitzer@cgsh.com
        jbromley@cgsh.com
Tel:    212.225.2000
Fax:    212.225.3999

Lawyers for Nortel Networks Inc.

AND TO:   **LERNERS LLP**
130 Adelaide St. West
Suite 2400
Toronto, ON  M5H 3P5

William E. Pepall

Email:  wpepall@lerners.ca
Tel:    416.601.2352
Fax:    416.867.2415

Lawyers for the Former Employees in Respect of the Distribution of the Corpus of the Health and Welfare Trust

AND TO:   **MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email:  kyle.kashuba@macleoddixon.com
Tel:    403.267.8399
Fax:    403.264.5973

Constellation NewEnergy Canada Inc.

AND TO:   **SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email:  pengelmann@sgmlaw.com
Tel:    613-482-2452
Fax:    613-235-3041

Email:  fcampbell@sgmlaw.com
Tel:    613-482-2451
Fax:    613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the Distribution of the Corpus of the Health and Welfare Trust

AND TO:   **LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

D. Brent McPherson

Email:  bmcpherson@langmichener.ca
Tel:    416.307.4103
Fax:    416.304.3769

Lawyers for Wells Fargo Bank, National Association, as successor by merger to Wachovia Bank, N.A., in its capacity as Servicer for the Nortel Networks Pass-Through Trust, Series 1-1

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, ON  M5K 1E6

Barbara J. Boake
James D. Gage

Email:   bboake@mccarthy.ca
Tel:      416.601.7557
Fax:     416.868.0673

Email:   jgage@mccarthy.ca
Tel:      416.601.7539
Fax:     416.686.0673

Lawyers for Morneau Sobeco Limited
Partnership

AND
TO:

**DAVID STEER**
10 Cypress Court
Nepean, ON  K2H 8Z8

Email:   davidsteer127@sympatico.ca

AND
TO:

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD. Centre
Toronto, ON  M5K 1N2

Michael Rotsztain
Adam M. Slavens

Email:   mrotsztain@torys.com
Tel:      416.865.7508
Fax:     416.865.7380

Email:   aslavens@torys.com
Tel:      416.865.7333
Fax:     416.865.7380

Lawyers for Ranger, Inc.

AND
TO:

**TEMPLEMAN MENNINGA LLP**
401-366 King Street East
Kingston, ON  K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email:   hvw@tmlegal.ca
             rbm@tmlegal.ca

Tel:      613.542.1889
Fax:     613.542.8202

Lawyers for The Corporation of the City of Belleville

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400-3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson

Email:   andrew.robertson@macleoddixon.com

Tel:      403.267.8222
Fax:     403.264.5973

Lawyers for Recently Severed Calgary
Employees

AND
TO:

**ATTORNEY GENERAL FOR ON**
Crown Law Office - Civil
720 Bay Street, 8th Floor
Toronto, ON  M7A 2S9

Leonard Marsello
William MacLarkey

Email:   leonard.marsello@ontario.ca
Tel:      416.326.4939
Fax:     416.326.4181
Email:   William.MacLarkey@ontario.ca
Tel:      416.326.4082
Fax:     416.326.4181

Lawyers for Her Majesty the Queen in Right of ON,
as represented by the Ministry of the Environment

## COURTESY COPIES:

AND
TO:

**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA  85004-4429

Scott K. Brown

Email:    sbrown@lrlaw.com

Tel:       602.262.5321
Fax:       602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:

**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

Email:    sreisman@curtis.com
              jdrew@curtis.com

Tel:       212.696.6000
Fax:       212-697-1559

Lawyers for Flextronics International

AND
TO:

**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara

Email:    fhodara@akingump.com

Tel:       212.872.1000
Fax:       212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:    DDunne@milbank.com
Tel:       212.530.5770
Fax:       212.530.5219

Email:    ALeblanc@milbank.com
Tel:       212.835.7574
Fax:       212.530.5219

Email:    APisa@milbank.com
Tel:       212.530.5319
Fax:       212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

- 21 -

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York  10019

Michael L. Schein

Email:    mschein@vedderprice.com

Tel:       212.407.6920
Fax:      212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email:    andrew.robertson@macleoddixon.com
            caylee.rieger@macleoddixon.com

Tel:       403.267.8222
Fax:      403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois  60601

Eric S. Prezant

Email:    eric.prezant@bryancave.com
Tel:       312.602.5033
Fax:      312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel:       212.906.1373
Fax:      212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**NOTICE OF MOTION**

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2  Canada

Tony DeMarinis (LSUC #: 29451Q)
Scott Bomhof (LSUC #: 37006F)
Sheila Block (LSUC #: 14089N)
Andrew Gray (LSUC #: 46626N)

Email:  tdemarinis@torys.com
        sbomhof@torys.com
        sblock@torys.com
        agray@torys.com

Tel:    416.865.0040
Fax:    416.865.8730

Lawyers for Nortel Networks Inc. and the other US
Debtors

11512629.1
35873-2002

**TAB 2**

Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

THE HONOURABLE MR.   ) ■, THE ■
JUSTICE MORAWETZ    ) DAY OF ■, 2011
           )

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,  NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**O R D E R**

  **THIS MOTION** made by Nortel Networks Inc. and certain of its affiliates (collectively, the "U.S. Debtors") and the Official Committee of Unsecured Creditors appointed in the chapter 11 cases of the U.S. Debtors (the "UCC") (collectively, the "Movants") for an Order approving the Allocation Protocol in the form attached as Schedule "A" to this Order was heard this day at 330 University Avenue, Toronto, Ontario.

  **ON READING** the Notice of Motion, Motion Record and Factum of the Movants, and on hearing the submissions of Counsel for the Movants, the Applicants, Monitor, ■ and Nortel Networks UK Limited (In Administration), no one else appearing, although properly served,

1. **THIS COURT ORDERS** that the time for service of the Notice of Motion and Motion Record be and it is hereby abridged and that the motion is properly returnable today, and, further, that any requirement for service of the Notice of Motion and the

- 2 -

Motion Record upon any interested party other than those served is hereby dispensed with.

2.    **THIS COURT ORDERS** that the Allocation Protocol in the form attached as Schedule "A to this Order is hereby approved.

3.    **THIS COURT ORDERS** that the Movants are authorized to take all steps necessary to carry out and give effect to the terms of the Allocation Protocol and this Order.

4.    **THIS COURT ORDERS** that the determination as to how the Sale Proceeds (as defined in the Notice of Motion) shall be allocated among the Selling Debtors (as defined in the Notice of Motion) and the Non-Filed Entities (as defined in the Notice of Motion) shall be made in accordance with the Allocation Protocol.

5.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States or elsewhere to give effect to this Order and to assist the Movants and the Monitor and its agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Movants and the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Movants and the Monitor and its agents in carrying out the terms of this Order.

6.    **THIS COURT ORDERS** that nothing in this Order or the Allocation Protocol shall supersede or constitute a waiver of any rights and obligations under the IFSA (as that term is defined in the Notice of Motion).

_____

Morawetz, J.

**Schedule "A"**

**ALLOCATION PROTOCOL**

1. <u>Purpose</u>.  The purpose of this Allocation Protocol is for the U.S. and Canadian Courts[1] to set forth binding procedures for the allocation of the Sale Proceeds among the Selling Debtors and the Non-Filed Entities (any hearing regarding same, an "<u>Allocation Protocol Hearing</u>," and any discovery regarding same, "<u>Allocation Protocol Discovery</u>").  Creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("<u>Intercompany Claims</u>") are not covered by or subject to this Allocation Protocol.  All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be addressed in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol.  All other Intercompany Claims shall be addressed in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2. <u>Participants</u>.  Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the Non-Filed Entities (collectively, the "<u>Parties</u>" and each individually, a "<u>Party</u>")[2] and their authorized representatives will have standing to fully participate in and submit written statements, present oral arguments and otherwise directly participate in any and all hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, as well as any and all discovery, depositions and examinations contemplated herein.

3. <u>Cross-Border Protocol</u>.  Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4. <u>Procedures</u>.  The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery.  In recognition of the extensive discovery already conducted by the Parties to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

    a. <u>Fact Discovery</u>.  The U.S. and Canadian Courts will facilitate the Parties' exchange of fact discovery by determining the following:

        i. the deadline for identification of fact witnesses and number of fact witnesses allowed;

        ii. the deadline for service of reasonable requests for the production of non-privileged documents on any other Party;

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief, dated April 25, 2011.

[2]      The listed parties are either signatories to or have rights under the IFSA or the Escrow Agreements.

    iii.  the deadline for objections to any Party's document requests; and

    iv.  the deadline for completion of depositions, the number of depositions permitted, and the time allowed for such depositions for each party.

b.  <u>Experts</u>.  The U.S. and Canadian courts shall facilitate expert discovery by determining the following:

    i.  the deadline for and format of expert reports (including exhibits), which shall constitute the direct testimony of each expert;

    ii.  the deadline for and format of rebuttal expert reports (including exhibits); and

    iii.  the deadline for completion of expert depositions and the time allowed for such expert depositions.

c.  <u>Joint Conferences</u>.  The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Parties and to receive updates as to the status of the proceedings.  The U.S. and Canadian courts will determine when joint conferences may be set.

d.  <u>Joint Hearings</u>.  The U.S. and Canadian Courts shall have joint hearings on the merits.  The U.S. and Canadian Courts shall determine:

    i.  the date(s) for an opening hearing on the Parties' allocation positions (prior to factual discovery) and the rules governing such hearing;

    ii.  the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination and limited redirect examination of fact and expert witnesses shall take place; and

    iii.  the procedure for requesting  or setting joint conferences as necessary to resolve any discovery disputes among the Parties or to receive updates to the status of the proceedings.

e.  <u>Written Submissions</u>.  The U.S. and Canadian Courts will determine:

    i.  the deadline for and format of opening submissions (including exhibits);

    ii.  the deadline for and format of fact affidavits to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

- 3 -

        iii.  the deadline for and format of reply submissions (including exhibits); and

        iv.  the deadline for and format of fact affidavits to accompany the reply submissions.

