Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

FACTUM OF NORTEL NETWORKS INC. AND
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
(Allocation Protocol Motion, returnable June 7, 2011)

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2  Canada

Tony DeMarinis (LSUC # 29451Q)
Scott Bomhof (LSUC # 37006F)
Sheila Block (LSUC # 14089N)
Andrew Gray (LSUC # 46626N)

Email: tdemarinis@torys.com
       sbomhof@torys.com
       sblock@torys.com
       agray@torys.com

Tel: 416.865.0040
Fax: 416.865.7380

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

Fraser Milner Casgrain LLP
77 King Street West
Toronto-Dominion Centre, Suite 400
Toronto, Ontario
M5K 0A1  Canada

Alex MacFarlane (LSUC# 28133Q)
Michael Wunder (LSUC # 31351O)
Ryan Jacobs (LSUC# 59510J)

Email: alex.macfarlane@fmc-law.com
       michael.wunder@fmc-law.com
       ryan.jacobs@fmc-law.com

Tel: 416.863.4511
Fax: 416.863.4592

Lawyers for The Official Committee of
Unsecured Creditors of Nortel Networks Inc.,
et al.

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF NORTEL NETWORKS INC. AND**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**PART 1 – OVERVIEW**

*The motions*

1.     This motion is brought by Nortel Networks Inc. and certain of its affiliates (collectively, the "U.S. Debtors") together with the Official Committee of Unsecured Creditors of the U.S. Debtors (the "UCC") for an order approving a protocol for the allocation of the proceeds of the sale ("Sale Proceeds") of Nortel's businesses and assets (the "Allocation Protocol"). The U.S. Debtors and the UCC seek an order approving an Allocation Protocol in the form attached as Schedule "C" to this factum. Nortel Networks Corporation, Nortel Networks Limited ("NNL"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors") brought a motion for identical relief on May 31, 2011.

2.     A motion for approval of the Allocation Protocol is also being brought by the U.S. Debtors and the UCC before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"). The approval of the Allocation Protocol will be considered at a joint hearing between this Court (the "Canadian Court") and the U.S. Court.

### *Summary of the position of the U.S. Debtors and the UCC*

3.      The U.S. Debtors, the Canadian Debtors and most of Nortel's European affiliates (the "EMEA Debtors") are parties to the Interim Funding and Settlement Agreement, dated June 9, 2009 and approved by the Canadian and U.S. Courts.

4.      The IFSA facilitated the global sales processes that to date have generated approximately US$3 billion in Sales Proceeds.[1]  Having had the benefit of the IFSA, the EMEA Debtors, in their response to this motion and in their cross-motion, now seek to rewrite the unambiguous terms of the IFSA.  But, contrary to the EMEA Debtors' arguments, the Canadian and U.S. Courts have jurisdiction to resolve allocation disputes under the IFSA, as well as under the Escrow Agreements and the Cross-Border Protocol incorporated into both the IFSA and Escrow Agreements and to grant the relief requested in this motion.

5.      The IFSA extensively addresses allocation of Sale Proceeds, and it contains a broad jurisdiction clause providing that the Canadian and U.S. Courts have exclusive jurisdiction over any proceeding by any party "*seeking any relief whatsoever ... related to the matters agreed in this Agreement*" (emphasis added).  In each of eight Escrow Agreements, the documents that govern the release of Sale Proceeds from escrow, executed on eight separate occasions spanning a two year period, the parties agreed in each to submit to the exclusive jurisdiction of the Canadian and U.S. Courts for all disputes "*arising under or out of, in respect of, or in connection with*" the Escrow Agreement (emphasis added).  And, in one additional Escrow Agreement the parties agreed to the exclusive jurisdiction of the U.S. Court.  Having agreed over and over again to the exclusive jurisdiction of the Canadian and U.S. Courts with respect to matters relating to allocation and the Sale Proceeds, the EMEA Debtors' argument that these Courts lack jurisdiction to resolve allocation disputes must be rejected.

6.      Similarly, the EMEA Debtors' argument that these forum selection clauses must be ignored because the parties agreed in the IFSA to binding arbitration is baseless.  Had these sophisticated parties wished to bind themselves to an arbitration agreement, they would have done so explicitly in the IFSA.  They did not.  The IFSA nowhere refers to arbitration, nor does it say that the parties have entered into any binding non-judicial procedure.  In fact, the IFSA says

---

[1] This figure has the prospect to increase materially over the next several weeks, as the sale of Nortel's patent portfolio moves to auction.

the opposite. The IFSA provides that the parties "will *negotiate in good faith* and *attempt to reach agreement* on a timely basis on a protocol" for resolving allocation disputes, which protocol "shall provide binding procedures" (emphasis added). The orders approving the IFSA, moreover, provide, as they must, that any protocol later agreed upon by the parties would be subject to Court approval. Plainly, there was no binding agreement in the IFSA on a protocol for resolving allocation disputes, much less on one that required arbitration.

7.      The EMEA Debtors' argument that because the parties tried to negotiate a protocol that would involve arbitration they must have agreed to arbitration is without merit. Of course, arbitration was one option that the parties' envisioned could be agreed upon – the term "dispute resolver" in the IFSA is unambiguously a broad term encompassing both a court and an arbitrator. But this does not mean that arbitration was the only option, or that the parties had bound them themselves to arbitrate. The parties' extensive negotiations of an allocation protocol based on an arbitral forum, all of which were conducted on a without prejudice, for settlement purposes only, basis are relevant only to respond to the EMEA Debtors' allegation of bad faith negotiations. The parties did try to negotiate an allocation protocol; those negotiations, despite the parties' good faith and extensive efforts, failed, and, therefore, under section 16 of the IFSA, and under the Escrow Agreements, the Canadian and U.S. Courts can and must resolve the parties' allocation disputes. The Courts, however, have no authority to compel arbitration where there is no arbitration agreement or to "fill in the gaps" of a non-existent arbitration agreement, and should resist any invitation in this regard proposed by the EMEA Debtors.

8.      Finally, there is no basis for the EMEA Debtors' suggestion that having the Canadian and U.S. Courts hear and resolve the allocation dispute pursuant to the IFSA and Cross-Border Protocol would lead to "chaos". The U.S. Debtors and the UCC anticipate that after conducting joint hearings, the Canadian and U.S. Courts would each issue decisions on the merits, the same process that has been followed with success on more than 20 occasions to date under the Cross-Border Protocol. Instead of "chaos," the U.S. Debtors and UCC believe that the Canadian and U.S. Courts' determination of allocation disputes will provide clarity to all creditors of the Nortel estates, and the transparency that such creditors deserve.

9.      It is only the Joint Administrators of the EMEA Debtors that appear have concerns about the Canadian and U.S. Courts resolving the merits of the allocation dispute. Notably, the U.K.

Pension Trust and the Board of the U.K. Pension Protection Fund – the largest creditors of the EMEA Debtors, having asserted claims in excess of $3 billion – do *not* object to having allocation disputes decided by the Courts. Their principal objections are that they wish to participate in the process and that the process be transparent, goals that could only be accomplished in public court proceedings, as opposed to a closed arbitration process. Further, the ad hoc group of bondholders – with over US$4 billion in claims against the Canadian and U.S. estates, fully supports the motion to have the Courts hear and determine the allocation dispute. Finally, since filing this motion, the U.S. Debtors and the UCC have reached agreement with the Canadian Debtors, the Monitor and the ad hoc group of major Canadian creditors on an amended Allocation Protocol (Schedule "C" to this factum). This amended Allocation Protocol not only shows a clear path forward, but also addresses many of the concerns raised by the EMEA Debtors.

10.     The U.S. Debtors and the UCC respectfully submit that it is critical that the Canadian and U.S. Courts, with their understanding of the intricacies of Nortel, take control of the allocation process. Not only is it critical that this occur, it is precisely what the parties to the IFSA agreed would occur where, as here, they were unable to reach agreement on either allocation or an allocation protocol.

