Court File No: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
### R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
### OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
### NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
### INTERNATIONAL CORPORATION AND NORTEL NETWORKS
### TECHNOLOGY CORPORATION
### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
### R.S.C. 1985, c. C-36, AS AMENDED

### BOOK OF AUTHORITIES OF NORTEL NETWORKS INC. AND
### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
### (Allocation Protocol Motion, returnable June 7, 2011)

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2 Canada

Tony DeMarinis (LSUC #: 29451Q)
Scott Bomhof (LSUC #: 37006F)
Sheila Block (LSUC #: 14089N)
Andrew Gray (LSUC #: 46626N)

Email: tdemarinis@torys.com
sbomhof@torys.com
sblock@torys.com
agray@torys.com

Tel: 416.865.0040
Fax: 416.865.7380

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

Fraser Milner Casgrain LLP
77 King Street West
Toronto-Dominion Centre, Suite 400
Toronto, Ontario
M5K 0A1 Canada
Alex MacFarlane (LSUC# 28133Q)
Michael Wunder (LSUC # 31351O)
Ryan Jacobs (LSUC# 59510J)

Email: alex.macfarlane@fmc-law.com
michael.wunder@fmc-law.com
ryan.jacobs@fmc-law.com

Tel: 416.863.4511
Fax: 416.863.4592
Lawyers for The Official Committee of
Unsecured Creditors of Nortel Networks Inc.,
et al.

Court File No: 09-CL-7951

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

## IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## AND IN THE MATTER OF NORTEL NETWORKS INC. AND THE OTHER COMPANIES LISTED ON SCHEDULE "A" HERETO WITH RESPECT TO CERTAIN PROCEEDINGS TAKEN IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

**APPLICATION UNDER Section 18.6 of the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended**

### SERVICE LIST

TO:  **OGILVY RENAULT LLP**
Royal Bank Plaza, South Tower
200 Bay Street, Suite 3800
Toronto, ON M5J 2Z4

Derrick Tay
Tony Reyes
Jennifer Stam

Email:  dtay@ogilvyrenault.com
treyes@ogilvyrenault.com
jstam@ogilvyrenault.com

Tel:  416.216.4000
Fax:  416.216.3930

Lawyers for the Applicants

TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON M5K 1J7

Murray McDonald
Brent Beekenkamp

Email: nortel.monitor@ca.ey.com

Tel: 416.943.3016
Fax: 416.943.3300

AND **GOODMANS LLP**
TO: Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email: jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
fmyers@goodmans.ca
carmstrong@goodmans.ca

Tel: 416.597.4107
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND **OSLER HOSKIN AND HARCOURT**
TO: **LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Betsy Putnam

Email: lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
putnam@osler.com

Tel: 416.362.2111
Fax: 416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND **FASKEN MARTINEAU DUMOULIN LLP**
TO: 66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email: dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel: 416.868.3538
Fax: 416.364.7813

Lawyers for Export Development Canada

AND TO: **EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON K1A 1K3

Jennifer Sullivan

Email: jsullivan@edc.ca

Tel: 613.597.8651
Fax: 613.598.3113

AND TO: **THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON M5K 1K7

Leanne M. Williams

Email: lwilliams@tgf.ca

Tel: 416.304.1616
Fax: 416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO: **McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email: john.stringer@mcinnescooper.com
stephen.kingston@mcinnescooper.com

Tel: 902.425.6500
Fax: 902.425.6350

Lawyers for Convergys EMEA Limited

AND TO: **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart

Email: jcarhart@millerthomson.com

Tel: 416.595.8615/8577
Fax: 416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO: **CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email: barry.wadsworth@caw.ca
lewis.gottheil@caw.ca

Tel.: 416.495.3776
Fax: 416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada

AND TO: **BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC V7X 1S8

R. Hoops Harrison

Email: hharrison@boughton.ca

Tel: 604.687.6789
Fax: 604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.,
in its capacity as duly authorized agent for
Holdings 1506 Enterprises Ltd.

AND TO:     **BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:    416. 367.6646
Fax:    416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:    416.367.6266
Fax:    416.361.7067

Email:  srappos@blgcanada.com
Tel:    416.367.6033
Fax:    416.361.7306

Lawyers for Bell Canada

AND TO:     **SISKINDS LLP**
680 Waterloo Street
London, ON N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein
Emilie E. M. Maxwell

Email:  ray.leach@siskinds.com
        dimitri.lascaris@siskinds.com
        emilie.maxwell@siskinds.com

Tel:    519.672.2121
Fax:    519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:     **McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON M5J 2T3

John Contini
Aaron Rousseau

Email   john.contini@mcmillan.ca
Tel:    416.307.4148
Fax:    416.304.3767

Email   aaron.rousseau@mcmillan.ca
Tel:    416.307.4081
Fax:    416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:     **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson
Richard Swan

Email:  zychk@bennettjones.com
Tel:    416.777.5738
Fax:    416.863.1716

Email:  orzyr@bennettjones.com
Tel:    416.777.5737
Fax:    416.863.1716

Email:  finlaysong@bennettjones.com
Tel:    416.777.5762
Fax:    416.863.1716

Email:  swanr@bennettjones.com
Tel:    416.777.7479
Fax:    416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

AND TO: **KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email: mzigler@kmlaw.ca
Tel: 416.595.2090
Fax: 416.204.2877

Email: sphilpott@kmlaw.ca
Tel: 416.595.2104
Fax: 416.204.2882

Email: dyiokaris@kmlaw.ca
Tel: 416.595.2130
Fax: 416.204.2810

Email: amckinnon@kmlaw.ca
Tel: 416.595.2150
Fax: 416.204.2874

Email: cpoltak@kmlaw.ca
Tel: 416.595.2701
Fax: 416.204.2909

Lawyers for the Former Employees of Nortel

AND TO: **KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email: mzigler@kmlaw.ca
Tel: 416.595.2090
Fax: 416.204.2877

Email: sphilpott@kmlaw.ca
Tel: 416.595.2104
Fax: 416.204.2882

Email: dyiokaris@kmlaw.ca
Tel: 416.595.2130
Fax: 416.204.2810

Email: amckinnon@kmlaw.ca
Tel: 416.595.2150
Fax: 416.204.2874

Email: cpoltak@kmlaw.ca
Tel: 416.595.2701
Fax: 416.204.2909

Lawyers for the LTD Beneficiaries

AND
TO:

**MILLER THOMSON LLP**

Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

| Email: | jcarhart@millerthomson.com |
| Tel: | 416.595.8615 |
| Fax: | 416.595.8695 |

| Email: | msims@millerthomson.com |
| Tel: | 416.595.8577 |
| Fax: | 416.595.8695 |

| Email: | jmklotz@millerthomson.com |
| Tel: | 416.595.4373 |
| Fax: | 416.595.8695 |

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**

11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:    joseph.kim@lge.com

| Tel: | +82.2.3777.3171 |
| Fax: | +82.2.3777.5345 |

AND
TO:

**MILLER THOMSON LLP**

Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart
Margaret Sims

| Email: | jcarhart@millerthomson.com |
| Tel: | 416.595.8615 |
| Fax: | 416.595.8695 |

| Email | msims@millerthomson.com |
| Tel: | 416.595.8577 |
| Fax: | 416.595.8695 |

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**CHAITONS LLP**

185 Sheppard Avenue West
Toronto, ON M2N 1M9

Harvey G. Chaiton

Email:    harvey@chaitons.com

| Tel: | 416.218.1129 |
| Fax: | 416.218.1849 |

Lawyers for IBM Canada Limited

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:  ken.rosenberg@paliareroland.com
Tel:    416.646.4304
Fax:   416.646.4301

Email:  max.starnino@paliareroland.com
Tel:    416.646.7431
Fax:   416.646.4301

Email:  lily.harmer@paliareroland.com
Tel:    416.646.4326
Fax:   416.646.4301

Email:  tina.lie@paliareroland.com
Tel:    416.646.4332
Fax:   416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON M5X 1G5

E. Patrick Shea

Email:  patrick.shea@gowlings.com

Tel:    416.369.7399
Fax:   416.862.7661

Lawyers for Westcon Group

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:  Shayne.kukulowicz@fmc-law.com
        Alex.macfarlane@fmc-law.com
        Michael.wunder@fmc-law.com
        ryan.jacobs@fmc-law.com

Tel:    416.863.4511
Fax:   416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:  rslattery@mindengross.com
        dullmann@mindengross.com
Tel:    416.369.4149
Fax:   416.864.9223

Lawyers for Verizon Communications Inc.

AND TO:
**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Harry Fogul
Peter K. Czegledy

Email: hfogul@airdberlis.com
Tel: 416.865.7773
Fax: 416.863.1515

Email: pczegledy@airdberlis.com
Tel: 416.865.7749
Fax: 416.863.1515

Lawyers for Microsoft Corporation

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email: renglish@airdberlis.com
smitra@airdberlis.com

Tel: 416.863.1500
Fax: 416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND TO:
**ALEXANDER HOLBURN BEAUDIN & LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia V7Y 1B8

Sharon M. Urquhart

Email: surquhart@ahbl.ca
Tel: 604.484.1757
Fax: 604.484.1957

Lawyers for Algo Communication Products Ltd.

AND TO:
**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email: jwigley@gardiner-roberts.com
Tel: 416.865.6655
Fax: 416.865.6636

Email: vdare@foglers.com
Tel: 416.865.6641
Fax: 416.865.6636

Lawyers for Andrew, LLC

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Steven L. Graff
Ian E. Aversa

Email: sgraff@airdberlis.com
Tel: 416.865.7726
Fax: 416.863.1515

Email: iaversa@airdberlis.com
Tel: 416.865.3082
Fax: 416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Maurice Fleming

Email: mfleming@millerthomson.com
Tel: 416.595.8686
Fax: 416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:     416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:     416.941.5397
Fax:     416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:     416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:     416.865.3082
Fax:     416.863.1515

Lawyers for Perot Systems Corporation

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:     416.865.7160
Fax:     416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:     416.865.7286
Fax:     416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:     416.865.7262
Fax:     416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON M5J 2T3

Adam C. Maerov

Email:   adam.maerov@mcmillan.ca
Tel:     416.865.7285
Fax:     416.865.7048

Lawyers for Citibank

AND TO: **CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, ON M5H 3C2

Deborah S. Grieve

Email: dgrieve@casselsbrock.com
Tel: 416.860.5219
Fax: 416.350.6923

Lawyers for Alvarion Ltd.

AND TO: **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email: jwigley@gardiner-roberts.com
Tel: 416.865.6655
Fax: 416.865.6636

Email: vdare@foglers.com
Tel: 416.865.6641
Fax: 416.865.6636

Lawyers for Amphenol Corporation

AND TO: **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Sanjeev P.R. Mitra

Email: smitra@airdberlis.com

Tel: 416.863.1500
Fax: 416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND TO: **BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, ON M5C 3G5

Domenico Magisano

Email: dmagisano@blaney.com
Tel: 416.593.2996
Fax: 416.593.5437

Lawyers for Expertech Network Installation Inc.

AND TO: **McMILLAN LLP**
Brookfield Place
Suite 4400, 181 Bay Street
Toronto, ON M5J 2T3

Aaron Rousseau

Email: aaron.rousseau@mcmillan.ca
Tel: 416.307.4081
Fax: 416.365.1719

Lawyer for Right Management Inc.

AND TO: **CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, ON M5H 3C2

E. Bruce Leonard
David S. Ward
Michael Casey

Email: bleonard@casselsbrock.com
dward@casselsbrock.com
mcasey@casselsbrock.com

Tel: 416.860.6455
Fax: 416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND
TO:

**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, ON K2P 0A2

Paul K. Lepsoe

Email: pklepsoe@mcfarlanelaw.com

Tel: 613.233.2679
Fax: 613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management,
Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email: theintzm@mccarthy.ca
Tel: 416.601.7627
Fax: 416.868.0673

Email: jsirivar@mccarthy.ca
Tel: 416.601.7750
Fax: 416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:

**IRVING MITCHELL KALICHMAN LLP**
Place Alexis Nihon, Tour 2
3500 Boulevard De Maisonneuve Ouest
Bureau 1400
Montreal, Quebec H3Z 3C1

Kurt A. Johnson

Email: kjohnson@imk.ca
Tel: 514.935.5755
Fax: 514.935.2999

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND
TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, ON K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email: janice.payne@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel: 613.231.8245
Fax: 613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, ON  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:      416.865.2318
Fax:     416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:      416.865.6944
Fax:     416.863.6275

Lawyers for Jabil Circuit Inc.

AND
TO:

**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
            mgaggino@schneidergaggino.com

Tel:      514.631.8787
Fax:     514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND
TO:

**EURODATA**
2574 Sheffield Road
Ottawa, ON  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:      613.745.0921
Fax:     613.745.1172

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
            laugesenm@bennettjones.com

Tel:      416.863.1200
Fax:     416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:      416.369.4335
Fax:     416.864.9223

Lawyers for 2748355 Canada Inc.

AND
TO:

**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, ON  K8N 5J2

Ian W. Brady

Email:   lbrady@baldwinlaw.ca
Tel:      613.771.9991
Fax:     613.771.9998

Lawyers for Sydney Street Properties Corp.

AND TO:
**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND TO:
**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email:   thomas.mcrae@shibleyrighton.com
Tel:      416.214.5206
Fax:     416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND TO:
**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email:   thomas.mcrae@shibleyrighton.com
Tel:      416.214.5206
Fax:     416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND TO:
**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351

AND TO:
**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com
Tel:      416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:    416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, ON M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

Email:  tosullivan@counsel-toronto.com
Tel:    416.598.1744
Fax:    416.598.3730

Email:  slaubman@counsel-toronto.com
Tel:    416.598.1744
Fax:    416.598.3730

Lawyers for William A. Owens

AND
TO:

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:  rschwill@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Email:  mgottlieb@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place
181 Bay Street, Suite 2100
Toronto, ON M5J 2T3

Lydia Salvi

Email:  lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Wipro Limited

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:     416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:     416.865.3082
Fax:     416.863.1515

Lawyers for the Current and Former Employees
of Nortel Networks Inc. who are or were
Participants in the Long-Term Investment Plan
Sponsored by Nortel Networks Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, ON M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:     416.601.8342
Fax:     416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:

**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON, M5J 2T3

Sheryl E. Seigel

Email: sheryl.seigel@mcmillan.ca
Tel:     416.307.4063
Fax:     416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, ON M5X 1K6

Diane Winters

Email: dwinters@justice.gc.ca
Tel:     416.973.3172
Fax:     416.973.0810

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON M5L 1A9

Susan M. Grundy
Marc Flynn

Email: susan.grundy@blakes.com
Tel:     416.863.2572
Fax:     416.863.2653

Email: marc.flynn@blakes.com
Tel:     416.863.2685
Fax:     416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

Kevin P. McElcheran

Email:   kmcelcheran@mccarthy.ca
Tel:     416.601.7730
Fax:     416.868.0673

Lawyers for Avaya Inc.

AND TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email: pamela.huff@blakes.com
Tel: 416.863.2958
Fax: 416.863.2653

Email: milly.chow@blakes.com
Tel: 416.863.2594
Fax: 416.863.2653

Email: hugh.desbrisay@blakes.com
Tel: 416.863.2426
Fax: 416.863.2653

Email: craig.thorburn@blakes.com
Tel: 416.863.2965
Fax: 416.863.2653

Lawyers for MatlinPatterson Global Advisers
LLC, MatlinPatterson Global Opportunities
Partners III L.P. and MatlinPatterson
Opportunities Partners (Cayman) III L.P.

AND TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, ON M5J 2Z9

Jeffrey K. Spiegelman

Email: jspiegelman@foglers.com
Tel: 416.864.9700
Fax: 416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, ON M5G 2G8

James McDonald
Darrell Brown

Email: jmcdonald@sgmlaw.com
Tel: 416.979.6425
Fax: 416.591.7333

Email: dbrown@sgmlaw.com
Tel: 416.979.4050
Fax: 416.591.7333

Lawyers for Edmund Fitzgerald

AND TO:

**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON K1N 7G2

Thomas Wallis

Email: thomas.wallis@vdg.ca
Tel: 613.241.2701
Fax: 613.241.2599

Lawyers for La Regie des Rentes du Quebec

AND
TO:
**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON M5L 1B9

Sean F. Dunphy

Email: sdunphy@stikeman.com
Tel: 416.869.5662
Fax: 416.947.0866

Lawyers for GENBAND Inc.

AND
TO:
**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY 10022

Gordon Cameron
Ron Ferguson

Email: gncameron@stikeman.com
Tel: 212.845.7464
Fax: 212.371.7087

Email: rferguson@stikeman.com
Tel: 212.845.7477
Fax: 212.371.7087

Lawyers for GENBAND Inc.

AND
TO:
**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON M4H 3Y4

John D. Marshall
Craig J. Hill

Email: jmarshall@blgcanada.com
Tel: 416.367.6024
Fax: 416.361.2763

Email: chill@blgcanada.com
Tel: 416.367.6156
Fax: 416.631.7301

Lawyers for the U.K. Pensions Regulator

AND
TO:
**BLAKE, CASSELS & GRAYDON**
Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, ON M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email: pamela.huff@blakes.com
Tel: 416.863.2958
Fax: 416.863.2653

Email: jeremy.forgie@blakes.com
Tel: 416.863.3888
Fax: 416.863.2653

Lawyers for The Northern Trust Company, Canada

AND
TO:
**ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON M5H 2K1

Joel P. Rochon

Email: jrochon@rochongenova.com
Tel: 416.363.1867
Fax: 416.363.0263

Lawyers for the Opposing LTD Employees

AND
TO:
**LERNERS LLP**
130 Adelaide St. West
Suite 2400
Toronto, ON M5H 3P5

William E. Pepall

Email: wpepall@lerners.ca
Tel: 416.601.2352
Fax: 416.867.2415

Lawyers for the Former Employees in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust

AND TO: **MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email: kyle.kashuba@macleoddixon.com
Tel: 403.267.8399
Fax: 403.264.5973

Constellation NewEnergy Canada Inc.

AND TO: **SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON K1P 5L4

Peter Engelmann
Fiona Campbell

Email: pengelmann@sgmlaw.com
Tel: 613-482-2452
Fax: 613-235-3041

Email: fcampbell@sgmlaw.com
Tel: 613-482-2451
Fax: 613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust

AND TO: **CLEARY GOTTLIEB STEEN &**
**HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer

Email: lschweitzer@cgsh.com
        jbromley@cgsh.com
Tel: 212.225.2000
Fax: 212.225.3999

Lawyers for Nortel Networks Inc.

AND TO: **McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

Barbara J. Boake
James D. Gage

Email: bboake@mccarthy.ca
Tel: 416.601.7557
Fax: 416.868.0673

Email: jgage@mccarthy.ca
Tel: 416.601.7539
Fax: 416.686.0673

Lawyers for Morneau Sobeco Limited Partnership

AND TO: **McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON M5J 2T3

D. Brent McPherson

Email: brent.mcpherson@mcmillan.ca
Tel: 416.307.4103
Fax: 416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to
Wachovia Bank, N.A., in its capacity as Servicer
for the Nortel Networks Pass-Through Trust,
Series 1-1

AND TO: **DAVID STEER**
10 Cypress Court
Nepean, ON K2H 8Z8

Email: davidsteer127@sympatico.ca

AND
TO:
**FOGLER RUBINOFF LLP**
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, ON M5J 2Z9

Jeffrey K. Spiegelman

Email:   jspiegelman@foglers.com
Tel:     416.864.9700
Fax:     416.941.8852

Lawyers for Apex Logistics Inc.

AND
TO:
**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD. Centre
Toronto, ON M5K 1N2

Tony DeMarinis
Scott Bomhof
Sheila Block
Andrew Gray

Email:   tdemarinis@torys.com
         sbomhof@torys.com
         sblock@torys.com
         agray@torys.com

Lawyers for Nortel Networks Inc.

AND
TO:
**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD. Centre
Toronto, ON M5K 1N2

Michael Rotsztain
Adam M. Slavens

Email:   mrotsztain@torys.com
Tel:     416.865.7508
Fax:     416.865.7380

Email:   aslavens@torys.com
Tel:     416.865.7333
Fax:     416.865.7380

Lawyers for Ranger, Inc.

AND
TO:
**TEMPLEMAN MENNINGA LLP**
401-366 King Street East
Kingston, ON K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email:   hvw@tmlegal.ca
         rbm@tmlegal.ca

Tel:     613.542.1889
Fax:     613.542.8202

Lawyers for The Corporation of the City of Belleville

AND
TO:
**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta T2P 4H2

Andrew Robertson

Email:   andrew.robertson@macleoddixon.com
Tel:     403.267.8222
Fax:     403.264.5973

Lawyers for Recently Severed Calgary
Employees

AND
TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON M5J 2T3

Brett Harrison

Email:   brett.harrison@mcmillan.ca
Tel:     416.865.7932
Fax:     416.865.7048

Lawyers for Rogers Communications Inc.

AND
TO:

**ATTORNEY GENERAL FOR ON**
Crown Law Office - Civil
720 Bay Street, 8th Floor
Toronto, ON M7A 2S9

Leonard Marsello
William MacLarkey

Email: leonard.marsello@ontario.ca
Tel: 416.326.4939
Fax: 416.326.4181

Email: William.MacLarkey@ontario.ca
Tel: 416.326.4082
Fax: 416.326.4181

Lawyers for Her Majesty the Queen in Right of
Ontario, as represented by the Ministry of the
Environment

AND
TO:

**TEMPLEMAN MENNINGA LLP**
366 King Street East, Suite 401
Kingston, ON K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email: hvw@tmlegal.ca
rbm@tmlegal.ca

Tel: 613.542.1889
Fax: 613.542.8202

Lawyers for Algonquin and Lakeshore Catholic
District School Board

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON M5L 1A9

Steven J. Weisz
Jackie Moher

Email: steven.weisz@blakes.com
Tel: 416.863.2612
Fax: 416.863.2653

Email: jackie.moher@blakes.com
Tel: 416.863.3174
Fax: 416.863.2653

Lawyers for the American Registry for Internet
Numbers

AND
TO:

**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON, M5J 2T3

Andrew J. Kent
Wael Rostom

Email: andrew.kent@mcmillan.ca
Tel: 416.865.7160
Fax: 416.865.7048

Email: wael.rostom@mcmillan.ca
Tel: 416.865.7790
Fax: 416.865.7048

Lawyers for the Norpax LLC and RPX Corporation,
in its capacity as Managing Member of Norpax LLC

## COURTESY COPIES:

AND TO: **LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email: sbrown@lrlaw.com

Tel: 602.262.5321
Fax: 602.734.3866

Lawyers for The Prudential Insurance Company of America

AND TO: **AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036

Fred S. Hodara

Email: fhodara@akingump.com

Tel: 212.872.1000
Fax: 212.872.1002

U.S. Lawyers for the Official Committee of Unsecured Creditors

AND TO: **CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

Email: sreisman@curtis.com
jdrew@curtis.com

Tel: 212.696.6000
Fax: 212-697-1559

Lawyers for Flextronics International

AND TO: **MILBANK, TWEED, HADLEY McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email: DDunne@milbank.com
Tel: 212.530.5770
Fax: 212.530.5219

Email: ALeblanc@milbank.com
Tel: 212.835.7574
Fax: 212.530.5219

Email: APisa@milbank.com
Tel: 212.530.5319
Fax: 212.530.5219

U.S. Lawyers for The Informal Nortel Noteholder Group

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:   mschein@vedderprice.com

Tel:     212.407.6920
Fax:     212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email:   andrew.robertson@macleoddixon.com
         caylee.rieger@macleoddixon.com

Tel:     403.267.8222
Fax:     403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email:   eric.prezant@bryancave.com
Tel:     312.602.5033
Fax:     312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel:     212.906.1373
Fax:     212.751.4864

U.S. Lawyers for The Bank of New York
Mellon



# TOC

## TABLE OF CONTENTS

Tab    Case

1.     *Abrams v. Abrams*, 2010 CarswellOnt 2915 (S.C.J.)

2.     *Blair v. Consolidated Enfield Corp.*, [1995] 4 S.C.R. 5

3.     *Campeau v. Olympia & York Developments Ltd.* (1992), 14 C.B.R. (3d) 303 (Ont. Gen. Div.)

4.     *Canada v. Borowski*, [1981] 2 S.C.R. 575

5.     *Century Services Inc. v. Canada (Attorney General)*, [2010] 3 S.C.R. 379

6.     *Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A. s.r.1.*, [1998] O.J. No. 1697 (Gen. Div.)

7.     *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machine Insurance Company*, [1980] 1 S.C.R. 888

8.     *Dunn v. Chubb Insurance Company of Canada*, 2009 ONCA 538

9.     *Equiprop Management Ltd. v. Harris* (2000), 195 D.L.R. (4th) 680 (Ont. Gen. Div.)

10.    *Expedition Helicopters Inc. v. Honeywell Inc.,* 2010 ONCA 351

11.    *Intertan Canada Ltd. and Tourmalet Corporation* (2009), 49 C.B.R. (5th) 232 (S.C.J.)

12.    *L.I.U.N.A., Local 183 v. Ferreira,* 2007 CarswellOnt 9784 (S.C.J.)

13.    *Nortel Networks Corporation (Re)*, 2011 ONSC 1091 (CanLII)

14.    *Re Calpine Energy Limited*, 2007 ABQB 504 (CanLII), leave to appeal denied, 2007 ABCA 266 (CanLII)

15.    *Re Stelco Inc.*, 2006 CarswellOnt 1505 (S.C.J. [Commercial List])

16.    *Red Seal Tours Inc. v. Occidental Hotels Management B.V.*, 2007 ONCA 620

17.    *Serm Investments Ltd. v. Deer Run Shopping Centre Ltd.*, [1998] O.J. No. 108 (C.A.)

18.    *Sport Maska Inc. v. Zittrer*, [1988] 1 S.C.R. 564

19.    *The Queen v. Beauregard*, [1986] 2 S.C.R. 56

20.    *Van Breda v. Village Resorts Limited*, 2010 ONCA 84 (CanLII)

21.    *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. 3d 254 (C.A.)

22.    *Western Canadian Shopping Centres Inc. v. Dutton*, [2001] 2 S.C.R. 534

- 2 -

23.    *Z.I. Pompey Industrie v. ECU-Line N.V..* 2003 SCC 27

24.    *360networks inc. (Re)*, (2001), 29 C.B.R. (4th) 287 (B.C.S.C.), aff'd (2001), 29 C.B.R. (4th) 300 (B.C.C.A.)

## SECONDARY SOURCES

Tab      Source

25.    Canadian Encyclopaedic Digest, 4th ed., "Arbitration", §21

26.    Casey & Mills, *Arbitration Law of Canada: Practice and Procedure*, (Huntington: Juris Publishing Inc., 2005)



# TAB1

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

## C

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

01; 358764436Abrams v. Abrams

Stephen Abrams (Applicant) and Ida Abrams, Judith Abrams, Philip Abrams and The Public Guardian and Trustee (Respondents)

Ontario Superior Court of Justice

D.M. Brown J.

Heard: April 8, 2010
Judgment: May 10, 2010
Docket: 03-003/08

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: M. Teitel for Applicant, S. Abrams

R. Swan for J. Abrams

E. Hoffstein, D. Lobl for P. Abrams

B. Schnurr for Ida Abrams

Subject: Civil Practice and Procedure

Civil practice and procedure --- Pre-trial procedures — Case management and status hearing — Case management — Case management judge or master

Inherent jurisdiction — SA requested that capacity and guardianship proceeding be subject to case management, but objected to directions in case management endorsement without appealing it and challenged court's jurisdiction to make it — SA's request to seal future decisions and not to use parties' names was dismissed — Court ruled that it had inherent jurisdiction or power to give directions to parties about trial and pre-trial stages of proceedings and that inherent jurisdiction co-exists with specific rules of practice — Judges sitting on Toronto Region Estates List enjoy inherent powers to case manage their proceedings even though R. 77.02(2) of Rules of Civil Procedure does not apply to proceedings on Estates List — SA's opposition to proportionate device of hearing refusals motion by way of writing in managed proceeding had no merit since judge managing litigation other than under R. 77 possesses inherent power to require written motions — Court had inherent jurisdiction to require evidence-in-chief to be given by way of affidavit and to impose time limits on length of trial — Court deferred setting final plan for proceeding until either SA appealed endorsement or this ruling about jurisdiction and time for appeal expired, or SA complied with endorsement's directions.

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

### Cases considered by *D.M. Brown J.*:

*Abrams v. Abrams* (2010), 54 E.T.R. (3d) 283, 2010 CarswellOnt 1135, 2010 ONSC 1254 (Ont. S.C.J.) — referred to

*Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 1 W.W.R. 1, 20 C.B.R. (N.S.) 240, 57 D.L.R. (3d) 1, 5 N.R. 515, 1975 CarswellMan 85, 1975 CarswellMan 3, [1976] 2 S.C.R. 475 (S.C.C.) — considered

*Business Depot Ltd. v. Genesis Media Inc.* (2000), 2000 CarswellOnt 1634, 47 C.P.C. (4th) 270, 48 O.R. (3d) 402 (Ont. S.C.J.) — considered

*Connelly v. Director of Public Prosecutions* (1964), [1964] A.C. 1254, [1964] 2 All E.R. 401, 48 Cr. App. R. 183, [1964] 2 W.L.R. 1145 (U.K. H.L.) — considered

*Control & Metering Ltd. v. Karpowicz* (1994), 23 C.P.C. (3d) 275, 17 O.R. (3d) 431, 1994 CarswellOnt 487 (Ont. Gen. Div.) — considered

*Equiprop Management Ltd. v. Harris* (2000), 195 D.L.R. (4th) 680, 9 C.P.C. (5th) 323, 2000 CarswellOnt 4398, 51 O.R. (3d) 496, 140 O.A.C. 1 (Ont. Div. Ct.) — considered

*Hallman v. Pure Spousal Trust (Trustee of)* (2009), 2009 CarswellOnt 5795, 52 E.T.R. (3d) 29, 80 C.P.C. (6th) 139 (Ont. S.C.J.) — considered

*J.B. Trust (Trustee of) v. B. (J.) (Litigation Guardian of)* (2009), 81 C.P.C. (6th) 107, 2009 CarswellOnt 3723, 50 E.T.R. (3d) 50, 97 O.R. (3d) 544 (Ont. S.C.J.) — considered

*Marcotte c. Longueuil (Ville)* (2009), 62 M.P.L.R. (4th) 1, 2009 SCC 43, 2009 CarswellQue 9842, 2009 CarswellQue 9843, (sub nom. *Usinage Pouliot inc. v. Longueuil (Ville de)*) 311 D.L.R. (4th) 1, (sub nom. *Marcotte v. Longueuil (Ville)*) 394 N.R. 1 (S.C.C.) — considered

*Mother of God Portaitissa Saint Raphael, Nicholas, Irene & Olympia Greek Orthodox Monastery of Metropolitan Toronto Inc. v. Bakolis* (2005), 2005 CarswellOnt 1592 (Ont. Master) — considered

*Park v. Lee* (2009), 2009 CarswellOnt 5293, 254 O.A.C. 52, 2009 ONCA 651, 98 O.R. (3d) 520 (Ont. C.A.) — referred to

*R. v. Felderhof* (2003), 68 O.R. (3d) 481, 10 Admin. L.R. (4th) 229, 2003 CarswellOnt 4943, 17 C.R. (6th) 20, 180 C.C.C. (3d) 498, 235 D.L.R. (4th) 131, 180 O.A.C. 288 (Ont. C.A.) — considered

*R. v. Keating* (1973), 21 C.R.N.S. 217, 1973 CarswellOnt 5, 11 C.C.C. (2d) 133, 15 Crim. L.Q. 464 (Ont. C.A.) — referred to

*R. v. Oliver* (2005), 2005 CarswellOnt 598, 194 C.C.C. (3d) 92, 194 O.A.C. 284, 127 C.R.R. (2d) 215, 28 C.R. (6th) 298 (Ont. C.A.) — considered

*R. v. Papadopoulos* (2005), 2005 CarswellOnt 1231, 196 O.A.C. 335, 201 C.C.C. (3d) 363 (Ont. C.A.) — referred to

*R. v. Rose* (1998), 1998 CarswellOnt 4392, 1998 CarswellOnt 4393, 40 O.R. (3d) 576 (headnote only), [1998] 3 S.C.R. 262, 115 O.A.C. 201, 57 C.R.R. (2d) 219, 6 B.H.R.C. 206, 232 N.R. 83, 166 D.L.R. (4th) 385, 20 C.R. (5th) 246, 129 C.C.C. (3d) 449 (S.C.C.) — referred to

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

*R. v. Snow* (2004), 190 C.C.C. (3d) 317, 2004 CarswellOnt 4287, 191 O.A.C. 212, 73 O.R. (3d) 40 (Ont. C.A.) — considered

*R. v. Steel* (1995), 1995 CarswellAlta 456, 34 Alta. L.R. (3d) 440, 174 A.R. 254, 102 W.A.C. 254 (Alta. C.A.) — considered

*R. v. Steel* (1996), 199 N.R. 400 (note), 187 A.R. 318 (note), 127 W.A.C. 318 (note), [1996] 1 S.C.R. 746, 37 Alta. L.R. (3d) xxxvi (note) (S.C.C.) — referred to

*Western Canadian Shopping Centres Inc. v. Dutton* (2001), (sub nom. *Western Canadian Shopping Centres Inc. v. Bennett Jones Verchere)* 201 D.L.R. (4th) 385, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, 272 N.R. 135, 2001 SCC 46, 2001 CarswellAlta 884, 2001 CarswellAlta 885, [2001] 2 S.C.R. 534 (S.C.C.) — considered

**Statutes considered:**

*Code de procédure civile*, L.R.Q., c. C-25

    en général — referred to

    art. 4.2 [ad. 2002, c. 7, art. 1] — referred to

*Courts of Justice Act*, R.S.O. 1990, c. C.43

    s. 11 — referred to

    s. 146 — considered

*Substitute Decisions Act, 1992*, S.O. 1992, c. 30

    Generally — referred to

    s. 3 — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

    Generally — referred to

    R. 1.04(1) — considered

    R. 1.04(1.1) [en. O. Reg. 438/08] — considered

    R. 20.05(2) — considered

    R. 20.05(2)(i) — referred to

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

R. 20.05(2)(j) — referred to

R. 20.05(2)(k) — referred to

R. 20.05(2)(l) — referred to

R. 30.1 — referred to

R. 37.15(1) — considered

R. 37.15(1.2) [en. O. Reg. 348/97] — considered

R. 38.10(1) — considered

R. 50.07(1)(c) — considered

R. 53.01 — considered

R. 77 — considered

R. 77.02(2) — considered

R. 78 — considered

RULING about court's jurisdiction to give directions in case management of capacity and guardianship proceeding.

*D.M. Brown J.*:

### I. The issue: the inherent power of judges to manage civil litigation

1       Do judges who hear applications and motions on the Toronto Region Estates List possess the jurisdiction or power to manage litigation on the List?

2       The applicant, Stephen Abrams, says, "No."

3       Although Mr. Abrams did not appeal my case management endorsement of March 1, 2010 (the "March Endorsement"),[FN1] which contained extensive directions about the remaining pre-hearing steps in this matter, as well as directions about the conduct of the ordered trial of issues, at a subsequent case management conference on April 8 he challenged my jurisdiction to make that endorsement and made it quite clear that he would not co-operate in moving his application to a trial of issues in accordance with the directions contained in that endorsement.

4       Stephen Abrams' position is simple: either I allow him to litigate this proceeding under the *Substitute Decisions Act, 1992,*[FN2] in the way that he wants, or he will appeal my case management directions. As I informed his counsel at the hearing, judges do not negotiate their jurisdiction or powers with litigants.

5       So, in this endorsement I will explain why judges possess the jurisdiction and power to manage litigation on the Toronto Region Estates List, including making specific directions of the type that I did in the March Endorsement, and I will defer

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

issuing further directions in this proceeding until either Mr. Abrams appeals my decision and the appeal is disposed of, or the time for bringing an appeal has expired.

## II. Procedural background

6     I set out the history of this high-conflict capacity and guardianship proceeding in the March Endorsement. In terms of the history of the case management of this proceeding, on the return of a motion before me on November 9, 2009, I agreed, at the request of the parties, including Stephen Abrams, to act as the case management judge for this proceeding. I directed the parties to develop a schedule for all remaining examinations.

7     I held a case management conference on November 25, 2009, at which time I set a timetable for the remaining exami-nations. I also directed that inquiries be made about allegations that Stephen Abrams had breached Rule 30.1 by sending certain information about his sister to the College of Physicians and Surgeons, and that a conference call on that issue be held on December 10, 2009. Stephen Abrams did not object to my jurisdiction at that time.

8     The conference call was held on December 10, 2009. Stephen Abrams did not object to my jurisdiction at that time.

9     The next case management conference was held on February 8, 2010. The parties reported that they had complied with my directions and completed the remaining examinations in accordance with the timetable I had imposed. The issues of out-standing motions and the length of trial were also discussed. Stephen Abrams did not object to my jurisdiction at that time.

10     A conference call was then held on February 24, 2010. My resulting March Endorsement summarized that call and directed counsel to co-operate and prepare a plan to adjudicate the ordered trial of issues in this application in accordance with certain parameters which included:

> (i) completing the trial of issues within three days on September 27, 28, and 29, 2010;

> (ii) conducting a hybrid trial, primarily relying on filed affidavits for a witness' evidence-in-chief, with latitude to conduct up to 30 minutes additional examination-in-chief of each party witness and the cross-examinations of each party witness limited to three hours in length;

> (iii) filing comprehensive document briefs, factums and briefs of authorities in advance of the hearing;

> (iv) bringing any remaining refusals motions before me by way of motions in writing; and,

> (v) preparing lists of any portions of pleadings or affidavits of the opposite parties to which a party objected so that I could consider whether any merit existed in dealing with such complaints prior to the trial, or whether the presiding judge should simply be given a list in advance of those portions of affidavits to which the parties took exception.

11     In that endorsement I indicated that following the hearing on April 8, 2010 I would finalize a plan dealing with all remaining pre-trial matters and I would fix the trial date which would be peremptory to all parties.

12     Stephen Abrams did not appeal the March Endorsement.

13     At the conference on April 8 the respondents submitted a joint trial plan which conformed to the parameters I had set. Mr. Abrams submitted two plans. The first his counsel described as conforming to my endorsement. It did not. That plan proposed that Mr. Abrams' case would occupy 2.5 days of the hearing, leaving 0.5 days for the respondents' case. I do not know why Mr. Abrams even bothered filing that document given its obvious unfairness.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

14      What Mr. Abrams really wanted was set out in the second plan contained in his written submissions - a 10-day trial using only *viva voce* evidence, including a full day to deal with pleadings-related issues, four days for Mr. Abrams' case, three days for the respondents' case, a day of reply evidence for Mr. Abrams, and a day for final submissions. Again, Mr. Abrams tilted the allocation of time in his favour.

15      The parties also filed briefs of refusals in respect of which they wished to bring motions. Mr. Stephen Abrams seeks to move on:

(i) about 50 refusals made by his sister, Judith Abrams, on her examination, with the lion's share relating to issues involving Ms. Abrams' employment and personal matters, five concerning "draft wills", eight dealing with Ida Abrams' capacity and treatment, and one relating to their father, Philip's, capacity; and,

(ii) four refusals taken on the examination of Philip Abrams.

The respondents seek to move on the following refusals:

(iii) Five refusals made on the examination of Stephen Abrams;

(iv) 21 refusals taken on the examination of Elizabeth Abrams, many dealing with issues relating to the estate planning undertaken by Ida and Philip Abrams;

(v) One refusal made by Rosette Rutman, the wife of Stephen Abrams; and,

(vi) Ten refusals given by Mark Wainberg, Elizabeth Abrams' husband, many dealing with issues relating to the estate planning undertaken by Ida and Philip Abrams.

In sum, approximately 95 refusals must be determined. Using a very conservative estimate of 5 minutes of oral motion time per refusal, two full motions days would be required to deal with that number of refusals in the ordinary course.

16      Finally, Stephen Abrams submitted a list of those portions of the respondents' affidavits and pleadings that he wished to strike out:

| Document | No. of paragraphs sought to be struck out |
|---|---|
| 1. Affidavit of Judith Abrams sworn October 8, 2009 | 51 |
| 2. Affidavit of Robert Lawrence sworn April 16, 2009 dealing with estate planning issues | Entire affidavit |
| 3. Affidavit of Philip Abrams sworn April 10, 2008 | 9 |
| 4. Affidavit of Philip Abrams sworn April 27, 2008 | 6 |
| 5. Affidavit of Philip Abrams sworn November 5, 2009 | 5 |
| 6. Statement of Defence of Judith Abrams | 15 |
| 7. Statement of Defence of Philip Abrams | 9 |

Stephen Abrams has already examined Judith and Philip Abrams on their affidavits.

### III. Positions of the Parties

17      In a 26 page written submission filed at the hearing, Mr. Stephen Abrams took the following positions:

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

(i) the March Endorsement contained factual inaccuracies and media reports of that endorsement contained errors;

(ii) these reasons for decision dealing with matters raised at the April 8 hearing should be sealed;

(iii) judges sitting on the Toronto Region Estates List possess no Rules-based or inherent jurisdiction to impose case management, including case management in this particular proceeding;

(iv) even if a judge sitting on the Toronto Region Estates List could impose case management in a proceeding, the judge lacked jurisdiction:

    a. to require affidavit evidence to be used at a trial of issues, and,

    b. to give directions regarding the length of the trial and time limits for witnesses.

### B. Ida Abrams

18    Section 3 counsel for Ida Abrams submitted that his client does not support her son's request for a sealing order and endorses the respondents' joint litigation plan prepared in response to March Endorsement that would see the timely adjudication of the issues in this proceeding.

### C. Philip Abrams

19    Counsel for Philip Abrams also opposed Stephen's request for a sealing order, observed that the parties actually had requested, back on November 9, 2009, that I act as the case management judge in this proceeding, and submitted that judges sitting on the Estates List possess the jurisdiction to impose the type of case management contained in the March Endorsement.

### D. Judith Abrams

20    Counsel for Judith Abrams submitted that his client took no formal position on the argument made by Stephen Abrams, but (i) wanted this proceeding heard as quickly and as expeditiously as possible, (ii) supported the respondents' joint litigation plan, and (iii) saw no justification for a sealing order in this proceeding. Counsel submitted that his client was pleased with the "firm hand" type of case management imposed to date in this proceeding.

### IV. Inaccuracies in media commentary on the March 1, 2010 endorsement

21    Stephen Abrams submitted that the March Endorsement contained factual errors and that I had misapprehended certain matters. His written submissions contained seven pages describing those errors. If Stephen Abrams thought that I had erred in any findings or conclusions in my March Endorsement, he was free to appeal my decision. He did not.

22    Stephen Abrams also expressed concern about media coverage of the March Endorsement, including what he contended were inaccuracies in the reports on my decision. The court has no control over how the media reports decisions that it releases. If Stephen Abrams feels aggrieved by any media coverage, he enjoys remedies at law.

### V. Mr. Abrams' request for a sealing order

23    Stephen Abrams requested an order barring the media from the April 8, 2010 hearing (none were present) and from any other scheduling appointments and case conferences. Since no media have shown the slightest interest in attending any case

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

conference or motion in this proceeding, I see no need to deal with this request.

24      Stephen Abrams also requested that all future case conference memoranda be sealed, "except to the extent that they correct alleged factual errors that this Honourable Court may conclude were made in March 1, 2010." The other parties opposed this request. No sealing order was requested when this application commenced, and the public file for this proceeding currently contains three boxes of filed materials. In *J.B. Trust (Trustee of) v. B. (J.) (Litigation Guardian of)*,[FN3] I summarized the principles governing requests to seal court files. No grounds exist in the present case to order that future decisions of this court should be sealed. I dismiss the request.

25      Similarly, there is no basis to grant Stephen Abrams' alternative request for an order "requiring the use of parties' initials in lieu of their names in any media reports of this case". This proceeding has been litigated under a full-names style of cause for two years; I see no reason to change that situation.

**VI. Jurisdiction of judges to manage proceedings on the Toronto Region Estates List**

*A. The problem*

26      Mr. Abrams' primary argument challenges the jurisdiction, or power, of judges sitting on the Toronto Region Estates List to impose case or litigation management in a proceeding. He submits that such judges possess neither the inherent jurisdiction nor any authority conferred by the *Rules of Civil Procedure* to do so. His argument is a straight-forward one. Both before and after January 1, 2010, the Rules provided that Rule 77 case management in the Toronto Region did not apply to most matters heard on the Toronto Region Estates List, including applications for guardianship of property or persons under the *Substitute Decisions Act, 1992*. In light of that situation, Mr. Abrams argued, no judge hearing a matter on the Toronto Region Estates List possesses the jurisdiction or power to manage a matter on the List.

27      To some extent Mr. Abrams' argument does not surprise me. The "gap" in Rule 77 became apparent as soon as the Rules Committee approved the "new" Rules in December, 2008. As I wrote last fall in *Hallman v. Pure Spousal Trust (Trustee of)* [2009 CarswellOnt 5795 (Ont. S.C.J.)]:[FN4]

> [47] As to case management, Ms. Hallman is correct that a form of case management is available for proceedings on the Toronto Estates List. I say a "form" of case management because, strictly speaking, the type of case management described in Rule 77 is not available for the majority of disputes heard on the Estates List: Rule 77.01(2)(d) through to (d.0.3)...

28      That Rule 77 case management may not be available for a proceeding does not mean that case management, more broadly understood as litigation management, cannot apply. Again, I addressed this issue in *Hallman*:

> [48] Yet the lack of availability of Rule 77-style case management has not impeded the ability of judges sitting on the Estates List from implementing more informal ways of managing cases that appear on the List, either at the request of counsel or at the initiative of the judges. This makes sense. On-going judicial intervention is necessary in some cases to ensure that justice is done. Some parties seek such intervention, and the courts should be ready to respond to reasonable requests to ensure proper access to justice. So, too, intractable cases often require judicial management to prevent abuses of the system of justice and fairness to both parties.

29      Mr. Abrams' submissions, however, call into question that analysis, so I propose to examine in more detail the inherent and Rules-based power of judges sitting on the Estates List to engage in the management of litigation on the List.

*B. The inherent jurisdiction or powers of a superior court of record*

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

### B.1 The source of inherent powers

30    What is the source of the inherent jurisdiction or powers of a superior court of record? In a seminal article[FN5] Sir I. H. Jacob viewed the inherent jurisdiction of a court as an aspect of its general jurisdiction, consisting of a set, or bundle, of powers which "derived, not from any statute or rule of law, but from the very nature of the court as a superior court of law, and for this reason such jurisdiction has been called 'inherent'":

> For the essential character of a superior court of law necessarily involves that it should be invested with a power to maintain its authority and to prevent its process being obstructed and abused. Such a power is intrinsic in a superior court; it is its very life-blood, its very essence, its immanent attribute. Without such a power, the court would have form but would lack substance.[FN6]

This led Jacob to conclude that the source of these powers was "the authority of the judiciary to uphold, to protect and to fulfil the judicial function of administering justice according to law in a regular, orderly and effective manner."[FN7] Jacob offered the following definition of a court's inherent jurisdiction:

> [T]he reserve or fund of powers, a residual source of powers, which the court may draw upon as necessary whenever it is just or equitable to do so, and in particular to ensure the observance of the due process of law, to prevent improper vexation or oppression, to do justice between the parties and to secure a fair trial between them.[FN8]

31    Although Jacob's definition has been accepted by the Supreme Court of Canada and the Ontario Court of Appeal,[FN9] his approach has been criticized by some as too metaphysical in nature, and an alternative way of describing the source of a court's inherent jurisdiction has been to regard as inherent those powers which are necessary if the court is to manage the work which has been assigned to it in an appropriate fashion,[FN10] a sort of jurisdiction by necessary implication kind of argument. As put by Lord Morris of Borth-y-Gest in *Connelly v. Director of Public Prosecutions*:

> There can be no doubt that a court which is endowed with a particular jurisdiction has powers which are necessary to enable it to act effectively without such jurisdiction. I would regard them as powers which are inherent in its jurisdiction. A court must enjoy such powers in order to enforce its rules of practice and to suppress any abuses of its process...[FN11]

32    Whichever view one takes of how to articulate the source of a court's inherent powers, the commentators unite in recognizing that courts, at least superior courts of record, enjoy inherent powers to regulate and control their own process and proceedings other than those which are conferred on them by legislation, including delegated legislation such as rules of practice.[FN12] Indeed, less than two years ago, former Chief Justice Lesage, and now Justice Code of this court, in their *Report of the Review of Large and Complex Criminal Cases Procedures* wrote:

> [A]t common law "the trial judge" has significant case management powers, both when hearing motions at the pre-trial stage and when hearing evidence at trial. All trial courts, whether statutory courts or superior courts, have the implied power to control their own process and ensure a fair trial. It is from this broad power that the common law developed an expansive list of remedial tools designed to ensure the fairness and effectiveness of trial processes.[FN13]

33    Justice Casey Hill, in a recent article,[FN14] exhaustively reviewed the origins and the scope of a judge's inherent powers to manage a criminal trial. His opening comments apply with equal force to civil proceedings:

> [1] Originally cast in terms of inherent authority to control the processes of the court and prevention of abuse of the process, it is today recognized that a trial judge has a duty to *manage* the trial process balancing fairness to the parties as well as efficient and orderly discharge of court process. Judicial management of litigation recognizes that "there is more at stake than just the interests of the accused". Management involves control, direction and administration in the conduct of a trial. This power, settled within a broad discretion, relates to the entirety of the trial proceeding extending beyond the scope of pre-trial case management rules designed for "effective and efficient case management"...

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

[2] While the criminal trial remains an adversarial process with a division of roles between the trial judge and counsel, the court bears responsibility for control of the trial process, achievement of a just result, and maintenance of respect for the administration of criminal justice. Avoidance of delay, efficient management of limited court time and re-sources, assistance to jurors to reach a verdict, compliance with rules of court and judicial directions designed to promote trial fairness, minimizing inconvenience, establishing a professional and civil forum for trying a case without distraction or personal disputes, and encouragement of public respect for the process, all legitimize a trial judge's authority to effectively manage a criminal trial.

[3] With the court's compass steadily pointed toward trial fairness, a trial judge's obligation to the administration of justice includes prevention of unnecessary delay or abuse of the court's process as well as attention to conservation of cost and resources. This is entirely consistent with guidelines relating to judicial conduct:

...judges are obliged to ensure that proceedings are conducted in an orderly and efficient manner and that the court's process is not abused. An appropriate measure of firmness is necessary to achieve this end. A fine balance is to be drawn by judges who are expected both to conduct the process effectively and avoid creating in the mind of a reasonable, fair minded and informed person any impression of a lack of impartiality.

. . . . .

The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court.

. . . . .

In disposing of matters promptly, efficiently and fairly, a judge must demonstrate due regard for the rights of the parties to be heard and to have issues resolved without unnecessary cost or delay. A judge should monitor and supervise cases so as to reduce or eliminate dilatory practices, avoidable delays and unnecessary costs.

34    These inherent powers are broad. It is difficult to set the limits upon the powers of the court in the exercise of its inherent jurisdiction to control and regulate its process because those limits cannot impair the need of the court to fulfill its judicial functions in the administration of justice.[FN15] That said, the exercise of inherent powers must not undermine principles of procedural natural justice or fairness. As the Court of Appeal recently pointed out, while a trial court has the inherent juris-diction to control its own process, that jurisdiction does not extend to dismissing cases without hearing the available evidence and submissions.[FN16]

*B.2 A court's inherent powers to regulate its own process apply to both the trial and pre-trial stages of proceedings*

35    Inherent powers to control the court's process are not confined to judges who preside at trials. Certainly on the civil side of the court, judges possess such inherent powers at all stages of a civil proceeding.[FN17] The scope of a court's contemporary inherent powers to control its own proceedings and to prevent abuse of its process necessarily reflects the trend that has emerged in the past few decades towards greater judicial oversight of civil proceedings. As noted in Justice Ferguson's *Ontario Courtroom Procedure*:

There has been a huge change in philosophy in civil trial procedure since the current rules came into force in 1985.

Up to that time the Rules of Practice, case law and tradition were based on the philosophy of a classic professional ad-versary system. The underlying assumption was that all parties would be represented by informed, skilled counsel whose professional skills and ethics would produce a fair trial subject to rulings by the trial judge when the parties asked for them.

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

Our current rules reflect a recognition that such an approach too often produced delay, unnecessary cost and unfairness.[FN18]

36    As a result of that recognition, the role of the judge in directing a civil proceeding has changed. The Court of Appeal has observed that the contemporary trial judge should not be regarded "as little more than a referee who must sit passively while counsel call the case in any fashion they please."[FN19] Instead, a trial judge may intervene at an appropriate time, pursuant to the court's inherent power to control its own process, to "make directions necessary to ensure that the trial proceeds in an orderly manner."[FN20] A "trial judge is entitled to manage the trial and control the procedure to ensure that the trial is effective, efficient and fair to both sides."[FN21]

37    So, too, judges have become more active in the pre-hearing phases of civil litigation. As put recently by Deschamps J. in her minority decision in *Marcotte c. Longueuil (Ville)*, "[w]hat is clear from these different sources is that the purpose of [proportionality] is to reinforce the authority of the judge as case manager. The judge is asked to abandon the role of passive arbiter."[FN22] Justice Ferguson has noted that today:

the.current philosophy in civil and family trials - and the evolving philosophy in criminal trials - is that the judge is not simply an independent observer who decides procedural issues as they are raised by counsel. The judge is now expected to manage litigation to ensure that it is efficiently and fairly dealt with.[FN23]

Even in the context of criminal proceedings, the Court of Appeal has recognized the power of judges to set schedules for the hearing of pre-trial motions as part of their responsibility of ensuring the orderly administration of justice: "Counsel are expected to comply with the schedules set by the court. This is no less true in criminal matters than in civil matters."[FN24]

38    The Alberta Court of Appeal articulated the contemporary duties and powers of judges in the following way:

In our view, it is the unpleasant duty of the courts to see to it that justice is not unduly delayed. Even when every party to a proceeding seems to be content to see litigation drag on, it is in the public interest to prevent that unhappy result. The modern concept of case management requires a judge not merely to see to it that every party has a fair hearing, but also to see to it that the parties do not abuse that right. For example, parties -and their counsel - should prepare for a step in a proceeding when preparation is required in order to move the proceedings along, and not just when it suits their calendars or their other interests. Courts today must decide, and give directions on, matters that unreasonably delay proceedings. Unreasonable delay can come from prolixity, but also hairsplitting and other techniques. *Increasingly judges in the future will be required to ration time and effort for motions and objections in terms of the quality of the application.*[FN25]

39    The purpose underlying this recognition of the enhanced role of judges to manage proceedings was succinctly put in the *Lesage-Code Report*:

The common law powers are very effective tools of judicial case management because they encourage efficient, focused and well-prepared lawyering.[FN26]

40    This same point finds expression, in slightly different terms, in the Ontario *Rules of Civil Procedure*. Judges exercise their inherent powers to manage litigation both before and during trial in order to achieve the two fundamental principles identified for civil litigation in Ontario. One fundamental principle is an end; the other, a means to that end. The end, or objective, of the judicial management of the civil process is to "secure the just, most expeditious and least expensive determination of every civil proceeding on its merits": Rule 1.04(1). The means to that end involves courts ensuring that their orders and directions "are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding": Rule 1.04(1.1). These two fundamental principles inform the contemporary inherent powers of the Superior Court of Justice to control and manage its civil process to achieve the due administration of justice in each and every case.

41    In sum, in the world of contemporary civil litigation, judges of the Ontario Superior Court of Justice necessarily possess

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

the inherent power to give directions to the parties, in appropriate cases, about the conduct and completion of both pre-hearing and hearing steps in the proceeding, so that the case receives a just, expeditious and least expensive determination on its merits and that the pre-hearing and hearing steps unfold in a proportionate manner. Such inherent powers are necessary to enable the court to act effectively within its jurisdiction.[FN27]

*B.3 The relationship between a court's inherent powers and rules of practice*

42      The Superior Court of Justice of Ontario is a superior court of record possessing "all the jurisdiction, power and au-thority historically exercised by courts of common law and equity in England and Ontario."[FN28] As such, the Superior Court of Justice enjoys the inherent, or necessary, powers to regulate and control its own proceedings and to prevent the abuse of its process. This inherent power is recognized, in part, by section 146 of the *Courts of Justice Act*, which provides that the "ju-risdiction conferred on a court...shall, in the absence of express provision for procedures for its exercise in any Act, regulation or rule, be exercised in any manner consistent with the due administration of justice."

43      A court may exercise its inherent jurisdiction or power even in respect of matters that are regulated by statute or by rules of court so long as it can do so without contravening any statutory provision.[FN29] As put by Jacob:

The powers conferred by Rules of Court are, generally speaking, additional to, and not in substitution of, powers arising out of the inherent jurisdiction of the court. The two heads of powers are generally cumulative, and not mutually exclusive, so that in any given case, the court is able to proceed under either or both heads of jurisdiction.

In *Equiprop Management Ltd. v. Harris*, Lang J. (as she then was) echoed Jacob's point when she observed that the Rules generally are considered to be in addition to, rather than in substitution for, inherent jurisdiction.[FN30] In his article, Dockray ventured that a court's inherent jurisdiction may supplement, but cannot be used to lay down procedure which is contrary to or inconsistent with, a valid rule of practice.[FN31]

44      The inherent powers of superior courts to prevent abuse of their process and ensure fairness in the trial process can only be removed by clear and precise statutory language.[FN32] However, the inherent jurisdiction of a superior court is not such as to empower a judge of that court "to make an order negating the unambiguous expression of the legislative will."[FN33]

45      In sum, the court's inherent jurisdiction, or power, to regulate, manage and control the proceedings before it co-exists with the specific rules of practice in respect of various proceedings. A court's power to control its own process is the sum of both sets of powers. Both sets of powers may operate together, with a court's inherent powers ceding only in the face of clear, unambiguous statutory, or regulatory, language that the court cannot manage its process in a specified manner.

## VII. The Nature and Content of Litigation or Case Management

46      Before dealing specifically with the issue of the powers of judges sitting on the Estates List to manage proceedings, it is important to stress that the concept of "case management" for civil cases is a broad one, and the term "case management" refers to a broad range of powers exercised by judges in the course of managing a civil proceeding.

47      A judge may intervene to manage a civil proceeding in a variety of circumstances. First, judges frequently issue di-rections for the further conduct or trial of a proceeding when disposing of a motion or application. For example, a judge hearing a motion, such as a motion to set aside a default judgment, may, as part of the disposition of the motion, give directions for further steps in the proceeding - e.g. timetabling the delivery of pleadings, affidavits of documents and the conduct of dis-coveries. This sort of case management occurs daily.

48      The Rules specifically encourage judges hearing certain motions, such as summary judgment motions, to give extensive case management directions in the event they conclude the proceeding should proceed to trial: see the extensive "check list" of directions contained in Rule 20.05(2). It is significant that Rule 20.05(2) provides that a judge should consider when disposing

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

of a summary judgment *motion* directions regarding how the *trial* should be conducted - e.g. placing time limits on the oral examination of a witness at trial; requiring that the evidence of a witness be given in whole or in part by affidavit; requiring expert witnesses to meet prior to trial and to file a joint statement setting out areas of agreement and disagreement; and, delivering concise summaries of their opening statements prior to the commencement of trial: Rules 20.05(2)(i), (j), (k) and (l).

49      In the case of an application, a judge possesses the broad power to "give such directions as are just" where the judge directs a trial of the application or any issue: Rule 38.10(1). Such directions could include how the trial of the issue should be conducted.

50      Second, judges conducting civil pre-trial conferences are now asked to consider issuing case management directions for the remaining steps in the proceeding and for the conduct of the trial: Rule 50.07(1)(c).

51      Third, it is a well established practice in the Toronto Region that counsel on certain types of cases may approach directly judges known for their expertise in a subject-matter area for assistance and directions in managing a case.

52      Fourth, parties may approach certain judges well known for their mediation skills in an effort to effect a settlement of the case.

53      Fifth, periodically a judge will have a case cross his or her radar screen, usually during a motion, where the judge concludes that the case falls into the category of those that have "fallen off the rails" and requires some litigation management in order to fulfill the fundamental objectives of the Rules. Judges will take on such cases in order to bring some semblance of order and proportionality back to the proceeding.

54      Sixth, parties to a proceeding may request formally the appointment of a judge to hear all motions in a proceeding, usually one of some complexity where numerous motions are contemplated: Rule 37.15(1).

55      Seventh, parties may make a formal request for Rule 77 case management.

56      All seven types of judicial intervention are forms of "case management" or "litigation management", in the sense that a judge intervenes in the proceeding prior to trial in order to give directions for the preparation of the case for trial, for the actual conduct of the trial, or to attempt to resolve the proceeding. As can be seen, case or litigation management may arise in a variety of circumstances and will require the application of a range of management tools in order to secure the just, most expeditious, least expensive and proportionate determination of the proceeding on its merits. As is also evident, Rule 77 case management represents only one of several different ways by which a judge can manage a proceeding. Put differently, Rule 77 case management does not exhaust the court's power to manage litigation before it; it simply provides a further tool, in addition to the court's inherent powers and other powers mentioned in the Rules, to manage a case in an effective way.

## VIII. The Powers of Judges on the Estates List to Manage Proceedings

### A. The Toronto Region Estates List

57      For administrative convenience the non-family civil work undertaken by the Superior Court of Justice in the Toronto Region has been broken down into different scheduling groups or teams: the Commercial List; Long Trials; and, Civil Motions/Short Trials. The Estates List constitutes part of the Civil Motions/Short Trials team. Judges rotate through these areas periodically, and the cases in each group are managed under the same scheduling umbrella. The Estates List is not a separate court, but simply a short-hand designation for the judge who is assigned each week to hear motions and applications involving estate, trust and capacity law.

### B. The availability of "case management" on the Toronto Region Estates List

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

58    Rule 77 establishes a mechanism by which parties can request the appointment of a case management judge or master in Toronto, Ottawa and Essex County. Rule 77.02(2) specifies that "this Rule does not apply to" a variety of matters, including proceedings on the Toronto Region Commercial List and Estates List. Pointing to that section, Stephen Abrams submitted that because Rule 77 case management does not apply to matters on the Estates List, judges who hear matters on the Estates List cannot intervene to manage cases. I see no merit in Mr. Abrams' submission for several reasons.

59    First, I see nothing in the language of Rule 77.02(2) that purports to strip judges hearing matters on the Estates or Commercial Lists of the inherent powers to manage litigation before them. Rule 77.02(2) simply states that Rule 77 case management does not apply to the Commercial List or Estates List. As I described above, Rule 77 case management constitutes only one of several different means by which a court can manage a proceeding. I see no conflict between Rule 77.02(2) and the inherent powers of judges sitting on the Estates List, or Commercial List, to manage litigation in those *fora*.

60    Second, Rule 77 has a long, and somewhat tortured, history. Its early days were reviewed by MacDonald J. in *Control & Metering Ltd. v. Karpowicz*[FN34] and *Business Depot Ltd. v. Genesis Media Inc.*[FN35] Suffice it to say that an initial effort to bring all civil proceedings in Toronto under a highly structured and formalized case flow management system collapsed under its own weight. The lack of resources needed to support such an initiative resulted in greater delays in cases, exactly the opposite of the intended result. In the Toronto Region, Rule 77 was replaced in 2005 by the "light touch" case management pilot project set out in Rule 78, and the "case management if necessary, but not necessarily case management" philosophy was carried over into the amended Rule 77 that came into effect on January 1, 2010.

61    Historically, cases on the Commercial List and Estates List were not rolled into the various Rule 77 and 78 case flow management initiatives in the Toronto Region, I suspect largely because both Lists had developed their own distinctive approaches to managing their proceedings. That approach has continued under the new Rule 77, leaving it to the Estates List and Commercial List to craft the litigation management practices best suited to the needs of the proceedings on those lists.

62    Third, Rule 77 applies only to proceedings in Toronto, Ottawa and Essex County. The exclusion of the other judicial regions in Ontario does not mean that judges in those regions lack the inherent powers to manage proceedings in their jurisdictions in accordance with local practices and resources. In fact, in the *Hallman* case I specifically noted the evidence in the record that a defined process for securing case management exists in Kitchener-Waterloo.[FN36] I have no doubt that similar litigation management practices operate in other judicial regions in Ontario, notwithstanding the language of Rule 77.

63    I conclude that judges sitting on the Toronto Region Estates List, like all other judges of the Ontario Superior Court of Justice, possess and enjoy inherent powers to manage litigation on their lists or, to use the more popular expression, to "case manage" their proceedings.

## IX. Application of these principles to the present case

### A. Stephen Abrams' alternative complaints

64    As an alternative argument Stephen Abrams submitted that even if judges on the Estates List possessed the power to manage litigation in some general way, three features of the directions contained in the March Endorsement went beyond the proper litigation management powers of a judge: (i) requiring interlocutory motions to be brought in writing; (ii) stipulating that the evidence-in-chief of witnesses at the trial be given by way of affidavit; and, (iii) setting the length of the trial.

### B. The inevitability of "judicial squeezing" in case management

65    It is apparent that Mr. Abrams has challenged my jurisdiction to make such directions because they do not accord with the way he wishes to litigate this proceeding. Judicial management of high-conflict cases, such as this one, involves, at times, a certain amount of "judicial squeezing" in order to advance the case to a hearing in a timely and proportionate manner. Not all

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

parties take kindly to such squeezing. But, it is worth recalling the comments made by Master Haberman in her decision in *Mother of God Portaitissa Saint Raphael, Nicholas, Irene & Olympia Greek Orthodox Monastery of Metropolitan Toronto Inc. v. Bakolis* where one party sought the recusal of a case management master with whose directions it did not agree:

> It is understood that, in a case managed environment, there will be times when the master forms an impression about how one party or the other has been conducting itself as a result of this repeated exposure. If the view is unfavourable, that, in and of itself, does not give rise to a basis for recusal. One must still meet the test that has been articulated by the Supreme Court of Canada. Similarly, if the master's repeated dealings with the parties and the issues gives rise to a sense that there is more merit to one side than the other, that, too, will not suffice to prevent further handling of the case. *That is precisely what case management was intended to do - create an expeditious and cost effective way to resolve all aspects of the disputes that come before the courts, by allowing judges/masters to become familiar with the case through repeated exposure.*[FN37]

In other words, some amount of judicial squeezing accompanies litigation management. If some pinching occurs, that does not signal a lack of jurisdiction or bias, but simply a necessary degree of judicial hammering to bang a case back into proper procedural shape. The recent adoption of the principle of proportionality signals that the sound of the judicial hammer will only get louder.

## C. The principle of proportionality

### C.1 Its origins as an express principle in rules of court practice

66    Although the principle of proportionality as a guide to the exercise of judicial discretion in controlling the process of the court is not a new concept, it was only earlier this year that the principle found express statement in Rule 1.04(1.1) as a foundational principle of the *Rules of Civil Procedure*: "In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding". In *Marcotte c. Longueuil (Ville)*, Deschamps J., in her minority reasons, outlined the genesis of the movement to include an express principle of proportionality in local rules of practice:

> 69 The acceptance of this principle and the increased significance attached to it originated in Lord Woolf's report on reform of the civil justice system of England and Wales: *Access to Justice - Final Report* (1996). One of the recommendations in that report was that greater proportionality be ensured between the nature of the case and the procedure used.

> 70 According to Lord Woolf, one thing that can be done to achieve justice is to deal with each case in a way that is proportionate to its importance, to the amount of money involved, to the complexity of the issues and to the parties' financial positions (*Final Report*, at p. 275). The English courts have stated that the main objective of the new rules of procedure is to control costs, which must, where possible, be proportionate to the amount of money at stake. To this end, the parties must adopt an appropriate strategy. (citations omitted)

> 71 Proportionality has been advanced as a guiding principle not only in Quebec, but also in other Canadian province and territories. For example, the British Columbia Supreme Court amended its rules of procedure in 2005 to formally incorporate this principle: Rule 68 — Expedited Litigation Project Rule ... In British Columbia, the principle of proportionality plays a significant role in case management: *Totol VisionEnterprises Inc. v. 689720 B.C. Ltd.*, 2006 BCSC 639...[FN38]

67    The inclusion of an express principle of proportionality in the Ontario *Rules of Civil Procedure* resulted from the recommendations made by the Honourable Coulter A. Osborne, Q.C., in his 2007 report on the Civil Justice Reform Project. In that report he stated that "proportionality, in the context of civil litigation, simply reflects that the time and expense devoted to a proceeding ought to be proportionate to what is at stake.[FN39]

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

*C.2 The operational scope of the principle of proportionality*

68    In *Marcotte c. Longueuil (Ville)*, the majority and minority of the Supreme Court of Canada agreed that the principle of proportionality found in article 4.2 of the Quebec *Code of Civil Procedure* ("C.C.P.")[FN40] offered a tool for judges to use in managing civil cases. As put by DesChamps J. in her minority reasons: "What is clear from these different sources is that the purpose of art. 4.2 C.C.P. is to reinforce the authority of the judge as case manager. The judge is asked to abandon the role of passive arbiter."[FN41] However, the majority and minority differed about the operational force of the principle of proportionality. The majority rejected the suggestion that proportionality was simply "a principle of interpretation that confers no real power on the courts in respect of the conduct of civil proceedings in Quebec."[FN42] Although technically *obiter*, LeBel J. offered an expansive view of the powers to manage a case which a judge could draw from the principle of proportionality:

> 43 *The principle of proportionality set out in art. 4.2 C.C.P. is not entirely new. To be considered proper, a proceeding must be consistent with it* (see Y.M. Morissette, "Gestion d'instance, proportionnalité et preuve civile: état provisoire des questions" (2009), 50 *C. de D.* 381). Moreover, the requirement of proportionality in the conduct of proceedings reflects the nature of the civil justice system, which, while frequently called on to settle private disputes, discharges state functions and constitutes a public service. This principle means that litigation must be consistent with the principles of good faith and of balance between litigants and must not result in an abuse of the public service provided by the institutions of the civil justice system. There are of course special rules for the most diverse aspects of civil procedure. The application of these rules will often make it possible to avoid having recourse to the principle of proportionality. However, *care must be taken not to deny this principle, from the outset, any value as a source of the courts' power to intervene in case management.* From this perspective, the effect of the principle of proportionality is to cast serious doubts on the appropriateness of bringing class actions to achieve the purposes being pursued in the appellants' proceedings...[FN43]

69    DesChamps J., for the minority, advanced a more modest role for the principle of proportionality. Emphasizing that proportionality is a principle, not an independent standard, DesChamps J. argued that proportionality operated as "a rule of assessment that does not alter the conditions set out in the C.C.P.", so that a judge was to apply the principle in exercising discretion when reviewing any conditions set out in the Quebec *Code of Civil Procedure*.[FN44] In sum, "this case management function does not mean that it would be open to a judge to prevent a party from exercising a right. However, the judge must uphold the principle of proportionality when considering the conditions for exercising a right."[FN45]

70    The debate in the *Marcotte* case about the operative function of proportionality in civil litigation took place in the realm of *obiter*. However, I have strong concerns that the narrower view set out in the minority reasons could see the work of the principle of proportionality frustrated before it even had a chance to start. I think that Justice Colin Campbell of this Court accurately captured the dynamic and reach of the introduction of an express principle of proportionality into the *Rules of Civil Procedure* by describing it as a step which signals a shift in the practice and culture of civil litigation.[FN46] While the *Rules of Civil Procedure* are not often compared to the Little Red Book of Chairman Mao popularized during China's Great Proletarian Cultural Revolution, I do not think it an exaggeration to characterize the recognition of proportionality in our own Little Blue (or White) Book as a "cultural revolution" in the realm of civil litigation. Proportionality signals that the old ways of litigating must give way to new ways which better achieve the general principle of securing the "just, most expeditious and least expensive determination of every proceeding on its merits." These new ways need be followed by the Bar which litigates and by the Bench, both in its adjudication of contested matters and in its management of litigation up to the point of adjudication.

71    Before dealing with each specific objection raised by Mr. Abrams, let me repeat that he did not appeal the March Endorsement. More importantly, as I pointed out in the March Endorsement, the December 19, 2008 Directions Order of Strathy J. made it obvious that he expected the trial of this proceeding to be held in 2009. It was not due to the fault of the parties. Having ignored the "light touch" directions of Strathy J., the parties should not be surprised that the next judicial intervention would possess a proportionally greater bite than the first. Or, to put it more colloquially, if parties turn their backs on a first set of judicial management directions, they can expect the court to turn up the heat on the second set. Such is one manifestation of the principle of proportionality in operation. Against this background, let me turn to the specific objections raised by Stephen

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

Adams to the directions that I gave in the March Endorsement.

### D. Motions in writing

72    As at February 24 the parties had indicated that they wished to bring refusals motions, and Mr. Stephen Abrams advised that he also wanted to bring motions to strike portions of the pleadings or affidavits of opposite parties and to vary the order of Strathy J. regarding the scope of the disclosure of his mother's financial and medical records. At the April 8 hearing Stephen Abrams indicated that he wanted to bring several additional motions - the appointment of an independent guardian or attorney of property for Ida Abrams during litigation; an examination *de bene esse* of Philip Abrams; and a determination of whether letters of Drs. McIntyre and Nusinowitz qualify as expert reports. Each case management conference seems to spawn a list of new motions which Stephen Abrams wishes to bring.

73    In paragraph 36(c)(v) of the Mareh Endorsement I directed that I would hear the refusals motions by way of writing. Stephen Abrams submitted that I lacked the jurisdiction to require the parties to argue their motions in writing. As he put it, on a motion a party has the "absolute right to present oral argument". He wants to set aside two days for oral argument of the refusals motions.

74    I must confess that I am puzzled by Mr. Abrams' opposition to the use of the efficient and proportionate device of hearing a refusals motion by way of writing in a managed proceeding. I used that method last year to hear refusals motions in a managed proceeding without any objection from the parties; they recognized that it operates as an effective way to deal with motions when the parties desire to proceed expeditiously to a final hearing.[FN47]

75    More to the point, when the parties were before me on a motion on November 9, 2009, I agreed to act as the case management judge for this proceeding. Indeed, my notes for that hearing record that it was counsel for Stephen Abrams who specifically asked that the proceeding be subject to case management. Over the course of three subsequent case management conferences I gained an understanding of the issues for adjudication in this proceeding, as well as the outstanding steps requiring completion prior to a hearing. It was in that context that I formed the view that the most efficient and proportionate manner in which to deal with the refusals motions was by way of motions in writing, and I issued directions accordingly in my March Endorsement.

76    Rule 37.15(1.2), which came into force on January 1, 2010, makes it clear that where a judge manages litigation pursuant to an appointment under Rule 37.15(1) to hear all motions, the judge "may, *in respect of the motions*, give such directions and make such procedural orders as are necessary to promote the most expeditious and least expensive determination of the proceeding." Such directions can include requiring the parties to bring motions by way of writing. In my view, a judge who is managing litigation other than under Rule 77 also possesses the inherent power to require written motions in appropriate circumstances. Case management, or litigation management, does not form part of a judge's regular work schedule, at least not in the Toronto Region; it is largely done "before hours" or "after hours", so to speak. Accordingly, a judge managing a proceeding reasonably can require parties to submit motions in writing so that the judge can more readily accommodate those motions in his or her schedule. To insist that a judge managing a proceeding must hear all motions in open court could result in significant unnecessary delays in managing litigation since a judge sitting on the civil team in the Toronto Region only hears motions periodically during a term. Written motions do not prejudice parties; a written factum can function just as effectively and fairly as oral submissions. Refusals motions especially lend themselves to a written hearing. Of course, the complexity of some motions might merit an oral hearing, but the mode of hearing for a particular motion falls within the discretion of the judge managing the proceeding, always keeping in mind the principle of proportionality.

77    Consequently, I see no merit in Stephen Abrams' argument that as the judge whom he requested manage his application I cannot issue directions requiring that certain motions be brought in writing.

### E. Imposing directions regarding the trial: requiring evidence-in-chief to be given by way of affidavit and imposing time limits on the length of trial

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

78      In paragraph 36(c)(iii) of the March Endorsement I gave the following directions regarding the trial of the issues ordered by Strathy J.:

> The trial will be a hybrid one, primarily relying on filed affidavits for a witness' evidence-in-chief, with latitude to conduct up to 30 minutes additional examination-in-chief of each party witness. Cross-examinations of each party witness shall not exceed 3 hours in length, a more than adequate amount of time given the extensive cross-examinations already conducted.

79      Stephen Abrams submitted that requiring the use of affidavit evidence at trial ignored "the general principle that evidence should be submitted orally in court" which "has been a cornerstone of our legal system for more than 200 years." With respect, that submission ignores how civil trials have evolved in this province in recent years.

80      For over a decade many trials on the Commercial List have used "sworn witness statements to replace examination in chief, in whole or in part, in appropriate circumstances": *Commercial List Practice Direction*, para. 50. The April, 2009 *Practice Direction Concerning the Estates List of the Superior Court of Justice of Toronto* adopted the practice of the Commercial List.[FN48] Trials using a hybrid record of written evidence-in-chief and *viva voce* cross-examination routinely occur in civil and family proceedings in the Toronto Region.

81      On January 2, 2010, the *Rules of Civil Procedure* finally caught up with this longstanding practice. The Rules now specifically provide that a judge who directs a trial on an unsuccessful summary judgment motion, and any judge conducting a civil pre-trial conference, may issue directions for the conduct of the trial, including that (i) the evidence of a witness at trial be given in whole or part by affidavit, (ii) any oral examination of a witness at trial be subject to a time limit, and (iii) each party deliver a concise summary of its opening statement: Rules 20.05(2)(i), (j) and (l) and 50.07(1)(c). By limiting the time for oral examination of witnesses at trial, a court can set the length of the trial.

82      Rule 53.01 states that the general rule of using *viva voce* evidence at a trial applies "unless these rules provide otherwise". The Rules now "provide otherwise" in order to reflect the reality that if proportionality is to have any meaning as a guiding principle, pre-hearing judges must be able to exercise some control over the length and process for the trial of the proceeding. Of course, any pre-trial directions given regarding the conduct of a trial ultimately are subject to the discretion of the judge presiding at the trial.

83      A judge engaged in case - or litigation - management also possesses the inherent powers to give directions regarding the mode of giving evidence-in-chief and the length of the oral examination of any witness at trial. Such powers are a necessary incident to the judge's ability to manage the case in a proportionate manner. That Rules 20.05(2) and 50.07(1)(c) do not specifically refer to judges involved in managing litigation is neither here nor there. A judge managing a case could easily direct the holding of a formal pre-trial conference and thereby engage the powers granted by Rule 50.07(1)(c). To require such formality is unnecessary; a case management judge can issue such directions, as an incident of his or her inherent powers, at an appropriate stage of the case or litigation management process.

84      For these reasons I conclude that I possessed the jurisdiction to issue the directions contained in paragraph 36(c)(iii) of the March Endorsement.

## X. Conclusion

85      By way of summary, on November 9, 2009, the applicant, Stephen Abrams, requested that this proceeding be subject to case management. When he did not like the case management directions that I issued on March 1, 2010, he subsequently argued that I lacked the jurisdiction to case manage the proceeding and issue those directions. I have explained above why I do not accept his arguments.

86      At the conclusion of the case management hearing on April 8, 2010, counsel for Stephen Abrams raised, as he put it, the

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

"A-Word". In a not so subtle fashion counsel suggested that should I not accede to Mr. Abrams' request to reverse my March Endorsement, his client would appeal my order. As I stated at the start of these reasons, courts do not negotiate their jurisdiction.

87    Stephen Abrams used the hearing on April 8, which was designed to finalize a plan for the remaining steps in this proceeding, to re-argue matters that I had already decided in my March Endorsement. I cannot manage this proceeding effectively while one of the parties - the applicant who initiated the proceeding - contests my jurisdiction to give directions when he is dissatisfied with an order I make. Accordingly, it makes no sense to me to issue final directions for the remaining steps in this proceeding until Stephen Abrams either appeals this decision or decides that he will comply with the parameters that I set for the trial of issues in my March Endorsement.

88    As a result, I defer setting a final plan for this proceeding until the time for an appeal has expired. I direct the parties to appear before me, in open court, for a further case management conference on Wednesday, June 16, 2010, at 9 a.m. If an appeal of my March Endorsement or this order remains outstanding at that time, counsel should so notify my office no later than June 14, 2010, and the June 16 hearing will be postponed until any appeal has been dealt with. If an appeal is not taken from my March Endorsement or this order, then I expect counsel to appear before me on June 16 with an agreed upon "plan to adjudicate the ordered trial of issues" in accordance with the parameters I set down in paragraph 36(c) of the March Endorsement. Until such time, of course, no further step may be taken in this proceeding without my leave, or the leave of an appellate court.

*Court has jurisdiction; order accordingly.*

FN1 *Abrams v. Abrams*, 2010 ONSC 1254 (Ont. S.C.J.)

FN2 S.O. 1992, c. 30.

FN3 (2009), 97 O.R. (3d) 544 (Ont. S.C.J.) at paras. 7-11.

FN4 2009 CanLII 51192

FN5 I. H. Jacob, "*The Inherent Jurisdiction of the Court*". (1970) 23 Curr. Legal Prob. 23 ("Jacob").

FN6 *Ibid.* at 27.

FN7 *Ibid.* at 27-28.

FN8 *Ibid.* at 51.

FN9 *R. v. Rose*, [1998] 3 S.C.R. 262 (S.C.C.), at para. 131; *R. v. Papadopoulos* (2005), 196 O.A.C. 335 (Ont. C.A.).

FN10 M.S. Dockray," *The Inherent Jurisdiction to Regulate Civil Proceedings*". (1997), 113 Law Q. Re. 120, at 126

FN11 [1964] A.C. 1254 (U.K. H.L.), at p. 1301.

FN12 Jacob, *supra.*, at 32; Dockray, *supra.*, at 122

FN13 (Queen's Printer for Ontario, 2008) at 70 ("Lesage-Code Report").

FN14 "*The Duty to Manage a Criminal Trial*" (Paper presented to the National Justice Institute, April, 2009.) Citations omitted.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645


FN15 Jacob, *supra.*, at 33.

FN16 *Park v. Lee* (2009), 98 O.R. (3d) 520 (Ont. C.A.), at 521.

FN17 As observed by the Supreme Court of Canada in *Western Canadian Shopping Centres Inc. v. Dutton*, [2001] 2 S.C.R. 534 (S.C.C.), at para. 34: "Absent comprehensive legislation, the courts must fill the void under their inherent power to settle the rules of practice and procedure as to disputes brought before them."

FN18 D.S. Ferguson, *Ontario Courtroom Procedure* (Toronto: LexisNexis, 2008) at 21 ("Ontario Courtroom Procedure").

FN19 *R. v. Felderhof* (2003), 68 O.R. (3d) 481 (Ont. C.A.) at para. 40.

FN20 *Ibid.*

FN21 *R. v. Snow* (2004), 73 O.R. (3d) 40 (Ont. C.A.) at para. 24.

FN22 2009 SCC 43 (S.C.C.) at para. 67.

FN23 *Ontario Courtroom Procedure*, at 31-32.

FN24 *R. v. Oliver*, [2005] O.J. No. 596 (Ont. C.A.) at para. 29.

FN25 *R. v. Steel*, [1995] A.J. No. 992 (Alta. C.A.) at para. 26; leave to appeal refused [1995] S.C.C.A. No. 533 (S.C.C.) (Emphasis added).

FN26 *Lesage-Code Report*, *supra.* at 71.

FN27 *Connelly v. Director of Public Prosecutions supra.*

FN28 *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 11.

FN29 Jacob, *supra.*, at 24.

FN30 (2000), 195 D.L.R. (4th) 680 (Ont. Div. Ct.), at 700-701.

FN31 Dockray, *supra.*, at 128

FN32 *R. v. Rose*, *supra.*, at 133; *R. v. Keating* (1973), 11 C.C.C. (2d) 133 (Ont. C.A.), at 135-6.

FN33 *Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475 (S.C.C.), at 480.

FN34 [1994] O.J. No. 345 (Ont. Gen. Div.), at 13 to 18.

FN35 [2000] O.J. No. 1593 (Ont. S.C.J.), at 25-27.

FN36 *Hallman v. Pure Spousal Trust (Trustee of)*, *supra.*, at 49.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellOnt 2915, 2010 ONSC 2703, 91 C.P.C. (6th) 337, 102 O.R. (3d) 645

FN37 *Mother of God Portaitissa Saint Raphael, Nicholas, Irene & Olympia Greek Orthodox Monastery of Metropolitan Toronto Inc. v. Bakolis, [2005] O.J. No. 1638 at 30* (Ont. Master) (Emphasis added.)

FN38 *Marcotte c. Longueuil (Ville), supra.*, at 69 to 71.

FN39 *Civil Justice Reform Project: Summary of Findings & Recommendations.* (Ontario Ministry of the Attorney General, 2007) at 134.

FN40 4.2 C.C.P. states: "In any proceeding, the parties must ensure that the proceedings they choose are proportionate, in terms of the costs and time required, to the nature and ultimate purpose of the action or application and to the complexity of the dispute; the same applies to proceedings authorized or ordered by the judge."

FN41 *Marcotte*, *supra.*, at 67.

FN42 *Ibid.*, at 42.

FN43 *Ibid.*, at 43. (Emphasis added.)

FN44 *Ibid.*, at 72 and 74.

FN45 *Ibid.*, at 67.

FN46 *"Proportionality"* in *Civil Justice Reform in Action: The New Rule Amendments*, CLE program held October 14, 2009. (Toronto: Law Society of Upper Canada, 2009) at 3.

FN47 *Beach v. Toronto Real Estate Board* (31 May 2009) Toronto - CV-08-366597.

FN48 See para. 65.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



# TAB2

**Consolidated Enfield Corporation** *Appellant*

*v.*

**Michael F. Blair** *Respondent*

INDEXED AS: BLAIR *v.* CONSOLIDATED ENFIELD CORP.

File No.: 23887.

Hearing and judgment: March 21, 1995.

Reasons delivered: October 19, 1995.

Present: La Forest, Sopinka, Gonthier, Cory, McLachlin, Iacobucci and Major JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Company law — Corporations — Directors and officers — Indemnity — Election of directors — Validity of proxies — President of corporation chairing annual shareholders' meeting — President ruling that certain proxies could be used to vote only in favour of management slate of directors — Court overturning ruling and awarding costs against president and corporation — Whether president entitled to be indemnified by corporation for costs — Ontario Business Corporations Act, R.S.O. 1990, c. B.16, s. 136(1).*

The respondent was the president and a director of the appellant corporation, which was plagued with infighting between him and another shareholder ("Canadian Express"). The respondent, as president of the corporation, was obliged under the by-laws to act as chairman of the annual shareholders' meeting, at which the new board of directors was to be elected. A management information circular had been issued in which 11 candidates were proposed for the 11 director positions. The respondent was part of this slate, which divided 6-5 in favour of his "camp" over Canadian Express's group. Although the Board had agreed on these candidates, at the shareholders' meeting Canadian Express nominated a surprise 12th candidate from the floor, thereby requiring a more formal election. The surprise candidate was elected, replacing the respondent. The night before the meeting, however, the respondent had been advised by corporate counsel that the proxies of Canadian Express and its supporters which had been deposited that day could be used to vote only in favour of the management slate since no specifications had been made thereon to

**Consolidated Enfield Corporation** *Appelante*

*c.*

**Michael F. Blair** *Intimé*

RÉPERTORIÉ: BLAIR *c.* CONSOLIDATED ENFIELD CORP.

No du greffe: 23887.

Audition et jugement: 21 mars 1995.

Motifs déposés: 19 octobre 1995.

Présents: Les juges La Forest, Sopinka, Gonthier, Cory, McLachlin, Iacobucci et Major.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Droit des compagnies — Sociétés — Administrateurs et dirigeants — Indemnisation — Élection d'administrateurs — Validité des procurations — Présidence de l'assemblée annuelle des actionnaires assumée par le président de la société — Décision du président que certaines procurations ne pourront être utilisées que pour voter en faveur des candidats de la direction — Tribunal renversant cette décision et condamnant le président et la société à payer des dépens — Le président a-t-il droit à l'indemnisation de frais par la société? — Loi sur les sociétés par actions de l'Ontario, L.R.O. 1990, ch. B.16, art. 136(1).*

L'intimé était président et administrateur de la société appelante, affectée par une querelle intestine entre l'intimé et un autre actionnaire («Canadian Express»). L'intimé, en sa qualité de président de la société, devait, en vertu des règlements administratifs, présider l'assemblée annuelle des actionnaires, au cours de laquelle un nouveau conseil d'administration devait être élu. La direction de la société avait distribué une circulaire d'information dans laquelle 11 candidats étaient proposés pour les 11 postes d'administrateur. L'intimé faisait partie de cette liste qui comptait six candidats du «camp» de Blair et cinq du groupe Canadian Express. Même si les membres du conseil d'administration s'étaient mis d'accord sur ces candidats, lors de l'assemblée des actionnaires, Canadian Express a proposé inopinément un douzième candidat qui se trouvait dans l'assistance, exigeant de ce fait la tenue d'une élection plus formelle. Ce candidat inopiné a été élu et a remplacé l'intimé. Toutefois, la veille de l'assemblée, les avocats de la société avaient informé l'intimé que les procurations déposées ce jour-là par Canadian Express et ses parti-

indicate otherwise. After the voting had taken place, the respondent once again solicited corporate counsel's advice on what he should do with the proxy votes. Following counsel's advice that the proxy votes in favour of the surprise candidate were invalid, the respondent declared that that candidate had received no votes and that the 11 candidates in the management circular had been elected. He refused to entertain any discussion of the decision. The respondent then convened another shareholders' meeting, for the purpose of settling the outstanding voting issues. The provincial Supreme Court found that the respondent's ruling with respect to the proxies was wrong in law and that he was in breach of his fiduciary duties. This decision was upheld on appeal. The respondent's application for an order that he be indemnified by the corporation for the legal costs incurred in defending his corporate acts was dismissed on the ground that his conduct had not been in the best interests of the company and was therefore outside the scope of the right to indemnification provided for in s. 136(1) of the Ontario *Business Corporations Act*. The Court of Appeal set aside this decision and permitted the respondent to be indemnified for all proceedings, except the appeal of the decision regarding the validity of the impugned proxies.

*Held*: The appeal should be dismissed.

Section 136(1) and the corporation's by-law which closely resembles it specify three conditions that the director or officer must fulfil in order to receive indemnification for the costs of defending litigation: (1) the person must have been made a party to the litigation by reason of being a director or an officer of the corporation; (2) the costs must have been reasonably incurred; and (3) the person must have acted honestly and in good faith with a view to promoting the best interests of the corporation. There is no reason to disturb the findings of the Court of Appeal that the expenses were reasonably incurred: (a) corporate counsel were retained in the annual meeting litigation to act for both the corporation and the respondent, in his capacity as chairman of the meeting; (b) the corporation's board reviewed the issue of whether it should have separate counsel from the respondent and determined that there were no grounds for taking such action; (c) the respondent added nothing to the costs of the litigation arising out of the shareholders' annual meeting; and (d) the respondent's conduct following the shareholders' meeting, in requisitioning

sans ne pourraient être utilisées que pour voter en faveur des candidats de la direction, étant donné qu'aucune indication de voter autrement n'y figurait. Après le vote, l'intimé a demandé, une fois de plus, aux avocats de la société des conseils sur ce qu'il devrait faire des votes par procuration. À la suite des conseils des avocats selon lesquels les votes par procuration en faveur du candidat inopiné étaient invalides, l'intimé a déclaré que ce dernier n'avait obtenu aucun vote et que les 11 candidats nommés dans la circulaire de la direction avaient été élus. Il s'est refusé à toute discussion de sa décision. L'intimé a alors convoqué une autre assemblée des actionnaires dans le but de régler les questions pendantes du scrutin. La Cour suprême de la province a conclu que la décision de l'intimé, relativement aux procurations, constituait une erreur de droit et qu'il avait manqué à ses obligations fiduciaires. La décision de la Cour suprême de la province a été maintenue en appel. La demande de l'intimé visant à obtenir une ordonnance enjoignant à la société de l'indemniser des frais de justice engagés pour défendre les actes qu'il avait accomplis à titre de président de la société a été rejetée pour le motif que sa conduite n'avait pas été au mieux des intérêts de la société, et qu'elle n'était donc pas visée par le droit à l'indemnisation prévu au par. 136(1) de la *Loi sur les sociétés par actions* de l'Ontario. La Cour d'appel a annulé cette décision et a permis à l'intimé d'être indemnisé relativement à toutes les procédures, à l'exception de l'appel de la décision portant sur la validité des procurations contestées.

*Arrêt*: Le pourvoi est rejeté.

Le paragraphe 136(1) et le règlement administratif de la société, qui lui ressemble beaucoup, énoncent trois conditions que l'administrateur ou le dirigeant doit remplir pour se faire indemniser des frais engagés pour se défendre lors d'un litige: (1) la personne doit avoir été constituée partie au litige en raison de son poste d'administrateur ou de dirigeant de la société, (2) les frais engagés doivent être raisonnables, et (3) la personne doit avoir agi avec intégrité et de bonne foi au mieux des intérêts de la société. Il n'y a aucune raison de modifier la conclusion de la Cour d'appel selon laquelle les frais engagés sont raisonnables: a) les services des avocats de la société ont été retenus, dans le cadre du litige relatif à l'assemblée annuelle, pour représenter à la fois la société et l'intimé, en sa qualité de président de l'assemblée, b) le conseil d'administration de la société s'est demandé s'il devait avoir recours à des avocats différents de ceux de l'intimé, et il a décidé que rien ne justifiait de le faire, c) l'intimé n'a rien ajouté aux frais du litige découlant de l'assemblée annuelle des actionnaires, et d) la conduite que l'intimé a adoptée, à la suite

another shareholders' meeting for the purpose of elect-
ing directors, was consistent with his protestations
throughout that he had no interest in leading the com-
pany if voted out by a majority of informed sharehold-
ers. The respondent is involved in this litigation in his
capacity as director/chairman of the corporation, not in
his personal capacity. Canadian Express's application
directly involved the corporation's reputation and the
integrity of its voting procedures; moreover, the respon-
dent's participation in the impugned proceedings flows
entirely from his role as chairman of the meeting, not
from his status as a shareholder.

The respondent has also satisfied the good faith
requirement contained in s. 136(1). Persons are assumed
to act in good faith unless proven otherwise. The best
interests of the corporation in this appeal centre solely
on the maintenance of the integrity and propriety of the
voting procedure. The duty of a chairman is one of hon-
esty and fairness to all individual interests and is
directed generally toward the best interests of the com-
pany. The fact that a chairman has an interest in the out-
come of a decision does not impugn the integrity of the
process because of the mere appearance of bias. It is the
corporation's shareholders who concluded that it is to be
the president of the company (who is allowed to be a
director) — a person who invariably is interested in
every matter discussed at the shareholders' meetings —
who is to act as chairman. In this respect, there is no
unacceptable appearance of bias because it was never
contemplated that the chairman was to be someone who
would appear to be totally disinterested in the first
place. Although a chairman has an obligation to pro-
mote administrative fairness, this is necessarily tem-
pered with the need to control and organize a meeting so
as to ensure that it proceeds effectively. In closing
debate on the proxy issue, the respondent was, based on
corporate counsel's instructions, fulfilling his responsi-
bility as chairman to see that the shareholders' instruc-
tions as set out in the proxies were followed. Further,
allowing the meeting to devolve into a shouting match
between two rival camps debating a complex and unset-
tled area of corporations law could hardly be seen as
enhancing the validity and integrity of the corporation's
voting procedure. The fact that the respondent made the
impugned ruling with the *bona fide* intent that the cor-
poration have a lawfully elected board of directors con-
stitutes evidence that he acted honestly and in good

de l'assemblée des actionnaires, en demandant qu'une
autre assemblée des actionnaires soit tenue dans le but
d'élire les administrateurs, était conforme à ses protesta-
tions répétées selon lesquelles il n'avait aucun intérêt à
diriger la société s'il n'était pas réélu par une majorité
d'actionnaires bien informés. L'intimé participe au pré-
sent litige en sa qualité d'administrateur et de président
d'assemblée de la société, et non à titre personnel. La
demande de Canadian Express concernait directement la
réputation de la société et l'intégrité de ses procédures
de scrutin; de plus, la participation de l'intimé aux pro-
cédures contestées découle entièrement de son rôle de
président de l'assemblée, et non de son statut d'action-
naire.

L'intimé a aussi satisfait à l'exigence de bonne foi du
par. 136(1). En l'absence de preuve contraire, on pré-
sume que les gens agissent de bonne foi. En l'espèce,
c'est le maintien de l'à-propos et de l'intégrité de la pro-
cédure de scrutin qui est au mieux des intérêts de la
société. Le président d'une assemblée est tenu d'agir de
façon intègre et équitable envers tous les intéressés indi-
viduellement et, en général, au mieux des intérêts de la
société. Le fait que le président d'une assemblée ait un
intérêt dans le résultat d'une décision ne compromet pas
l'intégrité du processus simplement en raison de l'appa-
rence de partialité. Ce sont les actionnaires de la société
qui ont conclu qu'il appartenait au président de la
société (qui peut être un administrateur) — une per-
sonne qui a immanquablement un intérêt dans toutes les
questions débattues aux assemblées d'actionnaires — de
présider leurs assemblées. À cet égard, il n'y a aucune
apparence inacceptable de partialité, parce qu'au départ
on n'a jamais prévu que le président devrait être quel-
qu'un qui paraîtrait complètement désintéressé. Bien
que le président d'une assemblée soit tenu de promou-
voir l'équité administrative, cela est nécessairement
tempéré par le besoin de contrôler et d'organiser une
assemblée de manière à ce qu'elle se déroule efficace-
ment. En mettant fin au débat sur la question des procu-
rations, l'intimé se trouvait, compte tenu des directives
des avocats de la société, à s'acquitter de la responsabi-
lité, qui lui incombait à titre de président de l'assemblée,
de veiller à ce que les instructions données par les
actionnaires dans les procurations soient suivies. De
plus, permettre à l'assemblée de dégénérer en un affron-
tement verbal entre deux camps rivaux qui débattent un
sujet complexe et incertain du droit des sociétés, pour-
rait difficilement être considéré comme rehaussant la
validité et l'intégrité de la procédure de scrutin de la
société. Le fait que l'intimé a pris de bonne foi la déci-
sion contestée, afin que la société ait un conseil d'admi-
nistration légalement élu, prouve qu'il a agi avec inté-

faith and with a view to the best interests of the corpora-
tion for the purposes of s. 136(1).

While mere *de facto* reliance on legal advice will not
guarantee indemnification, reliance that is reasonable
and in good faith will establish that a director or officer
acted honestly and in good faith with a view to the best
interests of the corporation. The respondent's reliance
on corporate counsel's advice in this case was both rea-
sonable and in good faith. In deciding not to reject the
advice of counsel, the respondent in fact fulfilled his
fiduciary duty. The advice given would, to a layperson
in the respondent's circumstances (and with his business
experience), have been ostensibly credible.

By following the instructions on the proxies and then
requisitioning a new shareholders' meeting, the respon-
dent gave all shareholders an opportunity to make a
fully informed decision regarding the election of the
directors, thereby promoting the integrity of the corpo-
ration's voting procedures. Canadian Express suffered
no prejudice in respect of its voting rights in that it had
the opportunity to nominate and support its surprise
candidate at the new meeting or pursue legal action
against the corporation. Instead of waiting for the newly
requisitioned meeting (at which it could have ensured
that its proxies were filled out in accordance with corpo-
rate counsel's instructions), Canadian Express took the
far more circuitous route of obtaining its candidate's
election through the court system, with the hope of
transferring the costs thereof onto the respondent.

Permitting the respondent to be indemnified is conso-
nant with the broad policy goals underlying indemnity
provisions; these allow for reimbursement for reasona-
ble good faith behaviour, thereby discouraging the hind-
sight application of perfection. Indemnification is
geared to encourage responsible behaviour yet still per-
mit enough leeway to attract strong candidates to direc-
torships and consequently foster entrepreneurism. It is
for this reason that indemnification should only be
denied in cases of *mala fides*.

## Cases Cited

Not followed: *Re Bomac Batten Ltd. and Pozhke*
(1983), 43 O.R. (2d) 344; referred·to: *General Motors
of Canada Ltd. v. Brunet*, [1977] 2 S.C.R. 537; *Alcyon*

grité et de bonne foi au mieux des intérêts de la société,
conformément au par. 136(1).

Bien que le simple fait que l'on s'en soit remis à des
conseils juridiques ne garantisse pas l'indemnisation, le
fait qu'un administrateur ou un dirigeant s'en soit remis
raisonnablement et de bonne foi à ces conseils établira
qu'il a agi avec intégrité et de bonne foi au mieux des
intérêts de la société. En l'espèce, l'intimé s'en est remis
raisonnablement et de bonne foi aux conseils des avo-
cats de la société. En décidant de ne pas rejeter les con-
seils des avocats, l'intimé a, en fait, rempli son obliga-
tion fiduciaire. Les conseils donnés auraient été
manifestement crédibles pour une personne non juriste
placée dans la situation de l'intimé (et possédant son
expérience des affaires).

En suivant les instructions contenues dans les procu-
rations et en demandant qu'une nouvelle assemblée des
actionnaires soit convoquée, l'intimé a donné à tous les
actionnaires la possibilité de prendre une décision par-
faitement éclairée au sujet de l'élection des administra-
teurs, et a préservé de ce fait l'intégrité des procédures
de scrutin de la société. Canadian Express n'a subi
aucun préjudice quant à ses droits de vote, étant donné
qu'elle avait la possibilité de nommer et d'appuyer son
candidat inopiné lors de la nouvelle assemblée, ou d'in-
tenter une action en justice contre la société. Au lieu
d'attendre la tenue de la nouvelle assemblée demandée
(à laquelle elle aurait pu s'assurer que ses procurations
seraient exécutées conformément aux directives des
avocats de la société), Canadian Express a emprunté la
voie beaucoup plus sinueuse des procédures judiciaires
pour obtenir l'élection de son candidat, en espérant que
l'intimé en assumerait les frais.

Permettre à l'intimé d'être indemnisé est conforme
aux objectifs de principe généraux qui sous-tendent les
dispositions en matière d'indemnisation; celles-ci per-
mettent le remboursement dans les cas de conduite rai-
sonnable et de bonne foi, décourageant ainsi l'applica-
tion après coup de normes de perfection.
L'indemnisation vise à encourager la conduite responsa-
ble, mais laisse tout de même assez de latitude pour atti-
rer des candidats solides aux postes d'administrateurs, et
favorise donc l'esprit d'entreprise. C'est pour cette rai-
son que l'indemnisation ne devrait être refusée que dans
les cas de mauvaise foi.

## Jurisprudence

Arrêt non suivi: *Re Bomac Batten Ltd. and Pozhke*
(1983), 43 O.R. (2d) 344; arrêts mentionnés: *General
Motors of Canada Ltd. c. Brunet*, [1977] 2 R.C.S. 537;

*Shipping Co. v. O'Krane*, [1961] S.C.R. 299; *Walters v. Essex County Board of Education*, [1974] S.C.R. 481; *Gray v. Yellowknife Gold Mines Ltd.*, [1946] O.W.N. 938; *Johnson v. Hall* (1957), 10 D.L.R. (2d) 243; *Re United Canso Oil & Gas Ltd.* (1980), 12 B.L.R. 130; *Byng v. London Life Association Ltd.* (1988), 42 B.L.R. 280; *National Dwellings Society v. Sykes*, [1894] 3 Ch. 159; *Cohen-Herrendorf v. Army & Navy Department Store Holdings Ltd.* (1986), 55 Sask. R. 134; *Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147; *Exco Corp. v. Nova Scotia Savings & Loan Co.* (1987), 35 B.L.R. 149; *Bathgate v. National Hockey League Pension Society* (1994), 16 O.R. (3d) 761, leave to appeal refused, [1994] 2 S.C.R. viii; *Canadian Merchant Service Guild v. Gagnon*, [1984] 1 S.C.R. 509; *Re City Equitable Fire Insurance Co.*, [1925] 1 Ch. 407, aff'd [1925] Ch. 500 (C.A.).

**Statutes and Regulations Cited**

*Business Corporations Act*, R.S.O. 1990, c. B.16, ss. 107, 134(1), 135(4), 136(1).
*Business Corporations Act*, R.S.S. 1978, c. B-10, s. 119.
*Business Corporations Act*, S.A. 1981, c. B-15, s. 119.
*Canada Business Corporations Act*, R.S.C., 1985, c. C-44, s. 124.
*Company Act*, R.S.B.C. 1979, c. 59, s. 152.
*Corporations Act*, R.S.M. 1987, c. C225, s. 119.
*Corporations Act*, R.S.N. 1990, c. C-36, s. 205.
*Rules of the Supreme Court of Canada*, SOR/83-74, r. 5, 51.
*Securities Act*, R.S.O. 1980, c. 466.

**Authors Cited**

Daniels, Ronald J., and Susan M. Hutton. "The Capricious Cushion: The Implications of the Directors' and Officers' Insurance Liability Crisis on Canadian Corporate Governance" (1993), 22 *Can. Bus. L.J.* 182.
Ziegel, Jacob S., et al. *Cases and Materials on Partnerships and Canadian Business Corporations*, vol. 1, 3rd ed. Toronto: Carswell, 1994.

APPEAL from a judgment of the Ontario Court of Appeal (1993), 15 O.R. (3d) 783, 106 D.L.R. (4th) 193, 66 O.A.C. 121, 12 B.L.R. (2d) 303, reversing a decision of Carruthers J., [1992] O.J. No. 2291 (QL), dismissing the respondent's application for indemnification. Appeal dismissed.

*Alcyon Shipping Co. c. O'Krane*, [1961] R.C.S. 299; *Walters c. Essex County Board of Education*, [1974] R.C.S. 481; *Gray c. Yellowknife Gold Mines Ltd.*, [1946] O.W.N. 938; *Johnson c. Hall* (1957), 10 D.L.R. (2d) 243; *Re United Canso Oil & Gas Ltd.* (1980), 12 B.L.R. 130; *Byng c. London Life Association Ltd.* (1988), 42 B.L.R. 280; *National Dwellings Society c. Sykes*, [1894] 3 Ch. 159; *Cohen-Herrendorf c. Army & Navy Department Store Holdings Ltd.* (1986), 55 Sask. R. 134; *Central Trust Co. c. Rafuse*, [1986] 2 R.C.S. 147;· *Exco Corp. c. Nova Scotia Savings & Loan Co.* (1987), 35 B.L.R. 149; *Bathgate c. National Hockey League Pension. Society* (1994), 16 O.R. (3d) 761, autorisation de pourvoi refusée, [1994] 2 R.C.S. viii; *Guilde de la marine marchande du Canada c. Gagnon*, [1984] 1 R.C.S. 509; *Re City Equitable Fire Insurance Co.*, [1925] 1 Ch. 407, conf. par [1925] Ch. 500 (C.A.).

**Lois et règlements cités**

*Business Corporations Act*, R.S.S. 1978, ch. B-10, art. 119.
*Business Corporations Act*, S.A. 1981, ch. B-15, art. 119.
*Company Act*, R.S.B.C. 1979, ch. 59, art. 152.
*Corporations Act*, R.S.N. 1990, ch. C-36, art. 205.
*Loi sur les corporations*, L.R.M. 1987, ch. C225, art. 119.
*Loi sur les sociétés par actions*, L.R.C. (1985), ch. C-44, art. 124.
*Loi sur les sociétés par actions*, L.R.O. 1990, ch. B.16, art. 107, 134(1), 135(4), 136(1).
*Règles de la Cour suprême du Canada*, DORS/83-74, art. 5, 51.
*Securities Act*, R.S.O. 1980, ch. 466.

**Doctrine citée**

Daniels, Ronald J., and Susan M. Hutton. «The Capricious Cushion: The Implications of the Directors' and Officers' Insurance Liability Crisis on Canadian Corporate Governance» (1993), 22 *Can. Bus. L.J.* 182.
Ziegel, Jacob S. et al. *Cases and Materials on Partnerships and Canadian Business Corporations*, vol. 1, 3rd ed. Toronto: Carswell, 1994.

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (1993), 15 O.R. (3d) 783, 106 D.L.R. (4th) 193, 66 O.A.C. 121, 12 B.L.R. (2d) 303, qui a infirmé la décision du juge Carruthers, [1992] O.J. No. 2291 (QL), qui avait rejeté la demande d'indemnisation de l'intimé. Pourvoi rejeté.

*Dennis R. O'Connor, Q.C.,* and *Ronald Foerster,* for the appellant.

*Patricia A. Virc,* for the respondent.

The judgment of the Court was delivered by

1    IACOBUCCI J. — This appeal was dismissed from the bench on March 21, 1995, with reasons to follow. These are those reasons.

2    This appeal requires us to determine who should bear the costs of legally contesting a disputed directors' election: the corporation, or the chairman in his personal capacity as the individual making the impugned ruling?

I. Background

3    The respondent Blair was, from 1984 to 1989, the President and a Director of the appellant Consolidated Enfield Corporation ("Enfield"). In 1989, Enfield was plagued with fairly serious corporate infighting between Blair and another shareholder, Canadian Express Limited ("Canadian Express"), which had, in 1988, elected some of its officers (Willard L'Heureux and Manfred Walt) to Enfield's Board of Directors.

4    The dispute came to a head on July 20, 1989 when Enfield's annual shareholders' meeting was scheduled to take place. Blair, as President of the company, was obliged under the by-laws to act as chairman. One of the matters on the agenda was the election of the new Board of Directors. A management information circular had been previously issued in which 11 candidates were proposed for the 11 director positions. Blair was part of this slate, which divided 6-5 in favour of Blair's "camp" over the Canadian Express group.

5    Although the Board had agreed on these candidates, on the day of the shareholders' meeting, Canadian Express nominated a surprise 12th candidate from the floor, Timothy Price, thereby requir-

*Dennis R. O'Connor, c.r.,* et *Ronald Foerster,* pour l'appelante.

*Patricia A. Virc,* pour l'intimé.

Version française du jugement de la Cour rendu par

LE JUGE IACOBUCCI — Notre Cour a rejeté le présent pourvoi à l'issue de l'audience tenue le 21 mars 1995, affirmant qu'elle ferait connaître ses motifs ultérieurement. Voici donc ces motifs.

Ce pourvoi nous oblige à déterminer qui devrait assumer les frais de contestation judiciaire d'une élection d'administrateurs: la société en cause, ou son président, à titre personnel, pour avoir pris la décision contestée?

I. Les faits

L'intimé Blair a été, de 1984 à 1989, président et administrateur de l'appelante Consolidated Enfield Corporation («Enfield»). En 1989, Enfield a été affectée par une assez sérieuse querelle intestine entre Blair et un autre actionnaire, Canadian Express Limited («Canadian Express»), qui avait, en 1988, élu certains de ses dirigeants (Willard L'Heureux et Manfred Walt) au conseil d'administration d'Enfield.

La querelle a atteint son paroxysme le 20 juillet 1989, au moment de fixer la date de l'assemblée annuelle des actionnaires d'Enfield. Blair, en sa qualité de président de la société, devait, en vertu des règlements administratifs, présider l'assemblée. L'élection d'un nouveau conseil d'administration était l'un des points à l'ordre du jour. La direction de la société avait précédemment distribué une circulaire d'information dans laquelle 11 candidats étaient proposés pour les 11 postes d'administrateur. Blair faisait partie de cette liste qui comptait six candidats du «camp» de Blair et cinq du groupe Canadian Express.

Même si les membres du conseil d'administration s'étaient mis d'accord sur ces candidats, lors de l'assemblée des actionnaires, Canadian Express a proposé inopinément un douzième candidat,

ing a more formal election. According to Canadian Express, although it had originally intended to vote for the management slate of directors, including Blair, Blair's actions in the months before the election (during which Canadian Express alleges that it and Blair had signed an "accord" to work together in the best interests of Enfield) purportedly indicated that he had no intention of co-operating with the Canadian Express camp.

The Canadian Express camp, with Walt being the proxyholder for these shares, combined with Ravelston Corporation Limited (another shareholding group whose proxyholder was John Boultbee) and together pooled their voting shares. Their coalition represented 43 percent of the total shares and a majority of the shares actually voted at the meeting. The one candidate they did not vote for was Blair. For his part, Blair, through his own holdings (14 percent of Enfield), plus substantial management proxy support, culled together 41 percent of the total shares. The effect of the election was that Blair was out and Price was in as the 11th director. This reflected a total change in control of the Board in favour of the nominees of Canadian Express.

There was, however, one major complication. On July 19, 1989, the night before the shareholders' meeting, the respondent had met with a representative of the scrutineer, Montreal Trust Company, and Enfield's corporate counsel, Osler, Hoskin & Harcourt ("Osler"), who had advised him that the Canadian Express and Ravelston proxies which had been deposited that day could be used to vote only in favour of the management slate since the instructions in the proxies (specifically Note 3 thereof) restricted the proxyholders to voting for the management slate because no specifications had been made thereon by the shareholders to indicate voting otherwise. Osler also noted

Timothy Price, qui se trouvait dans l'assistance, exigeant de ce fait la tenue d'une élection plus formelle. Canadian Express a affirmé que, même si elle avait d'abord eu l'intention de voter en faveur de la liste de candidats préparée par la direction et dont Blair faisait partie, les actes que ce dernier avait accomplis au cours des mois précédant l'élection (pendant lesquels il aurait, selon Canadian Express, signé avec elle une «entente» pour mettre en commun leurs efforts au mieux des intérêts d'Enfield) portaient à croire qu'il n'avait nullement l'intention de collaborer avec le camp de Canadian Express.

Le camp de Canadian Express, dont Walt étant    6
le fondé de pouvoir pour les actions qu'il détenait, et Ravelston Corporation Limited (autre groupe actionnaire, dont le fondé de pouvoir était John Boultbee) ont joint leurs actions avec droit de vote. Ensemble, les deux sociétés détenaient 43 pour 100 de toutes les actions et la majorité des actions assorties d'un droit de vote qui a été effectivement exercé à l'assemblée. Blair a été le seul candidat pour lequel elles n'ont pas voté. Pour sa part, Blair, grâce aux actions qu'il détenait lui-même (14 pour 100 des actions d'Enfield) et à l'appui important des procurations de la direction, réunissait 41 pour 100 de l'ensemble des actions. L'élection a entraîné le remplacement de Blair par Price au onzième poste d'administrateur et il en a résulté un changement complet de contrôle du conseil d'administration en faveur des candidats de Canadian Express.

Un ennui majeur est cependant survenu. Le 19    7
juillet 1989, la veille de l'assemblée des actionnaires, l'intimé a rencontré un représentant du scrutateur, la Compagnie Montréal Trust, et les avocats d'Enfield, Osler, Hoskin & Harcourt («Osler»), qui l'ont informé que les procurations déposées ce jour-là par Canadian Express et Ravelston ne pouvaient être utilisées que pour voter en faveur des candidats de la direction, étant donné que les instructions contenues dans ces procurations (notamment la note 3) prévoyaient que les fondés de pouvoir ne devraient voter que pour les candidats de la direction, les actionnaires n'ayant donné dans leurs procurations aucune autre

that the *Securities Act*, R.S.O. 1980, c. 466, provided that votes cast pursuant to proxies could not be counted in favour of a candidate not named in the circular. Osler also delivered to Enfield several written memoranda dealing with procedural matters, the role of the chair, and the principles relating to the validity of the proxies.

8     The next day, after the voting had taken place on the surprise candidacy of Price, Blair once again solicited Osler's advice on what he should do with the proxy votes. He turned towards corporate counsel and queried: "You know the law, I will take my direction from you. What should I do?". There were six senior corporate lawyers from Osler present at this *ad hoc* meeting and, before they reached their decision, they deliberated for over one and one half hours in part with the scrutineers while remaining in constant contact with solicitors in their head office. Following Osler's advice that the proxy votes in favour of Price were invalid, Blair, reading verbatim from a statement prepared by Osler, declared that Price had received no votes and that the 11 candidates in the management circular had been elected. When L'Heureux vigorously objected to this decision, Blair refused to entertain any discussion thereon, telling L'Heureux to take the matter up with Enfield's counsel.

9     Instead, the Canadian Express representatives immediately filed an application in the Ontario Supreme Court to the effect that Blair's ruling was wrong in law and that Price, not Blair, should have been elected as the 11th director. Both Blair and Enfield were named as co-respondents. Mention was made of the fact that Blair allegedly breached his quasi-judicial duties as chairman by not ceding the chair when the issue he was to rule upon so directly involved his own interests, as well as by foreclosing debate on the ruling and by not giving notice to Canadian Express as to the limitations of their proxy-holding power. On September 25, 1989, J. Holland J. found that Blair's ruling was

indication de voter autrement. Osler a aussi fait remarquer que la *Securities Act*, R.S.O. 1980, ch. 466, prévoyait que les suffrages exprimés conformément à une procuration ne pouvaient pas compter en faveur d'un candidat non nommé dans la circulaire. Osler a aussi remis `à Enfield plusieurs mémoires portant sur des questions de procédure, le rôle du président de l'assemblée et les principes relatifs à la validité des procurations.

Le lendemain, après le vote portant sur la candidature inopinée de Price, Blair a demandé, une fois de plus, à Osler des conseils sur ce qu'il devrait faire des votes par procuration. Il s'est adressé aux avocats de la société et leur a demandé: [TRADUC-TION] «Vous connaissez la loi. Je vais faire ce que vous me direz de faire. Qu'est-ce que je devrais faire?». Six avocats principaux d'Osler, spécialisés en droit des sociétés, assistaient à cette réunion spéciale et ils ne sont parvenus à une décision qu'après avoir délibéré pendant plus d'une heure et demie, en partie avec les scrutateurs, tout en restant en contact permanent avec des avocats de leur bureau principal. À la suite des conseils d'Osler selon lesquels les votes par procuration en faveur de Price étaient invalides, Blair a déclaré, en lisant textuellement une déclaration rédigée par Osler, que Price n'avait obtenu aucun vote et que les 11 candidats nommés dans la circulaire de la direction avaient été élus. Lorsque L'Heureux s'est opposé énergiquement à cette décision, Blair s'est refusé à toute discussion sur le sujet, lui disant de s'adresser aux avocats d'Enfield.

Au lieu de cela, les représentants de Canadian Express ont immédiatement déposé une demande en Cour suprême de l'Ontario, dans laquelle ils alléguaient que la décision de Blair constituait une erreur de droit et que c'était Price, et non Blair, qui aurait dû être élu au onzième poste d'administrateur. Blair et Enfield étaient tous les deux désignés comme cointimés. On mentionnait que Blair aurait manqué aux obligations quasi judiciaires qui lui incombaient à titre de président de l'assemblée, en ne cédant pas la présidence alors que la question qu'il allait trancher mettait si directement en cause ses propres intérêts, en refusant tout débat sur sa décision et en n'avisant pas Canadian Express des

wrong in law and that Blair was in breach of his fiduciary duties. He thus allowed the application, concluding that the ballots were legally cast for Price, in accordance with the proxies, and, consequently, that the respondent had not been elected a director. Costs were issued against Blair and Enfield.

Blair sought to appeal the substantive findings of J. Holland J. to Ontario Divisional Court. This appeal was unsuccessful.

Since Canadian Express was then in control of Enfield, it sought to recover its costs from Blair alone. Blair then applied to Enfield to be indemnified for these costs, which indemnification was refused.

Blair then filed an application under s. 4.02 of Enfield By-law No. 3, which essentially incorporates the terms of the statutory right to indemnification found in s. 136(1) of the Ontario *Business Corporations Act*, R.S.O. 1990, c. B.16, and in the business corporations statutes of most of the provinces as well as the federal business corporations statute, for an order that he be indemnified by Enfield for the legal costs incurred in defending his corporate acts.

On October 28, 1992, Carruthers J. dismissed the respondent's application, concluding that the respondent's conduct was not in the best interests of Enfield and thereby outside the scope of s. 136(1): [1992] O.J. No. 2291 (QL). Blair's appeal to the Court of Appeal for Ontario was allowed on October 6, 1993: (1993), 15 O.R. (3d) 783, 106 D.L.R. (4th) 193, 66 O.A.C. 121, 12 B.L.R. (2d) 303. Enfield, now controlled by Canadian Express, appeals to this Court.

limites de son pouvoir de procuration. Le 25 septembre 1989, le juge J. Holland a conclu que la décision de Blair constituait une erreur de droit et que Blair avait manqué à ses obligations fiduciaires. Il a donc accueilli la demande, concluant que les suffrages avaient été légalement exprimés en faveur de Price, conformément aux procurations, et que l'intimé n'avait donc pas été élu administrateur. Blair et Enfield ont été condamnés au paiement de dépens.

Blair à interjeté appel contre les conclusions de fond du juge J. Holland devant la Cour divisionnaire de l'Ontario. Cet appel a échoué. [10]

Étant donné que Canadian Express avait alors le contrôle d'Enfield, elle a cherché à se faire rembourser ses frais par Blair seulement. Blair a ensuite demandé à Enfield de l'indemniser de ces frais, ce qui lui a été refusé. [11]

Blair s'est alors appuyé sur l'art. 4.02 du règlement administratif n° 3 d'Enfield, qui reprend essentiellement les conditions du droit à l'indemnisation prévu au par. 136(1) de la *Loi sur les sociétés par actions* de l'Ontario, L.R.O. 1990, ch. B.16, ainsi que dans les lois sur les sociétés par actions de la plupart des provinces et la loi fédérale en la matière, pour déposer une demande d'ordonnance enjoignant à Enfield de l'indemniser des frais de justice engagés pour défendre les actes qu'il avait accomplis à titre de président de la société. [12]

Le 28 octobre 1992, le juge Carruthers a rejeté la demande de l'intimé, concluant que la conduite que ce dernier avait adoptée n'était pas au mieux des intérêts d'Enfield et qu'elle ne relevait donc pas du par. 136(1): [1992] O.J. No. 2291 (QL). L'appel de Blair devant la Cour d'appel de l'Ontario a été accueilli le 6 octobre 1993: (1993), 15 O.R. (3d) 783, 106 D.L.R. (4th) 193, 66 O.A.C. 121, 12 B.L.R. (2d) 303. Enfield, maintenant contrôlée par Canadian Express, se pourvoit devant notre Cour. [13]

II. Relevant Statutory Provisions and Corporate By-Laws

Ontario *Business Corporations Act*, R.S.O. 1990, c. B.16 (OBCA)

134. — (1) Every director and officer of a corporation in exercising his or her powers and discharging his or her duties shall,

(a) act honestly and in good faith with a view to the best interests of the corporation; and

(b) exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

135. ...

(4) A director is not liable under section 130 or 134 if the director relies in good faith upon,

. . .

(b) a report of a lawyer, accountant, engineer, appraiser or other person whose profession lends credibility to a statement made by any such person.

136. — (1) A corporation may indemnify a director or officer of the corporation . . . against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by him or her in respect of any civil, criminal or administrative action or proceeding to which he or she is made a party by reason of being or having been a director or officer of such corporation or body corporate, if,

(a) he or she acted honestly and in good faith with a view to the best interests of the corporation; . . .

Enfield By-law No. 3

4.02 Indemnity of Directors and Officers. Subject to the limitations contained in the [OBCA], every director or officer of the Corporation . . . shall, from time to time, be indemnified and saved harmless . . . from and against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by him in respect of any civil, criminal or administrative action or proceeding to which he is made a party by reason of being or having been a director or officer of such corporation . . . if (a) he acted honestly and in good faith with a view to the best interests of the Corporation . . . .

II. Dispositions législatives et règlements administratifs pertinents

*Loi sur les sociétés par actions* de l'Ontario, L.R.O. 1990, ch. B.16 (LSA)

134 (1) Les administrateurs et les dirigeants, dans l'exercice de leurs fonctions, agissent:

a) d'une part, avec intégrité et de bonne foi au mieux des intérêts de la société;

b) d'autre part, avec le soin, la diligence et la compétence dont ferait preuve, dans des circonstances semblables, une personne d'une prudence raisonnable.

135. . . .

(4) N'est pas engagée, en vertu de l'article 130 ou 134, la responsabilité de l'administrateur qui, de bonne foi, se fie:

. . .

b) à un rapport émanant d'un avocat, d'un comptable, d'un ingénieur, d'un estimateur ou d'une autre personne dont la profession permet d'ajouter foi à ses déclarations.

136 (1) La société peut indemniser ses administrateurs ou dirigeants [. . .] de tous les frais et de toutes les dépenses raisonnables, y compris les sommes versées pour le règlement d'une action ou pour satisfaire à un jugement, qu'ils ont engagés à l'égard d'une action ou d'une instance civile, pénale ou administrative à laquelle ils ont été parties à titre d'administrateurs ou de dirigeants ou d'anciens administrateurs ou dirigeants de la société ou de la personne morale, si:

a) d'une part, ils ont agi avec intégrité et de bonne foi au mieux des intérêts de la société;

Règlement administratif n° 3 d'Enfield

[TRADUCTION] 4.02 Indemnisation d'administrateurs et de dirigeants. Sous réserve des restrictions prévues dans la [LSA], tout administrateur ou dirigeant de la société [. . .] devra, à l'occasion, être indemnisé [. . .] de tous les frais et de toutes les dépenses raisonnables, y compris les sommes versées pour le règlement d'une action ou pour satisfaire à un jugement, qu'il a engagés à l'égard d'une action ou d'une instance civile, pénale ou administrative à laquelle il a été partie à titre d'administrateur ou de dirigeant ou d'ancien administrateur ou dirigeant de la société [. . .] si a) il a agi avec intégrité et de bonne foi au mieux des intérêts de la société . . .

III. Judgments Below

A. *Ontario Supreme Court* (1989), 46 B.L.R. 92, *per* J. Holland J. (*sub nom. Canadian Express Ltd. v. Blair*)

It is important to emphasize that it is not J. Holland J.'s decision that is appealed to this Court. The application before J. Holland J. was launched by Canadian Express to overrule, on the merits, Blair's decision to void the proxy votes tabulated in favour of Price. J. Holland J. found in favour of Canadian Express and named Price, not Blair, as the 11th director of Enfield. Blair appealed J. Holland J.'s decision; his application was summarily dismissed. However, a review of J. Holland J.'s decision is warranted since it (1) provides a factual background to the s. 136(1) issue involved in the present appeal, and (2) constitutes the first tier of the proceedings for which Blair is presently seeking indemnification. The matter before J. Holland J. is thus the underlying "litigation" for which Blair wishes his reasonable expenses defrayed by Enfield.

I note that the proceedings before J. Holland J. were commenced by Canadian Express even though Blair had convened another shareholders' meeting on July 24, 1989, ostensibly for the purpose of settling the outstanding voting issues. Blair was added to these proceedings in his capacity and status as a director of Enfield and as chairman of the shareholders' meeting of July 20, 1989.

J. Holland J. concluded (at p. 94) that "the true construction of the disputed proxies is that they conferred general discretion" on the proxyholders. He found that the proxies "were effectively converted to unsolicited shareholder proxies once the names of the proposed management proxyholders were deleted and the names of the shareholder designees were inserted". They were thus valid.

III. Juridictions inférieures

A. *Cour suprême de l'Ontario* (1989), 46 B.L.R. 92, le juge J. Holland (*sub nom. Canadian Express Ltd. c. Blair*)

Il importe de souligner que ce n'est pas contre la [14] décision du juge J. Holland que l'on se pourvoit devant notre Cour. La demande présentée au juge J. Holland provenait de Canadian Express et avait pour objet de faire renverser, pour une raison de fond, la décision de Blair d'annuler les suffrages exprimés par procuration en faveur de Price. Le juge J. Holland a conclu en faveur de Canadian Express et a nommé Price, non Blair, au onzième poste d'administrateur d'Enfield. Blair en a appelé de la décision du juge J. Holland, mais son appel a été rejeté sommairement. Cependant, un examen de la décision du juge J. Holland est justifié étant donné (1) qu'elle fournit un contexte factuel relativement à la question du par. 136(1) qui se pose en l'espèce, et (2) qu'elle constitue la première étape des procédures pour lesquelles Blair cherche maintenant à se faire indemniser. L'affaire dont a été saisi le juge J. Holland constitue donc le «litige» sous-jacent à l'égard duquel Blair souhaite être indemnisé par Enfield des dépenses raisonnables qu'il a engagées.

Je constate que les procédures devant le juge J. [15] Holland ont été engagées par Canadian Express, même si Blair avait convoqué une autre assemblée des actionnaires le 24 juillet 1989, manifestement dans le but de régler les questions pendantes du scrutin. Blair a été constitué partie à ces procédures en sa qualité d'administrateur d'Enfield et de président de l'assemblée des actionnaires du 20 juillet 1989.

Le juge J. Holland conclut (à la p. 94) que, [TRA- [16] DUCTION] «d'après leur sens véritable, les procurations contestées conféraient une discrétion générale» aux fondés de pouvoir, et que les procurations [TRADUCTION] «ont été effectivement converties en procurations d'actionnaires non sollicitées une fois que les noms des fondés de pouvoir proposés par la direction ont été supprimés et remplacés par les noms des personnes désignées par les actionnaires». Elles étaient donc valides.

17    J. Holland J. noted "the importance of enabling shareholders to freely exercise their voting rights in accordance with their intentions" and underscored that "shareholder designees who hold blank proxies . . . are recognized as having full discretion to vote as they see fit, just as the shareholders in person at the meeting could vote" (p. 94). He stated that the disputed proxies should be construed "in light of surrounding circumstances and, where possible, in a manner consistent with business common sense" (p. 95). With these considerations in mind, J. Holland J. held (at p. 95) that:

I accept that [the proxyholders] were entitled to vote a total of 19,038,296 shares, which was more than 50 per cent of the shares represented at the meeting. There is no doubt on the evidence that the proxyholders intended to, and *did*, cast their votes for Price and not for Blair. [Emphasis in original.]

18    J. Holland J. found that the respondent "failed to meet the quasi-judicial standard of conduct demanded of a chairman" (p. 95). He stated that, based on the evidence, it could be reasonably inferred that the respondent was alerted to the fact that the election of directors would be contentious and that he was likely to be in a position of conflict. He noted that the respondent, when he reconvened the meeting to announce the results of the balloting, read from a statement prepared by his solicitors, stating that Price had received no votes and that he had been elected. He found that this was in accordance with the plan conceived by the respondent to protect his personal interests and that it was no excuse for Blair to say that he relied upon legal advice. J. Holland J. then concluded (at p. 96) that:

From the tally, it was clear that all the votes cast by [the proxyholders] for Price had, by reason of the chairman's decision, been counted as votes resulting in his own election. He did not permit discussion at the meeting as to this decision. At the very least, he had an obligation to allow those affected by his ruling on the dis-

Le juge J. Holland a constaté [TRADUCTION] «l'importance de permettre aux actionnaires d'exercer librement leur droit de vote conformément à leurs intentions» et a souligné qu'[TRADUCTION] «il est reconnu que les personnes désignées par les actionnaires, qui détiennent des procurations en blanc [. . .] sont entièrement habilitées à voter comme elles l'entendent, tout comme les actionnaires eux-mêmes le feraient s'ils étaient présents à l'assemblée» (p. 94). Il a affirmé qu'il y avait lieu d'interpréter les procurations contestées [TRADUCTION] «à la lumière des circonstances et, dans la mesure du possible, conformément au bon sens des affaires» (p. 95). Ayant ces considérations à l'esprit, le juge J. Holland conclut (à la p. 95):

[TRADUCTION] J'accepte que [les fondés de pouvoir] pouvaient exercer le droit de vote dont étaient assorties en tout 19 038 296 actions, soit plus de 50 pour 100 des actions représentées à l'assemblée. La preuve ne permet pas de douter que les fondés de pouvoir avaient l'intention de voter et ont *effectivement* voté pour Price, et non pour Blair. [En italique dans l'original.]

Le juge J. Holland a décidé que l'intimé [TRADUCTION] «n'a pas satisfait aux normes quasi judiciaires qui s'appliquent à la conduite d'un président d'assemblée» (p. 95). Il a affirmé que, compte tenu de la preuve, on pouvait raisonnablement déduire que l'intimé était conscient du fait que l'élection des administrateurs serait controversée et qu'il se trouverait vraisemblablement dans une position de conflit d'intérêts. Le juge a fait remarquer que, lorsqu'il a convoqué de nouveau l'assemblée pour annoncer les résultats du scrutin, l'intimé a lu une déclaration préparée par ses avocats, selon laquelle Price n'avait obtenu aucun vote, et lui-même avait été élu. Le juge J. Holland a conclu que cela concordait avec le projet de l'intimé de protéger ses intérêts personnels, et que Blair ne pouvait pas invoquer comme excuse qu'il s'en était remis à des conseils juridiques. Le juge J. Holland conclut alors (à la p. 96):

[TRADUCTION] Le compte des résultats montrait clairement que tous les votes accordés à Price par [les fondés de pouvoir] avaient été, en raison de la décision du président de l'assemblée, comptés comme étant des votes lui permettant lui-même d'être élu. Il n'a pas permis que sa décision soit débattue à l'assemblée. Il se

puted ballots an opportunity to be heard. He chose to act as Judge in his own cause and it is properly inferred from the evidence that he had determined to act in this way, at least at the time of the July 19 meeting and until the announcement of the voting results. In view of Blair's conduct alone and quite apart from the true construction of the proxies, his ruling cannot stand.

It was Blair's decision and not that of the scrutineers to determine the ballots in this way. It is no excuse for Blair to say that in doing so he was relying upon legal advice. It was his responsibility to conduct himself quasi-judicially throughout the proceedings.

J. Holland J. stated that, in exercising his discretion as to costs, he did so on the basis of the relationship of the respondent and Enfield in the sense that the respondent breached his fiduciary duty following legal advice given by Enfield's solicitors. J. Holland J. concluded that Canadian Express was entitled to costs against both Blair as well as Enfield. These were assessed (after an assessment appeal) at \$165,432.67.

Blair appealed J. Holland J.'s order as to the proxy votes. This appeal was dismissed. He then commenced an application in the Ontario Court (General Division) for a declaration that Enfield was to indemnify him for all costs, charges and expenses incurred by him in respect of the proceedings before J. Holland J. It is to this issue that I now turn.

B. *Ontario Court (General Division)*

Carruthers J. denied Blair's claim for indemnification.

Carruthers J. stated that the onus was on the respondent, pursuant to s. 136(1) OBCA, to demonstrate, on a balance of probabilities, that he "acted honestly and in good faith with a view to the best interests" of Enfield throughout the litigation. However, Carruthers J. stated that, "following my opportunity to reflect on the merits of this application on the basis of the material filed with

devait tout au moins d'entendre les gens touchés par sa décision sur les bulletins de vote contestés. Il a choisi d'être à la fois juge et partie, et on peut déduire à bon droit de la preuve qu'il avait décidé d'agir ainsi, au moins lors de la réunion du 19 juillet, et jusqu'à l'annonce des résultats du scrutin. Compte tenu de la seule conduite de Blair, et tout à fait indépendamment du sens véritable des procurations, sa décision ne peut être maintenue.

Le résultat du scrutin a été déterminé par la décision de Blair et non par celle des scrutateurs. Blair ne peut invoquer comme excuse qu'il s'en est remis à des conseils juridiques. Il avait la responsabilité de se conduire d'une manière quasi judiciaire pendant toutes les procédures.

Le juge J. Holland a affirmé qu'il a exercé son pouvoir discrétionnaire en matière de dépens en se fondant sur la relation entre l'intimé et Enfield, en ce sens que l'intimé avait manqué à son obligation fiduciaire à la suite des conseils juridiques donnés par les avocats d'Enfield. Le juge J. Holland a conclu que Canadian Express avait droit au paiement de dépens tant par Blair que par Enfield. Ces dépens ont été fixés à 165 432,67 \$ (après un appel relatif à leur évaluation). **19**

Blair en a appelé de l'ordonnance du juge J. Holland quant aux votes par procuration. Cet appel a été rejeté. Il a alors déposé devant la Cour de l'Ontario (Division générale) une demande de jugement déclarant qu'Enfield devrait l'indemniser de tous les frais et dépenses qu'il avait engagés à l'égard des procédures intentées devant le juge J. Holland. C'est de cette question que je vais maintenant traiter. **20**

B. *Cour de l'Ontario (Division générale)*

Le juge Carruthers a rejeté la demande d'indemnisation de Blair. **21**

Le juge Carruthers a affirmé qu'il incombait à l'intimé, conformément au par. 136(1) LSA, de démontrer, selon la prépondérance des probabilités, qu'il avait «agi avec intégrité et de bonne foi au mieux des intérêts» d'Enfield pendant tout le litige. Cependant, le juge Carruthers a dit qu'[TRADUCTION] «après avoir réfléchi sur le bien-fondé de la présente demande en tenant compte des docu- **22**

the court to this point, I have been able to reach my conclusion without having to determine the issue of good faith on the part of Blair". In the end, Carruthers J. simply found that, since Blair's involvement in the Canadian Express application had not been undertaken with a view to Enfield's best interests, he was not entitled to indemnification.

23     Carruthers J. stated that the respondent's honesty and good faith were relevant for the purposes of the trial judge, who was not concerned with whether the respondent acted "with a view to the best interests of" Enfield in defending the litigation. Carruthers J. then stated that he had to be concerned with this last issue as it related to the respondent's conduct or involvement in the litigation. He concluded that:

The applicable provisions of the Act or by-law require that his involvement in that litigation be in the best interests of Enfield quite apart from whether it can also be described as honest and in good faith. Thus, whether Blair was in fact acting honestly and in good faith during the course of his disputing or defending the claims of Canadian Express raised in the litigation, he is not entitled to succeed in this present application unless, as well, what he did can be said to have been in the best interests of Enfield.

24     Carruthers J. was of the view that the dispute was about the control of Enfield and "involved efforts by both sides to either preserve or promote their respective desires and interests in this respect". He found that the respondent, on the advice of Enfield's solicitors, reached the decision that he had been elected. The question at this point was whether the respondent had done this "in order to promote the best interests of Enfield". Carruthers J. concluded that:

... Blair's conduct at the meeting, including his decision, was not something that can be said to have been in the best interests of Enfield. Accordingly, because the sole purpose of disputing the claims raised on behalf of Canadian Express in the litigation was to uphold Blair's conduct, again including his decision, Blair cannot fit

ments qui ont été déposés en cour jusqu'ici, j'ai pu arriver à une conclusion sans qu'il me soit nécessaire de statuer sur la question de la bonne foi de Blair». Finalement, le juge Carruthers a simplement conclu que Blair n'avait pas le droit d'être indemnisé étant donné qu'il n'avait pas agi au mieux des intérêts d'Enfield relativement à la demande de Canadian Express.

Le juge Carruthers a affirmé que l'intégrité et la bonne foi de l'intimé étaient pertinents en ce qui concernait le juge de première instance qui ne s'intéressait pas à la question de savoir si l'intimé avait agi «au mieux des intérêts» d'Enfield dans sa défense tours du litige. Le juge Carruthers a alors déclaré qu'il devait s'intéresser à cette dernière question étant donné qu'elle avait trait à la conduite de l'intimé ou à sa participation au litige. Il conclut ceci:

[TRADUCTION] Les dispositions applicables de la Loi ou du règlement administratif exigent que sa participation à ce litige soit au mieux des intérêts d'Enfield, tout à fait indépendamment de la question de savoir si elle peut aussi être décrite comme procédant de l'intégrité et de la bonne foi. Ainsi, peu importe que Blair ait effectivement agi avec intégrité et de bonne foi en contestant les réclamations faites par Canadian Express dans le cadre du litige, il ne pourra pas avoir gain de cause relativement à la présente demande à moins que l'on puisse dire également que ce qu'il a fait était au mieux des intérêts d'Enfield.

Le juge Carruthers était d'avis que le litige portait sur le contrôle d'Enfield et qu'il y [TRADUCTION] «était question d'efforts déployés par les deux camps pour préserver ou promouvoir leurs volontés et intérêts respectifs à cet égard». Il a jugé que l'intimé, sur les conseils des avocats d'Enfield, avait décidé qu'il avait été élu. À ce stade, il s'agissait de savoir si l'intimé avait fait cela [TRADUCTION] «pour promouvoir les intérêts d'Enfield». Le juge Carruthers conclut:

[TRADUCTION] ... on ne pouvait pas dire que la conduite de Blair lors de l'assemblée, y compris sa décision, avait été au mieux des intérêts d'Enfield. Par conséquent, étant donné que la contestation des réclamations présentées pour le compte de Canadian Express dans ce litige visait seulement à faire entériner la conduite de Blair, y

himself into either the provisions of s. 136(1) of the OBCA or of s. 4.02 of the Enfield By-Law No. 3.

Both Blair and Enfield were properly named as parties to the litigation; Blair chaired and ran the meeting and made the decision, and Enfield to be bound by the result . . . . [a]s that matter was one personal to him, and as well to the other shareholders who supported him, Enfield is not liable to indemnify Blair for the costs, charges and expense which he has incurred by reason of defending the litigation.

### C. *Ontario Court of Appeal* (1993), 15 O.R. (3d) 783

The Court of Appeal set aside Carruthers J.'s decision and permitted Blair to be indemnified under s. 136 for all proceedings (i.e. before J. Holland J., Carruthers J. and the Court of Appeal), with the exception of the appeal of J. Holland J.'s decision regarding the validity of the impugned proxies, and the expenses related thereto, which Carthy J.A. found not to have been reasonably incurred.

Carthy J.A. stated that the issue before the court was the proper application to the facts of the By-law which granted rights of indemnity in the terms authorized by s. 136(1) OBCA. He also stated that "reliance upon legal advice cannot be excluded as a factor in determining whether a director acted 'honestly and in good faith with a view to the best interests of the corporation' as set forth in s. 136" (p. 787). He then held (at pp. 789-90) that:

. . . I read s. 136(1)(*a*) and the language "acted . . . with a view to the best interests of the corporation" as referring back to, in this case, the conduct of the vote for directors — not to the conduct of the litigation. The litigation that is contemplated by s. 136(1)(*a*) is against the director personally and the indemnity is against personal liability. There is no purpose in a requirement that personal litigation be conducted in the best interests of the corporation. The costs of litigation are dealt with separately in s. 136(1) and must be "reasonably incurred".

Carthy J.A. emphasized that the issue was Blair's ruling on the overall balloting, and "to conclude that his ruling was *male fide* because the

compris, je le répète, sa décision, Blair ne peut se réclamer ni du par. 136(1) LSA ni de l'art. 4.02 du règlement administratif n° 3 d'Enfield.

Tant Blair qu'Enfield ont été à juste titre désignés comme . parties au litige; Blair avait présidé et dirigé l'assemblée et avait pris la décision, et Enfield était liée par le résultat [. . .] étant donné que cette question concernait Blair personnellement, de même que les autres actionnaires qui l'appuyaient, Enfield n'est pas tenue de l'indemniser des frais et dépenses qu'il a engagés pour se défendre dans ce litige.

### C. *Cour d'appel de l'Ontario* (1993), 15 O.R. (3d) 783

La Cour d'appel a annulé la décision du juge    25
Carruthers et a permis à Blair d'être indemnisé en vertu de l'art. 136, relativement à toutes les procédures (c.-à-d. devant le juge J. Holland, le juge Carruthers et la Cour d'appel), à l'exception de l'appel de la décision du juge J. Holland portant sur la validité des procurations contestées et sur les dépenses y relatives que le juge Carthy n'a pas jugées raisonnables.

Le juge Carthy a affirmé que ce que la cour était    26
appelée à déterminer c'était la façon dont il convenait d'appliquer aux faits le règlement administratif qui accordait le droit de se faire indemniser selon les termes du par. 136(1) LSA. Il a ajouté qu'[TRADUCTION] «on ne peut pas ignorer le fait qu'il s'en soit remis à des conseils juridiques lorsqu'il s'agit de savoir si un administrateur a agi «avec intégrité et de bonne foi au mieux des intérêts de la société», comme le prévoit l'art. 136» (p. 787). Il conclut ensuite (aux pp. 789 et 790):

[TRADUCTION] . . . selon moi, l'al. 136(1)*a*) et les mots «agi [. . .] au mieux des intérêts de la société» renvoient, en l'espèce, au déroulement de l'élection des administrateurs — et non à celui du litige. Le litige prévu par l'al. 136(1)*a*) vise l'administrateur personnellement, et l'indemnité prévue vise la responsabilité personnelle. Il n'y a aucune raison d'exiger que les litiges personnels se déroulent au mieux des intérêts de la société. Les frais du litige sont traités séparément au par. 136(1) et doivent être «raisonnables».

Le juge Carthy a souligné que ce qui était en    27
cause c'était la décision de Blair sur l'ensemble du scrutin, et que [TRADUCTION] «conclure que sa

result favoured him is to conclude that he was compelled to rule the other way, or give up the chair, no matter what advice he received" (p. 798). He then stated that, aside from the question of giving up the chair, "the real test should be whether the ruling was made with the *bona fide* intent that the company have a lawfully elected board of directors" (p. 798).

28    Carthy J.A. found that the authorities generally described the chairman's duty as quasi-judicial "without defining what that means in this context" (p. 799). He stated that it was confusing "to use, and seek to define, the word judicial or *quasi*-judicial in this context because an adjudicator or judge can never have a personal interest in the issue". He then concluded (at p. 799):

A chairperson who is more than a nominal shareholder of a public company, on the other hand, always has a personal interest in everything that affects the company, which includes all of the rulings of the chair. If that distinction is not recognized the reflex reaction is to assume that a decision which benefits the chair personally is non-judicial and thus not *bona fide*. In my view, it is preferable to describe the duty as one of honesty and fairness to all individual interests, and directed generally toward the best interests of the company.

29    Carthy J.A. found that the events leading up to the election created an "aggressively competitive atmosphere". He also found that Blair "felt very strongly that the shareholders as a whole should be fully informed of a change in control" and that Blair "undoubtedly resented the surprise nomination of Price". In the end, this made the respondent "a protagonist in the duel for control". Carthy J.A. stated that, based on the sequence of events, Blair did not have a choice when he made the impugned ruling (at pp. 799-801):

décision a été prise de mauvaise foi parce que le résultat l'avantageait revient à conclure qu'il était tenu de décider le contraire, ou d'abandonner la présidence, quels que soient les conseils reçus» (p. 798). Il a alors affirmé qu'à part la question d'abandonner la présidence [TRADUCTION] «la véritable question devrait être de savoir si la décision a été prise de bonne foi, dans l'intention que la société ait un conseil d'administration légalement élu» (p. 798).

Le juge Carthy a constaté que les autorités en la matière qualifient généralement de quasi judiciaire l'obligation du président [TRADUCTION] «sans définir ce que cela signifie dans ce contexte» (p. 799). Il a affirmé qu'il était déconcertant [TRADUCTION] «d'utiliser, de chercher à définir, le mot judiciaire ou quasi judiciaire dans ce contexte parce qu'un arbitre ou un juge ne peut jamais avoir d'intérêt personnel dans la question en litige». Il conclut ensuite (à la p. 799):

[TRADUCTION] Par contre, un président d'assemblée qui est plus qu'un actionnaire nominal d'une société publique a toujours un intérêt personnel dans tout ce qui touche la société, y compris toutes les décisions de la présidence. Si cette distinction n'est pas acceptée, il est normal de présumer qu'une décision qui favorise le président personnellement est non judiciaire et donc prise de mauvaise foi. À mon avis, il est préférable de parler d'une obligation d'intégrité et d'équité envers tous les intérêts individuels, qui doit généralement être remplie au mieux des intérêts de la société.

Le juge Carthy a conclu que les événements qui ont abouti à l'élection ont créé un [TRADUCTION] «climat de concurrence agressive». Il a aussi constaté que Blair [TRADUCTION] «croyait très fermement que l'ensemble des actionnaires devaient être parfaitement informés d'un changement de contrôle» et qu'il [TRADUCTION] «était sans doute froissé par la nomination inopinée de Price». En fin de compte, cela faisait de l'intimé [TRADUCTION] «un protagoniste dans le duel pour le contrôle». Le juge Carthy a affirmé que, compte tenu de la suite des événements, Blair n'avait pas le choix lorsqu'il a pris la décision contestée (aux pp. 799 à 801):

Given the necessity of determining who the legal directors of the company were, so that business could be carried on in a regular fashion, some decision had to be made. Even if a disinterested chairperson could have been found in the room, he or she would, in these circumstances, have had to look to the corporation's solicitors for an answer to this purely legal issue of interpretation . . . .

No matter what debate might have ensued on July 20 and no matter who the chairperson might have been, there was no obvious error or oversight which would enable the chairperson to turn away from the advice of the company's solicitors.

. . . I am satisfied that Blair was acting honestly and in good faith and in the best interests of the corporation in accepting and implementing that advice.

. . . I am satisfied that the evidence shows that he properly performed his duty as chairman of the meeting.

Carthy J.A. considered whether Blair acted reasonably in his defence of the litigation and concluded that there was nothing unreasonable in Blair's involvement in the initial application as well as in the other proceedings.

### IV. Issue on Appeal

Did the Ontario Court of Appeal err in concluding that the respondent Blair was entitled to be indemnified by the appellant Enfield regarding the costs of the Canadian Express application (and appeals on the costs issue emanating therefrom) pursuant to s. 4.02 of Enfield By-Law No. 3, modeled upon s. 136(1) OBCA?

### V. Analysis

#### A. *An Overview of the Legislation: Burden of Proof and the Scope of the Conduct that is Caught*

For purposes of convenience, I reproduce s. 136(1) OBCA (relevant portions underscored):

136. — (1) A corporation may indemnify a director or officer of the corporation . . . against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by him or her in respect of any civil, criminal or adminis-

[TRADUCTION] Vu la nécessité de déterminer qui légalement était administrateur de la société, de sorte que les affaires puissent se dérouler de façon normale, il fallait prendre une décision. Même si le président de l'assemblée avait été désintéressé, il lui aurait fallu, dans les circonstances, consulter les avocats de la société pour obtenir une réponse sur cette question portant purement sur l'interprétation du droit . . . .

Peu importe le débat qui aurait pu s'ensuivre le 20 juillet et peu importe qui aurait pu occuper la présidence, il n'y avait aucune erreur ni aucun oubli manifeste qui aurait permis au président de l'assemblée d'ignorer les conseils des avocats de la société.

. . . je suis convaincu que Blair a agi avec intégrité, de bonne foi et au mieux des intérêts de la société en acceptant et en suivant ces conseils.

. . . je suis convaincu que la preuve montre qu'il a fait correctement son devoir de président d'assemblée.

Le juge Carthy s'est demandé si Blair avait agi 30 raisonnablement dans sa défense lors du litige, et il a conclu que sa participation n'avait rien de déraisonnable, tant en ce qui concernait la demande initiale que les autres procédures.

### IV. La question en litige

La Cour d'appel de l'Ontario a-t-elle commis une erreur en concluant que l'intimé Blair avait le droit d'être indemnisé par l'appelante Enfield des frais liés à la demande de Canadian Express (et aux appels qui en ont résulté sur la question des dépens), conformément à l'art. 4.02 du règlement administratif n° 3 d'Enfield, qui s'inspire du par. 136(1) LSA?

### V. Analyse

#### A. *Aperçu de la législation: fardeau de la preuve et portée de la conduite visée*

Pour des motifs de commodité, je reproduis le 31 par. 136(1) LSA (en en soulignant les passages pertinents):

136 (1) La société peut indemniser ses administrateurs ou dirigeants [. . .] de tous les frais et de toutes les dépenses raisonnables, y compris les sommes versées pour le règlement d'une action ou pour satisfaire à un jugement, qu'ils ont engagés à l'égard d'une action ou

trative action or proceeding to which he or she is made a party by reason of being or having been a director of such corporation or body corporate, if,

(a) he or she acted honestly and in good faith with a view to the best interests of the corporation; [Emphasis added.]

32    The effect of s. 4.02 of Enfield By-law No. 3 essentially duplicates that of s. 136(1), although the wording does vary:

4.02 Indemnity of Directors and Officers. Subject to the limitations contained in the [OBCA], every director or officer of the Corporation . . . shall, from time to time, be indemnified and saved harmless . . . from and against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by him in respect of any civil, criminal or administrative action or proceeding to which he is made a party by reason of being or having been a director or officer of such corporation . . . if (a) he acted honestly and in good faith with a view to the best interests of the Corporation . . . . [Emphasis added.]

33    Given that the effect of s. 4.02 of By-law No. 3 is essentially the same as that of s. 136, any interpretation given to the By-law by this Court will affect the application of the Act. Furthermore, s. 136(1) is reproduced in turn in the corporations law of many provinces, as well as federally: *Canada Business Corporations Act*, R.S.C., 1985, c. C-44, s. 124; Newfoundland *Corporations Act*, R.S.N. 1990, c. C-36, s. 205; Manitoba *Corporations Act*, R.S.M. 1987, c. C225, s. 119; Saskatchewan *Business Corporations Act*, R.S.S. 1978, c. B-10, s. 119; Alberta *Business Corporations Act*, S.A. 1981, c. B-15, s. 119; British Columbia *Company Act*, R.S.B.C. 1979, c. 59, s. 152.

34    The largest difference between s. 136(1) and s. 4.02 of By-law No. 3 is that, whereas under s. 136(1) the director may be indemnified, under the By-law the director shall be indemnified. Is this of any importance? The respondent submits that this difference is relevant to the issue of the burden of

d'une instance civile, pénale ou administrative à laquelle ils ont été parties à titre d'administrateurs ou de dirigeants ou d'anciens administrateurs ou dirigeants de la société ou de la personne morale, si:

a) d'une part, ils ont agi avec intégrité et de bonne foi au mieux des intérêts de la société; [Je souligne.]

L'article 4.02 du règlement administratif n° 3 d'Enfield a essentiellement le même effet que le par. 136(1), bien que sa formulation soit différente:

[TRADUCTION] 4.02 Indemnisation d'administrateurs et de dirigeants. Sous réserve des restrictions prévues dans la [LSA], tout administrateur ou dirigeant de la société [. . .] devra, à l'occasion, être indemnisé [. . .] de tous les frais et de toutes les dépenses raisonnables, y compris les sommes versées pour le règlement d'une action ou pour satisfaire à un jugement, qu'il a engagés à l'égard d'une action ou d'une instance civile, pénale ou administrative à laquelle il a été partie à titre d'administrateur ou de dirigeant ou d'ancien administrateur ou dirigeant de la société [. . .] si a) il a agi avec intégrité et de bonne foi au mieux des intérêts de la société . . . [Je souligne.]

Étant donné que l'art. 4.02 du règlement administratif n° 3 a essentiellement le même effet que l'art. 136, toute interprétation que notre Cour donnera au règlement administratif aura une incidence sur l'application de la Loi. De plus, le texte du par. 136(1) est reproduit dans les lois sur les sociétés d'un bon nombre de provinces de même que dans la loi fédérale en la matière: *Loi sur les sociétés par actions*, L.R.C. (1985), ch. C-44, art. 124; *Corporations Act* de Terre-Neuve, R.S.N. 1990, ch. C-36, art. 205; *Loi sur les corporations* du Manitoba, L.R.M. 1987, ch. C225, art. 119; *The Business Corporations Act* de la Saskatchewan, R.S.S. 1978, ch. B-10, art. 119; *Business Corporations Act* de l'Alberta, S.A. 1981, ch. B-15, art. 119; *Company Act* de la Colombie-Britannique, R.S.B.C. 1979, ch. 59, art. 152.

La plus grande différence entre le par. 136(1) et l'art. 4.02 du règlement administratif n° 3 tient à ce que, alors qu'en vertu du par. 136(1) l'administrateur peut être indemnisé, en vertu du règlement administratif, l'administrateur devra l'être. Cela a-t-il de l'importance? L'intimé soutient que cette

proof. Since under the By-law indemnification is mandatory, the onus should lie on the corporation to demonstrate that the director acted with *mala fides*. I do not find this argument terribly persuasive.

What I do find more persuasive is the proposition that persons are assumed to act in good faith unless proven otherwise: *General Motors of Canada Ltd. v. Brunet*, [1977] 2 S.C.R. 537, at p. 548. In this respect, contrary to the appellant's submissions before this Court, I believe that a proper construction of the statute and law related to good faith issues reveals that Blair is not required to prove his good faith, although he may certainly call evidence in this regard to counter whatever evidence of bad faith may be adduced against him. To a large extent, it is the corporation that must establish, to the satisfaction of the court, exactly what Blair did that was inimical to its best interests.

Section 136(1) and the Enfield By-law specify three conditions that the director or officer must fulfil in order to receive indemnification for the costs of defending in litigation:

(1) the person must have been made a party to the litigation by reason of being a director or an officer of the corporation;

(2) the costs must have been reasonably incurred; and

(3) the person must have acted honestly and in good faith with a view to promoting the best interests of the corporation.

As I will now discuss, Blair has fulfilled all three conditions entitling him to indemnification.

In terms of applying this law to the facts, I see no reason to disturb the findings of the court below that the expenses were reasonably incurred. The court grounded its assessment in the following factors:

différence est pertinente quant à la question du fardeau de la preuve. Étant donné que l'indemnisation prévue dans le règlement administratif est obligatoire, il devrait incomber à la société de démontrer que l'administrateur a agi de mauvaise foi. Je ne trouve pas cet argument terriblement persuasif.

Je trouve davantage persuasive la proposition     35
voulant qu'en l'absence de preuve contraire on présume que les gens agissent de bonne foi: *General Motors of Canada Ltd. c. Brunet*, [1977] 2 R.C.S. 537, à la p. 548. À cet égard, contrairement aux arguments que l'appelante a avancés devant notre Cour, je crois que, selon l'interprétation qu'il convient de donner à la Loi et à la règle relative aux questions de bonne foi, Blair n'a pas à établir sa bonne foi, bien qu'il puisse sûrement présenter une preuve à cet égard pour contrer toute preuve de mauvaise foi qui pourrait être présentée contre lui. Dans une large mesure, c'est la société qui doit établir, à la satisfaction de la cour, exactement ce que Blair a fait et qui n'était pas au mieux de ses intérêts.

Le paragraphe 136(1) et le règlement adminis-     36
tratif d'Enfield énoncent trois conditions que l'administrateur ou le dirigeant doit remplir pour se faire indemniser des frais engagés pour se défendre lors d'un litige:

(1) la personne doit avoir été constituée partie au litige en raison de son poste d'administrateur ou de dirigeant de la société,

(2) les frais engagés doivent être raisonnables, et

(3) la personne doit avoir agi avec intégrité et de bonne foi au mieux des intérêts de la société.

Comme nous le verrons maintenant, Blair a rem-     37
pli les trois conditions lui donnant droit à indemnisation.

Quant à l'application de cette règle aux faits, je     38
ne vois aucune raison de modifier la conclusion de la Cour d'appel selon laquelle les frais engagés sont raisonnables. La cour a fondé son évaluation sur les faits suivants:

(a) Osler was retained in the annual meeting litigation to act for both Enfield and Blair, in his capacity as chairman of the meeting;

(b) The Enfield board reviewed the issue of whether it should have separate counsel from Blair and determined that there were no grounds for Enfield taking such action;

(c) Blair added nothing to the costs of the litigation arising out of the shareholders' annual meeting;

(d) Blair's conduct following the shareholders' meeting, in requisitioning another shareholders' meeting for the purpose of electing directors, was consistent with his protestations throughout that he had no interest in leading the company if voted out by a majority of informed shareholders.

39    Thus, this appeal, when properly focused, involves only the "good faith" requirement contained within s. 136(1). In this connection, I now direct my attention to the respondent's conduct during the July 20, 1989 shareholders' meeting, bearing in mind that this conduct must be placed within the context of the longstanding corporate feud arising between the respondent and Canadian Express. However, before a determination can be made whether this conduct was undertaken in good faith and with a view to promoting the best interests of the corporation, I must respond to the appellant's contention that Blair is involved in this litigation in his personal capacity as opposed to his capacity as a director, thereby *prima facie* precluding him from the benefit of s. 136(1).

B. *Is Blair Involved in this Litigation in his Capacity as Director/Chairman of Enfield or in his Personal Capacity?*

40    The appellant submits that the Canadian Express application (and appeals related thereto) is essen-

a) Les services d'Osler ont été retenus, dans le cadre du litige relatif à l'assemblée annuelle, pour représenter à la fois Enfield et Blair, en sa qualité de président de l'assemblée;

b) Le conseil d'administration d'Enfield s'est demandé s'il devrait avoir recours à des avocats différents de ceux de Blair, et il a décidé que rien ne justifiait Enfield de le faire;

c) Blair n'a rien ajouté aux frais du litige découlant de l'assemblée annuelle des actionnaires;

d) La conduite que Blair a adoptée, à la suite de l'assemblée des actionnaires, en demandant qu'une autre assemblée des actionnaires soit tenue dans le but d'élire les administrateurs, était conforme à ses protestations répétées selon lesquelles il n'avait aucun intérêt à diriger la société s'il n'était pas réélu par une majorité d'actionnaires bien informés.

Par conséquent, le présent pourvoi, correctement circonscrit, porte seulement sur la «bonne foi» exigée au par. 136(1). À cet égard, je vais maintenant examiner la conduite de l'intimé lors de l'assemblée des actionnaires du 20 juillet 1989, en gardant à l'esprit que cette conduite doit être située dans le contexte de la querelle intestine qui existe depuis longtemps entre l'intimé et Canadian Express. Cependant, pour pouvoir déterminer si l'intimé a agi de bonne foi et au mieux des intérêts de la société, je dois répondre à la prétention de l'appelante que Blair participe au présent litige à titre personnel et non en sa qualité d'administrateur, ce qui, à première vue, l'empêche de se prévaloir du par. 136(1).

B. *Blair participe-t-il au présent litige à titre personnel ou en sa qualité d'administrateur ou de président d'assemblée d'Enfield?*

L'appelante fait valoir que la demande de Canadian Express (et les appels y relatifs) résulte essen-

tially a dispute between two shareholders (Blair and Canadian Express) concerning the 11th position on Enfield's Board. As such, the logical inference to be drawn is that Enfield ought not to reimburse the losing shareholder, in this case Blair.

I disagree with this characterization of the Canadian Express application. It directly involved the reputation of Enfield and the integrity of its voting procedures; moreover, Blair's participation in the impugned proceedings flows entirely from his role as chairman of the meeting, not from his status as a shareholder. In fact, he was named as a respondent to the Canadian Express application in his capacity as "chairman of the meeting". The fact that, pending the outcome of that application, an interim order was adopted by McRae J. precluding Blair from acting as an Enfield director demonstrates the extent to which Blair was involved *qua* director, not *qua* shareholder or individual. Further, both Enfield and Blair were represented by the corporate counsel Osler. In a letter from Osler to counsel for Canadian Express dated July 25, 1989, Osler states:

In your letter dated July 24, 1989, you asked us to clarify who we are representing in these proceedings. In these proceedings we are counsel to Enfield and to Mr. Blair in his capacity as Chairman of the Annual Meeting. We are not acting for Mr. Blair in his personal capacity. [Emphasis added.]

In short, the impugned acts in this case were corporate acts insofar as they were made within the authority accruing to the chairman of Enfield meetings. I now turn to the content of the chairman's responsibilities for the purposes of s. 136(1) and the question whether Blair's conduct on July 20, 1989 disentitled him from indemnification.

tiellement d'un différend entre deux actionnaires (Blair et Canadian Express) concernant le onzième poste d'administrateur au conseil d'administration d'Enfield. Il faut donc conclure logiquement qu'Enfield ne devrait pas avoir à rembourser l'actionnaire perdant, en l'occurrence Blair.

Je ne suis pas d'accord avec cette qualification    41
de la demande de Canadian Express. Elle concernait directement la réputation d'Enfield et l'intégrité de ses procédures de scrutin; de plus, la participation de Blair aux procédures contestées découle entièrement de son rôle de président de l'assemblée, et non de son statut d'actionnaire. En fait, la demande de Canadian Express le désignait comme intimé, en sa qualité de «président de l'assemblée». Le fait que, en attendant qu'il soit statué sur cette demande, le juge McRae ait rendu une ordonnance provisoire interdisant à Blair d'agir en qualité d'administrateur d'Enfield démontre à quel point Blair était partie à titre d'administrateur, plutôt qu'à titre d'actionnaire ou en sa qualité personnelle. De plus, Blair et Enfield étaient tous deux représentés par les avocats de la société, à savoir le cabinet Osler. Dans une lettre adressée, le 25 juillet 1989, à l'avocat de Canadian Express, Osler affirme:

[TRADUCTION] Dans votre lettre du 24 juillet 1989, vous nous avez demandé de préciser qui nous représentons dans les présentes procédures. Dans les présentes procédures, nous sommes les avocats d'Enfield et de M. Blair, en sa qualité de président de l'assemblée annuelle. Nous ne représentons pas M. Blair à titre personnel. [Je souligne.]

Bref, les actes contestés en l'espèce sont des    42
actes de la société, dans la mesure où ils ont été accomplis dans la limite des pouvoirs accordés au président d'assemblée d'Enfield. Je passe maintenant à l'examen de la nature des responsabilités du président d'assemblée aux fins du par. 136(1), et de la question de savoir si la conduite que Blair a adoptée le 20 juillet 1989 lui fait perdre le droit d'être indemnisé.

C. *Factors Relevant in "Acting Honestly and in Good Faith with a View to the Best Interests of the Corporation"*

   (i) What are the "best interests of the corporation" in the context of this case?

43     The question is not who is the better director, or whether the corporation's best interests would be furthered by having one rather than the other as the 11th director. Rather, as Carthy J.A. held, the best interests of the corporation in the instant appeal centre solely on the maintenance of the integrity and propriety of the voting procedure.

   (ii) The quasi-judicial role of a chairman

44     If chairmen at shareholders' meetings are under a quasi-judicial duty and if Blair is found to have breached that duty, such a finding could constitute evidence in favour of denying him indemnification under s. 136(1).

45     At the outset, I would like to express my agreement with Carthy J.A. that the term "quasi-judicial" is, in a certain sense, inappropriate to describe the duty of a chairman when that chairman is also (as will often be the case in the corporate world) interested in the affairs that are being deliberated before him or her. A judge, adjudicator or arbitrator, on the other hand, will ideally never have any interest in the outcome of the proceedings before him or her. Consequently, chairmen of shareholders' meetings cannot labour under "quasi-judicial" duties in the strict sense because that term imports the idea of a wholly disinterested person.

46     In any event, Carthy J.A. correctly observed that it is one thing to state that a chairman is under a quasi-judicial duty, it is quite another to define the content of the responsibilities engendered by such a duty. Clearly, the chairman of any meeting, especially one mandated by and procedurally governed

C. *Facteurs pertinents pour savoir si on a «agi avec intégrité et de bonne foi au mieux des intérêts de la société»*

   (i) Qu'est-ce qui est «au mieux des intérêts de la société» dans le contexte de la présente affaire?

Il ne s'agit pas de savoir qui est le meilleur administrateur, ni de savoir s'il serait au mieux des intérêts de la société que ce soit l'un plutôt que l'autre qui occupe le onzième poste d'administrateur. Comme l'a décidé le juge Carthy, c'est plutôt uniquement le maintien de l'à-propos et de l'intégrité de la procédure de scrutin qui est au mieux des intérêts de la société en l'espèce.

   (ii) Le rôle quasi judiciaire du président d'assemblée

Si les présidents d'assemblée d'actionnaires ont une obligation quasi judiciaire et si on conclut que Blair a manqué à cette obligation, une telle conclusion pourrait justifier de lui refuser toute indemnisation fondée sur le par. 136(1).

Au départ, j'aimerais préciser que je suis d'accord avec le juge Carthy pour dire que l'expression «quasi judiciaire» est, dans un certain sens, inappropriée pour qualifier l'obligation du président d'une assemblée, quand ce président a aussi (comme c'est souvent le cas dans le milieu des sociétés par actions) des intérêts dans les affaires qui font l'objet de délibérations devant lui. Par contre, un juge ou un arbitre n'aura idéalement jamais aucun intérêt dans l'issue des procédures qui se déroulent devant lui. En conséquence, les présidents d'assemblée d'actionnaires ne peuvent pas être assujettis à des obligations «quasi judiciaires» au sens strict, parce que cette expression connote l'idée d'une personne totalement désintéressée.

Quoi qu'il en soit, c'est à juste titre que le juge Carthy a fait observer que c'est une chose que d'affirmer que le président d'une assemblée est assujetti à une obligation quasi judiciaire, mais que c'est une tout autre chose que de définir la nature des responsabilités engendrées par une telle obliga-

by statute, operates under certain duties of administrative fairness. The key question is to what extent a chairman will be permitted to be interested in the matters before him or her before a conflict of interest arises and he or she should be expected to cede the chair.

I would affirm Carthy J.A.'s standard; namely that the duty under which chairmen labour is "one of honesty and fairness to all individual interests, and directed generally toward the best interests of the company" (p. 799). However, when one turns to the application of this standard, a contextual approach is necessary. In this respect, it is very important to focus on the actual conduct of the chairman instead of perfunctorily finding bad faith simply because that person stands in a potential conflict and does not step down. As shall become evident, I do not find that Blair's conduct was such that he improperly used his position as chairman to further his own agenda. It was not his doing that the proxies were temporarily disqualified. We were not pointed to any evidence of a "design" or "plan" for the proxies to be invalidated.

In a sense, the argument of the appellant is rather simplistic: Blair was the chairman and because the proxies were deemed invalid and because no debate was fostered on the issue, Blair must have acted in bad faith. In response, I would affirm the following observations made by the Ontario Court of Appeal (at pp. 798 and 794):

... to conclude that [Blair's] ruling was *male fide* because the result favoured him is to conclude that he was compelled to rule the other way, or give up the chair, no matter what advice he received ....

It can also be assumed that he received the [legal] opinion agreeably and was not unhappy that he could make a ruling to thwart any attempt to alter the slate of direc-

tion. Il est clair que le président d'une assemblée, particulièrement celui qui est prescrit et régi par la loi sur le plan de la procédure, a certaines obligations d'équité sur le plan administratif. La question clé est de savoir jusqu'à quel point il peut avoir des intérêts dans les questions dont il est saisi, avant de devoir abandonner la présidence pour cause de conflit d'intérêts.

Je suis d'avis de confirmer la norme établie par le juge Carthy, à savoir que le président d'une assemblée est tenu d'agir de façon [TRADUCTION] «intègre et équitable envers tous les intéressés individuellement et, en général, au mieux des intérêts de la société» (p. 799). Toutefois, pour appliquer cette norme, il faut adopter une approche contextuelle. À cet égard, il est très important de se concentrer sur la conduite réelle du président de l'assemblée, plutôt que de conclure sommairement à la mauvaise foi simplement parce que la personne en question est dans une situation potentielle de conflit d'intérêts et n'abandonne pas son poste. Comme on le constatera, je ne conclus pas que la conduite adoptée par Blair a consisté à se servir de son poste de président d'assemblée pour réaliser ses propres fins. L'annulation temporaire des procurations n'était pas son fait. On ne nous a indiqué aucune preuve de «dessein» ou de «plan» visant l'invalidation des procurations.

47

Dans un sens, l'argument de l'appelante est plutôt simpliste: Blair était le président d'assemblée et, parce que les procurations ont été jugées invalides et qu'on n'a pas encouragé la tenue d'un débat sur la question, Blair doit avoir agi de mauvaise foi. Je répondrais à cela en entérinant les observations suivantes de la Cour d'appel de l'Ontario (aux pp. 798 et 794):

48

[TRADUCTION] ... conclure que [l]a décision [de Blair] a été prise de mauvaise foi parce que le résultat l'avantageait revient à conclure qu'il était tenu de décider le contraire, ou d'abandonner la présidence, quels que soient les conseils reçus ...

On peut aussi supposer qu'il a accepté volontiers l'opinion [juridique] et qu'il n'était pas malheureux de pouvoir prendre une décision qui contrecarrerait toute tenta-

tors. That falls short of a plan to deviously sidestep the entitlement of shareholders.

49    I also take issue with the appellant's statement that the fact that a chairman has an interest in the outcome of a decision impugns the integrity of the process because of the mere appearance of bias. With respect, it is the Enfield shareholders who concluded that it is to be the President of the company (who is allowed to be a director) — a person who invariably is interested in every matter discussed at the shareholders' meetings — who is to act as chairman (Enfield By-law No. 3, s. 5.05). In this respect, there is no unacceptable appearance of bias because it was never contemplated that the chairman was to be someone who would appear to be totally disinterested in the first place. The fact that a decision-maker has an interest in the outcome of his decision does not disqualify him or her from making decisions if the authority from which he or she obtains the status as decision-maker contemplates that he or she may act as judge in his or her own cause: *Alcyon Shipping Co. v. O'Krane*, [1961] S.C.R. 299, at p. 305; *Walters v. Essex County Board of Education*, [1974] S.C.R. 481, at pp. 487-88.

50    The detailed organization of a corporation is essentially a private contractual matter. If the shareholders decide to designate the President as chairman, so be it. If the shareholders are concerned about the maintenance of *prima facie* impartiality, they can specify through the by-laws or otherwise that the corporate meetings are to be chaired by a neutral third party. It is helpful to note that the drafters of the OBCA considered these issues and in fact established as a default principle that interested parties should operate as chairmen of shareholders' meetings. Section 97(c) of this statute provides:

97. Subject to this Act or the articles or by-laws of a corporation or a unanimous shareholder agreement,

   .   .   .

tive de modifier la liste des administrateurs. On est loin d'un plan visant à esquiver, de façon détournée, les droits des actionnaires.

Je n'accepte pas non plus l'affirmation de l'appelante voulant que le fait que le président d'une assemblée ait un intérêt dans le résultat d'une décision compromette l'intégrité du processus simplement en raison de l'apparence de partialité. En toute déférence, ce sont les actionnaires d'Enfield qui ont conclu qu'il appartenait au président de la société (qui peut être un administrateur) — une personne qui a immanquablement un intérêt dans toutes les questions débattues aux assemblées d'actionnaires — de présider leurs assemblées (art. 5.05 du règlement administratif n° 3 d'Enfield). À cet égard, il n'y a aucune apparence inacceptable de partialité, parce qu'au départ on n'a jamais prévu que le président de l'assemblée devrait être quelqu'un qui paraîtrait complètement désintéressé. Le fait qu'un décideur ait un intérêt dans le résultat de sa décision ne l'empêche pas de prendre des décisions si l'autorité qui l'a nommé décideur a prévu qu'il pourrait être à la fois juge et partie: *Alcyon Shipping Co. c. O'Krane*, [1961] R.C.S. 299, à la p. 305; *Walters c. Essex County Board of Education*, [1974] R.C.S. 481, aux pp. 487 et 488.

L'organisation détaillée d'une société relève essentiellement du domaine des contrats privés. Si les actionnaires décident de désigner le président de la société pour présider leur assemblée, eh bien soit! Si les actionnaires sont soucieux de maintenir une présomption d'impartialité, ils peuvent préciser, par voie de règlement administratif ou autrement, que les assemblées de la société devront être présidées par une tierce partie neutre. Il est utile de noter que les rédacteurs de la LSA ont pris en considération ces questions et ont, en fait, adopté comme principe que, sauf disposition contraire, les assemblées des actionnaires devraient être présidées par des parties intéressées. L'alinéa 97c) de cette loi prévoit ceci:

97 Sous réserve de la présente loi, des statuts ou des règlements administratifs de la société ou d'une convention unanime des actionnaires:

   .   .   .

(c) the president or, in his or her absence, a vice-president who is a director shall preside as chair at a meeting of shareholders . . . .

On a broader note, I find that there are valid policy reasons militating against blindly precluding anyone holding more than a nominal share in a public company from acting as a chairman. This is not practical for many closely held corporations and, moreover, might pave the way for much litigation regarding the definition of "nominal holdings", instead of properly focusing on the actual conduct that is impugned. There are many chairmen who have large holdings in a company yet conduct themselves on a most professional basis in terms of chairing meetings; there may be persons who own just one share who conduct themselves improperly. The focus should thus not be on the size of the holdings, but on the nature of the conduct. This is not to say, however, that there might not be situations in which the nomination of a wholly disinterested chairman is advisable as has apparently been the case in a number of situations that have arisen recently or where the court has appointed such a person pursuant to specific statutory provisions. However, such an exceptional situation is not found in the facts of the present appeal.

I now turn to the jurisprudence cited by the appellant in favour of the proposition that a chairman has a duty to act quasi-judicially: *Re Bomac Batten Ltd. and Pozhke* (1983), 43 O.R. (2d) 344 (H.C.); *Gray v. Yellowknife Gold Mines Ltd.*, [1946] O.W.N. 938 (H.C.); *Johnson v. Hall* (1957), 10 D.L.R. (2d) 243 (B.C.S.C.); *Re United Canso Oil & Gas Ltd.* (1980), 12 B.L.R. 130 (N.S.S.C.); *Byng v. London Life Association Ltd.* (1988), 42 B.L.R. 280 (Eng. C.A.). I do not find that this jurisprudence supports the appellant's position. Quite the contrary: many of these cases demonstrate the extent to which courts, through hindsight, are reluctant to find chairmen to be in

c) le président ou, en son absence, un vice-président qui est administrateur, préside l'assemblée des actionnaires . . .

De façon plus générale, je conclus qu'il y a de 51 bonnes raisons de principe de ne pas interdire aveuglément à quiconque détient plus qu'une faible participation dans une société de présider une assemblée. Ce n'est pas pratique pour bien des sociétés qui comptent peu d'actionnaires et, de plus, cela pourrait donner ouverture à un grand nombre de litiges qui porteraient sur la définition de ce qu'est une «faible participation», plutôt que de porter, comme cela devrait être le cas, sur la conduite contestée comme telle. Il y a de nombreux présidents d'assemblée qui détiennent un grand nombre d'actions d'une société, mais qui se conduisent de façon tout à fait professionnelle lorsqu'ils président des assemblées; il peut y avoir des personnes qui ne détiennent qu'une seule action et qui se conduisent incorrectement. L'attention devrait donc porter non pas sur la quantité d'actions détenues, mais sur la nature de la conduite. Toutefois, cela ne revient pas à dire qu'il ne pourrait pas y avoir des situations où la nomination d'un président d'assemblée tout à fait désintéressé serait souhaitable, comme cela semble avoir été le cas dans un certain nombre de situations qui se sont présentées récemment, ou dans le cas où les tribunaux ont nommé un tel président conformément à des dispositions législatives particulières. Cependant, les faits de la présente affaire ne révèlent pas l'existence d'une telle situation exceptionnelle.

J'examine maintenant la jurisprudence citée par 52 l'appelante à l'appui de l'allégation selon laquelle le président d'assemblée est tenu d'agir de façon quasi judiciaire: *Re Bomac Batten Ltd. and Pozhke* (1983), 43 O.R. (2d) 344 (H.C.); *Gray c. Yellowknife Gold Mines Ltd.*, [1946] O.W.N. 938 (H.C.); *Johnson c. Hall* (1957), 10 D.L.R. (2d) 243 (C.S.C.-B.); *Re United Canso Oil & Gas Ltd.* (1980), 12 B.L.R. 130 (C.S.N.-É.); *Byng c. London Life Association Ltd.* (1988), 42 B.L.R. 280 (C.A. Angl.). Je ne trouve pas que cette jurisprudence appuie la position de l'appelante. C'est plutôt le contraire: bon nombre de ces décisions démontrent à quel point les tribunaux hésitent à conclure a

dereliction of their responsibilities barring proof of bad faith. Those remaining cases that offer some assistance to the appellant can readily be distinguished on the facts. To the extent that *Re Bomac Batten Ltd. and Pozhke* is not distinguishable, I would overrule it.

53     On another note, although a chairman has an obligation to promote administrative fairness, this is necessarily tempered with the need to control and organize a meeting so as to ensure that it proceeds effectively. As noted by Chitty J. in *National Dwellings Society v. Sykes*, [1894] 3 Ch. 159, at p. 162:

> A question of some importance has been mooted in this case, with regard to the powers of the chairman over a meeting. Unquestionably it is the duty of the chairman, and his function, to preserve order, and to take care that the proceedings are conducted in a proper manner . . . .

54     In closing debate on the proxy issue, Blair was, based on Osler's instructions, fulfilling his responsibility as chairman to see that the shareholders' instructions as set out in the proxies were followed. Further, allowing the meeting to devolve into a shouting match between two rival camps debating a complex and unsettled area of corporations law could hardly be seen as enhancing the validity and integrity of Enfield's voting procedure. The function of a chairman is to oversee, not participate in a partisan sense. It may be sensible to refer briefly to the reason why the chairman is so ruling, but again courts should not attempt to hamstring in advance chairmen of meetings in contested settings. Although it is clearly proper for a shareholder to raise any relevant matter in the manner the Canadian Express representatives did, I cannot find anything improper in Blair's answer to the points raised, especially given his thorough

posteriori que des présidents d'assemblée ont manqué à leurs responsabilités, à moins qu'il n'y ait preuve de mauvaise foi. Quant aux autres décisions judiciaires qui sont quelque peu utiles à l'appelante, elles peuvent aisément faire l'objet d'une distinction fondée sur les faits. Dans la mesure où il n'est pas possible d'établir une distinction d'avec la décision *Re Bomac Batten Ltd. and Pozhke*, je suis d'avis d'écarter cette décision.

Par ailleurs, bien que le président d'une assemblée soit tenu de promouvoir l'équité administrative, cela est nécessairement tempéré par le besoin de contrôler et d'organiser une assemblée de manière à ce qu'elle se déroule efficacement. Comme l'a fait remarquer le juge Chitty dans *National Dwellings Society c. Sykes*, [1894] 3 Ch. 159, à la p. 162:

> [TRADUCTION] Une question d'une certaine importance a été soulevée, en l'espèce, concernant les pouvoirs du président d'une assemblée. Il ne fait aucun doute qu'il appartient et incombe au président d'une assemblée de préserver l'ordre et d'assurer le bon déroulement des procédures . . .

En mettant fin au débat sur la question des procurations, Blair se trouvait, compte tenu des directives d'Osler, à s'acquitter de la responsabilité, qui lui incombait à titre de président de l'assemblée, de veiller à ce que les instructions données par les actionnaires dans les procurations soient suivies. De plus, permettre à l'assemblée de dégénérer en un affrontement verbal entre deux camps rivaux qui débattent un sujet complexe et incertain du droit des sociétés, pourrait difficilement être considéré comme rehaussant la validité et l'intégrité de la procédure de scrutin d'Enfield. Le président d'assemblée a pour fonction de superviser les débats, non d'y prendre parti. Il peut être sage de renvoyer brièvement au motif de la décision du président de l'assemblée, mais, je le répète, les tribunaux ne devraient pas tenter de paralyser à l'avance les présidents d'assemblée dans des contextes controversés. Bien qu'il soit nettement approprié pour un actionnaire de soulever toute question pertinente comme l'ont fait les représentants de Canadian Express, je ne trouve rien d'incorrect dans la réponse que Blair a donnée aux

consultation with Enfield's independent legal counsel.

In fact, s. 107 OBCA specifically contemplates that, in an imbroglio such as that presented in this appeal, recourse is to be had to the courts, not to the chairman. The rationale behind this provision is to avoid the spectacle that can result from continual challenges made during the corporate meeting to decisions made by the chair. Section 107 reads as follows:

107. — (1) A corporation, shareholder or director may apply to the court to determine any controversy with respect to an election or appointment of a director or auditor of the corporation.

Blair properly instructed the Canadian Express representatives to take up their grievance with corporate counsel on the basis that the issue involved was a legal one. Despite the fact that corporate counsel were present at the meeting, the Canadian Express representative did not communicate with them.

On a final note, the duty of a chairman is to give effect to the proxy and ensure that the instructions it contains are followed. In this appeal, many of the beneficial owners of the shares for which proxies had been issued were not present at the meeting. The appellant submits that it was self-evident that these proxy-"givers" wanted to vote for Price. I find this untenable. First, there is no evidence that they had ever turned their minds to Price's candidacy. Second, and more importantly, the chairman has no duty to inquire into the minds of the beneficial owners of shares represented at a meeting: *Cohen-Herrendorf v. Army & Navy Department Store Holdings Ltd.* (1986), 55 Sask. R. 134 (Q.B.), at p. 148 (at paras. 80 and 81 citing Ontario and U.K. authority). There is no obligation to look behind the proxies. The chairman is simply required to give effect to their instructions. This is precisely what Blair did, believing Osler's interpretation of the instructions and thereby acting with a view to Enfield's best interests. Absentees from the meeting have the right to expect that proxy rules will be followed, and that their proxies

points soulevés, compte tenu particulièrement de sa consultation approfondie des avocats indépendants d'Enfield.

En fait, l'art. 107 LSA prévoit explicitement    55
qu'en cas d'imbroglio comme celui qui s'est produit en l'espèce il faut s'adresser aux tribunaux, non au président de l'assemblée. Cette disposition a pour objet d'éviter les scènes qui peuvent résulter de la contestation répétée des décisions du président .au cours de l'assemblée. L'article 107 est rédigé de la façon suivante:

107 (1) La société, un actionnaire ou un administrateur peut, par voie de requête, demander au tribunal de trancher tout différend relatif à l'élection ou à la nomination d'un administrateur ou d'un vérificateur.

Blair a eu raison de dire aux représentants de Canadian Express d'adresser leurs doléances aux avocats de la société, du fait que la question en litige était une question de droit. Bien que les avocats de la société aient été présents à l'assemblée, les représentants de Canadian Express n'ont pas communiqué avec eux.

Finalement, le président d'une assemblée est    56
tenu de donner effet aux procurations et de s'assurer que les instructions qu'elles contiennent soient suivies. En l'espèce, un bon nombre des propriétaires réels des actions pour lesquelles des procurations avaient été accordées n'étaient pas présents à l'assemblée. L'appelante soutient qu'il était évident en soi que ces «donneurs» de procuration voulaient voter pour Price. Je trouve cette opinion insoutenable. Premièrement, il n'y a aucune preuve qu'ils aient jamais songé à la candidature de Price. Deuxièmement, ce qui est plus important, le président d'assemblée n'est pas tenu de lire dans les pensées des propriétaires réels des actions représentées à une assemblée: *Cohen-Herrendorf c. Army & Navy Department Store Holdings Ltd.* (1986),. 55 Sask. R. 134 (B.R.), à la p. 148 (aux par. 80 et 81 où l'on cite des décisions de l'Ontario et du Royaume-Uni). Il n'y a aucune obligation de vérifier les procurations. Le président d'assemblée est seulement tenu de donner effet à leurs instructions. C'est précisément ce que Blair a fait, ajoutant foi à l'interprétation donnée par Osler aux ins-

will be applied pursuant to the instructions they place upon them.

tructions, et agissant ainsi au mieux des intérêts d'Enfield. Les absents ont le droit de s'attendre à ce que les règles en matière de procuration soient suivies, et que leurs procurations soient exécutées conformément aux instructions dont ils les assortissent.

57    In sum, the fact that Blair made the impugned ruling with the *bona fide* intent that Enfield have a lawfully elected board of directors constitutes evidence that he acted honestly and in good faith and with a view to the best interests of Enfield for the purposes of s. 136(1). Although his decision to disallow the proxies turned out, under judicial scrutiny, to be wrong, it did not evidence any *mala fides*. I am further buttressed in this conclusion by the fact that Blair entirely relied upon objective legal advice from corporate counsel in arriving at this decision. It is to this factor that I now turn.

Somme toute, le fait que Blair a pris de bonne foi la décision contestée, afin qu'Enfield ait un conseil d'administration légalement élu, prouve qu'il a agi avec intégrité et de bonne foi au mieux des intérêts d'Enfield, conformément au par. 136(1). Bien que sa décision de rejeter les procurations se soit avérée erronée lors d'un examen judiciaire, elle ne constituait pas une preuve de mauvaise foi. Cette conclusion est étayée par le fait que Blair s'en est entièrement remis aux conseils juridiques objectifs des avocats de la société pour prendre sa décision. Je passe maintenant à l'examen de ce facteur.

### (iii) The reliance on the legal advice of corporate counsel

### (iii) Le fait que l'on s'en soit remis aux conseils juridiques des avocats de la société

58    How does reliance on legal advice support a claim for indemnification under s. 136(1)? At the outset, I note my agreement with the position of the Court of Appeal that mere *de facto* reliance on legal advice will not guarantee indemnification. However, reliance that is reasonable and in good faith will establish that a director or officer acted "honestly and in good faith with a view to the best interests of the corporation". In the instant appeal, Blair's reliance on Osler's advice was both reasonable and in good faith.

Comment le fait que l'on s'en soit remis à des conseils juridiques justifie-t-il une demande d'indemnisation fondée sur le par. 136(1)? Au départ, je fais remarquer que je suis d'accord avec la position adoptée par la Cour d'appel selon laquelle le simple fait que l'on s'en soit remis à des conseils juridiques ne garantit pas l'indemnisation. Cependant, le fait qu'un administrateur ou un dirigeant s'en soit remis raisonnablement et de bonne foi à ces conseils établira qu'il a agi «avec intégrité et de bonne foi au mieux des intérêts de la société». En l'espèce, Blair s'en est remis raisonnablement et de bonne foi aux conseils d'Osler.

59    Blair sought Osler's advice in the broadest of terms:

Blair a demandé des conseils à Osler en des termes on ne peut plus larges:

"You know the law, I will take my direction from you. What should I do?"

[TRADUCTION] «Vous connaissez la loi. Je vais faire ce que vous me direz de faire. Qu'est-ce que je devrais faire?»

60    Implicit in this query was not only concern over whether the proxies should be allowed, but also the question whether Blair should step down as chair, or whether he was in any position at all to make a decision. At no time did Enfield's corporate coun-

Implicitement, il s'agissait non seulement de savoir si les procurations devraient être acceptées, mais encore de savoir si Blair devrait abandonner la présidence, ou s'il était en mesure de prendre une décision. À aucun moment les avocats d'En-

sel ever suggest that Blair should relinquish control of the chair. If anything, Osler advised Blair that it was his duty, as chairman, to make a ruling. Osler did not advise Blair that he should hear submissions regarding the ruling; nor did they correct Blair's decision not to allow for such submissions. The ruling made by Blair was entirely prepared by Osler: Blair read verbatim from a script, with the exception of one gratuitous comment directed at Price which, although it probably should not have been made, was, given the tense atmosphere, understandable and, even if it were not excusable, certainly did not demonstrate bad faith or an intention to undermine the best interests of the corporation.

Osler deliberated over these issues for about an hour and a half. Blair did not participate in the substantive aspects of this discussion. There were six senior corporate lawyers present and they were in constant communication with Osler's head office. Furthermore, the conclusions they reached on July 20, 1989 were in line with the conclusions arrived at the night before as well as the results of the research memoranda prepared for Enfield. The point of the matter is that there was no reason for Blair, acting reasonably, to have believed Osler was making a hasty decision based on sketchy advice. In any event, Osler was Enfield's corporate counsel and it strikes me as odd that it would amount to "bad faith" or a dereliction of a chairman's duty of care not to solicit a second opinion from an independent legal counsel.

The evidentiary record reveals that Blair believed that, in relying on the advice of Enfield's corporate counsel, he acted in a prudent manner, in good faith and with a view to Enfield's best interests. Blair goes so far as to affirm in discovery:

... having gone through an hour, an hour and a half of deliberation, including a discussion with other counsel

field n'ont laissé entendre que Blair devrait abandonner la présidence. Osler a plutôt avisé Blair qu'il était tenu, à titre de président d'assemblée, de prendre une décision. Osler n'a pas conseillé à Blair d'entendre des arguments au sujet de la décision; il n'a pas non plus corrigé la décision de Blair de ne pas permettre la présentation de tels arguments. La décision de Blair a été entièrement préparée par Osler: Blair a lu textuellement une déclaration, à l'exception d'un commentaire injustifié à l'égard de Price, qui, même s'il n'aurait probablement pas dû être fait, était compréhensible compte tenu de l'atmosphère tendue, et, même s'il n'était pas excusable, ne démontrait certainement pas de la mauvaise foi ou une intention d'agir à l'encontre des intérêts de la société.

Osler a délibéré sur ces questions pendant environ une heure et demie. Blair n'a pas participé au fond de cette discussion. Six avocats principaux spécialisés en droit des sociétés étaient présents et ils étaient en communication permanente avec le bureau principal d'Osler. De plus, les conclusions qu'ils ont tirées le 20 juillet 1989 concordaient avec les conclusions de la nuit précédente, de même qu'avec les résultats des mémoires de recherche préparés pour Enfield. En fait, il n'y avait aucune raison pour Blair, agissant raisonnablement, de croire qu'Osler prenait une décision hâtive fondée sur une opinion incomplète. Quoi qu'il en soit, les avocats du cabinet Osler étaient conseillers juridiques de la société, et je trouve particulièrement étrange que l'on puisse considérer que l'omission de demander une seconde opinion à un conseiller juridique indépendant traduit de la «mauvaise foi» ou un manquement à l'obligation de diligence qui incombe au président d'assemblée.

61

La preuve révèle que Blair a cru agir prudemment, de bonne foi et au mieux des intérêts d'Enfield en s'en remettant aux conseils des avocats de la société. Lors de l'interrogatoire préalable, Blair va jusqu'à dire:

62

[TRADUCTION] ... après une heure, une heure et demie de délibérations, y compris une discussion avec d'autres

in their firm, and gone through a full process, I would have felt compelled to accept their advice and act on it.

63   If anything, I am sympathetic to the respondent's submission that he believed that the rejection of Osler's advice, which is what the appellant appears to suggest Blair should have done, could not be in Enfield's best interest:

(a) Blair was not qualified to interpret and apply the law to the ballots and proxies;

(b) Blair owed a duty to shareholders to see that the instructions contained in their proxies were followed;

(c) The shareholders who had not received notice of the surprise nomination of Price and who were not present at the shareholders' meeting and who held enough votes to change the result had they received notice might have a cause of action if Price were declared elected against the advice of Enfield's counsel;

(d) The shareholders who were represented by management proxies had no opportunity to assess Price or to vote in relation to his candidacy, and they relied on Enfield and its chairman to ensure that their rights at the meeting were protected.

64   In deciding not to reject the advice of counsel, Blair in fact fulfilled his fiduciary duty. Consequently, I would disagree with J. Holland J. to the extent that he held otherwise in a series of *obiter* comments not necessary to the resolution of the question before him (i.e. whether, upon their true construction, the proxies were validly voted).

65   The appellant cites some case law in favour of the proposition that reliance on legal advice in and of itself does not entitle an officer or director to indemnification: *Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147; *Exco Corp. v. Nova Scotia Savings & Loan Co.* (1987), 35 B.L.R. 149

avocats à leur cabinet, et après avoir fait le tour de la question, je me serais senti forcé d'accepter leurs conseils et d'agir en conséquence.

En fait, je comprends l'argument de l'intimé voulant qu'il ait cru que rejeter les conseils d'Osler, ce que l'appelante semble dire que Blair aurait dû faire, ne pouvait être au mieux des intérêts de la société:

a) Blair n'était pas qualifié pour interpréter et appliquer la loi aux bulletins de vote et aux procurations;

b) Blair avait envers les actionnaires l'obligation de veiller à ce que les instructions contenues dans leurs procurations soient suivies;

c) Les actionnaires qui n'avaient pas été avisés de la nomination inopinée de Price, qui n'étaient pas présents à l'assemblée des actionnaires et qui auraient détenu assez de droits de vote pour changer le résultat s'ils avaient été avisés, auraient pu avoir une cause d'action si Price avait été déclaré élu malgré les conseils des avocats d'Enfield;

d) Les actionnaires qui étaient représentés par des procurations de la direction n'avaient aucune possibilité d'évaluer Price ou de voter sur sa candidature, et ils s'en remettaient à Enfield et à son président d'assemblée pour ce qui était de la protection de leurs droits au cours de l'assemblée.

En décidant de ne pas rejeter les conseils des avocats, Blair a, en fait, rempli son obligation fiduciaire. Par conséquent, je ne partagerais pas l'avis du juge J. Holland, dans la mesure où il a conclu le contraire dans une série de commentaires incidents qui n'étaient pas nécessaires pour trancher la question dont il était saisi (à savoir si, d'après leur sens véritable, les procurations avaient été utilisées validement).

L'appelante cite certaines décisions judiciaires à l'appui de la proposition voulant que le fait qu'il s'en soit remis à des conseils juridiques ne confère pas en soi à un dirigeant ou à un administrateur le droit à une indemnisation: *Central Trust Co. c. Rafuse*, [1986] 2 R.C.S. 147; *Exco Corp. c. Nova*

(N.S.S.C.T.D.). Although this principle is found in the jurisprudence, it is not really relevant to the case at bar, given that the decision to permit Blair to be indemnified is not grounded in and of itself in Blair's reliance on the erroneous advice yet, instead, takes root in several considerations, such as the fact that he did not breach his duties as chairman, and is further coloured by the fact that the reliance on Osler's advice was fully made in good faith. I note that the case law cited by the appellant establishes that reliance on counsel's advice (even if it leads to a deleterious result) will strongly militate against a finding of *mala fides* or fiduciary breach, such a finding being necessary to disentitle one from indemnification. For example, in *Exco* at pp. 220-21, Richard J. held:

The presence of . . . counsel . . . do[es] have the result of absolving the directors of any allegation of bad faith with respect to their actions . . . . Directors have a right, indeed a duty to rely on the opinion of counsel . . . .

Although what the directors did, as a board, may have been unlawful, no liability can attach to the directors personally for what they did, having first received advice from . . . counsel who held himself out as having experience and expertise in that area of law. [Emphasis added.]

And, in *Rafuse, supra,* at pp. 215-16, Le Dain J. held:

The executive officers of the . . . Company and the members of the Executive Committee of the Board of Directors did not have a duty of care with respect to the legal aspects of a transaction other than to retain qualified solicitors to perform the necessary legal services . . . . They might well have been negligent had they relied on their own legal judgment in such a case . . . . the trust company "took the only course open to it to determine the validity of the mortgage, namely, consulting the solicitors."

It was reasonable for Blair to believe, and the evidence shows he did believe, that reliance on the

*Scotia Savings & Loan Co.* (1987), 35 B.L.R. 149 (C.S.N.-É. 1re inst.). Même si ce principe se dégage de la jurisprudence, il n'est pas vraiment pertinent en l'espèce, étant donné que la décision de permettre à Blair d'être indemnisé ne s'appuie pas en soi sur le fait que Blair s'en est remis à des conseils erronés, mais découle plutôt de diverses considérations, comme le fait qu'il n'a pas manqué à ses obligations de président d'assemblée, et qu'elle s'explique en outre par le fait que c'est entièrement de bonne foi qu'il s'en est remis aux conseils d'Osler. Je souligne que la jurisprudence citée par l'appelante établit que le fait que l'on s'en soit remis aux conseils d'un avocat (même si cela mène à un résultat malheureux) milite fortement contre une conclusion à la mauvaise foi ou à un manquement à une obligation fiduciaire, laquelle conclusion est nécessaire pour faire perdre le droit à l'indemnisation. Par exemple, le juge Richard statue dans *Exco,* aux pp. 220 et 221:

[TRADUCTION] La présence de l'avocat [. . .] [a] pour résultat d'écarter toute allégation de mauvaise foi relative aux actes des administrateurs. [. . .] Les administrateurs ont le droit, en fait le devoir, de s'en remettre à l'opinion de l'avocat . . .

Bien que ce que les administrateurs ont fait, comme conseil d'administration, puisse être illégal, la responsabilité personnelle des administrateurs ne peut être engagée pour leurs actes, étant donné qu'ils ont d'abord obtenu les conseils de l'avocat [. . .], qui se disait expérimenté et expert dans ce domaine du droit. [Je souligne.]

Et, dans l'arrêt *Rafuse,* précité, aux pp. 215 et   66
216, le juge Le Dain affirme:

Les administrateurs de [la société] et les membres du comité exécutif du conseil d'administration n'avaient pas, à l'égard des aspects juridiques d'une opération, d'autre obligation de diligence que celle de retenir les services d'avocats compétents pour fournir les services juridiques nécessaires. [. . .] Ils auraient bien pu faire preuve de négligence si, dans un tel cas, ils s'en étaient remis à leur propre jugement juridique. [. . .] la société de fiducie [TRADUCTION] «a eu recours au seul moyen dont elle disposait pour déterminer la validité de l'hypothèque, savoir la consultation des avocats».

Il était raisonnable que Blair croie, et la preuve   67
montre que cela a été effectivement le cas, qu'il

advice of Osler was the only course open to him. Thus, it is clear that Blair fulfilled his duty of care under the *Rafuse* standard. This militates against a finding that he should not be indemnified for the subsequent litigation initiated by Canadian Express. I also note that such a conclusion is consonant with jurisprudence in other contexts which has held that reliance on actuarial and legal advice obtained from competent sources would militate against a finding of misconduct: *Bathgate v. National Hockey League Pension Society* (1994), 16 O.R. (3d) 761, leave to appeal to the Supreme Court of Canada refused, [1994] 2 S.C.R. viii (for trustees); *Canadian Merchant Service Guild v. Gagnon*, [1984] 1 S.C.R. 509, at p. 532 (a union's decision not to take a grievance to arbitration).

68    Of considerable relevance is the fact that reliance on the work of a lawyer has been recognized within the OBCA itself as comprising part of the director's standard of care. Section 135(4) reads as follows:

135. . . .

(4) A director is not liable under section 130 or 134 [describing the fiduciary duties and duties of care governing directors' conduct] if the director relies in good faith upon,

. . .

(b) a report of a lawyer, accountant, engineer, appraiser or other person whose profession lends credibility to a statement made by any such person. [Emphasis added.]

Blair fits within the scope of s. 135(4)(b) given that there was no reason to doubt Osler's competence. Osler was apprised of all the relevant facts, and Blair acted in full accordance with the advice that was given.

69    I should also mention that s. 135(4) codifies the anterior common law director duties of care, in which a director would be absolved of liability if he or she relied upon the work of an official of the

n'avait pas d'autre choix que de s'en remettre aux conseils d'Osler. Ainsi, il est clair que Blair a rempli son obligation de diligence au sens de l'arrêt *Rafuse*. Cela milite contre la conclusion qu'il ne devrait pas être indemnisé relativement aux procédures engagées ultérieurement par Canadian Express. Je constate aussi qu'une telle conclusion concorde avec la jurisprudence dans d'autres contextes, où on a jugé que le fait que l'on s'en soit remis à des conseils actuariels et juridiques obtenus de sources compétentes militerait contre une conclusion d'inconduite: *Bathgate c. National Hockey League Pension Society* (1994), 16 O.R. (3d) 761, autorisation de pourvoi devant la Cour suprême du Canada refusée, [1994] 2 R.C.S. viii (cas de fiduciaires); *Guilde de la marine marchande du Canada c. Gagnon*, [1984] 1 R.C.S. 509, à la p. 532 (décision d'un syndicat de ne pas soumettre un grief à l'arbitrage).

Il est particulièrement pertinent de noter que la LSA elle-même reconnaît que se fier au travail d'un avocat fait partie intégrante de l'obligation de diligence de l'administrateur. Le paragraphe 135(4) est rédigé ainsi:

135. . . .

(4) N'est pas engagée, en vertu de l'article 130 ou 134 [qui décrivent les obligations fiduciaires et les obligations de diligence régissant la conduite des administrateurs], la responsabilité de l'administrateur qui, de bonne foi, se fie:

. . .

b) à un rapport émanant d'un avocat, d'un comptable, d'un ingénieur, d'un estimateur ou d'une autre personne dont la profession permet d'ajouter foi à ses déclarations. [Je souligne.]

L'alinéa 135(4)b) s'applique à la situation de Blair, étant donné qu'il n'y avait aucune raison de douter de la compétence d'Osler. Le cabinet Osler avait été mis au courant de tous les faits pertinents, et Blair a suivi à la lettre les conseils qui lui ont été donnés.

Je tiens aussi à mentionner que le par. 135(4) codifie les obligations de diligence que la common law imposait auparavant aux administrateurs, selon lesquelles l'administrateur était dégagé de toute

company (in the present appeal, corporate counsel) if such work is properly left to that official and, in the absence of grounds for suspicion, the director is justified in trusting that official to perform the duty: *Re City Equitable Fire Insurance Co.*, [1925] Ch. 407, *per* Romer J., aff'd [1925] Ch. 500 (C.A.). Consequently, directors will be held liable for the misdeeds of officials of the company only if they have been personally negligent or if they have acted unreasonably in relying on an official whose honesty or competence they have reason to suspect.

On another note, I cannot accept Enfield's submission that Osler was partial to Blair and acted on behalf of Blair and was hence not independent counsel. At all material times, Osler was Enfield's corporate counsel and represented Blair in that capacity as it was professionally obliged to; in fact, the only reason Osler represented Blair at the Canadian Express application was because Enfield was joined as a co-defendant. There is no evidence whatsoever that Osler's advice to Blair during the meeting was influenced by any partiality. Its conclusion as to the validity of the proxies was reasonable and involved a complicated question of law over which J. Holland J. heard, for eight days, expert testimony before reaching his conclusion. This seems to confirm that this issue would not have been solved by giving Canadian Express representatives a few moments to address the shareholders' meeting. Further, it should be remembered that Blair, a layperson, could not have been expected to be suspicious about advice that, *prima facie,* appeared legitimate and came from Enfield's own corporate counsel. I would affirm the Court of Appeal's finding that the advice given by Osler and followed by Blair would, to a layperson in Blair's circumstances (and with his business experience), have been "ostensibly credible"

responsabilité s'il s'en était remis au travail d'un représentant de la société (en l'occurrence, les avocats de la société) et si le travail en question avait été confié à juste titre à ce représentant; en l'absence de raisons de douter, l'administrateur est justifié de faire confiance à ce représentant quant à l'exécution de ce travail: *Re City Equitable Fire Insurance Co.*, [1925] Ch. 407, le juge Romer, conf. par [1925] Ch. 500 (C.A.). Par conséquent, les administrateurs ne seront tenus responsables des mauvaises actions de représentants de la société que s'ils ont personnellement fait preuve de négligence ou s'ils ont agi déraisonnablement en s'en remettant à un représentant alors qu'ils avaient une raison de douter de son intégrité ou de sa compétence.

Par ailleurs, je ne puis accepter l'argument d'Enfield voulant que les avocats du cabinet Osler aient fait preuve de partialité en faveur de Blair, qu'ils aient agi pour le compte de Blair et qu'ils n'aient donc pas été des conseillers juridiques indépendants. Pendant toute la période pertinente, les avocats du cabinet Osler étaient conseillers juridiques d'Enfield et c'est à ce titre qu'ils ont représenté Blair, comme ils étaient tenus de le faire sur le plan professionnel. En fait, la seule raison pour laquelle Osler a représenté Blair lors de la demande de Canadian Express était qu'Enfield y était cité comme codéfendeur. Il n'y a pas la moindre preuve que les conseils donnés à Blair par Osler au cours de l'assemblée aient été influencés par quelque partialité que ce soit. Sa conclusion quant à la validité des procurations était raisonnable et portait sur une question de droit complexe au sujet de laquelle le juge J. Holland a entendu, pendant huit jours, des témoignages d'experts avant de tirer sa conclusion. Cela semble confirmer qu'accorder aux représentants de Canadian Express quelques instants pour s'adresser aux participants à l'assemblée des actionnaires n'aurait pas permis de régler cette question. En outre, il y a lieu de se rappeler que l'on n'aurait pas pu s'attendre à ce que Blair, qui n'était pas juriste, ait des doutes au sujet de conseils qui paraissaient légitimes à première vue et émanaient des propres avocats d'Enfield. Je suis donc d'avis de confirmer la conclusion de la Cour d'appel que les conseils donnés par Osler et

70

(p. 801). He thereby acted in accordance with the duties he owed.

#### (iv) The interests of the shareholders not present at the meeting

71    Many of the persons issuing proxies were not present at the meeting. Although they may very well have been informed of the tensions between Blair and Canadian Express, they would certainly not have expected there to be a contested election for the position of 11th director. At the time the proxies were given to Ravelston and Canadian Express, it was assumed that the 11 persons listed in the management circular would simply be elected. The evidentiary record does not reveal that anyone's mind was alerted to the possibility that the proxyholders would use the proxies to nominate Price over Blair. No notice whatsoever was given of Price's nomination. In this context, I find some merit to Blair's submission that his decision to follow Osler's advice must be viewed also in light of the interests of the shareholders not present at the meeting.

72    In the end, by following the instructions on the proxies and then requisitioning a new shareholders' meeting on July 24, 1989, Blair gave all shareholders an opportunity to make a fully informed decision regarding the election of the directors, thereby promoting the integrity of Enfield's voting procedures. Shareholders holding fully 16 percent of the shares of Enfield who were not aware that Canadian Express would attempt to take control of the Board were thus placed in a position of being able to make an informed choice as to how to vote (see judgment of the Court of Appeal, at p. 801). The corollary is that Canadian Express suffered no prejudice in respect of its voting rights in that it had the opportunity to nominate and support Price at the new meeting or pursue legal action against Enfield. Instead of waiting for the newly requisitioned meeting (at which it could have ensured that its proxies would be filled out as *per* Osler's

suivis par Blair auraient été [TRADUCTION] «manifestement crédibles» (p. 801) pour une personne non juriste placée dans la situation de Blair (et possédant son expérience des affaires). Blair a donc agi conformément aux obligations qui lui incombaient.

#### (iv) Les intérêts des actionnaires non présents à l'assemblée

Bon nombre des personnes ayant donné des procurations n'étaient pas présentes à l'assemblée. Bien qu'elles aient très bien pu être au courant des tensions entre Blair et Canadian Express, elles ne s'attendaient certainement pas à ce que l'élection du onzième administrateur soit contestée. Au moment où les procurations ont été remises à Ravelston et à Canadian Express, on présumait que les 11 personnes nommées dans la circulaire de la direction seraient tout simplement élues. D'après la preuve, personne ne croyait que les fondés de pouvoir pourraient utiliser les procurations pour nommer Price plutôt que Blair. Aucun avis de la nomination de Price n'a été donné. Dans ce contexte, je considère comme étant fondé jusqu'à un certain point l'argument de Blair voulant que sa décision de suivre les conseils d'Osler doive être également appréciée en fonction des intérêts des actionnaires qui n'assistaient pas à l'assemblée.

Finalement, en suivant les instructions contenues dans les procurations et en demandant, le 24 juillet 1989, qu'une nouvelle assemblée des actionnaires soit convoquée, Blair a donné à tous les actionnaires la possibilité de prendre une décision parfaitement éclairée au sujet de l'élection des administrateurs, et a préservé de ce fait l'intégrité des procédures de scrutin d'Enfield. Les actionnaires qui détenaient 16 pour 100 des actions d'Enfield et qui ne savaient pas que Canadian Express essaierait de prendre le contrôle du conseil d'administration étaient donc en mesure de faire un choix éclairé quant à leur façon de voter (voir l'arrêt de la Cour d'appel, à la p. 801). Il s'ensuit que Canadian Express n'a subi aucun préjudice quant à ses droits de vote, étant donné qu'elle avait la possibilité de nommer et d'appuyer Price lors de la nouvelle assemblée, ou d'intenter une action en justice contre Enfield. Au lieu d'attendre la tenue de la

instructions), Canadian Express took the far more circuitous route of obtaining Price's election through the court system, with the hope of transferring the costs thereof upon Blair. A similar observation was made by Carthy J.A. (at pp. 802-3):

Given the opportunity provided by Blair's requisition of the meeting on July 24 the more obvious question is why Canadian Express did not drop the litigation. In a way, it was being offered the opportunity to correct the mistake that had apparently been made on July 19 and 20. It was up to the board of Enfield to set the date for the meeting, and at a meeting on July 27 it was decided, without dissent and without Blair's involvement, to do nothing until the outcome of the court case was known . . . .

Blair added nothing to the costs of the proceedings, his requisition of an annual meeting made it possible for the board to hold one before the litigation reached the courtroom, and his conduct was consistent with his protestations throughout that he had no interest in leading the company if voted out by a majority of informed shareholders. [Emphasis added.]

In my mind, the fact that Blair promptly, and contrary to his personal interests, requisitioned a new meeting constitutes further evidence that his actions were taken with a view to the best interests of Enfield. If anything, Canadian Express's decision to pursue this matter through litigation drives against the well-being of Enfield's shareholders, especially those who have no personal interest in who acts as the 11th director, provided simply that individual discharge his or her duties to the corporation in a competent and trustworthy manner.

(v) Policy concerns

Permitting Blair to be indemnified is consonant with the broad policy goals underlying indemnity provisions; these allow for reimbursement for reasonable good faith behaviour, thereby discouraging the hindsight application of perfection. Indemnification is geared to encourage responsible beha-

nouvelle assemblée demandée (à laquelle elle aurait pu s'assurer que ses procurations seraient exécutées conformément aux directives d'Osler), Canadian Express a emprunté la voie beaucoup plus sinueuse des procédures judiciaires pour obtenir l'élection de Price, en espérant que Blair en assumerait les frais. Le juge Carthy fait une observation similaire (aux pp. 802 et 803):

[TRADUCTION] Compte tenu de l'occasion fournie, le 24 juillet, par la demande de tenue d'une assemblée présentée par Blair, la question la plus évidente qui se pose est de savoir pourquoi Canadian Express n'a pas laissé tomber les procédures judiciaires. En un sens, on lui donnait la possibilité de corriger l'erreur qui avait apparemment été commise les 19 et 20 juillet. Il revenait au conseil d'administration d'Enfield de choisir la date de l'assemblée et, à la réunion du 27 juillet, il a été décidé, à l'unanimité et sans la participation de Blair, de ne rien faire jusqu'à l'issue du procès . . .

Blair n'a rien ajouté aux frais des procédures, sa demande d'assemblée annuelle permettait au conseil d'administration d'en tenir une avant l'audition du litige, et sa conduite était conforme à ses protestations répétées selon lesquelles il n'avait aucun intérêt à diriger la société s'il n'était pas réélu par une majorité d'actionnaires bien informés. [Je souligne.]

À mon avis, le fait que Blair ait promptement, et contrairement à ses intérêts personnels, demandé que l'on tienne une nouvelle assemblée constitue une preuve de plus qu'il a agi au mieux des intérêts d'Enfield. C'est plutôt la décision de Canadian Express de régler la question par la voie de procédures judiciaires qui va à l'encontre du bien-être des actionnaires d'Enfield, en particulier ceux qui n'ont aucun intérêt personnel quant à la personne qui occupe le onzième poste d'administrateur, pourvu simplement que cette personne remplisse fidèlement et avec compétence ses obligations envers la société.

(v) Préoccupations de principe

Permettre à Blair d'être indemnisé est conforme aux objectifs de principe généraux qui soustendent les dispositions en matière d'indemnisation; celles-ci permettent le remboursement dans les cas de conduite raisonnable et de bonne foi, décourageant ainsi l'application après coup de

73

74

viour yet still permit enough leeway to attract strong candidates to directorships and consequently foster entrepreneurism. It is for this reason that indemnification should only be denied in cases of *mala fides*. A balance must be maintained. As noted by Ziegel et al. *Cases and Materials on Partnerships and Canadian Business Corporations*, vol. 1 (3rd ed. 1994), at p. 523:

If an officer or director is compensated for acts of fraud or misappropriation effected against the corporation and its shareholders, then, apart from the negative publicity aspect of an explicit judgment against the director or officer, there will be little deterrent value left in legal controls, and agency costs will be left uncontrolled. In essence, indemnification would be tantamount to an employment contract recognizing that a director owes no duty to various corporate constituencies.

Despite the concerns with unrestrained managerial opportunism, a blanket prohibition against arrangements designed to minimize the impact of civil liability may be overbroad. There may be situations in which directors and officers are held liable for conduct that was not coloured by any opportunistic behavior, and reflects outcomes that are the by-product of legitimate business judgments. [Emphasis added.]

75   Given the circumstances of this appeal, denying Blair indemnification would, in my mind, run afoul of these policy concerns. See also Daniels and Hutton, "The Capricious Cushion: The Implications of the Directors' and Officers' Insurance Liability Crisis on Canadian Corporate Governance" (1993), 22 *Can. Bus. L.J.* 182, at p. 187:

To temper excessive care and activity level reactions to potential gatekeeper liability, modern corporate law statutes permit a corporation to indemnify a director for any expense reasonably incurred in defending, settling or satisfying a judgment for any action, provided that the director's fiduciary duty to act "honestly and in good

normes de perfection. L'indemnisation vise à encourager la conduite responsable, mais laisse tout de même assez de latitude pour attirer des candidats solides aux postes d'administrateurs, et favorise donc l'esprit d'entreprise. C'est pour cette raison que l'indemnisation ne devrait être refusée que dans les cas de mauvaise foi. Il faut maintenir l'équilibre. Comme l'ont fait remarquer Ziegel et autres, dans *Cases and Materials on Partnerships and Canadian Business Corporations*, vol. 1 (3e éd. 1994), à la p. 523:

[TRADUCTION] Si un dirigeant ou un administrateur est indemnisé pour des actions frauduleuses ou des détournements faits au détriment de la société et de ses actionnaires, alors, à part la publicité négative qui pourrait entourer un jugement explicite contre ce dirigeant ou cet administrateur, les mécanismes de contrôle prévus par la loi n'auront pas beaucoup d'effet de dissuasion, et les coûts d'encadrement ne feront l'objet d'aucun contrôle. Essentiellement, l'indemnisation équivaudrait à un contrat de travail reconnaissant que l'administrateur n'a aucune obligation envers divers groupes de la société.

Malgré les craintes d'opportunisme effréné de la part de la direction, une interdiction générale de toute convention visant à minimiser l'incidence de la responsabilité civile peut être exagérée. Il peut se présenter des situations où les administrateurs et les dirigeants sont tenus responsables d'une conduite qui n'était entachée d'aucun opportunisme, et qui reflète des résultats constituant le sous-produit de décisions d'affaires légitimes. [Je souligne.]

Compte tenu des circonstances du présent pourvoi, j'estime que refuser à Blair l'indemnisation irait à l'encontre de ces préoccupations de principe. Voir aussi Daniels et Hutton, «The Capricious Cushion: The Implications of the Directors' and Officers' Insurance Liability Crisis on Canadian Corporate Governance» (1993), 22 *Can. Bus. L.J.* 182, à la p. 187:

[TRADUCTION] Afin de tempérer les réactions de prudence et d'activité excessives face au risque d'engager une responsabilité de «gardien», les lois modernes sur les sociétés permettent à une société d'indemniser un administrateur de toutes les dépenses raisonnablement engagées pour se défendre, régler une action ou satis-

faith and with a view to the best interests of the corporation" has been fulfilled.

## VI. Conclusion And Disposition

The appeal is dismissed. Blair's ruling was made with the *bona fide* intent that the corporation have a lawfully elected Board of Directors. It is insufficient to say retrospectively that Blair "should have" acted differently or that he did not handle things perfectly in order to deny indemnification under s. 136(1). Actual *mala fides* must be shown such that the director did not act with a view to the best interests of the corporation. This has not been demonstrated in this case. Therefore Blair is entitled to indemnification for the costs arising out of the application before J. Holland J. (though not for the costs of appealing J. Holland J.'s decision regarding the validity of the impugned proxies, and the expenses related thereto, which Carthy J.A. found not to have been reasonably incurred).

As pronounced at the hearing of the appeal, the appeal is dismissed with costs to the respondent on a solicitor-client basis. After the judgment was pronounced but before reasons were released, Blair brought a motion under rules 5 and 51 of the *Rules of the Supreme Court of Canada*, SOR/83-74, for an extension of time and a rehearing, to seek clarification of this Court's order with respect to costs. Upon consideration of the materials filed by Blair and Enfield in connection with the motion, and upon consideration of all the circumstances, Blair is awarded his costs on a solicitor and client scale not only in this Court but also in the proceedings before Carruthers J. and in the Ontario Court of Appeal.

*Appeal dismissed with costs.*

*Solicitors for the appellant: Borden & Elliot, Toronto.*

*Solicitors for the respondent: Patricia A. Virc, Collingwood, Ont.*

faire à un jugement relatif à une action, pourvu qu'il ait rempli son obligation fiduciaire d'agir «avec intégrité et de bonne foi au mieux des intérêts de la société».

## VI. Conclusion et dispositif

Le pourvoi est rejeté. Blair a pris sa décision de bonne foi, dans l'intention que la société ait un conseil d'administration légalement élu. Il ne suffit pas d'affirmer rétrospectivement que Blair «aurait dû» agir différemment ou qu'il n'a pas fait exactement ce qu'il devait faire, pour lui refuser l'indemnisation prévue au par. 136(1). Il faut démontrer l'existence réelle de mauvaise foi de manière à établir que l'administrateur n'a pas agi au mieux des intérêts de la société. Cela n'a pas été fait en l'espèce. C'est pourquoi Blair a droit à l'indemnisation des frais découlant de la demande devant le juge J. Holland (quoique non des frais d'appel de la décision du juge J. Holland portant sur la validité des procurations contestées et sur les dépenses y relatives que le juge Carthy n'a pas jugées raisonnables). [76]

Conformément au jugement prononcé à l'issue de l'audience, le pourvoi est rejeté et l'intimé a droit à ses dépens sur la base procureur-client. Après que le jugement eut été rendu mais avant le dépôt des motifs, Blair a présenté une requête fondée sur les art. 5 et 51 des *Règles de la Cour suprême du Canada*, DORS/83-74, en vue d'obtenir une prorogation de délai et une nouvelle audition qui permettraient de clarifier l'ordonnance que notre Cour a rendue en matière de dépens. Après examen des documents produits par Blair et Enfield relativement à cette requête, et compte tenu de toutes les circonstances, Blair a droit à ses dépens sur la base procureur-client non seulement devant notre Cour mais encore relativement aux procédures devant le juge Carruthers et la Cour d'appel de l'Ontario. [77]

*Pourvoi rejeté avec dépens.*

*Procureurs de l'appelante: Borden & Elliot, Toronto.*

*Procureurs de l'intimé: Patricia A. Virc, Collingwood (Ont.).*



# TAB3

[Indexed as: **Campeau v. Olympia & York Developments Ltd.**]

ROBERT CAMPEAU, ROBERT CAMPEAU INC., 75090 ONTARIO INC.,
and ROBERT CAMPEAU INVESTMENTS INC. v.
OLYMPIA & YORK DEVELOPMENTS LIMITED, 857408 ONTARIO INC.,
and NATIONAL BANK OF CANADA

Ontario Court of Justice (General Division),
R.A. Blair J.

Judgment – September 21, 1992.

**Stay of proceedings – Companies' Creditors Arrangement Act – Application for lifting of CCAA stay refused where proposed action being part of "controlled stream" of litigation and best dealt with under CCAA.**

The plaintiffs brought an action against the defendant, O & Y, alleging that it breached an obligation to assist in the restructuring of C Corp. The plaintiffs also alleged that O & Y actually frustrated the individual plaintiff's efforts to restructure C Corp.'s Canadian real estate operation. Damages in the amount of $1 billion for breach of contract or, alternatively, for breach of fiduciary duty, plus punitive damages of $250 million were claimed. The plaintiffs also claimed against the defendant bank alleging breach of fiduciary duty, negligence and breach of the provisions of s. 17(1) of the *Personal Property Security Act* (Ont.). Damages in the amount of $1 billion were claimed against the bank. This action was brought two weeks before an order was made extending the protection of the *Companies' Creditors Arrangement Act* ("CCAA") to O & Y.

The plaintiffs brought a motion to lift the stay imposed by the order under the CCAA and to allow them to pursue their action against O & Y. They argued that the claim would be better dealt with in the context of the action than in the context of the CCAA proceedings as it was uniquely complex.

The bank brought a motion opposing the plaintiffs' motion and seeking an order staying the plaintiffs' action against it pending the disposition of the CCAA proceedings. The bank argued that the factual basis of the claim against it was entirely dependent on the success of the allegations against O & Y and that the claim against O & Y would be better addressed within the context of the CCAA proceedings.

**Held** – The plaintiffs' motion was dismissed and the bank's motion was allowed.

In considering whether to grant a stay, a court must look at the balance of convenience. The balance of convenience must weigh significantly in favour of granting the stay, as a party's right to have access to the courts is something with which the court must not lightly interfere. The court must be satisfied that a continuance of the proceeding would serve as an injustice to the party seeking the stay. The onus of satisfying the court is on the party seeking the stay.

The CCAA proceedings in this case involved numerous applicants, claimants and complex issues and could be considered a "controlled stream" of litigation; maintaining the integrity of the flow was an important consideration.

The stay under the CCAA was not lifted, and a stay made under the court's general jurisdiction to order stays was imposed, preventing the continuation of the action against the bank. There was no prejudice to the plaintiffs arising from these decisions, as the processing of their action was not precluded, but merely postponed. Were the CCAA stay lifted, there might be great prejudice to O & Y resulting from the diversion of its attention from the corporate restructuring process in order to defend the complex action proposed. There might not, however, be much prejudice to the bank in allowing the plaintiffs' action to proceed against it; however, such a proceeding could not proceed very far or effectively without the participation of O & Y.

### Cases considered

*Arab Monetary Fund v. Hashim* (June 25, 1992), Doc. 34127/88, O'Connell J. (Ont. Gen. Div.), [1992] O.J. No. 1330 – referred to.

*Attorney General v. Arthur Anderson & Co.* (1988), [1989] E.C.C. 224 (C.A.) – referred to.

*Canada Systems Group (EST) Ltd. v. Allendale Mutual Insurance Co.* (1982), 29 C.P.C. 60, 137 D.L.R. (3d) 287 (Ont. H.C.) – applied. .

*Empire-Universal Films Ltd. v. Rank,* [1947] O.R. 775 (H.C.) – referred to.

*Norcen Energy Resources Ltd. v. Oakwood Petroleums Ltd.* (1988), 72 C.B.R. (N.S.) 1, 63 Alta. L.R. (2d) 361, 92 A.R. 81 (Q.B.) – referred to.

*Quintette Coal Ltd. v. Nippon Steel Corp.* (1990), 2 C.B.R. (3d) 303, 51 B.C.L.R. (2d) 105 (C.A.) – applied.

*Weight Watchers International Inc. v. Weight Watchers of Ontario Ltd.* (1972), 25 D.L.R. (3d) 419, 5 C.P.R. (2d) 122 (Fed. T.D.), appeal allowed by consent without costs (1972), 10 C.P.R. (2d) 96n, 42 D.L.R. (3d) 320n (Fed. C.A.) – referred to.

*Weight Watchers International Inc. v. Weight Watchers of Ontario Ltd.* (1972), 10 C.P.R. (2d) 96n, 42 D.L.R. (3d) 320n (Fed. C.A.) – referred to.

### Statutes considered

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 –
     s. 11

Courts of Justice Act, R.S.O. 1990, c. C.43 –
     s. 106

Personal Property Security Act, R.S.O. 1990, c. P.10 –
     s. 17(1)

### Rules considered

Ontario, Rules of Civil Procedure –
     r. 6.01(1)


MOTION to lift stay under *Companies' Creditors Arrangement Act*; MOTION for stay under *Courts of Justice Act*.


*Stephen T. Goudge, Q.C.* and *Peter C. Wardle*, for plaintiffs.
*Peter F.C. Howard*, for National Bank of Canada.
*Yoine Goldstein*, for Olympia & York Developments Limited and 857408 Ontario Inc.

(Docs. 92-CQ-19675, B-125/92)

1        September 21, 1992.  R.A. BLAIR J: – These motions raise
questions regarding the court's power to stay proceedings.  Two com-
peting interests are to be weighed in the balance, namely,

> a) the interests of a debtor which has been granted the protec-
> tion of the *Companies' Creditors Arrangement Act*, R.S.C.
> 1985, c. C-36, and the "breathing space" offered by a s. 11 stay
> in such proceedings, on the one hand, and,

> b) the interests of a unliquidated contingent claimant to pursue
> an action against that debtor *and* an arm's length third party, on
> the other hand.

2        At issue is whether the court should resort to an interplay be-
tween its specific power to grant a stay, under s. 11 of the C.C.A.A.,
and its general power to do so under the *Courts of Justice Act*, R.S.O.
1990, c. C.43 in order to stay the action completely; or whether it
should lift the s. 11 stay to allow the action to proceed; or whether it
should exercise some combination of these powers.

### Background and Overview

3        This action was commenced on April 28, 1992, and the state-
ment of claim was served before May 14, 1992, the date on which an
order was made extending the protection of the C.C.A.A. to Olympia
& York Developments Limited and a group of related companies
("Olympia & York", or "O & Y" or the "Olympia & York Group").

4        The plaintiffs are Robert Campeau and three Campeau family
corporations which, together with Mr. Campeau, held the control
block of shares of Campeau Corporation.  Mr. Campeau is the former
chairman and CEO of Campeau Corporation, said to have been one of
North America's largest real estate development companies, until its
recent rather high profile demise.  It is the fall of that empire which
forms the subject matter of the lawsuit.

### The Claim against the Olympia & York Defendants

5        The story begins, according to the statement of claim, in 1987,
after Campeau Corporation had completed a successful leveraged
buy-out of Allied Stores Corporation, a very large retailer based in the
United States.  Olympia & York had aided in funding the Allied
takeover by purchasing half of Campeau Corporation's interest in the
Scotia Plaza in Toronto and subsequently also purchasing 10 per cent

of the shares of Campeau Corporation. By late 1987, it is alleged, the relationship between Mr. Campeau and Mr. Paul Reichmann (one of the principals of Olympia & York) had become very close, and an agreement had been made whereby Olympia & York was to provide significant financial support, together with the considerable expertise and the experience of its personnel, in connection with Campeau Corporation's subsequent bid for control of Federated Stores Inc. (a second major U.S. department store chain). The story ends, so it is said, in 1991 after Mr. Campeau had been removed as chairman and CEO of Campeau Corporation and that company, itself, had filed for protection under the C.C.A.A. (from which it has since emerged, bearing the new name of Camdev Corp.).

6          In the meantime, in September 1989, the Olympia & York defendants, through Mr. Paul Reichmann, had entered into a shareholders' agreement with the plaintiffs in which, it is further alleged, Olympia & York obliged itself to develop and implement expeditiously a viable restructuring plan for Campeau Corporation. The allegation that Olympia & York breached this obligation by failing to develop and implement such a plan, together with the further assertion that the O & Y defendants actually frustrated Mr. Campeau's efforts to restructure Campeau Corporation's Canadian real estate operation, lies at the heart of the Campeau action. The plaintiffs plead that as a result they have suffered very substantial damages, including the loss of the value of their shares in Campeau Corporation, the loss of the opportunity of completing a refinancing deal with the Edward DeBartolo Corporation, and the loss of the opportunity on Mr. Campeau's part to settle his personal obligations on terms which would have preserved his position as chairman and CEO and majority shareholder of Campeau Corporation.

7          Damages are claimed in the amount of $1 billion, for breach of contract or, alternatively, for breach of fiduciary duty. Punitive damages in the amount of $250 million are also sought.

## The Claim against National Bank of Canada

8          Similar damages, in the amount of $1 billion (but no punitive damages), are claimed against the defendant National Bank of Canada, as well. The causes of action against the bank are framed as breach of fiduciary duty, negligence, and breach of the provisions of s. 17(1) of the *Personal Property Security Act* [R.S.O. 1990, c. P.10]. They arise out of certain alleged acts of misconduct on the part of the bank's representatives on the board of directors of Campeau Corporation.

9          In 1988 the plaintiffs had pledged some of their shares in Campeau Corporation to the bank as security for a loan advanced in

connection with the Federated Stores transaction. In early 1990, one
of the plaintiffs defaulted on its obligations under the loan and the
bank took control of the pledged shares. Thereafter, the statement of
claim alleges, the bank became more active in the management of
Campeau, through its nominees on the board.

10      The bank had two such nominees. Olympia & York had three.
There were 12 directors in total. What is asserted against the bank is
that its directors, in co-operation with the Olympia & York directors,
acted in a way to frustrate Campeau's restructuring efforts and
favoured the interests of the bank as a secured lender rather than the
interests of Campeau Corporation, of which they were directors. In
particular, it is alleged that the bank's representatives failed to ensure
that the DeBartolo refinancing was implemented and, indeed, actively
supported Olympia & York's efforts to frustrate it, and in addition,
that they supported Olympia & York's efforts to refuse to approve or
delay the sale of real estate assets.

## The Motions

11      There are two motions before me.

12      The first motion is by the Campeau plaintiffs to lift the stay im-
posed by the order of May 14, 1992 under the C.C.A.A. and to allow
them to pursue their action against the Olympia & York defendants.
They argue that a plaintiff's right to proceed with an action ought not
lightly to be precluded; that this action is uniquely complex and dif-
ficult; and that the claim is better and more easily dealt with in the
context of the action rather than in the context of the present C.C.A.A.
proceedings.   Counsel acknowledge that the factual bases of the
claims against Olympia & York and the bank are closely intertwined
and that the claim for damages is the same, but argue that the causes
of action asserted against the two are different. Moreover, they sub-
mit, this is not the usual kind of situation where a stay is imposed to
control the process and avoid inconsistent findings when the same
parties are litigating the same issues in parallel proceedings.

13      The second motion is by National Bank, which of course op-
poses the first motion, and which seeks an order staying the Campeau
action as against it as well, pending the disposition of the C.C.A.A.
proceedings. Counsel submits that the factual substratum of the claim
against the bank is dependent entirely on the success of the allegations
against the Olympia & York defendants, and that the claim against
those defendants is better addressed within the parameters of the
C.C.A.A. proceedings. He points out also that if the action were to be
taken against the bank alone, his client would be obliged to bring
Olympia & York back into the action as third parties in any event.

*The Power to Stay*

14        The court has always had an inherent jurisdiction to grant a stay of proceedings whenever it is just and convenient to do so, in order to control its process or prevent an abuse of that process: see *Canada Systems Group (EST) Ltd. v. Allendale Mutual Insurance Co.* (1982), 29 C.P.C. 60, 137 D.L.R. (3d) 287 (Ont. H.C.), and cases referred to therein. In the civil context, this general power is also embodied in the very broad terms of s. 106 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, which provides as follows:

> "106. A court, on its own initiative or on motion by any person, whether or not a party, may stay any proceeding in the court on such terms as are considered just."

15        Recently, Mr. Justice O'Connell has observed that this discretionary power is "highly dependent on the facts of each particular case": *Arab Monetary Fund v. Hashim* (unreported) [(June 25, 1992), Doc. 34127/88 (Ont. Gen. Div.)], [1992] O.J. No. 1330.

16        Apart from this inherent and general jurisdiction to stay proceedings, there are many instances where the court is specifically granted the power to stay in a particular context, by virtue of statute or under the *Rules of Civil Procedure*. The authority to prevent multiplicity of proceedings in the same court, under r. 6.01(1), is an example of the latter. The power to stay judicial and extra-judicial proceedings under s. 11 of the C.C.A.A., is an example of the former. Section 11 of the C.C.A.A. provides as follows:

> "11. Notwithstanding anything in the *Bankruptcy Act* or the *Winding-up Act*, whenever an application has been made under this Act in respect of any company, the court, on the application of any person interested in the matter, may, on notice to any other person or without notice as it may see fit,
>
>> (a) make an order staying, until such time as the court may prescribe or until any further order, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy Act* and the *Winding-up Act* or either of them;
>>
>> (b) restrain further proceedings in any action, suit or proceeding against the company on such terms as the court sees fit; and
>>
>> (c) make an order that no suit, action or other proceeding shall be proceeded with or commenced against the com-

> pany except with the leave of the court and subject to such terms as the court imposes."

### The Power to Stay in the Context of C.C.A.A. Proceedings

17     By its formal title the C.C.A.A. is known as "An Act to facilitate compromises and arrangements between companies and their creditors". To ensure the effective nature of such a "facilitative" process it is essential that the debtor company be afforded a respite from the litigious and other rights being exercised by creditors, while it attempts to carry on as a going concern and to negotiate an acceptable corporate restructuring arrangement with such creditors.

18     In this respect it has been observed that the C.C.A.A. is "to be used as a practical and effective way of restructuring corporate indebtedness": see the case comment following the report of *Norcen Energy Resources Ltd. v. Oakwood Petroleums Ltd.* (1988), 72 C.B.R. (N.S.) 1, 63 Alta. L.R. (2d) 361, 92 A.R. 81 (Q.B), and the approval of that remark as "a perceptive observation about the attitude of the courts" by Gibbs J.A. in *Quintette Coal Ltd. v. Nippon Steel Corp.* (1990), 2 C.B.R. (3d) 303, 51 B.C.L.R. (2d) 105 (C.A.) at p. 113 [B.C.L.R.].

19     Gibbs J.A. continued with this comment:

> "To the extent that a general principle can be extracted from the few cases directly on point, and the others in which there is persuasive obiter, it would appear to be that the courts have concluded that under s. 11 there is *a discretionary power to restrain judicial or extra-judicial conduct* against the debtor company *the effect of which is, or would be, seriously to impair the ability of the debtor company to continue in business during the compromise or arrangement negotiating period.*" (emphasis added)

20     I agree with those sentiments and would simply add that, in my view, the restraining power extends as well to conduct which could seriously impair the debtor's ability to focus and concentrate its efforts on the business purpose of negotiating the compromise or arrangement.

21     I must have regard to these foregoing factors while I consider, as well, the general principles which have historically governed the court's exercise of its power to stay proceedings. These principles were reviewed by Mr. Justice Montgomery in *Canada Systems Group (EST) Ltd. v. Allendale Mutual Insurance*, supra (a "Mississauga Derailment" case), at pp. 65-66 [C.P.C.]. The balance of convenience must weigh significantly in favour of granting the stay, as a party's

right to have access to the courts must not be lightly interfered with. The court must be satisfied that a continuance of the proceeding would serve as an injustice to the party seeking the stay, in the sense that it would be oppressive or vexatious or an abuse of the process of the court in some other way. The stay must not cause an injustice to the plaintiff. On all of these issues the onus of satisfying the court is on the party seeking the stay: see also *Weight Watchers International Inc. v. Weight Watchers of Ontario Ltd.* (1972), 25 D.L.R. (3d) 419, 5 C.P.R. (2d) 122 (Fed. T.D.), appeal allowed by consent without costs (1972), 10 C.P.R. (2d) 96n, 42 D.L.R. (3d) 320n (Fed. C.A.), where Mr. Justice Heald recited the foregoing principles from *Empire-Universal Films Ltd. v. Rank*, [1947] O.R. 775 (H.C.) at p. 779.

22      *Canada Systems Group (EST) Ltd. v. Allendale Mutual Insurance*, supra, is a particularly helpful authority, although the question in issue there was somewhat different than those in issue on these motions. The case was one of several hundred arising out of the Mississauga derailment in November 1979, all of which actions were being case-managed by Montgomery J. These actions were all part of what Montgomery J. called "a controlled stream" of litigation involving a large number of claims and innumerable parties. Similarly, while the Olympia & York proceedings under the C.C.A.A. do not involve a large number of separate actions, they do involve numerous applicants, an even larger number of very substantial claimants, and a diverse collection of intricate and broad-sweeping issues. In that sense the C.C.A.A. proceedings are a controlled stream of litigation. Maintaining the integrity of the flow is an important consideration.

## Disposition

23      I have concluded that the proper way to approach this situation is to continue the stay imposed under the C.C.A.A. prohibiting the action against the Olympia & York defendants, and in addition, to impose a stay, utilizing the court's general jurisdiction in that regard, preventing the continuation of the action against National Bank as well. The stays will remain in effect for as long as the s. 11 stay remains operative, unless otherwise provided by order of this court.

24      In making these orders, I see no prejudice to the Campeau plaintiffs. The processing of their action is not being precluded, but merely postponed. Their claims may, indeed, be addressed more expeditiously than might have otherwise been the case, as they may be dealt with – at least for the purposes of that proceeding – in the C.C.A.A. proceeding itself. On the other hand, there might be great prejudice to Olympia & York if its attention is diverted from the corporate restructuring process and it is required to expend time and

energy in defending an action of the complexity and dimension of this one. While there may not be a great deal of prejudice to National Bank in allowing the action to proceed against it, I am satisfied that there is little likelihood of the action proceeding very far or very effectively unless and until Olympia & York – whose alleged misdeeds are the real focal point of the attack on both sets of defendants – is able to participate.

25      In addition to the foregoing, I have considered the following factors in the exercise of my discretion:

> 1. Counsel for the plaintiffs argued that the Campeau claim must be dealt with, either in the action or in the C.C.A.A. proceedings and that it cannot simply be ignored. I agree. However, in my view, it is more appropriate, and in fact is essential, that the claim be addressed within the parameters of the C.C.A.A. proceedings rather than outside, in order to maintain the integrity of those proceedings. Were it otherwise, the numerous creditors in that mammoth proceeding would have no effective way of assessing the weight to be given to the Campeau claim in determining their approach to the acceptance or rejection of the Olympia & York plan filed under the Act.

> 2. In this sense, the Campeau claim – like other secured, under-secured, unsecured, and contingent claims – must be dealt with as part of a "controlled stream" of claims that are being negotiated with a view to facilitating a compromise and arrangement between Olympia & York and its creditors. In weighing "the good management" of the two sets of proceedings – i.e., the action and the C.C.A.A. proceeding – the scales tip in favour of dealing with the Campeau claim in the context of the latter: see *Attorney General v. Arthur Andersen & Co.* (1988), [1989] E.C.C. 224 (C.A.), cited in *Arab Monetary Fund v. Hashim*, supra.

> I am aware, when saying this, that in the initial plan of compromise and arrangement filed by the applicants with the court on August 21, 1992, the applicants have chosen to include the Campeau plaintiffs amongst those described as "Persons not Affected by the Plan". This treatment does not change the issues, in my view, as it is up to the applicants to decide how they wish to deal with that group of "creditors" in presenting their plan, and up to the other creditors to decide whether they will accept such treatment. In either case, the matter is being dealt with, as it should be, within the context of the C.C.A.A. proceedings.

3. Pre-judgment interest will compensate the plaintiffs for any delay caused by the imposition of the stays, should the action subsequently proceed and the plaintiffs ultimately be successful.

4. While there may not be great prejudice to National Bank if the action were to continue against it alone and the causes of action asserted against the two groups of defendants are different, the complex factual situation is common to both claims and the damages are the same. The potential of two different inquiries at two different times into those same facts and damages is not something that should be encouraged. Such multiplicity of inquiries should in fact be discouraged, particularly where – as is the case here – the delay occasioned by the stay is relatively short (at least in terms of the speed with which an action like this Campeau action is likely to progress).

## Conclusion

26      Accordingly, an order will go as indicated, dismissing the motion of the Campeau plaintiffs and allowing the motion of National Bank. Each stay will remain in effect until the expiration of the stay period under the C.C.A.A. unless extended or otherwise dealt with by the court prior to that time. Costs to the defendants in any event of the cause in the Campeau action. I will fix the amounts if counsel wish me to do so.

*Order accordingly.*



# TAB4

The Minister of Justice of Canada and the
Minister of Finance of Canada *(Defendants)*
*Appellants*;

and

Joseph Borowski *(Plaintiff) Respondent*;

and

The Attorney General of Ontario, the
Attorney General of British Columbia and the
Attorney General of Alberta *Interveners.*

1981: May 27, 28; 1981: December 1.

Present: Laskin C.J. and Martland, Ritchie, Dickson,
Beetz, Estey, McIntyre, Chouinard and Lamer JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR
SASKATCHEWAN

*Courts — Standing — Respondent seeking declara-
tion that abortion provisions of Criminal Code violating
Canadian Bill of Rights and therefore invalid —
Respondent's only interest that of concerned citizen —
Whether respondent should be given standing — Crimi-
nal Code, R.S.C. 1970, c. C-34, s. 251(4),(5),(6) —
Canadian Bill of Rights, R.S.C. 1970, Appendix III,
ss. 1(a), 2(e), (g).*

Respondent, a prominent crusader against abortion,
sought a declaration in Saskatchewan's Court of
Queen's Bench that s. 251(4),(5),(6) of the *Criminal
Code* permitting procurement of miscarriage were in-
valid and inoperative in that they abridged the right to
human life contrary to the *Canadian Bill of Rights*.
Appellant's argument that jurisdiction lay exclusively
with the Federal Court was rejected in an order of the
Court of Queen's Bench and on appeal from that order.
This Court considered not only the issue of jurisdiction
but also, on agreement of counsel, whether respondent
had the legal standing necessary to maintain the
action—a matter denied by the appellant but not
addressed in previous proceedings.

*Held* (Laskin C.J. and Lamer J. dissenting): The
appeal should be dismissed.

*Per* Martland, Ritchie, Dickson, Beetz, Estey, McIn-
tyre and Chouinard JJ.: To establish status as a plaintiff
in a suit seeking a declaration that legislation is invalid,
if there is a serious issue as to its validity, a person need
only to show that he is affected by it directly or that he

Le ministre de la Justice du Canada et le
ministre des Finances du Canada
*(Défendeurs) Appelants*;

et

Joseph Borowski *(Demandeur) Intimé*;

et

Le procureur général de l'Ontario, le
procureur général de la Colombie-Britannique
et le procureur général de l'Alberta
*Intervenants.*

1981: 27, 28 mai; 1981: 1ᵉʳ décembre.

Présents: Le juge en chef Laskin et les juges Martland,
Ritchie, Dickson, Beetz, Estey, McIntyre, Chouinard et
Lamer.

EN APPEL DE LA COUR D'APPEL DE LA
SASKATCHEWAN

*Tribunaux — Intérêt pour agir — Jugement déclara-
toire demandé par l'intimé portant que les dispositions
du Code criminel relatives à l'avortement sont contrai-
res à la Déclaration canadienne des droits et par consé-
quent nulles — Le seul intérêt de l'intimé est celui de
citoyen concerné — Faut-il déclarer que l'intimé a
intérêt pour agir? — Code criminel, S.R.C. 1970, chap.
C-34, art. 251(4),(5),(6) — Déclaration canadienne des
droits, S.R.C. 1970, Appendice III, art. 1a), 2e), g).*

L'intimé, qui est un opposant notoire à l'avortement, a
demandé à la Cour du Banc de la Reine de la Saska-
tchewan un jugement déclaratoire selon lequel les par.
251(4),(5),(6) du *Code criminel*, qui autorisent l'avorte-
ment, sont nuls et inopérants parce qu'ils enfreignent le
droit à la vie humaine en contravention de la *Déclara-
tion canadienne des droits*. La Cour du Banc de la
Reine a, par ordonnance confirmée en Cour d'appel,
rejeté l'argument de l'appelant selon lequel la Cour
fédérale est seule compétente. Cette Cour a non seule-
ment étudié la question de compétence, mais elle a aussi,
du consentement des procureurs des parties, étudié si
l'intimé avait l'intérêt nécessaire pour agir en justice, ce
qui est contesté par l'appelant mais n'a pas été abordé
dans les procédures antérieures.

*Arrêt*: (Le juge en chef Laskin et le juge Lamer sont
dissidents): Le pourvoi est rejeté.

*Les* juges Martland, Ritchie, Dickson, Beetz, Estey,
McIntyre et Chouinard: Pour établir l'intérêt pour agir
à titre de demandeur dans une poursuite visant à décla-
rer qu'une loi est invalide, si cette question se pose
sérieusement, il suffit qu'une personne démontre qu'elle

has a genuine interest as a citizen in the validity of the legislation and that there is no other reasonable and effective manner in which the issue may be brought before the Court. Respondent met this test. As the legislation provides exemption from criminal liability, it would be difficult to find a class of person directly affected or exceptionally prejudiced by it who would have cause to attack the legislation. This issue could not reasonably be brought into Court unless proceedings were launched by an interested citizen.

The jurisdictional issue did not differ materially from two cases heard immediately prior to this case and its disposition should be the same.

*Per* Laskin C.J. and Lamer J., *dissenting*: The jurisdictional issue should be disposed of as in two earlier and similar cases.

Generally, it is not open to a person as a citizen and/or taxpayer to invoke the jurisdiction of a competent court to obtain a ruling on the interpretation or application of legislation or its validity, when the person is not directly affected by the legislation or threatened by sanctions for its breach. While exceptions to this general rule exist, none applies to respondent's case. The legislation here did not affect all members of the public alike, and this fact was a central consideration to the court's exercising its discretion against giving respondent standing. The difficulty of reaching a judicial conclusion. in the time following satisfaction of statutory requirements for therapeutic abortion but before birth or abortion was not preclusive; the point should be decided at the instance of a person having a greater interest than that of citizen and taxpayer, such as the doctors involved or the husband of a woman planning to have an abortion.

[*Thorson v. Attorney General of Canada*, [1975] 1 S.C.R. 138; *Nova Scotia Board of Censors v. McNeil*, [1976] 2 S.C.R. 265, applied; *Smith v. Attorney General of Ontario*, [1924] S.C.R. 331; *MacIlreith v. Hart* (1908), 39 S.C.R. 657, referred to.]

APPEAL from a decision of the Saskatchewan Court of Appeal[1], dismissing appellant's appeal from a ruling of Hughes J. on a special motion, dealing with jurisdiction, in an action before the

[1] [1981] 1 W.W.R. 1; (1980), 6 Sask. R. 218.

est directement touchée ou qu'elle a, à titre de citoyen, un intérêt véritable quant à la validité de la loi et qu'il n'y a pas d'autre manière raisonnable et efficace de soumettre la question à la Cour. L'intimé répond à ce critère. Puisque la loi prévoit une exception à la responsabilité pénale, il est difficile de trouver une catégorie de personnes directement touchées ou qui subissent un préjudice exceptionnel et qui aient un motif de contester la loi. Il n'y a pas de façon raisonnable de soumettre la question à la Cour à moins qu'un citoyen intéressé n'intente des procédures.

La question de compétence n'est pas substantiellement différente de celle soumise à la Cour dans deux litiges entendus immédiatement avant le présent pourvoi et il y a lieu de répondre dans le même sens.

*Le* juge en chef Laskin et le juge Lamer, *dissidents*: Il faut répondre à la question de compétence comme dans deux arrêts récents et analogues.

En règle générale, une personne ne peut, parce qu'elle est citoyen ou contribuable ou les deux à la fois, s'en remettre à la cour compétente pour obtenir une décision sur l'interprétation ou sur l'application d'une loi, ou sur sa validité, lorsque cette personne n'est pas directement touchée par la loi ou qu'elle n'est pas menacée de sanctions pour une infraction possible à la loi. Il existe des exceptions à cette règle générale, mais aucune ne s'applique au cas de l'intimé. La loi en cause ici ne touche pas toutes les personnes du public également et c'est là le motif primordial pour lequel la cour a statué contre l'attribution à l'intimé de la qualité pour agir. La difficulté d'obtenir une décision judiciaire après avoir satisfait aux exigences de la loi pour obtenir un avortement thérapeutique, mais avant que ne survienne l'avortement ou l'accouchement n'est pas un empêchement; la question doit être décidée à la demande d'une personne qui a un intérêt plus grand que celui d'un citoyen et contribuable, tels les médecins en cause ou le mari d'une femme qui demande un avortement.

[Jurisprudence: arrêts appliqués: *Thorson c. Procureur général du Canada*, [1975] 1 R.C.S. 138; *Nova Scotia Board of Censors c. NcNeil*, [1976] 2 R.C.S. 265; arrêts mentionnés: *Smith c. Procureur général de l'Ontario*, [1924] R.C.S. 331; *MacIlreith c. Hart* (1908), 39 R.C.S. 657.]

POURVOI contre un arrêt de la Cour d'appel de la Saskatchewan[1], qui rejette l'appel de l'appelant d'une décision du juge Hughes, sur une requête spéciale, portant sur la compétence, dans

[1] [1981] 1 W.W.R. 1; (1980), 6 Sask. R. 218.

Court of Queen's Bench. Appeal dismissed, Laskin C.J. and Lamer J. dissenting.

*W. I. C. Binnie, Q.C.*, for the appellants.

*Morris C. Shumiatcher, Q.C.*, for the respondent.

*John Cavarzan, Q.C.*, for the intervener the Attorney General for Ontario.

*William Henkel, Q.C.*, for the intervener the Attorney General for Alberta.

*E. R. A. Edwards*, for the intervener the Attorney General of British Columbia.

The reasons of Laskin C.J. and Lamer J. were delivered by

THE CHIEF JUSTICE (*dissenting*)—This appeal, which is here by leave of this Court given on terms as to costs, arises out of a taxpayer's action brought in the Court of Queen's Bench of Saskatchewan. The purpose of the action was to obtain a declaration against the appellants, the Minister of Justice of Canada and the Minister of Finance of Canada, that the so-called abortion provisions of *Criminal Code*, s. 251(4),(5) and (6) are inoperative as offending subss. 1(*a*) and 2(*e*) and (*g*) of the *Canadian Bill of Rights* and that any expenditure of public money to support therapeutic abortions under the aforesaid provisions of the *Criminal Code* is consequently illegal. Issue was taken by the defendants appellants as to the jurisdiction of the Court of Queen's Bench to entertain the action, the contention being that exclusive jurisdiction resided in the Federal Court of Canada under ss. 17 and 18 of the *Federal Court Act*, R.S.C. 1970 (2nd Supp.), c. 10. In their statement of defence, the defendants also challenged the standing of the plaintiff to maintain the action, regardless, apparently, of the appropriateness of the forum. .

The issue of jurisdiction was made the subject of a special motion which was heard and determined adversely to the defendants by Hughes J. An appeal to the Saskatchewan Court of Appeal failed. The leave given to come here related only to the issue of jurisdiction but, during the course of

une action présentée à la Cour du Banc de la Reine. Pourvoi rejeté, le juge en chef Laskin et le juge Lamer sont dissidents.

*W. I. C. Binnie, c.r.*, pour les appelants.

*Morris C. Shumiatcher, c.r.*, pour l'intimé.

*John Cavarzan, c.r.*, pour l'intervenant le procureur général de l'Ontario.

*William Henkel, c.r.*, pour l'intervenant le procureur général de l'Alberta.

*E. R. A. Edwards*, pour l'intervenant le procureur général de la Colombie-Britannique.

Version française des motifs du juge en chef Laskin et du juge Lamer rendus par

LE JUGE EN CHEF (*dissident*)—Le présent pourvoi, interjeté avec l'autorisation de cette Cour, assortie de conditions spéciales quant aux dépens, provient d'une action intentée par un contribuable en Cour du Banc de la Reine de la Saskatchewan. L'action visait à obtenir à l'encontre des appelants, le ministre de la Justice du Canada et le ministre des Finances du Canada, une déclaration portant que les dispositions du *Code criminel* dites sur l'avortement, les par. 251(4), (5) et (6), sont sans effet et enfreignent les al. 1*a*) et 2*e*) et *g*) de la *Déclaration canadienne des droits* et que toute dépense de deniers publics qui vise à promouvoir les avortements thérapeutiques est par conséquent illégale. Les défendeurs appelants ont soulevé la question de la compétence de la Cour du Banc de la Reine d'entendre l'action, alléguant que la Cour fédérale du Canada a compétence exclusive en vertu des art. 17 et 18 de la *Loi sur la Cour fédérale*, S.R.C. 1970 (2ᵉ Supp.), chap. 10. Dans l'exposé des moyens de défense, les défendeurs ont en outre contesté la qualité du demandeur pour agir dans l'action, indépendamment, à ce qu'il paraît, de la compétence de la cour.

La question de la compétence a fait l'objet d'une requête particulière que le juge Hughes a entendue et décidée à l'encontre des défendeurs. Un appel à la Cour d'appel de la Saskatchewan a été rejeté. La permission d'appeler à cette Cour ne porte que sur la question de la compétence, mais au cours de

the hearing in this Court, counsel for the respec-
tive parties agreed to argue the question of the
plaintiff's standing before this Court and formally
asked the Court to hear them on that point. The
Court agreed and argument was heard accord-
ingly.

It is unnecessary to embark here on an examina-
tion of the issue of jurisdiction. This very issue,
namely, whether exclusive jurisdiction resides in
the Federal Court of Canada because of the char-
acter of the defendants, was raised and fully
argued in two cases heard together immediately
preceding the hearing in the present case. It was
conceded that there were no material differences
between those cases, *Attorney General of Canada
et al. v. The Law Society of British Columbia and
Victor McCallum* and *Donald Jabour v. The Law
Society of British Columbia et al. and Attorney
General of Canada* heard on May 25, 26, 27, 1981
and the present one, so far as the claim of exclu-
sive jurisdiction in the Federal Court of Canada is
concerned. The disposition in the two British
Columbia cases on the point will be equally dis-
positive here. I turn, therefore, to the issue of
standing, which arises whatever be the proper
forum for the action if it is one maintainable by
the plaintiff.

I start with the proposition that, as a general
rule, it is not open to a person, simply because he is
a citizen and a taxpayer or is either the one or the
other, to invoke the jurisdiction of a competent
court to obtain a ruling on the interpretation or
application of legislation, or on its validity, when
that person is not either directly affected by the
legislation or is not threatened by sanctions for an
alleged violation of the legislation. Mere distaste
has never been a ground upon which to seek the
assistance of a court. Unless the legislation itself
provides for a challenge to its meaning or applica-
tion or validity by any citizen or taxpayer, the
prevailing policy is that a challenger must show
some special interest in the operation of the legis-
lation beyond the general interest that is common
to all members of the relevant society. This is
especially true of the criminal law. For example,
however passionately a person may believe that it

l'audition devant cette Cour, les avocats des par-
ties respectives ont convenu de plaider devant cette
Cour la question de la capacité d'agir du deman-
deur et ont demandé formellement à cette Cour de
les entendre sur ce point. La Cour a consenti et a
par conséquent entendu les plaidoyers.

Il n'est pas nécessaire de se pencher ici sur
l'examen de la question de compétence. Cette
même question, savoir si la Cour fédérale du
Canada a compétence exclusive à cause du statut
des défendeurs, a été soulevée et plaidée complète-
ment dans deux affaires entendues ensemble
immédiatement avant l'audition de la présente
espèce. Il est admis qu'il n'y a pas de différence
importante entre ces affaires. *Procureur général
du Canada et autres c. The Law Society of British
Columbia et Victor McCallum* et *Donald Jabour
c. The Law Society of British Columbia et autres
et Procureur général du Canada*, entendues les 25,
26 et 27 mai 1981 et l'affaire en l'espèce, en ce qui
a trait à la prétention quant à la compétence
exclusive de la Cour fédérale du Canada. La déci-
sion dans les deux causes de la Colombie-Britanni-
que sur ce point prévaudra également en l'espèce.
Je passe par conséquent à la question de la qualité
d'agir, qui se pose quelle que soit la cour compé-
tente pour entendre l'action si le demandeur peut
la poursuivre.

Je commence par l'énoncé que, en règle géné-
rale, une personne ne peut, simplement parce
qu'elle est un citoyen, un contribuable ou les deux
à la fois, s'en remettre à la cour compétente pour
obtenir une décision sur l'interprétation ou l'appli-
cation d'une loi, ou sur sa validité, lorsque cette
personne n'est pas directement touchée par la loi
ou qu'elle n'est pas menacée de sanctions pour une
infraction possible à la loi. Le simple dégoût n'a
jamais été un motif pour demander l'intervention
d'une cour. A moins que la loi elle-même ne
permette à un citoyen ou un contribuable de con-
tester sa portée, son application ou sa validité, la
politique dominante veut que celui qui conteste la
loi établisse quant à l'application de la loi, qu'il a
un intérêt particulier plus grand que l'intérêt géné-
ral de chaque individu dans un groupe donné. Cela
vaut en particulier pour le droit pénal. Par exem-
ple, quelle que soit la ferveur de la croyance, chez

is wrong to provide for compulsory breathalizer tests or wrong to make mere possession of marijuana an offence against the criminal law, the courts are not open to such a believer, not himself or herself charged or even threatened with a charge, to seek a declaration against the enforcement of such criminal laws.

The rationale of this policy is based on the purpose served by courts. They are dispute-resolving tribunals, established to determine contested rights or claims between or against persons or to determine their penal or criminal liability when charged with offences prosecuted by agents of the Crown. Courts do not normally deal with purely hypothetical matters where no concrete legal issues are involved, where there is no *lis* that engages their processes or where they are asked to answer questions in the abstract merely to satisfy a person's curiosity or perhaps his or her obsessiveness with a perceived injustice in the existing law. Special legislative provisions for references to the courts to answer particular questions (which may be of a hypothetical nature) give that authority to governments alone and not to citizens or taxpayers. Merely because a government may refuse a citizen's or taxpayer's request to refer to the courts a question of interest to the taxpayer does not *per se* create a right in the citizen or taxpayer to invoke the court's process on his or her own, or by way of a class action on behalf of all citizens or taxpayers with the same interest.

There are exceptions to the general rule and to the policy. One of the earliest recognized has been a municipal taxpayer action to restrain an allegedly illegal municipal expenditure: see *MacIlreith v. Hart*[2]. An explanation of this exception is that it involved a public right to see that municipal expenditures were lawfully made, being expenditures which were limited by considerations that do not apply to a province or to Canada. No municipal taxpayer could raise a *lis* in the ordinary sense or court a penalty or other sanction in respect of an allegedly illegal municipal expenditure and, hence,

[2] (1908), 39 S.C.R. 657.

une personne, qu'il est injuste d'exiger des analyses d'haleine ou qu'il est injuste d'ériger en infraction criminelle la simple possession de marijuana, cette personne ne peut pas, si elle n'est pas accusée ou sous la menace d'être accusée, demander à une cour de déclarer ces lois pénales inapplicables.

La raison d'être de cette politique se fonde sur le rôle que jouent les cours. Ce sont des tribunaux qui tranchent les litiges, établis pour décider des droits ou des réclamations contestés entre ou contre des personnes, ou pour décider de leur responsabilité pénale ou criminelle lorsque des représentants de la Couronne les accusent d'infractions. Habituellement, les cours ne s'occupent pas de questions purement hypothétiques lorsque aucune question juridique concrète ne se pose, lorsqu'il n'y a pas de litige qui les engage ou lorsqu'on leur demande de répondre à des questions abstraites simplement pour satisfaire la curiosité d'une personne ou apaiser sa hantise face à ce qu'elle croit être une injustice de la loi. Les dispositions législatives particulières qui prévoient le renvoi à une cour pour répondre à des questions précises (qui peuvent être hypothétiques) n'accordent ce pouvoir qu'aux gouvernements, et non aux citoyens ou aux contribuables. Le simple refus du gouvernement d'accéder à la demande d'un citoyen ou d'un contribuable et de porter devant la cour une question qui intéresse le contribuable ne donne pas en soi au citoyen ou au contribuable le droit de s'en remettre au processus judiciaire de lui-même ou au moyen d'une action intéressant une catégorie de citoyens ou de contribuables qui ont le même intérêt.

La règle générale et le principe général comportent des exceptions. Une des premières exceptions reconnues a été l'action d'un contribuable municipal visant à empêcher une dépense municipale qu'il prétendait illégale: voir *MacIlreith c. Hart*[2]. Cette exception s'explique du fait qu'elle portait sur un droit du public à s'assurer que les dépenses municipales étaient légitimes, ces dépenses étant restreintes par des considérations qui ne s'appliquent pas à une province ou au Canada. Aucun contribuable municipal ne pouvait soulever un litige au sens ordinaire ou demander l'imposition

[2] (1908), 39 R.C.S. 657.

unless a taxpayer action was permitted the illegality would go unchallenged and unchallengeable.

In the provincial and federal field, the issue of an illegal, or perhaps unconstitutional, expenditure would not likely arise *per se* but, in the main, only (as is alleged in this case) in connection with the operation of challenged legislation; the challenge to the expenditure would thus depend on the outcome of the challenge to the legislation.

Another exception (but a more limited one in view of the discretion associated with it) is shown in the judgment of this Court in *Thorson v. Attorney General of Canada*[3]. That case involved a taxpayer's class action to obtain a declaration of the invalidity of the *Official Languages Act*, now R.S.C. 1970, c. 0-2, and of the illegality of the appropriation of money to administer it. It was clear that a justiciable question was raised by the claim of invalidity, namely, whether Parliament had respected the limits of its legislative authority under the *British North America Act*. Again, the *Official Languages Act* was not a regulatory type of statute nor a penal one but rather, uniquely, a declaratory and directory statute, a statute which created no offences and imposed no penalties. Unless, therefore, a citizen or taxpayer action was permitted to question its validity, there would be no way in which its validity could be tested unless the federal Attorney General did so through[1] a reference and a request to this end had been denied.

In allowing the taxpayer suit to proceed in the *Thorson* case, this Court made it clear that it did so in the exercise of a controlling judicial discretion which related to the effectiveness of process. It went on to say, *inter alia*, that "Central to that discretion is the justiciability of the issue sought to be raised" and that "Relevant as well is the nature of the legislation whose validity is challenged,

d'une amende ou d'une autre peine à l'égard d'une dépense municipale prétendue illégale, et partant, à moins qu'on ne permette que l'action d'un contribuable suive son cours, l'illégalité n'aurait pas été contestée ni contestable.

Dans le domaine provincial et fédéral, la question d'une dépense illégale, ou peut-être inconstitutionnelle, ne devrait pas se poser en soi, mais, en somme, uniquement (comme on le dit en l'espèce) comme accessoire à l'application d'une loi contestée; la contestation de la dépense dépendrait alors du résultat de la contestation de la loi.

Une autre exception (mais plus limitée compte tenu de la discrétion qui s'y rattache) ressort de l'arrêt de cette Cour *Thorson c. Procureur général du Canada*[3]. Il s'agissait dans cette affaire d'une action intéressant une catégorie de personnes intentée par un contribuable en vue d'obtenir que la *Loi sur les langues officielles*, maintenant S.R.C. 1970, chap. 0-2, soit déclarée inconstitutionnelle et que l'affectation de deniers à son application soit déclarée illégale. Il est évident que la question de l'invalidité pouvait être soumise aux tribunaux, savoir si le législateur avait respecté les limites de son pouvoir législatif en vertu de l'*Acte de l'Amérique du Nord britannique*. Là encore, la *Loi sur les langues officielles* n'était pas une loi de réglementation ni une loi pénale mais plutôt, uniquement, une loi déclaratoire et exécutoire, une loi qui ne créait aucune infraction et n'imposait aucune peine. Par conséquent, si l'on n'avait pas permis à un citoyen ou à un contribuable de soulever la question de sa constitutionnalité, il n'y aurait eu aucune façon de soulever cette question; seul le procureur général fédéral aurait pu le faire au moyen d'un renvoi, et il avait refusé une demande à cette fin.

En permettant que l'action du contribuable suive son cours dans l'affaire *Thorson*, cette Cour a souligné qu'elle le faisait dans l'exercice d'un pouvoir discrétionnaire prépondérant, qui se rapportait à l'efficacité du recours. Elle a poursuivi en disant entre autres que «La question de savoir si la question qu'on cherche à soulever peut être réglée par les tribunaux est au cœur de ce pouvoir discré-

according to whether it involves prohibitions or restrictions on any class or classes of persons who would thus be particularly affected by its terms beyond any effect upon the public at large. If it is legislation of that kind, the Court may decide . . . that a member of the public . . . is too remotely affected to be accorded standing'' (at p. 161). The Court concluded on this note (at p. 161):

On the other hand, where all members of the public are affected alike, as in the present case, and there is a justiciable issue respecting the validity of legislation, the Court must be able to say that as between allowing a taxpayers' action and denying any standing at all when the Attorney General refuses to act, it may choose to hear the case on the merits.

The *Criminal Code* provisions whose operation is challenged here are of a different order from the legislation with which the *Thorson* case was concerned. They are, moreover, exculpatory provisions which exclude criminality that is prescribed under s. 251(1) and (2) for the intentional procurement of a miscarriage. A distinction is made under s. 251 between unlawful abortions and permitted abortions. It is the latter which the plaintiff attacks as violative of the *Canadian Bill of Rights*. No attack is made on the constitutionality of any part of s. 251, it being recognized that what Parliament may validly proscribe under its criminal law power may at the same time be limited by fixing conditions under which the proscription is lifted. That is the case with the abortion provisions of s. 251. The plaintiff objects to any alleviating provisions that would (and in this case do) relieve against criminality for procuring abortions. Far from objecting that the criminal provisions are too strict in the face of the *Canadian Bill of Rights*, his objection is that they are too lax.

There is, in this respect, in the permissive provisions of s. 251(4), (5) and (6), some similarity perhaps to the directory features of the legislation in the *Thorson* case. However, these provisions are

tionnaire» et que «La nature de la loi dont la validité est contestée est toute aussi pertinente, selon qu'elle comporte des prohibitions ou restrictions à l'égard d'une ou de catégories de personnes qui se trouvent ainsi particulièrement touchées par ses dispositions en regard du public en général. S'il s'agit d'une loi de ce genre, la Cour peut décider . . . qu'une personne faisant partie du public . . . est touchée de trop loin pour qu'on lui reconnaisse qualité pour agir» (à la p. 161). La Cour a conclu en disant (aux pp. 161 et 162):

D'autre part, lorsque tous ceux qui font partie du public sont visés également, comme dans la présente affaire, et qu'une question réglable par les voies de justice est posée relativement à la validité d'une loi, la Cour doit être capable de dire que, entre le parti d'accueillir une action de contribuables et celui de nier toute qualité lorsque le procureur général refuse d'agir, elle peut choisir d'entendre l'affaire au fond.

Les dispositions du *Code criminel* dont l'application est contestée en l'espèce diffèrent, en nature, de la loi dont il s'agissait dans l'arrêt *Thorson*. En outre, ce sont des dispositions justificatives qui excluent la responsabilité pénale dont les par. 251(1) et (2) assortissent l'avortement volontaire. L'article 251 fait une distinction entre les avortements illégaux et les avortements permis. C'est cette dernière catégorie que le demandeur conteste, prétendant qu'elle contrevient à la *Déclaration canadienne des droits*. On ne conteste la constitutionnalité d'aucune partie de l'art. 251, puisqu'on reconnaît que ce que le Parlement peut valablement interdire en vertu de son pouvoir sur le droit pénal, il peut en même temps le restreindre par l'établissement de conditions en vertu desquelles l'interdiction est levée. C'est ce qui se produit dans le cas des dispositions de l'art. 251 relatives à l'avortement. Le demandeur s'oppose à toutes dispositions atténuantes qui permettraient (comme c'est le cas en l'espèce) de procurer des avortements sans encourir de responsabilité pénale. Loin de s'opposer à la rigidité des dispositions pénales en regard de la *Déclaration canadienne des droits*, il s'en prend à leur manque de ridigité.

A cet égard, les dispositions justificatives des par. 251(4), (5) et (6) comportent peut-être quelques similitudes avec les aspects exécutoires de la loi visée dans l'arrêt *Thorson*. Cependant, ces dis-

part of a scheme which embraces sanctions as well, and I do not find the similarity to be sufficient to put the legislation here on the same level as the statute involved in the *Thorson* case. Indeed, to borrow from the words of this Court in the *Thorson* case, the present case is not one where all members of the public are affected alike. This, in my view, is a central consideration in the exercise of the Court's discretion against giving standing here to the plaintiff respondent.

It is contended on the plaintiff's behalf that if he cannot bring himself within the *Thorson* case, his position as to standing is as strong as that of the respondent in this Court's follow-up decision in *Thorson* in *Nova Scotia Board of Censors v. McNeil*[4]. That was also a case where a taxpayer action challenging the validity of legislation, provincial legislation in that case, was held to be maintainable. The statute attacked in the *McNeil* case was a regulatory statute and not merely a declaratory one as in the *Thorson* case. This, however, was held, in the circumstances of the *McNeil* case, not to be a controlling distinction that should, in itself, be sufficient to deny standing, "especially [to use the words of the Court, at p. 269] in the light of the reserve of discretion in the Court, and more especially because the word or term 'regulatory' is not a term of art, not one susceptible of an invariable meaning which would in all cases serve to distinguish those in which standing to a taxpayer or citizen would be granted and those in which it would not".

The *Theatres and Amusements Act* of Nova Scotia, whose validity was challenged in the *McNeil* case, was a regulatory statute directed to film exchanges, theatre owners and cinematograph operators and apprentices. It also provided for the appointment of a Board, empowered to permit or prohibit the use or exhibition in Nova Scotia, for public entertainment, of any film or performance in any theatre. Licensing regulations were pro-

positions font partie d'un ensemble qui comprend aussi des peines, et je ne crois pas qu'elles soient assez semblables pour mettre sur un même niveau la loi en l'espèce et celle dont il était question dans l'arrêt *Thorson*. De fait, pour emprunter les mots de cette Cour dans l'arrêt *Thorson*, il ne s'agit pas en l'espèce d'un cas où tous ceux qui font partie du public sont visés également. Il s'agit là, à mon avis, lorsque la Cour est appelée à exercer son pouvoir discrétionnaire, d'un motif primordial plaidant contre l'attribution de la qualité d'agir au demandeur intimé en l'espèce.

On allègue en faveur du demandeur que s'il ne peut s'appuyer sur l'arrêt *Thorson*, sa situation quant à la qualité d'agir est aussi bonne que celle de l'intimé dans l'arrêt de cette Cour *Nova Scotia Board of Censors c. McNeil*[4], qui a suivi l'arrêt *Thorson*. Il s'agissait là également d'une affaire dans laquelle on a conclu qu'un contribuable qui contestait la constitutionnalité d'une loi, provinciale dans ce cas, pouvait faire valoir son action. La loi attaquée dans l'affaire *McNeil* était une loi de réglementation et non simplement une loi déclaratoire comme dans l'affaire *Thorson*. On a cependant décidé, dans les circonstances de l'arrêt *McNeil*, que ce n'était pas là une distinction fondamentale qui pouvait, en elle-même, justifier le refus d'accorder la qualité pour agir, «surtout [pour employer les mots de la Cour, à la p. 269] à la lumière de la réserve du pouvoir discrétionnaire de la Cour et plus particulièrement parce que les mots ou l'expression «de réglementation» ne sont pas un terme scientifique et n'ont pas un sens précis qui puisse invariablement distinguer les cas où un contribuable ou un citoyen se verrait reconnaître la qualité pour agir et les cas où elle ne lui serait pas reconnue».

La *Theatres and Amusements Act* de la Nouvelle-Écosse, dont la constitutionnalité était contestée dans l'affaire *McNeil*, était une loi de réglementation visant les distributeurs de films, les propriétaires de salles de spectacles, les projectionnistes et les apprentis. Elle prévoyait en outre la nomination d'une commission chargée de permettre ou d'interdire en Nouvelle-Écosse la présenta- ' tion d'un film ou une représentation destinée à

---

[4] [1976] 2 S.C.R. 265.

[4] [1976] 2 R.C.S. 265.

vided for in respect of theatres and film exchanges, in respect of cinematograph operators and apprentices and in respect of theatre performances. Unfettered discretion to suspend or revoke any licence was vested in the Board. It had, to put it shortly, complete control over the exhibition of films and over theatres in the Province. Although there was a statutory right of appeal to the Lieutenant Governor in Council, it was not open to a member of the public.

The Nova Scotia courts, before whom the question of standing came, and this Court on appeal, construed the challenged statute as involving members of the public in so far as the Board had the power to determine what members of the public were entitled to view in theatres and other places of public entertainment. This Court assessed the matter as follows (at p. 271):

Since the issue of validity does not fall for determination here and, indeed, has not even been argued in relation to the question of standing, I would not, in this case, go beyond the tentative conclusion that there is an arguable case under the terms of the challenged legislation that members of the Nova Scotia public are directly affected in what they may view in a Nova Scotia theatre, albeit there is a more direct effect on the business enterprises which are regulated by the legislation. The challenged legislation does not appear to me to be legislation directed only to the regulation of operators and film distributors. It strikes at the members of the public in one of its central aspects.

In my view, this is enough, in the light of the fact that there appears to be no other way, practically speaking, to subject the challenged Act to judicial review, to support the claim of the respondent to have the discretion of the Court exercised in his favour to give him standing.

This passage underlines at least one important difference between the situation in *McNeil* and the present case. In *McNeil*, the plaintiff could legitimately complain (on this Court's construction of the challenged statute) that he was a person within its terms who was being deprived of a right to view a film because of an allegedly unconstitutional exercise of legislative and administrative power. In the present case, there is no deprivation under or

divertir le public. Elle prévoyait l'établissement de règlements concernant les salles de spectacles et les distributeurs de films, concernant les projectionnistes et les apprentis et concernant les représentations théâtrales. La Commission avait entière discrétion pour suspendre ou révoquer tout permis. Bref, la Commission avait tous les pouvoirs sur la censure des films et sur les salles de spectacles dans la province. Même si la loi prévoyait un droit d'appel au lieutenant-gouverneur en conseil, ce droit n'était pas accordé aux citoyens.

Selon l'interprétation que les cours de la Nouvelle-Écosse, auxquelles la question de la qualité d'agir a été soumise, ainsi que cette Cour en appel, ont donnée à la loi contestée, les citoyens étaient touchés dans la mesure où la Commission avait le pouvoir de décider ce que le public avait le droit de voir dans les salles de spectacles et les autres lieux de divertissement public. Cette Cour a considéré la question comme suit (à la p. 271):

Etant donné que la question de la validité n'a pas à être décidée en l'espèce et qu'en fait elle n'a même pas été soulevée à l'égard de la qualité pour agir, je me limiterai donc à conclure qu'aux termes de la loi contestée, les citoyens de la Nouvelle-Écosse ont des motifs raisonnables de se déclarer directement touchés par ce qu'on peut leur présenter dans un lieu de spectacle dans leur province, bien que les entreprises régies par la loi soient visées plus directement. La loi contestée ne me semble pas viser uniquement les exploitants de salles et les distributeurs de films. Elle touche aussi à l'un des droits les plus fondamentaux du public.

Puisqu'il ne semble y avoir pratiquement aucun autre moyen de soumettre la loi contestée à l'examen judiciaire, cela suffit, à mon avis, à appuyer la demande de l'intimé à savoir que la Cour exerce son pouvoir discrétionnaire en sa faveur et lui reconnaisse la qualité pour agir.

Ce passage souligne au moins une différence importante entre la situation dans l'affaire *McNeil* et celle en l'espèce. Dans l'affaire *McNeil*, le demandeur pouvait légitimement se plaindre (selon l'interprétation que la Cour a donnée de la loi contestée) d'avoir été privé du droit de voir un film à cause de l'exercice qu'il estimait inconstitutionnel d'un pouvoir législatif et administratif. En l'espèce, le demandeur ne peut se plaindre d'être

by reason of the challenged legislation of which the plaintiff can complain. In short, the plaintiff here is not in the same position under the legislation which he challenges as was McNeil in his case. There he was a person within the compass of the enactment that he was challenging; the plaintiff is outside the *Criminal Code* provisions that he is attacking.

I am of the opinion that the plaintiff in this case cannot bring himself within the *McNeil* case nor within the *Thorson* case, so far as concerns the character of the legislation involved here as compared with the legislation in those cases. It was urged, however, that he was, nonetheless, in as favourable a position to warrant the exercise of discretion to accord him standing. This was because there was no other way in which the alleged inoperability of s. 251(4), (5) and (6) of the *Criminal Code* in the face of the *Canadian Bill of Rights* could be tested; the plaintiff was not seeking to challenge the prohibitions of s. 251—and, presumably, as a mere taxpayer, not threatened by any sanction, he could not do so—but rather was seeking to challenge the exculpating provisions.

I would not draw any distinction between a declaratory action to obtain a decision on validity under the *British North America Act* and a declaratory action to obtain a decision on operative effect in the face of the *Canadian Bill of Rights*. Justiciable issues are presented in both situations. The only question that remains is whether, neither the *Thorson* case nor the *McNeil* case being strictly applicable according to the character of the legislation there and here, this is an appropriate case for the Court to exercise its discretion to accord standing. My reason for distinguishing the legislative situation is that here there are persons with an interest in the operation of s. 251(4), (5) and (6) who might challenge it as offending the *Canadian Bill of Rights*. I refer to doctors and to hospitals, both having a clearer interest in the operation of s. 251(4), (5) and (6) than does the plaintiff. Husbands who might object to their pregnant wives seeking a therapeutic abortion also have a clearer interest. It may be that in their case there would be a dilemma, having regard to the

privé d'un droit en vertu ou en raison de la loi contestée. Bref, la situation du demandeur en l'espèce en vertu de la loi qu'il conteste n'est pas la même que celle dans laquelle se trouvait McNeil. Dans cette affaire, McNeil était touché par la loi qu'il contestait; le demandeur en l'espèce n'est pas visé par les dispositions du *Code criminel* auxquelles il s'attaque.

Je suis d'avis que le demandeur en l'espèce ne peut s'appuyer sur l'arrêt *McNeil* ni sur l'arrêt *Thorson*, si on compare la nature de la loi dont il s'agit en l'espèce à celle des lois en cause dans ces arrêts. On a cependant fait valoir qu'il était néanmoins dans une situation assez bonne pour justifier l'exercice du pouvoir discrétionnaire et lui reconnaître la qualité pour agir. On invoque à cette fin qu'il n'y a pas d'autre façon de vérifier ce qu'on allègue être l'impossibilité d'appliquer les par. 251(4), (5) et (6) du *Code criminel* en regard de la *Déclaration canadienne des droits*; le demandeur ne cherche pas à contester les interdictions visées à l'art. 251 (et on peut croire qu'à titre de simple contribuable qui n'est pas sous la menace d'une peine, il ne pourrait le faire) mais il cherche plutôt à en contester les dispositions justificatives.

Je ne ferais pas de distinction entre une action déclaratoire visant à obtenir une décision constitutionnelle en vertu de l'*Acte de l'Amérique du Nord britannique* et une action déclaratoire visant à obtenir une décision quant à l'applicabilité en regard de la *Déclaration canadienne des droits*. Les deux présentent des questions susceptibles d'être portées devant les tribunaux. Puisque les arrêts *Thorson* et *McNeil* ne sont pas, à strictement parler, applicables en raison de la nature des lois en cause, la seule question qui subsiste est de savoir si la présente affaire autorise la Cour à exercer son pouvoir discrétionnaire et à reconnaître la qualité pour agir. La raison qui m'incite à distinguer le contexte législatif est qu'il y a en l'espèce des personnes que l'application des par. 251(4), (5) et (6) intéresse et qui peuvent les contester en invoquant une violation à la *Déclaration canadienne des droits*. Je parle des médecins et des hôpitaux, dont l'intérêt à l'application des par. 251(4), (5) et (6) est plus évident que celui du demandeur. L'époux, qui peut s'opposer à ce que

inexorable progress of a pregnancy. In short, even if the statutory requirements for a therapeutic abortion were satisfied, it might be difficult to initiate and exhaust the judicial processes to obtain a ruling as to the compatibility of s. 251(4), (5) and (6) with the *Canadian Bill of Rights* before the abortion or birth, as the case might be, takes place. In principle, however, this should not be preclusive; the point will have been decided at the instance of a person having an interest and not at that of a person having no interest other than as a citizen and taxpayer.

sa femme enceinte cherche à obtenir un avortement thérapeutique, a aussi un intérêt plus évident. Dans son cas, il peut se poser un dilemme, étant donné l'avancement inexorable de la grossesse. Bref, même si on satisfait aux exigences prévues par la loi pour un avortement thérapeutique, il peut être difficile d'entreprendre et de compléter les procédures judiciaires en vue d'obtenir une décision sur la compatibilité des par.\251(4), (5) et (6) avec la *Déclaration canadienne des droits* avant que ne survienne l'avortement ou l'accouchement, selon le cas. En principe, cependant, cela ne devrait pas être un empêchement, la question aura été décidée à la demande d'une personne ayant un intérêt, et non à la demande d'une personne qui n'a aucun autre intérêt que celui de citoyen et de contribuable.

It may be urged, however, that because doctors who perform therapeutic abortions under proper auspices are protected from criminal liability, they would have no reason to challenge the provisions for such abortions, and correlatively doctors who do not would also have no reason to challenge them. So too with respect to hospitals through which therapeutic abortion committees are set up or not set up. In my opinion, these aspects of the matter do not affect the direct interest of hospitals and doctors in the authorization and performance of abortions or in challenging them. Apart from what may be subsidiary questions of budgeting and operating space, which are important to hospitals, there is the doctor-patient relationship to be considered. Patients may seek advice from doctors even if the doctors themselves do not perform abortions, or the doctors may be moved because of their relationship with patients to wish to perform abortions unless they cannot lawfully be done. The willingness or refusal of a hospital board to establish a therapeutic abortion committee can create tensions, whatever the outcome. The interest of hospitals and of doctors is, in my view, a direct interest arising from the *Criminal Code* provisions under challenge here, but at worst is a more compelling and immediate interest than that asserted by the plaintiff. His interest is not connected with the administration of the legislation but with an emotional response to its operation. I see

On peut cependant alléguer que, parce qu'ils sont à l'abri de la responsabilité pénale, les médecins qui pratiquent l'avortement thérapeutique dans les conditions permises n'auraient pas de motif pour contester les dispositions qui permettent l'avortement; corrélativement, les médecins qui ne pratiquent pas l'avortement n'auraient pas non plus de raison de les contester. Il en serait de même des hôpitaux qui établissent ou qui n'établissent pas de comité de l'avortement thérapeutique. A mon avis, ces aspects de la question ne touchent pas l'intérêt direct des hôpitaux et des médecins qui permettent et qui pratiquent l'avortement ou qui le contestent. Mis à part les questions' de budget et de locaux qui peuvent être accessoires et qui importent aux hôpitaux, il faut tenir compte du rapport du médecin avec son patient. Le patient peut demander conseil au médecin même si le médecin lui-même ne pratique pas l'avortement, ou le médecin peut être amené, du fait de sa relation avec le patient, à souhaiter pratiquer l'avortement à moins qu'il ne puisse le faire légalement. La volonté ou le refus d'un conseil hospitalier d'établir un comité de l'avortement thérapeutique peut créer des tensions, quelle que soit la décision adoptée. L'intérêt des hôpitaux et des médecins est, à mon avis, un intérêt direct découlant des dispositions du *Code criminel* contestées en l'espèce, mais c'est pour le moins un intérêt plus contraignant et plus immédiat que celui que le

nothing in such a response which should persuade this Court to open its judicial doors to him.

The position of doctors, hospitals and husbands under s. 251(4), (5) and (6) is not unlike the position of the plaintiffs in *Blaikie, Durand and Goldstein v. Attorney General of Quebec*[5]. This case was put forward by the plaintiff as a case where standing was granted in circumstances not too different from those here. There is, in fact, a considerable difference between the *Blaikie* case, the *Bill 101* case, and the present case. It is true that the question of the plaintiff's interest or standing in attacking the validity of Chapter III of Title I of the *Charter of the French Language*, 1977 (Que.), c. 5, was put in issue by the Attorney General of Quebec in his defence. The plaintiffs had alleged in their declaration that they were members of the legal profession engaged in litigation in the courts of Quebec and before quasi-judicial tribunals, and that they represented clients whose ordinary language was English. They were entitled, they said, to plead in English and to have the Statutes of Quebec published in English as well as in French, relying of course on s. 133 of the *British North America Act*. Deschênes C.J., in granting the declaration, dealt preliminarily with a number of points, including the question of standing.

In his reasons on this issue he said that the plaintiffs possessed a sufficient interest to satisfy art. 55 of the Quebec *Code of Civil Procedure*. That article reads as follows:

**55.** Whoever brings an action at law, whether for the enforcement of a right which is not recognized or is jeopardized or denied, or otherwise to obtain a pronouncement upon the existence of a legal situation, must have a sufficient interest therein.

Chief Justice Deschênes went on to say that in the circumstances the Attorney General of Quebec, in the course of the hearing, abandoned the paragraph of his defence which contested the plaintiffs' standing. The issue of standing was,

demandeur fait valoir. Son intérêt n'est pas lié à l'administration de la loi mais à une réaction émotive à son application. Je ne vois rien dans cette réaction qui doive convaincre cette Cour de permettre son recours.

La situation du médecin, de l'hôpital ou de l'époux en vertu des par. 251(4), (5) et (6) s'apparente à celle des demandeurs dans *Blaikie, Durand et Goldstein c. Procureur général du Québec*[5]. Le demandeur a cité cette affaire dans laquelle la qualité pour agir a été accordée dans des circonstances assez semblables à celles en l'espèce. Il y a en fait une différence importante entre l'affaire *Blaikie*, l'affaire de la *Loi 101*, et l'affaire en l'espèce. Il est vrai que la question de l'intérêt ou de la qualité du demandeur pour contester la constitutionnalité du Chapitre III du Titre Premier de la *Charte de la langue française*, 1977 (Qué.), chap. 5, a été soulevée par le procureur général du Québec dans sa défense. Les demandeurs plaidaient qu'ils étaient membres du Barreau, qu'ils plaidaient devant les cours du Québec et devant les tribunaux quasi judiciaires et qu'ils représentaient des clients dont la langue habituelle est l'anglais. Invoquant l'art. 133 de l'*Acte de l'Amérique du Nord britannique*, ils avaient droit, disaient-ils, de plaider en anglais et d'obtenir que les lois du Québec soient publiées en anglais comme en français. En accueillant l'action, le juge en chef Deschênes a d'abord examiné plusieurs points, y compris la question de la qualité pour agir.

Dans les motifs de sa décision sur cette question, il dit que les demandeurs possèdent un intérêt suffisant aux termes de l'art. 55 du *Code de procédure civile* du Québec, qui se lit:

**55.** Celui qui forme une demande en justice, soit pour obtenir la sanction d'un droit méconnu, menacé ou dénié, soit pour faire autrement prononcer sur l'existence d'une situation juridique, doit y avoir un intérêt suffisant.

Le juge en chef Deschênes poursuit en disant que dans ce cas, le procureur général du Québec a renoncé, au cours de l'audition, au paragraphe de sa défense qui contestait la qualité des demandeurs pour agir. Par conséquent, la question de la qualité

5 [1978] C.S. 37, aff'd [1979] C.A. 351, aff'd [1978] 2 S.C.R. 1016.

5 [1978] C.S. 37, confirmé à [1979] C.A. 351, confirmé à [1979] 2 R.C.S. 1016.

consequently, not pursued in the Quebec Court of Appeal nor in this Court.

The present case lacks concreteness despite the fact that it raises a highly charged issue. Moreover, it appears to me that to permit the issue to be litigated in as abstract a manner as would be the case in having the plaintiff alone carry it against two Ministers of the Crown would hardly do justice to it, absent even any interveners who might, with the same obsessiveness on the opposite side of the issue, argue for the valid operation of the challenged provisions. Even accepting, as is probable, that if standing was accorded to the plaintiff, other persons with an opposite point of view might seek to intervene and would be allowed to do so, the result would be to set up a battle between parties who do not have a direct interest, to wage it in a judicial arena.

I would hold, therefore, that not only has the plaintiff failed to establish any judicially cognizable interest in the matter he raises but, on any view of this case, the discretion of the Court should be exercised to deny him standing. It follows that his action should be dismissed. In accordance with the terms of the order granting leave, the appellants will pay to the respondent his costs of the appeal to this Court on the solicitor and client basis. There will be no other order as to costs.

The judgment of Martland, Ritchie, Dickson, Beetz, Estey, McIntyre and Chouinard JJ. was delivered by

MARTLAND J.—The respondent brought action against the appellants seeking, primarily, a declaration that subss. (4), (5) and (6) of s. 251 of the *Criminal Code* were, by reason of the operation of the *Canadian Bill of Rights*, invalid and inoperative. These subsections were added to s. 237 (now s. 251) of the *Criminal Code* by s. 18 of the *Criminal Law Amendment Act, 1968-69*, 1968-69 (Can.), c. 38. Prior to this amendment, s. 237 consisted of three subsections. Subsections (1) and (2) provided as follows:

pour agir n'a pas été soulevée devant la Cour d'appel ni devant cette Cour.

En dépit du fait qu'elle soulève une question hautement controversée, la présente affaire n'a pas de caractère concret. En outre, il m'apparaît qu'on viderait difficilement la question en permettant de la porter devant les tribunaux d'une manière abstraite comme ce serait le cas si le demandeur seul affrontait deux ministres de la Couronne, même en l'absence d'intervenants qui pourraient, avec une hantise égale dans le sens opposé, plaider en faveur de l'application des dispositions contestées. Même si on accepte, comme cela est probable, qu'en reconnaissant au demandeur la qualité pour agir, d'autres personnes ayant une opinion contraire peuvent chercher à intervenir et seraient autorisées à le faire, cela aurait pour résultat de déclencher une bataille entre des parties qui n'ont pas un intérêt direct, et de livrer cette bataille devant les tribunaux.

Par conséquent, je suis d'avis que non seulement le demandeur n'a pas établi qu'il a un intérêt judiciaire suffisant dans la question qu'il soulève, mais que, à tous égards, la Cour doit exercer son pouvoir discrétionnaire pour lui nier la qualité pour agir. Je suis donc d'avis de rejeter son action. Conformément à l'ordonnance d'autorisation d'appeler, les appelants doivent payer à l'intimé les dépens du pourvoi à cette Cour comme entre avocat et client. Il n'y aura pas d'autre adjudication de dépens.

Version française du jugement des juges Martland, Ritchie, Dickson, Beetz, Estey, McIntyre et Chouinard rendu par

LE JUGE MARTLAND—L'intimé a intenté contre les appelants une action par laquelle il demande d'abord une déclaration portant que les par. (4), (5) et (6) de l'art. 251 du *Code criminel* sont invalides et inapplicables en raison de la *Déclaration canadienne des droits*. Ces paragraphes ont été ajoutés à l'art. 237 (maintenant l'art. 251) du *Code criminel* par l'art. 18 de la *Loi de 1968-69 modifiant le droit pénal*, 1968-69 (Can.), chap. 38. Antérieurement à cette modification, l'art. 237 comportait trois paragraphes. Les paragraphes (1) et (2) se lisaient comme suit:

237. (1) Every one who, with intent to procure the miscarriage of a female person, whether or not she is pregnant, uses any means for the purpose of carrying out his intention is guilty of an indictable offence and is liable to imprisonment for life.

(2) Every female person who, being pregnant, with intent to procure her own miscarriage, uses any means or permits any means to be used for the purpose of carrying out her intention is guilty of an indictable offence and is liable to imprisonment for two years.

Subsection (3) was a definition section.

The subsections in issue in these proceedings provided for exceptions to the application of subss. (1) and (2) cited above. Subsection (4) provided:

(4) Subsections (1) and (2) do not apply to

(*a*) a qualified medical practitioner, other than a member of a therapeutic abortion committee for any hospital, who in good faith uses in an accredited or approved hospital any means for the purpose of carrying out his intention to procure the miscarriage of a female person, or

(*b*) a female person who, being pregnant, permits a qualified medical practitioner to use in an accredited or approved hospital any means described in paragraph (*a*) for the purpose of carrying out her intention to procure her own miscarriage,

if, before the use of those means, the therapeutic abortion committee for that accredited or approved hospital, by a majority of the members of the committee and at a meeting of the committee at which the case of such female person has been reviewed,

(*c*) has by certificate in writing stated that in its opinion the continuation of the pregnancy of such female person would or would be likely to endanger her life or health, and

(*d*) has caused a copy of such certificate to be given to the qualified medical practitioner.

Subsection (5) enabled the Minister of Health of a province to obtain a copy of a certificate and additional information from a therapeutic abortion committee and from a medical practitioner who has procured a miscarriage of a female person named in a certificate. Subsection (6) defined, *inter alia*, the words "accredited hospital", "approved hospital" and "therapeutic abortion

237. (1) Est coupable d'un acte criminel et passible de l'emprisonnement à perpétuité, quiconque, avec l'intention de procurer l'avortement d'une personne du sexe féminin, qu'elle soit enceinte ou non, emploie quelque moyen pour réaliser son intention.

(2) Est coupable d'un acte criminel et passible d'un emprisonnement de deux ans, toute personne du sexe féminin qui, étant enceinte, avec l'intention d'obtenir son propre avortement, emploie, ou permet que soit employé quelque moyen pour réaliser son intention.

Le paragraphe (3) énonçait les définitions.

Les paragraphes en question en l'espèce prévoient des exceptions à l'application des par. (1) et (2) précités. Le paragraphe (4) se lit comme suit:

(4) Les paragraphes (1) et (2) ne s'appliquent pas

*a*) à un médecin qualifié, autre qu'un membre d'un comité de l'avortement thérapeutique de quelque hôpital, qui emploie de bonne foi, dans un hôpital accrédité ou approuvé, quelque moyen pour réaliser son intention de procurer l'avortement d'une personne du sexe féminin, ou

*b*) à une personne du sexe féminin qui, étant enceinte, permet à un médecin qualifié d'employer, dans un hôpital accrédité ou approuvé, quelque moyen mentionné à l'alinéa *a*) aux fins de réaliser son intention d'obtenir son propre avortement,

si, avant que ces moyens ne soient employés, le comité de l'avortement thérapeutique de cet hôpital accrédité ou approuvé, par décision de la majorité des membres du comité et lors d'une réunion du comité au cours de laquelle le cas de cette personne du sexe féminin a été examiné,

*c*) a déclaré par certificat qu'à son avis la continuation de la grossesse de cette personne du sexe féminin mettrait ou mettrait probablement en danger la vie ou la santé de cette dernière, et

*d*) a fait remettre une copie de ce certificat au médecin qualifié.

Le paragraphe (5) permet au ministre de la Santé d'une province d'obtenir d'un comité de l'avortement thérapeutique et d'un médecin qui a procuré l'avortement d'une personne du sexe féminin nommée dans un certificat, une copie d'un certificat et des renseignements supplémentaires. Le paragraphe (6) définit entre autres les mots «hôpital accrédité», «hôpital approuvé» et «comité

committee". Subsection (6) defined such a committee as follows:

"therapeutic abortion committee" for any hospital means a committee, comprised of not less than three members each of whom is a qualified medical practitioner, appointed by the board of that hospital for the purpose of considering and determining questions relating to terminations of pregnancy within that hospital.

It is the contention of the respondent that the permission which is given by subss. (4), (5) and (6) for the procurement of a miscarriage, in the circumstances provided, abridges the human right to life declared in s. 1 of the *Canadian Bill of Rights* and is therefore invalid and inoperative by virtue of s. 2 of the *Canadian Bill of Rights*. Section 1 provides that:

1. It is hereby recognized and declared that in Canada there have existed and shall continue to exist without discrimination by reason of race, national origin, colour, religion or sex, the following human rights and fundamental freedoms, namely,

(a) the right of the individual to life, liberty, security of the person and enjoyment of property, and the right not to be deprived thereof except by due process of law;

Section 2 provides that, unless it is expressly declared that it shall operate notwithstanding the *Canadian Bill of Rights*, every law of Canada shall be so construed and applied as not to abrogate, abridge or infringe or to authorize the abrogation, abridgment or infringement of any of the rights declared.

The issue raised is a difficult and important one, involving the question as to whether the human rights declared in the *Canadian Bill of Rights* protect a human foetus.

In his statement of claim, the respondent states that he is a citizen of Canada and a taxpayer to the Government of Canada. He goes on to state in the following paragraphs of the statement of claim:

3. On February 20, 1969 the Plaintiff was elected by the voters of the provincial constituency of Thompson, Manitoba to represent them in the Legislative Assembly of Manitoba, a position he maintained until June 28,

de l'avortement thérapeutique». Le paragraphe (6) définit ce comité comme suit:

«comité de l'avortement thérapeutique» d'un hôpital désigne un comité formé d'au moins trois membres qui sont tous des médecins qualifiés, nommé par le conseil de cet hôpital pour examiner et décider les questions relatives aux arrêts de grossesse dans cet hôpital;

L'intimé plaide que la permission de procurer l'avortement donnée dans les cas prévus par les par. (4), (5) et (6) restreint le droit de l'individu à la vie déclaré à l'art. 1 de la *Déclaration canadienne des droits* et est par conséquent invalide et sans effet en vertu de l'art. 2 de la *Déclaration canadienne des droits*. L'article 1 prévoit:

1. Il est par les présentes reconnu et déclaré que les droits de l'homme et les libertés fondamentales ci-après énoncés ont existé et continueront à exister pour tout individu au Canada quels que soient sa race, son origine nationale, sa couleur, sa religion ou son sexe:

*a*) le droit de l'individu à la vie, à la liberté, à la sécurité de la personne ainsi qu'à la jouissance de ses biens, et le droit de ne s'en voir privé que par l'application régulière de la loi;

L'article 2 prévoit que, à moins qu'il ne soit déclaré expressément qu'elle s'appliquera nonobstant la *Déclaration canadienne des droits*, toute loi du Canada doit s'interpréter et s'appliquer de manière à ne pas supprimer, restreindre ou enfreindre l'un quelconque des droits déclarés, ni à en autoriser la suppression, la diminution ou la transgression.

La question est difficile et importante, puisqu'elle soulève la question de savoir si les droits de l'individu déclarés dans la *Déclaration canadienne des droits* protègent le fœtus humain.

Dans sa déclaration, l'intimé affirme qu'il est citoyen canadien et contribuable du gouvernement canadien. Il affirme ensuite dans les paragraphes suivants:

[TRADUCTION] 3. Le 20 février 1969, le demandeur a été élu par les électeurs de la circonscription électorale provinciale de Thompson, au Manitoba, pour les représenter à l'Assemblée législative du Manitoba, un poste

1973. In his capacity as taxpayer, elected representative of the people in the Legislative Assembly, a member of the governing party in the Legislative Assembly of Manitoba and Minister of and adviser to Her Majesty the Queen in Right of the Province of Manitoba, the Plaintiff has continuously promoted and defended the rights of individual human foetuses, including their right to life.

4. The Plaintiff has canvassed all practicable means to invoke action on the part of both Provincial and Federal Governments to repeal or to impugn the validity of the abortion sections of the Criminal Law Amendment Act, Statutes of Canada, 1968-69, chapter 38, section 18, (now section 251, subsections (4), (5) and (6), of the Criminal Code of Canada, hereinafter referred to as "the abortion section of the Criminal Code") and to cease and desist from spending public funds to abort and destroy individual human foetuses.

5. The steps taken by the Plaintiff included:

(a) His resignation, on or about September 9, 1971, inter alia, because as Minister of and adviser to Her Majesty the Queen, he "could not be a party to, or accept, child-destroying legislation in which we (are) involved";

(b) His address in the Legislative Assembly of Manitoba, on May 4, 1973, opposing adoption of the budget presented by the Provincial Treasurer that proposed to finance the abortion and destruction of individual human foetuses by the expenditure of public funds;

(c) His continuous objections over a term of years to payment of his personal income tax to the Federal Government to protest its expenditures of public moneys collected by personal income taxes, to finance and to promote the abortion and destruction of individual human foetuses, and his conviction and sentence to terms in jail for his stand;

(d) His personal correspondence with the Premier and Cabinet of the Province of Manitoba, with the Prime Minister of Canada and with Members, of his Cabinet including the Minister of National Health and Welfare, the Minister of Justice, the Minister of Finance, and the Solicitor-General of Canada requesting that they take appropriate legal action to protect the rights of individual human foetuses;

(e) His request addressed to the Official Guardian of Manitoba in the year 1977, to take legal proceed-

qu'il a occupé jusqu'au 28 juin 1973. En ses qualités de contribuable, de représentant élu du peuple à l'Assemblée législative, de membre du parti au pouvoir à l'Assemblée législative du Manitoba et de ministre et de conseiller de Sa Majesté la Reine du chef de la province du Manitoba, le demandeur a toujours encouragé et défendu les droits des fœtus humains, y compris leur droit à la vie.

4. Le demandeur a employé tous les moyens à sa disposition pour demander aux gouvernements provincial et fédéral d'agir en vue d'abroger les dispositions sur l'avortement dans la Loi modifiant le droit pénal, Statuts du Canada, 1968-69, chap. 38, art. 18, (maintenant les par. (4), (5) et (6) de l'art. 251 du Code criminel du Canada, appelés ci-après «les articles du Code criminel sur l'avortement»), d'en contester la validité et de cesser de dépenser les deniers publics pour avorter et détruire des fœtus humains.

5. Les mesures qu'a prises le demandeur comprennent:

a) Sa démission, le 9 septembre 1971 ou vers cette date, entre autres parce qu'en sa qualité de ministre et de conseiller de Sa Majesté la Reine, il «ne pouvait appuyer ou accepter une loi au préjudice des enfants dans laquelle nous avons un mot à dire»;

b) Son discours à l'Assemblée législative du Manitoba, le 4 mai 1973, par lequel il s'est opposé à l'adoption du budget présenté par le Trésorier provincial qui proposait de financer l'avortement et la destruction de fœtus humains à même les deniers publics;

c) Son objection permanente, au cours des années, à payer l'impôt sur son revenu personnel au gouvernement fédéral pour protester contre les dépenses, par ce gouvernement, à même les deniers publics prélevés au moyen de l'impôt sur le revenu personnel pour financer et promouvoir l'avortement et la destruction de fœtus humains, ainsi que sa condamnation et son emprisonnement à cause de sa prise de position;

d) Les lettres qu'il a adressées personnellement au Premier ministre et au Cabinet de la province du Manitoba, au Premier ministre du Canada et aux membres de son cabinet, dont le ministre de la Santé nationale et du Bien-être social, le ministre de la Justice, le ministre des Finances et le Solliciteur général du Canada, par lesquelles il a demandé l'adoption des mesures législatives qui s'imposent en vue de la protection des droits des fœtus humains;

e) Une demande adressée en 1977 au Tuteur public du Manitoba pour qu'il intente, au nom des

ings on behalf of individual human foetuses to prevent their abortion and destruction, and to protect their right to life.

In every instance, the efforts of the Plaintiff to move public officials to impugn the validity of the abortion provisions referred to in paragraph 4 hereof by judicial proceedings met with negative response. No one undertook to subject these provisions, of great public importance, to judicial review.

For the purpose of these proceedings, all of these statements must be accepted as being true.

The proceedings were commenced in the Court of Queen's Bench of the Province of Saskatchewan. In their defence, the appellant pleaded that the Court lacked jurisdiction because exclusive jurisdiction in the matter belonged to the Federal Court of Canada. It was also stated that the appellants did not admit that the respondent had the legal standing necessary to maintain the action.

The respondent then moved for an order that the Court of Queen's Bench did have the necessary jurisdiction. This order was granted and an appeal from the order by the appellants was dismissed. The issue of the respondent's legal standing was not raised in these proceedings. Leave to appeal to this Court was granted.

On the argument before this Court, the issue of legal standing was raised and counsel on both sides finally agreed that the issue of legal standing should be determined by this Court.

In order to decide whether the respondent should be recognized as having legal standing, it is necessary to consider the two leading decisions of this Court dealing with that issue. The first of these is *Thorson v. Attorney General of Canada*[6]. The real purpose of the proceedings in that action was to obtain a declaration that the *Official Languages Act*, 1968-69 (Can.), c. 54, was unconstitutional. The action was framed as being brought by a taxpayer on his own behalf and on behalf of all taxpayers and a declaration was also sought in relation to the *Appropriation Acts* providing

[6] [1975] 1 S.C.R. 138.

fœtus humains, des procédures judiciaires en vue d'en empêcher la destruction et de protéger leur droit à la vie.

Dans chaque cas, les efforts du demandeur pour amener les fonctionnaires publics à contester par des procédures judiciaires la validité des dispositions sur l'avortement mentionnées au paragraphe 4 ci-dessus se sont heurtés à un refus. Nul n'a entrepris d'assujettir ces dispositions très importantes au contrôle judiciaire.

Aux fins de la présente instance, il faut admettre la véracité de toutes ces déclarations.

Cette instance a été introduite devant la Cour du Banc de la Reine de la province de la Saskatchewan. En défense, les appelants ont fait valoir que la Cour n'avait pas compétence puisque la Cour fédérale du Canada a compétence exclusive en cette matière. On a en outre soutenu que les appelants n'ont pas admis que l'intimé ait l'intérêt requis pour agir dans l'action.

L'intimé a alors demandé une ordonnance établissant que la Cour du Banc de la Reine a la compétence requise. Cette ordonnance a été accordée, et l'appel des appelants à l'encontre de cette ordonnance a été rejeté. La question de l'intérêt de l'intimé n'a pas été soulevée dans ces procédures. La permission de se pourvoir devant cette Cour a été accordée.

Les plaidoyers en cette Cour ont soulevé la question de l'intérêt de l'intimé pour agir et les avocats des parties ont finalement convenu de demander à cette Cour de trancher cette question.

Afin de décider s'il faut reconnaître que l'intimé a l'intérêt requis pour agir, il y a lieu d'examiner les deux arrêts de principe de cette Cour sur la question. Le premier est l'arrêt *Thorson c. Procureur général du Canada*[6]. Dans cette action, le but véritable des procédures était d'obtenir une déclaration d'inconstitutionnalité de la *Loi sur les langues officielles*, 1968-69 (Can.), chap. 54. L'action a été intentée par un contribuable en son propre nom et au nom de tous les contribuables et il demandait en outre une déclaration visant les *Lois portant affectation de crédit* qui prévoyait les

[6] [1975] 1 R.C.S. 138.

money to implement the legislation. A preliminary issue of law was raised as to the legal standing of the plaintiff to bring the action. The plaintiff's action was dismissed by Houlden J. (as he then was) on the ground that the plaintiff did not have status to challenge the constitutional validity of the statute. In his reasons, he referred to and relied upon the judgment of this Court in *Smith v. Attorney General of Ontario*[7], and he distinguished the judgment of this Court in *MacIlreith v. Hart*[8]. His reasons are reported in [1972] 1 O.R. 86 and his conclusion is stated at p. 90 as follows:

> While the plaintiff has argued this application with great force and his memorandum of law is most comprehensive, I cannot agree with his submissions. In my judgment, the principle stated in the *Smith* case is one of general application. This principle is that an individual has no status or standing to challenge the constitutional validity of an Act of Parliament in an action of this type unless he is specially affected or exceptionally prejudiced by it: see also *Grant v. St. Lawrence Seaway Authority*, [1960] O.R. 298 at p. 303, 23 D.L.R. (2d) 252 at p. 256; *Cowan v. Canadian Broadcasting Corp.*, [1966] 2 O.R. 309 at p. 311, 56 D.L.R. (2d) 578 at p. 580, and *Burnham v. A.-G. Can.* (1970), 15 D.L.R. (2d) 6 at pp. 11-2, 74 W.W.R. 427. The fact that the taxes of the plaintiff and the taxes of every taxpayer in Canada will be raised as a result of the implementation of the *Official Languages Act* is not, in my opinion, sufficient to constitute special damage or prejudice to the plaintiff so as to enable the plaintiff to bring this action.

The Court of Appeal agreed with this judgment and dismissed the appeal. The three dissenting judges in this Court were of the same view.

The appeal to this Court was allowed. It was recognized that the claim to legal standing could not be founded solely on the damage resulting from an illegal expenditure of public funds. Laskin J. (as he then was), who delivered the majority reasons, said at pp. 162-63:

> I recognize that any attempt to place standing in a federal taxpayer suit on the likely tax burden or debt resulting from an illegal expenditure, by analogy to one of the reasons given for allowing municipal taxpayers'

sommes nécessaires pour mettre cette loi à exécution. Une question de droit préliminaire a été soulevée quant à l'intérêt du demandeur pour intenter l'action. Le juge Houlden (tel était alors son titre) a rejeté l'action du demandeur pour le motif que le demandeur n'avait pas l'intérêt pour contester la constitutionnalité de la loi. Dans ses motifs, il a cité et invoqué l'arrêt de cette Cour *Smith c. Procureur général de l'Ontario*[7], et il a fait une distinction avec l'arrêt de cette Cour *MacIlreith c. Hart*[8]. Les motifs de sa décision sont publiés à [1972] 1 O.R. 86, et sa conclusion est énoncée comme suit à la p. 90:

> [TRADUCTION] Bien que le demandeur ait plaidé sa demande avec beaucoup de vigueur et que l'exposé de ses moyens de droit soit très étoffé, je ne peux admettre ses prétentions. A mon avis, le principe énoncé dans l'arrêt *Smith* est un principe d'application générale. Ce principe veut qu'un citoyen n'a pas état ni l'intérêt pour contester la constitutionnalité d'une loi du Parlement dans une action de ce genre à moins qu'il soit particulièrement touché ou exceptionnellement lésé par la loi: voir aussi *Grant v. St. Lawrence Seaway Authority*, [1960] O.R. 298 à la p. 303, 23 D.L.R. (2d) 252 à la p. 256; *Cowan v. Canadian Broadcasting Corp.*, [1966] 2 O.R. 309 à la p. 311, 56 D.L.R. (2d) 578 à la p. 580, et *Burnham v. A.-G. Can.* (1970), 15 D.L.R. (2d) 6 aux pp. 11 et 12, 74 W.W.R. 427. Le fait que l'impôt du demandeur et celui de tous les contribuables du Canada sera augmenté par suite de la mise en œuvre de la *Loi sur les langues officielles* n'est pas, à mon avis, suffisant pour constituer un dommage ou un préjudice spécial au demandeur de manière à lui permettre d'intenter cette action.

La Cour d'appel a exprimé son accord avec ce jugement et a rejeté l'appel. Les trois juges dissidents en cette Cour étaient de cet avis.

Cette Cour a accueilli le pourvoi. Elle a reconnu que l'intérêt pour agir ne repose pas uniquement sur le dommage résultant d'une dépense illégale de deniers publics. Le juge Laskin (maintenant Juge en chef), qui a prononcé les motifs du jugement au nom de la majorité, dit aux pp. 162 et 163:

> Je reconnais que toute tentative de déterminer la qualité pour agir, dans une action de contribuable fédéral, d'après la charge fiscale ou la dette qui résultera probablement d'une dépense illégale, par analogie avec

---

[7] [1924] S.C.R. 331.

[8] (1908), 39 S.C.R. 657.

[7] [1924] R.C.S. 331.

[8] (1908), 39 R.C.S. 657.

suits, is as unreal as it is in the municipal taxpayer cases. Certainly, a federal taxpayer's interest may be no less than that of a municipal taxpayer in that respect. It is not the alleged waste of public funds alone that will support standing but rather the right of the citizenry to constitutional behaviour by Parliament where the issue in such behaviour is justiciable as a legal question.

At page 161 he said this:

In my opinion, standing of a federal taxpayer seeking to challenge the constitutionality of federal legislation is a matter particularly appropriate for the exercise of judicial discretion, relating as it does to the effectiveness of process. Central to that discretion is the justiciability of the issue sought to be raised, a point that could be said to be involved (although the case was not decided on that basis) in *Anderson v. Commonwealth* [(1932), 47 C.L.R. 50], where the High Court of Australia denied standing to a member of the public to challenge the validity of an agreement between the Commonwealth and one of the States. Relevant as well is the nature of the legislation whose validity is challenged, according to whether it involves prohibitions or restrictions on any class or classes of persons who would thus be particularly affected by its terms beyond any effect upon the public at large. If it is legislation of that kind, the Court may decide, as it did in the *Smith* case, that a member of the public, and perhaps even one like Smith, is too remotely effected to be accorded standing. On the other hand, where all members of the public are affected alike, as in the present case, and there is a justiciable issue respecting the validity of legislation, the Court must be able to say that as between allowing a taxpayers' action and denying any standing at all when the Attorney General refuses to act, it may choose to hear the case on the merits.

It was pointed out that the plaintiff had sought unsuccessfully to have the Attorney General of Canada take appropriate proceedings to test the validity of the *Official Languages Act*. It was also noted that that Act was not a regulatory type of statute, but was declaratory and directory in respect of the use of English and French by and in federal authorities and agencies and did not, itself,

un des motifs donnés pour sanctionner les actions de contribuables municipaux, est aussi irréelle que dans les affaires de contribuable municipal. A coup sûr l'intérêt d'un contribuable fédéral peut être aussi important que celui d'un contribuable municipal à cet égard. Ce n'est pas le seul gaspillage allégué de deniers publics qui étayera la qualité pour agir mais plutôt le droit des citoyens au respect de la constitution par le Parlement, quand la question que soulève la conduite du Parlement est réglable par les voies de justice en tant que question de droit.

Aux pages 161 et 162, il dit:

A mon avis, la qualité pour agir d'un contribuable fédéral qui cherche à contester la constitutionnalité d'une loi fédérale est une matière qui relève particulièrement de l'exercice du pouvoir discrétionnaire des cours de justice, puisqu'elle se rapporte à l'efficacité du recours. La question de savoir si la question qu'on cherche à soulever peut être réglée par les tribunaux est au cœur de ce pouvoir discrétionnaire, un point que l'on peut considérer avoir été en jeu (bien que l'affaire n'ait pas été décidée sur cette base) dans l'arrêt *Anderson v. Commonwealth* [(1932), 47 C.L.R. 50], dans lequel la Haute Cour d'Australie a nié à une personne faisant partie du public qualité pour contester la validité d'un accord entre le Commonwealth et un des États. La nature de la loi dont la validité est contestée est toute aussi pertinente, selon qu'elle comporte des prohibitions ou restrictions à l'égard d'une ou de catégories de personnes qui se trouvent ainsi particulièrement touchées par ses dispositions en regard du public en général. S'il s'agit d'une loi de ce genre, la Cour peut décider, comme elle l'a fait dans l'arrêt *Smith*, qu'une personne faisant partie du public, comme Smith peut-être même, est touchée de trop loin pour qu'on lui reconnaisse qualité pour agir. D'autre part, lorsque tous ceux qui font partie du public sont visés également, comme dans la présente affaire, et qu'une question réglable par les voies de justice est posée relativement à la validité d'une loi, la Cour doit être capable de dire que, entre le parti d'accueillir une action de contribuables et celui de nier toute qualité lorsque le procureur général refuse d'agir, elle peut choisir d'entendre l'affaire au fond.

On a souligné que le demandeur avait tenté sans succès d'obtenir que le procureur général du Canada prenne les procédures appropriées afin de vérifier la validité de la *Loi sur les langues officielles*. On a fait remarquer en outre que cette loi n'est pas une loi de réglementation, mais qu'elle est déclaratoire et exécutoire relativement à l'usage de l'anglais et du français par les organes

create offences or impose penalties. There was thus no person or class of persons particularly aggrieved who might raise the issue of its constitutional validity.

The plaintiff was recognized as having status to make his challenge to the statute and was permitted to proceed with his action. In substance, the case was decided on the basis that the validity of the legislation raised a serious constitutional issue and there was no reasonable way to have its validity tested unless an individual citizen could proceed in the manner sought by the plaintiff. This was a decision of major importance in that it recognized that although a person might not be specially affected or exceptionally prejudiced by the legislation which he sought to attack, he might be able to seek a declaratory judgment in the circumstances described.

The *Thorson* case was followed shortly afterwards by the case of *Nova Scotia Board of Censors v. McNeil*[9].

In that case the plaintiff sought to challenge the constitutional validity of certain sections of the *Theatres and Amusements Act*, R.S.N.S. 1967, c. 304 and certain regulations made thereunder. He was a resident and taxpayer in the Province of Nova Scotia. He was concerned about the powers of censorship provided in that Act. He had attempted to appeal to the Lieutenant Governor in Council from the decision of the Board of Censors to prohibit the exhibition of a particular film but was not recognized as having any right of appeal. He had also sought, without success, to have the Attorney General of Nova Scotia test the constitutional validity of certain sections of the Act and certain regulations. He then commenced action for a declaratory judgment.

Preliminary objection was taken to his status to institute the proceeding but this failed in both courts in Nova Scotia. An appeal to this Court was dismissed.

[9] [1976] 2 S.C.R. 265.

et organismes fédéraux et dans ces derniers, et qu'elle ne crée elle-même aucune infraction et n'impose aucune peine. Il n'y avait pas de personne ou de catégorie de personnes particulièrement lésée qui pouvait soulever la question de sa constitutionnalité.

On a reconnu que le demandeur avait l'intérêt pour contester la loi et on lui a permis de poursuivre son action. Au fond, on a décidé cette affaire en disant que la validité de la loi soulevait une importante question constitutionnelle et qu'il n'y avait aucune façon raisonnable d'en vérifier la validité à moins qu'une personne ne procède comme l'a fait le demandeur. Il s'agit d'une décision très importante en ce qu'elle a reconnu que même si une personne n'est pas particulièrement touchée ou même si elle ne subit pas un préjudice exceptionnel par suite de l'application de la loi qu'elle veut contester, elle doit, dans ces circonstances, pouvoir demander un jugement déclaratoire.

L'arrêt *Thorson* a été suivi peu de temps après par l'arrêt *Nova Scotia Board of Censors c. McNeil*[9].

Dans cette affaire, le demandeur voulait contester la constitutionnalité de certains articles de la *Theatres and Amusements Act*, R.S.N.S. 1967, chap. 304 et de certains de ses règlements d'application. Il était citoyen et contribuable de la Nouvelle-Écosse. Les pouvoirs de censure prévus dans cette loi le préoccupaient. Il avait tenté d'interjeter appel, auprès du lieutenant-gouverneur en conseil, de la décision de cette commission d'interdire un certain film, mais on ne lui a pas reconnu ce droit d'appel. Il avait aussi demandé, sans succès, au procureur général de la Nouvelle-Écosse de vérifier la constitutionnalité de certains articles de la Loi et de certains de ses règlements d'application. Il a alors intenté une action pour obtenir un jugement déclaratoire.

Son intérêt pour intenter cette action a fait l'objet d'une objection préliminaire qui a été rejetée par les deux cours de la Nouvelle-Écosse. L'appel à cette Cour a été rejeté.

[9] [1976] 2 R.C.S. 265.

This case differed from the *Thorson* case. The legislation under attack was regulatory legislation. The *Theatres and Amusements Act* provided for the appointment of a Board empowered to permit or prohibit the use or exhibition in Nova Scotia for public entertainment of any film or any performance in a theatre. Provision was made for licensing regulations in respect of theatres and film exchanges and in respect of cinematograph operators. Regulations could be enacted in respect of the exhibition, sale, lease and exchange of films. A licence from the Board was necessary for a film exchange to exhibit any film. The Board was given complete power over the showing of films. Penalties were prescribed for breaches of the Act or the regulations.

It is obvious that in this case certain classes of persons were directly affected by the operation of the Act and the regulations, *i.e.* film exchanges, theatre owners and cinematograph operators. A theatre owner who wished to challenge the validity of the Act could have done so by showing a film whose exhibition had been refused by the Board and, thereafter, resisting the imposition of a penalty.

Notwithstanding these circumstances, the plaintiff was recognized by this Court as having the necessary legal standing to seek a declaration that the legislation was constitutionally invalid. Chief Justice Laskin, who delivered the reasons of the Court, said at p. 271:

Since the issue of validity does not fall for determination here and, indeed, has not even been argued in relation to the question of standing, I would not, in this case, go beyond the tentative conclusion that there is an arguable case under the terms of the challenged legislation that members of the Nova Scotia public are directly affected in what they may view in a Nova Scotia theatre, albeit there is a more direct effect on the business enterprises which are regulated by the legislation. The challenged legislation does not appear to me to be legislation directed only to the regulation of operators and film distributors. It strikes at the members of the public in one of its central aspects.

In my view, this is enough, in the light of the fact that there appears to be no other way, practically speaking, to subject the challenged Act to judicial review, to

Cette affaire était différente de l'affaire *Thorson*. La loi contestée était une loi de réglementation. La *Theatres and Amusements Act* prévoyait la nomination d'une commission chargée de permettre ou d'interdire en Nouvelle-Écosse la présentation d'un film ou une représentation dans une salle de spectacles. La Loi prévoyait des règlements concernant les permis relatifs aux salles de spectacles et aux distributeurs de films de même qu'aux projectionnistes. Des règlements pouvaient être adoptés pour la présentation, la vente, la location et l'échange de films. Un distributeur devait obtenir de la Commission un permis pour présenter un film. La Commission avait tous les pouvoirs en matière de censure des films. Des peines étaient prévues en cas de violation de la Loi ou des règlements.

Il est évident que dans cette affaire certaines catégories de personnes étaient directement visées par l'application de la Loi et de ses règlements, soit les distributeurs de films, les propriétaires de salles de spectacles et les projectionnistes. Le propriétaire d'une salle de spectacles qui voulait contester la validité de la Loi pouvait le faire en présentant un film que la Commission avait interdit et en contestant par la suite l'imposition d'une peine.

Malgré cela, cette Cour a reconnu au demandeur l'intérêt requis pour demander que la loi soit déclarée inconstitutionnelle. Le juge en chef Laskin, qui a prononcé les motifs de la Cour, dit à la p. 271:

Etant donné que la question de la validité n'a pas à être décidée en l'espèce et qu'en fait elle n'a même pas été soulevée à l'égard de la qualité pour agir, je ne limiterai donc à conclure qu'aux termes de la loi contestée, les citoyens de la Nouvelle-Écosse ont des motifs raisonnables de se déclarer directement touchés par ce qu'on peut leur présenter dans un lieu de spectacle dans leur province, bien que les entreprises régies par la loi soient visées plus directement. La loi contestée ne me semble pas viser uniquement les exploitants de salles et les distributeurs de films. Elle touche aussi à l'un des droits les plus fondamentaux du public.

Puisqu'il ne semble y avoir pratiquement aucun autre moyen de soumettre la loi contestée à l'examen judiciaire, cela suffit, à mon avis, à appuyer la demande de

support the claim of the respondent to have the discretion of the Court exercised in his favour to give him standing.

This decision went beyond the *Thorson* judgment in that it recognized the possibility of a person having status to attack the validity of legislation in the circumstances defined in that case even though there existed classes of persons who were specially affected and who might be exceptionally prejudiced by it.

In both the *Thorson* and *McNeil* cases, the challenge to the legislation in question was founded upon their alleged constitutional invalidity. In the present case, the challenge is based upon the operation of the *Canadian Bill of Rights*. I agree with the view expressed by the Chief Justice that no distinction should be made between a declaratory action to obtain a decision on validity under the *British North America Act* and a declaratory action to obtain a decision on the operative effect in the face of the *Canadian Bill of Rights*.

The legislation under attack here is not declaratory or directory as in the case of the *Official Languages Act* nor is it regulatory as in the case of the *Theatres and Amusements Act*. It is exculpatory in nature. It provides that in certain specified circumstances conduct which otherwise would be criminal is permissible. It does not impose duties, but instead provides exemption from criminal liability. That being so, it is difficult to find any class of person directly affected or exceptionally prejudiced by it who would have cause to attack the legislation.

Doctors who perform therapeutic abortions are protected by the legislation and would have no reason to attack it. Doctors who do not perform therapeutic abortions have no direct interest to protect by attacking it, and, consequently, an attack by a doctor in that category would be no different from that made by any other concerned citizen. The same thing applies to hospitals. A hospital which appoints a therapeutic abortion committee has no reason to attack the legislation. A hospital which does not appoint such a committee has no direct reason to attack the legislation.

l'intimé à savoir que la Cour exerce son pouvoir discrétionnaire en sa faveur et lui reconnaisse la qualité pour agir.

Cet arrêt va plus loin que l'arrêt *Thorson* en ce qu'il reconnaît qu'une personne peut avoir l'intérêt pour attaquer la validité d'une loi dans les circonstances définies dans cette cause même s'il y a des catégories de personnes qui sont particulièrement visées et qui peuvent subir un préjudice exceptionnel.

Dans les arrêts *Thorson* et *McNeil*, la contestation des lois en question se fondait sur leur inconstitutionnalité possible. En l'espèce, la contestation s'appuie sur l'application de la *Déclaration canadienne des droits*. Je souscris à l'opinion du juge en chef qu'il ne faut pas faire de distinction entre une action déclaratoire qui vise à établir si une loi est valide en vertu de l'*Acte de l'Amérique du Nord britannique* et une action déclaratoire qui vise à établir si une loi doit s'appliquer en regard de la *Déclaration canadienne des droits*.

La loi contestée en l'espèce n'est ni déclaratoire ni exécutoire comme l'est la *Loi sur les langues officielles*, et elle n'est pas non plus une loi de réglementation comme l'est la *Theatres and Amusements Act*. Elle est de nature justificative. Elle permet, dans certaines circonstances précises, d'accomplir des actes qui seraient par ailleurs de nature criminelle. Elle n'impose pas d'obligations, mais elle prévoit plutôt une exception à la responsabilité pénale. De ce fait, il est difficile de trouver une catégorie de personnes directement touchées ou qui subissent un préjudice exceptionnel et qui aient un motif de contester la loi.

Les médecins qui provoquent des avortements thérapeutiques sont protégés par la loi et n'auraient pas de motif de la contester. Les médecins qui n'accomplissent pas d'avortements thérapeutiques n'ont pas d'intérêt direct à protéger en l'attaquant et, par conséquent, une contestation de la part d'un médecin de ce groupe ne serait pas différente de celle de tout autre citoyen concerné. La même chose s'applique aux hôpitaux. Un hôpital qui nomme un comité de l'avortement thérapeutique n'a pas de motif de contester la loi. Un hôpital qui ne nomme pas de comité n'a pas de motif direct de le faire.

There is no reason why a pregnant woman desirous of obtaining an abortion should challenge the legislation which is for her benefit. The husband of a pregnant wife who desires to prevent an abortion which she desires may be said to be directly affected by the legislation in issue in the sense that by reason of that legislation she might obtain a certificate permitting the abortion if her continued pregnancy would be likely to endanger her life or health and thus prevent the abortion from constituting a crime. However, the possibility of the husband bringing proceedings to attack the legislation is illusory. The progress of the pregnancy would not await the inevitable lengthy lapse of time involved in court proceedings leading to a final judgment. The abortion would have occurred, or a child would have been born long before the case had been finally terminated, perhaps in this Court.

The legislation proposed to be attacked has a direct impact upon the unborn human foetuses whose existence may be terminated by legalized abortions. They obviously cannot be parties to proceedings in court and yet the issue as to the scope of the *Canadian Bill of Rights* in the protection of the human right to life is a matter of considerable importance. There is no reasonable way in which that issue can be brought into court unless proceedings are launched by some interested citizen.

In the light of the *Thorson* and *McNeil* cases, it is my opinion that the respondent should be recognized as having legal standing to continue with his action. In the *Thorson* case, the plaintiff, as an interested citizen, challenged the constitutional validity of the *Official Languages Act*. The legislation did not directly affect him, save in his position as a taxpayer. He had sought, without avail, to have the constitutional issue raised by other means. He was recognized to have status. The position is the same in the present case. The respondent is a concerned citizen and a taxpayer. He has sought unsuccessfully to have the issue determined by other means.

In the *McNeil* case, the plaintiff was concerned about censorship of films in Nova Scotia. He had sought by other means to have the validity of the

Aucun motif ne justifie une femme enceinte désireuse d'obtenir un avortement de contester la loi qui lui permet de l'obtenir. L'époux qui souhaite empêcher un avortement que sa femme enceinte veut obtenir peut être touché directement par la loi en question en ce sens que, à cause de la loi, elle pourrait obtenir un certificat permettant l'avortement si la continuation de sa grossesse met vraisemblablement sa vie ou sa santé en danger, et empêcher ainsi que l'avortement soit un crime. Cependant, la possibilité que l'époux intente des procédures pour contester la loi est illusoire. L'avancement de la grossesse ne s'accommoderait pas des longs délais inévitables qu'exigent les procédures judiciaires jusqu'au jugement définitif. L'avortement aurait été pratiqué ou l'enfant serait né longtemps avant que l'instance soit décidée en dernier ressort, peut-être devant cette Cour.

La loi que l'on veut contester vise directement les fœtus humains dont la gestation est arrêtée par des avortements légalisés. Il est évident qu'ils ne peuvent être parties aux procédures judiciaires, et pourtant la question, quant à la portée de la *Déclaration canadienne des droits* sur la protection du droit à la vie, est d'une importance considérable. Il n'y a pas de façon raisonnable de soumettre la question à la cour à moins qu'un citoyen intéressé n'intente des procédures.

Sur la base des arrêts *Thorson* et *McNeil*, je suis d'avis qu'il y a lieu de reconnaître à l'intimé la capacité de poursuivre son action. Dans l'arrêt *Thorson*, le demandeur, à titre de citoyen intéressé, a contesté la constitutionnalité de la *Loi sur les langues officielles*. La loi ne le touchait pas directement, sauf en sa qualité de contribuable. Il avait tenté, sans succès, d'obtenir que la question constitutionnelle soit soulevée par d'autres moyens. On lui a reconnu la capacité d'agir. La situation est la même en l'espèce. L'intimé est un citoyen intéressé et un contribuable. Il a tenté sans succès d'obtenir une décision sur la question par d'autres moyens.

Dans l'arrêt *McNeil*, le demandeur s'inquiétait de la censure des films en Nouvelle-Écosse. Il avait tenté, sans succès, de faire déterminer la validité

*Theatres and Amusements Act* tested, but without success. In that case there were other classes of persons directly affected by the legislation who might have challenged it. Nonetheless, he was recognized as having legal standing because it also affected the rights of the public. The position of the respondent in this case is at least as strong. There are in this case no persons directly affected who could effectively challenge the legislation.

I interpret these cases as deciding that to establish status as a plaintiff in a suit seeking a declaration that legislation is invalid, if there is a serious issue as to its invalidity, a person need only to show that he is affected by it directly or that he has a genuine interest as a citizen in the validity of the legislation and that there is no other reasonable and effective manner in which the issue may be brought before the Court. In my opinion, the respondent has met this test and should be permitted to proceed with his action.

The issue which alone was raised in the courts below was as to whether exclusive jurisdiction to deal with the issue rested in the Federal Court of Canada because of the character of the appellants. The same issue is before the Court arising out of two other cases heard immediately prior to the hearing of the present appeal. These cases were *Attorney General of Canada et al. v. The Law Society of British Columbia and Victor McCallum* and *Donald Jabour v. The Law Society of British Columbia et al. and The Attorney General of Canada.* It is conceded that there are no material differences between those cases and the present one in respect of that issue. The disposition of this issue in the present case should be the same as its disposition in those cases.

Under the terms of the order which granted leave to appeal, the respondent is entitled to the costs of this appeal on a solicitor and client basis.

*Appeal dismissed with costs,* LASKIN C.J. *and* LAMER J. *dissenting.*

*Solicitor for the appellants: R. Tassé, Ottawa.*

*Solicitors for the respondent: Shumiatcher, Findlay & Newfeld, Regina.*

de la *Theatres and Amusements Act* par d'autres moyens. Dans cette affaire, il y avait d'autres catégories de personnes directement touchées qui pouvaient la contester. Néanmoins, on lui a reconnu l'intérêt pour agir parce que la loi touchait également les droits du public. La position de l'intimé en l'espèce est au moins aussi solide. En l'espèce, il n'y a pas de personnes directement touchées qui puissent réellement contester la loi.

Selon mon interprétation, ces arrêts décident que pour établir l'intérêt pour agir à titre de demandeur dans une poursuite visant à déclarer qu'une loi est invalide, si cette question se pose sérieusement, il suffit qu'une personne démontre qu'elle est directement touchée ou qu'elle a, à titre de citoyen, un intérêt véritable quant à la validité de la loi, et qu'il n'y a pas d'autre manière raisonnable et efficace de soumettre la question à la cour. A mon avis, l'intimé répond à ce critère et devrait être autorisé à poursuivre son action.

La seule question soulevée devant les cours d'instance inférieure était de savoir si, à cause du statut des appelants, la Cour fédérale du Canada est seule compétente pour trancher la question. La même question est soumise à la Cour dans deux litiges entendus immédiatement avant l'audition du présent appel. Il s'agit de *Procureur général du Canada et autres c. The Law Society of British Columbia et Victor McCallum* et *Donald Jabour c. The Law Society of British Columbia et autres et Procureur général du Canada.* Il est admis qu'il n'y a pas, sur cette question, de différence substantielle entre ces affaires et la présente espèce. Il y a lieu de répondre à cette question en l'espèce de la même façon que dans ces affaires.

Conformément à l'ordonnance d'autorisation de l'appel, l'intimé a droit aux dépens comme entre avocat et client.

*Pourvoi rejeté avec dépens, le juge en chef* LASKIN *et le juge* LAMER *sont dissidents.*

*Procureur des appelants: R. Tassé, Ottawa.*

*Procureurs de l'intimé: Shumiatcher, Findlay & Newfeld, Regina.*

*Solicitor for the intervener the Attorney General for Ontario: H. Allan Leal, Toronto.*

*Solicitor for the intervener the Attorney General for Alberta: William Henkel, Edmonton.*

*Solicitor for the intervener the Attorney General of British Columbia: E. Robert A. Edwards, Victoria.*

*Procureur de l'intervenant le procureur général de l'Ontario: H. Allan Leal, Toronto.*

*Procureur de l'intervenant le procureur général de l'Alberta: William Henkel, Edmonton.*

*Procureur de l'intervenant le procureur général de la Colombie-Britannique: E. Robert A. Edwards, Victoria.*



# TAB5

*Indexed as:*
## Century Services Inc. v. Canada (Attorney General)

**Century Services Inc. Appellant;**
**v.**
**Attorney General of Canada on behalf of Her Majesty The Queen**
**in Right of Canada Respondent.**

[2010] 3 S.C.R. 379

[2010] 3 R.C.S. 379

[2010] S.C.J. No. 60

[2010] A.C.S. no 60

2010 SCC 60

File No.: 33239.

Supreme Court of Canada

Heard: May 11, 2010;
Judgment: December 16, 2010.

**Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish,**
**Abella, Charron, Rothstein and Cromwell JJ.**

(136 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Catchwords:*

*Bankruptcy and Insolvency -- Priorities -- Crown applying on eve of bankruptcy of debtor company to have GST monies held in trust paid to Receiver General of Canada -- Whether deemed trust in favour of Crown under Excise Tax Act prevails over provisions of Companies' Creditors*

*Arrangement Act purporting to nullify deemed trusts in favour of Crown -- Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 18.3(1) -- Excise Tax Act, R.S.C. 1985, c. E-15, s. 222(3).*

*Bankruptcy and insolvency -- Procedure -- Whether chambers judge had authority to make order partially lifting stay of proceedings to allow debtor company to make assignment in bankruptcy and to stay Crown's right to enforce GST deemed trust -- Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11.*

*Trusts -- Express trusts -- GST collected but unremitted to Crown -- Judge ordering that GST be held by Monitor in trust account -- Whether segregation of Crown's GST claim in Monitor's account created an express trust in favour of Crown.*

[page380]

### Summary:

The debtor company commenced proceedings under the *Companies' Creditors Arrangement Act* ("*CCAA*"), obtaining a stay of proceedings to allow it time to reorganize its financial affairs. One of the debtor company's outstanding debts at the commencement of the reorganization was an amount of unremitted Goods and Services Tax ("GST") payable to the Crown. Section 222(3) of the *Excise Tax Act* ("*ETA*") created a deemed trust over unremitted GST, which operated despite any other enactment of Canada except the *Bankruptcy and Insolvency Act* ("*BIA*"). However, s. 18.3(1) of the *CCAA* provided that any statutory deemed trusts in favour of the Crown did not operate under the *CCAA*, subject to certain exceptions, none of which mentioned GST.

Pursuant to an order of the *CCAA* chambers judge, a payment not exceeding $5 million was approved to the debtor company's major secured creditor, Century Services. However, the chambers judge also ordered the debtor company to hold back and segregate in the Monitor's trust account an amount equal to the unremitted GST pending the outcome of the reorganization. On concluding that reorganization was not possible, the debtor company sought leave of the court to partially lift the stay of proceedings so it could make an assignment in bankruptcy under the *BIA*. The Crown moved for immediate payment of unremitted GST to the Receiver General. The chambers judge denied the Crown's motion, and allowed the assignment in bankruptcy. The Court of Appeal allowed the appeal on two grounds. First, it reasoned that once reorganization efforts had failed, the chambers judge was bound under the priority scheme provided by the *ETA* to allow payment of unremitted GST to the Crown and had no discretion under s. 11 of the *CCAA* to continue the stay against the Crown's claim. Second, the Court of Appeal concluded that by ordering the GST funds segregated in the Monitor's trust account, the chambers judge had created an express trust in favour of the Crown.

*Held* (Abella J. dissenting): The appeal should be allowed.

*Per* McLachlin C.J. and Binnie, LeBel, Deschamps, Charron, Rothstein and Cromwell JJ.: The apparent conflict between s. 222(3) of the *ETA* and s. 18.3(1) of the *CCAA* can be resolved through an interpretation that properly recognizes the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by [page381] Parliament and the principles for interpreting the *CCAA* that have been recognized in the jurisprudence. The history of the *CCAA* distinguishes it from the *BIA* because although these statutes share the same remedial purpose of avoiding the social and economic costs of liquidating a debtor's assets, the *CCAA* offers more flexibility and greater judicial discretion than the rules-based mechanism under the *BIA*, making the former more responsive to complex reorganizations. Because the *CCAA* is silent on what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily provides the backdrop against which creditors assess their priority in the event of bankruptcy. The contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the *CCAA* and the *BIA*, and one of its important features has been a cutback in Crown priorities. Accordingly, the *CCAA* and the *BIA* both contain provisions nullifying statutory deemed trusts in favour of the Crown, and both contain explicit exceptions exempting source deductions deemed trusts from this general rule. Meanwhile, both Acts are harmonious in treating other Crown claims as unsecured. No such clear and express language exists in those Acts carving out an exception for GST claims.

When faced with the apparent conflict between s. 222(3) of the *ETA* and s. 18.3(1) of the *CCAA*, courts have been inclined to follow *Ottawa Senators Hockey Club Corp. (Re)* and resolve the conflict in favour of the *ETA*. *Ottawa Senators* should not be followed. Rather, the *CCAA* provides the rule. Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so expressly and elaborately. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. The internal logic of the *CCAA* appears to subject a GST deemed trust to the waiver by Parliament of its priority. A strange asymmetry would result if differing treatments of GST deemed trusts under the *CCAA* and the *BIA* were found to exist, as this would encourage statute shopping, undermine the *CCAA*'s remedial purpose and invite the very social ills that the statute was enacted to avert. The later in time enactment of the more general s. 222(3) of the *ETA* does not require application of the doctrine of implied repeal to the earlier and more specific s. 18.3(1) of the *CCAA* in the circumstances of this case. In any event, [page382] recent amendments to the *CCAA* in 2005 resulted in s. 18.3 of the Act being renumbered and reformulated, making it the later in time provision. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*. The conflict between the *ETA* and the *CCAA* is more apparent than real.

The exercise of judicial discretion has allowed the *CCAA* to adapt and evolve to meet contemporary business and social needs. As reorganizations become increasingly complex, *CCAA* courts have been called upon to innovate. In determining their jurisdiction to sanction measures in a *CCAA* proceeding, courts should first interpret the provisions of the *CCAA* before turning to their inherent or equitable jurisdiction. Noteworthy in this regard is the expansive interpretation the language of

the *CCAA* is capable of supporting. The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. The requirements of appropriateness, good faith and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. The question is whether the order will usefully further efforts to avoid the social and economic losses resulting from liquidation of an insolvent company, which extends to both the purpose of the order and the means it employs. Here, the chambers judge's order staying the Crown's GST claim was in furtherance of the *CCAA*'s objectives because it blunted the impulse of creditors to interfere in an orderly liquidation and fostered a harmonious transition from the *CCAA* to the *BIA*, meeting the objective of a single proceeding that is common to both statutes. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA* to allow commencement of *BIA* proceedings, but no gap exists between the two statutes because they operate in tandem and creditors in both cases look to the *BIA* scheme of distribution to foreshadow how they will fare if the reorganization is unsuccessful. The breadth of the court's discretion under the *CCAA* is sufficient to construct a bridge to liquidation under the *BIA*. Hence, the chambers judge's order was authorized.

[page383]

No express trust was created by the chambers judge's order in this case because there is no certainty of object inferrable from his order. Creation of an express trust requires certainty of intention, subject matter and object. At the time the chambers judge accepted the proposal to segregate the monies in the Monitor's trust account there was no certainty that the Crown would be the beneficiary, or object, of the trust because exactly who might take the money in the final result was in doubt. In any event, no dispute over the money would even arise under the interpretation of s. 18.3(1) of the *CCAA* established above, because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount.

*Per* Fish J.: The GST monies collected by the debtor are not subject to a deemed trust or priority in favour of the Crown. In recent years, Parliament has given detailed consideration to the Canadian insolvency scheme but has declined to amend the provisions at issue in this case, a deliberate exercise of legislative discretion. On the other hand, in upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, courts have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In the context of the Canadian insolvency regime, deemed trusts exist only where there is a statutory provision creating the trust and a *CCAA* or *BIA* provision explicitly confirming its effective operation. The *Income Tax Act*, the *Canada Pension Plan* and the *Employment Insurance Act* all contain deemed trust provisions that are strikingly similar to that in s. 222 of the *ETA* but they are all also confirmed in s. 37 of the *CCAA* and in s. 67(3) of the *BIA* in clear and unmistakeable terms. The same is not true of the deemed trust created under the *ETA*. Although Parliament created a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it did not confirm the continued

operation of the trust in either the *BIA* or the *CCAA*, reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

[page384]

*Per* Abella J. (dissenting): Section 222(3) of the *ETA* gives priority during *CCAA* proceedings to the Crown's deemed trust in unremitted GST. This provision unequivocally defines its boundaries in the clearest possible terms and excludes only the *BIA* from its legislative grasp. The language used reflects a clear legislative intention that s. 222(3) would prevail if in conflict with any other law except the *BIA*. This is borne out by the fact that following the enactment of s. 222(3), amendments to the *CCAA* were introduced, and despite requests from various constituencies, s. 18.3(1) was not amended to make the priorities in the *CCAA* consistent with those in the *BIA*. This indicates a deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

The application of other principles of interpretation reinforces this conclusion. An earlier, specific provision may be overruled by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails. Section 222(3) achieves this through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" other than the *BIA*. Section 18.3(1) of the *CCAA* is thereby rendered inoperative for purposes of s. 222(3). By operation of s. 44(*f*) of the *Interpretation Act*, the transformation of s. 18.3(1) into s. 37(1) after the enactment of s. 222(3) of the *ETA* has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision. This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding-up Act*, that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes other than the *BIA* and the *Winding-up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request for payment of the GST funds during the *CCAA* proceedings.

[page385]

## Cases Cited

By Deschamps J.

**Overruled:** *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; **distinguished:** *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862; **referred to:** *Reference re Companies' Creditors*

*Companies' Creditors Arrangement Act, 1933*, S.C. 1932-33, c. 36 [am. 1952-53, c. 3].

*Employment Insurance Act*, S.C. 1996, c. 23, ss. 86(2), (2.1).

*Excise Tax Act*, R.S.C. 1985, c. E-15, s. 222.

*Income Tax Act*, R.S.C. 1985, c. 1 (5 Supp.), ss. 227(4), (4.1).

*Interpretation Act*, R.S.C. 1985, c. I-21, ss. 2 "enactment", 44(f).

*Winding-up Act*, R.S.C. 1985, c. W-11.

## Authors Cited

Canada. Advisory Committee on Bankruptcy and Insolvency. *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency*. Ottawa: Minister of Supply and Services Canada, 1986.

Canada. House of Commons. *Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, 3 Sess., 34 Parl., October 3, 1991, 15:15.

Canada. Industry Canada. Marketplace Framework Policy Branch. *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Corporate and Insolvency Law Policy Directorate, 2002.

Canada. Senate. *Debates of the Senate*, vol. 142, 1 Sess., 38 Parl., November 23, 2005, p. 2147.

Canada. Senate. Standing Committee on Banking, Trade and Commerce. *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Senate of Canada, 2003.

Canada. Study Committee on Bankruptcy and Insolvency Legislation. *Bankruptcy and Insolvency: Report of [page387] the Study Committee on Bankruptcy and Insolvency Legislation*. Ottawa: Information Canada, 1970.

Côté, Pierre-André. *The Interpretation of Legislation in Canada*, 3 ed. Scarborough, Ont.: Carswell, 2000.

Côté, Pierre-André, avec la collaboration de Stéphane Beaulac et Mathieu Devinat. *Interprétation des lois*, 4e éd. Montréal: Thémis, 2009.

Edwards, Stanley E. "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587.

Insolvency Institute of Canada and Canadian Association of Insolvency and Restructuring Professionals. Joint Task Force on Business Insolvency Law Reform. *Report* (2002) (online: http://www.cairp.ca/publications/submissions-to-government/law -reform/index.php).

Insolvency Institute of Canada and Canadian Association of Insolvency and Restructuring Professionals. Legislative Review Task Force (Commercial). *Report on the Commercial Provisions of Bill C-55* (2005).

Jackson, Georgina R. and Janis Sarra. "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2007*. Toronto: Thomson Carswell, 2008, 41.

Jones, Richard B. "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2005*. Toronto: Thomson Carswell, 2006, 481.

Lamer, Francis L. *Priority of Crown Claims in Insolvency*. Toronto: Carswell, 1996 (loose-leaf updated 2010, release 1).

Morgan, Barbara K. "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bankr. L.J.* 461.

Sarra, Janis. *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations*. Toronto: University of Toronto Press, 2003.

Sarra, Janis P. *Rescue! The Companies' Creditors Arrangement Act*. Toronto: Thomson Carswell, 2007.

Sullivan, Ruth. *Sullivan on the Construction of Statutes*, 5 ed. Markham, Ont.: LexisNexis, 2008.

Waters, Donovan W. M., Mark R. Gillen and Lionel D. Smith, eds. *Waters' Law of Trusts in Canada*, 3 ed. Toronto: Thomson Carswell, 2005.

Wood, Roderick J. *Bankruptcy and Insolvency Law*. Toronto: Irwin Law, 2009.

[page388]


## History and Disposition:

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Tysoe and Smith JJ.A.), 2009 BCCA 205, 98 B.C.L.R. (4) 242, 270 B.C.A.C. 167, 454 W.A.C. 167, [2009] 12

W.W.R. 684, [2009] G.S.T.C. 79, [2009] B.C.J. No. 918 (QL), 2009 CarswellBC 1195, reversing a judgment of Brenner C.J.S.C., 2008 BCSC 1805, [2008] G.S.T.C. 221, [2008] B.C.J. No. 2611 (QL), 2008 CarswellBC 2895, dismissing a Crown application for payment of GST monies. Appeal allowed, Abella J. dissenting.

**Counsel:**

*Mary I. A. Buttery*, *Owen J. James* and *Matthew J. G. Curtis*, for the appellant.

*Gordon Bourgard*, *David Jacyk* and *Michael J. Lema*, for the respondent.

The judgment of McLachlin C.J. and Binnie, LeBel, Deschamps, Charron, Rothstein and Cromwell JJ. was delivered by

**1** **DESCHAMPS J.**:-- For the first time this Court is called upon to directly interpret the provisions of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). In that respect, two questions are raised. The first requires reconciliation of provisions of the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*"), which lower courts have held to be in conflict with one another. The second concerns the scope of a court's discretion when supervising reorganization. The relevant statutory provisions are reproduced in the Appendix. On the first question, having considered the evolution of Crown priorities in the context of insolvency and the wording of the various statutes creating Crown priorities, I conclude that it is the *CCAA* and not the *ETA* that provides the rule. On the second question, I conclude that the broad discretionary jurisdiction conferred on the supervising judge must be interpreted having regard to the remedial nature of the *CCAA* and insolvency legislation generally. Consequently, the court had the discretion to partially lift a stay of proceedings to allow the debtor to make an assignment under the *Bankruptcy and Insolvency [page389] Act*, R.S.C. 1985, c. B-3 ("*BIA*"). I would allow the appeal.

1.  Facts and Decisions of the Courts Below

**2** Ted LeRoy Trucking Ltd. ("LeRoy Trucking") commenced proceedings under the *CCAA* in the Supreme Court of British Columbia on December 13, 2007, obtaining a stay of proceedings with a view to reorganizing its financial affairs. LeRoy Trucking sold certain redundant assets as authorized by the order.

**3** Amongst the debts owed by LeRoy Trucking was an amount for Goods and Services Tax ("GST") collected but unremitted to the Crown. The *ETA* creates a deemed trust in favour of the Crown for amounts collected in respect of GST. The deemed trust extends to any property or proceeds held by the person collecting GST and any property of that person held by a secured

creditor, requiring that property to be paid to the Crown in priority to all security interests. The *ETA* provides that the deemed trust operates despite any other enactment of Canada except the *BIA*. However, the *CCAA* also provides that subject to certain exceptions, none of which mentions GST, deemed trusts in favour of the Crown do not operate under the *CCAA*. Accordingly, under the *CCAA* the Crown ranks as an unsecured creditor in respect of GST. Nonetheless, at the time LeRoy Trucking commenced *CCAA* proceedings the leading line of jurisprudence held that the *ETA* took precedence over the *CCAA* such that the Crown enjoyed priority for GST claims under the *CCAA*, even though it would have lost that same priority under the *BIA*. The *CCAA* underwent substantial amendments in 2005 in which some of the provisions at issue in this appeal were renumbered and reformulated (S.C. 2005, c. 47). However, these amendments only came into force on September 18, 2009. I will refer to the amended provisions only where relevant.

[page390]

4    On April 29, 2008, Brenner C.J.S.C., in the context of the *CCAA* proceedings, approved a payment not exceeding $5 million, the proceeds of redundant asset sales, to Century Services, the debtor's major secured creditor. LeRoy Trucking proposed to hold back an amount equal to the GST monies collected but unremitted to the Crown and place it in the Monitor's trust account until the outcome of the reorganization was known. In order to maintain the *status quo* while the success of the reorganization was uncertain, Brenner C.J.S.C. agreed to the proposal and ordered that an amount of $305,202.30 be held by the Monitor in its trust account.

5    On September 3, 2008, having concluded that reorganization was not possible, LeRoy Trucking sought leave to make an assignment in bankruptcy under the *BIA*. The Crown sought an order that the GST monies held by the Monitor be paid to the Receiver General of Canada. Brenner C.J.S.C. dismissed the latter application. Reasoning that the purpose of segregating the funds with the Monitor was "to facilitate an ultimate payment of the GST monies which were owed pre-filing, but only if a viable plan emerged", the failure of such a reorganization, followed by an assignment in bankruptcy, meant the Crown would lose priority under the *BIA* (2008 BCSC 1805, [2008] G.S.T.C. 221).

6    The Crown's appeal was allowed by the British Columbia Court of Appeal (2009 BCCA 205, 270 B.C.A.C. 167). Tysoe J.A. for a unanimous court found two independent bases for allowing the Crown's appeal.

7    First, the court's authority under s. 11 of the *CCAA* was held not to extend to staying the Crown's application for immediate payment of the GST funds subject to the deemed trust after it was clear that reorganization efforts had failed and [page391] that bankruptcy was inevitable. As restructuring was no longer a possibility, staying the Crown's claim to the GST funds no longer served a purpose under the *CCAA* and the court was bound under the priority scheme provided by

the *ETA* to allow payment to the Crown. In so holding, Tysoe J.A. adopted the reasoning in *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), which found that the *ETA* deemed trust for GST established Crown priority over secured creditors under the *CCAA*.

**8** Second, Tysoe J.A. concluded that by ordering the GST funds segregated in the Monitor's trust account on April 29, 2008, the judge had created an express trust in favour of the Crown from which the monies in question could not be diverted for any other purposes. The Court of Appeal therefore ordered that the money held by the Monitor in trust be paid to the Receiver General.

2. Issues

**9** This appeal raises three broad issues which are addressed in turn:

(1) Did s. 222(3) of the *ETA* displace s. 18.3(1) of the *CCAA* and give priority to the Crown's *ETA* deemed trust during *CCAA* proceedings as held in *Ottawa Senators*?

(2) Did the court exceed its *CCAA* authority by lifting the stay to allow the debtor to make an assignment in bankruptcy?

(3) Did the court's order of April 29, 2008 requiring segregation of the Crown's GST claim in the Monitor's trust account create an express trust in favour of the Crown in respect of those funds?

[page392]

3. Analysis

**10** The first issue concerns Crown priorities in the context of insolvency. As will be seen, the *ETA* provides for a deemed trust in favour of the Crown in respect of GST owed by a debtor "[d]espite ... any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)" (s. 222(3)), while the *CCAA* stated at the relevant time that "notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be [so] regarded" (s. 18.3(1)). It is difficult to imagine two statutory provisions more apparently in conflict. However, as is often the case, the apparent conflict can be resolved through interpretation.

**11** In order to properly interpret the provisions, it is necessary to examine the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by Parliament, and the principles that have been recognized in the jurisprudence. It will be seen that Crown priorities in the insolvency context have been significantly pared down. The resolution of the second issue is also rooted in the context of the *CCAA*, but its purpose and the manner in which it has been interpreted

in the case law are also key. After examining the first two issues in this case, I will address Tysoe J.A.'s conclusion that an express trust in favour of the Crown was created by the court's order of April 29, 2008.

## 3.1 *Purpose and Scope of Insolvency Law*

**12** Insolvency is the factual situation that arises when a debtor is unable to pay creditors (see generally, R. J. Wood, *Bankruptcy and Insolvency Law* (2009), at p. 16). Certain legal proceedings become available upon insolvency, which typically allow a debtor to obtain a court order staying its creditors' enforcement actions and attempt to obtain [page393] a binding compromise with creditors to adjust the payment conditions to something more realistic. Alternatively, the debtor's assets may be liquidated and debts paid from the proceeds according to statutory priority rules. The former is usually referred to as reorganization or restructuring while the latter is termed liquidation.

**13** Canadian commercial insolvency law is not codified in one exhaustive statute. Instead, Parliament has enacted multiple insolvency statutes, the main one being the *BIA*. The *BIA* offers a self-contained legal regime providing for both reorganization and liquidation. Although bankruptcy legislation has a long history, the *BIA* itself is a fairly recent statute -- it was enacted in 1992. It is characterized by a rules-based approach to proceedings. The *BIA* is available to insolvent debtors owing $1000 or more, regardless of whether they are natural or legal persons. It contains mechanisms for debtors to make proposals to their creditors for the adjustment of debts. If a proposal fails, the *BIA* contains a bridge to bankruptcy whereby the debtor's assets are liquidated and the proceeds paid to creditors in accordance with the statutory scheme of distribution.

**14** Access to the *CCAA* is more restrictive. A debtor must be a company with liabilities in excess of $5 million. Unlike the *BIA*, the *CCAA* contains no provisions for liquidation of a debtor's assets if reorganization fails. There are three ways of exiting *CCAA* proceedings. The best outcome is achieved when the stay of proceedings provides the debtor with some breathing space during which solvency is restored and the *CCAA* process terminates without reorganization being needed. The second most desirable outcome occurs when the debtor's compromise or arrangement is accepted by its creditors and the reorganized company emerges from the *CCAA* proceedings as a going concern. Lastly, if the compromise or arrangement fails, either [page394] the company or its creditors usually seek to have the debtor's assets liquidated under the applicable provisions of the *BIA* or to place the debtor into receivership. As discussed in greater detail below, the key difference between the reorganization regimes under the *BIA* and the *CCAA* is that the latter offers a more flexible mechanism with greater judicial discretion, making it more responsive to complex reorganizations.

**15** As I will discuss at greater length below, the purpose of the *CCAA* -- Canada's first reorganization statute -- is to permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets. Proposals to creditors under the *BIA* serve the same remedial purpose, though this is achieved through a rules-based mechanism that offers less flexibility. Where reorganization is impossible, the *BIA* may be employed to provide an

orderly mechanism for the distribution of a debtor's assets to satisfy creditor claims according to predetermined priority rules.

**16** Prior to the enactment of the *CCAA* in 1933 (S.C. 1932-33, c. 36), practice under existing commercial insolvency legislation tended heavily towards the liquidation of a debtor company (J. Sarra, *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations* (2003), at p. 12). The battering visited upon Canadian businesses by the Great Depression and the absence of an effective mechanism for reaching a compromise between debtors and creditors to avoid liquidation required a legislative response. The *CCAA* was innovative as it allowed the insolvent debtor to attempt reorganization under judicial supervision outside the existing insolvency legislation which, once engaged, almost invariably resulted in liquidation (*Reference re Companies' Creditors [page395] Arrangement Act*, [1934] S.C.R. 659, at pp. 660-61; Sarra, *Creditor Rights*, at pp. 12-13).

**17** Parliament understood when adopting the *CCAA* that liquidation of an insolvent company was harmful for most of those it affected -- notably creditors and employees -- and that a workout which allowed the company to survive was optimal (Sarra, *Creditor Rights*, at pp. 13-15).

**18** Early commentary and jurisprudence also endorsed the *CCAA*'s remedial objectives. It recognized that companies retain more value as going concerns while underscoring that intangible losses, such as the evaporation of the companies' goodwill, result from liquidation (S. E. Edwards, "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587, at p. 592). Reorganization serves the public interest by facilitating the survival of companies supplying goods or services crucial to the health of the economy or saving large numbers of jobs (*ibid.*, at p. 593). Insolvency could be so widely felt as to impact stakeholders other than creditors and employees. Variants of these views resonate today, with reorganization justified in terms of rehabilitating companies that are key elements in a complex web of interdependent economic relationships in order to avoid the negative consequences of liquidation.

**19** The *CCAA* fell into disuse during the next several decades, likely because amendments to the Act in 1953 restricted its use to companies issuing bonds (S.C. 1952-53, c. 3). During the economic downturn of the early 1980s, insolvency lawyers and courts adapting to the resulting wave of insolvencies resurrected the statute and deployed it in response to new economic challenges. Participants in insolvency proceedings grew to recognize and appreciate the statute's distinguishing feature: a grant of broad and flexible authority to the supervising court to make [page396] the orders necessary to facilitate the reorganization of the debtor and achieve the *CCAA*'s objectives. The manner in which courts have used *CCAA* jurisdiction in increasingly creative and flexible ways is explored in greater detail below.

**20** Efforts to evolve insolvency law were not restricted to the courts during this period. In 1970, a government-commissioned panel produced an extensive study recommending sweeping reform but Parliament failed to act (see *Bankruptcy and Insolvency: Report of the Study Committee on*

*Bankruptcy and Insolvency Legislation* (1970)). Another panel of experts produced more limited recommendations in 1986 which eventually resulted in enactment of the *Bankruptcy and Insolvency Act* of 1992 (S.C. 1992, c. 27) (see *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)). Broader provisions for reorganizing insolvent debtors were then included in Canada's bankruptcy statute. Although the 1970 and 1986 reports made no specific recommendations with respect to the *CCAA*, the House of Commons committee studying the *BIA*'s predecessor bill, C-22, seemed to accept expert testimony that the *BIA*'s new reorganization scheme would shortly supplant the *CCAA*, which could then be repealed, with commercial insolvency and bankruptcy being governed by a single statute (*Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, 3rd Sess., 34th Parl., October 3, 1991, at 15:15-15:16).

21    In retrospect, this conclusion by the House of Commons committee was out of step with reality. It overlooked the renewed vitality the *CCAA* enjoyed in contemporary practice and the advantage that a [page397] flexible judicially supervised reorganization process presented in the face of increasingly complex reorganizations, when compared to the stricter rules-based scheme contained in the *BIA*. The "flexibility of the *CCAA* [was seen as] a great benefit, allowing for creative and effective decisions" (Industry Canada, Marketplace Framework Policy Branch, *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act* (2002), at p. 41). Over the past three decades, resurrection of the *CCAA* has thus been the mainspring of a process through which, one author concludes, "the legal setting for Canadian insolvency restructuring has evolved from a rather blunt instrument to one of the most sophisticated systems in the developed world" (R. B. Jones, "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2005* (2006), 481, at p. 481).

22    While insolvency proceedings may be governed by different statutory schemes, they share some commonalities. The most prominent of these is the single proceeding model. The nature and purpose of the single proceeding model are described by Professor Wood in *Bankruptcy and Insolvency Law*:

> They all provide a collective proceeding that supersedes the usual civil process available to creditors to enforce their claims. The creditors' remedies are collectivized in order to prevent the free-for-all that would otherwise prevail if creditors were permitted to exercise their remedies. In the absence of a collective process, each creditor is armed with the knowledge that if they do not strike hard and swift to seize the debtor's assets, they will be beat out by other creditors. [pp. 2-3]

The single proceeding model avoids the inefficiency and chaos that would attend insolvency if each creditor initiated proceedings to recover its debt. Grouping all possible actions against the debtor into a single proceeding controlled in a single forum facilitates negotiation with creditors because it

places them all on an equal footing, [page398] rather than exposing them to the risk that a more aggressive creditor will realize its claims against the debtor's limited assets while the other creditors attempt a compromise. With a view to achieving that purpose, both the *CCAA* and the *BIA* allow a court to order all actions against a debtor to be stayed while a compromise is sought.

**23** Another point of convergence of the *CCAA* and the *BIA* relates to priorities. Because the *CCAA* is silent about what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a *CCAA* reorganization is ultimately unsuccessful. In addition, one of the important features of legislative reform of both statutes since the enactment of the *BIA* in 1992 has been a cutback in Crown priorities (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, ss. 73 and 125; S.C. 2000, c. 30, s. 148; S.C. 2005, c. 47, ss. 69 and 131; S.C. 2009, c. 33, s. 25; see also *Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny*, 2009 SCC 49, [2009] 3 S.C.R. 286; *Deputy Minister of Revenue v. Rainville*, [1980] 1 S.C.R. 35; *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency*).

**24** With parallel *CCAA* and *BIA* restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation (see *An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta. L.R. (4th) 192, at para. 19).

**25** Mindful of the historical background of the *CCAA* and *BIA*, I now turn to the first question at issue.

[page399]

### 3.2 *GST Deemed Trust Under the CCAA*

**26** The Court of Appeal proceeded on the basis that the *ETA* precluded the court from staying the Crown's enforcement of the GST deemed trust when partially lifting the stay to allow the debtor to enter bankruptcy. In so doing, it adopted the reasoning in a line of cases culminating in *Ottawa Senators*, which held that an *ETA* deemed trust remains enforceable during *CCAA* reorganization despite language in the *CCAA* that suggests otherwise.

**27** The Crown relies heavily on the decision of the Ontario Court of Appeal in *Ottawa Senators* and argues that the later in time provision of the *ETA* creating the GST deemed trust trumps the provision of the *CCAA* purporting to nullify most statutory deemed trusts. The Court of Appeal in this case accepted this reasoning but not all provincial courts follow it (see, e.g., *Komunik Corp.*

*(Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), leave to appeal granted, 2010 QCCA 183 (CanLII)). Century Services relied, in its written submissions to this Court, on the argument that the court had authority under the *CCAA* to continue the stay against the Crown's claim for unremitted GST. In oral argument, the question of whether *Ottawa Senators* was correctly decided nonetheless arose. After the hearing, the parties were asked to make further written submissions on this point. As appears evident from the reasons of my colleague Abella J., this issue has become prominent before this Court. In those circumstances, this Court needs to determine the correctness of the reasoning in *Ottawa Senators*.

**28** The policy backdrop to this question involves the Crown's priority as a creditor in insolvency situations which, as I mentioned above, has evolved considerably. Prior to the 1990s, Crown claims [page400] largely enjoyed priority in insolvency. This was widely seen as unsatisfactory as shown by both the 1970 and 1986 insolvency reform proposals, which recommended that Crown claims receive no preferential treatment. A closely related matter was whether the *CCAA* was binding at all upon the Crown. Amendments to the *CCAA* in 1997 confirmed that it did indeed bind the Crown (see *CCAA*, s. 21, as added by S.C. 1997, c. 12, s. 126).

**29** Claims of priority by the state in insolvency situations receive different treatment across jurisdictions worldwide. For example, in Germany and Australia, the state is given no priority at all, while the state enjoys wide priority in the United States and France (see B. K. Morgan, "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bankr. L.J.* 461, at p. 500). Canada adopted a middle course through legislative reform of Crown priority initiated in 1992. The Crown retained priority for source deductions of income tax, Employment Insurance ("EI") and Canada Pension Plan ("CPP") premiums, but ranks as an ordinary unsecured creditor for most other claims.

**30** Parliament has frequently enacted statutory mechanisms to secure Crown claims and permit their enforcement. The two most common are statutory deemed trusts and powers to garnish funds third parties owe the debtor (see F. L. Lamer, *Priority of Crown Claims in Insolvency* (loose-leaf), at s.2).

**31** With respect to GST collected, Parliament has enacted a deemed trust. The *ETA* states that every person who collects an amount on account of GST is deemed to hold that amount in trust for the Crown (s. 222(1)). The deemed trust extends to other property of the person collecting the tax equal in value to the amount deemed to be in trust if that amount has not been remitted in accordance with the *ETA*. The deemed trust also extends to property [page401] held by a secured creditor that, but for the security interest, would be property of the person collecting the tax (s. 222(3)).

**32** Parliament has created similar deemed trusts using almost identical language in respect of source deductions of income tax, EI premiums and CPP premiums (see s. 227(4) of the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*"), ss. 86(2) and (2.1) of the *Employment Insurance Act*,

Page 17

S.C. 1996, c. 23, and ss. 23(3) and (4) of the *Canada Pension Plan*, R.S.C. 1985, c. C-8). I will refer to income tax, EI and CPP deductions as "source deductions".

33    In *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411, this Court addressed a priority dispute between a deemed trust for source deductions under the *ITA* and security interests taken under both the *Bank Act*, S.C. 1991, c. 46, and the Alberta *Personal Property Security Act*, S.A. 1988, c. P-4.05 ("*PPSA*"). As then worded, an *ITA* deemed trust over the debtor's property equivalent to the amount owing in respect of income tax became effective at the time of liquidation, receivership, or assignment in bankruptcy. *Sparrow Electric* held that the *ITA* deemed trust could not prevail over the security interests because, being fixed charges, the latter attached as soon as the debtor acquired rights in the property such that the *ITA* deemed trust had no property on which to attach when it subsequently arose. Later, in *First Vancouver Finance v. M.N.R.*, 2002 SCC 49, [2002] 2 S.C.R. 720, this Court observed that Parliament had legislated to strengthen the statutory deemed trust in the *ITA* by deeming it to operate from the moment the deductions were not paid to the Crown as required by the *ITA*, and by granting the Crown priority over all security interests (paras. 27-29) (the "*Sparrow Electric* amendment").

[page402]

34    The amended text of s. 227(4.1) of the *ITA* and concordant source deductions deemed trusts in the *Canada Pension Plan* and the *Employment Insurance Act* state that the deemed trust operates notwithstanding any other enactment of Canada, except ss. 81.1 and 81.2 of the *BIA*. The *ETA* deemed trust at issue in this case is similarly worded, but it excepts the *BIA* in its entirety. The provision reads as follows:

> 222... .
>
> ...
>
> > (3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed ... .

35    The Crown submits that the *Sparrow Electric* amendment, added by Parliament to the *ETA* in 2000, was intended to preserve the Crown's priority over collected GST under the *CCAA* while subordinating the Crown to the status of an unsecured creditor in respect of GST only under the *BIA*

. This is because the *ETA* provides that the GST deemed trust is effective "despite" any other enactment except the *BIA*.

**36** The language used in the *ETA* for the GST deemed trust creates an apparent conflict with the *CCAA*, which provides that subject to certain exceptions, property deemed by statute to be held in trust for the Crown shall not be so regarded.

**37** Through a 1997 amendment to the *CCAA* (S.C. 1997, c. 12, s. 125), Parliament appears to have, [page403] subject to specific exceptions, nullified deemed trusts in favour of the Crown once reorganization proceedings are commenced under the Act. The relevant provision reads:

> **18.3** (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

This nullification of deemed trusts was continued in further amendments to the *CCAA* (S.C. 2005, c. 47), where s. 18.3(1) was renumbered and reformulated as s. 37(1):

> **37.** (1) Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**38** An analogous provision exists in the *BIA*, which, subject to the same specific exceptions, nullifies statutory deemed trusts and makes property of the bankrupt that would otherwise be subject to a deemed trust part of the debtor's estate and available to creditors (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, s. 73; *BIA*, s. 67(2)). It is noteworthy that in both the *CCAA* and the *BIA*, the exceptions concern source deductions (*CCAA*, s. 18.3(2); *BIA*, s. 67(3)). The relevant provision of the *CCAA* reads:

> **18.3** ...
>
> (2) Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*... .

Thus, the Crown's deemed trust and corresponding priority in source deductions remain effective both in reorganization and in bankruptcy.

[page404]

**39**    Meanwhile, in both s. 18.4(1) of the *CCAA* and s. 86(1) of the *BIA*, other Crown claims are treated as unsecured. These provisions, establishing the Crown's status as an unsecured creditor, explicitly exempt statutory deemed trusts in source deductions (*CCAA*, s. 18.4(3); *BIA*, s. 86(3)). The *CCAA* provision reads as follows:

> **18.4** ...
>
> ...
>
> > (3) Subsection (1) [Crown ranking as unsecured creditor] does not affect the operation of
> >
> > > (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,
> > >
> > > (*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution ... .

Therefore, not only does the *CCAA* provide that Crown claims do not enjoy priority over the claims of other creditors (s. 18.3(1)), but the exceptions to this rule (i.e., that Crown priority is maintained for source deductions) are repeatedly stated in the statute.

**40**    The apparent conflict in this case is whether the rule in the *CCAA* first enacted as s. 18.3 in 1997, which provides that subject to certain explicit exceptions, statutory deemed trusts are ineffective under the *CCAA*, is overridden by the one in the *ETA* enacted in 2000 stating that GST deemed trusts operate despite any enactment of Canada except the *BIA*. With respect for my colleague Fish J., I do not think the apparent conflict can be resolved by denying it and creating a rule requiring both a statutory provision enacting the deemed trust, and a second statutory provision confirming it. Such a rule is unknown to the law. Courts must recognize [page405] conflicts, apparent or real, and resolve them when possible.

**41**    A line of jurisprudence across Canada has resolved the apparent conflict in favour of the *ETA*, thereby maintaining GST deemed trusts under the *CCAA*. *Ottawa Senators*, the leading case, decided the matter by invoking the doctrine of implied repeal to hold that the later in time provision of the *ETA* should take precedence over the *CCAA* (see also *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219 (Alta. Q.B.); *Gauntlet*).

**42** The Ontario Court of Appeal in *Ottawa Senators* rested its conclusion on two considerations. First, it was persuaded that by explicitly mentioning the *BIA* in *ETA* s. 222(3), but not the *CCAA*, Parliament made a deliberate choice. In the words of MacPherson J.A.:

> The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

**43** Second, the Ontario Court of Appeal compared the conflict between the *ETA* and the *CCAA* to that before this Court in *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862, and found them to be "identical" (para. 46). It therefore considered *Doré* binding (para. 49). In *Doré*, a limitations provision in the more general and recently enacted *Civil Code of Québec*, S.Q. 1991, c. 64 (*"C.C.Q."*), was held to have repealed a more specific provision of the earlier Quebec *Cities and Towns Act*, R.S.Q., c. C-19, with which it conflicted. By analogy, [page406] the Ontario Court of Appeal held that the later in time and more general provision, s. 222(3) of the *ETA*, impliedly repealed the more specific and earlier in time provision, s. 18.3(1) of the *CCAA* (paras. 47-49).

**44** Viewing this issue in its entire context, several considerations lead me to conclude that neither the reasoning nor the result in *Ottawa Senators* can stand. While a conflict may exist at the level of the statutes' wording, a purposive and contextual analysis to determine Parliament's true intent yields the conclusion that Parliament could not have intended to restore the Crown's deemed trust priority in GST claims under the *CCAA* when it amended the *ETA* in 2000 with the *Sparrow Electric* amendment.

**45** I begin by recalling that Parliament has shown its willingness to move away from asserting priority for Crown claims in insolvency law. Section 18.3(1) of the *CCAA* (subject to the s. 18.3(2) exceptions) provides that the Crown's deemed trusts have no effect under the *CCAA*. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so explicitly and elaborately. For example, s. 18.3(2) of the *CCAA* and s. 67(3) of the *BIA* expressly provide that deemed trusts for source deductions remain effective in insolvency. Parliament has, therefore, clearly carved out exceptions from the general rule that deemed trusts are ineffective in insolvency. The *CCAA* and *BIA* are in harmony, preserving deemed trusts and asserting Crown priority only in respect of source deductions. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. Unlike source deductions, which are clearly and expressly dealt with under both these insolvency statutes, no such clear and express language exists [page407] in those Acts carving out an exception for GST claims.

**46** The internal logic of the *CCAA* also militates against upholding the *ETA* deemed trust for GST. The *CCAA* imposes limits on a suspension by the court of the Crown's rights in respect of

source deductions but does not mention the *ETA* (s. 11.4). Since source deductions deemed trusts are granted explicit protection under the *CCAA*, it would be inconsistent to afford a better protection to the *ETA* deemed trust absent explicit language in the *CCAA*. Thus, the logic of the *CCAA* appears to subject the *ETA* deemed trust to the waiver by Parliament of its priority (s. 18.4).

47    Moreover, a strange asymmetry would arise if the interpretation giving the *ETA* priority over the *CCAA* urged by the Crown is adopted here: the Crown would retain priority over GST claims during *CCAA* proceedings but not in bankruptcy. As courts have reflected, this can only encourage statute shopping by secured creditors in cases such as this one where the debtor's assets cannot satisfy both the secured creditors' and the Crown's claims (*Gauntlet*, at para. 21). If creditors' claims were better protected by liquidation under the *BIA*, creditors' incentives would lie overwhelmingly with avoiding proceedings under the *CCAA* and not risking a failed reorganization. Giving a key player in any insolvency such skewed incentives against reorganizing under the *CCAA* can only undermine that statute's remedial objectives and risk inviting the very social ills that it was enacted to avert.

[page408]

48    Arguably, the effect of *Ottawa Senators* is mitigated if restructuring is attempted under the *BIA* instead of the *CCAA*, but it is not cured. If *Ottawa Senators* were to be followed, Crown priority over GST would differ depending on whether restructuring took place under the *CCAA* or the *BIA*. The anomaly of this result is made manifest by the fact that it would deprive companies of the option to restructure under the more flexible and responsive *CCAA* regime, which has been the statute of choice for complex reorganizations.

49    Evidence that Parliament intended different treatments for GST claims in reorganization and bankruptcy is scant, if it exists at all. Section 222(3) of the *ETA* was enacted as part of a wide-ranging budget implementation bill in 2000. The summary accompanying that bill does not indicate that Parliament intended to elevate Crown priority over GST claims under the *CCAA* to the same or a higher level than source deductions claims. Indeed, the summary for deemed trusts states only that amendments to existing provisions are aimed at "ensuring that employment insurance premiums and Canada Pension Plan contributions that are required to be remitted by an employer are fully recoverable by the Crown in the case of the bankruptcy of the employer" (Summary to S.C. 2000, c. 30, at p. 4a). The wording of GST deemed trusts resembles that of statutory deemed trusts for source deductions and incorporates the same overriding language and reference to the *BIA*. However, as noted above, Parliament's express intent is that only source deductions deemed trusts remain operative. An exception for the *BIA* in the statutory language establishing the source deductions deemed trusts accomplishes very little, because the explicit language of the *BIA* itself (and the *CCAA*) carves out these source deductions deemed trusts and maintains their effect. It is however noteworthy that no equivalent language maintaining GST deemed trusts exists under either

the *BIA* or the *CCAA*.

[page409]

**50**    It seems more likely that by adopting the same language for creating GST deemed trusts in the *ETA* as it did for deemed trusts for source deductions, and by overlooking the inclusion of an exception for the *CCAA* alongside the *BIA* in s. 222(3) of the *ETA*, Parliament may have inadvertently succumbed to a drafting anomaly. Because of a statutory lacuna in the *ETA*, the GST deemed trust could be seen as remaining effective in the *CCAA*, while ceasing to have any effect under the *BIA*, thus creating an apparent conflict with the wording of the *CCAA*. However, it should be seen for what it is: a facial conflict only, capable of resolution by looking at the broader approach taken to Crown priorities and by giving precedence to the statutory language of s. 18.3 of the *CCAA* in a manner that does not produce an anomalous outcome.

**51**    Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. It merely creates an apparent conflict that must be resolved by statutory interpretation. Parliament's intent when it enacted *ETA* s. 222(3) was therefore far from unambiguous. Had it sought to give the Crown a priority for GST claims, it could have done so explicitly as it did for source deductions. Instead, one is left to infer from the language of *ETA* s. 222(3) that the GST deemed trust was intended to be effective under the *CCAA*.

**52**    I am not persuaded that the reasoning in *Doré* requires the application of the doctrine of implied repeal in the circumstances of this case. The main issue in *Doré* concerned the impact of the adoption of the *C.C.Q.* on the administrative law rules with respect to municipalities. While Gonthier J. concluded in that case that the limitation provision in art. 2930 *C.C.Q.* had repealed by implication a limitation provision in the *Cities and Towns Act*, he did so on the basis of more than a textual analysis. The conclusion in *Doré* was reached after thorough [page410] contextual analysis of both pieces of legislation, including an extensive review of the relevant legislative history (paras. 31-41). Consequently, the circumstances before this Court in *Doré* are far from "identical" to those in the present case, in terms of text, context and legislative history. Accordingly, *Doré* cannot be said to require the automatic application of the rule of repeal by implication.

**53**    A noteworthy indicator of Parliament's overall intent is the fact that in subsequent amendments it has not displaced the rule set out in the *CCAA*. Indeed, as indicated above, the recent amendments to the *CCAA* in 2005 resulted in the rule previously found in s. 18.3 being renumbered and reformulated as s. 37. Thus, to the extent the interpretation allowing the GST deemed trust to remain effective under the *CCAA* depends on *ETA* s. 222(3) having impliedly repealed *CCAA* s. 18.3(1) because it is later in time, we have come full circle. Parliament has renumbered and reformulated the provision of the *CCAA* stating that, subject to exceptions for source deductions, deemed trusts do not survive the *CCAA* proceedings and thus the *CCAA* is now the later in time

statute. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*.

54    I do not agree with my colleague Abella J. that s. 44(*f*) of the *Interpretation Act*, R.S.C. 1985, c. I-21, can be used to interpret the 2005 amendments as having no effect. The new statute can hardly be said to be a mere re-enactment of the former statute. Indeed, the *CCAA* underwent a substantial review in 2005. Notably, acting consistently with its goal of treating both the *BIA* and the *CCAA* as sharing the same approach to insolvency, Parliament made parallel amendments to both statutes with respect to corporate proposals. In addition, new provisions were introduced regarding [page411] the treatment of contracts, collective agreements, interim financing and governance agreements. The appointment and role of the Monitor was also clarified. Noteworthy are the limits imposed by *CCAA* s. 11.09 on the court's discretion to make an order staying the Crown's source deductions deemed trusts, which were formerly found in s. 11.4. No mention whatsoever is made of GST deemed trusts (see Summary to S.C. 2005, c. 47). The review went as far as looking at the very expression used to describe the statutory override of deemed trusts. The comments cited by my colleague only emphasize the clear intent of Parliament to maintain its policy that only source deductions deemed trusts survive in *CCAA* proceedings.

55    In the case at bar, the legislative context informs the determination of Parliament's legislative intent and supports the conclusion that *ETA* s. 222(3) was not intended to narrow the scope of the *CCAA*'s override provision. Viewed in its entire context, the conflict between the *ETA* and the *CCAA* is more apparent than real. I would therefore not follow the reasoning in *Ottawa Senators* and affirm that *CCAA* s. 18.3 remained effective.

56    My conclusion is reinforced by the purpose of the *CCAA* as part of Canadian remedial insolvency legislation. As this aspect is particularly relevant to the second issue, I will now discuss how courts have interpreted the scope of their discretionary powers in supervising a *CCAA* reorganization and how Parliament has largely endorsed this interpretation. Indeed, the interpretation courts have given to the *CCAA* helps in understanding how the *CCAA* grew to occupy such a prominent role in Canadian insolvency law.

[page412]

### 3.3 *Discretionary Power of a Court Supervising a CCAA Reorganization*

57    Courts frequently observe that "[t]he *CCAA* is skeletal in nature" and does not "contain a comprehensive code that lays out all that is permitted or barred" (*Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513, at para. 44, *per* Blair J.A.). Accordingly, "[t]he history of CCAA law has been an evolution of judicial interpretation" (*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Ct. (Gen. Div.)), at para. 10, *per* Farley J.).

**58** *CCAA* decisions are often based on discretionary grants of jurisdiction. The incremental exercise of judicial discretion in commercial courts under conditions one practitioner aptly describes as "the hothouse of real-time litigation" has been the primary method by which the *CCAA* has been adapted and has evolved to meet contemporary business and social needs (see Jones, at p. 484).

**59** Judicial discretion must of course be exercised in furtherance of the *CCAA*'s purposes. The remedial purpose I referred to in the historical overview of the Act is recognized over and over again in the jurisprudence. To cite one early example:

> The legislation is remedial in the purest sense in that it provides a means whereby the devastating social and economic effects of bankruptcy or creditor initiated termination of ongoing business operations can be avoided while a court-supervised attempt to reorganize the financial affairs of the debtor company is made.

> (*Elan Corp. v. Comiskey* (1990), 41 O.A.C. 282
> , at para. 57, *per* Doherty J.A., dissenting)

**60** Judicial decision making under the *CCAA* takes many forms. A court must first of all provide the conditions under which the debtor can attempt to reorganize. This can be achieved by [page413] staying enforcement actions by creditors to allow the debtor's business to continue, preserving the *status quo* while the debtor plans the compromise or arrangement to be presented to creditors, and supervising the process and advancing it to the point where it can be determined whether it will succeed (see, e.g., *Chef Ready Foods Ltd. v. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84 (C.A.), at pp. 88-89; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134, at para. 27). In doing so, the court must often be cognizant of the various interests at stake in the reorganization, which can extend beyond those of the debtor and creditors to include employees, directors, shareholders, and even other parties doing business with the insolvent company (see, e.g., *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9, at para. 144, *per* Paperny J. (as she then was); *Air Canada, Re* (2003), 42 C.B.R. (4th) 173 (Ont. S.C.J.), at para. 3; *Air Canada, Re*, 2003 CanLII 49366 (Ont. S.C.J.), at para. 13, *per* Farley J.; Sarra, *Creditor Rights*, at pp. 181-92 and 217-26). In addition, courts must recognize that on occasion the broader public interest will be engaged by aspects of the reorganization and may be a factor against which the decision of whether to allow a particular action will be weighed (see, e.g., *Canadian Red Cross Society/Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158 (Ont. S.C.J.), at para. 2, *per* Blair J. (as he then was); Sarra, *Creditor Rights*, at pp. 195-214).

**61** When large companies encounter difficulty, reorganizations become increasingly complex. *CCAA* courts have been called upon to innovate accordingly in exercising their jurisdiction beyond merely staying proceedings against the debtor to allow breathing room for reorganization. They have been asked to sanction measures for which there is no explicit authority in the *CCAA*. Without

exhaustively cataloguing the various measures taken under the authority of the *CCAA*, it is useful to refer briefly to a few examples to illustrate the flexibility the statute affords supervising courts.

[page414]

**62** Perhaps the most creative use of *CCAA* authority has been the increasing willingness of courts to authorize post-filing security for debtor in possession financing or super-priority charges on the debtor's assets when necessary for the continuation of the debtor's business during the reorganization (see, e.g., *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118 (Ont. Ct. (Gen. Div.)); *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, aff'g (1999), 12 C.B.R. (4th) 144 (S.C.); and generally, J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), at pp. 93-115). The *CCAA* has also been used to release claims against third parties as part of approving a comprehensive plan of arrangement and compromise, even over the objections of some dissenting creditors (see *Metcalfe & Mansfield*). As well, the appointment of a Monitor to oversee the reorganization was originally a measure taken pursuant to the *CCAA*'s supervisory authority; Parliament responded, making the mechanism mandatory by legislative amendment.

**63** Judicial innovation during *CCAA* proceedings has not been without controversy. At least two questions it raises are directly relevant to the case at bar: (1) What are the sources of a court's authority during *CCAA* proceedings? (2) What are the limits of this authority?

**64** The first question concerns the boundary between a court's statutory authority under the *CCAA* and a court's residual authority under its inherent and equitable jurisdiction when supervising a reorganization. In authorizing measures during *CCAA* proceedings, courts have on occasion purported to rely upon their equitable jurisdiction to advance the purposes of the Act or their inherent jurisdiction to fill gaps in the statute. Recent appellate decisions have counselled against [page415] purporting to rely on inherent jurisdiction, holding that the better view is that courts are in most cases simply construing the authority supplied by the *CCAA* itself (see, e.g., *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236, at paras. 45-47, *per* Newbury J.A.; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (C.A.), at paras. 31-33, *per* Blair J.A.).

**65** I agree with Justice Georgina R. Jackson and Professor Janis Sarra that the most appropriate approach is a hierarchical one in which courts rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding (see G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2007* (2008), 41, at p. 42). The authors conclude that when given an appropriately purposive and liberal interpretation, the *CCAA* will be sufficient in most instances to ground measures necessary to achieve its objectives (p. 94).

**66** Having examined the pertinent parts of the *CCAA* and the recent history of the legislation, I accept that in most instances the issuance of an order during *CCAA* proceedings should be considered an exercise in statutory interpretation. Particularly noteworthy in this regard is the expansive interpretation the language of the statute at issue is capable of supporting.

**67** The initial grant of authority under the *CCAA* empowered a court "where an application is made under this Act in respect of a company ... on the application of any person interested in the [page416] matter, ... subject to this Act, [to] make an order under this section" (*CCAA*, s. 11(1)). The plain language of the statute was very broad.

**68** In this regard, though not strictly applicable to the case at bar, I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary authority of the court under the *CCAA*. Thus, in s. 11 of the *CCAA* as currently enacted, a court may, "subject to the restrictions set out in this Act, ... make any order that it considers appropriate in the circumstances" (S.C. 2005, c. 47, s. 128). Parliament appears to have endorsed the broad reading of *CCAA* authority developed by the jurisprudence.

**69** The *CCAA* also explicitly provides for certain orders. Both an order made on an initial application and an order on subsequent applications may stay, restrain, or prohibit existing or new proceedings against the debtor. The burden is on the applicant to satisfy the court that the order is appropriate in the circumstances and that the applicant has been acting in good faith and with due diligence (*CCAA*, ss. 11(3), (4) and (6)).

**70** The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* -- avoiding the social and economic losses resulting from liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all [page417] stakeholders are treated as advantageously and fairly as the circumstances permit.

**71** It is well established that efforts to reorganize under the *CCAA* can be terminated and the stay of proceedings against the debtor lifted if the reorganization is "doomed to failure" (see *Chef Ready*, at p. 88; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25 (B.C.C.A.), at paras. 6-7). However, when an order is sought that does realistically advance the *CCAA's* purposes, the ability to make it is within the discretion of a *CCAA* court.

**72** The preceding discussion assists in determining whether the court had authority under the *CCAA* to continue the stay of proceedings against the Crown once it was apparent that

reorganization would fail and bankruptcy was the inevitable next step.

73    In the Court of Appeal, Tysoe J.A. held that no authority existed under the *CCAA* to continue staying the Crown's enforcement of the GST deemed trust once efforts at reorganization had come to an end. The appellant submits that in so holding, Tysoe J.A. failed to consider the underlying purpose of the *CCAA* and give the statute an appropriately purposive and liberal interpretation under which the order was permissible. The Crown submits that Tysoe J.A. correctly held that the mandatory language of the *ETA* gave the court no option but to permit enforcement of the GST deemed trust when lifting the *CCAA* stay to permit the debtor to make an assignment under the *BIA*. Whether the *ETA* has a mandatory effect in the context of a *CCAA* proceeding has already been discussed. I will now address the question of whether the order was authorized by the *CCAA*.

[page418]

74    It is beyond dispute that the *CCAA* imposes no explicit temporal limitations upon proceedings commenced under the Act that would prohibit ordering a continuation of the stay of the Crown's GST claims while lifting the general stay of proceedings temporarily to allow the debtor to make an assignment in bankruptcy.

75    The question remains whether the order advanced the underlying purpose of the *CCAA*. The Court of Appeal held that it did not because the reorganization efforts had come to an end and the *CCAA* was accordingly spent. I disagree.

76    There is no doubt that had reorganization been commenced under the *BIA* instead of the *CCAA*, the Crown's deemed trust priority for the GST funds would have been lost. Similarly, the Crown does not dispute that under the scheme of distribution in bankruptcy under the *BIA* the deemed trust for GST ceases to have effect. Thus, after reorganization under the *CCAA* failed, creditors would have had a strong incentive to seek immediate bankruptcy and distribution of the debtor's assets under the *BIA*. In order to conclude that the discretion does not extend to partially lifting the stay in order to allow for an assignment in bankruptcy, one would have to assume a gap between the *CCAA* and the *BIA* proceedings. Brenner C.J.S.C.'s order staying Crown enforcement of the GST claim ensured that creditors would not be disadvantaged by the attempted reorganization under the *CCAA*. The effect of his order was to blunt any impulse of creditors to interfere in an orderly liquidation. His order was thus in furtherance of the *CCAA*'s objectives to the extent that it allowed a bridge between the *CCAA* and *BIA* proceedings. This interpretation of the tribunal's discretionary power is buttressed by s. 20 of the *CCAA*. That section provides that the *CCAA* "may be applied together with the provisions of any Act of Parliament ... that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them", such as [page419] the *BIA*. Section 20 clearly indicates the intention of Parliament for the *CCAA* to operate *in tandem* with other insolvency legislation, such as the *BIA*.

**77** The *CCAA* creates conditions for preserving the *status quo* while attempts are made to find common ground amongst stakeholders for a reorganization that is fair to all. Because the alternative to reorganization is often bankruptcy, participants will measure the impact of a reorganization against the position they would enjoy in liquidation. In the case at bar, the order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that is common to both statutes.

**78** Tysoe J.A. therefore erred in my view by treating the *CCAA* and the *BIA* as distinct regimes subject to a temporal gap between the two, rather than as forming part of an integrated body of insolvency law. Parliament's decision to maintain two statutory schemes for reorganization, the *BIA* and the *CCAA*, reflects the reality that reorganizations of differing complexity require different legal mechanisms. By contrast, only one statutory scheme has been found to be needed to liquidate a bankrupt debtor's estate. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA* to allow commencement of the *BIA* proceedings. However, as Laskin J.A. for the Ontario Court of Appeal noted in a similar competition between secured creditors and the Ontario Superintendent of Financial Services seeking to enforce a deemed trust, "[t]he two statutes are related" and no "gap" exists between the two statutes which would allow the enforcement of property interests at the conclusion of *CCAA* proceedings that would be [page420] lost in bankruptcy (*Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108, at paras. 62-63).

**79** The Crown's priority in claims pursuant to source deductions deemed trusts does not undermine this conclusion. Source deductions deemed trusts survive under both the *CCAA* and the *BIA*. Accordingly, creditors' incentives to prefer one Act over another will not be affected. While a court has a broad discretion to stay source deductions deemed trusts in the *CCAA* context, this discretion is nevertheless subject to specific limitations applicable only to source deductions deemed trusts (*CCAA*, s. 11.4). Thus, if *CCAA* reorganization fails (e.g., either the creditors or the court refuse a proposed reorganization), the Crown can immediately assert its claim in unremitted source deductions. But this should not be understood to affect a seamless transition into bankruptcy or create any "gap" between the *CCAA* and the *BIA* for the simple reason that, regardless of what statute the reorganization had been commenced under, creditors' claims in both instances would have been subject to the priority of the Crown's source deductions deemed trust.

**80** Source deductions deemed trusts aside, the comprehensive and exhaustive mechanism under the *BIA* must control the distribution of the debtor's assets once liquidation is inevitable. Indeed, an orderly transition to liquidation is mandatory under the *BIA* where a proposal is rejected by creditors. The *CCAA* is silent on the transition into liquidation but the breadth of the court's discretion under the Act is sufficient to construct a bridge to liquidation under the *BIA*. The court must do so in a manner that does not subvert the scheme of distribution under the *BIA*. Transition [page421] to liquidation requires partially lifting the *CCAA* stay to commence proceedings under the *BIA*. This necessary partial lifting of the stay should not trigger a race to the courthouse in an effort to obtain priority unavailable under the *BIA*.

**81** I therefore conclude that Brenner C.J.S.C. had the authority under the *CCAA* to lift the stay to allow entry into liquidation.

### 3.4 Express Trust

**82** The last issue in this case is whether Brenner C.J.S.C. created an express trust in favour of the Crown when he ordered on April 29, 2008, that proceeds from the sale of LeRoy Trucking's assets equal to the amount of unremitted GST be held back in the Monitor's trust account until the results of the reorganization were known. Tysoe J.A. in the Court of Appeal concluded as an alternative ground for allowing the Crown's appeal that it was the beneficiary of an express trust. I disagree.

**83** Creation of an express trust requires the presence of three certainties: intention, subject matter, and object. Express or "true trusts" arise from the acts and intentions of the settlor and are distinguishable from other trusts arising by operation of law (see D. W. M. Waters, M. R. Gillen and L. D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005), at pp. 28-29, especially fn. 42).

**84** Here, there is no certainty to the object (i.e. the beneficiary) inferrable from the court's order of April 29, 2008 sufficient to support an express trust.

[page422]

**85** At the time of the order, there was a dispute between Century Services and the Crown over part of the proceeds from the sale of the debtor's assets. The court's solution was to accept LeRoy Trucking's proposal to segregate those monies until that dispute could be resolved. Thus, there was no certainty that the Crown would actually be the beneficiary, or object, of the trust.

**86** The fact that the location chosen to segregate those monies was the Monitor's trust account has no independent effect such that it would overcome the lack of a clear beneficiary. In any event, under the interpretation of *CCAA* s. 18.3(1) established above, no such priority dispute would even arise because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount. However, Brenner C.J.S.C. may well have been proceeding on the basis that, in accordance with *Ottawa Senators*, the Crown's GST claim would remain effective if reorganization was successful, which would not be the case if transition to the liquidation process of the *BIA* was allowed. An amount equivalent to that claim would accordingly be set aside pending the outcome of reorganization.

**87** Thus, uncertainty surrounding the outcome of the *CCAA* restructuring eliminates the existence of any certainty to permanently vest in the Crown a beneficial interest in the funds. That much is clear from the oral reasons of Brenner C.J.S.C. on April 29, 2008, when he said: "Given the fact that [*CCAA* proceedings] are known to fail and filings in bankruptcy result, it seems to me that

maintaining the status quo in the case at bar supports the proposal to have the monitor hold these funds in trust." Exactly who might take the money in the final result was therefore evidently in doubt. Brenner C.J.S.C.'s subsequent order of September 3, 2008 denying the Crown's application to enforce the trust once it was clear [page423] that bankruptcy was inevitable, confirms the absence of a clear beneficiary required to ground an express trust.

4.    Conclusion

**88**    I conclude that Brenner C.J.S.C. had the discretion under the *CCAA* to continue the stay of the Crown's claim for enforcement of the GST deemed trust while otherwise lifting it to permit LeRoy Trucking to make an assignment in bankruptcy. My conclusion that s. 18.3(1) of the *CCAA* nullified the GST deemed trust while proceedings under that Act were pending confirms that the discretionary jurisdiction under s. 11 utilized by the court was not limited by the Crown's asserted GST priority, because there is no such priority under the *CCAA*.

**89**    For these reasons, I would allow the appeal and declare that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada is not subject to deemed trust or priority in favour of the Crown. Nor is this amount subject to an express trust. Costs are awarded for this appeal and the appeal in the court below.

The following are the reasons delivered by

FISH J. --

I

**90**    I am in general agreement with the reasons of Justice Deschamps and would dispose of the appeal as she suggests.

**91**    More particularly, I share my colleague's interpretation of the scope of the judge's discretion under s. 11 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). [page424] And I share my colleague's conclusion that Brenner C.J.S.C. did not create an express trust in favour of the Crown when he segregated GST funds into the Monitor's trust account (2008 BCSC 1805, [2008] G.S.T.C. 221).

**92**    I nonetheless feel bound to add brief reasons of my own regarding the interaction between the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*").

**93**    In upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), and its progeny have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In my respectful view, a clearly marked departure from that jurisprudential approach is warranted in this case.

**94** Justice Deschamps develops important historical and policy reasons in support of this position and I have nothing to add in that regard. I do wish, however, to explain why a comparative analysis of related statutory provisions adds support to our shared conclusion.

**95** Parliament has in recent years given detailed consideration to the Canadian insolvency scheme. It has declined to amend the provisions at issue in this case. Ours is not to wonder why, but rather to treat Parliament's preservation of the relevant provisions as a deliberate exercise of the legislative discretion that is Parliament's alone. With respect, I reject any suggestion that we should instead characterize the apparent conflict between s. 18.3(1) (now s. 37(1)) of the *CCAA* and s. 222 of the *ETA* as a drafting anomaly or statutory lacuna properly subject to judicial correction or repair.

[page425]

II

**96** In the context of the Canadian insolvency regime, a deemed trust will be found to exist only where two complementary elements co-exist: first, a statutory provision *creating* the trust; and second, a *CCAA* or *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*") provision *confirming* -- or explicitly preserving -- its effective operation.

**97** This interpretation is reflected in three federal statutes. Each contains a deemed trust provision framed in terms strikingly similar to the wording of s. 222 of the *ETA*.

**98** The first is the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*"), where s. 227(4) *creates* a deemed trust:

> (4) Every person who deducts or withholds an amount under this Act is deemed, notwithstanding any security interest (as defined in subsection 224(1.3)) in the amount so deducted or withheld, to hold the amount separate and apart from the property of the person and from property held by any secured creditor (as defined in subsection 224(1.3)) of that person that but for the security interest would be property of the person, in trust for Her Majesty and for payment to Her Majesty in the manner and at the time provided under this Act. [Here and below, the emphasis is of course my own.]

**99** In the next subsection, Parliament has taken care to make clear that this trust is unaffected by federal or provincial legislation to the contrary:

> (4.1) Notwithstanding any other provision of this Act, the *Bankruptcy and Insolvency Act* (except sections 81.1 and 81.2 of that Act), any other enactment of Canada, any enactment of a province or any other law, where at any time an amount deemed by subsection 227(4) to be held by a person in trust for Her Majesty is not paid to Her Majesty in the manner and at the time provided under

this Act, <u>property of the person</u> ... equal in value to the amount so deemed to be held in trust <u>is deemed</u>

> (*a*) <u>to be held</u>, from the time the amount was deducted or withheld by the person, separate and [page426] apart from the property of the person, <u>in trust for Her Majesty</u> whether or not the property is subject to such a security interest, ...

> ...

> ... and the proceeds of such property shall be paid to the Receiver General in priority to all such security interests.

**100**    The continued operation of this deemed trust is expressly *confirmed* in s. 18.3 of the *CCAA*:

> **18.3** (1) <u>Subject to subsection (2)</u>, notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

> (2) <u>Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*</u>, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* ... .

**101**    The operation of the *ITA* deemed trust is also confirmed in s. 67 of the *BIA*:

> (2) <u>Subject to subsection (3)</u>, notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

> (3) <u>Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*</u>, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* ... .

**102**    Thus, Parliament has first *created* and then *confirmed the continued operation of* the Crown's

*ITA* deemed trust under *both* the *CCAA* and the *BIA* regimes.

[page427]

**103**    The second federal statute for which this scheme holds true is the *Canada Pension Plan*, R.S.C. 1985, c. C-8 ("*CPP*"). At s. 23, Parliament creates a deemed trust in favour of the Crown and specifies that it exists despite all contrary provisions in any other Canadian statute. Finally, and in almost identical terms, the *Employment Insurance Act*, S.C. 1996, c. 23 ("*EIA*"), creates a deemed trust in favour of the Crown: see ss. 86(2) and (2.1).

**104**    As we have seen, the survival of the deemed trusts created under these provisions of the *ITA*, the *CPP* and the *EIA* is confirmed in s. 18.3(2) of the *CCAA* and in s. 67(3) of the *BIA*. In all three cases, Parliament's intent to enforce the Crown's deemed trust through insolvency proceedings is expressed in clear and unmistakable terms.

**105**    The same is not true with regard to the deemed trust created under the *ETA*. Although Parliament creates a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it does not *confirm* the trust -- or expressly provide for its continued operation -- in either the *BIA* or the *CCAA*. The second of the two mandatory elements I have mentioned is thus absent reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

**106**    The language of the relevant *ETA* provisions is identical in substance to that of the *ITA*, *CPP*, and *EIA* provisions:

> **222.** (1) Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II is deemed, for all purposes and despite any security interest in the amount, to hold the amount in trust for Her Majesty in right of Canada, separate and apart from the property of the person and from property held by any secured creditor of the person that, but for a [page428] security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).
>
> ...
>
> (3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and InsolvencyAct*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under

this Part, <u>property of the person</u> and property held by any secured creditor of the person that, but for a security interest, would be property of the person, <u>equal in value to the amount so deemed to be held in trust, is deemed</u>

> (a) <u>to be held</u>, from the time the amount was collected by the person, <u>in trust for Her Majesty</u>, separate and apart from the property of the person, whether or not the property is subject to a security interest, ...
>
> ...
>
> ... and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

**107** Yet no provision of the *CCAA* provides for the continuation of this deemed trust after the *CCAA* is brought into play.

**108** In short, Parliament has imposed *two* explicit conditions, or "building blocks", for survival under the *CCAA* of deemed trusts created by the *ITA*, *CPP*, and *EIA*. Had Parliament intended to likewise preserve under the *CCAA* deemed trusts created by the *ETA*, it would have included in the *CCAA* the sort of confirmatory provision that explicitly preserves other deemed trusts.

**109** With respect, unlike Tysoe J.A., I do not find it "inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception" (2009 BCCA 205, 98 B.C.L.R. (4th) 242, at para. 37). *All* of the deemed trust [page429] provisions excerpted above make explicit reference to the *BIA*. Section 222 of the *ETA* does not break the pattern. Given the near-identical wording of the four deemed trust provisions, it would have been surprising indeed had Parliament not addressed the *BIA* at all in the *ETA*.

**110** Parliament's evident intent was to render GST deemed trusts inoperative upon the institution of insolvency proceedings. Accordingly, s. 222 mentions the *BIA* so as to *exclude* it from its ambit -- rather than to *include* it, as do the *ITA*, the *CPP*, and the *EIA*.

**111** Conversely, I note that *none* of these statutes mentions the *CCAA* expressly. Their specific reference to the *BIA* has no bearing on their interaction with the *CCAA*. Again, it is the confirmatory provisions *in the insolvency statutes* that determine whether a given deemed trust will subsist during insolvency proceedings.

**112** Finally, I believe that chambers judges should not segregate GST monies into the Monitor's trust account during *CCAA* proceedings, as was done in this case. The result of Justice Deschamps's reasoning is that GST claims become unsecured under the *CCAA*. Parliament has deliberately chosen to nullify certain Crown super-priorities during insolvency; this is one such instance.

III

**113** For these reasons, like Justice Deschamps, I would allow the appeal with costs in this Court and in the courts below and order that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada [page430] be subject to no deemed trust or priority in favour of the Crown.

The following are the reasons delivered by

**114** ABELLA J. (dissenting):-- The central issue in this appeal is whether s. 222 of the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*"), and specifically s. 222(3), gives priority during *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"), proceedings to the Crown's deemed trust in unremitted GST. I agree with Tysoe J.A. that it does. It follows, in my respectful view, that a court's discretion under s. 11 of the *CCAA* is circumscribed accordingly.

**115** Section 11[1] of the *CCAA* stated:

> **11.** (1) Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

To decide the scope of the court's discretion under s. 11, it is necessary to first determine the priority issue. Section 222(3), the provision of the *ETA* at issue in this case, states:

[page431]

> (3) <u>Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law</u>, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed
>
> > (*a*) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person,

whether or not the property is subject to a security interest, and

(*b*) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

**116**   Century Services argued that the *CCAA*'s general override provision, s. 18.3(1), prevailed, and that the deeming provisions in s. 222 of the *ETA* were, accordingly, inapplicable during *CCAA* proceedings. Section 18.3(1) states:

**18.3** (1) ... [N]otwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**117**   As MacPherson J.A. correctly observed in *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), s. 222(3) of the *ETA* is in "clear conflict" with s. 18.3(1) of the *CCAA* (para. 31). Resolving the conflict between the two provisions is, essentially, what seems to me to be a relatively uncomplicated exercise in statutory [page432] interpretation: Does the language reflect a clear legislative intention? In my view it does. The deemed trust provision, s. 222(3) of the *ETA*, has unambiguous language stating that it operates notwithstanding any law except the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*").

**118**   By expressly excluding only one statute from its legislative grasp, and by unequivocally stating that it applies despite any other law anywhere in Canada *except* the *BIA*, s. 222(3) has defined its boundaries in the clearest possible terms. I am in complete agreement with the following comments of MacPherson J.A. in *Ottawa Senators*:

The legislative intent of s. 222(3) of the *ETA* is clear. If there is a conflict with "any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)", s. 222(3) prevails. In these words Parliament did two things: it decided that s. 222(3) should trump all other federal laws and, importantly, it addressed the topic of exceptions to its trumping decision and identified a single exception, the *Bankruptcy and Insolvency Act*... . The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the

> *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible
> second exception. In my view, the omission of the *CCAA* from s. 222(3) of the
> *ETA* was almost certainly a considered omission. [para. 43]

**119** MacPherson J.A.'s view that the failure to exempt the *CCAA* from the operation of the *ETA* is a reflection of a clear legislative intention, is borne out by how the *CCAA* was subsequently changed after s. 18.3(1) was enacted in 1997. In 2000, when s. 222(3) of the *ETA* came into force, amendments were also introduced to the *CCAA*. Section 18.3(1) was not amended.

**120** The failure to amend s. 18.3(1) is notable because its effect was to protect the legislative *status quo*, notwithstanding repeated requests from [page433] various constituencies that s. 18.3(1) be amended to make the priorities in the *CCAA* consistent with those in the *BIA*. In 2002, for example, when Industry Canada conducted a review of the *BIA* and the *CCAA*, the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals recommended that the priority regime under the *BIA* be extended to the *CCAA* (Joint Task Force on Business Insolvency Law Reform, *Report* (March 15, 2002), Sch. B, proposal 71). The same recommendations were made by the Standing Senate Committee on Banking, Trade and Commerce in its 2003 report, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*; by the Legislative Review Task Force (Commercial) of the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals in its 2005 *Report on the Commercial Provisions of Bill C-55*; and in 2007 by the Insolvency Institute of Canada in a submission to the Standing Senate Committee on Banking, Trade and Commerce commenting on reforms then under consideration.

**121** Yet the *BIA* remains the only exempted statute under s. 222(3) of the *ETA*. Even after the 2005 decision in *Ottawa Senators* which confirmed that the *ETA* took precedence over the *CCAA*, there was no responsive legislative revision. I see this lack of response as relevant in this case, as it was in *Tele-Mobile Co. v. Ontario*, 2008 SCC 12, [2008] 1 S.C.R. 305, where this Court stated:

> While it cannot be said that legislative silence is necessarily determinative
> of legislative intention, in this case the silence is Parliament's answer to the
> consistent urging of Telus and other affected businesses and organizations that
> there be express language in the legislation to ensure that businesses can be
> reimbursed for the reasonable costs of complying with evidence-gathering
> orders. I see the legislative history as reflecting Parliament's intention that
> compensation not be paid for compliance with production orders. [para. 42]

[page434]

**122** All this leads to a clear inference of a deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

**123** Nor do I see any "policy" justification for interfering, through interpretation, with this clarity of legislative intention. I can do no better by way of explaining why I think the policy argument cannot succeed in this case, than to repeat the words of Tysoe J.A. who said:

> I do not dispute that there are valid policy reasons for encouraging insolvent companies to attempt to restructure their affairs so that their business can continue with as little disruption to employees and other stakeholders as possible. It is appropriate for the courts to take such policy considerations into account, but only if it is in connection with a matter that has not been considered by Parliament. Here, Parliament must be taken to have weighed policy considerations when it enacted the amendments to the *CCAA* and *ETA* described above. As Mr. Justice MacPherson observed at para. 43 of *Ottawa Senators*, it is inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception. I also make the observation that the 1992 set of amendments to the *BIA* enabled proposals to be binding on secured creditors and, while there is more flexibility under the *CCAA*, it is possible for an insolvent company to attempt to restructure under the auspices of the *BIA*. [para. 37]

**124** Despite my view that the clarity of the language in s. 222(3) is dispositive, it is also my view that even the application of other principles of interpretation reinforces this conclusion. In their submissions, the parties raised the following as being particularly relevant: the Crown relied on the principle that the statute which is "later in time" prevails; and Century Services based its argument on the principle that the general provision gives way to the specific (*generalia specialibus non derogant*).

[page435]

**125** The "later in time" principle gives priority to a more recent statute, based on the theory that the legislature is presumed to be aware of the content of existing legislation. If a new enactment is inconsistent with a prior one, therefore, the legislature is presumed to have intended to derogate from the earlier provisions (Ruth Sullivan, *Sullivan on the Construction of Statutes* (5th ed. 2008), at pp. 346-47; Pierre-André Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 358).

**126** The exception to this presumptive displacement of pre-existing inconsistent legislation, is the *generalia specialibus non derogant* principle that "[a] more recent, general provision will not be construed as affecting an earlier, special provision" (Côté, at p. 359). Like a Russian Doll, there is also an exception within this exception, namely, that an earlier, specific provision may in fact be

"overruled" by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails (*Doré v. Verdun (City)*, [1997] 2 S.C.R. 862).

**127** The primary purpose of these interpretive principles is to assist in the performance of the task of determining the intention of the legislature. This was confirmed by MacPherson J.A. in *Ottawa Senators*, at para. 42:

> ... the overarching rule of statutory interpretation is that statutory provisions should be interpreted to give effect to the intention of the legislature in enacting the law. This primary rule takes precedence over all maxims or canons or aids relating to statutory interpretation, including the maxim that the specific prevails over the general (*generalia specialibus non derogant*). As expressed by Hudson J. in *Canada v. Williams*, [1944] S.C.R. 226, ... at p. 239 ... :

>> The maxim *generalia specialibus non derogant* is relied on as a rule which should dispose of the question, but the maxim is not a rule of law but a rule of construction and bows to the intention of the [page436] legislature, if such intention can reasonably be gathered from all of the relevant legislation.

(See also Côté, at p. 358, and Pierre-Andre Côté, with the collaboration of S. Beaulac and M. Devinat, *Interprétation des lois* (4th ed. 2009), at para. 1335.)

**128** I accept the Crown's argument that the "later in time" principle is conclusive in this case. Since s. 222(3) of the *ETA* was enacted in 2000 and s. 18.3(1) of the *CCAA* was introduced in 1997, s. 222(3) is, on its face, the later provision. This chronological victory can be displaced, as Century Services argues, if it is shown that the more recent provision, s. 222(3) of the *ETA*, is a general one, in which case the earlier, specific provision, s. 18.3(1), prevails (*generalia specialibus non derogant*). But, as previously explained, the prior specific provision does not take precedence if the subsequent general provision appears to "overrule" it. This, it seems to me, is precisely what s. 222(3) achieves through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" *other than the BIA*. Section 18.3(1) of the *CCAA* is thereby rendered inoperative for purposes of s. 222(3).

**129** It is true that when the *CCAA* was amended in 2005,[2] s. 18.3(1) was re-enacted as s. 37(1) (S.C. 2005, c. 47, s. 131). Deschamps J. suggests that this makes s. 37(1) the new, "later in time" provision. With respect, her observation is refuted by the operation of s. 44(*f*) of the *Interpretation Act*, R.S.C. 1985, c. I-21, which expressly deals with the (non) effect of re-enacting, without significant substantive changes, a repealed provision (see *Attorney General of Canada v. Public Service Staff Relations Board*, [1977] 2 F.C. 663, dealing with the predecessor provision to s. 44(*f*)). It directs that new enactments not be construed as [page437] "new law" unless they differ in substance from the repealed provision:

**44.** Where an enactment, in this section called the "former enactment", is repealed and another enactment, in this section called the "new enactment", is substituted therefor,

...

> (f) except to the extent that the provisions of the new enactment are not in substance the same as those of the former enactment, the new enactment shall not be held to operate as new law, but shall be construed and have effect as a consolidation and as declaratory of the law as contained in the former enactment;

Section 2 of the *Interpretation Act* defines an "enactment" as "an Act or regulation or any portion of an Act or regulation".

**130**    Section 37(1) of the current *CCAA* is almost identical to s. 18.3(1). These provisions are set out for ease of comparison, with the differences between them underlined:

> **37.** (1) Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

> **18.3** (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**131**    The application of s. 44(f) of the *Interpretation Act* simply confirms the government's clearly expressed intent, found in Industry Canada's clause-by-clause review of Bill C-55, where s. 37(1) was identified as "a technical amendment to re-order the provisions of this Act". During second reading, the Hon. Bill Rompkey, then the Deputy Leader of the Government in the [page438] Senate, confirmed that s. 37(1) represented only a technical change:

> On a technical note relating to the treatment of deemed trusts for taxes, the bill [*sic* ] makes no changes to the underlying policy intent, despite the fact that in the case of a restructuring under the CCAA, sections of the act [*sic* ] were repealed and substituted with renumbered versions due to the extensive reworking of the CCAA.

> (*Debates of the Senate*, vol. 142, 1st Sess., 38th Parl., November 23, 2005, at p. 2147)

**132**    Had the substance of s. 18.3(1) altered in any material way when it was replaced by s. 37(1), I would share Deschamps J.'s view that it should be considered a new provision. But since s. 18.3(1) and s. 37(1) are the same in substance, the transformation of s. 18.3(1) into s. 37(1) has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision (Sullivan, at p. 347).

**133**    This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. The question then is how that priority affects the discretion of a court under s. 11 of the *CCAA*.

**134**    While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding-up Act*, R.S.C. 1985, c. W-11, that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes *other* than the *BIA* and the *Winding-up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request [page439] for payment of the GST funds during the *CCAA* proceedings.

**135**    Given this conclusion, it is unnecessary to consider whether there was an express trust.

**136**    I would dismiss the appeal.

\* \* \* \* \*

## APPENDIX

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at December 13, 2007)

**11.** (1) [Powers of court] Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

...

(3) [Initial application court orders] A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

> (*a*) staying, until otherwise ordered by the court, all proceedings taken or that

might be taken in respect of the company under an Act referred to in subsection (1);

(*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(*c*) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

(4) [Other than initial application court orders] A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

[page440]

(*a*) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(*c*) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

...

(6) [Burden of proof on application] The court shall not make an order under subsection (3) or (4) unless

(*a*) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

(*b*) in the case of an order under subsection (4), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

**11.4** (1) [Her Majesty affected] An order made under section 11 may provide that

> (*a*) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for such period as the court considers appropriate but ending not later than

> (i)    the expiration of the order,
> (ii)   the refusal of a proposed compromise by the creditors or the court,
> (iii)  six months following the court sanction of a compromise or arrangement,

[page441]

> (iv)  the default by the company on any term of a compromise or arrangement, or
> (v)   the performance of a compromise or arrangement in respect of the company; and

> (*b*) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company where the company is a debtor under that legislation and the provision has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

> (i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or
> (ii)   is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that

subsection,

for such period as the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs *(a)*(i) to (v) may apply.

(2) [When order ceases to be in effect] An order referred to in subsection (1) ceases to be in effect if

> *(a)* the company defaults on payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

> (i) subsection 224(1.2) of the *Income Tax Act*,
> (ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, [page442] as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or
> (iii) under any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

>> (A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or
>> (B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

*(b)* any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

> (i) subsection 224(1.2) of the *Income Tax Act*,
> (ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*,

or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii)     any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(A)     has been withheld or deducted by a person from a payment to another person [page443] and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B)     is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

(3) [Operation of similar legislation] An order made under section 11, other than an order referred to in subsection (1) of this section, does not affect the operation of

(*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)     is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as

> defined in subsection 3(1) of the *Canada Pension Plan* and the provincial
> legislation establishes a "provincial pension plan" as defined in that
> subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of
Canada or of a province or any other law, deemed to have the same [page444] effect and scope
against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a
sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect
of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other
amounts.

18.3 (1) [Deemed trusts] Subject to subsection (2), notwithstanding any provision in federal or
provincial legislation that has the effect of deeming property to be held in trust for Her Majesty,
property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would
be so regarded in the absence of that statutory provision.

(2) [Exceptions] Subsection (1) does not apply in respect of amounts deemed to be held in trust
under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada
Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this
subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust
under any law of a province that creates a deemed trust the sole purpose of which is to ensure
remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of
the province where

> (*a*) that law of the province imposes a tax similar in nature to the tax imposed
> under the *Income Tax Act* and the amounts deducted or withheld under that law
> of the province are of the same nature as the amounts referred to in subsection
> 227(4) or (4.1) of the *Income Tax Act*, or

> (*b*) the province is a "province providing a comprehensive pension plan" as
> defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province
> establishes a "provincial pension plan" as defined in that subsection and the
> amounts deducted or withheld under that law of the province are of the same
> nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension
> Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed
trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the
same effect and scope against any creditor, however secured, as the corresponding federal
provision.

[page445]

**18.4** (1) [Status of Crown claims] In relation to a proceeding under this Act, all claims, including secured claims, of Her Majesty in right of Canada or a province or any body under an enactment respecting workers' compensation, in this section and in section 18.5 called a "workers' compensation body", rank as unsecured claims.

...

(3) [Operation of similar legislation] Subsection (1) does not affect the operation of

(*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and [page446] in respect of any related interest, penalties or other amounts.

**20.** [Act to be applied conjointly with other Acts] The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legislature of any province, that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at September 18, 2009)

**11.** [General power of court] Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

**11.02** (1) [Stays, etc. -- initial application] A court may, on an initial application in respect of a debtor company, make an order on any terms that it may impose, effective for the period that the court considers necessary, which period may not be more than 30 days,

> (*a*) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*;
>
> (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and
>
> (*c*) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

(2) [Stays, etc. -- other than initial application] A court may, on an application in respect of a debtor company other than an initial application, make an order, on any terms that it may impose,

> (*a*) staying, until otherwise ordered by the court, for any period that the court considers necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in paragraph (1)(*a*);

[page447]

> (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of any
action, suit or proceeding against the company.

(3) [Burden of proof on application] The court shall not make the order unless

   (a)   the applicant satisfies the court that circumstances exist that make the order
         appropriate; and

   (b)   in the case of an order under subsection (2), the applicant also satisfies the court
         that the applicant has acted, and is acting, in good faith and with due diligence.

...

**11.09** (1) [Stay -- Her Majesty] An order made under section 11.02 may provide that

         (a) Her Majesty in right of Canada may not exercise rights under subsection
         224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or
         of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income
         Tax Act* and provides for the collection of a contribution, as defined in the
         *Canada Pension Plan*, or an employee's premium, or employer's premium, as
         defined in the *Employment Insurance Act*, and of any related interest, penalties or
         other amounts, in respect of the company if the company is a tax debtor under
         that subsection or provision, for the period that the court considers appropriate
         but ending not later than

         (i)    the expiry of the order,
         (ii)   the refusal of a proposed compromise by the creditors or the court,
         (iii)  six months following the court sanction of a compromise or an
                arrangement,
         (iv)   the default by the company on any term of a compromise or an
                arrangement, or

                (v) the performance of a compromise or an
                arrangement in respect of the company; and

         (b) Her Majesty in right of a province may not exercise rights under any
         provision of provincial legislation in respect of the company if the company is a
         debtor under that legislation and the provision has a purpose similar to subsection
         224(1.2) of the *Income [page448] Tax Act*, or refers to that subsection, to the
         extent that it provides for the collection of a sum, and of any related interest,
         penalties or other amounts, and the sum

    (i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (ii)   is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for the period that the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) that may apply.

(2) [When order ceases to be in effect] The portions of an order made under section 11.02 that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*) cease to be in effect if

    (*a*) the company defaults on the payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

    (i)    subsection 224(1.2) of the *Income Tax Act*,

    (ii)   any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

    (iii)  any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the [page449] collection of a sum, and of any related interest, penalties or other amounts, and the sum

        (A)   has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

        (B)   is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(b) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i) subsection 224(1.2) of the *Income Tax Act*,

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection [page450] 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

(3) [Operation of similar legislation] An order made under section 11.02, other than the portions of that order that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*), does not affect the operation of

(*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(*c*) any provision of provincial legislation that has a purpose similar to subsection

224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that
it provides for the collection of a sum, and of any related interest, penalties or
other amounts, and the sum

(i)     has been withheld or deducted by a person from a payment to another
        person and is in respect of a tax similar in nature to the income tax
        imposed on individuals under the *Income Tax Act*, or

(ii)    is of the same nature as a contribution under the *Canada Pension Plan* if
        the province is a "province providing a comprehensive pension plan" as
        defined in subsection 3(1) of the *Canada Pension Plan* and the provincial
        legislation establishes a "provincial pension plan" as defined in that
        subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of
Canada or of a province or any other law, deemed to have the same effect and scope against any
creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred
to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum
referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

[page451]

**37.** (1) [Deemed trusts] Subject to subsection (2), despite any provision in federal or provincial
legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a
debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so
regarded in the absence of that statutory provision.

(2) [Exceptions] Subsection (1) does not apply in respect of amounts deemed to be held in trust
under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada
Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this
subsection referred to as a "federal provision"), nor does it apply in respect of amounts deemed to
be held in trust under any law of a province that creates a deemed trust the sole purpose of which is
to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under
a law of the province if

> (*a*) that law of the province imposes a tax similar in nature to the tax imposed
> under the *Income Tax Act* and the amounts deducted or withheld under that law
> of the province are of the same nature as the amounts referred to in subsection
> 227(4) or (4.1) of the *Income Tax Act*, or

(b) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

*Excise Tax Act*, R.S.C. 1985, c. E-15 (as at December 13, 2007)

**222.** (1) [Trust for amounts collected] Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II is deemed, for all purposes and despite any security interest in the amount, to hold the amount in trust for Her Majesty in right of Canada, separate and apart from the property of the person and from property held by any secured [page452] creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

(1.1) [Amounts collected before bankruptcy] Subsection (1) does not apply, at or after the time a person becomes a bankrupt (within the meaning of the *Bankruptcy and Insolvency Act*), to any amounts that, before that time, were collected or became collectible by the person as or on account of tax under Division II.

...

(3) [Extension of trust] Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

> (a) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

> (b) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the

property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 (as at December 13, 2007)

67. (1) [Property of bankrupt] The property of a bankrupt divisible among his creditors shall not comprise

[page453]

> (*a*) property held by the bankrupt in trust for any other person,
>
> (*b*) any property that as against the bankrupt is exempt from execution or seizure under any laws applicable in the province within which the property is situated and within which the bankrupt resides, or
>
> (*b*.1) such goods and services tax credit payments and prescribed payments relating to the essential needs of an individual as are made in prescribed circumstances and are not property referred to in paragraph (*a*) or (*b*),

but it shall comprise

> (*c*) all property wherever situated of the bankrupt at the date of his bankruptcy or that may be acquired by or devolve on him before his discharge, and
>
> (*d*) such powers in or over or in respect of the property as might have been exercised by the bankrupt for his own benefit.

(2) [Deemed trusts] Subject to subsection (3), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

(3) [Exceptions] Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada*

*Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

> (*a*) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

[page454]

> (*b*) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**86.** (1) [Status of Crown claims] In relation to a bankruptcy or proposal, all provable claims, including secured claims, of Her Majesty in right of Canada or a province or of any body under an Act respecting workers' compensation, in this section and in section 87 called a "workers' compensation body", rank as unsecured claims.

...

(3) [Exceptions] Subsection (1) does not affect the operation of

> (*a*) subsections 224(1.2) and (1.3) of the *Income Tax Act*;

> (*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an

employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts; or

(*c*) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

[page455]

(ii)    is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

*Appeal allowed with costs,* ABELLA J. *dissenting.*

**Solicitors:**

*Solicitors for the appellant: Fraser Milner Casgrain, Vancouver.*

*Solicitor for the respondent: Attorney General of Canada, Vancouver.*

cp/e/qlhbb

1 Section 11 was amended, effective September 18, 2009, and now states:

> **11.** Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

2 The amendments did not come into force until September 18, 2009.



# TAB6

*Indexed as:*
**Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A. s.r.**

**Between**
**Coldmatic Refrigeration of Canada Ltd., plaintiff, and**
**P.U.M.A. s.r. 1, defendant**

[1998] O.J. No. 1697

64 O.T.C. 157

21 C.P.C. (4th) 267

78 A.C.W.S. (3d) 1110

Court File No. 97-CV-127075

Ontario Court of Justice (General Division)
Motions Court - Toronto, Ontario

**Sharpe J.**

Heard: April 17, 1998.
Oral judgment: April 24, 1998.

(7 pp.)

*Conflict of Laws -- Contracts -- Choice of law -- General -- By parties -- Jurisdiction -- Choice of forum by parties.*

Motion for summary judgment by the defendant, PUMA. The defendant was a manufacturer of equipment. The defendant sold equipment to the plaintiff. The written contract contained an clause which provided for arbitration of disputes and the location where disputes were to be settled. In June 1997, the plaintiff commenced proceedings in an Ontario court. In September 1997, the defendant launched a claim in an Italian court. The defendant also filed a statement of defence and counter-claim to the Ontario action. In the statement of defence, the defendant alleged that the contract governed the place of jurisdiction, which the parties had agreed to as Padua, Italy. The defendant indicated that it did not wish to litigate, but to pursue the matter in arbitration in Italy.

HELD: Motion dismissed. The defendant made no attempt, other than to file the statement of defence, to dispute the jurisdiction of the Ontario court. The defendant failed to comply with the provision of the International Commercial Arbitration Act of Ontario. The pleadings did not ask for arbitration and a letter written prior to the commencement of the action did not constitute a request for arbitration. Ontario law required clarity in an arbitration or jurisdiction clause and such clarity was not present in the contract under dispute. Such an unclear clause could not oust the jurisdiction of the Ontario court. The defendant's statement of defence and counter-claim were a clear attornment to the jurisdiction of the Ontario court.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, s.106.
International Commercial Arbitration Act, R.S.O. 1990, c.I.9, Article 8.

**Counsel:**

Cynthia Amsterdam, for the plaintiff.
Inga B. Andriessen, for the defendant.

---

**1    SHARPE J.** (orally):-- This is a motion for Summary Judgment by the defendant to dismiss the action on the ground that Ontario is not the proper jurisdiction. The dispute arises from a contract for the manufacture and supply of certain equipment. The plaintiff purchaser is an Ontario corporation. The defendant manufacturer is an Italian corporation. I need not go into the details of the dispute. Some equipment has been supplied. The plaintiff takes the position that what has been supplied is damaged or defective and there is a dispute as to respective obligations of the parties at the present time to carry the contract forward to execution. The written contract contains the following provision which is relied on by the defendant. It is Cause "N" and it is headed "Arbitration Clause": "For possible disputes the place of jurisdiction will be that of Padua."

**2**    The procedural history is as follows. The statement of claim was issued on June 27, 1997 and served in Italy. On September 15th the Italian defendant took proceedings in an Italian court claiming return of the equipment that it had supplied. On September 19th the Italian defendant filed a statement of defence and counterclaim in this action. Paragraph 23 of the statement of defence states as follows:

> Pursuant to the Contract, at paragraph N, where there is a dispute, the place of jurisdiction is Padua, Italy accordingly, the proper forum for the hearing of this action is Padua, Italy.

The defendant took no other steps to dispute the jurisdiction of this court and on October 15th filed this motion for Summary Judgment to dismiss the claim.

3    There is also before me a cross-motion by the plaintiff which takes the position that if the court finds the jurisdictional arguments are well founded the appropriate remedy is a stay of the action rather than a dismissal.

4    During argument, counsel for the defendant made it clear that it was her client's position that Clause N should be treated as an arbitration clause and that her client had no intention to litigate the dispute in the Italian courts but rather intended to submit the dispute to arbitration in Italy. In effect, she conceded that if her arguments were successful the appropriate remedy would be a stay rather than a dismissal of the action.

5    In my view the defendant's motion must be dismissed in its entirety, both on procedural and on substantive grounds. With respect to procedure and on the assumption for these purposes only that we are dealing with an enforceable and valid arbitration clause, I find that the defendant has failed to take the appropriate steps to have this action stayed and referred to arbitration. The International Commercial Arbitration Act, R.S.O. 1990, c. I.9, Article 8, provides as follows:

> (1)    A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed.

6    I find that the defendant has failed to comply with the statutory requirements stipulated by that provision. First of all, in my view, the defendant has still not made a request to this court to refer the matter to arbitration. The only explicit reference to arbitration was contained in a letter to the plaintiff from the defendant's Italian counsel dated June 23, 1997. It is clear on the authorities that a letter written prior to the initiation of the action does not constitute a request within the meaning of the Act: See, Ruhrkohle Handel Inter GmbH v. Fednav Ltd. (1992), 42 C.P.R. (3d) 414, and ABN Amro Bank Canada v. Krupp MaK Maschinenbau (1994), 21 O.R. (3d) 511.

7    The pleading in the statement of defence does not ask for arbitration. It simply states that the proper forum for the hearing of the action is Padua, Italy. This motion is not a motion for a stay of the action to refer the matter to arbitration but rather a motion for summary judgment to dismiss the claim. As I have mentioned, it was only during oral argument that the point was conceded that if any remedy was available it would be that of arbitration. Moreover, even if the statement of defence does constitute a request for arbitration, it is not at all clear that it constitutes a timely request for arbitration. The ABN Amro Bank Canada case already referred to holds that pleading and arbitration clause in a statement of defence and counterclaim is not a timely request for arbitration and that the appropriate procedure is to bring a motion for a stay. While leave to appeal from that decision was granted: 24 O.R. (3d) 450, it does not appear that the appeal to the Divisional Court

has ever been heard. In any event, the statement of defence was not the first statement of substance on the dispute presented by the defendant. As I have indicated, the defendant took proceedings in Italy after receiving the statement of claim and only a few days before submitting the statement of defence. It would appear that before the Italian court, it took the position that Clause N in the agreement was a jurisdiction clause conferring jurisdiction on the Italian court rather than an arbitration clause. That position was accepted by the Italian court. The translation of the reasons of the Italian court states as follows:

> Notwithstanding the title "Arbitration Clause" it must be considered as a jurisdiction clause and not as a mere arbitration clause in consideration of the literal meaning of the words and also because it does not contain reference to an arbitration proceeding.

8    Accordingly for these procedural reasons, I find that the motion must be dismissed. I would add that in substance I would also reject the submission of the defendant on the ground that Clause N in the agreement falls well short of what is required under Ontario law to constitute a valid arbitration clause. While I note at this point that no submissions were made as to the appropriate law of this contract nor is there any evidence of Italian law as to how this clause would be interpreted. However, as noted above, it would appear that the Italian court regarded it as a jurisdiction clause. In the absence of contrary evidence, I must assess that Ontario law applies and interpret the clause in light of the law of Ontario. That law is summarized in the judgment of Justice Hoillett in Benner and Associates v. Northern Lights Distribution Inc. (1995), 22 B.L.R. (2d) 79. Justice Hoillett makes it clear that the established principles in Ontario require clarity in an arbitration clause and in particular that it must be clear that all disputes are to be submitted to arbitration and some indication of the appropriate procedure must be set out. It is not at all clear, here, that all disputes are referable to arbitration and, indeed, the conduct of the defendant itself would suggest that it does not so regard the clause for it took proceedings in Italy. The clause does not stipulate a process or procedure nor does it indicate who is to conduct the arbitration. It falls well short of the degree of precision required for such clauses to oust the jurisdiction of an Ontario court. I note the following passage from Justice Hoilett's decision at page 85 which is apposite to the circumstances here. He states:

> The agreement in issue was drafted by the defendant and had it been the defendant's intention to have all breaches and disputes submitted to arbitration, that intent could have been couched in plain and simple language.

9    I would add finally that while the defendant does not press the argument that this is a jurisdiction clause conferring jurisdiction on the Italian courts but rather requests arbitration, I find to the extent that argument was advanced, that the statement of defence and counterclaim here constitutes attornment to the jurisdiction of Ontario. The defendant chose not to avail itself of the established procedure to contest jurisdiction prescribed by Rule 17 but by section 106 of the Courts of Justice Act, but rather chose to invoke the jurisdiction of this court, not just to defend the action

but to assert a counterclaim. Such action plainly does not constitute an appearance or attornment under duress to protect property but rather amounts to attornment plain and simple. See, Gourmet Resources International Inc. (Trustee of) v. Paramount Capital Corp. (1991), 5 C.P.C. (3d) 140; Clinton v. Ford (1982), 37 O.R. (2d) 448; Boissiere v. Brockner (1889), 6 T.L.R. 85.

**10**   For those reasons I dismiss the motion.

SHARPE J.

qp/d/mii/DRS



# TAB7

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

▷

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

04; 358210250; 358211288; 359537757; 3595377l1Consolidated Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.

Consolidated-Bathurst Export Limited, (Plaintiff) Appellant and Mutual Boiler and Machinery Insurance Company, (Defendant) Respondent

Supreme Court of Canada

Martland, Ritchie, Pigeon, Dickson, Beetz, Estey, and McIntyre JJ.

Judgment: March 13, 1979
Judgment: December 21, 1979
© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirmed *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* ((4 octobre 1977)), no C.A. Montréal 500-09-000267-757 ((Que. C.A.))

Counsel: *Guy Desjardins, Q.C.*, for the appellant.

*Marcel Cinq-Mars, Q.C.*, for the respondent.

Subject: Insurance; Family

Insurance --- Principles of interpretation and construction — Contra proferentem rule.

Products of factory damaged following corrosion of machinery -- Insurer having right to inspect and terminate contract -- Exclusion clause in policy excluding liability for damages directly caused by corrosion -- Other exclusion clauses excluding liability for damages caused directly or indirectly -- Insurer liable under contra proferentem doctrine in not employing less ambiguous language to exclude liability for corrosion -- Liability also being imposed using normal rules of construction to discern intent of parties.

**The reasons of Martland, Ritchie and McIntyre JJ. were delivered by *Ritchie J. (dissenting)*:**

1    This is an appeal from a judgment of the Court of Appeal of the Province of Quebec affirming the judgment rendered at trial by Mr. Justice Bisson and dismissing the claim of the appellant against its insurer for damage sustained to its property located at a plant which it operated at New Richmond in the Province of Quebec, where it was engaged in the manufacture of paper and paper and wood products.

2    By reason of their malfunction, direct damage was caused to several tubes in the heaters employed for the

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

heating of bunker "C" fuel with the consequence that temporary closing of the plant became necessary. The appellant's claim in this action encompasses not only the direct damage done to the tubes, but the consequential loss allegedly sustained because of the breakdown of the tubes.

3    I have had the privilege of reading the reasons for judgment prepared for delivery by my brother Estey in this case, but as I reach a different conclusion concerning the risk insured against by the policy in question, I have found it necessary to express my views separately.

4    The appellant's claim is made pursuant to the terms of an insurance agreement with the respondent which was in force at the time of the events above referred to whereby the respondent agreed

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

. . . . .

1. ...To pay the Insured for loss or damage to property of the Insured directly caused by such Accident *to an Object*, or if the Company so elects, to repair or replace such damaged property; ...

(The italics are my own.)

5    The objects covered by the policy are defined in the 1st Schedule thereof as follows:

The Objects covered under this Schedule are of the type designated as follows:

1. Any metal fired or metal unfired pressure valve; and

2. Any piping, on or between premises of the Insured, connected with such vessel and which contains steam or other heat transfer medium or condensate thereof, air, refrigerant, or boiler feedwater between the feed pump or injector and a boiler, together with the valves, fittings, separators and traps on all such piping.

6    What is insured against by this agreement in my opinion is damage to the property of the insured "directly caused to an "object" by an "accident" as that word is defined in the policy. While the policy covers damage to property other than the object itself, it only covers that damage when it has been directly caused by "accident" to an "object". I am satisfied that the tubes were "objects" within the meaning of the above definition and that damage directly caused to the tubes would have been covered by the insurance agreement had it not been for the terms of the definition of "accident" contained therein which reads as follows:

C. Definition of Accident — As respects any Object covered under this Schedule, 'Accident' shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) *depletion, deterioration, corrosion, or erosion of material*, (b) wear and tear (c) leakage at any valve, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protection device.

(The italics are my own.)

7    Both the trial judge and the Court of Appeal were satisfied that the damage to the tubes was occasioned by

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

corrosion and this conclusion is supported by the fact that quantities of salt water did flow through the pipes. Expert evidence was called on behalf of the appellant directed to supporting the submission that the damage was caused by an hydraulic hammer effect of sudden origin which placed an inordinate strain on the pipes and tubes causing them to break. This evidence was, however, not accepted either at trial or in the Court of Appeal and I do not find it necessary to discuss it. In the result it has been concurrently found at trial and on appeal that corrosion was the cause of the damage to the tubes and pipes and it follows from the terms of the "definition of accident" that this damage is not insured against by the policy in question.

8     It was contended also that even if the coverage afforded by the policy did not include damage by "depletion, deterioration, corrosion" or "wear and tear" within the meaning of the definition of "accident", it was nevertheless effective to make the insurer responsible for consequential loss suffered by the insured as a result of a sudden rupture of the heat exchanger, whether due to corrosion or not. In view of the fact that the coverage is limited to indemnity in respect of loss or "damage to property of the insured *directly* caused by such accident to an Object", I cannot adopt an interpretation which would result in affording coverage to the insured for *consequential* damage whether it was due to "corrosion" or otherwise. In my opinion, the only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to me to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of ... material".

9     It has been suggested that the language employed in the policy should be construed against the insurance company which was the author of it in accordance with the *contra proferentem* rule which is frequently invoked in the construction of insurance contracts when it is found that all other rules of construction fail to assist the Court in determining the true meaning of the policy.

10     In this regard my brother Estey has made reference to the reasons for judgment of Cartwright J., as he then was, in *Stevenson v. Reliance Petroleum Limited; Reliance Petroleum Limited v. Canadian General Insurance Company*[FN1] where he said at p. 953:

    The rule expressed in the maxin, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

It will however be seen from what I have said that I do not find it necessary to resort to this rule in the interpretation of the policy here at issue.

11     My brother Estey has, however, adopted the view that in construing the policy and particularly the definition of accident contained therein in the manner adopted in these reasons and in those of the majority of the Court of Appeal, the result is to "largely, if not completely, nullify the purpose for which the insurance was sold" which is "a circumstances to be avoided so far as the language used will permit". In this regard reliance is placed on the judgment of this Court in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[FN2], at pp. 177-178, but with the greatest respect I am unable to relate the circumstances of that case to those with which we are here concerned.

12     The *Excel Cleaning Service* case was one in which an "on location cleaning service" business was covered by a property damage liability policy insuring it for damage to property caused by accident arising out of its work. This policy however contained an exclusion relating "to damage to or destruction of property owned, rented, occupied or used by or in the care, custody and control of the insured", and the insurer contended that a wall to wall carpet fixed to the floor of a house where the insured was employed which was damaged was "in the care, custody and control of the insured" and therefore excluded from the coverage. Consistent with this reasoning all of the customer's belongings on which the insured was working were similarly exclusions which would have meant that the policy afforded no coverage whatever for the business of the insured. It was in this connection that this Court said, at pp. 177-178:

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

> Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold — a circumstance to be avoided, so far as the language used will permit.

13    I am respectfully of the opinion that this case involves a very different situation from the one with which we are here concerned. The construction sought to be placed on the Excel Cleaning Service Policy would have meant that although it purported to be a property damage liability policy covering the insured's business, it in fact insured nothing whereas the present policy affords insurance "for loss or damage to property of the insured" directly caused by an accident as defined therein. The meaning assigned to the word "accident" in the policy does not constitute an exclusion from the coverage but is rather a part of the definition of the risk insured against.

14    For all these reasons, as well as for those stated by Mr. Justice Turgeon, I would dismiss this appeal with costs.

**The judgment of Pigeon, Dickson, Beetz and Estey JJ. was delivered by *Estey J.*:**

15    The appellant operates a manufacturing facility for the production of paper products, including paper boxes, at New Richmond, Quebec, and the respondent is the insurer under a policy of insurance issued in respect of certain property of the appellant including the property with which this action is concerned, being three heat exchangers. The heat exchangers in question are described by the trial judge as follows:

> [TRANSLATION] The parts of this system with which we are particularly concerned are three heat exchangers, a type of pipe measuring fifteen feet long with an interior diameter of ten inches.
>
> Within each of these three exchangers there are 102 tubes thirteen feet long, with an exterior diameter of $^5/_8$ inch and a metal casing measuring $^1/_{16}$ inch, or .065 inch.
>
> Inside each exchanger at the ends the 102 pipes pass through a tubular metal plate one inch thick.
>
> Further, the 102 tubes of each exchanger are themselves divided into three groups of 34 tubes each, so that oil flowing in the tubes passes around the exchanger three times and is heated to the right level before emerging and being directed towards the boilers as a fuel.
>
> Steam circulates in the exchangers, passing in through the left end immediately to the right of the tubular plate and emerging at the right end, just as it strikes the other tubular plate.
>
> Each exchanger is sealed at each end by a lid.
>
> As the exchanger measures fifteen feet and the tubes thirteen feet, it follows that a space of one foot remains at each end between the tubular plate and the lid closing the exchanger.
>
> The whole apparatus forms a sealed unit, which it was established cannot be opened without causing a breakdown and considerable damage.

16    Due to the failure of these heat exchangers, the appellant was required to shut down part of their facilities and thereby suffered a loss which the parties have agreed amounted to $158,289.24. This sum is set out in the Plaintiff's Declaration and includes "Direct Damage Loss" of $15,604.44. The insurer resists the appellant's claim on the basis that the damage was caused by corrosion of the tubes inside the heat exchanger and this risk was specifically excluded from the coverage provided by the policy of insurance. The material provisions of the policy of insurance issued by the respondent are as follows:

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

### INSURING AGREEMENT

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

### COVERAGE A — PROPERTY OF THE INSURED

1. ACTUAL CASH VALUE —- To pay the Insured for loss of or damage to property of the Insured directly caused by such Accident to an Object, or if the Company so elects, to repair or replace such damaged property; and

The definition of accident as employed in the above excerpt is as follows:

As respects any Object covered under this Schedule, "Accident" shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material, (b) wear and tear, (c) leakage at any value, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protective device.

17     The employees of the appellant became aware of the failure of the heat exchangers when small fuel oil spots were noticed on linerboard being produced in the mill. The source of the oil was traced to the boiler and hence to the heat exchangers where a number of ruptured tubes were discovered.

18  ·  The appellant advanced two main submissions:

(a) that the damage was caused by hydraulic hammer effect; and,

(b) alternatively, that the damage was caused by corrosion and that the terms of the policy do not exclude damage thus occasioned.

19     The learned trial judge found that the damage was caused by corrosion and discusses the contribution of pressure changes as follows:

[TRANSLATION] There is no doubt that the damage occurred suddenly, but the phenomenon which led up to it, namely the chemical process of corrosion, was not of a sudden and accidental nature, so that it could not be regarded as an "accident".

On December 4, 1968 some occurrence, probably a fall in the steam pressure in the heat exchanger, caused a failure in certain oil tubes, which moreover apparently broke in a relatively short space of time.

The fact remains, however, that corrosion was the cause of the damage.

20     The majority of the Court of Appeal found the damage was the result of corrosion and thereby excluded from policy coverage. Turgeon J.A. dealt with the hydraulic hammer theory as follows:

[TRANSLATION] This was a possibility, not a probability, mentioned by appellant's expert witness Mahoney in his examination in chief. However, when he was cross-examined, he admitted that he could not provide any direct

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

> evidence that a "hydraulic hammer" effect was produced, or that there was excessive pressure, or that the safety valves did not operate effectively.

Dissenting from the majority, Kaufman J.A. appears to have adopted in part the hydraulic hammer theory as being a "trigger" which precipitated the leaks in the tubes. The learned justice went on to state:

> But where, as here, the pressure suddenly increased, it will not do for the insurer to point to the corrosion and say that, sooner or later, the tubes would have burst anyway.

Thus it will be seen that in both courts below the cause of the damage was found to be corrosion of the tubes which both courts went on to conclude was a risk or peril not covered by the insurance contract.

21      The issue is simply, therefore, whether the admitted loss suffered by the appellant and which was occasioned by the corrosion of the heat exchangers is a loss recoverable under the above-quoted terms of the policy of insurance issued by the respondent to the appellant. This leaves the alternative submission advanced by the appellant, namely that the term of the contract of insurance covers the damages suffered by the appellant. The heart of this argument is that while the definition of accident does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material", the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion. Thus the insurer would not be liable under the contract for the cost of repairing or replacing any insured property damaged by "depletion, deterioration, corrosion, wear and tear, etc.", but would be responsible for any consequential loss to the insured following the sudden rupture of the heat exchanger whether or not it be due to "corrosion" or "wear and tear", etc.

22      In the preliminary provisions setting up the coverage under the policy of insurance, the definition of accident is, of course, fundamental, and strip ping out the words not here relevant, the definition reads as follows:

> Accident shall mean a sudden and accidental occurrence to the object ... but accident shall not mean ... corrosion...

23      Some light may be thrown on this interpretation difficulty by reference to a latter portion of the policy of insurance headed "Exclusions". The following excerpts illustrate the drafting technique employed in the policy where risks are to be excluded from its coverage:

## EXCLUSIONS

This policy does not apply to

   1. *WAR DAMAGE* — Loss from an Accident *caused directly or indirectly* by

   (a) Hostile or warlike action, including action in hindering, combating or defending against an actual, impending or expected attack, by

   •

. . . . .

   2. *NUCLEAR HAZARDS* — Loss, *whether it be direct or indirect, proximate or remote,*

   (a) From an Accident *caused directly or indirectly* by nuclear reaction...

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

> (b) From nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, *caused directly or indirectly by, contributed to or aggravated by an Accident*;

> •

> . . . . .

3. *MISCELLANEOUS PERILS* — Loss under Coverages A and B from

> •

> . . . . .

> (b) An Accident *caused directly or indirectly by fire* or from the use of water or other means to extinguish fire;

> •

> . . . . .

> (d) Flood *unless an Accident ensues and the Company shall then be liable only for loss from such ensuing Accident*;

> •

> . . . . .

(Emphasis added.)

Thus it may be argued that when the draftsman wished to exclude consequences from an event, the words "directly or indirectly" were employed. Had this technique been adopted in the primary coverage provisions excerpted above, it would have read;

    Accident does not mean that which directly or indirectly results from corrosion.

Alternatively, if the consequences of corrosion were intended by the parties to be beyond the protection of the contract, such circumstances would have been included under the heading "Exclusions" as a subparagraph comparable to one of those set out above.

24     At best, one must conclude that the definition of accident, including as it does the reference to corrosion, leaves two clear alternative interpretations open. Firstly, the definition may not include an event relating to corrosion. Secondly, the definition may exclude only the cost of making good the corrosion itself.

25     Insurance contracts and the interpretative difficulties arising therein have been before courts for at least two centuries, and it is trite to say that where an ambiguity is found to exist in the terminology employed in the contract, such terminology shall be construed against the insurance carrier as being the author, or at least the party in control of the contents of the contract. This is, of course, not entirely true because of statutory modifications to the contract, but we are not here concerned with any such mandated provisions. Meredith J.A. put the proposition in *Pense v. Northern*

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

*Life Assurance Co.*[FN3] at p. 137:

There is no just reason for applying any different rule of construction to a contract of insurance from that of a contract of any other kind; and there can be no sort of excuse for casting a doubt upon the meaning of such a contract with a view to solving it against the insurer, however much the claim against him may play upon the chords of sympathy, or touch a natural bias. In such a contract, just as in all other contracts, effect must be given to the intention of the parties, to be gathered from the words they have used. A plaintiff must make out from the terms of the contract a right to recover; a defendant must likewise make out any defence based upon the agreement. The onus of proof, if I may use such a term in reference to the interpretation of a writing, is, upon each party respectively, precisely the same. We are all, doubtless, insured, and none insurers, and so, doubtless, all more or less affected by the natural bias arising from such a position; and so ought to beware lest that bias be not counteracted by a full apprehension of its existence.

(Adopted in this Court in 1908[FN4].)

Such a proposition may be referred to as step one in the interpretative process. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine. This doctrine finds much expression in our law, and one example which may be referred to is found in *Cheshire and Fifoot's Law of Contract* (9th ed.), at pp. 152-3:

If there is any doubt as to the meaning and scope of the excluding or limiting term, the ambiguity will be resolved against the party who has inserted it and who is now relying on it. As he seeks to protect himself against liability to which he would otherwise be subject, it is for him to prove that his words clearly and aptly describe the contingency that has in fact arisen.

This Court applied the doctrine in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[FN5] where at pp. 179-180 it was stated:

It is, in such a case, a general rule to construe the language used in a manner favourable to the insured. The basis for such being that the insurer, by such clauses, seeks to impose exceptions and limitations to the coverage he has already described and, therefore, should use language that clearly expresses the extent and scope of these exceptions and limitations and, in so far as he fails to do so, the language of the coverage should obtain ... Furthermore, the language of Lord Greene in *Woolfall & Rimmer, Ltd. v. Moyle*, [1942] 1 K.B. 66 at 73, is appropriate. He there states:

I cannot help thinking that, if underwriters wish to limit by some qualification a risk which, prima facie, they are undertaking in plain terms, they should make it perfectly clear what that qualification is.

As has already been stated, this is, of course, the second phase of interpretation of such a contract. Cartwright J., as he then was, stated in *Stevenson v. Reliance Petroleum Limited; Reliance Petroleum Limited v. Canadian General Insurance Company*[FN6] at p. 953:

The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

Lindley L.J. put it this way:

In a case on the line, in a case of real doubt, the policy ought to be construed most strongly against the insurers; they frame the policy and insert the exceptions. But this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d)
169

the case raise no real difficulty.

*Cornish v. Accident Insurance Company*[FN7], at p. 456.

26     Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the
normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would
appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal
meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be
contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two
constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation
which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the
parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of
an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation
of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance
protection nugatory, should be avoided. Said another way, the courts should be loath to support a construction which
would either enable the insurer to pocket the premium without risk or the insured to achieve a recovery which could
neither be sensibly sought nor anticipated at the time of the contract.

27     The *Cornish* case, *supra*, illustrates a course generally taken when such contracts reach the courts. There the
court was interpreting an insurance contract in the light of the death of the insured while crossing a railway track. The
policy included an exception from insured risks resulting from "exposure of the insured to obvious risk of injury".
Lindley L.J., in the course of judgment, stated:

The words are "exposure of the insured to obvious risk of injury." These words suggest the following questions:
Exposure by whom? Obvious when? Obvious to whom? It is to be observed that the words are very general. There
is no such word as "wilful," or "reckless," or "careless"; and to ascertain the true meaning of the exception the
whole document must be studied and the object of the parties to it must be steadily borne in mind. The object of
the contract is to insure against accidental death and injuries, and the contract must not be construed so as to defeat
that object, nor so as to render it practically illusory. A man who crosses an ordinary crowded street is exposed to
obvious risk of injury; and, if the words in question are construed literally, the defendants would not be liable in
the event of an insured being killed or injured in so crossing, even if he was taking reasonable care of himself.
Such a result is so manifestly contrary to the real intention of the parties that a construction which leads to it ought
to be rejected. But, if this be true, a literal construction is inadmissible, and some qualification must be put on the
words used. (at p. 456)

An example of the application of the same principles is found in the *Indemnity Insurance Company of North America
v. Excel Cleaning Service, supra*, where, at pp. 177-8, it was concluded:

Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which
the insurance was sold — a circumstance to be avoided, so far as the language used will permit.

The appellant, as the owner and operator of a large forest products facility, sought insurance protection of the ma-
chinery employed in the plant in its industrial processes. There is no dispute that the heat exchangers in question were
covered by the insurance contract. There is also no serious dispute, at least by the time the litigation had reached this
Court, that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the
effective cause of the breakdown of the heat exchanger, and the consequential release of oil into the processed steam.
The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by
seeking to confine the definition of accident. If a court were to accept the submissions of the respondent, that loss
suffered by the insured by reason of the failure of a machine due to wear and tear and the consequential downtime of
the plant was excluded by the definition of accident, then the insured would have purchased, by its premiums, no

1979 CarswellQue 157, [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176, 1 A.C.W.S. (2d) 169

coverage for what may well be the most likely source of loss, or certainly a risk pervasive through much of the plant. Similarly, to interpret corrosion as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract. It may well be argued by insurers that the premium will reflect such a narrowed coverage. There is no evidence that such is the case here.

28      It may also be argued by the insurance industry that applying the more favourable construction to this ambiguous provision will be to unnecessarily and unfairly burden the carrier. The carrier under this policy has at least two defensive mechanisms which it can readily call to its aid: firstly, the right of inspection which was exercised here both before and during the contract; and secondly, the right to terminate in the event the insurance carrier determines that the condition of the insured machinery is such as to make it impractical to extend coverage in the manner required by the contract.

29      I therefore would allow the appeal, set aside the judgment at trial and of the Court of Appeal and direct the entry of judgment in favour of the appellant in the amount of $158,289.24 with interest from the 1st of April, 1969, as claimed (it being the date of submission of claim and which date has not been contested in any court in these proceedings), together with costs throughout. In the event the parties are in disagreement as to whether the "Direct Damage" in the amount of $15,604.44 mentioned above is, in fact, repairs of the actual corrosion damage and should not therefore, on the basis of these reasons be included in judgment granted, the matter shall be determined on application to a Judge of the Superior Court.

*Appeal allowed with costs, Martland, Ritchie and McIntyre JJ. dissenting.*

Solicitors of record:

Solicitors for the appellant: *Desjardins, Ducharme*, Desjardins & Bourque, Montreal.

Solicitors for the respondent: *Martineau, Walker, Allison, Beaulieu, MacKell & Clermont*, Montreal.

FN1 [1956] S.C.R. 936.

FN2 [1954] S.C.R. 169.

FN3 (1907), 15 O.L.R. 131 (Ont. C.A.).

FN4 (1908), 42 S.C.R. 246.

FN5 [1954] S.C.R. 169.

FN6 [1956] S.C.R. 936.

FN7 (1889), 23 Q.B. 453 (C.A.).

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



# TAB8

CITATION: Dunn v. Chubb Insurance Company of Canada, 2009 ONCA 538
DATE:20090702
DOCKET: C50079 & C50141

## COURT OF APPEAL FOR ONTARIO

O'Connor A.C.J.O. and Lang and Watt JJ.A.

BETWEEN

Frank Andrew Dunn

Applicant (Appellant)

and

Chubb Insurance Company of Canada, Chubb Atlantic Indemnity Ltd.
Zurich Insurance Company, Liberty International Underwriters Canada,
a Division of Liberty Mutual Insurance Company, ACE INA Insurance,
ACE Bermuda Insurance Ltd., Continental Casualty Company, XL Insurance
(Bermuda) Ltd., and American Home Assurance Company

Respondents (Respondents)

AND BETWEEN

Douglas Beatty

Applicant (Appellant)

and

Chubb Insurance Company of Canada, Chubb Atlantic Indemnity Ltd.
Zurich Insurance Company, Liberty International Underwriters Canada,
a Division of Liberty Mutual Insurance Company, ACE INA Insurance,
and American Home Assurance Company

Respondents (Respondents)

2009 ONCA 538 (CanLII)

Page: 2

Thomas G. Heintzman, Q.C., and Junior Sirivar, for the appellant, Frank Andrew Dunn

Bonnie A. Tough and Jennifer Lynch, for the appellant, Douglas Beatty

Gary H. Luftspring and Sam R. Sasso, for the respondent, Chubb Insurance Company of Canada

Richard H. Krempulec, Q.C., for the respondent, American Home Assurance Company

Heard: June 22, 2009

On appeal from the judgment of Justice Colin L. Campbell of the Superior Court of Justice dated February 11, 2009 and reported at 2009 CanLII 7083.

**By the Court:**

## OVERVIEW

[1]     These two appeals, heard together, concern the interpretation of provisions in a directors and officers liability insurance policy regarding the allocation of Defence Costs, a defined term in the policy, in proceedings brought against persons insured under the policy. The appellants challenge the decision of Campbell J. (the "application judge"), which dismissed their application for a declaration that the insurer is obligated to pay either 90 or 100 percent of their Defence Costs. The Defence Costs relate to proceedings brought after the expiry of the policy period and allege conduct occurring both prior to and after the end of the policy period.

2009 ONCA 538 (CanLII)

2009 ONCA 538 (CanLII)

[2]  At the request of the appellants, these appeals were expedited, and counsel have requested that we deliver our reasons expeditiously.

[3]  We have concluded that the insurance policy, as it relates to the allocation of Defence Costs, is ambiguous. The conclusion we have reached results from a submission first made in oral argument on this appeal. Were it not for that submission, we would have dismissed the appeal for the reasons set out below.

[4]  However, the current state of the record provides little help in resolving the ambiguity. Moreover, the parties assert different facts, most of which are not in evidence, in arguing for and against the application of the doctrine of *contra proferentem*. In our view, it is desirable that this important case be decided on a more complete record.

[5]  In the result, we have concluded that the preferable course is to order a new hearing of the application. We find this conclusion unfortunate because we are well aware of the urgency from the appellants' point of view of having the issues raised on this appeal resolved one way or the other. However, the delay is necessary to provide the parties with the opportunity to introduce evidence and provide argument that would assist with the resolution of the ambiguity.

[6]  In order to narrow the future proceedings, we have decided all of the issues other than the one giving rise to the ambiguity. We expect that the parties will co-operate with one another in order to achieve a speedy resolution of the outstanding issue.

Page: 4

## BACKGROUND

[7]     The appellants are Frank Andrew Dunn and Douglas Beatty.    Although we recognize that there are a number of insurers listed as respondents, for the purpose of the discussion in these reasons, we refer to the insurers simply as "Chubb" or the "insurers".

[8]     The insurance policy in issue (the "2001 Policy") was one of many issued by Chubb to Northern Telecom Limited (now Nortel Networks Corporation). It covered the Policy Period from 1999 to 2001 (the "Policy Period"). The 2001 Policy is a variant of a "claims made" policy.

[9]     During the Policy Period, the appellants participated in certain conduct that became the subject of civil proceedings commenced in 2001 and 2002 (the "2001 Proceedings"). Chubb acknowledges that the 2001 Proceedings triggered coverage under the 2001 Policy.

[10]    In 2004 and subsequent years, further proceedings were brought against the appellants. These proceedings include civil cases as well as regulatory proceedings by the Ontario Securities Commission and the United States Securities and Exchange Commission. All of these proceedings include allegations against the appellants by reason of their conduct in 2001 (the "2001 Conduct") as well as their conduct in 2003 to 2004 (the "2003 Conduct"). Counsel refer to these 2004 and subsequent civil and

2009 ONCA 538 (CanLII)

regulatory proceedings as the Hybrid Proceedings. All of the Hybrid Proceedings were commenced after the expiration of the Policy Period.

[11]   Chubb acknowledges that the 2001 Conduct pleaded in the Hybrid Proceedings triggers coverage under the 2001 Policy because a claim was made regarding the appellants' 2001 Conduct during the Policy Period. Thus, Chubb accepts that it is responsible for 100 percent of the Defence Costs incurred by the appellants in the Hybrid Proceedings to the extent that those proceedings relate to the 2001 Conduct. However, Chubb takes the position that it is not responsible for the appellants' Defence Costs in the Hybrid Proceedings to the extent that those costs relate exclusively to the appellants' 2003 Conduct. As a result of taking the above position, Chubb has been paying 50 percent of the appellants' Defence Costs for the Hybrid Proceedings.

[12]   The application judge dismissed the appellants' application for a declaration that Chubb is responsible to pay either 90 or 100 percent of the Defence Costs relating to the Hybrid Proceedings.

**ISSUES**

[13]   On this appeal, the appellants advance three arguments.

[14]   First, they argue that the application judge erred in failing to give effect to the allocation provisions contained in two endorsements to the 2001 Policy, which provide a specific allocation for Defence Costs in the case of claims that include both covered and

2009 ONCA 538 (CanLII)

uncovered matters.   The appellants submit that the endorsements are clear on their face

and entitle them to either 100 percent of their Defence Costs for the Hybrid Proceedings

(assuming the claims are based on, arising from or in consequence of a "Securities

Transaction"), or 90 percent otherwise.

[15]   Second, they argue that the application judge erred in failing to find that the

particulars of the 2003 Conduct alleged in the Hybrid Proceedings were "Interrelated

Wrongful Acts" with the 2001 Conduct and, as such, were all covered under the terms of

the 2001 Policy.

[16]   Third, in the alternative to their first and second arguments, the appellants submit

that the application judge erred in holding that the appellants had the burden of proving

that a greater proportion than 50 percent of the Defence Costs was appropriate for

coverage under the 2001 Policy.

## ANALYSIS

### 1.   The Allocation Provisions Issue

[17]   Chubb's responsibility for Defence Costs relating to the 2003 Conduct in the

Hybrid Proceedings turns on the interpretation of Endorsements 3 and 10 of the 2001

Policy.

[18]   Both endorsements became effective on the same date and replaced s. 12 of the

2001 Policy.   Section 12 was entitled "Allocation".   It provided that if both "**Loss**

Page: 7

covered and loss not covered" were incurred, "because a **Claim** against the **Insured**
**Persons** includes both covered and uncovered matters", the parties would use best efforts
to agree upon a fair and proper allocation between "covered **Loss** and uncovered loss"
(emphasis in original). Section 12 further provided that if the parties could not agree on
an allocation, Chubb would advance Defence Costs that it believed to be covered until a
different allocation was negotiated, arbitrated or judicially determined.

[19]    Endorsements 3 and 10 replaced the allocation scheme set out in s. 12 of the 2001
Policy. Both endorsements provide for a fixed percentage allocation of Defence Costs
for claims that include both covered and uncovered matters. Endorsement 10 allocates
100 percent of Defence Costs to covered loss in the case of a claim based on, arising from
or in consequence of a "Securities Transaction", as that term is defined in s. 2 of
Endorsement 10. Endorsement 3 allocates 90 percent of Defence Costs to covered
matters in the case of claims that do not fall within the definition of a "Securities
Transaction".

### a)    *Ambiguity in Endorsement 3*

[20]    The relevant part of Endorsement 3 reads as follows:

> If both **Loss** covered by this coverage section and **Loss** not
> covered by this coverage section are incurred, either because
> a **Claim** against an **Insured Person** includes both covered
> and uncovered matters or because a **Claim** is made against
> both an **Insured Person** and others, including the **Insured**
> **Organization**, the **Insureds** and the Company shall allocate
> such amounts as follows:

Page: 8

(a)   with respect to **Defence Costs**, to create
certainty in determining a fair and proper
allocation of **Defence Costs**, 90 % of all
**Defence Costs** which must otherwise be
allocated as described above shall be
allocated to covered **Loss** and shall be
advanced by the Company on a current
basis…. [Emphasis in original.]

[21]   The interpretation of Endorsement 3 and its application to the Hybrid Proceedings

depends in part on the meaning of the term "Loss". Indeed, Chubb acknowledges that,

but for the definition of "Loss" in the 2001 Policy, Endorsement 3 would require Chubb

to pay 90 percent of the appellants' Defence Costs of the Hybrid Proceedings, including

those aspects of the proceedings that relate to the 2003 Conduct.

[22]   The relevant part of the definition of "Loss" in the 2001 Policy reads as follows:

[T]he total amount which any **Insured Person** becomes
legally obligated to pay on account of each **Claim** and for all
**Claims** in each **Policy Period** and the Extended Reporting
Period, if exercised, made against them for **Wrongful Acts**
for which coverage applies, including, but not limited to,
damages, judgments, settlements, costs and **Defence Costs**.
[Emphasis in original.]

[23]   Chubb argues that this definition limits the application of Endorsement 3 to claims

made during the Policy Period and does not, therefore, cover claims arising from the

2003 Conduct. Chubb sets out its argument in its factum as follows:

The 90% Allocation Provision is inapplicable to the Hybrid
Proceedings because it applies only to **Claims** first made
during the 2001 Policy Period that give rise to **Loss** covered
by the 2001 Policy and loss not covered by the 2001 Policy.

Page: 9

2009 ONCA 538 (CanLII)

> None of the Hybrid Proceedings were **Claims** first made during that policy period.
>
> By its terms, the 90% Allocation Provision applies only "[i]f both **Loss** covered by this coverage section and **Loss** not covered by this coverage section are incurred . . . ." **Loss** is defined to include only those amounts which the **Insured** is legally obligated to pay "on account of each **Claim** and for all **Claims** in each **Policy Period** and the Extended Reporting Period, if exercised."[1] [Emphasis added]  Amounts incurred defending the Hybrid Proceedings are not amounts Dunn and Beatty are obligated to pay "on account of" a **Claim** in the 2001 Policy Period because the Hybrid Proceedings are not **Claims** made during the 2001 Policy Period. Accordingly, the 90% Allocation Provision simply has no application to defence costs incurred in the Hybrid Proceedings.

[24]    The appellants respond by arguing that the application of the definition of "Loss" to Endorsement 3 would render Endorsement 3 meaningless. The definition of "Loss" in the 2001 Policy includes only amounts that an insured person becomes legally obligated to pay "*for which coverage applies*" (emphasis added).   Endorsement 3 specifically provides for the allocation of costs in situations where there is a "Loss" for which there is no coverage.  Indeed, the whole purpose of Endorsement 3 is to allocate Defence Costs between covered and uncovered losses.  Thus, interpreting the contract as Chubb suggests would mean that there could be no "**Loss** not covered" and therefore no allocation.  The appellants submit that this interpretation would negate the overall purpose of the allocation provision, a result that could not have reflected the intention of the parties.[2]

---

[1] The Extended Reporting Period was not exercised and, therefore, is irrelevant.

[2] It is important to point out that it does not appear that this issue was addressed before the application judge.

[25]    Chubb acknowledges the difficulty in interpretation that is posed when applying the definition of "Loss" in the 2001 Policy to Endorsement 3. However, it submits that the difficulty could be resolved by removing the words "for which coverage applies" from the definition of "Loss" when interpreting Endorsement 3. Indeed, this is the only solution that Chubb proposes to the interpretation dilemma. Effectively, Chubb is asking the court to amend the definition of "Loss" in the 2001 Policy.

[26]    Chubb points out that the interpretation urged by the appellants would require ignoring a defined term in the 2001 Policy. In this respect, it is interesting to note that the previous allocation provision – s. 12 of the 2001 Policy – referred to "**Loss** covered by this coverage section and loss not covered by this coverage section" and provided an allocation scheme for "covered **Loss** and uncovered loss" (emphasis in original). Thus, in the original 2001 Policy, the word "loss", as it related to uncovered losses, was neither bolded nor capitalized. Hence, one could read into the term "**Loss**" in Endorsement 3 some support, if any is needed, for the position that the parties intended the definition of "Loss" to be relied upon when interpreting the allocation provisions.

[27]    Chubb argues that the only way the definition makes sense is if it is amended as set out above. The commercial reality, according to Chubb, is that once the parties moved to a fixed allocation for covered and uncovered matters, it made sense to limit the allocation to claims made during the Policy Period. Otherwise, the allocation provision

Page: 11

would be open-ended and would cover Defence Costs for claims against an insured brought years after the Policy Period had expired.

[28]    Thus, the parties' positions lead to one of two possible results:

- Interpret Endorsement 3 without reference to the definition of "Loss" because to do so would render Endorsement 3 meaningless.    This would require ignoring the definition of the term "Loss" in Endorsement 3 (the appellants' position); or

- Interpret Endorsement 3 by referring to the definition of "Loss" but delete from the definition the phrase "for which coverage applies" (Chubb's position).

[29]    The result would be either that the appellants are entitled to the 90 percent allocation under Endorsement 3,[3] or that Endorsement 3 does not apply to that portion of the Hybrid Proceedings relating to the 2003 Conduct because the claims relating to that conduct were not made during the Policy Period as required by the definition of "Loss" in the 2001 Policy.

[30]    In short, we conclude that the meaning of Endorsement 3 when read in conjunction with the definition of "Loss" is ambiguous.

[31]    In our view, it is impossible to resolve the ambiguity in this case on the factual record before us. In order to explain our position, it is necessary to review some of the basic principles of contractual interpretation.

---

[3] Assuming that the claims are not based on, arising from or in consequence of a "Securities Transaction".

[32]    The primary goal of contractual interpretation is to give effect to the intentions of

the parties. As Estey J. explained in *Consolidated-Bathurst Export Ltd. v. Mutual Boiler*

*and Machinery Insurance*, [1980] 1 S.C.R. 888, at p. 901, "the normal rules of

construction lead a court to search for an interpretation which, from the whole of the

contract, would appear to promote or advance the true intent of the parties at the time of

entry into the contract."

[33]    Where a contract is clear and unambiguous on its face, it is unnecessary to

consider extrinsic evidence in order to interpret its terms: *Eli Lilly & Co. v. Novopharm*

*Ltd.*, [1998] 2 S.C.R. 129, at para. 55; *Fraser River Pile & Dredge Ltd. v. Can-Dive*

*Services Ltd.*, [1999] 3 S.C.R. 108, at para. 32. Thus, it has been said that courts should

give effect to clear and unambiguous language in an insurance policy, having regard to

the contract as a whole: *Non-Marine Underwriters, Lloyd's of London v. Scalera*, [2000]

1 S.C.R. 551, at para. 71; *Brisette Estate v. Westbury Life Insurance Co.*, [1992] 3 S.C.R.

87, at p. 92. That being said, the terms of an insurance policy, like all contractual terms,

must be examined in light of the surrounding circumstances – or what is sometimes

called the "factual matrix" – in order to determine the intent of the parties and the scope

of their understanding: *Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of*

*Canada*, [2006] 1 S.C.R. 744, at para. 27.

[34]    A contractual provision is ambiguous if it is reasonably susceptible of more than

one meaning: *Hi-Tech Group Inc. v. Sears Canada Inc.* (2001), 52 O.R. (3d) 97 (C.A.), at

2009 ONCA 538 (CanLII)

para. 18. Extrinsic or parol evidence may be admitted to assist in resolving an ambiguity: *United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316, at p. 342; *Eli Lilly* at para. 55. For example, extrinsic evidence regarding the negotiations leading up to an agreement may be admitted if the contract is ambiguous, but not if the language of the contract is clear: see *Canadian Premier Holdings Ltd. v. Winterthur Canada Financial Corp.* (2000), 132 O.A.C. 172 (C.A.), at para. 15; *SimEx Inc. v. IMAX Corp.* (2005), 206 O.A.C. 3 (C.A.), at para. 23.[4]

[35]   Further, where an insurance policy is ambiguous, the court should adopt the interpretation that gives effect to the reasonable expectations or intentions of the parties: *Non-Marine Underwriters* at para. 71; *Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.*, [1993] 1 S.C.R. 252, at p. 269. As Estey J. explained in *Consolidated-Bathurst* at pp. 901-902:

> [L]iteral meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. *Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties.* Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an

---

[4] Regardless of ambiguity, however, as noted above, courts may have regard to the context or the factual matrix. This court has said that commercial contracts are to be interpreted "with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties": see *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. (3d) 254 (C.A.), at para. 24, citing *Eli Lilly* at para. 54 and *Kentucky Fried Chicken v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (C.A.), at paras. 25-27.

2009 ONCA 538 (CanLII)

> interpretation of the policy which promotes a sensible commercial result. It is trite to observe that *an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided.* Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract. [Emphasis added.]

[36]    Finally, if all other rules of construction are inadequate, the doctrine of *contra proferentem* may be applicable to resolve an ambiguity against the party who drafted the contract. *Contra proferentem* is a rule of last resort and will only apply "when all other rules of construction fail": *Canadian National Railway Co. v. Royal and Sun Alliance Insurance Co. of Canada*, [2008] 3 S.C.R. 53, at para. 33, citing *Stevenson v. Reliance Petroleum Ltd.*, [1956] S.C.R. 936, at p. 953.

[37]    Without being critical, there is little evidence in the record to assist the court in resolving the interpretation dilemma identified on this appeal. There is virtually no evidence about the context or the factual matrix within which the 2001 Policy or the endorsements were agreed to. While both sides have urged that "commercial realities" support their interpretation, there is little in the record, by way of either facts or argument, to assist the court in assessing the relative commercial practicality of the

approaches advocated by each party.[5] Indeed, we can think of benefits and problems with both interpretations depending from whose vantage point the situation is considered.

[38]    We do not know whether there is further evidence available that would assist in resolving the ambiguity. However, we do know that the parties take differing positions as to whether the doctrine of *contra proferentem* is available to assist with the resolution of the ambiguity. Significantly, the difference in the parties' positions results primarily from the different facts that the parties assert relating to the negotiations and the terms of the insurance contract.

[39]    The appellants accept that the parties appear to have negotiated the removal of the previous allocation clauses and replaced them with Endorsements 3 and 10. They also accept that there may have been negotiations with respect to the premiums to be paid for the new arrangements. However, the appellants go on to assert that there is no suggestion that Nortel or anyone on behalf of Nortel negotiated any of the contractual language in the body of the standard insurance policy, including the definition of "Loss". Nor is there any evidence that the parties negotiated the specific language used in Endorsements 3 and 10. Thus, the appellants' position is that there may have been negotiations, but those negotiations were limited to the issues of percentages and premiums. The appellants assert that the 2001 Policy is a standard policy, as are each of Endorsements 3 and 10. As

---

[5] Having said this, we note that the application of a standard of commercial reasonableness does not necessarily require the consideration of any evidence, extrinsic or otherwise: see *Lauren International, Inc. v. Reichert* (2008), 237 O.A.C. 94 (C.A.), at para. 23, leave to appeal to S.C.C. refused [2008] S.C.C.A. No. 327.

2009 ONCA 538 (CanLII)

such, they argue that the 2001 Policy is a contract of adhesion. They rely on case law,[6] which, in their submission, stands for the proposition that the doctrine of *contra proferentem* applies to contracts of adhesion, and that the ambiguity should be resolved against the insurers.

[40] Chubb takes the opposite position. It says that the appellants' arguments on the facts relating to the scope of the negotiations are inappropriate because there is no evidence about those negotiations. Chubb relies on Canadian[7] and American[8] authorities for the proposition that *contra proferentem* should not be applied against an insurer where the insured has participated in the negotiations of endorsements to an insurance policy. Chubb also relies upon the passage from the Supreme Court of Canada's decision in *Canadian National Railway* at para. 33. There, the court spoke of the doctrine being inapplicable where the entire policy had been negotiated between sophisticated parties and pointed out the difference between a manuscript (or fully negotiated) policy and a policy of adhesion.

---

[6] *Indemnity Insurance Co. of North America v. Excel Cleaning Service*, [1954] S.C.R. 169; *Consolidated-Bathurst; Fletcher v. Manitoba Public Insurance Co.*, [1990] 3 S.C.R. 191; *Canadian National Railway Co. v. Royal and SunAlliance Insurance Co. of Canada* (2004), 15 C.C.L.I. (4th) 1 (Ont. S.C.), rev'd (2007), 85 O.R. (3d) 186 (C.A.), rev'd [2008] 3 S.C.R. 53.

[7] *Hillis Oil & Sales v. Wynn's Canada*, [1986] 1 S.C.R. 57; *McClelland & Stewart Ltd. v. Mutual Life*, [1981] 2 S.C.R. 6; *Showmart Management Ltd. v. 853436 Ontario Ltd. (c.o.b. Features Cafe)* (1998), 18 R.P.R. (3d) 128 (Ont. S.C.); *Canadian Crude Separators Ltd. v. W.A. (Wes) Jacobson* (1998), 226 A.R. 171 (Q.B.).

[8] *Chubb Custom Ins. Co. v. Prudential Ins. Co. of America*, 948 A.2d 1285 (N.J. 2008); *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948 (5th Cir. 2009); *F.D.I.C. v. Ins. Co. of North America*, 105 F.3d 778 (1st Cir. 1997); *Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257 (5th Cir. 1976); *Fountain Powerboat Industries, Inc. v. Reliance Ins. Co.*, 119 F.Supp.2d 552 (E.D.N.C. 2000).

2009 ONCA 538 (CanLII)

[41]    The difficulty in both parties' submissions is the lack of evidence necessary to resolve this point. There is virtually no evidence about the negotiations, if any, leading to Endorsements 3 and 10; the definition of Loss in the 2001 Policy or other relevant terms; what matters were covered in the negotiations; the parties involved; or any other information that would assist in determining whether the resulting contract is a policy of adhesion or a manuscript policy.

[42]    Whether or not there is further evidence to assist with resolving the ambiguity, it seems obvious that the doctrine of *contra proferentem* will play an important role in the resolution of the interpretive issue arising from the allocation provisions in Endorsement 3. Clearly, this is an important issue for these parties. It is also an important issue for other cases where large and sophisticated parties contract for insurance coverage.

[43]    In our view, it is undesirable to resolve the ambiguity in this case without providing the parties an opportunity to call evidence regarding the factual matrix of the agreement, as well as extrinsic evidence and evidence that would inform the *contra proferentem* issue. It is for that reason that we have decided that there must be a new hearing on this issue only.

[44]    We wish to stress that the remedy in this case is unusual. As noted, it arises from a submission that was advanced for the first time in oral argument on this appeal and from the parties' different interpretation of facts that were not in evidence. In our view, it

2009 ONCA 538 (CanLII)

Page: 18

would be inappropriate to decide this issue in the absence of a complete factual record that would enable the parties to develop the relevant facts and arguments.

**b)** *Endorsement 10*

[45]   The appellants also argue that Chubb is required to pay 100 percent of their Defence Costs pursuant to Endorsement 10, which as discussed above, provides for a 100 percent reimbursement for Defence Costs for claims based on, arising from or in consequence of a "Securities Transaction". Section 7 of Endorsement 10 reads as follows:

> The first paragraph of subsection 12, **Allocation**, is deleted in its entirety and the following is inserted:
>
> (a)   If a **Claim** based on, arising from or in consequence of a **Securities Transaction** results in both **Loss** covered by this coverage section and **Loss** not covered by this coverage section, because such **Claim** includes both covered and uncovered matters or is made against both covered and uncovered parties, the **Insureds** and the Company shall allocate such amount to **Loss** as follows:
>
> (i)   100% of such amount constitute defense costs shall be allocated to covered **Loss**; and
>
> (ii)   100% of such amount other than defense costs shall be allocated to covered **Loss**. [Emphasis in original.]

2009 ONCA 538 (CanLII)

Page: 19

[46]    "Securities Transaction" is defined in s. 2 of Endorsement 10 to mean "the purchase or sale of, or offer to purchase or sell, any securities issued by any **Insured Organization**" (emphasis in original).

[47]    In our view, the allocation process described in Endorsement 10 does not apply to the Hybrid Proceedings.  We agree with Chubb's submission that the Hybrid Proceedings are not "based on, arising from, or in consequence of" the purchase or sale of Nortel securities.  Rather, as Chubb argues, the Hybrid Proceedings are based on the appellants' alleged improper accounting treatment of Nortel's revenues and reserves.

### c)    *Other Issues*

[48]    The appellants also relied on ss. 8 and 10 of the 2001 Policy to counter Chubb's argument that the definition of "Loss" limits Endorsement 3 to allocating losses for covered and uncovered matters to claims made during the Policy Period.  In effect, the appellants argue that the 2001 Conduct and the 2003 Conduct are "Interrelated Wrongful Acts" (s. 8) or claims arising from the same circumstances (s. 10).  As such, they argue that the Hybrid Proceedings include only claims made during the Policy Period.  That being the case, the appellants argue that the definition of "Loss" does not operate to exclude the claims in the Hybrid Proceedings relating to the 2003 Conduct from the operation of Endorsement 3.

2009 ONCA 538 (CanLII)

[49]   We do not accept this argument. For the reasons we set out below in dealing with the appellants' second ground of appeal, we are of the view that the 2001 Conduct and the 2003 Conduct are not "Interrelated Wrongful Acts" and did not arise out of the same circumstances. In our view, they are two separate and distinct sets of conduct.

[50]   Finally, before leaving the allocation issue, we point out that an exchange took place between the court and counsel during oral argument with respect to the definition of "Loss". The panel observed that the following sentence appears at the end of the definition of "Loss", as it is reproduced in Appendix A to the application judge's reasons:

> **Loss** does not include any amount allocated to uncovered loss pursuant to subsection 12, **Allocation**. [Emphasis in original.]

[51]   After oral argument, the court's Senior Legal Officer wrote to counsel advising that it appeared that this part of the definition of "Loss" was added by Endorsement 10.[9] Counsel were asked whether or not they had any submissions as to the applicability of the above sentence to the interpretation of the definition of "Loss" as it applied to Endorsement 3. For different reasons, counsel said that it did not. As a result, we have not taken into consideration the amendment to the definition of "Loss" found in Endorsement 10.

---

[9] Section 2(c) of Endorsement 10 provides that the definition of Loss is amended by adding the following: Loss does not include any amount allocated to uncovered loss pursuant to subsection 12, **Allocation**. For purposes of coverage under Insuring Clause 3, Loss includes punitive or exemplary damages which any **Insured Organization** becomes legally obligated to pay, provided the punitive or exemplary damages are otherwise covered under Insuring Clause 3 and are insurable under the law pursuant to which this coverage section is construed.

2009 ONCA 538 (CanLII)

[52]   We raise this point at this stage to say that we thought it might be argued that the amendment to the definition of "Loss" forms part of the entire 2001 Policy. If that were the case, it also might be argued that the definition of "Loss", as amended, is consistent with an approach that when Defence Costs are being allocated between covered and uncovered losses, the definition of "Loss" in the 2001 Policy should not be applied to uncovered losses. If that were the case, uncovered losses would not be limited by the requirement in the definition of "Loss" that they be on account of claims made in the Policy Period.

[53]   We do not raise this point at this time to suggest that the amendment to the definition of "Loss" in Endorsement 10 should determine the issue or even that it is relevant to the resolution of the ambiguity. We do so only so that the parties and the court hearing the reapplication may consider whether or not there is any assistance to be gleaned from that amendment.

## 2.   Interrelated Wrongful Acts

[54]   On this ground of appeal, the appellants argue that the 2003 Conduct that is pleaded in the Hybrid Proceedings is covered by the 2001 Policy on two bases.

[55]   First, they argue that the 2003 Conduct is the same as, or is interrelated to, the 2001 Conduct on the basis of s. 8 of the 2001 Policy. Section 8 provides coverage for "all **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts**"

2009 ONCA 538 (CanLII)

(emphasis in original). "Wrongful Act" is broadly defined to include the type of conduct at issue in the Hybrid Proceedings, including misleading statements.   "Interrelated Wrongful Act" is defined to mean "all causally connected **Wrongful Acts**" (emphasis in original).

[56]   Second, the appellants argue that the 2003 Conduct is conduct that was "subsequently arising from" the 2001 Conduct within the meaning of s. 10 of the 2001 Policy.   Section 10 provides for coverage where a claim after the Policy Period arises from circumstances about which the insured gave notice during the Policy Period.

[57]   In essence, these arguments are both based on the premise that the 2003 Conduct arose out of, was causally connected to, or was the same as the 2001 Conduct.   In support, the appellants point to various broad-based allegations in the Hybrid Proceedings, including the Ontario Securities Commission's allegation that the appellants displayed a "culture of non-compliance" throughout the whole period.

[58]   Broad language can usually be chosen to describe a wide variety of allegations of misconduct.      However, in our view, a reading of the allegations in the Hybrid Proceedings shows that the 2003 Conduct is different in nature, in kind, and in time from the 2001 Conduct alleged in the same proceedings.

[59]   The allegations of the 2003 Conduct relate to different acts of non-compliance than the 2001 Conduct and to acts that took place at different time frames and in different

2009 ONCA 538 (CanLII)

ways. The allegations are specific in describing the different acts. For example, the Securities and Exchange Commission proceedings allege that the appellants were involved in two fraudulent accounting schemes, which are explained as comprising a Revenue Recognition scheme based on the 2001 Conduct and a different Provisioning scheme based on the 2003 Conduct. The distinction between the parameters of the conduct and the two time frames is further illustrated by recent criminal charges which involve allegations restricted to the 2003 Conduct.

[60]    Accordingly, we reject this ground of appeal.

## 3.    Larger Costs Issue

[61]    On this ground of appeal, the appellants challenge the application judge's finding that "in the absence of evidence to the contrary", it was reasonable for Chubb to pay them 50 percent of the Defence Costs of the Hybrid Proceedings in relation to the 2001 Conduct covered under the 2001 Policy. The application judge made this finding because the appellants did not call evidence that the 2001 Conduct consumed more than 50 percent of the costs of the Hybrid Proceedings.

[62]    The appellants argue that the application judge erred in failing to apply the decision of this court in *Hanis v. Teevan* (2008), 92 O.R. (3d) 594. They submit, based on *Hanis*, that Chubb is obliged to pay any defence costs reasonably related to the

defence of the 2001 covered claims, even if those costs also relate to the defence of any 2003 uncovered claims.

[63] This argument is consistent with *Hanis* where Doherty J.A. stated at para. 2, "the insurer is required to pay all reasonable costs associated with the defence of those claims even if those costs further the defence of uncovered claims." However, Doherty J.A. continued to explain at para. 2 that the insurer "is not obliged to pay costs related solely to the defence of uncovered claims."

[64] In our view, on the state of the current record, and for our reasons relating to the Interrelated Wrongful Act argument, this case appears to be one where the Defence Costs can be separated into costs relating to the 2001 Conduct and costs relating to the 2003 Conduct. This does not appear to be a case where the same costs are being incurred for both covered and uncovered claims: see *Hanis* at paras. 25, 42.

[65] Finally, the appellants argue that the onus was on Chubb to establish which Defence Costs relate to the covered claims and which relate to the uncovered claims. On this issue, we agree with the observation of Doherty J.A. in *Hanis* at para. 43, that there does not appear to be "any compelling reason to depart from the general rule that the party claiming damages bears the ultimate or legal burden of proof on that issue, including proving the quantum of damages suffered."

2009 ONCA 538 (CanLII)

[66]   The application judge resolved this issue by observing that Chubb, in the absence of evidence to the contrary, had allocated 50 percent of the Defence Costs to the Policy Period. He left it open to the appellants to demonstrate, to the satisfaction of Chubb or the court, that a greater percentage was appropriate and stated in his reasons that his order could be amended accordingly. We are of the view that in the event that the appellants are ultimately unsuccessful on the allocation provisions issue, the approach taken by the application judge is appropriate.

[67]   Thus, we reject this ground of appeal.

**DISPOSITION**

[68]   In the result, we allow the appeal and direct a new hearing of the application to be limited in accordance with these reasons. Given the result, we make no order as to the costs of this appeal and leave that issue to the judge rehearing the application. However, to assist with respect to the amount of the costs to be awarded with respect to the appeal, we fix the costs as follows.

[69]   If the appellants are eventually successful, we would have awarded costs on a partial indemnity basis. The appellants argued in their costs submissions that the insured "is entitled to all his or her costs on a substantial (or full) indemnity basis in an action against an insurer who denies coverage". Substantial indemnity costs may be appropriate in cases where the issue on appeal is whether the insurer had a duty to defend: see *M.(E.)*

2009 ONCA 538 (CanLII)

*v. Reed*, [2003] O.J. No. 1791 (C.A.). However, where the issue on appeal involves the allocation of costs between the insurer and the insured, as in this case, costs are awarded on a partial indemnity basis: see *Hanis v. University of Western Ontario*, 2008 ONCA 793; *Boliden Ltd. v. Liberty Mutual Insurance Co.*, 2008 ONCA 418.

[70]  That said, the amount claimed must also be fair and reasonable having regard to the nature of the appeal: see *Boucher v. Public Accounts Council for the Province of Ontario* (2004), 71 O.R. (3d) 291 (C.A.). We would fix the costs for the appellant, Dunn, in the amount of $35,000 and for the appellant, Beatty, in the amount of $15,000. Both amounts are inclusive of disbursements and G.S.T. If an award is to be made in favour of Chubb, we would fix Chubb's costs on a partial indemnity basis in the amount of $35,000, inclusive of disbursements and G.S.T.

RELEASED: July 2, 2009                     "D. O'Connor A.C.J.O."
"DRO"                                       "S.E. Lang J.A."
                                            "David Watt J.A."



TAB9

680                          DOMINION LAW REPORTS          195 D.L.R. (4th)

[77] *Graham v. Rourke* (1990), 75 O.R. (2d) 622, at 629, 74 D.L.R. (4th) 1 (Ont. C.A.).

[78] M.A. Waldron, *The Law of Interest in Canada* (Scarborough, Ont.: Carswell, 1992) at p. 128.

[79] S.M. Waddams, *The Law of Damages*, 3rd ed. (Toronto: Canada Law Book, 1997) at p. 436.

[80] Waldron, *The Law of Interest in Canada*, supra, at pp. 129-130.

[81] (1987), 58 O.R. (2d) 449, at p. 487, 35 D.L.R. (4th) 641 (C.A.).

[82] *Stelco Inc. v. Royal Insurance Co. of Canada* (1997), 34 O.R. (3d) 263 (C.A.); *John Maryon International Ltd. v. New Brunswick Telephone Co.* (1982), 141 D.L.R. (3d) 193 (N.B.C.A.); *Pickett v. British Rail Engineering Ltd.*, [1979] 1 All E.R. 774 (H.L.).

[83] [1974] 1 Lloyd's Rep. 394 (C.A.).

[84] *Ibid.*, at 411.

[85] Waldron, *The Law of Interest in Canada*, supra, pp. 128-154.

[86] *Baud Corp., N.V. v. Brook*, [1979] 1 S.C.R. 677, at 679-680, 97 D.L.R. (3d) 300.

[87] *Spencer v. Rosati* (1985), 50 O.R. (2d) 661 (C.A.).

[88] *Armak Chemicals Ltd. v. Canadian National Railway Co.* (1991), 5 O.R. (3d) 1, 84 D.L.R. (4th) 326 *sub nom. Oakville Storage and Forwarders Ltd. v. C.N.R. Co.* (C.A.).

---

## Equiprop Management Ltd. v. Harris et al.

[Indexed as: Equiprop Management Ltd. v. Harris]

Court File No. 607/2000

*Ontario Superior Court of Justice, Divisional Court*
*Lang J.*

*Heard: November 1 and 2, 2000*
*Judgment rendered: November 21, 2000*

Civil procedure — Right of audience — Agent or paralegal has no right to appear in Divisional Court in landlord and tenant matter — Court has no inherent jurisdiction to permit agent to appear — Tenant Protection Act, 1997, S.O. 1997, c. 24, ss. 193(2), 196(1) — Law Society Act, R.S.O. 1990, c. L.8, s. 50(1) — Statutory Powers Procedure Act, R.S.O. 1990, c. S.22, s. 10 — Rules of Civil Procedure, R.R.O. 1990, Reg. 194, rule 15.01.

Landlord and tenant — Residential tenancies — Procedure — Agent or paralegal has no right to appear in Divisional Court in landlord and tenant matter — Court has no inherent jurisdiction to permit agent to appear —

EQUIPROP MANAGEMENT LTD. V. HARRIS                   681

**Tenant Protection Act, 1997, S.O. 1997, c. 24, ss. 193(2), 196(1) — Law Society Act, R.S.O. 1990, c. L.8, s. 50(1) — Statutory Powers Procedure Act, R.S.O. 1990, c. S.22, s. 10 — Rules of Civil Procedure, R.R.O. 1990, Reg. 194, rule 15.01.**

**Landlord and tenant — Residential tenancies — Appeals — Agent or paralegal has no right to appear in Divisional Court in landlord and tenant matter — Court has no inherent jurisdiction to permit agent to appear — Tenant Protection Act, 1997, S.O. 1997, c. 24, ss. 193(2), 196(1) — Law Society Act, R.S.O. 1990, c. L.8, s. 50(1) — Statutory Powers Procedure Act, R.S.O. 1990, c. S.22, s. 10 — Rules of Civil Procedure, R.R.O. 1990, Reg. 194, rule 15.01.**

In an appeal by a tenant to the Divisional Court from a decision of the Ontario Rental Housing Tribunal (ORHT), the landlord applied for an order quashing the appeal or setting terms for its continuance. An agent or "paralegal" appeared for the tenant and argued that paralegals were entitled to appear in Divisional Court on landlord and tenant matters as of right or with leave.

Section 50(1) of the *Law Society Act*, R.S.O. 1990, c. L.8, states that: "Except where otherwise provided by law, no person, other than a member . . . shall act as a [lawyer] . . . or represent themself to be a [lawyer] or practise as a [lawyer]." Rule 15.01(1) of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194, provides that: "A party to a proceeding who is under disability or acts in a representative capacity shall be represented by a solicitor." Rule 15.01(2) provides that: ". . . a corporation shall be represented by a solicitor, except with leave of the court". Rule 15.01(3) provides that: "Any other party . . . may act in person or be represented by a solicitor." Representation by agents before the ORHT is permitted by the *Tenant Protection Act, 1997*, S.O. 1997, c. 24 (the *TPA*), by the ORHT's *Rules of Practice*, and by s. 10 of the *Statutory Powers Procedure Act*, R.S.O. 1990, c. S.22 (the *SPPA*). Section 193(2) of the *TPA* provides that landlord and tenant matters shall go to a "court of competent jurisdiction" rather than the ORHT if the claim exceeds the ORHT's monetary jurisdiction ("excess claims"), and s. 196(1) provides for appeals on questions of law from the ORHT to the Divisional Court ("appeals").

**Held,** an agent or paralegal was not entitled to appear in Divisional Court in landlord and tenant matters.

Neither a court deciding excess claims nor the Divisional Court deciding appeals was a tribunal to which the *SPPA* applied. The Rules of Civil Procedure therefore applied to those proceedings. While the court had inherent jurisdiction to control its own proceedings, including who would have a right of audience, that inherent jurisdiction could not be exercised where it conflicted with a statutory enactment, including a rule. Rule 15.01(3), when read in light of the specific reference to agents in rule 15.01(2), did not give agents a right of audience. In any event, s. 50(1) of the *Law Society Act* was unequivocal in prohibiting non-lawyers from practising law unless authorized by law.

If that conclusion was wrong and paralegals might be permitted to appear, a request to appear should be made by means of a motion with supporting affidavit material from both the party and the paralegal. The party's affidavit should address the issues of availability of solicitor representation and informed consent to paralegal representation, and would have to indicate an appreciation of the possible consequences of such representation. The paralegal's affidavit should include the extent of the representation requested; the qualifications of the paralegal; how those qualifications related to the representation requested; whether the paralegal was subject to the direction or supervision of anyone or any organization; evidence of good character; what insurance or compensation would be available in the event of the paralegal's negligence or fraud; and whether the paralegal was knowledgeable about and prepared to abide by any relevant code of conduct.

**Cases referred to**

*1109222 Ontario Ltd. v. Murad*, [1999] O.J. No. 3642 (QL) — **refd to**

*Addai v. Greenwin Property Management*, Ont. S.C.J., Ground J., May 31, 2000, Court File No. 00-CV-190577 — **refd to**

*Addai v. Greenwin Property Management*, Ont. S.C.J., Cullity J., June 26, 2000, Court File No. 00-CV-190577 — **refd to**

*Banyasz v. Galbraith* (1996), 7 C.P.C. (4th) 307, 94 O.A.C. 75, 66 A.C.W.S. (3d) 816, [1996] O.J. No. 3860 — **consd**

*Baxter Student Housing Ltd. v. College Housing Cooperative Ltd.* (1975), 57 D.L.R. (3d) 1, [1976] 2 S.C.R. 475, 20 C.B.R. (N.S.) 240, [1976] 1 W.W.R. 1, 5 N.R. 515 — **refd to**

*Berhold Investment Ltd. v. Fall* (1982), 132 D.L.R. (3d) 481, 28 C.P.C. 198, 35 O.R. (2d) 338 — **refd to**

*Budgello v. Rovira*, Ont. S.C.J., Wright J., April 17, 2000, Court File No. 00-CU-188060 — **refd to**

*Cameron v. Narducci*, Ont. S.C.J., Loukidelis J., March 14, 2000, Court File No. 54850-00 — **refd to**

*Carroll v. Carroll* (2000), 100 A.C.W.S. (3d) 270, [2000] O.J. No. 3969 (QL) — **refd to**

*Cavalier v. Lamror*, Ont. S.C.J., Boyko J., September 19, 2000, Court File No. 3676/00 — **refd to**

*Conley v. Walker*, Ont. S.C.J., Snowie J., July 24, 2000, Court File No. 247-2000 — **refd to**

*Contu v. Boardman*, Ont. Div. Ct., Lofchik J., July 4, 1995, Court File No. D537/95 — **refd to**

*Currier v. Nunes*, Ont. S.C.J., Nordheimer J., May 19, 2000, Court File No. 00-CV-190123 — **refd to**

*Currier v. Nunes*, Ont. S.C.J., H. Sachs J., September 11, 2000, Court File No. 00-CV-190123 — **refd to**

*Dovale v. Metropolitan Toronto Housing Authority*, Ont. S.C.J., Hoilett J., September 29, 2000, Court File No. 00-CV-197768 — **refd to**

*Edwards v. Hoogerwerf*, Ont. Div. Ct., Herald J., December 22, 1999, Court File No. 1180/99 — **refd to**

*Edwards v. Hoogerwerf*, Ont. Div. Ct., Clarke J., April 25, 2000, Court File No. 1180/99 — **refd to**

*Freeman v. Peterson*, Ont. Div. Ct., Jenkins J., September 5, 2000, Court File No. 56334/00 — **refd to**

*Gabrielson v. Murovec* (1993), 44 A.C.W.S. (3d) 157, [1993] O.J. No. 2647 (QL) — **refd to**

*Gavin v. Kuyumcuoglu*, Ont. S.C.J., Ground J., May 7, 2000, Court File No. 00-CV-188626 — **refd to**

*Gavin v. Kuyumcuoglu*, Ont. S.C.J., C. Campbell J., June 1, 2000, Court File No. 00-CV-188626 — **refd to**

*Gavin v. Kuyumcuoglu*, Ont. S.C.J., Swinton J., July 26, 2000, Court File No. 00-CV-188626 — **refd to**

*Gavin v. Kuyumcuoglu*, Ont. S.C.J., Cullity J., October 10, 2000, Court File No. 00-CV-188626 — **refd to**

*Gibbs v. 2850 Jane Street*, Ont. S.C.J., Stinson J., February 25, 2000, Court File No. 00-CV-185245 — **refd to**

*Gill v. Residential Property Management Inc.* (2000), 50 O.R. (3d) 752, 100 A.C.W.S. (3d) 151, [2000] O.J. No. 3709 (QL) — **refd to**

*Gotlibowicz v. Gillespie* (1996), 47 C.P.C. (3d) 96, 28 O.R. (3d) 402, 90 O.A.C. 251, 62 A.C.W.S. (3d) 785 — **consd**

*Guy v. Guy* (2000), 95 A.C.W.S. (3d) 837, [2000] O.J. No. 1038 (QL) — **refd to**

*Henry v. Rovira*, Ont. S.C.J., Wright J., April 17, 2000, Court File No. 00-CU-188059 — **refd to**

*Ip v. King*, Ont. Ct. (Gen. Div.), O'Connor J., January 7, 1999, Court File No. V1124/98 — **refd to**

*Jackson v. Ontario (Attorney General)* (1995), 54 A.C.W.S. (3d) 884, [1995] O.J. No. 1125 (QL) [affd 78 A.C.W.S. (3d) 615] — **refd to**

*King v. Metropolitan Toronto Housing Authority*, Ont. Div. Ct., McMurtry C.J., Montgomery and Carruthers JJ., June 10, 1994, Court File No. DC 803/92 — **refd to**

*Letros (Re)* (1972), 26 D.L.R. (3d) 257, [1972] 2 O.R. 589 [motion to quash granted [1972] S.C.R. ix] — **refd to**

*ManuLife v. Molyneux*, Ont. Div. Ct., Steele J., January 10, 1995, Court File No. 868/94 — **refd to**

*Masuzzo v. Mancini*, Ont. S.C.J., Backhouse J., September 13, 2000, Court File No. 00-CV-194897 — **refd to**

*McKee v. Wang*, Ont. S.C.J., Greer J., June 20, 2000, Court File No. 00-CU-190578 — **refd to**

*Mohn v. Hearthstone Property*, Ont. S.C.J., Archibald J., April 18, 2000, Court File No. 00-CU-188062 — **refd to**

*Montreal Trust Co. v. Churchill Forest Industries (Manitoba) Ltd.* (1971), 21 D.L.R. (3d) 75, [1971] 4 W.W.R. 542 — **refd to**

*Ng-Evans v. Gray* (1992), 35 A.C.W.S. (3d) 351, [1992] O.J. No. 1758 (QL) — **refd to**

*Norno Developments Ltd. v. Papa*, Ont. Div. Ct., A. Campbell, May 15, 1998 — **refd to**

*Petsinis v. Escalhorda*, Ont. S.C.J., Lang J., August 9, 2000, Court File No. 00-CV-195090 — **refd to**

*Petsinis v. Escalhorda*, Ont. S.C.J., C. Campbell J., August 17, 2000, Court File No. 00-CV-195090 — **refd to**

*Petsinis v. Escalhorda* (2000), 99 A.C.W.S. (3d) 486, [2000] O.J. No. 3324 (QL) — **refd to**

*R. v. Duggan* (1976), 31 C.C.C. (2d) 167 — **refd to**

*R. v. Lawrie* (1987), 32 C.C.C. (3d) 549, 48 M.V.R. (2d) 189, 59 O.R. (2d) 161, 19
   O.A.C. 81, 1 W.C.B. (2d) 336 — **refd to**

*R. v. Romanowicz* (1999), 178 D.L.R. (4th) 466, 138 C.C.C. (3d) 225, 26 C.R. (5th)
   246, 45 M.V.R. (3d) 294, 45 O.R. (3d) 506, 124 O.A.C. 100, 43 W.C.B. (2d)
   339 — **refd to**

*Riccardi v. Anthony*, Ont. Div. Ct., Eberhardt J., September 5, 2000, Court File No.
   56147/00 — **refd to**

*Riccardi v. Anthony*, Ont. Div. Ct., McIsaac J., September 7, 2000, Court File No.
   56147/00 — **refd to**

*Sarkari v. Firaca*, Ont. Div. Ct., Weeks J., April 11, 2000, Court File No.
   55071/00 — **refd to**

*Smith v. Poot*, Ont. S.C.J., Lang J., August 9, 2000, Court File No. 00-CU-19509 —
   **refd to**

*Smith v. Smith* (2000), 43 C.P.C. (4th) 293, 96 A.C.W.S. (3d) 421, [2000] O.J. No.
   1236 (QL) — **refd to**

*Stone v. Metropolitan Toronto Housing Authority* (1987), 19 C.P.C. (2d) 31, 59 O.R.
   (2d) 605, 5 A.C.W.S. (3d) 143 — **refd to**

*Stone v. Stone* (1999), 4 R.F.L. (5th) 433, 94 A.C.W.S. (3d) 703, [1999] O.J. No.
   5266 (QL) — **refd to**

*Stone v. Stone* (2000), 5 R.F.L. (5th) 151, 95 A.C.W.S. (3d) 113, [2000] O.J. No. 570
   (QL) — **refd to**

*Straka v. Humber River Regional Hospital* (2000), 193 D.L.R. (4th) 680, 51 O.R.
   (3d) 1, 100 A.C.W.S. (3d) 761, [2000] O.J. No. 4212 (QL) — **refd to**

**Statutes referred to**

*Landlord and Tenant Act*, R.S.O. 1990, c. L.7 — renamed *Commercial Tenancies
   Act* by s. 213(5) of *Tenant Protection Act, 1997*, S.O. 1997, c. 24
   [Part IV (ss. 79 to 130) repealed 1997, c. 24, s. 213(4) (in force June 17, 1998)]
   s. 113(10) [repealed 1997, c. 24, s. 213(4)]
   s. 116 [repealed 1997, c. 24, s. 213(4)]
   s. 118(1) [repealed 1997, c. 24, s. 213(4)]
*Law Society Act*, R.S.O. 1990, c. L.8
   s. 50(1) [rep. & sub. 1991, vol. 2, c. 41, s. 4; am. 1993, c. 27, s. 5]
*Solicitors Act*, R.S.O. 1990, c. S.15
   s. 1
*Statutory Powers Procedure Act*, R S.O. 1990, c. S.22
   s. 1, definition "proceeding" [enacted 1994, c. 27, s. 56(2)]
   s. 3 [am. 1994, c. 27, s. 56(5) and (6)]
   s. 10 [rep. & sub. 1994, c. 27, s. 56(20)]
   s. 21.2 [enacted 1994, c. 27, s. 56(36); am. 1997, c. 23, s. 13(20)]
   s. 25(1) [rep. & sub. 1997, c. 23, s. 13(21)]
*Tenant Protection Act, 1997*, S.O. 1997, c. 24 (in force June 17, 1998, except for ss.
   223(4) and 224(17))
   s. 1(1), definition "rules"
   s. 2(1)
   s. 4
   s. 164(1), (2)
   s. 169(1)(a)

s. 190(3)
s. 192
s. 193(1), (2)
s. 194(1)
s. 196
s. 199(1)

**Rules referred to**

Family Law Rules, O. Reg. 114/99 (in force November 15, 1999 *per* O. Reg. 441/99, s. 2)
  rule 4(1)(*c*)
Rules of Civil Procedure, R.R.O. 1990, Reg. 194
  rule 1.02 [am. O. Regs. 484/94, s. 1; 288/99, s. 1; 292/99, s. 1; 504/00, s. 1]
  rule 1.04
  rule 15.01
  rule 63.01(3) [rep. & sub. O. Reg. 465/93, s. 8; am. O. Reg. 570/98, s. 15]
  rule 63.03(5.1) [enacted O. Reg. 288/99, s. 22(3)]

**Authorities referred to**

Cory, Peter deC., *A Framework for Regulating Paralegal Practice in Ontario*, Report for the Ontario Ministry of the Attorney General (Toronto, 2000)
Ontario Rental Housing Tribunal, *Rules of Practice* (June 17, 1998)

RULING concerning an agent's right to appear in Divisional Court on a landlord and tenant matter.

*Sandy Hutchens*, agent for appellant tenants.
*David Strashin*, solicitor for respondent landlord.

[1] LANG J.:—Whether paralegals should be permitted to represent litigants before the courts is a matter under study by the provincial government. The issue is for the legislature's determination. The question before me is a narrow one: whether a paralegal is currently authorized by law to represent parties in this court on a residential tenancy matter.

[2] It may be worthwhile to explain my use of the term paralegal. I use the term paralegal to refer to one of a growing number of individuals with diverse experience, with or without formal training, and not subject to regulation of any kind, who wish to represent litigants in proceedings before the court. Historically law clerks, trained by education or experience, assisted lawyers and were supervised by lawyers. Paralegals, on the other hand, are not subject to training or supervision by anyone. Anyone may designate him or herself as a paralegal. A paralegal, in today's context, assumes the

sole responsibility for a litigant's case, without reference to a lawyer at any point in the proceeding. A paralegal requires no qualifications, need not obtain insurance and is subject to neither regulation nor discipline. It is in this context that I use the term paralegal in these reasons.

[3] The question arose when the landlord, represented by counsel, sought to quash the tenant's appeal or, alternatively, to set terms for its continuance, such as removal of the stay pending appeal, and the posting of security for costs. Mr. Hutchens, a self-described paralegal, appeared for the appellant, and said that paralegals as agents are entitled as of right to appear both on appeals from the Ontario Rental Housing Tribunal (ORHT), and in this court on residential tenancy matters outside the jurisdiction of the ORHT. Alternatively, if paralegals are not entitled to represent tenants or landlords as of right, then Mr. Hutchens says that they are entitled to do so with leave and that leave should be given.

[4] Upon Mr. Hutchens' request for an adjournment, I put the representation question over for two days. For the limited purpose of the representation argument, I allowed Mr. Hutchens to represent the tenants. At the conclusion of argument, I reserved the representation decision. However, because both parties sought a speedy decision on the "stay" motion, I considered the fact of my reserve sufficient "special circumstances", (about which I will say more), to allow Mr. Hutchens to argue the "stay" motion. In the course of the "stay" argument, it became apparent that both issues depend upon whether the *Rules of Civil Procedure* apply. Accordingly, these reasons address first the "representation" issue and then the "stay" motion.

*Context*

[5] It is helpful to begin by putting the issues in context. Mr. Hutchens has been allowed to represent tenants on numerous occasions in the Superior Court of Justice and in this branch of the Superior Court, the Divisional Court. Indeed, Mr. Hutchens asked for the adjournment to supplement his one volume of authorities on paralegal representation with two further volumes of additional cases in which courts permitted such representation. I pause to note that at first appearance Mr. Hutchens did not include cases that held contrary to his position but that, at my request, he did include such cases in his supplementary material.

[6] The material he filed supports his position that many members of the court, including me, have permitted Mr. Hutchens to represent tenants on motions and at trials in the Superior Court of Justice and on appeals in Divisional Court. As Mr. Hutchens relies on this body of authority, I have summarized the cases in Appendix A to these reasons. I note that Mr. Hutchens was the referenced agent in by far the majority of the cases. Very few of the cases are more than an order or an endorsement. Very few judges gave any reasons analyzing the issue. The few cases deciding against paralegal representation will be discussed later in this judgment.

*Legislative History*

[7] With that background, I turn to what the legislature has enacted concerning representation of litigants by lawyers and representation of litigants by agents.

[8] Section 1 of the *Solicitors Act*, R.S.O. 1990, c. S.15, provides penalties for those persons, other than lawyers, who represent litigants in a proceeding. The penalties include a prohibition on recovery of fees and make allowance for contempt charges. While "proceeding" is not defined by the *Solicitors Act*, the reference to contempt of court is indicative that, at a minimum, the prohibition against non-lawyer, non-party representation applies to proceedings in a court.

[9] The issue is more broadly addressed by s. 50(1) of the *Law Society Act*, R.S.O. 1990, c. L.8, which says:

> 50(1) Except where otherwise provided by law,
>
> (a) no person, other than a member . . . shall act as a [lawyer] . . . or represent themself to be a [lawyer] or practise as a [lawyer] . . .

[10] Contravention of this provision is an offence that may result in conviction.

[11] The interrelationship of these provisions was considered by Blair J.A. in *R. v. Lawrie and Pointts Ltd.* (1987), 59 O.R. (2d) 161 (C.A.) at 178, where he said:

> The effect of the 1970 revision of the three statutes was to transfer the control of unauthorized practice to the *Law Society Act*. Section 1 of the *Solicitors Act* is merely an ancillary provision. It does not prohibit unauthorized practice. It merely provides penalties additional to those prescribed in s. 50 of the *Law Society Act* by preventing recovery of fees and exposing unauthorized persons to the charge of contempt of court. The section cannot stand

by itself. The penalties it provides can only apply to unauthorized practice as defined by s. 50(1) of the *Law Society Act* and as a result do not extend to agents in the position of the respondents whose activities are excepted as being "otherwise provided by law".

This interpretation is fortified by a consideration of s. 1 of the *Solicitors Act* by itself. The Act now deals entirely with solicitor-and-client accounts and it is logical for it to include the prohibition against charges for unauthorized practice. Contempt of court is the other penalty for unauthorized practice contained in s. 1. It is inconceivable that agents acting under the authority of other statutes could be held in contempt of court and this is a further indication that the Legislature intended s. 1 of the *Solicitors Act* to be merely ancillary to s. 50(1) of the *Law Society Act*.

It is ironic that there is lack of clarity in the statutes governing the legal profession and their application to the respondents. I commend for the Legislature's attention the clarification of this legislation and also the status of agents and other paralegals which is now a matter of considerable public discussion.

[12] In the intervening 13 years, the legislature has not given the matter its attention, although the Dr. R.W. Ianni "Task Force on Paralegals" (1990), considered the matter and more recently the Honourable Peter Cory completed a report on paralegals, which report I will reference later. Existing law prohibits representation by paralegals, except where otherwise provided by law. The question then is whether paralegal representation in residential tenancy matters is otherwise provided by law.

[13] The legislative position is reflected in Rule 15.01 of the *Rules of Civil Procedure*, which provides:

15.01(1) A party to a proceeding who is under disability or acts in a representative capacity shall be represented by a solicitor.

(2) A party to a proceeding that is a corporation shall be represented by a solicitor, except with leave of the court.

(3) Any other party to a proceeding may act in person or be represented by a solicitor.

[14] While it is rule 15.01(3) that is of immediate concern, the other two subsections assist with context. A person under disability is not allowed to represent him or herself and "shall" be represented by a solicitor. A corporation "shall" be represented by a solicitor, except with leave. Anyone else "may" either represent themselves or be represented by a solicitor. There is no provision in rule 15.01(3) for leave to be represented by a non-lawyer, unless leave may be

given under the umbrella of the inherent jurisdiction of the court to control its own process. More will be said about that later. These then are the legislative and regulatory provisions concerning paralegal or agent representation.

[15] In *Jackson v. Ontario (Attorney General)*, [1995] O.J. No. 1125 (QL) (Gen. Div.) [summarized 54 A.C.W.S. (3d) 884], a paralegal challenged the constitutionality of the above provisions of the *Solicitors Act*, the *Law Society Act* and Rule 15 on the basis that they infringed his *Charter* rights on a number of grounds, and in particular, his economic rights. In dismissing the challenge, Borins J. found that the provisions were both within the legislative competence of the legislature and did not infringe any of the Applicant's *Charter* rights.

[16] If the legislature provides for paralegal representation in a statute, such representation becomes "otherwise provided by law" in accordance with the *Law Society Act*. Of relevance to this case, the *Landlord and Tenant Act*, R.S.O. 1990, c. L.7, Part IV (*LTA*), which governed residential landlord and tenant matters before 1998, is an example of where the legislature so provided. The *LTA* specifically provided in s. 118(1) that an "agent" could represent a "party to an application" and specified that a residential tenancy dispute was to be determined in a "hearing", held by a judge in court. The *LTA* provided procedural guidelines for the initiation of such a proceeding and provided provisions for notice, service, filings, orders, judgments, enforcement and evidentiary issues.

[17] The *LTA* gave no specific guidance as to how the proceeding itself should be conducted, but did provide that it should be a "hearing" to be held "forthwith" (s. 113(10)).

*Agent Representation under the LTA*

[18] With that wording under this pre-1997 legislation, the issue arose whether the *Rules of Civil Procedure*, (such as pleadings, discoveries, disclosure and trial conduct requirements) applied to residential tenancy hearings. Rule 1.02(1) of the *Rules of Civil Procedure* applied the *Rules* to all civil proceedings in the court except where "a statute provides for a different procedure". The courts held that the *LTA* reference to documentary and notice requirements and to a "summary proceeding" was "a different procedure"

sufficient to oust the applicability of the *Rules*. See for example: *Berhold Investments Ltd. v. Fall* (1982), 35 O.R. (2d) 338, 132 D.L.R. (3d) 481 (H.C.J.); *Re Stone and Metropolitan Toronto Housing Authority* (1987), 59 O.R. (2d) 605 (Dist. Ct.); *Ng-Evans v. Gray*, [1992] O.J. No. 1758 (QL) (Gen. Div.) [summarized 35 A.C.W.S. (3d) 351]; *Gabrielson v. Murovec*, [1993] O.J. No. 2647 (QL) (Gen. Div.) [summarized 44 A.C.W.S. (3d) 157]. The result was a procedure with which our courts became very familiar: a summary trial procedure without discovery, but usually with *viva voce* evidence and with representation of parties by agents (usually paralegals), if a party so chose. Many did. Many of the agents were extremely skilled in representing landlords and tenants. Some were not. The procedure was not complex and did not require filing of voluminous material or adherence to strict rules of production or evidence.

[19] During this time frame, landlord and tenant appeals from a final order of a judge came to Divisional Court under the *LTA*, s. 116. In *Gotlibowicz v. Gillespie* (1996), 28 O.R. (3d) 402 (Div. Ct.), which considered whether a paralegal could represent a party on such an appeal, Feldman J. found there to be no statutory authority permitting an agent to represent a party in Divisional Court. She held that once the matter reached the appeal stage, an agent could no longer rely upon the representational right given by s. 118(1), which provision applied only to the initial application in court. Nor could it be said that s. 10 of the *Statutory Powers Procedure Act*, R.S.O. 1990, c. S.22, which permits limited agent representation, extended to Divisional Court proceedings (pp. 404-405). Feldman J. noted instances where the Court of Appeal held that s. 50 of the *Law Society Act* clearly prevented agents from appearing in courts, unless specifically permitted to do so by legislation. (See *Re Letros*, [1972] 2 O.R. 589, 26 D.L.R. (3d) 257 (agents cannot be granted audience in the Court of Appeal) and *R. v. Duggan* (1976), 31 C.C.C. (2d) 167, appeal dismissed by the Court of Appeal (agent could not appear in County Court).) After careful analysis, Feldman J. held that non-lawyers could not appear as agents before Divisional Court; that to the extent that the court had the discretion to allow a non-lawyer to appear in "special circumstances", no such circumstances existed; and that to provide consistency and clarity and to prevent unnecessary

costs, the prohibition against paralegal representation applied to all agents on appeals to Divisional Court on rent control matters.

[20] Later in 1996 the same issue arose before a Divisional Court panel in *Banyasz v. Galbraith* (1996), 94 O.A.C. 75. Writing for the panel, Steele J. agreed with Feldman J. that, absent special circumstances justifying the giving of leave, agents could not appear. Steele J. specifically considered the issue with respect to *LTA* appeals and found that the s. 118 allowance of agent representation in applications did not extend to appeals from decisions arising from those applications. This principle was extended to prohibit agent representation of a landlord by *Norno Developments Ltd. v. Papa*, a judgment of the Divisional Court, delivered May 15, 1998, where A. Campbell J. dismissed a rule 15.01(2) motion by a paralegal to represent a landlord. In doing so, Campbell J. relied upon *Banyasz v. Galbraith* and said, "It would be unfair to use Rule 15.01(2) to give corporations an advantage. Rule 15.01(2) contemplates an agent other than a full-time landlord and tenant agent."

[21] In summary, under the *LTA*, paralegals were specifically authorized to represent parties on the application but were not authorized by law to represent parties in appeals to Divisional Court, although occasionally an individual judge or panel did so (see Appendix A).

*The Tenant Protection Act*

[22] After many years of the *LTA*, the legislature moved residential tenancy jurisdiction from the court to a newly created tribunal. This was accomplished through the *Tenant Protection Act, 1997*, S.O. 1997, c. 24 (*TPA*), which provided a complete code of proceedings and procedures before the ORHT, including detailed rules for its own procedure. The court no longer had jurisdiction with respect to residential tenancies, except for appellate jurisdiction and with respect to "excess claims".

[23] I pause here to explain about "excess claims". I use that term to refer to certain claims that come to our court because they are said to be outside the jurisdiction of the ORHT. For example, claims over $10,000, mostly tenant abatement claims — s. 193(1) of the *TPA*. As well, excess claims includes claims for punitive damages. While I refer to excess claims when discussing the representation issue, I do so specifically without commenting on any jurisdictional argument,

which jurisdiction the landlord's counsel says may be challenged in the future.

[24] As is apparent from Appendix A, after the transfer of jurisdiction to the ORHT, residential tenancy matters did not come before this court for a period of time. In 1999 and 2000, an increasing number of proceedings have returned to us.

[25] Presumably because many judges were accustomed to paralegal representation under the *LTA*, judges frequently permitted paralegal representation under the *TPA*, on excess claims. However, I also note that in many of the instances set out in Appendix A, the relief requested was on consent or unopposed, and paralegal representation was not challenged. In other cases, Mr. Hutchens persuaded the presiding judge that he was entitled to represent a party either as of right or with leave. Until recently no judges had the occasion to reserve judgment and to analyze the question of paralegal representation. At first glance, it might seem that the judge in *Conley v. Walker*, a judgment of the Superior Court of Justice, delivered July 24, 2000, did give the matter extensive consideration because the "Reasons" presented in Mr. Hutchens' Book of Authorities show that the judge considered more than five pages of cited authorities. However, Mr. Hutchens acknowledged that these "Reasons for Decision" were never signed by the judge and were in fact drafted by him and by another agent. Mr. Hutchens said that as paralegals, they were unaware of the protocol for the preparation of Reasons and had sent this draft to the presiding judge for signature. The "Reasons" are not signed. Even if done out of the best of intentions, and I do not question those intentions here, this incident squarely raises issues about paralegal education and qualifications. When a court is unable to accept a Book of Authorities at face value, it is placed in a very difficult position.

*The Cory Report*

[26] Mr. Hutchens submits that paralegals should be able to represent parties who are unable to afford lawyers and that paralegals can serve by expediting cases through the system. He relies in this regard upon the Report of the Honourable Peter deC. Cory, "A Framework for Regulating Paralegal Practice in Ontario" (Cory Report), Ontario Ministry of the Attorney General, (2000). When Mr. Hutchens first appeared before me, he included the Executive

Summary of the Report in his Authorities. At that time, he said that the full Report recommended that paralegals could appear in Divisional Court. However, on the return of the motion, after the adjournment to allow further time for preparation, he advised me that circumstances had prevented him from obtaining the full Report.

[27] I have done so and find the Report's references most helpful, particularly with respect to the specific comments about the ORHT and appeals therefrom. The Report speaks to the difficulties posed by "incompetent, unscrupulous" paralegals as opposed to those who are "dedicated, able paralegals" and opines that competency and licensing requirements will alleviate the problem. For ease of reference, the ORHT extract is reproduced in full as Appendix B to these reasons.

[28] The Cory Report cites a number of cases permitting paralegal representation in residential tenancy matters, including those referred to in these reasons and in Appendix A. It also notes *1109222 Ontario Ltd. v. Murad*, now reported at [1999] O.J. No. 3642 (QL). In that Divisional Court appeal, where both parties were represented by counsel, reference is made to "unconscionable" conduct on the part of Mr. Hutchens. Coincidentally, Mr. Strashin, the lawyer in the case before me, also acted on the *Murad* appeal. I mention this case, however, only to note that it may explain why Mr. Hutchens did not provide the full report and underscores the importance of licensing and other requirements. At the same time, I am acutely aware that the conduct of one paralegal should not impact upon the rights of other paralegals. In the end, these issues may be resolved through the education, testing, licensing, regulating, disciplining, insuring, and good character requirements recommended in the Report.

[29] The Report is under consideration by the Attorney General and no doubt will be the subject of submissions by many organizations. Accordingly, it would be inappropriate to comment further. In the end, the courts are bound by the present law as the legislature has given it, unless and until the legislature decides to implement change.

*The TPA and the SPPA*

[30] In Mr. Hutchens' written submissions, he made the following argument:

> The *TPA*, ss. 2 and 4 prevent the invocation of the *SPPA*, s. 3 from exempting any proceeding under the *Tenant Protection Act* from being governed by the *Statutory Procedure Act* at both levels of the Superior Court.

[31] I do not understand that submission. From what he said in court, I believe Mr. Hutchens' argument is as follows:

> The *TPA* provides a complete code both procedurally and substantively. The *SPPA*, s. 10 permits agents to appear before the ORHT. When an applicant requests relief in the court for excess claims or brings an appeal of an ORHT decision, the court hearing the claim or the appeal is governed by the *SPPA*. In other words, the court is sitting as though it was the tribunal. The excess claims provision (s. 193(2)), the appeal provision (s. 196) of the *TPA*, the interpretive provisions of the *TPA* (s. 2(1) and (4)) and rules 1.02 and 1.04, he says, support his argument.

[32] This argument stretches the clear meaning of the various provisions beyond recognition.

[33] I begin by agreeing with Mr. Hutchens that the *TPA* does provide a complete code of procedure by virtue of s. 164 as follows:

> 164(1) The Chair of the Tribunal shall establish a Rules and Guidelines Committee to be composed of the Chair, as Chair of the Committee, and any other members of the Tribunal the Chair may from time to time appoint to the Committee.
>
> (2) The Committee shall adopt rules of practice and procedure governing the practice and procedure *before the Tribunal* under the authority of this section and section 25.1 of the *Statutory Powers Procedure Act* [R.S.O. 1990, c. S.22 (*SPPA*)]. [Emphasis added.]
>
> . . . . .
>
> 1(1) In this Act,
>
> . . . . .
>
> "Rules" means the rules of practice and procedure made by the Tribunal or the Minister under section 164 of this Act and section 25.1 of the *Statutory Powers Procedure Act*; ("règles")

[34] Indeed, the Tribunal has extensive rules, which do what s. 164 says: provide for the practice before the ORHT.

[35] The *SPPA* does permit agent representation in s. 10: "A party to a proceeding may be represented by counsel or an agent." "Proceeding" is defined as "a proceeding to which this Act applies"

(s. 1) and the *Act* applies specifically to "a proceeding by a tribunal" (s. 3). Such representation by agents/paralegals before the ORHT is contemplated by the *TPA* itself in the s. 190(3) reference to "paid agents" in ss. 194(1) and 199(1) and by the ORHT's *Rules of Practice* (Ontario Rental Housing Tribunal, released June 17, 1998).

[36] It is clear, therefore, that agent representation before the ORHT is permitted. However, it would appear that such representation is not extended to appearances before this court. Further, the *SPPA* specifically says that it does not apply to proceedings in the Superior Court of Justice, nor does it apply to proceedings in which the *Rules of Civil Procedure* apply (s. 3(2)(*b*)(ii) and (*c*)).

[37] Only if the court is in fact acting as the tribunal (as argued by Mr. Hutchens) would paralegals have the right to appear before the court. To support the argument, Mr. Hutchens relies upon the wording of the *TPA*'s excess claims and appeals sections:

> 193(2) A person entitled to apply under this Act but whose claim exceeds the Tribunal's monetary jurisdiction may commence a proceeding in any court of competent jurisdiction for an order requiring the payment of that sum and, if such a proceeding is commenced, the court may exercise any powers that the Tribunal could have exercised if the proceeding had been before the Tribunal and within its monetary jurisdiction.
>
> . . . . .
>
> 196(1) Any person affected by an order of the Tribunal may appeal the order to the Divisional Court within 30 days after being given the order, but only on a question of law.
>
> (2) A person appealing an order under this section shall give to the Tribunal any documents relating to the appeal.
>
> (3) The Tribunal is entitled to be heard by counsel or otherwise upon the argument on any issue in an appeal.
>
> (4) If an appeal is brought under this section, the Divisional Court shall hear and determine the appeal and may,
>
> (*a*) affirm, rescind, amend or replace the decision or order; or
>
> (*b*) remit the matter to the Tribunal with the opinion of the Divisional Court.
>
> (5) The Divisional Court may also make any other order in relation to the matter that it considers proper and may make any order with respect to costs that it considers proper.

[38] Mr. Hutchens also looks to s. 2(1) and (4) of the *TPA* to support his position that excess claims and appeals are heard by the

court under the *TPA/SPPA* Rules and procedures. Those sections provide:

> 2(1) This Act applies with respect to rental units in residential complexes, despite any other Act and despite any agreement or waiver to the contrary.
>
> . . . . .
>
> (4) If a provision of this Act conflicts with a provision of another Act, other than the *Human Rights Code*, the provision of this Act applies.

[39] He also points to Rules 1.02 and 1.04 of the court's *Rules*, which he says operate to oust the applicability of the *Rules of Civil Procedure*. Rule 1.04 requires that the "rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits". Rule 1.02 excepts from the application of the *Rules* any proceeding where "a statute provides for a different procedure". Mr. Hutchens argues that "different procedure" should be liberally construed to include the "different" procedure set out in the *TPA/SPPA* and that it is that procedure which should be applied to the determination of excess claims and of appeals. Although Mr. Hutchens submits that his argument applies equally to excess claims and to appeals, the two proceedings attract different considerations.

### Excess Claims

[40] With respect to excess claims, Mr. Hutchens can find little support from the general provisions of the *TPA* and the *Rules*. The *TPA* provides the ORHT with comprehensive jurisdiction on matters affecting residential tenancies as well as procedural rules to guide those matters through the Tribunal. However, while the predecessor *LTA* provided procedures to bring the initial dispute to *court*, the present *TPA* provides procedures to bring the initial dispute to the *tribunal*. Further, the *LTA* prescribed a "hearing", which before has been described as a "summary procedure" before the court. No similar provision exists in the *TPA/SPPA* for s. 193(2) excess claims.

[41] With respect, I must differ from those of my colleagues who may take a different view. I note that in *Conley v. Walker*, in addition to Mr. Hutchens' "Reasons", I was given a photocopy of a hand-written endorsement, the first page of which was too dark to read, and a typed unsigned endorsement. Relying upon the brief typed endorsement, it simply presents the question of non-solicitor

representation and the applicability of the *Rules*, then allows agent representation. It finds that the "*TPA*, like the *LTA* before it is a complete code of law and procedure for these summary matters and as such the *Rules of Civil Procedure* do not apply to the *TPA*". It also orders that "the matter is to proceed pursuant to s. 193(2) of the *TPA* + pursuant to the *SPPA* as an oral hearing".

[42] After having the benefit of time to consider this issue, I cannot agree that the *TPA/SPPA* apply to render the court "a tribunal", and accordingly, one before which a paralegal may appear as of right.

[43] The reasons in *Petsinis v. Escalhorda*, [2000] O.J. No. 3324 (QL) (S.C.J.) [summarized 99 A.C.W.S. (3d) 486], of Nordheimer J. and those in *Gill v. Residential Property Management Inc.*, [2000] O.J. No. 3709 (QL) (S.C.J.) [now reported 50 O.R. (3d) 752], of Juriansz J. are both instructive as they consider the issue in depth. *Petsinis v. Escalhorda* concerned a landlord who had not been personally served with a motion seeking a contempt order against him with respect to an earlier repairs order that I had made. C. Campbell J. found the landlord in contempt. The landlord moved before Nordheimer J. to set aside both earlier orders. Mr. Hutchens argued that personal service of contempt orders was unnecessary. He said that the *Rules of Civil Procedure* requiring such personal service did not apply to *TPA* matters and that the *TPA* and its rules did not require personal service. Further, he argued that judges dealing with *TPA*, s. 193(2) matters were sitting, in essence, as members of the ORHT.

[44] In deciding to grant leave to appeal both the earlier orders to the Divisional Court, Nordheimer J. found he had good reason "to doubt the correctness of the assertion that the *Rules of Civil Procedure* do not apply to these proceedings" (para. 17). As well, Nordheimer J. addressed the issue of agent representation noting that the *LTA*, s. 118 provision was not carried forward in the *TPA*. In his reasons, Nordheimer J. drew the distinction between excess claims and appeals:

> ... I am aware of the order of O'Connor J. dated January 7, 1999 in *Ip and Tsai v. King and King* (court file no. V1124/98) in which agents were permitted to represent the tenants in a matter before the Divisional Court. I would observe, however, that in that case the Divisional Court was dealing with an appeal from a matter that had been determined before the tribunal. I can see a

rationale for why the Divisional Court might conclude that agents who appeared before the tribunal ought to be able to appear before it on an appeal from the tribunal's decision. That conclusion does not appear to me to be determinative of whether agents should be allowed to appear on behalf of parties in proceedings which begin in this court as opposed to applying the normal requirements, found in Rule 15 of the *Rules of Civil Procedure*, which require parties to appear either in person or by counsel. While it might be suggested that to adopt the latter view would deprive parties, particularly tenants, to the right of representation, it should be remembered that we are not dealing here with all landlord and tenant matters but only that small subsection of such disputes in which a claim for more than $10,000.00 is involved such that the jurisdiction to bring the matter before this court is invoked. [Paragraph 25.]

[45] For these reasons, Nordheimer J. granted leave to appeal to the Divisional Court. While perhaps fortunate for the parties, but unfortunate for a resolution of the issue, Mr. Hutchens advises that the *Petsinis* matter is settled, and will not therefore have the benefit of a determination by a Divisional Court panel.

[46] However, the issue was considered again days later by Juriansz J. in *Gill v. Residential Property Management, supra*, which gave leave to agents for both the tenant and the landlord to argue the issue of agent representation. As has happened in this case, the issue came down to the applicability of the *Rules of Civil Procedure*. Like *Petsinis, Gill* was made in the context of a s. 193(2) excess claim. After a discussion of the authorities, and noting that Mr. Hutchens had failed to refer him to *Petsinis*, Juriansz J. concludes:

My view is that the Rules of Civil Procedure apply to proceedings brought under s. 193(2) of the *Tenant Protection Act*, and consequently it is necessary for the agents to seek leave to appear. [Paragraph 12.]

[47] However, Juriansz J. finally disposed of the question on the basis that the landlord's claim was for punitive damages, a category of damages not provided under the *TPA*. Accordingly, he said:

I hold that this application is not brought under s. 193(2) of the *Tenant Protection Act*, as the tenant is seeking relief for which she is not entitled to apply under the *Tenant Protection Act*. Consequently, the Rules of Civil Procedure apply to the application. Agents may not represent the parties without leave from the court. I share Feldman J.'s view that it would be inappropriate for the courts to ignore governing legislation, and that having courts exercise discretion on a case-by-case basis will place clients at risk. [Paragraph 25.]

[48] Both *Petsinis* and *Gill* opine that in s. 193(2) *TPA* applications, agent representation is governed by rule 15.01(3) of the *Rules of Civil Procedure* as interpreted in *Gotlibowicz*. I agree.

*Appeals to Divisional Court*

[49] Are there different considerations that apply to appeal rights? To consider this, I look to the *TPA*, s. 196, which I again set out for convenience:

196(1) Any person affected by an order of the Tribunal may appeal the order to the Divisional Court within 30 days after being given the order, but only on a question of law.

(2) A person appealing an order under this section shall give to the Tribunal any documents relating to the appeal.

(3) The Tribunal is entitled to be heard by counsel or otherwise upon the argument on any issue in an appeal.

(4) If an appeal is brought under this section, the Divisional Court shall hear and determine the appeal and may,

(a) affirm, rescind, amend or replace the decision or order; or

(b) remit the matter to the Tribunal with the opinion of the Divisional Court.

(5) The Divisional Court may also make any other order in relation to the matter that it considers proper and may make any order with respect to costs that it considers proper.

[50] With respect to appeals to Divisional Court, Mr. Hutchens argued that the *Rules* do not apply. However, there is no other mechanism or procedure for an appeal to be initiated and progress to Divisional Court for hearing. Certainly, the *TPA*, the ORHT *Rules* and the *SPPA* make no such provision. The *Rules of Civil Procedure* do establish appeal procedures including the requirements for Notices of Appeal, Appeal Books, Exhibit Books, *facta*, etc. I reject Mr. Hutchens' argument that these provisions do not apply to appeals under the *TPA*. Quite simply, once the proceeding reaches the appeal stage, it is no longer governed by the *TPA*, but by the *Rules of Civil Procedure*. Nothing in s. 196 specifies otherwise.

[51] In so finding, I rely upon *Gotlibowicz v. Gillespie*, *supra*, and *Banyasz v. Galbraith*, *supra*. However, I do take a different perspective from those decisions on whether a paralegal may seek leave to represent a party before a superior court. It is my view that the court is without jurisdiction to give such leave in light of s. 50 of the *Law Society Act*.

*Leave*

[52] *Gotlibowicz* has been taken by some as supporting the inherent jurisdiction of the court to allow paralegals to appear as agents in "special circumstances". With respect, I believe that is a misreading of the case. After reviewing the authorities, Feldman J. says:

> In my view, in light of the statutory provisions referred to above, to the extent that the court has discretion to allow a non-lawyer to represent a party as agent before it, as opposed to allowing a friend or family member to assist someone who is acting in person, it would be inappropriate for the court to ignore s. 1 of the *Solicitors Act* and s. 50 of the *Law Society Act* and, in effect, condone activity which the legislature characterizes as contempt of court and prohibits under penalty of prosecution. Furthermore, the statutory or legislative scheme which is reflected in a number of statutes which do provide for non-lawyers to appear, and which in some cases provide conditions of competence, suggests that in any other circumstance, non-lawyers are not to appear representing parties in court or other statutory proceedings.

> There are no special circumstances in this case. The argument was not that this is a special circumstance, but that the court should allow agents to represent landlord and tenant parties before the Divisional Court in rent control matters because these matters are analogous to *Landlord and Tenant Act* matters. [Pages 408-409.]

[53] In my view, the brief reference to "special circumstances" by Feldman J. is merely a comment that, if she erred in finding that agents could not represent parties in such proceedings, then the court's discretion to grant leave would only be exercised in "special circumstances". But her primary ruling was that agents, as contrasted with family members or friends, could not represent parties in rent control matters. It is my view that neither *Gotlibowicz* nor *Banyasz* stands for the proposition that paralegals can do so with leave or in special circumstances.

[54] I look to rule 15.01(3), which only allows self-representation or solicitor representation, for support. The rule makes no reference to other representation, although such representation is contemplated by rule 15.01(2). Unquestionably, the court has inherent jurisdiction to control its own process, including who will have right of audience, and the court may exercise that inherent jurisdiction provided that it does not conflict with a statutory enactment, including a rule. Rules are generally considered to be additional to, rather than in substitution for, inherent jurisdiction. See *Straka v. Humber River*

*Regional Hospital*, [2000] O.J. No. 4212 (QL) (C.A.) at para. 26 [now reported 193 D.L.R. (4th) 680].

[55] In *Baxter Student Housing Ltd. v College Housing Cooperative Ltd.*, [1976] 2 S.C.R. 475 at 480, 57 D.L.R. (3d) 1, Dickson J. opined that:

> In my opinion the inherent jurisdiction of the Court of Queen's Bench is not such as to empower a judge of that Court to make an order negating the unambiguous expression of the legislative will. The effect of the order made in this case was to alter the statutory priorities which a court simply cannot do.

Further, Dickson J. noted that while *Montreal Trust Company v. Churchill Forest Industries (Manitoba) Limited* (1971), 21 D.L.R. (3d) 75 (Man. C.A.) at 81, may be cited as a paradigm of the exercise of judicial discretion, Freedman C.J. was careful to say:

> Inherent jurisdiction cannot, of course, be exercised so as to conflict with a statute or rule. Moreover, because it is a special and extraordinary power, it should be exercised only sparingly and in a clear case.

[56] While it may be argued that rule 15.01(3) is equivocal because it simply omits reference to agent representation, this is belied by the specific reference to other representation with leave in rule 15.01(2). Agents are not given a right of audience under any circumstances by rule 15.01(3).

[57] In any event, s. 50 of the *Law Society Act* is unequivocal in that it prohibits non-lawyers from practising law unless authorized by law. A paralegal representing a party in court is practising law and paralegals are not yet authorized to do so by law. Indeed, they are specifically prohibited by s. 50 of the *Law Society Act*, which is an unequivocal statutory enactment that occupies the field. Hence, the court does not have an inherent jurisdiction, irrespective of the circumstances, to allow a paralegal to represent/practise law in our court.

*Special Circumstances*

[58] If I err in that conclusion, I will consider how a court might consider "special circumstances" or "leave" or "permission" and what process a litigant would employ to bring the question of paralegal representation before the court for determination.

[59] It is informative to compare rule 15.01(2) with the *Family Law Rules*, O. Reg. 114/99, rule 4(1)(c), which provides that a person may "be represented by a person who is not a lawyer, but

only if the court gives permission in advance". The decisions of those sitting in the Family Branch of the Superior Court of Justice are most helpful as they have given recent consideration to the issue of "permission" since the November 15, 1999 enactment of the family court rule.

[60] In *Stone v. Stone*, [2000] O.J. No. 570 (QL) (S.C.J. (Fam. Ct.)) [now reported 5 R.F.L. (5th) 151], Steinberg J. considered whether the party requesting paralegal representation had only to establish an informed decision in seeking such representation. (See *R v. Romanowicz* (1999), 45 OR. (3d) 506, 178 D.L.R. (4th) 466 (C.A.).) In determining that a higher standard rested on the requesting party, Steinberg J. commented on *Gotlibowicz v. Gillespie, supra,* and found that rule $4(1)(c)$ was not a substantive change in the law but simply a codification of the requirement for special circumstances where special expertise justifies it (para. 9). He agreed with an earlier decision by Mazza J., in the same case, *Stone v. Stone,* [1999] O.J. No. 5266 (QL) (S.C.J. (Fam. Ct.)) [reported 4 R.F.L. (5th) 433], that the inability to afford a lawyer is not a special circumstance, and added that the paralegal in question had failed to demonstrate special expertise.

[61] On March 22, 2000, Rogers J. gave further consideration to the issue in *Guy v. Guy*, [2000] O.J. No. 1038 (QL) (S.C.J. (Fam. Ct.)) [summarized 95 A.C.W.S. (3d) 837], where she also refused the required permission in the absence of special skills. Rogers J. spoke to the limited judicial discretion and to the responsibility of the legislature with respect to representation of parties by lay persons. She also raised concerns about the lack of recourse by clients represented by paralegals to any errors and omissions insurance or to the disciplinary sanctions of a governing body.

[62] *Smith v. Smith*, [2000] O.J. No. 1236 (QL) (S.C.J. (Fam. Ct.)) [now reported 43 C.P.C. (4th) 293], expanded on the need for information as to the agent's expertise in family law. That case suggested affidavit evidence should be submitted specifying the requested paralegal's family law training and specifying prior approvals from other courts.

[63] Hardman J. further expanded on this in *Carroll v. Carroll*, [2000] O.J. No. 3969 (QL) (C.J.) [summarized 100 A.C.W.S. (3d) 270], finding that a judge should only consider the issue of paralegal

representation upon a formal motion by a party with supporting material. That material, the case says, should address the appropriateness of paralegal representation in the circumstances of the matters at issue in the particular case, the extent of representation requested, and the education, expertise and insurance of the agent. Even if representation is granted, Hardman J. finds that further permission would be needed for each appearance before a court.

[64] I agree with my colleagues applying Family Court rule 4(1)(*c*) that where paralegals may appear with permission, consideration should not be given to the request unless sufficient materials are provided upon which a court may exercise its discretion. This should be done by means of a motion with supporting affidavit material from both the party and from the paralegal.

[65] The party's affidavit should address the issue of availability of solicitor representation and informed consent to paralegal representation and must indicate an appreciation for the possible consequences of such representation.

[66] The paralegal's affidavit should include, at a minimum, the following:

1) the extent of the representation requested whether it be to prepare specific written materials, to make submissions on a specific motion, to examine other parties in examinations for discovery or cross-examinations, to represent in a pretrial proceeding, to conduct a trial on behalf of the party, to argue an appeal, etc.;

2) the qualifications of the paralegal including education and experience;

3) how those qualifications relate to the nature of the representation requested;

4) indication of whether the paralegal is subject to the direction or supervision of anyone or any organization;

5) evidence of good character;

6) what insurance or compensation fund would be available in the event of the paralegal's negligence or fraud; and

7) indication of whether the paralegal is knowledgeable about and would be prepared to abide by any relevant code of conduct.

[67] There may well be other matters that courts will consider appropriate preconditions to paralegal representation. Amongst those one might ask what mechanism is in place to adjudicate complaints regarding a paralegal's conduct or statements of account. One might also consider which party should bear the costs of such a motion for paralegal representation in light of the fact that such representation would be considered an indulgence granted to a party. Indulgences normally carry costs consequences.

[68] Absent legislative change and regulation on the issue of paralegals, it is important for the court to proceed cautiously before approving paralegal representation where such representation might increase the expense of the litigation, delay the court process or result in inadequate or incompetent representation of a party.

[69] The more complex the process or the issues, the less likely leave would be given for paralegal representation. For example, the conduct of a trial would require an appreciation of the trial process and rules of evidence, matters that are difficult even for those who have had the benefit of significant legal education. As well, it will be an exceptional case where a paralegal is granted leave to represent a litigant on an appeal, particularly an appeal on the law. Appellate work requires knowledge of evidentiary issues that may have arisen at the first level, a knowledge of the *Rules*, an ability to write legal argument, to prepare books of relevant authorities, to draft *facta* and to make concise argument. These skills are outside the education and experience of most of today's paralegals.

[70] As perhaps an overriding principle, one must be mindful that legal representation is not confined to drafting material or appearances in court. Legal representation obliges counsel to consider at all times and from time to time the merits of their client's case. A lawyer must, with each new piece of information, assess the facts and apply the law in order to advise the client properly whether he or she should proceed with the next step in the litigation. This is a heavy if not impossible burden to place on a paralegal in all but the most routine of cases.

[71] None of this is to say that paralegal representation in court is never helpful or useful. It may well be, depending upon the factors I have enumerated and on other factors that I no doubt have failed to

consider. As the Cory Report indicates, licensing and regulation provisions for paralegals would eliminate many of the issues I have considered here. But unless such legislation is enacted, if it is, mechanisms are necessary for a judge in a particular case to determine whether a particular paralegal should be able to represent a litigant for a particular purpose.

*"Stay" Motion*

[72] With the determination that the *Rules of Civil Procedure* do apply to proceedings under the *TPA* including appeals, I turn to the landlord's motion to lift the stay pending appeal.

[73] On October 3, 2000, the Registrar of the Divisional Court stayed the order of the ORHT dated September 13, 2000, pursuant to s. 25(1) of the *SPPA* and rule 63.03(5.1). The stayed order terminated the tenancy, ordered vacant possession by September 23, 2000 and set arrears, compensation and costs. On its face, the order says that it was not disputed by the tenant.

[74] In the circumstances of failing to file a dispute or appear, the tenants had the option under the *TPA* to either move to set aside the order granted or to have it reviewed. They failed to do either. The relevant provisions with respect to the default order and the ability to move to set aside are:

192(1) The Tribunal may make an order with respect to any of the following applications without holding a hearing if the application is not disputed:

1. An application to terminate a tenancy or to evict a person, other than an application based in whole or in part on a notice of termination under section 65.

2. A landlord's application for arrears of rent, compensation . . .

. . . . .

(2) The respondent may, within 10 days after the order is issued, make a motion to the Tribunal on notice to the applicant to have the order *set aside*.

(3) An order under subsection (1) is stayed when a motion to have the order set aside is received by the Tribunal and shall not be enforced under this Act or as an order of a court during the stay.

(4) The Tribunal may set aside the order if satisfied that the respondent was not reasonably able to participate in the proceeding and the Tribunal shall then proceed to hear the merits of the application. [Emphasis added.]

[75] In this case, the tenants decided not to move to set aside the order and to thereby obtain an immediate stay of the effect of eviction and judgment for arrears. Even if the tenants learned of the order outside the ten-day period, and I do not know whether or not this is case, they could have applied for an extension of that time under rule 13.1 of the ORHT *Rules*.

[76] In the alternative, the tenants could have applied to the ORHT under the combination of s. 169(1)(a) of the *TPA* and s. 21.2 of the *SPPA* for a review of its order. The mechanism for this review is contained in Rule 27 of the ORHT's *Rules of Practice*.

[77] Without taking either step, the tenants appealed the order. In these circumstances, the merits of the appeal are, at best, tenuous. Further, the tenants have failed to pay any rent since May of this year. I see no reason why they should not pay rent pending the appeal. Accordingly, I lift the stay so that the landlord may enforce paragraphs 2, 3 and 4 of the Order, all of which deal with payment.

[78] The eviction order I treat differently. Under the predecessor *LTA*, rule 63.01(3) operated to stay, on the filing of a Notice of Appeal, any provision of the order appealed terminating the tenancy or directing that a writ of possession would issue. That rule is extant and there appears to be no similar provision with respect to the *TPA*. In the circumstances of this case, I am prepared to stay the issuance of a writ of possession provided that the appeal can be heard promptly. As this was a default order, and hence there is no further material needed from the tribunal, there is no reason why the merits of this appeal could not be heard expeditiously. If the tenants fail to pay the rent outstanding or fail to move the matter promptly to appeal, this motion may be returned to lift the partial stay with respect to the termination of the tenancy.

[79] I did not hear the landlord's motion with respect to security for costs. It is adjourned to a date to be fixed by Divisional Court, if such a date is requested by the landlord.

[80] If submissions are to be made regarding costs of the appearances before me, the tenants or counsel for the landlord may arrange a date to make those submissions through the Divisional Court Office.

*Order accordingly.*

APPENDIX A

| DATE | STYLE OF CAUSE | COURT | JUDICIARY | ORDER | SIGNED BY | REASONS ON ISSUE |
|---|---|---|---|---|---|---|
| June 10, 1994 | King v. MTHA File # DC 803/92 | Div. Ct. | McMurtry C.J. Montgomery J. Carruthers J. | Preamble shows agent representation and awards costs to Appellant. | Registrar | No |
| Jan. 10, 1995 | ManuLife v. Molyneux File # 868/94 | Div. Ct. | Steele J. | Not provided. | — | Gives costs to the agent. |
| July 4, 1995 | Contu v. Boardman File # D537/95 | Div. Ct. | Lofchik J. | Orders landlord may be represented by agent on appeal. | — | Resolves ambiguity about representation in favour of landlord. |
| April 11, 1996 | Golibowicz v. Gillespie (1996) 28 O.R. (3d) 402 | Div. Ct. | Feldman J. | — | — | Prima facie, agent not entitled to represent. |
| Nov. 4, 1996 | Banyasz v. Galbraith 94 O.A.C. 75 [1996] O.J. No. 3860 | Div. Ct. | Steele J. | — | — | — |
| Jan. 7, 1999 | Ip & Tsai v. King File # V1124/98 | OCJ (GD) | O'Connor J. | Leave to agent to represent T. | Judge | No |
| Dec. 22, 1999 | Edwards v. Hoogerwerf File # 1180/99 | Div. Ct. | Herald J. | Preamble refers to agent representation. | Registrar | No |
| Feb. 25, 2000 | Gibbs v. 2850 Jane Street File # 00-CV-185245 | SCJ | Stinson J. | Consent order shows agent representation. | Registrar | No |

| DATE | STYLE OF CAUSE | COURT | JUDICIARY | ORDER | SIGNED BY | REASONS ON ISSUE |
|---|---|---|---|---|---|---|
| March 14, 2000 | Cameron v. Narducci<br>File # 54850-00 | SCJ | Loukidelis J. | Order shows agent representation. | Registrar | No |
| April 11, 2000 | Sarkari v. Firaca<br>File # 55071/00 | Div. Ct. | Weeks J. | Consent order shows agent representation. | Registrar | No |
| April 17, 2000 | Budgello v. Rovira<br>File # 00-CU-188060 | SCJ | Wright J. | Consent order shows agent representation. | Judge | No |
| April 17, 2000 | Henry v. Rovira<br>File # 00-CU-188059 | SCJ | Wright J. | Consent order shows agent representation. | Judge | No |
| April 18, 2000 | Mohn v. Hearthstone Property<br>File # 00-CU-188062 | SCJ | Archibald J. | Order shows agent representation. | Registrar | No |
| April 25, 2000 | Edwards v. Hoogerwerf<br>File # 1180/99 | Div. Ct. | Clarke J. | Consent order shows agent representation. | Judge | No |
| May 2, 2000 | Not provided | SCJ | Lach J. | — | — | Follows O'Connor J. and allows agent representation. |
| May 7, 2000 | Gavin v. Kuyumcuoglu<br>File # 00-CV-188626 | SCJ | Ground J. | Preamble shows agent appearing. | Registrar | Do not address issue. |
| May 19, 2000 | Currier v. Nunes<br>File # 00-CV-190123 | SCJ | Nordheimer J. | Preamble shows agent representation. | Registrar | Refer to Rules or SPPA. |
| May 31, 2000 | Addai v. Greenwin Property Management<br>File # 00-CV-190577 | SCJ | Ground J. | Unopposed by L, T represented by agent, order that matter proceed under TPA, s. 193(2) and SPPA. | Registrar | Do not address issue. |

| DATE | STYLE OF CAUSE | COURT | JUDICIARY | ORDER | SIGNED BY | REASONS ON ISSUE |
|---|---|---|---|---|---|---|
| June 1, 2000 | Gavin v. Kuyumcuoglu File # 00-CV-188626 | SCJ C. | Campbell J. | Preamble shows agent representation. | Judge | Do not address issue. |
| June 20, 2000 | McKee v. Wang File # 00-CU-190578 | SCJ | Greer J. | Preamble shows agent representation and TPA and SPPA. | Unsigned | Do not address issue. |
| June 26, 2000 | Addai v. Greenwin Property File # 00-CV-190577 | SCJ | Culliity J. | Finds T permitted to be represented by agents. | Judge | — |
| July 24, 2000 | Conley v. Walker File # 247-2000 | SCJ | Snowie J. | Orders agents to represent T and that matter proceed under s. 193(2) TPA and SPPA and that Rules do not apply | | Endorsement provides decision. Draft reasons apparently prepared by Mr. Hutchens showing extensive list of authorities not signed by the judge. |
| July 26, 2000 | Gavin v. Kuyumcuoglu File # 00-CV-188626 | SCJ | Swinton J. | Preamble shows agent representation. | Unsigned | Do not address issue. |
| Aug. 9, 2000 | Smith v. Poot File # 00-CU-19509 | SCJ | Lang J. | Unopposed order shows agent representation. | Judge | No |
| Aug. 9, 2000 | Petsinis v. Escalhorda File # 00-CV-195090 | SCJ | Lang J. | Unopposed order shows agent representation. | Signature page missing | No |
| Aug. 17, 2000 | Petsinis v. Escalhorda File # 00-CV-195090 | SCJ | C. Campbell J. | Unopposed order shows agent representation. | Registrar | No |
| Sept. 5, 2000 | Freeman v. Peterson File # 56334/00 | Div. Ct. | Jenkins J. | Preamble shows agent representation. | Unsigned | No |

| DATE | STYLE OF CAUSE | COURT | JUDICIARY | ORDER | SIGNED BY | REASONS ON ISSUE |
|---|---|---|---|---|---|---|
| Sept. 5, 2000 | Riccardi v. Anthony File # 56147/00 | Div. Ct. | Eberhardt J. | Preamble shows agent representation. | Unsigned | Do not address this issue. |
| Sept. 7, 2000 | Riccardi v. Anthony File # 56147/00 | Div. Ct. | McIsaac J. | Orders agent representation under s. 10, SPPA. No leave needed. | Unsigned | Persuaded in absence of opposing submissions that agent entitled to appear. |
| Sept. 11, 2000 | Currier v. Nunes File # 00-CV-190123 | SCJ | H. Sachs J. | — | — | Reasons show agent representation. Provide costs to agent. |
| Sept. 11, 2000 | Petsinis v. Escalhorda File # 00-CV-195090 | SCJ | Nordheimer J. | Agent appeared. | — | Grants leave to appeal on issue. |
| Sept. 13, 2000 | Masuzzo v. Mancini File # 00-CV-194897 | SCJ | Backhouse J. | — | — | Endorsement orders proceeding under TPA and SPPA and permits T to appear by agent. |
| Sept. 19, 2000 | Cavalier v. Lamror File # 367/600 | SCJ | Boyko J. | Preamble, unopposed shows agent representation. | | |
| Sept. 29, 2000 | Gill v. Residential Property File # 00-CV-195628 | SCJ | Juriansz J. | — | — | Refused leave to agent representation. |
| Sept. 29, 2000 | Dovale v. MTHA File # 00-CV-197768 | SCJ | Hoilett J. | Preamble shows agent representation with leave. | Unsigned | Do not address issue. |
| Oct. 10, 2000 | Gavin v. Kuyumcuoglu File # 00-CV-188626 | SCJ | Cullity J. | Preamble shows agent representation with leave. | Unsigned | Do not address issue. |

## APPENDIX B

### A FRAMEWORK FOR REGULATING PARALEGAL PRACTICE IN ONTARIO

#### The Honourable Peter deC. Cory

Chapter IV: Areas of Permissible Practice — Provincial Boards and Tribunals

ii) Ontario Rental Housing Tribunal

I would like to thank the members of the Ontario Rental Housing Tribunal for their very helpful submissions. Again, it is apparent that there are both incompetent, unscrupulous, parasitic paralegals, who are a disgrace to the community, and hard-working, dedicated, able paralegals appearing before this Tribunal. This Tribunal welcomes the competent paralegals. I think the licensing requirement and the passing of a competency examination should be able to eliminate the "bad and the ugly" leaving only the good. There is general agreement from the lawyers' groups that licensed paralegals should be permitted to appear before this Tribunal. The competent paralegals have done very commendable work in this field and should be authorized to continue to do so.

It cannot be forgotten that this Tribunal is of great importance to members of the public. It is, after all, concerned with shelter, one of the basic necessities of life. For example, when funds are scarce, an increase in rent will have great significance for a family. Indeed, it might have quite tragic consequences. Tenants, as well as land-lords, should have access to competent paralegals to present their position, and to act on their behalf at a reasonable fee.

It has been recommended that all licensed paralegals must have passed a quali-fying examination to appear before this specialized Tribunal. I am pleased to note that accredited community colleges, particularly Sheridan Community College, are providing courses that include specific reference to landlord and tenant matters, and procedures and advocacy before this Tribunal. As well, they are prepared to provide a course for those who wish to take the competency examination. Indeed, Sheridan College indicated that it would make the courses available in the evening as well as during the day.

In my view, if a licensed paralegal has established the requisite competence to appear before this Tribunal then that paralegal is competent to take the first level of appeal of its decision. In *Coutu v. Boardman*,[2] a decision of the Justice Lofchik sitting as a member of the Divisional Court, it was held that the landlord might be represented by an agent of her choice in the appeal. In addition, the 1999 decision of Justice Terrance O'Connor of the Divisional Court in *Lai Sheung Ip v. King*[3] authorized an agent to appear for the appellant tenants on an appeal from the Ontario Rental Housing Tribunal. *King v. Metropolitan Toronto Housing Authority*[4] was heard by a panel of three judges of the Divisional Court with Chief Justice Mr. McMurtry presiding. It considered an appeal under the previous *Landlord and Tenant Act*,[5] and ordered that costs be paid to an agent who was a paralegal.

Other decisions of the Divisional Court have refused to permit paralegals to appear on appeals under the previous *Landlord and Tenant Act*, and have held that

the parties must appear in person or by a solicitor.[6] These cases have referred to the need for "special circumstances" before an agent would be allowed to represent a party on an appeal. Yet, in my view, it is significant that at least some of the judges of the Divisional Court have recognized the utility of allowing agents to appear on the first level of appeal.

In passing, I must refer to the reasons of the Divisional Court in *1109222 Ontario Ltd. v. Murad*.[7] There it was observed that the conduct of the paralegal appearing for the landlord on an appeal from a decision of the Ontario Rental Housing Tribunal was, to say the least, unfortunate. If paralegal regulation had been in force at that time, his conduct would have been the subject of an investigation. It is unfortunate that this person, who was put forward as a leading member of a paralegal organization, should have acted in such a manner that his conduct was the subject of severe criticism.

Qualified paralegals should be authorized to appear at the first level of appeal from this Tribunal. It is true that an appeal may set a precedent. However, it seems unnecessary and unrealistic to prohibit licensed paralegals from taking the appeal if they are requested to do so by a member of the public. They have demonstrated their competence and awareness of the pertinent issues before the Tribunal.

It was argued by the legal organizations that, if I was to decide to allow licensed paralegals to appear on an appeal, the appeal should only be taken by the same paralegal who dealt with the matter in the first instance. I do not agree with their position. Licensed paralegals have demonstrated their competency both in terms of passing the special examination and in their work before this Tribunal. It is their demonstrated competency that permits them to appear in the first level of appeal from a decision of the Tribunal.

I have been told that the fees of a paralegal would be significantly lower than that of a lawyer taking the appeal. If this is not the case, lawyers will undoubtedly make known their lower fees and their willingness to take these appeals at the lower fees.

### ENDNOTES

To Appendix B

2   Unreported (Ont. Div. Ct., File No. D537/95, July 4, 1995).

3   Unreported (Ont. Div. Ct., File No. V11124/98, January 7, 1999).

4   Unreported (Ont. Div. Ct., File No. DC 803/92, June 10, 1994).

5   R.S.O. 1990, c. L.7.

6   See *Gotlibowicz v. Gillespie* (1996), 47 C.P.R. (3d) 96 (Ont. Div. Ct.) and *Banyasz v. Galbraith* (1996), 94 O.A.C. 75, 7 C.P.C. (4th) 307 (Ont. Div. Ct.).

7   Unreported (Ont. Div. Ct., File No. 465/98, September 17, 1999).



# TAB10

CITATION: Expedition Helicopters Inc. v. Honeywell Inc., 2010 ONCA 351
DATE: 20100514
DOCKET: C51719

## COURT OF APPEAL FOR ONTARIO

O'Connor A.C.J.O., Gillese and Juriansz JJ.A.

BETWEEN

Expedition Helicopters Inc.

Plaintiff (Respondent)

and

Honeywell Inc.

Defendant (Appellant)

Susan M. Brown, for the appellant

Paul J. Pape and David S. Steinberg, for the respondent

Heard: April 21, 2010

On appeal from the decision of Justice L.L. Gauthier of the Superior Court of Justice dated January 21, 2010, with reasons reported at 2010 ONSC 732.

**Juriansz J.A.:**

## A. INTRODUCTION

[1] Honeywell Inc. ("Honeywell") appeals from the decision of Gauthier J. dismissing its motion to enforce a forum selection clause in a Bailment Agreement (the "Agreement") by staying the action of Expedition Helicopter Inc ("Expedition"). The Agreement related to a helicopter engine that Honeywell provided to Expedition. The

2010 ONCA 351 (CanLII)

Expedition helicopter in which the engine was installed crashed in northern Saskatchewan, resulting in the death of the pilot and a passenger, as well as the complete loss of the helicopter. Expedition commenced an action in Ontario for damages arising out of the crash. Honeywell brought a motion to stay the Ontario action because the Agreement provided that the courts of Arizona have exclusive jurisdiction over all proceedings "arising out of or in connection with this Agreement."

[2]     I would allow the appeal. The motion judge did not state or apply the correct test for enforceability of a forum selection clause and reached the wrong result.

## B. ANALYSIS

[3]     Expedition is incorporated in Ontario and has its head office in Cochrane, Ontario. It operates a fleet of eleven helicopters for charter. Honeywell is a Delaware corporation which operates globally.    The leased engine was manufactured in Williamsport, Pennsylvania and converted to the specific configurations required by Expedition at Honeywell's facility in Greer, South Carolina. The Greer facility is managed by a Honeywell division based in Phoenix, Arizona.

[4]     The relationship between the two companies is such that the replacement engine was shipped, installed and in use before the Agreement was signed.

[5]     The forum selection clause in the Agreement provided as follows:

> CHOICE OF LAW. THIS AGREEMENT SHALL BE GOVERNED, CONTROLLED AND INTERPRETED UNDER THE LAW OF THE STATE OF ARIZONA, EXCLUDING ITS CONFLICT OR CHOICE OF LAW PROVISIONS. The parties (i) agree that any state or

2010 ONCA 351 (CanLII)

federal court located in Phoenix, Arizona shall have exclusive jurisdiction to hear any suit, action or proceeding arising out of or in connection with this Agreement, and consent and submit to the exclusive jurisdiction of any such court in any such suit, action or proceeding and (ii) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding to the extent permitted by the applicable law, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or any of the transactions contemplated hereby may not be enforced in or by such courts.

## 1) The test for enforceability of forum selection clauses

[6]     The motion judge recognized that the Supreme Court of Canada's decision in *Z.I. Pompey Industrie v. ECU-Line N.V.*, [2003] 1 S.C.R. 450, is the governing authority regarding the enforcement of a forum selection clause. *Pompey* confirmed the exercise of the court's discretion not to enforce a forum selection clause is governed by the "strong cause" test first stated in the British case *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237 (Adm. Div.). The test in *The "Eleftheria"* as quoted in *Pompey* at para. 19, is as follows:

> (1) Where plaintiffs sue in England in breach of an agreement to refer disputes to a foreign Court, and the defendants apply for a stay, the English Court, assuming the claim to be otherwise within the jurisdiction, is not bound to grant a stay but has a discretion whether to do so or not. (2) The discretion should be exercised by granting a stay unless strong cause for not doing so is shown. (3) The burden of proving such strong cause is on the plaintiffs. (4) In exercising its discretion the Court should take into account all the circumstances of the particular case. (5) In particular, but without prejudice to (4), the following matters, where they arise, may be properly regarded: (a) In what country the evidence on the issues of fact is situated, or more readily available, and the effect of that on the relative convenience and expense of trial as between the English and foreign Courts. (b)

2010 ONCA 351 (CanLII)

Whether the law of the foreign Court applies and, if so, whether it differs from English law in any material respects. (c) With what country either party is connected, and how closely. (d) Whether the defendants genuinely desire trial in the foreign country, or are only seeking procedural advantages. (e) Whether the plaintiffs would be prejudiced by having to sue in the foreign Court because they would (i) be deprived of security for that claim; (ii) be unable to enforce any judgment obtained; (iii) be faced with a time-bar not applicable in England; or (iv) for political, racial, religious or other reasons be unlikely to get a fair trial.

[7]     This 1969 British test is best appreciated by what Bastarache J., writing for the Supreme Court, said about it in *Pompey* in 2003. Bastarache J. provided clear guidance as to how it should be understood and applied in Canada.

[8]     The central thrust of the *Pompey* decision is that the law favours the enforcement of forum selection clauses. In a brief overview of the law, Bastarache J. observed "[f]orum selection clauses are common components of international commercial transactions", they have, "been applied for ages in the industry and by the courts", they "are generally to be encouraged by the courts as they create certainty and security in transaction, derivatives of order and fairness, which are critical components of private international law", and "[i]t is essential that courts give full weight to the desirability of holding contracting parties to their agreements."

[9]     Bastarache J. noted that there is a similarity between a number of the factors of the test in *The "Eleftheria"* and those considered when applying the *forum non conveniens* doctrine in ordinary cases without a forum selection clause. He then went on to clearly reject the approach of considering the forum selection clause as but one factor of a

2010 ONCA 351 (CanLII)

conventional *forum non conveniens* analysis. He described that kind of analysis as the "unified approach to *forum non conveniens*". He explained that a "different test" and "separate approach" were required. The "starting point", he said, should be "that parties should be held to their bargain". Bastarache J. adopted the view of E. Peel in "Exclusive jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998] L.M.C.L.Q. 182, at pp. 189-90, that the unified approach would not:

> ...ensure that full weight is given to the jurisdiction clause since not only should the clause itself be taken into account, but also the effect which it has on the factors which are relevant to the determination of the natural forum. Factors which may otherwise be decisive may be less so if one takes into account that the parties agreed in advance to a hearing in a particular forum and must be deemed to have done so fully aware of the consequences which that might have on, for example, the transportation of witnesses and evidence, or compliance with foreign procedure etc.

[10] Therefore, Bastarache J. rejected the "unified approach to *forum non conveniens*" in favour of a "separate approach" that "ensures that these considerations are properly taken into account and that the parties' agreement is given effect in all but exceptional circumstances." He observed that:

> The "strong cause" test reflects the desirability that parties honour their contractual commitments and is consistent with the principles of order and fairness at the heart of private international law, as well as those of certainty and security of transaction at the heart of international commercial transactions.

[11] Thus, even though the literal wording of the test in *The "Eleftheria"* may imply a conventional *forum non conveniens* analysis, *Pompey* makes clear that such an analysis is

2010 ONCA 351 (CanLII)

Page: 6

not to be used. Rather, the forum selection clause pervades the analysis and must be given full weight in the consideration of other factors. It is not enough for the plaintiff to establish a "strong" case that Ontario is the more convenient forum. The plaintiff must show "strong cause" that the case is exceptional and the forum selection clause should not be enforced.

### 2) The motion judge's approach

[12]   The motion judge in this case conducted a *forum non conveniens* analysis in which she regarded the forum selection clause as but one factor to be considered, and a subsidiary one at that. She did not give full weight to the clause, and she did not consider the effect it had on the factors relevant to the *forum non conveniens* analysis. For example, she considered the location of witnesses and the procedures of the Arizona courts without taking into account that Expedition, by agreeing to the clause, had accepted at the time it entered into the contract that it would have to transport its witnesses to Arizona and resolve any claim it might bring according to the law and procedures of Arizona. In *Pompey*, Bastarache J. was not satisfied that even litigation costs disproportionate to the amount of the claim was reason enough to refuse to enforce a forum selection clause.

[13]   The marginal weight the motion judge placed on the clause is most evident in that part of her reasons where she sets out the argument in favour of enforcing it. There she discusses only factors relevant to *forum non conveniens* and does not even mention the

2010 ONCA 351 (CanLII)

clause. She alludes to the public policy that parties honour their contractual commitments and the principles of order and fairness at the heart of private international law only in setting out Honeywell's position and not in her analysis of the factors.

[14] The motion judge's failure to use the proper overall approach in applying the test is sufficient reason to set aside her decision. However, it may be of assistance to future cases to discuss the analysis she did conduct.

[15] The motion judge did not mention that the forum selection clause provided that "THIS AGREEMENT SHALL BE GOVERNED, CONTROLLED AND INTERPRETED UNDER THE LAW OF THE STATE OF ARIZONA". Quite to the contrary, it seems the motion judge may have assumed the case would be governed by the law of the jurisdiction in which it proceeded. She observed that the plaintiff's claim in Arizona might be dismissed because under the law of Arizona the issue would arise as to whether it had been "timely filed", and noted that in Ontario such an issue would not arise. There was no basis for the motion judge's apparent assumption that, if the case proceeded in Ontario, the law of Ontario would apply. The motion judge should have considered that the clause provided that the law of Arizona would apply.

[16] As it happens, the fresh evidence shows there is no issue of "timely filing" under the law of Arizona. Counsel for Expedition acknowledged that the expert evidence about Arizona law that Expedition filed before the motion judge was directed only to the applicable limitations period in Arizona. In any event, as counsel for Expedition recognized during argument, a party should not be able to take advantage of its own

2010 ONCA 351 (CanLII)

failure to bring an action in the proper jurisdiction in a timely way to create prejudice that would justify excusal from the forum selection clause.

[17] The motion judge also failed to accord sufficient weight to Expedition's commencement of an action in Arizona. She observed that Expedition's action in Arizona "was instituted to preserve the claim within the limitation period." Be that as it may, instituting an action in Arizona was an act of attornment. Clearly, Expedition has conceded that the Arizona court has jurisdiction and that it is feasible that the claim proceed in Arizona.

[18] Expedition's institution of an action in Arizona raises the factor of the multiplicity of proceedings. The motion judge discounted this factor because of Expedition's undertaking to abandon the Arizona action if the Ontario action were allowed to proceed. The motion judge should have at least considered whether a judgment obtained in Ontario would be enforced by the court in Arizona if that court concluded that the action should have proceeded in Arizona. Expedition filed no evidence on this issue.

[19] The motion judge erred by attaching weight to Honeywell's concession that Ontario was the appropriate and convenient forum for the trial of the wrongful death action of the passenger in the helicopter. That action was not governed by the forum selection clause. As explained above, whether Ontario is the convenient forum is not the proper question in a case with a forum selection clause.

2010 ONCA 351 (CanLII)

[20]   In her analysis, the motion judge should have contrasted the jurisdictions of Arizona and Ontario. Instead, she considered the appropriateness and convenience of the claim proceeding in Arizona on the one hand and Canada on the other. For example, the fact the helicopter crashed in Saskatchewan provides little support for trying the case in Ontario.

[21]   The motion judge considered significant expert evidence indicating that Canadian witnesses were beyond the reach of the Arizona court's subpoena power. She could have made the equivalent observation about the reach of the Ontario court's subpoena power in relation to American witnesses. Given the cross-border methods of obtaining evidence from friendly jurisdictions, this factor was not deserving of weight one way or the other.

[22]   Finally, the motion judge set out only a portion of the test in *The "Eleftheria"*. She omitted the portion of the test that asks whether the plaintiff would be prejudiced by having to sue in a foreign country. While some of her discussion touched on aspects of prejudice to the plaintiff, she did not consider the main concern — whether the plaintiff could expect a fair trial in the selected forum.

[23]   In this case, there is no reason to depart from the presumption that Expedition should be held to the bargain that it made. A departure is only justified in "exceptional circumstances", as Bastarache J. stressed in *Pompey*. There is nothing exceptional about this case. As discussed above, the analysis of whether there is "strong cause" to decline to enforce a forum selection clause is not an analysis of the *forum conveniens* in the

2010 ONCA 351 (CanLII)

conventional sense. In this case Expedition may have established that it will experience some inconvenience in the conventional sense in having to assert its claim in Arizona. That inconvenience does not justify permitting it to resile from its agreement in this commercial contract to tolerate that inconvenience.

[24] A forum selection clause in a commercial contract should be given effect. The factors that may justify departure from that general principle are few. The few factors that might be considered include the plaintiff was induced to agree to the clause by fraud or improper inducement or the contract is otherwise unenforceable, the court in the selected forum does not accept jurisdiction or otherwise is unable to deal with the claim, the claim or the circumstances that have arisen are outside of what was reasonably contemplated by the parties when they agreed to the clause, the plaintiff can no longer expect a fair trial in the selected forum due to subsequent events that could not have been reasonably anticipated, or enforcing the clause in the particular case would frustrate some clear public policy. Apart from circumstances such as these, a forum selection clause in a commercial contract should be enforced.

[25] None of these factors has been shown in this case. There was no basis to refuse the stay of proceedings.

## C. CONCLUSION

[26] I would allow the appeal, set aside the order of the motion judge, and enter a stay of proceedings. The appellant's costs of the appeal are fixed in the amount of $25,000.00

inclusive of disbursements and GST. The appellant is entitled to its costs before the

motion judge. Those costs shall be in the amount that the motion judge awarded to the

respondent.

"R.G. Juriansz J.A."
"I agree D. O'Connor J.A."
"I agree E.E. Gillese J.A."

RELEASED: May 14, 2010

2010 ONCA 351 (CanLII)



# TAB11

## Case Name:
## Intertan Canada Ltd. (Re)

### IN THE MATTER OF the Companies' Creditors Arrangement
### Act, R.S.C. 1985, c. C-36, as amended
### AND IN THE MATTER OF a plan of compromise or
### arrangement of Intertan Canada Ltd. and Tourmalet
### Corporation, Applicants

[2009] O.J. No. 293

49 C.B.R. (5th) 232

2009 CarswellOnt 324

Court File No. 08-CL-7841

Ontario Superior Court of Justice
Commercial List

### G.B. Morawetz J.

Heard: January 14 and 16, 2009.
Judgment: January 23, 2009.

(62 paras.)

[Editor's note: Supplementary reasons for judgment were released February 10, 2009. See [2009] O.J. No. 535.]

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters -- Application of Act -- Affiliated debtor companies -- Motion by the monitor Alvarez & Marsal Canada for an order extending a status quo order allowed -- An agreement concerning the applicants Intertan et al. had been made under the Companies' Creditors Arrangement Act -- The monitor sought an order prohibiting the applicants from transferring money or assets to US affiliates or lenders pursuant to a US facility agreement -- The CCAA proceedings were separate from the US proceedings -- The interests of the applicants' creditors and stakeholders must be protected -- The status quo order was continued.*

*Bankruptcy and insolvency law -- Proceedings -- Practice and procedure -- Injunctions -- Orders --*

*Interim or interlocutory orders -- Motion by the monitor Alvarez & Marsal Canada for an order extending a status quo order allowed -- An agreement concerning the applicants Intertan et al. had been made under the Companies' Creditors Arrangement Act -- The monitor sought an order prohibiting the applicants from transferring money or assets to US affiliates or lenders pursuant to a US facility agreement -- The CCAA proceedings were separate from the US proceedings -- The interests of the applicants' creditors and stakeholders must be protected -- The status quo order was continued.*

Motion by the monitor Alvarez & Marsal Canada for an directions and an order extending a status quo order. An agreement between the applicants Intertan Canada and Tourmalet and certain of its creditors had been made under the Companies' Creditors Arrangement Act. The monitor sought an order prohibiting the applicants from transferring money or assets to US affiliates or lenders. The monitor claimed that the order was necessary to protect the interests of the applicants and their creditors. The monitor claimed that debtor arrangements by the applicants' US affiliates would impact on the applicants and their stakeholders by requiring a transfer of assets from the applicants to satisfy the US creditor arrangement. The applicants were party to a common facility with the US affiliates, which would give priority to certain US creditors.

HELD: Motion allowed. The CCAA proceedings were clearly separate from the US proceedings. While there was a common facility, the interests of the applicants' creditors and stakeholders must be protected. The status quo order was continued until further order of the court.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 11

Ontario Rules of Civil Procedure, Rule 37.14, Rule 59.06

**Counsel:**

Edward Sellers and Jeremy Dacks, for the Applicants.

Orestes Pasparakis and Mario Forte, for Bank of America N.A.
(Canadian Branch), DIP Lender and Canadian Agent.

Fred Myers, Jay Carfagnini and L. Joseph Latham for Alvarez & Marsal Canada ULC, Monitor.

Paul MacDonald, for Rothschild Canada.

Keven McElchern and J. Salmas, for the Cadillac Fairview Corporation Limited.

Alexandra Lev-Farrell and Antonio Dimilta, for Monarch Construction Limited et al.

Linda Gallessiere, for OMERS Realty Management Corporation, Ivanhoe Cambridge 1 Inc., Morguard Investments Limited and 20 VIC management Inc. on behalf of OPB Realty Inc., Retrocom Limited Partnership and 920076 Ontario Limited o/a The Southridge Mall.

E. Patrick Shea, for Unsecured Creditors' Committee in Chapter 11 Proceedings.

H. Garman, for Garmin International, Inc.

J. Davis-Sydor, for FotoSource.

Margaret Sims, for VFC Inc.

Natalie Renner, for Star Choice Communications Inc.

---

## ENDORSEMENT

**1    G.B. MORAWETZ J.**:-- Alvarez & Marsal Canada ULC (the "Monitor" or "A&M") brings this motion for directions. In particular the Monitor requests an order extending the order of this court made December 24, 2008, (the "Status Quo Order") so that the Applicants shall not:

> (i)    distribute or otherwise permit the payment of any of the Applicants' property to any of their affiliates or lenders, provided that nothing prevents the distribution or payment of such proceeds to the DIP Lenders in accordance with the Amended and Restated Initial Order dated November 10, 2008, and the DIP Agreement (defined therein) on account of direct indebtedness owing by the Applicants to the DIP Lenders; or
>
> (ii)    make any advances to any of its U.S. affiliates.

**2**    The Monitor also requests an order directing that, notwithstanding the Amended and Restated Initial Order, no amount shall be paid to the DIP Lenders pursuant to the DIP Lenders' Charge listed as item number "six" in paragraph 44 of the Amended and Restated Initial Order (the "Sixth Charge") unless this court is satisfied that the DIP Lenders have exhausted all recourse they may have to realize proceeds from all other sources of recovery that may be available to them from the property and assets of the borrowers other than the property and assets of the Applicants.

**3**    Further, an order that the claims of the DIP Lenders under the Sixth Charge shall be reduced by the amount of the proceeds of the furniture, fixtures and equipment ("FF&E") of the U.S. Debtors and by an amount equal to the value or proceeds of any assets of the U.S. Debtors that were encumbered in the initial proposed DIP Facility which may be no longer subject to the DIP Facility approved in the U.S. Bankruptcy Court proceedings hy order dated December 23, 2008.

**4** Finally, the Monitor requests an order pursuant to the Second Amendment to the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of December 19, 2008 and, in particular, paragraph 7(b) thereof, that until such time as this court orders otherwise, this court has made no determination to allow any payment to be made pursuant to the Sixth Charge to be paid directly or indirectly to the estates of any of the U.S. affiliates of the Applicants or to any of the creditors of those entities.

**5** The position of the Monitor is set forth in a very detailed Third Report. The Monitor is of the view that the circumstances under which the Initial Order was made, as amended by the Amended and Restated Initial Order and, in particular, the extraordinary nature of the relief granted in favour of the DIP Lenders have subsequently been determined to have changed and warrant the protection of the interests of the Applicants and their creditors by the relief sought.

**6** The Monitor relies upon paragraph 53 of the Amended and Restated Initial Order which provides that the Applicants or the Monitor may from time to time apply to the court for advice and directions in the discharge of their powers and duties. In addition, reference was made to s.11 of the *CCAA*, Rules 37.14 and 59.06 as well as the inherent jurisdiction of this court to control its own process. I recite the grounds for bringing the motion as the Applicants have raised a concern that this is not a proper motion for directions.

**7** Counsel for the Applicants questioned whether this was a proper motion to set aside or vary an order or to amend same. In my view, it is not necessary to consider whether there is technical compliance with Rules 37.14 and 59.06. I am satisfied that this court has the inherent jurisdiction to consider this motion. The Court of Appeal in the recent decision of *TeleZone Inc. v. Attorney General (Canada)*, [2008] O.J. No. 5291, 2008 ONCA 892 made reference to a previous decision of the Court of Appeal in *80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd. et al*, [1972] 2 O.R. 280 (C.A.) where at p. 282, Brooke J.A. stated:

> As a superior Court of general jurisdiction, the Supreme Court of Ontario has all of the powers that are necessary to do justice between the parties. Except where provided specifically to the contrary, the Court's jurisdiction is unlimited and unrestricted in substantive law in civil matters.

Borins J.A. stated, after referring to this quotation, as follows: "Brooke J.A. was of the view that no cause should fail for want of remedy".

**8** In this case, I am of the view that this motion should be heard. I am satisfied that it is appropriate for the Monitor to bring a motion of this type, in fulfillment of its obligations as court-appointed Monitor under s.11 of the *CCAA*. In my view, in these particular circumstances, in view of the fact that InterTAN Canada Ltd. (InterTAN") does not have a functioning Board of Directors, the intervention of the Monitor is certainly appropriate. On October 7, 2008, InterTAN, Inc., in its capacity as sole shareholder of InterTAN, executed a Unanimous Shareholder Declaration ("USD") pursuant to the *Business Corporations Act (Ontario)* wholly relieving the

Board of Directors of InterTAN of its directorial powers and assuming those powers unto itself. Members of the Board of Directors of InterTAN have been functioning in a managerial role since that time.

**9**    In view of the decision-making process of the Applicants, I am of the view that it is entirely appropriate for the Monitor to bring forth this motion in the interests of the Applicants and their creditors and, I might add, I find it surprising that the Applicants would in any way question the authority of the Monitor to bring forth such a motion.

**10**    The Monitor, as a court officer, has a role to play in these proceedings and, in my view, it would be remiss if it did not bring forth its concerns to the court.

**11**    The Monitor is of the view that circumstances warrant the protection of the interests of the Applicants and their creditors by the requested relief. The concerns of the Monitor relate directly to arrangements entered into in the Chapter 11 proceedings of *Circuit City Stores Inc. et al* (the "Chapter 11 Proceedings"). The Chapter 11 debtors are hereinafter referred to as (the "U.S. Debtors"). InterTAN, Inc. is directly or indirectly involved in the Chapter 11 Proceedings.

**12**    On November 10, 2008, the U.S. Debtors filed a motion for interim and final Orders of the U.S. Court authorizing post-petition financing under the DIP Facility (the "DIP Motion"). The U.S. Court granted an interim order approving the DIP Facility on November 10, 2008, with a view to hearing additional objections with respect to the DIP Facility before granting a final order with respect to the DIP Motion at a later date.

**13**    The Monitor reports that a number of objections to the final approval of the DIP Facility were subsequently filed in the Chapter 11 Proceedings. The Monitor understands that the Unsecured Creditors' Committee in the Chapter 11 Proceedings (the "UCC") raised a number of objections to final approval of the DIP Facility.

**14**    The Monitor further reports that on December 20, 2008, counsel for the U.S. Debtors advised the Monitor's U.S. counsel that the UCC's objections to the DIP Motion had been settled. On December 21, 2008, the Monitor was provided with the Draft Second Amendment dated as of December 19, 2008 intended to be executed by the U.S. Debtors, the DIP Lenders and InterTAN.

**15**    Paragraph 5 of the Draft Second Amendment provides, in part, as follows:

> 5.    <u>Amendment to DIP Orders and Initial Orders</u> - The Borrowers and the Required Lenders hereby agree that the terms of the DIP Orders and the Initial Order may be amended as follows:
>
> ...

(b)    to provide that the Liens granted under the Initial Order with respect to the Property may be limited to provide that after payment of clauses one through five of Section 44 of the Initial Order, fifty (50%) percent of the remaining proceeds of such Property shall be used to pay the DIP Lenders' Charge set forth in clause six of Section 44 of the Initial Order, and the balance shall be available to be distributed to the Domestic Loan Parties (to the extent allowed by the Canadian bankruptcy court) and retained by the estate and not applied in reduction of the Obligations.

(c)    to permit the proceeds from the Domestic Loan Parties' furniture, Fixtures and Equipment to be retained by the estate and not applied in reduction of the Obligations.

**16**    After an initial review, the Monitor concluded that the Draft Second Amendment would impact the Canadian proceedings and Canadian stakeholders.

**17**    As a result of the Monitor's concerns, a scheduling motion was heard by me at 9:30 a.m. on December 23, 2008. This court was advised that amendments were being contemplated to the Draft Second Amendment. A further hearing was held on December 24, 2008, at which time this court was provided with an unsigned copy of the Final Second Amendment and a copy of the final U.S. DIP Order. This court then scheduled the hearing of this motion and indicated an intention to make an order prohibiting the distribution of proceedings of the Applicants' Property and any inter-company advances from the Applicants to any of its U.S. affiliates. This resulted in the Status Quo Order.

**18**    On December 23, 2008, the U.S. Bankruptcy Court granted final approval of the Applicants' DIP borrowing. Paragraph 2(e) of this order provides, in part:

> Notwithstanding the grant of the DIP Liens (a) the net proceeds, if any, realized after the date of this Final Order from the disposition of the Debtors' Equipment and Fixtures shall be paid to the Debtors' estates and not applied in reduction of the DIP Obligations or the Pre-Petition Debt; and (b) fifty percent (50%) of the net proceeds, if any, received by the DIP Lenders under the DIP Lenders' Charge set forth in clause six of Section 44 of the Initial Order (as amended and in effect) entered into in the CCAA proceedings of InterTAN Canada Ltd. (as ameded [sic] and in effect, the "CCAA Initial Order") shall be paid to the Debtors' estates and not applied in reduction of the DIP Obligations or the Pre-Petition Debt. <u>For the avoidance of doubt, nothing in this Final Order, the DIP Credit Agreement, or any amendment thereto, including without limitation, the prior DIP Amendments, shall amend or modify the terms and conditions of the CCAA Initial Order in any respect. In the event of any inconsistency between the terms and conditions of the Final Order and the CCAA Initial Order with respect to (i) InterTAN Canada Ltd. and any other Canadian Subsidiary of</u>

> Circuit City Stores, Inc., which are debtor companies in the Canadian
> Bankruptcy Case (collectively, the "Canadian Debtors") or (ii) the assets of the
> Canadian Debtors, the CCAA Initial Order shall control. (emphasis added)

**19**    A copy of the executed, finalized Second Amendment to the Senior Secured, Super- Priority, Debtor-in-Possession Credit Agreement (the "Final Second Amendment") has been filed with this court. Although InterTAN is recited as a party to the Final Second Amendment, it is not a signatory to the document.

**20**    Paragraph 7 of the Final Second Amendment provides, in part:

>       7.    <u>Amendment to DIP Orders</u> - The Borrowers and the Required Lenders hereby
>             agree that the terms of the DIP Orders may be amended as follows:
>
>             ...
>
>       (b)   to provide that fifty percent (50%) of the net proceeds, if any, received by the
>             DIP Lenders under the DIP Lenders' Charge set forth in clause six of Section 44
>             of the Initial Order (as amended and in effect) entered into [sic] the CCAA
>             proceedings of InterTAN Canada Ltd. shall be paid to the Debtors' estates (<u>to the
>             extent allowed by the Canadian bankruptcy court</u>) and not applied in reduction of
>             the DIP Obligations or the Pre-Petition Debt,
>       (c)   to permit the proceeds from the Domestic Loan Parties furniture, Fixtures and
>             Equipment to be retained by the estate and not applied in reduction of the
>             Obligation. (emphasis added)

**21**    Prior to these proceedings, the Applicants were not liable to their secured lenders for the indebtedness of the U.S. affiliates. Neither the secured nor the unsecured creditors of the U.S. Debtors had any entitlement to share in the proceeds of the Applicants' assets as a means to realize their claims against the U.S. Debtors, other than through the U.S. Debtors as equity holders after payment of all creditors of the Applicants.

**22**    The Applicants moved for approval of the DIP Facility at its initial hearing in these proceedings on November 10, 2008. Court approval of the DIP Facility was granted on that day with reasons to follows, which were released on November 26, 2008.

**23**    The Monitor reports at paragraph 65 of its Third Report that the DIP Lenders' Charge (as defined at paragraph 37 of its Amended and Restated Initial Order) was extraordinary because it was broader in scope (i.e. it charges more assets) than the lenders' pre-existing security and because it gave priority claims to the DIP Lenders against assets of the Applicants in respect of amounts owed by the U.S. Debtors ahead of the pre-existing claims of unsecured creditors of the Applicants.

It was recognized, at the time of the hearing, that the DIP Lenders' Charge was potentially prejudicial to pre-existing trade creditors.

**24** In an effort to address this issue of prejudice, the Applicants proposed a structure under which the DIP Lenders would have priority for the repayment of direct borrowings by InterTAN, followed by the Canadian Creditor Charge, which was to provide certain protection to pre-existing trade creditors of InterTAN in the amount of $25 million, and thereafter the DIP Lenders would have priority for any remaining DIP borrowings.

**25** Under paragraph 37 of the Amended and Restated Initial Order, the DIP Lenders were entitled to and were granted the benefit of a DIP Lenders' Charge on the "Property" of the Applicants. Property covered the Applicants' current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds.

**26** Subsequently, the extent of the Canadian Creditor Charge was revised on the basis that the Directors' Charge may not be fully required. The amendment to the Canadian Creditor Charge was incorporated at paragraph 43 of the Amended and Restated Initial Order. This amendment was made on or about December 5, 2008.

**27** At paragraph 70 of the Third Report, the Monitor reports that, from the Final Second Amendment, it now appears that the UCC raised concerns with respect to, among other things, the widening of the scope of the security covered by the DIP Facility to include assets that were not previously encumbered under pre-existing security. The Monitor goes on to report that unlike the situation in Canada, the DIP Lenders and the U.S. Debtors effectively agreed with the UCC to exclude the pre-petitioned unencumbered FF&E from the scope of the DIP security in the U.S. The Monitor's concluding comments in paragraph 70 are as follows:

* The Final Second Amendment provides that:

> (a) the proceeds from the furniture, fixtures and equipment of the U.S. Debtors are to be retained by the U.S. estate for the benefit of the U.S. unsecured creditors rather than being used by the DIP Lenders to reduce the obligations owing to them by the U.S Debtors; and
>
> (b) half of all amounts paid under the Sixth Charge, if any, are to be paid to the U.S. estate for the benefit of the U.S. unsecured creditors and will not reduce amounts owing to the DIP Lenders.

**28** The Monitor's conclusions are set out at paragraphs 71-78 of the Third Report which provide as follows:

> 71. Therefore, the security that the Monitor and this Court were advised was a non-negotiable condition precedent to the DIP Lenders' provision of the DIP

Facility, without which the Applicants and the U.S. Debtors would fail, has been bartered away by the U.S. Debtors and the DIP Lenders to unsecured creditors of the U.S. Debtors to settle their complaints as to the proposed terms of the DIP Facility. That is, rather than simply supporting the need for the DIP Lenders to be re-paid amounts advanced to the U.S. Debtors, the Sixth Charge has been used as a form of value or currency in negotiations with the UCC.

72. By enabling the DIP Lenders to share half of the Sixth Charge with the unsecured creditors of the U.S. Debtors, the Final Second Amendment makes proceeds of the assets of the Applicants available to unsecured creditors of the U.S. Debtors without any assurances that the unsecured creditors of the Applicants will be paid in full. This was not what the Monitor understood to be the purpose of the granting of the Sixth Charge to the DIP Lenders and is not consistent with the purposes of the accommodation that the Court was asked to grant. Rather than protecting the DIP Lenders' ability to be re-paid from Canadian assets for U.S. lending while protecting Canadian unsecured creditors and supporting the North American operations, the Final Second Amendment potentially allows unsecured creditors of the U.S. Debtors, which have no claims against the Applicants, to have access to the Applicants' assets and achieve recoveries ahead of the unsecured creditors of the Applicants. Therefore, the Monitor is of the view that the Final Second Amendment could have an unfair and inequitable impact on the unsecured creditors of the Applicants.

73. The Monitor notes that paragraph 7(b) of the Final Second Amendment provides that any proposed sharing of the Sixth Charge is only available "to the extent allowed by the Canadian bankruptcy court". The Monitor submits that it would be appropriate, fair and reasonable for this Honourable Court to make directions to govern the determination whether this Honourable Court is willing to allow any such sharing of the Sixth Charge.

74. The Monitor had been advised by the U.S. Debtors that the purpose of negotiations with the UCC was to obtain further credit that would decrease the likelihood of claims being made into Canada. In fact, by allowing the U.S. estate to access the value of the furniture, fixtures and equipment of the U.S. Debtors, the Final Second Amendment would potentially reduce the recoveries by the DIP Lenders in the Chapter 11 Proceedings and thus *increase* the likelihood that the DIP Lenders will need to have recourse to the Sixth Charge. Accordingly, the Monitor submits that, to the extent that any proceeds of the U.S. Debtors' assets are ultimately not used to repay the DIP Lenders, the equivalent amount ought to be deducted from the obligations owing by the Applicants to the DIP Lenders and the Sixth Charge should be likewise reduced.

75. During the 9:30 hearing on December 23, 2008 this Honourable Court was advised that the intention of parties to the Draft Second Amendment was that it would not allow a "double dip" (i.e. to the extent the DIP Lenders either shared

the proceeds of the DIP Lenders' Charge or did not claim the proceeds of the U.S. Debtors' furniture, fixtures and equipment, there would be a corresponding reduction in the DIP Obligations) and that the DIP Lenders were prepared to confirm this in writing. However, the Final Second Amendment and the U.S. Court Order of December 23, 2008 (which are quoted above in paragraphs 60 and 62 above) do not reflect this, nor does the letter dated January 8, 2009 from Canadian counsel for the DIP Lenders to the Monitor's counsel. A copy of this letter is attached as Appendix "G".

76. Until Canadian creditors' recovery is better particularized and until there is better clarity as to whether access to Canadian realization is required to protect the DIP Lenders from suffering a shortfall on their advances to the U.S. Debtors, if ever, the Monitor recommends that the Court make the following directions:

    (i)    An Order extending the Status Quo Order so that, until further Order of this Court, the Applicants shall not:

        (a)    distribute or otherwise permit the payment of any of the Applicants' property, assets and undertaking to any of their affiliates or lenders, provided that nothing herein prevents the distribution or payment of such proceeds to the DIP Lenders in accordance with the Initial Order and the DIP Agreement (defined therein) on account of direct indebtedness owing by the Applicants to the DIP Lenders; or

        (b)    make any advances to any of its U.S. affiliates;

    (ii)    An Order directing that, notwithstanding anything contained in the Initial Order, no amount shall be paid to the DIP Lenders pursuant to the DIP Lenders' Charge listed as item number "six" in paragraph 44 of the Initial Order (the "Sixth Charge") unless and to the extent that this Honourable Court is satisfied that the DIP Lenders have exhausted all recourse that they may have to realize proceeds from all other sources of recovery that may be available to them from the property and assets of the borrowers other than the property and assets of the Applicants;

    (iii)    An Order that the claims of the DIP Lenders under the Sixth Charge shall be reduced by the amount of the proceeds of the furniture, fixtures and equipment of the U.S. Debtors and by an amount equal to the value or the proceeds of any assets of the U.S. Debtors that were encumbered in the initial proposed DIP Facility which may be no longer subject to the DIP Facility approved in the U.S. Bankruptcy Court by Order dated December

23, 2008; and

(iv) An Order pursuant to the Final Second Amendment (as defined herein) and, in particular, paragraph 7(b) thereof, that, until such time, if ever, as this Honourable Court orders otherwise, this Honourable Court has made no determination to allow any payment to be made pursuant to the Sixth Charge to be paid directly or indirectly to the estates of any of the U.S. affiliates of the Applicants or to any of the creditors of those estates.

77.  In effect, the Monitor proposes that the property and assets of the U.S. Debtors should be applied first to repay direct advances by the DIP Lenders to the U.S. Debtors and only once this is completed would the Court determine the extent to which resort would be had to the Applicants' property and assets under the Sixth Charge. At that time, in accordance with the right given to this Court by the parties in paragraph 7(b) of the Final Second Amendment, the Court can determine if it will allow any sharing under the Final Second Amendment. With respect, it is the Monitor's view that this recommendation is consistent with the pre-filing state of affairs between Canada and the U.S. and their respective creditors; respects the basic concepts of the Initial Order; is responsive to the present circumstances; and allows the Sale Process and restructurings both in Canada and the U.S. to proceed with the least amount of disruption.

78.  Finally, in light of: (a) the fact the U.S. Debtors do not anticipate requiring advances from InterTAN; (b) there have been no discussions with the U.S. Debtors since November 19, 2008 as to the nature of the security to be provided to ensure the re-payment to InterTAN of any such advances in the event that they do seek to borrow from InterTAN; and (c) the concerns expressed above that access by creditors of the Applicants' affiliates to Canadian distributions should await realization on the property of all of the affiliates in any event, the Monitor therefore recommends that the Status Quo Order be extended pending further Order of this Honourable Court.

**29** The position of the Monitor is supported by counsel to Cadillac Fairview, the OMERS/Ivanhoe landlord Group, BFC, Garmin and Monarch Construction.

**30** Not surprisingly, the motion is opposed by the DIP Lenders, on the basis that if the motion is granted it would have significant ramifications:

(a)  the Applicants will be in default of the DIP Facility;

(b)  the DIP Lenders will have relied to their detriment on the Sixth Charge by making advances through the holiday season and by agreeing to subordinate their security to, *inter alia*, the $19.3 million Directors' Charge; and

(c)  significant uncertainty will arise in respect of the protection afforded by

Canadian orders to DIP Lenders.

**31**    Counsel to the DIP Lenders submits that what really is in issue is that the Monitor does not approve of the manner in which the Sixth Charge has been used in the DIP Lenders' negotiations. Counsel further submits that if the Monitor succeeds, the DIP Lenders (and any future DIP Lenders) will lose their court-ordered protection if they use their rights in a manner that is deemed by some stakeholders to be unfair and, in other words, an unstated condition should be read into DIP orders that any priority is subject to retroactive adjustment if the DIP Lenders' business decisions subsequently displease the court.

**32**    Counsel also submits that the DIP Lenders negotiated and struck what they believed to be a principled bargain which was the subject of debate in court, with the Monitor expressing its concerns. Counsel submits that the end result was ultimately accepted by the court and embodied in the Initial Order. Further, as an accommodation, on December 5, 2008, the DIP Lenders consented to an alteration of the waterfall priorities that permitted the Canadian creditors to avail themselves of any unused portion of the Directors' Charge, thereby effectively increasing the pool subject to the Canadian Creditor Charge to $44.3 million. As noted above, this alteration was court approved.

**33**    Counsel further submits that the position of the DIP Lenders in the renegotiated deal is that they compromised their position for the benefit of the Canadian creditors and that by compromising on this issue in Canada for the benefit of the Canadian creditors, the DIP Lenders arguably prejudiced the position of the U.S. unsecured creditors by agreeing to dilute the DIP Lenders priority claim.

**34**    The DIP Lenders take the position that the Initial Order established the DIP Lenders' Charge and dictated its parameters and, in reliance on the DIP Lenders' Charge in the Initial Order, and subsequently as amended in the Amended and Restated Initial Order, the DIP Lenders made tens of millions of dollars in advances to the Applicants and hundreds of millions of dollars to the U.S. debtors. Counsel further submits that the DIP Lenders relied on their rights in the Amended and Restated Initial Order both in making advances and also in their dealings with stakeholders within the Chapter 11 Proceedings.

**35**    The DIP Lenders submit that it was understood that pursuant to the U.S. Bankruptcy process, the U.S. DIP Order would not be finalized until the return date of the first omnibus hearing and it ought to have been clear that there could be alterations to the DIP Facility.

**36**    They submit that finding a consensual resolution with the UCC was important for all concerned and that this resolution was embodied in the Final Second Amendment. In Canada, the DIP Lenders compromise took the form of a $44.3 million Canadian Creditor Charge and in the U.S. it involved the DIP Lenders foregoing additional post-petition security on FF&E and agreeing to share 50% of the proceeds of the Sixth Charge received, to the extent received, with the U.S. Debtors' estate.

**37** The DIP Lenders acknowledged that under certain scenarios, the business deal outlined in the Second Amendment could adversely affect Canadian unsecured creditors. They do, however, submit that this is no different from the fact that the Directors' Charge and Canadian Creditor Charge may prove to work to the disadvantage of the U.S. unsecured creditors.

**38** The DIP Lenders take the position that its interests as stakeholders straddles both insolvency proceedings, and it recognizes that any decision it makes in one forum may affect the other. However, it submits it must act, within its rights, to the best of its business judgment.

**39** Counsel submits that the effect of the Monitor's motion would be pernicious as it would effectively allow the DIP Lenders' Charge to be reconsidered after advances made in reliance on the charge, had been made. They argue that the flexibility involved in *CCAA* proceedings cannot extend to re-opening and re-arguing issues that have already been resolved by the court. Further, by relying on the court-ordered charge, the DIP Lenders now retroactively face the prospect that (a) a form of "marshalling" may be imposed; (b) there will be a carve out for U.S. FF&E; and (c) there will be ongoing uncertainty as the "status quo" is frozen until further order of the court.

**40** The DIP Lenders submit that this cannot be the right outcome. They emphasize that once the DIP Lenders were granted the Sixth Charge, they could assign it, sell it or negotiate with it. The rights of the DIP Lenders they submit, have been set out in the materials before the court, and that they are entitled to certain rights. Further, these rights should not be redefined after the deal has been made. Counsel concludes that commercial certainty requires that the order requested by the Monitor should not be made.

**41** Counsel to the UCC supported the position of the DIP Lenders.

**42** Counsel to the Applicants submitted that, if the relief sought by the Monitor is granted, it would constitute the entry of an order which modifies the Initial Order or which otherwise materially adversely affects the effectiveness of the Initial Order without the express written consent of the DIP Lenders. The Applicants point out that it is their understanding that the DIP Lenders do not consent to the relief sought by the Monitor and that the granting of the requested relief would result in an Event of Default under the DIP Facility. Counsel points out that InterTAN still requires access to the DIP Facility and is concerned that such access would be lost if the motion was granted.

**43** Counsel to InterTAN submits that InterTAN should not be put in the position where an Event of Default will occur under its DIP Facility in that the court can just as effectively deal with the issues inherent in the requested relief that only become "ripe" after proceeds of sale have been realized. Counsel submits that any consideration of what should happen with respect to the priority of the Sixth Charge only becomes relevant after the five prior charges have been satisfied and that this will not happen until the completion of a transaction involving InterTAN's assets.

**44** In the circumstances, counsel submits that InterTAN cannot consent to an extension of the Status Quo Order. Counsel observes that there is no compelling reason for the court to consider now

any of the remaining Sixth Charge relief as the Canadian stakeholders would be protected if the court were to order a continuation of the Status Quo Order. By considering the matter after the completion of a going concern sale or other transaction involving the assets of the Canadian and U.S. estates, the court could avoid (i) putting InterTAN's access (and that of the U.S. Debtors) to the DIP Facility in peril; (ii) impacting the allocation negotiations to come concerning certain assets owned by the U.S. Debtors that are used in the operation of InterTAN's business; and (iii) considering the matter "in the abstract" without knowing whether the recovery issue raised by the Monitor has any relevance in this proceeding.

**45** Counsel also points out that if the DIP Lenders do recover on InterTAN's guarantee first, InterTAN will be subrogated to the position of the DIP Lenders and become entitled to participate in the U.S. estate. A similar submission was also contained in the factum submitted by counsel on behalf the DIP Lenders.

**46** It is clear that there are significant differences of opinion as to the effect of the Final Second Amendment. However, one thing is abundantly clear. The Final Second Amendment has not been considered, let alone approved, by this court.

**47** The starting point of my analysis is to consider the DIP Facility in the context of the Amended and Restated Initial Order.

**48** In the circumstances of this case, the granting of the DIP Facility, in the form requested, was extraordinary relief. I took into account that the creation of the Canadian Creditor Charge provided in theory, a degree of protection to the group of creditors, who could otherwise be detrimentally affected by the DIP Facility.

**49** I have no doubt that the DIP Lenders have relied on the approvals granted in the Amended and Restated Initial Order. I accept the submissions put forward by counsel to this effect. I also accept the submission that the DIP Lenders should be able to rely on what has been approved by this court.

**50** However, the strength of the DIP Lenders' argument is also its weakness.

**51** These *CCAA* proceedings are obviously separate from the Chapter 11 Proceedings. There is a common DIP Facility, but in order to be effective in the respective insolvency proceedings, the DIP Lenders, as well as the Applicants, recognized that the DIP Facility had to be court approved in both jurisdictions. The difficulty in this case is that there has not been a common approval process. The document that has been approved in the Chapter 11 Proceedings is different than what has been approved in the *CCAA* proceedings.

**52** In considering the relief requested by the Monitor, it is necessary to consider what has been approved in the *CCAA* proceedings. The DIP Lenders, the Applicants and the Monitor participated in the initial hearing. The scope and extent of the DIP Lender's Charge and other charges were before the court and the priority to be afforded to the specific charges was also before the court.

This is the package, in essence the bundle of rights, that was approved. Certain rights were subsequently amended as a result of expansion of the size of the Canadian Creditor Charge, but again, this amendment was court approved and was embodied in the Amended and Restated Initial Order.

53    To the extent that the DIP Lenders entered into an agreement with the UCC which was subsequently incorporated into the Final Second Amendment, these changes may have an adverse impact or a potential adverse impact on the Canadian creditors.

54    Counsel to the DIP Lenders took the position that the DIP Lenders are entitled to certain rights and, if used in a way that the Monitor does not approve, that is too bad. I have not been persuaded by this submission. In the context of these proceedings, I do not agree that the DIP Lenders have the unilateral ability to discharge portions of the collateral package to the detriment of the Canadian creditors without court authorization to do so. The DIP Lenders' Charge incorporates a charge on the Property of the Applicants. In considering whether it is appropriate to approve such a facility, the court takes into account a number of factors which include benefits that the Applicants will receive from the DIP Facility and the collateral that is charged under the DIP Lenders' Charge. In my view, it is not appropriate to provide court approval to the entire package and then tacitly approve of the unilateral activities of the DIP Lenders in discharging portions of the collateral to the potential detriment of certain stakeholders in the *CCAA* proceedings. In view of the extraordinary nature of the DIP Lenders' Charge, and the balancing of interests that was considered by the court when court approval was provided, a document which purports to amend a portion of the collateral, would not, in these circumstances, be a document that fits within a document contemplated by the DIP Facility or as may be reasonably required by the DIP Lenders under paragraph 36 of the Amended and Restated Initial Order.

55    The DIP Lenders had an option in this case. They chose to obtain approval of the Final Second Amendment in the Chapter 11 Proceedings and not to obtain such approval in this court. Having elected to proceed in this manner, the DIP Lenders now take the position that they are entitled to rely on court approval. I agree, but in the context of these proceedings, court approval has not been obtained to incorporate into the DIP Facility the amendments which are contained in the Final Second Amendment and approved in the Chapter 11 Proceedings.

56    The DIP Lenders point out that there was a *quid pro quo* in that the DIP Lenders made compromises in Canada which is reflected in the increased Canadian Creditor Charge. This submission ignores two important facts. Firstly, the extension of the Canadian Creditor Charge was specifically court approved in Canada and secondly, this amendment was agreed to and incorporated into an Amended and Restated Initial Order on or about December 5, 2008, some two and one-half weeks before the Final Second Amendment was agreed to by certain parties in the U.S. Proceedings. One cannot determine, after the fact, whether there would have been any linkage between the two events.

**57** In my view, to the extent that the DIP Lenders made advances and relied upon the Final Second Amendment having effect in these *CCAA* proceedings, they did so at their peril.

**58** The next issue to consider is the practical implications of the lack of this court's approval of the Final Second Amendment as well as the Monitor's motion. The Monitor has requested that the court make certain orders. If they are made, the DIP Lenders take the position that such orders would be an Event of Default under the DIP Facility. If this, indeed, is the outcome of the Monitor's motion, it is one that defies logic. The crisis has been created by an arrangement as between the DIP Lenders and the UCC and agreed to by the U.S. Debtors. On this issue, it would appear that these parties have, for all practical purposes, ignored the *CCAA* proceedings. Having ignored the *CCAA* proceedings, the DIP Lenders take the position that steps taken by the Monitor to monitor compliance with existing court orders, creates an Event of Default. This should not and cannot be the effect of this endorsement.

**59** The Amended and Restated Initial Order speaks for itself. The DIP Lenders, the UCC and the Applicants are free to do what they want with respect to the Chapter 11 Proceedings, but they have to ensure that a proper accounting is provided in the *CCAA* proceedings. A proper accounting has to ensure that the claims of the DIP Lenders under the Sixth Charge are to be reduced by the amount of the proceeds realized on the Property charged in the DIP Lenders' Charge as approved by Amended and Restated Initial Order. In this context, the accounting will require that the Sixth Charge be reduced by the amount of the proceeds of the FF&E of the U.S. Debtors and by an amount equal to the value or proceeds of any assets of the U.S. Debtors that were encumbered in the DIP Facility approved by this court which may be no longer be subject to the DIP Facility approved in the Chapter 11 Proceedings by order dated December 23, 2008. In my view, this direction is entirely consistent with the terms of the Amended and Restated Initial Order.

**60** Further, in considering whether any payments are to be made pursuant to the Sixth Charge, it is appropriate to take into consideration the ranking of the various charges as set out in paragraph 44 of the Amended and Restated Initial Order. The DIP Lenders' Charge is fourth (with certain restrictions and limitations) and sixth in priority. The Canadian Creditor Charge ranks between these two charges. The priority ranking of charges, other than the DIP Lenders' Charge, should not be dismissed or ignored. It is incumbent upon the Applicants to ensure that appropriate consideration is given and protection provided, to ensure that these priorities are respected, especially the Canadian Creditor Charge. In view of the USD, the Monitor is directed to report to the court if it is of the view that further direction is required.

**61** In the circumstances, it is, in my view, appropriate to extend the Status Quo Order until such time as the affected parties have had the opportunity to consider the impact of these reasons.

**62** In the result, the Status Quo Order is continued until further order of this court. I decline to make the orders requested at (ii), (iii) and (iv) as set out in the Notice of Motion. However, the claims of the DIP Lenders are to be accounted for in accordance with the foregoing directions.

G.B. MORAWETZ J.

cp/e/qlafr/qlpxm/qlrxg/qlrxc/qlaxw/qlaxr



# TAB12

2007 CarswellOnt 9784,

►

2007 CarswellOnt 9784

### L.I.U.N.A., Local 183 v. Ferreira

Universal Workers Union, Labourers' International Union of North America, Local 183, Applicant and Victor Ferreira, Respondent

Universal Workers Union, Local 183, Labourers' International Union of North America, Applicant and Antonio Dionisio and John Dias a.k.a. Joao Dias, Respondents

Ontario Superior Court of Justice

Perell J.

Heard: December 7, 2007
Judgment: December 12, 2007
Docket: 07-CV-333496PD1, 07-CV-333498PD3

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: additional reasons at *L.I.U.N.A., Local 183 v. Ferreira* (2008), 2008 CarswellOnt 8732 (Ont. S.C.J.); and reversed *L.I.U.N.A., Local 183 v. Ferreira* (2009), 2009 ONCA 155, 2009 CarswellOnt 793 (Ont. C.A.); additional reasons at *L.I.U.N.A., Local 183 v. Ferreira* (2009), 2009 CarswellOnt 1630, 2009 ONCA 260 (Ont. C.A.)

Counsel: Christopher Wirth, Patricia M. Latimer, for Applicant

Warren Sheffer, for Respondents

Subject: Civil Practice and Procedure; Corporate and Commercial; Public; Labour and Employment

Alternative dispute resolution --- Submission or agreement to arbitrate --- Form and nature

Canadian independent hearing officer ("CIHO") found that respondent union members breached their duties under union's local constitution and he suspended their membership — In another order CIHO expelled respondents because of their roles in establishing rival union — Union brought applications seeking to enforce CIHO's decisions as arbitration awards under s. 50 of Arbitration Act — Applications granted — Union members were bound by terms of local constitution and under its terms they implicitly agreed to be bound by arbitration process that resulted in CIHO's decisions — CIHO's orders were enforceable pursuant to s. 50.

Labour and employment law --- Labour law — Labour arbitrations — Jurisdiction of arbitration board — Source — Submission to arbitration

2007 CarswellOnt 9784,

Canadian independent hearing officer ("CIHO") found that respondent union members breached their duties under union's local constitution and he suspended their membership — In another order CIHO expelled respondents because of their roles in establishing rival union — Union brought applications seeking to enforce CIHO's decisions as arbitration awards under s. 50 of Arbitration Act — Applications granted — Respondents were bound by terms of local constitution and under its terms they implicitly agreed to be bound by arbitration process that resulted in CIHO's decisions — CIHO's orders were enforceable pursuant to s. 50.

### Cases considered by *Perell J.*:

*Berry v. Pulley* (2002), 2002 C.L.L.C. 220-022, 287 N.R. 303, 211 D.L.R. (4th) 651, 82 C.L.R.B.R. (2d) 161, 59 O.R. (3d) 159 (note), 158 O.A.C. 329, 11 C.C.L.T. (3d) 157, 2002 SCC 40, 2002 CarswellOnt 1111, 2002 CarswellOnt 1112, 20 C.P.C. (5th) 205, [2002] 2 S.C.R. 493 (S.C.C.) — considered

*Centre for Addiction & Mental Health v. 2041134 Ontario Ltd.* (2006), 2006 CarswellOnt 1177 (Ont. S.C.J.) — referred to

*Downey v. Leitner* (2004), 2004 CarswellOnt 4447 (Ont. S.C.J.) — considered

*Onex Corp. v. Ball Corp.* (1994), 12 B.L.R. (2d) 151, 1994 CarswellOnt 228 (Ont. Gen. Div.) — referred to

*Strofolino v. Helmstadter* (2001), 2001 CarswellOnt 2504, 55 O.R. (3d) 138, *(*sub nom. *Strofolino v. University of Toronto (Grievance Review Panel) (Chair))* 85 C.R.R. (2d) 316 (Ont. S.C.J.) — referred to

*Zittrer c. Sport Maska Inc.* (1988), 38 B.L.R. 221, [1988] 1 S.C.R. 564, 83 N.R. 322, 13 Q.A.C. 241, 1988 CarswellQue 27, 1988 CarswellQue 134 (S.C.C.) — considered

### Statutes considered:

*Arbitration Act, 1991*, S.O. 1991, c. 17

   Generally — referred to

   s. 1 "arbitration agreement" — considered

   s. 2(1)(a) — considered

   s. 50 — pursuant to

   s. 50(1) — considered

   s. 50(2) — considered

   s. 50(3) — considered

   s. 50(8) — considered

*Code civil du Québec*, L.Q. 1991, c. 64

   en général — referred to

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

APPLICATIONS by union to enforce decisions of Canadian Independent Hearing Officer as arbitrations under s. 50 of *Arbitration Act, 1991*.

*Perell J.*:

## Introduction and Overview

1    On January 5, 2007, Mr. Barry Stephens, who is a Canadian Independent Hearing Officer, found that the Respondents Antonio Dionisio and John Dias had breached certain articles of the international and the local constitutions of the applicant Universal Workers Union, Labourers' International Union of North America, Local 183 ("Local 183"), and he ordered that both Mr, Dionisio and Mr. Dias each pay $10,000 to Local 183.

2    On March 26, 2007, Mr. Stephens found that the Respondent Victor Ferreira had breached certain articles of the constitution of Local 183, and he ordered that Mr. Ferreira be suspended from membership for six months and that he pay $26,838.88 to Local 183.

3    The Respondents respectively did not comply with Mr. Stephens' orders, and in the two Applications that are now before the Court, Local 183 seeks orders enforcing Mr, Stephens' orders as arbitration awards. These Applications are brought pursuant to s. 50 of the *Arbitration Act, 1991*, S.O. 1991, c. 17.

4    In response, thc Respondents submit that there was no arbitration agreement between them and Local 183, and therefore Mr. Stephens' orders are not arbitration awards enforceable under the *Arbitration Act, 1991*.

5    In my opinion, however, there was an arbitration agreement and Mr. Stephen's orders were awards that are enforceable under s. 50 of the *Arbitration Act*.

## Factual Background

6    Mr. Dionisio is the former business manager of Local 183, and Mr. Dias is its former Secretary-Treasurer. Mr. Ferreira was a member of Local 183, and he was a business representative for the local. Messrs. Dionisio, Dias, and Ferreira were all formerly members of Local 183's Executive Board.

7    Local 183 is a local union of the Labourers' International Union of North America ("LIUNA"). Pursuant to Article III, s. 3 (b) of the Uniform Local Constitution and pursuant to the oath of office provided for in Article XIII of the Local Constitution, the Respondents agreed to abide by LIUNA's constitution, laws, rules, regulations, policies and lawful orders and decisions.

8    In the two Applications now before the court, it is conceded that there is no arbitration agreement other than as may be found in the constitutional documents of Local 183. The Respondents never signed or agreed orally or in writing to sign any other agreement that might qualify as an arbitration agreement.

9    In the early part of 2006, LIUNA launched an investigation into the affairs of Local 183, and ultimately LIUNA sought to have Local 183 placed into trusteeship. In April 2006, after a hearing, Mr. Brian Keller, who (like Mr. Stephens) is a Canadian Independent Hearing Officer, concluded that Local 183 should be placed into trusteeship. The trusteeship was confirmed by the Ontario Labour Relations Board by decision dated June 12, 2006. The Respondents had a role in the proceedings before Mr. Keller.

10    As a result of the order of the Ontario Labour Relations Board, the existing Board of Local 183, includ-

ing the Respondents, was removed from office and Mr. Rich Weiss and Mr. Tim Armstrong, Q.C. were appointed as co-trustees to govern Local 183.

11    On August 2, 2006, Mr. Weiss charged Messrs. Dionisio and Mr. Dias of contravening certain provisions of the Local Constitution and of the International Constitution by their acts in connection with an alleged scheme to misappropriate $5 million of Local 183's funds.

12    On September 16, 2006, Mr. Weiss charged Mr. Ferreira of contravening certain provisions of the Local Constitution and of the International Constitution in connection with allegations that he had misled at least two members of Local 183 with the result that they were prevented from employment for extended periods of time.

13    Pursuant to Article XII of the Local Constitution, charges are to be heard by the members of the Executive Board of the District Council. However, if the Executive Board is disqualified, the General President of LI-UNA shall refer the matter to an Independent Hearing Officer for decision and disposition.

14    Under the union's constitutions, the disposition of charges is governed by the Canadian Ethical Practices Code, which empowers a Canadian Independent Hearings Officer to preside at the hearings. Article 13 (a) of the Canadian Ethical Practices Code states:

The Canadian Independent Hearings Officer shall preside over and provide rulings in

(a) all charges brought by the GEBCC pursuant to the Disciplinary Procedure or where the Local Union or District Executive Board is disqualified within the meaning of Article IX of this Code....

15    Since Local 183 was in trusteeship, the General President referred the charges against Messrs. Dionisio, Dias, and Ferreira to Mr. Stephens, who held hearings with respect to the charges against Messrs Dionisio and Dias on October 28, November 9 and 18, 2006 and with respect to the charges against Mr. Ferreira on January 21 and 30, 2007.

16    Under the constitutional documents, Messrs. Dionisio, Dias, and Ferreira were entitled to notice of the hearing, the opportunity to attend the hearing and to cross-examine, to lead evidence, and to make submissions.

17    Messrs. Dionisio, Dias, and Ferreira all received notice of the proceedings before Mr. Stephens but did not attend their respective hearings, which proceeded in their absence. As already noted above, Mr. Stephens made orders against them.

18    Under the constitutional documents, Messrs, Dionisio, Dias, and Ferreira had rights of appeal. They did not exercise these rights.

19    On March 7, 2007, Mr, Stephens made another order against Messrs. Dionisio, Dias, and Ferreira. He expelled them from membership in LIUNA because of their role in establishing a rival union. This second order is part of the factual background, but it is not part of the relief being sought by Local 183 in the two Applications now before the court.

20    Messrs. Dionisio, Dias, and Ferreira have not complied with Mr. Stephens' orders, and pursuant to the *Arbitration Act, 1991*, Local 183 brings the two Applications now before the court to enforce the earlier orders as arbitration awards.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

21    The relevant provisions of the *Arbitration Act, 1991* are sections 2 (1) and 50 (1), (2), (3) and (8) and the definition of "arbitration agreement" in s. 1 of the Act. These sections state:

### Definitions

1. In this Act, "arbitration agreement" means an agreement by which two or more persons agree to submit to arbitration a dispute that has arise or may arise between them;

### Application of Act——Arbitrations conducted under agreements

2. (1) This Act applies to an arbitration conducted under an arbitration unless,

(a) the application of this Act is, excluded by law; or....

### Enforcement of award——Application

50. (1) A person who is entitled to enforcement of an award made in Ontario or elsewhere in Canada may make an application to the court to that effect.

### Formalities

(2) The application shall be made on notice to the person against whom enforcement is sought, in accordance with the rules of court, and shall be supported by the original award or a certified copy.

### Duty of court, award made in Ontario

(3) The court shall give a judgment enforcing an award made in Ontario unless,

(a) the thirty-day period for commencing an appeal or an application to set the award aside has not yet elapsed;

(b) there is a pending appeal, application to set the award aside or application for a declaration of invalidity;

(c) the award has been set aside or the arbitration is the subject of a declaration of invalidity; or

(d) the award is a family arbitration award.

. . . . .

### Powers of court

(8) The court has the same powers with respect to the enforcement of awards as with respect to the enforcement of its own judgments.

### Discussion and Analysis

22    Local 183's main argument that Mr. Stephens' orders are an arbitration award proceeds along the follow-

ing line of reasoning. In *Zittrer c. Sport Maska Inc.*, [1988] 1 S.C.R. 564 (S.C.C.), the Supreme Court of Canada prescribed the elements of an arbitration and set out four indicia. Local 183 submits that the four indicia from Sports Maska are present in the circumstances of Mr. Stephens' orders and therefore there was an arbitration and perforce an arbitration award.

23      In *Sport Maska*, the Supreme Court set out the following four indicia for an arbitration: (1) an identified dispute between the parties; i.e. a question to be resolved; (2) the remission of the dispute to a person who is to resolve the dispute by exercising a judicial function; (3) the parties having an opportunity to present evidence or submissions in respect of their positions as to how the dispute should be resolved; and (4) the parties having agreed to be bound by the decision.

24      In my opinion, the first three elements are satisfied in the case at bar, and the problematic part of Local 183's argument is whether the fourth element; namely, the parties having agreed to the decision, is present. It is a fundamental element of an arbitration that the parties have an agreement to submit their dispute to the arbitrator. For there to be an arbitration award, there must first be an arbitration agreement and that element is problematic in the case at bar.

25      In its factums. Local 183 addresses this problem as follows:

### Parties Agreed to Accept Decision

The parties agreed to accept Stephens' decision. While there may not have been an explicit arbitration agreement, by virtue of being members of LIUNA, Dionisio and Dias [and Ferreira] agreed to abide by all the terms and provisions of the Local and International Constitutions, and all of the rules, regulations, policies, practices and lawful orders and decisions adopted and promulgated in the furtherance and administration of the provisions of the constitutions. Accordingly, the Award is a lawful order which the parties are bound to accept.

Although there was no express agreement to arbitrate, there is a presumption towards finding a dispute resolution procedure to be an arbitration where the nature of the process is in doubt and the four indicia of an arbitration are met: *Onex Corp. v. Ball Corp.*, [1994] O.J. No. 98 (Ont. Gen. Div.).

Contrary to the Respondents' assertion ... the Courts have never ruled conclusively whether a hearing between a union and one or more of its members constitutes an arbitration. The Applicant submits that it is open to this Court to conclude that, in the particular circumstances of this case, the hearing held by CIHO Stephens ... was an arbitration and the Award is subject to enforcement pursuant to section 50 of the *Arbitration Act, 1991*.

26      To succeed, in its argument that there is an arbitration agreement, Local 183 needs first to show that there was a contract between the Respondents and the Local and second that that contract expressly or impliedly included an arbitration agreement ox to use the definition from the *Arbitrations Act, 1991* "an agreement by which two or more persons agree to submit to arbitration a dispute that has arise or may arise between them."

27      Local 183 relies on the Supreme Court of Canada's decision in *Berry v. Pulley*, [2002] 2 S.C.R. 493 (S.C.C.) to establish a contract between the Respondents and their union. In *Berry v. Pulley*, the Court stated at para. 49:

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

[T]he time has come to recognize formally that when a member joins a union, a relationship in the nature of a contract arises between the member and the trade union as a legal entity. By the act of membership, both union and the member are bound by the terms of the union constitution, and action may be brought by a member against the union for its breach.

28    It would follow from *Berry v. Pulley* that there is a contractual relationship between the Respondents and Local 183 and that either can sue the other for breach of contract. However, it does not follow that because there is a contract, the parties to it necessarily have agreed to arbitration as the means to resolve their contractual disputes. The question of whether there is an agreement to arbitrate becomes essentially a matter of determining the intention of the parties, which is to say it is largely interpretation.

29    It is conceded that the constitutional documents that would contractually bind the Respondents do not expressly stipulate that their disputes are to be arbitrated. It would thus appear that the heart of Local 183's argument is that the parties have impliedly or implicitly agreed to submit their disputes to arbitration because three of the four indicia of an arbitration are satisfied.

30    This type of argument was made in *Zittrer c. Sport Maska Inc.*, and although the argument did not succeed in the particular circumstances of that case, the Supreme Court accepted the approach as sound. In Sports *Sport Maska Inc.*, assets including inventory were sold, and the issue that worked its way through the Quebec courts to the Supreme Court of Canada was whether the vendor's auditors who had provided an opinion as to the value of the assets and who were later sued for negligence could rely on the immunity enjoyed by an arbitrator from civil liability. The resolution of that issue, in turn, depending on the court determining what constitutes an arbitration agreement and an arbitration.

31    Although in the main concerned with Québec law under the Civil Code, L'Heureux-Dubé, J., who wrote the judgment for the Court, examined common law from England and the United States, and the legal principles that she employed are applicable to the case at bar.

32    The auditors in *Sport Maska* argued that they were arbitrators, but this argument failed for two mutually exclusive reasons. First, in distinguishing between an arbitration and an expert's opinion, the Supreme Court held that for an arbitration there must be a present dispute. This criterion was missing, and therefore the auditors in *Sport Maska* were held not to be arbitrators. What, however, is significant to the case before me is the second reason for L'Heureux-Dubé, J, concluding that the auditors were not arbitrators. The second reason was that there was no arbitration agreement.

33    In paragraph 60 of her reasons, L'Heureux-Dubé, J, noted that an arbitration may result from legislation or from the intention of the parties and when the arbitration procedure results from a contractual clause, the situation must be examined closely, and it becomes necessary to draw the parties' intent from the relevant documents. In this regard, she stated:

This intent can be demonstrated in various ways. The courts and academic analysts have looked at certain indicia in this connection, such as the terminology used by the parties (*Re Premier Trust Co. and Hoyt and Jackman* (1969), 3 D.L.R. (3d) 417 (C.A.), at p. 419), the fact that a decision is final and binding (*Sutcliffe v. Thackrah*, supra, at p. 877), the judicial nature of the proceedings (*Re Cants-Wilson and Greene, supra*, at p, 9) and the professional status of the third party (*Pfeil v. Simcoe & Erie General Insurance Co.*, supra, at p. 97).

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

34      Later in her judgment, at paras. 93 to 99, she examined the various means used by the common law and by French and Quebec law to determine whether contracting parties who have not clearly indicated their intent in their contractual documents can be found to have intended to empower another to be an arbitrator. She stated:

> 93 .... The search for the components of a submission naturally does not present any difficulty when the parties have clearly indicated their intent to have the dispute between them arbitrated, and have clearly identified that dispute. The failure of the parties to express themselves clearly in this regard, as often happens, has resulted in the development, at common law as well as in French and Quebec law, of various means of determining the true nature of the "mission" they intended to give the third party, the nature and extent of whose powers will only be a corollary of that mission. ....

> 94. Beyond the requirement of a clearly identified dispute which will be the subject of the arbitration, the parties must have undertaken to submit that dispute to a third party, and I think it is crucial to identify the precise function the parties intended to entrust to this third party under their agreement and in the circumstances of each case.....

> 95. I will review some of these criteria, which though useful are neither exhaustive nor conclusive, but may serve as a guide in determining an intent which is often far from easy to identify. The language used by the parties may indicate their intent to submit a dispute either to arbitration or to an expert opinion. For example, the title given to the contract, the fact that the same word is used uniformly in various documents or the absence of any reference to one procedure rather than another may be taken into consideration in deciding the nature of the process contemplated by the parties. However, the courts are not bound by the terms chosen deliberately or otherwise by the parties, as these terms may well not correspond to the true intent appearing from other criteria.

> 96. One of the principal aspects that emerges from an analysis of the Code of Civil Procedure, academic opinion and the case law is the similarity that must exist between arbitration and the judicial process. The greater that similarity, the greater the likelihood that reference to a third party will be characterized as arbitration. The facts that the parties have the right to be heard, to argue, to present testimonial or documentary evidence, that lawyers are present at the hearing and that the third party delivers an arbitration award with reasons establish a closer likeness to the adversarial process than the expert opinion and tend to establish that the parties meant to submit to arbitration. The fact that the decision is final and binding is also indicative of an arbitration, but contrary to what was argued by the respondents, that criterion is not exclusive to arbitration.

> 97. The function assigned to the third party is indicative of the status conferred on him by the parties. If the third party has to decide between opposing arguments presented by the parties on a given point, we are much closer to arbitration. If, however, the parties call on a third party solely to supply a necessary component of the contract, it is less certain that they intended to submit a present dispute to the third party, but rather tried to ensure that such a dispute did not arise, unless there are other criteria to the contrary. In the same vein, is the third party called on to make a decision in light of his personal knowledge or must he choose among the various positions put forward by the parties concerned? In the first case, the situation will probably be one of an expert opinion, while in the second it will probably be an arbitration.

> 98. Moreover, if the third party is to be an arbitrator, he cannot act as the mandatory of one of the

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

parties. For example, the fact that he has a special connection with one of them or that he is paid by only one of them seems inconsistent with the concept of impartiality, a fundamental characteristic of arbitration.....

99 All these criteria are means of determining the true intent of the parties. However, a caveat is necessary at this point.The foregoing criteria are not necessarily exhaustive, nor are they mutually exclusive, in the sense that they may occur together and even merge into one another. They do not all have to be existing, still less be unanimously in favour of one position or another. The criteria, as their name suggests, are in fact only tools used to determine the intention disclosed by the documents and other instruments, in order to establish the function the parties actually meant to assign to the third party chosen by them.

35     As appears from reviewing these passages, L'Heureux-Dubé, J, provided an non-exhaustive list of criteria to determine whether the contracting parties intended to empower a third party as an arbitrator including; (a) the language they used; (b) the similitude between the designated process and the judicial process, because the greater the resemblance to a judicial process, the greater the likelihood that the parties intended arbitration; (c) the nature of the task assigned to the designated party and the extent to which the task is to decide between adversarial positions, which suggests that arbitration was intended, as opposed to a task of relying on personal knowledge or expertise, which suggests that the designated party was providing an opinion but not arbitrating; and (d) the presence or independence and impartiality in a decision-making process, which suggests that arbitration was intended. Later in her judgment at para, 121, she added the criteria that the degree of finality of the outcome was significant because it is of the essence of an arbitration award that it be final and binding.

36     Where there is a decision-making process in an agreement but the parties do not make their intention clear by express language as to whether they have agreed to arbitration, there is no simple litmus test to determine what the parties intended. In the case at bar, m my opinion, the criteria suggested by L'Heureux- Dubé, J., particularly the resemblance to a judicial process, weigh in favour of the conclusion that the parties intended arbitration and thus entered into an arbitration agreement. See also: *Strofolino v. Helmstadter* (2001), 55 O.R. (3d) 138 (Ont. S.C.J.); *Centre for Addiction & Mental Health v. 2041134 Ontario Ltd.*, [2006] O.J. No. 800 (Ont. S.C.J.).

37     In support of their counterargument that there was no agreement to arbitrate, the Respondents relied on the unreported judgment of Whitten, J. in *Downey v. Leitner* [2004 CarswellOnt 4447 (Ont. S.C.J.)] (October 13, 2004). This case, however, is not helpful to them. From what I can determine from the endorsement, Ms. Downey sued Mr. Leitner for defamation. Before her action, she had filed a complaint against Mr. Leitner with the union of which she and Mr. Leitner were members. The union had a discipline committee, and a discipline process was initiated against Mr. Leitner. What happened before the discipline committee is not described but Mr. Leitner in his statement of defence relied on the discipline process as an arbitration that precluded Ms. Downey from suing for defamation. Whitten, J, pointed out that that the parties to the discipline proceeding were the union and Mr. Leitner. Ms. Downey was just a complainant or witness and he struck out the pleading as not showing a reasonable defence. He said that the Arbitration Act was not engaged.

38     In *Downey v. Leitner*, there was no agreement as between Ms. Downey and Mr. Leitner that their disputes would be submitted to arbitration so as to preclude resort to the judicial process. The issue before me is much different. It does not involve the relationship between union members as was the case in *Downey v. Leit-*

*ner.* Rather, it involves interpreting the contractual relationship between the union and its members, where the member has agreed to be bound by the union's constitution and that constitution provides an elaborate process for adjudicating charges against union members for contravening the constitution.

39     The Respondents rely on certain statements made by the Supreme Court of Canada in *Berry v. Pulley, supra,* that the contract between the union and its members is an adhesion contract, because practically speaking a union member has no bargaining power within the union. Although, I think that one has to be very careful about taking that comment out of context because the issue in *Berry v. Pulley* was about whether one union member could sue another member for breach of the union constitution, which is a very different issue from the nature of the rights between the union and its members, I will accept that the contract between Local 183 and the Respondents is an adhesion contract. All that adds is that the contract should be interpreted *contra proferentum* but I see no ambiguity and based on the criteria specified by the Supreme Court of Canada my interpretative analysis yields the conclusion that there was an agreement to arbitrate.

40     I thus conclude that the Respondents bound themselves contractually to an arbitration process that yielded the orders of Mr. Stevens. I further conclude that his orders are awards that are potentially enforceable pursuant to s. 50 of the *Arbitration Act,* 1991.

41     The Respondents argue that any award was rendered moot because they are now no longer members of Local 183.1 think this argument is somewhat of a *non sequitur* because the doctrine of mootness applies to current proceedings that have become academic, that is, it applies to proceedings without a practical purpose because of a change of circumstances; one does not typically refer to a past award or judgment as being moot. There is before me a dispute between the parties about whether an arbitration award, which would have the respondents pay money to Local 183, should be enforced. I do not see how that dispute is made moot by the fact that the Respondents are no longer members of the union.

42     Subsection 50 (3), which is set out above, provides the court with very little discretion once it is determined that there is an arbitration award. Subsection 50(3) states that the court "shall give a judgment enforcing an award made in Ontario," unless certain criteria are established. None of those criteria are established in the case at bar.

### Conclusion

43     I therefore include that the two Applications should be granted and there should be an order enforcing the awards of Mr. Stephens as judgments of this court.

44     If the parties cannot agree as to the matter of costs, they may make submissions in writing beginning with Local 183 within 20 days of the release of these reasons. The Respondents will have 20 days to reply.

45     Orders accordingly.

*Applications granted.*

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



# TAB13

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 1091
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110217

2011 ONSC 1091 (CanLII)

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**     IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL
NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION,
NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL
NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**   MORAWETZ J.

**COUNSEL:**  Alan Mark, Derrick Tay, and Tony Reyes, for Nortel Networks Corporation et al.

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Barry Wadsworth, for the CAW-Canada

Sharon Kour, for Morneau Sobeco, Plan Administrator

Arthur Jacques, for the Nortel Continuing Canada Employees

Alex MacFarlane, for the Official Committee of Unsecured Creditors

Kevin Zych, for the Nortel Noteholder Group

Lyndon Barnes, for the Board of Directors of Nortel

Mark Zigler, for the Former and Disabled Employees

Andrew Gray, for Nortel Networks Inc. and Chapter 11 Debtors

M. Starnino, for the Pension Benefits Guarantee Fund

M. P. Gottlieb and R. Schwill, for the Joint Administrators of Nortel Networks
(UK) Limited

**HEARD &**
**DECIDED:**  JANUARY 14, 2011

**REASONS:**  February 17, 2011

- Page 2 -

## ENDORSEMENT

[1]     The motion was heard on January 14, 2011. At the conclusion of argument, the motion was granted with reasons to follow. These are the reasons.

[2]     Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") brought this motion for an order granting an "EMEA Claims Procedure Order".

[3]     By way of background, on January 14, 2009, Nortel Networks (UK) Limited ("NNUK") and certain subsidiaries of the Nortel Group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators from the High Court of England and Wales under the *Insolvency Act 1986*. These debtors, together with Nortel Networks Israel (Sales and Marketing) Limited, are defined in the proposed EMEA Claims Procedure Order as the "EMEA Companies", and are listed on Schedule "A" to the proposed draft order.

[4]     On July 30, 2009, the "2009 Claims Procedure Order" was granted, establishing a process for the proving of "Claims".

[5]     Certain categories of claims were excluded from the definition of "Claims" as defined in the 2009 Claims Procedure Order; among the excluded categories of claims were inter-company claims.

[6]     A Claims Resolution Order was granted on September 16, 2010, establishing the resolution process for "Claims" as defined in the 2009 Claims Procedure Order. The Claims Procedure Order did not establish resolution procedures for inter-company claims.

[7]     The Applicants are of the view that some of the largest claims to be filed in these proceedings will be inter-company claims, and among the largest inter-company claims are likely to be claims of the EMEA Companies ("EMEA Claims"). In addition, the Applicants are of the view that some of the EMEA Claims against some of the Applicants will likely be based on alleged facts and liabilities similar to those already asserted against NNC and NNL pursuant to the 2009 Claims Procedure Order.

[8]     The Applicants are of the view that it is appropriate to implement a "call for claims" procedure that will require the EMEA Companies to file their claims by a specified date, and to establish a process for the proving and resolution of the EMEA Claims.

[9]     The Applicants' stated intention is to establish a claims process that will ensure that the most significant claims against the Applicants can be dealt with in an orderly process, to avoid future delays in the administration of the Canadian estates, and delays in determining claims for voting and distribution purposes.

2011 ONSC 1091 (CanLII)

[10]    The Monitor filed its 58th Report and its Supplemental 58th Report in support of the relief sought by the Applicants.

[11]    Counsel to the Nortel Bondholder Group, the Unsecured Creditors' Committee, the Former and Disabled Employees, the Pension Benefit Guarantee Fund, the NCCE, the CAW, Morneau Sobeco, and the Board supported the motion. The motion was opposed by the Joint Administrators of NNUK.

[12]    Nortel has sold substantially all of its operating businesses in the course of insolvency proceedings in Canada, England and the United States. The proceeds are being held in escrow pending determination of how they are to be allocated among the various Nortel Companies. The EMEA Companies claim a significant entitlement to those proceeds. In addition, counsel submits that the EMEA Companies have significant inter-company claims against the Applicants. Counsel submits that the EMEA Claims and their claims for entitlement to the sale proceeds are inextricably intertwined and complex.

[13]    Counsel to the Joint Administrators further submitted that the proposed process is premature and flawed and that any effort to determine and resolve inter-company claims must be undertaken in a coordinated procedure that will also determine the proper allocation of the proceeds of the sale of Nortel's assets and businesses as between all the Nortel parties. Further, counsel submits that the determination of the EMEA Claims must be determined in coordinated proceedings, where all of those claims and corresponding claims of set-off and claims over as against other Nortel parties that may arise as a consequence can be determined in an appropriate forum under the appropriate law.

[14]    Counsel to the Joint Administrators also submits that the Interim Funding and Settlement Agreement ("IFSA") (which was entered into among the Applicants, Nortel Networks Inc. and the other U.S. Debtors, the Joint Administrators and the EMEA Companies) specifically contemplates the method for achieving a protocol for resolving the disputes concerning the allocation of the sales proceeds. Counsel further submits that the resolution of disputes concerning the allocation of proceeds will necessarily deal with the same issues as those that will be considered and resolved regarding the EMEA Claims.

[15]    In an effort to settle all outstanding issues, including inter-company claims and allocation of proceeds, the Nortel parties have engaged in a confidential mediation process. Counsel to the Joint Administrators advises that, in accordance with the terms of the mediation, a disclosure exercise was carried out and documents were placed into a central database. However, the use of the documents was limited for the purpose of settlement discussions.

[16]    In summary, counsel submits that the proposed EMEA Claims process is both premature and inapplicable on the basis that:

(a) the inter-company claims cannot be dealt with separate from or prior to a consideration of the allocation of proceeds;

2011 ONSC 1091 (CanLII)

- Page 4 -

(b) pursuant to s. 12.c. of the IFSA, the parties have begun a process of negotiating a protocol for resolving disputes concerning the allocation of proceeds;

(c) if all issues are not dealt with in a coordinate manner, there will be multiple courts considering the identical issues with the significant risks of inconsistent results.

[17]    Further, they submit that the claims process requested is mainly silent with respect to how issues of jurisdiction, applicable law and the coordination of proceeds will be dealt with and that the proposed claims process does not, in any way, deal with how documentary production is to be made in a context where insufficient documentation has been provided by the Applicants to the EMEA Companies.

[18]    I have not been persuaded by these arguments.

[19]    Section 12.c. of the IFSA references a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions. I am in agreement with the comments of the Monitor that the proposed EMEA Claims Procedure Order does not concern "the allocation of sale proceeds from sale transactions", but rather a process for the calling and resolution of claims that may be advanced by the EMEA Companies against the Applicants. The argument of the Joint Administrators based on section 12.c. of the IFSA is not persuasive.

[20]    With respect to the submission that claims of the EMEA Companies cannot be dealt with separate from or prior to a consideration of the allocation of proceeds, it appears that the linkage between inter-company claims and allocation of proceeds, that is referenced by counsel to the Joint Administrators, may have more to do with achieving maximum leverage in the global distribution negotiations than with the determination of the EMEA Claims. In a claims process, it is reasonable to expect that the Joint Administrators will file what they consider to be the broadest claim allowable and all heads of the claim and the quantum claim will be clearly set out.

[21]    In putting forth the position that a determination of the quantum of the claim cannot be made until the allocation issue is resolved, an indirect question is raised, namely, in formulating the EMEA Claim, will the Joint Administrators be in any way influenced by the allocation process. If the allocation process impacts the methodology to be utilized by the Joint Administrators in the preparation of the EMEA Claim, it follows that the EMEA Claim may not be complete in all respects. In my view, it is not helpful to have an incomplete EMEA Claim.

[22]    If, on the other hand, the objective of the Joint Administrators is to file the broadest claim allowable in these proceedings, I fail to understand why the preparation and submission of that claim has to wait until the allocation process has been resolved.

[23]    Nortel's insolvency proceedings were commenced in January 2009. At this stage, two years later, it is reasonable to expect that the Joint Administrators will have a complete understanding of the basis for filing an EMEA Claim.

[24]    It is also reasonable to expect that there will be a distribution in the CCAA proceedings and, in my view, all meaningful steps to achieve this objective should be implemented. In

2011 ONSC 1091 (CanLII)

- Page 5 -

addition to institutional creditors, it is important to again emphasize that there are thousands of individuals who have claims against Nortel, and for these individuals, time does not stand still.

[25]    The time has come where this matter has to move forward.  A full and complete claims process will be required before a distribution in the CCAA proceedings can take place.

[26]    That is not to say that the process issues raised by the Joint Administrators should be ignored.  The parties involved in the EMEA Claim are well aware of process issues which include how claims of set-off are to be dealt with, how documentary production is to be made and the timing of the claims bar date.  The Applicants recognize that the EMEA Claim is going to be significant.  The process issues raised by the Joint Administrators cannot and should not be ignored.

[27]    Accordingly, the Applicants' motion is granted.  The order should reflect that the purpose of the procedure is to fully identify and articulate the EMEA Claims, but the process issues referenced by counsel to the Joint Administrators remain to be addressed.  Counsel are to prepare a form of order to give effect to the foregoing.  To the extent that there is no agreement over the form of order, counsel should schedule a 9:30 a.m. appointment with me through the Commercial List Office.

2011 ONSC 1091 (CanLII)

MORAWETZ J.

Date: February 17, 2011



# TAB14

# Court of Queen's Bench of Alberta

Citation: Re Calpine Canada Energy Limited (Companies' Creditors Arrangement Act), 2007 ABQB 504

Date: 20070731
Docket: 0501 17864
Registry: Calgary

In the Matter of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as Amended

And in the Matter of Calpine Canada Energy Limited, Calpine Canada Power Ltd., Calpine Canada Energy Finance ULC, Calpine Energy Services Canada Ltd., Calpine Canada Resources Company, Calpine Canada Power Services Ltd., Calpine Canada Energy Finance II ULC, Calpine Natural Gas Services Limited, and 3094479 Nova Scotia Company

Applicants

---

Reasons for Judgment
of the
Honourable Madam Justice B.E. Romaine

---

## Introduction

[1]     This application involves the most recent development in the lengthy and complicated Calpine insolvency. That insolvency has required proceedings both in this jurisdiction under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") and in the United States under Chapter 11 of the U.S. Bankruptcy Code. The matter is extremely complex, involving many related corporations and partnerships, highly intertwined legal and financial obligations and a number of cross-border issues. The resolution of these proceedings has been delayed by several difficult issues with implications for the insolvencies on both sides of the border. The above-noted applicants (collectively, the "Calpine Applicants") and the U.S. debtors applied to this Court and to the United States Bankruptcy Court of the Southern District of New York in a joint hearing for approval of a settlement of these major issues, which they say will break the deadlock.

[2]     Both Courts approved the settlement. These are my reasons for that approval.

## Background

[3]     Given the complexity of the matter, it will be useful to set out some background. On December 20, 2005, the Calpine Applicants obtained an order of this Court granting them

protection from their creditors under the CCAA. That order appointed Ernst & Young Inc. as Monitor. It also provided for a stay of proceedings against the Calpine Applicants and against Calpine Energy Services Canada Partnership ("CESCA"), Calpine Canada Natural Gas Partnership ("CCNG") and Calpine Canadian Saltend Limited Partnership ("Saltend LP"). The Monitor's 23rd Report dated June 28, 2007 refers to the latter three parties collectively as the "CCAA Parties" and to those parties together with the Calpine Applicants as the "CCAA Debtors". Where I have quoted terms and definitions from the Report, I adopt those terms and definitions for purposes of these Reasons. On the same day, Calpine Corporation and certain of its direct and indirect U. S. subsidiaries filed voluntary petitions to restructure under Chapter 11 of the U.S. Bankruptcy Code. The Monitor refers to Calpine Corporation ("CORPX"), the primary party in the U. S. insolvency proceedings, and its U.S. subsidiaries collectively as the "U.S. Debtors".

[4]     During the course of the CCAA proceedings, a number of applications were made relating to the relationship of the CCAA Debtors and Calpine Power L.P. (the "Fund"), leading ultimately to the short and long-term retolling of the Calgary Energy Centre and the sale of the interest of Calpine Canada Power Ltd. ("CCPL") in the Fund to HCP Acquisition Inc. ("Harbinger") in February 2007, a sale that closed simultaneously with Harbinger's takeover of the publicly-held units in the Fund.

[5]     In addition to these issues, progress in the restructuring and the realization of maximum value for assets was made more difficult by various cross-border issues. The Report sets out the following "material cross-border issues that needed to be resolved between the CCAA Debtors and the U.S. Debtors":

a.  The Hybrid Note Structure ("HNS") and whether Calpine Canada Energy Finance ULC ("ULC1"), including the holders of the 8 ½% Senior Notes due 2008 (the "ULC1 Notes") issued by ULC1 and fully and unconditionally guaranteed by CORPX, had multiple guarantee claims against CORPX;

b.  The sale by Calpine Canada Resources Company ("CCRC") of its holdings of U.S.\$359,770,000 in ULC1 Notes (the "CCRC ULC1 Notes") and the effect of the U.S. Debtors' so-called Bond Differentiation Claims ("BDCs") on such a sale;

c.  Cross-border intercompany claims between the CCAA Debtors and the U.S. Debtors;

d.  Third party claims made against certain CCAA Debtors that were guaranteed by the U.S. Debtors;

e.  The priority of the claim of Calpine Canada Energy Limited ("CCEL") against CCRC;

2007 ABQB 504 (CanLII)

Page: 3

f.    A fraudulent conveyance action brought by the CCAA Debtors in this
      Court (the "Greenfield Action");

g.    Potential claims by the U.S. Debtors to the remaining proceeds repatriated
      from the sale of the Saltend Energy Centre;

h.    Cross-border marker claims filed by the U.S. Debtors and the CCAA
      Debtors and the appropriate jurisdiction in which to resolve those claims;
      and

i.    Marker claims filed by the ULC1 Indenture Trustee.

[6]    In the Report, the Monitor describes the settlement process that led to this application as
follows:

    10.    The CCAA Debtors and the U.S. Debtors concluded that the only way to
           resolve the issues between them was to concentrate on reaching a
           consensual global agreement that resolved virtually all the issues referred
           to above. The [CCAA Debtors and the U.S. Debtors] realized that without
           a global agreement, they could have faced lengthy and costly cross-border
           litigation.

    11.    Over the last five months, the Monitor and the CCAA Debtors held
           numerous discussions with the U.S. Debtors regarding a possible global
           settlement of the outstanding material and other issues. In addition, during
           various stages of discussion with the U.S. Debtors, the CCAA Debtors and
           the Monitor sought input from the major Canadian stakeholders as to the
           format and terms of a settlement.

    12.    While the settlement discussions between the U.S. Debtors and the CCAA
           Debtors were underway, the ad hoc committee of certain holders of ULC1
           Notes reached terms of a separate settlement between the holders of the
           ULC1 Notes and CORPX (the "Preliminary ULC1 Settlement"). The
           terms of the Preliminary ULC1 Settlement were agreed to on April 13,
           2007 and publicly announced by CORPX on April 18, 2007.

    13.    As a result of the above discussions and negotiations, [a settlement outline
           (the "Settlement Outline")] was agreed to on May 13, 2007 and publicly
           announced by CORPX on May 14, 2007. The Settlement Outline
           incorporates the terms of the Preliminary ULC1 Settlement. ...

    14.    The parties have negotiated the terms of [a global settlement agreement
           memorializing the terms of the Settlement Outline (the "GSA")] ...

2007 ABQB 504 (CanLII)

Page: 4

17.    The [GSA] is subject to the following conditions:

     a.     The approval of both this Court and the U.S. Bankruptcy
            Court;

     b.     The execution of the [GSA]; and

     c.     The CCRC ULC1 Notes being sold.

[7]    As the Monitor notes, the GSA resolves all of the material issues that exist between the
Calpine Applicants and the U. S. Debtors. The Report describes the "key elements" of the GSA
as follows:

     a.     The [GSA] provides for the ULC1 Note Holders to effectively receive a
            claim of 1.65x the amount of the ULC1 Indenture Trustee's proof of claim
            . . . against CORPX which results in a total claim against CORPX in the
            amount of US$3.505 billion (the "ULC1 1.65x Claim"). The 1.65x factor
            was agreed between the U.S. Debtors and the ad hoc committee of certain
            holders of the ULC1 Notes. As a result of the [GSA], the terms of the
            HNS can be honoured with no material adverse economic impact to the
            U.S. Debtors, CCAA Debtors or their creditors;

     b     The withdrawal of the BDCs advanced by the U.S. Debtors. . . ;

     c.     An agreement between the U.S. Debtors and the CCAA Debtors as to the
            cooperation in the sale of the CCRC ULC1 Notes;

     d.     The priority of claims against CCRC are clarified, including the claim of
            CCEL against CCRC being postponed to all other claims against CCRC;

     e.     The acknowledgement by the U.S. Debtors of certain guarantee claims
            advanced by creditors in the CCAA proceedings and the agreement by the
            U.S. Debtors that the quantum of these guarantee claims will be
            determined by the Canadian Court. The [GSA] contemplates that U.S.
            Debtors and their official committees will be afforded the right to fully
            participate in any settlement or adjudication of these guarantee claims.
            Pursuant to the [GSA], the U.S. Debtors acknowledge their guarantee of
            the following CCAA Debtors' creditors' claims:

          i.     The claims of Alliance Pipeline Partnership, Alliance
                Pipeline L.P., and Alliance Pipeline Inc. (collectively
                "Alliance") for repudiation of certain long-term gas
                transportation contracts held by CESCA;

Page: 5

2007 ABQB 504 (CanLII)

ii.   The claims of NOVA Gas Transmission Ltd. ("NOVA")
      for the repudiation of certain long-term gas transportation
      contracts held by CESCA;

iii.  The claims of TransCanada Pipelines Limited ("TCPL")
      for the repudiation of certain long-term gas transportation
      contracts held by CESCA;

iv.   The claims of Calpine Power L.P. [the "Fund"] for the
      repudiation of the tolling agreement between [the Fund]
      and CESCA (the "CLP Toll Claim");

v.    The claims of [the Fund] and Calpine Power Income Fund
      ("CPIF") relating to a potential fee resulting from the
      alleged transfer of the Island co-generation facility (the
      "Island Transfer Fee Claim"); and

vi.   The claims of [the Fund] for heat rate indemnity relating to
      the Island co-generation facility (the "Heat Rate Penalty
      Claim"); and

f.   The withdrawal of virtually all U.S. and CCAA Debtor Marker Claims;

g.   The settlement of the Greenfield Action;

h.   The withdrawal of the UL1 Indenture Trustee Marker Claim;

i.   The withdrawal of the claims filed by the Indenture Trustee of the Second
     Lien Notes against the CCAA Debtors;

j    The resolution of the quantum of the cross-border intercompany claims...;

k.   The settlement of the ULC2 Claims as against CCRC (as between the
     CCAA Debtors and the U.S. Debtors) and also confirmation of the ULC2
     guarantee by CORPX;

l.   The payment of all liabilities of ULC2, including the amounts due on the
     ULC2 Notes. For example, the ULC2 Indenture Trustee has advised that it
     believes a make-whole payment is applicable if ULC2 repays the holders
     of the ULC2 Notes prior to the final payment date as set out in the
     Indenture (the "ULC2 Make-Whole Premium"). The CCAA Debtors and
     the U.S. Debtors dispute that the ULC2 Make-Whole Premium is
     applicable. However, the [GSA] contemplates that if the issue is not
     resolved by the date of distribution to the ULC2 direct creditors, an

Page: 6

2007 ABQB 504 (CanLII)

amount sufficient to satisfy the claim may be set aside in escrow pending
the determination of the issue;

m.      An agreement on the allocation of professional fees relating to the CCAA
        proceedings amongst the CCAA Debtors and agreement as to the quantum
        of certain aspects of the Key Employee Retention Plan. . .;

n.      Resolution of all jurisdictional issues between Canada and the U.S.; and

o.      An agreement as to the allocation of the proceeds from the sale of
        Thomassen Turbines Systems, B.V. ("TTS").

[8]     The Monitor describes and analyzes the terms and effect of the GSA in great detail in the
Report. It concludes that the GSA is beneficial to the CCAA Debtors and their creditors,
providing a medium for an efficient payout of many of the creditors, resolving all material
disputes between the CCAA Debtors and the U.S. Debtors without costly and time-consuming
cross-border litigation, settling the complex priority issues of CCRC and providing for the
admission by the U.S. Debtors of the validity of guarantees provided to certain creditors of the
CCAA Debtors. It is important to note that the Monitor unequivocally endorses the GSA.

The Applications

[9]     The Calpine Applicants sought three orders from this Court. First, they sought an order
approving the terms of the GSA and directing the various parties to execute such documents and
implement such transactions as might be necessary to give effect to the GSA. Second, they
sought an order permitting CCRC and ULC1 to take the necessary steps to sell the CCRC ULC1
Notes. Third, they sought an extension of the stay contemplated by the initial CCAA order to
December 20, 2007.

[10]    The application was made concurrently with an application by the U.S. Debtors to the
U.S. Bankruptcy Court in New York state, the two applications proceeding simultaneously by
videoconference. No objection was taken to the latter two orders sought from this Court and I
have granted both. I also gave approval to the GSA with brief oral reasons. I indicated to counsel
at the hearing that these more detailed written reasons would be forthcoming as soon as possible.
The applications to the U.S. Court, including an application for approval of the GSA, were also
granted.

[11]    The controversial point in the applications, both to this Court and to the U.S. Court, was
approval of the GSA. The parties standing in opposition to the GSA are the Fund, the ULC2
Indenture Trustee and a group referring to itself as the "*Ad Hoc* Committee of Creditors of
Calpine Canada Resources Company" (the "Ad Hoc Committee"). (HSBC Bank USA, N.A., as
ULC1 Indenture Trustee, also filed a technical objection, but it has since been withdrawn.) The
bench brief of the Ad Hoc Committee states that it "is comprised of members of the *Ad Hoc*
Committee of Bondholders of Calpine Canada Energy Finance II ULC ... and Calpine Power,

L.P.". Thus, the Ad Hoc Committee consists of the Fund and certain unknown ULC2 noteholders. There was some objection to the status of the Ad Hoc Committee to oppose the GSA independently of the Fund, but that objection was not strenuously pursued and I do not need to address it. However, I note that the Fund thus makes its arguments through both the Ad Hoc Committee and its separate counsel, and the ULC2 noteholders make theirs through both the ULC2 Indenture Trustee and the Ad Hoc Committee. I will refer to those parties opposing the GSA collectively as the "Opposing Creditors" hereafter. The Opposing Creditors object to the GSA on a number of grounds and there is much overlap among their positions.

[12]    The primary objection is that the GSA amounts to a plan of arrangement and, therefore, requires a vote by the Canadian creditors. The Opposing Creditors support their submissions by isolating particular elements of the GSA and characterizing them as either a compromise of their rights or claims or as examples of imprudent concessions made by the CCAA Debtors in the negotiation of the GSA. These specific objections will be analysed in the next part of these reasons, but, taken together, they fail to establish that the GSA is a compromise of the rights of the Opposing Creditors for two major reasons:

a)    the GSA must be reviewed as a whole, and it is misleading and inaccurate to focus on one part of the settlement without viewing the package of benefits and concessions in its overall effect. The Opposing Creditors have discounted the benefits to the Canadian estate of the resolution of $7.4 billion in claims against the CCAA Debtors by arguing that these claims had no value. As the Report notes:

> . . .While the Monitor believes it is unlikely that the CCAA Debtors would have been unsuccessful on all the issues [identified earlier in these Reasons as material cross-border issues], there was a real risk of one or more claims being successfully advanced against CCRC by the U. S. Debtors or the ULC1 Trustee and, had this risk materialized, the recovery to the CCRC direct creditors and CESCA creditors would have been materially reduced.

b)    the Opposing Creditors blur the distinction between compromises validly reached among the parties to the GSA and the effect of those compromises on creditors who are not parties to the GSA. The Monitor has opined that the GSA allows for the maximum recovery to all the CCAA Debtors' creditors. According to the Monitor's conservative calculations, virtually all the Canadian creditors, including the Opposing Creditors, likely will be paid the full amount of their claims as settled or adjudicated, either from the Canadian estate or as a U.S. guarantee claim. If claims are to be paid in full, they are not compromised. If rights to a judicial determination of an outstanding issue have not been terminated by the GSA, which instead provides a mechanism for their efficient and timely resolution, those rights are not compromised.

2007 ABQB 504 (CanLII)

### The Ad Hoc Committee's Objections

[13]   The Ad Hoc Committee asserts that the GSA expropriates assets with a value of approximately U.S.$650 million to the U.S. Debtors that would otherwise be available to Canadian creditors, leaving insufficient value in the Canadian estates to ensure that the Canadian creditors are paid in full. The Ad Hoc Committee argues that the Canadian creditors will receive less than full recovery and that, therefore, their claims have been compromised.

[14]   This submission is misleading. The $650 million refers to two elements of the GSA: a payout to the U.S. Debtors of $75 million from CCRC in exchange for the withdrawal of the U.S. Debtors BDCs, settlement of the U.S. Debtors' claims against the Saltend proceeds and the postponement of CCEL's claim against CCRC and the elimination of CCRC's unlimited liability corporation claim against its member contributory, CCEL, which the Opposing Creditors complain effectively denies access to an intercompany claim of $575 million. I do not accept that the GSA "expropriates" assets to the U.S. Debtors, who had both equity and creditor claims against the Canadian estates that they relinquished as part of the GSA. The GSA is a product of negotiation and settlement and required certain sacrifices on the part of both the U.S. Debtors and the CCAA Debtors. The Ad Hoc Committee's piecemeal analysis of the GSA ignores the other considerable benefits flowing to the Canadian estate from the GSA, including the subordination of CCEL's $2.1 billion claim against CCRC. As recognized by the Monitor, this postponement permits the CESCA shortfall claim to participate in the anticipated CCRC net surplus, failing which the recovery by creditors of CESCA (notably including the Fund) would be materially reduced. The Ad Hoc Committee also fails to mention that an additional $50 million of claims against CESCA advanced by the U.S. Debtors have been postponed to the claims of other CESCA creditors.

[15]   The Ad Hoc Committee argues that the U.S. Debtors' claims that have been withdrawn are "untested" and "unmeritorious". Certainly, the claims have not been tested through litigation. However, it is the very nature of settlement to withdraw claims in order to avoid protracted and costly litigation. While the Ad Hoc Committee may consider the U.S. Debtors' claims unmeritorious, their saying so does not make it so. The fact remains that the U.S. Debtors have agreed, as part of the GSA, to withdraw claims that would otherwise have to be adjudicated, likely at considerable time and expense.

[16]   As part of the GSA, the U.S. Debtors agree to cooperate in the sale of the CCRC ULC1 Notes. The Ad Hoc Committee is of the view that that cooperation "should have been forthcoming in any event". Nevertheless, the U.S. Debtors previously have not been prepared to accede to such a sale, insisting instead on asserting their BDCs. The sale is acknowledged to be critical to resolution of this insolvency and the present willingness of the U.S. Debtors to cooperate therein is of great value.

[17]   The Ad Hoc Committee also takes issue with the recovery available under the GSA to the creditors of CESCA, arguing that those creditors face a potential shortfall of at least $175 million. The cited shortfall of $175 million is again misleading, failing to take into account that

Page: 9

the Fund, to the extent that its claims are adjudicated to be valid and there is a shortfall in CESCA, will now have the benefit of acknowledged guarantees of these claims by the U.S. Debtors as a term of the GSA. The Monitor thus reports its expectation that the Fund's claims will be paid in full. There exists, therefore, only the potential, under the Monitor's "low" recovery scenario, of a shortfall in CESCA of $25.1 million. Those creditors who may be at risk of such a shortfall are not the Opposing Creditors, but certain trade creditors to the extent of approximately $2 million, who are not objecting to the GSA, and certain gas transportation claimants to the extent of approximately $23 million, who appeared before the Court at the hearing to support the approval of the GSA on the basis that it improves their chances of recovery.

[18]    The shortfall, if any, to which the creditors of CESCA will be exposed will depend upon the quantum of the CLP Toll Claim. As yet, this claim remains, to use the Ad Hoc Committee's word, untested. Assessments of its value range from $142 million to $378 million. The Monitor's analysis, taking into account the guarantees by the U.S. Debtors contemplated by the GSA, indicates that if this claim is adjudged to be worth $200 million or less, all of the CESCA creditors will be assured of full payment whether under the "high" or "low" scenarios. Alternatively, under the Monitor's "high" recovery scenario, all creditors of CESCA will receive full payment even if the CLP Toll Claim is worth as much as $300 million.

[19]    Further, as I indicated in my oral reasons, even if the Fund does not receive full payment of the CLP Toll Claim through the Canadian estate, the GSA cannot be said to be a compromise of that claim. The GSA contemplates adjudication of the CLP Toll Claim rather than foreclosing it. While settlements made in the course of insolvency proceedings may, in practical terms, result in a diminution of the pool of assets remaining for division, this is not equivalent to a compromise of substantive rights. This point is discussed further later in these Reasons.

[20]    The Ad Hoc Committee points out that, according to the Report, the GSA results in recovery for CCPL of only 39% to 65%. As the Fund is CCPL's major creditor, the Ad Hoc Committee argues that this level of anticipated recovery constitutes a compromise of the Fund's claim in this respect.

[21]    The response to this argument is two-fold. First, the Report indicates that the CCPL recovery range is largely dependent upon the quantum of the Fund's Heat Rate Penalty Claim. The Monitor has taken the conservative approach of estimating the amount of this claim at the amount asserted by the Fund; the actual amount adjudicated may be less, resulting in greater recovery for CCPL. Further, the Monitor notes that, as part of the GSA, CORPX acknowledges its guarantee of the Heat Rate Penalty Claim. Therefore, the Monitor concludes that "[t]o the extent there is a shortfall in CCPL, based again upon the Monitor's expectation that CORPX's creditors should be paid 100% of filed and accepted claims, [the Fund] should be paid in full for the Heat Rate Penalty Claim regardless of whether a shortfall resulted in CCPL". As discussed above, the possibility of a shortfall in the asset pool against which claims may be made is not equivalent to a compromise of those claims. The Monitor reports that only $25,000 of CCPL's creditors may face a risk of less than 100% recovery after consideration of the CORPX

2007 ABQB 504 (CanLII)

Page: 10

guarantees under the "low" scenario, and those only to the extent of a $15,000 shortfall and that the CCAA Debtors are considering options to pay out these nominal creditors in any event.

[22]    The Ad Hoc Committee argues that CORPX's guarantees are not a satisfactory solution to potential shortfalls because resort to the guarantees may result in the issuance of equity rather than the payment of cash. This, however, is by no means certain at this point. Parties who must avail themselves of CORPX's guarantees will participate in the U.S. bankruptcy proceedings and will be entitled to a say in the ultimate distribution that results from those proceedings. The Opposing Creditors complain that recovery under the guarantees is uncertain as to timing and amount of consideration. However, the GSA removes any hurdle these creditors may have in establishing their rights to guarantees. Without the acknowledgment of guarantees that forms part of the GSA, those creditors who sought to rely on the guarantees faced an inefficient and expensive process to establish their rights in the face of the stay of proceedings in place in the U.S. proceedings. While it is true that the expectation of full payment under the GSA with respect to guarantee claims rests on the Monitor's expectation that these claims will be paid in full, the U. S. Debtors in a disclosure statement released on June 20, 2007 announced their expectation that their plan of reorganization in the U.S. proceedings would provide for the distribution of sufficient value to pay all creditors in full and to make some payment to existing shareholders.

[23]    The Ad Hoc Committee also argues that the GSA purports to dismiss claims filed by the ULC2 Indenture Trustee on behalf of the ULC2 noteholders without consent or adjudication. They further take the position that this alleged dismissal is to occur prior to any payment of the claims of the ULC2 noteholders, such payment being subject to further Court order and to a reserved ability on the part of the CCAA Debtors to seek to compromise certain of the ULC2 noteholders' claims.

[24]    Again, this is an inaccurate characterization of the effect of the GSA. First, as noted above, the GSA contemplates setting aside in escrow sufficient funds to satisfy the claims of the ULC2 noteholders pending adjudication. Thus, there is no compromise. With respect to the timing issue, it is important to remember that these claims are not being dismissed as part of the GSA. They remain extant pending adjudication and, if appropriate, payment from the funds held in escrow.

[25]    Finally, while the Ad Hoc Committee does not object to the sale of the CCRC ULC1 Notes, it argues that there is no urgency to such sale and that it should not occur until after there has been a determination of the various claims. As counsel for the Calpine Applicants pointed out, this is a somewhat disingenuous position for the Ad Hoc Committee to take, given its previous expressions of impatience in respect of the sale.

[26]    I am satisfied that the potential market for the CCRC ULC1 Notes is volatile and that, now that the impediments to the sale have been removed, it is prudent and indeed necessary for the CCRC ULC1 Notes to be sold as soon as possible. The present state of the market has created an opportunity for a happy resolution of this CCAA filing that should not be allowed to

be lost. In addition to alleviating market risk, the GSA will ensure that interest accruing on outstanding claims will be terminated by their earlier payment.. This is not a small benefit. As an example, interest accrues on the ULC2 Notes at a rate of approximately $3 million per month plus costs. The earlier payment of these notes that would result from the operation of the GSA thus increases the probability of recovery to the remaining creditors of CCRC.

[27]    As the Ad Hoc Committee made clear during the hearing, it wants the right to vote on the GSA but wants to retain the benefit of the GSA terms that it finds advantageous. It suggests that the implementation of the GSA be delayed "briefly" for the calling of a vote and the determination of the ULC2 entitlements and the Fund's claims with certainty, in accordance with a litigation timetable that has been proposed as part of the application. The "brief" adjournment thus suggested amounts to a delay of roughly 3 ½ months, without regard to allowing this Court a reasonable time to consider the claims after a hearing or the timing considerations of the U. S. Court.

## The Fund's Objections

[28]    As noted in its brief, the Fund "fully supports" the position of the Ad Hoc Committee. However, it says it has additional objections.

[29]    The Fund objects particularly to the settlement of the Greenfield Action. It argues that the GSA contemplates settlement of the Greenfield Action without payment to CESCA and that, as CESCA's major creditor, the Fund is thereby prejudiced.

[30]    Firstly, the settlement of this claim under the GSA was between the proper claimant, CCNG and the U.S. Debtors. It was not without consideration as alleged. The GSA provides that $15 million of the possible $90 million priority claim to be paid to the U. S. Debtors out of the Canadian estate will be netted off in consideration for the Greenfield settlement.

[31]    The Fund submits that there are conflict of interest considerations arising from the settlement of the Greenfield matter between the CCAA Debtors and the U.S. Debtors. This argument might have greater force if the Fund were actually compromised or prejudiced in the GSA. However, as I have already noted, the Fund and the remaining creditors of CESCA benefit from the GSA when it is considered on a global basis. It may be that there is a risk that the Fund will be unable to secure complete recovery. However, as discussed above, this does not represent a compromise of the Fund's claims. Further, as I indicated in my oral reasons, the fact that the Fund may bear some greater risk than other creditors does not, in itself, make the GSA unfair.

[32]    The Fund also complains of a potential shortfall in respect of its claims against CCPL. They argue that, even if they are able to have recourse to CORPX's guarantee in respect of any shortfall in the Canadian estate, they are prejudiced because they may receive equity rather than cash. I have previously addressed some of the issues relating to the possibility that the Fund may have to have recourse to the now-acknowledged guarantees of their disputed claims as part of the U.S. process to obtain full payment. This possibility existed prior to the negotiation of the GSA

2007 ABQB 504 (CanLII)

and in fact, the possibility of resort to the guarantees may have been of greater likelihood if the $7.4 billion of claims against the Canadian estate that the GSA eliminates had been established as valid to any significant degree. Without the provision of the GSA that enables the claims of the Fund that give rise to the guarantees being resolved in this Court, the Fund would have faced the possibility of adjudication of those claims in the U.S. proceedings. The Fund now will be entitled to participate with other guarantee claimants in the U.S. and will be entitled to a vote on the proposal of the U.S. Debtors to address those claims. I am not satisfied that the Fund is any worse off in its position as a result of the GSA in this regard.

[33]    The Fund further argues that it is not aware of any CORPX guarantee in respect of its most recent claim. A claim was filed against the Fund in Ontario on May 23, 2007 relating to CCPL's management of the Fund. The Fund made application before me on July 24, 2007 for leave to file a further proof of claim against CCPL. I have reserved my decision on that application. The Fund asserts that since there is no CORPX guarantee in respect of this claim, they face a shortfall of $10.5 million on the "high" scenario basis or $19.5 million on the "low" scenario basis on this claim. This claim has not yet been accepted as a late claim. It arose after the GSA was negotiated and, therefore, could not have been addressed by the negotiating parties in any event. It is highly contingent, opposed by both the Fund and the CCAA Debtors, and raises issues of whether the indemnity between CCPL and the Fund is even applicable. Even if accepted as a late claim, it would not likely be valued by the CCAA Debtors and the Monitor at anything near its face value. This currently unaccepted late claim is not properly a factor in the consideration of the GSA.

## The ULC2 Trustee's Objections

[34]    The ULC2 Trustee objects, first, to its exclusion from the negotiation process leading up to the GSA. It states in its brief that "[a]s the ULC2 Trustee was not provided with the ability to participate or seek approval of the proposed resolution of the ULC2 Claims, it cannot support the [GSA] unless and until it is clear that the terms thereof ensure that the ULC2 Claims are provided for in full and the [GSA] does not result in a compromise of any of the ULC2 Claims". Although the ULC2 Trustee may not have participated in the negotiation or drafting of the GSA, it did comment on the issues addressed in the settlement. The problem is that these issues have not been resolved to the satisfaction of the ULC 2 Trustee.

[35]    The ULC2 Trustee argues that the GSA provides it with one general unsecured claim in the CCAA Proceedings against ULC2 in an amount alleged to satisfy the outstanding principal amount of the ULC 2 Notes, accrued and unpaid interest and professional fees, costs and expenses of both the Ad Hoc ULC2 Noteholders Committee and the ULC2 Trustee and one guarantee claim against CORPX. It argues that the quantum contemplated by the GSA is insufficient to satisfy the amounts owing under the ULC2 Indenture because it does not take proper account of interest on the ULC2 Notes.

2007 ABQB 504 (CanLII)

Page: 13

[36]    In addition, the ULC2 Trustee takes the position that the GSA fails to provide for the ULC2 Make-Whole Premium. It objects to being required, under the terms of the GSA, to take this matter to the U.S. Bankruptcy Court rather than to this Court.

[37]    I am unable to conclude that the GSA compromises the rights of the ULC2 noteholders in the manner complained of by the UCL2 Trustee. First, the GSA contemplates that the ULC2 Trustee will be paid in full, whatever its entitlement is. If the quantum of that entitlement cannot be resolved consensually, the CCAA Debtors have committed to reserve sufficient funds to pay out the claims once they have been resolved.

[38]    While the GSA reorganizes the formal claims made by the ULC2 Trustee, the reorganization does not prejudice the ULC2 noteholders financially, as the effect of the reorganized claims is the same and the ULC2 Trustee's right to assert the full amount of its claims remains.

[39]    With respect to the requirement that the ULC2 Trustee take the matter of the ULC2 Make-Whole Premium to the U.S. Court, I am satisfied that the United States Bankruptcy Court of the Southern District of New York is an appropriate forum in which to address that and its related issues, given that New York law governs the Trust Indenture and the Trust Indenture provides that ULC II agrees that it will submit to the non-exclusive jurisdiction of the New York Court in any suit, action or proceedings. Granted, there may be arguments that could be made that this Court has jurisdiction over these issues under CCAA proceedings, but s. 18.6 of the CCAA recognizes that flexibility and comity are important to facilitate the efficient, economical and appropriate resolution of cross-border issues in insolvencies such as this one. I note that the GSA assigns responsibility for a number of unresolved claims which could be argued to have aspects that are within the jurisdiction of the U.S. Court to this Court for resolution. I am satisfied that I have the authority under s. 18.6 of the CCAA to approve the assignment of these issues to the U.S. Court even over the objections of the ULC2 Trustee.

[40]    The ULC2 Trustee also objects to the timing of the payment of $75 million to the U.S. Debtors and to the withdrawal of certain oppression claims relating to the sale of the Saltend facility, submitting that the payment and withdrawal should not occur prior to the payment of the claims of the ULC2 noteholders. There was some confusion over an apparent disparity between the Canadian form of order and the U.S. form with respect to the order of distributions of claims. The Canadian order, to which the U.S. order has now been conformed,  provides that the $75 million payment will not occur until the CCRC ULC1 Notes are sold and a certificate is filed with both Courts advising that all conditions of the GSA have been waived or satisfied. While this does not satisfy the ULC2 Trustee's objection under this heading in full, I accept the submission of the CCAA Applicants that the GSA requires certain matters to take effect prior to others in order to allow the orderly flow of funds as set out in the GSA and that the arrangement relating to the escrow of funds protects the ULC2 noteholders in any event.

Page: 14

### Analysis of Law re: Plan of Arrangement

[41]     It is clear that, if the GSA were a plan of arrangement or compromise, a vote by creditors would be necessary. The Court has no discretion to sanction a plan of arrangement unless it has been approved by a vote conducted in accordance with s. 6 of the CCAA: *Royal Bank v. Fracmaster* (1999), 244 A.R. 93 (C.A.) at para. 13.

[42]     The Ad Hoc Committee, the Fund and the ULC2 Trustee rely heavily on *Menegon v. Philip Services Corp.* (1999), 11 C.B.R. (4th) 262 (Ont. S.C.J.) to support their submissions. As noted by Blair, J. in *Philip* at para. 42, in the context of reviewing a plan of arrangement filed in CCAA proceedings involving Philip Services and its Canadian subsidiaries in Canada where the primary debtor, Philip Services, and its United States subsidiaries had also filed for Chapter 11 protection under U.S. law and had filed a separate U.S. plan, the rights of creditors under a plan filed in CCAA proceedings in Canada cannot be compromised without a vote of creditors followed by Court sanction.

[43]     The comments made by the Court in *Philip* must be viewed against the context of the specific facts of that case. Philip Services was heavily indebted and had raised equity through public offerings in Canada and the United States. These public offerings led to a series of class actions in both jurisdictions, which, together with Philip Services' debt load and the bad publicity caused by the class actions, led to the CCAA and Chapter 11 filings. At about the same time that plans of arrangement were filed in Canada and the U.S., Philip Services entered into a settlement agreement with the Canadian and U.S. class action plaintiffs that Philip Services sought to have approved by the Canadian Court. The auditors (who were co-defendants with Philip Services in the class action proceedings), former officers and directors of Philip Services who had not been released from liability in the class action proceedings and other interested parties brought motions for relief which included an attack on the Canadian plan of arrangement on the basis that it was not fair and reasonable as it did not allow them their right as creditors to vote on the Canadian plan.

[44]     The effect of the plans filed in both jurisdictions was that the claims of Philip Services' creditors, whether Canadian or American, were to be dealt with under the U.S. plan, and only claims against Philip Services' Canadian subsidiaries were to be dealt with under the Canadian plan.

[45]     The Court found that if the settlement and the Canadian and U.S. plans were approved, the auditors and the underwriters who were co-defendants in the class action proceedings would lose their rights to claim contribution and indemnity in the class action. The Court held at para. 35 that this was not a reason to impugn the fairness of the plans, since the ability to compromise claims under a plan of arrangement is essential to the ability of a debtor to restructure. The plans as structured deprived these creditors of the ability to pursue their contribution claims in the CCAA proceedings by carving out the claims from the Canadian proceedings and providing that they be dealt with under the U.S. plan in the U.S. Bankruptcy Court. The Court noted that this was so despite the fact that Philip Services had set in motion CCAA proceedings in Canada in

2007 ABQB 504 (CanLII)

Page: 15

the first place and, by virtue of obtaining a stay, had prevented these creditors from pursuing their claims in Canada. The Canadian plan was stated to be binding upon all holders of claims against Philip Services, including Canadian claimants, without according those Canadian claimants a right to vote on the Canadian plan.

[46]   In Blair J.'s opinion, it was this loss of the right of Philip Services' Canadian creditors to vote on the Canadian plan that caused the problem. He found at para. 38 that Philip Services, having initiated and taken the benefits of CCAA proceedings in Canada, could not carve out "certain pesky . . . contingent claimants, and... require them to be dealt with under a foreign regime (where they will be treated less favourably) while at the same time purporting to bind them to the provisions of the Canadian Plan...without the right to vote on the proposal.".

[47]   The Court took into account that the auditors, underwriters and former directors and officers of Philip Services would be downgraded to the same status as equity holders under the U.S. plan, rather than having their claims considered as debt claims as they would be in Canada.

[48]   These facts are not analogous to the facts of the Calpine restructuring. The CCAA Debtors and the U.S. Debtors are separate entities who have filed separate proceedings in Canada and the United States. No plan of arrangement has been filed or proposed in Canada and no attempt has been made to have a Canadian creditor's claims dealt with in another jurisdiction, except to the extent of continuing to require certain guarantee claims that the Fund has against CORPX dealt with as part of the U.S. proceeding, where the guarantee claims properly have been made and the reference of the ULC2 Trustee's issues to the U. S. Court, which I have found acceptable under s. 18.6 of the CCAA. No Canadian creditor has been denied a vote on a filed Canadian plan of arrangement. To the extent that *Philip* repeats the basic proposition that a plan of arrangement that compromises rights of creditors requires a vote by creditors before it is sanctioned by the Court, this principle has been applied to a situation where there were in existence clearly identified formal plans of arrangement.

[49]   Blair J. had different comments to make about the settlement agreement in *Philip*. The settlement agreement was conditional not only upon court approval, but also the successful implementation of both the Canadian and U.S. plans. Philip Services linked the settlement and the plans together and the Court found that the settlement agreement could not be viewed in isolation. Blair J. found that it was premature to approve the settlement which he noted would immunize the class action plaintiffs and Philip Services from the need to have regard to the co-defendants in those actions. He was concerned, for example, that the settlement agreement would deprive the underwriters of certain of their rights under an underwriting agreement. It is interesting that Blair J. commented at para. 31 that what was significant to him in deciding that approval of the settlement was premature was "not the attempt to compromise the claims", but the underwriters' loss of a "bargaining chip" in the restructuring process if the settlement was approved at that point. He also noted at para. 33 that he was not suggesting that the proposed settlement ultimately would not be approved, but only that it was premature at that stage and should be considered at a time more contemporaneous with a sanctioning hearing.

2007 ABQB 504 (CanLII)

Page: 16

[50]    It is noteworthy that Blair J. did not characterize the settlement agreement as a plan of arrangement requiring a vote, even though it was clear that it deprived other creditors of rights, thus compromising those rights. Nor did he question the jurisdiction of the Court to approve such a settlement. He merely postponed approval in light of the inter-relationship of the settlement agreement and the plans.

[51]    The GSA is not linked to or subject to a plan of arrangement. I have found that it does not compromise the rights of creditors that are not parties to it or have not consented to it, and it certainly does not have the effect of unilaterally depriving creditors of contractual rights without their participation in the GSA. The *Philip* case does not aid the creditors who are opposed to the GSA in any suggestion that a Court lacks jurisdiction under the CCAA to approve agreements that may involve resolution of the claims of some but not all of the creditors of a CCAA debtor prior to a vote on a plan of arrangement.

[52]    The Opposing Creditors rely on *Cable Satisfaction International, Inc. v. Richter Associés Inc.* (2004), 48 C.B.R. (4th) 205 (Que. S.C.) at para. 46 for the proposition that a court cannot force on creditors a plan which they have not voted to accept. This comment was made by Chaput, J. in the context of a very different fact situation than the one involved in this application. In *Cable Satisfaction*, creditors voting on a plan of arrangement proposed by the CCAA debtor had rejected the plan and approved instead an amended plan proposed at the creditors' meeting by one of the creditors. The Court's comment was made in response to the CCAA debtor's suggestion that the plan it had tabled should be approved because a majority of proxies filed prior to the amendment of the plan approved the original plan.

[53]    There is no definition of "arrangement" or "compromise" under the CCAA. In *Cable Satisfaction*, Chaput, J. suggested at para. 35 that, in the context of s. 4 of the CCAA, an arrangement or compromise is not a contract but a proposal, a plan of terms and conditions to be presented to creditors for their consideration. He comments at para. 36 that the binding force of an arrangement or compromise arises from Court sanction, and not from its status as a contract.

[54]    It is surely not the case that an arrangement or compromise need be labeled as such or formally proposed as such to creditors in order to require a vote of creditors. The issue is whether the GSA is, by its terms and in its effect, such an arrangement or compromise.

[55]    I am satisfied that the GSA is not a plan of compromise or arrangement with creditors. Under its terms, as agreed among the CCAA Debtors, the U.S. Debtors and the ULC1 Trustee, certain claims of those participating parties are compromised and settled by agreement. Claims of creditors who are not parties to the GSA either will be paid in full (and thus not compromised) as a result of the operation of the GSA, or will continue as claims against the same CCAA Debtor entity as had been claimed previously. Those claims will be adjudicated either under the CCAA proceeding or in the U.S. Chapter 11 proceeding and, to the extent they are determined to be valid, the GSA provides a mechanism and a financial framework for their full payment or satisfaction, other than for the possibility of a relatively small deficiency for some creditors of CESCA whose claims are not guaranteed by the U.S. Debtors and an even smaller deficiency of

2007 ABQB 504 (CanLII)

Page: 17

$25,000 in CCPL. The creditors of CESCA who are at real risk of suffering a deficiency have not objected to the approval of the GSA. In fact, counsel for TCPL and Alliance, two of the CESCA gas transportation claimants, and Westcoast, a major creditor of CCRC, appeared at the hearing to support approval of the GSA (or, at least in TCPL's case, not to object to it) on the basis that it improves their chances of recovery, resolving as it does all the major cross-border issues that have impeded the progress of this CCAA proceeding.

[56]    The Calpine Applicants submit that the GSA can be reviewed and approved by the Court pursuant to its jurisdiction to approve transactions and settlement agreements during the CCAA stay period. They cite *Re Playdium Entertainment Corp.* (2001), 31 C.B.R. (4th) 302 (Ont. S.C.J. [Comm. List]) at paras. 11 and 23 and *Re Air Canada* (2004), 47 C.B.R. (4th) 169 (Ont. S.C.J. [Comm. List]) at para. 9 in support of their submission that the Court must consider whether such an agreement is fair and reasonable and will be beneficial to the debtor and its stakeholders generally.

[57]    In *Playdium*, a CCAA restructuring in which no viable plan had been arrived at, Spence J. found that the Court could approve the transfer of substantially all of the assets of the CCAA debtor to a new corporation in satisfaction of the claims of the primary secured creditors. Against the objection of a party that had the right under certain critical contracts to withhold consent to such a transfer, the Court found that it had the jurisdiction to approve such a transfer of assets over the objection of creditors or other affected parties, citing *Re Lehendorff General Partner Ltd.* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]), *Re Canadian Red Cross Society* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div. [Comm. List]) and *Re T. Eaton Co.* (1999), 14 C.B.R. (4th) 289 (Ont. S.C.J. [Comm. List]). Spence J. found at para. 23 that for such an order to be appropriate, it must be in keeping with the purpose and spirit of the regime created by the CCAA. In determining whether to approve the transfer of assets, he considered the factors enumerated in *Red Cross*.

[58]    Whether the transfer constituted a compromise of creditors' rights was not in issue in *Playdium* and the comment was made that the transferees were the only creditors with an economic interest in the CCAA debtor. The case, however, is authority for the proposition that the powers of a supervisory court under the CCAA extend beyond the mere maintenance of the *status quo*, and may be exercised where necessary to achieve the objectives of the statute.

[59]    In *Air Canada*, Farley J., in the course of the restructuring, was asked to approve Global Restructuring Agreements ("GRAs"). He cited *Red Cross* as setting out the appropriate guidelines for determining when an agreement should be approved during a CCAA restructuring prior to a plan of arrangement. He commented at para. 9 that:

> ... I take the requirement under the CCAA is that approval of the Court may be given where there is consistency with the purpose and spirit of that legislation, a conclusion by the Court that as a primary consideration, the transaction is fair and reasonable and will be beneficial to the debtor and its stakeholders generally: see *Northland Properties Ltd.* .... In *Sammi Atlas Inc., Re* (1998), 3 C.B.R. (4th) 171

(Ont. Gen. Div. [Commercial List]), I observed at p. 173 that in considering what is fair and reasonable treatment, one must look at the creditors as a whole (i.e. generally) and to the objecting creditors (specifically) and see if rights are compromised in an attempt to balance interests (and have the pain of the compromise equitably shared) as opposed to the confiscation of rights. I think that philosophy should be applicable to the circumstances here involving the various stakeholders. As I noted immediately above in *Sammi Atlas Inc.,* equitable treatment is not necessarily equal treatment.

[60]    The GRA between Air Canada and a creditor, GECC, provided, among other things, for the restructuring of various leasing obligations and provided Air Canada with commitments for financing in return for interim payments on current aircraft rent and specific consideration in a restructured Air Canada. The Monitor noted that the financial benefits provided to Air Canada under the GRA outweighed the costs to Air Canada's estate arising from cross-collateralization benefits provided to GECC under the CCAA Credit Facility and Interfacility Collateralization Agreement. The Monitor therefore recommended approval of the GRA.

[61]    Another creditor complained at the approval hearing that other creditors were not being given treatment equal to that given to GECC. It appears that part of that unequal treatment was obtained by GECC as part of an earlier DIP financing that was not at issue before Farley J. at the time, but the Court engaged in an analysis of the benefits and costs to Air Canada of the GRA on the basis described above. It is noteworthy that Farley J. considered the suggestion of the objecting creditor that, if the GRA was not approved, GECC would not "abandon the field", but would negotiate terms with Air Canada that the objecting creditor felt would be more appropriate. The Court observed that the delay and uncertainty inherent in such an approach likely would be devastating to Air Canada.

[62]    This decision illustrates, in addition to the appropriate test to be applied to a settlement agreement, that such agreements almost inevitably will have the effect of changing the financial landscape of the CCAA debtor to some extent. This is so whether the settlement involves the resolution of a simple claim by a single debtor or the kind of complicated claim illustrated in a complex restructuring such as Air Canada (or Calpine). Settling with one or two claimants will invariably have an effect on the size of the estate available for other claimants. The test of whether such an adjustment results in fair and reasonable treatment requires the Court to look to the benefits of the settlement to the creditors as a whole, to consider the prejudice, if any, to the objecting creditors specifically and to ensure that rights are not unilaterally terminated or unjustly confiscated without the agreement or approval of the affected creditor.

[63]    I am satisfied that no rights are being confiscated under the GSA. Some claims are eliminated, but only with the full consent of the parties directly involved in those specific claims. The existing claims of the ULC2 Trustee are replaced with redesignated claims. However, the financial effect of the redesignated claims is the same, the ULC2 Trustee's right to assert the full amount of its claims remains and the CCAA Debtors and U.S. Debtors have agreed to hold funds in escrow sufficient to satisfy the entirety of those claims, once settled or judicially determined.

2007 ABQB 504 (CanLII)

[64]    The fact that this is a cross-border insolvency does not change the essential nature of the test which a settlement must meet, but consideration of the implications of the cross-border aspects of the situation is necessary and appropriate when weighing the benefits of the settlement for the debtors and their stakeholders generally. It cannot be ignored that the cross-border aspects of the insolvency of this inter-related corporate group have created daunting issues which have stymied progress on both sides of the border for many months. The GSA resolves most of those issues in a reasonably equitable and rational manner, provides a mechanism by which a number of the remaining issues may be resolved in the court of one jurisdiction or the other, and, by reason of the release for sale of the CCRC ULC1 Notes and the fortuity of the market, provides the likelihood of greatly enhanced recoveries and the expectation, supported by the Monitor's careful analysis, that an overwhelming majority of the Canadian stakeholders will be paid in full, either from the Canadian estate or through the U.S. Debtor guarantee process.

[65]    In *Red Cross*, the Red Cross, under the Court's supervision in CCAA proceedings, applied to approve the sale of its blood supply assets and operations to two new agencies. One of the groups of blood transfusion claimants objected and called for a meeting of creditors to consider a counterproposal.

[66]    Blair J. commented that the assets sought to be transferred were the source of the main value of the Red Cross's assets which might be available to satisfy the claims of creditors. He noted that the pool of funds resulting from the sale would not be sufficient to satisfy all claims, but that the Red Cross and the government were of the opinion that the transfer represented the best hope of maximizing distributions to the claimants. The Court characterized the central question on the motion as being whether the proposed purchase price for the assets was fair and reasonable in the circumstances and as close to maximum as reasonably likely, commenting at para. 16 that "(w)hat is important is that the value of that recovery pool is as high as possible."

[67]    The objecting claimants in *Red Cross* asked the Court to order a vote on a proposed plan of arrangement rather than approving the sale. Those supporting the plan argued that approval of the sale transaction in advance of a creditors' vote on a plan of arrangement would deprive the creditors of their statutory right to put forward a plan and vote upon it.

[68]    Blair J. declined to order a vote on the proposed plan, exercising his jurisdiction under ss. 4 and 5 of the CCAA to refuse to order a vote because of his finding that the proposed plan was unworkable and unrealistic in the circumstances.

[69]    He then proceeded to consider whether the Court had jurisdiction to make an order approving the sale of substantial assets of a debtor company before a plan has been placed before the creditors for approval.

[70]    Some of the objecting claimants submitted that the authority under s. 11 of the CCAA was narrow and would not permit such a sale. Others suggested that the sale should be permitted to proceed, but the transaction should be part of the plan of arrangement eventually put forth by

2007 ABQB 504 (CanLII)

the Red Cross, with the question of whether it was appropriate and supportable determined in that context by way of vote. The latter argument is similar in effect to that made by the Opposing Creditors in this case.

[71]    Blair J. rejected these submissions, finding that, realistically, the sale could not go forward on a conditional basis. He found that he had jurisdiction to make the order sought, noting at para. 43 that the source of his authority was found in the powers allocated to the Court to impose terms and conditions on the granting of a stay under s. 11 of the CCAA and may also be "grounded upon the inherent jurisdiction of the Court, not to make orders which contradict a statute, but to 'fill in the gaps in legislation so as to give effect to the objects of the CCAA'. "

[72]    At para. 45, Blair J. made the following comments, which resonate in this application:

It is very common in CCAA restructurings for the Court to approve the sale and disposition of assets during the process and before the Plan if formally tendered and voted upon. There are many examples where this has occurred, the recent Eaton's restructuring being only one of them. The CCAA is designed to be a flexible instrument, and it is that very flexibility which gives it its efficacy. As Farley J said in *Dylex Ltd.* supra (p. 111), "the history of CCAA law has been an evolution of judicial interpretation". It is not infrequently that judges are told, by those opposing a particular initiative at a particular time, that if they make a particular order that is requested it will be the first time in Canadian jurisprudence (sometimes in global jurisprudence, depending upon the level of the rhetoric) that such an order has made! Nonetheless, the orders are made, if the circumstances are appropriate and the orders can be made within the framework and in the spirit of the CCAA legislation. Mr. Justice Farley has well summarized this approach in the following passage from his decision in *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]), at p. 31, which I adopt:

The CCAA is intended to facilitate compromises and arrangements between companies and their creditors as an alternative to bankruptcy and, as such, is remedial legislation entitled to a liberal interpretation. It seems to me that the purpose of the statute is to enable insolvent companies to carry on business in the ordinary course *or otherwise deal with their assets* so as to enable plan of compromise or arrangement to be prepared, filed and considered by their creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors. See the preamble to and sections 4, 5, 7, 8 and 11 of the CCAA (a lengthy list of authorities cited here is omitted).

The CCAA is intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both. Where a debtor company realistically plans to continue operating *or to otherwise deal with its assets* but it requires the protection of the court in order to do so and

2007 ABQB 504 (CanLII)

> it is otherwise too early for the court to determine whether the debtor company will succeed, relief should be granted under the CCAA (citations omitted) [Emphasis in *Red Cross*.]

[73]    Blair J. then stated that he was satisfied that the Court not only had jurisdiction to make the order sought, but should do so, noting the benefits of the sale and concluding at para. 46 that to forego the favourable purchase price "would in the circumstances be folly".

[74]    While there are clear differences between the *Red Cross* sale transaction and the GSA in this case, what the *Red Cross* transaction did was quantify with finality the pool of funds available for distribution to creditors. The GSA does not go that far but, in its adjustments and allocations of inter-corporate debt and settlement of outstanding inter-corporate claims, it has implications for the value of the Canadian estate on an overall basis and implications for the funds available to creditors on an entity-by-entity basis. As recognized in *Red Cross*, *Air Canada* and *Playdium*, transactions that occur during the process of a restructuring and before a plan is formally tendered and voted upon often do affect the size of the estate of the debtor available for distribution.

[75]    That is why settlements and major transactions require Court approval and a consideration of whether they are fair, reasonable and beneficial to creditors as a whole. It is clear from the case law that Court approval of settlements and major transactions can and often is given over the objections of one or more parties. The Court's ability to do this is a recognition of its authority to act in the greater good consistent with the purpose and spirit and within the confines of the legislation.

[76]    In this case, as in *Red Cross*, the Opposing Creditors have suggested that approval of the GSA sets a dangerous precedent. The precedential implications of this approval must be viewed in the context of the unique circumstances that have presented a situation in which all valid claims of Canadian creditors likely will be paid in full. This outcome, particularly with respect to a cross-border insolvency of exceptional complexity, is unlikely to be matched in other insolvencies, and therefore, a decision to approve this settlement agreement will not open any floodgates.

[77]    The issue of the jurisdiction of supervising judges in CCAA proceedings to make orders that do not merely preserve the *status quo* was considered by the Ontario Court of Appeal in *Re Stelco Inc.* (2005), 78 O.R. (3d) 254 at para. 18. This was an appeal of an order made by Farley J. approving agreements made by the debtor with two of its stakeholders and a finance provider. One of the agreements provided for a break fee if the plan of arrangement proposed by Stelco failed to be approved by the creditors. The Court noted at para. 20 that the break fee could deplete Stelco's assets. However, Rosenberg, J.A., for the Court, also noted at para. 3 that the Stelco CCAA process had been going on for 20 months, longer than anyone had expected, and that the supervising judge had been managing the process throughout. He then reviewed some of the many obstacles to a successful restructuring and found that the agreements resolved at least a few of the paramount problems.

2007 ABQB 504 (CanLII)

Page: 22

[78]    At para. 16, the Court stated that the objecting creditors argued, as they have in this case, that the orders sought would have the effect of substituting the Court's judgment for that of the creditors who have the right under s. 6 of the CCAA to approve a plan. Nevertheless, the Court of Appeal held that Farley J. had the jurisdiction to approve the agreements under s. 11 of the CCAA, which provides a broad jurisdiction to impose terms and conditions on the granting of a stay. The Court commented as follows at paras. 18-9:

> In my view, s. 11(4) includes the power to vary the stay and allow the company to enter into agreements to facilitate the restructuring, provided that the creditors have the final decision under s. 6 whether or not to approve the Plan. The court's jurisdiction is not limited to preserving the *status quo*. The point of the CCAA process is not simply to preserve the *status quo* but to facilitate restructuring so that the company can successfully emerge from the process. ...

> In my view, provided the orders do not usurp the right of the creditors to decide whether to approve the Plan the motions judge had the necessary jurisdiction to make them. The orders made in this case do not usurp the s. 6 rights of the creditors and do not unduly interfere with the business judgment of the creditors. The orders move the process along to the point where the creditors are free to exercise their rights at the creditors' meeting.

[79]    The CCAA Debtors in this case were faced with challenges similar to those faced by Stelco in its restructuring. This CCAA proceeding is in its nineteenth month. As set out earlier, the process had encountered considerable hurdles relating to the nature of the ULC1 noteholder claims, the inter-corporate debt claims and the BDCs. The same creditors who object to this application were, in previous applications, clamouring for the resolution of the ULC1 noteholder issue and for the sale of the CCRC ULC1 Notes. The GSA resolves these issues and allows the process to move forward with a view to dealing with the remainder of the issues in an orderly and efficient way and with the expectation that this insolvency can be concluded with the determination and payment of virtually all claims by year-end.

Conclusion

[80]    Viewed against the test of whether the GSA is fair, reasonable and beneficial to creditors as a whole, the GSA is a remarkable step forward in resolving this CCAA filing. It eliminates approximately $7.5 billion in claims against the CCAA Debtors. It resolves the major issues between the CCAA Debtors and the U.S. Debtors that had stalled meaningful progress in asset realization and claims resolution. Most significantly, it unlocks the Canadian proceeding and provides the mechanism for the resolution by adjudication or settlement of the remaining issues and significant creditor claims and the clarification of priorities. The Monitor has concluded through careful and thorough analysis that the likely outcome of the implementation of the GSA is payment in full of all Canadian creditors. As the Ad Hoc Committee concedes, the GSA removes the issues that the members of the Committee have recognized for many months as the

Page: 23

major impediments to progress. The sale of the CCRC ULC1 Notes is a necessary precondition to resolution of this matter but, contrary to the Ad Hoc Committee's submissions, that sale cannot occur otherwise than in the context of a settlement with those parties whose claims directly affect the Notes themselves. I am satisfied that the GSA is a reasonable, and indeed necessary, path out of the deadlock.

[81]    I am also persuaded that the GSA provides clear benefits to the Canadian creditors of the CCAA Debtors and that, on an individual basis, no creditor is worse off as a result of the GSA considered as a whole. While it does not guarantee full payment of claims, the GSA substantially reduces the risk that this goal will not be achieved. Crucially, the GSA is supported and recommended unequivocally by the Monitor, who was involved in the negotiations and who has analysed its terms thoroughly. I am mindful that the GSA is not without risk to the Fund. However, that some risk falls upon the Fund does not make the GSA unfair. As the Calpine Applicants point out, particularly in the insolvency context, equity is not always equality. Given the Monitor's assessment that the risk of less than full payment to the CESCA creditors is relatively remote, I am satisfied that such risk does not obviate the fairness of the GSA.

[82]    The settlement of issues represented by the GSA is without precedent in its breadth and scope. That is perhaps appropriate given the enormous complexity and the highly intertwined nature of the issues in this proceeding. The cross-border nature of many of the issues adds to the delicacy of the matter. Given that complexity, it behooves all parties and this Court to proceed cautiously and with careful consideration. Nevertheless, we must proceed toward the ultimate goal of achieving resolution of the issues. Without that resolution, the Canadian creditors face protracted litigation in both jurisdictions, uncertain outcomes and continued frustration in unravelling the Gordian knot of intercorporate and interjurisdictional complexities that have plagued these proceedings on both sides of the border. In my view, the GSA represents enormous progress, and I approve it.

Heard on the 24th day of July, 2007.
Dated at the City of Calgary, Alberta this 31st day of July, 2007.

_____

**B.E. Romaine**
**J.C.Q.B.A.**

2007 ABQB 504 (CanLII)

Page: 24

**Major Canadian Appearances:**

Larry B. Robinson, Q.C. and Sean F. Collins of McCarthy Tetrault LLP
Jay A. Carfagnini, Fred Myers, Brian Empey and Joseph Pasquariello of Goodmans LLP
 for the CCAA Debtors

Patrick McCarthy, Q.C. and Josef A. Krueger of Borden Ladner Gervais LLP
 for the Monitor

Robert I. Thornton, John L. Finnigan and Rachelle F. Moncur of ThorntonGroutFinnigan LLP
 for the Ad Hoc Committee

Sean F. Dunphy and Elizabeth Pillon of Stikeman Elliott LLP
 for the ULC2 Trustee

Howard A. Gorman of Macleod Dixon LLP
 for the ULC1 Noteholders Committee

Peter H. Griffin and Peter J. Osborne of Lenczner Slaght Royce Smith Griffin LLP
 for the U.S. Debtors

Peter T. Linder, Q.C. and Emi R. Bossio of Peacock Linder & Halt LLP
 for the Fund

Ken Lenz of Bennett Jones LLP
 for the HSBC Bank USA, N.A., as ULC1 Indenture Trustee

Jay A. Swartz of Davies Ward Phillips & Vineberg LLP
 for Lehman Brothers

Rinus De Waal of Fasken Martineau DuMoulin LLP
 for the Unsecured Creditors' Committee

Neil Rabinovitch of Fraser Milner Casgrain LLP
 for the Unofficial Committee of 2nd Lien Debtholders

B. A. R. Smith, Q.C. of Fraser Milner Casgrain LLP
 for Alliance Pipelines

Douglas I. McLean
 for TransCanada Pipelines Limited

2007 ABQB 504 (CanLII)