# In the Court of Appeal of Alberta

Citation: Re Calpine Canada Energy Limited (Companies' Creditors Arrangement Act), 2007 ABCA 266

**Date:** 20070817
**Docket:** 0701-0222-AC
0701-0223-AC
**Registry:** Calgary

2007 ABCA 266 (CanLII)

In the matter of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended

And in the matter of Calpine Canada Energy Limited, Calpine Canada Power Ltd., Calpine Canada Energy Finance ULC, Calpine Energy Services Canada Ltd., Calpine Canada Resources Company, Calpine Canada Power Services Ltd., Calpine Canada Energy Finance II ULC, Calpine Natural Gas Services Limited and 3094479 Nova Scotia Company
(the "CCAA Applicants")

Between:

## Calpine Power L.P.

Appellant/Applicant (Creditor)

- and -

The CCAA Applicants and Calpine Energy Services Canada Partnership, Calpine Canada Natural Gas Partnership and Calpine Canadian Saltend Limited Partnership

Respondents (Applicants)

And Between:

## Calpine Canada Natural Gas Partnership

Respondent (Applicant/ CCAA Party)

- and -

Calpine Energy Services Canada Partnership and Lisa Winslow, Trustee of Calpine Greenfield Commercial Trust

Respondents (CCAA Applicant and Interested Parties)

- and -

**Calpine Power L.P.**

Appellant/Applicant (Creditor in CCAA Proceedings)

2007 ABCA 266 (CanLII)

---

**Reasons for Decision of
The Honourable Mr. Justice Clifton O'Brien
In Chambers**

---

Application for Leave to Appeal and
Stay Pending Appeal of the Orders granted by
The Honourable Madam Justice B. E. Romaine
Dated the 24th day of July, 2007
Filed on the 27th day of July, 2007
(Dockets: 0501-17864; 0601-14198)

**Reasons for Decision of
The Honourable Mr. Justice Clifton O'Brien
In Chambers**

## Introduction

[1]    Calpine Power L.P. (CLP) applies for a stay pending appeal and leave to appeal three orders granted on July 24, 2007 in a proceeding under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (CCAA). At the request of counsel, the applications have been dealt with on an expedited basis. Oral submissions were heard on August 15, at the close of which I undertook to deliver judgment by the end of the week. I do so now.

## Background facts

[2]    In December 2005, Calpine Canada Energy Limited, Calpine Canada Power Ltd., Calpine Canada Energy Finance ULC, Calpine Energy Services Canada Ltd., Calpine Canada Resources Company, Calpine Canada Power Services Ltd., Calpine Canada Energy Finance II ULC, Calpine Natural Gas Services Limited, and 3094479 Nova Scotia Company (CCAA Applicants) sought and obtain protection under the CCAA. At the same time, the parties referred to as the US Debtors sought and obtained similar protection under Chapter 11 of the U. S. Bankruptcy Code.

[3]    A monitor, Ernst & Young Inc., was appointed under the CCAA proceedings and a stay of proceedings was ordered against the CCAA Applicants and against Calpine Energy Services Canada Partnership, Calpine Canada Natural Gas Partnership and Calpine Canadian Saltend Limited Partnership. The latter three parties collectively are referred to as the CCAA Parties and those parties together with the CCAA Applicants as the CCAA Debtors.

[4]    This insolvency is extremely complex, involving many related corporations and partnerships, and highly intertwined legal and financial obligations. The goal of restructuring and realizing maximum value for assets has been made more difficult by a number of cross-border issues.

[5]    As described in the Monitor's 23rd Report, dated June 28, 2007, the CCAA Debtors and the US Debtors concluded that the most appropriate way to resolve the issues between them was to concentrate on reaching a consensual global agreement that resolved virtually all the material cross-border issues between them. The parties negotiated a global settlement agreement (GSA) subject to the approval of both Canadian and U. S. courts, execution of the GSA and the sale by Calpine Canada Resources Company of its holdings of Calpine Canada Energy Finance ULC (ULC1) Notes in the face amount of US$359,770,000 (the CCRC ULC1 Notes). Counsel at the oral hearing informed me that the Notes were sold on August 14, 2007, yielding a net amount of approximately US $403 million, an amount exceeding the face amount.

[6]    On July 24, 2007, the CCAA Applicants sought and obtained three orders. First, an order approving the terms of the GSA and directing the various parties to execute such documents and

implement the transactions necessary to give effect to the GSA. Second, an order permitting CCRC and ULC1 to take the necessary steps to sell the CCRC ULC1 Notes. Third, an extension of the stay contemplated by the initial CCAA order to December 20, 2007. No objection was taken to the latter two orders and both were granted. The supervising judge also, in brief oral reasons, approved the GSA with written reasons to follow.  Written Reasons for Judgment were subsequently filed on July 31, 2007: *Re Calpine Canada Energy Limited (Companies' Creditors Arrangement Act)*, 2007 ABQB 504. The reasons are careful and detailed. They fully set out the relevant facts and canvas the applicable law and as I see no need to repeat the facts and authorities, the reasons should be read in conjunction with these relatively short reasons dealing with the applications arising therefrom.

[7]     The applications to the supervising judge were made concurrently with applications by the US Debtors to the US Bankruptcy Court in New York state, the applications proceeding simultaneously by video conference. The applications to the US Court, including an application for approval of the GSA, were also granted.

[8]     The applicant, CLP, the Calpine Canada Energy Finance II ULC (ULC2) Indenture Trustee and a group referring to itself as the "Ad Hoc Committee of Creditors of Calpine Canada Resources Company" opposed the approval of the GSA. CPL is the only party seeking leave to appeal.

[9]     CLP submits that the supervising judge erred in concluding that the GSA was not a compromise or plan of arrangement and therefore, sections 4 and 5 of the CCAA did not apply and no vote by creditors was necessary.

[10]    Sections 4 and 5 of the CCAA provide:

> 4. Where a compromise or an arrangement is proposed between a debtor company and its unsecured creditors or any class of them, the court may, on the application in a summary way of the company, of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of the creditors or class of creditors, and, if the court so determines, of the shareholders of the company, to be summoned in such manner as the court directs.
>
> 5. Where a compromise or an arrangement is proposed between a debtor company and its secured creditors or any class of them, the court may, on the application in a summary way of the company or of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of the creditors or class of creditors, and, if the court so determines, of the shareholders of the company, to be summoned in such manner as the court directs.

[11]    CLP further submits that the jurisdiction of the supervising judge to approve the GSA is governed by section 6 of the CCAA. Section 6 provides:

2007 ABCA 266 (CanLII)

Where a majority in number representing two-thirds in value of the creditors, or class of creditors, as the case may be, present and voting either in person or by proxy at the meeting or meetings thereof respectively held pursuant to sections 4 and 5, or either of those sections, agree to any compromise or arrangement either as proposed or as altered or modified at the meeting or meetings, the compromise or arrangement may be sanctioned by the court, and if so sanctioned is binding

> (a) on all the creditors or the class of creditors, as the case may be, and on any trustee for any such class of creditors, whether secured or unsecured, as the case may be, and on the company; and

> (b) in the case of a company that has made an authorized assignment or against which a bankruptcy order has been made under the Bankruptcy and Insolvency Act or is in the course of being wound up under the Winding-up and Restructuring Act, on the trustee in bankruptcy or liquidator and contributories of the company.

[12]    The supervising judge found that the GSA is not linked to or subject to a plan of arrangement and does not compromise the rights of creditors that are not parties to it or have not consented to it, and it does not have the effect of unilaterally depriving creditors of contractual rights without their participation in the GSA. She concluded that the GSA was not a compromise or arrangement for the purposes of section 4 of the CCAA. In the course of her reasons she cites a number of cases for support that the court has jurisdiction to review and approve transactions and settlement agreements during the stay period of a CCAA proceedings if an agreement is fair and reasonable and will be beneficial to the debtor and its stakeholders generally.

**Test for leave to appeal**

[13]    This Court has repeatedly stated, for example in *Re Liberty Oil & Gas Ltd.*, 2003 ABCA 158, 44 C.B.R. (4th) 96 at paras. 15-16, that the test for leave under the CCAA involves a single criterion that there must be serious and arguable grounds that are of real and significant interest to the parties. The four factors used to assess whether this criterion is present are:

> (1) Whether the point on appeal is of significance to the practice;
> (2) Whether the point raised is of significance to the action itself;
> (3) Whether the appeal is *prima facie* meritorious or, on the other hand, whether it is frivolous; and
> (4) Whether the appeal will unduly hinder the progress of the action.

[14]    In assessing these factors, consideration should also be given to the applicable standard of review: *Re Canadian Airlines Corp.*, 2000 ABCA 149, 261 A.R. 120. Having regard to the commercial nature of the proceedings which often require quick decisions, and to the intimate

2007 ABCA 266 (CanLII)

knowledge acquired by a supervising judge in overseeing a CCAA proceedings, appellate courts have expressed a reluctance to interfere, except in clear cases: *Re Smoky River Coal Ltd.,* 1999 ABCA 252, 237 A.R. 326 at para. 61.

### Analysis

[15] The standard of review plays a significant, if not decisive, role in the outcome of this application for leave to appeal. The supervising judge, on the record of evidence before her, found that the GSA was "not a plan of compromise or arrangement with creditors" (Reasons, para. 51). This was a finding of fact, or at most, a finding of mixed law and fact. The applicant has identified no extricable error of law so the applicable standard is palpable or overriding error.

[16] The statute itself contains no definition of a compromise or arrangement. Moreover, it does not appear that a compromise or an arrangement has been *proposed* between a debtor company and either its unsecured or secured creditors, or any class of them within the scope of sections 4 or 5 of the CCAA. Neither the company, a creditor, nor anyone made application to convene a meeting under those sections.

[17] Rather, the GSA settles certain intercorporate claims between certain Canadian Calpine entities and certain US Calpine entities subject to certain conditions, including the approvals both of the Court of Queen's Bench of Alberta and of the US Bankruptcy Court.

[18] This is not to minimize the magnitude, significance and complexity of the issues dealt with in the intercorporate settlement which, by definition, was not between arm's length companies. The material cross-border issues are identified in the 23rd Report of the monitor and listed by the supervising judge (Reasons, para. 5).

[19] It is implicit in her reasons, if not express, that the supervising judge accepted the analysis of the monitor, and found that the GSA would likely ultimately result in payment in full of all Canadian creditors, including CLP. CLP does not challenge this finding, but points out that payment is not assured, and rightly relies upon its status as a creditor to challenge the approval in the meantime until such time as it has been paid.

[20] The supervising judge further found that the GSA "does not compromise the rights of creditors that are not parties to it or have not consented to it, and it certainly does not have the effect of unilaterally depriving creditors of contractual rights without their participation in the GSA" (Reasons, para. 51). CPL challenges this finding. In order to succeed in its proposed appeal, CPL must also demonstrate palpable and overriding error in these further findings of the supervising judge which once again, involve findings of fact or of mixed law and fact.

### Application in this case

2007 ABCA 266 (CanLII)

2007 ABCA 266 (CanLII)

[21]    CPL submits that the "fundamental problem" with the approval granted by the supervising judge is that the GSA is in reality a plan of arrangement because it settles virtually all matters in dispute in the Canadian CCAA estate and therefore, entitles the applicant to a vote. CPL argues that the GSA must be an arrangement or compromise within the meaning of sections 4, 5 and 6 of the CCAA because, in its view, the GSA requires non party creditors to make concessions, re-orders the priorities of creditors and distributes assets of the estate.

[22]    The supervising judge acknowledged at the outset of her analysis that if the GSA were a plan of arrangement or compromise, a vote by creditors would be necessary (Reasons, para. 41). However, she was satisfied that the GSA did not constitute a plan of arrangement with creditors.

[23]    The applicant conceded that a CCAA supervising judge has jurisdiction to approve transactions, including settlements in the course of overseeing proceedings during a stay period and prior to any plan of arrangement being proposed to creditors. This concession was proper having regard to case authority recognizing such jurisdiction and cited in the reasons of the supervising judge, including *Re Air Canada* (2004), 47 C.B.R. (4th) 169 (Ont. S.C.J.), *Re Playdium Entertainment Corp.* (2001), 31 C.B.R. (4th) 302 (Ont. S.C.J.), *Re Canadian Red Cross Society* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div.), *Re T. Eaton Co.* (1999), 14 C.B.R. (4th) 289 (Ont. S.C.) and *Re Stelco Inc.* (2005), 78 O.R. (3d) 254 (C.A.).

[24]    The power to approve such transactions during the stay is not spelled out in the CCAA. As has often been observed, the statute is skeletal. The approval power in such instances is usually said to be found either in the broad powers under section 11(4) to make orders other than on an initial application to effectuate the stay, or in the court's inherent jurisdiction to fill in gaps in legislation so as to give effect to the objects of the CCAA, including the survival program of the debtor until it can present a plan: *Re Dylex Ltd.* (1995), 31 C.B.R. (3d) 106 at para. 8 (Ont. Gen. Div.).

[25]    Hunt, J.A. in delivering the judgment of this Court in *Smoky River Coal* considered the history of the legislation and its objectives in allowing the company to take steps to promote a successful eventual arrangement. She concluded at para. 53:

> These statements about the goals and operation of the CCAA support the view that the discretion under s. 11(4) should be interpreted widely.

and further at para. 60:

> To summarize, the language of s. 11(4) is very broad. The CCAA must be interpreted in a remedial fashion.

[26]    In my view, there is no serious issue as to the jurisdiction of a supervising judge to approve a settlement agreement between consenting parties prior to consideration of a plan of arrangement pursuant to section 6 of the CCAA. The fact that the GSA is not a simple agreement between two

parties, but rather resolves a number of complex issues between a number of parties, does not affect the jurisdiction of the court to approve the agreement if it is for the general benefit of all parties and otherwise meets the tests identified in the reasons of the supervising judge.

[27]     CPL urges that the legal issue for determination by this Court is where the line is to be drawn to say when a settlement becomes a compromise or arrangement, thus requiring a vote under section 6 before the court can grant approval. It suggests that it would be useful to this practice area for the court to set out the criteria to be considered in this regard.

[28]     An element of compromise is inherent in a settlement as there is invariably some give and take by the parties in reaching their agreement. The parties to the GSA made concessions for the purpose of gaining benefits. It is obvious that something more than compromise between consenting parties within a settlement agreement is required to constitute an arrangement or compromise for purposes of the CCAA as if that were not so, no settlement agreement could be approved without a vote of the creditors. As noted, that is contrary to case authority accepted by all parties to these applications.

[29]     The CCAA deals with compromises or arrangements sought to be imposed upon creditors generally, or classes of creditors, and a vote is a necessary mechanism to determine whether the appropriate majority of the creditors proposed to be affected support the proposed compromise or arrangement.

[30]     As pointed out by the supervising judge, a settlement will almost always have an impact on the financial circumstances of a debtor. A settlement will invariably have an effect on the size of the estate available for other claimants (Reasons, para. 62).

[31]     Whether or not a settlement constitutes a plan of arrangement requiring a vote will be dependent upon the factual circumstances of each case. Here, the supervising judge carefully reviewed the circumstances and concluded, on the basis of a number of the fact findings, that there was no plan of arrangement within the meaning of the CCAA, and that the settlement merited approval. She recognized the peculiar circumstances which distinguishes this case, and observed at para. 76 of her Reasons:

The precedential implications of this approval must be viewed in the context of the unique circumstances that have presented a situation in which all valid claims of Canadian creditors likely will be paid in full. This outcome, particularly with respect to a cross-border insolvency of exceptional complexity, is unlikely to be matched in other insolvencies, and therefore, a decision to approve this settlement agreement will not open any floodgates.

[32]     At the time of granting her approval, the supervising judge had been overseeing the conduct of these CCAA proceedings since their inception – some 18 months earlier. She had the benefit of

the many reports of the monitor and was familiar with the record of the proceedings. Her determination of this issue is entitled to deference in the absence of legal error or palpable and overriding error of fact.

[33] CPL submits that the GSA compromises its rights and claims, and thus, challenges the express finding of the supervising judge that the settlement neither compromises the rights of creditors before it, nor deprives them of their existing contractual rights. The applicant relies upon the following effects of the GSA in making this submission:

  (i)   a priority payment of $75 million out of the proceeds of the sale of bonds owned by Calpine Canada Resources Company;

  (ii)  the release of a potential claim against Calpine Canada Energy Limited, the parent of Calpine Canada Resources Company, which is a partner of Calpine Energy Services Canada Ltd., against which CPL has a claim;

  (iii) the dismissal of a claim by Calpine Canada Energy Limited against Quintana Canada Holdings LLC, thereby depleting Calpine Canada Energy Limited of a potential asset which that company could use to satisfy any potential claim by CPL for any shortfall, were it not for the release of claims against Calpine Canada Energy Limited (see (ii) above); and

  (iv)  the dismissal of the Greenfield Action brought by another CCAA Debtor against Calpine Energy Services Canada Ltd. for an alleged fraudulent conversion of its interest in Greenfield LP which was developing a 1005 Megawatt generation plant.

[34] For purposes of the CCAA proceedings, the applicant is a creditor of Calpine Energy Services Canada Ltd., Calpine Canada Power Ltd. and perhaps, also, Calpine Canada Resources Company. The GSA does not change its status as a creditor of those companies, nor does it bar the applicant from any existing claims against those companies.

[35] In my view, the submission of the applicant does not show any palpable and overriding error in the findings of the supervising judge that the right of creditors not parties to the GSA have not been compromised or taken away. Firstly, there is no compromise of debt if such indebtedness, as ultimately found due to the applicant, is paid in full, which is the likely result as found by the supervising judge, albeit she acknowledged that this result was not guaranteed (Reasons, para. 81). Secondly, and in any event, the fact that the GSA impacts upon the assets of the debtor companies, against which the applicant may ultimately have a claim for any shortfall experienced by it, is a common feature of any settlement agreement and as earlier explained, does not automatically result in a vote by the creditors. The further fact that one of the affected assets of the debtor companies is a cause of action, or perhaps, more correctly, a possible cause of action, does not abrogate the rights of a creditor albeit there may be less monies to be realized at the end of the day.

[36] The GSA does not usurp the right of the creditors to vote on a plan of arrangement if it becomes necessary to propose such a plan to the creditors. As explained by the supervising judge,

the settlement between the CCAA Debtors and the US Debtors unlocked the Canadian proceedings to meaningful progress in asset realization and claims resolution, and provided the mechanisms for resolving the remaining issues and significant creditor claims, and the clarification of priorities.

[37]    It is correct, of course, that if the claims of CPL are paid in full in the course of the CCAA proceedings, it will never be necessary for it to vote on a plan of arrangement. The applicant should have no complaint with that result. On the other hand, if the claims are not satisfied, it seems likely a plan of arrangement will ultimately be proposed to the applicant, who will then have its right to vote on any such plan.

[38]    CPL argues that the supervising judge was not entitled to assess the merits of the GSA *vis-à-vis* the creditors as this was a matter for the exclusive business judgment of the creditors and to be exercised by their vote. As became apparent during the course of its submissions, if a vote were required, from the perspective of the CPL, this would give it veto power over the GSA. Unless clearly mandated by the statute, this is a result to be avoided. While it is understandable that an individual creditor seeks to obtain as much leverage as possible in order to enhance its negotiating position, the objectives and purposes of the CCAA could easily be frustrated in such circumstances by the self interest of a single creditor. Court approval requires, as a primary consideration, the determination that an agreement is fair and reasonable and will be beneficial to the debtor and its stakeholders generally. As the supervising judge noted, court approval of settlements and major transaction can and often is given over the objections of one or more parties because the court must act for the greater good consistent with the purpose and spirit and within the confines of the legislation.

[39]    I am not persuaded that the applicant has demonstrated any reasonably arguable error of law in the reasons of the supervising judge or any palpable and overriding errors in her findings of fact or findings of mixed fact and law. In the absence of any such error, it follows that she had discretion to approve the GSA, which she exercised based upon her assessment of the merits and reasonableness of the settlement, and other factors in accordance with the principles set out in the authorities, cited in her reasons, governing the approval of transactions, including settlements, during the stay period prior to a plan of arrangement being submitted to the creditors.

## Conclusion

[40]    CPL has failed to establish serious and arguable grounds for granting leave. In particular, two of the factors used to assess whether this criterion is present have not been met. It has not been demonstrated that the point on appeal is of significance to the parties having regard to the fact dependent nature of whether a plan of arrangement has been proposed to creditors. More importantly, having regard to the standard of review and the findings of the supervising judge, the applicant has not demonstrated that the appeal for which leave is sought is *prima facie* meritorious.

[41]    The application for leave is dismissed. It follows that the application for a stay likewise fails and is dismissed.

[42]    Finally, I would be remiss if I did not acknowledge the excellent quality of the submissions, both written and oral, of counsel on these applications. The submissions were of great assistance in permitting the application to be dealt with in an abbreviated time frame.

Application heard on August 15, 2007

Reasons filed at Calgary, Alberta
this 17th  day of August, 2007

O'Brien J.A.

2007 ABCA 266 (CanLII)

**Appearances:**

P.T. Linder, Q.C.
R. Van Dorp
     for the Applicant, CPL

L.B. Robinson, Q.C.
S.F. Collins
J.A. Carfagnini
     for the CCAA Applicants and the CCAA Parties (Respondents)

H.A. Gorman
     for the Ad Hoc ULC1 Noteholders Committee

P.H. Griffin
U. Sheikh
     for the Calpine Corporation and other US Debtors

F.R. Dearlove
     for HSBC

P. McCarthy, Q.C.
J. Kruger
     for Ernst & Young Inc., the Monitor

N.S. Rabinovitch
     for the Lien Debtholders

R. De Waal
     for the Unsecured Creditors Committee

2007 ABCA 266 (CanLII)



# TAB15

2006 CarswellOnt 1505,

# H

2006 CarswellOnt 1505

Stelco Inc., Re

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS
AMENDED

AND IN THE MATTER OF A PROPOSED PLAN OF COMPROMISE OR ARRANGEMENT WITH RE-
SPECT TO STELCO INC. AND THE OTHER APPLICANTS LISTED IN SCHEDULE "A"

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS
AMENDED

IN THE MATTER OF THE CANADA BUSINESS CORPORATIONS ACT, R.S.C. 1985, c. C-44, AS
AMENDED

AND IN THE MATTER OF A PROPOSED PLAN OF ARRANGEMENT INVOLVING STELCO INC.,
HAMILTON STEEL GP INC., LAKE ERIE STEEL GP INC., HAMILTON COKE GP INC., LAKE ERIE
COKE GP INC., HMLTN ENERGY GP INC., LAKE ERIE ENERGY GP INC., HLE MINING GP INC.,
HAMILTON LAND GP INC. and LAKE ERIE LAND GP INC.

Ontario Superior Court of Justice [Commercial List]

Farley J.

Heard: March 7, 2006
Judgment: March 7, 2006
Docket: 04-CL-5306, 06-CL-6275

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights re-
served.

Counsel: Kyla Mahar for Monitor

Paul Macdonald, Brett Harrison for Sunrise, Appaloosa and TD Securities (Converts)

Robert Staley, Richard Orzy for Senior Debenture Holders

Paul Basso for CIBC Administrative Agent

David Jacobs for USW Locals 8782/5328

Aubrey Kauffman for Tricap Management Ltd.

Subject: Insolvency; Corporate and Commercial

Bankruptcy and insolvency --- Proposal — Companies' Creditors Arrangement Act — Miscellaneous issues

Plan with respect to S Inc. under Companies' Creditors Arrangement Act required process to determine on timely basis entitlement to turnover proceeds — Monitor brought motion for directions — Timetable was established, including deadlines for making claim to turnover proceeds, response to claim, reply, notice to interested parties, exchange of material, cross-examinations, and hearing if necessary — It was unnecessary to have further claims bar order or newspaper advertising by S Inc. for turnover proceeds dispute, as it was sufficient that notice be given by S Inc. to all interested parties — Notice was to provide opportunity for any potential interested party to object to being represented by members of bonds/other senior debt and members of convertible debentures, or to being bound by decision regarding turnover proceeds — Trial was not necessary as most of dispute could be dealt with on basis of affidavit evidence, subject to cross-examination — If viva voce evidence was required, it was to be restricted to material portions that were in dispute, with limited direct and cross-examination in court.

## Statutes considered:

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

    Generally — considered

MOTION by monitor for directions.

### *Farley J.*:

1    There was no objection to the Monitor receiving the protection it sought in relief item 3 of its Motion Record. That relief is granted.

2    It is unfortunate that while this was a motion for directions by the Monitor (as technically it had to be pursuant to the terms of the Plan), that the two protagonists (those representing certain of the Senior Bonds ("Bonds") and those representing certain of the Convertible Debentures ("ConDebs")) engaged in last minute filing and hand-ups — all of which may be indicative of the game playing and jockeying about they are likely engaged in. It would have been far better for the Bonds and the ConDebs to have come to an agreement as to process — or to at least have had meaningful discussions concerning same so that true issues could be highlighted. The end result is that the entire burden of working out a process is put upon the Court's shoulders — unnecessarily as I pointed out. Since these two sides have engaged in a "2 solitudes" approach to this, then I pause to ask whether they should have any cause to complain about the process below.

3    The sanctioned CCAA Plan requires "a process to *determine on a timely basis* entitlements to the Turnover Proceeds". A determination on a timely basis does not mean that matters be dealt with at breakneck speed with all manner of corners cut. Nor does it mean the glacial pace to a secondary starting point, after which there will be a further hearing/case conference to decide where to go from there on. I do note in that respect that when pressed repeatedly for a ballpark timing on what the ConDebs submit is an inevitable trial "on all issues [known and unknown]" that the ConDebs were only able to speculate that such a trial might take 2-3 weeks and be heard at the earliest by March, 2007.

4    It seems to me that the appropriate process is the one which is "just right" in the Goldelockian analysis. It

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

is, of course, important to both sides that the question of entitlement to the Turnover Proceeds be determined on a timely basis, since these will be marketable securities which will fluctuate in market price from time to time and may be volatile in price changes. I have no doubt but that the winner — be it the Bonds or be it the ConDebs — would want to control their own destiny with respect to these proceeds at the earliest reasonable opportunity, so that the winner is able to determine whether to hold or dispose. I would assume that both sides would find common cause for complaint if the Court were to determine a process which kept these proceeds in limbo for, say, ten years.

5      The definition of "Senior Debt" in the First Supplemental Indenture is:

"Senior Debt" means the principal of, the premium (if any) and interest on: (i) indebtedness, other than indebtedness represented by the Debentures, for money borrowed by the Corporation or for money borrowed by others for the payment of which the Corporation is liable; (ii) indebtedness incurred, assumed or guaranteed by the Corporation in connection with the acquisition by it or by others of any business, property, services or other assets excluding indebtedness incurred in relation to any such acquisitions made in the ordinary course of business; and (iii) renewals, extensions and refundings of any such indebtedness, unless, in any of the cases specified above, it is provided by the terms of the instrument creating or evidencing such indebtedness that such indebtedness is not to be superior in right of payment to the Debentures;

[Debentures here being the ConDebs.]

6      I am satisfied that it would be unnecessary in these circumstances, given that Stelco has had a Claims Bar Order to flush out claims (as well as considerable publicity over the past 2 years which would likely have come to the attention of the any "unknown" creditor), that it is unnecessary to have a further Claims Bar Order for this Turnover Proceeds Dispute nor that there be any newspaper advertising by Stelco. To my view it is sufficient that notice be given by Stelco under the supervision of the Monitor to the service list (which list should be expanded to include all proven creditors), the Trustees under the various Bonds and ConDebs Trust Indentures and to CDS (the latter to ensure that notice gets through to the beneficial holders). Allow me to return to this question of notice. That notice will flush out any proven creditor who wishes to assert Senior Debt status under (ii) of that definition.

7      Both sides agree that the results of a court decision should be binding upon both all members of the Bonds/other Senior Debt and all members of the ConDebs. The notice will therefore have to provide a 17 day period (all periods being calendar days subject to Court holidays but including Saturdays and Sundays) after notice having become effective to allow any potential interested party on either side to object to being represented by these two sides (and their respective counsel) or otherwise being bound by such a decision.

8      While notice to the service list may be somewhat instantaneous, we must appreciate that it will take the Trustee and CDS approach some time to filter down. Therefore it would seem to me that notice is to be effective 14 days after notice is given to the Trustees and CDS.

9      Based on the material before me, it would not appear that a full-blown trial is necessary, notwithstanding the submissions of the ConDebs. Rather most of the dispute can be dealt with on the basis of affidavit evidence, subject to cross-examination. To the extent that *viva voce* evidence is truly required, then that should be restricted to the truly material portions which are in dispute so that there would be limited direct and cross-examination in court. I see no reason why repeated representatives of either the ConDebs of the Bonds/other Seni-

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

or Debt would be required; if any are required, it should be one representative.

10      The presently organized Bonds are supported by what are suggested to be the only 2 possible other Senior Debt as defined in (ii) of that definition Tricap and CIBC [I was subsequently advised by counsel for the CIBC that it considers itself likely to come under (i), not (ii)]. They are to make a claim against the ConDebs as a whole — i.e. as against all ConDebs — for their entitlement to all of the Turnover Proceeds or such amount as is required to make them whole pursuant to their claim as to their purported subordination rights. That claim is to be made by noon March 17, 2006. The response/dispute to that claim is to be made by Monday, April 3, 2006, with any reply by the claimants by noon April 10, 2006.

11      Notice is to be given to the service list, trustees and CDS by noon April 18, 2006. There then will follow the 14 days for notice to be effective and the 17-day period for objections. A hearing re possible objections/ modifications should be tentatively booked for May 26, 2006.

12      Assuming no objections/modifications, then by noon June 5, 2006, the 2 sides are to have exchanged the material including past documentation from other hearings and new affidavits. Reply affidavit/additional material in reply is to be exchanged by noon June 12, 2006. Cross-examinations on the affidavits are to be completed by June 28, 2006 with all undertakings to be fulfilled by June 30, 2006. Counsel are to follow the golden rule: there are to be no refusals since only proper questions are to be asked.

13      Factums are to be exchanged by noon July 10, 2006 setting out *succinctly* the facts, those truly disputed facts which truly need *viva voce* examination and the law. If there are no contentious facts, then I would assume that the hearing would not take more than 1 or 2 days; if *viva voce* evidence is required than no more than 5 days. That time may be booked for the week of July 17, 2006.

14      If there are objections/modifications which are found to have merit, then I would expect that the foregoing timetable would need only be adjusted by a factor of one week.

15      It is incumbent upon counsel to adhere to the 3 Cs of the Commercial List, communication, cooperation and common sense. I would expect counsel and their clients to make meaningful progress regarding this hearing, how it may be streamlined and how no one be caught off guard, or blindsided by "late" filings.

16      Of course if counsel having had the benefit of my decision (or at any time thereafter) decide to consent to another schedule or to another process (or modification of this one), then they are certainly at liberty to do so, keeping in mind the proviso that they aim at advancing this litigation. Of course it would be of advantage to both sides to see if they could come to an earlier consensual resolution.

17      I would assume that the winner of this dispute would be requesting costs. That factor should be included in the notice to be sent out along with a synopsis of the two sides to the dispute and the procedure envisioned herein. Stelco through the Monitor will keep the 2 sides apprised of any other claims to be other "Service Debt" and of objections/modifications proposed.

18      I would observe that both sides would appear to know what the other side will be arguing so that it is unlikely that either side will be caught off guard. Further they are now fully aware of the schedule so that there should be no problem with anyone not knowing what the next step will be and when.

19      Order accordingly.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 1505,

*Order accordingly.*

END OF DOCUMENT

.

.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



# TAB16

CITATION: Red Seal Tours Inc. v. Occidental Hotels Management B.V., 2007 ONCA 620
DATE: 20070912
DOCKET: C46081

## COURT OF APPEAL FOR ONTARIO

### SHARPE, CRONK and LANG JJ.A.

BETWEEN:

### RED SEAL TOURS INC.

Plaintiff (Respondent)

and

### OCCIDENTAL HOTELS MANAGEMENT B.V., carrying on business as OCCIDENTAL HOTELS & RESORTS and SLAM INC., carrying on business as VOX TRAVEL MANAGEMENT, ALLEGRO RESORTS MARKETING CORPORATION, ALLEGRO MARKETING DE ESPANA, S.L.U., HORECA INTERSERVICES N.V., and THE JACK TAR PUERTO PLATA BY OCCIDENTAL RESORT

Defendants (Appellants)

John Kingman Phillips and Fred S. Fischer for the appellants

Kenneth A. Dekker for the respondent

Heard: August 27, 2007

On appeal from the order of Justice Janet M. Wilson of the Superior Court of Justice dated September 19, 2006, with reasons reported at [2005] O.J. No. 3724.

SHARPE J.A.:

[1]     This appeal concerns the applicability of forum selection clauses in a series of commercial agreements involving the international tourism industry. The issue is whether the forum selection clauses, found in a series of "tour operator" agreements,

2007 ONCA 620 (CanLII)

apply to the respondent's claims against the appellants. The respondent's claims are based on a separate document (entitled "Guarantee/Special Rates/Contract Addendum") that does not contain a forum selection clause.

[2]     The motion judge found the "Guarantee/Special Rates/Contract Addendum" to be one of three guarantees involving different parties than the tour operator agreements and therefore constituting entirely separate and distinct agreements. Given this finding, she held that the forum selection clauses in the tour operator agreements did not apply. For the following reasons, I conclude that the motion judge erred, that the "Guarantee/Special Rates/Contract Addendum" forms part and parcel of the tour operator agreements, and that the forum selection clauses apply to this action.

[3]     The appellants Occidental Hotels Management B.V., Allegro Resorts Marketing Corporation, Allegro Marketing de Espana, S.L.U., and Horeca Interservices N.V. are separately incorporated in various jurisdictions and are members of the "Occidental Group". The Occidental Group has no corporate status of its own; rather, it is a conglomerate of separately incorporated entities that facilitates the management and marketing of resort properties. The appellant Slam Inc., carrying on business as VOX Travel Management, acted throughout as the Occidental Group's Canadian representative. In particular, VOX negotiates with Ontario tour operators, such as Red Seal Tours Inc., tour operator agreements for room allotments and pricing at Occidental Group hotels. These negotiations occur on a global basis; thereafter, the operators sign separate tour operator agreements with the individual resorts or hotels. These agreements are standard form contracts based on the global negotiations.

[4]     By April 28, 2003, Red Seal and Vox had negotiated and agreed to the terms of the tour operator agreements. Draft written agreements between Red Seal and each of the hotels were then sent to Red Seal. The draft agreements contained standard terms relating to room allotments, number of rooms, pricing, reservations, limitation of liability, payment, and no-shows. All but one of these agreements contain the following choice of forum clause:

> Each party hereto irrevocably agrees to refer over the jurisdiction of the Aruba courts any matters arising this agreement [sic], where each party irrevocably waives any applicable law.

[5]     For reasons specific to Cuban law, the other tour operator agreement, which involves a hotel in Cuba, contains a similar clause naming Cuba as the selected forum.

[6]     However, before the April 28, 2003 agreements were executed, the respondent sought better terms and there were further negotiations between April and October. These negotiations led to three documents providing Red Seal with additional guarantees at particular resorts. These three iterations of the agreement were signed, and are the

2007 ONCA 620 (CanLII)

focus of this appeal. After the second document was finalized, the tour operator agreements were executed on October 29, 2003. The final iteration was entitled "Guarantee/Special Rates/Contract Addendum". This document, executed on November 21, 2003, contains, in point form, certain specific terms relating to six of the eight hotels for which there are tour operator agreements. Those terms include changes to the room rates and allotments contained in the tour operator agreements, a "no-bumping" term, and a rental guarantee on the part of the respondent for a certain percentage of the allotted rooms. The final version was signed on behalf of the Occidental Group by "Fernando Robles" whose signature appears to be the same as that on each of the tour operator agreements.

[7]     The motion judge found that there were three operative guarantee agreements and that the "Guarantee/Special Rates/Contract Addendum", as well as the two earlier iterations of that document, were enforceable. With respect, this finding ignores the following clause in the final version: "This agreement supersedes all previous agreements". In my view, in the light of this language, the November 21, 2003 document is the final version and the only version that governs.

[8]     The final version contains several significant features not found in the earlier iterations and not mentioned in the motion judge's reasons. These features strongly support the appellants' position that any obligations created under this document are part and parcel of the tour operator agreements. First, it is described as a "Contract Addendum". Second, while the earlier iterations were on the letterhead of "Occidental Hotels and Resorts", the final version is framed as a grant of rights by six of the Hotels that are parties to the tour operator agreements. It begins: "The 'Hotel' as listed below grants the Tour Operator SUNWING BY RED SEAL VACATIONS Special Offers applicable during the following dates:". Third, under the heading "Conditions" at the end of the document, the final version specifies that certain matters (Payment and No shows) are as "Per Contract" while others (Release and Allotment) are as "Per Guarantee Agreement".

[9]     Another significant feature of the "Guarantee/Special Rates/Contract Addendum" is the fact that it simply cannot be read as a stand-alone agreement. Its terms deal with specific aspects of matters governed by the tour operator agreements.

[10]    In my view, in the light of these features and terms of the "Guarantee/Special Rates/Contract Addendum", the motion judge's finding that the "Guarantee Agreements are independent, separately enforceable contracts" cannot be sustained. There is only one Guarantee Agreement, not three, and on the language of the relevant document, the conclusion that it is a contract entirely independent from the tour operator agreements is not supportable.

[11]    Nor do I accept the submission that the parties to the tour operator agreements and the "Guarantee/Special Rates/Contract Addendum" must be different because there are

2007 ONCA 620 (CanLII)

Page: 4

individual agreements with the hotels but only one "Guarantee/Special Rates/Contract Addendum". In my view, that submission ignores the fact that according to its terms, it is the named hotels that grant the appellant the rights conferred.

[12]   Whether any of the appellants are liable under the terms of this document or for alleged misrepresentations in its negotiation is a matter to be determined at trial, not on this motion or appeal. However, at this stage of the proceedings, the respondent cannot escape the application of the choice of forum clauses by framing its claims as only being against the appellants, not against the hotels, and under the "Guarantee/Special Rates/Contract Addendum", not the tour operator agreements. See Janet Walker, *Castel and Walker: Canadian Conflict of Laws*, looseleaf (Toronto: Butterworths, 2005) at 13.58: "Parsing jurisdiction clauses to determine whether they apply to claims as they are framed could foster dubious efforts to evade legitimate agreements for dispute resolution, which can be of considerable significance in international commercial dealings."

[13]   It is well-established that the law strongly favours the enforcement of choice of forum clauses and that special deference is owed to forum selection clauses found in international agreements involving sophisticated parties. I do not accept the submission that there is "strong cause" to displace the forum chosen by the parties or that Ontario jurisdiction should be assumed on the basis that Aruba is not the *forum conveniens*. As the Supreme Court of Canada put it in *Z.I. Pompey Industrie v. ECU-Line N.V.*, [2003] 1 S.C.R. 450 at para. 20, "[i]t is essential that the courts give full weight to the desirability of holding contracting parties to their agreements". The strong cause test imposes a "burden on the plaintiff to satisfy the court that there is good reason it should not be bound by the forum selection clause". The court held, at para. 21: "the starting point is that the parties should be held to their bargain" and "that the parties' agreement is given effect *in all but exceptional circumstances*" [emphasis added]. This is a dispute involving many parties from many different jurisdictions. These parties are sophisticated actors familiar with the tourist industry. It was open to those parties to select a neutral forum for the resolution of their disputes. While undoubtedly it would be more convenient for the respondent to pursue its claims in Ontario, there are no "exceptional circumstances" to justify a departure from the forum selected in the agreements. The respondent has failed to discharge its burden that the choice of forum clauses should be set aside.

[14]   Accordingly, I would allow the appeal, set aside the motion judge's order, and substitute an order permanently staying the action. Costs to the appellant fixed at $7,500, inclusive of disbursements and GST.

"Robert J. Sharpe J.A."
"I agree E.A. Cronk J.A."
"I agree S.E. Lang J.A."

RELEASED: September 12, 2007

2007 ONCA 620 (CanLII)



# TAB17

*Indexed as:*
## Serm Investments Ltd. v. Deer Run Shopping Centre Ltd.

**Between**
**Serm Investments Limited, (plaintiff/respondent), and**
**Deer Run Shopping Centre Limited, (defendant/appellant)**

[1998] O.J. No. 108

Docket No. C28051

Ontario Court of Appeal
Toronto, Ontario

**Catzman, Doherty and Austin JJ.A.**

Heard: January 12, 1998.
Judgment: January 13, 1998.

(2 pp.)

*Arbitration -- Judicial review -- Jurisdiction of the courts -- Power to order arbitration proceedings.*

Appeal by the defendant Deer Run from an order of a motions judge staying the action and ordering the parties to submit to arbitration.

HELD: Appeal allowed. The order was set aside. The parties to the action were not the parties to the submission to arbitration. The motions judge thus had no jurisdiction to order an arbitration and there was thus no point in staying the action.

**Counsel:**

Aaron Postelnik, for the appellant.
Gary Wiseman, for the respondent.

The following judgment was delivered by

1    THE COURT (endorsement):-- However sensible the result achieved by the motion judge may be, it cannot be supported. The parties to the submission to arbitration are Schaffran Investments Limited and/or Samuel M. Schaffran and Marvin Rubner, in trust for a company to be incorporated. Absent submission to arbitration by the parties to an action, the court has no jurisdiction to order an arbitration. Serm Investments Limited is clearly not a party to the submission, nor is Deer Run. Accordingly, the motion judge had no jurisdiction to order an arbitration.

2    In the absence of any jurisdiction to make that order, there was no point in staying the action. In these circumstances, it is not necessary to decide whether or not there was a dispute within the meaning of the submission, whether the plaintiff could bring the motion under s. 7 of the Arbitration Act nor whether or not an adjournment should have been granted.

3    The appeal is allowed, the order below set aside, and Serm's motion to stay the action and to appoint an arbitrator is dismissed. In the circumstances, the costs of the motion and of the appeal should be left for disposition by the judge disposing of the action.

CATZMAN J.A.
DOHERTY J.A.
AUSTIN J.A.

cp/d/mop



# TAB18

sport maska inc. *v.* zittrer, [1988] 1 S.C.R. 564

**Sport Maska Inc.**   *Appellant*

*v.*

**Jack E. Zittrer, Herbert E. Siblin, Samuel S. Stein, Marvin B. Goldsmith, David B. Stein, Steven A. Yaphe, Morton S. Spector, Stanley Wener, Jeffrey L. Payne, Brahm D. Levine, Morrie L. Fogelbaum, Allan M. Liverman, Robert H. Zittrer**   *Respondents*

**INDEXED AS: SPORT MASKA INC. *v.* ZITTRER**

File No.: 19660.

1987: October 22; 1988: March 24.

Present: Beetz, Lamer, Wilson, Le Dain and L'Heureux-Dubé JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC

*Arbitration -- Criteria -- Distinction between arbitration and expert opinion -- Undertaking to arbitrate -- Mediation -- Code of Civil Procedure, R.S.Q. 1977, c. C-25, ss. 940 to 951.*

The receiver of a bankrupt company sold a large part of its assets to a company which on the same day resold the assets to appellant. Clause 2.01 of the agreement with regard to this latter sale provided that the valuation of the inventory

would be reviewed by the bankrupt's auditors, the respondents, who were to take into consideration the representations of appellant. Respondents had then to deliver a written opinion to all the parties to the effect that such inventory count and valuation was fairly presented, the whole at the cost of the bankrupt. Upon delivery of such opinion, the inventory count and valuation was to be deemed to be "definitively determined". In a letter sent to appellant (Exhibit DP-1), the bankrupt agreed that appellant attend the valuation of the inventory and make any representations, adding that respondents' valuation of the inventory would be "final and binding". Respondents confirmed the bankrupt's valuation of the inventory and appellant paid the amount so established. A year later, appellant brought an action for damages in the Superior Court against respondents in the amount representing the difference between the price it had paid and the price it would have paid if respondents had not been negligent in performing their task. Respondents made a declinatory exception alleging that they were acting in this matter as arbitrators and that, as such, they were covered by immunity. The Superior Court dismissed their motion. The Court of Appeal set aside that judgment. In its opinion, respondents were acting as arbitrators and that, in the absence of fraud or bad faith, they enjoyed the immunity from civil liability. This appeal is to determine whether the parties had agreed to submit a dispute to arbitration by a third party. This appeal must be disposed of according to the provisions then applicable, namely arts. 940 to 951 of the 1965 *Code of Civil Procedure* in force prior to the 1986 amendments.

*Held*: The appeal should be allowed.

*Per curiam*: For a third party to be classified as an arbitrator, it is essential for the agreement of the parties to contain the components of a submission, whether

or not this submission is the result of an undertaking to arbitrate. A submission requires the existence of a dispute and an undertaking by the parties to submit that dispute to a third party. If the parties simply intended to avoid a possible dispute, the situation is not one of submission. However, they may have agreed to submit to the arbitration of a third party once a dispute has arisen, pursuant to an undertaking to arbitrate, the prerequisite to a submission. The search for the components of a submission presents no difficulty when the parties have clearly indicated their intent to have the dispute between them arbitrated, and have clearly identified that dispute. But in the absence of a clear intention, it is crucial to identify the precise function the parties intended to entrust to this third party under their agreement and in the circumstances of each case. The language used by the parties, the similarity between arbitration and the judicial process, the role assigned to the third party, the third party's independence and the compliance by the parties with the mandatory provisions of the *Code of Civil Procedure* are means of determining that function and the parties' intent. However, these criteria are neither exhaustive nor mutually exclusive.

In the case at bar, an arbitration agreement (submission or undertaking to arbitrate) could not be found since there was no present or potential dispute either when the agreement was concluded between the parties or when respondents revised the valuation made by the bankrupt. Disagreement as to the value of the inventory only arose once the transaction had been completed, that is after the valuation has been checked by respondents. The parties did not intend to submit a dispute to arbitration by respondents, but simply agreed to rely on their opinion, as the essential components of the contract, namely the value of the assets sold, which essentially represented the selling price of those assets.

The parties' intent confirmed this finding. Although they agreed to be bound by respondents' opinion and provided for representations to be made by appellant, the language used in the agreement and the other documents giving effect to it, the process contemplated by the parties under the rules applicable to arbitration under the *Code of Civil Procedure*, and the fact that they deliberately deleted a paragraph providing for a possible arbitration, clearly indicated that the parties agreed to obtain an expert opinion from an accountant and did not intend to submit the matter to arbitration by respondents in the accepted understanding of the structure and legal consequences of that process.

Clause 2.01 of the agreement and letter DP-1 did not constitute an undertaking to arbitrate since they did not refer to an undertaking by the parties to conclude a submission to arbitrate should a dispute arise between them.

Finally, respondents were not acting as mediators. Mediation is not, as such, a legal concept distinct from that of the arbitration. Rather, the mediator is an arbitrator who is exempted from compliance with the rules of law. Since mediation is a departure from the law of arbitration, it must be expressly provided for or result from a clear and unambiguous intent of the parties. In fact, clause 2.01 and letter DP-1 made no mention of respondents' being exempted from compliance with the rules of law, acting on the basis of equity or their conscience, or, more simply, being mediators. Moreover, since the mediator is an arbitrator, the criteria for distinguishing between arbitration and expert opinions apply to him *mutatis mutandis*. Since respondents were not acting as arbitrators, it was therefore impossible to speak of mediators.

*Per* Beetz J.: Considering the origin of the provisions of the *Codcessary to rule on the possible similarity between common law and Quebec law in this respect. Such similarity, if any, cannot have any relevance in positive law.*

**Cases Cited**

By L'Heureux-Dubé J.

**Referred to**: *Corporation municipale du Village de St-Bernard c. Trottoirs et chaînes Pilotte Inc.*, [1983] R.D.J. 583; *Corporation de la Ville de Beauharnois v. Liverpool & London & Globe Ins. Co.* (1906), 15 K.B. 235; *Home Insurance Co. de New York v. Capuano* (1926), 41 K.B. 85; *Ouellette v. Cie d'assurance mutuelle de commerce contre l'incendie*, [1949] R.L. 163; *Beaudoin v. Rodrigue*, [1952] Q.B. 83; *St-Raymond Paper Ltd. c. Campeau Corp.*, Mtl. C.A., No. 500-09-000639-765, November 17, 1976; *Rindress c. Cie de Charlevoix Ltée*, [1983] C.S. 897; *Church v. Racicot* (1912), 21 K.B. 471; *Zodiak International Productions Inc. v. Polish People's Republic*, [1983] 1 S.C.R. 529; *Collins v. Collins* (1858), 26 Beav. 306, 53 E.R. 916; *Scott v. Corporation of Liverpool* (1858), 3 De G. & J. 334, 44 E.R. 1297; *Bos v. Helsham* (1866), L.R. 2 Ex. 72; *Re Hopper* (1867), L.R. 2 Q.B. 367; *Re Carus-Wilson and Greene* (1886), 18 Q.B.D. 7; *Sutcliffe v. Thackrah*, [1974] 1 All E.R. 859; *Arenson v. Casson Beckman Rutley & Co.*, [1975] 3 All E.R. 901; *Chambers v. Goldthorpe*, [1901] 1 Q.B. 624; *Pappa v. Rose* (1871), L.R. 7 C.P. 32; *Tharsis Sulphur and Copper Co. v. Loftus* (1872), L.R. 8 C.P. 1; *Stevenson v. Watson* (1879), 4 C.P.D. 148; *Finnegan v. Allen*, [1943] 1 K.B. 425; *Re Krofchick and Provincial Insurance Co.* (1978), 21 O.R. (2d) 805; *Pfeil v. Simcoe & Erie General Insurance Co.* (1986), 19 C.C.L.I. 91; *Preload Co. of Canada Ltd. v. Regina (City of)* (1953), 10 W.W.R. (N.S.) 241; *Campbellford, Lake Ontario and Western Railway Co. v. Massie* (1914), 50 S.C.R. 409; *Re Premier Trust Co. and Hoyt and Jackman* (1969), 3 D.L.R. (3d)

417; *Hartford Fire Insurcham,* 156 P.2d 757 (1945); *Preferred Insurance Co. v. Richard Parks Trucking Co.,* 158 So.2d 817 (1963); *In re Delmar Box Co.,* 127 N.E.2d 808 (1955); Cass. civ. 2ᵉ Ch., November 7, 1974, *Rev. arb.,* 1975.302 *(Di Trento c. Pinatel)*; Cass. civ., June 9, 1961, *Rev. arb.,* 1961.186 *(Soc. Distilleries réunies de Bretagne et de Normandie c. Sofridex)*; Cass. com., May 8, 1961, *Bull. civ.,* III, n° 192, p. 169 *(Société Idéal Coiffeur c. Société Raimon)*; Paris, 1ʳᵉ Ch. supp., February 5, 1976, *Rev. arb.,* 1976.255 *(S.C.I. Résidence Les Tilleuls c. S.A. Promeric)*; Trib. civ. Seine, 1ʳᵉ Ch., February 8, 1956, *Rev. arb.,* 1957.25 *(Distilleries de Bretagne et de Normandie c. Société privée d'exploitation immobilière)*; Cass. civ. 2ᵉ Ch., May 25, 1962, *Rev. arb.,* 1962.103 *(Société Romand c. de Montmort)*; Cass. civ. 1ʳᵉ Ch., October 26, 1976, *Rev. arb.,* 1977.336 *(Cayrol c. Cayrol)*; Cass. civ. 2ᵉ Ch., June 7 and November 30, 1978, *Rev. arb.,* 1979.343 *(Pentecost c. Pantaloni; Société Creaciones Reval c. Société Cerruti 1881)*; Paris, 1ʳᵉ Ch. C, January 12, 1979, *Rev. arb.,* 1980.83 *(Belon c. Maurey)*; Nancy, 1ʳᵉ Ch., December 12, 1985, *Rev. arb.,* 1986.255 *(Langlais c. Bruneau)*; Cass. civ. 3ᵉ Ch., October 9, 1984, *Rev. arb.,* 1986.263 *(Société S.E.C.A.R. c. Société Shopping Décor)*; *C.(G.) v. V.-F.(T.),* [1987] 2 S.C.R. 244; *Ville de Granby v. Désourdy Construction Ltée,* [1973] C.A. 971; *Concrete Column Clamps Ltd. v. Cie de Construction de Québec Ltée* (1939), 67 K.B. 536, aff'd [1940] S.C.R. 522; *Corporation du Village de Tadoussac v. Brisson,* [1959] Q.B. 644; *McKay v. Mackedie* (1897), 11 C.S. 513; *Chamberland v. Corporation du Village de Mont-Joli* (1936), 74 C.S. 529.

**Statutes and Regulations Cited** *Act respecting the Code of Civil Procedure of Lower Canada,* S. Prov. C. 1866, 29 & 30 Vict., c. 25.

*Act respecting the Code of Civil Procedure of the Province of Quebec,* S.Q. 1897, c. 48.

*Act to amend the Civil Code and the Code of Civil Procedure in respect of arbitration,* S.Q. 1986, c. 73, ss. 1, 2.

*Civil Code of Lower Canada,* arts. 1926.1 to 1926.6 [ad. 1986, c. 73, s. 1].

*Code civil* (France), art. 1592.

- 7 -

*Code de procédure civile* (France), arts. 1003 to 1028.

*Code of Civil Procedure*, R.S.Q., c. C-25, arts. 940 to 951.2 [ad. 1986, c. 73, s. 2].

*Code of Civil Procedure*, R.S.Q. 1977, c. C-25 [formerly S.Q. 1965, c. 80], arts. 165.4, 940 to 951.

*Code of Civil Procedure of Lower Canada*, arts. 1341 to 1354.

*Code of Civil Procedure of the Province of Quebec*, arts. 1431 to 1444.

*Nouveau Code de procédure civile* (France), art. 1451.


**Authors Cited**


Anctil, Jacques J. *Commentaires sur le Code de procédure civile avec tableaux synoptiques et formules*, t. 2. Sherbrooke: Revue de droit de l'Université de Sherbrooke, 1983.

Antaki, Nabil N. "L'Amiable composition". Dans Nabil N. Antaki et Alain Prujiner (éd.), *Actes du 1ᵉʳ Colloque sur l'arbitrage commercial international*. Montréal: Wilson & Lafleur, 1986.

Beullac, Pierre. *Code de procédure civile de la province de Québec annoté*. Montréal: Lovell & Son, 1908.

Boisséson, Matthieu de. *Le droit français de l'arbitrage*. Paris: Gide, Loyrette, Nouel, 1983.

Bredin, Jean-Denis. "L'amiable composition et le contrat", *Rev. arb.*, 1984.259.

Brierley, John E. C. "La convention d'arbitrage en droit québécois interne", [1987] *C.P. du N.* 507.

Brierley, John E. C. "Une loi nouvelle pour le Québec en matière d'arbitrage" (1987), 47 *R. du B.* 259.

Canadian Institute of Chartered Accountants. *CICA Handbook*, vol. II. Toronto: Canadian Institute of Chartered Accountants, [1983].

Colas, Emile. "Clause compromissoire, compromis et arbitrage en droit nouveau" (1968), 28 *R. du B.* 129.

Doutre, Gonzalve. *Les lois de la procédure civile*. Montréal: Eusèbe Sénécal, 1867.

Ferland, Philippe. *L'arbitrage conventionnel*. Montréal: Thélème, 1983.

Gérin-Lajoie, Henri. *Code de procédure civile de la province de Québec annoté*. Montréal: Wilson & Lafleur, 1920.

Hogg, Quintin McGarel. *The Law of Arbitration*. London: Butterworths, 1936.

- 8 -

Johnson, Walter Seely. *The Clause Compromissoire: Its Validity in Quebec.* Montreal: W. S. Johnson, 1945.

Langelier, François. *Cours de droit civil,* t. 1 à 6. Montréal: Wilson & Lafleur, 1905 à 1911.

Loquin, Eric. *L'amiable composition en droit comparé et international.* Paris: Librairies Techniques, 1980.

Martineau, Paul G. et Romuald Delfausse. *Code de procédure civile de la province de Québec annoté.* Montréal: Théoret, 1899.

Mayer, Pierre. Note, *Rev. arb.*, 1986.267.

McLaren, Richard H. and Earl Edward Palmer. *The Law and Practice of Commercial Arbitration.* Toronto: Carswells, 1982.

Mignault, Pierre Basil. *Code de procédure civile du Bas-Canada annoté.* Montréal: Valois, 1891.

Mignault, Pierre Basil. *Le droit civil canadien,* t. 1 à 9. Montréal: Whiteford & Théoret/Théoret/Wilson & Lafleur, 1895 à 1916.

Motulsky, Henri. *Écrits: études et notes sur l'arbitrage.* Paris: Dalloz, 1974.

Pothier, Robert. *Oeuvres de Pothier,* t. 9. Paris: Bechet Ainé, 1824.

Pourcelet, Michel. *La vente,* 5ᵉ éd. Montréal: Thémis, 1987.

Ravon, Henri. *Traité de l'arbitrage et de l'expertise.* Paris: Librairie d'architecture, 1905.

Reid, Henri. *Code de procédure civile du Québec, complément jurisprudence et doctrine,* 3ᵉ éd. Montréal: Wilson & Lafleur, 1987.

Reid, Hubert et Denis Ferland. *Code de procédure civile annoté du Québec,* vol. 2. Montréal: Wilson & Lafleur, 1981.

Robert, Jean. *L'arbitrage: droit interne, droit international privé,* 5ᵉ éd. Paris: Dalloz, 1983.

Rocher, Paul. *De l'arbitrage en matière civile.* Paris, Librairie de la Société du Recueil J. B. Sirey et du Journal du Palais, 1907.

Roland-Levy, Pierre. Note, *Rev. arb.*, 1979.345.

Rousseau-Houle, Thérèse. *Précis du droit de la vente et du louage,* 2ᵉ éd. Québec: Presses de l'Université Laval, 1986.

Rubellin-Devichi, Jacqueline. Note, *Rev. arb.*, 1980.87.

*Traité de Droit civil du Québec,* t. 1 à 15. Montréal: Wilson & Lafleur, 1942 à 1958.

Tyan, Emile. *Le droit de l'arbitrage.* Beyrouth: Librairies Antoine, 1972.

- 9 -

Walton Anthony. *Russell on the Law of Arbitration*, 19th ed. London: Stevens & Sons, 1979.

APPEAL from a judgment of the Quebec Court of Appeal, [1985] C.A. 386, [1985] R.D.J. 520, reversing a judgment of the Superior Court*[1], dismissing a declinatory exception. Appeal allowed.

[1] Mtl. Sup. Ct., No. 500-05-002102-844, April 13, 1984.

*Gilles Poulin* and *Richard Levy*, for the appellant.

*John Nicholl*, for the respondents.

English version of the reasons delivered by

1.              BEETZ J.--I would allow the appeal for the reasons given by Justice L'Heureux-Dubé. Considering the origin of the provisions of the *Code of Civil Procedure* with regard to arbitration, I do not consider it necessary to rule on the possible similarity between common law and Quebec law in this respect. Such similarity, if any, cannot have any relevance in positive law.

English version of the judgment of Lamer, Wilson, Le Dain and L'Heureux-Dubé JJ. delivered by

2.              L'HEUREUX-DUBÉ J.--Did the parties to an agreement for the sale of assets agree to submit a dispute to arbitration by a third party? If so, do such arbitrators enjoy immunity from prosecution? These are the issues raised by this appeal.

- 10 -

3.                         The Quebec Superior Court, district of Montréal (Yves Forest J.,

judgment of April 13, 1984), answered the first question in the negative, thus making

it unnecessary to answer the second.

4.                         The Quebec Court of Appeal, district of Montréal (McCarthy and

LeBel JJ.A., and Chevalier J. (*ad hoc*), [1985] C.A. 386), reversed this judgment and

answered both questions in the affirmative.

5.                         By leave of this Court, appellant is asking it to restore the Superior

Court judgment.


I--<u>Facts</u>

6.                         The parties related the facts differently in their respective factums;

respondents argued that appellant went beyond the facts alleged.

7.                         For the purposes of the discussion, it will only be necessary to

reproduce the facts as stated by Chevalier J. at pp. 387-88:

>         [TRANSLATION]  On December 8, 1982, a receiver chosen by the
> secured creditors of the insolvent company CCM Inc. accepted an offer
> from R.A.D. Inc. to buy a large part of CCM's assets, including in
> particular a stock of goods identified as the "Winter Goods Division".
>
>         The agreement in question contained the following clause (*P-2*):
>
> 2.01 Vendor and Purchaser hereby agree that the inventory described in
> Section 1.01(a) above will be counted or verified by representatives of the
> Vendor in the presence of representatives of the Purchaser and shall be
> valued by the Vendor on a going concern basis at the lower of cost and
> net realizable value on a basis consistent with prior years, such count and

- 11 -

valuation of the inventory described in Section 1.01(a) to be reviewed by
Vendor's auditors, Messrs. Zittrer, Siblin, Stein & Levine, Chartered
Accountants, who will deliver a written opinion to the Vendor and
Purchaser to the effect that such inventory count and valuation is fairly
presented, the whole at Vendor's sole cost. Upon delivery of such
opinion, the inventory count and valuation shall be deemed to be
definitively determined for all purposes in connection with this offer.

The physical counting on the inventory shall commence at 5:01 p.m. on
December 17, 1982 (the "Date of Possession") and the valuation of the
inventory described in Section 1.01(a) shall be completed prior to January
21, 1983 (the "Closing Date").

On December 17, 1982, R.A.D. Inc. in turn resold the aforesaid
winter stock to respondent Sport Maska Inc. This second agreement
contained the following wording (P-1):

2.01 Vendor and Purchaser hereby agree that the inventory described in
Section 1.01(a) above will be counted or verified by representatives of
CCM Inc. the Vendor and the Purchaser and shall be valued by CCM
Inc., the Vendor and the Purchaser on a going concern basis at the lower
of cost or net realizable value and on a basis consistent with prior years,
such count and valuation of the inventory described in Section 1.01(a) to
be reviewed by CCM Inc.'s auditors, Messrs. Zittrer, Siblin, Stein &
Levine, Chartered Accountants, who shall take into consideration the
representations of Sport Maska Inc. as to the valuation of the inventory,
and the said accountants shall deliver a written opinion to CCM Inc., to
the Vendor and the Purchaser to the effect that such inventory count and
valuation is fairly presented (marginal notation unclear), the whole at the
cost of CCM Inc. Upon delivery of such opinion, the inventory count and
valuation shall be deemed to be definitively determined for all purposes in
connection with this Offer.

The physical counting on the inventory shall commence at 5:01 p.m. on
December 17, 1982 (the "Date of Possession") and the valuation of the
inventory described in Section 1.01(a) shall be completed prior to January
21, 1983.

Also on December 17, 1982, CCM sent R.A.D. and Sport Maska a
letter reading as follows (DP-1):

We understand that Gestion R.A.D. Inc. has today entered into an
agreement to sell the winter goods division of CCM Inc. to Sport Maska
Inc. CCM Inc. hereby agrees that Sport Maska Inc. shall be entitled to
attend the valuation of the winter goods inventory as contemplated in the
accepted Offer of Purchase between Gestion R.A.D. Inc. and CCM Inc.

- 12 -

and shall further be entitled to make any representations to CCM Inc. and
Messrs. Zittrer, Siblin, Stein & Levine in connection with the valuation of
the said winter goods inventory. However, in determining the final
valuation of the winter goods inventory between CCM Inc. and Gestion
R.A.D. Inc., the opinion of Messrs. Zittrer, Siblin, Stein & Levine shall be
final and binding.

...

According to the allegations of the statement of claim, the inventory
was taken and the inventoried stock valued by CCM, which on January
20, 1983 sent appellants the following letter (P-4):

Gentlemen:

Pursuant to Paragraph 2.01 of the Offer by Gestion R.A.D. Inc. to
purchase certain assets of CCM Inc. (dated December 6, 1982; accepted
December 8, 1982), we hereby inform you that we have counted the
inventory described in Section 1.01(a) of the said Offer and valued the
same at $3,798,000.00 as at December 17, 1982. Such inventory has been
valued by us on a going concern basis at the lower of cost and net
realizable value on a basis consistent with prior years.

On the same day appellants sent R.A.D. and CCM a letter reading as
follows (P-3):

Pursuant to Section 2.01 of an Offer by Gestion R.A.D. Inc. to CCM Inc.
signed on December 6th, 1982 (the "Offer"), we have reviewed the count
and valuation by CCM Inc. of the inventory of CCM Inc. described in
Section 1.01(a) of the Offer. Our examination was made in accordance
with generally accepted auditing standards, and accordingly included such
tests and other procedures as we considered necessary in the
circumstances.

   In our opinion the count by CCM Inc. of such inventory as at
December 17th 1982 and the valuation thereof by CCM Inc. in the
amount of $3,798,000 present fairly such inventory as at such date on
a going concern basis at the lower of cost and net realizable value on
a basis consistent with prior years.

The following day, January 21, 1983, the date on which both
transactions were to be completed, respondent paid R.A.D. the amount
determined by CCM and confirmed by appellants.

- 13 -

Finally, on February 22, 1984, it brought against them an action the conclusions of which claimed damages in the amount of $1,306,263, representing the difference between the price it had paid for the stock purchased and the price which, it maintained, it would have had to pay if appellants had performed their obligation as they ought to have done.

II--Judgments

8.          The Superior Court judge stated his reasons as follows:

[TRANSLATION] WHEREAS it appears from the record that this is not a "judicial case", or a case involving an arbitrator or arbitration presented pursuant to arts. 940 *et seq.* of the Code of Civil Procedure;

WHEREAS an arbitral award is not in question and the authorities cited do not apply either in the case at bar;

WHEREAS it appears from reading the said relevant paragraph that an opinion was requested from accountants, and when that opinion is delivered there is a presumption that it is finally determined;

WHEREAS the Court has before it an action for damages against defendants for the reasons alleged in the declaration;

WHEREAS the Court considers that the arguments of the motion presented pursuant to arts. 163 and 165 C.C.P. appear to be ill-founded; and

WHEREAS the Court considers that the motion for a declinatory exception is ill-founded, it is dismissed with costs.

9.          Reversing this judgment, two judges of the Court of Appeal, LeBel

J.A. and Chevalier J. (*ad hoc*), filed joint reasons in which McCarthy J.A. concurred.

10.        At the outset the Court of Appeal eliminated the remedy based on

fraud and bad faith on the part of respondents, and allowed only the action for

damages which was based on respondents' professional status, given the allegations of

the action as brought.

11.        Chevalier J. stated the following in this regard, at p. 389:

> [TRANSLATION] The action brought is for damages. Nowhere in
> the declaration is there any allegation of fraud, corruption or any kind of
> delict affecting the personal integrity of appellants. All the allegations
> made against them by respondent have to do with the negligent and
> unprofessional manner in which they allegedly performed the task
> entrusted to them.
>
> ...
>
> I therefore rule out any possibility that this is an action for damages
> based on a delict which has no connection with the *professional* status of
> appellants, in the precise meaning of that adjective. I consider that this
> first point needs to be clarified forthwith for, had appellants committed a
> delict of a personal nature, I would have expressed myself differently
> from what follows.

12.        LeBel J.A. added at p. 394:

> [TRANSLATION] In order to rule the action admissible, something
> would have to be found suggesting more than negligence or professional
> misconduct. Even in paragraph 15 of the declaration, referred to above,
> and notwithstanding its ambiguous wording, I find no allegation to
> support a conclusion that appellants are personally liable.

13.        On the nature of respondents' function under the terms of the

foregoing agreements, Chevalier J. said the following at p. 389:

[TRANSLATION] Having said that, I am satisfied after examining the wording of clause 2.01 of the agreement of December 17, 1982, together with the wording of the letter from CCM and to R.A.D. and to Maska dated that same day, that the parties intended to submit the valuation of the goods to arbitration pursuant to arts. 940 *et seq.* of the Code of Civil Procedure.

14.        Chevalier J. drew the criteria pointing to arbitration from the wording

of the agreements in question and concluded at p. 391:

[TRANSLATION] In my view, it is impossible to give the last part of clause 2.01 or the wording of the letter from CCM to Maska and R.A.D. any meaning other than that of an intention to submit to the arbitration of a third party, in this case appellants, any issue that might arise between on the one hand, the direct seller R.A.D. and the original seller CCM, which were both interested in setting as high a price as possible, and Maska on the other hand, which undoubtedly wanted to get the lowest possible price.

15.        LeBel J.A. said the following on this point at pp. 392-93:

[TRANSLATION] The wording of the contracts and the documents alleged in support of the proceedings contain obscurities which make it difficult to categorize appellants' function in legal terms. However, Chevalier J.'s analysis indicates that this was not a mandate given to an expert to provide a simple valuation.

...

There was the possibility of a dispute. A procedure for avoiding litigation was agreed on and it was binding on the parties. The contracts—in particular Exhibit P-1, the contract concluded between Sport Maska Inc. and Gestion R.A.D. Inc.—do not support the contention that appellants were simply asked for a technical opinion on the methods of valuing inventories. According to the argument put forward by respondent, in the event that appellants disagreed with the valuation this would not be fixed but would result in another negotiation between the parties. However, I conclude from the handwritten notes attached to clause 2.01 and incorporated in it that Zittrer could either confirm the valuation or suggest an alteration or adjustment. In that case, when the opinion was issued the value of the inventory was regarded as having been finally determined for all practical purposes, either in the amount paid by

- 16 -

CCM Inc. or in the amount resulting from the adjustments determined by Zittrer. Moreover, the pleadings of respondent confirm the way in which it regarded the functions of appellants. This view can be found in paragraph 15 of the declaration, where respondent charged that appellants had broken certain obligations although they had "*agreed to be arbitrators*". See A.F., p. 36.

Appellants resolved the issue before them and the record contains the essential components of a valid undertaking to arbitrate, an undertaking which does not have to be formulated or stated in ritual language*[6]. Though privately appointed, appellants as arbitrators were still judges and not simply mandataries of the parties*[7].

------

[6] Zodiac International Productions Inc. c. *Polish People's Republic*, [1983] R.D.J. 277, at p. 287, Chouinard J., Supreme Court of Canada.

[7] Henri Vizioz and Pierre Raynaud. "Jurisprudence française en matière de procédure civile", (1947) 45 *Rev. trim. dr. civ.* 220 and E. Glasson, Albert Tissier and René Morel, *Traité théorique et pratique d'organisation judiciaire de compétence et de procédure civile*, 3ᵉ éd., Tome 5, Paris, Librairie du Recueil Sirey, 1936, pp. 352-54, No. 1821.

16.

17.        Finally, as the Court found that respondents were acting as

arbitrators, the question of their immunity was raised and was developed further by

LeBel J.A. at p. 393:

[TRANSLATION] As such an arbitrator, who is called on to settle or prevent a dispute, is given certain immunities. These are governed by the rules of public and not private law because of the similarity of arbitration to the judicial function, even when the conclusion of a submission to arbitration is contained in a private contract, when the law does not require recourse to this method of settling disputes. In the absence of fraud or bad faith, an arbitrator enjoys the immunity from civil liability suggested for him by counsel. A majority of the House of Lords again recently came to this conclusion in *Arenson*, cited above. Lord Morris of Borth-y-Gest had stated the same opinion some years earlier in *Sutcliffe* v. *Thackrah*, [1974] A.C. 727, at p. 744:

I think it must now be accepted that an action will not lie against an arbitrator for want of skill or negligence in making his award.

- 17 -

> Discussing the liability of a lower court, the Supreme Court made the same distinction between the jurisdiction and the immunity of the members of a disciplinary board. It held that the members of a disciplinary board could arrive at an unlawful decision which was incorrect in law, without it giving rise in itself to an action for damages against the Alberta Bar or its directors.

III--Procedure

18.          It is important to note that the Superior Court judge was dealing here with a declinatory exception brought by respondents against the appellant's action. As LeBel J.A. pointed out, this motion [TRANSLATION] "is equally an exception to dismiss" covered by art. 165(4) *C.C.P.*:

> **165.** The defendant may ask for the dismissal of the action if:
>
> ...
>
> 4. The suit is unfounded in law, even if the facts alleged are true.

19.          At this stage *in limine litis*, the facts alleged must be taken as proven.

20.          As appears from the motion, this exception is based solely on respondents' argument that they were acting in this matter as arbitrators and, as such, in view of the nature of the action brought by appellant, they were covered by immunity while in the course of their duties. Accordingly, the decision as to the nature of respondents' function must, I think, be dealt with at the outset. If respondents were not acting as arbitrators, they cannot enjoy any immunity and a decision as to the nature of the action brought by appellant would at this stage become moot.

- 18 -

IV--<u>Arbitration</u>

1--*Applicable Legislation*

21.          The agreements underlying this matter are dated December 17, 1982
and respondents' "valuation letter" January 20, 1983. At that time Book VII of the
1965 *Code of Civil Procedure*, R.S.Q. 1977, c. C-25 (formerly S.Q. 1965, c. 80), contained
provisions on arbitration (arts. 940 to 951). These provisions have since then been
extensively revised: *An Act to amend the Civil Code and the Code of Civil Procedure in respect of
arbitration*, S.Q. 1986, c. 73, arts. 1 and 2. Provisions on arbitration have been inserted
in the *Civil Code* on arbitration (arts. 1926.1 to 1926.6 *C.C.L.C.*) and the *Code of Civil
Procedure* has been substantially amended in this regard (arts. 940 to 951.2 *C.C.P.*) For
an analysis of these amendments see Brierley, "Une loi nouvelle pour le Québec en
matière d'arbitrage" (1987), 47 *R. du B.* 259.

22.          Before these amendments and at the time in question, Book VII of
the *Code of Civil Procedure*, entitled "Arbitration", provided that anyone could submit to
an arbitration "respecting any rights of which he has the free exercise" (art. 940
*C.C.P.*) The submission <u>had</u> to be in writing, contain the names and capacities of the
parties, appoint one or three arbitrators and state the objects in dispute (art. 941
*C.C.P.*) The arbitrators could require the parties to provide them with a statement of
their arguments but nevertheless were required to hear the parties and receive their
evidence in accordance with the procedure determined by themselves. Witnesses were
summoned pursuant to arts. 280 to 284 and sworn (art. 943 *C.C.P.*) The rules for
withdrawal applicable to arbitrators were the same as those applicable to judges (art.
946 *C.C.P.*) Arbitrators arrived at their decisions according to the rules of law, unless

- 19 -

exempted from so doing in the submission to arbitration or unless empowered to act as mediators; the award had to be made by a majority, had to give the reasons for the decision in all cases and had to be signed by all the arbitrators (art. 948 *C.C.P.*) Every award could be homologated by the court with the reservation that the court could not enquire into the merits of the contestation (art. 950 *C.C.P.*) Article 951 dealt with the undertaking to arbitrate: the only requirements mentioned in this case were that the arbitration had to be in writing and that the parties had to execute a submission once the dispute had arisen.

2--*Sources*

23.          The first *Code of Civil Procedure* of Quebec was adopted on June 28, 1867 (*An Act respecting the Code of Civil Procedure of Lower Canada*, S. Prov. C. 1866, 29 & 30 Vict., c. 25), and Title Eight dealt with arbitration (arts. 1341 to 1354). When the Code was first revised in 1897 (*An Act respecting the Code of Civil Procedure of the Province of Quebec*, S.Q. 1897, c. 48), these provisions were simply renumbered (arts. 1431 to 1444) without any other amendment than a clarification in art. 1436 regarding mediators.

24.          The chapter on arbitration in the 1965 revision of the *Code of Civil Procedure* (Book VII) which I have just noted, adopts essentially the same provisions. The only changes of importance are the omission of art. 1431, dealing with submissions, which was replaced by art. 940, and the insertion of an article dealing with the undertaking to arbitrate (art. 951).

- 20 -

25.         The codifiers of 1867 were sparing in their comments: they said, regarding arbitration:

> The articles concerning arbitrations reproduce the rules of our existing law, and only the last one requires to be noticed.

26.         The codifiers are here referring to art. 1354, which permitted an appeal from an arbitral award only where a penalty was stipulated in the submission.

27.         However, the draft *Code of Civil Procedure* and the version reproduced in Doutre, *Les lois de la procédure civile* (1867), refer to the sources relied on by the codifiers, who referred to them under each article. Articles 1341 to 1354 of the 1867 Code refer to French sources, namely Pothier, Couchot, Bonnin, Bonnier and in particular the French *Code de procédure civile* of 1806. The substance of arts. 1003 to 1028 of the 1806 Code was reproduced in our 1867 Code, some articles even being reproduced word for word. The 1806 French Code is itself derived from old French law. In his *Traité de la procédure civile* (*Oeuvres de Pothier*, vol. 9, 1824), at pp. 122-23, Pothier refers to the Edict of August 1560 and the Ordinance of 1667.

28.         Brierley writes that [TRANSLATION]  "...from a historical standpoint, the source of arbitration law in Quebec is old French law as adopted in Quebec before the codification of the laws relating to civil procedure in 1867 . . . ." (Brierley, loc. cit., at p. 263; see also: Ferland, *L'arbitrage conventionnel* (1983), at p. 28; Johnson, *The Clause Compromissoire: Its Validity in Quebec* (1945), at p. 82).

29.         The Quebec Court of Appeal approved this opinion when it referred to old French law in interpreting art. 950 of the 1965 Code in a question involving the

homologation of an arbitration award, in *Corporation municipale du Village de St-Bernard c. Trottoirs et chaînes Pilotte Inc.*, [1983] R.D.J. 583, at pp. 590-92.

*3--Definitions*

30.         Neither in French law, in the 1806 *Code de procédure civile* or earlier, nor

in the 1867 Quebec *Code of Civil Procedure* or in its subsequent revisions, is there a

definition of the word "arbitration", except for the 1986 amendments made to the

*Civil Code of Lower Canada.* However, the 1867 Quebec *Code of Civil Procedure*, which

differs in this respect from the French *Code de procédure civile* of 1806, contains a

definition of submission:

| | |
|---|---|
| **1341.** Submission is an act by which persons, in order to prevent or put an end to a lawsuit, agree to abide by the decision of one or more arbitrators whom they agree upon. | **1341.** Le compromis est un acte par lequel les parties pour éviter un litige ou y mettre fin, promettent de s'en rapporter à la décision d'un ou de plusieurs arbitres dont elles conviennent. |

31.         This article, renumbered 1431, was reproduced without any change in

the 1897 revision. The commissioners explained why this definition was omitted in the

subsequent 1965 revision:

> The definition of the submission given by article 1431 of the present Code is useless; moreover, if it were considered necessary, it should be found in the Civil Code. It is, however, necessary to set out in the Code of Civil Procedure the case where the submission is possible as it is there a question of means of resolving a dispute without having recourse to the Courts. Article 940 is, in this sense, new law.

32.              This comment is self-explanatory and also explains the absence of a definition of the various procedures for settling disputes in the *Civil Code* or the *Code of Civil Procedure*. In our civil law system, the parties' agreement is law provided they have the capacity to contract and are not acting contrary to good morals and public order. In solving a difficulty, difference or dispute the parties have a choice of means: an expert opinion, an appraisal, conciliation, mediation, transaction, arbitration or any other form of intervention designed to resolve or to try to resolve the problem confronting them. In each case the parties have probably tried to find a final solution. The legislator has recognized this contractual freedom, subject to the reservation that as is true throughout our law the parties in either case remain free to seek or not to seek a final settlement of the matter in the courts. Our system of law has only very reluctantly allowed the parties to agree to rule out such recourse to the courts. The decision of this Court in *Zodiak International Productions Inc. v. Polish People's Rebublic*, [1983] 1 S.C.R. 529, was necessary to give this status to the "complete" undertaking to arbitrate. It is in this context that provisions on arbitration must be seen. As the legislator had no reason to define the various procedures for settling disputes between litigants, he also had no clear interest in regulating the process for resolving such conflicts, and this gave the system chosen great flexibility. The legislator left these various procedures for settling disputes to be resolved freely by litigants when recourse to the courts was still possible. If judicial intervention was ruled out, however, the legislator had to ensure that the process would guarantee litigants the same measure of justice as that provided by the courts, and for this reason, rules of procedure were developed to ensure that the arbitrator is impartial and that the rules of fundamental justicre observed. The arbitrator will make an award which becomes executory by homologation. This indicates the similarity between the arbitrator's real function and that of a judge who has to decide a case. This judge, freely chosen by the parties, is subject to procedural constraints that cannot be applied to other forms of

- 23 -

intervention, such as an expert who does not have to settle an issue as a judge would or render a decision as the courts generally do. Once the expert's opinion has been given, the parties can still go to court unless they have clearly otherwise agreed.

33.          From this standpoint a definition of the submission is not absolutely necessary, since it is virtually axiomatic that an arbitrator cannot settle a dispute, which is his function, if no dispute exists: the arbitration would then be pointless.

34.          The purpose of the articles regarding the submission was therefore really to identify the dispute, the subject of the arbitration, and to indicate the function of the arbitrator or arbitrators regarding this dispute.

35.          The adoption of an amendment to the *Civil Code* in 1986, inserting art. 1926.1, accompanied by amendments to the *Code of Civil Procedure* at the same time under the heading of arbitration (arts. 940 to 951.2) did not, in my opinion, alter the state of the law on the matter, but rather merely added to the rules of procedure by clarifying them and included the undertaking to arbitrate and the submission in a single definition of the "arbitration agreement":

> **1926.1** An arbitration agreement is a contract by which the parties undertake to submit a present or future dispute to decision by one or more arbitrators to the exclusion of the courts.

36.          It might be thought that, in so doing, the legislator intended to merge the "submission" and the "undertaking to arbitrate" into a single concept. That is not the case. In my opinion, the distinction remains: the existing dispute refers to the submission and the potential dispute to the undertaking to arbitrate, both of which were and remain the components of the arbitration agreement. The only change I can see is to the

mechanism for setting the arbitration in motion, that is the notice mentioned in art. 944 *C.C.P.*, which was also adopted at the time of the 1986 amendments:

> **944.** A party intending to submit a dispute to arbitration must notify the other party of his intention, specifying the matter in dispute.
>
> The arbitration proceedings commence on the date of service of the notice.

37. If the obligation to make a submission under the undertaking to arbitrate is thereby reduced, the notice contained in art. 944 *C.C.P.* performs the function of the submission as defined in art. 1341 of the 1867 *Code of Civil Procedure*: the notice must describe the dispute, which at this point is necessarily an existing dispute, and set out the parameters of the dispute for arbitration. As these amendments were not in effect when the dispute at bar arose, I do not think any further analysis is necessary.

38. It must be assumed here that at the time of the 1965 revision the legislator did not abandon the legislative policy underlying both the definition of the submission and the rules on arbitration at the time the Code was enacted in 1867, as is indeed indicated by the adoption, almost without change, of the provisions on arbitration in that 1867 Code.

39. Article 940 of the 1965 Code simply indicates where the submission is possible:

> **940.** Any person may enter into a submission to arbitration respecting any rights of which he has the free exercise.

- 25 -

> However, no one may enter into a submission respecting alimentary gifts
> or legacies, separations between consorts or questions which concern either
> public order or the status or capacity of persons.

40.             Article 951, also added in the 1965 revision, mentions the undertaking
to arbitrate for the first time:

> **951.** An undertaking to arbitrate must be set out in writing.
>
> When the dispute contemplated has arisen, the parties must execute a
> submission. If one of them refuses, and does not appoint an arbitrator, a
> judge of the court having jurisdiction makes such appointment and states the
> objects in dispute, unless the agreement itself otherwise provides.

41.             I wish to embark on a short but relevant digression to note that the
French version of this new article introduces the term "*différend*". The 1986 amendments
to the *Civil Code* (art. 1926.1) and *Code of Civil Procedure* (arts. 940 to 951.2) also use the
term "*différend*" instead of "*litige*".

42.             In the context of arbitration, two meanings can be given to the term
"*litige*". In its first sense, "*litige*" means "lawsuit" (*poursuite civile*). Article 1341 of the 1867
Code states that "Submission is an act by which persons, in order to prevent or put an
end to a lawsuit, agree to abide by the decision of one or more arbitrators whom they
agree upon". In its second sense, the term "*litige*" refers more generally to any dispute.
Considering art. 951 *C.C.P.* and the 1986 amendments consistent therewith, I think it is
preferable to use in the French version the term "*différend*" instead of "*litige*" when
necessary to differentiate arbitration from expertise in order to avoid any ambiguity.

43.             Though article 951 was the subject of academic and judicial dispute for
many years, the commissioners only commented on it briefly:

- 26 -

> Articles 945, 947 and 951 contain provisions that one does not find in
> the present Code but which are self-explanatory.

44.             Though the French *Code de procédure civile* of 1806 and our 1867 *Code of Civil Procedure* do not mention the undertaking to arbitrate, that does not mean it was unknown to our law before the 1965 revision any more than to French law. It was in fact regarded as a natural extension of the submission, though the validity of the complete undertaking to arbitrate was not recognized at that time. The addition of art. 951 *C.C.P.* thus only filled this gap and officially recognized the existence of the undertaking to arbitrate in Quebec law, without thereby altering the rules applicable at the time to the submission and to arbitration.

45.             Before proceeding further, it is perhaps best to explain the concepts of submission and of undertaking to arbitrate.

46.             Based on the definition of the submission in the 1867 *Code of Civil Procedure*, applicable to the 1965 revision and so in effect at the time the agreement was concluded between the parties, and in light of art. 951 *C.C.P.*, introduced in the 1965 revision, it can be said that the undertaking to arbitrate applies to a potential dispute which, if it occurs, will require a submission. When the submission has been made, we can speak of arbitration. There is thus no arbitration without an existing dispute. This is what Chouinard J. said in *Zodiak, supra*, at p. 534:

> A submission applies only to existing disputes, while an undertaking to
> arbitrate also extends to future disputes.

47.             I will return to this aspect of the matter in considering one of respondents' arguments about the undertaking to arbitrate. For the moment, I must look

instead at the criteria for distinguishing between arbitration and the collateral or related concept of the expert opinion. A review of the state of the law on this point in other jurisdictions can often clarify the fine points of either system. In view of the sources of our law on arbitration, which comes to us from old French law, such an exercise can only serve as a point of comparison. The parties themselves asked the Court to undertake it and referred it to an imposing list of academic and judicial common law authorities, from which, in their submission, the applicable distinguishing criteria may be derived.

4--*Common Law, Canadian and English Law*

48.         The common law has in fact developed two concepts which it regards as characteristic of arbitration: the existence of a dispute and the duty or intent of the parties, as the case may be, to submit that dispute to arbitration.

49.         The very earliest authorities on the point required a dispute to exist if there was to be an arbitration. In *Collins v. Collins* (1858), 26 Beav. 306, 53 E.R. 916, the parties concluded a contract to sell a brewery and plant, the price to be set by valuation. The valuation clause provided that each party would appoint a representative, and that these representatives might in turn appoint a third person to make a valuation. As each party's representatives could not agree on the choice of a third party as an appraiser, one of the parties brought an action to have the Chancery Court appoint the third party. This procedure was authorized under s. 12 of the *Common Law Procedure Act*, 1854 (U.K.), 17 & 18 Vict., c. 125, provided it was a case of arbitration. The Court accordingly had to determine whether the valuation clause created an arbitration, thereby allowing it to appoint a third party arbitrator.

- 28 -

50.          Sir John Romilly, M.R., held that an arbitration required an existing

dispute. He explained, at p. 918:

> An arbitration is a reference to the decision of one or more persons, either
> with or without an umpire, of some matter or matters in difference between
> the parties. It is very true that in one sense <u>it must be implied that although
> there is no existing difference, still that a difference may arise between the
> parties; yet I think the distinction between an existing difference and one
> which may arise is a material one,</u> and one which has been properly relied
> upon in the case. If nothing has been said respecting the price by the vendor
> and purchaser between themselves, it can hardly be said that there is any
> difference between them. It might be that if the purchaser knew the price
> required by the seller, there would be no difference, and that he would be
> willing to give it. It may well be that if the vendor knew the price which the
> purchaser would give, there would be no difference, and that he would
> accept it. It may well be that the decision of a particular valuer appointed
> might fix the price and might be equally satisfactory to both; so that it can
> hardly be said that there is a difference between them. [Emphasis added.]

51.          This criterion was also used in the following cases: *Scott v. Corporation of*

*Liverpool* (1858), 3 De G. & J. 334, 44 E.R. 1297 (Chelmsford L.C., at p. 1310); *Bos v.*

*Helsham* (1866), L.R. 2 Ex. 72 (Kelly C.B., at pp. 78-79); *Re Hopper* (1867), L.R. 2 Q.B. 367

(Cockburn C.J., at pp. 372-73, and Blackburn J., at pp. 376-77); *Re Carus- Wilson and Greene*

(1886), 18 Q.B.D. 7 (C.A.) (Lord Esher, M.R., at p. 9).

52.          The Court of Appeal appears to have abandoned this criterion in

*Chambers v. Goldthorpe*, [1901] 1 Q.B. 624. In that case, an architect had to produce interim

certificates indicating the progress of work done on the building of a house so that the

owner could make partial payments to the builder as work progressed. The owner sued

the architect for negligence in performing his function. The issue turned on whether the

architect was acting as an arbitrator, in which case he would benefit from immunity

against civil suit.

53.         In upholding the architect's immunity Smith, M.R., for the majority, said

the following at p. 635:

> It was argued that there was no dispute between the parties prior to the
> plaintiff giving his certificate, and that, unless there was a dispute, the
> plaintiff could not be in the position of an arbitrator. I do not see why there
> should not be an arbitration to settle matters, as to which, even if there was
> no actual dispute, there would probably be a dispute unless they were so
> settled.

54.         The Master of the Rolls relied on a trilogy of cases, *Pappa v. Rose* (1871),

L.R. 7 C.P. 32, *Tharsis Sulphur and Copper Co. v. Loftus* (1872), L.R. 8 C.P. 1, and *Stevenson

v. Watson* (1879), 4 C.P.D. 148. This line of authority had reversed earlier decisions on the

arbitration/expert opinion distinction by widening the scope of arbitral status to apply

to appraisers. The following experts were classified as arbitrators: a broker, an insurance

adjuster and an architect.

55.         The Court of Appeal applied the same principle in *Finnegan v. Allen*,

[1943] 1 K.B. 425, in deciding the status of an accountant who was required to set the

value of certain shares. Despite the absence of a dispute prior to the valuation, the Court

granted the accountant immunity in the absence of fraud or bad faith.

56.         However, this line of authority was reversed by the House of Lords in

the leading cases of *Sutcliffe v. Thackrah*, [1974] 1 All E.R. 859, and *Arenson v. Casson

Beckman Rutley & Co.*, [1975] 3 All E.R. 901. In *Sutcliffe* the facts were practically identical

to those in *Chambers, supra*. An architect who had to issue interim certificates indicating

the progress of construction work on a building was sued for liability. The Court

specifically reintroduced the requirement of a present dispute as a criterion for

- 30 -

distinguishing between arbitration and a simple expert opinion. I quote Lord Morris of
Borth-Y-Gest at p. 870:

> One of the features of an arbitration is that there is a dispute between
> two or more persons who agree that they will refer their dispute to the
> adjudication of some selected person whose decision on the matter they
> agree to accept.

57.          See also Lord Morris of Borth-Y-Gest at p. 874 and Viscount Dilhorne
at p. 880. Lord Reid and Lord Salmon expressly reversed *Chambers* at pp. 864 and 887
respectively, and therefore by implication the line of authority which had followed it.
(McLaren and Palmer, *The Law and Practice of Commercial Arbitration* (1982), at p. 6.)

58.          In *Arenson, supra,* the purchase price of shares in a company was to be set
by its accountant. The appellant sued the accounting expert for damages, alleging
negligence in his valuation. As in *Sutcliffe* the Court of Appeal characterized the
accountant as an arbitrator, thereby granting him immunity from an action based on his
negligence. The House of Lords reversed the Court of Appeal and repeated the
requirement of a present dispute as an essential condition for the existence of arbitration.
Lord Simon said in the clearest possible terms (at p. 912):

> There may well be other indicia that a valuer is acting in a judicial role,
> such as the reception of rival contentions or of evidence, or the giving of a
> reasoned judgment. But in my view <u>the essential prerequisite for him to
> claim immunity as an arbitrator is that, by the time the matter is submitted
> for him for decision, there should be a formulated dispute between at least
> two parties</u> which his decision is required to resolve. It is not enough that
> parties who may be affected by the decision have opposed interests--still less
> that the decision is on a matter which is not agreed between them.
> [Emphasis added.]

- 31 -

59.           See also Lord Wheatley at p. 915 and Lord Salmon at p. 924; Walton, *Russell on the Law of Arbitration* (19th ed. 1979), at p. 59; Hogg, *The Law of Arbitration* (1936), at p. 8.

60.           This criterion is also accepted in Canada (*Re Krofchick and Provincial Insurance Co.* (1978), 21 O.R. (2d) 805 (H.C.), at p. 810; *Pfeil v. Simcoe & Erie General Insurance Co.* (1986), 19 C.C.L.I. 91 (Sask. C.A.), at p. 98; McLaren and Palmer, op. cit., at p. 1).

61.           The parties must be under an obligation to submit their dispute to arbitration. This requirement may result either from legislation or from the intention of the parties. No difficulty arise from a statutory obligation. When the arbitration procedure results from a contractual clause, however, the situation must be examined more closely. It then becomes necessary to draw the parties' intent from the relevant documents (*Sutcliffe v. Thackrah, supra,* at p. 867, *per* Lord Morris of Borth-Y-Gest; *Preload Co. of Canada Ltd. v. Regina (City of)* (1953), 10 W.W.R. (N.S.) 241 (Sask. C.A.), at p. 265 (Procter J.A., dissenting); *Pfeil v. Simcoe & Erie General Insurance Co., supra,* at p. 97; McLaren and Palmer, op. cit., at p. 4; *Campbellford, Lake Ontario and Western Railway Co. v. Massie* (1914), 50 S.C.R. 409, at p. 421 (Duff J.)) This intent can be demonstrated in various ways. The courts and academic analysts have looked at certain indicia in this connection, such as the terminology used by the parties (*Re Premier Trust Co. and Hoyt and Jackman* (1969), 3 D.L.R. (3d) 417 (Ont. C.A.), at p. 419), the fact that a decision is final and binding (*Sutcliffe v. Thackrah, supra,* at p. 877), the judicial nature of the proceedings (*Re Carus-Wilson and Greene, supra,* at p. 9) and the professional status of the third party (*Pfeil v. Simcoe & Erie General Insurance Co., supra,* at p. 97).

62.             Lord Wheatley gives a brilliant summary of the state of the common law

in this area in *Arenson, supra*, at pp. 914, 915-16:

> (1) It is clear from the speeches of Lord Reid, Lord Morris of
> Borth-Y-Gest and my noble and learned friend, Lord Salmon, in *Sutcliffe v.
> Thackrah* that while a valuer may by the terms of his appointment be
> constituted an abritrator [*sic*] (or quasi-arbitrator) and be clothed with the
> immunity, a valuer simply as such does not enjoy that benefit.
>
> (2) It accordingly follows that when a valuer is claiming that immunity
> he must be able to establish from the circumstances and purpose of his
> appointment that he has been vested with the clothing which gives him that
> immunity.
>
> (3) In view of the different circumstances which can surround individual
> cases, and since each case has to be decided on its own facts, it is not
> possible to enunciate an all-embracing formula which is habile to decide
> every case. What can be done is to set out certain indicia which can serve as
> guidelines in deciding whether a person is so clothed. The indicia which
> follow are in my view the most important, though not necessarily exhaustive.
>
> ...
>
> The indicia are as follows: (a) there is a dispute or a difference between
> the parties which has been formulated in some way or another; (b) the
> dispute or difference has been remitted by the parties to the person to
> resolve in such a manner that he is called on to exercise a judicial function;
> (c) where appropriate, the parties must have been provided with an
> opportunity to present evidence and/or submissions in support of their
> respective claims in the dispute; and (d) the parties have agreed to accept his
> decision.

*5--U.S. Law*

63.             Certain points of comparison may be derived from a brief review of U.S.

law.

- 33 -

64.          The approach taken by the U.S. courts is similar to that adopted by the

courts in England and in the Canadian common law provinces.


65.          The existence of a present dispute remains one of the principal criteria

of distinction. Similarity to the judicial process is also an important aspect. Thus, in

*Hartford Fire Insurance Co. v. Jones*, 108 So.2d 571 (1959), the Supreme Court of Mississippi

had to determine whether a valuation clause contained in an insurance policy was an

arbitration or a request for an expert opinion. Hall J., for the Court, said at p. 572:

> Appraisement, in particular, is perhaps most often confused with arbitration.
> While some of the rules of law that apply to arbitration apply in the same
> manner to appraisement, and the terms have at times been used
> interchangeably, there is a plain distinction between them. In the proper
> sense of the term, <u>arbitration presupposes the existence of a dispute or</u>
> <u>controversy to be tried and determined in a quasi judicial manner, whereas</u>
> <u>appraisement is an agreed method of ascertaining value or amount of</u>
> <u>damage, stipulated in advance, generally as a mere auxiliary or incident</u>
> <u>feature of a contract, with the object of preventing future disputes, rather</u>
> <u>than of settling present ones.</u> [Emphasis added.]

66.          See also *Sanitary Farm Dairies v. Gammel*, 195 F.2d 106 (8th Cir. 1952), at

p. 113.


67.          The fact that the third party makes a decision based on his personal

expertise rather than on an adversarial procedure requiring the admission of evidence and

argument by the parties suggests the existence of an expert opinion (*In re Waters*, 93 F.2d

196 (5th Cir. 1937), at p. 200; *Bewick v. Mecham*, 156 P.2d 757 (Cal. 1945), at p. 760;

*Sanitary Farm Dairies v. Gammel, supra*, at p. 113; *Preferred Insurance Co. v. Richard Parks*

*Trucking Co.*, 158 So.2d 817 (Fla. Dist. Ct. App. 1963), at p. 820).

- 34 -

68.              The U.S. courts have developed a criterion which does not appear to

have attracted the attention of the English and Canadian courts. It suggests that

arbitration implies the submission of the entire dispute to an arbitrator, whereas an

expert opinion is limited to a more specific aspect such as the valuation of damage or of

some piece of property:

> An agreement for arbitration ordinarily encompasses the disposition of
> the entire controversy between the parties upon which award a judgment
> may be entered, whereas an agreement for appraisal extends merely to the
> resolution of the specific issues of actual cash value and the amount of loss,
> all other issues being reserved for determination in a plenary action before
> the court.

*(Preferred Insurance Co., supra,* at p. 820.)

69.              In *In re Delmar Box Co.*, 127 N.E.2d 808 (1955), the New York Court of

Appeals, *per* Fuld J., made the following comments on the arbitration/expert opinion

distinction at pp. 810-11:

> A number of basic distinctions have long prevailed between an
> appraisement under the standard fire policy and a statutory arbitration. An
> agreement for arbitration ordinarily encompasses the disposition of the
> entire controversy between the parties, upon which judgment may be entered
> after judicial confirmation of the arbitration award. Civ.Prac.Act, § 1464,
> while the agreement for appraisal extends merely to the resolution of the
> specific issues of actual cash value and the amount of loss, all other issues
> being reserved for determination in a plenary action. See Matter of American
> Ins. Co., 208 App.Div. 168, 170-171, 203 N.Y.S. 206, 207-208. Appraisal
> proceedings are, moreover, attended by a larger measure of informality, see
> Strome v. London Assur. Corp., 20 App.Div. 571, 573, 47 N.Y.S. 481, 483,
> affirmed 162 N.Y. 627, 57 N.E. 1125, and appraisers are "not bound to the
> strict judicial investigation of an arbitration." See Matter of American Ins.
> Co., supra, 208 App.Div. 168, 171, 203 N.Y.S. 206, 208. Arbitrators are
> required to take a formal oath, Civ.Prac.Act, § 1455, and may act only upon
> proof adduced at a hearing of which due notice has been given to each of the
> parties, Civ.Prac.Act, § 1454. They may not predicate their award upon
> evidence garnered through an *ex parte* investigation of their own, at least
> unless so authorized by the parties. See Stefano Berizzi Co. v. Krausz, 239
> N.Y. 315, 146 N.E. 436. Appraisers, on the other hand, are not required to

take an oath. See Syracuse Savings Bank v. Yorkshire Ins. Co., 301 N.Y. 403, 411, 94 N.E.2d 73, 78; Wurster v. Armfield, 175 N.Y. 256, 264, 67 N.E. 584, 586; Williams v. Hamilton Fire Ins. Co., 118 Misc. 799, 194 N.Y.S. 798. They are likewise "not obliged to give the claimant any formal notice or to hear evidence"; and they may apparently proceed by *ex parte* investigation, so long as the parties are given an opportunity to make statements and explanations to the appraisers with regard to the matters in issue. See Kaiser v. Hamburg-Bremen Fire Ins. Co., 59 App.Div. 525, 530, 69 N.Y.S. 344, 347, affirmed 172 N.Y. 663, 65 N.E. 1118; Townsend v. Greenwich Ins. Co., 86 App.Div. 323, 326-327, 83 N.Y.S. 909, 911-912, affirmed 178 N.Y. 634, 71 N.E. 1140; Matter of American Ins. Co., supra, 208 App.Div. 168, 171, 203 N.Y.S. 206, 208.

Furthermore, in an arbitration, all the arbitrators, if there be more than one, "must meet together and hear all the allegations and proofs of the parties", Civ.Prac.Act, § 1456. The standard appraisal clause, in contrast, specifically recites that the umpire is not to participate in the appraisal in all cases, but is only to pass on such differences as there may be between the appraisers designated by the respective parties. In addition, the vacatur of an arbitration award invariably results in a new arbitration, Civ.Prac.Act, § 1462; see Matter of Fletcher, 237 N.Y. 440, 449, 143 N.E. 248, 251, whereas after an appraisal award has been set aside without any fault on the part of the insured, he is not required to submit to any further appraisement but is free to litigate the issues in an action at law on the policy. See Gervant v. New England Fire Ins. Co., 306 N.Y. 393, 400, 118 N.E.2d 574, 577.

70.          I note that the final and binding nature of the decision made by third

parties does not appear to have been adopted by the U.S. courts. On the contrary, in

*Sanitary Farm Dairies v. Gammel, supra*, the Federal Court of Appeals, Eighth Circuit, held

that a valuation could also be final and conclusive if that was the intent of the parties

without making it an arbitration. Johnsen J. explained, at p. 113:

> In general, where parties to a contract, before a dispute and in order to avoid one, provide for a method of ascertaining the value of something related to their dealings, the provision is one for an appraisement and not for an arbitration. 3 Am.Jur., Arbitration and Award, § 3, pp. 830, 831. But, under Minnesota law, as well as generally, the result of an appraisal which the parties have thus contracted to have made is just as conclusive upon them as would be an arbitration award--even though from the contract and the nature of the situation there may be involved no right to a hearing before the appraiser--if they have expressly stipulated that it shall be so conclusive, or if the intention to be so bound is fairly inferable from the language which they have used. State v. Equitable Ins. Co., 140 Minn. 48, 167 N.W. 292, 293; Nelson v. Charles Betcher Lbr. Co., 88 Minn. 517, 93 N.W. 661, 662.

- 36 -

6--*French Law*

71.             Turning now to France, we find that in the absence of an express provision, to distinguish arbitration from an expert opinion the French courts have developed two criteria, one objective and the other subjective, according to the terminology used by commentators. The first involves ascertaining whether a dispute exists and the second involves analyzing the intent of the parties to submit to arbitration.

72.             a) Objective criterion

73.             In a judgment dated November 7, 1974, *Di Trento c. Pinatel, Rev. arb.*, 1975.302, the Court of Cassation held, based on the fact that a dispute existed between the parties, that intervention by a third party was an arbitration rather than an expert opinion as the result of certain indicia, which it listed at p. 303:

> [TRANSLATION]  But whereas the judgment, after analysing the contract, states that it provides that the parties undertake to give effect to the decision as a judgment without any right of appeal; that the arbitrators are exempt from procedural formalities, and may make their decision as mediators; that the parties were assisted by their counsel; that from these facts, the judgment could conclude that a dispute existed between the parties concerned, if not as to the inventory of the property at least as to its value, and that the aforesaid agreement accordingly was an agreement to arbitrate;

74.             This decision appears to be consistent with earlier decisions and has also been approved by commentators (Cass. civ., June 9, 1961, *Rev. arb.*, 1961.186 *(Soc. Distilleries réunies de Bretagne et de Normandie c. Sofridex)*; Cass. com., May 8, 1961, *Bull. civ.*, III, No. 192, p. 169 *(Société Idéal Coiffeur c. Société Raimon)*; Paris, 1ʳᵉ Ch. supp., February 5, 1976, *Rev. arb.*, 1976.255 *(S.C.I. Résidence Les Tilleuls c. S.A. Promeric)*; Trib. civ. Seine, 1ʳᵉ Ch.,

February 8, 1956, *Rev. arb.*, 1957.25 (*Distilleries de Bretagne et de Normandie c. Société privée d'exploitation immobilière*); de Boisséson, *Le droit français de l'arbitrage* (1983), at p. 193; Motulsky, *Écrits: études et notes sur l'arbitrage* (1974), at p. 41; Rubellin-Devichi, *Rev. arb.*, 1980.87, note; Ravon, *Traité de l'arbitrage et de l'expertise* (1905), at p. 91; Rocher, *De l'arbitrage en matière civile* (1907), at p. 8).

75.              b) Subjective criterion

76.              Commentators consider that while use of the term "dispute" requires more than the mere existence of an issue, the court must determine whether the parties intended to submit their respective arguments in this connection to a decision-making body to be reviewed and decided upon. The search for this intent was the subject of a decision by the Court of Cassation on May 25, 1962, *Société Romand c. de Montmort, Rev. arb.*, 1962.103. In that case a commercial lease contained a rent adjustment clause under which the rent was to be set by agreement between the parties, and failing such agreement, by arbitrators designated by each of them, who if they disagreed could appoint a third party arbitrator.

77.              The rent was set by the arbitrators and de Montmort attempted to homologate the decision by an application *in exequatur*, to which the Société Romand objected. The lower courts dismissed the objection because the decision was not in the nature of an arbitration award. The Court of Cassation affirmed these judgments on the ground that the parties had not agreed to submit the dispute to the jurisdiction of the third parties, though they had appointed them as arbitrators. The Court held at p. 104:

> [TRANSLATION]  But whereas the judgment observes that although a dispute could be found to exist due to the disagreement of both parties as

> to the amount of the rental, <u>it must be shown that they intended to give the third parties whom they appointed arbitrators a decision-making authority</u>; that under the agreement of October 30, 1954 the latter were to determine the amount of the rental and incidentals; that the decision characterized as an "arbitration award" was simply the performance of the mandate so given by the parties; that the third party arbitrator, in the "award", stated that under the agreement between the parties the decision on the price constituted a rider to the lease; that accordingly this decision, which was intended to be incorporated in the contract, clearly became a constituent element of the agreement between the parties . . . . [Emphasis added.]

78.                     Motulski, op. cit., made the following observations in his text on

arbitration, at p. 42:

> [TRANSLATION] In the final analysis, therefore, it all depends on what the parties intended; and in order to know what they intended we should not be concerned essentially, or even primarily, with the *name* they gave, often without thinking about the consequences, to the third parties whom they called in; rather, we should ask <u>which of the possible actions by a third party the one actually intended corresponds to</u>. This truth was expressed in a judgment of a much earlier date (Req., March 31, 1862, S., 1862.I.362, D.P. 1862.I.242); and nearly a century later the Tribunal civil de la Seine, in the judgment to which I referred at the start of my remarks, Feb. 8, 1956, *Gaz. Pal.*, 1957.I.30, restated the concept: "even if", it said, "in the contract the parties used the word `arbitrator' to describe the third party, *the extent of his powers cannot depend on the formal designation so given but on the nature of the task entrusted to him*". [Emphasis added.]

79.                     The following decisions and academic articles are to the same effect:

Cass. civ. 1<sup>re</sup> Ch., October 26, 1976, *Rev. arb.*, 1977.336 (*Cayrol c. Cayrol*); Cass. civ. 2<sup>e</sup> Ch.,

June 7 and November 30, 1978, *Rev. arb.*, 1979.343 (*Pentecost c. Pantaloni; Société Creaciones

Reval c. Société Cerruti 1881*), note Roland-Levy; Paris, 1<sup>re</sup> Ch. C., January 12, 1979, *Rev. arb.*,

1980.83 (*Belon c. Maurey*), note Rubellin-Devichi; Nancy, 1<sup>re</sup> Ch., December 12, 1985, *Rev.

arb.*, 1986.255 (*Langlais c. Bruneau*); de Boisséson, op. cit., at p. 193; Loquin, *L'amiable

composition en droit comparé et international* (1980), at pp. 10-11.

80.                     In a recent judgment on October 9, 1984, *Société S.E.C.A.R. c. Société

Shopping Décor, Rev. arb.*, 1986.263, the Court of Cassation had to decide on the validity of

a decision made by a third party referred to by the parties as an "arbitrator". The parties

had included in a commercial lease an indexing clause using an index published by a

government body. In the event that index ceased to be published, and in the absence of

agreement, the parties undertook to refer the matter to an arbitrator. As publication

ceased and the parties did not agree, an arbitrator was appointed and he chose another

index. One of the parties challenged this decision. In upholding the third party's decision,

the Court implicitly treated the latter as an expert despite the fact that the parties had

referred to him as an "arbitrator". Mayer, *Rev. arb.*, 1986.267, explains the reasons

underlying the Court's decision at pp. 269-70:

> [TRANSLATION] Disagreement did not suffice in that case to create
> an issue because, though it was certainly the *cause* of the "arbitrator's"
> intervention, it was not the *subject* of the latter: once it was established that
> the parties had not reached agreement, and he therefore had to step into
> their shoes, the third party "chose" (this is the word used by the parties) at
> his own discretion what he thought was the most suitable index. He did not
> have to decide between opposing positions which might have been argued
> before him, and to rule that one or the other was correct.

> It is unnecessary, within the limits of this note, to suggest any definition
> of a dispute; it will be sufficient to ascertain whether the *rules governing* the
> document creating jurisdiction are consistent with the situation in the
> S.E.C.A.R. case. Clearly, at least three fundamental aspects of those rules are
> inapplicable. First, and most importantly, the requirement of *an adversarial
> procedure* does not have to be raised: the third party was to determine the new
> index by himself, and was not required to hear the parties (unless they had
> expressly contemplated his doing so). Secondly, the *dispositive rule* is
> inapplicable: the third party's choice was not limited by fixed options
> determined by the opposing arguments of the parties. Third, *reasons* did not
> have to be given for the decision. All of this results from the fact that there
> was no dispute, and also establishes that there was none.

81.         It is interesting to note that the French *Nouveau Code de procédure civile*

provides in art. 1451 that only a natural person fully able to exercise his civil rights may

act as an arbitrator. If the agreement names a legal entity, the latter has only the power

to organize the arbitration, nothing more.

82.         This brief review of the state of modern French law, which is derived like our own from old French law, indicates that there is no fundamental difference between the various approaches taken by the common law and that taken by French case law and academic analysis to the concept of arbitration.

7--*Quebec Law*

83.         In Quebec, in view of the legislator's silence both as to the definition of arbitration and its distinguishing features, academic analysis and case law are generally an invaluable source.

84.         Quebec courts, however, have not had many opportunities to rule on the point. In *Corporation de la Ville de Beauharnois v. Liverpool & London & Globe Ins. Co.* (1906), 15 K.B. 235, the Court of King's Bench vacated an arbitration award on the ground that the arbitrators had failed to inform one of the parties of the date and place of the hearing. However, the Court had first to decide as to the nature of a clause contained in the insurance contract which provided for the appointment by each party of an appraiser to fix the loss suffered by the insured. In the event of disagreement, each appraiser was to select a third party (an umpire) to whom their respective arguments would be submitted. The decision rendered would be final and binding on the parties. They undertook to submit all relevant documents to both the appraisers and the umpire who had the right to call witnesses under oath. The Court characterized this agreement as arbitration, relying primarily on the fact that the parties used the word "arbitration", even though the agreement was entitled "appraisement bond".

- 41 -

85.         *Home Insurance Co. de New York v. Capuano* (1926), 41 K.B. 85 and *Ouellette v. Cie d'assurance mutuelle de commerce contre l'incendie*, [1949] R.L. 163 (Sup. Ct.) are to the same effect: the clause requiring interpretation was identical to that in *Ville de Beauharnois, supra.*

86.         In *Church v. Racicot* (1912), 21 K.B. 471, an agreement to purchase logs provided that the logs were to be measured by an official inspector named by the buyer. The seller sued, alleging incorrect measurements. The Court held that a clause allowing one party to select a measurer without the other party's agreement could not be regarded as an [TRANSLATION] "undertaking to arbitrate which is binding on the parties" (p. 473).

87.         Most of the cases dealing with arbitration do so in a context different from that which concerns us here.

88.         Academic opinion in Quebec has also displayed little interest concerning the issue at bar. The *Civil Code* commentators did not examine arbitration, which at the time was a procedural matter. (Mignault, *Le droit civil canadien*, vols. 1 to 9, 1895 to 1916; Langelier, *Cours de droit civil*, vols. 1 to 6, 1905 to 1911, and *Traité de Droit civil du Québec*, vols. 1 to 15, 1942 to 1958.)

89.         In procedural matters, the annotated codes do not deal with the issue at bar nor do modern commentators (Mignault, *Code de procédure civile du Bas-Canada annoté* (1891); Martineau and Delfausse, *Code de procédure civile de la province de Québec annoté* (1899); Beullac, *Code de procédure civile de la province de Québec annoté* (1908); Gérin-Lajoie, *Code de procédure civile de la province de Québec annoté* (1920); Reid and Ferland, *Code de procédure civile*

*annoté du Québec* (1981), vol. 2; Anctil, *Commentaires sur le Code de procédure civile avec tableaux synoptiques et formules* (1983), vol. 2; and Reid, *Code de procédure civile du Québec, complément jurisprudence et doctrine* (3ᵉ éd. 1987).

90.         This lack of interest by our courts and academic commentators may be explained by the importance at the time of the debate on the validity of the undertaking to arbitrate, a matter settled by this Court in *Zodiak, supra*. This long period of legal uncertainty did nothing to encourage the use of this method of settling disputes. The fact remains however that, from the time of the definition of the submission in art. 1341 of the 1867 *Code of Civil Procedure* to which I referred above, there could be no submission without a dispute. This results not only from common sense, which is that without a dispute an arbitration is pointless, but from the provision itself which shows no ambiguity, especially if we refer to its English version, and from the interpretation given to it by the courts.

91.         Although the debate has centered on the validity of the undertaking to arbitrate, a good illustration is provided by *Corporation du Village de Tadoussac v. Brisson*, [1959] Q.B. 644. The deed of sale of a piece of land provided that the buyer would keep the seller in its employ unless three arbitrators selected by the parties dismissed him. The seller was dismissed and sued the buyer which, in turn, argued that it did not have to undertake arbitration because the agreement in this regard did not meet the requirements of the *Code of Civil Procedure*. In the course of his judgment for the Court, Taschereau J. said at p. 649:

> [TRANSLATION] However, as can be seen, the chapter of the Code of Civil Procedure dealing with the submission applies only where a dispute already exists between the parties or is about to occur. In the case at bar the parties agreed to submit to the jurisdiction of an arbitrator to settle a future

event. This is accordingly not the submission contemplated by art. 1431 C.C.P.

92.             Similar comments are to be found in *McKay v. Mackedie* (1897), 11 C.S.

513, at p. 515, and *Chamberland v. Corporation du Village de Mont-Joli* (1936), 74 C.S. 529, at

p. 531, and in Johnson, op. cit., at p. 16:

> By force of art. 1431 C.P., a submission or *compromis* is entered upon "in order to prevent or to put an end to a lawsuit".
>
> It is not necessary that a lawsuit be actually threatened or existing. Article 1434 requires that the submission must state the "object of dispute". In a word, there must be some defined and disputed or disputable *différend* involving adverse interests, susceptible of leading to litigation. It is said that the dispute must be *né*, a live and existing difference calling for adjustment. If it is not *né*, there is nothing to decide, no object.

93.             The contracting parties may certainly make a third party responsible for

arriving at a final and binding determination of one of the components of a contract. The

most common example is, of course, the setting of a price in a contract of sale. If,

however, such determination does not result in a dispute and the contract does not

disclose an intention of the parties to submit such dispute to the strict judicial

investigation of an arbitrator, there can be no question of arbitration.

94.             In *Beaudoin v. Rodrigue*, [1952] Q.B. 83, the Court of Queen's Bench, while

finding that there was no sale because the price was not stated in the contract,

nonetheless held, like Pothier, that it will suffice if the price can be determined by "an

arbitrator or by experts". However, in that case the Court did not make a decision as to

the status of the third party responsible for determining the selling price. The Chief

Justice of the Quebec Court of Appeal came to a similar conclusion in *St-Raymond Paper

Ltd. c. Campeau Corp.*, Mtl. C.A., No. 500-09-000639-765, November 17, 1976, not

reported, cited in *Rindress c. Cie de Charlevoix Ltée*, [1983] C.S. 897, at p. 900 (judgment appealed, No. 500-09-001019-835). Pourcelet, *La vente* (5ᵉ éd. 1987), at p. 80, and Rousseau-Houle, *Précis de droit de la vente et du louage* (2ᵉ éd. 1986), at p. 81, are of the same opinion. This mechanism, which is not expressly provided for in the *Civil Code of Lower Canada*, does however exist in art. 1592 of the French *Code civil*, which states that the price [TRANSLATION] "...may be left to the arbitration of a third party; if the third party is unwilling or unable to make an estimate, there is no sale". The interpretation of this article has caused some difficulty in France, because of the use of the word "arbitration" in a provision which is more similar to an expert opinion than a true arbitration. Commentators now consider that this procedure cannot be regarded as arbitration, since the parties have not agreed, as stated in art. 1592 of the French Code, to submit a present and existing dispute to the jurisdiction of a third party. Robert, *L'arbitrage: droit interne, droit international privé* (5ᵉ éd. 1983), says at p. 7:

> [TRANSLATION] It is beyond question that the cause of the two possible types of intervention is different. In the (broad) case of art. 1592, the joint action of the parties is indicated by their intent to be bound by contractual obligations. In the case of arbitration, the existence of a common intent is found only when a difference of opinion arises as to the existence of a right, which then gives rise to the intent to resolve that difference.

95.          I note here that French commentators distinguish "contractual" from "jurisdictional" arbitration, the first applying to the clarification or revision of a contract and the second to arbitration as such, the purpose of which is to resolve a dispute. This terminology, which derives from art. 1592 of the French *Code civil*, does not apply in Quebec since the French art. 1592 has no equivalent in the *Code of Civil Procedure* or the *Civil Code*. The question here is not whether the recourse to a third party to determine one of the components of a contract is lawful--that is well established--but whether the

- 45 -

agreement of the parties in this regard results in an arbitration. Professor Brierley

properly points out:

### [TRANSLATION] 15. Completion and Revision of Contracts

**40.** Contracting parties may provide for the intervention of a third party, designated an "arbitrator" or otherwise, whose function is to provide a part of the contract in order to perfect or to revise it. This part may be necessary to its initial formation or to its subsequent revision, so that in the long term the contract can continue to be binding on the parties.

**41.** The technique is covered by the wording of art. 1592 of the French *Code civil*, which provides that in a contract of sale the price can be left to the "arbitration of a third party". The article also states that if the third party does not make an estimate, there will be no sale. Clearly, the reason is that no sale will exist in that case since the setting of a price is essential for it to be perfected. This technique may be extended to other areas, such as rentals, where it may be necessary to revise the amount of the rental.

**42.** There is no comparable provision in the *Civil Code of Lower Canada*, but the absence of any provision is not an obstacle to the inclusion of such a clause under the general rules of contract law. This has already been quite properly held by the Court of Appeal. The question then is not whether such a clause is lawful, but as to its legal effects. Is the arbitration of a part of a contract, such as the setting of a price, arbitration consistent with the rules of arbitration in question here?

**43.** The temptation at once arises to see in this not an arbitration but a request to a common mandatary of the parties for an expert opinion. This would accordingly be an expert opinion accepted in advance by the parties, which agreed that whatever conclusion the expert arrived at would be binding on them. In such a case the function of the so-called "arbitrator" would be characterized as "legislative" rather than "decisional". An arbitrator, on the other hand, who may also be an expert, performs a judicial function: he *decides* a dispute referred to him, after observing, as an ordinary judge would do, the requirement that both sides be heard, that is, after hearing evidence and argument concerning a disputed relationship.

(Brierley, "La convention d'arbitrage en droit québécois interne", [1987] *C.P. du N.* 507,

at pp. 535-36.)

- 46 -

96.                        If nothing prevents recourse to a third party to determine a component

of the contract, as here, for that third party to be classified as an arbitrator with all the

resulting legal consequences, it is essential for the agreement of the parties to contain the

components of a submission, whether or not this submission is the result of an

undertaking to arbitrate. The search for the components of a submission naturally does

not present any difficulty when the parties have clearly indicated their intent to have the

dispute between them arbitrated, and have clearly identified that dispute. The failure of

the parties to express themselves clearly in this regard, as often happens, has resulted in

the development, at common law as well as in French and Quebec law, of various means

of determining the true nature of the "mission" they intended to give the third party, the

nature and extent of whose powers will only be a corollary of that mission. It has to be

recognized that, except for the observations of Brierley, neither the courts nor academic

writers have drawn a very clear line of demarcation between the various possible types

of intervention. This is particularly true of expert opinions as compared with arbitration.

Referring nevertheless to the definition of a submission in art. 1341 of the 1867 *Code of*

*Civil Procedure* and to the old French law sources on which it is based, as well as to arts.

940 and 951, introduced in the 1965 revision, it would appear that arbitration as seen by

the Quebec legislator at the time, and in my opinion even since the 1986 amendments,

is the end result of a process which necessarily involves the parties' making a submission,

whether following an undertaking to arbitrate or not. The first condition of the

submission stage is the existence of a dispute. If the parties simply intended to avoid a

possible dispute, the situation is not one of submission. However, once a dispute has

arisen, they may have agreed to submit to the arbitration of a third arbitrate--the

prerequisite to a submission. I will make further reference to this below. For the moment,

suffice it to say that if there is no existing dispute, we cannot speak of arbitration.

- 47 -

97.            Beyond the requirement of a clearly identified dispute which will be the subject of the arbitration, the parties must have undertaken to submit that dispute to a third party, and I think it is crucial to identify the precise function the parties intended to entrust to this third party under their agreement and in the circumstances of each case. This intent may be inferred from the rules developed by academic writers and the courts in Quebec and in France, as the sources of both systems are equally derived from old French law and the evolution of the provisions of both systems on the matter has taken the same course.

98.            I will review some of these criteria, which though useful are neither exhaustive nor conclusive, but may serve as a guide in determining an intent which is often far from easy to identify. The language used by the parties may indicate their intent to submit a dispute either to arbitration or to an expert opinion. For example, the title given to the contract, the fact that the same word is used uniformly in various documents or the absence of any reference to one procedure rather than another may be taken into consideration in deciding the nature of the process contemplated by the parties. However, the courts are not bound by the terms chosen deliberately or otherwise by the parties, as these terms may well not correspond to the true intent appearing from other criteria.

99.            One of the principal aspects that emerges from an analysis of the *Code of Civil Procedure*, academic opinion and the case law is the similarity that must exist between arbitration and the judicial process. The greater the similarity, the greater the likelihood that reference to a third party will be characterized as arbitration. The facts that the parties have the right to be heard, to argue, to present testimonial or documentary evidence, that lawyers are present at the hearing and that the third party

- 48 -

delivers an arbitration award with reasons establish a closer likeness to the adversarial process than the expert opinion and tend to establish that the parties meant to submit to arbitration. The fact that the decision is final and binding is also indicative of an arbitration, but contrary to what was argued by respondents, that criterion is not exclusive to arbitration.

100.         The function assigned to the third party is indicative of the status conferred on him by the parties. If the third party has to decide between opposing arguments presented by the parties on a given point, we are much closer to arbitration. If, however, the parties call on a third party solely to supply a necessary component of the contract, it is less certain that they intended to submit a present dispute to the third party, but rather tried to ensure that such a dispute did not arise, unless there are other criteria to the contrary. In the same vein, is the third party called on to make a decision in light of his personal knowledge or must he choose among the various positions put forward by the parties concerned? In the first case, the situation will probably be one of an expert opinion, while in the second it will probably be an arbitration.

101.         Moreover, if the third party is to be an arbitrator, he cannot act as the mandatary of one of the parties. For example, the fact that he has a special connection with one of them or that he is paid by only one of them seems inconsistent with the concept of impartiality, a fundamental characteristic of arbitration. Compliance by the parties with the mandatory provisions of the Code is an essential condition of arbitration. At the time the submission had, *inter alia*, to be in writing and contain the requirements set out in the old art. 941 of the *Code of Civil Procedure* (now art. 1926.3 *C.C.L.C.*); there had to be one or three arbitrators (art. 941 *C.C.P.*); the parties could not undertake to arbitrate the matters listed in art. 940 of the *Code of Civil Procedure* (now art. 1926.2

*C.C.L.C.*); the arbitral award had to be supported by reasons and signed (art. 948 *C.C.P.*, now art. 945.2 *C.C.P.*)

102.　　　　　　　All these criteria are means of determining the true intent of the parties. However, a caveat is necessary at this point. The foregoing criteria are not necessarily exhaustive, nor are they mutually exclusive, in the sense that they may occur together and even merge into one another. They do not all have to be existing, still less be unanimously in favour of one position or another. The criteria, as their name suggests, are in fact only tools used to determine the intention disclosed by the documents and other instruments, in order to establish the function the parties actually meant to assign to the third party chosen by them.

103.　　　　　　　It goes without saying that I only rule on these criteria, developed from Quebec law and French law, in the context of Quebec civil law.

8-- *Analysis*

104.　　　　　　　The foregoing must now be applied to the facts of the case at bar so as to determine whether agreement P-1, signed on December 17, 1982, and in particular clause 2.01, read together with the letter of the same date from CCM to appellant (Exhibit DP-1), the letter of January 20 from CCM to respondents (Exhibit P-4) and the letter of respondents dated the same day to CCM and Gestion R.A.D. (Exhibit P-3) contain an agreement to arbitrate or simply an agreement to obtain a professional opinion from a common mandatary.

- 50 -

105.         As was pointed out by LeBel J.A., the wording of the agreements and the exchange of correspondence between the parties contain [TRANSLATION] "obscurities which make it difficult to categorize appellants' function in legal terms" (p. 392).

106.         Did a dispute exist between the parties?

107.         When the purchase offers were signed, there was no dispute yet between the parties as to the value of the stock in the Winter Goods Division. The parties had not yet done an inventory, and *a fortiori*, had not valued it. The primary purpose of clause 2.01 was to establish a process allowing the parties to determine one of the essential components of the contract, namely the price.

108.         Disagreement as to the value of the inventory only arose once the transaction had been completed, that is after the valuation had been checked by respondents on January 20, 1983. Until that time, no dispute could have existed between the parties since the valuation was not complete, so that neither appellant nor the other parties involved would have had the information necessary to challenge the value assigned to the inventory.

109.         There was so little dispute between the parties at that date that appellant paid the agreed selling price of $3,798,000 on the basis of the certificate issued by respondents. It was not until after appellant took possession of the inventory that it allegedly found the value of the latter to be less than certified by respondents.

110.         Was there before that date a potential dispute or one that was about to arise, as respondents maintained? While any agreement contains the germ of a possible

- 51 -

dispute, that is not the criterion we must use in determining the existence of the arbitration mechanism. There must be a measure of reality to the possibility, a basis in fact. At the time the parties entered into their contract, they clearly did not have a dispute in mind: indeed, in accepting the certificate offered by the seller, appellant made certain, or thought it had made certain, there would be no dispute. It is hard to see what other reason or necessity there could have been for such a certificate, except to be a guarantee to the buyer, which did not have possession of the inventory and was not in a position to value it, of the accuracy of the amount represented by the seller, which formed the selling price.

111.         If at the time appellant signed the deed of sale it had foreseen the likelihood of a dispute about the price of the inventory sold, would it have relied on the seller's auditors, paid by the seller, and given it the responsibility of resolving the dispute impartially in accordance with the rules inherent in arbitral awards? This is one of the rare cases where this intent can be verified from the clause in the contract which the parties later deleted: in the event of a dispute clearly identified the clause provided for the impartiality of an arbitrator, and the appointment of another arbitrator selected by appellant, the two arbitrators having the right in certain circumstances to appoint a third. I reproduce this clause below.

112.         In my opinion it follows from this that neither at the time they signed their agreement nor when respondents intervened was there any dispute or potential dispute between the parties that could be the subject of a submission. Accordingly, it is not possible to speak of an arbitration here.

113.	Strictly speaking, this is conclusive. If however it is really necessary to determine the parties' intent, an exercise which the parties themselves asked the Court to undertake, an analysis of the agreements concluded confirms that no dispute existed between them and that, in any case, the parties did not intend to submit such a dispute to the arbitration of respondents.

114.	None of the documents containing the agreement uses the words "arbitrators" or "arbitration" or refers to any other expression suggesting arbitration. On the contrary, in the agreement initialled by the parties (Exhibit P-1), the heading under which clause 2.01 occurs is entitled "Valuation of Inventory" and in it the parties state that the inventory will be "counted or verified by representatives of CCM Inc., the Vendor and the Purchaser and shall be valued by CCM Inc., the Vendor and the Purchaser...to be reviewed by CCM Inc.'s auditors, Messrs. Zittrer, Siblin, Stein & Levine, Chartered Accountants, who shall...deliver a written opinion...to the effect that such inventory count and valuation is fairly presented...the whole at the cost of CCM Inc. Upon delivery of such opinion . . . ." (Emphasis added.)

115.	The letter of December 17, 1982 (Exhibit DP-1) uses the same word "valuation" in concluding "However, in determining the final valuation of...the opinion of Messrs. Zittrer . . . ." In their letter of January 20, 1983 (Exhibit P-3) the said respondents told the parties that "Our examination was made in accordance with generally accepted auditing standards...In our opinion...the valuation thereof . . . ." (Emphasis added.)

116.	The language used by the parties *prima facie* resembles that of a request for an expert opinion.

- 53 -

117.     It should be noted at this stage that the original agreement was modified.

Certain conditions were added by hand in the margin of clause 2.01. For greater clarity,

I again reproduce this clause with the handwritten notes inserted at the appropriate place,

underlined and identified by square brackets.

> 2.01 Vendor and Purchaser hereby agree that the inventory described in
> Section 1.01 (a) above will be counted or verified by representatives of CCM
> Inc. the Vendor and the Purchaser and shall be valued by CCM Inc., the
> Vendor and the Purchaser on a going concern basis at the lower of cost or
> net realizable value and on a basis consistent with prior years, such count
> and valuation of the inventory described in Section 1.01 (a) to be reviewed
> by CCM Inc.'s auditors, Messrs. Zittrer, Siblin, Stein & Levine, Chartered
> Accountants, [who shall take into consideration the representations of Sport
> Maska Inc. as to the valuation of the inventory and the said accountants
> shall] deliver a written opinion to CCM Inc., to the Vendor and the
> Purchaser to the effect that such inventory count and valuation is fairly
> presented [or should be modified or adjusted], the whole at the cost of CCM
> Inc. Upon delivery of such opinion, the inventory count and valuation shall
> be deemed to be definitively determined for all purposes in connection with
> this Offer.

118.     These handwritten additions appear to result from the striking out of a

paragraph which was in the original clause 2.01, and at first sight appeared to be a true

undertaking to arbitrate. This paragraph read as follows:

> In the event of a dispute between the parties with respect to the
> valuation as aforesaid, same shall be submitted to arbitration to Messrs.
> Zittrer, Siblin et al and a firm of accountants appointed by Purchaser; the
> said firms shall then review the valuation and if the difference between them
> does not exceed One Hundred Thousand Dollars ($100,000.00), it shall be
> divided between the Vendor and the Purchaser, and, if it exceeds One
> Hundred Thousand Dollars ($100,000.00), the said firms shall choose a third
> firm of accountants whose decision shall be binding on all parties. The cost
> of the arbitration shall be borne equally by the parties.

119.     The last part of the last sentence in clause 2.01 was also deleted. It read

as follows:

> Upon delivery of such opinion, the inventory count and valuation shall be deemed to be definitively determined for all purposes in connection with this Offer, [provided same is concurred in by the Purchaser.]

120.     The parties here deliberately rejected recourse to arbitration. It will be noted that the undertaking to arbitrate, which was deleted, resembled a submission, bringing an arbitration about, as it provided for the appointment of three arbitrators, division of costs and so on. I find it hard to see how, having ruled out arbitration, the parties could at the same time have chosen to resort to it.

121.     In view of the bankrupt condition of CCM, it would appear that the time factor was an essential element of the sale of the inventory for its creditors and shareholders. The speed with which the sale was concluded supports this assumption. The purchase offer was completed on December 17, 1982 and the closing date set at January 21 following, implying that the inventory was to be finalized and the valuation completed by that date.

122.     From this I conclude that the parties agreed to delete what might have constituted a true arbitration agreement, possibly in order to avoid any delay in concluding the contract or for some other reason which they did not see fit to explain.

123.     The fact remains that, under the handwritten additions to clause 2.01, appellant could make representations regarding valuation of the inventory. It is paradoxical that appellant should be expressly given this right without its being extended to the other parties concerned in the transaction, namely CCM and Gestion R.A.D. Exhibit DP-1 adds to the confusion in that CCM agrees that appellant can make representations not only to respondents, but to itself as well. Does this mean that CCM was thereby acting as arbitrator? The question suggests its answer. The opportunity to

make representations, though an essential component of arbitration and of any judicial process, is not exclusive to them. Nothing forbid parties to a contract from making representations to the expert they chose in order to draw to his attention certain facts which might affect the outcome of the valuation.

124.             Further, it is of the essence of an arbitration award that it be final and binding, except of course for recourses that may be permitted. However, the parties may agree to be bound by an expert's decision without his necessarily being an arbitrator. Various reasons may prompt the parties to act in this way. In the case at bar, for example, the necessity for speed imposed by the situation in which CCM found itself may have forced the parties to sell the inventory quickly. This may have created a necessity to ensure that the setting of the price, which in the circumstances was a complex operation, should be done so as not to prejudice completion of the contract within the agreed time limits.

125.             Although appellant had an opportunity to make representations, there is nothing in the contract to indicate that respondents' function here was to exercise a judicial authority by choosing between several opposing positions: they were simply required to determine the accuracy of the valuation to be made by the parties, which as Chevalier J. stated (at p. 388), was in fact made by CCM. Far from settling a dispute, respondents, indirectly it is true, completed the contract of sale concluded between the parties by approving the valuation of the inventory so that the price payable could be determined.

126.             Furthermore, respondents had a professional connection with one of the parties, CCM, as they acted as its auditors. Also, under clause 2.01 respondents' fees were

to be paid by CCM in full. These two facts appear to me to conflict with the rules on arbitration in which, besides the absence of any connection between the parties, costs are shared, in order to ensure at least in theory that the arbitrator will be impartial, something the parties had envisaged in the undertaking to arbitrate that was later deleted.

127.     The agreement names Messrs. Zittrer, Siblin, Stein, Levine, chartered accountants, to do the valuation and give their opinion. It is not clear whether the individuals or a firm are intended. If the parties meant to name the accounting firm as arbitrator, then the question arises whether a civil partnership can act as an arbitrator. Where there is no express stipulation by the parties, as here, the provisions of the *Code of Civil Procedure* then in effect suggest that only a natural person can act as an arbitrator. Thus, article 944 *C.C.P.* dealt with cases where an arbitrator died or became incapacitated; art. 946 *C.C.P.* dealt with cases where arbitrators withdrew; and art. 948 *C.C.P.* required each arbitrator to sign the award. I do not really see how death could affect a firm or how it could withdraw or physically sign an award.

128.     Finally, article 948 *C.C.P.* required arbitrators to give reasons for their award in all cases. Respondents' letter dated January 20, 1983 (Exhibit P-3) does not have the characteristics of such an award. Thus, no reference is made anywhere to appellant. It contains no analysis of arguments and no reason explaining or justifying the conclusions arrived at by respondents. The format of the letter and the forms it contains correspond exactly to what accounting experts describe in their terminology as an accounting opinion on a particular item, namely inventories (*CICA Handbook*, Canadian Institute of Chartered Accountants, chap. 5805.16).

129.                    In the final analysis, based on the language used, the process contemplated by the parties under the rules applicable to arbitration, the fact that they deliberately deleted the paragraph providing for a possible arbitration, although they agreed to be bound by respondents' opinion, and that they provided for representations to be made by appellant, the intent that in my opinion clearly emerges from the agreement and the other documents giving effect to it is that the parties agreed to obtain an expert opinion from an accountant and did not intend to submit the matter to arbitration by respondents in the accepted understanding of the structure and legal consequences of that process. To use the words of Mayer, loc. cit., [TRANSLATION] "All of this results from the fact that there was no dispute, and also establishes that there was none" (p. 269).

130.                    A digression must be made here. In his opinion LeBel J.A. notes that [TRANSLATION] "the pleadings of respondent [here the appellant] confirm the way in which it regarded the functions of appellants [here the respondents]" (p. 393). This "admission" can be found in paragraph 15 of the statement of claim, where respondent charged that appellants had broken certain obligations although they had [TRANSLATION] "agreed to be arbitrators". LeBel J.A. appears to regard this as a judicial admission.

131.                    At the hearing appellant explained that this word was used not in the legal sense, as it is found in the Quebec *Code of Civil Procedure*, but in a very broad sense as it is used in everyday language, and that, in any event, the classification of respondents' function was a question of law which could not be the subject of a judicial admission.

132.     In the very recent judgment of this Court *C.(G.) v. V.-F.(T.)*, [1987] 2
S.C.R. 244, in which a similar situation occurred though in a different context, Beetz J.,
delivering the unanimous judgment of the Court, held as follows at p. 257:

> At the hearing, counsel for the appellants conceded that the award of
> custody to a third person would amount to a declaration of partial
> deprivation . . . . This concession on a point of law is not binding on the
> Court.

133.     A similar conclusion must be drawn here.

134.     Finally, respondents argued that clause 2.01 of the agreement was an
undertaking to arbitrate, or at least that respondents were acting as mediators. These
arguments must be examined.

*9--Undertaking to Arbitrate*

135.     As I have already mentioned, there is no longer any question since
*Zodiak, supra*, concerning the validity of the undertaking to arbitrate in Quebec law. The
only applicable provision at the time the parties concluded their agreement was art. 951
*C.C.P.*, which I have set out earlier. I should point out that the undertaking to arbitrate
differs from the submission essentially in that the former is an agreement in
contemplation of a potential dispute while the latter relates to a dispute that has arisen.

136.     The undertaking to arbitrate is in fact a contract in which the parties
undertake to conclude a submission to arbitrate should a dispute arise between them.
Two stages are therefore required: first, the parties promise to resort to arbitration if a
dispute arises, and second, when the dispute does arise, they conclude a submission in

the proper form (*Ville de Granby v. Désourdy Construction Ltée*, [1973] C.A. 971, cited with approval in *Zodiak, supra*, at pp. 540-42; Colas, "Clause compromissoire, compromis et arbitrage en droit nouveau" (1968), 28 R. *du B.* 129). Nothing prevents that an undertaking to arbitrate specify the arbitration procedure. Once a dispute arises, it is only necessary to implement the process provided by the undertaking to arbitrate, if any, or by the parties' agreement if the wording is not in keeping with provisions of the *Code of Civil Procedure*. Since 1986, this machinery has been set out in art. 944 *C.C.P.* At that time, the undertaking to arbitrate was not subject to any formal requirement, except that it be in writing. It must clearly indicate the parties' intent to submit any future dispute to arbitration. It cannot obviously specify the subject-matter of the dispute since that had not yet arisen.

137.         Respondents argued that clause 2.01 of Exhibit P-2 and letter DP-1 constituted an undertaking to arbitrate. They relied principally on the following observations by Chouinard J. in *Zodiak, supra*, at p. 543:

> The *Code of Civil Procedure* contains no provision regarding the form of an undertaking to arbitrate. It will be sufficient if it contains the essential ingredients, namely that the parties have undertaken to execute a submission and that the arbitration award is final and binding on the parties.

138.         As respondents argued that a dispute had arisen and had been submitted to them in the capacity of arbitrators, they had to establish that the parties had undertaken to execute a submission. There is no mention anywhere of such an obligation, apart from the paragraph which they later deleted. Accordingly there can be no question here of an undertaking to arbitrate, still less of a submission.

10--*Mediation*

139.     Mediation was expressly covered by art. 948 *C.C.P.*:

> 948. The arbitrators must decide according to the rules of law, unless by
> the submission they have been exempted from doing so, or have been
> empowered to act as mediators.

140.     The status of a mediator allows its holder to decide on the basis of equity, without being bound by substantive or procedural rules of law, except of course for rules of public order such as those of natural justice which provide for impartiality, opportunity for the parties to be heard, reasons to be given for the award, and so on.

141.     Mediation is not, as such, a legal concept distinct from that of arbitration. Rather, the mediator is an arbitrator who is exempted from compliance with the rules of law as provided in art. 948 *C.C.P.* (Antaki, "L'Amiable composition", in Antaki and Prujiner, *Actes du 1er Colloque sur l'arbitrage commercial international* (1986), at p. 153). The mediator is in fact only the "*bon père de famille*" of the *Civil Code* transposed to arbitration matters.

142.     Mediation is a departure from the law of arbitration. Like any exception it must, if it is not expressly provided for, at least result from a clear and unambiguous intent (*Concrete Column Clamps Ltd. v. Cie de Construction de Québec Ltée* (1939), 67 K.B. 536, at pp. 545-46, *per* Galipeault J., aff'd by [1940] S.C.R. 522).

143.     This does not mean that the word "mediators" or any other hallowed expression must be contained in an agreement to arbitrate. It will suffice that the parties clearly indicate their intention to exempt the arbitrators from compliance with the rules of law (*Concrete Column Clamps Ltd. v. Cie de Construction de Québec Ltée, supra*, at p. 546; Antaki, loc. cit., at p. 155; Ferland, op. cit., at p. 84).

144.          This approach is in accordance with that adopted in French law (Loquin, op. cit., at p. 44; Bredin, "L'amiable composition et le contrat", *Rev. arb.* 1984.259; Tyan, *Le droit de l'arbitrage* (1972), at pp. 240-41; Robert, op. cit., at pp. 160-61).

145.          Mediation is only a simplified form of arbitration, and consequently must be the subject of a clear intent by the parties giving the arbitrators the status of mediators. Clause 2.01 and letter DP-1 make no mention of respondents' being exempted from compliance with the rules of law, acting on the basis of equity or their conscience, or, more simply, being mediators. Though a mediator is not bound by the rules of law, the criteria for distinguishing between arbitration and expert opinion nonetheless apply to him *mutatis mutandis*, since he remains first and foremost an arbitrator.

146.          I conclude from the foregoing analysis that respondents were not acting as arbitrators. It is therefore impossible to speak of mediators any more than of an undertaking to arbitrate or a submission.

## V--Conclusion

147.          Overall, I conclude that there was no present or potential dispute either at the time the agreement was concluded between the parties or when respondents performed their mandate. The parties did not intend to submit a dispute to arbitration by respondents, but simply agreed to rely on their opinion as accounting experts, making them their mandataries on one aspect of the contract, namely the value of the assets sold by CCM, which essentially represented the selling price of those assets.

148.          As the question of immunity does not arise in this context, it must be concluded that the motion for a declinatory exception made by respondents is unfounded and was properly dismissed by the Superior Court.

149.          For these reasons I would allow the appeal, reverse the judgment of the Court of Appeal and restore the judgment of the Superior Court, the whole with costs throughout.

> *Appeal allowed with costs.*
>
> *Solicitors for the appellant: Adessky, Kingstone, Montréal.*
>
> *Solicitors for the respondents: Ogilvy, Renault, Montréal.*



# TAB19

The Queen *v.* Beauregard, [1986] 2 S.C.R. 56

**Her Majesty The Queen**                                    *Appellant*

1986 CanLII 24 (SCC)

*v.*

**Marc Beauregard**     *Respondent*

INDEXED AS: BEAUREGARD *v.* CANADA

File No.: 17884.

1985: October 4; 1986: September 16.

Present: Dickson C.J. and Beetz, Estey, McIntyre and Lamer JJ.

on appeal from the federal court of appeal

*Constitutional law -- Judicial independence -- Financial security of federally appointed judges -- Pensions -- Federal legislation requiring superior court judges to contribute to pension --Whether federal legislation plan violated s. 100 of the Constitution Act, 1867 -- Judges Act, R.S.C. 1970, c. J-1 as amended, s. 29.1.*

*Civil rights -- Equality before the law -- Federal legislation requiring superior court judges to contribute to pension plan -- Legislative distinction on the basis of the appointment date of judges -- Higher contributions required from judges appointed after the date of first reading of the bill -- Whether federal legislation*

*violated s. 1(b) of the Canadian Bill of Rights -- Judges Act, R.S.C. 1970, c. J-1 as amended, s. 29.1.*

Respondent, a Quebec Superior Court judge appointed on July 24, 1975, challenged the constitutional validity of s. 29.1 of the *Judges Act*. This section was introduced in Parliament on February 17, 1975 and was enacted December 20, 1975. Section 29.1(1) provided that judges appointed before February 17, 1975 would contribute one and one-half per cent of their salary toward the cost of pensions, while s. 29.1(2) provided that judges appointed after February 16, 1975 would contribute six and one-half per cent prior to January 1, 1977, and seven per cent thereafter. Prior to the enactment of s. 29.1, superior court judges were not required to contribute to their pension plan. The Federal Court, at trial and on appeal, accepted respondent's allegation, but for different reasons, that s. 29.1 violated s. 100 of the *Constitution Act, 1867* but rejected his argument that s. 29.1 was inoperative in that it violated his right to equality before the law recognized by s. 1(b) of the *Canadian Bill of Rights*. This appeal is to determine whether s. 29.1 of the *Judges Act* infringes (1) s. 100 of the *Constitution Act, 1867* and (2) s. 1(b) of the *Canadian Bill of Rights*.

*Held* (Beetz and McIntyre JJ. dissenting in part): The appeal should be allowed.

### (1) *Section 100 of the Constitution Act, 1867*

*Per curiam*: The principle of judicial independence is fundamental to our Constitution. The role of our courts as resolver of disputes, interpreter of the law and defender of the Constitution, requires that they be completely separate in authority and

function from all other participants in the justice system, in particular, from the
executive and the legislative branches of government. One of the essential components
of the principle of judicial independence is financial security. In the present case, the
scheme for contributory pensions established in s. 29.1 of the *Judges Act* does not
interfere with the independence of superior court judges. All s. 29.1 does is treat
judges, pursuant to the constitutional obligation imposed by s. 100 of the *Constitution
Act, 1867*, in accordance with standard, widely used and generally accepted pension
schemes in Canada. Canadian judges are Canadian citizens and must bear their fair
share of the financial burden of administering the country. Parliament's power to fix
the salaries and pensions of superior court judges, however, is not unlimited. If there
were any hint that a federal law dealing with these matters was enacted for an
improper or colourable purpose, or if there were discriminatory treatment of judges
*vis-à-vis* other citizens, then serious issues relating to judicial independence would
arise and the law might well be held to be *ultra vires* of s. 100 of the *Constitution Act,
1867*. There is no suggestion of any of these considerations in the present appeal.

There is no "federalism" limitation on Parliament's capacity to change the
basis of superior court judges' pensions from non-contributory to contributory.
Provincial legislatures under s. 92(14) of the *Constitution Act, 1867* have no
jurisdiction with respect to these pensions. Section 100 explicitly subtracts them from
provincial jurisdiction respecting the administration of justice. This section states
clearly that the salaries and pensions of superior court judges shall be fixed and
provided by the Parliament of Canada.

Further, Parliament's ability to implement a widely used and accepted
latter-day pension model is not constrained by the words of s. 100. The word

- 4 -

"pensions" is not limited to the type of pensions known and in existence for the judiciary in 1867 and the word "provided" does not impose on Parliament an obligation to pay the full cost of judicial pensions.

Finally, although it might well be unconstitutional in most contexts for Parliament to direct how judges are to spend their salaries, the word "pensions" in s. 100 specifically authorizes Parliament to deal with this subject matter. In exercising that jurisdiction Parliament must legislate with respect to both the quantum and the scheme of judicial pensions. The 1975 law enacting s. 29.1 of the *Judges Act* dealt with the scheme. There can be no objection here to Parliament's action since the scheme chosen was a widely used and accepted one and since it was introduced in conjunction with a substantial increase in judicial salaries and other benefits in 1975.

**Cases Cited**

**Referred to:** *Valente v. The Queen*, [1985] 2 S.C.R. 673; *Toronto Corporation v. York Corporation*, [1938] A.C. 415; *McEvoy v. Attorney General for New Brunswick*, [1983] 1 S.C.R. 704; *Judges v. Attorney-General of Saskatchewan*, [1937] 2 D.L.R. 209; *Evans v. Gore*, 253 U.S. 245 (1920); *O'Malley v. Woodrough*, 307 U.S. 277 (1939); *Di Iorio v. Warden of the Montreal Jail*, [1978] 1 S.C.R. 152; *Re Residential Tenancies Act, 1979*, [1981] 1 S.C.R. 714; *Crevier v. Attorney General of Quebec*, [1981] 2 S.C.R. 220.

(2) *Section 1(b) of the Canadian Bill of Rights*

1986 CanLII 24 (SCC)

- 5 -

*Per* Dickson C.J. and Estey and Lamer JJ.: Section 29.1 of the *Judges Act* does not violate s. 1(*b*) of the *Canadian Bill of Rights*. Once it is accepted that the general substance of the law is consistent with a valid federal objective--here, to provide for remuneration of s. 96 judges--and that it is not discriminatory for Parliament to draw some line between present incumbents and future appointees, the cases under the *Canadian Bill of Rights* do not permit the courts to be overly critical in reviewing the precise line drawn by Parliament. Some line is fair and is not discriminatory. Thus, while from the respondent's perspective a line drawn on the date of passage of the bill would have been preferable, it cannot be said that the choice of the date of first reading as the cut-off date was contrary to the *Canadian Bill of Rights*.

*Per* Beetz and McIntyre JJ. (dissenting): The forms of discrimination prohibited by s. 1(*b*) of the *Canadian Bill of Rights* are not limited to the specifically mentioned grounds such as race, national origin, colour, religion or sex. This Court is also not bound by the Diceyan concept of equality nor is it prevented from adopting a more egalitarian approach.

A legislation passed by Parliament does not offend against the principle of equality before the law if passed in pursuance of a valid federal objective. The question which must be resolved in each case is whether an inequality that may be created by legislation affecting a special class is arbitrary, capricious or unnecessary, or whether it is rationally based and acceptable as a necessary variation from the general principle of the universal application of law to meet special conditions and to attain a necessary and desirable social objective. Where variation from the principle of universal application of the law is justified, the principle cannot be tampered with to a degree or to an extent which goes beyond what is necessary to reach a desirable

1986 CanLII 24 (SCC)

social objective. This test, including its element of proportionality, clearly extends to the manner or means chosen to achieve a valid federal objective, particularly where this manner or these means introduce the very inequality complained of. This manner or these means must then be carefully scrutinized by the courts and they must be struck down whenever they do not meet the test.

In the case at bar, s. 29.1(2) of the *Judges Act* is inconsistent with s. 1(*b*) of the *Canadian Bill of Rights*. The policy decision reflected in s. 29.1 of the *Judges Act* is that judges' pension plans should be on a contributory basis in order to reduce the financial burden on future taxpayers. Parliament chose to phase in the contributory requirement, by requiring contributions at the higher rate only from newly appointed judges so that, through the attrition of senior appointees as a result of death or resignation, the whole body of the judiciary would eventually participate in the contributory scheme. However, in choosing the date of first reading of the bill as the cut-off date to implement the phasing-in feature of the federal legislation, the new measure "grandfathered" certain incumbent superior court judges, but did not "grandfather" them all. A small minority of them--those appointed after February 16, 1975 but before December 20, 1975--were not grandfathered. Applying the test to s. 29.1, it cannot be said that the distinction between incumbent judges, which resulted from the selection of the date of first reading as the cut-off point, was necessary to achieve the federal objective. No rational motives were advanced or appear to exist for the selection of that date as the cut-off point which, with its discriminatory effect, is entirely arbitrary and capricious.

**Cases Cited**

1986 CanLII 24 (SCC)

By the majority

        **Referred to:** *MacKay v. The Queen*, [1980] 2 S.C.R. 370; *Curr v. The Queen*, [1972] S.C.R. 889; *R. v. Drybones*, [1970] S.C.R. 282; *Attorney General of Canada v. Lavell*, [1974] S.C.R. 1349; *Attorney General of Canada v. Canard*, [1976] 1 S.C.R. 170; *R. v. Burnshine*, [1975] 1 S.C.R. 693; *Prata v. Minister of Manpower and Immigration*, [1976] 1 S.C.R. 376; *Bliss v. Attorney General of Canada*, [1979] 1 S.C.R. 183.

By the minority

        *MacKay v. The Queen*, [1980] 2 S.C.R. 370; *Curr v. The Queen*, [1972] S.C.R. 889; *Attorney General of Canada v. Lavell*, [1974] S.C.R. 1349; *R. v. Burnshine*, [1975] 1 S.C.R. 693; *Roncarelli v. Duplessis*, [1959] S.C.R. 121; *Attorney General of Canada v. Canard*, [1976] 1 S.C.R. 170; *Prata v. Minister of Manpower and Immigration*, [1976] 1 S.C.R. 376; *Bliss v. Attorney General of Canada*, [1979] 1 S.C.R. 183.

**Statutes and Regulations Cited**

*Act of Settlement*, 1700 (Engl.), 12 & 13 Will. 3, c. 2.

*Act to amend the Judges Act and certain other Acts or related purposes and in respect of the reconstitution of the Supreme Courts of Newfoundland and Prince Edward Island*, S.C. 1974-75-76, c. 48.

*Canadian Bill of Rights*, R.S.C. 1970, App. III, s. 1(*b*).

*Canadian Charter of Rights and Freedoms.*

*Constitution Act, 1867*, preamble, ss. 55, 91(8), (27), 92(14), 96, 99, 100, 129.

*Judges Act*, R.S.C. 1970, c. J-1, s. 29.1 [en. S.C. 1974-75-76, c. 81, s. 100].

*Statute Law (Superannuation) Amendment Act, 1975*, S.C. 1974-75-76, c. 81, s. 100.

*Supplementary Retirement Benefits Act*, R.S.C. 1970 (1st Supp.), c. 43 as amended.

**Authors Cited**

Lane, Lord. "Judicial Independence and the Increasing Executive Role in Judicial Administration". In *Judicial Independence: The Contemporary Debate*. Edited by Shimon Shetreet and Jules Deschênes. Dordrecht, The Netherlands: Martinus Nijhoff Publishers, 1985, pp. 525-528.

Lederman, W. R. "The Independence of the Judiciary" (1956), 34 *Can. Bar Rev.* 769, 1139.

Shetreet, Shimon. "The Emerging Transnational Jurisprudence on Judicial Independence: The IBA Standards and Montreal Declaration". In *Judicial Independence: The Contemporary Debate*. Edited by Shimon Shetreet and Jules Deschênes. Dordrecht, The Netherlands: Martinus Nijhoff Publishers, 1985, pp. 393-402.

Tarnopolsky, Walter S. *The Canadian Bill of Rights*. 2nd ed., Toronto: McClelland and Stewart Ltd., 1975.

APPEAL from a judgment of the Federal Court of Appeal, [1984] 1 F.C.

1010, 148 D.L.R. (3d) 205, 48 N.R. 252, dismissing appellant's appeal and respondent

cross-appeal from a judgment of the Trial Division, [1981] 2 F.C. 543, 130 D.L.R. (3d)

433. Appeal allowed, Beetz and McIntyre JJ. dissenting in part.

*W. I. C. Binnie, Q.C.*, and *D. M. Low*, for the appellant.

*David W. Scott, Q.C.*, and *Carole Brown*, for the respondent.

The judgment of Dickson C.J. and Estey and Lamer JJ. was delivered by

- 9 -

1.          THE CHIEF JUSTICE--This appeal concerns the financial position and security of federally appointed judges. Relatively narrow amendments by Parliament to a federal law relating to pension benefits for judges, and pensions for their dependants, gave rise to the case. The legal issues which must be addressed are, however, quite broad. They involve careful consideration of at least three important relationships--the federal Parliament and the judiciary, the executive branch of the federal government and the judiciary, and the federal government and provincial governments. Moreover, it is crucial to the resolution of this appeal to develop a proper understanding and application of the fundamental constitutional principle of judicial independence.

I

Facts

2.          The law attacked in this appeal, the *Statute Law (Superannuation) Amendment Act, 1975*, S.C. 1974-75-76, c. 81, came into force on December 20, 1975. But the events relevant to the appeal started a year and a day earlier, and there are other important dates in the chronology.

3.          On December 19, 1974 the federal Government introduced a bill to amend the *Judges Act*, R.S.C. 1970, c. J-1. At that time the *Judges Act* provided provincial superior court judges with salaries of $38,000, pensions* after retirement, and pensions for surviving spouses and children of deceased judges. Judges were not required to pay for, or contribute toward, the costs of these pensions. The bill introduced by the Government on December 19, 1974 dealt with only the first and

1986 CanLII 24 (SCC)

- 10 -

third components of the regime then in existence. The bill made provision for a 39 per

cent increase in the salaries of superior court judges and a 50 per cent increase in the

pensions for their surviving spouses and children. But further changes were

foreshadowed; on the date the bill was introduced the federal Minister of Justice wrote

to all federally appointed judges, stating in part:

> *In the English version of the *Judges Act*, ss. 23-29 are found under the
> heading «Annuities» and the benefits to judges, spouses and children provided in these
> sections are referred to as `annuities'. The heading at the start of the French version of
> these sections is *Pensions* and the word *pension* is used throughout the sections. In this
> judgment I have used the word `pension' because I think it corresponds more closely
> to the ordinary understanding of the benefits being considered. Furthermore, s. 100 of
> the *Constitution Act, 1867*, which is the pivotal constitutional provision in this appeal,
> uses the word `Pensions'; in the interests of consistency and ease of understanding I
> will use it to describe the benefits conferred by the *Judges Act* and in issue in this
> appeal.

> > However, these improvements were achieved in the
> > context of a comprehensive review of federal policies in relation to
> > pensions which has just recently been concluded. As a result, it may
> > become necessary at some future time to ask judges now in office to make
> > a modest contribution towards the cost of the improved pensions for
> > widows, and to ask persons who are in the future appointed to judicial
> > office to contribute in some measure to pension benefit costs.

4.          On February 17, 1975 the judicial contribution to pension costs, signalled

in the Minister's letter, was initiated. On that date the *Statute Law (Superannuation)*

*Amendment Act, 1975* was introduced. It provided that judges appointed before

February 17, 1975 would contribute 1.5 per cent of salary toward the cost of pensions

(this was intended to be a contribution toward improved pensions for the spouses and

children of judges), and judges appointed after that date would contribute 6 per cent

of salary toward the cost of pensions plus ½ per cent, rising later to 1 per cent, toward

indexing them to keep pace with inflation. The relevant portion of this amendment,

which became s. 29.1 of the *Judges Act*, reads:

- 11 -

29.1(1) Every judge appointed before the 17th day of February, 1975 to hold office as a judge of a superior or county court shall, by reservation from his salary under this Act, contribute to the Consolidated Revenue Fund one and one-half per cent of his salary.

(2) Every judge appointed after the 16th day of February, 1975 to hold office as a judge of a superior or county court, to whom subsection (1) does not apply, shall, by reservation from his salary under this Act,

(*a*) contribute to the Consolidated Revenue Fund an amount equal to six per cent of his salary;                                      and

(*b*) contribute to the Supplementary Retirement Benefits Account established in the accounts of Canada pursuant to the *Supplementary Retirement Benefits Act*,

(i) prior to 1977, an amount equal to one-half of one per cent of his salary, and

(ii) commencing with the month of January 1977, an amount equal to one per cent of his salary.

5.            The next relevant date is July 4, 1975. On that date the bill amending the

*Judges Act* to increase salaries by 39 per cent and pensions to surviving spouses and

children by 50 per cent became law.

6.            On July 24, 1975 the respondent, Marc Beauregard, was appointed a judge

of the Superior Court of Quebec. The financial arrangements for a superior court judge

in Quebec on that date were a salary of $53,000 (an increase of 39 per cent from the

salary in effect just three weeks before), entitlement to a non-contributory retirement

pension and a pension, in certain circumstances, for his widow and children. When the

1986 CanLII 24 (SCC)

respondent assumed his position on July 24, 1975 the *Statute Law (Superannuation) Amendment Act, 1975* had not been enacted. It was still before Parliament and had been before Parliament since the previous February. The respondent contended, however, and the Crown conceded, that he did not know of its existence when he accepted his judicial appointment. In other words, on July 24, 1975 the 'salary and increased benefits' component of the proposed amendments to the *Judges Act* was in place but the negative aspect of the package (from the perspective of the respondent and, presumably, other superior court judges) was not.

7.        The contributory requirement of the pension scheme became effective on the last relevant date in the chronology, December 20, 1975. On that date the amendments introduced on February 17, 1975 were enacted. Although the respondent's salary remained at $53,000, as a consequence of the amendments he was required to contribute 6½ per cent of his total salary to his pension plan until 1977 and 7 per cent thereafter.

8.        The respondent, as plaintiff, challenged the constitutionality of the new s. 29.1 of the *Judges Act*. His challenge was two-pronged. First, he alleged that s. 29.1 violated s. 100 of the *Constitution Act, 1867* which provides:

> **100.** The Salaries, Allowances, and Pensions of the Judges of the Superior, District, and County Courts (except the Courts of Probate in Nova Scotia and New Brunswick), and of the Admiralty Courts in Cases where the Judges thereof are for the Time being paid by Salary, shall be fixed and provided by the Parliament of Canada.

Secondly, the respondent contended that the words "before the 17th day of February, 1975" in s. 29.1(1) of the *Judges Act* and the whole of s. 29.1(2) were inoperative

- 13 -

because they violated his right to equality before the law recognized by s. 1(*b*) of the

*Canadian Bill of Rights* which provides:

> 1. It is hereby recognized and declared that in Canada there have existed and shall continue to exist without discrimination by reason of race, national origin, colour, religion or sex, the following human rights and fundamental freedoms, namely
>
> ...
>
> (*b*) the right of the individual to equality before the law and the protection of the law;

II

Judgments

*Federal Court, Trial Division*

9.              In his judgment, reported at [1981] 2 F.C. 543, Addy J. held that s. 29.1(2) of the *Judges Act* was *ultra vires* in so far as it applied to the respondent. He said that the effect of this provision was to reduce the salaries of incumbent judges and that this was unconstitutional for two reasons: first, because it intruded into provincial jurisdiction under s. 92(14) of the *Constitution Act, 1867* with respect to the `administration of justice' (i.e. reductions in salary for superior court judges would require a constitutional amendment in which both the federal and provincial governments would participate); and secondly, because non-reduction of the salaries

1986 CanLII 24 (SCC)

- 14 -

of incumbent judges is a fundamental principle of constitutional law which Canada inherited from the United Kingdom.

10.          Addy J. dismissed the respondent's argument based on s. 1(*b*) of the *Canadian Bill of Rights*. He said that that provision was not concerned with issues relating to the "mere quantum of remuneration for services rendered". Additionally, following the language of McIntyre J. of this Court in *MacKay v. The Queen*, [1980] 2 S.C.R. 370 at p. 406, he held that the requirement of making contributions for pension and survivor benefits was not "arbitrary, capricious or unnecessary" and therefore did not constitute a denial of equality before the law.

*Federal Court of Appeal*

11.          The majority of the Federal Court of Appeal, in a decision reported at [1984] 1 F.C. 1010, agreed with the conclusion of Addy J. but disagreed with his reasoning (and with the reasoning of each other).

12.          Thurlow C.J. held that Parliament had the power under s. 100 of the *Constitution Act, 1867* to fix the salaries of superior court judges. He further held that the power to fix salaries included the power to reduce them and that this reduction could be achieved by federal statute and did not require constitutional amendment. Thurlow C.J. concluded, however, that s. 100 of the *Constitution Act, 1867* does not give Parliament the power to dictate how judges use their salaries. Both parts of s. 29.1 of the *Judges Act* impermissibly do this by compulsorily taking from judges part of their salaries to help pay for their pension and survivor benefits.

1986 CanLII 24 (SCC)

13.        Heald J. concluded that the clear wording of s. 100 of the *Constitution Act,*
*1867* meant that Parliament had to pay the total cost of the pensions of superior court
judges. It followed that s. 29.1(2) of the *Judges Act* was *ultra vires* because it
compelled a contribution to the pensions of judges by the judges themselves. Section
29.1(1) of the *Judges Act*, however, was *intra vires* because it was dedicated
exclusively to the cost of the improved pensions for widowed spouses and other
dependants of judges.

14.        Pratte J. dissented. He held that the words "fixed and provided" in s. 100
of the *Constitution Act, 1867* gave Parliament a plenary power with respect to the
salaries of superior court judges. This included the power to change them.

15.        Although the three justices of the Federal Court of Appeal disagreed
sharply on the interpretation of s. 100 of the *Constitution Act, 1867* and its application
to s. 29.1 of the *Judges Act* they were in agreement, both amongst themselves and with
Addy J., that the respondent's argument based on s. 1(*b*) of the *Canadian Bill of Rights*
failed.

16.        In summary, the respondent's *Canadian Bill of Rights* attack on s. 29.1 of
the *Judges Act* failed in both the Federal Court, Trial Division and the Federal Court
of Appeal. He was, however, successful in both courts in his argument based on s. 100
of the *Constitution Act, 1867*. Addy J. held that s. 100 prevented Parliament from
reducing the compensation paid to incumbent judges. The majority of the Court of
Appeal held that it would be unconstitutional for Parliament to require any superior
court judge to contribute to his or her pension plan.

- 16 -

III

Issues

17.        Although there are a myriad of legal issues to be addressed, they are all subsumed in the two constitutional questions stated by this Court on March 22, 1984:

1.        . Is section 29.1 of the *Judges Act*, as amended by s. 100 of the *Statute Law (Superannuation) Amendment Act, 1975*, S.C. 1974-75-76, c. 81, inconsistent with s. 100 of the *Constitution Act, 1867* and, therefore, in whole or in part, *ultra vires* the Parliament of Canada?

2.        Is section 29.1 of the *Judges Act* as amended by s. 100 of the *Statute Law (Superannuation) Amendment Act, 1975*, S.C. 1974-75-76, c. 81, inconsistent with s. 1(*b*) of the *Canadian Bill of Rights* and to the extent of the inconsistency is it of no force or effect?

IV

Section 100 of the *Constitution Act, 1867* and s. 29.1 of the *Judges Act*

18.        For convenience of reference I set out again s. 100 of the *Constitution Act, 1867*:

> **100.** The Salaries, Allowances, and Pensions of the Judges of the Superior, District, and County Courts (except the Courts of Probate in Nova Scotia and New Brunswick), and of the Admiralty Courts in Cases

- 17 -

> where the Judges thereof are for the Time being paid by Salary, shall be
> fixed and provided by the Parliament of Canada.

In the context of this appeal, it seems to me that three introductory points can be made about this provision. First, it deals explicitly with both judicial salaries and pensions. Secondly, it stands as a constitutional affirmation that superior, district and county court judges will receive at least some salary and pension benefits. Thirdly, it assigns the responsibility, in both a federalism sense and a separation of powers sense, for providing judicial salaries and pensions. In the federalism sense, the assignment is to Parliament, not the provincial governments. In the separation of powers sense, the assignment is to the federal legislative branch, Parliament, not to any component of the executive branch.

19.         The respondent makes three distinct arguments about the relationship between s. 100 of the *Constitution Act, 1867* and s. 29.1 of the *Judges Act*. These arguments correspond quite closely to the different bases for decision in the judgments of Addy J. at trial and Thurlow C.J. and Heald J. on appeal. They include:

(1)         Under the Constitution, Parliament could not, on December 20, 1975, diminish, reduce or impair the established benefits of the respondent.

(2)         Section 100 of the *Constitution Act, 1867* requires Parliament to provide to superior court judges non-contributory retirement pensions.

(3)         Section 100 does not authorize Parliament to compel  superior court judges to contribute to a fund through deductions from their salaries.

- 18 -

20.　　　　　　Although different points are made under each of these arguments, there
is a common thread running through all three. This common thread is the principle of
judicial independence. The respondent contends that judicial independence is an
important principle of Canadian constitutional law which must be interpreted to
invalidate the legislation under review. Before assessing the merits of the specific
arguments above, it is important to examine the principle of judicial independence.

V

Judicial Independence

1. *General Considerations*

21.　　　　　　Historically, the generally accepted core of the principle of judicial
independence has been the complete liberty of individual judges to hear and decide the
cases that come before them: no outsider--be it government, pressure group, individual
or even another judge--should interfere in fact, or attempt to interfere, with the way
in which a judge conducts his or her case and makes his or her decision. This core
continues to be central to the principle of judicial independence. Nevertheless, it is not
the entire content of the principle.

22.　　　　　　　Of recent years the general understanding of the principle of judicial
independence has grown and been transformed to respond to the modern needs and
problems of free and democratic societies. The ability of individual judges to make
decisions in discrete cases free from external interference or influence continues, of
course, to be an important and necessary component of the principle. Today, however,

- 19 -

the principle is far broader. In the words of a leading academic authority on judicial independence, Professor Shimon Shetreet: "The judiciary has developed from a dispute-resolution mechanism, to a significant social institution with an important constitutional role which participates along with other institutions in shaping the life of its community" ("The Emerging Transnational Jurisprudence on Judicial Independence: The IBA Standards and Montreal Declaration", in S. Shetreet and J. Deschênes (eds.), *Judicial Independence: The Contemporary Debate* (1985), at p. 393).

23.     There is, therefore, both an individual and a collective or institutional aspect to judicial independence. As stated by Le Dain J. in *Valente v. The Queen*, [1985] 2 S.C.R. 673, at pp. 685 and 687:

> [Judicial independence] connotes not merely a state of mind or attitude in the actual exercise of judicial functions, but a status or relationship to others, particularly to the executive branch of government, that rests on objective conditions or guarantees.

> ...

> It is generally agreed that judicial independence involves both individual and institutional relationships: the individual independence of a judge, as reflected in such matters as security of tenure, and the institutional independence of the court or tribunal over which he or she presides, as reflected in its institutional or administrative relationships to the executive and legislative branches of government.

24.     The rationale for this two-pronged modern understanding of judicial independence is recognition that the courts are not charged solely with the adjudication of individual cases. That is, of course, one role. It is also the context for a second,

1986 CanLII 24 (SCC)

- 20 -

different and equally important role, namely as protector of the Constitution and the
fundamental values embodied in it--rule of law, fundamental justice, equality,
preservation of the democratic process, to name perhaps the most important. In other
words, judicial independence is essential for fair and just dispute-resolution in
individual cases. It is also the lifeblood of constitutionalism in democratic societies.

2. *Foundations of Judicial Independence in Canada*

25.            It is trite history that the Canadian court system has its primary antecedents
in the United Kingdom. (This is not true of our substantive law which has deep roots
in both the United Kingdom and France.) In the United Kingdom the cornerstone of
the constitutional system has been for centuries, and still is today, the principle of
parliamentary supremacy. But it is not the only principle. The rule of law is another.
Judicial independence is a third. The history of the Constitution of the United
Kingdom reveals continuous growth towards independent judicial authority. That
history is well-described in Professor Lederman's classic article, "The Independence
of the Judiciary" (1956), 34 *Can. Bar Rev.* 769-809 and 1139-1179. Judicial authority
in the United Kingdom has matured into a strong and effective means of ensuring that
governmental power is exercised in accordance with law. Judicial independence is the
essential prerequisite for this judicial authority. In the recent words of Lord Lane:
"Few constitutional precepts are more generally accepted there in England, the land
which boasts no written constitution, than the necessity for the judiciary to be secure
from undue influence and autonomous within its own field" ("Judicial Independence
and the Increasing Executive Role in Judicial Administration", in S. Shetreet and J.
Deschênes (eds.), *Judicial Independence: The Contemporary Debate* (1985), at p.
525).

- 21 -

26.        In Canada, the constitutional foundation for the principle of judicial
independence is derived from many sources. Because the sources for the principle are
both varied and powerful, the principle itself is probably more integral and important
in our constitutional system than it is in the United Kingdom.

27.        Indeed, two of the sources of, or reasons for, judicial independence in
Canada do not exist in the United Kingdom. First, Canada is a federal country with a
constitutional distribution of powers between federal and provincial governments. As
in other federal countries, there is a need for an impartial umpire to resolve disputes
between two levels of government as well as between governments and private
individuals who rely on the distribution of powers. In most federal countries the courts
play this umpiring role. In Canada, since Confederation, it has been assumed and
agreed that the courts would play an important constitutional role as umpire of the
federal system. Initially, the role of the courts in this regard was not exclusive; in the
early years of Confederation the federal government's disallowance power contained
in s. 55 of the *Constitution Act, 1867* was also central to federal-provincial dispute-
resolution. In time, however, the disallowance power fell into disuse and the courts
emerged as the ultimate umpire of the federal system. That role, still fundamental
today, requires that the umpire be autonomous and completely independent of the
parties involved in federal-provincial disputes.

28.        Secondly, the enactment of the *Canadian Charter of Rights and Freedoms*
(although admittedly not relevant to this case because of its date of origin) conferred
on the courts another truly crucial role: the defense of basic individual liberties and
human rights against intrusions by all levels and branches of government. Once again,
in order to play this deeply constitutional role, judicial independence is essential.

1986 CanLII 24 (SCC)

- 22 -

29.          Beyond these two fundamental sources of, or reasons for, judicial independence there is also textual recognition of the principle in the *Constitution Act, 1867*. The preamble to the *Constitution Act, 1867* states that Canada is to have a Constitution "similar in Principle to that of the United Kingdom". Since judicial independence has been for centuries an important principle of the Constitution of the United Kingdom, it is fair to infer that it was transferred to Canada by the constitutional language of the preamble. Furthermore, s. 129 of the *Constitution Act, 1867* continued the courts previously in existence in the federating provinces into the new Dominion. The fundamental traditions of those courts, including judicial independence, were also continued. Additionally, the judicature provisions of the *Constitution Act, 1867*, especially ss. 96, 99 and 100, support judicial authority and independence, at least at the level of superior, district and county courts. As Lord Atkin said in *Toronto Corporation v. York Corporation*, [1938] A.C. 415 at p. 426:

> While legislative power in relation to the constitution, maintenance and organization of Provincial Courts of Civil Jurisdiction, including procedure in civil matters, is confided to the Province, the independence of the judges is protected by provisions that the judges of the Superior, District, and County Courts shall be appointed by the Governor-General (s. 96 of the British North America Act, 1867), that the judges of the Superior Courts shall hold office during good behaviour (s. 99), and that the salaries of the judges of the Superior, District, and County Courts shall be fixed and provided by the Parliament of Canada (s. 100). These are three principal pillars in the temple of justice, and they are not to be undermined.

(Emphasis added.)

30.          In summary, Canadian constitutional history and current Canadian constitutional law establish clearly the deep roots and contemporary vitality and vibrancy of the principle of judicial independence in Canada. The role of the courts as

1986 CanLII 24 (SCC)

- 23 -

resolver of disputes, interpreter of the law and defender of the Constitution requires that they be completely separate in authority and function from <u>all</u> other participants in the justice system.

31.       I emphasize the word 'all' in the previous sentence because, although judicial independence is usually considered and discussed in terms of the relationship between the judiciary and the executive branch, in this appeal the relevant relationship is between the judiciary and Parliament. Nothing turns on this contextual difference. Although particular care must be taken to preserve the independence of the judiciary from the executive branch (because the executive is so often a litigant before the courts), the principle of judicial independence must also be maintained against all other potential intrusions, including any from the legislative branch. In *McEvoy v. Attorney General for New Brunswick*, [1983] 1 S.C.R. 704, the Court said, at p. 720:

> The judicature sections of the *Constitution Act, 1867* guarantee the independence of the Superior Courts; they apply to Parliament as well as to the Provincial Legislatures.

In a similar vein, these sections, including s. 100, apply to both the executive and legislative branches of government.

3. *Content of the Principle of Judicial Independence*

32.       Turning from the general definition and constitutional foundations of judicial independence, it becomes necessary to consider its content or conditions in a Canadian setting. In the context of this appeal, it is particularly important to discuss the question of financial security as a component of judicial independence.

- 24 -

33.        There is, and has been at least since the *Act of Settlement*, 1700 (Engl.), 12
& 13 Will. 3, c. 2, agreement that judicial independence requires security of tenure and
financial security. In recent years, important international documents have fleshed out
in more detail the content of the principle of judicial independence in free and
democratic societies: see, for example, the thirty-two articles in the *Syracuse Draft
Principles on the Independence of the Judiciary* (1981), the forty-seven standards
enunciated in the *International Bar Association Code of Minimum Standards of
Judicial Independence* (1982), and, especially, the *Universal Declaration of the
Independence of Justice* (adopted at the final plenary session of the First World
Conference on the Independence of Justice held in Montréal in 1983). Invariably,
financial security has been recognized as a central component of the international
concept of judicial independence. For a recent example, the *Universal Declaration of
the Independence of Justice* (the Montreal Declaration) provides:

> 2.21 a) During their terms of office, judges shall receive salaries and
> after retirement, they shall receive pensions.
>
> b) The salaries and pensions of judges shall be adequate,
> commensurate with the status, dignity and responsibility of their
> office, and be regularly adjusted to account fully for price
> increases.
>
> c) Judicial salaries shall not be decreased during the judges'
> term of office, except as a coherent part of an overall public
> economic measure.

34.        This international understanding of one of the essential features of judicial
independence is, in my opinion, given powerful expression in a Canadian context by

- 25 -

s. 100 of the *Constitution Act, 1867*, earlier quoted. Speaking of financial security in *Valente*, Le Dain J. said, at p. 704:

> The second essential condition of judicial independence ...is...what may be referred to as financial security. That means security of salary or other remuneration, and, where appropriate, security of pension. The essence of such security is that the right to salary and pension should be established by law and not be subject to arbitrary interference by the Executive in a manner that could affect judicial independence.

I agree with this passage, although I believe it requires a somewhat broader expression by reason of the circumstances of this appeal. *Valente* dealt substantially, although not exclusively, with the relationship between the executive branch of a provincial government and a statutory court. In that context, Le Dain J.'s discussion of judicial independence in terms of the prevention of arbitrary interference "by the Executive" is, in my opinion, both apposite and correct. In this appeal, the relevant relationship is different; it is between the legislative branch of the federal government and a superior court with its combination of a constitutional position and statutory and equitable jurisdiction. In the context of this appeal it must be declared that the essence of judicial independence for superior court judges is complete freedom from arbitrary interference by both the executive and the legislature. Neither the executive nor the legislature can interfere with the financial security of superior court judges. That security is crucial to the very existence and preservation of judicial independence as we know it.

35.     Against this background of the historical foundations for, and contemporary content of, judicial independence in Canada it is now possible to consider the three specific grounds of attack on s. 29.1 of the *Judges Act*.

1986 CanLII 24 (SCC)

- 26 -

VI

1986 CanLII 24 (SCC)

Grounds of Attack

1.      *Parliament cannot diminish, reduce or impair established salary or remunerative benefits*

36.          Of the three arguments made by the respondent this is the one, in my opinion, deserving of special consideration. It is contended that Parliament cannot impair or diminish the established salary or benefits of incumbent judges because this might interfere in fact, or be perceived as interfering, with the independence of those judges. Since I have already concluded that judicial independence is an important constitutional value in Canada, the relevant question becomes: does the scheme for contributory pensions established in s. 29.1 of the *Judges Act* violate this principle?

37.          The starting point in this inquiry is recognition that <u>someone</u> must provide for judicial salaries and benefits and that, by virtue of s. 100 of the *Constitution Act, 1867*, that someone is, explicitly, Parliament.

38.          What then can Parliament do and not do in meeting its constitutional obligation to provide salaries and pensions to superior court judges? As a general observation, Canadian judges are Canadian citizens and must bear their fair share of the financial burden of administering the country. Thus, for example, judges must pay the general taxes of the land. See *Judges v. Attorney-General of Saskatchewan*, [1937] 2 D.L.R. 209 (P.C.) Judges also have an amount deducted from their salaries as a contribution to the Canada Pension Plan. These two liabilities are, of course, general

- 27 -

in the sense that all citizens are subject to them whereas the contributions demanded by s. 29.1 of the *Judges Act* are directed at judges only. (Other legislation, federal and provincial, establishes similar pension schemes for a substantial number of other Canadians.) Conceding the factual difference that s. 29.1 of the *Judges Act* is directed only at judges, I fail to see that this difference translates into any legal consequence. As I have earlier indicated, the essential condition of judicial independence at the individual level is the necessity of having judges who feel totally free to render decisions in the cases that come before them. On the institutional plane, judicial independence means the preservation of the separateness and integrity of the judicial branch and a guarantee of its freedom from unwarranted intrusions by, or even intertwining with, the legislative and executive branches. It is very difficult for me to see any connection between these essential conditions of judicial independence and Parliament's decision to establish a pension scheme for judges and to expect judges to make contributions toward the benefits established by the scheme. At the end of the day, all s. 29.1 of the *Judges Act* does, pursuant to the constitutional obligation imposed by s. 100 of the *Constitution Act, 1867*, is treat judges in accordance with standard, widely used and generally accepted pension schemes in Canada. From that factual reality it is far too long a stretch, in my opinion, to the conclusion that s. 29.1 of the *Judges Act* violates judicial independence.

39.            I want to qualify what I have just said. The power of Parliament to fix the salaries and pensions of superior court judges is not unlimited. If there were any hint that a federal law dealing with these matters was enacted for an improper or colourable purpose, or if there was discriminatory treatment of judges *vis-à-vis* other citizens, then serious issues relating to judicial independence would arise and the law might well be held to be *ultra vires* s. 100 of the *Constitution Act, 1867*.

- 28 -

40.          There is no suggestion, however, of any of these considerations in the present appeal. First, the motive underlying s. 29.1 of the *Judges Act,* especially when viewed in the context of the substantial increase in salaries received by superior court judges at virtually the same time, was, without question, to try to deal fairly with judges and with judicial salaries and pensions. Secondly, although superior court judges were required to contribute to their pension benefits commencing December 20, 1975, the contributory scheme was effectively introduced as part of a remuneration package which included a 39 per cent salary increase and a 50 per cent increase in pensions to dependants. The salary and pension changes were intended to be complementary and, as a comprehensive package, did not diminish, reduce or impair the financial position of federally-appointed judges. Thirdly, there was no discriminatory treatment of judges. Contributory pension schemes are now widespread in Canada; s. 29.1 of the *Judges Act* merely moved superior court judges into the mainstream of Canadian pension schemes. Recognition of that reality draws me, by way of conclusion on this point, to the words of Holmes and Frankfurter JJ. in two American cases. Article III, section 1 of the Constitution of the United States also protects judicial tenure and financial security. Speaking generally about this article, and admittedly in the context of a 'taxation', not a 'pension', fact situation, Holmes J. (dissenting) said in *Evans v. Gore*, 253 U.S. 245 (1920), at p. 265:

> I see nothing in the purpose of this clause of the Constitution to indicate that the judges were to be a privileged class, free from bearing their share of the cost of the institutions upon which their well-being if not their life depends.

In the same vein, Frankfurter J. said in *O'Malley v. Woodrough*, 307 U.S. 277 (1939), at p. 282:

To suggest that it makes inroads upon the independence of judges who took office after Congress had thus charged them with the common duties of citizenship, by making them bear their aliquot share of the cost of maintaining the Government, is to trivialize the great historic experience on which the framers based the safeguards of Article III, s. 1. To subject them to a general tax is merely to recognize that judges are also citizens, and that their particular function in government does not generate an immunity from sharing with their fellow citizens the material burden of the government whose Constitution and laws they are charged with administering.

2.       *Section 100 mandates non-contributory retirement pensions*

41.       There are two separate arguments that have been advanced in support of the claim that Parliament must provide non-contributory retirement pensions to superior court judges. I would label one the 'federalism' argument and the other the 'strict construction' argument.

42.       The `federalism' argument is that s. 100 of the *Constitution Act, 1867* must be read against the backdrop of s. 92(14) of the *Constitution Act, 1867* which gives provincial legislatures jurisdiction to make laws in relation to 'the administration of justice in the province'. Since that phrase includes matters relating to the judiciary, it follows that Parliament alone cannot change the basis of judicial pensions from non-contributory to contributory. Such a change would require a constitutional amendment following on from the proper degree of legal participation and consent of the federal and provincial governments.

43.       It is true that s. 92(14) of the *Constitution Act, 1867* gives the provincial governments jurisdiction over the field of the administration of justice. It is also true that, even more specifically, s. 92(14) entrusts to the provinces "the constitution, maintenance and organization of provincial courts" which, without question, includes

superior courts. Without more, it would not be a large step to move from these constitutional foundations to recognition of a provincial role in setting salaries and providing benefits, including pensions, to superior court judges. But s. 92(14) of the *Constitution Act, 1867* cannot be read in isolation. Although it is "intended to have [a] wide meaning" (*Di Iorio v. Warden of the Montreal Jail*, [1978] 1 S.C.R. 152 at p. 204), it must be read in light of other provisions of the Constitution. There are subtractions from what would appear, without more, to be complete provincial jurisdiction with respect to the justice system. One such subtraction, and it is a major one, is federal jurisdiction by virtue of s. 91(27) of the *Constitution Act, 1867* over criminal law and criminal procedure. See *Di Iorio*, at p. 199. A second subtraction flows from s. 96 of the same Act. Although provincial governments have the power to establish, maintain and organize provincial superior courts, s. 96 explicitly provides that only the Governor General, in effect the Governor General in Council, has power to appoint the judges of those courts. See, among many cases, *Re Residential Tenancies Act, 1979*, [1981] 1 S.C.R. 714; *Crevier v. Attorney General of Quebec*, [1981] 2 S.C.R. 220.

44.          Section 100 of the *Constitution Act, 1867* provides a third, and particularly explicit, subtraction from provincial jurisdiction with respect to the administration of justice. It states that the salaries and pensions of superior court judges shall be fixed and provided by the Parliament of Canada. It is difficult to conceive of clearer words. To attempt to create a provincial role in the determination of the salaries and pensions of superior court judges is blithely to ignore this clear mandate. Indeed, it turns s. 100 on its head. Just as s. 96 of the *Constitution Act, 1867* provides for federal appointment of superior court judges, so s. 100 provides for federal jurisdiction over their salaries and pensions. Both the intent and the actual wording of s. 100 are clear. There is no

'federalism' limitation on Parliament's capacity to change the basis of pensions for superior court judges from non-contributory to contributory.

45.        I turn now to what I have labelled the 'strict construction' argument. It has two dimensions. First, it is contended that, since judges received non-contributory pensions before and at Confederation, the word 'pensions' in s. 100 of the *Constitution Act, 1867* meant then, and must continue to mean today, non-contributory pensions. Secondly, it is contended that the words 'fixed and provided' mean that Parliament must pay for the full cost of the pensions of superior court judges, which rules out a contributory scheme.

46.        With respect to the first of these arguments, I do not think s. 100 imposes on Parliament the duty to continue to provide judges with precisely the same type of pension they received in 1867. The Canadian Constitution is not locked forever in a 119-year old casket. It lives and breathes and is capable of growing to keep pace with the growth of the country and its people. Accordingly, if the Constitution can accommodate, as it has, many subjects unknown in 1867--airplanes, nuclear energy, hydroelectric power--it is surely not straining s. 100 too much to say that the word 'pensions', admittedly understood in one sense in 1867, can today support federal legislation based on a different understanding of 'pensions'.

47.        The second 'strict construction' argument is, as noted above, that the words "Pensions ... shall be fixed and provided" in s. 100 impose on Parliament an obligation to pay the full cost of the pension. This is the argument which Heald J. accepted in the Federal Court of Appeal. He was particularly drawn to this argument because of the contrast he saw between the wording of s. 100 dealing with judicial pensions ("shall

- 32 -

be fixed and provided") and s. 91(8) dealing with pensions for federal public servants

("The fixing of and providing for the Salaries and Allowances of Civil and other

Officers of the Government of Canada"). In his words, at p. 1040:

> In my view, subsection 91(8) is in no way analogous or comparable
> to section 100. Subsection 91(8) is an enabling section. It empowers
> Parliament to provide for the salaries of civil servants but does not require
> it to do so. There is no provision in the subsection at all for the pensions
> of civil servants. Section 100, on the other hand, imposes a responsibility,
> *inter alia*, to provide the pensions of judges. The word "for" in subsection
> 91(8) is absent from section 100. In my view, the obligation imposed by
> section 100 to provide pensions imposes a duty on Parliament to provide
> the total amount of those pensions.

48.         I accept Heald J.'s description of the mandatory--permissive distinction

between ss. 100 and 91(8). Section 100 makes it clear that superior court judges will

have some salary and pension benefits. Section 91(8) does not go that far. It merely

authorizes, in a federalism sense, Parliament to make laws respecting salaries and

pensions for federal public servants; it does not require Parliament to legislate.

49.         Agreement with the mandatory--permissive distinction between the two

provisions, however, does not necessarily entail acceptance of the conclusion which

Heald J. suggests flows from it, namely that Parliament must pay the total cost of the

pensions of superior court judges. I fail to see how the absence of the word `for' in s.

100 leads to this conclusion. My view is that what emerges clearly from the word

`provided' in s. 100 is that Parliament must provide salaries and pensions to superior

court judges. What does not emerge clearly from this word is any constitutional

qualification on the type, scheme or even amount of these salaries or pensions. In light

of the modern-day reality that a great many people pay for a portion of their pension

- 33 -

benefits, it is, in my opinion, construing too literally the word `provided' to say that
it means that Parliament must pay every cent of the pensions of superior court judges.

50.                    In my view, strict construction is rarely controlling in constitutional
interpretation. My conclusion on the respondent's `strict construction' arguments is
simply that the word `pensions' in s. 100 of the *Constitution Act, 1867* is not limited
to the type of pensions known and in existence for the judiciary in 1867 and the word
`provided' does not necessarily mean that Parliament must pay the total cost of judicial
pensions. Parliament's ability to implement a widely used and accepted latter-day
pension model is not constrained by either of these words in terms of their strict
construction.

3.      *Parliament cannot dictate how judges spend their      salaries by requiring*
*pension contributions*

51.                    The respondent's argument here is that nothing in the *Constitution Act,*
*1867*, including s. 100, authorizes Parliament to make any deductions from the salaries
of superior court judges because such deductions constitute an unconstitutional
direction as to how judges are to spend their salaries and therefore a direct interference
on judicial independence. For three reasons, I cannot accept what the respondent tries
to read into s. 100.

52.                    First, there is a close relationship between salaries and pensions. They are
both remunerative benefits. Superior court judges are not in any sense `employees' of
anyone, including the federal government. Yet, as I have noted, they must be paid by
someone and that someone, according to s. 100, is Parliament. In fulfilling its

- 34 -

constitutional obligation to establish salaries and pensions for superior court judges,
it is reasonable that Parliament would ask: what is an appropriate total benefit package
and what components should constitute the package? Salary and pension must be two
of the components and Parliament must consider the relationship between them. It did
this in 1975; the 1975 'package' significantly raised judicial salaries and increased
certain benefits but, at the same time, compelled judges to contribute to their own
pension schemes. Parliament could have reached precisely the same financial result
by leaving the former non-contributory pension scheme in place but not raising
salaries as much as it did. No one contests that this would have been constitutional.
But if that is so, I see no reason why Parliament cannot achieve the same result in the
way it chose. There is nothing in the wording of s. 100 to suggest the limitation on
Parliament's jurisdiction contended for by the respondent.

53.                 Indeed, there is wording in s. 100 that points the other way, which brings
me to the second reason for holding against the respondent on this issue. The fatal
defect of the respondent's argument is that it ignores the word 'pensions' in s. 100 of
the *Constitution Act, 1867*. Although it might well be unconstitutional in most contexts
for Parliament to direct how judges are to spend their salaries, the word 'pensions' in
s. 100 specifically authorizes Parliament to deal with this subject-matter. In exercising
that jurisdiction Parliament must legislate with respect to both the quantum and the
scheme of judicial pensions. The 1975 law dealt with the scheme. Since the scheme
chosen was a widely used and accepted one and since it was introduced in conjunction
with other changes to judicial benefits in 1975, I see no objection to it on the ground
contended for by the respondent.

1986 CanLII 24 (SCC)

- 35 -

54.     Thirdly, the limitation proposed by the respondent would have nothing to do with my understanding of proper governmental respect for the independent role of the courts; neither would it bear directly upon the relationship between the judiciary and either Parliament or the executive; nor would it have any meaning in a federal-provincial sense. In short, I simply do not see any conceptual, principled or practical reason for drawing a line in the place contended for by the respondent.

55.     For all of these reasons I conclude that s. 29.1 of the *Judges Act* does not violate s. 100 of the *Constitution Act, 1867*.

VII

Section 1(*b*) of the *Canadian Bill of Rights* and s. 29.1 of the *Judges Act*

56.     For convenience of reference I set out again the relevant part of s. 1(*b*) of the *Canadian Bill of Rights*:

> **1.** It is hereby recognized and declared that in Canada there have existed and shall continue to exist without discrimination by reason of race, national origin, colour, religion or sex, the following human rights and fundamental freedoms, namely,
>
> ...
>
> (*b*) the right of the individual to equality before the law and the protection of the law;

- 36 -

I commence by noting that the respondent calls this his subsidiary argument and that it was dismissed by all four of the judges of the Federal Court, Trial Division and Federal Court of Appeal who heard the case.

1986 CanLII 24 (SCC)

57.          The respondent's argument is not that he or other superior court judges are being treated differently and more harshly than other Canadians. As discussed above, because of the broad use throughout the country of contributory pension schemes, such an argument would not be possible. Rather, the respondent's argument is that s. 29.1 of the *Judges Act* treats him more harshly than other superior court judges and that s. 1(*b*) of the *Canadian Bill of Rights* protects him from this treatment.

58.          The fact situation underlying this claim is somewhat complex and needs to be understood clearly before proceeding. There are three, not two, categories of judges affected by s. 29.1 of the *Judges Act* because, although the section was introduced into Parliament on February 17, 1975 and that date was selected as the cut-off for imposition of the contributory payments on judges, the section was not enacted until December 20, 1975. Accordingly, the three categories of judges are:

1.          Judges appointed before February 17, 1975 (they are 'grandfathered' from the contributory schemes in s. 29.1(2); they must, however, pay 1½ per cent of heir salaries toward improving pension benefits for their spouses and children).

2.          Judges appointed after December 20, 1975 (the law would be in force; they must pay under s. 29.1(2) of the Act).

- 37 -

3.          Judges appointed after February 17, 1975 but before   December 20, 1975
(the law would not be in force when they were appointed but, once enacted, it purports
to reach backward and apply to them).

The respondent is in the third category which, I understand, consists of a relatively
small number of judges.

59.          The respondent's argument is that "equality before the law" in s. 1(*b*) of the
*Canadian Bill of Rights* prohibits the different statutory treatment of some judges
*vis-à-vis* other judges with respect to their pensions. In assessing this argument it is
important to be aware of the cases in which s. 1(*b*) has been considered by this Court
and the conclusion reached in each such case.

60.          Only in *R. v. Drybones*, [1970] S.C.R. 282, did a majority of the Court hold
a federal statute to be inconsistent with s. 1(*b*) of the *Canadian Bill of Rights*. In that
case, a provision of the *Indian Act* made it an offence for an Indian to be intoxicated
outside an Indian reserve. The gist of Ritchie J.'s reasons is summarized in the
following passage at p. 297:

> ... I am therefore of opinion that an individual is denied equality before the
> law if it is made an offence punishable at law, on account of his race, for
> him to do something which his fellow Canadians are free to do without
> having committed any offence or having been made subject to any penalty.

There is not the faintest resemblance between *Drybones*, which involved racial
discrimination regarding a quasi-criminal offence, and the present case, which
involves a legislative distinction on the basis of the appointment date of judges.

61.        In *Attorney General of Canada v. Lavell*, [1974] S.C.R. 1349, the Court
had occasion to consider another provision of the *Indian Act*. The legislation under
review stipulated that an Indian woman who married a non-Indian man lost her Indian
status, although an Indian man who married a non-Indian woman retained his Indian
status. A majority of the Court held that this did not offend "equality before the law"
under s. 1(*b*).

62.        A third provision of the *Indian Act* was assessed against s. 1(*b*) of the
*Canadian Bill of Rights* in *Attorney General of Canada v. Canard*, [1976] 1 S.C.R.
170. In this case the legislation denied the widow of a deceased Indian the right to
administer the estate of her late husband. A majority of the Court rejected the claim
that such differential treatment of Indians violated the equality provision of the
*Canadian Bill of Rights*, noting that this type of legislative distinction was within
federal competence under s. 91(24) of the *Constitution Act, 1867*.

63.        In *R. v. Burnshine*, [1975] 1 S.C.R. 693, the majority again found no
violation of equality before the law under the *Canadian Bill of Rights*. A provision in
the *Prisons and Reformatories Act* called for sentences of "indeterminate" length for
offenders under the age of twenty-two. A person older than twenty-two would not in
the circumstances have been subjected to indeterminate sentences under the *Criminal
Code*. The law had application only in Ontario and British Columbia since the requisite
special correctional facilities were unavailable in other provinces. The legislation thus
created distinctions on the basis of both age and province of residence. Martland J.,
writing for the majority, noted at p. 702:

> I am not prepared to accept the respondent's submission as to the
> meaning of the phrase "equality before the law" in s. 1(*b*) of the *Bill of*

- 39 -

*Rights*. Section 1 of the Bill declared that six defined human rights and freedoms "have existed" and that they should "continue to exist". All of them had existed and were protected under the common law. The Bill did not purport to define new rights and freedoms. What it did was to declare their existence in a statute, and, further, by s. 2, to protect them from infringement by any federal statute.

He referred with approval to the passage in the judgment of Ritchie J. in *Lavell*, in which equality before the law was said to mean that the law must apply to all individuals without exemption from the duty to obey it. Martland J. also quoted with approval the following passage from *Curr v. The Queen*, [1972] S.C.R. 889 at p. 899:

... compelling reasons ought to be advanced to justify the Court in this case to employ a statutory (as contrasted with a constitutional) jurisdiction to deny operative effect to a substantive measure duly enacted by a Parliament constitutionally competent to do so, and exercising its powers in accordance with the tenets of responsible government, which underlie the discharge of legislative authority under the *British North America Act*.

The majority concluded with the observation that in order to have succeeded Burnshine would have to have demonstrated that Parliament was not seeking to achieve a "valid federal objective".

64.            In *Prata v. Minister of Manpower and Immigration*, [1976] 1 S.C.R. 376, the appellant claimed that a limitation on the discretionary power of the Immigration Appeal Board to quash a deportation order on compassionate grounds was contrary to equality before the law. The limitation was triggered by the filing of a certificate by the Minister, based upon intelligence reports, that it would be contrary to the national interest for the Board to so exercise its discretion. The prospective deportee had no statutory right to a hearing to go behind the Minister's certificate to challenge the

1986 CanLII 24 (SCC)

- 40 -

accuracy of the intelligence reports. The Court disposed of the s. 1(*b*) claim easily, saying that the limitation sought to achieve a valid federal objective.

65.                *Bliss v. Attorney General of Canada*, [1979] 1 S.C.R. 183, involved provisions in the *Unemployment Insurance Act, 1971* which denied the standard unemployment insurance benefits to persons whose employment was interrupted by pregnancy. Although the Act provided maternity benefits, it required a longer qualification period for maternity benefits than for standard benefits. Mrs. Bliss had satisfied the qualification period for standard benefits, but not for maternity benefits. In holding that these provisions did not offend the appellant's right to equality before the law, the judgment of the Court, delivered by Ritchie J., emphasized that s. 91 of the *British North America Act, 1867* had been amended in 1940 by the addition of unemployment insurance as a class of subjects reserved to Parliament. Since the impugned legislation was an integral part of Parliament's unemployment insurance scheme it was enacted for the purpose of achieving a valid federal objective. Ritchie J. also quoted the excerpt from *Curr* which I have reproduced above.

66.                The last case is *MacKay v. The Queen, supra*. The legislation under review created a special criminal procedure and forum for servicemen charged with criminal offences. Amongst other attributes, the court martial procedure deprived the accused serviceman of a preliminary hearing, the right to a jury trial, and in some circumstances the plea of *autrefois convict*. The majority judgment again relied on the "valid federal objective" test in denying any conflict between the *National Defence Act* and s. 1(*b*) of the *Canadian Bill of Rights*.

1986 CanLII 24 (SCC)

67.         This short history of "equality before the law" under s. 1(b) of the *Canadian Bill of Rights* demonstrates that a majority of the Court was never prepared to review impugned legislation according to an exacting standard which would demand of Parliament the most carefully tailored, finely crafted legislation. On the contrary, a majority of the Court was consistently prepared to look in a general way to whether the legislation was in pursuit of a valid federal legislative objective. This approach was followed in cases involving legislative distinctions on the basis of race, sex and age, and in cases involving profoundly important interests of the person asserting the equality right. The passages which I have quoted from these cases indicate that the Court was concerned with the merely statutory status of the *Canadian Bill of Rights* and the declaratory nature of the rights it conferred. I believe the day has passed when it might have been appropriate to re-evaluate those concerns and to reassess the direction this Court has taken in interpreting that document.

68.         Against this background of previous cases under s.1(b), the questions in this appeal are: Was it discriminatory for Parliament to choose any cut-off date in s. 29.1 of the *Judges Act*? Was the specific cut-off date chosen, February 17, 1975, legal?

69.         I have no trouble with the first question. Parliament could have imposed the new scheme on all superior court judges, including those appointed before 1975. However, taking into account the settled expectations of those earlier appointees, Parliament decided to `grandfather' them. I can see no objection to this decision. Nor, in fairness, does the respondent. His complaint is not so much against the `old judge/new judge' line drawn by Parliament. Rather, his complaint is against Parliament's assignment of him, by virtue of the February 17, 1975 cut-off date, to the `new judge' side of the line.

1986 CanLII 24 (SCC)

- 42 -

70.        That brings me to the second question, which is whether the February 17,

1975 cut-off date chosen by Parliament and reflected in s. 29.1 of the *Judges' Act*

unlawfully discriminates against the respondent. I cannot see how it does. Once it is

accepted that the general substance of the law is consistent with the valid federal

objective of providing for remuneration of s. 96 judges and that it is not discriminatory

of Parliament to draw some line between present incumbents and future appointees,

I do not think the jurisprudence I have summarized above allows the courts to be

overly critical in reviewing the precise line drawn by Parliament in *Canadian Bill of*

*Rights* cases. Some line is fair and is not discriminatory. From the respondent's

perspective a line drawn on December 20, 1975 would obviously be preferable. But

that does not mean that the choice of a different date, February 17, 1975, is illegal. In

light of the validity of the overall policy reflected in the 1975 amendments and the

legality and fairness of Parliament's attempt to protect the settled expectations of

incumbent judges, I cannot say that the choice of February 17, 1975 as the cut-off date

was contrary to the *Canadian Bill of Rights*.

71.        For these reasons, I conclude that s. 29.1 of the *Judges Act* does not violate

s. 1(*b*) of the *Canadian Bill of Rights*. Accordingly, in my view, neither Addy J. at trial

nor any of the justices of the Federal Court of Appeal erred in this aspect of their

judgments.

VIII

Conclusion

72.        I would answer the constitutional questions stated in this appeal as follows:

1986 CanLII 24 (SCC)

- 43 -

1. Question: Is section 29.1 of the *Judges Act*, as amended by s. 100 of the *Statute Law (Superannuation) Amendment Act, 1975,* S.C. 1974-75-76, c. 81, inconsistent with s. 100 of the *Constitution Act, 1867* and, therefore, in whole or in part, *ultra vires* the Parliament of Canada?

Answer: No.

2. Question: Is section 29.1 of the *Judges Act* as amended by s. 100 of the *Statute Law (Superannuation) Amendment Act, 1975,* S.C. 1974-75-76, c. 81, inconsistent with s. 1(*b*) of the *Canadian Bill of Rights* and to the extent of the inconsistency is it of no force or effect?

Answer: No.

73.      The appeal should be allowed, the judgments below set aside and the action dismissed. There should be no costs payable in this Court or in the courts below.

The reasons of Beetz and McIntyre JJ. were delivered by

74.      BEETZ J. (dissenting in part)--This is an appeal from a judgment of the Federal Court of Appeal, [1984] 1 F.C. 1010 (Thurlow C.J., Heald J., concurring in the result but for different reasons, and Pratte J., dissenting), which upheld (but on different grounds) the judgment of the Federal Court, Trial Division, [1981] 2 F.C. 543, wherein Addy J. ordered and declared that s. 29.1(2) of the *Judges Act*, R.S.C. 1970, c. J-1, as amended by s. 100 of the *Statute Law (Superannuation) Amendment Act, 1975*, S.C. 1974-75-76, c. 81, is, in so far as the respondent is concerned, *ultra vires* the Parliament of Canada.

I--The Facts

- 44 -

75.          As was put by the trial judge (at p. 545):

> The facts in this case are undisputed: no witnesses were called and the case was tried on the basis of admissions in the pleadings, an agreed statement of facts and certain exhibits which were filed on consent.

76.          On July 24, 1975, the respondent, now a judge of the Quebec Court of Appeal, accepted to be and was appointed a puisne judge of the Superior Court for the District of Montréal, with, as stated in the commission issued to him under the Great Seal of Canada in the name of Her Majesty the Queen,

> ... all and every the powers, rights, authority, privileges, profits, emoluments and advantages unto the said office of right and by law appertaining during your good behaviour....

77.          On the date of the respondent's appointment, the *Judges Act*, R.S.C. 1970, c. J-1, as amended by R.S.C. 1970 (2nd Supp.), c. 16; S.C. 1972, c. 17: S.C. 1973-74, c. 17; S.C. 1974-75-76, c. 19; S.C. 1974-75-76, c. 48, and the *Supplementary Retirement Benefits Act*, R.S.C. 1970 (1st Supp.), c. 43 as amended by R.S.C. 1970 (2nd Supp.), c. 30 and by S.C. 1973-74, c. 36, provided that puisne judges of the Superior Court in and for the Province of Quebec enjoyed the following "profits, emoluments and advantages":

1.          Global salaries of $53,000 (*Judges Act*, as amended, ss. 9 and 20);

2.          Non-contributory retirement annuities (*Judges Act*, as amended, s. 23);

- 45 -

3.        Non-contributory annuities for the judges' widows and children (*Judges Act*, as amended, s. 25);

4.        Non-contributory supplementary retirement benefits (the *Supplementary Retirement Benefits Act* as amended).

78.        The *Judges Act* was enacted pursuant to s. 100 of the *Constitution Act, 1867* which provides:

> **100.** The Salaries, Allowances, and Pensions of the Judges of the Superior, District, and County Courts (except the Courts of Probate in Nova Scotia and New Brunswick), and of the Admiralty Courts in Cases where the Judges thereof are for the Time being paid by Salary, shall be fixed and provided by the Parliament of Canada.

It will be observed that the pensions of judges' widowed spouses and children are not a benefit mentioned in s. 100 of the *Constitution Act, 1867*.

79.        Subsequent to the date of his appointment, namely from July 24 to December 20, 1975, the respondent's net monthly income was calculated and paid on the basis of the foregoing salary of $53,000 per annum, the same salary as that of all his fellow puisne judges of the Quebec Superior Court. In addition, he was not required any more than any one of them to contribute or pay anything towards the cost of his pension or that of his widow and children.

80.        On December 20, 1975, approximately five months after the respondent's appointment, Parliament enacted the legislative provisions impugned in this case, s. 29.1 of the *Judges Act*, added to this Act by s. 100 of the *Statute Law*

1986 CanLII 24 (SCC)

- 46 -

*(Superannuation) Amendment Act, 1975*, S.C. 1974-75-76, c. 81, an enactment which,

it is important to note, was introduced in the House of Commons and given first

reading on February 17, 1975.

81.          Section 29.1 of the *Judges Act* provides in part:

> **29.1** (1) Every judge appointed before the 17th day of February, 1975 to hold office as a judge of a superior or county court shall, by reservation from his salary under this Act, contribute to the Consolidated Revenue Fund one and one-half per cent of his salary.

> (2) Every judge appointed after the 16th day of February, 1975 to hold office as a judge of a superior or county court, to whom subsection (1) does not apply, shall, by reservation from his salary under this Act.

> (*a*) contribute to the Consolidated Revenue Fund an amount equal to six per cent of his salary; and

> (*b*) contribute to the Supplementary Retirement Benefits Account established in the accounts of Canada pursuant to the Supplementary Retirement Benefits Act,

>> (i) prior to 1977, an amount equal to one-half of one per cent of his salary, and

>> (ii) commencing with the month of January 1977, an amount equal to one per cent of his salary.

Here is how the trial judge characterized the effect of s. 29.1(2) upon the respondent:

> Its effect was to oblige the plaintiff thenceforth to contribute six per cent of his salary toward the cost of his own retirement and the annuities for his

1986 CanLII 24 (SCC)

- 47 -

widow and children as well as one-half of one per cent prior to the 1st of January, 1977 and thereafter one per cent, for the indexing of retirement annuities under the *Supplementary Retirement Benefits Act*. He thus suffered a reduction of seven per cent of the salary to which he was entitled as of the date of his appointment and for some five months following that appointment.

82.         The extent of a more global effect upon the respondent has been agreed upon by the parties in the pleadings as amended by the agreed statement of facts:

> The Plaintiff's contribution towards his retirement pension plan for the year 1977 will amount to $3,815.00 and for the year of 1978 to $3,955.00 and in subsequent years such contribution, it is to be expected, will be calculated on any and all adjustments to the Plaintiff's salary. On the assumption that the Plaintiff retires at the minimum age of 65, after 27 years in office, his contribution towards such annuities and supplementary retirement benefits will be at least $100,000.00 and in the light of adjustments from time to time to the Plaintiff's salary, his contribution is likely to be in the order of $125,000.00.

> ...

> Upon his retirement, the Plaintiff's minimum contribution of $3,815.00 per annum with interest compounded annually using a rate of interest of ten per cent per annum will have established in the hands of the defendant a capital sum in the order of $400,000.00 an amount more than sufficient to take care of the Plaintiff's retirement annuities and the Plaintiff's supplementary retirement benefits.

83.         On the other hand all the respondent's fellow puisne judges of the Superior Court appointed before February 17, 1975 and who until then had received the same salary as that of the respondent and had not been required to contribute and pay anything towards the cost of their pensions or that of their widowed spouses and children, remained entitled to the same salary as well as dispensed from contributions except, under s. 29.1(1), to the extent of one and one-half per cent of their salary, a

- 48 -

contribution described as being "in respect of the cost of the improved annuities for widowed spouses and other dependants" in a letter sent on February 17, 1975, by the Minister of Justice and Attorney General of Canada to all federally appointed judges.

84.          In other words, the new measure "grandfathered" incumbent superior court judges, but it did not "grandfather" them all; a small minority of them, including the respondent, that is those appointed after February 16, 1975, but before December 20, 1975, were not so "grandfathered": the impugned provisions were not in force when these judges were appointed, but they were retroactive to the date of first reading and reached the judges in question *ex post facto* on the date of enactment. Until the latter date, the respondent belonged to the class of incumbent puisne superior court judges, all the members of which were treated equally under the *Judges Act*. With respect to non-contributory and contributory retirement annuities, the impugned enactment transferred him from that class into the class of judges who were not incumbent judges at the time of the enactment and who were not treated as favourably as judges who had been "grandfathered". The respondent was no longer the equal of his colleagues. Where there had been equality, the impugned provisions introduced inequality.

85.          On the date of his appointment, July 24, 1975, the respondent was unaware of the existence of the bill which was to amend the *Judges Act* by adding s. 29.1 thereto, and the Minister of Justice did not mention the existence of the bill to the respondent at the time that his appointment was discussed.

86.          I should state at once however that the respondent's unawareness of the existence of the bill is in my view irrelevant. The bill was before Parliament and was

- 49 -

not yet law. One is presumed to know the law and to act accordingly, but not a bill which may or may not become law.

87.     In November 1977, the respondent launched a declaratory action in the Trial Division of the Federal Court. The statement of claim concludes with the following prayer for relief:

> WHEREFORE the Plaintiff claims:
>
> a)  A declaration that the words "before February 17, 1975" of Section 29.1 and that the whole of Section 29.1(2) of the *Judges Act*, as enacted by Section 100 of 1974-75-76, c. 81 are
>
>     i)    *ultra vires* of the Parliament of Canada, or, in the alternative:
>
>     ii)   *ultra vires* of the Parliament of Canada insofar as the Plaintiff is concerned:
>
> or, in the alternative,
>
> b)  A declaration that the words "before February 17, 1975" of Section 29.1 and the whole Section 29.1 (2) of the *Judges Act*, as enacted by Section 100 of 1974-75-76, c. 81 are inoperative insofar as the Plaintiff is concerned;
>
> c)  His costs of the within proceedings;
>
> d)  Such further and other relief as to this Honourable Court may seem meet.

88.          The declaration claimed in paragraph a) of the prayer for relief is allegedly
founded upon s. 99 of the *Constitution Act, 1867*, relating to the tenure of office of
judges as well as upon s. 100 of the same Act, quoted above and relating to the
salaries, allowances, and pensions of judges.

89.          The declaration claimed in paragraph b) of the prayer for relief is allegedly
founded upon s. 1(*b*) of the *Canadian Bill of Rights* which provides:

> 1. It is hereby recognized and declared that in Canada there have
> existed and shall continue to exist without discrimination by reason of
> race, national origin, colour, religion or sex, the following human rights
> and fundamental freedoms, namely,
>
> ...
>
> (*b*) the right of the individual to equality before the law and the protection
> of the law;

II--The Judgments of the Courts Below

90.          In the Trial Division, Addy J. found that the effect of the impugned
amendment to the *Judges Act* was to reduce the salary of the respondent and held that
Parliament has no legislative authority to reduce the salary of a judge during his or her
tenure of office. However he rejected the submission that s. 29.1 of the *Judges Act*
contravened s. 1(*b*) of the *Canadian Bill of Rights*. He granted the respondent a
declaration that s. 29.1(2) of the *Judges Act* was *ultra vires* of the Parliament of
Canada in so far as the respondent was concerned.

1986 CanLII 24 (SCC)

- 51 -

91. The appellant appealed to the Federal Court of Appeal and the respondent cross-appealed from the refusal of the trial judge to grant him a declaration that the impugned enactment was inoperative because it infringed s. 1(b) of the *Canadian Bill of Rights*.

92. The Federal Court of Appeal dismissed the appeal by a majority judgment but was unanimous in dismissing the cross-appeal. All three judges of the Federal Court of Appeal held, contrarily to the trial judge, that Parliament can reduce judges' salaries, provided it is not for a colourable purpose such, for instance, as to undermine the independance of the judiciary, which nobody has suggested was the case with respect to the impugned legislation. However, the majority of the Federal Court of Appeal held that it is *ultra vires* of Parliament to require any judge appointed pursuant to s. 96 of the *Constitution Act, 1867*, whenever appointed, to participate in a contributory pension plan for his own or her own pension, an issue not dealt with by the trial judge.

93. Thurlow C.J., who characterized the impugned enactment as effecting a forced contribution to a pension scheme rather than a reduction in salary, took the view that whereas under s. 100 of the *Constitution Act, 1867* Parliament must fix and provide judges salaries, it "has no authority to dictate how they are to be used by the recipient or to require that they be used for any particular purpose". Thurlow C.J. accordingly held that s. 29.1 of the *Judges Act* is wholly *ultra vires*, including s. 29.1(1), which, as stated above, was said to be "in respect of the cost of the improved annuities for widowed spouses and other dependants".

- 52 -

94.             Heald J., for his part, was of the opinion that the obligation set out in s. 100
of the *Constitution Act, 1867* imposes a duty on Parliament to provide the total amount
of judges' pensions and s. 29.1(2) is contrary to s. 100 of the *Constitution Act, 1867*
and *ultra vires* in that it requires judges to pay a portion of the cost of their own
pension. However, s. 29.1(1) of the Judges Act *is not ultra vires* in his view since the
deduction provided for therein is dedicated to the cost of improved annuities for
widowed spouses and other dependants of judges.

95.             Pratte J., dissenting, found that s. 29.1 of the *Judges Act* does not affect the
judges' right to a pension but rather their right to salaries. The real question then was
whether Parliament has the power to reduce the salaries of incumbent judges. He held
that Parliament has this power.

96.             In the result, the declaration of unconstitutionality granted by the trial
judge with respect to s. 29.1(2) of the *Judges Act* remained undisturbed.

97.             The appellant appealed to this Court by leave of this Court. The respondent
cross-appealed pursuant to s. 29(1) of the Rules of this Court asking for the declaration
claimed in paragraph b) of his prayer for relief on the basis of s. 1(*b*) of the *Canadian
Bill of Rights*.

III--Constitutional Questions

98.             On March 22, 1984, Dickson J., as he then was, stated the two following
constitutional questions:

- 53 -

   1. Is section 29.1 of the *Judges Act*, as amended by section 100 of the
   *Statute Law (Superannuation) Amendment Act, 1975*, S.C.
   1974-75-76, c. 81, inconsistent with s. 100 of the *Constitution Act,
   1867* and therefore in whole or in part, *ultra vires* the Parliament
   of Canada?

   2. Is section 29.1 of the *Judges Act* as amended by s. 100 of the
   *Statute Law (Superannuation) Amendment Act, 1975*, S.C.
   1974-75-76, c. 81, inconsistent with s. 1(*b*) of the *Canadian Bill of
   Rights* and to the extent of the inconsistency is it of no force or
   effect?

99.     With the greatest of respect for those who hold a contrary view, I have

reached the conclusion that, subject to one qualification to be mentioned later, the

second constitutional question should receive an affirmative answer. However, this

may not be sufficient to dispose of the entire case, given the declaration of

unconstitutionality granted by the trial judge. In any event, the variety of opinions

expressed in the courts below on the issues raised by the first constitutional question

and the need for certainty in this important area of the law make it preferable that I

also answer the first constitutional question.

### IV--The*Constitution Act, 1867* and s. 29.1 of the *Judges Act*

100.     I have had the advantage of reading the reasons for judgment written by

the Chief Justice. I agree with his general considerations on judicial independance, on

the foundation of judicial independance in Canada and on the content of the principle

of judicial independance. I also agree with him that the first constitutional question

should be answered in the negative, and I agree with his reasons for so answering it.

101.     I now turn to the second constitutional question.

1986 CanLII 24 (SCC)

- 54 -

V--Section 1(*b*) of the *Canadian Bill of Rights* and s. 29.1of the *Judges Act*

102.             As was already stated above, all the judges in the courts below held that

s. 29.1 of the *Judges Act* was not inconsistent with s. 1(*b*) of the *Canadian Bill of*

*Rights*. They had different reasons for so deciding however.

103.             The reasons of the trial judge read in part as follows at pp. 554 to 557 of

the Federal Court Reports:

> The plaintiff, in arguing that the words "before the 17th day of
> February, 1975" in subsection 29.1(1) and "after the 16th day of February,
> 1975" in subsection 29.1(2) offend the principle of equality before the law,
> relied on and referred to the following cases: *The Queen v. Drybones*,
> [1970] S.C.R. 282; *Curr v. The Queen*, [1972] S.C.R. 889; *Attorney*
> *General of Canada v. Lavell*, [1974] S.C.R. 1349; *The Queen v.*
> *Burnshine*, [1975] 1 S.C.R. 693; *Prata v. Minister of Manpower and*
> *Immigration*, [1976] 1 S.C.R. 376; *Bliss v. The Attorney General of*
> *Canada*, [1979] 1 S.C.R. 183; and *MacKay v. The Queen*, [1980] 2 S.C.R.
> 370.

> All of these cases with the exception of the *Bliss* case, which dealt
> with entitlement to unemployment insurance benefits and where in fact the
> *Canadian Bill of Rights* was held not to apply, dealt with loss or denial of
> very substantive fundamental rights of some kind or involved criminal or
> quasi-criminal responsibility and had nothing to do with the mere quantum
> of remuneration for services rendered.

> "Equality before the law" in the *Canadian Bill of Rights* has, since its
> enactment, been interpreted as understood by Dicey, namely, that there are
> no exemptions from the ordinary law of the land for any privileged class.
> As Ritchie J. stated in *Curr v. The Queen*, *supra*, at page 916:

> ... I prefer to base this conclusion on my understanding that the meaning
> to be given to the language employed in the *Bill of Rights* is the meaning
> which it bore at the time when the Bill was enacted ...

- 55 -

104.         The trial judge then referred to and quoted reasons to the same effect

written by Ritchie J. in *Attorney General of Canada v. Lavell*, [1974] S.C.R. 1349,

including the second meaning proposed by Dicey for the principle of the "rule of law":

> It means again equality before the law or the equal subjection of all classes
> to the ordinary law of the land administered by the ordinary courts; the
> "rule of law" in this sense excludes the idea of any exemption of officials
> or others from the duty of obedience to the law which governs other
> citizens or from the jurisdiction of the ordinary courts.

The trial judge noted that these reasons of Ritchie J. had been quoted with approval

by Martland J. speaking for the majority in *R. v. Burnshine*, [1975] 1 S.C.R. 693. The

trial judge continued:

> Even section 3 of the *Canadian Human Rights Act*, S.C. 1976-1977, c. 33
> which has been enacted since then (proclaimed in force on the 14th of
> July, 1977) and by means of which counsel for the plaintiff sought to draw
> an analogy with the *Canadian Bill of Rights*, does not prohibit
> discrimination generally on grounds other than "race, national or ethnic
> origin, colour, religion, age, sex, marital status, conviction for which a
> pardon has been granted and, in matters related to employment, physical
> handicap ...." It seems obvious that, in the case at bar, there exists no
> discrimination on any of the above-mentioned grounds.

> Counsel for the plaintiff emphasized particularly the following
> statement of McIntyre J. in the *MacKay* case, *supra*, which is found at
> page 406 of the above-mentioned report:

> The question which must be resolved in each case is whether such
> inequality as may be created by legislation affecting a special class--here
> the military--is arbitrary, capricious or unnecessary, or whether it is
> rationally based and acceptable as a necessary variation from the general
> principle of universal application of law to meet special conditions and to
> attain a necessary and desirable social objective.

- 56 -

This statement, in my view, does not support the proposition advanced on behalf of the plaintiff. As Martland J. stated in delivering the judgment for the Supreme Court of Canada in the *Prata* case, *supra*, at page 382 of the above-cited report of the case:

This Court has held that s. 1(*b*) of the *Canadian Bill of Rights* does not require that all federal statutes must apply to all individuals in the same manner. Legislation dealing with a particular class of people is valid if it is enacted for the purpose of achieving a valid federal objective (*R. v. Burnshine* (1974), 44 D.L.R. (3d) 584).

Since I find that the plaintiff cannot succeed under paragraph 1(*b*) of the *Canadian Bill of Rights* because the term "equality before the law" as used in that enactment does not refer and was never intended to refer to a question of equal pay for equal work, I shall refrain from dealing with the further answer advanced on behalf of the defendant to the effect that, even if "inequality": is found to exist, it in effect arises in the pursuit of a valid federal objective and that, in addition, the plaintiff has failed to discharge the onus of establishing that the requirement of making contributions is arbitrary, capricious or unnecessary.

105.         To summarize the trial judge's reasons on this issue, as I understand them,

s. 29.1 does not contravene the *Canadian Bill of Rights* because: first, s. 29.1 does not

offend the kind of equality defined by Dicey in the second meaning he gave to the rule

of law; second, the provisions of the *Canadian Bill of Rights* cannot be held to apply

to "the mere quantum of remuneration for services rendered" without trivializing these

provisions. Furthermore, the trial judge may also have suggested as is indicated by his

reference to the *Canadian Human Rights Act*, that discrimination is not prohibited by

the *Canadian Bill of Rights*, except on specifically mentioned grounds.

106.         In the Federal Court of Appeal, Thurlow C.J. speaking for himself and for

Heald J. had this to say on the *Canadian Bill of Rights* issue, at pp. 1016-17 of the

Federal Court Reports:

1986 CanLII 24 (SCC)

- 57 -

The argument on the last-mentioned point, as I understood it, was that inequality before the law was created by the enactment because under it the respondent no longer enjoyed his right to salary without deductions for contributions to the same extent as other judges who held office before December 20, 1975. Reliance was placed on the reasoning of McIntyre J., in *MacKay v. The Queen*, [1980] 2 S.C.R. 370, at page 406, and it was said that there was no valid federal objective to be attained by discriminating on December 20, 1975 between judges appointed on or before and those appointed after February 16, 1975, and that to do so was arbitrary, capricious and unnecessary.

...

The submission is thus based on the assumption that the legislation is within the legislative powers of Parliament. On that basis it seems to me that it cannot be said that Parliament, in requiring judges to participate in and contribute to a contributory pension scheme, was not seeking to achieve a valid federal objective. Moreover, the distinction made in the statute between judges appointed before a fixed date, for whom non-contributory pension provisions were already in existence, and judges to be appointed after that date so as ultimately, by the attrition of senior appointees through deaths and resignations, the whole body of the judiciary would be participants in and contributors to the contributory pension scheme seems to me to be but a manner of achieving the otherwise valid federal objective. Difficulty arises from the fact that the particular date chosen was earlier than the date of the coming into force of the Act but, harsh as the result may seem to be to one who did not know, as opposed to one who did know when appointed, that a contributory scheme to be applicable to all judges appointed after the date of the introduction of the bill was to be imposed, I do not think it can on that account be said that it has been established, in the sense referred to by Ritchie J., in the same case (*MacKay v. The Queen*, [1980] 2 S.C.R. 370, at page 393, citing *The Queen v. Burnshine*, [1975] 1 S.C.R. 693), that the provisions of the bill, including the choice of the date, were not enacted for the purpose of achieving the valid federal objective or that it was arbitrary or capricious or unnecessary for Parliament to have defined the class required to make contributions by reference to their being appointed after the date of the introduction of the bill. Accordingly, I would reject the contention and dismiss the cross-appeal.

107.                    At pages 1035 and 1036 of the Federal Court Reports, Pratte J. agreed with

Addy J. that the Dicey concept of equality before the law had not been offended by the

- 58 -

impugned provision. He also agreed that the whole of s. 29.1 of the *Judges Act* has

been enacted by Parliament for the purpose of achieving a valid federal objective.

108.                In this Court, counsel for the appellant did not reply upon the reasons of

the trial judge to support their submission that the second constitutional question

should be answered in the negative. They relied essentially upon the reasons of

Thurlow C.J. on this point. They quoted part of these reasons in their factum and

amplified them as follows:

> The policy decision reflected in section 29.1 is that all federally
> funded and administered pension plans should be on a contributory basis,
> so that all those who might eventually receive retirement benefits from the
> Consolidated Revenue Fund will have contributed toward the cost of those
> benefits and thereby reduce the financial burden on future taxpayers. It is
> submitted that a decision to shift part of the costs of the plan to its
> beneficiaries cannot be considered arbitrary, capricious or unnecessary.

> If the policy that the beneficiary should contribute is not unreasonable
> it is submitted that the means chosen to implement that policy do not
> render it objectionable or invalid in relation to the right to equality before
> the law. Parliament could have chosen to impose a contributory
> requirement at the full rate of 6½% and then 7% on all judges. However,
> it chose to protect the position of judges who were appointed prior to the
> introduction of the amending legislation and to phase in the contributory
> requirements progressively, by requiring contributions at the higher rate
> only from newly appointed judges. This progressive implementation of full
> contributions protected the legitimate expectations of the judges appointed
> prior to April [*sic*] 17, 1975, but it necessarily put them in a different
> position from that of judges appointed after the "trigger date" for the
> higher contributions.

109.                While no submissions were made to us by counsel for the appellant with

respect to the reasons of the trial judge on the *Canadian Bill of Rights* issue, I feel that

these reasons should be addressed.

1986 CanLII 24 (SCC)

- 59 -

110.          I first wish to dispel any suggestion that, in order to offend the *Canadian*

*Bill of Rights*, a discriminatory provision must be discriminatory on some specifically

mentioned ground such as race, national origin, colour, etc. The learned trial judge

erred in this respect. In *Curr v. The Queen*, [1972] S.C.R. 889, Laskin J. as he then

was, speaking for himself and six other members of the Court stated at pp. 896-97:

> In considering the reach of ... s. 1(*b*) ... I do not read it as making the
> existence of any of the forms of prohibited discrimination a *sine qua non*
> of its operation. Rather, the prohibited discrimination is an additional lever
> to which federal legislation must respond. Putting the matter another way,
> federal legislation which does not offend s. 1 in respect of any of the
> prohibited kinds of discrimination may nonetheless be offensive to s. 1 if
> it is violative of what is specified in any of the clauses (*a*) to (*f*) of s. 1. It
> is, *a fortiori*, offensive if there is discrimination by reason of race so as to
> deny equality before the law. That is what this Court decided in *Regina* v.
> *Drybones* and I need say no more on this point.

> It is, therefore, not an answer to reliance by the appellant on ... s. 1(*b*)
> of the *Canadian Bill of Rights* that [a particular provision] does not
> discriminate against any person by reason of race, national origin, colour,
> religion or sex. The absence of such discrimination still leaves open the
> question whether [a particular provision] can be construed and applied
> without abrogating, abridging or infringing the rights of the individual
> listed in ... s. 1(*b*).

111.          See also the *Burnshine* case, *supra*, at p. 700, and *Bliss v. Attorney General*

*of Canada*, [1979] 1 S.C.R. 183, at p. 191.

112.          As for the Diceyan concept of equality and the rule of law, perhaps its most

classical application in Canadian jurisprudence was in *Roncarelli v. Duplessis*,[1959]

S.C.R. 121, a case which antedates the *Canadian Bill of Rights*. It is true that this

concept was sometimes adopted for the purposes of the *Canadian Bill of Rights*, but

the early *dicta* in *Curr* and in *Lavell*, *supra*, to which Addy J. refers, do not represent

the opinion of the majority of this Court in those cases. However, that concept was

adopted by the majority of this Court in *Burnshine, supra*, although the extent to which the latter case turned on this adoption is not clear.

113.	The adoption of Dicey's concept of equality for the purposes of the *Canadian Bill of Rights* was criticized in some doctrinal works. Dicey's concept of equality was said to be outdated, unduly narrow and otherwise inappropriate for the purposes of the *Canadian Bill of Rights*: W. S. Tarnopolsky, *The Canadian Bill of Rights* (2nd ed. 1975), pp. 120, 158 to 160, 297 and 298.

114.	Of the five equality cases decided by this Court after the *Burnshine* case, *supra*, on the basis of the *Canadian Bill of Rights* that is, *Attorney General of Canada v. Canard*, [1976] 1 S.C.R. 170, *Prata v. Minister of Manpower and Immigration*, [1976] 1 S.C.R. 376, the *Bliss* case, *supra*, and *MacKay v. The Queen*, [1980] 2 S.C.R. 370, only one, the *Bliss* case, alludes to the Dicey concept of equality, at p. 192. But on the same page, Ritchie J., who delivered the judgment of the Court, mentioned a broader test applied by Pratte J. of the Federal Court of Appeal:

> ... the right to equality before the law could be defined as the right of an individual to be treated as well by the legislation as others who, if only relevant facts were taken into consideration, would be judged to be in the same situation.

> Mr. Justice Pratte concluded that where difference in treatment of individuals is based on a relevant distinction, the right to equality before the law would not be offended.

Not only did Ritchie J. not disapprove this other test but, on p. 193, he proceeded to apply it to decide that the legislation challenged in that case did not offend the *Canadian Bill of Rights*. Furthermore, in the *Canard* case, *supra*, Ritchie J. with whom

1986 CanLII 24 (SCC)

Martland and Judson JJ. agreed, in concurring reasons allowing the appeal, took at p.

191, at least in terms if not in the result, a much broader approach than the narrow

Diceyan test:

> The *Bill of Rights* was designed to eradicate any discriminatory laws
> passed by the Parliament of Canada and to guarantee the rights and
> freedoms therein specified to all Canadian citizens, but these guarantees
> are expressly declared in the preamble to the Bill to be enacted so as to
> "reflect the respect of Parliament for its constitution", and s. 91(24) of that
> document clearly vests in the Parliament of Canada the authority to pass
> laws concerning Indians which are different from the laws which the
> provincial legislatures may enact concerning the citizens of the various
> provinces.

115.        I accordingly think that this Court is not bound by the Dicey test of

equality nor prevented from adopting a more egalitarian approach.

116.        Finally I come to the trivialization point made by the trial judge to the

effect that the *Canadian Bill of Rights* should not be applied to "the mere quantum of

remuneration for services rendered" and "to a question of equal pay for equal work".

117.        Before I do so however, I should perhaps define my position with respect

to the characterization of the impugned enactment. The trial judge and Pratte J.

dissenting, held that s. 29.1 of the *Judges Act* operated a reduction in the respondent's

salary whereas Thurlow C.J., and as it seems, Heald J., held that the provision did not

reduce the amount credited to the respondent as salary but forced him to contribute to

a pension scheme. Given the form of s. 29.I, I am rather inclined to share the view of

Thurlow C.J. on this point although, on the *Canadian Bill of Rights* issue, it does not

matter whether the respondent suffered a reduction in salary or was forced to

- 62 -

contribute to a pension scheme with a corresponding reduction of the amount actually paid to him as his salary.

118.        In my view however, this case has nothing to do with the "equal pay for equal work" principle. It does have to do with money and the financial benefits attached to the respondent's office, but I think that the uneven distribution of financial benefits is quite capable of producing the type of inequality forbidden by s. 1(b) of the *Canadian Bill of Rights*. It was the entitlement of women to unemployment insurance benefits that was in issue in the *Bliss* case, *supra*, and nobody suggested that on that ground the case was incapable of or somehow unworthy of giving rise to arguable submissions advanced pursuant to the equality provisions of the *Canadian Bill of Rights*. More individuals were affected by the *Bliss* case, than by the case at bar. However, the amounts involved in the case at bar are considerably more substantial than those in the *Bliss* case.

119.        Furthermore, the benefits involved in the case at bar represent an important incident attached to the status of a high judicial officer and are linked with the dignity of his office, in real as well as in symbolic terms. The following remarks written by Thurlow C.J. are apposite. They are indicative of the gravity of the issues raised by this case, and that is the sole reason I quote them. At pages 1024 and 1025 of the Federal Court Reports, the learned Chief Justice wrote:

> The commission issues upon appointment of a judge by the Governor General under the authority of section 96 and the provincial statute setting up the office. It constitutes a grant both of the office with its authority and of the salary and other benefits attached by law at that time to the office as fixed by Parliament under section 99. The grant entitles the appointee to the salary so fixed in much the same way as a grant of money or land vests title to the money or the land in the grantee. It is something that cannot be taken from him except by due process of law. Due process may

1986 CanLII 24 (SCC)

- 63 -

include expropriation by the authority of the legislature, but it is established principle that the legislature is not, in the absence of a clear expression of intent to the contrary, to be taken as intending to expropriate without due compensation. And a taking without compensation is extraordinary. It is something that Parliament, ordinarily at least, avoids. It is, in my view, the reason why, in a number of statutes relating to judges' salaries, provisions referred to as grandfather clauses to protect the position of incumbent judges have been included. But the fact they have been included is not in itself a basis for saying that Parliament does not have the legal power to expropriate without compensation or to take away rights that have been lawfully granted.

As Parliament has under section 100 the responsibility to fix and provide the salaries of judges, it seems to me that as a matter of interpretation of the language of the section Parliament must have a continuing power to fix such salaries and that that power is not restricted to the fixing of salaries for judges to be subsequently appointed. Plainly Parliament can increase the salaries of judges who are in office and it seems to me that as a matter of naked power it can also decrease them even though such decrease may be regarded by the incumbent judges as confiscatory and unjust and may be in substance a derogation from the grant lawfully made by the Governor General in the judge's commission.

120.          Finally if, as I think, the impugned enactment contravenes s. 1(b) of the *Canadian Bill of Rights*, it takes on an added dimension in that it treats unevenly judges who are expected to administer justice with an even hand. Furthermore, it emanates from the very Parliament which is the custodian of judges' independence. While the impugned enactment is not sufficiently severe to impair the independence of judges, it is one that tend to affect the serenity of those concerned for the rest of their term of office. Judges may be expected to rise above such considerations but it is difficult to see how it could be conducive to the better administration of justice that they should be put to the test.

121.          I now turn to the "valid federal objective" argument retained by the majority of the Federal Court of Appeal and advanced by the appellant in support of the impugned enactment.

122.          Relying on the authority of *Burnshine*, *supra*, at pp. 707 and 708, and of
*Bliss*, *supra*, at p. 194, the appellant submits that the onus lies with the respondent to
demonstrate that a valid federal objective was not being sought by Parliament. The
extent to which this onus is of an evidentiary or of a persuasive nature, and whether
this onus, whatever its weight, can be discharged by inferences drawn from the
impugned legislation, are questions which may ultimately require clarification. I
should have thought that where a challenged provision *prima facie* offends against the
principle of equality before the law and does so for reasons which neither appear on
its face nor can be inferred from its nature, then it would be incumbent upon the
Attorney General, who is in a much better position to do so, to demonstrate what valid
objective was being sought by the legislation.

123.          Be that as it may, the question of onus does not really arise in the case at
bar since I am quite prepared to accept that s. 29.1 of the *Judges Act* was enacted by
Parliament in the pursuit of a valid federal objective, as was held by the Federal Court
of Appeal and as is submitted by the appellant.

124.          Paraphrasing the above-quoted reasons of Thurlow C.J. and the
submissions of the appellant, I would describe the valid federal objective in question
as follows: the policy decision reflected in s. 29.1 of the *Judges Act* is that judges'
pension plans should be on a contributory basis in order to reduce the financial burden
on future taxpayers; Parliament chose to phase in the contributory requirement, by
requiring contributions at the higher rate only from newly appointed judges so that,
through the attrition of senior appointees as a result of death and resignations, the
whole body of the judiciary would eventually participate in the contributory scheme.

1986 CanLII 24 (SCC)

- 65 -

125.        To repeat, I am prepared to accept that the above-mentioned federal objective is a valid one.

126.        What I am not prepared to agree with, on the other hand, with great respect for those who hold a contrary view, is that the manner or means chosen to achieve this valid federal objective, which manner or means themselves establish a new classification and discriminate between incumbent judges, should be immunized from the principle of universal application of the law. So to dispense altogether such manner or means from the equality provision of the *Canadian Bill of Rights* would have the effect of emasculating this provision; in my view, it is in part to guard against this danger that McIntyre J., writing for himself and for Dickson J., as he then was, wrote his concurring reasons in the *MacKay* case, *supra*. I find it appropriate to quote a substantial portion of those reasons. The main issue in that case was set out in these words at p. 401:

> Whether the provisions of the *National Defence Act* which authorize the trial by a service tribunal of military personnel charged with criminal offences committed in Canada contrary to the *Narcotic Control Act* or the *Criminal Code* are inoperable by reason of the *Canadian Bill of Rights*.

At page 402, McIntyre J. dealt with the historical background of military law and, at pp. 403 to 405, with the application of s. 2(*f*) of the *Canadian Bill of Rights* to the facts of that case. Then, at pp. 405 and following, McIntyre J. dealt with the application of s. 1(*b*) of the *Canadian Bill of Rights*:

> The appellant's second point raises the question of whether the trial of servicemen by court martial under military law for an offence under the criminal law of Canada or as here under the *Narcotic Control Act* deprives the serviceman of equality before the law contrary to the provisions of s. 1(*b*) and s. 2 of the *Canadian Bill of Rights*.

This Court decided in *Regina v. Drybones*, [1970] S.C.R. 282, that the *Canadian Bill of Rights* was effective to render inoperative validly enacted federal legislation where such legislation infringed the right of a subject to equality before the law. Judicial construction of the words "equality before the law" found in such cases as *The Queen v. Burnshine*, [1975] 1 S.C.R. 693, *Prata v. The Minister of Manpower and Immigration*, [1976] 1 S.C.R. 376, and *Bliss v. A.G. Canada*, [1979] 1 S.C.R. 183, has advanced the proposition that legislation passed by Parliament does not offend against the principle of equality before the law if passed in pursuance of a "valid federal objective". The significance of these words must be examined.

Prior to the passing of the *Canadian Bill of Rights*, Parliament could have passed in the exercise of its power under s. 91(7) of the *British North America Act* without restriction such legislation in respect of the governance and control of the armed forces as it wished. The *Canadian Bill of Rights*, however, has introduced another dimension and federal legislation must now be construed according to its precepts. Certainly the creation and maintenance of the armed forces of the land constitute a valid federal objective within the legislative competence of the federal Parliament. A valid federal objective, however, must mean something more than an objective which simply falls within the federal legislative competence under the *British North America Act*. Even in the absence of the *Canadian Bill of Rights*, a federal enactment could not be supported constitutionally if it did not embody such an objective. The word "valid" in this context must import a concept of validity not only within the field of constitutional legislative competence but also valid in the sense that it does not offend the *Canadian Bill of Rights*. Our task then is to determine whether in pursuit of an admittedly constitutional federal objective Parliament has, contrary to the provisions of the *Canadian Bill of Rights*, created for those subject to military law a condition of inequality before the law.

It seems to me that it is incontestable that Parliament has the power to legislate in such a way as to affect one group or class in society as distinct from another without any necessary offence to the *Canadian Bill of Rights*. The problem arises however when we attempt to determine an acceptable basis for the definition of such a separate class, and the nature of the special legislation involved. Equality in this context must not be synonymous with mere universality of application. There are many differing circumstances and conditions affecting different groups which will dictate different treatment. The question which must be resolved in each case is whether such inequality as may be created by legislation affecting a special class--here the military--is arbitrary, capricious or unnecessary, or whether it is rationally based and acceptable as a necessary variation from the general principle of universal application of law to meet special conditions and to attain a necessary and desirable social objective.

- 67 -

There are many such acceptable distinctions recognized in the law. If we are to have safety on the highways, the blind or those with deficient sight must be forbidden to drive. If young people and children are to be protected and their welfare fostered in youth, we have long recognized that special legislative provisions must be made for them imposing restrictions and limitations upon their freedom more stringent than upon adults. In matters of criminology, differences which have been considered conductive to the welfare of society and to young offenders have been considered permissible (see *Regina v. Burnshine, supra*). There are many such cases where the needs of society and the welfare of its members dictate inequality for the achievement of socially desirable purposes. It would be difficult, if not impossible, to propound an all-embracing test to determine what departures from the general principle of the equal application of law would be acceptable to meet a desirable social purpose without offence to the *Canadian Bill of Rights*. I would be of the opinion, however, that as a minimum it would be necessary to inquire whether any inequality has been created for a valid federal constitutional objective, whether it has been created rationally in the sense that it is not arbitrary or capricious and not based upon any ulterior motive or motives offensive to the provisions of the *Canadian Bill of Rights*, and whether it is a necessary departure from the general principle of universal application of the law for the attainment of some necessary and desirable social objective. Inequalities created for such purposes may well be acceptable under the Canadian Bill of Rights.

Applying this test, it seems to me that the creation of a body of military law and the tribunals necessary for its administration, involving as a necessary incident thereto different treatment at law for servicemen in certain cases from that afforded to civilians, does not by itself constitute a denial of equality before the law contrary to the provisions of the *Canadian Bill of Rights*. It is apparent that the creation of military law and its courts was undertaken in pursuit of a constitutional federal objective. It has been done in my view rationally, not arbitrarily or capriciously, and no ulterior motive has been shown which could be construed as an assault upon any of the rights, liberties and freedoms protected by the *Canadian Bill of Rights*. It seems abundantly clear to me that the emergence of a body of military law with its judicial tribunals has been made necessary because of the peculiar problems which face the military in the performance of its varied tasks. In my opinion, the recognition of the military as a class within society in respect of which special legislation exists dealing with legal rights and remedies, including special courts and methods of trial, fulfilling as it does a socially desirable objective, does not offend the Canadian Bill of Rights.

It must not however be forgotten that, since the principle of equality before the law is to be maintained, departures should be countenanced only where necessary for the attainment of desirable social objectives, and then only to the extent necessary in the circumstances to make possible the attainment of such objectives. The needs of the military must be met but the departure from the concept of equality before the law must not be

- 68 -

greater than is necessary for those needs. The principle which should be maintained is that the rights of the serviceman at civil law should be affected as little as possible considering the requirements of military discipline and the efficiency of the service. With this concept in mind, I turn to the situation presented in this case.

Section 2 of the *National Defence Act* defines a service offence as "an offence under this Act, the *Criminal Code*, or any other Act of the Parliament of Canada, committed by a person while subject to the Code of Service Discipline". The Act also provides that such offences will be triable and punishable under military law. If we are to apply the definition of service offence literally, then all prosecutions of servicemen for any offences under any penal statute of Canada could be conducted in military courts. In a country with a well-established judicial system serving all parts of the country in which the prosecution of criminal offences and the constitution of courts of criminal jurisdiction is the responsibility of the provincial governments, I find it impossible to accept the proposition that the legitimate needs of the military extend so far. It is not necessary for the attainment of any socially desirable objective connected with the military service to extend the reach of the military courts to that extent. It may well be said that the military courts will not, as a matter of practice, seek to extend their jurisdiction over the whole field of criminal law as it affects the members of the armed services. This may well be so, but we are not concerned here with the actual conduct of military courts. Our problem is one of defining the limits of their jurisdiction and in my view it would offend against the principle of equality before the law to construe the provisions of the *National Defence Act* so as to give this literal meaning to the definition of a service offence. The all-embracing reach of the questioned provisions of the *National Defence Act* goes far beyond any reasonable or required limit.

...

It is of course evident that there are many matters peculiar to the military which require a special code and special courts. I refer to what I would describe as specifically military offences, such as absence without leave, desertion, insubordination, failure to observe and comply with military regulations regarding care and handling and use of military store and equipment, failure to obey lawful commands of officers and a host of other matters dealt with in the *National Defence Act* which relate to service matters and concerns and which require special military rules and procedures. These form part of the proper field of military law and military courts. There are, in addition, other offences which, while offences under the civil law, are also, when committed by servicemen in relation to military service, properly to be considered within the scope of the military courts. Theft is a criminal offence punishable in the civil courts but it

would, I suggest, be impossible to say that theft by one soldier from another in barracks is not as well an offence which could be categorized as a military offence and come within the purview of military law. The same is true of trafficking or possession of forbidden narcotics in barracks, the same is true of many other matters and the military courts must have power to deal with them in addition to those offences which could be categorized as military offences pure and simple.

The question then arises: how is a line to be drawn separating the service-related or military offence from the offence which has no necessary connection with the service? In my view, an offence which would be an offence at civil law, when committed by a civilian, is as well an offence falling within the jurisdiction of the courts martial and within the purview of military law when committed by a serviceman if such offence is so connected with the service in its nature, and in the circumstances of its commission, that it would tend to affect the general standard of discipline and efficiency of the service. I do not consider it wise or possible to catalogue the offences which could fall into this category or try to describe them in their precise nature and detail. The question of jurisdiction to deal with such offences would have to be determined on a case-by-case basis. A serviceman charged in a service court who wished to challenge the jurisdiction of the military court on this basis could do so on a preliminary motion. It seems, by way of illustration, that a case of criminal negligence, causing death resulting from the operation of a military vehicle by a serviceman in the course of his duty, would come within the jurisdiction of the court martial, while the same accident, occurring while the serviceman was driving his own vehicle on leave and away from his military base or any other military establishment, would clearly not. It may be observed that, on an admittedly different constitutional basis, this approach has been taken in American courts where a possible conflict of jurisdiction has arisen between the military tribunals and the civil courts.

I would therefore hold that the provisions of the *National Defence Act*, in so far as they confer jurisdiction upon courts martial to try servicemen in Canada for offences which are offences under the penal statutes of Canada for which civilians might also be tried, and where the commission and nature of such offences has no necessary connection with the service, in the sense that their commission does not tend to affect the standards of efficiency and discipline of the service, are inoperative as being contrary to the *Canadian Bill of Rights* in that they create inequality before the law for the serviceman involved.

Turning to the case at bar, I have no difficulty in holding that the offences here under consideration are sufficiently connected with the service to come within the jurisdiction of the military courts. Trafficking

and possession of narcotics, in a military establishment, can have no other tendency than to attack the standards of discipline and effeciency of the service and must clearly come within the jurisdiction of the military courts and I would , therefore, dismiss the appeal.

127.        I adopt the above-quoted reasons in MacKay, supra.

128.        The test which is emphasized throughout those reasons is that of the necessity of a specific discrimination with respect to the attainment of a desirable social objective:

> The question which must be resolved in each case is whether such inequality as may be created by legislation affecting a special class ... is arbitrary, capricious or unnecessary, or whether it is rationally based and acceptable as a necessary variation from the general principle of universal application of law to meet special conditions and to attain a necessary and desirable social objective.

(Emphasis added.)

129.        Furthermore, the test is all the more exacting in that it includes an essential element of proportionality; even where variation from the principle of universal application of the law is justified, the principle cannot be tampered with to a degree or to an extent which goes beyond what is necessary to reach a desirable social objective:

> ... since the principle of equality before the law is to be maintained, departures should be countenanced only where necessary for the attainment of desirable social objectives, and then only to the extent necessary in the circumstances to make possible the attainment of such objectives. The needs of the military must be met but the departure from the concept of equality before the law must not be greater than is necessary for those needs.

(Emphasis added.)

130.        To the extent that a specific discrimination is unnecessary to achieve a valid social objective, it is arbitrary or capricious and in violation of the principle of equality.

131.        It seems to me that this test, including its element of proportionality, clearly extends to the manner or means chosen to achieve a valid federal objective, particularly where this manner or these means introduce the very inequality complained of. This manner or these means must then be carefully scrutinized by the courts and they must be struck down whenever they do not meet the test.

132.        Applying this test to the facts of the case at bar, it evidently cannot be said that the distinction made by s. 29.1 of the *Judges Act* between incumbent judges was necessary to achieve the above-mentioned federal objective. This distinction was effected by the selection of the date of first reading of the bill as a cut-off point to implement the phasing-in feature of the federal enactment and there was clearly no necessity to select this date.

133.        In order to prevent hoarding and other type of speculation, budgetary measures are sometimes enforced from the time they are announced in the House of Commons and there might be similar rational motives to make a law retroactive to the time it was introduced in Parliament. But no such rational motives have been advanced or appear to exist in the case at bar where the selection of the cut-off point, with its discriminatory effect, is entirely arbitrary and capricious. The selection of a cut-off point reaching back two or three years earlier for instance would appear even more

glaringly arbitrary and in my view, in the circumstances of the case at bar, there is no difference in the date of first reading that makes its selection any less arbitrary and capricious than the selection of an earlier date.

134.         It may well be that if Parliament wanted to phase-in the implementation of the new measure and to abide by s. 1(b) of the *Canadian Bill of Rights*, its only choice as to the cut-off date was the date of enactment. The selection of the latter date would admittedly have put all incumbent judges and judges appointed after the date of enactment on a different footing. But that is what "grandfather" clauses are about and it is accepted in the case at bar that "grandfathering" was an essential feature of the valid federal objective pursued by Parliament. The only alternative would be to hold that Parliament could not "grandfather" incumbent judges at all without offending the principle of equality before the law. Nobody has made such a far-reaching submission which would run contrary to a seemingly ancient and constant usage, as was indicated by Addy J. at p. 557 of the Federal Court Reports:

> ... the numerous Canadian statutes effecting judges' salaries enacted since 1846 until 1932 quoted by the defendant . . . clearly establish various categories of compensation for judges of equal rank from time to time, without the slightest objection being raised even indirectly on the grounds that the legislation was discriminatory. It is important to note also, however, that in this legislation whenever required to protect the compensation being paid to incumbents, "grandfather" clauses were inserted in the legislation and that, in the one or two cases where that precaution was not taken at the time of the passing of the legislation, an amending statute was subsequently enacted to rectify the situation. (V.g.: S.C. 1927, c. 33 which reduced the retirement annuity of certain judges to two-thirds of salary was amended by S.C. 1930, c. 27 where retirement at full salary of those judges was restored).

135.         Furthermore, judges appointed after the date of enactment know or are presumed to know the law when they freely accept the appointment, and none of them

- 73 -

has ever been treated on the same footing as judges who have been "grandfathered":
they are members of a new class the creation of which was necessary to attain a valid
federal objective.

136.        Assuming that Parliament is under no constitutional obligation to
"grandfather" any incumbent judge, it may appear anomalous, at first, that it should
be blamed for not "grandfathering" all incumbent judges, but only some of them, albeit
the majority in this case. The apparent anomaly is explained however when it is
remembered that the principle of equality is capable of being offended against by the
uneven granting of favourable treatment within a class, as well as by the uneven
imposition of unfavourable treatment.

137.        In the above-quoted passage of their factum, counsel for the appellant write
that the

> . . . progressive implementation of full contributions protected the
> <u>legitimate expectations</u> of the judges appointed prior to April [*sic*] 17,
> 1975 . . .

(Emphasis added.)

And I note that in his reasons for judgment, the Chief Justice characterizes the same
concept as "the settled expectations" of earlier appointees. With the greatest of respect,
I fail to see why the respondent's expectations were any less settled or legitimate than
those of his fellow judges appointed before the date of first reading of the bill.

- 74 -

138.        Implicit in the position of the appellant is the following proposition: if the respondent, unlike judges appointed before February 17, 1975 could have no expectations susceptible to be protected, it must be because he was put on notice that the *Judges Act* was likely to be amended by the mere fact of first reading of the bill, and he should have been alerted to the risk of changing his position. It is the only rational explanation that comes to mind for the selection of the cut-off date and it is the only one that is inferentially suggested in appellant's factum. It is also an explanation which must have crossed the mind of the trial judge who, at p. 548 of the Federal Court Reports wrote as follows, and correctly so in my view:

> Although one is deemed to know the law of the land, there is no such presumption in the case of Bills not yet enacted. No one is bound by their contents. Having regard to the substantive and progressive emasculation of certain Bills in their stormy passage through Parliament, such Bills as are finally passed into law frequently bear little resemblance either in substance or in form to the original proposal. It would be grossly unjust to impute to anyone, other than perhaps a Member of Parliament, constructive knowledge of the business of Parliament.

139.        The suggestion that the respondent may have been put on notice by the mere fact of first reading is not only factually erroneous in this case where it is conceded that he was unaware of that fact: it is also founded on a dangerous and far-reaching error in law in that it presumes knowledge of and reliance upon a bill as opposed to knowledge of and reliance upon the law.

140.        On January 27, 1976, the Minister of Justice and Attorney General of Canada responded in writing to a letter written to him by the respondent. After stating that the impugned enactment had received Royal Assent on December 20, 1975, with its provisions unchanged, the Minister's letter continues as follows:

1986 CanLII 24 (SCC)

> Prior to this event I had raised your concerns with several of my colleagues and indeed, an attempt was made while the Bill was before the joint House of Commons-Senate Committee to amend the clause so that the higher rate of contributions would apply only to judges appointed to office after the Royal Assent date. Unfortunately, the amendment that would have had this result was ruled out of order on procedural grounds.

141.         In my opinion, this late and unsuccessful attempt to have the bill amended along the lines indicated by the Minister, and the Minister's letter constitute an admission that the bill in question was flawed in that it unnecessarily discriminated against certain incumbent judges.

142.         I have reached the conclusion that s. 29.1(2) of the *Judges Act* is inconsistent with s. 1(b) of the *Canadian Bill of Rights* and that the respondent is entitled to a declaration that this subsection is inoperative in so far as the respondent is concerned.

143.         In addition, the respondent seeks a declaration that the words "before February 17, 1975" in s. 29.1(1) of the *Judges Act* are inoperative in so far as he is concerned. The reason why the respondent is seeking such a declaration, according to his factum, is to avoid being placed on a higher footing than that of his senior colleagues, appointed before February 17, 1975, who at present, have to contribute one and one-half per cent of their salary to the Consolidated Revenue Fund. In other words, the respondent is asking us to remedy one element of inequality with his colleagues, but not at the cost of creating or leaving another element of inequality within the same class of judges.

144.         On the face of it, we could not grant such a declaration at large without creating an insoluble problem: judges appointed after February 16, 1975 would then

have to contribute one and one-half per cent of their salary in addition to the seven per cent they have to contribute under s. 29.1(2). However, no problem would arise, so far as I can see, if the effect of the declaration is limited to the respondent.

145. The respondent is not asking us to redraft the impugned enactment but simply to declare these few words inoperative in so far as he is concerned, in order to restore complete equality within the class to which he belongs. I have reached the conclusion that it is legitimate for him to seek complete redress in a case of this sort and that he is entitled to the full declaration he is requesting.

146. Before I reach my final conclusion, I should perhaps state that a short time before the respondent's appointment, judges' salaries were increased by 39 per cent, and pensions to widowed spouses and children by 50 per cent: An Act to amend the Judges Act and certain other Acts for related purposes and in respect of the reconstitution of the *Supreme Courts of Newfoundland and Prince Edward Island*, S.C. 1974-75-76, c. 48. These increases together with the subsequent enactment of s. 29.1 of the *Judges Act* were sometimes referred to as a "package" and may be relevant to a discussion of the first constitutional question. In my view however, these increases are entirely irrelevant in so far as the second constitutional question is concerned since all incumbent judges profited by these increases, including those appointed before February 17, 1975.

## VI--Conclusion

147. I would allow the appeal, set aside the judgment of the Federal Court of Appeal and the declaration granted by the trial judge. I would allow the cross-appeal

- 77 -

and, to the declaration granted by the trial judge, I would substitute the following declaration:

148.         The words "before February 17, 1975" of s. 29.1(1) and the whole of s. 29.1(2) of the *Judges Act*, as enacted by s. 100 of S.C. 1974-75-76, c. 81, are inoperative in so far as the plaintiff is concerned.

149.         I would answer the first constitutional question in the negative.

150.         I would answer the second constitutional question as follows:

151.         The words "before February 17, 1975" of s. 29.1(1) and the whole of s. 29.1(2) of the *Judges Act* as amended by s. 100 of the *Statute law (Superannuation) Amendment Act, 1975*, S.C. 1974-75-76, c. 81, are inconsistent with s. 1(*b*) of the *Canadian Bill of Rights* and, to the extent of the inconsistency, of no force or effect in so far as the respondent is concerned.

152.         I would allow the respondent his costs throughout.

          *Appeal allowed*, BEETZ and MCINTYRE JJ. *dissenting in part.*

          *Solicitor for the appellant: Roger Tassé, Ottawa.*

          *Solicitor for the respondent: David W. Scott, Ottawa.*

1986 CanLII 24 (SCC)



# TAB20

2010 ONCA 84 (CanLII)

CITATION: Van Breda v. Village Resorts Limited, 2010 ONCA 84
DATE: 20100202
DOCKET: C49188 and C49632

## COURT OF APPEAL FOR ONTARIO

O'Connor A.C.J.O., Weiler, MacPherson, Sharpe and Rouleau JJ.A.

BETWEEN

Morgan Van Breda, Viktor Berg, Joan Van Breda, Tony Van Breda,
Adam Van Breda and Tonnille Van Breda

Plaintiffs (Respondents)

and

Village Resorts Limited, Superclubs International Ltd., Club Resorts Ltd.,
Rene Denis and Sport au Soleil

Defendants (Appellants)

AND BETWEEN

Anna Charron, Estate Trustee of the Estate of Claude Charron, deceased,
the said Anna Charron, personally, Jennifer Candace Charron,
Stephanie Michelle Charron and Christopher Michael Charron

Plaintiffs (Respondents)

and

Bel Air Travel Group Ltd., Hola Sun Holidays Limited, Village Resorts
International Ltd., carrying on business as Superclubs Breezes Costa Verde.
Club Resorts, Ltd., Gaviota SA (Ltd.), Marina Gaviota, Leonardo Vega Ricardo
and Andreas Oscar Sanchez Ricardo

Defendants (Appellant)

John A. Olah, for the appellant, Club Resorts Ltd. in Van Breda

Page: 2

Peter J. Pliszka and Robin P. Roddey, for the appellant, Club Resorts Ltd. in Charron

Chris G. Paliare, Robert A. Centa and Tina H. Lie, for the respondents, in Van Breda

Jerome R. Morse, John Adair and Lori Stoltz, for the respondents, in Charron

Howard Borlack, Lisa La Horey and Sabine Kharabian, for the respondent, Bel Air Travel Group Ltd.

Catharine H. Buie, for the respondent, Hola Sun Holidays Ltd.

John Terry and Charles W. Finlay, for the intervener The Tourism Industry Association of Ontario

Allan Rouben, for the intervener Ontario Trial Lawyers Association

Heard: October 5 and 6, 2009

On appeal from the order of Justice L.A. Pattillo of the Superior Court of Justice dated July 3, 2008, with reasons reported at 60 C.P.C. (6th) 186, and the from the order of Justice G.M. Mulligan of the Superior Court of Justice dated October 10, 2008, with reasons reported at 92 O.R. (3d) 608.

**Sharpe J.A.:**

[1]     These appeals involve the issue of when Ontario courts should assume jurisdiction over out-of-province defendants. Both cases involve claims for personal injury damages occasioned as a result of accidents suffered by Canadian tourists at resorts in Cuba. In both matters, the motion judges found that Ontario should assume jurisdiction against the out-of-province defendants. When the cases were first argued, the appellants did not challenge the test for assumed jurisdiction laid down by this court in the "*Muscutt* quintet": *Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 (C.A.); *Leufkens v. Alba Tours*

2010 ONCA 84 (CanLII)

*International Inc.* (2002), 60 O.R. (3d) 84 (C.A.); *Lemmex v. Bernard* (2002), 60 O.R. (3d) 54 (C.A.); *Sinclair v. Cracker Barrel Old Country Store Inc.* (2002), 60 O.R. (3d) 76 (C.A.); *Gajraj v. DeBernardo* (2002), 60 O.R. (3d) 68 (C.A.). The court subsequently directed that a five judge panel be established to permit us to reconsider the *Muscutt* test. On the re-argument, the appellants, supported by one intervener, submitted that we should essentially abandon the *Muscutt* test in favour of an approach based on the Uniform Law Conference model *Court Jurisdiction and Proceedings Transfer Act ("CJPTA")* and refuse jurisdiction. The respondents, supported by another intervener, essentially supported retention of a modified *Muscutt* test, and submitted that they satisfy the appropriate jurisdictional standard.

**FACTS**

**I. Charron**

[2] In January 2002, Claude Charron and his wife, the respondent Anna Charron, visited the Barrie office of the appellant Bel Air Travel Group Ltd., a travel agency which offers all-inclusive vacation packages to Cuba and other Caribbean destinations. The couple had decided to take a vacation to the Caribbean so that Claude could engage in scuba diving, having recently been certified as a scuba diver.

[3] The Bel Air representative recommended Cuba as a good place for scuba diving and provided the Charrons with a brochure from the appellant Hola Sun Holidays Ltd., an Ontario tour operator offering fixed-price vacation packages to Cuba. The brochure listed scuba diving as an included feature of an all-inclusive package at Breezes Costa

2010 ONCA 84 (CanLII)

Page: 4

Verde, a Cuban resort described as a "SuperClubs gem". This resort was owned by
Gaviota SA (Ltd.), a Cuban company. Club Resorts Ltd. ("CRL"), incorporated in the
Cayman Islands, manages Breezes Costa Verde on behalf of Gaviota, and is responsible
for training, motivation, and direction of staff and for promoting and marketing the resort
internationally. CRL also has an agreement with Hola Sun pursuant to which CRL
provides resort accommodation to Hola Sun for inclusion in package tours for sale to
tourists such as the Charrons.

[4]    CRL is part of the SuperClubs group of companies. It is incorporated and has its
head office in the Cayman Islands. Village Resorts International Ltd., (according to the
statement of defence, a misnomer for VRL International) another SuperClub entity, owns
trademarks, including "Breezes" and "SuperClubs"; pursuant to a license agreement,
these brands are used by CRL in connection with inclusive vacation holidays at resorts it
manages, promotes and markets, including Breezes Costa Verde.

[5]    The one-week all-inclusive package for two at Breezes Costa Verde that the
Charrons purchased through Bel Air and from Hola Sun included scuba diving at the
resort. The Charrons arrived at the resort on February 8, 2002. On February 11, Claude
went scuba diving without incident. The following day, however, Claude died during his
dive.

[6]    The respondent members of the Charron family brought an action based on breach
of contract and negligence on behalf of the estate of Claude Charron and also on their
own behalf pursuant to provisions of the *Family Law Act*, R.S.O. 1990, c.F.3.    The

2010 ONCA 84 (CanLII)

amended statement of claim (the "statement of claim") names two Ontario defendants, Bel Air, Hola Sun, and several foreign defendants: CRL, Village Resorts International Ltd., Gaviota SA (Ltd.), Marina Gaviota (the provider of scuba diving equipment and personnel), Leonardo Vega Ricardo (recreational diving instructor at the marina), and Andres Oscar Sanchez Ricardo (captain of the diving boat).

[7] For service on out-of-province defendants, the statement of claim alleges that the contract was made in Ontario (rule 17.02(f)(i)) and that the damages sustained from the breach of contract and in tort have been sustained in Ontario (rule 17.02(h)).

[8] CRL and VRL International Ltd brought a motion to dismiss the action against them on the basis that Ontario did not have jurisdiction or, alternatively, to stay the action on the grounds that Ontario was not the most appropriate forum.

**II. Van Breda**

[9] In early June 2003, the appellants Morgan Van Breda and Victor Berg, who had lived in Toronto since September 2002, travelled from Toronto for a one-week stay at the SuperClubs Breezes Jibacoa resort (the "resort") in Cuba. The trip had been arranged by Berg, a professional squash player, through the appellant Rene Denis who, from his home in Ottawa, operated a web-based business under the name Sport au Soleil. Denis arranged bookings for squash, tennis, and aerobics instructors who agreed to instruct at certain Caribbean resorts for a few hours each day in exchange for accommodation for two people at the resort. Denis had an arrangement with CRL to find instructors for CRL resorts. Berg and Van Breda selected the resort from those indicated as being available

2010 ONCA 84 (CanLII)

Page: 6

on Sport au Soleil's website and by looking at the websites of the various resorts and SuperClub brochures obtained from travel agents in Ontario.

[10]   All the arrangements were made through Denis. Berg paid Denis a fee of US$200. Berg paid for his own airfare and that of his common law spouse Van Breda. After making the arrangements with Denis, Berg received a letter from Denis on letterhead bearing the words "SuperClubs Cuba – Tennis" confirming the dates, providing information on what to do upon arrival at the airport, and outlining Berg's role as a tennis instructor for two one-hour sessions per day at times to be determined by the resort, in exchange for accommodation with a guest in a shared room, including all meals and drinks and transportation to and from the hotel.

[11]   Shortly after arriving at the resort, Berg and Van Breda went to the beach, where Berg did some chin-ups using a tubular metal apparatus, variously described as a chin-up bar and a soccer goal.   When Van Breda attempted to do chin-ups, the apparatus collapsed, sending her to the ground and collapsing on top of her.   Van Breda was seriously injured as a result.   She was rendered a paraplegic, has undergone extensive treatment and has suffered serious complications.  Because of the injury, Van Breda and Berg did not return to Ontario as they had intended.  Shortly after her fall, Van Breda was taken to Calgary, Alberta, the home of her family.  She and Berg have since moved to British Columbia, where they currently reside.

[12]   The respondents commenced this action in May 2006 for personal injury damages, punitive damages and damages for loss of support, care, guidance and companionship

2010 ONCA 84 (CanLII)

pursuant to the *Family Law Act*, R.S.O. 1990, c.F.1. The fresh as amended statement of claim (the "statement of claim") names as defendants Denis, Sport du Soleil, SuperClubs International Ltd., CRL and Village Resorts Limited, both controlled by SuperClubs International. The owner of the resort is a Cuban corporation not named as a party to this action. Pursuant to a detailed agreement with the Cuban owner, CRL was solely responsible for the operation and management of the resort, the training and management of the staff, and for advertising and promoting the resort in international markets.

[13]    The statement of claim is framed as one for breach of contract and negligence. For purposes of service on the out-of-province defendants, the statement of claim alleges that the contract was made in Ontario (rule 17.02(f)(i)); that the defendants carry on business in Ontario (rule 17.02(p)); that damages were sustained in Ontario (rule 17.02(h)); and that the out-of-province defendants are necessary and proper parties to a proceeding properly brought against another person served in Ontario (rule 17.02(o)).

[14]    All defendants moved to dismiss the action for want of jurisdiction or to stay the action on grounds of *forum non conveniens*.

## REASONS OF THE MOTION JUDGES

### I.    Charron

#### 1)    Real and Substantial Connection

[15]    Noting the guiding principles of order and fairness, set out by the Supreme Court of Canada in *Hunt v. T&N PLC*, [1993] 4 S.C.R. 289, the motion judge applied the eight factor *Muscutt* test to determine whether there was a real and substantial connection

2010 ONCA 84 (CanLII)

between the action and Ontario that could justify the assumption of jurisdiction by the Ontario courts.

### (i)    The connection between Ontario and the plaintiff's claim

[16]    The motion judge noted that Anna Charron resides in Ontario and that her damages for loss of love, care, guidance and companionship pursuant to the *Family Law Act* and damages for loss of future income continue in Ontario. Claude Charron saw the advertisement for the resort in Ontario, and Bel Air booked the vacation through Hola Sun, an Ontario company which had an agreement with CRL to promote the resort to Ontario residents. The motion judge concluded that it could be reasonably argued that a contract was entered into in Ontario not only for the vacation, but also for the constituent parts, including scuba diving. This factor weighed in favour of Ontario assuming jurisdiction.

### (ii)    The connection between Ontario and the defendants

[17]    The motion judge noted that Cuban resorts rely heavily on international markets and that Canada, and Ontario in particular, provides a large portion of the tourists purchasing vacation packages. CRL manages Cuban resorts and has a legal obligation to market them internationally. Hola Sun, in turn, advertises these resorts in Ontario and uses the SuperClubs trademarks to do so. The motion judge found that through the marketing agreement with Hola Sun, CRL has a connection to Ontario.

### (iii)    Unfairness to the defendant in assuming jurisdiction

[18]    The motion judge found that any unfairness to the foreign defendants must be balanced against the unfairness to the plaintiffs. Some witnesses for the defence may

2010 ONCA 84 (CanLII)

Page: 9

have to come from Cuba, and travel or immigration restraints may make this difficult or impossible. However, alternative arrangements for obtaining evidence could be arranged. On the other hand, the plaintiffs and the other Ontario residents have a number of witnesses in Ontario. The motion judge noted that insurance is a factor mitigating against unfairness to the defendant.

### *(iv)    Unfairness to the plaintiff in not assuming jurisdiction*

[19]    The motion judge noted that if the trial were to proceed in Cuba, the plaintiffs and their witnesses, as well as the Ontario defendants, would be required to travel there. The expert evidence indicated the availability of a fair trial in Cuba, but the plaintiffs would not have a *Family Law Act*-type claim there. Anna Charron's claim for damages for pain and suffering would also be hampered.

### *(v)    Involvement of other parties to the suit*

[20]    Both Hola Sun and Bel Air are Ontario corporations who defended the action and brought cross-claims. They oppose the motion of the foreign defendants. The motion judge held that their involvement favoured assuming jurisdiction and distinguished this case from *Leufkens* and *Lemmex*, where the court found that Ontario lacked jurisdiction, on the basis that in those cases the harm suffered did not result from activities covered by a contract made in Ontario but rather as a result of services purchased in the foreign jurisdiction.

2010 ONCA 84 (CanLII)

### (vi)   The court's willingness to recognize and enforce a similar judgment against a domestic defendant rendered on the same jurisdictional basis

[21]   The motion judge found that since CRL advertised extensively in Ontario through the Hola Sun agreement, marketing to and soliciting Ontario residents to travel to their resort in Cuba, it would be unfair to assert that it has no connection to Ontario and wash its hands of the jurisdiction.

### (vii)   Whether the case is international or interprovincial in nature

[22]   The motion judge noted that as this case is international in nature, assumed jurisdiction is more difficult to justify.

### (viii)   Comity and the standards of jurisdiction, recognition and enforcement prevailing elsewhere

[23]   The motion judge stated that there are no Cuban treaties, conventions or other such agreements providing for reciprocal enforcement of judgments with Ontario, and that Cuba does not provide for any type of claim comparable to an Ontario *Family Law Act* claim for loss of care, guidance and companionship.  The motion judge also noted that CRL and Village Resorts International Ltd. are not Cuban companies and that if the plaintiffs were forced to litigate there, they would have to take further steps to have the judgment enforced in the Cayman Islands.

### (ix) Conclusion: real and substantial connection

[24]   The motion judge concluded that the defendant Village Resorts Limited was a mere licensor of trademarks and that there is no real and substantial connection.  The action against Village Resorts International Ltd. was dismissed.  With respect to CRL, the motion judge found that Ontario does have jurisdiction to hear the case.

2010 ONCA 84 (CanLII)

Page: 11

### 2)   Forum Non Conveniens

[25]   The motion judge noted the ongoing damages in Ontario, the location of witnesses in Ontario and Cuba, the availability of experts on Cuban law, and the fact that the foreign corporations are not domiciled in Cuba though they argued for a trial there. Most significant was the lack of a *Family Law Act*-type claim if the matter were to proceed in Cuba. Having regard to these factors, the motion judge concluded that Ontario is clearly the most appropriate forum for the dispute.

### 3)   Conclusion

[26]   Accordingly, the motion judge dismissed the action against Village Resorts International Ltd. but refused to dismiss or stay the action against CRL.

## II.   Van Breda

### 1)   Real and Substantial Connection

[27]   The motion judge cited and applied the eight factor *Muscutt* test to determine whether there was a real and substantial connection between the action and Ontario to justify the assumption of jurisdiction by the Ontario courts.

#### *(i)   The connection between Ontario and the plaintiff's claim*

[28]   The motion judge found that, based on the statement of claim, there was an arguable case that the plaintiffs' agreement to attend the resort was entered into in Ontario and that Denis was acting "in part at least" as Club Resort's agent for the purpose of arranging their visit to the resort. As the plaintiffs did not return to Ontario, no damage was suffered in Ontario, although in cross-examination Van Breda testified that had the accident not occurred, they would have returned to and remained in Ontario. The

2010 ONCA 84 (CanLII)

motion judge concluded that despite the fact that the plaintiffs had ceased to be Ontario residents and had suffered no damage in Ontario, there was a good arguable case that the agreement was entered into in Ontario, and that this established "a significant connection between the plaintiffs claim and Ontario".

### (ii)    The connection between Ontario and the defendants

[29]    The motion judge found that there was no evidence that SuperClubs International had any involvement in or connection to Ontario. Likewise there was no evidence that Village Resorts Limited had any direct interest in the resort or that it was involved in any aspect of its management or operations. However, CRL had entered into various agreements with Ontario tour operators and CRL had the arrangement with Denis. While he did not consider the tour operator agreements to be sufficient to constitute a significant connection with Ontario, the motion judge found that CRL's arrangement with Denis in actively seeking professional instructors in Ontario and the contract it entered with Berg through Denis constituted "a significant connection between CRL and Ontario in connection with the claim being advanced by the plaintiffs, giving rise to a strong basis for assuming jurisdiction against it".

### (iii)    Unfairness to the defendant in assuming jurisdiction

[30]    The motion judge gave little weight to the submission that the assumption of jurisdiction by Ontario would be unfair to the defendants. The *Muscutt* quintet recognized the unfairness in Ontario assuming jurisdiction against foreign service providers in the tourism industry who confine their activities to their home jurisdiction. However, by entering into its arrangement with Denis, CRL had not confined its

Page: 13

activities to Cuba. The motion judge found that the difficulties the defendants would face in having witnesses testify in Ontario were not insurmountable. Moreover, the fact that the defendants had obtained liability insurance to protect them if sued in other jurisdictions indicated that they were aware that their activities could involve them in lawsuits in foreign jurisdictions, including Canada.

### (iv)    Unfairness to the plaintiff in not assuming jurisdiction

[31]    The motion judge found that while no other Canadian jurisdiction was available to the plaintiffs, they could sue in Cuba provided they joined the Cuban company that owned the resort. However, the motion judge expressed the concern that the communist regime in Cuba may exercise undue control over the judicial system, thereby creating uncertainty with respect to the fairness of the Cuban legal system. The motion judge concluded that "the balance of fairness debate tips in favour of the plaintiff".

### (v)    Involvement of other parties to the suit

[32]    The motion judge found that as the core of the plaintiffs' action was the claim against the foreign defendants, the involvement of Denis and Sport au Soleil did not strengthen the case for assumed jurisdiction against the foreign defendants.

### (vi)    The court's willingness to recognize and enforce a similar judgment against a domestic defendant rendered on the same jurisdictional basis

[33]    As CRL did not confine its activities to Cuba, the motion judge found that the assumption of jurisdiction would not set a standard that did not already exist in Ontario and elsewhere.

### *(vii) Whether the case is international or interprovincial in nature*

[34]   As the moving parties were all foreign defendants, the motion judge found that this factor weighed against assumption of jurisdiction.

### *(viii) Comity and the standards of jurisdiction, recognition and enforcement prevailing elsewhere*

[35]   No evidence was led as to the rules of jurisdiction, recognition or enforcement in any other relevant foreign jurisdiction and, accordingly, the judge gave no weight to this factor.

### *(ix) Conclusion: real and substantial connection*

[36]   The motion judge concluded that the balance favoured Ontario assuming jurisdiction against CRL given its connection with Ontario and the subject matter of the action, but that jurisdiction should not be assumed against the other two foreign defendants.

[37]   Denis and Sport au Soleil do not appeal the motion judge's finding that as they were resident in Ontario and had been served in Ontario, the real and substantial connection test did not apply and the court had jurisdiction over them.

### 2)   Forum non conveniens

[38]   The motion judge considered the evidence regarding what witnesses would be called and what issues would be litigated.   The motion judge concluded that it could not be said that Cuba was clearly a more appropriate jurisdiction to try the action than Ontario and accordingly dismissed the defendants' *forum non conveniens* motion.

2010 ONCA 84 (CanLII)

Page: 15

### 3)    Conclusion

[39]    Accordingly, the motion judge dismissed the action against Village Resorts Limited and SuperClubs International Ltd. and refused to dismiss or stay the action against CRL, Rene Denis and Sport au Soleil.

**ISSUES**

[40]    The following three issues arise on these appeals brought by CRL against the decisions refusing to dismiss the actions for want of jurisdiction or to stay the actions on grounds of *forum non conveniens*:

> (1)    Should the *Muscutt* test for assumed jurisdiction against out-of-province defendants be retained, revised or abandoned in favour of some other test?
>
> (2)    Should Ontario assume jurisdiction under the appropriate test for assumed jurisdiction in the circumstances of these cases?
>
> (3)    If there is jurisdiction, did the motion judges err in refusing to grant a stay on grounds of *forum non conveniens*?

**ANALYSIS**

***Should the Muscutt test for assumed jurisdiction against out-of-province defendants be retained, revised or abandoned in favour of some other test?***

### I.    The Muscutt test

[41]    The *Muscutt* quintet all dealt with claims for damages sustained in Ontario as a result of torts committed outside the province. *Muscutt* reflected an attempt to guide the courts in determining when jurisdiction should be assumed against an extra-provincial defendant in such cases, in light of the significant changes brought about by *Moran v.*

2010 ONCA 84 (CanLII)

Page: 16

*Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393, and a series of seminal judgments that rewrote the law of jurisdiction and enforcement of judgments.

[42]   *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, and *Hunt* laid down, for the first time, a common law test for assumed jurisdiction and enforcement of foreign judgments based on the idea of "real and substantial connection" and respect for the principles of "order and fairness". The reach of provincial jurisdiction against extra-provincial defendants was limited to cases that met the "real and substantial connection" test, and also required the courts of one province to recognize and enforce judgments of another province where the jurisdiction asserted by that other province satisfied the real and substantial connection test. In *Beals v. Saldhana*, [2003] 3 S.C.R. 416, the Supreme Court held that the real and substantial connection test also applied to the recognition and enforcement of foreign judgments. *Tolofson v. Jensen; Lucas (Litigation Guardian of) v. Gagnon*, [1994] 3 S.C.R. 1022, overruled the long-standing choice of law for tort cases that gave the law of the forum prominence, and introduced the rule that tort cases are to be decided on the basis of the law of the place where the tort was committed. *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897, elaborated the doctrine of *forum non conveniens,* the discretionary power of the courts to decline to exercise jurisdiction where the case is more appropriately dealt with in another jurisdiction.

[43]   As we noted in *Muscutt*, at paras. 36-37, in these cases, the Supreme Court of Canada described the real and substantial connection test in deliberately general language

2010 ONCA 84 (CanLII)

to allow for flexibility in its application. In *Tolofson*, at p. 1049, the Court described a

real and substantial connection as "a term not yet fully defined". In *Hunt*, at p. 325, the

Court observed that *Morguard* had not defined "[t]he exact limits of what constitutes a

reasonable assumption of jurisdiction" and added that "no test can perhaps ever be rigidly

applied" as "no court has ever been able to anticipate" all the possible circumstances.

The Court added that the real and substantial connection test "was not meant to be a rigid

test, but was simply intended to capture the idea that there must be some limits on the

claims to jurisdiction" and that "the assumption of and the discretion not to exercise

jurisdiction must ultimately be guided by the requirements of order and fairness, not a

mechanical counting of contacts or connections". To the same effect is the more recent

decision in *Pro-Swing v. Elta Golf Inc.* [2006] 2 S.C.R. 612, at para. 21, stating that the

real and substantial connection test "is flexible and its formulation has allowed it to be

applied to various evolving circumstances." See also *Castillo v. Castillo,* [2005] 3 S.C.R.

870, at para. 45, per Bastarache J.:

> The flexibility of the approach used to determine jurisdiction
> is reflected in the unanimous decision of the Ontario Court of
> Appeal in *Muscutt*, which identifies the factors which ought
> to be considered...These factors are not strictly concerned
> with the connection of the forum to the parties and the cause
> of action. Instead, these factors reflect important policy
> considerations such as fairness, comity and efficiency.

[44]    These pleas for flexibility echo Dickson J.'s comments in *Moran,* at p. 408, that it

would be "unnecessary, and unwise, to have resort to any arbitrary set of rules" for

jurisdiction and that an "arbitrary and inflexible" approach is to be avoided.

2010 ONCA 84 (CanLII)

[45]   However, the need for order and predictability necessarily imposes limits on flexibility and an important feature of *Morguard*, *Hunt* and *Tolofson* was the insistence upon jurisdictional restraint and order as well as fairness. *Morguard* held, at p. 1103, that "fairness to the defendant requires that the judgment be issued by a court acting through fair process and with properly restrained jurisdiction". *Tolofson*, at p. 1049, described one effect of the real and substantial connection test as being "[t]o prevent overreaching" and "preventing a court from entering into matters in which the jurisdiction in which it is located has little interest".

[46]   In *Muscutt*, it was against this background that, at paras. 75-76, we concluded as follows:

> It is apparent from *Morguard*, *Hunt* and subsequent case law that it is not possible to reduce the real and substantial connection test to a fixed formula. A considerable measure of judgment is required in assessing whether the real and substantial connection test has been met on the facts of a given case. Flexibility is therefore important.
>
> But clarity and certainty are also important. As such, it is useful to identify the factors emerging from the case law that are relevant in assessing whether a court should assume jurisdiction against an out-of-province defendant on the basis of damage sustained in Ontario as a result of a tort committed elsewhere. No factor is determinative. Rather, all relevant factors should be considered and weighed together.

[47]   We then laid down the now familiar eight factors to be used to determine whether there was a real and substantial connection sufficient to support the assumption of jurisdiction in such cases:

2010 ONCA 84 (CanLII)

Page: 19

1) The connection between the forum and plaintiff's claim;

2) The connection between the forum and defendant;

3) Unfairness to the defendant in assuming jurisdiction;

4) Unfairness to the plaintiff in not assuming jurisdiction;

5) The involvement of other parties to the suit;

6) The court's willingness to recognize and enforce an extra-provincial judgment rendered on the same jurisdictional basis;

7) Whether the case is interprovincial or international in nature; and

8) Comity and the standards of jurisdiction, recognition and enforcement prevailing elsewhere.

[48]   We pointed out, at paras. 42-43, the importance of distinguishing the real and

substantial connection test from the *forum non conveniens* doctrine:

> While the real and substantial connection test is a legal rule, the *forum non* conveniens test is discretionary. The real and substantial connection test involves a fact-specific inquiry, but the test ultimately rests upon legal principles of general application. The question is whether the forum can assume jurisdiction over the claims of plaintiffs in general against defendants in general given the sort of relationship between the case, the parties and the forum. By contrast, the *forum non conveniens* test is a discretionary test that focuses upon the particular facts of the parties and the case. The question is whether the forum should assert jurisdiction at the suit of this particular plaintiff against this particular defendant.

[49]   At para. 41, we described the different list of factors used to assess a claim of

*forum non conveniens*:

> Courts have developed a list of several factors that may be considered in determining the most appropriate forum for the action, including the following:
>
> - the location of the majority of the parties

- the location of key witnesses and evidence

- contractual provisions that specify applicable law or accord jurisdiction

- the avoidance of a multiplicity of proceedings

- the applicable law and its weight in comparison to the factual questions to be decided

- geographical factors suggesting the natural forum

- whether declining jurisdiction would deprive the plaintiff of a legitimate juridical advantage available in the domestic court

## II.   Post-*Muscutt developments*

[50]   Since *Muscutt* was decided seven years ago, there have been a number of developments that make it appropriate for us to consider whether the test we adopted then should now be retained, modified, simplified or abandoned in favour of a different approach.

[51]   First, the *Muscutt* quintet all dealt with assumed jurisdiction in cases where the link to Ontario was "damages sustained within the jurisdiction". However, it has been assumed that the *Muscutt* test has wider application, and the eight factor test has been routinely used to assess real and substantial connection in all cases of assumed jurisdiction. We now have a very significant body of experience and case law that can be used to gauge the workability and appropriateness of the *Muscutt* test in cases across a wider range of fact situations. As Vaughan Black and Mat Brechtel aptly put it in "Revising *Muscutt*: The Ontario Court of Appeal Takes Another Look" (2009) 36 Adv.

2010 ONCA 84 (CanLII)

Page: 21

Q. 35, at p. 36, "It is not surprising that after seven years in the trenches *Muscutt* would be due for a tune-up."

[52]   Second, since *Muscutt*, there have been other developments in the jurisprudence, namely, the decisions of the Supreme Court of Canada in *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, dealing with assumed jurisdiction on the basis of damages sustained within the jurisdiction under the *Civil Code of Quebec*, S.Q. 1991, c. 64, and *Beals* dealing with the recognition and enforcement of foreign judgments. *Muscutt* has also been considered by appellate courts in other provinces and was referred to by the Supreme Court of Canada in *Castillo*.  While the *Muscutt* test has generally been followed and applied, it has not escaped criticism in the case law: see e.g. *Coutu v. Gauthier (Estate)* (2006), 264 D.L.R. (4th) 319 (N.B.C.A.) ; *Black v. Breeden* (2009), 309 D.L.R. (4th) 708 (S.C.J.)

[53]   Third, the Uniform Law Conference of Canada has developed a model *Court Jurisdiction and Proceedings Transfer Act* ("*CJPTA*"), together with another model act on the enforcement of judgments.  These model acts are intended to implement uniform statutory rules by which all Canadian courts establish jurisdiction over particular proceedings.  *CJPTA* has been adopted in four Canadian jurisdictions.  The first to enact it (with minor modifications) was Saskatchewan: *Court Jurisdiction and Proceedings Transfer Act*, S.S. 1997, c. C-41.1.  Next was the Yukon Territory (also with minor modifications): *Court Jurisdiction and Proceedings Transfer Act*, S.Y. c. 64 a. 3136. Nova Scotia and British Columbia have also adopted *CJPTA*: *Court Jurisdiction and*

2010 ONCA 84 (CanLII)

Page: 22

*Proceedings Transfer Act*, S.N.S. 2003, c. 2; *Court Jurisdiction and Proceedings Transfer Act*, S.B.C. 2003, c. 28. In addition, the Alberta Law Institute in its Report No. 94, 2008, *Enforcement of Judgments* recommends enactment of ULCC package of acts, including the *Uniform Court Jurisdiction and Proceedings Act*, as does the Manitoba Law Reform Commission Report 119, 2009 (both with some modifications). The Ontario Law Commission is currently studying the issue and has published a consultation paper: *Reforming the Law of Crossborder Litigation: Judicial Jurisdiction* (March, 2009). The appellants urge us to adopt the test for jurisdiction prescribed by *CJPTA*.

[54]     Fourth, since *Muscutt* was decided, the concept of "forum of necessity" or "forum of last resort" has emerged as a significant jurisdictional doctrine. This doctrine allows the forum to take jurisdiction in cases despite the absence of a real and substantial connection where there is no other forum in which the plaintiff could reasonably seek relief. "Forum of necessity" is recognized by Article 3136 of the Quebec *Civil Code*, incorporated in s. 6 of *CJPTA*, adopted by both the EU and the UK, and was hinted as a possible basis for jurisdiction by this court in *Bouzari v. Islamic Republic of Iran* (2004), 71 O.R. (3d) 675 (C.A.), at paras. 36-38: see also Janet Walker, "*Muscutt* Misplaced: The Future of Forum of Necessity Jurisdiction in Canada" (2009) 48 C.B.L.J. 135. The appellants submit that the *Muscutt* test was formulated so that the reach of assumed jurisdiction was wide enough to accommodate certain extraordinary cases where plaintiffs cannot present their case elsewhere. As these cases can now be dealt with

directly through the forum of necessity doctrine, they argue that a narrower test for assumed jurisdiction may safely be applied to other cases.

[55]     Fifth, the *Muscutt* test has been critically assessed by a number of legal scholars in academic articles: see Vaughan Black & Mat Brechtel, "Revising *Muscutt*: The Ontario Court of Appeal Takes Another Look" (2009) 36 Adv. Q. 35; Vaughan Black & Stephen G.A. Pitel, "Reform of Ontario's Law on Jurisdiction" (2009) 47 C.B.L.J. 469; Janet Walker, "*Muscutt* Misplaced: The Future of Forum of Necessity Jurisdiction in Canada" (2009) 48 C.B.L.J. 135; Jean-Gabriel Castel, "The Uncertainty Factor in Canadian Private International Law" (2007) 52 McGill L.J. 555; Tanya J. Monestier, "A 'Real and Substantial' Mess: The Law of Jurisdiction in Canada" (2007) 33 Queen's L.J. 179; Stephen G.A. Pitel & Cheryl D. Dusten, "Lost in Transition: Answering the Questions Raised by the Supreme Court of Canada's New Approach to Jurisdiction" (2006) 85 Can. Bar Rev. 61; Joost Blom, Q.C. & Elizabeth Edinger, "The Chimera of the Real and Substantial Connection Test" (2005) 38 U.B.C. L. Rev. 373; Cheryl D. Dusten and Stephen G.A. Pitel, "The Right Answers to Ontario's Jurisdictional Questions: Dismiss, Stay or Set Service Aside" (2005) 30 Adv. Q. 297; Elizabeth Edinger, "*Spar Aerospace*: A Reconciliation of *Morguard* with the Traditional Framework for Determining Jurisdiction" (2003) 61 *Advocate* 511; Janet Walker, "Beyond Real and Substantial Connection: The *Muscutt* Quintet" (2002) Ann. Rev. of Civil Lit. 61.

[56]     This extensive body of writing provides us with a wide range of assessments of the *Muscutt* test from experts in the field that we can and should take into account along with

2010 ONCA 84 (CanLII)

Page: 24

the experience reflected by the case law. Many scholars who have written on the subject have expressed disagreement with the *Muscutt* test. These criticisms of *Muscutt* arise from what many legal scholars perceive to be undue complexity and lack of predictability in the eight factor test. These concerns may be summarized as follows:

1)   the *Muscutt* test is too subjective and confers too much discretion on motion judges;

2)   the eight-part test is too complicated and too flexible and therefore leads to inconsistent application;

3)   there is too much overlap of the test for jurisdiction with the test for *forum conveniens*;

4)   a clearer, more black-letter test should be applied to foster international trade and to avoid the cost and delay of preliminary skirmishing over jurisdiction;

5)   the *Muscutt* test allows ill-defined fairness considerations to trump order in an area of the law where order should prevail;

6)   the *Muscutt* framework, and especially the fairness factor, is susceptible to forum shopping, threatening to cause an influx of litigants to Ontario;

7)   lack of predictability and certainty increases litigation costs and jurisdictional motions can be used as dilatory tactics to impede meritorious claims;

8)   it is wrong to look to foreign court practice as a model for appropriate assertion of jurisdiction.

[57]   On the other hand, some scholars support *Muscutt*. These commentators argue that:

1)   the eight-part *Muscutt* test is consistent with the overriding principles of order *and* fairness laid out by the Supreme Court of Canada in *Morguard* and *Hunt* and no Supreme Court of Canada jurisprudence has called *Muscutt* into question;

2010 ONCA 84 (CanLII)

2) the real and substantial connection test, as interpreted in *Muscutt*, properly balances fairness to the plaintiff against fairness to the defendant, as required by *Morguard*;

3) the criticism that *Muscutt* leaves too much discretion to the motion judge and yields unpredictable results is unjustified. Given the range and diversity of cases that come before the courts, the search for certainty is illusory and some degree of uncertainty is unavoidable unless we were to adopt an inflexible, "bright line" test, like the "place of acting" theory rejected 35 years ago: see *Moran;*

4) moving some of the *Muscutt* factors out of "real and substantial connection" and into *forum non conveniens* would lead to more, not less, discretion and uncertainty because *forum non conveniens* is explicitly more discretionary that the test for jurisdiction *simpliciter*.

[58]   It is against this background of post-*Muscutt* legal developments that I proceed to consider the submissions of the parties and interveners.

## III.   The CJPTA model

[59]   The appellants and the intervener Tourism Industry Association of Ontario urge us to adopt a common law test modelled on *CJPTA*.

[60]   As *CJPTA* represents a significant effort to restate and update the modern Canadian law of jurisdiction, and given the importance attached to it by the appellants, it is appropriate to consider its purpose and operation in some detail. For convenience, I have attached the text of the key provisions of *CJPTA* relevant to this appeal as Appendix A to these reasons.

[61]   The Drafters' Introductory Comments state the four main purposes of *CJPTA*:

Page: 26

1) to replace the widely different jurisdictional rules currently used in Canadian courts with a uniform set of standards for determining jurisdiction;

2) to bring Canadian jurisdictional rules into line with the principles laid down by the Supreme Court of Canada in *Morguard* and *Amchem;*

3) by providing a uniform jurisdictional standard, to provide an essential complement to the rule of nation-wide enforceability of judgments in the uniform *Enforcement of Canadian Judgments Act*; and

4) to provide, for the first time, a mechanism by which the superior courts of Canada can transfer litigation to a more appropriate forum in or outside Canada, if the receiving court accepts such a transfer.

[62]    The transfer provisions are an important feature of *CJPTA*, but as they do not bear

directly on the issues raised on this appeal, I do not propose to review their operation in

detail.

[63]    In order to achieve the first three purposes, s. 3 sets out five grounds for the

assertion of jurisdiction against a person, namely:

1) the person is the plaintiff and the proceeding in question is a counterclaim;

2) the person has submitted to the jurisdiction;

3) the person has agreed that the court has jurisdiction;

4) the person is ordinarily resident in the jurisdiction at the time of the commencement of the proceeding;

5) there is a real and substantial connection between the jurisdiction and the facts on which the proceeding is based.

[64]    With the exception of point 4, which replaces residence at the jurisdiction time of

commencement of the proceeding for service of process in the jurisdiction, this catalogue

essentially reflects the present state of the common law of jurisdiction as interpreted in

2010 ONCA 84 (CanLII)

*Muscutt*. The real and substantial connection test remains the basic governing principle for the assertion of jurisdiction against parties who have not submitted or agreed to the jurisdiction and who do not reside within the jurisdiction.

[65]   Section 10 replaces provincial rules of court, such as Ontario's rule 17.02, providing for service of process outside the jurisdiction, with a list of substantive jurisdictional connections that presumptively establish a real and substantial connection for both assumed jurisdiction and recognition and enforcement.   The Uniform Law Conference Drafters' Comments indicate that this list is "based on the grounds for service *ex juris* in the rules of court of many provinces".   The list of connections is not exhaustive; s. 10 explicitly preserves "the right of the plaintiff to prove other circumstances that constitute a real and substantial connection".   Nor is real and substantial connection made out conclusively if the case falls into one of the categories listed; s. 10 merely provides a real and substantial connection is only "presumed to exist" and, as explained by the Drafters' Comments, "[a] defendant will still have the right to rebut the presumption by showing that, in the facts of the particular case, the defined connection is not real and substantial".

[66]   Another significant feature of *CJPTA* is the "forum of necessity" provision, s. 6, conferring a residual discretion on the court to entertain the proceeding if:

> (a)   there is no court outside the jurisdiction in which the plaintiff can commence the proceeding; or
>
> (b)   the commencement of the proceeding in a court outside the jurisdiction cannot reasonably be required.

2010 ONCA 84 (CanLII)

[67]   Finally, s. 11(1) purports to codify the doctrine of *forum non conveniens* by

providing that a court may decline to exercise jurisdiction "on the ground that a court of

another state is a more appropriate forum in which to hear the proceeding" and directing,

in s. 11(2), that the court "must consider the circumstances relevant to the proceeding,

including":

> (a)   the comparative convenience and expense for the parties to the proceeding and for their witnesses, in litigating in the court or in any alternative forum;
>
> (b)   the law to be applied to issues in the proceeding;
>
> (c)   the desirability of avoiding multiplicity of legal proceedings;
>
> (d)   the desirability of avoiding conflicting decisions in different courts;
>
> (e)   the enforcement of an eventual judgment; and
>
> (f)   the fair and efficient working of the Canadian legal system as a whole.

[68]   In my view, the submissions of the appellants exaggerate both the degree of

uncertainty produced by *Muscutt* and the degree of certainty and predictability that would

be achieved by adopting *CJPTA*. With regard to the alleged uncertainty produced by

*Muscutt*, the appellants did not challenge the correctness of the results reached in the

*Muscutt* quintet and were unable to identify conflicting or wrongly decided cases under

the *Muscutt* test. With regard to the claim that *CJPTA* is more certain and predictable,

*CJPTA* retains the real and substantial test as the guiding principle but does not define it.

The connecting factors listed in s. 10 are merely presumptive and they are not exhaustive,

leaving the issue of real and substantial connection as a matter to be resolved in every

case. In cases arising in Nova Scotia and British Columbia, jurisdictions that have

2010 ONCA 84 (CanLII)

Page: 29

adopted *CJPTA*, the courts have turned to the *Muscutt* factors in order to determine what other circumstances could meet the test: see *Bouch v. Penny (Litigation guardian of)* (2009), 310 D.L.R. (4th) 433 (N.S.C.A.), at paras. 51-54; *Stanway v. Wyeth Canada Ltd.* 2008 BCSC 847, at paras. 80-90; *Cameron v. Equineox Technologies Ltd.* 2009 BCSC 221, at paras. 25-26. Moreover, the s. 10 connecting factors are necessarily cast in general terms. They are not self-applying black-letter rules. Their application requires interpretation and consideration of broad issues of fairness and justice. They do not supersede Dickson J.'s admonition in *Moran* that it would be "unnecessary, and unwise, to have resort to any arbitrary set of rules".

[69]     However, I agree that there is much to be gained by paying close attention to the *CJPTA* model in clarifying or modifying the *Muscutt* test. We should not ignore the considerations that led to the adoption of *CJPTA* or the criticism that the *Muscutt* eight factor test is too complicated and difficult to apply. In refining the *Muscutt* test, we can look to *CJPTA* as a worthy attempt to restate and update the Canadian law of jurisdiction. We can adopt certain attractive features of *CJPTA* and, in so doing, bring Ontario law into line with the emerging national consensus on appropriate jurisdictional standards.

## IV.     Clarifying and Reformulating Muscutt

[70]     In my view, it is appropriate to make several clarifications and modifications to the *Muscutt* test in light of the post-*Muscutt* changes to the legal landscape that I outlined earlier in these reasons, and in response to the arguments we have heard in these appeals.

2010 ONCA 84 (CanLII)

### *(a)   A category-based presumption*

[71]   The first modification to *Muscutt* that I would make is modelled on s. 10 of *CJPTA*, which gives presumptive effect to a list of connecting factors drawn and distilled from provincial rules of court for service *ex juris*. I would adopt and apply this approach with reference to rule 17.02.

[72]   In *Muscutt*, at para. 51, we adopted a statement from Janet Walker in G.D. Watson & L. Jeffrey, eds., *Holmested and Watson: Ontario Civil Procedure* (Carswell: Toronto, 2001), at p. 17-19, that the grounds outlined in rule 17.02 "provide a rough guide to the kinds of cases in which persons outside Ontario will be regarded as subject to the jurisdiction of the Ontario courts". In my view, there are now several reasons that justify elevating the weight to be given rule 17.02 by saying that, with the exception of subrules 17.02(h) ("damages sustained in Ontario") and (o) ("a necessary or proper party"), if a case falls within one of the connections listed in rule 17.02, a real and substantial connection for the purposes of assuming jurisdiction against the defendant shall be presumed to exist. As with *CJPTA*, s. 10, this presumption would not preclude a plaintiff from proving a real and substantial connection in other circumstances and does not preclude the defendant from demonstrating that, notwithstanding the fact that the case falls under rule 17.02, in the particular circumstances of the case, the real and substantial connection test is not met.

[73]   I would make this change to *Muscutt* for the following reasons.

2010 ONCA 84 (CanLII)

Page: 31

[74]   First, it would bring Ontario law into line with one of the central features of *CJPTA* in a manner consistent with the development of the common law. I see s. 10 as a carefully crafted list of connecting factors, based upon a review of existing rules of court across Canada providing for service out of the jurisdiction, that experience has shown ordinarily point to a real and substantial connection sufficient to justify the assumption of jurisdiction. With the exceptions of subrules 17.02(h) and (o), the connecting factors listed in s. 10 of *CJPTA* are very similar to those listed in rule 17.02. *CJPTA* approves those connecting factors as a reliable guide to the propriety of assumed jurisdiction and this court should to do the same with respect to 17.02.

[75]   Second, a review of the post-*Muscutt* jurisprudence indicates that virtually all of the cases where it has been found that there is no real and substantial connection involve the connecting factors identified by subrule 17.02(h). The fact that after seven years of litigating the issue there have been very few cases finding no real and substantial connection under the other branches of rule 17.02 suggests that, apart from subrule (h), the connecting factors identified in the rule serve as generally reliable indicators of a real and substantial connection.

[76]   Third, there is some support from the jurisprudence for looking to the rules for service *ex juris* as a guide to real and substantial connection. In *Hunt*, La Forest J. stated, at p. 325, that although some of the rules for service *ex juris* "may well require reconsideration in light of *Morguard*, the connections relied on under traditional rules are a good place to start." In *Spar,* at para. 56, Lebel J. stated, with reference to art. 3148, the

2010 ONCA 84 (CanLII)

provision of the *Civil Code of Quebec* dealing with the jurisdiction of the Quebec courts in civil actions: "I am doubtful that a plaintiff who succeeds in proving one of the four grounds for jurisdiction would not be considered to have satisfied the 'real and substantial connection' criterion, at least for the purposes of jurisdiction *simpliciter*." The British Columbia Court of Appeal appears to have treated the cases falling within the rule of court for service *ex juris* as presumptively satisfying the real and substantial connection test: see, eg. *Strukoff v. Syncrude Canada Ltd* (2000), 80 B.C.L.R. (3d) 294 (C.A.), at para. 10.

[77]   Fourth, to the extent that giving Rule 17.02 presumptive effect will simplify and reduce the incidence and cost of litigation on the issue of jurisdiction, this change addresses at least in part the concern that the *Muscutt* test is unduly complex and unwieldy.

[78]   I would not give subrules 17.02(h) or (o) presumptive effect for the following reasons. The fact that neither is included in s. 10 of *CJPTA* indicates that neither has gained general acceptance as a sufficiently reliable indicator of a real and substantial connection. See also Janet Walker, "Beyond Real and Substantial Connection: The *Muscutt* Quintet", at pp. 71-74. The "damages sustained" rule was adopted to relieve against the very narrow view taken in the case law of the reach of the rule allowing for service *ex juris* "in respect of a tort committed in Ontario" before that area was liberalized by *Moran*. It is clear from the reasoning and the results in the *Muscutt* quintet that there are many situations where "damages sustained in Ontario" will not serve as a

2010 ONCA 84 (CanLII)

reliable indicator of a real and substantial connection.  In my view, this position is not

changed by *Spar*, which dealt with injurious acts committed outside Quebec that caused

damages within Quebec and not the *Muscutt* situation where a plaintiff was injured

outside the forum and then came to the forum and subsequently suffered damages: see

Janet Walker, "Must there be Uniform Standards for Jurisdiction within a Federation?"

(2003), 119 L.Q.R. 567, at p. 570.

[79]    With respect to rule 17.02(o), given the very generous scope of Rule 5 for the

joinder of parties, the fact that a foreign defendant qualifies as a "necessary *or* proper

party" to a proceeding is not, by itself, a reliable indicator that there is a real and

substantial connection to support the assertion of jurisdiction over that defendant. The

*CJPTA* Drafters' Comment to section 10 is apposite:

> [S]uch a rule would be out of place in provisions that are
> based, not on service, but on substantive connections between
> the proceeding and the enacting jurisdiction. If a plaintiff
> wishes to bring proceedings against two defendants, one of
> whom is ordinarily resident in the enacting jurisdiction and
> the other of whom is not, territorial competence over the first
> defendant will be present.... Territorial competence over the
> second defendant will not be presumed merely on the ground
> that that person is a necessary or proper party to the
> proceeding against the first person. The proceeding against
> the second person will have to meet the real and substantial
> connection test.

[80]    I emphasize, however, that I disagree with the appellant's suggestion that plaintiffs

should essentially be confined to the enumerated categories.  That is not the case under

*CJPTA* and to impose such a limit would be inconsistent with the entire thrust of the

2010 ONCA 84 (CanLII)

jurisprudence I have already reviewed emphasizing the need for flexibility in this area of law.

### (b) The importance of distinguishing real and substantial connection and forum non conveniens

[81]   I agree with the observation made in argument and in the academic literature that since *Muscutt* was decided, there has been a tendency to obscure the distinction between jurisdiction *simpliciter* and *forum non conveniens* and to merge considerations pertaining to *forum non conveniens* into the real and substantial connection analysis. In part, this tendency is a product of the unduly wide interpretation given in some cases to fairness (*Muscutt* factors 3 and 4), a topic to which I will return below.

[82]   I would reiterate what we said in *Muscutt*: there is a clear distinction to be drawn between legal jurisdiction *simpliciter* and the discretionary test for *forum non conveniens*. The factors to be considered are different and distinct. In order to maintain the necessary degree of certainty and clarity, it is important to maintain and respect the distinction between the two tests. In particular, the factors listed for consideration at the second, discretionary, *forum non conveniens* stage, have no bearing on real and substantial connection and, therefore, should not be considered at the first stage of jurisdiction *simpliciter* analysis. The test for jurisdiction *simpliciter* is whether there is *a* real and substantial connection, an inquiry that does not turn upon a comparison with the strength of the connection with another potentially available jurisdiction.

2010 ONCA 84 (CanLII)

### *(c)* *Refining and simplifying the Muscutt test*

[83] With the experience gained from the substantial volume of case law applying *Muscutt*, with the perspective offered by the extensive body of scholarly writing on the *Muscutt* test, and with the benefit of the very thorough arguments we have heard in these appeals, it is now possible and appropriate to refine and to simplify the test. I recognize that one of the shortcomings of the *Muscutt* test is that it provided little or no guidance on the relationship between the eight factors or as to the relative weight or significance each factor should bear. I think that it is now possible to simplify the test and to provide for more clarity and ease in its application. I will do this by reviewing each of the eight *Muscutt* factors, not to reinforce their continued application, but to explain the manner in which I would elaborate a new refined test.

### *(i)* *The core of the test: the connection between the forum, the plaintiff's claim and the defendant*

[84] The core of the real and substantial connection test is the connection that the plaintiff's claim has to the forum and the connection of the defendant to the forum, respectively. The remaining considerations or principles serve as analytic tools to assist the court in assessing the significance of the connections between the forum, the claim and the defendant.

[85] As we explained in *Muscutt*, at para. 36, the Supreme Court of Canada has rejected the notion that there is a precise or mechanical test to define the nature or degree of connections required. In *Morguard*, at pp. 1104-1109, the Court variously described a real and substantial connection as a connection "between the *subject-matter of the action*"

2010 ONCA 84 (CanLII)

Page: 36

and the territory where the action is brought", "between the jurisdiction and the *wrongdoing*", "between the *damages suffered* and the jurisdiction", "between the *defendant* and the forum province", "with the *transaction or the parties*", and "with the *action*" (emphasis added).

[86]    I see no reason to depart from what we said in *Muscutt*, at paras. 54-74, in rejecting the argument that assumed jurisdiction should focus solely or primarily upon the nature and extent of the *defendant's* contacts with the jurisdiction.  We concluded, at para. 74, that "[w]hile the defendant's contact with the jurisdiction is an *important* factor, it is not a *necessary* factor".  A personal subjection test based exclusively on the defendant's contacts would be unduly restrictive, would fail to pay adequate heed to the interests of the injured plaintiff, would be inconsistent with a substantial body of case law reviewed in *Muscutt*, at paras. 63-74, and would be contrary to the Supreme Court of Canada's emphasis on the need for flexibility.  It would also be inconsistent with *CJPTA*, s. 3(e), which confers jurisdiction if "there is a real and substantial connection between the [forum] and the facts on which the proceedings against that person is based."

[87]    As we put it in *Muscutt*, at para. 77, when explaining the importance of defining the real and substantial connection test broadly enough to embrace consideration of the connection between the forum and the plaintiff's claim:

> The forum has an interest in protecting the legal rights of its residents and affording injured plaintiffs generous access for litigating claims against tortfeasors. In *Moran v. Pyle* at p. 409, Dickson J. spoke of "the important interest a state has in injuries suffered by persons within its territory". The *Moran* decision and the introduction of the "damage sustained" rule

Page: 37

> in 1975 were both motivated by the perception that the
> interests of justice required a more generous approach to
> assumed jurisdiction. The connection between the forum and
> the plaintiff's claim is therefore relevant.

[88]    Accordingly, I would maintain the connection between the plaintiff's claim and

the forum as a core element of the real and substantial connection test.

[89]    When assessing the connection between the forum and the defendant, the primary

focus is on things done by the defendant within the jurisdiction. Where the defendant

confines its activities to its home jurisdiction, it will not ordinarily be subject to the

jurisdiction of the forum: see e.g. *Lemmex*, *Leufkins* and *Sinclair*. However, as was held

in *Moran*, physical presence or activity within the jurisdiction is not always required.

Where a defendant could reasonably foresee that its conduct would cause harm within the

forum by putting a product into the normal channels of trade and knows, or ought to

know, that the product would be used in the forum and that if defective could harm a

consumer in the forum, jurisdiction may be assumed.

[90]    I am not persuaded by the submission of the *Charron* respondents that *Muscutt*

reads *Moran* too narrowly and that jurisdiction should be assumed over a defendant who

ought to reasonably have contemplated being called upon to account in the forum. It is

difficult to see how a proposition stated that broadly could avoid subjecting anyone who

has regular dealings with extra-provincial parties from rendering themselves subject to

the home jurisdiction of the extra-provincial customer. In *Sinclair*, we dealt with

restaurant owners who regularly do business with extra-provincial customers. I see no

reason to depart from what we said at para. 21:

2010 ONCA 84 (CanLII)

Restaurant owners and operators deal with customers who are traveling away from home on a regular and routine basis. To require restaurant owners and operators to litigate the claims of customers wherever they reside would impose a heavy burden that is difficult to justify under the principles of order and fairness expressed in *Morguard* and *Hunt*. Travelers from all corners of the earth might choose to dine in any Ontario restaurant. Absent special circumstances, to require Ontario restaurant owners and operators to defend their conduct in the home jurisdictions of their customers would impose an undue and unreasonable burden on them. If Ontario courts are not prepared to impose that burden on Ontario restaurant owners and operators, we should also refuse to assume jurisdiction against foreign restaurant owners and operators sued by Ontario residents for consequential damages resulting from a tort committed outside the province.

[91]    Accordingly, I would maintain the distinction made in *Muscutt*, at para. 83, between the degree of foreseeability motivating *Moran* and the situation where a wrongful act and injury occur outside the jurisdiction and the plaintiff returns home and continues to suffer consequential damage. The fact that it was foreseeable that a visiting plaintiff will return home and continue to suffer damages from the injury does not, by itself, make the defendant subject to the plaintiff's home jurisdiction under the *Moran* principle.

[92]    On the other hand, acts or conduct short of residence or carrying on business will often support a real and substantial connection. As stated in *Beals*, at para. 32, "a defendant can reasonably be brought within the embrace of a foreign jurisdiction's law where he or she has participated in something of significance or was actively involved in that foreign jurisdiction."

2010 ONCA 84 (CanLII)

Page: 39

### (ii)    Fairness

[93]    *Morguard* and *Hunt* rewrote the law of jurisdiction in terms of both "real and substantial connection" and in terms of "order and fairness".  The two concepts are correlative and inextricably related.  As stated in *Hunt*, at p. 326, the assumption of jurisdiction "must ultimately be guided by the requirements of order and fairness, not a mechanical counting of contacts or connections".  As we stated in *Muscutt*, at para. 86, proper consideration of the defendant's position cannot be accomplished simply by looking at the acts or conduct that would render the defendant subject to the jurisdiction.  The quality, strength or significance of those contacts cannot be assessed in a purely mechanical fashion.  The inquiry necessarily entails consideration of the fairness or unfairness of asserting jurisdiction against the defendant in light of those contacts.  As the Nova Scotia Court of Appeal held in *O'Brien v. Canada (Attorney General)* (2002), 201 N.S.R. (2d) 338, at para. 20, leave to appeal to S.C.C. denied [2002] SCCA No. 155:

> The concept of order and fairness is integral to the question of determining whether there is a real and substantial question…[and] it is not inappropriate for a court to consider as a component of the test, the fairness to the parties in determining if there is a real and substantial question…

[94]    See also *Bouch*, at para. 51:

> …I reject the suggestion that considerations of fairness have no place in the inquiry into the existence of a real and substantial connection, and are only to be weighed during the application of the discretionary *forum non conveniens* doctrine. In my respectful view, such a prohibition would introduce an unnecessary and unrealistic rigidity to a test that is clearly designed to be flexible. To impose such a constraint would prevent a judge's assessment of the totality of the

2010 ONCA 84 (CanLII)

Page: 40

> evidence when deciding whether the circumstances made it
> proper to accept jurisdiction over the action as framed by the
> plaintiff.

[95]    The principles of order and fairness apply equally to the plaintiff and, as stated in

*Muscutt*, at para. 89, the entire thrust of modern jurisprudence, from *Moran* to *Morguard*

and beyond, has been to broaden the inquiry beyond the contacts the defendant has with

the jurisdiction and to include consideration of fairness to the plaintiff:

> *Morguard* and *Moran* both hold that given the realities of
> modern commerce and the free flow of goods and people
> across borders, plaintiffs should not be saddled with the
> anachronistic "power theory" that focuses exclusively on
> subjection and territorial sovereignty. Although *Tolofson*
> dealt with choice of law, at pp. 1071-72, the court also speaks
> of the need to balance the interests of the plaintiff and
> defendant. Further, in *Oakley v. Barry*, [(1998), 166 N.S.R.
> (2d) 282, leave to appeal to S.C.C. refused, [1998] S.C.C.A.
> No. 282] Pugsley J.A. held at p. 699 that "[t]he concept of
> fairness in determining jurisdiction should be considered from
> the point of view of both the respondent [plaintiff], as well as
> the appellants [defendants]". I agree that it is important to
> consider fairness to the plaintiff and to balance this against
> fairness to the defendant.

[96]    I would, therefore, maintain consideration of the fairness of assuming or refusing

jurisdiction as a consideration that bears upon the real and substantial connection test.

However, I would explain and clarify what was said in *Muscutt* and limit the extent to

which fairness considerations apply in the manner outlined in the following paragraphs.

[97]    First, Muscutt factors 3 and 4 should be collapsed into one and the fairness of

assuming or refusing jurisdiction should be considered together.

2010 ONCA 84 (CanLII)

Page: 41

[98]    Second, consideration of fairness should not be seen as a separate inquiry unrelated to the core of the test, the connection between the forum, the plaintiff's claim and the defendant.  Consideration of fairness should rather serve as an analytic tool to assess the relevance, quality and strength of those connections, whether they amount to a real and substantial connection, and whether assuming jurisdiction accords with the principles of order and fairness.

[99]    Third, I agree with CRL's submission that unfairness to the plaintiff in not assuming jurisdiction does not amount to an independent factor capable of trumping the want of a real and substantial connection between the forum and the plaintiff's claim and/or the defendant.  Moreover, the fact that the foreign defendant is insured against the risk of litigation does not overcome a lack of connection between the claim or the defendant and the forum, and insurance is a matter that is more properly considered in relation to *forum non conveniens.*

[100] The post-*Muscutt* emergence of the forum of necessity doctrine has a direct bearing on this issue.  The forum of necessity doctrine recognizes that there will be exceptional cases where, despite the absence of a real and substantial connection, the need to ensure access to justice will justify the assumption of jurisdiction.  The forum of necessity doctrine does not redefine real and substantial connection to embrace "forum of last resort" cases; it operates as an exception to the real and substantial connection test.  Where there is no other forum in which the plaintiff can reasonably seek relief, there is a residual discretion to assume jurisdiction.  In my view, the overriding concern for access

2010 ONCA 84 (CanLII)

Page: 42

to justice that motivates the assumption of jurisdiction despite inadequate connection with the forum should be accommodated by explicit recognition of the forum of necessity exception rather than by distorting the real and substantial connection test.

[101] Fourth, as I have already stated, it is important to maintain the distinction between jurisdiction *simpliciter* and *forum non conveniens*. Consideration of jurisdiction *simpliciter* and the real and substantial connection test must not anticipate, incorporate or replicate consideration of the matters that pertain to the *forum non conveniens* test.

### (iii)   The relevance of the involvement of other parties to the suit

[102] The involvement of other parties to the suit is not, as *Muscutt* suggests, a factor that needs to be routinely considered in all cases. It remains relevant to the real and substantial connection test, but only in cases where it is asserted as a possible (not a presumptive) connecting factor that may justify assuming jurisdiction. In addition, at the *forum non conveniens* stage, the avoidance of a multiplicity of proceedings remains one of the factors to be considered.

### (iv)   The court's willingness to recognize and enforce an extra-provincial judgment rendered on the same jurisdictional basis

[103] I agree with the submission that the court's willingness to recognize and enforce an extra-provincial judgment rendered on the same jurisdictional basis should not be treated as a separate factor to be considered and weighed in the balance with the other relevant factors. It remains, however, a general and overarching principle that emerges from the assimilation in *Morguard* and *Hunt* of the rules for jurisdiction over foreign

2010 ONCA 84 (CanLII)

defendants and the rules for recognition and enforcement of foreign judgments. If a court holds that there is a real and substantial connection sufficient to justify asserting jurisdiction against a foreign defendant, it thereby holds that there would be a real and substantial connection sufficient to require recognition and enforcement of a foreign judgment against an Ontario defendant rendered on the same basis. That is an important general legal principle that disciplines the assumption of jurisdiction against extra-provincial defendants. It is a principle that a court should bear in mind when considering whether to assume jurisdiction against an extra-provincial defendant. If the court would not be prepared to recognize and enforce an extra-provincial judgment against an Ontario defendant rendered on the same jurisdictional basis, it should not assume jurisdiction against the extra-provincial defendant.

### (v)    *Whether the case is interprovincial or international in nature*

[104] In *Muscutt*, at paras. 95-99, we cited a number of authorities that state that the assumption of jurisdiction is more easily justified in interprovincial cases than in international cases. In *Morguard*, at pp. 1098 and 1101, La Forest J. stated that the "considerations underlying the rules of comity apply with much greater force between the units of a federal state", that a federation "implies a fuller and more generous acceptance of the judgments of the courts of other constituent units of the federation", and that "the rules of comity or private international law as they apply between the provinces must be shaped to conform to the federal structure of the Constitution." In *Hunt* at p. 323, La Forest J. referred to the distinction drawn in *Aetna Financial Services Ltd. v. Feigelman*,

2010 ONCA 84 (CanLII)

Page: 44

[1985] 1 S.C.R. 2, at p. 34-35, between interprovincial and international cases for the purpose of *Mareva* injunctions and added "I do not think litigation engendered against a corporate citizen located in one province by its trading and commercial activities in another province should necessarily be subject to the same rules as those applicable to international commerce".

[105] I disagree with the submission that *Beals*, at para. 19, holding that "the 'real and substantial connection' test, which is applied to interprovincial judgments, should apply equally to the recognition of foreign judgments", obliterates the distinction between interprovincial and international cases. In my view, by applying the real and substantial connection test to international judgments, *Beals* does not require that in its precise application in particular cases, the real and substantial connection test will inevitably treat interprovincial and international cases identically. There is nothing in *Beals* that considers or disputes the reasons given in *Morguard*, *Hunt*, *Tolofson* and *Aetna* for applying jurisdictional standards in a manner that takes into account the realities of a federation with a shared legal tradition and integrated economic and social connections. Moreover, that distinction was reiterated by the Supreme Court of Canada in a post-*Beals* decision, albeit in a *forum non conveniens* case, *Teck Cominco Metals Ltd. v. Lloyd's Underwriters*, [2009] 1 S.C.R. 321, where the court stated, at para. 30: "A distinction should be made between situations that involve a uniform and shared approach to the exercise of jurisdiction (e.g. inter-provincial conflicts) and those, such as the present

[involving foreign parties], that do not." I conclude, accordingly, that *Beals* does not preclude differential treatment being accorded to interprovincial and international cases.

[106] I agree, however, with the submission that it is not useful to treat the difference between international and interprovincial judgments as one of several items on a multi-factor list having more or less equal weight with the other factors. Rather, it should be regarded a general principle of law that generally shapes and guides the analysis of real and substantial connection.

### (vi)    Comity and the standards of jurisdiction, recognition and enforcement prevailing elsewhere

[107] Comity and the encouragement of uniformity or reciprocity are general principles that shape the rules of private international law: see *Morguard*, at p. 1096, referring to *Hilton v. Guyot*, 159 U.S. 113 at 163-64 (1895); *Beals,* at paras. 27-29; and *Spar*, at para. 17, describing comity as "a useful guiding principle when applying the rules of private international law". In *Muscutt*, we reviewed the treatment accorded "damages sustained in the jurisdiction" as a result of a tort committed elsewhere as a basis for assumed jurisdiction in several foreign jurisdictions. I reject the surprisingly insular argument made by some scholars that we should ignore foreign law when considering and applying the real and substantial connection test. In my view, it is entirely appropriate to take foreign law into account in an area of law that has such obvious and immediate application to foreign litigants. While I certainly would not insist on the production of evidence of foreign law in every case, I view it as helpful to know how foreign courts

2010 ONCA 84 (CanLII)

treat like cases when determining the appropriateness of extending the reach of Ontario law against a foreign litigant.

[108]  Accordingly, while I would no longer list comity and the standards of jurisdiction, recognition and enforcement prevailing elsewhere as one of several items on a multi-factor list having more or less equal weight with the other factors, I would maintain these legal principles as relevant to the assessment of real and substantial connection.

## V.    Reformulating Muscutt: Summary

[109]  To summarize the preceding discussion, in my view, the *Muscutt* test should be clarified and reformulated as follows:

- First, the court should determine whether the claim falls under rule 17.02 (excepting subrules (h) and (o)) to determine whether a real and substantial connection with Ontario is presumed to exist.  The presence or absence of a presumption will frame the second stage of the analysis.  If one of the connections identified in rule 17.02 (excepting subrules (h) and (o)) is made out, the defendant bears the burden of showing that a real and substantial connection does not exist. If one of those connections is not made out, the burden falls on the plaintiff to demonstrate that, in the particular circumstances of the case, the real and substantial connection test is met.

- At the second stage, the core of the analysis rests upon the connection between Ontario and the plaintiff's claim and the defendant, respectively.

- The remaining considerations should not be treated as independent factors having more or less equal weight when determining whether there is a real and substantial connection but as general legal principles that bear upon the analysis.

2010 ONCA 84 (CanLII)

Page: 47

- Consideration of the fairness of assuming or refusing jurisdiction is a necessary tool in assessing the strengths of the connections between the forum and the plaintiff's claim and the defendant. However, fairness is not a free-standing factor capable of trumping weak connections, subject only to the forum of necessity exception.

- Consideration of jurisdiction *simpliciter* and the real and substantial connection test should not anticipate, incorporate or replicate consideration of the matters that pertain to *forum non conveniens* test.

- The involvement of other parties to the suit is only relevant in cases where that is asserted as a possible connecting factor and in relation to avoiding a multiplicity of proceedings under *forum non conveniens*.

- The willingness to recognize and enforce an extra-provincial judgment rendered on the same jurisdictional basis is as an overarching principle that disciplines the exercise of jurisdiction against extra-provincial defendants.    This principle provides perspective and is intended to prevent a judicial tendency to overreach to assume jurisdiction when the plaintiff is an Ontario resident.  If the court would not be prepared to recognize and enforce an extra-provincial judgment against an Ontario defendant rendered on the same jurisdictional basis, it should not assume jurisdiction against the extra-provincial defendant.

- Whether the case is interprovincial or international in nature, and comity and the standards of jurisdiction, recognition and enforcement prevailing elsewhere are relevant considerations, not as independent factors having more or less equal weight with the others, but as general principles of private international law that bear upon the interpretation and application of the real and substantial connection test.

- The factors to be considered for jurisdiction *simpliciter* are different and distinct from those to be considered for *forum non conveniens*.  The *forum non conveniens*

Page: 48

factors have no bearing on real and substantial connection and, therefore, should only be considered after it has been determined that there is a real and substantial connection and that jurisdiction *simpliciter* has been established.

- Where there is no other forum in which the plaintiff can reasonably seek relief, there is a residual discretion to assume jurisdiction.

## APPLICATION

### I.    Charron

### *(1)    Should a real and substantial connection be presumed on the ground that the case falls within a connection specified in Rule 17.02?*

[110] The plaintiff Anna Charron resides in Ontario and her damages for loss of love, care, guidance and companionship pursuant to the *Family Law Act* and the estate's claim for loss of future income are claims for damages suffered in Ontario as a result of a tort or breach of contact committed elsewhere pursuant to rule 17.02(h). As I have indicated, however, rule 17.02(h) is not one of the rule 17.02 connections that attract presumptive effect.

[111] The plaintiff's claim against CRL also arises directly from the contract the Charrons entered with Hola Sun for a one-week all-inclusive vacation package that included scuba diving at the Breezes Costa Verde resort. The statement of claim alleges "that it was a term of the contract, express or implied, that the late Claude Charron be provided with safe scuba diving instruction and equipment, and that the Defendants, by their conduct, have breached the said contract."

Page: 49

[112]  I see no reason to interfere with the motion judge's finding, at para. 21, that it "could reasonably be argued that a contract was entered into in Ontario".  All the arrangements were made in Ontario through the respondents Bel Air and Hola Sun, both corporations carrying on business in Ontario.

[113]  Although CRL was implicated in the promotion and execution of the contract, CRL was not a party to that contract, and for that reason, I do not view this as a case that triggers the presumptive effect of rule 17.02. Accordingly, it is necessary to consider whether the respondents have otherwise demonstrated a real and substantial connection to support Ontario assuming jurisdiction over CRL.

*(2)    Did the respondents establish a real and substantial connection?*

*(i) The connection between the forum and plaintiff's claim*

[114]  I see no basis upon which to interfere with the motion judge's finding that there is a significant connection between the plaintiffs' claim and Ontario.  While not presumptive of a real and substantial connection, damages suffered in the jurisdiction has often been accepted as a significant connection, both in Ontario and in other provinces: see, e.g. *Spar* (Quebec); *Sampson v. Olsen* (2005) 274 Sask. R. 234 (Q.B.), at para. 12; *Bouch*, at para 43 (Nova Scotia); *Oakley*, at para. 95 (Nova Scotia); *Coutu*, at para. 6 (New Brunswick); *Pacific International Securities Inc. v. Drake Capital Securities Inc.* (2000), 194 D.L.R. (4th) 716 (B.C.C.A.), at p. 722 (British Columbia).

2010 ONCA 84 (CanLII)

### *(ii)*   *The connection between the forum and defendant*

[115] I see no basis to interfere with the motion judge's finding, at para. 22 of his reasons, that there is a connection between the forum and the defendant:

> CRL manages resorts [in Cuba]. These resorts rely heavily on international travellers. Cubans and Americans, for economic and political reasons, are not the target market for these resorts. These resorts rely on an international market and Canada, and in particular Ontario, provides a large portion of tourists purchasing vacation packages. CRL has a legal obligation to market these resorts internationally. It fulfills its obligation in Ontario by way of an agreement with Hola Sun. Hola Sun, in turn, advertises these resorts in Ontario and uses the authorized VRL [Village Resorts International Ltd] trademarks to market these properties. Therefore, CRL has a connection with Ontario by way of its agreement with Hola Sun.

[116] The issue is the significance of CRL's connection with Ontario under the revised test for assumed jurisdiction elaborated in these reasons. While the evidence may fall short of establishing that CRL was carrying on business in Ontario, for the following reasons, I conclude there is evidence to support a finding that CRL's activities amount to a significant connection with Ontario.

[117] The record reveals that CRL was directly involved in activity in Ontario to solicit business for the resort. Unlike the defendants in *Leufkens*, *Lemmex* and *Sinclair*, CRL did not confine its activities to its home jurisdiction:

- pursuant to its contract with the Cuban hotel owner, CRL was required to and did promote and advertise the resort using the "SuperClubs" brand in Canada;

- CRL relies on maintaining a high profile for the SuperClubs brand in Ontario as residents of Canada

2010 ONCA 84 (CanLII)

and Ontario represent a high proportion of CRL's target market;

- CRL was licenced to use the "SuperClubs" label and itself "created" the "SuperClubs Cuba" label and used these labels to market the resort in Ontario

- CRL's witness Abe Moore agreed on cross-examination:

  - "that CRL was in the business of carrying out activities in countries such as Canada to generate paying guests of the resort";

  - that to do so CRL had to "either directly or engage others to undertake the activity of solicitation, promotion and advertising" in Canada;

  - that CRL ensured that it had relationships with others to do so in Ontario to satisfy its contractual obligation to promote the resort;

- CRL representatives regularly travel to Ontario to further CRL's promotional activity;

- CRL arranged for the preparation and distribution of promotional materials in Ontario; and

- as outlined in the following paragraph, CRL benefited from an office in Ontario that provided information and engaged in the promotion of the SuperClubs brand.

[118]  While CRL itself had no office in Ontario, the SuperClubs brand, used by CRL to

promote the resort, is held out in promotional materials as having an office in Ontario. In

brochures prepared by CRL for distribution to Ontario residents and in a travel industry

publication listing hotel representatives and major hotel chains in Canada, SuperClubs is

shown as having Canadian offices at 9019 Bayview Ave., Richmond Hill, phone number

905-771-8664.  Nancy Hay is referred to as Director of Sales, Canada.  On promotional

Page: 52

materials available from Ontario travel agents, Nancy Hay's name and telephone number appear on these promotional materials and advertisements and she is described as "Contact SuperClubs". The details of Nancy Hay's duties and the nature of her responsibilities are unclear, but there is little doubt that she is part of the promotion of the SuperClubs brand in Ontario and that CRL used and benefited from her presence in Ontario to promote its business. Abe Moore admitted on cross-examination that he visited Nancy Hay at her office to discuss the promotion of CRL's resorts. Hola Sun's witness Andrea Carr testified that "if I had any question about any SuperClubs property" she would call Hay's office and "they would find me the answer". As mentioned below in connection with *Van Breda*, Moore directed Rene Denis to contact Nancy Hay "for assistance with promotions". Abe Moore swore that the work of that office is now conducted by ILI Travel Limited, an Ontario corporation of which he is the president and for which he performs management services under a contract with CRL and that as a result, he now spends three months a year in Ontario.

[119] In my view, one can fairly infer from this body of evidence that although CRL itself maintained no office in Ontario, CRL is implicated in and benefits from the physical presence in Ontario of an office and contact person held out to the public as representing the same "SuperClubs" brand CRL uses to carry on its business of promoting and operating the resort.

[120] In my view, when considered as a whole, this level of activity and presence in Ontario on the part of CRL to promote its business amounts to a significant connection

Page: 53

with Ontario. CRL's situation is readily distinguishable from that of the local service providers in *Lemmex*, *Leufkens* and *Sinclair* who confined their activities to their home jurisdictions.

### (iii)    Fairness

[121] I respectfully disagree with the way the motion judge dealt with the issue of fairness. In my view, by considering the difficulties the parties would face in arranging for witnesses to testify in either Cuba or Ontario, he conflated the *forum non conveniens* test with the test for real and substantial connection. I will return to consider those factors when I consider the issue of *forum non conveniens*.

[122] However, when I consider the connections between the claim, CRL and Ontario through the lens of fairness to assess their significance and weight in relation to a real and substantial connection, I agree with the motion judge's conclusion that fairness supports the assumption of jurisdiction against CRL. In particular, I see nothing unfair in requiring CRL to defend this action in Ontario. As I have already indicated, CRL actively marketed in Ontario the all-inclusive vacation that the Charrons purchased in a variety of ways. While the contract between CRL and Hola Sun provided for the application of Cuban law and for Cuban jurisdiction in relation to disputes arising between CRL and Hola Sun, that provision has no application to the Charrons.

[123] Accordingly, I agree with the submission that in the light of these connections, and subject to the consideration of *forum non conveniens*, there is nothing unfair about requiring CRL to defend this claim in Ontario.

Page: 54

### *(iv)    General principles*

[124] An important discipline on the real and substantial connection inquiry and check on jurisdictional overreaching is to ask whether Ontario would be willing to recognize and enforce an extra-provincial judgment rendered on the same jurisdictional basis as that being asserted here. In my view, the answer to that question is yes. CRL's activities are far removed from those of a local tourist business – the restaurant owner discussed in *Sinclair* or the much discussed Algonquin canoe renter - that accepts business from out-of-province defendants but essentially confines its activities to Ontario. CRL targeted the Ontario market, it entered into contracts in Ontario with Ontario entities to promote its business, it ensured that printed promotional materials were available to allow Ontario travel agents to sell the products it was promoting, and its interests were fostered by the physical presence in Ontario of a SuperClubs office and contact person. In my view, if an Ontario defendant were to engage in a comparable level of activity in a foreign jurisdiction, Ontario would recognize and enforce a judgment rendered against the Ontario defendant by the courts of that foreign jurisdiction.

[125] I would add, with particular reference to the submission of The Tourism Industry Association of Ontario, that where an Ontario operator targets a particular foreign market and engages in activities likely to attract foreign jurisdiction, it can protect its interests by insisting upon an Ontario choice of law and choice of forum clause in its contracts with foreign visitors.

2010 ONCA 84 (CanLII)

Page: 55

### (3)    *Forum non conveniens*

[126] I would not interfere with the motion judge's rejection of the submission that the action should be stayed on grounds of *forum non conveniens*.

[127] The motion judge found that some defence witnesses would have to travel from Cuba and observed that Cuban travel and immigration restraints might "make their travel to Ontario for a trial difficult or impossible". On the other hand, he noted that there was evidence from an expert on Cuban law that alternative arrangements could be made to take their evidence in Cuba, if the trial were held in Ontario. Moreover, the plaintiffs would have to arrange for the attendance of several physicians and other individuals from Ontario who had been with them when the accident occurred. The motion judge noted that CRL is not domiciled in Cuba and that it is insured against liability in Ontario. While evidence of Cuban law will be required if the action proceeds in Ontario, both parties had already retained Cuban law experts. The action also involves Bel Air and Hola Sun, Ontario corporations named as defendants and who assert cross-claims against CRL, and permitting suit here would avoid a multiplicity of proceedings and the risk of inconsistent results. There is an issue as to whether the plaintiffs will be able to claim under the *Family Law Act* given the *lex loci delicti* rule laid down in *Tolofson*. The motion judge may have oversimplified the discussion of whether such a claim could be made if the action proceeds in Ontario. However, it is clear that such damages would be excluded if the Charrons were forced to sue in Cuba. There are also statements from this court suggesting that, in some cases, claims for *Family Law Act* damages may fall into

Page: 56

the exceptional category mentioned in *Tolofson*: see *Hanlan v. Sernesky* (1998), 38 O.R. (3d) 479 (C.A.); *Wong v. Lee* (2002), 58 O.R. (3d) 398 (C.A.), at para. 16; *Somers v. Fournier* (2002), 60 O.R. (3d) 225, at para. 34.

[128] The *forum non conveniens* decision is discretionary and the motion judge cited and applied the proper legal test. I see no error of principle that would justify appellate intervention.

### (4)    Conclusion: Charron

[129] Accordingly, I would dismiss the appeal.

## II.   Van Breda

### (1)    Should a real and substantial connection be presumed on the ground that the case falls within a connection specified in rule 17.02?

[130] I see no basis to interfere with the motion judge's conclusion that there was "a significant connection between the plaintiffs claim and Ontario" on the basis that the contract was entered into in Ontario. All the arrangements were made through Denis and Sport au Soleil in Ontario. Denis confirmed those arrangements with a letter to Berg, written on the letterhead "SuperClubs Cuba – Tennis", setting out the dates, instructions on how to get to the hotel, and specifying the nature of Berg's duties. The letter specified the terms of Berg's arrangement with the resort: "In exchange for your services the hotel will accommodate you and your guest in a shared room. This also includes all meals and drinks and transportation to and from the Veradero airport." The letter concludes with an

Page: 57

instruction addressed to the Hotel Reception Desk: "The above individual has been confirmed for these dates with the hotel General Manager."

[131] There was no written contract between Denis and CRL, but in my view, it may be inferred from the letter Abe Moore wrote to Denis asking him to find tennis teaching professionals that Denis was acting, as the motion judge put it, "in part at least" as CRL's agent:

> I do not want to do a formal arrangement nor get into a long term arrangement, we just want to be able to find some people who are prepared to teach for a couple of hours each day in exchange for accommodations for two people sharing. I am prepared to compensate you, hopefully in kind, for your efforts.

[132] In his affidavit, Moore described his arrangement with Denis as "an oral contract...whereby Sport au Soleil arranges for the services of various professionals such as the plaintiff, Viktor Berg." Denis used the SuperClubs trademark on his letterhead, he wrote the letter confirming the terms of the arrangement with the resort that CRL operated and he instructed the registration desk at the resort in Cuba that Berg's arrangements were "confirmed". Denis' conduct, including the letter he wrote on Berg and Van Breda's behalf setting out the terms of their contract, was accepted and acted on by CRL, giving rise to an inference of agency. I see no merit in the submission that the motion judge made a palpable or overriding error in finding that Denis was acting "in part at least" as CRL's agent in making these arrangements.

[133] Nor do I see any merit in CRL's submission that there was no binding contract until Berg and Van Breda arrived at and checked in to the hotel. This is not the usual

case where an Ontario resident simply makes a reservation with an out-of-province hotel and then finalizes the details of the contract upon arrival and check-in. Berg made all his arrangements with an Ontario-based entity clothed with the necessary authority to commit the foreign-based hotel to an unusual and specific arrangement for the provision of services in exchange for the provision of accommodation. See *Fordyce v. Round Hill Developments*, 1978 U.S. Dist. LEXIS 19112, where the District Court for the Southern District of New York declined to assume jurisdiction over the defendant owner of a Jamaican hotel as the New York agent of the hotel could not bind the resort by confirming reservations, an ability which could have been sufficient to ground the assumption of jurisdiction over Round Hill on the basis of 'doing business', as interpreted in *Frummer v. Hilton Hotels*, (1967) 19 N.Y.2d 533.

[134] In this case, there was no tour operator standing between the clients and CRL: the contract for the all-inclusive vacation was made directly with CRL. I conclude that, based upon the facts alleged in the pleadings and the evidence led on the motion, the respondents' claim against CRL falls within the connection described in rule 17.02 (f)(i) as a claim "in respect of a contract where...the contract was made in Ontario". I would accordingly hold that a real and substantial connection between the claim and Ontario is presumed to exist.

[135] The claim is framed both in contract and in tort. Arguably, it is more tortious that contractual in nature. However, that does not defeat or minimize the significance of the contract as a significant connection with Ontario. First, there is a strong nexus and

2010 ONCA 84 (CanLII)

Page: 59

overlap between claims in contract and tort, and there is concurrent liability for negligence arising from contractual relationships. A party is not required to elect between suing in tort or contract; the general rule is that of concurrent liability where a wrong supports an action in both contract and tort: *BG Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12. Second, the application of the real and substantial connection test in this context should not turn on a technical characterization of the plaintiff's cause of action. The issue is the significance of the connections of the defendant with Ontario, and CRL cannot escape the fact that the Ontario contract framed its relationship with the plaintiffs. The fact that the claim may sound deeper in tort that it does in contract does not diminish the significance of the contract as establishing between CRL and the plaintiffs a significant connection that was formed in Ontario.

[136] As this presumption is not conclusive, it remains open to CRL to demonstrate that in the particular circumstances of the case, the real and substantial connection test is not met. I will now consider whether, on the facts of this case, CRL has rebutted that presumption under the revised test for real and substantial connection

*(2)*   *Has the appellant rebutted the presumption of a real and substantial connection?*

   *(i)*   *The connection between the forum and plaintiff's claim*

[137] It is conceded that the respondents have suffered no damages in Ontario. On the other hand, Van Breda and Berg were residents of Ontario before travelling to Cuba and they would have returned to Ontario but for the injury Van Breda sustained. In my view,

the significance of the fact that they do not now reside in Ontario is diminished, as the only reason they did not return was the very injury that gives rise to the claim. In any event, the fact that the contractual arrangements were made in Ontario reflects a significant connection between the plaintiffs' claim and Ontario.

[138]  Accordingly, I would not interfere with the motion judge's finding that there was a significant connection between the plaintiff's claim and Ontario.

*(ii)*    ***The connection between the forum and defendant***

[139]  While the extent of CRL's activities in Ontario was not explored in the same depth in this case as in Charron, there was considerable evidence in the record to the same effect.

[140]  As administrator and manager of the resort, CRL was responsible for international advertising campaigns and international public relations campaigns to promote the resort. To carry out these responsibilities, CRL engaged professionals in Ontario to prepare promotional materials and entered contracts with Ontario tour operators to advertise and promote the resort. The record in the Van Breda appeal includes evidence of CRL's use of Nancy Hay and the Ontario SuperClubs office to promote its activities. In a letter written by Abe Moore to Rene Denis regarding making promotional materials available, Moore wrote: "By copy of this fax I am making Mrs. Nancy Hay, Director of Sales, SuperClubs Canada, aware that you may contact her for assistance with promotions."

Page: 61

[141] CRL's arrangement with Denis as an agent to solicit professional athletes to provide lessons in exchange for transportation to and from the airport and an all-inclusive vacation at the resort must be also be considered.

[142] In my view, even without the benefit of the presumption arising under Rule 17.02, the record establishes a significant connection between CRL and Ontario.

### (iii)    Fairness

[143] I reach the same conclusion here as I reached in the Charron appeal. While the motion judge erred by considering issues of fairness more appropriately dealt with under *forum non conveniens,* when the connections between the plaintiffs' claim, the defendant and Ontario are considered and weighed from the perspective of fairness, assuming jurisdiction against CRL is fully supported. This is not a case of a local operator that confined its activities to its home jurisdiction. CRL engaged in promotional activities in Ontario and the contract it entered with Berg was made in Ontario through an agent in Ontario that CRL used to solicit professional athletes as resort instructors. Viewed through the lens of fairness, these connections are sufficient to justify the finding of a real and substantial connection.

### (iv)    General principles

[144] I would adopt and apply here the discussion under this heading in *Charron*.

### (3)    Forum non conveniens

[145] As in Charron, the motion judge conflated the test for jurisdiction *simpliciter* and *forum non conveniens* and considered matters under the former that more properly

2010 ONCA 84 (CanLII)

belonged to the latter. However, when it came to deciding the issue of *forum non conveniens*, he cited and applied the correct legal test.

[146] All of the parties except CRL are located in Canada and while CRL carries on business in Cuba, it is located in the Cayman Islands. While obtaining the evidence of Cuban nationals in Ontario would be challenging, there was expert evidence explaining how their evidence could be obtained for use in an Ontario court. As Cuban law excluded damages for pain and suffering and for loss of care, guidance and companionship, the plaintiffs could suffer a loss of juridical advantage. In my view, the fact that CRL is insured may be taken into account at the *forum non conveniens* stage as a factor mitigating any difficulty CRL may have in litigating this case in Ontario.

[147] The motion judge noted that there was conflicting evidence on the fairness of the Cuban legal system. A former Canadian ambassador testified that the Cuban courts lacked judicial independence while an expert on Cuban law testified that the Cuban system of civil justice was fair and consistent with the civil law process in other civil countries. The former ambassador conceded that his concerns regarding lack of judicial independence arose from the administration of criminal justice in Cuba. The motion judge concluded that there was "an uncertainty which exists in respect of the fairness of the legal system in Cuba". In my view, comity requires more that "an uncertainty" to justify a judicial determination that condemns a foreign legal system as unfair. However, the uncertainty regarding the fairness of the Cuban legal system was discussed by the

2010 ONCA 84 (CanLII)

motion judge when dealing with jurisdiction *simpliciter*, and the extent to which it affected his assessment of the *forum non conveniens* issue is not clear.

[148] In the end, I am not persuaded that the motion judge erred in finding that the evidence fell short of showing that Cuba was clearly a more appropriate forum for this action than Ontario. While this was certainly not a clear-cut case, it was a discretionary decision and I see no error of principle that would justify the interference of this court.

*(4)   Conclusion: Van Breda*

[149] Accordingly, I would dismiss the appeal.

**COSTS**

[150] If the parties are unable to agree as to the appropriate disposition of costs, we will receive brief written submissions, from the respondents within 15 days of the release of these reasons and from the appellants within 10 days thereafter.

RELEASED: "RJS" Feb 2, 2010                "Robert J. Sharpe J.A."
                                           "I agree D. O'Connor A.C.J.O."
                                           "I agree K.M. Weiler J.A."
                                           "I agree J.C. MacPherson J.A."
                                           "I agree Paul Rouleau J.A."

## APPENDIX A
### Uniform Law Conference of Canada Model Court Jurisdiction and Proceedings Transfer Act

### PART 1: Interpretation

### Definitions

1.      In this Act:

2010 ONCA 84 (CanLII)

"**person**" includes a state;
"**plaintiff**" means a person who commences a proceeding, and includes a plaintiff by way of counterclaim or third party claim;
"**proceeding**" means an action, suit, cause, matter or originating application and includes a procedure and a preliminary motion;
"**procedure**" means a procedural step in a proceeding;
"**state**" means:

(a) Canada or a province or territory of Canada; and
(b) a foreign country or a subdivision of a foreign country;
"**subject matter competence**" means the aspects of a court's jurisdiction that depend on factors other than those pertaining to the court's territorial competence;
"**territorial competence**" means the aspects of a court's jurisdiction that depend on a connection between:

(a) the territory or legal system of the state in which the court is established; and
(b) a party to a proceeding in the court or the facts on which the proceeding is based.

### PART 2: Territorial Competence of Courts of [Enacting Province or Territory]

### Application of this Part

2(1)    In this Part:

"**court**" means a court of [enacting province or territory].

(2)     The territorial competence of a court is to be determined solely by reference to this Part.

Page: 2

**Proceedings in personam**

3.  A court has territorial competence in a proceeding that is brought against a person only if:

> (a) that person is the plaintiff in another proceeding in the court to which the proceeding in question is a counterclaim;
> (b) during the course of the proceeding that person submits to the court's jurisdiction;
> (c) there is an agreement between the plaintiff and that person to the effect that the court has jurisdiction in the proceeding;
> (d) that person is ordinarily resident in [enacting province or territory] at the time of the commencement of the proceeding; or
> (e) there is a real and substantial connection between [enacting province or territory] and the facts on which the proceeding against that person is based.

**Proceedings with no nominate defendant**

4.  A court has territorial competence in a proceeding that is not brought against a person or a vessel if there is a real and substantial connection between [enacting province or territory] and the facts upon which the proceeding is based.

**Proceedings in rem**

5.  A court has territorial competence in a proceeding that is brought against a vessel if the vessel is served or arrested in [enacting province or territory].

**Residual discretion**

6.  A court that under section 3 lacks territorial competence in a proceeding may hear the proceeding despite that section if it considers that:

> (a) there is no court outside [enacting province or territory] in which the plaintiff can commence the proceeding; or
> (b) the commencement of the proceeding in a court outside [enacting province or territory] cannot reasonably be required.

**Ordinary residence – corporations**

7.  A corporation is ordinarily resident in [enacting province or territory], for the purposes of this Part, only if:

2010 ONCA 84 (CanLII)

Page: 3

(a) the corporation has or is required by law to have a registered office in [enacting province of territory];

(b) pursuant to law, it:

(i) has registered an address in [enacting province or territory] at which process may be served generally; or

(ii) has nominated an agent in [enacting province or territory] upon whom process may be served generally;

(c) it has a place of business in [enacting province or territory]; or

(d) its central management is exercised in [enacting province or territory].

## Ordinary residence – partnerships

8.    A partnership is ordinarily resident in [enacting province or territory], for the purposes of this Part, only if:

(a) the partnership has, or is required by law to have, a registered office or business address in [enacting province or territory];

(b) it has a place of business in [enacting province or territory]; or

(c) its central management is exercised in [enacting province or territory].

## Ordinary residence – unincorporated associations

9.    An unincorporated association is ordinarily resident in [enacting province or territory] for the purposes of this Part, only if:

(a) an officer of the association is ordinarily resident in [enacting province or territory]: or

(b) the association has a location in [enacting province or territory] for the purpose of conducting its activities.

## Real and substantial connection

10.   Without limiting the right of the plaintiff to prove other circumstances that constitute a real and substantial connection between [enacting province or territory] and the facts on which a proceeding is based, a real and substantial connection between [enacting province or territory] and those facts is presumed to exist if the proceeding:

(a) is brought to enforce, assert, declare or determine proprietary or possessory rights or a security interest in immovable or movable property in [enacting province or territory];

(b) concerns the administration of the estate of a deceased person in relation

2010 ONCA 84 (CanLII)

Page: 4

to:

(i) immovable property of the deceased person in [enacting province or territory]; or

(ii) movable property anywhere of the deceased person if at the time of death he or she was ordinarily resident in [enacting province or territory];

(c) is brought to interpret, rectify, set aside or enforce any deed, will, contract or other instrument in relation to:

(i) immovable or movable property in [enacting province or territory]; or

(ii) movable property anywhere of a deceased person who at the time of death was ordinarily resident in [enacting province or territory];

(d) is brought against a trustee in relation to the carrying out of a trust in any of the following circumstances:

(i) the trust assets include immovable or movable property in [enacting province or territory] and the relief claimed is only as to that property;

(ii) that trustee is ordinarily resident in [enacting province or territory];

(iii) the administration of the trust is principally carried on in [enacting province or territory];

(iv) by the express terms of a trust document, the trust is governed y the law of [enacting province or territory];

(e) concerns contractual obligations, and:

(i) the contractual obligations, to a substantial extent, were to be performed in [enacting province or territory];

(ii) by its express terms, the contract is governed by the law of [enacting province or territory]; or

(iii) the contract:

(A) is for the purchase of property, services or both, for use other than in the course of the purchaser's trade or profession; and

(B) resulted from a solicitation of business in [enacting province or territory] by or on behalf of the seller;

(f) concerns restitutionary obligations that, to a substantial extent, arose in [enacting province or territory];

(g) concerns a tort committed in [enacting province or territory];

(h) concerns a business carried on in [enacting province or territory];

(i) is a claim for an injunction ordering a party to do or refrain from doing anything:

(i) in [enacting province or territory]; or

2010 ONCA 84 (CanLII)

Page: 5

      (ii) in relation to immovable or movable property in [enacting province or territory];

(j) is for a determination of the personal status or capacity of a person who is ordinarily resident in [enacting province of territory];

(k) is for enforcement of a judgment of a court made in or outside [enacting province or territory] or an arbitral award made in or outside [enacting province or territory]; or

(l) is for the recovery of taxes or other indebtedness and is brought by the Crown [of the enacting province or territory] or by a local authority [of the enacting province or territory].

**Discretion as to the exercise of territorial competence**

11(1) After considering the interests of the parties to a proceeding and the ends of justice, a court may decline to exercise its territorial competence in the proceeding on the ground that a court of another state is a more appropriate forum in which to hear the proceeding.

(2) A court, in deciding the question of whether it or a court outside [enacting province or territory] is the more appropriate forum in which to hear a proceeding, must consider the circumstances relevant to the proceeding, including:

      (a) the comparative convenience and expense for the parties to the proceeding and for their witnesses, in litigating in the court or in any alternative forum;

      (b) the law to be applied to issues in the proceeding;

      (c) the desirability of avoiding multiplicity of legal proceedings;

      (d) the desirability of avoiding conflicting decisions in different courts;

      (e) the enforcement of an eventual judgment; and

      (f) the fair and efficient working of the Canadian legal system as a whole.

**Conflicts or inconsistencies with other Acts**

12. If there is a conflict or inconsistency between this Part and another Act of [enacting province or territory] or of Canada that expressly:

      (a) confers jurisdiction or territorial competence on a court; or

      (b) denies jurisdiction or territorial competence to a court, that other Act prevails.

2010 ONCA 84 (CanLII)

2010 ONCA 84 (CanLII)

Page: 6

## APPENDIX B

### Comparison of CJPTA, s. 10 and Ontario Rule 17.02

| Court Jurisdiction and Proceedings Transfer Act s. 10 | Rule 17.02 |
|---|---|
| (a) enforce, assert, declare or determine proprietary or possessory rights or a security interest in immovable or movable property in Ontario; | (a) in respect of real or personal property in Ontario; |
| (b) concerns the administration of the estate of a dead person in relation to:<br>  i. immovable property of the deceased person in Ontario; or<br>  ii. movable property anywhere of the deceased person if at the time of death he or she was ordinarily resident in Ontario; | (b) in respect of the administration of the estate of a deceased person,<br>  i. in respect of real property in Ontario, or<br>  ii. in respect of personal property, where the deceased person, at the time of death, was resident in Ontario; |
| (c) brought to interpret, rectify, set aside or enforce any deed, will, contract or other instrument in relation to:<br>  i. immovable or movable property in Ontario; or<br>  ii. movable property anywhere of a deceased person who at the time of death was ordinarily resident on Ontario; | (c) for the interpretation, rectification, enforcement or setting aside of a deed, will, contract or other instrument in respect of,<br>  i. real or personal property in Ontario, or<br>  ii. the personal property of a deceased person who, at the time of death, was resident in Ontario; |
| (d) brought against a trustee in relation to the carrying out of a trust in any of the following circumstances:<br>  i. the trust assets include immovable or movable property in Ontario and the relief claimed is only as to that property;<br>  ii. that trustee is ordinarily resident in Ontario;<br>  iii. the administration of the trust is principally carried on in Ontario; | (d) against a trustee in respect of the execution of a trust contained in a written instrument where the assets of the trust include real or personal property in Ontario; |

Page: 7

iv.    by the express terms of a trust document, the trust is governed by the law of Ontario;

(e) for foreclosure, sale, payment, possession or redemption in respect of a mortgage, charge or lien on real or personal property in Ontario;

(e) concerns contractual obligations, and:
    i.    the contractual obligations, to a substantial extent, were to be performed in Ontario;
    ii.    by its express terms, the contract is governed by the law of Ontario; or
    iii.    the contract:
        A.    is for the purchase of property, services or both, for use other than in the course of the purchaser's trade or profession; and
        B.    resulted from a solicitation of business in Ontario by or on behalf of the seller;

(f) in respect of a contract where,
    i.    the contract was made in Ontario,
    ii.    the contract provides that it is to be governed by or interpreted in accordance with the law of Ontario,
    iii.    the parties to the contract have agreed that the courts of Ontario are to have jurisdiction over legal proceedings in respect of the contract, or
    iv.    a breach of the contract has been committed in Ontario, even though the breach was preceded or accompanied by a breach outside Ontario that rendered impossible the performance of the part of the contract that ought to have been performed in Ontario;

(f) concerns restitutionary obligations that, to a substantial extent, arose in Ontario;

(g) concerns a tort committed in Ontario;

(g) in respect of a tort committed in Ontario;

(h) in respect of damage sustained in Ontario arising from a tort, breach of contract, breach of fiduciary duty or breach of confidence, wherever committed;

(h) concerns a business carried on in

[see 17.02(m)]

2010 ONCA 84 (CanLII)

Page: 8

Ontario;

2010 ONCA 84 (CanLII)

(i) is a claim for an injunction ordering a party to do or refrain from doing anything:
    i.   In Ontario; or
    ii.  In relation to immovable or movable property in Ontario;

(j) is for a determination of the personal status or capacity of a person who is ordinarily resident in Ontario;

(k) is for enforcement of a judgment of a court made in or outside Ontario or an arbitral award made in or outside Ontario; or

[see s. 3(d) and s. 7]

[see s. 3(a)]

(l) is for the recovery of taxes or other indebtedness and is brought by the Crown of Ontario or by a local authority of Ontario.

(i) for an injunction ordering a party to do, or refrain from doing, anything in Ontario affecting real or personal property in Ontario;

(m) on a judgment of a court outside Ontario;

(n) authorized by statute to be made against a person outside Ontario by a proceeding commenced in Ontario;

(o) against a person outside Ontario who is a necessary or proper party to a proceeding properly brought against another person served in Ontario;

(p) against a person ordinarily resident or carrying on business in Ontario;

(q) properly the subject matter of a counterclaim, crossclaim or third or subsequent party claim under these rules; or

(r) made by or on behalf of the Crown or a municipal corporation to recover money owing for taxes or other debts due to the Crown or municipality.



# TAB21

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

▷

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

01; 358209578Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust

VENTAS, INC., 2124678 ONTARIO INC., and 2124680 ONTARIO INC. (Applicants / Respondents in Appeal) and
SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, SUNRISE REIT
GP, INC., SUNRISE SENIOR LIVING INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents /
Appellants in Appeal)

SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, and SUNRISE
REIT GP, INC. (Applicants / Appellants in Appeal) and VENTAS SSL ONTARIO II, INC. (FORMERLY 2124678
ONTARIO INC.), VENTAS SSL ONTARIO I, INC. (FORMERLY 2124680 ONTARIO INC.), VENTAS INC.,
SUNRISE SENIOR LIVING, INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Re-
spondents in Appeal / Ventas Inc. and numbered companies) (Appellant by Cross-Appeal / Health Care Property
Investors, Inc.)

Ontario Court of Appeal

R.A. Blair, J. MacFarland, H.S. LaForme JJ.A.

Heard: March 20, 2007
Judgment: March 23, 2007
Docket: CA C46790, C46791

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirming *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 2007 CarswellOnt
1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.)

Counsel: Peter F.C. Howard, Eliot Kolers for Appelants, Sunrise Senior Living Real Estate Investment Trust, Sunrise
REIT Trust, Sunrise REIT GP Inc.

Jeffrey S. Leon, Derek J. Bell for Appellants, Health Care Property Investors Inc.

Mark A. Gelowitz, Laura K. Fric for Respondents, Ventas Inc., Numbered Companies

Luis G. Sarabia, Cynthia Spry for Respondent, Sunrise Senior Living Inc.

Subject: Corporate and Commercial; Contracts; Property; Public

Business associations --- Powers, rights and liabilities — Contracts by corporations — Miscellaneous issues

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

Real estate investment trust was publicly traded entity — Board of trustees decided to sell assets and developed two-stage auction process to maximize value of units — Parties interested in purchasing were required to enter into confidentiality agreements with trust — Confidentiality agreements contained standstill terms prohibiting contact between either potential purchaser and trust's subsidiary — Corporation entered into agreement with trust to purchase assets — Third party learned of agreement and sent last-ditch proposal to trust — Trust told third party to enter dis-cussions with representatives from its subsidiary — Corporation refused to waive standstill terms of agreement — Corporation's application for declaration that trust was obliged to enforce standstill terms in confidentiality agreement was granted — Trust appealed — Third party cross-appealed for declaration that communications between it and subsidiary of trust were permitted — Appeal dismissed; cross-appeal dismissed — Trust was obliged to enforce standstill terms — Judge correctly outlined and applied principles of contract interpretation — Judge was correct that important purpose of s. 4.4 of purchase agreement was to ensure enforcement of standstill agreements entered into by previous players in auction process — Fiduciary out clause did not apply where unsolicited proposal was tendered in breach of non-solicitation provisions of purchase agreement — Fiduciary out clause did not allow trust to resile from terms of its standstill agreements with earlier bidders — Judge was sensitive to fiduciary out provisions that permitted other bona fide written unsolicited acquisition proposals — Judge found this was balanced by requirement that trust ensure enforcement of standstill agreements signed as part of auction process in order to protect successful bidder — This interpretation made commercial sense — Judge did not err in her assessment and use of term "bona fide" — Issue on cross-appeal was moot since ruling precluded third party proposal from being pursued.

**Cases considered by *R.A. Blair J.A.*:**

*ACE Ltd. v. Capital Re Corp. (1999), 747 A.2d 95* (U.S. Del. Ch.) — referred to

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10* (S.C.C.) — referred to

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co. (1979), (sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.) [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176* (S.C.C.) — referred to

*CW Shareholdings Inc. v. WIC Western International Communications Ltd. (1998), 39 O.R. (3d) 755, 160 D.L.R. (4th) 131, 1998 CarswellOnt 1891, 38 B.L.R. (2d) 196* (Ont. Gen. Div. [Commercial List]) — referred to

*Eli Lilly & Co. v. Novopharm Ltd. (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321* (S.C.C.) — referred to

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc. (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357* (Ont. C.A.) — considered

*Paramount Communcations Inc. v. QVC Network Inc. (1994), 637 A.2d 34, 62 U.S.L.W. 2530, Fed. Sec. L. Rep. P 98,063* (U.S. Del. Super.) — referred to

*Pente Investment Management Ltd. v. Schneider Corp. (1998), 113 O.A.C. 253, (sub nom. Maple Leaf Foods Inc. v. Schneider Corp.) 42 O.R. (3d) 177, 1998 CarswellOnt 4035, 44 B.L.R. (2d) 115* (Ont. C.A.) — considered

*Scanlon v. Castlepoint Development Corp. (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633* (Ont. C.A.) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of) (1998), 1998 CarswellOnt 2565, 40 B.L.R. (2d) 1*

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

(Ont. Gen. Div. [Commercial List]) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of) (1999), 45 O.R. (3d) 417, (sub nom. Toron-to-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

*Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 2005 CarswellOnt 1875, 197 O.A.C. 264, 75 O.R. (3d) 325, 4 B.L.R. (4th) 324 (Ont. C.A.) — referred to

APPEAL by public real estate trust from decision reported at *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 56 R.P.R. (4th) 184, 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.), granting application by corporation for declaration that trust was obligated to enforce confidentiality agreement; CROSS-APPEAL by third party for declaration that communications between it and subsidiary of trust were permitted.

*R.A. Blair J.A.*:

Overview

1    Sunrise REIT is a Canadian public real estate investment trust whose units are traded on the Toronto Stock Exchange. It owns and invests in senior living communities in Canada and the United States. In September 2006, Sunrise's board of trustees determined that a strategic sale process of its assets would be beneficial to its unitholders, thus effectively putting Sunrise "in play" on the public markets.

2    To carry out this plan, the Trustees developed a two-stage auction process with a view to maximizing the value of Sunrise's units. Ventas, Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCPI") were two of seven initially interested prospective purchasers in the auction process. They emerged from the preliminary round as the only two potential bidders asked to participate in the final round.

3    Ventas submitted a successful bid to acquire all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per unit), subject to unitholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid — after it knew what Ventas had offered — "topping up" the Ventas offer by twenty per cent to $18 per unit. This increased offer represents an additional $227.5 million for the unitholders, who are to meet on March 30, 2007, to consider the Ventas proposal.

4    Hence the urgency of this appeal.

5    The appeal turns on the interpretation of the terms of the purchase agreement executed by Sunrise and Ventas following acceptance of the Ventas bid. The issue is whether Sunrise is obliged to enforce the terms of a prior standstill agreement entered into between it and HCPI in the course of the auction process and which prohibits HCPI from making an offer for the Sunrise assets without Sunrise's consent. If the answer to that question is "Yes", Sunrise will be precluded from considering or accepting the richer HCPI offer pending the unitholders' meeting.

6    Following an urgent application, determined on March 6, 2007, Justice Pepall answered the foregoing question in the affirmative. Sunrise and HCPI appeal from that decision. Ventas supports it.

7    For the reasons that follow, I would dismiss the appeal and uphold the decision of the application judge.

Facts

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

8    As mentioned above, Sunrise owns and invests in senior living communities in Canada and the United States. The properties are managed by Sunrise Senior Living, Inc. ("SSL"), a U.S. public company whose shares are traded on the New York Stock Exchange.

9    HCPI is a self-administered real estate investment trust that also invests in healthcare facilities. Ventas is a U.S.-based health care real estate investment trust whose shares are listed on the New York Stock Exchange.

10    In September 2006, after Sunrise's board of trustees determined that a strategic sale process of the Trust's assets would be beneficial to its unitholders, it began an auction process with a view to maximizing unitholder value.

11    Parties who were interested in acquiring Sunrise (including HCPI and Ventas) were required to enter into a confidentiality agreement with it in order to prevent non-public information exchanged by the parties from being publicly disclosed (the "Confidentiality Agreements"). The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements").

12    Although the parties' Confidentiality Agreements were largely similar, Ventas's Standstill Agreement was worded differently from HCPI's in that the Ventas standstill ceased to apply if, among other things, Sunrise entered into an agreement to sell more than twenty per cent of its assets to a third party. Notably, HCPI's Standstill Agreement did not contain a similar termination clause.

13    On November 21, 2006, Sunrise invited potential bidders to submit bids in the non-binding preliminary round of an auction. After the first round of bids, Sunrise invited HCPI and Ventas to engage in further negotiations and on December 29, 2006, it invited them to submit final binding bids in the second round of the auction by January 8, 2007. Sunrise waived the Standstill Agreements with those bidders for that purpose, and HCPI and Ventas were expressly told not to assume that the "winning" bid was assured of actually acquiring Sunrise at the price agreed upon or that they would be given an opportunity to rebid, renegotiate, or improve the terms of their proposal.

14    Ventas submitted a second bid on January 8, but HCPI withdrew from the auction and did not.

15    On January 14, 2007, Ventas and Sunrise signed an agreement contemplating the purchase by Ventas of all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15.00 per Unit), subject to Unitholder approval (the "Purchase Agreement"). This price represented a 35.8% premium over the closing price of the units on January 12, 2007. The Purchase Agreement contemplated subsequent third-party unsolicited bids and allowed Sunrise to accept such a bid if it was financially superior to Ventas's bid.

16    On January 17, 2007, Sunrise notified HCPI of the agreement with Ventas and asked for the return of Sunrise's confidential materials. In the letter, Sunrise's solicitor reminded HCPI of the terms of the Confidentiality Agreement it signed in November 2006.

17    On February 14, 2007, HCPI submitted a proposal to acquire all of Sunrise's assets for $18.00 per unit (the "HCPI Proposal"), conditional on HCPI's ability to reach a management agreement with SSL. Sunrise treated the HCPI Proposal as an unsolicited third-party bid, but it concluded that it was not in a position to determine whether the bid was a superior bid because of the SSL condition.

18    The Confidentiality Agreements entered into in the course of the auction process contained a provision prohibiting prospective purchasers from communicating with SSL. This was because SSL was viewed as a possible bidder. Following the preliminary round of the auction, in late November 2006, and after realizing that SSL was not an interested purchaser, Sunrise had authorized its financial advisors to arrange to allow HCPI and Ventas to contact SSL

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

for purposes of the second round of bidding. On February 15, 2007, however — after learning of the HCPI Proposal — Ventas advised Sunrise that, if it permitted communications between SSL and HCPI, Sunrise would be in breach of the Purchase Agreement. It did not assert that HCPI would be in breach of its Standstill Agreement because it apparently assumed that HCPI's Standstill Agreement was worded similarly to the Ventas Standstill Agreement, which meant that the restraint on an unsolicited bid was no longer enforceable since Sunrise had entered into an agreement with a third party.

19      On February 18, 2007, Sunrise served application materials upon Ventas, HCPI and SSL indicating its intention to seek the court's interpretation of the Purchase Agreement, specifically on the issue of communications between HCPI and SSL. It is at this point that Ventas learned of the specific terms of HCPI's Confidentiality Agreement and realized that HCPI's Standstill Agreement did not contain the same termination clause as Ventas's Standstill Agreement. On February 21, 2007, Ventas brought the within Application seeking a declaration that Sunrise was required to enforce its Standstill Agreement with HCPI, thereby preventing it from considering the HCPI Proposal.

20      The application judge found that Sunrise had agreed with Ventas that it would enforce existing Standstill Agreements and that any bid made in breach of an existing Standstill Agreement would not be *bona fide*. She then concluded that Sunrise was required to enforce the Standstill Agreement with HCPI and that HCPI did not have prior written consent to submit its bid. She dismissed Sunrise's application on the grounds that the issue was moot in light of her earlier conclusion.

**The Provisions of the Agreement**

21      Section 4 of the Purchase Agreement deals generally with the covenants of the parties. Section 4.4 deals with Sunrise's "Covenants Regarding Non-Solicitation". Because of their importance, I reproduce the provisions of section 4.4 in their entirety (the underlining is mine):

4.4(1) Following the date hereof, Sunrise REIT shall not, directly or indirectly, through any trustee, officer, director, agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,

(i) solicit, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or proposals regarding, or other action that constitutes, or may reasonably be expected to lead to, an actual or potential Acquisition Proposal,

(ii) participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries,

(iii) approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal,

(iv) accept or enter into any agreement, arrangement or understanding, related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

(v) withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2) Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with regard to a

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (that did not result from a breach of this Section 4.4), from furnishing or disclosing non-public information to such Person if and only to the extent that:

(i) the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

(ii) such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

(3) Notwithstanding anything, contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and rec-ommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Ac-quisition Proposal (that did not result from a breach of this Section 4.4) ("Proposed Agreement") if and only to the extent that:

(i) it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

(ii) the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such de-termination,

(iii) a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transac-tions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv) if the Purchasers have proposed to amend the transactions contemplated under this Agreement in ac-cordance with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v) if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transac-tions contemplated hereby in such disclosure.

(4) If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5) Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of section 4.4.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

(6) During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7) Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8) Sunrise REIT shall

(i) ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

(ii) immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

(iii) require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;

(iv) terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

(v) not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties.

22    The Purchase Agreement defines "Acquisition Proposal" and "Superior Proposal" as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or, of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

(a) is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

(b) in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

(c) would, if consummated in accordance with its terms, result in a transaction more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

### Analysis

23    The central issue on this appeal, as it was before the application judge, is whether the provisions of section 4.4 of the Purchase Agreement impose an obligation on Sunrise to enforce the Standstill Agreement between it and HCPI, thus precluding it from considering the Acquisition Proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. In my view, they do.

24    Counsel accept that the application judge correctly outlined the principles of contractual interpretation applicable in the circumstances of this case. I agree. Broadly stated — without reproducing in full the relevant passages from her reasons (paras. 29-34) in full — she held that a commercial contract is to be interpreted,

(a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;[FN1]

(b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;[FN2]

(c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties;[FN3] and (to the extent there is any ambiguity in the contract),

(d) in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.[FN4]

25    The appellants assert, however, that the application judge misapplied the principles of contractual interpretation that she had properly enunciated. They say she did so essentially,

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

a) by misapprehending the interplay between sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8)(v) of the Purchase Agreement and, in particular by failing to appreciate, and to reconcile, the differences between the wording of sections 4.4(1) and 4.4(8), and more generally,

b) by failing to understand the "architecture" of section 4.4 of the Purchase Agreement and to consider it against the background of the factual matrix in which the Agreement was negotiated.

26    I do not agree.

### The Application Judge's Reasoning

27    The thrust of the application judge's reasoning in this regard is found at paragraphs 35, 36, 38 and 39 of her reasons:

35 Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

36 Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

[Footnote omitted.]

### The Scheme and Interpretation of Section 4.4

28    I agree with the application judge that an important purpose of this part of the Purchase Agreement is to ensure the enforcement of standstill agreements entered into by previous players in the auction process. The negotiating context demonstrates that Ventas has been skilful in protecting its own position with respect to competition and standstills — unlike the HCPI Standstill, the Ventas/Sunrise Standstill Agreement expired at the conclusion of the

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

auction — and it is objectively reasonable, given this background, that it would seek protection against competition from those who were unsuccessful in the auction, particularly its principle competitor.

29      From Sunrise's perspective, the safety valve lies in the unitholders' meeting. If the unitholders believe that there is a more favourable offer available — one worth the risk of rejecting the Ventas proposal — they may well vote to reject the Ventas proposal at their meeting on March 30.

30      The language used by the parties in the Purchase Agreement supports this interpretation.

31      Viewed contextually, sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8) form part of a section of the Purchase Agreement that deals with the general covenant of Sunrise not to shop for other offers pending unitholder consideration of the Ventas bid. Viewed in light of the factual matrix in which the Agreement was negotiated, the provisions provide deal protection for Ventas, as the successful bidder in the auction, subject to Sunrise REIT's fiduciary out obligations.

32      As I read section 4.4 of the Agreement, it has four major components. First, it contains the overriding obligation of Sunrise not to solicit other bids, buttressed by the commitment of Sunrise to enforce existing standstill agreements that may be in place with bidders who have already engaged in the auction process (section 4.4(1)). Secondly, it contains the "fiduciary out" protection for the Sunrise Trustees (and unitholders), permitting the Trustees to consider *bona fide* unsolicited Acquisition Proposals from third parties (*that are not in breach of the provisions of section 4.4*) (sections 4.4(2) and 4.4(3)). Thirdly, it contains a series of provisions dealing with how the parties are to address a situation where a permitted Acquisition Proposal is received (sections 4.4(3)-4.4(7)).[FN5] Lastly, section 4.4(8)(v) returns to the general non-solicitation obligation, reinforcing it by ensuring that Sunrise will (i) ensure all of its officers, Trustees and agents are aware of the non-solicitation provisions, (ii) immediately stop negotiating with anyone previously involved in the bidding process, (iii) require those bidders to return any confidential documentation and information they may have received during the process, (iv) terminate access to the data room by anyone other than Ventas and its representatives, and finally (a reiteration of the requirement set out in section 4.4(1)):

   `(v) not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties ...

33      Contrary to the appellants' submissions, however, it is not *any* Acquisition Proposal that the Trustees are free to consider as part of the fiduciary out scenario; it is only an Acquisition Proposal from a third party *that is not in breach of section 4.4 of the Agreement*.

34      Properly understood in this fashion, then, a reading of section 4.4 demonstrates that there is no *conflict* between the provisions of sections 4.4(1)(ii), 4.4(2), 4.4(3) and 4.4(8)(v). The repeated standstill enforcement terms *complement* one another. As the application judge pointed out, the opening phrases of sections 4.4(2) and 4.4(3) — "notwithstanding anything contained in Section 4.4(1)" — do not have the words "or Section 4.4(8)(v)" added to them. This reinforces the interpretation that section 4.4(8)(v) is there to clarify that Sunrise's obligation to enforce its Standstill Agreements with third parties is not negated by the fiduciary out clause. An unsolicited proposal by a prior bidder bound by a Standstill Agreement is a proposal that is otherwise in breach of section 4.4, because it violates section 4.4(8)(v), and therefore is not immunized by the fiduciary out provisions.

35      In that sense, contrary to the appellants' submissions, the application judge's reading of the Purchase Agreement does not reduce section 4.4(8)(v) to simply the functional equivalent of section 4.4(1)(ii). Nor is it a case of section 4.4(8)(v) continuing to require the enforcement of a Standstill Agreement even when the fiduciary out clause is otherwise applicable. The fiduciary out clause does not apply where the unsolicited proposal is tendered in breach of the non-solicitation provisions of the Purchase Agreement, i.e., in breach of a Standstill Agreement that Sunrise is obliged to enforce. The fiduciary out formula is an important feature of the non-solicitation format, but it does not allow Sunrise to resile from the terms of its Standstill Agreements with earlier bidders, in my opinion.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

*The Difference in Wording between Sections 4.4(1)(ii) and 4.4(8)(v)*

36      Mr. Howard emphasized what he argued was a difference in wording between those two provisions. He points out that section 4.4(1)(ii) expressly refers to situations involving "an actual or potential Acquisition Proposal" whereas section 4.4(8)(v) contains no such reference, and further, that other subsections of section 4.4(8) — namely, sections 4.4(8)(ii) and (iii) — refer to Acquisition Proposals as well, although not in the context of standstill agreements (4.4(8)(ii) and 4.4(8)(iii)). Because section 4.4(8)(v) does not refer to "Acquisition Proposals", Mr. Howard submits it does not apply in the context of such a proposal and therefore does not apply in the context of the HCPI Acquisition Proposal.

37      There are several problems with this argument. First, it misapprehends the fact that *any* proposal to acquire more than twenty percent of the assets of Sunrise — whether made before or after the close of the auction — constitutes an "Acquisition Proposal" as defined in the Agreement. Consequently, section 4.4(8)(v) can only apply in the context of an Acquisition Proposal of some sort, regardless of its wording.

38      Secondly, the argument appears to be founded on the unarticulated premise that an Acquisition Proposal, as referenced in sections 4.4(1)(ii), 4.4(2) and 4.4(3), is the equivalent of a Superior Proposal. The appellants' theory of the Agreement is that the Trustees are entitled to consider any Acquisition Proposal received after the close of the auction, and that the commitment in section 4.4(8)(v) to enforce standstill agreements only applies in the event that a subsequent Acquisition Proposal received by the Trustees does not make the grade as a Superior Proposal. The function of section 4.4(8)(v), they say, is to permit the Trustees in such circumstances to prevent a bidder in such a case — whether a prior bidder or not — from continuing to participate in the bidding process.

39      It is not the case, however, that an Acquisition Proposal and a Superior Proposal are the same thing. The latter is a narrower concept than the former. While an Acquisition Proposal is essentially an offer by anyone to acquire more than twenty percent of the assets of Sunrise, a Superior Proposal is an Acquisition Proposal[FN6] that is more favourable to the unitholders from a financial point of view than the Ventas bid. Sunrise submits, at paragraph 43 of its factum, that section 4.4(8)(v) "is part of the filtering protection for both Ventas and Sunrise REIT that allows and obliges Sunrise REIT to deal summarily with offers that do not meet the Acquisition Proposal threshold." Sunrise does not mean the "Acquisition Proposal threshold" in this statement, however; it means the "Superior Proposal threshold." To support the appellants' argument, the reference to "Acquisition Proposal" in section 4.4(1)(ii) would have to be read as "Superior Proposal". That is not what it says.

40      Moreover, and in any event, a careful reading of section 4.4(1)(ii) does not bear out the nexus between the reference to "Acquisition Proposal" and the commitment to enforce the standstill agreements. For ease of reference I repeat the wording of section 4.4(1)(ii) here:

4.4(1) Following the date hereof, Sunrise REIT shall not ...

(ii) participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligation to Sunrise REIT or any of its Subsidiaries.

41      Section 4.4(1)(ii) in reality contains two prohibitions, not one. The language does not work otherwise. Sunrise agrees not to participate in discussions or negotiations regarding actual or potential Acquisition Proposals. It also agrees not to release anyone from, or fail to enforce, existing Standstill Agreements. The drafters could well have divided section 4.4(1) into six general prohibitions rather than five. The commitment to enforce the Standstill Agreements is not, therefore, tied to "Acquisition Proposals" in a way that section 4.4(8)(v) is not.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

42    Accordingly, I agree with the application judge's observation that while the appellants' interpretation arguments are creative, they are strained. As she said, "They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole."

### An Interpretation that Reflects the "Factual Matrix", is "Commercially Sensible", and Accords with the Fiduciary Obligations of the Sunrise Trustees

43    Nor do I accept the submission that the application judge failed to consider the factual matrix underlying the negotiation of the Purchase Agreement, or that she failed to give effect to the "commercial sense" component of contract interpretation.

44    In a blended argument, the appellants submit that the application judge's interpretation of the Purchase Agreement ignores the factual matrix in which the Agreement was negotiated, defies commercial sense and reasonableness, and eviscerates the fiduciary out mechanism that was central to the parties' agreement. Respectfully, I do not read the application judge's reasons in this fashion.

### The Factual Matrix

45    Contracts are not made in a vacuum, and there is no dispute that the surrounding circumstances in which a contract is negotiated are relevant considerations in interpreting contracts. As this court noted in *Kentucky Fried Chicken*, *supra*, at para. 25, "[w]hile the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance."

46    Sunrise points to a number of surrounding circumstances which it says the application judge ignored in arriving at her decision. These include that:

a) the Purchase Agreement was entered into at the conclusion of the second stage of a private sale auction process where it was clear that the overall objective of Sunrise was to maximize value for it unitholders;

b) the expectations of the bidders, objectively determined, could not have been that the "winner" of the auction was assured of acquiring the Sunrise assets, because everyone was aware that there would be a fiduciary out clause and that superior proposals could displace the winning bid;

c) Ventas's own standstill terms ceased to apply in the event that Sunrise entered into a sales transaction with a third party, and Ventas could not know whether the other Standstill Agreements rested on the same footing (and did not know that HCPI's did not);

d) Ventas never told Sunrise it believed the participants in the auction would be excluded from the operation of the fiduciary out provision; and

e) Ventas had bargained for, and achieved, considerable deal protection, in the form of the "no shop" provision, the right to match any Superior Proposal, and the right to receive a $39.8 million break fee if it chose not to match such an offer.

47    Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such matters. Here, the experienced Commercial List judge was exercising a function common to that role — the interpretation of a commercial contract — and, while she may not have dealt with the foregoing themes expressly as the appellants would like, her reasons, read as a

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

whole, indicate that she was alive to most, if not all, of them. She was certainly aware of the facts contained in points (a), (b), (c) and (e) above, as she dealt with them at one time or another in the reasons. The factor mentioned in (d) is not dispositive of anything.

48      At the conclusion of her consideration of the interpretation issue, as noted earlier, the application judge said (at paras. 38 and 39):

38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone else who is in breach of its standstill agreement. [Emphasis added, footnote omitted.]

49      I can find no basis for concluding the applications judge was not attuned to the need to keep the factual matrix in mind when conducting her interpretative exercise.

50      Nor do I accept that she either ignored the need to interpret the contract in a way that reflected sound commercial sense, or that she failed to give it such an interpretation. It is apparent from her recitation of the principles of contract interpretation that she was aware of the relevance of the "sound commercial sense" theme. She cited the following passage from this Court's decision in *Kentucky Fried Chicken*, *supra*, at para. 27:

Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity: [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense: [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

51      The appellants' argument that the application judge failed to interpret the Purchase Agreement in a fashion that accords with sound commercial sense is grounded in the belief that she overlooked the importance of the "maximizing value" principle and the centrality of the Trustees' fiduciary obligations in that regard, in cases of this nature. She did neither, in my view.

52      As noted above, the application judge was sensitive to the fiduciary out provisions that permitted other *bona fide* written unsolicited Acquisition Proposals. In her view, however, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation makes commercial sense, in my view.

53      On behalf of HCPI, Mr. Leon placed great emphasis on the sanctity of the fiduciary out mechanism in acquisition agreements of this nature. There is no doubt that the directors of a corporation that is the target of a takeover bid — or, in this case, the Trustees — have a fiduciary obligation to take steps to maximize shareholder (or unitholder) value in the process: see *CW Shareholdings Inc. v. WIC Western International Communications Ltd. (1998), 39 O.R. (3d) 755* (Ont. Gen. Div. [Commercial List]), at 768 and 774. That is the genesis of the "fiduciary out" clauses in

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

situations such as the case at hand. They enable directors or trustees to comply with their fiduciary obligations by ensuring that they are not precluded from considering other *bona fide* offers that are more favourable financially to the shareholders or unitholders than the bid in hand.

54    It is not necessary — nor would it be wise, in my view — to go as far as HCPI suggests this court might go, and adopt the principle gleaned from some American authorities, that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable: see *Paramount Communcations Inc. v. QVC Network Inc.*, 637 A.2d 34 (U.S. Del. Super. 1994), and *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95 (U.S. Del. Ch. 1999) at 105. That is not what happened in this case.

55    The Trustees did not contract away their fiduciary obligations. Rather, they complied with them by setting up an auction process, in consultation with their professional advisers, that was designed to maximize the unit price obtained for Sunrise's assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. In this case, that turned out to be only HCPI.

56    An auction process is well-accepted as being one — although only one — "appropriate mechanism to ensure that the board of a target company acts in a neutral manner to achieve the best value reasonably available to shareholders in the circumstances": *Pente Investment Management Ltd. v. Schneider Corp.* (1998), 42 O.R. (3d) 177 (Ont. C.A.) at 200. Here, the trustees, acting reasonably and on professional advice, formed the view that an auction process was the best way to maximize value, and conducted such an auction to the point where they attracted a successful bidder. This is not a case where the Trustees were unable to judge the adequacy of the bid (*Schneider*, at 200). They had dealt with seven prospective purchasers in the course of the two auction rounds, and had received preliminary proposals. Ventas's $15.00-per-unit price represented a 35.8% increase over the market price of the Units on the date the auction closed. I do not think the Trustees can be said to have failed in the exercise of their fiduciary obligations to their unitholders in these circumstances simply by agreeing in the Purchase Agreement to preclude earlier bidders, who had bound themselves under Standstill Agreements not to do so, from coming in after the auction was concluded and the "successful" bidder had showed its cards and attempting to "top up" that bid.

57    It is well accepted that "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation": John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 729. Advancing this principle, the appellants argue that we should be loathe to adopt an interpretation of the Purchase Agreement that is inconsistent with overarching fiduciary obligations. While I accept the principle put forward, however, I do not think it applies in the context of this case for the reasons outlined above. The interpretation given to the Purchase Agreement by the application judge is not inconsistent with the Trustee's fiduciary obligation to maximize unitholder value. Indeed, it is consistent with that obligation.

58    Finally, Mr. Leon emphasizes the importance of the word "nothing" in the opening language of sections 4.4(2) and 4.4(3) of the Purchase Agreement. Both provisions open with the words "Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, *nothing* shall prevent the Board from ..." [emphasis added]. Mr. Leon submits that "nothing" means what it says, and must be given the full scope of that meaning, in order to ensure that "nothing" in the Purchase Agreement or otherwise is permitted to stand in the way of the Trustees performing their duty to maximize shareholder value. This point involves parsing the Purchase Agreement in a microscopic fashion that is a little too fine, in my view. The use of the word "nothing" in sections 4.4(2) and 4.4(3) is nothing more than a different way of saying "Notwithstanding anything contained in Section 4.4(1) ... *the Board is not prevented from* ...". I would not ascribe to it the expanded role that HCPI proposes.

*The Meaning of "Bona Fide"*

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

59    The appellants also attack the conclusion of the application judge that the HCPI Acquisition Proposal was not a "*bona fide*" offer. She accepted the Ventas submission that "a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be *bona fide*," noting that sections 4.4(2) and 4.4(3) of the Purchase Agreement contemplate an Acquisition Proposal from a third party "that did not result from a breach of ... Section 4.4".

60    There was much debate about the meaning of "*bona fide*". The application judge viewed it as meaning acting "in good faith; sincere, genuine", relying upon *The Oxford English Dictionary*.[FN7] She found that the HCPI Acquisition Proposal was not *bona fide* because it was made in breach of the HCPI Standstill Agreement, which Sunrise was obliged by s. 4.4 to enforce. The appellants agree that *bona fide* means "genuine" or "made in good faith" but submit that a *bona fide* Acquisition Proposal, as contemplated by the Purchase Agreement, is one that is "genuine" or "authentic" in the sense that it is not a sham and is reasonably capable of becoming a Superior Proposal, and that this decision must be made in the context of the entire situation.

61    In the end, there is not much difference between the parties as to the meaning of the term "*bona fide*". As with the principles of contract interpretation, they differ on the application of the term in the circumstances of this case. Given the language of the Purchase Agreement, and the context in which it was negotiated — particularly the language "that did not result from a breach of this Section 4.4" in sections 4.4(2) and 4.4(3) — I do not think the application judge erred in her assessment and use of the term "*bona fide*" here.

*Miscellaneous*

62    Two additional points were made by the appellants, but need not be dealt with at length.

63    First, HCPI argued that Sunrise had given its prior consent to HCPI to make its subsequent Acquisition Proposal following completion of the auction process and the execution of the Purchase Agreement. This consent is said to derive from the waiver Sunrise gave to both HCPI and Ventas as part of the invitation to bid in the second round. The application judge made a specific finding against this position, however, concluding that the December 29, 2006 letter "cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement." There is no basis for interfering with this finding.

64    Secondly, HCPI submitted that the position of Ventas on these applications was tantamount to saying that the benefit of the HCPI Standstill Agreement had been assigned to it. The application judge correctly found that there was no merit in this argument. I agree with her that neither the Standstill Agreement nor its benefits had been assigned to anyone, and no one was taking the position that they had.

*The HCPI Cross-Appeal*

65    HCPI applied for a declaration that communications between it and SSL regarding Sunrise were permitted. The application judge declined to deal with this request, given her ruling which effectively precluded the HCPI Acquisition Proposal from being pursued. She concluded the application was moot.

66    I agree and for the same reason find it unnecessary to deal with the cross-appeal for the same relief.

Conclusion

67    For the foregoing reasons, then, I would dismiss both the appeal and the cross-appeal.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

68    If the parties are unable to agree as to costs, they may make brief written submissions in that regard, not to exceed five pages in length.

69    In closing, I would like to thank all counsel for their able presentations and assistance.

*J. MacFarland J.A.:*

I agree.

*H.S. LaForme J.A.:*

I agree.

*Appeal dismissed; cross-appeal dismissed.*

FN1 *BG Checo International Ltd. v. British Columbia Hydro & Power Authority,* [1993] 1 S.C.R. 12 (S.C.C.) at 23-24; *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.) at 770.

FN2 *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) at para. 403, aff'd (1999), 45 O.R. (3d) 417 (Ont. C.A.); *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 75 O.R. (3d) 325 (Ont. C.A.) at para. 26; *Eli Lilly & Co. v. Novopharm Ltd.,* [1998] 2 S.C.R. 129 (S.C.C.) at 166-68 [*Eli Lilly*].

FN3 *Eli Lilly, ibid.* at 166; *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (Ont. C.A.) at paras. 25-27 [*Kentucky Fried Chicken*].

FN4 *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901; *Kentucky Fried Chicken, ibid.*

FN5 The Proposal has to be a Superior Proposal; Sunrise has to notify Ventas of the Proposal and provide it with all relevant documentation; Ventas had the right to match the Proposal within five days (as defined) and, if it chooses not to, to terminate the Agreement and receive the break fee (see also, section 5.3 and Sehedule "B" (definition of "Termination Payment")).

FN6 That meets the section 4.4(2) requirements of being *bona fide* and unsolicited.

FN7 2d ed., *s.v.* "bona fide".

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



# TAB22

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

▷

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

01; 358211538 Western Canadian Shopping Centres Inc. v. Dutton

Bennett Jones Verchere, Garnet Schulhauser, Arthur Andersen & Co., Ernst & Young, Alan Lundell, The Royal Trust Company, William R. MacNeill, R. Byron Henderson, C. Michael Ryer, Gary L. Billingsley, Peter K. Gummer, James G. Engdahl, Jon R. MacNeill, Appellants/Respondents on cross-appeal and Western Canadian Shopping Centres Inc. and Muh-Min Lin and Hoi-Wah Wu, representatives of all holders of Class "A", Class "E" and Class "F" Debentures issued by Western Canadian Shopping Centres Inc., Respondents/Appellants on cross-appeal

Supreme Court of Canada

McLachlin C.J.C., L'Heureux-Dubé, Gonthier, Iacobucci, Binnie, Arbour, LeBel JJ.

Heard: December 13, 2000
Judgment: July 13, 2001
Docket: 27138

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: additional reasons to (December 13, 2000), Doc. 27138 (S.C.C.); reversing in part (1998), 228 A.R. 188 (Alta. C.A.); affirming (1996), 41 Alta. L.R. (3d) 412 (Alta. Q.B.)

Counsel: *Barry R. Crump, Brian Beck, David C. Bishop*, for Appellants/Respondents on Cross-Appeal

*Hervé H. Durocher, Eugene J. Erler*, for Respondents/Appellants on Cross-Appeal

Subject: Civil Practice and Procedure; Corporate and Commercial; Contracts; Torts

Practice --- Parties — Representative or class actions — Procedural requirements

Appeal of dismissal of defendants' application to strike representative action on grounds that plaintiffs failed to establish requisite conditions was dismissed — Defendants' further appeal was dismissed — Discretion was exercised to strike balance between efficiency and fairness — No countervailing considerations existed that outweighed benefits of allowing action to proceed.

Fraud and misrepresentation --- Negligent misrepresentation (Hedley Byrne principle) — Particular relationships — Fiduciary relationship

Appeal of dismissal of defendants' application to strike representative action by foreign investors on grounds they had

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

failed to establish requisite conditions was dismissed — Defendants' further appeal was dismissed — Fiduciary duty issues raised by investors were common to all plaintiffs — Material differences between investors' rights could be dealt with if they arose — Class action was not foreclosed on ground that investors might be required to show individual reliance in order to establish breach of fiduciary duty.

Practice --- Discovery — Examination for discovery — Who may be examined — General

Appeal of dismissal of defendants' application to strike representative action by foreign investors on grounds they had failed to establish requisite conditions was dismissed on further appeal — Plaintiffs cross-appealed decision on appeal that defendants were allowed to discover each individual class member — Cross-appeal allowed — Individualized discovery was premature at this stage of proceeding — Defendants were allowed to discover representative plaintiffs — Discovery of other class members was only available by order of court, upon establishment of reasonable necessity.

Corporations --- Directors and officers — Fiduciary duties — General

Appeal of dismissal of defendants' application to strike representative action by foreign investors on grounds they had failed to establish requisite conditions was dismissed — Defendants' further appeal was dismissed — Fiduciary duty issues raised by investors were common to all plaintiffs — Material differences between investors' rights could be dealt with if they arose — Class action was not foreclosed on ground that investors might be required to show individual reliance in order to establish breach of fiduciary duty.

Procédure --- Parties — Recours collectif — Exigences procédurales

Pourvoi à l'encontre du rejet de la demande des défendeurs de radier le recours collectif parce que les plaignants n'avaient pas prouvé les conditions requises a été rejeté — Nouveau pourvoi des défendeurs a été rejeté — Pouvoir discrétionnaire a été utilisé pour concilier l'efficacité et l'équité — Il n'existait pas d'autres considérations défavorables qui l'emportaient sur les avantages d'autoriser le recours.

Fraude et assertion inexacte --- Assertion négligente et inexacte (principe Hedley Byrne) — Relations particulières — Relation fiduciaire

Pourvoi à l'encontre du rejet de la demande des défendeurs de radier le recours collectif intenté par des investisseurs étrangers sous prétexte que ces derniers n'avaient pas prouvé les conditions requises a été rejeté — Nouveau pourvoi des défendeurs a été rejeté — Questions relatives à l'obligation fiduciaire soulevées par les investisseurs touchaient tous les demandeurs — Différences importantes entre les droits des investisseurs pouvaient être résolues si elles survenaient — Recours collectif n'a pas été interdit au motif qu'on exigerait peut-être des investisseurs qu'ils démontrent un lien de confiance individuel afin de prouver le manquement à l'obligation fiduciaire.

Procédure --- Communication préalable — Interrogatoire préalable — Qui peut être interrogé — En général

Pourvoi à l'encontre du rejet de la demande des défendeurs de radier le recours collectif intenté par des investisseurs étrangers sous prétexte que ces derniers n'avaient pas prouvé les conditions requises a été rejeté — Demandeurs ont formé un appel incident à l'encontre de l'appel des défendeurs, lesquels voulaient interroger chaque membre du groupe individuellement — Pourvoi incident accueilli — À ce stade des procédures, l'interrogatoire préalable individuel était prématuré — Défendeurs ne pouvaient qu'interroger les représentants des demandeurs — L'interrogatoire des autres membres du groupe ne pouvait être autorisé que par ordonnance du tribunal, après avoir établi que c'était raisonnablement nécessaire.

Sociétés par actions --- Administrateurs et dirigeants — Obligations fiduciaires — En général

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94
Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2
S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

Pourvoi à l'encontre du rejet de la demande des défendeurs de radier le recours collectif intenté par des investisseurs
étrangers sous prétexte que ces derniers n'avaient pas prouvé les conditions requises a été rejeté — Nouveau pourvoi
des défendeurs a été rejeté — Questions relatives à l'obligation fiduciaire soulevées par les investisseurs touchaient
tous les demandeurs — Différences importantes entre les droits des investisseurs pouvaient être résolues si elles
survenaient — Recours collectif n'a pas été interdit au motif qu'on exigerait peut-être des investisseurs qu'ils démon-
trent un lien de confiance individuel afin de prouver le manquement à l'obligation fiduciaire.

The representative plaintiffs, together with 229 other investors, purchased debentures in a corporation under the fed-
eral government's business immigration program, in order to facilitate their qualification as Canadian permanent
residents. They made their purchases at different times pursuant to different offering memoranda presented to them by
different defendants. The corporation invested all of its proceeds into a gold mine, which failed. The plaintiffs lost all
of their investment. The plaintiffs commenced a representative action pursuant to R. 42 of the *Alberta Rules of Court*
against the defendants for breach of fiduciary duty. The defendants applied to strike the representative action on
grounds that the plaintiffs as a group could not show the requisite element of reliance because they invested at different
times under different offering memoranda. The application was dismissed on grounds that it was not plain and obvious
that the plaintiffs failed to meet the requirements under R. 42 and that the existence of a fiduciary duty was an issue of
fact that should be left for the trial judge. The defendants' appeal was dismissed. The defendants appealed.

Held: The appeal was dismissed and the cross-appeal was allowed.

Per McLachlin C.J.C. (Arbour, Binnie, Gonthier, Iacobucci, L'Heureux-Dubé and LeBel JJ. concurring): No com-
prehensive legislative framework currently exists in Alberta respecting class actions. Practice is governed by R. 42 of
the *Alberta Rules of Court*, which allows representative actions where "numerous persons have a common interest in
the subject of an intended action". Details of class action practice were left to the courts. The common law of Alberta
identified four conditions in order for the class action to proceed. First, the class must be capable of clear definition.
Secondly, there must be issues of fact or law common to all class members, and the resolution of those issues must be
necessary to a resolution of each class member's claim. Thirdly, success for one class member must mean success for
all, and no conflicting interests must exist. Finally, the class representatives must adequately represent the class. When
these conditions are met, the court should then exercise its discretion to strike a balance between efficiency and
fairness. Class actions should not be approached restrictively. The test was not whether it was plain and obvious that
an action should not proceed as a class action, under R. 42. Denial of class status under R. 42 did not defeat the claim,
it determined how the claim would proceed. No countervailing considerations outweighed the benefits of allowing the
action to proceed in this case. The court retained the discretion to deal with any non-common issues among the
plaintiffs. As the fiduciary duty issues raised were common to all the investors, the plaintiffs had satisfied the re-
quirements of R. 42. If the court later determined that the investors were required to show individual reliance to es-
tablish breach of fiduciary duty, the court could consider at that time whether the action should continue as a class
action.

Allowing individualized discovery at this stage of the proceedings was premature. One of the benefits of a class action
was that discovery of the class representatives was usually sufficient. Individual discovery of all class members was
the exception rather than the rule. The defendants were allowed to examine the representative plaintiffs as of right.
Examination of other class members was only available by court order, upon the demonstration by the defendants of
reasonable necessity.

Les demandeurs représentants, ainsi que 229 autres investisseurs, ont participé au programme d'immigration des gens
d'affaires du gouvernement fédéral en achetant des débentures d'une compagnie, dans le but de faciliter leur obtention
du statut de résident permanent du Canada. Ils ont effectué leurs achats à divers moments selon différentes notices
d'offre qui leur ont été présentées par divers défendeurs. La compagnie a investi tous ses profits dans une mine d'or, qui
a fait faillite. Les demandeurs ont tout perdu. Ils ont alors intenté un recours collectif, conformément à la règle 42 des
*Alberta Rules of Court*, à l'encontre des défendeurs pour manquement à leur obligation fiduciaire. Les défendeurs ont

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

demandé que le recours collectif soit radié sous prétexte que les demandeurs, en tant que groupe, ne pouvaient démontrer le lien de confiance requis parce qu'ils ont investi à divers moment selon différentes notices d'offre. La demande a été rejetée au motif qu'il n'était pas clair et évident que les demandeurs n'avaient pas satisfait à toutes les exigences de la règle 42 et aussi parce que l'existence d'une obligation fiduciaire constitue une question de fait qui devait être tranchée par le juge de première instance. Le pourvoi des défendeurs a été rejeté. Ils ont interjeté appel.

**Arrêt:** Le pourvoi a été rejeté et le pourvoi incident a été accueilli.

La juge en chef McLachlin (les juges Arbour, Binnie, Gonthier, Iacobucci, L'Heureux-Dubé et LeBel y souscrivant): À l'heure actuelle, il n'existe en Alberta aucun cadre législatif complet relatif aux recours collectifs. Cette procédure est régie par l'art. 42 des *Alberta Rules of Court* qui permet les recours collectifs lorsque « [traduction] de nombreuses personnes ont un intérêt commun dans l'objet de l'action projetée ». Les détails de la procédure à suivre pour les recours collectifs ont été laissés aux tribunaux. La common law de l'Alberta a identifié quatres conditions à respecter pour que le recours collectif puisse être exercé. Premièrement, le recours collectif doit pouvoir être clairement défini. Deuxièmement, tous les membres du groupe doivent avoir en commun des questions de fait ou de droit, et la résolution de ces questions doit être nécessaire pour résoudre la réclamation de chacun des membres du groupe. Troisièmement, le succès d'un membre du groupe doit se traduire par celui de tous les membres et il ne doit pas exister de conflits d'intérêts. En dernier lieu, les représentants du groupe doivent représenter adéquatement le groupe. Si toutes ces conditions sont réunies, le tribunal peut exercer son pouvoir discrétionnaire pour concilier l'efficacité et l'équité. Les recours collectifs ne devraient pas être abordés de façon restrictive. En vertu de la règle 42, le critère à respecter n'était pas de savoir s'il était clair et évident qu'une poursuite ne pouvait être intentée comme un recours collectif. Le refus du statut de recours collectif en vertu de la règle 42 n'empêchait pas la poursuite, cela ne faisait que déterminer de quelle façon la poursuite serait intentée. En l'espèce, il n'y avait aucune considération défavorable qui l'emportait sur les avantages que comportait l'autorisation du recours. Le tribunal conservait son pouvoir discrétionnaire lui permettant de trancher toutes questions qui n'étaient pas communes à tous les demandeurs. Les demandeurs avaient rempli toutes les conditions de la règle 42 parce que les questions soulevées relatives aux obligations fiduciaires étaient communes à tous les investisseurs. Si le tribunal venait à déterminer que les investisseurs doivent démontrer un lien de confiance individuel pour prouver le manquement à l'obligation fiduciaire, il pourrait, à ce moment-là, décider si le recours doit se poursuivre comme recours collectif.

À ce stade des procédures, il était prématuré de permettre des interrogatoires au préalable individuels. Un des avantages du recours collectif était que l'interrogatoire des représentants du groupe était habituellement suffisant. L'interrogatoire préalable individuel de tous les membres du groupe constitue l'exception et non la règle. Les défendeurs avaient l'autorisation, de plein droit, d'interroger les demandeurs représentants. L'interrogatoire des autres membres du groupe n'était possible que sur ordonnance du tribunal, une fois que les défendeurs auraient prouvé que cela était raisonnablement nécessaire.

**Cases considered by/Jurisprudence citée par *McLachlin C.J.C.*:**

*Bell v. Wood*, 38 B.C.R. 310, [1927] 1 W.W.R. 580, [1927] 2 D.L.R. 827 (B.C. S.C.) — referred to

*Bywater v. Toronto Transit Commission* (1998), 27 C.P.C. (4th) 172 (Ont. Gen. Div.) — referred to

*Chancey v. May* (1722), Prec. Ch. 592, 24 E.R. 265, 2 Eq. Ca. Abr. 168 (Eng. Ch.) — referred to

*City of London v. Richmond* (1701), 2 Vern. 421, 23 E.R. 870 (Eng. Ch.) — referred to

*Drummond-Jackson v. British Medical Assn.*, [1970] 1 All E.R. 1094, [1970] 1 W.L.R. 688 (Eng. C.A.) — considered

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

*Duke of Bedford v. Ellis* (1900), [1901] A.C. 1 (U.K. H.L.) — referred to

*Guarantee Co. of North America v. Caisse populaire de Shippagan Ltée* (1988), 86 N.B.R. (2d) 342, 219 A.P.R. 342 (N.B. Q.B.) — referred to

*Hodgkinson v. Simms,* [1994] 9 W.W.R. 609, 49 B.C.A.C. 1, 80 W.A.C. 1, 22 C.C.L.T. (2d) 1, 16 B.L.R. (2d) 1, 6 C.C.L.S. 1, 57 C.P.R. (3d) 1, 5 E.T.R. (2d) 1, [1994] 3 S.C.R. 377, 95 D.T.C. 5135, 97 B.C.L.R. (2d) 1, 117 D.L.R. (4th) 161, 171 N.R. 245 (S.C.C.) — referred to

*Horne v. Canada (Attorney General)* (1995), 39 C.P.C. (3d) 38, 129 Nfld. & P.E.I.R. 109, 402 A.P.R. 109 (P.E.I. T.D.) — referred to

*Hunt v. T & N plc,* 4 C.C.L.T. (2d) 1, 43 C.P.C. (2d) 105, 117 N.R. 321, 4 C.O.H.S.C. 173 (headnote only), (sub nom. *Hunt v. Carey Canada Inc.)* [1990] 6 W.W.R. 385, 49 B.C.L.R. (2d) 273, (sub nom. *Hunt v. Carey Canada Inc.)* 74 D.L.R. (4th) 321, [1990] 2 S.C.R. 959 (S.C.C.) — referred to

*International Capital Corp. v. Schafer* (1995), 130 Sask. R. 23 (Sask. Q.B.) — referred to

*International Corona Resources Ltd. v. Lac Minerals Ltd.,* 6 R.P.R. (2d) 1, 44 B.L.R. 1, 35 E.T.R. 1, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.)* 69 O.R. (2d) 287, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.)* 26 C.P.R. (3d) 97, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.)* 61 D.L.R. (4th) 14, 101 N.R. 239, 36 O.A.C. 57, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.)* [1989] 2 S.C.R. 574 (S.C.C.) — referred to

*Korte v. Deloitte, Haskins & Sells* (1993), 8 Alta. L.R. (3d) 337, 135 A.R. 389, 33 W.A.C. 389, 15 C.P.C. (3d) 109 (Alta. C.A.) — considered

*Langley v. North West Water Authority,* [1991] W.L.R. 711n (Eng. H.L.) — referred to

*Langley v. North West Water Authority,* [1991] 3 All E.R. 610 (Eng. C.A.) — referred to

*Lee v. OCCO Developments Ltd.* (1994), 148 N.B.R. (2d) 321, 378 A.P.R. 321, [1995] G.S.T.C. 71 (N.B. Q.B.) — referred to

*Markt & Co. v. Knight Steamship Co.,* [1910] 2 K.B. 1021, 79 L.J.K.B. 939, 103 L.T. 369 (Eng. K.B.) — referred to

*N.A.P.E. v. Newfoundland (Treasury Board)* (1995), (sub nom. *Newfoundland Assn. of Public Employees v. Newfoundland)* 132 Nfld. & P.E.I.R. 205, (sub nom. *Newfoundland Assn. of Public Employees v. Newfoundland)* 410 A.P.R. 205 (Nfld. T.D.) — referred to

*Naken v. General Motors of Canada Ltd.,* [1983] 1 S.C.R. 72, 144 D.L.R. (3d) 385, 46 N.R. 139, 32 C.P.C. 138 (S.C.C.) — distinguished

*Pasco v. Canadian National Railway* (1989), (sub nom. *Oregon Jack Creek Indian Band v. Canadian National Railway)* 102 N.R. 76, [1990] 2 C.N.L.R. 96, [1989] 2 S.C.R. 1069, 63 D.L.R. (4th) 607 (S.C.C.) — referred to

*Ranjoy Sales & Leasing Ltd. v. Deloitte, Haskins & Sells,* [1984] 4 W.W.R. 706, 44 C.P.C. 159, 27 Man. R. (2d) 311 (Man. Q.B.) — referred to

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

   *Shaw v. Vancouver Real Estate Board*, [1972] 5 W.W.R. 726, 29 D.L.R. (3d) 774 (B.C. S.C.) — referred to

   *Taff Vale Railway v. Amalgamated Society of Railway Servants*, [1901] A.C. 426, 70 L.J.K.B. 905 (U.K. H.L.) — referred to

   *Van Audenhove v. Nova Scotia (Attorney General)* (1994), 28 C.P.C. (3d) 305, 134 N.S.R. (2d) 294, 383 A.P.R. 294 (N.S. S.C.) — referred to

   *Wallworth v. Holt* (1841), 41 E.R. 238, 4 My. & Cr. 619 (Eng. Ch. Div.) — considered

   *353850 Alberta Ltd. v. Horne & Pitfield Foods Ltd.* (July 31, 1989), Doc. JDE 8803-26537 (Alta. Master) — referred to

**Statutes considered/Législation citée:**

*Class Proceedings Act*, R.S.B.C. 1996, c. 50

   Generally — considered

   s. 4(1) — considered

   s. 7 — considered

   s. 27 — considered

*Class Proceedings Act, 1992/Recours collectifs, Loi de 1992 sur les*, S.O./L.O. 1992, c. 6

   Generally/en général — considered

   s. 5(1) — considered

   s. 6 — considered

   s. 25 — considered

*Code de procédure civile*, L.R.Q., c. C-25

   Livre IX — considered

   art. 1003 — considered

   art. 1039 — considered

*Supreme Court of Judicature Act*, 1873 (36 & 37 Vict.), c. 66

   Generally — considered

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

**Rules considered/Règles cités:**

*Alberta Rules of Court*, Alta. Reg. 390/68

    R. 42 — considered

    R. 129 — considered

    R. 187 — considered

    R. 201 — considered

    Civil Practice Note 7 — referred to

*Civil Procedure Rules, 1998*, SI 1998/3132

    R. 19.10-19.15 — considered

*Federal Rules of Civil Procedure*, 28 U.S.C., Appendix

    R. 23 — referred to

*Supreme Court of Judicature Act*, 1873 (36 & 37 Vict.), c. 66

    Sched., R. 10 — considered

ADDITIONAL REASONS to judgment decided at (December 13, 2000), Doc. 27138 (S.C.C.), reversing in part judgment reported at 228 A.R. 188, 188 W.A.C. 188, [1998] A.J. No. 1364, 30 C.P.C. (4th) 1, 73 Alta. L.R. (3d) 227, 1998 ABCA 392 (Alta. C.A.), affirming judgment reported at 41 Alta. L.R. (3d) 412, 191 A.R. 265, 3 C.P.C. (4th) 329, 1996 CarswellAlta 690, [1996] A.J. No. 1165 (Alta. Q.B.), dismissing defendants' application to strike representative action.

MOTIFS SUPPLÉMENTAIRES de la décision rendue le 13 décembre 2000, Doc. 27138 (C.S.C.), infirmant en partie l'arrêt publié à 228 A.R. 188, 188 W.A.C. 188, [1998] A.J. No 1364, 30 C.P.C. (4th) 1, 73 Alta. L.R. (3d) 227, 1998 ABCA 392 (Alta. C.A.) qui a confirmé le jugement publié à 41 Alta. L.R. (3d) 412, 191 A.R. 265, 3 C.P.C. (4th) 329, 1996 CarswellAlta 690, [1996] A.J. No 1165 (Alta. Q.B.), qui avait rejeté le demande des défendeurs de radier le recours collectif.

**The judgment of the court was delivered by *McLachlin C.J.C.*:**

1    This appeal requires us to decide when a class action may be brought. While the class action has existed in one form or another for hundreds of years, its importance has increased of late. Particularly in complicated cases implicating the interests of many people, the class action may provide the best means of fair and efficient resolution. Yet absent legislative direction, there remains considerable uncertainty as to the conditions under which a court should permit a class action to be maintained.

2    The claimants wanted to immigrate to Canada. To qualify, they invested money in Western Canadian Shopping

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

Centres Inc., under the Canadian government's Business Immigration Program. They lost money and brought a class action. The defendants (appellants) claim the class action is inappropriate and ask the Court to strike it out. For the following reasons, I conclude that the claimants may proceed as a class.

## I. Facts

3     The representative plaintiffs Muh-Min Lin and Hoi-Wah Wu, together with 229 other investors, became participants in the government's Business Immigration Program of Employment and Immigration Canada by purchasing debentures in Western Canadian Shopping Centres Inc. ("WCSC"). WCSC was incorporated by Joseph Dutton, its sole shareholder, for the purpose of "facilitat[ing] the qualification of the Investors, their spouses, and their never-married children as Canadian permanent residents."

4     WCSC solicited funds through two offerings "to invest in land located in the Province of Saskatchewan for the purpose of developing commercial, non-residential, income-producing properties". The offering memoranda provided that the subscription proceeds would be deposited with an escrow agent, later designated as The Royal Trust Company ("Royal Trust"), and would be released to WCSC upon conditions, subsequently amended.

5     The dispute arises from events after the investors' funds had been deposited with Royal Trust. In May 1990, WCSC entered into a Purchase and Development Agreement ("PDA") with Claude Resources Inc. ("Claude") under which WCSC purchased from Claude, for $5,550,000, the rights to a Crown surface lease adjacent to Claude's "Seabee" gold deposits in northern Saskatchewan. WCSC also agreed to commit a further $16.5 million for surface improvements and for the construction of a gold mill, which would be owned by WCSC. A lease agreement executed in tandem with the PDA leased the not-yet-constructed gold mill and related facilities, together with the surface lands, back to Claude. The payments required of Claude under that lease agreement matched the semi-annual interest payments required of WCSC with respect to the investors.

6     To finance WCSC's obligations under the PDA with Claude, Dutton directed Royal Trust to issue debentures in an aggregate principal amount of $22,050,000 to a subset of the investors who had subscribed by that point. Royal Trust did so by issuing "Series A" debentures to 142 investors. After the debentures were issued, WCSC distributed an update letter to its investors, describing the investment in Claude.

7     In a separate series of transactions executed around the same time, Dutton and Claude entered into an agreement by which (1) Dutton effectively conveyed to Claude 49 percent of his shares in WCSC; (2) Claude paid Dutton $1.6 million in cash; (3) Claude advanced Dutton a $1.6 million non-recourse loan; (4) Dutton entered into an employment contract with Claude for a salary of $50,000 per year; and (5) Claude and Dutton's management company, J.M.D. Management Ltd., entered into a management contract for $200,000 per year. It appears that WCSC did not distribute an update letter to its investors describing this series of transactions.

8     Over the next months, Dutton advanced more funds to Claude and directed Royal Trust to issue corresponding debentures. Of particular relevance to the instant dispute are the Series E debentures issued in December 1990 (aggregate principal of $2.56 million), and the Series F debentures issued in May 1991 (aggregate principal of $9.45 million). When the Series E debentures were issued, the Series A and E debentures were pooled, so that investors in those series became entitled to a *pro rata* claim on the total security pledged with respect to the two series. When the Series F debentures were issued, the security for that series was pooled with the security that had been pledged with respect to the Series A and E debentures. WCSC apparently distributed investor update letters after the issuance of the Series E and F debentures, just as it had done after the issuance of the Series A debentures.

9     In December 1991, Claude announced that it could not pay the interest due on the Series A, E, and F debentures and Muh-Min and Hoi-Wah commenced this action. The gravamen of the complaint is that Dutton and various affiliates and advisors of WCSC breached fiduciary duties to the investors by mismanaging or misdirecting their funds.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

## II. Statutory Provisions

10    *Alberta Rules of Court*, Alta. Reg. 390/68

**42** Where numerous persons have a common interest in the subject of an intended action, one or more of those persons may sue or be sued or may be authorized by the Court to defend on behalf of or for the benefit of all.

**129** (1) The court may at any stage of the proceedings order to be struck out or amended any pleading in the action, on the ground that

(a) it discloses no cause of action or defence, as the case may be, or

(b) it is scandalous, frivolous or vexatious, or

(c) it may prejudice, embarrass or delay the fair trial of the action, or

(d) it is otherwise an abuse of the process of the court,

and may order the action to be stayed or dismissed or judgment to be entered accordingly.

(2) No evidence shall be admissible on an application under clause (a) of subrule (1).

(3) This Rule, so far as applicable, applies to an originating notice and a petition.

**187.** A person for whose benefit an action is prosecuted or defended or the assignor of a chose in action upon which the action is brought, shall be regarded as a party thereto for the purposes of discovery of documents.

**201** A member of a firm which is a party and a person for whose benefit an action is prosecuted or defended shall be regarded as a party for the purposes of examination.

## III. Decisions

11      The appellants applied to the Court of Queen's Bench of Alberta (1996), 41 Alta. L.R. (3d) 412 (Alta. Q.B.) for a declaration and order striking that portion of the Amended Statement of Claim in which the individual plaintiffs purport, pursuant to Rule 42 of the *Alberta Rules of Court*, to represent a class of 231 investors. The chambers judge identified four issues: (1) whether the court had the power under Rule 42 to strike the investors' claim to sue in a representative capacity; (2) whether the court was restricted to considering only the Amended Statement of Claim filed; (3) the standard of proof required to compel the court to exercise its discretion to strike the representative claim; and (4) whether, in this case, this standard was met.

12      On the first issue, the chambers judge relied on the decision of Master Funduk in *353850 Alberta Ltd. v. Horne & Pitfield Foods Ltd.* (July 31, 1989), Doc. JDE 8803-26537 (Alta. Master), to conclude that the court has the power, under Rule 42, to strike a claim made by plaintiffs to sue in a representative capacity.

13      On the second issue, the chambers judge held that the court need not limit its inquiry to the pleadings, relying on *353850 Alberta*, *supra*, and on the decision of the British Columbia Supreme Court in *Shaw v. Vancouver Real Estate Board* (1972), 29 D.L.R. (3d) 774 (B.C. S.C.). He concluded, however, that resolution of the case before him

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

did not require resort to the affidavit evidence.

14    On the third issue, the chambers judge concluded that the court should strike a representative claim under Rule 42 only if it is "entirely clear" or "beyond doubt" or "plain and obvious" that the claim is deficient — the standard applied to applications to strike pleadings for disclosing no reasonable claim: *Hunt v. T & N plc*, [1990] 2 S.C.R. 959 (S.C.C.).

15    On the final issue, the chambers judge, applying the "plain and obvious" rule, concluded that the Amended Statement of Claim was not deficient under Rule 42 and met the requirements set out in *Korte v. Deloitte, Haskins & Sells* (1993), 8 Alta. L.R. (3d) 337 (Alta. C.A.): (1) that the class be capable of clear and definite definition; (2) that the principal issues of law and fact be the same; (3) that one plaintiff's success would necessarily mean success for all members of the plaintiff class; and (4) that the resolution of the dispute not require any individual assessment of the claims of individual class members. However, he left the matter open to review by the trial judge.

16    The Alberta Court of Appeal, *per* Russell J.A. (for the majority), dismissed the appeal, Picard J.A., dissenting: (1998), 73 Alta. L.R. (3d) 227 (Alta. C.A.). The majority rejected the argument that the chambers judge should have conclusively resolved the Rule 42 issue rather than left it open to the trial judge, citing *Pasco v. Canadian National Railway*, [1989] 2 S.C.R. 1069 (S.C.C.), in which this Court left to the trial judge the issue of whether the plaintiffs were authorized to sue on behalf of a broader class. The majority also rejected the argument that the investors must show individual reliance to succeed. However, it granted the defendants the right to discovery from each of the 231 plaintiffs on the grounds that Rule 201, read with Rule 187, allows discovery from any person for whose benefit an action is prosecuted or defended and that the defendants should not be barred from developing an argument based on actual reliance merely because it was speculative.

17    Picard J.A., would have allowed the appeal. In her view, the Chambers judge erred in deferring the matter to the trial judge because, unlike *Pasco* , the case was narrow and "a great deal of relevant evidence was available to the court to allow it to make a decision" (p. 235). The need to show individual reliance was only one of many problems that the investors would face if allowed to proceed as a class. Citing this Court's decisions in *International Corona Resources Ltd. v. Lac Minerals Ltd.*, [1989] 2 S.C.R. 574 (S.C.C.), and *Hodgkinson v. Simms*, [1994] 3 S.C.R. 377 (S.C.C.), she concluded that "[t]he extent of fiduciary duties in a particular case requires a meticulous examination of the facts, particularly of any contract between the parties" (p. 237). She concluded that "[t]his responsibility of proof by the [investors] cannot possibly be met by a representative action nor by giving a right of discovery of the 229 other parties to the action" (*idem*).

### IV. Issues

18

> 1. Did the courts below apply the proper standard in determining whether the investors had satisfied the requirements for a class action under Rule 42?
>
> 2. Did the courts below err in denying defendants' motion to strike under Rule 42?
>
> 3. If the class action is allowed, should the defendants have the right to full oral and documentary discovery of all class members?

### V. Analysis

#### A. The History and Functions of Class Actions

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

19     The class action originated in the English courts of equity in the late seventeenth and early eighteenth centuries. The courts of law focussed on individual questions between the plaintiff and the defendant. The courts of equity, by contrast, applied a rule of compulsory joinder, requiring all those interested in the subject matter of the dispute to be made parties. The aim of the courts of equity was to render "complete justice" — that is, to "arrange[] all the rights, which the decision immediately affects": F. Calvert, *A Treatise Upon the Law Respecting Parties to Suits in Equity* (1837), at p. 3; see also C.A. Wright, A.R. Miller and M.K. Cane, *Federal Practice and Procedure* (2nd ed. 1986), § 1751; J. Story, *Equity Pleadings* (10th ed. 1892), at s. 76a. The compulsory-joinder rule "allowed the Court to examine every facet of the dispute and thereby ensure that no one was adversely affected by its decision without first having had an opportunity to be heard": J.A. Kazanjian, "Class Actions in Canada" (1973), 11 *Osgoode Hall L.J.* 397, at p. 400. The rule possessed the additional advantage of preventing a multiplicity of duplicative proceedings.

20     The compulsory-joinder rule eventually proved inadequate. Applied to conflicts between tenants and manorial lords or between parsons and parishioners, it closed the door to the courts where interested parties in such cases were too numerous to be joined. The courts of equity responded by relaxing the compulsory-joinder rule where strict adherence would work injustice. The result was the representative action. For example, in *Chancey v. May* (1722), Prec. Ch. 592, 24 E.R. 265 (Eng. Ch.), members of a partnership were permitted to sue on behalf of themselves and some 800 other partners for misapplication and embezzlement of funds by the partnership's former treasurer and manager. The court allowed the action because "it was in behalf of themselves, and all others the proprietors of the same undertaking, except the defendants, and so all the rest were in effect parties," and because "it would be impracticable to make them all parties by name, and there would be continual abatements by death and otherwise, and no coming at justice, if all were to be parties" (p. 265); see also Kazanjian, *supra*, at p. 401; G.T. Bispham, *The Principles of Equity* (8th ed. 1909), at para. 415; S.C. Yeazell, "Group Litigation and Social Context: Toward a History of the Class Action" (1977), 77 *Colum. L. Rev.* 866, at pp. 867 and 872; J.K. Bankier, "Class Actions for Monetary Relief in Canada: Formalism or Function?" (1984), 4 *Windsor Y.B. Access Just.* 229, at p. 236.

21     The representative or class action proved useful in pre-industrial English commercial litigation. The modern limited-liability company had yet to develop, and collectives of business people had no independent legal existence. Satisfying the compulsory-joinder rule would have required a complainant to bring before the court each member of the collective. The representative action provided the solution to this difficulty: see Kazanjian, *supra*, at p. 401; Yeazell, *supra*, at p. 867; *City of London v. Richmond* (1701), 2 Vern. 421, 23 E.R. 870 (Eng. Ch.) (allowing the plaintiff to sue trustees for rent owed, though the beneficiaries of the trust were not joined).

22     The class action required a common interest between the class members. Many of the early representative actions were brought in the form of "bills of peace," which could be maintained where the interested individuals were numerous, all members of the group possessed a common interest in the question to be adjudicated, and the representatives could be expected fairly to advocate the interests of all members of the group: see Wright, Miller and Kane, *supra*, at § 1751; Z. Chafee, *Some Problems of Equity* (1950), at p. 201, T.A. Roberts, *The Principles of Equity* (3rd ed. 1877), at pp. 389-92; Bispham, *supra*, at para. 417.

23     The courts of equity applied a liberal and flexible approach to whether a class action could proceed. They "continually sought a proper balance between the interests of fairness and efficiency": Kazanjian, *supra*, at p. 411. As stated in *Wallworth v. Holt* (1841), 4 My. & Cr. 619, 41 E.R. 238 (Eng. Ch. Div.), at p. 244, "it [is] the duty of this Court to adapt its practice and course of proceeding to the existing state of society, and not by too strict an adherence to forms and rules, established under different circumstances, to decline to administer justice, and to enforce rights for which there is no other remedy".

24     This flexible and generous approach to class actions prevailed until the fusion of law and equity under the *Supreme Court of Judicature Act, 1873* (U.K.), 36 & 37 Vict., c. 66, and the adoption of Rule 10 of the *Rules of Procedure*:

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

> 10. Where there are numerous parties having the same interest in one action, one or more of such parties may sue or be sued, or may be authorised by the Court to defend in such actions, on behalf or for the benefit of all parties so interested.

While early cases under the new rules maintained a liberal approach to class actions (see, e.g., *Duke of Bedford v. Ellis* (1900), [1901] A.C. 1 (U.K. H.L.); *Taff Vale Railway v. Amalgamated Society of Railway Servants*, [1901] A.C. 426 (U.K. H.L.)), later cases sometimes took a restrictive approach (see, e.g., *Markt & Co. v. Knight Steamship Co.*, [1910] 2 K.B. 1021 (Eng. K.B.). This, combined with the widespread use of limited-liability companies, resulted in fewer class actions being brought.

25      The class action did not forever languish, however. Conditions emerged in the latter part of the twentieth century that once again invoked its utility. Mass production and consumption revived the problem that had motivated the development of the class action in the eighteenth century — the problem of many suitors with the same grievance. As in the eighteenth century, insistence on individual representation would often have precluded effective litigation. And, as in the eighteenth century, the class action provided the solution.

26      The class action plays an important role in today's world. The rise of mass production, the diversification of corporate ownership, the advent of the mega-corporation, and the recognition of environmental wrongs have all contributed to its growth. A faulty product may be sold to numerous consumers. Corporate mismanagement may bring loss to a large number of shareholders. Discriminatory policies may affect entire categories of employees. Environmental pollution may have consequences for citizens all over the country. Conflicts like these pit a large group of complainants against the alleged wrongdoer. Sometimes, the complainants are identically situated *vis-à-vis* the defendants. In other cases, an important aspect of their claim is common to all complainants. The class action offers a means of efficiently resolving such disputes in a manner that is fair to all parties.

27      Class actions offer three important advantages over a multiplicity of individual suits. First, by aggregating similar individual actions, class actions serve judicial economy by avoiding unnecessary duplication in fact-finding and legal analysis. The efficiencies thus generated free judicial resources that can be directed at resolving other conflicts, and can also reduce the costs of litigation both for plaintiffs (who can share litigation costs) and for defendants (who need litigate the disputed issue only once, rather than numerous times): see W.K. Branch, *Class Actions in Canada* (1998), at para. 3.30; M.A. Eizenga, M.J. Peerless and C.M. Wright, *Class Actions Law and Practice* (1999), at § 1.6; Bankier, *supra*, at pp. 230-31; Ontario Law Reform Commission, *Report on Class Actions* (1982), at pp. 118-19.

28      Second, by allowing fixed litigation costs to be divided over a large number of plaintiffs, class actions improve access to justice by making economical the prosecution of claims that would otherwise be too costly to prosecute individually. Without class actions, the doors of justice remain closed to some plaintiffs, however strong their legal claims. Sharing costs ensures that injuries are not left unremedied: see Branch, *supra*, at para. 3.40; Eizenga, Peerless and Wright, *supra*, at § 1.7; Bankier, *supra*, at pp. 231-32; Ontario Law Reform Commission, *supra*, at pp. 119-22.

29      Third, class actions serve efficiency and justice by ensuring that actual and potential wrongdoers do not ignore their obligations to the public. Without class actions, those who cause widespread but individually minimal harm might not take into account the full costs of their conduct, because for any one plaintiff the expense of bringing suit would far exceed the likely recovery. Cost-sharing decreases the expense of pursuing legal recourse and accordingly deters potential defendants who might otherwise assume that minor wrongs would not result in litigation: see "Developments in the Law — The Paths of Civil Litigation: IV. Class Action Reform: An Assessment of Recent Judicial Decisions and Legislative Initiatives" (2000), 113 *Harv. L. Rev.* 1806, at pp. 1809-10; see Branch, *supra*, at para. 3.50; Eizenga, Peerless and Wright, *supra*, at § 1.8; Bankier, *supra*, at p. 232; Ontario Law Reform Commission, *supra*, at pp. 11 and 140-46.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

## B. The Test for Class Actions

30     In recognition of the modern importance of representative litigation, many jurisdictions have enacted comprehensive class action legislation. In the United States, Federal Rule of Civil Procedure 28 U.S.C.A. § 23 (introduced in 1938 and substantially amended in 1966) addressed aspects of class action practice, including certification of litigant classes, notice, and settlement. The English procedural rules of 1999 include detailed provisions governing "Group Litigation": United Kingdom, *Civil Procedure Rules 1998*, SI 1998/3132, rr. 19.10-19.15. And in Canada, the provinces of British Columbia, Ontario, and Quebec have enacted comprehensive statutory schemes to govern class action practice: see British Columbia *Class Proceedings Act*, R.S.B.C. 1996, c. 50; Ontario *Class Proceedings Act, 1992*, S.O. 1992, c. 6; Quebec *Code of Civil Procedure*, R.S.Q., c. C-25, Book IX. Yet other Canadian provinces, including Alberta and Manitoba, are considering enacting such legislation: see Manitoba Law Reform Commission, Report #100, *Class Proceedings* (January 1999); Alberta Law Reform Institute, Final Report No. 85, *Class Actions* (December 2000); see also R. Rogers, "A Uniform Class Actions Statute", Appendix O to the Proceedings of the 1995 Meeting of The Uniform Law Conference of Canada.

31     Absent comprehensive codes of class action procedure, provincial rules based on Rule 10, Schedule, of the English *Supreme Court of Judicature Act, 1873* govern. This is the case in Alberta, where class action practice is governed by Rule 42 of the *Alberta Rules of Court*:

42 Where numerous persons have a common interest in the subject of an intended action, one or more of those persons may sue or be sued or may be authorized by the Court to defend on behalf of or for the benefit of all.

The intention of the Alberta legislature is clear. Class actions may be brought. Details of class action practice, however, are largely left to the courts.

32     Alberta's Rule 42 does not specify what is meant by "numerous" or by "common interest". It does not say when discovery may be made of class members other than the representative. Nor does it specify how notice of the suit should be conveyed to potential class members, or how a court should deal with the possibility that some potential class members may desire to "opt out" of the class. And it does not provide for costs, or for the distribution of the fund should an action for money damages be successful.

33     Clearly, it would be advantageous if there existed a legislative framework addressing these issues. The absence of comprehensive legislation means that courts are forced to rely heavily on individual case management to structure class proceedings. This taxes judicial resources and denies the parties *ex ante* certainty as to their procedural rights. One of the main weaknesses of the current Alberta regime is the absence of a threshold "certification" provision. In British Columbia, Ontario, and Quebec, a class action may proceed only after the court certifies that the class and representative meet certain requirements. In Alberta, by contrast, courts effectively certify *ex post*, only after the opposing party files a motion to strike. It would be preferable if the appropriateness of the class action could be determined at the outset by certification.

34     Absent comprehensive legislation, the courts must fill the void under their inherent power to settle the rules of practice and procedure as to disputes brought before them: *Bell v. Wood*, [1927] 1 W.W.R. 580 (B.C. S.C.), at pp. 581-82; *Langley v. North West Water Authority*, [1991] 3 All E.R. 610 (Eng. C.A.), leave denied, [1991] W.L.R. 711n (Eng. H.L.); *N.A.P.E. v. Newfoundland (Treasury Board)* (1995), 132 Nfld. & P.E.I.R. 205 (Nfld. T.D.); W.A. Stevenson and J.E. Côté, *Civil Procedure Guide, 1996*, at p. 4. However desirable comprehensive legislation on class action practice may be, if such legislation has not been enacted, the courts must determine the availability of the class action and the mechanics of class action practice.

35     Alberta courts moved to fill the procedural vacuum in *Korte, supra. Korte* prescribed four conditions for a class

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

action: (1) the class must be capable of clear and definite definition; (2) the principal issues of fact and law must be the same; (3) success for one of the plaintiffs must mean success for all; and (4) no individual assessment of the claims of individual plaintiffs need be made.

36     The *Korte* criteria loosely parallel the criteria applied in other Canadian jurisdictions in which comprehensive class-action legislation has yet to be enacted: see, e.g., *Ranjoy Sales & Leasing Ltd. v. Deloitte, Haskins & Sells,* [1984] 4 W.W.R. 706 (Man. Q.B.); *International Capital Corp. v. Schafer (1995), 130 Sask. R. 23* (Sask. Q.B.); *Guarantee Co. of North America v. Caisse populaire de Shippagan Ltée (1988), 86 N.B.R. (2d) 342* (N.B. Q.B.); *Lee v. OCCO Developments Ltd. (1994), 148 N.B.R. (2d) 321* (N.B. Q.B.); *Van Audenhove v. Nova Scotia (Attorney General) (1994), 134 N.S.R. (2d) 294* (N.S. S.C.), at para. 7; *Horne v. Canada (Attorney General) (1995), 129 Nfld. & P.E.I.R. 109* (P.E.I. T.D.), at para. 24.

37     The *Korte* criteria also bear resemblance to the class-certification criteria in the British Columbia, Ontario, and Quebec class action statutes. Under the British Columbia and Ontario statutes, an action will be certified as a class proceeding if (1) the pleadings or the notice of application disclose a cause of action; (2) there is an identifiable class of two or more persons that would be represented by the class representative; (3) the claims or defences of the class members raise common issues (in British Columbia, "whether or not those common issues predominate over issues affecting only individual members"); (4) a class proceeding would be the preferable procedure for the resolution of common issues; and (5) the class representative would fairly represent the interests of the class, has advanced a workable method of advancing the proceeding and notifying class members, and does not have, on the common issues for the class, an interest in conflict with other class members: see Ontario *Class Proceedings Act, 1992*, s. 5(1); British Columbia *Class Proceedings Act*, s. 4(1). Under the Quebec statute, an action will be certified as a class proceeding if (1) the recourses of the class members raise identical, similar, or related questions of law or fact; (2) the alleged facts appear to warrant the conclusions sought; (3) the composition of the group makes joinder impracticable; and (4) the representative is in a position to adequately represent the interests of the class members: see Quebec *Code of Civil Procedure*, art. 1003.

38     While there are differences between the tests, four conditions emerge as necessary to a class action. First, the class must be capable of clear definition. Class definition is critical because it identifies the individuals entitled to notice, entitled to relief (if relief is awarded), and bound by the judgment. It is essential, therefore, that the class be defined clearly at the outset of the litigation. The definition should state objective criteria by which members of the class can be identified. While the criteria should bear a rational relationship to the common issues asserted by all class members, the criteria should not depend on the outcome of the litigation. It is not necessary that every class member be named or known. It is necessary, however, that any particular person's claim to membership in the class be determinable by stated, objective criteria: see Branch, *supra*, at paras. 4.190-4.207; Friedenthal, Kane and Miller, *supra*, at pp. 726-27; *Bywater v. Toronto Transit Commission (1998), 27 C.P.C. (4th) 172* (Ont. Gen. Div.), at paras. 10-11.

39     Second, there must be issues of fact or law common to all class members. Commonality tests have been a source of confusion in the courts. The commonality question should be approached purposively. The underlying question is whether allowing the suit to proceed as a representative one will avoid duplication of fact-finding or legal analysis. Thus an issue will be "common" only where its resolution is necessary to the resolution of each class member's claim. It is not essential that the class members be identically situated *vis-à-vis* the opposing party. Nor is it necessary that common issues predominate over non-common issues or that the resolution of the common issues would be determinative of each class member's claim. However, the class members' claims must share a substantial common ingredient to justify a class action. Determining whether the common issues justify a class action may require the court to examine the significance of the common issues in relation to individual issues. In doing so, the court should remember that it may not always be possible for a representative party to plead the claims of each class member with the same particularity as would be required in an individual suit.

40     Third, with regard to the common issues, success for one class member must mean success for all. All members of the class must benefit from the successful prosecution of the action, although not necessarily to the same extent. A

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

class action should not be allowed if class members have conflicting interests.

41    Fourth, the class representative must adequately represent the class. In assessing whether the proposed representative is adequate, the court may look to the motivation of the representative, the competence of the representative's counsel, and the capacity of the representative to bear any costs that may be incurred by the representative in particular (as opposed to by counsel or by the class members generally). The proposed representative need not be "typical" of the class, nor the "best" possible representative. The court should be satisfied, however, that the proposed representative will vigorously and capably prosecute the interests of the class: see Branch, *supra*, at paras. 4.210-4.490; Friedenthal, Kane and Miller, *supra*, at pp. 729-32.

42    While the four factors outlined must be met for a class action to proceed, their satisfaction does not mean that the court must allow the action to proceed. Other factors may weigh against allowing the action to proceed in representative form. The defendant may wish to raise different defences with respect to different groups of plaintiffs. It may be necessary to examine each class member in discovery. Class members may raise important issues not shared by all members of the class. Or the proposed class may be so small that joinder would be a better solution. Where such countervailing factors exist, the court has discretion to decide whether the class action should be permitted to proceed, notwithstanding that the essential conditions for the maintenance of a class action have been satisfied.

43    The class action codes that have been adopted by British Columbia and Ontario offer some guidance as to factors that would generally *not* constitute arguments against allowing an action to proceed as a representative one. Both state that certification should not be denied on the grounds that: (1) the relief claimed includes a demand for money damages that would require individual assessment after determination of the common issues; (2) the relief claimed relates to separate contracts involving different members of the class; (3) different class members seek different remedies; (4) the number of class members or the identity of every class member is unknown; or (5) the class includes subgroups that have claims or defences that raise common issues not shared by all members of the class: see Ontario *Class Proceedings Act, 1992*, s. 6; British Columbia *Class Proceedings Act*, s. 7; see also Alberta Law Reform Institute, *supra*, at pp. 75-76. Common sense suggests that these factors should no more bar a class action suit in Alberta than in Ontario or British Columbia.

44    Where the conditions for a class action are met, the court should exercise its discretion to disallow it for negative reasons in a liberal and flexible manner, like the courts of equity of old. The court should take into account the benefits the class action offers in the circumstances of the case as well as any unfairness that class proceedings may cause. In the end, the court must strike a balance between efficiency and fairness.

45    The need to strike a balance between efficiency and fairness belies the suggestion that a class action should be struck only where the deficiency is "plain and obvious", as the Chambers judge held. Unlike Rule 129, which is directed at the question of *whether* the claim should be prosecuted at all, Rule 42 is directed at the question of *how* the claim should be prosecuted. The "plain and obvious" standard is appropriate where the result of striking is to forever end the action. It recognizes that a plaintiff "should not be 'driven from the judgment seat' at this very early stage unless it is quite plain that his alleged cause of action has no chance of success": *Drummond-Jackson v. British Medical Assn.*, [1970] 1 All E.R. 1094 (Eng. C.A.), at pp. 1101-2 (quoted in *Hunt*, *supra*). Denial of class status under Rule 42, by contrast, does not defeat the claim. It merely places the plaintiffs in the position of any litigant who comes before the court in his or her individual capacity. Moreover, nothing in Alberta's rules suggests that class actions should be disallowed only where it is plain and obvious that the action should not proceed as a representative one. Rule 42 and the analogous rules in other provinces merely state that a representative may maintain a class action *if* certain conditions are met.

46    The need to strike a balance between efficiency and fairness also belies the suggestion that class actions should be approached restrictively. The defendants argue that *Naken v. General Motors of Canada Ltd.*, [1983] 1 S.C.R. 72 (S.C.C.), precludes a generous approach to class actions. I respectfully disagree. First, when *General Motors of Canada Ltd.* was decided, the modern class action was very much an untested procedure in Canada. In the intervening

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

years, the importance of the class action as a procedural tool in modern litigation has become manifest. Indeed, the reform that has been effected since *General Motors of Canada Ltd.* has been motivated in large part by the recognition of the benefits that class actions can offer the parties, the court system, and society: see, e.g., Ontario Law Reform Commission, *supra*, at pp. 3-4.

47     Second, *General Motors of Canada Ltd.* on its facts invited caution. The action was brought on behalf of all persons who purchased new 1971 or 1972 Firenza motor vehicles in Ontario. The complaint was that General Motors had misrepresented the quality of the vehicles and that the vehicles "were not reasonably fit for use." The statement of claim alleged breach of warranty and breach of representation, and sought $1,000 in damages for each of approximately 4,600 plaintiffs. Estey J., writing for a unanimous Court, disallowed the class action. While each plaintiff raised the same claims against the defendant, the resolution of those claims would have required particularized evidence and fact-finding at both the liability and damages stages of the litigation. Far from avoiding needless duplication, a class action would have unnecessarily complicated the resolution of what amounted to 4,600 individual claims.

48     To summarize, class actions should be allowed to proceed under Alberta's Rule 42 where the following conditions are met: (1) the class is capable of clear definition; (2) there are issues of fact or law common to all class members; (3) success for one class member means success for all; and (4) the proposed representative adequately represents the interests of the class. If these conditions are met the court must also be satisfied, in the exercise of its discretion, that there are no countervailing considerations that outweigh the benefits of allowing the class action to proceed.

49     Other procedural issues may arise. One is notice. A judgment is binding on a class member only if the class member is notified of the suit and is given an opportunity to exclude himself or herself from the proceeding. This case does not raise the issue of what constitutes sufficient notice. However, prudence suggests that all potential class members be informed of the existence of the suit, of the common issues that the suit seeks to resolve, and of the right of each class member to opt out, and that this be done before any decision is made that purports to prejudice or otherwise affect the interests of class members.

50     Another procedural issue that may arise is how to deal with non-common issues. The court retains discretion to determine how the individual issues should be addressed, once common issues have been resolved: see Branch, *supra*, at para. 18.10. Generally, individual issues will be resolved in individual proceedings. However, as under the legislation of British Columbia, Ontario, and Quebec, a court may specify special procedures that it considers necessary or useful: see Ontario *Class Proceedings Act, 1992*, s. 25; British Columbia *Class Proceedings Act*, s. 27; Quebec *Code of Civil Procedure*, art. 1039.

51     The diversity of class actions makes it difficult to anticipate all of the procedural complexities that may arise. In the absence of comprehensive class-action legislation, courts must address procedural complexities on a case-by-case basis. Courts should approach these issues as they do the question of whether a class action should be allowed: in a flexible and liberal manner, seeking a balance between efficiency and fairness.

*C. Whether the Investors Have Satisfied Rule 42*

52     The four conditions to the maintenance of a class action are satisfied here. First, the class is clearly defined. The respondents Lin and Wu represent themselves and "[229 other] immigrant investors ... who each invested at least the sum of $150,000.00 into a fund totalling $34,065,000.00, the said sum to be managed, administered and secured by ... Western Canadian Shopping Centres Inc.". Who falls within the class can be ascertained on the basis of documentary evidence that the parties have put before the court. Second, common issues of fact and law unite all members of the class. The essence of the investors' complaint is that the defendants owed them fiduciary duties which they breached. While the investors' Amended Statement of Claim alludes to claims in negligence and misrepresentation, counsel for the investors undertook in argument before this Court to abandon all but the fiduciary duty claims. Third,

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

at this stage of the proceedings, it appears that resolving one class member's breach of fiduciary claim would effectively resolve the claims of every class member. As a result of security-pooling agreements effected by WCSC, each investor now has an interest, proportional to his or her investment, in the same underlying security. Finally, the representative plaintiffs are appropriate.

53     The defendants argue that the proposed suit is not amenable to prosecution as a class action because: (1) there are in fact multiple classes of plaintiffs; (2) the defendants will raise multiple defences to different causes of action advanced against different defendants; and (3) in order to prevail, the investors must show actual reliance on the part of each class member. I find these arguments unpersuasive.

54     The defendants' contention that there are multiple classes of plaintiffs is unconvincing. No doubt, differences exist. Different investors invested at different times, in different jurisdictions, on the basis of different offering memoranda, through different agents, in different series of debentures, and learned about the underlying events through different disclosure documents. Some investors may possess rescissionary rights that others do not. The fact remains, however, that the investors raise essentially the same claims requiring resolution of the same facts. While it may eventually emerge that different subgroups of investors have different rights against the defendants, this possibility does not necessarily defeat the investors' right to proceed as a class. If material differences emerge, the court can deal with them when the time comes.

55     The defendants' contention that the investors should not be permitted to sue as a class because each must show actual reliance to establish breach of fiduciary duty also fails to convince. In recent decades fiduciary obligations have been applied in new contexts, and the full scope of their application remains to be precisely defined. The fiduciary duty issues raised here are common to all the investors. A class action should not be foreclosed on the ground that there is uncertainty as to the resolution of issues common to all class members. If it is determined that the investors must show individual reliance, the court may then consider whether the class action should continue.

56     The same applies to the contention that different defences will be raised with respect to different class members. Simply asserting this possibility does not negate a class action. If and when different defences are asserted, the court may solve the problem or withdraw leave to proceed as a class.

57     I conclude that the basic conditions for a class action are met and that efficiency and fairness favour permitting it to proceed.

## D. Cross-Appeal

58     The investors take issue on cross-appeal with the Court of Appeal's allowance of individualized discovery from each class member. The Court of Appeal held that the defendants are entitled, under Rules 187 and 201, to examination and discovery of each member of the class. The investors argue that the question of whether discovery should be allowed from each class member is a question best left to a case management judge appointed pursuant to the Alberta Rules of Court Binder, Practice Note No. 7.

59     I agree that allowing individualized discovery at this stage of the proceedings would be premature. One of the benefits of a class action is that discovery of the class representatives will usually suffice and make unnecessary discovery of each individual class member. Cases where individual discovery is required of all class members are the exception rather than the rule. Indeed, the necessity of individual discovery may be a factor weighing against allowing the action to proceed in representative form.

60     I would allow the defendants to examine the representative plaintiffs as of right. Thereafter, examination of other class members should be available only by order of the court, upon the defendants showing reasonable necessity.

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works

2001 CarswellAlta 884, 2001 SCC 46, [2001] A.W.L.D. 432, 201 D.L.R. (4th) 385, 272 N.R. 135, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, [2001] 2 S.C.R. 534, 2001 CarswellAlta 885, 2 S.C.R. 534, [2000] S.C.J. No. 63, REJB 2001-25017, J.E. 2001-1430

**VI. Conclusion**

61      For the foregoing reasons, I would dismiss the appeal and allow the investors to proceed as a class. I would allow the cross-appeal.

62      Costs of the appeal and cross-appeal are to the respondents.

*Appeal dismissed; cross-appeal allowed.*

*Pourvoi rejeté; pourvoi incident accueilli.*

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works



# TAB23

Z.I. Pompey Industrie v. ECU-Line N.V., [2003] 1 S.C.R. 450, 2003 SCC 27

**ECU-Line N.V.**                                             *Appellant*

*v.*

**Z.I. Pompey Industrie, Société lyonnaise de messageries
nationales, John S. James Co., Polyfibron Technologies Inc.,
Ellehammer Packaging Inc., and all others having an interest in
the cargo laden on board the M.V. "Canmar Fortune"**          *Respondents*

**Indexed as: Z.I. Pompey Industrie v. ECU-Line N.V.**

**Neutral citation: 2003 SCC 27.**

File No.: 28472.

2002: October 2; 2003: May 1.

Present: McLachlin C.J. and Gonthier, Iacobucci, Major, Bastarache, Binnie and
LeBel JJ.

on appeal from the federal court of appeal

*Conflict of laws — Courts — Jurisdiction — Bills of lading — Forum
selection clauses — Stay of proceedings — Arrangements made with appellant for
carriage of cargo by sea — Respondents filing action against appellant in Federal Court
alleging that cargo was damaged while in transit by rail — Appellant seeking stay of
proceedings on basis that bill of lading contained forum selection clause giving courts*

2003 SCC 27 (CanLII)

*in Antwerp, Belgium exclusive jurisdiction — Proper test for stay of proceedings to enforce forum selection clause in bill of lading — Whether "strong cause" test is proper test — Whether proper test should contemplate inquiry into whether there was fundamental breach or deviation — Federal Court Act, R.S.C. 1985, c. F-7, s. 50(1).*

The respondents filed an action for damages against the appellant in the Federal Court, alleging that cargo was damaged while in transit by rail. Under the bill of lading Antwerp, Belgium was designated as the port of loading and Seattle was designated as the port of discharge. The cargo was transported from Antwerp to Montréal, where it was unloaded and carried by train to Seattle. The bill of lading contained a forum selection clause stating that "[t]he contract evidenced by or contained in this bill of Lading is governed by the law of Belgium, and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts in Antwerp and no other Courts." The appellant brought a motion seeking a stay of proceedings on the basis that the bill of lading required disputes to be determined exclusively by the courts of Antwerp. A prothonotary denied the motion. The Federal Court, Trial Division dismissed the appellant's motion to set aside the prothonotary's order. The Federal Court of Appeal upheld the decision.

*Held*: The appeal should be allowed and a stay of proceedings issued in favour of the appellant.

In the absence of applicable legislation, such as s. 46(1) of the *Marine Liability Act*, the proper test for a stay of proceedings pursuant to s. 50 of the *Federal Court Act* to enforce a forum selection clause in a bill of lading is the "strong cause" test. Once a court is satisfied that a validly concluded bill of lading otherwise binds the

2003 SCC 27 (CanLII)

parties, it must grant the stay unless the plaintiff can show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause. In exercising its discretion, the court should take into account all of the circumstances of the particular case. The tripartite test for interlocutory injunctions is an inappropriate test for a stay of proceedings to enforce a forum selection clause in a bill of lading. First, the tripartite test would render most forum selection clauses unenforceable, creating commercial uncertainty by unduly minimizing the importance of contractual undertakings. Second, the tripartite test is also problematic because the first part of the test requires the court to evaluate the likelihood of success on the merits of the case — which would be impossible because there is normally no determination on the merits. Finally, the tripartite test would make it difficult to establish irreparable harm in the context of a stay application based on a forum selection clause.

On an application for a stay to uphold a forum selection clause in a bill of lading, a court must not delve into whether one party has deviated from or fundamentally breached an otherwise validly formed contract. Such inquiries would render forum selection clauses illusory since most disputes will involve allegations which, if proved, will make the agreement terminable or voidable by the aggrieved party. Issues respecting an alleged fundamental breach of contract or deviation therefrom should generally be determined under the law and by the court chosen by the parties in the bill of lading. Once it is determined that the bill of lading binds the parties, the "strong cause" test constitutes an inquiry into questions such as the convenience of the parties, fairness between the parties and the interests of justice, not of the substantive legal issues underlying the dispute.

2003 SCC 27 (CanLII)

- 4 -

The decisions of the prothonotary, the motions judge and the Court of Appeal in this case are clearly wrong. The prothonotary, to the extent he applied the "tripartite test", erred in law, as did the Court of Appeal in concluding that the appropriate test for a stay of proceedings involving a bill of lading with a forum selection clause was the "tripartite test" for interlocutory injunctions. The "strong cause" test remains relevant and effective and no social, moral or economic changes justify the departure advanced by the Court of Appeal. Further, the prothonotary erred in law when he determined that the forum selection clause was void as a result of the alleged deviation stemming from the discharge of the cargo in Montréal. It is unnecessary to determine whether there has been a fundamental breach or deviation because the forum selection clause clearly covers such a dispute.

**Cases Cited**

Applied: *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237; distinguished: *Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1 S.C.R. 110; considered: *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423; referred to: *American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504; *Captain v. Far Eastern SS. Co.* (1978), 7 B.C.L.R. 279; *Canada v. Aqua-Gem Investments Ltd.*, [1993] 2 F.C. 425; *Jian Sheng Co. v. Great Tempo S.A.*, [1998] 3 F.C. 418, leave to appeal refused, [1998] 3 S.C.R. vi; *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC 90; *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897; *RJR—MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311; *The "Seapearl" v. Seven Seas Dry Cargo Shipping Corp.*, [1983] 2 F.C. 161; *Anraj Fish Products Industries Ltd. v.*

2003 SCC 27 (CanLII)

- 5 -

*Hyundai Merchant Marine Co.* (2000), 262 N.R. 270; *Sarabia v. "Oceanic Mindoro"
(The)* (1996), 26 B.C.L.R. (3d) 143, leave to appeal refused, [1997] 2 S.C.R. xiv;
*Maritime Telegraph and Telephone Co. v. Pre Print Inc.* (1996), 131 D.L.R. (4th) 471;
*Morrison v. Society of Lloyd's* (2000), 224 N.B.R. (2d) 1, leaves to appeal refused,
[2000] 2 S.C.R. viii and xi; *Trendtex Trading Corp. v. Credit Suisse*, [1982] A.C. 679;
*The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972); *Advanced Cardiovascular
Systems Inc. v. Universal Specialties Ltd.*, [1997] 1 N.Z.L.R. 186; *Carnival Cruise Lines,
Inc. v. Shute*, 499 U.S. 585 (1991); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
515 U.S. 528 (1995); *Mackender v. Feldia A.G.*, [1966] 3 All E.R. 847; *Fairfield v. Low*
(1990), 71 O.R. (2d) 599; *Ash v. Lloyd's Corp.* (1992), 9 O.R. (3d) 755, leave to appeal
refused, [1992] 3 S.C.R. v; *Drew Brown Ltd. v. The "Orient Trader"*, [1974] S.C.R.
1286; *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426;
*Incremona-Salerno Marmi Affini Siciliani (I.S.M.A.S.) s.n.c. v. Ship Castor* (2002), 297
N.R. 151, 2002 FCA 479.

**Statutes and Regulations Cited**

*Federal Court Act*, R.S.C. 1985, c. F-7, s. 50(1).

*Marine Liability Act*, S.C. 2001, c. 6, s. 46(1).

**Authors Cited**

Michell, M. Paul. "Forum Selection Clauses and Fundamental Breach: *Z.I. Pompey
Industrie v. ECU-Line N.V., The Canmar Fortune*" (2002), 36 *Can. Bus. L.J.* 453.

Peel, Edwin. "Exclusive jurisdiction agreements: purity and pragmatism in the conflict
of laws", [1998] *L.M.C.L.Q.* 182.

Tetley, William. *Marine Cargo Claims*, 3rd ed. Montréal: Yvon Blais, 1988.

2003 SCC 27 (CanLII)

2003 SCC 27 (CanLII)

- 6 -

APPEAL from a judgment of the Federal Court of Appeal (2001), 268 N.R. 364, [2001] F.C.J. No. 96 (QL), dismissing an appeal from a decision of the Trial Division (1999), 182 F.T.R. 112, [1999] F.C.J. No. 2017 (QL), dismissing a motion to set aside the order of Prothonotary Hargrave denying a stay of proceedings (1999), 179 F.T.R. 254, [1999] F.C.J. No. 1584 (QL).  Appeal allowed.

*H. Peter Swanson*, for the appellant.

*George J. Pollack* and *Jean-Marie Fontaine*, for the respondents.

The judgment of the Court was delivered by

1            BASTARACHE J. — The appellant submits that the appropriate test on a motion for a stay of proceedings to uphold a forum selection clause in a bill of lading is the "strong cause" test, as set out by Brandon J. in *The "Eleftheria"*, [1969] 1 Lloyd's Rep. 237 (Adm. Div.).  The respondents, however, contend that the Federal Court of Appeal was correct in applying the tripartite test for interlocutory injunctions established in *American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504 (H.L.).  In my view, there is no legal or policy justification for setting aside the "strong cause" test in the context of a stay of proceedings to uphold a forum selection clause in a bill of lading. The dispute in this case arises under or in connection with the bill of lading.  Its broad, unambiguous and unqualified forum selection clause was clearly intended to cover the dispute that gave rise to this appeal.

I.    Facts

- 7 -

2003 SCC 27 (CanLII)

2          The respondent Polyfibron Technologies Inc. purchased a photo processor

and four "sub-assemblies" located in France from the respondent Z.I. Pompey Industrie

for resale to its customer, the respondent Ellehammer Packaging Inc. The cargo was to

be delivered directly to Ellehammer in Seattle, Washington. Polyfibron retained the

services of the respondent John S. James Co., a freight forwarder, to arrange for the

importation of the cargo. John S. James Co., in turn, retained the services of the

respondent Société lyonnaise de messageries nationales ("S.L.M.N. Shipping"), which

made arrangements with ECU-Line France, a division of the appellant ECU-Line N.V.,

a Belgian company, for carriage of the cargo by sea.

3          The respondent John S. James Co. was aware that the cargo could not be

transported by rail without there being a significant risk of it sustaining damage and

communicated this fact to the respondent S.L.M.N. Shipping.

4          Under a clean on-board bill of lading executed at Lyon, France on

January 23, 1997, the appellant was to carry the cargo from Antwerp, Belgium, to

Seattle. The bill of lading designates John S. James Co. as the "consignee", Antwerp as

the "port of loading", and Seattle as the "port of discharge". It bears the following forum

selection clause:

> The contract evidenced by or contained in this bill of Lading is governed by
> the law of Belgium, and any claim or dispute arising hereunder or in
> connection herewith shall be determined by the courts in Antwerp and no
> other Courts.

The back of the bill of lading contains, among other provisions, the following clause:

12. METHODS AND ROUTE OF TRANSPORTATION

- 8 -

(1) The Carrier may ant [*sic*] any time and without notice to the Merchant: use any means of transport or storage whatsoever; load or carry the Goods on any vessel whether named on the front hereof or not; transfer the Goods from one conveyance to another including transshipping or carrying the same on another vessel than that named on the front hereof or by any other means of transport whatsoever; at any place unpack and remove Goods which have been stuffed in or on a Container and forward the same in any manner whatsoever; proceed at any speed and by any route in his discretion (whether or not the nearest or most or customary or advertised route) and proceed to or stay at any place whatsoever once or more often and in any order; load or unload the Goods from any conveyance at any place (whether or not the place is a port named on the front hereof as the intended Port of Loading or intended Port of Discharge); . . .

(2) The liberties set out in (1) above be [*sic*] invoked by the Carrier for any purposes whatsoever whether or not connected with the Carriage of the Goods. Anything done accordance [*sic*] with (1) above or any delay arising therfrom [*sic*] shall be deemed to be within the contractual Carriage and shall not be a deviation or whatsoever nature or degree.

5          The appellant transported the cargo from Antwerp to Montréal, where it was unloaded. From there the cargo was carried by train to Seattle. The respondents filed an action for damages of $60,761.74 in the Federal Court of Canada, alleging that the cargo was damaged while in transit by rail. The appellant denied the cargo had been damaged, arguing in the alternative that any damage had been caused by the respondents, third parties, or events for which it was not responsible. The appellant also brought a motion seeking a stay of proceedings on the basis that the bill of lading required disputes to be determined exclusively by the courts of Antwerp.

II.    Relevant Statutory Provisions

6          The following statutory provisions are central to this appeal:

*Federal Court Act*, R.S.C. 1985, c. F-7

2003 SCC 27 (CanLII)

- 9 -

**50.** (1) The Court may, in its discretion, stay proceedings in any cause or matter,

(*a*) on the ground that the claim is being proceeded with in another court or jurisdiction; or

(*b*) where for any other reason it is in the interest of justice that the proceedings be stayed.

*Marine Liability Act*, S.C. 2001, c. 6

**46.** (1) If a contract for the carriage of goods by water to which the Hamburg Rules do not apply provides for the adjudication or arbitration of claims arising under the contract in a place other than Canada, a claimant may institute judicial or arbitral proceedings in a court or arbitral tribunal in Canada that would be competent to determine the claim if the contract had referred the claim to Canada, where

(*a*) the actual port of loading or discharge, or the intended port of loading or discharge under the contract, is in Canada;

(*b*) the person against whom the claim is made resides or has a place of business, branch or agency in Canada; or

(*c*) the contract was made in Canada.

III. Judicial History

A. *Federal Court of Canada, Trial Division* (1999), 179 F.T.R. 254

7        The appellant sought a stay of proceedings before the Federal Court, pursuant to s. 50 of the *Federal Court Act*, arguing that the courts of Antwerp were the proper jurisdiction to deal with any disputes arising from the bill of lading. The prothonotary held that the appellant had moved for a stay within reasonable time given the implementation of new court rules and had therefore not attorned to its jurisdiction.

2003 SCC 27 (CanLII)

The prothonotary accepted and applied the "strong cause" test as set out in the *The*

*"Eleftheria"* characterizing its finding in the following way, at paras. 4-5:

> ... I accept that ECU-Line prefers to litigate in a familiar jurisdiction and does not bring up the Antwerp jurisdiction merely to seek procedural advantage. Other factors favouring the upholding of the jurisdiction clause include reasonable connections with Belgium, Belgian and French witnesses, that any time bar which might preclude the plaintiffs from bringing their case in Antwerp has been waived, that no security has been posted and that enforcement of a Belgian judgment against the carrier, a Belgian company, should present no particular difficulties.

> I accept, from the Plaintiffs' point of view, that there will be Canadian and American witnesses, including from the American east-coast freight forwarder through whom the Plaintiff, Polyfibron Technologies Inc., arranged the carriage. Certainly the Tribunal of Commerce in [Antwerp], which would decide the case under the jurisdiction clause, conducts its proceedings in Flemish and decides cases on the basis of documents and statements, a procedure precluding witnesses and cross-examination. There may also be considerably more delay in most instances than in the Federal Court and all the more so in the case of an appeal. There are also some lesser factors which favour litigation in Vancouver.

The prothonotary concluded, at para. 5, that the factors raised by the respondents, while "substantial", were "just short [in this instance] of the strong case" which, by *The "Eleftheria"*, the respondents had to present in order to override the forum selection clause.

8      However, the prothonotary added that the respondents had presented a persuasive case that the bill of lading had come to an end in Montréal. For that reason, there was no forum selection clause to apply to the dispute. Notwithstanding clause 12 of the bill of lading, the prothonotary, relying on Professor W. Tetley's *Marine Cargo Claims* (3rd ed. 1988), accepted the presumption that a serious and willful breach or deviation of a contract of carriage may bring into question exclusion or limitation clauses

2003 SCC 27 (CanLII)

in the contract. The prothonotary's response to the appellant's contention that issues of fundamental breach or deviation should be determined on the merits by the trial judge was the following, at para. 8 :

> The answer to this is not complex. An interim injunction, obtained on an interlocutory application, which requires a testing of the waters by looking at the strength of the case, the harm being caused and the balance of convenience, is analogous to denial of a stay of the basis of a strong case that the jurisdiction clause is just not applicable. The interim injunction does not handicap the trial judge, nor should the denial of a stay on the basis that the jurisdiction clause is in all likelihood not available. Any prejudice to ECU-Line in having to litigate in Canada can be compensated by costs.

The prothonotary stated that it was common knowledge that rail carriage is usually accompanied by vibration, bumps and jolts, though considered this to be immaterial to the present case in which the intent to deviate was the sole issue. The prothonotary concluded that the appellant's deviation from the bill of lading was both unreasonable and voluntary. Relying on *Captain v. Far Eastern SS. Co.* (1978), 7 B.C.L.R. 279 (S.C.), the prothonotary concluded that there was no contract at the time the appellant discharged the cargo in Montréal and thus no forum selection clause upon which it could rely.

9          The motion for a stay of proceedings to uphold the forum selection clause was therefore denied.

B. *Federal Court of Canada, Trial Division* (1999), 182 F.T.R. 112

10          The court concluded that the prothonotary was obliged to take into account all the circumstances of the case in determining whether the respondent had demonstrated a "strong cause" in favour of denying a stay, pursuant to the test set out in

2003 SCC 27 (CanLII)

- 12 -

*The "Eleftheria"*, an inquiry that did not preclude him from concluding that the bill of lading ended in Montréal and that its forum selection clause did not apply thereafter. The court added that in any event the appellant would have the opportunity to raise its arguments regarding the existence of the bill of lading and its forum selection clause before a trial judge.

11          The court dismissed with costs the motion to set aside the order of the prothonotary.

C.    *Federal Court of Appeal* (2001), 268 N.R. 364

12          The Court of Appeal held that the test for reviewing decisions of a prothonotary is whether the prothonotary's exercise of discretion was clearly wrong and that the test for reviewing the exercise of discretion of a motions judge is whether sufficient weight was given to all relevant considerations.

13          The Court of Appeal concluded that *The "Eleftheria"* did not govern the case, stating, at para. 27:

> The burden of the appellant's submission is that when, as here, a contract contains a jurisdiction clause requiring that all disputes, wherever they arise, are to be dealt with by the Courts of a particular jurisdiction, Anglo-American and Anglo-Canadian jurisprudence both conclude that the dispute must be dealt with by the Courts of the jurisdiction the parties have agreed to. The appellant says that since *The Eleftheria* no case in Anglo-Canadian or Anglo-American jurisprudence has held otherwise. I disagree. *Jian Sheng Co. [v. Great Tempo S.A.*, [1998] 3 F.C. 418 (C.A.)] is a case where this Court held that a prothonotary was right to refuse a stay in circumstances where the appellant had not led sufficient evidence to support the existence of jurisdiction elsewhere than Canada.

2003 SCC 27 (CanLII)

- 13 -

14          The Court of Appeal emphasized *The "Eleftheria"* was decided in 1969 and

the House of Lords had since decided *American Cyanamid*, *supra*, thereby relaxing the

requirements for an interlocutory injunction to a tripartite test: first, a preliminary and

tentative assessment of the merits of the case must show there is a serious issue to be

tried; second, consideration must be given to whether the party seeking the interlocutory

injunction would suffer irreparable harm unless the injunction is granted; and third, there

must be a determination as to which party would suffer the greater harm as a result of the

granting or refusing of an interlocutory injunction.

15          The Court of Appeal quoted with approval Beetz J., writing for a unanimous

Supreme Court, in *Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1

S.C.R. 110, at p. 127:

> A stay of proceedings and an interlocutory injunction are remedies of
> the same nature. In the absence of a different test prescribed by statute, they
> have sufficient characteristics in common to be governed by the same rules
> and the courts have rightly tended to apply to the granting of interlocutory
> stay the principles which they follow with respect to interlocutory
> injunctions . . . .

The Court of Appeal reasoned that although the prothonotary had not referred to either

*American Cyanamid* or *Metropolitan Stores*, it was likely what he had in mind when he

concluded, at para. 8:

> An interim injunction, obtained on an interlocutory application, which
> requires a testing of the waters by looking at the strength of the case, the
> harm being caused and the balance of convenience, is analogous to denial
> of a stay of the basis of a strong case that the jurisdiction clause is just not
> applicable.

2003 SCC 27 (CanLII)

- 14 -

The Court of Appeal concluded that given the evolution of English and Canadian jurisprudence, the proper test to apply in stay applications is the tripartite test employed for the purposes of obtaining interlocutory injunctions.

16          The Court of Appeal dismissed the appeal with costs.

IV.   Issues

17   1.   What is the proper test on a motion brought for a stay of proceedings to enforce the forum selection clause in a bill of lading?

     2.   Does that test contemplate an inquiry into whether there was a fundamental breach or deviation, or should such an inquiry be left to the decision maker in the agreed forum?

V. Analysis

18          Discretionary orders of prothonotaries ought to be disturbed by a motions judge only where (a) they are clearly wrong, in the sense that the exercise of discretion was based upon a wrong principle or a misapprehension of the facts, or (b) in making them, the prothonotary improperly exercised his or her discretion on a question vital to the final issue of the case: *Canada v. Aqua-Gem Investments Ltd.*, [1993] 2 F.C. 425 (C.A.), *per* MacGuigan J.A., at pp. 462-63. An appellate court may interfere with the decision of a motions judge where the motions judge had no grounds to interfere with the prothonotary's decision or, in the event such grounds existed, if the decision of the motions judge was arrived at on a wrong basis or was plainly wrong: *Jian Sheng Co. v.*

2003 SCC 27 (CanLII)

*Great Tempo S.A.*, [1998] 3 F.C. 418 (C.A.), *per* Décary J.A., at pp. 427-28, leave to appeal refused, [1998] 3 S.C.R. vi. For the reasons below, I conclude that the decisions of the prothonotary, the motions judge and the Court of Appeal are clearly wrong.

A. *Stays of Proceedings to Enforce a Forum Selection Clause*

19      Pursuant to s. 50(1) of the *Federal Court Act*, the court has the discretion to stay proceedings in any cause or matter on the ground that the claim is proceeding in another court or jurisdiction, or where, for any other reason, it is in the interest of justice that the proceedings be stayed. For some time, the exercise of this judicial discretion has been governed by the "strong cause" test when a party brings a motion for a stay of proceedings to enforce a forum selection clause in a bill of lading. Brandon J. set out the test as follows in *The "Eleftheria"*, at p. 242:

> (1) Where plaintiffs sue in England in breach of an agreement to refer disputes to a foreign Court, and the defendants apply for a stay, the English Court, assuming the claim to be otherwise within the jurisdiction, is not bound to grant a stay but has a discretion whether to do so or not. (2) The discretion should be exercised by granting a stay unless strong cause for not doing so is shown. (3) The burden of proving such strong cause is on the plaintiffs. (4) In exercising its discretion the Court should take into account all the circumstances of the particular case. (5) In particular, but without prejudice to (4), the following matters, where they arise, may be properly regarded: (a) In what country the evidence on the issues of fact is situated, or more readily available, and the effect of that on the relative convenience and expense of trial as between the English and foreign Courts. (b) Whether the law of the foreign Court applies and, if so, whether it differs from English law in any material respects. (c) With what country either party is connected, and how closely. (d) Whether the defendants genuinely desire trial in the foreign country, or are only seeking procedural advantages. (e) Whether the plaintiffs would be prejudiced by having to sue in the foreign Court because they would (i) be deprived of security for that claim; (ii) be unable to enforce any judgment obtained; (iii) be faced with a time-bar not applicable in England; or (iv) for political, racial, religious or other reasons be unlikely to get a fair trial.

20        Forum selection clauses are common components of international
commercial transactions, and are particularly common in bills of lading. They have, in
short, "been applied for ages in the industry and by the courts": Décary J.A. in *Jian
Sheng, supra*, at para. 7. These clauses are generally to be encouraged by the courts as
they create certainty and security in transaction, derivatives of order and fairness, which
are critical components of private international law: La Forest J. in *Morguard
Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, at pp. 1096-97; *Holt Cargo
Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC
90, at paras. 71-72. The "strong cause" test remains relevant and effective and no social,
moral or economic changes justify the departure advanced by the Court of Appeal. In
the context of international commerce, order and fairness have been achieved at least in
part by application of the "strong cause" test. This test rightly imposes the burden on the
plaintiff to satisfy the court that there is good reason it should not be bound by the forum
selection clause. It is essential that courts give full weight to the desirability of holding
contracting parties to their agreements. There is no reason to consider forum selection
clauses to be non-responsibility clauses in disguise. In any event, the "strong cause" test
provides sufficient leeway for judges to take improper motives into consideration in
relevant cases and prevent defendants from relying on forum selection clauses to gain
an unfair procedural advantage.

21        There is a similarity between the factors which are to be taken into account
when considering an application for a stay based on a forum selection clause and those
factors which are weighed by a court considering whether to stay proceedings in
"ordinary" cases applying the *forum non conveniens* doctrine: E. Peel in "Exclusive
jurisdiction agreements: purity and pragmatism in the conflict of laws", [1998]
*L.M.C.L.Q.* 182, at pp. 189-90. The latter inquiry is well settled in Canada: *Amchem*

2003 SCC 27 (CanLII)

- 17 -

*Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897. In the latter inquiry, the burden is normally on the defendant to show why a stay should be granted, but the presence of a forum selection clause in the former is, in my view, sufficiently important to warrant a different test, one where the starting point is that parties should be held to their bargain, and where the plaintiff has the burden of showing why a stay should not be granted. I am not convinced that a unified approach to *forum non conveniens*, where a choice of jurisdiction clause constitutes but one factor to be considered, is preferable. As Peel, *supra*, notes, at p. 190, I fear that such an approach would not

> ensure that full weight is given to the jurisdiction clause since not only should the clause itself be taken into account, but also the effect which it has on the factors which are relevant to the determination of the natural forum. Factors which may otherwise be decisive may be less so if one takes into account that the parties agreed in advance to a hearing in a particular forum and must be deemed to have done so fully aware of the consequences which that might have on, for example, the transportation of witnesses and evidence, or compliance with foreign procedure etc.

In my view, a separate approach to applications for a stay of proceedings involving forum selection clauses in bills of lading ensures that these considerations are properly taken into account and that the parties' agreement is given effect in all but exceptional circumstances. See also M. P. Michell, "Forum Selection Clauses and Fundamental Breach: *Z.I. Pompey Industrie v. ECU-Line N.V., The Canmar Fortune*" (2002), 36 *Can. Bus. L.J.* 453, at pp. 471-72.

B.    *The Inappropriateness of the Tripartite Test*

22          The respondents adopted the Court of Appeal's holding in favour of extending the tripartite test for interlocutory injunction to motions for a stay of

2003 SCC 27 (CanLII)

proceedings to enforce a forum selection clause in a bill of lading. The tripartite test was

set out as follows by this Court in *RJR—MacDonald Inc. v. Canada (Attorney General)*,

[1994] 1 S.C.R. 311, at p. 334:

> First, a preliminary assessment must be made of the merits of the case to
> ensure that there is a serious question to be tried. Secondly, it must be
> determined whether the applicant would suffer irreparable harm if the
> application were refused. Finally, an assessment must be made as to which
> of the parties would suffer greater harm from the granting or refusal of the
> remedy pending a decision on the merits.

In support of the move to the tripartite test, the Court of Appeal quoted, at para. 29, with

approval this Court's statement in *Metropolitan Stores*, at p. 127:

> A stay of proceedings and an interlocutory injunction are remedies of
> the same nature. In the absence of a different test prescribed by statute, they
> have sufficient characteristics in common to be governed by the same rules
> and the courts have rightly tended to apply to the granting of interlocutory
> stay the principles which they follow with respect to interlocutory
> injunctions.

While a stay of proceedings to enforce a forum selection clause may be of the same

nature as an interlocutory injunction, I must respectfully disagree with the conclusion of

the Court of Appeal.

23        The conclusion of the Court of Appeal is not supported by this Court's

decision in *Metropolitan Stores*. The two main issues in that case were whether the

Court of Appeal erred in failing to recognize a presumption of constitutional validity

where legislation is challenged under the *Charter*, and what principles govern the

exercise of a Superior Court judge's discretionary power to order a stay until the

constitutionality of impugned legislation has been determined. The context of a

constitutional challenge has little in common with the case at bar. Indeed, *Metropolitan*

2003 SCC 27 (CanLII)

*Stores* did not involve forum selection clauses, and the underlying desirability of holding contracting parties to their bargain was not at issue. That case did not concern private international law; consequently, considerations of comity, uniformity of law, forum shopping and related issues were neither canvassed nor addressed by the Court.

24        As recently as 1998, Décary J.A., for a unanimous Federal Court of Appeal in *Jian Sheng*, confirmed at para. 10 the appropriateness of the "strong cause" test in Canada, a case in which the issue was whether the forum selection clause in a bill of lading was void for uncertainty:

> Where, in admiralty matters before this Court, a defendant applies for a stay pursuant to section 50 of the *Federal Court Act* . . . on the basis of a jurisdiction clause found in a bill of lading, the defendant has the burden of persuading the Court that the conditions of application of the clause have been met. Once the Court is satisfied that the clause applies, the burden of proof then shifts to the plaintiff to show sufficiently strong reasons to support the conclusion that it would not be reasonable or just in the circumstances to keep the plaintiff to the terms of the contract . . . . These "strong reasons" have been summarized in the often-quoted reasons of Brandon J. (as he then was) in *The "Eleftheria"* . . . .

In *Jian Sheng*, the forum selection clause contained in the bill of lading required the defendant to show it was the carrier and what was its principal place of business. *Jian Sheng* does not, as the Court of Appeal held in the case at bar, undermine in any way the "strong cause" test. Indeed, the tripartite test adopted by the Court of Appeal in this case constitutes a significant and unjustified departure from the jurisprudence not only of the Federal Court, but also of provincial courts, and those of other jurisdictions. See for instance: *The "Seapearl" v. Seven Seas Dry Cargo Shipping Corp.*, [1983] 2 F.C. 161 (C.A.), *per* Pratte J.A., at pp. 176-77, and *per* Lalande D.J., at p. 180; *Anraj Fish Products Industries Ltd. v. Hyundai Merchant Marine Co.* (2000), 262 N.R. 270 (F.C.A.), at para. 5; *Sarabia v. "Oceanic Mindoro" (The)* (1996), 26 B.C.L.R. (3d) 143

2003 SCC 27 (CanLII)

(C.A.), at paras. 37-38, leave to appeal refused, [1997] 2 S.C.R. xiv; *Maritime Telegraph and Telephone Co. v. Pre Print Inc.* (1996), 131 D.L.R. (4th) 471 (N.S.C.A.), at p. 483; *Morrison v. Society of Lloyd's* (2000), 224 N.B.R. (2d) 1 (C.A.), at para. 14, leaves to appeal refused, [2000] 2 S.C.R. viii and xi; *Trendtex Trading Corp. v. Credit Suisse*, [1982] A.C. 679 (H.L.); *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), at p. 15; *Advanced Cardiovascular Systems Inc. v. Universal Specialties Ltd.*, [1997] 1 N.Z.L.R. 186 (C.A.), at p. 190.

25          There are also compelling public policy reasons in favour of upholding the "strong cause" test. If the tripartite test were employed to deal with situations like the case at bar, most forum selection clauses would be rendered unenforceable, creating commercial uncertainty by unduly minimizing the importance of contractual undertakings. Instead of requiring a plaintiff to demonstrate a "strong cause" to not enforce a forum selection clause, the burden would be on the applicant to establish the elements of the tripartite test. The "strong cause" test rightly places the onus on the plaintiff who commences suit contrary to the terms of a forum selection clause.

26          Applying the tripartite test to a situation of this nature is also problematic because the first part of the test requires the court to evaluate the likelihood of success on the merits of the case. This part of the test is designed to allow a motions judge the opportunity to deal with legal issues in preliminary proceedings without prejudice to the final adjudication of their merits. In the case of motions to stay proceedings based on a forum selection clause in a bill of lading, such a process would be impossible because there is normally no determination on the merits. Either the stay will be granted, and the proceedings in Canada will come to an end, or the stay will be denied and the defendant will have to defend the case on the merits in Canada, losing the benefit of the jurisdiction

- 21 -

clause. For this reason the rule governing such stay applications cannot be based on a test that relies on the likelihood of success on the merits.

27            The test propounded by the Court of Appeal would make it difficult to establish harm in the context of a stay application based on a forum selection clause. Indeed, I can think of no instance where a defendant would suffer irreparable harm by being required to defend a lawsuit in a Canadian court. I am not satisfied that litigation costs disproportionate to the amount of the claim would constitute irreparable harm, as the respondents have argued. The "strong cause" test reflects the desirability that parties honour their contractual commitments and is consistent with the principles of order and fairness at the heart of private international law, as well as those of certainty and security of transaction at the heart of international commercial transactions. I see no reason to depart from the traditional approach for a stay of proceedings when the applicability of a forum selection clause is at issue. The Court of Appeal in effect read the choice of jurisdiction clause out of the contract. This approach is, in my view, untenable.

28            The respondents submit we ought to accord little weight to the forum selection clause in the bill of lading because bills of lading are, as a general rule, contracts of adhesion, devised unilaterally by the appellant. This submission is without merit despite the fact that bills of lading are often issued on pre-printed forms. See *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), at pp. 593-94.

29            Bills of lading are typically entered into by sophisticated parties familiar with the negotiation of maritime shipping transactions who should, in normal circumstances, be held to their bargain. See *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995). The parties in this appeal are corporations with

- 22 -

significant experience in international maritime commerce. The respondents were aware
of industry practices and could have reasonably expected that the bill of lading would
contain a forum selection clause. A forum selection clause could very well have been
negotiated with the appellant, in light of the respondent John S. James Co.'s insistence
that S.L.M.N. Shipping transport the cargo solely by sea. There is no evidence that this
bill of lading is the result of grossly uneven bargaining power that would invalidate the
forum selection clause contained therein.

C. *Fundamental Breach and Deviation*

30          Having concluded that the "strong cause" test governs whether to grant a
stay in the context of a bill of lading with a forum selection clause, I turn to whether, in
taking into account all the circumstances of the particular case, the Court should consider
issues arising under the contract. The respondents submit the Court should do just that,
relying in part on the following passage from Professor Tetley in *Marine Cargo Claims*,
*supra*, at p. 99:

> When however the breach is so serious, usually the result of a fraudulent
> or wilful act, the courts have questioned whether the carrier may rely on the
> terms of the contract or the law, and in particular, whether the carrier may
> rely on the exclusion or limitation clauses in the contract and the law
> because he has seemingly placed himself outside of the contract and the law.

In my view, the prothonotary erred in law when he determined the forum selection clause
was void as a result of the alleged deviation stemming from the discharge of the cargo
in Montréal.

2003 SCC 27 (CanLII)

- 23 -

31          Issues respecting an alleged fundamental breach of contract or deviation

therefrom should generally be determined under the law and by the court chosen by the

parties in the bill of lading. The "strong cause" test, once it is determined that the bill

of lading otherwise binds the parties (for instance, that the bill of lading as it relates to

jurisdiction does not offend public policy, was not the product of fraud or of grossly

uneven bargaining positions), constitutes an inquiry into questions such as the

convenience of the parties, fairness between the parties and the interests of justice, not

of the substantive legal issues underlying the dispute. See *Mackender v. Feldia A.G.*,

[1966] 3 All E.R. 847 (C.A.), *per* Lord Denning, at pp. 849-50, and *per* Lord Diplock,

at p. 852. Put differently, a court, in the context of an application for a stay to uphold a

forum selection clause in a bill of lading, must not delve into whether one party has

deviated from, or fundamentally breached an otherwise validly formed contract. Such

inquiries would render forum selection clauses illusory since most disputes will involve

allegations which, if proved, will make the agreement terminable or voidable by the

aggrieved party. Moreover, while the choice of forum for the determination of the

existence of the agreement would be made without reference to the forum selection

clause in the contract, if the agreement were found to remain intact, resort to the said

clause would presumably be necessary to decide the appropriate forum in which to settle

the rights of the parties under the agreement.

32          The position adopted by the Court of Appeal would remove many disputes

from the reach of a widely framed forum selection clause by the mere allegation of

various types of wrongful conduct. In my view, where, as here, the parties agree that

claims or disputes arising under or in connection with a bill of lading are to "be

determined by the courts in Antwerp and no other Courts", a proceeding in which one

party contends that the other party deviated from the agreement such as to give the

2003 SCC 27 (CanLII)

- 24 -

former the right to terminate or void the contract remains a proceeding in respect of a claim or dispute arising under or in connection with the bill of lading: *Fairfield v. Low* (1990), 71 O.R. (2d) 599 (H.C.), at pp. 605-8; *Ash v. of Lloyd's Corp.* (1992), 9 O.R. (3d) 755 (C.A.), at p. 758, leave to appeal refused, [1992] 3 S.C.R. v; *Morrison, supra*, at paras. 13 and 19. See also *Drew Brown Ltd. v. The "Orient Trader"*, [1974] S.C.R. 1286, *per* Ritchie J., at p. 1288, and *per* Laskin J., at p. 1318, where an alleged deviation was found not to displace an otherwise valid choice of law clause.

33          The conclusion that allegations of deviation or fundamental breach are matters arising under the contract that should not be considered in determining whether to give effect to a forum selection clause is supported by the construction approach to fundamental breach considered by our Court in *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423, a case concerning the use of fundamental breach in the context of time limitation provisions. Discussing *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426 (a case involving fundamental breach in the context of clauses excluding liability), the Court said this, at para. 52:

> [W]hether fundamental breach prevents the breaching party from continuing to rely on an exclusion clause is a matter of construction rather than a rule of law. The only limitation placed upon enforcing the contract as written in the event of a fundamental breach would be to refuse to enforce an exclusion of liability in circumstances where to do so would be unconscionable, according to Dickson C.J., or unfair, unreasonable or otherwise contrary to public policy, according to Wilson J.

In my view, the policy rationale in support of the construction approach applied to exclusion and time limitation clauses is equally applicable to forum selection clauses in bills of lading.

- 25 -

34          In the case at bar, it is unnecessary to determine whether there has been a
fundamental breach or deviation because the forum selection clause clearly covers such
a dispute.    The language of the clause is unambiguous and not subject to any
qualifications, and the parties' bargain was not unconscionable or unreasonable. The
clause becomes relevant precisely in disputes such as this one, as it regulates the way in
which liability for deviation or breach of contract is to be established.

35          This approach is sound for policy reasons. Stay applications in the Federal
Court should be brought quickly after commencement of the suit and consequently, the
parties will have limited knowledge and information regarding the strength or weakness
of their opponent's case. Issues regarding whether there has been, for instance, an
unreasonable deviation raise complicated questions of fact that require a consideration
of all the circumstances giving rise to the alleged deviation.

36          Given my conclusions, I do not consider it necessary to address the issue of
the relationship between deviation and fundamental breach. Suffice it to say that, in this
case, either allegation concerns a dispute arising under or in connection with the bill of
lading.  There is no need to consider the applicability of the doctrine of separability.

D.    *Section 46 of the Marine Liability Act*

37          Section 46(1) of the *Marine Liability Act*, which entered into force on August
8, 2001, has the effect of removing from the Federal Court its discretion under s. 50 of
the *Federal Court Act* to stay proceedings because of a forum selection clause where the
requirements of s. 46(1)(*a*), (*b*), or (*c*) are met. This includes where the actual port of
loading or discharge is in Canada.  In this case, there would be no question that the

2003 SCC 27 (CanLII)

- 26 -

Federal Court is an appropriate forum to hear the respondents' claim but for the fact that s. 46 does not apply to judicial proceedings commenced prior to its coming into force: *Incremona-Salerno Marmi Affini Siciliani (I.S.M.A.S.) s.n.c. v. Ship Castor* (2002), 297 N.R. 151, 2002 FCA 479, at paras. 13-24. Section 46 of the *Marine Liability Act* is therefore irrelevant in this appeal.

38          Indeed, s. 46(1) would appear to establish that, in select circumstances, Parliament has deemed it appropriate to limit the scope of forum selection clauses by facilitating the litigation in Canada of claims related to the carriage of goods by water having a minimum level of connection to this country. Such a legislative development does not, however, provide support for the fundamental jurisprudential shift made by the Court of Appeal in the case at bar. To the contrary, s. 46(1) indicates Parliament's intent to broaden the jurisdiction of the Federal Court only in very particular instances that can easily be ascertained by a prothonotary called upon to grant a stay of proceedings pursuant to the forum selection clause of a bill of lading. Section 46(1) in no way mandates a prothonotary to consider the merits of the case, an approach in line with the general objectives of certainty and efficiency, which underlie this area of the law.

### E.  *Application of the Law to the Facts of this Case*

39          I am of the view that, in the absence of applicable legislation, for instance s. 46(1) of the *Marine Liability Act*, the proper test for a stay of proceedings pursuant to s. 50 of the *Federal Court Act* to enforce a forum selection clause in a bill of lading remains as stated in *The "Eleftheria"*, which I restate in the following way. Once the court is satisfied that a validly concluded bill of lading otherwise binds the parties, the court must grant the stay unless the plaintiff can show sufficiently strong reasons to

2003 SCC 27 (CanLII)

- 27 -

support the conclusion that it would not be reasonable or just in the circumstances to require the plaintiff to adhere to the terms of the clause. In exercising its discretion, the court should take into account all of the circumstances of the particular case. See *The "Eleftheria"*, at p. 242; *Amchem*, at pp. 915-22; *Holt Cargo*, at para. 91. Disputes arising under or in connection with a contract may not be regarded by a court in determining whether "strong cause" has been shown that a stay should not be granted.

40      In this case, the bill of lading and its forum selection clause have been entered into and are otherwise binding on the parties. The prothonotary began by properly applying the "strong cause" test. In so doing the prothonotary weighed the fact that the appellant prefers to litigate in a familiar jurisdiction and does not bring up the jurisdiction clause merely to seek a procedural advantage; there are reasonable connections with Belgium; there are Belgian and French witnesses; any time bar which may preclude the respondents from bringing their case in Belgium has been waived; no security has been posted; and the enforcement of a Belgian judgment against the appellant should present no particular difficulties. The prothonotary also accepted the respondents' arguments that there will be Canadian and American witnesses in these proceedings; the Tribunal de commerce in Antwerp conducts its proceedings in Flemish and decides cases on the basis of documents and statements, a procedure precluding witnesses and cross-examination; and, there may be more delay in Belgium than in Canada, especially if there is an appeal. The prothonotary concluded that the factors in favour of denying a stay, while substantial, were just short of the "strong cause" test which the respondents had the burden of meeting. I see no reason why the prothonotary's conclusion on this point should be set aside. However, the prothonotary erred by subsequently turning his attention to a dispute arising under the bill of lading

2003 SCC 27 (CanLII)

- 28 -

and in effect extending the tripartite test for interlocutory injunctions to motions for a stay of proceedings involving forum selection clauses contained in bills of lading.

VI.   Disposition

41          The prothonotary, to the extent he applied the "tripartite test", erred in law, as did the Court of Appeal in concluding that the appropriate test for a stay of proceedings involving a bill of lading with a forum selection clause was the "tripartite test" for interlocutory injunctions. The "strong cause" test does not contemplate an inquiry into the question of establishing whether the surrounding contract is voidable. Such questions are best left to the decision maker in the forum agreed upon.

42          Accordingly, I would allow the appeal, overturn the judgments of the courts below, and issue a stay of proceedings in favour of the appellant, with costs throughout to the appellant.

        *Appeal allowed with costs.*

        *Solicitors for the appellant: Bernard & Partners, Vancouver.*

        *Solicitors for the respondents: Davies, Ward, Phillips and Vineberg, Montreal.*

2003 SCC 27 (CanLII)



# TAB24

*Indexed as:*
**360networks inc. (Re)**

**IN THE MATTER OF the Companies' Creditors
Arrangement Act R.S.C. 1985, c. C-36
AND IN THE MATTER OF the Nova Scotia Companies
Act, S.C.C, c. 81
AND IN THE MATTER OF the Company Act,
R.S.B.C. 1996, c. 62
AND IN THE MATTER OF 360networks inc., 360fibre
ltd., 360finance ltd., Carrier Centers (Canada)
Ltd., 360 Urbanlink Ltd., 360networks (CDN fiber)
ltd., 360networks services ltd., 360cayer ltée,
360engineering ltd., 360pacific (Canada) ltd. and
360networks sub inc., petitioners**

[2001] B.C.J. No. 2513

2001 BCSC 1439

29 C.B.R. (4th) 287

110 A.C.W.S. (3d) 618

Vancouver Registry No. L011792

British Columbia Supreme Court
Vancouver, British Columbia

**Tysoe J.**

Oral judgment: October 16, 2001.

(32 paras.)

*Practice -- Interim proceedings -- Interpleader -- Payment of money into court -- Payment out,
considerations -- Fraud and misrepresentation -- Fraudulent conveyances and preferences --
Conveyances and preferences impeachable by creditors or others -- Fraudulent preference, what
constitutes -- Evidence and proof.*

Application by 360networks and its subsidiaries to have $19,793,317 US paid out of court. Also claiming the funds were three related companies of the respondent, Impsat. Impsat and 360networks entered into agreements for 360networks to use Impsat's optical fibres and telecommunications facilities in South America. 360networks had embarked on a Companies' Creditors Arrangement Act financial reorganization, but not in Brazil. Impsat began an action against 360 Brazil for payment of money owing. The Brazilian court granted an injunction to Impsat, preventing 360 Brazil from transferring money outside of Brazil. However, two days later a Brazilian bank transferred $19,754,990 to 360networks' bank, the Canadian Imperial Bank of Commerce. 360networks demanded the immediate credit to its account of the funds. Impsat claimed that the transaction was a fraudulent conveyance or preference and should be set aside. CIBC interpleaded the funds into court. 360networks claimed that if the monies in Court were not paid to it, its restructuring efforts would be prejudiced.

HELD: Application allowed. The interpleaded funds were ordered paid out of court to 360networks. There was no evidence that there had been any determination in any proceedings commenced in Brazil to put 360 Brazil into bankruptcy or to have the transaction set aside as a fraudulent conveyance or preference. There were no ongoing proceedings in Brazil concerning the funds. Impsat's request amounted to a request for the court to assume jurisdiction and to reverse the transaction. 360networks had established a property interest in the funds, and Impsat had not established that there was any triable issue regarding the funds nor that it had any property interest in them.

**Counsel:**

Robert D. Holmes, for Impsat.
Richard J. Olson and Robert A. Millar, for 360networks.
William C. Kaplan, for the secured lenders.
Catherine Louise Shaley, for the monitor, PricewaterhouseCoopers Inc.

---

1    **TYSOE J.** (orally):-- At issue on these cross-applications is the disposition of the sum of $19,793,317.09 (U.S.) paid into this Court by Canadian Imperial Bank of Commerce ("CIBC") pursuant to my Order dated September 12, 2001 on an interpleader application by CIBC. The two parties claiming the funds are 360networks inc. and three related companies, Impsat Communcacoes Ltda. ("Impsat Brazil"), Impsat Fiber Networks, Inc. and Impsat S.A. (collectively, "Impsat" or "the three Impsat companies").

2    360networks inc. is indirectly in the business of constructing or acquiring and operating a fibre-optic network throughout the world. 360networks inc. is a holding company and the business is actively carried on by its subsidiaries. One of its indirect subsidiaries is 360Networks do Brasil

Ltda. ("360 Brazil") which, as its name suggests, carries on operations in Brazil. Two other subsidiaries of 360networks inc. carrying on business in Latin America are 360americas network (Bermuda) Ltd. and 360networks de Argentina S.R.L. The three Impsat companies and the three subsidiaries of 360networks inc. (the "360 Subsidiaries") entered into two series of agreements, one series consisting of four agreements known as the Related Fiber Agreements and the second series consisting of two agreements known as the Telehouse Services Agreements.

3    The Related Fiber Agreements relate to the right of the 360 Subsidiaries to use optical fibres belonging to the three Impsat companies and the maintenance of the optical fibres by the three Impsat companies. The aggregate fees payable by the 360 Subsidiaries to the three Impsat companies under the Related Fiber Agreements is approximately $145 million (U.S.). The Related Fiber Agreements were made subject to two other agreements between the three Impsat companies and the 360 Subsidiaries. One of the other agreements was called a Master Agreement and its purpose was to coordinate the activities under the Related Fiber Agreements. The other agreement was called a Master Dispute Resolution Agreement, in which the parties agreed to resolve any disputes under the Related Fiber Agreements by way of arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The Master Dispute Resolution Agreement also provided that the obligation to arbitrate is not binding with respect to requests for preliminary injunctions, temporary orders, or other procedures in the courts of New York, New York or Buenos Aires, Argentina.

4    The Telehouse Services Agreements were between 360 Brazil and Impsat Brazil. Fees totalling $49 million (U.S.) are payable by 360 Brazil under the Telehouse Services Agreements in respect of its use of certain telecommunications facilities constructed by Impsat Brazil. The Telehouse Services Agreements were not made subject to an arbitration agreement.

5    360networks inc. made two advances of $22 million (U.S.) to 360 Brazil during the first half of 2001. The first advance was made on or about February 17, 2001. By letter dated February 16, 2001, the Central Bank of Brazil, which has authority over the flow of funds in and out of Brazil, was notified of the advance. The letter stated that the advance was a non-interest bearing working capital loan to be repaid in six months on August 17, 2001. By E-mail dated February 21, 2001, the delegate manager of 360 Brazil confirmed that the funds had been received on February 19th, 2001, and that they constituted a non-interest bearing loan payable in six months on August 17, 2001. Impsat challenges the characterization of the advance as a loan and says that it was a contribution of capital. Impsat also challenges the advance date of the monies.

6    The second advance was made in early June 2001. 360networks inc. says that it was also a non-interest bearing loan. Shortly before the receipt of this second advance, a representative of the 360 Subsidiaries sent an e-mail to the chief operating officer of Impsat Fiber Networks, Inc. stating that approximately $21 million was being transferred from 360networks inc. to 360 Brazil, that the funds were expected to arrive in Brazil by the following Thursday and that they would then be forwarded to Impsat. The funds were received in Brazil but they were not paid to Impsat.

7     On June 28, 2001, 360networks inc. commenced this proceeding under the Companies' Creditors Arrangement Act by way of embarking upon a financial reorganization. Similar proceedings were commenced in at least one other jurisdiction namely, (Chapter 11 proceedings in New York), but no similar proceedings have been commenced in Brazil.

8     In late June or early July, a request was made to the Central Bank of Brazil by 360 Brazil to allow for early repayment of the loan made in February. This request was denied by the Central Bank of Brazil and on July 11, 360 Brazil entered into a contract with BankBoston Banco Multiplo S.A. ("BankBoston Brazil") called an exchange contract for currency sale or a derivative contract, by which 360 Brazil bought $19,754,990.52 in U.S. funds for settlement on August 17, by way of wire transfer to 360networks inc.

9     On August 3, the three Impsat companies made a demand for arbitration pursuant to the Master Dispute Resolution Agreement requesting damages against the 360 Subsidiaries for an amount expected to exceed $100 million (U.S.). The 360 subsidiaries have filed an answer to this demand and have made a counterclaim against the three Impsat companies for damages in excess of $25 million (U.S.).

10     On August 6, Impsat Brazil commenced an action against 360 Brazil in the 26th Central Civil Court of Brazil (the "Brazilian Court"). The action is called a monition or a special collection action (the "Brazil Collection Action"). In the Brazil Collection Action, Impsat Brazil seeks 1,727,425.95 Brazilian reals, or approximately $650,000 (U.S.), from 360 Brazil in respect of monies alleged to be owing under the Telehouse Services Agreements.

11     On August 15, in response to a precautionary measure filed by Impsat Brazil to block, and transfer to the court, assets estimated at more than $21 million (U.S.), said to be in process of being sent out of Brazil, the Brazilian Court granted an injunction preventing 360 Brazil from remitting or transferring funds to destinations outside Brazil for any reason until further notice from the court. The Brazilian Court stated that it was sending an urgent official communication to the Central Bank of Brazil and that it would be issuing an order to officially notify 360 Brazil of the injunction.

12     On August 17, BankBoston Brazil transferred the sum of $19,754,990.52 (U.S.) to the banker of 360networks inc., CIBC, at its offices in Toronto for the credit of 360networks inc. Later on August 17, 360 Brazil sent a letter to BankBoston Brazil confirming its request, in compliance with the order issued by the Brazilian Court, that it reverse the settlement of the $19,754,990.52 (U.S.) in funds and repay them to 360 Brazil. BankBoston Brazil then requested CIBC to return the funds on the basis of a court order in Brazil freezing the funds. On August 21, legal counsel for 360networks inc. wrote to CIBC demanding the immediate credit to its account of this sum of $19,754,990.52. In view of the competing claims, CIBC made application to this Court to interplead the funds into court.

13     The Brazilian Court has issued several additional orders. On August 20, upon evidence indicating that 360 Brazil did not intend to heed the August 15 Order, the Brazilian Court ordered

the blocking of all financial resources in excess of 100,000 Brazilian reals that 360 Brazil had on deposit in financial institutions that are members of Brazil's National Financial System.

**14**   On September 14, upon evidence that BankBoston Brazil and 360 Brazil may have been notified of the August 15 injunction prior to the transfer of the funds, the Brazilian Court ordered that (i) an official communication be sent to BankBoston Brazil to take all steps necessary to return the funds to Brazil in the event that it had learned of the injunction before finalizing the transfer; and (ii), an official communication be sent to CIBC instructing it to take the necessary steps to return the funds to Brazil. On September 24 or 25, upon evidence that 360 Brazil disobeyed the August 15 injunction by failing to take the steps necessary to halt the consummation of the exchange transaction, the Brazilian Court ordered that 360 Brazil take the appropriate steps with CIBC within 72 hours to have the funds sent back to Brazil, failing which it would be subject to a daily fine of 50,000 Brazilian reals and potential criminal liability.

**15**   360 Brazil applied for reconsideration of these orders and offered to deposit with the Brazilian Court the 1,727,425.95 reals claimed by Impsat Brazil in the Brazil Collection Action. On September 28, the Brazilian Court found as follows:

> (a)   BankBoston Brazil sent the funds to CIBC by electronic transfer at 13:02 on August 17;
> (b)   360 Brazil was notified of the August 15 injunction at 13:15 or 13:16 on August 17;
> (c)   after being notified of the injunction, 360 Brazil attempted to reverse the settlement of the exchange transaction; and
> (d)   contrary to the Court's previous belief, there was no noncompliance with the injunction.

**16**   The Brazilian Court stated that, although it was not convinced that 360 Brazil did not actually intend to liquidate its investments in Brazil and remit them to North America to the detriment of its creditors domiciled in Brazil, it was prepared to modify its previous Orders in light of nine considerations, including the facts that there was no failure to heed the August 15 injunction when the monies were sent to Canada and that 360 Brazil was willing to deposit with the court the full amount claimed by Impsat in the Brazil Collection Action. Concluding that maintaining the previous Orders did not satisfy the requisites of necessity and proportionality, the Brazilian Court (i) maintained the prohibition of remittance and/or transfer by 360 Brazil of any funds to destinations outside Brazil, (ii) permanently revoked its order for repatriation of the approximately $19 million (U.S.) sent to Canada, and (iii) substituted its order blocking the financial resources of 360 Brazil in excess of 100,000 reals for the pledge by 360 Brazil of the 1,727,425.95 reals claimed in the Brazil Collection Action.

**17**   360 Brazil has now deposited the 1,727,425.95 reals with the Brazilian Court. Impsat Brazil has filed an appeal of the September 28 Order made by the Brazilian Court.

**18** The Brazilian lawyer of Impsat Brazil has sworn an affidavit expressing expert opinions on various aspects of Brazilian law. He expressed views that (i) the cash advance made in February was a capital investment rather than a loan, (ii) the repayment made by 360 Brazil was a fraudulent conveyance because it was made prior to the maturity date of the alleged loan and should be reversed to the estate upon the bankruptcy of 360 Brazil, and (iii) the remittance of the funds abroad by 360 Brazil can be considered defrauding to creditors and, as a result, the transfer of funds to 360networks inc. should be nullified and the funds returned to 360 Brazil. Counsel for 360networks inc. objected to the admissibility of this affidavit. In my view, it is not necessary for me to rule on the admissibility of the opinions expressed in the affidavit because it would not be appropriate for me on the present applications to make any findings on the subject matters in respect of which the opinions were expressed. The affidavit is admissible to demonstrate that Impsat Brazil takes the position that the transfer of the funds should be set aside as a fraudulent conveyance or a fraudulent preference or in the event of the bankruptcy of 360 Brazil.

**19** There is no evidence that there has been any determination in any proceedings commenced in Brazil or elsewhere to put 360 Brazil into bankruptcy or to have the subject transaction set aside as being a fraudulent conveyance or fraudulent preference. It does not appear from the affidavit materials that such proceedings have yet been commenced. In an affidavit sworn on September 27th, the New York attorney for Impsat stated that a second action was going to be filed shortly in Brazil to seek millions of dollars in additional damages under the Telehouse Services Agreements, but the materials do not disclose whether this second action has been commenced.

**20** 360networks inc. introduced evidence to demonstrate that its restructuring efforts will be prejudiced if the monies in Court are not paid to it. In my view, such evidence is not relevant to the determination to be made by me.

**21** A threshold issue raised by Impsat is whether this Court has jurisdiction or, if so, whether this Court should decline jurisdiction. The test for jurisdiction simpliciter was articulated by Prowse J.A. in Cook v. Parcel, [1997] B.C.J. No. 428 as follows at paragraph 20:

> It is common ground that the test to be applied in determining whether the B.C. Supreme Court has jurisdiction over these proceedings is whether there is a real and substantial connection between the court and either the defendant (respondent firm) or the subject-matter of the litigation (occasionally referred to in the authorities as the "transaction" or the "cause of action"). Jurisdiction founded on this basis is referred to as "jurisdiction simpliciter".

**22** In my view, there is no doubt that this court has jurisdiction simpliciter. The subject matter of the litigation is entitlement to funds which have been interpleaded into and are presently being held by this Court. The party paying the funds into court is CIBC, which has resident branches in British Columbia, including the branch at which 360networks inc. has its account. One of the two claimants to the funds, 360networks inc., has its head office in British Columbia. Hence, there is a real and

substantial connection between this Court, the party which paid the funds into court, one of the claimants to the funds and the subject matter of these applications. These three connections, either individually or cumulatively, are sufficient to give this Court jurisdiction simpliciter.

**23** It is submitted by Impsat that, if this Court has jurisdiction, the obligation of comity requires that it should decline jurisdiction and order that the funds be returned to the jurisdiction that has ongoing proceedings concerning them and has the most real and substantial connection to them. With respect, there are no ongoing proceedings in Brazil concerning the funds. The Brazilian Court has found that 360 Brazil did not fail to heed the August 15 injunction and it has rescinded its order for the repatriation of the funds. While this order may be under appeal, there is no evidence of a stay of the order and it must be treated as valid unless and until it is stayed or an appeal is allowed. The full amount claimed by Impsat in the Brazil Collection Action has been deposited with the Brazilian Court and there is no evidence that there are any pending fraudulent conveyance, fraudulent preference or bankruptcy proceedings in Brazil or elsewhere.

**24** Counsel for Impsat has listed a number of factors in an attempt to demonstrate that Brazil is the natural forum. However, most of those factors relate to issues which are not before this Court. The sole issue before this Court is the determination of entitlement to the funds paid into court and I have all of the evidence necessary to make that determination. Brazil may be the natural forum to deal with the non-arbitral disputes between Impsat and 360 Brazil, but I will not be making any determinations with respect to those disputes.

**25** In my view, the effect of Impsat's request is not to have this Court decline jurisdiction. Impsat is requesting that the funds be returned to Brazil so that they will become subject to the still outstanding injunction restraining the disposition of any funds to a destination outside Brazil. In other words, under the guise of asking this Court to decline jurisdiction, Impsat is actually requesting this Court to exercise its jurisdiction to effectively reverse the transaction. Impsat is not asking that the funds simply be returned to CIBC, which would be the natural consequence of this court declining jurisdiction. I now come to the merits of the application. The funds were paid into court pursuant to Rule 48 because CIBC had received claims in respect of the monies from two persons. When the interpleader order was made on September 12, it was unclear whether the August 15 injunction had been knowingly breached and BankBoston Brazil was requesting the return of the funds. The Brazilian Court has now found that the injunction was not knowingly breached and it has rescinded its order for the repatriation of the funds to Brazil. There are two claimants presently before the Court, 360networks inc. and Impsat. Neither 360 Brazil nor BankBoston Brazil is asserting any claim to the funds.

**26** In view of the finding by the Brazil Court that its injunction was not knowingly breached and the rescission of its order for the repatriation of the funds to Brazil, it is my opinion that the normal test should be applied to determine whether the interpleaded funds should remain in court or should be paid out to one of the claimants. The test is whether there is a triable issue regarding the entitlement of the claimants to the monies. If there is a triable issue, the monies should be retained

in court pending the determination of the issue. If there is no triable issue, the funds should be paid to the claimant entitled to them.

**27**     It is my finding that 360networks inc. has established a property interest in the funds. If BankBoston Brazil had not requested the return of the funds, they would have been credited to the account of 360networks inc. with CIBC. Subject to any other valid interest in the funds or an outstanding court order, CIBC was required to pay the monies to 360networks inc., and 360networks inc. was entitled to receive them. The Brazilian Court is no longer requiring that the funds be returned to Brazil by CIBC.

**28**     The issue then becomes whether Impsat has raised a triable issue that it has a property interest in the funds. In my view, there is no triable issue in this regard. There is no evidence that under Brazilian law or any other law that Impsat has a property interest in the funds. The most that the expert opinion proffered by Impsat established was that if Impsat is successful in challenging the payment of the funds from 360 Brazil to 360networks inc., the transaction would be nullified and the funds would be returned to 360 Brazil or its bankruptcy estate. Impsat has no right to claim the funds directly and, hence, it has no potential property interest in the funds.

**29**     The remaining issue is whether, despite the fact that Impsat has not established a prima facie or arguable property interest in the funds, the monies should nevertheless remain in court while Impsat pursues its remedies against 360 Brazil and pursues a claim to have the transaction set aside. If I have a discretion in this regard, I would decline to exercise it to keep the funds in court because this would amount to a form of pre-judgment execution. The closest remedy available under British Columbia law is a garnishing order and Impsat does not qualify for such a remedy against 360networks inc.

**30**     In the result, I order that the interpleaded funds, plus interest thereon, be paid out of court to 360networks inc.

　　　　(Submissions on a stay of the Order)

**31**     THE COURT:-- I will grant a stay of my ruling until 11:59 p.m., October 19, 2001.

　　　　(Submissions on costs)

**32**     THE COURT:-- I do order costs of the application to 360networks inc. against Impsat. Those costs will be party to party costs, scale 3.

TYSOE J.

cp/i/qldrk/qlsng

*Indexed as:*
## 360networks inc. v. Impsat Comunicacoes Ltda.

**Between**
**360networks inc., petitioner (respondent), and**
**Impsat Comunicacoes Ltda., Impsat Fiber Networks,**
**Inc., and Impsat S.A., applicants (appellants), and**
**Chase Manhattan Bank, as administrative agent and**
**collateral agent and PriceWaterhouseCoopers Inc.,**
**Court appointed monitor of 360networks inc.**
**et al., respondent (respondents)**

[2001] B.C.J. No. 2306

2001 BCCA 656

160 B.C.A.C. 53

96 B.C.L.R. (3d) 335

29 C.B.R. (4th) 300

109 A.C.W.S. (3d) 224

Vancouver Registry No. CA029056

British Columbia Court of Appeal
Vancouver, British Columbia

**Lambert, Huddart and Mackenzie JJ.A.**

Heard: November 1, 2001.
Judgment: November 7, 2001.

(39 paras.)

*Practice -- Interim proceedings -- Interpleader -- Parties -- Appeals.*

Appeal by Impsat Comunicacoes from an interpleader order in favour of the respondent

360networks. The order required funds received from Brazil to be deposited into 360networks's account. 360networks was governed by the Companies' Creditors Arrangement Act. It was permitted to continue operations provided that it maintained cash deposits of at least $100 million US. To meet this condition, it relied upon the receipt of $19 million US from its Brazilian subsidiary. Impsat was a Brazilian company. It commenced proceedings against the subsidiary for claims in debt and damages. It feared that the subsidiary would not have the funds to satisfy an adverse judgment. Impsat obtained an order from a Brazilian court that prohibited the subsidiary from sending the funds. The order instructed the Brazilian Central Bank to stop the transfer. The Bank only acted after the subsidiary sent the funds to CIBC in Toronto. The subsidiary asked for the return of the funds. 360networks demanded that the funds be deposited into its account. CIBC brought an interpleader application and deposited the funds with the court. In the interim, the subsidiary borrowed funds from 360networks and paid them into the Brazilian court.

HELD: Appeal dismissed. Interpleader proceedings were not available for pre-judgment execution or to obtain more security than was negotiated when the contract was originally made. The only two entities with claims to the funds were 360networks and the subsidiary. The court ordered the funds to be paid to 360networks because it was the only claimant that established a property interest in them. Impsat was not entitled to relief in the interpleader proceedings. The court could not hold the funds until the Brazilian proceedings concluded. That would have amounted to pre-judgment execution by way of a garnishing order. This remedy was not available to Impsat in British Columbia. There was no triable issue regarding 360networks's entitlement to the funds. Impsat's claim was secured by funds deposited in the Brazilian court.

### Statutes, Regulations and Rules Cited:

Absconding Debtors' Act.

British Columbia Supreme Court Rules, Rule 48(1).

Companies' Creditors Arrangement Act.

Court Order Enforcement Act.

Creditors' Relief Act.

Interpleader Act.

### Counsel:

R.D. Holmes, for the appellants.
R. Olson and R. Millar, for the respondent, 360networks.
W. Kaplan, Q.C., for the respondent, Chase Manhattan.
C. Shaley, for the respondent, PriceWaterhouseCoopers.

The judgment of the Court was delivered by

**1    HUDDART J.A.**:-- This appeal from an order made in an interpleader application brought in a proceeding under the Companies' Creditors Arrangement Act raises interesting and difficult issues that counsel, the chambers judge, and this Court have been required to consider on a most urgent basis. Regretfully, these reasons may not be as complete as the issues and the submissions we heard with regard to them deserve.

**2**    The urgency arises from a condition imposed on 360networks inc. as the price of obtaining their agreement to an order permitting continuing operations during the restructuring period permitted under the CCAA. 360networks inc. and affiliated companies filing for relief in United States chapter 11 proceedings were required to maintain cash deposits during that period of at least $100 million US. In accepting that condition in the days immediately prior to the approval of the Confirmation Order in the CCAA proceedings, 360networks inc. relied on the anticipated receipt, not later than 31 August 2001, of about $19.7 million US from its Brazilian (indirect) subsidiary, 360networks do Brasil ltda. (360Brazil). When the Confirmation Order was made on 21 July 2001, 360networks inc. knew 360Brazil had purchased a forward exchange contract from BankBoston, N.A., payable to 360networks inc. on 17 August 2001 for US$19,754,990.51. It also knew the Central Bank of Brazil had refused to permit the early remittance of those funds. Presumably, it also knew 360Brazil could cancel the derivative exchange contract if it indemnified the seller for any loss the seller incurred as a result of the cancellation.

**3**    On 15 August 2001 the appellants (Impsat) obtained an order from a Brazilian court preventing 360Brazil from "remitting or transferring funds to destinations outside Brazil for any reason, until further notice from this Court." The same order asked the Central Bank of Brazil, inter alia, "not to make or permit the making by respondent or on behalf of respondent any remittance of cash to foreign destinations for any reason:" and directed that Impsat "shall arrange for the sending of the official communication." Impsat notified the Central Bank of the court order that day.

**4**    Failing to recognize any urgency in the matter, the Central Bank did not post the required notice of the order to Brazilian banks until 17 August at 4:22 p.m., by which time BankBoston Brazil had transferred the funds via Fleet National Bank Boston to CIBC in Toronto for deposit to 360networks' account. Less than 20 minutes after that transmission was begun, a court officer served the court order on the legal representative of 360Brazil, Vitoriano Locateli. Mr. Locateli advised the court officer that funds "would be sent abroad ... in light of the transaction already executed 15 days ago."

**5**    The court officer had first made an abortive attempt to deliver the notice to Ulrich Kuhn, having been directed to his office at a different location by the receptionist at the office of Mr.

Locateli. Because Mr. Kuhn had resigned on August 15 as legal representative of 360Brazil, the court officer was redirected to Mr. Locateli's office.

6 After receiving legal advice, 360Brazil that same day requested BankBoston's Sao Paulo exchange department to "reverse the settlement" and repay the monies to itself. Four days later, on 21 August, BankBoston Brazil asked CIBC by telex to "cancel the payment immediately" and return the funds to Fleet National Bank "based in a local judicial order received by our bank in Brazil." That same day counsel for 360networks demanded the funds be deposited in its account, writing that "we have not countermanded our instructions to the transferring bank." CIBC neither returned the funds to BankBoston nor deposited them to the account of 360networks. Instead it applied within the CCAA proceedings to interplead the funds under Rule 48(1) of the Supreme Court Rules.

7 By court order CIBC deposited the funds in the Supreme Court on 12 September. By that same order, Justice Tysoe directed copies of the order and the materials filed in support of it be served on interested parties that included 360Brazil and Impsat. That notice required any person making a claim to the funds to file materials supporting their claim by 27 September 2001.

8 Impsat's interest in the interpleader proceedings derives from claims for debt and damages for breach of contracts they made with 360Brazil in February this year. They have good reason to fear 360Brazil will have no funds to pay any judgment or arbitration decision they might obtain in their favour. When subsequently directed to deposit security for the liquidated portion of the claim Impsat made in the Brazilian action, 360Brazil borrowed 1.7 million reais from 360networks for its payment into court. For this reason, it is important to note that interpleader proceedings are not available for pre-judgment execution or to obtain more security for a contract than was negotiated at its making.

9 Although other issues were raised, in my view, the fundamental question on this appeal is whether Impsat has established that the validity of the transfer by 360Brazil to 360networks is the proper subject of an interpleader. In other words, is Impsat entitled to require the court to state an issue and direct its trial and meanwhile to order the funds be held in court. The issue on interpleader has traditionally been thought to be who among the claimants is entitled to the property, not absolutely, but as against the other claimants.

10 The evidence is persuasive that there are only two persons with claims to the funds CIBC paid into the Supreme Court, 360Brazil and 360networks. There may be issues between them as to whether the derivative forward exchange contract was cancelled before its completion and whether the transfer of funds it effected wrongfully preferred 360networks over its Brazilian creditors. The difficulty for those in Brazil who have claims against 360Brazil, including Impsat, is that 360Brazil has not made a claim for the funds in court.

11 It is not for want of opportunity. Neither the notice delivered to 360Brazil under Justice Tysoe's order nor the subsequent order of the Brazilian trial court persuaded that company to put

forward a claim based on its August 17 cancellation order to BankBoston. On October 17, the Brazilian trial court ordered "the urgent issuance of a notification order to [360Brazil] requiring it to make arrangements within 72 hours for the repatriation of the funds ...." It was not until October 19 that Justice Tysoe, after hearing further submissions from Impsat and 360networks, confirmed his order of October 16.

12   Thus, the question becomes whether Impsat can make a claim in interpleader proceedings not being pursued by 360Brazil. Justice Tysoe's reasons given orally on October 16 and October 19 (In the Matter of the Companies' Creditors Arrangement Act and 360networks inc., [2001] B.C.J. No. 2513, 2001 BCSC 1439 and [2001] B.C.J. No. 2514, 2001 BCSC 1512) describe Impsat's claims against 360Brazil and the proceedings with regard to them in Brazil and elsewhere. I need not repeat them.

13   Impsat considers itself a claimant within the meaning of that term in Rule 48. Claimant is given meaning by Rule 48(1), which provides in its relevant parts:

> (1)   Where a person (in this rule called "the applicant") is sued or expects to be sued in respect of property in the person's possession or under the person's control or in respect of the proceeds from a disposition of the property, or receives a claim in respect of the property or proceeds by or from 2 or more persons (in this rule called the "claimants") making adverse claims and the applicant claims no beneficial interest in the property, the applicant may apply to the court for relief by way of interpleader.

14   Obviously CIBC was entitled to interplead the funds. It had received two claims, one from counsel for 360networks and the other from BankBoston as agent for 360Brazil. Each was asserting the right to payment of the funds as against CIBC and the other.

15   Impsat considers its claim that the funds be returned to 360Brazil is adverse to that of networks inc. and "in respect of the" funds and that "claim" in Rule 48(1) is not restricted to a claim to a "proprietary interest."

16   In support of their proposition, they cite Peake v. Carter, [1916] 1 K.B. 651 (Eng. C.A.) where Swinfen Eady L.J., at 656, commented that "it has not been the practice of the Court to treat the exact form of the issue as material, as 'the issue is only a proceeding directed for the purpose of informing the conscience of the Court:' per Parke B., Carne v. Brice [(1840) 7 M. & W. 183, 187]." The point being made was that interpleader proceedings decide entitlement only as between claimants, and thus a claimant need only show such a title or interest in goods that the sheriff ought not to have seized them. While it follows that Impsat might bring a claim within the interpleader proceeding if it had the right to maintain an action for the funds against CIBC, I cannot find in Lord Justice Swinfen Eady's opinion support for Impsat's proposition that a trial must be directed whenever the court's conscience is tweaked by being made aware of a challenge to a claimant's title.

**17** I have no difficulty with the proposition that Impsat had the right to bring the Brazilian proceedings and orders to the attention of Justice Tysoe in the interpleader proceeding. Moreover, I consider Justice Tysoe was right to accede to Impsat's request to reconsider his order when Brazilian courts made further orders. The more difficult question is whether Impsat is entitled to any of the relief they sought in the interpleader proceeding.

**18** Impsat sees the injunction they obtained in Brazil as akin to a Mareva injunction or pre-trial garnishing order and themselves as having attached the property of 360Brazil for the benefit of Brazilian creditors who will suffer if 360networks is allowed to strip 360Brazil of its working capital to benefit North American creditors. Those orders gave them security for any judgment for damages they may obtain in a Brazilian court or by way of an arbitral order. They appear to consider that the effect of Justice Tysoe's order was to determine the entitlement issue in 360networks' favour and thus to permit absolutely that stripping. I disagree. In my view, the practical effect of the order was to deprive them of the security the injunction sought to give them and to make the enforcement of any judgment more difficult, if not impossible, but it does not preclude anyone who might obtain control of 360Brazil from directing it to pursue a claim against 360networks or Impsat and other creditors from challenging the transfer of funds under Brazilian law in a Brazilian court.

**19** Justice Tysoe noted his order was a determination only that 360networks inc. had established a property interest in the funds and that there was no triable issue as to whether Impsat did. He said nothing about any potential interest of 360Brazil or about what might be the outcome of an application in Brazil or British Columbia to set aside the transfer, under the law of either jurisdiction. He held only that Impsat was not entitled to have the question of 360Brazil's entitlement to the funds tried in the interpleader proceeding.

**20** Justice Tysoe ordered the funds be paid to 360networks because it was the only claimant who had established a property interest in them. Then he continued, at para. 27:

> ...Subject to any other valid interest in the funds or an outstanding court order, CIBC was required to pay the monies to 360networks inc., and 360networks inc. was entitled to receive them. The Brazilian Court is no longer requiring that the funds be returned to Brazil by CIBC.

**21** When he turned to the question whether Impsat had raised a triable issue as to whether it had a property interest in the funds, he concluded it had not. That conclusion is not challenged.

**22** Finally, he considered whether he should exercise any discretion he might have to keep the funds in court while Impsat pursued its remedies against 360Brazil and its claim to have the transfer from 360Brazil to 360networks set aside. He concluded such an order would amount to pre-judgment execution by way of garnishing order, a remedy not available in British Columbia to Impsat against 360networks.

**23**    In his reconsideration reasons, Justice Tysoe considered the effect of the restoration of the repatriation order of September 25 by the Brazilian Civil Appellate Court. He concluded that change did not affect his ruling that the Supreme Court had and should retain jurisdiction over the interpleader proceeding. He refused to "go behind the facts that 360 networks inc. was the payee under the derivative contract and that the funds were transferred to CIBC for the credit of 360networks inc.," in the absence of an application in either Brazil or British Columbia to set aside the transfer.

**24**    Impsat considers that was one of the applications they were making in the interpleader proceedings. Justice Tysoe dealt with that possibility when he concluded that the issue in any such proceeding would be whether the transfer should be set aside as a fraudulent conveyance or preference or as an impermissible return of capital, not whether the transfer occurred or whether the property in the funds passed.

**25**    When Justice Tysoe suggested to counsel that the funds be paid out of court to 360Brazil so it could have the ability to decide whether it would return them to Brazil, Impsat preferred that the Court cause the funds to be returned to Brazil given the existence of the Brazilian court orders and the submissions made concerning the untrustworthy and fraudulent conduct exhibited by 360networks and 360Brazil in the transactions thus far. In this Court, they resile from that position, considering that at the very least such should be the disposition of the funds.

**26**    What Impsat did not seek to do directly in the Supreme Court, they seek to do in this Court. Impsat's claim that comity requires deference to the proceedings in Brazil comes to a request that this Court enforce the Brazilian court's injunction. Its fifth ground of appeal challenges Justice Tysoe's refusal to require the return of funds to 360Brazil's account with BankBoston Brazil. That order is its preferred outcome of this appeal.

**27**    That submission was not made to Justice Tysoe. At para. 8 of his reconsideration reasons, Justice Tysoe noted that "counsel did not argue that comity required this court to respect these Orders by having the funds sent back to Brazil. Indeed, counsel stated that Impsat was not seeking to have this court enforce the foreign injunction." Justice Tysoe thought counsel had taken the right approach because the Brazilian orders operated only in personam against 360Brazil, and the Brazilian court had not requested the assistance of the Supreme Court to have the funds returned to Brazil. I agree with Justice Tysoe that comity does not require the enforcement of the Brazilian injunction in this interpleader proceeding.

**28**    I can find no error in Justice Tysoe's conclusion that the Supreme Court had jurisdiction simpliciter over the interpleader proceedings and that he should not decline that jurisdiction for reasons of comity. The difficult question is whether he erred in failing to find a triable issue regarding the entitlement of 360networks to the funds.

**29**    I accept that "in respect of" is "probably the widest of any expression intended to convey some connection between two related subject matters," as the Supreme Court of Canada held in

Nowegijick v. The Queen, [1983] 1 S.C.R. 29 at 39. Impsat maintains they are sufficiently broad to include them, in their capacity as an "attaching creditor" under Brazilian court orders. I am not persuaded, however, that Impsat is an "attaching creditor" by reason of those orders such as to entitle them to have the validity of the transfer determined in the interpleader proceeding. In my view, Impsat is seeking to extend interpleader proceedings to include claims by those who have obtained orders for pre-trial security.

**30** The two orders in place on the date of Justice Tysoe's order together resemble most closely a Mareva injunction. The Brazilian order of October 19 requires 360Brazil to "take appropriate action" with CIBC within 72 hours so that US$19,754,990.52 is repatriated to Brazil and deposited with BankBoston Brazil "where it will remain blocked until further decision by this Court."

**31** Included in the September 25 order were these provisions:

> 1. ...[360Brazil] need only take the appropriate steps with the Canadian Imperial Bank of Commerce to have the sum of US$19,754,990.52 sent back to Brazil and deposited (after conversion to Brazilian currency) at BankBoston, where it will remain blocked until further decision by this court. This step is to be implemented by respondent within 72 hours, ...
> 3. Official communications are to be sent to BankBoston N.A.and to the Canadian Imperial Bank of Commerce, along with a copy of this decision, so that they may be informed of it. Inasmuch as process was served on [Impsat] inviting it to respond to the court proceedings brought by the Canadian Imperial Bank of Commerce at the Supreme Court of British Columbia, it is [Impsat's] responsibility to inform that Court of the decision now rendered, in the defense of its interests.

**32** Impsat relies on eleven authorities for its proposition that the issue of the validity of the transfer is a proper issue to be the subject of an order for trial in the interpleader proceeding. All but three concerned applicants with proprietary claims. Two of those three involved attaching or execution creditors.

**33** In Leech v. Williamson (1884), 10 Ont. P.R. 226, the interpleader proceeding was held to extend to a claim by an attaching creditor that a prior execution creditor's judgment and execution were void against the attaching and other creditors of the judgment debtor whose goods had been taken in execution by the sheriff. In Standard Ins. Co. v. Hughes (1885), 11 Ont. P.R. 220, the judge was considering a sheriff's application to a master under the Ontario Interpleader Act for a summary resolution of disputes about priority among judgment creditors, attaching creditors under the Absconding Debtors' Act, and creditors certificated under the Creditors' Relief Act.

**34** It is a long stretch from resolving a dispute among such creditors of an absconding debtor about priority to property seized by a sheriff to the case at bar. The chambers judge did not err when he did not make that leap. I think it fair to say the court's reasoning in each case depended on the

funds being in the hands of the sheriff, and on the provisions of the Interpleader Act relating specifically to such circumstances.

35    Three decisions in Van's Nurseries Inc. v. Leung, [1992] B.C.J. No. 310, [1992] B.C.J. No. 1431 (Donald J.), and (1992), 17 B.C.A.C. 161, [1992] B.C.J. No. 3005 (Southin J.A.) were the last of the authorities cited to us on this point. The facts bear some resemblance to the situation that faced Justice Tysoe. Two groups were disputing who had the benefit of an agreement under which Van's Nurseries was to pay for services rendered in the arrangement of a sale of a business. The unfortunate misadventure, as Madam Justice Southin called the interpleader proceeding at para. 25 of her reasons, is of no precedential value. It does, however, demonstrate the need to identify the claimants to the fund in issue, to delineate the issues between them that are to be tried, and to set down the procedural foundation for the order being given.

36    In Madam Justice Southin's reasons can be found two other helpful comments with relevance on this issue. At para. 29, she commented: "Whether the liability to whomever it was which arose under the handwritten note, if there was a liability, falls within rule 48(1) is a nice question." In Van's Nurseries, all parties assumed it did. At para. 34, she noted that she found it difficult to know what order can properly be made in an interpleader proceeding other than a finding that one of the claimants is entitled to the fund in court.

37    I would not extend the scope of interpleader beyond a consideration of who is entitled as between the claimants to possession of the funds or goods that are the subject of the interpleader.

38    In any event, as Justice Tysoe found, Impsat would not be entitled to an order under the Court Order Enforcement Act in British Columbia and would not qualify as an attaching creditor. Its claim against 360Brazil on one contract is before the Brazilian court where the liquidated damages portion is fully secured by the deposit of 1.7 million reais 360Brazil borrowed from 360networks. Its claim on the other contract is being resolved by arbitration proceedings in accordance with its terms.

39    It follows I would dismiss the appeal. As discussed with counsel at the conclusion of the hearing, I would extend the stay of proceeding granted by Justice Tysoe for seven days following the giving of judgment on this appeal.

HUDDART J.A.
LAMBERT J.A.:-- I agree.
MACKENZIE J.A.:-- I agree.

cp/i/qldrk/qlsng/qlbrl



# TAB25



# THE
# **Canadian Encyclopedic**
# DIGEST
## FOURTH EDITION

**Ontario  Volume 3  Title 9**

**Western  Volume 4  Title 9**

# ARBITRATION

**This title contains material drawn from:**

**Cases up to and including:**
[2007] C.C.L. Case Law Digests No. 3

**Statutes up to and including:**
Canada Canada Gazette No. 141:17, 2007/08/22
Alberta Gazette No. 103:14, 2007/07/31
British Columbia Gazette No. 50:12, 2007/06/19
Manitoba Gazette No. 136:28, 2007/07/14
Ontario Gazette No. 140:30, 2007/07/28
Saskatchewan Gazette No. 103:30, 2007/07/27

# **CARSWELL**®

**§19** A demand for an arbitration by a notice in writing as required by statute may be deemed to be a submission.[1]

   1   *Kelowna (Municipality) v. Kelowna School District No. 23* (1952), 1952 CarswellBC 67 (B.C. S.C.).

## (ii) — Intention of Parties

*See* Canadian Abridgment: ADR.II.1 Alternative dispute resolution — Submission or agreement to arbitrate — Form and nature

**§20** Where the apparent intention of the parties as expressed in a contract is that no obligation exists on either party to request or agree to arbitration, there is no agreed submission within the meaning of the legislation.[1]

   1   *Fischbach & Moore of Canada Ltd. v. Noranda Mines Ltd.* (1971), 1971 CarswellSask 44 (Sask. C.A.) (decided under former legislation defining "submission"); *Tywood Industries Ltd. v. St. Anne-Nackawic Pulp & Paper Co.* (1979), 1979 CarswellOnt 792 (Ont. H.C.) (clause in standard form requiring arbitration; clause not binding on parties as not clearly established as part of contract); *McNamara Construction Ontario Ltd. v. Brock University* (1970), [1970] 2 O.R. 583 at 588 (Ont. C.A.) (where Canadian standard form of construction contract providing that "..... either party hereto shall be entitled to give to the other notice of such dispute and to request arbitration ..... and the parties may ..... agree to submit the same to arbitration", no submission as article avoiding foreclosing parties' option of recourse to courts); *Dynatec Mining Ltd. v. PCL Civil Constructors (Canada) Inc.* (1996), 1996 CarswellOnt 16 (Ont. Gen. Div.) (incorporation of arbitration clause from principal contract into subcontract requiring distinct and specific wording).

**§21** Where the language of a clause providing for arbitration is permissive and merely provides the parties to an agreement with the option of submitting a dispute to arbitration, there is no submission within the meaning of the legislation where the parties have not agreed to submit the dispute to arbitration.[1] However, such a clause does constitute a submission when it has the effect of making arbitration mandatory once one of the parties has elected to send a notice of dispute requesting arbitration.[2]

   1   *Lonmar Plumbing & Heating Ltd. v. Representative Holdings* (1968), 1 D.L.R. (3d) 591 (Sask. Q.B.) (decided under former legislation defining "submission"); *McNamara Construction Ontario Ltd. v. Brock University* (1970), [1970] 2 O.R. 583 at 588 (Ont. C.A.); *AltaSteel Ltd. v. Inverness Petroleum Ltd.* (1994), 1994 CarswellAlta 245 (Alta. Q.B.) (contract providing that disputes related to billing and payment to be submitted to arbitration; dispute over pricing to be submitted to arbitration only if both parties agreeing).

   2   *Toronto Non-Profit Housing Corp. v. Rampart Enterprises Ltd.* (1982), 1982 CarswellOnt 140 (Ont. H.C.).

**§22** Criteria which may be used to determine whether parties intend to make a submission to arbitration include: the existence of a dispute; identification of the precise function of an arbitrator; language used by parties; decision expressed to be final and binding; similarity between arbitration and judicial process; and compliance with the mandatory provisions of civil procedure.[1]

   1   *Zittrer c. Sport Maska Inc.* (1988), 1988 CarswellQue 27 (S.C.C.).

**§23** If the parties choose to determine for themselves that they will have a domestic forum instead of resorting to the ordinary courts, then a prima facie duty is cast upon the courts to act upon such an agreement.[1]

   1   *Fernan v. Monitor* (1906), 1906 CarswellBC 16 (B.C. C.A.); *Stokes-Stephens Oil Co. v. McNaught* (1918), 1918 CarswellAlta 120 (S.C.C.).

**§24** The parties may by consent submit a matter in dispute between them to a judge to act as arbitrator.[1]

   1   *Fleming v. Canadian Pacific Railway* (1893), 1893 CarswellNB 57 (S.C.C.).

**§25** Where there has been no submission to arbitration by the parties, an award by an arbitrator, under an order of a trial judge that issues should be tried by an arbitrator, is a nullity.[1]

   1   *Rolufs v. Jenkins* (1937), 1937 CarswellOnt 251 (Ont. H.C.); *Boucher v. Soo Homes Inc.* (1980), 1980 CarswellOnt 589 (Ont. Dist. Ct.) (parties not agreeing to be bound by conciliation report; not binding); *Serm Investments Ltd. v. Deer Run Shopping Centre Ltd.* (1998), 1998 CarswellOnt 42 (Ont. C.A.) (plaintiff not party to submission to arbitration; absent submission by parties court not having jurisdiction to order arbitration).

### (iii) — Limitation Periods

*See* Canadian Abridgment: ADR.II.1 Alternative dispute resolution — Submission or agreement to arbitrate — Form and nature; ADR.II.7 Alternative dispute resolution — Submission or agreement to arbitrate — Miscellaneous issues

**§26** Generally, the law with respect to limitation periods applies to an arbitration as if the arbitration were an action and a matter in dispute in the action were a cause of action.[1] If the court sets aside an award, terminates an arbitration or declares an arbitration to be invalid, it may order that the period from the commencement of the arbitration to the date of the order



TAB26

# Arbitration Law of Canada:

# Practice and Procedure

by

## J. Brian Casey

with

## Janet Mills



Juris Publishing, Inc.

'TORYS LLP
LIBRARY • TORONTO

# CHAPTER 3

## THE ARBITRATION AGREEMENT

The essence of arbitration is that it is consensual. In order to oust the jurisdiction of the court to hear and decide disputes, a party must be able to point to an enforceable agreement wherein the parties to the dispute have agreed to submit to arbitration. If the parties have agreed to arbitrate then, under the theory that the parties have full autonomy to craft their own dispute resolution mechanism, all claims whether sounding in contract, tort, equity or statute may be arbitrated.

### 3.1    ARBITRATION AGREEMENT DEFINED

Under the domestic Acts, an arbitration agreement is defined as an agreement by which two or more persons agree to submit to arbitration a dispute that has arisen or may arise between them.[1] The agreement may be made before the dispute arises, (a *"clause compromissoire"*) or after the dispute has arisen (a *"compromis"*). The arbitration agreement may be a stand-alone contract or it may appear as a clause in another contract.[2] Under the domestic Acts, the arbitration agreement need not be in writing.[3] Under the Civil Code of Quebec it must be in writing, but as with the Model Law it can consist of an exchange of written correspondence.[4]

An arbitration agreement is defined in the Model Law as an agreement by the parties to submit to arbitration all or certain disputes which have arisen or which may arise between them "in respect of a defined legal relationship, whether contractual or not".[5] It is suggested in the Commentary that the expression "defined legal relationship" should be given a wide interpretation so as to cover all non-contractual

---

[1] Ontario domestic Act, s. 1, the other provinces' domestic Acts are similar.

[2] Ibid at s. 5.

[3] Ontario domestic Act, s. 5(3); BC domestic Act s.1.

[4] Article 2640.

[5] Model Law, Article 7(1).

49

(iii) Is incapable of being performed.[22]

From the wording of the Model Law and the domestic Acts, it can be seen that it is up to the party seeking a stay of court proceedings in favour of arbitration to first prove there is an arbitral agreement. Once this is shown, the onus then shifts to the other party to show the agreement ought not be enforced, as it comes within one of the listed circumstances.[23]

### 3.3.1   Consensus ad idem

Ordinary contract law applies to determine whether or not there is an arbitration agreement. There must be an offer and an acceptance in circumstances in which the parties are *ad idem*. The consideration is the mutual covenant to submit disputes to arbitration. For example, in the case of *Tywood Industries Ltd. v. St. Anne-Nackawic Pulp & Paper Co.*,[24] in response to an invitation to tender which contained no provisions respecting arbitration, the plaintiff submitted a quotation on its standard form which also did not refer to arbitration. The plaintiffs quotation was accepted by a purchase order issued by the defendant. The defendant's standard form purchase order provided that all disputes arising from the agreement would be settled by arbitration. When the plaintiff brought an action in court for the price of goods sold and delivered, the defendant brought a motion to stay the proceedings on the grounds that an arbitration ought to be held. The court dismissed the application.   Mr. Justice Grange found the conduct of both parties indicated that neither had considered any terms other than those found on the face of the documents, namely the specifications and the price, and that, while each had attempted to impose upon the other their standard form provisions, there was doubt that the arbitration clause had ever been

[22] Model Law, Article 8(1). It would appear from the wording of the section and the analytical commentary it is sufficient to raise the request for arbitration in the statement of defence which is the "first statement on the substance of the dispute" within the meaning of those words in Article 8. See *ABN Amro Bank Canada v. Krupp Mak Maschinenbau GmbH*, [1996] 49 C.P.C. 212 (Ont. Div. Ct.); *Industrias Capsuvar, SA v. Stedin International Limited* [2001] O.J. 1447 (Ont. S.C.J.) unreported.

[23] See *Kanitz v. Rogers Cable Inc.* (2002), 58 O.R. (3d) 299 and the discussion in Chapter 7.

[24] (1979), 25 O.R. (2d) 89 (H.C.).

### 3.3 ARBITRATION LAW OF CANADA: PRACTICE AND PROCEDURE

accepted by the plaintiff. The *Tywood* decision has been followed in the
Ontario case of *Magnotta Winery Corp. v. Ziraldo*[25] which re-iterated
that issues respecting offer, acceptance, consensus *ad idem* and the
interpretation of an arbitration clause are to be determined in accordance
with ordinary contract principles except where modified by the Model
Law or a domestic Act.

Contrasting the *Tywood* decision is the case of *Fung Sang Trading
Ltd. v. Kai Sun Sea Produas & Food Ca Ltd.*, a case of the High Court of
Hong Kong,[26] the defendant argued there was doubt as to whether the
contract for the delivery of goods had ever been completely entered into.
There had been correspondence back and forth, and conflicting affidavits
were filed. The court, following the Model Law (which has been
adopted in Hong Kong), held it was up to the arbitrators to decide
whether or not the contract was entered into. In so doing, the court had
no difficulty separating the issue of whether the contract was entered into
from the issue as to whether an arbitration agreement had been
sufficiently proven and ought to be enforced.[27] Once the arbitration
agreement was sufficiently proven, the court found the arbitral tribunal
had the jurisdiction to rule on the existence of the contract.[28]

As with any contract, clarity and simplicity are the goals in drafting
an arbitration agreement. It should be unqualified if recourse to the
courts is sought to be completely ousted. For example, where one clause
of a contract provided that the parties agreed to submit all disputes to
arbitration, but another clause in the contract provided that for breach of
the agreement a party may maintain an action for damages, the second
clause was interpreted as qualifying the arbitration clause and the party
could litigate.[29]

---

[25] [1999] O.J. No. 3968 (Ont. S.C.J.).

[26] Y.B. Com. Arb., vol. XVII (1992). at 289. For a case in which the court found that
letters back and forth between the parties never did result in the parties being *ad idem*,
see *Frota Oceania Brasiliera S.A. v. Steamship Mutual Underwriting Association*,
[1996] 2 Lloyd's Rep. 461 (C.A.).

[27] Also see *Zambia Steel & Building Supplies Ltd. v. James Clerk & Eaton Ltd.*, [1986] 2
Lloyd's Rep. 225 (C.A.), in which an agreement to arbitrate was taken from an
exchange of a quotation and purchase order.

[28] See Chapter 5 for a more detailed discussion on jurisdiction.

[29] *Alberta Power Ltd. v. McIntyre Porcupine Mines Ltd.* (1975), 59 D.L.R. (3d) 303
(Alta. C.A.).

Care must also be exercised where parties have multiple contracts respecting their business relationship in order to avoid the unfortunate result of disputes being divided between the court and an arbitral tribunal. In *Riley Manufacturing Co. v. Anchor Glass Container Corp.*[30], for example, the U.S. Court of Appeals for the Tenth Circuit held, where parties had two successive, but separate, manufacturing and distribution agreements, but only one had an arbitration clause, a dispute between the parties had to be resolved partly in court and partly by arbitration. Particularly in commercial matters, the court will hold the parties to their bargain. If this results in a bifurcated proceeding, so be it.

Courts are reluctant to imply an arbitration agreement in a contract without some evidence that it was intended. So, for example, where a sub-contract was negotiated over a number of months, and did not contain an arbitration clause, but did contain a clause stating it was the entire agreement between the parties, the court would not imply an arbitration agreement or incorporate it by reference even though the main contract under which the sub-contract was awarded did contain such an arbitration agreement.[31]

### 3.3.2 *Incorporation by reference*

As stated above, and as provided for in the Model Law, it is possible to incorporate an arbitration agreement by reference. For example, standard conditions may be set out in a document separate from the contract, but referenced therein. If the standard conditions include an arbitration clause, this may be a sufficient reference to bind the parties to arbitrate.[32] Reference to another document, which by its nature may not make it clear that an arbitration clause is being incorporated may not be sufficient. The reference must be clear.[33]

---

[30] 157 F. 3d 775 (10th Cir. Kan. 1998)

[31] *Dynatec Mining Ltd. v. PCL Civil Constructors (Canada) Inc.* (1996), 25 C.L.R. (2d) 259 (Ont. Gen. Div.). Also see *Angelo Breda Ltd. v. Guizzetti*, [1995] O.J. 3250 (Ont. Gen. Div.) Note, however, that it may also depend on the wording of the arbitration clause in the main contract. If that clause is broad enough, and uses words such as "any dispute in any way connected to this contract," this may be sufficient to bring a dispute regarding a related contract between the same parties into arbitration.

[32] *Secretary of State for Foreign and Commonwealth Affairs v. The Percy Thomas Partnership* [1998] C.I.L.L. 1342.

[33] *The Rena K*, [1979] 1 All E.R. 397 (H.L.), *Nanisivik Mines Ltd. v. Canarctic Shipping Co.* (1994), 113 D.L.R. (4th) 536 (Fed. C.A.).

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

---

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at TORONTO

---

## BOOK OF AUTHORITIES
(Allocation Protocol Motion, returnable June 7, 2011)

**Torys LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2 Canada

Tony DeMarinis (LSUC #: 29451Q)
Scott Bomhof (LSUC #: 37006F)
Sheila Block (LSUC #: 14089N)
Andrew Gray (LSUC #: 46626N)

Email: tdemarinis@torys.com
sbomhof@torys.com
sblock@torys.com
agray@torys.com

Tel:   416.865.0040
Fax:  416.865.8730

Lawyers for Nortel Networks Inc. and the other U.S. Debtors