Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT**
**OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**SUPPLEMENTARY MOTION RECORD**
(Allocation Protocol Motion, returnable June 7, 2011)

June 3, 2011

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2 Canada

Tony DeMarinis (LSUC # 29451Q)
Scott Bomhof (LSUC # 37006F)
Sheila Block (LSUC # 14089N)
Andrew Gray (LSUC # 46626N)

Email: tdemarinis@torys.com
       sbomhof@torys.com
       sblock@torys.com
       agray@torys.com

Tel: 416.865.0040
Fax: 416.865.7380

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

Fraser Milner Casgrain LLP
77 King Street West
Toronto-Dominion Centre, Suite 400
Toronto, Ontario
M5K 0A1 Canada

Alex MacFarlane (LSUC# 28133Q)
Michael Wunder (LSUC # 31351O)
Ryan Jacobs (LSUC# 59510J)

Email: alex.macfarlane@fmc-law.com
       michael.wunder@fmc-law.com
       ryan.jacobs@fmc-law.com

Tel: 416.863.4511
Fax: 416.863.4592

Lawyers for The Official Committee of Unsecured
Creditors of Nortel Networks Inc., et al.

## SCHEDULE "A"

Nortel Networks Capital Corporation

Nortel Altsystems, Inc. (previously "Alteon Websystems, Inc.")

Nortel Altsystems International, Inc. (previously "Alteon Websystems International, Inc.")

XROS Inc.

Sonoma Systems

QTERA Corp.

CoreTek Inc.

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Optical Components Inc.

Nortel Networks HPOCS Inc.

Architel Systems (U.S.) Corp.

Nortel Networks International Inc.

Nortel Telecom International Inc.

Nortel Networks Cable Solutions, Inc.

Nortel Networks (CALA) Inc.

## SERVICE LIST

TO:      **OGILVY RENAULT LLP**
Royal Bank Plaza, South Tower
200 Bay Street, Suite 3800
Toronto, ON M5J 2Z4

Derrick Tay
Tony Reyes
Jennifer Stam

Email:    dtay@ogilvyrenault.com
treyes@ogilvyrenault.com
jstam@ogilvyrenault.com

Tel:    416.216.4000
Fax:   416.216.3930

Lawyers for the Applicants

- 2 -

TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:   nortel.monitor@ca.ey.com

Tel:      416.943.3016
Fax:      416.943.3300

AND
TO: **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:   jcarfagnini@goodmans.ca
          jpasquariello@goodmans.ca
          grubenstein@goodmans.ca
          fmyers@goodmans.ca
          carmstrong@goodmans.ca

Tel:      416.597.4107
Fax:      416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO: **OSLER HOSKIN AND HARCOURT
LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Betsy Putnam

Email:   lbarnes@osler.com
          rchartrand@osler.com
          esellers@osler.com
          putnam@osler.com

Tel:      416.362.2111
Fax:      416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO: **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:   dmilner@fasken.com
          akauffman@fasken.com
          elamek@fasken.com
          jlevin@fasken.com

Tel:      416.868.3538
Fax:      416.364.7813

Lawyers for Export Development Canada

- 3 -

AND TO:
**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:    jsullivan@edc.ca

Tel:    613.597.8651
Fax:    613.598.3113


AND TO:
**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:  john.stringer@mcinnescooper.com
stephen.kingston@mcinnescooper.com

Tel:    902.425.6500
Fax:    902.425.6350

Lawyers for Convergys EMEA Limited


AND TO:
**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:  barry.wadsworth@caw.ca
lewis.gottheil@caw.ca

Tel.:    416.495.3776
Fax:    416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada


AND TO:
**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific
Tower
Toronto, ON  M5K 1K7

Leanne M. Williams

Email:    lwilliams@tgf.ca

Tel:    416.304.1616
Fax:    416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.


AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart

Email:    jcarhart@millerthomson.com

Tel:    416.595.8615/8577
Fax:    416.595.8695

Lawyers for Toronto-Dominion Bank


AND TO:
**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:    hharrison@boughton.ca

Tel:    604.687.6789
Fax:    604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.,
in its capacity as duly authorized agent for
Holdings 1506 Enterprises Ltd.

- 4 -

AND TO:  **BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email: mmacnaughton@blgcanada.com
Tel: 416. 367.6646
Fax: 416. 682.2837

Email: rjaipargas@blgcanada.com
Tel: 416.367.6266
Fax: 416.361.7067

Email: srappos@blgcanada.com
Tel: 416.367.6033
Fax: 416.361.7306

Lawyers for Bell Canada

AND TO:  **SISKINDS LLP**
680 Waterloo Street
London, ON N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein
Emilie E. M. Maxwell

Email: ray.leach@siskinds.com
dimitri.lascaris@siskinds.com
emilie.maxwell@siskinds.com

Tel: 519.672.2121
Fax: 519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:  **McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON M5J 2T3

John Contini
Aaron Rousseau

Email john.contini@mcmillan.ca
Tel: 416.307.4148
Fax: 416.304.3767

Email aaron.rousseau@mcmillan.ca
Tel: 416.307.4081
Fax: 416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:  **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson
Richard Swan

Email: zychk@bennettjones.com
Tel: 416.777.5738
Fax: 416.863.1716

Email: orzyr@bennettjones.com
Tel: 416.777.5737
Fax: 416.863.1716

Email: finlaysong@bennettjones.com
Tel: 416.777.5762
Fax: 416.863.1716

Email: swanr@bennettjones.com
Tel: 416.777.7479
Fax: 416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

| Email: | mzigler@kmlaw.ca |
| Tel: | 416.595.2090 |
| Fax: | 416.204.2877 |

| Email: | sphilpott@kmlaw.ca |
| Tel: | 416.595.2104 |
| Fax: | 416.204.2882 |

| Email: | dyiokaris@kmlaw.ca |
| Tel: | 416.595.2130 |
| Fax: | 416.204.2810 |

| Email: | amckinnon@kmlaw.ca |
| Tel: | 416.595.2150 |
| Fax: | 416.204.2874 |

| Email: | cpoltak@kmlaw.ca |
| Tel: | 416.595.2701 |
| Fax: | 416.204.2909 |

Lawyers for the Former Employees of Nortel

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

| Email: | mzigler@kmlaw.ca |
| Tel: | 416.595.2090 |
| Fax: | 416.204.2877 |

| Email: | sphilpott@kmlaw.ca |
| Tel: | 416.595.2104 |
| Fax: | 416.204.2882 |

| Email: | dyiokaris@kmlaw.ca |
| Tel: | 416.595.2130 |
| Fax: | 416.204.2810 |

| Email: | amckinnon@kmlaw.ca |
| Tel: | 416.595.2150 |
| Fax: | 416.204.2874 |

| Email: | cpoltak@kmlaw.ca |
| Tel: | 416.595.2701 |
| Fax: | 416.204.2909 |

Lawyers for the LTD Beneficiaries

- 6 -

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:     416.595.8695

Email:   msims@millerthomson.com
Tel:      416.595.8577
Fax:     416.595.8695

Email:   jmklotz@millerthomson.com
Tel:      416.595.4373
Fax:     416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:   joseph.kim@lge.com

Tel:      +82.2.3777.3171
Fax:     +82.2.3777.5345

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:     416.595.8695

Email    msims@millerthomson.com
Tel:      416.595.8577
Fax:     416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:      416.218.1129
Fax:     416.218.1849

Lawyers for IBM Canada Limited

AND TO:

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:   ken.rosenberg@paliareroland.com
Tel:      416.646.4304
Fax:     416.646.4301

Email:   max.starnino@paliareroland.com
Tel:      416.646.7431
Fax:     416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:      416.646.4326
Fax:     416.646.4301

Email:   tina.lie@paliareroland.com
Tel:      416.646.4332
Fax:     416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:   Shayne.kukulowicz@fmc-law.com
          Alex.macfarlane@fmc-law.com
          Michael.wunder@fmc-law.com
          ryan.jacobs@fmc-law.com

Tel:      416.863.4511
Fax:     416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:   patrick.shea@gowlings.com

Tel:      416.369.7399
Fax:     416.862.7661

Lawyers for Westcon Group

AND TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:   rslattery@mindengross.com
          dullmann@mindengross.com
Tel:      416.369.4149
Fax:     416.864.9223

Lawyers for Verizon Communications Inc.

- 8 -

AND
TO:

**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Harry Fogul
Peter K. Czegledy

Email: hfogul@airdberlis.com
Tel: 416.865.7773
Fax: 416.863.1515

Email: pczegledy@airdberlis.com
Tel: 416.865.7749
Fax: 416.863.1515

Lawyers for Microsoft Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email: renglish@airdberlis.com
smitra@airdberlis.com

Tel: 416.863.1500
Fax: 416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND
TO:

**ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia V7Y 1B8

Sharon M. Urquhart

Email: surquhart@ahbl.ca
Tel: 604.484.1757
Fax: 604.484.1957

Lawyers for Algo Communication Products Ltd.

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email: jwigley@gardiner-roberts.com
Tel: 416.865.6655
Fax: 416.865.6636

Email: vdare@foglers.com
Tel: 416.865.6641
Fax: 416.865.6636

Lawyers for Andrew, LLC

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Steven L. Graff
Ian E. Aversa

Email: sgraff@airdberlis.com
Tel: 416.865.7726
Fax: 416.863.1515

Email: iaversa@airdberlis.com
Tel: 416.865.3082
Fax: 416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Maurice Fleming

Email: mfleming@millerthomson.com
Tel: 416.595.8686
Fax: 416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

- 9 -

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:      416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:      416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services


AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for Perot Systems Corporation


AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, ON  M5H 3C2

Deborah S. Grieve

Email:   dgrieve@casselsbrock.com
Tel:      416.860.5219
Fax:      416.350.6923

Lawyers for Alvarion Ltd.


AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:      416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:      416.865.7286
Fax:      416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:      416.865.7262
Fax:      416.865.7048

Lawyers for Royal Bank of Canada


AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:   lawrence.crozier@mcmillan.ca
Tel:      416.865.7178
Fax:      416.865.7048

Email:   adam.maerov@mcmillan.ca
Tel:      416.865.7285
Fax:      416.865.7048

Lawyers for Citibank


AND
TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, ON  M5C 3G5

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:      416.593.2996
Fax:      416.593.5437

Lawyers for Expertech Network Installation Inc.

- 10 -

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:   vdare@foglers.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Amphenol Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Sanjeev P.R. Mitra

Email:   smitra@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND
TO:

**McMILLAN LLP**
Brookfield Place
Suite 4400, 181 Bay Street
Toronto, ON  M5J 2T3

Aaron Rousseau

Email:   aaron.rousseau@mcmillan.ca
Tel:      416.307.4081
Fax:     416.365.1719

Lawyer for Right Management Inc.

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, ON  M5H 3C2

E. Bruce Leonard
David S. Ward
Michael Casey

Email:   bleonard@casselsbrock.com
          dward@casselsbrock.com
          mcasey@casselsbrock.com

Tel:      416.860.6455
Fax:     416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

- 11 -

AND
TO:
**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, ON  K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:     613.233.2679
Fax:     613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management,
Inc.

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, ON  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:     416.601.7627
Fax:     416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:     416.601.7750
Fax:     416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:
**IRVING MITCHELL KALICHMAN LLP**
Place Alexis Nihon, Tour 2
3500 Boulevard De Maisonneuve Ouest
Bureau 1400
Montreal, Quebec  H3Z 3C1

Kurt A. Johnson

Email:   kjohnson@imk.ca
Tel:     514.935.5755
Fax:     514.935.2999

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND
TO:
**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, ON  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
         steven.levitt@nelligan.ca
         christopher.rootham@nelligan.ca

Tel:     613.231.8245
Fax:     613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

- 12 -

| | | | | |
|---|---|---|---|---|
| AND TO: | **BAKER & McKENZIE LLP** | | AND TO: | **BENNETT JONES LLP** |

AND TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, ON  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:     416.865.2318
Fax:     416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:     416.865.6944
Fax:     416.863.6275

Lawyers for Jabil Circuit Inc.

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
         laugesenm@bennettjones.com

Tel:     416.863.1200
Fax:     416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND TO:

**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
         mgaggino@schneidergaggino.com

Tel:     514.631.8787
Fax:     514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:     416.369.4335
Fax:     416.864.9223

Lawyers for 2748355 Canada Inc.

AND TO:

**EURODATA**
2574 Sheffield Road
Ottawa, ON  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:     613.745.0921
Fax:     613.745.1172

AND TO:

**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, ON  K8N 5J2

Ian W. Brady

Email:   lbrady@baldwinlaw.ca
Tel:     613.771.9991
Fax:     613.771.9998

Lawyers for Sydney Street Properties Corp.

- 13 -

AND TO:

**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email:   thomas.mcrae@shibleyrighton.com
Tel:      416.214.5206
Fax:     416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email:   thomas.mcrae@shibleyrighton.com
Tel:      416.214.5206
Fax:     416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND TO:

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351

AND TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com
Tel:      416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

- 14 -

| | | | |
|---|---|---|---|
| AND TO: | **DAVIS LLP**<br>1 First Canadian Place<br>Suite 5600<br>100 King Street West<br>Toronto, ON  M5X 1E2 | AND TO: | **DAVIES WARD PHILLIPS & VINEBERG LLP**<br>44th Floor<br>1 First Canadian Place<br>Toronto, ON  M5X 1B1 |

AND TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:    416.365.7886

Lawyers for Computershare Trust Company of Canada

AND TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, ON  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

Email:  tosullivan@counsel-toronto.com
Tel:    416.598.1744
Fax:    416.598.3730

Email:  slaubman@counsel-toronto.com
Tel:    416.598.1744
Fax:    416.598.3730

Lawyers for William A. Owens

AND TO:

**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:  rschwill@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Email:  mgottlieb@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited (In Administration)

AND TO:

**BAKER & McKENZIE LLP**
Brookfield Place
181 Bay Street, Suite 2100
Toronto, ON  M5J 2T3

Lydia Salvi

Email:  lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Wipro Limited

- 15 -

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for the Current and Former Employees
of Nortel Networks Inc. who are or were
Participants in the Long-Term Investment Plan
Sponsored by Nortel Networks Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, ON  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:      416.601.8342
Fax:     416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:

**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON, M5J 2T3

Sheryl E. Seigel

Email:   sheryl.seigel@mcmillan.ca
Tel:      416.307.4063
Fax:     416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, ON  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:      416.973.3172
Fax:     416.973.0810

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:   susan.grundy@blakes.com
Tel:      416.863.2572
Fax:     416.863.2653

Email:   marc.flynn@blakes.com
Tel:      416.863.2685
Fax:     416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300
Toronto Dominion Bank Tower
Toronto, ON  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:   kmcelcheran@mccarthy.ca
Tel:      416.601.7730
Fax:     416.868.0673

Email:   rstabile@mccarthy.ca
Tel:      416.601.8335
Fax:     416.868.0673

Lawyers for Avaya Inc.

- 16 -

AND TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:    416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:    416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:    416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers
LLC, MatlinPatterson Global Opportunities
Partners III L.P. and MatlinPatterson
Opportunities Partners (Cayman) III L.P.

AND TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, ON  M5J 2Z9

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com
Tel:    416.864.9700
Fax:    416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, ON  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:    416.979.6425
Fax:    416.591.7333

Email:  dbrown@sgmlaw.com
Tel:    416.979.4050
Fax:    416.591.7333

Lawyers for Edmund Fitzgerald

AND TO:

**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

Email:  thomas.wallis@vdg.ca
Tel:    613.241.2701
Fax:    613.241.2599

Lawyers for La Regie des Rentes du Quebec

- 17 -

AND TO:
**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:  sdunphy@stikeman.com
Tel:    416.869.5662
Fax:    416.947.0866

Lawyers for GENBAND Inc.

AND TO:
**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:  gncameron@stikeman.com
Tel:    212.845.7464
Fax:    212.371.7087

Email:  rferguson@stikeman.com
Tel:    212.845.7477
Fax:    212.371.7087

Lawyers for GENBAND Inc.

AND TO:
**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:  jmarshall@blgcanada.com
Tel:    416.367.6024
Fax:    416.361.2763

Email:  chill@blgcanada.com
Tel:    416.367.6156
Fax:    416.631.7301

Lawyers for the U.K. Pensions Regulator

AND TO:
**BLAKE, CASSELS & GRAYDON**
Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, ON  M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email:  pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  jeremy.forgie@blakes.com
Tel:    416.863.3888
Fax:    416.863.2653

Lawyers for The Northern Trust Company, Canada

AND TO:
**ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON  M5H 2K1

Joel P. Rochon

Email:  jrochon@rochongenova.com
Tel:    416.363.1867
Fax:    416.363.0263

Lawyers for the Opposing LTD Employees

AND TO:
**LERNERS LLP**
130 Adelaide St. West
Suite 2400
Toronto, ON  M5H 3P5

William E. Pepall

Email:  wpepall@lerners.ca
Tel:    416.601.2352
Fax:    416.867.2415

Lawyers for the Former Employees in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust

- 18 -

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email:   kyle.kashuba@macleoddixon.com
Tel:     403.267.8399
Fax:     403.264.5973

Constellation NewEnergy Canada Inc.


AND
TO:

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer

Email:   lschweitzer@cgsh.com
         jbromley@cgsh.com
Tel:     212.225.2000
Fax:     212.225.3999

Lawyers for Nortel Networks Inc.


AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON  M5J 2T3

D. Brent McPherson

Email:   brent.mcpherson@mcmillan.ca
Tel:     416.307.4103
Fax:     416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to
Wachovia Bank, N.A., in its capacity as Servicer
for the Nortel Networks Pass-Through Trust,
Series 1-1


AND
TO:

**SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email:   pengelmann@sgmlaw.com
Tel:     613-482-2452
Fax:     613-235-3041

Email:   fcampbell@sgmlaw.com
Tel:     613-482-2451
Fax:     613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust


AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, ON  M5K 1E6

Barbara J. Boake
James D. Gage

Email:   bboake@mccarthy.ca
Tel:     416.601.7557
Fax:     416.868.0673

Email:   jgage@mccarthy.ca
Tel:     416.601.7539
Fax:     416.686.0673

Lawyers for Morneau Sobeco Limited Partnership


AND
TO:

**DAVID STEER**
10 Cypress Court
Nepean, ON  K2H 8Z8

Email:   davidsteer127@sympatico.ca

- 19 -

AND TO:
**FOGLER RUBINOFF LLP**
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, ON M5J 2Z9

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com
Tel:      416.864.9700
Fax:     416.941.8852

Lawyers for Apex Logistics Inc.


AND TO:
**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD. Centre
Toronto, ON  M5K 1N2

Michael Rotsztain
Adam M. Slavens

Email:  mrotsztain@torys.com
Tel:      416.865.7508
Fax:     416.865.7380

Email:  aslavens@torys.com
Tel:      416.865.7333
Fax:     416.865.7380

Lawyers for Ranger, Inc.


AND TO:
**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson

Email:  andrew.robertson@macleoddixon.com
Tel:      403.267.8222
Fax:     403.264.5973

Lawyers for Recently Severed Calgary
Employees


AND TO:
**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD. Centre
Toronto, ON  M5K 1N2

Tony DeMarinis
Scott Bomhof
Sheila Block
Andrew Gray

Email:  tdemarinis@torys.com
           sbomhof@torys.com
           sblock@torys.com
           agray@torys.com

Lawyers for Nortel Networks Inc.


AND TO:
**TEMPLEMAN MENNINGA LLP**
401-366 King Street East
Kingston, ON  K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email:  hvw@tmlegal.ca
           rbm@tmlegal.ca

Tel:      613.542.1889
Fax:     613.542.8202

Lawyers for The Corporation of the City of Belleville


AND TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON M5J 2T3

Brett Harrison

Email:  brett.harrison@mcmillan.ca
Tel:      416.865.7932
Fax:     416.865.7048

Lawyers for Rogers Communications Inc.

- 20 -

AND TO:
**ATTORNEY GENERAL FOR ON**
Crown Law Office - Civil
720 Bay Street, 8th Floor
Toronto, ON  M7A 2S9

Leonard Marsello
William MacLarkey

Email:   leonard.marsello@ontario.ca
Tel:      416.326.4939
Fax:     416.326.4181

Email:   William.MacLarkey@ontario.ca
Tel:      416.326.4082
Fax:     416.326.4181

Lawyers for Her Majesty the Queen in Right of
Ontario, as represented by the Ministry of the
Environment

AND TO:
**TEMPLEMAN MENNINGA LLP**
366 King Street East, Suite 401
Kingston, ON K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email:   hvw@tmlegal.ca
              rbm@tmlegal.ca

Tel:      613.542.1889
Fax:     613.542.8202

Lawyers for Algonquin and Lakeshore Catholic
District School Board

AND TO:
**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street,  Suite 2800
Commerce Court West
Toronto, ON M5L 1A9

Steven J. Weisz
Jackie Moher

Email:   steven.weisz@blakes.com
Tel:      416.863.2612
Fax:     416.863.2653

Email:   jackie.moher@blakes.com
Tel:      416.863.3174
Fax:     416.863.2653

Lawyers for the American Registry for Internet
Numbers

AND TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON, M5J 2T3

Andrew J. Kent
Wael Rostom

Email:  andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:     416.865.7048

Email:  wael.rostom@mcmillan.ca
Tel:      416.865.7790
Fax:     416.865.7048

Lawyers for the Norpax LLC and RPX Corporation,
in its capacity as Managing Member of Norpax LLC

## COURTESY COPIES:

AND
TO:
**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:   sbrown@lrlaw.com

Tel:    602.262.5321
Fax:    602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:
**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY 10036

Fred S. Hodara

Email:   fhodara@akingump.com

Tel:    212.872.1000
Fax:    212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:
**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

Email:   sreisman@curtis.com
         jdrew@curtis.com

Tel:    212.696.6000
Fax:    212-697-1559

Lawyers for Flextronics International

AND
TO:
**MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:   DDunne@milbank.com
Tel:     212.530.5770
Fax:     212.530.5219

Email:   ALeblanc@milbank.com
Tel:     212.835.7574
Fax:     212.530.5219

Email:   APisa@milbank.com
Tel:     212.530.5319
Fax:     212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

- 22 -

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:  mschein@vedderprice.com

Tel:    212.407.6920
Fax:    212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois  60601

Eric S. Prezant

Email:    eric.prezant@bryancave.com
Tel:      312.602.5033
Fax:      312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email:    andrew.robertson@macleoddixon.com
          caylee.rieger@macleoddixon.com

Tel:    403.267.8222
Fax:    403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel:    212.906.1373
Fax:    212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

- 23 -

AND TO:
**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:  jsullivan@edc.ca

Tel:    613.597.8651
Fax:    613.598.3113


AND TO:
**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON  M5K 1K7

Leanne M. Williams

Email:    lwilliams@tgf.ca

Tel:    416.304.1616
Fax:    416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.


AND TO:
**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:  john.stringer@mcinnescooper.com
        stephen.kingston@mcinnescooper.com

Tel:    902.425.6500
Fax:    902.425.6350

Lawyers for Convergys EMEA Limited


AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart

Email:    jcarhart@millerthomson.com

Tel:    416.595.8615/8577
Fax:    416.595.8695

Lawyers for Toronto-Dominion Bank


AND TO:
**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:  barry.wadsworth@caw.ca
        lewis.gottheil@caw.ca

Tel.:   416.495.3776
Fax:    416.495.3786

Lawyers for all active and retired Nortel employees represented by the CAW-Canada


AND TO:
**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:    hharrison@boughton.ca

Tel:    604.687.6789
Fax:    604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd., in its capacity as duly authorized agent for Holdings 1506 Enterprises Ltd.

