# EXHIBIT A

| From: | Kahn, Brad |
|---|---|
| To: | LLOYD, KEVIN; jcarfagnini@goodmans.ca; apisa@milbank.com; dtay@ogilvyrenault.com; Howard ZELBO; Inna Rozenberg; James L BROMLEY; jpasquariello@goodmans.ca; mlang@ogilvyrenault.com; stenai@ogilvyrenault.com; stephen.gale@herbertsmith.com; 'Lauren Peacock'; Michael Wunder; Alex MacFarlane; Jacobs, Ryan |
| CC: | Hodara, Fred; Botter, David; Schultz, Sarah A.; Qureshi, Abid; Pees, Robert; Rowe, Kevin |
| Sent: | 7/20/2010 10:00:28 PM |
| Subject: | Nortel- UCC Comments to Allocation Protocol |
| Attachments: | EAST-#8288169-v3-Nortel-_Allocation_Issues_List_(7-20-10).DOC; EAST-#8320387-v2-Nortel-_UCC_Comments_to_Allocation_Protocol_(7-20-10).DOC; EAST-#8320387-vdoc-Nortel-_UCC_Comments_to_Allocation_Protocol_(7-20-10).DOC |

All:

In accordance with the schedule set forth in the memorandum circulated by Herbert Smith on July 16, 2010, attached is a mark-up of the latest draft of the Allocation Protocol reflecting comments from the UCC, as well as an "issues list" summarizing and addressing those comments. Please note that, solely for convenience, we have deleted all but the first signature page of the protocol document.

Thank you

Brad M. Kahn
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Phone: (212) 872-8121
E-mail: bkahn@akingump.com

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━━ Attorneys at Law

Confidential
For Discussion Purposes Only
Subject to FRE 408

## PROCEEDS ALLOCATION PROTOCOL
## ISSUES LIST As of 7/20/10

### Prepared by the Official Committee of Unsecured Creditors
### (keyed to blackline circulated by Cleary on 4/7/10)

1. Joint Administrators' authority to bind EMEA entities (Footnote 3)
   - Need to discuss. Does the JA have authority to bind each of the EMEA entities (including non-filed entities) to the protocol and any allocation compromises agreed to by the JA's? What additional steps, if any, are necessary to bind those entities, and do we need specific effectiveness conditions built into this document?

2. Participating Parties (Page 4)
   - OR/G: Please explain the purpose of the additional language regarding Selling Debtors.
   - "Selling Debtors" is not defined. Is this intended to mirror the definition in IFSA?

3. The Non-Filed Affiliate Representative (Page 4)
   - Can the Non-Filed Affiliates be represented through other parties to this protocol?
   - If Non-Filed Affiliates are to be separately represented and party to this protocol, should they not be involved in the negotiation of this document?

4. Scope of Disputes Addressed/Resolved under Protocol (Whereas clause- top page 4)
   - Protocol should address allocation of all tangible and intangible assets of the Company that have been, or are anticipated to be, sold and/or otherwise monetized outside of the ordinary course.
   - Allocation of IP proceeds must be addressed through this protocol.

5. Mediation (Sections 1.2 – 1.3)
   - Necessity/appropriateness of mediation TBD.
   - Process for selection of a mediator and admissibility of statements from mediation in any Dispute before the Panel TBD.
   - Assuming mediation is agreed upon, in Section 1.3- "the sale of the Enterprise business" should be replaced with "any such In-Scope Sale".

6. Panel Members (Sections 2.2 - 2.4)
   - Conflict Disclosure (Footnote 8)
     - U.S. "disinterestedness" standard should be used by candidates for initial conflict disclosure. If Canada has an alternative and specific standard of initial conflict disclosure to propose, please provide.

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━ Attorneys at Law

Confidential
For Discussion Purposes Only
Subject to FRE 408

- Selection of Panel Members (Footnote 9)
  - o  UCC believes Panel members should be acceptable to <u>all</u> parties.
  - o  If all party consent is too onerous and we revert to estate selection, the US Panel member must be acceptable to UCC <u>in its sole discretion</u>.

7. Panel Costs (Section 2.5)
   - In the first sentence of new text from HS, add "allocated to the Non-Filed Affiliates, if any" after "If the Sales Proceeds".

8. Panel Considerations (Section 3.2)
   - We do not agree with HS comment to delete "the relevant" before "In Scope Sales".
   - Only the facts and circumstances relevant to that particular In-Scope Sale need to be considered by the Panel to determine a particular allocation.
   - Because the parties participating in the allocation proceedings for each In Scope Sale will not be identical, it would be inappropriate to use information from other In Scope Sales.

9. Separate Representations (Section 3.3)
   - We do not agree with HS comment to delete the provisos in this section.
   - HS language is a re-trade. We already reached agreement regarding how to handle the JA's multiple representations.

10. Written Submissions (Section 4.2)
    - Please explain the intention of the proposed additional sentence at the end of this section.

11. Witness Statements and Experts (Footnotes 13-15)
    - We agree that access to witnesses and the form of witness statements are important issues that need to be discussed and resolved.

12. Access to Information (Sections 5.1 and 5.2)
    - The information playing field must be level.
    - All information requested by or supplied to any party must be made available to all parties. (Footnote 16)
    - Parties should have access to all documents, whether or not they are pre-existing. (Footnote 17)
    - What is intended by the HS language regarding the schedule of acceptable categories of documents? (Section 5.2)

13. Access to Third Parties (Section 5.6)

AKIN GUMP ·
STRAUSS HAUER & FELD LLP
━━━━━━━ Attorneys at Law

Confidential
For Discussion Purposes Only
Subject to FRE 408

- HS and OR/G comments to delete or limit access to third-party advice given before/after the Petition Date TBD.

14. Timing of Examinations (Section 5.7- Footnote 19)
   - Examinations must be conducted prior to Second Round submissions.

15. Third Party/Witness Expenses (Footnote 20)
   - We do not believe the Company should be responsible for legal (or any other) fees incurred by witnesses or Third Parties.

16. Expert Examinations (Section 5.9)
   - We do not agree with HS comment to delete entire section.
   - Each Expert must be made available for an Examination, and if not subject to an Examination, the Expert's Expert Report cannot be considered without the consent of the parties requesting the Examination.

17. Examination Testimony (Section 5.10)
   - We should not try to pre-determine the admissibility of evidence. The Panel can determine the admissibility of Examination Testimony at an Evidentiary Hearing.
   - Negotiating Parties should be allowed to include Examination Testimony in Written Submissions. (Footnote 22)

18. Access to Privileged Information (Section 5.11)
   - We cannot agree to Canada's suggestion to delete this section. We are happy to discuss protections for privileged information vis-à-vis third parties, but this process fails if we do not have access to this information.

19. Compulsion of Third Parties by Courts (Article VI)
   - This is a very interesting idea that warrants further discussion.

20. Scope of Cross Examination (Section 7.3 and Footnote 26)
   - We disagree with the comments. The scope of cross should not be limited as proposed.

21. The Decision (Section 8.1 and Section 8.5)
   - Section 8.1: We will not agree to Canada's proposed language. We have already negotiated these issues and agreed that we will not decide for the Panel what they can and cannot consider in rendering an allocation decision.
   - Section 8.5: We cannot agree to the section added by HS. We cannot dictate to the Panel what law, practices or principles they will rely on in making their allocation decision.

22. Form of Decision (Section 8.2, Footnote 27)

AKIN GUMP
STRAUSS HAUER & FELD LLP
▬▬▬▬▬▬▬▬ Attorneys at Law

Confidential
For Discussion Purposes Only
Subject to FRE 408

- Footnote 27: Allocation should be in percentages, not dollars. It is easier and will assist in the calculation of the various adjustments based on allocated percentages in other documents (i.e., side agreements, etc.)

- Section 8.2- new HS language in brackets should read "... the Panel will provide any reasonably affected Parties, through their representative, the opportunity to make submissions and participate in an Evidentiary Hearing."

23. Admissibility of other allocations (Section 8.6)
- TBD. Please explain the purpose of this new section.

24. Partial Allocations (Section 8.8)
- Replace new HS language with "the Panel shall incorporate the Partial Allocation Amount into a Decision."

25. Assertion of Intercompany Claims (Section 8.14)
- We do not agree to delete this section. We have never agreed to delete this provision during our negotiations.

26. Attendance at Proceedings (Section 9.5)
- We do not agree with the section added by HS. The attendance of creditors at the proceedings raises confidentiality issues and is logistically cumbersome.

27. Jurisdiction (Section 10.4)
- Movement of jurisdiction to federal and state courts in New York county TBD.

28. IP Claims (Section 10.7, Footnote 32)
- We do not agree to remove this paragraph. Allocation of proceeds from IP must be within the scope of this protocol.

29. Severability (Section 10.18, Footnote 34)
- This agreement cannot be severable. The Committee will identify those key sections of the protocol that, if they are struck, the entire protocol should terminate.

THIS DRAFT AGREEMENT HAS BEEN PRODUCED
FOR DISCUSSION AND SETTLEMENT PURPOSES
ONLY AND IS SUBJECT TO THE PROVISIONS OF
RULE 408 OF THE RULES OF EVIDENCE FOR
UNITED STATES COURTS AND MAGISTRATES AND
ANY OTHER SIMILAR APPLICABLE RULES IN ALL
PERTINENT JURISDICTIONS.

~~Draft of April 7, 2010~~UCC Comments- 7/20/10
*Privileged and Confidential*

## PROTOCOL FOR RESOLVING DISPUTES
## CONCERNING ALLOCATION OF SALE PROCEEDS

This Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds, dated •, 2010 (the "Protocol"), is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, the Joint Administrators (as defined below), the Joint Israeli Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"), certain affiliates of the Debtors (as defined below) set forth in Schedule 4 attached hereto (the "Non-Filed Affiliates"), the Monitor (as defined below), the Official Committee of Unsecured Creditors appointed in the US Proceedings (as defined below) (the "Creditors' Committee") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with the Canadian Debtors and the US Debtors (each, as defined below) (the "Bondholders' Committee," and along with the Creditors' Committee, the "Committees") (each, a "Party," and collectively, the "Parties"). The Joint Administrators, in their personal capacity, shall be Party to this Protocol as provided in Section 10.8 and solely for the purposes of obtaining the benefit of the provisions of this Protocol expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly. The Joint Israeli Administrators,[1] in their personal capacity, shall be Party to this Protocol as provided in Section 10.9 and solely for the purposes of obtaining the benefit of the provisions of this Protocol expressed to be conferred on or given to the Joint Israeli Administrators and references to the Parties shall be construed accordingly.[2]

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC," and together with its debtor and non-debtor affiliates, the "Company" or the "Nortel Group"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, the "Canadian Proceedings" and the "CCAA"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "US Proceedings" and the "Bankruptcy Code"); and

---

[1] HS to speak to the Israeli Joint Administrators to find out what they intend to do in relation to representation

[2] Subject to review by NNI's UK counsel.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property     1

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), and the UK Court appointed individuals from Ernst & Young LLP (the "UK Administrator") and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, and including their respective successors, replacements and any subsequent office holders appointed to the relevant EMEA Debtors, the "Joint Administrators");[3] and

WHEREAS, subsequent to the Filing Date, Nortel Networks Israel (Sales and Marketing) Limited (the "Israeli Company") filed applications with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "Joint Israeli Administrators") on January 19, 2009, as joint administrators of the Israeli Company under the Israeli Companies Law, and further on November 25, 2009, the Israeli Court sanctioned a scheme of arrangement, which automatically means that the Israeli Company is no longer under a stay of proceedings, and further on November 29, 2009, the Israeli Court ordered that the Joint Israeli Administrators remain in office until the scheme of arrangement is completed in full, including up until the time when all funds arising from the sale of the Israeli Company's assets, are received and allocated; and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, the Debtors and their respective subsidiaries and affiliates have sold, have agreed to sell, or may in the future sell, license or otherwise monetize their tangible and intangible assets outside the ordinary course of business in several transactions (any such transaction, a "Sale"), including in connection with a sale of a particular line of business or portfolio of technologies (each, a "Business"), to third party buyers (each such buyer, a "Buyer"); and

WHEREAS, the Company has provided, or intends to provide, Buyers and potential Buyers, as applicable, with access to a data room (which may be an electronic data room) containing the books and records of the relevant Business and other financial information relating to such Business (each such electronic data room, an "Asset Sale EDR"); and

---

[3] HS to determine whether it can represent EMEA Non-~~Fileds~~Filed entities and whether it can bind them to the protocol and any allocation agreements agreed to by the JA's

WHEREAS, with respect to each Business, the Debtors and their respective affiliates have entered, or intend to enter, into one or more acquisition, sale, license, transfer and/or other ancillary agreements (each such agreement, with respect to the sale, transfer and/or license of each Business, an "Acquisition Agreement") with the Buyer to govern the sale of such Business; and

WHEREAS, after entering into an Acquisition Agreement in the case where a so-called "stalking horse" bidder has been selected, or prior to entering into an Acquisition Agreement in the case where no "stalking horse" bidder has been selected, certain of the Debtors, as applicable, have applied or intend to apply to the applicable Courts for orders authorizing such Debtors to establish notice, bidding and sale procedures for the Sale of the particular Business (the "Bidding Procedures Orders"); and

WHEREAS, after entry of the Bidding Procedures Orders, such Debtors intend to conduct, or have conducted, an auction for the Sale of each Business in accordance with the Bidding Procedures Orders; and

WHEREAS, after conclusion of the auction, certain of the Debtors intend to apply, or have applied, to certain of the Courts for orders approving the Sale of each Business to the relevant Buyer (the "Sale Orders"); and

WHEREAS, in connection with certain Sales, the relevant Debtors intend to request, or have requested, that the Sale Orders contain procedures for the establishment of one or more escrow accounts (the "Escrow Account") overseen by an independent agent (the "Escrow Agent") for deposit of the proceeds of the Sale (the "Sale Proceeds") pending the allocation thereof in accordance with the provisions of this Protocol (each such Sale, as set forth in Schedule 5 attached hereto, an "In-Scope Sale")[4] [Note: The Protocol must address allocation of all tangible and intangible assets of the Company that have been, or are anticipated to be, sold and/or otherwise monetized outside of the ordinary course, including sales consummated post-bankruptcy. The allocation of IP proceeds must be addressed in this Protocol.]; and

WHEREAS, after entry of the Sale Orders and satisfaction or waiver of the conditions to closing set forth in the relevant Acquisition Agreement, the Debtors and their respective affiliates intend to consummate, or have consummated, the Sale in accordance with the Sale Orders (in each case, a "Closing"); and

WHEREAS, the Debtors and certain other parties previously agreed, pursuant to the Interim Funding and Settlement Agreement, dated as of June 9, 2009 (as amended from time to time, the "Interim Funding Agreement"), as soon as reasonably practical following the execution of such agreement, to negotiate in good faith and attempt to reach agreement on a

---

[4] Schedule 5 will include monetization transactions related to intellectual property of the Debtors and Non-Filed Affiliates.

timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds, which would provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors (as defined therein) have been unable to reach agreement regarding such allocation; and

WHEREAS, the Parties wish to agree on procedures for determining allocation of Sale Proceeds of each In-Scope Sale between and among each of the Debtors and the Non-Filed Affiliates, [OR/G: in each case that are participating as Selling Debtors in such In-Scope Sale] [Note: Please explain the purpose of this additional language. Also, Selling Debtors is not defined in this document.] (each, a "Participating Party," and collectively, the "Participating Parties"); and

WHEREAS, the Parties wish to give each Participating Party an opportunity to assert, pursuant to the procedures set forth in this Protocol, an entitlement to an allocation of Sale Proceeds with respect to any In-Scope Sale, regardless of whether or not such Participating Party was a party or signatory to the Acquisition Agreements applicable to such In-Scope Sale; and

WHEREAS, each Party wishes to participate in the procedures set forth in this Protocol, and has agreed to be bound by this Protocol, any Partial Allocation Amount (as defined below) and any outcome with respect to the Allocation (as defined below) of Sale Proceeds of each In-Scope Sale pursuant to a Decision or a Supplementary Decision of the Panel (each, as defined below); and

[WHEREAS, the Non-Filed Affiliates have appointed ●[5] as their representative, which shall represent the Non-Filed Affiliates in connection with the negotiations and other procedures with respect to the Allocation of Sale Proceeds of each In-Scope Sale under this Protocol ("Affiliates' Representative"), and the Non-Filed Affiliates have also appointed an independent financial advisor and an independent counsel to assist the Affiliates' Representative.][6]

NOW THEREFORE, IT IS HEREBY CONSENTED TO, STIPULATED, AGREED AND ORDERED THAT:

## ARTICLE I
## INITIAL NEGOTIATIONS

*Section 1.1*       The Negotiating Parties (as defined below) shall use commercially reasonable efforts to negotiate in good faith and as expeditiously as possible a [fair and equitable][67] allocation of the Sale Proceeds of each In-Scope Sale among the Participating Parties, where "Negotiating Parties" means NNL, NNI, the Monitor, the Creditors' Committee, the Bondholders' Committee, the Joint Administrators and the Affiliates' Representative.

---

[5] Identity and role of Affiliates' Representative to be discussed.

[6] Can Non-Filed Entities be represented through other parties to this Protocol? If Non-Filed Entities are to be separately represented and party to this Protocol, should they not be involved in negotiating this document?

[67] OR/G: standard should be "fair and reasonable." Scope of dispute to be discussed.

Section 1.2        [HS: With the respect to all In-Scope Sales that closed before the date of this Protocol, if the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of such In-Scope Sales within [80] calendar days after the date of this Protocol, then the dispute as to the allocation of the relevant Sale Proceeds among the Participating Parties shall be automatically referred to mediation. Such mediation shall be held within [20] calendar days therefrom. Such mediation will cover the allocation of proceeds of all In-Scope Sales that have closed before the date of this Protocol unless the Negotiating Parties agree otherwise. The identity of the mediator shall be agreed between the Parties or in circumstances where no such agreement can be reached shall be appointed by _____.]

Section 1.3        [HS: If the mediation in Section 1.2 above is not successful and the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of such In-Scope Sales within [10] calendar days after the commencement of the mediation, then the dispute as to the allocation of the Sale Proceeds from the sale of the Enterprise business any such In-Scope Sale shall be automatically referred to the Panel (as defined below) pursuant to this Protocol. For the avoidance of doubt with respect to any and all In-Scope Sales that close after the date of this Protocol, the allocation of Sale Proceeds of such In-Scope Sales shall be determined by agreement between the Negotiating Parties and/or if possible by the mediation set out at Section 1.2 above, failing which by subsequent reference to the Panel.] **[TBD- necessity/ appropriateness of mediation, process for selection of mediator, and admissibility of statements from mediation in any Dispute before the Panel]**

Section 1.4        [With respect to any In-Scope Sale that closed before the date of this Protocol, if the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of such In-Scope Sale within [100] calendar days after the date of this Protocol, then the dispute as to the allocation of the relevant Sale Proceeds among the Participating Parties shall be automatically referred to the Panel (as defined below) pursuant to this Protocol. With respect to any In-Scope Sale that closes after the date of this Protocol, if the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of such In-Scope Sale within [100] calendar days after the closing of such In-Scope Sale, then the dispute as to the allocation of the relevant Sale Proceeds among the Participating Parties shall be automatically referred to the Panel (as defined below) pursuant to this Protocol.][HS: delete]  If an allocation dispute is referred to the Panel, the Panel shall determine a [fair and equitable] allocation of the Sale Proceeds of the relevant In-Scope Sale to be distributed to the Participating Parties. The Parties hereby agree that the negotiation periods provided for in this Section 1.4 [HS would instead include Sections 1.2 and 1.3] may be extended by mutual written agreement of all the Negotiating Parties or may be terminated before their expiration upon written notice by any Negotiating Party delivered to all other Negotiating Parties.

Section 1.5        Upon the automatic referral of an allocation dispute to the Panel as contemplated by Section 1.4, NNI shall be responsible for promptly sending a notice to the Panel and the other Negotiating Parties, indicating in such notice that pursuant to the terms of Section 1.4, an allocation dispute has been automatically referred to the Panel. If for any reason NNI shall fail to send such notification to the Panel and the other Parties within three days (excluding Saturdays, Sundays and national public holidays in any of the United States, Canada or the United Kingdom) (each a "Business Day") of the automatic referral of the allocation dispute to

the Panel, any other Negotiating Party may undertake to send such notice to the Panel and the other Negotiating Parties.

*Section 1.6*        The Negotiating Parties, in their sole discretion, may agree to a partial allocation of the Sale Proceeds [of an In-Scope Sale][HS: delete] (each such partial allocation, a "Partial Allocation Amount").[78] If the Negotiating Parties agree to a Partial Allocation Amount, such Partial Allocation Amount shall be released from the Escrow Account and distributed to one or more Participating Parties immediately following the later of (x) the closing of the In-Scope Sale and (y) the date when the Negotiating Parties agree to such Partial Allocation Amount. Any remaining amounts shall remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol. [HS: Any release of a Partial Allocation Amount shall be in accordance with the terms of the relevant escrow agreement for any relevant In-Scope Sale.]

**ARTICLE II**
**REFERRAL OF ALLOCATION DISPUTES TO THE PANEL**

*Section 2.1*        As contemplated by Section 1.4, an allocation dispute shall be automatically referred to a dispute resolution panel constituted in accordance with Sections 2.2, 2.3 and 2.4 (the "Panel").

