## SCHEDULE A
## OTHER SELLERS

Nortel Networks Technology Corporation

Nortel Networks (CALA) Inc.

Nortel de Mexico S. de R.L. de C.V.

Nortel Networks de Mexico S.A. de C.V.

Nortel Networks de Guatemala Ltda

Nortel Networks de Argentina S.A.

Nortel Networks de Columbia S.A.S.

Nortel Networks Peru S.A.C.

Nortel Networks de Ecuador S.A.

Nortel Networks Kabushiki Kaisha

Nortel Networks (Asia) Limited

Nortel Networks Singapore Pte. Ltd

Nortel Vietnam Limited

Nortel Networks (Thailand) Limited

Nortel Networks Malaysia Sdn. Bhd

Nortel Networks Australia Pty. Limited

Nortel Networks New Zealand Limited

Nortel Networks (China) Limited

Nortel Networks (Asia) Limited – Pakistan Branch

Nortel Networks Singapore Pte. Ltd – Philippines Branch

Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited

Nortel Trinidad and Tobago Limited

Nortel Networks (Asia) Limited – Taiwan Branch

PT Nortel Networks Indonesia

Qtera Corporation

CoreTek, Inc.

Xros, Inc.

Schedule A

## SCHEDULE B

### EMEA SELLERS

Nortel Networks UK Limited (In Administration)

Nortel GmbH (In Administration)

Nortel Networks S.p.A. (In Administration)

Nortel Networks Hispania, S.A. (In Administration)

Nortel Networks B.V. (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks N.V. (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks Polska Sp. z.o.o. (In Administration)

Nortel Networks Portugal S.A. (In Administration)

Nortel Networks s.r.o. (In Administration)

Nortel Networks France S.A.S. (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks (Northern Ireland) Limited

Nortel Networks o.o.o.

Nortel Networks A.G.

### ISRAELI COMPANY

Nortel Networks Israel (Sales and Marketing) Limited (In administration)

Schedule B

## SCHEDULE C

### AFFILIATES OF MAIN SELLERS THAT
### ARE DEEMED TO BE "SELLING DEBTORS"

Architel Systems (U.S.) Corporation

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Sonoma Systems

DOCSTOR: 1843462\14

## SCHEDULE D

### AFFILIATES OF THE EMEA SELLERS THAT ARE DEEMED TO BE A "SELLING DEBTOR"

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks Optical Components Limited

Schedule D

# SCHEDULE E

## STANDING SETTLEMENT INSTRUCTIONS

Nortel Networks Limited
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 38545364

Nortel Networks Inc.
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30463444

Nortel Networks Corporation
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30428374

Nortel Networks UK Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel GmbH (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SpA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Schedule E-1

Nortel Hispania S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks B.V. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AB (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks N.V. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Austria) GmbH. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Polska Sp z.o.o. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Portugal S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks s.r.o. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks France S.A.S (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Ireland) Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Engineering Services Kft (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Slovensko s.r.o. (In Administration)

Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Romania Srl (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Oy (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks International Finance & Holding BV. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Northern Ireland) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

o.o.o Nortel Networks
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AG
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Israel (Sales and Marketing) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

## SCHEDULE F

### NOTICE ADDRESSES

**Depositors:**

| | |
|---|---|
| **NNC, NNL and the Other Sellers listed on Schedule A (other than Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI), the affiliates of the Main Sellers listed on Schedule C and any other Respective Affiliates of NNC or NNL:** | 5945 Airport Road<br>Suite 360<br>Mississauga, Ontario, Canada  L4V 1R9<br>Attn:  Anna Ventresca<br>Phone: 905.863.1204<br>Facsimile: 905.863.2057 |
| **NNI and Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda, Nortel Networks Kabushiki Kaisha or any other Respective Affiliates of NNI:** | Legal Department<br>220 Athens Way, Suite 300<br>Nashville, Tennessee, USA  37228<br>Attn:  Lynn C. Egan<br>Phone: 615.432.4289<br>Facsimile: 615.432.4067 |
| **The EMEA Sellers and the affiliates of the EMEA Sellers listed on Schedule D:** | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: Stephen Gale and Kevin F Lloyd<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| **NNSA:** | Etude Cosme Rogeau<br>Mandataire Judiciare<br>26 avenue Hoche<br>78000 Versailles (France)<br>Phone: +33 (1) 39 49 52 08<br>Facsimile: +33 (1) 39 49 44 63<br>(with a copy to Antoine Tchekhoff, FTPA<br>1 bis avenue Foch 75116 Paris (France)<br>Phone: +33 (1) 45 00 86 20<br>Facsimile: +33 (1) 45 00 85 81) |
| **The Israeli Company:** | Avi D. Pelossof<br>Zellermayer, Pelossof & Co. |

Schedule F-1

The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile:        +972 3 6255500

**Distribution Agent:**

JPMorgan Chase Bank, N.A.
TS / Escrow Services
4 New York Plaza, 21st Floor
New York, New York 10004
Attn:  Andy Jacknick
Phone: 212.623. 0241
Facsimile: 212.623.6168

**Estate Fiduciaries:**

**The Official Committee of Unsecured
Creditors in connection with the
Chapter 11 cases of Nortel Networks
Inc., et al. (Case No. 09-10138):**

c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Fred S. Hodara, Stephen B. Kuhn,
David H. Botter and Kenneth A. Davis
Phone: 212.872.1000
Facsimile: 212.872.1002

**Monitor:**

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario, Canada
M5K 1J7
Facsimile: (416) 943-3300
Attn: Murray A. McDonald

**Bondholder Group:**

c/o Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Albert A. Pisa and Roland Hlawaty
Phone: 212.530.5000
Facsimile: 212.822.5735

Schedule F- 2

## SCHEDULE G

### Telephone Number(s) for Call-Backs;
### Person(s) Designated to Give and Confirm Funds Transfer Instructions; and Addresses

If to NNC, NNL and the Other Sellers listed on Schedule A (other than Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI), the affiliates of the Main Sellers listed on Schedule C or any other Respective Affiliates of NNC or NNL:

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| Paviter S. Binning | 905.863.1020 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule F | |

If to NNI, Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI:

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| John Ray | 239.331.4942 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule F | |

## SCHEDULE G

### Telephone Number(s) for Call-Backs;
### Person(s) Designated to Give and Confirm Funds Transfer Instructions; and Addresses

If to NNC, NNL and the Other Sellers listed on Schedule A (other than Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI), the affiliates of the Main Sellers listed on Schedule C or any other Respective Affiliates of NNC or NNL:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Paviter S. Binning | 905.863.1020 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule F | |

If to NNI, Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| John Ray | 239.331.4942 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule F | |

If to the EMEA Sellers (apart from Nortel Networks (Ireland) Limited) and the affiliates of the EMEA Sellers listed on Schedule D:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | |

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See Schedule F | |

If to Nortel Networks (Ireland) Limited:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP Exchange House Primrose Street London EC2A 2HS Attn: Stephen Gale and Kevin P Lloyd | |

If to the Israeli Company:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Yaron Har-Zvi | | |
| Name | Telephone Number | Signature Specimen |
| Avi D. Pelossof | | |
| Address | See Schedule F | |

If to the EMEA Sellers (apart from Nortel Networks (Ireland) Limited) and the affiliates of the EMEA Sellers listed on Schedule D:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | |

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See Schedule F | |

If to Nortel Networks (Ireland) Limited:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP Exchange House Primrose Street London EC2A 2HS Attn: Stephen Gale and Kevin F Lloyd | |

If to the Israeli Company:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Yaron Har-Zvi | | הנאמן בהקפאת הליכים |
| Name | Telephone Number | Signature Specimen |
| Avi D. Pelossof | | הנאמן בהקפאת הליכים |
| Address | See Schedule F | |

Address          See Schedule F

**Monitor:**

Name             Telephone Number          Signature Specimen

Sharon Hamilton   416-943-2153

Name             Telephone Number          Signature Specimen

Murray McDonald   416-943-3016

Address          See Schedule F

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Distribution Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Distribution Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders. Moreover, such Party agrees to accept any risk associated with a deviation from the Distribution Agent's policy.

Schedule G-4

DOCSTOR: 1843462\14

If to NNSA:

Name                    Telephone Number        Signature Specimen

Stephen Harris          +44 2079519835

Address                 See Schedule F

If to the Estate
Fiduciaries:

The Official Committee of
Unsecured Creditors in
connection with the
Chapter 11 cases of Nortel
Networks Inc., et al. (Case
No. 09-10138):

Name                          Telephone Number              Signature Specimen

Timothy Burling, acting on
behalf of Flextronics
Corporation as Chair of the
Official Committee of
Unsecured Creditors and
not in his personal capacity

Name                          Telephone Number              Signature Specimen

Stephen R. Kuhn, Esq.         (212) 872-1008
acting on behalf of Akin
Gump Strauss Hauer &
Feld LLP, as counsel to the
Official Committee of
Unsecured Creditors and
not in his personal capacity

Name                          Telephone Number              Signature Specimen

David H. Botter, Esq.         (212) 872-1055
acting on behalf of Akin
Gump Strauss Hauer &
Feld LLP, as counsel to the
Official Committee of
Unsecured Creditors and
not in his personal capacity

Address                       See Schedule F

# EXHIBIT 1

## INTEREST ALLOCATION PERCENTAGES(*)

|  | Interest Allocation Percentage |
|---|---|
| NNI | 0% |
| NNL | 100% |
| NNC | 0% |
| Qtera Corporation | 0% |
| CoreTek, Inc. | 0% |
| Xros, Inc. | 0% |
| Nortel Networks Technology Corporation | 0% |
| Nortel Networks (CALA) Inc. | 0% |
| Nortel de Mexico, S. de R.L. de C.V. | 0% |
| Nortel Networks de Mexico, S.A. de C.V. | 0% |
| Nortel Networks de Guatemala Ltda. | 0% |
| Nortel Networks de Argentina S.A. | 0% |
| Nortel Networks de Columbia S.A.S. | 0% |
| Nortel Networks Peru S.A.C. | 0% |
| Nortel Networks de Ecuador S.A. | 0% |
| Nortel Networks Kabushiki Kaisha | 0% |
| Nortel Networks (Asia) Limited | 0% |
| Nortel Networks Singapore Pte. Limited | 0% |
| Nortel Vietnam Limited | 0% |
| Nortel Networks (Thailand) Ltd. | 0% |
| Nortel Networks Malaysia Sdn. Bhd. | 0% |

Exhibit 1

|                                                                          | Interest Allocation Percentage |
|--------------------------------------------------------------------------|:------------------------------:|
| Nortel Networks Australia Pty Limited                                    | 0%                             |
| Nortel Networks New Zealand Limited                                      | 0%                             |
| Nortel Networks (China) Limited                                          | 0%                             |
| Nortel Networks (Asia) Limited – Pakistan Branch                         | 0%                             |
| Nortel Networks Singapore Pte. Limited – Philippines Branch              | 0%                             |
| Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd.        | 0%                             |
| PT Nortel Networks Indonesia                                             | 0%                             |
| The EMEA Sellers                                                         | 0%                             |
| The Israeli Company                                                      | 0%                             |
| NNSA                                                                     | 0%                             |
| Affiliates of Main Sellers that are deemed to be "Selling Debtors"       | 0%                             |
| Affiliates of the EMEA Sellers that are deemed to be a "Selling Debtor"  | 0%                             |

\*   The inclusion of the interest allocation percentages set forth above does not constitute an admission of any Depositor that such interest allocation percentage reflects the percentage of the proceeds to be received by any Depositor or any of its Respective Affiliates under the North American ASA or EMEA ASA, as applicable. The interest allocation percentages are the initial allocation percentages hereunder and are subject to amendment in accordance with Paragraph 15. The interest allocation percentages set forth above shall not be presented by any party hereto as being indicative of the final allocation of proceeds received by the Depositors under the North American ASA and EMEA ASA, as applicable.

Exhibit 1-2

**EXHIBIT 4**

CITATION: Nortel Networks Corporation (Re), 2011 ONSC 1091
COURT FILE NO.: 09-CL-7950
DATE: 20110217

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**    IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**    MORAWETZ J.

**COUNSEL:**    Alan Mark, Derrick Tay, and Tony Reyes, for Nortel Networks Corporation et al.

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Barry Wadsworth, for the CAW-Canada

Sharon Kour, for Morneau Sobeco, Plan Administrator

Arthur Jacques, for the Nortel Continuing Canada Employees

Alex MacFarlane, for the Official Committee of Unsecured Creditors

Kevin Zych, for the Nortel Notcholder Group

Lyndon Barnes, for the Board of Directors of Nortel

Mark Zigler, for the Former and Disabled Employees

Andrew Gray, for Nortel Networks Inc. and Chapter 11 Debtors

M. Starnino, for the Pension Benefits Guarantee Fund

M. P. Gottlieb and R. Schwill, for the Joint Administrators of Nortel Networks (UK) Limited

**HEARD &
DECIDED:**    JANUARY 14, 2011

**REASONS:**    February 17, 2011

## ENDORSEMENT

[1]     The motion was heard on January 14, 2011. At the conclusion of argument, the motion was granted with reasons to follow. These are the reasons.

[2]     Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") brought this motion for an order granting an "EMEA Claims Procedure Order".

[3]     By way of background, on January 14, 2009, Nortel Networks (UK) Limited ("NNUK") and certain subsidiaries of the Nortel Group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators from the High Court of England and ·Wales under the *Insolvency Act 1986*. These debtors, together with Nortel Networks Israel (Sales and Marketing) Limited, are defined in the proposed EMEA Claims Procedure Order as the "EMEA Companies", and are listed on Schedule "A" to the proposed draft order.

[4]     On July 30, 2009, the "2009 Claims Procedure Order" was granted, establishing a process for the proving of "Claims".

[5]     Certain categories of claims were excluded from the definition of "Claims" as defined in the 2009 Claims Procedure Order; among the excluded categories of claims were inter-company claims.

[6]     A Claims Resolution Order was granted on September 16, 2010, establishing the resolution process for "Claims" as defined in the 2009 Claims Procedure Order. The Claims Procedure Order did not establish resolution procedures for inter-company claims.

[7]     The Applicants are of the view that some of the largest claims to be filed in these proceedings will be inter-company claims, and among the largest inter-company claims are likely to be claims of the EMEA Companies ("EMEA Claims"). In addition, the Applicants are of the view that some of the EMEA Claims against some of the Applicants will likely be based on alleged facts and liabilities similar to those already asserted against NNC and NNL pursuant to the 2009 Claims Procedure Order.

[8]     The Applicants are of the view that it is appropriate to implement a "call for claims" procedure that will require the EMEA Companies to file their claims by a specified date, and to establish a process for the proving and resolution of the EMEA Claims.

[9]     The Applicants' stated intention is to establish a claims process that will ensure that the most significant claims against the Applicants can be dealt with in an orderly process, to avoid future delays in the administration of the Canadian estates, and delays in determining claims for voting and distribution purposes.

[10]    The Monitor filed its 58th Report and its Supplemental 58th Report in support of the relief sought by the Applicants.

[11]   Counsel to the Nortel Bondholder Group, the Unsecured Creditors' Committee, the Former and Disabled Employees, the Pension Benefit Guarantee Fund, the NCCE, the CAW, Morneau Sobeco, and the Board supported the motion. The motion was opposed by the Joint Administrators of NNUK.

[12]   Nortel has sold substantially all of its operating businesses in the course of insolvency proceedings in Canada, England and the United States. The proceeds are being held in escrow pending determination of how they are to be allocated among the various Nortel Companies. The EMEA Companies claim a significant entitlement to those proceeds. In addition, counsel submits that the EMEA Companies have significant inter-company claims against the Applicants. Counsel submits that the EMEA Claims and their claims for entitlement to the sale proceeds are inextricably intertwined and complex.

