**EXHIBIT 2**

**TAB 8**

**≡⅃ ERNST & YOUNG**

Ernst & Young LLP
1 More London Place
London SE1 2AF

Tel: 020 7951 2000
Fax: 020 7951 1345
www.ey.com/uk

TO ALL KNOWN CREDITORS

12 February 2010

Ref: MLP/7E/CH/NA/CC/LO3538

Chris Coley
Direct line: 0121 535 2394
Direct fax: 0121 535 2448
Email: ccoley@uk.ey.com

Dear Sirs

## Nortel Networks UK Limited (In Administration) (the "Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court Case number 536 of 2009

I write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a second report on the progress of the Administration (the "**Report**"). This Report covers the period from 14 July 2009 to 13 January 2010 and should be read in conjunction with my first report dated 13 August 2009 and the Administrators' Statement of Proposals dated 23 February 2009. A copy of this Report can be made available on request or can be obtained at the following;

www.nortel.com/corporate/adminprogreports.html

The Company entered administration on 14 January 2009 when AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "**Joint Administrators**") by an order (the "**Order**") of the High Court of Justice of England and Wales (the "**Court**"), following an application made by the Company's directors. Under the terms of the Order, any act required or authorised to be done by the Joint Administrators can be done by any of them. Further information on the Company and details of the Administrators' appointment are set out in Appendix 1.

On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region ("**EMEA**"). Details of the 19 companies are provided at Appendix 1. In accordance with Article 3 of the EC Regulation number 1346/2000 on Insolvency Proceedings 2000 (the "**EC Regulation**"), the court of the EC member state in which the centre of main interests ("**COMI**") of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the "**EMEA Companies**"), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company.

The Nortel group of companies (the "**Group**") reports in US dollars ("**US$**"), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office.



### 1. Executive Summary of Progress of the Administration

In early 2009, the Joint Administrators stabilised the businesses, continued to trade, maintained client and supplier relationships and implemented restructuring plans in certain entities as necessary. The Joint Administrators' proposals for the Administration were approved without modification by creditors of each of the EMEA Companies at meetings held in March 2009.

The Joint Administrators have continued to trade the Company's businesses with a view to achieving a rescue of the Company as a going concern or a better result for the Company's creditors as a whole than would be likely if the Company were wound up. Over time it has become clear that, owing to the financial and market pressures facing the Nortel businesses, the sale of all businesses would be necessary. The Group principally operates in three business segments: Enterprise Solutions ("**Enterprise**"), Metro Ethernet Networks ("**MEN**") and Carrier Networks, which comprises Global System for Mobile Communications ("**GSM**"), Carrier VoIP Application Solutions ("**CVAS**") and Code Division Multiple Access ("**CDMA**").

As at the date of this Report, the Joint Administrators are pleased to report that sales agreements have been reached in respect of all the Group's major global businesses with the exception of the smaller Multiservice Switch ("**MSS**") business, with global realisations before transaction costs of US$2.9 billion. All major disposals are being conducted on a Group-wide basis, following a "stalking horse" procedure in line with Section 363 of the US Bankruptcy Code unless otherwise stated.

The Group continues to seek the sale of the MSS business, residual intellectual property and other remaining assets. It is anticipated that all sales processes will be completed by the end of Q1 2010 or shortly thereafter. However, in the interim period, the Joint Administrators continue to work closely with the North American entities to maintain the value of the businesses up to the dates of completion, when they will transition to purchasers.

Owing to the integrated nature of the Group's business, it will be necessary for some Group companies to provide transitional services to the purchasers for a period of one year post sale completion. Such services include the provision of various back office functions, infrastructure support and the general allowance of lead time to enable each purchaser to integrate the business with their own. The purchaser will meet the direct cost of these services.

The proceeds of the global sale transactions will be placed into escrow until the allocation of proceeds between individual Group companies is determined. The mechanism of allocating disposal proceeds between Group companies is currently under negotiation. It is likely that any allocation process would need to be sanctioned by the US and Canadian Courts and the English High Court.

In accordance with the above, the Joint Administrators continue to pursue a better result for the Company's creditors as a whole than would be likely if the Company were wound up. The Joint Administrators believe that the businesses will be sold to the advantage of creditors and this remains the ultimate basis for the decision to continue to trade.

Further information is contained in the sections that follow.



## 2. Business Disposal Strategy

As outlined in our previous report, the Joint Administrators believe that a sale of the business will result in an enhanced realisation for creditors of the Company through capital receipts from the sales of businesses, the preservation and transfer of employment, and the transfer of contracts to purchasers.

All sales of the major businesses are intended to be dealt with on a global basis. The disposals follow a stalking horse auction process under Section 363 of the US Bankruptcy Code unless otherwise stated. Under this process, a bidder is selected and contractually committed to purchase the business, unless a better offer is made in a subsequent auction process. After a winning bidder is selected there is a period during which certain conditions need to be met (e.g. competition clearances) before the sale completes. If the conditions are not met, then the sale will not complete. The process provides relative certainty whilst maintaining competitive tension in the procedure, thereby maximising value. The auction process is conducted in accordance with US and Canadian court-approved auction parameters and is a common process in North America. The Joint Administrators have been, and remain, actively involved in these auction processes and the auction parameters subsequently approved by the US and Canadian courts. They are also fully involved in negotiating the EMEA sales agreements with purchasers and assisting in moving sales towards completion.

### Announced Disposals

The following stalking horse transactions have been entered into at the date of this Report. The sales values reported are headline global values and are stated before possible transaction costs and deductions.

### Sale of Layer 4-7 Business

On 31 March 2009, certain Group companies concluded the divestiture for US$18 million of certain parts of the Group's Virtual Service Switches business to Radware Ltd. The proceeds of sale remain in escrow for distribution once an allocation process has been agreed between the Group.

The Company is a party to this agreement.

### Sale of CDMA Business

On 19 June 2009, the Group announced that it had entered into a stalking horse asset sale agreement with Nokia Siemens Networks B.V. for the sale of substantially all of its North American CDMA business and parts of its LTE Access assets. Subsequently, on 25 July 2009 and following an auction process, the Group announced that Ericsson AB would purchase these assets for US$1.13 billion subject to approval by the US and Canadian Bankruptcy courts. The sale was concluded on 13 November 2009.

This transaction covers only the North American CDMA business and as such the modest EMEA CDMA business is excluded from the scope of the transaction. The EMEA entities, including the Company, will nevertheless rank for a share of the sale consideration.

 **ᴣ/ ERNST & YOUNG**                                                4

It should also be noted, that there are several CDMA contracts held by the Company and other EMEA entities. In order to safeguard the position of the EMEA estates, the Joint Administrators have negotiated necessary 'back to back' supply and licence agreements to allow the EMEA estates to run-off their respective CDMA contracts. This will allow the existing contracts to operate as normal until the expiry of the underlying contracts.

### Sale of Enterprise Business

On 21 July 2009, the Group announced that it had entered into a stalking horse asset and share sale agreement with Avaya Inc for its North American, Caribbean and Latin American ("**CALA**") and Asia Pacific Enterprise Solutions business, and an asset sale agreement with Avaya Inc for the EMEA portion of the Enterprise Solutions business, for a total purchase price of US$475 million. The agreements include the sale of substantially all of the assets of the Group's Enterprise Solutions business globally.

The auction of the business commenced on 9 September 2009 in New York at which there was one other bidder. The auction concluded on 14 September 2009 with Avaya declared as the winning bidder at a headline transaction price of US$900 million.

The transaction was subsequently approved by the US and Canadian courts and completed on 18 December 2009.

This transaction will result in the transfer of many jobs and contracts in EMEA. The proceeds will remain in escrow until an allocation process to the individual Group companies has been agreed.

### Sale of MEN Business

The MEN business was marketed for a stalking horse transaction, consisting of the Optical Networking and the Carrier Ethernet businesses. This excluded the MEN Carrier Data and EFA businesses which are likely to be marketed separately.

The stalking horse sale process was launched in April, led from North America but with heavy involvement by the Joint Administrators' M&A team. A stalking horse bid was announced with Ciena Corporation ("**Ciena**") on 7 October 2009 for headline consideration of US$390 million cash and 10 million shares in the Ciena business. As at the date of the announcement of the stalking horse, Ciena shares opened trading at US$13 per share thus indicating a total headline value of US$520 million (being US$390 million cash plus shares worth US$130 million at close of business on 6 October 2009).

The subsequent auction of the businesses commenced on 20 November 2009 in New York, at which there was one other bidder. Following three days of negotiation, the auction concluded with Ciena declared as the winning bidder at a cash price of US$530 million plus a convertible note for a principal amount of US$239 million – a total consideration of US$769 million.

This transaction was subsequently considered and approved at a joint hearing of the Canadian court and US Bankruptcy court on 2 December 2009. As at the date of this report, Ciena have

**≣Ⅱ ERNST & YOUNG**

already achieved US and Canadian antitrust clearance, which is an important factor in achieving a closure of the transaction.

There are approximately 2,300 Nortel employees in-scope for the transaction globally, of which 325 are based in EMEA. These positions will transfer to the purchaser.

### Sale of GSM / GSM-R Business

The GSM business is a global business with c.30% of revenues generated in EMEA (mainly in France and other mainland European countries) and includes the EMEA GSM-R (railway) business (c.15% of the global revenues).

The Group had attempted to obtain expressions of interest for the business through the stalking horse process with limited success. As a result, the decision was taken to seek expressions of interest through a 'naked auction' process (an auction conducted without a stalking horse bidder). It was ultimately necessary to extend the date of the auction until 24 November 2009 to allow more time for bids to be submitted.

The auction commenced on 24 November 2009 in New York and concluded with a joint bid from Kapsch CarrierCom AG ("**Kapsch**") and Telefonaktiebolaget LM Ericsson ("**Ericsson**") declared as the winning bid at a headline price of US$103 million. This is a good outcome for the GSM business, preserving approximately 680 jobs across the Group and including all in-scope EMEA employees.

This transaction was subsequently considered and approved at a joint hearing of the Canadian court and US Bankruptcy court on 2 December 2009.

### Sale of CVAS Business

Nortel entered into a stalking horse sale agreement with Genband Inc. ("**Genband**") on 22 December 2009 for a headline purchase price of US$282 million. In order to finance the transaction, Genband has teamed with one of its existing major shareholders, One Equity Partners III, L.P. ("**OEP**"). OEP manages investments and commitments for JP Morgan Chase & Co. in private equity transactions.

The scope of the stalking horse transaction includes the sale of substantially all of the assets of its CALA, Asia, and the EMEA entities. The purchase price, as is typical, is subject to certain working capital purchase price deductions to be applied pursuant to the terms of the sale agreement at the date of closing the transaction which are expected to have a value of approximately US$100 million, which would result in a net purchase price of approximately US$180 million.

The stalking horse transaction is a material milestone for the EMEA entities, securing the transfer of all 314 EMEA CVAS employees, CVAS contracts (subject to a limited exclusion criteria) and associated contractual liabilities. The proceeds from the transaction, as with other deals, will be subject to a global allocation process, the terms of which are yet to be agreed.



An Order setting the bidding procedures for an auction of the CVAS business was passed by the US Bankruptcy Court and the Canadian Court in January 2010. The auction date has been set for 25 February 2010. Any other qualifying bids are likely to be required to be submitted before that date.

**Future Transactions**

Given the integrated nature of the Group's businesses, the Joint Administrators continue to work closely with the North American management team to explore interests from external parties to acquire the remaining businesses of the Group in which the Company has an interest. Opportunities for the sale of other business units, primarily MSS, are currently being evaluated. In addition, the Group has a substantial residual intellectual property portfolio which is currently under review.



## 3. Trading and Operational Overview

The Company is the largest EMEA entity being engaged in all five of the global businesses. The Company also provides much of the infrastructure and management functions necessary for the EMEA region.

At an entity level, the Company has traditionally traded at an operating loss. This is a consequence of the levels of research and development activity and other overheads incurred on behalf of the wider EMEA region.

Within the Group itself, the Carrier businesses (GSM, CVAS and CDMA) and the MEN business generate an operating profit. In contrast, the Enterprise business generates an operating loss. All businesses have continued to trade since 14 January 2009 in order to achieve global sales of each business.

As a consequence of the filing, and general economic market conditions, customer orders have fallen since 2008. Despite this, the Company achieved a turnover to 30 September 2009 of US$520.6 million and an operating loss of US$52.5 million before professional fees, restructuring costs and transfer pricing receipts. It is typical for trading performance to improve in the second half of a year due to the nature of customer requirements. This trend is continuing despite the global filings.

As a result of the decrease in customer orders, it has been necessary to implement cost saving measures in order to realign the business to reflect current activity levels. Measures include headcount reduction, property restructuring and a reduction in the level of purchase orders, which have all helped long term asset preservation.

As detailed in our previous report, the Group operates a complex transfer pricing scheme. Typically the Company receives a contribution towards its trading losses under this arrangement. Post filing, the Company will receive up to US$96 million from the Group under this arrangement, which will enable the Joint Administrators to recover some of the trading losses incurred for the full year.

The Joint Administrators continue to trade in order to maximise the value of potential business and asset sales, and to reduce the value of termination claims and other contingent liabilities on the Company. The Joint Administrators balance the decision of continuing to trade with its impact on the interests of creditors. The Joint Administrators consider that the potential realisation values from selling the Company's various businesses as going concerns will result in a better return to creditors than if the businesses ceased to trade and the assets of the Company were sold on a break-up basis. This position is closely monitored by the Joint Administrators who continue to maintain a close dialogue with the unsecured creditors committee on the business disposal and ongoing trading strategy.



### Customers

The Joint Administrators continue to work with the rest of the Group to assess and stabilise its customer base by working 'hand-in-hand' with Group-wide Nortel customer account teams.

The Group's customer base has to a large extent remained loyal and supportive of the restructuring in a global context. The Group has maintained its market presence and won new customer contracts as well as renewing important existing customer relationships, set against continued challenging trading conditions in the market place.

The Joint Administrators continue to work with the Company's management to ensure the ongoing collection of receivables due from its customers in the normal course of business. Where customers have been slow in making payment the Joint Administrators have entered into discussions with the relevant party to resolve any outstanding issues and speed up payment. Where sales of businesses complete, the Joint Administrators will be reviewing options to incentivise certain customers to accelerate payment and thereby ensure collection of pre and post appointment receivables balances on a timely basis.

### Suppliers

Key suppliers continue to be supportive of the restructuring process, which has facilitated the trading strategy being followed by the Joint Administrators. There has been extensive work carried out to ensure continued supply and to advise suppliers of the sale of each of the business units, including the timing and activities required to migrate the businesses.

### Real Estate

Real estate remains a substantial cost element for the Company as a result of being party to several leases with high rental costs. The Joint Administrators continue to negotiate the surrender in whole or part (i.e. of areas or offices within these leasehold properties) in order to reduce the quarterly rent exposure in the Administration.

Since our last report, the Company has now exited eight sites in the UK. A further eight sites remain occupied, of which a lease assignment for one has been included in a sale agreement. The remaining sites continue to be assessed for potential assignments to the purchasers of the businesses, and the Joint Administrators are working closely with these parties in order to reduce rental costs where possible.

