Court File No. 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (Commercial List)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED.

---

## FACTUM OF THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK LIMITED AND THE COMPANIES LISTED IN SCHEDULE "A" HERETO
### (Motion and Cross-Motion to be heard June 7, 2011)

---

June 3, 2011

**Davies Ward Phillips & Vineberg LLP**
44th Floor, 1 First Canadian Place
Toronto, ON  M5X 1B1

Matthew Gottlieb (LSUC #32268B)
Robin B. Schwill (LSUC #38452I)
Sean Campbell (LSUC #49514J)
Tel:    416.863.0900
Fax:   416.863.0871

Lawyers for the Joint Administrators of Nortel Networks UK Limited (In Administration)

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED.

**FACTUM OF THE JOINT ADMINISTRATORS OF**
**NORTEL NETWORKS UK LIMITED**

**PART I ~ OVERVIEW**

1.        The main issue on these motions is whether an arbitration panel or the Courts of the U.S. and Canada should decide disputes relating to the allocation of the proceeds of sales of assets (the "Sales Proceeds") by various Nortel entities (the "Nortel Entities") where:

(a)      the parties entered into an agreement which provides that all disputes regarding Sales Proceeds will be determined by a dispute resolver(s) – clearly not the courts;

- 2 -

(b)    a majority of the Nortel Entities that sold assets and are entitled to Sales
Proceeds are companies incorporated and located outside of North
America; and

(c)    a significant portion of the assets sold were located outside of North
America when sold.

2.        At all times up to the day Nortel Network Inc. and the other U.S. Debtors
(the "U.S. Debtors") filed their Motion, the parties to the Interim Funding and Settlement
Agreement dated June 9, 2009 (the "IFSA") recognized and agreed that allocation of
the Nortel Sale Proceeds would be decided in a private, cross-jurisdictional arbitration
and not by any national court.  The terms of the IFSA make this absolutely clear.

3.        Indeed, statements made by the U.S. Debtors and the U.S. Court, among
others, during these proceedings confirm that it was well understood that the IFSA
requires that disputes regarding the allocation of Sales Proceeds are to be determined
not by the courts, but by an arbitration panel.  For example, in referring to the IFSA
Sales Proceeds dispute resolution scheme, the U.S. Court stated:

> The purpose of the protocol ... is to ensure a fair allocation to be
> determined (absent a consensual agreement) in a single cross-
> jurisdictional forum ... The Nortel debtors in Canada, the U.S. and the
> U.K. have agreed that these issues must be resolved on a global
> basis, in a single cross-jurisdictional forum.

4.        Also, Mr. Bromley, counsel to the U.S. Debtors, explained to the U.S.
Court that the IFSA Sales Proceeds dispute resolution scheme:

> would require very little participation or intervention or bother by these
> two courts.  The view being once we have a fair and reasonable and

> independent body deciding the allocation, that we would simply come
> to both of the of these courts for confirmation…

5.        A transnational arbitration is the only practical way in which a fair and efficient allocation of the Nortel Sales Proceeds can occur.  The parties themselves recognized the unfairness and insurmountable practical difficulties with having the allocation decided by any national court(s) and therefore agreed in the IFSA to submit the issue to arbitration.  As such, the IFSA's arbitration clause must be enforced and should be interpreted in light of the circumstances of the parties' agreement.

6.        The context of the creation of the IFSA is important and telling.  The parties to the IFSA are various Nortel debtors located around the world that recognized that the best way to preserve the value of Nortel's global assets was to ensure that they were sold quickly.  The parties also realized that deciding the proper allocation of the Sales Proceeds among the various Nortel debtors would be a complex and time consuming exercise.  In order to expedite the sales process, the parties struck an agreement embodied in the IFSA:  the parties would give up their intellectual property and other ownership rights in the assets to be sold in return for an agreement that, failing an agreement by the parties, the allocation of the Sales Proceeds would be decided in an arbitral forum that did not prejudice any of the parties by forcing any one of them to submit to the jurisdiction of a foreign court.  As said, the parties' clear agreement to this effect is enshrined in the IFSA.

7.        The IFSA also requires parties to agree a protocol to specify the method for appointing the "dispute resolvers" as well as the procedures to be followed in the arbitration.

8.          The asset sales were predicated on the basis that allocation would be decided by way of arbitration.  The escrow agreements governing the proceeds of asset sales reflect the obligations imposed on the parties by the IFSA, including that such proceeds will not be distributed without the agreement of the parties or, failing such agreement, until the allocation of proceeds is decided in an arbitration.

9.          Moreover, the U.S., Canadian, English and French courts approved of the parties entering into the IFSA on the basis that allocation would be decided by way of arbitration.

10.          Most importantly, the EMEA Debtors (and other Nortel entities outside of Canada and the U.S.) would never have agreed to give up their respective rights in businesses and assets if they believed that under the terms of the IFSA the Ontario and/or Delaware Court could decide the proper allocation of proceeds from the sale of assets, many of which have no connection to North America.  In fact, the contrary is true.  The EMEA Debtors agreed to sell their assets precisely because they had the protection of the IFSA provisions that placed the allocation decision outside the jurisdiction of any national court or courts.

11.          The position taken by the U.S. and Canadian Debtors is unfair.  Having obtained the EMEA Debtors' consent to sell their assets and interests on the strength of the agreement to arbitrate Sales Proceeds disputes, the two parties seek to resile from the agreement to arbitrate now that the sales have been completed.

12.          The U.S. and Canadian Debtors' position on their motions is contrary to the underlying agreements, basic principles of fairness, and the understandings and

expectations of Nortel stakeholders around the world.  The U.S. and Canadian Debtors have taken the position that, because the parties have not yet reached an agreement on the procedures to be followed in an allocation arbitration under the terms of the IFSA, the Ontario and Delaware Courts should supplant the arbitration process entirely and decide the issue themselves by rendering a decision regarding the proper allocation of the Sales Proceeds.  This position flies in the face of the parties' agreement to arbitrate, is wrong as a matter of law, denies the foreign parties to these proceedings the rights under the IFSA that they bargained for and is fundamentally unfair and procedurally impractical.

13.       Moreover, the reason the protocol has not been finalized is because the U.S. and Canadian Debtors have not complied with their obligations to negotiate in good faith regarding its terms.  Instead, the Canadian Debtors have insisted that the protocol contain terms that would limit the arguments that the parties would be allowed to raise in the arbitration regarding the allocation of Sales Proceeds.  It is interesting to note that they have not even attempted to include the same provisions in the protocol they seek before this Court.  In fact, their proposed protocol provides the opposite (*i.e.*, that there is no limit on the arguments any party can raise).  Further, the U.S. and Canadian Debtors have refused to continue to negotiate or even discuss the protocol. They have taken the position that, notwithstanding the terms of the IFSA and the clear understanding expressed by all parties over a two year period, they now find arbitration inappropriate.  They have given no explanation for this sudden change in position.

14.       In these circumstances, the proper role of the Ontario and Delaware courts in their supervisory role in relation to the Canadian and U.S. Debtors respectively

is to require those parties to negotiate in good faith regarding the protocol or require them to appoint an arbitration panel that will have the power to set a procedure for such an arbitration.

15.     The U.S. and Canadian Debtors' motions should be dismissed for at least the following reasons:

(a)     first, the arbitration provision in the IFSA must be respected and enforced. Under the IFSA, the parties (many outside of North America) agreed to give up significant rights in businesses and assets, many of which were located outside of North America, to enable the sale of Nortel's global assets to be completed without delay.   The arbitration provision was inserted to provide protection to each of the many Nortel entities around the world by ensuring that they would have input into the allocation protocol and the appointment of dispute resolvers.  The parties agreement to arbitrate the allocation of Sales Proceeds is clear on the face of the IFSA.   But if any ambiguity exists about whether the parties intended arbitration, such ambiguity is easily resolved by looking at the negotiating history, the surrounding circumstances, the various Courts' understanding of how the allocation was to be determined, the parties' public statements, and the positions taken in the negotiations towards a protocol for resolving allocation disputes (the "Interim Sales Protocol" or the "Protocol");

(b)     second, neither the Ontario nor the Delaware Court has the jurisdiction to determine how the proceeds of the sales of the global Nortel assets and

businesses should be divided among the estates of the 28 Nortel debtors located around the world. Simply, the courts have no statutory or inherent power over proceeds derived from the sale by parties outside of North America with respect to assets outside of the U.S. and Canada, nor do they have the jurisdiction to decide the entitlement to such proceeds of entities outside of these jurisdictions. Nothing in any of the parties' agreements can be construed as a consent to such jurisdiction. Nor is there any contractual, statutory or other basis that would authorize the courts to hold joint hearings leading to a single decision about allocation, as originally requested by the Canadian and U.S. Debtors. The procedure under the revised protocol, which admits that the courts cannot issue a joint decision, would be utterly impractical, vulnerable to a deadlock between the courts, and subject to parallel challenges through two separate and different appeal processes;

(c)     third, and in the alternative, the Ontario Court has the jurisdiction under the CCAA to order the Canadian Debtors to submit to an arbitration under a panel of arbitrators. The overriding principle that should guide the exercise of the Court's jurisdiction is ensuring that stakeholders are dealt with fairly. In this case, the most expeditious and just way to resolve the Sales Proceeds allocation is by way of a cross-jurisdictional arbitration; and

(d)     fourth, the parties to the IFSA made an enforceable promise to negotiate a protocol for the arbitration procedures in good faith. There has been no

*bona fide* failure of those negotiations. The parties had substantially agreed on the bulk of the terms contained in a 27-page document that set forth detailed procedures for an arbitration before a three-member panel composed of neutral arbitrators chosen by the U.S., Canada and EMEA, respectively. As referred to above, the only major dispute concerned a late effort by the Canadian Debtors to preclude the EMEA Debtors from presenting all relevant issues to the arbitrators. The Canadian Debtors' effort to limit the scope of the considerations that could be raised in the negotiation is contrary to the plain terms of the IFSA and contravenes their obligation to negotiate in good faith.

