Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERICAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORTATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

SECOND AFFIDAVIT OF TAI-HENG CHENG
(sworn June 6, 2011)

I, Tai-Heng Cheng, of the City of New York, in the State of New York, MAKE OATH AND SAY:

1. I have reviewed the affidavit of David M. Lindsey, dated June 3, 2011 (hereinafter the "Lindsey Affidavit" or "Lindsey Aff."), and am providing this affidavit in response to Mr. Lindsey's affidavit.[1]

## I. POINTS OF AGREEMENT

2. It is important to note that Mr. Lindsey agrees with me on most of the legal principles that I identified in my affidavit, dated May 31, 2010 (the "Cheng Aff.").

3. Specifically, Mr. Lindsey agrees that an arbitration agreement exists where a written agreement evinces an intent to arbitrate,[2] and that there is no requirement that the parties use the term "arbitrate" or any derivation thereof.[3] Mr. Lindsey does not dispute that, as a matter of law, parties need not designate any arbitral institution or rules.[4]

4. Mr. Lindsey does not dispute that extrinsic evidence is admissible to resolve ambiguities in a written agreement.[5] He likewise does not dispute my opinion that when reviewing an ambiguous contract, a court may consider extrinsic evidence predating and contemporaneous with a contract's formation, as well as evidence of the parties' subsequent course of conduct and performance as evidence of how the parties understood themselves to be bound.[6]

5. Mr. Lindsey also shares my opinion that an arbitration provision in a contract limits a more general jurisdiction provision in the same contract, and in such a contract, the jurisdiction of a court is restricted to compelling arbitration and reviewing the arbitration award.[7]

6. Mr. Lindsey further agrees that Section 12(c) of the IFSA represents an obligation to negotiate in good faith towards a protocol for resolving disputes concerning the

---

[1] Unless otherwise defined, capitalized terms have the same meaning as defined in the Cheng Aff.
[2] Cheng Aff. ¶ 17; *accord* Lindsey Aff. ¶ 16.
[3] Cheng Aff. ¶ 20; *accord* Lindsey Aff. ¶ 30.
[4] Cheng Aff. ¶ 30; *accord* Lindsey Aff. § IV(B).
[5] Cheng Aff. § 10; *accord* Lindsey Aff. ¶¶ 43-44.
[6] Cheng Aff. ¶¶ 59-51; *accord* Lindsey Aff. ¶ 43-44.
[7] Cheng Aff. ¶¶ 35-38; *accord* Lindsey Aff. ¶ 27.

allocation of the Sales Proceeds.[8] As is the case here, Mr. Lindsey acknowledges that courts have found a party to have failed to meet an obligation to negotiate in good faith on various occasions, including, for instance, when a party insisted on conditions that were at odds with or beyond the scope of the parties' original understanding or which were asserted as a pretext for preventing an agreement from being reached.[9]

II.    **POINTS OF DISAGREEMENT**

    A.    **Presumption in Favor of International Arbitration**

7.    Mr. Lindsey does not agree that there is a presumption in favor of arbitration when deciding whether a written agreement evinces an intention to submit to international arbitration and therefore is a binding arbitration agreement.[10] He claims that the strong federal policy in favor of arbitration set forth in the FAA applies only to the scope of an arbitration clause, and not to threshold questions of its existence.[11]

8.    With respect, Mr. Lindsey's view overreaches U.S. case law. Although he does not dispute that an arbitration over the allocation of Sale Proceeds would be an international arbitration, he consistently cites U.S. federal and New York cases that address only domestic arbitration, and he ignores cases that concern international arbitration, which contradict his view.

9.    Specifically, Mr. Lindsey cites cases from "lower U.S. courts" and commentators to support his contention.[12] However, as Mr. Lindsey tacitly acknowledges, the U.S. Supreme Court has not ruled directly on whether the federal presumption in favor of

