IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- X
                                                             :

In re:                                                   :    Chapter 11

NORTEL NETWORKS INC., *et al.*,          :    Case No. 09-10138 (KG)

                               Debtors.      :    (Jointly Administered)

                                                         :    **Hearing Date: June 7, 2011 at 9:30 a.m. (ET)**

                                                         :    **RE: Docket Nos. 5307, 5444, 5531, 5532, 5571, 5572, and 5573**

---------------------------------------------------------------- X

**THE JOINT ADMINISTRATORS'
REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR
<u>CROSS-MOTION TO COMPEL ARBITRATION</u>**

The Joint Administrators[1] submit this Reply Memorandum of Law in further support of their Cross-Motion to Compel Arbitration.

## **INTRODUCTION**

Movants do not dispute that, until the filing of the current motion, no party had ever suggested that disagreements about how to allocate the proceeds of Nortel asset sales should be decided by any one or more national courts. The record is clear that in the negotiations leading to the execution of the IFSA, the submissions made to the U.S., Canadian, English and French courts while approving the IFSA, the statements made by the courts themselves, and in all subsequent negotiations it was understood and accepted by all that allocation disputes would be decided in a private dispute resolution process and not in any of the various courts who have

---

[1].  Unless otherwise indicated, defined terms have the same meanings as in the *Joint Administrators' Memorandum of Law in Support of Their (I) Objection to Joint Motion for Entry of an Order Establishing An Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and (II) Cross-Motion to Compel Arbitration* [D.I. 5531].

jurisdiction over the debtors. The EMEA Debtors expressly relied on this understanding when they conveyed their rights in the various Nortel businesses without any prior agreement as to what share of the proceeds they would receive.

Now that all of the asset sales have taken place, the Movants have abruptly changed their minds about how allocation disputes should be resolved. They now contend that they are not bound by the prior understandings because (i) the term "dispute resolver" is arguably broad enough to encompass a national court, and (ii) the parties never finalized the terms of the Interim Sales Protocol specifying the precise procedures to be used in the proceedings to resolve allocation disputes.

Movants' arguments are without merit. A review of the IFSA shows that there is only one reasonable interpretation of the word "dispute resolver" -- i.e. the one the parties and courts have embraced at all relevant times. At best, Movants have shown in their objection to the Joint Administrators' cross-motion (the "Objection") that there is a latent ambiguity in the term, meaning that the Courts can examine extrinsic evidence in order to ascertain the parties' intent. All extrinsic evidence confirms that the parties and the Courts intended and understood that disputes over allocation would be decided in a private, transnational proceeding rather than in any national court or courts. This is all that is required to create an irrevocable arbitration agreement that must be enforced under the Federal Arbitration Act. If the U.S. and Canadian Debtors are not willing to comply with their obligations to complete the good faith negotiations and finalize the arbitral procedures, the Courts should nevertheless order them to submit the allocation disputes to arbitration.

Nor did the EMEA Debtors ever agree that if the parties could not finalize an Interim Sales Protocol the Courts should decide allocation by way of joint hearings. Movants

acknowledge, as they must, that no provision of the IFSA or any other agreement states this in so many words. Instead they seek to imply it from general forum selection clauses contained in the IFSA and the sales proceeds escrow agreements. An examination of these clauses shows that they do not, by their terms, apply to allocation disputes, nor can they be read to override Section 12(b) of the IFSA, and mirroring provisions in the sales proceeds escrow agreements, which state unequivocally that the sales proceeds shall only be released (i) by agreement of the selling parties, or (ii) pursuant to an award issued by dispute resolvers who followed procedures agreed to by the parties. Movants have not provided any basis for overriding the EMEA Debtors' contract rights by abrogating these bargained-for provisions which the EMEA Debtors relied on when recommending and seeking court approval of the IFSA.

## ARGUMENT

### I. SECTION 12 OF THE IFSA CONSTITUTES AN ENFORCEABLE ARBITRATION AGREEMENT.

Movants first argue that they could not have been bound to arbitrate until an IFSA protocol was finalized and approved by the Court because the Bankruptcy Code does not permit the U.S. Debtor to commit to arbitration without this Court's approval. This argument ignores the fact that the IFSA itself was approved by the Court. The comments made in connection with the court approval process leave no doubt that arbitration was intended. Inasmuch as the IFSA itself contains an enforceable agreement to arbitrate, the Court has given its approval.

