**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*, | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Re: Docket No. 5359 |
| | ) | **Hearing Date: June 30, 2011 at 10:00 a.m.** |
| _____ | ) | **Objection Deadline: June 6, 2011[1]** |

**OBJECTION OF QWEST CORPORATION, QWEST COMMUNICATIONS
COMPANY, LLC, AND EMBARQ MANAGEMENT COMPANY TO
PROPOSED REJECTION OF ANY CONTRACTS**

Qwest Corporation ("QC"), Qwest Communications Company, LLC ("QCC"), and

Embarq Management Company ("Embarq", and, collectively with QC and QCC, the "Contract

Parties", currently affiliates of CenturyLink, Inc.), by their undersigned counsel, object (the

"Objection"), to the extent applicable, to the proposed rejection of any contracts pursuant to the

procedures set forth in the Order (A) Authorizing Debtors' Entry Into the Stalking Horse Asset

Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections,

(C) Approving the Notice Procedures and the Assumption and Assignment Procedures,

(D) Approving the License Rejection Procedures, (E) Approving a Side Agreement, (F)

Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale

Hearing (the "Bid Procedures Order") (D.I. 5359), and state as follows:

---

[1] The objection deadline was extended from May 31, 2011, to June 6, 2011, on consent of the Debtors and the
Stalking Horse Purchaser (as such terms are defined herein).

I.    **FACTUAL BACKGROUND**

1.    On January 14, 2009 (the "Petition Date"), Nortel Networks, Inc. ("NNI") and

certain of its debtor affiliates (collectively, the "Debtors") filed a voluntary petition for relief

under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District

of Delaware.

A.    **The Agreements**

2.    Prior to the Petition Date, the Contract Parties, and/or certain of their affiliates or

predecessors in interest, and certain of the Debtors, and/or certain of their predecessors in

interest, entered into certain agreements (collectively, the "Agreements").[2]  The Agreements

include:[3]

- Agreement No. GAA0002, by and between US WEST Communications, Inc. ("US West Communications") and NNI;
- Agreement No. 98051104, by and between US WEST Business Resources, Inc. ("US West Business Resources") and Clarify, Inc.;
- Procurement Contract No. RPHCR42292, by and between US West Business Resources and Northern Telecom, Inc. ("NTI");
- Procurement Agreement No. QW9711CN, by and between NTI and QCC;
- Procurement Agreement No. QWT9801S, by and between NTI and QCC;
- Procurement Agreement No. QWT9901P, by and between QCC and NNI;

---

[2] The Agreements, which are voluminous, are not attached because the Contract Parties already have provided copies of the Agreements to the Debtors.

[3] This list of Agreements is not intended to encompass every agreement between the parties.  For instance, the Agreements include any amendments, supplemental agreements, annexes, exhibits, attachments, addenda, modules, orders, work orders and/or other similar agreements that are not listed here but comprise part of the Agreements expressly or by implication.  The list of the Agreements, above, is intended to include all such amendments, supplemental agreements, annexes, exhibits, attachments, addenda, modules, orders, work orders and/or other similar agreements.  The list of the Agreements, above, also is intended to include all express and implied license rights granted in relation thereto.  In addition, the Contract Parties are still searching their records to ensure that this list is a complete list of the main contracts between the parties.  If the Contract Parties discover additional contracts in the name of the Contract Parties, their predecessors, or any other affiliate of CenturyLink, Inc., they reserve their rights to modify this list.  The Contract Parties also reserve all rights to assert at any time that *any* agreement in the name of the Contract Parties, their predecessors, or any other affiliate of CenturyLink, Inc. constitutes a Commercial License.

- Master Purchase Agreement for Products, Systems and Services, by and between Embarq and NNI;
- Letter Agreement No. QW04-01267, by and between QC and NNI;
- Quest411 Agreement No. QW04-02426, by and between US West Communications and NNI;
- Global Services Agreement No. QW03-001922, by and between QCC and NTI;
- Nortel Networks Business Partner Agreement No. QW03-001943, by and between NNI and Qwest Business Resources, Inc.;
- Software License and Maintenance Agreement No. QWE121997, by and between Clarify, Inc. and QCC; and
- Design, Engineering, Supply & Systems Integration Agreement – Transport, by and between NTI and LCI International Management Services, Inc.

