## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.,* | Case No. 09-10138 (KG) |
| Debtors.[1] | Jointly Administered |
|  | **Hearing Date:  July 12, 2011 at 9:30 a.m.** |
|  | **Objection Deadline:  July 5, 2011 at 4:00 p.m.** |

## MOTION OF ROBERT HORNE, JAMES YOUNG, AND THE *AD HOC* GROUP OF BENEFICIARIES OF THE NORTEL NETWORKS U.S. DEFERRED COMPENSATION PLAN TO COMPEL DISCOVERY FROM THE NORTEL DEBTORS

Robert Horne ("Horne"), James Young ("Young") and the *Ad Hoc* Group of Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan (collectively, the "Beneficiaries"), by and through their undersigned counsel and pursuant to Fed.  R. Bankr. 9014(c), 7033, 7034, 7037(a) and Fed.  R. Civ. P. 33, 34, and 37(a), file this Motion to Compel Discovery from the Debtors.

## PRELIMINARY STATEMENT

1.      The Beneficiaries bring this motion to compel the Debtors to comply with their obligation to provide full and complete responses to the discovery requests made by the Beneficiaries by a date certain, or suffer the appropriate consequence -- a bar to introducing any evidence on these issues at trial or the entry of a default judgment.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. ("NNI") (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networds Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. ((3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

1

2.    The discovery requests are directed to the central issues raised in the Debtors' pending motion (the "Turnover Motion"), which seeks, *inter alia*, the turnover of approximately $34 million held in trust for certain employees of the Debtors, including the Beneficiaries, pursuant to a deferred compensation plan (the "Plan"), as described below.  [Docket No. 4638].

3.    Specifically, the Beneficiaries require the Court's assistance in resolving the following issues:

(i)    <u>The Debtors' Unreasonably Narrow Search for and Production of Relevant ESI</u>.  The Debtors have limited their search for and production of electronically stored information ("ESI") to just three individuals, claiming that information under the control of three other individuals originally identified by the Debtors has been lost or destroyed and no back-up data is available.  Even limiting such discovery to six individuals was, however, too limiting.

(ii)    <u>Abuse of "Attorney Eyes Only" Legends</u>.  Despite agreement between the parties on the terms of a Confidentiality Order that is to be submitted to the Court for approval, the Debtors have labeled 33,736 pages of their 36,856 page production with "Highly Confidential -Attorney Eyes Only" legends, thereby prohibiting the Beneficiaries' counsel from sharing 91.5% of the documents and information that they have requested with the Beneficiaries.

(iii)    <u>Refusal to Provide Employee Information</u>.  Despite disclosing employee names in their schedules and in pleadings, and despite an agreement on confidentiality, the Debtors have redacted from their document production the names, addresses and contact information of employees of the Debtors during relevant time periods, again imposing a needless obstacle for the Beneficiaries to discover and test the Debtors' proof.

(iv)    <u>Grossly Inadequate Interrogatory Responses</u>.  The Debtors have failed to respond to the Beneficiaries' targeted Interrogatory Requests with sworn written statements, instead stating that some of the requested information can be gleaned from some 14,500 pages of their document production, without specifying where, thereby evading their obligation to timely and cost-effectively provide access to their proof. [2]

---

[2] The issues raised in this Motion to Compel represent the most pressing ones on which the parties have reached an impasse.  The Beneficiaries fully reserve their rights concerning issues that the parties are still seeking to resolve via negotiation, as well as regarding future production and amended discovery responses.

2

## PROCEDURAL BACKGROUND, APPLICABLE LAW, AND
## THE NEED FOR DISCOVERY

4.     The Plan is comprised of the Nortel Networks U.S. Deferred Compensation Plan, effective on January 1, 2000 (and all amendments thereto), as well as other deferred compensation plans that were merged into the Nortel Plan, including, but not limited to: (i) the Bay Networks, Inc. Deferred Compensation Plan; and (ii) the Northern Telecom Inc. Agreement Regarding the Deferral Option of the Senior Management Incentive Award Plan and the Executive Management Incentive Plan.  *See* Turnover Motion, ¶10 [Docket No. 4638].

5.     The Turnover Motion asserts, among other things, that (i) the Plan qualifies as a "top hat" plan; (ii) it is therefore exempt from the Employee Retirement Income Security Act ("ERISA"); and (iii) accordingly, the Plan funds that are held in trust for the Beneficiaries should be made available to satisfy the claims of the creditors of the Debtors under the terms of the Plan, thereby extinguishing any claim of the Beneficiaries to those funds.  *Id.*

6.     The Turnover Motion, and its supporting documents, also reveal that sponsorship and/or administration of the Plan was transferred post-petition after the Debtors' January 14, 2009 petition date from a Canadian affiliate to one of the U.S. Debtors.  *See* Turnover Motion at ¶¶ 9-11.  Specifically, the Debtors state, at paragraph 11 of the Turnover Motion, that "[o]n December 10, 2010, the NNL Board amended the Plan to change the responsibility for sponsorship and administration of the Plan from NNL to NNI.  The NNL Board also acted to terminate the Plan, effective as of December 31, 2010."  The record does not reveal that the Court approved this transfer of rights and responsibilities (the "Post-Petition Plan Transfer"), nor is the Post-Petition Plan Transfer explained in any way.

7.     The Beneficiaries, all of whom are participants in the Plan, and including the *Ad Hoc* Group, have filed numerous objections to the Turnover Motion (the "Objections").

3

[Docket No. 4897 and related entries].

