This is Exhibit "A" referred to in the affidavit of MICHAEL JOSEPH LANG sworn before me, this 1ST day of JUNE 20 11

A COMMISSIONER FOR TAKING AFFIDAVITS

41

**Ma, Catherine**

**From:** Ellis, Ryan [Ryan.Ellis@herbertsmith.com]

**Sent:** July 27, 2009 10:15 AM

**To:** smalik@cgsh.com; fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Tay, Derrick C.; gadavies@nortel.com; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Matthew.Hart@lazard.com; Lang, Michael; orzyr@bennettjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; JHarris@milbank.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; Stam, Jennifer; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com; jbromley@cgsh.com; cbrod@cgsh.com; lschweitzer@cgsh.com; bsandstrom@cgsh.com; Fabrice BAUMGARTNER

**Cc:** abloom@UK.EY.COM; chill1@uk.ey.com; rjowitt@uk.ey.com; sharris@uk.ey.com; sedel@UK.EY.COM; GALE, STEPHEN; DAVIES, GAVIN; LLOYD, KEVIN; ELLIOTT, LAURENCE; WARD, BEN; MONTGOMERY, ALAN; Whiteoak, John; Segger, Joanne; BASUYAUX, BRUNO

**Subject:** FW: Allocation Protocol

Dear Sanjeet,

Here are the JA's high level points on the draft Protocol (and subject to more detailed mark-up comments), for when the group discusses that document. What do you think the likely timing of engagement on this will be? We assume that timing is being driven by the earliest date that M&A proceeds are received, which presumably would be on closing of the Zenith /CDMA transaction?

**1. Agreement**

1.1 The Protocol should be conditioned on the necessary court approvals being obtained from both the US and Canadian Courts, with the appropriate efforts standards (and creditor support) to such applications, consistent with the approach taken with the IFSA.

1.2 The Joint Administrators will likely seek a direction from the English Court that they be at liberty to enter into the Protocol.

1.3 The Protocol needs to be clear on its face that the Protocol constitutes the binding dispute resolution methodology for the allocation of proceeds for each M&A deal and that no further recourse is available to any Court (except as set out in paragraph 4.7 below).

1.4 Can you please circulate a pro-forma of the Escrow Agreement to be used on each M&A deal (including Zenith / CDMA, where the EMEA Estate participates through Section 11.d. of the IFSA). We expect that this document will be a fairly standard document, where no pay-out is allowed from the account without the unanimous approval of each of the Selling (or in the case of Section 11, deemed selling) Parties, to be held by an independent escrow agent, with any pay-out to be free of any set off or other claim between any of the parties.

**2. Parties and roles**

2.1 There should not be a Fourth Estate comprising the Non Filed entities. Each of the Non-Filed entities should be represented by their parent in the relevant US, Canadian or EMEA estates (as has been the practice with the EMEA Non-Filed entities to date).

2.2 There should only be three parties to the negotiation and Dispute Resolver process: the US, Canadian and EMEA Estates. We acknowledge that behind the US and Canadian Estates stand the Monitor, the Bonds and the UCC. However, any representations that these entities wish to make should be coordinated through the relevant Estates (as is the case with the EMEA creditors). This is consistent with and reflected in Section 12.g. of the IFSA. This point goes to the definitions of "Negotiating" and "Filing Parties" vs. "Selling Parties".

2.3 We need to include as deemed Selling Parties, non-selling entities that are participating via Section 11.d. of the IFSA.

2.4 As noted in my email to certain of you last Friday, the French Court has signed and handed down an order

authorising NNSA to accede to the IFSA and therefore to participate in the Protocol arrangements. We propose that the draft Protocol should assume the accession of NNSA and we await any comments on the form of the draft accession agreement I circulated last Friday. We note that while the court order authorises the NNSA's participation in the Protocol arrangements, we will need to confirm whether any further French Court approval may be needed in respect of the final agreed form of the Protocol.

2.5 We note the introduction of a mediator (Section 2.2). In principle, the Joint Administrators support the idea of good faith negotiations with or without a mediator during this process so as to facilitate, if possible, a negotiated solution. The Joint Administrators would therefore require that such negotiations be built into the Protocol at the end of each milestone in the DR process.

**3. Appointment of Dispute Resolver (DR)**

3.1 The Estates are to agree the genre / discipline of the DR in advance of the nomination of individual DR. We would welcome your initial views on the genre / disciple of the DR. Once agreed, the Estates can then submit relevant individuals for consideration.

3.2 There should be only one DR and not a panel of three.

3.3 The DR should have access to such specialist / expert advice as needed to assist in reaching his or her decision.

**4. DR process**

4.1 As mentioned above, the Monitor, Bonds and UCC should not be Filing Parties with rights to present written materials and oral arguments, but should coordinate their representation through their relevant estates.

4.2 The draft Protocol sets out the matters that the DR cannot be bound by (2.5), we broadly agree with these. However, 2.6 should be deleted.

