IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

|  |  |
|---|---|
| *In re* | : Chapter 11 |
| | : Case No. 09-10138 (KG) |
| Nortel Networks Inc., et al.,[1] | |
| | : Jointly Administered |
| Debtors. | |
| | : Related to ECF No. 5202 |
| | : Hearing Date: June 30, 2011 at 10:00 a.m. |
| | Objections Due: June 13, 2011 at 4:00 p.m. |

-------------------------------------------------------X

## LIMITED OBJECTION OF AT&T TO SALE OF PATENTS FREE AND CLEAR OF ALL CLAIMS AND INTERESTS

AT&T Services, Inc., on its own behalf and as agent on behalf of its subsidiaries and affiliates (collectively, "AT&T"), hereby files this limited objection to the Debtors' Motion (the "Sale Motion") for Orders (i) (a) Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement (the "ASA"), (b) Authorizing and Approving the Bidding Procedures and Bid Protections, (c) Approving the Notice Procedures and the Assumption and Assignment Procedures, (d) Approving the License Rejection Procedures, (e) Approving a Side Agreement, (f) Authorizing the Filing of Certain Documents Under Seal and (g) Setting a Date for the Sale Hearing, and (ii) Authorizing and Approving (a) the Sale of Certain Patents and Related Assets Free and Clear of all Claims and Interests, (b) the Assumption and Assignment of Certain Executory Contracts, (c) the Rejection of Certain Patent Licenses and (d) the License Non-Assignment and Non-Renewal Protections, and in support thereof states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

## PRELIMINARY STATEMENT

1.      Nortel's patents cannot be sold "free and clear" of the commitments Nortel made to standard determining organizations and industry groups (collectively, "SDOs"). Specifically, Nortel participated in SDOs that were developing industry standards incorporating Nortel technologies and patents into relevant industry standards.  Nortel committed to licensing its patents embodied in these industry standards on a "fair, reasonable and non-discriminatory" or, in some cases, even a royalty-free basis (collectively, "FRAND").   SDOs often require FRAND commitments from those who contribute technology to developing standards to help ensure that the patent holdings of these contributors will not be used to extract exorbitant licensing fees harming the broad adoption of such standards.   Relying upon the FRAND licensing commitments of Nortel, numerous companies in the telecommunications and technology industries have incorporated Nortel's technologies into their products and services upon establishment of these industry standards.  Absent these FRAND obligations, the purchaser of Nortel's intellectual property could engage in a "patent hold-up" of the companies reliant on continued licensing of Nortel's patents on a FRAND basis, potentially causing major disruptions to the orderly operations of affected markets.  For these reasons, non-bankruptcy law does not allow a purchaser to dishonor the seller's obligations to license such patents and technologies on a FRAND basis.  Moreover, the Bankruptcy Code does not give Nortel greater rights enabling it to sell the patents free and clear of the FRAND obligations.   Simply put, any purchaser is required to continue to honor Nortel's FRAND obligations with respect to the patents.  To suggest the FRAND obligations are limited by the arbitrary terms of the ASA would create confusion as to the reasonably priced availability of licenses, appreciably disrupt markets and, in short, give the Court's imprimatur to a potential "patent hold-up."  Nortel could not engage in such a hold-up, and neither may the buyer of its patents.

## RELEVANT FACTS

**I.      Nortel Irrevocably Committed Its Patents to Certain Licensing Terms Prior to Bankruptcy**

2.      SDOs typically promote rational licensing costs and broad adoption of industry standards by asking their members to certify as to the availability of relevant patents covering the technology the members sought to be included in the standard.  In particular, many SDOs ask those who make technological contributions to a proposed industry standard whether they have any patents or other intellectual property rights that are necessary in order to implement the standard.   Pursuant to these SDO's intellectual property policies, companies commit to license such patents on a FRAND basis.   These patents are often referred to as "essential patents" or intellectual property rights ("IPRs").  In the course of its work contributing to several industry standards, Nortel made such commitments with respect to its patents to several SDOs, including, for example and without limitation, the standard setting bodies of the Institute of Electrical and Electronics Engineers ("IEEE") and the 3rd Generation Partnership Project ("3GPP").[2]  The governing rules of IEEE and 3GPP, referenced in the declarations themselves, also make clear that such declarations are irrevocable, even by a transferee of the patents.

3.      For example, Nortel sent the IEEE "letters of assurance" ("LOAs") expressly stating or incorporating Nortel's statement, first included in a LOA dated December 16, 2004, a copy of which is attached hereto as Exhibit A, that:

> In the event the above-referenced draft IEEE 802.16e standard amendment is finally approved and in the event that Nortel Networks has one or more patent(s) and patent application(s) that,

---

[2]  The IEEE and 3GPP are mentioned for illustrative purposes.  These are only two of the numerous SDOs to which Nortel made such commitments.

