# EXHIBIT A



# NORTEL

DELIVERED BY FAX AND MAIL

December 16, 2004

Secretary, Patent Administrator
IEEE Standards Board Patent Committee
445 Hoes Lane, P.O. Box 1131
Piscataway, New Jersey
USA 08855-1331

Dear Sir:

**RE:  General Patent Statement**
**IEEE 802.16e Working Group** - *Draft Amendment to IEEE Standard for Local and Metropolitan Area Networks - Part 16: Air Interface for Fixed Broadband Wireless Access Systems- Amendment for Physical and Medium Access Control Layers for Combined Fixed and Mobile Operation in Licensed Bands*

In the event the above-referenced draft IEEE 802.16e standard amendment is finally approved and in the event that Nortel Networks has one or more patent(s) and patent application(s) that, if as issued, are essential to practice the resulting IEEE 802.16e standard, Nortel Networks Limited makes the assurance that it is prepared to make available, upon written request, licenses under such patent(s) on a non-discriminatory basis and upon reasonable terms and conditions to comply with the resulting IEEE 802.16e standard.

It is understood that if an IEEE standard is subsequently withdrawn, Nortel Networks has no obligation to license a party requesting a license after the date of such withdrawal.

This letter submission does not explicitly or implicitly grant any right to the IEEE with respect to Nortel's patent rights, copyrights or other intellectual property rights that relate or may relate to the proposed standard.

.../2

Nortel Networks
8200 Dixie Road, Suite 100, M/S DIX/ND/191, Brampton, Ontario, Canada L6T 5P6  T 905-863-1140   F 905 863-8433
miealan@nortel.com

# N⊘RTEL

Any party that would be interested in such licenses as described above may write to Richard Weiss, Deputy IP Counsel, 2221 Lakeside Blvd., M/S 991/14/B50, Richardson, Texas, USA 75082.

Yours truly,

*Michelle Lee*

Michelle Lee
IP Counsel

ML:dd

cc.   Dr. Roger Marks, IEEE 802.16 Working Group Chair
      Richard Weiss
      Jim MacFie
      Curt Dodd

Nortel Networks
8200 Dixie Road, Suite 100, M/S 036/MS/151, Brampton, Ontario, Canada L6T 5P6  T 905 863-1148   F 905-863 8431
michellee@nortel.com

# EXHIBIT B



European Telecommunication Standards Institute
IPR information statement and licensing declaration forms
Page 1 of 2 (version 5)

## IPR information statement and licensing declaration

**IPR Holder/Organisation**

Legal Name: Nortel Networks Limited

**Signatory**

Name: Dan Hermele

Position: Patent Attorney

Department: Intellectual Property Law Group

Address: MS V4 J07, London Road

Harlow, Essex CM17 9NA

Tel.: +44 1279402819      Fax: +44 1279403670

E-mail: dhermele@nortel.com

Licensing URL: www.nortel.com/corporate/technology_new/patents.html

Licensing Contact: Afzal Dean, 3500 Carling Avenue, GMS 04352F12, Ottawa, ON K2H 8E9, adean@nortel.com

**IPR information statement**

In accordance with the ETSI IPR Policy, Clause 4.1, I hereby inform ETSI that,

  with reference to the technical proposal identified as _____
and/or
  in relation to Work Item No. _____
and/or
  with reference to ETSI Standard No.   3GPP TS 36.321; Evolved Universal Terrestrial Radio Access (E-UTRA); Medium Access Control (MAC) Protocol Specification

it is my belief that the IPRs listed in the attached IPR information statement annex are, or are likely to become, Essential IPRs in relation to that Standard.

**IPR licensing declaration**

The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in the attached *IPR information statement annex* and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licences under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

This undertaking is made subject to the condition that those who seek licences agree to reciprocate the same in respect of the STANDARD in accordance with Clause 6.1 of the ETSI IPR Policy (delete this paragraph if this condition is not required).

The construction, validity and performance of this DECLARATION shall be governed by the laws of France.

