### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NORTEL NETWORKS INC., *et al.* | ) Case No. 09-10138 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) Objection Deadline: June 13, 2011 at 4:00 p.m. |
| | ) Related to Docket Nos. 5359, 5202 |
| | ) |

## NOKIA CORPORATION'S OBJECTION TO SALE FREE
## AND CLEAR OF DEBTORS' SSO COMMITMENTS

Nokia Corporation, on behalf of itself and its affiliates (collectively, "**Nokia**"), files this objection (the "**Objection**") to the Sale Motion (defined below) to the extent the above-captioned debtors and debtors in possession (the "**Debtors**") seek authority to sell their Assets[1] free and clear of the numerous and enforceable obligations, promises, declarations, and commitments, including, without limitation, obligations to disclose or identify patents or intellectual property (each, a "**SSO Commitments**") that they have made or should have made to various standard-setting bodies or industry groups (sometimes referred to as standard setting organizations ("**SSOs**")).   In support of its Objection, Nokia respectfully shows the Court as follows:

### I.   Background

1.      On April 4, 2011, the Debtors filed their *Motion For Orders (I)(A) Authorizing Debtors' Entry Into The Stalking Horse Asset Sale Agreement, (B) Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving The Notice Procedures And The Assumption And Assignment Procedures, (D) Approving The License Rejection Procedures, (E) Approving A Side Agreement, (F) Authorizing The Filing Of Certain Documents Under Seal And*

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

*(G) Setting A Date For The Sale Hearing And (Ii) Authorizing And Approving (A) The Sale Of Certain Patents And Related Assets Free And Clear Of All Claims And Interests, (B) The Assumption And Assignment Of Certain Executory Contracts, (C) The Rejection Of Certain Patent Licenses And (D) The License Non-Assignment And Non-Renewal Protections* [Docket No. 5202] (the "**Sale Motion**").

2.    On May 2, 2011, this Court entered its *Order (A) Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections, (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Approving the License Rejection Procedures, (E) Approving a Side Agreement, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing* [Docket No. 5359] (the "**Sale Procedures Order**").

3.    In the Asset Purchase Agreement attached as Exhibit A to the Sale Motion (the "**APA**"), the Debtors seek to sell their Assets to the stalking horse purchaser, Ranger, Inc. ("**Ranger**"), an affiliate of Google, Inc. "free and clear of all Liens and Claims in the U.S. Chapter 11 cases (*other than Permitted Encumbrances. . . .*" Sale Motion, Ex. A, § 2.1.1 (emphasis added). A "Permitted Encumbrance" is defined to include:

> the promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies or industry groups concerning the Transferred Patents, Purchased Specified UK Patents or Undisclosed Patent Interests, *solely to the extent* such standard-setting bodies or industry groups, together with the title and number of the standard and the Transferred Patents to which such promises, declarations or commitments apply (in each case, to the extent identified in the respective promise, declaration or commitment) are *listed in Section 1.1(g) of the Sellers Disclosure Schedule*, and (y) the commitments concerning the Transferred Patents, Purchased Specified UK Patents or Undisclosed Patent Interests granted in writing by the Sellers pursuant to the membership agreements, by-laws or policies of standard setting bodies or industry groups in which Sellers were participants, *solely to the extent* such standard-setting bodies or industry groups and the related membership agreements, by-laws or policies, pursuant to which such commitments were granted are *listed in*

> *Section 1.1(g) of the Sellers Disclosure Schedule*, and *solely to the extent the Sellers are bound by such standard setting bodies' or industry groups' membership agreements, by-laws or policies to bind the Purchaser to such commitments*.

Sale Motion, Ex. A, at 16 (emphasis added).

4.      In other words, under the APA, if an SSO, the title and number of the standard and the Transferred Patents, or the SSO's membership agreements, by-laws or policies, are listed in Section 1.1(g) of the Sellers Disclosure Schedule (each, a **"Scheduled SSO Commitment"**), then the Scheduled SSO Commitment is a Permitted Encumbrance.  But if an SSO, the title and number of the standard and the Transferred Patents, or the SSO's membership agreements, by-laws or policies, are *not* listed in Section 1.1(g) of the Sellers Disclosure Schedule (each, an **"Unscheduled SSO Commitments"**), then the Unscheduled SSO Commitment is *not* a Permitted Encumbrance and the sale will be free and clear of them.

