## EXHIBIT A

033

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**SIXTY-NINTH REPORT OF THE MONITOR**
**DATED JUNE 16, 2011**

( 034

## TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................................1

II.   PURPOSE.........................................................................................................3

III.  TERMS OF REFERENCE ................................................................................5

IV.   BACKGROUND ...............................................................................................5

V.    THE HWT OVERVIEW....................................................................................6

VI.   JANUARY INTERIM DISTRIBUTION, TERMINATION FUND PAYMENT,
      APRIL SIB/STB PAYMENT AND MAY/JUNE INTERIM DISTRIBUTION .........8

VII.  CURRENT STATUS .......................................................................................11

VIII. THIRD INTERIM DISTRIBUTION.................................................................13

IX.   MONITOR'S RECOMMENDATION ...............................................................13

035

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, **R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**SIXTY-NINTH REPORT OF THE MONITOR**
**DATED JUNE 16, 2011**

## I.    INTRODUCTION

1.    On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Applicants**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**").  Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA proceedings.  The stay of proceedings was extended to June 30, 2011, by this Honourable Court in its Order dated February 25, 2011.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S.**

- 2 -                                        ∟    036

Court") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law,

an official unsecured creditors committee (the "**Committee**") was established in January,

2009.

3.    An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital

Corporation has been organized and is participating in these proceedings as well as the

Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of

this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009,

representative counsel was appointed on behalf of the former employees of the

Applicants, the continuing employees of the Applicants and the LTD Beneficiaries,

respectively, and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed

on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of

Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA

were granted Administration orders (the "**UK Administration Orders**") by the High

Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**").

The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and

Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors,

except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan

Bloom were appointed (collectively the "**Joint Administrators**").

6.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency

proceedings within the meaning of Article 27 of the European Union's Council

Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II.    PURPOSE

9.    The purpose of this Sixty-Ninth Report of the Monitor (the "**Sixty-Ninth Report**") is to seek this Honourable Court's approval of a third interim distribution to the Income Beneficiaries on account of their Income Benefits from funds held in the HWT (the "**Third Interim Distribution**") and such ancillary relief as is just and convenient.

10.    As a result of the decision of the Supreme Court of Canada dismissing an application by counsel for a small group of dissenting LTD Beneficiaries for leave to appeal in respect of the HWT Allocation Order, there is now certainty that the distribution of the corpus of the HWT is to be made in accordance with the Approved HWT Allocation Methodology. Further, the Monitor believes the total ultimate distribution from the HWT is likely to meet or exceed 33.8% of the value of the Participating Benefits[1], being the percentage indicated in the illustrative scenario reflecting the Approved HWT Allocation Methodology filed with the Supplement to the Monitor's Fifty-First Report. However, some degree of uncertainty still remains regarding the final amount that will be available

---

[1] With the value of Pensioner Life relating to Pensioners being reduced as a result of actual 2010 Pensioner Life premiums.

- 4 -

to distribute from the HWT, which will be based on the outcome of matters referred to in the Monitor's prior reports and again in sub-paragraphs 23(e) and (f) below. Accordingly, the Monitor is not yet able to recommend that a final distribution be made from the HWT.

11.    The Monitor will continue to work diligently with the Applicants, the Trustee, the LTD Beneficiaries' Representative and her advisors, the Former Employees' Representatives and their advisors, the CAW and others to finalize outstanding HWT matters and accounting and financial reporting thereon so that the final distribution from the HWT may be made to all Participating Beneficiaries. The advisors to the LTD Beneficiaries' Representative and the Former Employees' Representatives include the respective Independent Counsel, Koskie Minsky LLP, RSM Richters Inc. and The Segal Company, as appropriate.

12.    The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW have asked the Monitor to bring this motion to provide a further interim payment to the Income Beneficiaries to assist them during the period between the termination of benefits on December 31, 2010 and the final distribution of the HWT corpus.

13.    The Monitor is bringing this motion in response to these requests. The Monitor is recommending that the amount of the Third Interim Distribution of the HWT corpus to each Income Beneficiary be the amount that, when taken with the previous interim distributions, will be 25% of his or her estimated Income Benefits. The illustrative scenario reflecting the Approved HWT Allocation Methodology shows 33.8% of the value of the Income Benefits ultimately being paid to Income Beneficiaries from the

corpus of the HWT.   The balance of the Income Beneficiaries' entitlement, being approximately 8.8%, will be paid in a further distribution from the HWT.

14.    The LTD Beneficiaries' Representative, the Former Employees' Representatives, CAW Counsel and the Independent Counsel each consent to the within motion and the proposed Third Interim Distribution.

## III.    TERMS OF REFERENCE

15.    In preparing this Sixty-Ninth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management.   The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, expresses no opinion or other form of assurance on the information contained in this Sixty-Ninth Report.

16.    Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Monitor's Sixty-Fourth Report dated April 25, 2011, filed in support of the May/June Interim Distribution (defined below).

17.    Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## IV.    BACKGROUND

18.    The Monitor has filed a number of reports that provide information concerning the HWT, the Approved HWT Allocation Methodology and interim distributions and other payments made to Income Beneficiaries since January 1, 2011, among other things. An index of these reports with some description is attached as Appendix "A" and the reports

with certain of their appendices are attached as Appendices "B" through "G". The illustrative allocation scenarios are attached to Appendix "C", the Supplemental Fifty-First Report, at Appendix "B" thereto.  Scenario 2 illustrates the Approved HWT Allocation Methodology.

## V.    THE HWT OVERVIEW

19.    As further described in the Fifty-First Report, Nortel provided the following benefits through the HWT (using the HWT as a payment mechanism with respect to non-pension employee benefits and to fund (in part) certain other benefit plans using trust assets): (a) medical, dental and life insurance benefits to pensioners; (b) income payments to disabled employees; (c) medical, dental and life insurance benefits to disabled employees; (d) income benefits for beneficiaries of deceased employees; and (e) medical, dental and life insurance benefits to active employees.

20.    Under the Approved HWT Allocation Methodology, distributions will be made on account of the following benefits (collectively, the **"Participating Benefits"**):

(a)      Pensioner Life;

(b)      LTD Life;

(c)      LTD Income;

(d)      LTD Optional Life Benefit;

(e)      SIBs; and

(f)      STBs in pay.

21.    The LTD Income, SIBs and STBs In Pay are referred to collectively as the **"Income Benefits"**, and the LTD beneficiaries entitled to LTD Income, the SIB Beneficiaries and

041

the STB Beneficiaries entitled to STBs In Pay are referred to collectively as the "**Income Beneficiaries**". The Pensioner Life, LTD Life and LTD Optional Life Benefit are referred to collectively as the **"Life Benefits."** The pensioners entitled to Pensioner Life and the LTD beneficiaries entitled to LTD Life, LTD Optional Life Benefit and Pensioner Life are referred to collectively as the **"Life Beneficiaries"**.

22.    Summary of Status:

    (a)    In accordance with the Settlement Agreement and by Order of this Court, income benefit payments by the Applicants ended on December 31, 2010.

    (b)    By Order dated November 9, 2010 (the **"HWT Allocation Order"**), the Approved HWT Allocation Methodology was approved to enable a distribution of the HWT corpus.

    (c)    On November 29, 2010, counsel for a small group of dissenting LTD Beneficiaries filed an application for leave to appeal the HWT Allocation Order.

    (d)    At the request of the LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW, the Monitor brought a motion requesting approval of an interim payment to the Income Beneficiaries. On December 15, 2010, this Honourable Court granted an Order for an interim distribution from the HWT to the Income Beneficiaries (the **"January Interim Distribution Order"**, attached to the Sixty-Second Report as Appendix "D"). The reasons an interim distribution was sought included, among other things:

        (i)    certain steps were needed to be completed prior to a final distribution from the HWT, including reconciliation of data as at December 31, 2010 and a determination of certain variables that may affect assets available for distribution;

        (ii)    it was unlikely that the leave to appeal and, if leave were granted, any appeal, would be finally resolved and that all steps required for final distribution would be completed in sufficient time to allow for a final distribution of the HWT corpus before December 31, 2010; and

        (iii)    the interim payment would assist the Income Beneficiaries during the period between the termination of Income Benefits and a final distribution of the HWT corpus.

- 8 -                                            ⸜ 042

(e)     The Ontario Court of Appeal denied leave to appeal the HWT Allocation Order on January 7, 2011. On March 8, 2011, counsel for the dissenting LTD Beneficiaries filed an application for leave to appeal the denial of leave with the Supreme Court of Canada.

(f)     By order dated February 25, 2011, this court approved the making of Termination Fund payments to, among others, LTD Beneficiaries, using such funds as necessary from the Hardship Fund.

(g)     By order dated April 8, 2011, this court approved necessary amendments to the employee hardship application process and criteria so that the April SIB/STB Payment could be made.

(h)     By order dated May 3, 2011, this court approved the making of a further interim distribution (the "**May/June Interim Distribution**").

(i)     By order dated June 9, 2011, the Supreme Court of Canada dismissed the application for leave to appeal.

## VI.     JANUARY INTERIM DISTRIBUTION, TERMINATION FUND PAYMENT, APRIL SIB/STB PAYMENT AND MAY/JUNE INTERIM DISTRIBUTION

23.     The Fifty-Seventh Report sets out the Monitor's considerations in recommending the level of payment for the January Interim Distribution, including:

(a)     In all illustrative scenarios, each of LTD Income and SIBs would participate in a distribution of the HWT corpus.

(b)     In certain illustrative scenarios, STBs In Pay are excluded as participating benefits. However, the LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (whose constituents would be impacted if leave to appeal is granted and scenarios other than the Approved HWT Allocation Methodology are considered) consented to the January Interim Distribution to STB Beneficiaries entitled to STBs In Pay, of approximately $355,000 (currently approximately $418,000 based on the current number of STB Beneficiaries receiving STBs in Pay).

(c)     The percentage distribution on account of Income Benefits differs (including from the percentage distribution resulting from the Approved HWT Allocation Methodology) depending on which illustrative scenario is applied.

(d)     The Monitor considered a range of possible interim distributions and the consent described in (b) above and believed that payment to Income Beneficiaries at 10%

of their Income Benefit to a maximum of 3 months would not prejudice other beneficiaries of the HWT.

(e)   The Monitor's Fifty-First Report indicated that for the purposes of the illustrative scenarios, the cash balance available for distribution on the termination of the HWT would be $80 million (including Pensioner Life premiums for 2010 of $7.8 million, which will be treated as a charge against any distribution in respect of Pensioner Life) but that the actual amount of cash available would be subject to adjustment for factors which include:

   (i)     investment returns;

   (ii)    treatment of stale-dated cheques;

   (iii)   the actual amount of Pensioner Life premiums paid during 2010;

   (iv)    the treatment of costs related to expenses incurred prior to the termination of the HWT but not submitted by February 28, 2010 and therefore not paid by Nortel pursuant to the Settlement Agreement;

   (v)     taxes and administrative costs; and

   (vi)    any fees paid from HWT assets pursuant to the Settlement Agreement with respect to any dispute or litigation regarding the HWT.

(f)   The Fifty-First Report also indicated that the ultimate distribution from the HWT would be dependent upon the outcome of other matters, including:

   (i)     changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

   (ii)    changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

         A.     a different allocation of the HWT corpus;

         B.     the resolution of contingencies;

         C.     updating of data to December 31, 2010; and

         D.     the award of fees against any particular benefit type.

044

- 10 -

24.     The January Interim Distribution Order was granted on December 15, 2010 and provided for the January Interim Distribution, being an interim distribution of the HWT corpus to each Income Beneficiary in an amount equal to 10% of the Income Benefits calculated in accordance with the Approved HWT Allocation Methodology, using data available as of December 31, 2010 according to the Applicants' books and records, as updated from time to time; provided that the interim distribution would not exceed 3 months of Income Benefits payable to the Income Beneficiary, based on the monthly amount payable to the Income Beneficiary for December, 2010.

25.     The January Interim Distribution was made and resulted in a lump sum amount representing 3 months of payments for approximately 512 Income Beneficiaries, and less than 3 months of payments for approximately 230 Income Beneficiaries. The majority of the Income Beneficiaries who received less than 3 months of Income Benefits were the STB Beneficiaries as STBs are limited to a 5 year time period and many are approaching the end of that period.

26.     Because the January Interim Distribution provided up to three months of Income Benefits, those who did not reach the Maximum 10% Interim Distribution were paid, effectively, their income benefits only through to March. The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW requested that further payments be made.

