115

# APPENDIX "B"
# TO SUPPLEMENT TO FIFTY-FIRST REPORT

C  **116**

APPENDIX B – REVISED APPENDIX D TO FIFTY-FIRST REPORT –
ILLUSTRATIVE SCENARIOS

C - 117

# Nortel Health and Welfare Trust
## REVISED Illustrative Allocation Scenarios
Scenario: Optional Life does not participate
Cdn Millions

REVISED Appendix D-1

Scenarios 1 to 4

| Type of Benefit | Benefit Liabilities [6] | 1 – All Benefits Share Pro Rata | 2 – Proposed Participating Benefits Share Pro Rata | 3 – Benefits in Pay Share Pro Rata | 4 – Reserved Asset Method [3,5] |
|---|---|---|---|---|---|
| | | [Distribution %: 14.6%] | [Distribution %: 33.8%] | [Distribution %: 72.1%] | [Distribution %: N/A] |
| Pensioner Life (including ADB) [1] | $ 126.9 | $ 10.72 | $ 35.05 | $ - | $ 33.53 |
| Pensioner M&D | 251.3 | 36.67 | | - | - |
| Pensioner Benefit Total | 378.2 | 47.39 | 35.05 | - | 33.53 |
| LTD Income (including IBNR) | 79.9 | 11.66 | 26.98 | 57.57 | 21.47 |
| LTD M&D [2] | 29.7 | 4.33 | - | - | - |
| LTD - STB accrued | 0.3 | 0.04 | - | - | - |
| LTD Life [2] | 4.5 | 0.66 | 1.52 | - | 0.65 |
| LTD Optional Life Benefit (including IBNR) | 5.3 | 0.78 | 1.80 | - | - |
| LTD Benefit Total | 119.7 | 17.47 | 30.30 | 57.57 | 22.12 |
| SIB [4] | | | | | |
| STB - in pay | 16.2 | 2.36 | 5.47 | 11.67 | 16.55 |
| STB - accrued | 4.1 | 0.60 | 1.38 | 2.95 | - |
| Optional Life | 30.0 | 4.38 | - | - | - |
| Total Benefits | $ 548.2 | $ 72.2 | $ 72.2 | $ 72.2 | $ 72.2 |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 | 7.80 |
| Total | $ 548.2 | $ 80.0 | $ 80.0 | $ 80.0 | $ 80.0 |

NOTES
1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any).
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Optional life reserved asset of $18.7 million has been allocated pro rata amongst the other reserved assets based on asset value
4. The pro-rata allocation of the optional life reserved asset amongst the other remaining reserved asset categories results in the SIB reserved asset allocation exceeding the total benefit claim attributable to this category. No adjustments have been made to limit the SIB distribution under the reserved asset method
5. The Reserved Asset Method allocates HWT Assets using the reserved asset mix as at December 31, 2009 (as disclosed in the 2009 Health Welfare Trust Financial Statements)
6. Source: Mercer 2010 HWT Preliminary Valuation

REVISED Illustrative Allocation Scenarios

0  118

# Nortel Health and Welfare Trust

## REVISED Illustrative Allocation Scenarios

Scenario: Optional Life is a participating benefit
Cdn Millions

**REVISED Appendix D-2**
Scenarios 5 to 8

| Type of Benefit | Benefit Liabilities [4] | 5 — All Benefits Share Pro Rata [Distribution %: 11.2%] | 6 — Proposed Participating Benefits Share Pro Rata [Distribution %: 25.8%] | 7 — Benefits in Pay Share Pro Rata [Distribution %: 53.3%] | 8 — Reserved Asset Method [3] [Distribution %: N/A] |
|---|---|---|---|---|---|
| Pensioner Life (Including ADB) [1] | $ 126.9 | $ 6.38 | $ 25.01 | $ - | $ 23.85 |
| Pensioner M&D | 251.3 | 28.08 | - | - | - |
| Pensioner Benefit Total | 378.2 | 34.46 | 25.01 | - | 23.85 |
| LTD Income (Including IBNR) | 79.9 | 8.93 | 20.66 | 42.63 | 16.44 |
| LTD M&D [2] | 29.7 | 3.32 | - | - | - |
| LTD - STB accrued | 0.3 | 0.03 | - | - | - |
| LTD Life [2] | 4.5 | 0.50 | 1.16 | - | 0.50 |
| LTD Optional Life Benefit (including IBNR) | 5.3 | 0.60 | 1.38 | - | - |
| LTD Benefit Total | 119.7 | 13.38 | 23.20 | 42.63 | 16.94 |
| SIB | 16.2 | 1.81 | - | - | - |
| STB - in pay | 4.1 | 0.46 | 4.19 | 8.64 | 12.67 |
| STB - accrued | 30.0 | 3.35 | 1.06 | 2.19 | - |
| Optional Life | - | 18.74 | 18.74 | 18.74 | 18.74 |
| Total Benefits | $ 548.2 | $ 72.2 | $ 72.2 | $ 72.2 | $ 72.2 |
| Pensioner Life 2010 Premiums [2] | NA | 7.80 | 7.80 | 7.80 | 7.80 |
| Total | $ 548.2 | $ 80.0 | $ 80.0 | $ 80.0 | $ 80.0 |

NOTES
1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. The Reserved Asset Method allocates HWT Assets using the reserved asset mix as at December 31, 2009 (as disclosed in the 2009 Health Welfare Trust Financial Statements)
4. Source: Mercer 2010 HWT Preliminary Valuation

119

# Nortel Health and Welfare Trust

**REVISED Appendix D-3**
Scenarios 9 to 11

REVISED Illustrative Allocation Scenarios
Scenario: STB Liability is excluded and Optional Life does not participate
Cdn Millions

| Type of Benefit | Benefit Liabilities [3] | 9 All Benefits Share Pro Rata [Distribution %: 15.6%] | 10 Proposed Participating Benefits [Distribution %: 34.4%] | 11 Benefits in Pay Share Pro Rata [Distribution %: 75.1%] |
|---|---|---|---|---|
| Pensioner Life (including ADB) [1] | $  126.9 | $   11.96 | $   35.80 | $    - |
| Pensioner M&D | 251.3 | 39.13 | - | - |
| Pensioner Benefit Total | 378.2 | 51.08 | 35.80 | - |
| LTD Income (including IBNR) | 79.9 | 12.44 | 27.45 | 60.03 |
| LTD M&D [2] | 29.7 | 4.62 | - | - |
| LTD - STB accrued | EXCLUDED | - | - | - |
| LTD Life [2] | 4.5 | 0.70 | 1.55 | - |
| LTD Optional Life Benefit (including IBNR) | 5.3 | 0.83 | 1.83 | - |
| LTD Benefit Total | 119.4 | 18.60 | 30.83 | 60.03 |
| SIB | | | | |
| STB - in pay | 16.2 | 2.52 | 5.57 | 12.17 |
| STB - accrued | EXCLUDED | - | - | - |
| Optional Life | EXCLUDED | - | - | - |
| Total Benefits | $  513.8 | $   72.2 | $   72.2 | $   72.2 |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 |
| Total | $  513.8 | $   80.0 | $   80.0 | $   80.0 |

NOTES
1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Source: Mercer 2010 HWT Preliminary Valuation (excludes STB Liability)

REVISED Illustrative Allocation Scenarios

120

# Nortel Health and Welfare Trust
## REVISED Illustrative Allocation Scenarios

Scenario: STB Liability is excluded and Optional Life is a participating benefit
Cdn Millions

REVISED Appendix D-4
Scenarios 12 to 14

| Type of Benefit | Benefit Liabilities [3] | 12 All Benefits Share Pro Rata [Distribution %: 11.8%] | 13 Proposed Participating Benefits [Distribution %: 26.3%] | 14 Benefits in Pay Share Pro Rata [Distribution %: 55.6%] |
|---|---|---|---|---|
| Pensioner Life (including ADB) [1] | $ 126.9 | $ 7.33 | $ 25.59 | $ - |
| Pensioner M&D | 251.3 | 29.96 | | - |
| Pensioner Benefit Total | 378.2 | 37.29 | 25.59 | - |
| LTD Income (including IBNR) | 79.9 | 9.53 | 21.02 | 44.45 |
| LTD M&D [2] | 29.7 | 3.54 | - | - |
| LTD - STB accrued | EXCLUDED | - | - | - |
| LTD Life [2] | 4.5 | 0.54 | 1.18 | - |
| LTD Optional Life Benefit (including IBNR) | 5.3 | 0.64 | 1.40 | - |
| LTD Benefit Total | 119.4 | 14.24 | 23.61 | 44.45 |
| SIB | 16.2 | 1.93 | 4.26 | 9.01 |
| STB - in pay | EXCLUDED | - | - | - |
| STB - accrued | EXCLUDED | - | - | - |
| Optional Life | - | 18.74 | 18.74 | 18.74 |
| Total Benefits | $ 513.8 | $ 72.2 | $ 72.2 | $ 72.2 |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 |
| Total | $ 508.5 | $ 80.0 | $ 80.0 | $ 80.0 |

NOTES
1. Pensioner Life Premiums for 2010 have been treated as change against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Source: Mercer 2010 HWT Preliminary Valuation (excludes STB Liability)

REVISED Illustrative Allocation Scenarios

123

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

SUPPLEMENT TO FIFTY-FIRST REPORT
OF THE MONITOR
DATED SEPTEMBER 17, 2010

GOODMANS LLP
Barristers & Solicitors
Bay Adelaide Centre, 333 Bay Street
Toronto, Canada  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Fred Myers  (LSUC#: 26301A)
Gale Rubenstein (LSUC# 17088E)
Melaney J. Wagner (LSUC# 44063B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# APPENDIX "D"

·0·  124

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

FIFTY-SEVENTH REPORT OF THE MONITOR
DATED DECEMBER 3, 2010

C    125

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | PURPOSE | 3 |
| III. | TERMS OF REFERENCE | 5 |
| IV. | BACKGROUND | 5 |
| V. | THE HWT | 6 |
|  | Overview | 6 |
|  | Mercer 2010 Preliminary HWT Valuation | 7 |
| VI. | INTERIM DISTRIBUTION | 8 |
|  | Tax Ruling Request | 10 |
|  | Specific Process Matters | 10 |
| VII. | MONITOR'S RECOMMENDATION | 11 |

126

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

FIFTY-SEVENTH REPORT OF THE MONITOR
DATED DECEMBER 3, 2010

## I.    INTRODUCTION

1.    On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Applicants**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA proceedings. The stay of proceedings was extended to February 28, 2011, by this Honourable Court in its Order dated October 27, 2010.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S.**

Court") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

3.    An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**").

6.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

Ľ 128

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.   The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.   Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II.   PURPOSE

9.   The purpose of this Fifty-Seventh Report of the Monitor (the "**Fifty-Seventh Report**") is to seek this Honourable Court's approval of an interim distribution to the Income Beneficiaries (defined below) from funds held in the Applicants' Health and Welfare Trust (the "**HWT**") on account of their Income Benefits (defined below) and such ancillary relief as is just and convenient.

10.   The Settlement Agreement provides and this Court has ordered that benefit payments by the Applicants will end on December 31, 2010.  The Monitor sought this Court's approval of a proposed allocation methodology (the "**Approved HWT Allocation Methodology**") for the funds held in the HWT, to enable a distribution of the HWT corpus, which this Court approved by Order dated November 9, 2010 (the "**HWT Allocation Order**").  On November 29, 2010, counsel for a small group of dissenting LTD Beneficiaries filed leave to appeal the HWT Allocation Order.

11.   The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW have asked that the Monitor bring this motion to provide an interim payment to the Income Beneficiaries receiving Income Benefits given, among other things:

(a)     as discussed in paragraph 26(e) below, certain steps must be completed prior to a final distribution from the HWT, including reconciliation of data as at December 31, 2010 and a determination of certain variables that may affect assets available for distribution;

(b)     it is unlikely that the leave to appeal and, if leave is granted, any appeal, would be finally resolved and that all steps required for final distribution will be completed in sufficient time to allow for a final distribution before December 31, 2010; and

(c)     the interim payment will assist the Income Beneficiaries in the period between the termination of Income Benefits and the final distribution of the HWT corpus.

12.     In response to the requests received from the LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW, the Monitor has agreed to bring this motion. The Monitor is recommending that the amount of the interim distribution of the HWT corpus to each Income Beneficiary be 10% of the Income Benefits calculated in accordance with the Approved HWT Allocation Methodology, using data available as of December 31, 2010 according to the Applicants' books and records, as updated from time to time; provided that the interim distribution cannot exceed three months of the Income Benefits payable to the Income Beneficiary[1]. Based on the illustrative scenarios appended to the Supplement to the Monitor's Fifty-First Report dated September 17, 2010 (the "**Supplemental Fifty-First Report**") and attached as Appendix "A" hereto, the Approved HWT Allocation Methodology (Scenario #2) results in an allocation on account of Income Benefits of 33.8% of the actuarial value of the Income Benefits. The Monitor believes that the proposed interim distribution is prudent and conservative and will not prejudice other beneficiaries. The LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (defined below) each consent to the within motion

---

[1] Based on the monthly amount payable to the Income Beneficiary for December, 2010

and the proposed interim distribution, without prejudice and with a reservation of all rights and arguments.

