**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.* | Case No.09-10138 (KG) |
| Debtors. | Jointly Administered |
| | [Re: Docket Nos. 5359, 5202] |

Objection Deadline: July 6, 2011 at 5:00 p.m. ET
Hearing Date: July 11, 2011, at 9:30 a.m. ET

**OBJECTION OF THE INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS, INC. TO SALE FREE AND CLEAR OF DEBTORS' SSO COMMITMENTS**

The Institute of Electrical and Electronics Engineers, Inc. ("IEEE") submits this limited objection to the Sale Motion.[1] For clarity, IEEE states at the outset that it takes no position on which party should be permitted to purchase the patents at issue or on the terms of any purchase agreement. IEEE's sole concern is that the bankruptcy process not be used in a way that permits a successor patent-holder to disavow the patent commitments that IEEE, other standards setting organizations (SSOs), entire industries, and end-users have relied upon.

1.  Nortel employees have participated in IEEE standards development for two decades, and Nortel has made a large number of commitments to IEEE and to stakeholders in IEEE's standards development activities. Three parties have already presented arguments for

---

[1] Motion For Orders (I) (A) Authorizing Debtors' Entry Into The Stalking Horse Asset Sale Agreement, (B) Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving The Notice Procedures And The Assumption And Assignment Procedures, (D) Approving The License Rejection Procedures, (E) Approving A Side Agreement, (F) Authorizing The Filing Of Certain Documents Under Seal And (G) Setting A Date For The Sale Hearing And (II) Authorizing And Approving (A) The Sale Of Certain Patents And Related Assets Free And Clear Of All Claims And Interests, (B) The Assumption And Assignment Of Certain Executory Contracts, (C) The Rejection Of Certain Patent Licenses And (D) The License Non-Assignment And Non-Renewal Protections [Docket No. 5202].

why disavowal of these commitments is not permitted under the bankruptcy laws,[2] and IEEE will not repeat those arguments. Instead, IEEE explains why patent commitments are critical to the entire standards development process.

## I. The IEEE, Standards Development, and Patent Commitments

2. IEEE is an educational and scientific organization described in section 501(c)(3) of the Internal Revenue Code of 1986, with more than 365,000 members in over 150 countries. IEEE seeks to advance global prosperity by fostering technological innovation, enabling members' careers, and promoting community worldwide. IEEE promotes the engineering process of creating, developing, integrating, sharing, and applying knowledge about electronics and information technologies and sciences for the benefit of humanity and the profession.

### A. Standards Development Activities

3. One of IEEE's activities in service of its mission is the development of standards. Through the IEEE Standards Association ("IEEE-SA"), IEEE is a leading forum for development of standards that underpin many of today's technologies. IEEE-SA's standards are developed in an open process based on input from all interested parties and building consensus. With nearly 1,300 standards either completed or under development, IEEE-SA is a central source of standardization in both traditional and emerging fields, particularly telecommunications, information technology, and power generation. IEEE-SA conducts over 200 standards ballots every year, through which proposed standards are voted upon for technical accuracy, soundness, and acceptance. IEEE-SA thrives because of the technical diversity of its 20,000 plus

---

[2] Limited Objection of AT&T to Sale of Patents Free and Clear of All Claims and Interests [Docket No. 5658]; Limited Objection of Microsoft Corporation to Motion of Debtors to Sell Certain Patents and Related Assets Free and Clear of All Claims and Interests and Related Relief [Docket No. 5664]; Nokia Corporation's Objection to Sale Free and Clear of Debtors' SSO Commitments [Docket No. 5665].

participants, consisting of technology experts and interested parties from around the globe, and including individuals in corporations, organizations, universities, and government agencies.

### B. The Role of Patents in IEEE Standards

4. IEEE-SA seeks to produce standards that any willing implementer can use and that will become widely adopted. IEEE-SA's patent policy permits the inclusion of patented technology in certain circumstances, because the best technological approach that the standards-development participants select is or may be covered by a patent. Inclusion of patented technology without a patent commitment, however, jeopardizes the goal of widespread adoption. Consequently, IEEE-SA (like most SSOs) has adopted a patent policy intended to remove this barrier.

