**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------X
                                            :
*In re*                                     :        Chapter 11
                                            :
Nortel Networks Inc., *et al.,*[1]          :        Case No. 09-10138 (KG)
                                            :
                     Debtors.               :        Jointly Administered
                                            :
                                            :        Hearing date: July 11, 2011 at 9:30 a.m.
                                            :
                                            :        **RE: Docket No. 5631**
                                            :
-----------------------------------------------------------X

**DEBTORS' OBJECTION TO THE MOTION OF ROBERT HORNE,
JAMES YOUNG, AND THE *AD HOC* GROUP OF BENEFICIARIES
OF THE NORTEL NETWORKS U.S. DEFERRED COMPENSATION
PLAN TO COMPEL DISCOVERY FROM THE NORTEL DEBTORS**

        Nortel Networks Inc. and certain of its affiliates, as respective debtors and debtors

in possession (collectively, the "<u>Debtors</u>") hereby object (the "<u>Objection</u>") to the Motion of

Robert Horne, James Young, and the *Ad Hoc* Group of Beneficiaries of the Nortel Networks

U.S. Deferred Compensation Plan (the "<u>Beneficiaries</u>") to Compel Discovery from the Nortel

Debtors (the "<u>Motion</u>")[2].  In support of this Objection, the Debtors rely on the Declaration of

Daniel Ray (the "<u>Ray Declaration</u>" or "<u>Ray Decl.</u>"), the Declaration of Gary Storr (the "<u>Storr

Declaration</u>" or "<u>Storr Decl.</u>") and the Declaration of Julie Graffam (the "<u>Graffam Declaration</u>"

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]      The Motion of Robert Horne, James Young, and the *Ad Hoc* Group of Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan to Compel Discovery from the Nortel Debtors, filed June 8, 2011 [D.I. 5631]. Capitalized terms used but not otherwise defined have the meanings ascribed to them in the Motion.

or "Graffam Decl."), each submitted in connection with this Objection, and further respectfully represent as follows:

<u>**PRELIMINARY STATEMENT**</u>

The Debtors have spent considerable time and effort in connection with their review and production of documents to the Beneficiaries in response to the dozens of interrogatories and document requests propounded by the Beneficiaries.  The Debtors' production efforts are currently underway, but rather than wait for the production to be completed, the Beneficiaries bring a motion to compel that, for the most part, is entirely premature and not ripe, and, in any event, seeks discovery that will have no impact on the final disposition of the Debtors' motion for turnover of the trust assets, given that the Debtors' deferred compensation plan (the "<u>Plan</u>") is an unfunded plan.

<u>First</u>, the Beneficiaries primarily focus their challenge to the Plan, as described in the Motion, on whether the Debtors offered the Plan to a select group of highly-compensated individuals or members of management.  The document production to date shows that the Debtors consistently limited enrollment to highly-compensated employees.  Even if that were not the case, however, it would not change the result of the Debtors' turnover motion.  While the ultimate resolution of the Beneficiaries' legal arguments is not before the Court at this time, it is notable that even if the Beneficiaries' potential challenges to the manner in which the Plan was administered had any merit (which they do not), such allegations would not entitle the Beneficiaries to anything more than an unsecured claim.  The Beneficiaries are not entitled to any interest in the assets in the Plan trust (the "<u>Trust</u>") greater than other unsecured creditors, given the terms of the Trust and the unfunded status of the Plan, regardless of whether the Plan

2

was a properly administered top hat plan.  Accordingly, the broad-ranging discovery sought by the Beneficiaries is unduly burdensome and likely irrelevant to the success of their objection.

In light of this, the Debtors oppose having to expend substantial time and expense pursuing the additional discovery proposed by the Beneficiaries, to the extent such materials are even available.[3]  Notwithstanding the size and breadth of the Debtors' production to date, the Beneficiaries argue that the production is not sufficient because of the limited number of custodians whose electronically stored information the Debtors searched.  It is not appropriate to require the Debtors to attempt to obtain and search the electronic information of additional employees who are not likely to have relevant, non-privileged information, particularly in light of the considerable additional burden that it would impose on the Debtors.  The Debtors have agreed to search the electronic files of employees who were most involved with the creation or administration of the Plan, and to the extent that certain of those files were not historically preserved, the Debtors have expended considerable effort to locate responsive documents, including by requesting that the Plan's third party administrator conduct a search of its e-mail for responsive documents.  As that production remains pending, the Beneficiaries' demand that the Debtors conduct further searches not likely to result in the production of non-duplicative, relevant and non-privileged information is not warranted and would be unduly burdensome.

Second, the Beneficiaries complain about the number of documents designated by the Debtors as "Highly Confidential – Attorneys' Eyes Only" and the fact that the Debtors redacted employee names and addresses and instead provided unique employee IDs.  Good cause, including the interests of the tens of thousands of employees employed by the Debtors

---

[3]    In this Objection, the Debtors address only the issues raised in the Beneficiaries' Motion.  The Debtors reserve all right, defenses and objections with respect to all other pending or potential discovery disputes with the Beneficiaries.

