~~Wachtell, Lipton, Rosen & Katz~~
~~51 West 52nd Street~~
~~New York, New York  10019~~

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, California  94065
United States
~~Attention:   Philip Mindlin~~
~~                        Adam O. Emmerich~~
Attention:   Kyle C. Krpata
Facsimile:   +1-650-802-3100

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
United States
Attention:  Ronit J. Berkovich
Facsimile:  +1-212-310-8007

and

~~            Benjamin M. Roth~~
~~Facsimile:        ~~Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention: Marilyn Sobel
Facsimile: +1-212-~~403-2000~~757-3900

If to the NA Sellers or the Other Sellers, to:

Nortel Networks Corporation
5945 Airport Road
Suite 360
Mississauga, Ontario, Canada  L4V 1R9
Attention:  Anna Ventresca
                     General Counsel-Corporate, Corporate Secretary and
                     Chief Compliance Officer
Facsimile:  +1-905-863-2057

and

Nortel Networks Limited
5945 Airport Road
Suite 360

Mississauga, Ontario, Canada  L4V 1R9
Attention:  Anna Ventresca
General Counsel-Corporate, Corporate Secretary and
Chief Compliance Officer
Facsimile:  +1-905-863-2057

and

Nortel Networks Inc.
Legal Department
4001 E. Chapel Hill – Nelson Hwy.
Research Triangle Park, North Carolina  27709
United States
Attention:  Timothy Ross
Secretary and Vice President
Facsimile:  +1-919-905-3741

With copies (that shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
United States
Attention:  Paul J. Shim
James L. Bromley
Lisa M. Schweitzer
Facsimile:  +1-212-225-3999

andOgilvy Renault

and

Norton Rose OR LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:  Michael Lang
Facsimile:  +1-416-216-3930

If to the EMEA Sellers, to:

Alan Bloom / Christopher Hill / Stephen Harris
Ernst & Young LLP
1 More London Place
London

SE1 2AF
United Kingdom
Facsimile:   +44 (0) 20 7951 1345

With copies (that shall not constitute notice) to:

Alex Kay
Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS
United Kingdom
Facsimile:   +44 (0) 20 7098 4447

If to the Joint Administrators, to:

Alan Bloom / Christopher Hill / Stephen Harris
Ernst & Young LLP
1 More London Place
London
SE1 2AF
United Kingdom
Facsimile:   +44 (0) 20 7951 1345

With copies (that shall not constitute notice) to:

Alex Kay
Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS
United Kingdom
Facsimile:   +44 (0) 20 7098 4447

and

Avner Ben-Gera
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York  10004
United States
Facsimile:   +1-212-299-6366

If to NNSA or the French Liquidator, to:

> Attention: Cosme Rogeau
> 26 avenue Hoche
> 78000 Versailles
> France
> Facsimile: +33 1 39 49 44 63

With a copy (that shall not constitute notice) to:

> Foucaud, Tchekhoff, Pochet & Associés
> Attention: Antoine Tchekhoff & Edouard Fabre
> 1bis, avenue Foch
> 75116 Paris
> France
> Facsimile: +33 1 45 00 08 19

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8.        ~~Section 1.75.~~ Exhibits; Sellers Disclosure Schedule.

The Sellers Disclosure Schedule, the Exhibits attached hereto and Annex I constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

Disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances in any other section of the Sellers Disclosure Schedule as though fully set forth in such other section, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable.  The inclusion of any information in any section of the Sellers Disclosure Schedule shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation, warranty or statement to be true and correct.  The Sellers Disclosure Schedule is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations or warranties by any Nortel Party except to the extent expressly set forth therein.  The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers, the Joint Administrators or the French Liquidator pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.        ~~Section 1.76.~~ Counterparts.  The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by

facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement.

SECTION 10.10.    ~~Section 1.77.~~ No Presumption.  The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations.  Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11.    ~~Section 1.78.~~ Severability.  If any provision, clause or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Without limiting Section 5.6(f), upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12.    ~~Section 1.79.~~ No Set-off, Deduction or Counterclaim.  Subject to Section 2.2.2, every payment payable by any Party under this Agreement or under any of the other Transaction Documents shall be made in full without any set-off or counterclaim howsoever arising and shall be free and clear of, and without deduction of, or withholding for, any amount which is due and payable to such Party by any other Party whether under this Agreement or under any of the other Transaction Documents or otherwise.

SECTION 10.13.    ~~Section 1.80.~~ Headings.  The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.14.    ~~Section 1.81.~~ Entire Agreement.  This Agreement (including the Sellers Disclosure Schedule and all Exhibits attached hereto), the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or other contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents, and all such prior or other contemporaneous understandings, agreements, representations and warranties are hereby terminated.  In the event of any irreconcilable conflict between this Agreement and the Non-Disclosure Agreement or the Supplementary Non-Disclosure Agreement, the provisions of

this Agreement shall prevail.  Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all Parties specifically acknowledge that no Party has any special relationship with another Party that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction.

SECTION 10.15.    ~~Section 1.82.~~ Availability of Equitable Relief; Limitations on Damages; Sole and Exclusive Remedy.

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, subject to the limitations set forth in this Section 10.15, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement (other than with respect to breaches of Section 5.9(c)), without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.  Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.  Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement or that equitable relief is not available pursuant to the express terms of this Section 10.15.  Without limiting the preceding provisions of this Section 10.15, it is acknowledged and agreed that (i) in the event of a material breach by the Sellers, the Purchaser shall be entitled to equitable relief to compel specific performance by the Sellers of all of the transactions contemplated by ~~the U.S. Bidding Procedures Order, the Canadian Sales Process Order,~~ this Agreement (other than Section 5.9(c) hereof) and any other Transaction Documents, in each case subject to the provisions of such document, including ~~to conduct the Auction as contemplated by the U.S. Bidding Procedures Order and~~ to effect the sale of the Assets to the Purchaser as contemplated by Article II, and (ii) under no circumstances shall any Person be liable for punitive damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or any other Transaction Document.  Except for the indemnification rights of ~~Purchaser Indemnitees expressly set forth in Article IX and~~ Seller Indemnitees expressly set forth in Section 10.1, nothing set forth in this Agreement shall confer or give, or shall be construed to confer or give, to any Person (including any Person acting in a representative capacity) other than the Parties any rights or remedies against any Person.

Notwithstanding anything to the contrary contained in any Transaction Document but except in the case of actual fraud by any Seller ~~and without prejudice to the Purchaser Indemnitees' right to indemnification pursuant to Article IX from and after Closing,~~ in no event shall any of the Nortel Parties be subject to any damage, remedy or relief in respect of any Liability to the Purchaser ~~or any other Purchaser Indemnitee~~ in connection with, or relating to, or arising under this Agreement, any other Transaction Document or the transactions contemplated hereby or thereby, either prior to or after the Closing, and regardless of whether any such claim arises in contract ~~(including, for the avoidance of doubt, with respect to clause (ii) below, payment of the Expense Reimbursement and/or the Break-Up Fee)~~, tort, breach of warranty or any other legal or equitable theory, in each case other than: (i) equitable relief granted pursuant to and in accordance

with Section 10.15(a); and (ii) prior to the Closing, for monetary damages in an aggregate amount not to exceed Twenty-Nine Million Dollars ($29,000,000).

The provisions of this Section 10.15 and the limitations on remedies provided hereunder were specifically bargained for between the Purchaser and the Sellers and were taken into account by the Purchaser and the Sellers in arriving at the Purchase Price.  The Sellers have expressly relied on the provisions of this Section 10.15, and the limitations on remedies provided hereunder in agreeing to the Purchase Price and in agreeing to provide the specific representations, warranties, statements and covenants set forth herein.

SECTION 10.16.    ~~Section 1.83.~~ Bulk Sales Laws.  Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

SECTION 10.17.    ~~Section 1.84.~~ NA Sellers as Representatives of Other Sellers.

For all purposes of this Agreement, each Other Seller hereby irrevocably appoints NNI as its representative.

Pursuant to Section 10.17(a), NNI shall expressly have the power to, in the name and on behalf of each Other Seller, (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.18.    ~~Section 1.85.~~ Obligations of Sellers and EMEA Sellers. When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller).  Notwithstanding anything to the contrary herein, the obligations of each EMEA Seller hereunder shall be several and not joint. Effective as of the date hereof, the parties are fully bound by the terms of this Agreement~~; provided, however, that, except with respect to Section 5.26, none of the Sellers, the Joint Administrators or the French Liquidator shall have any obligations or incur any liabilities under this Agreement unless and until (i) the U.S. Bankruptcy Court enters the U.S. Bidding Procedures Order and (ii) the Canadian Court enters the Canadian Sales Process Order~~.  For the avoidance of doubt, (x) no Seller shall assume any responsibility or liability for any obligations relating to any assets and/or liabilities that are not owned by it, and each Seller's liability to the Purchaser in relation to any matter contained in this Agreement shall be limited to the assets and/or liabilities of the relevant Seller and (y) the intent of the Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the French Liquidator under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

SECTION 10.19.    ~~Section 1.86.~~ Exclusion of Liability of Joint Administrators and Acknowledgement.

Notwithstanding that this Agreement shall have been signed by the Joint Administrators both in their capacities as administrators of the EMEA Sellers for and on behalf of the EMEA Sellers and in their personal capacities, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the Joint Administrators, or their firms, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act or otherwise.

The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed, that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other party to observe, perform or comply with any of its obligations under this Agreement, or under or in relation to any associated arrangements or negotiations.

The Joint Administrators are parties to this Agreement:  (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, or otherwise, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purpose of receiving the benefit of this Section 10.19.

The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each party hereto shall have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns.

SECTION 10.20.    ~~Section 1.87.~~ Exclusion of Liability of French Liquidator and Acknowledgments.  Notwithstanding that this Agreement shall have been signed by the French Liquidator both in his capacity as liquidator of NNSA for and on behalf of NNSA and in his personal capacity, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the French Liquidator or his firms, partners, employees, agents, advisers or representatives whether such Liability would arise under the FCC or otherwise.

SECTION 10.21.    ~~Section 1.88.~~ Joint Administrators and French Liquidator as agents of EMEA Sellers.

For all purposes of this Agreement, the Joint Administrators and the French Liquidator act without personal liability as agents of the EMEA Sellers.

The Joint Administrators shall expressly have the power to, in the name and on behalf of each EMEA Seller as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other

communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

~~Subject to entry of the French Court Order, the~~The French Liquidator shall expressly have the power to, in the name and on behalf of NNSA as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.22.    ~~Section 1.89.~~ Limitations.

Under this Agreement, except for any documents, the forms of which have been agreed by the Joint Administrators and the French Liquidator as at the date of this Agreement, none of the EMEA Sellers, the Joint Administrators or the French Liquidator shall be required to enter into or execute any document unless such document contains exclusions of liability in favour of the Joint Administrators or the French Liquidator (as applicable), to an extent consistent with, or more favourable than, the exclusions of liability provided in favour of the Joint Administrators or the French Liquidator (as applicable) in this Agreement. For the avoidance of doubt, neither the Joint Administrators nor the French Liquidator shall be required to enter into or execute any document in their personal capacities or as administrators of the EMEA Sellers or *mandataire liquidateur* of NNSA respectively, to the extent that such document would cause the Joint Administrators and/or the French Liquidator to incur any personal liability.

The obligations or undertakings of the ~~EMEA Sellers~~Joint Administrators and the French Liquidator under this Agreement are subject to their duties to act at all relevant times in the best interests of the creditors of the EMEA Sellers (in respect of the Joint Administrators) and, in relation to the French Liquidator, NNSA. Accordingly, nothing in this Agreement shall operate to derogate from, restrict, or prevent the Joint Administrators and French Liquidator from complying with their statutory duties or legal obligations in relation to the exercise of their powers, duties or functions as, in the case of the Joint Administrators, administrators of the EMEA Sellers or, in the case of the French Liquidator, as *mandataire liquidateur* of NNSA, under the Insolvency Act, FCC or any other applicable legislation or statutory instrument as they see fit, (acting in good faith) and/or preclude the Joint Administrators from terminating the administration of the EMEA Sellers pursuant to the Administration Orders (and/or the French Liquidator from terminating his appointment as *mandataire liquidateur* of NNSA) should the Joint Administrators (and/or the French Liquidator, in relation to NNSA) be required to do so to discharge their statutory duties or legal obligations, provided that, notwithstanding the foregoing, any failure to comply with the terms of this Agreement by any EMEA Seller will be a breach of this Agreement by the relevant EMEA Seller, and the Purchaser shall not be restricted from claiming against the relevant EMEA Seller and receiving any remedy, or exercising any right, other than a claim against the Joint Administrators or the French Liquidator in their respective personal capacities, to which it is otherwise entitled pursuant to the terms of this Agreement, for any breach of this Agreement notwithstanding that the Joint Administrators or the French Liquidator (as applicable) are complying with such statutory duties or legal obligations in accordance with this Section 10.22.

SECTION 10.23.    ~~Section 1.90.~~ Limitations on Post-Closing Obligations.
Notwithstanding any other provisions in this Agreement, all outstanding obligations of each

EMEA Seller under this Agreement (except under Section 5.11 (Confidentiality), and Article 6 (Tax Matters)) shall cease on and from the date six (6) months following the Closing Date without prejudice to (i) any accrued obligations of the EMEA Sellers, (ii) any accrued rights of the Purchaser, or (iii) any accrued Liabilities in relation to any obligations to have been carried out by the EMEA Sellers, in each of (i), (ii) or (iii), prior to or on such date.

Section 1.91.          Parent Guarantee.

(a)      The Parent, as primary obligor and not merely as surety, hereby absolutely, unconditionally and irrevocably guarantees the full and timely payment and performance of all Liabilities (including indemnities, fees and Liabilities in respect of equitable relief) of the Purchaser incurred under, arising out of or in connection with this Agreement and the other Transaction Documents, as from time to time amended, modified or supplemented in accordance with their terms (such Liabilities, the "**Guaranteed Obligations**").  This is a guarantee of payment and performance, and not of collectibility.  The obligations of the Parent under this Section 10.24 are absolute and unconditional in respect of satisfying the Guaranteed Obligations and shall be enforceable against the Parent to the same extent as if the Parent were the primary obligor (and not merely a surety) under this Agreement and the other Transaction Documents.

