92

- 14 -

**CONCLUSION**

43.    I believe that the process undertaken by the Applicants, the U.S. Debtors and their advisors, including with input from the Monitor, the official committee of unsecured creditors of NNI and the *ad hoc* bondholders committee, was in compliance with the Bidding Procedures and that maximum value for the *Purchased Assets has been achieved.*

44.    The bidding process was conducted by Nortel in consultation with its financial and legal advisors, the Monitor and several of its significant stakeholders and in accordance with the Bidding Procedures.  The auction resulted in a purchase price many multiples higher than the Stalking Horse Agreement purchase price.  I believe that the proposed transaction as set out in the Sale Agreement is the best offer available for the Assets.

**SWORN BEFORE ME** at the City of Bristol, in the State of Rhode Island on this 5th day of July, 2011.

George Riedel

Commissioner for Taking Affidavits or
Notary Public              7/5/11

MARIA H. LEAL
NOTARY PUBLIC
STATE OF RHODE ISLAND
COMMISSION EXPIRES JAN 05, 2014

93

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

SUPPLEMENTAL AFFIDAVIT OF
GEORGE RIEDEL
(sworn July 5, 2011)

NORTON ROSE OR LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com
Fax: (416) 216-3930
Lawyers for the Applicants

# TAB 5

94

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**SIXTY-THIRD REPORT OF THE MONITOR**
**DATED APRIL 14, 2011**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to June 30, 2011 by this Honourable Court in its Order dated February 25, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

95

- 2 -

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital
    Corporation has been organized and is participating in these proceedings as well as the
    Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this
    Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively,
    representative counsel was appointed on behalf of the former employees of the Applicants,
    the continuing employees of the Applicants and the LTD Beneficiaries and each of these
    groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its
    subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a
    voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were
    granted administration orders (the "UK Administration Orders") by the High Court of
    England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK
    Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill
    of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel
    Networks (Ireland) Limited ("NN Ireland"), to which David Hughes (Ernst & Young LLP
    Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.  Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary
    insolvency proceedings within the meaning of Article 27 of the European Union's Council
    Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France
    pursuant to which a liquidator (the "French Liquidator") and an administrator have been
    appointed by the Versailles Commercial Court.

7.  The CCAA proceedings and the UK Administration proceedings of NNUK and the other
    EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under
    Chapter 15 of the Code.

8.  Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor
    protection or bankruptcy proceedings in the local jurisdiction in which they are located.

76

- 3 -

## PURPOSE

9.  The purpose of this Sixty-Third Report of the Monitor (the "Sixty-Third Report") is to
    provide this Honourable Court with information regarding the Applicants' motion
    returnable May 2, 2011, seeking:

    • approval of an asset sale agreement dated April 4, 2011 (the "Ranger
      Agreement"), amongst NNC, NNL, NNUK, NN Ireland, Nortel Networks S.A.
      and certain of their affiliates (collectively, the "Sellers"), the Joint Administrators,
      the French Liquidator, Google Inc. ("Google"), and Ranger Inc., a wholly owned
      subsidiary of Google ("Ranger" or the "Purchaser") in respect of the sale of
      substantially all of Nortel's patent portfolio and certain other related assets (the
      "Residual IP") as a "stalking horse" agreement;

    • approval of the terms and conditions of the Break-up Fee and Expense
      Reimbursement (each as defined below);

    • approval of the Bidding Procedures (as defined below);

    • approval of the Licence Rejection Procedures (as defined below);

    • approval of the IP Transaction Side Agreement (as defined below);

    • a sealing order in respect of the confidential appendices hereto for the reasons set
      out below;

    and to provide the Monitor's support in respect thereof.

    This Sixty-Third Report also provides information regarding the Applicants' motion
    returnable June 30, 2011, as it relates to the License Non-Assignment and Non-Renewal
    Protections (as defined in the proposed Canadian Approval and Vesting Order).

97

- 4 -

**TERMS OF REFERENCE**

10. In preparing this Sixty-Third Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel. The Monitor has not audited, reviewed nor otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Sixty-Third Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12. Capitalized terms not defined in this Sixty-Third Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the Ranger Agreement or the Bidding Procedures.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**THE RESIDUAL IP**

*Background*

14. In connection with its previous post-filing business unit divestitures, Nortel sold certain patents and intellectual property assets related to such businesses; however, Nortel retained significant Residual IP, including approximately 6,000 Canadian, U.S. and foreign patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios. Legal title to substantially all such patents is held by and registered in the name of NNL.

98

- 5 -

15.  Over the course of 2010, Nortel, in consultation with its financial and legal advisors and various stakeholders, considered different methods of monetizing the Residual IP, including licensing the Residual IP to third parties to generate revenues and conducting a sale process for all of the Residual IP. Nortel ultimately concluded that a sale of the Residual IP was the best method of monetizing the Residual IP for the benefit of its stakeholders.

*Sale Process*

16.  In May 2010, Nortel commenced efforts to market the Residual IP. With the assistance of Lazard Frères & Co., the Company approached or was contacted by 105 buyers or buyer groups. As a result of those efforts, 95 parties that indicated an initial interest in purchasing the Residual IP were sent teaser information along with a form of confidentiality agreement. Approximately forty parties executed confidentiality agreements and were given access to a confidential electronic data room containing due diligence materials for the Residual IP.

17.  Nortel invited expressions of interest in the Residual IP in the fall of 2010 and 14 such expressions were submitted. Following a review of these expressions of interest, six parties were invited to submit formal bids for the Residual IP by December 20, 2010. Bids (based on a form of asset sale agreement made available by Nortel in the data room) were received from three buyers or buyer groups, including one from Google and the Company proceeded to engage in negotiations with two buyers / buyer groups in parallel before ultimately focussing on the bid received from Google. These negotiations culminated with Nortel entering into the Ranger Agreement as described below.

18.  The Monitor, in conjunction with representatives of the Applicants, the U.S. Debtors and the Joint Administrators, has had extensive involvement in the sale process, including attending and participating in management presentations and negotiations with prospective buyers, performing its own review of materials submitted by prospective purchasers (including the Ranger Agreement) and providing input to the Company with respect to these matters.

99

- 6 -

**THE RANGER AGREEMENT**

19. On April 4, 2011, the Sellers entered into the Ranger Agreement with the Purchaser and Google. The Ranger Agreement sets forth the terms of the Sellers' sale of the Residual IP assets to Ranger, and the assumption of certain related liabilities by Ranger. The Ranger Agreement (excluding exhibits and the Sellers Disclosure Schedule) is attached as Appendix "A" hereto. A copy of the exhibits and the Sellers Disclosure Schedule to the Ranger Agreement is attached as confidential Appendix "B" hereto. As these exhibits and schedules contain sensitive competitive information, the Monitor requests that confidential Appendix "B" to this Sixty-Third Report be sealed by this Honourable Court.

20. Ranger is a wholly owned subsidiary of Google. Google is a publicly traded multinational corporation that is listed on NASDAQ and headquartered in Mountain View, California. Google is an internet search engine provider and hosts and develops a number of Internet-based services and products including various forms of advertising and web applications. Google unconditionally guarantees the full and timely payment and performance of all of the Purchaser's obligations under or in connection with the Ranger Agreement and the other Transaction Documents.

21. A summary of the key provisions of the Ranger Agreement is provided in the paragraphs that follow. Reference should be made directly to the Ranger Agreement for a complete understanding of the terms governing the proposed transaction.

*Assets Purchased and Options to Purchase*

22. The assets being sold are as follows (collectively, the "Assets"):

   • the Transferred Patents, Specified UK Patents, and any inventions and improvements claimed or disclosed therein as of the Closing Date, together with, amongst other things, various rights in relation to such Assets, including the right to sue and recover damages for past, present or future infringements thereof, subject only to licences granted thereunder:

      o prior to the date of the Ranger Agreement, that are:

- 7 -

- granted pursuant to Commercial Licences entered into prior to the date of the Ranger Agreement;

- listed in Section 2.1.1(a) of the Sellers Disclosure Schedule; or

- Continuing Unlisted Licences;

o subsequent to date of the Ranger Agreement, but solely to the extent that such licenses would be permitted under the conduct of business covenants of the Ranger Agreement and either:

- constitute licences granted pursuant to Commercial Licences; or

- are identified to the Purchaser in writing prior to the Closing Date,

but in each case only to the extent such licenses remain in force after Closing.

- the Assigned Contracts and any claims arising under such Assigned Contracts on or after the Closing Date (although at present there are no such Assigned Contracts);

- the tangible embodiments (including electronic copies) of all Patent Related Documentation in the possession or under the control of the Sellers as of the date of the Ranger Agreement or the Closing Date;

- all rights to Intellectual Property (other than Trademarks) of any Seller, to the extent embodied in the Patent Related Documentation and that relate to the Transferred Patents or Purchased Specified UK Patents;

- all rights to the Sellers' patent-related data applications, provided that the Sellers shall not transfer any rights with respect to such patent-related data applications unless the Purchaser holds appropriate licenses to such applications;

- all rights of the Sellers under any non-disclosure agreement to the extent that such non disclosure agreements relate to the Assets; and

10

- 8 -

- the Sellers' right, title and interest in and to any and all tangible embodiments of Patent Related Documentation as of the Closing Date whether or not the tangible embodiments of such Patent Related Documentation are in the Sellers' possession or control.

23. The Assets do not include, among other things, cash and cash equivalents, accounts receivable other than those related to Assigned Contracts, all rights to Tax refunds, credits or similar benefits relating to the pre-Closing period, any right of the Sellers under any Contract that does not form part of the Assigned Contracts, any Excluded Licences and any Excluded Patents.

24. In the event the any Seller discovers that it owns an Undisclosed Patent Interest, the Purchaser shall have an option to purchase such Undisclosed Patent Interest for a cash purchase price of $50,000. The Purchaser shall have a thirty day period within which to exercise this option, following which the Sellers shall be free to dispose of such Undisclosed Patent Interest in their sole discretion. To the extent an Undisclosed Patent Interest is found to be owned by an Affiliate of the Sellers that is not a Seller, the Sellers shall use their best efforts to cause such Affiliate to transfer the Undisclosed Patent Interest to a Seller. Upon the winding up or dissolution of any of the Sellers, the Purchaser shall have a similar option to purchase on a "quitclaim" basis for $1.00 all of such Seller's right, title and interest in and to all remaining Undisclosed Patent Interests, whether or not previously identified.

25. From and after the Closing and upon written demand from the Purchaser, the Sellers shall transfer all of their interest in one or more specified Jointly Owned Patents to a Person of the Purchaser's choosing to the extent permitted by and subject to applicable Law, any Contracts governing a Seller's joint ownership of such Jointly Owned Patent and any licenses granted thereunder prior to the date of such transfer. In addition, subject to certain exceptions, the Sellers may not transfer any portion of a Seller's interest in any Jointly Owned Patent and no Seller shall reject, repudiate or terminate any Contract governing Seller's joint ownership of a Jointly Owned Patent prior to the last commercially reasonable date on which it can do so.

: 02

- 9 -

*Assumed Liabilities*

26. The Purchaser will assume the following liabilities:

- all liabilities with respect to the ownership or exploitation of the Assets by or
  through the Purchaser arising after the Closing Date, including (i) all such
  liabilities related to Actions or claims brought against the Assets that relate to post
  Closing ownership or exploitation of the Assets, and (ii) all maintenance fees and
  prosecution costs related to the Transferred Patents associated with the ownership
  and exploitation of the Assets arising after the Closing Date;

- all liabilities arising from or in connection with the performance (or breach) of the
  Assigned Contracts after the Closing Date and liabilities with respect to Cure
  Costs payable pursuant to the Ranger Agreement; and

- all liabilities for, or related to any obligation for, any Tax that the Purchaser bears
  pursuant to the Ranger Agreement, which includes Transfer Taxes.

*Purchase Price*

27. The Purchase Price is $900 million.

28. A Good Faith Deposit, being an amount equal to $27 million, shall be delivered by the
Purchaser to the Escrow Agent no later than three Business Days after the later of (i) the
date the U.S. Bidding Procedures Order is entered and (ii) the date that the Canadian Sales
Process Order is entered.

29. At Closing, the Purchaser shall deliver to the Distribution Agent, as distribution agent for
the Sellers, an amount equal to:

  - the Purchase Price; minus

  - the Good Faith Deposit (together with any actual earnings thereon); minus

  - the Indemnification Escrow Amount (as defined and discussed below).

:05

- 10 -

*Indemnification Escrow Amount*

30. Representations, warranties, statements, covenants, and agreements of the Sellers contained in the Ranger Agreement shall survive the Closing until a date that is twelve months after the Closing Date (the "Survival Date"), except for covenants that by their terms are to be satisfied after the Closing Date, which covenants will survive in accordance with their terms, and except as may be expressly provided in any Transaction Document other than the Ranger Agreement.

