## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                          :
                                          :      Chapter 11
*In re*                                   :
                                          :      Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]        :
                                          :      Jointly Administered
              Debtors.                    :
                                          :
                                          :      **RE: D.I. 5202**
                                          :
-------------------------------------------------------X

### ORDER AUTHORIZING AND APPROVING (A) THE SALE OF
### CERTAIN PATENT AND RELATED ASSETS FREE AND CLEAR
### OF ALL CLAIMS AND INTERESTS, (B) THE ASSUMPTION AND
### ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS,
### (C) THE REJECTION OF CERTAIN PATENT LICENSES AND
### (D) THE LICENSE NON-ASSIGNMENT AND NON-RENEWAL PROTECTIONS

Upon the motion, dated April 4, 2011 (the "Motion")[2] of Nortel Networks Inc. ("NNI")

and its affiliated debtors, as debtors and debtors in possession in the above-captioned Chapter 11

Cases (collectively, the "Debtors"), for entry of orders under sections 105, 107(b)(1), 363 and

365 of Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9014 and 9018 and Local Rules

6004-1 and 9018-1 (I)(A) authorizing Debtors' entry into the Stalking Horse Agreement,

(B) authorizing and approving the Bidding Procedures and the Bid Protections, (C) approving the

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, including the proposed bidding procedures attached thereto, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Sale Agreement (as defined herein).

Notice Procedures and the Assumption and Assignment Procedures, (D) approving the License Rejection Procedures, (E) approving a Side Agreement, (F) authorizing the filing of certain documents under seal, and (G) setting a date for the sale hearing, and (II) authorizing and approving (A) the sale of substantially all of the Debtors' patents and related assets free and clear of all claims and interests, (B) the assumption and assignment of certain executory contracts, (C) the rejection of certain patent licenses and (D) the License Non-Assignment and Non-Renewal Protections (as defined below); and the Court having entered an order approving, among other things, the Bidding Procedures [D.I. 5359] (the "Bidding Procedures Order") based upon the evidence presented at the bidding procedures hearing held on May 2, 2011 (the "Bidding Procedures Hearing"); and the auction held on June 27-30, 2011 (the "Auction") having been held in accordance with the Bidding Procedures Order; and at the conclusion of the Auction, the bid submitted jointly by Apple, Inc. ("Apple") and Rockstar Bidco, LP ("Rockstar" or the "Purchaser") was chosen as the Successful Bid in accordance with the Bidding Procedures; and the Court having conducted a hearing on the Motion on July 11, 2011 (the "Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the asset sale agreement attached hereto as Exhibit A (the "Sale Agreement"), by and among NNI, Nortel Networks Limited ("NNL"), Nortel Networks Corporation ("NNC"), Nortel Networks UK Limited (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciaire), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) and certain other entities identified therein as sellers (collectively, the "Sellers"), the Joint Administrators, the French Liquidator, and the Purchaser and the transactions contemplated thereby (the

"Transactions"), including[3] the granting by the Sellers of any licenses contemplated thereunder; and the Court having reviewed and considered the Motion, and the arguments of counsel made, and the evidence adduced, at the Bidding Procedures Hearing and the Sale Hearing; and upon the record of the Bidding Procedures Hearing and the Sale Hearing and these Chapter 11 Cases, and after due deliberation thereon, and good cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:[4]**

A.      This Court has jurisdiction over the Motion and the Transactions pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

B.      Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.      The statutory predicates for the relief sought in the Motion are sections 105, 107(b)(1), 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 6004-1 and 9018-1.

D.      Notice of the Motion and the Sale Hearing has been provided (a) to (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the nine (9) months preceding the filing of the Motion, (ii) all entities reasonably known to have asserted any claim, lien, encumbrance or interest in the Purchased Assets, (iii) the counterparties to the Cross-License Agreements and Outbound License Agreements, (iv) the attorneys general for all states in which Purchased Assets owned by the Debtors are located, all federal and state taxing authorities, the Securities and Exchange Commission, the Internal Revenue Service, and

---

[3]    For the avoidance of doubt, as used in this Order, the word "including" means "including without limitation".

[4]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

the Department of Labor and similar state labor or employment agencies, (v) all parties entitled

to notice pursuant to Local Rule 2002-1(b), (vi) all known creditors of the Debtors, (vii) counsel

to the Committee, (viii) counsel to the Bondholder Group and (ix) the additional persons agreed

between the Debtors and the Stalking Horse Purchaser to be served in accordance with the terms

of the Stalking Horse Agreement; and (b) through publication of the Publication Notice, all in

accordance with and as provided by the Bidding Procedures Order.

E.      As evidenced by affidavits of publication filed with the Court [D.I. 5465, 5466,

5467, and 5468], notice of the Sale Hearing was published in The Wall Street Journal (National

Edition), The Globe and Mail (National Edition), The New York Times (National Edition) and

The Financial Times (International Edition) on May 23, 2011.

F.      Based upon the affidavits of service and publication filed with the Court [D.I.

5799, 5408, 5413, 5465, 5466, 5467, 5736, 5468 and 5907]: (a) notice of the Motion, the Sale

Hearing, the Auction, and the sale of the Purchased Assets (the "Sale") was adequate and

sufficient under the circumstances of these Chapter 11 Cases and these proceedings and

complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy

Rules and the Bidding Procedures Order, and (b) a reasonable opportunity to object and be heard

with respect to the Motion and the relief requested therein was afforded to all interested persons

and entities.

