SECTION 5.2.        Canadian Bankruptcy Actions.

(a)        Canadian Approval and Vesting Order.  As promptly as practicable, but in no event later than the third Business Day following the completion of the Auction, and subject to their rights and obligations set forth in the Canadian Sales Process Order, the Canadian Debtors shall serve on the Canadian Debtors' service list as supplemented with such additional parties as the Purchaser may reasonably request, one or more motion records including one or more notices of motions and affidavits all in form and substance reasonably satisfactory to the Purchaser, including a draft Canadian Approval and Vesting Order (the "**Canadian Approval and Vesting Order Motion**") and shall file such motion records with the Canadian Court and use reasonable best efforts to seek an order (as granted, the "**Canadian Approval and Vesting Order**") of the Canadian Court to be entered no later than July 15, 2011, seeking approval of the sale of the Assets; provided that in any event the Canandian Approval and Vesting Order shall be entered no later than 45 days from the date of this Agreement.  The Canadian Approval and Vesting Order shall be in the form attached as Exhibit G hereto, with only such changes as the Purchaser and the Sellers shall approve in their reasonable discretion; provided,howeve r,that the Purchaser may withhold its consent to any modifications that affect the relief granted in or the findings of fact and conclusions of law expressed in paragraphs 1, 3, 6, 8, 10, 11, 13 through 15, 17 through 21, 22 through 24 of the Canadian Approval and Vesting Order in its sole discretion; provided,furt her,howev er,that the P urchaser may not withhold its consent to a modification to paragraphs 1 and 3 of the Canadian Approval and Vesting Order if (i) the sole effect of such modification would be to eliminate any differences between the Canadian Approval and Vesting Order and the form Canadian Approval and Vesting Order attached to the Canadian Approval and Vesting Order Motion and (ii) the Canadian Debtors used their best efforts to obtain Canadian Court approval of paragraphs 1 and 3 of the Canadian Approval and Vesting Order.

(b)        Subject to the provisions of this Agreement, the Canadian Debtors shall use their reasonable best efforts to obtain Canadian Court approval of the Canadian Approval and Vesting Order.

SECTION 5.3.        [Reserved]

SECTION 5.4.        Consultation; Notification.

(a)        The Purchaser and the U.S. Debtors shall cooperate in obtaining entry of the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements, schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection therewith and any objections thereto.

(b)        The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Approval and Vesting Order Motion, and in obtaining entry of the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings,

motions, notices, statements, schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any objections thereto.

(c)     If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court granting the relief relating to this Agreement set forth in Section 5.1 shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to, and to cause their Affiliates to, use their reasonable best efforts to, defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts.  Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal, petition or motion; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the U.S. Sale Order shall have been entered but shall not have become a Final Order, or require the Parties to do so unless they mutually so agree.

(d)     If the Canadian Approval and Vesting Order or any other order of the Canadian Court granting the relief relating to this Agreement set forth in Section 5.2 shall be appealed by any Person (or an application for certiorari or motion for leave to appeal, rehearing, re-argument, variation or vacating or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates to, take all reasonable steps, and use their reasonable best efforts, including incurring reasonable legal expenses, to defend against such appeal, application or motion, and the Purchaser agrees to cooperate in such efforts.  Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal, application or motion; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered but shall not have become a Final Order, or require the Parties to do so unless they mutually so agree.

(e)     If the French Court Order or any other order of the French Court relating to this Agreement shall be appealed or opposed by any Person (or a stay shall be filed with respect thereto), NNSA agrees to take all reasonable steps, and use its reasonable best efforts, including incurring reasonable expenses, to defend against such appeal, opposition or stay, and the Purchaser agrees to cooperate in such efforts.  Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal, opposition or stay; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the French Court Order shall have been entered but shall not have become a Final Order, or require the Parties to do so unless they mutually so agree.

SECTION 5.5.     Pre-Closing Cooperation.

(a)     Prior to the Closing, subject to the terms and conditions of this Agreement (including Section 5.6, which, for the avoidance of doubt, shall exclusively govern the Parties' obligations with respect to seeking the Mandatory Regulatory Approvals and any other Consents of applicable Government Entities other than those set forth in Section 5.6(g)), each of the

Primary Parties shall (and each Primary Party shall cause its Subsidiaries and Affiliates to) use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to cooperate with the other Primary Party and its Subsidiaries and Affiliates in order to do or cause to be done, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of the conditions to the Parties' obligations to consummate the transactions contemplated by this Agreement as set forth in Section 7.1, including: (i) without limiting Section 5.8(a), using reasonable best efforts to prepare and make filings with the appropriate Government Entities as necessary to record one of the Sellers as the owner of the Patents listed on Section 5.5(a) of the Sellers Disclosure Schedule and any other Assets where further action and cooperation is required by Sellers to vest title with the Purchaser at Closing; (ii) defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the Closing; (iii) causing to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Closing; and (iv) more generally, to facilitate an orderly transition at Closing, working with outside counsel on the prosecution of pending patent applications and maintenance of existing patents within the Transferred Patents and Purchased Specified UK Patents.

(b)      Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such party's Knowledge, of any event or condition, or the existence, to such party's Knowledge, of any fact, that would reasonably be expected to result in any of the conditions to the other Primary Party's obligation to effect the Closing set forth in Article VII not being satisfied.

(c)      From and after the date hereof, (i) no Seller may affirmatively take any material steps in furtherance of an Asset Retention Transaction and (ii) until the date following the Closing Date, no Seller may seek or support (A) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the U.S. Bankruptcy Code, (B) the appointment of a trustee, receiver, receiver and manager or liquidator in respect of any Canadian Debtor, (C) the dismissal of any CCAA Cases or (D) the conversion of any CCAA Cases to bankruptcy cases under the Bankruptcy and Insolvency Act or applicable Canadian Bankruptcy Laws.

(d)      From and after the date hereof, NNL shall use commercially reasonable efforts to (and Purchaser shall cooperate with NNL's efforts to) confirm that the execution of the Assumption Agreement by the parties thereto will satisfy the requirements of paragraph 7 of the CDMA Vesting Order; provided that this Section 5.5(d) shall not require the Purchaser, NNL or their Affiliates to make any payment, deliver anything of value or incur any expense, nor require the Purchaser or its Affiliates to assume any obligations that are not obligations of NNL under the IP Licenses (as such term is defined in the CDMA Vesting Order) with respect to the Transferred Patents, Purchased Specified UK Patents or other Patents or invention disclosures acquired by the Purchaser pursuant to this Agreement. Upon or prior to the Closing, the Purchaser shall execute and deliver the Assumption Agreement substantially in the form attached as Exhibit J hereto.

SECTION 5.6.        <u>Antitrust and Other Regulatory Approvals</u>.

(a)        Each of the Parties agrees to prepare and file as promptly as practicable all necessary documents, registrations, statements, petitions, filings and applications for the Mandatory Regulatory Approvals, and any other Consent of any other Government Entities either required or that the Primary Parties mutually and reasonably agree are advisable to satisfy the condition set forth in Section 7.1(a) as expeditiously as possible, and in any event by no later than twenty (20) Business Days from the date of this Agreement (or on such other subsequent day as the notifying Parties mutually agree (or the earlier date required by applicable Laws)).

(b)        If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement, then such Party shall make, or cause to be made, as soon as reasonably practicable and after consultation with all other Primary Parties and the Joint Administrators, an appropriate response in compliance with such request.

(c)        The Parties shall keep each other and the Joint Administrators apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement and work cooperatively in connection with obtaining the Mandatory Regulatory Approvals and Consents (and including in respect of responding to any information request from any Government Entity with respect to this Agreement or any of the transactions contemplated hereby pursuant to the applicable Antitrust Laws or Laws regulating foreign investment) of each applicable Government Entity, including:

(i)        cooperating with each other and the Joint Administrators in connection with the filings required under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement and each Mandatory Regulatory Approval and other Consents, and consulting with each other and the Joint Administrators in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities.  In particular, to the extent permitted by Law or Government Entity, no Party will make any submission, filing, notification, or communication in relation to the transactions contemplated hereunder without first providing the other Parties and the Joint Administrators with a copy of such notification in draft form (subject to reasonable redactions or limiting such draft, or parts thereof, on an outside-counsel-only basis where appropriate) and giving such other Party or Parties and the Joint Administrators a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider in good faith all reasonable comments timely made by the other Parties and the Joint Administrators in this respect;

(ii)        furnishing to the other Parties and the Joint Administrators (on an outside-counsel-only basis where appropriate) all information within its possession that is reasonably required for obtaining the Mandatory Regulatory Approvals and other Consents, or reasonably required for any application or other filing to be made by the other Party pursuant to the applicable Antitrust Laws or

any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement; provided,howeve r, that (a) no such information shall be required to be provided by a Party if it determines, acting reasonably, that the provision of such information would jeopardize any attorney-client or other legal privilege or that such information is material and competitively sensitive (it being understood, however, that the Parties shall cooperate in any reasonable requests that would enable an otherwise required production to occur without so jeopardizing privilege or jeopardizing the confidentiality of any such material and competitively sensitive information) and (b) in any such case the Parties shall cooperate with a view to establishing a mutually satisfactory procedure for providing such information, and the relevant Party required to provide such information shall provide it directly to such Government Entity requiring or requesting such information;

(iii)promptl    y notifying each other and the Joint Administrators of any substantive communications from or with any Government Entity with respect to the transactions contemplated by this Agreement (including promptly providing copies of all written communications on an outside-counsel-only basis where appropriate) and ensuring, to the extent permitted by Law and by the relevant Government Entity, that each of the Parties and the Joint Administrators is entitled to attend any meetings (including telephonic and video meetings) with, or other appearances before, any Government Entity with respect to the transactions contemplated by this Agreement; and

(iv)    consulting and cooperating with one another and the Joint Administrators in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with proceedings under or relating to the Mandatory Regulatory Approvals, and other Consents, the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, in connection with the transactions contemplated by this Agreement;

provided,howev er, that notwithstanding anything to the contrary in this Agreement (except Section 5.6(a)), the Purchaser will have the right to determine and direct the strategy and process (including all timing and substantive matters) by which the Parties will seek the Mandatory Regulatory Approvals and other Consents of applicable Government Entities, and under applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction (including all elements of any Actions and communications with Government Entities); provided that the Purchaser will exercise such right in accordance with clauses (i) through (iv) of this Section 5.6(c). Subject to the Purchaser's obligations under the preceding sentence, the Sellers shall, and shall use their best efforts to cause their respective Affiliates to comply, without unreasonable delay, with all such determinations and directions by the Purchaser and supply the Purchaser with all information reasonably requested by the Purchaser in connection with making such determinations.

(d)    Subject to the limitations in Section 5.6(e), each of the Primary Parties shall use its reasonable best efforts to satisfy (or cause the satisfaction of) the conditions

precedent to each respective Primary Party's obligations hereunder as set forth in Sections 7.1(a) and (b) to the extent the same is within its control and to take, or cause to be taken, all other action and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement, including using its reasonable best efforts to make all required filings and obtain all Mandatory Regulatory Approvals, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement.

(e)    The obligations of the Purchaser pursuant to Section 5.6(d) shall include committing to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to the Assets and to any and all arrangements for the conduct of any business and/or terminating any and all existing relationships and contractual rights and obligations with respect to the Assets as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement, including taking any and all actions necessary in order to ensure the receipt of the necessary Consents, the obtaining of all Mandatory Regulatory Approvals, or the termination, waiver or expiration of the necessary waiting periods under any other applicable Antitrust Laws or investment or similar Law without any reduction of the consideration paid to the Sellers; provided, however, that notwithstanding anything to the contrary in this Section 5.6 or otherwise in this Agreement, the Purchaser shall be required to offer, negotiate or commit to any of the foregoing actions only to the extent required to cause the satisfaction of the conditions set forth in Section 7.1(a) and Section 7.1(b) that relate to Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement so that the Closing may occur by the last Business Day before the Outside Date. The Parties further agree that the obligation of the Purchaser under this Section 5.6 is limited solely to the Assets, and does not apply to or require any action with respect to any of the assets or businesses or contractual relationships of the Purchaser or any of its Affiliates.

(f)    Notwithstanding anything in this Agreement to the contrary, if at any time (i) all of the conditions to the Closing set forth in Article VII other than the condition in Section 7.1(b) are satisfied (or were capable of being satisfied should Closing occur on the next Business Day); and (ii) the condition in Section 7.1(b) is not satisfied as a result of the existence of any Law, or any order, injunction, decree or judgment of any court or other Government Entity that purports to prohibit, prevent or make illegal the consummation of any of the transactions contemplated hereby in one or more jurisdictions other than Canada, France, Germany, the United Kingdom and the United States (each such other jurisdiction, a "**Deferred Jurisdiction**"), then if either the Sellers, on one hand, or the Purchaser, on the other, so request in their sole discretion, the Parties shall negotiate in good faith an amendment of this Agreement to provide for (x) the immediate consummation of the transactions contemplated by this Agreement in all applicable jurisdictions other than any Deferred Jurisdiction, and (y) a delay in the consummation of the transactions contemplated by this Agreement in each Deferred Jurisdiction until the condition in Section 7.1(b) is satisfied as to such Deferred Jurisdiction, provided that if the Purchaser reasonably determines in good faith that it would be impossible for the Purchaser to comply with this Section 5.6(f) without meaningful adverse consequences to the Purchaser or the Purchaser's Affiliates, the Purchaser shall not be required to undertake the foregoing actions, and provided, further, that if the Purchaser requests the negotiation of an

-45-

amendment of this Agreement pursuant to this Section 5.6(f), the Sellers shall not be required to agree to any reduction in, or any delay in payment of, the Purchase Price.

(g)    The covenants under this Section 5.6 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter under any Bankruptcy Law relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

SECTION 5.7.    Public Announcements.  Subject to the Parties' disclosure obligations imposed by Law (including any obligations under any Bankruptcy Laws), the Parties shall (a) cooperate with each other in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (b) not issue any such announcement or statement prior to consultation with, and the approval of, the Primary Parties (such approval not to be unreasonably withheld or delayed); provided that approval shall not be required (i) where a Party determines, based on advice of counsel and after consultation with the Primary Parties, that such disclosure is required by Law or the rules of any stock exchange on which the securities of such Party or any of its Affiliates are listed and (ii) after the public announcement of this Agreement and the transactions contemplated hereunder, with respect to public disclosures and announcements by the Purchaser and its Affiliates relating to the Assets after Closing, provided that to the extent reasonably practicable the Purchaser shall not make any public disclosure or announcement contemplated by this clause (ii) without first consulting the other Primary Party.

SECTION 5.8.    Further Actions.

(a)    Without limiting the foregoing, on and after the Closing Date, each Party shall cooperate with the other Parties, without any further consideration, to cause to be executed and delivered, all instruments, including instruments of conveyance, novations, assignment and transfer, and to make all filings with, and to obtain all consents, under any permit, license, agreement, indenture or other instrument or regulation, and to take all such other actions as any of the Parties may reasonably request any other Parties to take from time to time, consistent with the terms of this Agreement, in order to effectuate the provisions and purposes of this Agreement and the other Transaction Documents; provided that, (i) notwithstanding anything to the contrary in this Agreement, recordation or registration of the Short-Form Assignments or any other document evidencing the assignment of the Transferred Patents and Specified UK Patents from the Sellers to the Purchaser shall be the Purchaser's responsibility and at its sole cost and expense, and (ii) subject to Section 5.5 and Section 5.6, neither the Purchaser nor the Sellers shall be obligated to make any payment or deliver anything of value (unless, in the case of the Sellers, the Purchaser offers to promptly reimburse or indemnify the Sellers for such payment or delivery) to any Third Party (other than filing and application fees to Government Entities and payment of Cure Costs for which such Party is responsible pursuant to Section 2.1.7) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities.

(b)    Subject to Section 5.11, and, with respect to Patent Related Documentation relating to Purchased Specified UK Patents, to the extent permitted under applicable Law, as soon as practicable following the transfer of the Transferred Patents and

-46-

Purchased Specified UK Patents pursuant to the terms of this Agreement, the Sellers shall, in each case except for Patent Related Documentation that has been delivered pursuant to Section 2.3.2(b)(v): (i) deliver to the Purchaser or counsel designated by the Purchaser at locations to be designated by Purchaser copies (which, except for the items listed in clauses (i) and (vi) of the definition of "Patent Related Documentation," may be electronic copies) of all the tangible embodiments of the Patent Related Documentation existing as of the Closing Date and in the Sellers' possession that is related to such Transferred Patents or Purchased Specified UK Patents, and (ii) instruct all of the Sellers' outside counsel (A) that the ownership of such Transferred Patents, Purchased Specified UK Patents and Patent Related Documentation has been assigned to the Purchaser as of the Closing Date, (B) to release to the Purchaser or counsel designated by the Purchaser at locations to be designated by Purchaser copies (which, except for the items listed in clauses (i) and (vi) of the definition of "Patent Related Documentation," may be electronic copies) of all the tangible embodiments of the Patent Related Documentation existing as of the Closing Date and in such counsel's possession that is related to the Transferred Patents or Purchased Specified UK Patents, and (C) that the Purchaser or counsel designated by the Purchaser may contact such Sellers' counsel for coordination relative to further prosecution of such Transferred Patents or Purchased Specified UK Patents at the Purchaser's expense. The Sellers shall also include in such correspondence any other information that the Purchaser reasonably instructs the Sellers to include and is communicated to the Sellers prior to the Closing Date.

(c)      The Purchaser shall pay or reimburse the Sellers for all Agreed Expenses promptly after receipt of notice and demand therefor.

(d)      Sellers shall use their reasonable best efforts to obtain, as promptly as practicable and in any event prior to the commencement of the Auction, final, executed and effective copies of the Outbound License Agreements, Cross License Agreements and Joint Ownership Agreements listed in Section 2.3.2(b) of the Sellers Disclosure Schedule. Such reasonable best efforts shall include requesting production of such copies from the counterparties thereto and, to the extent reasonably practicable and permitted by applicable Law, seeking a court order to compel such production by such counterparties.

SECTION 5.9.      Conduct of Business. The Sellers covenant that, from and after the date hereof until the Closing Date, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings, and except as (i) the Purchaser may approve otherwise in writing, (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) required by Law (including any Bankruptcy Law of general applicability) but subject to Section 5.6(e), (iv) otherwise expressly contemplated or permitted by this Agreement, or (v) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall:

(a)      notify the Purchaser as promptly as practicable after becoming aware of any event, development or condition that has had or would reasonably be expected to have a Material Adverse Effect on the Assets;

(b)      use commercially reasonable efforts (but in any case no less efforts than the Sellers use with respect to their own assets of a similar nature) to maintain the confidentiality

(to the extent not publicly available), integrity and use of the Assets, and the availability of appropriate "back-up" copies thereof;

(c)　　not take any of the following actions:

(i)　　directly or indirectly (including by operation of law or through any merger, consolidation, reorganization, issuance of securities or rights, license, lease, encumbrance or otherwise) sell, assign, convey, transfer, license, lease or otherwise dispose of any Assets (except to the extent that such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement);

(ii)　　incur any Lien on any Assets, other than (A) Liens that will be discharged at or prior to Closing and (B) Permitted Encumbrances;

(iii)grant any license or sublicense of any rights under or with respect to any Assets (except to the extent that such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement);

(iv)　　waive, release, assign, settle or compromise any Action relating to the Assets to the extent that such waiver, release, assignment, settlement or compromise imposes any obligation, whether contingent or realized, upon the Purchaser or any of its Affiliates or the Assets or that materially affects any Seller's title to or the value of any Transferred Patent, Jointly Owned Patent or Specified UK Patent;

(v)　　enter into any Contract granting an indemnity that would impose any obligation upon the Purchaser or any of its Affiliates or the Assets;

(vi)　　modify, amend or change, in each case, in any material respect, or terminate (other than with respect to any Cross-License Agreements or Outbound License Agreements), or expressly waive compliance with the terms of or breaches under, or expressly waive, release, assign or terminate any rights or claims under, any term of any Transferred License, any non-disclosure agreement or any other agreement (including any Cross-License Agreement or Outbound License Agreement) relating to the sale or licensing of the Assets;

(vii)　　fail to make any filing, pay any fee, or take any other action consistent with past practice of the Sellers (including, after consultation with the Purchaser, responding to assertions of invalidity by Third Parties of which the Sellers become aware) as necessary to maintain the ownership, validity and enforceability of any Transferred Patent, Jointly Owned Patent or Specified UK Patent; provided that if any Seller fails to make any such filings, pay such fee, or take such other action consistent with past practice of the Sellers as described above, then such Seller will, upon becoming aware of any such failure, make all reasonable efforts to correct any adverse effects of such failure;

(viii)    take or omit to take any action, or request the Bankruptcy Court to approve, authorize or require the Sellers to take or to omit to take any action that would materially affect any Seller's title to or the value of any Transferred Patent, Jointly Owned Patent or Specified UK Patent or would otherwise breach the Sellers' covenants under or any other provisions of this Agreement or the Transaction Documents, or consent to any such approval or authorization;

(ix)    amend, or assign to any Third Party their rights under, any Cross-License Agreement or Outbound License Agreement to which any Transferred Patent, Jointly Owned Patent or Specified UK Patent is subject;

(x)    fail to exercise any termination right pursuant to the terms of any Cross-License Agreement or Outbound License Agreement provided that such exercise would not result in the Sellers' incurring any meaningful cost or Liability or losing any meaningful right under such Cross-License Agreement or Outbound License Agreement;

(xi)    consent to the assignment by any counterparty to any Cross-License Agreement or Outbound License Agreement of such counterparty's rights or obligations under any such agreement to any Person; or

(xii)    authorize, agree or commit to do any of the foregoing.

SECTION 5.10.    Transaction Expenses.  Except as otherwise provided in this Agreement or the other Transaction Documents, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 5.11.    Confidentiality.

(a)    The Parties acknowledge that the Non-Disclosure Agreement and the Supplementary Non-Disclosure Agreement, as amended from time to time, remain in full force and effect in accordance with their terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Parties, the Joint Administrators and the French Liquidator shall be at liberty to disclose the terms of this Agreement to (i) if required by order of any court of competent jurisdiction or under any applicable Law, any court or to any court-appointed liquidator of any of the Sellers to show appropriate figures in their administration records, accounts and returns, (ii) the applicable Bankruptcy Court for the purposes of obtaining the Bankruptcy Consents and to the applicable Government Entities and Third Parties for purposes of obtaining the Mandatory Regulatory Consents or any other Consents contemplated hereunder; and (iii) as otherwise required by the terms and conditions of this Agreement (in respect of Third Parties pursuant to clause (ii) other than Government Entities, without any appurtenant schedules except for Sections 1.1(d) (Jointly Owned Patents), 1.1(h) (Listed Patents),  1.1(k) (Listed Inventions): A.I(d) (Cross-License Agreements); A.I(e) (Outbound License Agreements), and A.I(m) (Joint Ownership Agreements) of the Sellers Disclosure

Schedule, and only to the extent necessary to obtain the applicable Consent).  Each Primary Party agrees not to request the other Primary Party to return or destroy Evaluation Material or Interested Party Material (as such terms are defined in the Non-Disclosure Agreement) pursuant to the Non-Disclosure Agreement unless this Agreement shall have terminated.  The Parties further acknowledge that the Cross License Agreements and Outbound License Agreements provided or delivered pursuant to Sections 2.3.2(b) shall be deemed to have been provided to the Purchaser as "Highly Confidential Information" under the Supplementary Non-Disclosure Agreement, and the Supplementary Non-Disclosure Agreement shall apply to such documents. The Sellers agree to treat the Sellers Disclosure Schedules as Purchaser Confidential Information from and after the Closing.

(b)    The Sellers shall not, and shall use best efforts to cause their Affiliates not to, disclose any Purchaser Confidential Information, including by means of appropriate redaction, other than (A) to any member of any committee of creditors which may include the holders of, or investment managers for holders of, equity or debt securities of the Sellers, including, without limitation, those of (i) the Official Committee of Unsecured Creditors in the Chapter 11 Cases, (ii) the Ad-Hoc Committee of Bondholders in such Chapter 11 Cases and in the filings made by the Sellers under the CCAA Cases, (iii) the unofficial Canadian creditors' committee, and (iv) any other creditors' committees or analogous bodies appointed in respect of the EMEA Sellers and their debtor affiliates, (B) to the United States Trustee for the District of Delaware in the Chapter 11 Cases, (C) to any monitor, administrator, trustee or similar appointed official in any foreign proceedings, including, without limitation, Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP and David Hughes of Ernst & Young Chartered Accountants, in their capacities as the Joint Administrators, Maître Cosme Rogeau as French Liquidator, the Monitor in the CCAA Cases and with respect to the Sellers and each of the foregoing persons described in clauses (A), (B) or (C), any employees, agents, advisors (including, without limitation, attorneys, accountants, investment banks and consultants) and other representatives thereof; provided that, in the case of each of the persons described in the foregoing clauses (A), (B) or (C), the Sellers shall have used reasonable efforts to inform such Persons of the confidential nature of such information, and that, to the extent such Persons are not already required by applicable Law or any confidentiality agreement with the Sellers to keep such information confidential, such Persons shall have agreed to be bound by confidentiality restrictions,or  (D) as may otherwise be required, based on the advice of legal counsel, under applicable Law, including, without limitation, the Bankruptcy Laws; provided,howeve r, that to the extent legally permissible and reasonably practicable, the Sellers shall provide the Purchaser with prompt notice of such event described in (D) above so that, where possible, the Purchaser may seek a protective order or other appropriate remedy and the Sellers shall cooperate with the Interested Party in taking steps to resist or narrow the scope of such request or legal process (at the expense of the Purchaser).  In the event that such protective order or other remedy is not obtained and any of the Sellers or their representatives are advised by legal counsel that it is compelled by Law to disclose any information described in the foregoing sentence, the Sellers or its representative, as the case may be, (i) may without liability hereunder furnish that portion (and only that portion) of such information which, based on the advice of legal counsel to the Sellers or their representatives, as the case may be, the Sellers or their representatives are legally required to disclose and (ii) will use commercially reasonable efforts to have confidential treatment accorded any such information so furnished.  For the avoidance of doubt, none of the Sellers shall act in furtherance of or consent to the unsealing of any Transaction Documents that

are filed under seal unless otherwise ordered by the applicable Bankruptcy Court or unless the Purchaser shall consent in its sole discretion.

(c)     Notwithstanding the foregoing Section 5.11(a), nothing contained in this Agreement or the Transaction Documents shall be deemed to prohibit the Parties, the Joint Administrators, or the French Liquidator from disclosing any information as may be required, based on the advice of legal counsel, under applicable Law, including Title 11 of the United States Code, the CCAA, the Insolvency Act of 1986 and any other applicable bankruptcy or insolvency Laws of any jurisdiction in which bankruptcy proceedings concerning Nortel are held from time to time, any legal process before, or any order of, the U.S. Bankruptcy Court or any other court of competent jurisdiction, the applicable rules or regulations of any securities exchange or similar self-regulatory authority or applicable securities Laws; provided,howeve r, that to the extent legally permissible and reasonably practicable, if the relevant Party believes in its reasonable judgment that such legally required disclosure includes confidential information of any other Party hereunder, the disclosing Party shall provide the other Parties with prompt notice of such event so that, where possible, the affected Parties may seek a protective order or other appropriate remedy, and the relevant Parties shall cooperate in taking steps to resist or narrow the scope of such request or legal process (at the expense of the Party requesting such action).  In the event that such protective order or other remedy is not obtained and any Party or its representatives are advised by legal counsel that it is compelled by Law, regulation or legal, regulatory or judicial process or the rules of a stock exchange or similar self-regulatory authority to disclose any information described in the foregoing sentence, such Party or its representatives, as the case may be, (i) may without liability hereunder furnish that portion (and only that portion) of such information which, based on the advice of legal counsel to such Party or its representative, as the case may be, such Party or its representative is legally required to disclose and (ii) will use commercially reasonable efforts to have confidential treatment accorded any such information so furnished.

SECTION 5.12.     Certain Payments or Instruments Received from Third Parties.  To the extent that, after the Closing Date, (a) the Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document, the Purchaser shall promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment or instrument that is for the account of the Purchaser according to the terms of any Transaction Document, such Seller shall promptly deliver such amount or instrument to the Purchaser. All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party.  Notwithstanding the foregoing, each Party hereby undertakes to use reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

SECTION 5.13.     License to Transferred Patents, Jointly Owned Patents, Specified UK Patents and Licensed Residual Patents; Termination of Intercompany Arrangements.

(a)     Concurrently with the Closing, (i) the Purchaser shall grant the Sellers a license under the Transferred Patents, the Purchased Specified UK and other Patents acquired pursuant to this Agreement in connection with (x) the disposal of Inventory and (y) contracts that

relate to wind-down operations of the Sellers and their Affiliates (such contracts being (A) existing contracts for Nortel Products or Nortel Services between one or more Sellers or Affiliates of the Sellers and a Third Party, that have been retained by the Sellers or their Affiliates in connection with the sale of a Divested Business (the "**Existing Contracts**"), (B) contracts entered into for performance of obligations under the Existing Contracts for customers or end users, or (C) contracts that are ancillary to Existing Contracts, including work orders, statements of work, purchase orders or contracts implementing phases of Existing Contracts, and are for provision of Nortel Products and/or Nortel Services to Persons who are customers or end users of Sellers or their Affiliates as of the date hereof (such contracts specified in this clause (y), the "**Retained Contracts**"); for avoidance of doubt, Retained Contracts do not include licenses granted pursuant to Intercompany Contracts), and (ii) the Sellers shall grant the Purchaser and its Affiliates a license under the Licensed Residual Patents, the Jointly Owned Patents, the Specified UK Patents that are not Purchased Specified UK Patents and Undisclosed Patent Interests, in each case on the terms described in Exhibit L hereto (the "**Closing Date License Agreement**").

(b)     Effective as of the Closing, the Sellers shall terminate all license rights granted under the Master R&D Agreement to the extent such license rights are under any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests; in each case, subject to the purchase thereof by (or, pursuant to Section 2.1.8, the grant of an exclusive license (with the right to sublicense) thereto to) the Purchaser pursuant to this Agreement. Effective as of the Closing, the Sellers shall also terminate all license rights granted under any other Intercompany Contracts (x) exclusively among Sellers or (y) pursuant to which any Seller is a licensee, to the extent such license rights are under any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests; in each case, subject to the purchase thereof by (or, pursuant to Section 2.1.8, the grant of an exclusive license (with the right to sublicense) thereto to) the Purchaser pursuant to this Agreement. Promptly following the Closing, each Seller shall request that any non-Seller Affiliate of such Seller that is a licensee under any other Intercompany Contract terminate its license rights pursuant to such Contract under any of the Transferred Patents, Specified UK Patents and Undisclosed Patent Interests (in each case, subject to the purchase thereof by, or, pursuant to Section 2.1.8, the grant of an exclusive license (with the right to sublicense) thereto to, the Purchaser pursuant to this Agreement) in exchange for a sublicense under the license rights granted to the Sellers and their Affiliates pursuant to the Closing Date License Agreement and shall keep the Purchaser reasonably informed of the progress of such requests and the responses of such Affiliates. From and after Closing there shall be no future manufacture, development, sale, supply or other distribution, or servicing of any products under the Transferred Patents or Specified UK Patents by, for or on behalf of Sellers other than to the extent such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement. From and after the Closing, neither the Sellers nor any Person acting on behalf of any Seller shall distribute any products, directly or, for the purpose of circumventing this Section 5.13(b) or the Closing Date License Agreement, indirectly, to any Affiliates of any Seller that have not complied with the foregoing request and agreed to receive a sublicense under the license rights granted to the Sellers and their Affiliates under the Closing Date License Agreement, except to the extent it is a Nortel Product required pursuant to the terms of any Intercompany Contract then in effect, provided that (x) neither the Sellers nor any Person acting on behalf of any Seller shall distribute to any Affiliate in any calendar year more than two times the aggregate number of units of Nortel Products (pertaining

to a historical line of business of the Sellers (e.g., CDMA, GSM, Enterprise)) distributed by or on behalf of the Sellers to such Affiliate during the last six months of calendar year 2010; and (y) the Sellers and any Person acting on behalf of any Seller shall immediately cease distributing any products to such Affiliate at such time, and shall not distribute any products to such Affiliate from and after such time, as such Affiliate experiences a Change of Control.

SECTION 5.14.    Use of Trademarks.  Nothing in this Agreement grants to the Purchaser the right to use the name "Nortel" or any Trademarks owned by the Sellers or any of their Affiliates or any other mark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing.

SECTION 5.15.    Certain Assets.  To the extent that any Transferred Patent, Jointly Owned Patent or Specified UK Patent that is a Listed Patent, Listed Jointly Owned Patent or Specified Listed UK Patent, as applicable,  any invention or improvement claimed or disclosed therein or any Patent Related Documentation relating to any of the foregoing is, notwithstanding the statement set forth at Annex I(n), owned by any Affiliate of the Sellers that is not, itself, a Seller, the Sellers shall cause (or, in the case of any other property that would be a Transferred Patent or Specified UK Patent if it were owned by a Seller, or any other Patent that would be a Jointly Owned Patent if any rights therein were owned by a Seller, and any invention or improvement claimed or disclosed therein or any Patent Related Documentation relating thereto, shall use their best efforts to cause) such Affiliate to transfer all of its right, title and interest in such asset to an NA Seller as soon as reasonably practicable and in any event prior to the Closing, and (a) in the case of property that would be Transferred Patents or Specified UK Patents if they were instead owned by a Seller, such assets shall be "Transferred Patents" or "Specified UK Patents" for all purposes hereof and (b) in the case of property that would be Jointly Owned Patents if any rights therein were owned by a Seller, such assets shall be "Jointly Owned Patents" subject to the Closing Date License Agreement for all purposes hereof; it being understood that (x) in the case of a Specified UK Patent or Patent Related Documentation relating thereto, the foregoing obligation shall be solely to the extent permitted by applicable Law, and (y) in the case of a Jointly Owned Patent or Patent Related Documentation relating thereto, the foregoing obligation shall be deemed satisfied by obtaining for the Purchaser the license rights granted thereunder in the Closing Date License Agreement.

SECTION 5.16.    Access to Systems.  From and after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is entered and until the Closing, the Sellers shall reasonably cooperate with the Purchaser to provide the Purchaser access to the Patent Databases, solely for the purposes of facilitating the transfer, upon and following the Closing, of such information residing in the Patent Databases from the Sellers to the Purchaser and integration of such information into the Purchaser's patent systems; provided that any such access shall only be granted to the extent the Purchaser has obtained, at its cost and expense, any license rights necessary for such access. From and after the Closing, at the Purchaser's request, the Sellers shall reasonably cooperate with the Purchaser to provide the Purchaser access to the Patent Databases, provided that such access shall be at the Purchaser's cost and expense and that the Purchaser has obtained, at its cost expense, any license rights necessary for such access.

SECTION 5.17.    Post-Closing Suits.

(a)    Each of the Sellers hereby covenants that, from and after the Closing Date, it will not, without the written consent of the Purchaser (acting in its sole discretion), sue or otherwise participate in any Action against any party to any of the Transferred Licenses or any other licenses granted under the Transferred Patents, Jointly Owned Patents or Purchased Specified UK Patents based upon any claim under or related to any such license, including with respect to nonpayment of unpaid past, present or future income and royalties relating to any such license or past, present and future damages thereunder.

(b)    Each of the Sellers hereby covenants that, from and after the Closing Date, it will not, without the written consent of the Purchaser (acting in its sole discretion), (x) waive, release, assign, settle, maintain or compromise any Action relating to the Assets to the extent that such waiver, release, assignment, settlement, maintenance or compromise imposes any obligation, whether contingent or realized, upon the Purchaser or any of its Affiliates or the Assets or materially affects any Seller's title to or the value of any Transferred Patent or Specified UK Patent or Jointly Owned Patent or (y) voluntarily take or voluntarily cooperate in taking any position that is not consistent with the statement in Annex I(c).

SECTION 5.18.    Production of Documents.  In the event that at any time following the Closing Date, any Seller discovers or comes into possession or control of any document that, if such Seller had known about, controlled or possessed such document on the Closing Date would have been required to be delivered to the Purchaser pursuant to the terms hereof, then such Seller shall (or, if such Seller does not have possession or control of such document, shall use its best efforts to) promptly deliver such document to the Purchaser.

SECTION 5.19.    Option to Purchase Undisclosed Patent Interests.  In the event that any of the Sellers or any Affiliate of any of the Sellers discovers that it owns (i) any right, title or interest in any Patents owned by the Sellers or their Affiliates that are not Transferred Patents, Jointly Owned Patents, Specified UK Patents or Excluded Patents, (ii) any right, title or interest in any inventions, other than the Listed Inventions, disclosed in the invention disclosures owned by any of the Sellers or their Affiliates, but only to the extent such invention disclosures (x) do not relate to a patent application filed anywhere in the world and (y) are dated less than three (3) years before the Closing Date, (iii) an exclusive license to all or substantially all of the rights under any Patent that is not a Transferred Patent, Jointly Owned Patent, Specified UK Patent or Excluded Patent, or (iv) an option to receive or purchase, or any reversionary interest in, any of the foregoing (any individual asset described in clauses (i) through (iv), an "**Undisclosed Patent Interest**"), then:

(a)    In the event that one or more non-Seller Affiliates of any Seller own an Undisclosed Patent Interest, the Sellers shall use their best efforts to cause such Affiliate(s) to transfer such Undisclosed Patent Interest to a Seller promptly.

(b)    Upon identification or receipt by any Seller of an Undisclosed Patent Interest, the relevant Seller shall provide reasonably prompt written notice describing such Undisclosed Patent Interest to the Purchaser (an "**Option Trigger Notice**") (it being understood that (i) in the event that an Undisclosed Patent Interest is identified or received by a Seller

-54-

between the date hereof and the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted, such Seller shall deliver an Option Trigger Notice to the Purchaser promptly after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted and (ii) each Option Trigger Notice shall relate to only one Undisclosed Patent Interest). For a period of thirty (30) calendar days following the delivery of such notice to the Purchaser, the Purchaser shall have the option (exercisable by delivery of written notice thereof to the relevant Seller) to purchase, subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any licenses that remain in force after Closing granted thereunder prior to the date such Undisclosed Patent Interest was discovered by or delivered to such Seller (it being understood that no Seller shall grant any licenses under or any Liens on any such Undisclosed Patent Interest after the date of discovery or delivery and during the Purchaser's consideration period described above), such Seller's right, title and interest in and to the Undisclosed Patent Interest from such Seller for a cash purchase price per Undisclosed Patent Interest of Fifty Thousand Dollars ($50,000) (the "**Exercise Price**").

(c)     From and after the date when any Seller discovers that it owns an Undisclosed Patent Interest until the expiration of the 30-day option period specified in Section 5.19(b), no Seller may directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to any Third Party, including by operation of law, in any transaction, series of related transactions or otherwise, other than as would be permitted by Section 5.9(c)(iii) if such Undisclosed Patent Interest were a Transferred Patent, and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by this Section 5.19 shall be void *ab initio* and of no force or legal effect.

(d)     The Sellers agree that, prior to the ultimate winding up or dissolution of any of them, the Primary Seller Parties will provide written notice to the Purchaser of such anticipated winding up or dissolution and provide the Purchaser with the option, exercisable by proper delivery of written notice to the Primary Seller Parties within a period of thirty (30) calendar days after delivery of the Primary Seller Parties' notice, to purchase on a "quitclaim" basis (and, for the avoidance of doubt, subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any licenses granted thereunder prior to the date of such purchase that remain in force after Closing, it being understood that no Seller shall voluntarily take any action to grant any licenses under or place any Liens on any such Undisclosed Patent Interest), at an aggregate price of $1.00, all of each Seller's right, title and interest in and to all remaining Undisclosed Patent Interests, whether or not theretofore identified, not previously offered for sale to the Purchaser pursuant to this Section 5.19.

(e)     The settlement of each purchase and sale of Undisclosed Patent Interests pursuant to this Section 5.19 shall occur at the offices of Cleary Gottlieb Steen & Hamilton LLP, New York (or such other place as the parties may mutually agree to in writing), on a Business Day (to be specified by the Purchaser in writing at least five (5) Business Days prior thereto) occurring within thirty (30) days after the exercise by the Purchaser of its option under Section 5.19(b). At each settlement, (i) the relevant Sellers shall deliver duly executed instruments of conveyance and assignment reasonably evidencing the assignment to the

Purchaser of their right, title and interest in and to the relevant Undisclosed Patent Interest (together with all assets that would have constituted "Assets" if such Undisclosed Patent Interest had been a Listed Patent), (ii) the Purchaser shall deliver to the relevant Sellers the Exercise Price for each Undisclosed Patent Interest by wire transfer of immediately available funds to an account designated by the relevant Sellers at least five (5) Business Days prior to the settlement date.

    (f)  The Parties acknowledge and agree that if the Purchaser does not elect to purchase any Undisclosed Patent Interest within the applicable 30-day option period after delivery of notice thereof pursuant to Section 5.19(b), then the Sellers shall have no further obligation whatsoever to the Purchaser with respect to such Undisclosed Patent Interest, and the Sellers shall be free to sell, license or otherwise dispose of such Undisclosed Patent Interest in their sole discretion.

    (g)  Notwithstanding anything herein to the contrary, the items listed on Section A.I(r) of the Sellers Disclosure Schedules shall be treated as "Undisclosed Patent Interests" for purposes of this Section 5.19; provided, however r, that (i) Seller shall deliver an Option Trigger Notice to the Purchaser promptly after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted, and (ii) the Exercise Price for such items listed on Section A.I(r) of the Sellers Disclosure Schedules shall be $0.00.

    SECTION 5.20.  Certain Obligations.  As of the Closing, the Purchaser agrees to (a) notify in writing (in the same level of detail as provided in Section 5.20 of the Sellers Disclosure Schedule) any subsequent purchaser of any of the Transferred Patents or Purchased Specified UK Patents of any promises, declarations and commitments listed in Section 5.20 of the Sellers Disclosure Schedule concerning such Patents, to the extent such promises, declarations and commitments (i) have been granted, made or committed to standard-setting bodies and (ii) are enforceable against the Sellers, and to (b) bind such subsequent purchasers to notice terms substantially the same as those set forth in this Section 5.20.

    SECTION 5.21.  Acknowledgement of Prior Obligations.  The Purchaser acknowledges that the sale and assignment of the Transferred Patents and Purchased Specified UK Patents is subject to the obligations of certain Sellers set forth in Section 5.21 of the Sellers Disclosure Schedule with respect to the agreements referenced therein to the extent applicable to such Patents and to the extent such obligations and agreements are enforceable against the Sellers.

    SECTION 5.22.  Disposition of Jointly Owned Patents.

    (a)  From and after the Closing, (i) the Sellers may not sell, transfer, assign, license or convey any portion of any Seller's interest in any Jointly Owned Patent except upon written consent of the Purchaser in its sole discretion or as permitted by the Closing Date License Agreement and (ii) as soon as practicable after written request by the Purchaser to the Primary Seller Parties, made at the Purchaser's sole discretion, the Sellers shall transfer all of their respective interest in one or more specified Jointly Owned Patents to a Person of the Purchaser's choosing (which, for the avoidance of doubt, may be the Purchaser or an Affiliate of the

Purchaser or one or more Third Parties), to the extent permitted by and subject to applicable Law and to any Contracts governing a Seller's joint ownership of such Jointly Owned Patent, and subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any licenses granted thereunder prior to the date of such transfer (it being understood that from and after the Closing, no Seller shall voluntarily take any action to place any Liens on any Jointly Owned Patents).

(b)     No Seller shall reject, repudiate or terminate any Contract governing such Seller's joint ownership of a Jointly Owned Patent, unless such Seller, prior to the date upon which such Seller consummates its plan of reorganization, liquidation or arrangement in the Bankruptcy Proceedings, provides the Purchaser at least 10 Business Days' advance written notice of such rejection, repudiation or termination (which notice shall specify the Contracts to be rejected and the Jointly Owned Patents governed by such Contracts and furnishing, to the extent the Sellers are not prohibited from doing so by such Contracts or by applicable Law, a true and complete copy of such Contracts), <u>provided</u>, that, in any event, no Seller shall reject, repudiate or terminate any Contract governing such Seller's joint ownership of a Jointly Owned Patent prior to the last commercially reasonable date on which it can do so in connection with such Seller's consummation of its plan of reorganization, liquidation or arrangement in the Bankruptcy Proceedings.

SECTION 5.23.     <u>Purchase of Specified UK Patents</u>.  The Sellers hereby covenant, to the extent permitted by applicable Law, from and after the date hereof, to cooperate with the Purchaser in conducting further diligence with respect to the Specified UK Patents and facilitating the transfer of the Specified UK Patents to the Purchaser on the Closing Date. The Parties hereby agree that at any time prior to the Closing, the Purchaser may elect, in its sole discretion, to exclude any or all of the Specified UK Patents from the "Assets" and to not take an assignment of such Specified UK Patents (in which case the Patent Related Documentation relating solely thereto shall also be excluded), it being understood that any such election shall not result in a decrease in purchase price.

SECTION 5.24.     <u>Maintenance of Books and Records</u>.  After the Closing, the Sellers shall preserve, until the first (1st) anniversary of the Closing Date (or such longer period as may be required under applicable Law), all pre-Closing Date records to the extent relating to the Assets possessed or to be possessed by such Person.  After the Closing Date and until the first (1st) anniversary of the Closing Date (or such longer period as may be required under applicable Law), upon any reasonable request from the Purchaser, the relevant Seller shall, and/or shall cause the Person holding such records to, (a) provide to the Purchaser or its representatives reasonable access to such records during normal business hours and (b) provide or permit the Purchaser or its respective representatives to make copies of such records, in each case subject to reimbursement of the Sellers' reasonable and actual out-of-pocket expenses in connection with responding to such requests of the Purchaser, including provision of access to, and segregation and duplication of, records; provided, however, that nothing herein shall require any Seller to disclose any information to the Purchaser or its representatives if such disclosure (i) would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Sellers shall cooperate in any

reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser or its representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement), (ii) would require the Sellers to disclose their Tax records, or (iii) involves Excluded Assets. The Purchaser acknowledges that the Sellers are in the process of ceasing active operations, and such reasonable access and costs may include the delay and expense of retrieving documents from inactive storage. Such records may be sought under this Section 5.24 for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the Purchaser or its representatives (other than, with respect to documents that do not describe the conception or reduction to practice of any of the Transferred Patents, Jointly Owned Patents, Specified UK Patents or Undisclosed Patent Interests, claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Transaction Document). Notwithstanding the foregoing but subject to Section 6.5, (1) any and all such records may be destroyed by the Sellers if the Sellers send to the Purchaser written notice of their intent to destroy such records, specifying in reasonable detail the nature of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Purchaser notifies the destroying party that the Purchaser desires to obtain possession of such records to the extent it is entitled thereto under this Section 5.24, in which event the Sellers shall transfer or cause to be transferred the records to the Purchaser and the Purchaser shall pay all reasonable and actual out-of-pocket expenses of the Sellers in connection therewith, including costs associated with the segregation of such records; and (2) the Sellers shall not be required to provide the Purchaser or its representatives access to, or copies of, any Tax records or audited financial statements covering any pre-Closing period. Nothing in this Section 5.24 shall limit or prejudice any of the Purchaser's rights at law or in equity relating to discovery, in the context of a dispute between the Purchaser and a Seller or otherwise.

SECTION 5.25.    License Power of Attorney.

(a)    With respect to the Commercial Licenses and, as such terms are defined in the Form of U.S. Sale Order set forth in Exhibit F and the form of the Canadian Approval and Vesting Order set forth in Exhibit G, the TSAs, IPLAs, Intercompany Licenses and the GDNT License, the Purchaser may exercise its rights under the License Power of Attorney only:

(i)    with respect to any such Contract, after a Seller that is a party to such Contract dissolves or ceases to exist, or

(ii)    with respect to any and all such Contracts, at any time after (A) a Seller has acted or omitted to act, as applicable, in contravention of its obligations described in Paragraph 28(b) through (g) of the Form of U.S. Sale Order set forth in Exhibit F and paragraph 14(b) through (g) of the Form of Canadian Approval and Vesting Order set forth in Exhibit G; (B) the Purchaser has subsequently provided such Seller with a notice entitled "NOTICE OF BREACH AND INTENDED USE OF LICENSE POWER OF ATTORNEY," alleging in reasonable detail the occurrence of such contravening action or omission described in the foregoing clause (A) and explaining why the Purchaser believes such contravening action or omission constitutes a contravention of such provisions, and (C) ten (10) Business Days have elapsed since the Purchaser

-58-

provided such notice to such Seller pursuant to the foregoing clause (B), during which time (x) the Purchaser did not subsequently agree that such act or omission was not in contravention of the Sellers' obligations described in (A) OR (y) the Sellers did not obtain from a court of competent jurisdiction declaratory relief stating that such Seller has neither acted nor omitted to act in contravention of such obligations.

(b)    Following the first valid exercise of the License Power of Attorney described in Section 5.25(a), the Purchaser shall provide the Sellers with written notice at least five (5) Business Days in advance of its exercise of its rights under the License Power of Attorney, unless such provision of such notice five (5) Business Days in advance is not reasonably practicable under the circumstances, in which case the Purchaser shall give written notice of its exercise of its rights under the License Power of Attorney as early as is reasonably practicable under the circumstances.

(c)    With respect to any exercise of the License Power of Attorney with respect to the obligations described in Paragraphs 28(a) and (h)(y) of the form of U.S. Sale Order set forth in Exhibit F and Paragraphs 14(a) and (h)(y) of the form of Canadian Approval and Vesting Order set forth in Exhibit G, the Purchaser shall provide the Sellers with written notice at least five (5) Business Days in advance of its exercise of its rights under the License Power of Attorney, unless such provision of such notice five (5) Business Days in advance is not reasonably practicable under the circumstances, in which case the Purchaser shall give written notice of its exercise of its rights under the License Power of Attorney as early as is reasonably practicable under the circumstances.

SECTION 5.26.    Exclusivity.  No Seller shall (and each Seller shall cause its directors, officers, employees, consultants, representatives and other advisors not to and use its best efforts to cause its Affiliates not to), directly or indirectly, at any time prior to the later of the entry of the U.S. Sale Order by the U.S. Bankruptcy Court and the granting of the Canadian Approval and Vesting Order by the Canadian Court, (i) initiate, solicit or knowingly encourage (including by way of furnishing information or assistance), or knowingly induce, the submission or announcement of any proposal or offer for an Alternative Transaction, or (ii) enter into any letter of intent, memorandum of understanding, asset sale agreement or other agreement, arrangement or understanding relating to any Alternative Transaction.

SECTION 5.27.    Optioned Licenses.

(a)    At any time after the date hereof but prior to the Closing Date, Purchaser shall have the right, by delivery of written notice to the Sellers, to require the Sellers to, and each Seller hereby agrees that it shall, concurrently with the Closing but immediately prior to the sale, conveyance, transfer, assignment and delivery to the Purchaser of the Assets, enter into one or more licenses with the Purchaser and/or one or more of the Purchaser's limited partners (collectively, the "**Optioned Licenses**") in the form or forms proposed by the Purchaser and acceptable to the Sellers (it being understood that the provisions in the Optioned Licenses relating to the field of use, scope of licensed products and services, releases by parties other than the Sellers, termination for breach,and  assignment or change of control shall be determined by the Purchaser and shall not be subject to the Sellers' acceptance), in exchange for an aggregate

amount of upfront license fees not to exceed $1,000,000,000 in respect of all such Optioned Licenses (such aggregate amount, the "**Optioned Licenses Fees**").  If Purchaser requires the Sellers to enter into Optioned Licenses, Purchaser shall pay or cause to be paid to the Distribution Agent, on the Closing Date in immediately available funds, the Optioned Licenses Fees, and the Purchase Price otherwise payable by Purchaser pursuant to Section 2.2 shall be reduced by the amount of the Optioned Licenses Fees.

(b)    (i)    Purchaser shall defend, indemnify and hold harmless each of the Seller Licensing Indemnitees from and against any and all Damages suffered by any Seller Licensing Indemnitee that arise out of, or result from or are caused by the Sellers' execution, delivery and performance of the Optioned Licenses other than with respect to Taxes, which shall be governed by Section 5.27(b)(ii).

(ii)    (A) Purchaser shall pay on Closing to the Canadian Sellers Fifteen Million Dollars ($15,000,000) in respect of the utilization of tax attributes of the Canadian Sellers as a result of the receipt of the Optioned Licenses Fees;

(B)    From the Closing Date until the expiration of the applicable statutes of limitation (or reassessment periods), Purchaser shall (x) indemnify and hold the Canadian Sellers harmless on an after-Tax basis from and against any Incremental Taxes paid or payable by a Canadian Seller pursuant to applicable Law; (y) indemnify and hold the U.S. Sellers harmless on an after-Tax basis from and against any Incremental Taxes paid or payable by a U.S. Seller pursuant to applicable Law; and (z) indemnify and hold the EMEA Sellers, Joint Administrators and the French Liquidator harmless on an after-Tax basis from and against any Incremental Taxes paid or payable by an EMEA Seller pursuant to applicable Law;

(C)    (x) the Purchaser will pay the Optioned License Fees to the Sellers, Joint Administrators and the French Liquidator free and clear of and without deduction or withholding for withholding Taxes or any other amounts; provided that if the Purchaser shall be required under applicable Law to deduct or withhold any amount from the Optioned Licenses Fees, then (i) the amount payable shall be increased as necessary so that, after making all required deductions or withholdings (including deductions or withholdings applicable to additional amounts payable), the Sellers, Joint Administrators and the French Liquidator receive an amount equal to the sum they would have received had no such deduction or withholding been made, (ii) the Purchaser shall make such deduction or withholding, and (iii) the Purchaser shall pay to the relevant Tax Authority in accordance with applicable Law the full amount deducted or withheld; provided, further, that Purchaser shall have no obligation to pay additional amounts pursuant to clause (i) of the preceding proviso to the extent that the withholding Taxes are attributable to a Seller's failure to comply with the requirements of Section 5.27(b)(ii)(C)(y) unless such failure is due to the Purchaser's failure to cooperate fully with any Seller for the purposes of obtaining any exemption or reduction referred to in Section 5.27(b)(ii)(C)(y).  The Purchaser shall promptly furnish the Sellers, Joint Administrators and the French Liquidator with such evidence as may be required by the applicable Tax Authorities to establish that any such Tax has been paid, and shall indemnify and hold harmless the Sellers,Joint Ad ministrators and French Liquidator on an after-Tax basis from any liability for penalties or interest due to the payor's failure to timely withhold and remit amounts in respect of Taxes to the applicable Tax Authority;

(y) If the Purchaser determines that a Seller is entitled to an exemption from or reduction of withholding Tax under the law of any jurisdiction in which Purchaser or its limited partners were formed or are located, or under any treaty to which such jurisdiction is a party with respect to the Optioned Licenses Fees, such Seller shall deliver at the time or times prescribed by applicable Law or reasonably requested by Purchaser, such properly completed and executed documentation prescribed by applicable Law and as reasonably requested by the Purchaser and provided that the Purchaser cooperates with any such Seller to the extent necessary for obtaining any such exemption or reduction as will permit such payments to be made without withholding or at a reduced rate, provided that such Seller is legally entitled to complete, execute and deliver such documentation; and

(D)     If any Seller becomes aware of any circumstances that could cause Purchaser to be required to indemnify any Seller, the Joint Administrators or the French Liquidator pursuant to Section 5.27(b)(ii)(B), such Seller shall promptly provide written notice to Purchaser.  The Sellers shall, at the request of Purchaser and at Purchaser's expense, use commercially reasonable efforts (taking into account available resources) to object to, challenge, or appeal any assessment, audit, or administrative or judicial proceeding that could result in the denial of or limitation on the applicability, availability, or amount of any losses, undeducted expenses, Tax credits or any other Tax attributes of the Sellers (a "Tax Attribute Contest").  In furtherance of the foregoing, the Sellers shall (i) provide Purchaser with a timely account of each phase of such Tax Attribute Contest, (ii) provide Purchaser with copies of all written materials prepared or furnished in connection with such Tax Attribute Contest and (iii) permit Purchaser to participate in any Tax Attribute Contest to the extent permitted by applicable Law. Notwithstanding the foregoing, the Sellers shall not be required to pursue any Tax Attribute Contest or permit Purchaser to participate in or control any Tax Attribute Contest to the extent that they determine, in their reasonable discretion, that doing so would be administratively burdensome in the circumstances or would materially delay or impede the CCAA Cases, Chapter 11 Cases or EMEA Cases.

(iii) For the a     voidance of doubt, subject to any provisions in this Agreement to the contrary, each party may report the transactions on its tax returns in its sole discretion.

SECTION 5.28.     Transferring Employees.

(a)     Purchaser shall cause one of its limited partners to, and the relevant Sellers named therein shall, enter into that certain Employee Transfer Side Agreement as set forth on Exhibit H.

(b)     Other than as provided for in 2.1.3(d), 5.28(c ) or the Employee Transfer Side Agreement, the Sellers shall retain, and none of the Purchaser or its limited Partners shall assume or be deemed to have assumed, any Liabilities of the Sellers or their Affiliates relating to Employees (the "**Excluded Employee Liabilities**").  The Excluded Employee Liabilities shall include, but not be limited to, the following:

(i)     the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any employee benefit

plan or arrangement of any Seller, any obligation to provide continuation coverage pursuant to COBRA under any employee benefit plan or arrangement of any Seller that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferring Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to the Closing; and

(ii)     any Liabilities relating to the Employees or any former employees employed by the Sellers (with respect only to such employees' employment with the Sellers), including payments or entitlements that Sellers or any of their Affiliates may owe or have promised to pay to any current or former Employees, including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions or benefits, Taxes, ERISA Affiliate Liability, any obligation, liability or expense relating to any employment agreement or contract, the employment practices of Sellers or any of their Affiliates prior to the Closing Date and any other liability, payment or obligations related to current or former Employees, including any Liabilities relating to actions of the Sellers arising on or prior to the Closing Date, any workers compensation, labor, social welfare or similar Law, if any, including any such Liabilities arising out of or resulting from the Closing and/or the consummation of the transactions contemplated by this Agreement, other than with respect to liabilities incurred after the Closing Date by Transferring Employees who are terminated by one of Purchaser's limited partners after the Closing Date.

(c)     The Purchaser shall bear severance costs incurred by the Sellers in connection with the termination of employment by Sellers of the Employees (other than the Transferring Employees (as defined in the Employee Transfer Side Agreement); provided, however, that the amount of such severance costs to be paid by the Purchaser shall not exceed $2,600,000.

(d)     The terms and provisions of this Section 5.28 are for the sole benefit of the Sellers and the Purchaser.  Nothing contained herein, express or implied (i) shall be construed to establish, amend or modify any employee benefit plans, programs, agreements or arrangements of any of the Sellers or the Purchaser, (ii) shall alter or limit the ability of the Purchaser or any of its limited partners to amend, modify or terminate any employee benefit plans, programs, agreements or arrangements after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or constitute or create an employment agreement with any Transferring Employees or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual any right as a third party beneficiary of this Agreement.

ARTICLE VI

TAX MATTERS

SECTION 6.1.        Transfer Taxes.

(a)        The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller, the Joint Administrators, or the French Liquidator or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Joint Administrators, French Liquidator, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller, Joint Administrators or French Liquidator. Upon request from a Seller, the Joint Administrators or the French Liquidator, the Purchaser shall provide to such Seller, Joint Administrators or French Liquidator an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller, Joint Administrator or French Liquidator) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1. For the avoidance of doubt, the Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses.

(b)        If the Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, or engage in any other transaction designed to reduce, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers, Joint Administrators or French Liquidator (as applicable) prior to Closing with its permit number, GST/HST, VAT, provincial sales taxes or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser. All parties shall make commercially reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction. Notwithstanding the foregoing, any such cooperation to be provided in this Section 6.1(b) shall not include or extend to (i) a liquidation or restructuring of a Seller or any business of a Seller, including the transfer of any assets or Assets or liabilities or Assumed Liabilities between the Sellers or their Affiliates, unless the Seller or the relevant Affiliate is indemnified (prior to such liquidation or restructuring) against any cost or expense of such liquidation or restructuring to its satisfaction (acting at all times reasonably and in good faith); (ii) any action or omission that would result in the imposition on any Seller or any Affiliate of any Seller of any additional Tax liability or making any additional payment to any Tax Authority or Government Entity in respect of Tax which is an Excluded Liability, unless such Seller or Affiliate is (prior to the relevant action or omission) indemnified against such additional Tax liability or payment; (iii) any action or omission that would result in any material out of pocket cost or expense for any Seller or any

-63-

Affiliate of any Seller, unless such Seller or Affiliate is (prior to the relevant action or omission), indemnified against such cost or expense to their satisfaction (acting at all times reasonably and in good faith) by the Purchaser; (iv) any action or omission which would cause the Sellers or any Affiliates of the Sellers to be in contravention of any applicable Law (including Bankruptcy Law) or published practice of a Tax Authority; (v) changing the identity or Tax residence of any Sellers, the location of any Assets or Assumed Liabilities, the nature or extent of any Assets or Assumed Liabilities, the Assets or Assumed Liabilities to be transferred by any particular Seller or the structure of the transaction as an asset sale rather than the sale of any form of entity, unless the Seller or the relevant Affiliate is indemnified (prior to such action) against any cost or expense of such action to its satisfaction (acting at all times reasonably and in good faith); or (vi) any reduction in the obligations of the Purchaser or rights of the Sellers.

It is agreed and acknowledged that for the purposes of this Section 6.1, "Transfer Taxes" do not include VAT in respect of any supply (or deemed supply) of goods and services pursuant to this Agreement, for which the provisions of Section 6.9 shall apply instead.

SECTION 6.2.    <u>Withholding Taxes</u>.  If the Purchaser is required for any reason to deduct or withhold from any payment made pursuant to this Agreement or any other Transaction Document (other than the Optioned License Fees, which shall be governed by Section 5.27(b)(ii)(C)), for any Tax imposed by a Tax Authority solely as a result of the identity of the Purchaser, the residence of the Purchaser or in respect of income of the Purchaser, but not for any other reason, and if the applicable Seller, Joint Administrators or French Liquidator after exercising commercially reasonable efforts is unable to recover such Tax from such Tax Authority, the payment of the Purchase Price shall be increased to an amount which, after taking into account such deduction or withholding or Tax, will result in payment to the applicable Seller, Joint Administrators or French Liquidator of the full amount such Seller, Joint Administrators or French Liquidator would have received from the Purchaser had no such deduction or withholding been made or Tax been liable.  The Purchaser shall promptly furnish the Sellers, Joint Administrators and French Liquidator with such evidence as may be required by the applicable Tax Authorities to establish that any such Tax has been paid, and shall indemnify and hold harmless the Sellers, Joint Administrators and French Liquidator on an after-Tax basis from any liability for penalties or interest due to the payor's failure to timely withhold and remit amounts in respect of Taxes to the applicable Tax Authority. The Purchaser shall promptly, and in any event not later than thirty (30) days prior to Closing, inform the Seller, Joint Administrators and French Liquidator, that either (i) deductions or withholdings as referred to in this Section 6.2 are required, or (ii) no such deductions or withholdings are required.  In the event that the Purchaser notifies that such deductions or withholdings are required, the applicable Seller, Joint Administrators or French Liquidator shall take no action inconsistent with the information contained in such notice unless such action is required to be taken in order to comply with any applicable Law or Tax Authority published practice.

SECTION 6.3.    <u>Tax Characterization of Payments Under This Agreement</u>. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than any interest payments and Optioned Licenses Fees) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4.    Apportionment of Taxes.

(a)    Except as otherwise provided in Section 5.27 or in this Article VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets for all Tax periods or portions thereof ending on or before the Closing Date and all Taxes resulting from the disposition of the Assets and the receipt of the Optioned Licenses Fees, and (ii) the Purchaser shall bear all Taxes relating to the Assets for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of any Taxes based on or measured by income or receipts related to the Assets shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period on a closing-of-the-books (at midnight on the Closing Date) basis. The amount of other Taxes shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

SECTION 6.5.    Records.

(a)    Except as provided elsewhere in this Section 6.5, (i) after the Closing Date, the Purchaser, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets or the Assumed Liabilities for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets or the Assumed Liabilities for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party such access as is reasonably necessary to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be reasonably necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof), provided, that, beginning on the date that is one year following the Closing Date, the obligations

-65-

of the Sellers under this Section 6.5(a) shall be limited to commercially reasonable efforts, taking into account available personnel and resources.

(b)    At any time within the ten (10) years immediately following the Closing, NNL and Nortel Networks Technology Corporation ("**NNTC**") may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending no later than ten (10) years after the Closing Date in accordance with an escrow agreement between the Purchaser, NNL and NNTC and the Records Custodian, in form satisfactory to the Purchaser, NNL and NNTC. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development Tax credits of NNL and NNTC under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser, acting reasonably.  The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)    The Purchaser shall use commercially reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided that such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)    The Purchaser shall have no obligation to provide any access under Section 6.5(c) unless NNL or NNTC (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with Section 6.5(c), including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)    The obligations of the Sellers under Section 6.5(a) shall be subject to the following:

(i)    the parties agree and acknowledge that the Sellers shall be entitled, prior to any disclosure or making available, to redact the relevant information, records or documents as they hold to ensure that they show only information relevant to the Assets or Assumed Liabilities and do not show any other information except as required by applicable Law;

(ii)    the Sellers, on the one hand, and the Purchaser, on the other hand, shall not be obliged to provide any access under Section 6.5(a) unless the

-66-

requesting party pays all of the reasonable costs and expenses of the party granting access, in each case incurred in connection with the granting of such access, including a reasonable hourly rate for access to employees or agents of the party granting access (based on the total compensation of the employee or agent at the time that access is provided); and

(iii)the Sellers shall not be re    quired, pursuant to Section 6.5(a), to provide the Purchaser with access to or copies of any working papers or other documentation (including court orders or other documents) prepared by, or relating to, the Joint Administrators or the French Liquidator which the Joint Administrators or the French Liquidator are required to maintain in confidence under applicable Law.

SECTION 6.6.        Tax Disclosure.  Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any nonpublic commercial or financial information); provided,h owever, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

SECTION 6.7.        Tax Returns.

(a)        The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.7(b)). Such Tax Returns shall be true, correct and complete in all material respects.  Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Sellers as and when required by Law.

(b)        Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. The Sellers shall make available to the Purchaser that portion of such Transfer Tax Returns prepared by the Sellers that is applicable to the sale and purchase transaction contemplated by this Agreement, and, to the extent not already disclosed, such information as will enable the Purchaser to review such portion of such Transfer Tax Returns at least ten (10) Business Days before such Tax Returns are due to be filed, and such portion of such Transfer Tax Returns shall

be revised before filing as reasonably requested by the Purchaser. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.7(b) at least one (1) Business Day before such Transfer Tax becomes due and payable in each case to the extent such Transfer Taxes are the responsibility of the Purchaser pursuant to Section 6.1(a).

(c)　　The Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets for all Post-Closing Taxable Periods and Straddle Periods, provided that for the avoidance of doubt, nothing in this Section 6.7(c) shall give the Purchaser any rights over the Tax Returns of the Sellers (a) that are required to be submitted to any relevant Tax Authority and which relate to such Sellers' taxable income and gains for the taxable period during which Closing takes place, or (b) that are in respect of VAT. Such Tax Returns shall be true, correct and complete in all material respects and shall be prepared on a basis consistent with Tax Returns prepared for prior taxable periods unless a different treatment of any item is required by Law or this Transaction. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Party responsible therefor pursuant to Section 6.4(b) hereof as and when required by Law. Nothing in this Section 6.7(c) shall prejudice the rights of the Parties under Section 2.2.3(b).

(d)　　The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.7(b)) prepared by the Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the NA Sellers at least sixty (60) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The NA Sellers shall have fifteen (15) days after the date of receipt thereof to submit to the Purchaser, in writing, the NA Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the NA Sellers within fifteen (15) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the NA Sellers, the Purchaser and the NA Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within ten (10) days, the parties immediately shall appoint an Accounting Arbitrator to determine the correct manner for reporting the items that are in dispute and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have fifteen (15) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

(e)　　It is agreed and acknowledged that for the purposes of this Section 6.7, "Transfer Taxes" do not include VAT in respect of any supply (or deemed supply) of goods and services pursuant to this Agreement, for which the provisions of Section 6.9 shall instead apply, except that and for the avoidance of doubt, for the purposes of Section 2.2.3(b), "Transfer Tax Returns" shall include Tax Returns with respect to VAT.

SECTION 6.8.      Canadian Tax Election.

(a)      If the Purchaser is a resident of Canada for purposes of the Income Tax Act (Canada) (and any equivalent provincial statute) and provided that a portion of the Assets transferred pursuant to this Agreement by the NA Sellers and Other Sellers to the Purchaser is being transferred to the Purchaser in consideration for the Purchaser assuming prepaid obligations of the NA Sellers and Other Sellers to deliver goods or provide services in the future, the NA Sellers and Other Sellers and the Purchaser will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute) as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election. The elected amount will be jointly determined by the NA Sellers and Other Sellers and the Purchaser, acting reasonably. The NA Sellers and Other Sellers and the Purchaser will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply *mutatis mutandis* in respect thereof.

(b)      To the extent the NA Sellers and Other Sellers and the Purchaser cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute), the NA Sellers and Other Sellers and the Purchaser promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant parties immediately shall appoint an Accounting Arbitrator to determine the correct amount to be elected and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

SECTION 6.9.      VAT.

(a)      All sums payable by the Purchaser under this Agreement and/or in respect of the Optioned Licenses shall be exclusive of VAT and, except to the extent Section 6.9(d) applies, where a sum is paid by the Purchaser pursuant to this Agreement and/or in respect of the Optioned Licenses in consideration for any supply (or deemed supply) of goods or services by any of the EMEA Sellers the Purchaser shall, in addition to the consideration payable for such supply, pay to the relevant EMEA Seller, on receipt of an appropriate VAT invoice, an amount equal to the VAT (if any) determined in accordance with Section 2.2.3(b) as, or (as appropriate) determined by the relevant EMEA Seller(s) as arising in respect of such supply together with all interest and penalties thereon (except to the extent that such interest or penalties arise other than as a result of a failure of the Purchaser to comply with any of its obligations pursuant to this Section 6.9), with payment to be made by the Purchaser within five (5) Business Days of receipt of an appropriate valid VAT invoice or Closing (whichever is the later), provided that, no payment shall be due from the Purchaser in respect of VAT pursuant to this Section 6.9(a) or Section 6.9(e) in circumstances where the EMEA Seller, the Joint Administrator or French Liquidator issues a VAT invoice to the Purchaser outside of any applicable time limits within which the Purchaser (or a member of its VAT group) can claim credit for the relevant input tax, and provided further that, for the avoidance of doubt, any amount payable pursuant to this

Section 6.9(a) in respect of any Optioned Licenses shall be an amount determined by the relevant EMEA Seller(s).

(b)     For the avoidance of doubt, and without prejudice to the generality of this Section 6.9, if the relevant EMEA Seller or Joint Administrators or French Liquidator forms the view, acting reasonably, that the supply by the EMEA Sellers of any Assets or assumption from the EMEA Sellers of any Assumed Liabilities (if relevant) is subject to VAT, or that any other amounts payable by the Purchaser or any other supplies made to the Purchaser in each case pursuant to this Agreement and/or in respect of the Optioned Licenses are subject to VAT, then, except to the extent Section 6.9(d) applies, the relevant EMEA Seller(s) or the Joint Administrators or the French Liquidator shall be entitled to provide the Purchaser with a VAT invoice in respect of the supply in question.

(c)     Subject to any contrary provision of this Agreement, a VAT invoice served by any EMEA Seller or the Joint Administrators or the French Liquidator in good faith and in accordance with applicable VAT laws, absent manifest error, shall be accepted by the Purchaser as valid, including in relation to amounts of VAT stated in such invoice, except to the extent the Purchaser has paid the applicable VAT by virtue of Section 6.9(d) below.

(d)     Where the liability for VAT in respect of any supply is a liability of the Purchaser (whether under Section 8 of the Value Added Tax Act 1994 or similar or equivalent provisions in any member of the European Union) the Purchaser shall account for such VAT to the relevant Tax Authority within any applicable time limits.

(e)     In the event that an amount in respect of VAT is payable under the terms of this Agreement and/or in respect of the Optioned Licenses in respect of a supply and: (1) the consideration amount as indicated on the relevant VAT invoice in respect of such supply differs from the actual consideration amount for that supply for VAT purposes (including, but not limited to, situations where the Purchase Price is adjusted in accordance with any provision of this Agreement, and/or the allocation of the Purchase Price to any Assets or Assumed Liabilities is amended, whether pursuant to Section 2.2.3 or otherwise); (2) a Tax Authority determines in writing that a supply by any EMEA Seller in respect of which the Purchaser has paid VAT should properly be characterized as a supply on which VAT does not arise; or (3) for any reason the rate of VAT applicable to the supply in question is changed, then the relevant EMEA Seller(s) and the Purchaser agree to co-operate in good faith to correct all relevant VAT invoices and VAT returns and (without prejudice to the generality of the foregoing):

(i)     where the purchase price for any Assets and/or Assumed Liabilities (if relevant) is increased, or VAT otherwise becomes due, the Purchaser shall pay to the relevant EMEA Seller (or relevant Tax Authority, where applicable) an amount equal to any additional VAT that becomes due as a result of such increase with payment to be made by the Purchaser within five (5) Business Days of receipt of an appropriate valid VAT invoice or Closing, whichever is the later; and

(ii)     where the purchase price for any Assets and/or Assumed Liabilities (if relevant) is decreased, or to the extent that a relevant Tax Authority

determines in writing that a supply by any EMEA Seller in respect of which the Purchaser has paid an amount in respect of VAT should properly be characterised as a supply on which VAT does not arise, or where the rate of VAT applicable to the supply in question is decreased, or where the Purchaser has otherwise paid an amount in respect of VAT to an EMEA Seller under Section 6.9(a) that was not due, the relevant EMEA Seller shall, without unreasonable delay, issue an appropriate and valid VAT credit note or equivalent to the Purchaser and shall use its reasonable endeavors to recover the Excess VAT and, to the extent the Excess VAT is actually recovered and retained by it (or by any member of its VAT group) or is creditable by any EMEA Seller against any VAT liability of an EMEA Seller (or is so creditable by any member of its VAT group), the relevant EMEA Seller shall, without unreasonable delay, pay such Excess VAT to the Purchaser, and for the purposes of this Section 6.9(e)(ii), "**Excess VAT**" means the amount in respect of VAT actually paid (after deducting any previous refund under this Section 6.9(e)(ii)) by the Purchaser that should not have been paid, taking into account the decrease in purchase price, the incorrect characterization of a supply, the decrease in the VAT rate or the amount in respect of VAT that was paid to an EMEA Seller that was otherwise not due.

(f)      The EMEA Sellers, Joint Administrators, French Liquidator and the Purchaser agree to act in good faith in accordance with Section 2.2.3 for all purposes relating to VAT (including the preparation and filing of any VAT invoices or Tax Returns with respect to VAT).

(g)      If it is not possible for the EMEA Sellers, Joint Administrators, French Liquidator and the Purchaser in accordance with Section 2.2.3 to determine before the date falling five (5) Business Days prior to Closing an amount of consideration for the purposes of VAT invoicing (notwithstanding that the Purchaser has not by such date delivered a proposed Partial Allocation pursuant to Section 2.2.3(b)) and in all cases in respect of all sums payable in respect of any Optioned Licenses, then:

(i)      where any of the EMEA Sellers, the Joint Administrators or the French Liquidator are required to account to a Tax Authority for VAT in respect of the supply of any goods or services under this Agreement and/or in respect of the Optioned Licenses, subject to Section 6.9(e), the determination of the relevant EMEA Seller or the Joint Administrators or the French Liquidator (in each case, acting reasonably) shall be accepted by the parties for VAT purposes in respect of such goods or services until and unless replaced pursuant to Section 6.9(e); and

(ii)      where the Purchaser is required to account to a Tax Authority for VAT in respect of the supply of any goods or services under this Agreement and/or in respect of the Optioned Licenses, subject to Section 6.9(e), the determination of the Purchaser (acting reasonably) shall be accepted by the parties for VAT purposes in respect of such goods or services unless and until replaced pursuant to Section 6.9(e).

ARTICLE VII

CONDITIONS TO THE CLOSING

SECTION 7.1.    Conditions to Each Party's Obligation. The Parties' obligation to effect the Closing is subject to the satisfaction or the express written waiver by all of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    *No Injunctions or Restraints*.  Subject to Section 5.6(f), there shall be in effect no Law, or any order, injunction, decree or judgment of any court or other Government Entity prohibiting, preventing or making illegal the consummation of any of the transactions contemplated hereby.

(b)    *U.S. Sale Order, Canadian Approval and Vesting Order, and French Court Order*. The U.S. Sale Order shall have been entered in the form of Exhibit F in accordance with Section 5.1(b), shall not have been modified, revised, vacated or amended in a manner inconsistent with the provisions of Section 5.1(b) and shall have become a Final Order. The Canadian Approval and Vesting Order shall have been entered in the form of Exhibit G in accordance with Section 5.2(a), shall not have been modified, revised, vacated or amended in a manner inconsistent with the provisions of Section 5.2(a) and shall have become a Final Order.

(c)    *CDMA Vesting Order*. The requirements of paragraph 7 of the CDMA Vesting Order shall have been satisfied.

SECTION 7.2.    Conditions to Sellers' Obligation. The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Primary Seller Parties), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties*. Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as of the Closing Date as if made on and as of such date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)    *No Breach of Covenants*.  The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(c)    *Officer Certificate*.  The Sellers shall have been furnished with a certificate signed by a senior officer of the Purchaser certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

(d)    *Recent Emergence of Unknown Licenses*.  Ten (10) Business Days shall have elapsed since the provision of the most recent notice, if any, that the Sellers have provided to the Purchaser pursuant to and in compliance with Section 8.1(d)(iii)(B).

SECTION 7.3.        Conditions to Purchaser's Obligation.  The Purchaser's obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)        *No Breach of Representations and Warranties and Annex I Statements.* Each of the representations and warranties set forth in Article IV and each statement in Annex I, in each case disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as of the Closing Date as if made on and as of such date or (ii) if made as of a date specified therein, as of such date, except for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)        *No Breach of Covenants.*  The Sellers shall have complied in all material respects with all material covenants, obligations and agreements contained in this Agreement required to be performed by the Sellers on or before the Closing.

(c)        *Officer Certificate.*  The Purchaser shall have been furnished with a certificate signed by a senior officer of each of the NA Sellers that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

For the avoidance of doubt, the parties acknowledge that the Purchaser's knowledge of the existence of any facts, events, conditions or circumstances, except by reason of the Transaction Documents and the Sellers Disclosure Schedule, shall not in any way prevent the Purchaser from exercising all of its rights hereunder and requiring that all conditions in Sections 7.1 and 7.3 be satisfied in full.

## ARTICLE VIII

## TERMINATION

SECTION 8.1.        Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)        by mutual written consent of the Primary Parties;

(b)        by either Primary Party, upon written notice to the other Primary Party if the Closing does not take place on or prior to the date that is one hundred and eighty (180) days from the date of this Agreement (such date, as it may be extended pursuant to the proviso below, the "**Outside Date**"); provided, that the Outside Date shall be extended by successive periods of forty-five (45) days if on the date of each such extension all of the conditions to the Closing set forth in Article VII other than the conditions in Section 7.1(a) and/or Section 7.1(b) are satisfied (or are capable of being satisfied should Closing occur on the next Business Day); provided, however, that the Outside Date shall in no event be more than three hundred and sixty (360) days from the date of this Agreement.

(c)        by the Purchaser, upon written notice to the Primary Seller Parties:

-73-

(i)     in the event of a breach by the Sellers of the Sellers' representations, warranties, Annex I statements, agreements or covenants set forth in this Agreement, which breach would result in a failure of any of the conditions to Closing set forth in Section 7.1, Section 7.3(a) or Section 7.3(b), as applicable, and which breach, if capable of being cured, has not been cured within twenty-five (25) days from receipt of written notice thereof from the Purchaser (but not later than the Outside Date);

(ii)     in the event of the Sellers' breach of their obligation to close the transactions contemplated hereby at the Closing, which breach, if capable of being cured, has not been cured within five (5) days from receipt of written notice thereof from the Purchaser (but not later than the Outside Date);

(iii) upon or following the d     etermination by any of the Primary Seller Parties (by resolution of the board of directors or similar governing body (in the case of the NA Sellers), decision in writing of the Joint Administrators (in the case of NNUK), or by entry into a definitive written agreement) or upon or following written notice to the Purchaser, the official committee of unsecured creditors (or the equivalent) in any of the Bankruptcy Proceedings or public announcement (including any filing in a Bankruptcy Court by any of the Primary Seller Parties) thereof to proceed with any Asset Retention Transaction;

(iv)     (A) upon or following the forty-fifth (45th) day after the date of this Agreement, if the hearing(s) to consider approval of the U.S. Sale Order and the Canadian Approval and Vesting Order shall not have commenced or the U.S. Sale Order and the Canadian Approval and Vesting Order shall not have been entered on such date, or (B) upon or following the date on which the U.S. Bankruptcy Court shall have stated unconditionally that it will not enter the U.S. Sale Order or the Canadian Court shall have stated unconditionally that it will not enter the Canadian Approval and Vesting Order;

(d)     by the Primary Seller Parties, upon written notice to the Purchaser:

(i)     in the event of a breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of any of the conditions to Closing set forth in Section 7.1, Section 7.2(a) or Section 7.2(b), as applicable, and which breach, if capable of being cured, has not been cured within twenty-five (25) days from receipt of written notice thereof from the Primary Seller Parties (but not later than the Outside Date);

(ii)     upon the Purchaser's breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Primary Seller Parties (but not later than the Outside Date); or

-74-

(iii) in the event that     (A) one or more Persons asserts the existence of an Unknown License (as defined in the U.S. Bidding Procedures Order and the Canadian Sales Process Order) that has been or would be rejected, repudiated or terminated pursuant to the procedures described in the U.S. Bidding Procedures Order or the Canadian Sales Process Order and that the Primary Seller Parties determine, in the exercise of their reasonable good faith judgment, would, taken together with all other such Unknown Licenses asserted to exist that have likewise been or would likewise be rejected, repudiated or terminated pursuant to the procedures described in the U.S. Bidding Procedures Order or the Canadian Sales Process Order, constitute a substantial risk of resulting in an aggregate allowed damage claim at least equal to the dollar amount specified in Section 8.1(d) of the Sellers Disclosure Schedule, if rejected, repudiated or terminated; (B) the Sellers promptly notified the Purchaser in writing of such assertion of the existence of such Unknown License(s) and the basis for the Sellers' reasonable good faith estimate of such potential allowed damage claim(s) and provided to the Purchaser such copy of such Unknown License(s) as in the Sellers' possession on the basis set forth in Section 2.3.2(b)(v), and subsequently provided the Purchaser updates (which shall not constitute a further notice under this clause (B)) as to any material change in the facts that formed the basis of the Primary Seller Parties' determination specified in the preceding clause (A); (C) the Primary Seller Parties have requested in writing the consent of the Purchaser to withdraw the rejection or repudiation of, or to elect not to terminate, such Unknown License(s) and to deem each such Unknown License a "Continuing Unlisted License" for purposes of Section 2.1.1(a) (which consent shall be granted or denied in the Purchaser's sole and absolute discretion); and (D) the Purchaser shall not have provided its consent in writing to such request by the date that is ten (10) Business Days after the date the Purchaser receives the notices described in the foregoing clauses (B) and (C) and such copy of the asserted Unknown License in the Sellers' possession on the basis set forth in Section 2.3.2(b)(v) (it being understood that the Purchaser's consent to such withdrawal or election not to terminate will not affect the Purchaser's rights under Article IX or any other provision of this Agreement);

provided, however, that the right to terminate this Agreement pursuant to Section 8.1(b), Section 8.1(c)(i), Section 8.1(c)(ii), Section 8.1(d)(i) or Section 8.1(d)(ii) shall not be available to the Primary Party seeking to terminate if such Primary Party has breached this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement.

SECTION 8.2.     Effects of Termination.  If this Agreement is terminated pursuant to Section 8.1:

(a)     all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other Parties except for the provisions of, or as provided in, this Section 8.2 and (i) Section 2.2.2 (Good Faith Deposit), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (vi) Section 8.2 (Effects of Termination) and (vii) Article X (Miscellaneous);

provided, that, subject to Section 10.15, nothing herein shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof; and

(b)    the provisions of the Non-Disclosure Agreement and the Supplementary Non-Disclosure Agreement will continue in full force and effect.

ARTICLE IX

SURVIVAL

SECTION 9.1.    Survival.  No representations, warranties, covenants or agreements of any of the Sellers contained herein (including Annex I) or in any other Transaction Document shall survive the Closing, except (x) for covenants that by their terms are to be satisfied after the Closing Date, which covenants shall survive in accordance with their terms, and (y) as may be expressly provided in any Transaction Document other than this Agreement.  No representations and warranties of the Purchaser contained herein or in any other Transaction Document (except, in the case of such other Transaction Documents, as may be expressly provided therein) shall survive beyond the Closing Date.  This Section 9.1 shall not limit any Party's liability for actual fraud (which, for the avoidance of doubt, shall exclude constructive fraud and equitable fraud).

ARTICLE X

MISCELLANEOUS

SECTION 10.1.    Indemnity Relating to Certain License Non-Assignment and Non-Renewal Protections.

(a)    The Purchaser shall indemnify and hold each Seller Indemnitee harmless from and against any and all Damages suffered by such Seller Indemnitee that arise out of, result from or are caused by any Action instituted or asserted by a Third Party against such Seller Indemnitee (a "**Section 10.1 Third Party Claim**") as a result of the Purchaser's use and exercise (and not merely the grant) of the power of attorney granted pursuant to Section 28(h) of the U.S. Sale Order or Section 14(h) of the Canadian Approval and Vesting Order (the "**License Power of Attorney**").

(b)    The Purchaser shall have the right to undertake, conduct and control, through counsel of its own choosing and at its own expense, the defense of any Section 10.1 Third Party Claim, and the Seller Indemnitees shall reasonably cooperate with the Purchaser in such defense at the expense of the Purchaser.  Promptly (and in any event within thirty (30) days) after any Seller Indemnitee actually learns of any Section 10.1 Third Party Claim that is reasonably likely to give rise to indemnification under this Section 10.1 (a "**Section 10.1 Indemnification Claim**"), such Seller Indemnitee shall deliver to the Purchaser a notice executed by such Seller Indemnitee setting forth in reasonable detail the matter giving rise to the Section 10.1 Indemnification Claim hereunder, including, if available, a reasonable estimate of the anticipated Damages (such notice, a "**Section 10.1 Notice of Claim**").  The Primary Seller Parties may, at their option, participate in the defense of such Section 10.1 Third Party Claim

-76-

(including through the employment of that choice of counsel, who shall be reasonably satisfactory to the Purchaser, it being understood that the Primary Seller Parties shall be responsible for the payment of the fees, charges and disbursements of such counsel) provided, that (i) such participation shall not limit the Purchaser's control of such Section 10.1 Third Party Claim and (ii) the Primary Seller Parties and their counsel shall reasonably cooperate with the Purchaser and its counsel in connection with such Section 10.1 Third Party Claim.

(c)     No delay on the part of any Seller Indemnitee in giving a Section 10.1 Notice of Claim shall limit or reduce such Person's right to indemnity hereunder, or relieve the Purchaser from any of its obligations under this Section 10.1, unless (and then only to the extent that) the Purchaser is actually prejudiced thereby (including with respect to the Purchaser's ability to fully undertake, conduct and control the defense of the Section 10.1 Third Party Claim or as a result of a material increase in the liability which the Purchaser would otherwise have under this Section 10.1).

(d)     The Seller Indemnitees shall not compromise or settle any Section 10.1 Third Party Claim without the consent of the Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned).

SECTION 10.2.    Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 10.3.    No Third Party Beneficiaries.  Except for any acknowledgments, rights, undertakings, covenants, indemnities, representations or warranties expressed to be for the benefit of the Joint Administrators,the Fr ench Liquidator and the Seller Indemnitees, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 10.4.    Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be, at their sole discretion.

SECTION 10.5.    Successors and Assigns.  Except as otherwise expressly provided in this Agreement, all representations, warranties, Annex I statements, covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Primary Seller Parties in case of an assignment by

the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such Party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided that the assigning Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties), (ii) assignment by a U.S. Debtor to a succeeding entity upon consummation of a plan of reorganization with respect to such U.S. Debtor pursuant to Chapter 11 of the U.S. Bankruptcy Code and (iii) assignment by any of the Canadian Debtors to a succeeding entity pursuant to any plan of arrangement approved by the Canadian Court.

The provisions of this Agreement shall survive for the benefit of the Joint Administrators, the French Liquidator, their firm, partners, employees, agents, advisers and representatives notwithstanding the discharge of the Joint Administrators as joint administrators of the EMEA Sellers, or the French Liquidator as liquidator of NNSA and shall be in addition to, and not in substitution for, any other right, indemnity or relief otherwise available to each of them.

SECTION 10.6.        Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)        Subject to Section 10.6(b) and Section 10.6(f), any questions, claims, disputes, remedies or Actions arising from or related to this Agreement or the transactions contemplated hereby, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)        To the fullest extent permitted by applicable Law, and except for those matters specifically required to be determined by the Accounting Arbitrator pursuant to the terms hereof, each Party:

(i)        agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of New York (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country;

-78-

(ii)      agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby;

(iii) waives and a    grees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum;

(iv)      agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and

(v)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)      The Purchaser hereby appoints (i) Ericsson Canada, Inc. as its authorized agent (the "**Purchaser Authorized Canadian Agent**" upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, and (ii) Telefonaktiebolaget L M Ericsson (publ) as its authorized agent (the "**Purchaser Authorized EMEA Agent**" and together with the Purchaser Authorized Canadian Agent, the "**Purchaser Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case) and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid. Service of process upon the applicable Purchaser Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)      Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, (ii) Norton Rose OR LLP as its authorized agent (the "**Seller Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable, and (iii) NNUK as its authorized agent (the "**Seller Authorized EMEA Agent**" and together with the Seller Authorized U.S. Agent and the Seller Authorized Canadian Agent, the "**Seller Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case)

and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Primary Seller Parties shall be deemed, in every respect, effective service of process upon every such Seller.

(e)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(f)    Notwithstanding Section 10.6(a) and (b), the Parties, the Joint Administrators and the French Liquidator agree that:

(i)    any questions, claims, disputes, remedies or Actions arising under Section 10.18 in respect of the EMEA Sellers or the Joint Administrators and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the Joint Administrators, (B) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (C) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (D) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts; and

(ii)    any questions, claims, disputes, remedies or Actions arising under Section 10.20 and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the French Liquidator, (B) the personal liability of the French Liquidator, (C) his appointment as liquidator of NNSA or the appointment of the French Office Holders of NNSA and their status as such, shall be governed by French law and be subject to the exclusive jurisdiction of the Versailles courts (France).

SECTION 10.7.    Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address