# EXHIBIT G

CITATION: Nortel Networks Corporation (Re), 2010 ONSC 3061
COURT FILE NO.: 09-CL-7950
DATE: 20100625

**SUPERIOR COURT OF JUSTICE - ONTARIO**

**RE:** IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:** MORAWETZ J.

**COUNSEL:** A. Merskey and S. Wood, for Nortel Networks Limited

S. Philpott, S. Archer, A. McKinnon, for the Former Employees

L. Harmer, for the Superintendent of Financial Services of Ontario

G. Finlayson and S. Zweig, for the Informal Noteholders

G. Rubenstein, for the Monitor

A. MacFarlane, for the Unsecured Creditors' Committee

**ENDORSEMENT**

[1]   On June 4, 2010, I released an endorsement directing that an order be granted requiring Nortel to assign the property to the Annuitants, being the individual annuity contracts to which each Annuitant or his or her beneficiary is an "annuitant", with reasons to follow.

[2]   These are those reasons.

[3]   Nortel Networks Limited ("NNL") brought this motion for advice and directions regarding the legal ownership of funds administered by Sun Life Assurance Company of Canada ("Sun Life") under Policy No. 14910 (the "Annuity Policy").

Case 09-10138-MFW   Doc 5951-9   Filed 07/13/11   Page 3 of 11

JUN-25-2010 14:12        JUGDES ADMIN RM 170                    416 327 5417      P.003/011

- Page 2 -

[4] On January 14, 2009, the Applicants were granted protection under the CCAA pursuant to an Initial Order (the "Initial Order").

[5] Upon commencement of the CCAA proceedings, the Applicants stopped making payments pursuant to a Supplementary Pension and Retirement Allowance Plan (the "SPRAP") which was a retirement benefit plan made available to certain invited senior officers. The Applicants considered these payments to be on account of unsecured claims that pre-dated the Initial Order.

[6] Pursuant to the SPRAP, Sun Life holds ten annuity contracts listing former Nortel employees as the "Annuitants" and Northern Telecom Limited, a predecessor corporation to NNL as the "Owner", (the "Annuities", or individually, "Annuity").

[7] NNL believes it is the owner of the Annuities. The Annuitants believe the Annuities are held in trust for them.

[8] Counsel to the Applicants states that the nub of the inquiry is whether the relationship between NNL and the Annuitants – and therefore the Annuities – is one of contract, or of trust. Counsel to the Applicants submits that the available facts regarding the Annuities contain indicia of both contract and trust, but it is the Applicants' view that the preponderance of the facts indicate a relationship of contract, rather than trust.

[9] The SPRAP dates back to 1979 and the Plan continued until 1985.

[10] The features of the SPRAP included:

   (a) the principal sums awarded to each employee were to be paid to a third party on the anniversary date of the Plan;

   (b) each payment would attract interest at a guaranteed rate for a five to ten year period, renewable for five to ten years at the renewable interest rate in effect at the time of the renewal. The length of the period for which the interest was guaranteed was to be selected by each employee;

   (c) that Nortel would be the owner and beneficiary of the individual Annuity Certificates issued for each payment into the Plan (to avoid constructive receipt).

[11] The SPRAP was specifically designed to take advantage of existing tax laws and Canadian jurisprudence by allowing Nortel to obtain a current deduction for payments made to Sun Life, while the participants could defer paying tax on the amounts until they were actually received.

[12] Significant amendments to the *Income Tax Act* were implemented in 1986, including the introduction of "retirement compensation arrangement" rules ("RCA Rules"). The RCA Rules rendered tax deferral arrangements like the SPRAP ineffective, however, plans already in

- Page 3 -

operation were grandfathered. As a result, the SPRAP was operating until the date of the Initial Order.

[13]   There is evidence to suggest that the Annuitants each entered individual agreements with NNL in accordance with the terms of the SPRAP, but due to the passage of time, the parties were only able to locate a draft Memorandum of Agreement and one agreement signed by a single Annuitant.

[14]   The draft Memorandum of Agreement makes no mention of the existence or creation of either a "trust" or a "trustee". The relevant terms of the agreement state:

>   (a) NNL agrees to pay to the employee in recognition of "services rendered and to be rendered" a special pension and retirement allowance; and
>
>   (b) the employee has the right upon but not before retirement to require NNL:
>
>   > to pay over, on his behalf, a capital sum determined by [NNL] to be equivalent to the special pension and retirement allowance, to a trust company or insurance company for the purchase of a Registered Retirement Savings Plan or an Income Averaging Annuity Contract of the Employee's choice.

[15]   The only signed Memorandum of Agreement that was located contains language which significantly differs from the draft Memorandum. This Agreement states:

> Nothing in this agreement shall give the employee any right in and to the annuity contract nor any right in any specific asset of [NNL] (either as a security interest, as a beneficiary of a trust, or otherwise).

[16]   NNL entered into a group annuity contract with Sun Life on July 1, 1980 (the "Group Annuity Contract"). Pursuant to the terms of the Group Annuity Contract:

>   (a) Sun Life would maintain a deposit fund, which would form a liability of Sun Life's general funds;
>
>   (b) NNL would make deposits to Sun Life annually which would be credited to the "deposit fund";
>
>   (c) a separate "account" would be maintained by Sun Life relating to each individual for whom a portion of a deposit has been allocated by NNL;
>
>   (d) the amounts credited to the "account" would comprise both the principal contributions plus accrued interest; and
>
>   (e) at the direction of NNL, Sun Life could pay to NNL all or any portion of the balance in any individual "account".

[17]  Upon retirement, participants could elect to have the amounts in their "account" with Sun Life (the "Accumulated Sum") paid to them through one of the following methods:

    (a) a life annuity, guaranteed for ten years with or without joint and survivor options;

    (b) a term-certain annuity for a specified period;

    (c) a lump-sum payment of the Accumulated Sum;

    (d) a transfer of the amounts of the Accumulated Sum to NNL from which "planned" withdrawals could be effected.

[18]  The funds were then withdrawn from the deposit fund and were paid out in accordance with the retiree's election. When a retiree elected to have the value of his Accumulated Sum paid into an annuity, Sun Life could use the Accumulated Sum, or funds from another source as directed by NNL, to purchase Annuity Certificates under Policy No. 14190.

[19]  The Annuities listed NNL as both the owner and the beneficiary. The Annuities also record on their face as "annuitant" the name of the individual electing retiree

[20]  Upon commencement of an annuity, Sun Life transferred scheduled payments from the Annuity to NNL. NNL recorded these payments as cash on its balance sheet and deposited the funds into its general operating account. NNL then arranged for payments to the participant (or their surviving spouse). NNL treated payments to participants as deductible expenses and participants were to report these payments as income to be taxed in the usual course.

[21]  As of the date of the Initial Order, nine former employees, or their surviving spouses, continued to receive monthly payments (ranging from $991 to $31,949.65) from NNL. The market value of the Annuities as at July 9, 2009 was approximately $7.5 million.

## LAW AND ARGUMENT

[22]  Counsel to the Applicants submits that NNL is recorded on the face of the Annuity Certificates as the owner and receives the funds from the Annuities. As such, NNL can and has exercised control over the Annuities and, for the Annuitants to establish a property claim to the Annuities, they must establish that the Annuities are trust property, held on their behalf.

[23]  Counsel further submits that, in the circumstances, there are two trust doctrines possibly available to the Annuitants: express trust and constructive trust.

[24]  In order to establish the existence of a express trust, it is necessary to demonstrate that the three constituent elements have been met:

    (a) there was certainty of an intention to create a trust;

    (b) the subject matter of the trust has been described with such certainty that it is ascertainable or capable of ascertainment; and

    (c) those who are to benefit from the trust must be described in terms clear enough that the trust obligation can be performed properly.

[25]   Counsel to the Applicants submits that, arguably, the available evidence is sufficient to demonstrate that the second two elements can be established. That is, the Annuity Certificates state both the name of the Annuitant as well as the monthly monetary entitlement and total principal amount invested.

[26]   Therefore, the primary issue is whether there are sufficient indicia to support a conclusion that NNL intended to create a trust.

[27]   Counsel to the Applicants sets out a number of facts which, he submits, indicates that the relationship between NNL and the Annuitants is contractual and that the Annuities are the property of NNL:

    (a) there is no mention of the words "trust" or "trustee" in any of the SPRAP documents;

    (b) the SPRAP noted that the company would be the owner and beneficiary of the individual annuity contracts;

    (c) the draft memorandum of agreement makes no mention of a trust;

    (d) the draft memorandum notes that the Annuities were subject to three conditions: a non-compete, a confidentiality agreement and an agreement to be available for consulting purposes as long as the retiree is physically able;

    (e) the Annuities could be purchased either using the Accumulated Sum or a capital sum determined by NNL to be equivalent to the special pension and retirement allowance;

    (f) the single signed memorandum of agreement that has been located specifically provides that nothing in the agreement shall give the employee any right in and to the annuity contract;

    (g) the Group Annuity contract between Nortel and Sun Life provides that:

        (i) at the direction of NNL, Sun Life could pay NNL all or any portion of the balance in any "account"; and

        (ii) NNL could elect to purchase an Annuity either using the Accumulated Sum held by Sun Life in the "account" or using any other funding medium;

    (h) the Annuity Certificates themselves provide:

- Page 6 -

(i) Sun Life will pay the benefits provided by this contract to the persons entitled to them; and

(ii) Nortel, rather than another entity, such as a trust company or the SPRAP itself is listed as the "owner";

(i) there is no trust agreement in place with respect to the annuity;

(j) Nortel deposited the funds into a general operating account.

[28]   On the other hand, counsel to the Applicants listed facts that may be indicia of a trust relationship and the Annuities being the property of the Annuitants:

(a) the originating source of the Accumulated Sum were funds or obligations awarded to individual retirees as compensation;

(b) when funds were deposited with Sun Life, although they formed only a general liability, they went into a separate "account" for each of the Annuitants;

(c) each Annuity Certificate lists a different "annuitant".

[29]   On balance, counsel to the Applicants submits that the preponderance of facts suggests that the intention of NNL was to create a contractual relationship and that the Annuities themselves, appear to be simply an investment vehicle through which NNL intended to fund its contractual obligations to the Annuitants.

[30]   Counsel to the Applicants then addressed the issue of whether a constructive trust should be imposed.

[31]   The constructive trust is a judicial tool through which courts remedy unjust enrichment or breach of fiduciary duty. As was affirmed by the Supreme Court of Canada:

"...the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the rules of natural justice and equity to refund the money."

*Moses v. McFerlan* (1760), 2 Burr. 1005, cited with approval in *Pettkus v. Becker*, [1980] 2 S.C.R. 834 at p. 847.

[32]   In order for the Annuitants to make out a successful claim for unjust enrichment, it is necessary to establish:

(a) An enrichment by NNL;

(b) A corresponding deprivation by the Annuitants; and

(c) Absence of any juristic reason for the enrichment.

[33] Counsel to the Applicants acknowledges that NNL has arguably been enriched by receiving funds from Sun Life but failing to make equivalent payments to the Annuitants. However, counsel submits that the Annuitants deprivation is not connected with NNL's receipt of funds from Sun Life; rather, the deprivation arises out of NNL's breach of its contractual obligation to pay the Annuitants. As such, the Annuitants cannot demonstrate that no juristic reason exists to deny recovery, as NNL is required to make monthly payments to the Annuitant but does not require that those payments come directly from or out of the Annuities. Consequently, they submit that the breach of NNL's obligation does not give rise to a trust, but is but one of many unsecured contractual obligations to be dealt with in the CCAA proceedings.

[34] The position of the Applicants is supported by the Informal Nortel Noteholder Group, who filed a factum, and by the Unsecured Creditors' Committee in the Chapter 11 proceedings.

[35] Counsel to the Former Employees submits that the Annuities are subject to an implied trust, submitting that a trust may exist even in the absence of a trust deed or clear language establishing a trust. In such a case, a court can consider the conduct and expectations of the parties in addition to the written documentation between them in determining whether a trust exists. In such circumstances, the court will "imply" a trust. Counsel to the Former Employees references Donovan Water, Water's Law of Trusts in Canada, 3rd ed. (Toronto: Thomson Canada Ltd., 2005); *Eu v. Rosedale Realty Corp. (Trustee of)* 1997, 33 O.R. (3d) 666 (Gen. Div.) at 5 and *McMillan v. Hughes*, 2004 B.C.S.C. 1210.

[36] Alternatively, Nortel has been unjustly enriched and a constructive trust should be imposed.

[37] For the following reasons, I agree with the submissions of counsel to the Former Employees that a constructive trust should be imposed.

[38] It is clear that Nortel has been enriched since January 2009 by its retention of the monthly annuity payments owed to the Annuitants under their applicable Annuity Certificates. It is also clear that the Annuitants have been deprived of those monthly payments.

[39] Counsel to the Former Employees disagrees with the Applicants' contention that the presence of a contractual relationship with the Annuitants is a juristic reason or, in the alternative, that the rights of third-party creditors are a juristic reason for the enrichment of Nortel and deprivation for the Annuitants. Counsel to the Former Employees submits that this is a mechanical interpretation that does not accurately reflect the nature and scope of the retirement arrangements, including the contracts, between Nortel, Sun Life and the Annuitants.

[40] Counsel to the Former Employees submits that a court must look at the entire arrangement in context, and not at terms in isolation. The retirement arrangements contemplate three parties, Nortel, the Annuitants and Sun Life. The Annuity Certificates name the Annuitants as "Annuitants" and these certificates were provided to Annuitants as evidence of their arrangements.

- Page 8 -

[41]     It seems to me that these three-party arrangements were entered into for no other purpose other than the Annuitants' ability to take advantage of a tax shelter. Counsel to the Former Employees submits that Nortel did not receive any benefit or seek to rely on these contracts and, in these circumstances, the existence of a contractual relationship does not form a juristic reason for Nortel to retain the enrichment.

[42]     In my view, it is both necessary and appropriate to take into account that, in substance, assets belonging to the Annuitants were set aside, during their employment, expressly for their benefit in retirement. These assets were a form of deferred compensation.

[43]     The amounts were segregated from Nortel's general assets through annual transfers to Sun Life.

[44]     Upon the purchase of the Annuities, Accumulated Sums were either applied to the purchase of the Annuities, or were transferred from Nortel to purchase the Annuities. Each retiree was as an "annuitant", and some of the Annuities were in the form of joint and survivor Annuities.

[45]     I am satisfied that the segregation of funds into Annuities, with named annuitants, demonstrates an intent to create a tax-effective deferred compensation arrangement for the benefit of the Annuitants. Although the form of the structure was one that involved Nortel, its participation was that of a conduit. In my view, the substance of the arrangement was consistent with the presence of a trust.

[46]     It is necessary to consider the role of all three parties – Nortel, the Annuitants and Sun Life. In this context, it seems to me that there was no reasonable expectation of the parties that Nortel would, at any time, have an interest in the monies being paid by Sun Life. The funds may have flowed through Nortel's accounts, but with the understanding that they were earmarked for the Annuitants – not for the interests of Nortel or, in the context of the CCAA proceedings, for the unsecured creditors of Nortel.

[47]     I accept the submissions of counsel to the Former Employees that the most reasonable explanation of the Retirement Arrangements is that they were designed to permit the Annuitants to purchase Annuities in a way that optimizes their tax planning and it would not have made "business sense" for Nortel to enter into the Annuities using the Annuitants' deferred compensation if it were not intended to be held in trust for the benefit of the Annuitants.

[48]     I also accept counsel's submission at paragraph 69 of their factum to the effect that the mere presence of a contract is not a juristic reason. A court must look at the entire agreement in context. The annuity certificates contemplate three parties: Nortel, the Annuitants and Sun Life. The annuity certificates name the Annuitants as such, and these certificates were provided to the Annuitants as evidence of their arrangements. In this case, the contract terms do not explicitly permit Nortel to keep the proceeds of the Annuities. The arrangements, including both the annuity certificates and the contractual terms, must be examined as a whole. In my view, the key relationship between the parties is that of Sun Life and the Annuitants. Sun Life pays money out in calculated amounts for the named Annuitants.

[49]  Further, at paragraph 70 of the factum, I accept the submission that the arrangements were entered into for no other purpose other than the Annuitants' ability to take advantage of a tax shelter. Nortel did not receive any benefit or seek to rely on these contracts. In these circumstances, the existence of a contractual relationship does not form a juristic reason for Nortel to retain the enrichment.

[50]  Insofar as other general creditors of Nortel are concerned, I am of the view that it is highly unlikely that this group of creditors would have had any expectation that the Annuities would form part of the property of Nortel. If a constructive trust was not ordered, the general creditors of Nortel would receive a windfall benefit at the expense of the Annuitants who would become involuntary creditors of Nortel. This would be an unjust outcome.

[51]  In *Pacific National Investments Limited v. Victoria (City)* [2004] 3 S.C.R. 575, the court confirmed that the application of the test for unjust enrichment must be flexible to deal with different circumstances according to principles routed in fairness and good conscious. As Binnie J. stated at para. 13:

> The doctrine of unjust enrichment provides an equitable cause of action that retains a large measure of remedial flexibility to deal with different circumstances according to principles rooted in fairness and good conscious. This is not to say that it is a form of "palm tree justice" (*Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762 at p. 802, that varies with the temperament of the sitting judges. On the contrary, as the court recently reaffirmed in *Garland v. Consumers' Gas Co.* [2004] 1 S.C.R. 629, a court is to follow an established approach to unjust enrichment predicated on clearly defined principles. However, their application should not be mechanical. Iacobucci J. observed that "this is an equitable remedy that will necessarily involve discretion and questions of fairness".

[52]  In my view, if a constructive trust was not imposed, the general creditors would benefit from a windfall at the expense of involuntary creditors. This would be most inequitable in the circumstances and runs contrary to principles routed in fairness and good conscience.

[53]  With respect to the submission on behalf of the Applicants that the existence of third-party creditors' rights as a sufficient juristic reason to justify the deprivation of the Annuitants, counsel on behalf of the Former Employees submits that this interpretation makes the Annuitants unintentional creditors of Nortel as the Annuitants did not intend to be creditors of Nortel and Nortel did not intend to be the ultimate beneficiary of the Annuities. I agree. The form of the arrangement reflects monies flowing through Nortel, but the substance, in my view, is one of payments by Sun Life to the Annuitants via Nortel.

[54]  The retirement arrangements were pre-funded through the Annuities. In my view, Nortel was merely a conduit through which the payments were made. The intention of the arrangements as between the Annuitants, Nortel and Sun Life was to provide a tax-effective

mechanism whereby payments would be made by Sun Life, through the conduit, to the Annuitants.

[55] In this case, fairness requires the court to impose a trust for the benefit of the Annuitants and ensure that Nortel is not unjustly enriched. This is a case where a constructive trust is to be imposed. Indeed, the constructive trust has been present since the time that the Annuities were established.

[56] An order shall issue requiring Nortel to assign the property of the Annuitants to the Annuitants, being the individual Annuity contracts to which each retiree or his or her beneficiary is an "Annuitant".

[57] In view of this, conclusion, it is not necessary to determine or comment further as to whether an implied trust exists.


"Morawetz J."

_____
                    MORAWETZ J.


Date: June 25, 2010