## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X

*In re*

Nortel Networks Inc., *et al.*,[1]

                     Debtors.

:     Chapter 11

:     Case No. 09-10138 (KG)

:     Jointly Administered

:     **Hearing date:**
:     **Beginning September 19, 2011 at 9:30 a.m. ET**
:     **Objection date:**
:     **August 12, 2011 at 4 :00 p.m. ET**

-------------------------------------------------------- X

## JOINT OBJECTION AND MOTION TO DISMISS CLAIMS OF
## NORTEL NETWORKS UK LIMITED

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Debtors and Debtors in Possession*

*Counsel for the Official Committee of Unsecured Creditors*

---

[1]      The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iv

SUMMARY CHARTS OF NNUK'S CAUSES OF ACTION ..................................... xii

PRELIMINARY STATEMENT ......................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 4

RELEVANT PROCEDURAL HISTORY ........................................................................ 5

    A.    English Proceedings of the EMEA Debtors .................................... 5

    B.    EMEA Claims Process ......................................................................... 7

NNUK'S AMENDED PROOF OF CLAIM ..................................................................... 8

    A.    Factual Predicate: Five Alleged Factual Patterns Underlie NNUK's Claim ........... 8

            1.    Transfer Pricing ....................................................................... 9

            2.    NNUK Intercompany Loans ................................................ 10

            3.    "Project Swift" ...................................................................... 11

            4.    Unspecified Pre-Petition Asset Sales .............................. 12

            5.    Contingent Tax Liability ...................................................... 13

    B.    Causes of Action Pled by NNUK: Roadmap .............................. 13

ARGUMENT ..................................................................................................................... 16

I. NNUK'S CLAIM MUST BE TESTED UNDER FEDERAL PLEADING REQUIREMENTS ....................................................................................................... 16

    A.    The Court Should Exercise its Discretion to Apply Rule 12(b) to NNUK's Proof of Claim ................................................................ 16

    B.    NNUK's Claim Fails to Meet the Relevant Pleading Standards ........... 18

II. NNI OWED NO DUTIES TO NNUK OR ITS CREDITORS ............................. 20

    A.    NNUK Is Estopped from Asserting that NNI or NNL Served as De Facto or Shadow Directors of NNUK ........................... 20

            1.    NNUK's Representations ..................................................... 21

            2.    NNUK is Judicially and Collaterally Estopped from Reversing its Position ....................................................... 25

    B.    NNUK Fails to Plead a Plausible Claim that NNI was a Director under English Law ................................................................. 29

            1.    English Law Regarding Shadow and De Facto Directors ........ 29

            2.    The Claim Fails to Allege Sufficient Well-Pleaded Facts to Render a Directorship Claim Plausible .................... 31

3.     NNUK's Allegations Fail to Establish Shadow Directorship or Resulting Duty ......................................................................37

C.     The Claim Includes No Well-Pleaded Allegations of NNUK's Insolvency Necessary for the Alleged Actions to Constitute a Breach of Fiduciary Duty.................................................................................................39

D.     NNI Owed No Independent Duty of Care under English Law ...........................42

E.     The English Doctrine of *Ex Turpi Causa* Precludes NNUK from Asserting Any of Its Common Law Claims Against NNI Where the Alleged Wrong is Attributable to NNUK Itself ...........................................................44

III. NNUK'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON NNI FAIL...............45

A.     NNUK's Claims for Aiding and Abetting and Dishonest Assistance Fail on Multiple Grounds (Claims 4, 6, 10, 13, 18, 20, 31, 34-35) .............................46

1.     English Law ........................................................................46

2.     Delaware and Texas Law...........................................................47

3.     NNUK's Allegations Fail to State a Plausible Claim...............................48

a.     NNUK Fails to Adequately Plead What Wrongful Actions NNI Knowingly Took to Assist a Breach of Fiduciary Duty........50

b.     NNUK Has Failed Adequately to Plead Any Underlying Breach by NNL Acting As a Shadow or De Facto Director .........55

c.     NNUK's Failure to Plead Insolvency Eliminates Both Any Underlying Breach and Any Knowledge NNI Had of That Purported Breach ........................................................55

B.     NNUK's Conspiracy Claims Must Be Dismissed as NNUK Fails to Allege Any Well-Pleaded Allegations to Support Those Claims (Claims 5, 7, 11, 12, 19, 21)................................................................................57

1.     English Law ........................................................................57

2.     Delaware and Texas Law...........................................................58

3.     NNUK's Conspiracy Allegations Fail to State a Plausible Claim ...........58

C.     NNUK's Claims For Aiding and Abetting, Dishonest Assistance, and Conspiracy are Barred by the *Ex Turpi Causa* and *In Pari Delicto* Doctrines ................................................................................61

IV. NNUK FAILS TO ADEQUATELY ALLEGE NNI'S UNJUST RECEIPT OF ANY NNUK PROPERTY ........................................................................63

A.     NNUK's Claims for Unconscionable Receipt and Knowing Receipt Fail on Multiple Bases ....................................................................63

B.     NNUK's Claims for Unjust Enrichment Also Fail to State a Plausible Claim ....................................................................................66

V. NNUK'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO
UNSPECIFIED ASSET SALES CAN BE SUMMARILY DISMISSED ...................... 69

    A.    Claims Allegedly Arising from Pre-Petition Asset Sales Fail a Basic Test
of Notice Pleading ............................................................................................ 70

    B.    Claims 24-27 Independently Fail to State a Claim ............................................ 71

        1.    Claim 26 Fails Adequately To Plead Mistake ........................................ 71

        2.    NNUK Does Not Plead Required Elements of a Transaction at
Undervalue Claim .................................................................................. 72

        3.    Implied Term / Implied Contract ........................................................... 73

VI. NNUK'S CLAIMS RELATING TO TRANSFER PRICING, INTERCOMPANY
LOANS, AND PRE-PETITION ASSET SALES ARE TIME BARRED ...................... 74

CONCLUSION .................................................................................................................... 80

# TABLE OF AUTHORITIES

**Page(s)**

## Rules and Statutes

10 Del. C. § 8106 ....................................................................................................... 76

10 Del. C. § 8121 ....................................................................................................... 75

15 U.S.C. § 1517(a)(1) ............................................................................................... 29

Fed. R. Bankr. P. 7009(b) ......................................................................................... 19

Fed. R. Bankr. P. 7012(b) ......................................................................................... 16

Fed. R. Bankr. P. 9014(c) ..................................................................................... 16, 19

Fed. R. Civ. P. 15(c)(1)(B) ........................................................................................ 78

## Cases

900 Capital Servs., Inc. v. Cloud (In re Cloud),
214 F.3d 1350, No. 99-51109 (CDK), 2000 WL 634637 (5th Cir. May 4, 2000) ...................... 17

Abramson v. Ritz-Carlton Hotel Co.,
Civ. Action No. 09-3264 (JHR), 2010 WL 3943666 (D.N.J. Oct. 6, 2010) ............................... 32

Acierno v. Haggerty,
Civ. Action No. 04-1376-KAJ, 2005 U.S. Dist. LEXIS 30353 (D. Del. Nov. 23, 2005) .............. 5

Adamson v. Bernier (In re Bernier),
282 B.R. 773 (Bankr. D. Del. 2002) ................................................................................. 19, 48

Allied Capital Corp. v. GC-Sun Holdings, L.P.,
910 A.2d 1020 (Del. Ch. 2006) ....................................................................................... 57, 58

Am. Int'l Group, Inc. v. Greenberg,
976 A.2d 872 (Del. Ch. 2009) ......................................................................................... 61, 62

Amatex Corp. v. Aetna Casualty & Surety Co. (In re Amatex Corp.),
107 B.R. 856 (Bankr. E.D. Pa. 1988) .................................................................................... 17

Angell v. Burrell (In re Caremerica, Inc.),
409 B.R. 759 (Bankr. E.D.N.C. 2009) ................................................................................... 41

Anjelino v. N.Y. Times Co.,
200 F.3d 73 (3d Cir. 2000) .................................................................................................... 27

Asarco LLC v. Ams. Mining Corp.,
382 B.R. 49 (S.D. Tex. 2007) ...................................................................................41

Asarco LLC v. Ams. Mining Corp.,
396 B.R. 278 (S.D. Tex. 2008) .................................................................................61

Ashcroft v. Iqbal,
129 S.Ct. 1937 (2009) .....................................................................................passim

Baldwin Cnty. Welcome Ctr. v. Brown,
466 U.S. 147 (1984) ...............................................................................................80

Bank Brussels Lambert v. Chase Manhattan Bank, N.A.,79
No. 93 Civ. 5298 (LMM), 1999 WL 672302 (S.D.N.Y. Aug. 27, 1999) ...................................80

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ........................................................................................passim

Bianco v. Erkins (In re Gaston & Snow),
243 F.3d 599 (2d. Cir. 2001) ...................................................................................75

Bonner v. Henderson,
No. 05-99-01582-CV (MW) (CIW) (JRR), 2001 WL 301582 (Tex. App. Dallas Mar. 29,
2001) ......................................................................................................................78

Boyd v. Tempay,
Civ. No. 07-377-JJF, 2008 WL 5156307 (D. Del. Dec. 4, 2008)................................................60

Brug v. Enstar Grp., Inc.,
755 F. Supp. 1247 (D. Del. 1991)......................................................................................passim

Burlington N. R.R. Co. v. Sw. Electric Power Co.,
925 S.W.2d 92 (Tex. App. 1996).............................................................................68

Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.,
63 F.3d 1227 (3d Cir. 1995) .....................................................................................28

Burrell v. AstraZeneca LP,
No. 07C-04-267 (JRS), 2010 WL 3706584 (Del. Super. Ct. Sept. 20, 2010).............................75

Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia
Bank of Del. Nat'l Ass'n.,
Civ. No. 10-520 (JBS/KMW), 2011 WL 864421 (D. Del. Mar. 9, 2011) ...................... 47, 48, 55

Chapa v. Chase Home Fin. LLC,
 No. C-10-359 (JGJ), 2010 WL 5186785 (S.D.Tex. Dec. 15, 2010)...........................................70

Chase Bank USA N.A. v. Hess,
No. 08-121-LPS, 2011 WL 45132 (D. Del. Jan. 6, 2011)..........................................................59

Clark v. Strober-Haddonfield Grp., Inc.,
No. 07-910 (RBK), 2008 U.S. Dist. LEXIS 58865 (D.N.J. July 29, 2008) ....................................5

Coan v. O & G Indus. Inc. (In re Austin Driveway Servs., Inc.),
179 B.R. 390 (Bankr. D. Conn. 1995) ........................................................................................79

Delgrosso v. Spang & Co.,
903 F.2d 234 (3d Cir. 1990) ......................................................................................................25

Doug Grant, Inc. v. Greate Bay Casino Corp.,
232 F.3d 173 (3d Cir. 2000) ........................................................................................................8

Eames v. Nationwide Mut. Ins. Co.,
No. 04-1324 (KAJ), 2006 WL 2506640 (D. Del. Aug. 29, 2006)...............................................76

End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.),
250 B.R. 168 (D. Del. 2000).......................................................................................................76

Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA Inc.),
398 B.R. 736 (S.D.N.Y. 2008) ...................................................................................................17

Fierro v. Gallucci,
No. 06-CV-5189(JFB)(WDW), 2008 WL 2039545 (E.D.N.Y. May 12, 2008)...........................58

Fleck v. KDI Sylvan Pools, Inc.,
981 F.2d 107 (3d Cir. 1992) ......................................................................................................25

Floyd v. Hefner,
556 F. Supp. 2d 617 (S.D. Tex. 2008) .......................................................................................47

Forman v. Salzano (In re Norvergence, Inc.),
405 B.R. 709 (Bankr. D.N.J. 2009)........................................................................ 19, 32, 48, 59

Fowler v. UPMC Shadyside,
578 F.3d 203 (3d Cir. 2009) ......................................................................................... 8, 18, 40

Frederico v. Home Depot,
507 F.3d 188 (3d Cir. 2007) ......................................................................................................49

G-I Holdings, Inc. v. Reliance Ins. Co.,
586 F.3d 247 (3d Cir. 2009) ......................................................................................................25

Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.),
333 B.R. 251 (Bankr. W.D. Pa.) ................................................................................................75

HECI Exploration Co. v. Neel,
982 S.W.2d 881 (Tex. 1998) ................................................................................. 78

Hertz Corp. v. Friend,
130 S.Ct. 1181 (2010) ........................................................................................... 26

Hill v. Day (In re Today's Destiny, Inc.),
388 B.R. 737 (Bankr. S.D. Tex. 2008) .............................................................. 17, 62

In re Adelphia Commc'n Corp.,
359 B.R. 54 (Bankr. S.D.N.Y. 2006) ..................................................................... 17

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (2008) ..................... 23, 26

In re Best Prods. Co.,
210 B.R. 714 (Bankr. E.D. Va. 1997) .................................................................... 17

In re British Am. Ins. Co.,
425 B.R. 884 (Bankr. S.D. Fla. 2010) .................................................................... 26

In re Coudert Bros. LLP,
No. 09 Civ. 9561 (AKH), 2010 WL 2382397 (S.D.N.Y. June 14, 2010) ................... 75

In re Diamond Mortg. Corp. of Ill.,
105 B.R. 876 (Bankr. N.D. Ill. 1989) ..................................................................... 17

In re Edison Bros. Stores,
No. 99-529 (JCA), 2002 Bankr. LEXIS 1228 (Bankr. D. Del. 2002) ........................ 79

In re Enron Corp.,
298 B.R. 513 (Bankr. S.D.N.Y. 2003) .................................................................... 18

In re Fedders N. Am., Inc.,
405 B.R. 527 (Bankr. D. Del. 2009) .................................................................. 47, 76

In re Global Link Telecom. Corp.,
327 B.R. 711 (Bankr. D. Del. 2005) ....................................................................... 79

In re Grand Prix Assocs.,
No. 09-16545 (DHS), 2009 Bankr. LEXIS 1239 (Bankr. D.N.J. 2009) ..................... 23

In re MarchFirst, Inc.,
448 B.R. 499 (Bankr. N.D. Ill. 2011) ..................................................................... 79

In re Maxim Truck Co., Inc.,
415 B.R. 346 (Bankr. S.D. Ind. 2009) .................................................................... 80

In re Milan Steel Fabricators, Inc.,
113 B.R. 364 (Bankr. N.D. Ohio 1990) ......................................................................79

In re NYMEX S'holder Litig.,
C.A. Nos. 3621-VCN, 3835-VCN (JWN), 2009 WL 3206051 (Del. Ch. Sept. 30, 2009) ...........48

In re Rockefeller Ctr. Prop. Inc. Sec. Litig.,
311 F.3d 198 (3d Cir. 2002) ......................................................................................49

In re Sevko, Inc.,
143 B.R. 167 (Bankr. N.D. Ill. 1992) .........................................................................17

In re Spiegel, Inc.,
337 B.R. 821 (Bankr. S.D.N.Y. 2006) ........................................................................17

In re Tronox Inc.,
No. 09-10156 (ALG), 2010 WL 2010844 (Bankr. S.D.N.Y. May 14, 2010) ..............................71

In re WorldCom, Inc.,
322 B.R. 530 (Bankr. S.D.N.Y. 2005) ........................................................................17

Jackson v. W. Telemarketing Corp. Outbound,
245 F.3d 518 (5th Cir. 2001) ....................................................................................78

Kahn v. Seaboard Corp.,
625 A.2d 269 (Del. Ch. 1993) ...................................................................................77

Krystal Cadillac-Oldsmobile GMC Truck Inc. v. GMC,
337 F.3d 314 (3d Cir. 2003) .....................................................................................27

Malleus v. George,
641 F.3d 560 (3d Cir. 2011) .....................................................................................18

Malpiede v. Townson,
780 A.2d 1075 (Del. 2001) ........................................................................... 47, 50, 55

Marvel Entm't Grp., Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.),
273 B.R. 58 (D. Del. 2002) .......................................................................................77

Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings LLC),
426 B.R. 488 (Bankr. D. Del. 2010) ...........................................................................76

Metcap Sec. LLC v. Pearl Senior Care, Inc.,
No. Civ. A 2129-VCN, 2007 WL 1498989 (Del. Ch. May 16, 2007)................................... 66, 68

Miller v. Greenwich Cap. Fin. Prods., Inc. (In re Am. Bus. Fin. Servs. Inc.),
361 B.R. 747 (Bankr. D. Del. 2007) ....................................................................... 58, 61

N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,
930 A.2d 92 (Del. 2007)..................................................................................................56

New Hampshire v. Maine,
532 U.S. 742 (2001).......................................................................................................25

Norman v. Elkin,
No. 06-005-JJF, 2007 WL 2822798 (D. Del. Sept. 26, 2007)....................................75

O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.),
383 B.R. 231 (Bankr. S.D.N.Y. 2008) .................................................................passim

Official Comm. of Bondholders of Metricom Inc. v. Derrickson,
No. C-02-4756 (JF), 2004 U.S. Dist. LEXIS 19497 (N.D. Cal. Feb. 25, 2004) ..........41

Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum
Capital Partners LLC (In re Radnor Holdings Corp.),
353 B.R. 820 (Bankr. D. Del. 2006) .............................................................................50

Official Comm. of Unsecured Creditors v. Am. Tower Corp. (In re Verestar, Inc.),
343 B.R. 444 (Bankr. S.D.N.Y. 2006) ..........................................................................62

Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.),
307 B.R. 787 (Bankr. D. Del. 2004) .............................................................................79

Pa. Emp. Benefit Trust Fund v. Zeneca, Inc.,
710 F. Supp. 2d 458 (D. Del. 2010).......................................................................66, 68

Port Auth. of N.Y. & N.J. v. Arcadian Corp.,
189 F.3d 305 (3d Cir. 1999) ..........................................................................................13

Pryor v. NCAA,
288 F.3d 548 (3d Cir. 2002) ......................................................................................8, 54

Quilling v. Compass Bank,
No. 3:03-CV-2180-R (JB), 2004 WL 2093117 (N.D. Tex. Sept. 17, 2004)................78

Related Westpac LLC v. Jer Snowmass LLC,
C.A. No. 5001-VCS, 2010 WL 2929708 (Del. Ch. July 23, 2010).............................56

Rescuecom Corp. v. Khafaga (In re Khafaga),
431 B.R. 329 (Bankr. E.D.N.Y. 2010)....................................................................79, 80

Roth v. Am. Family Mut. Ins. Co.,
567 F.3d 884 (7th Cir. 2009) .........................................................................................49

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
81 F.3d 355 (3d Cir. 1996) ............................................................................................27

Scarano v. Cent. R. Co of N.J.,
203 F.2d 510 (3d Cir. 1953) ....................................................................................27

Seidel v. Byron,
No. 05-C-6698 (JBM), 2008 U.S. Dist. LEXIS 76306 (N.D. Ill. Sept. 26, 2008) .......................41

Smith v. Nat'l City Mortg.,
No. A-09-CV-881 (LY), 2010 WL 3338537 (W.D.Tex. Aug. 23, 2010)...................................70

SmithKline Beecham Pharm. Co. v. Merck & Co.,
766 A.2d 442 (Del. 2000)........................................................................................76

Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),
335 B.R. 539 (D. Del. 2005)....................................................................................62

State Farm Bank, F.S.B. v. Manheim Auto. Fin. Servs., Inc.,
Civ. No. 10-cv-00519-L (SAL), 2010 WL 3156008 (N.D. Tex. Aug. 6, 2010) ...................66, 68

Timberlake v. Synthes Spine, Inc.,
No. V-08-4 (JDR), 2011 WL 711075 (S.D. Tex. Feb. 18, 2011).........................................58

Toner v. Allstate Ins. Co.,
821 F. Supp. 276 (D. Del. 1993)..............................................................................19

Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,
906 A.2d 168 (Del. Ch. 2006) .................................................................................56

Triton Constr. Co. v. E. Shore Elec. Servs., Inc.,
Civ. No. 3290-VCP, 2009 WL 1387115 (Del. Ch. May 18, 2009)......................................57

United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,
216 F. Supp. 2d 198  (S.D.N.Y. 2002)........................................................................19

United States v. Crawley,
No. H-09-3457 (FHS), 2010 WL 4393970 (S.D. Tex. Oct. 29, 2010) .................................80

United States v. Brodie,
403 F.3d 123 (3d Cir. 2005) ....................................................................................48

United States v. Flood,
327 Fed. Appx. 356, No. 08-2937 (AJS) (DKS) (DMF), 2009 WL 1220685 (3d Cir. May
6, 2009)...............................................................................................................47

Winstar Holdings LLC v. Blackstone Grp. LP (In re Winstar Commc'ns Inc.),
435 B.R. 33 (Bankr. D. Del. 2010) ........................................................................75, 76

Yelverton v. Homes at Potomac Greens Assoc. (In re Yelverton),
No. 09-00414, Adv. No. 10-10001 (SMT), 2010 WL 1688403 (Bankr. D.D.C. April 22,
2010) ....................................................................................................................................41

**Summary Table of NNUK Claims - By Cause of Action in the Order Addressed in the Objection**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 2 | English Law | Breach of fiduciary duty | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 8 | English Law | Breach of fiduciary duty | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 16 | English Law | Breach of fiduciary duty | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *Ex Turpi Causa* |
| 28 | English Law | Breach of fiduciary duty | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 32 | English Law | Breach of fiduciary duty | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 3 | English Law | Breach of duty of care | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 9 | English Law | Breach of duty of care | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 17 | English Law | Breach of duty of care | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), *Ex Turpi Causa* |
| 30 | English Law | Breach of duty of care | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 33 | English Law | Breach of duty of care | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 4 | English Law | Dishonest Assistance | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 10 | English Law | Dishonest Assistance | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 18 | English Law | Dishonest Assistance | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *Ex Turpi Causa* |
| 35 | English Law | Dishonest Assistance | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 6 | U.S. Law | Aiding and abetting breach of fiduciary duty | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 13 | U.S. Law | Aiding and abetting breach of fiduciary duty | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |

**Summary Table of NNUK Claims - By Cause of Action in the Order Addressed in the Objection**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 20 | U.S. Law | Aiding and abetting breach of fiduciary duty | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* |
| 31 | U.S. Law | Aiding and abetting breach of fiduciary duty | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 34 | U.S. Law | Aiding and abetting breach of fiduciary duty | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 5 | English Law | Unlawful Means Conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 12 | English Law | Unlawful Means Conspiracy | Intercompany loans | Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 19 | English Law | Unlawful Means Conspiracy | Project Swift | Failure to Plead (Rules 8(a) and 9(b)), *Ex Turpi Causa* |
| 7 | U.S. Law | Civil Conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 11 | U.S. Law | Civil Conspiracy | Intercompany loans | Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 21 | U.S. Law | Civil Conspiracy | Project Swift | Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* |
| 14 | English Law | Unconscionable Receipt | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 22 | English Law | Unconscionable Receipt | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *Ex Turpi Causa* |
| 15 | U.S. Law | Unjust enrichment | Intercompany loans | Failure to Plead (Rule 8(a)), SOL |
| 23 | U.S. Law | Unjust enrichment | Project Swift | Failure to Plead (Rule 8(a)) |
| 24 | Not specified | Implied Contract | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 25 | Not specified | Implied Term | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 29 | English Law | Knowing Receipt | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 26 | English Law | Mistake | Past business sales | Failure to Plead (Rules 8(a) and 9(b)),  SOL, *Ex Turpi Causa* |
| 27 | English Law | Transaction at Undervalue | Past business sales | Failure to Plead (Rule 8(a)) |

**Summary Table of NNUK Claims - By Claim Number**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 2 | English Law | Breach of fiduciary duty | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 3 | English Law | Breach of duty of care | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 4 | English Law | Dishonest Assistance | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 5 | English Law | Unlawful Means Conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 6 | U.S. Law | Aiding and abetting breach of fiduciary duty | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 7 | U.S. Law | Civil Conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 8 | English Law | Breach of fiduciary duty | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 9 | English Law | Breach of duty of care | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 10 | English Law | Dishonest Assistance | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 11 | U.S. Law | Civil Conspiracy | Intercompany loans | Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 12 | English Law | Unlawful Means Conspiracy | Intercompany loans | Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 13 | U.S. Law | Aiding and abetting breach of fiduciary duty | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 14 | English Law | Unconscionable Receipt | Intercompany loans | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 15 | U.S. Law | Unjust enrichment | Intercompany loans | Failure to Plead (Rule 8(a)), SOL |
| 16 | English Law | Breach of fiduciary duty | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *Ex Turpi Causa* |
| 17 | English Law | Breach of duty of care | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), *Ex Turpi Causa* |

**Summary Table of NNUK Claims - By Claim Number**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 18 | English Law | Dishonest Assistance | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *Ex Turpi Causa* |
| 19 | English Law | Unlawful Means Conspiracy | Project Swift | Failure to Plead (Rules 8(a) and 9(b)), *Ex Turpi Causa* |
| 20 | U.S. Law | Aiding and abetting breach of fiduciary duty | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* |
| 21 | U.S. Law | Civil Conspiracy | Project Swift | Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* |
| 22 | English Law | Unconscionable Receipt | Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *Ex Turpi Causa* |
| 23 | U.S. Law | Unjust enrichment | Project Swift | Failure to Plead (Rule 8(a)) |
| 24 | Not specified | Implied Contract | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 25 | Not specified | Implied Term | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 26 | English Law | Mistake | Past business sales | Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 27 | English Law | Transaction at Undervalue | Past business sales | Failure to Plead (Rule 8(a)) |
| 28 | English Law | Breach of fiduciary duty | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 29 | English Law | Knowing Receipt | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 30 | English Law | Breach of duty of care | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 31 | U.S. Law | Aiding and abetting breach of fiduciary duty | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 32 | English Law | Breach of fiduciary duty | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |
| 33 | English Law | Breach of duty of care | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL, *Ex Turpi Causa* |
| 34 | U.S. Law | Aiding and abetting breach of fiduciary duty | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 35 | English Law | Dishonest Assistance | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL, *Ex Turpi Causa* |

Nortel Networks Inc. ("NNI") and its affiliated debtors, as respective debtors and debtors in possession (collectively, the "Debtors" or the "U.S. Debtors"), together with the Official Committee of Unsecured Creditors (the "Committee" and collectively with the U.S. Debtors, the "Movants"), hereby object (the "Objection") to claim number 7786 (the "Proof of Claim" or the "Claim") filed against NNI by the Joint Administrators (as defined below) on behalf of Nortel Networks UK Limited ("NNUK") and move this Court pursuant to Sections 105 and 502 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 3001, 3002, 3003, 3007, 7012 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order in the form attached as Exhibit A dismissing NNUK's Claim and expunging it with prejudice.[2]  In support of this Objection, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

NNUK's claims are premised on the far-fetched allegation that NNI, a sister corporation to NNUK with no equity interest in NNUK and no contractual or other rights to control NNUK, for almost a decade was somehow able to compel NNUK's directors to abdicate their directorial responsibilities and repeatedly breach their fiduciary duties.  As NNUK utterly fails, however, to include well-pleaded facts sufficient to render such sweeping allegations plausible, the Supreme Court's decisions in Twombly and Iqbal require dismissal.

These allegations are not only inadequately pled, they are directly contrary to what NNUK told both the High Court of Justice of England and Wales to obtain orders of administration in England and this Court to secure Chapter 15 recognition.  In both proceedings, NNUK submitted sworn declarations, including from a long-time director of NNUK, affirming

---

[2]    NNUK previously filed claim No. 5122 against NNI, which has been superseded and replaced by the Claim.  To the extent not so superseded or replaced, the Movants object and move to dismiss claim No. 5122 as well.  Copies of claim Nos. 7786 and 5122 are attached to the Declaration of Luke A. Barefoot, submitted concurrently herewith (the "Barefoot Decl.") as Exhibits A and B respectively.

that the EMEA Debtors, including NNUK, were autonomously managed and controlled from England.  These submissions provided detailed descriptions of the key corporate functions located in England – including tax and treasury – that made decisions for the EMEA Debtors, including NNUK.  These prior sworn statements – which the EMEA Debtors relied upon in the courts of two countries to obtain relief – foreclose NNUK's current fanciful theory that its directors were passive puppets blindly following the dictates of either NNL (the common parent of NNI and NNUK) or NNI.  Both the judicial and collateral estoppel doctrines prevent NNUK from engaging in this type of gamesmanship and alone serve to bar most of its claims.

The bulk of NNUK's claims against NNI are based on the legally incorrect assertion that NNI owed fiduciary duties to NNUK because it was a de facto or "shadow" director of NNUK. Under certain limited circumstances not adequately pled in the Claim, English law will deem a person who is not a de jure director of a company nonetheless to be a director of that company. However, there is no English case that has ever found a company to be a de facto or shadow director of its sister corporation.  This is not surprising given that both doctrines at a minimum require that the alleged de facto or shadow director exercise directorial control over the company.  This Court should not accept NNUK's invitation to go where no English court has ever gone.

Moreover, <u>Twombly</u> and <u>Iqbal</u> stand for the proposition that a complaint may not rest on conclusory factual assertions that merely render its claims "conceivable."  Rather, the Claim must make well-pleaded factual allegations that render its claims plausible.  NNUK fails to meet this standard as it alleges no facts from which it could plausibly be inferred that NNI had the ability to or did control NNUK or its directors.  For example, with respect to NNUK's largest claim, NNUK alleges that NNI, with NNL, was "heavily involved" in formulating transfer

2

pricing policies designed to transfer cash and value from the Nortel group of companies to NNL. This is plainly insufficient to establish that NNI acted as a director of NNUK or controlled its existing directors.  Disregarding NNUK's conclusory allegations of control, as the Court must under <u>Twombly</u>, the only factual allegation NNUK pleads on this central issue is that it "was instructed" to sign the transfer pricing agreement.  This conspicuous use of the passive voice speaks volumes; NNUK does not, because it cannot, allege that NNI had the authority to give – or in fact gave – any such instruction.  This claim is rendered even more implausible by NNUK's admission that the transfer pricing arrangements were detrimental to NNI, which overpaid at least $2 billion under that system.

NNUK's claims that NNI had or breached a fiduciary duty owed to NNUK, as well as its alternative claims that NNI aided and abetted NNL or NNUK's directors' alleged breaches of fiduciary duty (or the English-law analogue of dishonest assistance) fail for numerous additional reasons.  NNUK's claims necessarily allege that all of NNUK's directors and NNL – its sole shareholder – engaged in breaches of fiduciary duty and other wrongdoing.  Even if NNUK alleged sufficient facts to state a claim (which it does not), under English law, this misconduct would be attributable to NNUK itself and bar its claims against NNI.  Moreover, NNUK's Claim is utterly devoid of well-pleaded facts from which it could be inferred that NNUK was insolvent or on the brink of insolvency for nine years before it filed for administration in England such that its directors owed duties to creditors.  If NNUK, which obviously has in its possession documents relating to its financial condition, was aware of any facts that could support this inherently suspect proposition, it would have pled them.  In addition, NNUK fails to plead facts that would pass muster under Rule 8 and <u>Twombly</u> with respect to virtually every element of its

claims.  The same is *a fortiori* true with respect to those claims, described herein, that are subject to the heightened pleading requirements of Rule 9(b).

Apart from its fiduciary duty claims, NNUK also alleges claims grounded in NNI's alleged wrongful receipt of NNUK's property.  These claims are curious given that NNUK does not allege that NNI actually received any property that could be traced to NNUK.  NNUK alleges that its board approved transactions (intercompany loans and Project Swift) with NNL that were unfair to NNUK.  NNI is not alleged to be a party to any of these transactions.  Instead, NNUK baldly asserts that NNUK's unfair transactions with NNL benefitted NNI because those transactions somehow enabled NNI to enter into unrelated transactions with NNL on terms that were not similarly disadvantageous to NNI.  NNUK fails to allege facts to render plausible any link between its property and any benefit to NNI – indeed, its allegations dispel any such connection.  More importantly, these claims are legally insufficient under English law because NNUK does not allege that it can trace any of its own funds to NNI.

Accordingly, and for the reasons set forth more fully below, NNUK's claims should be dismissed with prejudice.

## JURISDICTION AND VENUE

This Court has jurisdiction over the Objection pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue over the Debtors' Chapter 11 cases and this Objection is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory bases for the relief requested herein are Sections 105 and 502 of the Bankruptcy Code and Rules 3001, 3002, 3003, 3007, 7012 and 9014 of the Bankruptcy Rules.

## RELEVANT PROCEDURAL HISTORY

On January 14, 2009 (the "Petition Date"),[3] the U.S. Debtors, other than Nortel Networks (CALA) Inc.,[4] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and the cases were consolidated for procedural purposes only.  The Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL"), and certain of their Canadian affiliates (together, the "Canadian Debtors") commenced a parallel proceeding on the Petition Date with the Ontario Superior Court of Justice (the "Canadian Court") seeking relief from their creditors under the Companies' Creditors Arrangement Act (Canada).

### A.    English Proceedings of the EMEA Debtors[5]

NNUK and eighteen of its affiliates[6] sought orders from the High Court of Justice of England and Wales (the "English Court") placing NNUK and the other EMEA Debtors into administration, and appointing individuals from Ernst & Young LLP as administrators (collectively, the "Joint Administrators").  In support of these applications, the EMEA Debtors

---

[3]      Unless otherwise defined herein, initially capitalized terms have the meanings ascribed to them in the Claim.

[4]      Nortel Networks (CALA) Inc. ("NN CALA") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[5]      On this motion to dismiss, the Court may take judicial notice of the public record of proceedings before the English Court and in the related Chapter 15 proceedings pending in this Court under Case No. 09-11972 (the "Chapter 15 Proceedings").  Clark v. Strober-Haddonfield Grp., Inc., No. 07-910 (RBK), 2008 U.S. Dist. LEXIS 58865 at *4 (D.N.J. July 29, 2008) (taking judicial notice of the record in prior proceedings to dismiss claims based on judicial estoppel); Acierno v. Haggerty, Civ. Action No. 04-1376-KAJ, 2005 U.S. Dist. LEXIS 30353, at *19 (D. Del. Nov. 23, 2005) (taking judicial notice of pleadings submitted in previous state court litigation, as "public documents . . . or decisions of other courts" to dismiss claims on estoppel grounds).

[6]      In addition to NNUK, orders of administration were sought with respect to: Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S. ("NNSAS"); Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A. ("NNSA"); Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; and Nortel Networks, s.r.o. (collectively, with NNUK, the "EMEA Debtors").

submitted and relied upon witness statements from (i) Sharon Lynette Rolston, a director of each

of the EMEA Companies (the "Rolston Statement"), and (ii) Michel Clement, president of

NNSAS (the "Clement Statement").[7] These witnesses affirmed under oath that the EMEA

Debtors were autonomously managed and controlled from England, and provided detailed

descriptions of the key corporate functions located in England – including tax and treasury – that

made decisions for the EMEA Debtors.  Based on that evidence, the English Court granted the

applications for administration by orders entered January 14, 2009 (the "Initial Orders").[8]  The

Initial Orders found that the EMEA Debtors' administration proceedings (the "English

Proceedings") were "main proceedings," establishing England as the center of main interests for

NNUK and the other EMEA Debtors.[9]

      Upon the EMEA Debtors' petitions, this Court made parallel findings in granting Chapter

15 recognition to the English Proceedings.[10]  In support of their petitions, the EMEA Debtors

submitted the Rolston and Clement Statements to this Court along with declarations and

deposition testimony from the Joint Administrators affirming that (i) those witness statements

were true and correct, and (ii) the EMEA Debtors' "central management and control is to a large

---

[7]     See Barefoot Decl. at Ex. C (Rolston Statement), at Ex. D (Clement Statements).  The EMEA Debtors submitted parallel witness statements from Ms. Rolston captioned for each of the EMEA Debtors other than NNSA and NNSAS to both the English Court and this Court (see Barefoot Decl. Ex. J at Exhibit I).  Each of those statements, however, is substantively identical to the Rolston Statement captioned for NNUK.

[8]     Barefoot Decl. at Exs. E & F.

[9]     See id. at 1 ("[T]hese proceedings are main proceedings"); Declaration of Michael Todd, Q.C. in Support of Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Ltd. ("Todd Decl.") ¶ 141.

[10]     NNUK filed a petition for recognition of its English Proceedings as foreign main proceedings pursuant to Section 1517 of the Bankruptcy Code on June 8, 2009.  See Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code, Barefoot Decl. at Ex. G (the "NNUK Chapter 15 Petition").  The remaining EMEA Debtors filed parallel petitions for recognition on October 20, 2010. See Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, Barefoot Decl. at Ex. H (the "EMEA Chapter 15 Petitions").

extent handled from England, where all major decisions are made."[11]  In reliance on this

evidence, this Court entered two orders finding that the EMEA Debtors' center of main interests

was in England, such that their English Proceedings could be granted Chapter 15 recognition.[12]

**B.      EMEA Claims Process**

On August 4, 2009, this Court set September 30, 2009 as the general bar date for filing

proofs of claim or interests against the U.S. Debtors other than NN CALA.[13]  On September 30,

2009, NNUK filed a proof of claim against NNI, which was assigned Claim No. 5122 (the

"Placeholder Claim").  See Barefoot Decl. Ex B.[14]  The Placeholder Claim, which totaled a mere

five paragraphs, only asserted claims "in respect of any heretofore unknown, unliquidated or

unmatured claim or claims that the Administrators, NNUK, the Insolvency Practitioner and/or

any EMEA Company may have against Nortel Networks Inc."  Placeholder Claim ¶ 2.  The only

factual context the Placeholder Claim provided was to allege that these "potential claims against

the Debtors and their affiliates aris[e] out of transfer pricing, intercompany dealings, trading and

other arrangements or agreements between [NNI and NNUK]."  Id.  No such agreements or

arrangements were specified, nor was other supporting documentation attached.

Given the lack of any allegations sufficient to provide notice of the basis for the

Placeholder Claim, the Debtors objected to the Placeholder Claim on April 1, 2011, seeking an

order that required NNUK and the other EMEA Debtors to amend their proofs of claim to

---

[11]      See Barefoot Decl. at Ex. I, Ex. J, Ex. K at Exhibit A at 49:17-50:4, 107:7-17 and 278:25-279:13, and Ex. L at 20:11-4.  Note that while the excerpts of the Joint Administrators' deposition transcript is marked confidential, counsel for the Joint Administrators have agreed that such excerpts – which have been publicly filed – do not require confidential treatment.

[12]      See Order Granting Recognition And Relief In Aid Of Foreign Main Proceedings, dated June 26, 2009, Barefoot Decl. Ex. M (the "NNUK Recognition Order"); Order Granting Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, Barefoot Decl. Ex. N (the "EMEA Recognition Order").

[13]      See Order Establishing Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof [D.I. 1280], entered August 4, 2009.

[14]      Substantially similar claims were also filed on September 30, 2009 by the other EMEA Debtors or other related entities against each of the U.S. Debtors other than NN CALA.

provide a more definite statement.[15]  The Canadian Debtors had obtained a parallel order from

the Canadian Court, requiring the EMEA Debtors to file whatever claims they asserted against

the Canadian Debtors by March 18, 2011.[16]  This Court granted the U.S. Debtors' objection on

May 10, 2011, ordering that the EMEA Debtors provide a more definite statement by June 1,

2011, absent which their claims would be disallowed and expunged with prejudice.[17]

## NNUK'S AMENDED PROOF OF CLAIM

### A.    Factual Predicate: Five Alleged Factual Patterns Underlie NNUK's Claim

Pursuant to the EMEA Claims Order, on June 3, 2011, NNUK filed its amended Claim.

The Claim alleges 35 causes of action, based on five pre-petition transactions or types of

transactions to which NNUK allegedly was a party.[18]  In short, the Claim represents no more

than a series of "you too" additions to the EMEA Debtors' Canadian Claim: repeated conclusory

allegations that NNI should also somehow be responsible for transactions that were allegedly

entered into to benefit NNL.

---

[15]    See Debtors' Objection to the Proofs of Claim Filed by the EMEA Claimants and Motion for an Order
Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the
EMEA Claimants [D.I. 5200] (the "EMEA Claims Objection").

[16]    See EMEA Claims Objection ¶ 3.  Pursuant to the order of the Canadian Court, the EMEA Debtors filed
nineteen claims against the Canadian Debtors (collectively, the "Canadian Claims").  See Notice of Submission of
Proofs of Claim, dated May 18, 2011 [D.I. 5433].

[17]    See Order Requiring EMEA Claimants to File a More Definite Statement of Claim and Setting a Deadline
for the Filing of Any Proofs of Claim By the EMEA Claimants [D.I. 5402] (the "EMEA Claims Order").  On
request of the EMEA Debtors, that date was later extended to June 3, 2011.  See Order Approving Extension of
Deadline for EMEA Claimants to File a More Definite Statement of Claim and to File Any Proofs of Claim [D.I.
5588].  While NNUK timely filed its Claim against NNI, which purported to amend its Placeholder Claim, over 350
other claims that were the subject of the EMEA Claims Order were not timely amended or otherwise stated with
more particularity.  These claims have since been expunged from the U.S. Debtors' claims register in accordance
with the EMEA Claims Order.

[18]    Movants accept the truth of NNUK's well-pleaded allegations for purposes of this Objection and Motion
only.  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  On a motion to dismiss, the Court may
consider not only the complaint, but documents whose contents are alleged in the complaint, and documents
attached to a motion to dismiss that are referred to in the plaintiff's complaint and central to its claims.  See Pryor v.
NCAA, 288 F.3d 548, 559-60 (3d Cir. 2002).  While the court must accept as true all factual allegations in the
complaint, it "need not accept as true unsupported conclusions and unwarranted inferences", and must draw on the
allegations in the complaint "in a realistic, rather than a slavish, manner."  Doug Grant, Inc. v. Greate Bay Casino
Corp., 232 F.3d 173, 184 (3d Cir. 2000) (internal quotations and citations omitted).

1.    <u>Transfer Pricing</u>

Prior to the Petition Date, like many multinational groups, Nortel operated a transfer

pricing arrangement, with the goal of allocating profits in each of the countries where the Group

did business. Claim ¶ 30. From 2001, the Nortel Group adopted a "residual profit split method

('<u>RPSM</u>')" of transfer pricing. <u>Id.</u> ¶ 31. This system divided participants into two main groups –

limited risk entities and residual profit entities. <u>Id.</u> ¶ 34. Limited risk entities were entitled only

to profits from their direct sales earnings; residual profit entities also received remaining profits

or losses attributable to intangibles such as research and development. <u>Id.</u> ¶¶ 34-35. In

December 2004, NNUK, NNI, NNL and certain other Group members entered into a Master

Research and Development Agreement ("<u>MRDA</u>"), which "provided the architecture and

contractual basis to enable the RPSM to be applied." <u>Id.</u> ¶ 39.

NNUK admits that the MRDA and RPSM were approved by NNUK's duly appointed

directors. Claim ¶ 114. It nonetheless alleges that these arrangements were not entered into on

an arms' length basis, were not in its interests, and deprived it of revenue. <u>See, e.g.</u>, <u>id.</u> ¶¶ 11(a),

47, 92. Specifically, the Claim alleges that NNL did not make payments due to NNUK under the

RPSM, but that even if it had, such payments "would not have adequately rewarded NNUK" due

to other flaws in the RPSM. <u>Id.</u> ¶¶ 49-55. NNUK alleges that the transfer pricing systems "took

funds from NNUK, for the benefit of NNL" as part of a "general policy to the effect that value

and cash within the Group should be transferred to NNL." <u>Id.</u> ¶¶10, 48; <u>see also</u> <u>id.</u> ¶ 32 ("The

decision to implement the RPSM . . . was primarily motivated by a desire to allocate more profit

to the Canadian entities in order to benefit NNL at the expense of NNUK."). NNUK alleges that

Nortel's transfer pricing arrangement negatively affected not only NNUK, but also NNI. In

particular, the Claim explains that the RPSM model was challenged by the IRS, which resulted

in NNI's $2 billion claim against NNL "to reflect net overpayments made by NNI to NNL for [past] tax years."  Id. ¶ 56.

The Claim further asserts that control of the Nortel Group's operations "was highly centralized, and on a general basis, was maintained primarily by NNC and NNL."  Claim ¶ 13. As to NNI, NNUK alleges that it "was also involved in jointly controlling certain aspects of the Group's operation."  Id. ¶ 15.  The Claim avers that NNI was "heavily involved in the implementation and operation of the transfer pricing arrangements," to the exclusion of NNUK. Claim ¶¶ 16, 18; see also id. ¶ 47 (averring that "NNI facilitated this value transfer [to NNL]"). NNUK also asserts that "NNI, NNL and NNUK's de jure directors . . . were aware and intended that NNUK was not properly rewarded pursuant to the RPSM and MRDA."  Id. ¶ 109.

2.      NNUK Intercompany Loans

NNUK alleges that beginning in December 2003, NNUK entered into a series of interest-free loan agreements with NNL (the "NNUK Intercompany Loans").  Claim ¶¶ 57, 62.  These loan facilities were allegedly part of a "scheme[] which would enable the transfer of cash and/or value to NNL from NNUK and other EMEA Companies."  Id. ¶ 57.  NNUK asserts that these NNUK Intercompany Loans were contrary to NNUK's best interests, and were "put into place for the benefit of NNL to the detriment of NNUK."  Id. ¶ 21; see also id. ¶¶ 60, 65.  The Claim alleges the dates and amounts drawn on the NNUK Intercompany Loans, alleging a total of £ 45 million borrowed between January 2007 and May 2008, id. ¶ 61, and outstanding borrowings of approximately £ 113 million on the Petition Date.  Id. ¶ 68.

NNUK does not allege that NNI was a party to the NNUK Intercompany Loans.  Instead, the Claim alleges that NNI made a separate series of loans to NNL, which allegedly provided for payment of interest, and were regularly repaid by NNL in cash.  Claim ¶¶ 63, 65(d).  The Claim

alleges that NNL made repayments of loans from NNI – totaling approximately $535 million from November 2007 to April 2008 – "as well as various smaller repayments around the same time." <u>Id.</u> ¶ 58.  NNUK alleges that such amounts "should have instead gone to NNUK."  <u>Id.</u> ¶ 182.  NNUK does not allege that NNL used the proceeds of the NNUK Intercompany Loans to repay NNI; but rather that absent loans from NNUK, NNL would not have been able to make repayments to NNI.  <u>Id.</u> ¶¶ 59, 64, 145, 150.  The Claim thus alleges that NNI indirectly benefitted as a result of the NNUK Intercompany Loans (<u>id.</u> ¶ 64), and that NNI "together with NNL was controlling or influencing NNUK" in respect of such loans (<u>id.</u> ¶ 66) (internal marks omitted); <u>see also</u> <u>id.</u> ¶ 21 (alleging that "numerous NNI individuals were aware of and/or participated in the discussions relating to the initial [NNUK Intercompany Loan] facility and the later decisions imposed on NNUK relating to the utilization of the loan facilities that followed.").

        3.      <u>"Project Swift"</u>

        In addition to the NNUK Intercompany Loans themselves, NNUK also bases claims on NNL's partial repayment of those loan facilities through a corporate restructuring allegedly completed in December 2007, in a transaction known as "Project Swift."  Claim ¶¶ 71-72.  As part of Project Swift, NNL transferred to NNUK shares in its Dutch subsidiary (through which NNL indirectly held the shares of the other EMEA Debtors (excluding NNUK and NNSA)), in exchange for cancellation of approximately $630 million in outstanding NNUK Intercompany Loans.  <u>Id.</u>  Thus, Project Swift is not alleged to involve a transfer of NNUK property.  <u>See</u> <u>id.</u> ¶ 71.  However, NNUK alleges that Project Swift was contrary to NNUK's interests, and "improperly removed value from NNUK."  <u>Id.</u> ¶ 27.  Specifically, the Claim avers that the value of the shares transferred to NNUK "was substantially lower than the debt owed by NNL that was discharged as a result."  <u>Id.</u> ¶ 74.

As with the NNUK Intercompany Loans, the Claim does not allege that NNI was a party to Project Swift. NNUK alleges, however, that by reducing its obligation to NNUK through Project Swift, NNL was able to make cash payments on its loans from NNI. Id. ¶¶ 12, 67, 177. The Claim alleges that "NNI's directors, officers and senior employees were part of the management group that implemented Project Swift to the detriment of NNUK." Id. ¶ 23; see also id. ¶¶ 153, 158 (alleging that "NNI was involved in all decision making in relation to Project Swift").

      4.     Unspecified Pre-Petition Asset Sales

The Claim alleges that prior to the Petition Date, "NNUK entered into various global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser" (collectively, the "Pre-Petition Asset Sales"). Claim ¶ 79. The only example of such a transaction alleged in the Claim is a sale agreement dated December 4, 2006 for the "sale of Nortel's UMTS business to Alcatel Lucent S.A. ('Alcatel') for an adjusted purchase price of approximately US $291 million." Id. No other Pre-Petition Asset Sale is identified in the Claim, whether by date, parties to the transaction, purchase price, or otherwise.

The Claim asserts that the allocation of the proceeds of the Alcatel sale and other unspecified Pre-Petition Asset Sales failed to provide NNUK with the percentage to which it was allegedly entitled. Claim ¶ 82. Specifically, NNUK alleges that the proceeds from Pre-Petition Asset Sales were allocated "on the erroneous assumptions that were contained in the transfer pricing structure," which did not comply with an implied agreement to allocate proceeds "on the basis of an arm's length legal entitlement that each had to the proceeds." Id. ¶¶ 80-81. NNUK's Claim is silent as to what allocation methodology any such "legal entitlement" would require.

NNUK asserts only that neither a transfer-pricing method nor a revenue-based method would comply with the arms' length principle.  Id. ¶¶ 81-83.  The Claim suggests that the factual detail concerning the Pre-Petition Sale Proceeds "will be further particularized following discovery." Id. ¶ 184.

       5.     <u>Contingent Tax Liability</u>

Finally, NNUK asserts that its taxation matters were controlled by NNL and NNI.  Claim ¶ 84.  As such, NNUK asserts a contingent claim against NNI in the event any taxation authority were "to make a claim against NNUK in relation to a failure to pay the proper level of taxation in any years."  Id. ¶ 85.  There is no allegation that any taxation authority has made any such claim against NNUK.

**B.**      **Causes of Action Pled by NNUK: Roadmap**

Based on the five broad categories of transactions set forth above, NNUK's Claim purports to assert 35 causes of action.  The asserted legal bases for these claims range from tort to contract, from direct to secondary liability, and from English to U.S. law.[19]  While many of these causes of action are duplicative or mutually exclusive, for purposes of this Objection, they share common required elements, pleading deficiencies or other legal bars that permit the Court to consider – and dismiss – them in groups.[20]

---

[19]     As set forth herein, NNUK's various causes of action – many of which amount to duplicative claims under U.S. and foreign law – fail to state a claim even under the law NNUK asserts is applicable.  Accordingly – and solely for purposes of this Objection – Movants have analyzed NNUK's claims under the governing law asserted, without regard to principles of choice of law.  <u>See, e.g.</u>, <u>Port Auth. of N.Y. & N.J. v. Arcadian Corp.</u>, 189 F.3d 305, 311 (3d Cir. 1999) (where dismissal is required under the law of either potentially applicable jurisdiction, no choice of law analysis is necessary).  Movants reserve all of their rights concerning the law that governs NNUK's claims.

[20]     While the Movants do not currently seek to dismiss NNUK's claim for alleged outstanding intercompany trading debts (claim 1), the Movants reserve all of their rights with respect to such claim, including without limitation, to object to such claim at a later date on any and all grounds.  For the avoidance of doubt, in the event the Court finds that any portion of NNUK's Claim withstands Rule 12(b)(6) scrutiny, this Objection is without prejudice to further substantive or non-substantive objections to the Claim, including without limitation rights of set-off and any other defenses.

<u>First</u>, NNUK asserts claims based on all five categories of factual allegations that depend on parallel legal allegations that NNI owed a duty to NNUK under English law.  Specifically, in claims 2, 8, 16, 28 and 32, NNUK alleges that NNI breached fiduciary duties that it owed to NNUK based on its alleged status as either a de facto or shadow director.  <u>See</u> Claim ¶¶ 87(a), 120-21, 152-53, 192-93, 211.  Similarly, in claims 3, 9, 17, 30, and 33, NNUK asserts that NNI breached duties of care that it allegedly owed to NNUK under English law either as a (de facto or shadow) director or independently.  <u>See</u> <u>id.</u> ¶¶ 94-97, 124-25, 156-57, 198-99, 212.  As set forth below, each of these claims fails because NNUK either fails to adequately plead, or is estopped from pleading, facts that provide a cognizable basis for any such duty.  Even to the extent that NNUK has adequately stated a claim, the English law doctrine of *ex turpi causa* eliminates any entitlement to relief for all of its English common law claims – including both direct duty claims, and secondary liability claims for dishonest assistance, conspiracy, knowing or unconscionable receipt and contractual remedies.

<u>Second</u>, implicitly recognizing that its attempts to impose a direct duty on NNI fail, NNUK attempts to recharacterize its same allegations against NNI as giving rise to secondary liability for the alleged primary misconduct of others.  In claims 6, 13, 20, 31, and 34, NNUK makes allegations under U.S. state law that NNI aided and abetted breaches of fiduciary duty allegedly committed by NNL and/or the de jure directors of NNUK in respect of each of the five categories of transactions.  Claim ¶¶ 114, 140-41, 169-70, 204-05, 213.  NNUK also pleads parallel causes of action under English law in claims 4, 10, 18 and 35 for alleged dishonest assistance with respect to each category of transactions except alleged Pre-Petition Asset Sales.  <u>Id.</u> ¶¶ 107, 132, 164, 214.  The Claim lacks, however, any well-pleaded allegations of (i) any actions taken by NNI to assist in a breach of fiduciary duty, (ii) of an underlying breach of

fiduciary duty, or (ii) that any alleged assistance by NNI was undertaken with knowledge of such an underlying breach.

In addition, NNUK pleads nearly identical conspiracy claims under both English law (claims 5, 12 and 19) and U.S. state law (claims 7, 11, and 21), allegedly arising from each of the transfer pricing, NNUK Intercompany Loans, and Project Swift transactions. Compare Claim ¶¶ 109, 137, 166 (English law) *with* ¶¶ 118, 134, 174 (U.S. state law). These claims, however, fail to include any allegations identifying who was a party to the alleged conspiracy, the individuals involved, what the conspirators agreed, and when that agreement was reached. Even if the U.S. law conspiracy and aiding and abetting claims were adequately pled, because they are grounded on allegations of wrongdoing by NNUK's own directors, they are independently barred on *in pari delicto* grounds. As noted, the English law claims for conspiracy and dishonest assistance are also barred by the *ex turpi causa* doctrine.

Third, the Claim asserts causes of action under both English and U.S. state law grounded in NNI's alleged wrongful receipt of NNUK's property. In claims 15 and 23, NNUK asserts unjust enrichment claims under U.S. state law based on NNUK Intercompany Loans and Project Swift. Claim ¶¶ 150, 182. The Claim makes similar allegations in claims 14, 22 and 29 for a claim of knowing or unconscionable receipt under English law in relation to the NNUK Intercompany Loans, Project Swift, and Pre-Petition Asset Sales. Id. ¶¶ 145, 177, 197. Nowhere, however, does the Claim allege that these transactions were intended to benefit NNI, or that they resulted in NNI receiving specific NNUK property. The Claim also lacks allegations to demonstrate a plausible causal connection between the challenged transactions and any alleged benefit to NNI.

<u>Fourth</u>, NNUK asserts a variety of contractual and tort claims that allegedly arise from the "various" Pre-Petition Asset Sales.  Claim ¶ 79.  While these claims are pled under both U.S. and English law, each such claim – numbered 24-31 – shares a common failure to identify the underlying transactions, their dates, parties or other basic details to satisfy the requirements of notice pleading under <u>Twombly</u> and <u>Iqbal</u>.  While NNUK attempts to identify a single such sale – a December 2006 transaction with Alcatel – the various quasi-contractual claims for relief it asserts – contractual mistake (claim 26), transaction at undervalue (claim 27), implied contract (claim 24), and implied term (claim 25) – fail on independent grounds.[21]

Finally, a variety of the claims discussed above are barred by the applicable statute of limitations (claims 2-13, 15, 24-26, 28, 30-31).

## ARGUMENT

### I.
### NNUK'S CLAIM MUST BE TESTED UNDER FEDERAL PLEADING REQUIREMENTS

**A.    The Court Should Exercise its Discretion to Apply Rule 12(b)
to NNUK's Proof of Claim**

Bankruptcy Rule 9014(c) permits a bankruptcy court to exercise its discretion "at any stage in a particular matter [to] direct that one or more of the other rules in Part VII shall apply." Fed. R. Bankr. P. 9014(c).  This includes Bankruptcy Rule 7012(b), which makes Rules 12(b) through 12(i) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>" or "<u>Rules</u>") applicable in bankruptcy proceedings.  Fed. R. Bankr. P. 7012(b).  Where, as here, a determination under Bankruptcy Rule 7012(b) permits dismissal on the pleadings, without a waste of judicial economy and estate resources through discovery and trial, bankruptcy courts routinely apply

---

[21]    For the Court's convenience, two charts setting forth the causes of action pled by NNUK, together with the claim number, the law that NNUK asserts is applicable to the claim, and the bases for dismissal discussed herein, are included above at pages xiii-xvi.  The first chart presents this information in the order that this Objection addresses NNUK's claims; the second chart is sorted by claim number in the order used by NNUK in its Claim.

Rule 12(b)(6) to claims objections.  See, e.g., Flake v. Alper Holdings USA, Inc. (In re Alper

Holdings USA Inc.), 398 B.R. 736, 748 (S.D.N.Y. 2008) (affirming bankruptcy court's dismissal

of claims under Rule 12(b)).[22]  Even if the Court were only to grant this Objection in part,

winnowing the claims at issue would materially progress resolution of NNUK's Claim.  In re

Diamond Mortg. Corp. of Ill., 105 B.R. 876, 877 n.1 (Bankr. N.D. Ill. 1989) (deeming a claims

objection a motion under Bankruptcy Rule 7012 to resolve the objections as a matter of law "[i]n

an effort to move this litigation along.").[23]  Indeed, the Court has already recognized the

advantages the Part VII rules afford in addressing intercompany claims, having applied Rule

12(e) to the EMEA Debtors' Placeholder Claims.  See EMEA Claims Order.

Moreover, courts recognize that a proof of claim is generally the functional equivalent of

a complaint in an adversary proceeding or other civil action.  See, e.g., Hill v. Day (In re Today's

Destiny, Inc.), 388 B.R. 737, 757 (Bankr. S.D. Tex. 2008) (noting that the "procedural

consequences for filing a proof of claim or civil action are materially similar."); Amatex Corp. v.

Aetna Casualty & Surety Co. (In re Amatex Corp.), 107 B.R. 856, 859 (Bankr. E.D. Pa. 1988)

("[T]he filings of proofs of claims by claimants are equivalent of their filing suits against the

Debtor.").  This rationale applies with particular force to NNUK's Claim, which is structured as

a complaint, with separate asserted legal causes of action.  Therefore, Movants should be entitled

to move to dismiss the NNUK Claim just as one could move to dismiss a complaint, particularly

---

[22]    See also 900 Capital Servs., Inc. v. Cloud (In re Cloud), 214 F.3d 1350,  No. 99-51109 (CDK), 2000 WL
634637, at *2 (5th Cir. May 4, 2000) (affirming bankruptcy court's dismissal of proof of claim as "bankruptcy court
was well within its discretion to apply Rule 12(b)(6) to this contested matter"); In re Spiegel, Inc., 337 B.R. 821
(Bankr. S.D.N.Y. 2006) (exercising discretion under Bankruptcy Rule 9014 to apply Rule 12(b)(6) to claims
objection); In re WorldCom, Inc., 322 B.R. 530 (Bankr. S.D.N.Y. 2005) (dismissing proof of claim pursuant to Rule
12(b)(6)); In re Sevko, Inc., 143 B.R. 167 (Bankr. N.D. Ill. 1992) (applying Rule 12(b)(6) to objection to creditors'
amended proof of claim pursuant to Bankruptcy Rule 9014).

[23]    See also In re Adelphia Commc'n Corp., 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006) (finding the Rule
12(b)(6) motion "to be a useful procedural mechanism to decide some kinds of contested matter disputes
economically, saving litigation costs for the benefit of creditors and other stakeholders."); In re Best Prods. Co., 210
B.R. 714, 716 (Bankr. E.D. Va. 1997) (dismissing claim for administrative expenses under Rule 12(b)(6), as it
"offer[ed] an opportunity to resolve the parties' disputes expeditiously.").

as this furthers the goal of bringing bankruptcy court procedure into line with district court procedure.  See In re Enron Corp., 298 B.R. 513, 521-22 (Bankr. S.D.N.Y. 2003) (noting that "Part VII of the [B]ankruptcy [R]ules is based on the premise that to the extent possible practice before the bankruptcy court and the district court should be the same") (internal citations and quotations omitted).

**B.      NNUK's Claim Fails to Meet the Relevant Pleading Standards**

To survive scrutiny under Bankruptcy Rule 7012 and Federal Rule 12(b)(6), Rule 8 requires that a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (internal quotations omitted); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim has facial plausibility where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S.Ct. at 1949; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) ("[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts.") (citation omitted).  Although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regimes of a prior era, it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Iqbal, 129 S.Ct. at 1950.

The Third Circuit applies this Rule 8 analysis in three steps: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).  While various causes of action asserted by NNUK are purportedly brought under English (or other unspecified) law, the question of whether its Claim is adequately pled is

determined as a matter of U.S. federal procedure.  See O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.), 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008); United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 221 n.8 (S.D.N.Y. 2002).[24]

While Rule 8(a) alone requires dismissal of NNUK's Claim, Bankruptcy Rule 7009(b) also incorporates the provisions of Federal Rule 9(b), providing that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[25] Rule 9(b) "appl[ies] to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." Toner v. Allstate Ins. Co., 821 F. Supp. 276, 283 (D. Del. 1993). Certain of NNUK's claims allege that NNI either directly or indirectly participated in a scheme to remove assets from NNUK for the benefit of the Canadian Debtors. See Claim ¶¶ 57-58, 114, 122, 141; see also Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 746 (Bankr. D.N.J. 2009) (where complaint "equates the conduct of Debtor's [directors] and the Leasing Companies as a fraud enabling the defendants to exploit and loot the debtor for defendants' own purposes, the aiding and abetting claims allegations must be stated with particularity in accordance with Rule 9(b).") (internal quotations and citations omitted). NNUK's claims based on its transfer pricing and Pre-Petition Asset Sale allegations are also predicated on assertions that those transactions were not negotiated at arm's length (Claim ¶¶ 11, 18, 44-56, 80-81) – an allegation which Courts routinely consider as a "badge of fraud" in inferring fraudulent intent. See Adamson v. Bernier (In re Bernier), 282 B.R. 773, 781 (Bankr. D. Del. 2002) ("whether the transaction is conducted at arm's length" is a factor indicative of an intent to defraud). As a result, most of NNUK's claims – claims 2, 4-7, 8, 10-13, 16, 18-21, 26,

---

[24]    Nonetheless, as set forth in the Todd Declaration, the Claims also would fail under English procedural rules such that if they had been brought before an English court, they would be similarly dismissed. See Todd Decl. ¶ 34.

[25]    Bankruptcy Rule 9014(c) is clear that Bankruptcy Rule 7009(b) ("Rule 9(b)") automatically applies to contested matters such as this Claim Objection. Fed. R. Bankr. P. 9014(c).

28, 31-32, and 34-35 – invoke Rule 9(b)'s specificity requirements, as well as Rule 8(a)'s plausibility test.

## II.
## NNI OWED NO DUTIES TO NNUK OR ITS CREDITORS

NNUK asserts English law breach of fiduciary duty claims based on all five fact patterns (claims 2, 8, 16, 28, 32). As NNI is admittedly not a de jure director of NNUK, each of these claims is dependent upon both (i) imposing fiduciary duties on NNI as either a de facto or shadow director of NNUK and (ii) a breach of those duties. These claims fail as a matter of law for several independent reasons.

First, because of the prior inconsistent positions NNUK has taken that were adopted by this Court and the English Court, NNUK is estopped from asserting that NNI or NNL acted as a director of NNUK. Second, should the Court even consider these claims, they must nevertheless be dismissed, as NNUK does not allege sufficient facts to render its allegations of shadow or de facto directorship legally sufficient or plausible. Third, while NNUK's breach of fiduciary duty allegations are founded on duties owed to creditors, NNUK fails to sufficiently plead that NNUK was insolvent so as to invoke those duties. Finally, NNUK's independent claims (i.e., to the extent not based on director status) for a breach of the duty of care (claims 3, 9, 17, 30 and 33) are not cognizable under English law.

A.   **NNUK Is Estopped from Asserting that NNI or NNL Served as De Facto or Shadow Directors of NNUK**

In order to obtain relief in the administration proceedings in England, and then to obtain recognition of those proceedings in this Court, the EMEA Debtors took the position that they were managed, operated and controlled from England. After those arguments were accepted by this Court and the English Court, NNUK now attempts an about-face, asserting that the EMEA Debtors were managed and controlled by NNL, allegedly with the assistance of NNI, all from

North America.  NNUK's claims for breach of fiduciary duty depend on allegations that NNI

acted as a director of NNUK (claims 2, 8, 16, 28, 32).  NNUK's claims against NNI for aiding

and abetting or dishonest assistance are similarly based in part on the allegation that NNL acted

as a de facto or shadow director of NNUK (claims 4, 6, 10, 13, 18, 20, 31, 34-35).  In short, each

of those claims is premised on the allegation that NNI and/or NNL asserted directorial control

over NNUK.  But in light of NNUK's prior inconsistent positions – which were accepted by this

Court and the English Court in orders that have long since become final – NNUK is both

judicially and collaterally estopped from now making these contrary allegations.

     1.    <u>NNUK's Representations</u>

     To obtain the Initial Orders from the English Court placing the EMEA Debtors into

administration, the EMEA Debtors submitted sworn witness statements from Sharon Lynette

Rolston, a director of each of the EMEA Debtors, and Michel Clement, president of NNSAS and

a director of NNSA.  Barefoot Decl. Exs C and D.  Unlike the Joint Administrators, Rolston and

Clement had historical perspective on the actual operation of the EMEA Debtors before they

were placed into administration.[26]  Their witness statements repeatedly and unequivocally state

that the EMEA Debtors' own directors and officers controlled the EMEA Debtors.  The Rolston

Statement asserted that: (i) "senior management of all key primary function (i.e. sales, finance,

treasury, legal and human resources) required for the operation of the EMEA Region are located

in England" ¶ 15(c); (ii) "decisions in relation to settlement of intercompany accounts are made

by the EMEA treasury team in England" ¶ 15(i); and (iii) that both "finance and control

functions" and "treasury and banking functions" for the EMEA Debtors were run from England

¶¶ 15(g), 15(m).  The Rolston Statement also detailed how the EMEA Debtors' directors and

---

[26]    Barefoot Decl. Ex. K at Exhibit A, at p. 277:19-23.

officers were responsible for decisions concerning the EMEA Debtors.  Id. ¶ 32 ("The strength

of central management personnel and its business segment coverage means England is the

management centre for EMEA").[27]  This included tax and treasury functions.  Id. ¶ 85 ("Global

inter-company facilities and loans are all managed from EMEA Treasury in England"), ¶ 186

("The tax group based in England (the 'EMEA Tax Group') is responsible for managing and

supervising tax").[28]

     The Rolston Statement expressly acknowledged that NNUK functioned autonomously

from other Nortel Group entities.  Barefoot Decl. Ex. C ¶ 114 ("The EMEA senior management

operates with a large degree of autonomy from Canada, setting all policies, procedures, budgets,

targets and operational matters for the EMEA Region").[29]  The Clement Statement similarly took

the position that the EMEA Debtors operated independently.  Barefoot Decl. Ex. D ¶ 39 ("central

management and control is directed to a large extent from England, where all major decisions are

made").[30]

---

[27]     See also Barefoot Decl. Ex. C ¶ 30 ("[t]he UK business then became the largest operation . . . making the
vast majority of significant decisions for the EMEA Companies and performing head office functions"), ¶ 117
(referencing "England as the centre of decision making"), ¶ 117 ("Senior Management is required to operate from
and live in England"), ¶ 119 ("[t]he EMEA Senior Management exercise control and authority over the EMEA
region").

[28]     See also id. ¶¶ 84 ("EMEA treasury determines and facilitates how to settle inter-company accounts . . .
[and] [t]he ultimate decision regarding payment, or settlement is led by EMEA treasury"), ¶ 205 ("[i]nter-company
loans and inter-company trade settlements are both managed from England"), ¶ 15(f) ("management, supervision
and decision-making in relation to taxation of the EMEA Group is made in England.").

[29]     See also id. ¶ 109 (while "overall global strategy for the Nortel Group is set at a very high level of
generality by the board of directors of NNL and the Chief Executive Officer ('CEO') and Chief Finance Officer
('CFO') in Canada.  Senior Management for EMEA in Maidenhead [England] control the applicability of the global
strategy to EMEA.").  Notably, even to the extent that the Rolston Statement suggests that global strategy was set at
a high level of generality outside of England, it references only NNL – without reference to NNI or the United States.

[30]     See also Barefoot Decl. Ex. D at ¶¶ 27(c) ("management of [intercompany product] liability, like all
intercompany liabilities, is undertaken by Group Treasury in England"), ¶ 30 (referring to the Rolston Statement as
"evidenc[ing] the wide range of operational, strategic, financial and high level administrative and advisory control
over the Company in England by senior management of EMEA"), ¶ 32 ("Senior management in England exercise
control and authority over the Company"), ¶ 35 ("the Banking and Treasury functions are run out of England, by the
Group Treasury Operations"), ¶ 36 ("In relation to corporate matters such as financial, tax, and distribution issues,
strategic and high level decisions are generally made by the Finance and Tax functions of the EMEA group which
are all located in England.").

The English Court accepted this evidence, finding that because the EMEA Debtors were operated and controlled by individuals located in England – not North America – the center of main interests for NNUK and the other EMEA Debtors was in England.[31]   In its Initial Order, the English Court found that based upon the Rolston and Clement Statements, (i) the administration order could be entered, and (ii) that proceedings in England would qualify as "main proceedings."[32]   Applying the EC Regulation on Insolvency Proceedings 2000, the English Court necessarily accepted the EMEA Debtors contention that England was the center of main interests for the EMEA Debtors.   Todd Decl. ¶ 141.[33]

The EMEA Debtors then submitted much of that same evidence to this Court, upon which the Court entered two orders also finding that England was the center of main interests for the EMEA Debtors.[34]   The Rolston Statement was twice submitted to this Court – first in order to

---

[31]    See Barefoot Decl. Ex. O at 7-8 (arguing that the "[Rolston and Clement] witness statements attached as Exhibit I and II to the Bloom Declaration detail the many additional facts demonstrating that the English Proceedings are pending in the center of each of the EMEA Debtors' main interests and constitute 'foreign main proceedings' as defined in § 1502(4) of the Bankruptcy Code.   Viewing these same facts to determine if each of the EMEA Debtors was a proper debtor under the English Insolvency Act, the English Court held that England is the center of main interest for each of the EMEA Debtors."); see also Initial Orders, Barefoot Decl. Exs. E & F at 1.

[32]    See NNUK Chapter 15 Petition, Barefoot Decl. Ex. G ¶ 15(a) ("In the Initial Order, the English Court found that the English Proceedings are main proceedings as defined in Article 3 of Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings.   By definition, a main proceeding is one that takes place in the jurisdiction where the debtor has its center of main interests.   Therefore, the English Court concluded that the [center of main interests] for the Foreign Debtor was, in fact, England."); see also Initial Orders, Barefoot Decl. Ex E and F at 1 ("Upon reading the evidence relating to this application and upon the Court being satisfied on the evidence before it that the EC Regulation . . . does apply and that these proceedings are main proceedings as defined in Article 3 of the EC Regulation.").

[33]    The applicable European insolvency regulation is based on the same UNICTRAL Model Law on Cross-Border Insolvency as Chapter 15 of the Bankruptcy Code.   See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (2008).   Under both that regulation and Chapter 15, even though NNUK was incorporated in England, NNUK could not rely on that place of incorporation where its activities were actually controlled elsewhere.   Id. at 130 (rejecting Chapter 15 petition, even in the absence of objection, where Cayman-incorporated debtor was actually managed and controlled by personnel located in New York); see also In re Grand Prix Assocs., No. 09-16545 (DHS), 2009 Bankr. LEXIS 1239, at * 22 (Bankr. D.N.J. May 18, 2009) ("the Chapter 15 Petition process should not become a 'rubber stamp' exercise") (internal citations and quotations omitted).

[34]    See NNUK Recognition Order, Barefoot Decl. Ex. M at 1 (citing Rolston Statement); EMEA Recognition Order, Barefoot Decl. Ex. N at 2 (citing Rolston Statement, Clement Statement and related deposition testimony entered into evidence).

obtain recognition of NNUK in June 2009, and again to obtain recognition for the remaining

EMEA Debtors, together with the Clement Statement, in October 2010.[35]   NNUK also submitted

sworn declarations and deposition testimony from the Joint Administrators affirming that the

Rolston and Clement Statements were true and correct as late as January 2011, such that

"NNUK's central management and control is to a large extent handled from England, where *all*

*major decisions* are made."[36]   Indeed, the EMEA Debtors expressly argued that "[w]hile NNC is

the ultimate parent of all Nortel Companies worldwide and NNC's headquarters in Toronto

serves as the global headquarters, *the EMEA Debtors' central management and control is*

*directed from the head office in Maidenhead, England, where all major decisions specific to the*

*EMEA Debtors are made.*"[37]   In turn, this Court's orders granting recognition are express that its

findings on the EMEA Debtors' center of main interests are based upon the Rolston and Clement

Witness Statements.[38]

---

[35]     See Barefoot Decl. Ex. C & Ex. J ¶ 6.

[36]     Barefoot Decl. Ex. I ¶ 4(e) (emphasis added); see also Barefoot Decl. at Ex. L at 20:11-14 (submitting Joint Administrators' deposition transcript into evidence on record of recognition hearing); Barefoot Decl. Ex. K at Exhibit A at 49:17-50:4, 107:9-107:17, 278:21-279:9 (Rule 30(b)(6) deposition testimony from Joint Administrators affirming that Rolston and Clement Statements remained true and correct); Barefoot Decl. Ex. J ¶ 7; NNUK Chapter 15 Petition, Barefoot Decl. Ex. G ¶ 17 ("[NNUK's] management, strategic planning, decision making and key functions are located in England, which is [NNUK's] center of main interests").

[37]     See Barefoot Decl. Ex. O at 7 (emphasis added).

[38]     See NNUK Recognition Order, Barefoot Decl. Ex. M at 1 (basing findings "upon this Court's review and consideration of . . . the Declaration of Sharon L. Rolston, dated June 6, 2009, and Exhibit A (Witness Statement of Sharon Lynette Rolston, dated January 14, 2009) thereto, the Declaration of Stephen John Harris, dated June 5, 2009"), and ¶ G (finding that "England . . . is where the center of main interests of the Foreign Debtor is located"); see also EMEA Debtor Recognition Order, Barefoot Decl. Ex. N at 2 (noting that the "Court having considered and reviewed the Chapter 15 Petitions and all other documents and evidence filed in support thereof, namely the witness statements of Sharon Rolston attached as Exhibit I to the Declaration of Alan Robert Bloom dated October 18, 2010 and witness statements of Michel Clement attached as Exhibit II thereto, and the deposition testimony of Alan Robert Bloom dated December 16, 2010") and ¶ G (finding that "England is the center of main interests of each of the EMEA Debtors and, accordingly, the English Proceedings are 'foreign main proceedings' . . . and entitled to recognition as foreign main proceedings").

2.      NNUK is Judicially and Collaterally Estopped from Reversing its Position

Under the judge-created doctrine of judicial estoppel, "where a party assumes a certain

position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter,

simply because his interests have changed, assume a contrary position." Fleck v. KDI Sylvan

Pools, Inc., 981 F.2d 107, 121 (3d Cir. 1992) (internal quotations and citations omitted).  While

the doctrine is not subject to "inflexible prerequisites or an exhaustive formula," New Hampshire

v. Maine, 532 U.S. 742, 751 (2001), the Third Circuit has identified factors that inform the

application of judicial estoppel: (i) the positions a party has taken are irreconcilably inconsistent;

(ii) the party had adopted those positions in bad faith; and (iii) estoppel is tailored to the harm.

G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009).  Judicial estoppel is

particularly appropriate if – as here – the party benefitted from its original position.  Delgrosso v.

Spang & Co., 903 F.2d 234, 242 (3d Cir. 1990).  Each of these factors is present.

NNUK's allegations that NNL and NNI controlled NNUK and the other EMEA Debtors

from North America are directly contrary to its prior position that NNUK was managed and

controlled from England.  NNUK's Claim now asserts (in conclusory terms) that control of

NNUK was somehow exercised by NNL and NNI, who should be deemed directors of NNUK.[39]

This requires, at a minimum, a showing that NNUK's directors in England were accustomed to

act pursuant to directions from NNL and NNI, or that NNI and NNL participated in directing

NNUK's affairs on equal footing with its duly appointed directors.  Todd Decl. ¶¶ 39-40, 47-48.

To the extent the Claim provides any factual allegations to support these broad general

assertions, it focuses on tax and treasury functions, which NNUK alleges were controlled by

---

[39]      Claim ¶ 13 ("Control of the Nortel Group's operations was highly centralized and . . . was maintained
primarily by NNC and NNL."); ¶ 15 ("While the Canadian Entities controlled the group on a general basis, NNI was
also involved in jointly controlling certain aspects of the Group's operation together with the Canadian Entities.")

NNL and NNI.[40]  This is irreconcilably inconsistent with NNUK's prior position that tax,

treasury and other management functions for the EMEA Debtors were controlled from England

by NNUK.[41]  Indeed, the same Joint Administrators that signed the Proof of Claim previously

submitted a sworn declaration affirming that "NNUK's central management and control is to a

large extent handled from England, where *all major decisions* are made."[42]  The resulting

findings from both this Court and the English Court that the EMEA Debtors' center of main

interests was in England are tantamount to a determination that England was their principal place

of business.[43]  The principal place of business is the corporation's "nerve center," from which "a

corporation's high level officers [and directors] direct, control and coordinate the corporation's

activities."  Hertz Corp. v. Friend, 130 S.Ct. 1181, 1183 (2010) (internal quotations omitted).

Findings that the "nerve center" of the EMEA Debtors was England cannot be reconciled with

claims predicated upon control of the EMEA Debtors by NNL and NNI.

    NNUK also benefitted from its prior assertions that the EMEA Debtors' center of main

interests was in England.  The EMEA Debtors asserted that if the English Court did not find

England to be their center of main interests, they would be required to commence piecemeal

---

[40]    See, e.g., Claim ¶ 15 ("The control exerted [over NNUK] by NNI related to Group Tax matters, in particular transfer pricing, and to Group Treasury matters.  These Group Tax and Group Treasury functions were responsible for the transactions pursuant to which value was improperly removed from NNUK.").

[41]    Compare Claim ¶ 21 ("decisions [were] imposed on NNUK relating to the utilization of the [NNL] Interest Free Loan Facilities"), with Rolston Statement, Barefoot Decl. Ex. C ¶ 85 ("Global inter-company facilities and loans are all managed from EMEA Treasury in England."), and ¶ 15(i) ("decisions in relation to settlement of intercompany accounts are made by the EMEA Treasury team in England.").  Compare Claim ¶ 84 ("NNUK's taxation affairs were controlled by NNI and NNL"), with Rolston Statement, Barefoot Decl. Ex. C ¶ 186 ("The tax group based in England (the 'EMEA Tax Group') is responsible for managing and supervising tax throughout the EMEA Region").  Compare Claim ¶ 25 ("key individuals within Nortel Treasury were from NNI") and ¶ 15 ("The control exerted by NNI related to . . . Group Treasury matters") with Clement Statement, Barefoot Decl. Ex. D ¶ 35 ("the banking and treasury functions are run out of England by the Group Treasury Operations.").

[42]    Barefoot Decl. Ex. I ¶ 4(e) (emphasis added).

[43]    See In re British Am. Ins. Co., 425 B.R. 884, 908 (Bankr. S.D. Fla. 2010); In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (2008); Todd Decl. ¶ 141.

liquidation proceedings that would destroy value in the EMEA region. Rolston Statement, Barefoot Decl. Ex. C ¶¶ 101-102, 211-212, 219; Clement Statement, Barefoot Decl. Ex. D. ¶ 24(a). The EMEA Debtors also acknowledged to the English Court that it was "strategically advantageous" for NNUK to file administration applications in England. Rolston Statement, Barefoot Decl. Ex. C ¶ 211. In addition, by securing Chapter 15 recognition, NNUK enjoyed the protections of the automatic stay over any property located within the United States. See NNUK Recognition Order, Barefoot Decl. Ex. M ¶ 2. These benefits that the EMEA Debtors enjoyed as a result of their prior position "evidence an intent to play fast and loose with the courts." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996). This alone permits the Court to find that NNUK's change in position was made in bad faith. Anjelino v. N.Y. Times Co., 200 F.3d 73, 100 (3d Cir. 2000) (affirming district court's grant of motion to dismiss where finding of bad faith was based on party's prior inconsistent position).

Finally, no sanction short of estoppel can address this harm. To permit NNUK to take one position for commencement and recognition of its administration proceedings, and then an opposite position in order to manufacture claims against the U.S. Debtors, is precisely the sort of "intentional self-contradiction . . . used as a means of obtaining unfair advantage" that judicial estoppel aims to avoid. Scarano v. Cent. R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953); Krystal Cadillac-Oldsmobile GMC Truck Inc. v. GMC, 337 F.3d 314, 319 (3d Cir. 2003) (judicial estoppel precludes a party from "gain[ing] an advantage by litigation on one theory, and then seek[ing] an inconsistent advantage by pursuing an incompatible theory") (internal quotations and citations omitted).

Collateral estoppel also applies to foreclose NNUK's inconsistent claims. Collateral estoppel applies where: (i) the issue sought to be precluded was actually and necessarily

determined in a prior proceeding; (ii) the issue was actually litigated; (iii) the issue was finally

determined; and (iv) the determination was essential to the prior judgment.  Burlington N. RR Co.

v. Hyundai Merch. Marine Co., 63 F.3d 1227, 1232 (3d Cir. 1995).  First, as set forth above, the

EMEA Debtors' center of main interests was actually and necessarily determined before both the

English Court and this Court.  Second, the issue was also "actually litigated."  In connection with

the Chapter 15 Proceedings, both the U.S. Debtors, the Committee and the Canadian Monitor

engaged in extensive discovery concerning the factual basis for the EMEA Debtors' assertion

that England was the center of main interests for the EMEA Debtors, including multiple

document requests, the production of nearly 9,000 pages of documents (many of which were the

subject of a motion to compel granted by this Court), multiple rounds of interrogatories, and a

deposition pursuant to Rule 30(b)(6) of one of the Joint Administrators.[44]  With the benefit of

that discovery, the Court held a hearing, at which voluminous evidence was submitted in support

of the EMEA Debtors' assertions that their center of main interests was in England.  The Court

noted on the record that recognition "was a contested matter, hotly contested for awhile and that

certainly generates a good record upon which to make the finding and to make – to grant the

recognition of the foreign proceeding and as well – as well as find that it is the center of main

interest."  Barefoot Decl. Ex. L at 25:11-16.  Third, both the English Court's Initial Orders[45] and

---

[44]    See generally Notices of Service of Discovery [D.I. 58, D.I. 61, D.I. 64, D.I. 70, D.I. 71, D.I. 79, D.I. 83, D.I. 92]; Notices of Deposition [D.I. 65, D.I. 66, D.I. 67, D.I. 68, D.I. 84, D.I. 89]; Motion of the U.S. Debtors and the Committee for an entry of an Order Compelling Discovery of the EMEA Debtors and their Administrators [D.I. 69]; Order Compelling Discovery of the EMEA Debtors and Their Administrators [D.I. 77]; Nov. 29, 2010 Hr'g Tr. at 10:23-11:13 [D.I. 82] (permitting, over EMEA Debtors' objection, participation in discovery by Canadian Monitor); Dec. 8, 2010 Hr'g Tr. at 16 [D.I. 88] (granting, over EMEA Debtors' objection, U.S. Debtors' request for extended-time deposition); Dec. 22, 2010 Hr'g Tr. at 10:22-11:25 [D.I. 96] (ruling on discovery dispute concerning confidentiality of documents produced).

[45]    Todd Decl. ¶ 142 (explaining that Initial Orders are now final orders that are no longer subject to appeal except by way of appeal out of time).

this Court's NNUK and EMEA Recognition Orders[46] have become final and non-appealable.

Finally, a determination that England was the EMEA Debtors' center of main interests was

essential to the orders of both this Court and the English Court, as neither court could have

entered their orders without making that finding.[47]  Accordingly, the Court should dismiss

without further consideration NNUK's inconsistent claims – claims 2, 8, 16, 28 and 32 for NNI's

alleged direct breach of fiduciary duty, as well as claims 4, 6, 10, 13-14, 18, 20, 22, 29, 31, 34,

35 to the extent based on a breach of duty by NNL.

**B.      NNUK Fails to Plead a Plausible Claim that NNI was a Director under English Law**

Even if the Court were to permit NNUK now to assert its fiduciary duty claims, its Claim

nonetheless fails to state a basis on which to deem NNI a director of NNUK.  While NNUK

alleges such directorship claims based on each of the five factual patterns in its Claim, it does not

and cannot allege any well-pleaded facts as to how NNI – a sister corporation – exercised control

over NNUK sufficient to render its claims plausible.  The Claim fails to allege well-pleaded facts

of any actions undertaken by NNI that could only be undertaken by a director (as required to

state a de facto director claim), much less any directions given by NNI to NNUK's directors (as

required to state a shadow director claim).  NNUK's shadow director claim is similarly barred

both by other English law doctrines, as well as limitations on shadow directors' duties.

1.      English Law Regarding Shadow and De Facto Directors

Under English law, there is no exhaustive statutory definition of a director.  Rather, a

"director" includes "any person occupying the position of director, by whatever name called."

---

[46]      The NNUK Recognition Order was entered on June 26, 2009 [D.I. 36 in Case. No. 09-11972].  The EMEA Recognition Order was entered on January 31, 2011 [D.I. 116 in Case. No. 09-11972].

[47]      Todd Decl. ¶ 141; 15 U.S.C. § 1517(a)(1) ("an order recognizing a foreign proceeding shall be entered if (1) such foreign proceeding for which recognition is sought is a foreign main proceeding . . .").

Todd Decl. ¶ 37 (citing Companies Act § 250).  Apart from traditional de jure directors, English law recognizes both "de facto" and "shadow" directors.  <u>Id.</u> ¶ 38, 47.

A person may be deemed a de facto director if he acts as a director but is not actually appointed as such.  Todd Decl. ¶ 38.  A de facto director claim can arise in cases where an individual has been acting as a director, but there was a technical defect in her appointment.  <u>Id.</u> The individual must undertake functions in relation to the company that could only be discharged by a director, and must participate in directing the affairs of the company on an equal footing with the other director(s).  <u>Id.</u> ¶¶ 39-40.  A de facto director must have assumed the status and functions of a company director and exert a "real influence" in the company's corporate governance.  <u>Id.</u> ¶ 40.[48]  Being "held out" as a director to third parties is important evidence that would support a conclusion that a person acted as a director in fact.  <u>Id.</u> ¶ 43.  The Debtors' English law expert is aware of no English authorities that have found that one subsidiary company is a de facto director of another subsidiary.  <u>Id.</u>  Where the de facto director test is satisfied, however, a de facto director is regarded as holding a fiduciary position and will be subject to the general duties of directors.  <u>Id.</u> ¶ 38.

By contrast, a shadow director is a person "in accordance with whose directions or instructions the directors of the company are accustomed to act."  Todd Decl. ¶ 47 (citing Companies Act § 251(1)).[49]  While a shadow director must have a real influence in the corporate affairs of the company, such influence need not be exercised over all corporate activities, as in the case of a de facto director.  <u>Id.</u> ¶ 48(b).  The Companies Act clarifies, however, two circumstances in which directions to act will nonetheless fail to establish a shadow directorship.

---

[48]    If it is unclear whether the acts demonstrate an assumed directorship or some other capacity, the person in question is entitled to the benefit of the doubt, although English courts have cautioned not to strain the facts to apply this deference.  Todd Decl. ¶ 40.

[49]    The Companies Act establishes the elements necessary to state a claim for shadow directorship.  <u>Id.</u>

First, "a person is not to be regarded as a shadow director by reason only that the directors act on advice given by him in a professional capacity." Id. ¶ 47.  Second, a "body corporate is not to be regarded as a shadow director of any of its subsidiary companies . . . by reason only that the directors of the subsidiary are accustomed to act in accordance with its directions or instructions." Id. ¶ 47 (citing Companies Act § 251(3)).  The Debtors' English law expert is likewise not aware of a single English case that has held a sister corporation to be a shadow director of its affiliate. Id. ¶ 65.

Notably, in contrast to a de facto director, a shadow director does not normally owe fiduciary duties to the company. Id. ¶ 60.  A shadow director will only become subject to fiduciary duties if he does something more than act as a shadow director, such that he becomes a de facto director, or if he incurs fiduciary obligations in relation to the company by, for example, taking personal control of property of the company. Id. ¶¶ 60-61.  Given the different duties applicable to shadow and de facto directors, English law draws an important distinction between the two claims. Id. ¶¶ 52-55.  Indeed, as one English court has stated, an allegation that a person acted as a de facto or shadow director, without distinguishing between the two, is "embarrassing." Id. ¶ 54 (citing Re Hydrodan (Corby) Ltd [1994] 2 BCLC 180 at 182h).

Although a corporation can be a de facto or shadow director, because a corporation can only act through its agents, NNUK must ultimately show that individuals were acting within the scope of their employment and authority at NNI in order to impute that conduct to NNI and rely on it as the basis of a claim of shadow or de facto director. Todd Decl. ¶¶ 41, 50.

    2.    The Claim Fails to Allege Sufficient Well-Pleaded Facts to Render a Directorship Claim Plausible

As explained above, following the Supreme Court's decisions in Iqbal and Twombly, courts must determine whether a claim alleges sufficient facts to "state a claim to relief that is

31

plausible on its face." Twombly, 550 U.S. at 570. To make this determination, the Court must disregard unsupported conclusions and unwarranted inferences, as well as any legal conclusions or bare recitals of the cause of action. Iqbal, 129 S.Ct. at 1949. Only if the remaining well-plead components of the complaint have "shown" an entitlement to relief should the claim be permitted to stand. Id. at 1950; Abramson v. Ritz-Carlton Hotel Co., Civ. Action No. 09-3264 (JHR), 2010 WL 3943666, at *3 (D.N.J. Oct. 6, 2010).

When considered under this precedent, claims 2, 8, 16, 28 and 32 fail under Rule 8(a) alone. These are predicated on NNI having purportedly acted as a de facto or shadow director of its sister corporation NNUK for the benefit of their common parent, but NNUK has failed to plead facts that render such a claim *plausible*.[50]

NNI and NNUK are sister corporations, each wholly-owned subsidiaries of NNL. See Claim ¶ 2. Indeed, NNUK asserts that "[c]ontrol of the Nortel Group's operations was highly centralized and, on a general basis, was maintained primarily by NNC and NNL." Id. ¶ 13. Nonetheless, the Claim asserts that NNI was "also involved in jointly controlling certain aspects of the Group's operation together with the Canadian Entities." Id. ¶ 15. The Claim alleges that this control "related to Group Tax matters, in particular transfer pricing, and to Group Treasury matters." Id. Through these matters, NNUK asserts that "the resources of NNUK were depleted at the direction of the [sic] NNL and NNI." Id. ¶ 7; see also ¶ 57. From this, NNUK concludes that "NNI was a de facto or shadow director of NNUK under English law." Id. ¶ 26. NNUK makes directorship allegations with respect to each of the five categories of transactions; in each

---

[50] Indeed, when fairly read, NNUK's breach of fiduciary duty allegations invoke Rule 9(b). Claims 2, 8, 16, 28, and 32 are predicated on an alleged scheme by NNI and NNL to strip assets from NNUK for NNL's benefit. See Claim ¶¶ 57-58, 114, 122, 141. Courts routinely apply Rule 9(b) to such allegations. See Forman, 405 B.R. at 746. Moreover, because NNUK separately brings claims for breach of the duty of care and breach of fiduciary duty, its fiduciary duty claims necessarily involve allegations that exceed mere negligence, and allege self-dealing by NNI and/or NNL. See, e.g., Claim ¶ 87(b). However, regardless of whether the heightened pleading standards of Rule 9(b) apply, NNUK's claims fail even under the basic pleadings standards of Rule 8(a).

case, its claim is devoid of well-pleaded facts that NNI instructed NNUK's directors or undertook activities that could only be performed by a director, as English law requires:

**Pre-Petition Asset Sales**.  The Claim asserts breach of fiduciary duty claims with respect to these transactions (claims 28 and 32), but fails even to reference such transactions in alleging de facto and shadow director status for NNI.  Claim ¶ 26(a)-(b).  Moreover, the Claim fails to include any allegations whatsoever concerning functions performed by NNI or directions given by NNI with respect to NNUK's entry into Pre-Petition Asset Sales or decisions in respect of pre-petition taxation.  Nor does the Claim include any allegations regarding the process by which the Pre-Petition Asset Sales in claim 28 were considered and approved.  See generally Claim ¶¶ 79-83.[51]  Instead, for claim 28, NNUK avers only that NNI "was involved in all decision making in relation to the settlement of the allocation methodology and allocation amounts."  Id. ¶ 193.

**Contingent Tax Claims**.  For claim 32, NNUK makes the similar conclusory allegation that NNI "controlled" NNUK's tax affairs.  The Claim alleges only that "NNUK's taxation affairs were controlled by NNI . . . . more generally."  Id. ¶ 84; ¶ 208 ("NNI (together with NNL) controlled NNUK's tax affairs.").[52]  Disregarding these mere conclusions – as Iqbal requires – Claims 28 and 32 lack any well-pleaded facts concerning acts undertaken by NNI that could only be undertaken by a director or instructions it gave to NNUK's de jure directors.  Indeed, the allegations underlying Claim 32 are insufficient even to put NNI on notice of the conduct on which it bases its cause of action.

---

[51]    While paragraph 193 references paragraphs 15 to 27, those paragraphs in fact contain no allegations concerning Pre-Petition Asset Sales, which are instead contained at paragraphs 79-83.

[52]    NNUK separately makes certain tax-related allegations concerning transfer pricing and the NNUK Intercompany Loans, but the Claim asserts separate causes of action based on NNI's alleged fiduciary status for those transactions (claims 2 and 8).

**Transfer Pricing**.  Though NNUK makes more extensive allegations based on transfer pricing (claim 2), their length provides no additional well-pleaded facts sufficient to draw an inference that NNI acted as a de facto or shadow director of NNUK.  NNUK asserts that NNI was "heavily involved in the implementation and operation of the transfer pricing arrangements."  Claim ¶ 16.  On their face, these are not allegations of director level involvement as opposed to managerial actions.  NNUK does not include any allegations that these individuals were at any board meetings or took any actions only the board could take.  NNUK includes a list of "key individuals involved,"  but nowhere alleges any directions they gave to NNUK's directors.  Id. ¶ 17.  Nor does it allege that any of these individuals were held out as directors to third parties.  Moreover, the Claim fails to allege that these individuals were acting within the scope of their employment or authority for NNI sufficient to attribute their actions to NNI.  This is not a mere question of formality as the Claim itself alleges that many of the individuals at issue also held positions with NNL or the Nortel Group more broadly.  See, e.g., Claim ¶ 17.

The Claim alleges that certain individuals undertook negotiations with taxation authorities and instructed legal advisors.  Id. ¶¶ 16, 18(c) and (e).  Those activities are insufficient grounds on which to base a de facto directorship claim because they could have been undertaken by managers, and do not constitute "director only" activities.  Todd Decl. ¶¶ 39-40, 44-45.  Insofar as the claim alleges any direction given to NNUK, it tellingly does so in the passive voice, without affirmatively alleging that NNI was responsible.  Claim ¶ 18(c) ("NNUK was simply instructed to sign the MRDA"); see also ¶ 10 ("the EMEA Companies, together with their personnel, were instructed to identify new schemes which would enable the transfer of cash and value to NNL.").  The Claim asserts similar conclusions in the text of claim 2.  Id. ¶ 91 ("NNI was involved in all decision making in relation to the transfer pricing arrangements").

However, generalized references to alleged "involvement" are no substitute for well-pleaded facts identifying participation in corporate governance or directions given to NNUK's own directors. See Twombly 550 U.S. at 567-70 (dismissing complaint because it failed to include sufficient well-pleaded allegations to give rise to a plausible claim of conspiracy); Iqbal, 19 S. Ct. at 1952 (dismissing complaint because Plaintiff had not plead sufficient factual allegations against petitioners to establish discrimination claim).

**NNUK Intercompany Loans**.  NNUK's allegations in respect of the NNUK Intercompany Loans (claim 8) fare no better.  Again, the Claim resorts to conclusory allegations of NNI's "involvement" in those loan facilities – notwithstanding the allegations that NNI was not a party to those loans.  Claim ¶ 63 ("NNI was involved in the establishment of the [NNUK Intercompany Loans]"), ¶ 57 ("NNI personnel were actively involved in devising and implementing the [NNUK Intercompany Loans]"), ¶ 20 ("NNI, through its personnel, was, together with the Canadian Entities, involved in the implementation of the [NNUK Intercompany Loans]"), ¶ 21 ("Numerous NNI individuals were aware of and/or participated in discussions relating to the initial [NNUK Intercompany Loan]"), ¶ 121 (alleging "NNI was involved in all decision making in relation to the [NNUK Intercompany Loans]").  Even where NNUK attempts to allege facts, those facts still fall far short of the director-level participation in corporate governance, or direction of NNUK's de jure directors, that a plausible claim requires.  Instead NNUK repeatedly alleges NNI's "involvement" in the implementation, supervision and establishment of the NNUK Intercompany Loans.  Claim ¶¶ 20-22, 66.  These are not only functions that could be performed by managers, but these also fall far short of the directions given to the NNUK board that are a required element under English law.  See Todd Decl. ¶¶ 39-40, 44, 45, 47, 66, 67.  Again, the only allegation concerning any potential direction given is

tellingly made in the passive voice, without any suggestion that NNI gave such direction.  Claim

¶ 10 ("[t]he EMEA Companies, together with their personnel, *were instructed*, to identify new

schemes which would enable the transfer of cash and value to NNL.") (emphasis added).

To the extent that NNUK bases its claim on actions undertaken by Katharine Stevenson

(alleged to be a director of NNI), or Ryan Smith (alleged to be an NNI employee), NNUK has

not alleged sufficient well-pleaded facts to meet the requirements of English law for a de facto

director.  There are no allegations to suggest that Stevenson or Smith was acting as a director.

Nor are there allegations that those individuals were held out as NNUK directors to third parties,

or that those individuals were acting within the scope of their employment or authority for NNI.

Furthermore, the allegations in Claim itself suggest that the named individuals were <u>not</u> acting

within the scope of their employment with NNI, but rather in their capacities for NNL.  For

example, the Claim alleges that "[t]he implementation of the Interest Free Loan Facilities was

conducted under the ultimate direction of Katharine Stevenson" who signed many of the relevant

loan agreements.  Claim ¶ 22; <u>see also</u> Claim ¶ 57 (alleging that the "cash to Canada" policy

"was effectively a Group Treasury project, headed up by Katherine Stevenson of NNI.").

However, the NNUK Loan Agreements themselves make clear that Ms. Stevenson signed in her

capacity *as a director of NNL.*  <u>See, e.g.</u>, Barefoot Decl. Ex. P; <u>see also</u> Claim ¶ 22 (identifying

Stevenson as "Group Treasurer").  Similarly, the Claim repeatedly alleges that Ryan Smith

undertook actions on behalf of NNI (Claim ¶¶ 19, 22, 24), yet separately concedes that Smith

was "the EMEA Tax Leader on the ground in the EMEA Region [who] was seconded to NNUK

from NNI" (Claim ¶ 19).

**Project Swift**.  In respect of claim 16, NNUK alleges that "NNI's directors, officers and

senior employees were part of the management group that implemented Project Swift."  Claim

¶ 23.  It also asserts that "[d]irectors and officers of NNI (including Mr Paul Karr and Mr William LaSalle) were fully aware of Project Swift and were actively involved in its implementation."  Id. ¶ 24; ¶ 70 (alleging that NNI employed "key individual[s] in the implementation of Project Swift"); see also ¶ 153 (alleging only that "NNI was *involved* in all decision making in relation to Project Swift") (emphasis added).  Such conclusory allegations of involvement and implementation both fall short of well-pleaded facts, and of the relevant standard for both shadow and de facto directorship.  "Involvement" and "implementation" neither represent activities that could only be undertaken by directors (as opposed to managers), nor involve instructions to the members of NNUK's board.  Todd Decl. ¶ 66.  While NNUK alleges that Ryan Smith's "team came up with the idea for Project Swift," which they "structured and implemented," it also avers that the same team prepared notes for the presentation of Project Swift "to the various Nortel boards," who then approved the transaction.  Claim ¶ 24.  Such presentations to an authoritative board are at odds with any suggestion that NNI itself undertook director-level functions.  Ultimately, NNUK concedes that it was "NNL [that] elected to wipe out the loan balance by making a paper transfer from NNL to NNUK" of the Swift Subsidiaries.  Id. ¶ 71.  As such, to the extent that NNUK includes any well-pleaded facts regarding Project Swift, they tend to refute rather than render plausible the Claim's shadow director and de facto director claims.

Taken as a whole, the Claim thus lacks sufficient well-pleaded factual detail to "nudge" its allegations "across the line from conceivable to plausible."  Twombly, 550 U.S. at 570.

3.    NNUK's Allegations Fail to Establish Shadow Directorship or Resulting Duty

To the extent that the Claim relies on NNUK's attempts to deem NNL or NNI a director of NNUK, those claims independently fail for two reasons.  First, because of the statutory

protection for affiliates provided by Section 251(3) of the Companies Act, allegations that NNUK's directors acted in accordance with directions of NNI and/or NNL fail to state a claim. Second, even assuming that a shadow director claim were adequately pled, NNUK does not allege actions by NNI or NNL as an alleged shadow director of NNUK sufficient to give rise to fiduciary duties under English law.

Specifically, Section 251(3) of the Companies Act precludes shadow director claims against a parent corporation by reason of its subsidiary's directors acting on the directions or instructions of the parent.  Todd Decl. ¶ 51.  Section 251(3) provides that a body corporate is not to be regarded as a shadow director of any of its subsidiaries merely because the directors of that subsidiary are accustomed to act in accordance with its directions or instructions.  Id.  Instead, something more is required, such as the parent having taken over management of the subsidiary. Id.  As an initial matter, even if NNUK had adequately pled that its directors were accustomed to act in accordance with directions from NNL, Section 251(3) bars a shadow director claim against NNL.  Id. ¶ 68.  This, in turn, bars any secondary liability claim – whether for aiding and abetting or for dishonest assistance – based on an alleged primary breach of fiduciary duties that NNL owed to NNUK as a shadow director (claims 4, 6, 10, 13, 18, 20, 31, 34 and 35).  Moreover, the rationale of Section 251(3) applies with equal force where – as here – two subsidiaries are under common control and the only basis for an allegation of shadow directorship is alleged assistance given by one subsidiary to the parent.  Id.  Specifically, NNUK alleges that NNI took certain actions or was involved in certain transactions for the benefit, and at the behest of, NNL. Claim ¶¶ 9-10, 32, 57.  Under these circumstances, Section 251(3) bars a shadow director claim against NNI.  Todd Decl. ¶¶ 68-69.

Even assuming that NNI was a shadow director, the Claim fails to demonstrate any justification for imposing fiduciary duties on NNI that would support a breach of fiduciary duty claim.  An entity that acts as a shadow director of a corporation will not automatically owe fiduciary duties to that corporation's shareholders.  Todd Decl. ¶¶ 60-64.  Instead, a shadow director will become subject to fiduciary duties only if he does something more than act as a shadow director, such that he becomes a de facto director, or if he incurs fiduciary obligations in relation to the company by, for example, taking personal control of property of the company.  Id. As set forth above, NNUK has failed to allege sufficient well-pleaded allegations to state a claim of de facto directorship.  Nor has NNI anywhere alleged that NNI took control of specific property of NNUK, or otherwise took additional steps sufficient to impose a fiduciary duty as a shadow director.  Accordingly, even if NNUK had adequately pled a claim for shadow directorship, it has failed to plead the basis for any corresponding fiduciary duty on which to base its claim for breach.

**C.    The Claim Includes No Well-Pleaded Allegations of NNUK's Insolvency Necessary for the Alleged Actions to Constitute a Breach of Fiduciary Duty**

Even if NNUK had adequately pled facts on which NNI could be found a director of NNUK, the Claim does not adequately plead NNUK's alleged insolvency or risk of insolvency. Specifically, the Claim's breach of fiduciary duty claims are grounded in allegations that the transactions at issue were contrary to the interests of NNUK and its creditors.  Claim ¶¶ 58, 78, 87(b)(v).  NNUK alleges that each of the transactions on which it bases its claims benefitted NNL, but was not in the best interests of NNUK and its creditors.  Id. ¶¶ 10-11, 21, 32, 48-56, 60, 64-65, 78, 87.

Under English law, however, where a company is solvent, the interests of its shareholder are paramount.  Todd Decl. ¶¶ 71-74.  Where the directors of a solvent subsidiary act with regard

to the interests of its parent-shareholder, they will not be in breach of their fiduciary duties.  Id.

Moreover, if a parent-shareholder authorizes or ratifies a particular action of its solvent

subsidiary, English law does not permit a later challenge to what the subsidiaries' directors have

done.  Id.  Accordingly, even where a subsidiary's directors act for the benefit of their parent-

shareholder to the subsidiary's detriment, as long as the subsidiary is solvent, the parent-

shareholder can ratify their actions and preclude any action for breach of duty.  Id.  Only when a

subsidiary approaches insolvency do the interests of creditors intrude.  Id.

However, the Claim does not include any well-pleaded allegations that NNUK was

insolvent, near insolvency, or of doubtful solvency.  As noted above, in considering the

sufficiency of NNUK's Claim, the Court must disregard conclusory allegations or bare legal

conclusions, and consider only the remaining well-pleaded facts to determine whether each of

the elements of a claim has been sufficiently alleged.  Fowler, 578 F.3d at 210; see also Iqbal,

129 S.Ct. at 1949 (in considering a motion to dismiss, the court is "not bound to accept as true

[any] legal conclusion couched as a factual allegation.") (internal citation and quotations

omitted).

The Claim's allegations concerning NNUK's insolvency begin and end with such bare

legal conclusions.  NNUK merely asserts throughout the Claim that NNUK was in a state of

doubtful solvency or risk of insolvency from 2000 onwards without any – much less any well-

pleaded – factual support.  Claim ¶ 87(b)(v) (alleging "the doubtful solvency (and/or risk of

insolvency) of NNUK from 2000 onwards"), ¶ 113 (same); see also ¶ 72 (alleging that at the

time of Project Swift, "NNUK was in a parlous financial state").  The repetition of this

conclusion is no substitute for factual allegations that would render it plausible – for example,

allegations that NNUK's liabilities exceeded the value of its assets, that particular transactions

affected its financial condition, that it was unable to obtain credit on commercial terms, and/or that it was unable to pay debts as they fell due.  See Seidel v. Byron, No. 05-C-6698 (JBM), 2008 U.S. Dist. LEXIS 76306, at *8 (N.D. Ill. Sept. 26, 2008) (granting motion to dismiss claim for breach of fiduciary duties owed to creditors based only on bare allegation of insolvency, where "[n]othing in the complaint indicates when [the debtor's] liabilities far exceeded its assets, or when it could no longer pay its debts . . . thereby failing to provide notice to defendants"); Official Comm. of Bondholders of Metricom Inc. v. Derrickson, No. C-02-4756 (JF), 2004 U.S. Dist. LEXIS 19497, at *19 (N.D. Cal. Feb. 25, 2004) (dismissing claims that directors breached duties to creditors where plaintiffs "plead no facts that would tend to prove that [debtor] was insolvent or had entered a zone of insolvency"); Angell v. Burrell (In re Caremerica, Inc), 409 B.R. 759, 765 (Bankr. E.D.N.C. 2009) (dismissing preference claim where debtor alleged insolvency without substantiation or factual support); Yelverton v. Homes at Potomac Greens Assoc. (In re Yelverton), No. 09-00414, Adv. No. 10-10001 (SMT), 2010 WL 1688403, at *3 (Bankr. D.D.C. April 22, 2010) (recitation of insolvency was insufficient to survive motion to dismiss); see also Asarco LLC v. Ams. Mining Corp., 382 B.R. 49, 71 (S.D. Tex. 2007) (denying 12(b)(6) motion on claims for breach of fiduciary duties to creditors where plaintiffs alleged facts that if proven, would support claim of insolvency, including an inability to pay debts as they came due).

This is particularly the case as NNUK's allegation suggests, without further specification, that NNUK somehow teetered in the zone of insolvency for a full nine years – since 2000 – before commencing administration proceedings.  Claim ¶ 87(b)(v), 113.  NNUK's submissions to this Court belie such an implausible assertion, as they suggest that the EMEA Debtors entered the zone of insolvency only in late 2008, and only became insolvent as a result of the January

2009 bankruptcy filings. <u>See</u> Rolston Statement, Barefoot Decl. Ex. C ¶ 4 ("I am advised by E&Y [the Joint Administrators] that the predicted impairment on the global business of the Nortel Group as a consequence of those [bankruptcy] filings means that it is inevitable that the Company and the EMEA Companies *will become* insolvent.") (emphasis added), ¶¶ 87-88 (affirming that cash pooling arrangements among the EMEA Companies were "discontinued upon legal advice as of 29 December 2008 given the solvency concerns of the Nortel Group," absent which, "the Cash Pooling Arrangement would almost certainly have remained in place."). Nor can NNUK rely on the bare legal conclusion that NNUK owed duties to creditors. Claim ¶ 113 (alleging that "the directors [of NNUK] were obliged at all times (and, from 1 October 2007, statutorily obliged pursuant to section 172(3) of the Companies Act 2006), to consider the best interests of the creditors of NNUK as paramount").[53]  The Claim simply fails to allege sufficient facts that would "nudge [its allegations of insolvency] across the line from conceivable to plausible." <u>Twombly</u>, 550 U.S. at 570.

In addition, by entering into the transfer pricing, Project Swift, NNUK Intercompany Loans, and Pre-Petition Asset Sale transactions with NNUK, NNL implicitly ratified those transactions. Todd Decl. ¶ 74. This also eliminates any potential claim that NNUK's directors had breached their fiduciary duties, given that NNUK has failed to sufficiently plead insolvency. <u>Id.</u>

**D.     NNI Owed No Independent Duty of Care Under English Law**

In claims 3, 9, 17, 30, and 33, NNUK asserts that NNI breached a duty of care that it owed to NNUK. With respect to the alleged Pre-Petition Asset Sales, transfer pricing

---

[53]     While the Claim separately includes similar conclusory allegations concerning the alleged financial condition of the Nortel Group as a whole (Claim ¶¶ 6-7, 38, 76), even if proven, these allegations would not satisfy the necessary element concerning the financial condition of NNUK itself. To the extent these allegations reference NNUK at all they assert that NNUK undertook a reduction in force of its employees. Claim ¶ 7. If anything, such a reduction would improve, rather than worsen, NNUK's financial position.

arrangements, Project Swift, and NNUK Intercompany Loans, the Claim alleges that such a duty

existed based on either NNI's status as an alleged director, or independently as a matter of

English law.  Claim ¶¶ 96-97, 125, 157, 199.  As to its contingent tax liability allegations,

NNUK asserts a duty of care based solely on its claims that NNI was a de facto or shadow

director of NNUK.  Id. ¶ 212.

        To the extent these duty of care claims are based on NNI's alleged status as a director, as

set forth above, NNUK's allegations that NNI was a shadow director or de jure director are not

plausible.  See Section II.B above.  Because NNUK bases claim 33 solely on its directorship

allegations, the arguments above are dispositive of that claim.

        NNUK's alternative allegations based on an independent duty of care are equally faulty.

NNUK grounds these duty of care claims in allegations that there was a "relationship of

sufficient proximity" between NNI and NNUK to justify imposing a duty.  Claim ¶¶ 95-96, 99,

125, 157, 199, 212.  Just as NNL's implicit ratification of the alleged transactions vitiates any

claim for breach of fiduciary duty by NNUK's directors, it similarly precludes a breach of the

duty of care.  Todd Decl. ¶ 81.  Moreover, the U.S. Debtors' expert is unaware of a single

English decision imposing such a duty of care for pure economic loss as between companies in a

group.  Todd Decl. ¶ 79.  In cases of pure economic loss, English law typically imposes a duty of

care only in confined circumstances, such as cases involving the provision of independent

professional services (e.g., solicitors, surveyors, auditors, and bankers).  Id. ¶ 80.  On occasion,

the duty has also been imposed in contexts such as employment relationships and landlord/tenant

relationships.  Id.  The allegations of the Claim are divorced from those contexts in which

English Courts have imposed such a duty.  Id.  In any event, it would not be fair, just or

reasonable to impose a duty of care on NNI where, as NNUK repeatedly asserts, its harms arose

out of an alleged "cash to Canada" scheme to which NNI was also subjected.  See Claim ¶ 56

(acknowledging that under the transfer pricing arrangements, NNI overpaid NNL by at least $2

billion).

**E.      The English Doctrine of *Ex Turpi Causa* Precludes NNUK from Asserting Any of Its Common Law Claims Against NNI Where the Alleged Wrong is Attributable to NNUK Itself**

Even if the Court were to find that NNUK's conclusory allegations stated a claim, those

claims – as well as all of NNUK's additional English common law claims discussed below – are

barred by the English doctrine of *ex turpi causa*.  That doctrine applies to bar causes of action

that require a claimant to plead or rely on his own illegality.  Todd Decl. ¶¶ 131-32.  Grounded

in public policy, the principle is also known by the common law maxim *ex turpi causa non oritur*

*actio:* "from a dishonorable cause an action does not arise."  Id. ¶ 131.  While illegality will not

be attributed to a corporation based on the misconduct of its employee or agent, where the

directing mind and will of the company commits the fraud or wrong, those acts are treated as the

act of the company.  Id. ¶ 132.  In such cases, where all those in the management and ownership

of the company are, or must be taken to be, aware of the fraud or breach of duty at issue, their

wrongful acts will be attributed to the company.  Id. ¶ 134.  This applies even where the "sole

actor" consists of multiple shareholders or directors acting in concert.  Id.[54]  The only exception

to the "sole actor" rule – under which the wrongful conduct is attributed to the company – is

where there is an "innocent" shareholder or director unaware of the breach.  Id. ¶ 134(iii).

---

[54]      Importantly, the application of *ex turpi causa* does not depend on whether the company whose wrongdoing is at issue has been placed into liquidation or administration proceedings.  The creditors of an insolvent company thus fail to qualify as innocent individuals whose presence would bar the application of the *ex turpi causa* doctrine. Todd Decl. ¶ 134(iv) ("There is no good reason to apply a different rule to a company in liquidation . . . [which] cannot assert any cause of action which it could not have asserted before the commencement of its liquidation.") (quoting Stone & Rolls Ltd (in liquidation) v. Moore Stephens [2009] 3 WLR 455 at [128] per Lord Walker).

NNUK's common law claims are predicated on allegations that NNUK's de jure directors breached their fiduciary duties to the company, with the assistance, involvement and/or knowledge of NNI and/or NNL – its sole shareholder. Claim ¶¶ 29, 105, 130, 162, 214. Nowhere does NNUK allege that there were any independent directors or shareholders of NNUK who were ignorant of the breaches of fiduciary duty now alleged. To the contrary, the Claim's de facto and shadow director claims allege that NNL was either an equal participant with NNUK's de jure directors or gave directions to such directors. See, e.g., Claim ¶¶ 13, 15, 61, 105. The alleged breaches of fiduciary duty are thus imputed to NNUK and *ex turpi causa* precludes all of NNUK's English common law claims (claims 2-5, 8-10, 12, 14, 16-19, 22, 26, 28-30, 32-33, 35). Todd Decl. ¶ 128, 139; see also Alphastar, 383 B.R. at 274-75 (granting motion to dismiss dishonest assistance claim asserted under Bermuda law based on *ex turpi causa* where allegations demonstrated that the board of directors itself had sanctioned the allegedly wrongful conduct).

### III.
### NNUK'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON NNI FAIL

In claims 2-3, 8-9, 16-17, 28, 30, and 32-33, NNUK attempts, and fails, to impose primary liability on NNI for alleged breaches of duty. Many of NNUK's other claims purport to impose secondary liability on NNI for assisting the alleged breaches of duties by NNUK's own directors and by NNL, allegedly in the role of de facto or shadow director of NNUK. Specifically, NNUK asserts claims against NNI for dishonest assistance under English law, aiding and abetting breach of fiduciary duty under U.S. state law, and conspiracy under both English and U.S. state law. Claims 4-7, 10, 11-13 18-21, 31, 34-35. Each of these claims must be dismissed because NNUK has failed to show through well-pleaded allegations that it is

entitled to relief on these claims.  In any event, even if sufficiently pled, the claims are barred by the allegations of NNUK's own misconduct.

**A.      NNUK's Claims for Aiding and Abetting and Dishonest Assistance Fail on Multiple Grounds (Claims 4, 6, 10, 13, 18, 20, 31, 34-35)**

NNUK's dishonest assistance and aiding and abetting claims are based on each of the sets of factual allegations in the Claim: (i) transfer pricing (claims 4 and 6), (ii) intercompany loans (claims 10 and 13), (iii) Project Swift (claims 18 and 20), (iv) past business sales (claim 31), and (v) contingent tax liability (claims 34-35).  These are the same factual allegations that underlie NNUK's primary claims, which NNUK merely recharacterizes as assistance to NNUK's de jure directors and/or to NNL as NNUK's alleged de facto or shadow director.  Claim ¶¶ 105, 112, 130, 140, 162, 204-05, 213-14.  As a matter of required elements, NNUK's causes of action for dishonest assistance and aiding and abetting are essentially duplicative claims asserted alternatively under English and U.S. law.[55]  See generally Alphastar, 383 B.R. at 274 (explaining that "dishonest assistance" is similar to a state law claim for aiding and abetting breach of fiduciary duty).

1.      English Law

NNUK asserts claims for "dishonest assistance" under English law in claims 4, 10, 18, and 35.  To succeed on its claims for dishonest assistance, NNUK must show: (a) a breach of fiduciary duty owed to NNUK by the party NNI is alleged to have wrongfully assisted; (b) NNI's assistance in any such breach; (c) dishonesty on the part of NNI; and (d) damages to NNUK. Todd Decl. ¶ 84.  The standard for dishonesty is assessed objectively, requiring more than mere negligence or incompetence, though a party may be found to be dishonest if it has been reckless

---

[55]      As noted above, for purposes of this motion Movants apply the law that NNUK asserts is applicable to the claims.  Movants, however, reserve all rights as to the choice of governing law, including without limitation, as to those claims for which NNUK attempts to maintain duplicative claims under both U.S. law and English law.

or willfully blind.  Id. ¶ 85.  Because a claim for dishonest assistance requires an underlying

breach of fiduciary duty, if no such breach has been pleaded or proven, there can be no claim for

dishonest assistance as a matter of English law.  Id. ¶¶ 90, 92.

      2.     Delaware and Texas Law

NNUK also asserts duplicative claims for aiding and abetting breach of fiduciary duty

under U.S. state law in claims 6, 13, 20, 31, and 34, with specific reference to the law of

Delaware and Texas.  See Claim ¶¶ 111, 139, 168, 203.  Texas and Delaware law require the

same essential elements for such a claim: a breach of fiduciary duty by the primary wrongdoer,

the defendant's knowing participation in that breach, and resulting damages to the plaintiff.

Compare In re Fedders N. Am., Inc., 405 B.R. 527, 543-44 (Bankr. D. Del. 2009) with Floyd v.

Hefner, III, 556 F. Supp. 2d 617, 654-55 (S.D. Tex. 2008).  Thus, the defendant must have

known that the fiduciary's conduct constituted a breach of the fiduciary's duties.  See In re

Fedders, 405 B.R. at 544; Floyd, 556 F. Supp. 2d at 654-55; see also Brug v. Enstar Grp., Inc.,

755 F. Supp. 1247, 1256 (D. Del. 1991) (knowledge is a "critical element" in aiding and abetting

liability.)

The "kind of scienter required for aiding and abetting claims is actual knowledge.  The

'universal rule requires actual knowledge of the tortious conduct by the wrongdoer, not merely

that the defendant knew something was wrong in general.'"  Capitaliza-T Sociedad de

Responsabilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n., Civ. No.

10-520 (JBS/KMW), 2011 WL 864421, at *4 (D. Del. Mar. 9, 2011) (citing El Camino Res.,

LTD v. Huntington Nat'l Bank, 722 F. Supp. 2d 875, 905-10, 922 (W.D. Mich. 2010) (collecting

cases)); see also Malpiede v. Townson, 780 A.2d 1075, 1097-98 (Del. 2001).[56]  With regard to

---

[56]     Even to the extent that willful blindness or constructive knowledge were sufficient to establish knowledge,
NNUK's Claim fails under either standard as it is devoid of any well-pleaded facts of actual knowledge,

this element, "conclusory allegations such as '[aiding and abetting defendant] had knowledge of the [fiduciary d]efendants' fiduciary duties and knowingly and substantially participated and assisted in the [fiduciary d]efendants' breaches of fiduciary duty, and, therefore, aided and abetted such breaches of fiduciary duties' are insufficient as a matter of law." In re NYMEX S'holder Litig., C.A. Nos. 3621-VCN, 3835-VCN (JWN), 2009 WL 3206051, at *12 (Del. Ch. Sept. 30, 2009) (brackets in original).[57]

3.    NNUK's Allegations Fail to State a Plausible Claim

NNUK alleges a scheme by which NNI assisted in the deliberate removal of assets from NNUK through various non arm's-length transactions.  See, e.g., Claim ¶¶ 9, 10, 57.  NNUK's aiding and abetting and dishonest assistance claims therefore sound in fraud and are subject to Rule 9(b)'s heightened pleading standard.[58]  See Forman, 405 B.R. at 746-47 (applying Rule 9(b) to claim of aiding and abetting breach of fiduciary duty because the underlying violation asserted was a "fraud enabling the defendants to exploit and loot the debtor for [defendants'] own purposes"); see also Adamson v. Bernier (In re Bernier), 282 B.R. 773, 781 (Bankr. D. Del. 2002) ("whether the transaction is conducted at arm's length" is a factor indicative of an intent to

---

[57]    recklessness or willful blindness.  Capitaliza-T, 2011 WL 284421 at *5 (noting, without citation, potential ambiguity in Delaware law on sufficiency of willful blindness for aiding and abetting liability); see also United States v. Flood, 327 Fed. Appx. 356, 359, No.08-2937 (AJS) (DKS) (DMF), 2009 WL 1220685, at *2 (3d Cir. May 6, 2009) (noting that for criminal aiding and abetting a finding of willful blindness or deliberate ignorance satisfies the requisite intent to facilitate the crime); United States v. Brodie, 403 F.3d 123, 146-148 (3d Cir. 2005) (providing a detailed discussion of willful blindness in the context of a criminal conspiracy and explaining that to find willful blindness, a jury must conclude that "the defendant himself was objectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability") (internal quotation marks and citation omitted).

[57]    Moreover, "[t]here must be a clear nexus between the knowledge of the wrong and the substantial assistance in carrying out the wrong."  Capitaliza-T, 2011 WL 864421, at *4 (citing Jenkins v. Williams, No. 02-331-GMS, 2008 WL 1987268, at *14 (D. Del. May 7, 2008)).

[58]    Indeed, as noted above, by separately alleging a claim for the breach of the duty of care, which carries a negligence standard, NNUK implicitly concedes that its breach of fiduciary duty claims involve something more than negligence.  Compare ¶¶ 87-93 (claiming breach of fiduciary duty), with ¶¶ 94-102 (claiming breach of duty of care).  Further, NNUK specifically alleges that NNI intended to benefit itself at the expense of NNUK.  See e.g., Claim ¶ 122.

defraud).  Similarly, as a matter of English law, dishonest assistance requires that the defendant

act with dishonesty, which is a culpable state of mind that goes beyond mere negligence,

requiring, at a minimum, willful blindness or recklessness.  See Claim ¶ 103; Todd Decl. ¶¶ 85,

88, 91.  NNUK thus mischaracterizes the legal standard under English law regarding dishonest

assistance when it asserts that dishonesty only requires that the conduct be "commercially

unacceptable."  Claim ¶ 104 (internal quotations omitted); Todd Decl. ¶ 86.  Indeed, in this

context, fraud and dishonesty are synonymous and dishonest assistance is a fraud-based claim.

Todd Decl. ¶ 87.  Accordingly the claim for dishonest assistance is also subject to Rule 9(b).[59]

Alphastar Ins., 383 B.R. at 274 (dismissing claim for dishonest assistance under Bermuda law

where complaint "fail[ed] to allege with particularity that the [defendants] did anything that

would be considered 'dishonest'"); Roth v. Am. Family Mut. Ins. Co., 567 F.3d 884, 887 (7th

Cir. 2009) (holding that "dishonest" has "the primary connotation of theft or fraud").  NNUK

thus must plead enough detail to put NNI on notice as to the "precise misconduct" with which it

is charged.  Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (under Rule 9(b),

claimant must plead "the date, time and place of the alleged fraud or otherwise inject precision or

some measure of substantiation into a fraud allegation"); see also In re Rockefeller Ctr. Prop.

Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002).  NNUK does not come close to satisfying Rule

9(b)'s pleading requirements.

　　　　Even under the Rule 8(a) pleading standards, the dishonest assistance and aiding and

abetting claims still fail.  Disregarding conclusory allegations and looking only to NNUK's well-

pled factual allegations, its aiding and abetting and dishonest assistance claims are inadequate for

---

[59]　　　　Although the sufficiency of all of NNUK's claims is a matter of U.S. procedure, Movants note that claims
for dishonest assistance are subject to a higher pleading standard in England as well.  Todd Decl. ¶¶ 87, 91
(explaining that "fraud and dishonesty are synonymous" and "must be sufficiently particularized") (internal citation
and quotation marks omitted).

multiple reasons.  First, NNUK has not adequately pled what wrongful actions NNI took that

constitute any knowing or dishonest assistance.  Second, NNUK has failed to adequately plead

any underlying breach of fiduciary duty by either its unidentified de jure directors or by NNL

acting as an alleged de facto or shadow director of NNUK.[60]  Finally, because NNUK has

conspicuously omitted any allegation that it was insolvent, and made only conclusory allegations

of its supposed doubtful solvency, it has failed to adequately allege that its directors had any

fiduciary duties to its creditors – much less that NNI knew or avoided knowledge that (i) NNUK

had duties to creditors or (ii) that it was helping NNUK's directors breach those duties to

creditors.

    a.      **NNUK Fails Adequately to Plead What Wrongful Actions NNI
Knowingly Took to Assist a Breach of Fiduciary Duty**

NNUK's allegations regarding any "knowing assistance" that NNI offered to the NNUK

directors or "dishonesty" on the part of NNI are conclusory and must be disregarded for purposes

of the motion to dismiss.  Iqbal, 129 S. Ct. 1950; see also Todd Decl. ¶¶ 87, 91 (explaining that

an allegation of fraud or dishonesty must be sufficiently particularized).  As explained above,

"[k]nowing participation in a board's fiduciary breach requires that the third party act with the

knowledge that the conduct advocated or assisted constitutes such a breach" and knowledge is a

"critical element" in aiding and abetting liability.  Malpiede, 780 A.2d at 1097; see also Brug,

---

[60]      Notably, nothing in NNUK's Claim suggests that NNUK has commenced an action against the unnamed de jure directors of NNUK who are alleged to have breached their fiduciary duties.  Claim ¶¶ 28-29.  Nor are the Movants aware of any such action by NNUK.  NNUK thus seeks to hold NNI and NNL liable on an aiding and abetting theories without even attempting to seek any recovery from the primary actors responsible for the underlying breach.  See Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners LLC (In re Radnor Holdings Corp.), 353 B.R. 820, 844 n.3 (Bankr. D. Del. 2006) ("the Court notes that it is strikingly odd to have a trial on aiding and abetting breach of fiduciary duties where the alleged primary wrongdoers (the board) are not named as defendants.  The Court is not aware of a single reported post-trial or appellate decision awarding or upholding damages for aiding and abetting breach of fiduciary duty where the primary wrongdoers were not named as defendants.").  To the contrary, NNUK has, as recently as January 2011, vouched for the credibility and honesty of those directors who it now accuses – without suing – of massive wrongdoing by submitting and relying upon the witness statement of long-time NNUK director Sharon Rolston.

50

755 F. Supp. at 1256.  Similarly, as noted above, dishonest assistance requires a culpable state of

mind that goes beyond mere negligence to at least recklessness.  See Claim ¶ 103; Todd Decl. ¶¶

85, 91.

NNUK's Claim suffers from a complete absence of any well-pled factual allegations

regarding "knowing" or "dishonest" assistance on the part of NNI concerning breaches of duty

by NNUK's directors.

**Pre-Petition Asset Sales.**  With respect to the Pre-Petition Asset Sales that underlie

claim 31, NNUK only alleges in conclusory fashion that "NNI, through the involvement of its

personnel, as explained above, advocated or assisted the conduct by NNUK's directors which led

to these breaches."  Claim ¶ 206.  The Claim does not identify any individuals that offered

assistance to the NNUK directors (either de facto or de jure), or what the nature of that assistance

was.  The Claim fails to provide any further factual detail concerning NNI's alleged involvement

in any Pre-Petition Asset Sales, much less any allegation of how NNI knowingly participated in

or gave assistance to the NNUK directors' alleged breach.[61]  In fact, the Claim is entirely silent

on allegations of the process through which any Pre-Petition Asset Sales were considered or

approved.  This is precisely the type of conclusory allegation that is to be disregarded under

Iqbal and Twombly.  See Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 555.

**Contingent Tax Claims.**  Claims 34-35 are based on the NNUK directors' alleged

breach in respect of various pre-petition tax arrangements.  Claim ¶ 209.  The Claim, however,

provides no explanation of what actual conduct of NNI gives rise to claims for dishonest

assistance or aiding and abetting.  Instead, claims 34-35 are apparently based on NNI's purported

control over taxation affairs "more generally."  Claim ¶ 84.  The Claim provides no further

---

[61]     Indeed, as set forth below, all of NNUK's claims that allegedly arise from Pre-Petition Asset Sales
(including claim 31) fail even to identify (aside from Alcatel) the actual transactions at issue.

insight on the nature of that involvement or how, if at all, NNI assisted the alleged breaches of fiduciary duty by NNUK's directors or NNL allegedly acting as a de facto or shadow director of NNUK.  While, NNUK twice references in general fashion to "NNI's involvement and participation (together with NNL, alternatively NNUK's de jure directors) in controlling NNUK's tax affairs," this repetition is no substitute for well-pleaded factual allegations identifying precisely what knowing participation NNI is charged with as to the NNUK de jure, de facto or shadow directors' alleged breach of fiduciary duties.  Claim ¶¶ 213, 214.

**Transfer Pricing, the NNUK Intercompany Loans, and Project Swift.**  NNUK's claims arising from transfer pricing, Project Swift, and the NNUK Intercompany Loans involve more words but no more substance.  See Claims 4, 6, 10, 13, 18 and 20.  The Claim fails to allege any actions that any individuals undertook on behalf of NNI to advocate or assist in the alleged breach of fiduciary duties by NNUK's directors (or who those directors even were).  With respect to transfer pricing, the Claim alleges that NNI "through the involvement of its personnel in the implementation and operation of the MRDA and RPSM (as described in paragraphs 15 to 27 above), advocated or assisted the conduct by NNUK's directors (de jure and/or, in the case of NNL, *de facto*/shadow) which led to the breaches of fiduciary duties."  Claim ¶ 116.  NNUK makes parallel allegations as to Project Swift and the NNUK Intercompany Loans, alleging generally that "NNI, through the involvement of its directors, officers and senior employees, as explained in paragraphs 15 to 27 above, advocated or assisted the conduct by NNUK's directors which led to these breaches."  Claim ¶¶ 143, 172; see also ¶¶ 132, 164.  NNUK thus alleges that "[n]umerous NNI individuals were aware of and/or participated in the discussions relating to the initial Interest Free Loan Facility and the later decisions imposed on NNUK relating to the utilization of the Interest Free Loan Facilities that followed."  Claim ¶ 21.

The Claim attempts a patina of well-pleaded allegations by including named individuals, without pleading what actions those individuals undertook, or any connection they had to decisions made by NNUK's directors.  For example, in relation to transfer pricing, the Claim alleges that "[t]he key individuals involved included in particular John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI as well as representatives from the Canadian Entities."  Claim ¶ 17.  Nowhere, however, does the Claim allege any actions undertaken by Ms. Krebs, and the claim concedes that Mr. Doolittle held positions with NNL.  For the remaining individuals, NNUK alleges only that they instructed outside advisors and undertook negotiations with taxation authorities, without alleging any tie such actions had to the NNUK directors or their alleged breach.  Similarly, the Claim references a number of individuals alleged "at various times" to be NNI employees "within the Tax Department (Claim ¶ 19), again without explaining what activities each of these individuals undertook.  Nor does the Claim allege any instances of contact between these individuals and the NNUK directors (whomever they were), much less knowing participation or dishonest assistance in their purported breach.

Similarly, the Claim perfunctorily references certain individuals' "involvement" "supervision" or "direction" of the relevant transactions, without well-pleaded allegations regarding who was "supervised" or "directed," how they "directed," or even if the individuals named were acting on behalf of NNI as an NNI employee.  For example, NNUK alleges that "Ryan Smith ('Leader of Global Tax Planning' and an employee of NNI) supervised the team on the ground whose role included managing the use of the Interest Free Loan Facilities."  Claim ¶ 22.  Not only does this fail to allege what Mr. Smith did, it in fact points to a "team on the ground" at NNUK who actually managed the facilities, without alleging who was on that team or

53

what they did.[62]  Moreover, as noted above, even with respect to the Claim's conclusory

allegations, it fails to allege whether the actions of the named individuals were taken on behalf of

NNI such that NNI should be held responsible.  Indeed, as noted above, the allegations in Claim

suggest the contrary.  See Claim ¶ 22 (referring to Katharine Stevenson's signing certain of

intercompany loan agreements, while the agreements themselves reflect signature in her capacity

as a director of NNL); Barefoot Decl. Ex. P; Claim ¶¶ 19, 22, 24 (alleging that Ryan Smith

undertook certain actions on behalf of NNI, while separately conceding that Smith was "the

EMEA Tax Leader on the ground in the EMEA Region [who was] seconded to NNUK from

NNI.").[63]

        Notably, the Claim nowhere alleges that any NNI individuals undertook to implement or

operate the MRDA, Project Swift, or the NNUK Intercompany Loans in conjunction with either

NNL or NNUK's de jure directors, with knowledge that doing so would constitute a breach of

the NNUK directors' duties.  NNUK, in its pleading, explicitly recognizes that such knowledge

is a required element by referring to the requisite knowledge of the underlying breach of

fiduciary duty only when restating the abstract legal requirements for the claim.  Claim ¶ 111(c).

But entirely absent are allegations that NNI actually acted with knowledge that the actions of the

NNUK directors (whether de jure or otherwise) were in breach of their fiduciary duties.   Nor has

NNUK included any well-pleaded allegations which indicate that NNI acted with willful

blindness or recklessness toward the NNUK directors' alleged breaches.  NNUK thus entirely

---

[62]        This pattern pervades the NNUK Claims.  See also Claim ¶ 22 (alleging that Mark Weisz "was responsible
for approving and supervising the implementation of the initiatives to transfer cash and value to NNL, including via
the Interest Free Loan Facilities."); id. (averring that "[t]he implementation of the Interest Free Loan Facilities was
conducted under the ultimate direction of Katharine Stevenson"); id. ¶ 24 (alleging that "[Ryan Smith's] team came
up with the idea for Project Swift as a way of purportedly reducing NNL's debt to NNUK and was then largely
responsible for the structuring and implementation of the transaction."); id. ¶ 24 ("Mr. Weisz was again involved in
a supervisory capacity and approved the Project Swift proposal . . . and then supervised its implementation.").

[63]        As noted earlier, a Court may consider documents referenced in a complaint on a motion to dismiss.  See
supra n. 18; see also Pryor v. NCAA, 288 F.3d 548, 559-60 (3d Cir. 2002).

fails to allege the requisite elements of scienter/knowing participation and "dishonesty" and its claims must therefore be dismissed. See Malpiede, 780 A.2d at 1097; Brug, 755 F. Supp. at 1256; Capitaliza-T, 2011 WL 864421, at *4 (D. Del. Mar. 9, 2011) (with regard to an aiding and abetting claim, concluding that "[b]ecause Plaintiff fails to adequately allege the required knowledge element, the Court need not reach the other issues."); see also Todd Decl. ¶ 91.

        b.        <u>NNUK Has Failed Adequately to Plead Any Underlying Breach by NNL Acting As a Shadow or De Facto Director</u>

To the extent NNUK relies on an asserted breach of fiduciary duty by NNL as de facto or shadow director as the basis for its aiding and abetting claim against NNI, NNUK's claim fails. NNUK is estopped from asserting that NNL acted as a de facto or shadow director of NNUK; for the same reasons NNUK is estopped from making that claim against NNI. See Section II.A above. Thus, NNUK's claims against NNI for aiding and abetting again fail for lack of a well-pleaded allegation regarding the breach underlying the aiding and abetting claim.

In addition, to the extent NNUK's claim is upon a breach of fiduciary duty by NNL as a shadow director, Section 251(3) of the Companies Act precludes a claim of shadow directorship against a parent corporation (here, NNL) solely because a subsidiary acted in accordance with that parent's direction. Todd Decl. ¶¶ 51, 68, 92; see also Section II.B.3 above. Accordingly, as NNL cannot be considered a shadow director, NNUK cannot base its aiding and abetting claim against NNI on an alleged breach by NNL as shadow director.

        c.        <u>NNUK's Failure to Plead Insolvency Eliminates Both Any Underlying Breach and Any Knowledge NNI Had of That Purported Breach</u>

As discussed above in greater detail, there is no well-pleaded factual allegation that NNUK was insolvent, near insolvent or of doubtful solvency. See Section II.C above. Absent insolvency, the directors of a company do not owe any fiduciary duties to creditors. Todd Decl.

¶¶ 71-72;  see also N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 101 (Del. 2007).  Thus, because there is no well-pled basis for a fiduciary duty to NNUK's creditors, there is no well-pled allegation of breach of fiduciary duty and no viable allegation for aiding and abetting a breach of fiduciary duty or dishonestly assisting such a breach.  See, e.g., Brug, 755 F. Supp. at 1256; Related Westpac LLC v. Jer Snowmass LLC, C.A. No. 5001-VCS, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010) ("Because no cognizable breach of fiduciary duty claim is stated, the aiding and abetting claim also fails.") (internal quotation marks and citation omitted); Todd Decl. ¶ 90.

Moreover, even were NNUK to have adequately pled that it was insolvent (which it has not), it must plead that NNI knew it was insolvent (or was willfully blind or reckless to that fact) for NNI to have knowledge that its alleged actions could constitute breaches of those fiduciary duties to creditors.  Without NNI's knowledge of any insolvency, none of the facts alleged by NNUK could put NNI on notice of any breach of duty to NNUK's creditors simply because transactions were not alleged to be in the interest of creditors.  See Claim ¶¶ 21, 32, 48-56; see also Todd Decl. ¶ 91; cf. Gheewalla, 930 A.2d at 101.  Nowhere in the Claim does NNUK assert that NNI was aware that NNUK was actually insolvent at any time, much less that it was so aware at the time of each transaction.  Although NNUK includes allegations of "doubtful solvency," these not only fail to mention any knowledge on the part of NNI, but they are also too conclusory to merit consideration.  As one court has noted, the mere "incantation of the word 'insolvency'" in a complaint is not enough; the complaint must specifically "plead facts supporting a rational inference that [the subsidiary] was insolvent."  Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 202 (Del. Ch. 2006).

In sum, even assuming *arguendo* that *NNL* had duties to NNUK as a shadow director (which it did not), NNUK has no well-pleaded allegations that give rise to any inference that anyone at NNI knew (or was reckless or willfully blind to the fact that) that *NNL* had duties to NNUK as a shadow or de facto director, much less that it was allegedly breaching them. As there are no such allegations, NNI could not have knowingly participated in NNL's alleged breach or provided dishonest assistance in connection with such an alleged breach.

**B.    NNUK's Conspiracy Claims Must Be Dismissed as NNUK Fails to Allege Any Well-Pleaded Allegations to Support Those Claims (Claims 5, 7, 11, 12, 19, 21)**

NNUK also asserts duplicative secondary liability claims for an unlawful means conspiracy under English law and civil conspiracy under U.S. state (Texas and Delaware) law, all of which require substantially the same elements. NNUK asserts these claims based upon allegations relating to transfer pricing, the NNUK Intercompany Loans, and Project Swift.[64]

1.    English Law

Under English law, to establish an unlawful means conspiracy, NNUK must show: (a) a combination or agreement between NNI and another, (b) to do an unlawful act, (c) with the intention of harming NNUK and (d) the causing of harm as a result. Todd Decl. ¶ 107.[65] This is a scienter-based (i.e., an action knowingly or willfully taken) cause of action as it includes an element of intent. Id. ¶ 108. NNUK must also show an agreement between the conspirators on the scope of action to be undertaken. Id. ¶ 107.

---

[64]    These conspiracy claims – which fail as a matter of pleading – are themselves arguably duplicative of NNUK's aiding and abetting claims. Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1038 (Del. Ch. 2006) ("[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law."); see also Triton Constr. Co. v. E. Shore Elec. Servs., Inc., Civ. No. 3290-VCP, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009) (after trial, refusing to consider conspiracy claim because any relief granted for the conspiracy claim would be redundant of the relief for aiding and abetting).

[65]    Where the conspiracy involves the use of unlawful means, the intention to cause harm need not be the predominate intention.

2.      Delaware and Texas  Law

The requirements of U.S. state law are substantially similar to each other and to English

law.  A claim for conspiracy essentially requires an agreement between two or more persons,

who have taken at least one unlawful act, which caused actual damage to a plaintiff.  Compare

Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1036 (Del. Ch. 2006) with

Timberlake v. Synthes Spine, Inc., No. V-08-4 (JDR), 2011 WL 711075, at * 11 (S.D. Tex. Feb.

18, 2011).

3.      NNUK's Conspiracy Allegations Fail to State a Plausible Claim

Like NNUK's aiding and abetting breach of fiduciary duty allegations, NNUK's

conspiracy allegations are subject to Rule 9(b)'s heightened pleading requirements.  "The Third

Circuit has long required that claims of conspiracy be supported by allegations of specific facts."

Brug, 755 F. Supp. at 1255 (citations omitted).  Accordingly, "[o]nly allegations of conspiracy

which are particularized, such as those addressing the period of the conspiracy, the object of the

conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be

deemed sufficient."  Id. (quoting Kalmanovitz v. G. Heileman Brewing Co., 595 F. Supp. 1385,

1401 (D. Del. 1984), aff'd, 769 F.2d 152 (3d Cir. 1985)); see also Miller v. Greenwich Cap. Fin.

Prods., Inc. (In re Am. Bus. Fin. Servs. Inc.), 361 B.R. 747, 762 (Bankr. D. Del. 2007); Fierro v.

Gallucci, No. 06-CV-5189(JFB)(WDW), 2008 WL 2039545, at *16 (E.D.N.Y. May 12, 2008)

("[T]o survive a motion to dismiss, a complaint must contain more than general allegations in

support of the conspiracy.  Rather, it must allege the specific times, facts, and circumstances of

the alleged conspiracy." (internal quotation marks and citations omitted)).[66]

---

[66]      Rule 9(b) is particularly applicable because NNUK's conspiracy claims are based upon underlying acts
allegedly undertaken to loot NNUK, and therefore independently sound in fraud.  See, e.g., Claim ¶ 118 (accusing
NNI of engaging in a conspiracy to "remov[e] value" and loot NNUK); see also Allied Capital, 910 A.2d at 1040 n.
46 (explaining that the "frequent assertion that civil conspiracy claims require particularized allegations of fact may

However, even under Rule 8(a), NNUK's allegations fail.  The Supreme Court's decision in Twombly is particularly instructive on this point.  There, similar to the allegations here, because the alleged violations occurred over a seven-year span and the complaint "mentioned no specific time, place, or person involved in the alleged conspiracies" the Supreme Court "doubt[ed] that the complaint's reference to an agreement among the [defendant companies] would have given the notice required by Rule 8."  Twombly, 550 U.S. at 565 n.10.  The Supreme Court further contrasted the model form for pleading negligence which alleges that "the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time" with the complaint at issue, which "furnishe[d] no clue as to which of the [defendant companies] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."  Id.

NNUK's Claim is similarly devoid of any well-pleaded factual allegations concerning the alleged conspiracy.  NNUK essentially asserts that there is a conspiracy solely because it says so.  Stripping out those conclusory assertions which merely restate the elements of a conspiracy, the Court is left with no well-pleaded factual allegations that raise a plausible inference of conspiracy here, much less any particularized allegations.  See Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 555, 565 n.10.

Conspicuously absent from NNUK's pleading are factual allegations of who was involved in the alleged conspiracy, when any agreement was reached, or what was specifically agreed.  Instead of pleading who was involved in the conspiracy, the Claim asserts that "NNI and

---

simply stem from the fact that civil conspiracy claims often do involve fraud."); Chase Bank USA N.A. v. Hess, No. 08-121-LPS, 2011 WL 45132, at *10 (D. Del. Jan. 6, 2011) (noting that conspiracy claims based on fraud should meet Rule 9(b) pleading standard, but finding that the claims at issue were based on contractual relations and unjust enrichment, among others); cf. Forman, 405 B.R. at 746-47 (applying Rule 9(b) to claim of aiding and abetting breach of fiduciary duty because the underlying violation was based on fraud).

NNL" or "alternatively NNI and NNUK's de jure directors" or yet a third possibility of "NNI,

NNL, and NNUK's directors" "combined together" or "acted together" by implementing and

operating the RPSM and MRDA in a manner which operated contrary to NNUK's interests.

Claim ¶¶ 109, 118.  NNUK's allegations with regard to the NNUK Intercompany Loans and

Project Swift also lack specification of who was involved, when the agreement was reached, and

what specifically was agreed.  Claim ¶¶ 134, 137, 166, 174.  The fact that NNUK does not

identify the alleged participants in the civil conspiracy is fatal to its claim, as there is no notice

and plausibility, much less particularity, if the participants are not identified.  See Brug, 755 F.

Supp. at 1255.

      In addition, simply "acting together" – which is all NNUK alleges to have ocurred – is

not a sufficient basis upon which to allege a civil conspiracy.  NNUK must assert "the existence

of a confederation or combination" that is a "meeting of the minds on a course of action" by the

participants, which is not inferred solely from joint action.  See Twombly, 550 U.S. at 556-57

("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of

agreement at some unidentified point does not supply facts adequate to show illegality."); Boyd

v. Tempay, Civ. No. 07-377-JJF, 2008 WL 5156307, at *4 (D. Del. Dec. 4, 2008) (dismissing

under Rule 8, conspiracy claims as inadequately pled where the complaint failed to allege

individual acts were taken as a "conscious commitment to a common scheme" and failed to

provide the details of when or where the alleged acts occurred) (internal quotation marks and

citation omitted); see also Todd Decl. ¶ 110.

      As one court noted in dismissing insufficiently detailed allegations of conspiracy,

"[a]lthough the corporate and business relationships among the several defendants are identified,

plaintiffs do not state when and how they allegedly conspired together to commit fraud.  Nor do

they allege any meetings, any communications, or any other means for effecting the alleged conspiracy." Brug, 755 F. Supp. at 1255. NNUK has similarly not alleged any meetings, communications or other means for effecting the alleged conspiracy. Nor does it allege the individuals who agreed to conspire on behalf of NNI, NNL or NNUK, much less the specific terms of their agreement. NNUK's barebones allegations of conspiracy are similar to those types of conclusory allegations that have repeatedly been rejected by courts. See, e.g., Am. Bus. Fin. Servs., 361 B.R. at 762; see also Todd Decl. ¶¶ 9-10 (opining under English law that NNUK does not allege sufficient facts that would, if proven, make out a claim for unlawful means conspiracy).[67]

### C.    NNUK's Claims For Aiding and Abetting, Dishonest Assistance and Conspiracy are Barred by the *Ex Turpi Causa* and *In Pari Delicto* Doctrines

In addition to being inadequately pled, NNUK's aiding and abetting, dishonest assistance, and conspiracy claims must be dismissed under the *ex turpi causa* and *in pari delicto* doctrines. The English law *ex turpi causa* doctrine is discussed above in Section II.E, and applies with equal force to these secondary liability claims. Similarly, as a matter of U.S. law "under the *in pari delicto* doctrine, a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." Am. Int'l Group, Inc. v. Greenberg, 976 A.2d 872, 883 (Del. Ch. 2009) (internal quotation marks and citation omitted) (hereinafter "AIG").

To bar a claim on *in pari delicto* grounds, a court must only determine that the parties bore "substantially equal responsibility" for a wrongful scheme. The court need not engage in a

---

[67]    These allegations are particularly deficient in the context of a parent-subsidiary relationship. See Asarco LLC v. Ams. Mining Corp., 396 B.R. 278, 417-18 (S.D. Tex. 2008) (holding that "the most well-reasoned approach is one that recognizes a cause of action for conspiracy between a parent and subsidiary only when the parent acts outside its role as 100% owner of the subsidiary."). NNUK has not pled sufficient facts to demonstrate that NNL was at any time acting outside its role as 100% owner of NNUK.

detailed accounting of relative fault as that is precisely the type of analysis the doctrine is meant

to avoid. AIG, 976 A.2d at 883. Under both Delaware and Texas law, where, as here, the

applicability of the *in pari delicto* defense is evident from the face of the complaint, a motion to

dismiss should be granted. See AIG, 976 A.2d at 876-78 (granting a motion to dismiss based

upon the *in pari delicto* defense); Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),

335 B.R. 539, 547 (D. Del. 2005) ("Although *in pari delicto* is an affirmative defense, a

complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . .

appears on its face.") (alteration in original, internal citation omitted); Hill v. Day (In re Today's

Destiny, Inc.), 388 B.R. 737, 747 (Bankr. S.D. Tex. 2008) (considering *in pari delicto* defense

where necessary facts were within the complaint); see also Official Comm. of  Unsecured

Creditors v. Am. Tower Corp. (In re Verestar, Inc.), 343 B.R. 444, 478 -81 (Bankr. S.D.N.Y.

2006) (applying *in pari delicto* to dismiss a complaint even where plaintiff argued that an

unspecified jurisdiction's law applied as "all of the jurisdictions . . . possibly relevant have

endorsed either the *Wagoner* Rule or the common law principle of *in pari delicto*").

     NNUK's secondary liability claims rest on allegations that NNUK's own directors

(whether de facto, shadow, or de jure) breached their fiduciary duties. See, e.g., Claim ¶¶ 105,

109, 114, 118. Such actions and knowledge of top-level management and directors of a

corporation are imputed to the corporation. See AIG, 976 A.2d at 887 n.37, n.40.[68]

---

[68]    Although there can be an adverse interest exception to this imputation, it is not applicable here. To qualify
for the adverse interest exception, a party needs to allege total abandonment of the corporation's interests by the
interested parties. AIG, 976 A.2d at 891 (citing inter alia In re Mediators, Inc., 105 F.3d 822, 827 (2d Cir. 1997)).
In rejecting the adverse interest exception, the court in AIG noted that the complaint included details about how the
company could be said to benefit from the alleged schemes even though those benefits were short-lived. AIG, 976
A.2d at 891 n.53. Here, NNUK admits that it has received benefits. For example, NNUK admits receiving at least
$57,905,533 for the Alcatel sale. Although NNUK apparently believes it is entitled to more under its unspecified
theories, nearly $58 million is clearly a benefit. Similarly, while NNUK apparently believes that it could have
negotiated a better bargain under a transfer pricing arrangement because the RPSM arrangement did not
"adequately" reward it (see, e.g., Claim ¶ 50), there are no allegations that the alleged transactions were entirely

Accordingly, even assuming they were well plead, which is not the case, NNUK's claims for

aiding and abetting breach of fiduciary duty, dishonest assistance, and conspiracy are

nevertheless barred by the *in pari delicto* and *ex turpi causa* doctrines.

**IV.**
**NNUK FAILS TO ADEQUATELY ALLEGE NNI'S**
**UNJUST RECEIPT OF ANY NNUK PROPERTY**

NNUK asserts claims for unjust enrichment under U.S. law and unconscionable receipt

under English law, each predicated on allegations of NNI's wrongful receipt of property at

NNUK's expense through Project Swift and Intercompany Loan Transactions.[69]  Because NNUK

fails to allege a direct, plausible, well-pled link between its property and any alleged benefit

received by NNI, these claims must be dismissed.

**A.      NNUK's Claims for Unconscionable Receipt and Knowing Receipt Fail on Multiple Bases**

In claims 14, 22, and 29, NNUK asserts English law claims for unconscionable receipt

and knowing receipt.  Under English law, to establish a claim for knowing receipt NNUK must

show that (1) assets of NNUK were dispersed in breach of a fiduciary duty owed to NNUK and

(2) NNI received specific assets in which NNUK had a beneficial interest.  Todd Decl. ¶¶ 94-95.

To establish a claim for unconscionable receipt, NNUK must show the two factors necessary to

establish knowing receipt, but also establish that NNI was "at fault" by receiving the property.

This requires a showing that it would be unconscionable for NNI to retain the property at issue.

Todd Decl. ¶ 96.  To satisfy the beneficial interest element of both claims, NNUK must trace

property received by NNI to NNUK, meaning the original property must be located and

---

detrimental to NNUK.  See also Claim ¶ 72 (alleging that "actual value" of Swift Subsidiaries NNUK received was only somewhere south of $628.9 million).

[69]      NNUK also asserts a claim for knowing receipt based upon the Pre-Petition Asset Sales (claim 29).  If that claim is not dismissed on the pleading and statute of limitations grounds set forth below, it too fails for the reasons set forth in this section.

63

identified, either as a separate fund or as a separately-identifiable portion of a mixed fund.  Id. ¶ 95.  NNUK's claims for both unconscionable receipt and for knowing receipt both fail because it does not plausibly allege the beneficial interest element.

NNUK bases its unconscionable receipt claims on the NNUK Intercompany Loans and Project Swift (claims 14 and 22).  Critically, however, the Claim acknowledges that NNI was not a party to either the NNUK Intercompany Loans at issue (which were extended by NNUK to NNL) or Project Swift.  In addition, the Claim entirely fails to identify cash or other assets received by NNI from NNUK as a result of these transactions.  Claim ¶¶ 61-62, 71.  Indeed, based on NNUK's own allegations, there was no transfer of NNUK's funds to anyone in respect of Project Swift.  NNUK alleges that in Project Swift, it deemed $628.9 million of NNL's outstanding intercompany loan debt to be satisfied.  Id. ¶ 72.  NNUK does not allege that through Project Swift, NNUK's property was somehow ultimately received by NNI.  Instead, all that NNUK asserts in claims 22 and 23 is that NNL was indirectly able to make other unrelated payments to NNI as a result of Project Swift.  Id. ¶ 67 ("[A]t or around this time [of Project Swift] significant cash payments were made from NNL and NNI."); ¶ 177 ("NNL was only able to make certain cash repayments of the NNI loans due to the fact that it did not have to repay the [loans to NNUK that] were . . . purportedly reduced as a result of Project Swift.").[70]

---

[70]       Although NNUK separately references an "extraction of approximately $275 million of value from th[e] subsidiaries [transferred to NNUK in Project Swift]" which it alleges benefitted NNI (Claim ¶ 75), as best the allegations can be understood, they do not relate to Project Swift itself.  Specifically, the Claim avers that much of this "value extraction" occurred prior to Project Swift.  Id. (averring that $120 million of cash was extracted prior to Project Swift).  More importantly, the reference in paragraph 75 to "value extraction" – which is explained nowhere else in the Claim – makes no attempt to identify the various subsidiaries from which "value" was allegedly extracted, the nature of that value (whether cash or otherwise), the recipient of such "value," or even the approximate dates of any transfers.  See generally Claim ¶ 75.  Under Iqbal, these conclusory allegations must be disregarded in considering NNUK's claims.  Finally, while NNUK does suggest that NNI was the "beneficiary of that value extraction" (id.), it separately alleges that any such benefit was indirect as that "value extraction" "in turn was used to reduce the sums owed by NNL to NNI."  Claim ¶ 182.  Accordingly, to the extent even considered, the Claim acknowledges that this too relates to indirect benefits allegedly received by NNI as a result of transactions designed to benefit NNL.

In the same vein, NNUK does not allege that the proceeds of the NNUK Intercompany Loans were received by NNI or that NNI received any NNUK property as a result of these transactions.  Rather, it alleges that NNI was enriched by the NNUK Intercompany Loans "because NNL's draw down of the loan facilities enabled NNL to make large cash payments, including interest payments, to NNI in respect of outstanding loan balances owed to it" and "[h]ad cash not been channeled out of NNUK, NNL could not have made such repayments and NNI would not have benefitted in the way that it did."  Claim ¶ 150 (emphasis added).  NNUK elsewhere asserts that "[b]y virtue of cash being channeled to NNL from NNUK . . . NNL was able to, and did in fact, make large cash payments in respect of outstanding loan balances which it owed to NNI."  Id. ¶ 58 (emphasis added); see also ¶¶ 64, 145.  NNUK thus only alleges that the NNUK Intercompany Loans indirectly enabled other unrelated transfers – not that NNI received the proceeds of these loans.

NNUK similarly fails to allege that NNUK received any of its property in connection with the Pre-Petition Asset Sales for which it asserts a knowing receipt claim (claim 29).  Indeed, apart from its single example of the Alcatel sale, the Claim fails to even identify the Pre-Petition Asset Sales on which its claim is based.  Moreover, because NNUK deliberately refuses to allege what method of allocation would comply with the "arms' length principle," it fails to allege what specific property – if any – was received by NNI or any other Nortel seller that belonged to NNUK.

Because these allegations do not show that NNI received property in which NNUK can identify it had a specific interest, NNUK's allegations thus fall far short of the traceability requirement.  Todd Decl. ¶ 95 (explaining that under English law, NNUK is required to show that the original funds or property must be located and identified in a true sense, either as a

separate fund or as a separately-identifiable portion of a mixed fund).  This alone defeats any claim for unconscionable receipt under English law.  Id. ¶¶ 97-100.

Even if the Court were to find that NNI did receive property of NNUK, NNUK has not pled sufficient facts to establish that it would be unconscionable for NNI to retain that property, which is also required to state a claim for unconscionable receipt under English law.  Todd Decl. ¶¶ 96, 101.  As previously discussed, NNI was not a shadow or de facto director and there are no well-pleaded allegations that NNI knew these transactions (or these funds) resulted from a breach of NNUK's directors' duties.

**B.      NNUK's Claims for Unjust Enrichment Also Fail to State a Plausible Claim**

In claims 15 and 23, NNUK asserts claims for unjust enrichment under Delaware and Texas law.  Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  Pa. Emp. Benefit Trust Fund v. Zeneca, Inc., 710 F. Supp. 2d 458, 485 (D. Del. 2010); State Farm Bank, F.S.B. v. Manheim Auto. Fin. Servs., Inc., Civ. No. 10-cv-00519-L (SAL), 2010 WL 3156008, at *4-*5 (N.D. Tex. Aug. 6, 2010).  To prevail on an unjust enrichment claim, a claimant must demonstrate: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.  Metcap Sec. LLC v. Pearl Senior Care, Inc., No. Civ. A 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007).

NNUK's unjust enrichment theory is simply not plausible based on its own allegations.  NNUK seeks at least $890,250,037.69 in respect of claim 15.  Claim ¶ 151.  Similarly, the Claim seeks an amount no less than $478,266,584.27 in respect of claim 23.  Id. ¶ 183.  Despite these figures, the Claim does not explain their bases, and the numbers do not appear to bear any relation to the sums alleged in respect of the NNUK Intercompany Loans or Project Swift

transactions between NNUK and NNL.  The total of the NNI repayments alleged in the

Complaint totals approximately $535 million.  Claim ¶ 58.  Moreover, while the Claim identifies

certain examples of repayments between NNL and NNI based on their loan transactions, it also

vaguely references "various smaller repayments around the same time." Id. ¶ 58.

Indeed, the repayments that NNUK does allege NNL made to NNI bear no correlation

with its allegations on the dates and amounts of NNL's draw-downs under its loan facilities with

NNUK.  For example, although NNUK begins its chart of "purported transactions under the

Loan Facilities" between NNUK and NNL with transactions in 2003, the first repayment to NNI

by NNL that is referenced in the Claim dates from November 21, 2007.  Compare Claim ¶ 58,

with ¶ 62.  In other instances, the alleged dollar amounts of NNL's draw-downs make

implausible any allegation that the funds borrowed from NNUK were used to make transfers to

NNI.  For example, although NNUK alleges that NNL made a repayment to NNI of $154 million

on December 20, 2007, the Claim alleges that NNL only made a single draw-down on the loan

facilities in the preceding ten months – a draw-down of £ 17 million on October 23, 2007.  Claim

¶¶ 58, 62.  Indeed, even when accounting for the alleged preceding draw-down of £ 27 million in

February 2007 (Claim ¶ 62), the amounts of the draw-downs alleged still fall far short of the

amount necessary to permit NNL to make a $150 million repayment to NNI in November 2007

and a $154 million repayment to NNI in December 2007.  Comparing the other alleged

repayments that NNL made to NNI with the alleged borrowings that NNL made from NNUK

reveal similar implausibility issues.  Compare Claim ¶ 58, with ¶ 62 (no additional draw downs

took place before any of the other alleged repayments).  Again, NNUK has not alleged enough

facts to "nudge [its] claims . . . across the line from conceivable to plausible." Iqbal, 129 S. Ct.

at 1950 (citing Twombly, 550 U.S. at 570)).

Moreover, although unjust enrichment can be a flexible doctrine, "it is axiomatic that there must be some relationship between the parties.  A showing that the defendant was unjustly enriched by the plaintiff who acted <u>for</u> the defendant's benefit is essential."  <u>Metcap</u>, 2007 WL 1498989, at *6 (emphasis in original); <u>State Farm Bank</u>, 2010 WL 3156008, at *5 ("In order to maintain an action for unjust enrichment, the plaintiff must allege some connection between parties that could be interpreted as a quasi-contract between them.").

NNUK's claims for unjust enrichment fail because NNUK does not plead the requisite causal relationship between any enrichment on the part of NNI and any impoverishment on the part of NNUK.  As noted, NNI was not a party to either the NNUK Intercompany Loans or Project Swift.  Therefore, NNUK's allegations boil down to the claim that NNL "was able" to pay monies to NNI because of the NNUK Intercompany Loans or Project Swift.  This fails to plead a sufficient causal relationship.  <u>See</u> <u>Metcap</u>, 2007 WL 1498989, at*6; <u>State Farm Bank</u>, 2010 WL 3156008, at *5.  "It is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendants, the plaintiff must look to that person for recovery."  <u>Metcap</u>, 2007 WL 1498989 at *6; <u>Pa. Emp. Benefit Trust Fund.</u>, 710 F. Supp. 2d at 485.[71]  Further, NNUK concedes that the intercompany loans and Project Swift were undertaken for the benefit of NNL – not NNI.[72]  This

---

[71]      <u>See also</u> <u>State Farm Bank</u>, 2010 WL 3156008, at *5 ("In order to maintain an action for unjust enrichment, the plaintiffs must allege some connection between parties that could be interpreted as a quasi-contract between them.").  It is important to recall that unjust enrichment was developed as a quasi-contractual or restitution remedy. It is designed to restore an aggrieved plaintiff to the position he occupied prior to his dealings with the defendant, which is accomplished by requiring the defendant to return to the plaintiff any rendered performance to which the defendant is not entitled.  <u>See</u> <u>Burlington N. R.R. Co. v. Sw. Electric Power Co.</u>, 925 S.W.2d 92, 96 (Tex. App. 1996) (citing 5 Corbin § 1102).  NNUK alleges no contractual or quasi-contractual relationship between NNI and NNUK concerning the NNUK Intercompany Loans or Project Swift.

[72]      NNUK acknowledges that the NNUK Intercompany Loans were part of a "cash to Canada" initiative, designed to "ensure that cash and value in the group were transferred away from subsidiary companies, including NNUK, to NNL."  Claim ¶ 57; <u>see also</u> ¶¶ 9, 60.  NNUK expressly states that the intercompany loans were designed to benefit NNL – not NNI.  Claim ¶ 21 ("Those Interest Free Loan Facilities were put in place for the benefit of NNL to the detriment of NNUK.");  <u>see also</u> ¶ 57, ¶ 65 (alleging that the intercompany loan facilities "were entered

bars the unjust enrichment claim against NNI.  Following NNUK's logic, NNUK could – based

on this unsupported theory – assert unjust enrichment claims against anyone who received any

payments from NNL after the Intercompany Loans were put in place, because without them

NNL (a multi-billion dollar global entity) would not have "been able" to make such payments.

As the first drawdown alleged under the NNUK Intercompany Loans is £112 million in

December 2003, NNUK could recover from potentially millions of people or entities were this

Court to accept its baseless theory for relief.

### V.
### NNUK'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO UNSPECIFIED ASSET SALES CAN BE SUMMARILY DISMISSED

NNUK asserts eight different causes of action based on alleged sale transactions that closed

before the Petition Date.  Though these claims – numbered 24-31 – are based on a number of

different rights of action, sounding in tort, fraud and/or contract, each is grounded on the same

deficient and entirely conclusory factual allegations that fail – with a single exception – to even

specify the purported transactions at issue.  In addition, even to the extent claims arising from the

one transaction identified (the Alcatel sale) are adequately alleged, NNUK's claim for

transaction at undervalue (claim 27), as well as its quasi-contractual claims for breach of an

implied contract (claim 24), breach of an implied contract term (claim 25), or mistake (claim 26)

must be independently dismissed for failure to allege sufficiently the elements necessary to state

a claim.

---

into to transfer cash and/or value out of NNUK to NNL"); ¶ 150.  Similarly, NNUK's claims relating to Project
Swift are similarly premised on allegations that it was designed to benefit NNL, not NNI.  Claim ¶ 71 ("NNL
elected to wipe out [its] loan balance by making a paper transfer from NNL to NNUK"), ¶ 72 ("The result of Project
Swift was that NNUK accepted a $628.9 million reduction in sums owed to it [by NNL] under the [NNUK
Intercompany Loans] in exchange for illiquid assets").

**A.      Claims Allegedly Arising from Pre-Petition Asset Sales Fail a Basic Test of Notice Pleading**

Most fundamentally, the Claim fails to even *identify* the Pre-Petition Asset Sale transactions on which claims 24-31 are allegedly based.  Instead, these claims are founded on generalized allegations that "prior to 14 January 2009, NNUK entered into *various* global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser."  Claim ¶ 79 (emphasis added).  NNUK provides but a single example of such transactions – a December 2006 sale to Alcatel Lucent S.A. – which the Claim asserts was only "[t]he most significant of these [pre-petition] business sales."  Id.  Aside from this single example, nowhere else does the Claim put the Debtors on notice of the transactions at issue in claims 24-31.  Inexcusably, the Claim does not allege the dates of the signing or closing, the parties involved, the assets sold, or the sale price of the unspecified Pre-Petition Asset Sales.

NNUK attempts to mask these basic deficiencies by creating a defined term: "Pre-Petition Sale Proceeds."  Claim ¶ 184.  This term is defined only as "a fair and appropriate allocation of the proceeds for the assets [NNUK] has sold" in "any pre-petition business sale."  Id.  NNUK then uses this defined term throughout Claims 24-31, again without any identification of the transactions at issue.  Id. ¶¶ 185-189, 193-194, 196-197, 199-201, 205.  This impossibly vague pleading requires dismissal under Rule 8(a).  See Chapa v. Chase Home Fin. LLC, No. C-10-359 (JGJ), 2010 WL 5186785, at *5 (S.D.Tex. Dec. 15, 2010) (where "Plaintiff has failed to provide the loan documents and failed to indicate which loan documents – let alone which provisions – were breached, Plaintiff failed to satisfy the pleading standards of Rule 8(a)"); Smith v. Nat'l City Mortg., No. A-09-CV-881 (LY), 2010 WL 3338537, at *11 (W.D.Tex. Aug. 23, 2010) (dismissing breach of contract claim where plaintiffs "did not specify what provision

70

or for that matter what contract was allegedly breached").  Seemingly cognizant of these deficiencies, the Claim candidly notes that such allegations "will be further particularized following discovery."  Id. ¶ 184.  Discovery, however, is no substitute for well-pleaded allegations that satisfy Rule 8(a).  See Iqbal, 129 S.Ct. at 1953-54 ("because respondent is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.").

As to Alcatel – the only Pre-Petition Asset Sale that NNUK does attempt to identify – NNUK alleges that while the sale closed on December 31, 2006, the agreed allocation of the proceeds of that sale "was set out in a statement dated 24 July 2007."  Claim ¶¶ 79-80.  Even if NNUK's claims as to Alcatel allege sufficient facts to cross the plausibility threshold, those claims independently fail for the reasons set forth below.

**B.    Claims 24-27 Independently Fail to State a Claim**

1.    Claim 26 Fails Adequately To Plead Mistake

In claim 26, NNUK asserts a claim for mistake under English law.  While English law recognizes both common and unilateral mistake, NNUK's allegations fail to specify on which theory it purports to base its claims.  See Todd Decl. ¶¶ 113-14, 116.  In either case, however, because a claim for mistake is subject to the heightened pleading standard of Rule 9(b), NNUK must particularize (1) the mistake; (2) the identity of the individuals who made the mistake; (3) the nature of their misunderstanding; and (4) when and where the mistake occurred.  In re Tronox Inc., No. 09-10156 (ALG), 2010 WL 2010844, at *3 (Bankr. S.D.N.Y. May 14, 2010).

NNUK's allegations do not even approach that standard.  The Claim alleges only that "NNUK did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent of NNUK's entitlement."  Claim ¶ 188.  As a result, the Claim alleges that "NNI received considerably more from the allocation than it was intended," and "is therefore obligated to repay the overpayment to NNUK."  Id.  This falls far short of the

particularity required by Rule 9(b).  NNUK glaringly fails to identify even the basic nature of the

alleged mistake – summarily averring only "a mistake (either of fact or law)."  Id.  Indeed,

despite NNUK's amendment, the claim fails to even put NNI on notice of the whether the

alleged mistake was made only by NNUK or also by NNI and/or NNL.  If NNUK intended to

plead a common mistake claim, such claim would require that the alleged agreement as to

allocation was impossible to perform.  Todd Decl. ¶ 113.  NNUK makes no such allegations.  If

NNUK intended to assert a unilateral mistake claim, even that claim would require that NNI

were aware of the mistake (id. ¶ 114) – allegations that are entirely absent from NNUK's claim.

Moreover, NNUK also fails to offer any identification of (i) the individuals who made the

alleged mistake, or (ii) the time and place where the mistake occurred.  This plainly fails to

satisfy either Rule 9(b) or the basic elements of the cause of action under English law.

       2.    <u>NNUK Does Not Plead Required Elements of a Transaction at Undervalue Claim</u>

In Claim 27, NNUK asserts a claim under English law for transaction at undervalue,

under Section 238 of the Insolvency Act 1986.  The elements of a claim for transaction at

undervalue under this statute are: (i) the plaintiff entered into a transaction for no consideration

or "significantly less" consideration than the value of what it provided, (ii) during the "relevant

time," and (iii) when plaintiff was unable to pay its debts, or it became unable to pay its debts as

a result of the transaction.  Todd Decl. ¶¶ 121-125.  For "connected persons" – which includes

[associates] of the company – the "relevant time" is within two years of commencement of

administration proceedings.  Todd Decl. ¶¶ 124-125.

As discussed above, NNUK's vague references to unidentified "various" sale transactions

are insufficient to satisfy Rule 8 and must be dismissed out of hand.  To the extent that NNUK's

allegations relate to the Alcatel sale, they are either time-barred, or insufficiently pled.  NNUK

alleges that the Alcatel sale closed on December 31, 2006.  Claim ¶ 79.  However, the "relevant

period" within which NNUK could even bring a transaction at undervalue claim is limited to two years from the date of NNUK's administration proceedings.  Todd Decl. ¶¶ 124, 126.  NNUK obtained an order of administration on January 14, 2009.  Barefoot Decl. Ex. E.  The "reach back" period thus extends only to January 14, 2007.  NNUK cannot avoid this result by reference to its allegation that the "agreed allocation applied in relation to the Alcatel sale was set out in a statement dated 24 July 2007."  Claim ¶ 80.  Even if it were the relevant "transaction", this does not allege that the actual allocation occurred in July 2007.  Indeed, a well-pleaded transaction at undervalue claim would require a showing that NNUK received consideration that was significantly less than the value of what it sold.  Todd Decl. ¶ 123.  NNUK's ambiguous reference to an alleged statement in which the allocation was set out fails to provide a well-pleaded allegation regarding when the assets were transferred or when consideration for those assets was received.  NNUK thus fails to state a claim.

>     3.     <u>Implied Term / Implied Contract</u>

In claims 24 and 25, NNUK makes claims for breach of contract on the basis of either (i) "an implied contract as between the selling Nortel entities that the Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length principle," and/or (ii) an implied term contained within "the relevant sale contracts" that "NNUK would receive a fair and appropriate allocation."  Claim ¶¶ 185, 187.

In either case, NNUK does not adequately allege the parameters of the contract or contractual term.  Instead, the Claim only pleads an alleged agreement to allocate "fairly" "based on the arm's length principles."  Claim ¶¶ 186-187.  Nowhere, however, does NNUK allege facts that define the terms of this agreement, or what allocation of proceeds from any Pre-Petition Asset Sales (including Alcatel) would comply with NNI's alleged contractual obligations.

Instead, the Claim only alleges the allocation methods that it asserts violated or would violate the "fair" "arm's length" principles: (i) the allocation that was allegedly applied in accordance with the transfer pricing structure (Claim ¶ 81), or (ii) a revenue-based allocation approach (Claim ¶ 83). Without alleging the form of allocation that any implied agreement required, the Claim fails to put NNI on notice as to what allocation method would constitute a breach of contract and what method would comport with the alleged contracts or contractual terms. As a consequence of this deliberate ambiguity, the Claim also fails to allege what action or omission by NNI constituted a breach of the supposed implied term of implied contract. Instead, the Claim references only NNI's "participation in decision making" and "involvement in this regard." Claim ¶ 186.

This is only compounded by the Claim's general inability to identify which specific pre-petition sales contracts are purportedly at issue. Accordingly, the "contracts" claims should be dismissed.

## VI.
## NNUK'S CLAIMS RELATING TO TRANSFER PRICING, INTERCOMPANY LOANS, AND PRE-PETITION ASSET SALES ARE TIME BARRED

In addition to their basic pleading deficiencies, certain of NNUK's claims predicated on transfer pricing agreements, the Pre-Petition Asset Sales, and the NNUK Intercompany Loans (Claims 2-13, 15, 24-26, 28, 30-31, collectively the "Time-Barred Claims") are, with the exception of a single transaction, time barred under Delaware's three-year statute of limitations. Although NNUK and NNI entered into a tolling agreement approved by this Court, that agreement makes clear that it does not revive causes of action – such as the Time-Barred Claims – whose limitations period ran prior to its effective date.[73]

---

[73]    See Order Approving Stipulation Among the Debtors and the Joint Administrators on behalf of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited Regarding Tolling of Certain Claims, entered Dec.

For choice of law purposes, statutes of limitations are procedural rather than substantive. See Norman v. Elkin, No. 06-005-JJF, 2007 WL 2822798, at *3 (D. Del. Sept. 26, 2007); Winstar Holdings LLC v. Blackstone Grp. LP (In re Winstar Commc'ns Inc.), 435 B.R. 33, 44 (Bankr. D. Del. 2010). Accordingly, "the law of the forum generally determines whether an action is barred by the statute of limitations." Winstar, 435 B.R. at 44.[74] Delaware's borrowing statute, in turn, provides that where an action arises outside of Delaware, "an action cannot be brought . . . to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose." 10 Del. C. § 8121. Because this borrowing statute requires the application of the shorter limitations period, if a claim is time-barred under Delaware law, it is untimely as a matter of law without consideration of non-Delaware law. See Burrell v. AstraZeneca LP, No. 07C-04-267 (JRS), 2010 WL 3706584, at *4 (Del. Super. Ct. Sept. 20, 2010); Winstar, 435 B.R. at 44.[75]

---

17, 2010 [D.I. 4623] ¶ 9 (confirming that the stipulation "shall not operate to revive any NNUK Claim or NN Ireland Claim . . . that as of [December 17, 2010] was already barred by any Limitations Period.").

[74]    The fact that NNUK's claims involve fiduciary duties of non-Delaware corporations should not vary this analysis. See Norman, 2007 WL 2822798, at *3 (D. Del. Sept. 26, 2007) (internal affairs doctrine does not trump Delaware borrowing statute for fiduciary duty claims because limitations period is procedural not substantive); Winstar, 435 B.R. at 44 (situs of tort or injury not dispositive as to applicable statute of limitations). Even to the extent that the Court were to find the internal affairs doctrine relevant to certain of NNUK's causes of action, the doctrine has no bearing on NNUK's claims for conspiracy (Claims 5, 7, 11-12, 15), unjust enrichment (claim 15), or breach of contract (Claims 24-26).

[75]    The application of Delaware's borrowing statute should not depend on the bankruptcy forum in which NNUK has filed its Claim. See Winstar, 435 B.R. at 45 (finding no special circumstances that would require the bankruptcy court to vary application of Delaware borrowing statute). Indeed, bankruptcy courts both within and outside the Third Circuit routinely apply the literal terms of the borrowing statute of the forum state to bar untimely creditor claims. Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.), 333 B.R. 251, 260 (Bankr. W.D. Pa.) (dismissing creditor's claims as barred by Pennsylvania borrowing statute where Pennsylvania was the forum state for the debtor's bankruptcy and Pennsylvania law required use of its own limitations period if shorter); Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 606 (2d. Cir. 2001) (affirming that bankruptcy courts should apply the borrowing statute of the forum state to bar untimely claims, as bankruptcy context creates no sufficient federal interest to depart from state law); In re Coudert Bros. LLP, No. 09 Civ. 9561, 2010 WL 2382397, at *2-*3 (S.D.N.Y. June 14, 2010) (affirming bankruptcy court's dismissal of creditor's claims against debtor as time-barred under New York borrowing statute over creditor's assertion that claims were timely under English law). Moreover, where NNUK asserts that its Claims are "inextricably intertwined" with allocation of the proceeds of

Under Delaware law, a three-year statute of limitations applies to NNUK's claims for

breach of fiduciary duty, aiding and abetting breach of fiduciary duty, dishonest assistance, civil

conspiracy, breach of contract, breach of the duty of care, and unjust enrichment.  See 10 Del. C.

§ 8106; End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.), 250 B.R. 168, 184

(D. Del. 2000); Eames v. Nationwide Mut. Ins. Co., No. 04-1324 (KAJ), 2006 WL 2506640, at

*4 (D. Del. Aug. 29, 2006) (civil conspiracy claim is governed by statute of limitations for

underlying claims).[76]  In each case, the statute of limitations runs from the time of the alleged

wrongful act, even if the plaintiff was unaware of the cause of action at the time.  Fruehauf, 250

B.R. at 184; SmithKline Beecham Pharm. Co. v. Merck & Co., 766 A.2d 442, 450 (Del. 2000).

As the allegations of the Claim itself make clear, with the exception of a single transaction, the

Time Barred Claims have been brought more than three years since the time of the alleged

wrongful acts.

First, NNUK entered into the MRDA in December 2004.  Claim ¶ 39.  As the Claim

admits, "the MRDA provided the architecture and contractual basis to enable the RPSM [transfer

pricing method] to be applied."  Id.  As of December 2004, NNUK was thus contractually

obligated to participate in the Nortel Group's transfer pricing system.  See id. ¶ 109 n.5 (alleging

---

asset sales conducted under the supervision of this Delaware Court (see Joint Administrators' Response to the
Debtors' Motion for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of
Any Proofs of Claim by the EMEA Claimants [D.I. 5255] at ¶ 7), the Claims are divorced from those authorities
which would decline to apply Delaware's borrowing statute in favor of another jurisdiction.  Winstar, 435 B.R. at
45-46 (declining to apply New York limitations period where claims concerned "due diligence performed in this
case . . . as part of the sales process approved by this Bankruptcy Court, using professionals employed with the
approval of this Bankruptcy Court."); see Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings
LLC), 426 B.R. 488, 502 (Bankr. D. Del. 2010) (applying California statute of limitations where pre-petition
transaction lacked other ties to Delaware).

[76]      As this three-year limitations period applies to NNUK's claims for aiding and abetting breach of fiduciary
duty, it similarly applies to NNUK's duplicative English law claims for "dishonest assistance."  AlphaStar, 383 B.R.
at 274 (holding that dishonest assistance claims are akin to state law claims for aiding and abetting breach of
fiduciary duty); compare Todd Decl. ¶ 84 (elements of dishonest assistance claim are: (i) a breach of a fiduciary
duty, (ii) assistance in that breach by defendant, (iii) dishonesty on the part of defendant, and (iv) the causing of
harm to the defendant), with Fedders, 405 B.R. at 543 (elements of aiding and abetting claim are: (i) breach of a
fiduciary duty, (ii) substantial participation by defendant, (iii) with knowledge of the breach).

that NNL's operation of the transfer pricing system was "a breach of NNL's contractual

obligations under the MRDA" to NNUK).  Indeed, it is this decision to "participate" in the

RPSM on which NNUK bases its transfer pricing claims.  Id. ¶¶ 91-92 (asserting that "the RPSM

and MRDA was clearly contrary to NNUK's interests.  NNI breached its fiduciary duties in

causing NNUK to participate in such arrangements").[77]

Even where NNUK attempts to ground its claims in the "operation" or "implementation"

of the RPSM under the MRDA (see, e.g., Claim ¶ 107), Delaware law is clear that its transfer

pricing claims arose upon entry into the MRDA rather than during any period of its operation.

See Marvel Entm't Grp., Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.), 273 B.R.

58, 72-74 (D. Del. 2002) (subsidiary's claims for breach of fiduciary duty against parent based

on allegedly unfavorable tax-sharing agreement accrued upon the subsidiary's entry into the

contract, not dates or accrual of performance of obligations); Kahn v. Seaboard Corp., 625 A.2d

269, 274 (Del. Ch. 1993) (where "wrong alleged is the use of control over [subsidiary] to require

it to enter into a contract that was detrimental to it and beneficial, indirectly, to defendants . . .

such wrong occurred at the time that enforceable legal rights against [subsidiary] were created.").

However, NNUK did not assert any claims against the U.S. Debtors until its Placeholder Claim

was filed in September 2009 – more than four and a half years after NNUK entered into the

MRDA.  Accordingly, even assuming arguendo that the Placeholder Claim put the U.S. Debtors

on notice of NNUK's claims in relation to transfer pricing, claims 2-7 arise from entry into the

MRDA and must be dismissed as untimely.[78]

---

[77]     See also Claim ¶ 101 (basing breach of duty of care on "causing NNUK to participate in [the RPSM and
MRDA]"); ¶ 105 (basing dishonest assistance claim on allegations of "causing or allowing NNUK to participate in
the non arm's length compliant RPSM and MRDA arrangements"); ¶ 114 (basing aiding and abetting claims on
"bringing about and allowing NNUK's participation in the RPSM and MRDA").

[78]     Assuming arguendo that Delaware's borrowing statute did not apply, NNUK's claim for aiding and
abetting breach of fiduciary duty based on NNUK's agreement to transfer pricing systems (claim 6) is nonetheless

Second, the result is the same for certain of NNUK's claims that allegedly arise from Pre-Petition Asset Sales and the NNUK Intercompany Loans (claims 8-13, 15, 24-26, 28, 30-31) – each of which were asserted for the first time when the Claim was filed in June 2011.  Although the Claim fails even to specify what transactions constitute the Pre-Petition Asset Sales, NNUK does reference the sale of Nortel's UMTS business to Alcatel.  Claim ¶ 79.  That transaction closed in December 2006 (id.), with allocation of the proceeds allegedly "set out in a statement dated 24 July 2007" (id. ¶ 80).  Regardless of whether any alleged causes of action accrued in December 2006 or July 2007, they were time barred no later than July 2010 – nearly a year prior to NNUK's filing of the Claim.  Likewise, the claims based upon NNUK's alleged entry into NNUK Intercompany Loans dated December 2003, October 2004, April 2005, December 2005, December 2006, and September 2007[79] were clearly untimely when brought in June 2011.  See Claim ¶ 62.[80]

NNUK cannot salvage its alleged claims arising from Project Swift, the NNUK Intercompany Loans and any Pre-Petition Asset Sales by suggesting that such claims – first asserted in June 2011 – somehow "relate back" to its Placeholder Claim.  An amendment to a proof of claim will relate back only if it asserts a claim "that arose out of the conduct,

---

time barred.  The only other state whose law NNUK specifically suggests could apply to claim 6 is Texas.  Texas applies either a three or four year statute of limitations to claims for aiding and abetting breach of fiduciary duty claims.  See Quilling v. Compass Bank, No. 3:03-CV-2180-R (JB), 2004 WL 2093117, at *3 n.6 (N.D. Tex. Sept. 17, 2004) (Texas imposes a three year statute of limitations on aiding and abetting fiduciary duty claims); Bonner v. Henderson, No. 05-99-01582-CV (MW) (CIW) (JRR), 2001 WL 301582 (Tex. App. Dallas Mar. 29, 2001) (deciding that "the limitations period for appellant's . . . knowing participation in breach of fiduciary duty should be four years").  As such, even under Texas law, claims based on NNUK's entry into the MRDA in December 2004 -- brought at the earliest in September 2009 – are nonetheless time-barred.

[79]      Only claims arising from NNUK's allegations concerning the September 2008 facility can even possibly be timely.

[80]      The only other state whose law NNUK specifically suggests could apply to their state law claims is Texas, which applies a *shorter* two-year statute of limitations to claims for unjust enrichment and civil conspiracy.  See HECI Exploration Co. v. Neel, 982 S.W.2d 881, 885 (Tex. 1998); Jackson v. W. Telemarketing Corp. Outbound, 245 F.3d 518, 523-24 (5th Cir. 2001).  Accordingly, regardless of whether Texas or Delaware law applies, claims 11 and 15 for unjust enrichment and civil conspiracy arising from the NNUK Intercompany Loans are time-barred.

transaction, or occurrence set out – or attempted to be set out – in the original pleading." Fed. R. Civ. P. 15(c)(1)(B); Coan v. O & G Indus. Inc. (In re Austin Driveway Servs., Inc.), 179 B.R. 390, 395 (Bankr. D. Conn. 1995) ("[W]hen the amended pleading does not rely upon the facts and transactions originally pled or plead them more specifically, but rather is based on new facts and different transactions, the proposed amendment will not relate back to the original pleading." The essential inquiry "is whether the defendant was given adequate notice that such claims might be made upon examining the facts alleged in the original pleading."); Rescuecom Corp. v. Khafaga (In re Khafaga), 431 B.R. 329, 334 (Bankr. E.D.N.Y. 2010) (citation omitted).[81]  The Placeholder Claim simply failed to provide such notice: it included no mention of Project Swift, the NNUK Intercompany Loans, or any Pre-Petition Asset Sales whatsoever.  Instead, the Placeholder Claim asserted only "potential claims . . . arising out of transfer pricing, intercompany dealings, trading, and other arrangements or agreements between them." Placeholder Claim, Barefoot Decl. Ex. B ¶ 2.  NNI was simply not a party to Project Swift or the NNUK Intercompany Loans.  Accordingly, none of those transactions can fall within the Placeholder Claim's reference to "dealings" or "other arrangements" between NNI and NNUK.[82]  Nor can NNUK rely on any generic references to "intercompany dealings,"[83] or any notice

---

[81]    See also Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.), 307 B.R. 787, 790 (Bankr. D. Del. 2004) ("focus[ing] on the notice given by the general fact situation stated in the original pleading."); In re Edison Bros. Stores, No. 99-529 (JCA), 2002 Bankr. LEXIS 1228, at *10 (Bankr. D. Del. 2002) (amendment to claim will not relate back where it does not give debtor fair notice of the conduct, transaction, or occurrence that underlies the liability).

[82]    See In re MarchFirst, Inc., 448 B.R. 499, 508 (Bankr. N.D. Ill. 2011) (amendments did not relate back where "[t]he original and amended requests arise out of entirely different conduct at entirely different times"); Khafaga, 431 B.R. at 334 (factual discrepancies between original and amended claims – different time frames, different alleged conduct, and different operative facts – preclude a finding that the amended claim relates back); In re Global Link Telecom. Corp., 327 B.R. 711, 716 (Bankr. D. Del. 2005) ("[A]n amended complaint will relate back if it merely adds a new legal ground for relief, changes the date and location of the transaction alleged, . . . spells out the details of the transaction alleged, . . . [or] merely increas[es] the ad damnum clause . . . .").

[83]    See In re Milan Steel Fabricators, Inc., 113 B.R. 364, 367 (Bankr. N.D. Ohio 1990) (amended IRS claim for highway taxes could not relate back to an original claim for unemployment taxes based on generalized references to "taxes due under the Internal Revenue Laws of the United States").

allegedly provided outside of the four corners of the proof of claim[84] as a basis to permit relation back.

By entering the EMEA Claims Order, the Court has already recognized that the Placeholder Claim failed to adequately plead any basis for relief against NNI.  EMEA Claims Order ¶ 3 ("If the Claimants do not file . . . amended Proofs of Claim by June 1, 2011, the Proofs of Claim . . . will be disallowed and expunged with prejudice.").  Thus, there is no adequately pled timely claim arising from the NNUK Intercompany Loans and any Pre-Petition Asset Sales to which the claims can now "relate back."  See Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, at 149 n.3 (1984) (where an initial pleading is insufficient, it cannot be "rehabilitated" by invoking relation-back); United States v. Crawley, No. H-09-3457 (FHS), 2010 WL 4393970, at *11 (S.D. Tex. Oct. 29, 2010) (amended claim did not relate back where original filing was "completely devoid of facts, much less operative facts").[85]

---

[84]    Khafaga, 431 B.R. at 334 (rejecting arguments that defendant had adequate notice of allegations in amended claim allegations by virtue of examination conducted prior to commencement of adversary proceeding); Bank Brussels Lambert v. Chase Manhattan Bank, N.A., No. 93 Civ. 5298 (LMM), 1999 WL 672302, at *2 (S.D.N.Y. Aug. 27, 1999) (holding that the requisite notice must be given by the allegations set forth in the original complaint).

[85]    That the newly-brought claims were filed in response to the Court's order for a more definite statement certainly cannot help NNUK.  In re Maxim Truck Co., Inc., 415 B.R. 346 (Bankr. S.D. Ind. 2009) (dismissing claims asserted for the first time in an amended claim filed pursuant to court's order for a more definite statement).

## CONCLUSION

WHEREFORE, the Movants respectfully request that the Court (i) sustain this Objection and grant this Motion; (ii) enter the proposed order attached hereto as <u>Exhibit A</u> disallowing and expunging with prejudice claims 2 through 35 asserted in claim number 7786 (and to the extent it is not superseded and replaced by claim 7786, claim 5122); and (iii) grant such other and further relief as the Court deems just and proper.

Dated:  July 15, 2011  
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)  
Howard S. Zelbo (admitted *pro hac vice*)  
James L. Bromley (admitted *pro hac vice*)  
Lisa M. Schweitzer (admitted *pro hac vice*)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors*  
*and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

   - and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*