IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

*In re*

Nortel Networks Inc., *et al.*,[1]

           Debtors.

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

---

**DECLARATION OF MICHAEL TODD Q.C. IN SUPPORT
OF JOINT OBJECTION AND MOTION TO DISMISS
CLAIMS OF NORTEL NETWORKS UK LIMITED**

I, Michael Todd Q.C., hereby declare as follows, pursuant to 28 U.S.C. § 1746:

**A.    Introduction**

1.    My educational background and professional experience qualify me to address the
Court on the English law issues discussed in this declaration. I was called to the
English bar in 1977, and became a Queen's Counsel in 1997. I specialise in the field
of company law, corporate finance, capital markets and corporate insolvency. In
addition to my appearances as an advocate in the High Court, Court of Appeal, House
of Lords and Privy Council in England, I have also appeared as an advocate in the
Court of First Instance, Court of Appeal and Court of Final Appeal of Hong Kong, I
have often appeared as an advocate in the Courts of First Instance in the British
Virgin Islands, Bermuda, and the Cayman Islands, have appeared in the Courts of
First Instance in the Isle of Man, and have appeared in the Courts of Appeal in the
British Virgin Islands, Bermuda and Turks & Caicos Islands, and the High Court in
Northern Ireland. I am ranked as a Star Individual in the Company and
Restructuring/Insolvency section of Chambers UK. Since January 2001, I have
served as Vice-Chairman of the General Council of the Bar ("the Bar Council"), and
since May 2011, as Chairman-elect of the Bar Council. From January 2012 I will be
the Chairman of the Bar Council. I am also a former Chairman of the Chancery Bar
Association. I am presently Head of Chambers of Erskine Chambers, which is

---

[1]    I am instructed that the debtors in these chapter 11 cases, along with the last four digits of each debtor's
tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel
Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073),
Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc.
(2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel
Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International
Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226). Addresses
for the Debtors can be found in the Debtors' petitions, which are available at
http://chapter11.epiqsystems.com/nortel.

described by Chambers & Partners as "unrivalled at the Company Bar" and "the first port of call for company work" and by Legal 500 as "having outstanding strength and depth," being "first class in all respects" and having "an impressive mix of technical excellence and commercial understanding." I am also a consulting editor of the treatise *Gore-Browne on Companies*, published by Jordan Publishing Ltd. Further details are set out in my *curriculum vitae*, which is annexed to this declaration as Exhibit A.

2.     I submit this declaration in support of the Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited ("NNUK" and the "Motion" respectively). Except as otherwise indicated, all statements set out in this declaration are based upon my opinions, experience and knowledge, the English authorities which are cited herein, and the Proof of Claim.

3.     I have been retained by Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), counsel to Nortel Networks Inc. and other debtors and debtors in possession (the "U.S. Debtors"), and am being compensated at a rate of £850 per hour (plus Value Added Tax (VAT)), which is my customary hourly rate. No part of my compensation for performing this work is contingent upon the results of my work or on the outcome of the Motion. I have not previously acted for the U.S. Debtors in any matter.

4.     I have been asked to provide my expert opinion on matters of English law relating to NNUK's claims as set out in the Proof of Claim. The precise questions on which my expert opinion is sought are set out in a letter of instruction from Cleary Gottlieb to me dated July 15, 2011 ("the Letter of Instruction").

5.     I do not address the question of whether NNUK's claims are well founded as a matter of fact. Unless noted otherwise, where I refer to facts below, those facts are derived from the allegations made in the Proof of Claim. For the purposes of this declaration, I have assumed those alleged facts to be true (without prejudice to the right of the U.S. Debtors and other parties to challenge those facts). I have also assumed, solely for purposes of the Motion, that English law applies to those claims as to which NNUK alleges English law applies.

6.     This declaration is organized as follows. Part B sets out certain background facts which are derived from the Proof of Claim and the Letter of Instruction. Part C, by way of further background, provides a summary of the five general categories of alleged wrongdoing set out in NNUK's Proof of Claim. Part D sets out my opinions on English law in relation to NNUK's claims. In Part E, I discuss certain English court orders relevant to the Motion.

## B.     Background to the Case

7.     On 14 January 2009, the U.S. Debtors filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court") (except for Nortel Networks (CALA) Inc ("NN CALA"), which filed on 14 July 2009).

8.     In addition, in orders entered on 14 January 2009 (the "Initial Orders"), the High Court of Justice, Chancery Division (the "English Court") placed nineteen of Nortel's European affiliates, including NNUK, into administration (the "English

Administration Proceedings"). The English Court has appointed certain individuals as joint administrators for NNUK (collectively, the "Joint Administrators") and also for the other 18 debtor companies from the Europe, Middle East and Africa region (the "EMEA Debtors").

9.     Pursuant to an order of the U.S. Bankruptcy Court, the Joint Administrators filed an amended proof of claim on behalf of NNUK on June 3, 2011, which I understand has been assigned claim number 7757 (the "Proof of Claim"). The Proof of Claim asserts thirty-five (35) separate claims (collectively, the "Claims").

10.    Prior to the U.S. bankruptcy filing and the English Administration Proceedings, both NNI and NNUK were wholly owned subsidiaries of a Canadian parent company, Nortel Networks Limited ("NNL"). NNL was itself a wholly owned subsidiary of Nortel Networks Corporation ("NNC"), also a Canadian company, and the ultimate parent of both NNI and NNUK.

**C.    Overview of NNUK's Allegations**

11.    I have reviewed the Proof of Claim. I have also been provided by Cleary Gottlieb, counsel for the U.S. Debtors, a summary of the five categories of wrongdoing alleged in the Proof of Claim, which I include below in paragraphs 12-32 for the convenience of the Court.[2]

**C.1    Transfer Pricing**

12.    NNUK alleges several claims against NNI with respect to Nortel's "transfer pricing" system. Transfer pricing refers to the manner in which profits and losses are allocated amongst related or associated companies. Proof of Claim ¶ 30.

13.    Starting in 2001, the Nortel Group (as defined in Proof of Claim ¶ 2) adopted a residual profit split method ("RPSM") of transfer pricing. Id. ¶ 31. Nortel was divided into two principal groups – limited risk entities and residual profit entities. Id. ¶ 34. Limited risk entities were entitled only to routine profits on their direct earnings from sales to third parties, while residual profit entities also received profits or losses attributable to intangible activities, i.e. research and development. Id. ¶¶ 34-35. In December 2004, NNUK, NNI, NNL and the other residual profit entities entered into a Master Research and Development Agreement ("MRDA"), which "provided the architecture and contractual basis to enable the RPSM to be applied." Id. ¶ 39.

14.    The MRDA and RPSM were "brought about" and "allowed" by NNUK's duly appointed de jure directors. Id. ¶ 114. NNUK, however, alleges that these arrangements were not applied or implemented on an arms' length basis in accordance with their terms, nor in its interests, and as applied or implemented deprived NNUK of revenue. Id. ¶¶ 11(a), 45-47, 91-92. NNUK alleges that NNL did not make the payments which were due to NNUK under the RPSM, but withheld them; and that even had NNL properly made the payments due to NNUK from it, the RPSM "would not have adequately rewarded NNUK" due to other flaws in the method which, inter

---

[2]     I do not address NNUK's claim relating to intercompany trading debts (¶ 86), which are not addressed in the Motion, although I am instructed that counsel for the U.S. Debtors have reserved the right to object to such claim, including without limitation, to object to such claim at a later date on any and all grounds.

alia, had the effect that NNUK did not receive a proper return on its sales to third parties. Id. ¶¶ 49-55. Thus, the Proof of Claim alleges that the transfer pricing system "took funds from NNUK, for the benefit of NNL," id. ¶ 48, and that the RPSM was motivated by "a desire to allocate more profit to the Canadian Entities" (as defined in Proof of Claim ¶ 2) "in order to benefit NNL at the expense of NNUK." Id. ¶ 32. NNUK further alleges that the transfer pricing system was part of a "general policy to the effect that value and cash within the Group should be transferred to NNL." Id. ¶ 10.

15.    NNUK alleges that this policy of transferring cash to NNL harmed both NNI and NNUK. For example, NNUK asserts that the RPSM model was challenged by the IRS, as a result of which NNI was recognized as having a $2 billion claim against NNL "to reflect net overpayments made by NNI to NNL for [past] tax years." Id. ¶ 56.

16.    The Proof of Claim alleges that NNI was "heavily involved" in the "implementation and operation" of the transfer pricing arrangements, which were to the detriment of NNUK, that NNUK had no substantive involvement in the transfer pricing arrangements, id. ¶¶ 16, 18, 47, and that "NNI and NNL, alternatively NNI and NNUK's de jure directors, alternatively NNI, NNL and NNUK's de jure directors . . . were aware and intended that NNUK was not properly rewarded pursuant to the RPSM and MRDA." Id. ¶ 109.

**C.2    Intercompany Loans**

17.    NNUK makes several allegations with respect to certain intercompany loans between NNUK and NNL.

18.    NNUK alleges that beginning in December 2003, NNUK entered into a series of interest-free loan agreements with NNL pursuant to which loans were made by NNUK to NNL, which loan agreements were periodically extended through replacement facilities up until September 2008. Proof of Claim ¶¶ 60-62. These loan agreements were allegedly part of "schemes which would enable the transfer of cash and/or value to NNL from NNUK and other EMEA Companies," were contrary to NNUK's best interests, and instead were "put into place for the benefit of NNL to the detriment of NNUK." Id. ¶¶ 20, 21, 57, 60, 65.

19.    NNI is not alleged to have been a party to the intercompany loans made by NNUK to NNL. Instead, NNUK alleges that NNI made a separate series of loans to NNL, which provided for payment of interest and were regularly repaid in cash by NNL. Id. ¶¶ 63, 65(d). NNUK alleges that NNL was able to make cash repayments in respect of the interest bearing loans made by NNI to NNL because NNL did not make repayments on the interest free loans made by NNUK to NNL. Id. ¶ 64. NNUK alleges that the loan repayment amounts paid by NNL to NNI (in part, as a result of Project Swift) "should have been paid to NNUK not NNI." Id. ¶ 75.

20.    The Proof of Claim alleges that by virtue of cash being channeled to NNL from NNUK and the other EMEA Companies (as defined in Proof of Claim ¶ 1) (including by the favorable intercompany loans from NNUK to NNL), NNL was able to make cash repayments to NNI on the separate series of loans made by NNI to NNL. Id. ¶¶

58, 59, 64, 145, 150.  NNUK thus alleges that NNI "benefitted" as a result of the intercompany loans made by NNUK to NNL.  Id. ¶ 64.

21.    Furthermore, NNUK contends that "NNI (together with NNL) was controlling or influencing NNUK" in respect of such loans.  Id. ¶ 66.  According to NNUK, "[n]umerous NNI individuals were aware of and/or participated in the discussions relating to the initial [loan from NNUK to NNL] and the later decisions imposed on NNUK relating to the utilization of the [NNUK to NNL] facilities that followed."  Id. ¶ 21.

**C.3    Project Swift**

22.    NNUK makes various allegations with respect to a December 2007 corporate restructuring known within Nortel as "Project Swift."  Proof of Claim ¶¶ 69-72.

23.    According to the Proof of Claim, Project Swift entailed the "paper" transfer from NNL to NNUK of the shares of a Dutch subsidiary (Nortel Networks International Finance Holdings BV) which held the shares of certain EMEA Debtors (other than NNUK and NNSA), in exchange for cancellation of approximately $630 million in outstanding loans owed by NNL to NNUK.  Id. ¶ 71.

24.    NNUK alleges that Project Swift was contrary to NNUK's interests and "improperly removed value from NNUK."  Id. ¶ 27.  Specifically, NNUK avers that the value of the shares transferred to NNUK "was substantially lower than the debt owed by NNL that was discharged as a result."  Id. ¶ 74.

25.    NNUK further alleges that by reducing its loan obligations to NNUK through Project Swift, NNL was able to make payments on its loans with NNI.  Id. ¶¶ 12, 67, 177.

26.    NNUK also alleges that "NNI's directors, officers and senior employees were part of the management group that implemented Project Swift to the detriment of NNUK."  Id. ¶¶ 23, 153, 158.

**C.4    Past Business Sales**

27.    NNUK makes various allegations with respect to the allocation of the proceeds of certain business disposals prior to Nortel's bankruptcy filings.

28.    NNUK alleges that prior to January 2009, "NNUK entered into various global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser."  Proof of Claim ¶ 79.

29.    The only specific sale mentioned is a December 2006 "sale of Nortel's UMTS business to Alcatel Lucent S.A. ('Alcatel') for an adjusted purchase price of approximately US $291 million."  Id. ¶ 79.

30.    NNUK asserts that it was agreed that the allocation of the proceeds of these unspecified sales and the Alcatel sale "would be on the basis of an arm's length legal entitlement that each had to the proceeds" and that the allocation was to correspond with the allocation agreed in respect of transfer pricing.  Id. ¶ 80.  However, NNUK alleges that the allocation actually applied between the Nortel entities did not accord with that agreement and failed to provide NNUK with the sums to which it was

entitled because such allocation was attempted based "on the erroneous assumptions that were contained in the transfer pricing structure that prevailed within the Nortel group at the time," id. ¶¶ 81-82, and regardless of the agreement made, the allocation actually implemented resulted in NNUK receiving less than it was entitled to receive. The Proof of Claim states that factual detail concerning this subject "will be further particularized following discovery." Id. ¶ 184.

**C.5   Contingent Tax Liability**

31.   NNUK claims that NNI may be liable for a potential tax liability that NNUK might incur in the future.  Proof of Claim ¶ 85.

32.   NNUK asserts that taxation matters were controlled by NNL and NNI.  Id. ¶ 84. Whilst this is alleged to be "particularly so in relation to transfer pricing matters," allegedly it was "also the case more generally."  Id.  Accordingly, NNUK asserts a contingent claim against NNI if and to the extent any taxation authority were "to make a claim against NNUK in relation to a failure to pay the proper level of taxation in any years."  Id. ¶ 85.

**D.   English Law Opinions**

33.   With respect to the foregoing five areas of alleged wrongdoing, NNUK asserts various purported English law claims against NNI, namely:  (a) breach of fiduciary duty, acting as either a de facto or shadow director; (b) breach of duty of care; (c) dishonest assistance; (d) unconscionable / knowing receipt; (e) unlawful means conspiracy; (f) mistake; and (g) transaction at an undervalue.

34.   The purpose of this declaration is to set out and analyze the relevant principles of English substantive law in light of the pleaded allegations.  Whilst it is my understanding that a U.S. court will apply its own procedural rules in determining the sufficiency of the pleaded allegations based on English substantive law, I also note that an English court would, under its own procedural rules, unless properly/adequately particularized, "strike out" (what, I am instructed, would be referred to under U.S. law as granting a motion to dismiss) the claims discussed in this declaration.

35.   In my opinion, as explained further below, NNUK's claims do not comply with the requirements of English law.

**D.1   Breach of Fiduciary Duties – De Facto or Shadow Director (Claims 2, 8, 16, 28, 32)**

36.   The Proof of Claim alleges that NNI was a "de facto or shadow director" of NNUK (see, e.g., Proof of Claim ¶ 26), and that, in acting as such, NNI breached its fiduciary duties towards NNUK.  This allegation is made in respect of the following claims:  (a) Transfer pricing (Claim 2); (b) Intercompany loans (Claim 8); (c) Project Swift (Claim 16); (d) Past business sales (Claim 28) and (e) Contingent tax liability (Claim 32).

### D.1.a   Analysis of NNUK's case for de facto director

37.     There is no exhaustive statutory definition of a director in English law.  Section 250 of the Companies Act 2006 provides that a "director" includes "any person occupying the position of director, by whatever name called."[3]  That simply means that the label attached to describe a particular person is not determinative of his status; if he undertakes the duties of a director of the company, he will be a director regardless of the description applied to his role.

38.     A person who acts as a director but is not actually appointed as such (for example, if there was a defect in the appointment) is a de facto director (as opposed to a de jure director).  A de facto director will be treated as a director.  He will be regarded as holding a fiduciary office and subject to the general duties of directors (whether applicable under common law and equitable principles or by statute).[4]

39.     To establish that NNI was a de facto director of NNUK, NNUK must show that NNI: (a) occupied a place in the corporate governance structure of NNUK;[5] or (b) that NNI undertook functions in relation to NNUK that could only be undertaken by a director of NNUK.[6]

40.     The tests and authorities for determining whether a person should be regarded as a de facto director and thereby subject to fiduciary duties have relatively recently been reviewed and summarized in the case of *Gemma Ltd v Davies* [2008] 2 BCLC 281 at [39] and [40], as follows:

(i)     To establish that a person is a de facto director of a company, it is necessary to plead and prove that he undertakes functions in relation to the company, which could properly be discharged only by a director.[7]

(ii)    It is not a necessary characteristic of a de facto director that he is held out as a director; such "holding out" may, however, be important evidence in support of the conclusion that a person acted as a director in fact.[8]

(iii)   Holding out alone, however, is not a sufficient condition.  What matters is not what he called himself or what he was called by others, but what he did.[9]

---

[3]  .    With effect from 1 October 2007.  The same definition formerly applied under the Companies Act 1985, s 741(1).

[4]      *Ultraframe UK Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1254]-[1257], in particular [1257].

[5]      *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333 at 343-344.

[6]      *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 at 183.

[7]      Per Millett J in *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 at 183.

[8]      Per Etherton J in *Secretary of State for Trade and Industry v Hollier* [2006] EWHC 1084 (Ch), [2007] Bus LR 352 at [66].

[9]      Per Lewison J in  *Re Mea Corp Ltd* [2007] 1 BCLC 618.

(iv)    It is necessary for the person alleged to be a de facto director to have participated in directing the affairs of the company on an equal footing with the other director(s) and not in a subordinate role.[10]

(v)    The person in question must be shown to have assumed the status and functions of a company director and to have exercised "real influence" in the corporate governance of the company.[11]

(vi)    If it is unclear whether the acts of the person in question are referable to an assumed directorship or to some other capacity, the person in question is entitled to the benefit of the doubt.[12]  However, the Court must be careful not to strain the facts in deference to this observation.[13]

41.    In order for NNUK to establish that NNI was a *de facto* or *de jure* director of NNUK, NNUK must establish that in performing acts on behalf of NNUK, those acting on behalf of NNI were acting within the scope of the authority conferred on them by NNI.  The mere fact that two companies have common directors does not lead inexorably to the conclusion that each company is a director of the other company.

42.    There are several reasons why, in my opinion, NNUK's factual allegations, even if proven, would not make out a claim under English law that NNI acted as a de facto director of NNUK.

43.    First, I am not aware of any English cases, nor has my research revealed any, in which the Court has found that one subsidiary company was a de facto director of a fellow subsidiary.

44.    Second, the allegations in the Proof of Claim do not satisfy the requirements that NNI performed functions that could only have been properly performed by a director of NNUK or that NNI participated in directing the affairs of NNUK on an equal footing with NNUK's de jure directors.

45.    As regards transfer pricing, Project Swift, and past business sales, NNUK has alleged that NNI "was involved in all decision making" relating to those matters.  Proof of Claim ¶¶ 91, 153, 193.  In respect of intercompany loans, the Proof of Claim states that the "Group Treasurer," who was also a director of NNI, and another NNI employee carried out certain functions with respect to the "implementation" of the loans and that an NNI employee seconded to NNUK "supervised the team on the ground whose role included managing the use of" the loans.  Id. ¶¶ 19, 22, 24.  In my opinion, those allegations are insufficient to establish that NNI was a *de facto* director of NNUK in that they do not describe the performance of functions that can only be

---

[10]    Per Etherton J in *Secretary of State for Trade and Industry v Hollier* [2006] EWHC 1084 (Ch), [2007] Bus LR 352 at [68] and [69] explaining dicta of Timothy Lloyd QC in *Re Richborough Furniture Ltd* [1996] 1 BCLC 507 at 524.

[11]    Per Robert Walker LJ in *Re Kaytech International plc* [1999] 2 BCLC 351 at 424.

[12]    Per Timothy Lloyd QC in *Re Richborough Furniture Ltd* [1996] 1 BCLC 507 at 524).

[13]    Per Robert Walker LJ in *Re Kaytech International plc* [1999] 2 BCLC 351 at 423.

properly undertaken by a director, or describe participation by NNI in the management of NNUK on equal footing with NNUK's directors.

46.    Third, whilst NNUK does plead that it was "instructed to identify new schemes which would enable the transfer of cash and value to NNL," id. ¶ 10, or "instructed to sign the MRDA," id. ¶ 18(d), it does not allege that NNI was the source of those instructions.

### D.1.b   Analysis of NNUK's case for shadow director

47.    A "shadow director" is defined by section 251 of the Companies Act 2006 as follows:[14]

> *"(1)    ... "shadow director", in relation to a company, means a person in accordance with whose directions or instructions the directors of the company are accustomed to act.*
>
> *(2)    A person is not to be regarded as a shadow director by reason only that the directors act on advice given by him in a professional capacity.*
>
> *(3)    A body corporate is not to be regarded as a shadow director of any of its subsidiary companies for the purposes of-*
>
> *Chapter 2 (general duties of directors)*
>
> *Chapter 4 (transactions requiring members' approval), or*
>
> *Chapter 6 (contract with sole member who is also a director),*
>
> *by reason only that the directors of the subsidiary are accustomed to act in accordance with its directions or instructions."*

48.    The Court of Appeal has considered the meaning of "shadow director" and reviewed earlier authorities.[15]   It held (per Morritt LJ)[16] that:

(a)    The definition of a "shadow director" is to be construed in the normal way to give effect to the parliamentary intention ascertainable from the mischief to be dealt with and the words used.   It should not be strictly construed.

(b)    A shadow director must have real influence in the corporate affairs of the company.   However, it is not necessary that such influence should be exercised over the whole field of its corporate activities.

---

[14]    With effect from 1 October 2007.  A similar definition formerly applied under the Companies Act 1985, s 741(2) and (3).

[15]    *Secretary of State for Trade and Industry v Deverell* [2001] Ch 340 at CA at [35], applied in *Secretary of State for Trade and Industry v Becker* [2003] 1 BCLC 555 and *Ultraframe UK Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1260] and [1261].

[16]    A decision on the definition of "shadow director" in the Company Directors Disqualification Act 1986, s 22(5), which is in similar terms to the Companies Act 2006, s 251(1) and (2).

(c)      In respect of the directions or instructions given by the alleged shadow director, it is not always necessary have to prove the understanding or expectation of either giver or receiver.  Evidence of such understanding or expectation may be relevant but it cannot be conclusive.

(d)      Non-professional advice may come within the definition as "directions or instructions."

(e)      It is not necessary in all cases to show that the actual directors of the company (ie the de jure or de facto directors) or some of them cast themselves in a subservient role or surrendered their respective discretions.

49.     Applying those principles, to establish that NNI was a shadow director, NNUK must show:  (a) who were the *de jure* or *de facto* directors of NNUK; (b) that NNI directed those directors how to act in relation to NNUK; (c) that the directors of NNUK acted in accordance with such instructions from NNI; and (d) that the directors of NNUK were accustomed to act in accordance with such instructions from NNI.[17]

50.     In addition, in order for NNUK to establish that NNI was a shadow director of NNUK, NNUK must establish that those acting on behalf of NNI were acting within the scope of the authority conferred on them by NNI.

51.     Further, section 251(3) of the Companies Act 2006 provides that a body corporate is not to be regarded as a shadow director of any of its subsidiaries merely because the directors of that subsidiary are accustomed to act in accordance with its directions or instructions.  Something more is required.  In other words, the giving of directions or instructions by the parent to the directors of the subsidiary is not enough to give rise to a shadow directorship.  But if the parent company goes further and assumes or takes over the management of the subsidiary – for example, the subsidiary does not hold board meetings and management decisions for the subsidiary are taken by the directors of the parent – the parent may thereby become a shadow director of the subsidiary.

**D.1.b.i - Distinction between de facto and shadow directors**

52.     Although the two terms are not necessarily mutually exclusive, in most cases it is unlikely that a person will be simultaneously a shadow director and a de facto director, although he may be both in succession.[18]

53.     The distinction between a de facto and a shadow director is important.  As a matter of English law, each has a different legal nature and the duties applicable to them differ.

54.     As one English court has stated, an allegation that a person acted as a de facto or shadow director, without distinguishing between the two is "embarrassing"[19] (ie

---

[17]     *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 at 183.

[18]     *Ultraframe UK Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1262] and [1263].

[19]     *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 at 182h.

inadequate).  The allegation should identify the nature of the directorship alleged and the facts relied upon by the claimant for the allegation that the type of directorship existed.

55.     NNUK's Proof of Claim fails to identify in respect of each of the allegations made by NNUK whether NNI is alleged to have acted as a de facto or a shadow director.

### D.1.b.ii - Scope of fiduciary duties

56.     It is helpful to distinguish between different legal regimes which lay down the principles governing a director's fiduciary duties, depending upon the date of the act or omission in question.  For acts or omissions occurring before 1 October 2007, the duties of directors were governed by common law rules and equitable principles. Those common law rules and equitable principles were codified and given statutory force by Part 10 of the Companies Act 2006, mostly with effect from 1 October 2007, but in some respects (namely, Sections 175-177) from 1 October 2008.

57.     Sections 170-177 inclusive of Chapter 2 of Part 10 of the Companies Act 2006 set out the "General Duties of Directors."  Section 171 sets out the duty to act within the powers conferred; Section 172 sets out the duty to promote the success of the company; Section 173 sets out the duty to exercise independent judgment; Section 174 sets out the duty to exercise reasonable care, skill and diligence; Section 175 sets out the duty to avoid conflicts of interest; Section 176 sets out the duty not to accept benefits from third parties and Section 177 sets out the duty to declare an interest in a proposed transaction or arrangement.

58.     The relationship between the general statutory duties and the previous duties based on case law is set out in sections 170(3) and (4) of the Companies Act 2006, as follows:

> "*(3)   The general duties are based on certain common law rules and equitable principles as they apply in relation to directors and have effect in place of those rules and principles as regards the duties owed to a company by a director.*
>
> *(4)    The general duties shall be interpreted and applied in the same way as common law rules or equitable principles, and regard shall be had to the corresponding common law rules and equitable principles in interpreting and applying the general duties.*"

59.     The statutory duties are therefore a codification and replacement of the previous common law rules and equitable principles (section 170(3)).  However, those rules remain relevant in interpreting and applying the statutory duties (section 170(4)).[20] The large body of case law, which has established the common law and equitable duties, remains relevant, as does new case law dealing with the statutory general duties.

---

[20]     Gore-Browne on Companies, 45th ed, Vol 1, paragraph 15[8A].

60.     Under English law, various statutory duties, obligations and restrictions are expressly applied to "shadow directors."[21] However, in contrast to a de facto director, a shadow director does not normally owe fiduciary duties to the company.[22] He will only become subject to those duties if he does something more than act as a shadow director, for instance, if his activities are such that he becomes a de facto director or he incurs fiduciary obligations in relation to the company by taking personal control of property of the company.[23]

61.     In the latter case, the fiduciary obligations cannot arise until the alleged shadow director takes control of the property of the company. At that time, the person comes under a duty to use the asset for the benefit of the person to whom it belongs.[24] Only after that date can there be a breach of fiduciary duty by the shadow director – for example, by dealing with the property in a manner inconsistent with the rights or interests of the owner of the property. There is, therefore, an analogy with constructive trusteeship based upon the receipt of trust property; the status of a constructive trustee arises when the trust property is received by him. The breach of his duties as a constructive trustee arises when he deals with the trust property in a manner inconsistent with rights of the owner thereof.

62.     Furthermore, in my opinion, the better view of English law is that the fiduciary obligations to which the shadow director becomes subject on taking personal control of property of the company do not include the full range of duties to which a director may be subject at common law and in equity. Rather, the duties are more limited. As the duties arise because the person takes personal control of the property of the company, so the ambit of the duties are defined by that control. Once the person has taken personal control of the company's property, he comes under a duty to deal with that property in a manner which he considers in good faith to be in the best interests of the company. The duty to act in good faith in what the fiduciary considers to be in the best interests of the company is not at large, but is confined to the person's stewardship of the property. This, in my view, is consistent with the fact that the duty arises from the person's trusteeship of the company property.

63.     Accordingly, to succeed on its fiduciary duty claims based upon the allegation that NNI was a shadow director of NNUK, in addition to establishing the shadow director elements as set out above, NNUK must also show that: (i) NNI was subject to one or more fiduciary duties owed to NNUK in respect of the acts which are challenged; and (ii) in carrying out those acts, NNI acted in breach of one or more of those duties.

64.     Therefore, even assuming that NNI was a shadow director of NNUK, NNI would not of itself owe NNUK the full range of fiduciary duties owed by other directors.

---

[21]     For example, Companies Act 2006, ss 188, 190-196, 197-214 and 215-222 and Insolvency Act 1986, s 214, none of which are alleged to apply in the present case.

[22]     *Ultraframe UK Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1279]-[1291], in particular [1279, 1285, and 1288-1291].

[23]     *Ibid* at [1279]-[1291].

[24]     *Ibid* at [1290].

NNUK must show separately what, if any, fiduciary duties NNI owed to NNUK by being an alleged shadow director.[25]

### D.1.b.iii – NNUK's shadow director claims

65.    I have already discussed the de facto director claims above. There are several reasons why, in my opinion, NNUK's factual allegations, even if proven, would not make out a claim under English law that NNI acted as a shadow director of NNUK. First, I am not aware of any English cases, nor has my research revealed any, in which the Court has found that one subsidiary company was a shadow director of a fellow subsidiary.

66.    Second, as was the case for NNUK's claim of de facto directorship, allegations such as that NNI "was involved in all decision making," Proof of Claim ¶¶ 91, 153, 193, relating to transfer pricing, Project Swift, and past business sales, that the "Group Treasurer," who was also a director of NNI, and another NNI employee carried out certain functions with respect to the "implementation" of intercompany loans or that an NNI employee seconded to NNUK "supervised the team on the ground" regarding use of the intercompany loans, id. ¶¶ 19, 22, 24, do not plead the required elements of a claim for shadow directorship. Neither NNI's alleged "involvement" in decision making nor the allegations concerning "implementation" or "supervision" are equivalent to the required allegation that NNUK's directors acted and were accustomed to act in accordance with instructions from NNI.

67.    As noted above, where NNUK does plead that it was "instructed to identify new schemes which would enable the transfer of cash and value to NNL," id. ¶ 10, or "instructed to sign the MRDA," id. ¶ 18(d), it does not allege that NNI was the source of those instructions.

68.    Third, in order to succeed on a shadow director claim, NNUK must show that section 251(3) of the Companies Act does not apply to exclude liability on the part of NNI. Section 251(3) applies on its face to preclude shadow director claims against a parent corporation by reason of the subsidiary's directors acting on the directions or instructions of the parent. The rationale of this section is applicable with equal force to the situation in which two subsidiary companies are under common control by the parent company and the only basis for the allegation that one subsidiary company is a shadow director of the other company is the existence of that common control.

69.    NNUK's principal allegation is that NNI took certain actions or was involved in or assisted in certain transactions for the benefit and at the behest of NNL. Proof of Claim ¶¶ 9-10 ("At all relevant points the Nortel Group was operated in such a manner that cash and value were improperly removed from NNUK and the other EMEA companies and transferred to NNL," which occurred, "pursuant to a general policy . . . that value and cash within the Group should be transferred to NNL"); id. ¶ 32 ("The decision to implement the RPSM was taken by the Canadian Entities and NNI. It was primarily motivated by a desire to allocate more profit to the Canadian entities in order to benefit NNL at the expense of NNUK."); id. ¶ 57 (intercompany

---

[25]    Ibid at [1284, 1289].

loans were part of a "Cash to Canada" initiative).  The terms of Section 251(3) bar these claims.

70.    Fourth, the Proof of Claim does not aver what acts by NNI as an alleged shadow director of NNUK – assuming this status was adequately pleaded – would have given rise to fiduciary duties on NNI's part.  For the reasons discussed above, the Proof of Claim does not allege facts that could establish that NNI, even if a shadow director, went so far as to become a de facto director of NNUK.  Furthermore, the Claim is devoid of allegations that NNI assumed control or custody of NNUK property, thereby creating fiduciary duties on NNI's part in relation to that property.

71.    Fifth, NNUK's claims against NNI both as a shadow director and as a de facto director of NNUK are predicated on an alleged transfer of value from NNUK to NNL.  However, "in a solvent company the proprietary interests of the shareholders entitle them as a general body to be regarded as the company when questions of the duty of the directors arise.  If, as a general body they authorize or ratify a particular action of the directors, there can be no challenge to the validity of what the directors have done.  But where a company is insolvent the interests of the creditors intrude.  They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets.  It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration."[26]  The interests of creditors might also intrude where the company is near-insolvent or of doubtful solvency.[27]

72.    Accordingly, in my opinion, where the directors of a solvent subsidiary company of a parent act with regard to the interests of that parent, they will not be in breach of their fiduciary duties.  Where they seek to further the interests of the parent company, to the detriment of the subsidiary company, whilst the subsidiary company is solvent, any breach of duty occasioned by them so acting may be ratified, and would not be actionable by the subsidiary company.

73.    The Proof of Claim does not properly allege that NNI acted in breach of fiduciary duty by favouring the interests of NNL at a time when NNUK was insolvent, near-insolvent, or of doubtful solvency.  NNUK has made only a conclusory reference in the Proof of Claim to "the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards."  Proof of Claim ¶¶ 87(v), 113.  Accordingly, even if NNUK had pled the elements of a shadow director claim, there would be no breach of any duties owed to NNUK by operating NNUK for the benefit of NNL or the Nortel group of companies.

74.    Approval or ratification do not require any particular formality.  The Proof of Claim alleges various intercompany transactions with the parent company.  See supra Part C.  It is implicit in these allegations that the parent company knew about and approved the transactions.  Therefore, NNUK admits there was approval or ratification.

---

[26]    *Kinsela v Russell Kinsela Pty Ltd (in liq)* (1986) 4 NSWLR 722, 730 (per Street CJ), cited with approval in *West Mercia Safetywear Ltd (in liq) v Dodd* [1988] BCLC 250, 252.

[27]    *Nicholson v Permacraft (NZ) Ltd* [1985] 1 NZLR 242 at 249 per Cooke J, cited with approval in *Facia Footwear Ltd (in administration) v Hinchliffe* [1998] 1 BCLC 218 at 227 per Sir Richard Scott V-C.

**D.2    Breach of Duty of Care (Claims 3, 9, 17, 30, 33)**

75.    In my opinion, NNUK's allegation that NNI owed a duty of care to NNUK also does not comply with English law.

76.    NNUK alleges that NNI breached a duty of care to NNUK in respect of the following transactions: (a) Transfer pricing (Claim 3); (b) Intercompany loans (Claim 9); (c) Project Swift (Claim 17); (d) Past business sales (Claim 30); (e) Contingent tax liability (Claim 33).

77.    In order to understand the circumstances under which English law could impose a duty of care on NNI based on NNUK's allegations in this case, two scenarios must be distinguished.

78.    NNUK first alleges that NNI had a duty of care to NNUK based upon NNI's alleged status as a de facto or shadow director of NNUK.  Proof of Claim ¶¶ 95-96, 99, 125, 157, 199, 212.  As discussed above, NNUK's allegations that NNI acted as a de facto or shadow director of NNUK are not sufficiently pleaded.

79.    NNUK also alleges that NNI had a duty of care to NNUK because there was a relationship of sufficient proximity as to justify imposing such a duty.  Id. ¶¶ 97, 99, 125, 157, 199.  However, I am not aware of any English authorities that have ever imposed a duty of care for pure economic loss as between companies in a group.

80.    Indeed, the relationships where a duty of care has previously been held to arise for pure economic loss (such as this case) are typically restricted to situations involving the provision of independent professional services (solicitors, surveyors, auditors, bankers, etc.), employment relationships, or landlord/tenant relationships.[28]  The circumstances alleged concerning NNI's "involvement" in transfer pricing, intercompany loans, Project Swift, and the pre-petition sales, id. ¶¶ 15-27, 99, 125, 157, 199, are not analogous to these relationships.

81.    In addition, as with the claim for breach of fiduciary duty, where the directors of a solvent subsidiary company of a parent act with regard to the interests of that parent and seek to further the interests of the parent company, to the detriment of the

---

[28]      *White v. Jones* [1995] 2 AC 207 (solicitors who were directed to prepare will including bequests to client's daughters owed a duty of care to the daughters, which duty was breached when the solicitors failed to prepare the will before the client died); *Smith v. Eric S Bush* [1990] 1 AC 831 (surveyors who prepared a valuation report for a building society owed a duty of care to home purchasers, which duty was breached when a purchaser bought a home in reliance on the negligently prepared report and suffered damages as a result); *Gorham v British Telecommunications plc* [2000] 1 WLR 2129 (independent pension advisers owed a duty of care to a company employee who sought advice from them, which duty was breached when the advisers negligently failed to tell him that an occupational pension scheme might be better for him than the personal pension scheme he took out on their advice); *Hughes v Lloyds Bank plc* [1998] PIQR P 98 (doctor owed a duty of care to a patient, which duty was breached when the doctor negligently prepared a report indicating that the patient's injuries were transient, upon which the patient relied in settling her personal injury claim for only a small sum); *Spring v. Guardian Assurance plc* [1995] 2 AC 296 (former employer of an insurance salesman owed a duty of care to the salesman when asked by his prospective employer to provide a reference, which duty was breached when the former employer negligently and falsely stated that the salesman was dishonest); *Esso Petroleum v. Mardon* [1976] QB 801 (petrol company owed a duty of care to a businessman who was considering whether to lease a company filling station, which duty was breached when the petrol company provided the businessman with negligently overoptimistic throughput estimates).

subsidiary company, there will be no actionable breach of duty of care, either by reason of prior approval or subsequent ratification. See supra ¶¶ 71-74. The Proof of Claim alleges that the intercompany transactions at issue benefitted NNL, and admits that NNL approved of the transactions, but does not allege this occurred at a time when NNUK was insolvent, near-insolvent or of doubtful solvency, other than in a conclusory fashion. Id.

**D.3    Dishonest Assistance (Claims 4, 10, 18, 35)**

82.    NNUK alleges that NNI is liable for dishonest assistance under English law in respect of the following factual scenarios:  (a) Transfer pricing (Claim 4); (b) Intercompany loans (Claim 10); (c) Project Swift (Claim 18); (d) Contingent tax liability (Claim 35).

83.    The allegation by NNUK is that: (i) by causing or allowing NNUK to participate in the purportedly objectionable transactions, the directors of NNUK acted in breach of fiduciary duties owed to NNUK (Claim ¶¶ 105, 130, 162, 214); (ii) the breaches also included breaches of fiduciary duty by NNL as a de facto or shadow director of NNUK (id. ¶¶ 105, 130); and (iii) by using, or allowing to be used, its personnel in the transactions objected to, NNI dishonestly assisted these breaches of fiduciary duty (id. ¶¶ 107, 132, 164, 214).

**D.3.a    Description of legal requirements**

84.    To prevail on a claim for dishonest assistance under English law, NNUK must show: (a) an underlying breach of fiduciary duty owed to NNUK, whether owed by NNL as a shadow or de facto director or NNUK's de jure directors; (b) that NNI assisted in any such breach; (c) dishonesty on the part of NNI; and (d) the causing of harm to NNUK.[29]

85.    The standard for dishonesty is assessed objectively, and requires more than mere negligence or incompetence.

86.    Thus, I agree with the statement in paragraph 104 of the Proof of Claim that there is "an objective standard of dishonesty," but disagree that "in a commercial setting" it "simply means conduct which is 'commercially unacceptable'" since, as I stated above, something more than negligence or incompetence is required.

87.    The above principles and the principal authorities were summarised in <u>Three Rivers District Council v Bank of England</u> (No 3) [2003] 2 AC 1 (HL) at [183]-[190] per Lord Millett.  Another important aspect of this decision should be noted.  As the court explained, "The rules which govern both pleading and proving a case of fraud are very strict . . . ."[30]  In this respect, "fraud" and "dishonesty" are synonymous, as the balance of Lord Millett's opinion shows.[31]  In short, the claim for "dishonest assistance" is a fraud-based claim.

---

[29]    *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378 at 383.

[30]    *Three Rivers District Council v Bank of England (No 3)* [2003] 2 AC 1 (HL) at [183].

[31]    *Ibid* at [184]: "it is well established that fraud or dishonesty ... must be distinctly alleged and distinctly proved; that it must be sufficiently particularised; and that it is not sufficiently particularised if the

88.    As the court further explained, "It is important to note that there are two principles in play. The first is a matter of pleading. . . . The second principle, which is quite distinct, is that an allegation of fraud or dishonesty must be sufficiently particularised, and that particulars of facts which are consistent with honesty are not sufficient. This is only partly a matter of pleading. It is also a matter of substance . . . . [S]ince dishonesty is usually a matter of inference from primary facts, this involves knowing not only that he is alleged to have acted dishonestly, but also the primary facts which will be relied upon at trial to justify the inference. . . . There must be some fact which tilts the balance and justifies the inference of dishonesty, and this fact must be both pleaded and proved."[32]

### D.3.b  Analysis of NNUK's case for dishonest assistance

89.    In my opinion, NNUK's allegation that NNI dishonestly assisted others in breaches of duties owed to NNUK does not meet the requirements of English law.

90.    First, the alleged underlying breaches of fiduciary duty involved acts undertaken by NNUK's de jure, de facto, or shadow directors that purportedly were in the interest of NNL rather than NNUK, and there is no non-conclusory allegation that NNUK was insolvent, or near-insolvent, or of doubtful solvency at the relevant time. Therefore, those acts cannot form the basis for a claim of breach of fiduciary duty since the directors of a solvent subsidiary company of a parent can act with regard to the interests of the parent and seek to further the interests of the parent company, to the detriment of the subsidiary company, so long as such acts are approved or ratified by the parent, as is alleged to be the case here. The approval or ratification adopts the act on behalf of the company. There can therefore be no breach of duty and no dishonest assistance. See supra ¶¶ 71-74.

91.    Second, even if NNUK had pleaded that it was insolvent, it has not alleged that NNI acted with knowledge of, or that it was reckless or willfully blind as to, NNUK's insolvency, as necessary to plead that NNI acted dishonestly. While I understand that a U.S. court will apply its own rules in determining whether an allegation has been adequately pleaded, under English law the dishonest assistance claim would be struck out unless properly particularized.

92.    Third, to the extent that NNI is alleged to have dishonestly assisted NNL in breaches of duties owed to NNUK due to NNL's shadow directorship of NNUK, Section 251(3) of the Companies Act effectively precludes a claim of shadow directorship as against NNL (and hence a claim of dishonest assistance by NNI) absent the existence of a de facto directorship, as discussed above.

---

facts pleaded are consistent with innocence: see *Kerr on Fraud and Mistake*, 7th ed (1952), p 644; *Davy v Garrett* (1878) 7 Ch D 473, 489; *Bullivant v Attorney General for Victoria* [1901] AC 196; *Armitage v Nurse* [1998] Ch 241, 256.

[32]    *Three Rivers District Council v Bank of England (No 3)* [2003] 2 AC 1 (HL) at [185]-[186].

**D.4    Unconscionable / Knowing Receipt (Claims 14, 22, 29)**

93.    NNUK alleges that NNI is liable for unconscionable or knowing receipt under English law in respect of the following underlying facts:  (a) Intercompany loans (Claim 14); (b) Project Swift (Claim 22); (c) Past business sales (Claim 29).

**D.4.a    Description of legal requirements**

94.    To establish unconscionable or knowing receipt under English law, the claimant must show that assets were misapplied in breach of a fiduciary duty owed to the person / entity which owned the assets.[33]

95.    In addition, the claimant must show that it had a beneficial interest in the specific assets received.  This requirement is also referred to as "traceability."[34]  In order to show traceability, the original funds or property must be located and identified in a true sense, either as a separate fund or as a separately-identifiable portion of a mixed fund.

96.    Finally, with respect to unconscionable receipt, the claimant must show that the person or entity receiving the property was "at fault."  This requires a showing that it would be unconscionable to retain the property at issue.  While dishonesty is not required, this would require showing the requisite knowledge on the part of the person or entity receiving the property, such that it would be unconscionable for that person or entity to retain the benefit of any misapplication of assets.[35]

**D.4.b    Analysis of NNUK's case for unconscionable / knowing receipt**

97.    In my opinion, NNUK's allegation of unconscionable / knowing receipt does not comply with the requirements of English law.  First, NNUK does not allege that there are any assets that were received by NNI from NNL as part of the relevant transactions.  Thus, NNUK has not alleged that specific funds received by NNI could be traced to NNUK.  This alone is fatal to NNUK's claims as a matter of English law.

98.    For example, with respect to intercompany loans, NNUK alleges that "by virtue of cash being channeled to NNL from NNUK . . . NNL was able to and in fact did, make large cash payments in respect of outstanding loan balances which it owed to NNI."  Proof of Claim ¶ 58; see also id. ¶ 64 ("NNL was able to make cash repayments in relation to the NNI Loans because it did not make cash repayments in relation to the [intercompany loans NNUK made to NNL].");  id. ¶ 145 ("NNL was only able to make cash repayments of the NNI Loans due to the fact that it did not have to repay the [loans to NNUK].");  id. ¶ 150 (alleging that "NNL's draw down of the loan facilities enabled NNL to make large cash payments, including interest payments, to NNI").  These allegations, even if proven, would not satisfy the traceability requirement under English law.

---

[33]    *El Ajou v Dollar Land Holdings* [1994] 2 All ER 685.

[34]    *Ibid*.

[35]    *BCCI (Overseas) Ltd v Akindele* [2001] Ch 437 at 455.

99.   The allegations with respect to Project Swift are substantially similar. NNUK alleges that NNL was able to make certain payments to NNI as a result of the reduction in indebtedness that came as a result of Project Swift. Id. ¶ 67 ("at or around this time [of Project Swift] significant cash payments were made from NNL and NNI."); see also id. ¶ 177 ("NNL was only able to make certain cash repayments of the NNI loans due to the fact that it did not have to repay the [loans to NNUK that] were purportedly reduced as a result of Project Swift.").[36] Once again, NNUK includes no allegation that specific property of NNUK can be traced to NNI.

100.  With respect to past business sales, NNUK's allegations are slim. Other than paragraph 197 quoted above – "NNI received a higher allocation of the Pre-Petition Sale Proceeds than it should have, constituted in part by property that it knew was rightfully property of NNUK" – there are no facts alleged that would establish what each Nortel entity should have received or by what amounts or for what reasons NNUK claims that NNI received higher allocations than it should have. In fact, other than the example of the Alcatel sale, no other sales are even mentioned.

101.  Second, with respect to the unconscionable receipt claims, NNUK has failed to allege any facts that would establish that NNI was a knowing or unconscionable recipient of any NNUK assets. The allegations rest on "NNI's involvement and participation . . . in the Cash to Canada Strategy." Id. ¶¶ 147, 179.

102.  As explained above, where, as is alleged in the Proof of Claim, the directors of a solvent subsidiary company (here, NNUK) of a parent (here, NNL) act with regard to the interests of that parent and seek to further the interests of the parent company, to the detriment of the subsidiary company, they will not be in breach of their duties, where the parent approves or ratifies their actions. See supra ¶¶ 71-74.

**D.5   "Unlawful means" conspiracy (Claims 5, 12, 19)**

103.  NNUK alleges that NNI is liable for "unlawful means" conspiracy under English law in respect of: (a) Transfer pricing (Claim 5); (b) Intercompany loans (Claim 12); (c) Project Swift (Claim 19).

104.  With respect to transfer pricing, NNUK pleads that "NNI and NNL, alternatively NNI and NNUK's de jure directors, alternatively NNI, NNL and NNUK's directors, combined together by implementing and operating the RPSM and MRDA in a manner which operated contrary to NNUK's interests in a way that amounted to a breach of contract, breaches of fiduciary duty and a breach of duty of care under English law." Proof of Claim ¶ 109. NNUK further alleges that the parties to the conspiracy

---

[36]    While the Proof of Claim separately references in passing an "extraction of approximately $275 million of value from th[e] subsidiaries [transferred to NNUK in Project Swift]," id. ¶ 75, as best the allegations can be understood, they do not relate to Project Swift itself. Specifically, the Claim avers that much of this "value extraction" occurred prior to Project Swift. Id. (averring that $120 million of cash was extracted prior to Project Swift). More importantly, the reference in paragraph 75 to "value extraction" – which is explained nowhere else in the Proof of Claim – makes no attempt to identify the various subsidiaries from which "value" was allegedly transferred, the nature of that value (whether cash or otherwise), the recipient of such "value," or even the approximate dates of any transfers. Id. ¶ 75. While the Proof of Claim does suggest that NNI was the "beneficiary of that value extraction," id., it separately suggests that any "value extraction" "in turn was used to reduce the sums owed by NNL to NNI." Id. ¶ 182 Accordingly, the four sentences of paragraph 75, too, appear to relate to indirect benefits allegedly received by NNI as a result of transactions designed to benefit NNL.

"intended to cause damage to NNUK because they were aware and intended that NNUK was not properly rewarded pursuant to the RPSM and MRDA." Id.

105. With respect to intercompany loans, the same parties are alleged to have "combined together by designing, implementing and operating the Loan facilities in a manner which operated contrary to NNUK's interests in a way that amounted to breaches of fiduciary duty . . . and a breach of duty of care under English law," and similarly that the parties "intended to injure NNUK by subjecting it to improper lending arrangements which were contrary to its interests." Id. ¶ 137.

106. With respect to Project Swift, the same parties are alleged to have "combined together by designing and implementing Project Swift which was contrary to NNUK's interests in a way that amounted to breaches of fiduciary duty . . . and a duty of care under English law," and again that the parties "intended to injure NNUK by subjecting it to Project Swift which was contrary to its best interests." Id. ¶ 166.

**D.5.a   Description of legal requirements**

107. To prevail on a claim for unlawful means conspiracy against NNI, NNUK would have to show:  (a) a combination or agreement between NNI and another, (b) to do an unlawful act, (c) with the intention of harming NNUK and (d) the causing of harm.[37] Where the conspiracy involves the use of unlawful means, the intention to cause harm need not be the predominant intention.  Not only must there be an agreement between the conspirators, that agreement must cover the scope of action to be undertaken.

108. Finally, this is a scienter-based (i.e., action knowingly or willfully taken) cause of action as it includes an element of intent.  Thus, NNUK must demonstrate the alleged conspirators acted with the intent to cause a loss or harm to NNUK, although as stated above, that need not be the predominant intention of the conspirators.

**D.5.b   Analysis of NNUK's case for unlawful means conspiracy**

109. In my opinion, NNUK's allegation of unlawful means conspiracy does not comply with the requirements of English law.

110. NNUK does not allege sufficient facts that would establish that the four elements of a claim for unlawful means conspiracy are satisfied.  The allegation is set out in general terms, without proper particulars of (a) the combination or agreement made by the alleged conspirators, (b) the acts relied upon and why they were unlawful and (c) the facts relied upon for saying that the parties to the conspiracy had the requisite intention.

**D.6   Mistake (Claim 26)**

111. NNUK alleges that NNI is liable for mistake in respect of the claim for past business sales (Claim 26).  Specifically, NNUK alleges that the "parties agreed as required by law and international accounting regulations that the various selling Nortel entities agreed to allocate the proceeds of sale amongst themselves on the basis of an arm's length legal entitlement that each had to the proceeds," but that NNUK "did not

---

[37]   *Kuwait Oil Tanker Co v Al Bader* [2000] 2 All ER (Comm) 271, 311g at [107 ff], 312a at [108].

receive a fair allocation of the Pre-Petition sale proceeds due to a mistake (either of fact or law) as to the full extent of NNUK's entitlement." Proof of Claim ¶¶ 80, 188. As a result, NNUK asserts that "NNI received considerably more from the allocation than it was intended" and "is therefore obligated to repay the overpayment to NNUK." Id. ¶ 188.

**D.6.a    Description of legal requirements**

112.    NNUK is alleging mistake with respect to an agreement between the parties as to allocation of the proceeds of pre-petition business sales. There are two types of mistake under English law to which NNUK may be referring.

113.    To establish common mistake, NNUK would have to identify an agreement between NNUK and NNI and some common mistake which makes the agreement impossible to perform (such as a mistake as to the existence of the subject matter of the agreement).[38]

114.    To establish unilateral mistake, NNUK would have to: (a) identify an agreement between NNUK and NNI with respect to which NNUK was mistaken as to a term of the agreement; (b) identify the term; (c) identify the mistake; and (d) show that the mistake was known to NNI.[39]

**D.6.b    Analysis of NNUK's case for mistake**

115.    In my opinion, NNUK's allegation of mistake does not comply with the requirements of English law.

116.    NNUK has not alleged sufficient facts to establish a claim of either common or unilateral mistake under English law. The necessary elements of these claims are simply not pleaded.

117.    Since NNUK has not specified whether it is alleging common or unilateral mistake, both will be addressed below.

118.    With respect to common law mistake, NNUK has failed to plead a common mistake which makes the alleged agreement as to allocation impossible to perform.

119.    With respect to unilateral mistake, NNUK has failed to identify the relevant term of the alleged agreement or the nature of the alleged mistake or to plead that NNI was aware of this alleged mistake. Paragraph 188 of the Proof of Claim only states that "NNUK did not receive a fair allocation of the Pre-Petition Sales Proceeds due to a mistake (either of fact or law) as to the full extent of NNI's entitlement."

**D.7    Transaction at an Undervalue under English Law (Claim 27)**

120.    NNUK alleges, "As a result of the allocation of the Pre-Petition Sale Proceeds made within two years of insolvency, NNI received sums of money that were properly due

---

[38]    *Great Peace Shipping Limited v Tsavliris Salvage (International) Limited; The Great Peace* [2002] EWCA Civ 1407, [76] applying *Hobson v Pattenden & Company* (1903) 19 TLR 186.

[39]    E.g. *Statoil ASA v Louis Dreyfus Energy Services LP* [2008] EWHC 2257 (Comm), [87].

to NNUK, without NNUK receiving appropriate value in return. These diversions of cash from NNUK to NNI therefore constitute transactions at an undervalue in accordance with section 238 of the Insolvency Act of 1986." Proof of Claim ¶ 189. As mentioned above, apart from the Alcatel sale, NNUK does not identify the pre-petition sales at issue.

### D.7.a    Description of legal requirements

121.    The relevant statutory provisions to this claim are set out in sections 238 and 240 of the Insolvency Act 1986.

122.    Pursuant to section 238, *"Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue ... the court shall ... make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction."*

123.    Also pursuant to section 238, a transaction at an undervalue with a person occurs if *"the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration"* or *"the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company."*

124.    "Relevant time," as defined in section 240, is *"a time in the period of 2 years ending with the onset of insolvency"* so long as the company *"is at that time unable to pay its debts within the meaning of section 123"* of the Insolvency Act 1986 or *"becomes unable to pay its debts within the meaning of that section in consequence of the transaction."*

125.    However, section 240 clarifies that *"the requirements of this section are presumed to be satisfied, unless the contrary is shown, in relation to any transaction at an undervalue which is entered into by a company with a person who is connected with the company."*

### D.7.b    Analysis of NNUK's case for transaction at undervalue

126.    NNUK does not identify any relevant pre-petition business sales, other than the Alcatel sale, which it asserts had a sale agreement date of 4 December 2006 and a sale completion date of 31 December 2006.Proof of Claim ¶ 79. Both of those dates are outside of the two-year "relevant time" period, as defined in section 240 of the Insolvency Act 1986.

127.    NNUK also alleges that the allocation of proceeds with respect to the Alcatel sale "was set out in a statement dated 24 July 2007." Proof of Claim ¶ 80. However, NNUK does not allege that the actual allocation took place at that time.

### D.8    The *Ex Turpi Causa* Defence

128.    In addition to the reasons described above for why NNUK's allegations are insufficient to make out the English law claims asserted in the Proof of Claim, the English law "principle" of *ex turpi causa* bars all of NNUK's claims (except for the

claim for a transaction at an undervalue). *Stone & Rolls Ltd v. Moore Stephens* [2009] 3 WLR 455 at [26].

129.  In summary, English law applies the following principles:

(i)  the knowledge of a director of a company acting in that capacity will be imputed to the company of which he is a director;

(ii)  however, the knowledge of the director will not be imputed to the company if the knowledge concerns a wrong done by that director to the company – for example, where the director has acted in breach of fiduciary duty owed to the company;

(iii)  in such circumstances, the company may bring such action as is available to it without being treated as having the knowledge of the wrongful act which the director has;

(iv)  where the company brings a claim against a third party and needs to rely on the director's wrongdoing, the company will be barred from doing so under the *ex turpi causa* doctrine if the director's knowledge can be imputed to the company;

(v)  the knowledge of the director may be imputed to the company, notwithstanding that the director has done a wrong to the company which is relied upon by the company, if the director is the directing mind and will of the company.

130.  Under English law, where a director of a company commits a wrongful act against his company (for example, a breach of fiduciary duty) or a third party commits a wrong against the company (for example, dishonestly assisting the director's breach of fiduciary duty), knowledge of those wrongful acts is generally not attributed to the company.[40]  Consequently, the company can sue the wrongdoer in respect of the wrongful act.

131.  However, if knowledge of the wrongful act can be attributed to the company, it is the company's own act and the company cannot maintain an action in respect of it.  This is a principle of public policy, sometimes described as the common law maxim *ex turpi causa non oritur actio* (ie, "from a dishonourable cause an action does not arise").  Thus, a claim cannot be based on the illegal actions or wrongful conduct of the claimant, nor can the claimant benefit from its own wrongdoing.[41]

132.  The test for the applicability of the doctrine is whether the claimant has to plead or rely on his own illegality or wrongful conduct.[42]  For the principle to apply, the illegal

---

[40]  *Re Hampshire Land Co* [1896] 2 Ch 743 at 749-750; a principle approved by the House of Lords in *JC Houghton & Co v Northard, Lowe and Wills Ltd* [1928] AC 1 and *Stone & Rolls Ltd (in liquidation) v Moore Stephens* [2009] 3 WLR 455 at [137]-[138] per Lord Walker.

[41]  *See ibid* at [128] per Lord Walker.

[42]  *Ibid* at [129]-[131] inclusive.

act or wrongful conduct must be of the claimant itself, not an illegal act or wrongful conduct for which it is vicariously liable (eg as an employer for the act or conduct of an employee) or as a principal for the act or conduct of its agent. However, the acts of the company's employee or agent can be attributable to the company if the employee or agent is the directing mind or will of the company.

133.    The notion of "directing will" or "mind" of a company was explained by Lord Hoffmann in the Privy Council Decision *Meridian Global Funds Management Asia Ltd v. Securities Commission* [1995] 2 AC 500, 506-512.

134.    The English case law relating to the imputation of the knowledge or acts of a director to his company was recently considered by the House of Lords in *Stone & Rolls Ltd (in liquidation) v Moore Stephens* [2009] 3 WLR 455.[43] The following principles emerge from this case.

(i)    The knowledge or impropriety of an employee or agent will not be attributed to his employer or principal when the improper conduct is practised by the employee or agent on the employer or principal company itself – ie the "*Hampshire Land*" principle. Accordingly, in those circumstances the *ex turpi causa* principle does not bar a claim by an employer or principal against his employee or agent.

(ii)    However, where the directing mind and will of the company has committed the frauds or wrongs, they can be treated as the frauds or wrongs of the company. This is because the "*Hampshire Land*" principle does not apply in "one-man company" or "sole actor" cases,[44] those being cases in which all those involved in the management and ownership of the company are, or must be taken to be, aware of the fraud or breach of duty in question.[45]

(iii)    Lord Walker stated the test of what is to be regarded as a "one-man" or "sole-actor" company, such that the director's state of mind may be attributed to the company, in the negative: "It may be simplest to propose a test in negative terms ... that is a company which has no individual concerned in its management and ownership other than those who are, or must (because of their reckless indifference) be taken to be, aware of the fraud or breach of duty with which the court is concerned."[46]

(iv)    The *ex turpi causa* doctrine applies to bar claims, notwithstanding that the claimant company is in insolvent liquidation (or other insolvency regime) and its creditors could be alleged to be innocent parties defrauded or harmed by the wrongdoer's actions. This is because "There is no good reason to apply a different rule to a company in liquidation. Apart from special statutory claims in respect of

---

[43]    Its final Opinion before it transformed into the Supreme Court.

[44]    *Ibid* at [146] and [161].

[45]    *Ibid* at [161].

[46]    *Ibid* at [161].

misfeasance, wrong [sic] trading and so on, it cannot assert any cause of action which it could not have asserted before the commencement of its liquidation."[47]

135.    I therefore turn to consider the application of Lord Walker's negative test (paragraph 134(iii) above) to the question whether NNUK should be regarded as a "one-man" or "sole actor" company, such that the knowledge and acts of its directors should be attributed to it in respect of the claims made in the Proof of Claim against NNI which claims depend on the directors' alleged wrongdoing.  NNL was the sole shareholder of NNUK.  Thus, in respect of any claim made by NNUK in reliance on the conduct of its directors, there existed no "innocent" shareholders able to prevent the company being regarded as a "one-man" or "sole actor" company or to prevent the application of the *ex turpi causa* doctrine.

136.    As regards the management of NNUK, NNUK's case is that certain aspects of the management of NNUK (particularly tax and treasury) were conducted by NNI or by NNI in conjunction with NNC and other wholly owned subsidiaries of NNC, such as NNL, which companies were involved in the transactions now challenged.  Proof of Claim ¶¶ 13-85.

137.    Further, NNUK does not allege that the management of NNUK included directors who were unconnected with NNL and NNI and accordingly who could be regarded as the "independent" mind of NNUK capable of acting on behalf of NNUK untainted by the alleged wrongdoing.  On the contrary, NNUK alleges that all the de jure directors of NNUK acted in breach of fiduciary duty in the transactions which are the subject of the Claims.  Id. ¶¶ 28-29, 107, 109, 130, 137, 162, 166, 214.

138.    Accordingly, on NNUK's own case, and to paraphrase Lord Walker, NNUK "is a company which has no individual concerned in its management and ownership other than those who are, or must (because of their reckless indifference) be taken to be, aware of the fraud or breach of duty with which the court is concerned."[48]

139.    Consequently, on the basis of the decision of the majority in *Stone & Rolls Ltd* the *ex turpi causa* doctrine should apply to bar all of NNUK's claims in its Proof of Claim (except for the claim of a transaction at an undervalue).

E.    **Opinions as to findings and finality of the English Court's Initial Orders**

140.    I am instructed that on 14 January 2009, the English Court entered Initial Orders placing nineteen of Nortel's European affiliates, including NNUK, into administration.

141.    It is implicit in the making of the Initial Orders that the proceedings are "main proceedings," that the Court was satisfied that the centre of main interests of the EMEA Debtors was in England.  The English Court's finding that the EMEA Debtors' centre of main interests was in England is tantamount to a finding that the EMEA Debtors were managed and controlled from England.

---

[47]    *See ibid* at [184] per Lord Walker.

[48]    *Ibid* at [161].

142.    Furthermore, the English Court's Initial Orders are now final orders that are no longer subject to appeal under English law, save by way of appeal out of time.

I declare, under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2011

In London, England

Michael Todd Q.C.