B10 (Official Form 10) (12/07) – Cont.

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | AMENDED PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Nortel Networks, Inc. | Case Number:<br>09-10138 (KG) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor:
Nortel Networks UK Limited and/or any Court-appointed administrator or liquidator thereof

☒ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Attention: Edwin J. Harron
(302) 571-6600

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attention: Michael Luskin
(212) 837-6000

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
UNITED KINGDOM
Attention: Stephen Gale
44-20-7374-8000

Telephone number: See above

Court Claim Number: _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1.  Amount of Claim as of Date Case Filed: See attached Rider

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2.  Basis for Claim: See attached Rider to Proof of Claim of Foreign Administrators
    (See instruction #2 on reverse side.)

3.  Last four digits of any number by which creditor identified debtor:_____
    3a. Debtor may have scheduled account as:
    (See instruction #3a on reverse side.)

4.  Secured Claim (See instruction #4 on reverse side.)
    Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
    Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
    Describe:
    Value of Property: $_____   Annual Interest Rate ____%
    Amount of arrearage and other charges as of time case filed included in secured claim.
    If any: $_____   Basis for perfection: _____
    Amount of Secured Claim: Unknown   Amount Unsecured: Unknown

5.  Amount of claim Entitled to Priority under 11 U.S.C.§ 507(a). If any portion of your claim falls in one of the following categories check the box and state the amount.

Specify the priority of this claim.
Unknown

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a) (__).

Amount entitled to priority:

Unknown

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

6.  Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7.  Documents: Attach redz... invoices, itemized statement also attach a summary. Atta... may also attach a summary.

DO NOT SEND ORIGINAL SCANNING.

If the documents are not ava...

Filed: USBC - District of Delaware
Nortel Networks Inc., Et Al.
09-10138 (KG)      0000007786

...ssory notes, purchase orders, ...ty agreements. You may ...f a security interest. You

...OYED AFTER

| Date: 6/3/11 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>C. CHRISTOPHER HILL<br>JOINT ADMINISTRATOR | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

FILED / RECEIVED

JUN – 3 2011

EPIQ BANKRUPTCY SOLUTIONS, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS, INC., | Case No. 09-10138 (KG) |
| Debtor. | Jointly Administered |

## RIDER TO PROOF OF CLAIM OF NORTEL NETWORKS UK LTD

### PRELIMINARY STATEMENT

1.      Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, in their capacity as the court-appointed administrators and authorized foreign representatives (the "Joint Administrators") of Nortel Networks UK Limited ("NNUK") and its affiliates located in the region known as EMEA (Europe, Middle East, and Africa) (collectively, the "EMEA Companies")[1] in proceedings (the "English Proceedings") under the Insolvency Act of 1986 (the "English Insolvency Act"), pending before the High Court of Justice of England and Wales (the "English Court"), hereby submit this rider (the "Rider") to the amended proof of claim (the "Claim"), which amends, and provides a more definite statement of, the timely filed proof of claim submitted by the Joint Administrators on behalf of

---

1.    The following EMEA Companies, which are direct or indirect subsidiaries of NNUK, commenced insolvency proceedings under the English Insolvency Act in the English Court on January 14, 2009: Nortel GmbH; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; and Nortel Networks AB; and Nortel Networks International Finance & Holding BV.  In addition Nortel Networks (Ireland) Limited, Nortel Networks SA, Nortel Networks France SAS, which are not subsidiaries of NNUK, also commenced insolvency proceedings under the English Insolvency Act in the English Court on January 14, 2009.  With the exception of Nortel Networks (Ireland) Limited, the Joint Administrators are the court-appointed administrators and foreign representatives for all of the EMEA Companies that have commenced insolvency proceedings in the English Court.  Alan Robert Bloom and David Martin Hughes are the court-appointed administrators and foreign representatives of Nortel Networks (Ireland) Limited.

NNUK against Nortel Networks Inc. ("NNI") and its affiliated debtors in these Chapter 11 cases (collectively, the "Debtors") on September 20, 2009 (the "Original Proof of Claim").[2]  This Rider is an integral part of the Claim and is hereby incorporated into the Claim in full and for all purposes.

**FACTUAL BACKGROUND**

**A.      The Nortel Group and its Origins**

2.       NNI, its parent Nortel Networks Limited ("NNL"), its ultimate corporate parent, Nortel Networks Corporation ("NNC" and, together with NNL, the "Canadian Entities"), and its affiliates and subsidiaries (collectively, "Nortel" or the "Nortel Group") were one of the leading worldwide groups in the telecommunications industry, including networking solutions, computer networks and software.

3.       The Nortel Group was originally founded in Canada in 1895, subsequently expanded into the US and, by 1990, had become one of the leading telecommunications companies in all of North America.  From this pan-North American base, Nortel sought to expand overseas.

4.       In 1991 the Nortel Group acquired 100% of STC plc ("STC"), a major UK public telecommunications company.  This represented the Nortel Group's first major step into the UK market and brought customer relationships with large European carriers such as British Telecom, Cable & Wireless and Telefonica.  From this base Nortel was able to expand into the wider European markets.  In fiscal year 1991, European revenues were $1.35 billion, an increase

---

2.   The Joint Administrators amend the Original Proof of Claim under compulsion of the Order Requiring EMEA Claimants to File a More Definite Statement of Claims and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, entered by the Court on May 10, 2011 (the "Order").

of 514% from the previous year. These revenues accounted for 17% of the Nortel Group's total revenue, a figure which was to grow in subsequent years.

5.      The European market was therefore a very important source of revenue for the Nortel Group.

**B.      The Insolvency of the Nortel Group**

6.      Beginning in 2001, the demand for the Nortel Group's products dropped dramatically in the wake of the "Dot-Com" crisis.  Competition also increased.  In 2001 alone the Nortel Group reported losses of $25.7 billion.  Nortel itself described the downturn as "severe" and "dramatic".

7.      In an attempt to revive its fortunes, the Nortel Group undertook a major restructuring.  By 2008, the Group had reduced its employee numbers by two-thirds and outsourced its manufacturing.  During this period NNUK suffered a reduction of around 78% in the number of its employees, compared with an average of 63% for the Group as a whole.  This restructuring did not solve the Group's financial troubles which continued.  Nevertheless it helped provide a stay of execution and had the effect of ensuring that the collapse of the Group did not occur until early 2009.  In the period leading up to the collapse the resources of NNUK were depleted at the direction of the NNL and NNI.

8.      By January 2009, after such assets had been very significantly depleted formal insolvency proceedings were commenced.

**C.      Removal of value from the EMEA companies**

9.      At all relevant points the Nortel Group was operated in such a manner that cash and value were improperly removed from NNUK and the other EMEA Companies and

transferred to NNL. The claims in this Rider concern such improper value transfers and NNI's involvement in the same.

10.     Value removal from NNUK occurred pursuant to a general policy to the effect that value and cash within the Group should be transferred to NNL. Indeed, pursuant to this policy the EMEA Companies, together with their personnel, were instructed to identify new schemes which would enable the transfer of cash and value to NNL.

11.     Particular transactions pursuant to which value was improperly removed from the EMEA Companies and which form the basis of the claims set out in this Rider, include:

    a.  The Group's transfer pricing arrangements which failed to comply with the arm's length standard;

    b.  The non-commercial interest free and unsecured inter-company loans which were advanced by NNUK to NNL (the "Interest Free Loan Facilities"); and

    c.  The Project Swift transaction pursuant to which certain illiquid and undervalue subsidiary company shares were transferred to NNUK.

12.     Although NNL was the primary beneficiary of such value removal, NNI also benefited on certain occasions. These occasions include at the time of the Project Swift transaction when NNI received payments in cash from NNL in respect of its inter-company loan facility while NNUK received the illiquid and undervalue shares referred to above.

**D.     Control by and involvement of NNI**

13.     Control of the Nortel Group's operations was highly centralized and, on a general basis, was maintained primarily by NNC and NNL.

14.     NNUK has submitted separate claims against those entities pursuant to the Canadian EMEA Claims Process.

15.     While the Canadian Entities controlled the group on a general basis, NNI was also involved in jointly controlling certain aspects of the Group's operation together with the Canadian Entities.  The control exerted by NNI related to Group Tax matters, in particular transfer pricing, and to Group Treasury matters.  These Group Tax and Treasury functions were responsible for the transactions pursuant to which value was improperly removed from NNUK.

### Transfer pricing

16.     NNI was heavily involved in the implementation and operation of the transfer pricing arrangements that deprived NNUK of so much value (as explained below).  NNI was also heavily involved in the advance pricing agreement negotiations with the Internal Revenue Services ("IRS"), Canadian Revenue Authority ("CRA") and Her Majesty's Revenue and Customs ("HMRC" and together with the IRS and CRA, the "Revenue Authorities") pursuant to which the approval of those Revenue Authorities was being sought to the transfer pricing arrangements.

17.     The key individuals involved included in particular John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI as well as representatives from the Canadian Entities.

18.     NNUK had no substantive involvement.  Its role was limited to providing information for the above individuals as and when required and implementing the decisions which had been taken by NNI and the Canadian Entities.  In this regard:

a.  The policy decision to change from the previous cost sharing arrangements and to implement the RPSM was taken by NNI and

NNL.  NNUK was not involved or consulted in relation to this decision.  NNUK was only informed of the change to the RPSM after the RPSM had been implemented.

b.  The process by which the RPSM electronic model was created and structured was also one which was handled by NNI and NNL.

c.  The terms of the Master Research and Development Agreement ("MRDA") were determined by NNI and NNL.  NNUK was not consulted in relation to, or involved in, the decision to implement the MRDA or in the decision regarding what the terms of the MRDA would be.  NNI and NNL were also responsible for instructing the legal advisers in relation to the MRDA and transfer pricing generally.

d.  Once the terms of the MRDA had been decided by NNI and NNL, NNUK was simply instructed to sign the MRDA There was no arm's length negotiation of its terms.  NNUK first received a copy of the draft MRDA in or around December 2004 by which point its terms had already been decided.

e.  NNI and NNL controlled the all-important advanced pricing arrangement/agreement ("APA") application process (referred to above).  The triumvirate of Mark Weisz of NNI, Mike Orlando of NNI and John Doolittle took the lead in the negotiations with the IRS, the CRA and HMRC.  This team ran the negotiations until around 2006 when Peter Look joined the Nortel Group as Vice President of Global Tax.  He replaced John Doolittle alongside Mark Weisz and Mike

Orlando.  Later John Payne, also of NNI, joined the lead team together
with Peter Look.  NNI and NNL also took sole responsibility for
instructing Nortel's professional advisers in relation to the APA
application process, in particular Horst Frisch and Ernst & Young.

f.  Once more, NNUK and its directors and officers, were excluded from
the process, even in relation to negotiations with NNUK's own
Revenue Authority, HMRC.  All dealings with HMRC were conducted
by NNI and NNL.  NNUK's role was limited to assisting them to
provide information to the Revenue Authorities in response to their
information requests.

19.     The Nortel Group Tax Department was effectively a joint function
between NNI and the Canadian Entities.  Many of the key individuals within the Tax Department
were NNI personnel.  This was particularly so in respect of the members of the Tax Department
who had responsibility for NNUK and EMEA.  It was also particularly so in relation to the
transfer pricing function, which was heavily dominated by individuals from NNI.  For example,
at various times, the International Tax Director of Nortel was Mark Weisz; Mike Orlando was
the Global Transfer Pricing Leader (and right hand man of Peter Look, Vice President of Global
Tax); John Payne, was responsible for Global Transfer Pricing; Claire Barbieri was responsible
for Global Tax Accounting; and even the EMEA Tax Leader on the ground in the EMEA
Region, Ryan Smith, was seconded to NNUK from NNI.

### Treasury matters – Loan Facilities and Project Swift

20.     NNI, through its personnel, was, together with the Canadian Entities,
involved in the implementation of the initiative described above, pursuant to which Nortel

companies were instructed to identify opportunities to transfer cash and value to NNL.   It was in accordance with this initiative that the idea of the unsecured Interest Free Loan Facilities came about.

21.     Those Interest Free Loan Facilities were put in place for the benefit of NNL to the detriment of NNUK.  Both the Canadian Entities and NNI were involved in the implementation of the Interest Free Loan Facilities for this very purpose.  Numerous NNI individuals were aware of and/or participated in the discussions relating to the initial Interest Free Loan Facility and the later decisions imposed on NNUK relating to the utilization of the Interest Free Loan Facilities that followed.

22.     The implementation of the Interest Free Loan Facilities was conducted under the ultimate direction of Katharine Stevenson (Group Treasurer and a director of NNI). Ms Stevenson herself signed the formal Interest Free Loan Facility agreements in 2003, 2004 and April and December of 2005.  Ryan Smith ("Leader of Global Tax Planning" and an employee of NNI) supervised the team on the ground whose role included managing the use of the Interest Free Loan Facilities in such a way as to maximize the transfer of value from NNUK to NNL.  Mark Weisz ("Director of International Tax" and an employee of NNI) was responsible for approving and supervising the implementation of the initiatives to transfer cash and value to NNL, including via the Interest Free Loan Facilities.  He participated in the initial formulation in 2003 of the strategy for NNUK to make cash available to NNL on an interest free basis.

23.     In respect of Project Swift, again, NNI's directors, officers and senior employees were part of the management group that implemented Project Swift to the detriment of NNUK.

24.     Directors and officers of NNI (including Mr Paul Karr and Mr William LaSalle) were fully aware of Project Swift and were actively involved in its implementation. On the ground, Mr Smith of NNI was one of the key driving forces behind the implementation and structuring of the transaction. His team came up with the idea for Project Swift as a way of purportedly reducing NNL's debt to NNUK and was then largely responsible for the structuring and implementation of the transaction. He and his team were also responsible for preparing the briefing notes to the various Nortel boards and various presentations in support of the transaction, as well as being closely involved in the valuation of the Swift Subsidiaries. International Tax Director Mr Weisz was again involved in a supervisory capacity and approved the Project Swift proposal as made by Mr Smith's team and then supervised its implementation.

25.     In a similar way to the Tax department, Nortel Treasury also performed a central role in relation to the strategic management of the Nortel Group. Nortel Treasury was also involved in most of the significant transactions affecting the Nortel Group, and NNUK and EMEA in particular. The key individuals within Nortel Treasury were from NNI. For example, Katherine Stevenson, a director of NNI, was Treasurer and had overall responsibility for global treasury matters within the Nortel Group. John Doolittle was Treasurer from 2008. Mr Doolittle was also an officer of NNI. Paul Karr was Controller of the Nortel Group and a director of NNI.

E.     **NNI a de facto / shadow director**

26.     For the reasons set out above (and as explained further below), NNI was a de facto or shadow director of NNUK under English law by virtue of NNI making decisions in relation to treasury and tax issues which could only properly be made by a director of NNUK, or by causing the de jure directors to act in accordance with its directions, in relation to such issue, in particular regarding NNUK's involvement in:

        a.  the Nortel transfer pricing arrangements;  and

        b.  the Interest Free Loan Facilities and Project Swift.

As a de facto or shadow director, NNI owed fiduciary duties and a duty of skill and care to NNUK in relation to these specific tax- and treasury-related matters.  Notwithstanding this, NNI in any case assumed such fiduciary duties and such duty of skill and care with regard to these matters.

        27.    By reason of the fact that NNI jointly controlled each of those transactions and that the transactions themselves improperly removed value from NNUK and were contrary to its interests, NNI breached the duties it owed to NNUK.  NNI is therefore liable to NNUK on the bases set out below.

F.      **The NNUK de jure directors**

        28.    In addition, the de jure directors of NNUK also owed fiduciary duties and a duty of skill and care to NNUK (as set out below).

        29.    By causing or allowing NNUK to be involved in the prejudicial transfer pricing arrangements, the Interest Free Loan Facilities and Project Swift, all of which resulted in NNUK suffering losses, and by allowing NNI (and NNL) to control decision making in relation to those transactions, the de jure directors of NNUK also breached the duties which they owed.

G.      **Transfer Pricing Systems**

        1.      **Overview**

        30.    Transfer pricing arrangements are implemented in order to ensure that intra-group trading of a multinational group is undertaken on a basis that enables an allocation of profit in each of the countries where group companies do business (and across the entities within the group) in a manner that replicates the profits that would be earned in arm's length

transactions. The guiding principle, recommended by the Organization for Economic

Cooperation and Development and followed by most tax authorities, is that transactions between

companies within a group should, so far as possible, be priced as if they were arm's length

transactions between independent companies. This is straightforward for routine transactions,

such as the sale of manufactured goods, but much more difficult for "intangibles," such as R&D,

where the value added, and contribution to profits made, by different companies within an

integrated group are difficult to measure.

### 2.    Cost Sharing and RPSM Arrangements

31.    The Nortel Group's first set of transfer pricing arrangements consisted of a

cost-sharing arrangement ("CSA") or cost contribution agreement ("CCA") between the Nortel

Group's main R&D centres, to which NNUK was admitted in 1995.   From 2001, the transfer

pricing methods were revised and a residual profit split method ("RPSM") was adopted.  The

RPSM methodology was amended in 2006.

32.    The decision to implement the RPSM was taken by the Canadian Entities

and NNI.  It was primarily motivated by a desire to allocate more profit to the Canadian Entities

in order to benefit NNL at the expense of NNUK.  Both NNL and NNI knew that this was to be

the case.

33.    NNUK and the other EMEA Companies which lost out as a result of

RPSM were not involved in the decision to change from the previous cost sharing arrangement

to RPSM.

34.    The RPSM distinguished between two types of participants, RPEs and

LREs.  NNUK was a Residual Profit Entity ("RPE")).  NNL, NNI, Nortel Networks SA ("NN

France SA") and Nortel Networks (Ireland) Limited ("NN Ireland") were the other IEs/RPEs.

The other categories of company within the Nortel Group were classified as (1) Limited Risk Entities ("LRE"), (2) Cost Plus Entities, (3) At Risk Entities and (4) holding companies.

35.     The RPSM divided the participants' available pooled profits into two main elements: (i) routine profits to be allocated to the participants as measured by market returns, *i.e.* based on their own direct earnings from sales to third parties, and, (ii) the "residual" or remaining profits (or losses) which were treated as attributable to the Nortel Group's intangible development activities (*i.e.* R&D). Both the RPEs and LREs were rewarded with a routine return, whereas residual profits (or losses) were divided between the RPEs only.

36.     For the period 2001 to 2005, the LREs' routine return was based on an operating margin profit level indicator, while the RPEs' routine return was calculated using an adjusted return on net assets ("RONA"). From 2006 onwards, both the LREs and the RPEs received a routine return of an adjusted operating margin of 1% of third party sales. The residual profits were then divided between the RPEs based on their proportional contribution to R&D activity. From 2001 to 2005, the residual profit or loss was allocated to each of the RPEs on the basis of their relative proportion of consolidated R&D capital stock in a given year. From 2006 onwards, an RPE's allocation was determined by its relative proportion of Nortel's consolidated R&D expenditure over the preceding five years.

37.     From 2006 onwards those RPEs, such as NNUK, which provided regional central services and other extra-territorial services to other companies in the Nortel Group, *e.g.* on sales and marketing, received a mark-up on their "excess" costs incurred in relation to those services. The mark-up on excess costs was around 15%.

38.     The Nortel Group registered losses or at best broke even during the entire period in which the RPSM was in force.

### 3.    Master Research and Development Agreement ("MRDA")

39.    The MRDA was entered into on December 2004, effective from January 1, 2001, between NNL, NNI, NNUK, NN France SA ("NNSA"), NN Australia and NN Ireland Limited ("NN Ireland") (defined in the MRDA as the "Participants"). The MRDA provided the architecture and contractual basis to enable the RPSM to be applied.

40.    NNUK was not involved in the decision to implement the MRDA or in negotiating its terms. The terms of the MRDA were determined by NNI and NNL based mainly on the requirements of Canadian and U.S. tax laws, in negotiations with the Canadian and U.S. taxing agencies.

41.    Under the MRDA, in exchange for the performance of R&D activity, each Participant was entitled to receive payments in the manner explained above, purportedly as the measure of the benefit to which it was entitled commensurate with its performance of, and contribution to, R&D Activity. (MRDA Art. 3(a).)

42.    The MRDA provided that legal title to all intellectual property of the Nortel Group then in existence or thereafter to be acquired or developed would be vested in NNL, including intellectual property created by the three EMEA RPEs. However, the MRDA expressly provided that each of the RPE's would retain a beneficial or economic interest in the intellectual property. This continued the parties' agreement under the pre-2001 CSA. Accordingly the MRDA confirms that each RPE owns the intellectual property in the Nortel Group in proportion to the direct or indirect contribution that entity made to the creation of that intellectual property.

43.    NNL agreed to enter into licenses with each of the other Participants, but in fact profits (or losses) from all territories were divided in accordance with the RPSM. NNL

was obliged to administer the agreement and the determinations required under the RPSM with respect to its interests and the interests of the Participants, and in particular to compute the amount of any R&D Allocations due to, and payments due from, each Participant on a periodic basis (Article 3(d) of the MRDA).

### 4.    The Arm's Length Principle

44.    A fundamental requirement of a valid transfer pricing method is that it should ensure that each of the entities within the group acts in an arm's length manner in its dealings with another.

45.    This principle is expressly referred to in the MRDA. This defined the RPSM at all material times as "the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Schedule A." Schedule A to the MRDA in turn provided, that the RPSM was adopted at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due each Participant for its respective R&D Activity. "R&D Allocation" was defined as "Arm's Length R&D Allocation." Schedule A then set out the basis of calculation of residual profit, and of its division between the Participants/RPEs. Schedule A was subsequently amended, including by the Third Addendum to the MRDA to reflect the revised RPSM in fact employed from 2006 onwards.

46.    Accordingly, the MRDA is to be interpreted and applied, so far as possible, to give effect to the arm's length principle.

### 5.    Nortel's RPSM failed to properly reward NNUK

47.    The RPSM as applied under the MRDA did not comply with the arm's length principle. It deprived certain entities (including NNUK) of revenue, and resulted in an

14

intentional and improper transfer of value away from NNUK and the other EMEA entities and towards NNL.  NNI facilitated this value transfer.

48.    The ways in which the RPSM system took funds from NNUK, for the benefit of NNL, include but are not limited to:

a.    **Non payment of transfer pricing adjustments**

49.    Between 2003 and 2007 (at least) large amounts of money due to NNUK under the RPSM were withheld.  Payments made by the "debtor" companies under the RPSM were not sent automatically to the recipient companies, but were routed through NNL which acted as a clearing house.  There were book entries of the credit due into NNUK's annual accounts, but no cash or other liquid assets were transferred to NNUK.  Instead, the amounts due were converted into an interest-free loan to NNL, and purportedly redeemed in 2007.

b.    **Flaws in the RPSM**

50.    The RPSM arrangement would not have adequately rewarded NNUK even if the monies had been paid.  The RPSM arrangement was flawed for reasons including the following[3]:

51.    First, pursuant to the MRDA, from 2006 onwards, the RPEs, including NNUK, had a contractual right to receive a routine return which reflected an arm's length compensation for its distribution function.  In practice, NNUK received a distribution return of only 1% of its third party sales.  This level of return failed to recognize inter-company sales, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the routine return.

---

[3].    The precise nature of the flaws in the RPSM arrangements will be a matter of expert evidence in due course.

52. Second, as set out at paragraph 37 above, NNUK only received a return in respect of "excess" regional central services and costs incurred to support other Nortel entities outside of its territory from 2006 onwards. Although NNUK incurred such costs from 2001 to 2005, during this period the RPSM did not contain a specific provision for these costs to be reimbursed. An independent entity in the position of NNUK should have been remunerated for providing such services.

53. Third, the RPSM model did not reflect NNUK's high restructuring costs during the period because restructuring costs were ignored in the calculation of the RPEs' profits. Since NNUK's reductions in staffing were relatively higher than those made by other RPEs this would have worked to NNUK's disadvantage under the system.

54. Fourth, NNUK incurred losses associated with bad debts arising from vendor financing that NNL required NNUK to provide to its customers. A credit committee within NNL made the credit decisions for the Nortel Group. An independent party should not and would not have accepted these losses. As such, NNUK should have been reimbursed these losses to produce an arm's length result.

55. Finally, pursuant to the MRDA, for the period 2006 onwards, stewardship costs were to be excluded from the calculation of the RPEs' residual profits. However, in practice, these costs were not excluded. Further, the RPSM also allocated NNL and NNI's corporate costs to the residual profit pool. As a result, the amount of loss to be shared among the RPEs, including NNUK, was increased. Given the industry decline and the sudden reduction in volume of business, the corporate costs of NNL and NNI were significantly in excess of what was necessary to oversee and manage the global Nortel Group, and in particular the EMEA region, given that EMEA had its own head office. An independent party in the position of

NNUK acting at arm's length should not and would not have agreed to effectively bear these costs (or be charged a higher charge for services). In addition, a significant portion of these costs provided no benefit to NNUK as they duplicated the head office functionality that already existed within the region.

56.     The IRS successfully challenged the RPSM model on the basis that it did not comply with the arms length requirement. Pursuant to a settlement approved by the US Court, the IRS required that NNL decrease the amount of income reported on its Canadian income tax returns by $2 billion, and that NNI increase the amount of income reported on its US income tax returns by $2 billion. These adjustments were said to reflect net overpayments made by NNI to NNL for those tax years. The settlement is an admission that the RPSM model did not comply with the arms length principle.

## H.     NNUK's Intercompany Loans to NNL

### 1.     Background: "Cash to Canada"

57.     As described above, the Nortel Group was operated at all relevant times to ensure that cash and value in the group were transferred away from subsidiary companies, including NNUK, to NNL. In line with this general practice, in or around May 2003, NNI and NNL commenced the search for "Cash to Canada" initiatives to identify new schemes which would enable the transfer of cash and/or value to NNL from NNUK and other EMEA Companies. The policy was effectively a Group Treasury project, headed up by Katherine Stevenson of NNI. NNI personnel were actively involved in devising and implementing the resulting initiatives to remove cash from NNUK and move it to NNL.

58.     NNL was not the only beneficiary from the "Cash to Canada" initiatives. NNI itself also benefitted. By virtue of cash being channeled to NNL from NNUK and the

EMEA Entities NNL was able to, and did in fact, make large cash payments in respect of outstanding loan balances which it owed to NNI.  For example, repayments were made to NNI of $150,000,000 on 21 November 2007, $154,029,913 on 20 December 2007, $131,423,388 on 28 March 2008, $100,000,000 on 24 April 2008, as well as various smaller repayments around the same time.

59.     Had cash not been channeled in this way NNL could not have made such repayments and NNI would not have benefited in the way that it did.

60.     One "Cash to Canada" initiative was to use interest free loan facilities as a means of transferring value from NNUK to NNL.  As explained below, from December 2003 NNL required NNUK to make a series of large interest free and unsecured loan facilities available to NNL (each an "Interest Free Loan Facility" and collectively the "Interest Free Loan Facilities") in order to benefit NNL to NNUK's detriment.

## 2.     The various Loan Facility agreements and draw downs

61.     The first Interest Free Loan Facility was established on 10 December 2003 when NNUK was required by NNL and NNI to make available to NNL an unsecured, interest free loan facility of £200,000,000 until 31 October 2004.  The term of this Interest Free Loan Facility was repeatedly extended by the grant of replacement Interest Free Loan Facilities, as was the maximum facility amount, culminating in the drawn-down loan balance owed by NNL peaking at £466,782,402 in October 2007.

62.     The purported transactions under the Loan Facilities are set out in the table below:

| | | | Loan Balance (£) |
|---|---|---|---|
| **Agreement dated 10 December 2003, maximum facility amount £200,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 17 December 2003 | 112,985,142.04 | Draw-down | 112,985,142.04 |
| 20 April 2004 | 23,716,754.95 | Draw-down | 136,701,896.99 |
| 17 September 2004 | 27,298,103.01 | Draw-down | 164,000,000.00 |
| **Agreement dated 31 October 2004, maximum facility amount £250,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 17 December 2004 | 30,000,000.00 | Draw-down | 194,000,000.00 |
| 18 March 2005 | 36,000,000.00 | Draw-down | 230,000,000.00 |
| **Agreement dated 01 April 2005, maximum facility amount £350,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 20 June 2005 | 38,000,000.00 | Draw-down | 268,000,000.00 |
| 24 October 2005 | 81,500,000.00 | Draw-down | 349,500,000.00 |
| **Agreement dated 29 December 2005, maximum facility amount £500,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 16 February 2006 | 26,700,000.00 | Draw-down | 376,200,000.00 |
| 25 September 2006 | 10,000,000.00 | Draw-down | 386,200,000.00 |
| 15 December 2006 | 41,500,000.00 | Draw-down | 427,700,000.00 |
| **Agreement dated 27 December 2006, maximum facility amount £500,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 23 February 2007 | 27,400,000.00 | Draw-down | 455,100,000.00 |
| 20 March 2007 | (6,068,812.15) | Purported to be money owed by NNUK to NNL | 449,031,187.85 |

| Agreement dated 13 September 2007, maximum facility amount £600,000,000.00 | | | |
|---|---|---|---|
| Date | Amount (£) | Description | |
| 23 October 2007 | 17,751,215.01 | Draw-down | 466,782,402.86 |
| 04 December 2007 | (1,146,616.98) | Purported offset for transfer pricing adjustments | 465,635,785.88 |
| 31 December 2007 | (316,031,255.28) | Purported offset for Project Swift | 149,604,530.60 |
| 31 December 2007 | (1,019,661.22) | Purported offset for Project Swift | 148,584,869.38 |
| 27 March 2008 | (12,669,776.98) | Purported offset for transfer pricing adjustments | 135,915,102.40 |
| 31 March 2008 | (10,528,925.74) | Purported offset for Project Swift | 125,386,166.66 |
| 24 June 2008 | 8,956,636.70 | Draw-down | 134,342,803.36 |
| Agreement dated 10 September 2008, maximum facility amount £250,000,000.00 | | | |
| Date | Amount (£) | Description | |
| 10 September 2008 | (3,976,581.52) | Purported offset for transfer pricing adjustments | 130,366,221.84 |
| 25 November 2008 | 7,445,952.30 | Draw-down | 137,812,174.14 |
| 16 December 2008 | (24,779,973.80) | Purported offset for transfer pricing adjustments | 113,032,200.34 |

## 3.    NNI's benefit in relation to the Loan Facilities

63.    During the period that NNI was involved in the establishment of the Interest Free Loan Facilities, and the continued decisions to increase the size of the facility and enable larger and larger drawdowns by NNL, NNI also made a number of loans to NNL (the "NNI Loans").  Unlike the Interest Free Loan Facilities provided by NNUK, the loans provided

by NNI were made on an interest bearing basis. Further, the balances under the NNI Loans, along with the interest which accrued under the same, were (as explained above) regularly repaid in cash by NNL.

64.    The effect of this was that NNUK lost value while NNI benefited and received cash. The treatment of the NNI Loans by NNL contrasts starkly with the treatment of the Interest Free Loan Facilities. NNL was able to make cash repayments in relation to the NNI Loans because it did not make cash repayments in relation to the Interest Free Loan Facilities. The directors, officers and senior employees of NNI were, or should, have been aware of this. Either way, NNI benefited as a result.

### 4.    Interest Free Loan Facilities contrary to NNUK's best interests

65.    Each of the Interest Free Loan Facilities and the advances thereunder (the "Interest-Free Loans") amounted to unsecured, interest-free obligations, which had no legitimate commercial purpose for NNUK. They were entered into to transfer cash and/or value out of NNUK to NNL and, as stated at paragraph 58 above, were contrary to the best interests of and prejudicial to NNUK and its creditors. In particular:

a.  At the time that the idea of the Interest Free Loan Facilities was initially conceived in May 2003, and on the grant of the replacement Interest Free Loan Facilities and the draw-downs thereunder, NNL was not in a position, and knew that it was not in a position, to make repayment of the Interest-Free Loans on an adequate, timely or commercial basis, nor was it intended that NNL would do so. There was therefore a serious and unacceptable likelihood or risk that the

loans would never be repaid in full.  In the event, this likelihood became the reality.

b.  NNUK was not paid interest on the amounts it provided, nor was it granted any security under these arrangements in spite of the fact that this:

    i.  was uncommercial and of no benefit to NNUK;

    ii.  was contrary to the Nortel Group's general practice in respect of inter-company loans;

    iii.  effectively operated to impede NNUK's ability to enjoy benefits to which it was otherwise entitled under the MRDA (i.e. its entitlement to be paid interest by NNL on overdue transfer pricing adjustments which it owed to NNUK).

c.  Notwithstanding that NNUK was not paid interest by NNL, interest was imputed on the balance of the Interest Free Loan Facilities for UK tax purposes by HMRC, thereby eroding NNUK's tax losses and increasing its exposure to future tax liabilities.

d.  In contrast to the position with NNUK, NNL was paying interest on the loans which had been extended to NNL by NNI.  Given the size of the sums in question, the interest paid to NNI was of significant benefit to it.

66.    Notwithstanding the above, NNI who (together with NNL) was controlling or influencing NNUK in this regard, allowed the Interest Free Loan Facilities to be

extended, renewed and enlarged on an unsecured (as well as interest-free) basis without any, or any adequate, regard to the interests of NNUK (or its creditors), even though this was plainly not in NNUK's (or its creditors') interests.

67.    When the balance of the Interest Free Loan Facilities was purportedly reduced in December 2007, as a result of Project Swift (which transaction was itself objectionable, as set out below), this was done to the detriment of NNUK and its creditors. Further, at or around this time significant cash payments were made from NNL and NNI (see paragraph 58).

68.    Even following Project Swift, a loan balance of £113,032,200.34 on these inappropriate loans was left outstanding on the Interest-Free Loans as at 14 January 2009 when NNUK entered into administration.

## I.    Project Swift

### 1.    Background

69.    As described above, through the use of the Interest Free Loan Facilities, a large balance became outstanding from NNL to NNUK, reaching a peak of £467 million ($950 million) by late 2007.

70.    In late 2007 it was decided by NNI and NNL that part of the loan should be repaid by NNL.  As explained above, Ryan Smith of NNI, under the supervision of Mark Weisz, was a key individual in the implementation of Project Swift.

71.    Whilst NNI received cash repayments in respect of the loans it had made to NNL, NNUK was treated differently and prejudicially. Rather than make a repayment in cash, NNL elected to wipe out the loan balance by making a paper transfer from NNL to NNUK of all the shares of NNL's Dutch subsidiary, Nortel Networks International Finance Holdings BV

("NNIF") through which NNL held the shares of each of the EMEA Companies (the "Swift Subsidiaries"), except NNSA and NN Ireland, which remained in NNL's hands. A price of $628.9 million was applied for NNUK's purchase of NNIF, which was paid by NNUK by discharging the corresponding amount of the debt owing by NNL to NNUK under the revolving loan agreement. The transaction was agreed on December 20, 2007.

72.     The result of Project Swift was that NNUK accepted a $628.9 million reduction in the sums owed to it under the Interest Free Loan Facilities in exchange for illiquid assets (the Swift Subsidiaries), whose value depended on the continued trading of the Nortel Group and the continued use of each company for distribution purposes, at a time when the Nortel Group and NNUK was in a parlous financial state. To the detriment of NNUK and its creditors, the value attributed to the assets transferred was much greater than the actual value of those assets.

### 2.     Project Swift was contrary to NNUK's best interests

73.     Project Swift was not in NNUK's interests.

74.     The assets transferred to NNUK, in place of the cash repayment of its loans, comprised illiquid assets whose value, in light of the Group's financial difficulties, was substantially lower than the debt owed by NNL that was discharged as a result, not least in light of the desperate financial position of NNUK and the wider Nortel Group at the time.

75.     The value of the Swift Subsidiaries to NNUK was further reduced by the extraction of approximately $275 million of value from those subsidiaries (including $120 million of cash prior to Project Swift). The beneficiary of that value extraction was NNI. The cash in question was used to reduce sums owed by NNL to NNI. If paid to anyone, this cash should have been paid to NNUK not NNI.

76.    Prior to implementing Project Swift, and at a time when there was a significant likelihood of the Nortel Group being or becoming insolvent, both NNUK and NNL had been advised that NNUK would likely be in a materially worse position in any such insolvency as a result of Project Swift than it would had Project Swift not occurred.

77.    With regard to the purported reduction in NNUK's potential tax exposure going forward, NNUK should never have been exposed to such a tax charge in the first place. The only reason that it was exposed to this was because interest was being imputed on a Loan Facility which was not itself interest bearing. The removal of this potential tax exposure cannot therefore truly be seen as a benefit to NNUK. It was, in effect, nothing more than mitigation of a potential liability to which NNUK should never have been exposed.

78.    NNUK ought properly to have received repayment of the outstanding receivable in cash from NNL. By receiving shares in the Swift Subsidiaries, rather than cash, in settlement of the amount owed by NNL under the Interest-Free Loans, NNUK was put in a materially worse position in any Nortel Group-wide and/or NNUK insolvency situation than it would have been otherwise. This was not in the best interests of NNUK, nor was it in the interests of NNUK's creditors.

**J.    Business Sales**

79.    Prior to 14 January 2009, NNUK entered into various global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser. The most significant of these business sales was the sale of Nortel's UMTS business to Alactel Lucent S.A. ("Alcatel") for an adjusted purchase price of approximately US $291 million. This sale agreement for this deal was signed on 4 December 2006 and the sale completed on 31 December 2006.

80.    The parties agreed as required by law and international accounting regulations that the various selling Nortel entities agreed to allocate the proceeds of sale amongst themselves on the basis of an arm's length legal entitlement that each had to the proceeds.  In this way, the allocation of the proceeds of this sale had to correspond with the arm's length principles discussed above in relation to transfer pricing.  The agreed allocation applied in relation to the Alcatel sale was set out in a statement dated 24 July 2007.

81.    The allocation that was applied as between the various selling Nortel entities did not accord with the arm's length principles discussed above.  Rather, allocation was attempted on the erroneous assumptions that were contained in the transfer pricing structure that prevailed within the Nortel group at the time.  Further, it appears that in fact the allocation was not even applied in conformity with these erroneous assumptions.

82.  As a consequence of the allocation method adopted, NNUK received significantly less and NNI received significantly more than it was entitled to on an arm's length basis.

83.  Further, and in the alternative, NNUK understands that NNI will seek to argue that the appropriate arm's length basis on which to allocate the post-petition business sale proceeds is solely on the basis of the revenue lines generated.  For the avoidance of doubt, NNUK disagrees that this is the correct method for the allocation of these proceeds.  However, if this method had been adopted in relation to the allocation of the proceeds from the pre-petition business sales, it would reveal that NNUK received an extremely large undervalue from the proceeds of these sales.  Indeed, the undervalue received by NNUK as a result of the Alcatel sale is far greater if the revenue-only method (which we believe that NNI will suggest) is applied than that if the arm's length methodology suggested by NNUK is applied.  In relation to the Alcatel

sale, for instance, NNUK provided US $47,424,105 of the total of US $57,400,000 customer contracts sold to Alcatel, representing 82.6% of the revenue that the UMTS business was generating.  If a revenue-only basis for allocation was applied, NNUK should have received an allocation of approximately US $240.4m of the sale proceeds of the Alcatel sale, rather than the US$57,905,533 that it in fact received.  Applying the revenue-only methodology to the Alcatel sale results in NNUK receiving an undervalue of approximately US $106.6m.

**K.     Taxation matters**

84.  As explained above, NNUK's taxation affairs were controlled by NNI and NNL.  This was particularly so in relation to transfer pricing matters, but also the case more generally.  For example, the need to use up NNUK's tax losses resulted from NNI and NNL's decision to saddle NNUK with the Interest Free Loan Facilities which, as explained above, resulted in interest being imputed by HMRC despite the fact no such interest was paid.

85.     To the extent that any Revenue Authority were to make a claim against NNUK in relation to a failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or otherwise), then NNI and NNL would be responsible for any penalties, interest and other loss payable by NNUK.

**CLAIMS**

**I.     TRADING DEBT CLAIM**

**Claim 1**

86.     NNUK has claims against NNI in respect of the outstanding intercompany trading debts as between the two entities:

a.  As at 14 January 2009, the balance of the intercompany trading debts owed by NNI to NNUK stood at US $18,835,960.35. These debts were

carried on the books and records of NNUK and NNI pursuant to an express or implied agreement that they would be repaid.

b.  As such, to the best of NNUK's knowledge, this amount is contractually due and payable to NNUK by NNI, together with pre and post judgment interest.

c.  Alternatively, NNUK is entitled to damages in this amount for breach of contract.

## II.    TRANSFER PRICING CLAIMS

### Claim 2 - Breach of Fiduciary Duties by NNI as De Facto or shadow Director of NNUK under English Law

87. In order to bring an English law claim against NNI for breach of fiduciary duty it must be established that:

a.  NNI was a *de facto* or shadow director of NNUK and/or assumed fiduciary duties to NNUK in respect of decisions of NNUK in the determination of which it was involved;

b.  that NNI breached the fiduciary duties it owed to NNUK by

　　i.  failing to act bona fide in the best interests of the company;

　　ii.  failing to act for proper purposes (or by acting for collateral or improper ones);

　　iii.  failing to avoid conflicts of interest or favoring the interests of themselves or any other person over the interests of the company;

　　iv.  profiting from their fiduciary position at the expense of the company; or

v.  given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, failing to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions; and

c.  that breach caused NNUK loss.

88. Under English law:

a.  a company will be a *de facto* director of a second company if it can be shown that the company performed functions in relation to the second company which could only be properly performed by a director of the second company;

b.  a company will be a shadow director of a second company if the *de jure* directors of the second company were accustomed to acting in accordance with the company's instructions or directions;

c.  if a company has assumed the above role or performed the above functions in relation to some part only of the second company's business (for instance in relation to certain transactions), then the first company will owe the fiduciary duties of a director in respect of that part of the second company's business or those transactions.

89.    As a *de facto* or shadow director of a second company (or in the circumstances described above), the company will owe the fiduciary duties set out in paragraphs 112 and 113 below.

29

90.     The second company would be able to bring a claim against the company for breach of one or more of the above duties if it can establish a breach of one or more such duties and that such a breach caused loss to the company.

91.     For the reasons stated in paragraphs 15 to 27 above, NNI was a de facto or shadow director of NNUK and owed NNUK fiduciary duties in respect of tax and treasury matters, including NNUK's participation in the RPSM , by virtue of the fact that NNI was involved in all decision making in relation to the transfer pricing arrangements.

92.     For the reasons described in section G above, the implementation and operation of the RPSM and MRDA was clearly contrary to NNUK's interests.  NNI breached its fiduciary duties in causing NNUK to participate in such arrangements and in failing to ensure that NNUK received an arm's length return under the RPSM.

93.     As a result of NNI's breach of duty, NNUK suffered loss and/or damage in an amount to be established at trial but in any event no less than $1,083,000,000.  NNI is accordingly liable to NNUK for damages and/or liable to compensate NNUK in equity for that amount.

**Claim 3 - Breach of duty of care under English Law**

94.     In order to bring a claim under English law for breach of duty of care it must be established that;

> a.  NNI was a *de facto* or shadow director of NNUK or NNI otherwise owed NNUK a duty of care;
>
> b.  that NNI breached the duty of care which it owed to NNUK by failing to act with reasonable skill and care in relation to NNUK's affairs; and
>
> c.  that breach caused NNUK loss.

95.     For the reasons set out in paragraphs 15 to 27 above, NNI was a de facto or shadow director of NNUK in relation to tax and treasury matters.

96.     As a *de facto* or shadow director of a second company (or in the circumstances described above), the company will owe a duty to the second company to act with due skill and care in relation to the second company.

97.     Further, the company will owe a duty of care to the second company whether or not it is a *de facto* or shadow director of the second company if there is a relationship of sufficient proximity between the two, the harm in question was reasonably foreseeable and it is appropriate in the circumstances to impose a duty of care.

98.     The second company would be able to bring a claim against the company if it can establish a breach of such a duty of care and that such a breach caused loss to the company.

99.     NNI owed a duty as a *de facto* or shadow director to take reasonable care in and about its dealing with the affairs of NNUK (and/or the particular business and transactions referred to in this document) particularly in respect of transfer pricing.  In the circumstances described above,  NNI stood in such proximity to NNUK as to owe it a duty of care with regard to those parts of NNUK's business with which NNI involved itself (including the matters dealt with in paragraphs 15 to 27 above).

100.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to NNUK's participation in the RPSM and MRDA and the steps taken in the implementation of the same by virtue of the fact that NNI was involved in all decision making in relation to the transfer pricing arrangements, as explained above.

101.    For the reasons described in section G above, the implementation and

operation of the RPSM and MRDA was clearly not in NNUK's interests.  NNI breached its duty

of care in causing NNUK to participate in such arrangements and in failing to ensure that NNUK

received an arm's length return under the RPSM.

102.    As a result of NNI's breach of duty, NNUK suffered loss and/or damage in

an amount to be established at trial but in any event no less than $1,083,000,000.  NNI is

accordingly liable to NNUK for such loss and/or damages.

**Claim 4 - Dishonest Assistance under English Law**

103.    Under English common law a defendant will be liable for dishonest

assistance where:

> a.  a fiduciary breaches a fiduciary duty:
>
> b.  the defendant procures or assists in that breach of duty; and
>
> c.  the defendant does so dishonestly.

104.    The standard of dishonesty required is an objective standard of dishonesty,

which in a commercial setting simply means conduct which is 'commercially unacceptable'.

105.    For the reasons described above, in causing or allowing NNUK to

participate in the non arm's length compliant RPSM and MRDA arrangements, the directors of

NNUK (both de jure and/or, in the case of NNL, *de facto*/shadow)[4] breached their fiduciary

duties (both under common law and the Companies Act 2006).

---

4.  In this context (and as explained above) NNL maintained a high degree of control over NNUK and its affairs
    (including the transactions referred to in this Rider) and at all material times assumed and exercised the
    functions of a director in respect of NNUK's affairs.  Further or alternatively, NNL was a person in accordance
    with whose instructions the de jure directors of NNUK were accustomed to act.  In all the circumstances NNL
    was at all material times a de facto, further or alternatively shadow director of NNUK.  In any event, by reason
    of the controlling function it assumed in relation to the transactions that are the subject of this Rider, NNL
    assumed fiduciary duties in respect of those transactions.

106.    That breach of duty caused NNUK to suffer damage and/or loss in an amount to be established at trial but in any event no less than $1,083,000,000.

107.    NNI, through the involvement of its personnel in the design, implementation and operation of the MRDA and RPSM (as described above), advocated, procured or assisted the conduct by NNUK's directors which led to the breaches of fiduciary duties.  Further, NNI acted dishonestly as it appreciated that the implementation and operation of the MRDA and RPSM were contrary to NNUK's interests.

**Claim 5 - Conspiracy under English Law**

108.    Under English common law 'unlawful means' conspiracy is committed where:

    a.  two or more persons combine and take action;

    b.  which is unlawful in itself;

    c.  with the intention of causing damage to a third party who does incur the intended damage.

109.    In relation to the Nortel transfer pricing arrangements, NNI and NNL, alternatively NNI and NNUK's de jure directors, alternatively NNI, NNL and NNUK's directors, combined together by implementing and operating the RPSM and MRDA in a manner which operated contrary to NNUK's interests in a way that amounted to a breach of contract,[5] breaches of fiduciary duty and a breach of duty of care under English law (as set out above).  NNI and NNL, alternatively NNI and NNUK's de jure directors, alternatively NNI, NNL and NNUK's de jure directors intended to cause damage to NNUK because they were aware and intended that NNUK was not properly rewarded pursuant to the RPSM and MRDA.

---

5 .  The failure of NNL to provide NNUK with an arm's length return constitutes a breach of NNL's contractual obligations under the MRDA.

110.    This caused loss and/or damage to NNUK in an amount to be established at trial but in any case no less than US$1,083,000,000.

**Claim 6 - Aiding and Abetting Breach of Fiduciary Duty or Tortious Conduct Under State Law**

111.    To recover for aiding and abetting breach of fiduciary duty or a tortious act under the law of Delaware, Texas or any other state whose law might arguably apply, a party must plead and prove:

    a.  the existence of a fiduciary relationship;

    b.  that the fiduciary breached its duty to the plaintiff;

    c.  that the defendant, who is a non-fiduciary, knowingly participated in the breach with knowledge that the conduct advocated or assisted constituted such a breach; and

    d.  that damages resulted from the concerted action of the fiduciary and non-fiduciary.

112.    As regards the breach of fiduciary duty in question, under English Law NNUK's directors (de jure and/or, in the case of NNL[6], *de facto*/shadow) owed NNUK fiduciary duties (pursuant to English common law and, from 1 October 2007 were statutorily obliged):

    a.  to act bona fide in the best interests of the company;

    b.  to act for proper purposes (and not collateral or improper ones);

---

[6].    In this context NNL maintained a high degree of control over NNUK and its affairs (including the transactions referred to in this Rider) and at all material times assumed and exercised the functions of a director in respect of NNUK's affairs.  Further or alternatively, NNL was a person in accordance with whose instructions the de jure directors of NNUK were accustomed to act.  In all the circumstances NNL was at all material times a de facto, further or alternatively shadow director of NNUK.  In any event, by reason of the controlling function it assumed in relation to the transactions that are the subject of this Rider, NNL assumed fiduciary duties in respect of those transactions.

c.  to avoid conflicts of interest and not to favour the interests of themselves or any other person over the interests of the company;

d.  not to profit from their fiduciary position at the expense of the company.

113.    Further, given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, in carrying out their fiduciary duties to NNUK, the directors were obliged at all times (and, from 1 October 2007, statutorily obliged pursuant to section 172(3) of the Companies Act 2006), to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.

114.    For the reasons described above, it is clear that in bringing about and allowing NNUK's participation in the RPSM and MRDA and the steps taken in the implementation of the same, the directors of NNUK (both de jure and, in the case of NNL, *de facto*/shadow) breached their duties by failing:

a.  to act bona fide in the interests of NNUK;

b.  to act for proper purposes rather than for collateral or improper purposes;

c.  to avoid conflicts of interest, specifically by preferring other interests than the interests of NNUK; and/or

d.  in the case of NNL in its capacity as a *de facto*/shadow director, to act without profiting from their fiduciary position at the expense of the company.

115.    Those breaches of duty caused NNUK to suffer significant damage and/or loss in an amount to be established at trial but in any event no less than $1,083,000,000.

116.    NNI, through the involvement of its personnel in the implementation and operation of the MRDA and RPSM (as described in paragraphs 15 to 27 above), advocated or assisted the conduct by NNUK's directors (de jure and/or, in the case of NNL, *de facto*/shadow) which led to the breaches of fiduciary duties.

**Claim 7 - Civil Conspiracy under State Law**

117.    To recover for civil conspiracy under the law of Delaware, Texas or any other state whose law might arguably apply, a party must plead and prove:

    a.  the existence of a confederation or combination of two or more persons, including the defendant;

    b.  the existence of an object to be accomplished;

    c.  there was a meeting of the minds on the object or course of action;

    d.  that a tortious or unlawful act was done in furtherance of the conspiracy; and

    e.  actual damages.

118.    In relation to the Nortel transfer pricing arrangements, NNI and NNL, alternatively NNI, NNL and NNUK's de jure directors, or alternatively NNI and the de jure directors of NNUK, acted together by implementing and operating the RPSM and MRDA with the objective of removing value from NNUK and in a manner which, as NNI, NNL and NNUK's de jure directors were aware, operated contrary to NNUK's interests in a way that caused NNUK's directors (who also included NNL, which was itself a de facto or shadow director of NNUK) to breach their fiduciary duties and breach their duties of care under English law, as set out in sections D to F above.  The conduct of NNI and NNL, alternatively NNI, NNL and NNUK's de jure directors, alternatively NNI and NNUK's de jure directors, amounted to a civil

conspiracy to injure NNUK through the improper operation of the MRDA and RPSM and the breaches of duty by NNUK's directors inherent in such operation.

119.    This caused loss and/or damage to NNUK in an amount to be established at trial but in any event no less than $1,083,000,000.

## III.    CLAIMS BASED ON INTERCOMPANY LOANS

### Claim 8 - Breach of Fiduciary Duties by NNI as De Facto or shadow Director of NNUK under English Law

120.    In order to bring an English law claim against NNI for breach of fiduciary duty the elements explained in paragraphs 87 to 90 above must be established.

121.    For the reasons stated in paragraphs 15 to 27 above, NNI was a *de facto* or shadow director of NNUK and in any event owed NNUK fiduciary duties in respect of tax and treasury matters including NNUK's participation in the Interest Free Loan Facilities by virtue of the fact that NNI was involved in all decision making in relation to the Interest Free Loan Facilities.

122.    For the reasons described in section H above, the implementation and operation of the Interest Free Loan Facilities was clearly not in NNUK's best interests.  NNI breached its fiduciary duties in causing NNUK to enter and act in accordance with the Interest Free Loan Facilities given they were contrary to its best interests.  Further, by ensuring that NNUK was subject to the prejudicial Interest Free Loan Facilities NNI favored its own interests and profited as this resulted in interest being paid to NNI and NNI receiving repayments.

123.    This caused loss and/or damage to NNUK in an amount to be established at trial but in any event no less than US$ 890,250,037.69 plus pre and post judgment interest.

## Claim 9 -  Breach of duty of care under English Law

124.    In order to bring a claim under English law for breach of duty of care the elements explained in paragraphs 94 to 98 above must be established.

125.    For the reasons stated in paragraphs 15 to 27 above, NNI was a *de facto* or shadow director of NNUK in respect of tax and treasury matters and owed a duty to take reasonable care in and about its dealing with the affairs of NNUK (and/or the particular business and transactions referred to in this document) in particular the Interest Free Loans.  In the circumstances described above, NNI stood in such proximity to NNUK as to owe it a duty of care with regard to those parts of NNUK's business with which NNI involved itself (including the matters dealt with in paragraphs 15 to 27 above).

126.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to NNUK's participation in the Interest Free Loan Facilities by virtue of the fact that NNI was involved in all decision making in relation to the Interest Free Loan Facilities, as explained above.

127.    For the reasons described in section H above, the implementation and operation of the Interest Free Loan Facilities was clearly not in NNUK's best interests.  NNI breached its duty of care in causing or allowing NNUK to enter into and act in accordance with the Interest Free Loan Facilities.

128.    As a result of NNI's breach of duty, NNUK suffered loss and/or damage in an amount to be established at trial but in any event no less than US $890,250,037.69 plus pre and post judgment interest.

**Claim 10 - Dishonest assistance under English Law**

129.    Under English common law a defendant will be liable for dishonest assistance in the circumstances explained in paragraphs 103 to 104 above.

130.    For the reasons described in section H above, it is clear that the Interest Free Loan Facilities were not in NNUK's interests and that, accordingly, the directors of NNUK (both *de jure* and, in the case of NNL, *de facto*/shadow) breached their fiduciary duties (both under common law and the Companies Act 2006) by causing or allowing NNUK to participate in such arrangements.

131.    That breach of duty caused NNUK to suffer damage and/or loss in an amount to be established at trial but in any event no less than US $890,250,037.69 plus pre and post judgment interest.

132.    NNI, through the involvement of its personnel in the design and implementation of the Interest Free Loan Facilities, advocated or assisted the conduct by NNUK's directors which led to the breaches of fiduciary duties.  Further, NNI acted dishonestly as it appreciated that the Interest Free Loan Facilities were contrary to NNUK's interests.

**Claim 11 - Civil Conspiracy under State Law**

133.    The elements of the civil conspiracy cause of action under the law of Delaware, Texas, or any other state whose law might arguably apply, are set out in paragraph 117 above.

134.    In relation to the Interest Free Loan Facilities, NNI and NNL, alternatively NNI, NNL and NNUK's de jure directors, or alternatively NNI and NNUK's de jure directors, acted together by designing and implementing and operating the Interest Free Loan Facilities in a manner which, as NNI, NNL and NNUK's de jure directors were aware, operated contrary to

NNUK's interests in a way that amounted to breaches of fiduciary duties and breaches of their duties of care under English law, as set out in sections D to F above, which included a breach of fiduciary duty on the part of NNL which was a de facto or shadow director of NNUK. NNI and NNL's conduct, alternatively NNI and NNUK's de jure directors' conduct, amounted to a civil conspiracy to injure NNUK.

135.    This caused loss and/or damage to NNUK in an amount to be established at trial but in any event no less than US$ 890,250,037.69 plus pre and post judgment interest.

**Claim 12 - Conspiracy under English Law**

136.    Under English common law 'unlawful means' conspiracy is committed in the circumstances described in paragraph 108 above.

137.    In relation to the Interest Free Loan Facilities, NNI and NNL, alternatively NNL, NNI and NNUK's de jure directors, alternatively NNI and NNUK's de jure directors, combined together by designing, implementing and operating the Loan Facilities in a manner which operated contrary to NNUK's interests in a way that amounted to breaches of fiduciary duty (as set out above) and a breach of duty of care under English law (as set out above). NNI and NNL, alternatively NNL, NNI and NNUK's de jure directors, alternatively NNI and NNUK's de jure directors, intended to injure NNUK by subjecting it to improper lending arrangements which were contrary to its interests.

138.    This caused loss and/or damage to NNUK in an amount to be determined at trial but in any event no less than US$ 890,250,037.69 plus pre and post judgment interest.

**Claim 13 - Aiding and Abetting Breach of Fiduciary Duty under State Law**

139.    The elements of the aiding and abetting a breach of fiduciary duty cause of action under the law of Delaware, Texas or any other state whose law might arguably apply are set out in paragraph 111 above.

140.    NNUK's directors (either de jure or, in the case of NNL, de facto/shadow) owed NNUK fiduciary duties as set out in paragraphs 112 to 113 above.

141.    For the reasons described in subsection H above, the Interest Free Loan Facilities were manifestly not in NNUK's interests.  The directors of NNUK breached their duties by causing or allowing NNUK's entry into and/or implementation of the Interest Free Loan Facilities, the continued draw-downs under such facilities and by failing to call for repayment of such facilities.

142.    As a result of these breaches NNUK suffered losses in an amount to be determined at trial but in any event no less than US$ 890,250,037.69 plus pre and post judgment interest

143.    NNI, through the involvement of its directors, officers and senior employees, as explained in paragraphs 15 to 27above, advocated or assisted the conduct by NNUK's directors which led to these breaches.

**Claim 14.    Unconscionable receipt under English law**

144.    A claim under English law for unconscionable receipt to the extent that NNI received value:

        a.   which truly belonged to NNUK;

        b.   which came to NNI by virtue of breaches of fiduciary duty by NNUK's (de jure, de facto and/or shadow) directors; and

c.  in circumstances where NNI was aware that this was the case.

145.    As described at paragraph 58 above, NNL was only able to make certain cash repayments of the NNI Loans due to the fact that it did not have to repay the Interest Free Loan Facilities in cash or to pay interest on those facilities. As such, NNI received value which truly belonged to NNUK.

146.    For the reasons described above, this value came to NNI by virtue of breaches of NNUK's directors' fiduciary duties.

147.    Due to NNI's involvement and participation (as described above) in the Cash to Canada Strategy, it was sufficiently aware of these matters to render its receipt of the value unconscionable under English law.

148.    NNI is accordingly liable to NNUK in respect of the value it received.

**Claim 15 - Unjust Enrichment Under State Law**

149.    To recover for unjust enrichment under the law of Delaware, Texas or any other state whose law might arguably apply, a party must plead and prove:

a.  the defendant was enriched;

b.  enrichment was at the plaintiff's expense;

c.  a relation between the enrichment and impoverishment; and

d.  an injustice would result from the defendant's retention of the benefit

An unjust enrichment lies where the defendant either procured a consideration through a wrongful act or passively received a benefit that would be unconscionable to retain.

150.    As described in detail above, NNI's personnel were actively involved in the devising and implementing of the Interest Free Loan Facilities, one of the initiatives to remove cash from NNUK and move it to NNL.  NNI was enriched by the implementation of the

Interest Free Loan Facilities because NNL's draw down of the loan facilities enabled NNL to make large cash payments, including interest payments, to NNI in respect of outstanding loan balances owed to it.  Had cash not been channeled out of NNUK, NNL could not have made such repayments and NNI would not have benefitted in the way that it did.  NNI's retention of the benefits conferred to it by NNUK would therefore be unconscionable.

151.    NNUK seeks restitution from NNI of the benefits wrongfully received by NNI in an amount to be established at trial but in any event no less than US $890,250,037.69 plus pre and post judgment interest.

## IV.    CLAIMS BASED ON PROJECT SWIFT

### Claim 16 - Breach of Fiduciary Duties by NNI as De Facto or shadow Director of NNUK under English Law

152.    In order to bring an English law claim against NNI for breach of fiduciary duty the elements explained in paragraphs 87 to 90 above must be established.

153.    For the reasons stated in paragraphs 15 to 27 above, NNI was a de facto or shadow director of NNUK and in any event owed NNUK fiduciary duties in respect of tax and treasury matters including NNUK's participation in Project Swift by virtue of the fact that NNI was involved in all decision making in relation to Project Swift.

154.    For the reasons described in section I above, the implementation and operation of Project Swift was clearly not in NNUK's best interests.  NNI breached its fiduciary duties in allowing NNUK to enter into Project Swift in circumstances where it was contrary to NNUK's interests. Further, by ensuring that NNUK was subject to the prejudicial Swift transaction NNI favoured its own interests and profited as this resulted in interest being paid to NNI and NNI receiving repayments.

155.    As a result of NNI's breach of duty, NNUK suffered loss and/or damage in an amount to be established at trial but in any event no less than US$ 478,266,584.27 plus pre and post judgment interest.

**Claim 17 - Breach of duty of care under English Law**

156.    In order to bring a claim under English law for breach of duty of care the elements explained in paragraphs 95 to 99 above must be established.

157.    For the reasons stated in paragraphs 15 to 27 above, NNI owed a duty as a *de facto* or shadow director to take reasonable care in and about its dealing with the affairs of NNUK (and/or the particular business and transactions referred to in this document) in particular Project Swift.  In the circumstances described above,  NNI stood in such proximity to NNUK as to owe it a duty of care with regard to those parts of NNUK's business with which NNI involved itself (including the matters dealt with in paragraphs 15 to 27  above).

158.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to NNUK's participation in Project Swift by virtue of the fact that NNI was involved in all decision making in relation to Project Swift, as explained above.

159.    For the reasons described in section I above, the implementation of Project Swift was clearly not in NNUK's interests.  NNI breached its duty of care by its actions in bringing about project Swift and in allowing NNUK to enter into Project Swift.

160.    As a result of NNI's breach of duty, NNUK suffered loss and/or damage in an amount to be established at trial but in any event no less than US $478,266,584.27 plus pre and post judgment interest.

**Claim 18 - Dishonest assistance under English Law**

161. Under English common law a defendant will be liable for dishonest assistance in the circumstances explained in paragraphs 103 to 104 above.

162. For the reasons described in section I above, it is clear that the entry into and/or implementation of Project Swift was not in NNUK's interests and that, accordingly, the directors of NNUK breached their fiduciary duties (both under common law and the Companies Act 2006) by causing or allowing NNUK to participate in such arrangements.

163. That breach of duty caused NNUK to suffer damage and/or loss in an amount to be determined at trial but in any event no less than US $478,266,584.27 plus pre and post judgment interest.

164. NNI, through the involvement of its personnel in the design and implementation of Project Swift, advocated or assisted the conduct by NNUK's directors which led to the breaches of fiduciary duties. Further, NNI acted dishonestly as it appreciated that Project Swift was contrary to NNUK's interests.

**Claim 19 - Conspiracy under English Law**

165. Under English common law 'unlawful means' conspiracy is committed in the circumstances described in paragraph 108 above.

166. In relation to Project Swift, NNI and NNL, alternatively NNL, NNI and NNUK's de jure directors, alternatively NNI and NNUK's de jure directors, combined together by designing and implementing Project Swift which was contrary to NNUK's interests in a way that amounted to breaches of fiduciary duty (as set out above) and a breach of duty of care under English law (as set out above). NNI and NNL, alternatively NNL, NNI and NNUK's de jure

directors, alternatively NNI and NNUK's de jure directors, intended to injure NNUK by subjecting it to Project Swift which was contrary to its best interests.

167.   This caused loss and/or damage to NNUK in an amount to be determined at trial but in any event no less than US$ 478,266,584.27 plus pre and post judgment interest.

**Claim 20 - Aiding and Abetting Breach of Fiduciary Duty under State Law**

168.   The elements of the aiding and abetting a breach of fiduciary duty cause of action under the law of Delaware, Texas or any other state whose law might arguably apply are set out in paragraph 111 above.

169.   NNUK's directors (either de jure or, in the case of NNL, de facto/shadow) owed NNUK fiduciary duties as set out in paragraphs 112 to 113 above.

170.   For the reasons described in section I above, Project Swift was manifestly not in NNUK's interests. The directors of NNUK breached their duties by causing or allowing NNUK's entry into and/or implementing Project Swift.

171.   As a result of these breaches NNUK suffered the following losses:

a.   US $478,266,584.27 plus pre and post judgment interest.

172.   NNI, through the involvement of its directors, officers and senior employees, as explained in paragraphs 15 to 27 above, advocated or assisted the conduct by NNUK's directors which led to these breaches.

**Claim 21 - Civil Conspiracy under State Law**

173.   The elements of the civil conspiracy cause of action under the law of Delaware, Texas or any other state whose law might arguably apply the law of Delaware, Texas or any other state whose law might arguably apply are set out in paragraph 117 above.

174.    In relation to Project Swift, NNI and NNL, alternatively NNI and NNUK's de jure directors, acted together by designing and implementing Project Swift in a manner which, as NNI, NNL and NNUK's directors were aware, operated contrary to NNUK's interests in a way that amounted to breaches of fiduciary duties, as set out above, and breaches of their duties of care under English law, as set out above.  NNI and NNL's conduct, alternatively NNI and NNUK's de jure directors' conduct, amounted to a civil conspiracy to injure NNUK through the imposition of Project Swift and the breaches of duty by NNUK's directors inherent in such imposition.

175.    This caused loss and/or damage to NNUK in an amount to be determined a trial but in any event no less than US$ 478,266,584.27 plus pre and post judgment interest.

**Claim 22.    Unconscionable receipt under English law**

176.    A claim under English law for unconscionable receipt to the extent that NNI received value:

    a.    which truly belonged to NNUK;

    b.    which came to NNI by virtue of breaches of fiduciary duty by NNUK's (de jure, de facto and/or shadow) directors; and

    c.    in circumstances where NNI was aware that this was the case.

177.    As described at paragraph 58 above, NNL was only able to make certain cash repayments of the NNI Loans due to the fact that it did not have to repay the Interest Free Loan Facilities in cash because the Interest Free Loan Facilities were instead purportedly reduced as a result of Project Swift. As such, NNI received value which truly belonged to NNUK.

178.    For the reasons described above, this value came to NNI by virtue of breaches of NNUK's directors' fiduciary duties.

179.    Due to NNI's involvement and participation (as described above) in the Cash to Canada Strategy and Project Swift, it was sufficiently aware of these matters to render its receipt of the value unconscionable under English law.

180.    NNI is accordingly liable to NNUK in respect of the value it received.

**Claim 23 - Unjust Enrichment under State Law**

181.    The elements of the unjust enrichment cause of action under the law of Delaware, Texas or any other state whose law might arguably apply are set out above.

182.    As described in detail above, NNI's personnel were actively involved in the devising and implementing of Project Swift, one of the initiatives to remove cash from NNUK and move it to NNL.  NNI was enriched by the implementation of Project Swift as a result of the value extraction, described in paragraph 75 above, which in turn was used to reduce the sums owed by NNL to NNI.  Had cash not been channeled out of the Swift subsidiaries in this way, NNL could not have made such repayments and NNI would not have benefited in the way that it did.  The benefit NNI obtained should have instead gone to NNUK. NNI's retention of the benefits conferred to it by Project Swift would therefore be unconscionable.

183.    NNUK seeks restitution from NNI of the benefits wrongfully received by NNI in an amount to be established at trial but in any event no less than US$478,266,584.27 plus pre and post judgment interest.

**V.    CLAIMS IN RESPECT OF PAST DISPOSITIONS OF BUSINESS**

184.    To the extent that NNUK did not receive from any pre-petition business sale, a fair and appropriate allocation of the proceeds for the assets it has sold ("Pre-Petition Sale

Proceeds"), based on the arm's length principle, NNUK has various claims which will be further particularized following discovery. These claims include:

### Claim 24 – Contract Claim – Implied contract

185.    Given that the requirements of law and international accounting principles dictate that the Pre-Petition Sale Proceeds must be allocated on an arm's length basis as between the selling Nortel entities and pursuant to the agreement as between the selling Nortel entities that such a fair allocation would be applied, there was an implied contract as between the selling Nortel entities that the Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length principle.

186.    In the circumstances, the Pre-Petition Sale Proceeds were not distributed on an arm's length basis, to the detriment of NNUK. NNI's participation in the decision making in relation to the allocation of sale proceeds is explained above. NNI's involvement in this regard constituted a breach of the implied contract fairly to allocate the Pre-Petition Sale Proceeds by NNI.

### Claim 25 – Contractual claim – Implied term

187.    NNUK asserts a claim under the relevant sale contracts pursuant to the governing law applicable to the sale contracts that NNUK would receive a fair and appropriate allocation, based on the arm's length principles, of the Pre-Petition Sale Proceeds.

### Claim 26 – Mistake under English Law

188.    Alternatively, NNUK did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent of NNUK's entitlement. As a consequence of this mistake, NNI received considerably more from the allocation than it was intended to receive. NNI is therefore obliged to repay the overpayment to NNUK.

**Claim 27 – Transaction at an undervalue under English Law**

189.    As a result of the allocations of the Pre-Petition Sale Proceeds made

within two years prior to the onset of insolvency, NNI received sums of money that were

properly due to NNUK, without NNUK receiving appropriate value in return.  These diversions

of cash from NNUK to NNI therefore constitute transactions at an undervalue in accordance with

section 238 of the Insolvency Act 1986.

190.    As NNI is a related party, there is a presumption that NNUK was insolvent

at the time that the transaction took place.

191.    As a result, the Court may make any order that it sees fit, including an

account from NNI to NNUK of the sums that it received by way of the undervalue transaction.

**Claim 28 - Breach of Fiduciary Duties by NNI as De Facto or shadow Director of NNUK
under English Law**

192.    In order to bring an English law claim against NNI for breach of fiduciary

duty the elements explained in paragraphs 87 to 90 above must be established.

193.    For the reasons stated in paragraphs 15 to 27 above, NNI was a de facto or

shadow director of NNUK and owed NNUK fiduciary duties in respect of the allocation of Pre-

Petition Sale Proceeds by virtue of the fact that NNI was involved in all decision making in

relation to the settlement of the allocation methodology and allocation amounts, as explained

above.

194.    NNI breached its fiduciary duties in allowing NNUK to be allocated a

proportion of the Pre-Petition Sale Proceeds that was far below the proportion that it should have

received on an arm's length basis in clear contradiction to NNUK's interests.  Further, by

ensuring that NNUK received a lower allocation than it legally should have under the arm's

length test, NNI favoured its own interests and profited as this resulted in a larger proportion of the Pre-Petition Sale Proceeds being paid to NNI instead.

195.   As a result of NNI's breach of duty, NNUK suffered significant loss and/or damage. NNI is accordingly liable to NNUK for damages and/or liable to compensate NNUK in equity for that amount to be established at trial.

## Claim 29 - Knowing Receipt under English Law

196.   As explained above, the directors of NNUK breached their fiduciary duty to NNUK by allowing NNUK to receive a proportion of the Pre-Petition Sale Proceeds that was far below what it should have received on an arm's length basis. Without prejudice to NNUK's contention that NNI was either a de facto or shadow director of NNUK, NNI nonetheless knew that the acceptance of the allocation granted to NNUK by its directors would constitute a breach of fiduciary duty by those directors.

197.   As a result of this breach of duty, NNI received a higher allocation of the Pre-Petition Sale Proceeds than it should have, constituted in part by property that it knew was rightfully property of NNUK. NNI is therefore directly accountable to NNUK for the surplus allocation of the Pre-Petition Sale Proceeds that it received.

## Claim 30 - Breach of duty of care under English Law

198.   In order to bring a claim under English law for breach of duty of care the elements explained in paragraphs 94 to 98 above must be established.

199.   For the reasons stated in paragraphs 15 to 27 above, NNI owed a duty as a *de facto* or shadow director to take reasonable care in and about its dealing with the affairs of NNUK (including in relation to the allocation of Pre-Petition Sale Proceeds). In any event, in the circumstances described above, NNI stood in such proximity to NNUK that it owed it a duty of

care with regard to those parts of NNUK's business with which NNI involved itself (including in relation to the allocation of Pre-Petition Sale Proceeds).

200.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to the allocation of Pre-Petition Sale Proceeds to NNUK by virtue of the fact that NNI was involved in all decision making in relation to such allocation, as explained above.

201.    For the reasons described in section J above, the proportion of the Pre-Petition Sale Proceeds received by NNUK was clearly not in NNUK's interests.  NNI breached its duty of care in allowing NNUK to be allocated a proportion of the Pre-Petition Sale Proceeds that was far below the proportion that it should have received on an arm's length basis.

202.    As a result of NNI's breach of duty, NNUK suffered significant loss and/or damage.  NNI is accordingly liable to NNUK for damages to compensate NNUK for that amount to be established at trial.

**Claim 31 – Aiding and Abetting Breach of Fiduciary Duty under State Law**

203.    The elements of the aiding and abetting a breach of fiduciary duty cause of action under state law are set out in paragraph 111 above.

204.    NNUK's directors (either de jure or, in the case of NNL, de facto/shadow) owed NNUK fiduciary duties as set out in paragraphs 15 to 27 above.

205.    For the reasons described in section J above, it was manifestly not in NNUK's interests for NNUK to enter into sales in respect of which NNUK did not receive a proper allocation of the sale proceeds.  The directors of NNUK breached their duties by causing and/or allowing NNUK to enter into pre-petition sales and/or to receive an allocation of the Pre-Petition Sale Proceeds in respect of which NNUK did not receive appropriate value.

206.    NNI, through the involvement of its personnel, as explained above, advocated or assisted the conduct by NNUK's directors which led to these breaches.

207.    As such, NNUK is entitled to the remedies in section IX below.

## VI.    TAXATION MATTERS

208.    As explained in paragraphs 15 to 27 above, at all material times, NNI (together with NNL) controlled NNUK's tax affairs.

209.    In such circumstances, by causing and/or allowing NNI and NNL such control NNUK's directors (including its de facto and/or shadow directors) will have breached the fiduciary duties and duties of skill and care which they owe (as set out above).

210.    To the extent that NNUK suffers loss as a result of a claim by a tax authority and or the imposition of any form of penalty in relation to its tax affairs NNUK claims against NNI in respect of any losses, penalties and interest which it has suffered (or will suffer) on the below bases.

### Claim 32 – Breach of Fiduciary Duties by NNI as De Facto or shadow Director of NNUK under English Law

211.    A claim under English law for breach of fiduciary duty owed by NNI as a de facto or shadow director of NNUK (as explained in paragraphs 15 to 27 above) as a result of NNI controlling NNUK's tax affairs.

### Claim 33 – Breach of duty of care under English Law

212.    A claim under English law for breach of the duty of skill and care owed by NNI as a de facto or shadow director of NNUK (as explained in paragraphs 15 to 27 above) as a result of NNI controlling NNUK's tax affairs.

**Claim 34 – Aiding and Abetting Breach of Fiduciary Duty under State Law**

213.    A claim under Delaware Law or other potentially applicable state law in respect of NNI aiding and abetting the breaches of duty set out in paragraph 111 above, by virtue of NNI's involvement and participation (together with NNL, alternatively NNUK's de jure directors) in controlling NNUK's tax affairs.

**Claim 35 – Dishonest Assistance under English Law**

214.    A Claim under English law in respect of NNI dishonestly assisting the breaches of duty set out above, by virtue of NNI's involvement and participation (together with NNL, alternatively NNUK's de jure directors) in controlling NNUK's tax affairs.

**VII.    FUTURE AND CONTINGENT RIGHTS**

215.    In the event that a claim is made by any third party whatsoever or intimated against NNUK after the bar date (whether on the basis of matters currently known or unknown, and whensoever occurring), NNUK will assert and hereby asserts all claims it has (or may have), all rights of contribution and indemnity under whatever applicable law against NNI. NNUK's position is that such claims are not subject to this bar date but for completeness and the avoidance of doubt hereby includes all claims, rights to contribution or indemnity in respect of all claims, liabilities, costs and expenses from any person or persons, whensoever occurring and whether arising before or after the bar date, to the fullest extent possible and without limitation. NNUK reserves the right to further identify, particularize and modify all its entitlements in this respect in due course.

216.    NNUK further claims in respect of any future, prospective or contingent claims against NNI that NNUK or any office-holder or future office-holder may have.  NNUK

reserves the right to advance any prospective, contingent or future claims which may arise or become crystallized at any time hereafter.

## VIII.  PROPRIETARY CLAIMS

217.    If and to the extent that (a) NNI has obtained or derived any property or profit by reason of the breaches of duty or other improper conduct identified above, (b) any of NNUK's property has come into NNI's hands by reason of the breaches of fiduciary duty by NNUK's other directors identified above, (c) any profit or gain made by any such directors by reason of such breaches has come into NNI's hands, NNUK hereby asserts a proprietary claim to the same, and reserves the right to seek turnover and restitution of all such property or profits and/or an accounting for the same pursuant to a separate proceeding under Section 541 of the Bankruptcy Code.  NNUK reserves its rights in respect of all liens to which it may be entitled in connection with the same.

## IX.  RELIEF REQUESTED

WHEREFORE, NNUK claims the following relief:

218.    All equitable, common law, civil law, statutory and other remedies available under the applicable laws of any jurisdiction including, but not limited to, damages, equitable compensation, an equitable account of profits, restitution and/or any other recovery in respect of the matters the subject of:

   a.  Claim 1 relating to intercompany trading debts in an amount to be determined at trial but in any event no less than US$ 18,835,960.35.

   b.  Claims 2, 3, 4, 5, 6 and 7 relating to transfer pricing losses in an amount to be determined at trial but in any event no less than US$1,083,000,000.00.

c.  Claims 8, 9, 10, 11, 12, 13, 14 and 15 relating to inter-company loans in an amount to be determined at trial but in any event no less than US$ 890,250,037.69.

d.  Claims 16, 17, 18, 19, 20, 21, 22 and 23 relating to Project Swift in an amount to be determined at trial but in any event no less than US$ 478,266,584.27.

e.  Claims 24, 25, 26, 27, 28, 29, 30 and 31 relating to past dispositions of business in an amount to be determined at trial.

f.  Claims 32, 33, 34 and 35 relating to taxation matters in an amount to be determined at trial.

219.  Pre and post judgment interest on these amounts; and

220.  An accounting for, and restitution of, the identifiable or traceable sums, or substitutes of the above amounts, that are held in trust for and on behalf of NNUK.

## X.    RESERVATIONS

### A.    Reservation regarding jurisdiction, applicable law and forum

221.  For the avoidance of doubt:

a.  All claims and disputes with regard to the allocation of the "Lockboxes" are to be determined in accordance with the dispute resolution mechanisms to be set up pursuant to the IFSA Allocation Process and nothing herein shall be considered a waiver of NNUK's right to have allocation disputes determined by the dispute resolver appointed under the IFSA.

b.  Insofar as this Rider is silent as to applicable law, this is not to be taken as acceptance that Delaware law is, or is necessarily, the applicable law, and NNUK reserves the right further to identify appropriate foreign law as being the law applicable to its claims.

**B.    Reservation in respect of claims from NNI and alleged set-off**

222.    Nothing in this Claim is to be taken as acceptance that any claim from NNI against NNUK exists, is valid or is eligible for set off against any of NNUK's claims. Further, nothing in this Claim is to be taken as acceptance that the appropriate forum or proper jurisdiction for considering any claim by NNI against NNUK is the Delaware Bankruptcy Court (or any other US Court) (or the proof of claims process in the US), whether in the context of an allegation that such claim has been or should be the subject of a set off against any claim by NNUK or otherwise.

**C.    Reservation in respect of proprietary claims**

223.    NNUK's proprietary claims constitute claims and rights which fall outside the proof of claims process, being claims in respect of property which NNI does not own.

224.    As such, NNUK's proprietary claims are included in this Rider subject to the same general reservations in paragraph 227 and without prejudice to NNUK's rights to claim this property in other proceedings or processes and to assert its rights to seize this property without reference to the Delaware Bankruptcy Court proceedings (or those of any other US Court).

225.    For the avoidance of doubt all references herein to NNUK's proprietary claims are to be read as including a personal claim against NNI for the amount of the claims and for interest thereon to the extent that those proprietary claims are not fully satisfied out of the assets to which they attach.

**D.      Reservation in respect of claims against other parties**

226.    For the avoidance of doubt, all claims and allegations made against NNI made in this Rider are made without prejudice to all claims and allegations that NNUK has made or may make in this proof of claims process or otherwise against any other person (including NNC, NNL, and any present or former officer of NNUK, NNL, or any other natural or corporate person whomsoever).

**E.      General Reservation of Rights**

227.    The execution and filing of the Claim are not (i) a waiver or release of any of the rights against any entity or person liable for all or part of the Claim held by the Joint Administrators or NNUK; (ii) a waiver of the right to withdraw the reference with respect to the subject matter of the Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Joint Administrators or NNUK; (iii) an election of a remedy which waives or otherwise affects any other remedy; or (iv) a waiver or release of any rights against any third party on behalf of the Administrators or NNUK.

228.    The Administrators and NNUK expressly reserve their rights to further amend or supplement the Rider in any respect.

**XI.     MISCELLANEOUS**

229.    Supporting Documents: The writings upon which this Claim is based are in the possession of NNI, the Canadian Entities, the US and Canadian creditor committees and the Canadian Monitor and include, without limitation, the MRDA and the other agreements referred to herein. Such documents will be made available to other interested parties, upon request, under an appropriate confidentiality order.

230.    <u>Notice</u>.  All notices to the claimants concerning the Claim should be

sent to:

Young Conaway Stargatt & Taylor, LLP          Herbert Smith LLP
The Brandywine Building                                   Exchange House
1000 West Street, 17th Floor                              Primrose Street
Wilmington, Delaware 19801                             London  EC2A 2HS
Attention: Edwin J. Harron                               UNITED KINGDOM
(302) 571-6600                                                  Attention: Kevin Lloyd/Stephen Gale
                                                                        +44-20-7374-8000

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attention: Michael Luskin
(212) 837-6000

231.    <u>Protective Filing/Amendments</u>.  The Claim is filed to amend the Original

Proof of Claim to provide a more particularized statement of NNUK's claims as required by the

Order, and is filed to protect the Joint Administrators, NNUK, and the EMEA Companies from

forfeiture of their claims.

H
A
N
D

D
E
L
I
V
E
R
Y

_____
RECEIVED BY:

_____6/3/11_____
DATE

____3:30pm____
TIME