# EXHIBIT D

**(Clement Witness Statements)**

Applicant
Michel Clément
No. of Statement: First
Exhibits: MC 1
14 January 2009

NO. [ ] OF 2009

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**


**IN THE MATTER OF NORTEL NETWORKS FRANCE S.A.S.**

**AND**

**IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

## WITNESS STATEMENT OF MICHEL CLÉMENT

---

I Michel Clément of 40 rue Marius Anfan, 92300 Levallois Perret, France, **DO STATE** as follows:

**INTRODUCTION**

1.    I am the legal representative ("President") of Nortel Networks France S.A.S. (the "Company"), having been appointed on 18 October 2002. This is the same as a sole director under English law . In this statement I use my correct title of President rather than director. The two are for all relevant purposes interchangeable.

2.    I make this witness statement in support of the application of the President of the Company pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the "Act") for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom; Christopher John Wilkinson Hill; Stephen John Harris; and Alan Michael Hudson, of Ernst & Young LLP ("E&Y"), as joint administrators of the Company. I am duly authorised to make this witness statement on behalf of the Company.

3.    Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.    There is now produced and shown to me marked exhibit MC-1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit MC-1.

5.    I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies ("**Nortel Group**").

6.    I confirm that I have read the witness statement of Sharon Rolston which is filed in support of each of these applications (including the application in respect of the Company). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

## CONTENTS

7.    This witness statement is divided into the following sections:

    (a)    background;

    (b)    resolution of the shareholders of the Company to apply for an administration order in respect of the Company;

    (c)    financial position of the Company;

    (d)    purpose of the administration;

    (e)    centre of main interests ("**COMI**") of the Company;

    (f)    formal requirements; and

    (g)    conclusion.

## BACKGROUND

8.    The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa ("**EMEA**").

9.    The Company carries on business as a distribution and sales business. The Company is also responsible for distribution and sales of Nortel product and derives revenues from distribution and sales of Nortel product, largely to include third party customers within France but also third party customers outside France and other group companies. The Company has a close relationship with Nortel Networks S.A, which is both a minority shareholder of the Company and the holding company of the Company's majority shareholder, Northern Telecom France. In addition to its role as a Transactional Control Centre ("TCC") Nortel Networks SA is also a sales and distribution centre. The reason for this overlap is largely historic. In so far as there is a clear demarcation between the sales and distribution roles of the two companies it is that Nortel Networks France SAS sells specifically to the French market excluding any GSM products. As the Company and Nortel Networks S.A are both subject to global decision making approval and policy procedures of the Nortel Group, each take directions from the EMEA centre of control in England pursuant to those procedures (except for R&D activities, which take directions from the US).

10.    The Company was incorporated on 13 February 1984 under articles 210-211 of Code du Commerce (tab A).  The registered office of the Company is situated at Parc d'Activities de Magny-Chateaufort 78117, Chateaufort, France  78117 (tab A).

11.    The Company's name changed on 13 July 1998 from Marta Communication to Marta Nortel Communication. The Company then changed its name again on 5 February 2002 to Nortel Networks France.

12.    The audited accounts as at 31 December 2007 are tab B of the exhibit MC 1. The balance sheet of the Company as at 30 September 2008 is tab C of exhibit MC 1.

13.    The issued share capital of the Company is €55,161,000. The nominal share capital of the Company is 55,161,000 divided into 14,473,296 shares of €3.8113 each. The amount of the capital paid up or credited as paid up is €55,161,000.

14.    The Company has the following 2 shareholders:

        1.   Northern Telecom France SA: 92.61% (13,404,287 shares);

        2.   Nortel Networks SA: 7.39% (1,069,009 shares).

15.    I, Mr Michel Clément, am the Company's President and only legal representative, and was appointed on 18 October 2002. I am a citizen and resident of France.

3

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

16.     As set out at paragraphs [33] to [89] of the witness statement of Sharon Rolston, the global
        and EMEA business is highly integrated and inter dependent on each entity within the
        business for financial performance. This has the consequence that the business and affairs
        of the Company are inextricably linked with those of the other companies within the Nortel
        Group.

17.     As set out at paragraphs [100] to [108] of the witness statement of Sharon Rolston, the
        Nortel Group is experiencing financial difficulties. As the President of the Company, I
        understand that these financial difficulties have led to a decision being taken to file for
        protection in Ontario, Canada under the provisions of the Company Creditors Arrangement
        Act 1984 and in the United States in the State of Delaware under the provisions of Chapter
        11 of the US Bankruptcy Code.

18.     I have considered the likely effect of the filings in North America on the business of the
        Company and its ability to continue to trade. In summary, I have concluded that following
        the filings in North America, the North American operations will no longer be able to
        support the EMEA companies (including the Company) in terms of cash and that due to the
        predicted impairment on the global business it is inevitable that the Company will become
        insolvent. I refer to the detailed explanation of the likely consequences of the North
        American filings at paragraphs [100] to [108] of the witness statement of Sharon Rolston
        and confirm that these matters apply to the Company.

19.     On 14 January 2009, the shareholders of the Company decided what steps the Company
        should take to best preserve its business and assets for the benefit of its creditors. The
        shareholders resolved that an application should be made to the Court for an administration
        order to be made in relation to the Company. A copy of the shareholders' resolution is at
        tab D.

## FINANCIAL POSITION OF THE COMPANY

20.     I am advised that before the Court makes an administration order in relation to a company,
        it must be satisfied that the company is or is likely to become unable to pay its debts.

21.     I have concluded that the Company is or is likely to become unable to pay its debts. I have
        relied upon the following matters in reaching this conclusion:

(a)     As noted in E&Y's report which is attached to the witness statement of Sharon
        Rolston the Company has cash balances at 31 December 2008 of $28 million, a
        reduction from the balance on hand at 30 September 2008 which was $53 million.
        The Company will not survive as a stand alone business on account of the
        interdependencies within the EMEA group and therefore, and even though the
        Company is presently likely to solvent on a balance sheet basis, the Company is
        likely to become insolvent both on a balance sheet basis and a cash flow basis
        following the North American filing, unless it is protected through an insolvency
        process such as the administration order being sought.

(b)     In recent years, the operating costs of the Company have generally exceeded
        revenues, resulting in negative cash flow. A number of factors have contributed to
        these results, including competitive pressures, an inability to reduce operating
        expenses fast enough, the incurrence of costs related to restructuring efforts,
        significant competitor and customer consolidation, customers cutting back on
        capital expenditures and deferring new investments, and the poor state of the
        global economy. These difficulties have increased materially in recent months as
        global economic conditions have dramatically worsened. All Nortel companies are
        experiencing significant pressure on their businesses and facing a deterioration of
        their cash and liquidity as customers across all businesses delay and reduce their
        capital expenditures. In particular, the extreme volatility in the global markets has
        hampered the ability to accurately forecast future revenue and cash position.

(c)     I can confirm that these matters apply to this Company. Moreover, in light of
        these matters it is clear that the Company is or is likely to become unable to pay its
        debts.

## PURPOSE OF ADMINISTRATION

22.     I am advised that before the Court makes an administration order in relation to a company,
        it must be satisfied that the administration order is reasonably likely to achieve the purpose
        of the administration.

23.     Following consideration of this matter I have reached the conclusion that the purpose of the
        administration is reasonably likely to be achieved in the event that an administration order
        is made in respect of the Company.

24.     I have placed particular reliance upon:

10/17962234_2                                                                          5

[Paris #572590 v2]

(a)     The fact that an administration order provides the protection required by the
        Company and an opportunity to pursue a coordinated program with Canadian and
        U.S. companies for a disposal of parts of the global operations to potential buyers
        who have been identified;

(b)     the matters identified at paragraphs [5] and [216] to [218] of the witness statement
        of Sharon Rolston which highlight the likely benefits of administration orders
        being made in relation to the EMEA companies in respect of which applications
        have been made; and

(c)     the report prepared by E&Y which concludes that the purpose of the administration
        is reasonably likely to be achieved.

## COMI

25.     I am advised that the Court is required to consider the location of the COMI of a company
        when determining whether to make an administration order. I confirm, as President and
        the sole legal representative of the Company, that I have received legal advice in relation to
        the concept of COMI and, in light of this advice, I believe it is appropriate to file for and
        administration order in England. In summary, this is due to the fact that the Company is to
        a large extent managed from EMEA's head office which is located in Maidenhead,
        England. However, in order to ensure that all relevant information is before the Court, the
        following paragraphs set out the connecting factors with the place of incorporation,
        England and other countries.

### Place of incorporation and factors connecting the Company to the place of incorporation

26.     The Company is incorporated in France and has its registered office at Parc d'Activites de
        Magny-Chateufort 78117, Chateaufort, France.

27.     The Company has the following connections with the place of its incorporation:

(a)     the President and sole legal representative of the Company is myself. I am a
        French citizen residing in France;

(b)     there are 130 employees who are located in France subject to French employment
        contracts. The terms of employment are determined by HR shared services in
        England and tailored to meet local law requirements in France. Executive level

10/17962234_2                                                                              6

[Paris #572590 v2]                              6

employment agreements and compromise agreements are dealt with in England by
Mark Cooper and Sharon Ellerker who prepare and review the contracts and all
terms before signature. All senior recruitment is approved by personnel based in
England as referred to in paragraphs [195] to [199] of the witness statement of
Sharon Rolston;

(c)     as the Company's main business is the sale and distribution of products, it has to
source products from other Nortel Companies. Although the majority of these
products are sourced from Nortel Networks UK Ltd, products, were sourced from
other Nortel TCCs) including from Nortel Networks SA in relation to the GSM
products. Of the company's total intercompany creditors, 21% of these relate to
Nortel Networks SA. As mentioned below, management of this liability, like all
intercompany liabilities, is undertaken by Group Treasury in England.

(d)     with the assistance of our external advisers, I have reviewed the trade creditors for
the nine months to September 2008. I believe this represents the general position
of trade creditors for the Company over time. That shows that generally the
company made trade purchases for a total amount of around $50,000,000 over that
period. Of these, around 13% (or $6 million) relate to local French suppliers. The
top five French local suppliers are: Interdata, Network Services, Phoebe, Ilexia and
Magirus. The approval required for the Company to engage these local suppliers
and the terms on which they are engaged is subject to and constrained by the
procurement and supply approval processes referred to in paragraphs [170 ] to
[172] of the witness statement of Sharon Rolston. This includes consent of the
global contract review board being obtained over certain monetary limits
($100,000 for a new supplier or $500,000 for an existing supplier). Therefore,
even in connection with local supplies, personnel in France cannot decide which
suppliers to engage or the terms on which to engage them outside of these
procedures. I believe it is likely that a regular supplier of significant goods or
services would know that an internal approval process for the supply is necessary
and that this is approval process is conducted or managed out of England

(e)     low level administrative and book keeping functions are performed within France
and third party invoices are processed by accounts payable in France;

(f)     the Company was not a member of the EMEA cash pooling arrangements referred
to in paragraphs [87] and [89] of the witness statement of Sharon Rolston and

maintained its own accounts with French banks. Nevertheless, the Company was subject to and conducted all banking arrangements in accordance with the requirements of Group Treasury procedures set in paragraph [200] to [205] of the witness statement of Sharon Rolston. This included having both French and EMEA signatories on the accounts and being subject to ultimate direction by Simon Freemantle, who is based in England. Darryl Edwards is a signatory to these accounts and all other signatories are French employees;

(g)     the account management of the top third party customers is operated from France. The top 5 customers are: France Telecom, Neuf Cegetel, Verizon, Completel and Colt. Account managers for France Telecom, Neuf Cegetel and Completel are located in France. Management of all customers is, however, subject to overall management by Darryl Edwards. Mr Edwards, generally, only becomes involved at account level if significant issues arise with that account. These account personnel are also managed from England by Daryl Edwards and his team (which includes myself) who are responsible for setting sales strategy and budgets. The process for approving new contracts is referred to in paragraphs [140] to [153] of the witness statement of Sharon Rolston;

(h)     There are four AL2s based in France. Jean-Luc Khayat, Tom Parker and myself report to AL1s who are based in both England and the United States. Philippe Albert Lebrun is seconded to the EMEA headquarters in the UK as the EMEA controller. The witness statement of Sharon Rolston details the designation of Authority Levels in paragraphs [121] to [139].

(i)     the Company's parent company is Northern Telecom France S.A, which is incorporated in France. The parent company of Northern Telecom France S.A is Nortel Networks S.A., which is also incorporated in France. The Company together with Nortel Networks SA conduct the EMEA companies' operations in France. Within the constraints of the EMEA control out of England as dictated by the global decision making and policy procedure of the Nortel Group, the Company and the subsidiaries operate with a level of autonomy and independence;

(j)     the Company's legal services are provided by Jean-Luc Khayat, an AL2, from France. Mr Khayat provides similar services for Nortel's Africa and Middle East offices. Mr Khayat is, however, ultimately responsible to Mr Christian Waida General Counsel, EMEA, who is based in England (Mr Waida resigned on 19

December. The legal department has been re-organised as of 1 January 2008 to be split between two AL1s both of whom are resident in England).

**Factors connecting the Company with countries other than the place of incorporation or England**

For the 9 months to September 2008, global creditors of the company comprised around 7% of the Company's trade creditors (or around $3.5 million for that period). The substantial majority of these creditors are Jones Lang Lasalle, K&N, Alphabet France, Spie and Vobiscom. These creditors are subject to global supply agreements negotiated by the Nortel purchasing group under Nortel Procedures and policies. The relationships with these suppliers are managed at either the EMEA regional level in England or in Canada with the assistance of the purchasing team based in France

**Factors connecting the Company with England**

28.     I refer to paragraphs [119] to [139] of the witness statement of Sharon Rolston which set out in detail the decision making process in relation to the business of the companies within the EMEA region; paragraphs [140 ]to [143] which indicate how the contracting approval process is managed in the EMEA in relation to sale agreements; paragraphs [144] to [153] which detail the management of customer relationships of the companies within the EMEA region;  paragraphs [154] to [169] deals with the procurement of accounts payable processes in EMEA; paragraphs [170] to [172] deals with the supplier approval process in the EMEA; paragraphs [173] to [177] which relates to legal and contracts assistance across the EMEA region; paragraphs [178] to [180] which relate to global compliance across the EMEA region; paragraph [181] which relates to the internal audit across the EMEA region; paragraphs [182] to [183] which relate to the EMEA and other external audit processes; paragraphs [184] which relates to ethics management; paragraphs [185] which relates to corporate security; paragraphs [186] to [189] which relate to tax strategy across the EMEA; paragraphs [190] to [199] which relate to human resources management across the EMEA group; [200] to [205] which relates to banking and treasury across the EMEA region; paragraph [206] which relates to real estate across the EMEA region; and paragraphs [207] which relates to advice regarding proposed restructuring.

29.     I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company as a member of the EMEA group.

10/17962234_2

[Paris #572590 v2]

9

9

30.    These paragraphs evidence the wide range of operational, strategic, financial and high level administrative and advisory control over the Company in England by senior management of EMEA. These paragraphs also evidence the interconnectivity with the larger Nortel group in terms of customers, suppliers and finance functions.

31.    Without in any way limiting what is said in those paragraphs the following points are relevant to the Company's connection with England:

32.    **Decision Making:** Senior management in England exercise control and authority over the Company through the global decision making approval and policy procedure. Day to day operational management of the Company is conducted locally in accordance with these policies.

33.    **Creditors:** intercompany creditors comprise around 80% of the total trade creditors for the 9 months to September 2008 (or around $40 million for that period). These creditors are almost all part of the EMEA group and are managed out of England. Of these by far the most substantial (at 67%) is Nortel Networks UK Ltd. The second and third largest are Nortel Networks SA France and Nortel Networks B.V, which is part of the EMEA group and managed out of England. Subject to local laws, the payment of intercompany liabilities has been governed by EMEA group treasury, which is managed by Simon Freemantle out of England. Further, as noted above, the procurement and supply approval procedures for local French third party creditors are governed by the procurement and supply approval procedures as part of the global decision making approval procedure and policy.

34.    **Customers:** the approval process for all sale agreements is managed out of England pursuant to the approval policies described in paragraphs [140] to [143] of the witness statement of Sharon Ralston. Although customers of the Company are generally managed by French personnel, these sales management staff are managed from England by Darryl Edwards who sets the EMEA strategy, targets and budget for sales and sales related matters as well as managing individual customers of the company from time to time. I believe it is likely that at least for large and repeat customers they are aware that approval and oversight of the sale agreement and the customer relationship occurs in England and beyond.

35.    **Treasury:** As noted in the witness statement of Sharon Rolston, the Banking and Treasury functions are run out of England, by the Group Treasury Operations ("**Treasury**"). Relevantly:

(a) Subject to French law requirements decisions regarding payment of intercompany liabilities are made by the Treasury function which is based in England;

(b) All banking arrangements are conducted in accordance with Group Treasury procedures. Simon Freemantle operates in England for EMEA's treasury functions. All facilities are passed through the Group Treasury.

36. **Corporate Matters and External Advisers:** In relation to corporate matters such as, financial, tax, and distribution issues, strategic and high level decisions are generally made by the Finance and Tax functions of the EMEA group which are all located in England. Nevertheless, subject to strategic and operational management, the French office has its own financial, and distribution and capabilities through which day to day operational decisions are made.

KPMG is the Company's auditors. KPMG has a global agreement with the Nortel group through which its engagement is managed. For the Company, this relationship is managed by Béatrice Pin under the supervision of Philippe-Albert Lebrun, EMEA accounting controller, who is based in England.

37. **Property Management:** the Nortel group has a global relationship with Jones Lang Lasalle through which it manages its real estate interests. The leasehold properties of the company are managed by Jones Lang Lasalle along with other EMEA entities out of its offices in England. No leasehold decisions are made in France.

38. **Human Resources:** the Company's employees are likely to be aware that their "high level" employment queries are managed centrally from England by Sharon Ellerker and the EMEA HR Shared Services team. In addition, first line transactional and administrative HR support is provided by the EMEA HR Shared Services team, located in England, although some members of this team are based in France, who are typically the first point of contract for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums for some countries), but would refer more complex queries or case management support, such as disciplinaries or grievances, to the in house HR personnel where applicable.

**Conclusion on COMI**

39.  Having regard to the various factors identified above, I am not satisfied that the Company's
     central management and control is directed to a large extent from England, where all major
     decisions are made, that this is ascertainable by persons with whom the Company carries
     on business, and that in the circumstances the it is appropriate that an administration order
     is sought in England.

## FORMAL REQUIREMENTS

40.  To the best of my knowledge, I am not aware of any insolvency proceedings in relation to
     the Company, including any petition presented for the winding up of the Company.  No
     supervisor, administrative receiver or Member State liquidator has been appointed to the
     Company.  Further, I can confirm that no person is charged with an execution of other legal
     process against either the Company or its property and no person has distrained against
     either the Company or its property.

41.  To the best of my knowledge, I am not aware of any administrative receiver currently
     appointed to the Company, nor am I am aware of any creditor holding security over assets
     of the Company such as to confer power on the holder to appoint an administrative receiver.

42.  A statement from each of the proposed administrators is at tab F.  The statements confirm
     that the proposed administrators accept the appointment to the Company as administrators,
     that they have no existing professional relationship with the Company which would give
     them a conflict of interest and that in their opinion it is reasonably likely that the objectives
     of the administration will be achieved.

43.  It is intended that any of the proposed administrators will individually be able to exercise
     all or any of their functions and an order is sought pursuant to paragraph 100(2) of
     Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

44.  Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the
     Insolvency Rules 1986 specify the persons on whom the administration application must be
     served.  Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on
     the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

45.  At tab G is a copy of a letter from the Proposed Administrators confirming that they waive
     their respective rights to receive five days notice of the administration hearing and agree to
     service on them being dispensed with.

10/17962234_2

[Paris #572590 v2]

12

12

## EC REGULATION

46.    I understand that the EC Regulation on Insolvency Proceedings applies in this case.  The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

## CONCLUSION

47.    I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom; Christopher John Wilkinson Hill; Stephen John Harris; and Alan Michael Hudson of Ernst and Young LLP as joint administrators of the Company.

## STATEMENT OF TRUTH

I believe that the facts and matters set out in this witness statement are true.

Signed.........................................

Dated...14./...6.../...2009

Applicant
[Michel Clément]
No. of Statement: First
Exhibits: []
14 January 2009

NO. [ ] OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS
FRANCE S.A.S.

AND

IN THE MATTER OF THE INSOLVENCY ACT
1986

_____

WITNESS STATEMENT OF MICHÉL CLÉMENT

_____

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

10/17962234_2                                                14

[Paris #572590 v2]

14

Applicant
Michel Clément
No. of Statement:  First
Exhibits: MC 1
14 January 2009

NO. [] OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS S.A.

AND

IN THE MATTER OF THE INSOLVENCY ACT 1986

---

## WITNESS STATEMENT OF MICHEL CLÉMENT

---

I Michel Clément of 40 rue Marius Anfan, 92300 Levallois Perret, France DO STATE as follows:

### INTRODUCTION

1.     I am a director of Nortel Networks S.A. (the "Company"), having been appointed on 30 November 2000.

2.     I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the "Act") for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom; Christopher John Wilkinson Hill; Stephen John Harris; and Alan Michael Hudson, of Ernst & Young LLP ("E&Y"), as joint administrators of the Company.  I am duly authorised to make this witness statement on behalf of the directors of the Company (the "Directors").

3. Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4. There is now produced and shown to me marked exhibit MC-1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit MC-1.

5. I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of certain other members of the Nortel group of companies ("**Nortel Group**").

6. I confirm that I have read the witness statement of Sharon Rolston which is filed in support of each of these applications (including the application in respect of the Company). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

## CONTENTS

7. This witness statement is divided into the following sections:

    (a) background;

    (b) decision of the directors of the Company to apply for an administration order in respect of the Company;

    (c) financial position of the Company;

    (d) purpose of the administration;

    (e) centre of main interests ("**COMI**") of the Company;

    (f) formal requirements; and

    (g) conclusion.

## BACKGROUND

8. The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa ("**EMEA**").

10/17982095_4

[Paris #572591 v2]

2

2

9.    The Company is both a Residual Profit Entity ("**RP Entity**") and a Transactional Control Centre ("**TCC**"). These concepts are explained in further detail in paragraphs [40] to [43] and [76] to [79] of the witness statement of Sharon Rolston.

10.   In essence, the Company is responsible for the procurement of GSM products throughout the entire Nortel Group. GSM is a type of mobile telephony technology that is the common standard for wireless networks principally throughout Europe, but also through other countries around the world. As such whenever a Nortel sales company requires GSM products to fulfil a customer's order, they will order that product from the Company. The Company will then source that product from third party suppliers, customise the product as required and then on-supply it to the Nortel sales company for on-ward supply to the customer. The Company invoices the Nortel sales company at a mark-up on cost for the supply.

11.   The Company also supplies Nortel products (including but not limited to GSM products and systems) direct to customers. In so far as this involves non GSM products, these are sourced from other TCCs. The Company has two branch offices in Algeria and Malta that are essentially sales offices. The Company also has an ultimate French subsidiary, Nortel Networks France SAS, who is an "At Risk" sales and distribution company supplying Nortel products (including non-GSM products) to French and international customers. The Company has a close relationship with, and shares common management and administrative and support functions with Nortel Networks France SAS. The reason for the distinction between the two entities is largely historic. In so far as there is a clear demarcation between the sales and distribution roles of the two companies it is that Nortel Networks France SAS sells specifically to the French market excluding any GSM products. As the Company and Nortel Networks France SAS are both subject to the global decision making approval and policy procedures of the Nortel group, each take direction from EMEA centre of operations in England pursuant to those procedures (except for R&D activities, for which they take directions from the US).

12.   The Company was incorporated on the 23 December 1992 under articles 210-211 of Code du Commerce (tab A) of exhibit MC-1. The registered office of the Company is situated at Parc d'Activities de Magny-Chateaufort 78117, Chateaufort, France (tab A of exhibit MC-1).

13. Until July 24, 2000, the Company's name was Nortel Matra Cellular, whereupon its name was changed to Nortel Networks. On January 31, 2001, it was further renamed Nortel Networks SA after Nortel Networks Europe SA was merged into it.

14. The issued share capital of the Company is €136,963,426.50. The nominal share capital of the Company is € 136,963,426.50 divided into 91308951 shares of €1.50 each. The amount of the capital paid up or credited as paid up is €136,963,426.50.

15. The accounts as at 31 December 2007 as available on the date hereof are tab B of the exhibit MC-1. The balance sheet of the Company as at 30 September 2008 is tab C of exhibit MC-1.

16. Until 14 January 2009, the company had the following shareholders:

    1. Nortel Networks International Finance & Holding BV ("NNIF"): 8.83% (8,064,326 shares);

    2. Nortel Networks Limited: 91.168% (83,244,620 shares);

    3. Jean-Marie Lesur (1 share held on loan);

    4. Darryl Edwards (1 share held on loan);

    5. Michel Clément (1 share held on loan); and

    6. Jean-Luc Khayat (1 share held on loan).

    Except for the three shares held by Jean-Marie Lesur, Darryl Edwards and Jean-Luc Khayat, the board of January 14 2009 shall not impact the shareholding of the Company.

17. I am the President Directeur General of the Company who, under French law is the only legal representative of the Company, have been appointed to this position on 14 January 2009. I have been a director of the Company since 30 November 2000 having citizenship of and residing in France. The following persons are also directors of the Company:

    1. Simon Freemantle, appointed on 14 January 2009 who is a UK citizen residing in England; and

    2. Sharon Rolston, appointed on 14 January 2009 who is a UK citizen residing in England.

The following persons, until 14 January 2009, were directors of the Company:

1. Darryl Edwards, appointed on 28 September 2006 who is a UK citizen residing in England. Mr Edwards was until 14 January 2009 the President Directeur General of the Company;

2. Northern Telecom International Finance B.V, appointed on 4 February 2005 and represented by Simon Freemantle, who is a UK citizen residing in England, and

3. Jean-Marie Lesur, appointed on 19 December 2006 who is a French citizen residing in France.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

18. As set out at paragraphs [33] to [89] of the witness statement of Sharon Rolston, the global and EMEA business is highly integrated and inter dependent on each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

19. As set out at paragraphs [100] to [108] of the witness statement of Sharon Rolston, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for bankruptcy protection in Ontario, Canada under the provisions of the Companies Creditors Arrangement Act 1984 and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

20. The Directors, have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs [100] to [108] of the witness statement of Sharon Rolston and confirm that these matters apply to the Company.

21.    On 14 January 2009 a meeting of the directors of the Company was held in order to
determine what steps the Company should take to best preserve its business and assets for
the benefit of its creditors. The directors resolved that we should apply to the Court for an
administration order to be made in relation to the Company. A copy of the board
resolution is at tab D of exhibit MC-1.

## FINANCIAL POSITION OF THE COMPANY

22.    I am advised that before the Court makes an administration order in relation to a company,
it must be satisfied that the company is or is likely to become unable to pay its debts.

23.    My fellow directors and I have concluded that the Company is or is likely to become
unable to pay its debts. We have relied upon the following matters in reaching this
conclusion:

(a)    As noted in E&Y's report which is attached to the witness statement of Sharon
Rolston the Company's losses in quarters 1 to 3 in 2008 were $76 million
according to the quarter 3 figures and the Company had an overdraft of $282,000
at 30 September 2008, but a credit balance of approximately $1 million at 31
December 2008. This balance is not significant in relation to the scale of the
Company's business. The Company's balance sheet also indicated net assets of
$69,342,000 million, of which most assets are investments in its subsidiary,
intercompany account receivable and deferred taxes and thus the realisation of this
would be doubtful. E&Y in its report exhibited to the witness statement of Sharon
Rolston has amended this balance sheet to exclude investments in its subsidiaries,
the intercompany accounts receivables and deferred taxes. This amended balance
sheet shows net liabilities of $152 million. The Company is therefore likely to be
insolvent on a balance sheet basis and likely to become insolvent on a cash flow
basis following the North American filings. The Company's realisable value of its
assets is doubtful following the North American filings in view of the
interdependencies within the group and the likelihood of fragmentation of the
EMEA companies unless they are protected by the administration order being
sought or, otherwise, supported financially by the ultimate parent company in
Canada.

(b)    In recent years, the operating costs of the Company have generally exceeded
revenues, resulting in negative cash flow. A number of factors have contributed to

10/17982095_4

[Paris #572591 v2]

6

6

these results, including competitive pressures, an inability to reduce operating expenses, the incurrence of costs related to restructuring efforts, significant competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investment, and the state of the global economy. These difficulties have increased materially in recent months as global economic conditions have worsened. All Nortel companies are experiencing significant pressure on their businesses and facing a deterioration of their cash and liquidity as customers across all businesses delay and reduce their capital expenditures. In particular, the extreme volatility in the global markets has hampered the ability to accurately forecast future revenue and cash position.

(c)     I confirm that these matters apply to the Company. Moreover, in light of these matters it is clear that the Company is or is likely to become unable to pay its debts.

## PURPOSE OF ADMINISTRATION

24.     I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

25.     Following consideration of this matter with the Directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

26.     We have placed particular reliance upon:

(a)     the fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with North American companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)     the matters identified at paragraph [5] and [216] to [218] of the witness statement of Sharon Rolston which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)     the report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

27.   I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the Directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, the directors believe it is appropriate to file for and Administration order in England. In summary, this is due to the fact that the Company is to a large extent managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

28.   The Company is incorporated in France and has its registered office at Parc d'Activites de Magny-Chateufort 78117, Chateaufort, France.

29.   The Company has the following connections with the place of its incorporation:

      (a)   the following 2 individuals, until 14 January 2009, were directors of the Company and both are citizens and residents of France: myself and Jean-Marie Lesur. Since 14 January 2009 I, now the President Directeur General, am the only Board member resident in France;

      (b)   board meetings are held in France;

      (c)   there are 726 employees who are all located in France and subject to French employment contracts. The terms of employment are determined by HR shared services in England and tailored to meet local law requirements in France. Executive level employment agreements and compromise agreements are dealt with in England by Mark Cooper and Sharon Ellerker who prepare the contracts and sign all the terms. All senior recruitment is approved by personnel based in England as referred to in paragraphs [195] to [199] of the witness statement of Sharon Rolston (except for the GSM products line activity, which is done in coordination with North America);

      (d)   the Company was not a member of the EMEA cash pooling arrangements referred to in paragraphs [87] to [89] of the witness statement of Sharon Rolston and maintained its own accounts with French banks. Nevertheless, the Company was subject to and conducts all banking arrangements in accordance with the

10/17982095_4

[Paris #572591 v2]

requirements of Group Treasury procedures set out in paragraph [200] to [205] of the witness statement of Sharon Rolston. This included having both French and EMEA signatories on the accounts and being subject to ultimate direction by Simon Freemantle, who is based in England. Darryl Edwards was until today a signatory to these accounts and all other signatories are French employees;

(e)     the Company has a warehouse in France, which holds spares and repair inventories, for use in its role as a TCC for GSM products. The Company also has leasehold interests and company fit-out equipment in France;

(f)     There are four AL2s based in France. Jean-Luc Khayat, Tom Parker and myself report to AL1s who are based in both England and the United States. Philippe Albert Lebrun is seconded to the EMEA headquarters in the UK as the EMEA controller. The witness statement of Sharon Rolston details the designation of Authority Levels in paragraphs [121] to [139];

(g)     the account management of the top third party customers is operated from France. The top 5 customers are: France Telecom, Bouygues, Alcatel, RFF and SMARTS CIS. Other than Alcatel management of these customers is, however, subject to overall management by Darryl Edwards in England. Mr Edwards, generally, only becomes involved at account level if significant issues arise with that account. These account personnel are also managed from England by Daryl Edwards and his team (which includes myself) who are responsible for setting sales strategy and budgets. The process for approving new contracts is referred to in paragraphs [140] to [153] of the witness statement of Sharon Rolston;

(h)     the procurement procedure in paragraphs [76 ] to [79] of the witness statement of Sharon Rolston ordering of equipment from third party suppliers in relation to the Company's TCC role as the global hub for GSM wireless equipment occurs in France by its French employees. However, the terms on which the Company procures these products from Nortel's global suppliers is based on a master agreement with those suppliers which was negotiated by the Head Office located in Canada, as discussed below. The supplier approval process is subject to overall policies and approvals as referred to in paragraphs [154] to [172] of the witness statement of Sharon Rolston;

(i)     there are also members of the global HR team, based in France, and day to day HR issues in relation to the Company are conducted out of France. Strategic and management oversight of the HR function, does, however, remain with the EMEA office in England;

(j)     the Company's legal services are provided by Jean-Luc Khayat, an AL2, from France. Mr Khayat provides similar services for Nortel's Africa and Middle East offices. Mr Khayat was, however, ultimately responsible to Mr Christian Waida General Counsel, EMEA, who is based in England (Mr Waida resigned on 19 December 2008). The legal department has been re-organised as of 1 January 2009 to be split between two AL1s both of whom are resident in England);

(k)     with the assistance of our external advisers, I have reviewed the trade creditors for the nine months to September 2008. I believe this represents the general position of trade creditors for the Company over time. That shows that generally the company made trade purchase for an amount of around $215,500,000 over that period. Of these, around 30% (or $64 million) relate to local French suppliers. The top five French local suppliers are: Sasken, Gie Les Jeunes Bois, Orange and Mera and Bovis. The approval required for the Company to engage these local suppliers and the terms on which they are engaged is subject to and constrained by the procurement and supply approval processes referred to in paragraphs [154] to [172] of the witness statement of Sharon Rolston. This includes consent of the global contract review board being obtained over certain monetary limits ($100,000 for a new supplier or $500,000 for an existing supplier. Therefore, even in connection with local supplies, personnel in France cannot decide which suppliers to engage or the terms on which to engage them outside of these procedures. I also believe it is likely that a regular supplier of significant goods or services would know that an internal approval process for the supply is necessary and that this approval process is conducted or managed out of England;

(l)     the Company's subsidiary is Northern Telecom France S.A., which is incorporated in France. Northern Telecom France S.A is a largely dormant company. The subsidiary of Northern Telecom France S.A. is Nortel Networks France S.A.S, which is also incorporated in France. The Company together with Nortel Networks France S.A.S conduct the EMEA companies' operations in France and as noted above at paragraph [11], where permissible by French law, and subject to

EMEA control out of England, the management of the Company and Nortel Networks France S.A.S is combined with respect to commercial activities.;

(m)    funding for the Company comes in part from a 48 million Euro loan from Nortel Networks France SAS.

**Factors connecting the Company with countries other than the place of incorporation or England**

30.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)    For the 9 months to September 2008, global creditors of the company comprised around 41% of the Company's trade creditors over that period (or around $88 million). The substantial majority of these are Sanmina, Flextronics, Jones Lang Lasalle, Sun Microsystems and Hewlett Packard. The remainder are companies controlled out of US and Canada.  These creditors are subject to global supply agreements negotiated by the Nortel's group in Canada.  The relationships with these suppliers are managed at either the EMEA regional level in England or in Canada, with the assistance of the GSM French team;

(b)    part funding for the Company comes from a 25 million Euro equity loan from Nortel Networks Ltd, the Canadian parent company of the group; and

(c)    the majority shareholder, owing more than 90% of the shares, is the Canadian parent company for the group.

**Factors connecting the Company with England**

31.    I refer to paragraphs [119] to [139] of the witness statement of Sharon Rolston which set out in detail the decision making process in relation to the business of the companies within the EMEA region; paragraphs [140 ]to [143] which indicate how the contracting approval process is managed in the EMEA in relation to sale agreements; paragraphs [144] to [153] which detail the management of customer relationships of the companies within the EMEA region;  paragraphs [154]to [169] which deal with the procurement of accounts payable processes in EMEA; paragraphs [170] to [172] which deal with the supplier approval process in the EMEA; paragraphs [173] to [177] which relate to legal and

10/17982095_4

[Paris #572591 v2]

11

11

contracts assistance across the EMEA region; paragraphs [178] to [180] which relate to
global compliance across the EMEA region; paragraph [181] which relates to the internal
audit across the EMEA region; paragraphs [182] to [183] which relate to the EMEA and
other external audit processes; paragraphs [184] which relates to ethics management;
paragraphs [185] which relates to corporate security; paragraphs [186] to [189] which deals
with tax strategy across the EMEA region; paragraphs [190] to [199] which relate to
human resources management across the EMEA group; [200] to [205] which relate to
banking and treasury across the EMEA region; paragraph [206] which relate to real estate
across the EMEA region; and paragraphs [207] which relates to advice regarding proposed
restructuring.

32.    I confirm the accuracy of these paragraphs in relation to the conduct of the business of the
       Company to the extent it is related to the EMEA region activity.

33.    These paragraphs evidence the wide range of operational, strategic, financial and high level
       administrative and advisory control over the Company by senior management of EMEA in
       England. These paragraphs also evidence the interconnectivity with the larger Nortel group
       in terms of customers, suppliers and finance functions.

34.    Without in any way limiting what is said in those paragraphs the following points are
       relevant to the Company's connection with England:

35.    **Decision Making:** Senior management in England exercise control and authority over the
       Company through the global decision making approval and policy procedure.  Day to day
       operational management of the Company is conducted locally in accordance with these
       policies.

36.    **Directors:** Until 14 January 2009 Darryl Edwards was the President Directeur General and
       is based in England. Simon Freemantle is a director and is based in England. Darryl
       Edwards is the Head of EMEA sales with an AL1 approval level and Simon Freemantle is
       the Director, Global Treasury Operations. Whilst President Directeur General Mr Edwards
       was also the only legal representative of the company under French law and he performed
       that role from England.

37.    **Creditors:** intercompany creditors comprise around 29% of the total trade creditors for the
       9 months to September 2008 (or around $63 million). Of these by far the most substantial
       (at 35%) is Nortel Networks UK Ltd. The second and third largest are Guangdong Nortel
       and Nortel Networks B.V, which is part of the EMEA group and managed out of England.

Subject to local laws, the payment of all intercompany liabilities is governed by EMEA group treasury, which is managed by Simon Freemantle out of England. Further, as noted above, the procurement and supply approval procedures for local French creditors are governed by the procurement and supply approval procedures as part of the global decision making approval procedure and policy.

38.    **Customers:** the approval process for all sale agreements is managed out of England pursuant to the approval policies described in paragraphs [140] to [143] of the witness statement of Sharon Rolston. Although customers of the Company are generally managed by French personnel, these sales management staff are managed from England by Darryl Edwards who sets the EMEA strategy, targets and budget for sales and sales related matters as well as managing individual customers of the company from time to time. I believe that it is likely that at least for large and repeat customers they are aware that approval and oversight of the sale agreement and the customer relationship occurs in England and beyond.

Although the main third party customers are French, its second largest customer: Bouygues had been provided a performance bond guarantee by BNP Paribas, with whom Nortel had a Treasury Operations relationship which was managed by Simon Freemantle out of England.

39.    **Treasury:** As noted in the witness statement of Sharon Rolston Banking and Treasury functions are run out of England, by the Group Treasury Operations ("Treasury"). Relevantly:

(a)    Subject to French law requirements decisions regarding payment of intercompany liabilities are made by the Treasury function which is based in England;

(b)    All banking arrangements are conducted in accordance with Group Treasury procedures. Simon Freemantle operates in England for EMEA's treasury functions. All facilities are passed through the Group Treasury.

40.    **Corporate Matters and External Advisers:** In relation to corporate matters such as, financial, tax and distribution issues, strategic and high level decisions are generally made by the Finance, and Tax functions of the EMEA group which are all located in England. Nevertheless, subject to strategic and operational management, the French office has its own financial and distribution capabilities through which day to day operational decisions are made.

KPMG is the Company's auditors. KPMG has a global agreement with the Nortel group through which its engagement is managed. For the Company, this relationship is managed by Béatrice Pin under the supervision of Philippe-Albert Lebrun, EMEA accounting controller, who is based in England.

41.    **Property Management:** the Nortel group has a global relationship with Jones Lang Lasalle through which it manages its real estate interests. The leasehold properties of the company are managed by Jones Lang Lasalle along with other EMEA entities through a corporate relationship team based in England. No leasehold decisions are made in France.

42.    **Human Resources:** the Company's employees are likely to be aware that their "high level" employment queries are managed centrally from England by Sharon Ellerker and the EMEA HR Shared Services team. In addition, first line transactional and administrative HR support is provided by the EMEA HR Shared Services team, managed and located principally in England, although some members of this team are also based in France, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums), but would refer more complex queries or case management support, such as disciplinaries or grievances, to the in house HR personnel where applicable.

### Conclusion on COMI

43.    Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is to a large extent directed from England, where all major decisions are made, that this is ascertainable by persons with whom the Company carries on business, and that in the circumstances it is apparent that the Company will apply for an administrative order in England.

### FORMAL REQUIREMENTS

44.    To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

45. To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

46. A statement from each of the proposed administrators is at tab F. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

47. It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

48. Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

49. At tab G is a copy of a letter from the proposed administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

50. I understand that the EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

51. I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom; Christopher John Wilkinson Hill; Stephen John Harris; and Alan Michael Hudson of Ernst and Young LLP as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed.........................................

Dated.....14/01/2009.

Applicant
Michel Clément
No. of Statement:  First
Exhibits: MC 1
14 January 2009

NO. [ ] OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT


IN THE MATTER OF NORTEL NETWORKS S.A.

AND

IN THE MATTER OF THE INSOLVENCY ACT
1986

---

WITNESS STATEMENT OF MICHEL CLÉMENT

---


Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant