# EXHIBIT J

**(Bloom Declaration)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------- X

In re:                          :   Chapter 15

                                   :

NORTEL NETWORKS UK LIMITED, *et al.*,[1]    :   Case No. 09-11972 (KG)

                                   :

       Debtors in a Foreign Proceeding.      :   (Joint Administration Pending)

                                     :

------------------------------------------------------------------- X

## DECLARATION OF ALAN ROBERT BLOOM

I, ALAN ROBERT BLOOM, under penalty of perjury, pursuant to 28 U.S.C. § 1746, declare:

1.      Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in the region known as EMEA (Europe, Middle East, and Africa) (collectively, the "EMEA Debtors") are in proceedings (the "English Proceedings") under the *Insolvency Act 1986* (the "English Insolvency Act"), pending before the High Court of Justice of England and Wales (the "English Court").

2.      I am one of the court-appointed administrators and authorized foreign representatives for each of the EMEA Debtors.

3.      I am over the age of 21 years, of sound mind, am fully competent to testify to the matters set forth herein. All facts set forth in this declaration are based upon my personal knowledge, information supplied to me by the EMEA Debtors' personnel and professionals, or

---

[1]      The Debtors in these cases are: Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z. o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o. The mailing address for each Debtor is: Ernst & Young LLP, Attn: Nortel Administrators, 1 More London Place, London, SE1 2AF.

learned from my review of relevant documents or upon my opinion based upon my experience

and knowledge of the EMEA Debtors' operations, and is true and correct to the best of my

knowledge, information, and belief.

4.     I respectfully submit this declaration in support of the *Verified Chapter 15*

*Petitions for Recognition of Foreign Proceedings and Related Relief With Respect to the EMEA*

*Debtors* (the "Chapter 15 Petitions") and the Memorandum of Law in support of the Chapter 15

Petitions.

5.     Incorporated herein by reference and attached hereto as Exhibit I are true

and correct copies of each of the witness statements of Sharon L. Rolston, former director of the

below-referenced EMEA Debtors, dated January 14, 2009, submitted in connection with the

English Proceedings for NNUK and each of the following EMEA Debtors:

- Nortel GmbH;
- Nortel Networks (Austria) GmbH;
- Nortel Networks (Ireland) Limited;
- Nortel Networks AB;
- Nortel Networks B.V.;
- Nortel Networks Engineering Service Kft;
- Nortel Networks Hispania, S.A.;
- Nortel Networks International Finance & Holding B.V;
- Nortel Networks N.V.;
- Nortel Networks OY;
- Nortel Networks Polska Sp. z. o.o.;
- Nortel Networks Portugal S.A.;
- Nortel Networks Romania SRL;
- Nortel Networks S.p.A.;
- Nortel Networks Slovensko, s.r.o.; and
- Nortel Networks, s.r.o.

6.     Incorporated herein by reference and attached hereto as Exhibit II are true

and correct copies of the witness statements of Michel Clément, former President of Nortel

Networks France S.A.S. ("NNF") and former director of Nortel Networks S.A. ("NNSA"), dated

January 14, 2009, submitted in connection with the English Proceedings for NNF and NNSA.

2

7.     England is the center of main interest for each of the EMEA Debtors as each of the EMEA Debtor's central management and control is handled to a large extent from Maidenhead, England.

Executed on the ___18th___ day of October 2010.

_____
Alan Robert Bloom

**<u>EXHIBIT I</u>**

**(Rolston Witness Statements)**

<b>Applicant<br>
Sharon Rolston<br>
No. of Statement: First<br>
Exhibits: SLR1<br>
14 January 2009</b>

<u>**IN THE HIGH COURT OF JUSTICE**</u>        <u>No.</u>    <u>of 2009</u>

<u>**CHANCERY DIVISION**</u>

<u>**COMPANIES COURT**</u>

**IN THE MATTER OF NORTEL NETWORKS UK LIMITED**

**AND**

**IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

**WITNESS STATEMENT OF SHARON LYNETTE ROLSTON**

---

I, **SHARON ROLSTON** of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, **DO STATE** as follows:-

1.      I am a director of Nortel Networks UK Limited (the **"Company"**) and Chief Financial Officer. I make this witness statement in support of an application by the directors of the Company (the **"Directors"**) for the making of an administration order in respect of the Company and for the appointment of Alan Robert Bloom and Alan Michael Hudson, partners in the firm of Ernst & Young LLP (**"E&Y"**), and Christopher John Wilkinson Hill and Stephen John Harris, executive directors of E&Y, together as joint administrators of the Company. I am duly authorised to make this witness statement on behalf of the Directors.

2.      The Company is the centre of operations and headquarters for the Europe and Middle East and Africa (**"EMEA"** and **"EMEA Region"**) of the global Nortel group of companies (the **"Group"**). This application is also being made in conjunction with applications for the appointment of administrators made in respect of 18 other companies which form part of the EMEA Region (together the **"EMEA Companies"**) on the basis that their respective head office functions are carried out in England, and that England is where the centre of main interests (**"COMI"**) of each of the EMEA Companies is located. I am also a director of the

EMEA Companies having been appointed to the majority yesterday as a result of the resignation of a number of those directors in anticipation of the financial problems now facing the Group. This is described in more detail at paragraphs 208 to 212 below.

3.      Except where I indicate to the contrary, the facts contained in this witness statement are within my own knowledge and are true. Where the facts are not within my own knowledge I have indicated my sources of information which I believe to be true. There is now produced and shown to me a bundle of papers marked **"SLR1"** to which I shall refer in this witness statement.

## I.      SUMMARY

4.      This application is being made in connection with and following the insolvencies of the Company's parent company and certain of its subsidiaries in Canada and the U.S. (**"North America"**). I am advised by E&Y that the predicted impairment on the global business of the Nortel Group as a consequence of those filings means that it is inevitable that the Company and the EMEA Companies will become insolvent.

5.      The decision to seek an administration order in England for the Company and the EMEA Companies was made by the Directors on the basis that: (i) it will give the EMEA Companies the best opportunity, with North America, to pursue a fully coordinated approach to the restructuring of the Nortel global operations, including, in particular, approaches to potential buyers; and (ii) this course of action is in the best interests of the creditors of each of the EMEA Companies.

6.      There is a large volume of information for the Court to consider in relation to the complex arrangements between the Company and the EMEA Companies. To assist the Court the information is set out under the following headings:

a.      (Sections I – IV) The Group and its business

        This section sets out the history, overview and business of the global Nortel business. It will also demonstrate that the global and EMEA business is highly integrated and that successful financial performance depends upon a high degree of inter-dependence amongst the entities within the Group; and that the centre of operations and head office functions for the EMEA Region is carried out from and performed in England.

b.     (Section V) The financial difficulties of the Group and the EMEA Companies

This section will deal with the financial difficulties that have affected the global Nortel business and its EMEA business. It will also explain why administration is the best opportunity to appraise a global restructuring of the Nortel business.

c.     (Section VI) Details of why COMI for the EMEA Companies is located in England

This section sets out the evidence which demonstrates that the centre of operations and head office functions for the EMEA Region is carried out from and performed in England.

d.     (Section VII) Cascade of the board of directors of the EMEA Companies

This section details why it was considered strategically advantageous by the Company that Simon Freemantle and me become directors of the EMEA Companies in order to take a co-ordinated approach to the EMEA Companies in relation to any applications for administration in England or facilitating a restructuring.

e.     (Section VIII) Jurisdictional requirements set out in paragraph 11 of Schedule B1 to the Insolvency Act 1986 and Rule 2.4 of the Insolvency Rules 1986.

This section sets out the advantages of co-ordinated filings across the globe, as well as containing information required by law for this application.

## II.    BACKGROUND

### II.1    The Company

7.    The Company is the current owner of the UK business of the Group, which has been operating in England for around 20 years.

8.    The Company was incorporated on 25 February 2000 under the Companies Act 1985 and its registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire SL6 3QH. The printout from Companies House confirming this is at SLR1, tab 1, page 1.

9.    The Company's original name was Nortel Networks Holdings Limited (a private company). On 5 May 2000 the Company re-registered as a public company and changed its name to Nortel Networks Holdings plc. The Company then re-registered as a private company and changed its name to Nortel Networks UK Limited with effect from 2 March 2001. The Company has a branch in Saudi Arabia.

10.  The issued share capital of the Company is £1,468,100,001 divided into 1,468,100,001 ordinary shares of £1 each. The amount of the capital paid up or credited as paid up is £1,468,100,001.

11.  The Company is a wholly-owned subsidiary of Nortel Networks Limited ("NNL"), a Canadian company. The Company's ultimate parent company is Nortel Networks Corporation ("NNC"), a Canadian company listed on both the Toronto Stock Exchange ("**TSX**") and the New York Stock Exchange ("**NYSE**").

12.  NNC is the direct or indirect parent of 142 subsidiaries operating worldwide, including the Company and the EMEA Companies.

13.  References to "Nortel", the "**Nortel Companies**", the "**Group**" and the "**Nortel Group**" are references to the global enterprises as a whole. A copy of the Nortel Group structure is at SLR1, tab 2, page 2.

14.  The Company is the centre of operations for the EMEA Region of the Group. The 18 EMEA Companies are:

     1.   Nortel Networks S.A. (France)

     2.   Nortel GmbH (Germany)

     3.   Nortel Networks (Ireland) Limited (Ireland)

     4.   Nortel Networks N.V. (Belgium)

     5.   Nortel Networks S.p.A. (Italy)

     6.   Nortel Networks B.V. (Netherlands)

     7.   Nortel Networks Polska Sp. z o.o. (Poland)

     8.   Nortel Networks Hispania, S.A. (Spain)

     9.   Nortel Networks International Finance & Holding B.V. (Netherlands)

     10.  Nortel Networks (Austria) GmbH (Austria)

     11.  Nortel Networks, s.r.o. (Czech Republic)

     12.  Nortel Networks Engineering Service Kft. (Hungary)

     13.  Nortel Networks Portugal S.A. (Portugal)

     14.  Nortel Networks Slovensko, s.r.o. (Slovakia)

     15.  Nortel Networks France S.A.S (France)

     16.  Nortel Networks Oy (Finland)

17. Nortel Networks Romania SRL (Romania)

18. Nortel Networks AB (Sweden)

15. References to "**EMEA**", the "**EMEA Companies**", the "**EMEA Entities**" and the "**EMEA Group**" are references to the EMEA enterprises as a whole. The 18 EMEA Companies are incorporated and have registered offices outside England. However, the centre of main operations and head office functions are located in England. The EMEA Companies have their centre of main interests in England as:

a.  senior management for EMEA is largely located in England at the Company's Maidenhead campus;

b.  the senior management, which is largely located in Maidenhead, make the vast majority of significant decisions in respect of the operations of the EMEA Companies;

c.  the senior management of all key primary functions (i.e. sales, finance, treasury, legal and human resources) required for the operation of the EMEA Region are located in England;

d.  significant decisions in relation to sales and dealings with customers are largely made in England;

e.  obligations to suppliers are subject to approval processes conducted and managed in England, a process of which the majority of suppliers are thought to be aware;

f.  management, supervision and decision-making in relation to taxation of the EMEA Group is made in England;

g.  finance and control functions are run from England;

h.  human resources for EMEA are supervised and run from England;

i.  decisions in relation to settlement of intercompany accounts are made by the EMEA Treasury team in England. Those terms are determined in accordance with global and EMEA Region procurement policies and are authorised by the individual with the relevant authority level (as determined by the nature of the procurement transaction);

j.     all EMEA senior legal decisions are made in England;

k.     all matters in relation to compliance, ethics and corporate security for the EMEA Region are dealt with and managed out of England;

l.     the EMEA leasehold portfolio is managed through a relationship corporate real estate team located in England; and

m.     the treasury and banking functions for the EMEA Companies are managed out of England.

## II.2    North American bankruptcies

16.    On 14 January 2009 NNC, NNL and various other Canadian companies in the Group (the **"Canadian Companies"**) resolved to seek protection under the Canadian bankruptcy law, the Companies' Creditors Arrangement Act (**"CCAA"**), to facilitate the reorganisation of the Nortel Companies for the benefit of its creditors. Certain of NNC's direct and indirect U.S. subsidiaries (the **"U.S. Companies"**) also resolved to file for a voluntary petition pursuant to Chapter 11 of the United States Bankruptcy Code (the **"Code"**).

## II.3    History and Overview of the Nortel Group

### II.3.1   History of the Nortel business

17.    Nortel was founded by Bell Telephone Company of Canada in 1895 as Northern Electric and Manufacturing Company Limited, a provider of telecommunications equipment for Canada's telephone system. By the late 1980s it had become known as Northern Telecom Limited (**"Northern Telecom"**) which expanded into the U.S., operating out of a number of plants, employing thousands of people. Northern Telecom also made in-roads in China and Japan.

18.    In 1998, Northern Telecom changed its name to **"Nortel Networks Corporation"** and in 2000 NNC became a widely-held Canadian public company.

19.    For the last eight years, Nortel has focused on growth through strategic alliances, (e.g. LG Electronic Inc.) to provide more comprehensive solutions to customers on a global basis.

20.    Nortel's year end 2007 worldwide revenue was approximately U.S$11 billion, of which around 25% was generated by the EMEA Region and 6% by the Company.

21.    Overall, Nortel employs 24,000 people worldwide, of which approximately 4,600 are employed in the EMEA Region.

*II.3.2    Overview of the business*

22.     Nortel is a global supplier of networking solutions (i.e. telecommunications, computer networks and software), serving both **"Carrier"** (also referred to as a service provider) and **"Enterprise"** customers in North America, EMEA, Latin America and Asia.  This includes hardware and software solutions and related services.

23.     Nortel has a history of innovation in the design, development and deployment of products, systems, and solutions in modern communications to deliver value to its Carrier and Enterprise customers globally.  This includes internal Research & Development (**"R&D"**) initiatives and external R&D partnerships.

24.     Nortel conducts R&D through 10 key R&D "Centres of Excellence" globally and also invests in approximately 50 technology innovation initiatives with more than 20 major universities. Nortel also has strategic alliances, partnerships and joint ventures with other best-in-class companies.  Furthermore, Nortel Companies work with and contribute to leading research organisations with information technology (**"IT"**) and telecoms, and hold leadership positions in many of them.

*II.3.3    Global Structure*

25.     In summary, NNC is the ultimate holding company of the Nortel Group.  NNL is the primary Canadian operating company and holding company for most of the global subsidiaries.  It is also a primary obligor under all bond indentures and is the issuer of preferred shares listed on the TSX.  Nortel Networks Inc (a U.S. company) (**"NNI"**) is a private company and is the primary U.S. operating company.

**III.    GENESIS AND STRUCTURE OF THE EMEA REGION**

**III.1    Genesis of the EMEA Region**

26.     The Company owns all but three of the EMEA Companies via ownership of Nortel International Finance & Holding B.V. (**"NNIF"**) further to a restructuring of the EMEA Region in December 2007, when the Company acquired the whole of the issued share capital of NNIF from NNL.

27.     The purpose of the restructuring in 2007 was to deal with the position under which NNL had become significantly indebted to the Company over the preceding years, and that indebtedness was causing a UK tax problem resulting in a per annum tax cost of around US$18 million.

28.     Prior to the 2007 restructuring, the NNIF group had been owned by NNL since its formation in the 1980s, although NNIF was held via a Luxembourg subsidiary of NNL from 1993. NNIF was set up in the 1980s as the regional holding company to own the European interests of the Group, to both mitigate taxes on divestments of or dividends from those companies, and to act as a funding vehicle for the EMEA Region businesses.  The latter role was quite significant and has largely been assumed by the Company in recent years.

29.     Most of the interests in NNIF started off as new company formations when Nortel had the need for a corporate presence in territories in which target customers operated or where European joint ventures were entered into with outside parties.

30.     At the time NNIF was formed, the Nortel UK interests were not very substantial.  The acquisition by NNL in 1990 of STC plc, a major UK public company, significantly increased the Nortel Group's UK presence including both a large EMEA customer base and a significant technological base.  The UK business then became the largest operation in the EMEA Region as well as the centre of operations, making the vast majority of significant decisions for the EMEA Companies and performing head office functions. Since that time the majority of the individual EMEA Companies have operated as sales centres within the state of incorporation.

31.     Nortel Networks SA ("**NN France SA**") was a joint venture with an outside party which Nortel took 100% control of in 1999.

32.     The strength of central management personnel and its business segment coverage means England is the management centre for EMEA.  This has been assisted by the fact that senior North American personnel seconded to work in EMEA, which used to involve a considerable number of individuals, used England as a location when based in Europe which attracted management support functions around them.

### III.2    Structure of the EMEA Region

33.     The principal activities of the Company are the development and supply of telecommunication equipment and software services and serving as centre of operations of the EMEA Region.   The financial performance of the Company is determined by global agreements with certain other wholly-owned subsidiaries of NNL.

34.     As noted above, since 1990 the UK business of the Group has been the largest Nortel presence in EMEA and has had the widest coverage of Nortel business segments.  NN France SA was a joint venture until 1999, and is focused on the "Wireless-GSM" business segment. The next largest presence, Nortel GmbH ("**NN Germany**"), was also a joint venture until 2003 and remains focussed on its local market. However, the Company is by far the largest

business in the EMEA, and was ranked second highest earner out of all Nortel entities for the year end 2007. No other EMEA Company appears in the top 20.

35.    The EMEA Companies are tasked with the marketing, sale and distribution of Group products under the strategic and operational control of senior management in England.

36.    The majority of the EMEA Companies are subsidiaries of the Company, with the exception of:

  a.    Nortel Networks SA ("**NN France SA**") which is jointly owned by NNL (as to 9 per cent) and NNIF (as to 91 per cent);

  b.    Nortel Networks France ("**NN France SAS**") which is an ultimate subsidiary of NN France SA; and

  c.    Nortel Networks (Ireland) Limited ("**NN Ireland**") which is a wholly-owned subsidiary of NNL.

37.    With regards to NN France SA, it was proposed as part of the 2007 restructuring that the 91 per cent of the shares in NN France SA held by NNIF were to be transferred to the Company in early 2009 once a valuation had been undertaken. However, the completion of the restructuring has been overtaken by the North American insolvency filings. Despite this, NN France SA is effectively treated as an economic subsidiary of the Company.

38.    With regards to NN Ireland, it is the core legal entity for EMEA Enterprise sales. It has most of the EMEA sales for that business line passing through it, for historic reasons. It makes the larger part of product supplies from the Company; some US$160 million worth at group cost in the 9 months to September 2008.

39.    Until December 2007, NN Ireland was wholly owned by NNIF, but it was sold to NNL by NNIF prior to the 2007 restructuring for fiscal reasons.

III.3    **Inter-connected nature of the operations of the European group**

40.    The EMEA Region can be categorised as comprising the following types of entities:

  a.    Residual Profit entities (an "**RP Entity**", together the "**RP Entities**");

  b.    Cost Plus entities (a "**CP Entity**", together the "**CP Entities**");

  c.    Limited Risk entities (an "**LR Entity**", together the "**LR Entities**");

d.       At Risk entities (an "**AR Entity**", together the "**AR Entities**"); and

e.       holding companies (the "**Holding Companies**").

Each of these types of entities is addressed in turn in the following paragraphs.

*III.3.1   The RP Entities*

41.    There are three RP Entities:

| No. | RP Entity | EMEA Country |
|-----|-----------|--------------|
| 1.  | The Company | UK |
| 2.  | NN Ireland | Ireland |
| 3.  | NN France SA | France |

42.    RP Entities are fully integrated operations in that all the EMEA Group business functions sit within them. They derive revenues from distribution and sales of Nortel products, which will include customers outside their territory of incorporation, both third party and other Group companies. In addition to hosting parts of the Group business support functions they also conduct and fund the Group R&D effort.

43.    RP Entities are granted a licence to use the Group intellectual property ("**IP**") via a licensing agreement with NNL which owns all IP, known as the Master Research & Development Agreement. Each EMEA Company's profit is determined in accordance with the "**Transfer Pricing**", set out in more detail at paragraphs 80 to 81 below.

*III.3.2   The CP Entities*

44.    There are eight CP Entities:

| No. | CP Entity | EMEA Country |
|-----|-----------|--------------|
| 1.  | Nortel Networks O.O.O.* | Russia |
| 2.  | Nortel Networks Oy | Finland |
| 3.  | Nortel Networks (Scandinavia) AS * | Norway |
| 4.  | Nortel Networks Romania SRL | Romania |
| 5.  | Nortel Networks AB | Sweden |

| No. | CP Entity | EMEA Country |
|-----|-----------|--------------|
| 6. | Nortel Networks Ukraine Limited * | Ukraine |
| 7. | Nortel Networks South Africa (Proprietary) Limited * | South Africa |
| 8. | Nortel Telecom International Ltd * | Nigeria |

\* - No administration application is being made.

45.   CP Entities are service companies, their main roles being the marketing of Nortel product, customer relationship management and local product installation and training.   They may have a direct relationship with customers to provide these services or may provide the services to other EMEA Companies.

46.   CP Entities generally receive income on a **"Cost Plus"** basis.   "Cost plus" means the process by which the fully accounted cost, including attributable business overheads (but not funding costs), is calculated and a fee equal to those costs plus an agreed mark up (usually 10 per cent) is billed by the CP Entity to the Group company benefiting from the services (the Company and NN Ireland, as well as NNL). CP Entities may also derive some income locally from installation and training services to customers.

*III.3.3   The AR Entities*

47.   There are three AR Entities of which two are seeking administration – Israel is seeking the local equivalent of an administration:

| No. | AR Entity | EMEA Country |
|-----|-----------|--------------|
| 1. | Nortel GmbH | Germany |
| 2. | Nortel Networks Israel (Sales and Marketing) Limited | Israel |
| 3. | Nortel Networks France S.A.S. | France |

48.   AR entities are distribution and sales businesses.  They derive revenues from distribution and sales of Nortel product, largely to third party customers within their own territory of incorporation but also third party customers outside that territory and other Group Companies.

49.   The AR Entities were historically joint venture operations and their relationship with the Group continues to be governed by agreements entered into when they were former joint venture entities.  Their profitability depends on their own performance.

### III.3.4   The LR Entities

50.    There are 11 LR Entities of which 10 are seeking administration orders:

| No. | LR Entity | EMEA Country |
|-----|-----------|--------------|
| 1.  | Nortel Networks N.V. | Belgium |
| 2.  | Nortel Networks S.p.a. | Italy |
| 3.  | Nortel Networks B.V. | Netherlands |
| 4.  | Nortel Networks Polska S.p. z.o.o. | Poland |
| 5.  | Nortel Networks Hispania, S.A. | Spain |
| 6.  | Nortel Networks Austria GmbH | Austria |
| 7.  | Nortel Networks s.r.o. | Czech Republic |
| 8.  | Nortel Networks Engineering Service Kft | Hungary |
| 9.  | Nortel Networks Portugal S.A. | Portugal |
| 10. | Nortel Networks Slovensko s.r.o. | Slovakia |
| 11. | Nortel Networks A.G. * | Switzerland |

* - No administration application is being made.

51.    LR Entities are distribution and sales businesses. They will enter into third party customer contracts, which, in the case of larger pan-European and global customers, are often subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the EMEA group. They will satisfy customer contracts for products by placing an order with the relevant "**TCC**" (described in more detail at paragraphs 76 to 78 below).

52.    LR Entities' operating profit before restructuring and finance costs is calculated by reference to a benchmarked arms length return, currently 1% on third party sales under individual distribution agreements with NNL, which means that they are underwritten for business risks by NNL apart from those associated with their own business infrastructure.

53.    LR Entities are granted the right to use the group IP rights held by NNL pursuant to a standard form distribution agreement.

*III.3.5  The Holdings Entities*

54.    There are three Holding Companies of which one is seeking administration.  Israel is seeking the local equivalent of administration:

| No. | LR Entity | EMEA Country |
|-----|-----------|--------------|
| 1. | Nortel Networks International Finance & Holdings B.V. | Netherlands |
| 2. | Nortel Communication Holdings (1997) Limited | Israel |
| 3. | Northern Telecom France S.A.[*] | France |

[*] No administration application is being made.

55.    The Holding Entities undertake no trading activities and act solely as a holding company for their subsidiary entities.

56.    The RP, CP, LP and AR Entities make up the business of the EMEA Region and operate within the Nortel business segments, which are described in more detail below.

## IV.    BUSINESS OF THE COMPANY, THE GROUP AND THE EMEA REGION

### IV.1    Nortel's business

57.    There are two main parts to Nortel's global business:

a.    the supply of physical hardware with embedded or bundled software through Nortel's four business segments: Carrier Networks ("**CN**"), Enterprise Solutions ("**ES**"), Global Services ("**GS**") and Metro Ethernet Networks ("**MEN**"); and

b.    the deployment and support of that hardware (formerly provided through the GS business but now integrated into the CN, ES and MEN businesses).

58.    In year end 2007 total revenue generated by the businesses was approximately US$11 billion.

*IV.1.1  The CN business*

59.    The CN business provides wireless networking solutions that enable service providers and cable operators to supply mobile voice, data and multimedia communication services to individuals and enterprises using mobile telephones, personal digital assistants and other wireless computing and communications devices.

60.    The CN portfolio includes 3G and 2.5G mobility networking based on Code Division Multiple Access ("**CDMA**"), Global System for Mobile communications ("**GSM**"), Global

System for Mobile Communications - Railway ("**GSM-R**"), General Packet Radio Service ("**GPRS**") and Enhanced Data Rates for GSM Evolution ("**EDGE**").

61.    In year end 2007 the CN business generated approximately US$4.5 billion, around 41 per cent of Nortel's worldwide revenue.

*IV.1.2    The ES business*

62.    The ES business provides communication solutions to build networks and transform existing communications networks into cost effective, packet-based networks supporting data, voice and multimedia communications.  The ES business works with the headquarters, branch and home office needs of large and small businesses globally across a variety of industries, including healthcare and financial service providers, retailers, manufacturers, utilities, educational institutions and government agencies.

63.    In year end 2007 the ES business generated approximately US$2.6 billion, around 24 per cent of Nortel's worldwide revenue.

*IV.1.3    The MEN business*

64.    The MEN business provides optical networking and carrier grade ethernet data networking solutions to make the Carrier and large Enterprise customers' networks more scalable and reliable for the high speed delivery of multimedia communications services, for example internet video, residential broadcast TV, video on demand and new wireless broadband multimedia applications.

65.    In year end 2007 the MEN business generated approximately $1.5 billion, around 14 per cent of Nortel's worldwide revenue.

*IV.1.4    The GS business*

66.    The GS business provided a broad range of services supporting multi-vendor, multi-technology networks for enterprises and carriers worldwide to reduce costs and improve efficiency.  This included services to help design, deploy, support and evolve networks for small to medium-sized businesses and large global enterprises, municipal, regional and federal government agencies, wireline and wireless carriers, cable operators and mobile virtual network operators.

67.    In year end 2007 the GS business generated approximately $2.1 billion, around 19 per cent of Nortel's worldwide revenue.

IV.2    **Nortel Companies' Supply Structure**

68.    Due to the global nature of the business, many of Nortel's primary external supplier contractual relationships are with NNL in Canada.  However, most EMEA Companies order products pursuant to internal sub-agreements with suppliers and Nortel's regional hubs.

69.    Nortel's supply chain for hardware consists of three steps:

    a.    Contract manufacturers or electronics manufacturing services providers ("**EMS**").

        The EMS provides final assembly, testing and configuration and delivery to the Nortel distribution centres or Nortel customers directly.  An EMS may also perform sub-assembly of circuit board frames and cabinets.  Nortel's single largest EMS is Flextronics Telecon Systems Limited ("**Flextronics**") which is discussed in more detail below.

    b.    Original equipment manufacturing ("**OEM**") and original design manufacturing ("**ODM**") Tier II suppliers ("**TIER II Suppliers**").

        Tier II Suppliers are Nortel's suppliers of products which may be used in Nortel's final product or sold bundled with such product.  ODM Tier II Suppliers may also contribute IP development and customisation of products.  Although Nortel (usually NNL) enters into master contracts for the supply of products with these OEM/ODM Tier II suppliers.  In the case of the Company it contracts directly with the OEM/ODM Tier II Suppliers to facilitate the ultimate product delivery to the customer which placed the order with the regional sales company.  This differs with NN France SA where all purchase orders are issued by the EMS and are shipped directly to the EMS as required and Tier II Component Suppliers are paid by the issuer of the purchase order.

    c.    Tier II component suppliers ("**Tier II Component Suppliers**").

        Tier II Component Suppliers are parts suppliers who provide piece parts for Nortel's hardware products.  Again, Nortel (usually NNL) enters into master contracts for the supply of products with these component suppliers.  In the case of the Company it contracts directly with the OEM/ODM Tier II Suppliers to facilitate the ultimate product delivery to the customer which placed the order with the regional sales company.  This differs with NN France SA where all purchase orders are issued by the EMS and are shipped directly to the EMS as required and Tier II Component Suppliers are paid by the issuer of the purchase order.

### IV.2.1    Deployment Services

70. Once a customer's hardware has been manufactured, the businesses provide for installation, network integration and support services (the **"Deployment Services"**). Service professionals may be on-site for the installation of products or may operate remotely off-site.

71. Deployment Services are managed regionally and cover all product lines. For example, in EMEA, all deployments for all product groups are handled across the region through Global Operations led by Ashley Saunders from Maidenhead. This group is responsible for its own order taking, engineering, installation, commissioning and network integration.

72. Deployment Services are performed by both Nortel employees and third party suppliers. In EMEA, 27 per cent of Deployment Services are provided by third parties

### IV.2.2    Flextronics

73. In 2006, the Nortel Companies outsourced substantially all of their hardware manufacturing and related activities including certain product integration, testing, repair operations, supply chain management, third party logistics operations and design assets.

74. In this regard, NNL entered into an asset purchase agreement with Flextronics for the sale of the bulk of its inventory and manufacturing facilities. In connection with the Flextronics sale, NNL and Flextronics entered into a four year supply arrangement for the supply of products and services on an on-going basis.

75. Nortel has sought to diversify its supply sources. However, to date, Flextronics remains Nortel's largest supplier. For 2008, Nortel estimates that Flextronics will have supplied approximately 75 per cent of Nortel's products and provided logistics and maintenance in connection with those products.

### IV.3    Nortel internal purchasing system

76. Nortel employs a complex internal purchasing system for its hardware and software products.

77. Nortel's internal purchasing system works as follows:

   a. when a customer sales order is placed with one of the Nortel regional sales companies, an internal purchase order is placed, which is automatically routed through one of four transaction control centres ("TCCs") depending on the business (CN, MEN or ES) and the geographic region involved. The TCCs act as purchasing hubs for all of Nortel Companies' regional sales entities. The four TCCs are NNL (Canada), NNI (USA), the Company and NN France SA;

b.  when an internal purchasing order is received by one of the TCCs, that TCC (apart from the Company) contracts directly with the OEM and ODM Tier II Suppliers to facilitate the ultimate product delivery to the customer which placed the order with the regional sales company;

c.  upon completion of the purchase order, the TCC (apart from the Company) pays the OEM/ODM Tier II Supplier and bills the regional sales company with an additional mark up, which is paid after delivery. The OEM or ODM Tier II Supplier may be paid prior to the internal payment of the resulting receivable.

78.  Approximately two thirds of all purchasing flows through the North American purchasing hubs (NNL and NNI) and one third through the Company and NN France, as their revenues from this in the nine months to September 2008 being US$ 485 million and US$ 123 million respectively.

79.  The Company acts as the purchaser for EMEA of MEN, Enterprise "Voice" and Enterprise "Data" products. NNL generally acts as the purchaser for worldwide CDMA products and is where an EMEA entity will go to for those products. NNI acts as the purchaser for worldwide CN CVAS products and NN France SA acts as the purchaser for CN GSM products worldwide. Again, an EMEA Company is required to deal with those TCCs for such products. All supply issues for EMEA are dealt with and resolved in Northern Ireland by the Company's operations based there.

*IV.3.1  Transfer Pricing*

80.  The purchasing arrangements result in very large numbers of inter-company receivables and payables, which necessitates transfer pricing and inter-company settling methods.

81.  Nortel's transfer pricing model (the "**Transfer Pricing Model**") can be broken down into two main components:

a.  Inventory Mark Up.

When a TCC (e.g. the Company) purchases inventory following an order from a regional sales company, it invoices the regional sales company (the "**Internal Invoice**") for the product with a mark up on cost (the "**Initial Mark Up**") from the supplier invoice. The mark up is the first component on Nortel's Transfer Pricing Model;

b.        Residual Profit Sharing.

The second component of the Transfer Pricing Model is derived from Nortel's profit sharing adjustment model based on the profit projections that Nortel forecasts for its global entities and the RP Entities. On a quarterly (potentially moving to monthly) basis, operating profit is assessed and re-allocated based on the projections for each Nortel Company. To the extent that any Nortel Company has enjoyed a profit that exceeds its profit entitlement (after taking into consideration the amounts paid on the Initial Mark Up), it is required to remit additional monies back to the RP Entities. RP Entities then allocate amongst themselves based on their agreed upon profit entitlements.

*IV.3.2    Inter-Company Accounts*

82.    EMEA Treasury (carried out by the Company in Maidenhead) is responsible for the amount and flow of funds between the EMEA Companies. The two primary purposes of the inter-company accounts are (a) inter-company trade invoices and (b) to facilitate the Transfer Pricing Model.

83.    Typically, internal invoices are settled on a monthly basis. The way that internal invoices are settled is either through:

a.        set off against other invoices or debt;

b.        cash payment – where the Nortel Company has sufficient funds to pay the Internal Invoice, it will make an actual transfer from its accounts to the TCC account, or the NNL account in the case of RP Entities' settlements; or

c.        carry forward - in certain circumstances, the purchasing Nortel Company does not have sufficient funds to pay an Internal Invoice and so the vendor will allow the receivable to carry forward.

84.    EMEA Treasury determines and facilitates how to settle inter-company accounts. If it is not automatically settled under standard terms, a recommendation is sent to the applicable Nortel Company for consideration. The ultimate decision regarding payment, or settlement is led by EMEA Treasury taking into consideration local entity and tax issues

*IV.3.3    Inter-company balances*

85.    Funding for each Group subsidiary is first determined based on a capital requirement basis. The preference is to fund in the most flexible a tax efficient manner, the majority of which is

normally via loan rather than equity capital. Generally, lending is arranged in such a way as to mitigate both foreign exchange exposures and withholding taxes on interest flows and is done on a parent to direct subsidiary basis subject to tax efficiencies. Excess cash in a subsidiary can be loaned to facilitate funding of other subsidiaries within the region or globally. Global inter-company facilities and loans are all managed from EMEA Treasury in England.

86.    Inter-company receivables arise among the operating subsidiaries. When such receivables are not settled on a short time frame, such a receivable will be converted into an inter-company loan. These loans are typically repaid in the normal course of business.

### IV.4    Funding of the EMEA group

87.    A number of the EMEA Companies participated in a cash pooling arrangement (the "**Cash Pooling Arrangement**") managed by EMEA Treasury until it was discontinued upon legal advice as of 29 December 2008 given the solvency concerns of the Nortel Group. The Cash Pooling Arrangement operated in the following manner:

a.    cash denominated in U.S. dollars and/or Euros held by individual EMEA Companies within the Cash Pooling Arrangement in various bank accounts in the countries in which such participating EMEA Companies are situated was transferred from each such account into separate accounts with Citibank in London in the name of the relevant participating EMEA Company. Title to the transferred cash was thus retained by each participating EMEA Company.

b.    Such transfers could occur on a daily or weekly basis. EMEA Treasury would request a particular participating EMEA Company to make such transfers. In each case, the amount of cash transferred was not predetermined, but rather it was determined on an ad hoc basis depending on how much EMEA Treasury, in consultation with the relevant participating EMEA Company, determined was necessary or desirable. Each such transfer was manual, and thus deliberate, rather than predetermined or automatic.

c.    Once the transferred cash arrived at Citibank in London it did not move elsewhere. The Company held an account in its own name with Citibank in London with a nil balance. Citibank would allow this account to go into overdraft to the value of the aggregate of the cash balances of the individual accounts held with it in the names of the participating EMEA Companies. In this way, the Cash Pooling Arrangement was a notional, rather than an actual, cash pooling arrangement.

d.    On a daily basis, the Company would invest an amount equal to the aggregate of the cash balances of the individual Citibank accounts in money market deposits. The Company used the overdraft granted by Citibank to make such investments.

e.    If the Company did not deposit enough cash into its account to return the overdrawn balance on that account back to nil following receipt of such monies from money market investment counterparties, Citibank had the right to set-off any negative balance on the Company's account against the positive balances of the individual accounts in the names of the participating EMEA Companies. In such circumstances, each participating EMEA Company would have an unsecured claim against the Company. Each of the participating EMEA Companies entered into a counter-indemnity agreement whereby any participating EMEA Company that suffered a loss as a result of these set-off arrangements would be entitled to be reimbursed for the amount of such loss by another participating EMEA Company.

88.    The Cash Pooling Arrangement was discontinued in December 2008 because, once it became known that the North American Companies were facing financial difficulties, EMEA Treasury (on legal advice) did not want to expose the participating EMEA Companies to the risk that Citibank may utilise its right of set-off. This decision was taken by Simon Freemantle, Director Global Treasury Operations, based in Maidenhead. Had the EMEA Group been in a healthy financial position and the Directors not been aware of the possibility that it may need to apply for administration in the near future, the Cash Pooling Arrangement would almost certainly have remained in place.

89.    Since the ending of the Cash Pooling Arrangement, each EMEA Entity has at least one local bank account with minimal weekly working capital requirements. Their London account holds the "surplus" and is managed by EMEA Treasury which makes the investment decisions in relation to the Money Market Fund of short term deposits in the name of that EMEA Entity.

## V.    THE COMPANY'S AND EMEA'S FINANCIAL DIFFICULTIES

### V.1    Financial difficulties faced by the Nortel Group

90.    The Nortel Group is loss making and has reported only losses or break-even financial results in the last five financial years. In the nine months ended 30 September 2008, I am informed that the Nortel Group incurred a consolidated net loss after tax of $3.7 billion against a net loss after tax of $1 billion in the year ended 31 December 2007.

91.   In this context, the EMEA reporting region entities' results for the nine months ended 30 September 2008 were a combined loss after tax of US$261 million, against a combined net loss after tax of $134 million in the year ended 31 December 2007. Therefore, the EMEA reporting region entities are also loss making overall.

*V.1.1    Industry issues*

92.   The Nortel Companies operate in a highly competitive industry which is rationalising and consolidating. By way of example, two of Nortel's largest competitors, Lucent Technologies Inc. and Alcatel, merged in 2006 and two of its largest customers, Verizon Wireless and Alltell Corporation, merged in 2008.

93.   In recent years, the operating costs of the Nortel Companies have generally exceeded revenue. A number of factors have contributed to these results, including an inability to reduce operating expenses, restructuring costs, competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investments and the global economic downturn.

94.   On 17 September 2008, Nortel announced that with the sustained and expanding economic downturn it was experiencing significant pressure on its business as certain customers cut back their capital expenditures further than previously expected and others were deferring new IT and optical investments. In addition, the Nortel Companies were experiencing additional pressure on revenue due to foreign exchange impacts. In response to the business environment, Nortel announced that a comprehensive review of its business was taking place, including planning for further restructuring and other cost reduction initiatives.

95.   On 10 November 2008, Nortel announced an update to its business review including a new operating model (which took effect on 1 January 2009) to further consolidate management positions and increase efficiencies in its business units, a further planned restructuring of its workforce and other cost reduction actions and a focus on cash preservation including the suspension of the declaration of NNL's preferred share dividends. A second workforce reduction of the year in November 2008 announced job reductions of 3,500.

*V.1.2    Informal Restructuring Plans*

96.   Since September 2008, Nortel has also pursued sales disposals which would involve a sale of all or substantially all of Nortel's business. In the fourth quarter of 2008, Nortel commenced negotiations with a potential purchaser to explore a sale or merger of the businesses. These negotiations, however, were ultimately unsuccessful.

97.     As of this application, Nortel has been unable to successfully restructure the business. This has been, in part, due to the integrated nature of the business segment with the overall Nortel business structure.

*V.1.3     The insolvencies of the North American Companies*

98.     Since Nortel's announcement on 17 September 2008, worsening economic conditions and extreme volatility in the financial, foreign exchange and credit markets globally further impacted the Nortel Companies and customers resulting in reductions in customer spending levels and a reduced ability to forecast.

99.     The Canadian Companies believe that the actions which present the greatest potential for the survival and recovery of the Group are a comprehensive business and financial restructuring with the court's protection and, on 14 January 2009 the Canadian Companies resolved to seek protection under the CCAA to facilitate the reorganisation of the Nortel Companies for the benefit of all creditors. Simultaneously with the application under the CCAA in Canada, the U.S. Companies resolved to file for bankruptcy pursuant to Chapter 11 of the Code.

**V.2     Financial difficulties faced by the EMEA Group**

*V.2.1     Impact of the Canadian and U.S. Companies insolvencies on the European group*

100.    I have discussed with E&Y the impact which the North American insolvency filings is likely to have on the EMEA Companies and their ongoing financial position. In this regard I refer to paragraphs 5.1 to 5.8 of the E&Y report (the **"E&Y Report"**) at SLR1, tab 3, I believe that:

a.      whether or not the EMEA Companies themselves enter formal insolvency procedures, this will affect customer and supplier confidence in the EMEA Companies, and will be of concern to the work force upon which the future of the business depends;

b.      due to the nature of the business, which is heavily dependent on a customer's confidence that its supplier is able to continue in the long term as a business partner, a reduction in sales revenues as a result of the North American filings of 25 per cent to 40 per cent is probable;

c.      sales revenues for the first two to three months following a filing may be more stable as they would be partly based on orders already committed. However, revenues beyond the short term must inevitably be significantly affected, leading to increased losses and the dissipation of existing cash balances;

d.      even though some EMEA Companies have considerable cash resources and were, prior to the North American filings, solvent on the basis that the value of those

companies' assets exceed the value of their respective liabilities, taking into account contingent and prospective liabilities, it is likely that overall trading losses and other factors would cause the EMEA Companies to become insolvent as a result of the North American filings;

e.     the insolvency and effect of formal insolvency procedures is likely to cause a breakdown in the system of intercompany netting and settlement which provides the essential distribution of cash throughout the Nortel Group. This is because the directors of each individual company will need to consider the creditworthiness of their intragroup trading partners much more carefully before entering into transactions with them; and

f.     it will be difficult for the EMEA Companies' directors to conclude that it is appropriate to continue trading, either with each other or by incurring credit with external suppliers on behalf of another Nortel Group company, unless the parent company is in a position to underwrite trading losses and meet short term cash requirements. I understand that NNL is unable to support the EMEA Companies in this way within the cash resources available to it. The cash requirements of the EMEA Companies are liable to be increased both by reduction in sales revenues, as explained above, and by the likelihood of suppliers demanding accelerated payment terms as a result of understandable nervousness about the Nortel Group's long term future.  It may not be appropriate for the directors of the EMEA to continue trading and risk dissipating those cash resources in trading losses.

101.    For these reasons, E&Y have concluded that there is a danger that the EMEA Companies' affairs would disintegrate as individual companies sought protection under the insolvency laws of their own individual jurisdictions. Liquidation is the only insolvency option in some of the EMEA jurisdictions. Liquidation procedures do not facilitate the restructuring of a company's business and assets as a going concern, which, if it can be achieved, is almost invariably the best method of maximising returns to creditors.  Where an administration order over a non-UK company would not be recognised in the country of incorporation, I understand that E&Y (if appointed as administrators) intend to assess how best to deal with that company.  In some cases, they may seek to file locally where that can be coordinated with England, e.g. Israel.

102.    Overall, if no concerted action is taken, destruction of value within the EMEA region and in the Nortel Group as a whole (which I believe lies within its IP, goodwill and customer base,

as opposed to tangible assets) and dissipation of cash resources in trading losses is likely to occur. This would not be in the best interests of the EMEA Companies' creditors.

### V.2.2    Pending litigation

103.    The Company and the Group are under enquiry from HMRC and the Canadian and U.S. Tax Authorities in respect of transfer pricing arrangements covering years 2001 to 2005 inclusive. The authorities have very different views and there are inherent uncertainties as to the outcome of the negotiations between the authorities, the progress of which the Company continues to monitor.    The Nortel Companies are not a party to the negotiations but management believes it is possible that the result of the negotiations could result in a material reduction in the Company's net worth.

### V.2.3    Pensions liabilities

104.    The Company operates both defined benefit ("**DB**") and defined contribution pension plans. The pension fund is the largest single creditor of the Company.

105.    Under UK law, the Company is required to obtain an actuarial valuation for the Company's Pension Plan (the "**UK Plan**") every three years.  In 2005, the valuation showed a deficit of £356 million.    In November 2006, the Company entered into a funding agreement (the "**Funding Agreement**") with Nortel Networks UK Pension Trust Limited, the pension trustee (the "**Trustee**"),  pursuant to which:

   a.    the Company agreed to make ongoing current service contributions as well as past service "catch up" contributions (collectively, the "**Contributions**") to eliminate the deficit;

   b.    the Company agreed to pay the pension protection fund levy; and

   c.    except in certain circumstances, the Company agreed to not encumber its assets without prior consent of the Trustee or grant any new guarantees or indemnities in respect of NNC or any of its subsidiaries without prior consultation with the Trustee.

106.    As an additional term of the Funding Agreement, NNL entered into a guarantee dated November 2006 (the "**Primary Guarantee**") pursuant to which it guaranteed the Company's obligation to make the Contributions.   Under the Primary Guarantee, NNL's obligation to fulfil on the guarantee would be triggered by receipt of demand from the Trustee after the failure of the Company to make a payment and a grace period having gone by. In 2007, NNL granted an additional guarantee pursuant to which it guaranteed payment of the Contributions

which obligation would be triggered in the event of an "insolvency event" (i.e. namely, dissolution or wind up) affecting the Company.

107.    A further valuation of UK Plan is being carried out based on its financial position as at 31 March 2008. The calculations have not yet been finalised, but the initial indications are that the ongoing deficit is now in the region of £479 million to £619 million. A new agreement to remove this deficit must be reached between the Company and the Trustee by 30 June 2009. The initial suggestions from the Trustee are that annual contributions of between £136 million and £176 million (currently £85 million for part and current service) should be paid by the Company to remove the deficit by April 2012 and that £1,127 million should be set aside in an escrow account by the Company to ensure that these contributions are made.

108.    I understand that the 31 March 2008 valuation figures above are calculated on the basis that the Company does not go into administration – i.e. on the assumption that an ongoing employer will remain in place to continue to support the UK Plan for the foreseeable future. While the Company may have sufficient cash available to pay those contributions for a few months after the North American filings, it will not be able to meet contributions beyond the short term. In addition:

a.      the fact that there will be no long term support will cause the Trustee to revise its estimate of the funding deficit and increase its contribution demands; and

b.      under the requirements of FRS17, the Company's accounts will then have to reflect the increased funding deficit and the addition of this figure to the balance sheet will render the Company insolvent.

## VI.    COMI: OVERRIDING POINTS

### VI.1   Decision making process regarding the strategy of the operations of the European group

109.    The overall global strategy for the Nortel Group is set at a very high level of generality by the board of directors of NNL and the Chief Executive Officer ("CEO") and Chief Finance Officer ("CFO") in Canada. Senior Management for EMEA in Maidenhead control the applicability of the global strategy to EMEA by designing the manner in which it is implemented in respect of the EMEA Companies. Darryl Edwards, President, Global Carrier Sales (and previously President, EMEA, up to 1 January 2009) is a member of the CEO's cabinet and is based in England.

110.    The EMEA Senior Management is one step down in authority from the global strategy established in Canada.

111.   Senior Management for the EMEA Region is located in England at Nortel's Maidenhead campus, being:

    a.   Darryl Edwards, President, Global Carrier Sales;

    b.   Myself (Sharon Rolston), Director and Chief Financial Officer, EMEA;

    c.   Simon Freemantle, Director, Group Treasury Operations;

    d.   Ashley Saunders, Leader, Global Operations EMEA;

    e.   Sharon Ellerker, Human Resources ("**HR**") Leader, EMEA;

    f.   Christian Waida General Counsel, EMEA (up to 12 December 2008);

    g.   Mark Cooper, Assistant General Counsel, Employment;

    h.   Lynne Powell, Leader, Commercial Law, Carrier Networks, EMEA;

    i.   Dara Gill, General Counsel, Enterprise Solutions, EMEA (up to 31 January 2009);

    j.   Peter Newcombe, Product Group Leader for Carrier and MEN;

    k.   Calum Byers, Product Group Leader for Services; and

    l.   Lorraine Harper, Leader, EMEA Tax,

together, the "**EMEA Senior Management**".

112.   The following people are also members of the EMEA leadership team located outside of the UK:

    a.   Michel Clément, President, Southern Europe; and

    b.   Sorin Lupu, President, Eastern Europe.

113.   Michel Clement is located in France and Sorin Lupu in Israel. They both, however, report to Darryl Edwards and both have "Authority Level" or "AL" 2 (see paragraphs 121 to 124 below for an explanation of Authority Levels).

114.   The EMEA Senior Management operates with a large degree of autonomy from Canada, setting all policies, procedures, budgets, targets and operational matters for the EMEA Region which are disseminated to the EMEA Companies which are required to operate within those

instructions. Operational matters are determined by Ashley Saunders, also located in England. Corporate head office services including finance, human resources and information services are run on a global level with the head of each department being located in England (or in Ireland in the case of Information Services).

115. Policies are set on a global basis, but adherence to them by the EMEA Entities is implemented by EMEA Senior Management.

116. For example:

a. EMEA Senior Management will design its own policies where needed. The decision to enter into business in a new country requires prior approval from Darryl Edwards and myself. This is a policy that was designed and is implemented by EMEA Senior Management; and

b. each year, Darryl Edwards sets the targets for each EMEA Company with regards to sales and sales related matters. To illustrate how this is achieved, at SLR1, tab 4, page 51 is an email from Darryl Edwards to the EMEA regional leaders for sales and finance setting out targets and budgets through which they can operate.

117. Senior Management is required to operate from and live in England. For example, the EMEA Finance Controller was previously employed as the France Controller but as a condition of his new role he was required to relocate to England as the centre of decision making.

118. Therefore, all the key functions required for the operation of the EMEA Region are located in and carried out from England. In summary, the local operations of the EMEA Companies consist largely of implementing the strategic and operational decisions taken in Maidenhead.

VI.2    **Decision making and approval process of the European group**

*VI.2.1    Summary*

119. The EMEA Senior Management exercise control and authority over the EMEA Region through a global decision making approval procedure and policy entitled the Corporate Procedure no. 301.01 (the "**Approval Procedure**"), a copy of which is at SLR1, tab 5, pages 53 - 106.

120. The Approval Procedure is applicable to all EMEA Companies and is managed out of England in relation to the EMEA Companies. The EMEA Senior Management comprise the majority of the holders of the highest level of authority in the EMEA Region. Operational authority is vested in EMEA Senior Management who in turn have not delegated that down to

the EMEA Entities, so retaining high level operating control in England.  EMEA Senior Management has, for several years, determined that the Approval Procedure is implemented and governed by a process devised by the EMEA Senior Management, called the "**DCA Process**".  The DCA Process is discussed in further detail at paragraphs 140 to 143 below.  It is important to first address how the authority pursuant to the Approval Procedure applies.

*VI.2.2    Transactions to which the Approval Procedure applies*

121.    The Approval Procedure applies to all matters which have the potential to impact on Nortel's economic resources, obligations or equity ("**Transactions**").  A Transaction may be financial or non-financial.

122.    An employee's authority level under the Approval Procedure ("**Authority Level**" or "**AL**") means that person's decision making authority in respect of the ability to approve certain Transactions.

123.    Approval Authority Level depends upon the nature of the parameters to be approved.  Authority levels ranging from AL0 (highest authority) to AL3 (lowest authority) are assigned to employees as follows:

a.      AL0 – given to (i) CEO and President, (ii) CFO and Executive Vice-President and (iii) people who report directly to the CEO as approved by the board of directors in Canada;

b.      AL1 – typically restricted to the people who report directly to the CEO, the President or CFO and as approved by the board of directors in Canada;

c.      AL2 – typically restricted to employees in leadership roles as determined and as approved by the CEO, President or CFO; and

d.      AL3 – a lower level of authority assigned to employees in management roles by AL2 employees.

124.    The Authority Level required to approve a Transaction will depend on the size and nature of the Transaction.  For example, in the case of a sale proposal that has a standard margin of less than 0% - 45% and a value of $20 million - £100 million over the expected duration of the contract, approval is required from the "Business Unit" AL1, "Region" AL1 and also the "Finance" AL2.  If the customer payment terms are, for example, more than 90 days, AL1 Finance approval is required.  If the contractual terms include, for example, liquidated

damages that are greater than 20% of the contract value or greater than $10 million, approval from the Business Unit AL1 and the Finance and Legal AL2s are required.

125. All AL1 approvers for the EMEA region are based in England with the exception of the technology or "Business Unit" approvers, who are based in North America. It is worth noting that very few EMEA proposals / contracts require AL0 approvals, for example deals that are expected to generate revenue in excess of US$100 million.

126. In addition, the majority of the AL2 approvers for EMEA are based in England, being 16 in England and 13 in the rest of EMEA. The difference of authority between AL1 and AL2 relates to how significant the required involvement of the EMEA Entity is in relation to any particular matter, judged by factors such as numerical value and legal risk. For example, the decision to enter into a lease for a building can only be taken by an AL1 approver, based in England. Therefore, any strategic decision of importance is made in England.

127. Other levels are assigned by managers, subject to the proviso that a manager cannot assign a level that is higher than his/her own level or, in the case of managers who are AL0 – AL2, equivalent to his/her own level.

128. A table showing the names and locations of individuals who have been assigned an Authority Level relevant to the EMEA region is set out at SLR1, tab 6, pages 107 to 121.

*VI.2.3    Decision Makers*

129. A "**Decision Maker**" is an employee who has the appropriate Authority Level to approve a Transaction. An employee who has the appropriate Authority Level may perform the role of Decision Maker only if the Transaction is within his/her financial and/or business jurisdiction of responsibility and complies with certain other criteria.

130. Authority Levels for different Transactions are set out in a series of appendices to the Approval Procedure (the "**Approval Procedure Appendices**") at SLR1, tabs 5A-G, pages 68 - 106. Transactions are grouped according to risk, function and/or process and each transaction category is aligned to a specific Authority Level which identifies the relevant Decision Maker. The matrix setting out the Authority Levels applies globally unless a business unit specific matrix has been approved. Any such specific matrix must be more stringent than the global guidelines and approved by all impacted Decision Makers.

131. The Approval Procedure Appendices identify:

   a.    the category into which the Transaction falls;

b.      the Decision Maker or decision making function which ultimately approves the Transaction;

c.      any other functions / groups who must be consulted on the Transaction;

d.      whether or not "Finance" must be consulted;

e.      the corporate policies and procedures that relate to the Transaction; and

f.      any other special comments or requirements.

132.    At times, a Transaction will not fall within the Transaction category parameters and so will require AL3 or higher level review.

133.    At all times, employees are expected to use good business judgement when applying the Approval Procedure. If a Transaction value is close to the maximum limit, they must at a minimum appraise the next management level of authority, especially where a Transaction is infrequent, uncommon and/or material to the business.

### VI.2.4    Restrictions on decision making

134.    An Authority Level does not give the Decision Maker the authority to override Approval Procedure. The Decision Maker has an obligation to ensure the Transaction complies with the Approval Procedure requirements and restrictions as well as any legal, tax, statutory, employment, equity or other requirement.

135.    An Authority Level does not give employees the authority to execute external legal documents.

136.    An Authority Level does not give employees the authority to commit to any supplier or enter into any Transaction for the acquisition of goods and/or services, which is governed by the Global Operations / Global Procurement policy discussed in further detail in paragraphs 154 to 157 below.

### VI.2.5    Example – Customer Related Sales and Billing

137.    The Authority Levels for sales and billing are split into eight categories: (i) Sales and Proposals; (ii) Returns and Buybacks; (iii) Customer Incentives; (iv) Customer Credit; (v) Contractual Terms and Penalties; (vi) R&D, pre-GA (generally available) Product; (vii) Supply Chain Operations; and (viii) Other.

138.    Within each category, the Decision Maker and required consultants are allocated according to certain criteria. For example, in the Sales and Proposals category, the criteria are based on the standard margin and deal size. Customer credit is allocated according to length of payment terms. Contractual terms are allocated according to the nature of the term (for example, size of liquidated damages, exclusivity and most favoured customer provisions).

139.    In almost all instances, except where the deal size is very small or the criteria in question is not material, the Authority Level is AL2 or higher. For example, for Sales and Proposals (at SLR1, tab 5C, pages 79 and 80) the only criterion that has an AL3 for all jurisdictions are: (i) "Margin > 0%, Deal Size < $5M"; and (ii) "Margin >45%, Deal Size $5M - $20M".

VI.3    **Customer contracting**

140.    Nortel has a contracting approval process applicable to all EMEA Entities for all sales agreements which is managed out of England. This is the **"DCA Process"** and it covers the contracting life-cycle as follows:

    a.    approval to start bid preparation – DCA1;

    b.    approval to submit a bid – DCA2; and

    c.    approval to sign a contract – DCA3.

141.    A copy of the DCA Process is at SLR1, tab 7, pages 122 - 124.

142.    The DCA Process was implemented by EMEA Senior Management in England who wished to ensure that a robust approval process was maintained for conducting management reviews of opportunities across EMEA. The DCA Process is coordinated by the leader of the bid management team, also based in England, to ensure that presentation material and risk assessment is consistent across EMEA and meets the requirements of EMEA Senior Management located in England. Therefore, the acquisition of any new customer will involve the following steps:

    a.    sales force engages customer and / or Nortel receives request to bid;

    b.    sales force must obtain DCA approval of proposal according to authority levels set out in the governance matrix;

    c.    key risks and win strategy presented at DCA review;

d.      DCA approvers approve deal; win strategy, non-standard terms and conditions, pricing, etc.; and

e.      core team (sales, legal, technical prime) responsible for closing a deal within DCA Process approved parameters.

143.    The individuals assigned with approval authorities for the DCA Process (the **"DCA Primes"**) are set out at SLR1, tab 8, page 125. They are all located in England except as follows:

a.      South and Eastern Europe Region: DCA Prime, Finance and Legal AL2 are located in Israel and Russia;

b.      Central Region: DCA Prime and Finance AL2 in Germany;

c.      Southern Region: DCA Prime and Legal (France and Africa) AL2 in France, Finance and Legal (Italy, Greece, Spain, Portugal) AL2 in Spain and Legal (Middle East) AL2 in France; and

d.      Telefonica: DCA Prime, Finance and Legal AL2 in Spain.

Notwithstanding that there are several individuals with AL2 in France, approval from England will still be required for certain aspects of most transactions. For example, customer credit approval is given from England. It is highly unlikely therefore that an EMEA Entity could complete a proposal without approval and input from EMEA Senior Management based in England.

VI.4    **Management of customer relationships**

*VI.4.1    Sales team*

144.    Darryl Edwards is responsible for setting the EMEA strategy, targets and budgets for sales and sales related matters. Sales targets will deal with the type of customer the business wishes to deal with and the overall budget. The sales team ultimately reports to Darryl Edwards who conducts quarterly business reviews of the EMEA Region. Any deal that has (i) a margin of less than 0% and a value greater than US$20 million or (ii) a margin greater than 45% and a value of less than $50 million requires Darryl Edwards' approval. This has to be taken in the context of total EMEA third party revenues (including entities out of scope (for example Netas in Turkey) which for nine months to September 2008 was US$1.738 billion.)

145. Each sub-region within EMEA (Southern Europe (including Africa), Northern Europe, Central Europe and Eastern Europe) has its own manager. In addition, certain large customer accounts have their own manager, for example Iberia, Telefonica, BT and Vodafone UK.

146. Enterprise products are sold through "Channels", being a third party distributor or re-seller. The largest distributors, Azlan and Westcon, are managed from England. In the case of the Enterprise business, 87 per cent of the business is conducted through Channels rather than individual customers, all (Channels) of which are aware of the Nortel management structure. For example, British Telecom (**"BT"**) acts as a large Channel to the UK market. They would sign a supply and services contract with a BT user such as a bank. While BT holds the contract with the end user, the Company would supply BT with the product. As such, the Company supplies product to the Channel that then sells it on to the end user.

147. Decision Makers for sales are located largely in England. The location of the Authority Levels is as follows:-

    a.      AL0: three in Canada;

    b.      AL1: seven in the U.S. (largely technical approvers), two in Canada and three in England (business, finance and legal AL1); and

    c.      AL2: 16 in England, five in Israel, four in Germany, three in France, four in the U.S., three in Spain and one in Dubai.

148. The customer relationship will generally be dealt with by the local account manager who interacts with the customer on a regular basis. That said, Darryl Edwards has a long term relationship with over 30 customers and a strong relationship with several new customers, who will often contact him directly, particularly for serious matters. I have discussed the matter with Darryl Edwards who has confirmed to me that most customers recognise that EMEA Senior Management in England is where all key governance and decision making resides and always has resided through many executive changes over the last 16 years. All past Presidents of EMEA have been based in England (whatever their nationality) as have the Chief Financial Officer, Global Operations leader and HR functions for EMEA plus other key functional responsibilities. Strategy and governance control has also been centrally monitored and operated from England, as the centre of operations for EMEA.

149. Customers would understand that England is the centre of operations for the EMEA Companies and is the point for the resolution of serious issues in respect of customer relationships, final decision making, strategy and strategy investments. For example, in

October 2008, Marc Gosling, Managing Director of Vosko Networking BV, a customer of Nortel Networks B.V. (**"NN Netherlands"**), sent an email to Darryl Edwards requesting that Darryl Edwards deal with a problem that had arisen in relation to Nortel products that the customer was using at one of its projects. Darryl responded and requested that Ashley Saunders (Global Operations leader) address the problems with his team. The correspondence in relation to the resolution is at SLR1, tab 9, pages 126 - 130.

### VI.5    Decision making process regarding major customers

150.    All transactions handled by NN France SA requiring AL1 approval will be subject to approval by the EMEA Senior Management team in England and, if applicable, the relevant technology or "Business Unit" primes in North America.

151.    For example, the Bouygues transaction (for which the DCA2 review is at SLR1, tab 10, pages 131 - 138 shows how the required AL1 approval criteria was applied:

    a.    the projected deal size was US$140 million; and

    b.    there were special product and support commitments.

152.    In accordance with the DCA Process, the DCA review manager, Salma Drummond (based in England), set up the meeting and invited "Account Management" in France to present to the EMEA Senior Management team. Michel Clément, attended the review and gave his consent to the proposal, but as an AL2 approver, he did not have the necessary authority to approve the deal.

153.    Ultimately, Finance approval was provided by myself, Regional Approval was provided by Darryl Edwards and Legal approval was provided by the General Counsel (all based in England). "Business Unit" i.e. "Leadership Category or Technology and Services" approval was provided by Richard Lowe, John Owings and Carole Nadeau, based in North America.

### VI.6    Procurement and accounts payable

154.    Procurement is split between:

    a.    direct procurement – procurement related to the fulfilment of a customer sales order; and

    b.    indirect procurement – procurement related to selling, general and administration matters and R&D expenditure.

155.    The procurement organisation reports into Don McKenna, Chief Procurement Officer, located in North Carolina, U.S., although from 1 January 2009, Indirect Procurement reported to Alan Rice, Nortel Business Services, North Carolina, U.S. with Direct Procurement remaining with Don McKenna. These teams are collectively known as **"Global Procurement"**. Global Procurement is solely responsible for procurement strategy and for the selection, qualification and approval of all supplier arrangements.

156.    Any significant procurement arrangement, for example those with Flextronics, will be subject to a master agreement (**"Master Agreement"**) which constitutes the umbrella agreement governing all regional orders and ancillary agreements. In order to optimise tax and trading arrangements, regional orders will be issued on a "local to local" basis and entered into between the regional entity and the third party local entities.

157.    A global supplier relationship manager will be appointed to act as the interface and manage all activities with the third party entity, but local EMEA procurement and legal primes located in EMEA, with junior Management for legal based in England, will become involved to negotiate any EMEA specific requirements.

*VI.6.1    Direct Procurement*

158.    In EMEA, all Nortel equipment related to a customer order is ordered from the supplier (i.e. the contract manufacturer). The invoiced price, including mark up for intra group sales in the 9 months to September 2008 were US$458 million by the Company and US$123 million by NN France SA. Where necessary, the Company's or NN France SA's (in the case of wireless GSM equipment) intercompany purchase orders (**"PO"**) are placed on the Company or NN France SA by the other EMEA Companies. Where direct services relating to a particular customer order are sourced locally, they are ordered locally by the local Nortel Company as part of the customer order.

159.    The direct buyers for EMEA are located in Northern Ireland, with a few in Germany (using BIZ – a German legacy tool) and one in Italy.

160.    The procurement system is SAP – R3 (a software programme for purchasing) for those EMEA Companies that are SAP supply chain enabled (UK, Ireland, Holland, Belgium, France, Switzerland, Spain, Portugal, Italy, Israel). Germany and the other EMEA Companies have their own legacy systems. All procurement globally is governed by the Approval Procedure on procurement set by Don Mckenna – Chief Procurement Officer, Canada, for final authority Approval Levels. All procurement globally is governed by procurement procedures, set by the Chief Procurement Officer (Don McKenna) and approvals are

governed by the corporate procedure on final authority Approval Levels set by the NNC Controller, Paul Karr.

### VI.6.2    Indirect Procurement

161.    Indirect procurement is governed by the same procedures and reporting as direct procurement. POs will be raised and go out in the name of the regional Nortel Company that is procuring.

162.    For those EMEA Companies that are enabled on Enterprise Buyer Professional - a SAP bolt on procurement tool ("**EBP**") this is done by the requisitioner raising a purchase requisition (shopping cart) on EBP and workflow will then route through the requisitioner's organisational hierarchy to get the approval to purchase.

163.    Once approved, a PO is produced and sent to the vendor (the PO administration is centralised in India for those companies in EMEA that are on EBP). EMEA companies on EBP are the Company and the EMEA Companies based in Ireland, Holland, Belgium, France, Spain, Portugal, Switzerland, Italy, Israel, Austria, Czech Republic, Finland, Denmark, Norway, Sweden, Hungary, Poland, Romania, Russia, Egypt, Saudi Arabia, Tunisia and Dubai. Germany has its own legacy indirect procurement systems.

### VI.6.3    Accounts Payable

164.    Accounts Payable ("**AP**") is governed globally by the terms of the Approvals Procedure. AP will process and pay invoices in compliance with this procedure. AP will follow the same procedures irrespective of whether the PO is for direct procurement or indirect procurement.

165.    AP will follow one of two processes, depending on whether the invoice relates to a PO (the "**PO Process**") or not (the "**Non-PO process**"). For those EMEA companies on SAP the invoices will be processed by AP in France (for NN France SA and NN France SAS) or in England (Harlow) for the Company and the EMEA Companies based in Ireland, Holland, Belgium, Spain, Portugal, Switzerland, Italy and Israel. The "bill to" address on POs for these companies will be the local office address. The invoices are then forwarded to Harlow in England for processing payment. AP Processing means the recording of the invoice expense and liability into the financial books (AP sub-ledger), obtaining the approval to pay the vendor invoice and then paying the invoice. Most of the vendors know that the payment is effected from England (certainly all of the major vendors do) and most come to the AP processing centre in the event of a problem. A few of the smaller vendors would go to the local office in the first instance, either because of language problems or because they do not know that it is processed in Harlow. The local office would forward the query onto Harlow.

166.   The EMEA Companies based in Germany, Poland and Russia have their own AP processing on their legacy systems and the other EMEA Companies have outsourced AP processing with the accountants BDO Stoy Hayward, who also do all the book-keeping for those companies. The "bill to" address on POs for these companies will be the local company's registered office.

### VI.6.4   PO and Non-PO process

167.   Invoices must quote a PO number and are processed against that PO. The PO will contain the credit terms, either on the individual PO or on the vendor Master Agreement. These terms are set by the purchaser and cannot be overridden by AP.

168.   Certain commodities do not merit the issuance of a PO. These will follow the Non-PO process where AP will send the invoice to a finance Decision Maker for coding to book into the general ledger and then when processed will send to a relevant business Decision Maker for approval to pay (in each case as determined by the DCA Process). Once approval is granted then the invoice will be paid when the credit terms that are on the vendor Master Agreement are reached.

169.   AP globally has moved to twice monthly AP disbursements as standard, with exceptions paid on a weekly basis. Vendor exceptions that are included in this are Flextronics, Taxes, Utilities, Rentals and Freight. This list is maintained and approved centrally by Global Operations Finance. Any exception approvals outside of the above are also approved by Global Operation Finance centrally before payment (Primes are James Patchett, based in Canada, and Mike Sansom, based in the U.S.). In EMEA the AP processing centres in England (Harlow) and France will produce the payment files and send to the banks for the companies for which they process invoices. The AP processing centre will run a Payment Proposal routine on the AP sub-ledger. This routine will select all Vendor invoices for that company code that are approved for payment and due for payment (i.e. the invoice credit terms have elapsed at or pre the payment proposal run date). The file will pay, by vendor and by currency, the sum of those vendor invoices that have been selected for payment. AP will then inform Treasury of the amount to be paid and the local control prime and send the file to Citibank for processing through the banking system.

### VI.7   Supplier Approval Process

170.   The approval process for suppliers is governed by Corporate Procedure 712.04 – Supply Agreements (the "**Supply Procedure**") a copy of which is at SLR1, tab 11, pages 139 - 152. The Supply Procedure sets out the responsibilities, requirements and guidelines for the establishment and management of supply agreements. The Supply Procedure specifically refers to the Approval Procedure in relation to seeking approvals.

171.  In addition to the Supply Procedure, there is an EMEA Global Procurement Contract Management Procedure Guide (the "**Procurement Contract Management Procedure**") applicable to the procurement of network field service requirements, a copy of which is at SLR1, tab 12, pages 153 - 198.

172.  The Procurement Contract Management Procedure is managed out of England.  It provides that where the supply in question has a value of less than US$500,000 over its term, approval will not be required by the global contract review board (the "**CRB**") (in accordance with the Supply Procedure) and the arrangement will be subject to the approval of the EMEA regional procurement prime, Stella Katz (based in Israel) and by the EMEA legal prime in Lynne Powell's team based in England.  Similarly, minor amendments will not go to the CRB.  CRB approval is required for new suppliers with an estimated annual spend of more than $100,000 and for existing suppliers with a value greater than US$500,000 or where material changes to the standard terms are required.

## VI.8  Legal & Contracts team

173.  Up to and until 31 December 2008, Mr. Christian Waida, located in Maidenhead, acted as the general counsel for EMEA.  In this role Mr. Waida was responsible for the overall provision of legal support across the EMEA Region, and this was delivered by a team of internal resources mainly located in England, with ad-hoc assistance from external law firms dealing mainly on local corporate matters and advice on local law on a case by case basis.

174.  As of 1 January 2009, Mr. Waida left Nortel and the team was divided between the two business units.  Lynne Powell, located in Harlow, England, is leading the Carrier team together with providing advice and AL1 approvals with respect to all related Carrier business legal matters, whilst Dara Gill, located in Maidenhead is responsible for all UK corporate matters and is also leading the Enterprise business team together with providing advice and AL1 approvals with respect to all related Enterprise business legal matters.

175.  The teams reporting to Lynne Powell and Dara Gill are responsible for providing legal support in pre and post-contract activities, each in his/her jurisdiction.  The team members handle agreements and transactions with respect to the supply of products and services to customers, software licensing, representation, non-disclosure, escrow, support arrangements, consultancy, distribution, resale and sub-contracts together with handling local corporate matters and managing litigation cases.  This is done locally in all the larger countries (UK, France, Germany), as well as mid-size countries (Spain, Russia, Israel) with the smaller countries receiving remote support from the relevant team member within the relevant part of the EMEA region.

176.   Mark Cooper is the Assistant General Counsel, Employment Law, and is based in England. He reports directly to Gordon Davies, the Chief Legal Officer based in Canada, and is responsible for employment and pension law related matters globally and across the EMEA Region. Mark Cooper oversees a team of eight lawyers and an administrator. Four lawyers and a PA are located in England, one lawyer in France and three lawyers in the U.S. The team uses external counsel in those jurisdictions where Nortel does not have internal expertise, including in each jurisdiction in EMEA on an as required basis. His team provide employment law (including pensions and employee benefits) support to the HR team and to the business globally and across the EMEA region, dealing with merger, acquisition and divestiture work, insourcings and outsourcings, global and regional level HR policy and procedure review, executive level hiring and departures, employee contractual matters, disputes, grievances and litigation.

177.   Global and strategic OEM/ODM Tier II and supply agreements are dealt by global procurement in Canada/USA. Global accounts (such as Sprint, Verizon, Telefónica, T-Moblie and Vodafone) are managed by the legal team situated in the same location as the customer's headquarters and the approval team for such global agreements is located in the U.S. unless the customer's headquarters are based in Europe. For example, the Vodafone and T-Mobile groups are managed from England and the Orange group is managed from France. Therefore the approval team for such global agreements is located in England.

VI.9    **Compliance**

178.   Nortel's compliance organisation is a specialised team supporting the Nortel businesses in their activities and transactions to ensure their compliance with all corporate policies and procedures, laws and regulations. Sally March, located in Maidenhead, is the Director of Compliance for EMEA.

179.   In her role, Sally March is responsible for developing a programme ("**Compliance Programme**") to meet corporate standards, including a systematic risk assessment to help identify and address potential risks before they become potential compliance issues. She ensures that business is conducted in an ethical and legal manner by regularly reviewing policies and procedures to ensure that the EMEA Entities are compliant with relevant laws and are in alignment with overall goals of the global compliance programme. When a potential risk within EMEA is identified, Sally March is responsible to assist in conducting appropriate reviews with the relevant functions and ensuring corrective actions such as communication, training or process improvements are undertaken. Sally March is also responsible for providing oversight, guidance and recommendations for compliance with corporate standards.

180.   Sally March's team comprises of a Compliance Manager located in England and a Compliance Auditor located in France.

## VI.10   Internal Audit Services ("IAS")

181.   The EMEA IAS team, which is led by Perry Christian, based in England, assists Nortel leaders, managers and ultimately the Audit Committee of the Board of Directors in effectively carrying out their responsibilities. This work is guided by The Institute of Internal Auditors International Standards for the Professional Practice of Internal Auditing.

## VI.11   External Audit

182.   KPMG is appointed globally as the Group's auditor. This relationship is governed by a global engagement agreement which deals with U.S. GAAP accounting issues, but individual engagement letters are entered into between each local company and the local KPMG office.

183.   The EMEA audit process is managed by England KPMG team working with the Finance team located in England.

## VI.12   Ethics

184.   Nortel's Ethics programme has two goals. First, it aims to create a culture of integrity so that employees understand their obligation to act with the highest ethical standards and have the resources to provide answers to questions and help them make the right decisions. Second, the programme ensures that all employees understand Nortel's Code of Conduct and comply with the laws and regulations of the countries in which the Company operates. Sally March, the Director of Compliance for EMEA (located in Maidenhead) is also responsible for dealing with ethical issues in EMEA.

## VI.13   Corporate security

185.   Corporate security encompasses protecting Nortel people, assets and intellectual property, systems security, travel security emergencies, security tips and tools, articles dealing with espionage, identity theft, badge access information, laptop computers, confidential information, aggressive recruiting and scams. The Director of Corporate Security and the Corporate Security Advisor for EMEA are located in Maidenhead, England.

## VI.14   Tax

### VI.14.1   Tax team

186.   The tax group based in England (the **"EMEA Tax Group"**) is responsible for managing and supervising tax throughout the EMEA Region. The team consists of seven members of who have specific company responsibility.

### VI.14.2   Local tax returns

187.   All local tax returns are the direct responsibility of each Company, although those covering direct taxes on income will be reviewed in most cases by the EMEA Tax Group prior to filing. The EMEA Tax Group will in the main be the first port of call by the EMEA Companies to deal with any tax issues that arise, whether on audit by the local tax authority or on operational issues, and the EMEA Tax Group will decide how they should be handled (including whether outside professional advice is to be sought). The EMEA tax group has direct relationships with most company advisors and will take the lead in resolution of those issues.

### VI.14.3   Tax planning

188.   Tax planning initiatives come from Canada, where there is a global impact, or may be generated by the EMEA Tax Group in relation to specific opportunities in the region, although in the latter case this will always be discussed with Canada before any implementation. The implementation of tax planning initiatives in the region will be the responsibility of, and led by, the EMEA Tax Group in liaison with and reporting to the parent tax group where a global initiative is involved. If an EMEA Company wishes to do some domestic tax planning then it will engage with the EMEA Tax Group for approval and support in implementation.

### VI.14.4   Other tax issues

189.   The EMEA Tax Group is heavily involved in the reporting of tax both for U.S. GAAP accounting group consolidation and local statutory accounting reporting. The tax issues in merger and acquisition transactions are led out of North America, but the EMEA Tax Group will handle all regional tax issues arising. There are no employees of the EMEA Tax Group based outside England, although there may be individuals who spend a material amount of their time on tax issues, generally in relation to local tax returns.

## VI.15   HR

### VI.15.1   HR team

190.   As the regional EMEA HR leader, Sharon Ellerker, located in Maidenhead, is responsible for the overall provision of HR support across the EMEA region, and this is delivered by a team of internal resources, with the exception of some of the benefits programmes that are administered by third party vendors.

191.   Sharon Ellerker's team provides in-country (i.e. a member of her team is located within the relevant jurisdiction) HR generalist, Employment Rights and / Total Rewards support in all

the larger EMEA countries (UK, France and Germany), as well as mid-size countries (Spain, Russia, Israel and Italy) with the smaller countries receiving virtual support from HR generalists within the broader region.

192.    Transactional and administrative HR support is provided globally by the HR "Shared Services" organisation who manages some of the core processing globally in the HR Shared Services centre in Raleigh, North Carolina.  This includes offer letter generation, contract addendums and SAP updates), with region specific support such as responding to manager/employee queries, interfacing with payroll vendors and file management being provided by the EMEA HR Shared Services team who are predominantly based in Maidenhead although there are two team members in France and one each in Italy and Spain.  This team reports to Scott Peters, Global Leader, Nortel Business Services, based in the U.S.

193.    When a manager / employee in EMEA has an HR query, or requires HR support, they contact the HR Shared Services team (either via e-mail or phone) in England in the first instance.  The HR Shared Services team are trained to resolve transactional queries, and in the case of a more complex issue, they will log a ticket on behalf of the employee / manager and refer this to the relevant subject matter expert who will often be situated locally.  For example, if a manager based in Russia has a query that the HR Shared Services team in Maidenhead cannot answer, the query will be passed to the in-country expert who is located in the Moscow office.  If there is no in-country resource, the query will be directed to the member of Sharon Ellerker's team who has responsibility for the jurisdiction.  For example, the HR team member located in Germany will deal with queries relating to the Netherlands.  In addition, the senior business leaders in the region receive strategic HR business partner support from regionally located HR business partners.  The location of the EMEA HR managers is set out at SLR1, tab 13, page 198.

194.    Mark Cooper, the Assistant General Counsel, Employment Law (based in Maidenhead) also assists the HR Shared Support teams.

*VI.15.2  Employment terms and recruitment*

195.    Sharon Ellerker (based in Maidenhead) previously headed up the global recruitment team, however, this has folded into the regional HR organisation effective 1 January 2009.  As such, she is responsible for all recruitment within the EMEA Region.

196.    All senior management staffing matters, whether recruitment or departures, will involve Sharon Ellerker and Darryl Edwards.  Sharon will be at least aware if not actively involved

with such matters. For example, Sharon Ellerker and Darryl Edwards made all the decisions with respect to the hire of a new leader for Spain approximately two years ago.

197.    Nortel has global HR policies and processes, and there is little to no tolerance for any variation or exceptions other than those that are required for legislative / compliance reasons. As such, with the exception of some red-circled benefits that might occasionally exist for longer serving employees, or those who joined Nortel as part of an acquisition or in-source, terms and conditions of employment will be standard within an EMEA Company / country.

198.    Mark Cooper, located in Maidenhead, deals with executive level employment agreements and compromise agreements globally. These agreements tend to be on standard terms with deviations to deal with specific circumstances only.

199.    Employment terms and conditions for lower level employees are generated by HR Shared Services, although will vary from country to country, as necessary to deal with local law requirements.

### VI.16    Banking and treasury

#### VI.16.1    Treasury and Banking

200.    Simon Freemantle, based in Maidenhead, is the Director for Global Treasury Operations. There are 18 team members, with 5 based in Maidenhead to look after the treasury and banking issues for EMEA.

201.    Simon Freemantle managed the Cash Pooling Arrangements (as described at paragraphs 87 to 89 above) which was discontinued as of 29 December 2008.

202.    Due to the cost and availability, Nortel has not had any significant credit banking facilities. None of the EMEA Entities have local facility agreements. The only outside funding is obtained via equity through NNC via the issuance of corporate bonds.

203.    All EMEA Entities (regardless of whether they participated in the Cash Pooling Arrangements) will maintain local bank accounts with minimal balances with either the global cash management bank (Citibank) or a local bank. For practical reasons there are both local and EMEA Treasury approvers / signatories on many of these accounts. These accounts and all treasury activities will always be managed in accordance with the Global Treasury Policies and Procedures implemented and monitored by the EMEA treasury team. Deviation from such procedures will require approval from Simon Freemantle.

204.    Bid, performance and warranty bonds for Nortel projects and products are normally issued via a global facility. All EMEA bonding is managed out of England by the EMEA Treasury team. Where a claim is established, the customer will generally turn directly to the relevant local issuing bank for payment. However, that branch will usually communicate with England before making a payment.

205.    Inter-company loans and inter-company trade settlements are both managed from England.

## VI.17    Real Estate

206.    Nortel's global leasehold portfolio is managed by Jones Lang Lasalle under a global agreement. The global real estate team is aligned by region and until recently (early December 2008) the individual leading real estate for EMEA was based in England. His replacement has not yet been appointed. No decisions on real estate in terms of leases, purchases and contracts to run the offices can be taken locally as these are all managed through the real estate team in England. All approvals are governed by the Approvals Procedure. In practice, all requests to extend / renew leases or put in place new offices will require the approval of Darryl Edwards and me from Maidenhead as well as ratification by the real estate team.

## VI.18    Professional advice in relation to the proposed restructuring of the EMEA Group

207.    All professional advice for restructuring the EMEA Region is being provided by E&Y, who were formally engaged in December 2008.

## VII.    CASCADE OF THE BOARDS OF DIRECTORS OF THE EMEA COMPANIES

208.    On 12 January 2009, prior to the decision of the North American Companies to file for bankruptcy protection, the directors of all of the EMEA Companies (including those in respect of which no administration application is being made) were briefed at a high level about the global Nortel situation and informed that one of the options being considered was a filing by the Northern American Companies and that in that event, urgent action may well be required in respect of the EMEA Companies to protect their position. They were invited to resign from their posts as directors in order to be replaced by Simon Freemantle and me in order to facilitate an orderly restructuring of the EMEA Companies if considered appropriate.

209.    One of the key reasons for the above was to avoid placing responsibility on directors who are persons who have little or no knowledge of the current global position of Nortel and to allow those persons with knowledge of the current global Nortel situation, and the ongoing evolution of the restructuring strategy ,to prepare and sign the applications for administration in England for each of the EMEA Companies, if appropriate. Simon Freemantle and I have

known of the potential for the making of the North American bankruptcy filings and have been party to discussions regarding the global Nortel situation from an early stage.

210.    With the exception of Nir Elbaz, Michel Clément, Sorin Lupu and Darryl Edwards, the directors of each of the EMEA Companies were not made aware of, or party to, the detail of the considerations of the global situation of the Nortel Group and the ongoing evolution of the restructuring strategy before 12 January 2009. This was because, due to the sensitivities surrounding the North American discussions on a listed global business of this size and the need to maintain strict confidentiality, it was not thought appropriate to involve too wide a group of people.

211.    It is considered strategically advantageous by the Company to take a co-ordinated and fully integrated approach to the EMEA Companies in relation to any applications for administration in England for facilitating a restructuring, given that their head office functions are carried out from and centre of operations are in England. Simon Freemantle and I have detailed knowledge of the EMEA Companies through our positions as directors of the Company and, being respectively, Director, Group Treasury Operations, and the Chief Financial Officer, EMEA (AL1). We therefore have detailed knowledge of the business and affairs of the EMEA Companies, as well as the global Nortel situation and ongoing evolution of the restructuring strategy , to enable us to make the applications to Court for administration on behalf of each of the EMEA Companies.

212.    It is also recognised that the administration procedure will, if applied to the EMEA Companies, avoid the potentially more serious and uncoordinated consequences of insolvent liquidation in other jurisdictions in which the EMEA Companies are registered.

## VIII.    JURISDICTIONAL REQUIREMENTS SET OUT IN PARAGRAPH 11 OF SCHEDULE B1 TO THE INSOLVENCY ACT 1986 AND RULE 2.4 OF THE INSOLVENCY RULES 1986

### VIII.1    Insolvency

213.    In summary, based upon and, for the reasons set out in the E&Y Report at paragraphs 7.8 to 7.19 of SLR1, tab 3. , I believe that the Company is likely to be insolvent on a balance sheet basis and, ultimately, is likely to become insolvent on the basis that it is unable to pay its debts as they fall due.

VIII.2  **Financial Statements**

214.  At SLR1, tab 14, pages 199 to 237 is a copy of the Company's last audited accounts.  In that same tab is a statement of the Company's financial position specifying, to the best of my knowledge and belief, the Company's assets and liabilities, including contingent and prospective liabilities, as at 31 December 2007.

VIII.3  **Summary of Indebtedness**

215.  Other than leased equipment, the remainder of the Company's obligations are unsecured obligations.

VIII.4  **Purpose of the proposed administration**

216.  Under paragraph 3(1) of Schedule B1 to the Insolvency Act 1986, the administrator of a company must perform his functions with the objective of:

   a.  rescuing the company as a going concern; or

   b.  achieving a better result for the company's creditors as a whole than would be likely if the company were wound up (without first being in administration); or

   c.  realising property in order to make a distribution to one or more secured or preferential creditors.

217.  I believe (based on my discussion with the proposed administrator) that, if an administration order is made in relation to the Company, the purpose of administration set out in paragraph 3(1) of Schedule B1 of the Insolvency Act 1986 will be achieved.  An administration order is likely either to lead to a restructuring of the Company that rescues the Company as a going concern or achieves a better result for creditors than would be achieved in a winding-up (without first being in administration).

218.  On 14 January 2009 a meeting of the Directors was held in order to determine what steps the Company should take to preserve its business and assets for the benefit of its creditors.  The Directors resolved that they should apply to the Court for an administration order in relation to the Company.  A copy of the board resolution is at SLR1, tab 15, pages 244 - 245.

VIII.5  **Proposed strategy of administration**

219.  I refer to paragraphs 6.1 to 6.5 of the E&Y Report at SLR1, Tab 3, which concludes that administration orders over the EMEA Companies, with common office holders, is the best practical opportunity of preserving the EMEA Companies as cohesive operating units, continuing to trade and acting in concert as far as is possible with the rest of the Nortel Group.

220.    I understand that E&Y will carry out an analysis of the cost and benefits of continuing to trade immediately following the commencement of the administrations. However, I am advised that:

a.      it would be in the best interests of creditors to continue trading throughout the EMEA region, at least for a period, to explore a marketing and sale of the businesses and assets of the EMEA Companies as going concerns;

b.      continued trading would allow work in progress to be completed, enhance recoveries from trade debtors and avoid the crystallisation of some contingent liabilities such as redundancy costs and lease termination penalties (the quantum of which have yet to be assessed);

c.      the moratorium created by administration orders would allow the administrators to carry out a review of the EMEA Company businesses. The administrators would take into account, the interests of each Company. This would remove from the directors the very difficult decisions that would be required in order to continue trading outside a formal insolvency process;

d.      furthermore, the administration orders would enable the business to be restructured and would open up the possibility of pursuing sales of business and assets, in addition to the possibility of sales of shares. Both are likely to enhance sale opportunities and, therefore, the prospects of preserving the businesses of the EMEA Companies as going concerns.

221.    The Joint Administrators have confirmed in the report their view that the purpose of administration is likely to be achieved in this case.

VIII.6  **Security**

222.    At SLR1, tab 16, page 240 is the Register of Mortgages and Charges from Companies House relating to the Company.

223.    The Register of Mortgages shows that there are no outstanding charges granted against the Company.

### VIII.7  Insolvency Proceedings

224.  To the best of my knowledge and belief as at the date of this witness statement, there are no insolvency proceedings commenced in relation to the Company whether in England and Wales or any other jurisdiction.

### VIII.8  Winding up

225.  To the best of my knowledge and belief as at the date of this witness statement, no winding up petition or other insolvency process has been presented against the Company.

### VIII.9  Service and Abridgement of Time

226.  Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specifies the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

227.  At SLR1, tab 18, pages 251 to 252 is a copy of a letter from proposed administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

228.  So far as I am aware, no other person is entitled to appoint an administrative receiver or administrator of the Company.  This is confirmed by the search of the Register of Mortgages and Charges relating to the Company referred to at paragraph 222 above.

229.  Given that all parties entitled to receive notice have waived the requirement for five days notice, the applicant asks the Court to abridge the time for hearing of the application pursuant to rule 12.9(2) of the Insolvency Rules 1986.

### VIII.10  COMI of the Company

230.  The EC Regulation on Insolvency Proceedings 2000 (the "EC Regulation") will apply. Moreover, these proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation as the centre of main interests of the Company is located in England

### VIII.11  Joint administrators

231.  It is proposed that the court should appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson from E&Y to act as joint administrators of the Company.  Moreover, the Court is invited to order, pursuant to paragraph 100(2) of Schedule B1 to the Insolvency Act 1986, that any function to be exercised or performed by an

administrator may be done by all or any of one or more of the persons for the time being holding that office.

232.    At SLR1, tab 17, pages 247 – 250 are the written consents to act of proposed administrators which confirm their opinions that it is reasonably likely that the purpose of administration will be achieved.  Each of the proposed administrators has confirmed that they have had no material dealings or material professional client relationship with the Company.

### VIII.12 Inspection of the Court File

233.    I would also request that for reasons of commercial sensitivity surrounding the Company that this witness statement and its exhibit are ordered to be not open to inspection without the prior leave of the court pursuant to rule 7.31(5) of the Insolvency Rules 1986.

### IX.    CONCLUSION

234.    In the circumstances, I request that this Court makes an administration order in respect of the Company.

**I believe that the facts stated in this witness statement are true.**

**Sharon Lynette Rolston**

Date:  14·1·09 ·

NO. _____ OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF
NORTEL NETWORKS UK LIMITED

AND

IN THE MATTER OF
THE INSOLVENCY ACT 1986

---

**WITNESS STATEMENT OF SHARON LYNETTE ROLSTON**

---

Herbert Smith
Exchange House
Primrose Street
London EC2A 2HS
Tel: 020 7374 8000
Fax: 020 7374 0888

Ref: 3946/30895329

Applicant
**Sharon Lynette Rolston**
**No. of Statement:  First**
**Exhibits: SR1**
**14 January 2009**

NO.            OF 2009

## IN THE HIGH COURT OF JUSTICE

## CHANCERY DIVISION

## COMPANIES COURT

**IN THE MATTER OF NORTEL GMBH**

**AND**

**IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

### WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, **DO STATE** as follows:

## INTRODUCTION

1.      I am a director of Nortel GmbH (the **"Company"**), having been appointed on 14 January 2009.

2.      I make this witness statement in support of the application of the director of the Company pursuant to paragraph 12(1) (b) of Schedule B1 of the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom; Christopher John Wilkinson Hill; Stephen John Harris; and Alan Michael Hudson, of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company.  I am duly authorised to make this witness statement on behalf of the directors of the Company (the **"Directors"**)

3.   Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.   Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited (**"NNUK"**) and have been a director of the same since 1 April 2006.

5.   There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.   I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.   I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.   This witness statement is divided into the following sections:

   (a)   background;

   (b)   decision of the directors of the Company to apply for an administration order in respect of the Company;

   (c)   financial position of the Company;

   (d)   purpose of the administration;

   (e)   centre of main interests (**"COMI"**) of the Company;

   (f)   formal requirements; and

   (g)   conclusion.

## BACKGROUND

9.      The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (**"EMEA"**).

10.     · The Company is an "At Risk" entity. A description of an At Risk entity is provided at paragraphs 47 to 49 of the Main Witness Statement. Essentially the Company carries on business as a telecommunications sales, distribution and leasing entity. The Company derives its revenues from distribution, sales and leases of Nortel product, largely to third party customers within Germany but also to third party customers outside of Germany.

11.     The Company was incorporated on 24 March 1972 under the German Limited Liability Companies Act (**"GmbH Gesetz"**). The registered office of the Company is situated at Main Airport Center, Unterschweinstiege 6, 60549 Frankfurt am Main, Germany (tab A).

12.     The issued share capital of the Company is €6,137,000, split between one share worth €6,136,000 and the other worth €1000.00 and the amount of the capital paid up or credited as paid up is €6,137,000.

13.     The audited accounts as at 31 December 2007 are tab B of the exhibit SR1. The balance sheet of the Company as at 30 September 2008 is tab C of exhibit SR1.

14.     On 13 October 1983 the Company changed its name to Northern Telecom Data Systems GmbH and on 9 December 1986 the Company changed its name to Northern Telecom GmbH. The Company then changed its name from Northern Telecom GmbH to Nortel Networks GmbH on 17 June 1999 and finally to Nortel GmbH on 20 December 2006.

15.     The Company's sole shareholder is Nortel Networks International Finance & Holdings BV, a Netherlands based company ("NNIF"). NNIF is a wholly owned subsidiary of NNUK.

16.     I, along with Simon Freemantle, am a director of the Company and have been a director since 14 January 2009. Prior to my appointment, the Company's directors were Mr Willem Jan Te Niet and Mr Christian Waida. Mr Te Niet is a Dutch citizen who resides in the Netherlands and Mr Waida is a German citizen who resides in England.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

17.     As set out at paragraphs 33 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and inter dependent on each entity within the business for financial performance.  This has the consequence that the business and affairs of the

Company are inextricably linked with those of the other companies within the Nortel Group.

18.    As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

19.    Together with my fellow director, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 108 of the Main Witness Statement and confirm that these matters apply to the Company.

20.    On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab D.

## FINANCIAL POSITION OF THE COMPANY

21.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

22.    My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

    (a)    the Company had net assets on its balance sheet at 30 September 2008 of $51,757,000 (see tab C). Included within the assets are goodwill, deferred tax, intangibles and intercompany trading accounts receivable. The Company is advised by E&Y in their report which is attached to the Main Witness Statement

4

that the realisable value of those assets is doubtful following the North American filings in view of the interdependencies within the EMEA group and the larger Nortel Group and that the adjusted net balance sheet position after allowing for these adjustments is net liabilities of $53 million. The Company has cash balances at 31 December 2008 of $63 million. However, if the Company remains outside of an insolvency process such as the administration order being sought or the full protection of its parent company, it is likely that the Company's cash reserves will in time be dissipated in trading losses. The Company has had trading losses of US $9 million for the first to the third quarters of 2008. The rates of losses are likely to accelerate following the North American filings. Therefore the Company is likely to be insolvent on a balance sheet basis. Further, the Company is likely to become insolvent on a cash flow basis following the North American filing, unless it is protected through an insolvency process such as the administration order being sought;

(b)     factors including competitive pressures, an inability to reduce operating expenses fast enough, the incurrence of costs related to restructuring efforts, significant competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investments, and the poor state of the global economy have operated to increase the operating costs of the Company in recent years. These difficulties have increased materially in recent months as global economic conditions have dramatically worsened. The Company is experiencing significant pressure on its business and facing a deterioration of its cash and liquidity as customers across all businesses delay and reduce their capital expenditures. In particular, the extreme volatility in the global markets has hampered the ability to accurately forecast future revenue and cash position;

(c)     moreover, in light of these matters it is clear that the Company is or is likely to become unable to pay its debts.

## PURPOSE OF ADMINISTRATION

23.     I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

24.     Following consideration of this matter the directors have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

25.     The directors have placed particular reliance upon:

(a)     The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)     The matters identified at paragraphs 5, and 216 to 221 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)     The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

26.     I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that as a director of the Company I have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the Company's place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

27.     The Company is incorporated in Germany and has its registered office at Main Airport Center, Unterschweinstiege 6, 60549 Frankfurt am Main, Germany.

28.     The Company has the following connections with the place of its incorporation:

(a)     board meetings are commonly held in Germany and written resolutions passed in Germany. Nevertheless, written resolutions and all accompanying papers are first prepared by and with the assistance of the relevant EMEA functions (for example

Finance, Legal, Treasury and Tax) based in England. Board resolutions have historically been kept to the minimum as required by law and focussed on either corporate matters (the approval of local financial statements, distributions, funding and HR issues where Board involvement was required or expected in Germany) and major contracts;

(b)     there are 478 employees who are located in Germany and are subject to German employment contracts. The terms of employment are determined by HR shared services in England and tailored to meet local law requirements in Germany. Executive level employment agreements and compromise agreements are dealt with in England by Mark Cooper and Sharon Ellerker who prepare the contracts and sign all the terms. All senior recruitment is approved by personnel based in England as referred to in paragraphs 196 to 199 of the Main Witness Statement;

(c)     the Company has nine German human resources personnel who deal with human resources issues in Germany and other EMEA countries including the Netherlands. As noted below, these personnel form part of the global HR team which provides strategic high level advice and which is managed out of England by Sharon Ellerker;

(d)     the Company also has a local in house lawyer;

(e)     there are three German based personnel who have an AL2 authority level. They are, Martin Boeker, Antonio Beltran and Wolfgang Altmeyer. The Main Witness Statement details the designations of Authority Levels in paragraphs 121 to 128. These personnel are, however, managed from England.

(f)     low level administrative and book keeping functions are performed within Germany and the Company does hold local German bank accounts, with local signatories (and also signatories based in England), but these consist of only minimal balances (of less than €1 million), as referred to in paragraph 203 of the Main Witness Statement;

(g)     with the assistance of our external advisers, I have reviewed the trade creditors for the nine months to September 2008. I believe this represents the general position of trade creditors for the Company over time. That shows that generally the company has around $108,000,000 in trade purchases for that period. Of these, around 37% (or $40 million over that period) relate to local German suppliers. The top five

German local suppliers are: Hormann Funkwerk, Maske, Mac, CTDI and Bucet. The approval required for the Company to engage these local suppliers and the terms on which they are engaged is subject to and constrained by the procurement and supply approval processes referred to in paragraphs 170 to 172 of the Main Witness Statement. This includes consent of the global contract review board being obtained over certain monetary limits ($100,000 for a new supplier or $500,000 for an existing supplier). As noted in that witness statement, there are certain legacy issues in relation to Germany which means that Germany has its own indirect procurement systems. Nevertheless the Company is still bound by the approval process of the global contract review board. Therefore, even in connection with local supplies, personnel in Germany cannot decide which significant suppliers to engage or the terms on which to engage them outside these procedures. I believe it is likely that a regular supplier of significant goods and services would be aware that an internal approval process for the supply is necessary and that this approval process does not occur in Germany;

(h)     the Company conducts trade with customers located within Germany. Actual day to day sales are driven by the German sales team. The Company's top five customers, in order of value of revenues, are Telefonica / O2, Deutsche Ban, Vodafone, Deutsche Telecom and Verizon. The entire customer relationship for Deutsche Ban is based in Germany. There is a local account manager for Deutsche Telecom, although relationship management with it is based in France. Relationship management with Vodafone is based in the UK, although revenues are driven locally through subcontracts under the framework agreement between Vodafone and Nortel Networks UK Ltd. Teflonica/O2 and Verizon are managed out of Spain and the United Sates respectively. The customer relationship personnel are, however, managed from England by Darryl Edwards and his English team who are responsible for setting the sale strategy and budgets. Mr Edwards also manages individual accounts from time to time although this is usually only for significant matters, such as a claim, dispute or request for a significant price reduction. In addition, the process for actually approving new contracts is referred to in paragraphs 140 to 143 of the Main Witness Statement;

(i)     the Company's research and development operations are conducted from Frankfurt and Dusseldorf in Germany. This is however not significant or high level research and development;

(j)      the majority of the Company's assets are leasehold interests and office fit out equipment which is located in Germany;

29. the Company has its own accounts payable processing, albeit within the global EMEA policies and procedures as set out in paragraphs 164 to 169 of the Main Witness Statement, and the billing address for purchase orders is within Germany.

**Factors connecting the Company with countries other than the place of incorporation or England**

30. The global account directors of two of the Company's top five customers, Telefonica / O2 and Verizon are based in Spain and the United States respectively.

31. The Company's parent company is NNIF which is incorporated in the Netherlands. The parent company of NNIF is NNUK. I understand that NNIF is applying for an English Administration order on the basis that its COMI is also in England.

32. For the 9 months to September 2008, global creditors of the company comprised around 2% of the Company's trade creditors (or around $2.5 million over that period). The substantial majority of these creditors are namely, K&N, Jones Lang Lasalle, CSC, Sagem and Te Com. These creditors are subject to global supply agreements negotiated by the Nortel's group in Canada. The relationships with these suppliers are generally managed at either the EMEA regional level in England or in Canada.

33. Mr Willem Jan Te Niet, who was a director of the Company until 14 January 2009, has an authority level of AL2 and is resident in the Netherlands.

**Factors connecting the Company with England**

34. I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in detail the decision making process in relation to the business of the companies within the EMEA region; paragraphs 140 to 143 which indicate how the contracting approval process is managed in the EMEA in relation to sale agreements; paragraphs 144 to 153 which detail the management of customer relationships of the companies within the EMEA region; paragraphs 154 to 169 deals with the procurement of accounts payable processes in EMEA; paragraphs 170 to 172 deals with the supplier approval process in the EMEA; paragraphs 173 to 177 which relates to legal and contracts assistance across the EMEA region; paragraphs 178 to 180 which relate to global compliance across the EMEA region; paragraph 181 which relates to the internal audit across the EMEA region; paragraphs 182

to 183 which relate to the EMEA and other external audit processes; paragraph 184 which relates to ethics management; paragraph 185 which relates to corporate security; paragraphs 186 to 189 which relate to tax strategy across the EMEA; paragraphs 190 to 199 which relate to human resources management across the EMEA group; 200 to 205 which relates to banking and treasury across the EMEA region; paragraph 206 which relates to real estate across the EMEA region; and paragraphs 207 which relates to advice regarding proposed restructuring. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company as a member of the EMEA group.

35.    These paragraphs evidence the wide range of operational, strategic, financial and high level administrative and advisory control over the Company in England by senior management of EMEA. These paragraphs also evidence the interconnectivity with the larger Nortel group in terms of customers, suppliers and finance functions.

36.    Without in any way limiting what is said in those paragraphs referred to above, the following points are relevant to the Company's connection with England:

37.    **Decision Making:** key primary functions required for the operation of the Company are conducted from England. Senior management in England exercise control and authority over the Company through the global decision making approval and policy procedure. Day to day operational management of the Company is conducted in accordance with these policies.

38.    **Creditors:** intercompany creditors comprise around 60% of the total trade creditors for the 9 months to September 2008 (or around $64 million over that period). These creditors are almost all part of the EMEA group and are managed out of England. Subject to local laws, the payment of intercompany liabilities is governed by EMEA group treasury, which is managed by Simon Freemantle out of England. Further, as noted above, the procurement and supply approval procedures for local German creditors are governed by the procurement and supply approval procedures as part of the global decision making approval procedure and policy.

39.    **Customers:** the approval process for all sale agreements is managed out of England. Although customers of the Company are generally managed by German personnel, these sales staff are managed from England by Darryl Edwards who sets the EMEA strategy, targets and budget for sales and sales related matters as well as managing individual customers of the company from time to time. Vodafone, the Company's third largest

customer (with revenue of $19.7 million) is managed from England. As noted above, any serious or high level claim by customers against the Company would also be dealt with by Darryl Edwards in England. I believe it is likely that, at least for large and repeat customers, they are aware that approval and oversight of the sale agreement and the customer relationship occurs in England.

40.    **Treasury:** As noted in the Main Witness Statement banking and treasury functions are run out of England. Relevantly:

(a) subject to German law requirements, decisions regarding payment of intercompany liabilities are made by the Treasury function which is based in England;

(b) until terminated on 29 December 2008, the Company participated in the EMEA cash pooling arrangements with Citigroup. These arrangements were managed by the EMEA treasury located in England by Simon Freemantle, as set out in paragraphs 87 to 89 of the Main Witness Statement. That statement also sets out what has happened following the termination of the cash pooling arrangement.

(c) there is minimal interaction by the Company with German banking institutions. Although the Company has bank accounts with German banks, the accounts hold minimal balances and have a signatory who is based in England. In addition, all treasury activities are managed in accordance with the Global Treasury Policies and Procedures implemented and monitored by the EMEA treasury located in England. As referred to in paragraph 87(a) of the Main Witness Statement, the main account of the Company is with Citigroup in England, from where it is managed.

(d) all funding is provided from England or Canada and there are no German borrowing facilities;

(e) the EMEA treasury team manages the bid process, performance and warranty bonds for the Company's projects and products in England. However, the bond facility is a global facility and German banks may be called upon by the team to issue specific bonds.

41.    **Corporate Matters and External Advisers:** In relation to corporate matters such as, financial, tax and distribution decisions are generally made by the Finance, Legal and Tax functions of the EMEA group which are all located or led out of England. Internal legal

assistance is also provided by the Legal function in England, although as noted above, the Company has an in house lawyer located in Germany.  Tax planning initiatives are led by England and Canada.

42.     Before engaging professional advisers as a general rule, the Company will consult with the relevant corporate head office function, which is located in England. An exception to this would be where there is a purely local issue.

43.     KPMG is the Company's auditor. KPMG has a global agreement with the Nortel Group through which this engagement is managed. For the Company (and the wider EMEA group), this relationship is managed by Philippe-Albert Leburn, who is based in England.

44.     **Human Resources:** the Company's employees are likely to be aware that their "high level" employment queries are managed centrally from England by Sharon Ellerker and the EMEA HR Shared Services team, which they are.  However, due to historical and legacy reasons, much of the day to day Human Resources support for German employees is run out of Germany, with the various business units within the Company having a German based HR contact.

45.     **Property Management:** the Nortel Group has a global relationship with Jones Lang LaSalle through which it manages its real estate interests. The leasehold properties of the Company are managed by Jones Lang LaSalle along with other EMEA entities out of its offices in England and this is referred to in paragraph 206 of the Main Witness Statement.

46.     **Directors:** Mr Christian Waida, who was a director of the Company until 14 January 2009 was resident in England and had an AL1 authority level.

## Conclusion on COMI

47.     Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England, where all major decisions are made, that this is ascertainable by persons with whom the Company carries on business, and that in the circumstances the Company has its COMI in England.

## FORMAL REQUIREMENTS

48.     To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the

Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

49. To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

50. A statement from each of the proposed administrators is at tab F. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

51. It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

52. Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

53. At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

54. The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

55. I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill of Ernst & Young LLP as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed....Shann Norton.........

Dated.....16·1·09...............

Applicant
Sharon Lynette Rolston
No. of Statement:  First
Exhibits: SR1
14 January 2009

NO.          OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL GMBH

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

---

**WITNESS STATEMENT OF SHARON LYNETTE
ROLSTON**

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

**Applicant**
**Sharon Lynette  Rolston**
**First**
**SR1**
**14 January 2009**

NO.          OF 2009

<u>**IN THE HIGH COURT OF JUSTICE**</u>

<u>**CHANCERY DIVISION**</u>

<u>**COMPANIES COURT**</u>

**IN THE MATTER OF NORTEL NETWORKS (AUSTRIA) GMBH**

**AND**

**IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

I SHARON LYNETTE ROLSRON of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ
WILL SAY as follows:

**INTRODUCTION**

1.     I am a director of Nortel Networks (Austria) GmbH (the **"Company"**), having been
appointed on 14 January 2009.

2.     I make this witness statement in support of the application of the directors of the Company
pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the **"Act"**) for

an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson, of the firm Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company (the **"Proposed Administrators"**). I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.    Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.    Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited ("NNUK") and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 13 below).

5.    There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.    I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.    I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.    This witness statement is divided into the following sections:

    (a)    Background;

    (b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

    (c)    Financial position of the Company;

(d)    Purpose of the administration;

(e)    Centre of main interests (**"COMI"**) of the Company;

(f)    Formal requirements; and

(g)    Conclusion.

**BACKGROUND**

9.    The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the **"EMEA Group"**).

10.    The Company carries on business as a "limited risk entity" in the Nortel Group (as described at paragraphs 50 to 54 of the Main Witness Statement) (**"Limited Risk Entity"**). As such, the Company operates as the Austrian distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited ("NNL"), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the **"Distribution Agreement"**). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre ("TCC") operated by certain larger members of the Nortel Group.

11.    Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the Company is guaranteed by NNL.

12.    The Company was incorporated on 1 September 1998 under the provisions of Austrian Company Law. The registered office of the Company is situate at 1100 Wien, Business park Vienna, Clemens-Holzmeisterstrasse 4, Austria. (see tab A).

13.    The paid up and issued share capital of the Company is € 40,000 divided into one share with a par value of € 40,000. Nortel Networks International Finance and Holding B.V. (a Dutch company) ("NNIF") holds the share. NNIF is a wholly owned subsidiary of NNUK.

14.     I, along with Simon Freemantle am a director of the Company and have been a director
since 14 January 2009. Prior to my appointment the Company's directors were Cyrill Paul
Busslinger (appointed 28 April 2003), residing in Switzerland, and Torsten Koller
(appointed 21 July 2005), residing in Germany. Cyrill Paul Busslinger is a Swiss citizen
and Torsten Koller is a German citizen. I am an Irish citizen and Simon Freemantle is an
British citizen.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

15.     As set out at paragraphs 33 to 81 of the Main Witness Statement, the global and EMEA
business is highly integrated and there is inter-dependency between each entity within the
business for financial performance. This has the consequence that the business and affairs
of the Company are inextricably linked with those of the other companies within the Nortel
Group.

16.     As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is
experiencing financial difficulties. The directors of the Company understand that these
financial difficulties have led to a decision being taken to file for protection in Ontario,
Canada under the provisions of the Companies' Creditors Arrangement Act and in the
United States in the State of Delaware under the provisions of Chapter 11 of the US
Bankruptcy Code.

17.     Together with my fellow directors, we have considered the likely effect of the filings in
North America on the business of the Company and its ability to continue to trade. In
summary, we have concluded that following the filings in North America, the North
American operations will no longer be able to support the EMEA companies (including the
Company) in terms of cash and that due to the predicted impairment on the global business
it is inevitable that the Company will become insolvent. I refer to the detailed explanation
of the likely consequences of the North American filings at paragraphs 100 to 102 of the
Main Witness Statement and confirm that these matters apply to the Company.

18.     On 14 January 2009 a meeting of the directors of the Company was held in order to
determine what steps the Company should take to best preserve its business and assets for
the benefit of its creditors. The directors resolved that we should apply to the Court for an
administration order to be made in relation to the Company. A copy of the board
resolution is at tab B.

**FINANCIAL POSITION OF THE COMPANY**

19.   I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

20.   My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts.  We have relied upon the following matters in reaching this conclusion:

(a)   Whilst the Company's most recently published accounts dated 31 December 2007 (see tab C) and most recently available balance sheet as at 30 September 2008 (see tab D) show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 87 of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in inter-company funding within the EMEA Group.

(b)   This will particularly affect the Company because its profitability and balance sheet solvency are dependent on Nortel Group operating protocols and are not sustainable on a stand-alone basis without the support of the Nortel Group; in particular, NNL (a Canadian company) is responsible for underwriting the companies' profitability and is about to enter into an insolvency process.

(c)   This, along with the other matters set out at paragraphs 100 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

**PURPOSE OF ADMINISTRATION**

21.   I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

22.   Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

23.   We have placed particular reliance upon:

(a)     The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)     The matters identified at paragraph 217 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)     The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

## COMI

24.     I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

25.     The Company is incorporated in Austria and has its registered office there.

26.     The Company has the following connections with the place of its incorporation:

(a)     The Company has 16 employees who are employed in Austria;

(b)     The Company has external creditors in Austria, although these creditors are small in value (for example, our external advisers inform me that such creditors amounted to approximately 13% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$2.8 million) and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords;

(c)     The Company maintains a local bank account, although only with minimal balances sufficient for weekly capital requirements (and one of the account signatories is located in England);

(d)     The account manager of two of the Company's top five customers by value, as assessed over the previous nine months (the "**top five customers**") are located in Austria; and

(e)     Low level administrative and book keeping functions are performed in Austria.

**Factors connecting the Company with countries other than the place of incorporation or England**

27.     The Company has the following connections with countries other than the place of its incorporation or England:

(a)     Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)     Netherlands: the Company's only issued share is directly held by the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK) and the account manager of one of the Company's top five customers is located in the Netherlands;

(c)     Germany: the entire customer relationship in respect of one of the Company's top five customers is located in Germany;

(d)     United Sates of America: the account manager of one of the Company's top five customers is located in the United States of America; and

(e)     Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 5% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$2.8 million).

**Factors connecting the Company with England**

28.  **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision-making process in relation to the business of the companies within the EMEA Group, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. As stated in paragraph 122 of the Main Witness Statement, there are four levels of approval authority in relation to decision-making: AL0 (the highest level) to AL3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

29.  **Creditors:** the significant majority by value of the total creditors of the Company are inter-company creditors (for example, our external advisers inform me that such creditors amounted to approximately 82% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$2.8 million), as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors. Inter-company accounts are paid as per standard terms unless determined otherwise by the EMEA Group Treasury team in England.

30.  **Customers:** the Company's largest customers are accustomed to deal directly with the EMEA Group sales president, Darryl Edwards, based in England, particularly in relation to serious matters.

31.  **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds the only issued share in the Company.

32.  **Banking:** All banking arrangements are managed centrally in accordance with the policies and procedures set by the EMEA Group Treasury, located in England. As mentioned in paragraph 26(c) above, one of the account signatories is located in England.

33.  **Funding:** NNUK, along with the North American Nortel entities, provide all of the funding requirements of the Company.

34. **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, decisions are made by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of inter-company outstandings are made by the EMEA Group Treasury in England.

35. **Employees:** the Company's employees are aware that their high level employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to an Austrian HR specialist where necessary.

36. **Advisers:** the Company's advisers are located in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

37. **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

### Conclusion on COMI

38. Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the largest customers of the Company deal directly with England (see paragraph 30 above) and that the majority of the Company's creditors are inter-company creditors. Therefore, in the circumstances the directors believe that the Company has its COMI in England.

**FORMAL REQUIREMENTS**

39.     To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company.  No supervisor, administrative receiver or Member State liquidator has been appointed to the Company.  Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

40.     To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

41.     A statement from each of the Proposed Administrators is at tab F. The statements confirm that the Proposed Administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

42.     It is intended that any of the Proposed Administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

43.     Paragraph 12(2) of Schedule B1 to the Act and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served.  Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

44.     At tab D is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days' notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

45.     The EC Regulation on Insolvency Proceedings applies in this case.  The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

46.    I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed. *Shaun Naylor*

Dated......16·1·09.........

11

Applicant
Sharon Lynette Rolston
First
SR1
14 January 2009

NO.                        OF 2009

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

IN THE MATTER OF NORTEL NETWORKS
(AUSTRIA) GMBH

AND

IN THE MATTER OF THE INSOLVENCY ACT
1986

_____

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

_____

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

Applicant
Sharon Lynette Rolston
No. of Statement:  First
Exhibit: SR1
14 January 2009

<u>IN THE HIGH COURT OF JUSTICE</u>                                   No.    of 2009

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS (IRELAND) LIMITED

AND

IN THE MATTER OF THE INSOLVENCY ACT 1986

---

### WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, **DO STATE** as follows:

### INTRODUCTION

1.      I am a director of Nortel Networks (Ireland) Limited (the **"Company"**), having been appointed on 14 January 2009.

2.      I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom and David Martin Hughes of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company.  I am duly authorised to make this witness statement on behalf of the directors of the Company (the **"Directors"**).

3.      Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.     Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited (**"NNUK"**) and have been a director of the same since 1 April 2006.

5.     There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.     I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.     I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.     This witness statement is divided into the following sections:

   (a)     background;

   (b)     decision of the directors of the Company to apply for an administration order in respect of the Company;

   (c)     financial position of the Company;

   (d)     purpose of the administration;

   (e)     centre of main interests (**"COMI"**) of the Company;

   (f)     formal requirements; and

   (g)     conclusion.

**BACKGROUND**

9.     The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (**"EMEA"**).

10. The Company carries on business primarily as a Residual Profit Entity ("RP Entity") Company. Paragraphs 41 to 43 of the Main Witness Statement describe the role of a RP Entity within the group. The Company derives its revenues from the distribution and sales of Nortel products to both third parties and other group companies largely outside of Ireland. The Company is also granted a licence to use the group IP via a licensing agreement with Nortel Networks Limited which owns all IP and derives revenues from this according to the Master Research and Development Agreement.

11. Historically the Company was a Transactional Control Centre ("TCC") and thus the largest distribution chain and supplier for all the entities in Europe. The Company is, however no longer a TCC. As a result of this legacy the Company currently operates across Europe and deals with pan-European and global customers. The Company has limited business within Ireland itself, with only 10% of its total business accounting for business within Ireland.

12. The Enterprise Solutions ("ES") business for Europe is an element of this legacy and as the Company was a TCC it controlled this aspect of the business. Contracts with customers in the ES business are done out of the Company. The ES business is, however, overall managed from England.

13. The Company was incorporated on 25 January 1973 under the provisions of the Companies Act 1963 (Ireland). The registered office of the Company is situated at Mervue Business Park, Mervue, Galway, Ireland (see tab A).

14. The Company changed its name on 4 May 1999 from Nortel (Ireland) Limited to Nortel Networks (Ireland) Limited.

15. The issued share capital of the Company is 158,000 Ordinary shares and 100,000 Preference shares. The nominal share capital of the Company is 1,000,000 divided into 1,000,000 shares of £1 each. The amount of the capital paid up or credited as paid up is £258,000.

16. The audited accounts as at 31 December 2007 are tab B of the exhibit SR1. The balance sheet of the Company as at 30 September 2008 is tab C of exhibit SR1.

17. The sole shareholder is Nortel Networks Limited – Canada, holding 100% of the shares.

18. I, along with Simon Freemantle and David Quane, am a director of the Company and have been a director since 28 August 2006. Prior to 14 January 2009 the Company had Orla

Fitzpatrick (a citizen and resident of Ireland), David Quane (appointed 28 August 2006 and who is a citizen and resident of Ireland), Charlie Wade (appointed 1 May 2007 and is a citizen and resident of Ireland) and me as directors.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

19.    As set out at paragraphs 33 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and inter dependent on each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

20.    As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Company Creditors Arrangement Act 1984 and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

21.    Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 108 of the Main Witness Statement and confirm that these matters apply to the Company.

22.    On 14 January 2009, a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab D.

## FINANCIAL POSITION OF THE COMPANY

23.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

24.    My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

(a)    the Company's balance sheet at 30 September 2008 is showing net assets of $58,979,000 million (tab C). The most significant asset is intercompany loans receivable, the realisable value of which is doubtful following the North American filings in view of the interdependencies within the group and the likelihood of fragmentation of the EMEA companies unless they are protected by the administration orders being sought or otherwise supported financially by their ultimate parent company. E&Y in their report (referred to in paragraph 100 of the Main Witness Statement) have adjusted their net assets calculations and have concluded that the net liabilities of the Company will be $83 million. The Company's losses for quarters 1 to 3 in 2008 were $2 million according to the quarter 3 management accounts. The Company is therefore likely to be insolvent on the balance sheet basis and likely to become insolvent on a cash flow basis following the North American filing;

(b)    The Company had cash balances of $49 million at 31 December 2008. Therefore, the Company has cash resources that could be used to support an administration process. However, if the Company remains outside of an administration process or the full protection of its parent company, it is likely that the cash reserves will, in time, be dissipated in trading losses. The Company's losses for quarters 1 to 3 in 2008 were $2 million (according to the quarter 3 management accounts provided to E&Y), this is close to a break even position based on the turnover for that period of $447 million. However, it is likely that the volume of business being conducted by the Company and the rest of the EMEA Group will be adversely affected by the North America filings, which would have the effect of accelerating trading losses.

(c)    the matters set out at paragraphs 100 to 102 of the Main Witness Statement. I confirm that these matters apply to the Company. Moreover, in light of these matters it is clear that the Company is or is likely to become unable to pay its debts.

**PURPOSE OF ADMINISTRATION**

25.   I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

26.   Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

27.   We have placed particular reliance upon:

(a)   the fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)   the matters identified at paragraph 5, 16 and 216 to 218 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)   the report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

28.   I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

29.   The Company is incorporated in Ireland and has its registered office at Mervue Business Park, Mervue, Galway, Ireland.

30.   The Company has the following connections with the place of its incorporation:

(a)     until 14 January 2009 the following directors of the Company were Irish citizens and resided in Ireland: Orla Fitzpatrick, David Quane and Charlie Wade.

(b)     board meetings are held once a quarter in Ireland and the number of Board meetings held over the course of the year is dependant on local legal requirements and where, to the extent permissible by Irish law made my written resolution. The Board meetings focussed on either corporate matters (the approval of local financial statements, distributions, funding and HR issues where Board involvement was required or expected in Ireland). The written resolutions and/or draft minutes together with briefing papers were prepared with the assistance of the relevant EMEA functions (for example Finance, Legal, Treasury, HR and Tax) based in England;

(c)     there are 319 employees all based in Ireland and are all based on a local employment contract unless they are on secondment from other group companies. The terms of employment are determined by HR shared services in England and tailored to meet local law requirements in Ireland. Executive level employment agreements and compromise agreements are dealt with in England by Mark Cooper and Sharon Ellerker who prepare the contracts and sign all the terms. All senior recruitment is approved by personnel based in England as referred to in paragraphs 195 to 199 of the Main Witness Statement;

(d)     The Company does serve some business needs in Ireland, but this accounts for only 10% of total revenue. However, the majority of the customers of the Company are not based in Ireland nor relate to business they conduct in Ireland;

(e)     with the assistance of our external advisers, I have reviewed the trade creditors for the nine months to September 2008. I believe this represents the general position of trade creditors for the Company over time. That shows that generally the company has around $298,000,000 in trade purchases over that period. Of these, around 4% (or $12 million over that period) relate to local Irish suppliers. The top five Irish local suppliers are: Storm Technology Ltd, Stephen Harris, ESB Independent Energy Ltd, Tuong Minh Project Management and Brookvale Trust Ltd. The approval required for the Company to engage these local suppliers and the terms on which they are engaged is subject to and constrained by the procurement and supply approval processes referred to in paragraphs 170 to 172 of the Main Witness Statement. Therefore, even in connection with local supplies, personnel in

Ireland cannot decide which suppliers to engage or the terms on which to engage them outside of these procedures. I believe it is likely that a regular supplier of significant goods and services would be aware that an approval process for the supply is necessary and that this approval process does not occur in Ireland.

(f)     Only one employee has an authority level of AL3 but that employee is actively based from England 3 days of the week and in Ireland for the other two. The Main Witness Statement details the designation of Authority Levels in paragraphs 119 to 128;

(g)     the Company also has leasehold interests and company fit out equipment in Ireland, although the general management of the leasehold property is managed out of England, as discussed below;

(h)     formal invoices from creditors are addressed to the Company in Ireland, although subject to the accounts payable procedures described in paragraphs 164 to 166 of the Main Witness Statement; and

(i)     the Company maintains local Irish bank accounts, although with only minimal balances sufficient for weekly working capital requirements, as referred to in paragraph 203 of the Main Witness Statement, and has signatories for these accounts based in Ireland. These accounts also have signatories in England namely, Deborah Black and Simon Freemantle.

**Factors connecting the Company with countries other than the place of incorporation or England**

31.     The Company has the following connections with countries other than the place of its incorporation or England:

(a)     The Company trades with customers who are located globally and whose main centre of business is outside Ireland. These include Azlan, which forms one of the three pan-European centres for the Nortel group of companies, Westcon, BTC Saudi Arabia, the Company's third biggest customer which is managed from Saudi Arabia, Vodafone (who is based in England), MDS PACC (United Arab Emirates, which is managed locally by the team in Dubai).

(b)     Research and development related work is managed out of North America.

(c)    The Company's sole shareholder is the parent company of the Nortel Group, Nortel Networks Limited in Canada.

(d)    For the 9 months to September 2008, global creditors of the company comprised around 4% of the Company's trade creditors (or around $12 million over that period). Of these a significant majority are CSC, WIPRO, Jones Lang Lasalle, Dell, Verint Systems Limited. These creditors are subject to global supply agreements negotiated by the Nortel's group in Canada. The relationships with these suppliers are generally managed at either the EMEA regional level in England or in Canada.

**Factors connecting the Company with England**

32.    I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in detail the decision making process in relation to the business of the companies within the EMEA region; paragraphs 140 to 143 which indicate how the contracting approval process is managed in the EMEA in relation to sale agreements; paragraphs 144 to 153 which detail the management of customer relationships of the companies within the EMEA region; paragraphs 154 to 169 deals with the procurement of accounts payable processes in EMEA; paragraphs 170 to 172 deals with the supplier approval process in the EMEA; paragraphs 173 to 177 which relates to legal and contracts assistance across the EMEA region; paragraphs 178 to 180 which relate to global compliance across the EMEA region; paragraph 181 which relates to the internal audit across the EMEA region; paragraphs 182 to 183 which relate to the EMEA and other external audit processes; paragraph 184 which relates to ethics management; paragraph 185 which relates to corporate security; paragraphs 186 to 189 which relate to tax strategy across the EMEA; paragraphs 190 to 199 which relate to human resources management across the EMEA group; 200 to 205 which relates to banking and treasury across the EMEA region; paragraph 206 which relates to real estate across the EMEA region; and paragraphs 207 which relates to advice regarding proposed restructuring.

33.    I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company as a member of the EMEA group.

34.    These paragraphs evidence the wide range of operational, strategic, financial and high level administrative and advisory control over the Company in England by senior management of EMEA. These paragraphs also evidence the interconnectivity with the larger Nortel group in terms of customers, suppliers and finance functions.

35.     Without in any way limiting what is said in those paragraphs the following points are relevant to the Company's connection with England:

36.     **Decision Making:** key primary functions required for the operation of the Company are conducted from England. Senior management in England exercise control and authority over the Company through the global decision making approval and policy procedure. Day to day operational management of the Company is conducted in accordance with these policies. There is only one AL2 individual located in Ireland who is David Quane and only one AL3 individual works the majority of their week from England.

37.     **Creditors:** intercompany creditors comprise around 92% of the total trade creditors for the 9 months to September 2008 (or around $274 million for that period). These creditors are either managed out of England, US or Canada. Subject to local laws, the payment of intercompany liabilities is governed by EMEA group treasury, which is managed by Simon Freemantle out of England. Further, as noted above, the procurement and supply approval procedures for local Irish creditors are governed by the procurement and supply approval procedures as part of the global decision making approval procedure and policy.

38.     **ES Business:** This European business is often conducted through the Company. However, this is managed by personnel in England and all 'bids' for this work goes through the EMEA group.

39.     **Customers:** the approval process for all sale agreements is managed out of England and purchase orders often request that they are sent to Harlow in England for processing. The process for approving new contracts of the EMEA companies is referred to in paragraphs 140 to 143 of the Main Witness Statement.

40.     In addition to this the customer account management of the top two customers (Azlan and Westcon) which comprise of 80% of all total revenue of the Company is managed by Amanda Giddins who is based in England. Further, the fourth largest customer, Vodafone is subject to a framework agreement which is managed from England which is in turn driven locally via the individual sub contracts entered into under the terms of the framework agreement. Any serious or high level claim by customers against the Company would also be dealt with by Darryl Edwards in England. I believe that it is likely that at least for large and repeat customers they are aware that approval and oversight of the sale agreement and customer relationship occurs in England.

If there is a product claim (in the non ES business), the performance bond arrangements may apply. This is co-ordinated via a global facility and all EMEA bonding is managed out of England (by the EMEA treasury team). Where a claim is established, the customer will usually contact the relevant local issuing bank for payment and that branch will then communicate with England before a payment is issued.

41.    **Treasury:** As noted in the Main Witness Statement banking and treasury functions are run out of England. Relevantly:

    (a) All banking arrangements are conducted in accordance with group treasury procedures. Simon Freemantle operates for EMEA's treasury functions in England. All facilities are passed through the group treasury;

    (b) until terminated on 29 December the Company participated in the EMEA cash pooling arrangements with Citigroup. These arrangements were managed by the EMEA treasury located in England, as set out in paragraphs 87 to 89 of the witness statement of Sharon Rolston. The arrangement following the termination of the cash pooling arrangement is discussed in paragraphs 88 and 89 of the Main Witness Statement;

    (c) there is minimal interaction by the Company with Irish banking institutions. Although the Company has bank accounts with Irish banks, these accounts hold minimal balances of less than 1 million Euros. In addition, those Irish accounts have one or more signatories from EMEA personnel (Deborah Black and Simon Freemantle) based in England in addition to an Irish based signatory. The main account with the Company is with Citigroup in England, where it is managed; and

    (d) all funding is provided from England or Canada and there are no Irish borrowing facilities;

42.    **Corporate Matters and External Advisers:** In relation to corporate matters such as, financial, tax and distribution issues, decisions are generally made by the Finance, Legal, and Tax functions of the EMEA group which are all located in England. Tax planning initiatives are led by both England and Canada.

43.    Before engaging professional advisers, as a general rule, the Company will consult with the relevant corporate head office function, which is located in England. An exception to this would be purely localised issues.

44.    KPMG is the Company's auditors. KPMG has a global agreement with the Nortel group through which its engagement is managed. For the Company (and the EMEA group), this relationship is managed by Phillipe-Albert Leburn, who is based in England

45.    **Property Management:** the Nortel group has a global relationship with Jones Lang Lasalle through which it manages its real estate interests. The leasehold properties of the company are managed by Jones Lang Lasalle along with other EMEA entities out of its offices in England.

46.    **Directors:** I am a director of the Company and a UK citizen residing in England. I have an approved authority level of AL1.

47.    **Human Resources:** the Company's employees are likely to be aware that their "high level" employment queries are managed centrally from England by Sharon Ellerker and the EMEA HR Shared Services team. In addition, first line transactional and administrative HR support is provided by the EMEA HR Shared Services team, located in England, who are typically the first point of contract for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity such as, managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums for some countries.

**Conclusion on COMI**

48.    Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England, where all major decisions are made, that this is ascertainable by persons with whom the Company carries on business, and that in the circumstances the Company has its COMI in England.

**FORMAL REQUIREMENTS**

49.    To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

50. To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

51. A statement from each of the proposed administrators is at tab F. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

52. It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

53. Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

54. At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

55. The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

56. I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom and David Martin Hughes of Ernst and Young LLP as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed..........................

Dated........16.1.09

Applicant
Sharon  Lynette Rolston
No. of Statement:  First
Exhibits: SR1
14 January 2009

NO. 1 OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS
(IRELAND) LIMITED

AND

IN THE MATTER OF THE INSOLVENCY ACT
1986

---

**WITNESS STATEMENT OF SHARON LYNETTE
ROLSTON**

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

**Applicant**
**Sharon Lynette Rolston**
**First**
**SR1**

**14 January 2009**

NO.          OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS AB

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

I Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, WILL SAY
as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks AB (the **"Company"**), having been appointed on 18
        September 2006.

2.      I make this witness statement in support of the application of the directors of the Company
        pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the **"Act"**) for
        an administration order to be made in respect of the Company and for the appointment of
        Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan

Michael Hudson, of the firm of Ernst & Young LLP ("E&Y"), as joint administrators of the Company. I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.   In addition to being a director of the Company since 18 September 2006, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer and a director of Nortel Networks UK Limited ("NNUK").

4.   Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

5.   There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.   I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies ("Nortel Group").

7.   I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the "Main Witness Statement"). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.   This witness statement is divided into the following sections:

   (a)   Background;

   (b)   Decision of the directors of the Company to apply for an administration order in respect of the Company;

   (c)   Financial position of the Company;

   (d)   Purpose of the administration;

   (e)   Centre of main interests ("COMI") of the Company;

   (f)   Formal requirements; and

      (g)     Conclusion.

**STATUTORY INFORMATION**

9.     The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (**"EMEA"**).

10.     The Company carries on business as a cost plus entity (**"CP entity"**) of the EMEA Group. As described at paragraphs 40, 44 and 46 of the Main Witness Statement, CP entities are service companies.

11.     The main role of the Company involves marketing Nortel products, customer relationship management and local product installation and training.

12.     The income received by the Company primarily comes from other companies within EMEA, primarily Nortel Networks (Ireland) Limited (**"NNIL"**), NNUK and Nortel Networks Limited. This income is received on a "cost plus" basis, i.e. the fully accounted cost, including attributable business overheads but not funding costs, is calculated and a fee equal to those costs plus an agreed mark up, usually 10%, is billed by the CP entity to the group company benefitting from the services. The Company also derives some profit from within Sweden for providing installation and training services.

13.     The Company was incorporated on 16 September 1992 under the provisions of Swedish companies legislation. The registered office of the Company is situated at Box 6701, Stockholm 113 85, Sweden (tab A).

14.     The Company was initially named Nortel Networks Nordic AB and changed its name to Nortel Networks AB on 14 December 1999.

15.     The authorised share capital of the Company is SEK 400,000. The issued share capital is SEK 100,000, divided into 1000 shares.

16.     The Company is wholly-owned by Nortel Networks International Finance & Holding BV (**"NNIF"**). NNIF is a wholly-owned subsidiary of NNUK.

17.     I, along with Simon Freemantle and Roland Dahlson am a director of the Company and have been a director since 18 September 2006. Prior to 14 January 2009, the Company's directors were:

       (a) Roland Dahlman, a Swedish citizen who resides in Sweden;

(b) Robert Haitsma, who is a Dutch citizen who resides in the Netherlands;

(c) Joe O'Connor, an Irish citizen who resides in France; and

(d) me.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

18.     As set out at paragraphs 25, 26, 33, 35 and 40 of the Main Witness Statement, the global
        and EMEA business is highly integrated and inter dependent on each entity within the
        business for financial performance.  This has the consequence that the business and affairs
        of the Company are inextricably linked with those of the other companies within the Nortel
        Group.

19.     As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is
        experiencing financial difficulties.  The directors of the Company understand that these
        financial difficulties have led to a decision being taken to file for protection in Ontario,
        Canada under the provisions of the Company Creditors Arrangement Act 1984 and in the
        United States in the State of Delaware under the provisions of Chapter 11 of the US
        Bankruptcy Code.

20.     Together with my fellow directors, we have considered the likely effect of the filings in
        North America on the business of the Company and its ability to continue to trade.  In
        summary, we have concluded that following the filings in North America, the North
        American operations will no longer be able to support the EMEA companies (including the
        Company) in terms of cash and that due to the predicted impairment on the global business
        it is inevitable that the Company will become insolvent.  I refer to the detailed explanation
        of the likely consequences of the North American filings at paragraphs 100 to 102 of the
        Main Witness Statement and confirm that these matters apply to the Company.

21.     On 14 January 2009 a meeting of the directors of the Company was held in order to
        determine what steps the Company should take to best preserve its business and assets for
        the benefit of its creditors.  The directors resolved that we should apply to the Court for an
        administration order to be made in relation to the Company.  A copy of the board resolution
        is at tab B.

## FINANCIAL POSITION OF THE COMPANY

22. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

23. My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

    (a) Whilst the Company's most recently published accounts dated 31 December 2007 (see tab C), and most recently available balance sheet dated 30 September 2008 (see tab D), show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100(b) of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

    (b) This will particularly affect the Company because its profitability and balance sheet solvency are dependent on Nortel Group operating protocols and are not sustainable on a stand alone basis without support of the Nortel Group.

    (c) This, along with the other matters set out at paragraphs 100 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

24. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

25. Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

26. We have placed particular reliance upon:

(a) The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b) The matters identified at paragraph 213 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c) The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

27.    I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order.  I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England.  In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England.  However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

28.    The Company is incorporated in Sweden and has its registered office at Box 6701, Stockholm 113 85, Sweden.

29.    The Company has the following connections with the place of its incorporation:

(a) Roland Dahlman, a director of the Company, resides in Sweden.

(b) The Company has 17 employees, all of whom are located in Sweden.

(c) The majority of the Company's physical assets are leasehold interests and office fit-out equipment, which are held locally.

(d) Supply agreements are entered into by the Company within Sweden for office and administration goods and services such as car leasing plans, utility and phone (land

and mobile) services, local authority tax charges and office administration and supplies.

**Factors connecting the Company with countries other than the place of incorporation or England**

30. The Company has the following connections with countries other than the place of its incorporation or England:

(a) Two of its previous directors, reside in the Netherlands and France respectively;

(b) Most of the revenue for the CP entities is derived from enterprise solutions and the contracts are run through NNIL.

**Factors connecting the Company with England**

31. I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA region, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 153 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company.

32. To summarise, the Company, as a CP entity, has very little decision making authority. As stated in paragraph 123 of the Main Witness Statement, there are four levels of approval authority re decision making: AL1 (the highest level) to AL3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England. I am a director of the Company and am a Level 1 approver, however this is derived as a result of my position as CFO of NNUK.

33. ~~Intercompany creditors comprise approximately 100% of the Company's liabilities.~~ I have read paragraphs 76 to 81 of the Main Witness Statement which describes the way in which internal purchasing occurs within the global business and the EMEA region. As this sets out, the purchasing arrangements within the overall group results in high levels of inter-company receivables and payables which necessitates a transfer pricing and inter-company settling methods. The Company relies on NNUK to direct this and decisions regarding

payment of intercompany outstandings are made by the Treasury function based in England.

34.    Third parties make up the majority by value of the Company's debtors. The most significant of these is British Telecom. The account manager for British Telecom is located in England.

35.    Other matters which are particular to the Company and which connect the Company with England are:

(a) **Directors**:  I am a director of the Company, and I reside in England;

(b) **Management**:  the day-to-day management of the Company's affairs is conducted in accordance with EMEA Group policies and procedures. These policies and procedures are developed and implemented at the EMEA headquarters in Maidenhead, England ("**EMEA Headquarters**"), and then disseminated to the Company. The Company is expected to operate within the constraints of those policies and procedures. In line with these policies and procedures the Company holds the minimum number of board meetings required by law, except where there is an unusual high-value transaction requiring board approval. These are conducted by telephone or by written resolution and written resolutions will be circulated to the directors of the Company with briefing papers prepared by the relevant EMEA function at EMEA Headquarters (i.e. Finance, Legal, Treasury, Human Resources and Tax);

(c) **Corporate Matters**:  for matters such as approval of local financial statements, distributions, funding (both loan and equity), and human resources issues where involvement from senior management in England is either locally required or expected, the directors of the Company receive guidance and advice from the appropriate EMEA functions, such as Finance, Legal, Treasury, Human Resources, and Tax. Where transactions follow Board approval (for instance a dividend), these will be subject to the Authority Level / DCA Process. This process is described at paragraphs 121 to 128 of the Main Witness Statement. The authorities given as part of that process will act as a recommendation to the directors of the Company to approve the matter;

(d) **Major Contracts**:  where major contracts are entered into by the Company (such as material trading agreements, business acquisitions and divestments agreements,

and material business restructuring proposals), such contracts will have been reviewed as part of the Authority Level / DCA Process.  The authorities given as part of that process will act as a recommendation to the directors of the Company to approve the agreement or proposal;

(e) **Procurement**:  all procurement is done in accordance with Nortel global procurement procedures and policies.  The approval process for suppliers is governed by Nortel Group corporate procedures which set out the responsibilities, requirements and guidelines for the establishment and management of supply agreements.  There is also an EMEA Global Procurement Contract Management Procedure Guide which is applicable to the procurement of network field service requirements.  This is managed out of England;

(f) **Banking**:  while the Company has a bank account in Sweden, it maintains a minimal balance and the Company has minimal interaction with Swedish banks.  Further, all banking arrangements are conducted in accordance with the policies and procedures developed by the Treasury Group at EMEA Headquarters.  Any changes to these policies and procedures must be approved by EMEA Treasury in England;

(g) **Funding**:  the Company does not have local facilities or borrowing arrangements.  All funding for the Company is provided from England or Canada;

(h) **Advisers**:  KPMG acts as the auditor of for Nortel globally, and the relationship is governed by a global engagement letter.  However, there is also an individual engagement letter between the Company and the Swedish KPMG office.  It is the Company's practice to consult the relevant group at EMEA Headquarters before engaging other professional advisers, except in respect of issues that are of a purely local nature;

(i) **Tax**:  while the Company is responsible for preparing its Swedish tax returns, it is the Company's practice to have these returns reviewed by the Tax Group at EMEA Headquarters.  Further, Headquarters manages EMEA Group tax matters and EMEA-specific tax planning initiatives.  Other tax planning initiatives are led from Canada;

(j) **Property Management**:  all leasehold properties globally (including properties leased by the Company) are managed by Jones Lang Lasalle.  The relationship

with Jones Lang Lasalle is managed by the corporate real estate team at EMEA Headquarters;

(k) **Creditors**: ~~approximately 100% of the Company's creditors are intercompany creditors, and~~ The majority of the company's creditors are local in

(l) **Employees**: the Company's employees are aware that their high level employment queries are managed centrally from England by the EMEA HR Shared Services team. First line transactional and administrative HR support is provided by the EMEA HR Shares Services team, located in England, who are typically the first point of contact for employees and managers when they have a HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums for some countries), and would refer more complex queries or case management support (i.e. disciplinaries, grievances etc.) to an in-country HR generalist where applicable. In addition, senior leaders within the Company receive advice from regionally located HR business partners.

**Conclusion on COMI**

36.     Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England, where all major decisions are made, that this is ascertainable by persons with whom the Company carries on business, and that in the circumstances the directors believe that the Company has its COMI in England.

**FORMAL REQUIREMENTS**

37.     To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

38.     To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

39.     A statement from each of the proposed administrators is at tab F. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

40.     It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

41.     Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

42.     At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

43.     The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

44.     I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson, of E&Y as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed....Shannon........

Dated........14-1-09.........

Applicant
**Sharon Lynette Rolston**
**First**
**SR1**
**14 January 2009**

NO.          OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS AB

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

———————————————

### WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

———————————————

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

**Applicant**
**Sharon Lynette Rolston**
**First**
**SR1**
**14 January 2009**

**NO.    OF 2009**

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS B.V

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

I SHARON LYNETTE ROLSTON of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ
WILL SAY as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks B.V. (the **"Company"**), having been appointed on 14
        January 2009.

2.      I make this witness statement in support of the application of the directors of the Company
        pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the **"Act"**) for
        an administration order to be made in respect of the Company and for the appointment of

Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill, of the firm of Ernst & Young LLP ("E&Y"), as joint administrators of the Company (the "**Proposed Administrators**"). I am duly authorised to make this witness statement on behalf of the directors of the Company.

3. Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4. Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited ("NNUK") and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 13 below).

5. There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6. I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies ("**Nortel Group**").

7. I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the "**Main Witness Statement**"). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8. This witness statement is divided into the following sections:

    (a)    Background;

    (b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

    (c)    Financial position of the Company;

    (d)    Purpose of the administration;

    (e)      Centre of main interests ("**COMI**") of the Company;

    (f)      Formal requirements; and

    (g)      Conclusion.

## BACKGROUND

9.      The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the "**EMEA Group**").

10.    The Company carries on business as a limited risk entity in the Nortel Group (as described at paragraphs 50 to 54 of the Main Witness Statement ("**Limited Risk Entity**"). As such, the Company operates as the Dutch distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited ("**NNL**"), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the "**Distribution Agreement**"). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre ("**TCC**") operated by certain larger members of the Nortel Group.

11.    Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the company is guaranteed by NNL.

12.    The Company was incorporated on 26 January 1972 under the provisions of Dutch Companies Land.  The registered office of the Company is situated at Siriusdreef 42-72, 2132WT Hoofddorp, Netherlands (tab A).

13.    Until 29 July 1983 the Company's name was Data 100 B.V., whereupon its name was changed to Northern Telecom Data Systems B.V. On 6 August 1987 its name was changed to Northern Telecom B.V.  Finally, on 14 May 1999, the Company changed its name to Nortel Networks B.V.

14. The issued and paid up share capital of the Company is € 4,500,000 divided into 4,500 shares. The company is a wholly owned subsidiary of Nortel Networks International Finance and Holding BV (a Dutch company) ("NNIF"). NNIF, in turn, is a wholly owned subsidiary of NNUK.

15. I, along with Simon Freemantle am a director of the company and have been a director since 14 January 2009. Prior to my appointment the company's directors were Rob Haitsma, Alex Claasen and Bernard Visser, all of whom are resident in the Netherlands.

**DECISION TO APPLY FOR AN ADMINISTRATION ORDER**

16. As set out at paragraphs 33 to 81 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

17. As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

18. Together with my fellow director, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

19. On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab D.

## FINANCIAL POSITION OF THE COMPANY

20.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

21.    My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts.  We have relied upon the following matters in reaching this conclusion:

(a)    Whilst the Company's most recently published accounts, dated 31 December 2006 (See tab B), and most recently available balance sheet, dated 30 September 2008 (See tab C), show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 87 of the Main Witness Statement, it is likely that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

(b)    This will particularly affect the Company because its profitability and balance sheet solvency are dependant on Nortel Group operating protocols and are not sustainable on a stand alone basis without support of the Nortel Group; in particular, NNL is responsible for underwriting the Companies profitability and is now in an insolvency process. More specifically, the Company is owed an intercompany debt of around US$26 million which it may be unable to collect following the North American filings.

(c)    This, along with the other matters set out at paragraphs 100 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

22.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

23.    Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

10/17982112_2

24.     We have placed particular reliance upon:

   (a)     The fact that an administration order provides the protection required by the
           Company and an opportunity to pursue a coordinated program with Canadian and
           U.S. companies for a disposal of parts of the global operations to potential buyers
           who have been identified;

   (b)     The matters identified at paragraphs 217 of the Main Witness Statement which
           highlight the likely benefits of administration orders being made in relation to the
           EMEA companies in respect of which applications have been made; and

   (c)     The report prepared by E&Y which concludes that the purpose of the
           administration is reasonably likely to be achieved.

**COMI**

25.     I am advised that the Court is required to consider the location of the COMI of a company
        when determining whether to make an administration order.  I confirm that the directors of
        the Company have received legal advice in relation to the concept of COMI and, in light of
        this advice, believe that the COMI of the Company is located in England.  In summary, this
        is due to the fact that the Company is effectively managed from EMEA's head office
        which is located in Maidenhead, England.  However, in order to ensure that all relevant
        information is before the Court, the following paragraphs set out the connecting factors
        with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

26.     The Company is incorporated in the Netherlands and has its registered office there.

27.     The Company has the following connections with the place of its incorporation:

   (a)     as mentioned at paragraph 15 above, up until 14 January 2009 the three directors
           of the Company were all resident in the Netherlands;

   (b)     the board meetings of the Company are usually held in the Netherlands;

   (c)     the Company has 89 employees who are employed in the Netherlands;

   (d)     the Company has external creditors in the Netherlands, although these creditors are
           small in value (for example, our external advisers inform me that such creditors
           amounted to approximately 6% of the Company's total spend for the nine months

10/17982112_2                                                                                    6

to 30 September 2008: this total spend being approximately US$ 73 million) and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords;

(e)   the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and two of the account signatories are located in England);

(f)   the accounts for three of the company's top five customers by value, as assessed over the previous nine months (the "**top five customers**") are managed from the Netherlands;

(g)   low level administrative and book keeping functions are performed in the Netherlands; and

(h)   All of the Company's shares are directly held by the Dutch company NNIF.

**Factors connecting the Company with countries other than the place of incorporation or England**

28.   The Company has the following connections with countries other than the place of its incorporation or England:

(a)   Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)   Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers represent a large percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 58 % of the Company's total spend for the nine months to 30 September 2008: this total spend being approximately US$ 73 million). In particular, Flextronics is the company's largest creditor because the Company acts as a service repair hub and as such will have direct transactions with Flextronics to service or repair equipment.

**Factors connecting the Company with England**

29. **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA Group, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. As stated in paragraph 123 of the Main Witness Statement, there are four levels of approval authority re decision making: AL0 (the highest level) to AL 3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

30. **Creditors:** a significant percentage by value of the total creditors of the Company are intercompany creditors (for example, our external advisers inform me that such creditors amounted to approximately 36 % of the Company's total spend for the nine months to 30 September 2008: this total spend being approximately US$ 73 million), as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors. Intercompany accounts are paid as per standard terms unless determined otherwise by the EMEA Group Treasury team in England.

31. **Customers:** the Company's largest customers (numbering more than thirty) are accustomed to deal directly with the EMEA Group sales president, Darryl Edwards, who is based in England, particularly in relation to serious matters. Further, the account for one of the top five customers is managed by a European team based in England.

32. **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds all the shares in the Company.

33. **Banking:** until the practice was terminated on 29 December 2008, the Company participated in an EMEA Group cash pooling arrangement whereby the majority of its cash was effectively moved at regular intervals to a central account in England. These arrangements were managed, along with all other banking arrangements, in accordance

with policies and procedures set by the EMEA Group treasury located in England. The Company maintains an English bank account with signatories in England and Holland.

34.     **Funding:** NNUK, along with the North American Nortel entities, provides all of the funding requirements of the Company.

35.     **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, decisions are made by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. EMEA Tax planning initiatives are led from England. Also, decisions regarding payment of intercompany outstandings are made by the EMEA Group Treasury in England.

36.     **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to a Dutch HR specialist where necessary.

37.     **Advisers:** the Company's advisers are located in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

38.     **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

**Conclusion on COMI**

39.     Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the Company's largest customers deal directly with England (see paragraph 30 above) and that a significant proportion of the Company's creditors are

intercompany creditors. Therefore, in the circumstances the directors believe that the Company has its COMI in England.

## FORMAL REQUIREMENTS

40.     To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company.  No supervisor, administrative receiver or Member State liquidator has been appointed to the Company.  Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

41.     To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

42.     A statement from each of the proposed administrators is at tab E.  The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

43.     It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

## Service and Abridgement of Time

44.     Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served.  Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

45.     At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

## EC REGULATION

46.    The EC Regulation on Insolvency Proceedings applies in this case.  The proceedings will
       be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

47.    I respectfully request that the Court do make an administration order in respect of the
       Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and
       Christopher John Wilkinson Hill as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed.... *Sharon Newton*

Dated........ 16.1.09

Applicant

Sharon Lynette Rolston

First

SR1

14 January 2009

NO.    OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS B.V.

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

———————————————

WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON

———————————————

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

**Applicant**
**Sharon Lynette Rolston**
**First**
**SR1**
**14 January 2009**

NO.                OF 2009

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**


**IN THE MATTER OF NORTEL NETWORKS ENGINEERING SERVICE KFT.**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**


---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---


I Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ WILL SAY as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks Engineering Service Kft. (the **"Company"**), having been appointed on 14 January 2009.

2.      I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of

Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson, of the firm of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company (the **"Proposed Administrators"**). I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.    Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.    Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited ("NNUK") and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 13 below).

5.    There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.    I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.    I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

## CONTENTS

8.    This witness statement is divided into the following sections:

    (a)    Background;

    (b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

    (c)    Financial position of the Company;

    (d)    Purpose of the administration;

(e)     Centre of main interests (**"COMI"**) of the Company;

(f)     Formal requirements; and

(g)     Conclusion.

**BACKGROUND**

9.      The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the **"EMEA Group"**).

10.     The Company carries on business as a "limited risk entity" in the Nortel Group (as described at paragraphs 50 to 53 of the Main Witness Statement)(**"Limited Risk Entity"**). As such, the Company operates as the Hungarian distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited (**"NNL"**), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the **"Distribution Agreement"**). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre (**"TCC"**) operated by certain larger members of the Nortel Group.

11.     Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the company is guaranteed by NNL.

12.     The Company was incorporated on 6 August 1999 under The Controlling Act of Economic Companies ("Gazdasági Társaságokról Szoló Törvény"). The registered office of the Company is situate at Infopark setany u.1, 1117 Budapest, Hungary (see tab A).

13.     The paid up and issued capital of the Company is HUF 3,000,000. The Company is a wholly owned subsidiary of Nortel Networks International Finance and Holding BV (a Dutch company) (**"NNIF"**), which is in turn a wholly owned subsidiary of NNUK.

14. I, along with Simon Freemantle am a director of the company and have been a director since 14 January 2009. Prior to my appointment the company's directors were Cyrill Busslinger (a resident in Switzerland) and Antonio Beltran (a resident of Germany).

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

15. As set out in the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

16. As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

17. Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

18. On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab B.

## FINANCIAL POSITION OF THE COMPANY

19. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

20. My fellow directors and I have concluded that the Company is unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

(a) The Company's most recently available unaudited balance sheet dated 30 September 2008 (see tab C) shows that the Company is presently insolvent on a balance sheet basis (with a deficit of $735,000 as of 30 September 2008).

(b) This, along with the other matters set out at paragraphs 100 to 102 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is unable to pay its debts.

**PURPOSE OF ADMINISTRATION**

21. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

22. Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

23. We have placed particular reliance upon:

(a) The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b) The matters identified at paragraphs 216 to 220 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c) The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

24. I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of

this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

25.     The Company is incorporated in Hungary and has its registered office there.

26.     The Company has the following connections with the place of its incorporation:

    (a)     the Company has 6 employees who are employed in Hungary;

    (b)     the Company has external creditors in Hungary, although these creditors are small in value (for example, our external advisers inform me that such creditors amounted to approximately 7% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 3 million) and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords

    (c)     the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and one of the account signatories is located in the England); and

    (d)     low level administrative and book keeping functions are performed in Hungary.

**Factors connecting the Company with countries other than the place of incorporation or England**

27.     The Company has the following connections with countries other than the place of its incorporation or England:

    (a)     Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

    (b)     Netherlands: the Company is a wholly owned subsidiary of the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)     Germany: the account manager of one of the Company's top five customers is located in Germany; and

(d)  .  Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 5% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 3 million).

**Factors connecting the Company with England**

28.     **Decision making:** I refer to paragraphs 119 to 135 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA Group; paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. As stated in paragraphs 123 of the Main Witness Statement, there are four levels of approval authority re decision making: AL0 (the highest level) to AL 3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

29.     **Creditors:** the significant majority by value of the total creditors of the Company are intercompany creditors (for example, our external advisers inform me that such creditors amounted to approximately 88% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 3 million) as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors. Intercompany accounts are managed and settled by the EMEA Group Treasury team in England.

30.  **Customers:** the Company's largest customers usually deal directly with the EMEA Group sales president, Darryl Edwards, based in England, particularly in relation to serious matters.

31.  **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds all issued capital in the Company.

32.  **Banking:** All banking arrangements are managed in accordance with policies and procedures set by EMEA Group Treasury, located in England. As mentioned in paragraph 26, one of the account signatories is located in England.

33.  **Funding:** NNUK, along with the North American Nortel entities, provide all of the funding requirements of the Company.

34.  **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, decisions are made by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of intercompany outstandings are made by the EMEA Group Treasury in England.

35.  **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to a Belgium HR specialist where necessary.

36.  **Advisers:** the Company's advisers are centralised in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

37.  **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

**Conclusion on COMI**

38.   Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the Company's largest customers deal directly with England (see paragraph 30 above) and that the majority of the Company's creditors are intercompany creditors. Therefore, in the circumstances the directors believe that the Company has its COMI in England.

**FORMAL REQUIREMENTS**

39.   To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

40.   To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

41.   A statement from each of the proposed administrators is at tab E. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

42.   It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

43.   Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

44.     At tab F is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

45.     The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

46.     I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed.........................................

Dated......14·1·09·...............

Applicant

Sharon Lynette Rolston

First

SR1

14 January 2009

NO.                    OF 2009

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

IN THE MATTER OF NORTEL NETWORKS
ENGINEERING SERVICE KFT.

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

**Applicant**
**Sharon Lynette**
**Rolston**
**First**
**SR 1**
**14 January 2009**

NO.          OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS HISPANIA, S.A.

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

### WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I, Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, UK, WILL SAY as follows:

**INTRODUCTION**

1.    I am a director of Nortel Networks Hispania, S.A. (the **"Company"**), having been appointed on 14 January 2009.

2.    I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of

Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill, of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company (the **"Proposed Administrators"**). I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.    Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.    I am aware of the previous operations and management of the Company as I was first appointed as a director of the Company on 21 March 2007 and I am the Chief Financial Officer of Nortel Networks UK Limited (**"NNUK"**), an English company, and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 14 below).

5.    There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.    I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.    I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company)(the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.    This witness statement is divided into the following sections:

(a)    Background;

(b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

(c)    Financial position of the Company;

(d)    Purpose of the administration;

(e)     Centre of main interests ("COMI") of the Company;

(f)     Formal requirements; and

(g)     Conclusion.

**BACKGROUND**

9.     The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the **"EMEA Group"**).

10.     The Company carries on business as a "limited risk entity" in the Nortel Group (as described at paragraphs 50 to 53 of the Main Witness Statement) (the **"Limited Risk Entity"**). As such, the Company operates as the Spanish distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited ("NNL"), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the **"Distribution Agreement"**). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre ("TCC") operated by certain larger members of the Nortel Group.

11.     Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the company is guaranteed by NNL.

12.     The Company was incorporated on 8 January 1990 under the provisions of Ley de Sociedades Anonimas – RD Leg. 1564/1989 of 22 December as subsequently amended and Reglamento del Registro Mercatil. The registered office of the Company is situate at Carmino del Cerro de los Gamos, no. 1, Edificio 6, Pozuelo de Alarcon, Madrid, Spain (tab A).

13.     Until 1995 the Company's name was Radiotronica Standard Telephone and Cable, S.A., whereupon it was changed to Sociedad Espanola de Equipos de Telecomunicaciones Northern Telecom S.A. On 30 June 1995 the Company's name changed to Northern

3

Telecom Socieded Anonima. In December 1997 its name was changed to Nortel Hispania, S.A. Finally, on 19 April 1999, the Company changed its name to Nortel Networks Hispania, S.A.

14. The paid up and issued share capital of the Company is € 9,165,000 divided into 1,500,000 shares. Nortel Networks International Finance and Holding B.V. (a Dutch company) ("NNIF") holds the entire share capital of the Company. NNIF is a wholly owned subsidiary of NNUK.

15. I, along with Simon Freemantle and Michel Clement, am a director of the Company and have been a director since 14 January 2009. Prior to my appointment the Company's directors were Knut Stenseth, resident in Spain, and Christina Waida and myself, both residents in England.

**DECISION TO APPLY FOR AN ADMINISTRATION ORDER**

16. As set out at paragraphs 26 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

17. As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

18. Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

19.    On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab B.

## FINANCIAL POSITION OF THE COMPANY

20.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

21.    My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

    (a)    Whilst the Company's most recently published accounts, dated 31 December 2007 (tab C), and most recently available balance sheet, dated 30 September 2008 (tab D), show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100 of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

    (b)    This will particularly affect the Company because its profitability and balance sheet solvency are dependant on Nortel Group operating protocols and are not sustainable on a stand alone basis without support of the Nortel Group; in particular, NNL (a Canadian company) is responsible for underwriting the companies' profitability and is about to enter in an insolvency process.

    (c)    This, along with the other matters set out at paragraphs 100 to 102 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

22.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

23.    Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

24.    We have placed particular reliance upon:

(a)    The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)    The matters identified at paragraphs 216 to 221 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)    The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

25.    I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

26.    The Company is incorporated in Spain and has its registered office there.

27.    The Company has the following connections with the place of its incorporation:

(a)    as mentioned at paragraph 15 above, up until 14 January 2009 one director of the Company was resident in Spain;

(b)    the annual board meetings of the Company are usually held in Spain;

(c)    the Company has 146 employees who are employed in Spain;

(d)    the Company has external creditors in Spain, although these creditors do not constitute a majority (for example, our external advisers inform me that such creditors amounted to approximately 28% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 39 million) and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords;

(e)    the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and one of the account signatories is located in England);

(f)    the account managers of three of the Company's top five customers by value, as assessed over the previous nine months (the **"top five customers"**) are located in Spain;

(g)    as stated in paragraph 123 of the Main Witness Statement, there are four levels of approval authority in relation to decision making: AL 0 (the highest level) to AL 3 (the lowest level). The Company has the AL 2 business, finance and legal employees in relation to one of the top five customers, (Telefonica, who is also a top 15 EMEA customer and a pan-European customer) are located in Spain;

(h)    the Company has a local HR representative due to more complex case management support required as a result of local laws. However, the EMEA Group shared HR service team in England remain the first point of contact for employees (see paragraph 36 below);

(i)    the Company's legal support is partially provided in Spain as the Company has an in-house lawyer; and

(j)    low level administrative and book keeping functions are performed in Spain.

**<u>Factors connecting the Company with countries other than the place of incorporation or England</u>**

28.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)    Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks

Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)    Netherlands: the entire share capital of the Company's is directly held by the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)    France: the account manager of one of the top five customers is located in France; and

(d)    Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 5% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 39 million).

**Factors connecting the Company with England**

29.    **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA Group, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. Save as to the AL 2 employees mentioned in paragraph 27(g) above, the Company does not have any other employees with any of the authority levels and so has insufficient number of employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

30.    **Creditors:** the significant majority by value of the total creditors of the Company are intercompany creditors (for example, our external advisers inform me that such creditors amounted to approximately 67% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 39 million), as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors.