## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                               :

| | |
|---|---|
| *In re* | Chapter 11 |
| | : |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | : |
| Debtors. | Jointly Administered |
| | : |

**Hearing date: August 9, 2011, 9:30 AM (ET)**
**Objections due: August 2, 2011, 4:00 PM (ET)**

-------------------------------------------------------X

### DEBTORS' MOTION FOR ENTRY OF AN ORDER
### PURSUANT TO 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P. 9019
### APPROVING SETTLEMENT AND LOSS PORTFOLIO TRANSFER AGREEMENT
### WITH LIBERTY MUTUAL INSURANCE COMPANY

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving that certain Settlement and Loss Portfolio Transfer Agreement dated as of July 18, 2011 (the "LPT Agreement"), by and among NNI, NNC, NNL, the Monitor and Liberty Mutual Insurance Company on behalf of itself and its subsidiaries and affiliated companies including without limitation Helmsman Management Services, LLC ("Helmsman," and together with Liberty Mutual Insurance Company and its other affiliates, "Liberty Mutual"), attached hereto as **Exhibit**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

B; and granting the Debtors such other and further relief as the Court deems just and proper.  In

further support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b)

of the Bankruptcy Code and Bankruptcy Rule 9019.

## Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy

Code, which cases are consolidated for procedural purposes only.  The Debtors continue to

operate their remaining businesses and manage their properties as debtors in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in

respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized

(the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code
on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases
for procedural purposes [D.I. 1098].

Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.      On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales.  Since then, Nortel has sold its various business units and other assets to various purchasers.  Efforts continue to be made with respect to the realization of value from Nortel's remaining assets.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

### Relief Requested

7.      By this Motion, the Debtors seek an order, pursuant to sections 105(a) and 363(b)

---

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

of the Bankruptcy Code and Bankruptcy Rule 9019, approving the LPT Agreement; and granting

the Debtors such other and further relief as the Court deems just and proper.

**Facts Relevant to the Motion**

**A.      The Liberty Mutual Policies and Proofs of Claim**

8.      As described more fully in both the Debtors' Motion for Entry of an Order

Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other

Compensation, (II) Reimbursable Expenses, and (III) Medical Retirement and Similar Benefits

[D.I. 10] (the "Employee Wage Motion") and the Debtors' Motion for Entry of an Order

Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition, and (II)

Enter Into New Insurance Policies [D.I. 15] (the "Insurance Motion"), under the laws of the

various states in which the Debtors operate or operated, the Debtors are required to maintain

workers' compensation liability insurance and to provide employees with workers' compensation

coverage for claims arising from or related to their employment with the Debtors.

9.      NNI historically maintained workers' compensation and certain other insurance

policies through Liberty Mutual.  Specifically, Liberty Mutual maintained NNI's workers'

compensation and employers' liability insurance policies and commercial auto insurance policies

(collectively, the "Liberty Mutual Policies" or the "Covered Policies") during the period from

1979 to 1997.  Under the terms of the Covered Policies, Liberty Mutual provides workers'

compensation coverage for amounts in excess of the deductible amount – typically between

$750,000 and $1 million – up to applicable statutory limits.  As most workers' compensation

claims do not exceed the deductible amount, the costs associated with NNI's workers'

compensation programs are largely self-funded.  Liberty Mutual also assists NNI with the day-

to-day administration of the Covered Policies and seeks reimbursement from NNI for any costs

4

expended by Liberty Mutual that are the responsibility of NNI in the form of premium payments. Moreover, from time to time prior to the Petition Date, NNI and Liberty Mutual reached lump-sum settlements directly with workers' compensation claimants, thereby dispensing with any monthly payments with respect to such claimants. Also included in the Liberty Mutual Policies are certain commercial auto insurance policies that NNI maintained with Liberty Mutual during this period, under which NNI is required to pay losses within the applicable deductible amounts, or reimburse Liberty Mutual for losses advanced on NNI's behalf within such amounts.

10.    In addition, Helmsman provides third-party administration of NNI's self-insured workers compensation claims in the state of California (the "Helmsman Agreement," and together with the Covered Policies, the "Covered Agreements"), pursuant to which Helmsman has continued to pay claims on behalf of NNI, for which it bills NNI on a monthly basis.

11.    NNI's payment obligations to Liberty Mutual under the Covered Agreements are secured by:  (i) a letter of credit issued by RBC Financial Group (the "Liberty L/C"), which Liberty Mutual asserts that it has drawn for the full balance of US$2,898,225.00 (the "Liberty L/C Proceeds") pursuant to its rights under the Liberty L/C and remains unapplied; (ii) cash in the amount of $750,802.00 provided by NNI and held by Liberty Mutual in an escrow account (the "Liberty Escrow"); and (iii) a loss deposit fund provided by NNI with a remaining balance in the amount of $234,887.00 as of July 1, 2011 (the "Loss Deposit Fund").

12.    Although the terms on the Liberty Mutual Policies have expired, certain claims under the Covered Policies remain open, and other claims which are closed may in certain instances be re-opened under applicable state laws. According to an actuarial valuation conducted by Oliver Wyman Actuarial Consulting, Inc., NNI had approximately $3,676,944.00 in estimated outstanding liabilities on the Liberty Mutual Policies as of December 31, 2009.

13.     Liberty Mutual filed 17 substantially identical proofs of claim (Claim numbers 5664 through 5680, collectively, the "Proofs of Claim") in the Debtors' chapter 11 proceedings, asserting unliquidated and contingent secured and general unsecured claims "aris[ing] from insurance policies and related agreements . . . pursuant to which [the Debtors are] liable to pay premiums and related charges including defense costs and attorneys' fees."  See, e.g., Attachment to Claim No. 5665.

**B.     Workers' Compensation Relief Granted in these Chapter 11 Cases**

14.     This Court already has granted the Debtors certain relief with respect to their insurance obligations, including specifically with respect to their workers' compensation obligations, in the course of these chapter 11 proceedings.  In the Order Authorizing, but Not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical Retirement and Similar Benefits [D.I. 59] (the "Employee Wage Order"), entered on January 15, 2009, the Court authorized the Debtors to continue to pay, honor and process prepetition obligations with respect to the Employee Benefits, including their obligations with respect to their Workers' Compensation Policies, as both are defined in the Employee Wage Motion.  Employee Wage Order at ¶ 8.  Similarly, in the Order Authorizing Debtors to (A) Pay Prepetition Premiums Necessary to Maintain Insurance Coverage and (B) Enter Into New Insurance Policies [D.I. 51] (the "Insurance Order"), also entered on January 15, 2009, the Court authorized the Debtors to make any payments under or in respect of the Insurance Policies, which term includes their Workers' Compensation Policies, to the extent the Debtors determine in their discretion that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of

coverage, benefits or proceeds provided under any of the Insurance Policies.  Insurance Order at ¶ 5.

**C.      The LPT Agreement**[5]

15.      Since the Petition Date, the Debtors have engaged in arms' length, good faith discussions with Liberty Mutual, NNL, NNC and the Monitor regarding the possibility of transferring all future liability with respect to the Covered Agreements from NNI to Liberty Mutual through a loss portfolio transfer arrangement in order to resolve uncertainty regarding open claims under the Covered Agreements and resolve any other issues relating to the Covered Agreements, including the Proofs of Claim.  As a result of such negotiation, the parties agreed to and executed the LPT Agreement.  An executed copy of the LPT Agreement is attached as **Exhibit B** to this Motion.[6]  Under the terms of the LPT Agreement, Liberty Mutual will issue a new Loss Portfolio Transfer Policy (the "LPT Policy"), pursuant to which Liberty Mutual will assume all of NNI's financial obligations with respect to the Covered Agreements.[7]  In addition, Liberty Mutual will withdraw, or cause to be withdrawn, with prejudice, the Proofs of Claim and otherwise release NNI and its affiliates of any and all liabilities, including without limitation the claims asserted in the Proofs of Claim and any liabilities relating to the Covered Agreements, the Liberty L/C, the Liberty L/C Proceeds, the Liberty Escrow and the Loss Deposit Fund.

16.      In exchange, NNI, NNL and NNC have agreed to pay a premium for the LPT Policy in the amount of $3,022,486 to Liberty Mutual, which amount includes premium tax in

---

[5]      The summary of the LPT Agreement in this Motion is provided solely for the benefit of the Court and parties in interest.  To the extent that the summary and the terms of the LPT Agreement are inconsistent, the terms of the LPT Agreement shall control.

[6]      The execution of the LPT Agreement is conditioned on the approval of the Agreement by the Bankruptcy Court and the Canadian Court.

[7]      The form LPT Policy and relevant "Information Page" are attached to the LPT Agreement as Exhibits 1 and 2, respectively.

the amount of $59,264.[8]  In addition, NNI, NNL and NNC have agreed to pay certain reimbursement and premiums due under the Liberty Mutual Policies in the amount of $393,673.48, less the amount due from Liberty Mutual to NNI as a final adjustment in the amount of $64,478.  Finally, NNI has agreed to pay Helmsman $47,017.91 in satisfaction of NNI's outstanding financial obligation under the Helmsman Agreement.  The net payment to Liberty Mutual is $3,398,699.39.  The payment will be made by a combination of:  (i) Liberty Mutual's retention and application of the Liberty L/C Proceeds; (ii) Liberty Mutual's retention and application of the Liberty Escrow in the amount of $453,456.48; and (iii) Helmsman's retention and application of the Loss Deposit Fund in the amount of $47,017.91.  Liberty Mutual will return the $297,345.52 balance of the Liberty Escrow and the $187,869.09 balance of the Loss Deposit Fund through a payment of one-half of each amount to each of NNI and NNL.

17.    As part of the LPT Agreement, NNI has agreed to transfer its rights to recover payments made by Liberty Mutual as a result of assuming NNI's payment obligations under the LPT Policy and cooperate, upon reasonable request of Liberty Mutual, in all reasonable respects with Liberty Mutual to transfer or assert such rights.  The LPT Agreement also contains releases by NNI of Liberty Mutual from all claims relating to the Covered Agreements, the Liberty L/C, the Liberty L/C Proceeds and the Liberty Escrow.

18.    In addition, the LPT Agreement contains releases between NNI, on the one hand, and NNL, NNC and the Monitor, on the other hand, of all claims relating to the Covered Agreements, the Liberty L/C, the Liberty L/C Proceeds and the Liberty Escrow.  The LPT Agreement also contains certain releases between Liberty Mutual, on the one hand, and NNL, NNC and the Monitor, on the other hand.

---

[8]    The amount of the premium is based on Liberty Mutual's assessment of the cost of assuming the outstanding liabilities associated with the Policies.

**Basis for Relief**

19.     The Debtors seek an order granting the relief sought in this Motion pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  Section 105(a)

of the Bankruptcy Code provides that "[t]he court may issue any order … that is necessary or

appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

20.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease the

property of the estate outside of the ordinary course of business after notice and a hearing.  11

U.S.C. § 363.  Section 363 applies when an agreement involves the disposition of the estate's

assets in such a way that it ventures beyond an ordinary course transaction.  Myers v. Martin (In

re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

21.     The use or transfer of estate property under this provision must be supported by a

sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),

722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL

32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward

Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re

Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v.

Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).

A court determining whether a sound business purpose justifies the transaction "should consider

all salient factors pertaining to the proceeding and, accordingly, act to further the diverse

interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward Holding

Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071).  In addition, a

Debtor must show that the transaction has been proposed in good faith, that adequate and

reasonable notice has been provided and that it is receiving fair and reasonable value in

exchange.  See In re Decora Industries, Inc., 2002 WL 32332749, at *2; In re Delaware &
Hudson Ry. Co., 124 B.R. at 176.

22.      Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee
and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.
Bankr. P. 9019.  Citing this authority, the Third Circuit has emphasized that "[c]ompromises are
favored in bankruptcy."  Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996)
(quoting Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health
Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally
favored in bankruptcy").  Additionally, the Third Circuit has recognized that "'[i]n administering
reorganization proceedings in an economical and practical manner it will often be wise to
arrange the settlement of claims as to which there are substantial and reasonable doubts.'"  In re
Penn Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting Protective Comm. for
Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).  And
courts in this District have recognized that the approval of a proposed compromise and
settlement is committed to the sound discretion of the bankruptcy court.  See, e.g., In re Coram
Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

23.      Before approving a settlement under Bankruptcy Rule 9019, a court must
determine whether "the compromise is fair, reasonable, and in the interest of the estate."  In re
Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211
B.R. 798, 801 (D. Del. 1997)).  The court need not be convinced that the settlement is the best
possible compromise in order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.
Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below
the lowest point in a range of reasonableness."  Travelers Cas. & Sur. Co. v. Future Claimants

<u>Representative</u>, No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing <u>Matter of</u>

<u>Jasmine, Ltd.</u>, 258 B.R. 119 (D.N.J. 2000)); <u>see also</u> <u>In re Coram Healthcare Corp.</u>, 315 B.R. at

330.

24.     The Third Circuit has set out four criteria for a bankruptcy court to consider when

evaluating a settlement proposal:  "(1) the probability of success in litigation; (2) the likely

difficulties in collection; (3) the complexity of the litigation involved, and the expense,

inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."

<u>In re Martin</u>, 91 F.3d at 393 (citing <u>In re Neshaminy Office Bldg. Assocs.</u>, 62 B.R. 798, 803

(E.D. Pa. 1986)); <u>see also</u> <u>Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)</u>, 283 F.3d 159,

165 (3d Cir. 2002); <u>In re eToys, Inc.</u>, 331 B.R. 176, 198 (Bankr. D. Del. 2005).

25.     The Debtors respectfully submit that the LPT Agreement, and the settlement of

various claims and obligations thereunder, meets each of the requirements under section 363 of

the Bankruptcy Code and Bankruptcy Rule 9019, is of a sound business purpose and is in the

best interests of the Debtors' estates and their creditors.

26.     As contemplated by section 363 of the Bankruptcy Code, the LPT Agreement was

negotiated and entered into by the parties in good faith as a means by which the Debtors could

transfer any liability that could be incurred on claims under the Covered Agreements to Liberty

Mutual and resolve all outstanding and potential issues relating to the Covered Agreements,

including the Proofs of Claim, on a consensual basis.  Among other considerations, the Debtors

have reviewed and considered the costs associated with maintaining their current practice of

paying premiums to Liberty Mutual on the Covered Policies, of making periodic true-up

reconciliation, of facilitating one-off settlements with claimants and of resolving unliquidated

and contingent claims asserted in the Proofs of Claim without undue delay.  Based on this

review, the Debtors have determined that it is in their best interests to resolve any and all financial obligations, including costs and expenses, and the uncertainty associated with the Covered Agreements by entering into the LPT Agreement.  As the Debtors continue the process of winding down their businesses, the Debtors believe that it is more efficient for the responsibility for the Covered Agreements and the resolution of workers' compensation claims to be handled by Liberty Mutual, an entity that is currently better-situated to attend to and manage such claims and related issues on a day-to-day basis.  The Debtors believe that the premium for the LPT Policy is justified in light of both the benefits they are receiving and the estimated outstanding liabilities with respect to the Covered Agreements.  As described above, the LPT Agreement effectively transfers all financial obligations associated with the Covered Agreements from NNI to Liberty Mutual and will resolve all of Liberty Mutual's claims against the Debtors in these chapter 11 proceedings.  For these reasons, the Debtors believe that entering into the LPT Agreement represents the Debtors' sound business judgment and is in the best interests of the Debtors, their estates and their creditors.

## Notice

27.    Notice of the Motion has been given via hand delivery or first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to Liberty Mutual; and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

28.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached as **Exhibit A** hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  July 19, 2011
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*