## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
                              :

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | **Hearing date:** |
| | : | **Beginning September 19, 2011 at 9:30 a.m. ET** |
| | : | **Objection date:** |
| | : | **August 19, 2011 at 4:00 p.m. ET** |

---------------------------------------------------------X

## JOINT OBJECTION AND MOTION TO DISMISS CLAIMS OF
## NORTEL NETWORKS (IRELAND) LIMITED

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

AKIN GUMP STRAUSS HAUER & FELD
LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Debtors and Debtors in
Possession*

*Counsel for the Official Committee of
Unsecured Creditors*

---

[1]      The U.S. Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iv

SUMMARY TABLES OF NN IRELAND'S CAUSES OF ACTION .............................. xiii

PRELIMINARY STATEMENT ...................................................................... 1

JURISDICTION AND VENUE ...................................................................... 4

PROCEDURAL HISTORY ........................................................................... 4

    A.    English Proceedings of the EMEA Debtors ............................................... 5

    B.    UK Pension Proceedings .................................................................... 7

    C.    EMEA Claims Process ...................................................................... 8

NN IRELAND'S AMENDED PROOF OF CLAIM ................................................ 9

    A.    Factual Predicate: Five Factual Patterns Underlie NN Ireland's Claim ....... 9

        1.    Transfer Pricing ................................................................. 9

        2.    NNL Intercompany Loans and Dividends ................................. 11

        3.    Unidentified Pre-Petition Asset Sales ..................................... 12

        4.    Contingent Tax Liability ...................................................... 13

        5.    Contingent Claims Relating to FSD Proceedings ....................... 13

    B.    Causes of Action Pled by NN Ireland: Roadmap ................................... 13

ARGUMENT ......................................................................................... 17

I.    NN IRELAND'S CLAIMS MUST BE TESTED UNDER FEDERAL
PLEADING REQUIREMENTS ................................................................ 17

    A.    The Court Should Exercise its Discretion to Apply Rule 12(b)
to NN Ireland's Proof of Claim ......................................................... 17

    B.    NN Ireland's Claim Fails to Meet the Relevant Pleading Standards ............ 18

II.    NNI OWED NO DUTIES TO NN IRELAND OR ITS CREDITORS .................... 21

    A.    NN Ireland is Estopped from Asserting that NNI or NNL
Served as De Facto or Shadow Directors of NN Ireland ........................... 21

        1.    NN Ireland's Representations ................................................ 22

        2.    NN Ireland is Estopped from Reversing its Position ................... 25

    B.    NN Ireland Fails to Plead a Plausible Claim that NNI was a
Director Under Irish Law ................................................................. 29

        1.    Irish Law Regarding De Facto and Shadow Directors .................. 30

**Page**

2.     The Claim Fails to Allege Sufficient Well-Pleaded Facts
       to Render a Directorship Claim Plausible........................................    32

3.     NN Ireland's Allegations Do Not Implicate a Shadow
       Director's Duty..................................................................................    38

C.    The Claim Includes No Well-Pleaded Allegations of NN Ireland's
      Insolvency Necessary for the Alleged Actions to Constitute a Breach of
      Fiduciary Duty to Creditors..........................................................................    38

D.    NNI Owed No Independent Duty of Care Under Irish Law ........................    41

III.   NN IRELAND'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY
       ON NNI FAIL...................................................................................................    42

A.    NN Ireland's Claims for Aiding and Abetting and Dishonest Assistance
      Fail on Multiple Grounds (Claims 4, 6, 10, 13, 23, 26, 27) .......................    43

1.     Irish Law .........................................................................................    44

2.     Delaware and Texas Law.................................................................    44

3.     NN Ireland's Allegations Fail to State a Plausible Claim ................    45

       a.     NN Ireland Has Failed Adequately to Plead Any
              Underlying Breach by NNL acting as a Shadow or De
              Facto Director..........................................................................    47

       b.     NN Ireland Fails Adequately to Plead Any Knowing
              Assistance by NNI ...................................................................    48

B.    NN Ireland's Conspiracy Claims Must Be Dismissed as
      NN Ireland Fails to Allege Any Well-Pleaded Allegations
      to Support Those Claims (Claims 5, 7, 12, 14) ...........................................    52

1.     Irish Law .........................................................................................    52

2.     Delaware and Texas  Law...............................................................    52

3.     NN Ireland's Conspiracy Allegations Fail to State a
       Plausible Claim ...............................................................................    53

C.    NN Ireland's Claims For Aiding and Abetting and Conspiracy
      are Barred by the *In Pari Delicto* Doctrine .................................................    56

IV.    NN IRELAND FAILS TO ADEQUATELY ALLEGE NNI'S
       UNJUST RECEIPT OF ANY NN IRELAND PROPERTY ..................................    57

A.    NN Ireland's Claims for Unconscionable Receipt Under Irish Law Fail on
      Multiple Bases ..............................................................................................    58

**Page**

B.      NN Ireland's Claims for Unjust Enrichment Under Irish Law Also Fail to
        State a Plausible Claim.................................................................................   59

V.      NN IRELAND'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO
        UNSPECIFIED ASSET SALES CAN BE SUMMARILY DISMISSED ...............   62

A.      Claims Allegedly Arising from Pre-Petition Asset Sales
        Fail a Basic Test of Notice Pleading............................................................   62

B.      Claims 16, 17, 20 and 22 Independently Fail to State a Claim ....................   63

        1.      Claim 20 Fails Adequately To Plead Mistake .................................   64

        2.      NN Ireland Does Not Plead Required Elements of a
                Transaction at Undervalue / Fraudulent Disposition Claim .............   65

        3.      Implied Term / Implied Contract .....................................................   66

VI.     NN IRELAND'S CLAIMS IN RESPECT OF FSD LIABILITY
        SHOULD BE SUMMARILY DISMISSED............................................................   67

A.      NN Ireland's FSD Claims Fail to Plead a Basis for Imposing
        Liability on NNI Regarding the UK Pension Plan .......................................   68

B.      NN Ireland's FSD Claims Must be Disallowed Under the
        Bankruptcy Code ........................................................................................   71

VII.    NN IRELAND'S CLAIMS RELATING TO TRANSFER PRICING, IRISH
        LOANS, AND PRE-PETITION ASSET SALES ARE TIME-BARRED ...............   74

CONCLUSION.........................................................................................................   81

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

10 Del. C. § 8106 .................................................................................................. 76

10 Del. C. § 8121 .................................................................................................. 75

11 U.S.C. § 108(c) ................................................................................................ 78

11 U.S.C. § 502(e)(1)(B)............................................................................68, 71-74

15 U.S.C. § 1517(a)(1) .......................................................................................... 28

28 U.S.C. § 157 ...................................................................................................... 4

28 U.S.C. § 1334 .................................................................................................... 4

28 U.S.C. § 1408 .................................................................................................... 4

28 U.S.C. § 1409 .................................................................................................... 4

Fed. R. Bankr. P. 7009(b) ..................................................................................... 20

Fed. R. Bankr. P. 7012(b) ..................................................................................... 17

Fed. R. Bankr. P. 9014(c) ................................................................................. 17, 20

**Cases**

900 Capital Servs., Inc. v. Cloud (In re Cloud),
214 F.3d 1350, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000) (table) .............. 17

Abramson v. Ritz-Carlton Hotel Co.,
No. 09-3264, 2010 WL 3943666 (D.N.J. Oct. 6, 2010)..................................................... 32

Acierno v. Haggerty,
No. 04-1376-KAJ, 2005 U.S. Dist. LEXIS 30353 (D. Del. Nov. 23, 2005)..................... 5

Adamson v. Bernier (In re Bernier),
282 B.R. 773 (Bankr. D. Del. 2002) ............................................................................ 20, 46

Aetna Cas. & Sur. Co. v. Ga. Tubing Corp.,
93 F.3d 56 (2d Cir. 1996) .............................................................................................. 74

Allied Capital Corp. v. GC-Sun Holdings, L.P.,
910 A.2d 1020 (Del. Ch. 2006) .................................................................................. 52, 53

**Page(s)**

Am. Int'l Group, Inc. v. Greenberg,
976 A.2d 872 (Del. Ch. 2009), aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re
Corp., 11 A.3d 228 (Del. 2010) ..................................................................  56, 57

Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.),
107 B.R. 856 (E.D. Pa. 1988), aff'd, 908 F.2d 961 (3d Cir. 1990) ...................  18

Angell v. Burell (In re Caremerica, Inc.),
409 B.R. 759 (Bankr. E.D.N.C. 2009) ............................................................  40

Anjelino v. N.Y. Times Co.,
200 F.3d 73 (3d Cir. 2000) .............................................................................  27

Asarco LLC v. Ams. Mining Corp.,
396 B.R. 278 (S.D. Tex. 2008) ........................................................................  55

Asarco LLC v. Ams. Mining Corp.,
382 B.R. 49 (S.D. Tex. 2007) ..........................................................................  40

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009) ...................................................................................  passim

Baldwin Cnty. Welcome Ctr. v. Brown,
466 U.S. 147 (1984) ......................................................................................  80

Bank Brussels Lambert v. Chase Manhattan Bank, N.A.,
No. 93 Civ. 5298, 1999 WL 672302 (S.D.N.Y. Aug. 27, 1999) ......................  80

Beech Aircraft Corp. v. Jinkins,
739 S.W.2d 19 (Tex. 1987) ............................................................................  69

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ......................................................................................  passim

Bianco v. Erkins (In re Gaston & Snow),
243 F.3d 599 (2d. Cir. 2001) .........................................................................  76

Bonner v. Henderson,
No. 05-99-01582-CV, 2001 WL 301581 (Tex. App. Dall. Mar. 29, 2001) ......  78

Boyd v. Tempay,
No. 07-377-JJF, 2008 WL 5156307 (D. Del. Dec. 4, 2008) ............................  55

Brug v. Enstar Grp., Inc.,
755 F. Supp. 1247 (D. Del. 1991) ...................................................................  passim

**Page(s)**

Buck v. Hampton Twp. Sch. Dist.,
452 F.3d 256 (3d Cir. 2006) .............................................................. 73

Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.,
63 F.3d 1227 (3d Cir. 1995) .............................................................. 28

Burlington N. R.R. Co. v. Sw. Elec. Power Co.,
925 S.W.2d 92 (Tex. App. 1996), aff'd sub nom. Sw. Elec. Power Co. v. Burlington N.
R.R. Co., 966 S.W.2d 467 (Tex. 1998) .......................................................... 61

Burrell v. AstraZeneca LP,
No. 07C-04-267 (JRS), 2010 WL 3706584 (Del. Super. Ct. Sept. 20, 2010) ................... 75

Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia
Bank of Del. Nat'l Ass'n.,
No. 10-520 (JBS/KMW), 2011 WL 864421 (D. Del. Mar. 9, 2011) ............................ 45, 51

Celotex Corp. v. Allstate Ins. Co. (In re The Celotex Corp.),
289 B.R. 460 (Bankr. M.D. Fla. 2003) .............................................................. 73-74

Chamison v. Healthtrust, Inc.-The Hosp. Co.,
735 A.2d 912 (Del. Ch. 1999), aff'd sub nom. Healthtrust, Inc.-Hosp. Co. v. Chamison,
748 A.2d 407 (Del. 2000) .................................................................. 69

Chapa v. Chase Home Fin. LLC,
No. C-10-359 (JGJ), 2010 WL 5186785 (S.D. Tex. Dec. 15, 2010) ............................ 63

Charal Inv. Co. v. Rockefeller (In re Rockefeller Ctr. Props. Inc. Sec. Litig.),
311 F.3d 198 (3d Cir. 2002) .............................................................. 46

Chase Bank USA N.A. v. Hess,
No. 08-121-LPS, 2011 WL 45132 (D. Del. Jan. 6, 2011) .................................. 53

Clark v. Strober-Haddonfield Grp., Inc.,
No. 07-910 (RBK), 2008 U.S. Dist. LEXIS 58865 (D.N.J. July 29, 2008) .................... 5

Coan v. O & G Indus., Inc. (In re Austin Driveway Servs., Inc.),
179 B.R. 390 (Bankr. D. Conn. 1995) .............................................................. 79

Delgrosso v. Spang & Co.,
903 F.2d 234 (3d Cir. 1990) .............................................................. 25

DHP Holding II Corp. v. Peter Skop Indus., Inc.,
435 B.R. 220 (Bankr. D. Del. 2010) .............................................................. 70

Doug Grant, Inc. v. Greate Bay Casino Corp.,
232 F.3d 173 (3d Cir. 2000) .............................................................. 19

**Page(s)**

Eames v. Nationwide Mut. Ins. Co.,
No. 04-1324 (KAJ), 2006 WL 2506640 (D. Del. Aug. 29, 2006)..................................... 76

End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.),
250 B.R. 168 (D. Del. 2000)........................................................................................ 76

Fierro v. Gallucci,
No. 06-CV-5189 (JFB) (WDW), 2008 WL 2039545 (E.D.N.Y. May 12, 2008).............. 53

Flake v. Alper Holdings USA, Inc. (In re Alper Holdings),
398 B.R. 736 (S.D.N.Y. 2008) ..................................................................................... 17

Fleck v. KDI Sylvan Pools, Inc.,
981 F.2d 107 (3d. Cir. 1992) ....................................................................................... 25

Floyd v. Hefner,
556 F. Supp. 2d 617 (S.D. Tex. 2008) .......................................................................... 44

Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV,
209 F.3d 252 (3d Cir. 2000)........................................................................................ 70

Forman v. Salzano (In re Norvergence, Inc.),
405 B.R. 709 (Bankr. D.N.J. 2009).......................................................................... passim

Fowler v. UPMC Shadyside,
578 F.3d 203 (3d Cir. 2009) ................................................................................. 19, 39

Frederico v. Home Depot,
507 F.3d 188 (3d Cir. 2007) ....................................................................................... 46

G-I Holdings, Inc. v. Reliance Ins. Co.,
586 F.3d 247 (3d Cir. 2009) ....................................................................................... 25

Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.),
333 B.R. 251 (Bankr. W.D. Pa.) .............................................................................. 75-76

Greene v. N.Y. Mercantile Exch., Inc. (In re NYMEX S'holder Litig.),
C.A. Nos. 3621-VCN, 3835-VCN (JWN), 2009 WL 3206051 (Del. Ch. Sept. 30, 2009). 45

Hill v. Day (In re Today's Destiny, Inc.),
388 B.R. 737 (Bankr. S.D. Tex. 2008)..................................................................... 18, 56

Hertz Corp. v. Friend,
130 S.Ct. 1181 (2010) ................................................................................................ 26

In re Adelphia Commc'ns Corp.,
359 B.R. 54 (Bankr. S.D.N.Y. 2006) ........................................................................... 17

**Page(s)**

In re APCO Liquidating Trust,
370 B.R. 625 (Bankr. D. Del. 2007) ................................................................. 72, 74

In re Baldwin-United Corp.,
55 B.R. 885 (Bankr. S.D. Ohio 1985) ............................................................... 73

In re Bancredit Cayman Ltd.,
No. 06-11026(SMB), 2007 Bankr. LEXIS 3805 (Bankr. S.D.N.Y. Nov. 2, 2007) ........... 78

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008) ................... 24, 26

In re Best Prods. Co.,
210 B.R. 714 (Bankr. E.D. Va. 1997) ............................................................... 18

In re British Am. Ins. Co.,
425 B.R. 884 (Bankr. S.D. Fla. 2010) ............................................................... 26

In re Coudert Bros. LLP,
No. 09 Civ. 9561, 2010 WL 2382397 (S.D.N.Y. June 14, 2010) ...................................... 76

In re Diamond Mortg. Corp. of Ill.,
105 B.R. 876 (Bankr. N.D. Ill. 1989) ............................................................... 17-18

In re Edison Bros. Stores,
No. 99-529 (JCA), 2002 Bankr. LEXIS 1228 (Bankr. D. Del. May 15, 2002) ................. 80

In re Enron Corp.,
298 B.R. 513 (Bankr. S.D.N.Y. 2003), aff'd, 419 F.3d 115 (2d Cir. 2005) ...................... 18

In re Fairfield Sentry Ltd.,
No. 10-13164 (BRL), 2011 Bankr. LEXIS 1895 (Bankr. S.D.N.Y. May 23, 2011) .......... 78

In re Global Link Telecom. Corp.,
327 B.R. 711 (Bankr. D. Del. 2005) ................................................................. 80

In re Grand Prix Assocs.,
Case No. 09-16545 (DHS), 2009 Bankr. LEXIS 1239 (Bankr. D.N.J. May 18, 2009) ...... 24

In re Ins. Brokerage Antitrust Litig.,
618 F.3d 300 (3d Cir. 2010) ................................................................. 71

In re MarchFirst, Inc.,
448 B.R. 499 (Bankr. N.D. Ill. 2011) ............................................................... 80

In re Maxim Truck Co., Inc.,
415 B.R. 346 (Bankr. S.D. Ind. 2009) ............................................................... 81

**Page(s)**

In re Milan Steel Fabricators, Inc.,
113 B.R. 364 (Bankr. N.D. Ohio 1990) ............................................................    80

In re Nortel Networks Corp.,
426 B.R. 84 (Bankr. D. Del. 2010), aff'd, 2011 WL 1154225 (D. Del. Mar. 29, 2011) ....    7, 69

In re Sevko, Inc.,
143 B.R. 167 (Bankr. N.D. Ill. 1992) ..............................................................    17

In re Spiegel, Inc.,
337 B.R. 821 (Bankr. S.D.N.Y. 2006) ............................................................    17

In re Touch Am. Holdings, Inc.,
409 B.R. 712 (Bankr. D. Del. 2009) ..............................................................    72

In re Tronox Inc.,
No. 09-10156 (ALG), 2010 WL 2010844 (Bankr. S.D.N.Y. May 14, 2010) ...................    64

In re Wedtech, Corp.,
87 B.R. 279 (Bankr. S.D.N.Y. 1988) ............................................................    74

In re WorldCom, Inc.,
322 B.R. 530 (Bankr. S.D.N.Y. 2005) ............................................................    17

Jackson v. W. Telemarketing Corp. Outbound,
245 F.3d 518 (5th Cir. 2001) ......................................................................    79

Kahn v. Seaboard Corp.,
625 A.2d 269 (Del. Ch. 1993) ....................................................................    78

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC,
337 F.3d 314 (3d Cir. 2003) ......................................................................    28

Malleus v. George,
641 F.3d 560 (3d Cir. 2011) ......................................................................    19

Malpiede v. Townson,
780 A.2d 1075 (Del. 2001) ....................................................................45, 48, 52

Marvel Entm't Grp., Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.),
273 B.R. 58 (D. Del. 2002) ......................................................................    77

Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings LLC),
426 B.R. 488 (Bankr. D. Del. 2010) ............................................................    76

Metcap Sec. LLC v. Pearl Senior Care, Inc.,
No. Civ. A 2129-VCN, 2007 WL 1498989 (Del. Ch. May 16, 2007)............................    60, 61

**Page(s)**

Miller v. Greenwich Cap. Fin. Prods., Inc. (In re Am. Bus. Fin. Servs. Inc.),
361 B.R. 747 (Bankr. D. Del. 2007) ................................................................. 53, 56

Murray v. Cadle Co.,
257 S.W.3d 291 (Tex. App. 2008)..................................................................... 70

Nationwide Mut. Ins. Co. v. Kesterson,
575 A.2d 1127 (Del. 1990)................................................................................ 71

New Hampshire v. Maine,
532 U.S. 742 (2001)........................................................................................... 25

Norman v. Elkin,
No. 06-005-JJF, 2007 WL 2822798 (D. Del. Sept. 26, 2007)........................... 75

Norpak Corp. v. Eagle-Pitcher Indus., Inc. (In re Eagle-Picher Indus., Inc.),
131 F.3d 1185 (6th Cir. 1997) ........................................................................... 73

O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.),
383 B.R. 231 (Bankr. S.D.N.Y. 2008) .............................................................. passim

Official Comm. of Bondholders of Metricom Inc. v. Derrickson,
No. C-02-4756 (JF), 2004 U.S. Dist. LEXIS 19497 (N.D. Cal. Feb. 25, 2004) ............... 40

Official Comm. of Unsecured Creditors ex rel the Debtors' Estates v. Goldman Sachs
Credit Partners L.P. (In re Fedders N. Am., Inc.),
405 B.R. 527 (Bankr. D. Del. 2009) .................................................................. 45, 77

Official Comm. of Unsecured Creditors v. Am. Tower Corp. (In re Verestar, Inc.),
343 B.R. 444 (Bankr. S.D.N.Y. 2006) .............................................................. 57

Official Comm. of Unsecured Creditors v. Tennenbaum Capital Partners LLC (In re
Radnor Holdings Corp.),
353 B.R. 820 (Bankr. D. Del. 2006) .................................................................. 47

Pa. Employee, Benefit Trust Fund v. Zeneca, Inc.,
710 F. Supp. 2d 458 (D. Del. 2010).................................................................. 60, 61

Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.),
307 B.R. 787 (Bankr. D. Del. 2004) .................................................................. 80

Pryor v. NCAA,
288 F.3d 548 (3d Cir. 2002) .............................................................................. 19

Quilling v. Compass Bank,
No. 3:03-CV-2180-R, 2004 WL 2093117 (N.D. Tex. Sept. 17, 2004)............................ 78

x

**Page(s)**

Rescuecom Corp. v Khafaga (In re Khafaga),
431 B.R. 329 (Bankr. E.D.N.Y. 2010) .................................................... 80

Reserves Dev. LLC v. Severn Sav. Bank, FSB,
No. 2502-VCP, 2007 WL 4054231 (Del. Ch. Nov. 9, 2007), aff'd, 961 A.2d 521 (Del.
2008) ........................................................................................ 70, 71

Rolls-Royce Corp. v. Heros, Inc.,
576 F. Supp. 2d 765, (N.D. Tex. 2008) .................................................. 70

Roth v. Am. Family Mut. Ins. Co.,
567 F.3d 884 (7th Cir. 2009) ............................................................ 47

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
81 F.3d 355 (3d Cir. 1996) .............................................................. 27

Santiago v. Warminster Twp.,
629 F.3d 121 (3d Cir. 2010) ............................................................. 71

Scarano v. Cent. R.R. Co. of N.J.,
203 F.2d 510 (3d Cir. 1953) ............................................................. 28

Seidel v. Byron,
No. 05-C-6698 (JBM), 2008 U.S. Dist. LEXIS 76306 (N.D. Ill. Sept. 26, 2008) ............ 40

Smith v. Nat'l City Mortg.,
No. A-09-CV-881 (LY), 2010 WL 3338537 (W.D. Tex. Aug. 23, 2010) ........................ 63

SmithKline Beecham Pharm. Co. v. Merck & Co.,
766 A.2d 442 (Del. 2000) ................................................................ 77

Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),
335 B.R. 539 (D. Del. 2005) ............................................................. 57

State Farm Bank, F.S.B. v. Manheim Auto. Fin. Servs., Inc.,
No. 3:10-cv-00519-L (SAL), 2010 WL 3156008 (N.D. Tex. Aug. 6, 2010) ................. 60, 61

Timberlake v. Synthes Spine, Inc.,
No. V-08-4 (JDR), 2011 WL 711075 (S.D. Tex. Feb. 18, 2011) ............................ 53

Toner v. Allstate Ins. Co.,
821 F. Supp. 276 (D. Del. 1993) ........................................................ 20

Triton Constr. Co. v. E. Shore Elec. Servs., Inc.,
No. 3290-VCP, 2009 WL 1387115 (Del. Ch. May 18, 2009), aff'd, 988 A.2d 938 (Del.
2009) ...................................................................................... 52

**Page(s)**

United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,
216 F. Supp. 2d 198 (S.D.N.Y. 2002)................................................................. 20

United States v. Brodie,
403 F.3d 123 (3d Cir. 2005) ......................................................................... 45

United States v. Crawley,
No. H-09-3457 (FHS), 2010 WL 4393970 (S.D. Tex. Oct. 29, 2010) ............................ 81

United States v. Flood,
327 F. App'x 356 (3d Cir.), cert. denied, 130 S. Ct. 223 (2009)...................................... 45

Winstar Holdings LLC v. Blackstone Grp. LP (In re Winstar Commc'ns Inc.),
435 B.R. 33 (Bankr. D. Del. 2010) ................................................................. 75, 76

Yelverton v. Homes at Potomac Greens Assocs. (In re Yelverton),
No. 09-00414, Adversary No. 10-10001 (SMT), 2010 WL 1688403
(Bankr. D.D.C. Apr. 22, 2010) ....................................................................... 40

**Other Authorities**

Fyffes plc. v. DCC plc,
[2009] 2 I.R. 417.................................................................................... 44, 46

**Summary Table of NN Ireland Claims - By Claim Number**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 2 | Irish Law | Breach of fiduciary duty | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 3 | Irish Law | Breach of duty of care | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 4 | Irish Law | Dishonest assistance | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 5 | Irish Law | Conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 6 | U.S. Law | Aiding and abetting breach of fiduciary duty | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 7 | U.S. Law | Civil conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 8 | Irish Law | Breach of fiduciary duty | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 9 | Irish Law | Breach of duty of care | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 10 | Irish Law | Dishonest assistance | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 11 | Irish Law | Unconscionable receipt | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 12 | Irish Law | Conspiracy | Intercompany loans and dividends | Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 13 | U.S. Law | Aiding and abetting breach of fiduciary duty | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 14 | U.S. Law | Civil conspiracy | Intercompany loans and dividends | Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 15 | U.S. Law | Unjust enrichment | Intercompany loans and dividends | Failure to Plead (Rule 8(a)) |
| 16 | Not specified | Implied contract | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 17 | Not specified | Implied term | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 18 | Irish Law | Breach of fiduciary duty | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |

**Summary Table of NN Ireland Claims - By Claim Number**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 19 | Irish Law | Breach of duty of care | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 20 | Irish Law | Mistake | Past business sales | Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 21 | Irish Law | Unconscionable receipt | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 22 | Not specified (English or Irish Law) | Transaction at undervalue / Fraudulent disposition | Past business sales | Failure to Plead (Rule 8(a)) |
| 23 | U.S. Law | Aiding and abetting breach of fiduciary duty | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 24 | Irish Law | Breach of fiduciary duty | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)) |
| 25 | Irish Law | Breach of duty of care | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)) |
| 26 | Irish Law | Dishonest Assistance | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)) |
| 27 | U.S. Law | Aiding and abetting breach of fiduciary duty | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* |
| 28 | English, Irish, or U.S. Law | Contribution | Contingent FSD liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 29 | English, Irish, or U.S. Law | Unjust enrichment and/or subrogation | Contingent FSD liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 30 | English, Irish, or U.S. Law | Subrogation | Contingent FSD liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 31 | English, Irish, or U.S. Law | Obligation to repay | Contingent FSD liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |

**Summary Table of NN Ireland Claims - By Cause of Action**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---------|--------------|-----------------|-------------------|--------------------------------------------------|
| 2 | Irish Law | Breach of fiduciary duty | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 8 | Irish Law | Breach of fiduciary duty | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 18 | Irish Law | Breach of fiduciary duty | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 24 | Irish Law | Breach of fiduciary duty | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)) |
| 3 | Irish Law | Breach of duty of care | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 9 | Irish Law | Breach of duty of care | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 19 | Irish Law | Breach of duty of care | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 25 | Irish Law | Breach of duty of care | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)) |
| 4 | Irish Law | Dishonest assistance | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 10 | Irish Law | Dishonest assistance | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 26 | Irish Law | Dishonest assistance | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)) |
| 6 | U.S. Law | Aiding and abetting breach of fiduciary duty | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 13 | U.S. Law | Aiding and abetting breach of fiduciary duty | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 23 | U.S. Law | Aiding and abetting breach of fiduciary duty | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 27 | U.S. Law | Aiding and abetting breach of fiduciary duty | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* |
| 5 | Irish Law | Conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), SOL |

**Summary Table of NN Ireland Claims - By Cause of Action**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---------|-------------|----------------|-------------------|--------------------------------------------------|
| 12 | Irish Law | Conspiracy | Intercompany loans and dividends | Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 7 | U.S. Law | Civil conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 14 | U.S. Law | Civil conspiracy | Intercompany loans and dividends | Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 11 | Irish Law | Unconscionable receipt | Intercompany loans and dividends | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 21 | Irish Law | Unconscionable receipt | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 15 | U.S. Law | Unjust enrichment | Intercompany loans and dividends | Failure to Plead (Rule 8(a)) |
| 16 | Not specified | Implied contract | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 17 | Not specified | Implied term | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 20 | Irish Law | Mistake | Past business sales | Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 22 | Not specified (English or Irish Law) | Transaction at undervalue / Fraudulent disposition | Past business sales | Failure to Plead (Rule 8(a)) |
| 28 | English, Irish, or U.S. Law | Contribution | Contingent FSD liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 29 | English, Irish, or U.S. Law | Unjust enrichment and/or subrogation | Contingent FSD liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 30 | English, Irish, or U.S. Law | Subrogation | Contingent FSD liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 31 | English, Irish, or U.S. Law | Obligation to repay | Contingent FSD liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |

Nortel Networks Inc. ("NNI") and its affiliated debtors, as respective debtors and debtors in possession (collectively, the "Debtors" or the "U.S. Debtors"), jointly with the Official Committee of Unsecured Creditors (the "Committee" and collectively with the U.S. Debtors, the "Movants") hereby object (the "Objection") to claim number 7774 (the "Proof of Claim" or the "Claim") filed against NNI by the Joint Administrators (as defined below) on behalf of Nortel Networks (Ireland) Limited ("NN Ireland") and move this Court (the "Motion") pursuant to Sections 105 and 502 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 3001, 3002, 3003, 3007, 7012 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order in the form attached as Exhibit A dismissing NN Ireland's Claim and expunging it with prejudice.[2]  In support of this Objection, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

NN Ireland's Claim cannot be sustained as a matter of law.  To the contrary, this Claim is exactly the type of pleading the Supreme Court decisions in Twombly and Iqbal criticized in giving renewed substance to Rule 8.  Under Twombly and Iqbal, Rule 8 requires plausibility based on allegations of fact – not on conclusory speculation.

Tested by this standard – and most certainly when tested against Rule 9(b)'s requirement for particularity in pleading claims based on fraud, deception, conspiracy or mistake – NN Ireland's Claim plainly fails.  It is premised on one implausible conclusion after the next, but at its core is based on the far-fetched and unsupported allegation that NNI, a sister corporation to NN Ireland with no equity interest in NN Ireland and no contractual or other rights to control NN

---

[2]    NN Ireland previously filed claim No. 5089 against NNI, which has been superseded and replaced by the Claim.  To the extent not so superseded or replaced, the Movants object and move to dismiss claim No. 5089 as well.  Copies of claim Nos. 7774 and 5089 are attached to the Declaration of Tomislav A. Joksimovic, submitted concurrently herewith (the "Joksimovic Decl.") as Exhibits A and B respectively.

Ireland, compelled NN Ireland's directors for nearly a decade to abdicate their directorial responsibilities and repeatedly breach their fiduciary duties.

These implausible allegations are, moreover, directly contrary to what NN Ireland told both the High Court of Justice of England and Wales to obtain orders of administration in England and this Court to secure Chapter 15 recognition.  In both proceedings, NN Ireland submitted sworn declarations, including from a director of NN Ireland, affirming that the EMEA Debtors, including NN Ireland, were autonomously managed and controlled from England.  These submissions provided detailed descriptions of the key corporate functions located in England – including tax and treasury – that made decisions for NN Ireland and the other EMEA Debtors.  These prior sworn statements – which the EMEA Debtors relied upon in the courts of two countries to obtain relief – foreclose NN Ireland's theory that its directors were passive puppets blindly following the dictates of either NNL (the common parent of NNI and NN Ireland) or NNI.  Both the judicial and collateral estoppel doctrines prevent NN Ireland from engaging in this type of gamesmanship and alone serve to bar most of its claims.

The bulk of NN Ireland's claims against NNI are based on the legally incorrect assertion that NNI owed fiduciary duties to NN Ireland because it was a de facto or "shadow" director of NN Ireland.  Under certain limited circumstances not adequately pled in the Claim, Irish law will deem a person who is not a de jure director of a company nonetheless to be a director of that company.  Here, however, NN Ireland seeks to expand Irish law well beyond its existing precedent.

Moreover, Twombly and Iqbal stand for the proposition that a complaint may not rest on conclusory factual assertions that merely render its claims "conceivable."  Rather, the Claim must make well-pleaded factual allegations that render its claims plausible.  NN Ireland fails to

meet this standard as it alleges no facts from which it could plausibly be inferred that NNI had

the ability to or did control NN Ireland or its directors.  This is plainly insufficient to establish

that NNI acted as a director of NN Ireland or controlled its existing directors.  Disregarding NN

Ireland's conclusory allegations of control, as the Court must under Twombly, the only factual

allegation NN Ireland pleads on this central issue is that it "was instructed" – without specifying

by whom – to sign the transfer pricing agreement.  This conspicuous use of the passive voice

speaks volumes; NN Ireland does not, because it cannot, allege that NNI had the authority to

give – or in fact gave – any such instruction.  This claim is rendered even more implausible by

NN Ireland's admission that the transfer pricing arrangements were detrimental to NNI, which

overpaid at least $2 billion under that system.

NN Ireland's claims that NNI had or breached a fiduciary duty owed to NN Ireland, as

well as its alternative claims that NNI aided and abetted NNL or NN Ireland's directors' alleged

breaches of fiduciary duty (or the Irish-law analogue of dishonest or knowing assistance) fail for

numerous additional reasons.  NN Ireland's claims necessarily allege that all of NN Ireland's

directors and NNL – its sole shareholder – engaged in breaches of fiduciary duty and other

wrongdoing.  Even if NN Ireland alleged sufficient facts to state a claim (which it does not),

under U.S. law, this misconduct would be attributable to NN Ireland itself and bar its claims

against NNI.  In addition, NNUK fails to plead facts that would pass muster under Rule 8 and

Twombly with respect to virtually every element of its claims.  The same is *a fortiori* true with

respect to those claims, described herein, that are subject to the heightened pleading

requirements of Rule 9(b).

Apart from its fiduciary duty claims, NN Ireland also alleges claims grounded in NNI's

alleged wrongful receipt of NN Ireland's property.  NN Ireland does not allege that NNI actually

received any property that could be traced to NN Ireland, which itself is a legal bar to the claims under Irish law.  But the inadequate pleading is not limited to tracing of the property.  NN Ireland alleges that its board approved transactions (intercompany loans and dividends) with NNL that were unfair to NN Ireland.  NNI is not alleged to be a party to any of these transactions.   Instead, NN Ireland baldly asserts that NN Ireland's unfair transactions with NNL benefitted NNI because those transactions somehow enabled NNI to enter into unrelated transactions with NNL on terms that were not similarly disadvantageous to NNI.  NN Ireland fails to allege facts to render plausible any link between its property and any benefit to NNI – indeed, its allegations dispel any such connection.

Accordingly, and for the reasons set forth more fully below, NN Ireland's claims should be dismissed with prejudice.

## JURISDICTION AND VENUE

This Court has jurisdiction over the Objection pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue over the Debtors' Chapter 11 cases and this Objection is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory bases for the relief requested herein are Sections 105 and 502 of the Bankruptcy Code and Rules 3001, 3002, 3003, 3007, 7012 and 9014 of the Bankruptcy Rules.

## PROCEDURAL HISTORY

On January 14, 2009 (the "Petition Date")[3], the U.S. Debtors, other than Nortel Networks (CALA) Inc.,[4] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and

---

[3]     Unless otherwise defined herein, initially capitalized terms have the meanings ascribed to them in the Claim.

[4]     Nortel Networks (CALA) Inc. ("NN CALA") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 1098].

the cases were consolidated for procedural purposes only. The Debtors' ultimate corporate

parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks

Limited ("NNL"), and certain of their Canadian affiliates (together, the "Canadian Debtors")

commenced a parallel proceeding on the Petition Date with the Ontario Superior Court of Justice

(the "Canadian Court") seeking relief from their creditors under the Companies' Creditors

Arrangement Act (Canada).

A.      **English Proceedings of the EMEA Debtors**[5]

NN Ireland and eighteen of its affiliates[6] sought orders from the High Court of Justice of

England and Wales (the "English Court") placing NN Ireland and the other EMEA Debtors into

administration, and appointing individuals from Ernst & Young LLP as administrators

(collectively, the "Joint Administrators"). In support of these applications, the EMEA Debtors

submitted and relied upon witness statements from (i) Sharon Lynette Rolston, a director of each

of the EMEA Companies, including a witness statement specifically on behalf of NN Ireland (the

"Rolston Irish Statement") as well as a statement on behalf of NNUK that the Rolston Irish

Statement largely incorporated by reference (the "Rolston Main Statement", and collectively

with the Rolston Irish Statement, the "Rolston Statements"), and (ii) Michel Clement, president

---

[5]      On this motion to dismiss, the Court may take judicial notice of the public record of proceedings before the English Court and in the related Chapter 15 proceedings pending in this Court under Case No. 09-11972 (the "Chapter 15 Proceedings"). See Clark v. Strober-Haddonfield Grp., Inc., No. 07-910 (RBK), 2008 U.S. Dist. LEXIS 58865, at *4 (D.N.J. July 29, 2008) (taking judicial notice of the record in prior proceedings to dismiss claims based on judicial estoppel); Acierno v. Haggerty, No. 04-1376-KAJ, 2005 U.S. Dist. LEXIS 30353, at *19 (D. Del. Nov. 23, 2005) (taking judicial notice of pleadings submitted in previous state court litigation, as "public documents . . . or decisions of other courts," to dismiss claims on estoppel grounds).

[6]      In addition to NN Ireland, orders of administration were sought with respect to: Nortel Networks UK Limited ("NNUK"); Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S. ("NNSAS"); Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A. ("NNSA"); Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; and Nortel Networks, s.r.o. (collectively, with NN Ireland, the "EMEA Debtors").

of NNSAS (the "Clement Statements").[7] These witnesses affirmed under oath that the EMEA

Debtors – including specifically NN Ireland – were autonomously managed and controlled from

England, and provided detailed descriptions of the key corporate functions located in England –

including tax and treasury – that made decisions for the EMEA Debtors.  Based on that evidence,

the English Court granted the applications for administration by orders entered January 14, 2009

(the "Initial Orders").[8]  The Initial Orders found that the EMEA Debtors' administration

proceedings (the "English Proceedings") were "main proceedings," establishing England as the

center of main interests for NN Ireland and the other EMEA Debtors.[9]

Upon the EMEA Debtors' petitions, this Court made parallel findings in granting Chapter

15 recognition to the English Proceedings.[10]  In support of their petitions, the EMEA Debtors

submitted the Rolston and Clement Statements to this Court along with declarations and

deposition testimony from the Joint Administrators affirming that (i) those witness statements

were true and correct, and (ii) the EMEA Debtors' "central management and control is to a large

extent handled from England, where all major decisions are made."[11]  In reliance on this

---

[7]        See Joksimovic Decl. Ex. C (Rolston Main Statement), Ex.D (Rolston Irish Statement), Ex. E (Clement Statements).  The EMEA Debtors submitted parallel witness statements from Ms. Rolston captioned for each of the EMEA Debtors other than NNSA and NNSAS to both the English Court and this Court (see Joksimovic Decl. Ex. F at Exhibit II).

[8]        Joksimovic Decl. Exs. G, H and I.

[9]        See id. at 1 ("[T]hese proceedings are main proceedings"); Declaration of Michael Todd, Q.C. in Support of Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Ltd., dated July 15, 2011 [D.I. 5971] ("Todd Decl.") ¶ 141.

[10]        NN Ireland and the EMEA Debtors except for NNUK filed parallel petitions for recognition on October 20, 2010.  See Verified Chapter 15 Petitions for Recognition of Foreign Proceedings Pursuant and Related Relief with Respect to the EMEA Debtors, Joksimovic Decl. Ex J (the "EMEA Chapter 15 Petition").  NNUK had previously filed a petition for recognition of its English Proceedings as foreign main proceedings pursuant to Section 1517 of the Bankruptcy Code on June 8, 2009.  See Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code, Joksimovic Decl. Ex K (the "NNUK Chapter 15 Petition").

[11]        See Joksimovic Decl. Ex. F, Ex. L, Ex. M at Exhibit A at 49:17-50:4, 107:7-17 and 278:25-279:13, and Ex. N at 20:11-4.  Note that while the excerpts of the Joint Administrators' deposition transcript are marked confidential, counsel for the Joint Administrators have agreed that such excerpts – which have been publicly filed – do not require confidential treatment.

evidence, this Court entered two orders finding that the EMEA Debtors' center of main interests was in England, such that their English Proceedings could be granted Chapter 15 recognition.[12]

**B.    UK Pension Proceedings**

On or about September 30, 2009 and January 25, 2010, the Trustee of the Nortel Networks U.K. Pension Plan (the "UK Pension Trustee" and the "UK Pension Plan," respectively) and the U.K. Pension Protection Fund ("PPF") jointly filed proofs of claim against the U.S. Debtors.[13]  These UK Pension Claims assert that the UK Pension Plan is underfunded and that The Pensions Regulator ("TPR"), a U.K. statutory entity, could seek to require the U.S. Debtors as well as other members of the Nortel Group – such as NN Ireland – to provide financial support for the UK Pension Plan.  In particular, the UK Pension Claims are based on the potential issuance of a Financial Support Directive ("FSD") or Contribution Notice ("CN") by TPR in proceedings in the United Kingdom.  On February 18, 2010, the Debtors filed a motion to enforce the automatic stay against the UK Pension Trustee and the PPF to the extent those FSD or CN proceedings were directed at the Debtors.[14]  This Court entered an order enforcing the automatic stay on March 9, 2010.[15]

---

[12]    See Order Granting Recognition and Relief in Aid of Foreign Main Proceedings, dated June 26, 2009, Joksimovic Decl. Ex. O (the "NNUK Recognition Order"); Order Granting Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, Joksimovic Decl. Ex. P (the "EMEA Recognition Order").

[13]    The PPF and UK Pension Trustee claims have been assigned claim numbers 5573-5587 and 6979.  Such claims will be collectively referred to herein as the "UK Pension Claims".

[14]    See Debtors' Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants with Respect to the UK Pension Proceedings, dated February 18, 2010 [D.I. 2441].

[15]    See In re Nortel Networks Corp., 426 B.R. 84 (Bankr. D. Del. 2010), aff'd 2011 WL1154225 (D. Del. Mar. 29, 2011)

C.      **EMEA Claims Process**

On August 4, 2009, this Court set September 30, 2009 as the general bar date for filing proofs of claim or interests against the U.S. Debtors other than NN CALA.[16]  On September 30, 2009, NN Ireland filed a proof of claim against NNI, which was assigned Claim No. 5089 (the "Placeholder Claim").  See Joksimovic Decl. Ex. B.[17]  The Placeholder Claim, which totaled a mere five paragraphs, only asserted claims "in respect of any heretofore unknown, unliquidated or unmatured claim or claims that the Administrators, NNUK, the Insolvency Practitioner and/or any EMEA Company may have against Nortel Networks Inc."  Placeholder Claim ¶ 2.  The only factual context the Placeholder Claim provided was to allege that these "potential claims against the Debtors and their affiliates aris[e] out of transfer pricing, intercompany dealings, trading and other arrangements or agreements between [NNI and NN Ireland]."  Id.  No such agreements or arrangements were specified, nor was other supporting documentation attached.  Given the lack of any allegations sufficient to provide notice of the basis for the Placeholder Claim, the Debtors objected to the Placeholder Claim on April 1, 2011, seeking an order that required NN Ireland and the other EMEA Debtors to amend their proofs of claim to provide a more definite statement.[18]  The Canadian Debtors had obtained a parallel order from the Canadian Court, requiring the EMEA Debtors to file whatever claims they asserted against the Canadian Debtors by March 18, 2011.[19]  This Court granted the U.S. Debtors' objection on May 10, 2011, ordering

---

[16]     See Order Establishing Deadlines of Filing Proofs of Claim and Approving Form and Manner of Notice Thereof [D.I. 1280], entered August 4, 2009.

[17]     Substantially similar claims were also filed on September 30, 2009 by the other EMEA Debtors or other related entities against each of the U.S. Debtors other than NN CALA.

[18]     See Debtors' Objection to the Proofs of Claim Filed by the EMEA Claimants and Motion for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, dated April 1, 2011 [D.I. 5200] (the "EMEA Claims Objection").

[19]     See EMEA Claims Objection ¶ 3.  Pursuant to the order of the Canadian Court, the EMEA Debtors filed nineteen claims against the Canadian Debtors (collectively, the "Canadian Claims").  See Notice of Submission of Proofs of Claim, dated May 18, 2011 [D.I. 5433].

that the EMEA Debtors provide a more definite statement by June 1, 2011, absent which their claims would be disallowed and expunged with prejudice.[20]

## NN IRELAND'S AMENDED PROOF OF CLAIM

### A.    Factual Predicate: Five Factual Patterns Underlie NN Ireland's Claim

Pursuant to the EMEA Claims Order, on June 3, 2011, NN Ireland filed its amended Claim.   The Claim alleges 31 causes of action, based on five pre-petition transactions or types of transactions to which NN Ireland allegedly was a party.[21]   In short, the Claim represents a series of "you too" additions to the EMEA Debtors' Canadian Claim: repeated allegations that NNI should also somehow be responsible for transactions that were allegedly entered into to benefit NNL.

### 1.    Transfer Pricing

Prior to the Petition Date, like many multinational groups, the Nortel Group operated a transfer pricing arrangement, with the goal of allocating profits in each of the countries where the Group did business.  Claim ¶¶ 31-32.  From 2001, the Nortel Group adopted a "residual profit split method ('RPSM')" of transfer pricing.  Id. ¶ 32.  This system divided participants in the Nortel Group into two main groups – Limited Risk Entities and Residual Profit Entities.  Id. ¶ 35.  Limited Risk Entities were entitled only to profits from their direct sales earnings; Residual Profit Entities also received remaining profits or losses attributable to intangibles, i.e., research

---

[20]    See Order Requiring EMEA Claimants to File a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, dated May 10, 2011 [D.I. 5402] (the "EMEA Claims Order").  On request of the EMEA Debtors, that date was later extended to June 3, 2011.  See Order Approving Extension of Deadline for EMEA Claimants to File a More Definite Statement of Claim and to File Any Proofs of Claim, dated June 3, 2011 [D.I. 5588].  While NN Ireland timely filed its Claim against NNI, which purported to amend its Placeholder Claim, over 350 other claims that were the subject of the EMEA Claims Order were not timely amended or otherwise stated with more particularity.  These claims have since been expunged from the U.S. Debtors' claims register in accordance with the EMEA Claims Order.

[21]    For the Court's convenience, two charts setting forth the causes of action pled by NN Ireland, together with the claim number, the law that NN Ireland asserts is applicable to the claim and the bases for dismissal discussed herein, are included above.  The first chart presents this information in the order that this Objection addresses NN Ireland's claims; the second chart is sorted by claim number in the order used by NN Ireland in its Claim.

and development.  Id. ¶¶ 35-36.  In December 2004, NN Ireland, NNI, NNL and certain other

members of the Nortel Group also entered into a Master Research and Development Agreement

("MRDA"), which "provided the architecture and contractual basis to enable the RPSM to be

applied."  Id. ¶ 40.

NN Ireland acknowledges that the MRDA and RPSM were approved by NN Ireland's

duly appointed directors.  Claim ¶¶ 111, 113.  It nonetheless alleges that these arrangements

were not entered into on an arm's length basis, were not in NN Ireland's interests, and deprived

it of revenue.  See, e.g., id. ¶¶ 11(a), 48, 90.  Specifically, the Claim alleges that, due to flaws in

the RPSM, payments "did not adequately reward NN Ireland."  Id. ¶ 49.  NN Ireland thus alleges

that the transfer pricing systems "resulted in an intentional and improper transfer away from NN

Ireland . . . towards NNL" as part of a "general policy to the effect that value and cash within the

Nortel Group should be transferred to NNL."  Id. ¶¶ 10, 48; see also id. ¶ 33 ("The decision to

implement the RPSM . . . was primarily motivated by a desire to allocate more profit to the

Canadian Entities in order to benefit NNL at the expense of NN Ireland and the EMEA

Companies.").  NN Ireland alleges that Nortel's transfer pricing arrangement negatively affected

not only NN Ireland, but also NNI.  In particular, the Claim alleges that the RPSM model was

challenged by the IRS, which resulted in NNI's $2 billion claim against NNL "to reflect net

overpayments made by NNI to NNL for [past] tax years."  Id. ¶ 50.

The Claim further asserts that control of the Nortel Group's operations "was highly

centralized, and on a general basis, was maintained primarily by NNC and NNL."  Claim ¶ 13.

As to NNI, NN Ireland alleges that it "was also involved in jointly controlling certain aspects of

the Nortel Group's operation."  Id. ¶ 15.  The Claim avers that NNI was "heavily involved" in

the "implementation and operation" of the transfer pricing arrangements, to the exclusion of NN

Ireland.  Claim ¶¶ 16, 18; see also id. ¶ 48 (averring that "NNI facilitated this transfer of value [to NNL]").  NN Ireland also asserts that NNI, NNL and NN Ireland's de jure directors implemented and operated the RPSM and MRDA in such a way that "NN Ireland was not provided with the arm's length return which it would have otherwise received."  Id. ¶¶ 107-09.

2.    NNL Intercompany Loans and Dividends

NN Ireland alleges that "from at least the year 2000" "NNL with the participation and assistance of NNI" "structure[d] NN Ireland's affairs with the intention of channelling cash and profit to NNL."  Claim ¶ 51.  NN Ireland does not allege facts supporting this allegation until "in or around June 2006," when NN Ireland allegedly began to grant NNL a series of interest-free loans (collectively, the "Irish Loans").  The first of these alleged loans, which NN Ireland avers was extended in June 2006, was repaid in full in July 2006.  Id. ¶ 53.  NN Ireland alleges that subsequent loans were extended to NNL, either directly or through a recharacterization of dividend payments, which were repaid through a combination of transfer pricing adjustments and corporate restructurings.  Id. ¶¶ 53, 59.  Specifically, NN Ireland asserts that NNL transferred NN Ireland from its subsidiary Nortel Networks International Finance and Holding BV to NNL on December 20, 2007.  Id. ¶ 53.  Thereafter, NN Ireland's directors allegedly approved the payment of dividends to NNL (collectively, the "Irish Dividends").  Id. ¶¶ 54-58.  Both the Irish Loans and the Irish Dividends are alleged to have "had no legitimate commercial purpose for NN Ireland and were not in NN Ireland's best interests."  Id. ¶ 61.

NNI is not alleged to have been a party to or recipient of the Irish Loans or the Irish Dividends.  Instead, NNI made a separate series of loans to NNL, which allegedly provided for payment of interest, and were allegedly regularly repaid in cash.  Id. ¶ 60.  Importantly, NN Ireland does not allege that NNL used the proceeds of the Irish Loans and the Irish Dividends to

repay NNI.  Rather, the Claim alleges that absent the Irish Loans and the Irish Dividends, NNL would not have been able to make repayments to NNI.  Id. ¶¶ 60, 139.  The Claim further alleges, without any factual predicate, that NNI "was involved" or undertook "involvement and participation" in the establishment of the Irish Loans and the Irish Dividends.  Id. ¶¶ 60, 141.  See also id. ¶ 21 (alleging that "[n]umerous NNI individuals were aware of and/or participated in the discussions relating to [the Irish Loans and the Irish Dividends] and the later decisions made as to the use and repayment of the Irish Loans, including the related treatment of the Irish Dividends.").

       3.    Unidentified Pre-Petition Asset Sales

The Claim alleges that prior to the Petition Date, "NN Ireland entered into various global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser" (collectively, the "Pre-Petition Asset Sales").  Claim ¶ 66.  NN Ireland does not name any business sold, or allege or identify any such sale by date, parties to the transaction, purchase price, or otherwise.  However, the Claim asserts that the allocation of the proceeds of these unspecified Pre-Petition Asset Sales failed to provide NN Ireland with the percentage to which it was allegedly entitled.  Id. ¶ 69.  Specifically, NN Ireland alleges that allocation of these Pre-Petition Asset Sale proceeds was attempted "on the erroneous assumptions that were contained in the transfer pricing structure" and that in any event the actual allocation was unfair.  Id. ¶ 68.  The Claim asserts that this did not comply with an implied agreement to allocate proceeds "on the basis of an arm's length legal entitlement that each had to the proceeds."  Id. ¶¶ 67 161-163.  NN Ireland's Claim is silent as to what allocation methodology any such "legal entitlement" would require.  Id. ¶¶ 67-70.  While the Claim does not provide any factual allegations that identify the sale(s) at issue, it does allege that the "agreed

allocation" from "this [unspecified] sale" was "set out in a statement dated 24 July 2007."  Claim ¶ 67.  The Claim states that any additional factual detail concerning the (unidentified) Pre-Petition Sale Proceeds "will be further particularized following discovery."  Id. ¶ 160.

4.        Contingent Tax Liability

NN Ireland asserts that its taxation matters were controlled by NNL and NNI.  Claim ¶ 71.  As such, NN Ireland asserts a contingent claim against NNI in the event any taxation authority were "to make a claim against NN Ireland in relation to a failure to pay the proper level of taxation in any years."  Id. ¶ 72.  NN Ireland does not allege that any such claim has been made.

5.        Contingent Claims Relating to FSD Proceedings

Finally, the claim alleges that the UK Pensions Regulator has determined that a FSD requiring the provision of financial support to the UK Pension Plan should be issued "in respect of certain EMEA Companies," including NN Ireland.  Claim ¶ 73.  This determination has been referred to a higher court.  Id. ¶ 74.  An FSD was also issued against NNI.  Id. ¶ 75.

However, the Claim also alleges that "[i]n the event that there is a non-compliance with an FSD, the UK [Pensions] Regulator has power . . . to issue a contribution notice (a 'CN') to [any recipients of the FSD]."  Id. ¶ 79.  The Claim does not provide any factual allegations concerning the operation of the UK Pension Plan, or any involvement NNI allegedly had in such operations.  No CN is alleged to have been issued.

**B.     Causes of Action Pled by NN Ireland: Roadmap**

Based on the five broad categories of transactions set forth above, NN Ireland's Claim purports to assert 31 distinct causes of action.  The asserted legal bases for these claims range from tort to contract, and from direct to secondary liability, based primarily on Irish or U.S. law.

While many of these causes of action are duplicative or mutually exclusive, for purposes of this objection, they also share common required elements, pleading deficiencies or other legal bars that permit the Court to consider – and dismiss – them in groups.[22]

*First*, NN Ireland asserts claims based on transfer pricing, the Irish Loans/Irish Dividends, Pre-Petition Asset Sales and contingent tax liabilities that depend on allegations that NNI owed a duty to NN Ireland under Irish law.  Specifically, in claims 2, 8, 18, and 24, NN Ireland alleges that NNI breached fiduciary duties that it allegedly owed to NN Ireland based on its status as either a de facto or shadow director.  See Claim ¶¶ 87-90, 122-24, 165-67, 189.  In claims 3, 9, 19 and 25, NN Ireland asserts that NNI breached duties of care that it allegedly owed to NN Ireland under Irish law either as an alleged director or independently.  See id. ¶¶ 92-96, 128-29, 169-170, 190.  As set forth below, each of these claims fails because NN Ireland either fails to adequately plead, or is estopped from pleading, facts that provide a cognizable basis for any such duty.

*Second*, implicitly recognizing that its attempts to impose a direct duty on NNI fail, NN Ireland attempts to re-characterize its allegations of primary liability for NNI as giving rise to secondary liability for the alleged primary misconduct of others.  In claims 6, 13, 23 and 27, NN Ireland makes allegations under U.S. state law that NNI aided and abetted breaches of fiduciary duty allegedly committed by NNL and/or the de jure directors of NN Ireland in respect of each of the categories, except the FSD Proceedings.  Claim ¶¶ 111-15, 148-50, 181-84, 192.  NN Ireland pleads parallel causes of action in claims 4, 10, and 26 for alleged "dishonest assistance"

---

[22]     While the Movants do not currently seek to dismiss NN Ireland's claim for alleged outstanding intercompany trading debts (claim 1), the Movants reserve all of their rights with respect to such claim, including without limitation, to object to such claim at a later date on any and all grounds.  For the avoidance of doubt, in the event the Court finds that any portion of NN Ireland's Claim withstands Rule 12(b)(6) scrutiny, this Objection is without prejudice to further substantive or non-substantive objections to the Claim, including without limitation rights of set-off and any other defenses.

under Irish law with respect to transfer pricing, the Irish Loans and Irish Dividends, and the contingent tax liabilities.  Claim ¶¶ 102-04, 134-36, 191.  But those claims (referred to as "knowing assistance" under Irish law), like aiding and abetting under U.S. law, require allegations of both the alleged assistance and of intent far beyond what the Claim attempts.

In addition, NN Ireland pleads nearly identical conspiracy claims under both Irish law (claims 5 and 12), and U.S. state law (claims 7 and 14), allegedly arising from the transfer pricing and Irish Loans/Irish Dividends transactions.  Compare Claim ¶¶ 107, 144 (Irish law), with ¶¶ 118, 153 (U.S. state law).  These claims, however, fail to include any allegations identifying who was a party to the alleged conspiracy, the individuals involved, what the conspirators agreed, and when that agreement was reached.  And even if the U.S. law conspiracy and aiding and abetting claims were adequately pled, because they are grounded on allegations of wrongdoing by NN Ireland's own directors, they are independently barred on *in pari delicto* grounds.

*Third*, the Claim asserts causes of action under both Irish and U.S. state law grounded in NNI's alleged wrongful receipt of NN Ireland's property.  In claim 15, NN Ireland asserts unjust enrichment claims under U.S. state law based on the Irish Loans and Irish Dividends.  See Claim ¶¶ 157-58.  The Claim makes similar allegations in claims 11 and 21 for a claim of "unconscionable receipt" (properly referred to as "knowing receipt" under Irish law) in relation to the Irish Loans and Irish Dividends and Pre-Petition Asset Sales.  Id. ¶¶ 139-141, 175. Nowhere, however, does the Claim allege that these transactions were intended to benefit NNI or that they resulted in NNI receiving specific NN Ireland property.  The Claim also lacks allegations to demonstrate a plausible causal connection between the challenged transactions and any alleged benefit to NNI.

15

*Fourth*, NN Ireland asserts a variety of contractual or quasi-contractual claims that share a score of common operative facts, as they allegedly arise from the "various" but wholly unidentified Pre-Petition Asset Sales.  Claim ¶ 66.  Of these claims – numbered 16-17, 20 and 22 – only 22 is pled under Irish law, with the others unspecified as to governing law.  Each of these claims, however, shares a common failure to identify the underlying transactions, their dates, parties or other basic details to satisfy the requirements of notice pleading under <u>Twombly</u> and <u>Iqbal</u>.  And while NN Ireland asserts various quasi-contractual claims relating to these unspecified sales: (i) mistake (claim 20); (ii) transaction at an undervalue / fraudulent disposition (claim 22); (iii) implied contract (claim 16); and (iv) implied term (claim 17) – such claims also fail on independent grounds.  Specifically, NN Ireland's fails to adequately plead mistake, is unable to allege the required elements of a transaction at undervalue / fraudulent disposition claim and fails to allege the parameters of the purportedly implied term or contract.

*Fifth*, NN Ireland asserts several equitable claims "under English law, Irish law, or alternatively under US law," in the event that NN Ireland makes a payment pursuant to an FSD or CN (claims 28-31).  Claim ¶¶ 194-198.  These contingent claims are not only contrary to this Court's prior rulings concerning the FSD proceedings, but also fail based on the lack of any non-conclusory allegations as to the basis for imposing UK Pension Plan liability on NNI.  In any event, and at minimum, these claims must be disallowed pursuant to Section 502(e)(1)(B) of the Bankruptcy Code.

Finally, certain of the claims discussed above are barred by the applicable statute of limitations (claims 2-14, 16-21, 23).

# **ARGUMENT**

## **I.**

## **NN IRELAND'S CLAIMS MUST BE TESTED UNDER FEDERAL PLEADING REQUIREMENTS**

**A.     The Court Should Exercise its Discretion to Apply Rule 12(b)
       to NN Ireland's Proof of Claim**

Bankruptcy Rule 9014(c) permits a bankruptcy court to exercise its discretion "at any

stage in a particular matter to direct that one or more of the other rules in Part VII shall apply."

Fed. R. Bankr. P. 9014(c).  This includes Bankruptcy Rule 7012(b), which makes Rules 12(b)

through 12(i) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>" or "<u>Rules</u>") applicable

in bankruptcy proceedings.  Fed. R. Bankr. P. 7012(b).  Where, as here, a determination under

Bankruptcy Rule 7012(b) permits dismissal on the pleadings, without a waste of judicial

economy and estate resources through discovery and trial, bankruptcy courts routinely apply

Rule 12(b)(6) to claims objections.  <u>See, e.g.</u>, <u>Flake v. Alper Holdings USA, Inc. (In re Alper</u>

<u>Holdings)</u>, 398 B.R. 736, 748 (S.D.N.Y. 2008) (affirming bankruptcy court's dismissal of claims

under Rule 12(b)).[23]  Even if the Court were only to grant this Objection in part, winnowing the

claims at issue would materially progress resolution of NN Ireland's Claim.  <u>In re Diamond</u>

<u>Mortg. Corp. of Ill.</u>, 105 B.R. 876, 877 n.1 (Bankr. N.D. Ill. 1989) (deeming a claims objection a

motion under Bankruptcy Rule 7012 to resolve the objections as a matter of law "[i]n an effort to

move this litigation along.").[24]  Indeed, the Court has already recognized the advantages the Part

---

[23]    <u>See also</u> <u>900 Capital Servs., Inc. v. Cloud (In re Cloud)</u>, 214 F.3d 1350, 2000 WL 634637, at *2 (5th Cir.
2000) (table) (affirming bankruptcy court's dismissal of proof of claim where "bankruptcy court was well within its
discretion to apply Rule 12(b)(6) to this contested matter"); <u>In re Spiegel, Inc.</u>, 337 B.R. 821 (Bankr. S.D.N.Y.
2006) (exercising discretion under Bankruptcy Rule 9014 to direct that Rule 12(b)(6) be made applicable to claims
objection); <u>In re WorldCom, Inc.</u>, 322 B.R. 530 (Bankr. S.D.N.Y. 2005) (dismissing proof of claim pursuant to Rule
12(b)(6)); <u>In re Sevko, Inc.</u>, 143 B.R. 167 (Bankr. N.D. Ill. 1992) (applying Rule 12(b)(6) to objection to creditors'
amended proof of claim pursuant to Bankruptcy Rule 9014).

[24]    <u>See also</u> <u>In re Adelphia Commc'ns. Corp.</u>, 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006) (finding the Rule
12(b)(6) motion "to be a useful procedural mechanism to decide some kinds of contested matter disputes

VII rules afford in addressing intercompany claims, having applied Rule 12(e) to the EMEA Debtors' Placeholder Claims.  <u>See</u> EMEA Claims Order.

Moreover, courts recognize that a proof of claim is generally the functional equivalent of a complaint in an adversary proceeding or other civil action.  <u>See, e.g.</u>, <u>Hill v. Day (In re Today's Destiny, Inc.)</u>, 388 B.R. 737, 757 (Bankr. S.D. Tex. 2008) (noting that the "procedural consequences for filing a proof of claim or civil action are materially similar."); <u>Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)</u>, 107 B.R. 856, 859 (E.D. Pa. 1988) ("[T]he filings of proofs of claims by claimants are the equivalent of their filing suits against the Debtor."), <u>aff'd</u>, 908 F.2d 961 (3d Cir. 1990).  This rationale applies with particular force to NN Ireland's Claim, which is structured as a complaint, with separate asserted legal causes of action. Therefore, Movants should be entitled to move to dismiss the NN Ireland Claim just as one could move to dismiss a complaint, particularly where NN Ireland has already been provided an opportunity to state its claim with specificity.  This furthers the goal of bringing bankruptcy court procedure into line with district court procedure.  <u>See</u> <u>In re Enron Corp.</u>, 298 B.R. 513, 521-22 (Bankr. S.D.N.Y. 2003) (noting that "Part VII of the [B]ankruptcy [R]ules is based on the premise that to the extent possible practice before the bankruptcy court and the district court should be the same"), <u>aff'd</u>, 419 F.3d 115 (2d Cir. 2005) (internal quotation marks and citations omitted) (alterations in original).

## B.    NN Ireland's Claim Fails to Meet the Relevant Pleading Standards

To survive scrutiny under Bankruptcy Rule 7012 and Federal Rule 12(b)(6), Rule 8 requires that a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (internal

economically, saving litigation costs for the benefit of creditors and other stakeholders."); <u>In re Best Prods. Co.</u>, 210 B.R. 714, 716 (Bankr. E.D. Va. 1997) (dismissing claim for administrative expenses under Rule 12(b)(6), as it "offer[ed] an opportunity to resolve the parties' disputes expeditiously").

quotation marks omitted); <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).[25]  A claim has

facial plausibility where "the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 129 S. Ct. at

1949; <u>see also</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 211 (3d Cir. 2009) ("[A] complaint

must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an

entitlement with its facts.") (citation omitted).  Although "Rule 8 marks a notable and generous

departure from the hyper-technical, code-pleading regime of a prior era, it does not unlock the

doors of discovery for a plaintiff armed with nothing more than conclusions." <u>Iqbal</u>, 129 S. Ct.

at 1950.

The Third Circuit applies this Rule 8 analysis in three steps: "(1) identifying the elements

of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at

the well-pleaded components of the complaint and evaluating whether all of the elements

identified in part one of the inquiry are sufficiently alleged." <u>Malleus v. George</u>, 641 F.3d 560,

563 (3d Cir. 2011).  While various causes of action asserted by NN Ireland are purportedly

brought under Irish (or other unspecified) law, the question of whether its Claim is adequately

pled is determined as a matter of U.S. federal procedure.  <u>See</u> <u>O'Connell v. Arthur Andersen</u>

<u>LLP (In re Alphastar Ins. Grp. Ltd.)</u>, 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008); <u>United Feature</u>

<u>Syndicate, Inc. v. Miller Features Syndicate, Inc.</u>, 216 F. Supp. 2d 198, 221 n.8 (S.D.N.Y. 2002).

---

[25]     Movants accept the truth of NN Ireland's well-pleaded allegations for purposes of this Objection and
Motion only.  <u>See</u> <u>Fowler</u>, 578 F.3d at 210.  On a motion to dismiss, the Court may consider not only the complaint,
but documents whose contents are alleged in the complaint, and documents attached to a motion to dismiss that are
referred to in the plaintiff's complaint and central to its claims.  <u>See</u> <u>Pryor v. NCAA</u>, 288 F.3d 548, 559-60 (3d Cir.
2002).  While the court must accept as true all factual allegations in the complaint, it "need not accept as true
unsupported conclusions and unwarranted inferences," and must draw on the allegations in the complaint "in a
realistic, rather than a slavish, manner." <u>Doug Grant, Inc. v. Greate Bay Casino Corp.</u>, 232 F.3d 173, 184 (3d Cir.
2000) (internal quotation marks and citations omitted).

While Rule 8(a) alone requires dismissal of NN Ireland's Claim, Bankruptcy Rule 7009(b) also incorporates the provisions of Federal Rule 9(b), providing that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[26]  Rule 9(b) "appl[ies] to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud."  Toner v. Allstate Ins. Co., 821 F. Supp. 276, 283 (D. Del. 1993).  Certain of NN Ireland's claims allege that NNI either directly or indirectly participated in a scheme to remove assets from NN Ireland for the benefit of the Canadian Debtors.  See Claim ¶¶ 51-52, 124, 149-50; see also Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 747 (Bankr. D.N.J. 2009) (where complaint "equates the conduct of Debtor's [directors] and the Leasing Companies as a fraud enabling the defendants to exploit and loot the debtor for defendants' own purposes, the aiding and abetting claims allegations must be stated with particularity in accordance with Rule 9(b)" (internal quotation marks and citations omitted)).  NN Ireland's claims based on its transfer pricing and Pre-Petition Asset Sale allegations are also predicated on assertions that those transactions were not negotiated at arm's length (Claim ¶¶ 11, 18, 45-50, 67-69) – an allegation which Courts routinely consider as a "badge of fraud" in inferring fraudulent intent.  See Adamson v. Bernier (In re Bernier), 282 B.R. 773, 781 (Bankr. D. Del. 2002) ("whether the transaction is conducted at arm's length" is a factor indicative of an intent to defraud).  As a result, most of NN Ireland's claims – claims 2, 4-8, 10, 12-14, 18, 20, 23-24, and 26-27 – invoke Rule 9(b)'s specificity requirements, as well as Rule 8(a)'s plausibility test.

---

[26]    Bankruptcy Rule 9014(c) is clear that Bankruptcy Rule 7009(b) ("Rule 9(b)") automatically applies to contested matters such as this Claim Objection.  Fed. R. Bankr. P. 9014(c).

## II.

## NNI OWED NO DUTIES TO NN IRELAND OR ITS CREDITORS

NN Ireland asserts Irish law breach of fiduciary duty claims based on its allegations concerning transfer pricing arrangements, the Irish Loans and Irish Dividends, Pre-Petition Asset Sales and alleged contingent tax liability fact patterns (claims 2, 8, 18, and 24).  As NNI is unquestionably not a de jure director of NN Ireland, each of these claims is dependent upon both (i) imposing fiduciary duties on NNI as either a de facto or shadow director of NN Ireland and (ii) a breach of those duties.  These claims fail as a matter of law for several independent reasons.

*First*, because of the prior inconsistent positions NN Ireland has taken that were adopted by this Court and the English Court, NN Ireland is estopped from asserting that NNI or NNL acted as a director of NN Ireland.  *Second*, should the Court even consider these claims, they must nevertheless be dismissed, as NN Ireland does not allege sufficient facts to render its allegations of shadow or de facto directorship legally sufficient or plausible.  *Third*, while NN Ireland's breach of fiduciary duty allegations are founded on duties owed to creditors, NN Ireland fails to sufficiently plead that NN Ireland was insolvent, which its Claim concedes is required to invoke those duties.  *Finally*, NN Ireland's independent claims (i.e., to the extent not based on director status) for a breach of the duty of care (claims 3, 9, 19, 25) fail as a matter of Irish law.

### A.    NN Ireland is Estopped from Asserting that NNI or NNL Served as De Facto or Shadow Directors of NN Ireland

In order to obtain relief in the administration proceedings in England, and then to obtain recognition of those proceedings in this Court, NN Ireland and the other EMEA Debtors took the position that they were managed, operated and controlled from England.  After those arguments were accepted by the English Court in NN Ireland's administration proceeding and then this

Court in the Chapter 15 Proceedings, to NN Ireland's benefit, NN Ireland now attempts an about-face, asserting that the EMEA Debtors were managed and controlled from North America by NNL, allegedly with the assistance of NNI.

NN Ireland's claims for breach of fiduciary duty depend on allegations that NNI acted as a director of NN Ireland (claims 2, 8, 18 and 24).  NN Ireland's claims against NNI for aiding and abetting or dishonest assistance are similarly based in part on the allegation that NNL acted as a de facto or shadow director of NN Ireland (claims 4, 6, 10, 13, 23 and 26-27).[27]  In short, each of those claims is premised on the allegation that NNI and/or NNL asserted directorial control over NN Ireland.  But in light of NN Ireland's prior inconsistent positions – which were accepted by this Court and the English Court to NN Ireland's benefit in orders that have long since become final – NN Ireland is estopped from now making these contrary allegations.

1.    NN Ireland's Representations

To first obtain the Initial Orders from the English Court placing the EMEA Debtors into administration, the EMEA Debtors – including NN Ireland – submitted sworn witness statements from Sharon Lynette Rolston, who was, *inter alia*, a director of NN Ireland and Michel Clement, president of NNSAS and a director of NNSA.  Joksimovic Decl. Exs. C, D and E.  Unlike the Joint Administrators, Rolston and Clement had historical perspective on the actual operation of NN Ireland and the other EMEA Debtors before they were placed into administration.[28]  The Rolston Irish Statement repeatedly and unequivocally states that NN Ireland was controlled from England.  For example, it asserts that (i) NN Ireland was "effectively managed from EMEA's head office which is located in Maidenhead, England" (¶ 28); (ii) "a wide range of operational,

---

[27]    To the extent based on a breach of fiduciary duty by NNI or NNL, NN Ireland's claims for breach of the duty of care (claims 3, 9, 19, 25) and unconscionable receipt (claims 11 and 21) are similarly barred by estoppel.

[28]    Joksimovic Decl. Ex. M at Exhibit A at 277:19-23.

strategic, financial and high level administrative and advisory control" over NN Ireland was

exercised from England by senior management of EMEA (¶ 34); and (iii) "Senior management

in England exercise control and authority over [NN Ireland] through the global decision making

and policy procedure" (¶ 36; see also id. ¶ 33, which incorporates by reference ¶¶ 186-189 and

200-205 of the Rolston Main Statement).  This included tax and treasury functions.  Id. ¶

41("[B]anking and treasury functions are run out of England."); ¶ 42 ("In relation to corporate

matters such as, financial, tax and distribution issues, decisions are generally made by the

Finance, Legal, and Tax functions of the EMEA group which are all located in England").

    The Rolston Irish Statement expressly acknowledged that NN Ireland and the other

EMEA Debtors functioned autonomously from other Nortel Group entities.  Joksimovic Decl.

Ex. D ¶ 36 ("[K]ey primary functions required for the operation of [NN Ireland] are conducted

from England.  Senior management in England exercise control and authority over [NN Ireland]

through the global decision making approval and policy procedure.  Day to day operational

management of [NN Ireland] is conducted in accordance with these policies"); see also Rolston

Main Statement, Joksimovic Decl. Ex. C ¶ 114 ("EMEA Senior Management operates with a

large degree of autonomy from Canada, setting all policies, procedures, budgets, targets and

operational matters for the EMEA region, which are disseminated to the EMEA Companies

[including NN Ireland] which are required to operate within those instructions.")

    The English Court accepted this evidence, finding that because the EMEA Debtors were

operated and controlled by individuals located in England – not North America – the center of

main interests for NN Ireland and the other EMEA Debtors was in England.  In its Initial Order,

the English Court found that based upon the Rolston and Clement Statements, (i) the

administration order could be entered, and (ii) that proceedings in England would qualify as

"main proceedings."[29]  Applying the EC Regulation on Insolvency Proceedings 2000, the

English Court necessarily accepted the EMEA Debtors' contention that England was the center

of main interests for the EMEA Debtors.  Todd Decl. [D.I. 5971] ¶ 141.[30]

The EMEA Debtors then submitted much of that same evidence to this Court, upon

which the Court entered two orders also finding that England was the center of main interests for

the EMEA Debtors.[31]  The Rolston Statements were submitted to this Court in order to obtain

recognition for NN Ireland and the other EMEA Debtors, excepting NNUK,[32] together with the

Clement Statement, in October 2010.[33]  NN Ireland also submitted sworn declarations to this

Court from the Joint Administrators affirming that the Rolston and Clement Statements were true

and correct as late as January 2011, such that "each of the EMEA Debtor's [*sic*] central

management and control is handled to a large extent from Maidenhead, England."[34]  Indeed, the

EMEA Debtors expressly argued before this Court that "[w]hile NNC is the ultimate parent of all

---

[29]      See NNUK Chapter 15 Petition ¶ 15(a) ("In the Initial Order, the English Court found that the English Proceedings are main proceedings as defined in Article 3 of Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings.  By definition, a main proceeding is one that takes place in the jurisdiction where the debtor has its center of main interests.  Therefore, the English Court concluded that the COMI for the foreign debtor was, in fact, England."); see also Initial Orders at 1 ("upon reading the evidence relating to this application, and upon the Court being satisfied on the evidence before it that . . . the EC Regulation does apply and that these proceedings are main proceedings as defined in Article 3 of the EC Regulation.").

[30]      The applicable European insolvency regulation is based on the same UNICTRAL Model Law on Cross-Border Insolvency as Chapter 15 of the Bankruptcy Code.  See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008).  Under both that regulation and Chapter 15, even though NNUK was incorporated in England, NNUK could not rely on that place of incorporation where its activities were actually controlled elsewhere.  Id. at 130 (rejecting Chapter 15 petition, even in the absence of objection, where Cayman-incorporated debtor was actually managed and controlled by personnel located in New York, with citations to parallel decisions interpreting EU insolvency regulation); see also In re Grand Prix Assocs., Case No. 09-16545 (DHS), 2009 Bankr. LEXIS 1239, at *22 (Bankr. D.N.J. May 18, 2009) ("the Chapter 15 Petition process should not become a 'rubber stamp exercise'") (citations omitted).

[31]      See EMEA Recognition Order, Joksimovic Decl. Ex. P at 2 (citing Rolston Statements, Clement Statements and related deposition testimony entered into evidence).

[32]      The Rolston Statements were also submitted to the Court in June 2009 in order to obtain recognition of NNUK.

[33]      See Joksimovic Decl. Ex. F ¶¶ 5-6.

[34]      Joksimovic Decl. Ex. F ¶ 7.

Nortel Companies worldwide and NNC's headquarters in Toronto serves as the global headquarters, *the EMEA Debtors' central management and control is directed from the head office in Maidenhead, England, where all major decisions specific to the EMEA Debtors are made*" (emphasis added).[35]  In turn, this Court's orders granting recognition are express that its findings on the EMEA Debtors' center of main interests are based upon the Rolston and Clement Witness Statements.[36]

2.    NN Ireland is Estopped from Reversing its Position

Under the judge-created doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position."  Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 121 (3d. Cir. 1992) (internal quotation marks and citations omitted). While the doctrine is not subject to "inflexible prerequisites or an exhaustive formula," New Hampshire v. Maine, 532 U.S. 742, 751 (2001), the Third Circuit has identified factors that inform the application of judicial estoppel: (i) the positions a party has taken are irreconcilably inconsistent; (ii) the party had adopted those positions in bad faith; and (iii) estoppel is tailored to the harm.  G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009).  Judicial estoppel is particularly appropriate if – as here – the party benefitted from its original position. Delgrosso v. Spang & Co., 903 F.2d 234, 242 (3d Cir. 1990).  Each of those factors is present.

---

[35]    See Joksimovic Decl. Ex. L ¶ 4(e) (emphasis added); see also Joksimovic Decl. Ex. N at 20:11-14 (submitting Joint Administrators' deposition transcript into evidence on record of recognition hearing); Joksimovic Decl. Ex. M at Exhibit A at 49:17-50:4, 107:9-107:17, 278:21-279:9 (Rule 30(b)(6) deposition testimony from Joint Administrators affirming that Rolston and Clement Statements remained true and correct); Joksimovic Decl. Ex. K ¶ 7.

[36]    See EMEA Debtor Recognition Order, Joksimovic Decl. Ex. P at 2 (noting the "Court having considered and reviewed the Chapter 15 Petitions and all other documents and evidence filed in support thereof, namely the witness statements of Sharon Rolston attached as Ex. A at Exhibit I to the Declaration of Alan Robert Bloom dated October 18, 2010 and witness statements of Michel Clement attached as Ex. A at Exhibit II thereto and the deposition testimony of Alan Robert Bloom dated December 16, 2010"), and ¶ G (finding that "England is the center of main interests of each of the EMEA Debtors and, accordingly, the English Proceedings are 'foreign main proceedings' . . . and entitled to recognition as foreign main proceedings").

25

NN Ireland's allegations that NNL and NNI controlled it and the other EMEA Debtors are directly contrary to its prior position that NN Ireland was managed and controlled from England.  NN Ireland's Claim now asserts (in conclusory terms) that control of NN Ireland was somehow exercised by NNL and NNI, who should be deemed directors of NN Ireland.[37]  To establish a claim based on shadow or de facto director status under Irish law, however, requires, at a minimum, that NN Ireland's directors in England were clandestinely directed in their votes or decisions by NNL and NNI (shadow director), or that NNI and NNL participated in directing NN Ireland's affairs on equal footing with its duly appointed directors and were held out externally as directors of NN Ireland (de facto director).  Declaration of Aidan Redmond SC in Support of the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland ("Redmond Decl.") ¶¶ 17-18, 28.

The Claim fails to so plead, as set forth in detail below.  But even if it did so allege, such allegations[38] are irreconcilably inconsistent with NN Ireland's prior factual positions both in this Court and the English Court.  The resulting findings from both this Court and the English Court that NN Ireland's and the other EMEA Debtors' center of main interests was in England are tantamount to a determination that England was their principal place of business.[39]  The principal place of business is the corporation's "nerve center," from which "a corporation's high level officers [and directors] direct, control and coordinate the corporation's activities."  Hertz Corp. v. Friend, 130 S. Ct. 1181, 1183 (2010) (internal quotation marks omitted).  Findings that that

---

[37]    Claim ¶ 13 ("Control of the Nortel Group's operations was highly centralized and . . . was maintained primarily by NNC and NNL."); ¶ 15 ("While the Canadian Entities controlled the group on a general basis, NNI was also involved in jointly controlling certain aspects of the Group's operation together with the Canadian Entities.")

[38]    See, e.g., Claim ¶ 15 ("The control exerted [over NN Ireland] by NNI related to Group Tax matters, in particular transfer pricing, and to Group Treasury matters.  These Group Tax and Group Treasury functions were responsible for the transactions pursuant to which value was improperly removed from NN Ireland.")

[39]    See In re British Am. Ins. Co., 425 B.R. 884, 908 (Bankr. S.D. Fla. 2010); In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (2008); Todd Decl. [D.I. 5971] ¶ 141.

tax, treasury and other management functions for the EMEA Debtors were controlled from England cannot be reconciled with claims predicated upon control of the EMEA Debtors by NNL and NNI.[40]

NN Ireland also benefitted from its prior assertions that the EMEA Debtors' center of main interests was in England.  The EMEA Debtors asserted that if the English Court did not find England to be their center of main interests, they would be required to commence piecemeal liquidation proceedings that would destroy value in the EMEA region.  Rolston Main Statement, Joksimovic Decl. Ex. C ¶¶ 101-102, 211-212, 219.  The EMEA Debtors also acknowledged to the English Court that it was "strategically advantageous" to file administration applications in England.  Id. at ¶ 211.  In addition, by securing Chapter 15 recognition, NN Ireland enjoyed the protections of the automatic stay over any property located within the United States.  See EMEA Recognition Order, Joksimovic Decl. Ex. P. ¶ 2.  NN Ireland's change in position after obtaining these benefits in both the English Court and this Court "evidence[] an intent to play fast and loose with the courts."  Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996).  This alone permits the Court to find that NN Ireland's change in position was made in bad faith.  See Anjelino v. N.Y. Times Co., 200 F.3d 73, 100 (3d Cir. 2000) (affirming district court's grant of motion to dismiss where finding of bad faith was based on party's prior inconsistent position).

Finally, no sanction short of estoppel can address this harm.  To permit NN Ireland to take one position for commencement and recognition of its administration proceedings, and then

---

[40]    Compare Claim ¶ 19 ("The Nortel Group Tax Department was effectively a joint function between NNI and the Canadian Entities"), and ¶ 26 ("key individuals within Nortel Treasury were from NNI"), with Rolston Irish Statement ¶ 41 ("the Banking and Treasury functions are run out of England, by Group Treasury Operations"), and ¶ 42 ("In relation to corporate matters such as financial, tax, and distribution issues, strategic and high level decisions are generally made by the Finance and Tax functions of the EMEA group which are all located in England.").

an opposite position in order to manufacture claims against the U.S. Debtors, is precisely the sort of "intentional self-contradiction . . . used as a means of obtaining unfair advantage" that judicial estoppel aims to avoid.  Scarano v. Cent. R.R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953); see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC, 337 F.3d 314, 319 (3d Cir. 2003) (judicial estoppel precludes a party from "gain[ing] an advantage by litigation on one theory, and then seek[ing] an inconsistent advantage by pursuing an incompatible theory") (internal quotation marks and citations omitted).

Collateral estoppel also applies to foreclose NN Ireland's inconsistent claims.  Collateral estoppel applies where: (i) the issue sought to be precluded was actually and necessarily determined in a prior proceeding; (ii) the issue was actually litigated; (iii) the issue was finally determined; and (iv) the determination was essential to the prior judgment.  See Burlington N. R.R. Co. v. Hyundai Merch. Marine Co., 63 F.3d 1227, 1232 (3d Cir. 1995).  First, as set forth above, the EMEA Debtors' center of main interests was actually and necessarily determined by the English Court, as well as this Court.  Second, the issue was also "actually litigated."  In connection with the Chapter 15 Proceedings, both the U.S. Debtors, the Committee and the Canadian Monitor engaged in extensive discovery concerning the factual basis for the EMEA Debtors' assertion that England was the center of main interests for NN Ireland and the other EMEA Debtors, including multiple document requests, the production of nearly 9,000 pages of documents (many of which were the subject of a motion to compel granted by this Court), multiple rounds of interrogatories, and a deposition pursuant to Rule 30(b)(6) of one of the Joint Administrators.[41]

---

[41]    See generally Notices of Service of Discovery [D.I. 58, D.I. 61, D.I. 64, D.I. 70, D.I. 71, D.I. 79, D.I. 83, D.I. 92]; Notices of Deposition [D.I. 65, D.I. 66, D.I. 67, D.I. 68, D.I. 84, D.I. 89]; Motion of the U.S. Debtors and the Committee for an entry of an Order Compelling Discovery of the EMEA Debtors and Their Administrators [D.I. 69]; Order Compelling Discovery of the EMEA Debtors and Their Administrators [D.I. 77]; Nov. 29, 2010 Hr'g Tr.

With the benefit of that discovery, the Court held a hearing, at which voluminous

evidence was submitted in support of the EMEA Debtors' assertions that their center of main

interests was in England.  The Court noted on the record that recognition "was a contested

matter, hotly contested for awhile and that certainly generates a good record upon which to make

the finding and to make – to grant the recognition of the foreign proceeding and as well – as well

as find that it is the center of main interest."  Joksimovic Decl. Ex. N at 25:11-16.  Notably, both

the English Court's Initial Orders[42] and this Court's NNUK and EMEA Recognition Orders[43]

have become final and non-appealable.  Finally, a determination that England was the EMEA

Debtors' center of main interests was essential to the orders of both this Court and the English

Court, as neither court could have entered their orders without making that finding.[44]

Accordingly, the Court should dismiss without further consideration NN Ireland's inconsistent

claims – claims 2, 8, 18 and 24 for NNI's alleged direct breach of fiduciary duty, as well as

claims 6, 11, 13, 21, 23 and 27 to the extent based on a breach of duty by NNL.

**B.**     **NN Ireland Fails to Plead a Plausible Claim that NNI was a Director Under Irish Law**

Even if the Court were to permit NN Ireland now to assert its fiduciary duty claims, its

Claim fails to state a plausible basis on which to deem NNI a director of NN Ireland.  The Claim

fails to allege well-pleaded facts of any actions undertaken by NNI to comprehensively direct

---

at 10:23-11:13 [D.I. 82] (permitting, over EMEA Debtors' objection, participation in discovery by Canadian Monitor); Dec. 8, 2010 Hr'g Tr. at 16 [D.I. 88] (granting, over EMEA Debtors' objection, U.S. Debtors' request for extended-time deposition); Dec. 22, 2010 Hr'g Tr. at 10:22-11:25 [D.I. 96] (ruling on discovery dispute concerning confidentiality of documents produced).

[42]     Todd Decl. [D.I. 5971] ¶ 142 (explaining that Initial Orders are now final orders that are no longer subject to appeal except by way of appeal out of time).

[43]     The NNUK Recognition Order was entered on June 26, 2009 [D.I. 36 in Case. No. 09-11972].  The EMEA Recognition Order was entered on January 31, 2011 [D.I. 116 in Case. No. 09-11972].

[44]     Todd Decl. [D.I. 5971] ¶ 141; 15 U.S.C. § 1517(a)(1) ("an order recognizing a foreign proceeding shall be entered if (1) such foreign proceeding for which recognition is sought is a foreign main proceeding . . .").

NN Ireland's affairs as an acting board member (as required to state a de facto director claim), much less the imperative directions given by NNI to NN Ireland's directors (as required to state a shadow director claim).  NN Ireland's shadow director claim is also barred by limitations on shadow directors' duties.

1.    Irish Law Regarding De Facto and Shadow Directors

Under Irish law, Section 2(1) of the Companies Act, 1963 provides that a "director" includes any person occupying the position of director by whatever name called.  Redmond Decl. ¶ 12 (citing Section 2(1) of the Companies Act, 1963).  There is, however, no statutory definition of a de facto (or not validly appointed) director, and it is a concept that has developed through case law.  Id.

A person may be deemed a de facto director if he acts as a director but is not actually appointed as such.  Id.  Importantly, no Irish authority has held that a corporate entity can be deemed a de facto director and under the 1963 Companies Act, a corporate entity may not be a validly appointed director.  See Redmond Decl. ¶ 15.

A de facto director claim can arise in cases where an individual has been acting as a director, but there was a technical defect in his or her appointment.  Id.  The individual must undertake functions in relation to the company that could only be discharged by a director, and must participate in directing the affairs of the company on an equal footing with the other director(s).  Id. ¶¶ 13, 16.  A de facto director must exert such a widespread decision-making influence that they become "part of the corporate governing structure."  Id. ¶ 20.  Being "held out" as a director to third parties is important evidence that would support a conclusion that a person acted as a director in fact.  Id. ¶¶ 16, 20.  Some of the factors a court may consider include whether the putative director:  (i) was appointed by the directors or in a general meeting, albeit invalidly; (ii) sought to be referred to as a director; (iii) was an authorised signatory on

bank mandates of the company; (iv) attended board meetings by invitation; (v) was as well briefed as the de jure directors; or (vi) held a substantial shareholding in the company. Id. ¶ 18. Where the de facto director test is satisfied, a de facto director is regarded as holding a fiduciary position and will be subject to the general duties of de jure directors. Id. ¶ 15.

By contrast, a shadow director claim is based solely on an Irish statute – Section 27 of the 1990 Companies Act. Id. ¶ 24. A shadow director is a person who does not act as a director himself but "in accordance with whose directions or instructions the directors of the company are accustomed to act." Id. (citing Companies Act 1990 § 27). To establish that a person was acting as a shadow director requires a showing that he or she exerted a real and controlling influence on certain types of transactions over a period of time. Id. ¶ 28. Proving the requisite influence requires, at a minimum, that the majority of the board must act in accordance with the person's instructions. Id. The imperative quality of influence on the board is paramount, as is the prolonged nature of the influence.

Notably, distinct from a de facto director, a shadow director does not owe broad fiduciary duties to the company. Id. ¶¶ 29-32. A shadow director will only become subject to fiduciary duties if he engages in certain transactions involving directors, as set forth in Part III of the Companies Act 1990. Id. ¶ 33. These types of transactions involve loans to directors, related party transactions involving directors and disclosures of director-interested transactions. Id. Given the different duties applicable to shadow and de facto directors, Irish law draws an important distinction between the two claims. Id. ¶ 16. Indeed, as one English court decision that has been approvingly cited by the Irish courts has stated, an allegation that a person acted as a de facto or shadow director, without distinguishing between the two is "embarrassing." Id. (citing Re Hydrodan (Corby) Ltd. [1994] 2 BCLC 180 at 182h).

Although a corporation can be a shadow director,[45] because a corporation can only act through its agents, NN Ireland must allege that individuals were acting within the scope of their employment and authority at NNI in order to impute that conduct to NNI and rely on it as the basis of a claim of shadow or de facto director.  Id. ¶ 17.

2.    The Claim Fails to Allege Sufficient Well-Pleaded Facts to Render a Directorship Claim Plausible

As explained above, following the Supreme Court's decisions in Iqbal and Twombly, courts must determine whether a claim alleges sufficient facts to "state a claim to relief that it plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  To make this determination, courts disregard unsupported conclusions and unwarranted inferences, as well as any legal conclusions or bare recitals of the cause of action.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Only if the remaining well-pled components of the complaint "show" an entitlement to relief should the claim be permitted to stand.  Id. at 1940; Abramson v. Ritz-Carlton Hotel Co., No. 09-3264, 2010 WL 3943666, at *3 (D.N.J. Oct. 6, 2010).

When considered under this precedent, claims 2, 8, 18 and 24 fail under Rule 8(a) alone. These claims are predicated on NNI having purportedly acted as a de facto or shadow director of its sister corporation NN Ireland for the benefit of their common parent, but NN Ireland has failed to plead facts that render such a claim *plausible*.  And, when fairly read, NN Ireland's breach of fiduciary duty allegations also invoke the particularity requirements of Rule 9(b). Claims 2, 8, 18 and 24 are predicated on an alleged scheme by NNI and NNL to strip assets from NN Ireland for NNL's benefit.  See Claim ¶¶ 9-12, 16, 20, 51, 65, 68, 71.  Courts routinely apply Rule 9(b) to such allegations.  See Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709,

---

[45]    As shadow directors are special creations of Irish statute, Irish courts have determined that the general prohibition on corporate entities serving as de jure directors was not incorporated into the later Companies Act provision defining shadow directors.  Redmond Decl. ¶ 15.

746 (Bankr. D.N.J. 2009).  Moreover, because NN Ireland separately brings claims for breach of the duty of care and breach of fiduciary duty, its fiduciary duty claims necessarily involve allegations that exceed mere negligence, and allege self-dealing by NNI and/or NNL.  See, e.g., Claim ¶¶ 48, 90 (alleging breach of fiduciary duty on the basis that the RPSM represented "an international and improper transfer of value away from NN Ireland . . . and towards NNL").

Regardless, however, of whether the heightened pleading standards of Rule 9(b) apply, NN Ireland's claims fail.  NNI and NN Ireland are sister corporations, each wholly-owned subsidiaries of NNL.  See Claim ¶ 2; Rolston Irish Statement ¶ 17.  Importantly, NN Ireland asserts that "[c]ontrol of the Nortel Group's operations was highly centralized and, on a general basis, was maintained primarily by NNC and NNL."  Claim ¶ 13.  The Claim also asserts that NNI was "also involved in jointly controlling certain aspects of the Nortel's Group's operation together with the Canadian Entities."  Id. ¶ 15.  The Claim alleges that this control "related to Nortel Group Tax matters, in particular transfer pricing, and to Nortel Group Treasury matters." Id.  Through these matters, NN Ireland asserts that "the cash resources of NN Ireland were depleted at the direction of NNL and NNI."  Id. ¶ 7; see also ¶ 51.  From this, NN Ireland concludes that "NNI was a de facto or shadow director of NN Ireland under Irish law."  Id. ¶ 27. As set forth below, NN Ireland fails to provide the basic factual allegations necessary to satisfy the elements for a de facto or shadow directorship based on any of the groups of allegations it asserts.

**Unidentified Pre-Petition Asset Sales**.  The Claim asserts breach of fiduciary duty claims with respect to these transactions (claim 18), but nowhere provides the slightest identifying information regarding these asset sales – assets sold, buyers, sellers or consideration. Moreover, the Claim fails even to reference such transactions in alleging de facto and shadow

director status for NNI.  See Claim ¶ 27(a)-(b).  The Claim also fails to provide any allegations whatsoever concerning decisions allegedly made by NNI at NN Ireland board meetings with respect to NN Ireland's entry into the (unidentified) Pre-Petition Asset Sales or decisions by NNI acting as a director with other "directors" in respect of such sales.  Indeed, the Claim includes no allegations regarding the process by which the (unidentified) Pre-Petition Asset Sales in claim 18 were considered and approved.  See generally id. ¶¶ 66-70.  Instead, for claim 18, NN Ireland avers in a conclusory fashion that NNI "was involved in all decision making in relation to [the Pre-Petition Asset Sales]."  Id. ¶ 166.  To the extent such conclusory allegations even merit consideration, this falls far short of the comprehensive board involvement required of a de facto director or of the controlling influence required to be a shadow director.

**Contingent Tax Claims**.  For claim 24, NN Ireland makes a similar conclusory allegation that NNI "controlled" NN Ireland's tax affairs.  The Claim alleges only that "NN Ireland's taxation affairs were controlled by NNI . . . more generally."  Id. ¶ 71; see also ¶ 186 ("NNI (together with NNL) controlled NN Ireland's tax affairs.").[46]  Disregarding these mere conclusions – as Iqbal requires – claim 24 lacks any well-pleaded facts concerning acts undertaken by NNI in its purported role as a de facto director or instructions it gave (as a shadow director) to NN Ireland's de jure directors.  Indeed, the allegations underlying claim 24 are insufficient even to put NNI on notice of the conduct on which it bases its cause of action.

**Transfer Pricing**.  Though NN Ireland attempts more extensive allegations based on transfer pricing (claim 2), they provide no additional well-pleaded facts sufficient to draw a plausible inference that NNI acted as a de facto or shadow director of NN Ireland.  NN Ireland asserts that NNI was "heavily involved in the implementation and operation" of transfer pricing

---

[46]    NN Ireland separately makes certain tax-related allegations concerning transfer pricing and Irish Loans and Dividends, but the Claim asserts separate causes of action based on NNI's alleged fiduciary status for those transactions (claims 2 and 8).

arrangements.  Claim ¶ 16.  On their face, these are not allegations of director level involvement but rather are managerial actions.  NN Ireland does not include any allegations that these individuals were comprehensively engaged at the board level or took any actions that only the board could take.  NN Ireland includes a list of "key individuals involved," but nowhere alleges the votes they cast as de facto directors or any directions they gave to NN Ireland's directors.  Id. ¶ 17.  Nor does the Claim allege that any of these individuals were held out as directors to third parties.  Moreover, the Claim fails to allege that these individuals were acting within the scope of their employment or authority *for NNI* sufficient to attribute their actions to NNI.  This is not a mere question of formality as the Claim itself alleges that many of the individuals at issue also held positions with NNL or the Nortel Group more broadly.  See, e.g., Claim ¶¶ 17, 24, 26.

The Claim does allege that certain individuals undertook negotiations with taxation authorities and instructed professional advisors.  Claim ¶¶ 16, 18.  But those activities are also insufficient grounds on which to base a de facto directorship claim, because they could have been undertaken by managers, and do not constitute "director only" activities.  See Redmond Decl. ¶ 16.  Critically, insofar as the Claim alleges any direction was given to NN Ireland, the allegation is made in the passive voice – there is no affirmative allegation that NNI was responsible.  Claim ¶ 18(d) ("NN Ireland was simply instructed to sign the MRDA"); see also ¶ 10 ("the EMEA Companies were instructed to identify new schemes which would enable the transfer of cash and value to NNL.").

The Claim asserts similar conclusions in the text of claim 2.  Id. ¶ 88 ("NNI was involved in all decision making in relation to the transfer pricing arrangements").  However, generalized references to alleged "involvement" are no substitute for well-pleaded facts identifying the comprehensive participation in board level corporate governance or directions given to NN

Ireland's own directors that Irish law requires.  See Twombly 550 U.S. at 567-70 (dismissing complaint because it failed to include sufficient well-pleaded allegations to give rise to a plausible claim of conspiracy); Iqbal, 19 S. Ct. at 1952 (dismissing complaint because Plaintiff had not plead sufficient factual allegations against petitioners to establish discrimination claim).

**Irish Loans and Dividends**.  NN Ireland's allegations in respect of the Irish Loans and the Irish Dividends (claim 8) fare no better.  Again, the Claim resorts to bare-bones allegations of NNI's "involvement" in those transactions without any information laying a foundation for plausibility.  See Claim ¶ 60 ("NNI was involved in the establishment of the Irish Loans and the Irish Dividends"); ¶ 51 ("NNI personnel were actively involved in devising and implementing the [the Irish Loans and the Irish Dividends]"); ¶ 20 ("NNI, through its personnel was, together with the Canadian Entities, fully involved [in] and aware of the implementation of [the Irish Loans and the Irish Dividends]"); ¶ 21 ("Numerous NNI individuals were aware of and/or participated in discussions relating to [the Irish Loans and the Irish Dividends]"); ¶ 123 (alleging "NNI was involved in all decision making in relation to the [the Irish Loans and the Irish Dividends]").

To the extent that NN Ireland bases its claim on actions undertaken by Katharine Stevenson (alleged to be a director of NNI), or Ryan Smith (alleged to be an NNI employee), NN Ireland has not alleged sufficient well-pleaded facts to meet the requirements of Irish law for a de facto director.  As an initial matter, there are no allegations to suggest that Stevenson or Smith was acting as any kind of a director of NN Ireland.  Nor are there allegations that those individuals were held out as NN Ireland directors to third parties.  There are not even any allegations that those individuals were acting within the scope of their employment or authority for NNI when the allegedly improper conduct was carried out.  To the contrary, although the

Claim repeatedly asserts that Ryan Smith was an employee of NNI (Claim ¶¶ 19, 23), NN Ireland also acknowledges that Smith was *seconded to NNUK, in which role he acted on behalf of NN Ireland and the rest of the EMEA Debtors*.  <u>See</u> Claim ¶ 19 (stating that Smith was "the EMEA Tax Leader on the ground in the EMEA Region (responsible for NN Ireland) [who] was seconded to NNUK from NNI").  Nor is there any allegation that either Stevenson or Smith "directed" the vote or decision of any NN Ireland director, as required for shadow director status.

Even where NN Ireland attempts to allege facts, instead of conclusions, those allegations do not approach the director-level participation in corporate governance – or mandate to NN Ireland's de jure directors – that a plausible claim of de facto or shadow directorship requires. Instead, NN Ireland repeatedly and conclusorily alleges NNI's unspecified "involvement" in the implementation, supervision and establishment of the Irish Loans and the Irish Dividends.  Claim ¶¶ 20-22.  These are not only functions that could be performed by managers, but these also fall far short of the comprehensive involvement in corporate governance or the directions given to the NN Ireland board that are required under Irish law for either de facto or shadow director status.  <u>See</u> Redmond Decl. ¶ 16.  Again, the only allegation concerning any instruction given is made in the passive voice, without any suggestion that NNI gave such direction.  Claim ¶ 10 ("[T]he EMEA Companies *were instructed* to identify new schemes which would enable the transfer of cash and value to NNL." (emphasis added)).

Taken as a whole, the Claim thus lacks sufficient well-pleaded factual detail to "nudge" its allegations "across the line from conceivable to plausible."  <u>Twombly</u>, 550 U.S. at 570.

3.      <u>NN Ireland's Allegations Do Not Implicate a Shadow Director's Duty</u>

Even assuming that a shadow director claim were adequately pled, NN Ireland does not

allege actions by NNI as an alleged shadow director of NN Ireland sufficient to give rise to

broad-scale fiduciary duties under Irish law.

Unlike the broad range of conduct that can give rise to de facto director claims, Irish law

limits the circumstances under which a corporation can be found to be a shadow director to a

specific regulatory framework encompassing only certain types of transactions.  Redmond Decl.

¶¶ 26, 32-34.  An entity that acts as a shadow director of a corporation will not owe duties to that

corporation's shareholders outside specified and limited circumstances.  <u>Id</u>. ¶ 29.  This same

analysis applies to bar NN Ireland's claim that NNI aided and abetted NNL's breaches of duty to

NN Ireland as an alleged shadow director.  A shadow director is only subject to duties in certain

contexts not apposite here, such as transfers to directors, fraudulent and reckless trading, and

disqualification orders.  <u>Id.</u> ¶¶ 31-33.  NN Ireland's allegations do not touch those areas.

Because there is no authority under Irish law to impose a de jure director's broad common law

duties on shadow directors,  <u>id.</u> ¶ 23, for this claim to be sustained, this Court would have to

expand the present boundaries of Irish law.  <u>Id.</u>

**C.      The Claim Includes No Well-Pleaded Allegations of NN Ireland's
          Insolvency Necessary for the Alleged Actions to Constitute a Breach of Fiduciary
          Duty to Creditors**

NN Ireland alleges breach of fiduciary duty claims grounded in allegations that the NN

Ireland directors owed fiduciary duties not only to NN Ireland but also its creditors.  <u>See</u> Claim ¶

86.  It further alleges that each of the transactions on which it bases its claims benefitted NNL,

but was not in the best interests of NN Ireland and its creditors.  <u>Id.</u> ¶¶ 10-11, 21, 33, 48-49, 61-

64, 68-69.  NN Ireland predicates such duties to creditors on an allegation that "given the

doubtful solvency (and/or risk of insolvency) of NN Ireland . . . the directors were obliged at all times to consider the best interests of the creditors of NN Ireland as paramount." Id. ¶ 86.

The Claim does not allege a proper basis to sustain the claim that NNI was any kind of a "director" of NN Ireland.  But the Claim also does not include any well-pleaded allegations that NN Ireland was insolvent, near insolvency, or of doubtful solvency that would then give rise to fiduciary duties by its directors to NN Ireland's creditors.  Indeed, NN Ireland's claim leaves no dispute that it is only the alleged insolvency or doubtful solvency of NN Ireland that required its directors to consider the interests of creditors.  Claim ¶¶ 86, 112.

However, the Claim's allegations concerning NN Ireland's insolvency begin and end with bare legal conclusions.  NN Ireland merely asserts throughout the Claim that NN Ireland was in a state of doubtful solvency or risk of insolvency from 2000 onwards without any – much less any well-pleaded – factual support.  Claim ¶ 86 (alleging "the doubtful solvency (and/or risk of insolvency) of NN Ireland from 2000 onwards"), ¶ 112 (same); see also ¶ 64(b), (d) (alleging NN Ireland "was of doubtful solvency and/or at risk of insolvency" at the time the Irish Dividends were declared).  The repetition of this conclusion is no substitute for factual allegations that would render it plausible.  Indeed, as noted above, in considering the sufficiency of NN Ireland's Claim, the Court must disregard conclusory allegations or bare legal conclusions, and consider only the remaining well-pleaded facts to determine whether each of the elements of a claim has been sufficiently alleged.  Fowler, 578 F.3d at 210; see also Iqbal, 129 S. Ct. at 1950 (in considering a motion to dismiss, the court is "not bound to accept as true [any] legal conclusion couched as a factual allegation" (internal quotation marks and citation omitted)).

For example, there are no allegations that NN Ireland's liabilities exceeded the value of its assets, that particular transactions affected its financial condition, that it was unable to obtain credit on commercial terms, and/or that it was unable to pay debts as they fell due.  See Seidel v. Byron, No. 05-C-6698, 2008 U.S. Dist. LEXIS 76306, at *8 (N.D. Ill. Sept. 26, 2008) (granting motion to dismiss claim for breach of fiduciary duties owed to creditors based only on bare allegation of insolvency, where "[n]othing in the complaint indicates when [the debtor's] liabilities far exceeded its assets, or when it could no longer pay its debts . . . thereby failing to provide notice to defendants"); Official Comm. of Bondholders of Metricom Inc. v. Derrickson, No. C-02-4756 (JF), 2004 U.S. Dist. LEXIS 19497, at *19 (N.D. Cal. Feb. 25, 2004) (dismissing claims that directors breached duties to creditors where plaintiffs "plead no facts that would tend to prove that [debtor] was insolvent or had entered a zone of insolvency"); Angell v. Burell (In re Caremerica, Inc.), 409 B.R. 759, 765 (Bankr. E.D.N.C. 2009) (dismissing preference claim where debtor alleged insolvency without substantiation or factual support); Yelverton v. Homes at Potomac Greens Assocs. (In re Yelverton), Adversary No. 10-10001, 2010 WL 1688403 (Bankr. D.D.C. Apr. 22, 2010) (recitation of insolvency was insufficient to survive motion to dismiss); see also Asarco LLC v. Ams. Mining Corp., 382 B.R. 49, 71 (S.D. Tex. 2007) (denying 12(b)(6) motion on claims for breach of fiduciary duties to creditors where plaintiffs alleged facts that if proven, would support claim of insolvency, including an inability to pay debts as they came due).

This is particularly the case where NN Ireland's allegation suggests, without further specification, that NN Ireland somehow teetered in the zone of insolvency for a full nine years – since 2000 – before commencing administration proceedings.  Claim ¶¶ 86, 112.[47]  NN Ireland's

---

[47]    While the Claim separately includes similar conclusory allegations concerning the alleged financial condition of the Nortel Group as a whole (Claim ¶¶ 6-7, 39), even if proven, these allegations would not satisfy the

own submissions to this Court contradict this allegation, pointing to late 2008 as the relevant period for the zone of insolvency, after which NN Ireland only became insolvent as a result of the January 2009 bankruptcy filings.  See Rolston Irish Statement ¶ 21 (affirming that "following the [bankruptcy] filings in North America . . . it is inevitable that [NN Ireland] *will become* insolvent*" (emphasis added)).[48]  The Claim simply fails to allege sufficient facts that would "nudge[] [its allegations of insolvency] across the line from conceivable to plausible." Twombly, 550 U.S. at 570.  NN Ireland thus cannot ground its claims for a breach of fiduciary duty on duties owed to creditors.

## D.    NNI Owed No Independent Duty of Care Under Irish Law

In claims 3, 9, 19 and 25, NN Ireland asserts that NNI breached a duty of care that it owed to NN Ireland.  With respect to the unidentified Pre-Petition Asset Sales, transfer pricing arrangements, and the Irish Loans and Dividends, the Claim alleges that such a duty existed based on either on NNI's status as an alleged director, or independently as a matter of Irish law. Claim ¶¶ 93-94, 96, 129, 170, 190.

To the extent these duty of care claims are based on NNI's alleged status as a director, as set forth above, NN Ireland's allegations that NNI was a de facto director are not plausible.  See supra Sections II.B.1 and II.B.2.  And, to the extent NN Ireland relies on shadow director allegations, not only are the factual allegations deficient, but the scope of that duty is highly

---

necessary element concerning the financial condition of NN Ireland itself, which the Rolston Irish Statement directly addresses.

[48]    See also Rolston Main Statement ¶ 4 ("I am advised by E&Y [the Joint Administrators] that the predicted impairment on the global business of the Nortel Group as a consequence of those [bankruptcy] filings means that it is inevitable that the Company and the EMEA Companies *will become insolvent*." (emphasis added)); ¶¶ 87-88 (affirming that cash pooling arrangements among the EMEA Companies were "discontinued upon legal advice as of 29 December 2008 given the solvency concerns of the Nortel Group," absent which, "the Cash Pooling Arrangement would almost certainly have remained in place.").

limited and not implicated here.  See supra Section II.B.3.  Because NN Ireland bases claim 25 solely on its directorship allegations, the arguments above are dispositive of that claim.

NN Ireland's alternative allegations based on an independent duty of care are equally faulty.   NN Ireland grounds these duty of care claims in allegations that there was "a relationship of sufficient proximity" between NNI and NN Ireland to justify imposing a duty.  Claim ¶¶ 94, 96, 129, 170, 190.  However, where, as here, a claim involves only pure economic loss, Irish authorities have been very reluctant to extend torts to cover such charges.  Redmond Decl. ¶¶ 46-47.  Typically, this has been confined to actions for negligent misstatement or for the cost of remedying defects in construction cases.  Id. ¶ 46.  The allegations of the Claim are divorced from those contexts in which Irish Courts have imposed such a duty.  Id. ¶¶ 46-47.  Indeed, it would not be fair, just or reasonable to impose a duty of care on NNI where, as NN Ireland repeatedly asserts, its harms arose out of a transfer pricing scheme that also caused NNI to overpay NNL.  See Claim ¶ 50 (acknowledging that under the transfer pricing arrangements, NNI overpaid NNL by at least $2 billion).

## III.

## NN IRELAND'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON NNI FAIL

In claims 2-3, 8-9, 18-19 and 24-25, NN Ireland attempts, and fails, to impose primary liability on NNI for alleged breaches of duty.  In claims 4-7, 10, 12-14, 23 and 26-27 NN Ireland purports to impose secondary liability on NNI – based on the same, inadequate allegations on which NNI's *primary* liability is alleged.  See, e.g., Claim ¶¶ 102-104.  Thus, to the extent NNI was *not* a director of NN Ireland, the Claim asserts the same hodge podge of conclusory assertions as a basis to hold NNI liable for aiding and abetting the *real* (but unidentified)

directors in breaching their fiduciary duties.  This confused stew pot of shifting scenarios in no way helps NN Ireland to sustain these substantively distinct claims under Irish or U.S. law.

Specifically, NN Ireland asserts secondary liability claims against NNI for dishonest assistance under Irish law, aiding and abetting breach of fiduciary duty under U.S. law, and conspiracy under both Irish and U.S. law.  See claims 4-7, 10, 12-14, 23, 26-27.  Each of these claims must be dismissed for insufficient pleading.  Moreover, even if sufficiently pled, the claims are barred by the allegations of NN Ireland's own primary misconduct that underlie its secondary liability claims.

## A.    NN Ireland's Claims for Aiding and Abetting and Dishonest Assistance Fail on Multiple Grounds (Claims 4, 6, 10, 13, 23, 26, 27)

NN Ireland's dishonest assistance and aiding and abetting claims are based on four of the sets of factual allegations in the Claim: (i) transfer pricing (claims 4 and 6), (ii) intercompany loans and dividends (claims 10 and 13), (iii) past business sales (claim 23), and (iv) contingent tax liability (claims 26 and 27).  These are the same factual allegations that underlie NN Ireland's primary claims, which NN Ireland merely recharacterizes as assistance to NN Ireland's de jure directors and/or to NNL as an alleged de facto or shadow director of NN Ireland.  See Claim ¶¶ 104, 115, 136, 150, 184, 191-92.  As a matter of required elements, NN Ireland's causes of action for dishonest assistance and aiding and abetting are essentially duplicative claims asserted alternatively under Irish and U.S. law.  See generally O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.), 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008) (explaining "dishonest assistance" is similar to a state law claim for aiding and abetting breach of fiduciary duty).[49]

---

[49]    As noted above, for purposes of this motion Movants apply the law that NN Ireland asserts is applicable to the Claims.  Movants, however, reserve all rights as to the choice of governing law including, without limitation, as to those claims for which NN Ireland attempts to maintain duplicative claims under both U.S. law and Irish law.

1.      <u>Irish Law</u>

NN Ireland asserts claims for "dishonest assistance" under Irish law in claims 4, 10 and

26.  NN Ireland describes the legal elements for this claim under Irish law as (i) fiduciaries (the

directors of NN Ireland) having breached their fiduciary duties to NN Ireland; (ii) NNI, the

defendant, having procured or asserted that breach; and (iii) NNI having done so dishonestly.

<u>See</u> Claim ¶¶ 100, 102, 104, 133, 191.  Dishonest assistance – referred to as knowing assistance

under Irish law – requires a showing that a defendant knowingly assisted another party in a

dishonest and fraudulent design that caused the plaintiff injury.  <u>See</u> Redmond Decl. ¶ 52.  In the

Irish case of <u>Fyffes plc v. DCC plc</u> [2009] 2 I.R. 417, the court held that plaintiffs had failed to

establish dishonesty for knowing assistance in circumstances where there had been allegations of

insider trading by a director.  <u>Id.</u>

2.      <u>Delaware and Texas Law</u>

NN Ireland also asserts duplicative claims for aiding and abetting breach of fiduciary

duty under U.S. state law in claims 6, 13, 23, and 27, with specific reference to the laws of

Delaware and Texas.  <u>See</u> Claim ¶¶ 110, 147, 180.  Texas and Delaware law require the same

essential elements for such a claim: a breach of fiduciary duty by the primary wrongdoer, the

defendant's knowing participation in that breach, and damages to the plaintiff.  <u>Compare</u> <u>Official</u>

<u>Comm. of Unsecured Creditors</u> <u>ex rel</u> <u>the Debtors' Estates v. Goldman Sachs Credit Partners</u>

<u>L.P. (In re Fedders N. Am., Inc.)</u>, 405 B.R. 527, 543-44 (Bankr. D. Del. 2009), <u>with</u> <u>Floyd v.</u>

<u>Hefner</u>, 556 F. Supp. 2d 617, 654-55 (S.D. Tex. 2008).  Thus, the defendant must have known

that the fiduciary's conduct constituted a breach of the fiduciary's duties.  <u>See</u> <u>In re Fedders</u>, 405

B.R. at 544; <u>Floyd</u>, 556 F. Supp. 2d at 654-55; <u>see also</u> <u>Brug v. Enstar Grp., Inc.</u>, 755 F. Supp.

1247, 1256 (D. Del. 1991) (knowledge is a "critical element" in aiding and abetting liability).

The "kind of scienter required for aiding and abetting claims is actual knowledge. The 'universal rule requires actual knowledge of the tortious conduct by the wrongdoer, not merely that the defendant knew something was wrong in general.'" Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n., No. 10-520 (JBS/KMW), 2011 WL 864421, at *5 (D. Del. Mar. 9, 2011) (citing El Camino Res., Ltd. v. Huntington Nat'l Bank, 722 F. Supp. 2d 875, 905-10, 922 (W.D. Mich. 2010) (collecting cases)); see also Malpiede v. Townson, 780 A.2d 1075, 1097-98 (Del. 2001).[50] With regard to this element, "conclusory allegations such as '[aiding and abetting defendant] had knowledge of the [fiduciary d]efendants' fiduciary duties and knowingly and substantially participated and assisted in the [fiduciary d]efendants' breaches of fiduciary duty, and, therefore, aided and abetted such breaches of fiduciary duties' are insufficient as a matter of law." Greene v. N.Y. Mercantile Exch., Inc. (In re NYMEX S'holder Litig.), C.A. Nos. 3621-VCN, 3835-VCN(JWN), 2009 WL 3206051, at *12 (Del. Ch. Sept. 30, 2009) (alteration in original).[51]

3.    NN Ireland's Allegations Fail to State a Plausible Claim

NN Ireland alleges a scheme by which NNI assisted in the deliberate removal of assets from NN Ireland through various non arm's-length transactions. See, e.g., Claim ¶¶ 9-10, 51. NN Ireland's aiding and abetting and dishonest assistance claims therefore sound in fraud and

---

[50]    Even to the extent that willful blindness or constructive knowledge were sufficient to establish knowledge, NN Ireland's Claim fails under either standard as it is devoid of any well-pleaded facts of constructive knowledge or willful blindness. See Capitaliza-T, 2011 WL 864421, at *5 (noting, without citation, potential ambiguity in Delaware law on sufficiency of willful blindness for aiding and abetting liability); see also United States v. Flood, 327 F. App'x 356, 359 (3d Cir. 2009), cert. denied, 130 S. Ct. 223 (noting that for criminal aiding and abetting a finding of willful blindness or deliberate ignorance satisfies the requisite intent to facilitate the crime); see also United States v. Brodie, 403 F.3d 123, 146-48 (3d Cir. 2005) (providing a detailed discussion of willful blindness in the context of a criminal conspiracy and explaining that to find willful blindness, a jury must conclude that "the defendant himself was objectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability" (internal quotation marks and citation omitted)).

[51]    Moreover, "[t]here must be a clear nexus between the knowledge of the wrong and the substantial assistance in carrying out the wrong." Capitaliza-T, 2011 WL 864421, at *4 (citing Jenkins v. Williams, No. 02-331-GMS, 2008 WL 1987268, at *14 (D. Del. May 7, 2008)).

are subject to Rule 9(b)'s heightened pleading standard.[52]  See Forman v. Salzano (In re

Norvergence, Inc.), 405 B.R. 709, 746-47 (Bankr. D.N.J. 2009) (applying Rule 9(b) to claim of

aiding and abetting breach of fiduciary duty because the underlying violation asserted was a

"fraud enabling the defendants to exploit and loot the debtor for [defendants'] own purposes"

(alteration in original)); see also Adamson v. Bernier (In re Bernier), 282 B.R. 773, 781 (D. Del.

2002) ("whether the transaction is conducted at arm's length" is a factor indicative of an intent to

defraud).

        Similarly, as a matter of Irish law, dishonest assistance requires that the defendant assist

with knowledge of a dishonest and fraudulent design.  See Redmond Decl. ¶ 52, citing Fyffes

plc.  Accordingly, a claim for dishonest or knowing assistance is also subject to Rule 9(b) on this

ground as well.  See Alphastar, 383 B.R. at 274 (dismissing claim for dishonest assistance under

Bermuda law where complaint "fail[ed] to allege with particularity that the [defendants] did

anything that would be considered 'dishonest'"); Roth v. Am. Family Mut. Ins. Co., 567 F.3d

884, 887 (7th Cir. 2009) (holding that "dishonest" has "the primary connotation of theft or

fraud").

        NN Ireland thus must plead these claims with enough detail to put NNI on notice as to

the "precise misconduct" with which it is charged.  See Frederico v. Home Depot, 507 F.3d 188,

200 (3d Cir. 2007) (under Rule 9(b), claimant must plead "the date, time and place of the alleged

fraud or otherwise inject precision or some measure of substantiation into a fraud allegation");

see also Charal Inv. Co. v. Rockefeller (In re Rockefeller Ctr. Props. Inc. Sec. Litig.), 311 F.3d

198, 216 (3d Cir. 2002).

---

[52]     Indeed, as noted above, see supra Section II.B.2, by separately alleging a claim for the breach of the duty of
care, which carries a negligence standard, NN Ireland implicitly concedes that its breach of fiduciary duty claims
involve something more than negligence.  Compare ¶¶ 84-91 (claiming breach of fiduciary duty), with ¶¶ 92-99
(claiming breach of duty of care).  Further, NN Ireland specifically alleges that NNI intended to benefit itself at the
expense of NN Ireland.  See, e.g., Claim ¶ 21.

But even if measured solely under the Rule 8(a) pleading standards, the dishonest assistance and aiding and abetting claims fail. *First*, NN Ireland has failed adequately to plead what wrongful actions NNI took that constitute any knowing or dishonest assistance. *Second*, NN Ireland has failed to adequately plead any underlying breach of fiduciary duty by either its unidentified de jure directors or by NNL acting as an alleged de facto or shadow director of NN Ireland.[53]

> a.   NN Ireland Has Failed Adequately to Plead Any Underlying Breach by NNL Acting As a Shadow or De Facto Director

To the extent NN Ireland relies on an asserted breach of fiduciary duty by NNL as de facto or shadow director as the basis for the aiding and abetting and the dishonest (knowing) assistance claims against NNI, NN Ireland's claim fails. NN Ireland is estopped from asserting that NNL acted as a de facto or shadow director of NN Ireland, for the same reasons that NN Ireland is estopped from making that claim against NNI.[54] See supra Section II.A. Thus, NN Ireland's claims against NNI for aiding and abetting again fail for lack of a well-pleaded allegation regarding the alleged breach of duty underlying the aiding and abetting or dishonest assistance claims.

---

[53]     Notably, nothing in NN Ireland's Claim suggests that NN Ireland has commenced an action against the unnamed de jure directors of NN Ireland who are alleged to have breached their fiduciary duties. Claim ¶¶ 29-30. Nor are the Movants aware of any such action by NN Ireland. NN Ireland thus seeks to hold NNI and NNL liable on an aiding and abetting theory without even attempting to seek any recovery from the primary actors responsible for the underlying breach. See Official Comm. of Unsecured Creditors v. Tennenbaum Capital Partners LLC (In re Radnor Holdings Corp.), 353 B.R. 820, 844 n.3 (Bankr. D. Del. 2006) ("the Court notes that it is strikingly odd to have a trial on aiding and abetting breach of fiduciary duties where the alleged primary wrongdoers (the board) are not named as defendants. The Court is not aware of a single reported post-trial or appellate decision awarding or upholding damages for aiding and abetting breach of fiduciary duty where the primary wrongdoers were not named as defendants."). To the contrary, NN Ireland has, by submitting and relying upon the witness statement of NN Ireland director Sharon Rolston, in the English Court and this Court, vouched for the credibility and honesty of the directors who it now accuses – without suing – of massive wrongdoing.

[54]     In addition, as set forth in Section II.C above, NN Ireland has failed to adequately plead facts to render plausible its allegation that NN Ireland was insolvent. In the absence of such well-pleaded facts, there is no duty owed to creditors that could form the basis for a primary breach of fiduciary duty.

b.    NN Ireland Fails Adequately to Plead Any Knowing Assistance by NNI

NN Ireland's allegations regarding any "knowing assistance" that NNI offered to the NN

Ireland directors are conclusory and must be disregarded for purposes of the motion to dismiss.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).  As explained above, "[k]nowing participation

in a board's fiduciary breach requires that the third party act with the knowledge that the conduct

advocated or assisted constitutes such a breach" and knowledge is a "critical element" in aiding

and abetting liability.  Malpiede, 780 A.2d at 1097; see also Brug, 755 F. Supp. at 1256;

Redmond Decl. ¶ 52 (Irish law requires knowledge of a dishonest design).

NN Ireland's Claim lacks any well-pleaded factual allegations regarding "knowing" or

"dishonest" assistance by NNI to procure breaches of duty by NN Ireland's directors.

**Pre-Petition Asset Sales.**  With respect to the unidentified Pre-Petition Asset Sales that

underlie claim 23, NN Ireland only alleges in conclusory fashion that "NNI, through the

involvement of its directors, officers and senior employees, as explained in Section D [of the

Claim] above, advocated or assisted the conduct by NN Ireland's directors which led to these

breaches."[55]  Claim ¶ 184.  The Claim does not identify any individuals that allegedly offered

assistance to NN Ireland directors (either de facto or de jure), which directors, or what the nature

of that assistance was in connection with the unidentified Pre-Petition Asset Sales.  The Claim

fails to provide any factual detail concerning NNI's alleged involvement in any of the

unidentified Pre-Petition Asset Sales, much less any allegation of how NNI knowingly

participated in or gave assistance to the NN Ireland directors' alleged breach.  In fact, the Claim

is entirely silent on allegations of the process through which any of the unspecified Pre-Petition

Asset Sales were considered or approved.  Nor does the Claim identify any dishonest and

---

[55]    Section D in the Claim, which NN Ireland references in paragraph 184, bears no relation to its (unidentified) Pre-Petition Asset Sale allegations.  Instead, Section D is limited to NNI's alleged involvement in NN Ireland's tax and treasury matters – specifically transfer pricing and the Irish Loans and Dividends.  Claim ¶¶ 13-26.

fraudulent design, as required under Irish law.  <u>See</u> Redmond Decl. ¶ 52.  This is precisely the

type of conclusory allegation that is to be disregarded under <u>Iqbal</u> and <u>Twombly</u>.  <u>See Iqbal</u>, 129

S. Ct. at 1950; <u>Twombly</u>, 550 U.S. at 555.

    **Contingent Tax Liability.**  Claims 26-27 are based on the NN Ireland directors' alleged

breach in respect of various pre-petition tax arrangements.  Claim ¶¶ 186-87.  The Claim,

however, provides no explanation of what actual conduct of NNI gives rise to claims for

dishonest assistance or aiding and abetting.  Instead, claims 26-27 are apparently based on NNI's

alleged involvement in "taxation affairs . . . more generally."  Claim ¶ 71.  The Claim provides

no further allegations on the nature of that involvement or how, if at all, NNI assisted the alleged

breaches of fiduciary duty of NN Ireland's directors.  Indeed, the Claim fails to even identify

those directors.  While NN Ireland twice references in general fashion to "NNI's involvement

and participation (together with NNL, alternatively NN Ireland's de jure directors . . .) in

controlling NN Ireland's tax affairs," this repetition is no substitute for well-pleaded factual

allegations identifying the knowing participation NNI is charged with as to the NN Ireland

directors' alleged breach of fiduciary duties.  Claim ¶¶ 191, 192.

    **<u>Transfer Pricing and the Irish Loans and Dividends.</u>**  NN Ireland's claims arising

from transfer pricing and the Irish Loans and Dividends involve no more substance.  <u>See</u> Claims

4, 6, 10 and 13.  The Claim fails to allege any actions that any individuals undertook on behalf of

NNI to advocate or assist in the alleged breach of fiduciary duties by NN Ireland's directors (or

who those directors even were).  With respect to transfer pricing, the Claim alleges that "NNI,

through the involvement of its personnel in the design, implementation and operation of the

MRDA and RPSM (as described in paragraphs 16 to 19 above) advocated or assisted the conduct

by NN Ireland's directors (whether de jure, de facto and/or shadow) which led to these breaches

of fiduciary duties." Claim ¶ 115. NN Ireland makes parallel allegations as to the Irish Loans and Dividends, alleging generally that "NNI, through the involvement of its directors, officers and senior employees, as explained in paragraphs 20 to 26 above, advocated or assisted the conduct by NN Ireland's directors which led to these breaches." Claim ¶ 150; see also id. ¶ 136. NN Ireland thus alleges that "[n]umerous NNI individuals were aware of and/or participated in the initial discussions relating to these arrangements and the later decisions made as to the use and repayment of the Irish Loans, including the related treatment of the Irish Dividends." Claim ¶ 21.

But the assertion of names without tying them to conduct does not support a plausible pleading of what those individuals allegedly did to render NNI liable. In relation to transfer pricing, for example, the Claim alleges that "[t]he key individuals involved included in particular John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI as well as representatives from the Canadian Entities." Claim ¶ 17. Nowhere, however, does the Claim allege any actions undertaken by Ms. Krebs, and as to Mr. Doolittle the Claim pleads that Mr. Doolittle also held positions with NNL. For the remaining individuals, NN Ireland alleges only that they instructed outside advisors and undertook negotiations with taxation authorities, without alleging any tie such actions had to the NN Ireland directors or their alleged breaches of fiduciary duty. Similarly, the Claim references a number of individuals alleged "at various times" to be NNI employees "within the Tax Department" (Claim ¶ 19), again without explaining what activities each of these individuals undertook. Indeed, nowhere does the Claim allege any instances of contact between these individuals and the NN Ireland directors (whomever they were), much less knowing participation or dishonest assistance in their purported wrongdoing.

Similarly, the Claim perfunctorily references certain individuals' "involvement" "supervision" or "direction" of the matters, without allegations regarding who was "supervised" or "directed," how they "directed," or even if the individuals named were acting on behalf of NNI as an NNI employee.  For example, NN Ireland alleges that "Ryan Smith ('Leader of Global Tax Planning' and an employee of NNI) . . . appears to have focussed on supervising a team which identified cash that could be transferred to NNL and then considered the most tax efficient way of transferring that cash to NNL."  Claim ¶ 23.  Not only does this fail to allege what Mr. Smith did, it in fact points to a "team" without alleging who was on that team or what they did at the direction of Mr. Smith – who, as the Claim acknowledges, "was *seconded to Nortel Networks UK Limited* ("NNUK") from NNI."[56]  Id. ¶ 19 (emphasis added).  As noted above, the Claim's bald allegations fail to allege whether the actions the individuals took were taken on behalf of NNI such that NNI could be held responsible.

Moreover, entirely absent are particularized allegations that NNI actually acted with knowledge that the actions of the NN Ireland directors (whether de jure or otherwise) constituted a dishonest and fraudulent design.  NN Ireland thus fails to allege adequately the requisite elements of scienter/knowing participation and a "dishonest and fraudulent design" entirely and its claims must be dismissed.  See Malpiede, 780 A.2d at 1097; Brug, 755 F. Supp. at 1256; Capitaliza-T, 2011 WL 864421, at *4 (concluding, with regard to an aiding and abetting claim, that "[b]ecause Plaintiff fails to adequately allege the required knowledge element, the Court need not reach the other issues."); see also Redmond Decl. ¶ 52.

---

[56]    See also id. ¶ 24 (alleging that Mark Weisz "was responsible for approving and supervising the implementation of the various initiatives that Mr. Smith and his team identified"); id. ¶ 22  (averring that "[t]he implementation of the Irish Cash Repatriation Strategy was conducted under the ultimate direction of Katharine Stevenson").

**B.      NN Ireland's Conspiracy Claims Must Be Dismissed as NN Ireland Fails to Allege Any Well-Pleaded Allegations to Support Those Claims (Claims 5, 7, 12, 14)**

NN Ireland also asserts duplicative secondary liability claims for conspiracy under Irish law and civil conspiracy under U.S. state (Texas and Delaware) law, all of which require substantially the same elements.  NN Ireland asserts these claims based upon allegations relating to transfer pricing and the Irish Loans and Dividends.[57]

### 1.      Irish Law

Under Irish law, two types of conspiracy in tort exist: (1) conspiracy by unlawful means; and (2) simple conspiracy.

To establish an unlawful means conspiracy NN Ireland must show an agreement between NNI and another to collusively employ unlawful means that injured NN Ireland.  Redmond Decl. ¶ 62.  To establish a simple conspiracy, NN Ireland must show an agreement between NNI and another to act in concert and action in concert to inflict harm to NN Ireland.  Redmond Decl. ¶ 65.  Here, NN Ireland alleges that the conspiracy was undertaken for the "predominant unlawful purpose" of damaging NN Ireland.  Claim ¶¶ 107, 144.

### 2.      Delaware and Texas  Law

The requirements of Delaware and Texas state law are substantially similar to each other and to Irish law.  A claim for conspiracy essentially requires an agreement between two or more persons, who have taken at least one unlawful act, which caused actual damage to a plaintiff.

---

[57]      These conspiracy claims – which fail as a matter of pleading – are themselves arguably duplicative of NN Ireland's aiding and abetting claims.  Allied Capital Corp. v. GC-Sun Holdings, L.P.  910 A.2d 1020, 1038 (Del. Ch. 2006) ("in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law."); see also Triton Constr. Co. v. E. Shore Elec. Servs., Inc., No. 3290-VCP, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009), aff'd, 988 A.2d 938 (Del. 2009) (after trial, refusing to consider conspiracy claim because any relief granted for the conspiracy claim would be redundant of the relief for aiding and abetting).

Compare Allied Capital Corp., 910 A.2d at 1036, with Timberlake v. Synthes Spine, Inc., No. V-08-4 (JDR), 2011 WL 711075, at *11 (S.D. Tex. Feb. 18, 2011).

      3.     NN Ireland's Conspiracy Allegations Fail to State a Plausible Claim

Like NN Ireland's claims for knowing assistance (Irish law) and aiding and abetting breach of fiduciary duty, NN Ireland's conspiracy allegations are subject to Rule 9(b)'s heightened pleading requirements. "The Third Circuit has long required that claims of conspiracy be supported by allegations of specific facts." Brug, 755 F. Supp. at 1255. Accordingly, "[o]nly allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient." Id. (quoting Kalmanovitz v. G. Heileman Brewing Co., 595 F. Supp. 1385, 1401 (D. Del. 1984), aff'd, 769 F.2d 152 (3d Cir. 1985)); see also Miller v. Greenwich Cap. Fin. Prods., Inc. (In re Am. Bus. Fin. Servs. Inc.), 361 B.R. 747, 762 (Bankr. D. Del. 2007); Fierro v. Gallucci, No. 06-CV-5189(JFB)(WDW), 2008 WL 2039545, at *16 (E.D.N.Y. May 12, 2008) ("[T]o survive a motion to dismiss, a complaint must contain more than general allegations in support of the conspiracy. Rather, it must allege the specific times, facts, and circumstances of the alleged conspiracy." (internal quotation marks and citations omitted)).[58]

Here, whether tested under Rule 8(a) or Rule 9(b), NN Ireland's allegations fail. The Supreme Court's decision in Twombly is particularly instructive on this point. There, similar to

---

[58]     Rule 9(b) is particularly applicable because NN Ireland's conspiracy claims are based upon underlying acts allegedly undertaken to loot NN Ireland, and therefore independently sound in fraud. See, e.g., Claim ¶ 118 (accusing NNI of engaging in a conspiracy to "remov[e] value" and loot NN Ireland); see also Allied Capital, 910 A.2d at 1040 n.46 (explaining that the "frequent assertion that civil conspiracy claims require particularized allegations of fact may simply stem from the fact that civil conspiracy claims often do involve fraud."); Chase Bank USA N.A. v. Hess, No. 08-121-LPS, 2011 WL 45132, at *10 (D. Del. Jan. 6, 2011) (noting that conspiracy claims based on fraud should meet Rule 9(b) pleading standard but finding that the claims at issue were based on contractual relations and unjust enrichment, among others); cf. Forman, 405 B.R. at 746-47 (applying Rule 9(b) to claim of aiding and abetting breach of fiduciary duty because the underlying violation was based on fraud).

the allegations here, because the alleged violations occurred over a seven-year span and the complaint "mentioned no specific time, place, or person involved in the alleged conspiracies" the Supreme Court "doubt[ed] that the complaint's references to an agreement among the [defendant companies] would have given the notice required by Rule 8." Twombly, 550 U.S. at 565 n.10. The Supreme Court further contrasted the model form for pleading negligence which alleges that "the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time" with the complaint at issue, which "furnishe[d] no clue as to which of the [defendant companies] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." Id.

NN Ireland's conspiracy claims are similarly devoid of any well-pleaded factual allegations. *First*, conspicuously absent from NN Ireland's pleading are factual allegations of *who* was involved in the alleged conspiracy, *when* any agreement was reached, or *what* was specifically agreed. Instead of pleading who was involved in the conspiracy, the Claim alleges a multiplicity of conceivable combinations: that "NNI and NNL" conspired or "alternatively NNI and the de jure directors of NN Ireland" conspired or yet a third possibility of "NNI, NNL, and NN Ireland's directors" "engaged in a conspiracy together" by implementing and operating the RPSM and MRDA in a manner which operated contrary to NN Ireland's interests. Claim ¶¶ 107, 118. NN Ireland's allegations with regard to the Irish Loans and Dividends also lack specification of who was involved, when the agreement was reached, and what specifically was agreed. Claim ¶¶ 144, 153. The fact that NN Ireland does not identify the alleged participants in the civil conspiracy is fatal to its claim, since without knowing *who* agreed, the necessary allegations of *what* and *when* and how are also lacking. See Brug, 755 F. Supp. at 1255.

*Second*, simply "acting together" – which is all NN Ireland alleges – is not a sufficient basis upon which to allege a civil conspiracy.  NN Ireland must assert "the existence of a confederation or combination" that is a "meeting of the minds on a course of action" by the participants, which is not inferred solely from joint action.  See Twombly, 550 U.S. at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); Boyd v. Tempay, No. 07-377-JJF, 2008 WL 5156307, at *4 (D. Del. Dec. 4, 2008) (dismissing under Rule 8, conspiracy claims as inadequately pled where the complaint failed to allege individual acts were taken as a "conscious commitment to a common scheme" and failed to provide the details of when or where the alleged acts occurred) (internal quotation marks and citation omitted).

As one court noted in dismissing conclusory allegations of conspiracy, "[a]lthough the corporate and business relationships among the several defendants are identified, plaintiffs do not state when and how they allegedly conspired together to commit fraud.  Nor do they allege any meetings, any communications, or any other means for effecting the alleged conspiracy." Brug, 755 F. Supp. at 1255.  NN Ireland has similarly not alleged any meetings, communications or other means for effecting the alleged conspiracy.  Nor does it allege the individuals who agreed to conspire on behalf of NNI, NNL or NN Ireland, much less the specific terms of their agreement.  NN Ireland's bald allegations of conspiracy are similar to those types of conclusory allegations that have repeatedly been rejected by courts.  See, e.g., In re Am. Bus. Fin. Servs., 361 B.R. at 762. [59]

---

[59]    These allegations are particularly deficient in the context of a parent-subsidiary relationship.  See Asarco LLC v. Ams. Mining Corp., 396 B.R. 278, 417-18 (S.D. Tex. 2008) (holding that "the most well-reasoned approach is one that recognizes a cause of action for conspiracy between a parent and subsidiary only when the parent acts

**C.      NN Ireland's Claims For Aiding and Abetting and Conspiracy are Barred by the *In Pari Delicto* Doctrine**

In addition to being inadequately pled, NN Ireland's aiding and abetting and conspiracy claims must be dismissed under the *in pari delicto* doctrine.  "[U]nder the in pari delicto doctrine, a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in."  Am. Int'l Group, Inc. v. Greenberg, 976 A.2d 872, 883 (Del. Ch. 2009), aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re Corp., 11 A.3d 228 (Del. 2010) (internal quotation marks and citation omitted) (hereinafter "AIG").

To bar a claim on *in pari delicto* grounds, a court must only determine that the parties bore "substantially equal responsibility" for a wrongful scheme.  The court need not engage in a detailed accounting of relative fault as that is precisely the type of analysis the doctrine is meant to avoid.  Id. at 883.  Under both Delaware and Texas law, where, as here, the applicability of the *in pari delicto* defense is evident from the face of the complaint, a motion to dismiss should be granted.  See id. at 876-78 (granting a motion to dismiss based upon the *in pari delicto* defense); Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.), 335 B.R. 539, 547 (D. Del. 2005) ("Although *in pari delicto* is an affirmative defense, a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face.") (alteration in original, internal quotation marks omitted); Hill v. Day (In re Today's Destiny, Inc.), 388 B.R. 737, 747 (Bankr. S.D. Tex. 2008) (considering *in pari delicto* defense where necessary facts were within the complaint); see also Official Comm. of  Unsecured Creditors v. Am. Tower Corp. (In re Verestar, Inc.), 343 B.R. 444, 478-81 (Bankr. S.D.N.Y. 2006) (applying *in pari delicto* to dismiss a complaint even where plaintiff argued that an unspecified jurisdiction's law applied as

---

outside its role as 100% owner of the subsidiary.")  NN Ireland has not pled sufficient facts to demonstrate that NNL was acting outside its role as 100% owner of NN Ireland.

"all of the jurisdictions . . . possibly relevant have endorsed either the *Wagoner* Rule or the common law principle of *in pari delicto*").

NN Ireland's secondary liability claims rest on allegations that NN Ireland's own (but unidentified) directors (whether de facto, shadow, or de jure) breached their fiduciary duties. See, e.g., Claim ¶¶ 102, 107, 113, 118.  Such actions and knowledge of top-level management and directors of a corporation are imputed to the corporation.  See AIG, 976 A. 2d at 887 nn.37 & 40.[60]  Accordingly, even assuming the claims were well-pled, which they are not, NN Ireland's claims for aiding and abetting breach of fiduciary duty and conspiracy are nevertheless barred by the *in pari delicto* doctrine.

## IV.

### NN IRELAND FAILS TO ADEQUATELY ALLEGE NNI'S UNJUST RECEIPT OF ANY NN IRELAND PROPERTY

NN Ireland asserts claims for unjust enrichment under U.S. law and unconscionable receipt under Irish law, each predicated on allegations of NNI's wrongful receipt of value at NN Ireland's expense through the Irish Loans and Dividends.  Because NN Ireland fails to allege a direct, plausible, well-pled link between its property and any alleged property or value received by NNI, these claims must be dismissed.

---

[60]    Although there can be an adverse interest exception to this imputation, it is not applicable here.  To qualify for the adverse interest exception, a party needs to allege total abandonment of the corporation's interests by the interested parties.  AIG, 976 A.2d at 891 (citing inter alia Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 827 (2d Cir. 1997)).  In rejecting the adverse interest exception, the court in AIG, noted that the complaint included details about how the company could be said to benefit from the alleged schemes even though those benefits were short-lived.  AIG, 976 A.2d at 891 n.53.  Here, while NN Ireland apparently believes that it could have negotiated a better bargain under a transfer pricing arrangement because the RPSM arrangement did not "adequately" reward it (see, e.g., Claim ¶ 50), there are no allegations that the alleged transactions were entirely detrimental to NN Ireland.

A.    **NN Ireland's Claims for Unconscionable Receipt Under Irish Law Fail on Multiple Bases**

In claims 11 and 21 NN Ireland asserts Irish law claims for unconscionable receipt. Claim ¶¶ 99, 138, 175.  Under Irish law, unconscionable receipt – known as knowing receipt – requires a showing that the defendant received property, which the defendant knew had been taken from the plaintiff through a breach of a fiduciary duty by another party.  Redmond Decl.  ¶ 56.  To satisfy the requirement that NNI received property of NN Ireland as a result of a breach of fiduciary duty, NN Ireland must trace its property to the custody of NNI (although NNI need not have custody of the property today).  Redmond Decl. ¶ 57.  NN Ireland's claims fail because it does not sufficiently or plausibly allege this element or any other elements.

NN Ireland bases claim 11 for unconscionable receipt on the Irish Loans and Dividends. The Claim acknowledges that NNI was not a party to the Irish Loans and Dividends (which were extended and paid by NN Ireland to NNL).  Claim ¶¶ 53, 55-57.  In addition, the Claim entirely fails to identify cash or other assets received by NNI *from NN Ireland* as a result of the Irish Loans and Dividends.  See id. ¶¶ 53-60.  Nor does NN Ireland allege that NNI received NN Ireland's *property* from another source.  Indeed, based on NN Ireland's own allegations, NNI did not receive *any* of NN Ireland's property.  Rather, all that NN Ireland asserts in claim 11 is that "that NNL was only able to make certain cash repayments of the NNI Loans due to the fact that it did not have to repay the April 2008 Loan and/or the June 2008 dividends in cash."  Id. ¶ 139. The Claim does not even attempt to allege that NNL transferred any of the actual loan proceeds received from NN Ireland to NNI.  See id.

NN Ireland similarly fails to adequately allege that NNI received any of its property in connection with the Pre-Petition Asset Sales at issue in claim 21.  Indeed, the Claim fails to even identify any of the Pre-Petition Asset Sales on which its claim is allegedly based.  Moreover,

because NN Ireland deliberately refuses to allege what method of allocation its "arm's length principle" entitled it to, it fails to identify what specific property – if any – was received by NNI that belonged to NN Ireland.

Because the Claim thus fails to allege that NNI received any property from NN Ireland, NN Ireland's allegations fall far short of the tracing requirement of Irish law. See Redmond Decl. ¶ 57. This is particularly the case with a multi-billion dollar entity such as NNL, where NN Ireland's allegations include no facts to suggest that NNL's payments to NNI were made with funds related to NN Ireland. This alone defeats any claim for knowing receipt under Irish law.

Further, even if the Court were to find that NNI did directly receive property of NN Ireland, NN Ireland has not pled sufficient facts to establish that NNI knew these transactions (or these funds) resulted from a breach of NN Ireland's directors' duties, which is also required to state a claim for knowing receipt under Irish law. Redmond Decl. ¶ 56-57.

Also, to the extent this claim rests on allegations that NNL breached its fiduciary duty as a de facto or shadow director of NN Ireland, the doctrines of judicial and collateral estoppel preclude their assertion.

**B.    NN Ireland's Claims for Unjust Enrichment Under Irish Law Also Fail to State a Plausible Claim**

In claim 15, NN Ireland asserts claims for unjust enrichment under Delaware and Texas law. Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Pa. Employee, Benefit Trust Fund v. Zeneca, Inc., 710 F. Supp. 2d 458, 485 (D. Del. 2010); State Farm Bank, F.S.B. v. Manheim Auto. Fin. Servs., Inc., No. 3:10-cv-00519-L, 2010 WL 3156008, at *4-*5 (N.D. Tex. Aug. 6, 2010). There must be (1) an enrichment, (2) an

impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence

of justification, and (5) the absence of a remedy provided by law.  See Metcap Sec. LLC v. Pearl

Senior Care, Inc., No. Civ. A 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007).

While NN Ireland's unjust enrichment claim is similarly predicated on alleged

repayments by NNL to NNI that the Irish Loans enabled, the Claim fails to identify any specific

loan transactions and related repayments between NNL and NNI.  It merely alleges that "NNL

was able to make cash repayments in relation to the NNI Loans," which the Claim describes as

"a number of loans to NNL" that NNI made "[d]uring the period that NNI was involved in the

establishment of the Irish Loans and Irish Dividends."  Claim ¶ 60.  Notwithstanding the

conclusory nature of that allegation, nowhere does the Claim specify the amounts, dates, or

number of any loan repayments from NNL to NNI, nor does NN Ireland allege any facts to

render plausible that NNL could not have otherwise repaid NNI.  Stated simply, NN Ireland has

not alleged enough facts to "nudge[] [its] claims . . . across the line from conceivable to

plausible."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951 (2009) (quoting Twombly, 550 U.S. at 570).

Moreover, although unjust enrichment can be a flexible doctrine, "it is axiomatic that

there must be some relationship between the parties.  A showing that the defendant was enriched

unjustly by the plaintiff who acted *for* the defendant's benefit is essential."  Metcap Sec. LLC,

2007 WL 1498989, at *6 (emphasis in original); State Farm Bank, 2010 WL 3156008, at *5 ("In

order to maintain an action for unjust enrichment, the plaintiff must allege some connection

between parties that could be interpreted as a quasi-contract between them.").

NN Ireland's claims for unjust enrichment fail because NN Ireland does not plead the

requisite causal relationship between enrichment on the part of NNI and impoverishment on the

part of NN Ireland.  As noted, NNI was not a party to the Irish Loans and Dividends.  Therefore,

60

NN Ireland's allegations boil down to the claim NNL "was able" to pay monies to NNI because it chose not to repay the April 2008 Loan and June 2008 Dividends in cash. This fails to plead a sufficient causal relationship. See Metcap Sec. LLC, 2007 WL 1498989, at *6; State Farm Bank, 2010 WL 3156008, at *5. "It is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendants, the plaintiff must look to that person for recovery." Metcap Sec. LLC, 2007 WL 1498989, at *6; see also Pa. Employee, Benefit Trust Fund., 710 F. Supp. 2d at 485.[61] NN Ireland alleges that the Irish Loans and Dividends were undertaken for part of the "Irish Cash Repatriation Strategy," which was designed "with the intention of channeling cash and profit to NNL" from NN Ireland. Claim ¶¶ 51, 52. Accordingly, this bars any claim against NNI. Following NN Ireland's logic, NN Ireland could – based on this unsupported theory – assert unjust enrichment claims against anyone who received any payments from NNL after the Irish Loans and Dividends were put in place, because without them NNL (a multi-billion dollar global entity) would not have "been able" to make such payments. As the first Irish Loan was made in or around June 2006, NN Ireland could recover from potentially millions of people or entities were its meritless theory to be accepted.

---

[61]    See also State Farm Bank, 2010 WL 3156008, at *5 ("In order to maintain an action for unjust enrichment, the plaintiffs must allege some connection between parties that could be interpreted as a quasi-contract between them."). It is important to recall that unjust enrichment was developed as a quasi-contractual or restitution remedy. It is designed to restore an aggrieved plaintiff to the position he occupied prior to his dealings with the defendant, which is accomplished by requiring the defendant to return to the plaintiff any rendered performance to which the defendant is not entitled. See Burlington N. R.R. Co. v. Sw. Elec. Power Co., 925 S.W.2d 92, 96-97 (Tex. App. 1996), aff'd sub nom. Sw. Elec. Power Co. v. Burlington N. R.R. Co., 966 S.W.2d 467 (Tex. 1998) (citing 5 Arthur L. Corbin, Corbin on Contracts § 1102 (1964)). NN Ireland alleges no contractual or quasi-contractual relationship between NNI and NN Ireland concerning the Irish Loans and Dividends.

**V.**

**NN IRELAND'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO
UNSPECIFIED ASSET SALES CAN BE SUMMARILY DISMISSED**

NN Ireland asserts eight different causes of action based on alleged sale transactions that

closed before the Petition Date. Though these claims – numbered 16-23 – are based on a number

of different rights of action, sounding in tort, fraud and/or contract, each is grounded on the same

deficient and entirely conclusory factual allegations that fail to identify any of the transactions at

issue. NN Ireland's claim for transaction at undervalue or fraudulent disposition (claim 22), as

well as its quasi-contractual claims for breach of an implied contract (claim 16), breach of an

implied contract term (claim 17), or mistake (claim 20), must be independently dismissed for

failure to allege elements necessary to state a claim.

**A.      Claims Allegedly Arising from Pre-Petition Asset Sales Fail a Basic Test of
        Notice Pleading**

Most fundamentally, the Claim fails even to *identify* the Pre-Petition Asset Sale

transactions on which claims 16-23 are allegedly based. Instead, these claims are founded on

generalized allegations that "[p]rior to 14 January 2009, NN Ireland entered into *various* global

business sales with other Nortel entities, including NNI, whereby a particular business line was

sold by those Nortel entities to a third party purchaser." Claim ¶ 66 (emphasis added). Nowhere

does the Claim put the Debtors on notice of the transactions at issue in claims 16-23. The Claim

does not allege the dates of the signing or closing, the parties involved, the assets sold, or the sale

price of the unspecified Pre-Petition Asset Sales.

NN Ireland attempts to mask these basic deficiencies by creating a defined term: "Pre-

Petition Sale Proceeds." Claim ¶ 160. This term is defined only as "a fair and appropriate

allocation of the proceeds for the assets [NN Ireland] has sold" in "any pre-petition business

sale." Id. NN Ireland then uses this defined term throughout claims 16-23, again without any

identification of the transactions at issue.  Id. ¶¶ 161-63, 174-76, 182.  This impossibly vague

pleading thus requires dismissal under Rule 8(a).  See Chapa v. Chase Home Fin. LLC, No. C-

10-359 (JGJ), 2010 WL 5186785, at *5 (S.D. Tex. Dec. 15, 2010) (where plaintiff "failed to

provide the loan documents and failed to indicate which loan documents – let alone which

provisions – were breached, [p]laintiff has failed to satisfy the pleading standards of Rule 8(a)");

Smith v. Nat'l City Mortg., No. A-09-CV-881 LY, 2010 WL 3338537, at *11 (W.D. Tex. Aug.

23, 2010) (dismissing breach of contract claim where plaintiffs "[did] not specify what provision

or for that matter what contract was allegedly breached").  Seemingly cognizant of these

deficiencies, the Claim candidly notes that such allegations "will be further particularized

following discovery."  Claim ¶ 160.  Discovery, however, is no substitute for well-pleaded

allegations that satisfy Rule 8(a).  See Iqbal, 129 S.Ct. at 1954 ("[B]ecause respondent's

complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.").

The only agreement relating to the unspecified sales that NN Ireland even alleges is a

"statement dated 24 July 2007," which allegedly set out the "allocation of the proceeds of this

[unspecified] sale."  Claim ¶ 67.  But not having identified any of the sales – much less their

dates, terms, or the assets of NN Ireland involved – NNI has not stated a plausible claim that it

was deprived of anything due it.  See id. ¶¶ 68-69 (stating, without elaboration or reference to

any transaction, that "[t]he allocation that was applied as between the various selling Nortel

entities did not accord with the arm's length principles " and that "[a]s a consequence . . . NN

Ireland received significantly less, and NNI received significantly more, than it was entitled to").

**B.     Claims 16, 17, 20 and 22 Independently Fail to State a Claim**

Aside from the fundamental failure to plead any of the past asset sales upon which claims

16-23 are allegedly based, claims 16 (implied contract), 17 (implied term), 20 (mistake), and 22

63

(transaction at undervalue / fraudulent disposition), independently fail for the reasons set forth below.

1.    <u>Claim 20 Fails Adequately To Plead Mistake</u>

In claim 20, NN Ireland asserts a claim for mistake under Irish law.  While Irish law recognizes common, mutual, and unilateral mistake, NN Ireland's allegations fail to specify which type of mistake it pleads.  <u>See</u> Redmond Decl. ¶¶ 71, 73.  In each case, however, because a claim for mistake is subject to the heightened pleading standard of Rule 9(b), NN Ireland must particularize (1) the mistake; (2) the identity of the individuals who made the mistake; (3) the nature of their misunderstanding; and (4) when and where the mistake occurred.  <u>In re Tronox Inc.</u>, No. 09-10156, 2010 WL 2010844, at *3 (Bankr. S.D.N.Y. May 14, 2010).

NN Ireland's allegations do not approach that standard.  The Claim alleges only that "NN Ireland did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent to which NN Ireland is entitled."  Claim ¶ 174.  As a result, the Claim alleges that "NNI received considerably more from the allocation than it was intended to receive," and NNI "is therefore obligated to repay the overpayment to NN Ireland."  <u>Id.</u>  This falls far short of the particularity required by Rule 9(b).  NN Ireland glaringly fails to identify even the basic nature of the alleged mistake – summarily averring only "a mistake (either of fact or law)."  <u>Id.</u>  Indeed, despite NN Ireland's amendment, the claim fails to even put NNI on notice of the whether a mistake was allegedly made only by NN Ireland or also by NNI and/or NNL, a required element for a claim of common or mutual mistake.  Redmond Decl. ¶ 71(i), (ii).  Even if NN Ireland intended to assert a unilateral mistake claim, that claim would require that NNI misled NN Ireland in an unconscionable manner as to the fact in question, <u>id.</u> ¶ 71(iii) – allegations that are entirely absent from NN Ireland's claim.  Moreover, NN Ireland also fails to offer any identification of (i) the individuals who made the alleged mistake, or (ii) the time and

place where the mistake occurred.  This plainly fails to satisfy either Rule 9(b) or the basic

elements of the cause of action under Irish law.

> 2. <u>NN Ireland Does Not Plead Required Elements of a Transaction at Undervalue /
> Fraudulent Disposition Claim</u>

In claim 22, NN Ireland asserts a claim for transaction at undervalue under Section 238 of

the English Insolvency Act 1986, Claim ¶¶ 176-78, and further alleges that "[i]f a liquidator were

to be appointed in Ireland in relation to NN Ireland, a similar claim could be brought on the basis

that these diversions of cash from NN Ireland to NNI constituted fraudulent dispositions

pursuant to section 139 of the Irish Companies Act 1990." <u>Id.</u> ¶ 179.

The elements of a claim for transaction at undervalue under the English statute are: (i) the

plaintiff entered into a transaction for no consideration or "significantly less" consideration than

the value of what it provided, (ii) during the "relevant time," and (iii) when plaintiff was unable

to pay its debts, or it became unable to pay its debts as a result of the transaction.  Todd Decl.

[D.I. 5971] ¶¶ 121-25.  For "connected persons" – which includes associates of the company –

the "relevant time" is within two years of commencement of administration proceedings.  <u>Id.</u> ¶¶

124-25.

As discussed above, NN Ireland's vague references to "various" unidentified sale

transactions are insufficient to satisfy Rule 8 and must be dismissed out of hand.  Moreover, the

"relevant period" within which NN Ireland could even bring a transaction at undervalue claim is

limited to two years from the date of NN Ireland's administration proceedings.  Todd Decl. [D.I.

5971] ¶¶ 124, 126.  NN Ireland obtained an order of administration on January 14, 2009.

Joksimovic Decl. Ex. H.  The "reach back" period thus extends only to January 14, 2007,

meaning that even if NN Ireland had adequately alleged any sales, claims relating to those that

closed before that date would fail.  NN Ireland cannot avoid this result by reference to its

allegation of a "statement dated 24 July 2007," which allegedly set out the agreed allocation for "this" unspecified sale. Claim ¶ 67. The Claim does not allege what transactions were undervalued and even if the statement were a relevant "transaction," this pleading does not allege that any actual allocation occurred in July 2007. Indeed, a well-pleaded transaction at undervalue claim would require a showing that NN Ireland received consideration that was significantly less than the value of what it sold. See Todd Decl. [D.I. 5971] ¶ 123. NN Ireland's ambiguous reference fails to provide a well pleaded allegation regarding when the assets were transferred or when consideration for those assets was received. NN Ireland thus fails to state a claim.

It is unclear whether NN Ireland is actually advancing a claim for fraudulent disposition under the Irish Companies Act 1990. See Claim ¶ 179 (stating only that "[i]f a liquidator were to be appointed in Ireland in relation to NN Ireland, a similar claim *could* be brought" (emphasis added)). To the extent that NN Ireland does advance such a claim, as a matter of the statute it may be asserted only by a liquidator in an Irish proceeding – not by an entity in U.K. administration insolvency proceedings. See Redmond Decl. ¶¶ 80-81. NN Ireland does not allege that such a liquidator has been appointed. The Claim's conditional "if" makes clear that NN Ireland could not plead the predicate facts. Claim ¶ 179.

3.    Implied Term / Implied Contract

In claims 16 and 17, NN Ireland makes claims for breach of contract on the basis of either (i) "an implied contract as between the selling Nortel entities that the Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length principle," and/or (ii) an implied term contained within "the relevant sale contracts" that "NN Ireland would receive a fair and appropriate allocation." Claim ¶¶ 161, 163.

In either case, NN Ireland does not begin to allege the parameters of the contract or contractual term.  Instead, the Claim only pleads an alleged agreement to allocate "fair[ly]" "based on the arm's length principles."  Id.  Nowhere, however, does NN Ireland allege facts that define the terms of this agreement, or what allocation of proceeds from any (unidentified) Pre-Petition Asset Sales would comply with NNI's alleged contractual obligations.  See Redmond Decl. ¶¶ 102-03 .  Instead, the Claim only alleges the allocation methods that it asserts are not "fair" under arm's length principles:  (i) the allocation that was allegedly applied in accordance with the transfer pricing structure, or (ii) a revenue-based allocation approach.  See Claim ¶¶ 68, 70.  Without alleging the method of allocation that any implied agreement required, the Claim fails to put NNI on notice as to what allocation method would constitute a breach of contract and what method would comport with the alleged contracts or contractual terms.  As a consequence of this deliberate ambiguity, the Claim also fails to allege what action or omission by NNI constituted a breach of these agreements.  Instead, the Claim references only NNI's "participation in the decision making" and "involvement in this regard."  Id. ¶ 162.

This is only compounded by the Claim's general inability to identify the specific pre-petition sales contracts involved.  Accordingly, the "contracts" claims must be dismissed.

## VI.

## NN IRELAND'S CLAIMS IN RESPECT OF FSD LIABILITY SHOULD BE SUMMARILY DISMISSED

In claims 28-31, NN Ireland asserts contingent claims that seek to hold NNI liable for any payments or other financial support that NN Ireland may ultimately be required to provide for the UK Pension Plan.  See Claim ¶¶ 73, 79, 193-198.  NN Ireland asserts these contingent claims under English, Irish, or U.S. law as alternative causes of action for: (i) contribution; (ii) unjust

enrichment and/or subrogation; (iii) subrogation; and (iv) an unspecified "obligation to repay" (together, the "FSD Claims"). Claim ¶¶ 194-98.

These FSD claims must be dismissed. First, because the FSD Claims seek to indirectly hold NNI liable for a Financial Support Direction or Contribution Notice issued in the United Kingdom, they effectively seek an end run around this Court's determination that it will *directly* determine NNI's share of liability, if any, relating to the UK Pension Plan. Even if the Court were to consider the FSD Claims, NN Ireland has failed to allege in anything other than conclusory fashion any basis on which NNI should be held liable for any of NN Ireland's potential FSD liability. Finally, the FSD Claims are quintessential contingent co-debtor claims, subject in any event to disallowance under Section 502(e)(1)(B) the Bankruptcy Code.

## A.    NN Ireland's FSD Claims Fail to Plead a Basis for Imposing Liability on NNI Regarding the UK Pension Plan

As this Court is aware, the UK Pension Trustee and the PPF have directly filed their UK Pension Claims against the U.S. Debtors. Joksimovic Decl. Exs. Q and R. Those UK Pension Claims seek to hold the U.S. Debtors liable in respect of the UK Pension Plan on the basis of a Financial Support Direction or Contribution Notice issued by a UK Determination Panel. This Court has firmly rejected, however, any attempt to hold the U.S. Debtors liable on the basis of a Financial Support Direction or Contribution Notice issued in proceedings in the United Kingdom. Instead, the Court has made clear that it can and will decide NNI's liability, if any, in respect of the UK Pension Plan in the context of the claims of the UK Pension Trustee and the PPF. See, e.g., Joksimovic Decl. Ex. S (Feb. 26, 2010 Hr'g Tr. at 183:13-14 [D.I. 2646] (ruling that the UK Pension Claim "is a claim which the Court, not easily but, certainly, capably, can decide")); In re Nortel Networks Corp., 426 B.R. 84, 92 (Bankr. D. Del. 2010), aff'd, 2011 WL 1154225 (D. Del. Mar. 29, 2011) (observing that "[the PPF and UK Pension Trustee] can obtain

complete monetary relief in this Court at the appropriate time"). Indeed, the Court has enforced the automatic stay against the UK Pension Trustee and the PPF, holding that as to the U.S. Debtors, the U.K. Pension Proceedings – and thus any finding of liability that results from a Financial Support Directive or Contribution Notice – will be "deemed void and of no force or effect." Joksimovic Decl. Ex. T.

NN Ireland cannot reconcile its FSD Claims with these rulings. Each of those FSD Claims asserts that NNI should be held liable as a joint tortfeasor or otherwise on the basis of the same Financial Support Direction or Contribution Notice at issue in the UK Pension Claims. See Claim ¶¶ 76-77, 194, 196-98. But the reasoning of this Court's rulings on the UK Pension Claims – which require this Court to itself determine whether it is reasonable to hold NNI liable in respect of any obligations to the UK Pension Plan – apply with equal force to foreclose liability on the FSD Claims based on proceedings in the United Kingdom. Nothing in NN Ireland's Claim suggests any basis for its FSD Claims other than an FSD or CN.

Even if this Court were to consider the FSD claims, NN Ireland has failed to plead plausible claims for relief. Its Claim asserts no well-pleaded facts on which NNI should be held liable for any FSD liability, let alone NN Ireland's FSD liability. Specifically, each of NN Ireland's various FSD Claims require a showing that NNI is liable for the potential exposure that *NN Ireland* may face in respect of the UK Pension Plan. First, its contribution claim would require a showing of NNI's common liability with NN Ireland under either Irish, English or U.S. law.[62] Second, its subrogation or unjust enrichment claims similarly require that any payments

---

[62]      See Redmond Decl. ¶ 97 ("Contribution is an equitable claim that arises under Irish law only when the plaintiff, as a surety, has paid more than its due proportion of the debt in issue."); English Civil Liability (Contribution) Act 1978 c.47 § 1(1) ("any person liable in respect of damage suffered by another person may recover contribution from any other person liable in respect of the same damage (whether jointly or otherwise)"); Chamison v. Healthtrust, Inc.-Hosp. Co., 735 A.2d 912, 918, 925 n.46 (Del. Ch. 1999) (contribution claim arises "where two or more persons are under a common burden or liability" and "a joint debtor . . . is compelled to pay more than his share"); Beech Aircraft Corp. v. Jinkins, 739 S.W.2d 19, 21 (Tex. 1987) ("The essential prerequisites

made by NN Ireland would have been in respect of an obligation of NNI.[63]  To the extent an

"obligation to repay" even represents a cause of action, NN Ireland's Claim also alleges it is

based on a supposed independent obligation on the part of NNI to repay NN Ireland for any FSD

payment.  See Claim ¶ 198.[64]

However, NN Ireland's Claim is devoid of any factual allegations concerning NNI's

supposed joint liability in respect of any potential UK Pension Plan obligations.  Instead, its

Claim begins and ends with the legal conclusion that NNI is or should be liable.  See Claim ¶

194 ("NN Ireland will or may be entitled as a matter of English law, Irish law, or alternatively as

a matter of US law, to recover a contribution from NNI"), ¶ 196 ("NN Ireland will have been

required . . . to satisfy in whole or in part an obligation owed by NNI"), ¶ 198 ("NNI is otherwise

obligated under English, Irish and US law to repay").[65]  Once the Court disregards such legal

conclusions, as Twombly requires, there are no remaining well-pled facts with which NN Ireland

has "shown" its entitlement to relief.  Twombly, 550 U.S. at 557; see also Santiago v.

Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (a court "disregard[s] legal conclusions" in

---

for a contribution claim are a judgment finding the party seeking contribution to be a joint tortfeasor and the payment by such party of a disproportionate share of the common liability.").

[63]    See Redmond Decl. ¶¶ 92, 96; Murray v. Cadle Co., 257 S.W.3d 291, 299 (Tex. App. 2008) ("There are two key elements to equitable subrogation:  (1) the person whose debt was paid was primarily liable on the debt, and (2) the claimant paid the debt involuntarily"); Reserves Dev. LLC v. Severn Sav. Bank, FSB, No. 2502-VCP, 2007 WL 4054231, at *17 (Del. Ch. Nov. 9, 2007) ("Subrogation rights arise . . . to prevent the unjust enrichment of a party whose obligation is fully performed by another").

[64]    Though NN Ireland's claim 29 makes passing reference to "recoupment," Claim ¶ 196, recoupment is not a cause of action, but rather a remedy or defense and thus need not be addressed independently.  See, e.g., Redmond Decl. ¶ 95; DHP Holdings II Corp. v. Peter Skop Indus., Inc. (In re DHP Holdings II Corp.), 435 B.R. 220, 232 (Bankr. D. Del. 2010) (recoupment is "the setting up of a demand arising from the same transaction as plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." (citation omitted)); Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 260-61 (3d Cir. 2000) (stating "the right of recoupment is a defense, not a claim"); Rolls-Royce Corp. v. Heros, Inc., 576 F. Supp. 2d 765, 790 (N.D. Tex. 2008) ("Recoupment is a defense" and "is available to defendant so long as plaintiff's claim survives.") (internal quotations marks and citations omitted).

[65]    Even to the extent that NN Ireland's Claim suggests that the FSD Claims are based on its allegations concerning NNI's alleged role in the corporate governance of NN Ireland (see Claim ¶ 194 (referencing "breaches of the duties owed by NNI to NN Ireland referred to in this proof of claim")), those conclusory allegations are similarly deficient for the reasons set out in Section II above.

assessing adequacy of claims); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 320 n.18 (3d

Cir. 2010) ("The touchstone of Rule 8(a)(2) is whether a complaint's statement of facts is

adequate to suggest an entitlement to relief under the legal theory invoked . . . .").

While NN Ireland asserts that "[f]ull particulars of [its FSD] claim are subject to the

circumstances leading to NN Ireland's obligation" (Claim ¶ 198), any factual basis on which

NNI should be treated as a joint tortfeasor or primary obligor depends not on the amount of any

Contribution Notice that is ultimately issued, but on the pre-petition relationship between the

parties and operation of the UK Pension Plan.  Despite the passage of nearly three years since the

Joint Administrators' appointment and the Court's order for a more definite statement, the Claim

is devoid of any factual allegations on this critical point.  Iqbal and its progeny thus require

dismissal of the FSD Claims.[66]

**B.     NN Ireland's FSD Claims Must be Disallowed Under the Bankruptcy Code**

Even if NN Ireland had adequately pled claims for contribution, subrogation, or unjust

enrichment, the Bankruptcy Code would mandate that its FSD Claims be disallowed.  Section

502(e)(1)(B) provides, in relevant part, that a bankruptcy court "shall disallow any claim for

reimbursement or contribution of an entity that is liable with the debtor on or has secured the

claim of a creditor, to the extent that . . . such claim . . . is contingent as of the time of allowance

or disallowance . . . ."  11 U.S.C. § 502(e)(1)(B).  The Bankruptcy Code mandates disallowance

where three elements are satisfied: "(1) the claim must be one for *reimbursement or contribution*;

---

[66]     Moreover, to state a valid claim for subrogation, the underlying obligation must be one for which NN Ireland was not primarily liable.  See Severn Sav. Bank, 2007 WL 4054231, at *17.  Here, NN Ireland's Claim is predicated on a potential FSD or CN under which *NN Ireland is ultimately required . . . to make a payment or series of payments.*"  Claim ¶¶ 196-97 (emphasis added).  On this basis alone, NN Ireland has thus pled itself out of a valid cause of action for subrogation in claims 29 and 30.  Nationwide Mut. Ins. Co. v. Kesterson, 575 A.2d 1127, 1130 (Del. 1990) (rejecting subrogation claim by plaintiff whose claim was premised upon a payment "made as a result of the federal action which resulted in a judgment against [the plaintiff] directly," which thus discharged its own primary obligation).

(2) the entity asserting the claim for reimbursement or contribution must be '*liable with the debtor*' on the claim; and (3) the claim must be *contingent* at the time of its allowance or disallowance." In re APCO Liquidating Trust, 370 B.R. 625, 631 (Bankr. D. Del. 2007) (emphasis added) (quoting In re Provincetown-Boston Airlines, Inc., 72 B.R. 307, 309 (Bankr. M.D. Fla. 1987), and citing additional cases). The FSD Claims satisfy each of these elements for disallowance.

First, NN Ireland's own pleadings demonstrate that its FSD Claims are contingent. A claim is considered "contingent" for the purposes of Section 502(e)(1)(B) if it "has not yet accrued and is dependent upon some future event that may never happen." In re Touch Am. Holdings, Inc., 409 B.R. 712, 716 (Bankr. D. Del. 2009) (internal punctuation and citation omitted). Here, NN Ireland's FSD Claims begin by conceding that "[a]t the present time, it is *not yet known* . . . whether any one or more of the EMEA Targets [including NN Ireland] will ultimately be required pursuant to an FSD or CN to make a payment." Claim ¶ 193 (emphasis added). Each of its causes of action is similarly clear that the FSD Claims arise only "in the event that NN Ireland is ultimately required pursuant to an FSD or CN to make a payment." Claim ¶¶ 194, 196-98.

Second, the FSD Claims are predicated on NNI's alleged "liability with" NN Ireland in respect of any Financial Support Direction or Contribution Notice. "Courts have held that the phrase 'an entity that is liable with the debtor' is broad enough to encompass any type of liability shared with the debtor, whatever its basis." Norpak Corp. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 131 F.3d 1185, 1190 (6th Cir. 1997) (internal quotation marks, citations, and alterations omitted) (citing cases).

Both NN Ireland's pleadings and public records of the FSD proceedings upon which NN Ireland's pleadings are based make clear that NN Ireland and NNI are alleged to be co-liable in respect of the FSD Claims.  See Joskimovic Decl. Ex. U (listing NNI and NN Ireland as subject to the then-pending FSD).[67]  Indeed, the FSD Claims are by their nature premised upon monies allegedly owed by NNI directly to the Trustee, which the Trustee allegedly might require NN Ireland to pay in NNI's stead.  See Claim ¶ 195 (averring that if NN Ireland is required to make payments to the U.K. Pension Trustee, NN Ireland should recover from NNI "having regard to the extent of NNI's responsibility for the damage in question."); see also In re Baldwin-United Corp., 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985) ("By its very nature a claim for contribution presupposes a sharing of liability and thus a codebtor relationship.").  The same holds true for NN Ireland's alternative claims for subrogation, unjust enrichment, or unspecified "obligation to repay."  Claim ¶¶ 194-98; see also In re Eagle-Picher, 131 F.3d at 1190 ("[S]o long as [claimant] and [debtor] are both potentially responsible . . . , the legal theory underpinning that shared responsibility is irrelevant.").[68]

Finally, the FSD Claims plainly sound in "reimbursement or contribution" as Section 502(e) requires.  Whether a contingent claim sounds in "reimbursement or contribution" is construed broadly, "encompass[ing] every possible right to compensation for paying the debt of another . . . ."  Celotex Corp. v. Allstate Ins. Co. (In re Celotex Corp.), 289 B.R. 460, 466

---

[67]    Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (On a motion to dismiss, a court "may consider ... any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.") (internal quotations and citations omitted).

[68]    Notably, the applicability of Section 502(e)(1)(B) turns neither upon a final determination of liability nor even upon the filing of claims against a debtor, but rather upon the existence of *potential* claims for which the debtor is co-liable.  See In re APCO Liquidating Trust, 370 B.R. 625, 634 (Bankr. D. Del. 2007) (co-liability for purposes of Section 502(e)(1)(B) "is not premised upon the filing of multiple claims but, rather, on the actual existence of such claims") (internal quotation marks and citations omitted).  For the avoidance of doubt, the U.S. Debtors indeed do not admit co-liability in respect of the UK Pension Plan, and reserve all of their rights and defenses with respect to any claim in conjunction therewith.

(Bankr. M.D. Fla. 2003); <u>In re Wedtech, Corp.</u>, 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988)

("[Reimbursement] is a broad word which encompasses whatever claims a codebtor has which

entitle him to be made whole for monies he has expended on account of a debt for which he and

the debtor are both liable."). NN Ireland's claim for contribution (claim 28) falls within the

literal text of this requirement. Its remaining claims similarly qualify, as they are each asserted

on the "basis that NN Ireland will have been required . . . to satisfy in whole or in part an

obligation owed by NNI." Claim ¶¶ 196-98; <u>see also</u> <u>In re Celotex</u>, 289 B.R. at 466 (the terms

reimbursement and contribution "encompass every possible right to compensation for paying the

debt of another"); <u>Aetna Cas. & Sur. Co. v. Ga. Tubing Corp.</u>, 93 F.3d 56, 57 (2d Cir. 1996)

(claim for "prospective" subrogation was properly disallowed under Section 502(e)(1)(B)).

    The FSD Claims fall squarely within the class of contingent claims disallowed by Section

502(e)(1)(B). While claims 28-31 independently fail to state a claim and thus should be

dismissed with prejudice, at minimum, Section 502(e)(1)(B) compels their disallowance.

## VII.

### <u>NN IRELAND'S CLAIMS RELATING TO TRANSFER PRICING, IRISH LOANS, AND PRE-PETITION ASSET SALES ARE TIME-BARRED</u>

    In addition to their basic pleading deficiencies, certain of NN Ireland's claims predicated

on transfer pricing agreements, the Irish Loans, and Pre-Petition Asset Sales (claims 2-7, 8-14,

16-21, 23, collectively the "<u>Time-Barred Claims</u>") are, with the exception of a single transaction,

time-barred under Delaware's three-year statute of limitations. Although NN Ireland and NNI

entered into a tolling agreement approved by this Court, that agreement makes clear that it does

not revive causes of action – such as the Time-Barred Claims – whose limitations period ran prior to its effective date.[69]

For choice of law purposes, statutes of limitations are procedural rather than substantive. See Norman v. Elkin, No. 06-005-JJF, 2007 WL 2822798, at *3 (D. Del. Sept. 26, 2007); Winstar Holdings LLC v. Blackstone Grp. LP (In re Winstar Commc'ns Inc.), 435 B.R. 33, 44 (Bankr. D. Del. 2010). Accordingly, "the law of the forum generally determines whether an action is barred by the statute of limitations." Winstar, 435 B.R. at 44.[70] Delaware's borrowing statute, in turn, provides that where an action arises outside of Delaware, "an action cannot be brought . . . to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose." 10 Del. C. § 8121. Because this borrowing statute requires the application of the *shorter* limitations period, if a claim is time-barred under Delaware law, it is untimely as a matter of law without consideration of non-Delaware law. See Burrell v. AstraZeneca LP, No. 07C-04-267 (JRS), 2010 WL 3706584, at *4 (Del. Super. Ct. Sept. 20, 2010); Winstar, 435 B.R. at 44.[71]

---

[69]    See Order Approving Stipulation Among the Debtors and the Joint Administrators on Behalf of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited Regarding Tolling of Certain Claims, entered Dec. 17, 2010 [D.I. 4623], Exhibit A ¶ 9 (confirming that the stipulation "shall not operate to revive any NNUK Claim or NN Ireland Claim . . . that as of [December 17, 2010] was already barred by any Limitations Period.").

[70]    The fact that NN Ireland's claims involve alleged fiduciary duties of non-Delaware corporations should not vary this analysis. See Norman, 2007 WL 2822798, at *3 (D. Del. Sept. 26, 2007) (internal affairs doctrine does not trump Delaware borrowing statute for fiduciary duty claims because limitations period is procedural not substantive); Winstar, 435 B.R. at 44 (situs of tort or injury not dispositive as to applicable statute of limitations). Even to the extent that the Court were to find the internal affairs doctrine relevant to certain of NN Ireland's causes of action, the doctrine has no bearing on NN Ireland's claims for conspiracy (claims 5, 7, 12, 14), breach of contract (claims 16-17) or contractual mistake (claim 20).

[71]    The application of Delaware's borrowing statute should not depend on the bankruptcy forum in which NN Ireland has filed its Claim. See Winstar, 435 B.R. at 45 (finding no special circumstances that would require the bankruptcy court to vary application of Delaware borrowing statute). Indeed, bankruptcy courts both within and outside the Third Circuit routinely apply the literal terms of the borrowing statute of the forum state to bar untimely creditor claims. Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.), 333 B.R. 251, 260 (Bankr. W.D. Pa.) (dismissing creditor's claims as barred by Pennsylvania borrowing statute where Pennsylvania was the forum state for the debtor's bankruptcy and Pennsylvania law required use of its own limitations period if

Under Delaware law, a three-year statute of limitations applies to NN Ireland's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, dishonest assistance, civil conspiracy, breach of contract, breach of the duty of care, and unjust enrichment.  See 10 Del. C. § 8106; End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.), 250 B.R. 168, 184 (D. Del. 2000); Eames v. Nationwide Mut. Ins. Co., No. 04-1324 (KAJ), 2006 WL 2506640, at *4 (D. Del. Aug. 29, 2006) (civil conspiracy claim is governed by statute of limitations for underlying claims).[72]   In each case, the statute of limitations runs from the time of the alleged wrongful act, even if the plaintiff was unaware of the cause of action at the time.  Fruehauf, 250 B.R. at 184; SmithKline Beecham Pharm. Co. v. Merck & Co., 766 A.2d 442, 450 (Del. 2000). As the allegations of the Claim itself make clear, the Time-Barred Claims have been brought more than three years since the time of certain of the alleged wrongful acts.

First, NN Ireland entered into the MRDA in December 2004.  See Claim ¶ 40.  As the Claim admits, "[t]he MRDA provided the architecture and *contractual basis* to enable the RPSM

---

shorter); Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 606 (2d. Cir. 2001) (affirming that bankruptcy courts should apply the borrowing statute of the forum state to bar untimely claims, as bankruptcy context creates no sufficient federal interest to depart from state law); In re Coudert Bros. LLP, No. 09 Civ. 9561, 2010 WL 2382397, at *2-*3 (S.D.N.Y. June 14, 2010) (affirming bankruptcy court's dismissal of creditor's claims against debtor as time-barred under New York borrowing statute over creditor's assertion that claims were timely under English law). Moreover, where the Joint Administrators for NN Ireland have asserted that the Claims are "inextricably intertwined" with allocation of the proceeds of asset sales conducted under the supervision of this Delaware Court (see Joint Administrators' Response to the Debtors' Motion for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, dated April 15, 2011 [D.I. 5255] ¶ 7), the Claims are divorced from those authorities which would decline to apply Delaware's borrowing statute in favor of another jurisdiction.  Winstar, 435 B.R. at 45-46 (declining to apply New York limitations period where claims concerned "due diligence performed in this case . . . as part of the sales process approved by this Bankruptcy Court, using professionals employed with the approval of this Bankruptcy Court."); see Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings LLC), 426 B.R. 488, 502 (Bankr. D. Del. 2010) (applying California statute of limitations where pre-petition transaction lacked other ties to Delaware).

[72]      As this three-year limitations period applies to NN Ireland's claims for aiding and abetting breach of fiduciary duty, it similarly applies to NN Ireland's duplicative Irish law claims for "dishonest assistance" or knowing assistance.  AlphaStar, 383 B.R. at 274 (holding that dishonest assistance claims are akin to state law claims for aiding and abetting breach of fiduciary duty).  Compare Redmond Decl. ¶ 50 (knowing assistance claim "[k]nowing assistance requires a showing that defendant knowingly participated in a dishonest and fraudulent design by another [director] that injures the plaintiff"), with Official Comm. of Unsecured Creditors ex rel the Debtors' Estates v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.), 405 B.R. 527, 543 (Bankr. D. Del. 2009) (elements of aiding and abetting claim are: (i) breach of a fiduciary duty, (ii) substantial participation by defendant, (iii) with knowledge of the breach).

[transfer pricing method] to be applied." Id. (emphasis added).  As of December 2004, NN

Ireland was thus contractually obligated to participate in the Nortel Group's transfer pricing

system.  See, e.g., id. ¶ 49(a) (referencing NN Ireland's "contractual right[s]" under the MRDA).

Indeed, it is this decision to "participate" in the RPSM on which NN Ireland bases its transfer

pricing claims.  Id. ¶ 98 (asserting that "the RPSM and MRDA was clearly not in NN Ireland's

best interests.  NNI breached its duty of care in causing NN Ireland to participate under such

arrangements").[73]

    Even where NN Ireland attempts to frame its claims as relating to the "operation" or

"implementation" of the RPSM under the MRDA (see, e.g., Claim ¶ 98), Delaware law is clear

that its transfer pricing claims arose upon entry into the MRDA in December 2004 rather than

during any period of its operation.  See Marvel Entm't Grp., Inc. v. Mafco Holdings, Inc. (In re

Marvel Entm't Grp., Inc.), 273 B.R. 58, 72-74 (D. Del. 2002) (subsidiary's claims for breach of

fiduciary duty against parent based on allegedly unfavorable tax-sharing agreement accrued upon

the subsidiary's entry into the contract, not dates or accrual of performance of obligations); Kahn

v. Seaboard Corp., 625 A.2d 269, 274 (Del. Ch. 1993) (where "wrong alleged is the use of

control over [subsidiary] to require it to enter into a contract that was detrimental to it and

beneficial, indirectly, to defendants . . . such wrong occurred at the time that enforceable legal

rights against [subsidiary] were created.").  However, NN Ireland did not assert any claims

against the U.S. Debtors until its Placeholder Claim was filed in September 2009 – more than

four and a half years after NN Ireland entered into the MRDA.  Those MRDA-related claims

were time-barred under Delaware law no later than December 2007 – long before the U.S.

Debtors even commenced these Chapter 11 proceedings.  Accordingly, even assuming arguendo

---

[73]    See also Claim ¶ 102 (basing NN Ireland's dishonest assistance claim on "causing or allowing NN Ireland to participate in the non arm's length compliant RPSM and MRDA arrangements"); ¶ 113 (basing aiding and abetting claim on "bringing about and allowing NN Ireland's participation in the RPSM and MRDA").

that the Placeholder Claim put the U.S. Debtors on notice of NN Ireland's claims in relation to

transfer pricing, claims 2-7 arise from *entry* into the MRDA and must be dismissed as

untimely.[74]

Second, the result is the same for certain of NN Ireland's claims that allegedly arise from

Pre-Petition Asset Sales and the Irish Loans – each of which were time-barred well before the

U.S. Debtors' agreement to toll any limitations period on NN Ireland's claims.[75]  Although the

Claim fails even to allege a single transaction on which claims 16-23 are based, NN Ireland does

allege that "the allocation of the proceeds of this [unspecified] sale . . . was set out in a statement

dated 24 July 2007."  Claim ¶ 67.  Even if NN Ireland's claims accrued on the date of this

alleged statement (rather than the date of the prior unspecified asset sale), those claims were

time-barred no later than July 2010 – nearly a year prior to NN Ireland's filing of the Claim in

---

[74]        Assuming arguendo that Delaware's borrowing statute did not apply, NN Ireland's claim for alleged aiding and abetting breach of fiduciary duty based on NN Ireland's agreement to transfer pricing systems (claim 6) is nonetheless time-barred.  The only other state whose law NN Ireland specifically suggests could apply to claim 6 is Texas.  Texas applies either a three or four year statute of limitations to aiding and abetting breach of fiduciary duty claims.  See Quilling v. Compass Bank, No. 3:03-CV-2180-R (JB), 2004 WL 2093117, at *3 n.6 (N.D. Tex. Sept. 17, 2004) (Texas imposes a three year statute of limitations on aiding and abetting fiduciary duty claims); Bonner v. Henderson, No. 05-99-01582-CV (MW) (CIW) (JRR), 2001 WL 301581, at *6 (Tex. App. Dall. Mar. 29, 2001) (deciding that "the limitations period for appellant's . . . knowing participation in breach of fiduciary duty should be four years").  As such, even under Texas law, claims based on NN Ireland's entry into the MRDA in December 2004 – brought at the earliest in September 2009 – are nonetheless time-barred.

[75]        While the limitations period for NN Ireland's Pre-Petition Asset Sale and certain Irish Loans claims expired after the U.S. Debtors' petition date, Section 108 of the Bankruptcy Code does not render these claims timely.  Even if Section 108(a) could apply to a Chapter 15 debtor, this Court's EMEA Recognition Order was not entered until January 2011, and makes no mention of relief under Section 108.  See In re Bancredit Cayman Ltd., No. 06-11026(SMB), 2007 Bankr. LEXIS 3805, at *7 (Bankr. S.D.N.Y. Nov. 2, 2007) (rejecting attempt to apply Section 108(a) to Chapter 15 debtor whose recognition order did not provide for such relief, noting that in any event "the argument that Section 108 is already available to trustees is hard to fathom since the foreign representatives are not trustees"); In re Fairfield Sentry Ltd., No. 10-13164 (BRL), 2011 Bankr. LEXIS 1895, at *25 (Bankr. S.D.N.Y. May 23, 2011) (granting Chapter 15 debtor relief under Section 108(a) where proposed orders put defendants on notice, providing potential defendants with an opportunity to be heard).  Nor can NN Ireland rely on the tolling provisions of Section 108(c).  By its terms, Section 108(c) applies to creditors whose claims would be time-barred based on their inability to commence action "in a court other than the bankruptcy court" because of the pendency of the automatic stay.  11 U.S.C. § 108(c).  Nothing precluded NN Ireland, however, from filing a proof of claim – or even an adversary proceeding – against the U.S. Debtors in this Court before an intercompany bar date was set.  Indeed, while the EMEA Debtors did file their Placeholder Claim in September 2009, it failed to so much as mention the Irish Loans or any Pre-Petition Asset Sale.  Section 108 is thus unavailing to NN Ireland or the other EMEA Debtors, to whom the same arguments apply.  See Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited, dated July 15, 2011 at 74-80 [D.I. 5970].

June 2011, and six months before the U.S. Debtors agreed to toll NN Ireland's claims.  Likewise,

NN Ireland bases its claims relating to the Irish Loans in part on an alleged June 2006 loan

facility that was repaid in July 2006.  See Claim ¶¶ 53, 64(f), 65(a), 125(a).  The limitations

period on NN Ireland's claims relating to that June 2006 Loan expired at the latest in July 2009 –

before its Placeholder Claim was even filed.[76]

NN Ireland cannot salvage its alleged claims arising from any Pre-Petition Asset Sales by

suggesting that such claims – first asserted in June 2011 – somehow "relate back" to its

Placeholder Claim.  An amendment to a proof of claim will relate back only if it asserts a claim

"that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in

the original pleading."  Fed. R. Civ. P. 15(c)(1)(B); see also Coan v. O & G Indus., Inc. (In re

Austin Driveway Servs., Inc.), 179 B.R. 390, 395 (Bankr. D. Conn. 1995) ("[W]hen the amended

pleading does not rely upon the facts and transactions originally pled or plead them more

specifically, but rather is based on new facts and different transactions, the proposed amendment

will not relate back to the original pleading.").  The essential inquiry "is whether the defendant

was given adequate notice that such claims might be made upon examining the facts alleged in

the original pleading."  Rescuecom Corp. v. Khafaga (In re Khafaga), 431 B.R. 329, 334-35

(Bankr. E.D.N.Y. 2010) (internal quotation marks and citation omitted).[77]  The Placeholder

Claim simply failed to provide such notice: it included no mention of any Pre-Petition Asset

Sales whatsoever.  Instead, the Placeholder Claim asserted only "potential claims . . . arising out

---

[76]    The only other state whose law NN Ireland specifically suggests could apply to its state law claims is
Texas, which applies a shorter two-year statute of limitations to claims for civil conspiracy.  See Jackson v. W.
Telemarketing Corp. Outbound, 245 F.3d 518, 523-24 (5th Cir. 2001).  Accordingly, regardless of whether Texas or
Delaware law applies, claim 14 for civil conspiracy arising from the Irish Loans is time-barred.

[77]    See also Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.), 307 B.R. 787, 790 (Bankr. D. Del. 2004)
("focus[ing] on the notice given by the general fact situation stated in the original pleading.") (internal quotation
marks and citation omitted); In re Edison Bros. Stores, No. 99-529 (JCA), 2002 Bankr. LEXIS 1228, at *10 (Bankr.
D. Del. May 15, 2002) (amendment to claim will not relate back where it does not give debtor fair notice of the
conduct, transaction, or occurrence that underlies the alleged liability).

of transfer pricing, intercompany dealings, trading and other arrangements or agreements between them." Placeholder Claim ¶ 2. The Placeholder Claim thus focused on potential transfer pricing claims, and failed to put NNI on notice that NN Ireland intended to assert claims relating to Pre-Petition Asset Sales.[78] Nor can NN Ireland rely on any generic references to "intercompany dealings,"[79] or any notice allegedly provided outside of the four corners of the proof of claim[80] as a basis to permit relation back.

By entering the EMEA Claims Order, the Court has already recognized that the Placeholder Claim failed to adequately plead any basis for relief against NN Ireland. EMEA Claims Order ¶ 3 ("If the Claimants do not file . . . amended Proofs of Claim by June 1, 2011, the Proofs of Claim . . . will be disallowed and expunged with prejudice."). Thus, there is no adequately pled timely claim arising from any Pre-Petition Asset Sales to which the claims can now "relate back." See Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, at 149 n.3 (1984) (where an initial pleading is insufficient, it cannot be "rehabilitated" by invoking relation-back); United States v. Crawley, No. H-09-3457 (FHS), 2010 WL 4393970, at *11 (S.D. Tex. Oct. 29,

---

[78]      See In re MarchFirst, Inc., 448 B.R. 499, 508 (Bankr. N.D. Ill. 2011) (amendments did not relate back where "[t]he original and amended requests arise out of entirely different conduct at entirely different times"); Khafaga, 431 B.R. at 334 (factual discrepancies between original and amended claims – different time frames, different alleged conduct, and different operative facts – preclude a finding that the amended claim relates back); In re Global Link Telecom. Corp., 327 B.R. 711, 716 (Bankr. D. Del. 2005) ("[A]n amended complaint will relate back if it merely adds a new legal ground for relief, changes the date and location of the transaction alleged, . . . spells out the details of the transaction alleged, . . . [or] merely increas[es] the ad damnum clause . . . .").

[79]      See In re Milan Steel Fabricators, Inc., 113 B.R. 364, 367 (Bankr. N.D. Ohio 1990) (amended IRS claim for highway taxes could not relate back to an original claim for unemployment taxes based on generalized references to "taxes due under the Internal Revenue Laws of the United States").

[80]      See Khafaga, 431 B.R. at 334 (rejecting arguments that defendant had adequate notice of allegations in amended claim allegations by virtue of examination conducted prior to commencement of adversary proceeding); Bank Brussels Lambert v. Chase Manhattan Bank, N.A., No. 93 Civ. 5298 (LMM), 1999 WL 672302, at *2 (S.D.N.Y. Aug. 27, 1999) (holding that the requisite notice must be given by the allegations set forth in the original complaint).

2010) (amended claim did not relate back where original filing was "completely devoid of facts, much less operative facts").[81]

## CONCLUSION

WHEREFORE, the Movants respectfully request that the Court (i) sustain this Objection and grant this Motion; (ii) enter the proposed order attached hereto as Exhibit A disallowing and expunging with prejudice claims 2 through 31 asserted in claim number 7774 (and to the extent it is not superseded and replaced by claim 7774, claim number 5089); and (iii) grant such other and further relief as the Court deems just and proper.

Dated:  July 22, 2011
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

---

[81]    That the newly-brought claims were filed in response to the Court's order for a more definite statement certainly cannot help NN Ireland. In re Maxim Truck Co., Inc., 415 B.R. 346 (Bankr. S.D. Ind. 2009) (dismissing claims asserted for the first time in an amended claim filed pursuant to court's order for a more definite statement).

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee*
*of Unsecured Creditors*