5.  <u>Decision</u>.  After the completion of Allocation Protocol Discovery and the Allocation Protocol Hearings, the U.S. and Canadian Courts shall issue a decision on the merits.

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**ORDER**

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario M5K 1N2 Canada

Tony DeMarinis (LSUC #: 2945lQ)
Scott Bomhof (LSUC #: 37006F)
Sheila Block (LSUC #: 14089N)
Andrew Gray (LSUC #: 46626N)

Email:  tdemarinis@torys.com
        sbomhof@torys.com
        sblock@torys.com
        agray@torys.com

Tel:   416.865.0040
Fax:   416.865.8730

Lawyers for Nortel Networks Inc. and the other US Debtors

11512629.1
35873-2002

**TAB 3**

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL
NETWORKS LIMITED, NORTEL NETWORKS GLOBAL
CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF NATASHA DE CICOO**
(sworn April 25, 2011)

1.      I am an associate lawyer with Torys LLP, lawyers in this proceeding for Nortel Networks Inc. and certain of its affiliates (the "U.S. Debtors"), and as such I have knowledge of the matters to which I hereinafter depose. Where in my affidavit I rely on information provided to me by other persons, I state the source of that information and in each case I believe that the information is true.

2.      The Movants seek the approval of this Honourable Court of an Allocation Protocol, attached as Schedule "A" to the proposed order. Attached as Exhibit "A" to my affidavit is a motion of the Movants, seeking approval of the Allocation Protocol from the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"). I am

- 2 -

advised by Daniel Northrop of Cleary Gottlieb Steen & Hamilton LLP, U.S. counsel to the U.S. Debtors, that the motion and declaration of Inna Rozenberg, dated April 25, 2011, attached as Exhibit "A" was submitted for filing in the U.S. Court on April 25, 2011.

SWORN BEFORE ME at the City of
Toronto, in the Province of Ontario, on
April 25, 2011.

_____
Commissioner for Taking Affidavits

Andrew Gray

_____
Natasha De Cicco

This is Exhibit.........referred to in the
affidavit of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
sworn before me, this. . . . . . . . . . . . . . . . . . . . . . .
day of . . . . . . . . . . . . . . . . . . . . . . . . . . 20. . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

A COMMISSIONER, ETC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------X
:
*In re*                                            :    Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                 :    Case No. 09-10138 (KG)
:
          Debtors.     :    Jointly Administered
:
:    **Hearing date: June 7, 2011 at 9:30 a.m. (ET)**
:    **Objections due: May 19, 2011 at 4:00 p.m. (ET)**
:
------------------------------------------------------X

## NOTICE OF JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND FOR RELATED RELIEF

       PLEASE TAKE NOTICE that Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "U.S. Debtors"), and the Official Committee of Unsecured Creditors (the "Committee" and together with the U.S. Debtors, the "Movants") have today filed the attached **Joint Motion For Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, And For Related Relief** ("Motion").

       PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before the objection deadline of **May 19, 2011 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

       At the same time, you must serve such Objection on counsel for the Movants so as to be received by the Objection Deadline.

       PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **JUNE 7, 2011 AT 9:30 A.M. (EASTERN TIME)** BEFORE THE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801.  ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated:  April 25, 2011
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
Howard S. Zelbo
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)

2

One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

        - and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Mark Collins*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee of Unsecured
Creditors*

4220793.1

3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X

*In re*

Nortel Networks Inc., *et al.*,[1]

            Debtors.

:    Chapter 11

:    Case No. 09-10138 (KG)

:    Jointly Administered

:    **Hearing date: June 7, 2011 at 9:30 a.m. (ET)**
:    **Objections due: May 19, 2011 at 4:00 p.m. (ET)**

---------------------------------------------------------- X

## JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND FOR RELATED RELIEF

Nortel Networks Inc. ("<u>NNI</u>") and certain of its affiliates, as debtors and debtors in possession (collectively, the "<u>U.S. Debtors</u>"), and the Official Committee of Unsecured Creditors (the "<u>Committee</u>" and together with the U.S. Debtors, the "<u>Movants</u>"), hereby move the Court (the "<u>Motion</u>") for the entry of an order substantially in the form attached hereto as <u>Exhibit A</u>, approving an Allocation Protocol substantially in the form attached as <u>Exhibit B</u> hereto (the "<u>Allocation Protocol</u>"), establishing procedures and an expedited schedule for the cross-border resolution by the U.S. and Canadian Courts (as defined below) of the allocation of the proceeds from the Sale Transactions (as defined below) (the "<u>Sale Proceeds</u>") pursuant to the Interim Funding and Settlement Agreement, dated as of June 9, 2009 by and between the parties listed on

---

[1]    The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

Schedules 1, 2, and 3 thereto (the "IFSA"),[2] which was approved by the U.S. Court by order dated June 29, 2009 [D.I. 993] (the "U.S. IFSA Order"), and by the Canadian Court by order dated June 29, 2009 (the "Canadian IFSA Order"), and granting them such other and further relief as the U.S. Court deems just and proper.  In support of this Motion, the Movants respectfully represent as follows:

## Preliminary Statement

1.     On April 4, 2011, the U.S. Debtors, together with NNL and NNC (as defined below) announced an agreement with an affiliate of Google Inc. to sell Nortel's remaining patent portfolio and related assets (the "IP Assets") for $900 million (the "Google Bid"), subject to higher or better offers.  With the announcement of the Google Bid and the contemplated auction, the last remaining substantial assets of the Nortel companies are now in the process of being sold.  The allocation of the Sale Proceeds[3] — an amount that should be at least approximately $3.7 billion after consummation of the sale of the IP Assets — now remains the primary outstanding impediment to the solicitation and approval of a chapter 11 plan in these cases and the distribution of funds to creditors.

2.     To this end, the Movants are filing this Motion and a companion application before the Canadian Court requesting that both the U.S. and Canadian Courts establish a timeline and protocol for joint hearings to determine the allocation of the Sale Proceeds.  As required by the IFSA, the various Selling Debtors[4] and certain of their key creditor constituencies have

---

[2]     The IFSA is attached as Exhibit 1 to the Declaration of Inna Rozenberg, dated April 25, 2011 (the "Rozenberg Decl."), submitted contemporaneously herewith.

[3]     Capitalized terms used but not defined herein have the meanings ascribed to them in the IFSA.

[4]     In this Motion, the term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements (as defined below), and the term "Non-Filed Entities" refers to any non-debtor Nortel company that signed one or more of the Escrow Agreements.

attempted to agree to an Interim Sales Protocol to govern the allocation of the Sale Proceeds. These Selling Debtors, along with the Committee and certain other interested parties, have also engaged in a lengthy non-binding mediation process that recently came to an unsuccessful conclusion. The mediation involved wide-ranging voluntary discovery resulting in the exchange of thousands of pages in submissions with respect to the allocation of the Sale Proceeds. Although the parties have now reached an impasse on allocation, it is the Movants' position that the issues have been narrowed and now revolve around a discrete set of alternative valuation methodologies.[5] The U.S. and Canadian Courts have both the power and the duty, both under the IFSA and applicable law, to establish an Allocation Protocol and hold joint hearings to determine how the Sale Proceeds should be allocated among the Selling Debtors and the Non-Filed Entities. Having failed to achieve consensual resolution, the time has come to move forward before the U.S. and Canadian Courts with a fully transparent and expeditious process to reach a resolution.

### Jurisdiction

3.     The U.S. Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the terms of the IFSA and the U.S. IFSA Order. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code").

---

[5]     As discussed below, certain claims raised by the Joint Administrators on behalf of the EMEA Debtors (as defined below), are not part of the allocation process and are subject to separate procedures and proceedings before the U.S. and Canadian Courts (as defined below).

## Background

5.      On January 14, 2009 (the "Petition Date"), the U.S. Debtors, other than Nortel

Networks (CALA) Inc.,[6] filed voluntary petitions for relief under chapter 11 of the Bankruptcy

Code in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"),

which cases are consolidated for procedural purposes only.  The U.S. Debtors continue to

operate their remaining businesses and manage their properties as debtors in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On the Petition Date, the U.S. Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the U.S. Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[7] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court," and together with the U.S. Court, the

"U.S. and Canadian Courts") under the Companies' Creditors Arrangement Act (Canada) (the

"CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a

Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on

the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European

affiliates (collectively, the "EMEA Debtors")[8] into administration (the "English Proceedings")

under the control of individuals from Ernst & Young LLP (collectively, the "Joint

---

[6]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[7]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[8]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

4

Administrators"). Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

7.     On the Petition Date, the U.S. Debtors filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol* [D.I. 18], which established procedures for the coordination of cross-border hearings between the U.S. and Canadian Courts. This Court approved the Court-to-Court Protocol on January 15, 2009 [D.I. 54][9] and the Canadian Court approved the Court-to-Court Protocol on the Petition Date, which was later amended by order of this Court on June 29, 2009 [D.I. 990][10] and by an order of the Canadian Court on that same date (as amended, the "Cross Border Protocol").

8.     On January 22, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee [D.I.s 141, 142]. The Bondholder Group has also been organized.

9.     On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales. Since then, Nortel, working with all major creditor constituencies, has sold all of its business units and most of its assets to various purchasers, and after completion of the sale of the IP Assets will have sold substantially all of its assets. For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the U.S. Debtors and http://dm.epiq11.com/nortel.

---

[9]     *Order Approving Cross-Border Court-to-Court Protocol*, Jan. 15, 2009 [D.I. 54].

[10]     *Order Approving Stipulation of the Debtors and the Official Comm. of Unsecured Creditors of Nortel Networks Inc., et. al., Amending the Cross-Border Court-to-Court Protocol*, June 29, 2009 [D.I. 990].

## Relief Requested

10.     By this Motion, the Movants seek an order establishing an Allocation Protocol pursuant to the IFSA, scheduling joint hearings to determine allocation, and granting such other relief as the U.S. Court may deem just and proper. The Movants are seeking the same relief from the Canadian Court in accordance with the Cross-Border Protocol and the IFSA.

## Facts Relevant to this Motion

### A.     The Selling Debtors Agreed to Escrow the Sale Proceeds Pursuant to the IFSA.

11.     On or about June 9, 2009, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors, excluding Nortel Networks S.A. and Nortel Networks AG, entered into the IFSA.[11] The IFSA addressed several important issues, including the reimbursement of NNL for costs alleged to have been incurred on behalf of NNI during the post-petition period, the prevention of a potential funding crisis at NNL and the resolution of certain payments owed by NNL to NNUK.[12]

12.     More importantly, in order to ensure that the planned sale of Nortel's businesses and assets could progress unimpeded by disputes over proceeds among various Nortel sellers, the IFSA also addressed the allocation of the Sale Proceeds. In particular, the parties to the IFSA agreed not to condition the execution of any sale agreement upon reaching agreement with the other parties proposed to be a party to such Sale Transaction regarding the allocation (or a binding procedure for allocation) of the ultimate Sale Proceeds. IFSA, ¶ 12(a). The IFSA instead provides that all Sale Proceeds shall be held in escrow accounts corresponding to each

---

[11]     Nortel Networks S.A. and Nortel Networks AG acceded to the IFSA as EMEA Debtors – each agreeing "to perform and comply with its obligations under the IFSA as if it had been a party from the date of execution thereof" – on or about September 11, 2009. *Accession and Amendment Agreement relating to the Interim Funding Settlement Agreement,* dated September 11, 2009, attached as Exhibit 2 to the Rozenberg Decl.

[12]     Any description of the IFSA set forth herein is for informational purposes only. In the event of any discrepancy between such description and the terms of the IFSA, the terms of the IFSA shall govern.

Sale Transaction (each, an "Escrow Account"), and shall not be distributed "in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the [Interim Sales] Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors." Id., ¶ 12(b).  The parties also agreed to "negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which [Interim Sales] Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation." Id., ¶ 12(c).  The parties further agreed in the IFSA that any disputes relating to the IFSA and the matters addressed therein that affected the U.S. Debtors, Canadian Debtors and EMEA Debtors must be resolved in a joint hearing of the U.S. and Canadian Courts conducted in accordance with the Cross-Border Protocol. Id., ¶ 16(b).

13.    After holding a joint hearing on June 29, 2009, the U.S. and Canadian Courts both entered the IFSA Orders authorizing the U.S. Debtors and the Canadian Debtors respectively to enter into the IFSA.  Furthermore, on June 23, 2009, the English High Court provided directions to the Joint Administrators on behalf of the EMEA Debtors, stating the Joint Administrators were at liberty to enter into the IFSA on behalf of the EMEA Debtors.

**B.      Sale of Operating Business Lines and Marketing of Remaining Assets.**

14.    As part of the extensive sale processes referenced above, Nortel has sold and continues to undertake efforts to sell its businesses and assets, including:  (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539] (the "Layer 4-7 Sale"); (ii) the

sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM

Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of substantially all of the assets of the

Enterprise Solutions business globally, including the shares of Nortel Government Solutions

Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (iv) the sale of the assets of its

Wireless Networks business associated with the development of Next Generation Packet Core

network components to Hitachi Ltd. [D.I. 1760]; (v) the sale of substantially all the assets of its

Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks

business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM-

R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; (vii) the sale of certain assets of

its Carrier Voice Over IP and Application Solutions business to GENBAND US LLC [D.I.

2632]; (viii) the sale of certain assets of the Debtors' Multi-Service Switch (formerly known as

"Passport") business to Ericsson [D.I. 4054]; (ix) the proposed Google Bid to purchase the IP

Assets [D.I. 5202]; and (x) certain other sale transactions (collectively, the "Sale

Transactions").[13]

---

[13]    *Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts*, Mar. 26, 2009 [D.I. 539] ("Layer 4-7 Sale Order"); *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' CDMA and LTE Bus. Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C) the Assumption and Sublease of Certain Leases*, July 28, 2009 [D.I. 1205] ("CDMA Sale Order"); *Order Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests In, Debtors' Enterprise Solutions Bus., (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases*, Sept. 16, 2009 [D.I. 1514] ("Enterprise Sale Order"); *Order Authorizing and Approving Sale of Debtors Next Generation Packet Core Network Components Free and Clear of All Liens, Claims, and Interests*, Oct. 28, 200) [D.I. 1760] ("Next Gen. Sale Order"); *Order Authorizing and Approving (A) Sale of Certain Assets of the Debtors' Metro Ethernet Networks Bus. Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Executory Contracts*, Dec. 3, 2009 [D.I. 2070] ("MEN Sale Order"); *Order Authorizing and Approving Sale of Debtors' GSM/GSM-R Free and Clear of All Liens, Claims and Encumbrances*, Dec. 3, 2009 [D.I. 2065] ("GSM/GSM-R Sale Order"); *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Commc'ns Solutions Bus. Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts*, Mar. 4, 2010 [D.I. 2632] ("CVAS Sale Order"); *Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch (Formerly Known as 'Passport') Bus. Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts*, Sept. 30, 2010 [D.I. 4054] ("MSS Sale Order"); *Mot. to Authorize Debtors Mot. for Orders (I)(A) Authorizing Debtors' Entry Into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Prots., (C) Approving the Notice*

15.     The U.S. and Canadian Courts have authorized the U.S. Debtors and Canadian Debtors to enter into the Sale Transactions other than the Google Bid to purchase the IP Assets (which is in process) in their respective jurisdictions in most cases following joint cross-border hearings.  In fact, to date, the U.S. and Canadian Courts have held over a dozen joint cross-border hearings in these proceedings.  The sale orders entered by the U.S. Court and the approval and vesting orders entered by the Canadian Court require that the Sale Proceeds be held in Escrow Accounts pursuant to the IFSA.[14]

16.     Pursuant to the IFSA and the U.S. and Canadian Courts' orders, the Selling Debtors entered into escrow agreements on or before the time each Sale Transaction closed (the "Escrow Agreements").  To date, approximately $2.7 billion has been deposited in accounts managed by JPMorgan Chase Bank, N.A., as third party escrow agent, pursuant to the Escrow Agreements.  All such escrow accounts are maintained in the United States.  The Sale Proceeds generated by the sale of the IP Assets will be treated in a substantially similar fashion.

**C.    No Agreement Has Been Reached on a Consensual Allocation of the Sale Proceeds or an Interim Sales Protocol.**

17.     Representatives of the Selling Debtors, together with the Monitor, the Joint Administrators, the Committee and the Bondholder Group, have unsuccessfully attempted since

---

*Procedures and the Assumption and Assignment Procedures, (D) Approving the License Rejection Procedures, (E) Approving a Side Agreement, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing and (II) Authorizing and Approving (A) the Sale of Certain Patents and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses and (D) the License Non-Assignment and Non-Renewal Protections*, Apr. 4, 2011 [D.I. 5202].

[14]     The U.S. Court order approving the Layer 4-7 Sale, which was entered prior to the signing of the IFSA, contains different language relating to the proceeds and retains the U.S. Court's jurisdiction "with respect to all matters arising from or related to the implementation of this Order."  *Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts*, Mar. 26, 2009, ¶ 25 [D.I. 539].  The relevant Escrow Agreement is consistent with the IFSA in that it provides that the $17.65 million in proceeds from the Layer 4-7 Sale shall be held in escrow pending the Escrow Agent's receipt of consistent orders from both the U.S. and Canadian Courts (or a letter of direction or final decision of a court of competent jurisdiction if the bankruptcy cases have been closed).  Escrow Agreement, Mar. 19, 2009, ¶ 5.

June 2009 to negotiate an Interim Sales Protocol to govern the allocation of the Sale Proceeds in the event a consensual agreement on allocation could not be reached. From June 2009 to May 2010, these parties had numerous conference calls and other communications to discuss the framework of an Interim Sales Protocol, including exchanging draft protocols. They also met on October 21, 2009 and May 4, 2010 for face-to-face negotiations. Rather than resulting in a consensus, these discussions instead exposed widely differing views as to the proper scope of any allocation exercise and related procedures. At least one draft Interim Sales Protocol ultimately swelled to 26 single-spaced pages, but still no consensus was reached. As a result, the Parties decided to shift their focus to comprehensive settlement discussions with respect to the allocation of the Sale Proceeds.

18.     From May 2010 to April 2011, the same parties, along with certain other key creditor constituencies and eventually the Non-Filed Entities (collectively, the "Mediation Attendees"), engaged in extensive efforts in an attempt to reach a consensual resolution on the allocation of the Sale Proceeds. The Mediation Attendees exchanged their respective positions on how to allocate the Sale Proceeds over email, conference calls and during in-person meetings, including all hands meetings held in New York on August 17-18, 2010 and on September 21, 2010. To further these negotiations, the Parties voluntarily exchanged documents and information, which included the posting of over 42,000 documents to a confidential electronic data room.

19.     Furthermore, the Mediation Attendees engaged a third party, retired U.S. federal judge Layn Phillips, to conduct formal non-binding mediation sessions on allocation of the Sale Proceeds. The Mediation Attendees submitted briefs to Judge Phillips and conducted five in-person, full day mediation sessions between November 11, 2010 and November 16, 2010 in New

10

York.  At those sessions, approximately 125 representatives of the Mediation Attendees

participated in an attempt to resolve allocation.  Thereafter, the Mediation Attendees had further

negotiations and, in addition, the Mediation Attendees engaged in further in-person full-day

mediation sessions in New York with Judge Phillips over three days from April 11, 2011 through

April 13, 2011, with approximately 115 individuals attending.  Despite these extensive efforts,

the mediation concluded unsuccessfully with no settlement reached.  In addition, as set out in

Joint Administrators' April 15, 2011 filing in this Court, during the course of the mediation

process, the Joint Administrators, on behalf of the EMEA Debtors, raised certain intercompany

claims against the U.S. and Canadian Debtors.  It is the Movants' firm view that claims against

the U.S. Debtors are not part of the allocation process and instead are the subject of separate

proceedings and processes pending before the U.S. Court.[15]

      20.     The allocation discussions, mediation sessions and associated preparation have

resulted in extensive professional fees and related costs over the past two years.  While allocation

efforts were delayed at times by the substantial efforts needed to negotiate and close the Sale

Transactions, those obstacles no longer exist.  With the failure of the most recent mediation

sessions, it is time to move forward before the U.S. and Canadian Courts as contemplated by the

IFSA.  As discussed further below, the lack of a final resolution of the allocation of the Sale

Proceeds is the primary hurdle preventing the U.S. Debtors from moving forward with the

---

[15]      See *Debtors' Objection to the Proofs of Claim Filed by the EMEA Claimants and Mot. for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants*, Apr. 1, 2011 [D.I. 5200], and *The Joint Administrators' Response to the Debtors' Mot. for an Order Requiring a More Definitive Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants*, Apr. 15, 2011 [D.I. 5255] (the "Joint Administrators' April 15 Response"), noticed to be heard by the U.S. Court on May 10, 2011. The Canadian Debtors are in the process of challenging the claims made against the Canadian Debtors, which are likewise not part of the allocation process. The Canadian Court set a bar date and established a mechanism for the filing, proving and resolution of claims by the EMEA Debtors against the Canadian Debtors, see *EMEA Claims Procedure Order*, In re Companies Creditors Arrangement Act, No. 09-CL-7950 (Super Ct. of J. Commercial List Jan. 20, 2011), and such claims were filed against the Canadian Debtors on March 18, 2011.

solicitation and confirmation of a chapter 11 plan that will allow them to distribute assets to their creditors.

## Basis for Relief

**A.    The U.S. and Canadian Courts Have Jurisdiction to Implement the IFSA, Enforce the Related Orders and Approve an Allocation Protocol.**

21.    The jurisdiction of the U.S. and Canadian Courts to hear the Motion is embedded in multiple documents agreed to by the Selling Debtors and approved by orders of the U.S. and Canadian Courts. First, in the U.S. IFSA Order, the U.S. Court "retains jurisdiction with respect to all matters arising from or related to the implementation of this Order." U.S. IFSA Order, ¶ 11. Further, for any Sale Transaction for which any of the U.S. Debtors was a Selling Debtor, the U.S. IFSA Order provides that "no Protocol for the allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court[,]" and that no proceeds from a Sale Transaction may be allocated among the Selling Debtors "unless such allocation is in accordance with a Protocol approved by this Court." Id., ¶ 8.

22.    In addition, section 16(b) of the IFSA, in relevant part, provides that:

> To the fullest extent permitted by applicable law, each Party
>
> (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally),
>
> **(ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in . . . . a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors . . . .**

(iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, . . . .

(v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.[16]

IFSA, ¶ 16(b) (emphasis added).

23.    The approval of an Allocation Protocol and the resulting allocation of the Sale Proceeds are undoubtedly "relat[ed] to the matters agreed in this Agreement." Id. It is therefore clear that the U.S. and Canadian Courts must jointly hear the relief requested herein and are empowered to and should grant it.

24.    Furthermore, the Escrow Agreements entered into by the Selling Debtors in order to close each Sale Transaction have clear provisions designating jurisdiction for legal proceedings arising from or in connection with the Escrow Agreements. In particular, the Selling Debtors unconditionally submitted to the exclusive jurisdiction of the U.S. and Canadian Courts for actions brought prior to the entry of a final decree closing the bankruptcy cases.[17] The allocation of the funds in the Escrow Accounts clearly arises in connection with the Escrow Agreements, and the jurisdiction vested in the U.S. and Canadian Courts is manifest.

---

[16]    Section 17 of the IFSA, which is not implicated by allocation, provides that any claim, action, or proceeding against the Joint Administrators in their personal capacities under the IFSA shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts. IFSA, ¶ 17.

[17]    Escrow Agreement, dated as of December 1, 2009, ¶ 21; Escrow Agreement, dated as of May 27, 2010, ¶ 20; Escrow Agreement, dated as of June 3, 2010, ¶ 20; Escrow Agreement, dated as of March 11, 2011, ¶ 20. Escrow Agreement, dated as of March 31, 2010, ¶ 21; Escrow Agreement, dated as of March 19, 2010, ¶ 21; Escrow Agreement, dated as of December 18, 2009, ¶ 21; Escrow Agreement, dated as of November 11, 2009, ¶ 21. In the case of the Layer 4-7 Sale, jurisdiction was vested in the U.S. Court alone. Escrow Agreement, dated as of March 19, 2009, ¶ 20. The Selling Debtors did not submit to the exclusive jurisdiction of the U.S. and Canadian Courts with respect to claims solely against the Joint Administrators in their personal capacities.

25.     The U.S. and Canadian Courts also approved the Cross-Border Protocol to govern proceedings affecting both the U.S. Debtors and the Canadian Debtors. The Cross-Border Protocol, *which predates and is expressly referenced in the IFSA*, specifically provides that "any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor" is properly heard at a Joint Hearing (as defined in the Cross-Border Protocol) if, as is the case here, "the filing party agrees to seek a Joint Hearing." Cross-Border Protocol, ¶ 15. Given that the Movants seek allocation of Sale Proceeds in excess of U.S. $30 million and ask for joint hearings, the Cross-Border Protocol requires that the relief sought herein must be heard at a joint hearing of the U.S. and Canadian Courts.

26.     Section 105(a) of the Bankruptcy Code provides that the U.S. Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions [of the Bankruptcy Code,]" such as implementing the clear language of the IFSA, the Escrow Agreements and the Cross-Border Protocol. 11 U.S.C. § 105(a). Bankruptcy courts, based on the reference of the inherent power of the district court contained in Section 157(c) of Title 28 of the United States Code and on the broad statutory grant of equitable powers in Section 105 of the Bankruptcy Code, have the inherent authority to enforce the terms of their lawful orders. See, e.g., In re WorldCorp., Inc., 252 B.R. 890, 897 (Bankr. D. Del. 2000) (compelling party to make payment in accordance with agreement that was previously approved by court order); U.S. Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus., Inc.), 68 B.R. 690, 695-97 (Bankr. S.D.N.Y. 1986); Baer v. Bowser (In re Jones), Case No. 97-41205-7, Adv. No. 01-7131, 2003 Bankr. LEXIS 2056, at *15 (Bankr. D. Kan. Nov. 10, 2003) ("[T]he Court can think of no better

14

use of its equity powers under § 105 than to issue an order that compels compliance with a previous order."); JMF Acquisitions Co. v. Boccella (In re Edgehill Nursing Home, Inc.), 68 B.R. 413, 415-16 (Bankr. E.D. Pa. 1986); *Opinion on Motions Seeking Modification of the Sale Order Pursuant to Rule 60(b), the Trustee's Motion for Relief under the SIPA Sale Order, Barclays' Cross-motion to Enforce the Sale Orders and Adjudication of Related Adversary Proceedings*, In re Lehman Bros. Holdings Inc., No. 08-13555 (Bankr. S.D.N.Y. Feb. 22, 2011) [D.I. 14612] (granting in part motion under 105(a) to enforce previous sale order and compel delivery of approximately $1.9 billion in undelivered assets). Here, relying on section 363 of the Bankruptcy Code, the U.S. Court approved the IFSA (and its jurisdiction provisions) by issuing the U.S. IFSA Order, which order also preserves the U.S. Court's jurisdiction to hear "matters arising from or related to the implementation of this Order." U.S. IFSA Order, ¶ 11. By exercising its jurisdiction over the allocation process, the U.S. Court will be enforcing the terms of the U.S. IFSA Order as authorized by the Bankruptcy Code. The U.S. Court similarly relied on section 363 in approving each of the Sale Transactions and certain Escrow Agreements and retained jurisdiction to implement and enforce each of those Orders.[18]

27.    In sum, there can be no question that the Selling Debtors have submitted to the jurisdiction of the U.S. and Canadian Courts for the adjudication of issues relating to the

---

[18]     See Layer 4-7 Sale Order [D.I. 539]; CDMA Sale Order [D.I. 1205]; *Order Pursuant to 11 U.S.C. § 105(A) and § 363(B) Approving Debtors' Entry Into the CDMA Escrow Agreement and (B) Granting Related Relief*, Nov. 12, 2009 [D.I. 1889]; Enterprise Sale Order [D.I. 1514]; *Order Pursuant to 11 U.S.C. §105(A) and § 363(B) (A) Approving Debtors' Entry Into the Enterprise Solutions Bus. Escrow Agreement and (B) Granting Related Relief*, Dec. 17, 2009 [D.I. 2167]; Next Gen. Sale Order [D.I. 1760]; *Order Pursuant to 11 U.S.C. § 105(A) and § 363(B) (A) Approving Debtors' Entry Into the Next Generation Packet Core Network Components Escrow Agreement And (B) Granting Related Relief*, Dec. 3, 2009 [D.I. 2062]; MEN Sale Order [D.I. 2070]; *Order Approving the Metro Ethernet Networks Side Agreement and Granting Related Relief*, Mar. 3, 2010 [D.I. 2627]; GSM/GSM-R Sale Order [D.I. 2065]; CVAS Sales Order [D.I. 2632]; *Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Bus. Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal*, May 24, 2010 [D.I. 3048]; MSS Sale Order [D.I. 4054].

allocation of the Sale Proceeds on multiple occasions.  Accordingly, the U.S. and Canadian

Courts have the authority, and indeed have specifically reserved their jurisdiction, to enforce the

IFSA and the IFSA Orders, to approve an Allocation Protocol and to allocate the Sale Proceeds

in accordance therewith.

**B.**      **The Selling Debtors Have Reached an Impasse.**

28.      Despite extensive good-faith efforts, the Selling Debtors have been unable to

reach agreement regarding an Interim Sales Protocol or on allocation of the Sale Proceeds.

Notwithstanding numerous in-person meetings, lengthy, good faith negotiations, and eight days

of non-binding mediation before a former U.S. federal judge, the result of such sessions has

resulted in a disagreement among the Selling Debtors that could not be bridged.  Given the

Mediation Attendees' failure to reach an agreement at the latest mediation session, an impasse

has been reached and the U.S. and Canadian Courts must step in to facilitate a resolution that

will allow timely distributions to creditors generally.[19]

29.      Allocation of the Sale Proceeds is an essential next step in the progression of the

U.S. Debtors' cases.  In that regard, the U.S. Debtors cannot move forward with the solicitation

and approval of their plan or to make distributions to creditors without knowing the portion of

the Sale Proceeds to be allocated to them.  Moreover, NNI will also receive a distribution as a

material creditor of the Canadian Debtors (with an allowed claim of over $2 billion in the

Canadian Proceedings), which they are unable to estimate until allocation is complete.  There

must be a mechanism to move the allocation process forward expeditiously.

---

[19]      In response to the U.S. Debtors' separate motion regarding the EMEA Debtors' claims, the Joint
Administrators concede that the mediation process failed.  Joint Administrators' April 15 Response, ¶ 7.  Moreover,
while the Joint Administrators grossly and improperly mischaracterize the Selling Debtors' confidential, off-the-
record settlement discussions surrounding the draft allocation protocol, id. at 14, they cannot and do not dispute the
bottom line – that the Selling Debtors were unable to agree on the scope and terms of such a protocol after over one
year of negotiations.

C.      **The U.S. and Canadian Courts Should Approve an Allocation Protocol.**

30.      The approval of the proposed Order is appropriate under section 105(a) of the Bankruptcy Code.  The law is clear that section 105 gives the U.S. Court broad discretion to issue orders necessary to "carry out the provisions of this title."  11 U.S.C. § 105(a).  See In re Combustion Eng'g, Inc., 391 F.3d 190, 236 (3d Cir. 2004) (noting that section 105(a) of the Bankruptcy Code "has been construed . . . to assure the orderly conduct of reorganization proceedings"); In re VII Holdings Co., 362 B.R. 663, 668 (Bankr. D. Del., 2007) (noting that "[s]ection 105(a) bestows broad equitable powers on the Court") (citing In re Combustion Eng'g, Inc.).

31.      General principles of contract interpretation also support the intervention of the U.S. and Canadian Courts.  As noted, the IFSA expressly provides that the U.S. and Canadian Courts should resolve any disputes relating to the matters addressed in the IFSA in a joint hearing.  In interpreting a contract, courts choose "an interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention."  Am. Law Institute, *Restatement (First) of Contracts* § 236 (1932); see Galli v. Metz, 973 F.2d 145,149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has "'the effect of rendering at least once clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'") (quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988)); see also Conzo v. City of New York, 438 F. Supp. 2d 432, 435-36 (S.D.N.Y. 2006) (denying motion to dismiss court action based on underlying agreement's dispute resolution clause, on grounds that movants' interpretation of the contract would render certain parts of agreement unenforceable and meaningless).  Although the IFSA is governed in relevant part by New York law, Canadian courts similarly have found that "[w]here words may bear two constructions, the more

17

reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intentions of the parties." Consol.-Bathurst Export Ltd. v. Mut. Boiler and Mach. Ins. Co., (1979) [1980] 1 S.C.R. 888, para. 26 (Can.); see Ventas, Inc. v. Sunrise Senior Living Real Estate Inv. Trust, (2007) 85 O.R. 3d 254, para. 24(d) (Can. Ont. C.A.) (upholding a lower court decision based in part on its affirmation that the decision "accords with sound commercial principles and good business sense, and . . . avoid[s] commercial absurdity").

32.     It manifestly was <u>not</u> the intention of the parties to the IFSA that, absent consensual agreement, there would be a never-ending stalemate, and that the Sale Proceeds would remain in escrow in perpetuity.  Such a result would prevent any creditor recoveries from the Sale Proceeds and cause the U.S. Debtors to be unable to solicit and confirm chapter 11 plans, rendering the provisions in the IFSA and Escrow Agreements regarding the release of escrowed funds frustrated and superfluous.  The only reasonable interpretation of the IFSA – consistent with its clear terms – is that the U.S. and Canadian Courts may – and indeed must – resolve any disputes under the IFSA, including the current impasse regarding an Interim Sales Protocol and allocation of the Sale Proceeds.

33.     Other courts have recognized their inherent powers with respect to allocation of sale proceeds in cross-border chapter 11 cases.  The court in In re Calpine Corp., for example, approved a settlement among debtors pursuant to sections 105(a) and 363 and Rule 9019 that settled major cross-border issues, including a division of post-petition sale proceeds held in escrow between U.S. and Canadian debtors.  *Order Granting Debtors' Mot. for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Bankr. Rule 9019(a) to Approve a Settlement with the Calpine Canadian Debtors*, In re Calpine Corp., No 05-60200 (Bankr. S.D.N.Y. July 26, 2007) [D.I. 5422].

18

34.     In addition, courts have approved similar allocations of proceeds and obligations among cross-border debtors through the confirmation of plans of reorganization. *Order Confirming Debtors' Fourth Am. Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the Bankr. Code*, In re Semcrude, L.P., No 08-11525 (Bankr. D. Del. Oct. 28, 2009) [D.I. 6347] (confirming plan of reorganization which included contribution of Canadian debtors' cash assets and proceeds from certain settlements to U.S. debtors for payments of certain claims); see also *Order Approving the Findings of Fact, Conclusions of Law and Order Confirming the Joint Plan of Reorganization for Smurfit-Stone Container Corporation and Its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors*, In re Smurfit-Stone Container Corp., No. 09-10235 (Bankr. D. Del. June 21, 2010) [D.I. 8107] (confirming joint plan of reorganization of U.S. and Canadian debtors); *Opinion on Confirmation*, In re AbitibiBowater Inc., No. 09-11296 (Bankr. D. Del. Nov. 22, 2010) [D.I. 3931] (confirming debtors' plan of reorganization and overruling objections to the debtors' proposed plan, including an objection that there was inadequate disclosure of value allocation among U.S. debtors, Canadian debtors, and cross-border debtors, and affirming the use of a distribution model to calculate allocation of asset value to creditors at each of those debtors).

35.     Approving an Allocation Protocol is indisputably in the best interest of the U.S. Debtors' creditors – as well all Nortel creditors wherever situated.  All such creditors have an interest in the speedy allocation of the Sale Proceeds, which will ultimately determine the distribution they receive on their claims.

36.     As time has passed and negotiations have failed, it has become clear to the Movants that a dispute resolution process established by the U.S. and Canadian Courts and

19

binding upon the Selling Debtors is the sole means to resolve allocation issues. The Selling Debtors and the other Mediation Attendees have worked hard over the almost two years since signing the IFSA to find common ground and substantially limit the open issues. As a result, the Movants believe that a limited universe of narrow issues can be presented to the U.S. and Canadian Courts to allow determination on a streamlined basis.

37.      The Movants, accordingly, respectfully request that the U.S. and Canadian Courts jointly approve the Allocation Protocol set forth in Exhibit B. The proposed procedures, which provide the Courts with great latitude to craft specific procedures to resolve the allocation of proceeds, are both fair and appropriate under the circumstances, will provide a final and full resolution of the allocation process on an expedited basis, and are neutral and designed to equally protect the interests of all interested parties.

### Request for a Joint Hearing

38.      As interested parties and as claimants or representatives of direct or indirect beneficiaries of over $2 billion in claims against the Canadian Debtors, the Movants hereby request that the relief in this Motion, the companion relief to be sought before the Canadian Court and any objections thereto be considered at a joint hearing between the U.S. and Canadian Courts pursuant to section 15 of the Cross-Border Protocol. A joint hearing is appropriate here given that the same relief is being sought from both the U.S. and Canadian Courts, and that the approval of an Allocation Protocol will impact the allocation of Sale Proceeds in excess of U.S. $30 million. Cross-Border Protocol, ¶ 15.

### Notice

39.      Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Monitor; (iii) counsel to the Canadian Debtors; (iv) counsel to the Joint Administrators; (v) the Selling Debtors; (vi) the Non-Filed Entities; and (vii) the general service

list established in these chapter 11 cases.  The Movants submit that under the circumstances no

other or further notice is necessary.

## **No Prior Request**

40.    No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Movants respectfully request that the U.S. Court (i) grant this Motion

and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such

other and further relief as it deems just and proper.

Dated:  April 25, 2011
         Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
Howard S. Zelbo
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

- and -

21

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Mark Collins*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*

22

**EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------X
                                        :
                                        :        Chapter 11
                                        :
In re                                   :
                                        :        Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,[1]        :
                                        :        Jointly Administered
                    Debtors.            :
                                        :
                                        :        RE: D.I. _____
                                        :
--------------------------------------------------------X
```

## ORDER APPROVING ALLOCATION PROTOCOL

Upon the motion dated April 25, 2011 (the "Motion"),[2] of Nortel Networks Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (the "U.S. Debtors"), and the Official Committee of Unsecured Creditors (the "Committee" and together with the U.S. Debtors, the "Movants"), for entry of an order, as more fully described in the Motion, approving an Allocation Protocol pursuant to the Interim Funding and Settlement Agreement, dated as of June 9, 2009 (the "IFSA"), and granting them such other and further relief as the Court deems just and proper; and adequate notice of the Motion having been given as set forth in the Motion; and it appearing that no other or further notice is necessary; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28

---

[1]    The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

U.S.C. §§ 157 and 1334 and the terms of the IFSA and the U.S. IFSA Order; and the Court

having determined that consideration of the Motion is a core proceeding pursuant to 28 U.S.C. §

157(b)(2); and the Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief requested in the Motion pursuant to 11 U.S.C. §§ 105

and 363, and that such relief is in the best interests of the U.S. Debtors, their estates, their

creditors and the parties in interest; and upon the record in these proceedings; and after due

deliberation;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Allocation Protocol in the form attached as <u>Exhibit B</u> to the Motion is

approved.

3.      The determination regarding how to allocate the Sale Proceeds among the Selling

Debtors and the Non-Filed Entities shall be made in accordance with the Allocation Protocol.

4.      The Movants are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

5.      Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to

the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its

entry, (ii) the Movants are not subject to any stay in the implementation, enforcement or

realization of the relief granted in this Order, and (iii) the Movants may, in their discretion and

without further delay, take any action and perform any act authorized under this Order.

6.      Nothing in this Order or the Allocation Protocol shall supersede or constitute a

waiver of any rights and obligations under the IFSA.

2

7.      The Court retains jurisdiction with respect to all matters arising from or related to
the implementation of this Order.

Dated: _____, 2011
            Wilmington, Delaware

                                                            _____
                                                            THE HONORABLE KEVIN GROSS
                                                            UNITED STATES BANKRUPTCY JUDGE

3

**EXHIBIT B**

# ALLOCATION PROTOCOL

1.  <u>Purpose</u>.  The purpose of this Allocation Protocol is for the U.S. and Canadian Courts[1] to set forth binding procedures for the allocation of the Sale Proceeds among the Selling Debtors and the Non-Filed Entities (any hearing regarding same, an "<u>Allocation Protocol Hearing</u>," and any discovery regarding same, "<u>Allocation Protocol Discovery</u>").  Creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("<u>Intercompany Claims</u>") are not covered by or subject to this Allocation Protocol.  All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be addressed in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol.  All other Intercompany Claims shall be addressed in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2.  <u>Participants</u>.  Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the Non-Filed Entities (collectively, the "<u>Parties</u>" and each individually, a "<u>Party</u>")[2] and their authorized representatives will have standing to fully participate in and submit written statements, present oral arguments and otherwise directly participate in any and all hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, as well as any and all discovery, depositions and examinations contemplated herein.

3.  <u>Cross-Border Protocol</u>.  Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4.  <u>Procedures</u>.  The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery.  In recognition of the extensive discovery already conducted by the Parties to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

    a.  <u>Fact Discovery</u>.  The U.S. and Canadian Courts will facilitate the Parties' exchange of fact discovery by determining the following:

        i.  the deadline for identification of fact witnesses and number of fact witnesses allowed;

        ii.  the deadline for service of reasonable requests for the production of non-privileged documents on any other Party;

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief, dated April 25, 2011.

[2]  The listed parties are either signatories to or have rights under the IFSA or the Escrow Agreements.

    iii.  the deadline for objections to any Party's document requests; and

    iv.  the deadline for completion of depositions, the number of depositions permitted, and the time allowed for such depositions for each party.

b.  <u>Experts</u>.  The U.S. and Canadian courts shall facilitate expert discovery by determining the following:

    i.  the deadline for and format of expert reports (including exhibits), which shall constitute the direct testimony of each expert;

    ii.  the deadline for and format of rebuttal expert reports (including exhibits); and

    iii.  the deadline for completion of expert depositions and the time allowed for such expert depositions.

c.  <u>Joint Conferences</u>.  The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Parties and to receive updates as to the status of the proceedings.  The U.S. and Canadian courts will determine when joint conferences may be set.

d.  <u>Joint Hearings</u>.  The U.S. and Canadian Courts shall have joint hearings on the merits.  The U.S. and Canadian Courts shall determine:

    i.  the date(s) for an opening hearing on the Parties' allocation positions (prior to factual discovery) and the rules governing such hearing;

    ii.  the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination and limited redirect examination of fact and expert witnesses shall take place; and

    iii.  the procedure for requesting or setting joint conferences as necessary to resolve any discovery disputes among the Parties or to receive updates to the status of the proceedings.

e.  <u>Written Submissions</u>.  The U.S. and Canadian Courts will determine:

    i.  the deadline for and format of opening submissions (including exhibits);

    ii.  the deadline for and format of fact affidavits to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

        iii.  the deadline for and format of reply submissions (including exhibits); and

        iv.  the deadline for and format of fact affidavits to accompany the reply submissions.

5.  <u>Decision</u>.  After the completion of Allocation Protocol Discovery and the Allocation Protocol Hearings, the U.S. and Canadian Courts shall issue a decision on the merits.

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------X
                                                       :
                                                       :        Chapter 11
                                                       :
In re                                                  :        Case No. 09-10138 (KG)
                                                       :
Nortel Networks Inc., et al.,¹                         :        Jointly Administered
                                                       :
                    Debtors.                           :
                                                       :
                                                       :
                                                       :
                                                       :
                                                       :
-------------------------------------------------------X
```

## DECLARATION OF INNA ROZENBERG IN SUPPORT OF
## JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN
## ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING
## AND SETTLEMENT AGREEMENT, AND FOR RELATED RELIEF

I, Inna Rozenberg, do hereby declare as follows:

1.    I am associated with the law firm of Cleary Gottlieb Steen & Hamilton LLP, co-counsel to Nortel Networks Inc. and its affiliated debtors, as respective debtors and debtors in possession (collectively, the "U.S. Debtors"), in the above-captioned proceeding. I am admitted to the bar of the State of New York and have been a member in good standing of such bar since 2001. I respectfully submit this declaration in support of the joint motion for entry of an order establishing an Allocation Protocol pursuant to the Interim Funding and Settlement Agreement, and for related relief (the "Joint Motion"), dated April 25, 2011.

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. ("NNI") (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. ("NN CALA") (4226) (collectively, the "Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

2.      Annexed to this declaration are true and correct copies of the following documents that are cited and relied upon in the Joint Motion:

a.      Attached hereto as Exhibit 1 is a true and correct copy of the Interim Funding and Settlement Agreement, dated as of June 9, 2009.

b.      Attached hereto as Exhibit 2 is a true and correct copy of the Accession and Amendment Agreement relating to the Interim Funding and Settlement Agreement, dated as of September 11, 2009.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 25, 2011.

/s/ Inna Rozenberg
Inna Rozenberg

2

**Exhibit 1**

EXECUTION VERSION

# INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "January Payment"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "Canada/US Interim Period" and the "NNI Interim Obligations") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "Inter-Company Trading Payments") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "GSPAs") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("Trading Orders"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee") have each agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

    a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

3

2. <u>Use of Funds; Reporting</u>.

    a. NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "<u>Permitted Uses</u>"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b. NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "<u>13 Week CF Forecast</u>"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3. <u>Maximum Payment; Full and Final Settlement</u>.  The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4. <u>Settlement of Motions.</u>  It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

4

5. <u>True-up Obligations</u>.  NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>").  Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>").  The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full.  For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6. <u>Administration; Funding</u>.

   a.  NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below.  Each of the EMEA Debtors hereby appoints NNUK as its agent

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on <u>Annex D</u> hereto. Each of the EMEA Debtors agrees that the payments set out in <u>Annex D</u> shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b. Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>First Shortfall Payment</u>"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "<u>Material Asset Sale</u>"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c. Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>Second Shortfall Payment</u>" and together with the First Shortfall Payment, the "<u>Shortfall Payments</u>"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d. The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full.  The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group.  Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL.  For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge).  Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f.  The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g.  In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances.  In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.  The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7

7.  Covenants.

    a.  [left intentionally blank].

    b.  In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor.  The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8.  Maximum Payment; Full and Final Settlement.  Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto.  Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9.  Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors.  It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

PART C – PROVISIONS OF GENERAL APPLICATION

10.  Scope of this Agreement.  The Parties hereto agree that:

    a.  this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b.  this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either:  (i) prior to the Filing Date, or (ii)

8

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however*, the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.  this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.  this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

a.  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

9

b.  For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property. For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c.  The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination." In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

10

    d.   Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. Entry into Sale Transactions.

    a.   Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

    b.   Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

    c.   Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

    d.   The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

11

e. Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f. Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g. For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

   i. the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

   ii. the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

a. No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the

12

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "<u>Cross-Border Protocol</u>") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "<u>Cross-Border Protocol Condition</u>", and together with the Court Approval Condition, the "<u>Conditions</u>").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition.  Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective).  Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective.  For the purposes of this Agreement, "<u>Subject Transaction</u>" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

i.  use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

iii.  use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

13

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e.  If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f.  Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. Term. This Agreement shall expire on December 31, 2009 (the "Expiration Date"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. Amendments. This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. Governing Law and Jurisdiction.

a.  This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

14

b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. <u>No Personal Liability of the Joint Administrators</u>.

a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b. The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c. Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

15

18. Creditors' Committee and Bondholders' Committee Support.

    a.  Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b.  Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

    a.  Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i.  it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii.  the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii.  this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b.  Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights. Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the

16

Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. <u>Counterparts.</u>  This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. <u>Severability.</u>  In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. <u>Several Obligations.</u>  Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. <u>Defunct Distributors' Covenant.</u>  Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:   Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
    Name: Paviter S. Binning
    Title: Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:  Assistant Secretary

NORTEL NETWORKS GLOBAL CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Director

By: _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Director

By _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By: _____
    Name: Tracy S. J. Connelly McGilley
    Title:   Assistant Secretary

NORTEL NETWORKS INC.

By _____
    Name: John Doolittle
    Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President


CORETEK, INC.

By _____
    Name:  John Doolittle
    Title:  Vice President


NORTEL ALTSYSTEMS, INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS HPOCS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Name: John Doolittle
    Title: Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

QTERA CORPORATION

By _____
Name: John Doolittle
Title: Vice President


SONOMA SYSTEMS

By _____
Name: John Doolittle
Title: Vice President


XROS, INC.

By _____
Name: John Doolittle
Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

Name: _____
Title: _____

in the presence of: _____

Witness Signature _____

Name: _____
Address: _____

SIGNED for and on behalf of NORTEL      )
NETWORKS UK LIMITED (IN                  )    ALAN BLOOM
ADMINISTRATION)                          )
by ALAN BLOOM as Joint Administrator     )
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name: _____
Address: _____

SIGNED for and on behalf of NORTEL )
NETWORKS (IRELAND) LIMITED )      ALAN BLOOM
(IN ADMINISTRATION) )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS NV (IN )                  ALAN BLOOM
ADMINISTRATION) )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS SPA (IN )                 ALAN BLOOM
ADMINISTRATION) )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL
NETWORKS BV (IN
ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL
NETWORKS POLSKA SP Z.O.O. (IN
ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL
NETWORKS HISPANIA SA (IN
ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:

Address: _(handwritten)_

**SIGNED** for and on behalf of **NORTEL NETWORKS (AUSTRIA) GMBH (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

**ALAN BLOOM**    _(signature)_

Witness signature    _(signature)_

Name: _(handwritten)_
Address: _(handwritten)_

**SIGNED** for and on behalf of **NORTEL NETWORKS SRO (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

**ALAN BLOOM**    _(signature)_

Witness signature    _(signature)_

Name: _(handwritten)_
Address: _(handwritten)_

SIGNED for and on behalf of NORTEL        )
NETWORKS ENGINEERING                      )        ALAN BLOOM
SERVICES KFT (IN                          )
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL        )
NETWORKS PORTUGAL SA (IN                  )        ALAN BLOOM
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator      )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL        )
NETWORKS SLOVENSKO SRO (IN                )        ALAN BLOOM
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator      )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: *Helen Macnaughton*
Address: *1 More London Place*
*London SE1.*

**SIGNED** for and on behalf of **NORTEL**                )
**NETWORKS ROMANIA SRL (IN**                )    **ALAN BLOOM**
**ADMINISTRATION)**                )
by **ALAN BLOOM** as Joint Administrator                )
(acting as agent and without personal
liability) in the presence of:

Witness signature *Helen Macnaughton*

Name: *Helen Macnaughton*
Address: *1 More London Place*
*London SE1.*

**SIGNED** for and on behalf of **NORTEL**                )
**GMBH (IN ADMINISTRATION)**                )    **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator                )
(acting as agent and without personal                )
liability) in the presence of:

Witness signature *Helen Macnaughton*

Name: *Helen Macnaughton*
Address: *1 More London Place*
*London SE1.*

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS OY (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS AB (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS INTERNATIONAL**    )    **ALAN BLOOM**
**FINANCE AND HOLDING BV (IN**    )
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

10-06-2009   01:03      FRAN-RADISSON SAS STRAND HOTEL                    +46                    T-141   P.009/009   F-787

SIGNED for and on behalf of **NORTEL**    )
**NETWORKS FRANCE S.A.S. (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**Schedule 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**Schedule 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**Schedule 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.    Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.    Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.    Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.    Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.    Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.    Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.    Release in Connection with Master R&D Agreement dated 1 January 2009.

8.    Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

Annex B

**Distribution Agreements**

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

**Annex C**

**<u>Funding Schedule</u>**

Payments pursuant to Section 1.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 ............................................................................ | US$31,400,000.00 |
| June 15, 2009 ............................................................................ | US$31,400,000.00 |
| July 31, 2009............................................................................. | US$31,400,000.00 |
| August 31, 2009......................................................................... | US$31,400,000.00 |
| September 30, 2009 .................................................................... | US$31,400,000.00 |
| **TOTAL** ................................................................................ | **US$157,000,000.00** |

C-1

| EMEA Debtor | Amount receivable US$m |
|---|---|
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)] [1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)] [1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |

## Exhibit 2

## ACCESSION AND AMENDMENT AGREEMENT

### relating to the

### INTERIM FUNDING AND SETTLEMENT AGREEMENT

**THIS AGREEMENT** (the "**Agreement**") is entered into by and among:

1.  **NORTEL NETWORKS LIMITED ("NNL")** and the other entities set forth in Part 1 of Schedule 1 attached hereto;

2.  **NORTEL NETWORKS INC. ("NNI")** and the other entities set forth in Part 2 of Schedule 1 attached hereto;

3.  the entities set forth in Part 3 of Schedule 1 attached hereto (the "**EMEA Debtors**");

4.  the Joint Administrators (as defined in the IFSA),

    (the above being the "**Existing Parties**");

5.  **NORTEL NETWORKS AG**, a company incorporated under the laws of Switzerland having its registered office at Wilstrasse 11, Building U95, Uster, Switzerland CH-8610 (the "**NNAG**"); and

6.  **NORTEL NETWORKS S.A. (In Administration)**, a French *société anonyme* registered with the Registry of Commerce of Versailles under the number RCS Versailles no. 389 516 741 ("**NNSA**") represented by the Joint Administrators acting in their capacity as agents of NNSA without personal liability.

**WHEREAS:**

(A)  This Agreement is supplemental to an interim funding and settlement agreement (as amended or supplemented from time to time) dated 9 June 2009 between the Existing Parties (the "**IFSA**").

(B)  NNAG and NNSA wish to accede to the IFSA and each has agreed to perform and comply with its obligations under the IFSA as if it had been a party from the date of execution thereof.

(C)  The parties hereto have further agreed to make certain amendments to the IFSA as set out in this Agreement.

**NOW THEREFORE, THE PARTIES HERETO HEREBY AGREE THAT:**

**1.    DEFINITIONS**

1.1    Words and expressions defined in (or by reference to) the IFSA have the same meaning when used in this Agreement (including the Recitals and Schedule hereto).

**2.    ACCESSION**

2.1    The Existing Parties hereby agree that NNAG and NNSA shall accede to the IFSA as EMEA Debtors. The IFSA shall henceforth be read and construed as if NNAG and NNSA had originally been party thereto and accordingly references therein to an EMEA Debtor shall be deemed to include references to NNAG and NNSA.

2.2    Each of NNAG and NNSA hereby undertakes to and covenants with each of the Existing Parties in the same terms as it would have undertaken and covenanted if it had originally been a party to the IFSA as an EMEA Debtor.

2.3    Each of the Existing Parties to this Agreement covenants with each of NNAG and NNSA that NNAG and NNSA shall each be entitled to the benefit of the terms of the IFSA as if each were a party to it and named therein as an EMEA Debtor.

**3.    AMENDMENT AND RESTATEMENT OF THE IFSA**

3.1    The parties hereto hereby agree that with effect from the date hereof the provisions of the IFSA shall be amended and restated by:

3.1.1    inserting the words *"(excluding Nortel Networks AG and NNSA)"* after the words *"EMEA Debtor"* in the second line of Section 6.g.;

3.1.2    inserting the words *"Nortel Networks AG"* and *"Nortel Networks S.A.(In Administration)"* (each on a separate line) below the words *"Nortel Networks France S.A.S. (In Administration)"* in Schedule 3 (EMEA Debtors); and

3.1.3    inserting the following sentence at the end of Section 6.g.: *"In the event of a breach of Section 12.a. in connection with the Subject Transaction by Nortel Networks AG, NNSA or both, NNL's obligation to make any Shortfall Payments and the Shortfall Charge shall be automatically reduced by $4.08 million, $4.80 million or $8.88 million, respectively."*

**4.    WAIVER**

4.1    The Existing Parties hereby waive the requirement in Section 15 of the IFSA that the IFSA be amended on no less than 10 Business Days' notice as applicable to this Agreement.

**5.    MISCELLANEOUS**

5.1    Subject to the terms of this Agreement, the IFSA shall remain in full force and effect.

5.2    The following provisions of the IFSA shall apply to this Agreement as if set out in this Agreement: Sections 16, 17 and 20-23.

2

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered as of this _11th_ day of September 2009

NORTEL NETWORKS CORPORATION

By _____
John Doolittle, SVP, Finance & Corp.
Services

NORTEL NETWORKS LIMITED

By: _____
John Doolittle, SVP, Finance &
Corporate Services

By _____
John Doolittle, Director

By _____
John Doolittle, Director

NORTEL NETWORKS CORPORATION

By _____
Title: GENERAL COUNSEL - CORPORATE +
CORPORATE SECRETARY

NORTEL NETWORKS LIMITED

By _____
Title: GENERAL COUNSEL - CORPORATE +
CORPORATE
SECRETARY

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
Title: Anne Ventresca, Secretary

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
Title: Anne Ventresca, Secretary

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
Title: Anne Ventresca, Secretary

Signature page to Accession and Amendment Agreement

NORTEL NETWORKS INC.

By _____
    Title: John Doolittle, Vice President

ARCHITEL SYSTEMS (U.S.) CORPORATION

By _____
    Title: John Doolittle, Vice President

CORETEK, INC.

By _____
    Title: John Doolittle, Vice President

NORTEL ALTSYSTEMS, INC.

By _____
    Title: John Doolittle, Vice President

NORTEL ALTSYSTEMS INTERNATIONAL INC.

By _____
    Title: John Doolittle, Vice President

NORTEL NETWORKS APPLICATIONS MANAGEMENT SOLUTIONS INC.

By _____
    Title: John Doolittle, Vice President

NORTEL NETWORKS CABLE SOLUTIONS INC.

By _____
    Title: John Doolittle, Vice President

Signature page to Accession and Amendment Agreement

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
Title: John Doolittle, Vice President

NORTEL NETWORKS HPOCS INC.

By _____
Title: John Doolittle, Vice President

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
Title: John Doolittle, Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
Title: John Doolittle, Vice President

NORTHERN TELECOM INTERNATIONAL
INC.

By _____
Title: John Doolittle, Vice President

QTERA CORPORATION

By _____
Title: John Doolittle, Vice President

SONOMA SYSTEMS

By _____
Title: John Doolittle, Vice President

XROS, INC.

By _____
Title: John Doolittle, Vice President

Signature page to Accession and Amendment Agreement

Signed by **ALAN BLOOM** as joint
Administrator on behalf of the Joint
Administrators without personal liability solely
for the purpose of obtaining the benefit of the
provisions of this Agreement expressed to be
conferred on or given to the Joint Administrators

By _____

Title:

**SIGNED** for and on behalf of **NORTEL**       )
**NETWORKS UK LIMITED (IN**                       )        **ALAN BLOOM**
**ADMINISTRATION)**                               )
by **ALAN BLOOM** as Joint Administrator          )
(acting as agent and without personal liability)
in the presence of:

Witness signature

Name:    WILMA   GRAHAM
Address: 1 MORE LONDON PLACE
         LONDON  SE1 2AF

**SIGNED** for and on behalf of **NORTEL**       )
**NETWORKS (IRELAND) LIMITED (IN**                )        **ALAN BLOOM**
**ADMINISTRATION)**                               )
by **ALAN BLOOM** as Joint Administrator          )
(acting as agent and without personal liability)
in the presence of:

Witness signature

Name:    WILMA  GRAHAM
Address: 1 MORE LONDON PLACE
         LONDON  SE1 2AF

Signature page to Accession and Amendment Agreement

SIGNED for and on behalf of **NORTEL** )
**NETWORKS NV (IN ADMINISTRATION)** )      **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal liability) )
in the presence of:

Witness signature    *W. Graham*

Name:      WILMA GRAHAM
Address:   1 MORE LONDON PLACE
           LONDON SE1 2AF

SIGNED for and on behalf of **NORTEL** )
**NETWORKS SPA (IN** )                    **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal liability)
in the presence of:

Witness signature    *W. Graham*

Name:      WILMA GRAHAM
Address:   1 MORE LONDON PLACE
           LONDON SE1 2AF

SIGNED for and on behalf of **NORTEL** )
**NETWORKS BV (IN ADMINISTRATION)** )    **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal liability) )
in the presence of:

Witness signature    *W. Graham*

Name:      WILMA GRAHAM
Address:   1 MORE LONDON PLACE
           LONDON SE1 2AF

Signature page to Accession and Amendment Agreement

**SIGNED** for and on behalf of **NORTEL NETWORKS POLSKA SP Z.O.O. (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature     *W. Graham*

Name:     WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS HISPANIA SA (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature     *W. Graham*

Name:     WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS (AUSTRIA) GMBH (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature     *W. Graham*

Name:     WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS SRO (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:    WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS ENGINEERING SERVICES KFT (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:    WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS PORTUGAL SA (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:    WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

SIGNED for and on behalf of **NORTEL**
**NETWORKS SLOVENSKO SRO (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

 )
 )  **ALAN BLOOM**
 )
 )

Witness signature

Name: WILMA GRAHAM
Address: 1 MORE LONDON PLACE
    LONDON SE1 2AF

SIGNED for and on behalf of **NORTEL**
**NETWORKS ROMANIA SRL (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

 )
 )  **ALAN BLOOM**
 )
 )

Witness signature

Name: WILMA GRAHAM
Address: 1 MORE LONDON PLACE
    LONDON SE1 2AF

SIGNED for and on behalf of **NORTEL**
**GMBH (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

 )
 )  **ALAN BLOOM**
 )
 )

Witness signature

Name: WILMA GRAHAM
Address: 1 MORE LONDON PLACE
    LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL**          )
**NETWORKS OY (IN ADMINISTRATION)**          )    **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator          )
(acting as agent and without personal liability)          )
in the presence of:

Witness signature        *W. Graham*

Name:    WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL**          )
**NETWORKS AB (IN ADMINISTRATION)**          )    **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator          )
(acting as agent and without personal liability)          )
in the presence of:

Witness signature        *W. Graham*

Name:    WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL**          )
**NETWORKS INTERNATIONAL**          )    **ALAN BLOOM**
**FINANCE & HOLDING BV (IN**          )
**ADMINISTRATION)**          )
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

Witness signature        *W. Graham*

Name:    WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS FRANCE S.A.S. (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:    WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS S.A. (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:    WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** by **SIMON FREEMANTLE** duly )
authorised for and on behalf of **NORTEL** )     SIMON FREEMANTLE
**NETWORKS AG** in the presence of: )
)

Witness signature

Name:      B. DANDRIDGE
Address:   4/0 NORTEL NETWORKS
           MAIDENHEAD, UK

Signature page to Accession and Amendment Agreement

**SCHEDULE 1**

**PART 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**PART 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**PART 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**AFFIDAVIT OF NATASHA DE CICCO**

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2  Canada

Tony DeMarinis (LSUC #: 29451Q)
Scott Bomhof (LSUC #: 37006F)
Sheila Block (LSUC #: 14089N)
Andrew Gray (LSUC #: 46626N)

Email:  tdemarinis@torys.com
       sbomhof@torys.com
       sblock@torys.com
       agray@torys.com

Tel:   416.865.0040
Fax:   416.865.8730

Lawyers for Nortel Networks Inc. and the other US Debtors

11512629.1
35873-2002

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**MOTION RECORD**

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario M5K 1N2  Canada

Tony DeMarinis (LSUC #: 29451Q)
Scott Bomhof (LSUC #: 37006F)
Sheila Block (LSUC #: 14089N)
Andrew Gray (LSUC #: 46626N)

Email:  tdemarinis@torys.com
         sbomhof@torys.com
         sblock@torys.com
         agray@torys.com

Tel:    416.865.0040
Fax:    416.865.8730

Lawyers for Nortel Networks Inc. and the other US Debtors

11512629.1
35873-2002