## PART II – FACTS

11.     In Part II of the Factum, we set out the facts relevant to this motion:

- the insolvency proceedings which are the background to the motion;

- the circumstances of the signing of the IFSA and the Escrow Agreements and their terms as they relate to allocation and the jurisdiction of the Canadian and U.S. Courts to resolve allocation disputes;

- the Sale Transactions resulting in the Sale Proceeds;

- the extensive but ultimately unsuccessful efforts made over the last full year by the parties to the IFSA and other stakeholders to negotiate an allocation protocol and resolve the allocation of Sale Proceeds;

- the allocation impasse that now exists in these proceedings that will prevent creditor distributions without the necessary intervention of the Canadian and U.S. Courts, as contemplated by the parties; and

- the position of other parties on this motion, including the EMEA Debtors.

**Background**

12.    On January 14, 2009, the Canadian Debtors commenced a proceeding in the Canadian Court under the *Companies' Creditors Arrangement Act* (the "CCAA") seeking relief from their creditors. Ernst & Young Inc. was appointed as Monitor by the Canadian Court.

13.    Also on January 14, 2009, the U.S. Debtors (other than Nortel Networks (CALA) Inc.), filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code in the U.S. Court, which cases are consolidated for procedural purposes only. The U.S. Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the U.S. Bankruptcy Code.

14.    Also on January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (i.e., the EMEA Debtors) into administration under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators"). Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency or dissolution proceedings around the world.

15.    On January 15, 2009, the U.S. and Canadian Courts each approved the Cross-Border Court-To-Court Protocol, which was later amended by order of both courts (as amended, the "Cross-Border Protocol"). In accordance with section 15 of the Cross-Border Protocol, this motion for approval of the Allocation Protocol is being heard at a joint hearing of the Canadian and U.S. Courts.[2]

---

[2] A copy of the Cross-Border Protocol is found at Tab 2 of the Supplementary Motion Record of the U.S. Debtors and the UCC.

**The IFSA**

16.    On or about June 9, 2009, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors, excluding Nortel Networks S.A. and Nortel Networks AG, entered into the IFSA.[3] Nortel Networks S.A. and Nortel Networks A.G. each acceded to the IFSA on or about September 11, 2009.

*Terms of the IFSA*

17.    The IFSA addressed several issues facing the parties at that time, including liquidity issues at Nortel Networks Limited.  Furthermore, in order to ensure that the planned sale of Nortel's businesses and assets ("Sale Transactions") could progress unimpeded by disputes among the estates, the IFSA also addressed the allocation of Sale Proceeds.

18.    In particular, the parties in section 12(a) of the IFSA agreed not to condition the execution of any sale agreement upon reaching agreement with other IFSA parties proposed to be a party to such Sale Transaction (each, a "Selling Debtor") regarding the allocation (or a binding procedure for allocation) of the ultimate Sale Proceeds (section 12(a), page 11 of the IFSA).

19.    The IFSA provides, in section 12(b), that all Sale Proceeds shall be held in escrow accounts corresponding to each Sale Transaction (each, an "Escrow Account"), and not distributed "in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the [Interim Sales ] Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors" (section 12(b), page 11 of the IFSA).

20.    While the Sale Proceeds were being held in Escrow Accounts, the IFSA required good faith negotiation to attempt to reach a protocol for the allocation of Sale Proceeds.  (The relevant terms of the Escrow Agreements are set out below.)

21.    The parties to the IFSA agreed, in section 12(c), to "*negotiate* in good faith and *attempt* to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the 'Interim Sales Protocol'), which [Interim

---

[3] A copy of the IFSA is at Tab 3B(1) of the Motion Record of the U.S. Debtors and the UCC.

Sales ] Protocol shall provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation" (section 12(c), page 11 of the IFSA, emphasis added).

22.     Section 12(g) of the IFSA provides that the U.S. Debtors must obtain the consent of the UCC and the ad hoc group of bondholders (the "Bondholder Group") before they could agree to an Allocation Protocol or the allocation of Sale Proceeds.  Section 12(g) also requires that the Canadian Debtors obtain the consent of the Bondholder Group and the Monitor to any similar agreements.

23.     The parties to the IFSA further agreed in section 16(b) that any disputes relating to the IFSA and the matters addressed therein that affected the U.S. Debtors, the Canadian Debtors and the EMEA Debtors must be resolved in a joint hearing of the Canadian and U.S. Courts under the Cross-Border Protocol (section 16(b), page 15 of the IFSA).

24.     Through section 16(b) of the IFSA, the parties have agreed that the Canadian and U.S. Courts have the jurisdiction to determine the allocation of Sale Proceeds.  The forum selection provision is very broad in its scope:

> To the fullest extent permitted by applicable law, each Party...

>> (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement ...

>> (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in...a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors.... (emphasis added)

25.     Furthermore, section 16(b) also includes the parties' waiver of any objection to the jurisdiction of the Canadian and U.S. Courts:

> To the fullest extent permitted by applicable law, each Party...

(iii) <u>waives and agrees not to assert any objection</u> that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any action brought in such a Court has been brought in an inconvenient forum. (emphasis added)

### *Approval of the IFSA*

26.    After conducting a joint hearing on June 29, 2009, the Canadian and U.S. Courts both entered orders (the "U.S. IFSA Order" and the "Canadian IFSA Order", respectively) authorizing the U.S. Debtors and the Canadian Debtors respectively to enter into the IFSA. The U.S. IFSA Order expressly states that nothing therein or in the IFSA itself "shall constitute a protocol for determining the allocation of proceeds from a Sale Transaction."[4]  Indeed, the U.S. Court ordered that "no [such] protocol for allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court after notice to parties in interest with an opportunity to object." On July 9, 2009, the Canadian Court entered an order recognizing the U.S. IFSA Order in Canada (the "IFSA Recognition Order").[5]

27.    At the same time the IFSA was approved by the Canadian and U.S. Courts, the Cross-Border Protocol was also amended to address the allocation of Sale Proceeds. The amended Cross-Border Protocol, in new paragraph 15, set out certain procedures for determining the allocation of Sale Proceeds in excess of $30 million, including that such matters could be dealt with in a joint hearing of the Canadian and U.S. Courts. The EMEA Debtors did not object to the amended Cross-Border Protocol when it was approved.

28.    On June 23, 2009, the English High Court provided directions to the Joint Administrators on behalf of the EMEA Debtors, stating that the Joint Administrators were "at liberty" to enter into the IFSA on behalf of the EMEA Debtors. Such direction from the English High Court was not required under the IFSA but rather was a waivable condition at the election of the Joint

---

[4] U.S. IFSA Order, para. 8, Tab 3 of the Supplementary Motion Record of the U.S. Debtors and the UCC.

[5] A copy of the Canadian IFSA Order and the endorsement of the Canadian Court is found at Tab 4 of the Supplementary Motion Record of the U.S. Debtors and the UCC. Copies of the U.S. IFSA Order and the IFSA Recognition Order are found at Tabs 3 and 6, respectively, of the Supplementary Motion Record of the U.S. Debtors and the UCC. In making the Canadian IFSA Order, this Court noted in its endorsement that (i) the UCC, among other stakeholders, supported the motion seeking authorization on the basis that the supporting stakeholders were reserving their rights "in respect of the allocation issues", and (ii) the motion for authorization "does not deal with allocation issues"  See: Tab 5 of the Supplementary Motion Record of the U.S. Debtors and the UCC.

Administrators.  Approval of the IFSA by the Canadian and U.S. Courts were conditions precedent that could not be waived.

**The Sale Process**

### *Sale of Nortel's businesses and assets*

29.    On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and assets, and that it would assess other restructuring alternatives in the event that it was unable to maximize value through such sales.  Since then, Nortel has sold most of its business units and assets to various purchasers.  On May 2, 2011, the Canadian and U.S. Courts each authorized a sale process for Nortel's patent portfolio and related assets.  After completion of the sale of Nortel's remaining patent portfolio and related assets, Nortel will have sold substantially all of its business units and assets.

30.    The Canadian and U.S. Courts have authorized the U.S. Debtors and the Canadian Debtors to enter into the Sale Transactions in their respective jurisdictions, in most cases after conducting a joint cross-border hearing.  The sale orders made by the U.S. Court and the approval and vesting orders entered by the Canadian Court order the Sale Proceeds to be held in Escrow Accounts pursuant to the IFSA.

### *Escrow Agreements*

31.    Under the Escrow Agreements, the parties (including the EMEA Debtors) agreed that the Canadian and U.S. Courts had jurisdiction over the parties and the matters dealt with in the Escrow Agreements, including release of the Sale Proceeds subject to the Escrow Agreements.[6]

32.    The U.S. Debtors, Canadian Debtors and EMEA Debtors all agreed to submit to the jurisdiction of the Canadian and U.S. Courts under the separate Escrow Agreements, which established an escrow account in the United States for the Sales Proceeds for each Sales Transaction.[7]  The jurisdictional provision in these Escrow Agreements provides that the parties submit to the exclusive jurisdiction of the Canadian and U.S. Courts for all disputes "arising under or out of, in respect of, or in connection with" the Escrow Agreement to the extent brought prior to the final decree closing the proceedings.  Thus, the parties agreed no fewer than eight

---

[6] Declaration of Inna Rozenberg, Tab 1C of the Supplementary Motion Record of the U.S. Debtors and the UCC.

[7] The limited exception is the jurisdictional provision in the first Escrow Agreement, executed in March of 2009, which provided for exclusive jurisdiction only in the U.S. Court.  However, that agreement is otherwise substantively consistent with the jurisdictional provisions in the other Escrow Agreements.

times that matters – such as this one – relating to the funds placed in escrow accounts in the United States would be heard by the Canadian and U.S. Courts.

33.    To date, approximately US$3 billion has been deposited to Escrow Accounts managed by JPMorgan Chase Bank, N.A., as third party escrow agent, pursuant to the Escrow Agreements. All such accounts are maintained in the United States. The Sale Proceeds generated by the sale of Nortel's remaining patent portfolio and related assets will be treated in a substantially similar fashion.

**Good Faith Negotiations**

34.    For almost one year, representatives of the Selling Debtors, together with the Monitor, the Joint Administrators, the UCC, the Bondholder Group and other key stakeholders have unsuccessfully attempted to negotiate a protocol for the allocation of Sale Proceeds outside of a consensual resolution, which has also not been achieved. At least one draft protocol exchanged among the parties swelled to 26 single-spaced pages.[8]

35.    The EMEA Debtors assert that it was bad faith not to continue negotiations because there are only a "few remaining open points" to be resolved. That is wrong. On July 20, 2010, the UCC circulated comments to the April 7, 2010 draft of a protocol – the last draft exchanged before negotiations broke down -- as well as a list of open issues, many of which were reflected in the draft itself. The list of fundamental open issues still remaining after almost one year of negotiations included, but were not limited to:

- the scope of the disputes to be addressed and resolved, including whether the intercompany claims should be included in the process;

- the parties permitted to participate in the allocation process;

- the standard by which the panel should make the allocation determination, namely whether it should be "fair and equitable" or "fair and reasonable," and whether it should be based on national or state law;

- the method of selection of the arbitrators, including initial arbitrators and potential replacement arbitrators;

---

[8] The history of the discussions described in this section of the factum are set out in the motion filed by the U.S. Debtors in the U.S. Court – Tab 3A of the Motion Record of the U.S. Debtors and the UCC.

- the types of conflicts that would or would not disqualify an arbitrator;

- information access;

- the scope of examination of witnesses and experts; and

- the content and form of the final decision.[9]

36.    The evidence relied on by the EMEA Debtors on this motion demonstrates amply that the parties to the IFSA more than satisfied the obligation to negotiate in good faith. The negotiations resulted in an impasse.[10]

37.    Representatives of the Selling Debtors, together with the Monitor, the Joint Administrators, the UCC, the Bondholder Group and certain other key stakeholders, have also unsuccessfully attempted to negotiate an agreement on the allocation of the Sale Proceeds, including through all hands meetings on two occasions in 2010, and by engaging in an extensive mediation process on two separate occasions, in November 2010 and April 2011. On April 13, 2011, the U.S. Debtors and the Canadian Debtors each issued press releases indicating that their attempts to reach a consensual allocation of Sale Proceeds had failed.

**The Allocation Protocol**

38.    Having reached an impasse in negotiations, on April 25, 2011, the U.S. Debtors and the UCC served motions seeking orders from the Canadian and U.S. Courts approving the Allocation Protocol. The form of Allocation Protocol originally delivered as part of the Motion record has been revised, and the revised version is attached as Schedule "C" to the Factum.

39.    Following discussions with the U.S. Debtors, the UCC and others, on May 31, 2011 the Canadian Debtors served a motion seeking approval of the Allocation Protocol in the same form attached as Schedule "C" to the Factum.

40.    The approval of the proposed Allocation Protocol and the resulting allocation of Sale Proceeds are matters expressly covered by the IFSA and the Escrow Agreements, and the parties under those agreement have submitted themselves to the jurisdiction of the Canadian and U.S. Courts for the adjudication of those matters.

---

[9] Declarations of Craig Broad and Fred Hodara, Tabs 1A and 1B of the Supplementary Motion Record of the U.S. Debtors and the UCC.
[10] Declaration of Kevin Lloyd, Motion Record of the EMEA Debtors, Exhibit A at 7.

41.     The Canadian and U.S. Courts have the authority, and jurisdiction, to enforce the IFSA and approve an Allocation Protocol to allocate the Sale Proceeds in accordance therewith.

42.     The lack of a final resolution of the allocation of the Sales Proceeds is preventing the Canadian and U.S. estates from moving forward with plans that will allow them to distribute assets to their respective creditors.

43.     The Allocation Protocol contemplates pre-hearing and hearing procedures that will ensure a fair and efficient resolution of the allocation of the Sale Proceeds in accordance with the previous orders made by the Canadian and U.S. Courts and in accordance with the agreement of the parties to the IFSA and the Escrow Agreements.  Importantly, the Allocation Protocol provides the Courts with great latitude to craft specific procedures to resolve the allocation of proceeds and will provide a final and full resolution of the allocation dispute on an expedited basis in a manner designed to protect the interests of all of the interested parties in a public, transparent forum.

**The Position of Other Parties**

*The Monitor, the CCC and the Bondholder Group support*
*a Court process for resolution of allocation disputes*

44.     The Monitor and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors (the "CCC") support the approval of the Allocation Protocol and resolution of the allocation dispute by the Canadian and U.S. Courts.

45.     The Bondholder Group also agrees that the allocation of Sale Proceeds should be determined by the Canadian and U.S. Courts.

*The U.K. Pension Claimants do not oppose a Court process*
*for resolution of allocation disputes*

46.     The U.K. Pension Claimants (as that term is defined in their Limited Objection filed in respect of the motion in the U.S. Court), the largest creditors of the EMEA estate, do not oppose the substantive relief being sought by the U.S. debtors and the UCC.  They support a fully transparent process for resolution of the allocation disputes, which can only be achieved through the proposed Allocation Protocol and corresponding proceedings before the Canadian and U.S. Courts, rather than by a closed arbitration process.

- 13 -

### The EMEA Debtors

47.    The EMEA Debtors are alone in opposing the motions before the Canadian and U.S. Courts. The EMEA Debtors argue that the IFSA includes an agreement that the parties would submit the issue of the allocation of the Sale Proceeds to arbitration, and they therefore also seek an order compelling arbitration.

48.    As set out above, and as dealt with in more detail below in the second section of Part III of the Factum, the IFSA simply does not include an agreement to arbitrate the allocation of Sale Proceeds, and the Canadian and the U.S. Courts do not have the jurisdiction to compel arbitration without an agreement.

49.    The IFSA includes obligations to attempt to negotiate an allocation protocol, and to attempt to negotiate a resolution to the allocation of Sale Proceeds. The IFSA is, in this respect, an agreement to negotiate. The parties have fulfilled that obligation. After almost one year of intensive efforts, the negotiations did not result in an agreement on allocation or on an allocation protocol, and it is now time for the Canadian and U.S. Courts to move forward with the resolution of allocation disputes.

50.    Through the IFSA and the Escrow Agreements, the EMEA Debtors agreed that allocation disputes could be resolved by the Canadian and U.S. Courts but they now seek to avoid their agreement. Notwithstanding their position on this motion, the Joint Administrators have always understood that the intention of the IFSA was that the allocation of Sale Proceeds could ultimately be resolved by the Canadian and U.S. Courts. In the February 11, 2011 progress report, the Joint Administrators advised EMEA creditors that, with respect to the allocation of Sale Proceeds, "[i]f it is not possible for the three estates to reach a consensual agreement, an *arbitration or litigation process* remains likely."[11] A year earlier, the Joint Administrators advised EMEA creditors that "[i]t remains possible that the selling estates could reach a consensual allocation agreement regarding purchase price allocation (without the need for recourse to arbitration) or are simply unable to agree on the form of arbitration proceedings. In the event that it is not possible to agree on an arbitration process with the Canadian and U.S.

---

[11] February 11, 2011 progress report of the Joint Administrators, Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 7 (emphasis added).

entities, the process for determining allocation of the sale proceeds *is likely to be decided by the courts*".[12]

51.     The parties reached an impasse in their negotiations, and therefore, as anticipated by the Joint Administrators, a litigation process is now required to resolve allocation disputes.  As agreed, that litigation process must be before the Canadian and U.S. Courts.

## PART III - THE LAW

52.     The only issue on this motion is whether the Canadian Court has the jurisdiction to approve the Allocation Protocol.  In order to address this issue, we deal with the following:

- the Canadian Court has the jurisdiction to resolve allocation disputes and therefore to approve the Allocation Protocol;

- the IFSA does not include an agreement to arbitrate and the Canadian Court must decline any invitation to create an arbitration agreement for the parties; and

- the parties have reached an impasse on allocation following good faith negotiations, and the Allocation Protocol includes fair and efficient procedures to resolve the allocation of Sale Proceeds.

**The Courts Have Jurisdiction to Resolve Allocation Disputes**

53.     The Canadian and U.S. Courts have the jurisdiction to approve an Allocation Protocol and resolve allocation disputes:

(a)     First, the parties to the IFSA have agreed to submit the issue of the allocation of the Sale Proceeds to the Canadian Court and the U.S. Court, and in approving the IFSA the Courts retained jurisdiction to resolve allocation disputes.  This agreement is also found in the Escrow Agreements.

(b)     Second, the Canadian Court has the jurisdiction to approve the Allocation Protocol under the CCAA and pursuant to its inherent jurisdiction.  The U.S. Court similarly has jurisdiction under the Bankruptcy Code and its inherent

---

[12] February 12, 2010 progress report of the Joint Administrators, Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 8 (emphasis added).

jurisdiction. This, together with the EMEA Debtors' consent to jurisdiction, is dispositive of the Court's powers to grant the relief requested on the motion.

### The IFSA and Escrow Agreements

54.    Under the IFSA, the parties agreed in section 16(b) that any disputes relating to the IFSA and the matters addressed therein that affected the U.S. Debtors, the Canadian Debtors or the EMEA Debtors must be resolved in a joint hearing of the Canadian and U.S. Courts under the Cross-Border Protocol. Accordingly, the parties to the IFSA have agreed that the Canadian Court, together with the U.S. Court, have jurisdiction to approve the Allocation Protocol and resolve the dispute over the allocation of Sale Proceeds.

55.    The jurisdiction clause in section 16(b) of the IFSA is very broad:

> To the fullest extent permitted by applicable law, each Party...

> > (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), <u>for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement</u> ...

> > (ii) <u>agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in...a joint hearing of both the Canadian and US Courts</u> conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors.... (emphasis added)

56.    Furthermore, section 16(b) also includes the parties' waiver of any objection to the jurisdiction of the Canadian and U.S. Courts:

> To the fullest extent permitted by applicable law, each Party...

> > (iii) <u>waives and agrees not to assert any objection</u> that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any action brought in such a Curt has been brought in an inconvenient forum. (emphasis added)

57.     Critically, the expert tendered by the EMEA Debtors to provide an opinion on issues of New York law has acknowledged that section 16(b) of the IFSA in fact grants the Canadian and U.S. Courts jurisdiction over the EMEA Debtors with respect to the dispute on allocation of Sale Proceeds.[13]

58.     The IFSA does include a narrow exception to the Canadian and U.S. Courts' jurisdiction over the matters that are the subject of the IFSA: claims relating to the personal liability of the Joint Administrators are to be dealt with before an English court. The EMEA Debtors, who are sophisticated parties, and who were assisted at all times by counsel in the U.S., Canada and the U.K., could have negotiated to exclude allocation matters from their submission to the jurisdiction of the Canadian and U.S. Courts, but they did not.

59.     The Escrow Agreements similarly include very broad language setting out the parties agreement that the Canadian and U.S. Courts have jurisdiction in respect of the Sale Proceeds subject to the Escrow Agreements: each of the Selling Debtors submitted to the jurisdiction of the Canadian and U.S. Courts in respect "any claim, action or proceeding arising under or out of, in respect of, or in connection with this agreement," and agreed that such matters would be dealt with in a joint hearing before those Courts under the Cross-Border Protocol. The parties, including the EMEA Debtors, agreed eight times that the matters relating to allocation – such as this one – would be heard by the Canadian and U.S. Courts.

60.     The EMEA Debtors now seek to avoid the clear import of their agreement to the jurisdiction of the Canadian and U.S. Courts by contending that allocation was not the subject of their contractual consent to jurisdiction. Forum selection clauses are common components of international commercial transactions and have been encouraged by the courts in Canada, and they have been routinely enforced because they create certainty and security in commercial transactions. Deference is owed to forum selection clauses by the courts, which are found in international agreements involving sophisticated parties. It is essential that courts give full weight to the desirability of holding the contracting parties to their agreements, and in this regard the starting point must be that the parties should be bound by the forum selection clause *in all but*

---

[13] Opinion of Professor Tai-Heng Cheng, para. 10, Motion Record of the EMEA Debtors. The EMEA Debtors' expert witness acknowledges that section 16(b) of the IFSA grants to the Canadian and U.S. Court jurisdiction over the EMEA Debtors but argues that this jurisdiction clause should be ignored based on a purported agreement for "ad hoc" arbitration in section 12 of the IFSA. For the reasons described elsewhere in the Factum, Section 12 of the IFSA contains no such arbitration agreement and the jurisdiction clause in section 16 of the IFSA stands.

*exceptional circumstances*. Canadian courts have recognized the following as evidencing *exceptional circumstances*: (i) the complaining party was induced to agree to the clause by fraud, improper inducement or the contract is unenforceable; (ii) the court in the selected forum clause does not accept jurisdiction and is unable to deal with the claim; (iii) the claim or circumstances that have arisen are outside of what was reasonably contemplated by the parties when they agreed to the clause; (iv) the complaining party can no longer expect a fair trial in the selected forum; or (v) enforcement of the clause would frustrate some clear public policy. None of these enumerated *exceptional circumstances* exist in respect of the facts surrounding the negotiation and execution by the EMEA Debtors of the IFSA and the eight successive Escrow Agreements, all of which were ultimately approved by the Canadian and U.S. Courts with the consent of the EMEA Debtors.

> *Z.I. Pompey Industrie v. ECU-Line N.V.*, [2003] 1 S.C.R. 450,
> Brief of Authorities of the U.S. Debtors and the UCC, Tab 23
>
> *Expedition Helicopters Inc. v. Honeywell Inc.*, 2010 ONCA 351
> (leave to the Supreme Court refused at 319 D.L.R. (4th) 316),
> Brief of Authorities of the U.S. Debtors and the UCC, Tab 10
>
> *Red Seal Tours Inc. v. Occidental Hotels Management B.V.*, 2007
> ONCA 620, Brief of Authorities of the U.S. Debtors and the UCC,
> Tab 16

### *Statutory and inherent jurisdiction*

61.    As set out in the reply memorandum of law filed with the U.S. Court by the U.S. Debtors and the UCC, the U.S. Court has jurisdiction to deal with allocation disputes under the Bankruptcy Code and pursuant to the U.S. Court's inherent jurisdiction.

62.    The Canadian Court also has jurisdiction to resolve matters relating to all of the foregoing pursuant to the CCAA and its inherent jurisdiction.

63.    The jurisdiction of the Canadian Court under the CCAA is broad and flexible and includes, under section 11, the power to "make any order that it considers appropriate in the circumstances." The CCAA is remedial legislation that has to be given a large and liberal interpretation. In that regard, the Supreme Court of Canada has recently stated:

> CCAA courts have been called upon to innovate accordingly in
> exercising their jurisdiction beyond merely staying proceedings
> against the debtor to allow breathing room for

reorganization. They have been asked to sanction measures for which there is no explicit authority in the CCAA.

\*       \*       \*

The general language of the CCAA should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising CCAA authority. Appropriateness under the CCAA is assessed by inquiring whether the order sought advances the policy objectives underlying the CCAA. The question is whether the order will usefully further efforts to achieve the remedial purpose of the CCAA — avoiding the social and economic losses resulting from liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.

> CCAA, sections 9 and 11, Schedule "B" to the Factum

> *Century Services Inc. v. Canada (Attorney General)*, [2010] 3 S.C.R. 379 at paras. 61 and 70, Brief of Authorities of the U.S. Debtors and the UCC, Tab 5

64.    The allocation of sale proceeds and the determination of similar issues in cross-border insolvency proceedings are not novel issues in CCAA proceedings. Courts have exercised jurisdiction under the CCAA with respect to the arrangements between related debtor companies in other significant, cross-border insolvency proceedings. In addressing such matters in this case, the Canadian Court may rely on the broad jurisdiction provided by the CCAA.

> *Re Calpine Energy Limited*, 2007 ABQB 504 (CanLII), leave to appeal denied, 2007 ABCA 266 (CanLII), Brief of Authorities of the U.S. Debtors and the UCC, Tab 14

65.    In addition to the jurisdiction provided under the CCAA, the Superior Court of Justice enjoys a broad jurisdiction to "do justice between the parties", as this Court has recently noted in a CCAA proceeding:

> The Court of Appeal in the recent decision of *TeleZone Inc. v. Canada (Attorney General)*, 2008 ONCA 892 (Ont. C.A.) made

reference to a previous decision of the Court of Appeal in *80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd.*, [1972] 2 O.R. 280 (Ont. C.A.) where at p. 282, Brooke J.A. stated:

> As a superior Court of general jurisdiction, the Supreme Court of Ontario has all of the powers that are necessary to do justice between the parties. Except where provided specifically to the contrary, the Court's jurisdiction is unlimited and unrestricted in substantive law in civil matters.

Borins J.A. stated, after referring to this quotation, as follows: "Brooke J.A. was of the view that no cause should fail for want of remedy".

> *Intertan Canada Ltd. and Tourmalet Corporation* (2009), 49 C.B.R. (5th) 232 (S.C.J.) at para. 7, Brief of Authorities of the U.S. Debtors and the UCC, Tab 11

> See, also: *Courts of Justice Act*, sections 11 and 96, Schedule "B" to the Factum

66.     The Canadian Court has the inherent, or necessary, powers to regulate and control its own proceedings and to prevent the abuse of its process. This inherent power is recognized, in part, by section 146 of the *Courts of Justice Act*, which provides that the "jurisdiction conferred on a court....shall, in the absence of express provision for procedures for its exercise in any Act, regulation or rule, be exercised in any manner consistent with the due administration of justice." Absent comprehensive legislation, the courts must exercise their inherent power to settle the rules of practice and procedure as to disputes brought before them.

> *Courts of Justice Act*, section 146, Schedule "B" to the Factum

> *Abrams v. Abrams*, 2010 CarswellOnt 2915 (S.C.J.), at para. 42, Brief of Authorities of the U.S. Debtors and the UCC, Tab 1 (hereinafter "*Abrams*")

> *Western Canadian Shopping Centres Inc. v. Dutton*, [2001] 2 S.C.R. 534 at para. 34, Brief of Authorities of the U.S. Debtors and the UCC, Tab 22

67.     It is also clear that in approving the IFSA, both the Canadian Court and the U.S. Court retained jurisdiction with respect to allocation issues.

68.     Pursuant to the U.S. IFSA Order, "…no Protocol for the allocation of proceeds from a Sale Transaction may become effective without the prior approval of the Court[,]… and no proceeds from a Sale Transaction may be allocated among the US Debtors and the other Selling Debtors unless such allocation is in accordance with a Protocol approved by this Court…". Further, the U.S. Court retained jurisdiction with respect to all matters arising from or related to the implementation of that Order.[14]

69.     Pursuant to the IFSA Recognition Order, the Canadian Court recognized the U.S. IFSA Order and ordered it to be implemented and effective in Canada in accordance with its terms.[15] The Canadian Court also made it clear, in approving Sales Transactions, that any allocation protocol was subject to approval by the Canadian Court.[16]

70.     The jurisdiction of the Canadian and U.S. Courts to resolve allocation disputes is also explicitly reflected in the Cross-Border Protocol which states that "any motion to allocate sale proceeds which are in the aggregate more than US$30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor" is properly heard at a joint hearing if "the filing party agrees to seek a Joint Hearing"[17]. These provisions were added to the Cross-Border Protocol at the time the Canadian and U.S. Courts approved the IFSA. Thus, from early on, the Canadian and U.S. Courts acknowledged their jurisdiction to hear allocation disputes.[18]

71.     The underlying purpose of the Cross-Border Protocol is to allow the Canadian and U.S. Courts to work together, and to make consistent rulings. The Courts have been able to do so thus far in the Nortel proceedings, and there is no reason to believe that the determination of the allocation of Sale Proceeds would result in a departure from this practice.

---

[14] U.S. IFSA Order, paras. 8 and 11, Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 3
[15] IFSA Recognition Order, para. 2, Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 6
[16] CDMA Order, para. 10(b), Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 9.
[17] U.S. Cross-Border Protocol Order, Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 10; Canadian Cross-Border Protocol Order, Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 2.
[18] In all but the first Escrow Agreement, the EMEA Debtors agreed to be bound by the terms of the Cross-Border Protocol. See, e.g., MEN Escrow Agreement at para. 21 (providing that, for claims brought prior to a final bankruptcy decree, each party submits and agrees to the jurisdiction and rules of the U.S. and Canadian Courts, "including that certain cross-border insolvency protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order dated January 14, 2009, as amended or as amended and restated from time to time…").

72.     Contrary to the arguments of the EMEA Debtors, allocation by the Canadian and U.S. Courts would not be inefficient or lead to "chaos". The proceedings to date, for example the approval of Sale Transactions, demonstrates that the Cross-Border Protocol can be relied upon for the efficient and co-ordinated advancement of the proceedings. The Allocation Protocol provides for co-ordination of pre-hearing and hearing procedures, including a joint hearing of the allocation dispute, all as contemplated by the Cross-Border Protocol. While the Allocation Protocol may result in appeals in separate jurisdictions, that possibility is equally likely should allocation be decided through arbitration, as the EMEA Debtors urge, as any arbitral decision would be subject to appeal or confirmation proceedings potentially in multiple jurisdictions. Moreover, the EMEA Debtors' argument ignores the complete stand-off that the parties face today.

73.     In their Notice of Cross Motion, the EMEA Debtors allege that "the U.S. and Canadian Courts do not have the jurisdiction to allocate the Sale Proceeds with respect to assets owned by Nortel entities outside of North America". The scope of the Canadian Court's jurisdiction over the EMEA Debtors and their purported assets, however, is clear under the CCAA, the IFSA, Escrow Agreements, Cross Border Protocol, and other orders of this Court made in these proceedings. The EMEA Debtors have not provided any basis for the Canadian Court to conclude that it lacks jurisdiction, and they have not shown that some other court could or should determine the issue.

> *360networks Inc. (Re)*, (2001), 29 C.B.R. (4th) 287 (B.C.S.C.), affirmed (2001), 29 C.B.R. (4th) 300 (B.C.C.A.), Brief of Authorities of the U.S. Debtors and the UCC, Tab 24
>
> *Van Breda v. Village Resorts Limited*, 2010 ONCA 84 at para. 109 (CanLII), Brief of Authorities of the U.S. Debtors and the UCC, Tab 20

## The IFSA Does Not Include an Agreement to Arbitrate

74.     It is clear from the plain language of the IFSA that there is no agreement to arbitrate.

### U.S. law applies – no agreement to arbitrate

75.     The IFSA is governed by U.S. law, and the U.S. law governs the question of whether there is an agreement to arbitrate under the IFSA.[19] The applicable authorities and argument are set out in detail in the memorandum of law and reply memorandum filed by the U.S. Debtors and the UCC in support of the motion before the U.S. Court.

76.     As is set out in the memorandum and the reply memorandum of the U.S. Debtors and the UCC, under U.S. law, including federal common law and NY law, the EMEA Debtors cannot sustain their burden of establishing that the parties entered into a binding arbitration agreement. The IFSA simply does not include an agreement to arbitrate.

77.     Section 12 of the IFSA, upon which the EMEA Debtors exclusively rely, does not contain a clear and express agreement to arbitrate as U.S. law requires. The IFSA nowhere says that the parties have entered into a binding arbitration agreement, which is the argument of the EMEA Debtors. Had the parties, all of whom are sophisticated entities represented by experienced counsel, wished to enter into a binding arbitration agreement as part of the IFSA, they would have expressly and clearly said so in the IFSA. They did not. On the contrary, as reflected in section 12 of the IFSA, the parties had *not* yet agreed on an allocation protocol and would instead attempt to negotiate one *after* signing the IFSA. Section 12(c) of the IFSA provides that the parties will "*negotiate* in good faith and *attempt* to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation" of sale proceeds, which protocol "shall provide binding procedures" for allocating sale proceeds in the event the parties are unable to agree on an allocation (emphasis added). Similarly, in section 12(a), the parties agreed not to condition willingness to execute future asset sale agreements on having "binding procedures" for resolving allocation disputes in place. The IFSA therefore included an agreement to negotiate, but it does not include an agreement to arbitrate. Further, the extrinsic evidence filed by the EMEA Debtors in support of their position is not admissible as the terms of the IFSA are unambiguous.

78.     In an effort to lend support to their misapplication of U.S. law and the interpretation of the IFSA, the EMEA Debtors have submitted by affidavit the opinion of Professor Tai-Heng

---

[19] Opinion of David Lindsey, para., Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 11 (applying U.S. federal common law and New York state law).

Cheng. The U.S. Debtors and the UCC believe that expert evidence on New York law is not required by this Court in order to interpret the IFSA, as this Court should defer to the findings and conclusions of the U.S. Court, which is best situated to assess and decide such issues. In that regard, the Canadian Court may rely on section 14 of the Cross Border Protocol in order to consult with the U.S. Court in respect of U.S. law.

79.      To the extent any resort to expert evidence is deemed necessary by this Court, the U.S. Debtors and the UCC believe that the Cheng opinion does not fairly state the applicable principles under U.S. law. Moreover, Professor Cheng has provided conclusions as to the interpretation of the IFSA, a matter for the Courts and not for expert evidence.

80.      For this Court's convenience, if required, the applicable legal principles under U.S. law, including federal common law and New York law, are accurately set out in the opinion of David Lindsey. Mr. Lindsey indicates a number of fundamental errors in the approach taken by Professor Cheng. He also responds to Professor Cheng's conclusions as to the interpretation of the IFSA, to the extent the Canadian Court determines that conclusions on that issue are helpful.[20]

### Ontario legal principles – the same result

81.      Ontario law does not apply to the IFSA. If it did, the result would not be different:

(a)      the IFSA must be interpreted in a manner that accords with sound commercial principles and good business sense, and which avoids commercial absurdity;

(b)      extrinsic evidence of the kind relied upon by the EMEA Debtors is irrelevant in light of the clear language in the IFSA;

(c)      it is up to the party seeking to stay a court proceeding in favour of arbitration to prove there is an arbitration agreement;

(d)      in order to find an agreement to arbitrate, the courts consider the following relevant indicia in respect of such clause: (i) an identified dispute between the parties; i.e. a question to be resolved; (ii) the remission of the dispute to a person who is to resolve the dispute by exercising a judicial function; (iii) the parties having an opportunity to present evidence or submissions in respect of their

---

[20] Opinion of David Lindsey, Supplementary Motion Record of the U.S. Debtors and the UCC, Tab 11.

positions as to how the dispute should be resolved; and (iv) the parties having agreed to be bound by the decision as final;

(e)     in determining whether the contracting parties intended to empower a third party as an arbitrator, the courts consider the following non-exhaustive list of criteria: (i) the language used by the parties; (ii) the similitude between the designated process and the judicial process (the greater the resemblance to a judicial process, the greater the likelihood that the parties intended arbitration); (iii) the nature of the task assigned to the designated party and the extent to which the task is to decide between adversarial positions, which suggests that arbitration was intended, as opposed to a task of relying on personal knowledge or expertise, which suggests that the designated party was providing an opinion but not arbitrating; (iv) the presence or independence and impartiality in a decision-making process, which suggests that arbitration was intended; and (iv) the degree of finality of the outcome;

(f)     with respect to the IFSA, the indicia of an arbitration agreement are not present – all that was required by section 12 was a good faith negotiation that may have resulted in an agreement to arbitrate or some other binding procedure; however, permissive language of that nature does not result in an agreement to arbitrate;

(g)     with respect to the term "dispute resolver(s)" in particular, that term is capable of referring to either the court or some other decision-maker and reflects that the IFSA contemplated the possibility of (as the Joint Administrators put it) "an arbitration or litigation process". The parties to the IFSA could have chosen the word "arbitrator" if they had agreed to arbitrate, but they did not. They chose the term "dispute resolver", which is capable of meaning the courts. As the Supreme Court of Canada has put it, courts "are dispute-resolving tribunals, established to determine contested rights or claims between or against persons …". Nothing in the language used by the parties in the IFSA excludes the courts as "dispute resolver(s)", as one would expect if the parties intended an agreement to arbitrate the resolution of allocation disputes.

*Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. 3d 254 at para. 24 (C.A.), Brief of Authorities of the U.S. Debtors and the UCC, Tab 21

*Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machine Insurance Company*, [1980] 1 S.C.R. 888 para. 26, Brief of Authorities of the U.S. Debtors and the UCC, Tab 7

*Dunn v. Chubb Insurance Company of Canada*, 2009 ONCA 538 at para. 34, Brief of Authorities of the U.S. Debtors and the UCC, Tab 8

Casey & Mills, *Arbitration Law of Canada: Practice and Procedure*, (Huntington: Juris Publishing Inc., 2005) at 49, 57-59, Brief of Authorities of the U.S. Debtors and the UCC, Tab 26

*Sport Maska Inc. v. Zittrer*, [1988] 1 S.C.R. 564, at paras. 61, 98-101 Brief of Authorities of the U.S. Debtors and the UCC, Tab 18

Canadian Encyclopaedic Digest, 4th ed., "Arbitration", §21, Brief of Authorities of the U.S. Debtors and the UCC, Tab 25

*Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A. s.r.l.*, [1998] O.J. No. 1697 at para. 8 (Gen. Div.), Brief of Authorities of the U.S. Debtors and the UCC, Tab 6

*L.I.U.N.A., Local 183 v. Ferreira*, 2007 CarswellOnt 9784 at paras. 23-24, 35 (S.C.J.), Brief of Authorities of the U.S. Debtors and the UCC, Tab 12

*Canada v. Borowski*, [1981] 2 S.C.R. 575 at 579, Brief of Authorities of the U.S. Debtors and the UCC, Tab 4

*The Queen v. Beauregard*, [1986] 2 S.C.R. 56 at para. 30, Brief of Authorities of the U.S. Debtors and the UCC, Tab 19

### *Absent an agreement the Canadian Court cannot compel arbitration*

82.    In Ontario, as in the U.S., a party cannot be compelled to arbitrate absent their agreement to do so. The essence of arbitration is that it is consensual, and without consent the court has no jurisdiction to order an arbitration. In order to oust the jurisdiction of the court to hear and

decide disputes, a party must be able to point to an enforceable agreement wherein the parties to the dispute have agreed to submit to arbitration.

> *Serm Investments Ltd. v. Deer Run Shopping Centre Ltd.*, [1998]
> O.J. No. 108 at para. 1 (C.A.), Brief of Authorities of the U.S.
> Debtors and the UCC, Tab 17

> Casey & Mills, *Arbitration Law of Canada: Practice and Procedure* at 49, Brief of Authorities of the U.S. Debtors and the UCC, Tab 26

83.    There is no arbitration agreement in respect of the allocation of Sale Proceeds, and the U.S. Debtors cannot be compelled to arbitrate.

84.    Moreover, the Monitor, the UCC, the Bondholders Group and the CCC – none of which are parties to the IFSA – also do not wish to arbitrate the allocation of sale proceeds and cannot be compelled to do so.  Further, the U.K. Pension Claimants – the largest creditors of the EMEA estate – have expressed a desire for a fully transparent allocation resolution process and in that regard have not opposed the jurisdiction of these Courts to resolve allocation disputes.  The allocation of the Sale Proceeds should be determined by the Canadian and U.S. Courts within the parameters of the cross-border insolvency proceedings in order to maintain the transparency and integrity of these proceedings.

> *Campeau v. Olympia & York Developments Ltd.* (1992), 14 C.B.R.
> (3) 303 at 311 (Ont. Gen. Div.), Brief of Authorities of the U.S.
> Debtors and the UCC, Tab 3

**The Allocation Protocol**

### *Parties negotiated in good faith and failed to reach an agreement*

85.    As set out above, section 12(c) of the IFSA requires the parties to engage in good faith negotiations; it is not an agreement to arbitrate.  The extensive negotiations surrounding a protocol more than satisfy the obligation to negotiate in good faith.

86.    The good faith standard under U.S. law is set out in the reply memorandum of law filed with the U.S. Court by the U.S. Debtors and the UCC and that is the applicable standard that is to be applied.  As with the interpretation of the IFSA, the Canadian Court should defer to the findings of the U.S. Court in this regard and may, pursuant to the Cross-Border Protocol, consult with the U.S. Court.  If necessary, the opinion of Mr. Lindsey also addresses this issue.

87.     Under Ontario law, good faith is presumed and it is therefore the burden of the EMEA Debtors to show that the negotiations described above were undertaken other than in good faith. The EMEA Debtors have not shown that there was anything other than good faith negotiations. Even if the U.S. Debtors and the UCC had the burden in this regard, the pages and pages of evidence filed by the EMEA Debtors, while inadmissible in respect of contract interpretation matters, amply demonstrate that the parties had good faith negotiations to attempt to agree on a protocol for allocation, thereby fulfilling the obligations under section 12(c) of the IFSA.

> *Blair v. Consolidated Enfield Corp.*, [1995] 4 S.C.R. 5 at para. 35,
> Brief of Authorities of the U.S. Debtors and the UCC, Tab 2

88.     The EMEA Debtors are wrong to claim that this is a case where the parties have agreed upon the material terms of an arbitration agreement and all that remains is to complete procedural gaps. As the EMEA Debtors have admitted, the parties reached an impasse. It is therefore critical that the Canadian and U.S. Courts approve the Allocation Protocol to permit allocation disputes to be resolved.

89.     The EMEA Debtors also rely on the allegation that the Canadian Debtors did not negotiate in good faith because they were not prepared to have intercompany claims included in the proposed arbitral forum for allocation. There was nothing improper about insisting that those matters are distinct, and certainly nothing in that position that evidences a lack of good faith. This Court also recognized this distinction in its ruling of February 17, 2011, stating "Section 12.c. of the IFSA references a protocol for resolving disputes concerning the allocation of sale proceeds [and not] a process for the calling and resolution of claims that may be advanced by the EMEA Companies against [the other Nortel entities]." This Court went on to note that "[w]ith respect to the submission that claims of the EMEA Companies cannot be dealt with separate from or prior to a consideration of the allocation of proceeds, it appears that the linkage between inter-company claims and allocation of proceeds, that is referenced by counsel to the Joint Administrators, may have more to do with achieving maximum leverage in the global distribution negotiations than with the determination of the EMEA Claims."[21]

---

[21] *Nortel Networks Corporation (Re)*, 2011 ONSC 1091 at paras. 19 and 20 (CanLII), Brief of Authorities of the U.S. Debtors and the UCC, Tab 13

### *The terms of the Allocation Protocol*

90.      The pre-hearing and hearing procedures contemplated by the Allocation Protocol are within the jurisdiction of the Canadian Court to order.  Judges of the Superior Court of Justice necessarily possess the inherent power to give directions to the parties, in appropriate cases, about the conduct and completion of both pre-hearing and hearing steps in the proceeding, so that the case receives a just, expeditious and least expensive determination on its merits and that the pre-hearing and hearing steps unfold in a proportionate manner.  Such inherent powers are necessary to enable the court to act effectively within its jurisdiction.  A court may exercise its inherent jurisdiction or power even in respect of matters that are regulated by statute or by rules of court so long as it can do so without contravening any statutory provision.  The powers conferred by rules of court are, generally speaking, additional to and not in substitution of, powers arising out of the inherent jurisdiction of the court.

> *Abrams* at paras. 41 and 43, Brief of Authorities of the U.S.
> Debtors and the UCC, Tab 1

> *Equiprop Management Ltd. v. Harris* (2000), 195 D.L.R. (4th) 680
> (Ont. Gen. Div.), at 700-701, Brief of Authorities of the U.S.
> Debtors and the UCC, Tab 9

91.      Judges of the Superior Court of Justice exercise their inherent powers to control and manage litigation to achieve two fundamental principles, namely to: (i) secure the just, most expeditious and least expensive determination of every civil proceeding on its merits; and (ii) ensure that their orders and directions are proportionate to the importance and complexity of the issues and to the amount involved in the proceeding.

> *Abrams* at para. 40, Brief of Authorities of the U.S. Debtors and
> the UCC, Tab 1

> *Rules of Civil Procedure*, rule 1.04, Schedule "B" to the factum

92.      The approval of the Allocation Protocol by the Canadian and the U.S. Courts is a necessary step to allow Nortel's global insolvency proceedings to move forward, and to finally permit creditor distributions to occur.  The Canadian Court has the jurisdiction to approve the Allocation Protocol, and the Allocation Protocol contains fair and efficient procedures for resolving the Sale Proceeds allocation disputes.

93.    The CCAA court has exercised its inherent jurisdiction in other cases to establish a process and timeline to determine important issues in a proceeding on a timely basis.  In exercising its inherent jurisdiction, CCAA courts have determined that in such a proceeding most of the evidence could be put before the court via affidavit evidence, subject to cross-examination, and deadlines could be established for serving notice to interested parties, exchanging materials, filing a reply, cross-examinations and a setting a formal hearing date.  Those matters are also addressed in the Allocation Protocol.

> *Re Stelco Inc.*, 2006 CarswellOnt 1505 (S.C.J. [Commercial List]),
> Brief of Authorities of the U.S. Debtors and the UCC, Tab 15

## PART IV - ORDER REQUESTED

94.    The U.S. Debtors and the UCC request an Order approving the Allocation Protocol in the form attached as Schedule "C" to this Factum, and an Order denying the EMEA Debtors Cross Motion.

ALL OF WHICH IS RESPECTFULLY SUBMITTED

Tony DeMarinis

Scott Bomhof

Andrew Gray

Lawyers for Nortel Networks Inc. and the other U.S. Debtors

Alex MacFarlane

Michael Wunder

Ryan Jacobs

Lawyers for Official Committee of Unsecured Creditors
of Nortel Networks Inc. et al.

## SCHEDULE A

## AUTHORITIES

*Abrams v. Abrams*, 2010 CarswellOnt 2915 (S.C.J.)

*Blair v. Consolidated Enfield Corp.*, [1995] 4 S.C.R. 5

*Campeau v. Olympia & York Developments Ltd.* (1992), 14 C.B.R. (3) 303 (Ont. Gen. Div.)

*Canada v. Borowski*, [1981] 2 S.C.R. 575

*Century Services Inc. v. Canada (Attorney General)*, [2010] 3 S.C.R. 379

*Coldmatic Refrigeration of Canada Ltd. v. PU.MA. s.r.l.*, [1998] O.J. No. 1697 (Gen. Div.)

*Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machine Insurance Company*, [1980] 1 S.C.R. 888

*Dunn v. Chubb Insurance Company of Canada*, 2009 ONCA 538

*Equiprop Management Ltd. v. Harris (2000)*, 195 D.L.R. (4th) 680 (Ont. Gen. Div.)

*Expedition Helicopters Inc. v. Honeywell Inc.*, 2010 ONCA 351

*Intertan Canada Ltd. and Tourmalet Corporation* (2009), 49 C.B.R. (5th) 232 (S.C.J.)

*L.I.U.N.A., Local 183 v. Ferreira*, 2007 CarswellOnt 9784 (S.C.J.)

*Nortel Networks Corporation (Re)*, 2011 ONSC 1091 (CanLII)

*Re Calpine Energy Limited*, 2007 ABQB 504 (CanLII), leave to appeal denied, 2007 ABCA 266 (CanLII)

*Re Stelco Inc.*, 2006 CarswellOnt 1505 (S.C.J. [Commercial List])

*Red Seal Tours Inc. v. Occidental Hotels Management B.V.*, 2007 ONCA 620

*Serm Investments Ltd. v. Deer Run Shopping Centre Ltd.*, [1998] O.J. No. 108 (C.A.)

*Sport Maska Inc. v. Zittrer*, [1988] 1 S.C.R. 564

*The Queen v. Beauregard*, [1986] 2 S.C.R. 56

*Van Breda v. Village Resorts Limited*, 2010 ONCA 84 (CanLII)

*Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust (2007)*, 85 O.R. 3d 254 (C.A.)

*Western Canadian Shopping Centres Inc. v. Dutton*, [2001] 2 S.C.R. 534

*Z.I. Pompey Industrie v. ECU-Line N.V.*. 2003 SCC 27

*360networks Inc. (Re)*, (2001), 29 C.B.R. (4th) 287 (B.C.S.C.), aff'd (2001), 29 C.B.R. (4th) 300 (B.C.C.A.)

# SCHEDULE B
# STATUTES

*Companies' Creditors Arrangement Act*

9. (1) Any application under this Act may be made to the court that has jurisdiction in the province within which the head office or chief place of business of the company in Canada is situated, or, if the company has no place of business in Canada, in any province within which any assets of the company are situated.

(2) The powers conferred by this Act on a court may, subject to appeal as provided for in this Act, be exercised by a single judge thereof, and those powers may be exercised in chambers during term or in vacation.

11. Despite anything in the Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

*Courts of Justice Act*

11.(1) The Ontario Court (General Division) is continued as a superior court of record under the name Superior Court of Justice in English and Cour supérieure de justice in French.

(2) The Superior Court of Justice has all the jurisdiction, power and authority historically exercised by courts of common law and equity in England and Ontario.

96.(1) Courts shall administer concurrently all rules of equity and the common law.

(2) Where a rule of equity conflicts with a rule of the common law, the rule of equity prevails.

(3) Only the Court of Appeal and the Superior Court of Justice, exclusive of the Small Claims Court, may grant equitable relief, unless otherwise provided.

146. Jurisdiction conferred on a court, a judge or a justice of the peace shall, in the absence of express provision for procedures for its exercise in any Act, regulation or rule, be exercised in any manner consistent with the due administration of justice.

*Rules of Civil Procedure*

1.04 (1) These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

(1.1) In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding.

(2) Where matters are not provided for in these rules, the practice shall be determined by analogy to them.

## SCHEDULE C
## ALLOCATION PROTOCOL

(attached)

Schedule "A"

**ALLOCATION PROTOCOL**

1. Purpose. The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors[2] ("Allocation", and any hearing regarding same, an "Allocation Protocol Hearing," and any discovery regarding same, "Allocation Protocol Discovery"). Subject to paragraph 5 hereof, creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("Intercompany Claims") are not governed by this Allocation Protocol. All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be determined in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol. All other Intercompany Claims shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2. Participants. Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators, the Non-Filed Entities and the CCC (collectively, the "Core Parties," and each individually, a "Core Party") and their authorized representatives shall have the right to participate fully in (a) any and all Allocation Protocol Hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, and (b) any and all Allocation Protocol Discovery conducted in connection therewith. The foregoing is without prejudice to (x) the right of any other party in interest to file written submissions in support of or in opposition to any theory of allocation advanced at any Allocation Protocol Hearing before the U.S. and Canadian Courts or request permission to become a Core Party and fully participate in the foregoing, which request shall be made by motion on notice to the Core Parties for cause shown to both the U.S. and Canadian Courts, or (y) the power of the U.S. and Canadian Courts to adopt procedures to manage the Allocation Protocol Hearings and related proceedings.

3. Cross-Border Protocol. Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4. Procedures. The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery. After hearing the procedural submissions of the Core Parties and taking into account the discovery already conducted to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

---

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in ●. **[NTD: To conform defined terms prior to finalizing.]**

a. <u>Pleadings</u>. The Core Parties will exchange pleadings, which they shall be entitled to amend, from time to time, in accordance with the usual practice of the U.S. and Canadian Courts. There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation.

b. <u>Fact Discovery</u>. The U.S. and Canadian Courts will facilitate the Core Parties' exchange of fact discovery by determining the following:

    i.   the deadline for, and acceptable manners of service of, reasonable requests for the production of non-privileged documents on any other Core Party;

    ii.   the deadline for objections to any Core Party's document requests;

    iii.   the deadline for identification of fact witnesses and number of fact witnesses allowed;

    iv.   the process for compelling attendance of fact witnesses at depositions; and

    v.   the deadline for completion of depositions, the number of depositions permitted, and the location of and time allowed for such depositions for each Core Party.

c. <u>Experts</u>. The U.S. and Canadian Courts shall facilitate expert discovery by determining the following:

    i.   the deadline for and format of expert reports (including exhibits);

    ii.   the deadline for and format of rebuttal expert reports (including exhibits); and

    iii.   the deadline for completion of expert depositions and the time allowed for such expert deposition.

d. <u>Joint Conferences</u>. The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Core Parties and to receive updates as to the status of the proceedings. The U.S. and Canadian courts will determine when joint conferences may be set.

e. <u>Joint Hearings</u>. The U.S. and Canadian Courts shall have joint hearings on the merits. The U.S. and Canadian Courts shall determine:

    i.   the date(s) for an opening hearing on the Core Parties' allocation positions (prior to factual discovery) and on the rules governing the joint hearing on the merits;

    ii.   the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written

submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination and redirect examination of fact and expert witnesses shall take place; and

    iii.   the procedure for requesting or setting joint conferences as necessary to resolve any discovery disputes among the Core Parties or to receive updates to the status of the proceedings.

  f.  <u>Written Submissions</u>. The U.S. and Canadian Courts will determine:

    i.   the deadline for and format of opening submissions (including exhibits);

    ii.   the deadline for and format of fact affidavits, if any, to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

    iii.   the deadline for and format of reply submissions (including exhibits); and

    iv.   the deadline for and format of fact affidavits, if any, to accompany the reply submissions.

5.  <u>EMEA Claims</u>. Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators or any other administrator of an EMEA Debtor against (a) the U.S. Debtors (the "<u>EMEA U.S. Claims</u>") and (b) the Canadian Debtors (the "<u>EMEA Canadian Claims</u>" (and together with the EMEA U.S. Claims, the "<u>EMEA Claims</u>")). The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA U.S. Claims. The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Canadian Claims.

6.  <u>Decisions</u>. The U.S. and Canadian Courts will (a) hold simultaneously (i) the Allocation Protocol Hearings, (ii) hearings before the U.S. Court on the merits of any remaining EMEA U.S. Claims, and (iii) hearings before the Canadian Court on the merits of any remaining EMEA Canadian Claim, provided, however, that the U.S. and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims or only EMEA Canadian Claims, and (b) issue their respective decisions on (i), (ii) and (iii).

6.  <u>Appeals</u>. The Core Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. and Canadian Courts.

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**FACTUM**
**(Allocation Protocol Motion, returnable June 7, 2011)**

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2  Canada

Tony DeMarinis (LSUC #: 29451Q)
Scott Bomhof (LSUC #: 37006F)
Sheila Block (LSUC #: 14089N)
Andrew Gray (LSUC #: 46626N)

Email:  tdemarinis@torys.com
        sbomhof@torys.com
        sblock@torys.com
        agray@torys.com

Tel:   416.865.0040
Fax:   416.865.8730

Lawyers for Nortel Networks Inc. and the other U.S.
Debtors