- 24 -

AND
TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:    416. 367.6646
Fax:    416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:    416.367.6266
Fax:    416.361.7067

Email:  srappos@blgcanada.com
Tel:    416.367.6033
Fax:    416.361.7306

Lawyers for Bell Canada

AND
TO:

**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

John Contini
Aaron Rousseau

Email   jcontini@langmichener.ca
Tel:    416.307.4148
Fax:    416.304.3767

Email   arousseau@langmichener.ca
Tel:    416.307.4081
Fax:    416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND
TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein
Emilie E. M. Maxwell

Email:  ray.leach@siskinds.com
        dimitri.lascaris@siskinds.com
        monique.radlein@siskinds.com
        emilie.maxwell@siskinds.com

Tel:    519.672.2121
Fax:    519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson
Richard Swan

Email:  zychk@bennettjones.com
Tel:    416.777.5738
Fax:    416.863.1716

Email:  orzyr@bennettjones.com
Tel:    416.777.5737
Fax:    416.863.1716

Email:  finlaysong@bennettjones.com
Tel:    416.777.5762
Fax:    416.863.1716

Email:  swanr@bennettjones.com
Tel:    416.777.7479
Fax:    416.863.1716
Canadian Lawyers for The Informal Nortel
Noteholder Group

- 25 -

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:      416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:      416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:      416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:      416.595.2150
Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:      416.595.2701
Fax:     416.204.2909

Lawyers for the Former Employees of Nortel

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:      416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:      416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:      416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:      416.595.2150
Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:      416.595.2701
Fax:     416.204.2909

Lawyers for the LTD Beneficiaries

AND
TO:

**MILLER THOMSON LLP**

Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:    jcarhart@millerthomson.com
Tel:       416.595.8615
Fax:      416.595.8695

Email:    msims@millerthomson.com
Tel:       416.595.8577
Fax:      416.595.8695

Email:    jmklotz@millerthomson.com
Tel:       416.595.4373
Fax:      416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**

11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:    joseph.kim@lge.com

Tel:       +82.2.3777.3171
Fax:      +82.2.3777.5345

AND
TO:

**MILLER THOMSON LLP**

Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:    jcarhart@millerthomson.com
Tel:       416.595.8615
Fax:      416.595.8695

Email    msims@millerthomson.com
Tel:       416.595.8577
Fax:      416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**CHAITONS LLP**

185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:    harvey@chaitons.com

Tel:       416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

- 27 -

| | | | |
|---|---|---|---|
| AND<br>TO: | **PALIARE ROLAND ROSENBERG**<br>**ROTHSTEIN LLP**<br>Suite 501<br>250 University Avenue<br>Toronto, ON  M5H 3E5 | AND<br>TO: | **FRASER MILNER CASGRAIN LLP**<br>1 First Canadian Place<br>100 King Street West<br>Toronto, ON  M5X 1B2 |

<table>
<tr><td></td><td>

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:  ken.rosenberg@paliareroland.com
Tel:     416.646.4304
Fax:    416.646.4301

Email:  max.starnino@paliareroland.com
Tel:     416.646.7431
Fax:    416.646.4301

Email:  lily.harmer@paliareroland.com
Tel:     416.646.4326
Fax:    416.646.4301

Email:  tina.lie@paliareroland.com
Tel:     416.646.4332
Fax:    416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

</td><td></td><td>

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:  Shayne.kukulowicz@fmc-law.com
          Alex.macfarlane@fmc-law.com
          Michael.wunder@fmc-law.com
          ryan.jacobs@fmc-law.com

Tel:     416.863.4511
Fax:    416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

</td></tr>
</table>

| | | | |
|---|---|---|---|
| AND<br>TO: | **GOWLING LAFLEUR HENDERSON LLP**<br>Suite 1600, First Canadian Place<br>100 King Street West<br>Toronto, ON  M5X 1G5 | AND<br>TO: | **MINDEN GROSS LLP**<br>145 King Street West, Suite 2200<br>Toronto, ON  M5H 4G2 |

<table>
<tr><td></td><td>

E. Patrick Shea

Email:  patrick.shea@gowlings.com

Tel:     416.369.7399
Fax:    416.862.7661

Lawyers for Westcon Group

</td><td></td><td>

Raymond M. Slattery
David T. Ullmann

Email:  rslattery@mindengross.com
          dullmann@mindengross.com
Tel:     416.369.4149
Fax:    416.864.9223

Lawyers for Verizon Communications Inc.

</td></tr>
</table>

- 28 -

AND
TO:

**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:   hfogul@airdberlis.com
Tel:      416.865.7773
Fax:      416.863.1515

Email:   pczegledy@airdberlis.com
Tel:      416.865.7749
Fax:      416.863.1515

Lawyers for Microsoft Corporation

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:      416.865.6636

Email:   vdare@foglers.com
Tel:      416.865.6641
Fax:      416.865.6636

Lawyers for Andrew, LLC

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:   renglish@airdberlis.com
             smitra@airdberlis.com

Tel:      416.863.1500
Fax:      416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:

**ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:   surquhart@ahbl.ca
Tel:      604.484.1757
Fax:      604.484.1957

Lawyers for Algo Communication Products Ltd.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:   mfleming@millerthomson.com
Tel:      416.595.8686
Fax:      416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

- 29 -

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:      416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:      416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:      416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:      416.865.7286
Fax:      416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:      416.865.7262
Fax:      416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for Perot Systems Corporation

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, ON  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:   lawrence.crozier@mcmillan.ca
Tel:      416.865.7178
Fax:      416.865.7048

Email:   adam.maerov@mcmillan.ca
Tel:      416.865.7285
Fax:      416.865.7048

Lawyers for Citibank

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, ON  M5H 3C2

Deborah S. Grieve

Email:   dgrieve@casselsbrock.com
Tel:      416.860.5219
Fax:      416.350.6923

Lawyers for Alvarion Ltd.

AND
TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, ON  M5C 3G5

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:      416.593.2996
Fax:      416.593.5437

Lawyers for Expertech Network Installation Inc.

# INDEX

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**INDEX**

**TAB    DOCUMENT**

1.    Affidavit of Natasha De Cicco sworn June 3, 2011

      Exhibit "A" – Declaration of Craig B. Brod executed June 2, 2011

      Exhibit "B" – Declaration of Fred S. Hodara executed June 2, 2011

      Exhibit "C" – Declaration of Inna Rozenberg executed June 2, 2011

      Exhibit "D" – Digital Transcript of Hearing Held on June 23, 23, 2009 before the High
                    Court of England and Wales

2.    Initial Order dated January 14, 2009, as amended and restated by the Third Amended
      and Restated Initial Order dated June 30, 2009, attaching a copy of the Cross-Border
      Protocol

3.    U.S. IFSA Order dated June 29, 2009

4.    Canadian IFSA Order dated June 29, 2009

5.    Endorsement of Mr. Justice Morawetz dated June 29, 2009 re: Canadian IFSA Order

6.    IFSA Recognition Order dated July 9, 2009

7.    Progress Report of the Joint Administrators to the EMEA Debtors dated February 11,
      2011

8.    Progress Report of the Joint Administrators to the EMEA Debtors dated February 12,
      2010

9.    Approval and Vesting Order (CDMA & LTE Business Sale Transaction) dated July 28,
      2009

10.     U.S. Order Approving Stipulation of the U.S. Debtors and the UCC Amending the Cross-Border Protocol, together with the Stipulation of the U.S. Debtors and the UCC attaching the Amended the Cross-Border Protocol, dated June 29, 2009

11.     Affidavit of David M. Lindsey sworn June 3, 2011

**TAB 1**

Court File No: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AFFIDAVIT OF NATASHA DE CICOO
(sworn June 3, 2011)

1.      I am an associate lawyer with Torys LLP, lawyers in this proceeding for Nortel Networks Inc. and certain of its affiliates (the "U.S. Debtors"), and as such I have knowledge of the matters to which I hereinafter depose. Where in my affidavit I rely on information provided to me by other persons, I state the source of that information and in each case I believe that the information is true.

2.      The U.S. Debtors and the Official Committee of Unsecured Creditors of the U.S. Debtors (the "UCC") seek the approval of this Honourable Court of an Allocation Protocol, attached as Schedule "C" to the factum of the U.S. Debtors and the UCC, filed.

3.      Attached as Exhibit "A" is the Declaration of Craig B. Brod in Support of the Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief, and in Response to the EMEA Debtors' Objection to the Joint Motion and Cross-Motion to Compel Arbitration executed on June 2, 2011 (the "Brod Declaration").

- 2 -

4.      Attached as Exhibit "B" is the Declaration of Fred S. Hodara in Support of the Joint
Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim
Funding and Settlement Agreement, and for Related Relief, and in Response to the EMEA
Debtors' Objection to the Joint Motion and Cross-Motion to Compel Arbitration executed on
June 2, 2011 (the "Hodara Declaration").

5.      Attached as Exhibit "C" is the Second Declaration of Inna Rozenberg in Support of the
Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim
Funding and Settlement Agreement, and for Related Relief executed on June 2, 2011 (together
with the Brod Affidavit and the Hodara Affidavit, collectively, the "Declarations").

6.      I am advised by Daniel Northrop of Cleary, Gottlieb, Steen & Hamilton LLP, U.S.
counsel to the U.S. Debtors that the Declarations attached as Exhibits "A", "B" and "C" to my
affidavit were submitted for filing in the United States Bankruptcy Court for the District of
Delaware on June 2, 2011.

7.      Attached as Exhibit "D" is a copy of the digital transcript of the hearing held on June 23,
2009 before the High Court of England and Wales authorizing Ernst & Young LLP, as joint
administrators of Nortel's European affiliates (the "EMEA Debtors") to execute and deliver the
Interim Funding and Settlement Agreement on behalf of the EMEA Debtors.

SWORN BEFORE ME at the City of
Toronto, in the Province of Ontario, on
June 3, 2011.

_____                    _____
Commissioner for Taking Affidavits                      Natasha De Cicco
        Scott Bowhot

This is Exhibit "A" referred to in the

Affidavit of Natasha De Cicco

sworn before me, this 3rd

day of June , 2011

A Commissioner, etc.
          Scott Bomhof

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------X
                                                :
                                                :
*In re*                                         :        Chapter 11
                                                :
Nortel Networks Inc., *et al.*, [1]             :        Case No. 09-10138 (KG)
                                                :
                        Debtors.                :        Jointly Administered
                                                :
                                                :
                                                :
                                                :
------------------------------------------------X

### DECLARATION OF CRAIG B. BROD IN SUPPORT OF
### JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN
### ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING
### AND SETTLEMENT AGREEMENT, AND FOR RELATED RELIEF,
### AND IN RESPONSE TO THE EMEA DEBTORS' OBJECTION TO THE
### JOINT MOTION AND CROSS-MOTION TO COMPEL ARBITRATION

I, Craig B. Brod, do hereby declare as follows:

1.      I am a partner at the law firm of Cleary Gottlieb Steen & Hamilton LLP

("Cleary Gottlieb"), co-counsel to Nortel Networks Inc. and its affiliated debtors, as respective

debtors and debtors in possession (collectively, the "U.S. Debtors"), in the above-captioned

proceeding. I am admitted to the bars of the States of New York and New Jersey and have been

a member in good standing of such bars since 1981. I respectfully submit this declaration in

support of the Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are: Nortel Networks Inc. ("NNI") (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems
Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera
Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel
Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel
Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. ("NN CALA") (4226) (collectively, the
"Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://chapter11.epiqsystems.com/nortel.

the Interim Funding and Settlement Agreement, and for Related Relief (the "Joint Motion"),

dated April 25, 2011, and in response to the EMEA Debtors' Objection to the Joint Motion and

Cross-Motion to Compel Arbitration (the "Objection") and the supporting declaration of Kevin

Francis Lloyd (the "Lloyd Decl."), both dated May 19, 2011. Unless otherwise stated, the facts

set forth below are based upon my personal knowledge.[2]  With this declaration, I do not intend to

and do not waive any attorney-client, work product or other similar privilege.

A.    Negotiations of a Draft Protocol

2.    On or about June 9, 2009, the Canadian, U.S. and EMEA Debtors

executed the Interim Funding and Settlement Agreement (the "IFSA").  Attached hereto as

Exhibit A is a true and correct copy of the IFSA.  Throughout the IFSA negotiations, all the

parties were represented and advised by sophisticated counsel, some parties by more than one set

of counsel from more than one country.

3.    Section 12(c) of the IFSA provides that "the Debtors shall, as soon as

reasonably practicable following the execution of this Agreement, negotiate in good faith and

attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the

allocation of Sale Proceeds from Sale Transactions (the 'Interim Sales Protocol'), which Protocol

shall provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors in

such Sale Transaction have been unable to reach agreement regarding such allocation."

4.    Accordingly, after execution of the IFSA, the parties to the IFSA

embarked upon good faith negotiations on "a protocol for resolving disputes concerning the

allocation" (such draft protocol, a "Protocol").  Along with other attorneys at Cleary Gottlieb, I

represented the U.S. Debtors in these negotiations.

---

[2]    Capitalized terms used herein and not otherwise defined shall have the same meaning as ascribed to them in
the Joint Motion.

5.      The negotiations were extremely complex for several reasons, not the least of which was the number of parties involved and the number of issues that needed to be resolved. During the Protocol negotiations, the principal parties and their lead counsel were: the Canadian Debtors, represented by the Canadian law firm Ogilvy Renault LLP (now Norton Rose OR LLP); the Monitor, Ernst & Young Inc., represented by the Canadian law firm Goodmans LLP; the EMEA Debtors and the Joint Administrators, Ernst & Young LLP, represented by the English law firm Herbert Smith LLP; the U.S. Debtors, represented by their principal officer John Ray and Cleary Gottlieb; the Committee, represented by Akin Gump Strauss Hauer & Feld LLP, the Canadian law firm Fraser Milner Casgrain LLP, and the English law firm Ashurst LLP; and the Bondholder Group, represented by Milbank, Tweed, Hadley & McCloy LLP and the Canadian law firm Bennett Jones LLP.

6.      The process of creating a draft Protocol was extremely complex. The U.S. Debtors, acting through Cleary Gottlieb, volunteered to take the lead on receiving and incorporating the negotiating parties' proposals and comments into successive drafts of a Protocol.

7.      On June 14, 2009, the U.S. Debtors distributed a first draft of a Protocol, dated June 13, 2009. Lloyd Decl., Exs. at 802-839. The cover email noted "that this draft has not been reviewed by our client or any other stakeholders and therefore remains subject to further internal review and comments from other parties." It also included a header indicating that "this draft agreement has been produced for discussion and settlement purposes only" and another header stating, "[f]or discussion and contingency purposes only."

8.      Even at this early stage of the negotiations, the blacklined copy of the draft Protocol was 17 pages long. It proposed that the allocation dispute would be resolved by an

3

individual who could engage the services of an accounting firm to assist him or her in resolving the dispute. Id. at 809 § 2.2. However, there was no agreement on the identity of such an individual or the accounting firm who might assist such individual. Id. In addition, as reflected in the bracketed provisions or the notes to draft ("NTD") included in the draft Protocol, the parties recognized that there were many issues requiring discussion. See, e.g., id. at 803 ¶ 1; 815 § 8.5; 817 § 9.3; 818 § 9.7.

9.    Following the circulation of this draft Protocol, the negotiating parties organized an in-person meeting for September 30, 2009, which was held in New York at the offices of Cleary Gottlieb. Multiple representatives from each party or their counsel and advisors attended this meeting, which lasted a full day. The parties discussed numerous substantive issues, and by the end of the meeting, while the parties had moved toward a working consensus on some points, there were many other items as to which there was not yet any common ground.

10.    The U.S. Debtors attempted to incorporate to the greatest extent possible the comments, proposals and suggestions that the parties provided during the September 30, 2009 meeting, as well as through subsequent email and telephone communications, into a new draft Protocol, dated October 9, 2009, the blacklined copy of which by that time was 20 pages long. The cover email to the distribution of this draft noted that "this draft remains subject to further internal review." In addition, the header once again stated that "this draft agreement has been produced for discussion and settlement purposes only." Lloyd Decl., Exs. at 850-888.

11.    New provisions were introduced into the October 9, 2009 draft. For instance, Article II was revised to provide that a three-member panel should hear the allocation dispute, instead of an individual assisted by an accounting firm, the members of which panel

4

would be named in the document and the replacements for which would be listed in an attached exhibit. Id. at 856-857. Other issues were highlighted, such as: which allocation dispute from the proposed sale transactions would be addressed first, id. at 855 n.4; whether different valuation methodologies should be specified in the draft Protocol, id. at 860 n.8; whether the Committee, Bondholder Group, Monitor and NNSA would be parties to the draft Protocol, id. at 851 n.1 & 852 n.2; and the manner in which aggregate distributions to the estates would be held, id. at 863 n.14. A variety of procedural issues were raised in the draft as well, such as: whether second round submissions would include expert reports and witness statements and the potential unavailability of a witness for cross-examination at the hearing. Id. at 861 n.11 & 862 n.13.

12.     Following subsequent email and telephone communications, including a conference call among a number of the parties on October 13, 2009, the U.S. Debtors produced another draft Protocol, dated October 19, 2009, which was circulated on October 20, 2009. The cover email to this distribution stated, "We are circulating this draft to you and our clients simultaneously and therefore it remains subject to further material change." Once again, the header also indicated that "this draft agreement has been produced for discussion and settlement purposes only." Lloyd Decl., Exs. at 889-910.

13.     While the U.S. Debtors attempted to incorporate to the greatest extent possible the comments, proposals and suggestions that the parties had provided, due to the complexity of some of the comments received, the October 19, 2009 draft Protocol did not reflect all of the parties' comments, proposals and suggestions. As specified in the header to the draft, "this draft does not incorporate Akin Gump's suggestion regarding discovery procedures or Ogilvy's suggestions regarding access to company employees." Id. at 891. In addition, a number of issues raised in the footnotes in the October 9, 2009 draft were not answered and a

5

number of provisions were set forth in brackets for consideration, such as: the conflict of interest standard for panel members, id. at 897 n.11; whether a chair of the panel should be appointed, id. at 896 n.10; whether the decision of the panel should be reasoned, id. at 903 n.28; and the status of the EMEA non-filed entities, id. at 891 n.1.

14. The October 19, 2009 draft Protocol was distributed in advance of the second in-person negotiation session among the parties, which took place on October 21, 2009 at Cleary Gottlieb's offices in New York. Again, multiple representatives from each party or their counsel and advisors attended this meeting or participated by conference call, which was a full-day discussion of both big picture issues and more technical and detailed points.

15. Mr. Lloyd states that "in or around October 2009," the EMEA Debtors had discussions with English counsel to the Committee and English counsel to the Canadian Debtors during which "we agreed the identity of a few suitable Dispute Resolvers on behalf of EMEA." Lloyd Decl. ¶ 53. While some of the parties may have been in discussion on the identity of potential panel members as noted above, to my knowledge, the proposals were not circulated to all of the participants to the draft Protocol negotiations and there was certainly never any consensus on the identity of potential panel members. Moreover, the October 19, 2009 draft Protocol does not identify by name any agreed upon or potential dispute resolvers (nor, for that matter, do any prior or subsequent drafts).

16. Following the October 21, 2009 meeting, the U.S. Debtors attempted to incorporate to the greatest extent possible the participants' comments into a new draft Protocol, dated November 8, 2009. The relevant cover email explained that "in the interest of time, this draft is being circulated to you and our client simultaneously, and this draft remains subject to further internal review and review by our client." The header also reminded everyone that "this

6

draft agreement has been produced for discussion and settlement purposes only." Lloyd Decl.,
Exs. at 911-932.

17. In his declaration, Mr. Lloyd asserts that the second October 2009 draft
Protocol and the November 2009 draft Protocol evidence the fact that "by this point substantive
agreement had been reached on the process for arbitration." Lloyd Decl. ¶ 52. I disagree.

18. As discussed above, the October 19, 2009 draft was not an agreement but
a draft Protocol that was "subject to further material change" and "for discussion and settlement
purposes only." The November 8, 2009 draft, which was the last draft Protocol circulated to the
parties in 2009, likewise was "subject to further internal review" and was "produced for
discussion and settlement purposes only." In short, the *draft* Protocols at this time – and at all
pertinent times – were just that, drafts. It was always the U.S. Debtors' understanding that there
was no binding agreement on any term in the draft Protocol unless and until the parties reached
agreement on all issues and – after obtaining any requisite corporate approval – signed a
Protocol, which in turn would require U.S. Court approval to be binding on the U.S. Debtors.
Both the October 19 and November 8, 2009 drafts also reflected that there were many important
items as to which there was not even a preliminary consensus and that the parties still needed to
discuss.

19. Importantly, in the November 8, 2009 draft, a key issue arose – whether
intercompany claims, particularly claims of the EMEA Debtors against the Canadian and U.S.
Debtors, would be decided within the same process to be used to resolve the disputes as to the
allocation of the sales proceeds. In particular, additional bracketed language was added to
Section 1.2 (in my recollection, at the request of counsel to the Canadian Debtors and/or counsel
to the Monitor), providing, "[e]ach Basic Allocation Dispute shall be determined without regard

7

to, or adjustment for, any other rights, entitlements, set offs, or adjustment of any nature asserted by or on behalf of any Selling Party against another Selling Party, including, without limiting the generality of the foregoing, claims of beneficial ownership or equitable interests in and to the assets included in the Business that is the subject of an In-Scope Sale (collectively, 'Inter-Party Claims')." The footnote to this proposal indicated that the issue was "TBD" or to be discussed. Lloyd Decl., Exs. at 916 & n.9.

20.    In addition, the November 8, 2009 draft reflected a number of procedural issues on which there was no working consensus and a number of new issues that had been raised, including, without limitation: which sales would be included in the process, id. at 914 n.4; whether there would be a requirement for panel members to update conflict disclosures, id. at 917 n.12; the status of the Bondholder Group, id. at 912 n.2; whether NNSA would be represented by the Joint Administrators, id. at 932 § 9.10; and the procedure for submission of expert reports, id. at 921-922 § 4.3.

21.    At the end of 2009 and in the early part of 2010, the negotiating parties exchanged further comments via email and telephone, including during a November 10, 2009 conference call. The U.S. Debtors received these comments and attempted to the greatest extent possible to integrate them into a new draft Protocol, which was dated and circulated on February 26, 2010 and again included the header indicating that "this draft agreement has been produced for discussion and settlement purposes only." The blacklined copy of the draft Protocol had grown to 27 pages by that time. This draft reflected significant additional provisions being circulated to the parties for the first time for purposes of further discussion and negotiation. True and correct copies of the blacklined and unmarked February 26, 2010 draft Protocol are attached hereto as Exhibit B.

8

22.    Following the distribution of the February 26, 2010 draft Protocol, the negotiating parties again exchanged comments via email and telephone, and the U.S. Debtors attempted to the greatest extent possible to incorporate those comments into a new 28-page blacklined draft of a Protocol which was dated and circulated on April 7, 2010. Lloyd Decl., Exs. at 963-1010. The April 7, 2010 draft, which is described in more detail below, ended up being the last draft Protocol circulated to the negotiating parties. The first page of the draft also reminded everyone that "this draft agreement has been produced for discussion and settlement purposes only."

B.    Disagreements Over the Protocol Drafts

23.    Reflecting the fact that a number of the parties' comments could not be reconciled, the April 7, 2010 draft Protocol included new proposed language at various points with an identification of the party that was proposing such language, as well as an indication of other provisions proposed to be deleted by the identified party. Moreover, as stated in the cover email, "More substantive comments are included in the footnotes, preceded by an indication of which firm made the comment . . . ." Lloyd Decl., Exs. at 963 (email from Cleary Gottlieb to the other parties explaining the drafting approach to the April 7, 2010 draft Protocol).

24.    In addition to highlighting the parties' numerous differences, the April 7, 2010 draft Protocol demonstrates the shifts that had occurred over time in the parties' views as well as the disagreements that existed with respect to some of the most fundamental issues surrounding the draft Protocol.

25.    In his declaration, Mr. Lloyd asserts that the April 7, 2010 draft "shows that, so far as the procedural terms of the Protocol went, it was largely agreed." Lloyd Decl. ¶ 57. The blacklined copy of the April 7, 2010 draft, as well as the annotations in the text and the

9

footnotes, clearly indicate that this is not the case. At the outset, as noted above, and as reflected in the headers to the Protocol drafts, it was always the U.S. Debtors' understanding that these drafts were for discussion and settlement purposes only and no party was bound by any provision in the draft Protocol unless and until the parties had agreed on all issues and – after obtaining any required corporate approval – signed a Protocol, which in turn would require U.S. Court approval to be binding on the U.S. Debtors. The April 7, 2010 draft further shows that the parties disagreed on and were still discussing numerous procedural, as well as substantive, issues. For example:

      a.     The Canadian Debtors and Monitor added a more detailed provision along the lines of what had been Section 1.2 in the November 8, 2009 draft, providing that the allocation decision "shall be determined without regard to, or adjustment for, any other claims, entitlements, set-offs or adjustment of any nature whatsoever." Id. at 980. As further discussed below, this was a major point of disagreement among certain of the parties. The Canadian Debtors and Monitor proposed deletion of language in Section 10.7 of the draft for similar reasons. Id. at 988 n.32.

      b.     The parties contemplated at that time a potential panel of three dispute resolvers, but the standard for conflict disclosure was still under discussion as was the method of selection of initial and replacement panel members (i.e., whether it should be done by each estate or pursuant to agreement of all parties). Id. at 969-970 nn.8-10.

10

c.      The standard by which such a panel should make the allocation determination was in dispute, namely, whether it should be "fair and equitable" or "fair and reasonable." Id. at 967 n.6.

d.      The draft text reflected a new proposal that the panel's decision should be based on a national or state law. Id. at 982 § 8.5.

e.      The parties were still discussing whether the allocation decision should be expressed as a percentage of the sale proceeds or as a U.S. dollar amount and whether it should contain a statement of reasons. Id. at 981-982 & n.27.

f.      There was a disagreement as to whether all Nortel entities or only "Selling Debtors" could participate in the allocation dispute resolution process. Id. at 967 ¶ 1.

g.      The Joint Administrators did not know whether they would also represent the Israeli Nortel entities and the EMEA non-filed entities, and whether the various constituents within their group would be taking differing allocation positions. Id. at 964-965 nn.1, 3 & 972-973 § 3.4.

h.      How the Non-Filed Entities' representative would be selected and how such representative would be paid was unclear. Id. at 970 n.11.

i.      A host of basic procedural issues were still being discussed, including the process for document disclosure, the scope of cross-examination at the hearings, third-party discovery, the extent and admissibility of deposition testimony, the form of witness statements and the requisite independence of experts. Id. at 974-980 nn.13-26.

11

26.    Mr. Lloyd criticizes the Canadian Debtors for seeking to exclude intercompany claims from the process for the resolution of allocation disputes then under discussion, as the EMEA Debtors appeared to demand. He characterizes the debate, however, as one in which the Canadian Debtors were allegedly seeking to limit the EMEA Debtors' ability to argue in the allocation process that they had "beneficial interests" in "intellectual property assets." Lloyd Decl. ¶ 57. Mr. Lloyd further claims that, based on an April 16, 2010 email from Howard Zelbo, one of my partners at Cleary Gottlieb, "it was clear that the U.S. Debtors agreed with the EMEA Debtors' position" that there should be no attempt "to limit the matters that could be raised at the arbitration." Lloyd Decl. ¶ 58 (citing Exs. at 1013-1014). The statements on this issue must be understood in context.

27.    On April 14, 2010, Mr. Lloyd wrote an email to certain parties, in which he stated, "What I am not clear about is whether the Canadian Debtor and Monitor are still maintaining a point they advanced last year namely, that EMEA (and the other estates) are unable to contend in the Allocation Hearing that they have a beneficial ownership in various assets, including most relevantly intellectual property. . . . It may be that all that is intended by the Canadian Debtor and the Monitor is that the allocation hearing shall not cover inter-estate claims. We are content to discuss that – [sic] Indeed I do not believe the Protocol was ever intended to extend to those types of claims, which will be dealt with in the ordinary way by the various claim processes." Lloyd Decl., Exs. at 1011. Based on this email, the U.S. Debtors therefore believed at that time that the EMEA Debtors' preservation of their "beneficial ownership" arguments did not amount to an attempt to include intercompany claims in the allocation dispute resolution process.

12

28.     Thus, on April 16, 2010, when Mr. Lloyd sent an email to Mr. Zelbo stating that the U.S. Debtors' position was that there was "no limitation to argue beneficial ownership" in the allocation process, Mr. Zelbo did not dispute the statement. A true and correct copy of the April 16, 2010 email exchange between Messrs. Lloyd and Zelbo, as received and sent by Cleary Gottlieb, is attached hereto as Exhibit C.

29.     Later in the day on April 16, 2010, Michael Lang, partner at Ogilvy Renault LLP, counsel to the Canadian Debtors, wrote to Mr. Lloyd, in response to his April 14, 2010 email described above, stating, "the April 7th draft reflects the position of the Canadian Debtors and the Monitor. Our amendments are intended to clarify, among other things, that the Protocol is not the proper venue for asserting claims or attempting to prioritize claims against any estate that should be asserted and resolved in the applicable bankruptcy proceeding. As to whether EMEA's claim to having, to use your words, 'beneficial ownership in various assets' is or is not such a claim, we cannot comment as we have not had the benefit of an explanation of the basis of your position." A true and correct copy of Mr. Lang's April 16, 2010 email is attached hereto as Exhibit D. This apparent difference continued to be the source of discussion among certain of the parties.

30.     The parties' substantial disagreements over this and other numerous issues in the draft Protocol are also reflected in an agenda circulated by Cleary Gottlieb on May 3, 2010 for a May 4, 2010 meeting to discuss the draft Protocol (the "May 4 Agenda"). True and correct copies of the May 4 Agenda and the accompanying blacklined and unmarked draft Protocol are attached hereto as Exhibit E. The May 4 Agenda was circulated in an effort to make the May 4, 2010 meeting as productive as possible. The purpose of the May 4, 2010 meeting was for the parties to gather in New York at Cleary Gottlieb's offices for another intensive in-person

13

negotiating session (with some representatives also participating by conference call) to discuss the latest draft Protocol and see whether they could come closer to agreement on the terms of a draft Protocol.

31.     The May 4 Agenda did not list all of the items as to which there was no working consensus but only the most critical and important issues the parties needed to discuss. The following is an excerpt from the May 4 Agenda, from the section entitled "Principal Issues":

A.     Scope of the Panel's Jurisdiction

    1.     Who is entitled to seek an allocation (Recitals p. 4)

    2.     Standard of Review: "fair and reasonable" vs. "fair and equitable" (Sections 1.1, 8.1)

    3.     Issues that can be raised before the Panel (Sections 8.6, 10.7)

B.     The Panel Members

    1.     Appointment of Panel members (Section 2.2)

    2.     Standard for conflict disclosures (Sections 2.2, 2.3)

    3.     Ongoing disclosures (Section 2.3)

    4.     Replacement Panel members (Section 2.4)

C.     Access to Information

    1.     Pre-petition privileged materials (Sections 5.6, 5.11)

    2.     Use of courts to compel third-party discovery (Article VI)

    3.     Examination of experts (Section 5.9)

D.     Mediation / Negotiation (Sections 1.2, 1.3 and 1.4)

E.     Law and Jurisdiction

    1.     Law applicable to the Panel's allocation decision (Sections 8.5, 10.3)

    2.     Forum for resolution of disputes under the Protocol (Section 10.4)

14

32.    At the May 4, 2010 meeting, which once again was attended in person or by conference call by multiple representatives from each party or their counsel and advisors and lasted a full day, the parties discussed a variety of matters including the list of issues set forth on the May 4 Agenda. The discussions reflected apparent irreconcilable differences on a number of these central issues. Therefore, certain of the parties generally expressed the view that, in the coming months, the parties should focus on negotiating in good faith to attempt to reach agreement on the allocation of sale proceeds, while at the same time continuing their good faith negotiations on a draft Protocol, as appropriate.

33.    In the spring of 2010, a number of parties were working on setting up and populating an electronic data room, through which they had voluntary agreed to exchange documents relevant to the ongoing discussions.

34.    On July 20, 2010, counsel to the Committee circulated to a variety of parties, including Cleary Gottlieb, comments to the April 7, 2010 draft Protocol as well as a list of 29 points, certain of which included sub-bullet points, reflecting those items upon which the parties still needed to reach agreement before the Protocol could be finalized. The list of issues included such items as: the scope of disputes to be addressed and resolved; the inclusion in the allocation process of the potential sale of intellectual property assets; the selection and conflict disclosures of the panel members; the content and form of the final decision; the identity of the parties permitted to participate in the process; representation of the parties during the process; information access; examination of witnesses and experts; the treatment of privileged information; and attendance at hearings. A true and correct copy of the Committee's July 20, 2010 email, as received by Cleary Gottlieb, transmitting the issues list and comments to the April 7, 2010 draft Protocol is attached hereto as Exhibit F.

15

35.     Certain of the parties continued to have some discussions about the draft Protocol during the August 17-18, 2010 in-person settlement meeting that took place at Cleary Gottlieb's offices in New York, where the parties principally focused on exchanging their respective positions on how the sale proceeds should be allocated. The parties' attention thereafter shifted to further detailing their positions on how the proceeds should be allocated during a September 21, 2010 in-person settlement meeting at Cleary Gottlieb's offices in New York and during the unsuccessful mediation sessions held in person on November 11-16, 2010 at Cleary Gottlieb's offices and April 11-13, 2011 at The Downtown Conference Center in New York. After the conclusion of the unsuccessful mediation sessions, in light of the failure of the parties to reach agreement on a draft Protocol due to the substantial and fundamental prolonged disagreements that existed concerning its material terms, as described above, the U.S. Debtors and the Committee filed the Joint Motion, requesting that the U.S. and Canadian Courts establish procedures and an expedited schedule for the cross-border resolution of the allocation of the proceeds from the sale transactions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2011.

_____
Craig B. Brod

**EXHIBIT A**

**EXECUTION VERSION**

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

related understandings contained in, the documents listed in <u>Annex A</u> hereto, the "<u>Master R&D Agreement</u>") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in <u>Annex B</u> hereto and any other agreements similar to the agreements listed in <u>Annex B</u> hereto (as amended, supplemented or otherwise modified, the "<u>Distribution Agreements</u>"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "<u>January Payment</u>"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "<u>Canada/US Interim Period</u>" and the "<u>NNI Interim Obligations</u>") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "<u>EMEA Interim Period</u>"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "<u>Inter-Company Trading Payments</u>") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "<u>GSPAs</u>") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("<u>Trading Orders</u>"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "<u>Creditors' Committee</u>") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "<u>Bondholders' Committee</u>") have each agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

    a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

2.  Use of Funds; Reporting.

a.  NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

b.  NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3.  Maximum Payment; Full and Final Settlement. The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4.  Settlement of Motions. It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

5. <u>True-up Obligations</u>. NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>"). Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

## PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6. <u>Administration; Funding</u>.

   a. NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on Annex D hereto. Each of the EMEA Debtors agrees that the payments set out in Annex D shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "Material Asset Sale"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.  The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full. The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group. Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL. For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e. NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge). Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f. The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g. In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances. In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h. The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7

7. Covenants.

    a. [left intentionally blank].

    b. In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor. The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8. Maximum Payment; Full and Final Settlement. Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto. Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9. Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors. It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

PART C – PROVISIONS OF GENERAL APPLICATION

10. Scope of this Agreement. The Parties hereto agree that:

    a. this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b. this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii)

8

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however,* the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c. this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d. each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e. this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f. this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

a. Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however*, that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

9

b.  For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property. For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c.  The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination." In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

d.  Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. Entry into Sale Transactions.

a.  Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

b.  Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c.  Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

d.  The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

11

e.  Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f.  Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g.  For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

    i.  the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

    ii. the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

    a.  No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the

12

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition. Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective). Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective. For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

  i.   use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

  ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

  iii. use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

13

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e.  If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f.  Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. Term. This Agreement shall expire on December 31, 2009 (the "Expiration Date"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. Amendments. This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. Governing Law and Jurisdiction.

a.  This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

14

b.  To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. No Personal Liability of the Joint Administrators.

a.  The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b.  The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c.  Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

15

18. Creditors' Committee and Bondholders' Committee Support.

    a. Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b. Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

    a. Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i. it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii. the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii. this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b. Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights. Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the

Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. Defunct Distributors' Covenant. Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

17

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
Name: Paviter S. Binning
Title:  Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title:   Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
Name: Paviter S. Binning
Title:  Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title:  Assistant Secretary

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
Name: Paviter S. Binning
Title:  Director

By: _____
Tracy S. J. Connelly McGilley
Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
    Name: Paviter S/Binning
    Title: Director

By: _____
    Name: Tracy S. J. Connelly McGilley
    Title:  Assistant Secretary

NORTEL NETWORKS INC.

By _____
     Name: John Doolittle
     Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
     Name: John Doolittle
     Title: Vice President


CORETEK, INC.

By _____
     Name:  John Doolittle
     Title:  Vice President


NORTEL ALTSYSTEMS, INC.

By _____
     Name: John Doolittle
     Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
     Name: John Doolittle
     Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
     Name: John Doolittle
     Title:  Vice President


Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS CAPITAL
CORPORATION

By
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS HPOCS INC.

By
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS INTERNATIONAL
INC.

By
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By
Name: John Doolittle
Title: Vice President


NORTHERN TELECOM
INTERNATIONAL INC.

By
Name: John Doolittle
Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

QTERA CORPORATION

By _____
Name: John Doolittle
Title: Vice President

SONOMA SYSTEMS

By _____
Name: John Doolittle
Title: Vice President

XROS, INC.

By _____
Name: John Doolittle
Title: Vice President

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By

Name:

Title:

in the presence of

Witness Signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**      )
**NETWORKS UK LIMITED (IN**              )      **ALAN BLOOM**
**ADMINISTRATION)**                      )
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS (IRELAND) LIMITED    )    **ALAN BLOOM**
(IN ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS NV (IN    )    **ALAN BLOOM**
ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS SPA (IN    )    **ALAN BLOOM**
ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS BV (IN                             )        ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: HELEN MACNAUGHTAN
Address: 1 MORE LONDON PLACE
LONDON SE1 .

SIGNED for and on behalf of NORTEL          )
NETWORKS POLSKA SP Z.O.O. (IN               )        ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: HELEN MACNAUGHTAN
Address: 1 MORE LONDON PLACE
LONDON SE1 .

SIGNED for and on behalf of NORTEL          )
NETWORKS HISPANIA SA (IN                    )        ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: HELEN MACNAUGHTAN

Address:  *[handwritten] MORE LONDON PLACE LONDON SE1*

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS (AUSTRIA) GMBH (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:  *[handwritten] Helen Macharg Dyson*
Address:  *[handwritten] MORE LONDON PLACE LONDON SE1*

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS SRO (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:  *[handwritten] Helen Macharg Dyson*
Address:  *[handwritten] MORE LONDON PLACE LONDON SE1*

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS ENGINEERING**
**SERVICES KFT (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS PORTUGAL SA (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS SLOVENSKO SRO (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name: *Helen Machugston*
Address: *1 more London Price*
         *London SE1.*

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS ROMANIA SRL (IN**                )    **ALAN BLOOM**
**ADMINISTRATION)**                          )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature *H K Machaeln*

Name: *Helen Machugston*
Address: *1 more london peace*
         *London SE*

**SIGNED** for and on behalf of **NORTEL**   )
**GMBH (IN ADMINISTRATION)**                 )    **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal        )
liability) in the presence of:

Witness signature *H K Machaeln*

Name: *Helen Machugston*
Address: *1 more london peace*
         *London SE1.*

SIGNED for and on behalf of NORTEL            )
NETWORKS OY (IN                               )      ALAN BLOOM
ADMINISTRATION)                               )
by ALAN BLOOM as Joint Administrator          )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL           )
NETWORKS AB (IN                              )      ALAN BLOOM
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator         )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL           )
NETWORKS INTERNATIONAL                       )      ALAN BLOOM
FINANCE AND HOLDING BV (IN                   )
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

10-06-2009   01:09   FRAN-RADISSON SAS STRAND HOTEL             +46             T-141   P.009/009   F-787

SIGNED for and on behalf of NORTEL        )
NETWORKS FRANCE S.A.S. (IN                )   **ALAN BLOOM**
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator      )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

## Schedule 1

### Canadian Debtors

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

## Schedule 2

### US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

## Schedule 3

### EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.    Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.    Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.    Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.    Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.    Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.    Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.    Release in Connection with Master R&D Agreement dated 1 January 2009.

8.    Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

**Annex B**

**Distribution Agreements**

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

**Annex C**

**Funding Schedule**

Payments pursuant to Section 1.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| **TOTAL** | **US$157,000,000.00** |

C-1

**Annex D**

**Intra-EMEA Transfer Pricing Settlement Amounts**

| EMEA Debtor | Amount payable US$m |
|---|---|
| [Nortel Networks S.A.][1] | [(4.80)] |
| Nortel Networks (Ireland) Limited | (20.84) |
| [Nortel Networks AG][1] | [(4.08)] |
| Nortel Networks Hispania SA | (1.72) |
| Nortel Networks Slovensko s.r.o | (0.52) |
| Nortel Networks Romania SRL | (0.19) |
| Nortel Networks Portugal S.A. | (1.50) |
| Nortel Networks Polska S.p.z.o.o | (8.22) |
| Nortel Networks B.V. | (17.99) |
| Nortel Networks S.p.A. | (2.73) |
| Nortel Networks Engineering Services Kft | (1.92) |
| Nortel Networks s.r.o | (2.79) |
| Nortel Networks N.V. | (6.43) |
| Nortel Networks Austria GmbH | (2.35) |

---

[1]  To the extent it becomes a Party hereto.

D-1

| **EMEA Debtor** | **Amount receivable US$m** |
| --- | --- |
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)] [1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)] [1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |

**EXHIBIT B**

From:       Inna Rozenberg/NY/Cgsh
To:         "'aleblanc@milbank.com'" <aleblanc@milbank.com>, "Alex MacFarlane"
            <alex.macfarlane@fmc-law.com, amark@ogilvyrenault.com, "'annav@nortel.com'"
            <annav@nortel.com>, "'apisa@milbank.com'" <apisa@milbank.com>, "Qureshi, Abid"
            <aqureshi@AkinGump.com>, "Kahn, Brad" <bkahn@akingump.com>,
            "'Brent.R.Beekenkamp@ca.ey.com'" <Brent.R.Beekenkamp@ca.ey.com>,
            "'bzarnett@goodmans.ca'" <bzarnett@goodmans.ca>, Craig B BROD/NY/Cgsh/CGSH,
            David.Descoteaux@Lazard.com, "Botter, David" <dbotter@AkinGump.com>,
            "'dtay@ogilvyrenault.com'" <dtay@ogilvyrenault.com>, "Hodara, Fred" <fhodara@AkinGump.com>,
            "'Gavin.Davies@herbertsmith.com'" <Gavin.Davies@herbertsmith.com>, "Giles Boothman"
            <giles.boothman@ashurst.com>, Howard ZELBO/NY/Cgsh/CGSH, James L
            BROMLEY/NY/Cgsh/CGSH, "'jcarfagnini@goodmans.ca'" <jcarfagnini@goodmans.ca>,
            jharris@milbank.com, "'Joanne.Segger@herbertsmith.com'" <Joanne.Segger@herbertsmith.com>,
            "'John.Whiteoak@herbertsmith.com'" <John.Whiteoak@herbertsmith.com>,
            "'jpasquariello@goodmans.ca'" <jpasquariello@goodmans.ca>, "'jstam@ogilvyrenault.com'"
            <jstam@ogilvyrenault.com>, "Sturm, Joshua" <jsturm@akingump.com>,
            "Kevin.Lloyd@herbertsmith.com" <Kevin.Lloyd@herbertsmith.com>, "Rowe, Kevin"
            <krowe@akingump.com>, Lisa M SCHWEITZER/NY/Cgsh/CGSH, "'Matthew.Hart@lazard.com'"
            <Matthew.Hart@lazard.com>, "Michael Wunder" <michael.wunder@fmc-law.com>,
            "'mlang@ogilvyrenault.com'" <mlang@ogilvyrenault.com>, mnolan@milbank.com,
            "'Murray.A.McDonald@ca.ey.com'" <Murray.A.McDonald@ca.ey.com>, 'Nortel'
            <Nortel@capstoneag.com>, "'Orzyr@bennetjones.com'" <Orzyr@bennetjones.com>, "Bagon,
            Paul" <paul.bagon@ashurst.com>, "'plook@nortel.com'" <plook@nortel.com>, "Jacobs, Ryan"
            <rjacobs@AkinGump.com>, "Pees, Robert" <rpees@AkinGump.com>,
            "'SDrymer@ogilvyrenault.com'" <SDrymer@ogilvyrenault.com>, "Shayne Kukulowicz"
            <shayne.kukulowicz@fmc-law.com>, stenai@ogilvyrenault.com,
            "Stephen.Gale@herbertsmith.com'" <Stephen.Gale@herbertsmith.com>, "tkreller@milbank.com"
            <tkreller@milbank.com>, "'ZychK@bennetjones.com'" <ZychK@bennetjones.com>, Sanjeet
            Malik/NY/Cgsh, Theodore Geiger/NY/Cgsh/cgsh, jravidity@earthlink.net
Date:       02/26/2010 12:17 PM
Subject:    Nortel - Allocation Protocol

Please find attached the current draft of the Allocation Protocol, along with a blackline against
the last draft circulated.

   

Allocation Protocol draft 2-26-10.doc   Protocol blackline.doc

Inna Rozenberg
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2972 | f: +1 212 225 3999
www.clearygottlieb.com | irozenberg@cgsh.com

THIS DRAFT AGREEMENT HAS BEEN PRODUCED
FOR DISCUSSION AND SETTLEMENT PURPOSES
ONLY AND IS SUBJECT TO THE PROVISIONS OF
RULE 408 OF THE RULES OF EVIDENCE FOR
UNITED STATES COURTS AND MAGISTRATES AND
ANY OTHER SIMILAR APPLICABLE RULES IN ALL
PERTINENT JURISDICTIONS.

*Draft of February 26, 2010*
*Privileged and Confidential*

## PROTOCOL FOR RESOLVING DISPUTES
## CONCERNING ALLOCATION OF SALE PROCEEDS

This Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds, dated •, 2010 (the "Protocol"), is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, the Joint Administrators (as defined below), the Joint Israeli Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"), certain affiliates of the Debtors (as defined below) set forth in Schedule 4 attached hereto (the "Non-Filed Affiliates"), the Monitor (as defined below), the Official Committee of Unsecured Creditors appointed in the US Proceedings (as defined below) (the "Creditors' Committee") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with the Canadian Debtors and the US Debtors (each, as defined below) (the "Bondholders' Committee," and along with the Creditors' Committee, the "Committees") (each, a "Party," and collectively, the "Parties"). The Joint Administrators, in their personal capacity, shall be Party to this Protocol as provided in Section 9.7 and solely for the purposes of obtaining the benefit of the provisions of this Protocol expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly. The Joint Israeli Administrators, in their personal capacity, shall be Party to this Protocol as provided in Section 9.8 and solely for the purposes of obtaining the benefit of the provisions of this Protocol expressed to be conferred on or given to the Joint Israeli Administrators and references to the Parties shall be construed accordingly.[1]

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC," and together with its debtor and non-debtor affiliates, the "Company" or the "Nortel Group"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, the "Canadian Proceedings" and the "CCAA"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "US Proceedings" and the "Bankruptcy Code"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's

---

[1] Subject to review by NNI's UK counsel.

affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), and the UK Court appointed individuals from Ernst & Young LLP (the "UK Administrator") and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, and including their respective successors, replacements and any subsequent office holders appointed to the relevant EMEA Debtors, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, Nortel Networks Israel (Sales and Marketing) Limited (In Administration)(the "Israeli Company") filed applications with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "Joint Israeli Administrators") on January 19, 2009, as joint administrators of the Israeli Company under the Israeli Companies Law, and further on November 25, 2009, the Israeli Court sanctioned a scheme of arrangement, which automatically means that the Israeli Company is no longer under a stay of proceedings, and further on November 29, 2009, the Israeli Court ordered that the Joint Israeli Administrators remain in office until the scheme of arrangement is completed in full, including up until the time when all funds arising from the sale of the Israeli Company's assets, are received and allocated; and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, the Debtors and their respective subsidiaries and affiliates have sold, have agreed to sell, or may in the future sell, license or otherwise monetize their tangible and intangible assets outside the ordinary course in several transactions (any such transaction, a "Sale"), including in connection with a sale of a particular line of business or portfolio of technologies (each, a "Business"), to third party buyers (each such buyer, a "Buyer"); and

WHEREAS, the Company has provided, or intends to provide, Buyers and potential Buyers, as applicable, with access to a data room (which may be an electronic data room) containing the books and records of the relevant Business and other financial information relating to such Business (each such electronic data room, an "Asset Sale EDR"); and

WHEREAS, with respect to each Business, the Debtors and their respective affiliates have entered, or intend to enter, into one or more acquisition, sale, license, transfer and/or other ancillary agreements (each such agreement, with respect to the sale, transfer and/or license of each Business, an "Acquisition Agreement") with the Buyer to govern the sale of such Business; and

WHEREAS, after entering into an Acquisition Agreement in the case where a so-called "stalking horse" bidder has been selected, or prior to entering into an Acquisition Agreement in the case where no "stalking horse" bidder has been selected, certain of the Debtors, as applicable, have applied or intend to apply to the applicable Courts for orders authorizing such Debtors to establish notice, bidding and sale procedures for the Sale of each Business (the "Bidding Procedures Orders"); and

WHEREAS, after entry of the Bidding Procedures Orders, such Debtors intend to conduct, or have conducted, an auction for the Sale of each Business in accordance with the Bidding Procedures Orders; and

WHEREAS, after conclusion of the auction, certain of the Debtors intend to apply, or have applied, to certain of the Courts for orders approving the Sale of each Business to the relevant Buyer (the "Sale Orders"); and

WHEREAS, in connection with certain Sales, the relevant Debtors intend to request, or have requested, that the Sale Orders contain procedures for the establishment of one or more escrow accounts (the "Escrow Account") overseen by an independent agent (the "Escrow Agent") for deposit of the proceeds of the Sale (the "Sale Proceeds") pending the allocation thereof in accordance with the provisions of this Protocol (each such Sale, as set forth in Schedule 5 attached hereto, an "In-Scope Sale")[2]; and

WHEREAS, after entry of the Sale Orders and satisfaction or waiver of the conditions to closing set forth in the relevant Acquisition Agreement, the Debtors and their respective affiliates intend to consummate, or have consummated, the Sale in accordance with the Sale Orders (in each case, a "Closing"); and

WHEREAS, the Debtors and certain other parties previously agreed, pursuant to the Interim Funding and Settlement Agreement, dated as of June 9, 2009 (as amended from time to time, the "Interim Funding Agreement"), as soon as reasonably practical following the execution of such agreement, to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds, which would provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors (as defined therein) have been unable to reach agreement regarding such allocation; and

WHEREAS, the Parties wish to agree on procedures for determining allocation of Sale Proceeds of each In-Scope Sale between and among each of the Debtors and the Non-Filed Affiliates (each, a "Participating Party," and collectively, the "Participating Parties"); and

WHEREAS, the Parties wish to give each Participating Party an opportunity to assert, pursuant to the procedures set forth in this Protocol, an entitlement to an allocation of Sale

---

[2] Schedule 5 will include monetization transactions related to intellectual property of the Debtors and Non-Filed Affiliates.

Proceeds with respect to any In-Scope Sale, regardless of whether or not such Participating Party was a party or signatory to the Acquisition Agreements applicable to such In-Scope Sale; and

WHEREAS, each Party wishes to participate in the procedures set forth in this Protocol, and has agreed to be bound by this Protocol and any outcome with respect to the Allocation (as defined below) of Sale Proceeds of each In-Scope Sale pursuant to a Decision or a Supplementary Decision of the Panel (each, as defined below); and

WHEREAS, the Non-Filed Affiliates have appointed •[3] as their representative, which shall represent the Non-Filed Affiliates in connection with the negotiations and other procedures with respect to the Allocation of Sale Proceeds of each In-Scope Sale under this Protocol ("Affiliates' Representative"), and the Non-Filed Affiliates have also appointed an independent financial advisor and an independent counsel to assist the Affiliates' Representative.

NOW THEREFORE, IT IS HEREBY CONSENTED TO, STIPULATED, AGREED AND ORDERED THAT:

## ARTICLE I
## INITIAL NEGOTIATIONS

*Section 1.1*    The Negotiating Parties (as defined below) shall use commercially reasonable efforts to negotiate in good faith and as expeditiously as possible a fair and equitable allocation of the Sale Proceeds of each In-Scope Sale among the Participating Parties, where "Negotiating Parties" means NNL, NNI, the Monitor, the Creditors' Committee, the Bondholders' Committee, the Joint Administrators and the Affiliates' Representative.

*Section 1.2*    With respect to any In-Scope Sale that closed before the date of this Protocol, if the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of such In-Scope Sale within [100] calendar days after the date of this Protocol, then the dispute as to the allocation of the relevant Sale Proceeds among the Participating Parties shall be automatically referred to the Panel (as defined below) pursuant to this Protocol. With respect to any In-Scope Sale that closes after the date of this Protocol, if the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of such In-Scope Sale within [100] calendar days after the closing of such In-Scope Sale, then the dispute as to the allocation of the relevant Sale Proceeds among the Participating Parties shall be automatically referred to the Panel (as defined below) pursuant to this Protocol. If an allocation dispute is referred to the Panel, the Panel shall determine a fair and equitable allocation of the Sale Proceeds of the relevant In-Scope Sale to be distributed to the Participating Parties. The Parties hereby agree that the negotiation periods provided for in this Section 1.2 may be extended by mutual written agreement of all the Negotiating Parties or may be terminated before their expiration upon written notice by any Negotiating Party delivered to all other Negotiating Parties.

*Section 1.3*    Upon the automatic referral of an allocation dispute to the Panel as contemplated by Section 1.2, NNI shall be responsible for promptly sending a notice to the Panel and the other Negotiating Parties, indicating in such notice that pursuant to the terms of Section

---

[3] Identity of Affiliates' Representative to be discussed

1.2 of this Protocol, an allocation dispute has been automatically referred to the Panel. If for any reason NNI shall fail to send such notification to the Panel and the other Parties within three days (excluding Saturdays, Sundays and national public holidays in any of the United States, Canada or the United Kingdom) (each a "Business Day") of the automatic referral of the allocation dispute to the Panel, any other Negotiating Party may undertake to send such notice to the Panel and the other Negotiating Parties.

    *Section 1.4*    The Negotiating Parties, in their sole discretion, may agree to a partial allocation of the Sale Proceeds of an In-Scope Sale (each such partial allocation, a "Partial Allocation Amount").[4] If the Negotiating Parties agree to a Partial Allocation Amount, such Partial Allocation Amount shall be released from the Escrow Account and distributed to one or more Participating Parties immediately following the later of (x) the closing of the In-Scope Sale and (y) the date when the Negotiating Parties agree to such Partial Allocation Amount. Any remaining amounts shall remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.

## ARTICLE II
## REFERRAL OF ALLOCATION DISPUTES TO THE PANEL

    *Section 2.1*    As contemplated by Section 1.2 of this Protocol, an allocation dispute shall be automatically referred to a dispute resolution panel constituted in accordance with Sections 2.2, 2.3 and 2.4 (the "Panel").

    *Section 2.2*    The Parties have previously requested and received from the members of the Panel initial conflict disclosures in accordance with the standard for "disinterestedness" under the Bankruptcy Code as well as agreed upon procedures for identifying and preventing any potential current or future conflicts, and have determined based on such disclosures that the following individuals are acceptable and shall serve as the members of the Panel: ●, ● and ●. For the purposes of administrative convenience, the Panel may appoint an administrative secretary.

    *Section 2.3*    Each member of the Panel shall be and remain at all times impartial and independent of the Parties. Each member of the Panel shall disclose to the Parties any new or previously undisclosed conflict, pursuant to the "disinterestedness" standard under the Bankruptcy Code, that comes to the Panel member's attention from time to time, as well as any proposed remedy with respect to such conflict. Following any such disclosure, the Negotiating Parties agree to confer regarding whether such disclosure requires disqualification of the Panel member, it being understood that a Panel member's disclosure under this Section 2.3 does not automatically render the Panel member conflicted or require the Panel member's disqualification. If the Negotiating Parties cannot reach an agreement within [x] days of the Panel member's disclosure as to whether such Panel member should be disqualified, the US Court and the Canadian Court, in a joint hearing conducted under the Cross-Border Protocol (as

---

[4] Prior to signing of this Protocol (by which time the timing of the CDMA and Equinox closing should be known to the Parties), this Protocol will be revised to add language to accommodate EMEA's request that the Equinox dispute be the first allocation dispute to be handled by the Panel so long as it does not unreasonably delay the allocation for CDMA.

defined below), shall decide the issue. Notwithstanding anything to the contrary in this Protocol, if a member of the Panel is disqualified pursuant to this Section 2.3, the sole method for replacement of such member shall be as set forth in Section 2.4 of this Protocol.

*Section 2.4*        If any member of the Panel is unable or unwilling to serve after receiving notice of the referral of any matter to the Panel or at any time thereafter, or is disqualified as a result of a conflict pursuant to the procedures in section 2.3, such member shall be replaced as soon as possible by another individual to be selected by the Participating Party that originally proposed the inclusion of the outgoing Panel member in Section 2.2, as previously set forth in writing provided to all Negotiating Parties, but only upon the prior written consent of the other Negotiating Parties, which consent shall not be unreasonably withheld. The Panel may not consider or continue to consider issues or render any Decision, Supplementary Decision or other decision during the period when a Panel member is being replaced.

*Section 2.5*        Each of the Negotiating Parties (other than the Non-Filed Affiliates, as represented by the Affiliates' Representative) shall bear its respective costs and expenses, including attorneys' fees, associated with the preparation and presentation of its case to the Panel and any other costs and expenses incurred by such Negotiating Party in connection with the proceedings pursuant to this Protocol, provided that nothing herein shall in any way affect any arrangements or agreements to cover [certain] fees and expenses of the Committees, including, without limitation, pursuant to any order by the US Court approving the fee applications of the Committees, as applicable. The Panel shall specify in each Decision the total amount of the costs and other expenses of the Panel in connection with such Decision (the "Panel Costs"), and the proportions in which the Participating Parties shall bear such Panel Costs. The costs and expenses of the Affiliates' Representative and the portion of the Panel Costs to be paid by the Non-Filed Affiliates shall be paid from the Sale Proceeds of the particular In-Scope Sale allocated to the Non-Filed Affiliates. The incremental costs and other expenses of the Panel in connection with a Supplementary Decision (as defined below) shall be paid from the Sale Proceeds of the particular In-Scope Sale allocated to the Participating Party or Participating Parties requesting such Supplementary Decision.

*Section 2.6*        To the maximum extent permitted by applicable law, none of the members of the Panel shall be liable to any Party or any third party howsoever for any act or omission in connection with any proceedings under this Protocol.

*Section 2.7*        The place of arbitration shall be New York, New York. Other than as expressly specified otherwise in this Protocol, or as agreed by the Parties, all proceedings pursuant to this Protocol, including, but not limited to, Administrative Meetings, Evidentiary Hearings and Oral Arguments (as defined herein), shall be held in New York, New York and shall be conducted in the English language.

*Section 2.8*        No members of the Panel, whether before or after appointment to the Panel, shall advise any Party on the merits or outcome of a dispute. There shall be no communications between any member of the Panel and a Party unless all other Parties are given the opportunity to be present during such communication. For the avoidance of doubt, written communication (whether transmitted by email, facsimile or post) between any member of the Panel and a Party must also be transmitted contemporaneously to all other Parties.

6

## ARTICLE III
## ADMINISTRATIVE MEETINGS

*Section 3.1*        Within ● (●) calendar days of an allocation dispute being referred to the Panel, the Negotiating Parties and the Panel shall hold a meeting to discuss any administrative, procedural or other relevant matters (the "Administrative Meeting"), which shall be convened by the Panel. Each of the Negotiating Parties must be given (i) at least seven (7) calendar days' notice prior to the Administrative Meeting and (ii) the opportunity to attend and participate in the Administrative Meeting. The Administrative Meeting shall be held at a time and in a location, as determined by the Panel, such that each Negotiating Party and/or its counsel shall be able to participate by telephone, videoconference or in person. At the Administrative Meeting and at any other proceeding before the Panel, each of the Negotiating Parties shall be entitled to be represented by counsel.

*Section 3.2*        Except as specifically provided in this Protocol, the Panel shall, after taking into account, among other things, the facts and circumstances of the relevant In-Scope Sale, the multiple jurisdictions involved in such In-Scope Sale or the applicable dispute and such other factors as the Panel considers relevant, establish the procedure and manner in which the resolution of the allocation dispute shall be conducted, including, without limitation, (i) the due dates for Written Submissions, (ii) the timing of the identification of Experts (as defined below), the submission of Expert Reports (as defined below), the identification of witnesses and the submission of Witness Statements (as defined below), (iii) the time, place, length and number of oral arguments for each Negotiating Party (the number of oral arguments for a given Negotiating Party multiplied by the length of each such oral argument, the "Oral Argument Duration"), (iv) whether to order the Negotiating Parties to prepare a joint statement of facts, and (v) other administrative, procedural, or other relevant matters such as the scheduling of the Evidentiary Hearings (as defined below) and subsequent Administrative Meetings (if necessary), provided that the right of the Non-Filed Affiliates to participate and present their Interests (as defined below and as determined by the Panel) to the Panel shall reflect, to the extent reasonably practicable and determinable under the circumstances, the Panel's assessment of the relative contribution of the assets (tangible and intangible) and the rights transferred or relinquished by and liabilities assumed from the Non-Filed Affiliates in comparison to other Participating Parties with regards to a given Sale. Notwithstanding anything else in this Protocol, the Panel shall have the right in its discretion, and after providing an opportunity for all Negotiating Parties to be heard on the issue, to modify the procedures decided at any Administrative Hearing or otherwise either upon request of any Negotiating Party or on the Panel's own initiative.

*Section 3.3*        If any Negotiating Party determines that there is an actual or potential conflict with respect to the dispute among any of the Respective Participating Parties (as such term is defined in Schedule 6 attached hereto) of such Negotiating Party or that such Negotiating Party represents a diversity of interests with regard to such Negotiating Party's Respective Participating Parties (each such interest, an "Interest"), such Negotiating Party may petition in writing the Panel to further modify the procedures, including, without limitation, by increasing the Oral Argument Duration allocated to such Negotiating Party or providing separate representation to address such potential conflict of interest or diversity of interests, provided that in the case of the Joint Administrators or the Monitor, their respective petitions to the Panel to represent up to three separate Interests shall not be opposed by any other Negotiating Party, and

7

provided, further that any other Negotiating Party shall be free to make submissions as to the extent and scope of any additional representation rights.[5] Nothing herein shall prevent any Negotiating Party from opposing any arguments raised by the various Interests, or Presented Positions (as defined below) with respect to such Interests, represented by any Negotiating Party.

*Section 3.4*     Nothing in the preceding section shall affect the right of the Panel to call other administrative meetings to discuss administrative, procedural or other relevant matters after the initial Administrative Meeting. Each such meeting shall constitute a separate Administrative Meeting for the purposes of this Protocol and must comply with the requirements set forth in Section 3.1 of this Protocol.

## ARTICLE IV
## WRITTEN SUBMISSION BY THE NEGOTIATING PARTIES

*Section 4.1*     Each Negotiating Party may submit a written statement to the Panel, including, without limitation, Expert Reports (as defined below) and written Witness Statements (as defined below), of such Negotiating Party's one or more Interests (as permitted by the Panel pursuant to Section 3.3) with regards to the Allocation of the relevant Sale Proceeds to the Panel (such submission, the "First Round Submission").

*Section 4.2*     Each Negotiating Party shall present in its First Round Submission its methodology for the allocation of the relevant Sale Proceeds (the "Presented Position"). In the case of a Negotiating Party that represents more than one Interest (as determined by the Panel), such Negotiating Party may offer more than one Presented Position to the Panel. The Presented Positions may also address any allocation or allocation methodology adopted or employed by any Buyer.

*Section 4.3*     A Negotiating Party may rely, in its sole discretion, on one or more experts as a means of evidence on specific issues (each such expert, an "Expert"). A report by an Expert (each such report, an "Expert Report") shall provide the following information: (i) a description of the qualifications of such Expert, (ii) a description of the scope of work or mandate of such Expert together with a copy of the engagement letter of such Expert, (iii) a description of the compensation paid or to be paid to such Expert, (iv) a description of any relationship on the part of such Expert within the two years immediately preceding the date that such Expert was first contacted with respect to the engagement that could reasonably be considered relevant to an assessment of the Expert's independence or objectivity, (v) a description of the scope of review conducted by such Expert (including a list of the materials and other information relied upon by such expert in preparing such report, the identity of all current or former employees, officers or directors of Nortel Group entities who such expert interviewed and relied upon in connection with the preparation of such report, and any limitation on the scope of such review), (vi) a statement of the facts on which such Expert is basing its opinions and conclusions, (vii) the allocation approach and methodologies selected by such Expert and the reasons for selecting the particular allocation approach and methodology or methodologies, (viii) the key assumptions made by such Expert, (ix) such Expert's findings, opinions and conclusions, and (x) any qualifications or limitations to which such Expert's findings, opinions or conclusions

---

[5] TBD: Retention of multiple professionals by Parties that represent more than one Interest

8

are subject. Notwithstanding anything to the contrary in this Protocol, a Negotiating Party need not disclose, and shall not be required to disclose, any information (other than the information set forth in the preceding sentence) concerning its Experts, including but not limited to (1) drafts of an Expert Report and (2) communications between a Negotiating Party (including its counsel) and an Expert (or documents reflecting such communications).

*Section 4.4*        A Negotiating Party may rely on a written statement by any person, including, without limitation, any Party's officer, employee or other representative. Such witness statement must contain a full and detailed description of the facts, and the source of the witness's information as to those facts, sufficient to serve as that witness's evidence in the matter in dispute (each such statement, a "<u>Witness Statement</u>").

*Section 4.5*        No Witness Statement or Expert Report shall be admissible unless such witness or expert makes himself or herself available for an Examination (as defined below) and at the Evidentiary Hearing (as defined below), or unless the Negotiating Party or Negotiating Parties who requested such witness's or expert's Examination or presence at the Evidentiary Hearing otherwise consents.

*Section 4.6*        Each Negotiating Party shall provide a First Round Submission to the Panel, with a copy to all other Negotiating Parties, no later than the deadline established by the Panel for such submission (the "<u>First Round Submission Deadline</u>"). The First Round Submission of each Negotiating Party shall not be subject to any page limits.

*Section 4.7*        Each Negotiating Party, in its sole discretion, may opt to submit a second written submission to the Panel, with a copy to all other Negotiating Parties, no later than the deadline established by the Panel for such submission, which shall be at least ● calendar days after the First Round Submission Deadline (respectively, the "<u>Second Round Submission</u>" and the "<u>Second Round Submission Deadline</u>"). The Second Round Submission of each Negotiating Party shall not be subject to any page limits, <u>provided</u> that the Second Round Submission shall be limited to (a) responding to the First Round Submissions of other Negotiating Parties with regards to each Interest of the relevant Party and (b) presenting additional information or arguments in support of such Negotiating Party's Presented Position(s) based on Examination Testimony (as defined below) or new document discovery. For the purposes of this Protocol, the First Round Submission, the Second Round Submission, the Post-Hearing Submission (as defined below) and any other written submissions by any Negotiating Party to the Panel shall be collectively referred to as the "<u>Written Submissions</u>."

*Section 4.8*        Each Negotiating Party, in its sole discretion, may opt to submit one or more reports prepared by their Expert to respond to Expert Reports submitted by the other Negotiating Parties (each such report, a "<u>Rebuttal Expert Report</u>"). Such Rebuttal Expert Reports, to the extent such information is different from the Negotiating Party's Expert Reports or relevant to the Rebuttal Expert Report, shall include the information required in Section 4.3 herein for the submission of Expert Reports.

9

## ARTICLE V
## ACCESS TO INFORMATION

*Section 5.1*     Each Party shall have prompt and equal access to the Asset Sale EDR for any sale that the Negotiating Parties reasonably anticipate to fall within the scope of the Protocol. In addition, the Company has established an electronic data room (the "Data Room") that shall contain any documents reasonably requested by any Negotiating Party pursuant to a Data Request (as defined below) issued in accordance with Section 5.2 of this Protocol. It has been the intention of the Parties to use reasonable best efforts to provide prompt and equal access to the Data Room to all Parties, and the Parties agree to continue using their reasonable best efforts to provide such prompt and equal access to the Data Room to all Parties. For the avoidance of doubt, all information requested by or supplied to any Party shall be made available to all Parties.

*Section 5.2*     Any Negotiating Party may send a written request to any Nortel Group entity, with a copy to all Negotiating Parties, for access to documents concerning such Nortel Group entity in the possession of such Nortel Group entity that may be reasonably relevant to resolution of any dispute in respect of an In-Scope Sale (a "Data Request"). The relevant Nortel Group entity shall use reasonable best efforts to make such documents available in the Data Room as soon as reasonably practicable.

*Section 5.3*     Commencing as early as the start of the negotiations for any Sale that parties reasonably anticipate to fall within the scope of this Protocol, the Negotiating Parties shall use their reasonable best efforts to permit each Negotiating Party the same prompt and equal access to employees of NNC, NNL, and their debtor and non-debtor affiliates, including the Debtors and the Non-Filed Affiliates (each an "Employee"), for purposes of obtaining information relevant to a dispute and having the Employee provide a Witness Statement. To enable an Employee to prepare for an interview, the Negotiating Party requesting such an interview shall deliver to the Employee, reasonably in advance of such an interview, a list of topics or subject matters which the requesting Negotiating Party intends to cover with the Employee together with a list of information, if any, that the requesting Negotiating Party requests the Employee provide in writing. Any written information provided by such Employee in response to a request from a Negotiating Party shall be made available in the relevant Data Room as soon as reasonably practicable after it has been so provided. Interviews conducted pursuant to this Section 5.3 with Employees shall be expressly identified as being for such purpose and shall be separate from any discussions for the purpose of or in furtherance of a negotiated settlement of a dispute.

*Section 5.4*     It is the intention of the Parties that each Employee will use its reasonable best efforts to assist any Negotiating Party that seeks assistance of such Employee. The Parties, however, acknowledge and recognize that (i) Employees have a corporate job function to perform with priorities that must be accommodated and (ii) each Employee's available time must be equitably shared with all Negotiating Parties. Each Negotiating Party shall use its reasonable best efforts to ensure that Employees within its control provide the assistance requested of them by any Negotiating Party consistent with the considerations mentioned herein.

*Section 5.5*     [Each Negotiating Party shall be permitted reasonable access to third parties that have rendered advice to another Negotiating Party relevant to a dispute (each a

10

"Third Party"). Any Nortel Debtor to whom such advice was rendered shall use its reasonable best efforts to ensure that such Third Parties are made available to the Negotiating Parties. Notwithstanding the foregoing or anything to the contrary contained in Section 5.10 below, a Negotiating Party shall not be permitted access to Third Party advice rendered before the Filing Date that is protected from disclosure by the attorney-client privilege, the solicitor-client privilege, the attorney work product doctrine or any other similar privilege.][6]

*Section 5.6*    Each witness that a Negotiating Party intends to call as a witness at an Evidentiary Hearing or from whom a Negotiating Party intends to submit a Witness Statement must be made available for a pre-hearing examination under oath (an "Examination") to take place following the First Round Submissions but no later than [●] days before the commencement of the Evidentiary Hearing, provided, further that the Witness Statement of any individual that does not submit to an Examination, if requested, shall only be considered by the panel upon the prior written consent of the Negotiating Party or Negotiating Parties that requested the Examination.[7]   A Negotiating Party may also request an Examination of any other Employee of another Party or Third Party.[8]   Each examination will be held at the location of the relevant witness unless otherwise agreed to by the Negotiating Parties.  Each Negotiating Party may attend an Examination and may ask questions at such Examination regardless of whether such Negotiating Party requested the Examination of the witness.  The Negotiating Parties shall agree in advance of an Examination on the length and scope of such Examination, or failing such agreement within ● days in advance, the Panel shall determine the length and scope of such Examination.  Except for witnesses that a Negotiating Party intends to call as a witness at an Evidentiary Hearing or from whom a Negotiating Party intends to submit a Witness Statement, and unless the Party or Third Party whose Employee is requested to submit to an Examination consents to such Examination, the Panel, after submissions by the relevant Negotiating Parties and a hearing, may prevent an Examination solely on the grounds that such Examination would be unduly burdensome or would not likely lead to the discovery of relevant evidence.

*Section 5.7*    Each Negotiating Party shall use its reasonable best efforts to make available any Employee within its control for Examinations pursuant to Section 5.7 or for the Evidentiary Hearing if they may be properly called pursuant to Section 6.2 of this Protocol as a non-expert witness for such Evidentiary Hearing.

*Section 5.8*    Each Expert that a Negotiating Party intends to present at an Evidentiary Hearing, if requested by another Negotiating Party, must be made available for an Examination no later than ● days before the commencement of the Evidentiary Hearing, provided, further that the Expert Report or Rebuttal Expert Report of any Expert that does not submit to an Examination, if requested, shall only be considered by the panel upon the prior written consent of the Negotiating Party or Negotiating Parties that requested the Examination.  Such Examination will be conducted in the manner described in Section 5.7.

---

[6] To be discussed.

[7] Parties to consider whether this should be tied to the Second Round Submission Deadline.

[8] TBD: Procedure for compelling third parties to appear for Examination.

11

*Section 5.9*    Testimony from an Examination ("Examination Testimony") shall be admissible at an Evidentiary Hearing if (i) the witness giving such Examination Testimony is unavailable to testify at the Evidentiary Hearing, or (ii) agreed upon by all of the Negotiating Parties. Where a witness will testify at an Evidentiary Hearing, such witness's Examination Testimony, and, in the case of an Expert, the Expert Report or the Rebuttal Expert Report of such Expert, shall not be admissible except for the purpose of impeaching such witness's live testimony at the Evidentiary Hearing. Nothing herein shall prevent a Negotiating Party from quoting or referring to Examination Testimony in their Written Submissions.

*Section 5.10*    With respect to information created before the Filing Date that may be requested pursuant to this Article 5, the Parties agree not to withhold such information on the basis that such information is protected from disclosure by the attorney-client privilege, the solicitor-client privilege, the attorney work product doctrine or under any other similar privilege, provided that by so agreeing, the Parties do not intend to waive any such applicable privilege or protection from disclosure with respect to any non-parties to this Protocol, and provided further that no Party shall be compelled to disclose any information potentially subject to any applicable privilege or protection from disclosure until the Parties have entered into a common interest agreement in substantially the form set forth in Schedule 8.

*Section 5.11*    All disagreements or controversies arising from or related to access to information and pre-hearing Examinations provided for under this Protocol including, but not limited to, any disagreements related to the Data Room, the scope and reasonableness of questions on Examinations, Witness Statements and Experts Reports (each, a "Discovery Matter") shall be referred to the Panel for resolution, which resolution shall be determined by a majority of the Panel and shall be final and binding upon the Parties. The procedure for resolution of a Discovery Matter shall be left to the discretion of the Panel.

## ARTICLE VI
## EVIDENTIARY HEARING; ORAL ARGUMENT

*Section 6.1*    Following submission of all Written Submissions, the Panel shall schedule one or more days of hearings, which may or may not be consecutive, at which the Panel shall receive oral evidence from the Negotiating Parties (an "Evidentiary Hearing").

*Section 6.2*    Each Negotiating Party may present oral testimony from (a) an Expert who has submitted an Expert Report or (b) a non-expert witness who has submitted a Witness Statement, so long as the Negotiating Party has given prior written notice to all other Negotiating Parties, in a timely manner and in accordance with any deadline established by the Panel for such notification, that such witness shall be called to provide evidence during an Evidentiary Hearing. Following direct testimony by a witness, any other Negotiating Party may question the witness in an order to be determined by the Panel. The Negotiating Party that initially presented the witness shall subsequently have the opportunity to ask additional questions raised in the other Negotiating Parties' questioning.

*Section 6.3*    Evidence from proceedings held in connection with the resolution of another dispute under this Protocol, including, without limitation, evidence from a prior Evidentiary Hearing, Administrative Meeting, Written Submission, Witness Statement, or Expert

Report (as defined below) for a given In-Scope Sale ("Prior Evidence") shall be admissible in the proceedings for subsequent In-Scope Sales, unless, on motion by any Negotiating Party, the Panel decides that the Prior Evidence shall not be admitted or otherwise limits the admissibility of the Prior Evidence, provided that each Negotiating Party shall have the right to further re-direct and cross-examine such Prior Evidence to the extent it consists of a witness's testimony.[9]

Section 6.4    At the Evidentiary Hearing, each of the Negotiating Parties shall be entitled to present orally arguments in favor of their Presented Positions (the "Oral Argument") and to examine witnesses, including Experts, from whom Witness Statements and Expert Reports, as applicable, have been submitted by another Negotiating Party.

Section 6.5    Evidentiary Hearings shall be held at a time and place specified by the Panel, but in no event before ● (●) calendar days or after ● (●) calendar days of the Second Round Submission Deadline.  For the avoidance of doubt, Evidentiary Hearings and Oral Argument shall be held in person.

Section 6.6    At the close of the final Evidentiary Hearing or final Oral Argument, whichever is later, the Panel shall determine whether to require post-hearing submissions, and if so, the scope, length and due dates for such submissions (each such submission, a "Post-Hearing Submission").

## ARTICLE VII
## THE DECISION OF THE PANEL

Section 7.1    The Panel shall render a written decision (the "Decision") as soon as reasonably practicable after the completion of the final Evidentiary Hearing or final Oral Argument in the particular dispute.  Each Decision, Supplementary Decision and any other decision of the Panel shall be made by at least a majority of the members of the Panel.

Section 7.2    The Decision shall contain: (a) the percentage, if any, (rounded to four decimal points) of the Sale Proceeds of a given In-Scope Sale to be allocated to the Canadian Debtors, the US Debtors, the EMEA Debtors and the Non-Filed Affiliates (an "Allocation"); (b) if the Panel deems appropriate, instructions to the Escrow Agent to distribute the relevant Sale Proceeds to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Joint Administrators (on behalf of the EMEA Debtors) and to the Non-Filed Affiliates in accordance with the applicable Allocation; and (c) [if necessary, a ruling on the allocation of any amounts to be returned to the Participating Parties from any reserves or escrow accounts established as part of the applicable In-Scope Sale.][10]  Following the issuance of a Decision, and upon the written request of NNL, NNI (with the consent of the Creditors' Committee), the Joint Administrators (on behalf of the EMEA Debtors) or the Affiliates' Representative, the Panel, [only after submissions by all reasonably affected Parties and a hearing, may] issue a supplementary decision containing the percentage, if any, (rounded to four decimal points) of the

---

[9] TBD - Whether Prior Evidence should be subject to limitations set forth herein regarding the binding nature of previous agreements and/or Decisions.

[10] TBD – Whether to include a schedule of the reserve or escrow accounts from the sales to be dealt with in a Decision.

applicable Allocation of the Sale Proceeds of such In-Scope Sale to be allocated amongst the group of debtors or affiliates represented by the Party requesting the supplementary decision (each such supplementary decision, a "Supplementary Decision"). Any incremental costs incurred in connection with the prosecution and rendering of a Supplementary Decision shall be borne solely by the Party or Parties requesting such Supplementary Decision, including any Panel Costs incurred in accordance with Section 2.5 herein. No Party will deliver a duly authenticated copy of any Decision or Supplementary Decision of the Panel to any Escrow Agent directing a release of any Sale Proceeds from any Escrow Account unless such Decision or Supplementary Decision contains an express direction to the Escrow Agent for the release of such Sale Proceeds to some or all of the Participating Parties.

*Section 7.3*    Each Decision, Supplementary Decision and any other decision of the Panel shall be made in writing, and shall contain a statement signed by each member of the Panel certifying that such writing constitutes the decision of the Panel. Any Decision or Supplementary Decision, in the sole discretion of the Panel, may contain a short statement the reasons upon which such Decision or Supplementary Decision, as the case may be, is based, provided that such Decision or Supplementary Decision, as the case may be, shall not include any dissenting reasons.

*Section 7.4*        In rendering a Decision or Supplementary Decision and an Allocation set forth in such Decision or Supplementary Decision, the Panel shall (i) treat as final and binding any Partial Allocation Amount, and (ii) not be bound to adopt, follow or place any weight in rendering a Decision on (x) any allocation contained in the relevant Transaction Documents, other than as set forth in Schedule 7 attached hereto (such schedule to be supplemented from time to time with the consent of the Negotiating Parties), where "Transaction Documents" means, with respect to an In-Scope Sale, any agreement (a) among the one or more Parties, or (b) one or more Parties and the Purchaser, relating to or in connection with such In-Scope Sale, or (y) any previous Decision or Allocation of Sale Proceeds of the Panel relating to another In-Scope Sale. Additionally, in rendering such a Decision, Supplementary Decision or an Allocation contained in such Decision or Supplementary Decision the Panel shall not be bound (a) to select one of the Presented Positions; (b) to adopt, follow or place any weight on anything contained in the Acquisition Agreements or any side or related agreement, [including any allocation agreed with the Buyer in or pursuant to the relevant Acquisition Agreement or any side or related agreement];[11] (c) by any previous Decision or Allocation of Sale Proceeds by the Panel relating to another In-Scope Sale; or (d) by the rules, provisions or administrative practices of any particular national, provincial, state or other law or legal system or government agency or the principles or standards of any particular organization or association (each such rule, provision, administrative practice, principles or standards, an "Allocation Rule"), provided that the Panel may, in its sole discretion, base a Decision, an Allocation or a Supplementary Decision or any element thereof upon one or more Allocation Rules.

*Section 7.5*        [**Rider excluding tax returns in connection with M&A transactions to follow**].

---

[11] Tax counsel to provide rider to carve-out an exception to this rule b/c Nortel has agreed to allocate at least the book value to each tangible asset and the Panel has to respect this allocation principle.

14

*Section 7.6*        If the Negotiating Parties agree at any point in time prior to the relevant Decision as to a Partial Allocation Amount in respect of the Sale Proceeds of a particular In-Scope Sale, then the Panel shall render a Decision only with respect to the allocation of the remaining portion of such Sale Proceeds. If the relevant Parties agree at any point in time prior to the relevant Supplementary Decision as to the Allocation of any portion of the relevant Sale Proceeds allocated to the applicable Participating Parties pursuant to the applicable Decision, then the Panel shall render a Supplementary Decision only with respect to the allocation of the remaining portion of the Sale Proceeds allocated to such Participating Parties pursuant to the applicable Decision.

*Section 7.7*        The Panel shall not use, consult with or appoint any expert to report to the Panel on any issue.

*Section 7.8*        After the Panel has entered a Decision or Supplementary Decision, the Panel shall be barred from modifying such Decision or Supplementary Decision, as the case may be, other than to correct a clerical, computational or typographical error contained in the Decision or Supplementary Decision. If the Panel makes such a correction on its own initiative, it shall do so within 30 days of the date of the Decision or Supplementary Decision, as the case may be. Any application by a Party for such a correction must be made within 30 days of the date of the Decision or Supplementary Decision, as the case may be.

*Section 7.9*        Any Decision and Supplementary Decision of the Panel shall be conclusive, final and binding in connection with the applicable In-Scope Sale and, to the fullest extent permitted by applicable law, may not be challenged, appealed or sought to be vacated or set aside by any Party in any jurisdiction.

*Section 7.10*   Any Decision and Supplementary Decision of the Panel shall be deemed an arbitral award enforceable under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") and all legislation implementing the Convention, including, in the United States, the United States Federal Arbitration Act.

*Section 7.11*        Provided that a Decision contains an appropriate instruction to the Escrow Agent, the Sale Proceeds for an In-Scope Sale shall be transferred by the Escrow Agent, in accordance with the Allocation contained in such Decision and the terms of the relevant escrow agreement, after the relevant Decision has been rendered, without the need for an order from any of the Courts.

*Section 7.12*        Except as expressly provided for in any agreement of the relevant parties, neither this Protocol nor any Decision of the Panel shall preclude any Participating Party from asserting any legally cognizable claim or defense against any other Participating Party pursuant to the applicable claims procedure approved by the applicable Court by or on behalf of any Participating Party against any other Participating Party.

15

### ARTICLE VIII
### CONFIDENTIALITY

*Section 8.1*        Except as may be required by applicable law or court order or by an authority having appropriate jurisdiction, each Party agrees (i) to maintain confidentiality as to all aspects of these procedures, including, without limitation, any Information (as defined below), the presentation of any issue to the Panel, any discussions, deliberations or proceedings of the dispute resolution procedure set forth in this Protocol, and any Submissions or Oral Arguments (the "Confidential Material") and (ii) not to use any Confidential Material for its own benefit or the benefit of any of its affiliates, including, without limitation, for the purpose of asserting or proving a Claim (as defined in Section 101(5) of the Bankruptcy Code) against any Debtor in any of the Proceedings, it being understood that the Parties may disclose the existence and nature of this Protocol and the dispute resolution procedure conducted hereunder as may be necessary to (x) satisfy any Condition (as defined below) or (y) comply with the applicable laws, including, without limitation, the U.S. federal or state securities laws or any Canadian federal, provincial or territorial securities laws, and it being further understood that the Parties may disclose any Decision or Supplementary Decision by the Panel. As used in this Section 8.1, "Information" means any and all documents and information obtained by or on behalf of a Party from another Party or Nortel Group entity pursuant to this Protocol, including, without limitation, documents and information made available in the Data Room, Witness Statements, Written Submissions, responses given by Employees in interviews pursuant to Section 5.3, responses to Questionnaires served pursuant to Section 5.5, Examination Testimony and oral testimony given in any Evidentiary Hearing (but excluding any Decision or Supplementary Decision).

*Section 8.2*        In the event that a Party is served with or otherwise subject to legal process (including subpoena or discovery notice) requiring it to testify about, to produce, or otherwise to divulge Confidential Material, to the extent permitted by applicable law such Party will as soon as practicable inform the provider(s) of such Confidential Material so that the provider may seek a protective order or other remedy. In the event that such protective order or other remedy has not been obtained and such entity is advised, in the opinion of counsel, that it is legally compelled to disclose any of the Confidential Material, such Party may disclose only such Confidential Material so advised to be disclosed.

*Section 8.3*        The Parties further agree that prior to the appointment of any individual to the Panel or appointment as an Expert by any Party, such individual shall agree in writing to preserve the confidentiality of the dispute resolution procedure conducted under this Protocol and all Confidential Material obtained hereunder.

*Section 8.4*        Nothing herein shall prevent any Party from disclosing information regarding the dispute resolution procedure conducted under Section 9.4 of this Protocol or all Confidential Material obtained hereunder for purposes of proceedings to resolve any disputes arising from, relating to or in connection for purposes of all legal proceedings arising from, relating to or in connection with the enforcement or implementation of this Protocol, including, without limitation, any matters relating to enforcement or otherwise of any Decision or Supplementary Decision.

16

## ARTICLE IX
## MISCELLANEOUS

*Section 9.1*        In all matters not expressly provided for in this Protocol, the Panel and the Parties shall act in the spirit of this Protocol and shall make every reasonable effort to ensure that any Allocation pursuant to this Protocol will be legally enforceable.

*Section 9.2*        All notices, requests, instructions, directions and other communications provided for herein shall be made in writing (including by facsimile) delivered to the intended recipient as follows:

**If to the US Debtors:**
c/o Nortel Networks Inc.
Attention: John Ray
Address: 2221 Lakeside Boulevard
            Richardson, Texas 75082
            U.S.A.
Facsimile No.: [ ]
Telephone No.: [+1 312 259 7627]

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley, Esq.
Address: One Liberty Plaza
            New York, New York 10006
            U.S.A.
Facsimile No.: +1 212 225 3999
Telephone No.: +1 212 225 2163

**If to the Canadian Debtors:**
c/o Nortel Networks Limited
Attention: Anna Ventresca, Esq.
            Chief Legal Officer
Address: 5945 Airport Road, Suite 360
            Mississauga, Ontario L4V 1R9
            Canada
Facsimile No.: +1 905 863 2075
Telephone No.: +1 905 863 1204

**With a copy to:**
Ogilvy Renault LLP
Attention: Derrick Tay, Esq. and Michael J.
Lang, Esq.
Address: Suite 3800
            Royal Bank Plaza, South Tower
            200 Bay Street, P.O. Box 84
            Toronto, Ontario M5J 2Z4
            Canada
Facsimile No.: +1 416 216 4832 / 216 3930
Telephone No.: +1 416 216 4832 / 216 3939

**If to the EMEA Debtors:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
            London SE1 2AF
            United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**With a copy to:**
Herbert Smith LLP
Attention: Stephen Gale, Esq. and Kevin Lloyd,
Esq.
Address: Exchange House
            Primrose Street
            London EC2A 2HS
            United Kingdom
Facsimile No.: +44 (0) 20 7098 4878
Telephone No.: +44 (0) 20 7466 2878

**If to the Monitor:**
c/o Ernst & Young, Inc.
Attention: Murray A. McDonald
Address: Ernst & Young Tower
        222 Bay Street, P.O. Box 251
        Toronto, ON M5K 1J7
        Canada
Facsimile No.: +1 416 943 3300
Telephone No.: +1 416 943 3016

**With a copy to:**
Goodmans LLP
Attention: Jay Carfagnini, Esq.
Address: 250 Yonge Street, Suite 2400
        Toronto, Ontario M5B 2M6
        Canada
Facsimile No.: +1 416 979 1234
Telephone No.: +1 416 597 4107

**If to the Creditors' Committee:**
c/o Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara, Esq.
        David H. Botter, Esq.
Address: One Bryant Park
        New York, New York 10036
        U.S.A.
Facsimile No.: +1 212 872 1002
Telephone No.: +1 212 872 8040

**If to the Bondholders' Committee:**
c/o Milbank, Tweed, Hadley & McCloy LLP
Attention: Albert A. Pisa, Esq.
Address: One Chase Manhattan Plaza
        New York, New York 10005-1413
        U.S.A.
Facsimile No.: +1 212 530 5219
Telephone No.: +1 212 530 5319

All notices, requests, instructions, directions and other communications to be sent under this Protocol to the Non-Filed Affiliates shall be made in writing (including by facsimile) and delivered to the contact addresses or facsimile numbers set forth in Schedule 4 hereto.

*Section 9.3*     This Protocol shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction, except to the extent that the United States Federal Arbitration Act applies, provided that Section 9.7 shall be governed exclusively by English law.

*Section 9.4*     To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the exclusive jurisdiction of the US Court and the Canadian Court (in a joint hearing conducted under the cross-border protocol adopted by such courts, as it may be in effect from time to time (the "Cross-Border Protocol")), for purposes of all legal proceedings arising from, relating to or in connection with the enforcement or implementation of this Protocol, including, without limitation, any matters relating to enforcement or otherwise of any Decision or Supplementary Decision, (ii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such courts or any claim that any such action brought in such courts has been brought in an inconvenient forum, (iii) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law, provided that any claim, action or proceeding set forth in Section 9.6 of this Protocol shall be brought exclusively in the English courts.

*Section 9.5*     Each Party set forth on Schedule 6[12] (each such party, "Designating Party") has appointed ● as its authorized agent (the "Process Agent"), upon whom process may be served in any legal proceeding arising from, relating to or in connection with the enforcement or implementation of this Protocol. Each Designating Party consents to process being served in any legal proceeding arising from, relating to or in connection with the enforcement or implementation of this Protocol by mailing a copy thereof by registered or certified mail to the Process Agent. Each Designating Party hereby represents and warrants that the Process Agent has accepted such appointment and has agreed to act as said agent for service of process, and each Designating Party agrees to take any and all action, including the filing of any and all documents that may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the Process Agent shall be deemed, in every respect, effective service of process upon the relevant Designating Party.

*Section 9.6*     No provision of this Protocol (other than as set forth in Sections [9.2, 9.3, 9.4, 9.6, 9.7, 9.10, 9.11, 9.15, 9.17 and 9.18] of this Protocol) shall be effective until the satisfaction of the following conditions: (A) each of the US Court, the Canadian Court and the UK Court approve the entirety of this Protocol and all of the provisions hereof (the "Conditions").

*Section 9.7*     [Nothing contained in any Transaction Document, including without limitation any intellectual property license termination agreements, shall be with prejudice to (A) any right, entitlement or claim by or on behalf of NNL or any affiliate or subsidiary which licensed any intellectual property from NNL (each a "Nortel Licensee") to assert solely as (x) between NNL and any such Nortel Licensee or (y) between two or more Nortel Licensees any ownership or proprietary interest in and to the intellectual property subject to the intellectual property licenses, whether in respect of or pursuant to that certain Master Research and Development Agreement, dated as of December 22, 2004 (as amended and supplemented from time to time, the "Master R&D Agreement"), or otherwise, for the purpose of advocating such position in connection with an allocation of the Sale Proceeds resulting from the sale, license or other disposition of the intellectual property in an In-Scope Sale, or (B) the right, entitlement or claim by or on behalf of NNL or any Nortel Licensee to dispute and defend any such assertions in connection with an allocation of Sale Proceeds from an In-Scope Sale; and][13]

*Section 9.8*     The Parties agree that the Joint Administrators have negotiated and are entering into this Protocol as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Protocol or under or in relation to any associated arrangements or negotiations. The Joint Administrators are a Party to this Protocol: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to

---

[12] Non-Filed Affiliates + EMEA Non-Filed entities. TBD – whether EMEA Debtors should be included in this list.

[13] To be discussed.

this Protocol. Notwithstanding anything to the contrary in this Protocol, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Protocol shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts.[14]

*Section 9.9*      The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Protocol or under or in relation to any associated arrangements or negotiations. The Joint Israeli Administrators are a party to this Protocol: (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (a) obtaining the benefit of any provisions of this Protocol expressed to be conferred on them and (b) enforcing the obligations of the other Parties to this Protocol. Notwithstanding anything to the contrary in this Protocol, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents, (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

*Section 9.10*      Except as specifically set forth in this Protocol, this Protocol is not intended to, and shall not, create rights in any person or entity not a Party hereto.

*Section 9.11*      Other parties may be added to this Protocol only with the prior unanimous written consent of all Parties hereto, which consent shall not be unreasonably withheld.

*Section 9.12*      This Protocol may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original, shall be binding on the Party who signed the counterpart and together shall constitute a single agreement.

*Section 9.13*      This Protocol constitutes the complete agreement among the Parties with respect to the subject matter herein, and supersedes all other agreements among some or all of the Parties with respect to the subject matter herein. This Protocol may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all the remaining Parties to this Protocol, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts.

*Section 9.14*      This Protocol does not affect the confidentiality of any information exchanged between or among any of the Parties pursuant to any prior agreements or understandings.

---

[14] UK counsel to advice whether we need language delegating authority from NNSA to the Joint Administrators.

20

*Section 9.15*        This Protocol shall inure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns from the date of its execution, but is expressly subject to and contingent upon its approval and entry by the Courts.

*Section 9.16*        Each Party to this Protocol shall (a) use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Protocol; (b) keep all other Parties reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and (c) use commercially reasonable efforts to allow any other Party, which so requests in writing, reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

*Section 9.17*        Subject to satisfaction of the Conditions, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof: (a) such Party has the power and authority to enter into this Protocol and to carry out its obligations hereunder; (b) the execution of this Protocol, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Protocol; and (c) this Protocol has been duly executed by such Party and constitutes the legal, valid and binding obligations of such Party.

*Section 9.18*        In the event that any provision of this Protocol shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision.  The Parties shall negotiate in good faith with respect to any provision to this Protocol found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.  Notwithstanding anything to the contrary in this Section, in the event that all or any part of Section(s) ● of this Protocol shall be found pursuant to a final order of a court or tribunal with competent jurisdiction to be illegal, invalid or unenforceable, or any part of Section(s) ● is any way struck down or modified without the consent of the Parties, this Protocol in its entirety shall automatically terminate and shall cease to have any force and effect.

*Section 9.19*        Except as specifically set forth in this Protocol, the obligations of each Party hereunder are several, and not joint and several.

*Section 9.20*        If any of the Parties, the Experts, the Affiliates' Representative or the Panel shall have an obligation or deadline imposed pursuant to this Protocol that shall fall on any of a Saturday, Sunday or a national public holiday in any of the United States, Canada or the United Kingdom, such Party, Expert or the Panel shall have until the next Business Day immediately following such day to comply with such deadline or obligation.

*Section 9.21*        The Parties agree that, if after the date hereof, any subsidiary of any US Debtor commences chapter 11 proceedings in the US Court, then the Parties and such entity shall

21

enter into an accession agreement whereby such entity shall accede to this Protocol as a US Debtor.

*Section 9.22* The Non-Filed Affiliates hereby appoint [●] as the Affiliates' Representative and grant the Affiliates' Representative the authority to represent each Non-Filed Affiliate in all matters relating to this Protocol, including, without limitation, the power (a) to agree to any Partial Allocation Amount on behalf of the Non-Filed Affiliates, (b) to agree to a fair and equitable allocation of the Sale Proceeds pursuant to Section 1.1 or otherwise, (c) to amend or waive any provision of this Protocol, (d) to deliver and receive any notices permitted or required under this Protocol, and (e) to perform on behalf of the Non-Filed Affiliates any other act which the Affiliates' Representative deems necessary or desirable in the performance of the Affiliates' Representative's role under this Protocol. Any action taken by the Affiliates' Representative and any agreement or settlement entered into by the Affiliates' Representative on behalf of the Non-Filed Affiliates in connection with the performance of this Protocol shall be binding upon and enforceable against the Non-Filed Affiliates without any need for further ratification by the Non-Filed Affiliates. In addition, the Non-Filed Affiliates hereby grant the Affiliates' Representative the authority to select and retain one counsel and financial advisor to assist the Affiliates' Representative in connection with any proceedings or matters under this Protocol.

IN WITNESS WHEREOF, the Parties hereto have caused this Protocol to be duly executed and delivered as of this [●]th day of [●].

NORTEL NETWORKS CORPORATION

By _____
     Name:
     Title:

NORTEL NETWORKS LIMITED

By _____
     Name:
     Title:

NORTEL NETWORKS GLOBAL CORPORATION

By _____
     Name:
     Title:

NORTEL NETWORKS INTERNATIONAL CORPORATION

By _____
     Name:
     Title:

NORTEL NETWORKS TECHNOLOGY CORPORATION

By _____
     Name:
     Title:

**Signature page to Protocol**

NORTEL NETWORKS INC.

By _____
    Name:
    Title:

ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name:
    Title:

CORETEK, INC.

By _____
    Name:
    Title:

NORTEL ALTSYSTEMS, INC.

By _____
    Name:
    Title:

NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name:
    Title:

NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name:
    Title:

**Signature page to Protocol**

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____

    Name:
    Title:

NORTEL NETWORKS CAPITAL
CORPORATION

By _____

    Name:
    Title:

NORTEL NETWORKS HPOCS INC.

By _____

    Name:
    Title:

NORTEL NETWORKS
INTERNATIONAL INC.

By _____

    Name:
    Title:

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____

    Name:
    Title:

**Signature page to Protocol**

NORTHERN TELECOM
INTERNATIONAL INC.

By _____

Name:

Title:

QTERA CORPORATION

By _____

Name:

Title:

SONOMA SYSTEMS

By _____

Name:

Title:

XROS, INC.

By _____

Name:

Title:

NORTEL NETWORKS (CALA) INC.

By _____

Name:

Title:

**Signature page to Protocol**

Signed by ALAN BLOOM on behalf of each of
the Joint Administrators of each of the EMEA
Debtors over which they have been appointed,
without personal liability as provided in Section
9.4 of this Protocol and solely for the purpose of
obtaining the benefit of the provisions of this
Protocol expressed to be conferred on or given to
each of the Joint Administrators

By _____

　　Name:
　　Title:

in the presence of:

Witness Signature

_____
　　Name:
　　Address:


**SIGNED** for and on behalf of **NORTEL**　)
**NETWORK UK LIMITED (IN**　　　　　　　)　　**ALAN BLOOM**
**ADMINISTRATION)**　　　　　　　　　　　)
by **ALAN BLOOM** as Joint Administrator　)
(acting as agent and without personal　　　)
liability) in the presence of:　　　　　　　)


Witness signature:

Name:
Address:


**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL**　　)
**NETWORKS (IRELAND) LIMITED**　　)　　**ALAN BLOOM**
**(IN ADMINISTRATION)**　　)
by **ALAN BLOOM** as Joint Administrator　)
(acting as agent and without personal　　)
liability) in the presence of:　　)

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**　　)
**NETWORKS NV (IN**　　)　　**ALAN BLOOM**
**ADMINISTRATION)**　　)
by **ALAN BLOOM** as Joint Administrator　)
(acting as agent and without personal　　)
liability) in the presence of:　　)

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**　　)
**NETWORKS SPA (IN**　　)　　**ALAN BLOOM**
**ADMINISTRATION)**　　)
by **ALAN BLOOM** as Joint Administrator　)
(acting as agent and without personal　　)
liability) in the presence of:　　)

Witness signature:

Name:
Address:

**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS BV (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal    )
liability) in the presence of:    )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS POLSKA SP Z.O.O. (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal    )
liability) in the presence of:    )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS HISPANIA SA (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal    )
liability) in the presence of:    )

Witness signature:

Name:
Address:

**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS (AUSTRIA) GMBH (IN**   )   **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS SRO (IN**   )   **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS ENGINEERING**   )
**SERVICES KFT (IN**   )   **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**Signature page to Protocol**

[New York #2068820 v15]

**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS PORTUGAL SA (IN**  )    **ALAN BLOOM**
**ADMINISTRATION)**  )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal  )
liability) in the presence of:  )

Witness signature:

Name:
Address:


**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS SLOVENSKO SRO (IN**  )    **ALAN BLOOM**
**ADMINISTRATION)**  )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal  )
liability) in the presence of:  )

Witness signature:

Name:
Address:


**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS ROMANIA SRL (IN**  )    **ALAN BLOOM**
**ADMINISTRATION)**  )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal  )
liability) in the presence of:  )

Witness signature:

Name:
Address:

**Signature page to Protocol**

[New York #2068820 v15]

**SIGNED** for and on behalf of **NORTEL** )
**GMBH (IN ADMINISTRATION)** )   **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS OY (IN** )   **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS AB (IN** )   **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**Signature page to Protocol**

[New York #2068820 v15]

**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS INTERNATIONAL**        )        **ALAN BLOOM**
**FINANCE AND HOLDING BV (IN**     )
**ADMINISTRATION)**                )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal    )
liability) in the presence of:           )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS FRANCE S.A.S. (IN**      )        )        **ALAN BLOOM**
**ADMINISTRATION)**                )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal    )
liability) in the presence of:           )

Witness signature:

Name:
Address:

**Signature page to Protocol**

[NOTE: Additional signature blocks to be added for NNSA, the Monitor, the Creditors' Committee, the Bondholders' Committee, the Non-Filed Affiliates]

**Signature page to Protocol**

## SCHEDULE 1

### Canadian Debtors

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

S-1

## SCHEDULE 2

### US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc.  (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc.  (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

Nortel Networks (Cala), Inc.

S-2

## SCHEDULE 3

### EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

Nortel Networks Israel (Sales and Marketing) Limited (In Administration)

**SCHEDULE 4**

**Names of Non-Filed Affiliates**

**and Notice Information**

[New York #2068820 v15]

**SCHEDULE 5**

**List of In-Scope Sales**

[New York #2068820 v15]

**SCHEDULE 6**

**Names of Respective Participating Parties**

**for each Party**

[New York #2068820 v15]

**SCHEDULE 7**

**List of Transaction Documents**

[New York #2068820 v15]

THIS DRAFT AGREEMENT HAS BEEN PRODUCED
FOR DISCUSSION AND SETTLEMENT PURPOSES
ONLY AND IS SUBJECT TO THE PROVISIONS OF
RULE 408 OF THE RULES OF EVIDENCE FOR
UNITED STATES COURTS AND MAGISTRATES AND
ANY OTHER SIMILAR APPLICABLE RULES IN ALL
PERTINENT JURISDICTIONS.

*Draft of ~~November 8, 2009~~February 26, 2010*
*Privileged and Confidential*

## PROTOCOL FOR RESOLVING DISPUTES
## CONCERNING ALLOCATION OF SALE PROCEEDS

This Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds,
dated ~~as of •~~, 2010 (the "Protocol"), is entered into by and among Nortel Networks Limited
("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc.
("NNI") and the other entities set forth in Schedule 2 attached hereto, {the Joint **Administrators
(as defined below), the Joint Israeli** Administrators (as defined below) and the entities set forth
in Schedule 3 attached hereto (the "EMEA Debtors")}[1], certain affiliates of the Debtors (as
defined below) set forth in Schedule 4 attached hereto (the "Non-Filed Affiliates"), the Monitor
(as defined below), the Official Committee of Unsecured Creditors appointed in the US
Proceedings (as defined below) (the "Creditors' Committee") {and the steering committee
members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure
agreements with the Canadian Debtors and the US Debtors (each, as defined below) (the
"Bondholders' Committee," and along with the Creditors' Committee, the "Committees")}[2]
(each, a "Party," and collectively, the "Parties"). {The Joint Administrators, in their personal
capacity, shall be Party to this Protocol as provided in Section 9.7 and solely for the purposes of
obtaining the benefit of the provisions of this Protocol expressed to be conferred on or given to
the Joint Administrators ~~(as defined below)~~ and references to the Parties shall be construed
accordingly.}[3] **The Joint Israeli Administrators, in their personal capacity, shall be Party to
this Protocol as provided in Section 9.8 and solely for the purposes of obtaining the benefit
of the provisions of this Protocol expressed to be conferred on or given to the Joint Israeli
Administrators and references to the Parties shall be construed accordingly.**[1]

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks
Corporation ("NNC"," and together with its **debtor and non-debtor** affiliates, the "Company"
or the "Nortel Group"), NNL and certain of NNC's other Canadian affiliates included in
Schedule 1 (collectively, the "Canadian Debtors"), commenced creditor protection proceedings
before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the
Companies' Creditors Arrangement Act (Canada) (respectively, the "Canadian Proceedings" and
the "CCAA"), in connection with which Ernst & Young Inc. was appointed monitor (the
"Monitor"); and

---

[1] ~~Whether unfiled subsidiaries of EMEA-filed entities will be parties to the Protocol as EMEA-Debtors or Non-Filed Affiliates.~~

[2] ~~TBD: Whether the Bondholders' Committee will be a party to the Protocol or third party beneficiaries. Also discuss whether the Bondholders' Committee has the ability to execute submissions to the Panel.~~

[3] ~~To be reviewed by English counsel in light of JAs' increased obligations in this draft.~~

[1] **Subject to review by NNI's UK counsel.**

~~[New York #2068820 v5]~~

WHEREAS, on the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "US Proceedings" and the "Bankruptcy Code"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), and the UK Court appointed individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, and including their respective successors, replacements and any subsequent office holders appointed to the relevant EMEA Debtors, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, **Nortel Networks Israel (Sales and Marketing) Limited (In Administration)(the "Israeli Company") filed applications with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "Joint Israeli Administrators") on January 19, 2009, as joint administrators of the Israeli Company under the Israeli Companies Law, and further on November 25, 2009, the Israeli Court sanctioned a scheme of arrangement, which automatically means that the Israeli Company is no longer under a stay of proceedings, and further on November 29, 2009, the Israeli Court ordered that the Joint Israeli Administrators remain in office until the scheme of arrangement is completed in full, including up until the time when all funds arising from the sale of the Israeli Company's assets, are received and allocated; and**

**WHEREAS, subsequent to the Filing Date,** NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, the Debtors and their respective **subsidiaries and** affiliates ~~intend,~~ ~~or~~**have sold,** have agreed~~, to sell certain assets of their estates in several transactions, each relating to~~ **to sell, or may in the future sell, license or otherwise monetize their tangible and intangible assets outside the ordinary course in several transactions (any such transaction, a "Sale"), including in connection with a sale of** a particular line of business or portfolio of

2

technologies (each, a "Business"), to a third party ~~buyer~~**buyers** (each such buyer, a "Buyer"); and

WHEREAS, the Company has provided, or intends to provide, **Buyers and** potential Buyers**, as applicable,** with access to a data room (which may be an electronic data room) containing the books and records of the relevant Business and other financial information relating to such Business (each such electronic data room, an "Asset Sale EDR"); and

WHEREAS, with respect to each Business, the Debtors and their respective affiliates **have entered, or** intend to enter, ~~or have entered,~~ into one or more acquisition ~~agreements, sale, license, transfer~~ **sale, license, transfer** and/**or** other ancillary agreements (**each** such ~~agreements~~**agreement**, with respect to the sale**, transfer and/or license** of each Business, ~~collectively the~~**an** "Acquisition Agreement") with the Buyer to govern the sale of such Business ~~(the "Sale")~~; and

WHEREAS, after entering into an Acquisition Agreement in the case where a so - called "stalking horse" bidder has been selected, or prior to entering into an Acquisition Agreement in the case where no "stalking horse" bidder has been selected, certain of the Debtors**, as applicable, have applied or** intend to apply~~, or have applied,~~ to ~~certain of~~ **the applicable** Courts for orders authorizing such Debtors to establish notice, bidding and sale procedures for the Sale of each Business (the "Bidding Procedures Orders"); and

WHEREAS, after entry of the Bidding Procedures Orders, such Debtors intend to conduct, or have conducted, an auction for the Sale of each Business in accordance with the Bidding Procedures Orders; and

WHEREAS, after conclusion of the auction, certain of the Debtors intend to apply, or have applied, to certain of the Courts for orders approving the Sale of each Business to the relevant Buyer (the "Sale Orders"); and

{WHEREAS, in connection with certain Sales, the relevant Debtors intend to request, or have requested, that the Sale Orders contain procedures for the establishment of one or more escrow accounts (the "Escrow Account") overseen by an independent agent (the "Escrow Agent") for deposit of the proceeds of the Sale (the "Sale Proceeds") pending the allocation thereof in accordance with the provisions of this Protocol (each such Sale, **as set forth in Schedule 5 attached hereto,** an "In-Scope Sale")}[2];[4] and

WHEREAS, after entry of the Sale Orders and satisfaction or waiver of the conditions to closing set forth in the relevant Acquisition Agreement, the Debtors and their respective affiliates intend to consummate, or have consummated, the Sale ~~of each Business~~ in accordance with the Sale Orders (in each case, a "Closing"); and

---

[2] **Schedule 5 will include monetization transactions related to intellectual property of the Debtors and Non-Filed Affiliates.**

[4] ~~TBD: Definition of In-Scope Sale.~~

WHEREAS, the Debtors and certain ~~Non-Filed Affiliates~~**other parties** previously agreed, pursuant to the Interim Funding and Settlement Agreement, dated as of June 9, 2009 (as amended from time to time, the "Interim Funding Agreement"), as soon as reasonably ~~practicable~~**practical** following the execution of such agreement, to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of ~~Sales~~**Sale** Proceeds, which would provide binding procedures for the allocation of ~~Sales~~**Sale** Proceeds where the Selling Debtors (as defined therein) have been unable to reach agreement regarding such allocation; and

WHEREAS, the Parties wish to ~~provide for a mechanism to negotiate the~~**agree on procedures for determining** allocation of Sale Proceeds of each In-Scope Sale between and among **each of** the ~~Canadian Debtors that are Selling Parties with respect to such In-Scope Sale, if any, (the "Canadian Filed Sellers"), the EMEA Debtors that are Selling Parties with respect to such In-Scope Sale, if any, (the "EMEA Filed Sellers"), the US Debtors that are Selling Parties with respect to such In-Scope Sale, if any, (the "US Filed Sellers") and to~~**Debtors and** the Non-Filed Affiliates ~~that are Selling Parties with respect to such In-Scope Sale, if any, (the "Non-Filed Selling Parties") and to resolve disputes with respect to the allocation of the Sale Proceeds of each In-Scope Sale, where ["Selling Parties," with respect to the US Debtors, the Canadian Debtors and the EMEA Debtors, means the Selling Debtors in connection with such In-Scope Sale (as such term is defined under the Interim Funding Agreement) and, with respect to the Non-Filed Affiliates, refers to those Nortel Group entities that are participating as sellers in the In-Scope Sale or otherwise releasing their intellectual property rights in connection with such In-Scope Sale]; and~~**(each, a "Participating Party," and collectively, the "Participating Parties"); and**

**WHEREAS, the Parties wish to give each Participating Party an opportunity to assert, pursuant to the procedures set forth in this Protocol, an entitlement to an allocation of Sale Proceeds with respect to any In-Scope Sale, regardless of whether or not such Participating Party was a party or signatory to the Acquisition Agreements applicable to such In-Scope Sale; and**

WHEREAS, each Party ~~(including the Monitor, the Creditors' Committee and [the Bondholders' Committee])~~ wishes to participate in the procedures set forth in this Protocol, and has agreed to be bound by this Protocol and any outcome with respect to the Allocation **(as defined below)** of ~~Sales~~**Sale** Proceeds of each In-Scope Sale pursuant to a Decision or a Supplementary Decision of the Panel (each, as defined below); and

[WHEREAS, the Non-Filed Affiliates have appointed _____ [3] as their representative, which shall represent the Non-Filed Affiliates in connection with the negotiations and other procedures with respect to the Allocation of Sale Proceeds of each In-Scope Sale under this Protocol ("Affiliates' Representative"), and the Non-Filed Affiliates have also appointed an

---

[3] Identity of Affiliates' Representative to be discussed

independent financial advisor and an independent counsel to assist the Affiliates' Representative.]~~⁵~~[5]

NOW THEREFORE, IT IS HEREBY CONSENTED TO, STIPULATED, AGREED AND ORDERED THAT:

**ARTICLE I**
**INITIAL NEGOTIATIONS**

*Section 1.1* ~~During the period beginning as early as the execution of each Acquisition Agreement (such date, the "Relevant Signing Date") but commencing no later than the consummation of the In-Scope Sale that is the subject of such Acquisition Agreement (such date, the "Relevant Closing Date"), the~~**The** Negotiating Parties (as defined below) shall use commercially reasonable efforts to negotiate in good faith **and as expeditiously as possible** a fair and equitable allocation of the Sale Proceeds of ~~such~~**each** In-Scope Sale among the ~~Canadian Filed Sellers, the US Filed Sellers, the EMEA Filed Sellers and the Non-Filed Selling~~**Participating** Parties, where ~~the "~~**"**Negotiating Parties" means ~~[NNL (on behalf of Canadian Filed Sellers), NNI (on behalf of US Filed Sellers), the [Joint Administrators]⁶ (on behalf of EMEA Filed Sellers), the Affiliates' Representative (on behalf of Non-Filed Selling Parties)~~**NNL, NNI**, the Monitor, the Creditors' Committee ~~and~~**,** the Bondholders' Committee.~~]⁷~~ ~~The Non-Filed Selling Parties shall be represented in such negotiations and all other procedures under this Protocol by~~**,** **the Joint Administrators and** the Affiliates' Representative.

*Section 1.2* ~~If~~**With respect to any In-Scope Sale that closed before the date of this Protocol, if** the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of ~~an In-Scope Sale prior to the [one-hundredth (100ᵗʰ)~~**such In-Scope Sale within [100]** calendar ~~day immediately following the later of (x) the Relevant Closing Date or (y) the date when all Conditions (as defined below) have been satisfied (the "First DR Referral Date"),~~**days after the date of this Protocol, then** the dispute as to the allocation of the relevant Sale Proceeds among the ~~Canadian Filed Sellers, the US Filed Sellers, the EMEA Filed Sellers and the Non-Filed Selling~~**Participating** Parties shall be automatically referred to the Panel (as defined below) pursuant to this Protocol ~~and~~**. With respect to any In-Scope Sale that closes after the date of this Protocol, if the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of such In-Scope Sale within [100] calendar days after the closing of such In-Scope Sale, then the dispute as to the allocation of the relevant Sale Proceeds among the Participating Parties shall be automatically referred to the Panel (as defined below) pursuant to this Protocol. If an allocation dispute is referred to the Panel,** the Panel shall determine a fair and equitable allocation of the Sale Proceeds of ~~such In-Scope Sale among the Canadian Filed Sellers, the US Filed Sellers, the EMEA Filed~~

---

~~⁵ Consensual settlement with Non-Filed Affiliates to be discussed.~~

~~⁶ TBD: Please confirm that the proposal to replace NNUK with Joint Administrators does not contemplate the Joint Administrators acting separately. In other words, please confirm that the UK Administrator and the NN Ireland Administrator will not have a right to act separately.~~

~~⁷ Consider whether the definition of Negotiating Parties should be dynamic and change with each sale. For instance, for the purposes of CDMA sale, should the definition of Negotiating Parties exclude the Joint Administrators?~~

~~Sellers and the Non-Filed Selling Parties on the basis of such Selling Parties' relative contribution, if any, of the assets (tangible and intangible) and rights transferred or relinquished and liabilities assumed in the particular In-Scope Sale (a "Basic Allocation Dispute").~~ [8] ~~[Each Basic Allocation Dispute shall be determined without regard to, or adjustment for, any other rights, entitlements, set-offs, or adjustments of any nature asserted by or on behalf of any Selling Party against another Selling Party, including, without limiting the generality of the foregoing, claims of beneficial ownership or equitable interests in and to the assets included in the Business that is the subject of an In-Scope Sale (collectively, "Inter-Party Claims").]~~ [9] **the relevant In-Scope Sale to be distributed to the Participating Parties.** The Parties hereby agree that the ~~deadlines imposed by~~**negotiation periods provided for in** this Section 1.2 may be ~~modified~~**extended** by mutual written agreement ~~among the~~**of all the Negotiating Parties or may be terminated before their expiration upon written notice by any Negotiating Party delivered to all other** Negotiating Parties.

     *Section 1.3*         Upon the automatic referral of ~~the Basic Allocation Dispute~~**an allocation dispute** to the Panel as contemplated by Section 1.2, NNI shall be responsible for promptly sending a notice to the Panel and the other Negotiating Parties, indicating in such notice ~~(a)~~that pursuant to the terms of Section 1.2 of this Protocol, ~~the Basic Allocation Dispute~~**an allocation dispute** has been automatically referred to the Panel~~, and (b) the First DR Referral Date~~. If for any reason NNI shall fail to send such notification to the Panel **and the other Parties** within ~~[two]~~**three** days (excluding Saturdays, Sundays and national public holidays in any of the United States, Canada or the United Kingdom) (each a "Business Day") of the automatic referral of the ~~Basic Allocation Dispute~~**allocation dispute** to the Panel, any other Negotiating Party may undertake to send such notice to the Panel and the other Negotiating Parties.

     *Section 1.4*       [The Negotiating Parties, in their sole discretion, may agree to a partial allocation of the Sale Proceeds of an In-Scope Sale (each such partial allocation, a "Partial Allocation Amount").] [10] [4] If the Negotiating Parties agree to a Partial Allocation Amount, such Partial Allocation Amount shall be released from the Escrow Account and distributed to one or more ~~Selling~~**Participating** Parties immediately following the later of (x) the ~~Closing~~**closing** of the In-Scope Sale and (y) the date when the Negotiating Parties agree to such Partial Allocation Amount~~; and any~~**. Any** remaining amounts shall remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.

---

[8] ~~Prior to signing of this Protocol (by which time the timing of the CDMA and Equinox closing should be known to the Parties), this Protocol will be revised to add language to accommodate EMEA's request that the Equinox dispute be the first Basic Allocation Dispute to be handled by the Panel so long as it does not unreasonably delay the allocation for CDMA, which is expected to close earlier than Equinox~~

[9] ~~TBD~~

[10] ~~Compare this language with Section 12.d. of the IFSA.~~ [4] **Prior to signing of this Protocol (by which time the timing of the CDMA and Equinox closing should be known to the Parties), this Protocol will be revised to add language to accommodate EMEA's request that the Equinox dispute be the first allocation dispute to be handled by the Panel so long as it does not unreasonably delay the allocation for CDMA.**

6

## ARTICLE II
## REFERRAL OF ALLOCATION DISPUTES TO THE PANEL

*Section 2.1*    As contemplated by Section 1.2 of this Protocol, ~~a Basic Allocation Dispute~~an allocation dispute shall be automatically referred to a dispute resolution panel constituted in accordance with Sections 2.2, 2.3 and 2.4 (the "Panel"). ~~[In addition, the Parties hereby agree that the Panel may decide any other dispute, controversy or claims of a Selling Party that the Panel considers must be addressed in order to finally determine the Allocation of the Sale Proceeds of a given In-Scope Sale in accordance with this Protocol (each such dispute, controversy or claim, an "Other Dispute" and together with a Basic Allocation Dispute, a "Dispute"), provided that the resolution of any Other Dispute shall be binding on the Parties solely for the purposes of the determination of the relevant Allocation.]~~[11]

*Section 2.2*    The ~~members of the Panel shall be as follows: (the "_____ Category A Member"), ● (the "Category B Member") and ● (the "Category C Member")~~Parties have **previously requested and received from the members of the Panel initial conflict disclosures in accordance with the standard for "disinterestedness" under the Bankruptcy Code as well as agreed upon procedures for identifying and preventing any potential current or future conflicts, and have determined based on such disclosures that the following individuals are acceptable and shall serve as the members of the Panel●, ● and ●.** For the purposes of administrative convenience, the Panel may ~~designate one of its members as the chairperson of the Panel with regards to a given Dispute ("Relevant Chairperson"). The Relevant Chairperson shall have no special powers or authority to act unless otherwise agreed by other members of the Panel~~appoint an administrative secretary.

*Section 2.3*    ~~[Each member of the Panel shall be and remain at all times impartial and independent of the Parties~~and Selling Parties.]~~[12] ~~No member of the Panel shall act as an advocate of any Party. No member, whether before or after appointment to the Panel, shall advise any Party on the merits or outcome of a Dispute. Each Party hereby agrees that such Party shall communicate with the Panel only as expressly permitted by this Protocol, provided that any written communication must be served on the Panel and the Negotiating Parties simultaneously.~~ **Each member of the Panel shall disclose to the Parties any new or previously undisclosed conflict, pursuant to the "disinterestedness" standard under the Bankruptcy Code, that comes to the Panel member's attention from time to time, as well as any proposed remedy with respect to such conflict. Following any such disclosure, the Negotiating Parties agree to confer regarding whether such disclosure requires disqualification of the Panel member, it being understood that a Panel member's disclosure under this Section 2.3 does not automatically render the Panel member conflicted or require the Panel member's disqualification. If the Negotiating Parties cannot reach an agreement within [x] days of the Panel member's disclosure as to whether such Panel member should be disqualified, the US Court and the Canadian Court, in a joint hearing**

---

[11] ~~Concept of Other Dispute to be reviewed after resolution of the issue relating to assertion of beneficial claims to IP being transferred by Canadian Debtors.~~

[12] ~~Parties to discuss whether each Panel member must make disclosures as required to satisfy the "disinterestedness" standard under the Bankruptcy Code. Will there be a requirement to update such disclosures on a periodic basis?~~

7

conducted under the Cross-Border Protocol (as defined below), shall decide the issue. Notwithstanding anything to the contrary in this Protocol, if a member of the Panel is disqualified pursuant to this Section 2.3, the sole method for replacement of such member shall be as set forth in Section 2.4 of this Protocol.

*Section 2.4*    If any member of the Panel is unable or unwilling to serve after receiving notice of the referral of any matter to the Panel or at any time thereafter, or is disqualified as a result of a conflict pursuant to the procedures in section 2.3, such member shall be replaced as soon as possible by another individual from the names set forth on Exhibit A attached hereto at the sole discretion of the Panel, provided that such replacement must belong to the same category as the member that is being replaced.to be selected by the Participating Party that originally proposed the inclusion of the outgoing Panel member in Section 2.2, as previously set forth in writing provided to all Negotiating Parties, but only upon the prior written consent of the other Negotiating Parties, which consent shall not be unreasonably withheld. The Panel may not consider or continue to consider issues or render any Decision, Supplementary Decision or other decision during the period when a Panel member is being replaced.

*Section 2.5*    In connection with a particular In-Scope Sale, all costs and expenses of the Mediator (if any) shall be paid from the relevant Escrow Account before transfer of Sale Proceeds in accordance with the terms of this Protocol and the relevant escrow agreement. Each of the Negotiating Parties (other than the Non-Filed Affiliates, as represented by the Affiliates' Representative) shall bear its respective costs and expenses, including attorneys' fees, associated with the preparation and presentation of its case to the Panel and any other costs and expenses incurred by such Negotiating Party in connection with the proceedings pursuant to this Protocol, provided that nothing herein shall in any way affect any arrangements or agreements to cover [certain] fees and expenses of the Committees, including, without limitation, pursuant to any order by the US Court approving the fee applications of the Committees, as applicable. The Panel shall specify in each Decision the total amount of the costs and other expenses of the Panel in connection with such Decision (the "Panel Costs"), and the proportions in which the US Filed Sellers, the Canadian Filed Sellers, the EMEA Filed Sellers and the Non-Filed SellingParticipating Parties shall bear such Panel Costs. The costs and expenses of the Affiliates' Representative and the pro-rata portion of the Panel Costs to be paid by the Non-Filed Selling PartiesAffiliates shall be paid from the Sale Proceeds of the particular In-Scope Sale allocated to the Non-Filed Selling PartiesAffiliates. The incremental costs and other expenses of the Panel in connection with a Supplementary Decision (as defined below) shall be paid from the Sale Proceeds of the particular In-Scope Sale allocated to the Selling Parties covered byParticipating Party or Participating Parties requesting such Supplementary Decision.

*Section 2.6*    In rendering any Decision and the Allocation in such Decision, the Panel shall (i) treat as final and binding any Partial Allocation Amount, and (ii) not be bound to adopt or follow [(x) any allocation agreed with the Buyer in or pursuant to the relevant Acquisition Agreement,][13] or (y) any previous Decision or Allocation of the Panel relating to

---

[13] Tax counsel to provide rider to carve-out an exception to this rule b/c Nortel has agreed to allocate at least the book value to each tangible asset and the Panel has to respect this allocation principle.

8

~~another In-Scope Sale. In addition, after the Panel has entered a Decision or a Supplementary Decision, the Panel shall be barred from modifying such Decision or Supplementary Decision, as the case may be, other than to correct a clerical, computational or typographical error contained in the Decision or Supplementary Decision. If the Panel makes such a correction on its own initiative, it shall do so within 30 days of the date of the Decision or Supplementary Decision, as the case may be. Any application by a Party for such a correction must be made within 30 days of the date of the Decision or Supplementary Decision, as the case may be.~~

**_Section 2.6_**        ~~Section 2.7~~ To the maximum extent permitted by applicable law, none of the members of ~~the Panel or any expert appointed by~~ the Panel shall be liable to any Party or any third party howsoever for any act or omission in connection with any proceedings under this Protocol.

**_Section 2.7_**        ~~Section 2.8~~ The place of arbitration shall be New York, New York. Other than as expressly specified otherwise in this Protocol, **or as agreed by the Parties,** all proceedings pursuant to this Protocol, including, but not limited to, Administrative Meetings, ~~an~~ Evidentiary ~~Hearing~~**Hearings** and ~~the~~ Oral ~~Argument~~**Arguments (as defined herein)**, shall be held in New York, New York and shall be conducted in the English language.

**_Section 2.8_        No members of the Panel, whether before or after appointment to the Panel, shall advise any Party on the merits or outcome of a dispute. There shall be no communications between any member of the Panel and a Party unless all other Parties are given the opportunity to be present during such communication. For the avoidance of doubt, written communication (whether transmitted by email, facsimile or post) between any member of the Panel and a Party must also be transmitted contemporaneously to all other Parties.**

### ARTICLE III
### ADMINISTRATIVE MEETINGS

_Section 3.1_        Within● (●) calendar days of ~~a Basic Allocation Dispute~~**an allocation dispute** being referred to the Panel, the Negotiating Parties and the Panel shall hold a meeting to discuss any administrative, procedural or other relevant matters (the "Administrative Meeting"), which shall be convened by the Panel. Each of the Negotiating Parties must be given (i) at least seven (7) calendar days' notice prior to the Administrative Meeting and (ii) the opportunity to ~~present at~~**attend and participate in** the Administrative Meeting. The Administrative Meeting shall be held at a time and in a location, as determined by the Panel, such that each Negotiating Party and/or its counsel shall be able to participate by telephone, videoconference or in person. At the Administrative Meeting and at any other proceeding before the Panel, each of the Negotiating Parties shall be entitled to be represented by counsel.

_Section 3.2_        Except as specifically provided in this Protocol, the Panel shall, after taking into account**, among other things,** the facts and circumstances of the relevant In-Scope Sale, the multiple jurisdictions involved in such In-Scope Sale or the applicable ~~Dispute, the different types of Nortel Group entities under the Nortel Group's transfer pricing regime which was in effect prior to the Filing Date~~**dispute** and such other factors as the Panel considers relevant, establish the procedure and manner in which the resolution of the ~~Basic Allocation~~

9

~~Dispute or Other Dispute, as the case may be,~~**allocation dispute** shall be conducted, including, without limitation, (i) the due dates for Written Submissions, (ii) the timing of the identification of Experts (as defined below), the submission of Expert Reports (as defined below), the identification of witnesses and the submission of Witness Statements (as defined below), (iii) the time, place, length and number of oral arguments for each Negotiating Party (the number of oral arguments for a given Negotiating Party multiplied by the length of each such oral argument, the "Oral Argument Duration")~~and (iv,~~ **(iv) whether to order the Negotiating Parties to prepare a joint statement of facts, and (v)** other administrative, procedural, or other relevant matters such as the scheduling of the Evidentiary Hearings (as defined below) and subsequent Administrative Meetings (if necessary), ~~[~~**provided** that the right of the Non-Filed ~~Selling Parties~~**Affiliates** to participate and present their Interests (as defined below and as determined by the Panel) to the Panel shall reflect, to the extent reasonably practicable and determinable under the circumstances, the Panel's assessment of the relative contribution of the assets (tangible and intangible) and the rights transferred or relinquished by and liabilities assumed from the Non-Filed ~~Selling Parties~~**Affiliates** in comparison to other ~~Selling~~**Participating** Parties with regards to a given Sale.~~]¹⁴~~ **Notwithstanding anything else in this Protocol, the Panel shall have the right in its discretion, and after providing an opportunity for all Negotiating Parties to be heard on the issue, to modify the procedures decided at any Administrative Hearing or otherwise either upon request of any Negotiating Party or on the Panel's own initiative.**

*Section 3.3*      If any Negotiating Party determines that there is an actual or potential conflict with respect to the ~~Dispute~~**dispute** among any of the Respective ~~Selling~~**Participating** Parties (as such term is defined in ~~Exhibit B~~**Schedule 6** attached hereto) of such Negotiating Party or that such Negotiating Party represents a diversity of interests with regard to such Negotiating Party's Respective ~~Selling~~**Participating** Parties (each such interest, an "Interest"), such Negotiating Party may petition in writing the Panel to further modify the procedures, including, without limitation, by increasing the Oral Argument Duration allocated to such Negotiating Party, or providing separate representation, to address such potential conflict of interest or diversity of interests, provided that ~~any other Negotiating Party shall be free to make submissions as to the extent and scope of any additional representation rights; and provided, further that~~ in the case of **the** Joint Administrators or the Monitor, their respective petitions to the Panel to represent up to three separate Interests shall not be opposed by any other **Negotiating Party, and provided, further that any other Negotiating Party shall be free to make submissions as to the extent and scope of any additional representation rights.⁵ Nothing herein shall prevent any Negotiating Party from opposing any arguments raised by the various Interests, or Presented Positions (as defined below) with respect to such Interests, represented by any** Negotiating Party.

*Section 3.4*      Nothing in the preceding section shall affect the right of the Panel to call other **administrative** meetings to discuss administrative, procedural or other relevant matters after the initial Administrative Meeting. Each such meeting shall constitute a separate Administrative Meeting for the purposes of this Protocol and must comply with the requirements set forth in Section 3.1 of this Protocol.

---

¹⁴ ~~Due Process concerns to be discussed.~~

⁵ **TBD: Retention of multiple professionals by Parties that represent more than one Interest**

10

### ARTICLE IV
### WRITTEN SUBMISSION BY THE NEGOTIATING PARTIES

*Section 4.1*        Each ~~of the following [P]arties~~**Negotiating Party** may submit a written statement to the Panel, including, without limitation, ~~Party Appointed~~ Expert Reports (as defined below) and written Witness Statements (as defined below), of such ~~[P]arty~~**Negotiating Party**'s one or more Interests (as permitted by the Panel pursuant to Section 3.3) with regards to the Allocation of the relevant Sale Proceeds to the Panel (such submission, the "First Round Submission"): ~~NNL (on behalf of Canadian Filed Sellers), NNI (on behalf of US Filed Sellers), the Joint Administrators (on behalf of EMEA Filed Sellers), the Affiliates' Representative (on behalf of Non-Filed Selling Parties), the Monitor, the Creditors' Committee and the Bondholders' Committee.~~

*Section 4.2*        Each ~~of the [~~Negotiating ~~Parties]~~[1,5]**Party shall present** in its First Round Submission ~~shall present~~ its methodology for the allocation of the relevant Sale Proceeds (the "Presented Position"). In the case of a Negotiating Party that represents more than one Interest (as determined by the Panel), such Negotiating Party may offer more than one Presented Position to the Panel. The Presented Positions may also address any allocation or allocation methodology adopted or employed by any Buyer.

*Section 4.3*        A Negotiating Party may rely, in its sole discretion, on one or more experts as a means of evidence on specific issues (each such expert, ~~a~~**an** "~~Party Appointed~~ Expert"). A report by ~~any Party Appointed~~**an** Expert (each such report, ~~a~~**an** "~~Party Appointed~~ Expert Report") shall ~~include:~~**provide the following information:** (i) a description of the qualifications of such ~~expert~~**Expert**, (ii) a description of the scope of work or mandate of such ~~expert~~**Expert** together with a copy of the engagement letter of such ~~expert~~**Expert**, (iii) a description of the compensation paid or to be paid to such ~~expert~~**Expert**, (iv) a description of any relationship on the part of such ~~expert~~**Expert** within the two years immediately preceding the date that such ~~expert~~**Expert** was first contacted with respect to the engagement that could reasonably be considered relevant to an assessment of the ~~expert~~**Expert**'s independence or objectivity, (v) a description of the scope of review conducted by such ~~expert~~**Expert** (including a list of the materials and other information ~~reviewed and~~ relied upon by such expert **in preparing such report**, the identity of all current or former employees, officers or directors of Nortel Group entities who such expert interviewed **and relied upon** in connection with the preparation of such report, and any limitation on the scope of such review ~~and the implications of such limitation on the expert's opinions or conclusions~~), (vi) a statement of the facts on which such ~~expert~~**Expert** is basing its opinions and conclusions, (vii) the allocation approach and methodologies selected by such ~~expert~~**Expert** and the reasons for selecting the particular allocation approach and methodology or methodologies, (viii) the key assumptions made by such ~~expert~~**Expert**, (ix) such ~~expert~~**Expert**'s findings, opinions and conclusions, and (x) any qualifications or limitations to which such ~~expert~~**Expert**'s findings, opinions or conclusions are subject. **Notwithstanding anything to the contrary in this Protocol, a Negotiating Party need not disclose, and shall not be required to disclose, any information (other than the**

---

[1,5] ~~If the definition of Negotiating Party is dynamic, then consider adding a different term to ensure that each Selling Party has the right to at least make an initial written submission.~~

**information set forth in the preceding sentence) concerning its Experts, including but not limited to (1) drafts of an Expert Report and (2) communications between a Negotiating Party (including its counsel) and an Expert (or documents reflecting such communications).**

*Section 4.4*        A Negotiating Party may rely on a written statement by any person, including, without limitation, any Party's officer, employee or other representative (the Parties hereby acknowledge that certain individuals occupy multiple positions in the Company). Such witness statement must contain a full and detailed description of the facts, and the source of the witness's information as to those facts, sufficient to serve as that witness's evidence in the matter in dispute (each such statement, a "Witness Statement").

**Section 4.5        No Witness Statement or Expert Report shall be admissible unless such witness or expert makes himself or herself available for an Examination (as defined below) and at the Evidentiary Hearing (as defined below), or unless the Negotiating Party or Negotiating Parties who requested such witness's or expert's Examination or presence at the Evidentiary Hearing otherwise consents.**

**Section 4.6**        *Section 4.5* Each of the Negotiating Parties**Party** shall provide a First Round Submission to the Panel, with a copy to all other Negotiating Parties, no later than the deadline established by the Panel for such submission (the "First Round Submission Deadline"). The First Round Submission of each Negotiating Party shall not be subject to any page limits.

*Section 4.6***4.7** Each Negotiating Party, in its sole discretion, may opt to submit a second written submission to the Panel, with a copy to all other Negotiating Parties, no later than the deadline established by the Panel for such submission, which shall be at **c**alendar days after the First Round Submission Deadline (respectively, the "Second Round Submission" and the "Second Round Submission Deadline"). The Second Round Submission of each Negotiating Party shall not be subject to any page limits, provided that the sole purpose of a Second Round Submission shall be **limited** to (a) respond**responding** to the First Round Submissions of other Negotiating Parties with regards to each Interest of the relevant Negotiating Party and (b) present**presenting** additional information or arguments in support of such Negotiating Party's Presented Position(s) based on Examination Testimony (as defined below) **or new document discovery.**[16] For the purposes of this Protocol, the First Round Submission and**,** the Second Round Submission**, the Post-Hearing Submission (as defined below)** and any other written submissions by any Negotiating Party to the Panel shall be collectively referred to as the "Written Submissions."

*Section 4.7***4.8**        Each Negotiating Party, in its sole discretion, may opt to submit one or more reports prepared by their Party-Appointed Expert to respond to Party-Appointed Expert Reports submitted by the other Negotiating Parties (each such report, a "Rebuttal Expert

---

[16] Consider whether other Negotiating Parties should be granted an opportunity to respond to these new arguments / information?

12

Report").[17]  Such Rebuttal Expert Reports, to the extent such information is different from the Negotiating Party's Expert Reports or relevant to the Rebuttal Expert Report, shall include the information required in Section 4.3 herein for the submission of Expert Reports.

### ARTICLE V
### ACCESS TO INFORMATION

Section 5.1    ~~Commencing as early as the start of the negotiations~~Each Party shall have prompt and equal access to the Asset Sale EDR for any ~~Sale~~sale that ~~parties~~the Negotiating Parties reasonably anticipate to fall within the scope of ~~this Protocol but in any event no later than the date of entry into the Acquisition Agreement, each Party shall have equal access to the relevant Asset Sale EDR. Upon the later of (x) entry into the Acquisition Agreement or (y) ● days from the satisfaction of all Conditions (as defined below), the Company shall establish~~the Company has established an electronic data room (the "Data Room") that shall contain ~~the following information: (a) all documents available in the relevant Asset Sale EDR and (b) additional documents as~~any documents reasonably requested by any Negotiating Party pursuant to a Data Request (as defined below) issued in accordance with Section 5.2 of this Protocol ~~(such electronic data room, a "Data Room"). Upon establishment of a Data Room, each Party shall have equal access to the Data Room.~~ It has been the intention of the Parties to use reasonable best efforts to provide prompt and equal access to the Data Room to all Parties, and the Parties agree to continue using their reasonable best efforts to provide such prompt and equal access to the Data Room to all Parties. For the avoidance of doubt, all information requested by or supplied to any Party shall be made available to all Parties.

Section 5.2    Any Negotiating Party may~~, following the execution of the Acquisition Agreement,~~ send a written request to any Nortel Group entity, with a copy to all Negotiating Parties, for access to ~~[pre-existing]~~documents concerning such Nortel Group entity in the possession of such Nortel Group entity ~~not contained in the relevant Asset Sale EDR~~that may be reasonably relevant to resolution of any ~~Dispute or Supplementary Dispute, as the case may be,~~dispute in respect of an In-Scope Sale (a "Data Request"). The relevant Nortel Group entity shall ~~undertake commercially~~use reasonable best efforts to make such documents available in the Data Room as soon as reasonably practicable.

Section 5.3    ~~Each~~Commencing as early as the start of the negotiations for any Sale that parties reasonably anticipate to fall within the scope of this Protocol, the Negotiating Parties shall use their reasonable best efforts to permit each Negotiating Party ~~shall be permitted~~ the same ~~reasonable~~prompt and equal access to employees of NNC, NNL, and their debtor and non-debtor affiliates, including the Debtors and the Non-Filed Affiliates (each an "Employee"), for purposes of obtaining information relevant to a ~~Dispute~~dispute and having the Employee provide a Witness Statement. To enable an Employee to prepare for an interview, the Negotiating Party requesting such an interview shall deliver to the Employee, reasonably in advance of such an interview, a list of topics or subject matters which the requesting Negotiating

---

[17] ~~Parties to confirm that the intention is to introduce any new experts to provide rebuttals.~~

Party intends to cover with the Employee together with a list of information, if any, that the requesting Negotiating Party requests the Employee provide in writing. Any written information provided by such Employee in response to a request from a Negotiating Party shall be made available in the **relevant** Data Room as soon as reasonably practicable after it has been so provided. Interviews conducted pursuant to this Section 5.3 with Employees shall be expressly identified as being for such purpose and shall be separate from any discussions for the purpose of or in furtherance of a negotiated settlement of a ~~Dispute~~**dispute**.

*Section 5.4*   It is the intention of the Parties that each Employee will use its reasonable best efforts to assist any Negotiating Party that seeks assistance of such Employee. The Parties, however, acknowledge and recognize that (i) Employees have a corporate job function to perform with priorities that must be accommodated and (ii) each Employee's available time must be equitably shared with all Negotiating Parties ~~to the Dispute or Supplementary Dispute~~. Each Negotiating Party shall use its reasonable best efforts to ensure that Employees within its control provide the assistance requested of them by any Negotiating Party consistent with the considerations mentioned herein.

*Section 5.5*   ~~[Prior to the First DR Referral Date for any Dispute, any Negotiating Party may serve upon any other Negotiating Party a list of written questions which the requesting Negotiating Party determines to be relevant to such Dispute (each a "Questionnaire"). A Negotiating Party receiving a Questionnaire shall respond to such Questionnaire within [15] calendar days, which response shall be made available simultaneously to all Negotiating Parties.]~~[8] **[Each Negotiating Party shall be permitted reasonable access to third parties that have rendered advice to another Negotiating Party relevant to a dispute (each a "Third Party"). Any Nortel Debtor to whom such advice was rendered shall use its reasonable best efforts to ensure that such Third Parties are made available to the Negotiating Parties. Notwithstanding the foregoing or anything to the contrary contained in Section 5.10 below, a Negotiating Party shall not be permitted access to Third Party advice rendered before the Filing Date that is protected from disclosure by the attorney-client privilege, the solicitor-client privilege, the attorney work product doctrine or any other similar privilege.]**[6]

*Section 5.6*   ~~A Witness Statement shall be filed for each individual~~**Each witness** that a Negotiating Party ~~will~~**intends to** call as a witness at an Evidentiary Hearing ~~and, if another~~**or from whom a** Negotiating Party ~~requests, such individual shall~~**intends to submit a Witness Statement must** be made available for a pre-hearing examination under oath **(an "Examination")** to take place following the First Round Submissions but no later than [●] days before the commencement of the Evidentiary Hearing.~~[19]~~**[9]**, **provided, further that the Witness Statement of any individual that does not submit to an Examination, if requested, shall only be considered by the panel upon the prior written consent of the Negotiating Party or Negotiating Parties that requested the Examination.**[7]  A Negotiating Party may also ~~conduct additional examinations under oath~~**request an Examination** of any other Employee of another

---

~~[8]~~ **Parties to discuss further. This seems very broad.**

[6] **To be discussed.**

~~[19]~~[7] Parties to consider whether this should be tied to the Second Round Submission Deadline.

Party ~~on either the consent of the [Negotiating Parties] or, failing such consent, if the Panel concludes that it would be unfair to require the Negotiating Party requesting the examination to proceed to the Evidentiary Hearing without having conducted such examination.~~or Third Party.[8] Each examination will be held at the location of the relevant witness unless otherwise agreed to by the Negotiating Parties. Each Negotiating Party may attend an ~~examination~~Examination and may ask questions at such ~~examination~~Examination regardless of whether such Negotiating Party requested the ~~examination of the witness~~Examination of the witness. The Negotiating Parties shall agree in advance of an Examination on the length and scope of such Examination, or failing such agreement within● days in advance, the Panel shall determine the length and scope of such Examination. Except for witnesses that a Negotiating Party intends to call as a witness at an Evidentiary Hearing or from whom a Negotiating Party intends to submit a Witness Statement, and unless the Party or Third Party whose Employee is requested to submit to an Examination consents to such Examination, the Panel, after submissions by the relevant Negotiating Parties and a hearing, may prevent an Examination solely on the grounds that such Examination would be unduly burdensome or would not likely lead to the discovery of relevant evidence.

Section 5.7    Each Negotiating Party shall use its reasonable best efforts to make available any Employee within its control for ~~examinations~~Examinations pursuant to Section ~~5.6~~5.7 or for the Evidentiary Hearing if they may be properly called pursuant to Section ~~6.●~~6.2 of this Protocol as a non-expert witness for such Evidentiary Hearing.

Section 5.8    Each Expert that a Negotiating Party intends to present at an Evidentiary Hearing, if requested by another Negotiating Party, must be made available for an ~~examination under oath~~Examination no later than● days before the commencement of the Evidentiary Hearing~~. Such examination~~, provided, further that the Expert Report or Rebuttal Expert Report of any Expert that does not submit to an Examination, if requested, shall only be considered by the panel upon the prior written consent of the Negotiating Party or Negotiating Parties that requested the Examination. Such Examination will be conducted in the manner described in Section ~~5.6 herein.~~5.7.

Section 5.9    Testimony from an Examination ("Examination Testimony") shall be admissible at an Evidentiary Hearing if (i) the witness giving such Examination Testimony is unavailable to testify at the Evidentiary Hearing, or (ii) agreed upon by all of the Negotiating Parties. Where a witness will testify at an Evidentiary Hearing, such witness's Examination Testimony, and, in the case of an Expert, the Expert Report or the Rebuttal Expert Report of such Expert, shall not be admissible except for the purpose of impeaching such witness's live testimony at the Evidentiary Hearing. Nothing herein shall prevent a Negotiating Party from quoting or referring to Examination Testimony in their Written Submissions.

Section 5.10    With respect to information created before the Filing Date that may be requested pursuant to this Article 5, the Parties agree not to withhold such information on the basis that such information is protected from disclosure by the attorney-client privilege, the solicitor-client privilege, the attorney work product doctrine or under any other similar

---

[8] TBD: Procedure for compelling third parties to appear for Examination.

privilege, provided that by so agreeing, the Parties do not intend to waive any such applicable privilege or protection from disclosure with respect to any non-parties to this Protocol, and provided further that no Party shall be compelled to disclose any information potentially subject to any applicable privilege or protection from disclosure until the Parties have entered into a common interest agreement in substantially the form set forth in Schedule 8.

**Section 5.11** ~~Section 5.10~~ All disagreements or controversies arising from or related to access to information and pre-hearing ~~examinations under oath~~Examinations provided for under this Protocol including, but not limited to, any disagreements related to the Data Room, the scope and reasonableness of questions on ~~examinations~~Examinations, Witness Statements and Experts Reports (each, a "Discovery Matter") shall be referred to the Panel for resolution, which resolution shall be determined by a majority of the Panel and shall be final and binding upon the Parties. The procedure for resolution of a Discovery Matter shall be left to the discretion of the Panel.

## ARTICLE VI
## EVIDENTIARY HEARING; ORAL ARGUMENT

*Section 6.1*    ~~If any Negotiating Party so requests within 10 Business Days of the expiration of the deadline to make Second Round~~Following submission of all Written Submissions, the Panel shall schedule ~~a hearing~~one or more days of hearings, which may or may not be consecutive, at which the Panel shall receive oral evidence from the Negotiating Parties (~~such hearing, whether or not held on consecutive days,~~an "Evidentiary Hearing").

*Section 6.2*    Each Negotiating Party may present oral testimony from (a) an ~~expert appointed by such Negotiating Party~~Expert who has submitted an Expert Report or (b) a non-expert witness who has submitted a Witness Statement ~~and~~, so long as the Negotiating Party has given prior written notice to all other Negotiating Parties, in a timely manner and in accordance with any deadline established by the Panel for such notification, that such witness shall be called to provide evidence during an Evidentiary Hearing. Following direct testimony by a witness, any other Negotiating Party may question the witness in an order to be determined by the Panel. The Negotiating Party that initially presented the witness shall subsequently have the opportunity to ask additional questions raised in the other Negotiating Parties' questioning.

*Section 6.3*    Evidence from proceedings held in connection with the resolution of another ~~Dispute~~dispute under this Protocol, including, without limitation, evidence from a prior Evidentiary Hearing, Administrative Meeting, Written Submission, Witness Statement, ~~and~~or Expert Report (as defined below) for a given In-Scope Sale ("Prior Evidence") shall be admissible in the proceedings for subsequent In-Scope Sales, unless, on motion by any Negotiating Party, the Panel decides that the Prior Evidence shall not be admitted or otherwise limits the admissibility of the Prior Evidence, provided that each Negotiating Party shall have the

16

right to further re-direct and cross-examine such Prior Evidence, to the extent it consists of a witness's testimony.[2]

Section 6.4     ~~The Panel shall hold one or more proceedings where~~At the Evidentiary Hearing, each of the Negotiating Parties ~~may~~shall be entitled to present orally ~~present~~ arguments in favor of their Presented Positions (the "Oral Argument"), and to examine witnesses, including Experts, from whom Witness Statements and Expert Reports, as applicable, have been submitted by another Negotiating Party.

Section 6.5     ~~Oral Argument~~Evidentiary Hearings shall be held at a time and place specified by the Panel, but in no event before(●) calendar days or after ● (●) calendar days of the Second Round Submission Deadline. ~~Oral Argument shall be held in person or by videoconference, as decided by the Panel.~~ For the avoidance of doubt, Evidentiary Hearings and Oral ~~Arguments may take place in the same session, as determined by the Panel.~~Argument shall be held in person.

Section 6.6     At the close of the final Evidentiary Hearing or final Oral Argument, whichever is later, the Panel shall determine whether to require post-hearing submissions, and if so, the scope, length and due dates for such submissions (each such submission, a "Post-Hearing Submission").

## ARTICLE VII
## THE DECISION OF THE PANEL

Section 7.1     The Panel shall render a written decision (the "Decision") as soon as reasonably practicable after the completion of the ~~last~~final Evidentiary Hearing or final Oral Argument in the particular ~~Dispute~~dispute. Each Decision, Supplementary Decision and any other decision of the Panel shall be made by at least a majority of the members of the Panel.

Section 7.2     The Decision shall contain: (a) the percentage, if any, (rounded to four decimal points) of the Sale Proceeds of a given In-Scope Sale to be allocated to the Canadian Filed ~~Sellers~~Debtors, the US Filed ~~Sellers~~Debtors, the EMEA Filed ~~Sellers~~Debtors and the Non-Filed ~~Selling Parties~~Affiliates (an "Allocation"); and (b) if the Panel deems appropriate, instructions to the Escrow Agent to distribute the relevant Sale Proceeds to NNL (on behalf of the Canadian Filed ~~Sellers~~Debtors), NNI (on behalf of the US Filed ~~Sellers~~Debtors), the Joint Administrators (on behalf of the EMEA Filed ~~Sellers~~Debtors) and to the Non-Filed ~~Selling Parties~~Affiliates in accordance with the applicable Allocation.[20]; and (c) [if necessary, a ruling on the allocation of any amounts to be returned to the Participating Parties from any reserves or escrow accounts established as part of the applicable In-Scope Sale.][10] ~~Upon~~Following the issuance of a Decision, and upon the written request of NNL, ~~NNUK, NNI~~

[9] TBD - Whether Prior Evidence should be subject to limitations set forth herein regarding the binding nature of previous agreements and/or Decisions.

[20] ~~How will the aggregate distributions to each estate be held? This question is even more complicated for the case of Non-Filed Selling Parties. After this has been resolved, we need to re-visit Section 7.9 as this provision (as drafted) does not cover Supplementary.~~[10] TBD – Whether to include a schedule of the reserve or escrow accounts from the sales to be dealt with in a Decision.

17

orNNI (with the consent of the Creditors' Committee), the Joint Administrators (on behalf of the EMEA Debtors) or the Affiliates' Representative, as the case may be, the Panel shallthe Panel, [only after submissions by all reasonably affected Parties and a hearing, may] issue a supplementary decision upon the issuance of the Decision containing the percentage, if any, (rounded to four decimal points) of the applicable Allocation of the Sale Proceeds of such In-Scope Sale to be allocated within each of the Canadian Filed Sellers, the US Filed Sellers, the EMEA Filed Sellers or the Non-Filed Selling Parties, respectivelyamongst the group of debtors or affiliates represented by the Party requesting the supplementary decision (each such supplementary decision, a "Supplementary Decision").  Any incremental costs incurred in connection with the prosecution and rendering of a Supplementary Decision shall be borne solely by the Party or Parties requesting such Supplementary Decision, including any Panel Costs incurred in accordance with Section 2.5 herein.  No Party will deliver a duly authenticated copy of any Decision or Supplementary Decision of the Panel to any Escrow Agent directing a release of any  Sale Proceeds from any Escrow Account unless such Decision or Supplementary Decision contains an express direction to the Escrow Agent for the release of such Sale Proceeds to some or all of the Participating Parties.

Section 7.3    Each Decision, Supplementary Decision and any other decision of the Panel shall be made in writing, and shall becontain a statement signed and authenticated by oneeach member of the Panel for and on behalfcertifying that such writing constitutes the decision of the Panel. [Any Decision or Supplementary Decision, in the sole discretion of the Panel, may statecontain a short statement the reasons upon which such Decision or Supplementary Decision, as the case may be, is based, provided that such Decision or Supplementary Decision, as the case may be, shall not include any dissenting reasons.]²⁺

Section 7.4    In rendering a Decision, or Supplementary Decision, and an Allocation contained in such Decision, or Supplementary Decision, or Supplementary Decision and an Allocation set forth in such Decision or Supplementary Decision, the Panel shall (i) treat as final and binding any Partial Allocation Amount, and (ii) not be bound to adopt, follow or place any weight in rendering a Decision on (x) any allocation contained in the relevant Transaction Documents, other than as set forth in Schedule 7 attached hereto (such schedule to be supplemented from time to time with the consent of the Negotiating Parties), where "Transaction Documents" means, with respect to an In-Scope Sale, any agreement (a) among the one or more Parties, or (b) one or more Parties and the Purchaser, relating to or in connection with such In-Scope Sale, or (y) any previous Decision or Allocation of Sale Proceeds of the Panel relating to another In-Scope Sale.  Additionally, in rendering such a Decision, Supplementary Decision or an Allocation contained in such Decision or Supplementary Decision the Panel shall not be bound (a) to select one of the Presented Positions or (b; (b) to adopt, follow or place any weight on anything contained in the Acquisition Agreements or any side or related agreement, [including any allocation agreed with the Buyer in or pursuant to the relevant Acquisition Agreement or any side or related agreement];¹¹ (c) by any previous Decision or Allocation of Sale Proceeds by the Panel

---

²⁺ Parties to discuss further.

¹¹ Tax counsel to provide rider to carve-out an exception to this rule b/c Nortel has agreed to allocate at least the book value to each tangible asset and the Panel has to respect this allocation principle.

relating to another In-Scope Sale; or (d) by the rules, provisions or administrative practices of any particular national, provincial, state or other law or legal system or government agency or the principles or standards of any particular organization or association (each such rule, provision, administrative practice, principles or standards, an "Allocation Rule"), provided that the Panel may, in its sole discretion, base a Decision, an Allocation or a Supplementary Decision or any element thereof upon one or more Allocation Rules.

  **_Section 7.5_**  [Rider excluding tax returns in connection with M&A transactions to follow].

  **_Section 7.6_**  ~~Section 7.5~~ If the Negotiating Parties agree at any point in time prior to the relevant Decision as to a Partial Allocation Amount in respect of the Sale Proceeds of a particular In-Scope Sale, then the Panel shall render a Decision only with respect to the allocation of the remaining portion of such Sale Proceeds. [If the relevant ~~Selling~~ Parties agree at any point in time prior to the relevant Supplementary Decision as to the Allocation of any portion of the relevant Sale Proceeds allocated to ~~such Selling Party pursuant to the applicable Decision, then the Panel shall render a Supplementary Decision only with respect to the allocation of the remaining portion of the Sale Proceeds allocated to such Selling Parties pursuant to the applicable Decision.~~]the applicable Participating Parties pursuant to the applicable Decision, then the Panel shall render a Supplementary Decision only with respect to the allocation of the remaining portion of the Sale Proceeds allocated to such Participating Parties pursuant to the applicable Decision.

  ~~Section 7.6~~  ~~The Panel and the Negotiating Parties shall seek to minimize the use of any expert appointed by the Panel, proivded that in exceptional circumstances, the Panel may, upon consultation with the Negotiating Parties, appoint one or more experts to report to the Panel on specific issues designated by the Panel (each such expert, a "Panel-Appointed Expert" and together with Party-Appointed Expert, an "Expert"). The Panel shall establish, upon consultation with the Negotiating Parties, the terms of reference for any Panel-Appointed Expert. Each Panel-Appointed Expert shall report in writing to the Panel, and such report must contain the information detailed in Section 4.3 ("Panel-Appointed Expert Report", and together with Party-Appointed Expert Report and Rebuttal Expert Report, an "Expert Report"). A copy of the final terms of reference and the written report of a Panel-Appointed Expert shall be sent by the Panel to each of the Negotiating Parties.~~

  **_Section 7.7_**  The Panel shall not use, consult with or appoint any expert to report to the Panel on any issue.

  **_Section 7.8_**  After the Panel has entered a Decision or Supplementary Decision, the Panel shall be barred from modifying such Decision or Supplementary Decision, as the case may be, other than to correct a clerical, computational or typographical error contained in the Decision or Supplementary Decision. If the Panel makes such a correction on its own initiative, it shall do so within 30 days of the date of the Decision or Supplementary Decision, as the case may be. Any application by a Party for such a correction must be made within 30 days of the date of the Decision or Supplementary Decision, as the case may be.

19

**Section 7.9**    ~~Section 7.7~~ Any Decision and Supplementary Decision of the Panel shall be conclusive, final and binding ~~upon each Party~~ in connection with the applicable In-Scope Sale and, to the fullest extent permitted by applicable law, may not be challenged, appealed or sought to be vacated **or set aside** by any ~~such~~ Party **in any jurisdiction**.

**Section 7.10**    ~~Section 7.8~~ Any Decision and Supplementary Decision of the Panel shall be deemed an arbitral award enforceable under the United ~~States Federal Arbitration Act and the~~ ~~United~~ Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards **(the "Convention") and all legislation implementing the Convention, including, in the United States, the United States Federal Arbitration Act**.

**Section 7.11**    ~~Section 7.9 The~~ **Provided that a Decision contains an appropriate instruction to the Escrow Agent, the** Sale Proceeds for ~~any~~ **an** In-Scope Sale shall be transferred **by the Escrow Agent,** in accordance with the Allocation **contained in such Decision** and the **terms of the** relevant escrow agreement ~~by the Escrow Agent,~~ after **the** relevant Decision has been rendered**,** without the need for an order from any of the Courts.

**Section 7.12**    ~~Section 7.10~~ [Except as expressly provided for in any agreement of the relevant parties, neither this Protocol nor any Decision of the Panel shall preclude any ~~Inter-Party~~ ~~Claims asserted~~ **Participating Party from asserting any legally cognizable claim or defense against any other Participating Party** pursuant to the applicable claims procedure approved by the applicable Court by or on behalf of any ~~Selling~~ **Participating** Party against any other ~~Selling~~ **Participating** Party.][22]

## ARTICLE VIII
## CONFIDENTIALITY

*Section 8.1*    Except as may be required by applicable law or court order or by an authority having appropriate jurisdiction, each Party agrees (i) to maintain confidentiality as to all aspects of these procedures, including, without limitation, **any Information (as defined below),** the presentation of any issue to the Panel, any discussions, deliberations~~, or~~ proceedings ~~or results~~ of the dispute resolution procedure set forth in this Protocol, **and** any Submissions or Oral Arguments~~, or any Decisions produced by these proceedings~~ (the "Confidential Material") and (ii) not to use any Confidential Material for its own benefit or the benefit of any of its affiliates**, including, without limitation, for the purpose of asserting or proving a Claim (as defined in Section 101(5) of the Bankruptcy Code) against any Debtor in any of the Proceedings,** it being understood that the Parties may disclose the existence and nature of this Protocol and the dispute resolution procedure conducted hereunder as may be necessary to (x) satisfy any Condition (as defined below) or (y) comply with the applicable laws, including, without limitation, the U.S. federal or state securities laws or **any** Canadian ~~or~~ **federal,** provincial **or** territorial securities laws~~,~~**, and it being further understood that the Parties may disclose any Decision or Supplementary Decision by the Panel. As used in this Section 8.1, "Information" means any and all documents and information obtained by or on behalf**

---

[22] ~~TBD~~

**of a Party from another Party or Nortel Group entity pursuant to this Protocol, including, without limitation, documents and information made available in the Data Room, Witness Statements, Written Submissions, responses given by Employees in interviews pursuant to Section 5.3, responses to Questionnaires served pursuant to Section 5.5, Examination Testimony and oral testimony given in any Evidentiary Hearing (but excluding any Decision or Supplementary Decision).**

*Section 8.2*       In the event that a Party is served with or otherwise subject to legal process (including subpoena or discovery notice) requiring it to testify about, to produce, or otherwise to divulge Confidential Material, to the extent permitted by applicable law such Party will as soon as practicable inform the provider(s) of such Confidential Material so that the provider may seek a protective order or other remedy. In the event that such protective order or other remedy has not been obtained and such entity is advised, in the opinion of counsel, that it is legally compelled to disclose any of the Confidential Material, such Party may disclose only such Confidential Material so advised to be disclosed.

*Section 8.3*       The Parties further agree that prior to the appointment of any individual to the Panel or appointment as an Expert by any Party ~~or the Panel~~, such individual shall agree in writing to preserve the confidentiality of the dispute resolution procedure conducted under this Protocol and all Confidential Material obtained hereunder.

*Section 8.4*       Nothing herein shall prevent any Party from disclosing information regarding the dispute resolution procedure conducted under **Section 9.4 of** this Protocol or all Confidential Material obtained hereunder for purposes of proceedings to resolve any disputes arising from, relating to or in connection **for purposes of all legal proceedings arising from, relating to or in connection** with the enforcement or implementation of this Protocol, **including, without limitation, any matters relating to enforcement or otherwise of any Decision or Supplementary Decision**.

### ARTICLE IX
### MISCELLANEOUS

*Section 9.1*       In all matters not expressly provided for in this Protocol, the Panel and the Parties shall act in the spirit of this Protocol and shall make every reasonable effort to ensure that any Allocation pursuant to this Protocol will be legally enforceable.

~~Section 9.2       There shall be no communications between any member of the Panel and a Party unless all other Parties are given the opportunity to be present during such communication. For the avoidance of doubt, written communication (whether transmitted by email, facsimile or post) between any member of the Panel and a Party must also be transmitted contemporaneously to all other Parties.~~

**Section 9.2**       ~~Section 9.3~~ All notices, requests, instructions, directions and other communications provided for herein shall be made in writing (including by facsimile) delivered to the intended recipient as follows:

21

**If to the US Debtors:**
c/o Nortel Networks Inc.
Attention: ~~Anna Ventresca, Esq.~~ **John Ray**
~~Chief Legal Officer~~
Address: 2221 Lakeside Boulevard
          Richardson, Texas 75082
          U.S.A.
Facsimile No.: ~~+1 905 863 2075~~[ ]
Telephone No.: [+1 ~~905 863 1204~~ **312 259 7627**]

**If to the Canadian Debtors:**
c/o Nortel Networks Limited
Attention: Anna Ventresca, Esq.
          Chief Legal Officer
Address: ~~[195 The West Mall~~ **5945 Airport Road, Suite 360**
          ~~Toronto~~**Mississauga**, Ontario ~~M9C 5K~~**L4V 1R9**
          Canada]
Facsimile No.: +1 905 863 2075
Telephone No.: +1 905 863 1204

**If to the EMEA Debtors:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
          London SE1 2AF
          United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**If to the Monitor:**
c/o Ernst & Young, Inc.
Attention: Murray A. McDonald
Address: Ernst & Young Tower
          222 Bay Street, P.O. Box 251
          Toronto, ON M5K 1J7
          Canada
Facsimile No.: +1 416 943 3300
Telephone No.: +1 416 943 3016

**If to the Creditors' Committee:**
c/o Akin Gump Strauss Hauer & Feld LLP

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley, Esq.
Address: One Liberty Plaza
          New York, New York 10006
          U.S.A.
Facsimile No.: +1 212 225 3999
Telephone No.: +1 212 225 2163

**With a copy to:**
Ogilvy Renault LLP
Attention: Derrick Tay, Esq. and Michael J. Lang, Esq.
Address: Suite 3800
          Royal Bank Plaza, South Tower
          200 Bay Street, P.O. Box 84
          Toronto, Ontario M5J 2Z4
          Canada
Facsimile No.: +1 416 216 4832 / 216 3930
Telephone No.: +1 416 216 4832 / 216 3939

**With a copy to:**
Herbert Smith LLP
Attention: Stephen Gale, Esq. and Kevin Lloyd, Esq.
Address: Exchange House
          Primrose Street
          London EC2A 2HS
          United Kingdom
Facsimile No.: +44 (0) 20 7098 4878
Telephone No.: +44 (0) 20 7466 2878

**With a copy to:**
Goodmans LLP
Attention: Jay Carfagnini, Esq.
Address: 250 Yonge Street, Suite 2400
          Toronto, Ontario M5B 2M6
          Canada
Facsimile No.: +1 416 979 1234
Telephone No.: +1 416 597 4107

**If to the Bondholders' Committee:**
c/o Milbank, Tweed, Hadley & McCloy LLP

22

Attention: Fred S. Hodara, Esq.
      **David H. Botter, Esq.**
Address: One Bryant Park
      New York, New York 10036
      U.S.A.
Facsimile No.: +1 212 872 1002
Telephone No.: +1 212 872 8040

Attention: Albert A. Pisa, Esq.
Address: One Chase Manhattan Plaza
      New York, New York 10005-1413
      U.S.A.
Facsimile No.: +1 212 530 5219
Telephone No.: +1 212 530 5319

All notices, requests, instructions, directions and other communications to be sent under this Protocol to the Non-Filed Affiliates shall be made in writing (including by facsimile) and delivered to the contact addresses or facsimile numbers set forth in Schedule 4 hereto.

**Section 9.3**   ~~Section 9.4~~ This Protocol shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction, except to the extent that the United States Federal **Arbitration** Act applies, provided that Section 9.7 shall be governed exclusively by English law.

**Section 9.4**   ~~Section 9.5~~ To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the ~~non-~~exclusive jurisdiction of the US Court and the Canadian Court (in a joint hearing conducted under the cross-border ~~Protocol~~**protocol** adopted by such courts, as it may be in effect from time to time (the "Cross-Border Protocol")), for purposes of all legal proceedings arising from, relating to or in connection with the enforcement or implementation of this Protocol, **including, without limitation, any matters relating to enforcement or otherwise of any Decision or Supplementary Decision,** (ii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such ~~a Court~~**courts** or any claim that any such action brought in such ~~a Court~~**courts** has been brought in an inconvenient forum, (iii) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law, provided that any claim, action or proceeding set forth in Section ~~9.7~~**9.6** of this Protocol shall be brought exclusively in the English courts. ~~{designation of process agent to be considered}~~

**Section 9.5**   **Each Party set forth on Schedule 6[12] (each such party, "Designating Party") has appointed● as its authorized agent (the "Process Agent"), upon whom process may be served in any legal proceeding arising from, relating to or in connection with the enforcement or implementation of this Protocol. Each Designating Party consents to process being served in any legal proceeding arising from, relating to or in connection with the enforcement or implementation of this Protocol by mailing a copy thereof by registered or certified mail to the Process Agent. Each Designating Party hereby represents and warrants that the Process Agent has accepted such appointment and has agreed to act as said agent for service of process, and each Designating Party agrees to take any and all**

---

[12] **Non-Filed Affiliates + EMEA Non-Filed entities. TBD -- whether EMEA Debtors should be included in this list.**

23

action, including the filing of any and all documents that may be necessary to continue such
appointment in full force and effect as aforesaid.  Service of process upon the Process
Agent shall be deemed, in every respect, effective service of process upon the relevant
Designating Party.

    *Section 9.6*        No provision of this Protocol (other than as set forth in Sections [9.2,
9.3, 9.4, 9.5, 9.6, 9.7, 9.10, 9.11, 9.15, 9.17 and 9.18] of this Protocol) shall be effective until the
satisfaction of the following conditions:  (A) each of the US Court ~~and~~, the Canadian Court
~~approving~~and the UK Court approve the entirety of this Protocol and all of the provisions
hereof (the "~~North American Court Condition~~") ~~and (B) the UK Court giving a direction (the~~
~~"UK Court's Directions")²³  that the Joint Administrators be at liberty to enter into this Protocol~~
~~(the "UK Court Condition" and, together with the North American Court Condition, the~~
"Conditions").

    *Section 9.7*        [Nothing contained in any Transaction Document, including
without limitation any intellectual property license termination agreements, shall be with
prejudice to (A) any right, entitlement or claim by or on behalf of NNL or any affiliate or
subsidiary which licensed any intellectual property from NNL (each a "Nortel Licensee") to
assert solely as (x) between NNL and any such Nortel Licensee or (y) between two or more
Nortel Licensees any ownership or proprietary interest in and to the intellectual property
subject to the intellectual property licenses, whether in respect of or pursuant to that
certain Master Research and Development Agreement, dated as of December 22, 2004 (as
amended and supplemented from time to time, the "Master R&D Agreement"), or
otherwise, for the purpose of advocating such position in connection with an allocation of
the Sale Proceeds resulting from the sale, license or other disposition of the intellectual
property in an In-Scope Sale, or (B) the right, entitlement or claim by or on behalf of NNL
or any Nortel Licensee to dispute and defend any such assertions in connection with an
allocation of Sale Proceeds from an In-Scope Sale; and]¹²

    *Section 9.8*        ~~Section 9.7~~ The Parties agree that the Joint Administrators have
negotiated and are entering into this Protocol as agents for the EMEA Debtors to which they are
appointed and that none of the Joint Administrators, their firm, partners, employees, advisers,
representatives or agents shall incur any personal liability whatsoever whether on their own part
or in respect of any failure on the part of any Nortel Group company to observe, perform or
comply with any of its obligations under this Protocol or under or in relation to any associated
arrangements or negotiations.  The Joint Administrators are a Party to this Protocol:  (i) as agents
of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own
capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of
Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of
certain other Parties to this Protocol.  Notwithstanding anything to the contrary in this Protocol,
any claim, action or proceeding against the Joint Administrators in their personal capacities (and

---

²³ ~~Is UK Court approving the Protocol?  Compare with HS's suggested edits to Sections 9.12 and 9.14.~~

¹³ To be discussed.

[New York #2068820 v5]

not as agents for any EMEA Debtors) under this Protocol shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English ~~Courts.~~courts.[14]

**Section 9.9** The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Protocol or under or in relation to any associated arrangements or negotiations. The Joint Israeli Administrators are a party to this Protocol: (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (a) obtaining the benefit of any provisions of this Protocol expressed to be conferred on them and (b) enforcing the obligations of the other Parties to this Protocol. Notwithstanding anything to the contrary in this Protocol, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents, (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

**Section 9.10** ~~Section 9.8~~Except as specifically set forth in this Protocol, this Protocol is not intended to, and shall not, create rights in any person or entity not a Party hereto.

**Section 9.11** ~~Section 9.9 Without prejudice to the provisions of Sections 9.10 and 9.20 below, other~~Other parties may be added to this Protocol only with the prior unanimous written consent of all Parties hereto, which consent shall not be unreasonably withheld.

~~Section 9.10    [TBD — UK counsel to advice whether we need language delegating authority from NNSA to the Joint Administrators]~~

**Section 9.12** ~~Section 9.11~~This Protocol may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original, shall be binding on the Party who signed the counterpart and together shall constitute a single agreement.

**Section 9.13** ~~Section 9.12~~This Protocol constitutes the complete agreement among the Parties with respect to the subject matter herein, and supersedes all other agreements among **some or all of** the Parties with respect to the subject matter herein. This Protocol may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all the remaining Parties to this Protocol, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts.

---

[14] UK counsel to advice whether we need language delegating authority from NNSA to the Joint Administrators.

**Section 9.14** ~~Section 9.13~~ This Protocol does not affect the confidentiality of any information exchanged between or among any of the Parties pursuant to any prior agreements or understandings.

**Section 9.15** ~~Section 9.14~~ This Protocol shall inure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns from the date of its execution, but is expressly subject to and contingent upon its approval and entry by the Courts.

**Section 9.16** ~~Section 9.15~~ Each Party to this Protocol shall (a) use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Protocol; (b) keep all other Parties reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and (c) use commercially reasonable efforts to allow any other Party, which so requests in writing, reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

**Section 9.17** ~~Section 9.16~~ Subject to satisfaction of the Conditions, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof: (a) such Party has the power and authority to enter into this Protocol and to carry out its obligations hereunder; (b) the execution of this Protocol, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Protocol; and (c) this Protocol has been duly executed by such Party and constitutes the legal, valid and binding obligations of such Party.

**Section 9.18** ~~Section 9.17~~ In the event that any provision of this Protocol shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Protocol found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision. <u>Notwithstanding anything to the contrary in this Section, in the event that all or any part of Section(s) of this Protocol be found pursuant to a final order of a court or tribunal with competent jurisdiction to be illegal, invalid or unenforceable, or any part of Section(s) is any way struck down or modified without the consent of the Parties, this Protocol in its entirety shall automatically terminate and shall cease to have any force and effect.</u>

**Section 9.19** ~~Section 9.18~~ Except as specifically set forth in this Protocol, the obligations of each Party hereunder are several, and not joint and several.

**Section 9.20** ~~Section 9.19~~ If any of the Parties, the ~~Mediator, the~~ Experts, the Affiliates' Representative or the Panel shall have an obligation or deadline imposed pursuant to this Protocol that shall fall on any of a Saturday, Sunday or a national public holiday in any of the United States, Canada or the United Kingdom, such Party, <u>Expert or the Panel</u> shall have

26

until the next Business Day immediately following such day to comply with such deadline or obligation.

**_Section 9.21_**     ~~_Section 9.20_~~ The Parties agree that, if after the date hereof, any subsidiary of any US Debtor commences chapter 11 proceedings in the US Court, then the Parties and such entity shall enter into an accession agreement whereby such entity shall accede to this Protocol as a US Debtor.

**_Section 9.22_**     ~~_Section 9.21_~~ The Non-Filed Affiliates hereby appoint [●] [34] as the Affiliates' Representative and grant the Affiliates' Representative the authority to represent each Non-Filed Affiliate in all matters relating to this Protocol, including, without limitation, the power (a) to agree to any Partial Allocation Amount on behalf of the Non-Filed Affiliates, (b) to agree to a fair and equitable allocation of the Sale Proceeds pursuant to Section 1.1 or otherwise, (c) to amend or waive any provision of this Protocol, (d) to deliver and receive any notices permitted or required under this Protocol, and (e) to perform on behalf of the Non-Filed Affiliates any other act which the Affiliates' Representative deems necessary or desirable in the performance of the Affiliates' Representative's role under this Protocol. Any action taken by the Affiliates' Representative and any agreement or settlement entered into by the Affiliates' Representative on behalf of the Non-Filed Affiliates in connection with the performance of this Protocol shall be binding upon and enforceable against the Non-Filed Affiliates without any need for further ratification by the Non-Filed Affiliates. In addition, the Non-Filed Affiliates ~~appoint [●] and [●] as~~**hereby grant the Affiliates' Representative the authority to select and retain one** counsel and financial advisor~~, respectively,~~ to assist the ~~Non-Filed~~ Affiliates**'** **Representative in connection with any proceedings or matters under this Protocol**.

---

[34] ~~The Affiliate's Representative should be a corporate entity.~~

27

IN WITNESS WHEREOF, the Parties hereto have caused this Protocol to be duly executed and delivered as of this [●]th day of [●].

NORTEL NETWORKS CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By _____
    Name:
    Title:

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS
INTERNATIONAL CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
    Name:
    Title:

**Signature page to Protocol**

NORTEL NETWORKS INC.

By _____
    Name:
    Title:


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name:
    Title:


CORETEK, INC.

By _____
    Name:
    Title:


NORTEL ALTSYSTEMS, INC.

By _____
    Name:
    Title:


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name:
    Title:


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name:
    Title:


**Signature page to Protocol**

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name:
    Title:

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS HPOCS INC.

By _____
    Name:
    Title:

NORTEL NETWORKS
INTERNATIONAL INC.

By _____
    Name:
    Title:

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name:
    Title:

**Signature page to Protocol**

NORTHERN TELECOM
INTERNATIONAL INC.

By _____

    Name:
    Title:


QTERA CORPORATION


By _____

    Name:
    Title:


SONOMA SYSTEMS


By _____

    Name:
    Title:


XROS, INC.


By _____

    Name:
    Title:


NORTEL NETWORKS (CALA) INC.


By _____

    Name:
    Title:


**Signature page to Protocol**

Signed by ALAN BLOOM on behalf of each of
the Joint Administrators of each of the EMEA
Debtors over which they have been appointed,
without personal liability as provided in Section
9.4 of this Protocol and solely for the purpose of
obtaining the benefit of the provisions of this
Protocol expressed to be conferred on or given to
each of the Joint Administrators

By _____

    Name:
    Title:

in the presence of:

Witness Signature

_____

    Name:
    Address:

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORK UK LIMITED (IN**   )    **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS (IRELAND) LIMITED**   )   **ALAN BLOOM**
**(IN ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS NV (IN**   )   **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS SPA (IN**   )   **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**Signature page to Protocol**

[New York #2068820 v515]

**SIGNED** for and on behalf of **NORTEL**     )
**NETWORKS BV (IN**                             )     **ALAN BLOOM**
**ADMINISTRATION)**                             )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal          )
liability) in the presence of:                 )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**          )
**NETWORKS POLSKA SP Z.O.O. (IN**                  )     **ALAN BLOOM**
**ADMINISTRATION)**                                )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal              )
liability) in the presence of:                     )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**          )
**NETWORKS HISPANIA SA (IN**                       )     **ALAN BLOOM**
**ADMINISTRATION)**                                )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal              )
liability) in the presence of:                     )

Witness signature:

Name:
Address:

**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS (AUSTRIA) GMBH (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal    )
liability) in the presence of:    )

Witness signature:

Name:
Address:


**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS SRO (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal    )
liability) in the presence of:    )

Witness signature:

Name:
Address:


**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS ENGINEERING**    )
**SERVICES KFT (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal    )
liability) in the presence of:    )

Witness signature:

Name:
Address:


**Signature page to Protocol**

[New York #2068820 v515]

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS PORTUGAL SA (IN** )   **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS SLOVENSKO SRO (IN** )   **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS ROMANIA SRL (IN** )   **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL** )
**GMBH (IN ADMINISTRATION)** )          **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS OY (IN** )               **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS AB (IN** )               **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS INTERNATIONAL** )  **ALAN BLOOM**
**FINANCE AND HOLDING BV (IN** )
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS FRANCE S.A.S. (IN** )  )  **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**Signature page to Protocol**

[NOTE: Additional signature blocks to be
added for NNSA, the Monitor, the Creditors'
Committee, the Bondholders' Committee, the
Non-Filed Affiliates]

**Signature page to Protocol**

## SCHEDULE 1

### Canadian Debtors

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

S-1

## SCHEDULE 2

### US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

Nortel Networks (Cala), Inc.

## SCHEDULE 3

### EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

**Nortel Networks Israel (Sales and Marketing) Limited (In Administration)**

**SCHEDULE 4**

**Names of Non-Filed Affiliates**

**and Notice Information**

S-4

## ~~EXHIBIT A~~ SCHEDULE 5

[*Note to draft*:  Insert list of agreed-upon replacement Panel.]

~~EXHIBIT B~~

## List of In-Scope Sales

[New York #2068820 v6~~1~~5]

## SCHEDULE 6

### Names of Respective Participating Parties

[~~Note to draft~~: ~~Insert list of respective Selling Parties~~ for each ~~Negotiating Party~~]Party

## SCHEDULE 7

## List of Transaction Documents

S-7