*Section 2.2*        The Parties have previously requested and received from the members of the Panel initial conflict disclosures [in accordance with the standard for "disinterestedness" under the Bankruptcy Code][89] as well as agreed upon procedures for identifying and preventing any potential current or future conflicts, and have determined based on such disclosures that the following individuals are acceptable and shall serve as the members of the Panel: ●, ● and ●. For the purposes of administrative convenience, the Panel may appoint an administrative secretary.[910]

*Section 2.3*        Each member of the Panel shall be and remain at all times impartial and independent of the Parties. Each member of the Panel shall disclose to the Parties any new or previously undisclosed conflict, [pursuant to the "disinterestedness" standard under the Bankruptcy Code,] that comes to the Panel member's attention from time to time, as well as any proposed remedy with respect to such conflict. Following any such disclosure, the Negotiating Parties agree to confer regarding whether such disclosure requires disqualification of the Panel

---

[78] Prior to signing of this Protocol (by which time the timing of the CDMA and Equinox closing should be known to the Parties), this Protocol will be revised to add language to accommodate EMEA's request that the Equinox dispute be the first allocation dispute to be handled by the Panel so long as it does not unreasonably delay the allocation for CDMA.

[8] ~~OR/G: Conflict disclosure standard to be discussed.~~[9] U.S. "disinterestedness" standard should be used by candidates for initial conflict disclosure. If Canada has an alternative and specific standard of initial conflict disclosure to propose, please provide.

[9] ~~OR/G: If the Negotiating Parties cannot agree upon~~[10] Panel members, ~~each estate should be permitted to select one member of the Panel~~ should be acceptable to all parties. If all party consent proves too onerous, the U.S. Panel member must be acceptable to the UCC in its sole discretion.

member, it being understood that a Panel member's disclosure under this Section 2.3 does not automatically render the Panel member conflicted or require the Panel member's disqualification. If the Negotiating Parties cannot reach an agreement within [x] days of the Panel member's disclosure as to whether such Panel member should be disqualified, the US Court and the Canadian Court, in a joint hearing conducted under the Cross-Border Protocol (as defined below), shall decide the issue. Notwithstanding anything to the contrary in this Protocol, if a member of the Panel is disqualified pursuant to this Section 2.3, the sole method for replacement of such member shall be as set forth in Section 2.4.

Section 2.4    If any member of the Panel is unable or unwilling to serve after receiving notice of the referral of any matter to the Panel or at any time thereafter, or is disqualified as a result of a conflict pursuant to the procedures in Section 2.3, such member shall be replaced as soon as possible by another individual to be selected by the Participating Party that originally proposed the inclusion of the outgoing Panel member in Section 2.2, [as previously set forth in writing provided to all Negotiating Parties, but the Negotiating Parties must give prior written consent to the appointment of the replacement Panel member, which consent shall not be unreasonably withheld.][1011] [HS: delete and add: Such Participating Party will provide written notification to all other Negotiating Parties of the identity of the replacement Panel Member. The Negotiating Parties hereby consent to the concept of a replacement Panel Member being appointed but shall have the opportunity to consent to the identity of such replacement Panel Member. Such consent will not be unreasonably withheld. Following such consent from all Negotiating Parties, the appointment of the replacement Panel Member will be effective. Such potential replacement Panel member shall meet the standards of impartiality and independence set out in Section 2.3 above and shall be from the same country as the Panel member being replaced.] The Panel may not consider or continue to consider issues or render any Decision, Supplementary Decision or other decision during the period when a Panel member is being replaced.

Section 2.5    Each of the Negotiating Parties (other than the Non-Filed Affiliates, as represented by the Affiliates' Representative) shall bear its respective costs and expenses, including attorneys' fees, associated with the preparation and presentation of its case to the Panel and any other costs and expenses incurred by such Negotiating Party in connection with the proceedings pursuant to this Protocol, provided that nothing herein shall in any way affect any arrangements or agreements to cover [certain] fees and expenses of the Committees, including, without limitation, pursuant to any order by the US Court approving the fee applications of the Committees, as applicable. The Panel shall specify in each Decision the total amount of the costs and other expenses of the Panel in connection with such Decision (the "Panel Costs"), and the proportions in which the Participating Parties shall bear such Panel Costs. The costs and expenses of the Affiliates' Representative and the portion of the Panel Costs to be paid by the Non-Filed Affiliates shall be paid or reimbursed from the Sale Proceeds of [the particular][HS: delete and replace with: an] In-Scope Sale allocated to the Non-Filed Affiliates. [HS: If the Sales Proceeds allocated to the Non-Filed Affiliates, if any, are insufficient to pay the costs and expenses of the Affiliates' Representative and their portion of the Panel costs, the Non-Filed

---

[1011] OR/G: Veto right to be discussed. Consider going back to concept of categories. [See comment to previous footnote]

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    7

Affiliates shall pay such costs jointly and severally in proportion to the allocation they receive from the Sale Proceeds.[412] The Panel may direct the Parties to make one or several interim payments on account of their costs in reaching a Decision ("Interim Costs"). The Parties agree to instruct the Escrow Agent to pay such Interim Costs from the Escrow Account associated with such a Decision.] The incremental costs and other expenses of the Panel in connection with a Supplementary Decision (as defined below) shall be paid from the Sale Proceeds [of the particular In-Scope Sale][HS: delete] allocated to the Participating Party or Participating Parties requesting such Supplementary Decision. [HS: Such incremental costs and other expenses shall only be those costs and expenses in connection with the Supplementary Decision incurred after the rendering of the Decision.]

      *Section 2.6*      To the maximum extent permitted by applicable law, none of the members of the Panel shall be liable to any Party or any third party howsoever for any act or omission in connection with any proceedings under this Protocol.

      *Section 2.7*      The place of arbitration shall be New York, New York. Other than as expressly specified otherwise in this Protocol, or as agreed by the Parties, all proceedings pursuant to this Protocol, including, but not limited to, in-person Administrative Meetings,[1213] Evidentiary Hearings and Oral Arguments (as defined herein), shall be held in New York, New York and shall be conducted in the English language, provided that Administrative Meetings may be held by telephone or videoconference.

      *Section 2.8*      No members of the Panel, whether before or after appointment to the Panel, shall advise any Party on the merits or outcome of a dispute. There shall be no communications between any member of the Panel after appointment to the Panel and a Party unless all other Parties are given the opportunity to be present during such communication. For the avoidance of doubt, written communication (whether transmitted by email, facsimile or post) between any member of the Panel and a Party must also be transmitted contemporaneously to all other Parties.

## ARTICLE III
## ADMINISTRATIVE MEETINGS

      *Section 3.1*      Within ● (●) calendar days of an allocation dispute being referred to the Panel, the Negotiating Parties and the Panel shall hold a meeting to discuss any administrative, procedural or other relevant matters (the "Administrative Meeting"), which shall be convened by the Panel. Each of the Negotiating Parties must be given (i) at least seven (7) calendar days' notice prior to the Administrative Meeting and (ii) the opportunity to attend and participate in the Administrative Meeting. The Panel shall determine whether to hold the Administrative Meeting by telephone, videoconference or in person, and shall determine a time and, for in-person Administrative Meetings only, a location within New York, New York, such that each

---

[412] HS: This is a matter for the Non- Filed Affiliates to discuss between themselves.

[1213] HS: Consider having in-person Administrative Meetings outside of New York City and add: Notwithstanding Section 2.7, Administrative Meetings may be held outside New York, State of New York or by telephone conference.

Negotiating Party and/or its counsel shall be able to participate. At the Administrative Meeting and at any other proceeding before the Panel, each of the Negotiating Parties shall be entitled to be represented by counsel.

   *Section 3.2*      Except as specifically provided in this Protocol, the Panel shall, after taking into account, among other things, the facts and circumstances of [the relevant][HS: delete and substitute "any"] In-Scope Sale [Note: only the facts and circumstances relevant to that particular In-Scope Sale need to be considered by the Panel in that particular Dispute], the multiple jurisdictions involved in such In-Scope Sale or the applicable dispute and such other factors as the Panel considers relevant, establish the procedure and manner in which the resolution of the allocation dispute shall be conducted, including, without limitation, (i) the due dates for Written Submissions, (ii) the timing of the identification of Experts (as defined below), the submission of Expert Reports (as defined below), the identification of witnesses and the submission of Witness Statements (as defined below), (iii) the time, place, length and number of oral arguments for each Negotiating Party (the number of oral arguments for a given Negotiating Party multiplied by the length of each such oral argument, the "Oral Argument Duration"), (iv) whether to order the Negotiating Parties to prepare a joint agreed statement of facts, and (v) other administrative, procedural, or other relevant matters such as the scheduling of the Evidentiary Hearings (as defined below) and subsequent Administrative Meetings (if necessary), provided that the right of the Non-Filed Affiliates to participate and present their Interests (as defined below and as determined by the Panel) to the Panel shall reflect, to the extent reasonably practicable and determinable under the circumstances, the Panel's assessment of the relative contribution of the assets (tangible and intangible) and the rights transferred or relinquished by and liabilities assumed from the Non-Filed Affiliates in comparison to other Participating Parties with regards to a given Sale. Notwithstanding anything else in this Protocol, the Panel shall have the right in its discretion, and after providing an opportunity for all Negotiating Parties to be heard on the issue, to modify the procedures decided at any Administrative Meeting or otherwise either upon request of any Negotiating Party or on the Panel's own initiative.

   *Section 3.3*      [HS: Subject to Section 3.4 below,] if[If any Negotiating Party determines that there is an actual or potential conflict with respect to the dispute among any of the Respective Participating Parties (as such term is defined in Schedule 6 attached hereto) of such Negotiating Party or that such Negotiating Party represents a diversity of interests with regard to such Negotiating Party's Respective Participating Parties (each such interest, an "Interest"), such Negotiating Party may petition in writing the Panel to further modify the procedures, including, without limitation, by increasing the Oral Argument Duration allocated to such Negotiating Party or providing separate representation to address such potential conflict of interest or diversity of interests,[ provided that in the case of the Joint Administrators or the Monitor, their respective petitions to the Panel to represent up to three separate Interests shall not be opposed by any other Negotiating Party, and provided, further that any other Negotiating Party shall be free to make submissions as to the extent and scope of any additional representation rights. Nothing herein shall prevent any Negotiating Party from opposing any arguments raised by the various Interests, or Presented Positions (as defined below) with respect to such Interests, represented by any Negotiating Party.][HS: delete]

   *Section 3.4*      [HS: The Parties agree that the Joint Administrators may represent up to

~~three separate Interests and the Parties will not object to such representation. The procedures~~
~~will be modified to enable this (including, without limitation, by increasing the Oral Argument~~
~~Duration allocated to the Joint Administrators and allowing for separate representation). If the~~
~~Joint Administrators determine that they want to represent more than three separate Interests,~~
~~they will petition the Panel in writing in the same manner as the other Negotiating Parties as set~~
~~out in Section 3.3. Nothing in Section 3.3 or Section 3.4 shall prevent: (a) any Negotiating Party~~
~~from opposing any arguments which may subsequently be raised by the various Interests, or~~
~~Presented Positions (as defined below) with respect to such Interests, represented by any~~
~~Negotiating Party; or (b) any Negotiating Party making submissions as to the extent and scope of~~
~~any additional representation rights.]__ [Note: the UCC understood that we already had an__
__agreement on how to handle the JA's multiple representations and that the language in__
__Section 3.3 represented that agreement]__

    *Section 3.4*    ~~*Section 3.5*~~Nothing in Section 3.1 shall affect the right of the Panel to
call additional Administrative Meetings to discuss administrative, procedural or other relevant
matters after the initial Administrative Meeting. Each such meeting shall constitute a separate
Administrative Meeting for the purposes of this Protocol and must comply with the requirements
set forth in Section 3.1.

## ARTICLE IV
### WRITTEN SUBMISSION BY THE NEGOTIATING PARTIES

    *Section 4.1*    Each Negotiating Party may submit a written statement to the Panel,
including, without limitation, Expert Reports (as defined below) and written Witness Statements
(as defined below), of such Negotiating Party's one or more Interests (as permitted by the Panel
pursuant to Sections 3.3 and 3.4) with regards to the allocation of the relevant Sale Proceeds
(such submission, the "First Round Submission").

    *Section 4.2*    Each Negotiating Party shall present in its First Round Submission
its methodology for the allocation of the relevant Sale Proceeds (the "Presented Position"). In
the case of a Negotiating Party that represents more than one Interest (as determined by the Panel
[HS: or pursuant to Sections 3.3 and 3.4 above]), such Negotiating Party may offer more than
one Presented Position to the Panel. The Presented Positions may also address any allocation or
allocation methodology adopted or employed by any Buyer. [HS: The Presented Position should
include the legal basis for the entitlement of the Negotiating Party and any Interest(s) it
represents to the Sale Proceeds and also the valuation methodology by which it is valued.] __[Note:__
__this additional language seems redundant. Please explain the intention of this proposed__
__additional sentence.]__

    *Section 4.3*    A Negotiating Party may rely, in its sole discretion, on one or more
experts as a means of evidence on specific issues (each such expert, an "Expert"). A report by an
Expert (each such report, an "Expert Report") shall include the following information: (i) a
description of the qualifications of such Expert, (ii) a description of the scope of work or
mandate of such Expert together with a copy of the engagement letter of such Expert, (iii) a
description of the compensation paid or to be paid to such Expert, (iv) a description of any
relationship on the part of such Expert within the two years immediately preceding the date that

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property    10

such Expert was first contacted with respect to the engagement that could reasonably be considered relevant to an assessment of the Expert's independence or objectivity, (v) a description of the scope of review conducted by such Expert (including a list of the materials and other information relied upon by such expert in preparing such report, the identity of all current or former employees, officers or directors of Nortel Group entities who such expert interviewed and relied upon in connection with the preparation of such report, and any limitation on the scope of such review), (vi) a statement of the facts on which such Expert is basing its opinions and conclusions, (vii) the allocation approach and methodology or methodologies selected by such Expert and the reasons for selecting the particular allocation approach and methodology or methodologies, (viii) the key assumptions made by such Expert, (ix) such Expert's findings, opinions and conclusions, and (x) any qualifications or limitations to which such Expert's findings, opinions or conclusions are subject. Notwithstanding anything to the contrary in this Protocol, a Negotiating Party need not disclose, and shall not be required to disclose, any information (other than the information set forth in the preceding sentence) concerning its Experts, including but not limited to (1) drafts of an Expert Report and (2) communications between a Negotiating Party (including its counsel) and an Expert (or documents reflecting such communications).[1314]

   *Section 4.4*      A Negotiating Party may rely on a written statement by any person, including, without limitation, any Party's officer, employee or other representative. Such witness statement must contain a full and detailed description of the facts, and the source of the witness's information as to those facts, sufficient to serve as that witness's evidence in the matter in dispute (each such statement, a "Witness Statement").[1415]

   *Section 4.5*      No Witness Statement or Expert Report shall be admissible unless such witness or Expert makes himself or herself available for an Examination (as defined below) and at the Evidentiary Hearing (as defined below), or unless the Negotiating Party or Negotiating Parties who requested such witness's or Expert's Examination or presence at the Evidentiary Hearing otherwise consents.[1516]

   *Section 4.6*      Each Negotiating Party shall provide a First Round Submission to the Panel, with a copy to all other Negotiating Parties, no later than the deadline established by the Panel for such submission (the "First Round Submission Deadline"). The First Round Submission of each Negotiating Party shall not be subject to any page limits.

   *Section 4.7*      Each Negotiating Party, in its sole discretion, may opt to submit a second written submission to the Panel, with a copy to all other Negotiating Parties, no later than the deadline established by the Panel for such submission, which shall be at least ● calendar days after the First Round Submission Deadline (respectively, the "Second Round Submission" and

---

[1314] HS: To be discussed: mechanism whereby Expert Evidence may be given by those advisers already engaged and objections will not be made to their independence. **[UCC agrees that issues raised by HS in FN's 14-16 require discussion]**

[1415] HS: Discuss whether Witness Statements should be by sworn affidavits or an equivalent statement of truth.

[1516] HS: Discuss mechanism to deal with circumstances where (a) an employee has left the employment of one of the Negotiating Parties; or (b) where a person is being uncooperative with the process.

the "Second Round Submission Deadline"). The Second Round Submission of each Negotiating Party shall not be subject to any page limits, provided that the Second Round Submission shall be limited to (a) responding to the First Round Submissions of other Negotiating Parties with regards to each Interest of the relevant Party and (b) presenting additional information or arguments in support of such Negotiating Party's Presented Position(s) based on Examination Testimony (as defined below) or new document discovery. For the purposes of this Protocol, the First Round Submission, the Second Round Submission, the Post-Hearing Submission (as defined below) and any other written submissions by any Negotiating Party to the Panel shall be collectively referred to as the "Written Submissions."

Section 4.8        Each Negotiating Party, in its sole discretion, may opt to submit one or more reports prepared by their Expert to respond to Expert Reports submitted by the other Negotiating Parties (each such report, a "Rebuttal Expert Report"). Such Rebuttal Expert Reports, to the extent such information is different from the Negotiating Party's Expert Reports or relevant to the Rebuttal Expert Report, shall include the information required in Section 4.3 herein for the submission of Expert Reports.

## ARTICLE V
## ACCESS TO INFORMATION

Section 5.1        Each Party shall have prompt and equal access to the Asset Sale EDR for any sale that the Negotiating Parties reasonably anticipate to fall within the scope of the Protocol. In addition, the Company has established an electronic data room (the "Data Room") to serve as a repository of all documents reasonably requested by the Negotiating Parties pursuant to Data Requests (as defined below) issued in accordance with Section 5.2. It has been the intention of the Parties to use reasonable best efforts to provide prompt and equal access to the Data Room to all Parties, and the Parties agree to continue using their reasonable best efforts to provide such prompt and equal access to the Data Room to all Parties. [For the avoidance of doubt, all information requested by or supplied to any Party shall be made available to all Parties.][16][17]

Section 5.2        Any Negotiating Party may send a written request to any Nortel Group entity, with a copy to all Negotiating Parties, for access to [pre-existing][17][18] documents [concerning such Nortel Group entity][HS: delete] in the possession of such Nortel Group entity that may be reasonably relevant to resolution of any dispute in respect of an In-Scope Sale (each a "Data Request"). The relevant Nortel Group entity shall use reasonable best efforts to make such documents available in the Data Room as soon as reasonably practicable. [HS: The Parties agree that the categories of documents set out in the information requests set forth in Schedule ____ [previously exchanged requests] are relevant for the purposes of this Section.] [Please explain the intent of this new language proposed by HS]

Section 5.3        [HS: Counsel for any Nortel Group entity who has been requested to provide documents shall provide a timely written certification confirming that persons acting

---

[16] OR/G: To be discussed. [17] The information playing field must be level. All information requested by or supplied to any party must be made available to all parties.

[17] OR/G: To be discussed [18] Parties should have access to all documents, whether or not they are pre-existing.

Error! Unknown document property
name.Error! Unknown document property
name Error! Unknown document property          12

under the supervision of counsel have made a reasonably diligent search for the requested documents and, except as otherwise indicated, all requested materials have been made available in the Data Room.]

     *Section 5.4*   [Commencing as early as the start of the negotiations for any Sale that the Parties reasonably anticipate to fall within the scope of this Protocol,][HS: delete] the Negotiating Parties shall use their reasonable best efforts to permit each Negotiating Party the same prompt and equal access to employees of NNC, NNL, and their debtor and non-debtor affiliates, including the Debtors and the Non-Filed Affiliates (each an "Employee"), for purposes of obtaining information relevant to a dispute and having the Employee provide a Witness Statement. To enable an Employee to prepare for an interview requested pursuant to this Section 5.4, the Negotiating Party requesting such an interview shall deliver to the Employee, reasonably in advance of such an interview, a list of topics or subject matters which the requesting Negotiating Party intends to cover with the Employee together with a list of information, if any, that the requesting Negotiating Party requests the Employee provide in writing. Any written information provided by such Employee in response to a request from a Negotiating Party shall be made available in the relevant Data Room as soon as reasonably practicable after it has been so provided. Interviews conducted pursuant to this Section 5.4 with Employees shall be expressly identified as being for such purpose and shall be separate from any discussions for the purpose of or in furtherance of a negotiated settlement of a dispute.

     *Section 5.5*   It is the intention of the Parties that each Employee will use its reasonable best efforts to assist any Negotiating Party that seeks assistance of such Employee. The Parties, however, acknowledge and recognize that (i) Employees have a corporate job function to perform with priorities that must be accommodated and (ii) each Employee's available time must be equitably shared with all Negotiating Parties. Each Negotiating Party shall use its reasonable best efforts to ensure that Employees within its control provide the assistance reasonably requested of them by any Negotiating Party consistent with the considerations mentioned herein.

     *Section 5.6*   Each Negotiating Party shall be permitted reasonable access to third parties that have rendered advice to another Negotiating Party relevant to a dispute (each a "Third Party"). Any Nortel Debtor to whom such advice was rendered shall use its reasonable best efforts to ensure that such Third Parties are made available to the Negotiating Parties. Notwithstanding the foregoing or anything to the contrary contained in Section 5.10 below, a Negotiating Party shall not be permitted access to Third Party advice rendered after the Filing Date [that is protected from disclosure by the attorney-client privilege, the solicitor-client privilege, the attorney work product doctrine or any other similar privilege.][HS: delete][18]. [Access to third party advice given before or after the Petition Date TBD][19]

     *Section 5.7*   Each witness that a Negotiating Party intends to call as a witness at an Evidentiary Hearing or from whom a Negotiating Party intends to submit a Witness Statement must be made available for a pre-hearing examination under oath (an "Examination") to take place following the First Round Submissions but no later than [●] days before the

---

[18][19] OR/G: To be discussed.

commencement of the Evidentiary Hearing,[1920] provided further that the Witness Statement of any individual that does not submit to an Examination, if requested, shall only be considered by the Panel upon the prior written consent of the Negotiating Party or Negotiating Parties that requested the Examination. A Negotiating Party may also request an Examination of any other Employee of another Party or Third Party. Each examination will be held at the location of the relevant witness unless otherwise agreed [to by the Negotiating Parties][HS: delete]. Each Negotiating Party may attend an Examination and may ask questions at such Examination regardless of whether such Negotiating Party requested the Examination of the witness. The Negotiating Parties shall agree in advance of an Examination on the length and scope of such Examination, or failing such agreement within ● days in advance, the Panel shall determine the length and scope of such Examination. Except for witnesses that a Negotiating Party intends to call as a witness at an Evidentiary Hearing or from whom a Negotiating Party intends to submit a Witness Statement, and unless the Party or Third Party whose Employee is requested to submit to an Examination consents to such Examination, the Panel, after submissions by the relevant Negotiating Parties and a hearing, may prevent an Examination solely on the grounds that such Examination would be unduly burdensome or would not likely lead to the discovery of relevant evidence.[2021]

*Section 5.8*   Each Negotiating Party shall use its reasonable best efforts to make available any Employee within its control for Examinations pursuant to Section 5.7 or for the Evidentiary Hearing if they may be properly called pursuant to Section 6.2 as a non-expert witness for such Evidentiary Hearing.[2122]

*Section 5.9*   [Each Expert that a Negotiating Party intends to present at an Evidentiary Hearing, if requested by another Negotiating Party, must be made available for an Examination no later than ● days before the commencement of the Evidentiary Hearing, provided, further that the Expert Report or Rebuttal Expert Report of any Expert that does not submit to an Examination, if requested, shall only be considered by the Panel upon the prior written consent of the Negotiating Party or Negotiating Parties that requested the Examination. Such Examination will be conducted in the manner described in Section 5.7.][HS: delete]

*Section 5.10*   [Testimony from an Examination ("Examination Testimony") shall be admissible at an Evidentiary Hearing [HS: keep only preceding language] if (i) the witness giving such Examination Testimony is unavailable to testify at the Evidentiary Hearing, or (ii) agreed upon by all of the Negotiating Parties. Where a witness will testify at an Evidentiary Hearing, such witness's Examination Testimony, {and, in the case of an Expert, the Expert Report or the Rebuttal Expert Report of such Expert,}[OR/G: delete] shall not be admissible except for the purpose of impeaching such witness's live testimony at the Evidentiary Hearing.] [Note: we

---

[1920] Parties to consider whether this should be tied to the Second Round Submission Deadline. [UCC believes that Examinations must be conducted prior to Second Round Submissions]

[2021] OR/G: Issue of Third Parties to be discussed. HS: Witnesses may want or require their own counsel and we will need to provide a mechanism to pay for such representation.The Company should not be responsible for legal (or any other) fees incurred by witnesses or Third Parties.

[2122] HS: To be discussed.

should allow the Panel to determine the admissibility of Examination Testimony at an Evidentiary Hearing rather than attempting to pre-determine admissibility through the Protocol] [Nothing herein shall prevent a Negotiating Party from quoting or referring to Examination Testimony in their Written Submissions.][22]

Section 5.11    [With respect to information created before the Filing Date that may be requested pursuant to this Article 5, the Parties agree not to withhold such information on the basis that such information is protected from disclosure by the attorney-client privilege, the solicitor-client privilege, the attorney work product doctrine or under any other similar privilege, provided that by so agreeing, the Parties do not intend to waive any such applicable privilege or protection from disclosure with respect to any non-parties to this Protocol, and provided further that no Party shall be compelled to disclose any information potentially subject to any applicable privilege or protection from disclosure until the Parties have entered into a common interest agreement in substantially the form set forth in Schedule 8.][23]

Section 5.12    All disagreements or controversies arising from or related to access to information and pre-hearing Examinations provided for under this Protocol including, but not limited to, any disagreements related to the Data Room, the scope and reasonableness of questions on Examinations, Witness Statements and Experts Reports (each, a "Discovery Matter") shall be referred to the Panel for resolution, which resolution shall be determined by at least a majority of the members of the Panel and shall be final and binding upon the Parties. The procedure for resolution of a Discovery Matter shall be left to the discretion of the Panel.

## ARTICLE VI[24]
### [COMPULSION OF THIRD PARTY DOCUMENTS AND WITNESSES; OPERATION OF THE COURTS]

Section 6.1    The Parties shall use their best endeavors to ensure that any witnesses or documents required by any other Party are procured. To assist in this, the Parties agree to support each other and assist in any application to the Courts for assistance to compel the production of documents and witnesses.

Section 6.2    The Parties agree to use the powers they have available under their respective insolvency regimes to ensure that any witnesses or documents required by any other Party are procured.

---

[22] OR/G: To be discussed whether Examination Testimony should be allowed to be used in Written Submissions, which may be inconsistent with only using Examination Testimony for impeachment purposes.

[23] OR/G: Delete provision on the grounds that disclosure should not be required if to do so would compromise a party's ability to assert privilege and this provision does not protect privilege under Canadian law The UCC cannot agree to Canada's suggestion to delete this paragraph. We are happy to discuss protections for privileged information vis-à-vis third parties, but this process will fail if we do not have access to this information.

[24] [HS suggests including this Article as a way to ensure the Courts' support of the arbitration process.] [The UCC believes this warrants further discussion]

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                   15

*Section 6.3*    The Joint Administrators acknowledge that Sections 234 to 236 of the Insolvency Act 1986 apply with respect to this Protocol and that documents gathered and evidence obtained through the interview of witnesses pursuant to such sections may be used in the Protocol and for the benefit of the EMEA Debtors.

*Section 6.4*    The US Court Order approving the Protocol will provide that any proceeding under the Protocol shall be considered an adversary proceeding for purposes of the power to obtain discovery from non-parties by issuing subpoenas under Bankruptcy Rule 7045, and that the US Court shall enforce such non-party subpoenas in the same manner as if they were issued from an adversary proceeding. The US Bankruptcy Court shall have the jurisdiction to decide any claims by any third parties that documents held by them or any party are not subject to such disclosure for any reason.

*Section 6.5*    In seeking the approval of the US and Canadian Courts to the entirety of this Protocol (as required by Section 10.6 herein), the US and Canadian Debtors will move that such order of the US and Canadian Courts approving this Protocol contain provisions, acceptable to each of the Parties acting reasonably, which entitle each Party to return to the US and Canadian Courts for an order to compel any person in the US or Canada that the Panel requests attend an Examination to attend to be examined as provided for under this Protocol, if such person fails to attend in accordance with Panel's initial request as served on such person.

## ARTICLE VII
## EVIDENTIARY HEARING; ORAL ARGUMENT

*Section 7.1*    Following submission of all Written Submissions, the Panel shall schedule one or more days of hearings, which may or may not be consecutive, at which the Panel shall receive oral evidence from the Negotiating Parties (an "Evidentiary Hearing").

*Section 7.2*    Each Negotiating Party may present oral testimony from (a) an Expert who has submitted an Expert Report or (b) a non-expert witness who has submitted a Witness Statement, so long as the Negotiating Party has given prior written notice to all other Negotiating Parties, in a timely manner and in accordance with any deadline established by the Panel for such notification, that such witness shall be called to provide evidence during an Evidentiary Hearing. Following the direct testimony of an Expert or non-expert witness, any other Negotiating Party may cross-examine such witness in an order to be determined by the Panel. The Negotiating Party that initially presented the Expert or non-expert witness shall subsequently have the opportunity to ask additional questions raised in the other Negotiating Parties' cross-examination.

*Section 7.3*    Evidence from proceedings held in connection with the resolution of [another][HS: delete and substitute "any"] dispute under this Protocol, including, without limitation, evidence from a prior Evidentiary Hearing, Administrative Meeting, Written Submission, Witness Statement, or Expert Report (as defined below) for a given In-Scope Sale ("Prior Evidence") shall be admissible in the proceedings for [subsequent][HS: delete and substitute "all"] In-Scope Sales, unless, on motion by any Negotiating Party, the Panel decides that the Prior Evidence shall not be admitted or otherwise limits the admissibility of the Prior

Evidence, provided that each Negotiating Party shall have the right to further re-direct and cross-examine[25] such Prior Evidence.[26]

Section 7.4      At the Evidentiary Hearing, each of the Negotiating Parties shall be entitled to examine witnesses, including Experts, from whom Witness Statements, Expert Reports or Rebuttal Expert Reports, as applicable, have been submitted by another Negotiating Party and present oral arguments in favor of their Presented Positions (the "Oral Argument").

Section 7.5      Evidentiary Hearings and Oral Argument shall be held at a time and location within New York, New York specified by the Panel, but in no event before • (•) calendar days or after • (•) calendar days of the Second Round Submission Deadline. For the avoidance of doubt, Evidentiary Hearings and Oral Argument shall be held in person.

Section 7.6      At the close of the final Evidentiary Hearing or final Oral Argument, whichever is later, the Panel shall determine whether to require post-hearing submissions, and if so, the scope, length and due dates for such submissions (each such submission, a "Post-Hearing Submission").

## ARTICLE VIII
## THE DECISION OF THE PANEL

Section 8.1      The Panel shall render a written decision (the "Decision") as soon as reasonably practicable after the completion of the final Evidentiary Hearing or final Oral Argument in the particular dispute. Each Decision, Supplementary Decision and any other decision of the Panel shall be made by at least a majority of the members of the Panel.

[OR/G: Each Decision or Supplementary Decision, as the case may be:

(i)      shall reflect the Panel's determination of a fair and reasonable allocation of the Sale Proceeds of the particular In-Scope Sale between and among each of the relevant Participating Parties based on an evaluation of the assets, rights, properties and liabilities of each such Participating Party sold, assigned, transferred or licensed to, or assumed by, the Buyer in such In-Scope Sale (including, without limitation, any intellectual property license rights of a Participating Party that were terminated pursuant to an Appropriate License Termination, as such term is defined in the Interim Funding Agreement, in connection with such In-Scope Sale), provided that the foregoing shall not require the Panel to allocate any amount of such Sale Proceeds to any or all of such assets, rights, properties or liabilities; and

(ii)     shall be determined without regard to, or adjustment for, any other claims, entitlements, set-offs or adjustments of any nature whatsoever.

---

[25] OR/G: Scope of cross to be discussed.

[26] TBD—Whether Prior Evidence should be subject to limitations set forth herein regarding the binding nature of previous agreements and/or Decisions. Canadian Debtors/Monitor also question whether cross-examination should be limited to the scope of direct examination.

~~For greater certainty, the Panel shall have no duty or authority to inquire into or determine (i) whether any Participating Party is responsible for any alleged breach or non-performance of, or any indemnification obligation under, the terms of any Acquisition Agreement, or (ii) any Adverse Claim (as defined below) that may be asserted by any Participating Party (an "Adverse Person"). For this purpose, "Adverse Claim" means a claim that a particular Adverse Person is or was the rightful owner of or has or had an interest in the particular asset, right, property or liability that was not recorded in the instrument of title, deed, grant, lease, license or agreement governing the ownership, creation, invention, development or establishment of the asset, right, property or liability.~~]

[Note: The UCC will not agree to Canada's proposed language. We have already negotiated these issues and agreed that we will not decide for the Panel what they can and cannot consider in rendering an allocation Decision.]

    *Section 8.2*    The Decision shall contain: (a) the percentage,[37][25] if any, (rounded to four decimal points) of the Sale Proceeds of a given In-Scope Sale to be allocated to the Canadian Debtors, the US Debtors, the EMEA Debtors and the Non-Filed Affiliates (an "Allocation"); (b) if the Panel deems appropriate, instructions to the Escrow Agent to distribute the relevant Sale Proceeds to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Joint Administrators (on behalf of the EMEA Debtors) and to the Non-Filed Affiliates in accordance with the applicable Allocation immediately after the 15-day period set forth in Section 8.10 has elapsed without any application by a Party for a correction thereunder; and (c) [if necessary, a ruling on the allocation of any amounts to be returned to the Participating Parties from any reserves or escrow accounts established as part of the applicable In-Scope Sale.][28][26] Following the issuance of a Decision, and upon the written request of any of NNL, NNI (with the consent of the Creditors' Committee), the Joint Administrators (on behalf of the EMEA Debtors) or the Affiliates' Representative, the Panel, [only after submissions by all reasonably affected Parties and a hearing,][HS: delete] may issue a supplementary decision containing the percentage, if any, (rounded to four decimal points) of the applicable Allocation of the Sale Proceeds of such In-Scope Sale to be allocated amongst the group of debtors or affiliates represented by the Party requesting the supplementary decision (each such supplementary decision, a "Supplementary Decision"). [HS: Before issuing a Supplementary Decision, the Panel will provide ~~the group of debtors or affiliates represented by the Party requesting the Supplementary Decision~~any reasonably affected Parties, through their representative, the opportunity to make submissions and~~, if necessary, hold a hearing~~ participate in an Evidentiary Hearing.] Any incremental costs incurred in connection with the prosecution and rendering of a Supplementary Decision shall be borne solely by the Party or Parties requesting such Supplementary Decision, including any Panel Costs incurred in accordance with Section 2.5. No Party will deliver a duly authenticated copy of any Decision or Supplementary Decision of the Panel to any Escrow Agent directing a release of any Sale Proceeds from any Escrow Account

---

[37] ~~OR/G: To be discussed whether an~~[25] Allocation ~~may alternatively~~should be expressed ~~in U.S. dollars.~~ in percentages, not dollars. It will assist in the calculation of the various adjustments based on allocated percentages in other documents (i.e., side agreements).

[28][26] TBD -- Whether to include a schedule of the reserve or escrow accounts from the sales to be dealt with in a Decision.

unless such Decision or Supplementary Decision contains an express direction to the Escrow Agent for the release of such Sale Proceeds to some or all of the Participating Parties.

     *Section 8.3*    Each Decision, Supplementary Decision and any other decision of the Panel shall be made in writing, and shall contain a statement signed by each member of the Panel certifying that such writing constitutes the decision of the Panel. Any Decision or Supplementary Decision, [in the sole discretion of the Panel, may][HS: delete and change "may" to "shall"] contain a short statement of the reasons upon which such Decision or Supplementary Decision, as the case may be, is based, <u>provided</u> that such Decision or Supplementary Decision, as the case may be, shall not include any dissenting reasons.

     *Section 8.4*    In rendering a Decision or Supplementary Decision and an Allocation set forth in such Decision or Supplementary Decision, the Panel shall (i) treat as final and binding any Partial Allocation Amount, and (ii) not be bound to adopt, follow or place any weight in rendering a Decision on (x) any allocation contained in the relevant Transaction Documents, other than as set forth in <u>Schedule 7</u> attached hereto (such schedule to be supplemented from time to time with the consent of the Negotiating Parties), where "<u>Transaction Documents</u>" means, with respect to an In-Scope Sale, any agreement (a) among the one or more Participating Parties, or (b) one or more Participating Parties and the Purchaser, relating to or in connection with such In-Scope Sale, or (y) any previous Decision or Allocation of Sale Proceeds of the Panel relating to another In-Scope Sale. Additionally, in rendering such a Decision, Supplementary Decision or an Allocation contained in such Decision or Supplementary Decision the Panel shall not be bound (a) to select one of the Presented Positions; (b) to adopt, follow or place any weight on anything contained in the Acquisition Agreements or any side or related agreement, [including any allocation agreed with the Buyer in or pursuant to the relevant Acquisition Agreement or any side or related agreement; [(c) by any previous Decision or Allocation of Sale Proceeds by the Panel relating to another In-Scope Sale; or (d) by the rules, provisions or administrative practices of any particular national, provincial, state or other law or legal system or government agency or the principles or standards of any particular organization or association (each such rule, provision, administrative practice, principles or standards, an "<u>Allocation Rule</u>"), <u>provided</u> that the Panel may, in its sole discretion, base a Decision, an Allocation or a Supplementary Decision or any element thereof upon one or more Allocation Rules.][HS: delete]

     ~~*Section 8.5*~~    ~~[HS: The Panel shall base a Decision, an Allocation or a Supplementary Decision or any element thereof upon the relevant laws of the state or country governing or relating to the underlying transaction or issue. The Panel in its own discretion may also have regard to valuation principles and practices which it considers relevant.]~~

<u>[Note: The UCC cannot agree to the language added by HS regarding choice of law. We cannot dictate to the Panel what law, practices or principles they will rely on in making their allocation Decisions.]</u>

     <u>*Section 8.5*</u>    ~~*Section 8.6*~~ [HS: The Parties agree that they shall not tender as evidence or rely on as evidence of an allocation (i) any allocation contained in the relevant Transaction Documents (as defined in Section 8.4 above), other than as set forth in <u>Schedule 7</u> attached

hereto (such schedule to be supplemented from time to time with the consent of the Negotiating Parties), (ii) any agreement (a) among the one or more Parties, or (b) one or more Parties and the Purchaser, relating to or in connection with such In-Scope Sale, and (iii) [further condition to reflect tax situation.]][Please explain the purpose of this new section.]

<u>Section 8.6</u>    ~~Section 8.7~~ [Placeholder for language excluding tax returns.]

<u>Section 8.7</u>    ~~Section 8.8~~ If the Negotiating Parties agree at any point in time prior to the relevant Decision as to a Partial Allocation Amount in respect of the Sale Proceeds of a particular In-Scope Sale, then the ~~[Panel shall render a Decision only with respect to the allocation of] [HS: delete and substitute with: Decision of the Panel shall take into account~~Panel shall incorporate the Partial Allocation Amount ~~in allocating] the remaining portion of such Sale Proceeds~~into a Decision. If the relevant Parties agree at any point in time prior to the relevant Supplementary Decision as to the Allocation of any portion of the relevant Sale Proceeds allocated to the applicable Participating Parties pursuant to the applicable Decision, [then the Panel shall render a Supplementary Decision only with respect to the allocation of the remaining portion of the Sale Proceeds allocated to such Participating Parties pursuant to the applicable Decision][HS: delete and add: (the "<u>Supplementary Partial Allocation</u>"), then the Panel shall take into account the Supplementary Partial Allocation in allocating the remaining portion of the Sale Proceeds to the entities affected by the Supplementary Decision.]

<u>Section 8.8</u>    ~~Section 8.9~~ The Panel shall not use, consult with or appoint any expert to report to the Panel on any issue.

<u>Section 8.9</u>    ~~Section 8.10~~ After the Panel has entered a Decision or Supplementary Decision, the Panel shall be barred from modifying such Decision or Supplementary Decision, as the case may be, other than to correct a clerical, computational or typographical error contained in the Decision or Supplementary Decision. If the Panel makes such a correction on its own initiative, it shall do so within 15 days of the date of the Decision or Supplementary Decision, as the case may be. Any application by a Party for such a correction must be made within 15 days of the date of the Decision or Supplementary Decision, as the case may be.

<u>Section 8.10</u>    ~~Section 8.11~~ Any Decision and Supplementary Decision of the Panel shall be conclusive, final and binding in connection with the applicable In-Scope Sale and, to the fullest extent permitted by applicable law, may not be challenged, appealed or sought to be vacated or set aside by any Party in any jurisdiction.

<u>Section 8.11</u>    ~~Section 8.12~~ Any Decision and Supplementary Decision of the Panel shall be deemed an arbitral award enforceable under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "<u>Convention</u>") and all legislation implementing the Convention, including, in the United States, the United States Federal Arbitration Act.

<u>Section 8.12</u>    ~~Section 8.13~~ Provided that a Decision contains an appropriate instruction to the Escrow Agent, the Sale Proceeds for an In-Scope Sale shall be transferred by the Escrow Agent, in accordance with the Allocation contained in such Decision and the terms of

the relevant escrow agreement, after the relevant Decision has been rendered, without the need for an order from any of the Courts.

Section 8.13    ~~Section 8.14~~ [Except as expressly provided for in any agreement of the relevant parties, neither this Protocol nor any Decision of the Panel shall preclude any Participating Party from asserting any legally cognizable claim or defense against any other Participating Party pursuant to the applicable claims procedure approved by the applicable Court by or on behalf of any Participating Party against any other Participating Party.][29]

ARTICLE IX
CONFIDENTIALITY

Section 9.1    Except as may be required by applicable law or court order or by an authority having appropriate jurisdiction, each Party agrees (i) to maintain confidentiality as to all aspects of these procedures, including, without limitation, any Information (as defined below), the presentation of any issue to the Panel, any discussions, deliberations or proceedings of the dispute resolution procedure set forth in this Protocol, including without limitation any Submissions, Oral Arguments or Post-Hearing Submissions (the "Confidential Material") and (ii) not to use any Confidential Material for its own benefit or the benefit of any of its affiliates, including, without limitation, for the purpose of asserting or proving a Claim (as defined in Section 101(5) of the Bankruptcy Code) against any Debtor in any of the Proceedings, it being understood that the Parties may disclose the existence and nature of this Protocol and the dispute resolution procedure conducted hereunder as may be necessary to (x) satisfy any Condition (as defined below) or (y) comply with the applicable laws, including, without limitation, the U.S. federal or state securities laws or any Canadian federal, provincial or territorial securities laws, and it being further understood that the Parties may disclose any Decision or Supplementary Decision by the Panel. As used in this Section 8.1, "Information" means any and all documents and information obtained by or on behalf of a Party from another Party or Nortel Group entity pursuant to this Protocol, including, without limitation, documents and information made available in the Data Room, Witness Statements, Written Submissions, responses given by Employees in interviews pursuant to Section 5.3, Examination Testimony and oral testimony given in any Evidentiary Hearing (but excluding any Decision or Supplementary Decision).

Section 9.2    In the event that a Party is served with or otherwise subject to legal process (including subpoena or discovery notice) requiring it to testify about, to produce, or otherwise to divulge Confidential Material, to the extent permitted by applicable law such Party will as soon as practicable inform the provider(s) of such Confidential Material so that the provider may seek a protective order or other remedy. In the event that such protective order or other remedy has not been obtained and such entity is advised, in the opinion of counsel, that it is legally compelled to disclose any of the Confidential Material, such Party may disclose only such Confidential Material so advised to be disclosed.

---

[29] ~~OR/G: Delete this section because claims against an estate should be asserted in the applicable claims resolution procedure and not under the Protocol. HS also requests deletion of this section.~~

*Section 9.3*    The Parties further agree that prior to the appointment of any individual to the Panel or appointment as an Expert by any Party, such individual shall agree in writing to preserve the confidentiality of the dispute resolution procedure conducted under this Protocol and all Confidential Material obtained hereunder.

*Section 9.4*    Nothing herein shall prevent any Party from disclosing information regarding the dispute resolution procedure conducted under this Protocol or all Confidential Material obtained hereunder for purposes of any legal proceedings brought in accordance with Section 10.4 to resolve any dispute arising from, relating to or in connection with the enforcement or implementation of this Protocol, including, without limitation, any matters relating to enforcement or otherwise of any Decision or Supplementary Decision.

~~*Section 9.5*    [HS: On the entering into of an appropriate confidentiality agreement, the Parties agree that representatives of the Parties' creditors may attend all proceedings relating to this Protocol, including, but not limited to, Administrative Meetings, Evidentiary Hearings and Oral Arguments. Notwithstanding this, if any Party is of the view that a certain subject matter requires further confidentiality restrictions, they may petition the Panel for that proceeding or part of it to be held in camera.]~~

<u>*Section 9.5*</u>    ~~*Section 9.6*~~[HS: The Parties agree that the Parties may disclose the terms, existence and nature of this Protocol to their creditors.]

## ARTICLE X
## MISCELLANEOUS

*Section 10.1*    In all matters not expressly provided for in this Protocol, the Panel and the Parties shall act in the spirit of this Protocol and shall make every reasonable effort to ensure that any Allocation pursuant to this Protocol will be legally enforceable.

*Section 10.2*    All notices, requests, instructions, directions and other communications provided for herein shall be made in writing (including by facsimile) delivered to the intended recipient as follows:

**If to the US Debtors:**
c/o Nortel Networks Inc.
Attention: John Ray
Address: 2221 Lakeside Boulevard
          Richardson, Texas 75082
          U.S.A.
Facsimile No.: [ ]
Telephone No.: [+1 312 259 7627]

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley, Esq.
Address: One Liberty Plaza
          New York, New York 10006
          U.S.A.
Facsimile No.: +1 212 225 3999
Telephone No.: +1 212 225 2163

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    22

**If to the Canadian Debtors:**
c/o Nortel Networks Limited
Attention: Anna Ventresca, Esq.
              Chief Legal Officer
Address: 5945 Airport Road, Suite 360
              Mississauga, Ontario L4V 1R9
              Canada
Facsimile No.: +1 905 863 2075
Telephone No.: +1 905 863 1204

**With a copy to:**
Ogilvy Renault LLP
Attention: Derrick Tay, Esq. and Michael J.
Lang, Esq.
Address: Suite 3800
              Royal Bank Plaza, South Tower
              200 Bay Street, P.O. Box 84
              Toronto, Ontario M5J 2Z4
              Canada
Facsimile No.: +1 416 216 4832 / 216 3930
Telephone No.: +1 416 216 4832 / 216 3939

**If to the EMEA Debtors:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
              London SE1 2AF
              United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**With a copy to:**
Herbert Smith LLP
Attention: Stephen Gale, Esq. and Kevin Lloyd,
Esq.
Address: Exchange House
              Primrose Street
              London EC2A 2HS
              United Kingdom
Facsimile No.: +44 (0) 20 7098 4878
Telephone No.: +44 (0) 20 7466 2271

**If to the Monitor:**
c/o Ernst & Young, Inc.
Attention: Murray A. McDonald
Address: Ernst & Young Tower
              222 Bay Street, P.O. Box 251
              Toronto, ON M5K 1J7
              Canada
Facsimile No.: +1 416 943 3300
Telephone No.: +1 416 943 3016

**With a copy to:**
Goodmans LLP
Attention: Jay Carfagnini, Esq.
Address: 250 Yonge Street, Suite 2400
              Toronto, Ontario M5B 2M6
              Canada
Facsimile No.: +1 416 979 1234
Telephone No.: +1 416 597 4107

**If to the Creditors' Committee:**
c/o Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara, Esq.
              David H. Botter, Esq.
Address: One Bryant Park
              New York, New York 10036
              U.S.A.
Facsimile No.: +1 212 872 1002
Telephone No.: +1 212 872 8040

**If to the Bondholders' Committee:**
c/o Milbank, Tweed, Hadley & McCloy LLP
Attention: Albert A. Pisa, Esq.
Address: One Chase Manhattan Plaza
              New York, New York 10005-1413
              U.S.A.
Facsimile No.: +1 212 530 5219
Telephone No.: +1 212 530 5319

All notices, requests, instructions, directions and other communications to be sent under

Error! Unknown document property
name.Error! Unknown document property
name Error! Unknown document property                23

this Protocol to the Non-Filed Affiliates shall be made in writing (including by facsimile) and delivered to the contact addresses or facsimile numbers set forth in Schedule 4 hereto.

*Section 10.3*     The terms of this Protocol shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction, except to the extent that the United States Federal Arbitration Act applies, provided that Section 10.7 shall be governed exclusively by English law. [HS: For the avoidance of doubt, the Parties do not agree that the underlying issues and the subject of the dispute are governed by New York law, and the Panel will determine the relevant laws pertaining to such issues.]

*Section 10.4*     To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the exclusive jurisdiction of the [US Court and the Canadian Court (in a joint hearing conducted under the cross-border protocol adopted by such courts, as it may be in effect from time to time (the "Cross-Border Protocol"))][HS: delete and add: federal and state courts sitting in New York County, State of New York][27], for purposes of all legal proceedings arising from, relating to or in connection with the enforcement or implementation of this Protocol, including, without limitation, any matters relating to enforcement or otherwise of any Decision or Supplementary Decision, (ii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such courts or any claim that any such action brought in such courts has been brought in an inconvenient forum, (iii) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law, provided that any claim, action or proceeding set forth in Section 10.8 shall be brought exclusively in the English courts.

*Section 10.5*     Each Party set forth on Schedule 6[3028] (each such party, "Designating Party") has appointed ● as its authorized agent (the "Process Agent"), upon whom process may be served in any legal proceeding arising from, relating to or in connection with the enforcement or implementation of this Protocol. Each Designating Party consents to process being served in any legal proceeding arising from, relating to or in connection with the enforcement or implementation of this Protocol by mailing a copy thereof by registered or certified mail to the Process Agent. Each Designating Party hereby represents and warrants that the Process Agent has accepted such appointment and has agreed to act as said agent for service of process, and each Designating Party agrees to take any and all action, including the filing of any and all documents that may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the Process Agent shall be deemed, in every respect, effective service of process upon the relevant Designating Party.

*Section 10.6*     No provision of this Protocol (other than as set forth in Sections [9.2, 9.3, 9.4, 9.6, 9.7, 9.10, 9.11, 9.15, 9.17 and 9.18]) shall be effective until the satisfaction of the

---

[27] Movement of jurisdiction to federal and state courts in New York county TBD

[3028] Non-Filed Affiliates + EMEA Non-Filed entities. TBD – whether EMEA Debtors should be included in this list.

following conditions: (A) each of the US Court and the Canadian Court approve the entirety of this Protocol and all of the provisions hereof and (B) the Joint Administrators apply to the UK Court and receive a direction from the UK Court that they are at liberty to enter into this Protocol [and it approves the entirety of this Protocol and all of the provisions hereof] (the "Conditions"). [3129]

Section 10.7    [Nothing contained in any Transaction Document, including without limitation any intellectual property license termination agreements, shall be with prejudice to (A) any right, entitlement or claim by or on behalf of NNL or any affiliate or subsidiary which licensed any intellectual property from NNL (each a "Nortel Licensee") to assert solely as (x) between NNL and any such Nortel Licensee or (y) between two or more Nortel Licensees any ownership or proprietary interest in and to the intellectual property subject to the intellectual property licenses, whether in respect of or pursuant to that certain Master Research and Development Agreement, dated as of December 22, 2004 (as amended and supplemented from time to time, the "Master R&D Agreement"), or otherwise, for the purpose of advocating such position in connection with an allocation of the Sale Proceeds resulting from the sale, license or other disposition of the intellectual property in an In-Scope Sale, or (B) the right, entitlement or claim by or on behalf of NNL or any Nortel Licensee to dispute and defend any such assertions in connection with an allocation of Sale Proceeds from an In-Scope Sale.][32]

Section 10.8    The Parties agree that the Joint Administrators have negotiated and are entering into this Protocol as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Protocol or under or in relation to any associated arrangements or negotiations. The Joint Administrators are a Party to this Protocol: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Protocol. Notwithstanding anything to the contrary in this Protocol, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Protocol shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts. [3330]

Section 10.9    The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations

---

[3129] Section revised by HS.

[32] OR/G: Delete as it is beyond the scope of the Protocol and intrudes on the jurisdiction of the applicable claims resolution procedures.

[3330] UK counsel to advice whether we need language delegating authority from NNSA to the Joint Administrators.

Error! Unknown document property
name.Error! Unknown document property
name Error! Unknown document property        25

under this Protocol or under or in relation to any associated arrangements or negotiations. The Joint Israeli Administrators are a party to this Protocol: (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (a) obtaining the benefit of any provisions of this Protocol expressed to be conferred on them and (b) enforcing the obligations of the other Parties to this Protocol. Notwithstanding anything to the contrary in this Protocol, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents, (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the courts of Israel.

    *Section 10.10*    Except as specifically set forth in this Protocol, this Protocol is not intended to, and shall not, create rights in any person or entity not a Party hereto.

    *Section 10.11*    Other parties may be added to this Protocol only with the prior unanimous written consent of all Parties hereto, which consent shall not be unreasonably withheld.

    *Section 10.12*    This Protocol may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original, shall be binding on the Party who signed the counterpart and together shall constitute a single agreement.

    *Section 10.13*    This Protocol constitutes the complete agreement among the Parties with respect to the subject matter herein, and supersedes all other agreements among some or all of the Parties with respect to the subject matter herein. This Protocol may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all the remaining Parties to this Protocol, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts.

    *Section 10.14*    This Protocol does not affect the confidentiality of any information exchanged between or among any of the Parties pursuant to any prior agreements or understandings.

    *Section 10.15*    This Protocol shall inure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns from the date of its execution, but is expressly subject to and contingent upon its approval and entry by the Courts.

    *Section 10.16*    Each Party to this Protocol shall (a) use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Protocol; (b) keep all other Parties reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and (c) use commercially reasonable efforts to allow any other Party, which so requests in writing, reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property.    26

*Section 10.17*    Subject to satisfaction of the Conditions, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof: (a) such Party has the power and authority to enter into this Protocol and to carry out its obligations hereunder; (b) the execution of this Protocol, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Protocol; and (c) this Protocol has been duly executed by such Party and constitutes the legal, valid and binding obligations of such Party.

*Section 10.18*    In the event that any provision of this Protocol shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Protocol found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision. [Notwithstanding anything to the contrary in this Section, in the event that all or any part of Section(s) ● of this Protocol shall be found pursuant to a final order of a court or tribunal with competent jurisdiction to be illegal, invalid or unenforceable, or any part of Section(s) ● is any way struck down or modified without the consent of the Parties, this Protocol in its entirety shall automatically terminate and shall cease to have any force and effect.]³⁴

*Section 10.19*    Except as specifically set forth in this Protocol, the obligations of each Party hereunder are several, and not joint and several.

*Section 10.20*    If any of the Parties, the Experts, the Affiliates' Representative or the Panel shall have an obligation or deadline imposed pursuant to this Protocol that shall fall on any of a Saturday, Sunday or a national public holiday in any of the United States, Canada or the United Kingdom, such Party, Expert or the Panel shall have until the next Business Day immediately following such day to comply with such deadline or obligation.

*Section 10.21*    The Parties agree that, if after the date hereof, any subsidiary of any US Debtor commences chapter 11 proceedings in the US Court, then the Parties and such entity shall enter into an accession agreement whereby such entity shall accede to this Protocol as a US Debtor.

*Section 10.22*    The Non-Filed Affiliates hereby appoint [●] as the Affiliates' Representative and grant the Affiliates' Representative the authority to represent each Non-Filed Affiliate in all matters relating to this Protocol, including, without limitation, the power (a) to agree to any Partial Allocation Amount on behalf of the Non-Filed Affiliates, (b) to agree to a [fair and equitable] allocation of the Sale Proceeds pursuant to Section 1.1 or otherwise, (c) to amend or waive any provision of this Protocol, (d) to deliver and receive any notices permitted or required under this Protocol, and (e) to perform on behalf of the Non-Filed Affiliates any other

---

³⁴ OR/G: Is this provision intended to apply retroactively?  HS: Which provisions are intended to be non-severable?

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                27

act which the Affiliates' Representative deems necessary or desirable in the performance of the Affiliates' Representative's role under this Protocol. Any action taken by the Affiliates' Representative and any agreement or settlement entered into by the Affiliates' Representative on behalf of the Non-Filed Affiliates in connection with the performance of this Protocol shall be binding upon and enforceable against the Non-Filed Affiliates without any need for further ratification by the Non-Filed Affiliates. In addition, the Non-Filed Affiliates hereby grant the Affiliates' Representative the authority to select and retain one counsel and financial advisor to assist the Affiliates' Representative in connection with any proceedings or matters under this Protocol.

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property 

28

IN WITNESS WHEREOF, the Parties hereto have caused this Protocol to be duly executed and delivered as of this [•]th day of [•].

NORTEL NETWORKS CORPORATION

By
    Name:
    Title:

NORTEL NETWORKS LIMITED

By
    Name:
    Title:

NORTEL NETWORKS GLOBAL
CORPORATION

By
    Name:
    Title:

NORTEL NETWORKS
INTERNATIONAL CORPORATION

By
    Name:
    Title:

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By
    Name:
    Title:

This is Exhibit "C" referred to in the

Affidavit of Natasha De Cicco

sworn before me, this 3rd

day of June , 2011

_____

A Commissioner, etc.

Scott Bomhof

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------X
                                               :
                                               :   Chapter 11
                                               :
In re                                          :   Case No. 09-10138 (KG)
                                               :
Nortel Networks Inc., et al.,[1]               :   Jointly Administered
                                               :
                        Debtors.               :
                                               :
                                               :
                                               :
                                               :
-----------------------------------------------X
```

**SECOND DECLARATION OF INNA ROZENBERG IN SUPPORT OF
JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN
ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING
AND SETTLEMENT AGREEMENT, AND FOR RELATED RELIEF**

I, Inna Rozenberg, do hereby declare as follows:

1.      I am associated with the law firm of Cleary Gottlieb Steen & Hamilton

LLP, co-counsel to Nortel Networks Inc. and its affiliated debtors, as respective debtors and

debtors in possession (collectively, the "U.S. Debtors"), in the above-captioned proceeding. I am

admitted to the bar of the State of New York and have been a member in good standing of such

bar since 2001. I respectfully submit this second declaration in support of the joint motion for

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are: Nortel Networks Inc. ("NNI") (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems
Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera
Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel
Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel
Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. ("NN CALA") (4226) (collectively, the
"Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://chapter11.epiqsystems.com/nortel.

entry of an order establishing an Allocation Protocol pursuant to the Interim Funding and Settlement Agreement, and for related relief (the "Joint Motion"), dated April 25, 2011.[2]

2.      Annexed to this second declaration are true and correct copies of the following documents that are cited and relied upon in the reply memorandum in further support of the Joint Motion and in response to the EMEA Debtors' cross-motion to compel arbitration, filed by the U.S. Debtors and the Committee on June 2, 2011:

a.      Attached hereto as Exhibit 1 is a true and correct copy of the Joint Administrators' fourth progress report to creditors, dated February 11, 2011.

b.      Attached hereto as Exhibit 2 is a true and correct copy of the Joint Administrators' second progress report to creditors, dated February 12, 2010.

c.      Attached hereto as Exhibit 3 is a true and correct copy of the MEN Distribution Escrow Agreement, dated March 19, 2010.

d.      Attached hereto as Exhibit 4 is the Opinion of the Superior Court of Justice – Ontario, Nortel Networks Corp (Re), 2011 ONSC 1091, dated February 17, 2011.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2011.

_Inna Rozenberg_
Inna Rozenberg

---

[2]      Capitalized terms used herein but not otherwise defined shall have the same meaning as ascribed to them in the Joint Motion.

EXHIBIT 1

**≣‖ ERNST & YOUNG**

Ernst & Young LLP
1 More London Place
London SE1 2AF

Tel. 020 7951 2000
Fax: 020 7951 1345
www.ey.com/uk

TO ALL KNOWN CREDITORS

11 February 2011

Ref: MLP/TE/DM/TF/L03547

Tara Felton
Direct line: 020 7951 8151
Direct fax: 020 7951 1345
Email: tfelton@uk.ey.com

Dear Sirs

## Nortel Networks UK Limited (In Administration) ("the Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court Case number 536 of 2009

We write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a fourth report on the progress of the Administration (the "**Report**"). This Report covers the period from 14 July 2010 to 13 January 2011 and should be read in conjunction with the Joint Administrators' previous reports dated 13 August 2009, 13 February 2010 and 12 August 2010, as well as the Joint Administrators' Statement of Proposals dated 23 February 2009. Additional copies of this Report, and the previous reports referred to, can be made available on request or can be obtained at the following;

www.nortel.com/corporate/adminprogreports.html

The Company entered administration (the "**Administration**") on 14 January 2009 when AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "**Joint Administrators**") by an order (the "**Order**") of the High Court of Justice of England and Wales (the "**Court**"), following an application made by the Company's directors.

This was part of a wider restructuring of the Nortel group of companies. Nortel Networks Corporation ("**NNC**"), the ultimate parent company of the Nortel group, Nortel Networks Limited ("**NNL**") and certain of its other Canadian subsidiaries filed an application for creditor protection under the Companies' Creditors Arrangement Act ("**CCAA**") in Canada to facilitate a comprehensive business and financial restructuring under the CCAA. Nortel Networks Inc ("**NNI**"), Nortel Networks Capital Corporation and a number of other US Nortel group companies filed petitions in the United States under Chapter 11 of the US Bankruptcy Code.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office.



**ERNST&YOUNG**

2

On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region (**"EMEA"**). Article 3 of the EC Regulation on Insolvency Proceedings 1346/2000 (the **"EC Regulation"**), states that the court of the EC member state in which the centre of main interests (**"COMI"**) of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the **"EMEA Companies"**), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company. Details of the 19 companies are provided at Appendix 1.

The Nortel group of companies (the **"Group"**) reports in US dollars (**"US$"**), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

Please refer to the disclaimer at the end of the principal section of this report.



## 1. Executive Summary of Progress of the Administration

### Purpose of the Administration

The Joint Administrators continued to trade the Company's businesses with a view to achieving either a rescue of the Company as a going concern or a better result for the Company's creditors as a whole than would be likely if the Company were wound up. In 2009, it became clear that, owing to the financial and market pressures facing the Nortel businesses, the sale of all businesses would be necessary and a rescue of the Company as a going concern would not be possible.

The Joint Administrators considered that the decision to continue to trade, even at a carefully monitored loss, in order to achieve going concern values for the businesses and business assets, and to avoid contingent claims, would be to the benefit of creditors as a whole. Now that the sale process is near completion, this decision is justified by the realisations achieved (subject to a final apportionment of those proceeds to the Company) and contingent claims avoided.

### Sale of Businesses and Assets

The Group principally operated in four business segments: Enterprise Solutions ("**Enterprise**"); Metro Ethernet Networks ("**MEN**"); Carrier Networks, which comprises Global System for Mobile Communications ("**GSM**"), Carrier VoIP Application Solutions ("**CVAS**") and the Multi Service Switch business ("**MSS**"); and Code Division Multiple Access ("**CDMA**").

With the exception of MSS all businesses had been sold by 30 June 2010. The total global sales proceeds, which are held in escrow pending allocation within the Group (as further explained below), now exceed US$3 billion. Since our last report the MSS business has continued to operate across Europe whilst a sale was explored.

A sale of the MSS business was agreed on 24 September 2010 with Telefonaktiebolaget Ericsson for a headline price of $65 million, but has not yet completed.

Owing to the integrated nature of the Group's business, it is necessary for some EMEA Companies to provide transitional services to the purchasers for a period of one year post sale completion. Such services include the provision of various back office functions, infrastructure support and other assistance to enable each purchaser to integrate the business with their own. The purchasers will meet the direct cost of these services.

Nortel Networks International Finance & Holdings B.V. ("**NNIFH**"), a fully owned subsidiary of the Company, completed a share transfer agreement for its shareholding in Networks Netas Telekomunikasyon A.S. ("**Netas**") on 22 December 2010.

Buyers are being sought, and other options are being considered, for the Group's remaining intellectual property portfolio.



ⅢⅠ ERNST & YOUNG

4

**Next Steps**

The Joint Administrators, having completed the principal trading phase of the Administration, are now focused on winding down the Company's affairs and resolving outstanding issues with the other Group companies.

The key remaining issues for the EMEA companies are to deal with the post sale arrangements, including; the continuation of the transitional services currently being provided; the resolution of intra-Group issues such as Purchase Price Allocation ("PPA") and related claims; the Financial Support Directions ("FSD") claims by the UK Pensions Regulator ("TPR") on certain EMEA companies (but not the Company); and the development of an appropriate process to agree creditors' claims and distribute available funds to them.

In addition, the Joint Administrators are currently finalising the Company's trading operations, settling post appointment liabilities and collecting working capital assets.

Since our last report, we have held detailed discussions with the representatives of other Group estates and key stakeholders (e.g. US Bondholders and The Pensions Regulator) in order to progress a negotiated settlement in respect of most of these issues.

Owing to the complexities of the various estate claims this is, by nature, a gradual process. However, the Joint Administrators have continually attempted to drive the process forward and maintain momentum so that an appropriate return may be achieved for creditors and a distribution to creditors can be made as early as possible.

It is possible, however, that differences may not be reconciled and that a more formal approach to settling disputes may be required, which would inevitably delay any distribution.

The Joint Administrators have continued to hold confidential meetings with the Company's creditors' committee ("the Committee") in order to update it on events and the strategy adopted.

Further information is contained in the sections that follow.

 **ERNST & YOUNG**

### 2. Business Disposal Strategy

The Joint Administrators have now completed the disposal of the majority of businesses. The Joint Administrators consider that this has achieved a better return for creditors of the Company than would otherwise have been possible, owing to likely higher levels of realisations, the preservation of jobs through the transfer of employees to new entities, and the orderly transfer of contracts to purchasers.

All sales of the major businesses were dealt with on a global basis in conjunction with the rest of the Group. The disposals, excluding the GSM transaction, followed a stalking horse auction process under Section 363 of the US Bankruptcy Code. The Joint Administrators were actively involved in these auction processes and in setting the auction parameters subsequently approved by the US and Canadian courts.

### Completed Disposals

The following transactions have been completed.  Please see the previous report dated 12 August 2010 for further details.  The proceeds of sale, which now exceed US$3 billion, remain in escrow for distribution once the PPA has been agreed between the Group.

| Business Sale | Date of Completion |
|---|---|
| Layer 4-7 | Completed 31 March 2009 |
| CDMA | Completed 14 Nov 2009 |
| Enterprise | Completed 18 Dec 2009 |
| MEN | Completed 19 March 2010 |
| GSM/GSM-R | Completed 1 April 2010 |
| CVAS | Completed 28 May 2010 |
| MSS | Expected Q1 2011 |

### Post Completion Transitional Services

The Group's affairs were organised on a business basis with each legal entity operating a number of businesses.  The purchasers have required ongoing support from the Group, as vendor, to provide transitional services to enable an orderly migration of the business to new ownership. These transitional services have largely been provided in EMEA by Nortel Networks (UK) Limited ("NNUK") and, to a more limited extent, by Nortel Networks (Ireland) Limited.

### Shareholding in Netas

NNIFH, a fully owned subsidiary of the Company, entered into a conditional share transfer agreement on 13 October 2010 with OEP RHEA Turkey Tech B.V. ("OEP RHEA") for the sale of its 53% shareholding in Netas. Netas is a company registered and trading in Turkey, where it is listed on the Istanbul Stock Exchange. OEP RHEA is a company established by a consortium comprising of One Equity Partners and Rhea Girisim Sermayesi Yatirim Ortakligi

## ⅃I ERNST & YOUNG

A.S.. The sale was completed on 22 December 2010, once all conditions precedent had been satisfied.

The sale valued NNIFH's shareholding at US$83.7 million, subject to a downward adjustment for dividends paid to NNIFH between 31 December 2009 and the date of completion. The total consideration was received by NNIFH in the form of a dividend of US$4.0 million paid in May 2010 (before withholding tax), a dividend of US$11.7 million paid in December 2010 (before withholding tax) and cash paid on completion of US$68.0 million. Total withholding tax of US$1.6 million was deducted from the two dividend payments received by NNIFH. The Joint Administrators continue to seek offers for the remaining Intellectual Property portfolio.

**Future Transactions and Disposals**

*MSS*

A sale of the MSS business was agreed on 24 September 2010 with Telefonaktiebolaget Ericsson for a headline price of $65 million. It is currently anticipated that this transaction will complete in the first quarter of 2011. The sale will transfer substantially all of the MSS assets globally, including customer contracts and employees of which there are 59 across Europe. The sale of MSS concludes the sales of all trading global business lines within the Group.

*Residual Intellectual Property*

After the various business sales, the Group will have in excess of 3,500 registered patent families remaining, and is exploring the strategic alternatives available to best optimise the value of the assets.

**⧉ ERNST & YOUNG**                                          7

### 3. Trading and Operational Overview

The Joint Administrators concluded that continued trading of the businesses, pending sales as going concerns, was in the best interests of the Company's creditors.

The Joint Administrators balanced the decision of continuing to trade with its impact on creditors. The Joint Administrators continued to trade at a carefully monitored loss in the short term, in order to maximise the value of potential business and asset sales, and to reduce the value of termination claims and other contingent liabilities on the Company in the future. The Joint Administrators considered that the potential realisation values from selling the Company's various businesses as going concerns would result in a better return to creditors than if the businesses had ceased to trade and the assets of the Company were sold on a break-up basis.

The successful completion of the sales of the Group's major global businesses should, once the PPA has been completed, result in the receipt of sales proceeds and other benefits which more than off-set the losses made in the trading period. In addition the completion of these sales has resulted in the transition of employment contracts, certain supply/ purchase arrangements and most customer contracts, to the respective purchasers. This will facilitate the orderly winding down of the Company's operations.

The headline trading results of the Company (including its Saudi Arabia branch) for the period from 1 January 2009 to 30 September 2010 are set out in the following table.

| Headline Financial Information (US GAAP) | US$ (m) |
|---|---|
| Turnover 2009 | 694.87 |
| Turnover Q1-3 2010 | 118 |
| Trading Profit/ (Loss) 2009 | (46.54) |
| Trading Profit/ (Loss) Q1-3 2010 | (13.91) |
| Net Profit/ (Loss) 2009 | (71.65) |
| Net Profit/ (Loss) Q1-3 2010 | (62.17) |



ERNST&YOUNG                                              8

**Real Estate**

Since the last report the Company has vacated its remaining leasehold properties. Two short term leases have been entered into for continuing employees at Harlow and Maidenhead at significantly reduced quarterly rental costs.

With regards to the freehold properties, it is likely that the Company will continue to occupy Monkstown until the end of 2011. The Joint Administrators have sublet part of the surplus space and continue to consider longer term options.

**Employees**

Through the various business sales, the Joint Administrators have succeeded in transferring 1,135 employment contracts to the purchasers of the businesses.

| Employee numbers as at 13 January 2011 | |
|---|---|
| Employees at appointment | 1915 |
| Transferred with business sales | 1135 |
| Resignations and other leavers | 235 |
| Redundancies | 397 |
| Employees continuing as at 13 January 2011 | 148 |

The continuing employees are being retained by the Joint Administrators to deliver transitional services to the purchasers of the businesses and to assist with the winding up of the Company's affairs, or are in scope to transfer to the purchaser of the MSS business.



## 4.  Receipts and Payments Account

Attached at Appendix 2 is the Joint Administrators' receipts and payments ("R & P") account for the period 14 July 2010 to 13 January 2011 for the Company in the UK and the Saudi Arabia branch. This shows total receipts of US$89,265,448, and payments of US$89,137,442. A trading overview is included in Section 3 above.

The Company in the UK and the Saudi Arabia branch together held cash in various currencies equivalent to US$365.6 million at 13 January 2011.

The R & P account is a statement of cash received and cash paid out, and does not reflect estimated future receipts or payments, including proceeds from the sales of businesses held in escrow pending allocation amongst the Group.

There has been a significant reduction in the receipts and payments activity during the interim period against prior periods, which is representative of the wind down position of the business. For further information, see the detailed notes provided in Appendix 2.

 **ERNST & YOUNG**

10

## 5. Joint Administrators' Remuneration and Disbursements

The Joint Administrators' remuneration was fixed on a time-costs basis by the Committee and it is the responsibility of the Committee to approve the Joint Administrators' fee. During the period 5 June 2010 to 3 December 2010 the Joint Administrators incurred time costs of GB£5,231,803, of which GB£4,185,443 has been drawn on account in accordance with the court order dated 28 February 2009. An analysis of the time spent is at Appendix 3, which includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

The Joint Administrators are currently in the process of seeking approval for fees totalling GB£7,614,793 in respect of the period 6 February 2010 to 1 October 2010.

Since our last report, we have conducted a review of the time costs attributed to the Company since 6 February 2010 (being the date up to which fees have been approved by the Committee) with a view to ensuring that only costs relating directly to the Company are billed to the Company. In respect of workstreams that are undertaken for the benefit of all the EMEA entities, we have sought to ensure that a proportionate and reasonable allocation of time billed for this type of work is apportioned and absorbed by the other filed EMEA entities. As a result of our review, we consider that certain costs need to be re-apportioned across EMEA to reflect the end of transfer pricing adjustments at end Q1 2010, which previously reimbursed the Company for costs incurred on behalf of other estates. As a result the Company will receive recharges from the EMEA companies amounting to GB£2,549,965 for work carried out in the period 6 February 2010 to 1 October 2010. Please see Appendix 4 for further details.

### Payments to Other Professionals

The Joint Administrators continue to engage the following professional advisors to assist them in the Administration. These professionals work on a time cost basis and internal review processes are undertaken to assess their invoices. During the period 14 July 2010 to 13 January 2011 the following has been paid:

Herbert Smith LLP – GB£8,218,023 (Legal Advisors)

Local Counsel – US$740,668 (Legal Advisors)

**EI ERNST & YOUNG**

## 6. Future Conduct of the Administration

### Purchase Price Allocation – The Business Disposals

The proceeds from the business sales, which were placed in escrow accounts on completion, will subsequently be apportioned between the selling companies. The proper allocation of proceeds across each selling entity, including the Company and the other EMEA Companies, is a matter of great importance not only to the Joint Administrators but also to all other Group Companies and, where applicable, the office holders or other fiduciaries responsible for them.

The intention of the Joint Administrators, NNL and NNI (together with the Monitor and the legal advisors to the Unsecured Creditors' Committee) is for the PPA and the settlement of intra-group claims to be determined by way of a consensual agreement between the three principal estates; EMEA, US and Canada.

To further support the estates' ability to reach a consensual agreement, the EMEA, US and Canadian estates undertook to exchange PPA methodologies and heads of intercompany claims that could potentially be made. Such claims have been exchanged but remain confidential at this time.

The Joint Administrators attended an inter-estate meeting in November 2010 to progress the PPA. A further meeting is due to be held in April 2011. Owing to the confidential nature of the meetings we are unable to disclose any further information to creditors at this stage.

If it is not possible for the three estates to reach a consensual agreement, an arbitration or litigation process remains likely.

Whatever mechanism is used to determine the allocation of sale proceeds, the Joint Administrators remain mindful that it is their duty to act in the best interests of the Company's creditors as a whole.

### Distributions to Creditors

The Joint Administrators obtained Court directions to allow them to commence an informal claims process. This informal claims process commenced in July 2010. The Joint Administrators have invited submissions of claim forms so that Nortel accounting personnel can assist with the process of reconciling claims to company records.

On the basis that the remaining business sale process is expected to complete by Q1 2011, and that a consensual agreement is being sought by the Group in respect of the inter-company claims and the PPA, it is possible that a formal creditor claims process will be called for in late 2011. In accordance with the Insolvency Act 1986, the Joint Administrators will be writing to all known creditors and advertising for claims.

Once the trading position has been finalised, but before PPA receipts from the business disposal escrow account (which the Joint Administrators are confident will reflect the value of the businesses sold), and the receipt of intra group dividends, the Joint Administrators anticipate that there will be, absent any unforeseen liabilities arising, in the region of US$318 million available to distribute to the creditors of the Company.

**ΞII ERNST & YOUNG**                                                          12

The Joint Administrators are, however, still neither able to confirm the quantum of the pre-appointment creditor claims nor the likely return for individual creditors or class of creditor. These will be determined for the most part by the following key factors:

- a. An analysis of the claims notified to the Joint Administrators following the recent advertising campaign requesting creditors to submit their claims on an informal basis. This process is currently ongoing.
- b. The impact of any FSD on any subsidiary company of the Company.
- c. Finalisation of quantum of certain complex liabilities and claim (including the TPR's FSD claims).
- d. Finalisation of ranking of creditor claims which will be determined as part of the distribution process.

The Company also has a branch in Saudi Arabia which has now ceased trading. A local solvent winding up process is required, even though the Company, as holder of the branch, is in Administration. The proposed liquidator has now petitioned to the Ministry of Commerce in Saudi Arabia for the commencement of the liquidation to be with effect from 1 January 2011. We are currently awaiting confirmation that approval has been granted. The net benefit to the Company will be the recovery of cash to the UK administration bank account of some US$3.4 million, of which US$2.9 million has been received to date and the balance is anticipated at the conclusion of the liquidation.

The Joint Administrators will continue to update the creditors' committee as appropriate of any key issues and their resolution.

### Exit Strategy

The Joint Administrators applied to court in January 2010, and obtained an extension of the administrations, which will allow for the completion of the M&A processes, transitional services agreements and implementation of an orderly wind down process.

The Joint Administrators continue to explore the most appropriate exit route from the administration process for the Company and the other EMEA companies in administration; that is to say the method by which creditors' claims are agreed, surplus funds are distributed to creditors and the Company's affairs generally brought to a conclusion.

The Joint Administrators will be required to carry out statutory obligations such as formalising the calling of proofs of debt, obtaining creditor agreements, finalising all asset disposals, dealing with all sale proceeds and inter-company claims, agreeing all other creditor claims and establishing the mechanics of distributing funds.

In all of the above scenarios, the distribution process used will be subject to timing implications, cost, the size of entity under review, relevant currencies, local law provisions on claims and local processes of other Group entities in relation to intra group dividends, in addition to UK legislation.

The process of agreeing claims and distributing surplus funds to creditors could be done within the administration process (with the Court's approval), or within a follow-on company voluntary



arrangement ("CVA") or liquidation process. Each option has merits in different circumstances, and it is not yet clear which option is most beneficial for the Company and its creditors.

## 7. Other Matters

### The Committee

The committee of creditors was formed at the creditors' meeting held on 11 March 2009. The Joint Administrators continue to provide detailed information to the members of the Committee as the Administration progresses and matters evolve (including an analysis of their time costs for approval). The Joint Administrators will continue to keep the Committee apprised of developments.

### The Prescribed Part

Section 176A of the Insolvency Act 1986 does not apply to this Administration as there is no qualifying floating charge security, and as such there is no Prescribed Part to be set aside for non-preferential creditors.

### North American Claims Process

The Joint Administrators have filed certain claims on behalf of the Company and the other EMEA Companies in insolvency proceedings, in jurisdictions where a bar date has been imposed.

A bar date of 18 March 2011 has now been set for inter-company claims by the EMEA entities against the Canadian estate. The Joint Administrators are taking appropriate steps to ensure that the Company's claims are formally lodged by the deadline.

The Joint Administrators will continue to file claims on behalf of the Company and the other EMEA Companies in jurisdictions where a bar date is imposed.

### French Employee Claims

A number of former employees of the French entity, Nortel Networks SA, have filed claims in the French tribunal court. The claims have been raised against a number of Nortel entities as the employees are claiming co-employment rights for damages for unfair dismissal and an alleged breach of the obligation of priority hiring against the buyers of the various businesses.

These claims are being defended and a judgement hearing is scheduled to take place in October 2011.

**≡// ERNST & YOUNG**                                    15

The Joint Administrators will report to creditors again in six months' time.

Yours faithfully
for Nortel Networks UK Limited (In Administration)



C Hill
Joint Administrator

Enc:   Company information
       Joint Administrators' Receipts and Payments Account
       Summary of Joint Administrators' Time Costs
       Joint Administrators' Policy on Fees and Disbursements
       Form 2.24B Administrators' Progress Report

*For the Companies listed below, The Institute of Chartered Accountants in England and Wales in the UK authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants in the UK authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks S.A.; Nortel Networks GmbH; Nortel Networks France S.A.S.; Nortel Networks N.V.; Nortel Networks S.p.A.; Nortel Networks B.V.; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, S.A.; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal S.A.; Nortel Networks Slovensko s.r.o.; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding B.V.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

*Nortel Networks S.A. was placed into French liquidation judiciaire on 28 May 2009. The business and assets of the company that are situated in France are now under the control of la liquidateur judiciaire.*

*We advise that this report is provided pursuant to our appointments as Joint Administrators of the Company. It is provided solely for the purpose of informing creditors of certain aspects of the current status of the Administration. As this report is only an interim indication of the overall position of the Company, and not a valuation of the current or future value of any particular item of debt, and is liable to change, it should not be relied upon as an indication of the final return to creditors and, in particular, neither we nor the Company shall have any responsibility to any person who relies on our report for the purpose of trading in debt of the Company.*

## Appendix 1

## Nortel Networks UK Limited (In Administration)

### Company Information

| | |
|---|---|
| Registered number: | 3937799 |
| Company name: | Nortel Networks UK Limited |
| Registered office address | Fleming House, 71 King Street, Maidenhead, Berkshire SL6 1DU |
| Previous names: | Nortel Networks Holdings Limited |
| | Nortel Networks Holdings plc |

### Details of the Administrators and of their appointment

| | |
|---|---|
| Administrators: | AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London, SE1 2AF |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors. |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 536 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly. |

### Statement Concerning the EC Regulation on Insolvency Proceedings 2000

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

### Share Capital

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | Number | £ | Number | £ |
| Ordinary | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 |

### Shareholder

Nortel Networks Limited - 100%

### Directors (current and for the last three years) and company secretary (current)

| Name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| William LaSalle | Director | 01/10/2001 | 23/05/2008 | |
| Geoff Lloyd | Director | 01/02/2002 | 17/03/2006 | - |
| Christian Waida | Director | 17/12/2004 | 08/12/2008 | - |
| Henry Birt | Director | 01/09/2005 | 31/03/2007 | - |
| Peter Currie | Director | 01/09/2005 | 10/04/2007 | - |
| Sharon Rolston | Director | 01/04/2006 | 30/09/2010 | - |
| Simon Freemantle | Director | 31/03/2007 | - | - |
| David Quane | Director | 30/09/2010 | - | |
| Brenda Dandridge | Secretary | 01/12/2010 | - | - |

## Summary of Nortel Group Structure

The EMEA Companies in English administration proceedings:

| Legal Entity | Country of Incorporation |
|---|---|
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

## Appendix 2

## Nortel Networks UK Limited (In Administration)

### Joint Administrators' Abstract of Receipts and Payments from 14 July 2010 to 13 January 2011

| Currency: USD | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| Opening balance | 338,622,958 | | 338,622,958 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Post appointment sales | 373,968,096 | 14,934,596 | 388,902,692 |
| - Post appointment intercompany | 339,332,011 | 27,461,837 | 366,793,847 |
| - Pre-liquidation distribution from NN Saudi | - | 2,900,000 | 2,900,000 |
| - TSA receipts | 20,299,729 | 28,471,042 | 48,770,772 |
| - Asset sales | 5,468,614 | - | 5,468,614 |
| - Property income | 3,494,718 | - | 3,494,718 |
| - Other receipts | 937,165 | 945,024 | 1,882,189 |
| - Overpayment refunds | 22,563 | 16,641 | 39,204 |
| *Other:* | | | |
| - Pre appointment sales | 98,961,782 | 2,352,072 | 101,313,854 |
| - Pre appointment intercompany - Asia Pacific entities | 14,307,186 | - | 14,307,186 |
| - FX translation movement | 9,243,881 | 11,305,722 | 20,549,403 |
| - Bank interest | 2,721,263 | 876,981 | 3,598,244 |
| - Pre appointment intercompany - Nortel Networks Israel | 308,492 | - | 308,492 |
| | 869,065,463 | 89,263,713 | 958,329,176 |
| **Payments** | | | |
| *Trading:* | | | |
| - Accounts payable - Inventory related | (404,459,599) | (37,634,735) | (442,094,334) |
| - Payroll, employee benefits, and payroll taxes | (190,122,407) | (12,511,880) | (202,634,288) |
| - Property costs | (41,978,647) | (6,518,361) | (48,497,008) |
| - Other taxes | (34,019,520) | 5,984,427 | (28,035,093) |
| - Other payments | (18,592,723) | (1,114,169) | (19,706,892) |
| - Pension contributions | (10,356,973) | (833,564) | (10,990,538) |
| - Utilities | (10,196,968) | (1,636,161) | (11,833,128) |
| - Trade payables | (8,954,822) | - | (8,954,822) |
| - Contractors | (3,890,946) | (260,564) | (4,151,510) |
| *Other:* | | | |
| - Legal fees | (60,829,384) | (14,031,397) | (74,860,781) |
| - Joint Administrators' fees and disbursements | (48,587,868) | (13,522,388) | (62,110,256) |
| - Other professional services costs | (8,652,589) | (3,247,831) | (11,900,400) |
| - Restructuring costs | (3,402,957) | (33,790) | (3,436,748) |
| - FX translation movement on FX transactions within the entity | (1,417,152) | (483,524) | (1,900,676) |
| - Bank charges and interest | (665,689) | (227,995) | (893,684) |
| - Capital expenditure | (173,711) | - | (173,711) |
| | (846,301,733) | (85,871,932) | (932,173,665) |
| **Closing balance** | 361,386,688 | | 364,778,469 |
| **Account reconciliations:** | | | |
| Current accounts | 29,471,376 | | 26,255,069 |
| Local deposit accounts | 5,952,000 | | 171,197,150 |
| Administration deposit accounts | 325,963,311 | | 167,326,250 |
| | 361,386,688 | | 364,778,469 |

# Nortel Networks UK Limited (In Administration)

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2010 to 13 January 2011**

| Currency: GBP | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 236,900,621 | | 236,900,621 |
| **Receipts** | | | |
| **Trading:** | | | |
| - Post appointment sales | 240,734,251 | 7,918,737 | 248,652,989 |
| - Post appointment intercompany | 218,372,565 | 19,959,578 | 238,332,143 |
| - Pre-liquidation distribution from NN Saudi | - | 1,908,194 | 1,908,194 |
| - TSA receipts | 13,354,359 | 18,732,129 | 32,086,463 |
| - Asset sales | 3,598,898 | - | 3,598,898 |
| - Property income | 2,249,055 | - | 2,249,055 |
| - Other receipts | 599,878 | 621,697 | 1,221,574 |
| - Overpayment refunds | 14,848 | 10,948 | 25,796 |
| **Other:** | | | |
| - Pre appointment sales | 63,251,518 | 1,547,843 | 64,799,359 |
| - Pre appointment intercompany – Asia Pacific entities | 9,217,676 | - | 9,217,676 |
| - FX translation movement | - | 48,863 | 48,863 |
| - Bank interest | 1,754,477 | 577,074 | 2,331,552 |
| - Pre appointment intercompany – Nortel Networks Israel | 203,011 | - | 203,011 |
| | 553,350,332 | 51,323,261 | 604,673,593 |
| **Payments** | | | |
| **Trading:** | | | |
| - Accounts payable - inventory related | (259,941,373) | (24,765,885) | (284,707,258) |
| - Payroll, employee benefits, and payroll taxes | (122,152,387) | (8,233,775) | (130,386,162) |
| - Property costs | (27,030,485) | (4,289,580) | (31,320,065) |
| - Other taxes | (21,870,014) | 3,938,013 | (17,932,001) |
| - Other payments | (11,922,433) | (733,174) | (12,655,607) |
| - Pension contributions | (6,648,645) | (416,934) | (7,065,579) |
| - Utilies | (6,581,847) | (1,076,615) | (7,658,461) |
| - Trade payables | (5,723,287) | - | (5,723,287) |
| - Contractors | (2,496,200) | (171,403) | (2,667,603) |
| **Other:** | | | |
| - Legal fees | (39,349,439) | (9,233,913) | (48,583,352) |
| - Joint Administrators' fees and disbursements | (31,307,850) | (8,898,767) | (40,206,617) |
| - Other professional services costs | (5,580,222) | (2,137,296) | (7,717,518) |
| - Restructuring costs | (2,210,734) | (22,237) | (2,232,971) |
| - FX translation movement | (5,335,312) | - | (5,335,312) |
| - FX translation movement on FX transactions within the entity | (883,508) | (291,738) | (1,175,246) |
| - Bank charges and interest | (430,431) | (150,036) | (580,467) |
| - Capital expenditure | (111,026) | - | (111,026) |
| | (549,575,192) | (56,483,339) | (606,058,531) |
| **Closing balance** | 240,675,762 | | 235,515,684 |
| **Account reconciliations:** | | | |
| Current accounts | 19,627,303 | | 16,951,331 |
| Local deposit accounts | 3,963,904 | | 110,531,781 |
| Administration deposit accounts | 217,084,555 | | 108,032,572 |
| | 240,675,762 | | 235,515,684 |

**Receipts and payments comments**

**Notes to R & P**

- Account balances have all been reported in a local currency, GBP, in addition to a common currency across all entities, USD.
  Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2010 month end spot rates which have been provided by the Company. This approach is in line with the Company's internal reporting procedures.
  Transactions that have taken place through the accounts over the course of the reporting period (14 July 2010 to 13 January 2011) have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.
  Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates. These are translation movements only and do not reflect an actual receipt or payment.
  The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.
- The amounts reported are inclusive of sales tax where applicable.
- All amounts referred to below are in USD unless stated otherwise.


**RECEIPTS**

There was cash on appointment held in GBP, Euro, USD and CAD accounts which totalled $338.6 million.

Total receipts since 13 July 2010 total $78.0 million (net of FX translation). This primarily relates to intercompany receipts, Transitional Service Agreement receipts and sales receipts.

**Post appointment Intercompany receipts**

Intercompany receipts received since 13 July 2010 total $27.5 million.

The Company was a net receiver during the reporting period through the Nortel group's monthly netting process. Intercompany receipts were primarily collected from Nortel Networks N.V. (net $17.1 million) as the Company incurs and is later reimbursed the majority of costs in connection with the Alcatel Lucent contract.

**Pre-liquidation distribution from NN Saudi**

A distribution was made to the Company of $2.9 million in December 2010 as part of the wind up of the Saudi branch.

**Transitional Service Agreement ("TSA") receipts**

The TSA receipts since 13 July 2010 total $28.5 million. This represents the reimbursement of costs incurred on behalf of the purchasers under the terms of the respective TSAs.

**Sales receipts**

Pre appointment sales receipts collected since 13 July 2010 total $2.4 million.

Post appointment sales receipts collected since 13 July 2010 total $14.9 million.

*Foreign exchange translation movement*

The total FX translation movement to 13 January 2011 is a result of the movement of the USD against the GBP. The translation movement shown since 13 July 2010 is simply the difference between the FX movement for the total period and that reported previously to 13 July 2010. As such the interim FX translation movement does not represent a true FX translation gain for the period.

## PAYMENTS

Total payments made since 13 July 2010 total $85.9 million. This primarily relates to inventory purchases, legal fees, Joint Administrators' fees, payroll related costs, property costs, other professional services costs and utility costs.

### *Accounts payable*

The accounts payable inventory related payments since 13 July 2010 total $37.6 million.

### *Legal fees*

Legal fees since 13 July 2010 total $14.0 million. This relates predominantly to fees paid to Herbert Smith LLP.

### *Joint Administrators' fees*

Joint Administrators' fees paid since 13 July 2010 are $13.5 million. These costs relate to fees and disbursement incurred in the course of the administration.

### *Payroll*

Payroll costs since 13 July 2010 total $12.5 million and include net pay in addition to employee expenses, employee benefits and payroll taxes.

### *Property costs*

Property costs since 13 July 2010 total $6.5 million. This principally relates to rental payments made for the premises at Maidenhead in addition to property management costs.

### *Utilities*

Utilities costs since 13 July 2010 total $1.6 million. This primarily relates to electricity costs at the Maidenhead and Harlow sites.

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments**
**from 14 July 2010 to 13 January 2011**

| Currency: USD | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 2,554,345 | | 2,554,345 |
| **Receipts** | | | |
| Trading: | | | |
| - Other receipts | 1,058 | - | 1,058 |
| Other: | | | |
| - Pre appointment sales | 1,884,240 | - | 1,884,240 |
| - FX translation movement | 2,328 | (375) | 1,952 |
| - Bank interest | 32,065 | 2,110 | 34,176 |
| | 1,919,701 | 1,735 | 1,921,436 |
| **Payments** | | | |
| Trading: | | | |
| - Trade payables | (229,715) | (172,610) | (402,325) |
| - Payroll, employee benefits, and payroll taxes | (194,830) | - | (194,830) |
| - Other taxes | (104,308) | - | (104,308) |
| - Other professional services costs | (103,627) | (37,246) | (140,873) |
| - Other payments | (78,271) | (36,514) | (114,785) |
| - Property costs | (73,768) | (18,710) | (92,478) |
| - Utilities | (70,228) | (1,562) | (71,790) |
| - Contractors | (29,343) | - | (29,343) |
| Other: | | | |
| - Bank charges and interest | (873) | (77) | (950) |
| - Intercompany | 491,896 | (98,791) | 393,095 |
| - Pre-liquidation distribution - NN UK | - | (2,900,000) | (2,900,000) |
| - FX translation movement on FX transactions within the entity | (507) | - | (507) |
| | (393,564) | (3,265,510) | (3,659,094) |
| **Closing balance** | 4,080,481 | | 816,686 |
| **Account reconciliations:** | | | |
| Current accounts | 17,719 | | 284,578 |
| Local deposit accounts | 31,494 | | - |
| Administration deposit accounts | 4,031,269 | | 532,108 |
| | 4,080,481 | | 816,686 |

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

## Joint Administrators' Abstract of Receipts and Payments
from 14 July 2010 to 13 January 2011

| Currency: SAR | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| Opening balance | 9,585,178 | | 9,585,178 |
| **Receipts** | | | |
| Trading: | | | |
| - Other receipts | 4,000 | - | 4,000 |
| Other: | | | |
| - Pre appointment sales | 7,065,584 | - | 7,065,584 |
| - FX translation movement on FX transactions within the entity | 248 | | 248 |
| - Bank interest | 120,136 | 7,902 | 128,038 |
| | 7,189,968 | 7,902 | 7,197,870 |
| **Payments** | | | |
| Trading: | | | |
| - Trade payables | (860,924) | (646,283) | (1,507,187) |
| - Payroll, employee benefits, and payroll taxes | (729,918) | - | (729,918) |
| - Other taxes | (390,785) | - | (390,785) |
| - Other professional services costs | (388,139) | (139,451) | (527,590) |
| - Other payments | (293,158) | (136,712) | (429,870) |
| - Property costs | (276,330) | (70,050) | (346,380) |
| - Utilities | (263,069) | (5,846) | (268,911) |
| - Contractors | (109,931) | | (109,931) |
| Other: | | | |
| - Intercompany | 1,854,361 | (369,879) | 1,484,482 |
| - Pre-liquidation distribution - NN UK | - | (10,857,763) | (32,978) |
| - FX translation movement | (10,420) | (22,558) | (32,978) |
| - Bank charges and interest | (3,274) | (289) | (3,563) |
| | (1,471,578) | (12,248,613) | (13,720,391) |
| Closing balance | 15,303,567 | | 3,062,658 |
| **Account reconciliation:** | | | |
| Current accounts | 66,452 | | 1,067,197 |
| Local deposit accounts | 118,116 | | - |
| Administration deposit accounts | 15,118,999 | | 1,995,458 |
| | 15,303,567 | | 3,062,655 |

**Receipts and payments comments**

**Notes to R & P**

- Account balances have all been reported in a local currency, SAR, in addition to a common currency across all entities, USD.
  Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2010 month end spot rates which have been provided by the Company. This approach is in line with the Company's internal reporting procedures.
  Transactions that have taken place through the accounts over the course of the reporting period (14 July 2010 to 13 January 2011) have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.
  Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates. These are translation movements only and do not reflect an actual receipt or payment.
- The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.
- The amounts reported are inclusive of sales tax where applicable.
- All amounts referred to below are in USD unless stated otherwise.

**RECEIPTS**

On appointment $2.6 million in cash was held in local SAR and USD accounts.

Since 13 July 2010 receipts have totalled approximately $2,000 (net of FX translation). This predominantly relates to bank interest.

*Foreign exchange translation movement*

The total FX translation movement to 13 January 2011 is a result of the movement of the USD against the SAR. The translation movement shown since 13 July 2010 is simply the difference between the FX movement for the total period and that reported previously to 13 July 2010. As such the interim FX translation movement does not represent a true FX translation gain for the period.

## PAYMENTS

Total payments of $3.3 million have been made since 13 July 2010, which primarily relates to a pre-liquidation distribution to the Company's UK bank account.

### *Pre-liquidation distribution - NNUK*

A distribution was made to the Company of $2.9 million in December 2010 as part of the wind up of the Saudi branch.

## Appendix 3

## Nortel Networks UK Limited (In Administration)

**Summary of Joint Administrators' time costs from 5 June 2010 to 3 December 2010 (GB£)**
**Excluding core M&A transaction time**

# Administration fee analysis (in GB£)

## Summary of total core M&A transactions time costs for all EMEA filed entities from 5 June 2010 to 3 December 2010

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| M&A / Transitional Services | 22 | 503.0 | 697.0 | 1,366.2 | - | - | 2,279.2 | 538.77 | 941,500.00 | 7,202,094.50 |
| M&A / Special | 24.5 | 6.0 | 1.0 | 72.6 | - | - | 166.1 | 680.34 | 86,470.00 | 4,302,490.00 |
| Purchase Price Allocation | 212.9 | 811.9 | 1,316.3 | 654.9 | 286.3 | 47.2 | 4,409.7 | 431.87 | 1,003,533.30 | 3,454,097.50 |
| M&A / Nelas | 307.6 | 62.0 | 231.6 | 27.0 | 47.2 | - | 983.6 | 497.33 | 475,300.00 | 2,217,033.21 |
| M&A Snow | 77.8 | 20.0 | 0.3 | 3.3 | - | - | 110.2 | 782.04 | 182,874.50 | 1,551,313.00 |
| M&A / GSM | 16.5 | 60.7 | 4.1 | 0.1 | - | - | 77.4 | 573.80 | 44,412.00 | 1,284,018.00 |
| M&A / Carrier | 32.0 | 42.9 | - | - | - | - | 91.9 | 698.60 | 94,201.50 | 1,135,270.00 |
| M&A / Passport | 357.3 | 621.5 | 89.6 | - | 6.0 | 6.0 | 1,140.3 | 665.96 | 945,384.00 | 875,651.00 |
| Sale and M&A | - | - | - | - | - | - | - | - | - | 663,320.00 |
| Other Assets | 44.3 | - | - | 1.3 | 1.3 | 1.3 | 61.9 | 640.88 | 39,000.50 | 355,882.57 |
| M&A / Velocity | 7.0 | 7.6 | 8.7 | 3.3 | 3.3 | 3.3 | 8.3 | 540.24 | 4,494.00 | 97,430.00 |
| **Grand Total** | 1,126.2 | 2,147.5 | 2,607.4 | 2,279.0 | 345.5 | 34.15 | 9,790.5 | 5,899.89 | 4,317,764.00 | 23,677,265.78 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Average hourly rate | 585.10 | 848.40 | 504.66 | 361.81 | 286.46 | 178.67 | |
| Time costs for the period | 878,032.00 | 723,992.00 | 1,083,677.00 | 943,392.00 | 809,462.00 | 61,859.00 | |
| Time costs for the Administration to date | 3,386,248.19 | 4,234,185.31 | 6,791,301.00 | 6,016,519.00 | 6,016,519.00 | 3,146,959.81 | 449,235.78 |

## Total time costs for the Administration from 5 June 2010 to 3 December 2010

| | |
|---|---|
| Administration time costs excluding transactions for the period | 5,805,516.20 |
| Reallocation of time costs removed from NNUK to be borne by EMEA entities | (2,284,138.56) |
| Transaction time costs seeking approval for the period | 1,710,325.78 |
| **Total time costs for the period 05/06/10 – 03/12/10** | **5,231,803.38** |

## Note

Time costs in respect of transactions for the period 5 June 2010 to 3 December 2010 have been apportioned on a provisional basis, having regard to the nature of the work done and the extent of progress made in respect of some, but not all, core M&A transactions. The allocation is provisional and will change as the transactions progress and the outcome of the PPA is clear.

Please note the Joint Administrators have only apportioned core M&A transactions time costs in respect of those transactions that have made sufficient progress. Therefore further core M&A transactions time costs will be apportioned in due course to the Company, and reapportioned as the outcome of the PPA process becomes clear.

## Appendix 4

## Nortel Networks UK Limited (In Administration)

### Apportionment

As commented in the report, during the period we have conducted a review of the time being charged to NNUK.

We found that in certain cases (e.g. Finance, Accounting and Administration) the vast majority of time has historically been charged to NNUK with a re-charge to EMEA being made through the transfer pricing arrangements. However, this effectively ended at end Q1 2010.

Therefore a new methodology was required to apportion costs appropriately across EMEA

In addition, certain workstreams (for example Creditors and Exit) have started to attract significant costs in 2010 and we considered that an appropriate apportionment of time was not in place and therefore a method of reapportionment to EMEA again was required for these workstreams.

The workstreams identified for reapportionment along with the apportionment basis used and the effect are summarised in the table below:

| Workstreams | Basis for Apportionment | Apportionment rate Applicable to NNUK |
|---|---|---|
| Finance, Accounting & Administration | Gross assets per Directors | |
| Trading | Statement of Affairs for all | 49.33% |
| Exit | EMEA companies | |
| Customers | Trade receivables per Directors | |
| Debtors | Statement of Affairs for all EMEA companies | 30.99% |
| Outcome for Creditors | Unsecured creditors (exc. Interco. | |
| Creditors | Debts, pensions & employee claims) per Directors Statement of Affairs, for all EMEA companies. | 62.93% |
| Exit IT costs | Rates used by the Group prior to the Company going into Administration | 45.74% |
| Strategy | Same rate used for M & A cost | |
| Canada / USA | apportionment | 46.17% |
| Transfer Pricing | | |
| Intellectual Property | | |

Time costs have been apportioned retrospectively from 6 February 2010 to date and will be apportioned going forward.

As a result NNUK will receive recharges from the EMEA companies amounting to GB£2,549,965 for work carried out in the period 6 February 2010 to 1 October 2010.

## Nortel Networks UK Limited (In Administration)

### Office Holders' Charging Policy for Fees

The statutory provisions relating to remuneration are set out in Rule 2.106 of the Rules. Further information is given in the Association of Business Recovery Professionals' publication "A Creditors' Guide to Administrators' Fees", a copy of which may be accessed from the web site of the Insolvency Practitioners Association at http://www.insolvency-practitioners.org.uk (follow 'Regulation and Guidance' then 'Creditors' Guides to Fees'), or is available in hard copy upon written request to the Administrators.

The creditors have determined that the Administrators' remuneration should be fixed on the basis of time properly spent by the Administrators and their staff in attending to matters arising in the Administration.

The Administrators have engaged managers and other staff to work on the cases. The work required is delegated to the most appropriate level of staff taking account of the nature of the work and the individual's experience. Additional assistance is provided by accounting and treasury executives dealing with the Company's bank accounts and statutory compliance diaries, secretaries providing typing and other support services and filing clerks. Work carried out by all staff is subject to the overall supervision of the Administrators.

All time spent by staff working directly on case-related matters is charged to a separate time code established for each case. Each member of staff has a specific hourly rate, which is subject to change over time. The average hourly rate for each category of staff over the period is shown in Appendix 2, as are the current hourly rates used. The current hourly rates may be higher than the average rates, if hourly rates have increased over the period covered by this report.

### Office Holders' Charging Policy for Disbursements

Statement of Insolvency Practice No. 9 ("SIP 9") published by R3 (The Association of Business Recovery Professionals) divides disbursements into two categories.

Category 1 disbursements comprise payments made by the office holders' firm, which comprise specific expenditure relating to the administration of the insolvent's affairs and referable to payment to an independent third party. These disbursements can be paid from the insolvent's assets without approval from the Committee. In line with SIP 9, it is our policy to disclose such disbursements drawn but not to seek approval for their payment.

Category 2 disbursements comprise payments made by the office holders' firm which include elements of shared or overhead costs. Such disbursements are subject to approval from Creditors' Committee as if they were remuneration. It is our policy, in line with SIP 9, to seek approval for this category of disbursement before they are drawn.

Rule 2.47                                                      Form 2.24B

The Insolvency Act 1986

## Administrator's progress report                    **2.24B**

| Name of Company | Company number |
|---|---|
| Nortel Networks UK Limited | 3937799 |

| In the | Court case number |
|---|---|
| High Court of Justice of England and Wales, Chancery Division, Companies Court | 536 of 2009 |

We AR Bloom, CJW Hill, SJ Harris and AM Hudson

Ernst & Young LLP, 1 More London Place, London, SE1 2AF

administrators of the above company attach a progress report for the period

| From | to |
|---|---|
| 14 July 2010 | 13 January 2011 |

Signed

Joint Administrator

Dated    11 February 2011

---

## Contact Details:

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record

| Tara Felton | |
|---|---|
| Ernst & Young LLP, 1 More London Place, London, SE1 2AF | |
| | Tel: 020 7951 8151 |
| DX Number: | DX Exchange: |

Companies House receipt date barcode

When you have completed and signed this form please send it to the Registrar of Companies at:

**Companies House, Crown Way, Cardiff, CF14 3UZ**                    **DX 33050 Cardiff**

**EXHIBIT 2**

**ƎƔ ERNST & YOUNG**

Ernst & Young LLP
1 More London Place
London SE1 2AF

Tel: 020 7951 2000
Fax: 020 7951 1345
www.ey.com/uk

TO ALL KNOWN CREDITORS

12 February 2010

Ref:  MLP/7E/CH/NA/CC/LO3538

Chris Coley
Direct line: 0121 535 2394
Direct fax: 0121 535 2448
Email: ccoley@uk.ey.com

Dear Sirs

## Nortel Networks UK Limited (In Administration) (the "Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court Case number 536 of 2009

I write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a second report on the progress of the Administration (the "**Report**"). This Report covers the period from 14 July 2009 to 13 January 2010 and should be read in conjunction with my first report dated 13 August 2009 and the Administrators' Statement of Proposals dated 23 February 2009. A copy of this Report can be made available on request or can be obtained at the following;

www.nortel.com/corporate/adminprogreports.html

The Company entered administration on 14 January 2009 when AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "**Joint Administrators**") by an order (the "**Order**") of the High Court of Justice of England and Wales (the "**Court**"), following an application made by the Company's directors. Under the terms of the Order, any act required or authorised to be done by the Joint Administrators can be done by any of them. Further information on the Company and details of the Administrators' appointment are set out in Appendix 1.

On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region ("**EMEA**"). Details of the 19 companies are provided at Appendix 1. In accordance with Article 3 of the EC Regulation number 1346/2000 on Insolvency Proceedings 2000 (the "**EC Regulation**"), the court of the EC member state in which the centre of main interests ("**COMI**") of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the "**EMEA Companies**"), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company.

The Nortel group of companies (the "**Group**") reports in US dollars ("**US$**"), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office.

⧈ ERNST & YOUNG

## 1. Executive Summary of Progress of the Administration

In early 2009, the Joint Administrators stabilised the businesses, continued to trade, maintained client and supplier relationships and implemented restructuring plans in certain entities as necessary. The Joint Administrators' proposals for the Administration were approved without modification by creditors of each of the EMEA Companies at meetings held in March 2009.

The Joint Administrators have continued to trade the Company's businesses with a view to achieving a rescue of the Company as a going concern or a better result for the Company's creditors as a whole than would be likely if the Company were wound up. Over time it has become clear that, owing to the financial and market pressures facing the Nortel businesses, the sale of all businesses would be necessary. The Group principally operates in three business segments: Enterprise Solutions ("**Enterprise**"), Metro Ethernet Networks ("**MEN**") and Carrier Networks, which comprises Global System for Mobile Communications ("**GSM**"), Carrier VoIP Application Solutions ("**CVAS**") and Code Division Multiple Access ("**CDMA**").

As at the date of this Report, the Joint Administrators are pleased to report that sales agreements have been reached in respect of all the Group's major global businesses with the exception of the smaller Multiservice Switch ("**MSS**") business, with global realisations before transaction costs of US$2.9 billion. All major disposals are being conducted on a Group-wide basis, following a "stalking horse" procedure in line with Section 363 of the US Bankruptcy Code unless otherwise stated.

The Group continues to seek the sale of the MSS business, residual intellectual property and other remaining assets. It is anticipated that all sales processes will be completed by the end of Q1 2010 or shortly thereafter. However, in the interim period, the Joint Administrators continue to work closely with the North American entities to maintain the value of the businesses up to the dates of completion, when they will transition to purchasers.

Owing to the integrated nature of the Group's business, it will be necessary for some Group companies to provide transitional services to the purchasers for a period of one year post sale completion. Such services include the provision of various back office functions, infrastructure support and the general allowance of lead time to enable each purchaser to integrate the business with their own. The purchaser will meet the direct cost of these services.

The proceeds of the global sale transactions will be placed into escrow until the allocation of proceeds between individual Group companies is determined. The mechanism of allocating disposal proceeds between Group companies is currently under negotiation. It is likely that any allocation process would need to be sanctioned by the US and Canadian Courts and the English High Court.

In accordance with the above, the Joint Administrators continue to pursue a better result for the Company's creditors as a whole than would be likely if the Company were wound up. The Joint Administrators believe that the businesses will be sold to the advantage of creditors and this remains the ultimate basis for the decision to continue to trade.

Further information is contained in the sections that follow.

ᴱᴵ ERNST & YOUNG                                                        3

## 2. Business Disposal Strategy

As outlined in our previous report, the Joint Administrators believe that a sale of the business will result in an enhanced realisation for creditors of the Company through capital receipts from the sales of businesses, the preservation and transfer of employment, and the transfer of contracts to purchasers.

All sales of the major businesses are intended to be dealt with on a global basis. The disposals follow a stalking horse auction process under Section 363 of the US Bankruptcy Code unless otherwise stated. Under this process, a bidder is selected and contractually committed to purchase the business, unless a better offer is made in a subsequent auction process. After a winning bidder is selected there is a period during which certain conditions need to be met (e.g. competition clearances) before the sale completes. If the conditions are not met, then the sale will not complete. The process provides relative certainty whilst maintaining competitive tension in the procedure, thereby maximising value. The auction process is conducted in accordance with US and Canadian court-approved auction parameters and is a common process in North America. The Joint Administrators have been, and remain, actively involved in these auction processes and the auction parameters subsequently approved by the US and Canadian courts. They are also fully involved in negotiating the EMEA sales agreements with purchasers and assisting in moving sales towards completion.

### Announced Disposals

The following stalking horse transactions have been entered into at the date of this Report. The sales values reported are headline global values and are stated before possible transaction costs and deductions.

### *Sale of Layer 4-7 Business*

On 31 March 2009, certain Group companies concluded the divestiture for US$18 million of certain parts of the Group's Virtual Service Switches business to Radware Ltd. The proceeds of sale remain in escrow for distribution once an allocation process has been agreed between the Group.

The Company is a party to this agreement.

### *Sale of CDMA Business*

On 19 June 2009, the Group announced that it had entered into a stalking horse asset sale agreement with Nokia Siemens Networks B.V. for the sale of substantially all of its North American CDMA business and parts of its LTE Access assets. Subsequently, on 25 July 2009 and following an auction process, the Group announced that Ericsson AB would purchase these assets for US$1.13 billion subject to approval by the US and Canadian Bankruptcy courts. The sale was concluded on 13 November 2009.

This transaction covers only the North American CDMA business and as such the modest EMEA CDMA business is excluded from the scope of the transaction. The EMEA entities, including the Company, will nevertheless rank for a share of the sale consideration.



It should also be noted, that there are several CDMA contracts held by the Company and other EMEA entities. In order to safeguard the position of the EMEA estates, the Joint Administrators have negotiated necessary 'back to back' supply and licence agreements to allow the EMEA estates to run-off their respective CDMA contracts. This will allow the existing contracts to operate as normal until the expiry of the underlying contracts.

### Sale of Enterprise Business

On 21 July 2009, the Group announced that it had entered into a stalking horse asset and share sale agreement with Avaya Inc for its North American, Caribbean and Latin American ("**CALA**") and Asia Pacific Enterprise Solutions business, and an asset sale agreement with Avaya Inc for the EMEA portion of the Enterprise Solutions business, for a total purchase price of US$475 million. The agreements include the sale of substantially all of the assets of the Group's Enterprise Solutions business globally.

The auction of the business commenced on 9 September 2009 in New York at which there was one other bidder. The auction concluded on 14 September 2009 with Avaya declared as the winning bidder at a headline transaction price of US$900 million.

The transaction was subsequently approved by the US and Canadian courts and completed on 18 December 2009.

This transaction will result in the transfer of many jobs and contracts in EMEA. The proceeds will remain in escrow until an allocation process to the individual Group companies has been agreed.

### Sale of MEN Business

The MEN business was marketed for a stalking horse transaction, consisting of the Optical Networking and the Carrier Ethernet businesses. This excluded the MEN Carrier Data and EFA businesses which are likely to be marketed separately.

The stalking horse sale process was launched in April, led from North America but with heavy involvement by the Joint Administrators' M&A team. A stalking horse bid was announced with Ciena Corporation ("**Ciena**") on 7 October 2009 for headline consideration of US$390 million cash and 10 million shares in the Ciena business. As at the date of the announcement of the stalking horse, Ciena shares opened trading at US$13 per share thus indicating a total headline value of US$520 million (being US$390 million cash plus shares worth US$130 million at close of business on 6 October 2009).

The subsequent auction of the businesses commenced on 20 November 2009 in New York, at which there was one other bidder. Following three days of negotiation, the auction concluded with Ciena declared as the winning bidder at a cash price of US$530 million plus a convertible note for a principal amount of US$239 million – a total consideration of US$769 million.

This transaction was subsequently considered and approved at a joint hearing of the Canadian court and US Bankruptcy court on 2 December 2009. As at the date of this report, Ciena have

**⇒l ERNST & YOUNG**                                                    5

already achieved US and Canadian antitrust clearance, which is an important factor in achieving a closure of the transaction.

There are approximately 2,300 Nortel employees in-scope for the transaction globally, of which 325 are based in EMEA. These positions will transfer to the purchaser.

### Sale of GSM / GSM-R Business

The GSM business is a global business with c.30% of revenues generated in EMEA (mainly in France and other mainland European countries) and includes the EMEA GSM-R (railway) business (c.15% of the global revenues).

The Group had attempted to obtain expressions of interest for the business through the stalking horse process with limited success. As a result, the decision was taken to seek expressions of interest through a 'naked auction' process (an auction conducted without a stalking horse bidder). It was ultimately necessary to extend the date of the auction until 24 November 2009 to allow more time for bids to be submitted.

The auction commenced on 24 November 2009 in New York and concluded with a joint bid from Kapsch CarrierCom AG (**"Kapsch"**) and Telefonaktiebolaget LM Ericsson (**"Ericsson"**) declared as the winning bid at a headline price of US$103 million. This is a good outcome for the GSM business, preserving approximately 680 jobs across the Group and including all in-scope EMEA employees.

This transaction was subsequently considered and approved at a joint hearing of the Canadian court and US Bankruptcy court on 2 December 2009.

### Sale of CVAS Business

Nortel entered into a stalking horse sale agreement with Genband Inc. (**"Genband"**) on 22 December 2009 for a headline purchase price of US$282 million. In order to finance the transaction, Genband has teamed with one of its existing major shareholders, One Equity Partners III, L.P. (**"OEP"**). OEP manages investments and commitments for JP Morgan Chase & Co. in private equity transactions.

The scope of the stalking horse transaction includes the sale of substantially all of the assets of its CALA, Asia, and the EMEA entities. The purchase price, as is typical, is subject to certain working capital purchase price deductions to be applied pursuant to the terms of the sale agreement at the date of closing the transaction which are expected to have a value of approximately US$100 million, which would result in a net purchase price of approximately US$180 million.

The stalking horse transaction is a material milestone for the EMEA entities, securing the transfer of all 314 EMEA CVAS employees, CVAS contracts (subject to a limited exclusion criteria) and associated contractual liabilities. The proceeds from the transaction, as with other deals, will be subject to a global allocation process, the terms of which are yet to be agreed.

 **ERNST & YOUNG**

6

An Order setting the bidding procedures for an auction of the CVAS business was passed by the US Bankruptcy Court and the Canadian Court in January 2010. The auction date has been set for 25 February 2010. Any other qualifying bids are likely to be required to be submitted before that date.

**Future Transactions**

Given the integrated nature of the Group's businesses, the Joint Administrators continue to work closely with the North American management team to explore interests from external parties to acquire the remaining businesses of the Group in which the Company has an interest. Opportunities for the sale of other business units, primarily MSS, are currently being evaluated. In addition, the Group has a substantial residual intellectual property portfolio which is currently under review.

**ElI ERNST & YOUNG**

### 3. Trading and Operational Overview

The Company is the largest EMEA entity being engaged in all five of the global businesses. The Company also provides much of the infrastructure and management functions necessary for the EMEA region.

At an entity level, the Company has traditionally traded at an operating loss. This is a consequence of the levels of research and development activity and other overheads incurred on behalf of the wider EMEA region.

Within the Group itself, the Carrier businesses (GSM, CVAS and CDMA) and the MEN business generate an operating profit. In contrast, the Enterprise business generates an operating loss. All businesses have continued to trade since 14 January 2009 in order to achieve global sales of each business.

As a consequence of the filing, and general economic market conditions, customer orders have fallen since 2008. Despite this, the Company achieved a turnover to 30 September 2009 of US$520.6 million and an operating loss of US$52.5 million before professional fees, restructuring costs and transfer pricing receipts. It is typical for trading performance to improve in the second half of a year due to the nature of customer requirements. This trend is continuing despite the global filings.

As a result of the decrease in customer orders, it has been necessary to implement cost saving measures in order to realign the business to reflect current activity levels. Measures include headcount reduction, property restructuring and a reduction in the level of purchase orders, which have all helped long term asset preservation.

As detailed in our previous report, the Group operates a complex transfer pricing scheme. Typically the Company receives a contribution towards its trading losses under this arrangement. Post filing, the Company will receive up to US$96 million from the Group under this arrangement, which will enable the Joint Administrators to recover some of the trading losses incurred for the full year.

The Joint Administrators continue to trade in order to maximise the value of potential business and asset sales, and to reduce the value of termination claims and other contingent liabilities on the Company. The Joint Administrators balance the decision of continuing to trade with its impact on the interests of creditors. The Joint Administrators consider that the potential realisation values from selling the Company's various businesses as going concerns will result in a better return to creditors than if the businesses ceased to trade and the assets of the Company were sold on a break-up basis. This position is closely monitored by the Joint Administrators who continue to maintain a close dialogue with the unsecured creditors committee on the business disposal and ongoing trading strategy.

# ⧉ ERNST & YOUNG

8

### Customers

The Joint Administrators continue to work with the rest of the Group to assess and stabilise its customer base by working 'hand-in-hand' with Group-wide Nortel customer account teams.

The Group's customer base has to a large extent remained loyal and supportive of the restructuring in a global context. The Group has maintained its market presence and won new customer contracts as well as renewing important existing customer relationships, set against continued challenging trading conditions in the market place.

The Joint Administrators continue to work with the Company's management to ensure the ongoing collection of receivables due from its customers in the normal course of business. Where customers have been slow in making payment the Joint Administrators have entered into discussions with the relevant party to resolve any outstanding issues and speed up payment. Where sales of businesses complete, the Joint Administrators will be reviewing options to incentivise certain customers to accelerate payment and thereby ensure collection of pre and post appointment receivables balances on a timely basis.

### Suppliers

Key suppliers continue to be supportive of the restructuring process, which has facilitated the trading strategy being followed by the Joint Administrators. There has been extensive work carried out to ensure continued supply and to advise suppliers of the sale of each of the business units, including the timing and activities required to migrate the businesses.

### Real Estate

Real estate remains a substantial cost element for the Company as a result of being party to several leases with high rental costs. The Joint Administrators continue to negotiate the surrender in whole or part (i.e. of areas or offices within these leasehold properties) in order to reduce the quarterly rent exposure in the Administration.

Since our last report, the Company has now exited eight sites in the UK. A further eight sites remain occupied, of which a lease assignment for one has been included in a sale agreement. The remaining sites continue to be assessed for potential assignments to the purchasers of the businesses, and the Joint Administrators are working closely with these parties in order to reduce rental costs where possible.

### Restructuring Measures

As previously reported, redundancies were made in the first six months of the Administration. No further redundancies have taken place during the period of this Report. It should be noted however, that 95 employees have resigned.

It should also be noted that, upon completion of sales transactions, the majority of employees will transfer to the respective purchasers therefore preserving future employment.

ᴇᵁ ERNST & YOUNG                                    9

### 4.  Receipts and Payments Account

Attached at Appendix 2 is the Joint Administrators' receipts and payments ("**R & P**") account for the period 14 July 2009 to 13 January 2010 for the Company in the UK and the Saudi Arabia branch, which shows total receipts of US$362.1 million, and payments of US$331.1 million. A trading overview is included in Section 3 above.

The Company held cash in various currencies equivalent to US$365.2 million at 13 January 2010. It should be noted that the transfer pricing contributions received to date for 2009, outlined in our previous report and in Section 3 above, are reflected in the R & P.

The R & P account is a statement of cash received and cash paid out and does not reflect estimated future realisations or costs, including proceeds from the sales of businesses held in escrow pending allocation amongst the Group.

For further information, see the detailed notes provided in Appendix 2.

**ᴲ ERNST & YOUNG**                                                    10

### 5. Joint Administrators' Remuneration and Disbursements

The Joint Administrators' remuneration was fixed on a time-costs basis by the Committee. During the period 1 June 2009 to 6 November 2009 the Joint Administrators incurred time costs of GB£10,192,922, of which GB£7,705,078 has been drawn on account in accordance with the court order dated 28 February 2009.

It is the responsibility of the Committee to approve fees incurred. GB£4,203,797, out of time costs incurred for the period 28 February 2009 to 1 May 2009 has been approved by a resolution passed by the Committee. The Joint Administrators are in the process of seeking approval from the Committee for fees incurred for the period 2 May 2009 to 4 September 2009. An analysis of the time spent is at Appendix 3, which includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

#### *Payments to Other Professionals*

The Joint Administrators continue to engage the following professional advisors to assist them in the Administration. These professionals work on a time cost basis and internal review processes are undertaken to review their invoices. As at 13 January 2010 the following has been paid:

Herbert Smith LLP – GB£21,079,656 (Legal Advisors)

Legal Counsel – GB£1,344,160 (Legal Advisors)

ᴲ ERNST & YOUNG                                                    11

## 6. Other Matters

### The Committee

A committee of the unsecured creditors was formed at the creditors' meeting held on 11 March 2009 (the "**Committee**"). The Joint Administrators continue to provide detailed information to the members of the Committee as the Administration progresses and matters evolve (including an analysis of their time costs for approval). The Joint Administrators will continue to keep the Committee appraised of developments.

### The Prescribed Part

Section 176A of the Insolvency Act 1986 does not apply to this Administration as there is no qualifying floating charge security, and as such there is no Prescribed Part to be set aside for non preferential creditors.

### North American Claims Process

In North America, the Nortel Canadian Companies under the Companies' Creditors Arrangement Act ("CCAA") proceedings and the US Companies in Chapter 11 proceedings had obtained orders approving formal claims processes in each jurisdiction. In both jurisdictions there was a call for claims, including supplier claims, arising prior to 14 January 2009. The bar date set for such claims was 30 September 2009.

The Joint Administrators have now filed protective claims on behalf of the Company and the EMEA Companies in order to preserve any potential claims falling against Group companies in jurisdictions where bar dates were imposed.

Creditors with claims in either of the jurisdictions outlined above should seek separate legal advice in relation to such claims. Further information on the claims process can be found at:

http://www.nortel.com/corporate/restructuring.html

The Joint Administrators will continue to file protective claims on behalf of the Company and the EMEA Companies in jurisdictions where a bar date is imposed.

### Company Directors' Disqualification Act 1986

As part of our statutory duties, the Joint Administrators perform a review of the conduct of all Directors of the Company that have held office in the past three years. This review is a statutory requirement and the resulting report has been sent to the Secretary of State at the Department of Trade and Industry and is confidential.

**ᴲ ERNST & YOUNG**                                                    12

## 7. Future Conduct of the Administration

### Purchase Price Allocation ("PPA") – The Business Disposals

The proceeds from business disposals, which will be placed in a global escrow account on completion, will subsequently be apportioned across the selling companies. The proper allocation of proceeds across each selling entity, including the Company and the EMEA Companies, is a matter of importance not only to the Joint Administrators, but also to the Court-appointed Monitor of Nortel Networks Ltd (the Canadian company) and the Unsecured Creditors' Committee of Nortel Networks Inc (the US company), as fiduciaries responsible in respect of the Chapter 11 proceedings of the US company.

The Joint Administrators, Nortel Networks Ltd and Nortel Networks Inc (together with the Monitor and the legal advisors to the Unsecured Creditors' Committee) have been negotiating a purchase price allocation framework to agree how the respective entitlement of each of the Nortel entities to the proceeds of the business sales will be determined.

The current intention is for the allocation of sale proceeds to be determined by way of an arbitration process to which all entities with a claim to sale proceeds will subject themselves. That arbitration process would involve an arbitration panel of three independent arbiters, of international repute.

It remains possible that the selling estates could reach a consensual allocation agreement regarding purchase price allocation (without the need for recourse to arbitration) or are simply unable to agree on the form of arbitration proceedings.

In the event that it is not possible to agree an arbitration process with the Canadian and US entities, the process for determining allocation of the sale proceeds is likely to be decided by the courts.

Whatever mechanism is used to determine the allocation of sale proceeds, the Joint Administrators are mindful that in the negotiations that take place, it is their duty to act in the best interests of the Company's creditors.

### Distributions to Creditors

It remains too early to be precise on the potential quantum or timing of any dividend payment, owing to the ongoing sales processes in relation to the various businesses operated by the Company, and the fact that the formal process of claims admittance/adjudication has not yet commenced.

The Joint Administrators expect to have a better view not only of the value of the asset realisations, but also of the totality of claims, including contingent claims that might rank for dividend, as business disposals complete, contracts of employment transfer to the purchasers, certain customer and supplier contracts novate to the purchasing parties and progress is made in respect of the PPA.



With respect to the PPA process and recoveries therefrom, which will form an integral element of any dividend to creditors, the Joint Administrators are mindful of the pending arbitration process and the potential to reach a consensual allocation. The Joint Administrators do not believe that it is in the interests of the Company and its creditors to define and circulate a view on an expected recovery level for the Company; such assertion at this time might prejudice the Company's position in any arbitration proceedings or negotiations between selling estates.

However, as previously reported, the disposals are complex and there will be periods of some months between contracting and completion. In addition, the Administration is likely to need to remain in place for some time (possibly 12 months or more for certain Group companies) to provide transitional services to the purchasers.

On the basis the sales processes are expected to complete by mid 2010, it is likely external creditor claims will be called for in 2010. In accordance with the Insolvency Act 1986, the Joint Administrators' will be writing to all known creditors and advertising for claims.

The Joint Administrators do have a statutory power to agree and pay preferential creditors in this matter, and will be attending to this at an earlier stage.

### Administration Extension

The Joint Administrators applied to the Court on 12 January 2010 for extensions of the Administrations of the Company and the other EMEA Companies. I am pleased to report that the extension applications have been successful and the Administrations have been extended for a further 24 months. The Administrations are now due to expire on 13 January 2012.

### Exit Routes from Administration

Certain exit routes set out in the Proposals remain viable options and continue to be explored by the Joint Administrators as mechanisms to agree creditors' claims and distribute assets to creditors once the Administration has been completed. The Joint Administrators will be in a position to provide further information on these exit routes once administration trading has ceased, assets have been realised and administration liabilities settled.

**≡ ERNST & YOUNG**                                                    14

The Joint Administrators will report to you again in six months' time.

Yours faithfully
For Nortel Networks UK Limited (In Administration)

C Hill
Joint Administrator

Enc:   Company information
       Joint Administrators' Receipts and Payments Account
       Summary of Joint Administrators' Time Costs
       Joint Administrators' Policy on Fees and Disbursements
       Form 2.24B Administrators' Progress Report

For the Companies listed below, The Institute of Chartered Accountants in England and Wales in the UK authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants in the UK authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.

The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability.

The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV

The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.

Nortel Networks SA was placed into French liquidation judiciaire on 28 May 2009. The business and assets of the company that are situated in France are now under the control of an administrateur judiciaire.

## Appendix 1

## Nortel Networks UK Limited (In Administration)

### Company Information

| | |
|---|---|
| Registered number: | 3937799 |
| Company name: | Nortel Networks UK Limited |
| Registered office address | Maidenhead, Office Park, Westacott Way, Maidenhead, Berkshire, SL6 3QH, UK |
| Previous names: | Nortel Networks Holdings Limited<br>Nortel Networks Holdings plc |

### Details of the Administrators and of their appointment

| | |
|---|---|
| Administrators: | AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London, SE1 2AF |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors. |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 536 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly. |

### Statement Concerning the EC Regulation on Insolvency Proceedings 2000

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

**Share Capital**

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | **Number** | **£** | **Number** | **£** |
| Ordinary | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 |

**Shareholder**

Nortel Networks Limited - 100%

**Directors (current and for the last three years) and company secretary (current)**

| Name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| Bill LaSalle | Director | 01/10/2001 | 23/05/2008 | |
| Geoff Lloyd | Director | 01/02/2002 | 17/03/2006 | - |
| Christian Waida | Director | 17/12/2004 | 08/12/2008 | - |
| Henry Birt | Director | 01/09/2005 | 31/03/2007 | - |
| Peter Currie | Director | 01/09/2005 | 10/04/2007 | - |
| Sharon Rolston | Director | 01/04/2006 | - | - |
| Simon Freemantle | Director | 31/03/2007 | - | - |
| Nir Elbaz | Secretary | 17/12/2008 | - | - |

Summary of Nortel Group Structure



Reference

The EMEA Companies in UK administration procedures

The EMEA Companies in English administration proceedings:

| Legal Entity | Country of Incorporation |
|---|---|
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

## Appendix 2

## Nortel Networks UK Limited (In Administration)

### Joint Administrators' Abstract of Receipts and Payments
from 14 July 2009 to 13 January 2010

| Currency: USD | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| Opening balance | 338,622,958 | - | 338,622,958 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Post appointment sales | 127,722,670 | 155,327,815 | 283,050,485 |
| - Intercompany | 76,522,188 | 195,540,540 | 272,062,728 |
| - Property income | 1,623,241 | 1,056,070 | 2,679,311 |
| - Other receipts | 450,579 | 451,284 | 901,863 |
| *Other:* | | | |
| - Pre appointment sales | 82,580,000 | 16,381,782 | 98,961,782 |
| - FX translation movement | 42,263,155 | (7,574,574) | 34,688,581 |
| - Bank interest | 1,088,526 | 828,135 | 1,916,661 |
| | 332,250,358 | 362,011,052 | 694,261,411 |
| **Payments** | | | |
| *Trading:* | | | |
| - Accounts payable - inventory related | (169,895,702) | (158,744,602) | (328,640,305) |
| - Payroll, employee benefits, and payroll taxes | (82,513,236) | (73,941,431) | (156,454,667) |
| - Property costs | (15,430,052) | (15,973,711) | (31,403,763) |
| - Other taxes | (13,658,787) | (13,669,258) | (27,328,045) |
| - Other payments | (9,599,248) | (6,933,918) | (16,533,166) |
| - Trade payables | (8,652,726) | (301,897) | (8,954,622) |
| - Pension contributions | (4,146,123) | (4,674,704) | (8,820,827) |
| - Utilities | (2,504,653) | (4,276,559) | (6,781,212) |
| - Contractors | (2,052,190) | (1,347,952) | (3,400,143) |
| *Other:* | | | |
| - Legal fees | (7,668,284) | (28,270,409) | (35,938,693) |
| - Joint Administrators' fees and disbursements | (16,487,245) | (18,718,972) | (35,206,217) |
| - Other professional services costs | (2,735,246) | (3,276,823) | (6,012,069) |
| - FX translation movement on FX transactions within the entity | (3,314,420) | (475,297) | (3,789,717) |
| - Restructuring costs | (1,502,842) | (11,263) | (1,514,105) |
| - Bank charges and interest | (211,764) | (191,797) | (403,562) |
| - Capital expenditure | (166,764) | (6,947) | (173,711) |
| | (340,539,282) | (330,815,541) | (671,354,823) |
| **Closing balance** | 330,334,035 | | 361,529,546 |
| **Account reconciliations:** | | | |
| Current accounts | 33,317,147 | | 29,445,022 |
| Local deposit accounts | - | | - |
| Administration deposit accounts | 297,016,887 | | 332,084,524 |
| | 330,334,035 | | 361,529,546 |

## Nortel Networks UK Limited (In Administration)

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2009 to 13 January 2010**

| Currency: GBP | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| **Opening balance** | 236,900,621 | - | 236,900,621 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Post appointment sales | 85,048,017 | 95,863,966 | 180,911,983 |
| - Intercompany | 51,003,923 | 122,958,888 | 173,962,811 |
| - Property income | 1,080,884 | 631,570 | 1,712,455 |
| - Other receipts | 300,666 | 275,780 | 576,446 |
| *Other:* | | | |
| - Pre appointment sales | 55,173,350 | 8,078,166 | 63,251,516 |
| - Bank interest | 724,871 | 500,159 | 1,225,030 |
| | 193,331,710 | 228,308,530 | 421,640,240 |
| **Payments** | | | |
| *Trading:* | | | |
| - Accounts payable - Inventory related | (113,470,875) | (96,577,530) | (210,048,404) |
| - Payroll, employee benefits, and payroll taxes | (54,934,480) | (45,061,956) | (99,996,436) |
| - Property costs | (10,272,903) | (9,798,498) | (20,071,401) |
| - Other taxes | (9,093,475) | (8,372,938) | (17,466,412) |
| - Other payments | (6,396,923) | (4,170,241) | (10,567,164) |
| - Trade payables | (5,766,578) | 43,291 | (5,723,287) |
| - Pension contributions | (2,760,346) | (2,877,397) | (5,637,744) |
| - Utilities | (1,668,110) | (2,666,073) | (4,334,183) |
| - Contractors | (1,368,297) | (804,943) | (2,173,240) |
| *Other:* | | | |
| - Joint Administrators' fees and disbursements | (10,976,642) | (11,525,060) | (22,501,701) |
| - Legal fees | (5,104,789) | (17,864,565) | (22,969,355) |
| - FX translation movement | 1,743,716 | (7,298,203) | (5,554,487) |
| - Other professional services costs | (1,823,896) | (2,018,691) | (3,842,587) |
| - FX translation movement on FX transactions within the entity | (2,256,623) | (245,423) | (2,502,046) |
| - Restructuring costs | (1,003,443) | 35,717 | (967,725) |
| - Bank charges and interest | (141,088) | (116,845) | (257,934) |
| - Capital expenditure | (111,026) | - | (111,026) |
| | (225,405,778) | (209,319,354) | (434,725,133) |
| **Closing balance** | 204,826,553 | | 223,815,729 |
| **Account reconciliations:** | | | |
| **Current accounts** | 20,658,593 | | 18,228,826 |
| **Local deposit accounts** | - | | - |
| **Administration deposit accounts** | 184,167,959 | | 205,586,903 |
| | 204,826,553 | | 223,815,729 |

## Receipts and payments comments

### Notes to R & P

*Note 1*

Account balances have all been converted into a local currency, Sterling, in addition to a common currency across all entities, USD.

Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2009 month end spot rates which have been provided by the Company. This approach is in line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts over the course of the reporting period have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

*Note 2*

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

*Note 3*

All items within the Receipts & Payments analysis are recorded gross of VAT where applicable.

*Note 4*

All amounts referred to are in US$ unless stated otherwise.


**RECEIPTS**

There was cash on appointment held in Euro, US$, Sterling and Canadian dollar current and deposit accounts which totalled $338.6 million.

Total receipts since 13 July 2009 total $362.0 million. This primarily relates to intercompany receipts and pre and post appointment sales receipts.

*Intercompany receipts*

Intercompany receipts received since 13 July 2009 total $195.5 million. $67.4 million of this amount relates to transfer pricing receipts received from other Nortel EMEA filed entities in accordance with the Interim Funding Settlement Agreement.

In addition, the balance relates to net receipts collected through the Citinetting process (majority of funds received from Nortel (Ireland) Limited) and payments to reimburse Nortel Networks Limited and Nortel Networks Inc for payments made to Flextronics and other global business costs.

In addition, $10.0 million has been received from Nortel's Asia Pacific companies in respect of pre-filing intercompany balances.

### Sales receipts

Pre appointment sales receipts relate to amounts collected against balances outstanding at the date of appointment. Since 13 July 2009, an amount of $16.0 million has been collected, bringing total collections to $98.6 million.

Post appointment sales receipts collected since 13 July 2009 total $213.6 million. There remains an outstanding balance on the post appointment sales ledger of $ 54.2 million as at 13 January 2009.

### Property income

Property income collected since 13 July 2009 totals $1.1 million. This relates to rental receipts and service charges on sites in Harlow, Maidenhead and Welwyn Garden City.

Property income in the period to 13 July 2009 has been restated from nil to $1.6 million, following a reclassification of this income from post appointment sales receipts to property income.

### Foreign exchange translation movement

The total FX translation movement to 13 January 2009 is a result of the appreciation of the sterling against USD. The translation movement shown since 13 July 2009 is simply the difference between the FX gain/loss for the total period and that for the period to 13 July 2009. As such the interim FX translation movement does not represent a true FX translation gain for the period.


## PAYMENTS

Total payments made since 13 July 2009 total $330.8 million. This primarily relates to inventory purchases and payroll related costs.

### Accounts payable – inventory related

The accounts payable inventory related payments since 13 July 2009 total $158.7 million. Flextronics continues to be the major supplier of inventory to NNUK.

### Payroll

Payroll costs since 13 July 2009 total $73.9 million and include net pay in addition to employee expenses, employee benefits and payroll taxes.

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments**
**from 14 July 2009 to 13 January 2010**

| Currency: USD | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| **Opening balance** | 2,554,345 | - | 2,554,345 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Other receipts | - | - | - |
| *Other:* | | | |
| - Pre appointment sales | 1,749,361 | 134,879 | 1,884,240 |
| - Bank interest | 30,236 | 873 | 31,109 |
| - FX translation movement | 1,878 | 536 | 2,414 |
| | 1,781,475 | 136,288 | 1,917,763 |
| **Payments** | | | |
| *Trading:* | | | |
| - Trade payables | (229,736) | 21 | (229,715) |
| - Payroll, employee benefits, and payroll taxes | (44,478) | (150,351) | (194,830) |
| - Other taxes | (98,585) | (5,724) | (104,308) |
| - Other professional services costs | (23,243) | (40,381) | (63,624) |
| - Property costs | - | (57,407) | (57,407) |
| - Utilities | (21,291) | (30,933) | (52,224) |
| - Other payments | (27,960) | (17,055) | (45,015) |
| - Contractors | - | (28,343) | (28,343) |
| - Intercompany | (3,015) | 180 | (2,835) |
| *Other:* | | | |
| - Bank charges and interest | (349) | (378) | (726) |
| - FX translation movement on FX transactions within the entity | - | (507) | (507) |
| | (448,857) | (331,877) | (780,534) |
| **Closing balance** | 3,887,163 | | 3,691,574 |
| **Account reconciliations:** | | | |
| Current accounts | 820,723 | | 44,419 |
| Local deposit accounts | 31,420 | | 31,491 |
| Administration deposit accounts | 3,035,020 | | 3,615,664 |
| | 3,887,163 | | 3,691,574 |

## Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2009 to 13 January 2010**

| Currency: SAR | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| **Opening balance** | 9,585,178 | - | 9,585,178 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Other receipts | - | - | - |
| *Other:* | | | |
| - Pre appointment sales | 6,558,735 | 506,849 | 7,065,584 |
| - Bank interest | 113,267 | 3,291 | 116,558 |
| - FX translation movement | (11,627) | 152 | (11,475) |
| | 6,660,375 | 510,292 | 7,170,667 |
| **Payments** | | | |
| *Trading:* | | | |
| - Trade payables | (860,923) | - | (860,924) |
| - Payroll, employee benefits, and payroll taxes | (166,617) | (563,301) | (729,918) |
| - Other taxes | (369,300) | (21,485) | (390,785) |
| - Other professional services costs | (87,069) | (151,295) | (238,364) |
| - Property costs | - | (215,073) | (215,073) |
| - Utilities | (79,758) | (115,867) | (195,655) |
| - Other payments | (104,737) | (63,907) | (168,645) |
| - Contractors | - | (109,931) | (109,931) |
| - Intercompany | 2,080 | 16 | 2,096 |
| *Other:* | | | |
| - Bank charges and interest | (1,308) | (1,418) | (2,726) |
| - FX translation movement on FX transactions within the entity | - | 248 | 248 |
| | (1,667,630) | (1,242,044) | (2,909,674) |
| **Closing balance** | 14,577,923 | | 13,846,171 |
| **Account reconciliations:** | | | |
| Current accounts | 3,077,876 | | 166,604 |
| Local deposit accounts | 118,116 | | 118,116 |
| Administration deposit accounts | 11,381,931 | | 13,561,452 |
| | 14,577,923 | | 13,846,171 |

## Receipts and payments comments

### Notes to R & P

### Note 1

Account balances have all been reported in a local currency, SAR, in addition to a common currency across all entities, US$.

Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2009 month end spot rates which have been provided by the Company.  This approach is in line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts have been converted at average spot rates for the period 14 January 2009 to 13 January 2010, which have been sourced from the foreign exchange website Oanda.

Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates. These are translation movements only and do not reflect an actual receipt or payment.

### Note 2

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited.  Material items have been reviewed for accuracy and reasonableness.

### Note 3

All items within the Receipts & Payments analysis are recorded gross of sales tax where applicable.

### Note 4

All amount referred to are in US$ unless stated otherwise.

### Note 5

The receipts and payments to 13 July 2009 have been restated to remove the previous double count of "other receipts" which was later identified as having been accounted for in the opening balance. This restatement has the effect of reducing the closing balance by $68,000.

### RECEIPTS

On appointment $2.6 million in cash was held in SAR current accounts.

During the period 14 July 2009 to 13 January 2010 receipts totalling $136,000 have been received.  This predominantly relates to pre appointment sales receipts.

*Sales receipts*

Pre appointment sales receipts relate to amounts collected against balances outstanding at the date of appointment. Since 13 July 2009, an additional $135,000 has been collected bringing total collections to $1.9 million.

## PAYMENTS

Total payments of $332,000 have been made since 13 July 2009. This primarily relates to payroll costs, property costs and other professional service costs.

### *Payroll*

Payroll costs since 13 July 2009 total $150,000. $112,000 of this value relates to social insurance tax repayments for two employees who were not correctly registered when they commenced employment and as a consequence had not been paying the required income tax. The remaining payroll amount of $38,000 relates to net pay and employee expenses.

### *Property*

Property costs since 13 July 2009 total $57,000. This relates to rental payments for the Riyadh property which is to be vacated on 31 January 2010 and the deposit for the new offices.

### *Other professional services*

Other professional services costs since 13 July 2009 total $40,000. These payments primarily relate to BDO for their ongoing account management services.

### *Contractors*

Contractor costs since 13 July 2009 total $29,000. This primarily relates to payments to Baud Telecom Company for technical support.

## Appendix 3

## Nortel Networks UK Limited (In Administration)

### Summary of Joint Administrators' time costs from 1 June 2009 to 6 November 2009 (GB£)
### Excluding core M&A transaction time

| Activity | Partner / Executive Director | Director | Partner / Associate Director | Manager | Executive | Analyst | Total hours | Average hourly rate | Time cost by activity | Time cost by activity Contribution to date |
|---|---|---|---|---|---|---|---|---|---|---|
| Finance, Accounting & Administration | 10.0 | 0.9 | 903.6 | 848.5 | 2,139.1 | 1,249.4 | 5,251.5 | 292.77 | 1,537,494.00 | 2,749,703.50 |
| Trading | 6.5 | 102.7 | 147.8 | 1,088.2 | 909.5 | 344.0 | 2,628.7 | 318.18 | 828,960.50 | 1,992,712.00 |
| Employees | 162.9 | 91.1 | 210.0 | 1,104.7 | 90.1 | 8.0 | 1,686.8 | 339.55 | 560,975.50 | 1,353,754.50 |
| Creditors | 32.7 | 24.1 | 683.1 | 726.1 | 139.8 | 46.3 | 1,656.1 | 317.61 | 525,889.00 | 1,224,604.50 |
| Suppliers | 47.6 | 38.5 | 58.4 | 805.7 | 405.9 | 322.8 | 1,676.7 | 312.91 | 524,663.50 | 1,895,229.42 |
| Canada / USA | 583.9 | 19.6 | 55.7 | 33.6 | - | - | 692.7 | 664.48 | 460,287.50 | 881,488.50 |
| UK Tax / VAT advisory and compliance | 46.5 | 76.3 | 111.8 | 171.9 | 230.5 | 23.6 | 690.6 | 555.34 | 386,855.50 | 983,591.00 |
| Customers | 29.6 | 216.0 | 45.0 | 403.8 | 182.3 | 2.5 | 870.5 | 399.55 | 348,944.50 | 1,005,504.00 |
| Statutory | 68.9 | 20.1 | 27.2 | 342.9 | 62.0 | 534.8 | 1,075.7 | 286.24 | 307,909.00 | 668,785.50 |
| Property | 11.0 | 182.9 | 375.8 | 3.0 | 6.5 | 11.5 | 592.7 | 507.00 | 300,500.00 | 567,728.00 |
| Case management | 30.7 | 73.0 | 45.8 | 150.1 | 382.6 | 183.3 | 865.5 | 235.82 | 204,108.00 | 708,139.50 |
| Creditors' Committee | 47.8 | 52.9 | 34.4 | 70.4 | 202.7 | 22.8 | 431.0 | 342.76 | 147,738.50 | 298,043.00 |
| Strategy | 129.8 | 26.5 | 40.0 | 22.0 | - | - | 218.3 | 591.63 | 129,198.00 | 419,868.50 |
| Transfer Pricing | 40.6 | 6.5 | 129.5 | 15.0 | 27.0 | 7.5 | 228.1 | 555.25 | 126,651.50 | 422,333.50 |
| Legal | 37.5 | 21.8 | 3.5 | 3.3 | 2.3 | 485.6 | 554.2 | 202.55 | 112,254.50 | 229,388.00 |
| Debtors | 35.8 | 27.1 | 6.9 | 7.5 | 117.1 | - | 194.4 | 393.75 | 76,545.50 | 410,984.00 |
| Investigators | 0.5 | - | 15.6 | 33.3 | 150.1 | 97.5 | 297.0 | 224.25 | 66,602.00 | 370,039.00 |
| Branches & equity interests | 7.0 | 35.3 | 16.5 | 80.4 | 14.0 | 5.3 | 158.5 | 415.38 | 65,838.00 | 241,301.89 |
| Liaising Directors | 43.5 | 46.5 | 3.9 | - | - | - | 93.9 | 614.97 | 58,976.00 | 158,743.00 |
| Treasury / Banks | 4.0 | 7.3 | - | 42.0 | 22.5 | 118.1 | 193.9 | 263.09 | 51,013.00 | 207,867.50 |
| Pensions | 43.6 | - | 8.7 | 46.5 | - | - | 101.8 | 489.03 | 47,747.50 | 128,250.50 |
| PR / Media | 6.5 | 25.3 | 5.0 | 13.0 | - | - | 49.8 | 488.97 | 24,351.00 | 52,265.00 |
| Briefing EMEA | - | - | - | 58.4 | - | - | 58.4 | 360.00 | 21,024.00 | 131,924.00 |
| Intra Group & Netting | 17.0 | 1.0 | - | - | - | - | 18.0 | 664.44 | 11,960.00 | 30,040.00 |
| Administration application and planning | - | - | - | - | - | - | - | - | - | 172,741.40 |
| Stabilisation | - | - | - | - | - | - | - | - | - | 147,531.00 |
| Retention of title | - | - | - | - | - | - | - | - | - | 1,970.00 |
| **Grand Total** | 1,459.1 | 1,095.4 | 2,928.2 | 6,153.3 | 5,096.0 | 3,462.8 | 20,215.8 | 341.57 | 6,905,208.50 | 17,471,578.72 |
| | | | | | | | | | | |
| Average hourly rate | 694.24 | 583.83 | 458.85 | 341.47 | 246.32 | 155.76 | | | | |
| Time costs for the period | 1,012,951.50 | 639,482.50 | 1,338,217.00 | 2,111,400.00 | 1,252,778.00 | 538,363.50 | | | | |
| Time costs for the Administration to date | 2,692,083.04 | 1,432,812.34 | 4,284,236.54 | 5,018,217.37 | 2,841,208.49 | 1,102,038.84 | | | | |