[13]   Counsel to the Joint Administrators further submitted that the proposed process is premature and flawed and that any effort to determine and resolve inter-company claims must be undertaken in a coordinated procedure that will also determine the proper allocation of the proceeds of the sale of Nortel's assets and businesses as between all the Nortel parties. Further, counsel submits that the determination of the EMEA Claims must be determined in coordinated proceedings, where all of those claims and corresponding claims of set-off and claims over as against other Nortel parties that may arise as a consequence can be determined in an appropriate forum under the appropriate law.

[14]   Counsel to the Joint Administrators also submits that the Interim Funding and Settlement Agreement ("IFSA") (which was entered into among the Applicants, Nortel Networks Inc. and the other U.S. Debtors, the Joint Administrators and the EMEA Companies) specifically contemplates the method for achieving a protocol for resolving the disputes concerning the allocation of the sales proceeds. Counsel further submits that the resolution of disputes concerning the allocation of proceeds will necessarily deal with the same issues as those that will be considered and resolved regarding the EMEA Claims.

[15]   In an effort to settle all outstanding issues, including inter-company claims and allocation of proceeds, the Nortel parties have engaged in a confidential mediation process. Counsel to the Joint Administrators advises that, in accordance with the terms of the mediation, a disclosure exercise was carried out and documents were placed into a central database. However, the use of the documents was limited for the purpose of settlement discussions.

[16]   In summary, counsel submits that the proposed EMEA Claims process is both premature and inapplicable on the basis that:

   (a) the inter-company claims cannot be dealt with separate from or prior to a consideration of the allocation of proceeds;

   (b) pursuant to s. 12.c. of the IFSA, the parties have begun a process of negotiating a protocol for resolving disputes concerning the allocation of proceeds;

   (c) if all issues are not dealt with in a coordinate manner, there will be multiple courts considering the identical issues with the significant risks of inconsistent results.

[17]   Further, they submit that the claims process requested is mainly silent with respect to how issues of jurisdiction, applicable law and the coordination of proceeds will be dealt with and that the proposed claims process does not, in any way, deal with how documentary production is to be made in a context where insufficient documentation has been provided by the Applicants to the EMEA Companies.

[18]   I have not been persuaded by these arguments.

[19]   Section 12.c. of the IFSA references a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions. I am in agreement with the comments of the Monitor that the proposed EMEA Claims Procedure Order does not concern "the allocation of sale proceeds from sale transactions", but rather a process for the calling and resolution of claims that may be advanced by the EMEA Companies against the Applicants. The argument of the Joint Administrators based on section 12.c. of the IFSA is not persuasive.

[20]   With respect to the submission that claims of the EMEA Companies cannot be dealt with separate from or prior to a consideration of the allocation of proceeds, it appears that the linkage between inter-company claims and allocation of proceeds, that is referenced by counsel to the Joint Administrators, may have more to do with achieving maximum leverage in the global distribution negotiations than with the determination of the EMEA Claims. In a claims process, it is reasonable to expect that the Joint Administrators will file what they consider to be the broadest claim allowable and all heads of the claim and the quantum claim will be clearly set out.

[21]   In putting forth the position that a determination of the quantum of the claim cannot be made until the allocation issue is resolved, an indirect question is raised, namely, in formulating the EMEA Claim, will the Joint Administrators be in any way influenced by the allocation process.   If the allocation process impacts the methodology to be utilized by the Joint Administrators in the preparation of the EMEA Claim, it follows that the EMEA Claim may not be complete in all respects. In my view, it is not helpful to have an incomplete EMEA Claim.

[22]   If, on the other hand, the objective of the Joint Administrators is to file the broadest claim allowable in these proceedings, I fail to understand why the preparation and submission of that claim has to wait until the allocation process has been resolved.

[23]   Nortel's insolvency proceedings were commenced in January 2009. At this stage, two years later, it is reasonable to expect that the Joint Administrators will have a complete understanding of the basis for filing an EMEA Claim.

[24]   It is also reasonable to expect that there will be a distribution in the CCAA proceedings and, in my view, all meaningful steps to achieve this objective should be implemented. In addition to institutional creditors, it is important to again emphasize that there are thousands of individuals who have claims against Nortel, and for these individuals, time does not stand still.

[25]   The time has come where this matter has to move forward. A full and complete claims process will be required before a distribution in the CCAA proceedings can take place.

[26]   That is not to say that the process issues raised by the Joint Administrators should be ignored. The parties involved in the EMEA Claim are well aware of process issues which

include how claims of set-off are to be dealt with, how documentary production is to be made and the timing of the claims bar date. The Applicants recognize that the EMEA Claim is going to be significant. The process issues raised by the Joint Administrators cannot and should not be ignored.

[27]    Accordingly, the Applicants' motion is granted. The order should reflect that the purpose of the procedure is to fully identify and articulate the EMEA Claims, but the process issues referenced by counsel to the Joint Administrators remain to be addressed. Counsel are to prepare a form of order to give effect to the foregoing. To the extent that there is no agreement over the form of order, counsel should schedule a 9:30 a.m. appointment with me through the Commercial List Office.

MORAWETZ J.

Date: February 17, 2011

This is Exhibit "D" referred to in the

Affidavit of Natasha De Cicco

sworn before me, this 3rd

day of June , 2011.

A Commissioner, etc.
Scott Bomhof

Case No: 536 of 2009

**A**

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand
London WC2A 2LL

Tuesday, 23 June 2009

**B**

BEFORE:

**MR JUSTICE BLACKBURNE**

**C**

--------------------

IN THE MATTER OF:

**NORTEL NETWORKS UK LIMITED AND OTHERS**

**D**

AND IN THE MATTER OF:

**THE INSOLVENCY ACT 1986**

-------------------

**E**

MR G MOSS and MR ALLISON (instructed by **Herbert Smith**) appeared on behalf of
the Companies

-------------------

**F**

**Proceedings**

-------------------

Digital Transcript of Wordwave International, a Merrill Communications Company
101 Finsbury Pavement London EC2A 1ER
Tel No: 020 7421 6131   Fax No: 020 7421 6134
Web: www.merrillcorp.com/mls   Email: mlstape@merrillcorp.com

**G**

(Official Shorthand Writers to the Court)

No of Words: 3602
No of Folios: 50

**H**

1

<u>Tuesday, 29 June 2009</u>

**A**  MR MOSS: I appear in this matter with my learned friend, Mr Allison, on behalf of the companies in the title and it is an application for directions from the court for liberty to enter into a funding agreement which the administrators believe is essential for the further trading of the relevant companies.

MR JUSTICE BLACKBURNE: Are we in private?

**B**  MR MOSS: No, it did not seem to us necessary that we should sit in private, especially when the court is very vigilant not to sit in private unless it is absolutely necessary but we will be asking for an order restricting access to the witness statement, because that does contain a number of commercially confidential matters, which you may have seen. But we did not feel it was necessary actually to sit in private.

**C**  I hope you have had an opportunity to look at our skeleton argument, which we try to make reasonably comprehensive and try and cover all the relevant matters which need to be put before you on this application.

MR JUSTICE BLACKBURNE: I have.

**D**  MR MOSS: We start off with the summary of paragraph 4. What we have is a draft funding agreement which has been negotiated and finalised within this global group; with the other key companies, particularly in the US and Canada but also within the EMEA group (Europe, Middle East and Africa).

MR JUSTICE BLACKBURNE: Ring fence EMEA as far as you can; that is the objective, is it not, one of the objectives?

**E**  MR MOSS: I think it is one of the objectives because it is the EMEA companies that these administrators have to look after as distinct from the Canadian and the American companies and there is a concern about liquidity on the other side of the Atlantic, so one of the things that this does achieve is a flow of payments not (inaudible).

**F**  MR JUSTICE BLACKBURNE: The UK has been trading at a considerable loss and that loss is thought to be £180 million odd in the 2009, well since 14 January?

MR MOSS: Yes, that is right, yes.

MR JUSTICE BLACKBURNE: The object of all of this is to secure the payment of, at the most, is this right, £96 million?

**G**  MR MOSS: Yes, that is right.

MR JUSTICE BLACKBURNE: £76 million comes from the other EMEAs?

MR MOSS: Yes.

**H**

2

MR JUSTICE BLACKBURNE: £20 million, you hope, from the Canadian main operating company, is that right?

**A**

MR MOSS: Well, hope and trust, yes.

MR JUSTICE BLACKBURNE: Yes, because I was going to get you to take me to the provisions in relation to the £20 million, because they seem to be somewhat hedged about with ifs and buts.

**B**

MR MOSS: Yes.

MR JUSTICE BLACKBURNE: But then there will still be a considerable trading loss for the current year, will there not?

MR MOSS: Yes.

**C**

MR JUSTICE BLACKBURNE: The thinking is that when the asset sales take place there will be a sufficient share coming to UK and the other companies in administration to make the current trading at a loss in the long-term interests of the creditors?

MR MOSS: Exactly, yes.

**D**

MR JUSTICE BLACKBURNE: All this has been brought about, this particular funding problem, as I understand it, because although you have these transfer payment arrangements and the two, is it, GPRAs (I cannot remember what they are called)?

MR MOSS: There are acronyms, as I am sure, of some complexity but yes.

**E**

MR JUSTICE BLACKBURNE: Having entered into these things, then people on the other side of the Atlantic have started to have second thoughts about whether they should or should not make payment under them?

MR MOSS: Yes, I was not going to put it quite in that way but yes, that is actually right.

**F**

MR JUSTICE BLACKBURNE: That is what it comes to, is it not?

MR MOSS: It does boil down to that, yes.

MR JUSTICE BLACKBURNE: So, this funding agreement secures, so far as you can, the flow of cash to UK but payment of the £76 million has been allocated between various of the companies in administration?

**G**

MR MOSS: Yes. UK, of course, is a key part of that group.

MR JUSTICE BLACKBURNE: I appreciate that; as far as I can see from the evidence, it is pretty well the linchpin.

**H**

MR MOSS: Yes.

3

**A**

MR JUSTICE BLACKBURNE:   But you hope and you trust, having done your diligence, as it were (I say "you" because the administrators are administrators of each of these companies as I well know) that they will actually make the payments allocated to them by schedule D or whatever it is.

MR MOSS:   Yes.  It is going to be approved by the US and Canadian courts.

**B**

MR JUSTICE BLACKBURNE:   It may be but the actual £76 million is going to come from the EMEA companies.

MR MOSS:   Yes.  That is more certain because, of course, that is the administrators themselves.

**C**

MR JUSTICE BLACKBURNE:   Yes, that is true.  The great unknown, as I understand it, is in relation to the asset sales because nobody has yet managed to agree anything.

MR MOSS:   That is right.  That is in negotiation and then there is the allocation issue as well.

**D**

MR JUSTICE BLACKBURNE:   Yes, but the idea is that one of the purposes of this funding agreement is that everybody agrees that there should be asset sales and they will argue about who gets what after the net proceeds hereafter --

MR MOSS:   Yes, that is right.

MR JUSTICE BLACKBURNE:   -- which is obviously sensible, is it not?

**E**

MR MOSS:   Absolutely.

MR JUSTICE BLACKBURNE:   All right.

MR MOSS:   I think you have the picture precisely.

**F**

MR JUSTICE BLACKBURNE:   So you require this court to say, "Well, we can see no objection to the administrators entering into this agreement".  You have entered into this agreement, have you not?  I thought you had.

MR MOSS:   Yes.

MR JUSTICE BLACKBURNE:   You have signed it?

**G**

MR MOSS:   It is said to have been agreed, yes.  Obviously it is not effective yet until --

MR JUSTICE BLACKBURNE:   Unless you waive your condition 13(a) (overspeaking).

**H**

MR MOSS:   Exactly, unless we waive it.  You have seen a side letter in relation to that as well.

4

MR JUSTICE BLACKBURNE: Yes, just tell me, is that page 603?

A

MR MOSS: Yes, indeed. What that is designed to deal with is this; that the North Americans, I think, in particular, were concerned that the court may say, "Well, this is up to you whether you enter this or not. We don't want to get involved in making directions." As you probably know, there have been judges in the past from time to time, that have looked at something and said, "Well, that's just a commercial decision; the court is not going to get involved in that". It was really

B
just to cope with that situation that it enables -- the purpose of the side letter was to give comfort to the other parties, particularly the North Americans, that, in fact, if the administrators sign up to this in the best interests of the companies, if the court decline (not because of any problems with the funding agreement itself or any doubts that it was in the interests of the creditors but simply in terms of the function of the court, that sort of basis) to get involved and make a direction, then that still enables the administrators to -- we have seen that they are able to waive

C
the condition and a side letter agrees that they will then waive the condition as long as the reason for not making the direction is a reason to do with the court's view of what is appropriate rather than the merits of the agreement itself. That is what that is designed to deal with.

I must apologise that because of the rush with which this was put together, the side letter should have been referred to in the evidence and I am afraid it is not, at page

D
39, paragraphs 153 and 154 of Mr Bloom's witness statement, but we have presented the full picture to you in the skeleton and put the side letter in the bundle so you see the entire picture.

MR JUSTICE BLACKBURNE: Yes.

E
MR MOSS: I am afraid this has been done in a rush and Mr Bloom, physically, is in Vancouver so it has not been so easy to do things quite as one would have liked.

MR JUSTICE BLACKBURNE: The urgency is because there is a hearing in the States and Canada, is that right?

MR MOSS: There is a double urgency; partly the hearing in the States and Canada

F
and the other thing is we must get on and try and sell and that is obviously critical for the return to creditors.

MR JUSTICE BLACKBURNE: Yes. How do you want to go about this, because as you can appreciate I have done the reading I have been asked to do, I have looked carefully at Mr Bloom's witness statement, I obviously have not had a chance to read through all the exhibits.

G

MR MOSS: No, I would not expect you to do that.

MR JUSTICE BLACKBURNE: No, but I have looked briefly, and it is only briefly because it is a rather dense document, at the entering funding and settlement agreement.

H

MR MOSS: It is, that is why we tried to summarise it for the skeleton.

5

MR JUSTICE BLACKBURNE: It is to be written in American style?

**A**

MR MOSS:    Yes, it is very American style; small print, closely typed and going on in sentences of eight or ten lines each at least but what we --

MR JUSTICE BLACKBURNE: I am not concerned with clause 1 am I, because that is between NNI and NNL for £157 million? Am I concerned with that?

**B**

MR MOSS:    No, I do not think you are concerned with things that are only between non-EMEA companies.

MR JUSTICE BLACKBURNE:    Am I expected to understand clause 5, the true-up obligations provision?

**C**

MR MOSS:    Only as a concept, perhaps.  The idea of true-up is to (I am afraid it is probably an Americanism) even up, in other words trading goes on at a certain price but the real --

MR JUSTICE BLACKBURNE: The basic price is it?  Is that the so-called basic price?

MR MOSS:    Yes and the idea is that there is a real market price that should have been

**D**

applied and one can work out in retrospect and the idea of true-up is that you ante up the difference.  So it is just a concept that you need to be aware of, rather than the details.   To try and assist you we did try and summarise these important provisions, starting at paragraph 8 of our skeleton and (inaudible) at paragraph 17. There we point out that sections 1 to 5 constitute a settlement between the Americans and the Canadians, less the transfer pricing payments.  Sixty-nine is the settlement between the Canadians, the Americans and the EMEA companies and

**E**

the EMEA companies inter se.  I think you have already mentioned the figures this morning.

MR JUSTICE BLACKBURNE: Tell me about NN France?

MR MOSS:    There is a special position there.  After this matter left your Lordship and

**F**

went to Mr Justice Patten (as he then was), we persuaded him to send a letter of request out to the various European jurisdictions designed to ask the courts to ensure that the administrators got notice of any applications to open secondary proceedings, because, as you will appreciate, the opening of secondary proceedings, where the business and asset is physically located could have broken up the whole process of trying to reorganise rescue and sell the worldwide business as a whole.  That seems to have been successful entirely so far in that no

**G**

secondary proceedings have been opened except in the case of France.
Now, what happened in France was, France turned out to be a rather special case so what we were advised by our French lawyers was that if an English administrator tried to slim down the workforce, as unfortunately was necessitated in order to make the French end a viable business (and that is exceptionally difficult because of the special statutory protections that French workers have, but

**H**

there is apparently a much speedier and easier procedure which a French insolvency administrator can take under French law) --

6

MR JUSTICE BLACKBURNE: But nobody else can?

A   MR MOSS:   That is right.  This is what we were advised and as a result of that we made an application which was heard by Mr Kay, sitting as a Deputy High Court Judge (Kay HHJ) and he again was persuaded to give liberty to the English administrators to apply, as one can under the issue regulation, for the opening of secondary proceedings in France, and there you have both an administrator and a liquidator appointed who somehow work together and what we agreed to do is to

B   discuss this with France and try and persuade them to join but we do have to get the consent of the administrator and liquidator and perhaps the court there as well. So that is in progress but I am afraid that is the situation where we have got attention, which we have managed to avoid in every other case between the main proceedings and the secondary proceedings.  In that one case, because the business and some of the assets were in France, we needed to get the French insolvency practitioners on board.

C

MR JUSTICE BLACKBURNE: But there is no part in the payments that are going to come to UK envisaged as deriving from France, is there?

MR MOSS:   Yes, they are but that will require them to be signed out, because I believe they are users of the --

D

MR JUSTICE BLACKBURNE: Well, they are an R&E source, as I understand it.

MR MOSS:   Yes.

MR JUSTICE BLACKBURNE: Basically it is the R&E companies which are owed money, is it not?

E

MR MOSS:   As a sweeping generalisation but some are owed more than others.  I have been reminded some paid for other R&E companies which do more R&E.

MR JUSTICE BLACKBURNE: Is it Nortel Networks -- no that is SAS, it is not --

F   MR MOSS:   SAS is a different company that is within this agreement; it is SA that has the secondary proceedings.  So it is confusing; there are two French companies. The one that is in the heading here does not have a secondary proceedings so it is part of it, whereas SA does have a secondary proceeding and therefore the administrator and liquidator need to come on board separately.

MR JUSTICE BLACKBURNE: Yes.  I was looking at the column on page 28 of Mr

G   Bloom's --

MR MOSS:   Yes, I have just been shown that from behind.

MR JUSTICE BLACKBURNE: £4.8 million?

H   MR MOSS:   That is right, yes, but that will depend on the agreement of the French insolvency administrators, which we hope will be forthcoming.

7

A

MR JUSTICE BLACKBURNE: Yes.

MR MOSS:    Just going back to our summary, at subparagraph 4 we say:
"The EMEA debtors which use commercially reasonable effort to obtain the agreement of NN France liquidator and then France administrator of entering into the funding agreement ..."

B

That is the obligation, that we undertake that.
Then section 11 deals with the position in relation to intellectual property rights with a view to assisting the sale.
Then section 12 deals with the position in relation to material asset sales to assist, again, in the selling process.
Then in section 13, which has the condition that you have seen.

C

So that points out the key aspects but obviously if you want to delve into any of the debt's working we can do that but in our skeleton in the evidence there is a treatment of all the key parts of this that you have already seen.  I am not sure if you need to get into all the technical detail, unless you particularly want to.

MR JUSTICE BLACKBURNE:  No, I am just a bit puzzled about the first shortfall payment, how that's going to operate.  This is page 568, this is internal page 6 of the funding agreement.

D

MR MOSS:    Yes.  That is little (b), "NNL should pay NN UK the sum of $10 per shortfall payment".

MR JUSTICE BLACKBURNE: Yes, "Such amount to be paid out of the sale proceeds allocated and not actually received".

E

MR MOSS:    Yes, by NNL.  That is when the hopeful global sale takes place; there is going to be an allocation from the sale proceeds and out of the amount that is allocated to NNL (the Canadian company) then will be deducted.  It is sort of like a marshalling exercise.

MR JUSTICE BLACKBURNE: Yes.  It says, "Where the aggregate amount of one or more allocations of sale proceeds" and then, ignoring the parenthesis, "exceeds the amount previously communicated to the joint administrators, NNL".  So the payment of the first shortfall payment depends upon there being an excess over and above already notified?

F

MR MOSS:    Yes, I think that's right.

G

MR JUSTICE BLACKBURNE:  I find it a little bit difficult to follow.

MR MOSS:    Yes.  (pause)  The position apparently is that NNL is the most cash-strapped company, yet it is a key company in the group and so the idea is that they should pay this over as and when they are in a position to pay it and not at a time when they could not afford to pay it, which might lead to the collapse of this particular company.  So that is why this is put in this complicated way; it is designed to ensure that they only have to pay it if they can afford to make the

H

8

payment. (pause) I am reminded that in case they are not able to pay it under (b), there is a sweep-up under (d) --

**A**

MR JUSTICE BLACKBURNE: And there is a security provision under (e)?

MR MOSS:   Exactly, and then there is security under (e), yes.

MR JUSTICE BLACKBURNE: So by hook or by crook it is hoped that the $20 million (because it is a significant part of the overall settlement, is it not?) ...

**B**

MR MOSS:   Yes. You will appreciate the administrators of the EMEA companies have to do the best they can, given the very severe liquidity problems in North America.

MR JUSTICE BLACKBURNE:   It sounds to me a complete nightmare trying to co-ordinate everything.

**C**

MR MOSS:   Yes. One of the administrators used that exact expression before Court at the start of this morning and that was only in relation to what is going on across the Channel.

MR JUSTICE BLACKBURNE: What? In France?

**D**

MR MOSS:   Yes.

MR JUSTICE BLACKBURNE: Yes. As far as I am concerned, on the face of it this funding agreement seems to unlock a great deal of value for the benefit of creditors and deals with a problem that seems to have grown up since 14 January, when despite what was said in these various agreements, UK has found itself doing a lot of the work but getting little or nothing of the cash.

**E**

MR MOSS:   Yes, exactly.

MR JUSTICE BLACKBURNE:   If this is going to assist in easing that problem, enabling assets to be sold without having first of all to work out down to the last penny who gets what out of the net sale proceeds, all to the good and that is what it appears to be.   I cannot claim that I have got a deal on understanding of all of this but as far as I have followed it, having looked at Mr Bloom's witness statement, it has my blessing.

**F**

MR MOSS:   My Lord, that is what the administrators seek.
There is a draft administrative order which perhaps we can hand up?

**G**

MR JUSTICE BLACKBURNE: Yes. (pause)

MR MOSS:   So, after the recitals, we would ask you to order and direct that the joint administrators of the companies be at liberty to enter into the Interim Funding and Settlement Agreement.

**H**

9

A

Then, under paragraph 2, we ask for a Restriction Order which reverses onus of proof; people can still apply but the onus is on them rather than the evidence being open for inspection as a matter of course.

And simply for the costs of and incidental to the application to be paid as an expense of the administrations of the Companies.

MR JUSTICE BLACKBURNE:  Yes, I am willing to do that.  I should say that I have looked at the authorities that you have mentioned, most of which are very well known, and I see no problem about my jurisdiction and I give this the blessing that I am willing to give it.

B

MR MOSS:    I am very much obliged, my Lord.  I would like to thank you for so much hard work in such a short time to enable this to be done.

C

D

E

F

G

H

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, Court File No. 09-CL-7950
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

|  |
|---|
| *ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST) |
| Proceeding commenced at TORONTO |
| **AFFIDAVIT OF NATASHA DE CICCO**<br>(SWORN JUNE 3, 2011) |
| Torys LLP<br>79 Wellington St. W., Suite 3000<br>Box 270, TD Centre<br>Toronto, Ontario<br>M5K 1N2 Canada<br><br>Tony DeMarinis (LSUC #: 29451Q)<br>Scott Bomhof (LSUC #: 37006F)<br>Sheila Block (LSUC #: 14089N)<br>Andrew Gray (LSUC #: 46626N)<br><br>Email: tdemarinis@torys.com<br>sbomhof@torys.com<br>sblock@torys.com<br>agray@torys.com<br><br>Tel: 416.865.0040<br>Fax: 416.865.8730<br><br>Lawyers for Nortel Networks Inc. and the other U.S.<br>Debtors |

# TAB 2

Court File No.    09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

THE HONOURABLE MR.                )        WEDNESDAY, THE 14TH

                                  )

JUSTICE MORAWETZ                   )        DAY OF JANUARY, 2009



IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the "Applicants")

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

#### THIRD AMENDED AND RESTATED INITIAL ORDER

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn January 14, 2009 (the "Doolittle Affidavit") and the Exhibits thereto, the affidavit of John Doolittle sworn June 22, 2009 (the "June Affidavit") and the Exhibits thereto, the report dated January 14, 2009 of Ernst & Young Inc. ("E&Y"), the proposed monitor, and on hearing the submissions of counsel for the Applicants, counsel for the boards of directors of Nortel Networks Corporation and Nortel Networks Limited, counsel for E&Y, counsel for Export Development Canada ("EDC"), Flextronics

- 2 -

Telecom Systems Ltd., no one else appearing on this Application and on reading the consent of E&Y to act as the Monitor,

**SERVICE**

1. THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2. THIS COURT ORDERS AND DECLARES that each of the Applicants is a "debtor company" to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3. THIS COURT ORDERS that each of the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, such Applicant and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4. THIS COURT ORDERS that each of the Applicants shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property"). Subject to further Order of this Court, each of the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property. Each of the Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, brokers, accountants, legal counsel, financial advisors and such other persons (collectively "Assistants") currently retained or employed by such Applicant, with liberty to retain such further Assistants as such Applicant deems reasonably necessary or desirable for the Business or to carry out the terms of this Order or for the purposes of the Plan.

- 3 -

5. THIS COURT ORDERS that the Applicants shall be entitled to continue to utilize the central cash management system currently in place as described in the Doolittle Affidavit or replace it with another substantially similar central cash management system (the "Cash Management System") and that any present or future bank or banks providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System; and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6. THIS COURT ORDERS that each of the Applicants, either on its own behalf or on behalf of another Applicant, shall be entitled but not required to pay the following expenses whether incurred prior to, on or after the date of this Order:

   (a) all outstanding and future wages, salaries and employee benefits (including, but not limited to, employee medical and similar benefit plans, relocation and tax equalization programs, the Incentive Plan (as defined in the Doolittle Affidavit) and employee assistance programs), current service, special and similar pension benefit payments, vacation pay, commissions and employee and director expenses, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

   (b) compensation to employees in respect of any payments made to employees prior to the date of this Order by way of the issuance of cheques or electronic transfers, which are subsequently dishonoured due to the commencement of proceedings under the CCAA;

- 4 -

(c)  all outstanding and future amounts owing to or in respect of individuals working as independent contractors in connection with the Business;

(d)  the fees and disbursements of any Assistants retained or employed in accordance with paragraph 4 hereof;

(e)  subject to the consent of the Monitor, amounts owing by one of more of the Applicants in respect of its Customer Programs (as defined in the Doolittle Affidavit);

(f)  subject to consent of the Monitor, amounts owing by one or more of the Applicants to any other Nortel Company (as defined in the Doolittle Affidavit) in order to settle their inter-company accounts and make inter-company loans in the ordinary course of business, including as a result of the Nortel Companies' Transfer Pricing Model (as defined in the Doolittle Affidavit); and

(g)  subject to the consent of the Monitor, amounts owing to the Applicants' carriers and warehousemen.

7.  THIS COURT ORDERS that, except as otherwise provided to the contrary herein, each of the Applicants shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)  all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance) and maintenance and security services;

(b)  payment for goods or services actually supplied to the Applicants on or after the date of this Order;

(c)  with the written approval of the Monitor, the posting of additional cash collateral into existing cash collateral accounts (collectively, and together with the cash collateral posted as at February 10, 2009, the "LC Cash Collateral") held by either or both of ABN AMRO Bank N.V., Canada Branch ("ABN") and Royal Bank of Canada

- 5 -

("RBC") as additional and continuing security for existing, renewed and new letters of credit, letters of guarantee, surety bonds, and similar instruments (collectively, "LCs") issued (whether before or after January 14, 2009) for the account of or requested by the Applicants or any of them to third parties pursuant to the existing letter of credit agreements between the Applicants and ABN and RBC and any amendments thereto made with the written approval of the Monitor, and for any foreign exchange losses incurred by ABN and its correspondent banks, if any, under LCs issued in currencies other than Canadian dollars, U.S. dollars, British pounds sterling and Euros, on the following basis:

(i)     the posting of such additional cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(ii)    the aggregate of all cash collateral that may be posted (inclusive of the cash collateral posted as at February 10, 2009) in respect of LCs issued in Canadian dollars, U.S. dollars, British pounds sterling and Euros shall not exceed the amount of U.S.$40 million (converting Canadian dollars at the Bank of Canada's Noon spot exchange rate for any day), provided that the LC Banks shall have no liability in the event that cash collateral is posted in an amount that exceeds such maximum and the validity of their claims with respect to any or all of the LC Cash Collateral shall not be limited, lessened or otherwise impaired in any way as a result of such excess; and

(iii)   cash collateral may be posted in respect of LCs issued by ABN in any other currencies in such amounts as are required by the provisions of the applicable letter of credit agreement, including any amendments thereto made with the written approval of the Monitor as security for ABN's exposure to foreign exchange losses;

- 6 -

(d)     if the same is not guaranteed by EDC, payment of any indebtedness of the Applicants to the LC Banks (as defined in paragraph 10A hereof) when due under the LC Agreements (as defined in paragraph 10A hereof) by way of set-off and transfer of LC Cash Collateral posted as at January 14, 2009 or posted thereafter pursuant to the LC Agreements and subparagraph (c) above;

(e)     without limiting (d), payment of costs and expenses of the LC Banks in connection with the amendment and enforcement of rights under the LC Agreements and any related guarantee bonds issued by EDC if so provided for under an applicable LC Agreement, whether incurred before or after February 10, 2009, including by way of set-off and transfer of LC Cash Collateral;

(f)     the posting of cash collateral in favour of Export Development Canada ("EDC") (collectively, the "EDC Cash Collateral") pursuant to the second amended and restated short-term support agreement between Nortel Networks Limited ("NNL") and EDC dated April 24, 2009, as amended by the amending agreement between NNL and EDC dated June 18, 2009, and the cash collateral agreement between NNL and EDC dated June 18, 2009 and any further amendments to the foregoing made with the written approval of the Monitor (collectively, the "EDC Support Agreements"), on the basis that the EDC Support Agreements are hereby ratified and approved and the posting of such cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(g)     payment of any indebtedness of NNL to EDC under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral posted as at June 29, 2009 or posted thereafter pursuant to the EDC Support Agreements and subparagraph (f) above; and

(h)     without limiting (g), payment of costs and expenses of EDC provided for under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral, to the extent provided for in the EDC Support Agreements.

7A.     THIS COURT ORDERS that no provision of this Order shall require EDC to provide its approval for any proposed amendments to any of the LC Agreements pursuant to any agreement between EDC and any of the LC Banks.

8.      THIS COURT ORDERS that the each of the Applicants shall remit, in accordance with legal requirements, or pay:

   (a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

   (b)     all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by such Applicant in connection with the sale of goods and services by such Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

   (c)     any amount payable to the Crown in right of Canada or of any Province or Territory thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by such Applicant.

9.      THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), each Applicant shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated by such Applicant and the landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, monthly on the first day of each month,

DOCSTOR: 1713506\5

in advance (but not in arrears). On the date of the first of such payment, any arrears relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10. THIS COURT ORDERS that, except as specifically permitted herein, each of the Applicants is hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business unless such obligation has been approved by the Monitor.

10A. THIS COURT ORDERS that, notwithstanding paragraph 10 hereof,

(a) the existing letter of credit agreements between the Applicants and ABN, RBC and Citibank, N.A. acting through its Canadian branch ("Citibank") and any amendments thereto made after January 14, 2009 with the written approval of the Monitor, together with any agreements entered into by the Applicants or any of them with any other lenders with the written approval of the Monitor providing letter of credit facilities or similar facilities to the Applicants or any of them (including those which may be the subject of EDC guarantee bonds issued pursuant to the EDC Support Facility) (collectively, the "LC Agreements"), and the issuance or renewal of LC's pursuant thereto by ABN, RBC, Citibank and any other lenders (collectively, the "LC Banks"), together with any payments made by the Applicants or EDC with respect thereto; and

(b) the EDC Support Agreements and any amendments thereto made after June 18, 2009 with the written consent of the Monitor, together with any payments made by NNL with respect thereto,

DOCSTOR: 1713506\5

are specifically permitted herein and authorized hereby and shall not and will not constitute fraudulent preferences, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law

10B.    THIS COURT ORDERS that, notwithstanding any other provision in this Order, no LC Bank shall be required to issue a letter of credit to the Applicants or any of them and EDC shall not be required to provide any Secured Support to the Applicants or any of them.

## RESTRUCTURING

11.    THIS COURT ORDERS that each of the Applicants shall, have the right to:

(a)    permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets not exceeding CDN$10,000,000 in any one transaction or CDN$50,000,000 in the aggregate, subject to paragraph (c), if applicable;

(b)    terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

(c)    in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than seven (7) days notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)    repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-

- 10 -

parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

(e) pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above);

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

12.     THIS COURT ORDERS that each of the Applicants shall provide each of the relevant landlords with notice of such Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes such Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and such Applicant, or by further Order of this Court upon application by such Applicant on at least two (2) days notice to such landlord and any such secured creditors. If such Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to such Applicant's claim to the fixtures in dispute.

13.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicants and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in respect of such lease or leased premises and such landlord shall be entitled to notify the Applicants of the basis on which it is taking possession and to gain possession of and re-lease such leased

DOCSTOR: 1713506\5

- 11 -

premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

14.    THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

15.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

16.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

**CONTINUATION OF SERVICES**

17.     THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or with third parties on behalf of the Applicants, or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, employment agency services, insurance, transportation services, utility, leasing or other services to the Business or to any of the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the applicable Applicant and that such Applicant shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by such Applicant, in accordance with normal payment practices of such Applicant, as applicable, or such other practices as may be agreed upon by the supplier or service provider and the affected Applicant and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

18.     THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

19.     THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such

obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

## DIRECTORS AND OFFICERS

20.    THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

21.    THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN$90 million, as security for the indemnities provided in paragraph 20 of this Order as well as the fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

22.    THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.

23.    THIS COURT ORDERS that each of NNC's and NNL's directors shall be entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall U.S.$25,000 reduction) notwithstanding the terms of, or elections made under, the Directors' Compensation Plan.

- 14 -

**APPOINTMENT OF MONITOR**

24.    THIS COURT ORDERS that E&Y is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the Business with the powers and obligations set out in the CCAA or set forth herein and that each of the Applicants and its officers, directors, and Assistants shall advise the Monitor of all material steps taken by such Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

25.    THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

    (a)    monitor the Applicants' receipts and disbursements;

    (b)    provide the consents contemplated herein;

    (c)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

    (d)    advise the Applicants in their preparation of the Applicants' cash flow statements and any other reporting to the Court or otherwise;

    (e)    advise the Applicants in their development of the Plan or Plans and any amendments to such Plan or Plans;

    (f)    assist the Applicants, to the extent required by the Applicants, with the Restructuring;

    (g)    assist the Applicants, to the extent required by the Applicants, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan or Plans;

    (h)    have full and complete access to the books, records and management, employees and advisors of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order including, without limitation, one or more entities related to or affiliated with the Monitor;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan or Plans;

(k)     assist the Applicants with respect to any insolvency proceedings commenced by or with respect to any other Nortel Company (as defined in the Doolittle Affidavit) in any foreign jurisdiction (collectively, "Foreign Proceedings") and report to this Court, as it deems appropriate, on the Foreign Proceedings with respect to matters relating to the Applicants;

(l)     apply as the foreign representative of the Applicants, for recognition of these proceedings as "Foreign Main Proceedings", pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §101 (the "U.S. Bankruptcy Code") or similar legislation in any other jurisdiction; and

(m)     perform such other duties as are required by this Order or by this Court from time to time.

26.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

27.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the

*Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28.     THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29.     THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment and the fulfilment of its duties or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, counsel to the Applicants and counsel to directors shall be paid their reasonable fees and disbursements incurred both before and after the making of the Order, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. Each of the Applicants is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicants and counsel to directors on a weekly basis and, in addition, each of the Applicants is hereby authorized to pay to: (a) the Monitor and its Canadian and U.S. counsel a retainer in the aggregate amount of CDN$750,000; and (b) counsel to the Applicants a retainer

- 17 -

in the amount of CDN\$750,000 (collectively, the "Retainers") to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.    THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of \$5,000,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**EDC**

33.    Intentionally Deleted.

**INTERCOMPANY LOANS**

34.    THIS COURT ORDERS to the extent that an Applicant receives a post-filing inter-company loan or other transfer (including goods and services) from a Chapter 11 Entity (as defined in the Doolittle Affidavit) (including as a result of the Applicants' cash management system or otherwise) (each such Applicant, a "Beneficiary Applicant"), and such post-filing inter-company loan or other transfer is made (each an "Advance") by a Chapter 11 Entity (together with NNL for the purposes of paragraph 34A below, a "Protected Entity"), then, subject to the limitations set forth in this paragraph:

(a)    the Protected Entity shall have a proven and valid claim against such Beneficiary Applicant for the amount of such Advance (each, an "Inter-company Reimbursement Claim"), which Inter-company Reimbursement Claim shall bear interest at a rate agreed between the applicable Beneficiary Applicant and Protected Entity from time to time for the period in accordance with past practice; and

(b)     all of the Property of the Beneficiary Applicant, is hereby charged by a mortgage, lien and security interest (such mortgage, lien and security interest, "Inter-company Charge") in favour of each of the Protected Entities as security for payment of the Inter-company Reimbursement Claim (including principal, interest and expenses) by the applicable Beneficiary Applicant to the corresponding Protected Entity.

34A.   THIS COURT ORDERS that the Inter-Company Charge shall also secure any Advances made by NNL to Nortel Networks Technology Corporation ("NNTC") on or after January 14, 2009 and that NNL shall be a "Protected Entity" and NNTC shall be a "Beneficiary Applicant" in respect of such Advances.

35.    THIS COURT ORDERS that the Inter-company Charge shall also secure any amounts owed by any of the Applicants to any Chapter 11 Entity at the date of filing under the Existing NNI Revolver (as defined in the Doolittle Affidavit) and all rights that such Chapter 11 Entity has with respect thereto are preserved.

36.    THIS COURT ORDERS the Inter-company Charge shall be junior, subject and subordinate only to the other Charges (defined below), and any other future charges against such Beneficiary Applicant that, by the Court order creating them, are expressly stated to be senior to the Inter-company Charges entered after notice and a hearing.

37.    THIS COURT ORDERS that pending further order of this Court, an Inter-company Charge shall be a "silent" charge and the Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Inter-company Reimbursement Claim held by such party, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of a Beneficiary Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of a Beneficiary Applicant. An Inter-company Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such Inter-company Charge is sold or otherwise disposed of in accordance with the terms of this Order or further order of this Court after notice and a hearing, with respect to the effect of an Inter-company Charge on any sale of Property by any Beneficiary Applicant.

38.   THIS COURT ORDERS that the Beneficiary Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of any Inter-company Charge, with such Inter-company Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

### INTERIM GROUP SUPPLIER PROTOCOL AGREEMENT

39.   THIS COURT ORDERS that the Applicants be and are hereby authorized to enter into a group supplier protocol agreement (the "Interim GSPA") substantially in the form attached as Exhibit "C" to the Doolittle Affidavit which agreement shall be effective upon the appointment of the Administrators in the United Kingdom, and the Applicants are hereby authorized to perform each of their obligations, if any, under the Interim GSPA. The obligations of the Applicants under the Interim GSPA shall be secured by the Inter-Company Charge.

### NNI LOAN

40.   THIS COURT ORDERS that the amended and restated loan agreement entered into between NNL, as borrower, NNTC and the other Applicants as guarantors, and Nortel Networks Inc. ("NNI") as lender (the "NNI Loan Agreement"), substantially in the form attached as Exhibit "B" to the Affidavit of John Doolittle sworn March 27, 2009 providing for a revolving loan facility of up to U.S.$200 million is hereby approved and each of the Applicants is hereby directed to execute and to comply with its obligations under the NNI Loan Agreement.

41.   THIS COURT ORDERS that as security for NNL's and NNTC's obligations under the NNI Loan Agreement, NNI shall be entitled to the benefit of and is hereby granted charges (the "Carling Facility Charges") by each of NNL and NNTC, NNL's wholly owned subsidiary, on all of the fee simple interest of NNTC and leasehold interest of NNL respectively in the Carling Facility (as defined in the Doolittle Affidavit) and that no equal or higher charge shall be granted by the Court order unless consented to by NNI as authorized by the United States Bankruptcy Court for the District of Delaware. The Carling Facility Charges shall have the priority set out in paragraphs 42 and 44, hereof. For greater certainty, NNI shall not be required to have exhausted

its remedies under the Carling Facility Charges prior to realizing on or being entitled to proceeds from the NNI Loan Charge.

41A. THIS COURT ORDERS that in addition to the Carling Facility Charges, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "NNI Loan Charge") as security for the Applicants obligations under the NNI Loan Agreement. The NNI Loan Charge shall have the priority set out in paragraphs 42 and 44 hereof.

41B. THIS COURT ORDERS that pending further order of this Court, NNI shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to the Applicants' obligations under the NNI Loan Agreement, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of an Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of an Applicant. The NNI Loan Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such NNI Loan Charge is sold or otherwise disposed of in accordance with the terms of this Order or further order of this Court after notice and a hearing, with respect to the effect of an NNI Loan Charge on any sale of Property by any Applicant.

41C. THIS COURT ORDERS that the Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of the NNI Loan Charge, with the NNI Loan Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

### EXCESS FUNDING CHARGE

41D. THIS COURT ORDERS that as security for NNL's obligation to repay to NNI the Contingent Payment (as defined in the Interim Funding Agreement, as defined in the June Affidavit) along with interest, if any, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Excess Funding Charge"). The Excess Funding Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**SHORTFALL CHARGE**

41E. THIS COURT ORDERS that as security for any obligation of NNL to make the Shortfall Payments (as defined in the Interim Funding Agreement, as defined in the June Affidavit), Nortel Networks UK Limited shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Shortfall Charge"). The Shortfall Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

42.     THIS COURT ORDERS that the priorities of the Administration Charge, the Goldman Charge, the Carling Facility Charges, the Excess Funding Charge, the Directors' Charge, the NNI Loan Charge, the Inter-company Charge and the Shortfall Charge on all Property:

First -

(a) the Administration Charge;

(b) the Goldman Charge (as defined in the Nortel-LGE Joint Venture Sale Process Order of this Court made on June 1, 2009), ranking *pari passu* with the Administration Charge but only with respect to the assets which are the subject of the Goldman Charge

Second – the Carling Facility Charges;

Third – the Excess Funding Charge

Fourth – the Directors' Charge;

Fifth – the NNI Loan Charge; and

Sixth -

(a) the Inter-Company Charge;

(b) the Shortfall Charge,

which Inter-company Charge and Shortfall Charge shall rank *pari passu*
with one another.

43.    THIS COURT ORDERS that the filing, registration or perfection of the Administration
Charge, the Goldman Charge, the Carling Facility Charges, Excess Funding Charge, the
Directors' Charge, the NNI Loan Charge, the Inter-company Charge and the Shortfall Charge
(collectively, the "Charges") shall not be required, and that the Charges shall be valid and
enforceable for all purposes, including as against any right, title or interest filed, registered,
recorded or perfected subsequent to the Charges coming into existence, notwithstanding any
such failure to file, register, record or perfect. Notwithstanding anything herein, the Charges
shall not attach to the Retainers.

44.    THIS COURT ORDERS that each of the Charges (all as constituted and defined herein),
shall subject to this paragraph 44 and to paragraph 46 herein constitute a charge on the Property
secured thereunder, and such Charges shall rank in priority to all other security interests, trusts,
liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in
favour of any Person. For greater certainty,

(a)    the Charges shall attach to the LC Cash Collateral junior in priority to any rights or
Encumbrances in favour of LC Banks in respect of LC Cash Collateral and only to
the extent of the rights of the Applicants to the return of any LC Cash Collateral from
the LC Banks following the exercise of the rights of the LC Banks as against any such
LC Cash Collateral pursuant to the LC Agreements or section 18.1 of the CCAA, and

(b)    the Charges shall attach to the EDC Cash Collateral junior in priority to any rights or
Encumbrances in favour of EDC in respect of EDC Cash Collateral and only to the
extent of the rights of NNL to the return of any EDC Cash Collateral from EDC
following the exercise of the rights of EDC as against any such EDC Cash Collateral
pursuant to the EDC Support Agreements or section 18.1 of the CCAA

notwithstanding anything to the contrary contained in this Order.

45.    THIS COURT ORDERS that except as otherwise expressly provided for herein, or as
may be approved by this Court, the Applicants shall not grant any Encumbrances over any
Property that rank in priority to, or *pari passu* with, any of the Charges charging such Property,

- 23 -

unless the Applicants also obtain the prior written consent of the Monitor and the beneficiaries of such Charges, or by further Order of this Court.

46.     THIS COURT ORDERS that none of the Charges, the LC Agreements and the EDC Support Agreements shall be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") thereunder, the rights of the LC Banks under LC Agreements and the rights of EDC under the EDC Support shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

   (a)     the creation of the Charges, the entering into of the LC Agreements and the issuance or renewal of LC's thereunder and the entering into of the EDC Support Agreements and the provision of Secured Support, as defined and contemplated thereunder, shall not create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

   (b)     none of the Chargees, the LC Banks and EDC shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from, the creation of the Charges, the entering into of the LC Agreements or the issuance or renewal of LC's thereunder or the entering into of the EDC Support Agreements and the provision of Secured Support; and

   (c)     the payments made by the Applicants pursuant to this Order and the granting of the Charges and the entering into of the LC Agreements and the EDC Support Agreements do not and will not constitute fraudulent preferences, fraudulent

conveyances, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law.

47. THIS COURT ORDERS that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

## FLEXTRONICS AMENDING AGREEMENT

48. THIS COURT ORDERS that the Flextronics Amending Agreement in the form attached as Exhibit "B" to the Doolittle Affidavit be and is hereby approved and NNL is hereby authorized and directed to comply with its obligations thereunder.

## CROSS-BORDER PROTOCOL

49. THIS COURT ORDERS that the cross-border protocol, as amended, in the form attached as Schedule "A" hereto be and is hereby approved and shall become effective upon its approval by the United States Bankruptcy Court for the District of Delaware and the parties to these proceedings and any other Person shall be governed by it and shall comply with the same.

## FOREIGN PROCEEDINGS

50. THIS COURT ORDERS that the Monitor is hereby authorized and directed to apply for recognition of these proceedings as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

51. THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

52. THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

## SERVICE AND NOTICE

53. THIS COURT ORDERS that the Monitor shall, within ten (10) business days of the date of entry of this Order, send notice of this Order and the commencement of the within proceedings to the Applicants' known creditors, other than employees and creditors to which the Applicants owe less than $5,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process. The Monitor, on behalf of the Applicants, shall, in its discretion, be entitled to engage a third party mailing service in order to assist or complete the mailing. Any such service provider shall be considered an "Assistant" hereunder.

54. THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, and any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

55. THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at http://www.ey.com/ca/nortel.

- 26 -

## GENERAL

56.     THIS COURT ORDERS that any of the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

57.     THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

58.     THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

59.     THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 3 0 2009

PER / PAR:

## SCHEDULE "A" – CROSS-BORDER PROTOCOL

**Attached.**

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

### A.    Background

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee of bondholders (the "Bondholders Committee") has also been organized.

        3.      On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under which, inter alia: (a) the Canadian Debtors have been determined to be entitled to relief under the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors has been granted.

        4.      The Monitor filed petitions and obtained an order in the U.S. Court granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the "Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian Proceedings.

---

[2]   The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

3

5. For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

## B. Purpose and Goals

6. Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity. Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a. harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b. promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c. honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d. promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e. facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

f.  implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

## C.    Comity and Independence of the Courts

7.  The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

8.  The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

5

9.    In accordance with the principles of comity and independence recognized

herein, nothing contained herein shall be construed to:

a.    increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

b.    require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

c.    require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

d.    require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

e.    authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

f.    preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.  The Debtors, the Creditors Committee, the Estate Representatives and their

respective employees, members, agents and professionals shall respect and comply with the

independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the

CCAA, the Canadian Order and other applicable laws.

**D.    Cooperation**

11.    To assist in the efficient administration of the Insolvency Proceedings and

in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

6

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a)

cooperate with each other in connection with actions taken in both the U.S. Court and the

Canadian Court and (b) take any other appropriate steps to coordinate the administration of the

Insolvency Proceedings for the benefit of the Debtors' respective estates.

        12.    To harmonize and coordinate the administration of the Insolvency

Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider

whether it is appropriate to defer to the judgment of the other Court. In furtherance of the

foregoing:

      a.    The U.S. Court and the Canadian Court may communicate with one
another, with or without counsel present, with respect to any procedural
matter relating to the Insolvency Proceedings.

      b.    Where the issue of the proper jurisdiction of either Court to determine an
issue is raised by an interested party in either of the Insolvency
Proceedings with respect to a motion or application filed in either Court,
the Court before which such motion or application was initially filed may
contact the other Court to determine an appropriate process by which the
issue of jurisdiction will be determined; which process shall be subject to
submissions by the Debtors, the Creditors Committee, the Monitor, the
Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee
and any interested party prior to a determination on the issue of
jurisdiction being made by either Court.

      c.    The Courts may, but are not obligated to, coordinate activities in the
Insolvency Proceedings such that the subject matter of any particular
action, suit, request, application, contested matter or other proceeding is
determined in a single Court.

      d.    The U.S. Court and the Canadian Court may conduct joint hearings (each
a "Joint Hearing") with respect to any cross-border matter or the
interpretation or implementation of this Protocol where both the U.S.
Court and the Canadian Court consider such a Joint Hearing to be
necessary or advisable, or as otherwise provided herein, to, among other
things, facilitate or coordinate proper and efficient conduct of the
Insolvency Proceedings or the resolution of any particular issue in the
Insolvency Proceedings. With respect to any Joint Hearing, unless
otherwise ordered, the following procedures will be followed:

7

(i)     A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)    Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)   Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)    If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)     The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)    The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8·

13.     Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.     Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.     Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the

wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

    a.    unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however*, that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

    b.    upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

    c.    if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

    d.    if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

## E.    Recognition of Stays of Proceedings

    16.    The Canadian Court hereby recognizes the validity of the stay of

proceedings and actions against the U.S. Debtors and their property under section 362 of the

11

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.     The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.     Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.     **Rights to Appear and Be Heard**

19.     The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

12

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.     In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

### G.     Claims Protocol

21.     The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

13

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

## H.    Retention and Compensation of Estate Representative and Professionals

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.     The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order. In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.     Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including: (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States. The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

15

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.     Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.     Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court. .

27.     Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

I.    **Notice**

28.    Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following: (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time. Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur. In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

17

**J.    Effectiveness; Modification**

30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing.  Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.    Procedure for Resolving Disputes Under this Protocol**

32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above.  In rendering a determination in any such dispute, the Court to which the issue is addressed:  (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either:  (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above.  Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

> a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;
>
> b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

18

        c.      copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

        d.      the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

        e.      for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

## L.    Preservation of Rights

34.     Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

THIRD AMENDED AND RESTATED
INITIAL ORDER

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte  LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1717808\2

# TAB 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X
                                        :
                                        :    Chapter 11
*In re*                                 :
                                        :    Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]      :
                                        :    Jointly Administered
                        Debtors.        :
                                        :    RE: D.I. 874
                                        :
-----------------------------------------------------------X

## ORDER (A) APPROVING THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

Upon the motion dated, June  9 , 2009 (the "Motion"),[2] of Nortel Networks Inc. and its

affiliated debtors, as debtors and debtors in possession in the above-captioned cases (the "US

Debtors"), for entry of an order, as more fully described in the Motion, pursuant to sections

105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms

and conditions of the Interim Funding and Settlement Agreement (the "Agreement"), and (b)

granting related relief; and adequate notice of the Motion having been given as set forth in the

Motion; and it appearing that no other or further notice is necessary; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

and 1334; and the Court having determined that consideration of the Motion is a core proceeding

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief requested in the Motion, and that such relief is in the best interests of the US Debtors, their estates, their creditors and the parties in interest; and upon the record in these proceedings; and after due deliberation;

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED.

2. The US Debtors are authorized, but not directed, to enter into the Interim Funding Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and to take any and all actions that may be reasonably necessary or appropriate to perform all obligations contemplated thereunder.

3. NNI is authorized to pay NNL $157 million as set forth in the Interim Funding Agreement as an administrative expense pursuant to sections 503(b) and 363 of the Bankruptcy Code for the Postpetition Services NNL has provided and the Expenses NNL has paid for the benefit of NNI subsequent to the Petition Date.

4. The Total Payment reflects the maximum administrative claim that the Canadian Debtors may assert against the US Debtors for the Postpetition Services and Expenses, as well as the maximum amount that NNI could owe under the Master R&D Agreement.

5. Pursuant to Bankruptcy Rule 9019, the Interim Funding Agreement constitutes a full and final settlement of any and all NNI Interim Obligations, all of the matters set forth in Part A of the Interim Funding Agreement whether arising during, or related to the Canada/US Interim Period, including, without limitation, any relief the Canadian Debtors and the US Debtors intended to seek from this Court and the Canadian Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

2

6. Each of NNL and the Canadian Debtors shall indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

7. With respect to any of the matters referred to in Sections 11.c. and 12.a. through 12.f. (inclusive) of the Agreement, as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditor Groups in any negotiations on such issues with the Canadian Debtors and/or the EMEA Debtors, or any related proceedings, and any agreement or determination by the US Debtors shall require the prior consent of the Creditor Groups acting in good faith.

8. Nothing in this Order or in the Interim Funding Agreement shall determine the allocation of proceeds from a Sale Transaction among the Selling Debtors or shall constitute a Protocol for determining the allocation of proceeds from a Sale Transaction among the Selling Debtors. In any Sale Transaction for which a US Debtor is a Selling Debtor, no Protocol for the allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court after notice to parties in interest with an opportunity to object, and no proceeds from a Sale Transaction may be allocated among the US Debtors and the other Selling Debtors unless such allocation is in accordance with a Protocol approved by this Court after notice to

3

parties in interest with an opportunity to object or upon further order of this Court after notice to parties in interest with an opportunity to object.

9. The failure to specifically describe or include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be approved in its entirety.

10. Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the US Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the US Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

11. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: __June 29__, 2009
      Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

4

**TAB 4**

Court File No.: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

THE HONOURABLE MR.                )        MONDAY, THE 29th
                                  )
JUSTICE MORAWETZ                  )        DAY OF JUNE, 2009

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### ORDER
### (Interim Funding Agreement)

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited

("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and

Nortel Networks International Corporation (collectively, the "Applicants") for, *inter alia*, the

approval of an interim funding and settlement agreement dated as of June 9, 2009 (the "Interim

Funding Agreement") among the Applicants, the Chapter 11 Debtors (as defined in the Doolittle

Affidavit, as defined below), the EMEA Debtors (as defined in the Doolittle Affidavit) and the

- 2 -

Joint Administrators (as defined in the Doolittle Affidavit) (other than the Joint Administrator appointed in respect of Nortel Networks S.A.) and the other relief set out in the Applicants' notice of motion dated June 22, 2009 was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of John Doolittle sworn June 22, 2009 (the "Doolittle Affidavit") and the fifteenth report of Ernst & Young Inc. dated June 25, 2009 (the "Fifteenth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Katie Legree sworn June 22, 2009, filed.

1.    **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Fifteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.    **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Doolittle Affidavit.

3.    **THIS COURT ORDERS** that the Interim Funding Agreement, including without limitation, all of the settlements and reservations of rights provided for therein, be and is hereby approved and that the Applicants are hereby authorized and directed to comply with their obligations thereunder.

4.    **THIS COURT ORDERS** that, without limiting anything contained in paragraph 3 hereof, with respect to any matters referred to in Section 11.c. and 12.a. through 12.f. (inclusive) of the Interim Funding Agreement, as to which agreement or determination of any of the

DOCSTOR: 1712969\3

- 3 -

Applicants is required, the Applicants shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Applicants shall require prior consent of the Bondholders' Committee acting in good faith and the Monitor.

5.      **THIS COURT ORDERS** that, subject to the terms of the Interim Funding Agreement, the Extensions to the Canadian GSPA and the Accession be and are hereby approved.

6.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

7.      **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 3 0 2009

PER / PAR:

DOCSTOR: 1712969\3

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**ORDER
(Interim Funding Agreement)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

**TAB 5**

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

MOTION RECORD
Interim Funding Agreement
(returnable June 29, 2009)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

Derrick Tay LSUC# 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte LSUC# 27293R
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

*(court stamp: FILED / DÉPOSÉ  JUN 23 2009  AT/À TORONTO)*

June 29/09

The motion is granted. The order has been signed in the form approved. Reasons. Brief reasons will follow.

Than me the reasons in respect
1) the above adjournment.

The motion was not opposed.

The Monitor recommended that the relief be granted.

The [illegible] ...

U.K Administrator, the [illegible] ...

the [illegible] Creditors [illegible] ...

[illegible] that these parties are [illegible] ...

rights in respect of the allocation issue

It is clear that this motion is to [illegible]
approval of the Interim Funding Agreement.
~~Approved~~

The reservation of rights has been noted.
ed. The Tax counsel to the Applicants,
acknowledging that the ~~the~~ motion does not
deal with the allocation of funds.

[illegible]

The affidavit of Mr. Doolittle sworn
June 22/09 at the 15th [illegible]
[illegible] provides a
detailed background as to
[illegible] of the Interim Funding Agreement.
I am satisfied that, in the
[illegible], the Interim Funding Agreement
should be approved. As part
of the approval process I
[illegible] certain [illegible]

3, 4

To the Inter - Border Protocol were
also sought. These amedments were
not approved. I am satisfied that
the amendment (*proposed*) are appropriate and
they are approved.

& The mechanism in respect of the
EDC (*Charge*) were also referenced. And I
am satisfied that it is appropriate for
the order deleting the EDC Charge &
to become effective upon the Monitor
filing a certificate on the advice of
EDC That EDC has received the
collateral funds. (Such certificate
was delivered by the Monitor
at 5⁰⁰ p.m. on June 30/09)
The (*requested*) amendments to the
Interim order are also approved
as are the extensions to the Canadian
GSPA and the EDC Short
Term Support Agreement.

4,4

NETWORKS CORPORATION NORTEL NETWORKS (CALA) INC. AND THE NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**ORDER**
(Interim Funding Agreement)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

An order to give effect to the
foregoing has been signed in the form
presented.

[signature]

DOCSTOR: 1712969\3

**TAB 6**

Court File No.:  09-CL-7951

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

THE HONOURABLE MR.        )      THURSDAY, THE 9th

JUSTICE MORAWETZ        )      DAY OF JULY, 2009

         )

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF NORTEL NETWORKS INC. AND THE
OTHER COMPANIES LISTED ON SCHEDULE "A" HERETO WITH
RESPECT TO CERTAIN PROCEEDINGS TAKEN IN THE UNITED
STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE**

**APPLICATION UNDER Section 18.6 of the *Companies' Creditors Arrangement
Act*, R.S.C. 1985, c. C-36, as amended**

**O R D E R**
**(Recognition of the U.S. Interim Funding Agreement Order)**

**THIS MOTION,** made Nortel Networks Inc. and the other debtors listed on Schedule "A"

hereto (collectively, the "Applicants") for the relief set out in the Applicants' notice of motion

dated July 9, 2009 was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of John Doolittle sworn July 2, 2009 and on hearing

submissions of counsel for the Applicants and those other parties present, no one appearing

for any other person on the service list, although served as appears from the Affidavit of

Service of Katie Legree sworn July 2, 2009, filed.

- 2 -

1.  **THIS COURT ORDERS** that the time for the service of the Notice of Motion and Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.  **THIS COURT ORDERS** that the Order of the Honourable Kevin Gross of the United States Bankruptcy Court for the District of Delaware dated June 29, 2009, attached hereto as Schedule "B", authorizing and approving, *inter alia*:

    (a)    the Applicants to enter into a certain interim funding and settlement agreement dated as of June 9, 2009 (the "Interim Funding Agreement"); and

    (b)    Nortel Networks Inc. to pay NNL US$157 million as set forth in the Interim Funding Agreement;

is hereby recognized and shall be implemented and be effective in Canada in accordance with its terms.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUL 0 9 2009

PER / PAR:

- 3 -

## SCHEDULE "A"

(List of Applicants)

## U.S. SUBSIDIARIES FILING A VOLUNTARY PETITION PURSUANT TO

## CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE, 11 U.S.C. §§ 101-1330

2001 - Nortel Networks Inc.

2110 - Nortel Networks Capital Corporation

2107 – Nortel Altsystems, Inc.  (previously "Alteon Websystems, Inc.")

2101 – Nortel Altsystems International Inc. (previously "Alteon Websystems International, Inc.")

2102 - XROS, Inc.

2103 - Sonoma Systems

2104 - QTERA Corporation

2105 - CoreTek, Inc.

2106 - Nortel Networks Applications Management Solutions Inc.

2108 - Nortel Networks Optical Components Inc.

2113 - Nortel Networks HPOCS Inc.

2114 - Architel Systems (U.S.) Corporation

2115 - Nortel Networks International Inc.

2117 - Northern Telecom International Inc.

2121 - Nortel Networks Cable Solutions Inc.

Schedule "B"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                              :

*In re*                           :

Nortel Networks Inc., *et al.*,[1]      :

             Debtors.      :

-------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**RE: D.I. 874**

## ORDER (A) APPROVING THE INTERIM FUNDING AND
## SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

Upon the motion dated, June 9, 2009 (the "Motion"),[2] of Nortel Networks Inc. and its

affiliated debtors, as debtors and debtors in possession in the above-captioned cases (the "US

Debtors"), for entry of an order, as more fully described in the Motion, pursuant to sections

105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms

and conditions of the Interim Funding and Settlement Agreement (the "Agreement"), and (b)

granting related relief; and adequate notice of the Motion having been given as set forth in the

Motion; and it appearing that no other or further notice is necessary; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

and 1334; and the Court having determined that consideration of the Motion is a core proceeding

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief requested in the Motion, and that such relief is in the best interests of the US Debtors, their estates, their creditors and the parties in interest; and upon the record in these proceedings; and after due deliberation;

IT IS HEREBY ORDERED THAT:

1.  The Motion is GRANTED.

2.  The US Debtors are authorized, but not directed, to enter into the Interim Funding Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and to take any and all actions that may be reasonably necessary or appropriate to perform all obligations contemplated thereunder.

3.  NNI is authorized to pay NNL $157 million as set forth in the Interim Funding Agreement as an administrative expense pursuant to sections 503(b) and 363 of the Bankruptcy Code for the Postpetition Services NNL has provided and the Expenses NNL has paid for the benefit of NNI subsequent to the Petition Date.

4.  The Total Payment reflects the maximum administrative claim that the Canadian Debtors may assert against the US Debtors for the Postpetition Services and Expenses, as well as the maximum amount that NNI could owe under the Master R&D Agreement.

5.  Pursuant to Bankruptcy Rule 9019, the Interim Funding Agreement constitutes a full and final settlement of any and all NNI Interim Obligations, all of the matters set forth in Part A of the Interim Funding Agreement whether arising during, or related to the Canada/US Interim Period, including, without limitation, any relief the Canadian Debtors and the US Debtors intended to seek from this Court and the Canadian Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

2

6. Each of NNL and the Canadian Debtors shall indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

7. With respect to any of the matters referred to in Sections 11.c. and 12.a. through 12.f. (inclusive) of the Agreement, as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditor Groups in any negotiations on such issues with the Canadian Debtors and/or the EMEA Debtors, or any related proceedings, and any agreement or determination by the US Debtors shall require the prior consent of the Creditor Groups acting in good faith.

8. Nothing in this Order or in the Interim Funding Agreement shall determine the allocation of proceeds from a Sale Transaction among the Selling Debtors or shall constitute a Protocol for determining the allocation of proceeds from a Sale Transaction among the Selling Debtors. In any Sale Transaction for which a US Debtor is a Selling Debtor, no Protocol for the allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court after notice to parties in interest with an opportunity to object, and no proceeds from a Sale Transaction may be allocated among the US Debtors and the other Selling Debtors unless such allocation is in accordance with a Protocol approved by this Court after notice to

3

parties in interest with an opportunity to object or upon further order of this Court after notice to parties in interest with an opportunity to object.

9.  The failure to specifically describe or include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be approved in its entirety.

10. Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the US Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the US Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

11. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: __June 29__, 2009
Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

4

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF NORTEL NETWORKS INC. AND THE OTHER COMPANIES
LISTED ON SCHEDULE "A" HERETO WITH RESPECT TO CERTAIN PROCEEDINGS
TAKEN IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE

Court File No: 09-CL-7951

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**ORDER**
(Recognition of the U.S. Interim Funding Agreement Order)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1721959\1

**TAB 7**

**ᛱ ERNST & YOUNG**

Ernst & Young LLP
1 More London Place
London SE1 2AF

Tel: 020 7951 2000
Fax: 020 7951 1345
www.ey.com/uk

TO ALL KNOWN CREDITORS

11 February 2011

Ref: MLP/7E/DM/TF/LO3547

Tara Felton
Direct line: 020 7951 8151
Direct fax: 020 7951 1345
Email: tfelton@uk.ey.com

Dear Sirs

## Nortel Networks UK Limited (In Administration) ("the Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court Case number 536 of 2009

We write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a fourth report on the progress of the Administration (the "Report"). This Report covers the period from 14 July 2010 to 13 January 2011 and should be read in conjunction with the Joint Administrators' previous reports dated 13 August 2009, 13 February 2010 and 12 August 2010, as well as the Joint Administrators' Statement of Proposals dated 23 February 2009. Additional copies of this Report, and the previous reports referred to, can be made available on request or can be obtained at the following;

www.nortel.com/corporate/adminprogreports.html

The Company entered administration (the "Administration") on 14 January 2009 when AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "Joint Administrators") by an order (the "Order") of the High Court of Justice of England and Wales (the "Court"), following an application made by the Company's directors.

This was part of a wider restructuring of the Nortel group of companies. Nortel Networks Corporation ("NNC"), the ultimate parent company of the Nortel group; Nortel Networks Limited ("NNL") and certain of its other Canadian subsidiaries filed an application for creditor protection under the Companies' Creditors Arrangement Act ("CCAA") in Canada to facilitate a comprehensive business and financial restructuring under the CCAA. Nortel Networks Inc ("NNI"), Nortel Networks Capital Corporation and a number of other US Nortel group companies filed petitions in the United States under Chapter 11 of the US Bankruptcy Code.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office.



On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region ("EMEA"). Article 3 of the EC Regulation on Insolvency Proceedings 1346/2000 (the "EC Regulation"), states that the court of the EC member state in which the centre of main interests ("COMI") of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the "EMEA Companies"), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company. Details of the 19 companies are provided at Appendix 1.

The Nortel group of companies (the "Group") reports in US dollars ("US$"), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

Please refer to the disclaimer at the end of the principal section of this report.

## 1. Executive Summary of Progress of the Administration

### Purpose of the Administration

The Joint Administrators continued to trade the Company's businesses with a view to achieving either a rescue of the Company as a going concern or a better result for the Company's creditors as a whole than would be likely if the Company were wound up. In 2009, it became clear that, owing to the financial and market pressures facing the Nortel businesses, the sale of all businesses would be necessary and a rescue of the Company as a going concern would not be possible.

The Joint Administrators considered that the decision to continue to trade, even at a carefully monitored loss, in order to achieve going concern values for the businesses and business assets, and to avoid contingent claims, would be to the benefit of creditors as a whole. Now that the sale process is near completion, this decision is justified by the realisations achieved (subject to a final apportionment of those proceeds to the Company) and contingent claims avoided.

### Sale of Businesses and Assets

The Group principally operated in four business segments: Enterprise Solutions ("Enterprise"); Metro Ethernet Networks ("MEN"); Carrier Networks, which comprises Global System for Mobile Communications ("GSM"), Carrier VoIP Application Solutions ("CVAS") and the Multi Service Switch business ("MSS"); and Code Division Multiple Access ("CDMA").

With the exception of MSS all businesses had been sold by 30 June 2010. The total global sales proceeds, which are held in escrow pending allocation within the Group (as further explained below), now exceed US$3 billion.  Since our last report the MSS business has continued to operate across Europe whilst a sale was explored.

A sale of the MSS business was agreed on 24 September 2010 with Telefonaktiebolaget Ericsson for a headline price of $65 million, but has not yet completed.

Owing to the integrated nature of the Group's business, it is necessary for some EMEA Companies to provide transitional services to the purchasers for a period of one year post sale completion. Such services include the provision of various back office functions, infrastructure support and other assistance to enable each purchaser to integrate the business with their own. The purchasers will meet the direct cost of these services.

Nortel Networks International Finance & Holdings B.V. ("NNIFH"), a fully owned subsidiary of the Company, completed a share transfer agreement for its shareholding in Networks Netas Telekomunikasyon A.S. ("Netas") on 22 December 2010.

Buyers are being sought, and other options are being considered, for the Group's remaining intellectual property portfolio.



**Next Steps**

The Joint Administrators, having completed the principal trading phase of the Administration, are now focused on winding down the Company's affairs and resolving outstanding issues with the other Group companies.

The key remaining issues for the EMEA companies are to deal with the post sale arrangements, including; the continuation of the transitional services currently being provided; the resolution of intra-Group issues such as Purchase Price Allocation ("PPA") and related claims; the Financial Support Directions ("FSD") claims by the UK Pensions Regulator ("TPR") on certain EMEA companies (but not the Company); and the development of an appropriate process to agree creditors' claims and distribute available funds to them.

In addition, the Joint Administrators are currently finalising the Company's trading operations, settling post appointment liabilities and collecting working capital assets.

Since our last report, we have held detailed discussions with the representatives of other Group estates and key stakeholders (e.g. US Bondholders and The Pensions Regulator) in order to progress a negotiated settlement in respect of most of these issues.

Owing to the complexities of the various estate claims this is, by nature, a gradual process. However, the Joint Administrators have continually attempted to drive the process forward and maintain momentum so that an appropriate return may be achieved for creditors and a distribution to creditors can be made as early as possible.

It is possible, however, that differences may not be reconciled and that a more formal approach to settling disputes may be required, which would inevitably delay any distribution.

The Joint Administrators have continued to hold confidential meetings with the Company's creditors' committee (**"the Committee"**) in order to update it on events and the strategy adopted.

Further information is contained in the sections that follow.

**ᴱᴵ ERNST & YOUNG**

## 2. Business Disposal Strategy

The Joint Administrators have now completed the disposal of the majority of businesses. The Joint Administrators consider that this has achieved a better return for creditors of the Company than would otherwise have been possible, owing to likely higher levels of realisations, the preservation of jobs through the transfer of employees to new entities, and the orderly transfer of contracts to purchasers.

All sales of the major businesses were dealt with on a global basis in conjunction with the rest of the Group. The disposals, excluding the GSM transaction, followed a stalking horse auction process under Section 363 of the US Bankruptcy Code. The Joint Administrators were actively involved in these auction processes and in setting the auction parameters subsequently approved by the US and Canadian courts.

### Completed Disposals

The following transactions have been completed. Please see the previous report dated 12 August 2010 for further details. The proceeds of sale, which now exceed US$3 billion, remain in escrow for distribution once the PPA has been agreed between the Group.

| Business Sale | Date of Completion |
|---|---|
| Layer 4-7 | Completed 31 March 2009 |
| CDMA | Completed 14 Nov 2009 |
| Enterprise | Completed 18 Dec 2009 |
| MEN | Completed 19 March 2010 |
| GSM/GSM-R | Completed 1 April 2010 |
| CVAS | Completed 28 May 2010 |
| MSS | Expected Q1 2011 |

### Post Completion Transitional Services

The Group's affairs were organised on a business basis with each legal entity operating a number of businesses. The purchasers have required ongoing support from the Group, as vendor, to provide transitional services to enable an orderly migration of the business to new ownership. These transitional services have largely been provided in EMEA by Nortel Networks (UK) Limited ("NNUK") and, to a more limited extent, by Nortel Networks (Ireland) Limited.

### Shareholding in Netas

NNIFH, a fully owned subsidiary of the Company, entered into a conditional share transfer agreement on 13 October 2010 with OEP RHEA Turkey Tech B.V. ("OEP RHEA") for the sale of its 53% shareholding in Netas. Netas is a company registered and trading in Turkey, where it is listed on the Istanbul Stock Exchange. OEP RHEA is a company established by a consortium comprising of One Equity Partners and Rhea Girisim Sermayesi Yatirim Ortakligi

**ΞIJ ERNST & YOUNG**

A.S.. The sale was completed on 22 December 2010, once all conditions precedent had been satisfied.

The sale valued NNIFH's shareholding at US$83.7 million, subject to a downward adjustment for dividends paid to NNIFH between 31 December 2009 and the date of completion. The total consideration was received by NNIFH in the form of a dividend of US$4.0 million paid in May 2010 (before withholding tax), a dividend of US$11.7 million paid in December 2010 (before withholding tax) and cash paid on completion of US$68.0 million. Total withholding tax of US$1.6 million was deducted from the two dividend payments received by NNIFH.  The Joint Administrators continue to seek offers for the remaining Intellectual Property portfolio.

**Future Transactions and Disposals**

**MSS**

A sale of the MSS business was agreed on 24 September 2010 with Telefonaktiebolaget Ericsson for a headline price of $65 million.  It is currently anticipated that this transaction will complete in the first quarter of 2011.  The sale will transfer substantially all of the MSS assets globally, including customer contracts and employees of which there are 59 across Europe. The sale of MSS concludes the sales of all trading global business lines within the Group.

**Residual Intellectual Property**

After the various business sales, the Group will have in excess of 3,500 registered patent families remaining, and is exploring the strategic alternatives available to best optimise the value of the assets.



### 3. Trading and Operational Overview

The Joint Administrators concluded that continued trading of the businesses, pending sales as going concerns, was in the best interests of the Company's creditors.

The Joint Administrators balanced the decision of continuing to trade with its impact on creditors. The Joint Administrators continued to trade at a carefully monitored loss in the short term, in order to maximise the value of potential business and asset sales, and to reduce the value of termination claims and other contingent liabilities on the Company in the future. The Joint Administrators considered that the potential realisation values from selling the Company's various businesses as going concerns would result in a better return to creditors than if the businesses had ceased to trade and the assets of the Company were sold on a break-up basis.

The successful completion of the sales of the Group's major global businesses should, once the PPA has been completed, result in the receipt of sales proceeds and other benefits which more than off-set the losses made in the trading period. In addition the completion of these sales has resulted in the transition of employment contracts, certain supply/ purchase arrangements and most customer contracts, to the respective purchasers. This will facilitate the orderly winding down of the Company's operations.

The headline trading results of the Company (including its Saudi Arabia branch) for the period from 1 January 2009 to 30 September 2010 are set out in the following table.

| Headline Financial Information (US GAAP) | US$ (m) |
|---|---|
| Turnover 2009 | 694.87 |
| Turnover Q1-3 2010 | 118 |
| Trading Profit/ (Loss) 2009 | (46.54) |
| Trading Profit/ (Loss) Q1-3 2010 | (13.91) |
| Net Profit/ (Loss) 2009 | (71.65) |
| Net Profit/ (Loss) Q1-3 2010 | (62.17) |



**Real Estate**

Since the last report the Company has vacated its remaining leasehold properties. Two short term leases have been entered into for continuing employees at Harlow and Maidenhead at significantly reduced quarterly rental costs.

With regards to the freehold properties, it is likely that the Company will continue to occupy Monkstown until the end of 2011. The Joint Administrators have sublet part of the surplus space and continue to consider longer term options.

**Employees**

Through the various business sales, the Joint Administrators have succeeded in transferring 1,135 employment contracts to the purchasers of the businesses.

| Employee numbers as at 13 January 2011 | |
| --- | --- |
| Employees at appointment | 1915 |
| Transferred with business sales | 1135 |
| Resignations and other leavers | 235 |
| Redundancies | 397 |
| Employees continuing as at 13 January 2011 | 148 |

The continuing employees are being retained by the Joint Administrators to deliver transitional services to the purchasers of the businesses and to assist with the winding up of the Company's affairs, or are in scope to transfer to the purchaser of the MSS business.

**≡ ERNST & YOUNG**                                                       9

## 4. Receipts and Payments Account

Attached at Appendix 2 is the Joint Administrators' receipts and payments ("R & P") account for the period 14 July 2010 to 13 January 2011 for the Company in the UK and the Saudi Arabia branch. This shows total receipts of US$89,265,448, and payments of US$89,137,442. A trading overview is included in Section 3 above.

The Company in the UK and the Saudi Arabia branch together held cash in various currencies equivalent to US$365.6 million at 13 January 2011.

The R & P account is a statement of cash received and cash paid out, and does not reflect estimated future receipts or payments, including proceeds from the sales of businesses held in escrow pending allocation amongst the Group.

There has been a significant reduction in the receipts and payments activity during the interim period against prior periods, which is representative of the wind down position of the business. For further information, see the detailed notes provided in Appendix 2.



### 5. Joint Administrators' Remuneration and Disbursements

The Joint Administrators' remuneration was fixed on a time-costs basis by the Committee and it is the responsibility of the Committee to approve the Joint Administrators' fee. During the period 5 June 2010 to 3 December 2010 the Joint Administrators incurred time costs of GB£5,231,803, of which GB£4,185,443 has been drawn on account in accordance with the court order dated 28 February 2009. An analysis of the time spent is at Appendix 3, which includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

The Joint Administrators are currently in the process of seeking approval for fees totalling GB£7,614,793 in respect of the period 6 February 2010 to 1 October 2010.

Since our last report, we have conducted a review of the time costs attributed to the Company since 6 February 2010 (being the date up to which fees have been approved by the Committee) with a view to ensuring that only costs relating directly to the Company are billed to the Company. In respect of workstreams that are undertaken for the benefit of all the EMEA entities, we have sought to ensure that a proportionate and reasonable allocation of time billed for this type of work is apportioned and absorbed by the other filed EMEA entities. As a result of our review, we consider that certain costs need to be re-apportioned across EMEA to reflect the end of transfer pricing adjustments at end Q1 2010, which previously reimbursed the Company for costs incurred on behalf of other estates. As a result the Company will receive recharges from the EMEA companies amounting to GB£2,549,965 for work carried out in the period 6 February 2010 to 1 October 2010. Please see Appendix 4 for further details.

#### Payments to Other Professionals

The Joint Administrators continue to engage the following professional advisors to assist them in the Administration. These professionals work on a time cost basis and internal review processes are undertaken to assess their invoices. During the period 14 July 2010 to 13 January 2011 the following has been paid:

Herbert Smith LLP – GB£8,218,023 (Legal Advisors)

Local Counsel – US$740,668 (Legal Advisors)

**ΞII ERNST & YOUNG**

## 6. Future Conduct of the Administration

### Purchase Price Allocation – The Business Disposals

The proceeds from the business sales, which were placed in escrow accounts on completion, will subsequently be apportioned between the selling companies. The proper allocation of proceeds across each selling entity, including the Company and the other EMEA Companies, is a matter of great importance not only to the Joint Administrators but also to all other Group Companies and, where applicable, the office holders or other fiduciaries responsible for them.

The intention of the Joint Administrators, NNL and NNI (together with the Monitor and the legal advisors to the Unsecured Creditors' Committee) is for the PPA and the settlement of intra-group claims to be determined by way of a consensual agreement between the three principal estates, EMEA, US and Canada.

To further support the estates' ability to reach a consensual agreement, the EMEA, US and Canadian estates undertook to exchange PPA methodologies and heads of intercompany claims that could potentially be made. Such claims have been exchanged but remain confidential at this time.

The Joint Administrators attended an inter-estate meeting in November 2010 to progress the PPA. A further meeting is due to be held in April 2011. Owing to the confidential nature of the meetings we are unable to disclose any further information to creditors at this stage.

If it is not possible for the three estates to reach a consensual agreement, an arbitration or litigation process remains likely.

Whatever mechanism is used to determine the allocation of sale proceeds, the Joint Administrators remain mindful that it is their duty to act in the best interests of the Company's creditors as a whole.

### Distributions to Creditors

The Joint Administrators obtained Court directions to allow them to commence an informal claims process. This informal claims process commenced in July 2010. The Joint Administrators have invited submissions of claim forms so that Nortel accounting personnel can assist with the process of reconciling claims to company records.

On the basis that the remaining business sale process is expected to complete by Q1 2011, and that a consensual agreement is being sought by the Group in respect of the inter-company claims and the PPA, it is possible that a formal creditor claims process will be called for in late 2011. In accordance with the Insolvency Act 1986, the Joint Administrators will be writing to all known creditors and advertising for claims.

Once the trading position has been finalised, but before PPA receipts from the business disposal escrow account (which the Joint Administrators are confident will reflect the value of the businesses sold), and the receipt of intra group dividends, the Joint Administrators anticipate that there will be, absent any unforeseen liabilities arising, in the region of US$318 million available to distribute to the creditors of the Company.

**Ξ ERNST & YOUNG**

The Joint Administrators are, however, still neither able to confirm the quantum of the pre-appointment creditor claims nor the likely return for individual creditors or class of creditor. These will be determined for the most part by the following key factors:

  a. An analysis of the claims notified to the Joint Administrators following the recent advertising campaign requesting creditors to submit their claims on an informal basis. This process is currently ongoing.

  b. The impact of any FSD on any subsidiary company of the Company.

  c. Finalisation of quantum of certain complex liabilities and claim (including the TPR's FSD claims).

  d. Finalisation of ranking of creditor claims which will be determined as part of the distribution process.

The Company also has a branch in Saudi Arabia which has now ceased trading. A local solvent winding up process is required, even though the Company, as holder of the branch, is in Administration. The proposed liquidator has now petitioned to the Ministry of Commerce in Saudi Arabia for the commencement of the liquidation to be with effect from 1 January 2011. We are currently awaiting confirmation that approval has been granted. The net benefit to the Company will be the recovery of cash to the UK administration bank account of some US$3.4 million, of which US$2.9 million has been received to date and the balance is anticipated at the conclusion of the liquidation.

The Joint Administrators will continue to update the creditors' committee as appropriate of any key issues and their resolution.

### Exit Strategy

The Joint Administrators applied to court in January 2010, and obtained, an extension of the administrations, which will allow for the completion of the M&A processes, transitional services agreements and implementation of an orderly wind down process.

The Joint Administrators continue to explore the most appropriate exit route from the administration process for the Company and the other EMEA companies in administration; that is to say the method by which creditors' claims are agreed, surplus funds are distributed to creditors and the Company's affairs generally brought to a conclusion.

The Joint Administrators will be required to carry out statutory obligations such as formalising the calling of proofs of debt, obtaining creditor agreements, finalising all asset disposals, dealing with all sale proceeds and inter-company claims, agreeing all other creditor claims and establishing the mechanics of distributing funds.

In all of the above scenarios, the distribution process used will be subject to timing implications, cost, the size of entity under review, relevant currencies, local law provisions on claims and local processes of other Group entities in relation to intra group dividends, in addition to UK legislation.

The process of agreeing claims and distributing surplus funds to creditors could be done within the administration process (with the Court's approval), or within a follow-on company voluntary



arrangement ("CVA") or liquidation process.  Each option has merits in different circumstances, and it is not yet clear which option is most beneficial for the Company and its creditors.

## 7. Other Matters

### The Committee

The committee of creditors was formed at the creditors' meeting held on 11 March 2009. The Joint Administrators continue to provide detailed information to the members of the Committee as the Administration progresses and matters evolve (including an analysis of their time costs for approval). The Joint Administrators will continue to keep the Committee apprised of developments.

### The Prescribed Part

Section 176A of the Insolvency Act 1986 does not apply to this Administration as there is no qualifying floating charge security, and as such there is no Prescribed Part to be set aside for non-preferential creditors.

### North American Claims Process

The Joint Administrators have filed certain claims on behalf of the Company and the other EMEA Companies in insolvency proceedings, in jurisdictions where a bar date has been imposed.

A bar date of 18 March 2011 has now been set for inter-company claims by the EMEA entities against the Canadian estate. The Joint Administrators are taking appropriate steps to ensure that the Company's claims are formally lodged by the deadline.

The Joint Administrators will continue to file claims on behalf of the Company and the other _ EMEA Companies in jurisdictions where a bar date is imposed.

### French Employee Claims

A number of former employees of the French entity, Nortel Networks SA, have filed claims in the French tribunal court. The claims have been raised against a number of Nortel entities as the employees are claiming co-employment rights for damages for unfair dismissal and an alleged breach of the obligation of priority hiring against the buyers of the various businesses.

These claims are being defended and a judgement hearing is scheduled to take place in October 2011.

Case 09-10138-MFW   Doc 5605-9   Filed 06/06/11   Page 124 of 142



The Joint Administrators will report to creditors again in six months' time.

Yours faithfully
for Nortel Networks UK Limited (In Administration)



C Hill
Joint Administrator

Enc:   Company information
       Joint Administrators' Receipts and Payments Account
       Summary of Joint Administrators' Time Costs
       Joint Administrators' Policy on Fees and Disbursements
       Form 2.24B Administrators' Progress Report

*For the Companies listed below, The Institute of Chartered Accountants in England and Wales in the UK authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants in the UK authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks S.A.; Nortel GmbH; Nortel Networks France S.A.S.; Nortel Networks N.V.; Nortel Networks S.p.A.; Nortel Networks B.V.; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, S.A.; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal S.A.; Nortel Networks Slovensko s.r.o.; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding B.V.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

*Nortel Networks S.A. was placed into French liquidation judiciaire on 28 May 2009. The business and assets of the company that are situated in France are now under the control of la liquidateur judiciaire.*

*We advise that this report is provided pursuant to our appointments as Joint Administrators of the Company. It is provided solely for the purpose of informing creditors of certain aspects of the current status of the Administration. As this report is only an interim indication of the overall position of the Company, and not a valuation of the current or future value of any particular item of debt, and is liable to change, it should not be relied upon as an indication of the final return to creditors and, in particular, neither we nor the Company shall have any responsibility to any person who relies on our report for the purpose of trading in debt of the Company.*

## Appendix 1

## Nortel Networks UK Limited (In Administration)

Company Information

| | |
|---|---|
| Registered number: | 3937799 |
| Company name: | Nortel Networks UK Limited |
| Registered office address | Fleming House, 71 King Street, Maidenhead, Berkshire SL6 1DU |
| Previous names: | Nortel Networks Holdings Limited |
| | Nortel Networks Holdings plc |

Details of the Administrators and of their appointment

| | |
|---|---|
| Administrators: | AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London, SE1 2AF |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors. |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 536 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly. |

### Statement Concerning the EC Regulation on Insolvency Proceedings 2000

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

**Share Capital**

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | Number | £ | Number | £ |
| Ordinary | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 |

**Shareholder**

Nortel Networks Limited - 100%

**Directors (current and for the last three years) and company secretary (current)**

| Name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| William LaSalle | Director | 01/10/2001 | 23/05/2008 | |
| Geoff Lloyd | Director | 01/02/2002 | 17/03/2006 | - |
| Christian Waida | Director | 17/12/2004 | 08/12/2008 | - |
| Henry Birt | Director | 01/09/2005 | 31/03/2007 | - |
| Peter Currie | Director | 01/09/2005 | 10/04/2007 | - |
| Sharon Rolston | Director | 01/04/2006 | 30/09/2010 | - |
| Simon Freemantle | Director | 31/03/2007 | - | - |
| David Quane | Director | 30/09/2010 | - | |
| Brenda Dandridge | Secretary | 01/12/2010 | - | - |

Summary of Nortel Group Structure



The EMEA Companies in English administration proceedings:

| Legal Entity | Country of Incorporation |
|---|---|
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

## Appendix 2

## Nortel Networks UK Limited (In Administration)

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2010 to 13 January 2011**

| Currency: USD | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 338,622,958 | | 338,622,958 |
| **Receipts** | | | |
| **Trading:** | | | |
| - Post appointment sales | 373,968,056 | 14,934,596 | 388,902,652 |
| - Post appointment intercompany | 339,332,011 | 27,461,637 | 366,793,647 |
| - Pre-liquidation distribution from NN Saudi | - | 2,900,000 | 2,900,000 |
| - TSA receipts | 20,299,729 | 28,471,042 | 48,770,772 |
| - Asset sales | 5,468,614 | - | 5,468,614 |
| - Property income | 3,494,718 | - | 3,494,718 |
| - Other receipts | 937,165 | 945,024 | 1,882,189 |
| - Overpayment refunds | 22,563 | 16,641 | 39,204 |
| **Other:** | | | |
| - Pre appointment sales | 98,961,782 | 2,352,072 | 101,313,854 |
| - Pre appointment intercompany - Asia Pacific entities | 14,307,188 | - | 14,307,188 |
| - FX translation movement | 9,243,681 | 11,305,722 | 20,549,403 |
| - Bank interest | 2,721,263 | 876,981 | 3,598,244 |
| - Pre appointment intercompany - Nortel Networks Israel | 308,492 | - | 308,492 |
| | 869,065,463 | 89,263,713 | 958,329,176 |
| **Payments** | | | |
| **Trading:** | | | |
| - Accounts payable - inventory related | (404,459,599) | (37,634,735) | (442,094,334) |
| - Payroll, employee benefits, and payroll taxes | (190,122,407) | (12,511,880) | (202,634,288) |
| - Property costs | (41,978,947) | (6,518,061) | (48,497,008) |
| - Other taxes | (34,019,520) | 5,984,427 | (28,035,093) |
| - Other payments | (18,592,723) | (1,114,169) | (19,706,892) |
| - Pension contributions | (10,356,973) | (633,564) | (10,990,538) |
| - Utilities | (10,196,966) | (1,636,161) | (11,833,126) |
| - Trade payables | (8,954,822) | - | (8,954,822) |
| - Contractors | (3,890,948) | (260,564) | (4,151,510) |
| **Other:** | | | |
| - Legal fees | (60,829,384) | (14,031,397) | (74,860,781) |
| - Joint Administrators' fees and disbursements | (48,587,868) | (13,522,388) | (62,110,256) |
| - Other professional services costs | (8,652,559) | (3,247,831) | (11,900,400) |
| - Restructuring costs | (3,482,957) | (33,790) | (3,436,748) |
| - FX translation movement on FX transactions within the entity | (1,417,152) | (483,524) | (1,900,676) |
| - Bank charges and interest | (655,689) | (227,969) | (883,684) |
| - Capital expenditure | (173,711) | - | (173,711) |
| | (846,301,733) | (85,871,932) | (932,173,665) |
| **Closing balance** | 361,386,688 | | 364,778,469 |
| **Account reconciliations:** | | | |
| Current accounts | 29,471,376 | | 26,255,068 |
| Local deposit accounts | 5,952,000 | | 171,197,160 |
| Administration deposit accounts | 325,963,311 | | 167,326,250 |
| | 361,386,688 | | 364,778,469 |

# Nortel Networks UK Limited (In Administration)

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2010 to 13 January 2011**

| Currency: GBP | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 236,900,621 | | 236,900,621 |
| **Receipts** | | | |
| **Trading:** | | | |
| - Post appointment sales | 240,734,251 | 7,918,737 | 248,652,989 |
| - Post appointment intercompany | 218,372,565 | 19,959,578 | 238,332,143 |
| - Pre-liquidation distribution from NN Saudi | - | 1,908,194 | 1,908,194 |
| - TSA receipts | 13,354,358 | 18,732,128 | 32,088,483 |
| - Asset sales | 3,598,898 | - | 3,598,898 |
| - Property income | 2,249,055 | - | 2,249,055 |
| - Other receipts | 599,678 | 621,897 | 1,221,574 |
| - Overpayment refunds | 14,848 | 10,948 | 25,796 |
| **Other:** | | | |
| - Pre appointment sales | 63,251,518 | 1,547,843 | 64,799,359 |
| - Pre appointment intercompany – Asia Pacific entities | 9,217,876 | - | 9,217,876 |
| - FX translation movement | - | 46,863 | 46,863 |
| - Bank interest | 1,754,477 | 577,074 | 2,331,552 |
| - Pre appointment intercompany – Nortel Networks Israel | 203,011 | - | 203,011 |
| | 553,350,332 | 51,323,261 | 604,673,593 |
| **Payments** | | | |
| **Trading:** | | | |
| - Accounts payable – inventory related | (259,941,373) | (24,765,885) | (284,707,258) |
| - Payroll, employee benefits, and payroll taxes | (122,152,387) | (8,233,775) | (130,386,162) |
| - Property costs | (27,030,485) | (4,289,580) | (31,320,065) |
| - Other taxes | (21,870,014) | 3,938,013 | (17,932,001) |
| - Other payments | (11,922,433) | (733,174) | (12,655,607) |
| - Pension contributions | (6,648,645) | (416,934) | (7,065,579) |
| - Utilities | (6,581,847) | (1,076,615) | (7,658,461) |
| - Trade payables | (5,723,287) | - | (5,723,287) |
| - Contractors | (2,496,200) | (171,403) | (2,667,603) |
| **Other:** | | | |
| - Legal fees | (39,349,439) | (9,233,913) | (48,583,352) |
| - Joint Administrators' fees and disbursements | (31,307,860) | (8,898,757) | (40,206,617) |
| - Other professional services costs | (5,580,222) | (2,137,296) | (7,717,518) |
| - Restructuring costs | (2,210,734) | (22,237) | (2,232,971) |
| - FX translation movement | (6,335,312) | - | (6,335,312) |
| - FX translation movement on FX transactions within the entity. | (883,508) | (291,738) | (1,175,246) |
| - Bank charges and interest | (430,431) | (150,036) | (580,467) |
| - Capital expenditure | (111,026) | - | (111,026) |
| | (549,575,192) | (56,483,339) | (606,058,531) |
| **Closing balance** | 240,675,762 | | 235,515,664 |
| **Account reconciliations:** | | | |
| Current accounts | 19,627,303 | | 16,951,331 |
| Local deposit accounts | 3,963,904 | | 110,531,781 |
| Administration deposit accounts | 217,084,555 | | 108,032,572 |
| | 240,675,762 | | 235,515,664 |

**Receipts and payments comments**

**Notes to R & P**

- Account balances have all been reported in a local currency, GBP, in addition to a common currency across all entities, USD.
- Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2010 month end spot rates which have been provided by the Company. This approach is in line with the Company's internal reporting procedures.

  Transactions that have taken place through the accounts over the course of the reporting period (14 July 2010 to 13 January 2011) have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

  Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates. These are translation movements only and do not reflect an actual receipt or payment.

  The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.
- The amounts reported are inclusive of sales tax where applicable.
- All amounts referred to below are in USD unless stated otherwise.

### RECEIPTS

There was cash on appointment held in GBP, Euro, USD and CAD accounts which totalled $338.6 million.

Total receipts since 13 July 2010 total $78.0 million (net of FX translation). This primarily relates to intercompany receipts, Transitional Service Agreement receipts and sales receipts.

#### Post appointment intercompany receipts

Intercompany receipts received since 13 July 2010 total $27.5 million.

The Company was a net receiver during the reporting period through the Nortel group's monthly netting process. Intercompany receipts were primarily collected from Nortel Networks N.V. (net $17.1 million) as the Company incurs and is later reimbursed the majority of costs in connection with the Alcatel Lucent contract.

#### Pre-liquidation distribution from NN Saudi

A distribution was made to the Company of $2.9 million in December 2010 as part of the wind up of the Saudi branch.

#### Transitional Service Agreement ("TSA") receipts

The TSA receipts since 13 July 2010 total $28.5 million. This represents the reimbursement of costs incurred on behalf of the purchasers under the terms of the respective TSAs.

#### Sales receipts

Pre appointment sales receipts collected since 13 July 2010 total $2.4 million.

Post appointment sales receipts collected since 13 July 2010 total $14.9 million.

### Foreign exchange translation movement

The total FX translation movement to 13 January 2011 is a result of the movement of the USD against the GBP. The translation movement shown since 13 July 2010 is simply the difference between the FX movement for the total period and that reported previously to 13 July 2010. As such the interim FX translation movement does not represent a true FX translation gain for the period.

### PAYMENTS

Total payments made since 13 July 2010 total $85.9 million. This primarily relates to inventory purchases, legal fees, Joint Administrators' fees, payroll related costs, property costs, other professional services costs and utility costs.

### Accounts payable

The accounts payable inventory related payments since 13 July 2010 total $37.6 million.

### Legal fees

Legal fees since 13 July 2010 total $14.0 million. This relates predominantly to fees paid to Herbert Smith LLP.

### Joint Administrators' fees

Joint Administrators' fees paid since 13 July 2010 are $13.5 million. These costs relate to fees and disbursement incurred in the course of the administration.

### Payroll

Payroll costs since 13 July 2010 total $12.5 million and include net pay in addition to employee expenses, employee benefits and payroll taxes.

### Property costs

Property costs since 13 July 2010 total $6.5 million. This principally relates to rental payments made for the premises at Maidenhead in addition to property management costs.

### Utilities

Utilities costs since 13 July 2010 total $1.6 million. This primarily relates to electricity costs at the Maidenhead and Harlow sites.

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2010 to 13 January 2011**

| Currency: USD | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 2,554,345 | | 2,554,345 |
| **Receipts** | | | |
| Trading: | | | |
| - Other receipts | 1,058 | - | 1,058 |
| Other: | | | |
| - Pre appointment sales | 1,884,249 | - | 1,884,249 |
| - FX translation movement | 2,328 | (375) | 1,952 |
| - Bank interest | 32,065 | 2,110 | 34,176 |
| | 1,919,701 | 1,735 | 1,921,436 |
| **Payments** | | | |
| Trading: | | | |
| - Trade payables | (229,715) | (172,610) | (402,325) |
| - Payroll, employee benefits, and payroll taxes: | (194,830) | - | (194,830) |
| - Other taxes | (104,308) | - | (104,308) |
| - Other professional services costs | (103,627) | (37,246) | (140,873) |
| - Other payments | (78,271) | (36,514) | (114,785) |
| - Property costs | (73,768) | (18,710) | (92,478) |
| - Utilities | (70,228) | (1,562) | (71,790) |
| - Contractors | (29,343) | - | (29,343) |
| Other: | | | |
| - Bank charges and interest | (873) | (77) | (950) |
| - Intercompany | 491,686 | (98,791) | 393,095 |
| - Pre-liquidation distribution - NN UK | - | (2,900,000) | (2,900,000) |
| - FX translation movement on FX transactions within the entity | (507) | - | (507) |
| | (393,584) | (3,265,510) | (3,658,094) |
| **Closing balance** | 4,080,461 | | 816,686 |
| **Account reconciliations:** | | | |
| Current accounts | 17,718 | | 284,578 |
| Local deposit accounts | 31,494 | | - |
| Administration deposit accounts | 4,031,249 | | 532,108 |
| | 4,080,461 | | 816,686 |

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2010 to 13 January 2011**

| Currency: SAR | Period 14 January 2009 to 13 July 2010 | Period 14 July 2010 to 13 January 2011 | Total to 13 January 2011 |
|---|---|---|---|
| **Opening balance** | 9,585,178 | | 9,585,178 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Other receipts | 4,000 | - | 4,000 |
| *Other:* | | | |
| - Pre appointment sales | 7,065,584 | - | 7,065,584 |
| - FX translation movement on FX transactions within the entity | 248 | - | 248 |
| - Bank Interest | 120,136 | 7,902 | 128,038 |
| | 7,189,968 | 7,902 | 7,197,870 |
| **Payments** | | | |
| *Trading:* | | | |
| - Trade payables | (860,924) | (646,263) | (1,507,187) |
| - Payroll, employee benefits, and payroll taxes | (729,918) | - | (729,918) |
| - Other taxes | (390,785) | - | (390,785) |
| - Other professional services costs | (388,139) | (139,451) | (527,590) |
| - Other payments | (293,158) | (136,712) | (429,870) |
| - Property costs | (276,330) | (70,050) | (346,380) |
| - Utilities | (263,063) | (5,848) | (268,911) |
| - Contractors | (109,931) | | (109,931) |
| *Other:* | | | |
| - Intercompany | 1,854,361 | (369,879) | 1,484,482 |
| - Pre-liquidation distribution - NN UK | - | (10,857,763) | |
| - FX translation movement | (10,420) | (22,558) | (32,978) |
| - Bank charges and interest | (3,274) | (289) | (3,563) |
| | (1,471,579) | (12,248,813) | (13,720,393) |
| **Closing balance** | 15,303,567 | | 3,062,655 |
| **Account reconciliations:** | | | |
| Current accounts | 68,452 | | 1,067,197 |
| Local deposit accounts | 118,116 | | - |
| Administration deposit accounts | 15,116,999 | | 1,995,458 |
| | 15,303,567 | | 3,062,655 |

**Receipts and payments comments**

**Notes to R & P**

* Account balances have all been reported in a local currency, SAR, in addition to a common currency across all entities, USD.

  Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2010 month end spot rates which have been provided by the Company. This approach is in line with the Company's internal reporting procedures.

  Transactions that have taken place through the accounts over the course of the reporting period (14 July 2010 to 13 January 2011) have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

  Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates. These are translation movements only and do not reflect an actual receipt or payment.

* The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

* The amounts reported are inclusive of sales tax where applicable.

* All amounts referred to below are in USD unless stated otherwise.

**RECEIPTS**

On appointment $2.6 million in cash was held in local SAR and USD accounts.

Since 13 July 2010 receipts have totalled approximately $2,000 (net of FX translation). This predominantly relates to bank interest.

**Foreign exchange translation movement**

The total FX translation movement to 13 January 2011 is a result of the movement of the USD against the SAR. The translation movement shown since 13 July 2010 is simply the difference between the FX movement for the total period and that reported previously to 13 July 2010. As such the interim FX translation movement does not represent a true FX translation gain for the period.

**PAYMENTS**

Total payments of $3.3 million have been made since 13 July 2010, which primarily relates to a pre-liquidation distribution to the Company's UK bank account.

### Pre-liquidation distribution - NNUK

A distribution was made to the Company of $2.9 million in December 2010 as part of the wind up of the Saudi branch.

## Appendix 3

## Nortel Networks UK Limited (In Administration)

Summary of Joint Administrators' time costs from 5 June 2010 to 3 December 2010 (GB£)
Excluding core M&A transaction time

# Administration fee analysis (in GBE)

## Summary of total core M&A transactions time costs for all EMEA filed entities from 5 June 2010 to 3 December 2010

| | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M&A / Transitional Services | 12.0 | 2.0 | 503.0 | 657.0 | | 1,365.2 | | 2,731.2 | 533.77 | 841,500.50 | | 7,220,034.50 |
| M&A / Equinox | 63.7 | 50.5 | 8.0 | 1.0 | | 22.6 | | 148.1 | 660.34 | 98,478.00 | | 4,530,496.00 |
| Purchase Price Allocation | 825.5 | 212.8 | 811.9 | 1,316.3 | 854.9 | | 298.3 | 4,409.7 | 431.67 | 1,903,533.50 | | 3,454,667.50 |
| M&A / Nokia | 140.4 | 367.5 | 82.0 | 281.5 | 27.0 | 47.2 | | 958.6 | 497.39 | 475,306.00 | | 2,217,039.21 |
| M&A Snow | 9.0 | 77.8 | 20.0 | 0.3 | 3.3 | | | 110.2 | 762.04 | 82,574.50 | | 1,551,313.00 |
| M&A / GSM | 4.0 | 18.5 | 59.7 | 4.1 | 0.1 | | | 77.4 | 573.90 | 44,412.00 | | 1,394,016.00 |
| M&A / Cache | 17.0 | 32.0 | 42.9 | | | | | 91.9 | 696.60 | 64,201.50 | | 1,135,278.00 |
| M&A / Passport | 67.0 | 357.3 | 821.6 | 88.5 | | | 6.0 | 1,140.3 | 565.99 | 645,356.00 | | 575,651.00 |
| Sale and M&A | | | | | | | | | | | | 569,376.00 |
| Other Assets | 44.3 | | 7.5 | 6.7 | 1.3 | | | 61.8 | 640.85 | 39,605.50 | | 265,952.57 |
| M&A / Velocity | | 7.0 | | | 1.3 | | | 8.3 | 540.24 | 4,464.00 | | 97,430.00 |
| **Grand Total** | 1,242.9 | 1,126.2 | 2,147.6 | 2,607.4 | 2,278.0 | 341.6 | | 9,780.5 | 5,689.80 | 4,297,764.00 | | 23,067,265.78 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Average hourly rate | 585.19 | | 843.40 | 504.66 | 365.81 | 266.46 | 179.97 | |
| Time costs for the period | 876,032.00 | | 723,862.00 | 1,083,577.00 | 643,392.00 | 606,462.00 | 61,369.00 | |
| Time costs for the Administration to date | 3,385,245.19 | | 4,234,185.51 | 6,791,301.08 | 5,016,619.00 | 3,195,569.81 | 449,251.79 | |

## Total time costs for the Administration from 5 June 2010 to 3 December 2010

| | |
|---|---|
| Administration time costs excluding transactions for the period | 5,805,616.20 |
| Reallocation of time costs removed from NNUK to be borne by EMEA entities | (2,284,138.58) |
| Transaction time costs seeking approval for the period | 1,710,325.76 |
| **Total time costs for the period 05/08/10 – 03/12/10** | **5,231,803.38** |

### Note

Time costs in respect of transactions for the period 5 June 2010 to 3 December 2010 have been apportioned on a provisional basis, having regard to the nature of the work done and the extent of progress made in respect of some, but not all, core M&A transactions. The allocation is provisional and will change as the transactions progress and the outcome of the PPA is clear.

Please note the Joint Administrators have only apportioned core M&A transactions time costs in respect of those transactions that have made sufficient progress. Therefore further core M&A transactions time costs will be apportioned in due course to the Company, and reapportioned as the outcome of the PPA process becomes clear.

## Appendix 4

## Nortel Networks UK Limited (In Administration)

### Apportionment

As commented in the report, during the period we have conducted a review of the time being charged to NNUK.

We found that in certain cases (e.g. Finance, Accounting and Administration) the vast majority of time has historically been charged to NNUK with a re-charge to EMEA being made through the transfer pricing arrangements. However, this effectively ended at end Q1 2010.

Therefore a new methodology was required to apportion costs appropriately across EMEA

In addition, certain workstreams (for example Creditors and Exit) have started to attract significant costs in 2010 and we considered that an appropriate apportionment of time was not in place and therefore a method of reapportionment to EMEA again was required for these workstreams.

The workstreams identified for reapportionment along with the apportionment basis used and the effect are summarised in the table below:

| Workstreams | Basis for Apportionment | Apportionment rate Applicable to NNUK |
|---|---|---|
| Finance, Accounting & Administration | Gross assets per Directors | |
| Trading | Statement of Affairs for all | 49.33% |
| Exit | EMEA companies | |
| Customers | Trade receivables per Directors | |
| Debtors | Statement of Affairs for all | 30.99% |
| | EMEA companies. | |
| Outcome for Creditors | Unsecured creditors (exc. Interco. | |
| Creditors | Debts, pensions & employee claims) | 62.93% |
| | per Directors Statement of Affairs. | |
| | for all EMEA companies. | |
| Exit IT costs | Rates used by the Group prior to the | 45.74%. |
| | Company going into Administration | |
| Strategy | Same rate used for M & A cost | |
| Canada / USA | apportionment | 46.17% |
| Transfer Pricing | | |
| Intellectual Property | | |

Time costs have been apportioned retrospectively from 6 February 2010 to date and will be apportioned going forward.

As a result NNUK will receive recharges from the EMEA companies amounting to GB£2,549,965 for work carried out in the period 6 February 2010 to 1 October 2010.

## Nortel Networks UK Limited (In Administration)

### Office Holders' Charging Policy for Fees

The statutory provisions relating to remuneration are set out in Rule 2.106 of the Rules. Further information is given in the Association of Business Recovery Professionals' publication *"A Creditors' Guide to Administrators' Fees"*, a copy of which may be accessed from the web site of the Insolvency Practitioners Association at http://www.insolvency-practitioners.org.uk (follow 'Regulation and Guidance' then 'Creditors' Guides to Fees'), or is available in hard copy upon written request to the Administrators.

The creditors have determined that the Administrators' remuneration should be fixed on the basis of time properly spent by the Administrators and their staff in attending to matters arising in the Administration.

The Administrators have engaged managers and other staff to work on the cases. The work required is delegated to the most appropriate level of staff taking account of the nature of the work and the individual's experience. Additional assistance is provided by accounting and treasury executives dealing with the Company's bank accounts and statutory compliance diaries, secretaries providing typing and other support services and filing clerks. Work carried out by all staff is subject to the overall supervision of the Administrators.

All time spent by staff working directly on case-related matters is charged to a separate time code established for each case. Each member of staff has a specific hourly rate, which is subject to change over time. The average hourly rate for each category of staff over the period is shown in Appendix 2, as are the current hourly rates used. The current hourly rates may be higher than the average rates, if hourly rates have increased over the period covered by this report.

### Office Holders' Charging Policy for Disbursements

Statement of Insolvency Practice No. 9 ("SIP 9") published by R3 (The Association of Business Recovery Professionals) divides disbursements into two categories.

Category 1 disbursements comprise payments made by the office holders' firm, which comprise specific expenditure relating to the administration of the insolvent's affairs and referable to payment to an independent third party. These disbursements can be paid from the insolvent's assets without approval from the Committee. In line with SIP 9, it is our policy to disclose such disbursements drawn but not to seek approval for their payment.

Category 2 disbursements comprise payments made by the office holders' firm which include elements of shared or overhead costs. Such disbursements are subject to approval from Creditors' Committee as if they were remuneration. It is our policy, in line with SIP 9, to seek approval for this category of disbursement before they are drawn.

Rule 2.47                                                                                         Form 2.24B

The Insolvency Act 1986

## Administrator's progress report                           **2.24B**

| Name of Company | Company number |
|---|---|
| Nortel Networks UK Limited | 3937799 |

| In the | Court case number |
|---|---|
| High Court of Justice of England and Wales, Chancery Division, Companies Court | 536 of 2009 |

We <u>AR Bloom, CJW Hill, SJ Harris and AM Hudson</u>

<u>Ernst & Young LLP, 1 More London Place, London, SE1 2AF</u>

administrators of the above company attach a progress report for the period

| From | to |
|---|---|
| <u>14 July 2010</u> | <u>13 January 2011</u> |

Signed

    Joint Administrator

Dated    <u>11 February 2011</u>

---

**Contact Details:**

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record

| Tara Felton | |
|---|---|
| Ernst & Young LLP, 1 More London Place, London, SE1 2AF | |
| | Tel: 020 7951 8151 |
| DX Number: | DX Exchange: |

Companies House receipt date barcode

When you have completed and signed this form please send it to the Registrar of Companies at:

**Companies House, Crown Way, Cardiff, CF14 3UZ**          **DX 33050 Cardiff**