### Restructuring Measures

As previously reported, redundancies were made in the first six months of the Administration. No further redundancies have taken place during the period of this Report. It should be noted however, that 95 employees have resigned.

It should also be noted that, upon completion of sales transactions, the majority of employees will transfer to the respective purchasers therefore preserving future employment.

**ᴣᴍ ERNST & YOUNG**

9

#### 4. Receipts and Payments Account

Attached at Appendix 2 is the Joint Administrators' receipts and payments ("**R & P**") account for the period 14 July 2009 to 13 January 2010 for the Company in the UK and the Saudi Arabia branch, which shows total receipts of US$362.1 million, and payments of US$331.1 million. A trading overview is included in Section 3 above.

The Company held cash in various currencies equivalent to US$365.2 million at 13 January 2010. It should be noted that the transfer pricing contributions received to date for 2009, outlined in our previous report and in Section 3 above, are reflected in the R & P.

The R & P account is a statement of cash received and cash paid out and does not reflect estimated future realisations or costs, including proceeds from the sales of businesses held in escrow pending allocation amongst the Group.

For further information, see the detailed notes provided in Appendix 2.



## 5. Joint Administrators' Remuneration and Disbursements

The Joint Administrators' remuneration was fixed on a time-costs basis by the Committee. During the period 1 June 2009 to 6 November 2009 the Joint Administrators incurred time costs of GB£10,192,922, of which GB£7,705,078 has been drawn on account in accordance with the court order dated 28 February 2009.

It is the responsibility of the Committee to approve fees incurred. GB£4,203,797, out of time costs incurred for the period 28 February 2009 to 1 May 2009 has been approved by a resolution passed by the Committee. The Joint Administrators are in the process of seeking approval from the Committee for fees incurred for the period 2 May 2009 to 4 September 2009. An analysis of the time spent is at Appendix 3, which includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

### Payments to Other Professionals

The Joint Administrators continue to engage the following professional advisors to assist them in the Administration. These professionals work on a time cost basis and internal review processes are undertaken to review their invoices. As at 13 January 2010 the following has been paid:

Herbert Smith LLP – GB£21,079,656 (Legal Advisors)

Legal Counsel – GB£1,344,160 (Legal Advisors)

**≡|| ERNST & YOUNG**

## 6. Other Matters

### The Committee

A committee of the unsecured creditors was formed at the creditors' meeting held on 11 March 2009 (the "**Committee**"). The Joint Administrators continue to provide detailed information to the members of the Committee as the Administration progresses and matters evolve (including an analysis of their time costs for approval). The Joint Administrators will continue to keep the Committee appraised of developments.

### The Prescribed Part

Section 176A of the Insolvency Act 1986 does not apply to this Administration as there is no qualifying floating charge security, and as such there is no Prescribed Part to be set aside for non preferential creditors.

### North American Claims Process

In North America, the Nortel Canadian Companies under the Companies' Creditors Arrangement Act ("CCAA") proceedings and the US Companies in Chapter 11 proceedings had obtained orders approving formal claims processes in each jurisdiction. In both jurisdictions there was a call for claims, including supplier claims, arising prior to 14 January 2009. The bar date set for such claims was 30 September 2009.

The Joint Administrators have now filed protective claims on behalf of the Company and the EMEA Companies in order to preserve any potential claims falling against Group companies in jurisdictions where bar dates were imposed.

Creditors with claims in either of the jurisdictions outlined above should seek separate legal advice in relation to such claims. Further information on the claims process can be found at:

http://www.nortel.com/corporate/restructuring.html

The Joint Administrators will continue to file protective claims on behalf of the Company and the EMEA Companies in jurisdictions where a bar date is imposed.

### Company Directors' Disqualification Act 1986

As part of our statutory duties, the Joint Administrators perform a review of the conduct of all Directors of the Company that have held office in the past three years. This review is a statutory requirement and the resulting report has been sent to the Secretary of State at the Department of Trade and Industry and is confidential.



## 7.  Future Conduct of the Administration

### Purchase Price Allocation ("PPA") – The Business Disposals

The proceeds from business disposals, which will be placed in a global escrow account on completion, will subsequently be apportioned across the selling companies. The proper allocation of proceeds across each selling entity, including the Company and the EMEA Companies, is a matter of importance not only to the Joint Administrators, but also to the Court-appointed Monitor of Nortel Networks Ltd (the Canadian company) and the Unsecured Creditors' Committee of Nortel Networks Inc (the US company), as fiduciaries responsible in respect of the Chapter 11 proceedings of the US company.

The Joint Administrators, Nortel Networks Ltd and Nortel Networks Inc (together with the Monitor and the legal advisors to the Unsecured Creditors' Committee) have been negotiating a purchase price allocation framework to agree how the respective entitlement of each of the Nortel entities to the proceeds of the business sales will be determined.

The current intention is for the allocation of sale proceeds to be determined by way of an arbitration process to which all entities with a claim to sale proceeds will subject themselves. That arbitration process would involve an arbitration panel of three independent arbiters, of international repute.

It remains possible that the selling estates could reach a consensual allocation agreement regarding purchase price allocation (without the need for recourse to arbitration) or are simply unable to agree on the form of arbitration proceedings.

In the event that it is not possible to agree an arbitration process with the Canadian and US entities, the process for determining allocation of the sale proceeds is likely to be decided by the courts.

Whatever mechanism is used to determine the allocation of sale proceeds, the Joint Administrators are mindful that in the negotiations that take place, it is their duty to act in the best interests of the Company's creditors.

### Distributions to Creditors

It remains too early to be precise on the potential quantum or timing of any dividend payment, owing to the ongoing sales processes in relation to the various businesses operated by the Company, and the fact that the formal process of claims admittance/adjudication has not yet commenced.

The Joint Administrators expect to have a better view not only of the value of the asset realisations, but also of the totality of claims, including contingent claims that might rank for dividend, as business disposals complete, contracts of employment transfer to the purchasers, certain customer and supplier contracts novate to the purchasing parties and progress is made in respect of the PPA.



With respect to the PPA process and recoveries therefrom, which will form an integral element of any dividend to creditors, the Joint Administrators are mindful of the pending arbitration process and the potential to reach a consensual allocation. The Joint Administrators do not believe that it is in the interests of the Company and its creditors to define and circulate a view on an expected recovery level for the Company; such assertion at this time might prejudice the Company's position in any arbitration proceedings or negotiations between selling estates.

However, as previously reported, the disposals are complex and there will be periods of some months between contracting and completion. In addition, the Administration is likely to need to remain in place for some time (possibly 12 months or more for certain Group companies) to provide transitional services to the purchasers.

On the basis the sales processes are expected to complete by mid 2010, it is likely external creditor claims will be called for in 2010. In accordance with the Insolvency Act 1986, the Joint Administrators' will be writing to all known creditors and advertising for claims.

The Joint Administrators do have a statutory power to agree and pay preferential creditors in this matter, and will be attending to this at an earlier stage.

### Administration Extension

The Joint Administrators applied to the Court on 12 January 2010 for extensions of the Administrations of the Company and the other EMEA Companies. I am pleased to report that the extension applications have been successful and the Administrations have been extended for a further 24 months. The Administrations are now due to expire on 13 January 2012.

### Exit Routes from Administration

Certain exit routes set out in the Proposals remain viable options and continue to be explored by the Joint Administrators as mechanisms to agree creditors' claims and distribute assets to creditors once the Administration has been completed. The Joint Administrators will be in a position to provide further information on these exit routes once administration trading has ceased, assets have been realised and administration liabilities settled.

**ᴱᴵ ERNST & YOUNG**

14

The Joint Administrators will report to you again in six months' time.

Yours faithfully
For Nortel Networks UK Limited (In Administration)



C Hill
Joint Administrator

Enc:    Company information
        Joint Administrators' Receipts and Payments Account
        Summary of Joint Administrators' Time Costs
        Joint Administrators' Policy on Fees and Disbursements
        Form 2.24B Administrators' Progress Report

*For the Companies listed below, The Institute of Chartered Accountants In England and Wales in the UK authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants in the UK authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

*Nortel Networks SA was placed into French liquidation judiciaire on 28 May 2009. The business and assets of the company that are situated in France are now under the control of an administrateur judiciaire.*

## Appendix 1

## Nortel Networks UK Limited (In Administration)

Company Information

| | |
|---|---|
| Registered number: | 3937799 |
| Company name: | Nortel Networks UK Limited |
| Registered office address | Maidenhead, Office Park, Westacott Way, Maidenhead, Berkshire, SL6 3QH, UK |
| Previous names: | Nortel Networks Holdings Limited Nortel Networks Holdings plc |

Details of the Administrators and of their appointment

| | |
|---|---|
| Administrators: | AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London, SE1 2AF |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors. |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 536 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly. |

### Statement Concerning the EC Regulation on Insolvency Proceedings 2000

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

**Share Capital**

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | Number | £ | Number | £ |
| Ordinary | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 | 1,468,100,001 |

**Shareholder**

Nortel Networks Limited - 100%

**Directors (current and for the last three years) and company secretary (current)**

| Name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| Bill LaSalle | Director | 01/10/2001 | 23/05/2008 | |
| Geoff Lloyd | Director | 01/02/2002 | 17/03/2006 | - |
| Christian Waida | Director | 17/12/2004 | 08/12/2008 | - |
| Henry Birt | Director | 01/09/2005 | 31/03/2007 | - |
| Peter Currie | Director | 01/09/2005 | 10/04/2007 | - |
| Sharon Rolston | Director | 01/04/2006 | - | - |
| Simon Freemantle | Director | 31/03/2007 | - | - |
| Nir Elbaz | Secretary | 17/12/2008 | - | - |

Summary of Nortel Group Structure



The EMEA Companies in English administration proceedings:

| *Legal Entity* | *Country of Incorporation* |
| --- | --- |
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

## Appendix 2

## Nortel Networks UK Limited (In Administration)

**Joint Administrators' Abstract of Receipts and Payments**
**from 14 July 2009 to 13 January 2010**

| Currency: USD | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| Opening balance | 338,622,958 | - | 338,622,958 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Post appointment sales | 127,722,670 | 155,327,815 | 283,050,485 |
| - Intercompany | 76,522,188 | 195,540,540 | 272,062,728 |
| - Property Income | 1,623,241 | 1,056,070 | 2,679,311 |
| - Other receipts | 450,579 | 451,284 | 901,863 |
| *Other:* | | | |
| - Pre appointment sales | 82,580,000 | 16,381,782 | 98,961,782 |
| - FX translation movement | 42,263,155 | (7,574,574) | 34,688,581 |
| - Bank interest | 1,088,526 | 828,135 | 1,916,661 |
| | 332,250,358 | 362,011,052 | 694,261,411 |
| **Payments** | | | |
| *Trading:* | | | |
| - Accounts payable - Inventory related | (169,895,702) | (158,744,602) | (328,640,305) |
| - Payroll, employee benefits, and payroll taxes | (82,513,236) | (73,941,431) | (156,454,667) |
| - Property costs | (15,430,052) | (15,973,711) | (31,403,763) |
| - Other taxes | (13,658,787) | (13,669,258) | (27,328,045) |
| - Other payments | (9,599,248) | (6,933,918) | (16,533,166) |
| - Trade payables | (8,652,726) | (301,897) | (8,954,622) |
| - Pension contributions | (4,146,123) | (4,674,704) | (8,820,827) |
| - Utilies | (2,504,653) | (4,276,559) | (6,781,212) |
| - Contractors | (2,052,190) | (1,347,952) | (3,400,143) |
| *Other:* | | | |
| - Legal fees | (7,668,284) | (28,270,409) | (35,938,693) |
| - Joint Administrators' fees and disbursements | (16,487,245) | (18,718,972) | (35,206,217) |
| - Oher professional services costs | (2,735,246) | (3,276,823) | (6,012,069) |
| - FX translation movement on FX transactions within the entity | (3,314,420) | (475,297) | (3,789,717) |
| - Restructuring costs | (1,502,842) | (11,263) | (1,514,105) |
| - Bank charges and interest | (211,764) | (191,797) | (403,562) |
| - Capital expenditure | (166,764) | (6,947) | (173,711) |
| | (340,539,282) | (330,815,541) | (671,354,823) |
| **Closing balance** | 330,334,035 | | 361,529,546 |
| **Account reconciliations:** | | | |
| Current accounts | 33,317,147 | | 29,445,022 |
| Local deposit accounts | - | | - |
| Administration deposit accounts | 297,016,887 | | 332,084,524 |
| | 330,334,035 | | 361,529,546 |

# Nortel Networks UK Limited (In Administration)

**Joint Administrators' Abstract of Receipts and Payments**
**from 14 July 2009 to 13 January 2010**

| Currency: GBP | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| **Opening balance** | 236,900,621 | - | 236,900,621 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Post appointment sales | 85,048,017 | 95,863,966 | 180,911,983 |
| - Intercompany | 51,003,923 | 122,958,888 | 173,962,811 |
| - Property income | 1,080,884 | 631,570 | 1,712,455 |
| - Other receipts | 300,666 | 275,780 | 576,446 |
| *Other:* | | | |
| - Pre appointment sales | 55,173,350 | 8,078,166 | 63,251,516 |
| - Bank interest | 724,871 | 500,159 | 1,225,030 |
| | 193,331,710 | 228,308,530 | 421,640,240 |
| **Payments** | | | |
| *Trading:* | | | |
| - Accounts payable - inventory related | (113,470,875) | (96,577,530) | (210,048,404) |
| - Payroll, employee benefits, and payroll taxes | (54,934,480) | (45,061,956) | (99,996,436) |
| - Property costs | (10,272,903) | (9,798,498) | (20,071,401) |
| - Other taxes | (9,093,475) | (8,372,938) | (17,466,412) |
| - Other payments | (6,396,923) | (4,170,241) | (10,567,164) |
| - Trade payables | (5,766,578) | 43,291 | (5,723,287) |
| - Pension contributions | (2,760,346) | (2,877,397) | (5,637,744) |
| - Utilities | (1,668,110) | (2,666,073) | (4,334,183) |
| - Contractors | (1,368,297) | (804,943) | (2,173,240) |
| *Other:* | | | |
| - Joint Administrators' fees and disbursements | (10,976,642) | (11,525,060) | (22,501,701) |
| - Legal fees | (5,104,789) | (17,864,565) | (22,969,355) |
| - FX translation movement | 1,743,716 | (7,298,203) | (5,554,487) |
| - Other professional services costs | (1,823,896) | (2,018,691) | (3,842,587) |
| - FX translation movement on FX transactions within the entity | (2,256,623) | (245,423) | (2,502,046) |
| - Restructuring costs | (1,003,443) | 35,717 | (967,725) |
| - Bank charges and interest | (141,088) | (116,845) | (257,934) |
| - Capital expenditure | (111,026) | - | (111,026) |
| | (225,405,778) | (209,319,354) | (434,725,133) |
| **Closing balance** | 204,826,553 | | 223,815,729 |
| **Account reconciliations:** | | | |
| **Current accounts** | 20,658,593 | | 18,228,826 |
| **Local deposit accounts** | - | | - |
| **Administration deposit accounts** | 184,167,959 | | 205,586,903 |
| | 204,826,553 | | 223,815,729 |

## Receipts and payments comments

### Notes to R & P

#### Note 1

Account balances have all been converted into a local currency, Sterling, in addition to a common currency across all entities, USD.

Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2009 month end spot rates which have been provided by the Company.  This approach is in line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts over the course of the reporting period have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

#### Note 2

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

#### Note 3

All items within the Receipts & Payments analysis are recorded gross of VAT where applicable.

#### Note 4

All amounts referred to are in US$ unless stated otherwise.

### RECEIPTS

There was cash on appointment held in Euro, US$, Sterling and Canadian dollar current and deposit accounts which totalled $338.6 million.

Total receipts since 13 July 2009 total $362.0 million. This primarily relates to intercompany receipts and pre and post appointment sales receipts.

#### Intercompany receipts

Intercompany receipts received since 13 July 2009 total $195.5 million.  $67.4 million of this amount relates to transfer pricing receipts received from other Nortel EMEA filed entities in accordance with the Interim Funding Settlement Agreement.

In addition, the balance relates to net receipts collected through the Citinetting process (majority of funds received from Nortel (Ireland) Limited) and payments to reimburse Nortel Networks Limited and Nortel Networks Inc for payments made to Flextronics and other global business costs.

In addition, $10.0 million has been received from Nortel's Asia Pacific companies in respect of pre-filing intercompany balances.

### Sales receipts

Pre appointment sales receipts relate to amounts collected against balances outstanding at the date of appointment. Since 13 July 2009, an amount of $16.0 million has been collected, bringing total collections to $98.6 million.

Post appointment sales receipts collected since 13 July 2009 total $213.6 million. There remains an outstanding balance on the post appointment sales ledger of $ 54.2 million as at 13 January 2009.

### Property income

Property income collected since 13 July 2009 totals $1.1 million. This relates to rental receipts and service charges on sites in Harlow, Maidenhead and Welwyn Garden City.

Property income in the period to 13 July 2009 has been restated from nil to $1.6 million, following a reclassification of this income from post appointment sales receipts to property income.

### Foreign exchange translation movement

The total FX translation movement to 13 January 2009 is a result of the appreciation of the sterling against USD. The translation movement shown since 13 July 2009 is simply the difference between the FX gain/loss for the total period and that for the period to 13 July 2009. As such the interim FX translation movement does not represent a true FX translation gain for the period.

## PAYMENTS

Total payments made since 13 July 2009 total $330.8 million. This primarily relates to inventory purchases and payroll related costs.

### Accounts payable – inventory related

The accounts payable inventory related payments since 13 July 2009 total $158.7 million. Flextronics continues to be the major supplier of inventory to NNUK.

### Payroll

Payroll costs since 13 July 2009 total $73.9 million and include net pay in addition to employee expenses, employee benefits and payroll taxes.

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments
from 14 July 2009 to 13 January 2010**

| Currency: USD | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| Opening balance | 2,554,345 | - | 2,554,345 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Other receipts | - | - | - |
| *Other:* | | | |
| - Pre appointment sales | 1,749,361 | 134,879 | 1,884,240 |
| - Bank interest | 30,236 | 873 | 31,109 |
| - FX translation movement | 1,878 | 536 | 2,414 |
| | 1,781,475 | 136,288 | 1,917,763 |
| **Payments** | | | |
| *Trading:* | | | |
| - Trade payables | (229,736) | 21 | (229,715) |
| - Payroll, employee benefits, and payroll taxes | (44,478) | (150,351) | (194,830) |
| - Other taxes | (98,585) | (5,724) | (104,308) |
| - Other professional services costs | (23,243) | (40,381) | (63,624) |
| - Property costs | - | (57,407) | (57,407) |
| - Utilities | (21,291) | (30,933) | (52,224) |
| - Other payments | (27,960) | (17,055) | (45,015) |
| - Contractors | - | (29,343) | (29,343) |
| - Intercompany | (3,015) | 180 | (2,835) |
| *Other:* | | | |
| - Bank charges and interest | (349) | (378) | (726) |
| - FX translation movement on FX transactions within the entity | - | (507) | (507) |
| | (448,657) | (331,877) | (780,534) |
| **Closing balance** | 3,887,163 | | 3,691,574 |
| **Account reconciliations:** | | | |
| **Current accounts** | 820,723 | | 44,419 |
| **Local deposit accounts** | 31,420 | | 31,491 |
| **Administration deposit accounts** | 3,035,020 | | 3,615,664 |
| | 3,887,163 | | 3,691,574 |

# Nortel Networks UK Limited (In Administration) – Saudi Arabia Branch

**Joint Administrators' Abstract of Receipts and Payments**
**from 14 July 2009 to 13 January 2010**

| Currency: SAR | Period 14 January 09 to 13 July 09 | Period 14 July 09 to 13 January 10 | Total to 13 January 10 |
|---|---|---|---|
| **Opening balance** | 9,585,178 | - | 9,585,178 |
| **Receipts** | | | |
| *Trading:* | | | |
| - Other receipts | - | - | - |
| *Other:* | | | |
| - Pre appointment sales | 6,558,735 | 506,849 | 7,065,584 |
| - Bank interest | 113,267 | 3,291 | 116,558 |
| - FX translation movement | (11,627) | 152 | (11,475) |
| | 6,660,375 | 510,292 | 7,170,667 |
| **Payments** | | | |
| *Trading:* | | | |
| - Trade payables | (860,923) | - | (860,924) |
| - Payroll, employee benefits, and payroll taxes | (166,617) | (563,301) | (729,918) |
| - Other taxes | (369,300) | (21,485) | (390,785) |
| - Other professional services costs | (87,069) | (151,295) | (238,364) |
| - Property costs | - | (215,073) | (215,073) |
| - Utilities | (79,758) | (115,897) | (195,655) |
| - Other payments | (104,737) | (63,907) | (168,645) |
| - Contractors | - | (109,931) | (109,931) |
| - Intercompany | 2,080 | 16 | 2,096 |
| *Other:* | | | |
| - Bank charges and interest | (1,308) | (1,418) | (2,726) |
| - FX translation movement on FX transactions within the entity | - | 248 | 248 |
| | (1,667,630) | (1,242,044) | (2,909,674) |
| **Closing balance** | 14,577,923 | | 13,846,171 |
| **Account reconciliations:** | | | |
| **Current accounts** | 3,077,876 | | 166,604 |
| **Local deposit accounts** | 118,116 | | 118,116 |
| **Administration deposit accounts** | 11,381,931 | | 13,561,452 |
| | 14,577,923 | | 13,846,171 |

## Receipts and payments comments

### Notes to R & P

#### Note 1

Account balances have all been reported in a local currency, SAR, in addition to a common currency across all entities, US$.

Opening balances have been converted using January 2009 month end spot rates and closing balances converted using December 2009 month end spot rates which have been provided by the Company. This approach is in line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts have been converted at average spot rates for the period 14 January 2009 to 13 January 2010, which have been sourced from the foreign exchange website Oanda.

Consequently, foreign exchange movements have occurred in the period as a result of fluctuations in currency conversion rates. These are translation movements only and do not reflect an actual receipt or payment.

#### Note 2

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

#### Note 3

All items within the Receipts & Payments analysis are recorded gross of sales tax where applicable.

#### Note 4

All amount referred to are in US$ unless stated otherwise.

#### Note 5

The receipts and payments to 13 July 2009 have been restated to remove the previous double count of "other receipts" which was later identified as having been accounted for in the opening balance. This restatement has the effect of reducing the closing balance by $68,000.

### RECEIPTS

On appointment $2.6 million in cash was held in SAR current accounts.

During the period 14 July 2009 to 13 January 2010 receipts totalling $136,000 have been received. This predominantly relates to pre appointment sales receipts.

### Sales receipts

Pre appointment sales receipts relate to amounts collected against balances outstanding at the date of appointment. Since 13 July 2009, an additional $135,000 has been collected bringing total collections to $1.9 million.

### PAYMENTS

Total payments of $332,000 have been made since 13 July 2009. This primarily relates to payroll costs, property costs and other professional service costs.

### Payroll

Payroll costs since 13 July 2009 total $150,000. $112,000 of this value relates to social insurance tax repayments for two employees who were not correctly registered when they commenced employment and as a consequence had not been paying the required income tax. The remaining payroll amount of $38,000 relates to net pay and employee expenses.

### Property

Property costs since 13 July 2009 total $57,000. This relates to rental payments for the Riyadh property which is to be vacated on 31 January 2010 and the deposit for the new offices.

### Other professional services

Other professional services costs since 13 July 2009 total $40,000. These payments primarily relate to BDO for their ongoing account management services.

### Contractors

Contractor costs since 13 July 2009 total $29,000. This primarily relates to payments to Baud Telecom Company for technical support.

## Appendix 3

## Nortel Networks UK Limited (In Administration)

**Summary of Joint Administrators' time costs from 1 June 2009 to 6 November 2009 (GB£)**
**Excluding core M&A transaction time**

| | | | | | | | Total hours | Average hourly rate | Total cost for the period | Time costs to date |
|---|---:|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| Finance, Accounting & Administration | 10.0 | 0.8 | 800.6 | 948.5 | 2,130.1 | 1,248.4 | 5,231.5 | 282.77 | 1,507,494.00 | 2,749,703.50 |
| Trading | 6.5 | 162.7 | 147.8 | 1,098.2 | 809.5 | 344.0 | 2,608.7 | 318.16 | 628,992.50 | 1,992,712.00 |
| Employees | 162.9 | 51.1 | 210.0 | 1,104.7 | 93.1 | 8.0 | 1,690.8 | 338.56 | 560,875.50 | 1,353,754.50 |
| Creditors | 32.7 | 24.1 | 683.1 | 728.1 | 138.8 | 46.3 | 1,655.1 | 317.61 | 525,660.00 | 1,224,634.50 |
| Suppliers | 47.6 | 36.5 | 58.4 | 806.7 | 405.9 | 322.6 | 1,676.7 | 312.91 | 624,663.50 | 1,895,229.42 |
| Canada / USA | 563.9 | 19.6 | 55.7 | 33.5 | - | - | 692.7 | 664.48 | 460,287.50 | 881,458.50 |
| UK Tax / VAT advisory and compliance | 48.5 | 76.3 | 111.6 | 171.9 | 230.5 | 23.8 | 660.6 | 555.34 | 368,855.50 | 983,591.00 |
| Customers | 20.8 | 216.0 | 45.0 | 403.9 | 182.3 | 2.5 | 870.5 | 368.58 | 348,944.50 | 1,005,504.00 |
| Statutory | 88.9 | 20.1 | 27.2 | 342.8 | 62.0 | 534.6 | 1,075.7 | 288.24 | 307,909.00 | 688,769.50 |
| Property | 11.0 | 182.9 | 375.8 | 3.0 | 6.5 | 11.5 | 592.7 | 507.00 | 300,500.00 | 597,728.00 |
| Case management | 30.7 | 73.0 | 45.8 | 150.1 | 382.8 | 183.3 | 865.5 | 235.82 | 204,106.00 | 708,138.50 |
| Creditors' Committee | 47.8 | 52.9 | 34.4 | 70.4 | 202.7 | 22.8 | 431.0 | 342.78 | 147,736.50 | 286,643.00 |
| Strategy | 129.8 | 28.5 | 40.0 | 22.0 | - | - | 218.3 | 591.83 | 128,196.00 | 418,669.50 |
| Transfer Pricing | 40.6 | 6.5 | 128.5 | 15.0 | 27.0 | 7.5 | 228.1 | 555.25 | 128,651.50 | 422,333.50 |
| Legal | 37.5 | 21.8 | 3.5 | 3.3 | 2.3 | 485.8 | 554.2 | 202.55 | 112,254.50 | 220,368.00 |
| Debtors | 35.6 | 27.1 | 6.9 | 7.6 | 117.1 | - | 194.4 | 383.75 | 76,545.50 | 410,954.00 |
| Investigations | 0.5 | - | 15.6 | 33.3 | 150.1 | 97.5 | 297.0 | 224.25 | 66,602.00 | 370,639.00 |
| Branches & equity interests | 7.0 | 35.3 | 16.6 | 80.4 | 14.0 | 5.3 | 158.6 | 415.38 | 65,838.00 | 241,901.89 |
| Liaising Directors | 45.5 | 46.5 | 3.9 | - | - | - | 95.9 | 614.97 | 58,878.00 | 156,743.00 |
| Treasury / Banks | 4.0 | 7.3 | - | 42.0 | 22.5 | 118.1 | 193.9 | 283.09 | 51,013.00 | 207,867.50 |
| Pensions | 45.6 | - | 1.7 | 46.5 | - | - | 101.8 | 469.03 | 47,747.50 | 128,236.50 |
| PR / Media | 0.5 | 25.3 | 5.0 | 13.0 | - | - | 49.8 | 486.67 | 24,251.00 | 52,266.00 |
| Briefing EMEA | - | - | - | 56.4 | - | - | 66.4 | 380.00 | 21,024.00 | 131,934.00 |
| Intra Group & Netting | 17.0 | 1.0 | - | - | - | - | 18.0 | 654.44 | 11,960.00 | 30,040.00 |
| Administration application and planning | | | | | | | | | | 172,241.40 |
| Stabilisation | | | | | | | | | | 147,931.00 |
| Retention of title | | | | | | | | | | 1,970.00 |
| **Grand Total** | 1,459.1 | 1,065.4 | 2,929.2 | 6,183.3 | 5,086.0 | 3,462.8 | 20,216.6 | 341.57 | 6,905,203.50 | 17,471,578.72 |
| | | | | | | | | | | |
| Average hourly rate | 694.24 | 593.83 | 456.85 | 341.47 | 246.32 | 165.76 | | | | |
| Time costs for the period | 1,012,961.50 | 650,482.50 | 1,338,217.00 | 2,111,400.00 | 1,252,778.00 | 538,363.50 | | | | |
| Time costs for the Administration to date | 2,692,063.04 | 1,432,612.34 | 4,284,238.54 | 5,018,217.37 | 2,841,208.48 | 1,102,038.84 | | | | |

Administration fee analysis (in GB£)

Summary of total core M&A transactions time costs for all EMEA filed entities from 1 June 2009 to 6 November 2009



| | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&A / Transitional Services | 22.5 | 111.1 | 2,042.2 | 1,950.5 | 1,333.5 | 449.5 | 5,849.3 | 428.41 | 2,505,925.00 | | 2,243,091.00 |
| M&A / Equinox | 555.4 | 1,186.0 | 662.1 | 559.8 | 611.2 | 156.8 | 3,681.3 | 517.28 | 1,904,203.00 | | 3,840,865.50 |
| M&A / Metas | 86.4 | 74.3 | 535.4 | 243.5 | 1,063.0 | 236.5 | 2,239.1 | 351.59 | 787,249.00 | | 983,939.00 |
| M&A Snow | 97.4 | 256.4 | 403.9 | 502.0 | 41.9 | 87.8 | 1,424.4 | 464.30 | 653,200.00 | | 782,210.59 |
| M&A / GSM | 321.5 | 128.2 | 215.2 | 7.0 | 467.3 | 10.0 | 1,147.2 | 446.06 | 511,716.00 | | 659,261.00 |
| Purchase Price Allocation(PPA) | 67.0 | 124.0 | 60.0 | 252.0 | 100.0 | 107.9 | 728.9 | 391.97 | 285,704.00 | | 265,704.08 |
| M&A / Carrier | 39.1 | 22.1 | 164.9 | 445.0 | 70.3 | 57.5 | 788.9 | 346.16 | 276,548.50 | | 325,086.53 |
| Other Assets | 43.1 | 21.6 | 13.0 | 97.5 | - | 41.0 | 216.2 | 372.14 | 80,456.50 | | 83,136.50 |
| M&A / Velocity | 5.0 | 6.5 | 11.2 | - | 19.8 | - | 42.5 | 517.81 | 22,007.00 | | 47,506.50 |
| Safe and M&A | - | - | - | - | - | - | - | - | - | | 756,985.50 |
| Grand Total | 1,237.4 | 1,957.2 | 4,116.9 | 3,947.3 | 3,716.0 | 1,147.0 | 16,151.6 | 436.22 | 7,037,009.00 | | 10,822,830.50 |
| Average hourly rate | 692.91 | 644.47 | 546.47 | 388.23 | 289.84 | 168.31 | | | | | |
| Time costs for the period | 857,406.50 | 1,287,611.00 | 2,250,122.50 | 1,453,551.50 | 1,011,951.50 | 194,284.00 | | | | | |
| Time costs for the Administration to date | 1,463,718.50 | 1,882,883.50 | 3,611,265.50 | 2,085,621.00 | 1,438,313.00 | 203,027.50 | | | | | |

Total time costs for the Administration from 1 June 2009 to 6 November 2009

| Time costs for the administration during the period of 06/09 to 06/11/09 | £ |
|---|---|
| Administration time costs excluding transactions | 6,905,203.50 |
| Provisional estimated core M&A transaction time costs (Note) | 3,287,718.64 |
| Total time costs for administration | 10,192,922.14 |

Note

Time costs in respect of transactions for the period 1 June 2009 to 9 November 2009 have been apportioned on a provisional basis, having regard to the nature of the work done and the extent of progress made in respect of some, but not all, core M&A transactions. The allocation is provisional and will change as the transactions progress and the outcome of the PPA is clear.

Please note the Joint Administrators have only apportioned core M&A transactions time costs in respect of those transactions that have made sufficient progress. Therefore further core M&A transactions time costs will be apportioned in due course to the Company, and reapportioned as the outcome of the PPA process becomes clear.

## Nortel Networks UK Limited (In Administration)

### Office Holders' Charging Policy for Fees

The statutory provisions relating to remuneration are set out in Rule 2.106 of the Rules. Further information is given in the Association of Business Recovery Professionals' publication "A Creditors' Guide to Administrators' Fees", a copy of which may be accessed from the web site of the Insolvency Practitioners Association at http://www.insolvency-practitioners.org.uk (follow 'Regulation and Guidance' then 'Creditors' Guides to Fees'), or is available in hard copy upon written request to the Administrators.

The creditors have determined that the Administrators' remuneration should be fixed on the basis of time properly spent by the Administrators and their staff in attending to matters arising in the Administration.

The Administrators have engaged managers and other staff to work on the cases. The work required is delegated to the most appropriate level of staff taking account of the nature of the work and the individual's experience. Additional assistance is provided by accounting and treasury executives dealing with the Company's bank accounts and statutory compliance diaries, secretaries providing typing and other support services and filing clerks. Work carried out by all staff is subject to the overall supervision of the Administrators.

All time spent by staff working directly on case-related matters is charged to a separate time code established for each case. Each member of staff has a specific hourly rate, which is subject to change over time. The average hourly rate for each category of staff over the period is shown in Appendix 2, as are the current hourly rates used. The current hourly rates may be higher than the average rates, if hourly rates have increased over the period covered by this report.

### Office Holders' Charging Policy for Disbursements

Statement of Insolvency Practice No. 9 ("SIP 9") published by R3 (The Association of Business Recovery Professionals) divides disbursements into two categories.

Category 1 disbursements comprise payments made by the office holders' firm, which comprise specific expenditure relating to the administration of the insolvent's affairs and referable to payment to an independent third party. These disbursements can be paid from the insolvent's assets without approval from the Committee. In line with SIP 9, it is our policy to disclose such disbursements drawn but not to seek approval for their payment.

Category 2 disbursements comprise payments made by the office holders' firm which include elements of shared or overhead costs. Such disbursements are subject to approval from Creditors' Committee as if they were remuneration. It is our policy, in line with SIP 9, to seek approval for this category of disbursement before they are drawn.

Rule 2.47                                                                                    Form 2.24B

The Insolvency Act 1986
**Administrator's progress report**

**2.24B**

| Name of Company | Company number |
|---|---|
| Nortel Networks UK Limited | 3937799 |

| In the | Court case number |
|---|---|
| High Court of Justice of England and Wales, Chancery Division, Companies Court | 536 of 2009 |

(a) Insert full name(s) and address(es) of administrator(s)

I / We (a) <u>AR Bloom, CJW Hill, SJ Harris and AM Hudson</u> _____
<u>Ernst & Young LLP, 1 More London Place, London, SE1 2AF</u>

administrator(s) of the above company attach a progress report for the period

| From | | to | |
|---|---|---|---|
| (b) | 14 July 2009 | (b) | 13 January 2010 |

(b) Insert date

Signed
Joint / Administrator(s)

Dated    12 February 2010 _____

---

**Contact Details:**

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record

| Chris Coley | |
|---|---|
| Ernst & Young LLP, 1 More London Place, London, SE1 2AF | |
| | Tel: 0121 535 2394 |
| DX Number: | DX Exchange: |

Companies House receipt date barcode

When you have completed and signed this form please send it to the Registrar of Companies at:
**Companies House, Crown Way, Cardiff, CF14 3UZ**        **DX 33050 Cardiff**

# TAB 9

Court File No.: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

THE HONOURABLE MR.                )        TUESDAY, THE 28th
                                  )
JUSTICE MORAWETZ                   )        DAY OF JULY, 2009

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### APPROVAL AND VESTING ORDER
(CDMA & LTE Business Sale Transaction)

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an order approving the sale transaction (the "Transaction") contemplated by an asset sale agreement dated as of July 24, 2009 (the "Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain of their affiliates, as vendors (the "Sellers"), and Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), in respect of the sale of certain assets relating to Nortel's CDMA business and LTE business and as appended to the Seventeenth Report of Ernst & Young Inc, in it capacity as court-appointed monitor (the "Monitor") dated July 27, 2009 (the "Seventeenth Report"), and vesting in the Purchaser the Applicants' right, title and interest in and to the Assets (as defined in the Sale Agreement), was heard this day at 393 University Avenue, Toronto, Ontario.

- 2 -

**ON READING** the Affidavit of George Riedel, sworn July 25, 2009 (the "Riedel Affidavit"), the Seventeenth Report and on hearing the submissions of counsel for the Applicants and for the Monitor and those other parties present, and from no one appearing for any other person on the service list, although properly served as appears from the affidavit of service of Jennifer Stam sworn July 28, 2009 and filed:

1.   **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Seventeenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.   **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

3.   **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved and that the execution of the Sale Agreement by NNC and NNL is hereby authorized and approved, and the Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents, including without limitation the Ancillary Agreements, as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Purchaser.

4.   **THIS COURT ORDERS** that in the event that the Transaction contemplated by the Sale Agreement cannot be consummated, the Alternate Bid (as defined in the Riedel Affidavit) be and is here by approved and the execution of the asset sale agreement pursuant to the Alternate Bid by the Applicants is approved and the Applicants and the Monitor shall be authorized and directed to take such additional steps and execute such additional documents, including without limitation the Ancillary Agreements, as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Alternative Bidder.

5.   **THIS COURT ORDERS AND DECLARES** that the Applicants are authorized and directed to perform their obligations under the Sale Agreement and each of the Ancillary Agreements.

6.    **THIS COURT ORDERS AND DECLARES** that the Intellectual Property License Agreement substantially in the form attached as Confidential Appendix D to the Seventeenth Report and the Trademark License Agreement substantially in the form attached as Appendix D to the Seventeenth Report (the "IP Licenses") are hereby authorized and approved and NNL is directed to comply with its obligations thereunder.

7.    **THIS COURT ORDERS AND DECLARES** that the Ancillary Agreements, including the IP Licenses, shall be binding on the Applicants that are party thereto, and shall not be repudiated, disclaimed or otherwise compromised in these proceedings, and that intellectual property subject to the IP Licenses shall not be sold, transferred, conveyed or assigned by any of the Applicants unless the buyer or assignee of such intellectual property assumes all of the obligations of NNL under the IP Licenses and executes an assumption agreement in favour of the Purchaser in a form satisfactory to the Purchaser.

8.    **THIS COURT ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Mr. Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system, excluding only Permitted Encumbrances and those Claims expressly assumed in writing by the Purchaser under the Sale Agreement. For greater certainty, this Court orders that all of the Claims affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

9.    **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Applicants' right, title and interest in and to the

- 4 -

Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims shall attach to the net proceeds from the sale of the Applicants' right, title and interest in and to the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Applicants' right, title and interest in and to the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

10.      **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

11.      **THIS COURT ORDERS** that, provided that the Purchaser is not in default (beyond any period given under the Occupancy Agreements (as defined below) to cure such default) in the payment and performance of its material obligations under each of the license agreement and the sub-lease (collectively, the "Occupancy Agreements") to be entered into between NNL and the Purchaser in respect of the Carling Property, the Charges (other than the Carling Facility Charges) will, in no event, adversely affect the rights of possession, use and occupation to be granted to the Purchaser pursuant to the Occupancy Agreements and that no steps shall be taken under, pursuant to or in connection with the Charges (other than the Carling Facility Charges) that adversely affect, diminish, interfere with or disturb such rights of possession, use and occupation. The Carling Facility Charges and the rights of enforcement thereunder shall be subject to a non-disturbance agreement between the Purchaser and NNI, in the form agreed by the Purchaser and NNI and filed with the Court. For the purposes of this paragraph 11, the terms Carling Property, Charges and Carling Facility Charges have the meanings given to them in the Initial Order granted on January 14, 2009, as subsequently amended and restated.

12.      **THIS COURT ORDERS** that, to the extent permitted by law, neither the Purchaser nor any relevant Designated Purchaser shall be a successor to any of the Applicants and neither the Purchaser nor any Designated Purchaser shall assume any liability of the Applicants, other than as expressly provided for in the Sale Agreement.

13.      **THIS COURT ORDERS** that in connection with the Stalking Horse Agreement and the Bidding Procedures (as both terms are defined in the Riedel Affidavit):

- 5 -

(a)     without limiting the relief granted in the Nokia Siemens Networks BV bidding procedures order of this Court granted on June 29, 2009, NNL is hereby authorized to pay 50% of the Bid Protections (as defined in the Bidding Procedures), it being acknowledged that Nortel Networks Inc. ("NNI") has agreed to pay the other 50% of the Bid Protections, if, as and when such Bid Protections become due and payable to Nokia Siemens Networks B.V. ("NSN") pursuant to and in accordance with the terms of the NSN Agreement and the Bidding Procedures Order;

(b)     in the event the Closing occurs, amounts paid to the Sellers in accordance with Section 2.3.2(b)(i) of the Sale Agreement shall be applied first to reimburse NNI and NNL for any amounts paid to NSN pursuant to clause (a) above and the remainder of such payment and all remaining Sale Proceeds (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) arising out of the Transaction shall be deposited into an escrow account pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g. of the IFA, and such Sale Proceeds shall not be distributed in advance of either (i) agreement by all of the Main Sellers as to the distribution of such Sale Proceeds (in accordance with Section 12.g. of the IFA) or (ii) in the case where the Main Sellers fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court;

(c)     in the event the Closing does not occur and the Sale Agreement is terminated as a result of the breach thereof by one or more of the Sellers, the payment of the Bid Protections as set out herein shall be without prejudice to any and all rights that may be asserted by such parties with respect to the allocation of the liability for payment of the Bid Protections; and

DOCSTOR: 1736641\5

- 6 -

(d)　　The Main Sellers agree that this agreement in respect of the Bid Protections (a) is being made only with respect to the initial allocation of the Bid Protections among the Main Sellers, and that nothing herein (i) shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of Sale Proceeds (other than reimbursement of the Bid Protections contemplated in clause (b) above) or (ii) shall be precedental for any other sale transaction that has occurred or may occur in the future.

14.　　**THIS COURT ORDERS** that, notwithstanding:

(a)　　the pendency of these proceedings;

(b)　　any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "BIA") in respect of the Applicants and any bankruptcy order issued pursuant to any such applications; and

(c)　　any assignment in bankruptcy made in respect of the Applicants;

each of (i) the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser pursuant to this Order, and (ii) IP Licenses shall be binding on any trustee-in-bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall they constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall they constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

15.　　**THIS COURT ORDERS AND DECLARES** that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

16.　　**THIS COURT ORDERS** that the confidential appendices to the Seventeenth Report be and are hereby sealed pending further Order of this Court.

17.　　**THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United

- 7 -

Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representatives status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

18.     **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

**JUL 2 8 2009**

**PER / PAR:**

**Schedule "A"**
**Form of Monitor's Certificate**

Court File No.:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE**
(CDMA & LTE Business Sale Transaction)

**RECITALS**

A.      Pursuant to an Order of the Honourable Mr. Justice Morawetz of the Ontario Superior

Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel

Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and certain of their

Canadian affiliates (collectively, the "Applicants") commenced proceedings pursuant to the

*Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc., was appointed as

monitor (the "Monitor") in those proceedings.

B.      Pursuant to an Order of the Court dated July 28, 2009, the Court approved an asset sale

agreement dated as of July 28, 2009 (the "Sale Agreement") among NNC, NNL and Nortel

Networks Inc. ("NNI") and certain of their affiliates, as vendors (the "Sellers"), and

Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), in respect of the sale of

certain assets relating to Nortel's CDMA business and LTE business and provided for the vesting

- 9 -

in the Purchaser of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming (i) the payment by the Purchaser of the Purchase Price for the Assets; (ii) that the conditions to closing as set out in Article ■ of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser; and (iii) the Applicants have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

C.      Unless otherwise indicated herein, terms with initial capital have the meanings set out in the Sale Agreement.

**THE MONITOR CERTIFIES** the following:

1.      NNC and NNL have advised the Monitor that the Purchaser has paid and the Applicants **[NTD: unless paid to an escrow agent]** have received the Purchase Price for the Assets payable on the Closing Date pursuant to the Sale Agreement;

2.      NNC and NNL have advised the Monitor that the conditions to Closing as set out in Article ■ of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser; and

3.      NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

**THIS CERTIFICATE** was delivered by the Monitor at _____ [time] on      _____
_____ [date].

**DATED** this      day of _____, 2009.

> **ERNST & YOUNG Inc., in its capacity as Monitor in the Applicants' CCAA proceedings and not in its personal capacity**
>
> Per:
> _____
> Name:
> Title:

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
(CDMA & LTE Business Sale Transaction)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

**TAB 10**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------X
                                            :
*In re*                                     :   Chapter 11
                                            :
Nortel Networks Inc., *et al.*,[1]          :   Case No. 09-10138 (KG)
                                            :
                        Debtors.            :   Jointly Administered
                                            :
                                            :   RE: D.I. 18, 54 + *983*
-------------------------------------------------------------X

## ORDER APPROVING STIPULATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET AL., AMENDING THE CROSS-BORDER COURT-TO-COURT PROTOCOL

Upon consideration of the stipulation dated June 26, 2009 (the "Stipulation")[2] attached

hereto as Exhibit A between Nortel Networks Inc. and its affiliated debtors, as debtors and

debtors in possession in the above-captioned cases (the "Debtors") and the Official Committee of

Unsecured Creditors (the "Committee") to amend the cross-border court-to-court protocol

approved by the Court in the Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border

Court-to-Court Protocol [D.I. 54], and good cause appearing for the approval thereof;

IT IS HEREBY ORDERED THAT:

1.      The Stipulation is APPROVED.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Stipulation.

2.     The Amended Protocol, as attached to the Stipulation as Exhibit 1, is approved in all respects, subject to approval of the same by the Canadian Court.

3.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: JUNE 29 , 2009
       Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X
                                    :
*In re*                             :    Chapter 11
                                    :
Nortel Networks Inc., *et al.*,[1]  :    Case No. 09-10138 (KG)
                                    :
                    Debtors.        :    Jointly Administered
                                    :
                                    :    RE: D.I. 18, 54
                                    :
-----------------------------------------------------------X

### STIPULATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE
### OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET AL.,
### AMENDING THE CROSS-BORDER COURT-TO-COURT PROTOCOL

This stipulation (the "Stipulation") is by and between Nortel Networks Inc. ("NNI") and

certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors") and the

Official Committee of Unsecured Creditors (the "Committee"). The parties hereby stipulate and

agree as follows.

### Background

1.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code

(the "Bankruptcy Code").

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

3.    Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

Proceedings"). The Canadian Debtors continue to manage their properties and operate their

businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed

Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the

"Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as

foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the

Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign

proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order

recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the

Bankruptcy Code. In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of

Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA

Debtors")[3] into administration under the control of individuals from Ernst & Young LLC

(collectively, the "Joint Administrators"). On May 28, 2009, at the request of the

Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered

---

[2]    The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A.,
Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel
Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks
B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel
Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

2

the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"),
which consist of liquidation proceedings during which NNSA will continue to operate as a going
concern for an initial period of three months. In accordance with the European Union's Council
Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain
the main proceedings in respect of NNSA. On June 8, 2009, Nortel Networks UK Limited
("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign
main proceedings under chapter 15 of the Bankruptcy Code. On June 26, 2009, the Court
entered an order recognizing the English Proceedings as foreign main proceedings under chapter
15 of the Bankruptcy Code.

   4.     On January 15, 2009, this Court entered an order of joint administration pursuant
to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that
provided for the joint administration of these cases and for consolidation for procedural purposes
only [D.I. 36].

   5.     On January 26, 2009, the Office of the United States Trustee for the District of
Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the
"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad
hoc group of bondholders holding claims against certain of the Debtors and certain of the
Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner
has been appointed in the Debtors' cases.

### The Cross-Border Court-to-Court Protocol

   6.     On January 14, 2009, the Debtors filed the Debtors' Motion for Entry of an Order
Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol [D.I. 18] (the
"Cross-Border Protocol Motion") for the purpose of establishing a cross-border court-to-court

3

protocol to govern the chapter 11 and Canadian Proceedings (the "First Day Protocol"). On January 15, 2009, the Court entered the Cross-Border Protocol Order [D.I. 54]. Likewise, on January 14, 2009, the Canadian Court issued an order (the "Initial Order") granting the Canadian Debtors various forms of relief, including approval of the First Day Protocol. Initial Order at ¶ 49.

7.      Since the Petition Date, the Court has, on six occasions, approved stipulations among the Debtors and the Committee extending the Committee's time to file a motion for reconsideration of the Cross-Border Protocol Order [D.I.s 318, 466, 549, 676, 799, 900] pursuant to Rule 9013-1(m) Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). During this time, the Debtors, the Canadian Debtors and the Committee have engaged in constructive, good faith discussions regarding the terms of the First Day Protocol and possible amendments thereto. The changes reflected in the amended cross-border court-to-court protocol (the "Amended Protocol"), attached hereto as Exhibit 1, are the result of those discussions.

8.      In addition to a variety of ministerial changes, the Amended Protocol provides greater clarity on a number of issues including the right to appear and be heard, mutual recognition of the stay of proceedings entered in the U.S. and Canadian Proceedings and the contemplation of a claims protocol. Most importantly, the Amended Protocol clarifies matters for which a joint hearing between the U.S. and Canadian Courts might be necessary and sets forth procedures for obtaining such joint hearings. A blackline reflecting all amendments from the First Day Protocol to the Amended Protocol is attached to the Stipulation as Exhibit 2.

9.      As the Court is aware, the Debtors have entered into the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "Agreement") with the Canadian Debtors

4

and the EMEA Debtors, excluding Nortel Networks S.A. A joint hearing between this Court and the Canadian Court has been scheduled for June 29, 2009 (to be continued on June 30, 2009 if necessary) regarding the funding of NNL by NNI and other related issues addressed by the Agreement. Obtaining court approval of the amendments to the cross-border protocol constitutes an express condition required for the Agreement to become effective. See Agreement at ¶ 13(a).

### Stipulation

NOW, THEREFORE, the Debtors and the Committee hereby stipulate and agree that the First Day Protocol shall be amended to incorporate the changes reflected in the Amended Protocol attached hereto as Exhibit 1 and that the Court should approve the Amended Protocol in all respects.

Dated: June 26, 2009
      Wilmington, Delaware

By: _____

James L. Bromley (*pro hac vice*)
Lisa Schweitzer (*pro hac vice*)
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000

    - and -

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200

*Counsel for the Debtors*
*and Debtors in Possession*

By: _____

Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Kenneth A. Davis (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000

    - and -

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700

*Counsel to the Committee*

5.

## **EXHIBIT 1**

**Amended Cross-Border Court-to-Court Protocol**

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

### A.    Background

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee

of bondholders (the "Bondholders Committee") has also been organized.

      3.    On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC,

NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S.

Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian

Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained

an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under

which, inter alia:  (a) the Canadian Debtors have been determined to be entitled to relief under

the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the

Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the

CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors

has been granted.

      4.    The Monitor filed petitions and obtained an order in the U.S. Court

granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian

Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign

proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of

the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian

Proceedings.

---

[2]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation,
Nortel Networks Global Corporation and Nortel Networks International Corporation.

5.    For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

**B.    Purpose and Goals**

6.    Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity. Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

    f.  implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

## C.  Comity and Independence of the Courts

    7.  The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

    8.  The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

9.      In accordance with the principles of comity and independence recognized

herein, nothing contained herein shall be construed to:

      a.      increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

      b.      require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

      c.      require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

      d.      require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law; .

      e.      authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

      f.      preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.    The Debtors, the Creditors Committee, the Estate Representatives and their

respective employees, members, agents and professionals shall respect and comply with the

independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the

CCAA, the Canadian Order and other applicable laws.

**D.    Cooperation**

11.    To assist in the efficient administration of the Insolvency Proceedings and

in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

6

estates, the Debtors and their respective Estate Representatives shall, where appropriate:  (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

   12. To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court.  In furtherance of the foregoing:

   a. The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

   b. Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

   c. The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

   d. The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings.  With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

(i)    A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)   Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)  Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)   If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)    The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)   The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8

13.     Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.     Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.     Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

a.    unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however,* that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

b.    upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

c.    if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

d.    if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.    **Recognition of Stays of Proceedings**

16.    The Canadian Court hereby recognizes the validity of the stay of proceedings and actions against the U.S. Debtors and their property under section 362 of the

11

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.    The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.    Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.    **Rights to Appear and Be Heard**

19.    The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

12

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.     In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

## G.     Claims Protocol

21.     The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

**H.    Retention and Compensation of Estate Representative and Professionals**

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.    The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order. In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.    Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including: (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States. The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

15

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.     Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.     Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court.

27.     Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court;
and (b) shall not be required to seek approval of their retention or compensation in the Canadian
Court or any other court.

## I.    Notice

28.    Notice of any motion, application or other Pleading or paper (collectively
the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating
to matters addressed by this Protocol and notice of any related hearings or other proceedings
shall be given by appropriate means (including, where circumstances warrant, by courier,
telecopier or other electronic forms of communication) to the following: (a) all creditors and
interested parties, in accordance with the practice of the jurisdiction where the papers are filed or
the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under
clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors
Committee; the Bondholders Committee and any other statutory committees appointed in the
Insolvency Proceedings and such other parties as may be designated by either of the Courts from
time to time. Notice in accordance with this paragraph shall be given by the party otherwise
responsible for effecting notice in the jurisdiction where the underlying papers are filed or the
proceedings are to occur. In addition to the foregoing, upon request, the U.S. Debtors or the
Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with
copies of any orders, decisions, opinions or similar papers issued by the other Court in the
Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to
be addressed before a Court, notices shall be provided in the manner and to the parties referred to
in paragraph 28 above.

17

**J.    Effectiveness; Modification**

30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing. Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.    Procedure for Resolving Disputes Under this Protocol**

32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above. In rendering a determination in any such dispute, the Court to which the issue is addressed: (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above. Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

        a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

        b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

18

    c.    copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

    d.    the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

    e.    for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

## L.    Preservation of Rights

34.    Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

19

**TAB 11**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*, **R.S.C.**
**1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION and**
**NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*, **R.S.C.**
**1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF DAVID M. LINDSEY**
**(sworn June 3, 2011)**

I, David M. Lindsey, of the City of New York, in the State of New York, MAKE OATH
AND SAY:

1.    I have been retained jointly by the U.S. Debtors and the Canadian Debtors in the above

referenced matter to provide my independent expert opinion on the matters set forth below, as

well as to respond to the Affidavit of Tai-Heng Cheng, dated May 31, 2011 (the "Cheng

Affidavit").

**I.  QUALIFICATIONS**

2.    I am a founding partner in the firm of Chaffetz Lindsey LLP ("Chaffetz Lindsey" or the

"Firm") in New York.  Chaffetz Lindsey opened in May 2009 and is a boutique law firm

specializing in international arbitration, commercial litigation, and reinsurance.

3.    I was admitted to the bar of the State of New York in 1999, and I was previously

admitted to the bars of the District of Columbia in 1998 and Florida in 1988.  I have been

practicing law for more than 22 years. I am a U.S. citizen and currently a resident of Manhattan in the City of New York. I am 49 years old.

4. Before establishing Chaffetz Lindsey, I was a partner at Clifford Chance LLP in New York from late 1999 until 2009. At Clifford Chance, I was head of the firm's International Arbitration Group for the Americas. I began my legal career at the Miami firm Steel Hector & Davis LLP in 1988 as an associate. I became a partner at Steel Hector in late 1994 and remained there until late 1999, when I joined Clifford Chance as a partner. In 1997, I opened the London office of Steel Hector and lived in London through 1998.

5. I have experience trying cases in both U.S. federal and state courts. However, for most of the last approximately 17 years, my practice has focused primarily on international arbitration and related international litigation matters involving a wide range of business disputes, with emphasis on the energy/power sector. This particular focus was led by the fact that Latin American markets, which until the 1990s generally refused to enforce agreements to arbitrate future disputes, began to amend their laws and allow arbitration as an accepted form of alternative dispute resolution. These events greatly increased the amount of international arbitration work in south Florida during that time. I increased my academic interest in the area while in London and eventually teamed up with a Freshfields partner to publish International Arbitration in Latin America, N. Blackaby, D. Lindsey, A. Spinillo, eds. (Kluwer 2002), the first such English language book of its kind.

6. Over this period I have acted as counsel in both institutional and *ad hoc* arbitrations under the rules of the ICDR, AAA, ICC, LCIA, SIAC, JCAA, NIA, ICSID and UNCITRAL, as well as under industry rules such as reinsurance arbitrations in the U.S. Some of these cases involved parallel litigation relating to the arbitral proceedings. I am well acquainted with New

- 3 -

York federal and state arbitration law, which has played a prominent part in my practice for more than a decade. I have also sat as arbitrator in institutional and *ad hoc* proceedings under the ICC, ICDR and UNCITRAL rules.

7.      The other side of my practice involves acting as counsel both for and against sovereigns in investment treaty arbitrations under the ICSID rules. I also have an active sovereign immunity practice acting as lead counsel for a South Asia sovereign's central bank in the Federal District Court for the Southern District of New York in a case involving the seizure of nearly $2 billion in assets.

8.      I have published articles in the field of international commercial arbitration and recently authored "The Law Applicable to International Arbitration in New York", which appears as chapter one in International Commercial Arbitration in New York, J. Carter and J. Fellas, eds. (Kluwer 2010). I am currently working on a book addressing recently adopted amendments to the rules of the major international arbitral institutions, scheduled to be published by the ABA in 2012.

9.      I am a member of the Federal District Court for the Southern District of New York and the U.S. Court of Appeals for the Second Circuit, both based in Manhattan. I am also a member of the Federal District Court for the Southern District of Florida and the United States Supreme Court. I am a member of the New York State Bar Association's International Arbitration Task Force and the New York State Bar Association's Task Force on the Use of New York Law in International Transactions. Until recently I was co-Chair of the Dispute Resolution Interest Group of the American Society of International Law. I am one of six original sponsors of the International Arbitration Club of New York, a group of about 75 New York area practitioners who specialize in international arbitration and meet every month to discuss the significant

- 4 -

arbitration topics of the day. I have been rated annually by my peers as a leader in the field of

international arbitration since 2001 as reported in publications such as Chambers Global,

Chambers USA, Chambers Latin America, Best Lawyers, Super Lawyers, Who's Who in

Commercial Arbitration, Who's Who in International Arbitration, and PLC's Which Lawyer?.

Global Arbitration Review rated me as one of the world's top 45 lawyers under 45, as voted by

its subscribers when that poll was first released. I am invited to speak at 6 to 8 conferences a

year on matters concerning international arbitration law in North and South America.

10.     My curriculum vitae is attached as Exhibit B to this affidavit.

### II.   QUESTIONS PRESENTED

11.     I have been asked to express my opinion on the following questions of U.S. federal

and/or New York state law:

> (A)   The standards applicable to finding an enforceable agreement to submit to
>        the jurisdiction of a court and for interpreting the scope of such an
>        agreement;
>
> (B)   The standards applicable for finding an enforceable agreement to arbitrate
>        and for determining whether it is appropriate to compel arbitration;
>
> (C)   The admissibility of extrinsic evidence to interpret a contractual provision
>        and the weight that should be accorded to such evidence;
>
> (D)   The factors relevant to determining whether a party has negotiated in good
>        faith.

12.     I have also been asked to comment on the opinion of Professor Cheng on the legal

questions he was asked to address. I understand that the typical role of an expert in Canadian

courts is to state legal principles, rather than to apply those legal principles to a particular set of

facts. In this affidavit, in addition to setting forth legal principles, I have provided my opinion of

how U.S. courts would apply these legal principles in interpreting the Interim Funding and

Settlement Agreement ("IFSA"), where it was necessary to do so in order to respond to Professor

Cheng's arguments.

13.    The materials I reviewed in preparing this opinion are listed in Exhibit A to this affidavit.

## III. PRINCIPLES OF INTERPRETATION APPLICABLE TO DETERMINE WHETHER AN ARBITRATION AGREEMENT EXISTS

14.    Any arbitration agreement arising out of a legal, commercial relationship falls under the

New York Convention ("Convention")[1] unless the relationship is entirely between citizens of the

U.S. and does not have some reasonable relation with a foreign state.[2] U.S. federal courts have

original jurisdiction over an action based on an arbitration agreement covered by the

Convention.[3] As a result, the FAA, chapter two of which codifies U.S. ratification of the

Convention, would govern a federal court's determination of whether an agreement to arbitrate

exists within the terms of the IFSA. In determining the existence of the agreement to arbitrate,

the federal courts most often simply apply the federal common law that has developed under the

FAA, which in turn has it origins in state contract law principles.[4]   Some courts rely more

---

[1]       The 1958 U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

[2]       Federal Arbitration Act, 9 U.S.C. § 202 ("FAA").

[3]       9 U.S.C. § 203.

[4]       *See, e.g., Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Intern., Inc.,* 198 F.3d 88, 96 (2d Cir. 1999) ("When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable."); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH,* 585 F.2d 39, 43 (3d Cir. 1978) ("the question of whether, in contracts involving commerce, there is an agreement to arbitrate an issue or dispute upon which suit has been brought is governed by federal law. Concomitantly, questions of interpretation and construction of such arbitration agreements are similarly to be determined by reference to federal law."); *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1211 (2d Cir. 1972) ("Once a dispute is covered by the [FAA], federal law applies to all questions of interpretation, construction, validity, revocability and enforceability"), *cert. denied,* 406 U.S. 949 (1972); *In re Coimex Trading (Suisse) S.A.,* No. 05 Civ. 2630 (LLS), 2005 WL 1216227, at *1 (S.D.N.Y. May 20, 2005) ("In this non-diverse action under the Federal Arbitration Act and [New York] Convention (9 U.S.C. §§ 2, 202), the determination whether there is an agreement to arbitrate depends on federal, not state, law."); *Borsack v.*

- 6 -

directly on state contract law in the first instance.[5] Rarely would the result change by applying

federal law or state law to the issue of the existence of the agreement to arbitrate.[6] In my

opinion, the result in the instant case would be the same no matter if federal law or New York

state law were applied. Therefore I discuss both sets of laws in the opinion.

A. Legal Principles On Which Professor Cheng and I Agree

15.    Professor Cheng and I agree on a number of basic legal principles of interpretation

applicable to the question of whether an enforceable agreement to arbitrate exists.

16.    For example, Professor Cheng and I agree that whether parties have agreed to arbitrate is

a basic question of contract law.[7] The starting point for any contract interpretation is the plain

language of the contract.[8] An agreement to arbitrate requires the parties to the agreement to

express an intent to resolve a dispute by arbitration.[9] The cornerstone of the inquiry, therefore, is

whether the parties' written agreement demonstrates an *intent* to arbitrate.

---

*Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 300 n.5 (S.D.N.Y. 1997) ("where jurisdiction is alleged under chapter 2 of the Federal Arbitration Act the issue of enforceability and validity of the arbitration clause is governed by federal law.").

[5]     *Perry v. Thomas*, 482 U.S., 483, 492 n.9 (1987) ("state-law principles" may be applied to claims asserted under Chapter 2 of the FAA provided they are rules generally applicable to contracts, not only to arbitration agreements).

[6]     Federal common law rules for formation of arbitration agreements "dovetail[] precisely with general principles of contract law." *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994).

[7]     FAA, 9 U.S.C. § 2, states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation for any contract." *See also, e.g., Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960) (under the FAA, "ordinary contract principles determine who is bound by such written provisions").

[8]     Cheng Aff. ¶ 19 ("Where the parties' intent is discernible from the plain meaning of the language of the contract, there is no need to look further.").

[9]     The United States Supreme Court states that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotations omitted); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001) ("[C]ourts must treat agreements to arbitrate like any other contract .... A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement."); *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) ("parties may not be forced into arbitration if that was not their true agreement."); GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION 640 (2009) ("The central issues arising with regard to the formation of international arbitration agreements concern the consent of the parties.").

17. Under both federal common law and New York state law, where the parties' intent can be

discerned from the four corners of the contract, courts will not look to evidence outside of the

contract to determine the meaning of any provision.[10] As Professor Cheng correctly notes,

extrinsic evidence of the parties' negotiations or their course of conduct is admissible only if the

contract language is ambiguous.[11] This is a threshold question, to be determined by the court.

B. Principal Areas Of Disagreement With Professor Cheng

18. While Professor Cheng and I agree on the legal principles discussed above as well as

others, my principal disagreement with Professor Cheng's affidavit lies with its underlying

assumption that an arbitration agreement indeed exists.

19. An important example of the confusion this assumption creates is the Cheng Affidavit's

incorrect application of the U.S. federal policy favoring the arbitration of disputes to the

threshold question of whether an agreement to arbitrate exists at all. Professor Cheng states:

> *In interpreting whether an agreement evinces an intention to arbitrate, New York law is consistent with the federal presumption in favor of arbitration enacted in the FAA.*[12]

20. This misstates the federal policy in favor of arbitration set forth in the FAA. The U.S.

Supreme Court has made clear that the federal policy in favor of arbitration only applies to the

interpretation of the *scope* of an arbitration clause, not its *existence*.[13] In other words, under

---

[10]   *See, e.g., 131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (N.Y. App. Div. 2d Dep't 2011). ("The court's role is limited to interpretation and enforcement of the terms agreed to by the parties, and the court may not rewrite the contract or impose additional terms which the parties failed to insert.") (applying New York law) (internal citations omitted); *Maniolos v. United States*, 741 F. Supp. 2d 555, 565 (S.D.N.Y. 2010) (holding that under both New York and federal common law, "[i]t is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence.").

[11]   Cheng Aff. ¶ 48.

[12]   Cheng Aff. ¶ 21.

[13]   *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("any doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration."). Professor Cheng quotes *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) in support of his assertion. Cheng

applicable U.S. law the question of whether an arbitration agreement exists in the first place is not entitled to any presumption in favor of arbitration – nor would such a presumption be appropriate. Basic contract law principles govern whether an arbitration agreement exists,[14] and the U.S. Supreme Court has repeatedly held that, at its core, arbitration is a creature of consent, and should not be foisted upon parties who have not agreed to arbitrate their disputes.[15] Not surprisingly, lower U.S. courts and commentators uniformly reject the application of the federal presumption in favor of arbitration to the determination of the existence of an arbitration agreement.[16]

21. While some U.S. courts have applied a lower threshold of required proof to arbitration agreements than applicable to other agreements, this certainly does not reflect the majority view, and I am not aware of the U.S. Court of Appeals for the Second Circuit, which sits in New York, having ever endorsed such an approach.

---

Aff. ¶ 21. However, even the passage he quotes clearly states that the federal presumption applies to the scope, as opposed to the existence, of an arbitration clause: "the federal policy in favor or arbitration [which] requires that any doubts concerning the *scope* of the arbitrable issues should be resolved in favor of arbitration. *Id.* (emphasis added).

[14]    Professor Cheng agrees that the question of whether an arbitration agreement exists is a basic matter of contract interpretation. Cheng Aff. ¶ 18.

[15]    *See, e.g., Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) ("the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion.") (internal quotation omitted); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit").

[16]    *See, e.g., Kirleis v. Dickie, McCamey and Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) ("It is well established that the Federal Arbitration Act (FAA) reflects a strong federal policy in favor of the resolution of disputes through arbitration. But this presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.") (internal quotations omitted); *Chevron U.S.A., Inc. v. Consolidated Edison Co. of New York, Inc.*, 872 F.2d 534, 537 (2d Cir. 1989) ("Application of the [FAA's pro-arbitration] presumption, however, is constrained by the fact that the source of any obligation to arbitrate is the contract between the parties: arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (internal quotation omitted); *see also* GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION 649 (2009) ("it is important under the FAA to distinguish between the standards of proof applicable to the *existence* of an agreement to arbitrate and those applicable to the question whether a particular dispute falls within the *scope* of an existing arbitration agreement.") (emphasis in original).

- 9 -

22.     At the other end of the spectrum, I am also aware of the practice among some courts,

including a long-held precedent in New York state courts applying New York state law, to

require "clear and unequivocal evidence" of an agreement to arbitrate.[17]  Thus, Professor

Cheng's assertion that "New York law is consistent with the federal presumption in favor of

arbitration" not only misconstrues the object of the federal presumption, but it also misstates

New York law.[18]  Notwithstanding Professor Cheng's statement to the contrary, New York state

courts have historically been skeptical of arbitration.  New York's highest court, the Court of

Appeals, provides that "a litigant ought not to be forced into arbitration and, thus, denied the

procedural and substantive rights otherwise available in a judicial forum, absent evidence of an

express intention to be so bound."[19]  Thus, New York state law, which Professor Cheng argues

applies in this case,[20] arguably sets a high standard of proof for establishing an intent to arbitrate.

23.     The better approach, however, is articulated by the U.S. Supreme Court, which instructs

that the FAA requires the same level of proof for the establishment of arbitration agreements as

for any other agreement.[21]  Lower courts follow this approach.[22]  Since the FAA is applicable to

---

[17]     *See, e.g., Matter of Doughboy Indus., Inc.*, 17 A.D.2d 216, 219 (N.Y. App. Div. 1st Dep't 1962) ("the threshold for clarity of agreement to arbitrate is greater than with respect to other contractual terms"); *Computer Assoc. Int'l, Inc. v. Com-Tech Assoc.*, 239 A.D.2d 379, 381 (N.Y. App. Div. 2d Dep't 1997) (requiring "clear indication of intent").

[18]     Cheng Aff. ¶ 21.

[19]     *Schubtex Inc. v. Allen Snyder, Inc.*, 49 N.Y.2d 1, 5-6 (1979)

[20]     Cheng Aff. ¶¶ 16, 17.

[21]     *See, e.g., EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002) ("The FAA directs courts to place arbitration agreements on equal footing with contracts...") (*quoting Volt Info. Sciences, Inc. v. Bd. of Trustees*, 489 U.S. 468, 478 (1989); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) (FAA's purpose "was to make arbitration agreements as enforceable as other contracts but not more so.").

[22]     *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135 (2d Cir. 2001) ("courts must treat agreements to arbitrate like any other contract .... A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement."); *see also Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 354 n.4 (5th Cir. 2003) ("the purpose of the FAA was to make arbitration agreements as enforceable as other contracts, not more so.").

the purported arbitration clause in this case, my analysis below adopts the Supreme Court's instruction.

## IV. DOES IFSA SECTION 12(B) REFLECT AN INTENT OF THE PARTIES TO RESOLVE DISPUTES BY ARBITRATION AND NOT BY OTHER MEANS?

### A. IFSA Section 16 Gives U.S. And Canadian Courts Jurisdiction Over Allocation Disputes

24. In my judgment, Section 16(b) represents the principal dispute resolution agreement of the IFSA. In that section, the parties agreed "to submit to the non-exclusive jurisdiction of the U.S. and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol . . .), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement . .

. .["23](#)" Section 16(b) further provides that the parties "agree[] that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in . . . a joint hearing of both the Canadian and U.S. Courts conducted under the Cross-Border Protocol . . . .").[24](#)

25. Section 16(b) is a broadly worded forum selection clause typical of international contracts entered into by sophisticated commercial parties. In my view, such a clause is enforceable under applicable U.S. law.[25](#) Forum selection clauses are typically construed quite broadly to encompass a wide range of disputes, in particular where they use general terms such as "any claim," "relating to" or "any relief whatsoever."[26](#)

---

23 IFSA, § 16(b)(i) (emphasis added).

24 IFSA, § 16(b)(ii) (emphasis added).

25 *See, e.g., Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1216, 1219 (3d Cir. 1991) (noting that forum selection clauses are prima facie valid and affirming the enforcement of the clause to give effect to the freely negotiated agreement); *Tradecomet.com. LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 377 (S.D.N.Y. 2010) (stating that the Second Circuit "regularly enforce[s]" forum selection clauses).

26 *See, e.g., Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468, 470-471 (D.N.J. 2007) (observing that the Third Circuit has found forum selection clauses governing claims "related to" or "concerning" the parties' agreement to be broadly worded).

26. Professor Cheng does not dispute that Section 16(b) is a "general jurisdiction provision"[27] conferring jurisdiction on the courts of Canada and the United States to hear disputes arising under the IFSA. He argues, however, that because to his mind Section 12(b) constitutes an agreement to arbitrate allocation disputes, Section 12(b) limits Section 16(b)'s agreement to the jurisdiction of Canadian and U.S. courts. Professor Cheng would read Section 16(b) to limit the jurisdiction of Canadian and U.S. courts to determining the validity of the arbitration agreement and to reviewing the arbitration award, at least as to allocation disputes.[28]

27. With respect, I do not find Professor Cheng's reading of Sections 12(b) and 16(b) to be persuasive. First, to ignore almost entirely the undisputedly broad scope of Section 16(b)'s text is not in keeping with applicable U.S. law of contract interpretation. Second, while I agree in principle with Professor Cheng that where a contract contains both general and more specific forum selection provisions, the more specific will prevail, Professor Cheng assumes that Section 12(b) constitutes an enforceable arbitration agreement, and therefore represents a specific provision that supersedes the more general Section 16(b). I disagree with this assumption. As I explain below, the better reading of Section 12 is that it does not contain an arbitration agreement, but merely an "agreement to negotiate in good faith and attempt to reach" a protocol for the resolution of allocation disputes. If no agreement to arbitrate exists, then Professor Cheng's principle of contract interpretation is inapplicable, and there is no reason why Section 16(b) should not be read to mean what it says: that all disputes related to the IFSA, including disputes on allocation, shall be referred to the courts. Read together with Section 12, it is clear that Section 16(b) provides a "fallback" provision for the resolution of allocation disputes in the

---

27      Cheng Aff. ¶ 34.

28      Cheng Aff. ¶ 34.

event that the parties fail to reach agreement on some other procedure for resolving their allocation disputes.

28.     Further, I understand that the parties agreed to submit to the exclusive jurisdiction of the U.S. and Canadian courts for disputes relating to the funds placed in escrow accounts in each of eight separate escrow agreements entered into after the IFSA.[29] This history is consistent with the broadly-worded text of Section 16(b). The presence of forum selection clauses in the escrow agreements and IFSA Section 16(b) demonstrates that parties to the IFSA possessed both the skill and foresight to draft a well-crafted forum selection clause. To my mind, the contrast between these fully-drafted forum selection clauses and Section 12(b), which does not even contain the word "arbitration," makes it less likely that the parties intended Section 12(b) to serve as a binding arbitration clause between the parties.

     B.     Section 12(b) Cannot Properly Be Interpreted As An Arbitration Agreement

29.     Professor Cheng's reading of IFSA Section 16(b), as well as many of the other conclusions reached in his opinion, is based entirely on the notion that Section 12(b) is a written agreement evincing the parties' intent to submit disputes regarding allocation to binding arbitration. Professor Cheng finds this written agreement in the following language of Section 12(b):

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the protocol applicable to the Sale Proceeds.[30]

---

[29]     *See* MEN Escrow Agreement, dated as of March 19, 2010, ¶ 21; Escrow Agreement, dated as of Nov. 11, 2009, ¶ 21; Escrow Agreement, dated as of Dec. 1, 2009; Escrow Agreement, dated as of Dec. 18, 2009, ¶ 21; Escrow Agreement, dated as of March 31, 2010, ¶ 21; Escrow Agreement, dated as of May 27, 2010, ¶ 20; Escrow Agreement, dated as of June 3, 2010, ¶ 20; Escrow Agreement, dated as of Mar. 11, 2011, ¶ 20.

[30]     *See* IFSA §12(b); Cheng Aff. ¶¶ 25-28.

30. As stated above, any interpretation of Section 12(b) must begin with its plain language. There is simply nothing in the plain language of Section 12(b) that would demonstrate to a court that the parties intended that their disputes be referred to arbitration. Neither the FAA nor New York law permits courts to read words into a contract that are not there.[31] While it is true, generally speaking, that an intention to arbitrate may be found even in the absence of the term "arbitration" or its derivatives, courts will not find an agreement to arbitrate in the absence of some clear indicia of their intention to arbitrate. Here, I see no such indicia.

31. Section 12(b) is quite obviously devoid of the features typically found in enforceable arbitration agreements. Section 12 says nothing about the "seat" of the arbitration (an important choice in any international arbitration, but particularly so in a multi-jurisdictional dispute such as this one), the number of arbitrators, the method for appointing arbitrators, the language or governing law of the arbitration, or the procedural rules that would govern the arbitration.

32. Professor Cheng dismisses the absence of these important elements from the purported arbitration clause. Although he concedes that Section 12(b) does not adopt the wording typically found in model arbitration clauses, he attributes this to the fact that Section 12(b) is intended to be an "*ad hoc*" arbitration agreement. He describes an *ad hoc* arbitration agreement as one "where the parties agree to binding resolution of their disagreements, but do not set forth the procedure for such arbitration in the arbitration agreement."[32] With respect, this is not the commonly understood definition of *ad hoc* arbitration, and Section 12 of the IFSA resembles no

---

[31] *See, e.g., 131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (N.Y. App. Div. 2d Dep't 2011). ("The court's role is limited to interpretation and enforcement of the terms agreed to by the parties, and the court may not rewrite the contract or impose additional terms which the parties failed to insert.") (applying New York law) (internal citations omitted); *Lui v Park Ridge at Terryville Ass'n., Inc.*, 196 A.D.2d 579, 581 (N.Y. App. Div. 2d Dep't 1993) ("A court should not, under the guise of contract interpretation, 'imply a term which the parties themselves failed to insert' or otherwise rewrite the contract.") (quoting *Mitchell v Mitchell*, 82 A.D.2d 849 (N.Y. App. Div. 2d Dep't 1981)).

[32] Cheng Aff. ¶ 30.

*ad hoc* arbitration agreement that I have ever seen. Rather, an *ad hoc* arbitration is one in which

the parties agree to arbitrate their disputes but choose not to have the arbitration administered by

a particular arbitral institution (such as, for example, the International Chamber of Commerce,

the AAA, or the London Court of International Arbitration).[33] In other words, parties who wish

to refer their disputes to arbitration but do not wish to have their arbitration administered by an

arbitral institution may choose to do so, but this does not mean that U.S. law permits their *intent*

to arbitrate in the first place to be any less clear.[34]

33. In my view, the absence of the features commonly found in enforceable arbitration

agreements cannot be interpreted as a submission to *ad hoc* arbitration, but is instead further

indication that the parties did not reach any agreement to arbitrate allocation disputes. As

Section 12(c) of the IFSA makes clear, the parties left the decision of how allocation disputes

would be resolved to be negotiated at a later date. Section 12(c) clearly states that the parties

"shall . . . negotiate in good faith and attempt to reach agreement on a timely basis on a protocol

---

[33]     For example, one leading treatise on international commercial arbitration defines *ad hoc* arbitrations as those "not conducted under the auspices or supervision of an arbitral institution. Instead, parties simply agree to arbitrate, without designating any institution to administer their arbitration." GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION 149 (2009).

[34]     Some might argue that parties choosing *ad hoc* arbitration would be wise to be even more detailed and explicit in their arbitration clause, because the absence of key features cannot be assumed to have meant to refer to the standard procedures of a particular arbitral institution. For example, the UNCITRAL Arbitration Rules, which are commonly selected by parties who do not wish to arbitrate under the auspices of any particular arbitration, recommend the following "Model Arbitration Clause" for parties who wish to enter into *ad hoc* arbitration using the UNCITRAL Rules:

> Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules.

The UNCITRAL Rules further recommend that the "Parties should consider adding: (a) The appointing authority shall be ... [name of institution or person]; (b) The number of arbitrators shall be ... [one or three]; (c) The place of arbitration shall be ... [town and country]; (d) The language to be used in the arbitral proceedings shall be . . . . "

*See* 2010 UNCITRAL Arbitration Rules, Annex, *available at*
http://www.uncitral.org/pdf/english/texts/arbitration/arb-rules-revised/arb-rules-revised-2010-e.pdf.  Similarly, the IBA Guidelines for Drafting Model Arbitration Clauses include a quite detailed "model" arbitration clause for parties choosing ad hoc arbitration. *See* IBA Guidelines for Drafting Model Arbitration Clauses, ¶ 13, *available at*
http://www.ibanet.org/Publications/publications_IBA_guides_and_free_materials.aspx#drafting.

for resolving disputes concerning the allocation of Sale Proceeds . . . ."[35]  Section 12(b),

particularly when read together with Section 12(c), unambiguously establishes that Section 12

does not contain an agreement to arbitrate, but merely an agreement to negotiate in good faith on

a procedure for resolving allocation disputes.

34.     Professor Cheng relies solely on IFSA Section 12(b) as constituting the parties'

agreement to arbitrate;[36] he does not suggest that any other part of Section 12, including Section

12(c), makes up the arbitration agreement.  Yet of the provisions in Section 12, it is Section 12(c)

that addresses dispute resolution,[37] not Section 12(b).  Professor Cheng argues that the parties'

decision in Section 12(c) to leave the issue of dispute resolution procedures for another day

cannot trump Section 12(b)'s referral of disputes to arbitration.[38]  Here again Professor Cheng

assumes that the parties already chose arbitration in Section 12(b), and left only the arbitration

*procedures* to a later day.  Employing this reasoning, he urges the court to fashion its own

procedures for an *ad hoc* arbitration proceeding and to impose those procedures on the parties.[39]

35.     But Professor Cheng's interpretation of Section 12(b) and 12(c) is entirely inconsistent

with the plain language and the obvious intent of those provisions.  Section 12(b) is not a dispute

resolution clause at all, but a provision addressing the maintenance of the sale proceeds in an

escrow account *until* agreement on allocation can be reached, either through agreement of the

parties or by the relevant "dispute resolver(s)."  It is Section 12(c) that addresses the resolution

of allocation disputes, and unambiguously requires that the parties negotiate in good faith on a

---

[35]     IFSA § 12(c) (emphasis added).

[36]     Cheng Aff. ¶¶ 25, 29.

[37]     *See* IFSA § 12(c) (obligating the parties to "negotiate in good faith and attempt to reach agreement on a
timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale
Transactions.").

[38]     Cheng Aff. ¶ 45.

[39]     Cheng Aff. ¶ 46.

- 16 -

"protocol for resolving disputes."[40] Thus, far from expanding on any agreement on resolving

disputes already found in Section 12(b), Section 12(c) itself addresses the formation of a protocol

on resolving allocation disputes – and makes clear that no such protocol has been reached.

### C. The Language Relied Upon By Professor Cheng Does Not Demonstrate An Intent To Arbitrate

#### 1.    *Section 12(b)'s Use of the Term "Dispute Resolver(s)"*

36.    Professor Cheng relies primarily on a few words found in Sections 12(b) and 12(c) of the

IFSA as providing sufficient indicia of the parties' intention to arbitrate. First, Professor Cheng

says that the term "dispute resolver(s)" in Section 12(b) can only mean an arbitrator, and that the

use of this term "evinces a clear intention" to have "disputes adjudicated by an alternative form

of dispute resolution rather than through the judicial system."[41]

37.    I respectfully disagree. The term "dispute resolver" does not have any special meaning in

international commercial usage, and I note that Professor Cheng does not provide any support for

the proposition that it does. To the contrary, the term "dispute resolver" is a broad, general term

that is consistent with an intent to ensure the parties' freedom to agree at a later date on a method

for resolving disputes that incorporates any one of a number of different types of decision-

makers. For example, the "dispute resolver" might have been a judge in a particular judicial

system, a sole arbitrator or panel of arbitrators, or even a private party with expertise in

allocation matters, such as, for example, a major accounting firm. I do not believe the broad

term dispute resolver can properly be read to evince an intention to submit to arbitration or to

exclude the possibility of referral of disputes to the judicial system.

#### 2. *Section 12(c)'s Reference To "Binding Procedures"*

---

[40]    IFSA § 12(c).

[41]    Cheng Aff. ¶ 28.

.

38.    The other "indicia" of an intent to arbitrate relied on by Professor Cheng is found in

Section 12(c)'s reference to the formation of "binding procedures" for the allocation of sales

proceeds. Professor Cheng argues that, because it is not possible to "bind" a court to a particular

procedure, the parties must have intended to submit their allocation disputes to arbitration, and

not to a court.[42]

39.    As an initial matter, I disagree with the premise that the parties in a court case are not at

liberty to devise binding procedures to govern the resolution of allocation disputes that will be

binding as between them, subject to the approval of the court. Professor Cheng concedes that

parties may seek a court's permission to vary the court's procedures.[43] And in fact, here, any

decision on procedures for resolving allocation disputes was ultimately subject to the approval of

the court. The U.S. Bankruptcy Court's Order approving the IFSA states that no protocol on the

allocation of proceeds can become effective without the prior approval of the court.[44] The

court's clear expectation that it will monitor the allocation process and approve the procedures

for resolving allocation disputes suggests that such disputes might just as well have been referred

to the courts instead of to arbitration.

40.    Second, this is a cross-border insolvency proceeding, in which the procedures for

resolving disputes will necessarily be unique and will require the agreement of various parties

across various jurisdictions. The term "binding procedures" can be construed to encompass any

agreement of the parties in this cross-border proceeding for resolving disputes -- including, for

example, the type of procedure decided upon in Section 16(b), which contemplates a joint

hearing of the courts in the United States and Canada for any claims that would affect debtors in

---

[42]    Cheng Aff. ¶ 31.

[43]    Cheng Aff. ¶ 31.

[44]    *In re Nortel Networks, Inc.*, No. 09-10138 (KG), at ¶ 8 (Bankr. D. Del. June 29, 2009) (order (A)
approving the interim funding and settlement agreement, (B) granting related relief).

- 18 -

more than one jurisdiction. This agreement in Section 16(b) — which of course has nothing to do with arbitration whatsoever — is just such an example of a unique, "binding" procedure already established by the parties for the resolution of disputes.

41.     Stated simply, I do not believe that the reference to binding procedures in Section 12(c) can be interpreted to signify an intent to exclude any possibility of the parties' agreeing to submit disputes to the judicial system. Nor do I believe that the term "dispute resolver(s)" can reasonably be interpreted to require arbitration and exclude the possibility of resort to the courts. In sum, there is simply not sufficient indicia nor any plain language in either Section 12(b) or 12(c) that evinces the parties' intent to arbitrate.

       D.     It Is Inappropriate To Consider Extrinsic Evidence To Vary The Interpretation Of IFSA Section 12

42.     Although Professor Cheng states that he does not believe that Section 12(b) of the IFSA is ambiguous, he was nonetheless asked to opine on what evidence would be relevant to resolve any ambiguity in Section 12(b). His conclusion, after reviewing certain extrinsic evidence, is that if Section 12(b) is found to be ambiguous, the extrinsic evidence "confirms that the parties intended to submit any disputes regarding the distribution of the Sales Proceeds to binding arbitration."[45]

43.     The legal principles applicable to extrinsic evidence are quite straightforward. Under both New York and federal common law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[46] "The best evidence of what parties to a written agreement intend is what they say in their writing,"[47] and therefore, where the parties' intent can be discerned from the four corners of the contract,

---

[45]     Cheng Aff. ¶ 54.

[46]     *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).

[47]     *Id.* (citing *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992) (citations omitted).

courts will not look to evidence outside of the contract to determine the meaning of any provision.[48] Not only is there no "need" to look further, "if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."[49] Importantly, extrinsic evidence, including subjective intent and alternative interpretations, cannot be used to create an ambiguity in a written agreement where none otherwise exists.[50]

44.     It is a matter of law whether contract terms are clear or ambiguous.[51] As discussed above, I believe that a court can discern the true meaning of Section 12 from the four corners of the contract, which unambiguously confirms that the parties did not enter into a binding, enforceable arbitration agreement, and therefore it would be unnecessary for the court to consider extrinsic evidence to vary the interpretation of this Section. I have not considered the extrinsic evidence identified by Professor Cheng and do not offer any opinion of it.

## V. PRINCIPLES APPLICABLE TO AN AGREEMENT TO NEGOTIATE IN GOOD FAITH UNDER NEW YORK LAW

45.     Professor Cheng and I are in agreement that Section 12(c) is properly interpreted as an agreement to negotiate in good faith.[52] Professor Cheng opines that he does not believe, for various reasons, that the U.S. and Canadian Debtors met their obligation to negotiate a protocol for resolving disputes in good faith. As Professor Cheng recognizes, the question of whether a

---

[48]     *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (N.Y. App. Div. 2d Dep't 2011); *Maniolos v. United States*, 741 F. Supp. 2d 555, 565 (S.D.N.Y. 2010).

[49]     *Greenfield*, 98 N.Y.2d at 569-70 (emphasis added).

[50]     *See, e.g., W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.") (internal quotation and citation omitted); *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 306 n.10. (S.D.N.Y. 2010).

[51]     *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).

[52]     Cheng Aff. ¶ 55.

party met its obligation to negotiate in good faith is necessarily a fact-based inquiry, which I do not purport to opine on here.[53] However, I will comment briefly on New York law principles governing an agreement to negotiate in good faith.

46. Under New York law, "[o]rdinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract."[54] As noted in the cases cited by Professor Cheng, "[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."[55]

47. An agreement to negotiate in good faith does not require that a party finalize a contract or reach any agreement at all. In the event no final agreement is reached, "the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing."[56]

48. I take issue with Professor Cheng's interpretation of Section 12(c) to impose a obligation on the parties "to agree to a protocol setting forth procedures for an *ad hoc* arbitration."[57] Section 12(c) says nothing of the sort. Under New York law, an agreement to negotiate in good faith "is a mere promise to agree, which is insufficiently definite to be enforceable."[58] Such an agreement does not require that the parties reach any particular outcome or even that they are successful in reaching an agreement at all.[59] Rather, the parties were bound by the plain

---

[53] Cheng Aff. ¶ 56.

[54] *Rappaport v. Buske*, No. 98 CIV. 5255 (BSJ), 2000 WL 1224828 (S.D.N.Y. Aug. 29, 2000).

[55] *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987).

[56] *Adjustrite Sys., Inc. v. GAB Bus. Services, Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).

[57] Cheng Aff. ¶ 45.

[58] *McGee & Gelman v. Park View Equities, Inc.*, 187 A.D.2d 1012, 1013, (N.Y. App. Div. 4th Dep't 1992) (internal citations omitted).

[59] *Adjustrite Sys., Inc. v. GAB Bus. Services, Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).

- 21 -

language of Section 12(c) simply to negotiate in good faith "*to attempt*" to reach agreement on a procedure for resolving allocation disputes. There is nothing in the language of Section 12(c) that would suggest that the only appropriate outcome of a good faith negotiation would be to agree on *ad hoc* arbitration to resolve their allocation disputes.

49.    The cases cited by Professor Cheng illustrate the rare circumstances under which a New York court will find that a party violated its obligation to negotiate in good faith.[60] To my knowledge, no New York court has found that a failure to negotiate the terms of an arbitration agreement constituted a breach of an obligation to negotiate in good faith.

---

[60]    *See CanWest Global Communications Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549 (N.Y. Sup. Ct. 2005) (finding that the party that breached its duty to negotiate in good faith insisted on terms that were in direct conflict with those contained in the prior agreement); *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987) (finding breach of implied duty under concededly binding preliminary agreement to negotiate formal closing documents in good faith); *Milex Products, Inc. v. Alra Laboratories, Inc.*, 603 N.E.2d 1226 (Ill. App. Ct. 1992) (applying Illinois law) (finding that a party breached its duty to negotiate in good faith by attempting to force the other party to accept terms that were not economically feasible).

## VI. CONCLUSION

50.     As a matter of U.S. law, the forum selection clause found in Section 16(b) of the IFSA should be enforced. In my view, Section 16(b) would be interpreted broadly to include allocation disputes in circumstances such as those here, where the parties have not reached an agreement on a protocol for resolving allocation disputes.

51.     As a matter of U.S. federal or New York state law, an agreement to arbitrate exists only where the parties have entered into a written agreement evincing their intent to arbitrate. I disagree with Professor Cheng's view that Section 12(b) of the IFSA is an enforceable agreement to arbitrate. I do not believe that IFSA Section 12 evinces the intent of the parties to arbitrate their allocation disputes.

52.     Under both New York and federal common law, where a contract is unambiguous, extrinsic evidence is inadmissible. It is my view that as a matter of New York and federal common law, IFSA Section 12 unambiguously provides an agreement to negotiate, not an agreement to arbitrate, and therefore extrinsic evidence should not be considered.

53.     Under New York law, the obligation to negotiate in good faith does not require a party to reach any particular agreement, or to reach any agreement at all. I disagree with Professor Cheng's view that the IFSA requires the parties to negotiate an agreement on *ad hoc* arbitration.

SWORN before me at the City of New
York in the State of New York, this 3rd
day of June 2011.

A Commissioner for taking affidavits.

**ANDREW SCHLESINGER**
**Notary Public, State of New York**
**No. 01SC6212271**
**Qualified in New York County**
**Commission Expires 10/13/2013**

David M. Lindsey

This is **EXHIBIT "A"** referred to in the
Affidavit of David M. Lindsey sworn
this 3rd day of June, 2011.

A commissioner for taking affidavits

ANDREW SCHLESINGER
Notary Public, State of New York
No. 01SC6212271
Qualified in New York County
Commission Expires 10/13/2013

## MATERIALS REVIEWED

1.  Interim Funding and Settlement Agreement ("IFSA"), dated June 9, 2009

2.  Order Approving the IFSA and Granting Related Relief, dated June 29, 2009

3.  Selected documents filed in *Re Nortel Networks Corporation, et. al., Court File No. 09-CL-7950*:

    - Joint Motion For The Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, And For Related Relief, dated April 25, 2011
    - Notice of Motion of the Canadian Debtors For Approval Of An Allocation Protocol, dated May 31, 2011
    - Notice of Cross-Motion, dated May 31, 2011
    - Affidavit of Tai-Heng Cheng, dated May 31, 2011

4.  Selected documents filed in *In re Nortel Networks Inc., et al,* Case No. 09-10138 (KG), U.S. Bankr. Ct. Del.:

    - Joint Motion, and Memorandum Of Law In Support Of The Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, and For Related Relief, dated April 25, 2011
    - Joint Administrators' Objection and Cross-Motion, and Memorandum of Law in Support of Their (I) Objection to Joint Motion For Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, And (II) Cross-Motion to Compel Arbitration, dated May 19, 2011
    - Reply Memorandum of U.S. Debtors And Committee In Further Support of Joint Motion For Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, and For Related Relief, And In Response To The EMEA Debtors' Cross-Motion To Compel Arbitration, dated June 2, 2011

5.  Escrow Agreements:

    - CDMA Escrow Agreement, dated November 11, 2009
    - New Gen Packet Core-Seville Purchase Price Escrow Agreement, dated December 1, 2009
    - Full Equinox Distribution Escrow Agreement, dated December 18, 2009
    - GSM Distribution Escrow Agreement, dated March 31, 2010
    - CVAS Full Distribution Escrow Agreement, dated May 27, 2010
    - MEN Distribution Escrow Agreement, dated March 19, 2010
    - GSM Retained Contracts Distribution Escrow Agreement, dated June 3, 2010
    - MSS Distribution Escrow Agreement, dated March 11, 2011

This is **EXHIBIT "B"** referred to in the
Affidavit of David M. Lindsey sworn
this 3rd day of June, 2011.

A commissioner for taking affidavits

ANDREW SCHLESINGER
Notary Public, State of New York
No. 01SC6212271
Qualified in New York County
Commission Expires 10/13/2013

# CHAFFETZ LINDSEY LLP

DAVID M. LINDSEY I PARTNER

DIRECT: (212) 257-6966 | david.lindsey@chaffetzlindsey.com

## DAVID M. LINDSEY

**CONTACT INFO:**

David M. Lindsey
Partner
CHAFFETZ LINDSEY LLP
1350 Avenue of the Americas
Suite 800
New York, New York 10019
Tel +1.212.257.6966
Fax +1.212.257.6950
Cell +1.917.443.4790
david.lindsey@chaffetzlindsey.com
www.chaffetzlindsey.com

David Lindsey is a founding partner of Chaffetz Lindsey LLP, a boutique international arbitration and commercial litigation firm in midtown Manhattan providing the highest quality work on the most complex disputes. His 22-year career has focused on cross-border disputes tried before international arbitration tribunals and U.S. courts. He has acted as counsel, arbitrator, and expert witness. His experience includes power/energy projects, public international law, sovereign immunity, reinsurance, intellectual property, franchise/distribution agreements, license agreements, joint ventures, post-merger (M&A) disputes, breach of contract, and various other types of commercial disputes in the Americas, the Far East, South Asia, the Middle East, and Europe.

### Peer Ratings, Publications, and Association Memberships

David's clients and peers have consistently rated him as one of the global leaders in the field of international arbitration. He was voted by readers of *Global Arbitration Review* as one of the world's top 45 international arbitration counsel under the age of 45. David regularly speaks at arbitration conferences and is listed annually by *Chambers Global*, *Chambers USA*, *Chambers Latin America*, *The Best Lawyers in America*, *Super Lawyers*, *The International Who's Who of Business Lawyers*, *The International Who's Who of Commercial Arbitration*, *Benchmark, The Definitive Guide to America's Leading Litigation Firms and Attorneys*, and *Practical Law Company's "Which Lawyer?"*.

David has published numerous articles on international arbitration. In 2010, he co-authored chapter one on applicable law in the context of enforcing agreements to arbitrate in New York in a leading text, *International Arbitration in New York* (Kluwer 2010), James Carter and John Fellas, eds. He is co-author and co-editor of Blackaby, Lindsey, and Spinillo on *International Arbitration in Latin America* (Kluwer 2002) (2nd edition anticipated 2013). He is currently working on a new book

6/2011

on the recently adopted amendments to the arbitration rules of various arbitral institutions, due to be published by the ABA in 2012.

David was recently the co-chair of the Dispute Resolution Interest Group of the American Society of International Law. He is a member of the International Commercial Disputes Committee of the New York City Bar, the International Arbitration Task Force of the New York State Bar Association, and the New York Law in International Transactions Task Force of the NYSBA. He is also a member of the American Bar Association's International Law Committee, the International Bar Association's Committee D on international arbitration, the Institute for Transnational Arbitration's Advisory Board, the London Court of International Arbitration, the New York International Arbitration Club, the London International Arbitration Club, and the Swiss Arbitration Association.

**Legal Employment and Law Firm Partnerships**

David has been a partner at Chaffetz Lindsey since it was founded in May 2009. He was a partner at Clifford Chance in New York from December 1999 to May 2009, where he led the Americas International Arbitration Group. Before becoming a partner at Clifford Chance, David was a partner at the leading Miami law firm Steel Hector & Davis from December 1994 until December 1999. David was based in London for several years in the late 1990s, where he opened Steel Hector's London office. In 1994-95, he was seconded for six months to Burges Salmon in Bristol, Wragge & Co. in Birmingham, and Norton Rose in London. He was an associate at Steel Hector & Davis from 1988 until he became a partner in late 1994.

**Education and Licenses to Practice Law**

David obtained his BA from the University of Texas at Austin with honors in 1985 and his JD from the Florida State University College of Law with honors in 1988.

He is licensed to practice law in Florida (1988), the District of Columbia (1998) and New York (1999).

**Personal**

David is a U.S. citizen.  He was born in Tallahassee, Florida in 1962.

**Examples of Recent Experience**
- representing the central bank of a Middle East sovereign in U.S. federal district court regarding the court's order freezing nearly $2 billion of the bank's securities in a New York account, addressing application of the Foreign Sovereign Immunities Act and OFAC regulations
- representing a European investor in the Venezuelan insurance sector in an ICSID arbitration against the Republic of Venezuela alleging expropriation of more than $200 million in assets
- representing a Swiss pharmaceutical company in a more than $1.3 billion claim against a U.S. pharmaceutical company over the breach of a license agreement
- representing a US power company against an instrumentality of an Indian State Government in an *ad hoc* arbitration seated in India where approximately $400 million damages were claimed
- representing a major European engineering company in an ICC arbitration against its former joint venture partner in a dispute arising out of environmental contamination and claims for indemnity, fraud, misrepresentation, breach of a joint venture agreement, and breach of fiduciary duty, with approximately $70 million at stake
- representing a multinational energy company in a SIAC arbitration in Singapore concerning claims for breach of representations/warranties and fraud arising out of the acquisition of a power plant in Asia and associated parallel litigation
- representing a Jordanian company against its Florida-based joint venture partner in US federal court proceedings in a dispute regarding the delivery of jet fuel to US armed forces in Iraq, and possible related litigation in Jordan and Israel
- representing a Syrian auto dealer in an arbitration in Tokyo against a Japanese manufacturer in a distributorship dispute
- representing a North American energy company in an arbitration seated in Texas regarding rights to an oil and gas concession in Brunei

- representing minority owners in a joint venture dispute regarding a multi-billion dollar concession agreement in Kurdistan

- representing a European energy company in an ICDR arbitration concerning a tax-related dispute arising from an LNG project in the Caribbean

- representing a Brazilian oil and gas company in a post-M&A dispute with an Argentine seller of an oil company

- advising a power company in resolving various arbitrations and litigation proceedings against the Brazilian electricity regulator and other Brazilian government entities as part of restructuring the power company's Brazil operations, involving hundreds of millions of dollars invested in Brazil's power sector

- representing a licensor of luxury goods in an action filed by licensee in federal district court in Manhattan

- representing a power company in an ICSID arbitration against Argentina alleging breaches of the US-Argentina BIT, claiming several hundred million dollars in damages

- representing the Liberian government in an ICSID arbitration brought by foreign investors in the mining sector

- advising a multinational energy company on complex BIT claims and parallel breach of contract claims concerning interference with investments in Kazakhstan, with more than $1 billion at stake

- representing an Italian energy company in Section 1782 proceedings arising from an ICC arbitration in Paris against a Central American state-owned company

- enforcing in US federal courts an arbitration award obtained by a Russian client against a US party in a dispute concerning uranium, with more than $2 billion at stake

- representing a German engineering company in an ICC arbitration concerning a Mexican oil refinery

- advising a Brazilian construction company in the drafting of a fast-track arbitration procedure and in subsequent arbitration proceedings relating to the construction of a power plant

- representing a US company in ICC and AAA arbitrations against Indian and US entities regarding alleged breaches of pharmaceutical marketing agreements

- recently acting as sole arbitrator and as co-arbitrator in arbitral proceedings in New York and Miami under the ICC, the AAA/ICDR, and UNCITRAL rules regarding transactions involving parties from the Far East, the Middle East, Europe, and Latin America

**FORM 53**

*Courts of Justice Act*

ACKNOWLEDGMENT OF EXPERT'S DUTY

*(General heading)*

ACKNOWLEDGMENT OF EXPERT'S DUTY

1. My name is **David M. Lindsey** *(name)*. I live at **New York** *(city)*, in the **State** *(province/state)* of **New York** *(name of province/state)*.

2. I have been engaged by or on behalf of **Canadian Debtors and U.S. Debtors** *(name of party/parties)* to provide evidence in relation to the above-noted court proceeding.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   (a) to provide opinion evidence that is fair, objective and non-partisan;

   (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and

   (c) to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date **June 3, 2011**

_____
Signature

NOTE: This form must be attached to any report signed by the expert and provided for the purposes of subrule 53.03(1) or (2) of the *Rules of Civil Procedure*.

RCP-E 53 (November 1, 2008)

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**SUPPLEMENTARY MOTION RECORD**
(Allocation Protocol Motion,
Returnable June 7, 2011)

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2  Canada

Tony DeMarinis (LSUC #: 29451Q)
Scott Bomhof (LSUC #: 37006F)
Sheila Block (LSUC #: 14089N)
Andrew Gray (LSUC #: 46626N)

Email:  tdemarinis@torys.com
        sbomhof@torys.com
        sblock@torys.com
        agray@torys.com

Tel:   416.865.0040
Fax:   416.865.8730

Lawyers for Nortel Networks Inc. and the other U.S.
Debtors