## PART II ~ FACTS

### A.    The Joint Administrators of the EMEA Debtors

16.        The Joint Administrators of the EMEA Debtors are the court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators") for Nortel Network UK Limited ("NNUK") and certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors") located in the region known as the EMEA (Europe, Middle East and Africa) in proceedings under the Insolvency Act 1986, pending before the High Court of Justice of England and Wales.[1]

---

[1]     The EMEA Debtors are: Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z. o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

## B.    The IFSA

17.        In the Spring of 2009, the U.S., Canadian and EMEA Debtors[2] were working to address two issues.  First, they were in negotiations to settle certain inter-company debts and related transfers of cash needed by the Canadian Debtors. Second, they were preparing for the first sale of a global Nortel business (the "Enterprise Sale").  Because of the geographic spread of this business, the Enterprise Sale could only be consummated if all of the relevant Nortel debtors were prepared to convey their assets, intellectual property and other ownership rights (and transfer their employees) to a purchaser in one transaction, for one purchase price.  Accordingly, the parties needed to determine how that purchase price would be divided among the various estates.[3]

18.        Initially the U.S., Canadian and EMEA Debtors engaged in negotiations with respect to the actual percentages that each of them should receive from the Enterprise Sale proceeds, expecting that they could reach agreement on this before the sale went forward.[4]  As of late April 2009, they had made substantial progress in these negotiations.   However, there was a concern that the negotiations would not be completed in time for the sale. In addition, the parties recognized that it would be sensible to have a format for addressing the allocation issue in relation to all of the other pending asset sales, so that there would be no delay in consummating those

---

[2]    The Canadian Debtors include Nortel Networks Corporation, Nortel Networks Limited and certain of their Canadian affiliates.  The EMEA Debtors, the U.S. Debtors and the Canadian Debtors shall be collectively referred to herein as "Nortel" or the "Nortel Group".

[3]    Declaration of Kevin Francis Lloyd, sworn May 19, 2011 ("Lloyd Declaration"), at para. 12.

transactions, and in order to maximize the proceeds available for distribution to creditors.[5]

19.        As a result, the parties agreed to a basic template for determining how proceeds should be allocated for all of the future sales.[6] First, the debtors who had an interest in a given asset sale would attempt to negotiate and reach agreement on how the Sale Proceeds should be divided.[7] Second, if these negotiations failed, the parties would submit the question of allocation for determination by an independent dispute resolver in a private dispute resolution process (*i.e.*, an arbitration).[8]

## C.    The IFSA's Agreement to Arbitrate

20.        The parties' agreement with respect to how allocation would  be handled was ultimately incorporated in the IFSA.[9]  In order to properly construe the IFSA arbitration clause, one must understand how the arbitration provision relates to the provisions in the IFSA regarding asset sales.

21.        The provisions relevant to asset sales are contained in Sections 11 and 12 of the IFSA.  Under Sections 11 and 12, the debtors agreed that they would transfer their assets and give up significant ownership rights by terminating their intellectual property licenses and executing all other documents necessary to consummate the

---

[4]        Lloyd Declaration, at para. 13.

[5]        Lloyd Declaration, at paras. 14-18.

[6]        Lloyd Declaration, at para. 18.

[7]        Lloyd Declaration, at para. 19.

[8]        Lloyd Declaration, at para. 20.

asset sales, even if they had not yet reached a final agreement as to how the proceeds of a particular sale would be allocated.[10]

22.        The IFSA provides at Section 12(a) that:

> [each Debtor's] execution of definitive documentation with a purchaser...of, or closing of any sale of, material assets...shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.[11]

23.        Section 12(a) is linked to Section 11 of the IFSA, which requires that certain parties also agree to enter into appropriate license termination agreements in relation to certain transactions whether or not they were actually a selling debtor transferring assets to a purchaser.  In exchange for entering into these agreements, these parties would be entitled to claim any interest or right in the intellectual property that was being sold through the allocation process in Section 12 of the IFSA (and the ownership rights the parties' had in respect of intellectual property were specifically reserved for this purpose in Section 11(b) of the IFSA). Indeed, in consideration for signing these licence termination agreements, the relevant entity was deemed, under Section 11(d) of the IFSA, a Selling Debtor under Section 12 of the IFSA.

24.        Sections 11 and 12(a) of the IFSA reflect the parties' intention that one of the primary purposes of the IFSA was to ensure that the various global sales were able

---

[9]    Lloyd Declaration, at para. 21.

[10]    IFSA, at paras. 11, 12(a); Lloyd Declaration, at para. 24.

[11]    Lloyd Declaration, at para. 23, Ex. p. 21.

to continue without being hindered by discussions among the various Nortel Entities located around the world in respect of the allocation of Sale Proceeds. The parties recognised that an inability to reach prior agreement on the allocation of Sale Proceeds could well delay the various global sales, thereby reducing the value of the businesses to be sold, or indeed could make it impossible to consummate the sales. An agreement to place the Sale Proceeds into an escrow account allowed the various global sales to continue and for the allocation of Sale Proceeds to be addressed at a later point.[12]

25.      In return for Nortel Entities from around the world transferring their assets or otherwise giving up their very considerable rights in order to facilitate expeditious sales, the parties received the protections afforded by Section 12(b) of the IFSA.   In Section 12(b), the parties agreed that the Proceeds from the asset sales would be placed in escrow and would only be disbursed following either (i) an agreement of the parties regarding how the proceeds should be divided; or (ii) failing agreement, a binding determination by "dispute resolver(s)".[13]  Section 12(b) of the IFSA reads:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol applicable to the Sale Proceeds.

---

[12]     Lloyd Declaration, at para. 25.

[13]     IFSA, at para. 12(b).

26.         Under Section 12(c) of the IFSA, the parties agreed to negotiate in good

faith to agree on a "protocol for resolving disputes concerning the allocation of asset

Sale Proceeds" (*i.e.*, the Interim Sales Protocol).[14]  Section 12(c) of the IFSA reads:

> [T]he Debtors shall, as soon as reasonably practicable, following the
> execution of this Agreement, negotiate in good faith and attempt to
> reach agreement on a timely basis on a protocol for resolving disputes
> concerning the allocation of Sale Proceeds from Sale Transactions
> (the "Interim Sales Protocol"), which Protocol shall provide binding
> procedures for the allocation of Sales Proceeds where the Selling
> Debtors in such transactions have been unable to reach agreement
> regarding such allocation.

27.         It almost goes without saying that the parties would not and could not

devise a "protocol for resolving disputes concerning the allocation of asset Sale

Proceeds" if the "dispute resolver" the parties had in mind included the court.  Courts, of

course, have their own rules and procedures for resolving disputes that cannot be

supplanted by "binding procedures" agreed to by the parties.

28.         The IFSA was intended to facilitate the global sale of international

businesses by ensuring that the Sales Proceeds would be distributed pursuant to a

cross-jurisdictional process so that no single court or insolvency regime could determine

the rights of the many foreign debtors in a multi-national insolvency.[15]

29.         The evidence of the EMEA Debtors is unequivocal and unchallenged that,

without the IFSA arbitration provision, the representatives of each selling debtor would

never have agreed to allow asset sales to proceed without a binding agreement

---

14      IFSA, at para. 12(c).

15      Lloyd Declaration, at para. 27.

regarding what percentage of the proceeds the selling debtor would receive from each sale.[16] The parties recognized that, without the IFSA, there would have been no forum that would have had the jurisdiction to make a binding determination as to the relative interests of each debtor, nor to order any recalcitrant debtors to surrender their rights in order to facilitate a global sale. It was only by agreement of the parties, in the exercise of their duties to their creditors, and under the supervision of their respective courts, that a unified dispute resolution procedure could be implemented. In light of the competing national interests, it was a necessary ingredient of that dispute resolution procedure that it would be conducted in an independent forum rather than in the courts of any of the individual nations concerned.[17]

### D.    The Terms of the Asset Sales Reflected the Parties' Agreement to Arbitrate

30.         The terms of the asset sales by the Nortel Entities, including sales by the EMEA Debtors, reflected the parties' agreement to determine the allocation of sales proceeds by way of arbitration. As noted above, the EMEA Debtors would not have sold their businesses or assets but for the protections afforded by Section 12 of the IFSA. The EMEA Debtors entered into separate but cross-conditional (to those of the Canadian and U.S. Debtors) purchase and sale agreements and, in other cases, signed "Appropriate Licence Termination Agreements" in relation to intellectual property (under Section 11 of the IFSA) in consideration for the right to assert their interest in the Sale Proceeds or the intellectual property in an arbitral forum. The first such assets sold

---

[16]     Lloyd Declaration, at para. 25.

[17]     Lloyd Declaration, at para. 27.

were certain assets relating to the CDMA and LTE Access businesses. The CDMA and LTE Access Assets Business was sold pursuant to a stalking horse process to Telefonaktiebolaget LM Ericsson (PUBL) ("Ericsson") by way of an asset and share sale agreement dated July 24, 2009, and amended October 30, 2009, for $1.13 billion (the "CDMA Sale").[18]

31.         Further to Section 12(b) of the IFSA, the sale proceeds from the CDMA Sale were to be placed into an escrow account until distribution. The parties started negotiating the escrow agreement around October 2009 (the "CDMA Escrow Agreement").[19]

32.         During the negotiations of the CDMA Escrow Agreement, the parties expressly considered, and decided against, adopting recourse to the courts to determine allocation. The first draft of the CDMA Escrow Agreement, circulated by Cleary Gottlieb, on October 22, 2009,[20] provided for the release of funds from the escrow account in two circumstances: "(i) a letter of direction executed by the Depositors ... and Creditor Representatives or (ii) a final decision of a court of competent jurisdiction" (Clause 5).[21]

---

[18]     Lloyd Declaration, at para. 62.

[19]     Lloyd Declaration, at para. 64.

[20]     Lloyd Declaration, at para. 65, Ex. pp. 1028-1048.

[21]     Lloyd Declaration, at para. 66, Ex. p. 1033.

33.          Shortly afterwards, Kevin Lloyd of Herbert Smith LLP emailed the parties[22]
pointing out that Clause 5 "does not reflect the agreed terms for distribution of the
proceeds from the escrow monies in IFSA – no reference is made to the decision of a
dispute resolver and instead distribution is allowed by an order of the US/Canadian
courts ... the [Escrow Agreement] must obviously reflect the IFSA terms".  An amended
draft of the CDMA Escrow Agreement was attached to the email that was consistent
with Clause 12 of the IFSA.

34.          Following circulation of the first draft of the CDMA Escrow Agreement, the
parties had further discussions in respect of the allocation of sale proceeds from the
CDMA Sale.  On November 3, 2009, Cleary Gottlieb proposed that 50% of the sale
proceeds of the CDMA Sale be made available for the US estate and the Canadian
estate by court order with the remaining 50% to be released by (a) joint instruction by
the parties, or (b) by agreed mechanism of the protocol outlined by Herbert Smith LLP
on October 30, 2009.  In response, Herbert Smith emailed Cleary Gottlieb[23] explaining
that, while the Joint Administrators may be prepared to accommodate the proposal
under certain conditions, "it is for the dispute resolver(s) appointed under the [IFSA] to
determine final allocation of all sale proceeds".

35.          In the end, the parties executed the CDMA Escrow Agreement on
November 11, 2009.  The CDMA Escrow Agreement mirrored the parties agreement in
the IFSA that, failing the parties' agreement, allocation of the proceeds of the CDMA

---

[22]      Lloyd Declaration, at para. 68, Ex. p. 1049.

sale would be decided by way of a binding arbitration.  Section 5 of the CDMA Escrow Agreement provides for the release of funds from the escrow account.  Section 5 states that funds may be disbursed "pursuant to (i) a letter of direction jointly executed by the Depositors...or (ii) where the Depositors have entered into the Allocation Protocol in accordance with Section 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding allocation of sales proceeds (a 'Decision')".[24] (emphasis added)

36.        Following the CDMA Sale, the EMEA Debtors completed a number of sales that were accompanied by escrow agreements incorporating materially the same terms as the CDMA Escrow Agreement.[25]

37.        The EMEA Debtors are not the only Nortel Entities outside Canada and the U.S. that sold assets on the basis that the division of Sales Proceeds would be determined by way of international arbitration.  Nortel Switzerland, Nortel Norway and Nortel South Africa were party to several asset sales, have an entitlement to Sales

---

[23]     Lloyd Declaration, at p. 29, para. 68, Ex. pp. 1070-1072.

[24]     Lloyd Declaration, Ex. p. 1079.

[25]     Lloyd Declaration, at paras. 62-76.

Proceeds and agreed to such sales on the basis that the proceeds of those sales would be allocated by way of international arbitration.

**E.      The Courts Approved the IFSA on the Basis of the Agreement to Arbitrate**

38.          The Courts of the U.S., Canada, the U.K. and France all approved the terms of the IFSA on the basis that allocation disputes would be determined by one or more arbitrators as envisaged by the parties to the IFSA, and not by a national court or courts.

39.          Following execution of the IFSA the parties sought the approval of their respective national courts to enter into the IFSA.[26]  Section 13 of the IFSA provides that no provision of the IFSA shall be effective until each of the U.S., Canadian and U.K. Courts approve of the relevant party entering into the IFSA.

40.          As a result of Section 13, the U.S., Canadian and English Courts each considered the IFSA prior to the parties entering into the agreement. Subsequently, the French Court considered the IFSA when deciding whether the French office holders should consent to the Joint Administrators (as office holders in the main proceedings) acceding to the IFSA on behalf of the French Nortel entity, Nortel Networks SA ("NNSA").

---

[26]      At this point, NNSA was not yet a party to the IFSA but later acceded.

(i)    **U.S. Court Approval of the IFSA**

41.         By Motion dated June 9, 2009,[27] the U.S. Debtors sought the approval of the Delaware Court to enter into the IFSA.  The Delaware Court heard the Motion on June 29, 2009.[28]

42.         The transcript of that motion records that Mr. Bromley, counsel for the U.S. Debtors, explained to the Court that the parties had entered into the IFSA, and that the IFSA "envisions a process by which proceeds relating to asset sales will be divvied up".  Mr. Bromley continued:

> That protocol, where we have distributed drafts of that and are in the process of discussing, is envisioned to be something that would require very little participation or intervention or bother by these two courts. The view being that once we have a **fair and reasonable and independent body** deciding the allocation, that we would simply come to both of these courts for confirmation that those amounts are appropriate, and that due process would be available to all parties who are interested in the allocation of those resources.[29]   (emphasis added)

The only role for the Court envisioned by the U.S. Debtors, as expressed by Mr. Bromley, was to confirm the arbitral award that would be issued by an "independent body".

43.         Following the U.S. Debtors' submissions, the Delaware Court referred to the merit in having the allocation decided by way of the sort of arbitration envisioned by the U.S. Debtors' counsel stating that it would be "very difficult for [the Delaware Court]

---

[27]    Lloyd Declaration, Ex. pp. 179-243.

[28]    Lloyd Declaration, Ex. pp. 244-497.

[29]    Lloyd Declaration, Ex. p. 277 (lines 9-10).

to have arrived at an allocation process as fair as [the] parties have here in [the IFSA]".[30]

44.         On June 29, 2009, on the basis of, among other things, the oral submissions set out above, the Delaware Court approved the terms of the IFSA and authorised the U.S. Debtors to enter into the IFSA.[31]

45.         Other statements made by the Delaware Court in this proceeding make it clear that the Delaware Court has interpreted the IFSA as an agreement by the parties to determine allocation by way of arbitration.   In relation to an application to stay proceedings, brought by the U.K. Pension Authorities, the Delaware Court clearly recognized that, in light of the fact that the allocation of Sales Proceeds involved parties around the world, the protocol that would govern the Sales Proceeds allocation would be a cross-jurisdictional forum that reflects the international constituency of the parties involved.  The Delaware Court stated that:

> An overriding issue in these cases – as well as in the related insolvency proceedings in Canada and the U.K. – is the allocation of the billions of dollars in proceeds of the post-petition asset sales. This allocation will determine the amounts available for distribution to the creditors located in the various jurisdictions, in part based on the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold.
>
> In recognition of this fundamental question, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK) entered into the IFSA, pursuant to which they agreed, *inter alia*, (a) that all such sales proceeds will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain

---

[30]    Lloyd Declaration, Ex. p. 301 (lines 21-22).

[31]    Lloyd Declaration, at paras. 32-36.

> a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process.
>
> In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of the allocation protocol.  <u>The purpose of the protocol</u> (called the "Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds") <u>is to ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum.</u>
>
> ...
>
> <u>The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum.  They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.</u>[32]
> (citations omitted) (emphasis added)

46.      The Delaware Court's statements make it clear that it viewed the IFSA arbitration clause as requiring a cross-jurisdictional arbitration and that it was alive to the unfairness that would occur if any particular national court or tribunal were to decide how to allocate the Sales Proceeds.

47.      These motions by the U.S. and Canadian Debtors fly in the face of the Delaware Court's statements regarding the IFSA and the agreement of the parties.

**(ii)     Canadian Court Approval of the IFSA**

48.      Similarly, the Ontario Court approved of the Canadian Debtors' entering into the IFSA on the basis that, in the absence of an agreement by the parties regarding allocation, the Sales Proceeds would be allocated by way of an arbitration.

---

[32]      Lloyd Declaration, at para. 10(b), Ex. pp. 66-67.

49.         By Motion dated June 22, 2009, the Canadian Debtors asked the Canadian Court to approve the IFSA.[33] In the Affidavit of John Doolittle, filed by the Canadian Debtors, Mr. Doolittle noted that the proceeds from any sale were to be deposited into an escrow account and could only be released from the escrow account by agreement of the parties or by "determination by the relevant dispute resolver(s) under the terms of the [Protocol]". Mr. Doolittle continued: "the parties have agreed to continue to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation" and notes that such protocol shall provide a "binding procedure".[34]

50.         The repeated references in Mr. Doolittle's Affidavit to a "protocol for resolving disputes concerning the allocation" clearly precludes court involvement in the Sales Proceeds allocation because, as noted above, courts' rules cannot be supplanted by an agreed upon "binding procedure".

51.         By Order dated June 29, 2009,[35] the Canadian Court ordered that the Canadian debtors enter into the IFSA.[36]

---

[33]     Lloyd Declaration, Ex. pp. 506-530.

[34]     Lloyd Declaration, Ex. p. 548 (paragraphs 25(n)-(o)).

[35]     Lloyd Declaration, Ex. pp. 727-734.

[36]     Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.   Lloyd Declaration, at paras. 37-38.

(iii)    **English Court Approval of the IFSA**

52.          By Order dated June 23, 2009 the English Court ordered that the Joint Administrators "be at liberty" to enter into the IFSA,[37] in part based on the Court's understanding that allocation would be decided by way of an arbitration.

53.          In making the Order, the English Court considered the oral submissions by counsel for the Joint Administrators along with the witness statement of Alan Robert Bloom, one of the Joint Administrators. In his witness statement, Alan Robert Bloom notes that the dispute resolution protocol contained in the IFSA is to be "agreed between the Parties".[38] Mr. Bloom stated that part of the reason for entering into the IFSA was to achieve certainty as regards to "avoiding future litigation and the associated cost".[39] (emphasis added)

54.          Again, the evidence is clear that the Joint Administrators would not, did not, and indeed could not, agree to allow the sale of businesses to proceed without the protections in Section 12 of the IFSA, that is, that the allocation of Sales Proceeds would be determined by agreed upon dispute resolvers and not the courts of any one or more jurisdiction.   To have so agreed would have been a failure of the Joint Administrators' duty to properly represent to the English Court that the IFSA was in the best interests of the creditors of the EMEA Debtors.   Absent a representation that the

---

[37]     Lloyd Declaration, Ex. p. 736.

[38]     Lloyd Declaration, Ex. p. 761 (paragraph 87(e)).

[39]     Lloyd Declaration, at paras. 39-40, Ex. p. 762 (paragraph 91(c)).

- 24 -

IFSA was in creditors' best interests, the English Court would not have declared that the Joint Administrators were at liberty to enter into the IFSA.[40]

### (iv)    French Court Approval of the IFSA

55.         Similarly, the French Court's approval of the IFSA was based on its understanding that the Sales Proceeds would be allocated by way of arbitration.

56.         The NNSA Liquidator and NNSA Administrator sought authorisation from the French Court before providing their consent for the Joint Administrators to enter into the IFSA on behalf of NNSA.   By Order dated July 7, 2009,[41] the French Court authorised the NNSA Liquidator and NNSA Administrator, among other things, to agree to:

    (a)    "continue with the transfer of assets simultaneously with the implementation of the process to reach an agreement on the split among companies of the NORTEL group, it being recalled however that with regard to NNSA's assets the offer presented to the Court must indicate a price to be paid to NNSA, which is either determined or which may at least be determinable by a third party neutral arbitrator"; and

    (b)    NNSA's "participation in forthcoming negotiations concerning the sharing of the sale price, and, more particularly if the parties fail to reach an

---

40    Lloyd Declaration at paras. 39-41.

41    Lloyd Declaration, Ex. pp. 779-785.

agreement, <u>negotiating the agreement on the procedure for having such price determined by an expert</u>".[42] (emphasis added)

57.          The French Court's approval of the NNSA Liquidator and Administrator entering into the IFSA clearly reflects the French Court's understanding that the IFSA contemplated that allocation would be decided by way of some form of third party arbitration.[43]

58.          Similar to the English, U.S. and Canadian courts, these statements made by the French Court make it clear that it understood the IFSA to require that allocation be decided by way of arbitration and granted its approval on that basis.

## F.    Negotiations Towards The Interim Sales Protocol

59.          After the execution of the IFSA, the U.S., Canadian and EMEA Debtors promptly commenced negotiations towards an Interim Sales Protocol.  The progress of these negotiations is detailed in the Lloyd Declaration and will not be repeated here. However, several points should be noted:

     (a)     first, consistent with the terms of the IFSA, throughout the protocol negotiations it was clear that all parties intended and agreed that allocation would be decided in a private proceeding presided over by one or more individuals appointed for this purpose, and not by any national

---

[42]     Lloyd Declaration, Ex. p. 784.

[43]     Lloyd Declaration, at paras. 42-45.

court. It was never contemplated that the allocation could or should be determined by any court;[44]

(b)    second, the protocol negotiations were in fact quite successful.    The parties had reached agreement on the bulk of the provisions in a 27-page document that set out detailed procedures for all phases of the arbitration proceeding.    Although there had initially been some debate about the manner for appointing the members of the arbitration panel, the parties had ultimately agreed that each of the U.S., Canada and EMEA estates would appoint one member each of the three-member arbitration panel, whose appointment would be made with the advice and consent of the other Nortel debtors.[45]    However, a dispute arose when the Canadian Debtors attempted to limit the arguments that could be raised before the dispute resolvers.  This would have limited the ability of the EMEA Debtors to make their full argument in relation to their rights to the intellectual property assets that were sold in the sales;[46] and

(c)    third, the protocol negotiations did not in fact reach the point of failure. Rather, in a context where most of the asset sales had been or soon would be consummated, the parties agreed that it would be more productive to see if they could reach agreement on the underlying

---

[44]    Lloyd Declaration, at paras. 47-57.

[45]    Lloyd Declaration, at paras. 47, 49-51.

[46]    Lloyd Declaration, at paras. 57-59.

substantive issue (*i.e.*, how to allocate the Sale Proceeds).   The parties, therefore, halted the protocol negotiations in order to pursue attempts to agree on how the proceeds should be allocated, eventually through the use of a mediator.   It has been over one year since the protocol negotiations were suspended. [47]

60.         After the recent suspension of the mediation, the Joint Administrators promptly indicated their view that the parties should proceed expeditiously with finalizing the Interim Sales Protocol in order to commence arbitration.  The Joint Administrators' view was stated in their response to the U.S. Debtors' objection to the claims filed by the EMEA Debtors.   In this response, the Joint Administrators requested the Court's assistance in causing the parties to finalize the Interim Sales Protocol.[48]  Before filing the present Motion, the U.S. Debtors made no effort to ascertain whether the open points on the year-old draft protocol could be resolved.   Moreover, they have subsequently refused an express invitation from the EMEA Debtors to restart and conclude the halted protocol negotiations because, contrary to the position they had taken throughout all of the previous discussions, they now take the position that allocation should not be decided by arbitration.[49]

---

[47]      Lloyd Declaration, at paras. 47, 49-51

[48]      Lloyd Declaration, at para. 60.

[49]      Lloyd Declaration, at para. 61.

## G.    Fourth Estate's Position

61.        Certain subsidiaries of Nortel Networks Corporation (the "Fourth Estate") have taken the position on this motion that they support "the assumption of jurisdiction by the U.S. Court and the Canadian Court over the process of determining the allocation of Sales Proceeds".[50]  The Fourth Estate is not a party to the IFSA.  However, the Fourth Estate is a party to the Asia Restructuring Agreement (the "APAC Agreement").  The EMEA Debtors, the US Debtors and the Canadian Debtors are also parties to the APAC Agreement.  The APAC Agreement served a similar function as the IFSA in respect of the sale of assets that involved the Fourth Estate.

62.        The Fourth Estate's position on these motions is flatly inconsistent with their obligations under the APAC Agreement that the allocation of sales proceeds governed by the APAC Agreement will be decided by way of arbitration.  Under Section 11 of the APAC Agreement, the parties agree to "accede to a common protocol for resolving disputes concerning the allocation of Sale Proceeds" and "[i]n the event the Selling Debtors fail to reach agreement regarding the allocation of Sale Proceeds under the Allocation Protocol, such dispute shall be automatically referred to the dispute resolver(s)".  The APAC Agreement further states that: "[t]he written decision of the dispute resolver(s) allocating the Sales Proceeds among the Selling Debtors shall be conclusive, final and binding upon each of the parties".

## H.    Expert Evidence on New York Law

63.        The IFSA is governed by New York law.  Section 16 of the IFSA states:

> This Agreement shall be governed exclusively by the laws of the State
> of New York without regard to the rules of conflict of laws of the State
> of New York or any other jurisdiction...

64.        It is trite that foreign law is a question of fact that needs to be proven by

expert evidence.[51]  As such, the EMEA Debtors have served and filed the Affidavit of

Mr. Tai-Heng Cheng on the relevant New York law governing the IFSA.  This expert

evidence on the law is set out below in connection with the proper interpretation of the

IFSA.

65.        Mr. Cheng is a Senior Legal Advisor at Hoguet Newman Regal & Kenney,

LLP.  He received a Bachelor of Arts in Law with First Class Honors from Oxford

University in 1999, where he was an Oxford University Scholar.[52]  Mr. Cheng holds a

Doctor of the Science of Law and Master of Laws degrees from Yale Law School from

2004 and 2000, respectively, where he was a Howard M. Holtzmann Fellow for

International Law.  He is a member of the bars of the State of New York, the U.S.

District Courts for the Southern, Eastern and Western Districts of New York, and the

U.S. Court of Appeals for the Second Circuit, and has assisted the U.S. Court of

Appeals for the Second Circuit as *amicus curiae* on international law issues.[53]

---

[50]      Limited Response of the Fourth Estate, para. 9.

[51]      *General Refactories Co. of Canada v. Venturedyne, Ltd.,* [2002] O.J. No. 54 at para. 229 (Sup.
Ct.)

[52]      Affidavit of Tai-Heng Cheng, sworn May 31, 2011, Responding and Cross-Motion Record of the
Joint Administrators of Nortel Networks UK Limited and the Companies Listed in Schedule "A"
thereto ("Cheng Expert Report"), at p. 45, para. 6.

[53]      Cheng Expert Report, at p. 44, para. 2.

66.         Mr. Cheng is an arbitrator, expert and counsel in international arbitrations under ICSID, UNCITRAL, ICDR, ICC, SCC, and JAMS rules, and is a member of the panels of neutrals of the ICDR, CPR, and HKIAC.  He has also advised the Republic of Kosovo on international law matters, including treaties.  In 2010, Mr. Cheng chaired an arbitration tribunal that resolved an international contract dispute governed by New York law.   He  is  presently  serving  as  an  expert  in  international  law  and  arbitration agreements in two international arbitrations.[54]

67.         Mr. Cheng is the author of forty published and forthcoming books, articles and essays in international law, of which a dozen of them address international dispute resolution.  Mr. Cheng has given sixty lectures worldwide on international law, including twenty addressing international dispute resolution.  U.S. federal appeals and district court decisions, as well as U.S. Supreme Court briefs, have cited and relied on his scholarship as authoritative on international law.[55]

68.         A *curriculum vitae* setting forth a complete list of Mr. Cheng's professional activities and publications is appended to Mr. Cheng's Affidavit.[56]

## PART III ~ ISSUES AND LAW

69.         The issues raised on these Motions are as follows:

(a)      Is the IFSA an enforceable agreement to arbitrate?

---

[54]      Cheng Expert Report, at p. 44, para. 3.

[55]      Cheng Expert Report, at pp. 44-45, para. 4.

[56]      Cheng Expert Report, at p. 45, para. 7.

(b)     If so, what is the Ontario Court's role in enforcing the parties' agreement to arbitrate?

(c)     In these circumstances, does the Ontario Court have the jurisdiction to determine how the Sales Proceeds should be allocated?

(d)     If the IFSA is not an enforceable agreement to arbitrate, does the Ontario Court have the jurisdiction to order the Canadian Debtors to arbitrate the Sales Proceeds allocation?

**Issue 1:     IFSA is an Enforceable Agreement to Arbitrate**

70.     As said, the IFSA is governed by the law of New York. As such, whether or not Section 12 constitutes an enforceable arbitration clause must be resolved by reference to the law of New York.

71.     Under New York law, Section 12 of the IFSA is an enforceable arbitration clause that requires the parties to resolve all disputes concerning the allocation of Sales Proceeds by way of an *ad hoc* arbitration. An *ad hoc* arbitration is an arbitration in which the parties did not select the rules of any arbitral institution in their arbitration agreement.[57]

**A.     The Agreement to Arbitrate**

72.     Under New York law, there are two requirements for an enforceable agreement to arbitrate a dispute. First, there must be a written agreement. Second,

---

[57]     Cheng Expert Report, at p. 46, para. 9.

that agreement must evince the intention of the parties to submit a dispute for resolution through a binding private dispute resolution process rather than a national court. If these two requirements are met, an arbitration agreement is valid and must be enforced unless there is a clear public policy against arbitrating the particular dispute.[58]

73.        Section 12(b) is an enforceable arbitration agreement because it is a written agreement evincing the intention of the parties to submit themselves to binding *ad hoc* arbitration, and there is no policy against the arbitrability of disputes among debtors to allocate assets from the estate of a bankrupt corporation.[59] According to New York law, Section 12(b) of the IFSA is a valid and enforceable agreement to submit any disputes among the IFSA parties regarding the allocation of the Sale Proceeds to *ad hoc* arbitration.

74.        As noted above, Section 12(b) states:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol applicable to the Sale Proceeds.[60]

75.        There is no dispute that Section 12(b) is a written agreement.

76.        Section 12(b) also unambiguously refers to *ad hoc* arbitration, even though the word "arbitration" is not used.

---

[58]    Cheng Expert Report, at pp. 51-52, para. 17.

[59]    Cheng Expert Report, at p. 54, para. 24.

[60]    IFSA at Section 12(b); Cheng Expert Report, at p. 55, para. 26.

77.         It is not necessary to use the terms "arbitrate", "arbitration", or "arbitrator"
for an agreement to arbitrate to be enforceable as such.    No particular wording is
required to constitute a valid, binding arbitration agreement, nor even the inclusion of
the words 'arbitrate' or 'arbitrator'.[61]

78.         Contract language is ambiguous only when it is capable of more than one
meaning when viewed objectively by a reasonably intelligent person who has examined
the context of the entire integrated agreement and who is cognizant of the customs,
practices, usages and terminology as generally understood in the particular trade or
business.    When viewed objectively by a reasonably intelligent person who has
examined the entire context of Section 12 and international commercial usages, Section
12(b) can only mean that disputes would be submitted to *ad hoc* arbitration.    The
agreement provides that any disputes on the allocation of sale proceeds would be
resolved by "dispute resolver(s)".  There is no need to use the word "arbitrator",  when
the phrase "dispute resolver" is commonly used internationally to refer to decision-
makers in alternative dispute resolution.[62]

79.         Section 12(c) further confirms that Section 12(b) is an agreement to
submit disputes on the allocation of Sale Proceeds to *ad hoc* arbitration.  Section 12(c)
states:

> [T]he Debtors shall, as soon as reasonably practicable, following the
> execution of this Agreement, negotiate in good faith and attempt to

---

[61]    Cheng Expert Report, at pp. 52-53, para. 20.

[62]    Cheng Expert Report, at pp. 55-56, para. 28.

> reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the 'Interim Sales Protocol'), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such transactions have been unable to reach agreement such allocations.[63]

80.         Section 12(c) thus envisages good faith negotiations to agree on a binding procedure for the arbitration.  This is similar to other *ad hoc* arbitration agreements, where the parties agree to binding resolution of their disagreements, but do not set forth the procedure for such arbitration in the arbitration agreement.  Such *ad hoc* arbitration agreements are valid under New York law.  The New York Appellate Division has stated that where "[t]he dominant intent was to arbitrate", the machinery of procedures is "subordinate and incidental".[64]

81.         The U.S. and Canadian Debtors' attempt to argue that because the parties have not agreed on a protocol, there is no binding agreement to arbitrate.  That misstates both the IFSA and New York law.  First, the IFSA does not make arbitration conditional on the agreement on the terms of the Protocol.  It simply does not say that.

82.         Second, under New York law, where the parties are unable to reach such agreement, the court shall, under the *Federal Arbitration Act*, appoint an arbitration panel, which will then decide the rules to apply and adjudicate the merits of the dispute.

---

[63]   IFSA at Section 12(c); Cheng Expert Report, at p. 56, para. 29.

[64]   Cheng Expert Report, at p. 56, para. 30.

The fact that the parties do not agree on a protocol will not invalidate either the arbitration agreement or the obligation to arbitrate thereunder.[65]

83.            Further, because Section 12(c) explicitly refers to procedures to which the parties would bind themselves and the "dispute resolver(s)", the reference to "dispute resolver(s)" cannot mean courts under New York law.   In New York, procedures for adjudication in court are set by the New York Civil Law and Practice Rules and not by the parties.  It is not open to the parties in a court case to mutually agree to set those rules aside.[66]

84.            Under New York law, because Section 12(b) is a clear arbitration agreement, it is must be enforced unless arbitrating the disputes it covers would violate public policy.  There is no policy, in the form of statute or otherwise, that would prohibit the arbitrability of disputes over the allocation of the Sale Proceeds.  On the contrary, the consistent public policy of New York is to favour arbitration of international commercial disputes such as the one in this case.  International arbitration provides a neutral forum for dispute resolution that avoids giving any one party real or perceived advantages by bringing claims in their own courts rather than the courts of another foreign party.   It also promotes comity among courts around the world by avoiding different courts asserting jurisdiction over the same dispute when an international

---

[65]      Cheng Expert Report, at p. 49, para. 14(D).

[66]      Cheng Expert Report, at pp. 56-57, para. 31.

arbitration tribunal can resolve it.  Enforcing the *ad hoc* arbitration agreement contained in Section 12 would thus promote judicially-recognized public policy.[67]

85.        Therefore, based on New York law, Section 12 of the IFSA constitutes a binding arbitration agreement that requires the parties to have all disputes regarding the allocation of Sales Proceeds determined through arbitration, and not through the courts.

## B.    The Conduct of the Parties Confirms Intention to Arbitrate

86.        As referred to above, it is submitted that the IFSA provisions are unambiguous in creating an obligation to arbitrate Sales Proceeds disputes.  In the event that it is determined that the IFSA provisions are ambiguous in this regard, under New York law, extrinsic evidence, including negotiations of the IFSA and post agreement conduct, is admissible to determine the intention of the parties.[68]  The extrinsic evidence here clearly establishes that the parties intended arbitration and not litigation in the courts.

87.        The circumstances in which the IFSA was entered into, statements made by the parties regarding the effect of the IFSA and the basis for court approval of the IFSA in the U.S., Canada, the U.K. and France all confirm the parties' intention that the Sales Proceeds allocation would occur by way of cross-jurisdictional arbitration.

88.        As set out above, the asset sales were predicated on the basis that allocation would be decided by mutual agreement or, failing that, arbitration.  The

---

[67]    Cheng Expert Report, at pp. 57-58, para. 33.

[68]    Cheng Expert Report, at pp. 63-66, paras. 47-54.

escrow agreements governing the proceeds of asset sales reflect the obligations imposed on the parties by the IFSA, including that Sales Proceeds will not be distributed without the agreement of the parties or, failing such agreement, until the allocation of proceeds is decided in an arbitration.

89.        Most importantly, as set out above, the evidence is unchallenged that the Nortel Entities outside of Canada and the U.S. would never have agreed to give up rights in businesses and assets if they believed that under the terms of the IFSA the Ontario and/or Delaware Court could decide the proper allocation of proceeds from the sale of assets, many of which were located outside of North America. Any interpretation of IFSA giving the courts of Ontario and Delaware such sweeping and unjustified jurisdiction should be rejected as commercially unreasonable.

90.        Further, it is critical to note that during the lengthy protocol negotiations, at all times, the parties explicitly made clear in their discussions and the written draft protocols that an arbitral panel was to determine the disputes over the allocation of Sales Proceeds. At no time did any party take the position that the courts would make those determinations.

91.        Further, U.S. Debtors' counsel told the U.S. Court that the disputes would be resolved by an independent body.

92.        Moreover, as set out above, the U.S., Canadian, English and French courts approved of the parties entering into the IFSA on the basis that allocation would be decided by way of arbitration. The U.S. and French Courts have explicitly stated that fact.

93.         All of the conduct of the parties, until the U.S. Debtors filed their motion, was consistent with the fact that the IFSA provided for arbitration.

## C.    The Jurisdiction of the Court Under Section 16(b) of the IFSA

94.         Contrary to the arguments made by the U.S. and Canadian Debtors, the parties did not, by Section 16(b) of the IFSA, provide the Delaware or the Ontario Court with jurisdiction to determine disputes relating to the allocation of Nortel Sales Proceeds.    Indeed, it would make no sense whatsoever for the parties to agree on arbitration in Section 12, but then give the parties the ability to avoid arbitration by relying on Section 16.

95.         Section 16(b) of the IFSA provides, in relevant part:

> To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. and Canadian Courts … for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for any doubt, any Transfer Pricing Agreement matter generally) …[69]

96.         As set out above, Section 12(b) is a valid and enforceable arbitration agreement.  Because Section 12(b) is a more specific provision providing for arbitration, it precludes interpreting the more general jurisdiction provision in Section 16(b) to grant jurisdiction to the court to resolve disputes that are subject to arbitration under Section 12(b).

97.         Instead, under New York principles of contractual interpretation, Section 16(b) must be harmonized with Section 12(b) by interpreting Section 16(b) to confer

---

[69]    IFSA at Section 16(b); Cheng Expert Report, at p. 59, para. 36.

jurisdiction to the court only to determine the validity of the Section 12 arbitration agreement and to confirm, enforce or annul the arbitration award after an arbitral tribunal issues the award.[70]

98.        The broader jurisdictional provision of Section 16(b) does not negate the specific arbitration agreement embodied in Section 12.  Moreover, the *ejusdem generis* principle of contract interpretation would give precedence to the specific clause for arbitration rather than the general clause for the exclusive jurisdiction of the courts.[71]

99.        The principle that conflicting contract provisions should be harmonized, if reasonably possible, so as not to leave any provision without force and effect, would also require that the arbitration agreement be given full force such that any dispute arising from the allocation of the Nortel Sales Proceeds would need to be adjudicated by an arbitrator, as required by Section 12.[72]

**Issue 2:        The Court's Role in Enforcing the Parties' Agreement to Arbitrate**

100.        For the reasons set out above, the IFSA contains an enforceable agreement between the parties that, failing agreement among them, the allocation of Sales Proceeds will be decided by way of arbitration.

101.        If the parties to the IFSA do not, after good faith negotiations, agree on the binding procedures for an arbitration, as referred to above, that does not impact the

---

[70]        Cheng Expert Report, at p. 58, para. 34.

[71]        Cheng Expert Report, at p. 59, para. 37.

[72]        Cheng Expert Report, at pp. 59-60, para. 38.

obligation to arbitrate. Instead, the proper role of the courts in their supervisory function in relation to the U.S. and the Canadian Debtors is to require that the parties appoint an arbitration panel that will have the power to set a procedure for such an arbitration.[73]

102.        The most sensible, commercially desirable and, indeed, only feasible method of allocating the Sales Proceeds is a cross-jurisdictional international arbitration.[74] A panel comprised of arbitrators selected by each of the three jurisdictions – Canada, U.S. and EMEA – is the best way to ensure, not just that justice is done, but that justice is seen to be done. The insolvency of the Nortel Group is a global process and requires a global solution to ensure a fair result for creditors worldwide. The EMEA Debtors comprise 19 separate companies located in 18 separate countries across Europe, Middle East and Africa. Although the English insolvency regime is the relevant regime in respect of the various insolvencies, each EMEA Debtor has a significant number of local creditors, on whose behalf the Joint Administrators, as officers of the English Court, act.[75]

103.        As noted above, the Joint Administrators did not agree, and would not have agreed, to a process whereby the rights to the assets sold inside the EMEA region would be determined by the courts of jurisdictions outside the EMEA region. It is for this reason that the parties insisted on the arbitration provision in the IFSA.[76]

---

[73]    Cheng Expert Report at p. 60, para. 39.

[74]    Cheng Expert Report at p. 57, para. 33.

[75]    Lloyd Declaration, at para. 87.

[76]    Lloyd Declaration, at paras. 87-91.

- 41 -

104.        For all these reasons, the Court should order that the allocation of Sales

Proceeds be determined by way of an arbitration.


**Issue 3:        The Ontario Court Does Not Have Jurisdiction to Jointly
                  Decide the Allocation**

105.        It is respectfully submitted that the Ontario Court does not have the

jurisdiction to enter into the allocation protocol proposed by the U.S. and Canadian

Debtors.  The allocation protocol originally proposed on this Motion by the U.S. Debtors

required the U.S. and Canadian Courts to render a single joint decision.  Section 5 of

the allocation protocol proposed by the U.S. Debtors provided that "[a]fter completion of

Allocation Protocol Discovery and the Allocation Protocol Hearings, the U.S. and

Canadian Courts shall issue <u>a decision</u> on the merits".

106.        After receiving the Joint Administrator' U.S. materials, that set out, what

should have been obvious – that two sovereign Courts cannot render a joint decision,

the U.S. and Canadian Debtors now attempt to propose a protocol of the same effect

albeit using different words.  They now suggest that the U.S. and Canadian Courts will

each render a decision on the merits of the allocation dispute – not a single one.  The

result is exactly the same.  In order for the decisions to be useful and enforceable, they

need to be identical.  This will be highly unlikely if the Courts arrive at their decisions

independently, given the number of sales involved, issues involved and allocations

required.  In any event, two separate sovereign courts cannot embark on a process that

can only be successful if those courts reach an identical conclusion.

107.        It is neither proper nor feasible for courts of two independent nations to

reach, in effect, a joint decision.  This is so for at least three reasons:

- 42 -

(a)    such a process would violate the Cross-Border Insolvency Protocol[77] (the "Cross-Border Protocol") governing this proceeding;

(b)    the Ontario Court does not have jurisdiction to allocate Sales Proceeds from sales of assets and businesses that were outside of the U.S. and Canada by entities outside the U.S. and Canada and it would be unfair for the Courts to do so; and

(c)    there are very substantial practical impediments to the Courts proceeding on the basis of a joint hearing regarding the Sales Proceeds allocation.

## A.    A Joint Decision would Violate the Cross-Border Protocol

108.    The U.S. and Canadian Debtors have proposed that the Ontario and Delaware courts issue, in reality, a single decision regarding the merits of the allocation of the Sales Proceeds.  Such an exercise in coordinated decision making goes well beyond the sort of procedural coordination envisaged by the Cross-Border Protocol. Indeed, the issuance of a joint decision would violate the letter and spirit of the Cross-Border Protocol that governs this proceeding and would constitute an improper ceding of a portion of each Court's sovereignty and jurisdiction. The Nortel entities adopted the Cross Border Protocol to ensure that the Canadian and U.S. proceedings were coordinated.  In their Motion to Approve the Cross-Border Protocol, the U.S. Debtors stated:

---

[77]    The Cross Border Protocol was approved by this Court on January 15, 2009, which was later amended by order of this Court on June 29, 2009.

> [T]he Protocol is designed to promote the orderly and efficient administration of the Insolvency Proceedings, honor the independence and integrity of [the U.S.] Court and the Canadian Court, promote international cooperation and respect for comity among [the U.S.] Court and the Canadian Court, facilitate fair and open administration of the Insolvency Proceedings and implement a framework to address issues that will arise in these cases.[78]

In essence, the Cross-Border Protocol was designed and implemented for procedural purposes – to coordinate the administration of the proceedings by means of joint hearings and open communication between the two courts.

109.      The jurisdiction of the Ontario Court to enter into cross border protocols has traditionally derived from its inherent jurisdiction to control its own processes or the discretion afforded the Court in a *Companies' Creditors Arrangement Act* ("CCAA") proceeding.[79]  Since certain amendments to the CCAA were proclaimed into force on September 18, 2009, the Ontario Court's jurisdiction in a CCAA proceeding to enter into a cross-border insolvency protocol derives from subsection 52(3)(d) of the CCAA which reads:

> (3) For the purpose of this section, [cross border] cooperation may be provided by any appropriate means, including
>
> ...
>
> (d) the approval or implementation by courts of agreements concerning the coordination of proceedings

---

[78]     Cross-Border Protocol Motion, at para. 18.

[79]     *Olympia & York Developments Ltd.*, [1993] O.J. No. 1748 (Ont. Gen. Div.) at para. 7; *Babcock & Wilcox Canada Ltd.*, [2000] O.J. No. 786 (Ont. S.C.J. – Commercial List) at para. 12.

110.        Section 52 of the CCAA mirrors the Model Law provisions governing cross

border cooperation in the UNCITRAL Model Law on Cross-Border Insolvency[80] (the

"Model Law") which provides that courts have the authority to approve or implement

agreements concerning the coordination of proceedings.  Significantly, the UNCITRAL

Practice Guide on Cross Border Insolvency Cooperation[81] (the "Handbook") cautions,

however, that such agreements or protocols should not compromise the independent

decision making function of a court or the rights of parties.  In order to safeguard the

independence  of  courts  entering  into  cross-border  protocols,  the  Handbook

recommends  including  provisions  that  are  intended  to  preserve  each  court's

independent jurisdiction.  According to the Handbook:

> Provisions on the preservation of jurisdiction may also be included, for
> example that nothing in the agreement is intended to affect, impair,
> limit, extend or enlarge the jurisdiction of the courts involved, as,
> notwithstanding cooperation and coordination, each court should be
> entitled at all times to exercise its independent jurisdiction and authority
> with respect to matters presented to it and the conduct of the parties
> appearing before it.[82]

111.        In order to guard against any party construing a cross-border protocol in a

manner  which  infringes  on  the  independence  of  either  court,  the  Handbook

recommends including a "Preservation of jurisdiction" clause.  The sample clause it

recommends reads:

> Nothing in this agreement shall increase, decrease or otherwise affect
> in any way the independence, sovereignty or jurisdiction of any of the

---

[80]    G.A. Res. 52/158, U.N. Doc. A/RES/52/125 (January 30, 1997).

[81]    United Nations Commission on International Trade Law, United Nations (New York, 2010).

[82]    Handbook, at p. 111.

> relevant courts in States A or B, including, without limitation, the ability of any of the relevant courts under applicable law to provide appropriate relief. [83]

112.     The Cross Border Protocol approved by the Courts in these proceedings adopts, in many places, the sorts of cautionary language intended to ensure that it is not construed to derogate from the Ontario or Delaware Court's independence.    For example, paragraph 7 of the Cross-Border Protocol reads:

> By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

113.     Paragraph 8 of the Cross-Border Protocol reads, in part:

> The Canadian Court shall have the sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

114.     Similarly, paragraph 9 of the Cross-Border Protocol states that:

> In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States.

115.     Finally, paragraph 13 of the Protocol reads:

> [A]lthough the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to (a) the conduct of parties appearing in matters presented before such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

---

[83]     Handbook, at p. 113.

116.         Although the Cross-Border Protocol authorizes the U.S. and Canadian Courts to hold joint hearings when they find it necessary or advisable, Section 12(d)(vi) only enables the courts to communicate with each other during or after any joint hearing for the limited purposes of "(1) determining whether <u>consistent rulings can</u> be made by both Courts; (2) coordinating the terms upon [sic] of the Courts' <u>respective</u> rulings and (3) addressing any other procedural or administrative matters".[84] (emphasis added)  It is evident that the Cross-Border Protocol contemplates independent decisions and that while the Courts are encouraged to communicate in an attempt to issue consistent rulings, each remains responsible for making its own independent decision.

117.         It is clear that the purpose of court-to-court communications include coordination, efficiency and other procedural advantages, but that the actual decision-making of each court must be exercised independently by each court.  The proposed protocol represents exactly the sort of infringement on each court's independence and diminution of sovereignty that the Handbook and the Cross-Border Protocol itself cautions against again and again.

118.         There is no statutory or other legal basis for either court to cede part of its decision-making authority to another sovereign.   Indeed, the U.S. and Canadian Debtors have not cited any support for such a proposition.

---

[84]      Cross-Border Protocol § 12(vi); (emphasis added).

**B.    The Ontario Court does not have the Jurisdiction to Allocate Sales Proceeds from the Sale of Assets Outside Canada**

119.      There is no basis at law or in practice for the Ontario Court to assert jurisdiction over proceeds derived from the sale of assets located outside North America by Nortel Entities located outside of Canada and the U.S.

120.      As set out above, the majority of the 28 Nortel debtors around the world are located outside the U.S. or Canada.  The Ontario Court does not have jurisdiction over these foreign entities, which includes the EMEA Debtors, or the proceeds of asset sales derived from the sale of assets outside of North America.  In respect of a number of sales, the EMEA Debtors had their own purchase and sale agreements.  Far from acceding to the jurisdiction of the U.S. or Canadian Courts for the purposes of the Sales Proceeds allocation, these parties specifically agreed in the IFSA that allocation issues would not fall within the jurisdiction of the court or courts of any Debtor country and instead would be decided by way of an arbitration.

121.      The Ontario Court does not have jurisdiction over the foreign Nortel Entities with respect to the allocation of the proceeds of the sale of their foreign assets. The Ontario Court of Appeal has recently reformulated the real and substantial connection test for the assumption of personal jurisdiction over parties.  The Court of Appeal in *Van Breda v. Village Resorts Ltd.*[85] held that the core of the test is whether (i) the matter falls under rule 17.02 (with the exception of subrules (h) and (o)); and (ii) if it does not, the party asking the court to take jurisdiction must prove that a real and

---

[85]      2010 CarswellOnt 549 (C.A.).

substantial connection exists between Ontario and the foreign party and the subject matter of the dispute. The Court in *Van Breda* enumerated the factors that are relevant to whether there is a real and substantial connection to Ontario, including: the connection between the parties and the subject matter of the dispute and Ontario; fairness; whether the case is interprovincial or international; and whether there is another forum in which the plaintiff can reasonably seek relief.[86]

122.        In this case, the Sales Proceeds allocation does not fall within any of the relevant enumerated circumstances set out in Rule 17.02 (which involve property, estates, mortgages, torts and injunctions in Ontario, instruments and contracts governed by Ontario law, or regarding taxes, a counterclaim, crossclaim or third party claim).

123.        Because the Sales Proceeds allocation does not fall under Rule 17,02, the US and Canadian Debtors bear the burden of establishing some other basis for a real and substantial connection between the foreign Nortel Entities and their foreign assets and Ontario.  The U.S. and Canadian Debtors have not put forward any evidence of such a connection and, indeed, no such evidence exists.  As such, this Court should not, and it is respectfully submitted, cannot, take jurisdiction over all the EMEA Debtors regarding the allocation of Sales Proceeds with respect to their foreign assets.

---

[86]    *Van Breda, supra* at para. 109; *Catania v. Giannattasio,* [1999] O.J. No., 1197 (C.A.); *Duke v. Andler,* [1932] S.C.R. 734; *Apotex Inc.v. Sarofi-Aventis,* [2008] O.J. No. 85 (Sup. Ct.) aff'd 2008 ONCA 724; *Bond v. Brookfield Asset Management Inc.,* [2011] O.J. No. 1901 (Sup. Ct.); *Dundee Precious Metals Inc. v. Marshland* (2010), 104 O.R. (3d) 51 (Sup. Ct.).

**C.      Insurmountable Practical Impediments**

124.          Even if this Court found that it did have the authority to proceed in the manner suggested by the U.S. Debtors, the practical and prudential difficulties should weigh strongly against its doing so.

125.          First, the procedure contemplated by the U.S. Debtors would require the courts to coordinate full-scale discovery and trial of the allocation issues. But there are major differences between the procedural and evidentiary rules that apply in the two jurisdictions, not to mention different interpretations of constitutional principles such as due process and the privilege against self-incrimination.  Determining how to harmonize all of these procedural and substantive gaps is likely to take an undue amount of the parties' and courts' time and energy, and may not be achievable at all.

126.          Assuming the procedural hurdles are overcome, the courts will then be required to reach, in essence, a unified decision on the precise dollar amounts to be allocated to numerous debtors from the proceeds of the multiple separate sale transactions conducted around the world.  If the procedure is to be effective, the courts must reach the same decision on each of a multitude of individual fact determinations about the relative interests of each of the various debtors in each of these cases with some debtors not even being party to a related insolvency proceeding in any event.  A deadlock or inconsistency will be fatal to the entire process.  A panel of two is not advisable.

127.          Assuming the courts are able to overcome these considerable hurdles and are indeed able to reach agreement on all the necessary determinations, chaos will

ensue if any party exercises its right to appeal the courts' decision, or indeed any preliminary decisions issued by the courts during the process. There is no provision for a joint, cross-border appeal. Separate appeals would therefore make their way up through the U.S. and Canadian court systems, with a strong likelihood of inconsistent results.

128.        In short, resolution of the allocation dispute through an international arbitration – as the parties have always intended – offers the quickest, fairest and jurisdictionally most sensible way to allocate the Sale Proceeds and make funds available to pay creditors. Indeed, it may be the only feasible way to proceed.[87]

**Issue 4:        The Court has the Inherent Jurisdiction or Discretion to Appoint Arbitrators**

129.        In the event that this Court finds that the IFSA does not contain an enforceable arbitration provision, the Court has the inherent jurisdiction or discretion under the CCAA to order the Canadian Debtors to submit the allocation dispute to arbitration.

**A.        Inherent Jurisdiction or Discretion Under the CCAA**

130.        The Court's discretion derives from the fact that the CCAA is a statute with minimal content. It is "skeletal in nature" and does not "contain a comprehensive code that lays out all that is permitted or barred". The Court has wide discretion within this

---

[87]        The Joint Administrators further submit that Nortel Switzerland, Nortel Norway and Nortel South Africa support the resolution of the purchase price allocation issue by means of international arbitration rather than by decisions of the U.S. and/or the Canadian courts. These entities are not

skeleton to make Orders specific to the circumstances. According to the Ontario Court of Appeal, it is the flexibility of the CCAA that gives the Act its efficacy.[88]

131.     An Order invoking the Court's discretion under the CCAA must be consistent with the purposes of the Act.[89]     The Supreme Court of Canada has recognized that among the principal purposes of the Act is to ensure that stakeholders are treated fairly.[90]  In this case, an arbitration is the only way to ensure that fairness is done to the Nortel Entities' many stakeholders.

132.     Moreover, ordering the parties to arbitrate the Sales Proceeds allocation would not be an unusual exercise of this Court's discretion in the circumstances. Indeed, the court exercises a similar discretion in appointing claims officers in CCAA proceedings.  Such orders recognize that a dispute resolution process outside of the court advances the purposes of the CCAA.  There are numerous examples of courts appointing such claims officers.[91]  Indeed, this Court has approved of the Canadian Debtors' ability to appoint claims officers in this proceeding.

---

in the control of the Joint Administrators nor subject to the insolvency proceedings in the English Court but were party to several sales and have an entitlement to the sales proceeds.

[88]  *Re Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 92 O.R. (3d) 513 (O.C.A.) at para.. 44; *Re Stelco Inc.*, (2005) 75 O.R. (3d) 5 (O.C.A.) at para. 32 [*Re Stelco Inc.*].

[89]  *Re Lehndorff General Partners Ltd.* (1993), 17 C.B.R. (3d) 24 at 31-35 (Ont. Gen. Div.); *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 4 C.B.R. (3d) 307 at 309-310 (B.C.S.C.); aff'd by B.C.C.A at (1990), 4 C.B.R. (3d) 311.

[90]  *Century Services Inc. v. Canada (Attorney General)*, [2010] 3 S.C.R. 379 at para. 70 [*Century Services*]; *Re Stelco Inc., supra* at para. 44.

[91]  *AbitibiBowater Inc. (Arrangement relatif à)* 2010 QCCS 1064 at para. 21; *Re Canwest Global Communications Corp.* 2011 ONSC 2215 at para. 3; *Re Muscletech Research and Development Inc.* [2006] O.J. No. 2571 (S.C.J.) at para.21.

133.        There is a clear similarity between the claims officer process and arbitration. At the most basic level, both procedures are intended to facilitate a simpler, more expeditious and efficient method of resolving claims disputes. The parties do not appear before the court but rather before an impartial third party. In both cases, the dispute resolvers are entitled to set their own procedures. They hear evidence and argument and render a decision. Both of these methods recognize that Courts are not always the best or most efficient venue for resolving complex claims.

**B.    The Court Should Order the Canadian Debtors to Arbitrate the Dispute**

134.        The complex and multi-jurisdictional nature of the disputes involved in the Sales Proceeds allocation makes a cross-jurisdictional international arbitration the most efficient, expeditious and fair way to determine the allocation of the Nortel Sales Proceeds. This is because, among other things:

(a)    it will enable the dispute resolvers to be appointed by each of the three main estates, resulting in a breadth of international expertise to deal with the allocation of truly international sales, including the various and complex inter-linking cross-border legal and conflict of laws questions that arise from the sale of assets in so many different jurisdictions;

(b)    as the arbitration process cannot be appealed or challenged, it will avoid lengthy, time consuming and costly appeals and jurisdictional disputes which are a consequence of court litigation in a matter like this, thereby avoiding any delay in money being released from the escrow accounts;

(c)     it enables the dispute resolvers to structure a procedure and allow
        representations by various interests for the unique situation that the
        allocation process will require.   This is likely to lead to efficiency and
        therefore the quicker release of money from the escrow accounts. The
        sooner money is able to be released from the escrow accounts into the
        various estates, the sooner the separate Nortel entities can distribute the
        money to their individual creditors under their local insolvency regimes;
        and

(d)     the resolution of the allocation issues is likely to significantly curtail the
        outstanding issues between the parties (including in relation to claims) and
        possibly even obviate the need for, or reduce the scope of, any further
        litigation, further expediting the resolution of the insolvency processes in
        the Nortel Group.

## PART IV ~ ORDER REQUESTED

135.    The EMEA Debtors request an Order:

(a)     dismissing the motion brought by the U.S. Debtors;

(b)     compelling and directing the parties to the IFSA to engage in arbitration
        regarding all disputes concerning the allocation of Sales Proceeds; and

- 54 -

(c)     such further and other Orders as counsel may request and this Court may

permit.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 3rd day of June, 2011.

_____
Matthew Gottlieb

_____
Robin B. Schwill

_____
Sean Campbell

**Davies Ward Phillips & Vineberg** LLP
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Tel:  416.863.0900
Fax: 416.863.0871

Lawyers for the Joint Administrators of
Nortel Networks UK Limited (In
Administration)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, et al.

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**MEMORANDUM OF ARGUMENT OF THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK LIMITED AND THE COMPANIES LISTED IN SCHEDULE "A" HERETO**

**Davies Ward Phillips & Vineberg LLP**
44th Floor, 1 First Canadian Place
Toronto, ON   M5X 1B1

Matthew P. Gottlieb (LSUC #32268B)
Robin B. Schwill (LSUC #38452I)
Sean R. Campbell (LSUC #49514J)
Tel:     416.863.0900
Fax:    416.863.0971

Lawyers for the Joint Administrators of Nortel Networks UK Limited (In Administration)