---

[8] Cheng Aff. § IV; *accord* Lindsey Aff. ¶ 45.
[9] *See* Cheng Aff. ¶ 56; *accord* Lindsey Aff. ¶ 49 n.60 (citing cases). Although Mr. Lindsey cites only one case from 1992 in which a court observed under New York law that an agreement to negotiate in good faith may be "insufficiently definite to be enforceable," he acknowledges a string of cases, including the 2005 decision in *CanWest Global Commns. Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S. 2d 549, 570 (N.Y. Sup. Ct. 2005), in which New York and other courts have enforced contractual obligations to negotiate in good faith. *Compare* Lindsey Aff. n.58 *with id.* n.60. Further, that sole case that Mr. Lindsey cites is inapplicable because it concerned a malpractice claim, and did not provide the court with occasion to examine the merits of the potential claim for a breach of an agreement to negotiate in good faith. *McGee & Gelman v. Park View Equities, Inc.*, 591 N.Y.S.2d 656 (N.Y. App. Div. 1992).
[10] Lindsey Aff. ¶ 20.
[11] *Id.*
[12] *Id.* ¶ 20 & n.16.

arbitration applies to the existence of an international arbitration agreement, as opposed to a domestic arbitration agreement, which has no relevance here.[13] He also recognizes that other U.S. courts have taken a contrary view, and employing this pro-arbitration policy, applied a "lower threshold of required proof to arbitration agreements than applicable to other agreements."[14] Therefore, his position, that the federal presumption in favor of arbitration does not apply to the existence of international arbitration agreements, stands on weak ground.

10. Further, the two lower court cases Mr. Lindsey cites for his proposition that lower courts "uniformly reject" the application of the federal presumption in favor of arbitration to the determination of the existence of an arbitration agreement, are in fact cases about *domestic* arbitration.[15] Whether or not Mr. Lindsey is correct that this represents the "majority" view with respect to domestic arbitrations, these cases say nothing about international arbitration and do not apply here.

11. In contrast to the cases concerning domestic arbitration that Mr. Lindsey cites, U.S. cases addressing whether there is an agreement to submit to international arbitration have confirmed that the presumption in favor of international arbitration applies to the existence of an international arbitration agreement.[16] The more accurate view of U.S. law is therefore that there is a federal presumption in favor of finding that international arbitration agreements exist.

---

[13] *See id.* ¶ 20 n.16 (quoting only lower court and domestic-based cases); *id.* ¶ 13 n.13 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (involving a domestic, rather than an international, dispute) and *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (addressing the scope of an arbitration agreement and not the existence of the agreement)).

[14] *Id.* ¶ 21.

[15] Lindsey Aff. ¶ 20 n.16 (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156 (3d Cir. 2009) (domestic arbitration) and *Chevron U.S.A. Inc. v. Consol. Edison Co. of N.Y., Inc.*, 872 F.2d 534 (2d Cir. 1989) (same)).

[16] *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 248 (2d Cir. 1991) (addressing, *inter alia*, the existence of an international arbitration agreement and holding that the policy in favor of arbitration is "even stronger in the context of international business transactions"); *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 450 (3d Cir. 2003) (holding that federal policy in favor of arbitration "applies with special force in the field of international commerce" when deciding the existence of an arbitration agreement (quotation omitted)).

3

12. Policy reasons support a more liberal approach to the interpretation of international arbitration agreements. As Gary Born, the chair of the International Arbitration Practice Group of the WilmerHale law firm and a Lecturer on Law at Harvard Law School, has observed:

> Arbitration is the natural and preferred means for resolving international business disputes. Moreover, the rights of access to judicial protection must be considered from a different perspective in international matters than in domestic matters: in international matters, both parties inevitably claim access to different national courts as the putative "natural" forum, and international arbitration is adopted in large part to avoid the resulting jurisdictional disputes and confusion, which frequently deprive one or both parties of effective access to a judicial forum or legal remedy.[17]

13. Consistent with Mr. Born's view, which I share, the U.S. Court of Appeals for the Second Circuit explained in *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245 (2d Cir. 1990):

> Enforcement of international arbitral agreements promotes the smooth flow of international transactions by removing the threats and uncertainty of time-consuming and expensive litigation. The parties may agree in advance as to how their disputes will be expeditiously and inexpensively resolved should their business relationship sour. Stability in international trading was the engine behind the [New York Convention]. This treaty – to which the United States is a signatory – makes it clear that the liberal federal arbitration policy "applies with special force in the field of international commerce."[18]

14. Other U.S. judicial decisions involving international arbitration agreements have also expressly distinguished international cases from purely domestic ones and have held that policies favoring arbitration are "even stronger" in the context of international business transactions.[19]

---

[17] GARY B. BORN, INT'L COMMERCIAL ARBITRATION, VOL. I, 646-47 (3d ed. 2009) (hereinafter, "BORN").

[18] *Id.* at 248 (citations omitted) (citing, *inter alia*, *Mitsubishi Motors Corp., Inc.*, 473 U.S. at 631 ("emphatic" federal policy in favor of arbitral dispute resolution "applies with special force in the field of international commerce")).

[19] *See, e.g.*, *Standard Bent Glass Corp.*, 333 F.3d at 450 (3d Cir. 2003) (strong federal policy in favor of arbitration "applies with special force in the field of international commerce" (quotation omitted)); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir.

15. Mr. Lindsey supplements his arguments about federal law by claiming that I "argue[] that New York law applies to this case,"[20] and by contending that New York law "arguably sets a high standard of proof for establishing an intent to arbitrate."[21]

16. Mr. Lindsey's characterization of my view is misleading. As I explicitly stated in my affidavit, I provided my opinion "under New York law, and applicable federal law and international law" and it is my view that "New York law is harmonized with and modified by the FAA on issues relating to international arbitration."[22] It would be wrong to think that New York law would trump federal law if New York applied a higher standard of proof than federal law in determining whether the parties intended to submit to international arbitration.

17. In any event, Mr. Lindsey's statement that New York law might "arguably" impose a high standard overreaches New York case law.[23] Mr. Lindsey cites *Schubtex Inc. v. Allen Snyder, Inc.*, 49 N.Y.2d 1 (1979), in support of his argument.[24] *Schubtex* does not apply here because it concerned a purported domestic arbitration clause in an order form that purported to materially alter an oral agreement to buy yarn,[25] whereas the issue here is an international arbitration pursuant to a negotiated bilateral contract – the IFSA. In any event, the purported higher standard in *Schubtex* from over two decades ago is now "largely discredited,"[26] especially in the context of international arbitration.[27]

---

1999) (same); *Meadows Indem. Co. Ltd. v. Baccala & Schoop Ins. Servs., Inc.*, 760 F. Supp. 1036, 1041 (E.D.N.Y. 1991) ("[T]he liberal federal arbitration policy applies with special force in the field of international commerce" (quotation omitted)).

[20] Lindsey Aff. ¶ 22 (citing Cheng Aff. ¶¶ 16, 17).
[21] Lindsey Aff. ¶ 22.
[22] Cheng Aff. ¶ 16.
[23] Lindsey Aff. ¶ 22.
[24] *Id.* ¶ 22.
[25] *Schubtex Inc. v. Allen Snyder, Inc.*, 49 N.Y.2d 1, 4-6 (1979).
[26] BORN, VOL. I, at 646. *See also Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 47 (N.Y. 1997) (recognizing that New York courts have "long promoted" the federal policy favoring liberal agreements to arbitrate; that New York "favors and encourages arbitration as a means of conserving the time and resources of the courts and the contracting parties"; and that therefore, "New York courts interfere as little as possible with the freedom of consenting parties to submit disputes to arbitration" (quotations omitted)).
[27] *See* BORN, VOL. I, at 647 ("[W]hatever the rule in domestic cases, there is no satisfactory basis for imposing any heightened proof requirement for establishing the

18. Accordingly, it remains my opinion that New York law does not impose a high standard for finding an intent to submit to international arbitration, and there is a clear federal presumption in favor of international arbitration when determining whether Section 12(b) is an international arbitration agreement.

### B. Whether Section 12(b) Is an International Arbitration Agreement

19. Whether or not there is a presumption in favor of international arbitration in interpreting the validity of an international arbitration agreement, here, Section 12(b) of the IFSA clearly evinces an intent to arbitrate and is a valid and enforceable international arbitration agreement.[28]

20. Mr. Lindsey takes the opposite view that Section 12(b) of the IFSA is not an international arbitration agreement. He argues that Section 12(b) is not an international arbitration agreement because it is "devoid of the features typically found in enforceable arbitration agreements," including the seat of arbitration, the constitution of a tribunal, and the procedure for arbitration.[29] With respect, here, too, Mr. Lindsey makes errors of law.

21. Contrary to what Mr. Lindsey suggests, it is well established, as a matter of law, that none of the features Mr. Lindsey identifies as the *sine qua non* of arbitration agreements – including a designation of the arbitral seat or a method for selecting an arbitral panel – need to be present in an international arbitration agreement.[30]

---

existence of international arbitration agreements."); *id.* at 650-51 (observing that state law rules that purport to require greater evidence of an agreement to arbitrate than of other types of contracts, especially in the international context, would likely fall afoul of the FAA, which preempts state law rules that discriminate against arbitration agreements); *id.* at 653 (explaining that the "better approach to the formation of international arbitration agreements in commercial settings is to apply a reduced standard of proof to issues of consent" when dealing with international contracts).

[28] *See* Cheng Aff. ¶¶ 24-33.

[29] Lindsey Aff. ¶ 31.

[30] *See* BORN, VOL. I, at 659 (observing that concerns about so-called "blank" clauses, where parties have manifested an intent to arbitrate but without specifying the arbitral seat or means for selecting an arbitral panel, are "misconceived" and should not provide a basis for invalidation of the arbitration agreement). *See also id.* at 659-60 & n. 520-21(noting that "most authorities uphold arbitration clauses that fail to specify (or that specify ambiguously) the seat of arbitration and means of selecting the arbitrators") (citing cases and STEPHEN V. BERTI ET AL. (EDS.), INT'L ARBITRATION IN SWITZERLAND

22. The New York Appellate Division has instructed:

> The absence of any provision in the main contract, to which reference was to be had for the manner and method of procedure, does not alter the clear and dominant purpose of these parties, as evidenced by their written agreement, to submit all disputes to arbitration.[31]

In that appeal, the court found that the trial court properly designated the arbitral forum and seat, even though the parties' contract had failed to specify either.[32]

23. Federal courts have taken a similar view.[33] In *Jain v. de Mere*, the Seventh Circuit Court of Appeals found that a district court could compel arbitration despite the fact that the arbitration agreement failed to specify a location for arbitration or a method of choosing an arbitrator.[34] In *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, an arbitration agreement was enforced in spite of its failure to identify: (a) which association will arbitrate the dispute; (b) where the arbitration will occur; or (c) which arbitration rules will apply.[35]

24. Likewise, Mr. Born has explained that "a valid agreement to arbitrate exists even in the absence of provisions regarding the arbitral seat, the arbitral procedure, the constitution of the arbitral tribunal or other similar matters."[36] Thus, it is the intent derived from the entire agreement, rather than the specific features that make an

---

Art. 178, ¶ 34 (2000) ("[T]he seat of the arbitral tribunal is not one of the *essentialia negotii* which has to be covered by the parties' consent") and M. MUSTILL & S. BOYD, COMMERCIAL ARBITRATION 107 (2d ed. 1989)).

[31] *L.A. Swyer Co., Inc. v. John W. Cowper Co., Inc.*, 389 N.Y.S.2d 197, 198 (N.Y. App. Div. 1976).

[32] *Id.; accord Ballas v. Mann*, 82 N.Y.S.2d 426, 427 (N.Y. Sup. Ct. 1948) ("[A] proper construction of the contract is that the intention to arbitrate is the dominant intention, the personality of the arbitrator being an auxiliary incident rather than the essence, and that frustration of that dominant intention is not to be permitted merely because the precise method of accomplishing that intent has become impossible . . . .").

[33] *Oriental Commercial & Shipping Co. Ltd v. Rosseel, N.V.*, 609 F. Supp. 75, 78 (S.D.N.Y. 1985) (upholding validity of clause providing: "Arbitration: If required in New York City" despite missing other indicia of proper procedural choices "[i]n light of the strong federal policy favoring arbitration, and the duty of the courts to implement the intent of the parties at the time of contracting . . . .").

[34] 51 F.3d 686, 690-92 (7th Cir. 1995).

[35] 642 F. Supp. 1155, 1156-57 (N.D. Ill. 1986), *aff'd*, 831 F.2d 709 (7th Cir. 1987).

[36] BORN, VOL. I, at 656.

arbitration agreement enforceable.[37]  Courts will step in and fill in those gaps where necessary in order to give meaning to the parties' intent to be bound to arbitration.[38]

25.   Mr. Lindsey's quibble with my use of the term "*ad hoc* arbitration" to describe the international arbitration prescribed in Section 12(b) is thus immaterial in light of the foregoing legal analysis that Section 12(b) conforms with applicable law that *ad hoc* or "blank" arbitration agreements are nevertheless enforceable.[39]

26.   Mr. Lindsey also states that, to him, the term "dispute resolver" does not have any "special meaning" in international commercial usage.  He does not offer any authority in support of his contention.  He also offers no authority to support his speculation that "dispute resolver" could have meant "judicial adjudication" in this context.[40]

27.   I am of the opinion that "dispute resolver" refers to alternative dispute resolution and not judicial adjudication.  As I stated in my affidavit, the designation of the parties of third party "dispute resolver[s]" should be understood, both as a matter of general international commercial usage, and given the structure of this agreement, as an agreement to submit disputes to *ad hoc* international arbitration, rather than to judicial adjudication.  As Chief Judge Weinstein of the U.S. District Court for the Eastern District

---

[37] *Lory Fabrics v. Dress Rehearsal, Inc.*, 434 N.Y.S.2d 359, 364 (N.Y. App. Div. 1980) ("The dominant intent was to arbitrate," thus the machinery of procedures is "subordinate and incidental." (quoting *Delma Eng'g Corp. v. K & L Constr. Co.*, 155 N.E.2d 675 (N.Y. 1958))).

[38] *L.A. Swyer Co.*, 389 N.Y.S.2d at 198 ("Accordingly, Special Term was correct in directing arbitration before the most appropriate tribunal available under the circumstances."); *In Matter of Petition of HZI Research Ctr. v. Sun Instruments Japan Co., Inc.*, No. 94 CV 2146 (CSH), 1995 WL 562181, at *3 (S.D.N.Y. Sept. 20, 1995) ("If the parties imperfectly or incorrectly designate the instrumentality through which arbitration should be effected, the court will enforce the contract by making an appropriate designation."); *Ballas*, 82 N.Y.S.2d at 446 (explaining that courts may step in to appoint an appropriate arbitrator where either the contract fails to appoint one or the appointed arbitrator is unavailable); *see also Lucky-Goldstar Int'l (H.K.) Ltd. v. Ng Moo Kee Eng'g Ltd.*, 1993 No. A94 (Sup. Ct. Hong Kong 1993) (where agreement failed to properly designate existing tribunal and rules, court explained that "I believe that the correct approach in this case is to satisfy myself that the parties have clearly expressed the intention to arbitrate any dispute which may arise under this contract. I am so satisfied.").

[39] *See* BORN, VOL. I, at 659-60 (describing "blank" international arbitration agreements as agreements that do not specify an arbitral seat or prescribe other procedural matters but which are nevertheless enforceable and valid arbitration agreements).

[40] Lindsey Aff. ¶ 37.

of New York held in *AMF Inc. v. Brunswick Corp.*: "If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration."[41]

28. In *AMF*, the parties, like here, had not used the word "arbitration" anywhere in their agreement, but instead had simply agreed to submit controversies to an "advisory third party for the rendition of an advisory opinion." The court concluded that this meant arbitration, and explained:

> Case law following the passage of the [FAA] reflects unequivocal support of agreements to have third parties decide disputes – the essence of arbitration. No magic words such as "arbitrate" or "binding arbitration" or "final dispute resolution" are needed to obtain the benefits of the Act.[42]

Likewise, Section 12(b)'s reference to third party "dispute resolver(s)" to determine disputes relating to allocation of the Sales Proceeds, unambiguously refers to *ad hoc* arbitration, rather than judicial resolution, even though the word "arbitration" was not used.[43]

### C. The Court's Jurisdiction Under Section 16 of the IFSA

29. Mr. Lindsey claims that my opinion that Section 16 of IFSA grants only limited jurisdiction to the courts to compel arbitration is based on a mistaken assumption that Section 12(b) of the IFSA is an international arbitration agreement.[44] I make no such assumption. As set forth in my earlier affidavit, as well as above, my opinion that Section 12(b) of the IFSA is an international arbitration agreement is based on law and the clear intention of the parties evident from the words of Section 12.[45] Mr. Lindsey agrees that should the Court find that Section 12(b) of the IFSA is an international

---

[41] 621 F. Supp. 456, 460 (E.D.N.Y. 1985). It is unclear from *AMF* decision whether or not this was a dispute between parties of different nationalities. Even if it is a domestic arbitration, its reasoning applies *a priori* to international arbitration, because, as shown above, the FAA imposes an even stronger presumption in favor of arbitration in the international context.
[42] *Id.* at 460.
[43] Cheng Aff. § VII(A); *see also* 5 N.Y. Jur. 2d Arbitration & Award 89; *Railworks Corp. v. Villafane Elec. Corp.*, 788 N.Y.S.2d 834, 837 (N.Y. Sup. Ct. 2004).
[44] Lindsey Aff. ¶ 27.
[45] Cheng Aff. § VI & *supra*, § II.B.

arbitration agreement, its jurisdiction is limited to enforcing the agreement and that the Court is precluded under New York law from allocating the Sale Proceeds.[46]

30. Mr. Lindsey is also of the view that "[i]f no agreement to arbitrate exists,"[47] Section 16 would grant U.S. and Canada courts jurisdiction over "all disputes related to the IFSA, including the resolution of allocation disputes."[48] He additionally implies that I would agree with this statement because I "do not dispute that Section 16(b) is a 'general jurisdiction provision.'"[49]

31. Mr. Lindsey mischaracterizes my view by omitting a key word from my affidavit. I did not state in my affidavit that Section 16 was "a 'general jurisdiction provision.'"[50] I stated instead that Section 16 was a "*more* general jurisdiction provision" than Section 12(b), but that the more specific provision in Section 12(b) providing for arbitration divests courts of jurisdiction over disputes that fall within the scope of Section 12(b), that is, disputes over the allocation of Sale Proceeds.[51]

32. In any event, even if Section 12(b) were not an arbitration agreement, Mr. Lindsey's view that Section 16(b) confers jurisdiction on the Court to allocate Sale Proceeds stretches the plain words of Section 16(b) too far. I agree with Mr. Lindsey that "there is no reason why Section 16(b) should not be read to mean what it says."[52] I also agree that Section 16(b) states that the U.S. and Canada courts have jurisdiction over "matters agreed in [the IFSA]."[53] I do not agree, however, with Mr. Lindsey's further statement that this "includes disputes on allocation."[54] Section 16(b) does not say anything about allocation disputes, and, as Mr. Lindsey and I both agree, Section 16(b) should only be read to mean what it says. That does not, in terms, include allocation disputes.[55]

---

[46] Lindsey Aff. ¶ 27.
[47] *Id.*
[48] *Id.*
[49] Lindsey Aff. ¶ 26 (quoting out of context Cheng Aff. ¶ 34).
[50] *Id.* ¶ 26.
[51] Cheng Aff. ¶ 34 (emphasis added).
[52] Lindsey Aff. ¶ 26.
[53] *Id.* ¶ 24 (quoting the IFSA, Section 16(b)).
[54] *Id.* ¶ 27.
[55] *See John Wyeth & Bro. Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997) ("[W]hether or not a forum selection clause applies depends on what

33. The limited scope of Section 16(b) is further confirmed by other sections of the IFSA. Sections 12(a) and 12(b) explicitly state that the allocation of Sale Proceeds is not agreed to in the IFSA. Instead, Sale Proceeds will only be distributed when the parties mutually agree on the allocation or when a dispute resolver makes a determination about allocation. Therefore, allocation of Sale Proceeds is not a matter "agreed in [the IFSA],"[56] and does not fall within the jurisdictional ambit of Section 16(b), whether or not Section 12(b) is an arbitration agreement.

### III. CONCLUSION

34. Having reviewed Mr. Lindsey's affidavit, and considered the sources and authorities referenced therein, my opinions as stated in my affidavit of May 31, 2011 remain unchanged for the reasons contained in my May 31 affidavit and this affidavit.

35. At the Court's request, a case book containing all of the case law and other authority referenced herein will be made available.

_____
Tai-Heng Cheng

STATE OF NEW YORK    }
                     }
COUNTY OF NEW YORK   }

Sworn to before me this
6th day of June, 2011

_____
Notary Public

**MARC AARON MELZER**
Notary Public, State of New York
No. 02ME6150927
Qualified in New York County
Commission Expires Dec. 20, 2014

---

the *specific clause at issue* says." (emphasis in original)); *see also Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) ("Because we cannot presume that the parties intended to exclude all statutory claims, or even all copyright claims, from the forum selection clause, we examine the substance of Phillips' claims as they relate to the precise language of the clause.").
[56] IFSA § 16(b).