Movants next contend that Section 12 of the IFSA is not an arbitration agreement because it does not explicitly refer to "arbitration" and does not spell out the procedures to be followed in the arbitration. (*See* Obj. at 13-19.) The authorities the Joint Administrators cited in support of the cross-motion show that neither of these is a condition to having an enforceable arbitration clause. (Cross-Mot. at 17-18, 25.) The Joint Administrators also refer the Court to

the First and Second Affidavits of Professor Tai-Heng Cheng, an expert on New York arbitration law, which have been filed in Canada in connection with the present application. Professor Cheng cites numerous additional authorities supporting the EMEA Debtors' position.

The cases the Movants cite are not to the contrary. In *Bor Corp. v. ADT Automotive Inc.*, No. 96 Civ. 1019, 1996 WL 689364 (S.D.N.Y. Nov. 27, 1996), the court found no agreement to arbitrate where the parties had agreed to "have an accounting firm, acceptable to all parties, independently confirm Plaintiff's numerical representations and determine the adjustments, if any, to be made to" the purchase price for a business. *Id. at* *7. The court found that this did not constitute an agreement to arbitrate because the intended process did not constitute a dispute resolution procedure:

> The parties did not contemplate that the accounting firm would engage in a dispute resolution between the parties. Further, no dispute between the parties as to the Adjusted Operating Income could occur because that calculation would be made by an independent third party. Section 2.6 of the Purchase Agreement merely provides for an independent process by which the Purchase Price could be adjusted, without argument or submissions from the parties, after the closing date.

*Id.*[2]

In other words, the essence of an "arbitration" is simply that it is a contested procedure for resolving a dispute that has arisen between the parties. *Id*. ("An arbitration implies a difference, a dispute, and involves ordinarily a hearing and all thereby implied. . . . This seems to be the distinction between an arbitration and an appraisement, though the first term is used

---

[2.] Movants cite *Bor Corp* mainly for the court's dictum that "The parties are sophisticated business entities. If they wanted arbitration, they would have used the term or a derivative thereof." 1996 WL 689364 at *10. But an examination of the decision shows that the absence of the word "arbitration" was not the basis of the court's finding that there was no agreement to arbitrate in any of the several agreements the parties to the case had signed. Further, the term "dispute resolver" is plainly a "derivative" of arbitrator, as it clearly invokes the various procedures grouped under the name "alternative dispute resolution."

when the other is more appropriate") (quoting *City of Omaha v. Omaha Water Co.*, 218 U.S. 180, 192 (1910)); *see also AMF v. Brunswick Corp.*, 621 F. Supp. 456, 460 (E.D.N.Y 1985) ("If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration."). Section 12 of the IFSA clearly meets this test. It expressly provides that a "dispute resolver" (IFSA § 12(b)) will be appointed to resolve "disputes concerning the allocation of Sale Proceeds" (IFSA § 12(c)). Under the terms of Section 12, such a dispute only arises after the parties have negotiated but been unable to agree on how proceeds from a sale should be allocated. (IFSA § 12(d).)[3]

Movants next argue that because courts resolve disputes, the parties could have intended that the term "dispute resolver" to encompass either a court or a private arbitrator. This suggestion is belied by the terms of Section 12 itself, which clearly contemplates that the parties will negotiate and attempt to agree on the procedures to be followed by the dispute resolver. This cannot have been intended to include a court because private parties cannot dictate the procedures to be followed by a court, particularly with respect to the type of detailed procedural matters addressed in the parties' draft protocols. Further, if the parties had intended a joint reference to the Canadian and U.S. courts, they could have made this explicit in Section 12, as they did in relation to other matters under Section 16 of the IFSA.

Movants cite a series of cases in which various courts have used the term "dispute resolver," in passing, to include courts. These references do not advance their position. In none

---

[3.] Movants' reliance on *Truck Drivers, Oil Drivers, Filling Station & Platform Workers' Union Local 705 v. Schneider Tank Lines, Inc.*, 958 F.2d 171 (7th Cir. 1992), is puzzling. (*See* Obj. at 17 n.18.) The portion of the opinion quoted by Movants omits the court's reference to a just-cause provision, which was the focal point of the decision. (*See* Obj. at 17 n.18 (quoting *Truck Drivers*, 958 F.2d at 175).) Moreover, in that case the court did not even consider whether the contract contained an arbitration clause, because the lack of an arbitration clause was not disputed. *See id.* at 172 (observing that operative contract did not contain arbitration clause but parties agreed to add one following instant litigation).

of these cases was the court construing a contract term like the one presented here. It is also significant that all of these references come from the relatively recent era when "alternative dispute resolution" has been a hot topic for lawyers and the courts. It appears that the courts are using the term in a conscious echoing of this terminology.

The EMEA Debtors respectfully submit that ordinary meaning of the term "dispute resolvers," in the context presented in Section 12 of the IFSA, does not permit the interpretation that it is intended to encompass judicial proceedings. Contrary to Movants' argument, this is the precisely the type of terminology lawyers would use to denote that the dispute resolver was not intended to be a court, by adopting an intentional reference to "alternative dispute resolution." Indeed this term appears to have been selected because the parties had initially thought they could agree to a dispute resolution process that would not be subject to even the limited court challenges available for arbitral awards. (*See* Lloyd Aff. Ex. At 72 (First, pre-IFSA, draft of allocation dispute resolution protocol provides that decision of "dispute resolver" "may not be challenged or appealed and shall not be deemed an arbitral award.); *id.* at 88 (second draft provides same).) As explained above, any procedure whereby a dispute is referred to a private party for resolution is considered an "arbitration" under the FAA.

At best Movants' arguments demonstrate that there is a latent ambiguity in the term dispute resolver. At best Movants have shown that there is an alternative reading of "dispute resolver", divorced from the concept of alternative dispute resolution, that could encompass court proceedings. *See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994) ("In reviewing the two interpretations, we need not determine which is the more likely interpretation; we need merely decide whether [each] . . . is sufficiently reasonable to render the clause ambiguous.") (internal quotation omitted). In this case the Court should refer

to extrinsic evidence of the parties' intent. As show in the prior Memorandum of Law, and Mr. Lloyd's Declaration, all extrinsic evidence confirms the parties' agreement to arbitrate.

## II. THE U.S. AND CANADIAN DEBTORS HAVE NOT COMPLIED WITH THEIR OBLIGATION TO NEGOTIATE IN GOOD FAITH.

All parties accept that they had a duty to negotiate in good faith in an attempt to agree on the procedures to be applied in the allocation arbitration. The papers submitted by the U.S. and Canadian Debtors confirm that they have not complied with this obligation.

All agree that the protocol discussions were merely suspended, without conclusion. At the time they were suspended, the remaining issues were trivial drafting points and unlikely to lead to any deadlock or impasse. The one exception to this was the Canadian Debtor's attempt to limit the arguments that could be made in the arbitration. This argument, which was opposed by the U.S. Debtors and Creditors' Committee, was not in good faith because it was contrary to the agreed upon scope of what was to be negotiated, i.e. procedures for resolving disputes about allocation.

The U.S. and Canadian Debtors suggest that the EMEA Debtors created an impasse in the protocol negotiations by insisting that the intercompany claims be adjudicated in the same proceeding as allocation, or by improperly seeking to make allegations of wrongdoing or misconduct against the other estates. These assertions are incorrect. Although the EMEA Debtors did suggest that it would be most efficient to determine claims in the same proceeding as allocation, given the overlap in many underlying issues, they did not insist on this as a condition to entering any protocol. What the EMEA Debtors, and the U.S. Debtors, did insist upon was that no limitations be imposed on the arguments the parties would be permitted to make in an effort to show the value of what they contributed to the assets that were sold to generate the sale proceeds. (*See* Hodara Decl. Ex. A at 3 ¶ 21 ("The UCC will not agree to Canada's proposed

language.  We have already negotiated these issues and agreed that we will not decide for the Panel what they can and cannot consider in rendering an allocation decision.") & attachment (marked up draft) at 18 (same).)

The other parties' recent refusal to confer with respect to resolving the protocol issues that were open when discussions were suspended is a breach of their duty to negotiate in good faith.  It is true that the parties to an agreement to negotiate in good faith retain the flexibility to not consummate the transaction if good faith impediments to agreement arise over the course of negotiations.  *See Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (in performing under an obligation to negotiate in good faith, "[i]t is . . . possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation.  The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.")  Here, however, Movants have not alleged that any circumstances have changed, nor that the parties have mutually abandoned the negotiation of a Protocol.  Instead, the Movants have attempted to renounce the material terms they had agreed, abandon negotiations, and to insist on conditions that do not conform to the preliminary agreement, especially the limitation on arguments that could be raised during arbitration.

Similarly, it is a breach of their duty of good faith for the parties to suddenly change course with respect to who the dispute resolver should be after a year of negotiations.  An agreement to negotiate in good faith does not allow a party to arbitrarily declare that negotiations have reached an impasse, while justifying that conclusion on its own sudden insistence on unexpected terms.  *See P.A. Bergner & Co. v. Martinez*, 823 F. Supp. 151, 156 (S.D.N.Y. 1993) ("Both parties can fulfill their obligations under [an agreement to negotiate in good faith], and

yet not agree on the ultimate written contract, provided good faith differences in the negotiation of the open issues prevent the parties from reaching a final contract. Such an 'agreement to agree,' however, *does prevent one party from arbitrarily abandoning the transaction or insisting on conditions that to do not conform to what was spelled out in the preliminary agreement*.") (emphasis added).  In the present case, the Movants have shown no reason why they have chosen to arbitrarily end negotiations of the allocation protocol and ask this court to allow them to proceed in what they apparently perceive as a more favorable forum.

The Movants cite *IDT Corp. v. Tyco Group*, 918 N.E.2d 913, 915 (N.Y. 2009), for the proposition that the contemplation of a future formal agreement relieves a party from its obligations under a preliminary agreement.  Yet *Tyco* involved an express reservation in a settlement agreement not to be bound by its terms until definitive documentation of a fiber optics capacity "indefeasible right to use" agreement could be executed.  *Tyco*, 13 N.Y.3d at 212 (preliminary agreement required as a precondition to any binding effect that the subsequent agreement "shall be documented pursuant to definitive agreements to be mutually agreed upon").  Section 12 of the IFSA contains no such explicit provision.  In any event, the Movants have repeatedly acknowledged the validity of their duty to negotiate in good faith.  *See Adjustrite Systems, Inc. v. GAB Business Services, Inc.*, 145 F.3d 543, 548 (2nd Cir. 1998) (even where parties expressly require a future formal agreement, "[i]n some circumstances, however, preliminary agreements can create binding obligations," including the obligation to negotiate in good faith) (citations omitted).

The Movants' reliance on *SNC Ltd. v. Kamine Eng'g & Mech. Contracting Co.*, 238 A.D.2d 146, 146, 655 N.Y.S.2d 47, 47 (1st Dep't 1997), is curious.  In *Kamine*, the court was confronted with a preliminary construction contract between the plaintiff and certain

defendants. The plaintiff alleged that those defendants had breached the duty to negotiate in good faith. The trial court granted summary judgment to those defendants as to the plaintiff's breach of contract claims, <u>except</u> for the claim that the defendants failed to negotiate in good faith, and the First Department affirmed the decision to allow the issue of good faith negotiations to proceed to trial. *Kamine*, 238 A.D.2d at 146.

Movants' use of *River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 274, 743 N.Y.S.2d 870, 870 (1st Dep't 2002) is also misplaced. The *River Glen* court concluded that a commercial mortgage application containing explicit disclaimers of binding effect did not create an obligation to negotiate in good faith. Again, in the present case, the IFSA contains no disclaimers that would vitiate the duty to negotiate in good faith. Indeed Movants concede that they have such a duty.

### III. THE COURTS DO NOT HAVE JURISDICTION TO DICTATE THE TERMS OF AN ALLOCATION PROTOCOL OR TO DETERMINE ALLOCATION.

#### A. The EMEA Debtors Did Not Consent To The Courts' Jurisdiction To Determine Protocol Terms Or To Decide Allocation.

##### 1. The IFSA Does Not Give The Courts Power To Dictate An Allocation Protocol Or Decide Allocation.

Contrary to Movants' suggestion, the EMEA Debtors do not dispute that forum selection clauses are generally valid and enforceable. However, like all agreements, they can only be enforced in accordance with their terms. The Third Circuit has observed that the scope of a forum selection clause is a question of contract interpretation, and that whether or not such clause applies "depends on what the <u>specific clause at issue</u> says." *See John Wyeth & Bro. Ltd. v. Cigna Int'l Corp.*, 119 F. 3d 1070, 1075 (3rd Cir. 1997) (emphasis in original).

Section 16(b)(i) of the IFSA only gives the U.S. and Canadian Courts joint jurisdiction over disputes "to the extent related to matters agreed in [the IFSA]."

(IFSA § 16(b)(i).) Many matters were agreed in the IFSA, including all of the funding arrangements detailed in Paragraphs 1 to 9, which were in fact the primary focus of the agreement. However, the EMEA Debtors' right to receive the proceeds from the sale of their own property was not among the matters "agreed in the IFSA." It was a pre-existing right that was not affected by the terms of the IFSA.

What <u>was</u> expressly agreed in the IFSA is that sale proceeds could only be distributed in accordance with (i) the agreement of all parties, including the EMEA Debtors, or (ii) an award reached through a dispute resolution process to which all parties, including the EMEA Debtors, had given their consent. The forum clause in Section 16 cannot be read in a manner which abrogates these protections by substituting the Courts for the dispute resolver to be agreed by the parties. Insofar as Section 12 of the IFSA creates an "agreement to agree" about how allocation disputes should be resolved, the process for allocation can simply not be said to be a matter that was "agreed to" in the IFSA.

Significantly, in seeking approval of the IFSA, Mr. Bromley, counsel for the U.S. Debtors, expressly stated for the record that IFSA was <u>not</u> intended to provide either Court with jurisdiction to allocate proceeds:

> I should note while we're at the point of allocation, the U.S. Trustee has made a request for a clarification, which we've added to the order. The clarification that this order, in and of itself, <u>does not approve either here or in Ontario for the allocation of any particular proceeds</u>. But rather sets the stage for the parties to come back to these courts with a protocol for approval. And it is the intention of all of the interested parties, the core parties, as we refer to them in the agreement, to come back to both of these courts for approval of that allocation protocol.

(Transcript of June 29, 2009 Hearing at 34: 14-23.)

Moreover, the order approving the IFSA expressly provides that nothing therein or in the IFSA "shall determine the allocation of proceeds from a Sale Transaction among the

Selling Debtors or shall constitute a protocol for determining the allocation of proceeds from a Sale Transaction among the Selling Debtors." (IFSA Approval Order, ¶ 8.)

Any other interpretation of Section 16 of the IFSA would fly in the face of the understanding of the EMEA Debtors (and the other Nortel entities outside of the U.S. and Canada) who agreed to give up rights in their businesses and assets based on the understanding that the sale proceeds would be allocated through a transnational process, not in any national court. This was an important term due to the many competing national creditor groups and interests.

Furthermore, Section 16 only gives the U.S. and Canadian courts joint jurisdiction "to the extent permitted by law." (IFSA § 16(b).) As the Joint Administrators have noted, principles of sovereignty do not permit the courts to engage in joint deliberations to determine matters such as allocation of sales proceeds.

### 2. The Escrow Agreements Do Not Give The Courts Power To Dictate An Allocation Protocol Or Decide Allocation.

The Movants also submit that the parties agreed to submit to the jurisdiction of the U.S. and Canadian Courts under the separate Escrow Agreements, which On the contrary, the escrow agreements make even clearer that the courts may <u>not</u> exercise jurisdiction. The jurisdiction clauses in the escrow agreements cannot be read to give the courts authority to determine how the sale proceeds should be allocated. The escrow agreements expressly provide that escrowed funds can only be paid out if (i) instructed by all parties, or (ii) "where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA" there has been a binding decision made by the relevant dispute resolver(s). This cannot be construed as an agreement that the courts should ever be allowed to decide allocation. It

expressly maintains the control of each of the selling debtors over the allocation process. Movants have not stated any basis for the Court to override or ignore these contract provisions.

Indeed, the U.S. Debtors initially tried to include a provision in the CDMA escrow agreement that would have expressly allowed for court determination of allocation. The Joint Administrators rejected this provision. (Lloyd Decl. ¶¶ 65-67.)

### 3. The Cross Border Protocol Does Not Give The Courts Power To Dictate An Allocation Protocol Or Decide Allocation

Contrary to the Movants' assertions, the EMEA Debtors' agreement to submit certain types of disputes for resolution under the Cross-Border Protocol cannot be construed as a consent to have allocation of sales proceeds decided in joint hearings under that Protocol. Numerous terms of the Cross Border Protocol confirm that it is not to be construed to affect the jurisdiction of the courts, or substantive rights of any party, in any way. (*See* Cross Border Insolvency Protocol § 9(a) ("nothing contained herein shall be construed to . . . increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal . . . ."); *id.* § 13 (Protocol does not affect entitlement of each court "at all times to exercise its independent jurisdiction and authority with respect to . . . matters presented to such Court, including, without limitation, the right to determine if matters are properly before such court."); *id.* § 13 ("Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall:  (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors . . . .").)

Nor can Paragraph 15(ii) of the Cross-Border Protocol be construed as giving the Courts independent jurisdiction to decide motions to allocate sales proceeds which are in the

aggregate more than U.S.$30 million.  This omnibus paragraph simply states the procedures that will be followed, and specific rights of participation, "to the extent" any of fourteen different types of motions are filed.  (*See* Cross Border Protocol ¶ 15.)  This provision does not grant the Courts any new jurisdiction that they did not already have.  Further, although this provision is one of many housekeeping changes that were made to the Cross Border Protocol as a condition of the effectiveness of the IFSA, the EMEA Debtors were not consulted in the drafting of these amendments.  (*See* IFSA ¶ 13a (effectiveness of IFSA conditioned on the courts' "approving amendments to the cross-border protocol . . . that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the U.S. Debtors), the Monitor, the Creditors Committee and the Bondholders Committee . . . .")

      **B.**    **The Courts Do Not Have Inherent Jurisdiction To Determine Protocol Terms or Decide Allocation.**

The Movants cleverly frame the jurisdiction question in terms of whether the Court has the power to approve an allocation protocol.  The EMEA Debtors do not dispute that, pursuant to the IFSA Approval Order, the U.S. Debtor would be required to present a negotiated allocation protocol for final approval.  But this is not the jurisdiction Movants are asking the Court to exercise here.  What Movants ask the Court to do is precisely what, in opposition to the EMEA Debtors' cross-motion, they say the Court may not do:  dictate the terms of an IFSA dispute resolution protocol in a situation where the parties have not themselves reached agreement.  This is not a matter of jurisdiction but of substantive rights.  Movants simply have not articulated any basis upon which, confronted by a situation in which the parties' negotiations have not produced a final protocol, the Court is empowered to impose terms proposed by one party that have no relationship to the terms the parties had reached consensus on their rather advanced discussions towards a protocol.

Movants have chosen to frame their application as seeking entry of a protocol under the IFSA in an effort to conform their relief with the parties' unequivocal agreement, in the IFSA and all of the escrow agreements, that sales proceeds may only be disbursed (i) upon agreement of the selling debtors, or (ii) pursuant to an award entered by a dispute resolver appointed under an agreed IFSA dispute resolution protocol. But there is no legal basis for the Court to dictate the terms of such a protocol in the absence of the parties' agreement.

## IV. JOINT HEARINGS WILL BE TIME CONSUMING, FRAUGHT WITH PRACTICAL DIFFICULTIES, AND OFFER NO GUARANTEE OF PRODUCING AN ENFORCEABLE RESULT.

After receiving the Joint Administrators' objections to the proposed allocation protocol, which set out what should have been obvious -- that two sovereign courts cannot render a joint decision, the Movants now attempt to propose a protocol that uses different words but has the same effect. They now suggest that the U.S. and Canadian Courts should each render a decision on the merits of the allocation dispute. The result is exactly the same. In order for the decisions to be useful and enforceable, they need to be identical. This will be highly unlikely if the Courts arrive at their decisions independently. Engaging in joint deliberations in order to arrive at consistent results will infringe on each court's sovereignty, in violation of the letter and spirit of the Cross-Border Protocol, which is "designed to honor the independence and integrity of the U.S. and Canadian Courts." (Cross-Border Protocol at ¶ 6(c).

Indeed, Movants propose to do something that is contrary to fundamental principles of jurisprudence: have two courts issue separate decisions about the disposition of a single *res* (a fund of money). In order to determine how to allocate the funds held in escrow, the courts would be called upon to decide the rights of each of several dozen selling debtors to the price received for some eight separate sale transactions. This will entail hundreds of individual determinations. This makes allocation quite different from the prior matters that have been

addressed through joint hearings, which have mainly concerned sale procedures and asset sales. Movants' concession that the courts have no authority to enter a joint decision on allocation emphasizes one of the central risks of proceeding through joint hearings, i.e. that there is no guarantee that the courts will agree on all matters. In the event the Courts disagree, they would be deadlocked, without any procedure for resolving the disagreement.

In the event the courts enter differing judgments, there will be a race to enforce these judgments in New York where the assets are held in escrow. And even if the judgments are consistent, disappointed parties will be able to appeal through two separate appeal systems, leading to a strong likelihood of inconsistent results. Movants are incorrect to suggest that an arbitral award would also be subject to parallel appeals. Under the terms of the Federal Arbitration Act, enacted to implement the New York Convention, the courts at the seat of the arbitration will be the only courts with jurisdiction over an action to confirm or challenge the award. Furthermore full scale appeals (to two levels of courts in the U.S.) will take longer to resolve than attempts to vacate an arbitral award because the grounds for vacating are very limited. Motions to confirm/vacate are handled in summary fashion.

## V. THE PRESENT MOTION IS PROCEDURALLY IMPROPER AND SHOULD HAVE BEEN BROUGHT BY WAY OF AN ADVERSARY PROCEEDING.

A critical distinction between the relief being sought by the Movants in their motion (the "Motion") and the relief being sought by the Joint Administrators in their Cross-Motion is that the Motion seeks to impose an Allocation Protocol which the Movants concede has not been agreed, while the Cross-Motion asks the court to enforce an arbitration provision to which (as explained above) the parties previously have agreed and which the Courts previously approved in the IFSA Order. While the Joint Administrators are asking the Court only to enforce

a prior order, the Movants are seeking much broader relief, relief which only can be obtain in an adversary proceeding.

The Movants repeatedly embrace the proposition that the IFSA empowers this court to enforce "the matters agreed in this Agreement." (*See* Obj. ¶ 2, 5-6, 8, 9.) The Movants also concede the proposition that the Court has the inherent power to enforce the terms of its own order. (*See* Motion ¶ 37.) It is for precisely these reasons that the Cross-Motion does not require an adversary proceeding; The Joint Administrators are asking the Court to enforce the unambiguous terms of an agreement that it has already approved.

On the other hand, the Motion seeks affirmative relief in respect of a matter that the parties repeatedly acknowledge has never been the subject of an agreement: the Allocation Protocol. Not only is there no agreement on the Allocation Protocol, the IFSA is silent on what is to occur when that parties are unable to agree on such a protocol. It is because it has not been "agreed" that the Allocation Protocol is not within the scope of the "matters agreed in this Agreement" and is not a subject that the IFSA (and the U.S. IFSA Order) reserves for the Court to enforce.

In asking this Court to unilaterally impose the Allocation Protocol, Movants are seeking relief beyond what was agreed in the IFSA. This entitlement to such relief can only be adjudicated in an adversary proceeding.[4]

---

[4] Had Movants proceeded properly by filing an adversary complaint, the EMEA Debtors could (and would) have counterclaimed for the relief they seek.

## CONCLUSION

For the foregoing reasons, the Courts should grant the Joint Administrators' motion to compel the parties to arbitrate all allocation disputes.

| | |
|---|---|
| Dated: Wilmington, Delaware<br>June 6, 2011 | **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br><br>/s/ Edwin J. Harron<br>James L. Patton (No. 2202)<br>Edwin J. Harron (No. 3396)<br>Jaime N. Luton (No. 4936)<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 571–6600<br>Facsimile: (302) 571–1253<br><br>- and -<br><br>**HUGHES HUBBARD & REED LLP**<br>Michael Luskin<br>Derek J.T. Adler<br>One Battery Park Plaza<br>New York, New York 10004<br>Telephone: (212) 837–6000<br>Facsimile: (212) 422–4726<br><br>- and -<br><br>**HERBERT SMITH LLP**<br>Kevin Lloyd<br>John Whiteoak<br>Richard Lawton<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br><br>*Counsel for the Joint Administrators* |