**B.    The Sale Motion**

3.    On April 4, 2011, the Debtors filed the Motion for Orders (I)(A) Authorizing Debtors' Entry Into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections, (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Approving the License Rejection Procedures, (E) Approving a Side Agreement, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing and (II) Authorizing and Approving (A) the Sale of Certain Patents and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption  and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses, and (D) the License Non-Assignment and Non-Renewal Protections (the "Sale Motion") (D.I. 5202).[4]

4.    In the Sale Motion, the Debtors sought authority to enter into an Asset Sale Agreement (the "ASA") pursuant to which, *inter alia*, Ranger, Inc. (the "Stalking Horse Purchaser"), with Google Inc., as guarantor, would purchase substantially all of the Debtors'

---

[4] Capitalized terms used but not otherwise defined in this Objection shall have the meanings ascribed to them in the Sale Motion.

right, title and interest in certain residual patents and related assets.  See Sale Motion at p. 2; see also ASA (Ex. A to Sale Motion).

5.      The Stalking Horse Purchaser's acquisition of these assets is "subject to," among other things, all Commercial Licenses (as defined in the ASA).[5]  See Sale Motion at ¶ 11, p. 8.

6.      The Debtors did not file, provide or produce a list of the Commercial Licenses.

7.      In the Sale Motion, the Debtors seek to reject, pursuant to Section 365 of the Bankruptcy Code, any pre-petition contract pursuant to which the Debtors are a party and pursuant to which the Debtors granted a patent license, except for (i) the Commercial Licenses; (ii) certain other licenses designated in schedules to the ASA (the "Known Licenses"); and (iii) certain disclosed intercompany licenses, as well as other intercompany contracts, agreements or understandings similar to the disclosed intercompany licenses.  See Sale Motion at ¶ 23, p. 22. In the Sale Motion, the Debtors proposed a set of procedures (the "License Rejection Procedures") governing the disposition of any such pre-petition contract to be rejected (the "Unknown Licenses").  See Sale Motion at ¶¶ 23-32, pp. 22-26.

8.      Pursuant to the License Rejection Procedures, the Debtors would serve counterparties to the Known Licenses with a notice (the "Known License Notice"):

> identifying the Known Licenses that such counterparty has with the Debtors, informing such Known Licensees that the sale of the Assets to the Stalking Horse Purchaser is being made subject to the

---

[5] Under the ASA, Commercial Licenses include "the Pre-Divestiture Commercial Licenses, the Post-Divestiture Commercial Licenses and the End-User Licenses."  See ASA at § 1.1, p. 6.  Generally, Pre-Divesture Commercial Licenses refer to certain pre- and post-petition contracts entered into by the Debtors that provide for, inter alia, the manufacture or servicing of the Debtors' products.  See ASA at § 1.1, p. 17.  Post-Divesture Commercial Licenses refer to certain contracts entered into by the Debtors, on or after the date of divestiture of certain of the Debtors' business units, in connection with, inter alia, the sale, offer for sale, importation, distribution and/or lease of certain inventory.  See ASA at § 1.1, p. 17.  End-User Licenses refer to, inter alia, contracts that accompany the sale, servicing or licensing of the Debtors' products.  See ASA at § 1.1, p. 8.

> Known Licenses and informing the Known Licensees that the
> Debtors intend to reject any Unknown Licenses to which any
> Debtor is a party as of, and conditioned on, the occurrence of the
> Closing, including any Unknown Licenses with such Known
> Licensee that are not identified on such Known License Notice.

See Sale Motion at ¶ 25, p. 23.

9.     Under the License Rejection Procedures, if a counterparty fails to object to rejection of the Unknown Licenses, such Unknown Licenses will be rejected on the date on which the sale of the Debtors' assets closes.  See Sale Motion at ¶¶ 27-28, p. 24.

10.     In addition, a counterparty to an Unknown License is required to file a "Notice of Election" in order to elect to retain its rights under such Unknown License in accordance with Section 365(n) of the Bankruptcy Code, pursuant to which Notice of Election its rights will be preserved as of the date on which the sale of the Debtors' assets closes.  See Sale Motion at ¶¶ 29-30, pp. 24-25.

### C.     The Bid Procedures Order

11.     On May 2, 2011, the Court entered the Bid Procedures Order.

12.     The Bid Procedures Order approved and incorporated the License Rejection Procedures.  See Bid Procedures Order at ¶ 6, p. 7.[6]

---

[6] The Bid Procedures Order also provided that:

> A counterparty to an Unknown License with both the Debtors and the Canadian
> Debtors that wishes to retain its license rights under such Unknown License
> must (i) file and serve a Notice of Election and (ii) act to preserve its license
> rights in accordance with the license rejection procedures approved by the
> Canadian Court.  Such a counterparty may not attempt to retain its license rights
> in one jurisdiction and terminate such license rights in the other.

See Bid Procedures Order at ¶ 9, p. 7.  In a June 3, 2011, telephone conference with the Contract Parties' counsel, Debtors' counsel clarified that a licensee of a U.S. Debtor with a world-wide license is not required to file a Notice of Election in the Canadian Court.  Debtors' counsel further clarified that the requirement of filing a Notice of Election in Canada applies only when an entity in the CCAA proceedings is a licensor.

        **D.**      **Status of the Agreements**

13.      The Debtors did not serve a Known License Notice on the Contract Parties.

14.      The Contract Parties believe the Agreements are all Commercial Licenses that are *not* rejected under the License Rejection Procedures and to which the Stalking Horse Purchaser's purchase are subject.

15.      The Debtors have not yet confirmed that any or all of the Agreements are Commercial Licenses.

**II.**      <u>**OBJECTION**</u>

16.      The Debtors have not filed, provided or produced the list of Commercial Licenses to be assumed and assigned as part of the sale contemplated by the Sale Motion.  Thus, the Contract Parties are forced to speculate whether any or all of the Agreements are being assumed as Commercial Licenses.   The Contract Parties have no way to know whether the Agreements are being assumed or rejected.

17.      The Contract Parties believe that it is clear that all Agreements, as well as any other agreement with the Debtors, and/or their predecessors in interest, in the name of the Contract Parties, their predecessors, or any other affiliate of CenturyLink, Inc., constitute Commercial Licenses.  The Debtors have not, however, provided confirmation of same.  Thus, the Debtors have introduced uncertainty as to *their* position regarding characterizing such agreements as Commercial Licenses.

18.    The Contract Parties request that the Debtors confirm that the Agreements are *not* being rejected because the Agreements are Commercial Licenses and are otherwise not being rejected.[7]

19.    In the absence of such confirmation from the Debtors, the Contract Parties request that this Court determine whether the Agreements are Commercial Licenses as such determination affects the Contract Parties' rights and obligations.

## III.    <u>RESERVATION OF RIGHTS</u>

20.    As indicated above, the Contract Parties believe that the Agreements are Commercial Licenses.  To date, however, the Contract Parties have neither the Debtors' agreement nor the Court's ruling confirming that the Agreements are Commercial Licenses.

21.    Today, June 6, is the deadline for filing a Notice of Election.  Accordingly, in an abundance of caution, the Contract Parties intend to file a Notice of Election with respect to the Agreements (and, therefore, assert their rights under Section 365(n) of the Bankruptcy Code), as well as with respect to any other agreement with the Debtors, and/or their predecessors in interest, in the name of the Contract Parties, their predecessors, or any other affiliate of CenturyLink, Inc.  The filing of such Notice of Election, however, is not intended to indicate, and shall not be interpreted as indicating, that the Contract Parties believe that any such agreements are *not* Commercial Licenses.  To the contrary, as stated above, the Contract Parties assert that all such agreements are Commercial Licenses.

---

[7] The Contract Parties have submitted copies of the Agreements to the Debtors in the hope of resolving this question.

WHEREFORE, for the foregoing reasons, the Contract Parties respectfully request that this Court enter an Order (i) providing that the Agreements are assumed and assigned as "Commercial Licenses," and (ii) granting such other and further relief to the Contract Parties as is appropriate.

Dated:  June 6, 2011                 Respectfully submitted,
      Wilmington, Delaware

                                 REED SMITH LLP

                        By:    /s/ Timothy P. Reiley
                                 Kurt F. Gwynne (DE No. 3951)
                                 Timothy Reiley (DE No. 5435)
                                 REED SMITH LLP
                                 1201 Market Street, Suite 1500
                                 Wilmington, DE 19801
                                 Phone: (302) 778-7550
                                 Facsimile: (302) 778-7575
                                 Email:  kgwynne@reedsmith.com
                                         treiley@reedsmith.com

                                 Counsel for Qwest Corporation, Qwest Communications Company, LLC, and Embarq Management Company