8.    The Plan is undeniably an "employee benefit plan" under ERISA since it provides for deferred compensation and retirement benefits.  29 U.S.C. § 1002(3); Senior Executive Benefit Plan Participants v.  New Valley Corp. (In re New Valley Corp.), 89 F.3d 143, 148 (3d Cir. 1996) (ERISA definition of "employee benefit plan" extremely broad).  Accordingly, unless the Debtors are able to establish that the Plan falls under the "top hat" exception, the Plan is subject to an array of ERISA procedural and substantive requirements and protections designed to protect the interests of the participants in the funds in the Plan and Trust.  *See* Brasley v. Fearless Farris Serv. Stations, Inc., 2010 WL 1727840 *4 (D. Idaho) ("Because the Plan is not a 'Top Hat' plan, it is subject to the substantive requirements under ERISA."); Daft v. Advest, Inc., 2010 WL 271421 *6 (N.D. Ohio) ("[I]n successfully arguing that the AE Plan is not a top-hat plan, the Plaintiffs have obtained a judicial determination that the AE Plan is subject to ERISA's vesting requirements, that the Plan administrators owe fiduciary duties to all participants, and that the Defendants improperly amended the plan."); Fenwick v.  The Advest, Inc. Account Executive Nonqualified Benefit Plan, 2009 WL 5184405 *4.  (D. Conn.) (Because court held plan was not "top hat" plan, plan was therefore subject to all additional ERISA requirements); Daft v. Advest, Inc., 2007 WL 7024715 *13 (N.D. Ohio) (same) ("Advest I")

9.    Among the ERISA protections is the "exclusive benefit rule," which provides that all contributions to the plan must be and are held in trust for the exclusive benefit of the plan participants -- the employees, former employees or their designated beneficiaries -- and may not be used or diverted for the benefit of the employer or to satisfy the employer's obligations.  29 U.S.C. § 1103(c)(1).  Indeed the exclusive benefit rule is a "cardinal principle" of ERISA which is violated if there is *any* removal of plan assets for the benefit of the employer or *anyone* other

4

than plan participants.  Resolution Trust Corp. v. Financial Institutions Retirement Fund, 71 F.3d 1553, 1557 (10th Cir. 1995).  The circuit courts have held that this rule is nearly inviolable and that the protection of the interests of participants in plan assets is paramount.  Id at 1556-1557.

10.    In addition, plan assets are protected by provisions preventing their voluntary or involuntary transfer or alienation.  29 U.S.C. § 1056(d); Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 110 S. Ct. 680, 107 L. Ed. 2d 782 (1990).  Under these and other provisions, assets in an employee benefit plan cannot ever become assets of the employer's bankruptcy estate, unless an exception contained within ERISA applies.  Patterson v. Shumate, 504 U.S. 753, 112 S.Ct. 2242, 119 L. Ed. 2d 519 (1992).  As the Court summarized in In re B.B. Walker Co.:

> As noted earlier, the assets of an ERISA plan are held solely for the benefit of the plan participants and their beneficiaries and may not inure to the benefit of the employer.  When the contribution is made, the trustee and/or plan administrator acquires control over the assets and the plan participants and their beneficiaries acquire the interest in the assets.  A contribution to the plan by the employer thus severs and terminates, subject to certain limited exceptions under ERISA which are not applicable in this case, any interest in or control over the assets that the employer previously possessed.  Therefore, the plan assets generally cannot be considered property of the [employer's] bankruptcy estate.

2002 WL 31770849, at *4 (Bankr. M.D.N.C.) (footnotes and internal citations omitted).  The exception for "top hat" plans, if applicable, is such an ERISA exception.  However, the Beneficiaries contend that the "top hat" exception is not available here.

11.    The term "top hat" plan is not found in ERISA, but is rather a colloquial term used to describe a plan that is "unfunded and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly

5

compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1); New Valley

Corp., 89 F.3d at 148. As the Third Circuit has noted:

> The elements of this definition make the top hat category a narrow
> one. Not only must the plan be unfunded and exhibit the required
> purpose, it must also cover a "select group" of employees. This
> final limitation has both quantitative and qualitative restrictions. In
> number, the plan must cover relatively few employees. In
> character, the plan must cover only high level employees. Because
> of these limitations, top hat plans form *a rare sub-species of ERISA
> plans*, and Congress created a special regime to cover them.

*Id.* (emphasis supplied).

12.     Moreover, the "dominant characteristic of the special top hat regime is the near-

complete exemption of top hat plans from ERISA's substantive requirements . . . [29 U.S.C.]

Section 1101(a)(1) exempts top hat plans from ERISA's fiduciary responsibility provisions,

including . . . the need to give control of plan funds to a trustee, . . . and limitations on

transactions and investments." *Id.* at 148-49.

13.     Congress exempted "top hat" plans from these protections because such plans are

supposed to be strictly limited to a select group of employees who possess the sophistication,

economic leverage and individual bargaining power necessary to protect themselves in the

selection of benefit and pension plan options. *E.g.*, Guiragoss v. Khoury, 444 F.Supp. 649, 661-

662 (E.D. Va. 2006) (collecting authorities). Again, the Beneficiaries contend that such was not

the case with the Plan.

14.     Determining if a plan is a top hat plan involves a highly fact-specific and fact-

intensive analysis. MacDonald v. Summit Orthopedics, Ltd., 681 F. Supp. 2d 1019 (D. Minn.

2010); Fenwick v. Merrill Lynch & Co., Inc., 2007 WL 2727436 at *3 (D. Conn. 2007). As the

statute requires and consistent with the rationale for the exception, most courts look at three

distinct elements. To be designated a "top hat" plan, ERISA requires the court to determine (i)

6

whether the plan is "unfunded"; (ii) whether the plan is "maintained by an employer primarily for the purpose of providing deferred compensation for a *select* group of management or highly compensated employees"; and (iii) whether the employees participating in the alleged "top hat" plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply." Khoury, 444 F.Supp. 2d at 658-59 (emphasis supplied). *See also*, Bakri v. Venture Mfg. Co., 473 F.3d 677, 678-80 (6th Cir. 2007) (three elements cited; court finds plan not a top hat plan); Alfa Laval, Inc. v. Nichols, 2007 WL 984111 (E.D. Va. 2007) (citing three part analysis); Carraba v. Randalls Food Market, Inc., 38 F.Supp. 2d 469, 476-78 (N.D. Tex. 1999) (citing three-part test and finding plan not a top hat plan). The burden is on the party seeking to establish top hat status to prove all of the elements. *E.g.*, Carrabba, 38 F. Supp. 2d at 478; Virta v. Desantis Ent. Inc., 1996 WL 663970, at *3 (N.D.N.Y. 1996). Moreover, in applying the three-part test, courts must take into account that "ERISA is a remedial statute that should be liberally construed in favor of employee benefit fund participants. To that end, exemptions from . . . ERISA coverage should be confined to their narrow purpose." *E.g.*, New Valley Corp., *supra*; Khoury, 444 F. Supp. 2d at 659.[3]

15.    The operative documents must, of course, be examined. However, merely putting language in the operative documents that recites the top hat plan requirements is insufficient, as is the employer's sincere intent to create a top hat plan; the actual plan, in its actual implementation, must satisfy all of the top hat requirements. Carraba, 38 F. Supp. 2d at 478; Virta, 1996 WL 663970, at *3.

---

[3] The Delaware bankruptcy court has held that New Valley Corp. sets forth a two-part analysis, with the third element or prong subsumed within the second, "selectivity" prong. Schroeder v. New Century Holdings, Inc. (In re New Century Holdings, Inc.), 387 B.R. 95, 110 n. 12 (Bankr. D. Del. 2008) ("Schroeder"). Whether seen as a two- or three-prong analysis, the relevant inquiry is the same.

16.     Analysis of the second requirement -- whether the plan is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees -- requires a fact-specific inquiry that examines both quantitative and qualitative factors.  *See* Schroeder, 387 B.R. at 111. "Both the qualitative and quantitative elements must be met for a court to find that a plan qualifies as a top hat plan." *Id.*

17.     First, the plan must be offered to a "select group."  Relevant factors include the percentage of the workforce invited and eligible to join the plan (quantitative) and the "nature of their employment duties, the compensation disparity between the top hat members and non-members, and the actual language of the plan agreement (qualitative factors)."  Khoury, 444 F. Supp. 2d. at 660.  Second, the select group must consist only of management or highly compensated individuals, an analysis turning on many of the same qualitative factors noted above. *Id.*

18.     Existing precedent does not establish a bright line for when a plan is too large or two inclusive to satisfy the select group requirement; in the majority of the reported cases, the percentage of the workforce permitted to enroll in a "top hat" plan has been considerably smaller than 15%, usually less than 5%.  (Department of Labor opinion letters use a 5% threshold). Khoury, 444 F. Supp. 2d. at 660-61.  *See also*, The IT Group, inc. v. Bookspan (In re The IT Group, Inc.), 305 B.R. 402, 410 (Bankr. D. Del. 2004) (noting absence of a bright line test.) Critically, "the analysis should focus on the percentage of the workforce invited to participate in a potential 'top hat' plan, rather than on the percentage of the workforce that actually enrolled. *E.g.*, Khoury, 444 F.Supp.2d at 661, n. 14; Advest I, 2007 WL 7024715 at *12 ("The Court first considers the percentage of the work force invited to join the plan.")

19.     If plan participation is not based upon managerial status or compensation level,

the plan fails as a "top hat" plan regardless of participation rates.  *Id.* at 661; <u>Starr v. JCI Data Processing, Inc.</u>, 757 F. Supp. 390, 394 (D.N.J. 1991).  There must be some well-established and meticulously applied standard for designating plan members as "high level" employees.  *E.g.*, <u>Khoury</u>, 444 F.Supp.2d at 661.

20.    Courts, in performing the qualitative analysis, have compared the compensation of eligible employees against those of all employees.  <u>Schroeder</u>, 387 B.R. at 112 (internal citations omitted).  Only compensation actually earned is relevant to this comparative analysis.  *Id.* at 113 ("the Court will consider the compensation actually earned by participants…when it determines whether the plan meets the 'highly compensated' element.")  In this regard, "the proper comparison ..[is].. between the minimally qualifying participant and the universe of ...[ineligible] employees."  <u>Daft v. Advest, Inc.</u>, 2008 WL 190436 *6-7 (N.D. Ohio Jan. 18, 2008) ("<u>Advest II</u>").

21.    In examining the "highly compensated" prong of the qualitative analysis, a court must be able to determine that employees eligible for the Plan "had high income relative to other …employees."  <u>Advest I</u>, 2007 WL 7024715 at *12.  The Court considers the compensation disparity between eligible plan participants and ineligible nonparticipants in deciding whether the relevant plan was limited to "highly compensated employees."  *Id.*  *See also*, <u>Simpson v. Ernst & Young</u>, 879 F. Supp. 802, 816 (S.D. Ohio 1994) (To qualify as a 'top hat' plan there must be a "significant disparity" between the compensation of eligible and ineligible employees).[4]

---

[4] Having a seemingly high salary, in absolute terms, is insufficient.  In <u>Simpson</u>, the issue was whether the eligible employee, notwithstanding a salary of $194,092, "was highly compensated when compared to the average compensation of Ernst & Young employees."  <u>Simpson</u>, 879 F. Supp. at 816.  The Court found, in the absence of evidence as to the average compensation of all employees covered by the plan, and not covered, that it could not find that all those eligible were "highly compensated" and held that the Ernst & Young plan did "not fall into the 'top hat' exemption."  *Id.*

22.    Moreover, current precedent establishes that "averages are not as useful for determining whether plan participants count as a select group of highly compensated employees." Advest II, 2008 WL 190436 at *6.[5] Rather, the proper analysis is a comparison of the salary earned by employees minimally qualifying for participation in the Plan against the average salary of all … employees." Id. See also Fishman v. Zurich Am. Ins. Co., 539 F.Supp.2d 1036 (N.D. Ill. 2008) (comparing the average employees' compensation with that of each plan participant); Carraba v. Randalls Food Markets, Inc., 38 F. Supp. 2d 468, 477 (N.D. Tex. 1999) (examining range of salaries); Starr v. JCI Data Processing, Inc., 757 F. Supp. 390, 394 (D.N.J. 1991) (considering range of salary of eligibles and ineligibles and not average salaries); Belka v. Rowe Furniture Corp., 571 F. Supp. 1249, 1253 (D. Md. 1983) (averages skew results; court considers using median salaries).  As the Advest II Court noted:

> To consider averages and not the minimum salary would not protect the Congressional goal underlying the creation of top hat plan exemptions.  Specifically, an average can mask wide divergence in compensation and show little regarding whether participation is restricted to highly compensated individuals.

Advest II, at *6.

23.    The burden of proving each of the factors necessary to establish the existence of a top hat plan rests on the party asserting that it is a top hat plan, in this case the Debtors. Schroeder, 387 B.R. at 110 (citing IT Group, Inc., 305 B.R. 402, 407 (Bankr.D.Del.2004).  The Plan proponent -- again, the Debtors -- must prove, through admissible evidence, that the Plan satisfies all of the qualitative and quantitative elements in order for the court properly to find

---

[5] Earlier DOL opinions and case law compared average compensation of eligibles and ineligibles and still found plans not to be "top hat" plans.  DOL Op. Ltr.  85-37A (October 25, 1985) (2 to 1 ratio of average compensation of eligibles to compensation of ineligibles insufficient); Darden v. Nationwide Mutual Inc. Co., 717 F .Supp. 388 (E.D.N.C. 1989) (Average compensation of eligibles was $31,528; average compensation of non-agent ineligibles was $19,121 and for ineligible management employees was $24,501; plan did not qualify as 'top hat' plan.)

that the Plan qualifies as a top hat plan.  *Id.* (citing <u>New Valley Corp.</u>, 89 F.3d at 148).

24.    With respect to the "management" prong of the qualitative analysis, proof as to the "job titles and/or job functions of the participating employees" is required.  <u>Schroeder</u>, 387 B.R. at 112. (citing, *inter alia*, <u>Bakri v. Venture Mfg. Co.</u>, 473 F.3d 677, 678 (6th Cir. 2007), <u>Khoury</u>, <u>Starr</u> and <u>Belka</u>).  The titles and job functions of each eligible and each ineligible employee must be established.

25.    In addition, if employees originally eligible, but subsequently ineligible, were allowed to remain in the Plan, that fact can also doom "top hat" status.  <u>Advest I</u>, 2007 WL 7024715 at *12.

26.    As noted above, the failure of the Debtors to meet their evidentiary burden on any of these elements would result in Plan assets *<u>being</u>* subject to all aspects of *<u>ERISA</u>*, and would mean that all such Plan assets are held in trust for the exclusive benefit of the Beneficiaries and are not property of the Debtors' estates.  The Turnover Motion would have to be denied, and the Court would order the Plan assets distributed to the Plan participants, and beneficiaries.[6]

27.    Accordingly, relevant discovery includes (but is not limited to), for each plan year, without limitation, the number and identity of eligible employees, the number and identity of ineligible employees, the actual compensation earned by each employee (eligible or ineligible), whether subsequently ineligible employees remained in the Plan, the job titles and job functions of each eligible and ineligible employee for each plan year (and any mid-year changes), as well as any information relating to changes in either the eligible population or the total workforce during any plan year.

28.    Discovery should also reach all eligibility criteria in any plan year, how such

---

[6] *See* <u>Cigna Corp. v. Amara</u>, 131 S.Ct. 1866,  2011 WL 1832824 (2011) (Supreme Court held that, under applicable ERISA remedies provisions and to remedy ERISA violations, a court could reform plan to one that was ERISA compliant and order payment of benefits due under plan as reformed).

criteria were applied or not applied, and any change thereto.  Any other discovery relative to any element of either the quantitative or qualitative analysis is also critical.  The Beneficiaries should have the raw data to perform their own analysis and calculations as to all elements; obviously litigants are not required to accept their opponent's calculations and analysis without any means to test them.

### THE BENEFICIARIES' DISCOVERY REQUESTS AND THE DEBTORS' INADEQUATE RESPONSES

29.     Following a preliminary hearing on February 9, 2011, this Court granted the Beneficiaries leave to conduct discovery regarding the issues raised in the Turnover Motion and the Objections.

30.     On February 16, 2011, the Beneficiaries served Interrogatories and Document Requests on the Debtors, seeking discovery of documents and information addressed to Plan administration, compliance with the quantitative and qualitative top hat factors, and the Post-Petition Plan Transfer.  A copy of the Beneficiaries' Interrogatories and Document Requests is attached hereto as **Exhibit A** (the "Discovery Requests").

31.     On March 4, 2011, the Debtors served their Responses and Objections to the Discovery Requests.  A copy of the Debtors' Objections and Reponses to Interrogatories is attached hereto as **Exhibit B**; a copy of the Debtors' Objections and Reponses to the Document Requests is attached hereto as **Exhibit C** (Exhibits B and C, collectively, the Discovery Responses").  The Debtors' Discovery Responses asserted various objections regarding their scope, and otherwise refused to comply fully with the Discovery Requests.

32.     Counsel for the Debtors and the Beneficiaries participated in several "meet and confer" conferences from February 28, 2011 through May 11, 2011 in an effort to narrow the areas of dispute (collectively, the "Conferences").

12

33.     Counsel for the Debtors and the Beneficiaries also agreed to the terms of a Confidentiality Stipulation and Protective Order aimed at facilitating the production of documents (the "Confidentiality Order"), which will be submitted to the Court for approval.  A copy of the agreed-upon Confidentiality Order is attached hereto as **Exhibit D**.

34.     On April 13, 2011, the Beneficiaries' counsel sent a letter to the Debtors' counsel addressing various issues raised by the Debtors' Discovery Responses and production of documents (the "April 13 Letter").  A copy of the April 13 Letter is attached hereto as **Exhibit E**.

35.     On April 19, 2011, the Debtors responded to the April 13 Letter, providing the Beneficiaries with their stated positions regarding the concerns raised by the Beneficiaries in the April 13 Letter and at the Conferences (the "April 19 Response").  A copy of the April 19 Response is attached hereto as **Exhibit F.**

36.     To date, Debtors have produced in excess of 36,000 pages of documents.  This "document dump," while impressive in its size, still lacks essential documents and information concerning the quantitative and qualitative factors necessary to determine the Plan's compliance, *vel, non*, with ERISA's top hat requirements, documents which -- based on the Beneficiaries' counsel's prior experience in similar cases -- must be maintained by the Debtors and are readily available.

37.     The Debtors have answered some, but not all of the Interrogatories; many of the Interrogatory Answers are incomplete.

## ARGUMENT

A.     **The Debtors Have Restricted Their Search For ESI To The Files Of An Unreasonably Small Number of Custodians**

38.     The Debtors' "General Objection No. 10" to each of the Discovery Requests

refuses to produce electronic and other information that is "not readily available." *See* **Exhibit C** and **Exhibit D** at General Objection No. 10.   The Debtors agreed only to conduct a "reasonable search" of hard copy files and "readily available" electronic files of individuals who, to Debtor's knowledge, were *primarily responsible* for establishment/administration of Plan, and then, only if such information is within the possession custody and control of the Debtors.  *Id.*

39.    Based on these objections, the Debtors have agreed to search for and produce records for just three records custodians: Daniel Ray, Cindy Kanaday, and Debbie Lorimer.  *See* **Exhibit C** at Response No. 1 and 4 (identifying individuals "primarily responsible"); **Exhibit F** at p. 2 (stating no hard drive or back-up drives or tapes for Linda Kathy Frates, Mary Anne Crowley, and Norma Crowder (without further explanation); offering only to produce ESI from Ray, Lorimer, Kanaday).

40.    The Debtors have the burden of demonstrating that the search for and production of ESI responsive to the Beneficiaries' Discovery Requests will cause the Debtors "*undue burden or cost.*"  Fed. R. Civ. P. 26(b)(2)(B);  *see also* <u>Susquehanna Comm. Fin., Inc. v. Vascular Resources, Inc.</u>, 2010 WL 4973317 *13 (M.D. Pa.) ("burden rests with the party objecting to the production of metadata or ESI to show undue hardship or expense") (citation omitted).  The Debtors have made no showing that ESI beyond the files of the three enumerated custodians is not reasonably accessible because of undue burden or cost.  Fed. R. Civ. P. 26(b)(2)(B).

41.    Confining the Debtors' search for responsive ESI to just three custodians is unreasonable on its face.  In fact, the documents produced to date indicate that other key individuals were involved in the formation and administration of the Plan.  *See, e.g.,* documents

14

attached at **Exhibit G** (indicating that Paula Holden, a Director of Global Benefits, Martin Cozyn, Ruth Hills, and Amy Vukovitz were involved in significant matters regarding the Plan). The Debtors offer no explanation as to why word searches or other means of searching electronic files cannot reasonably be performed to identify and collect responsive ESI that was prepared by or sent to or from these (and other) individuals.

42.     The Debtors' Privilege Log is also instructive on this issue.   A copy of the Privilege Log is attached hereto as **Exhibit H**.  Five of the sixteen documents identified on the Privilege Log were sent to or received from Norma Crowder -- one of the six persons identified as primarily responsible for establishment/administration of Plan, *see* ¶38 *supra*, but for whom no hard drive or back-up drives or tapes allegedly exist, *id.*  at ¶39.  Again, the Debtors offer no explanation as to why word searches or other means of searching electronic files cannot reasonably be performed to identify and collect Crowder's and other individuals' responsive ESI.

43.     The Privilege Log also identifies seven individuals who were senders and/or recipients of allegedly privileged documents, but whose ESI the Debtors have refused to search for.  *See* **Exhibit H**, identifying Ruth Hillis, Joy Haas, Norma Crowder, Richard Beet, Johnannus Poos, Catherine Gilbert, and Bill Knapp.  The Debtors should not be allowed to shield these selected documents from disclosure without searching for and producing the non-privileged documents of these individuals (and others) that are responsive the Beneficiaries' Discovery Requests.

44.     The Debtors cannot unilaterally determine which employees' e-mails and other ESI are important and relevant and unilaterally grant themselves relief from producing ESI they have unilaterally determined they need not produce.  *See e.g.,* Kipperman v. Onex Corp. 260

15

F.R.D. 682, 693 (N.D. Ga. 2009) (Sanctioning defendants for unilaterally limiting electronic discovery search to seven witnesses' e-mail boxes rather than entire available back-up tape and other data, among other offenses.)  As was true in <u>Kipperman</u>, the Debtors have attempted to "improperly control the scope of discovery."  *Id*.;  *see also*, <u>Tulip Computers Int'l B.V. v. Dell Computer Corp.</u>, 2002 WL 818061 (D. Del.) (Defendant required to produce all e-mail generated by Plaintiff's acceptable list of search terms unless other privilege applied).

45.     This Court should compel the Debtors to expand their search for and production of ESI and hard copy documents to include: (i) all reasonably accessible documents of all present and former employees of the Debtors; and (ii) all reasonably accessible documents from third parties that are within the Debtors control, including documents maintained by third party agents, such as Plan administrator, Mullen TBG, as well as Nortel's affiliated Canadian Debtors.  The Beneficiaries have supplied search terms and have worked with the Debtors to refine search terms and will, of course, continue to do so.

**B.     The Debtors Have Abused the "Attorney Eyes Only" Legend By Labeling Ninety Percent Of Their Documents "Attorney Eyes Only"**

46.     The Beneficiaries and the Debtors have reached agreement on the terms of a Confidentiality Order designed to promote the production of documents and protect truly confidential information from public disclosure.  *See* **Exhibit D**.  To that end, the documents and information produced by the Debtors may only be used for purposes of this litigation and can be disclosed only to the parties, their counsel, and other identified persons.  *Id.* at ¶ 4.  Until approved by the Court, the parties have agreed to abide by the Confidentiality Order's terms.

47.     Notwithstanding the protections provided by the Confidentiality Order, the Debtors have designated 33,736 pages of 36,856 documents produced as of June 3, 2011 -- more than 91% --as "Highly Confidential - Attorney Eyes Only," thereby placing them off

16

limits to the Beneficiar*ies.*

48.    The Debtors designation of 91.5% of the produced documents as "Attorneys Eyes Only" is *per se* improper in these circumstances.  *See THK America, Inc. v. NSK Co.,* 157 F.R.D. 637, 645 (N.D. Ill. 1993) (finding a "confidentiality" designation of 79% of produced documents to be "absurdly high").  *See also,* Kipperman, 260 F.R.D. at 695 (chiding defendants for overuse of redaction and "confidential" designation despite presence of a confidentiality agreement).

49.    The Debtors' blanket use of "Attorney Eyes Only" designations prevents the Beneficiaries' counsel from consulting with their clients regarding various critical issues in this matter, including Plan eligibility and participation of specific employees.

50.    The Debtors' blanket use of "Attorney Eyes Only" designations prevents the Beneficiaries themselves from knowing the contents of the majority of the documents that are relevant to the Turnover Motion and the Objections.

51.    The Debtors will not be substantially harmed or put at a competitive disadvantage by permitting the Beneficiaries to review the data and communications that they have requested; the Confidentiality Order provides adequate protection for information that is truly confidential or sensitive in nature.

52.    This Court should compel the Debtors to reclassify "Highly Confidential-Attorney Eyes Only" documents and information to "Confidential" so that the Beneficiaries may review and analyze the discovery that they have requested and are entitled to receive.

C.      **Failure to Identify Employees By Name and Similar Identifying Data**

53.      The Debtors have claimed that their corporate privacy policies prohibit them from disclosing information that identifies specific employees, including their name, address, social security number, and other contact information.  The Debtors, therefore, have redacted all such information from the documents they have produced, identifying employees only by number.[7] *See* **Exhibit F** at p. 2 ("[The] entry of a protective order will not change the Debtors' position that personal information about employees, including names, home addresses and social security numbers, are subject to privacy laws as covered by the Debtors' corporate policies[] and the Debtors will redact any such information on documents they produce."); *see also* **Exhibit B** at General Objection No. 18; **Exhibit C** at General Objection No. 17.  Of course, the Debtors have identified employees holding claims by name and address in their schedules, and have identified other employees in various pleadings.

54.      The Debtors' redaction of employee names and addresses precludes the Beneficiaries' counsel from, among other things, performing word searches of emails and other documents based on employee names.  Moreover, such redaction also prevents any meaningful testimony regarding compensation, job titles, and job functions.

55.      The Debtors' redaction of employee names and addresses precludes the Beneficiaries' counsel from identifying potential witnesses who may have information relevant to the Turnover Motion.

56.      At best, the Debtors' redaction of employee names and addresses makes the task of analyzing whether the Plan complies with the quantitative or qualitative top hat factors unnecessarily cumbersome, time consuming, and expensive.  At worst, it makes that task

---

[7]  The Debtors have also designated all such documents a "Highly Confidential, Attorneys Eyes Only."

impossible.

57.     This Court should compel the Debtors to remove redactions of the names, addresses, social security numbers and other identifying information of employees and produce documents and information as maintained by the Debtors in the ordinary course.  <u>Kipperman</u>, 260 F.R.D. at 695 (sanctioning overuse of redaction despite confidentiality agreements being in place).

**D.      <u>Grossly Inadequate Interrogatory Responses</u>**

58.     The Beneficiaries' Interrogatories requested, among other things, that the Debtors identify the following information for each year of the Plan:

(i)      All employees eligible to participate in the Plan ("Eligible Employees");

(ii)     All employees who participated in the Plan ("Participating Employees");

(iii)    The average and median compensation of each Eligible Employee;

(iv)     The average and median compensation of each Participating Employee;

(v)      The average and median compensation of the employees of the Debtor entities whose employees were able to participate in the Plan;

(vi)     The highest and lowest paid Eligible Employee;

(vii)    The highest and lowest paid Participating Employee;

(viii)   The highest and lowest paid employees of the Debtor entities whose employees were able to participate in the Plan;

(ix)     All Eligible Employees or Participating Employees who failed to meet the particular salary threshold determined by the Committee as part of its eligibility criteria.

*See* **<u>Exhibit A</u>** at Interrogatories Nos. 5-6, 8-9, 16.

59.     This information is the type specifically identified in the case law as determinative of whether a plan meets, or not, the requirements of a top hat plan.  *See e.g.*,

Schroeder, *supra* (collecting cases); Advest I, *supra*; Advest II, *supra*.

60.     The Beneficiaries' Interrogatories also requested, among other things, that the

Debtors identify the following information for each year of the Plan:

> (i)     All Participating Employees who were permitted to withdraw funds from the Plan;
>
> (ii)    All Participating Employees who were permitted to participate in the Nortel Plan after the first day of the Plan Year and the specific reason for permitting such participation;
>
> (iii)   All Participating Employees who were allowed to change contribution elections after the first day of the Plan Year and the specific reason for permitting such changes;
>
> (iv)    All Eligible Employees and Participating Employees who were not "employed by an Employer that has adopted the Plan," as required by Section 1.19 of the Nortel Plan.
>
> (v)     All Eligible Employees and Participating Employees who were not "on the U.S. Payroll of the Employer," as required by Section 1.19 of the Nortel Plan.

*See* **Exhibit A** at Interrogatory Nos. 10, 12-15.

61.     This information is relevant to and probative of the question whether the Debtors

adhered to the terms of the Plan as written, which, in turn is probative of the question whether

the Plan qualifies as a top hat plan.

62.     The Debtors lodged a host of objections to these Interrogatories, and have refused

to provide the requested information in the form of sworn answers.  *See* **Exhibit A** at Response

Nos. 5-6, 8-10, 12-16.  Noticeably absent from the Debtors Objections to these Interrogatories

was one based on Fed. R. Civ. P, 33(d), which permits a party to produce business records in

lieu of a sworn answer if (i) the burden of ascertaining the answer will be substantially the same

for either party, and (ii) the responding party specifically identifies the records from which the

answers can be obtained.  Fed. R. Civ. P. 33(d).

20

63.    Thereafter, the Debtors' counsel agreed to provide actual compensation data and targeted compensation data for all employees for Plan Years for which the Debtors have such information.  *See* **Exhibit G** at p. 4.

64.    But instead of providing that information -- or any other information requested in Interrogatories 5-6, 8-10, and 12-16 -- the Debtors recently dumped 14,500 pages of additional documents on the Beneficiaries' counsel, which the Debtors' counsel claimed "are responsive to Interrogatories 5 through 9 and Interrogatory 12, with respect to Plan Years 2002 through 2008."  *See* letter from Tamara Britt, Esquire to Daniel J. Murphy, Esquire dated May 20, 2011 at p, 2, ¶ 2, a copy of which is attached hereto as **Exhibit I**.

65.    Fed. R. Civ. P. 33(d) -- which allows production of documents in lieu of written sworn responses under specified conditions -- has no application when not expressly invoked. However, even if it had been properly invoked, it could not apply in the present case.

66.    The recently produced documents are voluminous and do not address each of the items requested in Interrogatory Nos. 5-6, (addressing identification of Eligible and Participating Employees, along with compensation and management data); Interrogatory No. 8 (addressed to average and median compensation data for Eligible's, Participating and all Employees); Interrogatory No. 9 (addressed to compensation data for high and low for Eligibles, Participating, and all Employees); Interrogatory No. 10 (addressing individuals who were permitted to withdraw funds from the Plan); Interrogatory Nos. 12-15 (addressing compliance with the terms of the Plan) or Interrogatory No. 16 (addressing identification of all Eligible or Participating Employees who failed to meet particular salary thresholds for eligibility in the Plan).

67.    The Debtors should be found to have waived reliance on Fed. R. Civ. P. 33(d).

68.     The Debtors have failed to identify with any specificity the documents from which full and complete answers to the Interrogatories can be found, as required by Fed. R. Civ. P. 33(d).

69.     The Debtors have made no showing that the burden of ascertaining the requested information is equally shared by all parties, as required by Fed. R. Civ. P. 33(d).  In fact, they can make no such showing.

70.     By way of example, the Debtors counsel previously provided lists of the employees who were eligible to participate in the Plan for certain Plan Years, but have now demanded that the Beneficiaries return those lists.  *See* **Exhibit I** at p. 2, ¶ 3.  The Beneficiaries counsel are simply unable to determine from the trove of documents information of that sort. Moreover, the Beneficiaries counsel are unable to otherwise determine from these 14,500 pages of heavily redacted documents whether the Plan meets the quantitative or qualitative top hat factors, or whether the Debtors complied with the terms of the Plan itself.

71.     Referring the party serving interrogatories to an unspecified pile of documents does not comply with Rule 33(d).  "[Rule 33(d)] does give a party the option of responding to interrogatories with documents; however, it does not allow a party to simply refer to its entire production."  Kipperman, 260 F.R.D. at 688.

72.     This Court should provide the Debtors with no quarter to hide the ball and rely upon their unspecified document dump, in the place of complete, sworn Answers to Interrogatories No. 5-6, 8-10, and 12-16. *Id*. *See also,* United States Securities and Exchange Commission v. Elfindepan, S.A., 206 F.R.D. 574, 576 (M.D. NC 2002) ("[D]ocuments themselves rarely, if ever, reveal contentions of fact or law. A party reveals its contentions."); The United Oil Co., Inc. v. Parts Associates, Inc., 227 F.R.D. 404 (D. Md. 2005) (court granted

22

motion to compel based on improper use of Fed. R. Civ. P. 33(d) when answers to interrogatories involved exercise of particular knowledge and judgment).

## CONCLUSION AND REQUESTED RELIEF

73.    The Debtors, like all debtors in bankruptcy, have an affirmative obligation under applicable statutes to faithfully and diligently preserve all corporate and financial records and provide such documents and information in discovery.  *See* 11 U.S.C. §§ 704(2), 1106(a)(1) (providing that the trustee or debtor-in-possession is "accountable for all property received."); Fed. R. Bankr. P. 9014(c) (providing that the discovery obligations set forth in Fed. R. Civ. P. 33, 34, and 37 apply with full force, in accordance with Fed. R. Bankr. P. 7033, 7034 and 7037); 11 U.S.C. § 727(a)(3), 1141(d)(3)(C) (denying discharge for failure to preserve or maintain records); 18 U.S.C. §152(8) (possible criminal implications for destruction of records).

74.    Status as a debtor, even a liquidating debtor, under the Bankruptcy Code does not excuse one from discovery responsibilities; indeed it imposes additional responsibilities regarding the preservation of records and the production of relevant discovery when predictable disputes arise in the context of a bankruptcy case.  *See, e.g.,* West v. Hsu (In re Advanced Modular Power Systems, Inc.), 413 B.R. 643 (Bankr. S.D. Tex. 2009) (noting debtor's duty to preserve records and sanctioning debtor for failing to review files before authorizing their destruction); In re Kmart Corp., 372 B.R. 823 (Bankr. N.D. Ill. 2007) (Debtor sanctioned for failure to timely place "litigation hold" on records, leading to loss of records relevant to dispute); In re Krause, 367 B.R. 740 (Bankr. D. Kan. 2007) (Debtor sanctioned for running software that scrubbed electronic files.)  *See also* Southside Comm. Action Ass'n, Inc. v. Georgia Pacific Corp., 972 F.2d 348, (6th Cir, 1992) (holding limited financial resources is no excuse for failure to comply with discovery).

23

75.     The Debtors -- who have affirmatively invoked this Court's jurisdiction to compel the turnover of the Plan assets -- have had and continue to have a legal obligation to preserve and produce information and documents that are responsive to the Discovery Requests.[8]  It is not up to the Debtors to unilaterally and selectively produce information they consider helpful, while at the same time shutting down discovery in areas and on topics that likely will result in the production of information that could undermine their claims. Kipperman, *supra*.[9]

76.     In sum, the Debtors should be ordered to provide this requested discovery by a date certain.  If they do not, they should be barred from introducing any evidence in relation to the "top hat" elements, or judgment should be entered in the Beneficiaries' favor.  In re Quintus Corp., 353 B.R. at 92-93.

77.     For all of the foregoing reasons, the beneficiaries respectfully request that the Court:

(i)     Order the Debtors to expand their search for hard copy documents and ESI to the records of all custodians who are likely to have documents responsive to the Beneficiaries' Document Requests;

(ii)    Order the Debtors to remove the "Highly Confidential - Attorney's Eyes Only" designations from all documents produced to date and re-produce those documents with the original Bates Numbers;

(iii)    Order the Debtors to re-produce, in unredacted form but containing the original Bates Numbers, all documents on which the Debtors had

---

[8] In the event the Debtors' highly selective and very limited production is due to the fact that the documents at issue have been improperly destroyed, the Beneficiaries will seek appropriate sanctions.  *See In re Quintus Corp.*, 353 B.R. 77, 84, 92-93 (Bankr. D. Del. 2006) (holding that appropriate sanctions for destruction of Debtor's financial records that were necessary for a determination of the merits of the suit include: (i) an inference that the evidence would have been unfavorable to the party that destroyed it; (ii) the preclusion of any evidence to contradict the missing evidence; and (iii) the entry of judgment in favor of the other party; and (iv) ordering entry of judgment in favor of Trustee against Debtor for its failure to maintain the Debtors' financial records)), *affirmed*, 2007 WL 4233665 (D. Del.) (court remands on damages calculation only).  *See also* Fed. R. Civ. P. 37.

[9] This is particularly true given that the limited discovery to date indicates that the Plan cannot qualify as a "top hat" plan; in at least one plan year, more than 20% of the total workforce was apparently eligible to join the Plan.

24

previously redacted employee identifying information; and

(iv)    Answer fully, completely and under oath Interrogatories No. 5-6, 8-10, and 12-16.

78.    Pursuant to Local Rule 7026-1, counsel hereby certifies that reasonable efforts have been made to reach agreement with counsel for the Debtors on the matters addressed in the Motion.

WHEREFORE, the Beneficiaries respectfully request this Court to enter an Order in the form of the Order submitted herewith compelling the Debtors to comply with the Beneficiaries' Discovery Requests.

Dated:  June 8, 2011                    **BLANK ROME, LLP**

/s/  Jane Ann Bee____
Bonnie Glantz Fatell (No. 3809)
Jane Ann Bee (No. 5457 )
1201 Market Street, Suite 800
Wilmington, Delaware 19801
(302) 425-6400
(302) 425-6464 (fax)
fatell@blankrome.com
bee@blankrome.com

-and-

**BERNSTEIN, SHUR, SAWYER & NELSON**
Robert J. Keach (admitted *Pro Hac Vice*)
Paul McDonald (admitted *Pro Hac Vice*)
Daniel J. Murphy (admitted *Pro Hac Vice*)
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
Telephone: (207) 774-1200
Telecopier: (207) 774-1127
Email: rkeach@bernsteinshur.com
         pmcdonald@bernsteinshur.com
         dmurphy@bernsteinshur.com