4.3 The Estates should not be entitled to provide oral submissions from expert witnesses. In terms of their written submissions, these submissions may only refer to one named valuation expert.

4.4 Filing should be on a fixed date, rather than within a period as proposed (4.5).

4.5 Where the Selling Parties have already agreed a partial allocation (2.5), we should clarify that the DR's allocation decision, while considering the sale proceeds as a whole, should be applied proportionately only to the proceeds that remain outstanding. So there are no refunds if there has been an overdistribution in the partial allocation, compared to the DR's allocation decision (7.5).

4.6 Whilst it is acknowledged that the DR should not reach his decision on the basis of any national, federal, state or provincial law (7.4), there may be there the need for legal determination on IP ownership issues, where the DR may not be best placed to reach a conclusion. As such, consideration needs to be given to a process by which such legal determinations can be made within the Protocol process.

4.7 As currently drafted the DR's decision is not open to challenge on any basis by any Estate or Selling Party. We should discuss potential restricted grounds upon which the DR's decision can be challenged. The obvious grounds would be fraud and "manifest error" (as that term is understood in English Law).

4.8 The DR should provide brief reasons for his / her decision.

**5. Other points**

5.1 Section 9.3 of the draft Protocol provides that the Protocol shall be governed exclusively by the laws of the state of New York. It needs to be made clear that whilst the agreement reached in the Protocol may be governed by New York law the underlying issues that are the subject of the DR process are not governed by New York law.

5.2 There are a number of other points (e.g. usual protections for the Joint Administrators, access to information, more detailed points on timing and process) that we can deal with once we start looking at the actual drafting of the Protocol.

We look forward to discussing.

Gavin / Ryan

**Ryan Ellis**

31/05/2011

**Associate (New Zealand), Corporate Division**
Herbert Smith LLP
DD: +44 20 7466 7565
Mob: +44 780 920 0571
e-mail: ryan.ellis@herbertsmith.com



---

**From:** Sanjeet Malik [mailto:smalik@cgsh.com]
**Sent:** 14 June 2009 00:04
**To:** fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com; DAVIES, GAVIN; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE; Kois, Maria; Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; GALE, STEPHEN; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; JHarris@milbank.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; jstam@ogilvyrenault.com; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com
**Cc:** Craig B BROD; James L BROMLEY; Lisa M SCHWEITZER; Brian T Sandstrom
**Subject:** NT: Allocation Protocol

Dear All:

Attached is the first draft of the Allocation Protocol for your review. Please note that this draft has not been reviewed by our client or any other stakeholders and therefore remains subject to further internal review and comments from other parties.

We would appreciate if you could please provide written comments to the attached draft. In addition, we propose to have a call to discuss this draft next week - we will circulating the details during the course of the week.

Please feel free to call me if you have any questions or concerns.

Regards,
Sanjeet

---

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2136 | f: +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

This message is confidential and may be covered by legal professional privilege. If you have received this message in error please delete it and notify the sender immediately by contacting our main switchboard +44 (0)20 7374 8000; you should not retain the message or disclose its contents to anyone. Herbert Smith LLP may monitor e-mail communications in accordance with applicable law and regulations.

Herbert Smith LLP is a Limited Liability Partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation Authority of England and Wales whose rules can be accessed via www.sra.org.uk/code-of-conduct.page. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications. Herbert Smith LLP's registration number for Value Added Tax in the

# TAB 8

This is Exhibit "C" referred to in the affidavit of MICHAEL JOSEPH LANG sworn before me, this 1st day of JUNE 20 11

A COMMISSIONER FOR TAKING AFFIDAVITS

**Nortel**

**HERBERT SMITH Comments on the Draft Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds**

**9 October 2009**

48

1. Generally, presumably we have the same Panel for all disputes/transactions.

2. Footnote 2 (page 2). This remains to be discussed.

3. Recital (page 3). "Whereas, the Parties wish to provide for a mechanism ..." The definition of "Selling Parties" needs to be broad enough to cover parties who assert that they are beneficial owners of assets being sold or who have an economic interest therein even if those parties are not participating as a named seller in the sale. An obvious example is NNUK in the CDMA transaction.

4. Section 1.1 (page 4). "At any time prior to the First DR Referral Date (as defined below), the Parties may elect to use the services of a mediator .... and each Negotiating Party hereby agrees to fully cooperate, acting in good faith, with such mediator."

   Is it proposed that all parties need to consent to such election or can a Mediator be appointed on the election of any one Party? The latter may be the most sensible. We should discuss this.

5. Footnote 3 (page 4). The idea of the definition of Negotiating Parties in say the CDMA Sale excluding NNUK would not be acceptable.

6. Section 1.4 (page 5). This clause seems to suggest that the Escrow Account is subject to a Side Agreement but the Side Agreement is only to be reached between the "Principal Selling Parties". It is not clear how the phrase "Principal Selling Parties" is to be construed. But if it has the consequence of excluding for instance NNUK, I would have difficulties with it. We may be able to agree this if our consent is also required.

7. Footnote 4 (page 5). This was discussed in New York. As indicated, our clients would wish the Equinox dispute to be the first Basic Allocation Dispute to be handled by the Panel and would enter into the agreed Protocol on this express understanding.

8. Section 2.1 (page 5). The procedure set out for dealing with an "Additional Dispute" is extremely short and I question whether the 10 day period is sufficient.

9. Section 2.2 (page 6). We are not convinced that there is a need for a "Chairperson" of the Panel. This was discussed on the telephone call earlier this week.

10. Section 2.3 (page 6). This clause should also include provision to the effect that no party may independently contact the Panel.

11. Section 2.4 (page 6). We consider that one Alternate only per category is required. There is a cost to retaining a second alternate. We doubt that this is justified and the overwhelming possibility is that that expense will be wasted.

    Consideration should be given to the parties jointly taking out insurance on the Panel. Whether this is warranted will probably depend upon the length of the Hearing.

12. Section 2.6 (page 6). This provision should be extended so that it is explicit that none of the parties is able to refer or rely on the Buyer's allocation as evidence. We should also consider whether we want to prevent any of the parties relying on statements made by any court on allocation.

    We agree that the Panel should not be "bound to adopt or follow" any previous Decision or Allocation of the Panel relating to another Sale but it should be clear that they can nevertheless be aware of it and have regard to it. Indeed if the members of the Panel are the same this will no doubt be the case in any event.

13. Section 2.8 (page 7). We would not agree to the inclusion of the indemnity which is contained in square brackets. If the Panel and/or any experts should subsequently raise this then that matter can be considered at that time.

14. Section 2.9 (page 8). This refers to all "Proceedings" being heard in New York. This needs to be read with Section 3.1 which provides for Administrative Hearings being held at various venues. Section 2.9 should probably be subject to Section 3.1.

15. Section 3.2 (page 7). The first line should be amended to read "except as specifically provided in this Protocol, the Panel shall, after taking into account ...."

16. Section 4.2 (page 8). As discussed we suggest that the various valuation methodologies referred to should be omitted.

Further, we suggest that the sentence "The Presented Positions may also address any allocation advanced by a Buyer in the Acquisition Agreement" be deleted.

17. Generally, we have no difficulty with the incorporation of the IBA Rules of Evidence but equally this is a matter which presumably can be discussed and thereafter agreed with the Panel.

18. Section 4.6 (page 9). This should be amended to ensure there is capability for the different interests in a given estate (eg say three in EMEA) to be represented at the second stage.

19. Article V (page 9). As a general comment we would wish to ensure that greater flexibility is built in so that there is the necessary access by all parties to information and also to witnesses. Further, in the event that there is a delay in providing such information/access there should be a right for the disadvantaged party to extend the date that their submission is due.

    We consider that the relevant documents of all Parties should be available and that there should be access to witnesses of all parties. The current wording uses the definition of "Data Room" and limits the information to be contained in the Data Room to that information which is provided to potential Buyers (see Recital re the "Data Room" on page 2).

    It may be that at an early stage the Parties should agree the nature of the issues in dispute because this will determine or govern the issue of relevance for the purpose of disclosure. I know that this is a slightly contentious issue but it is something we need to consider further.

20. Section 5.2 (page 10). Reference to "the Company" should instead be reference to each of the relevant Estates.

    We suggest that the words "always readily obtainable" be deleted. If the information is not obtainable then the Company (or relevant Estate) will not be able to make it available by use of commercially reasonable efforts.

21. Footnote 12 (page 10). Prima facie we have no difficulty with incorporating or copying provisions from Articles 8 and 9 of IBA Rules of Evidence. Consideration needs to be given as to who is the Claimant for the purposes of the Hearing. But as a general proposition we think it is probably preferable for the Panel to set the rules.

22. Footnote 13 (page 11). If Prior Evidence cannot be further tested in circumstances where it may be necessary to do so, presumably there will be an issue of weight to be given to earlier evidence. This will depend upon the reason why the Witness in question is not available. Generally, we are content with the proposed wording of section 6.2.

23. Section 7.3 (page 11). This was discussed on the telephone call. We consider that the clause should be drafted so that a Decision should be capable of being signed on behalf of the Panel. We agree that no dissenting decision should be issued.

24. Section 7.9 (page 12). Our initial reaction to this paragraph was that we were unclear as to why the parties would not want there to be an arbitral award. We can see that an arbitral award would provide advantages with regard to enforceability. We understand that there are reasons for the paragraph and would wish to hear these.

25. Section 9.3 (page 14). Would you please add my name (Kevin Lloyd) to the notice provision under Herbert Smith LLP.

26. Section 9.6 (page 15). The words "if so sought" should be deleted from the phrase "the UK Court giving a direction (the UK Court's Directions )" that if so sought the Joint Administrators ...

27. Section 9.10 (page 16). We do not see the need for the inclusion of this clause.

28. Section 9.12 (page 16). Insert in the last line "and the UK Court".

29. Section 9.14 (page 16). In the last line insert "and the UK Court".

**Kevin F. Lloyd**

**Herbert Smith**

**15 October 2009**

# TAB 9

This is Exhibit "E" referred to in the affidavit of MICHAEL JOSEPH LANG sworn before me, this 1st day of JUNE 20 11

A COMMISSIONER FOR TAKING AFFIDAVITS

**Ma, Catherine**

**From:** Lang, Michael
**Sent:** March 19, 2010 5:06 PM
**To:** smalik@cgsh.com; Inna Rozenberg
**Cc:** jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; bzarnett@goodmans.ca; Tenai, Steve; Mark, Alan; Drymer, Stephen; Tay, Derrick C.; jbromley@cgsh.com; Craig B. Brod (cbrod@cgsh.com)
**Subject:** Nortel- Allocation Protocol
**Attachments:** DOCSTOR-#1901235-vdoc-Draft_Allocation_Protocol.DOC; DOCSTOR-#1901235-v3-Draft_Allocation_Protocol.DOC

91

Sanjeet,

Attached are Ogilvy's and Goodmans' comments on the Feb. 26/10 draft of the Allocation Protocol.

As a general comment, both of our firms feel that the last draft of this document did not highlight sufficiently all areas of substantive disagreement among the parties. So that there is no misunderstanding, the following are the principal areas of disagreement from the perspective of the Canadian Debtors and the Monitor, although other issues are noted in our mark-up. We ask that further drafts of the Protocol reflect all outstanding issues until they are satisfactorily resolved.

1. We continue to be of the view that the scope of the Panel's jurisdiction should be limited to determining the allocation of sale proceeds based on the actual assets and liabilities contributed by each of the Selling Debtors in the particular In-Scope Sale (including through relinquishment of intellectual property license rights). The Protocol should not be used as a surrogate forum for addressing putative claims that should be asserted in, and determined under, the appropriate claims resolution process.

2. We believe the proper allocation standard is a "fair and reasonable", rather than a "fair and equitable", allocation. The recognition of principles of equitable division of proceeds potentially opens the door to the consideration of a number of factors that go well beyond the purpose of the Protocol. For example, would the fact that a purchaser has excluded certain assets, contracts or employees, resulting in additional costs or losses incurred by a particular Selling Debtor, merit some compensation under an "equitable" allocation formula? The recognition of equitable considerations opens a Pandora's box of unforeseen circumstances and unintended consequences. If equity supports a basis for a legally cognizable claim against any estate, the matter should be left for determination by the applicable court or other court-approved claims resolution process.

3. On a number of occasions we have expressly reserved comment on the issue of the appropriateness of the adoption of the U.S. Bankruptcy Code "disinterestedness" standard as a conflict disclosure standard for Panel members. As I recall, Cleary had agreed to provide us with a description of what that standard would require, which we have yet to receive. Further, the current draft seeks to extend that standard on an "evergreen" basis, as opposed to relying on firewalls or other structural conflict procedures that could be put in place post-appointment. We once again reserve comment on this issue until we know exactly what the standard will require potential Panellists to disclose at the outset and on an on-going basis.

4. A new provision (section 5.5) has been added requiring access to all third party advisors who have "rendered advice to another Negotiating Party relevant to the dispute". There is no explanation in the draft of the purpose or effect of this broadly sweeping discovery provision. As drafted, it is unacceptable to our respective clients.

# TAB 10

This is Exhibit "6" referred to in the affidavit of MICHAEL JOSEPH LANG sworn before me, this 1st day of JUNE 20 11

A COMMISSIONER FOR TAKING AFFIDAVITS

182

**Ma, Catherine**

**From:** Lang, Michael
**Sent:** April 16, 2010 11:20 AM
**To:** 'LLOYD, KEVIN'; 'irozenberg@cgsh.com'
**Cc:** 'Pasquariello, Joe'; 'Murray.A.McDonald@ca.ey.com'; 'cbrod@cgsh.com'; 'jbromley@cgsh.com'; 'fhodara@akingump.com'; 'dbotter@AkinGump.com'; Tay, Derrick C.; 'cbrod@cgsh.com'; 'GALE, STEPHEN'; 'Whiteoak, John'; 'abloom@uk.ey.com'; 'rjowitt@uk.ey.com'; 'apisa@milbank.com'; 'smalik@cgsh.com'; Tenai, Steve; Mark, Alan; Drymer, Stephen; jcarfagnini@goodmans.ca; bzarnett@goodmans.ca
**Subject:** RE: Nortel - Allocation Protocol

Sorry, Kevin. This was to be addressed to you.

---

**From:** Lang, Michael
**Sent:** April 16, 2010 11:16 AM
**To:** LLOYD, KEVIN; irozenberg@cgsh.com
**Cc:** Pasquariello, Joe; Murray.A.McDonald@ca.ey.com; cbrod@cgsh.com; jbromley@cgsh.com; fhodara@akingump.com; dbotter@AkinGump.com; Tay, Derrick C.; cbrod@cgsh.com; GALE, STEPHEN; Whiteoak, John; abloom@uk.ey.com; rjowitt@uk.ey.com; apisa@milbank.com; smalik@cgsh.com; Tenai, Steve; Mark, Alan; Drymer, Stephen; jcarfagnini@goodmans.ca; bzarnett@goodmans.ca
**Subject:** RE: Nortel - Allocation Protocol

David,

The February 26th draft of the Allocation Protocol, at least from the standpoint of the Canadian Debtors and the Monitor, did not sufficiently highlight all areas of substantive disagreement among the parties on the terms of that document, and we advised Cleary to that effect in our comments on that draft. The April 7th draft reflects the position of the Canadian Debtors and the Monitor. Our amendments are intended to clarify, among other things, that the Protocol is not the proper venue for asserting claims or attempting to prioritize claims against any estate that should be asserted and resolved in the applicable bankruptcy proceeding. As to whether EMEA's claim to having, to use your words, "beneficial ownership in various assets" is or is not such a claim, we cannot comment as we have not had the benefit of an explanation of the basis of your position.

We look forward to more fully discussing these and other issues on the Protocol with you and the other participants at our meeting next week in New York.

Regards,
Michael

---

**From:** LLOYD, KEVIN [mailto:Kevin.Lloyd@herbertsmith.com]
**Sent:** April 14, 2010 1:53 PM
**To:** irozenberg@cgsh.com
**Cc:** Pasquariello, Joe; Lang, Michael; Murray.A.McDonald@ca.ey.com; cbrod@cgsh.com; jbromley@cgsh.com; fhodara@akingump.com; dbotter@AkinGump.com; Tay, Derrick C.; cbrod@cgsh.com; GALE, STEPHEN; Whiteoak, John; abloom@uk.ey.com; rjowitt@uk.ey.com; apisa@milbank.com; smalik@cgsh.com
**Subject:** Nortel - Allocation Protocol

Inna

Thanks for your email.

I have now had a chance to look at the comments from the Canadian Debtor and Monitor.

What I am not clear about is whether the Canadian Debtor and Monitor are still maintaining a point they advanced last year namely, that EMEA (and the other estates) are unable to contend in the Allocation Hearing that they have a beneficial ownership in various assets, including most relevantly intellectual property. I thought that that point had been withdrawn because, as I had indicated, it is something that I simply could not recommend to my clients that they concede. But the way I read the recent amendments to recital 15, clause 8.1 and 10.7 is to suggest that this issue has resurfaced. It may be that all that is intended by the Canadian Debtor and the Monitor is that the allocation hearing shall not cover inter-estate claims. We are content to discuss that - Indeed I do not believe the Protocol was ever intended to extend to those type of claims, which will be dealt with in the ordinary way by the various claim processes. This of course, will still entitle the parties to argue beneficial ownership in any allocation hearing.

I hope that I have misunderstood the effect of the proposed amendments from the Canadian Debtor and the Monitor but before we finalise arrangements to travel over to New York I need to confirm this.

Hopefully, the position is as per Cleary's draft on 26 February, which we felt was a useful basis in which to progress discussions. Could either you or representatives for the Canadian Debtor and the Monitor please confirm this, ideally by return email. Subject to this, I am looking forward to seeing you next week when hopefully we will finalise the terms of the protocol.

Regards

Kevin

---

**From:** Inna Rozenberg
**To:** 'aleblanc@milbank.com' ; Alex MacFarlane ; amark@ogilvyrenault.com ; 'annav@nortel.com' ; 'apisa@milbank.com' ; Qureshi, Abid ; Kahn, Brad ; 'Brent.R.Beekenkamp@ca.ey.com' ; 'bzarnett@goodmans.ca' ; Craig B BROD ; David.Descoteaux@Lazard.com ; Botter, David ; 'dtay@ogilvyrenault.com' ; Hodara, Fred ; DAVIES, GAVIN; Giles Boothman ; Howard ZELBO ; James L BROMLEY ; 'jcarfagnini@goodmans.ca' ; jharris@milbank.com ; Segger, Joanne; Whiteoak, John; 'jpasquariello@goodmans.ca' ; 'jstam@ogilvyrenault.com' ; Sturm, Joshua ; LLOYD, KEVIN; Rowe, Kevin ; Lisa M SCHWEITZER ; 'Matthew.Hart@lazard.com' ; Michael Wunder ; 'mlang@ogilvyrenault.com' ; mnolan@milbank.com ; 'Murray.A.McDonald@ca.ey.com' ; 'Nortel' ; 'Orzyr@bennettjones.com' ; Bagon, Paul ; Jacobs, Ryan ; Pees, Robert ; 'SDrymer@ogilvyrenault.com' ; Shayne Kukulowicz ; stenai@ogilvyrenault.com ; GALE, STEPHEN; tkreller@milbank.com ; 'ZychK@bennettjones.com' ; Sanjeet Malik ; Theodore Geiger ; jravidity@earthlink.net ; Jacobs, Ryan
**Sent:** Wed Apr 07 22:01:56 2010
**Subject:** Nortel - Allocation Protocol

Dear all,

Please find attached the latest draft of the Allocation Protocol, along with a blackline against the last version circulated.

This draft incorporates comments received from Ogilvy and Goodmans (denoted as OR/G) and Herbert Smith (denoted as HS), as well as some smaller language changes that Cleary implemented.

Suggested additions to the text are bracketed and preceded by an indication of the firm making the proposal (using the initials described above). Suggested deletions to the text are bracketed, and the firm suggesting the deletion is indicated by the legend [OR/G: delete] or [HS:delete], which appears

# TAB 11

## A. Background

10. The Joint Administrators were appointed in respect of the EMEA Debtors, pursuant to Administration Orders (the "**UK Administration Orders**") granted by the High Court of Justice of England and Wales (the "**UK Court**") on the Filing Date pursuant to the provisions of the *Insolvency Act 1986* (UK) (collectively, the "**UK Proceedings**"). The UK Administration Orders remain in full force and effect and are not subject to any appeal or motions to vary or set aside.

11. Nortel has sold substantially all of its operating businesses in the course of the insolvency proceedings in Canada, England and also the United States. The proceeds are being held in escrow pending determination of how they are to be allocated among the Nortel companies.

12. Two material and significant issues in the administration of the EMEA Debtors involves determining and valuing:

(a) The EMEA Debtors' entitlement to the sale proceeds which are currently held in escrow; and

(b) the interrelated issue of the inter-company claims between and among the EMEA Debtors and the Nortel CCAA Debtors who filed for and obtained protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") pursuant to an order of this Court made on the Filing Date (the "**Nortel Canada CCAA Proceedings**").

13. The Amended and Restated Claims Procedure Order (the "**Claims Procedure Order**") and the Claims Resolution Order made by this Court on July 30, 2009 and September 16, 2010, respectively, do not pertain to the inter-company claims as described in paragraph 3(t)(ii) of the Claims Procedure Order (defined in the EMEA Claims Procedure Order as the "EMEA Claims").

14. The IFSA among the Nortel CCAA Debtors, Nortel Networks Inc. and the other companies listed at Schedule 2 of the IFSA (collectively the "**US Debtors**"), the Joint Administrators, and the EMEA Debtors (the "**Parties**") was approved by this Court and specifically contemplated the method for addressing this complex and inextricably intertwined inter-company claims issue. In particular, Section 12 (b) of the IFSA provides that funds cannot be distributed from the escrow accounts until either: (i) an agreement on allocation is reached by the Parties; or (ii) if the Parties fail to reach an agreement, a determination is made on the basis of an agreed upon protocol by the Parties for resolving disputes. A copy of the IFSA is attached hereto as Exhibit "B". All the proceeds of all the major sales which have been completed to date (including those not covered by the IFSA) have been placed into escrow and are not to be released until the occurrence of one of the two events listed above. An example copy of the escrow agreements relating to the sales proceeds is at Exhibit "C".

15. To date, various efforts have been undertaken but have not yet resulted in the resolution of the allocation of these sale proceeds, or the various inter-company claims.

22. The fact that the determination and resolution of inter-company claims is intertwined with allocation issues is explicitly recognised by the monitor of the Nortel CCAA Debtors (the "**Monitor**") at paragraph 18 in its Fifty-Eighth Report filed in support of the EMEA Claims Procedure Motion.

23. It is therefore impossible to deal with the EMEA Claims in advance of the allocation process. At the very least, therefore, the EMEA Claims should be decided after the allocation process. However, for the reasons outlined above, it makes the most commercial sense to have these issues determined at the same time as resolving the allocation of the sale proceeds.

24. For the reasons above, the main justification relied on by the Nortel CCAA Debtors at paragraph 25 of the Ventresca Affidavit is not sustainable. The claims process, if granted, will lead to significant delay and additional, unnecessary costs.

**ii. EMEA claims must in any case be dealt with in accordance with section 12(c) of the IFSA**

25. The attempt to unilaterally impose a claims resolution process through the EMEA Claims Procedure Order runs counter to section 12(c) of the IFSA.

26. Section 12(c) of the IFSA requires the Parties to agree on a protocol for resolving allocation disputes that provides binding procedures for allocation where the parties are unable to agree. As acknowledged by the Monitor in its

Fifty-Eighth Report, these allocation issues are inextricably intertwined with all Nortel company inter-company claims issues.

27. In accordance with section 12(c) of the IFSA, the estates began a process of negotiating a protocol for resolving disputes concerning the allocation of the sales proceeds from sale transactions of the material assets of Nortel (the "Interim Sales Protocol"). This process took place for over almost a year from 2009 - 2010, whereby the Joint Administrators acted in good faith in an attempt to reach agreement in accordance with the IFSA. An agreement has not yet been reached. As these discussions proceeded on a without prejudice basis, I am not able to divulge the content of them. If the Court desires, and with the other parties' consent, counsel will be able to advise the Court as to the progress that was made in those discussions.

28. As noted above, the EMEA debtors' position is that the EMEA Claims are so inextricably linked with allocation that EMEA's Claims must be dealt with under the section 12(c) IFSA process.

**iii. Ongoing Mediation**

29. As part of an attempt to reach a consensual resolution, the Parties met on several occasions in an attempt to agree on a global settlement. A disclosure exercise was carried out and documents were placed into a central database (albeit their use was limited only to the settlement discussions). Although helpful, this disclosure fell a long way short of the disclosure that would be required

# TAB 12

19. For example, sales proceeds allocation as well as claims adjudication may well require a detailed interpretation, analysis and assessment of the Nortel Group's complex transfer pricing system. Consideration of the probity of pre-filing transfer pricing arrangements between the Nortel Group entities would appear to be central to any allocation arguments. The propriety of precisely the same transfer pricing arrangements is put directly in issue by the UK Pension Claimants' proofs of claim which allege that the intra-Group arrangements were non-open-market transactions imposed upon NNUK to the financial detriment of NNUK and the Plan.

20. The Allocation Protocol does not address these concerns regarding subject matter overlap. This is acknowledged at paragraph 28 of the Monitor's Report as follows:

> 38. Although not expressly contemplated by the Allocation Protocol, the Monitor is also of the view that the claims advanced by the U.K. Pension Trustee and the PPF (whom the Monitor understands to be the majority creditors of NNUK and, potentially, certain of the other EMEA Debtors) against the Canadian Debtors must be resolved in a manner similar to the EMEA Claims. As outlined in the Sixty-Fifth Report, these claims are both significant and, importantly, cover much of the same factual territory as the EMEA Claims. Similar to the situation with the EMEA Claims as outlined above, a failure to resolve these claims in conjunction with the allocation dispute, or a failure to consider them without regard to the allocation dispute and/or the EMEA Claims, would expose the Canadian Debtors to the possibility of the same alleged wrongdoings being asserted, and extracting value from the Canadian Debtors' estates, in three separate ways. In addition, the concerns outlined above with respect to the EMEA Claims regarding efficiency, preservation of scarce resources and risk of inconsistent decisions apply equally to the U.K. Pension Claims.

# TAB 13

with the FAA and the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), to which both the United States and Canada are treaty parties and which the United States implemented domestically through the FAA. The court has no jurisdiction to adjudicate the merits of a dispute over the allocation of the Sale Proceeds, which is subject to dispute resolution only through international arbitration.

11. In New York, if a court were to find that Section 12 is ambiguous, extrinsic evidence of the parties' intent to arbitrate these issues is admissible to resolve the ambiguity. Such evidence includes oral agreements or writings between the parties made prior to or contemporaneous with the execution of the IFSA, as well as evidence of the course of conduct between the parties following the execution of the IFSA. If, after reviewing all evidence submitted, any doubt remained as to the existence of an agreement to arbitrate between the parties, New York law requires courts to support the federal policy favoring arbitration and therefore to resolve any ambiguities in favor of arbitration.

12. My opinions are explained fully below and are supported by statutes, binding precedents, and persuasive authority.

## III. Questions Presented and Answers

13. The Joint Administrators have asked me to express an opinion on the following specific questions of New York law:

(A) The requirements for there to be an enforceable agreement to arbitrate a dispute;

(B) Whether Section 12(b) of the IFSA constitutes an agreement to arbitrate relating to the allocation of Sales Proceeds;

(C) Whether Section 16(b) of the IFSA provides the Court with jurisdiction to determine any disputes relating to the allocation of Sales Proceeds;

(D) Whether Section 12(c) of the IFSA creates a binding obligation on any party to negotiate in good faith towards an agreement on the Interim Sales Protocol referred to in the IFSA;

(E) Whether extrinsic evidence is admissible in order to consider and determine the proper interpretation of the IFSA with respect to whether the parties agreed to arbitration and regarding what the term "dispute resolver(s)" in the IFSA means; and

(F) Whether evidence regarding the parties' negotiations is admissible to determine whether such negotiations were conducted in good faith.

14. For the reasons set forth in more detail below, it is my opinion that:

(A) Under New York law, an arbitration agreement is valid and enforceable if it is in writing and evinces an intent of the parties to the agreement to submit themselves to binding arbitration. The parties need not agree to the arbitration procedures; rather, New York law only requires an agreement to be bound. Additionally, the terms "arbitration," "arbitrator," or "arbitrate" need not appear in the text of the agreement so long as the agreement evidences the intent of the parties to submit to arbitration. Where the parties' intent is discernible from the plain meaning of the language of the contract, there is no need to look further.

(B) Section 12(b) of the IFSA is a valid and enforceable arbitration agreement because it is a written agreement evidencing the intent of the parties to submit themselves to binding *ad hoc* arbitration and is consistent with public policy favoring arbitration of international commercial disputes.

# TAB 14

directly on state contract law in the first instance.[5] Rarely would the result change by applying federal law or state law to the issue of the existence of the agreement to arbitrate.[6] In my opinion, the result in the instant case would be the same no matter if federal law or New York state law were applied. Therefore I discuss both sets of laws in the opinion.

A. Legal Principles On Which Professor Cheng and I Agree

15. Professor Cheng and I agree on a number of basic legal principles of interpretation applicable to the question of whether an enforceable agreement to arbitrate exists.

16. For example, Professor Cheng and I agree that whether parties have agreed to arbitrate is a basic question of contract law.[7] The starting point for any contract interpretation is the plain language of the contract.[8] An agreement to arbitrate requires the parties to the agreement to express an intent to resolve a dispute by arbitration.[9] The cornerstone of the inquiry, therefore, is whether the parties' written agreement demonstrates an *intent* to arbitrate.

---

*Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 300 n.5 (S.D.N.Y. 1997) ("where jurisdiction is alleged under chapter 2 of the Federal Arbitration Act the issue of enforceability and validity of the arbitration clause is governed by federal law.").

[5] *Perry v. Thomas*, 482 U.S., 483, 492 n.9 (1987) ("state-law principles" may be applied to claims asserted under Chapter 2 of the FAA provided they are rules generally applicable to contracts, not only to arbitration agreements).

[6] Federal common law rules for formation of arbitration agreements "dovetail[] precisely with general principles of contract law." *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994).

[7] FAA, 9 U.S.C. § 2, states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation for any contract." *See also, e.g., Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960) (under the FAA, "ordinary contract principles determine who is bound by such written provisions").

[8] Cheng Aff. ¶ 19 ("Where the parties' intent is discernible from the plain meaning of the language of the contract, there is no need to look further.").

[9] The United States Supreme Court states that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotations omitted); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001) ("[C]ourts must treat agreements to arbitrate like any other contract .... A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement."); *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) ("parties may not be forced into arbitration if that was not their true agreement."); GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION 640 (2009) ("The central issues arising with regard to the formation of international arbitration agreements concern the consent of the parties.").

# TAB 15

JUL-15-2009 10:16 JUGDES ADMIN RM 170 416 327 5417 P.002/005

June 29, 2009

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**MOTION RECORD**
**Interim Funding Agreement**
**(returnable June 29, 2009)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

SUPERIOR COURT OF JUSTICE / COUR SUPERIEURE DE JUSTICE
FILED / DÉPOSÉ
JUN 2 3 2009
AT / À
LOCAL REGISTRAR - GREFFIER LOCAL
TORONTO

June 29/09

The motion is granted. The Order has been signed in the form requested. Brief reasons will follow.

[signature] J.

July 13/09

These are the reasons in respect of the above endorsement.

The motion was not opposed.

The Monitor recommended that the relief be granted.

The motion was supported by the UK Administrator, the Bondholders, and the Unsecured Creditors' Committee on the basis that these parties are reserving their rights in respect of the allocation issue.

It is clear that this motion is to for approval of the Interim Funding Agreement. The reservation of rights has been noted and Mr. Tay, counsel to the Applicants, acknowledged that the motion does not deal with the allocation of funds.

The affidavit of Mr. Doolittle sworn June 22/09 and the 15th Report of the Monitor provides a detailed background as to benefits of the Interim Funding Agreement.

I am satisfied that, in the circumstances, the Interim Funding Agreement should be approved. As part of the approval process, I understand certain amendments

to the Cross-Border Protocol were also sought. These amendments were not opposed. I am satisfied that the proposed amendments are appropriate and they are approved.

3 The mechanism in respect of the EDC Charge were also referenced and I am satisfied that it is appropriate for the order deleting the EDC Charge to become effective upon the Monitor filing a certificate on the advice of EDC that EDC has received the Collateral funds. (Such certificate was delivered by the Monitor at 5:00 p.m. on June 30/09.)

The requested amendments to the Interim Order are also approved as are the extensions to the Canadian GSPA and the EDC Short Term Support Agreement.

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the "Applicants")**

**SUPPLEMENTAL FIFTEENTH REPORT OF THE MONITOR**
**DATED JUNE 26, 2009**

## INTRODUCTION

1. On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"). Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to July 30, 2009, by this Honourable Court in its Order dated April 28, 2009.

2. Nortel concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the U.S. Court on January 14, 2009, for Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors").

3. Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

4. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

5. Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court for NNSA.

**PURPOSE**

6. The purpose of this Supplemental Fifteenth Report of the Monitor (the "Supplemental Fifteenth Report") is to provide this Honourable Court with an update in respect of proposed amendments to the Cross-Border Insolvency Protocol.