> if as issued, are essential to practice the resulting IEEE 802.16e
> standard, Nortel Networks Limited makes the assurance that it is
> prepared to make available, upon written request, licenses under
> such patent(s) on a non-discriminatory basis and upon reasonable
> terms and conditions to comply with the resulting IEEE 802.16e
> standard.

Letter Of Assurance For Essential Patents from Michele Lee to Secretary, Patent Administrator

IEEE Standards Board Patent Committee (December 16, 2004), *available at*

http://standards.ieee.org/about/sasb/patcom/loa-802_16e-nortel-16dec2004.pdf.

And, IEEE by-laws further provide that:

> The Submitter of a Letter of Assurance shall agree (a) to provide
> notice of a Letter of Assurance either through a Statement of
> Encumbrance or by binding any assignee or transferee to the terms
> of such Letter of Assurance; and (b) to require its assignee or
> transferee to (i) agree to similarly provide such notice and (ii) to
> bind its assignees or transferees to agree to provide such notice as
> described in (a) and (b).

(IEEE-SA Standards Board Bylaws §6.2, available at

http://standards.ieee.org/develop/policies/bylaws/sect6-7.html#6).   The by-laws further provide

that "[t]his assurance shall apply, at a minimum, from the date of the standard's approval to the

date of the standard's withdrawal *and is irrevocable during that period.*" *Id.* (emphasis added).

4.      Similarly, the licensing declarations provided by Nortel to 3GPP, in

accordance with the ETSI IPR Policy, stated that:

> The SIGNATORY and/or its AFFILIATES hereby declare that
> they are prepared to grant irrevocable licenses under the IPRs on
> terms and conditions which are in accordance with Clause 6.1 of
> the ETSI IPR Policy, in respect of the STANDARD, to the extent
> that the IPRs remain ESSENTIAL.

IPR Information Statement and Licensing Declaration from Dan Dermele (June 11, 2008),

*available at* http://ipr.etsi.org/IPRDetails.aspx?IPRD_ID=736&IPRD_TYPE_ID=2&MODE=2

(attached hereto as Exhibit B).

5.     Clause 6.1 of the ETSI IPR Policy, in turn, governs the extent to which the declarant irrevocably agrees to provide licenses to any essential patents on a reasonable and non-discriminatory basis and also makes clear that:

> In the event a MEMBER assigns or transfers ownership of an ESSENTIAL IPR that it disclosed to ETSI, the MEMBER shall exercise reasonable efforts to notify the assignee or transferee of any undertaking it has made to ETSI pursuant to Clause 6 with regard to that ESSENTIAL IPR.

ETSI    Intellectual    Property    Rights    Policy,    *available    at* http://www.etsi.org/WebSite/document/Legal/ETSI_IPR-Policy.pdf.

## II.    The Asset Sale Agreement Purports to Limit Purchaser's Commitments

6.     On or about April 4, 2011, Nortel filed the Sale Motion.  The ASA, by which Ranger, Inc., an affiliate of Google, Inc., could acquire the patents, references the commitments made to SDOs as a "Permitted Encumbrance" but expressly only preserves some such commitments.  Instead of recognizing that the encumbrances are attached to the patents and must be fully binding on any transferee of the patents, the ASA attempts to limit purchaser's obligations by defining "Permitted Encumbrances," in relevant part, as:

> . . . (vi) (x) *the promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies or industry groups* concerning the Transferred Patents, Purchased Specified UK Patents or Undisclosed Patent Interests, *solely to the extent* such standard-setting bodies or industry groups, together with the title and number of the standard and the Transferred Patents to which such promises, declarations or commitments apply (in each case, to the extent identified in the respective promise, declaration or commitment) are *listed in Section 1.1(g) of the Sellers Disclosure Schedule*, and (y) *the commitments* concerning the Transferred Patents, Purchased Specified UK Patents or Undisclosed Patent Interests *granted in writing by the Sellers pursuant to the membership agreements, by-laws*

*or policies of standard setting bodies or industry groups in which Sellers were participants, solely to the extent* such standard-setting bodies or industry groups and the related membership agreements, by-laws or policies, pursuant to which such commitments were granted are *listed in Section 1.1(g) of the Sellers Disclosure Schedule, and solely to the extent the Sellers are bound by such standard setting bodies' or industry groups' membership agreements, by-laws or policies to bind the Purchaser to such commitments.*

Sale Motion, Ex. A at 16-17 (emphasis added).

## ARGUMENT

7.    The language of the ASA suggests that the purchaser of the patents might not be bound by the same commitments Nortel made with respect to the patents. The relevant portion of the ASA's definition of a "Permitted Encumbrance" improperly narrows the purchaser's obligations, including the limitation that such obligations exist "solely to the extent the Sellers are bound by such standard setting bodies' or industry groups' membership agreements, by-laws or policies to bind the Purchaser to such commitments." Moreover, the current definition of "Permitted Encumbrances" purports to limit the continued FRAND obligations "solely to the extent" Nortel listed them on Section 1.1(g) of the Sellers Disclosure Schedules to the ASA. Thus, if a FRAND obligation is not scheduled in Section 1.1(g) of the Sellers Disclosure Schedule, then the sale arguably will be free and clear of such FRAND obligation. The inclusion of this language creates potential gaps improperly limiting the FRAND related obligations irrevocably encumbering the patents. As demonstrated herein, Nortel's commitments to the SDOs are binding on any transferee regardless of whether they appear on a

schedule to the ASA or whether the SDOs' membership agreements, by-laws or policies require Nortel to bind a purchaser.[3]

## I.     The Rights to License the Patents on a Non-FRAND Basis Are Not a Part of Nortel's Bankruptcy Estate

8.      As provided in Section 541 of the Bankruptcy Code, the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). But "the estate's legal and equitable interests in property rise no higher than those of the debtor." *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3rd Cir. 1993) (internal quotations and citation omitted). "The estate in bankruptcy only includes property to which the debtor would have a right if the debtor were solvent." *Id.* citing *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1401 (5th Cir. 1987). Even a debtor's minor interests are not a part of the estate as "Congress intended to exclude from the estate property of others in which the debtor had some minor interest." *In re Sandralee Rodgers*, 333 F.3d 64, 69 (2d Cir. 2003) (holding that when a debtor "lost her legal and equitable interest in the property by virtue of the foreclosure sale, the property did not become property of the estate when the bankruptcy petition was filed) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.8 (1983)). In short, the operation of the bankruptcy law does not provide for the "springing" of debtor rights and interests in property the moment after the petition is filed that did not exist the instant before the filing.

9.      In *First Fidelity Bank v. McAteer*, the Third Circuit Court of Appeals examined whether the proceeds of a life insurance policy owned by the debtor were the property

---

[3] A purchaser may want Nortel to disclose in its schedules such encumbrances, but that is a matter between a buyer and a seller and would be the subject of a seller's representations, warranties and indemnities. It cannot act to limit the rights of third parties, however.

of the estate or the policy's primary beneficiary, another party. *McAteer*, 985 F.2d at 115-16. The district court affirmed the bankruptcy court's order requiring the turnover of insurance proceeds to the debtor's estate. *Id.* at 116. The Court of Appeals, however, reasoned that "if the owner of a life insurance policy did not have an interest in its proceeds, the filing of the petition in bankruptcy cannot create one." *Id.* at 117. Finding the owner had no interest, the Third Circuit reversed the courts below, and held "the bankruptcy court cannot now alter the insurance contract's terms" to bring the property of another into the estate. *Id.* at 118-19.

10.    Interests sold or transferred by the debtor to another party prior to the filing of bankruptcy are not a part of the estate under Section 541. *See Boyd v. Martin Exploration Co.*, 56 B.R. 776, 779 (E.D. La. 1986) (holding that "interests formally assigned from [the debtor] to [another party] and recorded are not a part of [the debtor's] estate in bankruptcy"); *see also In re Jurgielewicz Duck Farm*, No. 8-10-70231-478, 2010 Bankr. LEXIS 1507, *11-12 (Bankr. E.D.N.Y. May 20, 2010); *In re Moskowitz*, 14 B.R. 677, 682 (Bankr. S.D.N.Y. 1981). In *In re Moskowitz*, a debtor assigned his medical insurance proceeds to a hospital and the hospital was paid the funds prior to the bankruptcy. The trustee commenced an action to recover funds paid to the hospital as a "voidable preferential transfer." *Id.* at 678. The court granted summary judgment in favor of the hospital finding that the assignment alone "answer[ed] negatively the question whether the proceeds could be considered property of the estate under Code § 541" and, therefore, there was no preference. *Id.* at 682.

11.    Non-monetary interests are similarly treated by Section 541. In *In re Jurgielewicz Duck Farm*, prior to the bankruptcy, the debtor sold the development rights for his land to the county and town, which bought the rights to ensure the property remained farmland.

2010 Bankr. LEXIS at *19.  The court refused to allow the sale of the property free and clear of the development rights, holding that:

> When the Debtor conveyed its interest in the Development Rights to the County and Town for fair consideration, it no longer owned the Development Rights.  If the Debtor sought to convey the land which represents the Property outside of bankruptcy, it can only convey Property subject to the Development Rights held by the County and the Town.  Accordingly, when the Debtor filed for bankruptcy relief, the Development rights did not become property of the Debtor's bankruptcy estate under 11 U.S.C. § 541.

*Id.* at *12.  The court reasoned that to hold otherwise and permit a sale of the property "free and clear of the Development Rights" would enable the debtor to be "compensated twice for sale of the same rights."  *Id.* at *24.

12.    Nortel's commitments to the SDOs were effectively an assignment of its previously unfettered right to license the relevant patents on any terms it saw fit.  Nortel exchanged its rights to freely and fully license its patents as it saw fit for, among other things, the fair consideration of future profits resulting from its patents becoming part of industry-wide standards and the financial benefits from associated licensing revenue – consistent with FRAND obligations.  At bottom, Nortel's various commitments to the SDOs meant the right to license the technologies on a non-FRAND basis was not a right held by Nortel at the time it filed bankruptcy.  As a matter of law, therefore, the right to license the patents on a non-FRAND basis was not part of the bankruptcy estate under Section 541.  Clearly, if Nortel did not have a right and it was not part of the bankruptcy estate, that right cannot be conveyed to a third-party purchaser.  Moreover, the sale of the patents absent the FRAND obligations would provide an inequitable windfall to a transferee who could exploit – unfettered – the industry's widespread adoption of standards incorporating Nortel's patents.  Just as the Third Circuit Court of Appeals

held in *McAteer*, the court cannot alter the understanding between Nortel and the SDOs in order

to create new rights in the estate or in any transferee. *See McAteer*, 985 F.2d at 118-19.

**II.     Non-Bankruptcy Law Does Not Allow Patent Holders and Purchasers to
         Avoid Representations Made by a Seller to SDOs**

13.     Courts and federal agencies regularly enforce commitments made to SDOs

because numerous other companies in the industry adopt uniform technological standards in

reliance on their ability to secure licenses to any essential patents on FRAND terms.  Courts and

the Federal Trade Commission (the "FTC" or the "Commission") have concluded that a party

with commitments to an SDO is bound by those commitments and may not enforce such patents

against the rest of the market in contravention of those commitments.  *See, e.g., Broadcom Corp.

v. Qualcomm Inc.*, 501 F.3d 297, 310 (3rd Cir. 2007); *In the Matter of Dell Computer Corp.*, 121

F.T.C. 616 (May 20, 1996); *In the Matter of Union Oil Co. of Cal.*, No. 9305, 2005 FTC LEXIS

116 (F.T.C. July 27, 2005).

14.     One of the FTC's first actions enforcing the commitments to an SDO, *In

the Matter of Dell Computer Corp.*, involved the Video Electronics Standards Association

("VESA"), which is an SDO that asked its members to certify whether they had any patents or

other intellectual property applicable to a new computer component standard VESA was

considering adopting.  *Id.* at *13-14.  Dell certified that it had no such patents, but then sought to

enforce certain of its patents against companies planning on adopting the new standard.  *See id.*

The FTC ultimately approved a consent order, based on Section 5 of the FTC Act, prohibiting

Dell from enforcing its patent against those using the adopted standard.  *Id.* at *16.  Section 5 of

the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or

deceptive acts or practices in or affecting commerce . . ." which is precisely what will result if a

purchaser of Nortel's patents is permitted to ignore Nortel's commitments to various SDOs. The

FTC noted that enforcement of Dell's commitments to VESA was consistent with courts'

treatment of patent holders who failed to disclose the existence of those patents. *Id.* at *16, n.4

(*citing Potter Instrument Co., Inc. v. Storage Technology Corp.*, 641 F.2d 190 (4th Cir.), *cert.*

*denied*, 454 U.S. 832 (1981); *Wang Laboratories Inc. v. Mitsubishi Electronics America Inc.*, 29

U.S.P.Q. 2d 1481 (C.D. Cal. 1993); *Stambler v. Diebold, Inc.*, 11 U.S.P.Q. 2d 1709, 1715

(E.D.N.Y. 1988), *aff'd*, 878 F.2d 1445 (Fed. Cir. 1989)). The FTC also reasoned that such

enforcement was required not only to protect those who already adopted the standard, but also,

as in the instant case, to protect the broader competitive process and consumers:

> Here the market adopted the VL-bus standard. Both those who
> relied on Dell's representation, and others who had to adopt the
> industry standard, were faced with potential harm. Absent our
> enforcement action, Dell could have required royalties from all
> firms that adopted the standard. Where the market has chosen a
> particular technology believed to be available to all without cost,
> limiting the order solely to those companies that relied on Dell's
> certification might not fully protect the competitive process or
> consumers.

*Id.* at *17.

15.     Subsequent actions taken by the FTC in several proceedings confirm the

Commission's view that the attempted avoidance of commitments made to an SDO could also

constitute unlawful monopolization under Section 2 of the Sherman Act. *See In the Matter of*

*Union Oil Co. of Cal.*, No. 9305, 2005 FTC LEXIS 116 (F.T.C. July 27, 2005) ("*Unocal*");

*Rambus, Inc.*, FTC No. 9302, 2006 FTC LEXIS 60 (Aug. 2, 2006).[4] The Commission's logic in

*Rambus* is particularly instructive with respect to the concerns that would arise in the event

---

[4]   The Commission's unanimous *Rambus* decision was overturned by the D.C. Circuit because the court found the
Commission failed to prove the SDO in that case would have selected alternative technologies for the standard had
Rambus disclosed the existence of its patents during the standard-setting process. But the court also expressly noted
deception of an SDO that leads to monopoly power could still be actionable under Section 2 of the Sherman Act.
*See Rambus Inc. v. FTC*, No. 07-1086, 2008 WL 1795594, at *6 (D.C. Cir. Apr. 22, 2008).

Nortel's patents are transferred without the obligations made to the SDOs – especially so long after the adoption of the relevant standards that are now common in the marketplace.

> Early in the process of implementing a standard, industry members still might find it relatively easy to abandon one technology in favor of another. But as time passes, and the industry commits greater levels of resources to developing products that comply with the standard, the costs of switching to alternative technologies begin to rise. Industry members may find themselves "locked in" to the standardized technology once switching costs become prohibitive. Once lock-in occurs, the owner of the standardized technology may be able to "hold up" the industry and charge supracompetitive rates.

2006 FTC LEXIS 60, *4 (F.T.C. Aug. 2, 2006).

16.    In *Broadcom Corp. v. Qualcomm Inc.*, the Third Circuit followed what it described as the Commission's "landmark" decision in *Rambus*. 501 F.3d 297, 311 (3rd Cir. 2007). The court recognized that a failure to abide by the strictures of the standard setting process could lead to anti-competitive monopoly-like power in a marketplace where a properly adopted standard is applicable.

> Private standard setting occurs in a consensus-oriented environment, where participants rely on structural protections, such as rules requiring the disclosure of IPRs, to facilitate competition and constrain the exercise of monopoly power. In such an environment, participants are less likely to be wary of deception and may not detect such conduct and take measures to counteract it until after lock-in has occurred. At that point, the resulting harm to competition may be very difficult to correct.

501 F.3d at 312 (citing, *inter alia, Rambus*). Like the Commission's decision in *Rambus*, the court recognized the anti-competitive impact of an attempted "patent hold-up."

> Inefficiency may be injected into the standard-setting process by what is known as "patent hold-up." An SDO may complete its lengthy process of evaluating technologies and adopting a new standard, only to discover that certain technologies essential to implementing the standard are patented. When this occurs, the

> patent holder is in a position to "hold up" industry participants from implementing the standard. Industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become "locked in" to the standard. In this unique position of bargaining power, the patent holder may be able to extract supracompetitive royalties from the industry participants.

*Id.* at 310. The Third Circuit also cited the Supreme Court's recognition of the pro-competitive benefits of SDOs in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988). In *Allied Tube*, the Court noted that an SDO's "private standards can have significant procompetitive advantages." *Id.* at 501. The Supreme Court also addressed the danger of exclusionary anti-competitive activity through manipulation of an SDO in *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982). In that case, the Court noted that SDOs "can be rife with opportunities for anticompetitive activity" and upheld the finding of liability for antitrust violations even though there was no evidence proving the SDO's rules were violated. *Id.* at 571.

17.    The FTC has also expressly recognized that enforcement of commitments made to SDOs extends to purchasers of patents from a company that made representations to an SDO regarding those patents. In *In the Matter of Negotiated Data Solutions LLC*, No. 0510094 (F.T.C. Sept. 22, 2008), Negotiated Data Solutions LLC ("N-Data") acquired certain patents from National Semiconductor Corporation ("National"). National made a commitment to the IEEE (which is an SDO) that if the IEEE adopted a "Fast Ethernet" standard based on National's patented "NWay" technology, National would offer to license the technology, for a one-time, paid-up royalty of $1,000 per licensee, to manufacturers and sellers of products using the IEEE standard. *Id.* After acquiring the patents, N-Data reneged on National's prior licensing commitment to the IEEE by demanding royalties in excess of that commitment. *Id.* The FTC, in

a statement issued upon the filing of its complaint, found that N-Data obtained the patents with knowledge of National's commitment to the IEEE and concluded that N-Data's conduct violated both the "unfair methods of competition" and "unfair . . . acts or practices" prongs of Section 5 of the FTC Act.  Statement of the Federal Trade Commission, *In the Matter of Negotiated Data Solutions LLC*, No. 0510094 at 1. (A copy of the FTC's Statement is attached hereto as Exhibit C.)  The FTC stated that N-Data's actions "could be enormously harmful to standard-setting" since it would allow patents to be sold to companies "who are less interested in honoring commitments than in exploiting industry lock-in." *Id.*[5]

18.    Similarly, courts have held that a patent buyer assumes the seller's prior FRAND commitments. In *Ess-Tech., Inc. v. PC-TEL, Inc.*, 1999 WL33520483 (N.D. Cal. 1999), General DataComm, Inc. ("GDC") represented to the International Telecommunications Union ("ITU") that certain of its patents were part of the V.34 and V.90 modem standards and agreed to the ITU patent policy of licensing these patents on a FRAND basis.  Thereafter, PC-TEL acquired the patents at issue when it purchased GDC and a dispute arose between Ess-Tech, Inc. ("Ess-Tech") and PC-TEL.  Subsequently, Ess-Tech brought claims against PC-TEL seeking to enforce GDC's prior FRAND commitments.  PC-TEL resisted, contending Ess-Tech could not assert a claim based on GDC's prior commitments to the ITU.  The Court, however, refused to dismiss the plaintiff's claim that PC-TEL was obligated to specifically comply with GDC's FRAND commitments. *Id.* at *9-11.[6]  Similarly, in *Rembrandt Tech., L.P. v. Harris Corp.*, 2008 Del. Super. LEXIS 400 (Del. Super. Ct., Oct. 31, 2008), Rembrandt acquired a patent from

---

[5] N-Data ultimately entered into an FTC consent order agreeing to comply with National's FRAND obligations. *In the Matter of Negotiated Data Solutions LLC*, No. 0510094, Decision and Order.

[6]  The Court in *Ess-Tech* dismissed the antitrust claims for failure to sufficiently allege antitrust injury to competition, not just the plaintiff Ess-Tech, but allowed Ess-Tech to amend its complaint and moreover did not dismiss the claim against PC-TEL for specific performance of GDC's FRAND obligations.

Paradyne Corporation (which was originally issued to AT&T IPM Corp.). AT&T IPM Corp., as a member of the Advanced Television System Committee ("ATSC"), had committed it would license on a FRAND basis the technology necessary to comply with the ATSC standard for HDTV technology. Rembrandt initially denied it was bound by AT&T IPM Corp.'s FRAND commitments to ATSC. Rembrandt changed its position when it discovered that at the time it acquired the patent, Rembrandt had notice (either constructive or actual) of AT&T IPM Corp.'s FRAND commitments in its patent statement to grant licenses on essential patents. *Id.* at *7. The Court then granted partial summary judgment against Rembrandt, with the matter of whether the patents were essential to the standard, and if so, the FRAND licensing terms, left for trial.[7]

19.   Any purchaser of Nortel's patents cannot deny awareness of Nortel's commitments to SDOs. Even in the proposed ASA's overly narrow definition of "Permitted Encumbrance" the parties describe obligations to SDOs. Sale Motion, Ex. A at 17. Nor do any of the cases cited above hinge on whether the SDOs' by-laws, policies and/or membership agreements require a patent seller to bind a buyer to the FRAND commitments. Accordingly, the purchaser should not be permitted to acquire the patents "free and clear" of any FRAND obligations attached to those patents.

**III.   Section 363(f) Does Not Allow a Sale Free and Clear of Nortel's Obligations to SDOs**

20.   Section 363(f) permits the sale of estate property "free and clear of any interest in such property of an entity other than the estate" only if one of five conditions are met:

---

[7] The court's decision ultimately was vacated under Delaware rules due to the court's later finding that both parties were using the state court litigation as a strategic device to produce a desired outcome in a related federal multi-district patent litigation involving the same parties. *See Rembrandt Tech., L.P. v. Harris Corp.*, 2009 Del. Super. LEXIS 298 (Del. Super. Ct., Aug. 14, 2009).

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See In re Kellstrom Industries, Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002). Conditions (2), (3) and (4) are plainly not applicable in this case. No consent has been given, and the interest in question is not a lien or in bona fide dispute. The sale can only be made free and clear if conditions (1) or (5) are found to apply.

21.     Courts interpret Section 363(f)(1) as written and have consistently held that it "is not applicable [when] non-bankruptcy law does not permit a sale" free and clear of the interest at issue. *In re Kellstrom Industries, Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002). *See also In re Oyster Bay Cove*, 196 B.R. 251, 256 n.9 (E.D.N.Y. 1996); *In re Jurgielewicz Duck Farm*, 2010 Bankr. LEXIS at *19. Nortel bears the burden of proving that a free and clear sale of such assets would be permitted under applicable non-bankruptcy law. *See, e.g., Gonzalez v. Beery (In re Beery)*, 295 B.R. 385, 396 (Bankr. D.N.M. 2003) ("a trustee may not sell any property free and clear of all interests of debtor . . . unless the trustee can provide evidence that such a sale will meet the tests delineated in § 363 (f) and (h)"). As set forth in Section II, *supra*, applicable non-bankruptcy law does not permit the sale of the patents free and clear of the commitments made to the SDOs.

22.     In the analogous scenario of an easement on real property, courts reason that Section 363(f) was "not intended to sever easements and other non-monetary property interests that are created under State law." *In re Oyster Bay Cove*, 196 B.R. at 255.  In *Oyster Bay Cove*, the District Court affirmed the bankruptcy court's finding that state law prevented the severing of easements and as a result concluded subsection (f)(1) will "never, by law, apply to an easement." *Id.* at 256, n.9.  Absent the application of subsections (2) or (4), "the Bankruptcy Code does not even allow the Bankruptcy Court to authorize a sale of property 'free and clear' of an easement." *Id.* at 255-56.

23.     What is permitted by non-bankruptcy law defines the standard for application of subsection (f)(1). *See In re Jurgielewicz Duck Farm*, 2010 Bankr. LEXIS at \*19 (holding that subsection (f)(1) cannot be used to sell property absent an existing restrictive covenant because state law "does not provide for the sale of the Property free and clear").  In *In re Kellstrom Industries, Inc.*, the bankruptcy court considered whether the debtor could sell goods in which it held title "free and clear" of the rights of a vendor to withhold and refuse delivery of the goods to the debtor pursuant to the Uniform Commercial Code. *In re Kellstrom Industries, Inc.*, 282 at 789.  In applying Section 363(f), the court held that subsection (1) was "not applicable because non-bankruptcy law does not permit a sale by the Debtors free and clear of [the vendor's] right to withhold and stop delivery." *Id.* at 793.  As set forth in Section II, *supra*, applicable non-bankruptcy law does not allow for the sale of Nortel's patents free and clear of the commitments made to the SDOs.

24.     Section 363(f)(5) also does not apply to permit a sale free and clear of commitments made to the SDOs.  Section 363(f)(5) will only allow a "free and clear" sale to proceed when the interest in property is one that "can be reduced to a money satisfaction." *Id.* at

794 (holding that Section 363(f)(5) applied because the U.C.C. would have forced the buyer to accept payment in exchange for its interest in the goods). In *In re TWA, Inc.*, the Third Circuit Court of Appeals joined the district court in affirming the bankruptcy court's order approving the sale of assets free and clear of Equal Employment Opportunity Commission discrimination claims under Section 363(f)(5) because they were "subject to monetary valuation" and were "reducible to, and [could] be satisfied by, monetary awards even if the relief sought [was] injunctive in nature." *In re TWA, Inc.*, 322 F.3d 283, 291 (3rd Cir. 2003) citing *In re Continental Airlines*, 125 F.3d 120, 133-36 (3rd Cir. 1997). The court in *TWA* relied on its decision in *In re Continental Airlines* where it found that seniority rights of employees could be satisfied by monetary awards because the injunctive remedy they sought was "a vehicle by which to provide a benefit or compensation." *In re Continental Airlines*, 125 F.3d at 134.

25.    In contrast, the FRAND encumbrances on Nortel's patents are not a way to provide the SDOs or the market and industry monetary compensation. Like an easement, the interest was obtained for a specific purpose that monetary compensation cannot satisfy. *See, e.g., In re Oyster Bay Cove*, 196 B.R. 251, 256 n.9 (E.D.N.Y. 1996) (holding that Section 363(f)(5) will "never, by law, apply to an easement"). Accordingly, the FTC seeks and awards injunctive relief prohibiting patent holders' enforcement of protected patents in contravention of their commitment to SDOs because it seeks to ensure the marketplace participants' continued ability to use technology incorporated into industry-wide standards on a FRAND basis. *See, e.g., In the Matter of Negotiated Data Solutions LLC*, No. 0510094, at *5; *Unocal*, 2005 FTC LEXIS at *5; *In the Matter of Dell Computer Corp.*, 121 F.T.C. at 620; *see also Rambus, Inc.*, FTC No. 9302, 2006 FTC LEXIS at *286 (establishing a briefing schedule for parties to share their views on how best to set reasonable royalty rates and what other injunctive relief should be included in

the FTC's final order). In *In re Jurgielewicz Duck Farm*, the court held subsection (f)(5) did not apply because "[t]he extinguishment of the Development Rights would defeat the public's purpose of purchasing these rights and preserving existing farmland and no measure of damages would make the County and Town whole or compensate them for the loss of farmland." 2010 Bankr. LEXIS at *22. Further, FRAND obligations and their guarantees are clearly analogous to easements in that – without those obligations – if a marketplace participant refuses to pay exorbitant fees demanded by the patent owner the marketplace participant can be enjoined from offering those standard-compliant products or services that infringe the patent. The SDOs' purpose in establishing FRAND rules and in obtaining Nortel's commitments was to guarantee the use of the technology on a FRAND basis since the technology was to be incorporated into an industry-wide standard. No amount of money could satisfy that purpose or compensate the market and industry for the loss of Nortel's FRAND obligations, and therefore Section 363(f)(5) does not apply and no part of Section 363(f) authorizes a sale free and clear of the commitments made to the SDOs.

**IV.     The Bankruptcy Code Provides Special Protections
to Intellectual Property Licensees**

26.     Congress is especially concerned with the effect of a licensor's bankruptcy on intellectual property rights. In *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, the Fourth Circuit Court of Appeals reversed the district court and rejected a technology licensing contract pursuant to Section 365, thereby depriving the licensee of the continued use of the debtor's technology. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1048 (4th Cir. 1985). In doing so, the court recognized "that allowing rejection . . . could have a general chilling effect upon the willingness of such parties to contract at all with businesses in possible financial difficulty." *Id.* at 1048. Congress believed this "chilling effect"

would extend to the "development of technology" in the United States. *In re Quad Systems Corp.*, No. 00-35667F, 2001 Bankr. LEXIS 2284, *31 (Bankr. E.D. Pa. Mar. 20, 2001) citing H.R.Rep. No. 1012, 100th Cong., 2d Sess. (1988) (internal quotation marks omitted).  If *Lubrizol* remained the law:

> [l]icensees would be fearful that their business ventures could be seriously undermined by a bankruptcy filing of their licensors and would thus demand agreements which would provide them with ownership interest in the software.  Such transfers of ownership could reduce incentive for further software development. . . . Demand for outright transfers of ownership of the intellectual property is wasteful and chilling to business innovators who would otherwise benefit from keeping their ownership rights.

*Id.* at 31-32, 33 (internal quotation marks and citation omitted).  Congress concluded that the *Lubrizol* holding represented a "fundamental threat to the creative process that has nurtured innovation in the United States."  *In re Qimonda AG Bankruptcy Litigation*, 433 B.R. 547, 567 (Bankr. E.D. Va. 2010) citing S. Rep. No. 100-505, at *3 (1988).

27.    In response to *Lubrizol*, Congress passed 11 U.S.C. § 365(n).  In enacting Section 365(n), "Congress sought to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy."  *In re Exide Technologies*, 607 F.3d 957, 965 (3rd Cir. 2010) citing S. Rep. No. 100-505, at *1 (1988) (internal quotation marks omitted).  These same considerations should direct this court's protection of prospective licensees that relied on Nortel's commitments to the SDOs.  The potential disruption and devastation to various marketplaces that could be unleashed by the abolition of FRAND requirements are directly analogous to the concerns following from *Lubrizol*.

28.    As recognized by the Supreme Court, SDOs exist to foster the creative process, innovation, and the development of technology in the United States.  Congress acted quickly to reverse the Fourth Circuit after it deprived one licensee of its rights in the *Lubrizol* case.  Failing to protect the commitments currently applicable to Nortel's patents will deprive a myriad of prospective license holders of their rights, throw the entire standard setting process into disarray and create turmoil in the orderly functioning of numerous critical technological and telecommunications marketplaces.

## CONCLUSION

29.    For the reasons set forth herein, AT&T respectfully requests that the Court ensure any sale order transferring the patents include language making clear that a purchaser of the patents must continue to provide licenses to such patents in accordance with the commitments currently binding Nortel.  To prevent any confusion about a purchaser's continuing obligations, and the attendant uncertainty and potential "patent hold-up" of an entire industry, the ASA's definition of a "Permitted Encumbrance" should be altered in the Sale Order and/or the ASA so it is clear that any purchaser shall, without any doubt, continue to be bound by and obligated for both (a) all promises, declarations or commitments regarding Nortel's patents made by any Nortel entity to any SDO, its members or any individual SDO member and (b) all obligations contained in the membership agreements, by-laws or policies of SDOs that may concern Nortel's patents.

Dated: June 13, 2011

Respectfully submitted,

ASHBY & GEDDES, P.A.

By: _____
William P. Bowden (DE No. 2553)
Leigh-Anne M. Raport (DE No. 5055)
500 Delaware Avenue
Wilmington, Delaware 19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067

-and-

FULBRIGHT & JAWORSKI L.L.P.
Pamela Jones Harbour
David A. Rosenzweig
Sue Ross
Peter Guirguis
666 Fifth Avenue
New York, New York 10103
Telephone:  (212) 318-3000
Facsimile:  (212) 318-3400

-and-

AT&T SERVICES, INC.
James W. Grudus, Esq.
One AT&T Way
Bedminster, New Jersey 07921
Telephone:  (908) 234.3318
Facsimile:  (832) 213.0157

ATTORNEYS FOR AT&T