**Place, Date:**                                   **Signature:**

HARLOW, 11 JUNE 08
(Place, Date)                                      (Signed for and on behalf of the SIGNATORY)

Please return this form duly signed to: ETSI Director-General
ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex – France  Fax. +33 (0) 4 93 65 47 16

European Telecommunication Standards Institute
IPR information statement and licensing declaration forms
Page 2 of 2 (version 5)

# IPR information statement annex

| Project or Standard name | ETSI Standard, Technical Specification or Work Item | | | Patent Proprietor | Application No. | Patent No. | Patent Subject/Title | Country of registration | OPTIONAL INFORMATION: Other Patents/Applications No. in same family* | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Work Item or Standard No. | Illustrative Specific part of the standard (e.g. Section) | Version (V.X.X.X) | | | | | | Patent/Application No. | Country Applicable |
| 3GPP – e-UTRA | 3GPP TS 36.321 | | v.8.1.0 | Nortel Networks Limited | 01921706.6 | Publication # 1 275 216 | Dual Protocol Layer Automatic Retransmission Request Scheme for Wireless Air Interface | EP | ZL01811337.0 | CN |
| | | | | | | | | | 1 275 216 | HK |
| | | | | | | | | | 209046 | IN |
| | | | | | | | | | 2002-89478 | KR |
| | | | | | | | | | 92023 | SG |
| | | | | | | | | | 6,931,569 | US |

*Patent family information is provided voluntarily. The completeness and accuracy of any patent family information that is provided cannot be guaranteed.

Please return this form duly signed to: ETSI Director-General
ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex – France / Fax. +33 (0) 4 93 65 47 16

# EXHIBIT C

## STATEMENT OF THE FEDERAL TRADE COMMISSION
### *In the Matter of Negotiated Data Solutions LLC*
### File No. 0510094

The Federal Trade Commission ("Commission") has voted to issue a Complaint against Negotiated Data Solutions LLC ("N-Data") and to accept the proposed consent agreement settling it.[1] The Complaint in this matter alleges that N-Data reneged on a prior licensing commitment to a standard-setting body and thereby was able to increase the price of an Ethernet technology used by almost every American consumer who owns a computer. Based on the facts developed by staff during the investigation, we find reason to believe that this conduct violated Section 5 of the FTC Act.[2]

The impact of Respondent's alleged actions, if not stopped, could be enormously harmful to standard-setting.[3] Standard-setting organization participants have long worried about the impact of firms failing to disclose their intellectual property until after industry lock-in. Many standard-setting organizations have begun to develop policies to deal with that problem. But if N-Data's conduct became the accepted way of doing business, even the most diligent standard-setting organizations would not be able to rely on the good faith assurances of respected companies. The possibility exists that those companies would exit the business, and that their patent portfolios would make their way to others who are less interested in honoring commitments than in exploiting industry lock-in.[4] Congress created the Commission precisely to challenge just this sort of conduct.

To prohibit such unacceptable behavior, the Commission today accepts a proposed consent agreement premised on a Complaint that identifies two separate violations. First, we find that N-Data's alleged conduct is an unfair method of competition. Second, we find that this conduct is also an unfair act or practice.

There is little doubt that N-Data's conduct constitutes an unfair method of competition.[5] The legislative history from the debate regarding the creation of the

---

[1] Commissioners Harbour, Leibowitz, and Rosch support the issuance of the Complaint and proposed consent agreement and join in this statement.

[2] Section 5 of the FTC Act prohibits "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 USC § 45(a)(1).

[3] One dissent recites a different set of facts than those alleged in the Complaint. We do not agree with that version of the facts. Rather, we believe that staff's investigation, as described in the Analysis to Aid Public Comment, accurately depicts the facts in this case.

[4] *See generally* Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy* ch. 2 at 31, n. 220; ch. 3 at 38-41, *available at* http://www.ftc.gov/os/2003/10/innovationrpt.pdf (2003) (conduct by "non-producing entities" – sometimes referred to as 'patent trolls' – may harm consumers when such firms force manufacturers to agree to licenses after the manufacturers have sunk substantial investments into technologies).

[5] *See, e.g.,* E.I. du Pont de Nemours & Co. v. FTC, 729 F.2d 128 (2d Cir. 1984) ("*Ethyl*"); Official Airline Guides v. FTC, 630 F.2d 920 (2d Cir. 1980). The conduct falls squarely within the parameters of cases like *Ethyl.* One dissent quotes a passage from the *Ethyl* decision; even that excerpt

Commission is replete with references to the types of conduct that Congress intended the Commission to challenge. *See, e.g.,* 51 Cong. Rec. 12,153 (1914) (statement of Sen. Robinson) ("unjust, inequitable or dishonest competition"), 51 Cong. Rec. 12,154 (1914) (statement of Sen. Newlands) (conduct that is "contrary to good morals"). The Supreme Court apparently agrees as it has found that the standard for "unfairness" under the FTC Act is "by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws, but also practices that the Commission determines are against public policy for other reasons." *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 477, 454 (1986); *see also F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 242 (1972) (FTC has authority to constrain, among other things "deception, bad faith, fraud or oppression").

We also have no doubt that the type of behavior engaged in by N-Data harms consumers. The process of establishing a standard displaces competition; therefore, bad faith or deceptive behavior that undermines the process may also undermine competition in an entire industry, raise prices to consumers, and reduce choices.[6] We have previously

---

makes clear that a Section 5 violation can be found when there are "some indicia of oppressiveness" such as "coercive...conduct." For the reasons stated in the Analysis to Aid Public Comment, we find reason to believe that Respondent engaged in conduct that was both oppressive and coercive when it engaged in efforts to exploit licensees that were locked into a technology by the adoption of a standard. We believe the Analysis to Aid Public comment adequately describes the limiting principles applicable here. *See generally* Statement of Commissioner J. Thomas Rosch, *Perspectives on Three Recent Votes: the Closing of the Adelphia Communications Investigation, the Issuance of the Valassis Complaint & the Weyerhaeuser Amicus Brief*, before the National Economic Research Associates 2006 Antitrust & Trade Regulation Seminar, Santa Fe, New Mexico (July 6, 2006) at 5-12, *available at* http://www.ftc.gov/speeches/rosch/Rosch-NERA-Speech-July6-2006.pdf; Concurring Opinion of Commissioner Jon Leibowitz, *In re Rambus, Inc.*, Docket No. 9302, *available at* http://www.ftc.gov/os/adjpro/d9302/060802rambusconcurringopinionofcommissionerleibowitz.pdf.

One dissent cites the Areeda and Hovenkamp antitrust treatise as well as several other sources to mistakenly suggest that there is a "scholarly consensus" that an unfair method of competition cannot be found under Section 5 unless there is liability under the antitrust laws. Most of the sources cited by the dissent, however, actually support the Analysis to Aid Public Comment, which notes that, although Section 5 extends beyond the antitrust laws, there are limitations on its reach. Indeed, Professor Hovenkamp has explicitly acknowledged that there is a *lack* of consensus on the scope and application of Section 5. *See* HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY at 596-97 (3d ed. 2005). Professor Hovenkamp states that "[t]here are two views about the wisdom of the FTC's use of Section 5" and goes on to discuss "[A]n alternative view, perfectly consistent with the proposition that the FTC's antitrust concern should be limited to identifying practices that are economically anticompetitive." Under that alternative view, it is appropriate to apply "the FTC Act to practices that do not violate the other antitrust laws . . . when (1) the practice seems anticompetitive but is not technically covered by the antitrust laws; and (2) the social cost of an error seems to be relatively small." The social cost of an error here is small given the nature of the remedy and the low likelihood that a Commission consent order will be followed by a valid antitrust-based class action suit. *See id.* ("Findings of violations of the FTC Act that are not also antitrust violations will not support subsequent private actions for treble damages"). We nevertheless recognize Commissioner Kovacic's concern that FTC "unfair methods" cases may support private actions based on state law, and join him in encouraging comment on that issue.

[6] *See* Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 500 (1989); Am. Soc'y of Mech. Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 571 (1982); Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 41 (1912). *See generally* Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 310-314 (3d Cir. 2007).

noted that "[i]ndustry standards are widely acknowledged to be one of the engines driving the modern economy."[7] Conduct like N-Data's – which undermines standard-setting – threatens to stall that engine to the detriment of all consumers.

N-Data's conduct is also an unfair act or practice under Section 5(n) of the FTC Act and *Orkin Exterminating Co.,* 108 F.T.C. 263 (1986), aff'd, 849 F.2d 1354 (11th Cir. 1988). This Commission – *unanimously* – has often found an unfair act or practice proscribed by Section 5 in conduct that victimizes businesses (as well as individuals) who are consumers. The dissent would distinguish those cases on the ground that the businesses here are all "large, sophisticated computer manufacturers" who are able to protect themselves. There is no basis for that distinction in Section 5. In any event, moreover, there is no basis in the record of this investigation for describing all of the "locked in" licensees that way. Similarly, as discussed in detail in the Analysis to Aid Public Comment, no meaningful distinction can be drawn between the circumstances in *Orkin,* where the respondent sought to exploit consumers who were "locked into" long term contracts, and the unique circumstances of this case, where licensees are "locked into" the standard containing technology controlled by this Respondent.

We recognize that some may criticize the Commission for broadly (but appropriately) applying our unfairness authority to stop the conduct alleged in this Complaint. But the cost of ignoring this particularly pernicious problem is too high. Using our statutory authority to its fullest extent is not only consistent with the Commission's obligations, but also essential to preserving a free and dynamic marketplace.

---

[7] U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement And Intellectual Property Rights: Promoting Innovation And Competition* 33, available at http://www.ftc.gov/reports/innovation/P040101PromotingInnovationandCompetitionrpt0704.pdf (2007).