5.      SSOs are industry groups that set common standards to ensure product compatibility and device interoperability of certain products owned or manufactured by different companies.  A "standard" is a set of technical specifications that provides a common design for a product or process.  To provide a platform for component products and technologies to work together, such as wireless devices and networks owned by different providers, SSO participants typically make certain obligations, promises, declarations, and commitments to the SSO.  One major commitment companies typically make is the commitment to license any patents that are essential to a standard on reasonable and nondiscriminatory terms (**"F/RAND"**).

6.      Nokia is aware that various Nortel entities have made SSO Commitments to at least the following non-exhaustive list of SSOs:

(i)      The Third Generation Partnership Project (**"3GPP"**) through the European Telecommunications Standard Institute (**"ETSI"**), including standards relating to GSM, WCDMA, and LTE;

(ii)    The Third Generation Partnership Project 2 ("**3GGP2**") through the Telecommunications Industry Association ("**TIA**");

(iii)   The Internet Engineering Task Force ("**IETF**");

(iv)   The Alliance for Telecommunications Industry Solutions ("**ATIS**");

(vi)   Bluetooth Special Interest Group ("**Bluetooth SIG**"); and

(vii)  The Institute of Electrical and Electronics Engineers ("**IEEE**").

## II.   Objection

7.      Nokia objects to the Sale Motion to the extent Debtors and/or their affiliates seek to sell their Assets free and clear of the SSO Commitments.  Section 363(f) of the Bankruptcy Code permits the sale of estate property "free and clear of any interest in such property of an entity other than the estate" only if one of five conditions are met:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Subsections (2), (3), and (4) of Section 363(f) are not applicable here as Nokia has not consented, the interest at issue is not a lien, and the SSO Commitments are not in bona fide dispute.  Thus, the Debtors must satisfy subsections (1) or (5) to sell the Assets free and clear of Unscheduled SSO Commitments.

8.      Under Section 363(f) of the Bankruptcy Code, the Debtors cannot sell their Assets "free and clear" of the SSO Commitments, whether or not listed in the Seller's Disclosure Schedule.  First, regarding Section 363(f)(1), courts and the Federal Trade Commission ("**FTC**")

have held that a party that has made SSO commitments is bound by those commitments and may

not enforce its patents in a manner inconsistent with those commitments. *See, e.g., Broadcom*

*Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310 (3rd Cir. 2007); *In re Dell Computer Corp.*, 121

F.T.C. 616 (May 20, 1996); *In re Union Oil Co. of Cal.*, No. 9305, 2005 FTC LEXIS 116

(F.T.C. July 27, 2005). The underlying reasoning is that the failure to abide by the commitment

could lead to monopoly-like power over a standard that has been adopted:

> Private standard setting occurs in a consensus-oriented
> environment, where participants rely on structural protections,
> such as rules requiring the disclosure of IPRs, to facilitate
> competition and constrain the exercise of monopoly power. In
> such an environment, participants are less likely to be wary of
> deception and may not detect such conduct and take measures to
> counteract it until after lock-in has occurred. At that point, the
> resulting harm to competition may be very difficult to correct.

*Broadcom Corp.*, 501 F.3d at 312.

9.      Courts and the FTC have also recognized that a seller's SSO commitments should

extend to the purchaser of those patents and that a patent buyer assumes the seller's prior

F/RAND commitments. *See, e.g., In re Negotiated Data Solutions LLC*, No. 051-0094 (F.T.C.

Sept. 22, 2008); *Ess Tech., Inc. v. PC-TEL, Inc.*, 1999 WL33520483 (N.D. Cal. 1999) (denying

motion to dismiss claim that patent holder who purchased patents subject to SSO commitments

and then demanded high royalties from SSO adopter was subject to F/RAND licensing

commitment). Thus, the Debtors cannot use Section 363(f)(1) of the Bankruptcy Code to sell

free and clear of any SSO Commitments because nonbankruptcy law (that is, antitrust and unfair

competition law) prohibit that result.

10.      Second, Section 363(f)(5) of the Bankruptcy Code does not permit a sale free and

clear of the SSO Commitments because Nokia and other industry participants could not be

forced to accept "a money satisfaction of such interest." Under nonbankruptcy law, if the Assets

were sold free and clear of the SSO Commitments, the holder of a truly essential patent (that is, the purchaser) might be able to enforce its patents against an SSO adopter, perhaps enjoining the adopter's use of the truly essential and valid patent to practice the standard by making standard-compliant products, which would likely cause irreparable harm to the adopter. In such a circumstance, the adopter could not obtain a money satisfaction for the loss of its right to practice the standard by using truly essential and valid patents, which had previously been committed to being licensed under the SSO Commitments on a F/RAND basis. *See In re Union Oil Co. of Ca.*, No. 9305, 2005 FTC LEXIS 116 at *5 (F.T.C. July 27, 2005); *In re Dell Computer Corp.*, 121 F.T.C. at 620. The reason why the Debtors made SSO Commitments for their patents is so that technology could be incorporated into an industry-wide standard, whereby adopters could practice the standard and access and use necessary patented technology on a F/RAND basis.

11.     If patents previously subject to SSO Commitments are transferred free and clear of those SSO Commitments, no amount of money could compensate the market for the loss of the Debtors' SSO Commitments, particularly the ability to practice the standard and access any needed patented technology on a F/RAND basis, because the purpose of the SSO Commitments is to promote industry standardization, device interoperability, and product compatibility. Similar to an easement, which runs with the land, the SSO Commitments run with the underlying patent asset and are not subject to being sold free and clear under Section 363(f)(5) because the SSO Commitments are non-monetary interests obtained for a specific purpose that monetary compensation cannot remedy. *C.f., In re Oyster Bay Cove*, 196 B.R. 251, 256 n.9 (E.D.N.Y. 1996) (holding that Section 363(f)(5) will "never, by law, apply to an easement"). Accordingly,

Section 363(f)(5) of the Bankruptcy Code does not provide a basis for the Debtors to sell their Assets free and clear of the SSO Commitments.

12.    Upon information and belief, not all of the SSO Commitments are scheduled SSO Commitments in the APA. Nortel's SSO Commitments to ATIS appear to be at least one undisclosed example. But regardless of whether Nortel has failed to properly schedule all of its SSO Commitments, Nokia objects to the Sale Motion to the extent it seeks a Court order approving the sale of the patent assets to Ranger or any other successful bidder "free and clear" of *any* SSO Commitments made by any Nortel entity to *any* SSOs. Nortel has declared many of its patents as essential to industry standards, and in doing so, has committed to licensing those patents that are embodied in these industry standards on a F/RAND basis.

13.    Nokia and other industry members have relied on and will continue to rely on these SSO Commitments, which are enforceable against Nortel and its affiliates, and which must remain enforceable against the purchasers of these patent assets, including Ranger. If this Court permitted the Debtors to sell their Assets free and clear of the SSO Commitments various Nortel entities have made to numerous SSOs, it may provide the purchaser of the Assets with a path to engage in "patent hold-up." The Third Circuit in *Broadcom* explained "patent hold-up" as follows:

> Inefficiency may be injected into the standard-setting process by what is known as "patent hold-up." An [SSO] may complete its lengthy process of evaluating technologies and adopting a new standard, only to discover that certain technologies essential to implementing the standard are patented. When this occurs, the patent holder is in a position to "hold up" industry participants from implementing the standard. Industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become "locked in" to the standard. In this unique position of bargaining power, the patent holder may be able to extract supracompetitive royalties from the industry participants.

501 F.3d at 310.

14.    In short, "patent hold-up" might occur if the purchaser bought the Assets and later argued that because it purchased the Assets free and clear of Nortel's SSO Commitments, it is entitled to higher than F/RAND compensation and/or an injunction against parties otherwise willing to pay F/RAND compensation from practicing the relevant standard and using any truly essential and valid patents.    No legal basis exists for the Court to permit the Debtors to unnecessarily limit the definition of "Permitted Encumbrance" in the APA.    Accordingly, if the Court approves the sale of the Assets to Ranger or any other successful bidder, the Assets must be sold subject to all existing SSO Commitments.    This requirement should be included in the final executed version of any asset purchase agreement and in any order approving the Sale Motion.

WHEREFORE, Nokia respectfully requests that the Court modify the proposed order attached as Exhibit D to the Sale Motion to provide that the sale to Ranger or another successful bidder will be subject to the Debtors' SSO Commitments.

Dated this 13th day of June, 2011.

WERB & SULLIVAN

Duane D. Werb
Duane D. Werb (No. 1042)
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware  19801
Telephone: (302) 652-1100
Facsimile: (302) 652-1111

-and-

ALSTON & BIRD LLP

John C. Weitnauer, Esq. (*pro hac vice* forthcoming)
William S. Sugden, Esq. (*pro hac vice* forthcoming)
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Counsel for Nokia Corporation*