27.     Two further payments were approved by this Court and were made so that all eligible Income Beneficiaries received a payment in April. These payments were not interim distributions from the HWT and did not affect the corpus of the HWT or the quantum of the Income Beneficiaries' claims in the HWT:

- 11 -

045

(a)   **The Termination Fund Payments** - As discussed in the Fifty-Ninth Report and approved by Order dated February 25, 2011, payment of $3,000 to each eligible employee terminated from July 1, 2010 to December 31, 2010, being approximately 351 out of approximately 356 LTD Beneficiaries, were made in April from the balance remaining in the Termination Fund and using funds from the Hardship Fund (since the assets in the Termination Fund were not sufficient) to all those who provided information to the Applicants by April 1, 2011; and

(b)   **The April SIB/STB Payments** - As discussed in the Sixty-Second Report and approved by Order dated April 8, 2011, the employee hardship application process and criteria were amended so that payments could be made from the Hardship Fund to SIB Beneficiaries and STB Beneficiaries entitled to STBs in Pay to the Maximum 10% Interim Distribution, for a maximum of one month of benefits, to be credited against future distributions by the Applicants (the "**April SIB/STB Payments**"). All 80 SIB Beneficiaries received a full month's benefits, none of them being at 10%. Approximately 160 STB Beneficiaries entitled to STBs in Pay, including approximately 20 whose entitlement was reported in 2011, received payments, of which approximately 90 received a full month's benefits.

28.   The Monitor took into account the considerations referred to in respect of the making of the January Interim Distribution discussed in paragraph 23 above, in recommending the level of payment for the May/June Interim Distribution. The May/June Interim Distribution totalled approximately $1.7 million to 532 Income Beneficiaries, representing 2 months of payments for approximately 349 Income Beneficiaries and less than 2 months of payments for approximately 183 Income Beneficiaries. The majority of the Income Beneficiaries who received less than 2 months of Income Benefits were those in receipt of STBs In Pay, which are limited to a 5 year time period.

**VII.   CURRENT STATUS**

29.   As indicated above, given the decision of the Supreme Court of Canada, it is now certain that the distribution of the corpus of the HWT will be in accordance with the Approved HWT Allocation Methodology. Therefore, certain of the considerations referred to in paragraph 23 are no longer relevant. However, certain of the considerations continue,

046

including those referred to in sub-paragraphs 23(e) and (f). While the Monitor believes the ultimate total distribution from the HWT is likely to meet or exceed 33.8% of the value of the Participating Benefits[2], being the percentage indicated in the illustrative scenario reflecting the Approved HWT Allocation Methodology filed with the Supplement to the Monitor's Fifty-First Report, some degree of uncertainty remains.

30.    The Monitor and the Applicants are reviewing the cash available from the HWT with the LTD Beneficiaries' Representative and her advisors, the Former Employees' Representatives and their advisors, and the CAW, and will seek the approval of this court with respect to the accounting and form of financial reporting thereon.

31.    Using data as at December 31, 2010 available from the Applicants as of May 31, 2011, there are in total approximately 8,600 Life Beneficiaries. The Monitor and the Applicants are continuing to work on establishing a cost effective method for finalizing data confirmation and distribution of the Life Benefits, and will continue to consult with the LTD Beneficiaries' Representative and her advisors, the Former Employees' Representatives and their advisors, and the CAW. Approval for an interim distribution of Life Benefits will be sought as soon as practicable. In any event, the Monitor expects to bring a motion seeking approval of an interim distribution to LTD Beneficiaries on account of LTD Life and the LTD Optional Life Benefit in August 2011.

32.    The Monitor will continue to work diligently with the Applicants, the Trustee, the LTD Beneficiaries' Representative and her advisors, the Former Employees' Representatives

---

[2] With the value of Pensioner Life relating to Pensioners being reduced as a result of actual 2010 Pensioner Life premiums.

047

and their advisors, the CAW and others to finalize all outstanding matters so that the final distribution may be made to all Participating Beneficiaries.

## VIII.   THIRD INTERIM DISTRIBUTION

33.   Attached as Appendix "H" is a chart illustrating the proposed Third Interim Distribution to a total of 25% of the Income Benefits calculated in accordance with the Approved HWT Allocation Methodology using data as at December 31, 2010 available from the Applicants as of May 31, 2011. The Third Interim Distribution would result in payment to Income Beneficiaries of a total of approximately $19.2 million. Approximately 307 out of 347 LTD Beneficiaries, 228 out of 337 beneficiaries entitled to STBs In Pay and all 80 SIB Beneficiaries would be entitled to receive the equivalent of at least 3 months of benefit payments. Those LTD Beneficiaries receiving less than the equivalent of 3 months of benefit payments are generally at or close to age 65 and entitled to commence his or her pension. The STBs in Pay are limited to a 5 year time period and those receiving less than 3 months are at or close to the expiry of that period.

34.   If approved, the Third Interim Distribution will be made to Income Beneficiaries in late July. The Third Interim Distribution will be subject to applicable statutory withholdings on SIBs and STBs In Pay but not on LTD Income. If an Income Beneficiary has not forwarded banking information and there is a postal disruption at the relevant time, the distribution will be delivered by courier.

## IX.   MONITOR'S RECOMMENDATION

35.   The Monitor believes that an interim distribution to Income Beneficiaries is appropriate in the circumstances and that an interim distribution of the amount that, when taken with the previous interim distributions, will be 25% of his or her Income Benefits is prudent

- 14 -

048

and reasonable.  The Monitor believes that the proposed interim distribution would not prejudice other beneficiaries of the HWT and is responsive to the Income Beneficiaries' request for an interim payment pending final distribution of the HWT corpus.

36.    Accordingly, the Monitor requests that this Honourable Court grant the Order in the form submitted.

All of which is respectfully submitted this 16th day of June, 2011.

**ERNST & YOUNG INC.**

**In its capacity as Monitor of the Applicants**
Per:

Murray A. McDonald
President

\5977776

# APPENDIX "A"

ᴸ  049

**Appendix "A"**

**Index of Reports**

| Appendix | Description of Report |
|---|---|
| Appendix "B" | Fifty-First Report filed in support of the motion for approval of the HWT allocation methodology |
| Appendix "C" | Supplemental Fifty-First Report, providing an update to the Fifty-First Report and attaching: |

       1.   the Mercer 2010 Addendum reflecting information received with respect to the LTD Optional Life Benefit; and

       2.   revised illustrative allocation scenarios reflecting the valuation of the LTD Optional Life Benefit

| Appendix | Description of Report |
|---|---|
| Appendix "D" | Fifty-Seventh Report filed in support of the January Interim Distribution |
| Appendix "E" | Fifty-Ninth Report filed in support of the Termination Fund Payments |
| Appendix "F" | Sixty-Second Report filed in support of the April SIB/STB Payment |
| Appendix "G" | Sixty-Fourth Report filed in support of the May/June Interim Distribution |

\5978802

# APPENDIX "B"

050

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

FIFTY-FIRST REPORT OF THE MONITOR
DATED AUGUST 27, 2010

051

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     PURPOSE.........................................................................................................3

III.    TERMS OF REFERENCE .................................................................................5

IV.     BACKGROUND .................................................................................................6

        Appointment of Representatives........................................................................6

        The Settlement Agreement ...............................................................................7

V.      PROCESS LEADING TO THIS MOTION ..........................................................9

VI.     FACTS CONCERNING THE HWT ...................................................................10

        Overview of the HWT ......................................................................................10

        Revenue Canada Ruling ..................................................................................12

        The Trust Agreement .......................................................................................13

        Current Plans...................................................................................................14

        Sun Life...........................................................................................................15

        Pensioner Benefits ..........................................................................................15

                (a)     Pensioner Life ................................................................... 16

                (b)     Medical and Dental Benefits.............................................. 17

        LTD Benefits ...................................................................................................18

                (a)     LTD Life Insurance Benefits .............................................. 18

                (b)     Medical and Dental Benefits.............................................. 19

                (c)     Income Benefits ................................................................. 19

        Survivor Income Benefits ................................................................................19

        Survivor Transition Benefits.............................................................................20

        Optional Life Benefit ........................................................................................21

        Basic and Optional Life Cross-Experience Rating...........................................22

        Financial Reports on the HWT.........................................................................23

                (a)     Tax Returns....................................................................... 23

                (b)     HWT Financial Statements ............................................... 23

        HWT Valuations ..............................................................................................24

        Funding and Administration..............................................................................25

        Available Cash .................................................................................................26

052
Page

VII.    MERCER 2010 PRELIMINARY HWT VALUATION .................................................27

VIII.   PROPOSED ALLOCATION METHODOLOGY .......................................................29

        Illustrative Scenarios.............................................................................................29

        Proposed Allocation Methodology .......................................................................34

        Independent Legal Counsel....................................................................................36

        Specific Process Matters .......................................................................................39

        Operational Steps...................................................................................................42

IX.     RECOMMENDATION ...........................................................................................44

- ii -

L  -053

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

FIFTY-FIRST REPORT OF THE MONITOR
DATED AUGUST 27, 2010

I.    INTRODUCTION

1.    On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and
collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks
Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks
International Corporation and Nortel Networks Global Corporation (collectively the
"**Applicants**") filed for and obtained protection under the *Companies' Creditors
Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Honourable Court dated
January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc.
was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA
proceedings. The stay of proceedings was extended to October 29, 2010, by this
Honourable Court in its Order dated July 16, 2010.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed
voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the
"**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S.

( 054

Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.    An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted Administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

- 3 -

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.      The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.      Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

II.     PURPOSE

9.      The purpose of this Fifty-First Report of the Monitor (the "Fifty-First Report") is:

      (a)     to seek this Honourable Court's approval of a proposed allocation methodology[1] (the "Proposed Allocation Methodology") for the allocation of funds held in the Applicants' Health and Welfare Trust (the "HWT") and such ancillary relief as is just and convenient to terminate the HWT and implement the Proposed Allocation Methodology to distribute the funds held in the HWT to the beneficiaries who are entitled thereto; and

      (b)     to provide this Honourable Court with information about the HWT relevant to its termination and more specifically to the allocation and distribution of its corpus and the process that has been followed by the Applicants and the Monitor to resolve these issues in a reasonable and practical manner.

10.     The Settlement Agreement (defined below) provides and this Court has ordered that benefit payments by the Applicants will end on December 31, 2010. It is therefore timely to seek approval of the Proposed Allocation Methodology, which will enable a distribution of the HWT corpus.

---

[1] Described in Section VIII below. An illustrative example of the application of the Proposed Allocation Methodology to the participating benefits on an aggregate basis (not an individual basis) is attached as Appendix D-1, Column 2.

056

11.     It is appropriate for the Monitor to bring this motion in these proceedings and seek

approval of the Proposed Allocation Methodology in order to assist this Honourable

Court and the parties, given, among other things:

(a)     the Applicants administer the HWT and, as they are under the supervision of this
        Honourable Court in these proceedings, require approval of this Honourable
        Court prior to taking those proposed steps that are not in the ordinary course of
        the Applicants' business;

(b)     a resolution of HWT allocation and distribution matters is required in order to
        determine certain claims (in that distributions from the HWT will reduce them)
        against the Applicants, assist in the development of a CCAA Plan and advance
        the administration of the Applicants' estates;

(c)     the provisions of the Settlement Agreement;

(d)     The Northern Trust Company, Canada, the current trustee of the HWT (the
        "**Trustee**"), has an extremely limited mandate, pursuant to which virtually all
        decisions concerning the HWT are the Applicants' responsibility and the Trustee
        merely acts in accordance with instructions from the Applicants;

(e)     the Applicants' have no financial interest in the HWT corpus; and

(f)     the Monitor's role as an independent Court-appointed officer to balance the
        interests of the various parties, particularly in light of the uncertainties with
        respect to the interpretation of the Trust Agreement and the number of potential
        outcomes.

12.     Counsel has advised the Monitor that the Trust Agreement (defined below) does not

provide clear guidance on which individuals are entitled to participate in a distribution on

termination of the HWT and there are a number of interpretations and possible outcomes.

To assist this Honourable Court and the parties, counsel to the Monitor has prepared a

memorandum of law considering the potential interpretations of the Trust Agreement and

issues related thereto, a copy of which is attached as Appendix "B".

13.     The Monitor recommends the Proposed Allocation Methodology based on the advice of

counsel with respect to the interpretation of the Trust Agreement and, in the Monitor's

C   057

view, it represents a fair and reasonable balancing of various interests in a trust fund inadequate to fully meet all claims. It is also a practical methodology which can be implemented without undue cost and delay. Further, the Proposed Allocation Methodology is, in general, consistent with the way in which the HWT has been administered, in that, with the exception of the LTD Optional Life Benefit and the STBs, these benefits are not paid on a pay-as-you-go basis by Nortel and assets of the HWT are shown as reserved for payment of these benefits on the HWT financial statements.

14.    The Proposed Allocation Methodology is set out in paragraph 101 below. In brief, it provides that those beneficiaries whose claims are in pay (that is, those with income claims presently being paid) and those whose claims are certain to be payable at some future date will share in the distribution. Therefore, the following benefits would share *pro rata*: (a) LTD Income; (b) LTD Life; (c) LTD Optional Life Benefit; (d) SIBs and STBs in pay; and (e) Pensioner Life.

15.    The Proposed Allocation Methodology and subsequent distributions are based on the Mercer 2010 HWT Preliminary Valuation, a copy of which is attached as Appendix "C". An illustrative example of the application of the Proposed Allocation Methodology to the participating benefits on an aggregate basis (not on an individual basis) is attached as Appendix D-1, Column 2. Schedules providing illustrative examples under various allocation scenarios are attached as Appendix "D".

III.    TERMS OF REFERENCE

16.    In preparing this Fifty-First Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management. The Monitor has not audited,

reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, expresses no opinion or other form of assurance on the information contained in this Fifty-First Report.

17. Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Monitor's Thirty-Ninth Report dated February 18, 2010 (the **"Thirty-Ninth Report"**), which terms from the Thirty-Ninth Report are reproduced on Appendix "A" attached hereto for ease of reference.

18. Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## IV.    BACKGROUND

### Appointment of Representatives

19. As set out in detail in the Monitor's Thirty-Sixth Report dated February 8, 2010 and the Affidavit of Elena King sworn February 18, 2010, all but a very few individuals are represented in these proceedings by Court appointed representative counsel; namely, Former Employees' Representative Counsel, LTD Beneficiaries' Representative Counsel, Continuing Employees' Representative Counsel or CAW Counsel, and also Court appointed representatives; namely, the Former Employees' Representatives, the LTD Beneficiaries' Representative (collectively, the **"Employee Representatives"**) or the Continuing Employees' Representatives.

20. The only individuals (collectively referred to as the **"Individual Parties"**) not represented by the above appointments are:

- 7 -

(a)   3 former employees and one working employee who opted out of such representation; and

(b)   any former chief executive officer or chairman of the board of directors, any non-employee member of the board of directors, or such former employees or officers that are subject to investigation and charges by the Ontario Securities Commission or the United States Securities and Exchange Commission.

21.   The Court Orders appointing the Employee Representatives expressly state that they may represent their constituents for the purpose of settling or compromising their claims in insolvency proceedings "or in any other proceeding which has been or may be brought before this Honourable Court". The administration of the HWT, the benefits which it provides and its termination are all being overseen within the CCAA proceedings. Payments by Nortel of certain benefits funded through the HWT are included in the Applicants' cash flows approved in the CCAA proceedings. Employee and pensioner benefit claims against the Applicants will be dealt with in a compensation claims process to be subsequently brought before this Court for approval. These claims will be reduced by the amount of any distributions made to the claimant from the HWT. Therefore, an allocation and distribution of the corpus of the HWT impacts on, and relates to, employee and pensioner claims against the Applicants in the CCAA proceedings. As a result, the Court approved Settlement Agreement (discussed below) contemplated the involvement of the Employee Representatives in the allocation and distribution process for the HWT.

22.   The Employee Representatives engaged RSM Richter Inc. as their financial advisor and The Segal Company Ltd. ("Segal") as their actuarial advisor.

## The Settlement Agreement

23.   Although Nortel is insolvent, it continued for more than a year to fund its pre-filing obligations for medical, dental and certain other benefits to its pensioners, their survivors

- 8 -

L  060

and disabled employees; however, it could not continue to do so indefinitely. In the absence of special arrangements, Nortel's benefits payments would have ceased on March 31, 2010. At the conclusion of the payment of benefits in accordance with the Settlement Agreement, these benefits will have been funded for two years.

24.    The Applicants, the Monitor, the Former Employee Representatives (on their own behalf and on behalf of the parties they represent), the LTD Employee Representative (on her own behalf and on behalf of the parties she represents), the Former Employees' Representative Counsel, the LTD Beneficiaries' Representative Counsel and the CAW (the "**Settlement Parties**") reached an agreement regarding certain issues related to, among other things, the Applicants' registered Pension Plans, certain employee benefits for, among others, Pensioners and LTD Beneficiaries and certain employment related issues. The agreement was amended and restated on March 30, 2010 (as amended and restated, the "**Settlement Agreement**") following issuance of this Honourable Court's reasons on March 26, 2010. Additional information on the Settlement Agreement and the process leading up to the Settlement Agreement can be found in the Thirty-Ninth Report, the supplements to the Thirty-Ninth Report and the Forty-Second Report of the Monitor dated March 30, 2010.

25.    The Settlement Agreement was approved by this Honourable Court by Order dated March 31, 2010 (the "**Settlement Approval Order**"). Leave to appeal the Settlement Approval Order was denied by Endorsement of the Ontario Court of Appeal dated June 3, 2010. Copies of the Settlement Approval Order (which attaches a copy of the Settlement Agreement) and of the Endorsement of the Court of Appeal are attached hereto as Appendices "E" and "F", respectively.

26.    In summary, the Settlement Agreement addresses the payment of benefits during 2010 to, among others, Pensioners and LTD Beneficiaries, confirms that claims in respect of benefits and relating to the HWT rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of the Applicants and releases directors, officers, the Trustee and others from all direct and indirect claims related to the HWT (other than against a director of Nortel for a matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud.)

27.    The Settlement Agreement also provides:

> Resolution: *The Parties will work towards a Court approved distribution of the Health and Welfare Trust ("HWT") corpus in 2010 to its beneficiaries entitled thereto and the resolution of any issues necessarily incident thereto.* For greater certainty, nothing in this Settlement Agreement affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT. Any fees or expenses incurred in connection with any dispute or litigation among the beneficiaries of the HWT concerning entitlement (including without limitation all legal, actuarial and other fees and expenses of the trustee of the HWT and other service providers of the HWT) shall not be paid by Nortel, but shall be paid by the HWT corpus. For greater certainty, such fees or expenses shall not include those of the Monitor and incurred by Nortel in connection with any motion for termination of the HWT or for directions with respect to the HWT, which shall be paid by Nortel. (Section C.1) (Emphasis added.)

28.    This provision was in recognition of the importance and significance of achieving an allocation of the HWT corpus before the end of 2010 (when payment of benefits will cease) in order for distributions to be made to individuals based on such an allocation.

V.    **PROCESS LEADING TO THIS MOTION**

29.    The Monitor has worked closely with the Applicants, the Trustee, Sun Life Assurance Company of Canada ("**Sun Life**") (party to an administrative services only arrangement with Nortel in respect of certain benefit plans and a provider of certain life insurance

062

policies) and Mercer (the Applicants' actuarial advisor) on all major aspects of the Applicants' current employee and former employee benefit plans and has sought their assistance in assembling facts and documents relevant to this motion. Section VI below summarizes the material facts relating to the HWT and refers to documents relevant to the HWT that are attached as Appendices to this Fifty-First Report.

30.     In order to analyze the options available for distribution of the funds held in the HWT, the Monitor and its advisors reviewed documentation relevant to the HWT that was available. Not all supporting records are available as the HWT was established 30 years ago. The Monitor also shared this information with Representative Counsel and Independent Counsel (discussed in Section VIII below) so as to ensure that all constituencies had the same available information.

31.     The information provided included:

    (a)     the documents basic to the establishment of the HWT, being the Revenue Canada ruling and the trust documents;

    (b)     benefits information, including policies with Sun Life and experience reports; and

    (c)     financial reports and valuations.

## VI.  FACTS CONCERNING THE HWT

### Overview of the HWT

32.     Nortel established the HWT on January 1, 1980 as a tax-efficient vehicle through which Nortel would continue to provide employee benefits by agreement between Northern Telecom Limited (a predecessor company to NNL) and Montreal Trust Company (as trustee), amended by agreements made as of September 24, 1984, June 1, 1994 and

C  063

- 11 -

December 1, 2005 and further amended by letter agreement dated December 1, 2005 (collectively, the "**Trust Agreement**"). The Trust Agreement (with an appendix respecting administrative services) is attached as Appendix "G". Northern Telecom Canada, Limitée, Montreal Trust Company (a predecessor trustee) and Association D'Hospitalisation du Québec entered into an administrative services only agreement dated January 1, 1981 in respect of benefits provided under medical and dental plans, a copy of which agreement is attached as Appendix "H".

33. As the successor to Northern Telecom Limited, Nortel is bound by the Trust Agreement pursuant to Article IX.

34. Most of Nortel's non-pension employee benefits, including life insurance, long term disability, medical, dental and survivor income benefits, are funded by Nortel on a pay-as-you-go basis but as an administrative matter are paid using the HWT as a payment mechanism. In respect of certain other benefit plans, the benefits have been funded (in part) by the HWT using trust assets (referred to as "**Reserved Plans**"). Assets were notionally allocated in the HWT financial statements with respect to the Reserved Plans; however, assets were not segregated in the HWT by benefit plan and no separate bank accounts were established. As a result, all the HWT assets are commingled.

35. Employees and former employees of Nortel were not informed of the existence of the HWT until at least 2007 nor were they promised that their benefits would be provided through a health and welfare trust. None of Nortel's collective bargaining agreements referenced the HWT or promised to provide benefits through a health and welfare trust.

**Revenue Canada Ruling**

36.    In 1979, prior to the establishment of the HWT, Nortel sought and obtained an advance
income tax ruling from Revenue Canada (as it then was) regarding the tax treatment of
the HWT. Nortel's letter to Revenue Canada dated December 16, 1979 (the "**Ruling
Request Letter**"), attached as Appendix "I", and the ruling obtained on December 28,
1979 (the "**Ruling**"), attached as Appendix "J", described the facts relevant to the
proposed health and welfare trust and benefit plans, including how the trust was to be
operated.

37.    The Ruling Request Letter and the Ruling referred to:

   (a)    the establishment of a single health and welfare trust fund by Nortel through
          which certain benefit plans would be provided;

   (b)    the following benefit plans as comprising the plans within the HWT: health care
          (medical and dental); sickness and accident; long term disability; survivor
          income benefit and group life insurance;

   (c)    the Trustee being responsible for receiving Nortel's contributions and employee
          contributions and arranging for payment of benefits to eligible employees and
          dependents and payment of premiums to the insurance company;

   (d)    the transfer to the HWT of the Pensioners' Insurance Fund (in respect of the
          group life insurance plan -- part I) of $11 million held by Mutual Life Assurance
          of Canada representing a surplus in a prior retirement life insurance arrangement;

   (e)    employee contributions in respect of optional life insurance (group life insurance
          - part II), stating they would form part of the Trust Fund (as defined below) but
          be kept in a separate sub-account; and

   (f)    the following proposed funding arrangements:

          (i)    · Health Care Plan - Nortel to make contributions to the HWT to satisfy the
                 claims liability and may fund expected future claims, as actuarially
                 determined by the insurance carrier;

└ 065

   (ii)     Long Term Disability Plan - Nortel's contributions to be sufficient to satisfy all claims and may make additional/increased contributions based on an actuarial valuation or some other reasonable basis;

   (iii)    Survivor Income Benefit Plan - funding to be identical to that of long term disability, but employees required to make contributions;

   (iv)    Group Life Insurance Plan (Part I – Basic & Part II – Optional)

       A.    Nortel to make contributions to the HWT sufficient to pay premiums. Contributions (both active employees' and Nortel's) not immediately applied against claims and expenses of the insurer to be deposited/transferred to a sub-account of the HWT called the 'Pensioners Insurance Fund'.[2]

       B.    At the time of the Ruling, the Pensioners' Insurance Fund of approximately $11 million, with Mutual Life Assurance of Canada, to be transferred into the HWT.

       C.    Group Life Insurance (Part II) to be paid totally by the employees, to form part of the Trust Fund but be kept in a separate account.

## The Trust Agreement

38.    In summary, the Trust Agreement provides that:

   (a)    the Trust Fund is created for the purpose of providing the Health and Welfare Plan benefits for the benefit of the Applicants' active and retired employees;

   (b)    Nortel may designate as the "Health and Welfare Plan" certain of the following health and welfare plans (and such other similar plan or plans as Nortel may from time to time place in effect): health care; management long term disability; union long term disability; a management survivor income benefit; management short term disability; and group life insurance;

   (c)    all contributions (from both Nortel and employees) will be held in a single fund (the **"Trust Fund"**), including all profits, increments, and earnings thereon (Article I, Section 6);

---

[2] This funding arrangement is applicable to Part I – Basic life insurance.

- 14 -

(d)     with respect to record-keeping, the Trustee shall keep accurate and detailed accounts of all investments and transactions and separate records for each of the separate Plans (Article III, Section 2(p)); and

(e)     on termination of the HWT, the following shall apply:

> Upon sixty (60) days prior written notice to the Trustee, the Corporation may terminate its obligation to make Employer's contributions in respect of benefits after the date of written notice to the Trustee (hereinafter called the "Notice of Termination"). Upon receipt of the Notice of Termination the Trustee shall within one hundred twenty (120) days determine and satisfy all expenses, claims and obligations arising under the terms of the Trust Agreement and Health and Welfare Plan up to the date of the Notice of Termination. The Trustee shall also determine upon a sound actuarial basis, the amount of money necessary to pay and satisfy all future benefits and claims to be made under the Plan up to the date of the Notice of Termination. The Corporation and the designated affiliated or subsidiary corporations shall be responsible to pay to the Trustee sufficient funds to satisfy all such expenses, claims and obligations, and such future benefits and claims. The final accounts of the Trustee shall be examined and the correctness thereof ascertained and certified by the auditors appointed by the Trustee. Any funds remaining in the Trust Fund after the satisfaction of all expenses, claims and obligations and future benefits and claims, arising under the terms of the Trust Agreement and the Health and Welfare Plan shall revert to the Corporation. (Article VI, section 2.)

**Current Plans**

39.   According to the 2005 Valuation (as defined below) (the most recent actuarial valuation of the obligations of the HWT located by the Monitor), the following plans (collectively, the "**Plans**") formed the Health and Welfare Plan as at that date:

- medical, dental and life insurance benefits provided to pensioners,

- income payments to disabled employees (long term disability and short term disability),

- medical, dental and life insurance benefits provided to disabled employees,

- income benefits for beneficiaries of deceased employees (survivor income benefit and survivor transition benefit[3]),

- medical and dental benefits provided to active employees,

- employer-paid basic life insurance provided to active employees, and

- employee-paid optional life insurance provided to active employees.

Handbooks concerning certain of Nortel's benefit plans are attached as Appendix "K". We will discuss each of the pensioner benefits, LTD benefits, survivor income benefits, survivor transition benefits and optional life in turn.

## Sun Life

40.    Nortel has an administrative services only arrangement with Sun Life in respect of benefits provided under health, dental, survivor transition, survivor income and long-term disability plans, all of which are self-insured by Nortel. Sun Life insures pensioner life and active employee life benefits (Life Part I – Basic and Part II – Optional). Copies of certain Sun Life policies and history summaries and amendments with respect thereto are attached as Appendix "L".

## Pensioner Benefits

41.    The Pensioner benefits are paid to pensioners of Nortel or eligible dependents. Approximately 11,000 pensioners are entitled to pensioner benefits, comprised of (a) pensioner life (10,461 pensioners), and (b) medical and dental benefits (11,180 pensioners and 6,251 spouses).

---

[3]    STBs are listed in the 2005 Valuation. However, as set out below, since closure of the STB plan in 2003, the STB plan has not been referenced in the HWT financial statements since the 2004 HWT financial statement.

- 16 -

068

*(a)    Pensioner Life*

42.     Pensioners are entitled to a group life insurance benefit ("**Pensioner Life**"). The benefit amount varies and generally decreases with age but it is permanent and not term insurance. Pensioner Life premiums were historically paid from HWT assets and this has continued throughout the CCAA proceedings.

43.     Sun Life insures Pensioner Life by a policy issued to Nortel, as policyholder. The policy is experience rated. Each year, the accounts between Nortel and Sun Life are adjusted based on claims experience. Essentially, if the claims experience in a year was less than the premiums paid, Sun Life paid a refund to Nortel and, if the claims experience was more than the premiums paid, the deficiency was paid to Sun Life from the HWT, subject to the cross-experience rating described in paragraph 74.

44.     The basic life insurance policy and the optional life insurance policy (discussed below) contain conversion privileges entitling a participant, without evidence of insurability, to convert to an individual life policy with Sun Life, to a maximum of $200,000 for basic and optional life insurance combined.

45.     The Settlement Agreement does not require Nortel to pay the premiums in respect of Pensioner Life for 2010. These premiums continue to be paid from the corpus of the HWT.

46.     The HWT financial statements indicate reserve assets in respect of Pensioner Life of $30.7 as at December 31, 2009[4] and $49.6 million as at December 31, 2008.

---

[4] The reserved asset amounts as at December 31, 2009 are lower than the comparable December 31, 2008 amounts primarily due to the payment of benefits during 2009 and a reduction in the net assets reflected in the 2009

- 17 -

Accordingly, this is a Reserved Plan.

47.    Pensioner Life premiums for 2009 were approximately $5.7 million. The estimated cost of Pensioner Life premiums for 2010 is approximately $7.8 million. For the period January 1 to June 30, 2010, Pensioner Life premiums amount to approximately $3.9 million, including taxes and administrative costs relating thereto.

48.    In addition, there are 77 Pensioners (most of whom retired prior to 1983) entitled to receive an additional death benefit of 1 x preretirement earnings, with no reductions ("ADB"). From January 1, 2010 to June 30, 2010, Nortel has paid approximately $0.2 million in ADB. For the purposes of the Proposed Allocation Methodology and the illustrative scenarios, ADB forms part of Pensioner Life.

*(b)    Medical and Dental Benefits*

49.    Medical and dental benefits for Pensioners ("Pensioner M&D") were historically funded by Nortel on a pay-as-you-go basis but, as an administrative matter, were paid using the HWT as a payment mechanism. This has continued throughout the CCAA proceedings. Under the Settlement Agreement, the cost of Pensioner M&D will continue to be paid by Nortel on a pay-as-you-go basis until December 31, 2010.

50.    Pensioner M&D costs for 2009 were approximately $16.7 million. The estimated cost of the Pensioner M&D for 2010 is between $17.1 million and $20.9 million. For the period January 1 to June 30, 2010, Pensioner M&D costs amount to approximately $7.4 million, including taxes and administrative costs relating thereto.

---

HWT financial statements as a result of a reserve established on the amount Due from Sponsoring Company. This reserve has been allocated to the reserved assets *pro rata* based on their asset balances.

- 18 -

( 070

### LTD Benefits

51.     Long-term disability ("LTD") benefits are provided when short-term disability benefits end and continue for the duration of the employee's disability or until age 65 when the employee qualifies for pensioner benefits.   Approximately 360 people are entitled to receive LTD benefits, comprised of: (a) LTD life (358 individuals); (b) medical and dental benefits (360 individuals and 318 dependents); and (c) income benefits (351 individuals).

52.     LTD Beneficiaries are active employees.  Under the Settlement Agreement, LTD benefits are to be paid by Nortel on a pay-as-you-go basis until December 31, 2010.   The Settlement Agreement further provides that the employment of LTD beneficiaries terminates as of December 31, 2010 and that such termination does not affect in any manner their rights against Nortel arising out of their employment.

*(a)*     *LTD Life Insurance Benefits*

53.     Life insurance benefits for LTD employees ("LTD Life") end when a disabled employee attains age 65.  At that time, the disabled employee is eligible for Pensioner Life.

54.     LTD Life premiums were historically paid on a pay-as-you-go basis by Nortel through the HWT.   This has continued throughout the CCAA proceedings.   However, the premium for Optional Life (defined below) is waived while an individual is on LTD benefits (the "LTD Optional Life .").  These premiums were generally treated as part of the experience under the Optional Life policy, which was then cross-rated with the basic life policy as described in paragraph 74.

*(b)*    *Medical and Dental Benefits*

55.    Medical and dental benefits for LTD employees ("LTD M&D") were funded by Nortel on a pay-as-you-go basis, but as an administrative matter, were paid using the HWT as a payment mechanism. This has continued throughout the CCAA proceedings.

56.    LTD M&D and LTD Life costs for 2009 were approximately $2.5 million. The estimated cost of LTD M&D and LTD Life for 2010 is between $2.1 million and $2.6 million. The LTD M&D costs and life insurance premiums are included with the payment of medical, dental and life benefits for all active employees.

*(c)*    *Income Benefits*

57.    Income replacement benefits ("LTD Income") for Nortel employees on long-term disability were historically paid from HWT assets. This has continued throughout the CCAA proceedings.

58.    The HWT financial statements indicate reserve amounts in respect of LTD Income of $15.7 million as at December 31, 2009 and $30.7 million as at December 31, 2008. Accordingly, this is a Reserved Plan.

59.    LTD Income costs for 2009 were approximately $12.0 million. The estimated cost of LTD Income for 2010 is between $12.0 million and $12.2 million. For the period January 1 to June 30, 2010, LTD Income costs amount to approximately $5.3 million, including taxes and administrative costs relating thereto.

## Survivor Income Benefits

60.    Survivor income benefits ("SIBs") are life-time income benefits for survivors of certain non-unionized Nortel employees. SIBs are no longer offered and have not been since

- 20 -

072

before the commencement of the CCAA proceedings but continue to be paid to a group of surviving spouses. SIBs were historically paid by the HWT from HWT assets. This has continued throughout the CCAA proceedings.

61. Approximately 80 survivors of former employees of Nortel are currently in receipt of SIB ("SIB Beneficiaries").

62. The HWT financial statements indicate reserve amounts in respect of SIBs of $12.1 million as at December 31, 2009 and $17.1 million as at December 31, 2008. Accordingly, this is a Reserved Plan.

63. The cost of the SIBs for 2009 was approximately $1.4 million. The estimated cost of the SIBs for 2010 is approximately $1.4 million. For the period January 1 to June 30, 2010, the cost of SIBs amounts to approximately $0.7 million, including taxes and administrative costs relating thereto.

**Survivor Transition Benefits**

64. Survivor transition benefits ("STBs") are income benefits for survivors of certain unionized former Nortel employees, payable for a five year period. STBs are paid on a pay-as-you-go basis by Nortel but, as an administrative matter, were paid using the HWT as a payment mechanism. This has continued throughout the CCAA proceedings.

65. STBs were closed during 2003. Those people who were entitled to STBs at that time (namely, survivors then in pay, survivors of individuals that retired prior to April 1, 2003 and who remained LTD Beneficiaries with no interruptions of more than 60 days) were grandfathered. As of 2005, certain disabled employees continued to have STB coverage (the "STB Beneficiaries").

- 21 -

66.  It does not appear that there have been any reserve amounts in respect of STBs.  The 2004 HWT financial statements were the last to show the present value of future payments related to STBs.

67.  The actuarial liabilities associated with the STBs consist of three components: (i) liability for approximately 305 survivors currently receiving STBs (approximately $4.1 million as at December 31, 2010); (ii) an accrual for the approximately 2,900 pensioners on whose death their survivors would be eligible for STBs (approximately $30 million as at December 31, 2010); and (iii) an accrual for the approximately 101 LTD Beneficiaries on whose death their survivors would be eligible for STBs (approximately $0.3 million as at December 31, 2010).

68.  The cost of the STBs for 2009 was approximately $2.8 million.  The estimated cost of the STBs for 2010 is approximately $2.8 million.  For the period January 1 to June 30, 2010, the cost of STBs amounts to approximately $1.2 million, including taxes and administrative costs relating thereto.

**Optional Life Benefit**

69.  Nortel provides basic, core group life insurance (group life – part I), for all active employees.  In addition, there is an optional life insurance program (also known as group life – part II) ("**Optional Life**"), available to active employees at their own cost.  Participants in the Optional Life program ("**Optional Life Participants**") may change from year to year as they decide to opt in or out or their employment is terminated.

70.  As set out above, the basic life and Optional Life insurance policies contain conversion privileges.

71.    In summary, under Optional Life coverage:

    (a)    Benefits are insured by Sun Life in a policy naming Nortel as the policyholder. Premiums are paid entirely by Optional Life Participants (other than those on long term disability, whose premiums are waived by Nortel).

    (b)    The insurance is term life, with benefits terminating no later than January 1st following an Optional Life Participant's 65th birthday. Each Optional Life Participant chooses the amount of benefit by applying the benefit formula. When an Optional Life Participant dies, Sun Life pays the beneficiary the benefit in effect on the date of death.

    (c)    The policy is experience-rated. Each year, the accounts between Nortel and Sun Life are adjusted, depending on the claims experience. Essentially, if the claims experience in a year was less than premiums paid, Sun Life paid a refund to Nortel and if the claims experience was more than the premiums paid, the deficiency was paid to Sun Life from the HWT, subject to the cross-experience rating described in paragraph 74. Premiums for Optional Life were reduced for the Optional Life Participants from about 2007 to reflect favourable experience.

    (d)    Within 30 days of leaving Nortel, an Optional Life Participant is entitled, without evidence of insurability, to convert to an individual life policy with Sun Life, to a maximum of $200,000 for basic and Optional Life insurance coverage combined.

    (e)    Neither the policies nor employee communications provided to the Monitor indicate any employee entitlement to a refund of premium.

72.    The HWT financial statements indicate reserve amounts in respect of Optional Life of $17.9 million as at December 31, 2009 and $26.0 million as at December 31, 2008 . Accordingly, Optional Life is a Reserved Plan.

73.    The number of working employees and LTD Beneficiaries that elected Optional Life coverage is being determined.

**Basic and Optional Life Cross-Experience Rating**

74.    Typically, each year Sun Life and Nortel agreed to cross-rate Optional Life (group life - part II) with basic life insurance (group life - part I). Accordingly, at the end of each year, any surplus or deficit under the two group policies was netted together. Sun Life

returned any net surplus to Nortel and Nortel deposited it in the HWT. If there was a net deficit, this was paid as a lump sum to Sun Life from the HWT or carried over to the next year to be included in the next year's claims experience. Generally, the surplus or deficit was allocated to the reserve accounts for Optional Life or Pensioner Life, depending on their respective experience. Copies of Sun Life letters available in respect of the Sun Life policies for 2004, 2005, 2008, 2009 and 2010 and Sun Life financial reports available in respect of the Sun Life policies for 2005 to 2009 are attached as Appendix "M". Certain portions of these documents are redacted for privacy purposes.

### Financial Reports on the HWT

**(a)    Tax Returns**

75.    For taxation purposes, the HWT files only one return in respect of the HWT. Attached as Appendix "N" are the HWT tax returns for the years 2005 to 2010.

**(b)    HWT Financial Statements**

76.    Nortel has prepared financial statements in respect of the HWT, certain of which were audited, since 1982. The financial statements for 1982 through 2009 are attached as Appendices "O" to "PP".

77.    To assist in a review of the financial statements:

    (a)    A summary including certain notes that have evolved over the years from the years in which the notes first appeared is attached as Appendix "QQ"; and

    (b)    A chart summarizing amounts from the financial statements called accounts receivable or "due from sponsoring corporations or company" is attached as Appendix "RR". As indicated therein, almost from the inception of the HWT, there have been amounts receivable from the sponsoring companies. As set out in the Thirty-Ninth Report, the Monitor has been advised by the Applicants that these amounts are primarily related to benefit payments made to beneficiaries of

the HWT prior to the filing date. The Monitor has found nothing to indicate that these amounts represent anything other than accumulated contributions owing.

78.     The 2009 financial statements disclose cash on hand and investments of $80.0 million, net assets available for payment of benefits of $76.4 million, total claims paid and accrued of $23.9 million, employer contributions of $0.1 million and employee contributions of $1.6 million. For purposes of the 2009 financial statements, certain amounts are included in cash and investments that were excluded from the $78.0 million reported in the Thirty-Ninth Report. These amounts predominately related to stale-dated cheques.

## HWT Valuations

79.     Various valuations were performed in respect of the HWT from time to time. The Monitor has located:

    (a)     analyses of the funding status of the Pensioners' Insurance Fund in the years 1993, 1998 and 2002 (the "**PIF Valuations**");

    (b)     certain valuations of post-employment benefit liabilities for accounting purposes in the years 2003, 2004, 2006, 2007, 2008 and 2009 (the "**Accounting Valuations**"), the purpose of which valuations is to determine the unfunded liability related to post-employment benefits;

    (c)     certain reports on non-pension post-retirement benefit net periodic benefit cost and disclosure for accounting purposes in the years 2005, 2006, 2007, 2008 and 2009 (the "**Accounting Cost Reports**"), which provide information related to the Applicants' non-pension post-retirement benefit plans intended for use in accounting for the costs of the plans and preparing financial statements;

    (d)     a valuation of liabilities for the year 2005 (the "**2005 Valuation**"), which sets out the actuarial present value of the obligations of the HWT as at September 30, 2005 and the assumptions and data used therein; and

    (e)     Mercer letters dated January 15, 2008 and April 30, 2008 (the "**Mercer Letters**"), which provide an estimate of the fiscal 2008 incremental expense for post-employment benefits, intended for use in the 2008 interim financial reporting, and the results of Mercer's analysis and calculations to determine the

estimated historical adjustments to certain post-retirement benefit expenses for certain years, respectively.

The PIF Valuations, Accounting Valuations, Accounting Cost Reports, 2005 Valuation and Mercer Letters are attached as Appendices "SS" to "III".

80.    To assist in a review of the above valuations, a summary including certain notes to the valuations is attached as Appendix "JJJ".

**Funding and Administration**

81.    Nortel's general funding practices are described in the HWT financial statements and the 2005 Mercer Valuation. Though certain benefit plans were funded on a pay-as-you-go-basis, an exception to this funding practise occurred from May 2005 until April 2006 when Nortel was contemplating the termination of the HWT. The pay-as-you-go amounts were paid from the HWT and no corresponding contributions were made by Nortel. Once Nortel decided to keep the HWT in place, it made catch up payments through extra contributions in subsequent years in the amount of one month each year.

82.    The Monitor also located a policy manual in respect of the HWT, which appears to be the first policy manual. A copy of this manual is attached as "KKK". The funding policy in respect of the HWT is set out at page 32 of this manual; however, Nortel's funding policies changed over time. The Company has advised the Monitor there is not a current policy manual.

83.    In general:

    (a)    contributions to the HWT (including employee contributions in respect of Optional Life) have been made to the Trustee and the Trustee has held all contributions in a single fund, as required by Article I, section 6 of the Trust Agreement;

078

- 26 -

    (b)    the Trustee has made payments out of the HWT upon receipt of directions from Nortel in accordance with Article II, section 3 of the Trust Agreement;

    (c)    there was only one trust account established for the HWT; and

    (d)    one investment account and one bank account in respect of the HWT have been maintained with all contributions to the HWT co-mingled in such accounts.

## Available Cash

84.    The cash and investments of the HWT were reported to be approximately $80.0 million as at December 31, 2009 in the 2009 HWT financial statements. At that time, the majority of investments held by the HWT were of a long term nature, which potentially subjected their value at any point to significant volatility.

85.    As a result of this volatility and in anticipation of the distribution of the corpus of the HWT, Nortel determined a more appropriate asset mix would include holding of investments with a shorter average duration. Accordingly, during May 2010 Nortel directed the disposal of the long term bonds and their replacement with a portfolio of short term interest-bearing government issued instruments.

86.    The value of investments held at June 30, 2010 is approximately $77.2 million, comprised of $4.1 million of cash and $73.2 million of short term investments.

87.    According to Nortel's financial statements for the quarter ended June 30, 2010, Nortel's restricted cash includes, in part, US$72.0 million as of June 30, 2010 related to assets held in the HWT and restricted as to their use in operations by Nortel. The difference between the value of cash and investments as at June 30, 2010 reported in paragraph 86 and the amount disclosed in the Nortel June 30, 2010 financial statements primarily relates to foreign exchange.

88. For purposes of the illustrative scenarios discussed in Section VIII b elow, the cash balance available for distribution at December 31, 2010 is $80 million, including Pensioner Life premiums for 2010 of $7.8 million, which will be treated as a charge against any distribution in respect of Pensioner Life. The actual amount of cash available as at the date of termination of the HWT is subject to adjustment for factors which include:

    (a)    investment returns;

    (b)    treatment of stale-dated cheques;

    (c)    the actual amount of Pensioner Life premiums paid during 2010;

    (d)    the treatment of costs related to expenses incurred prior to the termination of the HWT but not submitted by February 28, 2010 and therefore not paid by Nortel pursuant to the Settlement Agreement;

    (e)    taxes and administrative costs; and

    (f)    any fees paid from HWT assets pursuant to the Settlement Agreement with respect to any dispute or litigation regarding the HWT.

## VII.   MERCER 2010 PRELIMINARY HWT VALUATION

89. Attached as Appendix "C" is a report of Mercer dated August 27, 2010 (the "**Mercer 2010 HWT Preliminary Valuation**"), providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when it is expected that the HWT will be terminated and such plans will be discontinued.

90. The Mercer 2010 HWT Preliminary Valuation was prepared solely for the purpose of providing a preliminary valuation of the non-pension post retirement benefit plans and post employment benefit plans to assist with the analysis of the Proposed Allocation

Methodology and is the basis for distribution of the HWT corpus.  As mentioned previously, the Applicants have not yet initiated a compensation claims process relating to, among other things, employee benefit claims.  The Monitor anticipates that Mercer will prepare a separate valuation report for the purposes of the compensation claims process.  The Mercer 2010 HWT Preliminary Valuation has not been prepared for and is not to be used for the purpose of determining the value, if any, of non-pension post retirement and post employment benefits for submission in a compensation claims process.  Accordingly the assumptions used, the valuation date, the beneficiary data and the resulting values in the Mercer 2010 HWT Preliminary Valuation may differ materially from those relevant to a compensation claims process.

91.    In addition, the Mercer 2010 HWT Preliminary Valuation does not address those beneficiaries that have a right to the HWT corpus but only the valuation associated with each benefit.

92.    No amount has been included in the valuation for individuals who were employees of Nortel prior to being transferred as part of a pre-filing divestiture transaction.  It has not been determined at this time whether these individuals have a claim against Nortel or the HWT in respect of certain benefits.  If they have a claim against the HWT, under the Proposed Allocation Methodology this would result in an aggregate distribution from the HWT of approximately $2.0 million to these individuals.

93.    In addition, no amount has been included in the valuation for LTD Optional Life Benefit as there is insufficient data at this time to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life.  In the 2005 Valuation, Mercer estimated that the present value of the LTD Optional Life as at September 30, 2005 was

$3.0 million relative to a present value of LTD Life and LTD M&D of approximately $28.8 million in the aggregate. As set out in the Mercer 2010 HWT Preliminary Valuation, the present value of LTD Life and LTD M&D as at December 31, 2010 aggregates approximately $27.0 million. For reference purposes, if the present value of the LTD Optional Life Benefit as at December 31, 2010 were $3.0 million, under the Proposed Allocation Methodology this would result in an aggregate distribution from the HWT of approximately $1.0 million to individuals participating in the LTD Optional Life Benefit. The Applicants and the Monitor will continue to work with Mercer to provide sufficient data to determine the present value of the LTD Optional Life Benefit as at December 31, 2010.

94.    Mercer has used the most recent data available. The actuarial assumptions do not attempt to reflect individuals' specific historical health experience or current health circumstances, as that may not be predictive of their future health experience. Faced with the uncertainty of future events and the conflict inherent in each beneficiary seeking to maximize his or her recovery by obtaining the highest possible valuation, the Monitor believes the use of actuarial assumptions is a reasonable and equitable approach to the required valuation.

95.    The data and assumptions on which the Mercer 2010 HWT Preliminary Valuation is based are set out in Sections 3 and 4 of the Valuation.

## VIII.  PROPOSED ALLOCATION METHODOLOGY

### Illustrative Scenarios

96.    It was apparent that a number of outcomes relating to an allocation of the HWT corpus is possible given, among other things: (a) ambiguities within the Trust Agreement; and (b)

- 30 -

the evolution of Nortel's practices, business, benefits and record keeping over the 30 years of the HWT's existence. In working with counsel, the Monitor has considered a number of potential interpretations of the Trust Agreement, and specifically the provisions dealing with the termination of the HWT, and has also taken into account other relevant documents and the manner in which the HWT was historically administered. The interpretations and issues related thereto included the following:

(a)     whether the HWT constitutes one trust or several trusts;

(b)     who is entitled to the assets in the reserve account on the HWT financial statements referred to as Group Life – Part II (optional life insurance);

(c)     which benefits should participate on a termination of the HWT; and

(d)     how the corpus of the HWT should be shared among participating beneficiaries.

97.     As mentioned above, to assist this Honourable Court and the parties, counsel to the Monitor has prepared a memorandum of law considering the potential interpretations of the Trust Agreement and issues related thereto, a draft of which was provided to Representative Counsel and Independent Counsel. A copy of the memorandum of law is attached as Appendix "B".

98.     The Monitor has prepared charts indicating the financial results of various allocation scenarios resulting from interpretations counsel has identified. In order to provide a basis for comparison, the resulting allocations are described using both a distribution percentage, where applicable (namely, the percentage of the present value of a particular benefit that is represented by the aggregate distribution amount for that benefit), and the aggregate distribution amount in dollars. The resulting allocations are expressed as an aggregate amount for each benefit type under the HWT and therefore relate to an

aggregate group of individuals participating in those benefits, not to individual beneficiaries.   The illustrative scenarios use the following categories of benefits in accordance with the Mercer 2010 HWT Preliminary Valuation, except that they include an Optional Life category and an LTD Optional Life Benefit category and subdivide STBs into those in pay and those accrued but not in pay:

(a)     Pensioner Life (including ADB);

(b)     Pensioner M&D;

(c)     LTD Income (including IBNR[5]);

(d)     LTD M&D;

(e)     LTD – STB accrued;

(f)     LTD Life;

(g)     LTD Optional Life Benefit;

(h)     SIB;

(i)     STB – in pay;

(j)     STB – accrued; and

(k)     Optional Life,

(collectively, the "**Potential Participating Benefits**").

---

[5] "Incurred but not reported".  As set out in the Mercer 2010 HWT Preliminary Valuation, there are 6 individuals whose status as LTD Beneficiaries as at December 31, 2010 cannot be known for certain at this time.

99.    Schedules prepared under the various scenarios are attached as Appendix "D" and

describe in more detail below[6]:

(a)    **Appendix D-1** – Optional Life is not a participating benefit, the surplus associated with Optional Life forms part of the assets available for allocation to other assets and:

(i)    **Column 1** – The HWT is to be treated as one trust. On termination, all Potential Participating Benefits except Optional Life share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits).

(ii)    **Column 2** – This scenario reflects the Proposed Allocation Methodology. The HWT is to be treated as one trust. On termination, certain of the Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits. A determination of which Potential Participating Benefits share *pro rata* in this scenario was based on an analysis of the beneficiaries with claims that have been or would certainly be made with no contingency except timing.

Claims that have been or would certainly be made are claims of:

A.    Pensioners (including those active employees who will vest by the valuation date and LTD Beneficiaries) for Pensioner Life;

---

[6] Under all applicable scenarios, it is assumed the Pensioner Life premiums paid from the HWT during 2010 are to be treated as a reduction only to the allocation otherwise made to Pensioner Life. The reason for this treatment is that the only beneficiaries of this allocation are those with a claim for Pensioner Life. In the scenarios set out in Columns 3, 7, 11 and 14, there is no allocation to Pensioner Life and, accordingly, the participating benefits in these scenarios bear the approximately $7.8 million in Pensioner Life premiums *pro rata*. The estimated assets upon which the allocation under all scenarios is based are the cash and investments set out in the HWT financial statements as at December 31, 2009 since, except for the reduction in assets due to the payment of Pensioner Life premiums from the HWT, the December 31, 2009 cash and investments will be similar to the December 31, 2010 cash and investments. To the extent the actual December 31, 2010 asset base differs from the December 31, 2009 asset base (other than for Pensioner Life premiums paid in 2010), that difference would apply equally to each benefit.

In addition, these illustrative scenarios include a line item for LTD Optional Life Benefit; however, amounts are not inserted as insufficient data is available at this time. As set out in paragraph 93 above, for reference purposes, if the present value of the LTD Optional Life Benefit as at December 31, 2010 were $3 million (as estimated in the 2005 Valuation as at September 30, 2005), it would result in an aggregate distribution from the HWT of approximately $1.0 million to the participants in the LTD Optional Life Benefit. Further, these illustrative scenarios do not include an amount relating to individuals who were employees of Nortel prior to being transferred as part of a pre-filing divestiture transaction. As set out in paragraph 92, if these individuals are determined to have a claim against the HWT, under the Proposed Allocation Methodology, this would result in an aggregate distribution from the HWT of approximately $2.0 million to these individuals.

- 33 -

    B.      LTD Beneficiaries for LTD Income and LTD Life;

    C.      LTD Beneficiaries participating under Optional Life for LTD Optional Life Benefit;

    D.      STB Beneficiaries currently in pay for STBs; and

    E.      SIB Beneficiaries currently in pay for SIBs.

(iii)    **Column 3** – The HWT is to be treated as one trust.  On termination, certain of the Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits).  A determination of which Potential Participating Benefits share *pro rata* in this scenario was based on an analysis of the beneficiaries currently in pay who have claims for benefits in pay.

Claims for benefits in pay are claims of:

    A.      LTD Beneficiaries for LTD Income;

    B.      STB Beneficiaries currently in pay for STBs; and

    C.      SIB Beneficiaries currently in pay for SIBs;

(iv)    **Column 4** – The HWT is to be treated as separate trusts.  Plans with reserved assets (the "**Reserved Asset Plans**") are each treated as a separate trust.  On termination, the beneficiaries of each Reserved Asset Plan share pro rata in the assets reserved in respect of that plan.  The estimated assets available at December 31, 2010 are allocated to the reserves proportionate to the values included in the HWT financial statements as at December 31, 2009.

(b)    **Appendix D-2** – Optional Life is a participating benefit with resulting allocations shown in Columns 5 to 8 on the same basis as indicated with respect to Columns 1 to 4 (except that a claim for Optional Life is included as a claim that has been or would certainly be made or a claim for benefits in pay).

(c)    **Appendix D-3** – STB is not a participating benefit and Optional Life is a participating benefit, with allocations shown in Columns 9 to 11 on the same basis as indicated with respect to Columns 1 to 3 (except that a claim for STBs is not included as a claim that has been or would certainly be made or a claim for benefits in pay and a claim for Optional Life is included as a claim that has been or would certainly be made or a claim for benefits in pay); however, as there are

no reserved assets for STBs, the allocation using the reserved asset method set out in Appendix D-1 is applicable and is not reproduced in Appendix D-3.

(d)   **Appendix D-4** – STB is a participating benefit and Optional Life is not a participating benefit, with allocations shown in Columns 12 to 14 on the same basis as indicated with respect to Columns 1 to 3; however, as there are no reserved assets for STBs, the allocation using the reserved asset method set out in Appendix D-2 is applicable and is not reproduced in Appendix D-4.

100.   The scenarios are illustrative examples only to assist this Honourable Court and the interested parties in considering the Proposed Allocation Methodology. The actual dollar amount available may differ from the illustrative scenarios. There is also the potential for an adjustment to an allocation relating only to a particular benefit, thereby reducing the *pro rata* share relating to that particular benefit, for example, were this Honourable Court to award costs against a distribution otherwise available for a particular benefit.

**Proposed Allocation Methodology**

101.   The Proposed Allocation Methodology (illustrated in Appendix D-1, Column 2) is as follows:

(a)   the HWT is to be treated as one trust;

(b)   on termination, the following Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits):

(i)    Pensioner Life;

(ii)   LTD Income;

(iii)  LTD Life;

(iv)   LTD Optional Life Benefit;

(v)    STBs – in pay; and

L    087

- 35 -

    (vi)    SIBs – in pay;

(collectively, the "**Proposed Participating Benefits**");

(c)    the following beneficiaries will receive distributions from the Proposed Participating Benefits' *pro rata* share of the HWT corpus:

    (i)    Pensioners (including those active employees who will vest by the valuation date and LTD Beneficiaries) for Pensioner Life;

    (ii)    LTD Beneficiaries for LTD Income and LTD Life;

    (iii)    LTD Beneficiaries participating under Optional Life for LTD Optional Life Benefit;

    (iv)    STB Beneficiaries currently in pay for STBs; and

    (v)    SIB Beneficiaries currently in pay for SIBs;

(collectively, the "**Proposed Participating Beneficiaries**");

(d)    the amount of the distribution to each Proposed Participating Beneficiary from the Proposed Participating Benefits' *pro rata* share of the HWT corpus will be calculated pursuant to the assumptions in the Mercer 2010 HWT Preliminary Valuation, with data as of December 31, 2010, and the Pensioner Life premiums paid from the HWT during 2010 will be treated as a reduction only to the allocation otherwise made to Pensioner Life;

(e)    the present value of the Proposed Participating Benefits will be calculated pursuant to the assumptions in the Mercer 2010 HWT Preliminary Valuation, with data as of December 31, 2010; and

(f)    there will be no payment from the HWT on account of any conversion privilege, if any, relating to the Pensioner Life or Optional Life that is exercised by any holder of such right.

102.    The Monitor recognizes the hardship felt by the beneficiaries of the HWT as a result of Nortel's insolvency and the deficit in the HWT. The Monitor believes the Proposed Allocation Methodology reasonably and equitably addresses this hardship as far as available funds of the HWT allow and in the most economical and practical manner available, by balancing the interests of the beneficiaries of the HWT in the circumstances,

- 36 -

and, as discussed with counsel, is consistent with the most reasonable interpretation of the Trust Agreement.

## Independent Legal Counsel

103.    Analysis of the HWT reveals there could be a multitude of potential differing interests among the beneficiaries. Each individual seeks to maximize his/her recovery from the HWT assets. Since the assets are insufficient to pay all claims, each has an interest in minimizing the claims of others. Through their Court-appointed representative counsel, Employee Representatives informed the Monitor that, as a result of the potential for conflicts arising from the different interpretations of the Trust Agreement, they would retain independent counsel to provide advice concerning the HWT and sought funding from the Applicants for this purpose. The Applicants and the Monitor agreed to: (a) the retention of independent legal counsel to consider the Proposed Allocation Methodology and provide the Employee Representatives with legal advice thereon; and (b) the Applicants providing funding for the retention of independent legal advice, subject to a fee cap.

104.    In June 2010, the LTD Beneficiaries' Representative retained Sack Goldblatt Mitchell LLP ("Sack") to represent the interests of her constituents in the HWT. In July 2010, the Former Employees' Representatives retained Lerners LLP ("Lerners") to represent the interests of their constituents in the HWT (Lerners and Sack together are referred to as "Independent Counsel"). CAW Counsel also ensured that the Pensioners and STB Beneficiaries they represent were advised by the same independent counsel as the Former Employees' Representatives. As it became evident that Independent Counsel would be required to attend this motion, the Applicants and Monitor agreed to increase the fee cap

to $85,000 for each firm, with an additional $7,500 available for Sack to retain an actuarial advisor. As part of the relief requested on the within motion, the Monitor is seeking that, for certainty, this Honourable Court approve the retention of Independent Counsel.

105. Independent Counsel signed confidentiality agreements in June 2010 and were then provided with access to documents, financial and actuarial information and other analysis related to the HWT. Attached hereto as Appendix "LLL" is a list of the documents provided to each Independent Counsel. The Monitor has confirmed that the same information has been provided to each Independent Counsel. The Monitor provided Continuing Employees' Representative Counsel with the same information and engaged in discussions with such counsel. All of the documents provided to Independent Counsel are attached as Appendices to this Fifty-First Report except for certain documents subject to confidentiality restrictions with third parties or portions of certain documents that have been redacted for privacy purposes.

106. Since June 2010, there have been many in person meetings and telephone discussions concerning the HWT among various combinations of the Monitor, the Applicants, Mercer, Former Employees' Representatives, Former Employees' Representative Counsel, certain members of the NRPC, CAW Counsel, Lerners, LTD Beneficiaries' Representative, LTD Beneficiaries' Representative Counsel, Segal, certain members of the CNELTD and Sack.

107. At the meetings and calls in which the Monitor participated, the Monitor discussed the Proposed Allocation Methodology, and the Monitor's process in developing and

- 38 -

presenting the scenarios provided above. The Monitor and its advisors have remained available for discussion and continue to respond to information requests.

108.    Independent Counsel are considering the Proposed Allocation Methodology and will advise the Court of their position prior to the return of the within motion.

109.    As mentioned above, there could be a multitude of potential differing interests among the beneficiaries. The Monitor is of the view that with the retention of Independent Counsel, the interests of the beneficiaries are appropriately represented and that retaining yet further counsel is not required and would not assist with the fair, practical and timely resolution of the issues at hand. There are already four sets of counsel appearing on this motion: two Independent Counsel, Continuing Employees' Representative Counsel and CAW counsel. The Monitor has been advised by Koskie Minsky LLP that it will not appear on this motion. A copy of a letter from Koskie Minsky LLP dated August 26, 2010 to the Monitor and the Service List is attached as Appendix "MMM".

110.    Each individual beneficiary may be a participant in multiple benefit plans or may only participate in a single benefit plan. For example, some LTD Beneficiaries do not or will not receive LTD Income because they receive or will receive income or income benefits from another source. Furthermore, the specific interests of individual participants in any one benefit may differ from those of another participant because of individual employment history or particular circumstances. Therefore, interests may differ between members in the same general group and interests may differ between participants in the same benefit plan. The Monitor has also considered the impracticality of hearing representations from thousands of individuals, including the timing and the costs of any attempt to do so.

L   091

111.    The Monitor is aware that a motion record has been served by Arlene Borenstein (Plante) on behalf of a group of dissident LTD Beneficiaries (the **"Dissident Beneficiaries"**). The motion seeks, among other things, the appointment of Rochon Genova LLP as counsel for the LTD Beneficiaries at Nortel's expense and the replacement of the LTD Beneficiaries' Representative.  Sack has already been retained as independent counsel for the LTD Beneficiaries as noted above.  The Monitor has corresponded with Rochon Genova LLP and advised it that the motion is unnecessary and the Dissident Beneficiaries may wish instead to make their submissions on the merits in response to the within motion.  The Monitor reserves the right to deliver material in reply should the Dissident Beneficiaries choose to deliver material in response to this motion.  The Monitor notes the Dissident Beneficiaries have not opted out of the various representation orders and are already represented by LTD Beneficiaries' Representative Counsel in these proceedings.  Pursuant to the Settlement Agreement, the fees and disbursements of counsel are a cost to the HWT to the extent they are incurred in respect of disputes concerning entitlement to a distribution of the HWT corpus.

**Specific Process Matters**

112.    The Monitor will serve the within Motion Record and this Fifty-First Report on the Service List, including Independent Legal Counsel, and the Individual Parties not otherwise represented by counsel on the Service List.

113.    In addition, as discussed above, the Mercer 2010 HWT Preliminary Valuation was prepared on an aggregate basis to assist in an analysis of the effect of various scenarios, including the proposed allocation methodology, on the various benefits covered by the HWT and thereby on the aggregate group of individuals participating in those benefits.

( 092

- 40 -

The LTD Beneficiaries' Employee Representative advised the Monitor that it is very important for those she represents to have an estimate of the amount they would receive individually as a result of an allocation and requested that such estimates be provided to LTD Beneficiaries. The Monitor considered the request and agreed to provide such a statement to those individuals in receipt of income benefits, namely, all LTD Beneficiaries in receipt of LTD Income, STB Beneficiaries in receipt of STBs and SIB Beneficiaries in receipt of SIBs (a "**Beneficiary Estimated Allocation Statement**"). Accordingly, the Monitor instructed Mercer to prepare such statements for delivery to such individuals subsequent to service of this Fifty-First Report and the within Motion Record, with the proviso that the statements must clearly indicate, among other things, that they are estimates only and subject to change, including as a result of an allocation of the HWT corpus different from the Proposed Allocation Methodology.

114.    In preparing the Beneficiary Estimated Allocation Statements, Mercer will apply the same actuarial assumptions and data dates used to value the benefits on an aggregate basis to each LTD Beneficiary, STB Beneficiary and SIB Beneficiary and will also apply unique employee information to determine the individual amounts for LTD Income, SIBs and STBs as indicated in Section 5 of the Mercer 2010 HWT Preliminary Valuation. The LTD Beneficiaries' Employee Representative and its independent counsel, Sack, reviewed and approved the form of Beneficiary Estimated Allocation Statement. The Beneficiary Estimated Allocation Statement substantially in the form attached hereto as Appendix "NNN" will be available in both English and French.

115.    The Monitor was provided with the spreadsheet used to produce the individual statements. The Monitor compared that spreadsheet to information available from the

093

- 41 -

Company, including addresses and recipient information, and was satisfied that the spreadsheet was suitable for producing Beneficiary Estimated Allocation Statements.

116.   Each Beneficiary Estimated Allocation Statement will include the actuarial value (expressed as a dollar amount) of: (a) the LTD Income[7], SIB or STB the respective LTD Beneficiary, SIB Beneficiary or STB Beneficiary would be entitled to on a distribution based on the Proposed Allocation Methodology; and (b) if the recipient of such income benefits is also a recipient of LTD Life, the actuarial value (expressed as a dollar amount) of the LTD Life such individual would be entitled to on a distribution based on the Proposed Allocation Methodology. The Beneficiary Estimated Allocation Statement will also indicate that the dollar amounts set out therein reflect such individual's share of a distribution representing an estimated 34.5% of the present value of the Proposed Participating Benefits.

117.   The Beneficiary Estimated Allocation Statements clearly indicate they are illustrative only and subject to change for such things as:

(a)   changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

(b)   changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

(i)   a different allocation of the HWT corpus;

(ii)   the distributable assets being more or less than estimated;

(iii)   the resolution of contingencies;

---

[7] LTD Beneficiaries entitled to an income benefit will receive a Beneficiary Estimated Allocation Statement; however, certain LTD Beneficiaries with health and/or life insurance coverage may not receive an income benefit from Nortel because they receive income benefits from certain other sources.

(iv)    updating of data to December 31, 2010; and

(v)    the award of fees against any particular benefit type.

118.    It is not proposed that individual statements be provided to participants under Pensioner Life as the number of participants is very large (approximately 10,400) and the average claim value and distribution to such participants is much smaller on an individual basis than the average claim and distribution of a participant under LTD Income.

119.    The distribution amount for each participant under Pensioner Life will be calculated using the assumptions in the Mercer 2010 HWT Preliminary Valuation (including Section 5 thereof) based on data as of December 31, 2010.

**Operational Steps**

120.    Court approval of a proposed allocation methodology is one of a number of steps that must take place in order to implement a distribution of the HWT corpus. Many steps facilitating such allocation and distribution have already occurred, and many must still be implemented, particularly since the HWT continues to operate. Accordingly, many variables may still affect the assets available for distribution and the benefits in respect of which those assets will be distributed.

121.    To date, the Applicants and the Monitor have taken a number of steps to facilitate the allocation and distribution of the HWT corpus, including:

(a)    reducing the term of the investments held by the HWT;

(b)    establishing a new banking arrangement for payment of current employee health benefits;

(c)    requesting a tax ruling with respect to the taxability to recipients of funds to be distributed from the HWT;

- 43 -

(d)    instructing Mercer to prepare the Mercer 2010 HWT Preliminary Valuation and working with Mercer on such valuation;

(e)    analyzing the impact of various allocation scenarios;

(f)    amassing and organizing documents;

(g)    terminating the current LTD program for working employees;

(h)    investigating options with respect to life insurance; and

(i)    ongoing data review and reconciliation.

Settlement Representative Counsel and CAW Counsel were involved and consulted with respect to the tax ruling referred to in (c) above.

122.    A further step required to facilitate the allocation and ultimate distribution of the corpus of the HWT is Court approval of the provisions in the requested Order deeming December 31, 2010 as the date of notice of termination of the HWT for the purposes of the Trust Agreement and dispensing with Nortel sending a notice of termination to the Trustee. This will create synergy between the date of termination of benefits and the LTD Beneficiary termination date of December 31, 2010 pursuant to the Settlement Agreement, the valuation date in the Mercer 2010 HWT Preliminary Valuation and the expected date of termination of the HWT. Otherwise, a date at least sixty days prior to termination of the HWT would have to be used (depending on the date of written notice to the Trustee). A deemed notice of termination date of December 31, 2010 creates certainty and consistency and avoids confusion.

123.    With Court approval of an allocation methodology, including a deemed notice of termination date of December 31, 2010, the Monitor, the Applicants and the Trustee can look to distributing the HWT corpus.

096

## IX.   RECOMMENDATION

124.   The Monitor believes the Proposed Allocation Methodology represents the most equitable, reasonable and practical approach to the distribution of the HWT funds, balancing the interests of the beneficiaries in the circumstances, particularly given the following:

(a)   the Trust Agreement does not provide clear guidance on the issue of who is entitled to participate in a distribution on termination of the HWT and there are a number of interpretations and possible outcomes;

(b)   based on its counsel's legal analysis, the Proposed Allocation Methodology is consistent with the most reasonable interpretation of the Trust Agreement;

(c)   in general, the Proposed Allocation Methodology is consistent with the manner in which the HWT has been administered; and

(d)   the resolution of HWT allocation and distribution matters is a necessary step to completion of the Applicants' claims process, development of a CCAA plan and administration of the Applicants' estates.

125.   The Monitor believes the retention of Independent Counsel by the respective Employee Representatives will facilitate the fair, timely and practical resolution of the within motion and recommends the approval of their retention.

126.   Accordingly, the Monitor requests that this Honourable Court grant the Order in the form submitted.

- 45 -

097

All of which is respectfully submitted this 27th day of August, 2010.

ERNST & YOUNG INC.
In its capacity as Monitor of the Applicants

Per:
Murray A. McDonald
President

\5879303

# APPENDIX "C"

C - 098

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

SUPPLEMENT TO FIFTY-FIRST REPORT OF THE MONITOR
DATED SEPTEMBER 17, 2010

PURPOSE

1.      This supplement to the Fifty-First Report of the Monitor ("**Supplemental Fifty-First
Report**") is provided in reference to the Monitor's Fifty-First Report dated August 27,
2010 (the "**Fifty-First Report**").  The purpose of this Supplemental Fifty-First Report is
to provide this Honourable Court with:

(a)     information on the LTD Optional Life Benefit, in respect of which there was
insufficient data at the date of the Fifty-First Report; and

(b)     an update on specific process matters relating to the Monitor's motion for
approval of the Proposed Allocation Methodology (the "**Proposed Allocation
Methodology Approval Motion**"), including information on certain inquiries
received.

- 2 -                                                    099

TERMS OF REFERENCE

2.     In preparing this Supplemental Fifty-First Report, the Monitor has relied upon unaudited

       financial information, the Company's books and records, financial information prepared

       by the Company and discussions with management of Nortel.   The Monitor has not

       audited, reviewed or otherwise attempted to verify the accuracy or completeness of the

       information and accordingly, expresses no opinion or other form of assurance on the

       information contained in this Supplemental Fifty-First Report.   Unless otherwise stated,

       all monetary amounts contained herein are expressed in Canadian dollars.

3.     Capitalized terms used in this Supplemental Fifty-First Report (including in the preceding

       paragraphs) are as defined herein or in the Fifty-First Report.

GENERAL BACKGROUND

4.     The Fifty-First Report was filed in support of the Monitor's motion for approval of a

       proposed allocation methodology (the "Proposed Allocation Methodology") for the

       allocation of funds held in the Applicants' Health and Welfare Trust (the "HWT") and

       such ancillary relief as is just and convenient to terminate the HWT and implement the

       Proposed Allocation Methodology to distribute the funds held in the HWT to the

       beneficiaries who are entitled thereto.

5.     The Fifty-First Report provided this Honourable Court with information about the HWT

       relevant to its termination and more specifically to the allocation and distribution of its

       corpus.  This information included the Mercer 2010 Preliminary HWT Valuation, which

       provided a preliminary valuation of certain non-pension post retirement benefit plans and

ᴗ. **100**

post employment benefit plans, estimated as at December 31, 2010.  As indicated in paragraph 93 of the Fifty-First Report, no amount was included in the valuation for the LTD Optional Life Benefit as there was insufficient data at the date of the Fifty-First Report to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life.

6.    The Fifty-First Report also provided this Honourable Court with information on the process that has been followed by the Applicants and the Monitor leading up to the within motion.

## LTD OPTIONAL LIFE BENEFIT

7.    As set out in paragraph 54 of the Fifty-First Report, the premium for Optional Life is waived while an individual is on LTD benefits (the "**LTD Optional Life Benefit**"). Since the date of the Fifty-First Report, Nortel has provided the Monitor and Mercer with the data to enable Mercer to determine the present value of the LTD Optional Life Benefit based on the assumptions set out in the Mercer 2010 HWT Preliminary Valuation.

8.    The information provided by Nortel and Mercer, as applicable, regarding the LTD Optional Life Benefit is as follows:

    (a)    there are 273 individuals receiving LTD benefits who participate under Optional Life[1] (collectively, the "**LTD Optional Life Participants**"); and

---

[1] Of the LTD Optional Life Participants, 171 are non-union and 102 are unionized.

(b)    as indicated in the addendum to the Mercer 2010 HWT Preliminary Valuation dated September 16, 2010 attached hereto as Appendix "A" (the "2010 Mercer Addendum") and based on the assumptions referred to therein, the estimated present value of the LTD Optional Life Benefit is $5.3 million (including $0.1 million of LTD – IBNR claims relating to the LTD Optional Life Benefit[2]).

9.    The Monitor has revised the illustrative scenarios attached as Appendix "D" to the Fifty-First Report to include the present value of the LTD Optional Life Benefit, which revised illustrative scenarios are attached as Appendix "B" hereto.  As set out in revised Appendix D-1, Column 2, under the Proposed Allocation Methodology, the present value of the LTD Optional Life Benefit of approximately $5.3 million will result in:

(a)    an aggregate distribution from the HWT of approximately $1.8 million to individuals participating in the LTD Optional Life Benefit; and

(b)    a revised distribution percentage (namely, the percentage of the present value of a particular benefit that is represented by the aggregate distribution amount for that benefit) of 33.8%[3].

10.    All qualifications set out in the Fifty-First Report, including those relating to the Mercer 2010 Preliminary HWT Valuation and the illustrative scenarios, continue to apply to the

---

[2] Incurred but not reported.  As set out in the Mercer 2010 HWT Preliminary Valuation, there are 6 individuals whose status as LTD Beneficiaries as at December 31, 2010 cannot be known for certain at this time.  4 of these 6 individuals participated in Optional Life resulting in an increase of the LTD – IBNR amount from $2.6 million set out in the Mercer 2010 Preliminary HWT Valuation to $2.7 million set out in the 2010 Mercer Addendum.

[3] When no amount was included in the valuation for the LTD Optional Life Benefit as a result of insufficient data, the distribution percentage was 34.5%.

- 5 -

ṵ  102

information provided in, or attached as Appendices to, this Supplemental Fifty-First Report.

UPDATE ON SPECIFIC PROCESS MATTERS

Update on Inquiries Received

11.    The Monitor has received inquiries relating to the Proposed Allocation Methodology Approval Motion and is responding to these inquiries on a timely basis. One of these inquiries asked for an explanation of the reduction of the $37 million due from sponsoring company amount set out on the 2008 HWT financial statements to $1.358 million in the 2009 HWT financial statements.

12.    As reported in the Thirty-Ninth Report of the Monitor dated February 18, 2010, the $37 million Amount Due from Sponsoring Company set out on the 2008 HWT financial statements represents amounts due by the Applicants primarily related to benefit payments made to beneficiaries of the HWT prior to the Filing Date.

13.    During 2009, Nortel made payments to the HWT for pay-as-you-go benefits using a payment schedule based on prior period benefit activity. Payments to the HWT during 2009 exceeded benefits paid through the HWT during 2009 for a number of reasons, including headcount reductions that occurred during 2009, and this contributed to the reduction in the Amount Due from Sponsoring Company from approximately $37 million to approximately $28 million.

- 6 -                                                           ·· **103**

14.    As noted in the 2009 HWT financial statements[4], as a result of the commencement of Nortel's creditor protection proceedings, a reserve of approximately $27 million was recorded with respect to the Due from Sponsoring Company balance.

Update on Notice Matters

15.    In addition to serving the Service List and the individual parties listed on the Notice of Motion:

(a)    the Monitor posted on its website:

(i)    on August 30, 2010, the Motion Record (in English) relating to the Proposed Allocation Methodology Approval Motion; and

(ii)    commencing September 7, 2010 to September 10, 2010, French translations of Appendix "D" – Illustrative Scenarios, the draft HWT Allocation Order and the form of Beneficiary Estimated Allocation Statement; and

(b)    on September 10, 2010, the Monitor placed an English version of a notice in the form attached as Appendix "C" hereto in the Toronto Star, The Globe and Mail (National Edition), the Ottawa Citizen, the London Free Press, the Montreal Gazette, the Calgary Herald, the Halifax Chronicle Herald, the Kingston Whig Standard, the Vancouver Sun and the Belleville Intelligencer and a French translation of the notice in La Presse and La Droit.

---

[4] See note 4 to the 2009 HWT financial statements.

- 7 -

Ｃ  104

16.    Further, as described in the Fifty-First Report, the Monitor, with the assistance of Mercer, agreed to provide statements to individuals in receipt of income benefits (a "Beneficiary Estimated Allocation Statement") setting out the estimated actuarial value (expressed as a dollar amount) of:

    (a)    the LTD Income[5], SIB or STB the respective LTD Beneficiary, SIB Beneficiary or STB Beneficiary would be entitled to on a distribution based on the Proposed Allocation Methodology; and

    (b)    the LTD Life such individual would be entitled to on a distribution (if the recipient of such income benefits is also a recipient of LTD Life), based on the Proposed Allocation Methodology.

17.    Following service of the Fifty-First Report, Mercer prepared the Beneficiary Estimated Allocation Statements in the manner and using the methodology described in the Fifty-First Report and the Mercer 2010 Preliminary HWT Valuation. Substantially the form of the Beneficiary Estimated Allocation Statement was attached as Appendix "NNN" to the Fifty-First Report.

18.    On September 3, 2010, Mercer mailed the Beneficiary Estimated Allocation Statements to individuals in receipt of income benefits, namely, LTD Beneficiaries, STB Beneficiaries and SIB Beneficiaries,

---

[5] LTD Beneficiaries entitled to an income benefit will receive a Beneficiary Estimated Allocation Statement; however, certain LTD Beneficiaries with health and/or life insurance coverage may not receive an income benefit from Nortel because they receive income benefits from certain other sources.

19.    Following receipt of the information from Nortel on the LTD Optional Life Benefit enabling Mercer to determine the present value of the LTD Optional Life Benefit, Mercer prepared revised Beneficiary Estimated Allocation Statements for the LTD Optional Life Participants.    The revised Beneficiary Estimated Allocation Statements for the LTD Optional Life Participants:

   (a)    included a line item reflecting the estimated actuarial value of the LTD Optional Life Benefit such individual would be entitled to on a distribution based on the Proposed Allocation Methodology; and

   (b)    reflected an adjusted estimated actuarial value of LTD Income and LTD Life, if applicable, such individual would be entitled to on a distribution based on the Proposed Allocation Methodology and the revised distribution percentage of 33.8% (since there is now sufficient data to determine the estimated present value of the LTD Optional Life Benefit).

20.    Mercer has advised the Monitor that it anticipates sending the revised Beneficiary Estimated Allocation Statements to LTD Optional Life Participants on or about September 20, 2010.  Revised Beneficiary Estimated Allocation Statements will not be sent to any other individuals in receipt of income benefits.  The Beneficiary Estimated Allocation Statements clearly indicated that the amounts set out therein were estimates only and subject to change depending on several factors.  Accordingly, it was determined that the slight change in the distribution percentage from 34.5% to 33.8% as a result of the estimated present value of the LTD Optional Life Benefit did not merit the significant time and expense associated with preparing and delivering revised Beneficiary Estimated.

- 9 -                                            -0    106

Allocation Statements to those individuals not participating in the LTD Optional Life

Benefit.

All of which is respectfully submitted this 17th day of September, 2010.

ERNST & YOUNG INC.
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

\5885743

107

# APPENDIX "A"
# TO SUPPLEMENT TO FIFTY-FIRST REPORT

APPENDIX A – ADDENDUM TO MERCER 2010 PRELIMINARY HWT VALUATION

# MERCER

C   109

MARSH  MERCER  KROLL
GUY CARPENTER   OLIVER WYMAN

## Addendum

16 September 2010

To Nortel Networks Limited ("Nortel" or the "Company") and Ernst & Young Inc. (the "Monitor").

In accordance with your request, and further to our report titled *Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010*, dated August 27, 2010, the purpose of this addendum is to provide updated pages of the August 27, 2010 report to reflect the estimated liabilities for the Optional Employee Life Insurance benefit for disabled members. This addendum should be read in combination with the August 27, 2010 report which contains the details on the methods and assumptions used for all calculations, as well as the necessary certifications.

Each non-union employee can elect Optional Employee Life Insurance amounts ranging from a minimum of 1 to a maximum of 5 times their annual earnings. Each union employee can elect Optional Employee Life Insurance which is a flat amount that varies depending on the option level selected. The Optional Employee Life Insurance benefit is employee paid. While the employee is disabled, the employee-paid premiums are waived.

Optional Employee Life Insurance amounts for the LTD members was provided as at June 30, 2010 and projected to December 31, 2010 and used for the LTD – Optional Life plans.

The updated Valuation Results (page 5) and Membership Data (pages 10, 12, and 13) from the August 27, 2010 report are attached, as well as a new Employer Certification (page 35) reflecting the Optional Employee Life Insurance data provided subsequent to the August 27, 2010 report.

k:\nortel\opeb\year2010\correspondence\addendum - sep 16 10.doc

Mercer (Canada) Limited

Consulting. Outsourcing. Investments.

Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010

Nortel Networks Limited (September 16, 2010)

<div style="border:1px solid black; display:inline-block; padding:40px;">

**2**

</div>

## Valuation Results

The following table presents a summary of the estimated liabilities from our valuation as at December 31, 2010 (in millions Canadian dollars).

| Plans | Actives | LTD | Pensioners/ Beneficiaries | Total | Percent |
|---|---|---|---|---|---|
| PRB - M&D | $1.0 | $5.2 | $250.3 | $256.5 | 46.8% |
| PRB – Life | 1.0 | 2.0 | 124.9 | 127.9 | 23.3% |
| PRB – ADB | | | 1.0 | 1.0 | 0.2% |
| PRB – Total | $2.0 | $7.2 | $376.2 | $385.4 | 70.3% |
| | | | | | |
| LTD – Income | | $77.3 | | $77.3 | 14.1% |
| LTD – IBNR | | 2.7 | | 2.7 | 0.5% |
| LTD – M&D | | 24.5 | | 24.5 | 4.5% |
| LTD – Life | | 2.5 | | 2.5 | 0.4% |
| LTD – Optional Life | | 5.2 | | 5.2 | 0.9% |
| LTD – STB – accrual | | 0.3 | | 0.3 | 0.1% |
| LTD – Total | $0.0 | $112.5 | $0.0 | $112.5 | 20.5% |
| | | | | | |
| SIB | | | $16.2 | $16.2 | 3.0% |
| STB – in receipt | | | 4.1 | 4.1 | 0.7% |
| STB – accrual | | | 30.0 | 30.0 | 5.5% |
| SIB/STB – Total | $0.0 | $0.0 | $50.3 | $50.3 | 9.2% |
| | | | | | |
| Grand Total | $2.0 | $119.7 | $426.5 | $548.2 | 100.0% |

0   111

Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010                    Nortel Networks Limited (September 16, 2010)

## Member Headcount

| Plans | Remaining Active | LTD | Pensioners/ Beneficiaries | Total |
|---|---|---|---|---|
| PRB – M&D[1] | 165 | 355 | 10,660 | 11,180 |
| PRB -- Life | 165 | 355 | 9,941 | 10,461 |
| PRB – ADB | 0 | 0 | 77 | 77 |
| | | | | |
| LTD – Income | 0 | 351 | 0 | 351 |
| LTD – IBNR | 0 | 6 | 0 | 6 |
| LTD – M&D[2] | 0 | 360 | 0 | 360 |
| LTD – Life | 0 | 358 | 0 | 358 |
| LTD -- Optional Life | 0 | 273 | 0 | 273 |
| LTD -- STB – accrual | 0 | 101 | 0 | 101 |
| | | | | |
| SIB | 0 | 0 | 81 | 81 |
| STB – in receipt | 0 | 0 | 305 | 305 |
| STB – accrual | 0 | 0 | 2,873 | 2,873 |

---

[1]    There are also 6,251 spouses of pensioners covered for benefits.

[2]    There are also 158 spouses and 160 children covered for benefits (85 members with children).

Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010

Nortel Networks Limited (September 16, 2010)

| | Non-Union | Union | Total |
|---|---|---|---|
| **LTD Members projected to 31.12.10[3]** | | | |
| Number with Income Benefits[4] | 225 | 126 | 351 |
| • Average age (years) | 54.5 | 58.3 | 55.8 |
| • Average duration on claim | 12.2 | 17.6 | 14.2 |
| • Average monthly benefit | $3,018 | $1,651 | $2,527 |
| Number with Medical/Dental | 232 | 128 | 360 |
| • Average age (years) | 54.4 | 58.2 | 55.8 |
| • Average duration on claim | 12.3 | 17.6 | 14.2 |
| Number with Basic Life Insurance | 232 | 126 | 358 |
| • Average age (years) | 54.4 | 59.2 | 56.1 |
| • Average duration on claim | 12.3 | 17.9 | 14.2 |
| • Average life insurance benefit | $65,305 | $33,536 | $54,124 |
| Number with Optional Life Insurance | 171 | 102 | 273 |
| • Average age (years) | 54.1 | 56.9 | 55.1 |
| • Average duration on claim | 12.6 | 17.6 | 14.5 |
| • Average optional life insurance benefit | $189,041 | $64,711 | $142,588 |
| Number with STB accrual | | 101 | 101 |
| • Average age (years) | | 57.0 | 57.0 |
| • Average monthly STB benefit | | $551 | $551 |
| | | | |
| **LTD – IBNR[5] Members projected to 31.12.10** | | | |
| Number with Income Benefits | 6 | | 6 |
| • Average age (years) | 50.2 | | 50.2 |
| • Average duration on claim | 1.7 | | 1.7 |
| • Average monthly benefit | $5,013 | | $5,013 |
| Number with Medical/Dental | 6 | | 6 |
| • Average age (years) | 50.2 | | 50.2 |
| • Average duration on claim | 1.7 | | 1.7 |
| Number with Basic Life Insurance | 6 | | 6 |
| • Average age (years) | 50.2 | | 50.2 |
| • Average duration on claim | 1.7 | | 1.7 |
| • Average life insurance benefit | $103,453 | | $103,453 |

---

[3]  3 Non-Union and 3 Union members from the data provided were excluded as they will reach age 65 before December 31, 2010.

[4]  6 Non-union and 2 Union members from the data provided have $0 net benefit as the Workers' Compensation benefits or other offsets have reduced the net benefit to $0.  One Non-Union member is from previous divestitures and Nortel is only responsible for their medical/dental and life insurance benefits.  All 9 of these records have been excluded from the LTD income benefit information.

[5]  There are 4 members on STD and 2 members with STD/LTD claims under appeal as at the date of this report.  We have included a liability estimate for these members assuming they are on open LTD claim as at December 31, 2010.

Mercer (Canada) Limited

113

Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010

Nortel Networks Limited (September 16, 2010)

| | Non-Union | Union | Total |
|---|---|---|---|
| Number with Optional Life Insurance | 4 | | 4 |
| • Average age (years) | 48.3 | | 48.3 |
| • Average duration on claim | 0.8 | | 0.8 |
| • Average optional life insurance benefit | $367,000 | | $367,000 |

**SIB/STB – Beneficiaries in receipt of SIB/STB projected to 31.12.10**

| | Non-Union | Union | Total |
|---|---|---|---|
| Number of STB | | 305 | 305 |
| • Average Age (years) | | 76.7 | 76.7 |
| • Average monthly STB benefit | | $535 | $535 |
| Number of SIB | 81 | | 81 |
| • Average Age (years) | 70.5 | | 70.5 |
| • Average monthly SIB benefit | $1,395 | | $1,395 |

**STB – Accruals for Future Beneficiaries projected to 31.12.10**

| | Non-Union | Union | Total |
|---|---|---|---|
| Number | | 2,873 | 2,873 |
| • Average Age (years) | | 74.5 | 74.5 |
| • Average monthly STB Benefit | | $579 | $579 |

O 114

Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010

Nortel Networks Limited (September 16, 2010)

7

## Employer Certification

With respect to the Addendum to the *Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010* (dated August 27, 2010) for Nortel's Benefit Plans, I
hereby certify that to the best of my knowledge and belief:

- The Optional Employee Life Insurance data for members on Long Term Disability
  supplied to the actuary provides a complete and accurate description of all persons
  who are entitled to benefits under the terms of the Plan for service up to the date of
  the data provided as outlined in this Addendum.

- A copy of the plan documents and of all amendments made up to the date of the
  valuation were supplied to the actuary.

- All events subsequent to the valuation that may have an impact on the results of the
  valuation have been communicated to the actuary.

September 16, 2010
Date

*Julie Graffam*
Signed

Julie Graffam
Name

Director, HR Operations
Title

Mercer (Canada) Limited

35