### III.    TERMS OF REFERENCE

13.    In preparing this Fifty-Seventh Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management.   The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, expresses no opinion or other form of assurance on the information contained in this Fifty-Seventh Report.

14.    Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Monitor's Fifty-First Report dated August 27, 2010 (the "**Fifty-First Report**"), filed in support of the application for approval of the Approved HWT Allocation Methodology.

15.    Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

### IV.    BACKGROUND

16.    The Fifty-First Report is attached hereto as Appendix "B", without appendices except for the Mercer 2010 HWT Preliminary Valuation (Appendix "C" to the Fifty-First Report).

17.    In addition, the Supplemental Fifty-First Report is attached hereto as Appendix "C", with appendices (being the Mercer 2010 Addendum, the illustrative scenarios (initially attached as Appendix "D" to the Fifty-First Report) as revised to reflect the present value

of LTD Optional Life Benefit, and the form of newspaper notice regarding the motion for

the HWT Allocation Order).

18.    The Fifty-First Report provides background concerning:

      (a)    the appointment of the representatives;

      (b)    the Settlement Agreement, including the cessation of benefits payable by Nortel on December 31, 2010;

      (c)    the HWT and the benefits provided thereunder;

      (d)    the process leading to the motion for approval of the allocation methodology proposed thereunder;

      (e)    the Mercer 2010 HWT Preliminary Valuation;

      (f)    the retainer of Sack Mitchell Goldblatt LLP by the LTD Beneficiaries' Representative and Lerners LLP by the Former Employees' Representatives (collectively, the "**Independent Counsel**"); and

      (g)    various allocation scenarios.

19.    The Supplemental Fifty-First Report provides the following update to the Fifty-First

Report:

      (a)    an addendum to the Mercer 2010 HWT Preliminary Valuation reflecting information received with respect to the LTD Optional Life Benefit (the "**Mercer 2010 Addendum**"); and

      (b)    revised illustrative allocation scenarios reflecting the valuation of the LTD Optional Life Benefit.

## V.    THE HWT

### Overview

20.    As further described in the Fifty-First Report, Nortel provided the following benefits

through the HWT (using the HWT as a payment mechanism with respect to non-pension

employee benefits and to fund (in part) certain other benefit plans using trust assets): (a) medical, dental and life insurance benefits to pensioners; (b) income payments to disabled employees; (c) medical, dental and life insurance benefits to disabled employees; (d) income benefits for beneficiaries of deceased employees; and (e) medical, dental and life insurance benefits to active employees.

21.     Under the Approved HWT Allocation Methodology, distributions would be made on account of the following benefits:

    (a)     Pensioner Life;

    (b)     LTD Life;

    (c)     LTD Income;

    (d)     LTD Optional Life Benefit;

    (e)     SIBs; and

    (f)     STBs in pay ("**STBs In Pay**")

22.     The LTD Income, SIBs and STBs In Pay are referred to collectively as the "**Income Benefits**", and the LTD beneficiaries entitled to LTD Income, the SIB Beneficiaries and the STB Beneficiaries entitled to STBs In Pay are referred to collectively as the "**Income Beneficiaries**".

**Mercer 2010 Preliminary HWT Valuation**

23.     Attached as Appendix "C" to the Fifty-First Report is a report of Mercer dated August 27, 2010 (the "**Mercer 2010 HWT Preliminary Valuation**"), providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when payments under such plans will

- 8 -

C  133

cease. As indicated in the Fifty-First Report, no amount was included in the valuation for the LTD Optional Life Benefit as there was insufficient data at the date of the Fifty-First Report to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life.

24.    Attached as Appendix "A" to the Supplemental Fifty-First Report is the Mercer 2010 Addendum, which provides a preliminary valuation of the LTD Optional Life Benefit based on the assumptions set out in the Mercer 2010 HWT Preliminary Valuation and data Nortel provided to Mercer and the Monitor following the date of the Fifty-First Report.

## VI.    INTERIM DISTRIBUTION

25.    The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW asked the Monitor to seek Court approval for an interim distribution to Income Beneficiaries on account of Income Benefits because of the difficulties that could arise for them if their income payments cease before there is any distribution on account thereof.

26.    In evaluating an interim distribution to Income Beneficiaries, the Monitor considered a number of factors, including:

(a)    In all illustrative scenarios, each of LTD Income and SIBs would participate in a distribution of the HWT corpus.

(b)    In certain illustrative scenarios, STBs In Pay are excluded as participating benefits; however:

(i)    under the proposed interim distribution, STB Beneficiaries entitled to STBs In Pay would receive in aggregate approximately $355,000; and

(ii)    the LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (whose constituents would be impacted if leave to appeal is granted and scenarios other than the Approved HWT Allocation Methodology are considered) consent to the proposed interim distribution as described in paragraph 12, including an interim distribution to STB Beneficiaries entitled to STBs In Pay (such consenting parties are referred to herein as the "**Consenting Parties**").

(c)    The percentage distribution on account of Income Benefits differs (including from the percentage distribution resulting from the Approved HWT Allocation Methodology) depending on which illustrative scenario is applied.

(d)    The Monitor has considered a range of possible interim distributions and the consent described in (b)(ii) above and believes that payment to Income Beneficiaries at 10% of their Income Benefit to a maximum of 3 months will not prejudice other beneficiaries of the HWT.

(e)    The Monitor's Fifty-First Report indicated that the ultimate distribution from the HWT would be dependent upon the outcome of the following matters:

(i)    changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

(ii)    changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

A.    a different allocation of the HWT corpus;

B.    the distributable assets being more or less than estimated;

C.    the resolution of contingencies;

D.    updating of data to December 31, 2010; and

E.    the award of fees against any particular benefit type.

(f)    Although there is increased certainty regarding the outcome of some of the above matters, there is still some uncertainty such that a conservative interim distribution is warranted.

27.    The proposed interim distribution will result in a lump sum amount representing 3 months of payments for approximately 503 Income Beneficiaries, and less than 3 months

of payments for approximately 240 Income Beneficiaries. The majority of the Income

Beneficiaries who will receive less than 3 months of Income Benefits under the proposed

interim distribution are those in receipt of STBs In Pay, which STBs In Pay are limited to

a 5 year time period. Attached as Appendix "D" hereto is a chart illustrating the

proposed interim distribution using data as of June 30, 2010 according to the Applicants'

books and records.

## Tax Ruling Request

28.    LTD Beneficiaries' Representative Counsel and Former Employees' Representative

Counsel, in conjunction with CAW Counsel and with the assistance and cooperation of

the Applicants and the Monitor, have sought a ruling from the Canada Revenue Agency

that payments from the corpus of the HWT on account of certain benefits, including

payments for those benefits contemplated by this interim distribution, would be made on

a tax-exempt basis. The Canada Revenue Agency has not issued a ruling on this matter.

Until such time as the ruling is issued, payments from the HWT would be subject to the

applicable statutory withholdings. If the ruling from the Canada Revenue Agency is

received prior to December 31, 2010 then the interim distribution will be made in

accordance with that ruling.

## Specific Process Matters

29.    As discussed in the Fifty-First Report, the Mercer 2010 HWT Preliminary Valuation was

prepared on an aggregate basis to assist in an analysis of the effect of various scenarios

(including the allocation methodology proposed in the Fifty-First Report) on the various

benefits covered by the HWT and thereby on the aggregate group of individuals

participating in those benefits. At the request of the LTD Beneficiaries' Representative,

the Monitor provided a statement to the Income Beneficiaries setting out an estimate of the amount they would receive if the proposed allocation methodology were approved, subject to certain caveats (a **"Beneficiary Estimated Allocation Statement"**).

30.    The Beneficiary Estimated Allocation Statement was substantially in the form attached to the Fifty-First Report as Appendix "NNN", which is also attached hereto as Appendix "E".

31.    In response to inquiries received following delivery of the Beneficiary Estimated Allocation Statements, on November 16, 2010, the Monitor caused to be sent to each Income Beneficiary a form indicating the data from Nortel's books and records on which the particular Beneficiary Estimated Allocation Statement was based and asking that any corrections to the data be forwarded to the Monitor by December 17, 2010.    The Applicants will amend their books and records according to any corrections received and validated.

## VII.    MONITOR'S RECOMMENDATION

32.    The Monitor believes that an interim distribution to Income Beneficiaries is appropriate in the circumstances and that an interim distribution of 10% of the Income Benefits to a maximum of 3 months is prudent and reasonable.    The Monitor believes that the proposed interim distribution does not prejudice other beneficiaries of the HWT (particularly given its conservative nature, that the proposed interim distribution results in a relatively small distribution on account of STBs In Pay and the Consenting Parties have consented to the proposed interim distribution, including on account of STBs In Pay) and is responsive to the Income Beneficiaries' request for an interim payment pending final distribution of the HWT corpus.

137

33.    Accordingly, the Monitor requests that this Honourable Court grant the Order in the form
submitted.

All of which is respectfully submitted this 3rd day of December, 2010.

**ERNST & YOUNG INC.**

**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

\5910968

# APPENDIX "E"

-0.  138

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FIFTY-NINTH REPORT OF THE MONITOR**
**DATED FEBRUARY 18, 2011**

**INTRODUCTION**

1.   On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to February 28, 2011 by this Honourable Court in its Order dated October 27, 2010.

2.   Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by

O   139

U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.  Subsequent to the filing date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

2

0    **140**

7.  The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.  Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9.  The purpose of this fifty-ninth report of the Monitor (the "Fifty-Ninth Report") is to report to this Honourable Court on the following matters:

    a)  consolidated cash position and liquidity as at February 5, 2011;

    b)  actual receipts and disbursements from October 3, 2010 until February 5, 2011;

    c)  cash flow forecast for the period from February 6, 2011 until June 30, 2011;

    d)  consolidated Canadian entities' net inter-company position by region;

    e)  status of Applicants' claims process and cross-border claims;

    f)  status of EMEA inter-company claims process;

    g)  current status of the Group Supplier Protocol Agreement ("GSPA");

    h)  status of Health and Welfare Trust ("HWT");

    i)  status of Termination Fund;

    j)  status of the Employee Hardship Application Process;

    k)  asset divestitures and allocation matters;

3

0  **141**

l)  status of foreign proceedings;

m) other restructuring activities; and

n)  the Applicants' request for an order that:

> i.   the employee hardship application criteria be amended such that sufficient hardship funds (the "Required Funds") be made available for payment of CAD $3,000 to each of those employees terminated from July 1, 2010 through to and including December 31, 2010 who meet the other criteria for Termination Fund payments, when combined with unused funds in the Termination Funds;

> ii.  the amount available for hardship applications be reduced by the Required Funds

> iii. the Employee Hardship Application Process be extended up to June 30, 2011;

> iv.  the Eligibility Requirements and the Procedure with respect to Employee Hardship Payments Applications be amended consistent with (i) through (iii) above; and

> v.   the stay of proceedings be extended up to and including June 30, 2011.

**TERMS OF REFERENCE**

10. In preparing this Fifty-Ninth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Fifty-Ninth Report.

0  **142**

11. Unless otherwise stated, all monetary amounts contained herein are expressed in US dollars.

12. Capitalized terms not defined in this Fifty-Ninth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

○    143

CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT FEBRUARY 5, 2011

14. As at February 5, 2011, Nortel's consolidated cash balance was approximately $6.1 billion including $3.1 billion of total treasury cash.  Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures.  The following is an overview of Nortel's consolidated cash position as at February 5, 2011:

| Region | Gross Cash | Restricted | Unavailable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 526 | (19) | (238) | 269 |
| Other Canada | 34 | (22) | - | 12 |
| | | | | |
| NNI | 930 | (15) | - | 915 |
| NNI - Reserve MMF (ST/LT) | - | - | - | - |
| Other US (excluding NN CALA) | 54 | - | - | 54 |
| North America | 1,544 | (56) | (238) | 1,250 |
| | | | | |
| NN UK Limited | 380 | (20) | - | 360 |
| Other EMEA Filed Entities | 487 | (2) | - | 485 |
| JV - Netas | - | - | - | - |
| EMEA non-filed entities | 21 | - | - | 21 |
| UK/Europe | 888 | (22) | - | 866 |
| | | | | |
| Greater China | 151 | (3) | - | 148 |
| Other ASIA PAC (excl JVs) | 280 | (1) | - | 279 |
| Other JVs | 118 | (2) | (116) | - |
| ASIA | 549 | (6) | (116) | 427 |
| | | | | |
| NN CALA | 90 | - | - | 90 |
| Other CALA filed entities | - | - | - | - |
| CALA non-filed entities | 57 | - | - | 57 |
| Cala | 147 | - | - | 147 |
| | | | | |
| Total Treasury Cash | 3,128 | (84) | (354) | 2,690 |
| | | | | |
| Divestiture Proceeds | 2,957 | (2,957) | - | - |
| | | | | |
| Other Funds held in Escrow | 35 | (35) | - | - |
| | | | | |
| Total Cash | 6,120 | (3,076) | (354) | 2,690 |

6

0   144

15. As at February 5, 2011, the Canadian entities had cash available for operations and post-filing inter-company settlements of approximately $281 million.

16. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $12 million of cash collateral posted by Nortel in support of non-EDC performance bonds and letter of credit facilities, (ii) $12 million held in the D&O Trust as detailed in the Pre-Filing Report, (iii) $10 million held in escrow related to the settlement of the Global Class Action, (iv) $4 million in support of the EDC performance bonds issued in exotic foreign currencies, (v) $0.3 million held in relation to benefits paid through the HWT, (vi) $2 million held in escrow as cash collateral to support the Jabil supply agreement, and (vii) $1 million of cash collateral posted with EDC in support of post filing performance bonding. Unavailable Cash relates primarily to: (i) $8 million of net proceeds from the sale of the Strandherd Lands, (ii) $229 million held in a single purpose bank account received from the sale of NNL's interest in the LGN joint venture, and (iii) $1 million held in a single purpose bank account received from the sale of NNL's interest in the Relay business.

17. The U.S. entities had cash available for operations and post-filing inter-company settlements of approximately $969 million. NNI's Restricted Cash relates primarily to: (i) $1 million held in escrow for the benefit of utility providers in accordance with the First Day Order, and (ii) $14 million held in escrow as cash collateral to support the Jabil supply agreement.

18. The U.K. Administrators on behalf of NNUK and the other EMEA Debtors had available cash for operations and post–filing inter-company settlements of approximately $845 million. The EMEA non-filed entities had available cash of approximately $21 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

7

145

19. The NETAS sale transaction closed on December 21, 2010 and cash held by NETAS was transferred to the buyer. NETAS sale proceeds of $68 million and gross dividends of $16 million were received by Nortel Networks International Finance and Holdings BV, a subsidiary of NNUK, and are reflected in the Other EMEA Filed Entities balance.

20. Nortel entities in the APAC region have approximately $427 million of available cash for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $148 million are generally only available to fund operations within Greater China and inter-company settlements.

21. As at February 5, 2011, NN CALA and the CALA non-filed entities had available cash of $90 million and $57 million, respectively. This cash is expected to be used to fund their domestic operations and inter-company settlements.

22. On March 10, 2010, Nortel Networks Telecomunicacoes Do Brazil Ltda. ("NN Brazil") filed for bankruptcy protection, on April 15, 2010 Nortel Networks de Colombia S.A. ("NN Colombia") was placed into liquidation and on July 30, 2010 Nortel Networks de Venezuela C.A. ("NN Venezuela") ceased operations as its financial obligations exceeded its available funds. These balances have not been reflected as the entities are no longer participating in the Nortel global restructuring and are under the control of local officials in their respective jurisdictions.

23. Divestiture proceeds of approximately $3.0 billion are being held in escrow by various escrow agents (the "Divestiture Proceeds"). The funds held in escrow include:

    a) approximately $2.8 billion held in escrow by JPMorgan Chase Bank, N.A. until an agreement is reached regarding allocation of these proceeds among the various Nortel legal entities, including NNL. The current divestiture proceeds held in escrow include: (i) $1.0 billion from the sale of CDMA/LTE

8

Case 09-10138-MFW    Doc 5805-2    Filed 06/24/11    Page 33 of 94

0  **146**

Access assets, (ii) $18 million from the sale of the Layer 4-7 Business, (iii) $10 million from the sale of the Next Generation Packet Core business, (iv) $920 million from the sale of Enterprise assets, (v) $629 million from the sale of the MEN assets, (vi) $87 million from the sale of GSM assets, (vii) $159 million from the sale of CVAS assets;

b) $50 million held by CitiBank relating to the sale of CDMA/LTE Access assets. These divestiture proceeds are being held in support of the related Transition Service Agreement (the "TSA");

c) $29 million held by CitiBank relating to the sale of MEN assets. These divestiture proceeds include $15 million being held in support of the related TSA and $14 million being held subject to certain succession tax and other adjustments;

d) $0.6 million held by Ogilvy Renault LLP relating to the sale of MEN assets in support of certain real estate adjustments;

e) $24 million held by CitiBank relating to the sale of GSM assets. These divestiture proceeds are being held in support of the related TSA;

f) $13 million held by Wells Fargo relating to the sale of CVAS assets. These divestiture proceeds include $8 million in support of the finalization of purchase price adjustments and $5 million subject to resolution of certain tax liabilities in North America and EMEA; and

g) $10 million held by JP Morgan Chase Bank, N.A. consisting of $5 million in support of the CVAS TSA and $5 million in support of potential severance liabilities for a specified employee group in EMEA relating to the sale of CVAS assets.

147

24. Other unavailable funds include $35 million transferred from the CDMA/LTE Access asset divestiture proceeds escrow to a separate trust account pursuant to the Cascade Trust Indenture as more fully described in the Forty-First Report.

25. The consolidated cash position balances presented above do not reflect deposits of $1.3 million from Ericsson related to the pending sale of the MSS assets.

## ACTUAL RECEIPTS AND DISBURSEMENTS FROM OCTOBER 3, 2010 TO FEBRUARY 5, 2011

26. The Applicants' actual consolidated net cash inflow for the period October 3, 2010 to February 5, 2011 was $85.6 million.   A summary of the actual receipts and disbursements as compared to the forecast filed with the Fifty-Fifth Report (the "Fifty-Fifth Report Forecast") is attached at Appendix "A".

27. Actual net cash flow exceeded forecast by $3.0 million. Significant items contributing to this favourable variance were as follows:

   a) a favourable permanent variance of $2.4 million with respect to the collection of accounts receivable primarily as a result of $2.2 million related to higher than forecast contract manufacturing receipts;

   b) a favourable permanent variance of $6.7 million with respect to Other Receipts primarily as a result of the following:

   i. $5.3 million reimbursement from LGN with respect to 2005 to 2009 expatriate charges;

   ii. $1.0 million primarily related to favourable foreign exchange translation on the Canadian denominated Carling facility sales proceeds; and

   iii. $0.4 million received from the release of the MEN real estate escrow.

10

c) a favourable timing variance of $9.2 million with respect to TSA recoveries from buyers primarily as a result of expedited collections on Enterprise and CVAS TSA billings.

d) a favourable net variance of approximately $0.3 million with respect to inter-company receipts and disbursements primarily as a result of the following:

   i. $4.7 million favourable timing variance relating to payment to NNUK with respect to the Shortfall Payment (as defined in the Interim Funding and Settlement Agreement ("IFSA") and more fully described in the Fifteenth Report of the Monitor) has been retimed from Q4 2010 to Q2 2011;

   ii. $0.8 million favourable permanent variance related to interest savings with respect to the NNI Loan being repaid earlier than forecast;

   iii. $2.5 million unfavourable timing variance as trade payables with NNI were settled earlier than originally forecast; and

   iv. $2.5 million unfavourable permanent variance related to inter-company settlements with the APAC and CALA regions being lower than originally forecast.

e) a favourable variance of $2.2 million with respect to payroll primarily as a result of the following:

   i. a favourable permanent variance of $1.2 million as a result of greater than forecast headcount reductions; and

   ii. a favourable timing variance of $1.0 million as payments with respect to the Termination Fund, pursuant to the terms of the Amended and Restated Employee Settlement Agreement, were retimed.

149

f) a favourable timing variance of $1.1 million with respect to benefits as a result of lower than forecast funding for the HWT;

g) an unfavourable variance of $3.7 million with respect to inventory purchases primarily related to last time buys from certain suppliers for MSS;

h) an unfavourable variance of $12.0 million with respect to non-inventory purchases primarily as a result of: (i) $7.7 million unfavourable permanent variance related to higher than forecast Directors and Officers Obligation and Fiduciary insurance premiums; (ii) $1.0 million unfavourable permanent variance related to higher than forecast audit fees; and (iii) approximately $3.3 million of timing variances relating to other trade amounts which were paid earlier than originally forecast; and

i) an unfavourable permanent variance of $3.2 million with respect to restructuring costs as professional fees were higher than originally forecast.

28. Available Cash was higher than forecast by approximately $5.4 million relating to a favourable foreign exchange translation on Canadian dollar denominated cash balances as a result of an appreciation of the Canadian dollar relative to the U.S. dollar.

29. Restricted Cash was lower than forecast by approximately $3.5 million primarily as a result of a decrease in the balance of HWT.

**CASH FLOW FORECAST FOR THE PERIOD FEBRUARY 6, 2011 TO JUNE 30, 2011**

30. The Applicants, with the assistance of the Monitor, have prepared an updated 21-week cash flow forecast for the period February 6, 2011 to June 30, 2011 (the "February 6th Forecast" and the "Forecast Period", respectively). A copy of the February 6th Forecast is attached as Appendix "B".

150

31. As at February 6, 2011, the Applicants have Available Cash balances of approximately $280.7 million, excluding Restricted Cash and Unavailable Cash of approximately $278.6 million.

32. Based on the February 6th Forecast, it is anticipated the Applicants will have total receipts of $67.4 million and total disbursements of $106.4 million resulting in a net cash outflow of $39.0 million during the Forecast Period.

33. Significant assumptions used in preparing the February 6th Forecast include the following:

   a) the sale of the MSS business closes in March 2011;

   b) monthly billings for transition services provided by the Applicants to buyers of the various Nortel assets and businesses, pursuant to the respective TSAs, are invoiced on an average 45 day billing cycle and subject to 30 day payment terms;

   c) accounts payable disbursements relating to the CDMA/LTE Access assets continue to be administered by Nortel subsequent to closing of this sale transaction. During this transition period and in accordance with the relevant asset purchase agreement, Ericsson will pre-fund these expenses to Nortel resulting in no material working capital impact. The administration of accounts payable disbursements is assumed to continue throughout the Forecast Period;

   d) divestiture proceeds from the CDMA/LTE Access assets, Enterprise business, MEN business, MSS business, GSM/GSM-R, and CVAS asset sale transactions are to be held in escrow, except as otherwise noted, and are not reflected in the February 6th Forecast;

13

151

e) reimbursement from the divestiture proceeds of $30.0 million to the Applicants with respect to fees incurred in connection with the preparation of financial statement carve-outs will occur in the last week of March 2011;

f) accounts receivable collections, consisting of the collection of residual accounts receivable not acquired by the purchasers as part of the divestiture of the business units, have been estimated by the Applicants' collection group based on historic customer collection experience;

g) all pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

h) inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities. Inter-company pre-filing trade accounts and loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

i) payroll includes 2010 retention and AIP for the second half of 2010 and will be paid in March 2011. Q1 AIP for MSS and IP employees will be paid in June 2011;

j) pursuant to the terms of the Amended and Restated Employee Settlement Agreement ("Settlement Agreement"), there are no further current funding contributions to the Applicants' defined benefit pension plans. Funding related to current employees' retirement savings plans are reflected in Benefits disbursements. Funding for non-registered pension or other retirement plans is stayed;

k) run-off funding for the benefits incurred up to December 31, 2010 for pensioners and individuals on long term disability will be in accordance with the provisions of the Settlement Agreement;

14

152

l) all interest payments relating to the Company's pre-filing indebtedness are stayed;

m) disbursements include CAD $1.0 million of Termination Payments pursuant to the terms of the Settlement Agreement; and

n) inter-company disbursements include a payment of $4.7 million with respect to the Shortfall Payment owing to NNUK.

34. Based on an analysis prepared by the Monitor, the Applicants have sufficient cash resources to fund the CCAA proceedings through June 30, 2011.

## CONSOLIDATED CANADIAN ENTITIES' NET INTER-COMPANY POSITION BY REGION

35. Summarized below are the preliminary net inter-company book balances (including only trade and loan balances) as at December 31, 2010. For purposes of the summary, all Canadian entities (the Applicants and their Canadian non-filed subsidiaries) have been consolidated. These inter-company balances have been prepared by the Company under US GAAP and are subject to further adjustments. The Company, under US GAAP, has fully reserved against the net inter-company balances owing from filed entities. For presentation purposes the full amount of the inter-company balance, before the reserve, has been reflected.

36. For purposes of calculating the net inter-company balances between trading pairs, balances between the same legal entities have been set-off provided such balances both arose prior to January 14, 2009 ("Pre-filing Balances") or both arose after January 14, 2009 ("Post-filing Balances"). No Pre-filing Balances have been set-off against Post-filing Balances.

37. Pre-filing Balances have been converted using January 14, 2009 foreign exchange rates. Post-filing Balances are converted using December 31, 2010 foreign exchange rates.

38. The net pre-filing inter-company payable position of $2.065 billion with the U.S. region includes a $62.7 million Revolver Claim by the U.S. Debtors which remains outstanding and is secured by a court-ordered charge in the CCAA proceedings. The balance of the pre-filing inter-company payable position is unsecured. Further details regarding this payable are provided at paragraph 45, below.

| | Region | Pre-filing (Jan. 14, 2009 FX rates) | | Post-filing (Dec 31, 2010 FX rates) |
|---|---|---|---|---|
| | | (in millions) | | |
| **Net Receivable Position** | | | | |
| Filed Entities | CALA | 3 | ** | - |
| | EMEA | 101 | | 2 |
| | US * | 49 | *** | - |
| Filed Total | | 154 | | 2 |
| | | | | |
| Non Filed | | | | |
| | APAC | 70 | | 11 |
| | CALA | 42 | | 2 |
| | EMEA | 5 | | - |
| | US | 14 | | 2 |
| Non Filed Total | | 131 | | 14 |
| | | | | |
| Net Receivable Total | | 285 | | 16 |
| **Net Payable Position** | | | | |
| Filed Entities | | | | |
| | CALA | (24) | | - |
| | EMEA | (203) | | (1) |
| | US | (2,065) | | (6) |
| Filed Total | | (2,291) | | (6) |
| | | | | |
| Non Filed | APAC | (202) | | (4) |
| | CALA | - | | - |
| | EMEA | - | | - |
| Non Filed Total | | (202) | | (4) |
| | | | | |
| Net Payable Total | | (2,493) | | (12) |
| Grand Total | | (2,209) | | 4 |

* Includes NN CALA Inc., a US entity that filed for Chapter 11 protection on July 14, 2009.

** $2.3M of the CALA region pre-filing balance relate to amounts owing from NN Brazil and NN Colombia for the period from January 14, 2009 to March 10, 2010 and April 15, 2010, respectively and subject to a stay of proceedings.

*** $4.9M of the US region pre-filing balance relate to amounts owing from NN CALA Inc. for the period from January 14, 2009 to July 14, 2009 and subject to a stay of proceedings.

C  **154**

## STATUS OF APPLICANTS' CLAIMS PROCESS AND CROSS BORDER CLAIMS

39. On July 30, 2009, this Honourable Court issued an Order (as amended and restated, the "Claims Procedure Order") setting out the procedures for the filing of certain claims against the Applicants.

40. Pursuant to the provisions of the Claims Procedure Order, a claims bar date of September 30, 2009 was established (the "Claims Bar Date") whereby all claims were to be filed with the Monitor with the exception of the Excluded Claims, as defined in the Claims Procedure Order, including:

   a) Inter-company Claims;

   b) Compensation Claims of the current and former employees and directors of the Applicants;

   c) claims secured by any of the Charges in the Initial Order;

   d) claims for grievances under any collective agreements to which any of the Applicants are a party; and

   e) claims of any director or officer of the Applicants for indemnification and/or contribution, arising from such director's and officer's service to any Applicant.

41. By order dated August 4, 2009, the U.S. Court also established September 30, 2009 as its bar date for filing of claims in the Chapter 11 Proceedings with the exception of claims against NN CALA, for which the bar date was January 25, 2010.

42. On September 16, 2010, this Honourable Court issued an Order approving the methodology applicable for the review and determination of claims filed against the Applicants (the "Claims Resolution Order"). In a joint hearing on the same date, a Cross-Border Claims Protocol was approved which addresses matters relating to the resolution of overlapping claims and same-creditor claims, including, the level of

17

C  155

cooperation and consultation between the Applicants and U.S. Debtors with respect
the resolution of such claims.

43. In its Fifty-Fifth Report, the Monitor provided an update as to the status of claims
filed against the Applicants as of October 19, 2010.

44. The table below (the "Claims Report") provides an update as to the status of claims
filed against the Applicants as of February 2, 2011.  All claim amounts are in
Canadian dollars using January 14, 2009 exchange rates.

**Nortel Networks - CCAA Applicants Overall Claims Status**
February 2, 2011
All amounts in CAD $ millions

| CCAA Applicant / Claim Category | Filed $ out of Claim # | $ | Under Review # | $ | Accepted as Reviewed and unadjusted # | $ | Value per Notice of Disallowance # | $ | Value per Notice of Dispute # | $ | Valued by Claims Officer # | $ | Valued by Court # | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Nortel Networks Corporation** | | | | | | | | | | | | | | |
| Trade | 64 | 1,656.1 | 30 | 149.2 | 28 | 0.3 | - | - | 6 | 20.8 | - | - | - | - |
| Bonds | 2 | 4,808.7 | 2 | 4,808.7 | - | - | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,514.0 | 7 | 2,514.0 | - | - | - | - | - | - | - | - | - | - |
| Other | 141 | 727.6 | 71 | 723.5 | 67 | 0.6 | - | - | 23 | 3.4 | - | - | - | - |
| Total | 214 | 9,706.5 | 110 | 8,195.5 | 95 | 0.8 | - | - | 29 | 23.2 | - | - | - | - |
| | | | | | | | | | | | | | | |
| **Nortel Networks Global Corporation** | | | | | | | | | | | | | | |
| Trade | 17 | 1,484.6 | 4 | 1.1 | 5 | 0.1 | - | - | 3 | 1.1 | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,500.8 | 6 | 2,500.8 | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 213.6 | 35 | 213.6 | - | - | - | - | - | - | - | - | - | - |
| Total | 53 | 4,208.5 | 45 | 2,725.2 | 5 | 0.1 | - | - | 3 | 1.2 | - | - | - | - |
| | | | | | | | | | | | | | | |
| **Nortel Networks International Corporation** | | | | | | | | | | | | | | |
| Trade | 7 | 3,483.2 | 4 | 0.1 | 1 | - | - | - | - | - | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,500.3 | 6 | 2,500.3 | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 223.6 | 35 | 223.6 | - | - | - | - | - | - | - | - | - | - |
| Total | 48 | 6,207.2 | 45 | 2,724.0 | 1 | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | |
| **Nortel Networks Limited** | | | | | | | | | | | | | | |
| Trade | 295 | 1,314.7 | 67 | 1021.5 | 193 | 25.9 | 4 | 0.3 | 31 | 66.2 | - | - | - | - |
| Bonds | 4 | 5,243.1 | 4 | 5,243.1 | - | - | - | - | - | - | - | - | - | - |
| Inter-company (HW claim) | 1 | 2,517.0 | - | - | 1 | 2,517.0 | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,510.7 | 7 | 2,510.7 | - | - | - | - | - | - | - | - | - | - |
| Other | 189 | 1,541.1 | 148 | 1,533.7 | 23 | 0.1 | - | - | 18 | 7.2 | - | - | - | - |
| Total | 496 | 13,126.6 | 226 | 9,679.1 | 217 | 2,543.0 | 4 | 0.3 | 49 | 73.4 | - | - | - | - |
| | | | | | | | | | | | | | | |
| **Nortel Networks Technology Corporation** | | | | | | | | | | | | | | |
| Trade | 137 | 1,535.0 | 16 | 2.7 | 100 | 18.5 | - | - | 11 | 22.8 | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,500.3 | 6 | 2,500.3 | - | - | - | - | - | - | - | - | - | - |
| Other | 36 | 213.7 | 36 | 213.7 | - | - | - | - | - | - | - | - | - | - |
| Total | 179 | 4,258.9 | 58 | 2,716.6 | 100 | 18.5 | - | - | 11 | 22.8 | - | - | - | - |

Notes:
Note 1: All amounts (other than Accepted) are subject to potential material change (i.e. through negotiation, appeal, etc.) as the process for the determination of claims proceeds.
Note 2: Amount and number of claims both in aggregate and for each Applicant may be materially different than previously presented for the following reasons:
- Claims filed have been split or branched among Applicants
- Additional fees filed claims and amendment to claims filed previously was included for presentation purposes only and without prejudice to the rights of the Applicants in connection with such Claims

18

156

45. Pursuant to the provisions of the Canadian Funding and Settlement Agreement, the Claims Report includes a claim by NNI against NNL for $2.0627 billion. This claim consists of two portions:

    a) $2.0 billion representing a pre-filing unsecured claim against NNL ranking pari passu with all other unsecured pre-filing claims; and

    b) $62.7 million representing a pre-filing secured claim pursuant to the provisions of the Initial Order relating to the Revolving Loan Agreement.

46. To date, 1,010 claims including cross-border Claims with a cumulative value of CAD $35.5 billion have been filed against the Applicants. This includes potential duplicative claims filed against multiple Applicants and claims filed subsequent to the Claims Bar Date. The Monitor, in conjunction with the Applicants, has reviewed 526 claims with a claim value of $9.5 billion. Of the claims reviewed, the Monitor has provisionally accepted 430 claims with a claim value of $2.6 billion.

47. Pursuant to the provisions of the Claims Resolution Order, the Monitor has provided the U.S. Debtors with supporting detail for the Claims Report as of February 2, 2011. A copy of the Claims Report has been posted on the Monitor's website.

48. The claims resolution process has progressed since the issuance of the Claims Resolution Order. The Monitor continues to review, revise and disallow claims, as applicable, and continues to work with the U.S. Debtors with respect to cross-border claims and will report to this Honourable Court further on these processes in subsequent reports.

**STATUS OF EMEA INTER-COMPANY CLAIMS PROCESS**

49. The Claims Procedure Order specifically identified certain claims, including inter-company claims, not subject to the provisions contained within the order.

19

157

50. On January 14, 2011, this Honourable Court issued an Order (the "EMEA Claims Procedure Order") stipulating a bar date and a mechanism for the filing, proving and resolution of claims by an EMEA Company (as defined in the EMEA Claims Procedure Order) against the Applicants, their property or their Directors and Officers (the "EMEA Claims").

51. Pursuant to the provisions of the EMEA Claims Procedure Order, a bar date of 4:00 p.m. (prevailing time in Toronto, Ontario, Canada), March 18, 2011 (the "EMEA Claims Bar Date") was established whereby EMEA Claims are to be filed with the Monitor, failing which they are forever barred and extinguished.

52. Pursuant to the provisions of the EMEA Claims Procedure Order, the Monitor:

    a) has posted a copy of the Proof of Claim Document Package on its website at *www.ey.com/ca/nortel*;

    b) has sent, on behalf of the Applicants, a copy of a Proof of Claim Document Package to the Administrators and the Administrators' counsel; and

    c) will continue to provide a copy of the Proof of Claim Document Package to any person claiming to be an EMEA Creditor as soon as reasonably possible after receipt of such a request provided such request is received prior to the EMEA Claims Bar Date.

**CURRENT STATUS OF GSPA**

53. Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the CCAA proceedings (e.g. the Initial Order) and the Chapter 11 Proceedings and/or in accordance with the Code

(together, the "Trading Orders"). Trade between the EMEA Debtors and the Applicants is pursuant to the GSPA.

54. The purpose of the Trading Orders and GSPA is to ensure goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed as between the Nortel parties prior to the Filing Date. In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amounts for post-filing purchases owing to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

55. The GSPA had continued to be extended by the parties substantially in the same form as the initial GSPA through the end of May 2010. Subsequent to the expiry of the sixteenth extension of the GSPA on May 31, 2010, ongoing day to day trade of goods and services and settlement of post filing inter-company accounts continues in normal course.

## STATUS OF HEALTH AND WELFARE TRUST

56. By Court Order dated November 9, 2010, this Honourable Court approved an allocation methodology for the corpus of the HWT. An application for leave to appeal therefrom to the Ontario Court of Appeal was dismissed on January 7, 2011.

57. By Court Order dated December 15, 2010, this Honourable Court approved an interim distribution from the HWT to Income Beneficiaries (as defined in such Order). The interim distribution, in the amount of approximately CAD $3.1 million, was made on January 31, 2011 to 742 Income Beneficiaries (including 344 LTD Beneficiaries, 80 SIB Beneficiaries and 318 STB Beneficiaries). A notice was sent to all Income Beneficiaries in January 2011 solely to advise them of this payment.

58. Prior to sending the notice of the interim payment, a Nortel HWT Personal Data Confirmation ("HWT - PDC") had been sent to those Income Beneficiaries who

0   159

were known to the Company at June 30, 2010. Following the November 2010 mailing of the HWT-PDC's, beneficiaries returned their HWT–PDC to the Monitor with changes to their information, including status changes. The changes were not significant to the amount of the interim distribution; however, the Monitor is working with the Company to validate the changes so that the effect of the changes on the actuarially determined value of the beneficiary's entitlement may be taken into account for further HWT distributions. The validated personal data will also be used to calculate claims against the estate. To the extent applicable, changes are being validated by reference to Company or external documents. Certain changes require information from the individual and the Monitor is seeking such information.

59. The receipt of the interim distribution has also resulted in communications from beneficiaries regarding the amounts of their payments. The Monitor believes certain of the inquiries have arisen as a result of the HWT - PDC being based on June 2010 payments while the interim distribution was based on December 2010 payments. The Monitor continues to work closely with the Company on finalizing HWT distribution matters, including gathering, updating and validating data to December 31, 2010.

**STATUS OF TERMINATION FUND**

60. In accordance with the settlement agreement, approved by this Honourable Court on March 31, 2010, the Applicants established a CAD $4.3 million fund for former employees of the Applicants (the "Termination Fund"). Under the settlement agreement, a former employee is eligible for payment from the Termination Fund to a maximum of CAD $3,000, if: (a) employment was terminated on or prior to June 30, 2010; (b) amounts are owing to the former employee for termination or severance payments; (c) the former employee has not been offered employment with a purchaser of Nortel's assets; and (d) the former employee did not receive certain other payments. Pursuant to the settlement agreement, any payments under the Termination Fund to former employees will be credited against allowed claims of

22

160

such individuals and such claims will be correspondingly reduced. To the extent that funds remain unused in respect of terminations prior to or on June 30, 2010, the Termination Fund may be used to make payments on account of terminations after June 30, 2010 to former employees who meet the eligibility requirements.

61. The Termination Fund in the amount of CAD $4.3 million consisted of a maximum CAD $100,000 for payment of fees and costs of Representative Counsel (as defined in the settlement agreement) and for payments to eligible former employees (based on an estimate of 1,400 eligible former employees). On September 17, 2010, 1,157 former employees were notified by mail they were eligible for a maximum payment of CAD $3,000 each from the Termination Fund and advised of the steps they were to take to receive their Termination Fund payment.

62. As of January 31, 2011, 1,105 of these 1,157 former employees have taken the necessary steps and received their payment. In aggregate, the payments to these former employees amounted to CAD $3,315,000. The Monitor understands the Company continues to work to contact the 52 former employees who have not yet taken the necessary steps to receive their payments. These 52 former employees have an entitlement of CAD $156,000.

63. Taking into account payments made to eligible former employees in the aggregate amount of CAD $3,315,000 and a reserve of CAD $156,000 for eligible former employees who have not yet completed the required documentation, there is an estimated CAD $729,000 remaining in the Termination Fund as of January 31, 2011. Accordingly, it is proposed the remaining funds in the Termination Fund be used to make payments to former employees who were terminated during the period from July 1, 2010 to and including December 31, 2010 and who otherwise meet the eligibility requirements.

64. Subsequent to June 30, 2010 and on or prior to December 31, 2010, an additional 363 employees were terminated (including 354 employees on Long Term Disability)

23

161

who would be eligible for Termination Fund payments (the "Additional Eligible Former Employees"). It is anticipated that employees who are terminated after December 31, 2010 will receive certain payments that otherwise prohibit their being eligible for the Termination Fund. The unused funds available in the Termination Fund are only sufficient to provide each Additional Eligible Former Employee terminated during this period with approximately CAD $2,000.

65. To date each eligible terminated employee has received CAD $3,000. The amount required to pay CAD $3,000 to each of the Additional Eligible Former Employees is CAD $1,086,000, or approximately CAD $360,000 (i.e. the Required Funds) in excess of the remaining funds available in the Termination Fund. In order to provide equitable treatment to the Additional Eligible Former Employees an amendment to the Employee Hardship Application Process is proposed, as discussed below, to permit the use of a portion of the amounts allocated to the Employee Hardship Application Process, in combination with the remaining funds in the Termination Fund, to pay CAD $3,000 to each of the Additional Eligible Former Employees, which payment would be credited against allowed claims of such individuals.

**STATUS OF EMPLOYEE HARDSHIP APPLICATION PROCESS AND FUND**

66. On July 30, 2009, an order was issued by this Honourable Court approving an employee hardship application process (the "Employee Hardship Order") as more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

67. On October 27, 2010, this Honourable Court approved the Applicants' request to extend the Application Period until February 28, 2011 and to amend the eligibility requirements in respect of the Employee Application Hardship Process to reflect the extended date.

68. The Monitor is continuing to administer the hardship payment application process and report thereon to the relevant representative counsel. There currently remains

24

0   162

available approximately CAD $626,000 of the original CAD $750,000 provided pursuant to the Employee Hardship Order.  Applications continue to be received from former employees of the Applicants asserting financial hardship resulting from illness, healthcare costs or ineligibility for pension or employment insurance benefits.

69.  As noted above approximately 354 of the 363 Additional Eligible Former Employees are LTD Beneficiaries.  The LTD representative has advised the Monitor that many of those terminated on December 31, 2010 are experiencing financial difficulties and has requested that they receive the same payment of CAD $3,000 as those former employees terminated prior to June 30, 2010.

70.  As noted in the Status of the Termination Fund update in this Fifty-Ninth Report, the Required Funds of approximately CAD $360,000 would allow payments of CAD $3,000 to be made to the Additional Eligible Former Employees, consistent with the amount awarded from the Termination Fund to the initial 1,157 former employees.  Given that to date only about 20% of the hardship monies have been used, the Monitor considers that it would not cause undue prejudice to other former employees to use approximately half the amount remaining for the termination payments to this group.

71.  Accordingly, the Monitor supports the Applicants' request that:

   a)  the Employee Hardship Application Process criteria be amended such that the Required Funds be made available for payment of CAD $3,000 to each of the Additional Eligible Former Employees who meet the other criteria for Termination Fund payments;

   b)  hardship funds so made available shall be treated in the same manner as payments from the Termination Fund and credited against allowed claims of such individuals;

25

163

c) the amount available for hardship applications be reduced by the Required Funds;

d) the Application Period be extended until and including June 30, 2011; and

e) Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended consistent with clauses (a) to (c) above.

72. A copy of the proposed amended Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications is attached as Appendix "C" to this Fifty-Ninth Report.

## ASSET DIVESTITURES AND ALLOCATION MATTERS

73. While Nortel has now completed the sale of most of its operating units, Nortel continues to assess the sale of its remaining assets, in consultation with its legal and financial advisors, while at the same time exploring other options in the event it cannot maximize value through sale transactions.

**Divestiture Activities**

*MSS Business Sale*

74. As discussed in the Fifty-Fourth Report, NNC, NNL and certain of NNL's subsidiaries, including NNI, entered into an asset sale agreement dated September 24, 2010 with Ericsson for the sale of substantially all of the MSS Business for $65 million plus certain assumed liabilities.

75. The sale transaction was approved by this Honourable Court and the U.S. Court on September 30, 2010.

76. The sale transaction is currently targeted to close before the end of March 2011; however, due to the timing of the application process for EU anti-trust approval the closing may be further delayed.

164

*Carling Campus*

77. As discussed in the Fifty-Sixth Report, NNTC and NNL (the "Vendor") entered into an asset sale agreement for the sale of 3500 Carling Avenue, Ottawa, Ontario (the "Carling Campus") to Public Works and Government Services Canada (the "Purchaser") for an amount of CAD $208 million. On November 8, 2010, this Honourable Court issued an order approving the sale.

78. The sale of the Carling Campus closed on December 17, 2010.

79. Net proceeds realized by the Vendor on closing amounted to approximately CAD $126.3 million after normal closing adjustments, payment of approximately CAD $3.1 million of real estate commissions and repayment in full of all principal and interest obligations owing to NNI pursuant to the NNI Loan Agreement (as described in the Fifty-Sixth Report) of approximately CAD $77.5 million.

80. Pursuant to the provisions of the asset sale agreement, the Vendor was directed by the Purchaser to exercise its early termination rights regarding two leases of portions of the Carling Campus with Ciena Canada, Inc., an affiliate of the purchaser of Nortel's Metro Ethernet Networks business. The early termination right was exercised and an amount of $33.5 million (plus interest) was paid from the Carling Property Escrow Amount (as described in the Twenty-Fourth Report) to Ciena.

81. At closing, NNL entered into a three year lease for certain portions of the Carling Campus at reasonable market rates to facilitate completion of obligations it has pursuant to provisions of transition service agreements entered into with various purchasers of Nortel businesses, facilitate the sale of the MSS business and monetize its remaining intellectual property assets. The lease is subject to early termination rights in favour of NNL. In addition, NNL continues to have access to certain free space within the Carling Campus for varying periods up to one year to allow it to vacate lab equipment and other assets and to consolidate its remaining operations.

0    165

*Realization of Remaining Assets*

82. Nortel continues to make progress towards maximizing proceeds of realization on its residual assets. The Corporate Group remains focused on facilitating the sale of Nortel's residual businesses and assets, including the sale of GDNT, one of NNL's remaining joint ventures. In addition, the Corporate Group continues to explore the strategic alternatives available to best optimize the value of Nortel's remaining intellectual property assets.

*Allocation Matters and Mediation*

83. As previously reported by the Monitor, a voluntary non-binding mediation process is underway through which the Applicants, the U.S. Debtors, the Joint Administrators, various other Nortel entities and their respective stakeholders are attempting to negotiate a comprehensive settlement of all outstanding inter-estate matters, including sale proceeds allocation and inter-company claims. Mediation sessions were held with mediator Layn R. Phillips, a former U.S. federal district court judge, over four days in November 2010. The mediation was initially scheduled to continue in January 2011; however, by agreement of the estates, the continuation of the mediation was postponed until mid-April 2011.

**OTHER RESTRUCTURING ACTIVITIES**

*CVAS Purchase Price Dispute*

84. As detailed in the Thirty-Fourth Report of the Monitor, on December 22, 2009, NNC, NNL, NNI and various other Nortel entities entered into an asset sale agreement (the "Sale Agreement") for the sale of certain assets pertaining to Nortel's CVAS business to GENBAND Inc. (now Genband US LLC, "GENBAND"), which sale subsequently closed on May 28, 2010. Subsequent to the closing, certain disputes have arisen between Nortel and GENBAND as regards the final purchase price payable to Nortel, which disputes have centered around the interpretation of the

28

166

term "Deferred Profit Amount" in the Sale Agreement. Under Nortel's interpretation of the term, the final purchase price payable under the Sale Agreement, subject to the resolution of certain other outstanding disputes, would be approximately $182 million, whereas under GENBAND's interpretation, the final purchase price payable would be approximately $143 million.

85.  This dispute resulted in each of Nortel and GENBAND bringing motions before the U.S. Court and this Honourable Court which, in the case of Nortel's motions, sought, amount others things, a declaration that the dispute was within the exclusive jurisdiction of the U.S. Court and this Honourable Court and an order enforcing Nortel's interpretation of the meaning of Deferred Profit Amount, and, in the case of GENBAND's motions, sought an Order that the dispute be referred to an accounting arbitrator.

86.  The parties agreed to defer a hearing on the substantive dispute in order to permit the U.S. Court and this Honourable Court to consider the jurisdictional issue at a joint hearing held on December 16, 2010.

87.  On January 21, 2011, both this Honourable Court and the U.S. Court issued reasons which confirmed the Deferred Profit Amount dispute was not subject to arbitration under the provisions of the Sale Agreement and that this Honourable Court and the U.S. Court retained exclusive jurisdiction to determine the dispute.

88.  On February 1, 2011, GENBAND filed a Notice of Appeal with respect to the U.S. Court's order and on February 11, 2011, GENBAND sought leave to appeal this Honourable Court's decision to the Ontario Court of Appeal. The Applicants and the Monitor, in conjunction with NNI, are presently considering their options with respect to these matters.

167

*CTDI Litigation*

89. As further detailed in the Fifty-Fifth Report, on September 21, 2010, NNL commenced an adversary proceeding in the Chapter 15 proceedings against Communications Test Design, Inc. ("CTDI"). NNL alleges in its complaint that CTDI obtained or used its proprietary materials, components and information for unauthorized purposes, including but not limited to the manufacture of new products. NNL is asserting claims against CTDI for misappropriation of trade secrets, trademark infringement, dilution of a famous mark, false designation of origin, breach of contract, breach of covenant of good faith and fair dealing, fraud and unjust enrichment. NNI has commenced a related adversary proceeding against CTDI in the Chapter 11 Proceedings, which has been joined with NNL's proceeding. The parties are currently engaged in the discovery process. In addition, CTDI brought a motion before the U.S. Court to dismiss both complaints, which motion is pending before the U.S. Court. On January 3, 2011 CTDI answered NNI and NNL's complaints and asserted counterclaims of breach of contract against both NNI and NNL and has moved to join NNC as a counterclaim defendant. NNI has moved to dismiss CTDI's counterclaims and NNL has joined in that motion. Further, NNL has objected to the joinder of NNC.

*BreconRidge Dispute*

90. On November 15, 2010, the Applicants served a Notice of Motion seeking an Order compelling SCI Brockville Corp. ("SCI Brockville"), as successor to BreconRidge Corporation, to pay certain payables due and owing to NNL (the "BreconRidge Payable"). SCI Brockville is a subsidiary of Sanmina SCI Corporation ("Sanmina"). On December 1, 2010, SCI Brockville and Sanmina filed a responding motion record in which they allege SCI Brockville is entitled to set-off amounts claimed to be owing by various Nortel entities to Sanmina or its affiliates against the BreconRidge Payable. The Applicants and the Monitor take the position that SCI Brockville is not entitled to such a set-off and that the BreconRidge Payable is due in

30

168

full. The motion, originally scheduled to be heard on February 11, 2011, was adjourned to March 25, 2011, to allow the parties further time to discuss a potential settlement of these issues.

*Estate Separation Activities*

91. As discussed in previous reports, many of Nortel's corporate functions span multiple legal entities. As the divestiture of the various operating lines of business has largely been completed and with the expectation that transitional services provided to the various buyers will be completed during 2011, the interdependency of the Nortel entities is expected to diminish. The various Nortel estates are developing plans for the separation of various functions to allow each estate to operate going forward on a "standalone" basis.

92. Further analysis by the Applicants and the Monitor is required to finalize these plans and identify the resources required by the Applicants to ensure all necessary functions continue to operate allowing the administration of the Canadian estates to continue on an effective, efficient and independent basis.

93. The Monitor believes that it is in the best interest of the Applicants to position themselves, in the near term, to operate on an independent basis.

*French Employee Claims*

94. Approximately 128 former employees of NNSA of have commenced actions against; *inter alia*, NNC, NNL and the Monitor, before the Versailles employment tribunal in France. Although the specific relief claimed varies on a case by case basis, the central claim is that NNC and NNL are liable for various employment related claims on the grounds that they were "co-employers" with NNSA. The aggregate amount claimed is approximately €18 million. A consultation hearing before a French tribunal was held in France on November 24, 2010 and a full hearing has been scheduled before the French tribunal on October 31, 2011. The Applicants, in

31

169

consultation with the Monitor and their respective counsel, are reviewing the claims and considering their options.

*Appeal of the U.K. Pension Regulator*

95. On February 25, 2010, this Honourable Court heard a motion brought by the Monitor requesting certain relief with respect to "financial support direction" proceedings commenced by the U.K. Pensions Regulator (the "UKPR") against NNC and NNL. Additional information relating to this matter can be found in the Thirty-Eighth Report.

96. On February 26, 2010, this Honourable Court granted an Order providing, among other things, that all acts taken by the UKPR in the purported exercise of rights and in commencing any proceedings against any of the Applicants are null and void and shall be given no force or effect in these proceedings, nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertakings in Canada.

97. Notices of Motion for Leave to Appeal this Order were filed with the Ontario Court of Appeal by the UKPR, the Nortel Networks UK Pension Trust Limited and The Board of the UK Pension Protection Fund and leave to appeal was granted on May 10, 2010.

98. Following a hearing on June 16, 2010, the Ontario Court of Appeal dismissed the appeal. The UKPR subsequently sought leave to appeal to the Supreme Court of Canada. On January 27, 2011, the Supreme Court dismissed the UKPR's leave application.

170

## STATUS OF FOREIGN PROCEEDINGS

*Chapter 11*

99. The following is a summary of the court orders that have been issued and the financial information that has been filed in the Chapter 11 Proceedings since the last update provided in the Monitor's Fifty-Fifth Report:

    a) on October 27, 2010, the U.S. Debtors obtained an order appointing Layn R. Phillips as the mediator for resolving disputes concerning the allocation of sale proceeds;

    b) on November 8, 2010, the U.S. Debtors obtained an order approving a stipulation between the U.S. Debtors, the Committee, and the UKPR regarding the UKPR's participation in the mediation;

    c) on November 23, 2010, the U.S. Debtors obtained an order approving the sale of limited partnership and limited liability company interests free and clear of all liens, claims and encumbrances to CS Strategic Partners IV VC Holdings, L.P. and Amberbrook V, LLC;

    d) on December 17, 2010, the U.S. Debtors obtained an order approving a stipulation between the U.S. Debtors and the Joint Administrators on behalf of NNUK and Nortel Networks (Ireland) Limited regarding the tolling of certain claims;

    e) on January 21, 2011, the U.S. Debtors obtained an order denying the motion of GENBAND US LLC to compel arbitration. On February 2, 2011, GENBAND US LLC filed a notice appealing this order; and

    f) the U.S. Debtors filed Debtor-in-Possession Monthly Operating Reports for the months of September, October and November on November 11, 2010, December 6, 2010 and December 22, 2010, respectively.

100. In addition, the U.S. Debtors obtained orders authorizing the expenditure of funds related to the wind-down of non-debtor subsidiaries and branch offices, extending the deadline for the Internal Revenue Service to complete its examination, granting omnibus objections to claims, authorizing the retention and payment of professionals, resolving certain claims and motions, and approving omnibus procedures to settle advance claims.

*Chapter 15*

101. The following is a summary of the filings in the Chapter 15 proceedings of the Applicants since the last update provided in the Monitor's Fifty-Fifth Report:

a) the Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Honourable Court. The Monitor also filed notice of the Stay Extension Order and Endorsement of the Ontario Court dated October 27, 2010;

b) on November 5, 2010, the Monitor obtained an order from the U.S. Court recognizing and enforcing the order of this Court approving a cross-border claims protocol establishing procedures to resolve overlapping and same-creditor claims in the CCAA proceedings and the Chapter 11 Proceedings. The US Court's order also recognized and enforced this Court's claims resolution order establishing mechanisms to determine the proven claims of creditors, including protocol claims; and

c) on November 5, 2010, the Monitor obtained an order enforcing this Court's order approving the sale of certain MSS business assets by NNC, NNL, NNI, and certain of their affiliates, to Telefonaktiebolaget L M Ericsson.

## REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS

102. The Stay Period presently expires on February 28, 2011. The Applicants are seeking a 122 day extension of the Stay Period up to and including June 30, 2011.

As stated above, based on the cash flow analysis, including the assumptions contained therein, the Applicants have sufficient cash resources to fund operations through the requested stay extension.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

103. The Monitor has assisted and continues to assist the Applicants in their efforts to efficiently complete the realization and maximization of value from their assets, conduct the claims process and prepare a plan of arrangement. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a Plan.

104. For the reasons outlined in this Fifty-Ninth Report, the Monitor supports the Applicants' request for the following:

    a) the employee hardship application criteria be amended such that the Required Funds be made available for payment of CAD $3,000 to the Additional Eligible Employees who meet the other criteria for Termination Fund payments, when combined with unused funds in the Termination Funds;

    b) the amount available for hardship applications be reduced by the Required Funds;

    c) an extension of the Employee Hardship Application Process to June 30, 2011;

    d) the Eligibility Requirements and the Procedure with Respect to Hardship Payments Applications be amended consistent with (a) through (c) above; and

    e) an extension of the stay up to and including June 30, 2011.

105. The Monitor also supports the administrative amendments to the Initial Order proposed by the Applicants to remove references to the NNI Loan, the NNI Loan

C  **173**

Charge, the Goldman Charge and the Carling Facility Charge as the obligations to which those provisions and charges relate have been satisfied by the Applicants.

All of which is respectfully submitted this 18 day of February, 2011.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

36

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

FIFTY-NINTH REPORT OF THE MONITOR
DATED FEBRUARY 18, 2011

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Jay A. Carfagnini (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

175

# APPENDIX "F"

- 176

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

SIXTY-SECOND REPORT OF THE MONITOR
DATED April 4, 2011

177

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................................1

II.    PURPOSE......................................................................................................3

III.   TERMS OF REFERENCE ..............................................................................5

IV.    BACKGROUND .............................................................................................7

V.     THE HWT.......................................................................................................7

       Overview.......................................................................................................8

       Mercer 2010 Preliminary HWT Valuation ...................................................8

VI.    JANUARY INTERIM DISTRIBUTION AND TERMINATION FUND PAYMENT .....9

VII.   PROPOSED APRIL PAYMENT TO SIB BENEFICIARIES AND STB
       BENEFICIARIES ........................................................................................11

VIII.  MONITOR'S RECOMMENDATION .............................................................12

**178**

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

SIXTY-SECOND REPORT OF THE MONITOR
DATED April 4, 2011

## I.   INTRODUCTION

1.    On January 14, 2009 (the **"Filing Date"**) Nortel Networks Corporation (**"NNC"** and collectively with all its subsidiaries **"Nortel"** or the **"Company"**), Nortel Networks Limited (**"NNL"**), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the **"Applicants"**) filed for and obtained protection under the *Companies' Creditors Arrangement Act* (**"CCAA"**). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the **"Initial Order"**), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the **"Monitor"**) in the CCAA proceedings. The stay of proceedings was extended to June 30, 2011, by this Honourable Court in its Order dated February 25, 2011.

2.    Nortel Networks Inc. (**"NNI"**) and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the **"Code"**) in the United States Bankruptcy Court for the District of Delaware (the **"U.S.**

Court") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

3.  An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**").

6.  Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7. The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8. Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II.    PURPOSE

9. This Sixty-Second Report is to report on the Applicants' request for an order that:

(a)   the employee hardship application criteria be amended such that sufficient funds (the "**Required Funds**") be made available for the payment from the Hardship Fund to beneficiaries entitled to survivor income benefits ("**SIBs**") and beneficiaries entitled to survivor transition benefits in pay ("**STBs In Pay**") of an amount that, when taken with the January Interim Distribution, will be 10% of their SIBs or STBs In Pay, calculated in accordance with the methodology used for the January Interim Distribution (the "**Maximum 10% Interim Distribution**"), provided that the payment shall not exceed one month's benefits, and to be credited against future distributions by the Applicants;

(b)   the amount available for hardship applications be reduced by the Required Funds; and

(c)   the Eligibility Requirements and Procedure with respect to Employee Hardship Payment Applications be amended consistent with (a) and (b) above.

10. On the making of the payment for which this Order is being sought and of the Termination Fund Payments, all SIB Beneficiaries, approximately 158 of the 335 STB Beneficiaries currently receiving STBs in Pay (the others having received the Maximum 10% Interim Distribution as part of the January Interim Distribution) and approximately 351 of the total of 356 LTD Beneficiaries will receive a payment from the Applicants in April.

11.  Although not before the Court at this time, the Monitor considers it appropriate to advise the Court that, in response to concerns raised by the Representative for the LTD Beneficiaries, the Representatives for the Former Employees and the CAW, the Monitor has continued its discussions with them, Independent Counsel, counsel to the CAW and Representative Counsel for the Continuing Employees.  All have now confirmed that they will consent to an order for a further interim distribution from the HWT to the Income Beneficiaries of the Maximum 10% Interim Distribution, to a maximum of an additional two months of benefits, bringing the maximum number of months to 5 months. The effect will be to allow for payments in respect of May and June, 2011.  Monitor's counsel so advised counsel to certain dissenting LTD Beneficiaries by letter dated April 1, 2011, a copy of which is attached as Appendix "A".

### III.  TERMS OF REFERENCE

12.  In preparing this Sixty-Second Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, expresses no opinion or other form of assurance on the information contained in this Sixty-Second Report.

13.  Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Monitor's Fifty-First Report dated August 27, 2010 (the "**Fifty-First Report**"), filed in support of the application for approval of the Approved HWT Allocation Methodology or in the Monitor's Fifty-Seventh Report dated December 3, 2010 (the "**Fifty-Seventh Report**"), filed in support of the application for approval of the January Interim Distribution from the HWT.

14.  Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## IV.  BACKGROUND

15.  The Fifty-Seventh Report (which attaches the Fifty-First Report and the Supplemental Fifty-First Report as appendices thereto) and the Monitor's Fifty-Ninth Report dated February 18, 2011 (the "**Fifty-Ninth Report**") are attached hereto as Appendices "B" and "C", with only relevant appendices attached thereto.

16.  The Fifty-First Report provides background concerning:

    (a)   the appointment of the representatives;

    (b)   the Settlement Agreement, including the cessation of benefits payable by Nortel on December 31, 2010;

    (c)   the HWT and the benefits provided thereunder;

    (d)   the process leading to the motion for approval of the allocation methodology proposed thereunder;

    (e)   the Mercer 2010 HWT Preliminary Valuation;

    (f)   the retainer of Sack Mitchell Goldblatt LLP by the LTD Beneficiaries' Representative and Lerners LLP by the Former Employees' Representatives (collectively, the "**Independent Counsel**"); and

    (g)   various allocation scenarios.

17.  The Supplemental Fifty-First Report provides the following update to the Fifty-First Report:

    (a)   an addendum to the Mercer 2010 HWT Preliminary Valuation reflecting information received with respect to the LTD Optional Life Benefit (the "**Mercer 2010 Addendum**"); and

(b)    revised illustrative allocation scenarios reflecting the valuation of the LTD Optional Life Benefit.

18.    The Fifty-Seventh Report provides background on the January Interim Distribution. The Fifty-Ninth Report provides background on Termination Fund payments to individuals terminated between July 1, 2010 and December 31, 2010 (including LTD Beneficiaries) using the balance of funds in the Termination Fund and such funds as necessary from the Hardship Fund.

19.    In summary:

    (a)    In accordance with the Settlement Agreement and the Order of this Court, income benefit payments by the Applicants ended on December 31, 2010.

    (b)    The Monitor sought this Court's approval of the Approved HWT Allocation Methodology for the funds held in the HWT, to enable a distribution of the HWT corpus, which this Court approved by Order dated November 9, 2010 (the "**HWT Allocation Order**").

    (c)    On November 29, 2010, counsel for a small group of dissenting LTD Beneficiaries filed an application for leave to appeal the HWT Allocation Order.

    (d)    At the request of the LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW, the Monitor brought a motion to provide an interim payment to the Income Beneficiaries. On December 15, 2010, this court granted an Order for an interim distribution from the HWT to the Income Beneficiaries (the "**January Interim Distribution Order**", attached hereto as Appendix "D") given, among other things:

        (i)    certain steps needed to be completed prior to a final distribution from the HWT, including reconciliation of data as at December 31, 2010 and a determination of certain variables that may affect assets available for distribution;

        (ii)    it was unlikely that the leave to appeal and, if leave were granted, any appeal, would be finally resolved and that all steps required for final distribution would be completed in sufficient time to allow for a final distribution before December 31, 2010; and

- 7 -

    (iii)    the interim payment would assist the Income Beneficiaries in the period between the termination of Income Benefits and the final distribution of the HWT corpus.

    (e)    The Ontario Court of Appeal denied leave to appeal the HWT Allocation Order on January 7, 2011. On March 8, 2011, counsel filed an application for leave to appeal the denial of leave with the Supreme Court of Canada.

    (f)    By order dated February 25, 2011, this court approved the making of Termination Fund payments to, among others, LTD Beneficiaries, using such funds as necessary from the Hardship Fund.

20.    The January Interim Distribution Order approved an interim distribution of the HWT corpus to each Income Beneficiary in an amount equal to 10% of the Income Benefits calculated in accordance with the Approved HWT Allocation Methodology, using data available as of December 31, 2010 according to the Applicants' books and records, as updated from time to time; provided that the interim distribution would not exceed 3 months of Income Benefits payable to the Income Beneficiary, based on the monthly amount payable to the Income Beneficiary for December, 2010 (the "**January Interim Distribution**").

## V.    THE HWT

## Overview

21.    As further described in the Fifty-First Report, Nortel provided the following benefits through the HWT (using the HWT as a payment mechanism with respect to non-pension employee benefits and to fund (in part) certain other benefit plans using trust assets): (a) medical, dental and life insurance benefits to pensioners; (b) income payments to disabled employees; (c) medical, dental and life insurance benefits to disabled employees; (d) income benefits for beneficiaries of deceased employees; and (e) medical, dental and life insurance benefits to active employees.

22.   Under the Approved HWT Allocation Methodology, distributions would be made on account of the following benefits:

    (a)   Pensioner Life;

    (b)   LTD Life;

    (c)   LTD Income;

    (d)   LTD Optional Life Benefit;

    (e)   SIBs; and

    (f)   STBs In Pay.

**Mercer 2010 Preliminary HWT Valuation**

23.   Attached as Appendix "C" to the Fifty-First Report is a report of Mercer dated August 27, 2010 (the "**Mercer 2010 HWT Preliminary Valuation**"), providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when payments under such plans ceased. As indicated in the Fifty-First Report, no amount was included in the valuation for the LTD Optional Life Benefit as there was insufficient data at the date of the Fifty-First Report to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life.

24.   Attached as Appendix "A" to the Supplemental Fifty-First Report is the Mercer 2010 Addendum, which provides a preliminary valuation of the LTD Optional Life Benefit based on the assumptions set out in the Mercer 2010 HWT Preliminary Valuation and data Nortel provided to Mercer and the Monitor following the date of the Fifty-First Report.

## VI.    JANUARY INTERIM DISTRIBUTION AND TERMINATION FUND PAYMENT

25.    The Fifty-Seventh Report sets out the Monitor's considerations in recommending the level of payment for the January Interim Distribution, including:

(a)    In all illustrative scenarios, each of LTD Income and SIBs would participate in a distribution of the HWT corpus.

(b)    In certain illustrative scenarios, STBs In Pay are excluded as participating benefits. However, the LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (whose constituents would be impacted if leave to appeal is granted and scenarios other than the Approved HWT Allocation Methodology are considered) consented to the January Interim Distribution to STB Beneficiaries entitled to STBs In Pay, of approximately $355,000 (currently approximately $405,000 based on the current number of STB Beneficiaries receiving STBs in Pay).

(c)    The percentage distribution on account of Income Benefits differs (including from the percentage distribution resulting from the Approved HWT Allocation Methodology) depending on which illustrative scenario is applied.

(d)    The Monitor considered a range of possible interim distributions and the consent described in (b) above and believed that payment to Income Beneficiaries at 10% of their Income Benefit to a maximum of 3 months would not prejudice other beneficiaries of the HWT.

(e)    The Monitor's Fifty-First Report indicated that for the purposes of the illustrative scenarios, the cash balance available for distribution on the termination of the HWT would be $80 million (including Pensioner Life premiums for 2010 of $7.8 million, which will be treated as a charge against any distribution in respect of Pensioner Life) but that the actual amount of cash available would be subject to adjustment for factors which include:

(i)    investment returns;

(ii)    treatment of stale-dated cheques;

(iii)    the actual amount of Pensioner Life premiums paid during 2010;

(iv)    the treatment of costs related to expenses incurred prior to the termination of the HWT but not submitted by February 28, 2010 and therefore not paid by Nortel pursuant to the Settlement Agreement;

(v)     taxes and administrative costs; and

(vi)    any fees paid from HWT assets pursuant to the Settlement Agreement with respect to any dispute or litigation regarding the HWT.

(f)     The Fifty-First Report also indicated that the ultimate distribution from the HWT would be dependent upon the outcome of other matters, including:

(i)     changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

(ii)    changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

A.     a different allocation of the HWT corpus;

B.     the resolution of contingencies;

C.     updating of data to December 31, 2010; and

D.     the award of fees against any particular benefit type.

26.    The January Interim Distribution was made and resulted in a lump sum amount representing 3 months of payments for approximately 512 Income Beneficiaries, and less than 3 months of payments for approximately 230 Income Beneficiaries. The majority of the Income Beneficiaries who received less than 3 months of Income Benefits under the interim distribution were the STB Beneficiaries because STBs are limited to a 5 year time period and many are approaching the end of that period.

27.    As discussed in the Fifty-Ninth Report, at the request of the LTD Beneficiaries' Representative, the Applicants sought and the Monitor recommended that the Termination Fund payments under the Settlement Agreement of $3,000 to each eligible employee whose employment was terminated by June 30, 2010 be extended to those employees terminated by December 31, 2010. By Order dated February 25, 2011, this

Court approved payment of $3,000 to each eligible employee terminated from July 1, 2010 to December 31, 2010 (the "**Termination Fund Payments**") from the balance remaining in the Termination Fund and using funds from the Hardship Fund (since the assets in the Termination Fund were not sufficient). At the time of the February 25, 2011 Order, approximately $626,000 remained in the Hardship Fund, of which approximately $360,000 will be required for Termination Fund Payments, leaving approximately $266,000. Approximately 351 out of approximately 356 LTD Beneficiaries are eligible for Termination Fund Payments, which will be made in April to all those who provided information to the Applicants by April 1, 2011. Those who provide information thereafter will receive their payments later.

## VII.   PROPOSED APRIL PAYMENT TO SIB BENEFICIARIES AND STB BENEFICIARIES

28.   Although there is increased certainty regarding the outcome of some of the matters in paragraph 25(e) and (f) above, some uncertainty remains, including as a result of the application for leave to appeal to the Supreme Court of Canada. Accordingly, the Monitor is not yet able to recommend that the final distribution be made from the HWT. The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW have therefore renewed requests for further interim Income Benefit payments.

29.   The Applicants are proposing a payment from the Hardship Fund in the month of April to SIB Beneficiaries and STB Beneficiaries in receipt of STBs In Pay, since they will not be receiving Termination Fund payments in April. The total payment will be approximately $179,000, leaving approximately $87,000 in the Hardship Fund. Given that, to date, only about 20% of the original amount of the Hardship Fund has been used to make payments to eligible applicants, the Monitor does not consider that this payment to SIB

- 12 -

Beneficiaries and STB Beneficiaries would cause prejudice. The payment to SIB Beneficiaries and STB Beneficiaries from the Hardship Fund would be treated like other hardship payments as an advance against future distributions by the Applicants and would be limited to the Maximum 10% Interim Distribution, provided that the payment shall not exceed one month's benefits. Payments from the Hardship Fund will be subject to applicable statutory withholdings. All 80 SIB Beneficiaries will receive a full month's benefits, none of them being at 10%. 158 STB Beneficiaries receiving STBs in Pay, including 17 whose entitlement was reported in 2011, will receive payments, of which 87 will receive a full month's benefits. The form of amended Hardship Eligibility Requirements and Procedure with respect to Hardship Payment Applications is attached here to as Appendix "E".

## VIII.  MONITOR'S RECOMMENDATION

30.    The Monitor recommends that this Honourable Court amend the hardship application criteria and grant the Order in the form submitted by the Applicants.

All of which is respectfully submitted this 4th day of April, 2011.

**ERNST & YOUNG INC.**

**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President
\5953952

# APPENDIX "G"

190

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

SIXTY-FOURTH REPORT OF THE MONITOR
DATED APRIL 25, 2011

191

# TABLE OF CONTENTS

Page

I.    INTRODUCTION..................................................................................................1

II.   PURPOSE.............................................................................................................3

III.  TERMS OF REFERENCE ...................................................................................4

IV.   BACKGROUND ..................................................................................................5

V.    THE HWT OVERVIEW.......................................................................................6

VI.   JANUARY INTERIM DISTRIBUTION, TERMINATION FUND PAYMENT AND
      APRIL SIB/STB PAYMENT.................................................................................8

VII.  MAY/JUNE INTERIM DISTRIBUTION............................................................11

VIII. MONITOR'S RECOMMENDATION ................................................................12

**192**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**SIXTY-FOURTH REPORT OF THE MONITOR**
**DATED APRIL 25, 2011**

## I.   INTRODUCTION

1.   On January 14, 2009 (the **"Filing Date"**) Nortel Networks Corporation (**"NNC"** and collectively with all its subsidiaries **"Nortel"** or the **"Company"**), Nortel Networks Limited (**"NNL"**), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the **"Applicants"**) filed for and obtained protection under the *Companies' Creditors Arrangement Act* (**"CCAA"**). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the **"Initial Order"**), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the **"Monitor"**) in the CCAA proceedings. The stay of proceedings was extended to June 30, 2011, by this Honourable Court in its Order dated February 25, 2011.

2.   Nortel Networks Inc. (**"NNI"**) and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the **"Code"**) in the United States Bankruptcy Court for the District of Delaware (the **"U.S.**

Court") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

3.      An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.      Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.      Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**").

6.      Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

- 3 -

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II.    PURPOSE

9.    The purpose of this Sixty-Fourth Report of the Monitor (the **"Sixty-Fourth Report"**) is to seek this Honourable Court's approval of a second interim distribution to the Income Beneficiaries on account of their Income Benefits from funds held in the HWT (the **"May/June Interim Distribution"**) and such ancillary relief as is just and convenient.

10.    As discussed in the Monitor's Sixty-Second Report dated April 4, 2011 (the **"Sixty-Second Report"**), although there is increased certainty regarding the outcome of some of the matters referred to therein and below, some uncertainty remains, including as a result of an application by counsel for certain LTD Beneficiaries for leave to appeal the HWT Allocation Order to the Supreme Court of Canada.  Accordingly, the Monitor is not yet able to recommend that a final distribution be made from the HWT.

11.    The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW have asked the Monitor to bring this motion to provide a further interim payment to the Income Beneficiaries to assist them during the period between the termination of benefits on December 31, 2010 and a final distribution of the HWT corpus.

12. As the Monitor advised in the Sixty-Second Report, the Monitor is bringing this motion in response to these requests. The Monitor is recommending that the amount of the May/June Interim Distribution of the HWT corpus to each Income Beneficiary be the amount that, when taken with the January Interim Distribution, will be 10% of his or her Income Benefits in pay, calculated in accordance with the methodology used for the January Interim Distribution (the "**Maximum 10% Interim Distribution**"), provided that the payment shall not exceed an additional two months of benefits, bringing the maximum number of months to 5 months. (As discussed below, payments from the hardship fund and the termination fund are being made in April).

13. The LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (the "**Consenting Parties**") each consent to the within motion and the proposed May/June Interim Distribution, without prejudice and with a reservation of all rights and arguments.

## III.  TERMS OF REFERENCE

14. In preparing this Sixty-Fourth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, expresses no opinion or other form of assurance on the information contained in this Sixty-Fourth Report.

15.  Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Sixty-Second Report, filed in support of the April SIB/STB Payment (defined below).

16.  Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## IV.  BACKGROUND

17.  The Sixty-Second Report provided background concerning the April SIB/STB Payment. The Sixty-Second Report is attached as Appendix "A", including the following appendices attached to the Sixty-Second Report:

    (a)  The Fifty-Seventh Report filed in support of the January Interim Distribution, which attaches:

        (i)  the Fifty-First Report filed in support of the motion for approval of HWT allocation methodology, providing background concerning:

            A.  the appointment of the representatives;

            B.  the Settlement Agreement, including the cessation of benefits payable by Nortel on December 31, 2010;

            C.  the HWT and the benefits provided thereunder;

            D.  the process leading to the motion for approval of the allocation methodology proposed thereunder;

            E.  the Mercer 2010 HWT Preliminary Valuation, providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when payments under such plans were to cease;

            F.  the retainer of the Independent Counsel; and

            G.  various allocation scenarios; and

(ii)   the Supplemental Fifty-First Report, providing the following update to the Fifty-First Report:

A.   the Mercer 2010 Addendum reflecting information received with respect to the LTD Optional Life Benefit; and

B.   revised illustrative allocation scenarios reflecting the valuation of the LTD Optional Life Benefit; and

(b)   The Fifty-Ninth Report in support of the Termination Fund Payments.

## V.   THE HWT OVERVIEW

18.   As further described in the Fifty-First Report, Nortel provided the following benefits through the HWT (using the HWT as a payment mechanism with respect to non-pension employee benefits and to fund (in part) certain other benefit plans using trust assets): (a) medical, dental and life insurance benefits to pensioners; (b) income payments to disabled employees; (c) medical, dental and life insurance benefits to disabled employees; (d) income benefits for beneficiaries of deceased employees; and (e) medical, dental and life insurance benefits to active employees.

19.   Under the Approved HWT Allocation Methodology, distributions would be made on account of the following benefits:

(a)   Pensioner Life;

(b)   LTD Life;

(c)   LTD Income;

(d)   LTD Optional Life Benefit;

(e)   SIBs; and

(f)   STBs in pay.

20.   The LTD Income, SIBs and STBs In Pay are referred to collectively as the "**Income Benefits**", and the LTD beneficiaries entitled to LTD Income, the SIB Beneficiaries and the STB Beneficiaries entitled to STBs In Pay are referred to collectively as the "**Income Beneficiaries**".

21.   Summary of Status:

(a)   In accordance with the Settlement Agreement and by Order of this Court, income benefit payments by the Applicants ended on December 31, 2010.

(b)   By Order dated November 9, 2010 (the "**HWT Allocation Order**"), the Approved HWT Allocation Methodology was approved to enable a distribution of the HWT corpus.

(c)   On November 29, 2010, counsel for a small group of dissenting LTD Beneficiaries filed an application for leave to appeal the HWT Allocation Order.

(d)   At the request of the LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW, the Monitor brought a motion requesting approval of an interim payment to the Income Beneficiaries. On December 15, 2010, this Honourable Court granted an Order for an interim distribution from the HWT to the Income Beneficiaries (the "**January Interim Distribution Order**", attached to the Sixty-Second Report as Appendix "D"). The reasons an interim distribution was sought included, among other things:

(i)    certain steps were needed to be completed prior to a final distribution from the HWT, including reconciliation of data as at December 31, 2010 and a determination of certain variables that may affect assets available for distribution;

(ii)   it was unlikely that the leave to appeal and, if leave were granted, any appeal, would be finally resolved and that all steps required for final distribution would be completed in sufficient time to allow for a final distribution of the HWT corpus before December 31, 2010; and

(iii)  the interim payment would assist the Income Beneficiaries during the period between the termination of Income Benefits and a final distribution of the HWT corpus.

(e)    The Ontario Court of Appeal denied leave to appeal the HWT Allocation Order on January 7, 2011. On March 8, 2011, counsel filed an application for leave to appeal the denial of leave with the Supreme Court of Canada.

(f)    By order dated February 25, 2011, this court approved the making of Termination Fund payments to, among others, LTD Beneficiaries, using such funds as necessary from the Hardship Fund.

(g)    By order dated April 8, 2011, this court approved necessary amendments to the employee hardship application process and criteria so that the April SIB/STB Payment could be made.

## VI.  JANUARY INTERIM DISTRIBUTION, TERMINATION FUND PAYMENT AND APRIL SIB/STB PAYMENT

22.    The Fifty-Seventh Report sets out the Monitor's considerations in recommending the level of payment for the January Interim Distribution, including:

(a)    In all illustrative scenarios, each of LTD Income and SIBs would participate in a distribution of the HWT corpus.

(b)    In certain illustrative scenarios, STBs In Pay are excluded as participating benefits. However, the LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (whose constituents would be impacted if leave to appeal is granted and scenarios other than the Approved HWT Allocation Methodology are considered) consented to the January Interim Distribution to STB Beneficiaries entitled to STBs In Pay, of approximately $355,000 (currently approximately $415,000 based on the current number of STB Beneficiaries receiving STBs in Pay).

(c)    The percentage distribution on account of Income Benefits differs (including from the percentage distribution resulting from the Approved HWT Allocation Methodology) depending on which illustrative scenario is applied.

(d)    The Monitor considered a range of possible interim distributions and the consent described in (b) above and believed that payment to Income Beneficiaries at 10% of their Income Benefit to a maximum of 3 months would not prejudice other beneficiaries of the HWT.

(e)    The Monitor's Fifty-First Report indicated that for the purposes of the illustrative scenarios, the cash balance available for distribution on the termination of the HWT would be $80 million (including Pensioner Life premiums for 2010 of $7.8 million, which will be treated as a charge against any distribution in respect of

Pensioner Life) but that the actual amount of cash available would be subject to adjustment for factors which include:

    (i)       investment returns;

    (ii)      treatment of stale-dated cheques;

    (iii)     the actual amount of Pensioner Life premiums paid during 2010;

    (iv)    the treatment of costs related to expenses incurred prior to the termination of the HWT but not submitted by February 28, 2010 and therefore not paid by Nortel pursuant to the Settlement Agreement;

    (v)      taxes and administrative costs; and

    (vi)    any fees paid from HWT assets pursuant to the Settlement Agreement with respect to any dispute or litigation regarding the HWT.

(f)    The Fifty-First Report also indicated that the ultimate distribution from the HWT would be dependent upon the outcome of other matters, including:

    (i)      changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

    (ii)     changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

        A.     a different allocation of the HWT corpus;

        B.     the resolution of contingencies;

        C.     updating of data to December 31, 2010; and

        D.     the award of fees against any particular benefit type.

23.    The January Interim Distribution Order was granted on December 15, 2010 and provided for the January Interim Distribution, being an interim distribution of the HWT corpus to each Income Beneficiary in an amount equal to 10% of the Income Benefits calculated in accordance with the Approved HWT Allocation Methodology, using data available as of

- 10 -

December 31, 2010 according to the Applicants' books and records, as updated from time

to time; provided that the interim distribution would not exceed 3 months of Income

Benefits payable to the Income Beneficiary, based on the monthly amount payable to the

Income Beneficiary for December, 2010.

24.    The January Interim Distribution was made and resulted in a lump sum amount

representing 3 months of payments for approximately 512 Income Beneficiaries, and less

than 3 months of payments for approximately 230 Income Beneficiaries. The majority of

the Income Beneficiaries who received less than 3 months of Income Benefits were the

STB Beneficiaries as STBs are limited to a 5 year time period and many are approaching

the end of that period.

25.    Because the January Interim Distribution provided up to three months of Income

Benefits, those who did not reach the Maximum 10% Interim Distribution were paid,

effectively, their income benefits only through to March. The LTD Beneficiaries'

Representative, the Former Employees' Representatives and the CAW requested that

further payments be made.

26.    Two further payments have been approved by this Court and are being made so that all

eligible Income Beneficiaries will receive a payment in April. These payments are not

interim distributions from the HWT and do not affect the corpus of the HWT or the

quantum of the Income Beneficiaries' claims in the HWT:

(a)    **The Termination Fund Payments** - As discussed in the Fifty-Ninth Report and
       approved by Order dated February 25, 2011, payment of $3,000 to each eligible
       employee terminated from July 1, 2010 to December 31, 2010, being
       approximately 351 out of approximately 356 LTD Beneficiaries, are being made
       in April from the balance remaining in the Termination Fund and using funds
       from the Hardship Fund (since the assets in the Termination Fund were not

sufficient) to all those who provided information to the Applicants by April 1, 2011; and

(b)  **The April SIB/STB Payments** - As discussed in the Sixty-Second Report and approved by Order dated April 8, 2011, the employee hardship application process and criteria have been amended so that payments can be made from the Hardship Fund to SIB Beneficiaries and STB Beneficiaries entitled to STBs in Pay to the Maximum 10% Interim Distribution, for a maximum of one month of benefits, to be credited against future distributions by the Applicants (the "**April SIB/STB Payments**"). All 80 SIB Beneficiaries are receiving a full month's benefits, none of them being at 10%. Approximately 160 STB Beneficiaries entitled to STBs in Pay, including approximately 20 whose entitlement was reported in 2011, are receiving payments, of which approximately 90 will receive a full month's benefits.

## VII.  MAY/JUNE INTERIM DISTRIBUTION

27.  Attached as Appendix "B" is a chart illustrating the proposed May/June Interim Distribution using data as at December 31, 2010 available from the Applicants as of April 21, 2011.

28.  The Monitor has taken into account the considerations referred to in respect of the making of the January Interim Distribution discussed in paragraph 22 above, in recommending the level of payment for the May/June Interim Distribution.

29.  As discussed in paragraph 22(b), STBs In Pay are excluded as participating benefits in certain illustrative scenarios. The January Interim Distribution resulted in total payments of approximately $415,000 on account of STBs In Pay. The May/June Interim Distribution would result in a further payment of approximately $92,000. The Consenting Parties are consenting to this further payment.

30.  The May/June Interim Distribution would result in a lump sum amount representing 2 months of payments for approximately 348 Income Beneficiaries, and less than 2 months of payments for approximately 182 Income Beneficiaries. The majority of the Income Beneficiaries who receive less than 2 months of Income Benefits under the proposed

- 12 -

203

interim distribution are those in receipt of STBs In Pay, which are limited to a 5 year time period. The May/June Interim Distribution will be subject to applicable statutory withholdings.

## VIII.   MONITOR'S RECOMMENDATION

31.   The Monitor believes that an interim distribution to Income Beneficiaries is appropriate in the circumstances and that an interim distribution of 10% (when taken with the January Interim Distribution) of the Income Benefits to a maximum of 2 months is prudent and reasonable. The Monitor believes that the proposed interim distribution would not prejudice other beneficiaries of the HWT (particularly given its conservative nature, that the proposed interim distribution results in a relatively small distribution on account of STBs In Pay and the Consenting Parties have consented to the proposed interim distribution, including on account of STBs In Pay) and is responsive to the Income Beneficiaries' request for an interim payment pending final distribution of the HWT corpus.

32.   Accordingly, the Monitor requests that this Honourable Court grant the Order in the form submitted.

All of which is respectfully submitted this 25th day of April, 2011.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
Per:

Murray A. McDonald
President
\5957485

# APPENDIX "H"

204

# Nortel Health and Welfare Trust
## Proposed Third HWT Interim Distribution
Cdn (000s)

Appendix H

| Income Beneficiaries | # of Beneficiaries[1] | Estimated income benefit claim[1] | # of Beneficiaries[2] | Estimated income benefit claim[2] | Maximum 25% Distribution | January HWT Interim Distribution | May/June HWT Interim Distribution | Third HWT Interim Distribution[4] |
|---|---|---|---|---|---|---|---|---|
| LTD (including IBNR) | 357 | $ 79,897 | 347 | $ 76,408 | $ 19,102 | $ 2,407 | $ 1,426 | $ 14,977 |
| STB in Pay | 305 | $ 4,110 | 337 | $ 5,134 | $ 1,283 | $ 418 | $ 94 | $ 772 |
| SIB | 81 | $ 16,169 | 80 | $ 16,006 | $ 4,002 | $ 335 | $ 224 | $ 3,443 |
| | 743 | $ 100,176 | 764 | $ 97,548 | $ 24,388 | $ 3,161 | $ 1,744 | $ 19,192 |

The following tables stratify the income beneficiaries by the number of months of net[3] monthly benefits that would be received by them, solely with respect to the proposed Third HWT Interim Distribution:

LTD (including IBNR)

| # of months of net[3] monthly benefit | Total HWT interim distribution | Median HWT interim distribution | Average HWT interim distribution | # of beneficiaries |
|---|---|---|---|---|
| <1 | $ 11 | $ 1 | $ 1 | 14 |
| ≥1 & <3 | 103 | 3.0 | 3.9 | 26 |
| ≥3 & <6 | 342 | 8.3 | 9.5 | 36 |
| ≥6 & <9 | 699 | 13.4 | 23.3 | 30 |
| ≥9 & <12 | 496 | 17.9 | 27.5 | 18 |
| ≥12 | 13,326 | 46.7 | 59.8 | 223 |
| Total | $ 14,977 | | | 347 |

STB in Pay

| # of months of net[3] monthly benefit | Total HWT interim distribution | Median HWT interim distribution | Average HWT interim distribution | # of beneficiaries |
|---|---|---|---|---|
| <1 | $ 6 | $ 0 | $ 0 | 6 |
| ≥1 & <3 | 86 | 1.1 | 1.1 | 81 |
| ≥3 & <6 | 341 | 2.4 | 2.4 | 140 |
| ≥6 & <9 | 339 | 3.8 | 3.8 | 88 |
| ≥9 & <12 | - | $ - | $ - | - |
| ≥12 | - | $ - | $ - | - |
| Total | $ 772 | | | 337 |

SIB

| # of months of net[3] monthly benefit | Total HWT interim distribution | Median HWT interim distribution | Average HWT interim distribution | # of beneficiaries |
|---|---|---|---|---|
| <1 | $ - | $ - | $ - | 0 |
| ≥1 & <3 | - | $ - | $ - | - |
| ≥3 & <6 | - | $ - | $ - | - |
| ≥6 & <9 | 17 | $ 9 | $ 9 | 2 |
| ≥9 & <12 | 22 | $ 11 | $ 11 | 2 |
| ≥12 | 3,403 | $ 38.0 | $ 44.8 | 76 |
| Total | $ 3,443 | | | 80 |

[1] Based on data as of June 30, 2010 as reflected in the Illustrative HWT Allocation Scenarios in Appendix D to the Monitor's Fifty-First Report.
[2] Based on data as of December 31, 2010 updated to May 31, 2011 using the methodology used in the Monitor's Fifty-First Report. Numbers are subject to change based on any status changes and estimated income benefits are subject to change based on confirmation of personal data.
[3] Gross monthly benefit net of other income benefits (i.e. CPP, WSIB) as applicable but before income tax
[4] Amounts exclude IBNR

205

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**SIXTY-NINTH REPORT**
**OF THE MONITOR**
**DATED JUNE 16 , 2011**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre, 333 Bay Street
Toronto, Canada  M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Fred Myers (LSUC#: 26301A)
Gale Rubenstein (LSUC# 17088E)
Melaney J. Wagner (LSUC# 44063B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5977776