### C. IEEE's Requirement for Patent Commitments

5. The first step in IEEE-SA's policies is to determine the existence of potential "essential" patent claims.[3] IEEE-SA asks every participant in a standards-development project, at every standards-development meeting, to identify any holders of potential essential patent claims, and to do so as early as possible in the standards development process.[4] IEEE-SA expects that working group members will act in good faith and will disclose any known patents that might prove essential (or identify any persons who might hold potentially essential patents).[5] IEEE-SA then asks any person so identified to state its licensing intentions. As long as the

---

[3] If a patent is not technically or commercially necessary for a compliant implementation of the standard, then it is not covered by the IEEE-SA's policy.

[4] IEEE-SA's current patent policy is available at http://standards.ieee.org/develop/policies/bylaws/sect6-7.html#6.

[5] *See Understanding Patent Issues During IEEE Standards Development Patented Technology in IEEE Standards* ¶ 17 ("the IEEE-SA does expect that participants will conduct themselves in good faith"), *available at* http://standards.ieee.org/faqs/patents.pdf.

patent-holder makes a sufficient commitment,[6] then the existence of the patent will not preclude IEEE-SA from adopting the standard. The IEEE-SA policy permits the known use of essential patents (and patent applications) if IEEE-SA receives the patent-holder's or applicant's commitments that either (a) the patent-holder or applicant will not enforce any of its present or future essential patent(s) against any person complying with the standard; or (b) the patent-holder or applicant will make available a license for such implementation to an unrestricted number of applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination (RAND — i.e., reasonable and non-discriminatory).[7] IEEE-SA's policy is consistent with the IPR policy requirements issued by the American National Standards Institute.[8]

6. Patent commitments must be durable for the standards development process to function. If a patent-holder could withdraw a commitment, then a standards-development group could not rely on it. Years of joint effort would be wasted if the standards development effort had to go back to square one. Or if the standard had already been adopted, the reneging patent-holder would be able to extract monopoly profits from all implementers (or, if the patent-holder produces its own compliant implementation, refusing to license its rivals at all) – monopoly, because there would be no competing (and noninfringing) alternative for compliance with the standard because, by definition, the committed patent is "essential" for a compliant

---

[6] In IEEE-SA's parlance, this commitment is referred to as a "Letter of Assurance," but for consistency with the three previously submitted briefs, we will use "commitment."

[7] IEEE Standards Board Bylaws § 6, *available at* [http://standards.ieee.org/develop/policies/bylaws/sect6-7.html#6](http://standards.ieee.org/develop/policies/bylaws/sect6-7.html#6).

[8] *See* ANSI, *Normative National Standards Policies* § 3.1 (rev. ed. 2008), *available at* http://publicaa.ansi.org/sites/apdl/Reference%20Documents%20Regarding%20ANSI%20Patent%20Policy/ANSI%20Patent%20Policy%20-%20Revised%202008.pdf.

implementation of the standard.  Thus, a patent commitment "is irrevocable once submitted and accepted."[9]

7.  The patent commitment needs to be durable even if the underlying patent is transferred.  From the perspective of IEEE-SA (and other SSOs) and would-be implementers of the standard, what matters is not the identity of the patent-holder, but the continuing validity of the commitment after transfer.  Thus, IEEE-SA policy requires that the original provider of the commitment bind its successor to honor the commitment (who then needs to bind that successor's successor to honor the commitment, and so on).[10]

## II.  Antitrust Enforcers Require that Patent Commitments to SSOs Bind Successor Owners

8.  The need for durable patent commitments is not simply an IEEE-SA position.  Rather, it is a core concern of antitrust enforcers in dealing with patents and standards.  For example, the Federal Trade Commission brought its *N-Data* case to require a successor to honor its predecessor's patent commitment.  In its statement on issuance of the Complaint, the FTC explained that N-Data had "reneged on a prior licensing commitment to a standard-setting body and *thereby was able to increase the price of an Ethernet technology used by almost every American consumer who owns a computer*."  Statement of the Federal Trade Commission, *In the Matter of Negotiated Data Solutions LLC*, FTC File No. 0510094 (Jan. 23, 2008) (emphasis added), *available at* http://www.ftc.gov/os/caselist/0510094/080122statement.pdf.  Permitting a successor patent-holder to renege on its predecessor's commitment "could be enormously

---

[9] IEEE-SA Standards Board Bylaws § 6.2, *available at* http://standards.ieee.org/develop/policies/bylaws/sect6-7.html#6.

[10] *Id.* ("The Submitter of a Letter of Assurance shall agree (a) to provide notice of a Letter of Assurance either through a Statement of Encumbrance or by binding any assignee or transferee to the terms of such Letter of Assurance; and (b) to require its assignee or transferee to (i) agree to similarly provide such notice and (ii) to bind its assignees or transferees to agree to provide such notice as described in (a) and (b).").

harmful to standard-setting." *Id.* As the Commission put it, if the ability to renege on a predecessor's commitment "became the accepted way of doing business, even the most diligent standard-setting organizations would not be able to rely on the good faith assurances of respected companies. The possibility exists that those companies would exit the business, and that their patent portfolios would make their way to others who are less interested in honoring commitments than in exploiting industry lock-in." *Id.*

9.  Nor is the U.S. alone in this concern. More recently the European Commission issued a report discussing standards-development (as well as other forms of cooperation among competitors). The Commission explicitly recognized the problem of the continued vitality of patent commitments to SSOs when a patent is transferred, and it recommended that the SSO take steps to ensure that the commitment followed the patent:

> To ensure the effectiveness of the FRAND commitment,[11] there would also need to be a requirement on all participating IPR holders who provide such a commitment to ensure that any company to which the IPR owner transfers its IPR (including the right to license that IPR) is bound by that commitment, for example through a contractual clause between buyer and seller.

European Commission, *Guidelines On The Applicability Of Article 101 Of The Treaty On The Functioning Of The European Union To Horizontal Co-Operation Agreements* ¶ 285 (Jan. 14r, 2011), available at *http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX: 52011XC0114(04):EN:NOT*.

### III. The Reason for Transfer and the Use of Bankruptcy Proceedings to Accomplish the Transfer Do Not Lessen the Public Harm from Negating SSO Commitments

10.  The harm that will flow from evisceration of patent commitments to SSOs does not depend on the nature of the transfer. A transfer approved by a bankruptcy court is still a

---

[11] "FRAND" stands for "*f*air, *r*easonable *a*nd *n*on*d*iscriminatory" and is the more common European usage.

transfer, and freeing a successor patent-holder from the associated patent commitments to SSOs would still result in anticompetitive harm to consumers and other end-users of compliant implementations of a standard.  While the trustee certainly should seek to maximize the value of the bankruptcy estate, this Court should not approve a sale that maximizes the estate's value by harming consumers.

11.     Furthermore, this Court should be wary of entering an order that appears to give more than this Court can give.  Even if this Court says that the transfer is free and clear of patent commitments to SSOs, a court sitting in equity could still consider the commitments as an equitable factor in determining whether to issue an injunction against infringement. *See generally eBay Inc. v. Mercexchange LLC,* 547 U.S. 388 (2006)  (injunction not automatic; court must consider whether equitable factors, including whether the public interest would be disserved by an injunction).  If a purchaser today decides to overpay for the assets in the hope of being able to extract unreasonable royalties or exclude rivals, it does so at its own peril.  Likewise, this Court's order could not prevent the Federal Trade Commission from determining that a refusal to honor a pre-bankruptcy patent commitment is an unfair method of competition under Section 5 of the FTC Act, 15 U.S.C. § 45.

## IV.     No Transfer Should Be Approved Unless It Provides at Least as Much Protection as the Stalking Horse Bid

12.     The Stalking Horse Bid provides for transfer of the patents free of all liens and encumbrances except "Permitted Encumbrances," which is defined to include written commitments to SSOs to the extent that they are listed on a schedule that has been filed under seal.  The transfer of patents should be subject to *all* commitments to SSOs, whether or not they are in writing, and whether or not they are included on a sealed schedule, and IEEE objects to any transfer that is not so subject.  But a bid that does not include at least the protections

included in the Stalking Horse Bid is even worse and should not be approved under any circumstances.

## V.     Conclusion

13.     For these reasons, IEEE urges the Court to require that the successful bidder agree to honor all prior patent commitments to IEEE and other SSOs and for such other relief as the Court deems just and proper.

Dated: June 27, 2011          DORSEY & WHITNEY (DELAWARE) LLP

  /s/     Robert W. Mallard
Eric Lopez Schnabel (DE Bar No. 3672)
Robert W. Mallard (DE Bar No. 4279)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Facsimile: (302) 425-7177
E-mail: schnabel.eric@dorsey.com
E-mail: mallard.robert@dorsey.com


DORSEY & WHITNEY LLP
Michael Lindsay (MN Bar No. 163466)
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

Attorneys for The Institute of
Electrical and Electronics Engineers,
Incorporated