(most of whom were never eligible to participate in the Plan) over a twelve-year period to maintain the privacy of their compensation information, supports the Debtors' treatment of this information.  The Beneficiaries rejected every effort by the Debtors to reach a compromise that balances the employees' privacy interests with the Beneficiaries' interest in seeking discovery. Asking that the Debtors produce information that identifies employees beyond their unique employee identification numbers is not relevant or necessary, and, in particular, the Beneficiaries have identified no legitimate relevant reason for giving access to this information to anyone beyond counsel.  The Beneficiaries' request is of particular concern where the employees' identity would be associated with other personal information, such as their compensation history over a period of several years.

Finally, the Beneficiaries request that the Court compel the Debtors to amend their responses to the Beneficiaries' interrogatories, which request information relating to all of the Debtors' employees from 1996 to 2008 and their compensation information, as well as the identification of each employee who was eligible to participate in the Plan or did participate in the Plan, and calculations with respect to their compensation.  But the Debtors already have agreed to amend their responses to the interrogatories, after the completion of the Debtors' production.  Requiring the Debtors to amend their responses prior to the completion of the Debtors' production does not make sense given the nature of the interrogatories at issue and the fact that the Debtors need the benefit of their document review and production to confirm their information regarding eligible and participating employees.

## FACTS RELEVANT TO THE OBJECTION

1.      On December 22, 2010, the Debtors filed their Motion for an Order Pursuant to 11 U.S.C. §§ 105, 541, 542 and 543 and Bankruptcy Rule 9019 (I) Approving the Stipulation

By and Between NNI and U.S. Bank National Association, (II) Directing U.S. Bank National Association to Turn over Property to NNI, and (III) Granting Related Relief Related to the Nortel Networks U.S. Deferred Compensation Plan, filed on December 22, 2010 (the "Debtors' Motion") [D.I. 4638].

2.      The Beneficiaries objected to the Motion on February 7, 2011, and the parties agreed to engage in written discovery.  On February 16, 2011, the Beneficiaries propounded 16 interrogatories (the "Interrogatories") and 35 document requests (the "Requests") on the Debtors. Among those Interrogatories and Requests were requests to identify every single employee employed by the Debtors since the beginning of the Plan in 1996 and each employee's compensation for each Plan Year, as well as each employee who was eligible to participate or did participate in the Plan and such employee's compensation and job title for each Plan Year. See Interrogatories 5-6 and Requests 14-20 (attached to Motion as Exhibit A).

3.      On March 18, 2011, the Debtors objected to the Interrogatories and Requests. The Debtors then engaged in several meet and confer discussions with the Beneficiaries concerning the Interrogatories and Requests and the Debtors' objections.  In the course of those discussions, the Beneficiaries requested, and the Debtors agreed, that production of documents would be made on a rolling basis.  The Beneficiaries also demanded that all information produced with respect to employees' compensation and job titles be raw data from the Debtors' business records.

4.      On February 22, 2011, the Debtors began to produce documents responsive to the Requests on a rolling basis.  Interrogatories 1 and 4 asked the Debtors to identify individuals with the "most knowledge of the facts and circumstances surrounding the Plan," and the "processes and methodologies" of the Plan.  The Debtors complied with these requests by

5

identifying the six individuals who were the primary employees responsible for administering the Plan (the "Custodians") for any given year since its inception through the termination of the Plan. These six Custodians are: Daniel Ray, Debbie Lorimer, Linda Kathy Frates, Mary Anne Crowley, Norma Crowder and Cindy Kanaday.[4] Of those six individuals, two are current employees (Ray and Lorimer), and four are former employees (Frates, Crowley, Crowder, Kanaday).

5.      In their responses and objections to the Requests, the Debtors stated that they would produce responsive documents based on a reasonable search of the Debtors' hard copy files and the hard copy files and readily available electronic documents of the individuals who were primarily responsible for the drafting, establishment and/or administration of the Plan, to the extent such documents were within the possession, custody and control of the Debtors. See Objections to Requests ¶ 10. Accordingly, the Debtors' information technology group ("Nortel IT") searched for the electronically stored information ("ESI") of the six Custodians. Nortel IT determined that there was no ESI retained with respect to three of the Custodians, Frates, Crowley and Crowder. See Storr Decl. ¶ 9.

6.      The Debtors restored the hard drive of Cindy Kanaday through a third party vendor and searched and produced non-privileged responsive documents from the hard drives of Daniel Ray and Debbie Lorimer, who are current employees of the Debtors. In addition, the Debtors searched the inventories of the document storage facilities scattered over nearly a dozen locations throughout the country and in Canada and retrieved potentially relevant hard copy files from those storage facilities. Moreover, the Debtors pulled payroll and human resources data

---

[4]      The years for which each Custodian was responsible for the Plan are as follows: Daniel Ray (1999-2001, 2006-2009), Debbie Lorimer (2000-2003), Linda Kathy Frates (1999-2000), Mary Anne Crowley (1999-2002), Norma Crowder (2003-2005), Cindy Kanaday(2006-2009).

listing compensation and other information relating to each employee employed by the Debtors for each year from 1996 to 2008.  Finally, the Debtors requested and received documents relating to the Plan from the Canadian Debtors, and also requested documents from MullinTBG, the third party administrator of the Plan, including all e-mails to or from Nortel employees.  The Debtors produced the responsive documents received from the Canadian Debtors and are in the process of reviewing for the purpose of producing the thousands of e-mails pulled by MullinTBG.

7.      To date, the Debtors have produced over 2,500 documents, totaling over 137,000 pages.  As of June 20, 2011, the Debtors estimate their cost of production at nearly $900,000, representing almost 4,000 hours of work by the Debtors' personnel, lawyers and IT professionals and other associated costs.

8.      On numerous occasions, including as recently as one week prior to the filing of the Motion, the Debtors informed the Beneficiaries that they intended to amend their responses to the Interrogatories following the completion of their document production, and that they would continue to produce further responsive documents, including following a review of the documents recently received from MullinTBG.  The Debtors continue to produce documents, and have produced over 1,800 documents since the filing of the Motion.

**ARGUMENT**

I.      **The Beneficiaries' Demand for More Custodians Is Premature**

    A.      **The Debtors Will Be Able To Satisfy Their Burden That The Plan Was A Top Hat Plan**

9.      Although the Debtors have not yet completed their document production, they expect that the documents and other evidence, taken together, will demonstrate that the Plan was a properly administered top hat plan under ERISA, as proven first and foremost by the plain terms of the Plan.   The documents produced to date support the fact that the Plan consistently

was offered to less than 10% of the total employee population.[5]  Moreover, the documents produced to date also support the fact that the Debtors were consistent in inviting only employees expected to earn compensation at a high level (ranging from $142,500 in 2000 to $180,000 in 2008) to participate in the Plan, and the Plan documents made clear to employees that it was only offered to highly-compensated employees.  In that regard, it is worth noting that the cases cited by the Beneficiaries make clear that it is not necessary to demonstrate indisputably that every employee invited to enroll in the Plan was in fact a highly-compensated employee; rather, it is simply necessary to show that the Plan was primarily offered to highly compensated individuals or individuals in a management position.  See Guiragoss v. Khoury, 444. F. Supp. 2d 649, 663 (E.D. Va 2006); Fishman v. Zurich Am. Ins. Co., 539 F. Supp. 2d 1036, 1046 (D. Ill. 2008), cited at Motion ¶ 22 ("And it should be remembered that if a few of the lowest compensated Plan participants were to be viewed as missing the mark . . . , the 'primarily' standard called for by Section 1051(2) would still be satisfied. . . .") (finding top hat status).[6]

---

[5]     The Beneficiaries argue that further discovery "likely will result in the production of information that could undermine" the Debtors' argument because in at least one plan year, more than 20% of the total workforce was apparently eligible to join the Plan.  Motion  ¶ 75 n.9.  While the Beneficiaries do not specify the Plan Year in question, upon a review of the information produced, the Debtors determined that the only Plan Year to which this claim could apply was the 2001 Plan Year, with respect to which the Debtors discovered that they inadvertently produced an incomplete headcount that omitted approximately 20,000 employees from the total workforce population.   The Debtors have since produced to the Beneficiaries the correct headcount information, which demonstrates that less than 10% of the total workforce population was eligible to enroll in the Plan in 2001.

[6]     The Beneficiaries overstate the legal burden required of the Debtors for a determination that a deferred compensation plan is a top hat plan.  For example, the Beneficiaries assert that Department of Labor opinion letters state that a plan must be made available to less than 5% of the total workforce to qualify as a top hat plan, Motion at ¶ 18, yet they do not cite to any letters requiring such a low threshold, and courts have accepted significantly higher percentages.  See, e.g., Guiragoss, 444 F. Supp. 2d at 660 (observing that while "[t]here is no existing authority that firmly establishes when a plan is too large to satisfy the select group requirement," there is also no existing authority affirming top hat status for a plan offered to more than 16% of the total workforce) (cited in Motion ¶ 18).

**B.    Even If The Plan Were Not A Top Hat Plan, Turnover of the Assets Is Appropriate Because The Beneficiaries Are General Unsecured Creditors**

10.    Of greater importance, and undisputed in the Motion, is the fact that the Plan is unfunded and the Trust assets are not held for the benefit of the Beneficiaries.  While the Beneficiaries seek further discovery to scrutinize whether the Plan was offered to highly compensated individuals, such inquiry misses the point that, as the Plan and Trust documents make clear, the Beneficiaries are unsecured creditors because the Plan is an unfunded plan and the trust assets of which the Debtors seek turnover are held in a rabbi trust to which the Beneficiaries do not have a superior interest.  Indeed, these facts were essential for the Beneficiaries to receive the primary benefit of the Plan – the deferral of their payment of tax on their income.

11.    As the Debtors stated in the Debtors' Motion, the Debtors seek turnover of the assets contained in a grantor "rabbi" trust, under which such assets remain the property of the Debtors.  The Third Circuit has stated that a plan is unfunded if (1) beneficiaries of the plan cannot look to a res separate from the general assets of the corporation to satisfy their claims, and (2) beneficiaries of the plan do not have a legal right greater than that of general, unsecured creditors to the assets of the corporation or to some subset of assets, and that this inquiry is made by looking at the plan's intent, the language of the plan and trust documents and the intended and actual tax consequences.  Accardi v. IT Litig. Trust (In re IT Group, Inc.), 448 F.3d 661, 669 (3d Cir. 2006).  As the Debtors' Motion explains, the Plan was maintained for the purpose of providing tax deferral benefits to a select group of employees, Debtors' Motion ¶ 9, and the Trust documents are clear that the rights of the Beneficiaries are "unsecured contractual rights" against the Debtors, and "[a]ny assets held by the trust [are] subject to the claims of the [Debtors']

general creditors . . . in the event of Insolvency"), Debtors' Motion ¶ 16 (quoting Trust agreement).

12.     Such treatment was required to permit the participants in the Plan, including the Beneficiaries, to avoid compensation deferred through the Plan from being considered taxable income.  See, e.g., IT Group, Inc. v. Rochelle Bookspan (In re The IT Group, Inc.), 305 B.R. 402, 409 (Bankr. D. Del. 2004), aff'd, 323 B.R. 578 (D. Del. 2005), (cited at Motion ¶ 23 ("By deferring payment of compensation, the tax liability for that deferred amount is also deferred.  This benefit is not without risk, however, because to qualify for such treatment, the deferred amount must be subject to general unsecured creditors' claims."); see also In re Washington Mutual, Inc., Case No. 08-12229 (MFW), 2011 WL 2162917 at *11 (Bankr. D. Del. June 1, 2011) ("In order to preserve the tax benefits, the Plan Participants could not have any legal or beneficial interest in the assets in the Ahmanson Trusts."); Resolution Trust Corp. v. MacKenzie, 60 F.3d 972, 976-77 (2d Cir. 1995) ("Section 671 of the Internal Revenue Code treats the grantor as the owner of the trust assets, thus making the trust assets taxable to the grantor, until those trust assets are distributed to the grantee.").

13.     As a result, the Beneficiaries' focus on challenging whether the Plan is a top hat plan is simply misplaced.  The Beneficiaries claim that, in the event that the Court were to find that the Plan was not a top hat plan, the Plan assets would be distributed to the Plan participants.  But even if the Beneficiaries could demonstrate that the Plan was not limited to a select group of highly compensated individuals (which they cannot), that still would not mean that they would have any greater interest in the Trust assets or change the fact that the Plan was unfunded.  As a recent case in this District makes clear, because the Trust assets are held in a grantor trust for the benefit of general unsecured creditors, the Beneficiaries can be no more than

general unsecured creditors.  <u>Washington Mutual</u>, 2011 WL 2162917 at *11 ("[B]ecause a top

hat plan is unfunded and consequently any funds that the Debtors may have put aside in the

Ahmanson Trusts to meet their obligations are owned by the Debtors, there can be no funds or

other property that in good conscience belong to the Plan Participants for tracing purposes."); <u>see</u>

<u>also</u> <u>In re IT Group, Inc.</u>, 448 F.3d at 669-70 (finding that beneficiaries were unsecured creditors

because "the Trust is a 'Rabbi Trust' that 'does not provide security in the event that IT

Corporation or its subsidiaries become insolvent or file for bankruptcy"); <u>MacKenzie</u>, 60 F.3d at

976 ("Assets held in a grantor trust are considered the property of the grantor.").

        14.    In <u>Washington Mutual</u>, Judge Walrath found that the Debtors had violated

ERISA in failing to make prepetition distributions as required under their top hat deferred

compensation plan, and in fact, such refusal constituted wrongful conduct.  2011 WL 2162917 at

*8, *10-11.  Nevertheless, Judge Walrath found that the trusts at issue were trusts that "were

established for the benefit of the Debtors and their general unsecured creditors," and therefore,

denied the plan participants' claim for a constructive trust over the assets in the trusts.  <u>Id.</u> at

*11.[7]  The court instead found that the plan participants' ERISA violation claims were general

unsecured claims and approved the Debtors' motion for turnover of the assets in the trusts.  <u>Id.</u> at

*12 ("Their claims will be allowed as general unsecured claims because they do not have a right

to the funds in the Ahmanson Trusts that is superior to the rights of the other general unsecured

---

[7]      Judge Walrath acknowledged that imposition of a constructive trust is an equitable remedy available under
ERISA.  <u>Washington Mutual</u>, 2011 WL 2162917 at *4-5 (citing sections 502(a)(1)(B) and 502(a)(3) of ERISA).
Thus, Judge Walrath's decision is consistent with the Supreme Court decision cited by the Beneficiaries as the sole
support for their assertion that the result of their prevailing would be the distribution of the Trust assets.  <u>Cigna</u>
<u>Corp. v. Amara</u>, 131 S. Ct. 1866, 1878 (2011) (cited in Motion ¶ 26 n.6).  In <u>Cigna</u>, the Supreme Court found that
section 502(a)(3) of ERISA gave the district court the ability to fashion "'those categories of relief' that,
traditionally speaking, . . . 'were typically available in equity.'"  <u>Id.</u>  <u>Cigna</u> does not deal with a company in
bankruptcy proceedings and does not address the status of plan participants' ERISA violation claims in bankruptcy.
As Judge Walrath found, where, as here, the alleged ERISA violations occurred prior to the bankruptcy and the plan
is unfunded, the claims of the plan participants are, at best, general unsecured claims.

creditors.") (citing <u>MacKenzie</u>, 60 F.3d at 976; <u>Silicon Graphics, Inc. v. Merrill Lynch Trust Co.</u> <u>(In re Silicon Graphics, Inc.)</u>, 363 B.R. 690, 699-700 (Bankr. S.D.N.Y. 2007)).

15.     Here, as in <u>Washington Mutual</u>, the Trust was established for the benefit of the Debtors and their general creditors, and the Trust assets are assets of the Debtors.  The claims relating to the Plan asserted by the Beneficiaries are with respect to the prepetition actions of the Debtors.  As a result, even if the Beneficiaries were able to prove that the Plan was not maintained as a proper top hat plan prepetition, the Beneficiaries would be no more than general unsecured creditors with respect to the Plan, and therefore their position with respect to the Trust assets and their claims under the Plan would not be improved.  The Beneficiaries simply do not need the broad discovery they seek in order to confirm these facts.

### C.    The Debtors' Continuing Production Is Sufficient

16.     Notwithstanding the plain language of the Plan and Trust documents and the Debtors' agreement to provide the Beneficiaries' counsel with the employee data necessary to determine eligibility and participation levels and qualifications, the Beneficiaries seek further broad-based discovery in the hope of crafting an argument as to why they are still entitled to an interest in the Trust assets.  In light of the above, the Beneficiaries' complaints about the sufficiency of the Debtors' production are unfounded.  But the Beneficiaries also completely disregard the Debtors' substantial efforts to ensure a full production of relevant information.  The Debtors attempted to produce the ESI of each of the six Custodians, who, together, represent the employees primarily responsible for the Plan for each relevant Plan year.  That the Debtors only produced ESI with respect to three Custodians is not, as the Beneficiaries suggest, a deliberate tactical decision by the Debtors.  Instead, it is simply the result of three Custodians having left Nortel prior (in some cases, years prior) to the filing of the bankruptcy proceedings and the ESI

for such Custodians not being retained after they left Nortel, which was consistent with the Debtors' document retention procedures.  See Storr Decl. ¶ 3.[8]

17.       The Debtors do not believe that the absence of ESI for three Custodians will result in gaps in the production for two reasons.  First, the Debtors produced responsive documents from the three Custodians for whom the Debtors were able to collect and produce ESI, even for those years in which they were not the primary employees responsible for the administration of the Plan.  Second, the Debtors requested that the Canadian Debtors search their records for Plan-related documents and that MullinTBG, who was the third party Plan administrator for all relevant Plan Years, conduct a search of all e-mails to or from a Nortel employee.  The Debtors have produced the responsive documents provided by the Canadian Debtors.[9]  MullinTBG, using a third party vendor, performed the electronic search the Debtors requested.  One week before the Beneficiaries' filing of the Motion, the Debtors informed the Beneficiaries that MullinTBG had recently sent the Debtors thousands of e-mails that the Debtors planned to review and produce.  While the Debtors are still in the process of completing this review and production, the Debtors expect that, to the extent the production of the three Custodians' documents resulted in time gaps, the production of MullinTBG documents will fill in any such gaps.

18.       Without waiting for the completion of the Debtors' production that is in progress, the Beneficiaries request that the Court require the Debtors to produce more documents.  This request ignores both the factual reality of what the Debtors have produced and

---

[8]       Because the three Custodians for whom no ESI is available left Nortel (and had their hard drives and e-mails recycled or destroyed) prior to the commencement of these bankruptcy cases, and well prior to any actual or threatened litigation with respect to the Plan, there is no basis for the Beneficiaries' baseless threat of sanctions for spoliation.  See Motion ¶ 75 n.8.

[9]       As this Court is well aware, the Debtors do not have control over the Canadian Debtors, who are subject to their own creditor protection proceedings in Canada, contrary to the unsupported assertion of the Beneficiaries.  See Motion ¶ 45.

will continue to produce as well as the legal test as to whether they are entitled to further production.

19.    Federal Rule of Civil Procedure 26(b)(2)(B) specifically provides that "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost."  Further, "the court must limit . . . discovery . . . [when] the burden or expense of the proposed discovery outweighs its likely benefit.  Fed. R. Civ. Pro. 26(b)(2)(C).  Additionally, the court is required to prevent discovery that "is unreasonably cumulative or duplicative."  Fed. R. Civ. Pro. 26(b)(2)(C)(i).

20.    The additional discovery sought by the Beneficiaries would place a significant burden on the Debtors, whose resources are already in short supply.  To date, the Debtors have spent almost $900,000 and 4,000 combined hours on this discovery process.  This time and money was spent identifying the most relevant custodians, of which there were six, and then reviewing and producing available documents, including the available ESI of such Custodians.[10]  In the Motion, the Beneficiaries name no fewer than eleven additional custodians whose documents they demand be searched.[11]  See Motion ¶¶ 41, 43.  Complying with such a demand could require the Debtors to nearly triple the time and expense that has already been spent on this discovery.  At this stage of the wind down process, such an expenditure would be grossly burdensome to the Debtors.   Moreover, it is not possible to undertake, as the Beneficiaries would require, a word search or other type of search of the Debtors' electronic

---

[10]    The Debtors also searched their physical document storage facilities for potentially relevant documents.

[11]    The Debtors note that one of the custodians named by the Beneficiaries is Norma Crowder, a former NNL employee.  Contrary, to the Beneficiaries' statement that the Debtors "have refused to search for" her ESI is a gross mischaracterization of the facts, Ms. Crowder is one of the six Custodians whose ESI the Debtors tried to recover, and one of the three Custodians whose ESI was not retained following her departure from Nortel.

files, without individually restoring and conducting a search of each employee's hard drive, because the Debtors did not maintain a central archive of e-mails.  See Storr Decl. at 4.

21.    Indeed, the obvious burden on the Debtors stands in sharp contrast to the minimal benefit to be gained by the Beneficiaries.  The Debtors have already produced over 2,000 documents responsive to the Beneficiaries' Requests, the majority of which are electronic documents from those Custodians who were most involved with the Plan, and the Debtors are in the process of producing additional documents, including a substantial number of documents recovered by MullinTBG.  The additional individuals named by the Beneficiaries either were not directly involved in the operation of the Plan or were in-house counsel for the Debtors whose relevant documents would be overwhelmingly privileged.  Ray Decl. ¶ 5.  Moreover, to the extent such individuals have relevant documents, such documents largely would be duplicative of the documents that have already been produced from the other Custodians.  See Ray Decl. ¶ 5. Forcing the Debtors to review the documents for these custodians created over a period of over a decade would not yield the type of benefit necessary to outweigh the burden to the Debtors, and the Court should deny the Beneficiaries' request.

## II.    **Personal Information Identifying Employees Should Be Protected**

22.    The Beneficiaries complain that the Debtors over-designated documents as "Highly Confidential – Attorneys' Eyes Only" and did not provide employee names and addresses.  Contrary to the Beneficiaries' assertions, the Debtors' treatment of employee information and their designation of "Attorneys' Eyes Only" documents are reasonable and appropriate given what the Beneficiaries have demanded.

23.    As discussed above, the Requests and Interrogatories asked for identification of every employee employed by the company (whether eligible or not) during each Plan Year,

together with each employee's compensation information.  See Interrogatories 5-6 and Requests 14-20.  In meet and confer discussions, the Beneficiaries informed the Debtors that they required that the information produced be the exact raw data contained in the Debtors' databases.

24.     The compensation information pulled from the Debtors' databases is broken down by salary, incentive and bonus payments, commissions and other benefits.  Many of the lists contained in the ESI produced by the Debtors also included employees' home addresses and social security numbers.

25.     As described in the Graffam Declaration, Nortel has maintained a Privacy and Data Protection Procedure (the "Procedure")[12] from at least 2005, which prohibits the company from sharing employees' personal information with third parties except as required by law or authorized by the employees.  Graffam Decl. ¶ 3.  Employees rely on Nortel complying with this policy, and, in particular, not disclosing their sensitive personal information such as concerning their compensation and benefits.  Graffam Decl. ¶ 4.[13]  Considering that the overwhelming majority of the Debtors' tens of thousands of employees employed by the Debtors during the twelve-year period in question were never eligible to enroll in the Plan, these employees' interest in maintaining the confidentiality of their personal compensation and contact information is all the more valid.

---

[12]     The Procedure is attached as Exhibit A to the Graffam Declaration, which has been filed simultaneously with this Objection.

[13]     The Beneficiaries point to the identification of employees in the Debtors' schedules to support their argument that they are entitled to unredacted employee lists.  However, even in their schedules and in other pleadings, the Debtors identified current employees by their unique employee ID numbers and did not disclose their home addresses.  In any event, the mere listing of names and addresses of a subset of former employees in certain pleadings is not comparable to the privacy interests implicated by the information requested by the Beneficiaries, of the names and addresses of every employee the Debtors employed over a 12-year period alongside detailed information about their compensation.

26.    As a result of these concerns, the Debtors redacted names and home addresses and identified employees by their unique employee ID number.  The Debtors also marked the spreadsheets listing the compensation information "Attorneys' Eyes Only."

27.    As of the date of the filing of the Motion, of the 699 individual documents produced, 182 (26%) were designated as "Highly Confidential – Attorneys' Eyes Only," and the large majority, 517 (74%), did not have the "Highly Confidential – Attorneys' Eyes Only" designation.  That the proportionate page count of "Attorneys' Eyes Only" documents is far greater is not surprising, given that the Beneficiaries demanded a full listing from the Debtors' databases of the compensation information for all of the Debtors' employees (eligible or not eligible).  The Debtors' workforce each Plan Year had tens of thousands of employees, and these spreadsheets therefore were each an average of over 2,000 pages and the total page count of such spreadsheets produced to date for all Plan Years is nearly 20,000 pages.  These spreadsheets, on a page count basis, accounted for 48% of the total number of pages produced, although they only accounted for 1% of the total number of documents produced.

28.    Absent from the Motion is any acknowledgement that the Debtors made attempts to reach reasonable compromises to balance the need to protect the information with the Beneficiaries' interests in seeing the information.  For example, the Debtors proposed disclosing the names and home addresses of eligible or participating employees on an attorneys' eyes only basis.  The Debtors also proposed that the Beneficiaries identify certain categories of documents for which they would want to see employee identifying information, or, after reviewing the document production, identify specific categories of documents of which they would want to see unredacted versions.

29.     The Beneficiaries rejected every one of the Debtors' proposals, and insisted that they have the right to (i) get the information, and (ii) show their clients all of the employee information that they determine necessary or appropriate.   But under Federal Rule of Civil Procedure 26(b)(1), parties are only entitled to obtain "discovery regarding any non-privileged matter that is relevant to any party's claim or defense."   Because the Debtors provided employee ID numbers that are unique to each individual and the Beneficiaries can sort and search through the spreadsheets just as easily by employees' employee ID numbers as they could by name, the disclosure of employee names and addresses is irrelevant to either the quantitative or qualitative tests of proving the top hat status of the Plan.[14]

30.     The Court should deny the Beneficiaries' motion to compel the Debtors to reclassify highly sensitive documents from "Highly Confidential – Attorney Eyes Only" to merely "Confidential" because the documents are entitled to the highest level of protection under the terms of the Agreed Protective Order Between the Debtors and Certain Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan, filed June 14, 2011 (the "Protective Order") [D.I. 5689].   The Protective Order specifically allows the Debtors, as the Producing Party (as defined in the Protective Order) to mark documents as "Highly Confidential – Attorneys' Eyes Only" (Protective Order at 1(a)(ii)) and thereby prevent counsel to the Beneficiaries from revealing such documents to the Beneficiaries (Protective Order at 5).

31.     Enforcing the Protective Order to protect the employee information is supported by good cause.   Good cause is established by "demonstrating a particular need for protection" by articulating the significant harm that will result if the information in not protected.

---

[14]     For the same reason, the Beneficiaries' assertion in the Motion that the redaction of employee names and addresses makes the task of analyzing the Plan "unnecessarily cumbersome, time consuming, and expensive" or even "impossible," Motion ¶ 56, is simply false.

See Cipollone v. Liggett Grp., Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).  Courts analyze the need

for protection through a balancing process.  Arnold v. Pa., Dep't of Transp., 477 F.3d 105, 108

(3d Cir. 2007).  Various factors are weighed, including: whether disclosure will violate any

privacy interests; whether the information is being sought for a legitimate or improper purpose;

whether disclosure will cause a party embarrassment; and whether the sharing of information

will promote fairness and efficiency.  See Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787-88

(3d Cir. 1994).

   32. Courts routinely consider privacy concerns when deciding whether to compel

disclosure of information in discovery.  See Pearson v. Miller, 211 F.3d 57, 65 (3d Cir. 2000)

(noting that a court can "prevent[] unnecessary intrusions into the legitimate interests – including

privacy and other confidentiality interests – that might be harmed by the release of the material

sought").  Requiring the Debtors to widely disclose employee names, home addresses, social

security numbers and other identifying information will clearly violate the privacy interests of

those employees.  This is especially true since the information would be provided together with

each employee's benefit and compensation information, and particularly given that the

Beneficiaries were or are colleagues of the employees.  By contrast, counsel to the Beneficiaries

can point to no legitimate, relevant need for this information, and certainly no legitimate need to

share this private information with the Beneficiaries.  When the employees' privacy interests are

balanced with the irrelevance of the information to the Beneficiaries' claim, the Court should

find that the employees are entitled to protection.

   33. The Debtors remain willing to negotiate a limited disclosure of information

relating to the employees who were eligible to participate or actually participated in the Plan, on

an attorneys' eyes only basis.  Limiting any disclosure of employee personal information to

counsel is a reasonable exercise of the Court's discretion and serves to protect the Debtors'

current and former employees and their rightful expectation that hundreds of their colleagues

will not be given free reign to rifle through their personal information.

### III.    The Beneficiaries' Arguments Relating to the Debtors' Interrogatory Responses Are Not Ripe

34.    The Beneficiaries' final request in the Motion is that the Court compel the

Debtors to answer completely certain of the Interrogatories.  The Beneficiaries' request is not

ripe for dispute, as the Debtors have never refused to amend their responses to the

Interrogatories.  Instead, given that, at the Beneficiaries' request, the Debtors' production was

made on a rolling basis rather than held until after the Debtors had compiled all relevant

information, and given the nature of the Interrogatories at issue, the Debtors informed the

Beneficiaries that they planned to amend their responses to the Interrogatories at a later date

following the completion of the Debtors' production of spreadsheets providing employee

compensation information.  See Declaration of Tamara J. Britt, Ex. A, Letter dated May 6, 2011

from Tamara J. Britt to Daniel J. Murphy[15].

35.    The Interrogatories at issue include requests for identification of (a) all

employees employed by the Debtors each Plan Year and their compensation information, (b) all

employees eligible to participate in the Plan each Plan Year and their compensation information,

(c) all employees who actually participated in the Plan each Plan Year and their compensation

information and (d) certain mathematical analyses relating to (a) through (c) (e.g., average,

median, highest and lowest compensation).  In order to respond accurately and completely to

such Interrogatories, the Debtors must complete their production to ensure that they have

complete information as to who was eligible to participate and actually participated in the Plan

---

[15]    The Declaration of Tamara J. Britt, dated July 5, 2011, is being filed concurrently herewith.

each Plan Year.  As discussed above, the Debtors' production remains underway, and the Debtors expect to be able to complete their production shortly.[16]  Accordingly, the Beneficiaries' request with respect to the Debtors' responses to the Interrogatories is not ripe for dispute.[17]

---

[16]    The Beneficiaries' complaint regarding the Debtors' recall of certain spreadsheets is disingenuous if not misleading.  As the Debtors explained to the Beneficiaries one week prior to the filing of the Motion, the Debtors created these spreadsheets specifically in response to the Interrogatories and so the spreadsheets should not have been included in the Bates-stamped production of the Debtors' books and records.  In addition, some of the spreadsheets contained errors in calculation, and therefore the Debtors informed the Beneficiaries that they would replace the recalled spreadsheets with non-Bates stamped corrected versions and would append them to the Debtors' supplemental, amended responses to the Interrogatories.

[17]    Even if this issue were ripe for dispute, the Beneficiaries cite no law to support their bald assertion that the Debtors waived reliance on Fed. R. Civ. P. 33(d).  At the completion of the Debtors' production, the Debtors will have produced thousands of pages of documents from their business records in response to the Beneficiaries' broad Interrogatories, which include requests for information regarding the compensation of every one of the tens of thousands of employees employed by the Debtors during each of the Plan Years.  In such a case, even references to a broad range of documents are appropriate.  See United States v. Rachel, 289 F. Supp. 2d 688, 693 (D. Md. 2003) (finding the government complied with Rule 33(d) when it referred defendants to garage containing 175 boxes of materials, 10 filing cabinets, and numerous computer diskettes, because the interrogatories were extremely broadly worded and therefore induced the government to produce all available documents).   In any event, the Debtors have found no law to support the Beneficiaries' argument that the Debtors can be held to have waived reliance on Fed. R. Civ. P. 33(d) prior to their actually amending their responses to the Interrogatories, and the Debtors specifically reserve their right to rely on Rule 33(d) in connection with their amended responses to the Interrogatories.

21

WHEREFORE, the Debtors respectfully request that this Court: (i) deny the Motion in its entirety; and (ii) grant such other and further relief as it deems just and proper.

Dated:  July 5, 2011
          Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Alissa T. Gazze*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Alissa T. Gazze (No. 5338)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*