(b)      The Parent hereby waives as to itself promptness, diligence, notice of the acceptance of this guarantee and of the Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Guaranteed Obligations incurred, all defenses which may be available by virtue of any valuation, stay, moratorium Law or other similar Law now or hereafter in effect, and all suretyship defenses (it being understood that nothing in this sentence shall be deemed a waiver by the Parent of the obligation of any other Party to deliver notice pursuant to the terms of this Agreement).  The Parent agrees that the Guaranteed Obligations shall not be discharged except by complete performance or payment of the amounts payable under this Agreement, as applicable, and that the obligations of the Parent hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure or delay on the part of the Sellers to assert any claim or demand or to enforce any right or remedy against the Purchaser; (ii) any change in the time, place or manner of payment of any of the Guaranteed Obligations or any waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of this Agreement made in accordance with the terms thereof or any agreement evidencing, securing or otherwise executed in connection with any of the Guaranteed Obligations; (iii) any change in the corporate existence, structure or ownership of the Parent, Purchaser or any other Person interested in the transactions contemplated by this Agreement; or (iv) the adequacy of any other means the Sellers may have of obtaining payment related to any of the Guaranteed Obligations.  If at any time payment under the Agreement is rescinded or must be otherwise restored or returned by the Sellers upon the insolvency, bankruptcy or reorganization of the Purchaser or the Parent or otherwise, the Parent's obligations hereunder with respect to such payment shall be reinstated upon such restoration or return being made by the Sellers, all as though such payment had not been made.  The Parent acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by this Agreement.

(c)      The Parent hereby expressly acknowledges and agrees to be bound by the following provisions of this Agreement: Article III (Representations and Warranties of the Parent and the Purchaser), Section 10.2 (Remedies),Section 10.4 (Consent to Amendments; Waivers), the

first paragraph of Section 10.5 (Successors and Assigns), Section 10.6(a) through (e) (Governing Law; Submission to Jurisdiction; Waiver of Jury Trial), Section 10.7 (Notices), Section 10.9 (Counterparts), Section 10.10 (No Presumption), Section 10.11 (Severability), Section 10.12 (No Set-off, Deduction or Counterclaim), Section 10.13 (Headings) and Section 10.14 (Entire Agreement), Section 10.18 (Obligations of Sellers and EMEA Sellers), Section 10.19 (Exclusion of Liability of Joint Administrators and Acknowledgement), Section 10.20 (Exclusion of Liability of French Liquidator and Acknowledgments), Section 10.21 (Joint Administrators and French Liquidator as Agents of EMEA Sellers), Section 10.22 (Limitations), Section 10.23 (Limitations on Post-Closing Obligations), and this Section 10.24 (Parent Guarantee).

**[Remainder of this page intentionally left blank. Signature pages follow.]**

IN WITNESS WHEREOF, the parties have duly executed this Asset Sale Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: _____
Name:
~~Title:~~   George A. Riedel
Title:    Chief Strategy Officer and President,
            Business Units


By: _____
Name:
~~Title:~~   John M. Doolittle
Title:    Senior Vice President, Corporate
            Services and Chief Financial Officer


**NORTEL NETWORKS LIMITED**

By: _____
Name:
~~Title:~~   George A. Riedel
Title:    Chief Strategy Officer and President,
            Business Units


By: _____
Name:
~~Title:~~   John M. Doolittle
Title:    Senior Vice President, Corporate
            Services and Chief Financial Officer


**NORTEL NETWORKS INC.**

By: _____
Name:   John Ray
Title:  Principal Officer

**NN APPLICATIONS MANAGEMENT SOLUTIONS INC.**

By: _____
    Name:  John Ray
    Title: Principal Officer


**NORTEL ALTSYSTEMS, INC.**

By: _____
    Name:
    Title:


**CORETEK, INC.**

By: _____
    Name:
    Title:


**QTERA CORPORATION**

By: _____
    Name:
    Title:


**XROS, INC.**

By: _____
    Name:
    Title:

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Net-**    )
**works UK Limited** (in administration) by    )
Christopher Hill as Joint Administrator (act-    )
ing as agent and without personal liability)    )
in the presence of:

………………………………………..
Christopher Hill


Witness signature

 ....................................................................    )
Name: Wilma Graham    )
Address: Ernst & Young LLP, 1 More Lon-    )
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Net-**
**works (Ireland) Limited** (in administra-
tion) by David Hughes as Joint Administra-
tor (acting as agent and without personal
liability) in the presence of:

)
)
)
)

…………………………………….…

David Hughes

Witness signature

.................................................................

Name:

Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Net-**  )
**works S.A.** (in administration and *liquida-*  )
*tion judiciaire*) by Christopher Hill as Joint  )
Administrator (acting as agent and without  )
personal liability) in the presence of:

……………………………………………….
Christopher Hill

Witness signature

 .....................................................................  )
Name: Wilma Graham  )
Address: Ernst & Young LLP, 1 More Lon-  )
don Place, SE1 2AF

NEWYORK:2412508.1    *Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Networks France S.A.S.** (in administration) by Kerry Trigg acting as authorised representative of Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

…………….………………………….

Kerry Trigg

Witness signature

…………………………………………………
Name:
Address:

)
)
)

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel GmbH** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

…………………………….……………….
Christopher Hill

Witness signature

 .......................................................... )
Name: Wilma Graham )
Address: Ernst & Young LLP, 1 More Lon- )
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

**SIGNED** by Alan Bloom ) ………………………………………..

) Alan Bloom

in his own capacity and on behalf of the Joint ) Administrators without personal liability and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators in the presence of:

Witness signature

 .................................................................... )
Name: )
Address: )

Signed by **MAÎTRE COSME ROGEAU**, acting in the capacity of *Mandataire Liquidateur* of **NORTEL NETWORKS S.A. (IN ADMINISTRATION AND LIQUIDATION JUDICIARE)**, without personal liability and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the French Liquidator:

By _____

Name: Maître Cosme Rogeau
    Title: *Mandataire Liquidateur*

In the presence of:
Witness signature

_____

Name:
Address:

**SIGNED** for and on behalf of **NORTEL NETWORKS S.A. (IN ADMINISTRATION AND LIQUIDATION JUDICIARE)** by **MAÎTRE COSME ROGEAU** as *Mandataire Liquidateur* (acting as agent and without personal liability) in the presence of:
Witness signature

)
)
)
)
)
)
)
)

…………………………………….
**MAÎTRE COSME ROGEAU**

_____

Name:
Address:

*Asset Sale Agreement Signature Page*

**RANGER INC.**

*Asset Sale Agreement Signature Page*

**ROCKSTAR BIDCO, LP**

By: Rockstar Bidco GP, LLC, *its General Partner*

By: _____  _____

    Name:

    Title:

       ~~Solely for the purpose of Section 10.24~~
       ~~and the other Sections referenced in~~
       ~~Section 10.24(c):~~

         ~~**GOOGLE INC.**~~

      ~~By:~~_____  _____

        ~~Name:~~

        ~~Title:~~

## ANNEX I – ~~STATEMENTS~~Statements

Except (i) as set forth in the applicable sections of the Sellers Disclosure Schedule or (ii) to the extent solely relating to the Excluded Assets or the Excluded Liabilities:

(a)    To the Knowledge of the Sellers, an accurate, true and complete list of all Patents owned in whole or in part by the Sellers (including Jointly Owned Patents and Specified UK Patents) is set forth in Section A.I(a) of the Sellers Disclosure Schedule.  Such list includes, for each patent and patent application, the patent number or application serial number and the jurisdiction, and for each U.S. patent and patent application that is not a Specified UK Patent, the name of the Person holding such patent or patent application and the filing date and issue date, if applicable.  With respect to Jointly Owned Patents, the list identifies the co-owner(s) of each U.S. patent and, to the extent the Sellers have or are able to obtain copies of the applicable agreements, the agreements under which any Seller and the co-owner(s) share ownership of the patent.

(b)    None of the Listed Patents, the Listed Jointly Owned Patents, the Specified Listed UK Patents or the Listed Inventions, and, to the Knowledge of the Sellers, none of the other Transferred Patents, Jointly Owned Patents or Specified UK Patents, is subject to any Liens other than Permitted Encumbrances, and no Seller has granted any exclusive license to any Third Party with respect to any Listed Patent, Listed Jointly Owned Patent, Specified Listed UK Patent or Listed Invention or, to the Knowledge of the Sellers, any other Transferred Patent, Jointly Owned Patent or Specified UK Patent, which exclusive license is in force as of the date hereof.

(c)    With respect to the Specified Listed UK Patents, the Listed Jointly Owned Patents and the Listed Patents, and, to the Knowledge of the Sellers, with respect to the other Specified UK Patents, Jointly Owned Patents and Transferred Patents, the Sellers own all right, title, and interest in and to each such Patent (other than the rights of co-owners of Jointly Owned Patents in and to the Jointly Owned Patents); and subject to the Cross-License Agreements, the Outbound License Agreements and the Commercial Licenses, such right, title, and interest are sufficient for the Sellers to independently bring suit against a Third Party to enforce the Listed Patents, the Specified Listed UK Patents, and, to the Knowledge of the Sellers, the other Specified UK Patents and Transferred Patents.

(d)    To the Knowledge of the Sellers, Section A.I(d) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts between the Sellers or their Affiliates, on the one hand, and any other Person, on the other hand, under which the Sellers or their Affiliates both (i) grant a license under any Transferred Patent, Jointly Owned Patent or Specified UK Patent and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property) (collectively, the "**Cross-License Agreements**"), and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof, except to the extent disclosure of the terms or existence of a Cross License Agreement is prohibited, in which case it has been omitted from Section A.I(d) of the Sellers Disclosure Schedule, but the number of such Cross License Agreements that have been omitted is set forth in Section A.I(d) of the Sellers Disclosure Schedule.

(e)    To the Knowledge of the Sellers, Section A.I(e) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts (other than Cross-License Agreements and Commercial Licenses) under which the Sellers or their Affiliates grant a license (including a grant back or any other express license made by any of the Sellers (as licensors) to improvements or any other license rights) to a Transferred Patent, Jointly Owned Patent or Specified UK Patent (whether alone or with any Software or Trade Secrets) (collectively, the "**Outbound License Agreements**"), indicating for each such Outbound License Agreement the title and the parties thereto, and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof.

(f)    To the Knowledge of the Sellers, (i) Section A.I(f) of the Sellers Disclosure Schedule sets forth (A) an accurate, true and complete list of each transition services agreement, master purchase agreements and development and support agreements that the Sellers entered into with the purchasers of its various business units after the Petition Date in connection with their divestitures and (B) with respect to the transition services agreements, the original scheduled termination date thereof (which, as of the date hereof, has not been extended by more than 90 days), and (ii) the scope of the licenses granted under the Transferred Patents, Jointly Owned Patents and Specified UK Patents pursuant to such transition services agreements, master purchase agreements and development and support agreements is not broader than the scope of such licenses contained in the form licenses provided to the Purchaser prior to the date hereof in the Data Room as document numbers 2.5.3.187 2.5.3.193, 2.5.3.194 and 2.5.3.195; it being understood that work orders under certain of such agreements have been issued pursuant to such agreements, but are not listed. To the Knowledge of the Sellers, the license rights, if any, granted by the Sellers under the Transferred Patents, Jointly Owned Patents and Specified UK Patents pursuant to each such transition services agreement during the term of such transition services agreement shall expire upon the termination of such transition services agreement (except for (A) rights to use and make certain Software applications and tools relating to the businesses being divested, to the extent that such Software applications and tools were delivered by the Sellers or their Affiliates and (B) internal use of Intellectual Property created by Sellers or their Affiliates prior to the expiration of such transition services agreement in support of or during the course of performing the services, to the extent such Intellectual Property has been delivered, including by integration into the divested business.

(g)    To the Knowledge of the Sellers, there is no Action pending asserting invalidity, misuse or unenforceability of any of the Jointly Owned Patents, Transferred Patents or Specified UK Patents or challenging the Sellers' right to use, right to transfer, or ownership of any of the Jointly Owned Patents, Transferred Patents or Specified UK Patents.

(h)    To the Knowledge of the Sellers, each of the registrations and applications for the Jointly Owned Patents, Transferred Patents or Specified UK Patents included in the Assets is currently in good standing and subsisting. The foregoing will not be construed as a warranty that any patent will issue based on a patent application.

(i)    To the Knowledge of the Sellers, Section A.I(i) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Actions (including opposition, interferences and cancellation petitions and like proceedings) against any Seller, except for the

Bankruptcy Proceedings, pending before any Government Entity or threatened in writing that involves the Jointly Owned Patents, Transferred Patents or Specified UK Patents.

(j)       To the Knowledge of the Sellers, there are no prior or preferential rights, rights of first refusal, rights of first offer or other similar rights of any party (other than the Purchaser) to purchase or otherwise acquire any of the Assets.

(k)       To the Knowledge of the Sellers: every Patent solely owned by the Sellers or their Affiliates, except for the Excluded Patents, is included among the Listed Patents or the Specified Listed UK Patents; every Patent jointly owned by one or more of the Sellers and their Affiliates, on the one hand, and one or more Third Parties, on the other hand, except for the Excluded Patents, is included among the Listed Jointly Owned Patents; and every invention disclosure owned by the Sellers or their Affiliates and under consideration for the filing of a patent application is included among the Listed Inventions.

(l)       No Person listed in Section A.I(l) of the Sellers Disclosure Schedule has been granted any license (other than a Commercial License) under the Jointly Owned Patents, Transferred Patents or Specified UK Patents by the Sellers, which license is in force as of the date hereof, it being understood that such Persons may have rights or licenses solely with respect to products or services sold or provided by the Sellers or Sellers' Affiliates.

(m)       To the Knowledge of the Sellers, Section A.I(m) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts (other than Cross-License Agreements and Outbound License Agreements listed in Sections A.I(d) or A.I(e) of the Sellers Disclosure Schedule, respectively) under which the Sellers or their Affiliates have joint ownership in the Jointly Owned Patents (collectively, the "**Joint Ownership Agreements**"), indicating each Jointly Owned Patent and the title and the parties to each such agreement, and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof.

(n)       To the Knowledge of the Sellers, no Affiliate of the Sellers that is not itself a Seller owns any Patents, invention disclosures or Patent Related Documentation.

(o)       To the Knowledge of the Sellers, (i)(x) all promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies or industry groups (other than those contained in membership agreements, by-laws or policies of standard-setting bodies or industry groups and described in clause (y) below or, without limiting clause (y) below, in Section A.I(b) of the Sellers Disclosure Schedule) and that may concern the Transferred Patents or Specified UK Patents, together with the title and number of the standard and the Patents to which such promises, declarations or commitments refer (in each case, to the extent identified in the respective promise, declaration or commitment), are listed in Section A.I(o)(i)(x) of the Sellers Disclosure Schedule, and (y) all membership agreements, by-laws or policies of standard-setting bodies or industry groups in which Sellers were participants and which contained commitments that may concern the Transferred Patents or Specified UK Patents granted in writing by the Sellers and which bind Sellers to bind the Purchaser thereto, are listed in Section A.I(o)(i)(y) of the Sellers Disclosure Schedule; and (ii) except as set forth on Schedule A.I(o)(ii) of the Sellers

Disclosure Schedule, none of the declarations, promises and commitments referred to in clause (i) above require royalty-free licensing of any of the Transferred Patents.

(p)     The patents, patent applications and provisional patent application listed in Section 1.1(c) of the Sellers Disclosure Schedule are solely those sold after the Petition Date to purchasers in connection with sales of divisions of Sellers and are not included in the Sellers' Patents.

(q)     There exist no Permitted Encumbrances of the type described in clause (i) of the definition of "Permitted Encumbrances" on any of the Assets.

(r)     To the Knowledge of the Sellers, there exist no Licensed Residual Patents (other than invention disclosures that (x) relate to a patent application filed anywhere in the world or (y) are dated thirty (30) months or more before the date hereof) or Undisclosed Patent Interests.

(s)     To the Knowledge of the Sellers, the aggregate amount of all unpaid past, present and future income and royalties payable to the Sellers under (i) the Transferred Licenses and (ii) any licenses granted under the Transferred Patents, Jointly Owned Patents or Specified UK Patents does not exceed $10 million.

(t)     The portions of the Ericsson Licenses and any other agreement between any Seller, on one hand, and Ericsson on the other hand, which were redacted in the copy of such agreements provided in the Data Room, do not provide for: (i) the assignment to any Person of any ownership or exclusive rights (including any option to acquire ownership or exclusive rights) to any Transferred Patents, Specified UK Patents or Jointly Owned Patents, (ii) the grant of any sublicense or other license rights under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, (iii) the Sellers to have any rights to receive an ownership or exclusive interest in any Patents transferred by any Sellers to Ericsson or (iv) any rights for any Person in any improvements to any Transferred Patents, Specified UK Patents or Jointly Owned Patents made by any Seller or any purchaser of Transferred Patents, Specified UK Patents or Jointly Owned Patents.

(u)     The Sellers have disclosed to Purchaser all agreements, contracts, notices and correspondence to, from or with Ericsson that relate in any way to the Transferred Patents, Jointly Owned Patents or Specified UK Patents, other than agreements, contracts, notices and correspondence relating to a potential stalking horse transaction for the Transferred Patents, Jointly Owned Patents and Specified UK Patents, as a whole.

(v)     To the Knowledge of the Sellers, there exist no disputes between any Seller, on the one hand, and Ericsson, on the other hand, concerning the Transferred Patents, Jointly Owned Patents or Specified UK Patents or the scope of any licenses granted to the Transferred Patents, Jointly Owned Patents or Specified UK Patents.

(w)     There are no Collective Labor Agreements in effect or labor organizing efforts outstanding or threatened with respect to any Employee of any of the Sellers.

(x)     No Employee of any of the Sellers works in Quebec, Canada.

(y)      [Reserved]

(z)      To the Knowledge of the Sellers, there is no ongoing and will be no future manufacture, development, sale, supply or other distribution, or servicing of Nortel Products or other products under the Transferred Patents or Specified UK Patents by, for or on behalf of Sellers or an Affiliate of any Seller, other than to the extent such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement or Section 5.13(b) of this Agreement.

**APPENDIX "D"**

**[CONFIDENTIAL]**

**APPENDIX "E"**

**[CONFIDENTIAL]**

**APPENDIX "F"**

**[CONFIDENTIAL]**

**APPENDIX "G"**

**[ATTACHED]**

Dominion of Canada, PROVINCE OF ONTARIO,
MUNICIPALITY of METROPOLITAN TORONTO

TO WITNESS:

IN THE MATTER OF:   NORTEL NETWORKS INC.

I Patricia Tabone, of the City of Toronto, in the Municipality of Metropolitan
Toronto, in the Province of Ontario, Advertising Services Representative, in
the employment of The Globe and Mail, make oath and say that the
advertisement :

LEGAL NOTICE

A true copy of which is hereto annexed, was duly distributed in
the issues of The Globe and Mail a daily newspaper, simultaneously
published in the Cities of Toronto, Montreal, Vancouver, Halifax, Calgary,
Brandon, Canada, on the following dates, namely:

**MAY 6 TH , A.D. 2011**

That I have examined copies of the said newspaper published on the said
dates and found the said advertisement to be correctly inserted therein.

Sworn before me at the City of Toronto
in the Municipality of Metropolitan
Toronto this 17TH  day of  MAY,  A.D. 2011

Fatima Brito Wilson,
a Commissioner, etc., City of Toronto,
for CTVglobemedia Publishing Inc.
Expires June 28, 2013

...COM

## LEGALS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
| --- | --- |
| In re: | Chapter 11 |
| Nortel Networks Inc., et al., | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

ONTARIO
SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)
IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION

JOINT NOTICE OF HEARING, SALE HEARING AND REJECTION OF LICENSES

[Body of legal notice — illegible fine print]

# AFFIDAVIT

STATE OF TEXAS                              )
                                            )
CITY AND COUNTRY OF DALLAS)

I, Albert Fox, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher

of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout

 the United States, and that the notice attached to this Affidavit has been regularly

published in THE WALL STREET JOURNAL for National distribution for

1   insertion(s) on the following date(s):

MAY-06-2011;

ADVERTISER: Nortel Networks Inc., et al.;

and that the foregoing statements are true and correct to the best of my knowledge.

_____

Sworn to before me this
6    day of   May         2011

_____
Notary Public

DONNA HESTER
Notary Public, State of Texas
My Commission Expires
October 29, 2014

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re ) Chapter 11
Nortel Networks Inc., et al., ) Case No. 09-10138 (KG)
Debtors. ) Jointly Administered

Court File No.: 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE - (COMMERCIAL LIST)
IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

**JOINT NOTICE OF PUBLIC AUCTION, SALE HEARING
AND REJECTION OF IP LICENSES**

**PLEASE TAKE NOTICE** that on April 4, 2011, Nortel Networks Corporation, Nortel Networks Limited (together, the "Canadian Debtors"), Nortel Networks Inc. (collectively with certain of its U.S. debtor affiliates, the "U.S. Debtors") and together with the Canadian Debtors, the "Sellers") entered into an agreement (the "Agreement") to convey substantially all of the Sellers' residual patents and certain related assets as described therein (the "Assets") to Ranger Inc., an affiliate of Google Inc., as more fully set forth in the motions for approval of the Agreement and other related relief, including the procedures for the rejection of certain outbound and cross patent licenses, filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April 4, 2011 (D.I. 5202) (the "U.S. Sale Motion") and filed with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") on April 7, 2011 (the "Canadian Sale Motion"). Except as set forth in the Agreement, the Sellers seek to sell to Ranger Inc. or such other successful bidder(s) at an auction (the "Successful Bidder") the Assets conveyed by the Agreement free and clear of all claims and interests, in the case of the U.S. Debtors, pursuant to Section 363 of the Bankruptcy Code, and in the case of the Canadian Debtors, pursuant to the Canadian Approval and Vesting Order.

**PLEASE TAKE FURTHER NOTICE** that the terms and conditions of the proposed sale to Ranger Inc. are set forth in the Agreement attached to the U.S. Sale Motion and the Canadian Sale Motion. The Agreement represents the results of extensive marketing efforts conducted by the Sellers to obtain the highest and best offer for the Assets.

**PLEASE TAKE FURTHER NOTICE** that on May 2, 2011, the Bankruptcy Court entered an order (D.I. 5359) (the "Bidding Procedures Order") and that on May 2, 2011 the Canadian Court entered an order (the "Canadian Sales Process Order") approving, among other things, (i) the bidding procedures (the "Bidding Procedures"), which set the key dates and times related to the sale of the Assets under the Agreement and (ii) the patent license rejection procedures, which establish procedures for the rejection of Unknown Licenses (as defined in the U.S. Sale Motion and Canadian Sale Motion). *All interested bidders should carefully read the Bidding Procedures, and all counterparties to patent licenses with the Sellers should carefully read the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sale Process Order.*

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order and Canadian Sales Process Order, an auction (the "Auction") to sell the Assets will be conducted at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, or such other location as shall be timely communicated in accordance with the Bidding Procedures, on **June 20, 2011 at 9:00 a.m. (ET)** (the "Auction Date"). Only the Sellers, Ranger Inc., the Committee, the Bondholder Group, Ernst & Young Inc. in its capacity as the monitor of Nortel Networks Corporation et al. (the "Monitor") and the Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall be entitled to attend the Auction in person, and Ranger Inc. and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

**PLEASE TAKE FURTHER NOTICE** that Ranger Inc. has agreed to take the Assets subject to substantially all known outbound and cross patent licenses to such Assets granted prior to the signing of the Agreement, as identified by the Sellers, upon the terms and subject to the limitations contained in the Agreement. In an abundance of caution and in furtherance of the Sale, (i) the U.S. Debtors intend to reject any Unknown Licenses (as defined in the U.S. Sale Motion) to such Assets pursuant to section 365 of the Bankruptcy Code, effective as of and conditioned upon the occurrence of the Closing, and (ii) the Canadian Debtors intend to terminate all Unknown Licenses (as defined in the Canadian Sale Motion) to such Assets, effective as of and conditioned on the occurrence of the Closing. The U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order further describe the types of patent licenses that will be rejected or terminated by the U.S. Debtors and Canadian Debtors in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that the U.S. Debtors and Canadian Debtors do not intend to reject or terminate certain "Covered Licenses" which consist of Commercial Licenses and certain intercompany agreements among the Sellers and their affiliates. Inquiries regarding the license rejection procedures, including whether a particular license is a Covered License (i) can be directed to the Monitor at (416) 943-4439 or (866) 942-7171, in the case of license agreements to which the Canadian Debtors are a party, and (ii) can be directed to Cleary Gottlieb Steen & Hamilton LLP at (212) 225-3830, in the case of license agreements to which the U.S. Debtors are a party.

**PLEASE TAKE FURTHER NOTICE** that the deadline for any counterparty to an Unknown License with the U.S. Debtors or a party in interest in the U.S. Debtors' chapter 11 cases to file and serve an objection to the rejection of any Unknown License is **May 31, 2013 at 4:00 p.m. (ET)**. Such objection shall be served in accordance with the Objection Procedures (as defined below) on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors; and counsel to the Monitor.

**PLEASE TAKE FURTHER NOTICE** that the deadline for a counterparty to an Unknown License with the U.S. Debtors to elect to retain its rights under such license in accordance with section 365(n)(1)(b) of the Bankruptcy Code is **June 6, 2011 at 4:00 p.m. (ET)** (the "Notice of Election Deadline"). Any counterparty to an Unknown License with the U.S. Debtors that wishes to retain such rights must file a notice of election to retain such rights (a "Notice of Election") in accordance with the Objection Procedures and serve such notice on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors; and counsel to the Monitor. If such counterparty fails to file a Notice of Election and serve such notice on counsel to each of the U.S. Debtors, the Canadian Debtors and the Monitor, the U.S. Debtors and the Stalking Horse Purchaser (or other Successful Bidder) reserve their right to object to any Notices of Election on any and all grounds, which objections will be heard at the Sale Hearing. *Any counterparty to an Unknown License with the U.S. Debtors that does not file and serve a Notice of Election by the Notice of Election Deadline will be deemed to have elected to treat each such Unknown License as terminated under section 365(n)(1)(a) of the Bankruptcy Code.* For any Unknown License with the U.S. Debtors that is rejected, the deadline for any counterparty to such Unknown License to file a rejection damages claim against the U.S. Debtors with respect to such rejection will be thirty (30) days following the date of the Closing of the Sale.

**PLEASE TAKE FURTHER NOTICE** that the deadline for any counterparty to an Unknown License with the Canadian Debtors to come forward and object to the termination of such Unknown License by serving a notice of objection substantially in the form posted on the Monitor's website at www.ey.com/ca/nortel on counsel to the Canadian Debtors, counsel to the Monitor, counsel to the U.S. Debtors and counsel to Ranger Inc. is **June 6, 2011 at 4:00 p.m. (ET)** (the "Canadian License Bar Date"). To the extent that a counterparty comes forward and asserts an Unknown License with the Canadian Debtors prior to the Canadian License Bar Date, which Unknown License is established by court order to be a valid Unknown License prior to the Closing (as defined in the Agreement), the Assets will be sold subject to such license. *Any Unknown License with the Canadian Debtors for which the counterparty to such Unknown License does not come forward and file and serve an objection notice, or whose objection is not established by court order, will be terminated and forever barred.* Any claim arising from such deemed termination shall be an unsecured claim against the Canadian Debtors, shall be deemed a Restructuring Claim as such term is defined in the Claims Procedure Order granted by the Canadian Court on July 30, 2009, must be filed within thirty (30) days of the date of Closing and must otherwise be in compliance with that order.

**PLEASE TAKE FURTHER NOTICE** that, in addition to the foregoing license rejection procedures, the U.S. Debtors and the Canadian Debtors have agreed as part of the transaction to various limitations and prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts containing licenses to the patents offered for sale, including outbound and cross patent licenses and certain licenses incorporated in Commercial Licenses, Intercompany Licenses (as defined in the Sale Order and the Vesting Order, each as defined below) and certain agreements entered into in connection with the divestiture of Nortel's business units, as set forth in paragraph 28 of the proposed Sale Order annexed to the U.S. Sale Motion (the "Sale Order") and paragraph 14 of the proposed Approval and Vesting Order annexed to the affidavit of George Riedel contained in the Canadian Sale Motion (the "Vesting Order"). *All counterparties to contracts with the Sellers should carefully read the U.S. Sale Motion and the proposed Sale Order annexed thereto and the Canadian Sale Motion and the proposed Approval and Vesting Order attached to the affidavit of George Riedel contained in the Canadian Sale Motion.*

**PLEASE TAKE FURTHER NOTICE** that a joint hearing (the "Sale Hearing") will be held before the Honorable Kevin Gross, United States Bankruptcy Judge and the Honourable Justice Morawetz of the Ontario Superior Court of Justice (Commercial List), which hearing is currently scheduled to be held on **June 30, 2011 at 10:00 a.m. (ET)**, or at such other time as the Courts permit, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801 and the Ontario Superior Court (Commercial List) at 393 University Ave., Toronto, Ontario to confirm the results of the Auction, approve the sale of the U.S. Debtors' and Canadian Debtors' respective interests in the Assets to Ranger Inc. or the Successful Bidder and approve the rejection of the Unknown Licenses with the U.S. Debtors and the Canadian Debtors. The U.S. Debtors and the Canadian Debtors may each adjourn their respective Sale Hearings one or more times without further notice by making an announcement in open Court or, in the case of the U.S. Debtors, by the filing of a hearing agenda pursuant to Local Rule 9029-3 announcing the adjournment or, in the case of the Canadian Debtors, by providing notice to the service list in the Canadian Debtors' *Companies' Creditors Arrangement Act* proceedings (the "Canadian Service List").

**PLEASE TAKE FURTHER NOTICE** that, except as described above, pursuant to the Bidding Procedures Order, the Bankruptcy Court has currently set (a) **June 13, 2011 at 4:00 p.m. (ET)** as the deadline for all general objections to the U.S. Sale Motion, including objections to the sale of the Assets, (b) **June 13, 2011 at 4:00 p.m. (ET)** as the deadline (as defined in the Bidding Procedures) and (c) **June 28, 2011 at 6:00 p.m. (ET)** as the deadline for supplemental objections regarding objections to issues arising from any bid in connection with the Auction and/or the Sellers' selection of a Successful Bid made by a Successful Bidder other than Ranger Inc. Except as described above, pursuant to the Canadian Sales Process Order, the Canadian Court has currently set **June 13, 2011 at 4:00 p.m. (ET)** as the Bid Deadline.

**PLEASE TAKE FURTHER NOTICE** that all objections to the U.S. Sale Motion must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than the General Objection Deadline, or the applicable deadline as indicated above; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following at the addresses provided in the Bidding Procedures and U.S. Sale Motion: (i) counsel to the U.S. Debtors, (ii) counsel to Ranger Inc., (iii) counsel to the Committee, (iv) counsel to the Bondholder Group, and (v) the Office of the United States Trustee (collectively, the "Objection Notice Parties", such processes the "Objection Procedures").

**PLEASE TAKE FURTHER NOTICE** that this notice is a summary only and is subject to the full terms and conditions of the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order, the Canadian Sales Process Order and the Bidding Procedures, and you should review such documents in their entirety. Copies of the Agreement, the U.S. Sale Motion, and the Bidding Procedures Order (including the Bidding Procedures approved by the Bankruptcy Court) may be examined by interested parties between the hours of 8:00 a.m. and 4:00 p.m. (ET) at the office of the Clerk of the Court, 824 Market Street, Wilmington, Delaware 19801, or by appointment during regular business hours at the office of the U.S. Debtors' attorneys: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley and Lisa M. Schweitzer. Additionally, copies of these documents may be downloaded from the Bankruptcy Court's docket at www.deb.uscourts.gov and from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://dm.epiq11.com/nortel. Copies of the Agreement, Canadian Sale Motion and Canadian Sales Process Order (including the Bidding Procedures approved by the Canadian Court) and the Canadian Service List can be viewed at the Monitor's website at http://www.ey.com/ca/nortel or by contacting the Monitor by telephone (1-416-943-4439 or 1-866-942-7171) or by fax (1-416-943-2808).

**PLEASE TAKE FURTHER NOTICE** that dates set forth in this notice are subject to change, and further notice of such changes may not be provided except through announcements in open court and/or the filing of notices and/or amended agendas. Parties in interest are encouraged to monitor the electronic court docket, the noticing agent website and/or the Monitor's website for further updates.

Dated: May 2, 2011, Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP, James L. Bromley (admitted pro hac vice), Lisa M. Schweitzer (admitted pro hac vice), One Liberty Plaza, New York, New York 10006, Telephone: (212) 225-2000, Facsimile: (212) 225-3999 -and- MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Derek C. Abbott (No. 3376), Eric D. Schwartz (No. 3134), Ann C. Cordo (No. 4817), 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19801, Telephone (302) 658-9200, Facsimile: (302) 658-3989, *Counsel for the U.S. Debtors and U.S. Debtors in Possession* -and- OGILVY RENAULT LLP, Suite 3800 Royal Bank Plaza, South Tower, 200 Bay Street, Toronto, Ontario M5J2Z4 CANADA, Derrick Tay LSUC# 21152A, Telephone: (416) 216-2327, Email: dtay@ogilvyrenault.com, Jennifer Stam LSUC# 46735J, Telephone: (416) 216-4832, Email: jstam@ogilvyrenault.com, Fax: (416) 216-3930, *Lawyers for Canadian Debtors*

SEC. B  PG 7

# The New York Times

620 8TH AVENUE · NEW YORK, NY 10018

## CERTIFICATION OF PUBLICATION

MAY 0 6 2011                    20

I, _Alice Weber_ , in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

MAY 0 6 2011                    20

_Alice Weber_

Approved: _Maria Pannullo_

THIS CERTIFICATION
NOT VALID
WITHOUT NYT RAISED SEAL

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| Nortel Networks Inc., *et al.*, | ) Case No. 09-10138 (KG) |
| Debtors. | ) Jointly Administered |

Court File No.:09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE - (COMMERCIAL LIST)
IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION AND NORTEL
NETWORKS TECHNOLOGY CORPORATION

JOINT NOTICE OF PUBLIC AUCTION, SALE HEARING
AND REJECTION OF IP LICENSES

**PLEASE TAKE NOTICE** that on April 4, 2011, Nortel Networks Corporation, Nortel Networks Limited (together, the "**Canadian Debtors**"), Nortel Networks Inc. (collectively with certain of its U.S. debtor affiliates, the "**U.S. Debtors**," and together with the Canadian Debtors, the "**Sellers**") entered into an agreement (the "**Agreement**") to convey substantially all of the Sellers' residual patents and certain related assets as described therein (the "**Assets**") to Ranger Inc., an affiliate of Google Inc., as more fully set forth in the motions for approval of the Agreement and other related relief, including the procedures for the rejection of certain outbound and cross patent licenses, filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on April 4, 2011 (D.I. 5202) (the "**U.S. Sale Motion**") and filed with the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") on April 7, 2011( the "**Canadian Sale Motion**"). Except as set forth in the Agreement, the Sellers seek to sell to Ranger Inc. or such other successful bidder(s) at an auction (the "**Successful Bidder**") the Assets covered by the Agreement free and clear of all claims and interests, in the case of the U.S. Debtors, pursuant to section 363 of the Bankruptcy Code and, in the case of the Canadian Debtors, pursuant to the Canadian Approval and Vesting Order.

**PLEASE TAKE FURTHER NOTICE** that the terms and conditions of the proposed sale to Ranger Inc. are set forth in the Agreement attached to the U.S. Sale Motion and the Canadian Sale Motion. The Agreement represents the results of extensive marketing efforts conducted by the Sellers to obtain the highest and best offer for the Assets.

**PLEASE TAKE FURTHER NOTICE** that on May 2, 2011, the Bankruptcy Court entered an order (D.I. 5359) (the "**Bidding Procedures Order**") and that on May 2, 2011 the Canadian Court entered an order (the "**Canadian Sales Process Order**") approving, among other things, (i) the bidding procedures (the "**Bidding Procedures**"), which set the key dates and times related to the sale of the Assets under the Agreement and (ii) the patent license rejection procedures, which establish procedures for the rejection of Unknown Licenses (as defined in the U.S. Sale Motion and Canadian Sale Motion). *All interested bidders should carefully read the Bidding Procedures, and all counterparties to patent licenses with the Sellers should carefully read the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order.*

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order and Canadian Sales Process Order, an auction (the "**Auction**") to sell the Assets will be conducted at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, or such other location as shall be timely communicated in accordance with the Bidding Procedures, on **June 20, 2011 at 9:00 a.m. (ET)** (the "**Auction Date**"). Only the Sellers, Ranger Inc., the Committee, the Bondholder Group, Ernst & Young Inc. in its capacity as the monitor of Nortel Networks Corporation *et al.* (the "**Monitor**") and the Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall be entitled to attend the Auction in person, and only Ranger Inc. and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

**PLEASE TAKE FURTHER NOTICE** that Ranger Inc. has agreed to take the Assets subject to substantially all known outbound and cross patent licenses to such Assets granted prior to the signing of the Agreement, as identified by the Sellers, upon the terms and subject to the limitations contained in the Agreement. In an abundance of caution and in furtherance of the Sale, (i) the U.S. Debtors intend to reject any Unknown Licenses (as defined in the U.S. Sale Motion) to such Assets pursuant to section 365 of the Bankruptcy Code, effective as of and conditioned on the occurrence of the Closing, and (ii) the Canadian Debtors intend to terminate all Unknown Licenses (as defined in the Canadian Sale Motion) to such Assets, effective as of and conditioned on the occurrence of the Closing. The U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order further describe the types of patent licenses that will be rejected or terminated by the U.S. Debtors and Canadian Debtors in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that the U.S. Debtors and Canadian Debtors do not intend to reject or terminate certain "Covered Licenses" which consist of Commercial Licenses and certain intercompany agreements among the Sellers and their affiliates. Inquiries regarding the license rejection procedures, including whether a particular license is a Covered License (i) can be directed to the Monitor at (416) 943-4439 or (866) 942-7177, in the case of license agreements to which the Canadian Debtors are a party, and (ii) can be directed to Cleary Gottlieb Steen & Hamilton LLP at (212) 225-3830, in the case of license agreements to which the U.S. Debtors are a party.

**PLEASE TAKE FURTHER NOTICE** that the deadline for any counterparty to an Unknown License with the U.S. Debtors or a party in interest in the U.S. Debtors' chapter 11 cases to file and serve an objection to the rejection of any Unknown License is **May 31, 2011 at 4:00 p.m. (ET)**. Such objection shall be served in accordance with the Objection Procedures (as defined below) on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors; and counsel to the Monitor.

**PLEASE TAKE FURTHER NOTICE** that the deadline for a counterparty to an Unknown License with the U.S. Debtors to elect to retain its rights under such license in accordance with section 365(n)(1)(b) of the Bankruptcy Code is **June 6, 2011 at 4:00 p.m. (ET)** (the "**Notice of Election Deadline**"). Any counterparty to an Unknown License with the U.S. Debtors that wishes to retain such rights must file a notice of election to retain such rights (a "**Notice of Election**") in accordance with the Objection Procedures and serve such notice on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors; and counsel to the Monitor, including a copy of such Unknown License with the Notice of Election served on counsel to each of the U.S. Debtors, the Canadian Debtors and the Monitor.  The U.S. Debtors and the Stalking Horse Purchaser (or other Successful Bidder) reserve their right to object to any Notices of Election on any and all available grounds, which objections will be heard at the Sale Hearing. *Any counterparty to an Unknown License with the U.S. Debtors that does not file and serve a Notice of Election by the Notice of Election Deadline will be deemed to have elected to treat each such Unknown License as terminated under section 365(n)(1)(a) of the Bankruptcy Code.* For any Unknown License with the U.S. Debtors that is rejected, the deadline for any counterparty to such Unknown License to file a rejection damages claim against the U.S. Debtors with respect to such rejection will be thirty (30) days following the date of the Closing of the Sale.

**PLEASE TAKE FURTHER NOTICE** that the deadline for any counterparty to an Unknown License with the Canadian Debtors to come forward and object to the termination of such Unknown License by serving a notice of objection substantially in the form posted on the Monitor's website at www.ey.com/ca/nortel on counsel to the Canadian Debtors, counsel to the Monitor, counsel to the U.S. Debtors and counsel to Ranger Inc. is **June 6, 2011 at 4:00 p.m. (ET)** (the "**Canadian License Bar Date**"). To the extent that a counterparty comes forward and asserts an Unknown License with the Canadian Debtors prior to the Canadian License Bar Date, which Unknown License is established by court order to be a valid Unknown License prior to the Closing (as defined in the Agreement), the Assets will be sold subject to such license. *Any Unknown License with the Canadian Debtors for which the counterparty to such Unknown License does not come forward and file and serve an objection notice, or who objection is not established by court order, will be terminated and forever barred.* Any claim arising from such deemed termination shall be an unsecured claim against the Canadian Debtors, shall be deemed a Restructuring Claim as such term is defined in the Claims Procedure Order granted by the Canadian Court on July 30, 2009, must be filed within thirty (30) days of the date of Closing and must otherwise be in compliance with that order.

**PLEASE TAKE FURTHER NOTICE** that, in addition to the foregoing license rejection procedures, the U.S. Debtors and the Canadian Debtors have agreed as part of the transaction to various limitations and prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts containing licenses to the patents offered for sale, including outbound and cross patent licenses and certain licenses incorporated in Commercial Licenses, Intercompany Licenses (as defined in the Sale Order and the Vesting Order, each as defined below) and certain agreements entered into in connection with the divestiture of Nortel's business units, as set forth in paragraph 28 of the proposed Sale Order annexed to the U.S. Sale Motion (the "**Sale Order**") and paragraph 14 of the proposed Approval and Vesting Order annexed to the affidavit of George Riedel contained in the Canadian Sale Motion (the "**Vesting Order**"). *All counterparties to contracts with the Sellers should carefully read the U.S. Sale Motion and the proposed Sale Order annexed thereto and the Canadian Sale Motion and the proposed Approval and Vesting Order attached to the affidavit of George Riedel contained in the Canadian Sale Motion.*

**PLEASE TAKE FURTHER NOTICE** that a joint hearing (the "**Sale Hearing**") will be held before the Honorable Kevin Gross, United States Bankruptcy Judge and the Honourable Justice Morawetz of the Ontario Superior Court of Justice (Commercial List), with hearing is currently scheduled to be held on **June 30, 2011 at 10:00 a.m. (ET)**, or at such other time as the Courts permit, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801 and the Ontario Superior Court (Commercial List) at 393 University Ave., Toronto, Ontario to confirm the results of the Auction, approve the sale of the U.S. Debtors' and Canadian Debtors' respective interests in the Assets to Ranger Inc. or the Successful Bidder and approve the rejection of the Unknown Licenses with the U.S. Debtors and the Canadian Debtors. The U.S. Debtors and the Canadian Debtors may each adjourn their respective Sale Hearings one or more times without further notice by making an announcement in open Court or, in the case of the U.S. Debtors, by the filing of a hearing agenda pursuant to Local Rule 9029-3 announcing the adjournment or, in the case of the Canadian Debtors, by providing notice to the service list in the Canadian Debtors' *Companies' Creditors Arrangement Act* proceedings (the "**Canadian Service List**").

**PLEASE TAKE FURTHER NOTICE** that, except as described above, pursuant to the Bidding Procedures Order, the Bankruptcy Court has currently set: (a) **June 13, 2011 at 4:00 p.m. (ET)** as the deadline for all general objections to the U.S. Sale Motion, including objections to the sale of the Assets; (b) **June 13, 2011 at 4:00 p.m. (ET)** as the Bid Deadline (as defined in the Bidding Procedures); and (c) **June 28, 2011 at 4:00 p.m. (ET)** as the deadline for supplemental objections regarding objections to issues arising from and in connection with the Auction and/or the Sellers' selection of a Successful Bid made by a Successful Bidder other than Ranger Inc. Except as described above, pursuant to the Canadian Sales Process Order, the Canadian Court has currently set **June 13, 2011 at 4:00 p.m. (ET)** as the Bid Deadline.

**PLEASE TAKE FURTHER NOTICE** that all objections to the U.S. Sale Motion must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than the General Objection Deadline, or other applicable deadline as indicated above; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following at the addresses provided in the Bidding Procedures and U.S. Sale Motion: (i) counsel to the U.S. Debtors, (ii) counsel to Ranger Inc., (iii) counsel to the Committee, (iv) counsel to the Bondholder Group, and (v) the Office of the United States Trustee (collectively, the "**Objection Notice Parties**"; such procedures the "**Objection Procedures**").

**PLEASE TAKE FURTHER NOTICE** that this notice is a summary only and is subject to the full terms and conditions of the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order, the Canadian Sales Process Order and the Bidding Procedures, and you should review such documents in their entirety. Copies of the Agreement, the U.S. Sale Motion, and the Bidding Procedures Order (including the Bidding Procedures approved by the Bankruptcy Court) may be examined by interested parties between the hours of 8:00 a.m. and 4:00 p.m. (ET) at the office of the Clerk of the Court, 824 Market Street, Wilmington, Delaware 19801, or by appointment during regular business hours at the offices of the U.S. Debtors' attorneys: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley and Lisa M. Schweitzer. Additionally, copies of these documents may be downloaded from the Bankruptcy Court's docket at www.deb.uscourts.gov and from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://dm.epiq11.com/nortel. Copies of the Agreement, Canadian Sale Motion and Canadian Sales Process Order (including the Bidding Procedures approved by the Canadian Court) and the Canadian Service List can be viewed at the Monitor's website http://www.ey.com/ca/nortel/ or by contacting the Monitor by telephone (1-416-943-4439 or 1-866-942-7177) or by fax (1-416-943-2808).

**PLEASE TAKE FURTHER NOTICE** that dates set forth in this notice are subject to change, and further notice of such changes may not be provided except through announcements in open court and/or the filing of notices and/or amended agendas. Parties in interest are encouraged to monitor the electronic court docket, the noticing agent website and/or the Monitor's website for further updates.

Dated: May 2, 2011, Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP, James L. Bromley (admitted *pro hac vice*), Lisa M. Schweitzer (admitted *pro hac vice*), One Liberty Plaza, New York, New York 10006, Telephone: (212) 225-2000, Facsimile: (212) 225-3999 -and- MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Derek C. Abbott (No. 3376), Eric D. Schwartz (No. 3134), Ann C. Cordo (No. 4817), 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19801, Telephone: (302) 658-9200, Facsimile: (302) 658-3989, *Counsel for the U.S. Debtors and U.S. Debtors in Possession* -and- OGILVY RENAULT LLP, Suite 3800, Royal Bank Plaza, South Tower, 200 Bay Street, Toronto, Ontario M5J2Z4 CANADA, Derrick Tay LSUC# 21153A, Telephone: (416) 216-2327, Email: dtay@ogilvyrenault.com, Jennifer Stam LSUC# 46735J, Telephone: (416) 216-4832, Email: jstam@ogilvyrenault.com, Fax: (416) 216-3930, Lawyers for Canadian Debtors

# AFFIDAVITS

**IN THE MATTER
OF:**  Nortel

**STATE OF NEW YORK:**

**ss:**

**COUNTY OF NEW YORK:**

I, Tim Hart, being duly sworn, hereby certify that (a) I am the Vice President - Financial Advertising of FT Publications, Inc., Publisher of the FINANCIAL TIMES, a daily newspaper published and of general circulation in the City and County of New York, and (b) that the Notice of which the annexed is a copy was published in the WORLDWIDE EDITIONS OF THE FINANCIAL TIMES on 6th day of MAY 2011.

**TIM HART VICE-PRESIDENT OF ADVERTISING -FINANCIAL ADVERTISING:**

**SWORN TO BEFORE ME THIS:**

Hope Kaye

**NOTARY PUBLIC**

HOPE KAYE
Notary Public, State of New York
No. 31-4944197
Qualified in New York County
Commission Expires . . . . . .   3/15/14

company is pricing its IPO at a level that gives it a valuation of $48bn-$58bn, below the average forecast of $62bn provided by the banks underwriting the offering. Following the issue of $7.9bn of new shares, the enlarged company will have a market capitalisation of $61bn at

Swiss private banks and US money managers. They invested a total of $3.1bn.

In spite of the response, Glencore is expected to stick with its original IPO timetable, oversubscribing the order book over the next two weeks. It plans to announce the pricing of the new shares on May 19.

of these desert states.

Gulf nations, including Abu Dhabi, plan billions of dollars of investments in global food supply and infrastructure as they guard against price shocks and supply shortages in core resources.

As such, Aabar's stake in Glencore takes on a broader

## Legal Notices

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* Nortel Networks Inc., *et al.*, Debtors. | Chapter 11 • Case No. 09-10138 (KG) Jointly Administered |

**Court File No.: 09-CL-7950**

***ONTARIO***
**SUPERIOR COURT OF JUSTICE - (COMMERCIAL LIST)**
**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**
**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**JOINT NOTICE OF PUBLIC AUCTION, SALE HEARING AND REJECTION OF IP LICENSES**

**PLEASE TAKE NOTICE** that on April 4, 2011, Nortel Networks Corporation, Nortel Networks Limited (together, the "Canadian Debtors"), Nortel Networks Inc. (collectively with certain of its U.S. debtor affiliates, the "U.S. Debtors", and together with the Canadian Debtors, the "Sellers") entered into an agreement (the "Agreement") to convey substantially all of the Sellers' residual patents and certain related assets as described therein (the "Assets") to Ranger Inc., an affiliate of Google Inc., as more fully set forth in the motions for approval of the Agreement and other related relief, including the procedures for the rejection of certain outbound and cross patent licenses, filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April 4, 2011 (D.I. 5202) (the "U.S. Sale Motion") and filed with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") on April 7, 2011 ( the "Canadian Sale Motion"). Except as set forth in the Agreement, the Sellers seek to sell to Ranger Inc. or such other successful bidder(s) at an auction (the "Successful Bidder") the Assets covered by the Agreement free and clear of all claims and interests, in the case of the U.S. Debtors, pursuant to section 363 of the Bankruptcy Code, and in the case of the Canadian Debtors, pursuant to the Canadian Approval and Vesting Order.

**PLEASE TAKE FURTHER NOTICE** that the terms and conditions of the proposed sale to Ranger Inc. are set forth in the Agreement attached to the U.S. Sale Motion and the Canadian Sale Motion. The Agreement represents the results of extensive marketing efforts conducted by the Sellers to obtain the highest and best offer for the Assets.

**PLEASE TAKE FURTHER NOTICE** that on May 2, 2011, the Bankruptcy Court entered an order (D.I. 5359) (the "Bidding Procedures Order") and that on May 2, 2011 the Canadian Court entered an order (the "Canadian Sales Process Order") approving, among other things, (i) the bidding procedures (the "Bidding Procedures"), which set the key dates and times related to the sale of the Assets under the Agreement and (ii) the patent license rejection procedures, which establish procedures for the rejection of Unknown Licenses (as defined in the U.S. Sale Motion and Canadian Sale Motion). ***All interested bidders should carefully read the Bidding Procedures, and all counterparties to patent licenses with the Sellers should carefully read the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order.***

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order and Canadian Sales Process Order, an auction (the "Auction") to sell the Assets will be conducted at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, or such other location as shall be timely communicated in accordance with the Bidding Procedures, on **June 20, 2011 at 9:00 a.m. (ET)** (the "Auction Date"). Only the Sellers, Ranger Inc., the Committee, the Bondholder Group, Ernst & Young Inc. in its capacity as the monitor of Nortel Networks Corporation *et al.* (the "Monitor") and the Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall be entitled to attend the Auction in person, and only Ranger Inc. and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

**PLEASE TAKE FURTHER NOTICE** that Ranger Inc. has agreed to take the Assets subject to substantially all known outbound and cross patent licenses to such Assets granted prior to the signing of the Agreement, as identified by the Sellers, upon the terms and subject to the limitations contained in the Agreement. In an abundance of caution and in furtherance of the Sale, (i) the U.S. Debtors intend to reject any Unknown Licenses (as defined in the U.S. Sale Motion) to such Assets pursuant to section 365 of the Bankruptcy Code, effective as of and conditioned on the occurrence of the Closing, and (ii) the Canadian Debtors intend to terminate all Unknown Licenses (as defined in the Canadian Sale Motion) to such Assets, effective as of and conditioned on the occurrence of the Closing. The U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order further describe the types of patent licenses that will be rejected or terminated by the U.S. Debtors and Canadian Debtors in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that the U.S. Debtors and Canadian Debtors do not intend to reject or terminate certain "Covered Licenses" which consist of Commercial Licenses and certain intercompany agreements among the Sellers and their affiliates. Inquiries regarding the license rejection procedures, including whether a particular license is a Covered License (i) can be directed to the Monitor at (416) 943-4439 or (866) 942-7177, in the case of license agreements to which the Canadian Debtors are a party, and (ii) can be directed to Cleary Gottlieb Steen & Hamilton LLP at (212) 225-3830, in the case of license agreements to which the U.S. Debtors are a party.

**PLEASE TAKE FURTHER NOTICE** that the deadline for any counterparty to an Unknown License with the U.S. Debtors or a party in interest in the U.S. Debtors' chapter 11 cases to file and serve an objection to the rejection of any Unknown License is **May 31, 2011 at 4:00 p.m. (ET)**. Such objection shall be served in accordance with the Objection Procedures (as defined below) on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors; and counsel to the Monitor.

**PLEASE TAKE FURTHER NOTICE** that the deadline for a counterparty to an Unknown License with the U.S. Debtors to elect to retain its rights under such license in accordance with section 365(n)(1)(b) of the Bankruptcy Code is **June 6, 2011 at 4:00 p.m. (ET)** (the "Notice of Election Deadline"). Any counterparty to an Unknown License with the U.S. Debtors that wishes to retain such rights must file a notice of election to retain such rights (a "Notice of Election") in accordance with the Objection Procedures and serve such notice on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors; and counsel to the Monitor, including a copy of such Unknown License with the Notice of Election served on counsel to each of the U.S. Debtors, the Canadian Debtors and the Monitor. The U.S. Debtors and the Stalking Horse Purchaser (or other Successful Bidder) reserve their right to object to any Notices of Election on any and all available grounds, which objections will be heard at the Sale Hearing. ***Any counterparty to an Unknown License with the U.S. Debtors that does not file and serve a Notice of Election by the Notice of Election Deadline will be deemed to have elected to treat each such Unknown License as terminated under section 365(n)(1)(a) of the Bankruptcy Code.*** For any Unknown License with the U.S. Debtors that is rejected, the deadline for any counterparty to such Unknown License to file a rejection damages claim against the U.S. Debtors with respect to such rejection will be thirty (30) days following the date of the Closing of the Sale.

**PLEASE TAKE FURTHER NOTICE** that the deadline for any counterparty to an Unknown License with the Canadian Debtors to come forward and object to the termination of such Unknown License by serving a notice of objection substantially in the form posted on the Monitor's website at www.ey.com/ca/nortel on counsel to the Canadian Debtors, counsel to the Monitor, counsel to the U.S. Debtors and counsel to Ranger Inc. is **June 6, 2011 at 4:00 p.m. (ET)** (the "Canadian License Bar Date"). To the extent that a counterparty comes forward and asserts an Unknown License with the Canadian Debtors prior to the Canadian License Bar Date, which Unknown License is established by court order to be a valid Unknown License prior to the Closing (as defined in the Agreement), the Assets will be sold subject to such license. ***Any Unknown License with the Canadian Debtors for which the counterparty to such Unknown License does not come forward and file and serve an objection notice, or whose objection is not established by court order, will be terminated and forever barred.*** Any claim arising from such deemed termination shall be an unsecured claim against the Canadian Debtors, shall be deemed a Restructuring Claim as such term is defined in the Claims Procedure Order granted by the Canadian Court on July 30, 2009, must be filed within thirty (30) days of the date of Closing and must otherwise be in compliance with that order.

**PLEASE TAKE FURTHER NOTICE** that, in addition to the foregoing license rejection procedures, the U.S. Debtors and the Canadian Debtors have agreed as part of the transaction to various limitations and prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts containing licenses to the patents offered for sale, including outbound and cross patent licenses and certain licenses incorporated in Commercial Licenses, Intercompany Licenses (as defined in the Sale Order and the Vesting Order, each as defined below) and certain agreements entered into in connection with the divestiture of Nortel's business units, as set forth in paragraph 28 of the proposed Sale Order annexed to the U.S. Sale Motion (the "Sale Order") and paragraph 14 of the proposed Approval and Vesting Order annexed to the affidavit of George Riedel contained in the Canadian Sale Motion (the "Vesting Order"). ***All counterparties to contracts with the Sellers should carefully read the U.S. Sale Motion and the proposed Sale Order annexed thereto and the Canadian Sale Motion and the proposed Approval and Vesting Order attached to the affidavit of George Riedel contained in the Canadian Sale Motion.***

**PLEASE TAKE FURTHER NOTICE** that a joint hearing (the "Sale Hearing") will be held before the Honorable Kevin Gross, United States Bankruptcy Judge and the Honourable Justice Morawetz of the Ontario Superior Court of Justice (Commercial List), which hearing is currently scheduled to be held on **June 30, 2011 at 10:00 a.m. (ET)**, or at such other time as the Courts permit, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801 and the Ontario Superior Court (Commercial List) at 393 University Ave., Toronto, Ontario to confirm the results of the Auction, approve the sale of the U.S. Debtors' and Canadian Debtors' respective interests in the Assets to Ranger Inc. or the Successful Bidder and approve the rejection of the Unknown Licenses with the U.S. Debtors and the Canadian Debtors. The U.S. Debtors and the Canadian Debtors may each adjourn their respective Sale Hearings one or more times without further notice by making an announcement in open Court or, in the case of the U.S. Debtors, by the filing of a hearing agenda pursuant to Local Rule 9029-3 announcing the adjournment or, in the case of the Canadian Debtors, by providing notice to the service list in the Canadian Debtors' *Companies' Creditors Arrangement Act* proceedings (the "Canadian Service List").

**PLEASE TAKE FURTHER NOTICE** that, except as described above, pursuant to the Bidding Procedures Order, the Bankruptcy Court has currently set: (a) **June 13, 2011 at 4:00 p.m. (ET)** as the deadline for all general objections to the U.S. Sale Motion, including objections to the sale of the Assets; (b) **June 13, 2011 at 4:00 p.m. (ET)** as the Bid Deadline (as defined in the Bidding Procedures); and (c) **June 28, 2011 at 4:00 p.m. (ET)** as the deadline for supplemental objections regarding objections to issues arising from and in connection with the Auction and/or the Sellers' selection of a Successful Bid made by a Successful Bidder other than Ranger Inc. Except as described above, pursuant to the Canadian Sales Process Order, the Canadian Court has currently set **June 13, 2011 at 4:00 p.m. (ET)** as the Bid Deadline.

**PLEASE TAKE FURTHER NOTICE** that all objections to the U.S. Sale Motion must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than the General Objection Deadline, or other applicable deadline as indicated above; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following at the addresses provided in the Bidding Procedures and U.S. Sale Motion: (i) counsel to the U.S. Debtors, (ii) counsel to Ranger Inc., (iii) counsel to the Committee, (iv) counsel to the Bondholder Group, and (v) the Office of the United States Trustee (collectively, the "Objection Notice Parties", such procedures the "Objection Procedures").

**PLEASE TAKE FURTHER NOTICE** that this notice is a summary only and is subject to the full terms and conditions of the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order, the Canadian Sales Process Order and the Bidding Procedures, and you should review such documents in their entirety. Copies of the Agreement, the U.S. Sale Motion, and the Bidding Procedures Order (including the Bidding Procedures approved by the Bankruptcy Court) may be examined by interested parties between the hours of 8:00 a.m. and 4:00 p.m. (ET) at the office of the Clerk of the Court, 824 Market Street, Wilmington, Delaware 19801, or by appointment during regular business hours at the offices of the U.S. Debtors' attorneys: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley and Lisa M. Schweitzer. Additionally, copies of these documents may be downloaded from the Bankruptcy Court's docket at www.deb.uscourts.gov and from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://dm.epiq11.com/nortel. Copies of the Agreement, Canadian Sale Motion and Canadian Sales Process Order (including the Bidding Procedures approved by the Canadian Court) and the Canadian Service List can be viewed at the Monitor's website at http://www.ey.com/ca/nortel/ or by contacting the Monitor by telephone (1-416-943-4439 or 1-866-942-7177) or by fax (1-416-943-2808).

**PLEASE TAKE FURTHER NOTICE** that dates set forth in this notice are subject to change, and further notice of such changes may not be provided except through announcements in open court and/or the filing of notices and/or amended agendas. Parties in interest are encouraged to monitor the electronic court docket, the noticing agent website and/or the Monitor's website for further updates.

Dated: May 2, 2011, Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP, James L. Bromley (admitted *pro hac vice*), Lisa M. Schweitzer (admitted *pro hac vice*), One Liberty Plaza, New York, New York 10006, Telephone: (212) 225-2000, Facsimile: (212) 225-3999, *-and-* MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Derek C. Abbott (No. 3376), Eric D. Schwartz (No. 3134), Ann C. Cordo (No. 4817), 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19801, Telephone: (302) 658-9200, Facsimile: (302) 658-3989, *Counsel for the U.S. Debtors and U.S. Debtors in Possession -and-* OGILVY RENAULT LLP, Suite 3800, Royal Bank Plaza, South Tower, 200 Bay Street, Toronto, Ontario M5J2Z4 CANADA, Derrick Tay LSUC# 21152A, Telephone: (416) 216-2327, Email: dtay@ogilvyrenault.com, Jennifer Stam LSUC# 46735J, Telephone: (416) 216-4832, Email: jstam@ogilvyrenault.com, Fax: (416) 216-3930, Lawyers for Canadian Debtors

**APPENDIX "H"**

**[ATTACHED]**

## COMMERCIAL LICENSES ACKNOWLEDGMENT

This acknowledgment dated as of June 30, 2011 (the "**Acknowledgment**") is provided by Rockstar Bidco, LP (the "**Purchaser**") to:

(i)   Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**");

(ii)  Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**");

(iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**");

(iv)  the entities listed in Exhibit A hereto (the "**EMEA Sellers**") which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability;

(v)   the entities listed in Exhibit B hereto;

(vi)  the French Liquidator; and

(vii) the Joint Administrators.

The parties referred to in (i) through (v) are referred to collectively as the "**Sellers**".

The parties referred to in (i) through (vii) are referred to collectively as the "**Selling Parties**".

## W I T N E S S E T H

WHEREAS the Selling Parties have entered into an asset sale agreement dated as of June 30, 2011, among the Selling Parties and the Purchaser (as the same may be further amended, restated, amended and restated or modified, the "**Sale Agreement**") pursuant to which the Sellers are selling the Assets (as defined in the Sale Agreement) to the Purchaser. The sale of the Assets shall be referred to herein as the "**Transaction**".

WHEREAS under the Sale Agreement, the Assets are sold subject to, *inter alia*, Commercial Licenses (as such term is defined in the Sale Agreement) entered into prior to the date of the Sale Agreement.

WHEREAS the Selling Parties wish to clarify with the Purchaser the Selling Parties' characterization of certain agreements between the Sellers, or any of them, and certain third parties as Commercial Licenses.

NOW, THEREFORE, The Purchaser acknowledges as follows:

1. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Sale Agreement.

2. All agreements listed in Schedule "A" hereto, as well as all amendments and supplements thereto (whether or not listed in Schedule "A") and all agreements that are substantially similar to those listed in Schedule "A" (and with licensing terms that are substantially similar to or no more broad than the licensing terms in the agreements listed in Schedule "A") and that are between any of the Sellers and the counterparties to the agreements listed in Schedule "A" and their respective affiliates, as well as all amendments and supplements thereto (collectively, the "**Subject Agreements**") shall be deemed to constitute Commercial Licenses.

3. Notwithstanding any provision to the contrary in the Sale Agreement, the Purchaser shall purchase the Assets subject to any licenses granted under the Subject Agreements, if any, and shall have no entitlement to indemnification or other remedy from any of the Sellers, including in respect of Damages suffered, or that may be suffered, as a result of the existence of any licenses granted under the Subject Agreements.

4. The Purchaser acknowledges that the list of Subject Agreements attached hereto as Schedule "A" is not, and is not intended to be, an exhaustive list of all Commercial Licenses to which the Assets are subject.  For greater certainty, the Purchaser shall purchase the Assets subject to the Commercial Licenses entered into prior to the date of the Sale Agreement and thereafter in accordance with the terms of the Sale Agreement, whether or not such licenses have been identified on Schedule "A" hereto or elsewhere.

5. Listing of a particular Subject Agreement on Schedule "A" hereto is not intended by the Parties to be, and shall not be, an acknowledgment or evidence that any such agreement remains in force as of the date of execution of this Acknowledgment or that any such agreement provides any license rights whatsoever to any third party.

6. Listing of a particular Subject Agreement on Schedule "A" hereto is not intended by the Parties to be, and shall not be, an acknowledgment or evidence that any particular Seller or its affiliates that is party to such Subject Agreement has any rights in any particular Asset that is the subject of the Transaction.

7.     This Acknowledgment shall be binding upon the Purchaser and its successors and permitted assigns.

8.     No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Acknowledgment by any Selling Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Acknowledgment preclude any other or further exercise of any right, remedy, power or privilege. No Selling Party will be deemed to have waived any acknowledgment provided herein unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.

**ROCKSTAR BIDCO, LP**
by: Rockstar Bidco GP, LLC, *its general partner*

By: _K. Alfalahi_____

Name: Kasim Alfalahi.

Title: Vice President.

### EXHIBIT A – EMEA Sellers

Nortel Networks UK Limited (in administration)
Nortel Networks S.A. (in administration and *liquidation judiciaire*)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks France S.A.S. (in administration)
Nortel GmbH (in administration)

**EXHIBIT B – Other Sellers**

NN Applications Management Solutions Inc.
Nortel Altsystems, Inc. (previously "Alteon Networks, Inc.")
CoreTek, Inc.
Qtera Corporation
Xros, Inc.

## SCHEDULE "A"

## SUBJECT AGREEMENTS

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| International Business Machines Corporation | ICL PLC | Agreement, dated January 1, 1982 (L821428) |
| International Business Machines Corporation | Northern Telecom Limited | Agreement, dated July 1, 1979, and Amending Agreement No. 1, dated April 28, 1983 (L791262) |
| Verizon Services Corp. *et al.* | Nortel Networks Inc. | General Purchase Agreement No. 710-30912-2006, Articles I, II, III and V, effective as of January 1, 2007 |
| Alltel Communications Inc. | Nortel Networks Inc. | Master Purchase Agreement with Attachments A-L, Appendices and Exhibits Contract No. 26857, dated July 17, 2006 |
| Verizon Services Corp. | Nortel Networks Inc. | General Product Purchase Agreement for Softswitch and TDM Products and Services Contract No. C0404520, effective as of August 5, 2004 |
| Verizon Services Corp. | Nortel Networks Inc. | Succession Products and Services Deployment Agreement C0404529 |
| Verizon Services Corp. | Nortel Networks Inc. | Policy Decision Manager Products and Services Deployment Agreement MA-000797-2007 |
| WorldCom Purchasing, L.L.C. | Nortel Networks Inc. | Global Master Procurement Agreement, dated November 20, 1998 |
| Verizon Corporate Services Group Inc. | Nortel Networks Inc. | Nortel NGADM Agreement MA-003136-2008 dated November 10, 2008, as amended by Amendments 1-18 |
| Verizon Network Integration Corporation | Nortel Networks Inc. | Global Business Partner Agreement, effective January 1, 2003 |
| Verizon Corporate Services Group, Inc. | Nortel Networks Inc. | Managed Service Provider Agreement, effective July 8, 2008 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| Bell Atlantic Network Integration, Inc. | Bay Networks USA, Inc. | Verizon (Bell Atlantic) Non-Exclusive Integrator Agreement effective May 1, 1997 |
| MCI WorldCom Australia Pty Limited | Nortel Networks Australia Pty Limited | Managed Services Agreement with Nortel Networks Australia executed September 26, 2002 |
| Broadcom Corporation | Nortel Networks Inc. | Nortel Networks Agreement No. 020896, dated March 22, 2001, as amended by (i) the Amendment No. 1 with effective date of January 17, 2002, Nortel Networks Amended Agreement No. 021263, (ii) the Amendment No. 2 with effective date of March 15, 2002, Nortel Networks Amended Agreement No. 021319, and (iii) Amendment No. 3 with effective date of March 22, 2001, Nortel Networks Amended Agreement No. 021274 |
| Broadcom Corporation | Nortel Networks Inc. | Power Ranger FTAPMUX, FSWIP and FFAD ASIC Design and Development Agreement dated as of November 2, 2001 |
| SBC Operations, Inc. | Northern Telecom Inc. | AT & T – Nortel General Agreement No. 980332, dated April 30, 1999, between SBC Operations, Inc. n/k/a AT&T Services, Inc. and Northern Telecom Inc. n/k/a Nortel Networks, Inc. (as amended by Amendment No 1 dated May 5, 2008, and supplemented by a Supplemental Agreement dated March 3, 2009 and January 1, 2010). |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Services Inc. | Nortel Networks, Inc. | Nortel Switching Module No. 03031410, dated as of December 19, 2003 |
| AT&T Corp. | Nortel Networks Inc. | General Purchase Agreement No. GPA011D, dated as of March 5, 1998, as amended by Amendment No. 2 effective November 29, 1999 and Amendment 12 dated as of March 4, 2009 |
| Bellsouth Corporation | Nortel Networks Inc. | Global Supply and Services Contact No. R11796A, dated as of October 1, 1999, as supplemented by Supplemental Agreement effective as of June 25, 2001, and Supplemental Agreement effective as of April 16, 2006, as amended by Amendment No. 1 executed on April 4, 2008. |
| BellSouth Long Distance, Inc. | Nortel Networks Inc. | Purchase/License Agreement No. 100097, dated as of November 1, 1997 |
| AT&T Services, Inc. | Nortel Networks Inc. | Multi-Commitment and Purchase Agreement No. 20080912.028.C, effective November 15, 2008, as amended by amendment No. 1 executed August 21, 2009. |
| SBC Services, Inc. | Nortel Networks Inc. | Unified Networks Distributorship Agreement, Version 4.02 No. 00017864, dated as of January 1, 2001 as supplemented by Supplemental Agreement No. 20070622.898.C executed on July 11, 2007, Supplemental Agreement No. 20070705.007.C executed on July 11, 2007, Supplemental Agreement No. 20070828.022.C executed September 5, 2007; |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Services Inc. | Nortel Networks Inc. | Subordinate Agreement No. 00017864.S.006 to Agreement No. 17864 between AT&T Services, Inc. and Nortel Networks, Inc. dated December 18, 2008 |
| Cingular Wireless LLC | Nortel Networks Inc. | Master Sales Agreement, No. 20070723.013C, dated November 1, 2001<br><br>As supplemented by: Supplement A: GSM Requirements; Equipment and Services Supplement No. cing 6770.S.001; and Supplement F: UMTS Requirements<br><br>As amended by: Amendment 3 to Supplement A: GSM Requirements; Amendment 9 to Supplement A: GSM Requirements; and Amendment 12; Amendment 1 to Equipment and Services Supplement No. cing 6770.S.001 |
| Cingular Wireless LLC | Nortel Networks Inc. | Letter Agreement dated April 23, 2002, and related Memorandum of Agreement – e3 BSC |
| Cingular Wireless LLC | Nortel Networks Inc. | Letter Agreement, dated April 20, 2006. |
| Cingular Wireless LLC | Nortel Networks Inc. | Letter Agreement, dated December 18, 2006 |
| Cingular Wireless LLC | Nortel Networks, Inc. | Letter Agreement, dated September 19, 2007 |
| AT&T Mobility LLC f/k/a Cingular Wireless LLC | Nortel Networks Inc | Letter Agreement, dated December 30, 2008 |
| Cingular Wireless LLC | Nortel Networks Inc. | Information Exchange Agreement dated November 6, 2006 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Mobility LLC<br><br>Openet Telecom, Incorporated | Nortel Networks Inc. | Information Exchange Agreement, No. 20070912.049.C, dated September 7, 2007 |
| BellSouth Communications Systems, LLC d/b/a AT&T Communications Systems Southeast, LLC | Nortel Networks Inc. | Nortel Facilities Management Agreement, No. 20091008.015.C. dated June 2, 2006, as amended by Amendment No. 3 dated December 2, 2009 |
| AT&T Mobility LLC f/k/a Cingular Wireless LLC | Nortel Networks Inc. | Letter Agreement regarding ESSP Cap Solutions, No. 200900107, effective as of January 1, 2009, |
| Southwestern Bell Telephone Company | Northern Telecom Inc. | General Agreement No. C0228MO, effective January 1, 1985 |
| AT&T Services, Inc. | Nortel Networks, Inc. | AT&T – Nortel Switching Module Agreement, No. 20081204.042.C, dated as of September 11, 2009, as amended by Amendment No 20081204.042.A.0001 and supplemented by Supplemental Agreement 20081204.042.S.001, as amended by Amendment No. 1 thereto. |
| AT&T Services, Inc. | Nortel Networks Inc. | Non-Disclosure – Reciprocal, No. 20090410.042.C, dated April 28, 2009 |
| AT&T Corp | Nortel Networks, Inc. | DMS-250 Switching Level Agreement No. LLJ276D, dated as of December 21, 1998, |
| BellSouth Telecommunications Inc. | Nortel Networks Inc. | Supplemental Agreement No. 7 for DMS 10 & 100 Products and Services, dated as of April 14, 2006 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| SBC Global Services, Inc. | Nortel Networks Inc. | Nortel Services Agreement No. 021255/SBC Contract 90055200 dated June 1, 2002, as amended by Amendments 1 through 4. |
| AT&T Services, Inc. | Nortel Networks, Inc. | Non-Disclosure - Reciprocal, No. 20071102.018.C, dated as of November 12, 2007 |
| Insight Communications Company LP<br><br>AT&T Services, Inc. | Nortel Networks Inc. | 3-Way Non-Disclosure Agreement, No. 20080922.052.C, dated as of September 23, 2008 |
| AT&T Services Inc. | Nortel Networks Inc. | Reciprocal Non-Disclosure Agreement, No. 20080514.015.C, dated as of May 19, 2008 |
| AT&T Services, Inc. | Nortel Networks Inc. | Non-Disclosure - Reciprocal No. 20070307.004.C effective as of March 7, 2007 |
| BellSouth Telecommunications, Inc. | Nortel Networks Inc. | Trial Agreement, No. SLK0041, dated as of July 7, 2006 |
| Southwestern Bell Telephone Co. | Northern Telecom, Inc. | Network ACD RT-1000 Agreement, No. CSL0348, dated as of October 7, 1992 |
| Southwestern Bell Technologies Resources, Inc. | Northern Telecom, Inc. | Technology Lab Agreement, No. 94K007, dated as of June 16, 1994 |
| AT&T Services, Inc. | Nortel Networks Inc. | Notification Letter, No. 20070919.019.C, dated as of November 8, 2007 |
| AT&T Services, Inc. | Nortel Networks Inc | OME6000 Product Family Supplemental Agreement No. 20080605.036.C dated August 31, 2009 |
| Cingular Wireless LLC | Nortel Networks Inc. | Interactive Voice Response (IVR) Professional Services Agreement effective January 1, 2005 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Corp. | Nortel Networks Inc. | AT&T/Nortel Networks Reseller Agreement, Nortel Agreement No. 24777 |
| AT&T Services, Inc. | Nortel Networks Inc. | Trial Agreement, No. 20061215.034.C, effective as of March 27. 2007 |
| AT&T Services, Inc. | Nortel Networks Inc | Product Evaluation Agreement #20061215.034.S.004A OM 5000/OME 6500 LNS |
| SBC Services, Inc. | Nortel Networks Inc. | Work Statement, No. 04034025, dated April 1, 2004, as amended by Amendment No. 2, Amendment No. 3 and supplemented by Supplemental Statement of Work No.0434025.S.001, as amended. |
| SBC Services, Inc. | Nortel Networks Inc. | Agreement for the License of Incremental Software No. 03031697, dated October 31, 2003, as amended by Amendment No. 1. |
| Pacific Bell<br><br>Nevada Bell | Northern Telecom Inc. | Master Agreement for INA Software, No. P07137 dated June 30, 1995 |
| SBC Services, Inc.<br><br>Federal Bureau of Investigation | Nortel Networks Inc. | Cooperative Agreement to Letter Agreement No. J-FBI-99-053, No. 00014322 |
| SBC Services, Inc. | Nortel Networks Inc. | Optical Networks Management Software and Technical Support Agreement, No. 5041050, effective October 1, 2005 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Services, Inc. | Nortel Networks Inc. | Agreement for Purchases of User Licenses and Technical Support for Optical Planner Software, No. 20071110.001.C effective June 1, 2008 as amended by Amendment No. 20071110.A.001 |
| AT&T Services, Inc | Nortel Networks Inc. | Subordinate MPS 1000 Products and Services Agreement, No. 04036069, as amended by Amendment No. 1, Amendment No. 2, and Amendment 04036069.A.003 |
| Southwestern Bell Telephone Company | Northern Telecom Inc. | DMS Family Material and Installation Contract, No. C4113FO |
| AT&T Corp. | Nortel Networks Inc. | LOA Proposal No. YEPR021105 to DMS 500 Products Sup., dated November 14, 2002 |
| | | LOA 20090828.OME between AT&T and Nortel, dated August 1, 2009 |
| AT&T Services, Inc. | Nortel Networks (Ireland) Limited | Procurement Arrangement for Supply of IP Telephony, Contract No. 20080624.025.C |
| AT&T Services Inc. | Nortel Networks Inc. | Agreement No. 06046944 dated August 28, 2006 |
| AT&T Services Inc. | Nortel Networks Inc. | Agreement No. 06046687 dated August 28, 2006 as amended by Amendment 06046687.A.001 and Amendment 06046687.A.002 |
| AT&T Services Inc. | Nortel Networks Inc. | Amendment #11 to DWDM/CWDM Agreement #01019547 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| SBC Services, Inc. | Nortel Networks Inc. | Optical Module Agreement with Amendment #1 and Appendix #1-9, Agreement No. 03032497 effective October 1, 2005. |
| Hewlett Packard | Northern Telecom Limited | License Agreement, made and entered into on September 14, 1977 |
| Hewlett Packard Company | Northern Telecom Inc. | Operating Agreement, dated August 8, 1983. |
| Hewlett-Packard Company and Hewlett-Packard Development Company, LP | Nortel Networks Inc. | Master Agreement #MA-02-006, effective May 5, 2003 |
| US WEST Communications, Inc. | Nortel Networks Inc. | Agreement No. GAA0002 made as of October 6, 1983 |
| US West Business Resources, Inc. | Clarify Inc | Agreement No. 98051104 |
| US West Business Resources Inc. | Northern Telecom, Inc | Procurement Contract No. RPHCR42292 dated December 11, 1989 |
| Qwest Communications Corporation | Northern Telecom Inc. | Procurement Agreement No. QW9711CN |
| Qwest Communications Corporation | Northern Telecom Inc. | Procurement Agreement For Transmission Products No. QWT9801S effective May 20, 1998 |
| Qwest Communications Corporation | Nortel Networks Inc. | Procurement Agreement For Transmission Products effective January 1, 1999 |
| Embarq Management Company | Nortel Networks Inc. | Master Purchase Agreement for Products, Systems and Services |
| Qwest Corporation | Nortel Networks Inc. | Letter Agreement Re: Qwest Corporation Geomax Program – Optera Metro 5200 Products |
| US West Communications, Inc. | Nortel Networks Inc. | Quest411 Agreement effective October 21, 1999 |
| Qwest Communications Corporation | Northern Telecom Inc. | Global Services Agreement QW03-001922 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| Qwest Business Resources, Inc. | Nortel Networks Inc. | Nortel Networks Business Partner Agreement effective January 1, 2003 |
| Qwest Communications Corp. | Clarify Inc. | Software License and Maintenance Agreement No. QWE121997 effective December 19, 1997 |
| LCI International Management Services, Inc. | Northern Telecom Inc. | Design, Engineering, Supply & Systems Integration Agreement – Transport |
| Thomas Swan & Co. Limited | STC PLC | Letter Memorializing Ultrasonic Analyser Licence, 1/28/1998 |
| Motorola Solutions, Inc. | Nortel Networks Inc. | Supply, Installation and Services Agreement dated July 22, 2002 |
| 3M Company | Northern Telecom Inc., among others | Project Agreement Number 98039, dated December 14, 1998. |
| Verint Systems Inc. | Nortel Networks Limited | Interface License Agreement dated January 16, 2003 |

**APPENDIX "I"**

**[ATTACHED]**

Execution Version

## IP TRANSACTION SIDE AGREEMENT RE: CERTAIN STRUCTURAL MATTERS

This agreement dated as of June 15, 2011 (the "**Agreement**") by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"); (iv) the entities listed in <u>Exhibit A</u> hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in <u>Exhibit B</u> hereto; (vi) the French Liquidator;  and (vii) the Joint Administrators.

The parties referred to in (i) through (v) are referred to collectively as the "**Nortel Parties**".  The parties referred to in (i) through (vii) are referred to collectively as the "**Parties**".

### W I T N E S S E T H

WHEREAS the Nortel Parties have entered into a stalking horse agreement for the sale of the Nortel patent portfolio and certain other assets (the "**Assets**") pursuant to an asset sale agreement dated as of April 4, 2011, among the Parties and Ranger Inc. ("**Bidder 1**"), as purchaser, and Google Inc., as parent guarantor (as the same may be further amended, restated, amended and restated or modified, the "**Stalking Horse Agreement**").  The sale of the Assets, whether pursuant to the Stalking Horse Agreement or otherwise (such agreement, including the Stalking Horse Agreement, the "**Sale Agreement**") and whether to Bidder 1 or any other person (such person, including Bidder 1, a "**Purchaser**"), shall be referred to herein as the "**Transaction**";

WHEREAS the Parties entered into that certain IP Transaction Side Agreement on April 4, 2011 (the "**IP Transaction Side Agreement**"); and

WHEREAS the sale of the Assets to Bidder 1 is subject to higher or better offers and an auction process approved by the U.S. Court and Canadian Court; and

WHEREAS the Parties wish to enter into certain further agreements with respect to the sale of the Assets and the potential Transaction.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

1.      Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or, if not defined below, the meanings set forth in the Stalking Horse Agreement:

      (a)      "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List);

      (b)      "**Canadian Debtors**" means NNC, NNL and their Canadian affiliates that are subject to proceedings pending before the Canadian Court under the *Companies' Creditors Arrangement Act* (Canada);

      (c)      "**Direct Canadian Payment**" means the amount of US$7,500,000 paid to NNL pursuant to the Rockstar Bid;

      (d)      "**EMEA Debtors**" means each Nortel debtor in respect of which the Joint Administrators were appointed as administrators on 14 January 2009, including but not limited to the EMEA Sellers;

      (e)      "**Interim Sales Protocol**" has the meaning ascribed to it in the Interim Funding and Settlement Agreement entered into by certain of the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators, among others, on June 9, 2009 (the "**IFSA**");

      (f)      "**Total Proceeds**" means the aggregate amounts (A) paid by the Purchaser to the Sellers under or in respect of the Sale Agreement as Purchase Price, Good Faith Deposit, damages, and any amount paid by the Purchaser to the Sellers as compensation or remuneration for a license granted in connection with the Transaction (a "**License Fee**") and (B) paid to the Sellers under any escrow arrangement pursuant to which a portion of the Purchase Price, License Fee or Good Faith Deposit has been placed in escrow, including the Indemnification Escrow Amount, but for greater certainty, subject to the provisions of Paragraph 2 below, shall exclude any amounts not constituting a portion of the Purchase Price or License Fee paid or payable by the Purchaser to one or more Sellers to compensate such Seller for costs incurred or to be incurred by such Seller, as contemplated to be paid directly to such Seller in accordance with the terms of the Sale Agreement, other Transaction Documents or related agreements, including, without limitation, the Direct Canadian Payment, if any;

      (g)      "**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware; and

(h)     "**U.S. Debtors**" means NNI and its affiliated debtors subject to the jurisdiction of the U.S. Court in proceedings pending under Chapter 11 of the U.S. Bankruptcy Code.

2.      The Parties agree that:

(a)     In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation[1] or a Seller is preparing any Partial Allocation with the Purchaser (whether by agreement or submission to the Accounting Arbitrator), the Seller responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Sellers and shall consider in good faith any comments by the other Sellers with respect to such Tax Return and any Partial Allocation related thereto, provided, and for the avoidance of doubt, that the other Sellers shall not have a consent or veto right with respect to such Tax Returns or Partial Allocations related thereto.  It is understood that neither this Paragraph 2 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, adopt, or have any impact whatsoever on, the allocation of proceeds from the Transaction among the Sellers.

(b)     In the event that the Purchaser prepares or files a Tax Return that requires an allocation of the proceeds from the Transaction, such Tax Return and any information contained therein shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers.

(c)     If, in connection with the preparation or filing of a Tax Return as described in subparagraphs (a) and (b) of this Paragraph 2, or in connection with the transfer of the proceeds from the Transaction on the Closing Date, the Purchaser obtains any valuation calculation prepared at its request ("**Valuation**"), such Valuation and any information contained therein (other than information that may be derived therefrom that Purchaser publicly discloses, provided that the Purchaser shall not be considered to have publicly disclosed information solely by virtue of Purchaser giving notice of such information to the Sellers), shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers. The Parties agree that none of them shall request, suggest or otherwise encourage the Purchaser to make any Valuation or any information derived therefrom publicly available. Additionally, the Parties agree to oppose and to cooperate in opposing the use of the Tax Return or the Valuation by any entity before any dispute resolver(s) appointed pursuant to the Interim Sales Protocol, any court, or such other judicial or quasijudicial body or similar authority that may determine the allocation or distribution of the Total Proceeds, in a manner inconsistent with this Agreement.

---

[1]      The Parties agree that, for the purposes of this Agreement, "Partial Allocation" refers to an allocation of the Total Proceeds and not merely the Purchase Price.

(d)     In the event a Party becomes aware that the Purchaser or a designated purchaser intends to deduct and withhold an amount from the Transaction proceeds as may be contemplated by the Sale Agreement (a "**Withholding**"), such Party shall forthwith consult with each of NNL, NNI and NNUK with respect to such Withholding. No Party shall consent to a Withholding by the Purchaser or a designated purchaser without the prior written consent of NNL, NNI and NNUK.

(e)     If, in connection with the Transaction, the Purchaser provides for separate consideration to be paid for the intellectual property license being granted to the Purchaser or its affiliates by one or more of the Sellers including any waivers or consents granted by the Sellers in relation to such license (the "**IP License**"), on the one hand, and the other Assets being transferred to the Purchaser by the Sellers on the other, or otherwise ascribes or allocates a portion of the Total Proceeds or a value to such IP License, on the one hand, and to the other Assets being transferred on the other (any such separate consideration or allocation, a "**License/Patent Designation**"), the Parties agree that any such License/Patent Designation or the structure of both the IP License and any waiver or consent in relation to the IP License shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers, and it is the express intent of the Parties that the allocation of the Total Proceeds shall be effected as if the Transaction had been structured so that the Total Proceeds were paid in consideration for the sale of the Assets in a manner similar to that provided in the Stalking Horse Agreement.  The Parties agree that, to the extent that any such License/Patent Designations have not been made public through the auction process for the Transaction and the obtaining of the orders of the U.S. Court and the Canadian Court approving the Transaction, none of them shall request, suggest or otherwise encourage the Purchaser to make any License/Patent Designation or any information derived therefrom publicly available. Additionally, the Parties agree to oppose and to cooperate in opposing the use of the License/Patent Designation or the structure of both the IP License and any waiver or consents in relation to the IP License by any entity before any dispute resolver(s) appointed pursuant to the Interim Sales Protocol, any court, or such other judicial or quasi-judicial body or similar authority that may determine the allocation or distribution of the Total Proceeds, in a manner inconsistent with this Agreement.

(f)     The Parties agree that, subject to the IP Transaction Side Agreement, in accordance with Section 12 of the IFSA, any payment due by the Purchaser (and any designated purchaser) to the Nortel Parties under the Sale Agreement, or upon release from escrow, any escrow agreements provided for in the Sale Agreement, the Transaction Documents or any related agreements, that is included in the Total Proceeds shall be collected and held in escrow by the Distribution Agent (as agent for the Sellers).

(g)    In the event that the Parties accept a bid to enter into a Sale Agreement with Rockstar Bidco, LP ("**Rockstar**") as Purchaser, which provides for a structure similar to that proposed in Rockstar's bid submitted on June 13, 2011 (such Sale Agreement, including Optioned License Fees (as defined in the Rockstar bid of June 13, 2011) not to exceed US$500,000,000, the "**Rockstar Bid**"), the Parties agree that (i) NNL shall receive with respect to any such Rockstar Bid at Closing the Direct Canadian Payment, (ii) the Canadian Debtors shall have no right to seek a further allocation of the Total Proceeds based on such tax attributes of the Canadian Debtors as are or may be used in connection with a Rockstar Bid, and that (iii) subject to receipt of the Direct Canadian Payment, the use of such tax attributes shall not, and shall not be deemed to, determine, ratify, adopt or have any further impact whatsoever on the allocation of proceeds from the Transaction among the Sellers.  The Parties further agree that, at each round of bidding at the Auction (as defined in the U.S Bidding Procedures Order and the Canadian Sales Process Order), the amount of the Direct Canadian Payment should be deducted from the consideration offered by Rockstar in any bid prior to the Sellers determining whether such bid constitutes the highest or otherwise best offer in that round of bidding.  For the avoidance of doubt, except as provided in the preceding sentence, each of the Sellers reserves its right at the Auction to determine whether a bid by Rockstar constitutes a higher or otherwise better offer for the Assets, and nothing herein shall constitute the acceptance of a Rockstar Bid or the Agreement by any Seller to the terms of a Rockstar Bid.

3.    The U.S. Debtors and the Canadian Debtors agree they will seek approval of this Agreement by the U.S. Court and the Canadian Court in connection with the approval of the Transaction.

4.    The Parties agree that:

(a)    the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations;

(b)    the Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) subject to paragraph 4(d) hereof, the purposes of the other Parties hereto enforcing the obligations of the Joint Administrators hereunder;

(c)     notwithstanding anything in paragraphs 8 and 9 hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act, (iii) their appointment as joint administrators of the relevant EMEA Sellers and their remaining as current joint administrators thereof under this Agreement, or (iv) the duties and obligations of the Joint Administrators as administrators of the EMEA Debtors, shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts;

(d)     any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns;

(e)     the French Liquidator is entering into this Agreement as agent for NNSA and that none of the French Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and

(f)     notwithstanding anything in paragraphs 8 and 9 hereof, any claim, action or proceeding against the French Liquidator arising from or related to (i) the personal liability of the French Liquidator, his firm, partners, employees, advisers, representatives or agents, (ii) his appointment as Liquidateur Judiciaire of NNSA, or (iii) the duties and obligations of the French Liquidator as Liquidateur Judiciaire of NNSA, shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French courts.

5.     No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. Except as expressly set out herein, this Agreement, or any provision hereof, may be waived or amended on no less than five (5) days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Official Committee of Unsecured Creditors of the U.S. Debtors (the "**Committee**") and Ernst & Young Inc. in its capacity as the Monitor of the Canadian Debtors (the "**Monitor**").

6.     This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors.

7.     Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of the Parties and their respective successors.

8.     The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction provided, however, that subparagraphs 4(a) through (d) hereof shall be governed exclusively by English law and subparagraphs 4(e) and (f) hereof shall be governed exclusively by French law.

9.     To the fullest extent permitted by Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the U.S. Court if such claim, action, or proceeding would solely affect NNI or any of the other U.S. Debtors, the Canadian Court if such claim, action, or proceeding would solely affect NNL or any of the other Canadian Debtors, or the English Court if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such claim, action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law provided, however, that any claim, action or proceeding set forth in or on the basis of subparagraphs 4(a) through (d) hereof shall be brought exclusively in the English courts and any claim, action or proceeding set forth in or on the basis of subparagraphs 4(e) through (f) hereof shall be brought exclusively in the French courts.

10.    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS

REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 10.

11.    All notices and communications provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified for such Party in the Stalking Horse Agreement, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this paragraph 11. Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable. A copy of any notice or communication sent pursuant to this paragraph 11 shall also be sent to the Committee: c/o Akin Gump Strauss Hauer & Feld LLP Attention:  Fred S. Hodara and Stephen B. Kuhn, Esq. One Bryant Park New York, New York 10036, U.S.A (Facsimile:  +1 212 872 1002) and to the Monitor: Ernst & Young Inc., Ernst & Young Tower Attn: Murray A. McDonald, 222 Bay Street, P. O. Box 251, Toronto, Ontario, Canada, M5K 1J7 (Facsimile:  +1 416 943 3300).

12.    The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Facsimile and pdf signatures shall be deemed original signatures.

13.    The obligations of NNC and NNL under this Agreement shall be joint and several. The obligations of NNI and the other U.S. Debtors party hereto shall be joint and several. The obligations of the EMEA Sellers under this Agreement shall be joint and several.

14.    If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally

contemplated to the greatest extent possible even in such jurisdiction.

15.      Notwithstanding anything contained herein, nothing in this Agreement shall supercede the IP Transaction Side Agreement, nor act as an amendment or waiver of any of the rights or obligations thereunder.

**[Signature pages immediately follow]**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By: _____
    Name: Anna Ventresca
    Title: General Counsel - Corporate
         and Corporate Secretary

By: _____
    Name: Clarke E Glaspell
    Title: Controller


NORTEL NETWORKS LIMITED

By: _____
    Name: Anna Ventresca
    Title: General Counsel - Corporate
         and Corporate Secretary

By: _____
    Name: Clarke E. Glaspell
    Title: Controller


NORTEL NETWORKS INC.


By: _____
    Name:
    Title:


NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.


By: _____
    Name:
    Title:

Execution Version

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: _____
    Name:
    Title:

By:.
    Name:
    Title:

**NORTEL NETWORKS LIMITED**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**NORTEL NETWORKS INC.**

By: _____
    Name: Chris Ricaurte
    Title: President

**NN APPLICATIONS MANAGEMENT SOLUTIONS INC.**

By _____
    Name: Chris Ricaurte
    Title: President

**NORTEL ALTSYSTEMS, INC.**

By: _____

Name: Chris Ricaurte

Title: President

**CORETEK, INC.**

By: _____

Name: Chris Ricaurte

Title: President

**QTERA CORPORATION**

By: _____

Name: Chris Ricaurte

Title: President

**XROS, INC.**

By: _____

Name: Chris Ricaurte

Title: President

**SIGNED** for and on behalf of **Nortel
Networks UK Limited** (in administration)
by Christopher Hill as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

......................................................................
Christopher Hill

Witness signature

......................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Networks (Ireland) Limited** (in administration) by David Hughes as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

David Hughes

Witness signature

Name: Niall J Coveney
Address:
c/o Ernst + Young.
Harcourt Street
Dublin 2.

)
)
)

**SIGNED** for and on behalf of **Nortel
Networks S.A.** (in administration and
*liquidation judiciaire*) by Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence
of:

)
)
)
)

..............................................
Christopher Hill

Witness signature

..............................................    )

Name:    JAN CORDELL

Address:    1 MORE LONDON PLACE
LONDON SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks France S.A.S.** (in administration) by Kerry Trigg acting as authorised representative of Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

*Kerry Trigg*

Kerry Trigg

Witness signature

*T Allen*

Name: TERESA ALLEN

Address: 1 MORE LONDON PLACE

LONDON

SE1 2AF

)
)
)