31. At Closing, the Purchaser shall deliver $45 million (increased by any actual earnings thereon, the "Indemnification Escrow Amount") to the Escrow Agent to serve as the Indemnification Escrow Amount.

32. The Purchaser (and certain related parties) shall be indemnified out of the Indemnification Escrow Account from Damages suffered resulting from: (i) inaccuracies or misrepresentations in respect of Seller representations, warranties and statements under the Ranger Agreement; (ii) the breach of certain covenants of the Sellers under the Ranger Agreement; (iii) Excluded Liabilities; or (iv) the existence of certain Permitted Encumbrances on the Assets, provided that the Purchaser shall not be entitled to any indemnification until the total amount of such Damages exceeds $1,000,000, in which case the Purchaser shall be entitled only to Damages in excess of such amount. The Indemnification Escrow Account is the sole source of funding for any Indemnification Claims and under no circumstances shall any Purchaser be entitled to indemnification or other monetary remedy from the Nortel Parties in respect of Damages other than from the Indemnification Escrow Amount, except to the extent Damages are incurred as a result of actual fraud of the Sellers under the Ranger Agreement. No Indemnification Claim may be asserted unless the applicable Notice of Claim is received by the Primary Seller Parties on or prior to the Survival Date.

33. The process for the resolution of Indemnification Claims is provided for in the Ranger Agreement. Contested Claims that cannot be resolved by written settlement shall be resolved by a joint hearing of the U.S. Court and this Honourable Court.

104

- 11 -

*Representations, Warranties and Annex I Statements*

34. The Ranger Agreement contains a number of representations and warranties of the Sellers (or certain of them) with respect to various matters, including Canadian tax matters and export controls. In addition, Annex I of the Ranger Agreement contains various statements in connection with the Assets and other matters contemplated by the Ranger Agreement, including statements regarding the Patents owned by the Sellers, contracts that grant licenses in respect of any Transferred Patent, Jointly Owned Patent or Specified UK Patent, and various other matters relating to the status of the Transferred Patents, Jointly Owned Patents and Specified UK Patents.

*Other Covenants*

35. The Ranger Agreement includes a number of covenants with respect to various matters including, among others, pre-Closing cooperation, preparation and filings regarding Antitrust and other Regulatory Approvals as necessary, conduct of business, public announcements, confidentiality, preservation and maintenance of patents, licenses to be granted at Closing (as discussed in greater detail below), the use of trademarks, and the maintenance of books and records and taxes.

*Sale Free and Clear*

36. The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Ranger Agreement.

*Exclusivity*

37. Prior to the later of the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order, the Sellers shall not initiate, solicit or knowingly encourage the submission or announcement of any proposal or offer for an Alternative Transaction, enter into a letter of intent or other agreement relating to any Alternative Transaction or enter into, continue or otherwise participate in any discussions or negotiations, furnish any Third Party any information or data with respect to, or commence or continue affording access to any Third

: 05

- 12 -

Party to any information, data or its employees with respect to any Alternative Transaction, provided that nothing in the Ranger Agreement shall prohibit any Seller from providing any person with the Bidding Procedures and related documents, discussing, negotiating and entering into non-disclosure agreements relating to the sale of the Assets or, from and after April 18, 2011, providing access to the Data Room.

*Inter-Company Arrangements*

38. The Sellers have agreed to terminate all license rights granted under the Master R&D Agreement and other Intercompany Contracts which are exclusively among the Sellers or under which a Seller is a licensee to the extent such license rights are under any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests. In addition, each Seller shall request that any non-Seller Affiliate of such Seller that is a licensee under any other Intercompany Contract terminate its license rights pursuant to such Contract under any of the Transferred Patents, Specified UK Patents and Undisclosed Patent Interests in exchange for a sublicense of the license rights granted to the Sellers and their Affiliates pursuant to the Closing Date License Agreement.

39. From and after Closing there shall be no future manufacture, development, sale, supply or other distribution, or servicing of any products under the Transferred Patents or Specified UK Patents by, for or on behalf of Sellers other than to the extent such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement. Further, neither the Sellers nor any Person acting on behalf of any Seller shall distribute any products, directly or, for the purpose of circumventing this provision of the Ranger Agreement, indirectly, to any Affiliates of any Seller that have not complied with the request described in paragraph 38, above, and agreed to receive a sublicense under the license rights granted to the Sellers and their Affiliates under the Closing Date License Agreement, except to the extent it is a Nortel Product required pursuant to the terms of any Intercompany Contract then in effect, but, in such case, subject to a cap on the quantum of Nortel Products to be distributed and an absolute prohibition on the distribution of any products upon the Change of Control of an Affiliate.

106

- 13 -

*Termination Rights*

40.  The Ranger Agreement may be terminated prior to Closing:

- by mutual written consent of the Primary Parties;

- by either Primary Party:

    o   if the Closing does not take place on or prior to the date that is 180 days
        from the date of the Ranger Agreement (the "Outside Date"), provided
        that the Outside Date shall be extended by successive periods of 45 days
        (to a maximum of 360 days from the date of the Ranger Agreement) if on
        the date of such extension all of the conditions to Closing other than
        receipt of Mandatory Regulatory Approvals and/or the absence of
        injunctions or restraints have been or are capable of being satisfied;

    o   upon or following the determination by any of the Primary Seller Parties
        to proceed with an Alternative Transaction, such determination to be
        made:

        o   if the Auction occurs, not later than the date that is three Business
            Days after the conclusion of the Auction; or

        o   if the Auction does not occur, not later than 63 days from the later
            of the date that the U.S. Bidding Procedures Order is first entered
            and the date the Canadian Sales Process Order is first granted.

- by the Purchaser:

    o   in the event of a breach by the Sellers of the Sellers' representations,
        warranties, Annex 1 statements, agreements or covenants set forth in the
        Ranger Agreement, which breach would result in a failure of certain
        conditions to Closing, subject to certain cure rights;

:07

- 14 -

o   in the event of the Sellers' breach of their obligation to close the
    transaction as contemplated in the Ranger Agreement, subject to certain
    cure rights;

o   upon or following the determination by any of the Primary Seller Parties
    to proceed with any Asset Retention Transaction;

o   if the Canadian Debtors have failed to serve and file the Canadian Sales
    Process Order Motion or if the U.S. Debtors have failed to file the U.S.
    Bidding Procedures and Sale Motion within 10 Business Days of the date
    the Ranger Agreement was entered into;

o   if the U.S. Court or this Honourable Court have not entered the U.S.
    Bidding Procedures Order and the Canadian Sales Process Order,
    respectively, within 35 days of the date the Ranger Agreement was entered
    into;

o   at any time following the entry of the U.S. Bidding Procedures Order and
    the Canadian Sales Process Order but prior to the entry of the U.S. Sale
    Order and the Canadian Approval and Vesting Order, upon or following
    the date that an order of any court of competent jurisdiction shall be
    entered vacating or reversing the U.S. Bidding Procedures Order or the
    Canadian Sales Process Order or amending, supplementing or otherwise
    modifying the U.S. Bidding Procedures Order or the Canadian Sales
    Process Order in a manner that is inconsistent with the standards set forth
    in the Ranger Agreement;

o   if the Auction shall not have been completed by the date that is 60 days
    from the later of the date that the U.S. Bidding Procedures Order is first
    entered by the U.S. Court and the date that the Canadian Sales Process
    Order is first granted by this Honourable Court;

o   if the hearing(s) to consider approval of the U.S. Sale Order and the
    Canadian Approval and Vesting Order shall not have commenced by the

108

- 15 -

date that is 75 days from the later of the date that the U.S. Bidding Procedures Order is first entered by the U.S. Court and the date that the Canadian Sales Process Order is first granted by this Honourable Court; or

o    upon or following the date on which the U.S. Court or this Honourable Court shall have stated unconditionally that it will not enter the U.S. Sale Order or the Canadian Approval and Vesting Order, respectively.

• by the Primary Seller Parties:

o    in the event of a breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in the Ranger Agreement, which breach would result in a failure of certain conditions to Closing, subject to certain cure rights;

o    in the event of the Purchaser's breach of its obligation to close the transaction as contemplated in the Ranger Agreement, subject to certain cure rights; or

o    in the event that one or more Persons asserts the existence of an Unknown License (as defined below) that has been or would be rejected, repudiated or terminated pursuant to the Licence Rejection Procedures described below and that the Primary Seller Parties determine, in the exercise of their reasonable good faith judgment, constitute a substantial risk of resulting in an aggregate allowed damage claim at least equal to the dollar amount specified in the Seller Disclosure Schedule if rejected, repudiated or terminated, and, after the procedures outlined in Section 8.1(d)(iii) of the Ranger Agreement have been followed, the Purchaser has not consented to the Primary Seller Parties' request to withdraw the rejection or repudiation of, or to elect not to terminate, such Unknown License and to deem such Unknown License a Continuing Unlisted License.

109

- 16 -

*Break-Up Fee and Expense Reimbursement*

41. The Ranger Agreement provides for an aggregate expense reimbursement payable by the Sellers to the Purchaser in certain circumstances in respect of its actual fees, costs and expenses reasonably incurred by the Purchaser in connection with the preparation, execution and performance of the Ranger Agreement, to a maximum of $4,000,000 (the "Expense Reimbursement"). The Ranger Agreement also provides for an aggregate break-up fee of $25,000,000 to be paid by the Sellers to the Purchaser (the "Break-Up Fee") in certain circumstances. The combined Expense Reimbursement and Break-up Fee equals approximately 3.2% of the Purchase Price and is comparable in percentage terms to expense reimbursements and break-up fees approved in Nortel's other post-filing business unit divestitures.

42. The Sellers shall pay the Expense Reimbursement if the Ranger Agreement is terminated by the Purchaser or Primary Seller Parties pursuant to certain specified termination provisions and when the Ranger Agreement is terminated the Purchaser is not in breach thereof which breach would result in a failure to satisfy any of the Seller conditions or mutual conditions to Closing.

43. The Sellers shall pay the Break-Up Fee to the Purchaser if the Ranger Agreement is terminated by the Purchaser or Primary Seller Parties pursuant to certain specified termination provisions, when the Ranger Agreement is terminated the Purchaser is not in breach thereof which breach would result in a failure to satisfy any of the Seller conditions or mutual conditions to Closing, and an Alternative Transaction is consummated within twelve (12) months following such termination.

*Closing Date Licence Agreement*

44. At Closing, the Purchaser and the Sellers shall enter into the Closing Date License Agreement pursuant to which:

   • The Sellers grant the Purchaser and its Affiliates an irrevocable, perpetual, non-exclusive, non-assignable and non sub-licensable (except in certain specified circumstances), worldwide, royalty free, fully paid up license in respect of the

‘ 1 Ü

- 17 -

Licensed Residual Patents in connection with the Purchaser's or its Affiliates' products, systems, technologies or services;

- The Sellers grant the Purchaser and its Affiliates an irrevocable, perpetual, non-exclusive, non-assignable and non sub-licensable (except in certain specified circumstances), worldwide, royalty free, fully paid up license in respect of the Jointly Owned Patents, Specified UK Patents (other than Purchased Specified UK Patents) and any other non-assignable Assets;

- The Purchaser grants an irrevocable, non-exclusive, non-assignable, worldwide (but only to the extent necessary for the Sellers' and the Seller Permitted Sublicensees' performance under Retained Contracts), royalty free, fully paid up license in respect of the Licensed Back Patents (as defined in the Closing Date License Agreement) solely as necessary (and only to the extent necessary) for the Sellers' and the Seller Permitted Sublicensees' performance of their obligations under the Retained Contracts; and

- The Purchaser grants to the Sellers an irrevocable, non-exclusive, non-assignable, non-sublicensable (except as expressly provided), worldwide, royalty free, fully paid up license in respect of the Licensed Back Patents, for a period of three years following the Closing, to sell, offer for sale, import, lease or otherwise provide (and sublicense to users and customers in the ordinary course of business the right to use, even beyond such 3-year period), directly or indirectly, Inventory that would otherwise constitute infringement of any of the Licensed Back Patents.

*Closing*

45. Closing shall occur five Business Days after the date upon which all Closing conditions have been satisfied or waived.

- 18 -

*Closing Conditions*

46.  The Parties' obligation to effect the Closing is subject to the satisfaction of the following
conditions:

  • all Mandatory Regulatory Approvals shall have been obtained from appropriate
  Government Entities;

  • there shall be in effect no Law, or any order, injunction, decree or judgment of
  any court or other Government Entity prohibiting, preventing or making illegal
  the consummation of any of the transactions contemplated in the Ranger
  Agreement. In the event that this condition is not satisfied only as to one or more
  jurisdictions other than Canada, France, Germany, the United Kingdom and the
  United States (each such other jurisdiction, a "Deferred Jurisdiction"), then if the
  Sellers or Purchaser so request, the Parties shall negotiate in good faith an
  amendment to the Ranger Agreement to provide for (i) the immediate
  consummation of the transactions contemplated in the Ranger Agreement in all
  applicable jurisdictions other than any Deferred Jurisdiction, and (ii) a delay in
  the consummation of the transactions contemplated in the Ranger Agreement in
  each Deferred Jurisdiction until this condition is satisfied as to such Deferred
  Jurisdiction. However, if the Purchaser reasonably determines in good faith that it
  would be impossible for the Purchaser to comply with delaying the consummation
  of the transactions in the Deferred Jurisdiction without meaningful adverse
  consequences to the Purchaser or the Purchaser's Affiliates, the Purchaser shall
  not be under the obligation to effect the Closing, and provided further, that if the
  Purchaser requests the negotiation of an amendment pursuant to the Ranger
  Agreement, the Sellers shall not be required to agree to any reduction in, or any
  delay in payment of, the Purchase Price;

  • the U.S. Sale Order, the Canadian Approval and Vesting Order and the French
  Court Order shall have been entered and shall be Final Orders; and

112

- 19 -

- the requirements of paragraph 7 of this Honourable Court's Approval and Vesting Order dated July 28, 2009 (the "CDMA Vesting Order"), regarding a buyer of the Applicants' intellectual property assuming all of NNL's obligations under the IP Licenses (as defined in the CDMA Vesting Order) and executing an assumption agreement shall have been satisfied.

47.  The obligation of the Sellers to effect the Closing is subject to satisfaction of the following conditions:

- each of the Purchaser's representations and warranties being true and correct as of the Closing Date or such other date as specified, except for any failure to be true and correct that has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of the Purchaser to consummate the transaction contemplated by the Ranger Agreement;

- the Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in the Ranger Agreement required to be performed by the Purchaser on or before the Closing;

- the Sellers shall be furnished with a certificate by a senior executive officer of the Purchaser certifying that the above two conditions have been satisfied; and

- ten Business Days shall have elapsed since the provision of the most recent notice, if any, that the Sellers have provided to the Purchaser in respect of the emergence of an Unknown Licence which could give rise to the Seller termination right discussed in paragraph 40, above.

48.  The obligation of the Purchaser to effect the Closing is subject to satisfaction of the following conditions:

- each of the Sellers' representations and warranties and each Annex 1 statement being true and correct as of the Closing Date or such other date as specified, except for any failure to be true and correct that has not had, and would not

:13

- 20 -

reasonably be expected to have, individually or in the aggregate, a Material
Adverse Effect;

- the Sellers shall have complied in all materials respects with all material
covenants, obligations and agreements contained in the Ranger Agreement
required to be performed by the Sellers on or before Closing; and

- the Purchaser shall be furnished with a certificate of a senior officer of each of the
NA Sellers certifying that the above two conditions have been satisfied.

## LICENSE REJECTION PROCEDURES

49. The Transferred Patents and Specified UK Patents are subject to licenses granted prior to
the date of the Ranger Agreement pursuant to various patent license agreements as well as
to various Commercial Licenses (as defined in the Ranger Agreement, but which generally
encompasses limited licenses granted under Contracts entered into in the ordinary course of
business of Nortel). The Monitor is aware that Nortel has conducted significant diligence
regarding the patent licenses (other than Commercial Licenses) to which the Transferred
Patents, Specified UK Patents and Jointly Owned Patents are subject to and has compiled a
list of all such known licenses (defined more fully below as the Known Licenses).

50. As noted above, the Transferred Patents and Specified UK Patents are to be transferred to
the Purchaser subject to the Known Licenses, all Commercial Licenses and certain
intercompany licenses.

51. In view of the negative impact any "unknown" licenses (i.e. licenses other than the Known
Licenses, Commercial Licenses and certain intercompany licenses) may have on the value
of the Assets to the Purchaser, the Applicants have agreed to conduct a process (the
"Canadian License Rejection Procedures") for the rejection or termination of Unknown
Licenses (as defined below). The U.S. Debtors have agreed to conduct a substantially
similar process under the auspices of the Chapter 11 Proceedings (with the Canadian
License Rejection Procedures, the "License Rejection Procedures").

214

- 21 -

52.  The Canadian License Rejection Procedures are as follows:

- The Applicants shall serve on each counterparty to an Outbound License Agreement or a Cross-License Agreement with the Applicants (as listed in the Sellers Disclosure Schedules, such licenses, collectively, the "Known Licenses", and such counterparties, collectively, the "Known Licensees") a notice (the "Known License Notice"), identifying the Known Licenses that such counterparty has with the Applicants. The Known Licence Notices shall be served by the Applicants (or another person on behalf of the Applicants) by no later than five business days following the entry of the Canadian Sales Process Order or as soon thereafter as is reasonably practicable. A copy of the Known License Notice is attached as Appendix "C" hereto;

- Notice of the Licence Deemed Termination Procedures (the "Publication Notice") will be published in The Globe & Mail (National Edition), The Wall Street Journal (National Edition), The Financial Times (International Edition) and The New York Times (National Edition) within five business days following the entry of the Canadian Sales Process Order or as soon thereafter as is reasonably practicable. A copy of the Publication Notice is attached as Appendix "D" hereto;

- Any counterparty to any pre-filing Contract pursuant to which any Applicant is a party and pursuant to which such Applicant has granted a license under any Transferred Patents, Specified UK Patents or Jointly Owned Patents other than (i) the Known Licenses, (ii) the Commercial Licenses, (iii) the Disclosed Intercompany Licences, and (iv) any intercompany contract, arrangement or understanding that is not a Disclosed Intercompany License but that is in effect and that is similar in kind to the Disclosed Intercompany Licenses (it being understood that any such intercompany contract, arrangement or understanding that grants license rights under the Transferred Patents, Specified UK Patents or Jointly Owned Patents that is broader in scope or longer in duration than the broadest license or longest license to such patents granted under any of the Disclosed Intercompany Licenses is not similar in kind to the Disclosed Intercompany Licenses) (any such licenses, collectively, the "Unknown Licenses"), who wishes to assert an Unknown License must serve an

315

- 22 -

objection notice (an "Objection Notice") on the parties listed on Schedule "B" of the Canadian Sales Process Order prior to 4:00 p.m. (ET) on June 6, 2011 (the "Canadian License Bar Date"). A copy of the Objection Notice is attached as Appendix "E" hereto. The Monitor intends to post the form of Objection Notice on its website within two Business Days of the entry of the proposed Canadian Sales Process Order;

- Without prejudice, as between the Sellers and the Purchaser, to the rights of the Purchaser under the Ranger Agreement, to the extent that a party asserts an Unknown License prior to the 4:00 p.m. (ET) on the Canadian License Bar Date (and if so asserted, an "Additional License"), the Assets shall only be sold subject to such Additional License, provided however that the validity of the Additional License has been established by Court Order prior to Closing;

- Except as provided in the immediately preceding bullet point, any Unknown Licenses to which the Applicants are a party are deemed to be terminated as of the Closing and shall forever be barred, released and extinguished, and any claim arising from such deemed termination shall be a claim against the Applicants, which claim shall be deemed to be a Restructuring Claim as such term is defined in the Claims Procedure Order granted by this Honourable Court on July 30, 2009, as amended from time to time (the "Claims Procedure Order") and must be filed within thirty (30) days of the date of Closing and otherwise in compliance with the Claims Procedure Order; and

- Subject to the consent of the Purchaser, in its sole and absolute discretion, or any other Successful Bidder, as applicable, the Applicants reserve their right to not terminate an Unknown License at any time prior to the occurrence of the Closing.

53. As noted above, the U.S. Debtors are seeking approval of a substantially similar procedure in the U.S. Bidding Procedures Order. A counterparty seeking to retain rights under an Unknown License with both the U.S. Debtors and the Applicants that is subject to rejection and termination under both the Canadian License Rejection Procedures and the corresponding procedures to be approved by the U.S. Court must (i) file and serve an Objection Notice; and (ii) elect to retain its license rights in accordance with the procedures

116

- 23 -

contained in the U.S. Bidding Procedures Order. Such a counterparty may not attempt to retain license rights in one jurisdiction and terminate such license rights in the other.

54. In addition to serving the service list in these CCAA proceedings, sending the Known License Notices to the Known Licensees and publishing the Publication Notice in the various newspapers identified, the Applicants, with the assistance of the Monitor, have or will undertake the additional service and notification procedures outlined in paragraphs 31 to 34 of the Affidavit of George Riedel sworn April 7, 2011 (the "First Riedel Affidavit"), including the service of the Notice of Sale (as defined in the First Riedel Affidavit) on various parties as provided for in the proposed Canadian Sales Process Order, with a view to ensuring that notice of the Canadian License Rejection Procedures (and the other relief sought in the Canadian Sales Process Order) is disseminated as widely as possible. The form of Notice of Sale is attached as Appendix "F" hereto.

55. In addition to the parties identified in paragraph 31 of the First Riedel Affidavit, the Applicants, with the assistance of the Monitor, have also served copies of (i) the Notice of Motion returnable May 2, 2011, the First Riedel Affidavit, and the proposed Canadian Sales Process Order, and (ii) the Notice of Motion, the Affidavit of George Riedel sworn April 7, 2011, and the draft Order in respect of the Applicants' motion returnable June 30, 2011, on counterparties to the Known Licenses. Attached hereto as confidential Appendix "G" is a copy of the affidavit of service attesting to such service. The Applicants and the Monitor are requesting that confidential Appendix "G" be sealed by this Honourable Court as it contains the identity of the Known License counterparties, which information is competitively sensitive.

56. The Applicants, the Monitor and the U.S. Debtors are working to implement a system that will allow them to respond in a timely fashion to any inquiries regarding the License Rejection Procedures as well as to review any Unknown Licenses that are asserted.

- 24 -

## LICENSE NON-ASSIGNMENT AND NON-RENEWAL PROTECTIONS

57. In light of the impact existing and continuing licenses of the Transferred Patents, Specified UK Patents or Jointly Owned Patents have on the value of the Assets to the Purchaser, and, in particular, the negative impact the expansion or assignment of such licenses by the Sellers or counterparties would have on the value of the Assets, the Sellers have also agreed to implement the License Non-Assignment and Non-Renewal Protections as outlined in the form of the Canadian Approval and Vesting Order and U.S. Sale Order negotiated between the Sellers and the Purchaser. Broadly conceived, and subject to various exceptions as outlined below to preserve flexibility for Nortel in relation to its global wind-down, the License Non-Assignment and Non-Renewal Protections are intended to prevent the Applicants and the U.S. Debtors from assigning, or consenting to the assignment of, the various types of specified licenses or expanding the scope or terms of such licenses as they relate to the Transferred Patents, Specified UK Patents or Jointly Owned Patents, as well as to provide for the termination of such licenses at the earliest time permissible.

58. Pursuant to the License Non-Assignment and Non-Renewal Protections as they relate to the Applicants:

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any renewal, extension, assignment, amendment, waiver or modification of any license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, pursuant to any Cross-License Agreement or Outbound License Agreement (excluding (i) the Commercial Licenses, (ii) the transition services agreements (the "TSAs") and intellectual property license agreements (the "IPLAs") that the Applicants entered into with the purchasers of their various business units after the Filing Date in connection with their divestitures, (iii) any intercompany Contracts with the Sellers (the "Intercompany Licenses") and (iv) the Technology License Contract between Northern Telecom Limited and Guangdong-Nortel Telecommunications Switching Equipment Ltd. ("GDNT"), dated November 8, 1994, as amended (the "GDNT License")) (collectively, the "License

- 25 -

Agreements", and any one, a "License Agreement") that requires the consent of any Applicant pursuant to the terms of such License Agreement and that would have the practical effect of expanding the scope or term of the licenses to the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder (regardless of whether such renewal, extension, assignment, amendment, waiver or modification is sought prior to or after the Applicants dissolve or otherwise cease to exist), in each case unless the Purchaser shall otherwise agree in writing, in its sole discretion;

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment, modification or waiver to the GDNT License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of the GDNT License or any rights or obligations thereunder other than to Ericsson (as defined in the Sale Agreement) or another purchaser of all or substantially all of the assets or all of the outstanding shares of GDNT, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion. As the GDNT License is to be assigned by GDNT to Ericsson in connection with the sale of substantially all of the assets of GDNT to Ericsson, the Monitor is of the view that sufficient flexibility has been preserved with respect to the GDNT License;

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification to the IPLAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of any IPLA by the license counterparty or any rights or obligations of the license counterparty under any IPLA, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion;

119

- 26 -

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any amendment, modification, renewal or extension to the TSAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder beyond June 30, 2012 unless the Purchaser shall otherwise agree in writing, in its sole discretion. As all TSAs are presently scheduled to be concluded by such date, the Monitor is of the view that sufficient flexibility has been preserved with respect to the TSAs;

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any amendment or modification of any Commercial License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except (i) to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement or (ii) to the extent the Purchaser shall otherwise agree in writing, in its sole discretion;

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification of any Intercompany License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement, and (ii) to any assignment of any Intercompany License by the license counterparty or any rights or obligations of the license counterparty under any Intercompany License, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion;

‘20

- 27 -

- no Applicant shall have the right or power to transfer any of its obligations, right, title or interest in the licenses under the Transferred Patents, Specified UK Patents and Jointly Owned Patents under:

    i. any License Agreement,

    ii. the GDNT License,

    iii. any Intercompany License,

    iv. (other than in connection with the consolidation, wind-down, reorganization or restructuring of the Applicants and their affiliates, including to the Applicants under confirmed plan(s) of arrangement) any IPLA, or

    v. (other than the transfer by the Applicants of Retained Contracts or contracts relating to the disposal of inventory, in each case to the extent a sublicense to the assignee of such contract is permitted by the Closing Date License Agreement) any Commercial License,

in each case, to any other person from and after the Closing, and any purported renewal, extension, assignment, amendment, waiver, transfer or modification of a License Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License that would contravene the provisions outlined in this paragraph 58 shall be null and *void ab initio* and unenforceable and of no force or effect, and

59. In furtherance of the License Non-Assignment and Non-Renewal Protections the Purchaser is also granted a limited power of attorney over the Applicants to take any and all action and to execute and deliver any and all instruments that the Purchaser may deem necessary or advisable to accomplish the matters outlined in paragraph 58, above, and regardless of whether or not any Applicant party to the applicable License Agreement is then in existence, to terminate the license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents in any License Agreement (including by delivering a notice of termination on behalf of an Applicant party thereto, regardless of whether such Applicant is

121

- 28 -

then in existence) upon the occurrence of any specific date or event or the existence of any specific circumstance to the extent that the occurrence of such date or event or the existence of such circumstance gives any Applicant (regardless of whether such Applicant is then in existence) a right to terminate such License Agreement pursuant to the terms thereof. A corresponding power of attorney over the U.S. Debtors is granted to the Purchaser in furtherance of the License Non-Assignment and Non-Renewal Protections as they relate to the U.S. Debtors. The exercise of the powers of attorney is subject to the provisions of the Ranger Agreement and the Purchaser has agreed to indemnify the Sellers (and certain related parties) from and against any and all Damages suffered resulting from the Purchaser's use and exercise (and not merely the grant) of such powers of attorney.

**IP TRANSACTION SIDE AGREEMENT**

60.  In connection with the Ranger Agreement, the Sellers, the Joint Administrator and the French Liquidator have negotiated and executed a IP Transaction Side Agreement dated as of April 4, 2011 (the "IP Transaction Side Agreement"), to address the sharing of certain costs incurred, or that may be incurred, in connection with the transaction and various other agreements in relation to the transaction. A copy of the IP Transaction Side Agreement is attached as confidential Appendix "H" hereto. As the IP Transaction Side Agreement contains sensitive information regarding certain inter-estate matters, the disclosure of which would be potentially harmful to the Applicants and their stakeholders, the Applicants and the Monitor are requesting that confidential Appendix "H" be sealed by this Honourable Court.

**BIDDING PROCEDURES AND AUCTION PROCESS**

61.  Given that certain of the U.S. Debtors are parties to the Ranger Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Ranger Agreement, Nortel has determined and has agreed with the Purchaser that the Ranger Agreement is subject to higher or better offers being obtained

122

- 29 -

pursuant to a sale process under section 363 of the Code and that the Ranger Agreement shall serve as a "stalking horse" bid pursuant to that process.

62. A copy of the proposed bidding procedures is attached as Appendix "I" hereto (the "Bidding Procedures"). The Monitor notes that the Bidding Procedures are substantially similar to the bidding procedures used in the sale of Nortel's significant business units.

63. The Ranger Agreement provides that the Sellers that are U.S. Debtors shall file the U.S. Bidding Procedures and Sale Motion with the U.S. Court no later than three Business Days from the date of the Ranger Agreement. This motion was filed with the U.S. Court on April 4, 2011. The Ranger Agreement also provides that the Applicants shall serve the Canadian Sales Process Order Motion no later than the date that is five Business Days from the date of the Ranger Agreement. This motion was served on April 7, 2011.

64. The Monitor understands that the Applicants and the U.S. Debtors will seek approval of the Bidding Procedures at a videoconference joint hearing between this Honourable Court and the U.S. Court scheduled for May 2, 2011, conducted pursuant to the Cross-Border Insolvency Protocol previously approved by both Courts.

65. The Bidding Procedures provide that all bids must be received by the Sellers not later than 4:00 p.m. (ET) on June 13, 2011, and that the Sellers will conduct an auction of the Assets beginning on June 20, 2011, at 9:00 a.m. (ET) (the "Auction").

66. A joint sale hearing has been scheduled before both this Honourable Court and the U.S. Court for June 30, 2011.

67. The key provisions of the Bidding Procedures are outlined in the paragraphs that follow. Reference should be made directly to the Bidding Procedures for a complete understanding of the terms thereof.

*Provisions Governing Qualifications of Bidders*

68. Unless otherwise ordered by both the U.S. Court and this Honourable Court and accepted by the Joint Administrators, for cause shown, or as otherwise determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, in order to

123

- 30 -

participate in the Bidding Process, prior to the Bid Deadline each person other than the
Purchaser who wishes to participate in the Bidding Process, and in the event that such
person is an entity formed for the purpose of acquiring the Assets (or any portion thereof),
each actual or proposed holder of the equity (whether in the form of stock, partnership
interests, LLC interests, debt issued in connection with such person's bid for the Assets or
otherwise) or proposed beneficiary of such person through license or similar arrangement
granted in connection with such person's bid (each an "Equity Holder") (each such person
other than the Purchaser who wishes to participate in the Bidding Process, and each Equity
Holder thereof, a "Potential Bidder") must deliver to the Notice Parties:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of
       any confidential information by the Sellers to such Potential Bidder) in substance
       substantially the same as the confidentiality agreement executed by the Purchaser
       in form and substance satisfactory to the Sellers and which shall inure to the
       benefit of any purchaser of the Assets. In the event that the Potential Bidder has
       already entered into a confidentiality agreement with the Sellers, prior to the
       distribution of any additional confidential information by the Sellers to such
       Potential Bidder, such Potential Bidder must provide a statement (i) agreeing that,
       if the confidentiality agreement executed by the Purchaser contains provisions
       that are more restrictive than the confidentiality agreement executed by such
       Potential Bidder, then the confidentiality agreement executed by such Potential
       Bidder shall be deemed to be amended to contain such more restrictive
       provisions; (ii) agreeing that its obligations under such agreement shall inure to
       the benefit of any purchaser of the Assets; and (iii) waiving any of its rights under
       such confidentiality agreement that are in conflict with the Bidding Procedures or
       that would otherwise prohibit disclosures regarding the Potential Bidder, or any
       Transactions it may enter into, to the Notice Parties and other Qualified Bidders
       who submit a Qualified Bid;

(b)    current audited financial statements and latest unaudited financial statements of
       the Potential Bidder or such other form of financial disclosure and credit-quality
       support or enhancement that will allow the Sellers and their respective financial

: 2 4

- 31 -

advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transactions; and

(c)    a statement demonstrating to the Sellers' satisfaction, a bona fide interest in purchasing the Assets from the Sellers including: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded; (iii) the structure and financing of the Transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Ranger Agreement.

69. A Potential Bidder that has delivered the documents described above, whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, the financial capability of the Potential Bidder to consummate the Transactions, that has submitted a reasonably competitive and realistic non-binding proposal, as described above, that has delivered executed confidentiality agreement(s), as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transactions, will be deemed a "Qualified Bidder". The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group, the Joint Administrators and the Monitor, whether to entertain bidders for the Assets that have not

125

- 32 -

met one or more of the requirements specified above and deem such bidders to be Qualified Bidders. As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets as outlined in the Bidding Procedures.

### *Bid Deadline*

70. A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the Notice Parties identified in the Bidding Procedures so as to be received not later than 4:00 p.m. (ET) on June 13, 2011 (as may be extended as set out below, the "Bid Deadline"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so, provided that for any such extension beyond five Business Days, the Sellers shall have obtained the written consent of the Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably withheld.

### *Provisions Governing Qualified Bids*

71. A bid, other than the Ranger Agreement, submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

    (a)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Ranger Agreement, including without limitation with respect to certainty and timing of closing, or pursuant to alternate structure or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Committee, the Bondholder Group and the Monitor, are no less favourable than the terms and conditions of the Ranger Agreement;

'26

- 33 -

(b)    it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the sale to the Successful Bidder or the Alternate Bidder, and (ii) (a) with respect to the Successful Bidder only, 180 days from the Sale Hearing, subject to further extensions as may be agreed to under the applicable purchase agreements and (b) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below); provided further that, notwithstanding anything to the contrary provided in the Bidding Procedures, in no event shall the Purchaser be required to serve as an Alternate Bidder without its consent, in its sole discretion;

(c)    it includes a duly authorized and executed Purchase Agreement, including the purchase price for the Assets expressed in U.S. Dollars, together with all exhibits, schedules thereto and ancillary agreements as well as copies of such materials marked to show those amendments and modifications to the Ranger Agreement, ancillary agreements and proposed orders to approve the sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, as proposed by the Qualified Bidder;

(d)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction;

(e)    it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder and/or (ii) obtaining financing;

(f)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), participating in or benefiting from (including through

127

- 34 -

license or similar arrangement with respect to the assets to be acquired in connection with such bid) such bid, and the complete terms of any such sponsorship, participation, financing or benefit, such disclosure to include, without limitation, (i) in the case of a Qualified Bidder formed for the purpose of acquiring the Assets (or any portion thereof), the identity of each of the actual or proposed Equity Holders of such Qualified Bidder and the terms and participation percentage of such Equity Holder's interest in such bid and (ii) the identity of each entity that has or will receive a benefit from such bid from or through the Qualified Bidder or any of its Equity Holders and the terms of such benefit;

(g)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Ranger Agreement, plus the Break-Up Fee plus $4 million (representing the Expense Reimbursement); provided that, in determining such value, the Sellers will not be limited to evaluating the dollar amount of a competing bid, but may also consider factors including those described under the section below titled "Evaluation of Competing Bid";

(h)    it includes an acknowledgement and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)    it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the

128

- 35 -

Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of the any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)   it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of Marked Agreements and Marked Ancillary Agreements;

(k)   it is accompanied by a good faith deposit in the form of a wire transfer, certified check or such other form acceptable to the Sellers payable to the Sellers in an amount equal to $27 million;

(l)   it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with their continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)   it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the

129

- 36 -

Qualified Bidder in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)     it contains other information reasonably requested by the Sellers; and

(o)     it is received by the Bid Deadline.

72.  The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified in the Bidding Procedures and deem such bids to be Qualified Bids, provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(iv), (j), (k) or (o) in paragraph 71, above, without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, provided further that such consent shall not be unreasonably withheld in connection with any bid that would (i) otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimis failure to comply with those criteria; and (ii) such noncompliance is cured within 24 hours of the Bid Deadline and provided further that the Sellers shall give the Purchaser written notice no later than the later of (a) three Business Days prior to the commencement of the Auction or (b) 5:00 p.m. (ET) five calendar days prior to the commencement of the Auction of any determination by the Sellers (subject to the two preceding provisos in this sentence) to entertain a bid for the Assets that does not conform to one or more of the requirements specified herein and to deem such bid to be a Qualified Bid (it being understood that such notice shall include a description of the manner in which the applicable bid deviated from the requirements set forth herein) or to entertain a bidder for the Assets that has not met one or more of the requirements set forth under the heading "Participation Requirements" in the Bidding Procedures and deem such bidder to be a Qualified Bidder (it being understood that such notice shall include a description of the manner in which the applicable bidder deviated from the requirements set forth herein).   Notwithstanding the foregoing, the Purchaser is deemed a Qualified Bidder and the Ranger Agreement is deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

! 3()

- 37 -

73. The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or
    not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that
    submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a
    Qualified Bid) on the next Business Day after the day that the determination is made,
    provided that such notification shall be given no later than two Business Days following the
    expiration of the Bid Deadline. The Sellers shall provide the Purchaser and any Qualified
    Bidder that has previously submitted a Qualified Bid with a copy of any Qualified Bid
    received by the Sellers on the day that the determination is made that such bid is a Qualified
    Bid but in no event later than the later of (x) 12:00 p.m. (noon) (ET) three Business Days
    prior to the commencement of the Auction or (y) 5:00 p.m. (ET) five calendar days prior to
    the commencement of the Auction.

74. The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified
    Bid" from one or more "Qualified Bidders", provided that all bidders, including all Equity
    Holders of such bidder shall remain subject to the provisions of 11 U.S.C. § 363(n)
    regarding collusive bidding.

*Evaluation of Competing Bids*

75. A Qualified Bid will be valued based upon several factors including, without limitation,
    items such as the purchase price and the net value (including assumed liabilities and the
    other obligations to be performed or assumed by the Qualified Bidder, including any
    assumed pension liabilities) provided by such bid, the claims likely to be created by such
    bid in relation to other bids, the counterparties to such Transactions, the proposed revisions
    to the relevant Transaction documents, the effect of the transaction on the value of the
    ongoing businesses of Sellers, other factors affecting the speed, certainty and value of the
    Transactions (including any regulatory approvals required to close the Transactions), the
    assets included or excluded from the bid, the estimated number of in-scope employees of
    the Sellers (apportioned by jurisdiction), if any, to be offered post-closing employment by
    the Qualified Bidder and any proposed measures associated with their continued
    employment, the transition services required from the Sellers post-closing, if any, and any
    related restructuring costs, and the likelihood and timing of consummating such

131

- 38 -

transactions, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

*Auction Process*

76. If the Sellers receive one or more Qualified Bids in addition to the Ranger Agreement, the Sellers will conduct the Auction of the Assets at 9:00 a.m. (ET) on June 20, 2011, which Auction may be cancelled or adjourned, subject to the terms of the Ranger Agreement. The Auction shall run in accordance with the following procedures:

- only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the French Liquidator (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Applicants and any other Qualified Bidder that has timely submitted a Qualified Bid (and the advisors to such Qualified Bidder) shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any bids at the Auction;

- each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with respect to the bidding or the Transactions, and if such Qualified Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each of the Equity Holders of such Qualified Bidder shall be required to confirm that it has not engaged, and will not engage, in any collusion with respect to the bidding or the Transactions, such confirmation, in each case, in form and substance satisfactory to the Sellers in their joint and sole discretion;

- at least one calendar day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such

- 39 -

Qualified Bidder (other than the Purchaser) is selected as an Alternate Bidder, the Alternate Bid Expiration Date. By 12:00 p.m. (noon) (ET) at least one Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction;

•   all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids at the Auction with the understanding that (i) the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction, (ii) if such Qualified Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), the true identity of each of the Equity Holders of such Qualified Bidder will be fully disclosed to all Qualified Bidders at the Auction and (iii) all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction in person;

•   the Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures, the Code, or any order of the U.S. Court, this Honourable Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

•   bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid

135

- 40 -

is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least $5,000,000 over the Starting Bid or the Leading Bid as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise best offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Ranger Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

*Selection of Successful Bid*

77. Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor and the Joint Administrators, will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth under the heading "Evaluation of Competing Bids", above, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such Qualified Bids, collectively the "Successful Bid" and the Qualified Bidder(s) making such Qualified Bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if

134

- 41 -

any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers after consultation with the Committee, the Bondholder Group, the Monitor and the Joint Administrators, at the conclusion of the Auction shall be final subject to approval by the U.S. Court and this Honourable Court.

78. The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described below, the Alternate Bidder) upon approval of such Successful Bid by the U.S. Court, this Honourable Court and receipt of any required approvals of any other applicable court(s).

*Closing with Alternative Bidders*

79. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid," and such Qualified Bidder, the "Alternate Bidder"). Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder. The Alternate Bid shall remain open until the earlier of (a) July 12, 2011 unless, prior to such date, the North American Sellers and NNUK have delivered written notice to the Alternate Bidder that the transaction contemplated by the Successful Bid will not occur and the North American Sellers intend to consummate the transaction contemplated by the Alternate Bid, in which case the terms of the Alternate Bid shall be enforceable and shall govern or (b) the consummation of the sale to the Successful Bidder. All the Qualified Bids other than the Successful Bid and the Alternate Bid shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and Alternate Bid by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval is required.

- 42 -

*Reservation of Rights*

80. The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction, may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Code, the Bidding Procedures, any orders of this Honourable Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or (iv) contrary to the statutory duties or legal obligations of the Joint Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, and (c) except as otherwise expressly provided in the Bidding Procedures, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

81. Notwithstanding anything in the Bidding Procedures, the Sellers may not, without the prior written consent of the Committee, the Bondholder Group, the Joint Administrators and the Monitor, which consent may not be unreasonably withheld, (i) extend the Bid Deadline for more than five Business Days beyond June 13, 2011, (ii) adjourn the Auction for more than three Business Days, or (iii) subject to the availability of the U.S. Court and this Honourable Court, adjourn the Sale Hearing for more than three Business Days if the Auction has concluded, provided that the Sellers shall give the Purchaser written notice within one Business Day after any such action (it being understood that such notice shall include a description of the action taken). Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the Bidding Procedures or the Ranger Agreement, including Purchaser's rights with respect to the timing of the Auction and the Sale Hearing, or the Purchaser's

136

- 43 -

right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids.


## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES

82. NNL holds legal title to the Residual IP which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases on a non-exclusive basis.

83. As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the Joint Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers.

84. As of the current date, no agreement has been reached regarding the allocation of the Residual IP sale proceeds. Accordingly, the Monitor expects that such proceeds will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date.


## MONITOR'S ANALYSIS AND RECOMMENDATIONS

85. The Monitor has reviewed Nortel's efforts to divest the Residual IP and is of the view that the Applicants are acting in good faith to maximize value. Accordingly, the Monitor

- 44 -

recommends approval of the Ranger Agreement as a "stalking horse" bid and approval of the Bidding Procedures as described above. In so doing, the Monitor considers the potential payment of the Break-Up Fee and Expense Reimbursement as reasonable in the circumstances.

86. The Monitor also supports the Applicants' request for approval of the Licence Rejection Procedures and the IP Transaction Side Agreement.

87. For the reasons described at paragraphs 19, 55 and 60, respectively, the Monitor also recommends that confidential Appendices "B", "G" and "H" to this Sixty-Third Report be sealed by this Honourable Court.


All of which is respectfully submitted this 14th day of April, 2011.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants
and not in its personal capacity

Per:


Murray A. McDonald
President

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

## SIXTY-THIRD REPORT OF THE MONITOR
### DATED APRIL 14, 2011

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# TAB 6

*138.*

Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | ■ DAY, THE ■ |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF ■, 2011 |

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER**
**(Certain Patents and Other Assets)**

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Notice of Motion dated July 5, 2011, including the approval of a transaction pursuant a bid submitted jointly by Apple Inc. and Rockstar Bidco LP ("Rockstar" or the "Purchaser") and an asset sale agreement dated as of June 30, 2011 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc., Nortel Networks UK Limited (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciaire), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration), the other entities identified therein as sellers (collectively, the "Sellers"),

139

- 2 -

Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson, David Hughes and Christopher John Wilkinson Hill as Joint Administrators, and Maître Cosme Rogeau as French Liquidator and Rockstar, as purchaser for the sale of the Assets to the Purchaser and vesting in the Purchaser all of the Applicants' right, title and interest in and to the Assets (including the granting of any licenses contemplated by the Sale Agreement, the "Transaction"), was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the two affidavits of George Riedel sworn April 7, 2011 (the "First Affidavit" and the "Second Affiavit", respectively), the affidavit of George Riedel sworn July 5, 2011 (the "Third Riedel Affidavit") and the seventy-first report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated ■ ■, 2011 (the "Seventy-First Report") and on hearing the submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list although properly served as appears from the affidavit of ■ sworn ■ ■, 2011 (the "Service Affidavit"), filed:

### Service

1.      **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Third Riedel Affidavit, the Seventy-First Report and/or the Motion Record on the parties and interests identified or referred to in the Third Riedel Affidavit, filed, is full and proper service of such materials for purposes of this Order and the Transaction and that the time for service of such materials be and is hereby validated and abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof. Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all aspects with the Bidding Procedures Order.

### Interpretation

2.      **THIS COURT ORDERS AND DECLARES** that

(a)     capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement; and

- 3 -

(b)    "Initial Order" means the Order of the Honourable Justice Morawetz dated
January 14, 2009, as amended and restated.

**The Transaction**

3.    **THIS COURT ORDERS AND DECLARES** that the Transaction is commercially
reasonable and in the best interests of the Debtor and its stakeholders and is hereby approved.
Subject to approval of the Sale Agreement by the United States Bankruptcy Court for the District
of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors, the execution, delivery
and performance of the Sale Agreement and the other Transaction Documents by the Applicants
is hereby authorized and approved, and the Applicants are hereby authorized and directed to take
such additional steps and execute such additional documents as may be necessary or desirable for
the completion of the Transaction and for the conveyance of the Applicants' right, title and
interest in and to the Assets to the Purchaser in accordance with the provisions of the Sale
Agreement (including, the licenses under the Jointly Owned Patents, the Specified UK Patents,
the Undisclosed Patent Interests and any other Patents granted by one or more of the Applicants
to the Purchaser pursuant to the Sale Agreement and, effective upon receipt by the Sellers or any
successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its
Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19
of the Sale Agreement, any Undisclosed Patent Interests sought to be transferred, granted and/or
assigned by the Sellers to the Purchaser pursuant to the Sale Agreement, together with all the
other Assets, collectively the "Purchased Assets").

4.    **THIS COURT ORDERS AND DECLARES** that, without limiting the generality of the
foregoing, Closing Date License Agreement substantially in the form attached as Confidential
Appendix ■ to the Seventy-First Report is specifically approved and the Applicants party thereto
are hereby authorized and directed to perform and comply with their respective obligations
thereunder.

5.    **THIS COURT ORDERS AND DECLARES** that the Applicants are authorized and
directed to enter into the Sale Agreement and to perform their respective obligations under the
Sale Agreement and each of the Transaction Documents.

- 4 -

6.      **THIS COURT ORDERS AND DECLARES** that, upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Purchased Assets (except any Undisclosed Patent Interests for which the Purchaser pays the Exercise Price after Closing, in which case the provisions of the balance of this paragraph shall be effective and enforceable upon receipt by the Sellers or a successor or assign or any receiver, trustee or liquidator appointed in respect of such Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement for the applicable Undisclosed Patent Interest) shall vest absolutely in the Purchaser as more particularly set out in the conveyance documents delivered by the Purchaser at Closing pursuant to the Sale Agreement and any ancillary agreements, free and clear of and from:

(a)      any and all liens, claims and interests, including, without limitation, all security interests (whether contractual, statutory or otherwise), equity security holders, hypothecs, mortgages, collateral assignments, pledges, deeds of trust, trusts or deemed trusts (whether contractual, statutory or otherwise), judgments, executions, options, rights, levies, charges, or other financial or monetary claims, charges, rights of first refusal, encumbrances, restrictive covenants, rights of offset or recoupment, leases or conditional sale arrangements, debts, liabilities, obligations, guarantees, contractual rights and commitments, claims and rights or causes of action, obligations, demands, restrictions, consent rights, options, indemnities, defects, offsets, recoupment and orders and decrees of any court or governmental entity; and

(b)      claims and interests of any nature or kind of employees, consultants or agents or former employees, consultants or agents, of any of the Applicants arising out of the alleged invalidity, unenforceability or irregularity on any grounds of any of their assignments, transfers or waivers to or in favour of any of the Applicants, whether express or implied or by operation of contract, law or otherwise, of any or all of their right, title and interest in any of the Purchased Assets,

142

in each case, whether or not they have attached or been perfected, registered or filed, whether secured, unsecured or otherwise, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, allowed or disallowed, arising prior to or subsequent to the date of the Initial Order but prior to Closing, whether imposed by agreement, understanding, law, statute, equity or otherwise and whether allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether asserted prior to or after Closing, (collectively, the "Claims") including, for the avoidance of doubt: (i) any encumbrances or charges created by any of the Orders made in these proceedings including the Initial Order; and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which, together with Liens and Claims in the CCAA Cases, are collectively referred to as the "Encumbrances", provided however that "Encumbrances" shall not include (i) Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order), (ii) the Standards Obligations (as defined below), (iii) Liens created by or through the Purchaser or any of its Affiliates, (iv) Assumed Liabilities, or as otherwise set forth Section 2.1.1(a) of the Sale Agreement and Section 5.21 of the Sale Agreement), and (v) as provided in the Nokia Agreement (as defined in the Supplemental Affidavit of George Riedel sworn July ●, 2011). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets. For purposes of this Order, the "Standards Obligations" shall mean, to the extent valid and enforceable under applicable non- bankruptcy law, any promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies concerning the licensing of any of the Transferred Patents, Purchased Specified UK Patents or Undisclosed Patent Interests (including those commitments contained in the membership agreements, by-laws or policies of standard-setting bodies), whether or not listed in Section 1.1(g) of the Sellers Disclosure Schedule.

7.    **THIS COURT ORDERS** that:

(a)    effective upon Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver,

- 6 -

trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), all Government Entities maintaining records or data bases in which the Encumbrances are recorded, filed or registered are authorized and directed to strike such Encumbrances as they affect the Purchased Assets from their records and data bases; and

(b)     if any Person or entity which has filed statements or other documents or agreements evidencing Encumbrances affecting the Purchased Assets shall not have delivered to the Applicants before the Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) in proper form for filing and executed by the appropriate parties, discharge statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances which the Person or entity has or may assert with respect to the Purchased Assets, then the Applicants are each hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such Person or entity with respect to the Purchased Assets.

8.     **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims and Encumbrances, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, and that from and after the delivery of the Monitor's Certificate (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the Closing (or in the case of Undisclosed Patent Interests immediately prior to the date of the receipt of the Exercise Price), as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control

144

- 7 -

immediately prior to the Closing (or in the case of Undisclosed Patent Interest(s) immediately prior to the receipt of the Exercise Price).

9.   **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

10.   **THIS COURT ORDERS AND DECLARES** that the Transaction Documents shall be binding on the Applicants that are parties thereto, and shall not be repudiated, disclaimed or otherwise compromised in these proceedings or any subsequent receivership, bankruptcy or liquidation proceedings.

11.   **THIS COURT ORDERS AND DECLARES** that, in the event that any Applicant or any of their Affiliates owns any Undisclosed Patent Interest, no Applicant shall directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to a Third Party, other than the Purchaser, including by operation of law, in any transaction, series of related transactions or otherwise, except as expressly permitted by Section 5.19 of the Sale Agreement, and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by Section 5.19 of the Sale Agreement shall be null and void *ab initio* and of no force or legal effect.

12.   **THIS COURT ORDERS** that the Sale Agreement and the Transaction Documents and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment or supplement is not materially adverse to the interests of the Applicants (it being understood, for the sake of clarity and solely for the purposes of this paragraph, that no such modification, amendment or supplement shall be deemed to be materially adverse to the Applicants to the extent that the impact does not exceed two percent of the Purchase Price); and provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Monitor.

145

13.     **THIS COURT ORDERS AND DECLARES** that the Applicants have complied with the License Rejection Procedure approved by this Court in the Canadian Sales Process Order dated May 2, 2011 (the "Sales Process Order").

**License Non-Assignment and Non-Renewal Protections**

14.     **THIS COURT ORDERS** that effective from and after Closing,

    (a)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any renewal, extension, assignment, amendment, waiver or modification of any license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, pursuant to any Cross-License Agreement or Outbound License Agreement (excluding (i) the Commercial Licenses, (ii) the transition services agreements (the "TSAs") and intellectual property license agreements (the "IPLAs") that the Applicants entered into with the purchasers of their various business units after the Petition Date in connection with their divestitures, (iii) any intercompany Contracts with the Sellers (the "Intercompany Licenses") and (iv) the Technology License Contract between Northern Telecom Limited and Guangdong-Nortel Telecommunications Switching Equipment Ltd., dated November 8, 1994, as amended (the "GDNT License")) (collectively, the "License Agreements", and any one, a "License Agreement") that requires the consent of any Applicant pursuant to the terms of such License Agreement and that would have the practical effect of expanding the scope or term of the licenses to the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder (regardless of whether such renewal, extension, assignment, amendment, waiver or modification is sought prior to or after the Applicants dissolve or otherwise cease to exist), in each case unless the Purchaser shall otherwise agree in writing, in its sole discretion;

    (b)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment,

- 9 -

146

modification or waiver to the GDNT License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of the GDNT License or any rights or obligations thereunder other than to Ericsson (as defined in the Sale Agreement) or another purchaser of all or substantially all of the assets or all of the outstanding shares of Guangdong Nortel Telecommunication Equipment Company Ltd., in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

(c)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification to the IPLAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of any IPLA by the license counterparty or any rights or obligations of the license counterparty under any IPLA, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

(d)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any amendment, modification, renewal or extension to the TSAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder beyond June 30, 2012 unless the Purchaser shall otherwise agree in writing, in its sole discretion,

(e)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any amendment or modification of any Commercial License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK

147

Patents or Jointly Owned Patents thereunder except (i) to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement or (ii) to the extent the Purchaser shall otherwise agree in writing, in its sole discretion,

(f)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification of any Intercompany License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement, and (ii) to any assignment of any Intercompany License by the license counterparty or any rights or obligations of the license counterparty under any Intercompany License, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

(g)     no Applicant shall have the right or power to transfer any of its obligations, right, title or interest in the licenses under the Transferred Patents, Specified UK Patents and Jointly Owned Patents under:

   (i)     any License Agreement,

   (ii)    the GDNT License,

   (iii)   any Intercompany License,

   (iv)    (other than in connection with the consolidation, wind-down, reorganization or restructuring of the Applicants and their affiliates, including to the Applicants under confirmed plan(s) of arrangement) any IPLA, or

   (v)     (other than the transfer by the Applicants of Retained Contracts or contracts relating to the disposal of Inventory, in each case to the extent a sublicense to the assignee of such contract is permitted by the Closing Date License Agreement) any Commercial License,

- 11 -

in each case, to any other person from and after the Closing, and any purported renewal, extension, assignment, amendment, waiver, transfer or modification of a License Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License that would contravene the provisions of subparagraphs 14(a) through (g) hereof shall be null and void *ab initio* and unenforceable and of no force or effect, and

(h)     the Purchaser is hereby irrevocably appointed (such appointment being coupled with an interest) as each Applicant's attorney-in-fact, with full authority in the place and stead of such Applicant and in the name of such Applicant, from time to time from and after the Closing in the Purchaser's sole discretion, subject to the provisions of paragraph 5.25 of the Sale Agreement, (x) to take any and all action and to execute and deliver any and all instruments that the Purchaser may deem necessary or advisable to accomplish the purposes of sub-paragraphs 14(a) through (g) of this Order and (y) regardless of whether or not any Applicant party to the applicable License Agreement is then in existence, to terminate the license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents in any License Agreement (including by delivering a notice of termination on behalf of an Applicant party thereto, regardless of whether such Applicant is then in existence) upon the occurrence of any specific date or event or the existence of any specific circumstance to the extent that the occurrence of such date or event or the existence of such circumstance gives any Applicant (regardless of whether such Applicant is then in existence) a right to terminate such License Agreement pursuant to the terms thereof (the provisions set forth in subparagraphs 14(a) through (h) hereof collectively, the "License Non-Assignment and Non-Renewal Protections").

- 12 -

149

For the avoidance of doubt, the License Non-Assignment and Non-Renewal Protections shall not limit in any way the applicable Applicants' obligations to comply with the provisions of Section 5.13(b) of the Sale Agreement.

15.    THIS COURT ORDERS that the License Non-Assignment and Non-Renewal Protections shall not constitute the assignment of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses to, or assumption of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses by, the Purchaser, other than as the Purchaser may otherwise agree in an assumption agreement between the Purchaser and NNL in satisfaction of the requirements of paragraph 7 of the CDMA Vesting Order.

## Proceeds

16.    **THIS COURT ORDERS** that all the proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA") pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

## Miscellaneous

17.    **THIS COURT ORDERS** that, notwithstanding:

        (a)    the pendency of these proceedings;

150

- 13 -

(b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications;

(c)    any assignment in bankruptcy made in respect of any of the Applicants, and

(d)    any further event or circumstances in these proceedings or any other insolvency proceedings to which Applicants or their assets or estates may be subject,

the provisions of the Transaction Documents and the vesting of the Applicants' right, title and interest in and to the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

18.    **THIS COURT ORDERS AND DECLARES** that neither the *Bulk Sales Act* (Ontario), Sections 6(1) and (2) of the *Retail Sales Tax Act* (Ontario) nor any equivalent or similar legislation under any province or territory in Canada applies to the Transaction.

19.    **THIS COURT ORDERS** that confidential Appendix "■"to the Seventy-First Report and Exhibits ■ through ■ of the Service Affidavit be and is hereby sealed and shall not form part of the public record pending further order of the Court.

20.    **THIS COURT ORDERS AND DECLARES** that, to the extent permitted by law, neither the Purchaser nor any permitted assignee of the Purchaser pursuant to the Sale Agreement shall be a successor to any of the Applicants and neither the Purchaser nor any permitted assignee of the Purchaser pursuant to the Sale Agreement shall assume any liability of the Applicants or in respect of the Encumbrances, other than as expressly provided for in the Sale Agreement nor shall any labour, employment or pension claims continue with respect to the Purchased Assets or be liabilities of the Purchaser.

151

- 14 -

21.    **THIS COURT ORDERS AND DECLARES** that effective upon Closing, counterparties to the Unknown Licenses (as defined in the Sales Process Order) that are deemed to be terminated pursuant to the Sales Process Order shall have no right or claims against the Purchaser or the Purchased Assets.

22.    **THIS COURT ORDERS** that neither the Purchaser nor the Sellers shall have an obligation to close the Transaction until all conditions precedent in the Sale Agreement to each of their obligations to close the Transaction has been met satisfied, or waived in accordance with the terms of the Sale Agreement.

23.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory, administrative or governmental body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory, administrative or governmental bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

24.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory, administrative or governmental body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

152:

Schedule A – Form of Monitor's Certificate

Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE**

**RECITALS**

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court
of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks
Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation,
Nortel Networks International Corporation and Nortel Networks Technology Corporation
(collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors
Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in
these proceedings.

B.      Pursuant to an Order of the Court dated ■ ■, 201■ (the "Approval and Vesting Order"),
the Court approved an asset sale transaction (the "Transaction") contemplated by an asset sale
agreement dated as of ■ ■, 2011 (the "Sale Agreement") among NNC, NNL, Nortel Networks
Inc., Nortel Networks UK Limited, Nortel Networks (Ireland) Limited, Nortel Networks S.A.,
the other entities identified therein as sellers (collectively, the "Sellers"), Alan Robert Bloom,
Stephen John Harris, Alan Michael Hudson, and Christopher John Wilkinson Hill as Joint
Administrators, and Maître Cosme Rogeau as French Liquidator, and ■, as purchaser ("■" or the
"Purchaser") and provided for the vesting in the Purchaser all of the Applicants' right, title and
interest in and to the Purchased Assets (as defined in the Approval and Vesting Order (but
excluding any Undisclosed Patent Interests for which the Purchaser pays the Exercise Price after
Closing (the "Closing Date Assets")) which vesting is to be effective with respect to the Closing
Date Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming receipt
of confirmation from each of NNC, NNL and the Purchaser that: (i) the Purchaser has paid the

153

Purchase Price for the Closing Date Assets as set out in the Sale Agreement; (ii) the conditions to Closing as set out in Article ▪ of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Applicants and the Purchaser.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.


THE MONITOR CERTIFIES the following:

1.      NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and [▪] has received the Purchase Price payable for the Closing Date Assets on the Closing Date pursuant to the terms of the Sale Agreement;

2.      NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in Article ▪ of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and

3.      NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

4.      The Purchaser has advised the Monitor that the Transaction has been completed to the satisfaction of the Purchaser.

This Certificate was delivered by the Monitor at ▪ {TIME} on ▪ 2011.

<div style="margin-left:40%">

**ERNST & YOUNG INC. in its capacity as monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**

Per:_____

Name:

Title:

</div>

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
**(Certain Patents and Other Assets)**

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

154

# TAB 7

~~Revised: May 11, 2010~~

155

Court File No.————: 09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

THE HONOURABLE MR.                )        ■ DAY, THE ■

                                  )

JUSTICE MORAWETZ                   )        DAY OF ■, 2011


~~THE HONOURABLE————~~        )        ~~————DAY, THE————DAY~~
                             )
~~JUSTICE————————~~          )        ~~OF————————,20——~~


~~B E T W E E N:~~

~~PLAINTIFF~~

~~Plaintiff~~

~~-and-~~

~~DEFENDANT~~

~~Defendant~~

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

12482773.2

~~DOCSTOR: 1201927\13~~

- 2 -

156

## APPROVAL AND VESTING ORDER
### (Certain Patents and Other Assets)

~~THIS MOTION, made by [RECEIVER'S NAME] in its capacity as the Court-appointed receiver (the "Receiver") of the undertaking, property and assets of [DEBTOR] (the "Debtor") for an order approving the sale transaction (the "Transaction") contemplated by an agreement of purchase and sale (the "Sale Agreement") between the Receiver and [NAME OF PURCHASER] (the "Purchaser") dated [DATE] and appended to the Report of the Receiver dated [DATE] (the "Report");~~ **THIS MOTION,** made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Notice of Motion dated July 5, 2011, including the approval of a transaction pursuant a bid submitted jointly by Apple Inc. and Rockstar Bidco LP ("Rockstar" or the "Purchaser") and an asset sale agreement dated as of June 30, 2011 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc., Nortel Networks UK Limited (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciaire), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration), the other entities identified therein as sellers (collectively, the "Sellers"), Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson, David Hughes and Christopher John Wilkinson Hill as Joint Administrators, and Maître Cosme Rogeau as French Liquidator and Rockstar, as purchaser for the sale of the Assets to the Purchaser and vesting in the Purchaser all of the ~~Debtor's~~Applicants' right, title and interest in and to the ~~assets described in~~Assets (including the granting of any licenses contemplated by the Sale Agreement, ~~(the "Purchased Assets"~~"Transaction"), was heard this day at 3~~93~~0 University Avenue, Toronto, Ontario.

~~ON READING the Report~~ **ON READING** the two affidavits of George Riedel sworn April 7, 2011 (the "First Affidavit" and the "Second Affiavit", respectively), the affidavit of George Riedel sworn July 5, 2011 (the "Third Riedel Affidavit") and the seventy-first report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated ■ ■, 2011 (the "Seventy-First Report") and on hearing the submissions of counsel for the ~~Receiver, [NAMES OF OTHER PARTIES APPEARING]~~Applicants, the Monitor and those other parties present, no one

157

appearing for any other person on the service list~~;~~ although properly served as appears from the affidavit of ~~[NAME]~~■ sworn ~~[DATE]~~■ ■, 2011 (the "Service Affidavit"), filed[1]:

**Service**

1. **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Third Riedel Affidavit, the Seventy-First Report and/or the Motion Record on the parties and interests identified or referred to in the Third Riedel Affidavit, filed, is full and proper service of such materials for purposes of this Order and the Transaction and that the time for service of such materials be and is hereby validated and abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof. Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all aspects with the Bidding Procedures Order.

**Interpretation**

2. **THIS COURT ORDERS AND DECLARES** that

(a) capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement; and

(b) "Initial Order" means *the Order of the Honourable Justice* Morawetz dated January 14, 2009, as amended and restated.

**The Transaction**

3. ~~1.~~ **THIS COURT ORDERS AND DECLARES** that the Transaction is ~~hereby approved,~~[2] ~~and~~commercially reasonable and in the best interests of the Debtor and its stakeholders and is hereby approved. Subject to approval of the Sale Agreement by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors, the execution, delivery and performance of the Sale Agreement and the

[1] ~~This model order assumes that the time for service does not need to be abridged. The motion seeking a vesting order should be served on all persons having an economic interest in the Purchased Assets, unless circumstances warrant a different approach. Counsel should consider attaching the affidavit of service to this Order.~~

[2] ~~In some cases, notably where this Order may be relied upon for proceedings in the United States, a finding that the Transaction is commercially reasonable and in the best interests of the Debtor and its stakeholders may be necessary. Evidence should be filed to support such a finding, which finding may then be included in the Court's endorsement.~~

other Transaction Documents by the ~~Receiver³~~Applicants is hereby authorized and approved, ~~with such minor amendments as the Receiver may deem necessary. The Receiver is~~and the Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the ~~Purchased Assets to the Purchaser~~Applicants' right, title and interest in and to the Assets to the Purchaser in accordance with the provisions of the Sale Agreement (including, the licenses under the Jointly Owned Patents, the Specified UK Patents, the Undisclosed Patent Interests and any other Patents granted by one or more of the Applicants to the Purchaser pursuant to the Sale Agreement and, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement, any Undisclosed Patent Interests sought to be transferred, granted and/or assigned by the Sellers to the Purchaser pursuant to the Sale Agreement, together with all the other Assets, collectively the "Purchased Assets").

4.    ~~2.~~THIS COURT ORDERS AND DECLARES that, _without limiting the generality of the foregoing_, Closing Date License Agreement substantially in the form attached as Confidential Appendix ■ to the Seventy-First Report is specifically approved and the Applicants party thereto are hereby authorized and directed to perform and comply with their respective obligations thereunder.

5.    THIS COURT ORDERS AND DECLARES that the Applicants are authorized and directed to enter into the Sale Agreement and to perform their respective obligations under the Sale Agreement and each of the Transaction Documents.

6.    THIS COURT ORDERS AND DECLARES that, upon the delivery of a ~~Receiver~~Monitor's certificate to the Purchaser substantially in the form attached as Schedule ~~A hereto (the "Receiver'~~"A" hereto (the "Monitor's Certificate~~"~~"), all of the ~~Debtor's~~Applicants' right, title and interest in and to the Purchased Assets ~~described in the Sale Agreement [and listed~~

³ ~~In some cases, the Debtor will be the vendor under the Sale Agreement, or otherwise actively involved in the Transaction. In those cases, care should be taken to ensure that this Order authorizes either or both of the Debtor and the Receiver to execute and deliver documents, and take other steps.~~

- 5 -                                                                        159

on Schedule B hereto]⁴(except any Undisclosed Patent Interests for which the Purchaser pays the Exercise Price after Closing, in which case the provisions of the balance of this paragraph shall be effective and enforceable upon receipt by the Sellers or a successor or assign or any receiver, trustee or liquidator appointed in respect of such Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement for the applicable Undisclosed Patent Interest) shall vest absolutely in the Purchaser as more particularly set out in the conveyance documents delivered by the Purchaser at Closing pursuant to the Sale Agreement and any ancillary agreements, free and clear of and from any and:

    (a)    any and all liens, claims and interests, including, without limitation, all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages or otherwise), equity security holders, hypothecs, mortgages, collateral assignments, pledges, deeds of trust, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions or otherwise), judgments, executions, options, rights, levies, charges, or other financial or monetary claims, charges, rights of first refusal, encumbrances, restrictive covenants, rights of offset or recoupment, leases or conditional sale arrangements, debts, liabilities, obligations, guarantees, contractual rights and commitments, claims and rights or causes of action, obligations, demands, restrictions, consent rights, options, indemnities, defects, offsets, recoupment and orders and decrees of any court or governmental entity; and

    (b)    claims and interests of any nature or kind of employees, consultants or agents or former employees, consultants or agents, of any of the Applicants arising out of the alleged invalidity, unenforceability or irregularity on any grounds of any of their assignments, transfers or waivers to or in favour of any of the Applicants, whether express or implied or by operation of contract, law or otherwise, of any or all of their right, title and interest in any of the Purchased Assets.

⁴ To allow this Order to be free-standing (and not require reference to the Court record and/or the Sale Agreement), it may be preferable that the Purchased Assets be specifically described in a Schedule.

.

160

in each case, whether or not they have attached or been perfected, registered or filed ~~and~~, whether secured, unsecured or otherwise ~~(collectively, the "Claims"~~[5], known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, allowed or disallowed, arising prior to or subsequent to the date of the Initial Order but prior to Closing, whether imposed by agreement, understanding, law, statute, equity or otherwise and whether allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether asserted prior to or after Closing, (collectively, the "Claims") including, ~~without limiting the generality of the foregoing~~for the avoidance of doubt: (i) any encumbrances or charges created by ~~the Order of the Honourable Justice~~ [NAME] dated [DATE];any of the Orders made in these proceedings including the Initial Order; and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system; ~~and (iii) those~~ (all of which, together with Liens and Claims ~~listed on Schedule C hereto~~ (all of which in the CCAA Cases, are collectively referred to as the ~~""~~Encumbrances", ~~which term shall not include the permitted encumbrances, easements and restrictive covenants listed on Schedule D) and, for",~~ provided however that "Encumbrances" shall not include (i) Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order), (ii) the Standards Obligations (as defined below), (iii) Liens created by or through the Purchaser or any of its Affiliates, (iv) Assumed Liabilities, or as otherwise set forth Section 2.1.1(a) of the Sale Agreement and Section 5.21 of the Sale Agreement), and (v) as provided in the Nokia Agreement (as defined in the Supplemental Affidavit of George Riedel sworn July ●, 2011). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets. For purposes of this Order, the "Standards Obligations" shall mean, to the extent valid and enforceable under applicable non- bankruptcy law, any promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies concerning the licensing of any of the Transferred Patents.

[5] ~~The "Claims" being vested out may, in some cases, include ownership claims, where ownership is disputed and the dispute is brought to the attention of the Court. Such ownership claims would, in that case, still continue as against the net proceeds from the sale of the claimed asset. Similarly, other rights, titles or interests could also be vested out, if the Court is advised what rights are being affected, and the appropriate persons are served. It is the Subcommittee's view that a non-specific vesting out of "rights, titles and interests" is vague and therefore undesirable.~~

- 7 -

Purchased Specified UK Patents or Undisclosed Patent Interests (including those commitments contained in the membership agreements, by-laws or policies of standard-setting bodies), whether or not listed in Section 1.1(g) of the Sellers Disclosure Schedule.

3.    ~~THIS COURT ORDERS that upon the registration in the Land Registry Office for the [Registry Division of {LOCATION} of a Transfer/Deed of Land in the form prescribed by the Land Registration Reform Act duly executed by the Receiver][Land Titles Division of {LOCATION} of an Application for Vesting Order in the form prescribed by the Land Titles Act and/or the Land Registration Reform Act][6], the Land Registrar is hereby directed to enter the Purchaser as the owner of the subject real property identified in Schedule B hereto (the "Real Property") in fee simple, and is hereby directed to delete and expunge from title to the Real Property all of the Claims listed in Schedule C hereto.~~

7.    **THIS COURT ORDERS** that:

    (a)    effective upon Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), all Government Entities maintaining records or data bases in which the Encumbrances are recorded, filed or registered are authorized and directed to strike such Encumbrances as they affect the Purchased Assets from their records and data bases; and

    (b)    if any Person or entity which has filed statements or other documents or agreements evidencing Encumbrances affecting the Purchased Assets shall not have delivered to the Applicants before the Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) in proper form for filing and executed by the appropriate parties, discharge statements, instruments of satisfaction, releases of liens and easements,

---

[6] ~~Elect the language appropriate to the land registry system (Registry vs. Land Titles).~~

162

- 8 -

> and any other documents necessary for the purpose of documenting the release of all Encumbrances which the Person or entity has or may assert with respect to the Purchased Assets, then the Applicants are each hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such Person or entity with respect to the Purchased Assets.

8. ~~4.   THIS   COURT   ORDERS~~**THIS  COURT  ORDERS** that for the purposes of determining the nature and priority of Claims and Encumbrances, the net proceeds[7] from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, and that from and after the delivery of the ~~Receiver's Certificate~~Monitor's Certificate (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the ~~sale~~[8] Closing (or in the case of Undisclosed Patent Interests immediately prior to the date of the receipt of the Exercise Price), as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the ~~sale~~Closing (or in the case of Undisclosed Patent Interest(s) immediately prior to the receipt of the Exercise Price).

9. ~~5.~~ **THIS COURT ORDERS AND DIRECTS** the ~~Receiver~~Monitor to file with the Court a copy of the ~~Receiver'~~Monitor's Certificate, forthwith after delivery thereof.

~~6.     THIS  COURT  ORDERS  that,  pursuant  to  clause  7(3)(c)  of  the  Canada  Personal Information Protection and Electronic Documents Act, the Receiver is authorized and permitted to  disclose  and  transfer  to  the  Purchaser  all  human  resources  and  payroll  information  in  the Company's  records  pertaining  to  the  Debtor's  past  and  current  employees,  including  personal~~

---

[7] ~~The Report should identify the disposition costs and any other costs which should be paid from the gross sale proceeds, to arrive at "net proceeds".~~
[8] ~~This provision crystallizes the date as of which the Claims will be determined.  If a sale occurs early in the insolvency process, or potentially secured claimants may not have had the time or the ability to register or perfect proper claims prior to the sale, this provision may not be appropriate, and should be amended to remove this crystallization concept.~~

- 9 -                                                                    1 6 3

information of those employees listed on Schedule "●" to the Sale Agreement. The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Debtor.

10.    **THIS COURT ORDERS AND DECLARES** that the Transaction Documents shall be binding on the Applicants that are parties thereto, and shall not be repudiated, disclaimed or otherwise compromised in these proceedings or any subsequent receivership, bankruptcy or liquidation proceedings.

11.    **THIS COURT ORDERS AND DECLARES** that, in the event that any Applicant or any of their Affiliates owns any Undisclosed Patent Interest, no Applicant shall directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to a Third Party, other than the Purchaser, including by operation of law, in any transaction, series of related transactions or otherwise, except as expressly permitted by Section 5.19 of the Sale Agreement, and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by Section 5.19 of the Sale Agreement shall be null and void *ab initio* and of no force or legal effect.

12.    **THIS COURT ORDERS** that the Sale Agreement and the Transaction Documents and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment or supplement is not materially adverse to the interests of the Applicants (it being understood, for the sake of clarity and solely for the purposes of this paragraph, that no such modification, amendment or supplement shall be deemed to be materially adverse to the Applicants to the extent that the impact does not exceed two percent of the Purchase Price); and provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Monitor.

¦ 6 4

13.    **THIS COURT ORDERS AND DECLARES** that the Applicants have complied with the License Rejection Procedure approved by this Court in the Canadian Sales Process Order dated May 2, 2011 (the "Sales Process Order").

**License Non-Assignment and Non-Renewal Protections**

14.    **THIS COURT ORDERS** that effective from and after Closing,

   (a)    the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any renewal, extension, assignment, amendment, waiver or modification of any license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, pursuant to any Cross-License Agreement or Outbound License Agreement (excluding (i) the Commercial Licenses, (ii) the transition services agreements (the "TSAs") and intellectual property license agreements (the "IPLAs") that the Applicants entered into with the purchasers of their various business units after the Petition Date in connection with their divestitures, (iii) any intercompany Contracts with the Sellers (the "Intercompany Licenses") and (iv) the Technology License Contract between Northern Telecom Limited and Guangdong-Nortel Telecommunications Switching Equipment Ltd., dated November 8, 1994, as amended (the "GDNT License")) (collectively, the "License Agreements", and any one, a "License Agreement") that requires the consent of any Applicant pursuant to the terms of such License Agreement and that would have the practical effect of expanding the scope or term of the licenses to the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder (regardless of whether such renewal, extension, assignment, amendment, waiver or modification is sought prior to or after the Applicants dissolve or otherwise cease to exist), in each case unless the Purchaser shall otherwise agree in writing, in its sole discretion;

   (b)    the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment,

-11-

165

modification or waiver to the GDNT License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of the GDNT License or any rights or obligations thereunder other than to Ericsson (as defined in the Sale Agreement) or another purchaser of all or substantially all of the assets or all of the outstanding shares of Guangdong Nortel Telecommunication Equipment Company Ltd., in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion.

(c)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification to the IPLAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of any IPLA by the license counterparty or any rights or obligations of the license counterparty under any IPLA, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion.

(d)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any amendment, modification, renewal or extension to the TSAs  that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder beyond June 30, 2012 unless the Purchaser shall otherwise agree in writing, in its sole discretion.

(e)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any amendment or modification of any Commercial License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK

166

Patents or Jointly Owned Patents thereunder except (i) to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement or (ii) to the extent the Purchaser shall otherwise agree in writing, in its sole discretion.

(f)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification of any Intercompany License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement, and (ii) to any assignment of any Intercompany License by the license counterparty or any rights or obligations of the license counterparty under any Intercompany License, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion.

(g)     no Applicant shall have the right or power to transfer any of its obligations, right, title or interest in the licenses under the Transferred Patents, Specified UK Patents and Jointly Owned Patents under:

(i)      any License Agreement,

(ii)     the GDNT License,

(iii)    any Intercompany License,

(iv)    (other than in connection with the consolidation, wind-down, reorganization or restructuring of the Applicants and their affiliates, including to the Applicants under confirmed plan(s) of arrangement) any IPLA, or

(v)     (other than the transfer by the Applicants of Retained Contracts or contracts relating to the disposal of Inventory, in each case to the extent a sublicense to the assignee of such contract is permitted by the Closing Date License Agreement) any Commercial License,

- ~~13~~ -                                                                167

in each case, to any other person from and after the Closing, and any purported renewal, extension, assignment, amendment, waiver, transfer or modification of a License Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License that would contravene the provisions of subparagraphs 14(a) through (g) hereof shall be null and void *ab initio* and unenforceable and of no force or effect, and

(h)    the Purchaser is hereby irrevocably appointed (such appointment being coupled with an interest) as each Applicant's attorney-in-fact, with full authority in the place and stead of such Applicant and in the name of such Applicant, from time to time from and after the Closing in the Purchaser's sole discretion, subject to the provisions of paragraph 5.25 of the Sale Agreement, (x) to take any and all action and to execute and deliver any and all instruments that the Purchaser may deem necessary or advisable to accomplish the purposes of sub-paragraphs 14(a) through (g) of this Order and (y) regardless of whether or not any Applicant party to the applicable License Agreement is then in existence, to terminate the license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents in any License Agreement (including by delivering a notice of termination on behalf of an Applicant party thereto, regardless of whether such Applicant is then in existence) upon the occurrence of any specific date or event or the existence of any specific circumstance to the extent that the occurrence of such date or event or the existence of such circumstance gives any Applicant (regardless of whether such Applicant is then in existence) a right to terminate such License Agreement pursuant to the terms thereof (the provisions set forth in subparagraphs 14(a) through (h) hereof collectively, the "License Non-Assignment and Non-Renewal Protections").

¹ 6 8

*For the avoidance of doubt, the License Non-Assignment and Non-Renewal Protections shall not limit in any way the applicable Applicants' obligations to comply with the provisions of Section 5.13(b) of the Sale Agreement.*

15.     THIS COURT ORDERS that the License Non-Assignment and Non-Renewal Protections shall not constitute the assignment of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses to, or assumption of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses by, the Purchaser, other than as the Purchaser may otherwise agree in an assumption agreement between the Purchaser and NNL in satisfaction of the requirements of paragraph 7 of the CDMA Vesting Order.

**Proceeds**

16.     **THIS COURT ORDERS** that all the proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA") pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

**Miscellaneous**

17.     7. **THIS COURT ORDERS** that, notwithstanding:

      (a)     the pendency of these proceedings;

- 15 -

1 6 9

(b) any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of ~~any of~~ the ~~Debtor~~Applicants and any bankruptcy order issued pursuant to any such applications; ~~and~~

(c) any assignment in bankruptcy made in respect of any of the ~~Debtor~~Applicants, and

(d) any further event or circumstances in these proceedings or any other insolvency proceedings to which Applicants or their assets or estates may be subject,

the provisions of the Transaction Documents and the vesting of the Applicants' right, title and interest in and to the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the ~~Debtor~~Applicants and shall not be void or voidable by creditors of the ~~Debtor~~Applicants, nor ~~shall it~~ constitute ~~nor~~or be deemed to be a ~~settlement, fraudulent~~ preference, ~~assignment,~~ fraudulent conveyance, transfer at undervalue, or other ~~reviewable~~challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

18. ~~8.~~ THIS COURT ORDERS AND DECLARES that ~~the Transaction is exempt from the application of~~neither the *Bulk Sales Act* (Ontario), Sections 6(1) and (2) of the *Retail Sales Tax Act* (Ontario) nor any equivalent or similar legislation under any province or territory in Canada applies to the Transaction.

19. THIS COURT ORDERS that confidential Appendix "■"to the Seventy-First Report and Exhibits ■ through ■ of the Service Affidavit be and is hereby sealed and shall not form part of the public record pending further order of the Court.

20. THIS COURT ORDERS AND DECLARES that, to the extent permitted by law, neither the Purchaser nor any permitted assignee of the Purchaser pursuant to the Sale Agreement shall be a successor to any of the Applicants and neither the Purchaser nor any permitted assignee

- -16 -

170

of the Purchaser pursuant to the Sale Agreement shall assume any liability of the Applicants or in respect of the Encumbrances, other than as expressly provided for in the Sale Agreement nor shall any labour, employment or pension claims continue with respect to the Purchased Assets or be liabilities of the Purchaser.

21.    **THIS COURT ORDERS AND DECLARES** that effective upon Closing, counterparties to the Unknown Licenses (as defined in the Sales Process Order) that are deemed to be terminated pursuant to the Sales Process Order shall have no right or claims against the Purchaser or the Purchased Assets.

22.    **THIS COURT ORDERS** that neither the Purchaser nor the Sellers shall have an obligation to close the Transaction until all conditions precedent in the Sale Agreement to each of their obligations to close the Transaction has been met satisfied, or waived in accordance with the terms of the Sale Agreement.

23.    9. **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or, administrative or governmental body having jurisdiction in Canada or in, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Receiver and its Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and, administrative or governmental bodies are hereby respectfully requested to make such orders and to provide such assistance to the Receiver Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Receiver and its Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

24.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory, administrative or governmental body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

171

-2-

72

Schedule A – Form of ~~Receiver~~Monitor's Certificate

Court File No.————; 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

~~COMMERCIAL LIST~~

~~B E T W E E N:~~

~~PLAINTIFF~~

~~Plaintiff~~

~~-and-~~

~~DEFENDANT~~

~~Defendant~~

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

~~RECEIVER~~**MONITOR'S CERTIFICATE**

**RECITALS**

A.    Pursuant to an Order of the Honourable ~~[NAME OF JUDGE]~~Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated ~~[DATE OF ORDER], [NAME OF RECEIVER] was appointed as the receiver (the "Receiver") of the undertaking, property and assets of [DEBTOR] (the "Debtor")~~January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation,

175

-2-

Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.      Pursuant to an Order of the Court dated [DATE]■ ■, 201■ (the "Approval and Vesting Order"), the Court approved the an asset sale transaction (the "Transaction") contemplated by an asset sale agreement of purchase and sale made dated as of [DATE OF AGREEMENT] (the "Sale Agreement") between the Receiver [Debtor] and [NAME OF PURCHASER] (the "Purchaser" ■ ■, 2011 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks (Ireland) Limited, Nortel Networks S.A., the other entities identified therein as sellers (collectively, the "Sellers"), Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson, and Christopher John Wilkinson Hill as Joint Administrators, and Maître Cosme Rogeau as French Liquidator, and ■, as purchaser ("■" or the "Purchaser") and provided for the vesting in the Purchaser all of the Debtor's Applicants' right, title and interest in and to the Purchased Assets. (as defined in the Approval and Vesting Order (but excluding any Undisclosed Patent Interests for which the Purchaser pays the Exercise Price after Closing (the "Closing Date Assets")) which vesting is to be effective with respect to the Purchased Closing Date Assets upon the delivery by the Receiver Monitor to the Purchaser of a certificate confirming receipt of confirmation from each of NNC, NNL and the Purchaser that: (i) the payment by the Purchaser of has paid the Purchase Price for the Purchased Closing Date Assets as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in section ■ Article ■ of the Sale Agreement have been satisfied or waived by the Receiver Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Receiver Applicants and the Purchaser.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE RECEIVER MONITOR CERTIFIES the following:

1.      The NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and the Receiver [■] has received the Purchase Price payable for the Purchased Closing Date Assets payable on the Closing Date pursuant to the terms of the Sale Agreement;

2.      The NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in section ■ Article ■ of the Sale Agreement have been satisfied or waived by the Receiver Sellers and/or the Purchaser, as applicable; and

3.      The NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Receiver Applicants.

4.      The Purchaser has advised the Monitor that the Transaction has been completed to the satisfaction of the Purchaser.

-2-                                        ⁺7 4

This Certificate was delivered by the ~~Receiver~~Monitor at ————[■ {TIME}} on ————
[DATE]■ 2011.

> ~~[NAME OF RECEIVER], in its capacity as~~
> ~~Receiver of the undertaking, property and~~
> ~~assets of [DEBTOR], and not in its personal~~
> ~~capacity~~
>
> ~~Per:~~ _____
> ~~Name:~~
> ~~Title:~~

~~Schedule B — Purchased Assets~~

> <u>ERNST & YOUNG INC. in its capacity as monitor
> in the CCAA proceedings of Nortel Networks
> Corporation, et. al. and not in its personal capacity</u>
>
> <u>Per:</u>
>
> <u>Name:</u>
>
> <u>Title:</u>

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

APPROVAL AND VESTING ORDER
(Certain Patents and Other Assets)

NORTON    ROSE    OR    LLP
Suite    3800
Royal    Bank    Plaza    South    Tower
200    Bay    Street
P.O.    Box    84
Toronto, Ontario M5J 2Z4

Derrick    Tay    LSUC#:    21152A
Tel:    (416)    216-4832
Email: derrick.tay@nortonrose.com

Jennifer    Stam    LSUC    #46735I
Tel:    (416)    216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

Schedule C – Claims to be deleted and expunged from title to Real Property

1248277.3
DOCSTOR: 1201937713

175

176

~~Schedule D – Permitted Encumbrances, Easements and Restrictive Covenants~~
~~related to the Real Property~~

~~(unaffected by the Vesting Order)~~

12482773.2
DOCSTOR: 1204492243

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**AMENDED AND RESTATED MOTION RECORD**
CANADIAN APROVAL AND VESTING ORDER REGARDING CERTAIN PATENTS AND OTHER ASSETS
**(returnable July 11, 2011)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2211094\1

1