G.      Based upon the affidavits of service and publication filed with the Court [D.I.

5408, 5413, 5465, 5466, 5467, 5468 and 5907]: (a) notice to the counterparties of the Cross-

License Agreements and Outbound License Agreements of the License Non-Assignment and

Non-Renewal Protections was adequate and sufficient under the circumstances of these Chapter

11 Cases and these proceedings and complied with the various applicable requirements of the

Bankruptcy Code, the Bankruptcy Rules, and the Bidding Procedures Order, and (b) a reasonable opportunity to object and be heard with respect to the License Non-Assignment and Non-Renewal Protections was afforded to all counterparties to the Cross-License Agreements and Outbound License Agreements.

H.      The Debtors have complied with the License Rejection Procedures approved by this Court in the Bidding Procedures Order.  Based upon the affidavits of service and publication filed with the Court [D.I. 5799, 5408, 5413, 5465, 5466, 5467, 5468 and 5907]: (a) notice to the counterparties to the Unknown Licenses was adequate and sufficient under the circumstances of these Chapter 11 Cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Bidding Procedures Order, (b) a reasonable opportunity to object and be heard with respect to the rejection of any Unknown License and the License Rejection Procedures was afforded to all counterparties to the Unknown Licenses and (c) a reasonable opportunity to make an election under section 365(n)(1) of the Bankruptcy Code was afforded to any counterparties to the Unknown Licenses.  The following parties filed timely elections under section 365(n)(1), pursuant to the License Rejection Procedures, with respect to purported Unknown Licenses:  AT&T Services, Inc. [D.I. 5584], Broadcom Corporation [D.I. 5587], Hewlett-Packard Company [D.I. 5600], EADS Secure Networks S.A.S. [D.I. 5607], Nokia Corporation [D.I. 5610], International Business Machine Corporation [D.I. 5612], Verizon Communications Inc. [D.I. 5613], Hitachi, Ltd. [D.I. 5614], Motorola Solutions, Inc.[D.I. 5616], Qwest Corporation, Qwest Communications Company, LLC, and Embarq Management Company [D.I. 5618], and Thomas & Betts Manufacturing, Inc. [D.I. 5619].  No other parties timely filed such elections.

I.      No further or other notice beyond that described in the foregoing Paragraphs E, F, G and H is required in connection with the Transactions.

J.      The Assets (as defined in the Sale Agreement), the licenses under the Jointly Owned Patents, Specified UK Patents, Undisclosed Patent Interests and any other Patents granted by the Sellers to the Purchaser pursuant to the Sale Agreement, and, effective upon receipt by the Sellers of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement, any Undisclosed Patent Interest, sought to be transferred, granted and/or assigned by the Debtors to the Purchaser pursuant to the Sale Agreement (the "Purchased Assets") are property of the Debtors' estates and good and valid title thereto is vested in the Debtors' estates. Together with the other Sellers, the Debtors own all right, title and interest to the Purchased Assets.

K.      As demonstrated by (a) the testimony and other evidence proffered or adduced at the Sale Hearing and (b) the representations of counsel made on the record at the Sale Hearing, the Debtors and their professionals marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

L.      On or about April 4, 2011, the Sellers, the Joint Administrators, the French Liquidator and Ranger Inc. (the "Stalking Horse Purchaser") and Google Inc. entered into the Stalking Horse Agreement, subject to higher and better offers.

M.      The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders. The Debtors undertook substantial marketing efforts, and conducted the sale process (including the Auction) without collusion and in accordance with the Bidding

Procedures.  The Debtors (a) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Purchased Assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets and (c) considered any bids submitted on or before the Bid Deadline.

N.      The Purchaser submitted a bid in accordance with the Bidding Procedures Order. Prior to the Auction, the Debtors, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor, and the Joint Administrators, analyzed Apple's bid and Rockstar's bid and determined that each was a Qualified Bid and that each of Apple and Rockstar was a Qualified Bidder eligible to participate in the Auction.  During the Auction, with the consent of the Debtors, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor, and the Joint Administrators, Apple partnered with the original Rockstar Bidco, LP consortium and adopted the transaction structure of the original Rockstar Bidco, LP consortium (including using the Purchaser as the purchaser of the Purchased Assets).  At the conclusion of the Auction, in accordance with the Bidding Procedures Order, the Debtors determined, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor, and the Joint Administrators, in a valid and sound exercise of their business judgment, that the highest and best Qualified Bid was the joint bid submitted by Apple and the original Rockstar Bidco, L.P. consortium and that the Purchaser was the Successful Bidder.

O.      Subject to the entry of this Order, each Debtor that is a Seller (a) has full power and authority to execute the Sale Agreement and all other documents contemplated thereby, (b) has all of the power and authority necessary to consummate the Transactions contemplated by the Sale Agreement and (c) has taken all company action necessary to authorize and approve

the Sale Agreement and all other documents contemplated thereby, the Sale and the consummation by the Debtors of the Transactions. No consents or approvals, other than those expressly provided for in the Sale Agreement or this Order, are required for the Debtors to close the Sale and consummate the Transactions.

P.    The Sale Agreement and the Transactions were negotiated and have been and are undertaken by the Debtors and the Purchaser at arm's length without collusion or fraud, and in good faith, within the meaning of section 363(m) of Bankruptcy Code. The Purchaser is purchasing the Purchased Assets in good faith and the Purchaser has otherwise proceeded in good faith in connection with these proceedings in that *inter alia*: (a) the Debtors were free to deal with any other party in connection with the sale of the Purchased Assets; (b) the Purchaser complied with the provisions in the Bidding Procedures Order; (c) the selection of the Purchaser as the Successful Bidder was the result of the competitive bidding process set forth in the Bidding Procedures Order; (d) no common identity of directors or controlling stockholders exists between the Purchaser and any of the Debtors; (e) the Purchaser in no way induced or caused the chapter 11 filings by the Debtors; and (f) all payments to be made by the Purchaser in connection with the Sale have been disclosed. As a result of the foregoing, the Debtors and the Purchaser are entitled to and shall have the protections of section 363(m) of the Bankruptcy Code.

Q.    The total consideration provided by or on behalf of the Purchaser for the Assets and any related licenses is fair and reasonable and is the highest and best offer received by the Sellers, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession

thereof, or the District of Columbia, for the Assets. The sale of the Assets to the Purchaser may not be avoided under section 363(n) of the Bankruptcy Code or any other section of the Bankruptcy Code or applicable non-bankruptcy law. No person or entity or group of persons or entities has offered to purchase the Assets pursuant to the Bidding Procedures established by this Court in a transaction that would provide greater value to the Sellers than the Transactions. The Court's approval of the Motion, the Sale Agreement, and all other documents contemplated thereby is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

R.      The transfer of the Debtors' right, title and interest in the Purchased Assets to the Purchaser will be a legal, valid, enforceable and effective transfer of the Purchased Assets, and, except for the Assumed Liabilities, Permitted Encumbrances, the Standards Obligations (as defined below), as provided for in the Nokia Agreement (as defined below) and as provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement, will vest the Purchaser with all of the Debtors' right, title and interest of, in and to the Purchased Assets, free and clear of (i) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), obligations, demands, restrictions, indemnities, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, common law, statutory law, equity or otherwise (collectively, the "Claims"), (ii) all Interests (as defined herein) of any kind or nature whatsoever and (iii) all Excluded Liabilities (as defined in the Sale Agreement).

S.      The Purchaser would not have entered into the Sale Agreement and would not consummate the Transactions, thus adversely affecting the Debtors, their estates and their

creditors, if the sale of the Purchased Assets to the Purchaser and the assumption of the Assumed Liabilities set forth in the Sale Agreement by the Purchaser were not free and clear of all liens, claims and interests pursuant to section 363(f) of the Bankruptcy Code, or if the Purchaser would, or in the future could, be liable for any of such liens, claims and interests. A sale of the Purchased Assets other than one free and clear of all liens, claims and interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale. Therefore, the Sale contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

T.    The Debtors may sell the Purchased Assets free and clear of all Claims and Interests, because, with respect to each creditor asserting a Claim or Interest, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims or Interests that did object and the Claims and Interests held by such holders, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

U.    A sale of the Purchased Assets that does not include the License Non-Assignment and Non-Renewal Protections would yield less value for the Debtors' estates, with less certainty, than the Sale. Therefore, the Sale contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest. The Purchaser would not have entered into the Sale Agreement, and the Purchaser would not consummate the Transactions, without the License Non-Assignment and Non-Renewal Protections.

V.    Neither the Debtors nor the Purchaser, or any of their respective affiliates and representatives engaged in any conduct, or failed to take any action, that would cause or permit the Sale Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, or any other amounts to be recovered against any of them jointly or severally, under section 363(n) of the Bankruptcy Code.

W.    The Sale Agreement and the agreements contemplated thereby were not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser has entered into the Sale Agreement or any agreement contemplated thereby or is consummating the Sale with any fraudulent or otherwise improper purpose.

X.    The Purchaser is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and any of the Debtors. Pursuant to the Sale Agreement, the Purchaser is not purchasing all of the Debtors' assets. The conveyance of the Purchased Assets pursuant to the Transactions does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates. Upon the Closing, the Purchaser shall be deemed to have assumed only those liabilities that it agreed to assume in the

11

Sale Agreement. Except for such liabilities assumed by the Purchaser under the Sale Agreement, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing, to the extent permitted by applicable law. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets. The Court finds that the Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

Y.      The Debtors have demonstrated that it is a good and sufficient exercise of their sound business judgment to seek the License Non-Assignment and Non-Renewal Protections and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.

Z.      The Debtors have demonstrated that it is a good and sufficient exercise of their sound business judgment to have the right to assume and assign the Assumed and Assigned Contracts to the Purchaser in connection with the consummation of the Sale and therefore is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The right to assign the Assumed and Assigned Contracts to the Purchaser is an integral part of the Purchased Assets being purchased by the Purchaser, and accordingly is reasonable and enhances the value of the Debtors' estates. The Cure Costs required to be paid pursuant to section 365(b) of the Bankruptcy Code to the counterparty to the applicable Assumed and Assigned Contract, or as ordered to be paid by this Court pursuant to a final order, are deemed to be the entire cure obligations due and owing under the Assumed and Assigned Contracts under section 365 of the Bankruptcy Code and no further amounts will be required to be paid.

AA.    The Debtors have not designated any contracts as Assumed and Assigned Contracts on or prior to the date of this Order.

BB.    Each and every provision of the Assumed and Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned Contract has been satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.

CC.    The Purchaser has demonstrated adequate assurance of future performance of all Assumed and Assigned Contracts within the meaning of section 365 of Bankruptcy Code.

DD.    Upon the assignment and Sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in the Assumed and Assigned Contracts or other restrictions prohibiting assignment or transfer.

EE.    Entry into the Sale Agreement, the agreements contemplated thereby and consummation of the Transactions constitute a good and sufficient exercise by the Debtors of their sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.  The Court finds that the Debtors have articulated both (a) good, sufficient, and sound business purposes and justifications and (b) compelling circumstances for the Sale of the Purchased Assets to the Purchaser pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization.  Additionally, (a) the Sale Agreement constitutes the highest and best offer for the Purchased Assets; (b) the Sale Agreement and the Closing will present the best opportunity to realize the value of the Purchased Assets and avoid further decline and devaluation of the Purchased Assets; (c) there is risk of

deterioration of the value of the Purchased Assets if the Sale is not consummated promptly; and (d) the Sale Agreement and the Closing will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative.

FF.    The sale and assignment of the Purchased Assets outside of a plan of reorganization pursuant to the Sale Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan for the Debtors. The Sale does not constitute a *sub rosa* chapter 11 plan.

GG.    The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code. Accordingly, appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

HH.    Time is of the essence in consummating the Sale.  In order to maximize the value of the Debtors' assets, it is essential that the Sale occur within the time constraints set forth in the Sale Agreement.  Accordingly, there is a cause to lift the stay contemplated by the Bankruptcy Rules 6004(h) and 6006(d).

II.    There is no legal or equitable reason to delay the Transactions.

JJ.    The Schedules to the Sale Agreement contain substantial sensitive commercial information, which would be damaging to the Debtors and the Purchaser if such information were to be disclosed to their competitors.  Filing the Schedules to the Sale Agreement under seal or refraining from filing the Schedules to the extent they are substantially similar to the Stalking Horse Agreement schedules filed under seal is in the best interests of the Debtors, their estates, creditors and other parties-in-interest; and it is therefore:

**ORDERED ADJUDGED AND DECREED THAT:**

1.      The relief requested in the Motion is **GRANTED**.

2.      All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing, and all reservations of rights included therein, are hereby overruled on the merits, with prejudice.   Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with the Bidding Procedures Order, section 102(1) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 9014.

3.      Pursuant to sections 105, 363 and 365 of Bankruptcy Code, and subject to the approval of the Sale by the Ontario Superior Court of Justice in the Canadian Proceedings with respect to the Canadian Debtors, the Sale Agreement, the agreements contemplated thereby, the Sale of the Purchased Assets, and consummation of the Transactions are hereby approved and the Debtors are authorized to enter into the Sale Agreement and to comply with the Sale Agreement and the ancillary agreements contemplated thereby.

4.      Pursuant to section 365 of the Bankruptcy Code, notwithstanding any provision of any Assumed and Assigned Contracts or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors are authorized to assume and to assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing, or as otherwise provided by order of this Court.  The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assumed and Assigned Contracts.  Notwithstanding the foregoing, unless required by the Purchaser under the Sale Agreement, no Debtor shall be required by the Court to assume and assign any Assumed and Assigned Contracts, and, if no such assumption and

assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required.

5.      [Reserved]

6.      The Debtors' assumption of the Assumed and Assigned Contracts is subject to the consummation of the Sale of the Purchased Assets to the Purchaser. To the extent that an objection by a counterparty to any Assumed and Assigned Contract, including an objection related to the applicable Cure Cost, is not resolved prior to the Closing Date, the Debtors, in consultation with the Purchaser, may, without any further approval of the Court or notice to any party, elect to (a) not assume such Assumed and Assigned Contract, or (b) postpone the assumption of such Assumed and Assigned Contract until the resolution of such objection. Any Cure Costs outstanding on the Closing Date shall be paid to the appropriate counterparty as a condition subsequent to such assumption and/or assumption and assignment of the relevant Assumed and Assigned Contract.

7.      Effective as of the Closing, the Unknown Licenses are rejected. Counterparties to the rejected Unknown Licenses have no rights against the Purchaser or the Purchased Assets with respect to such Unknown Licenses except to the extent that both (a) such counterparty made a timely election on or before June 6, 2011 under section 365(n)(1)(B) in accordance with the License Rejection Procedures approved by this Court in the Bidding Procedures Order and (b) neither the Debtors, the Purchaser, nor any other party in interest has objected to such election or the Court has determined by Final Order that the election was proper. To the extent that a counterparty to an Unknown License retains rights under a contract with a Debtor upon the satisfaction of (a) and (b) of this paragraph, such rights shall not be greater than the rights retained under section 365(n) of the Bankruptcy Code. Any counterparty to a rejected Unknown

16

License that has not made an election on or before June 6, 2011 shall have the right to file a rejection damages claim against the applicable Sellers, subject to all applicable deadlines and the allowance of such claim under applicable law, and no other rights, remedies or claims, including no rights, remedies, or claims against the Purchaser or the Purchased Assets. For the avoidance of doubt, the licenses granted under the Subject Agreements (as defined in section 2 of the Commercial License Acknowledgement attached hereto as Exhibit B) shall constitute Commercial Licenses under the Sale Agreement.

8.      Upon the Closing (and in the case of any Undisclosed Patent Interests, subject to receipt by the Sellers of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), (a) the Debtors are hereby authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Debtors' right, title and interest in the Purchased Assets to the Purchaser free and clear of any and all Claims and interests pursuant to sections 363 and 365 of the Bankruptcy Code including all liens, including any and all liens (statutory or otherwise), Lien (as defined in the Sale Agreement), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, collateral assignment, easement, encroachment, right-of-way, restrictive covenant, rights of offset or recoupment, lease or conditional sale arrangement (collectively, the "Liens") and debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding,

law, equity or otherwise (collectively, the "Liabilities" and together with the Liens, the "Interests") other than (i) the Assumed Liabilities, (ii) the Permitted Encumbrances, (iii) to the extent valid and enforceable under applicable non-bankruptcy law, any promises, declarations and commitments granted, made or committed in writing by the Sellers (or made on the Sellers' behalf by any of their Affiliates and legally binding upon the Sellers) in writing to standard-setting bodies and industry groups (including any written commitments, declarations and promises that were made by or on behalf of the Sellers to the members or participants thereof, but solely in connection with the standard-setting activities of such bodies or groups and solely to the extent legally valid and enforceable under applicable non-bankruptcy law) concerning the licensing of or the grant of rights with respect to the use of any of the Transferred Patents, Purchased Specified UK Patents, Undisclosed Patent Interests or Jointly Owned Patents acquired pursuant to the Sale Agreement (including those legally valid and enforceable commitments contained in the membership agreements, by-laws or policies of the standard-setting bodies and industry groups), whether or not listed in Section 1.1(g) of the Sellers Disclosure Schedule (the "Standards Obligations"), (iv) as provided for in that certain letter agreement dated as of the date hereof between the Sellers and the Purchaser with respect to Nokia Corporation (the "Nokia Agreement") and (v) as provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement, with such Interests to attach to the sale proceeds in the same validity, extent and priority as existed with respect to the Purchased Assets immediately prior to the Transactions, subject to any rights, claims and defenses of the Debtors and other parties in interest, and (b) except for (i) the Assumed Liabilities, (ii) the Permitted Encumbrances, (iii) the Standards Obligations, (iv) as provided for in the Nokia Agreement and (v) as provided in Sections 2.1.1(a) and 5.21 of the

Sale Agreement, all such Interests shall be and hereby are released, terminated and discharged as to the Purchaser and the Purchased Assets.

9.     Except with respect to enforcing the terms of the Sale Agreement, the Bidding Procedures Order or this Order, no person shall take any action to prevent, enjoin or otherwise interfere with the consummation of the Sale of the Purchased Assets and the Transactions, including the transfer to the Purchaser of the Debtors' title to and the right to use and enjoy the Purchased Assets.

10.     The transfer of the Debtors' right, title and interest in the Purchased Assets to the Purchaser pursuant to the Sale Agreement shall be, and hereby is deemed to be, a legal, valid, enforceable and effective transfer of the Debtors' right, title and interest in the Purchased Assets, and vests with or will vest in the Purchaser all right, title and interest of the Debtors in the Purchased Assets, free and clear of all Claims and Interests of any kind or nature whatsoever (other than the Permitted Encumbrances, the Standards Obligations and the Assumed Liabilities, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement), with any Interests attaching to the sale proceeds in the same validity, extent and priority as existed with respect to the Purchased Assets immediately prior to the Transactions, subject to any rights, claims and defenses of the Debtors and other parties in interest.

11.     Upon the Closing, and except for the Assumed Liabilities, the Permitted Encumbrances, the Standards Obligations, as otherwise provided in the Sections 2.1.1(a), 5.8(c) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement, the Purchaser shall not be liable for any Claims against, Interests against or in or obligations of, the Debtors or any of the Debtors' predecessors or Affiliates, as a result of having purchased the Purchased Assets or

otherwise as a result of the Transactions. Without limiting the generality of the foregoing, (a) the Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits (including contributions or payments on account of any under-funding with respect to any pension plans) or make any other payment to employees of the Debtors, (b) the Purchaser shall have no liability or obligation in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit), (c) the Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and (d) all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against the Purchaser any Claims or Interests arising from or relating to such employee benefit, agreement, plan or program.

12.    As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

13.    Upon Closing, (a) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured and satisfied in full through the payment of the Cure Costs; (b) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed and Assigned Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser or the Purchased Assets that any additional amounts are

due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing. The Purchaser's promise pursuant to the terms of the Sale Agreement to pay the Cure Costs and to perform the obligations under the Assumed and Assigned Contracts after the Closing shall constitute adequate assurance of its future performance under the Assumed and Assigned Contracts being assigned to it within the meanings of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

14.     Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in the contracts or other restrictions prohibiting assignment or transfer. To the extent any executory contract or unexpired lease is assumed and assigned to the Purchaser under the Order, no executory contract or unexpired lease will be assumed and assigned pursuant to this Order until the Closing. Furthermore, other than Assumed and Assigned Contracts, no other Contract shall be deemed assumed by and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assumed and Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assumed and Assigned Contracts.

15.     The Transactions have been undertaken by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Purchased Assets as that term is used in section 363(m) of Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to

the Purchaser. The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

16.    Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and the Purchaser are each hereby authorized to take any and all actions, including the payment of any fee or cost, necessary or appropriate to: (a) consummate the Sale of the Purchased Assets to the Purchaser, the Transactions, including the granting of any licenses contemplated by the Sale Agreement, and the Closing in accordance with the Motion, the Sale Agreement and this Order; (b) assume and assign the Assumed and Assigned Contracts; and (c) perform, consummate, implement and close fully the Sale Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement. The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the agreements contemplated thereby prior to or after Closing without further order of the Court.

17.    For the avoidance of doubt, the Transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

18.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale and the Transactions.

19.    The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code. Accordingly, appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

20.    The consideration provided by or on behalf of the Purchaser for the Purchased Assets under the Sale Agreement, including in respect of the granting of any related licenses, shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, and costs, damages, or other amounts may not be imposed, recovered or awarded, under section 363(n) of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

21.    From and after the Closing Date (and in the case of any Undisclosed Patent Interests, subject to receipt by the Sellers of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Purchased Assets and a bill of sale transferring good, valid and marketable title in such Purchased Assets to the Purchaser on the Closing Date pursuant to the terms of the Sale Agreement and any ancillary agreements, free and clear of all Claims and Interests (other than the Assumed Liabilities, the Standards Obligations, Permitted Encumbrances, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement).  From and after the Closing Date, the licenses under the Jointly Owned Patents, Specified UK Patents, Undisclosed Patent Interests and any other Patents granted by the Debtors to the Purchaser or the other licenses granted by the Debtors, in either case, pursuant to the Sale Agreement and any related ancillary agreements shall be legal, valid and binding and enforceable in accordance with their terms.  The Purchaser is hereby authorized in connection with the consummation of the Sale and the other Transactions or otherwise to

allocate the Purchased Assets or any licenses granted pursuant to the Sale Agreement or any related ancillary agreements among its affiliates, designees, assignees and/or successors as contemplated by the Sale Agreement or in such other manner as it in its sole discretion deems appropriate.

22.     Any and all Purchased Assets in the possession or control of any person or entity, including any vendor, supplier or employee of the Debtors shall be transferred to the Purchaser free and clear of all Claims and Interests (other than the Assumed Liabilities, Permitted Encumbrances and the Standards Obligations, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement) and shall be delivered and deemed delivered at the time of Closing (or such other time as provided in the Sale Agreement) to the Purchaser.

23.     Upon the Closing, all holders of Claims and Interests against the Debtors or the Purchased Assets are permanently and forever barred, restrained and enjoined from asserting any Claims or Interests or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Purchaser or the Purchased Assets on account of any of the Claims, Interests, Excluded Liabilities or Excluded Assets (other than the Assumed Liabilities, Permitted Encumbrances and the Standards Obligations, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement).

24.     There is no legal or equitable reason to delay the Transactions.

25.     The Transactions do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise, business or operations between the Debtors and the Purchaser, the Purchaser is not a mere continuation of

the Debtors or the Debtors' estates or their respective or collective businesses or operations, and the Purchaser does not constitute a successor to the Debtor or the Debtors' estates for any purposes including for purposes of any liabilities, debts or obligations of or required to be paid by the Debtors for any tax, pension, labor, employment, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. Except for the Assumed Liabilities, Permitted Encumbrances and the Standards Obligations, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims or theories of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of Closing to the extent permitted by applicable law. The Purchaser's business and operations shall not be deemed a continuation of the Debtors' business or operations as a result of the acquisition of the Purchased Assets or the Transactions.

26.    This Order (a) is and shall be effective as a determination that, other than the Permitted Encumbrances, the Standards Obligations, the Assumed Liabilities, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement, all Claims and Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) is and shall be binding upon and shall authorize all persons, institutions, agencies, and entities, including, all filing agents and agencies, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units (including the U.S. Patent

and Trademark Office and similar patent agencies of any jurisdiction), governments and governmental departments or units, secretaries of state, federal, state and local officials and all other persons institutions, agencies, and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Purchaser.  All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Interests against the Purchased Assets from their records, official and otherwise.

27.    If any person or entity which has filed statements or other documents or agreements evidencing Interests in the Purchased Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Purchaser are each acting singly hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets without further order of the Court.

28.    In furtherance of the sale of the Purchased Assets to the Purchaser, effective from and after the Closing,

a.    the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) to any renewal, extension, assignment, amendment, waiver or modification of any license under the Transferred Patents,

Specified UK Patents or Jointly Owned Patents pursuant to any Cross-License Agreement or Outbound License Agreement (excluding (i) the Commercial Licenses, (ii) the transition services agreements (the "TSAs") and intellectual property license agreements (the "IPLAs") that the Debtors entered into with the purchasers of their various business units after the Petition Date in connection with their divestitures, (iii) any intercompany Contracts with the Sellers (the "Intercompany Licenses") and (iv) the Technology License Contract between Northern Telecom Limited and Guangdong-Nortel Telecommunications Switching Equipment Ltd., dated November 8, 1994, as amended (the "GDNT License")) (collectively, the "License Agreements", and any one, a "License Agreement") that requires the consent of any Debtor pursuant to the terms of such License Agreement and that would have the practical effect of expanding the scope or term of the licenses to the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder (regardless of whether such renewal, extension, assignment, amendment, waiver or modification is sought prior to or after the Debtors dissolve or otherwise cease to exist), in each case unless the Purchaser shall otherwise agree in writing, in its sole discretion,

b.     the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) (i) to any amendment, modification or waiver to the GDNT License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of the GDNT

License or any rights or obligations thereunder other than to Ericsson (as defined in the Sale Agreement) or another purchaser of all or substantially all of the assets of or all of the outstanding shares of Guangdong Nortel Telecommunication Equipment Company Ltd., in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

c.    the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) (i) to any amendment. or modification to the IPLAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of any IPLA by the license counterparty or any rights or obligations of the license counterparty under any IPLA, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

d.    the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) to any amendment, modification, renewal or extension to the TSAs  that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder beyond June 30, 2012 unless the Purchaser shall otherwise agree in writing, in its sole discretion,

e.    the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a

result of inaction by such Debtor) to any amendment or modification of any Commercial License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except (i) to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement or (ii) to the extent the Purchaser shall otherwise agree in writing, in its sole discretion,

f.      the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) (i) to any amendment or modification of any Intercompany License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement, and (ii) to any assignment of any Intercompany License by the license counterparty or any rights or obligations of the license counterparty under any Intercompany License, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

g.      no Debtor shall have the right or power to transfer any of its obligations, right, title or interest in the licenses under the Transferred Patents, Specified UK Patents and Jointly Owned Patents under

(1)     any License Agreement,

(2)     the GDNT License,

(3)    any Intercompany License,

(4)    (other than in connection with the consolidation, wind-down, reorganization or restructuring of the Debtors and their affiliates (including to reorganized Debtors under confirmed plan(s) of reorganization)) any IPLA or

(5)    (other than the transfer by the Debtors of Retained Contracts (as defined in the Sale Agreement) or contracts relating to the disposal of Inventory (as defined in the Sale Agreement), in each case to the extent a sublicense to the assignee of such contract is permitted by the Closing Date License Agreement) any Commercial License,

in each case, to any other person from and after the Closing, and any purported renewal, extension, assignment, amendment, waiver, transfer or modification of a License Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License that would contravene the provisions of subparagraphs 28(a) through 28(g) hereof shall be null and void ab initio and unenforceable and of no force or effect and

h.    the Purchaser is hereby irrevocably appointed (such appointment being coupled with an interest) as each Debtor's attorney-in-fact, with full authority in the place and stead of such Debtor and in the name of such Debtor, from time to time from and after the Closing, in the Purchaser's sole discretion, subject to the provisions of paragraph 5.25 of the Sale Agreement, (x) to take any and all action and to execute and deliver any and all instruments that the Purchaser may deem necessary or advisable to accomplish the purposes of subparagraphs 28(a) through 28(g) hereof and (y) regardless of whether or not any Debtor party to the applicable License Agreement is then in existence, to terminate the license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents in any License Agreement (including by delivering a notice of termination on behalf of a Debtor party thereto, regardless of whether such Debtor is then in existence) upon

the occurrence of any specific date or event or the existence of any specific circumstance to the extent that the occurrence of such date or event or the existence of such circumstance gives any Debtor (regardless of whether such Debtor is then in existence) a right to terminate such License Agreement pursuant to the terms thereof (the provisions of this sentence set forth in subparagraphs 28(a) through 28(h) hereof collectively, the "License Non-Assignment and Non-Renewal Protections").

i.      For the avoidance of doubt, the License Non-Assignment and Non-Renewal Protections shall not limit in any way the applicable Debtors' obligations to comply with the provisions of Section 5.13(b) of the Sale Agreement.  Each counterparty to a License Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License has been provided adequate notice of and opportunity to object to the License Non-Assignment and Non-Renewal Protections and is hereby bound thereby.

29.     The License Non-Assignment and Non-Renewal Protections shall not constitute the assignment of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses to, or assumption of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses by, the Purchaser.

30.     In the event that any Debtor or any of their Affiliates owns any Undisclosed Patent Interest, no Debtor shall directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to a Third Party (as defined in the Sale Agreement), other than the Purchaser, including by operation of law, in any transaction, series of related transactions or otherwise, except as expressly permitted by Section 5.19 of the Sale Agreement,

and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by Section 5.19 of the Sale Agreement shall be null and void *ab initio* and of no force or legal effect.

31.    All counterparties to the Assumed and Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transactions.

32.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions.

33.    No governmental unit may revoke or suspend any lawful right, license, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale or other Transactions.

34.    To the extent this Order is inconsistent with any prior order or pleading in these Chapter 11 Cases, the terms of this Order shall govern. To the extent there is any inconsistency between the terms of this Order and the terms of the Sale Agreement (including all ancillary documents executed in connection therewith), the terms of the Order shall govern.

35.    Except as expressly provided in this Order, the Sale Agreement or the ancillary agreements contemplated thereby, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish

any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

36.    This Order shall not be modified by any chapter 11 plan confirmed in these Chapter 11 Cases by any dismissal or conversion of these Chapter 11 Cases, by the appointment of or any action or inaction by any trustee, examiner, responsible person, or foreign representative, or otherwise by any subsequent order of this Court unless expressly consented to in writing by the Purchaser.

37.    This Order and the Sale Agreement shall be binding in all respects upon all creditors and interest holders of any of the Debtors (whether known or unknown), all non-debtor parties to the Assumed and Assigned Contracts, all license counterparties, the Committee, the Bondholder Group, all successors and assigns of the Debtors and their Affiliates and subsidiaries, and any trustees, examiners, "responsible persons," foreign representatives, or other fiduciaries appointed in the Debtors' bankruptcy cases or upon a conversion to chapter 7 under the Bankruptcy Code, and the Sale Agreement shall not be subject to rejection or avoidance under any circumstances.

38.    The failure specifically to include or make reference to any particular provisions of the Sale Agreement or any ancillary agreement contemplated thereby in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement and the ancillary agreements contemplated thereby are authorized and approved in their entirety.

39.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including the authority to: (a) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and

the terms of the Sale Agreement, the ancillary agreements contemplated thereby, all amendments thereto and any waivers and consents thereunder; (b) protect the Purchaser, or the Purchased Assets, from and against any Claims, Interests or Excluded Liabilities; (c) compel delivery of all Purchased Assets to the Purchaser; (d) compel the Purchaser and the Debtors to perform all of their obligations under the Sale Agreement; (e) resolve any disputes arising under or related to the Sale Agreement, the ancillary agreements contemplated thereby, the Sale or the Transactions; and (f) provide any further relief that is necessary or appropriate in furtherance of this Order or the Transactions.

40.     The Sale Agreement, the ancillary agreements contemplated thereby and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby (it being understood, for the sake of clarity, for the purposes of this paragraph, that no such modification, amendment or supplement shall be deemed to be material or shall be deemed to materially change the economic substance of the transactions to the extent that the impact does not exceed two percent of the Purchase Price); and provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention: Fred S. Hodara, Stephen Kuhn, and Kenneth Davis). The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the ancillary agreements thereto prior to or after Closing without further order of the Court.

41.     Notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, (a) the terms of this Order shall be immediately effective and enforceable upon its entry, (b) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (c) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

42.     The provisions of this Order are nonseverable and mutually dependent.

43.     The Purchaser is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the Transactions contemplated by the Sale Agreement based upon any arrangement made by or on behalf of the Debtors.

44.     This Order applies only to Assets owned by the Debtors or in which the Debtors, individually or collectively, have any right, title or interest, to the extent of the Debtors' right title and interest in such Assets.  Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of the Purchased Assets to the Purchaser free and clear of all Claims and Interests, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring Purchased Assets, apply only to Purchased Assets owned by the Debtors or in which the Debtors, individually or collectively, have any right, title or interest (to the extent of such right, title and interest) and do not apply to any assets owned solely by non-debtor entities and/or in which the Debtors, individually or collectively, have no right, title or interest.

45.     The Purchaser shall deposit proceeds of the Sale less the Good Faith Deposit and any applicable transfer or value-added taxes incurred by the Sellers, and, to the extent agreed by the Sellers, any transaction costs, into an Escrow Account (as defined in the Interim Funding and

Settlement Agreement, dated June 9, 2009 (the "IFSA")).  In accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the Selling Debtors (as such term is defined in the IFSA) as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with Section 12.g of the IFSA) or (b) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFSA and subject to the requirements of Section 12.g of the IFSA), which Interim Sales Protocol shall be approved by the Court.  The Debtors are hereby authorized to negotiate and enter into an escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish an Escrow Account without further order of this Court.

46.    Neither the Purchaser nor the Debtors shall have an obligation to close the Transactions until all conditions precedent in the Sale Agreement to each of their obligations to close the Transactions have been met, satisfied, or waived in accordance with the terms of the Sale Agreement.

47.    This Court hereby requests the aid and recognition of any court, tribunal, regulatory, administrative or other governmental body having jurisdiction in Canada, the United States, France, Germany, the United Kingdom, Ireland or elsewhere, to give effect to this Order and to assist the Sellers and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Sellers as may be necessary or desirable to give

effect to this Order or to assist the Sellers and their respective agents in carrying out the terms of this Order.

48.     The Sellers are hereby authorized and empowered to apply to any court, tribunal, regulatory, administrative or other governmental body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

49.     The Schedules delivered to the Court by the Debtors shall be kept segregated and under seal by the Clerk of Court and shall not be made publicly available pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9081-1(b).

50.     Nothing in this Order is intended to affect the ability of the U.S. Department of Justice to undertake antitrust review or other action with respect to any subsequent use, allocation or distribution of the Purchased Assets.

DATED: July 11, 2011


THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE