IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF
DELAWARE

×

*In re*

Nortel Networks Inc., *et al.*,[1]

Debtors.

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

×

## DECLARATION OF AIDAN REDMOND SC IN SUPPORT OF THE JOINT OBJECTION AND MOTION TO DISMISS THE CLAIMS OF NORTEL NETWORKS IRELAND (NORTEL IRELAND)

I, Aidan Redmond SC, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

## A.     INTRODUCTION

1.     My educational background and professional experience qualify me to address the Court on the Irish law issues discussed in this declaration. I am a practicing barrister having been admitted to the Bar of Ireland in Michaelmas 1987 and to the Inner Bar in Michaelmas 2008. I graduated from Trinity College Dublin with a law degree in 1985 and from the Honourable Society of King's Inns with a BL in 1987. In my early years at the Bar I lectured on Company and Commercial Law and also began to practice in those areas concentrating on debt recovery and asset recovery. I have maintained those areas of practice which overlap with practice in the areas of commercial property, commercial investment and professional negligence arising therefrom.

---

[1]     I am informed that the debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226), (collectively the "U.S. Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

2. I submit this declaration in support of the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland ("Nortel Ireland" and the "Motion" respectively). Except as otherwise indicated, all statements set forth in this declaration are based upon my opinions, experience and knowledge, the Irish authorities which are cited herein, and the Proof of Claim dated June 3, 2011 filed by Nortel Networks Ireland ("Nortel Ireland").

3. I have been retained by Eugene F. Collins, solicitors, to assist Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), counsel to the U.S. Debtors, and am being compensated at a rate of €500 per hour (plus Value Added Tax (VAT)), which is my customary hourly rate. No part of my compensation for performing this work is contingent upon the results of my work or on the outcome of the Motion. I have not previously acted for the U.S. Debtors in any matter.

4. I have been asked to provide my expert opinion on the principles of Irish law in respect of certain of the legal claims that Nortel Ireland purports to assert against Nortel Networks Incorporated ("Nortel Networks Inc.") under Irish law.[2]

5. For the avoidance of confusion it is worthwhile to point out that there is considerable reference throughout to decisions of the superior English courts which are deemed by the Irish courts, in areas where there is no specific constitutional or statutory divergence, to be of persuasive authority. Where there has been specific importation of a decision or dicta therefrom into Irish jurisprudence this has been acknowledged.

6. I do not address the question of whether Nortel Ireland's claims are well founded as a matter of fact. Unless noted otherwise, where I refer to facts below, those facts are derived from the allegations made in the Nortel Ireland Proof of Claim. For the purposes of this declaration, I have assumed those alleged facts to be true (without prejudice to the right of the U.S. Debtors and other parties to challenge those facts at trial). I have also assumed, solely for the purposes of this Motion, that Irish law applies to those claims as to which Nortel Ireland alleges Irish law applies.

## B. CASE BACKGROUND

7. The administrators of Nortel Ireland have submitted a lengthy Proof of Claim in the bankruptcy proceedings of Nortel Networks Inc. in the United States. In that Proof of Claim, it is asserted that a number of transactions and dealings between Nortel Ireland and *inter alia* Nortel Networks Limited (a Canadian limited company), Nortel Networks Corporation (a Canadian company) and Nortel Networks Inc. (an American company) were and are subject to Irish

---

[2] I do not address Nortel Ireland's claim relating to intercompany trading debts [Para. 80-83 of the Proof of Claim], which are not addressed in the Motion, although I am instructed that counsel for the U.S. Debtors have reserved the right to object to such claim, including without limitation, to object to such claim at a later date on any and all grounds.

law, and that Irish law should apply to certain claims in the US bankruptcy proceedings of Nortel Networks Inc.

## C.   LEGAL ANALYSIS OF NORTEL IRELAND'S CLAIMS

### I.   Breach of Fiduciary Duty (Claims 2, 8, 18, and 24 )

8.   I have reviewed the Proof of Claim dated June 3, 2011 filed by Nortel Ireland. It is alleged in a number of the claims that Nortel Networks Inc. acted as a *de facto* or shadow director of Nortel Ireland under Irish law and accordingly that it owed fiduciary duties to Nortel Ireland which it breached.

9.   It is alleged in particular that Nortel Networks Inc. owed these fiduciary duties due to the involvement of the directors, officers and senior employees in the decision-making function of Nortel Ireland. [Para. 87 of the Proof of Claim]

10.   In the factual background it is simply alleged that the Nortel Group's operations were highly centralised and on a general basis maintained primarily by the Canadian entities. [Para.13 of the Proof of Claim] It is also alleged that NNI was involved in jointly controlling certain aspects of the Group's operation with the Canadian entities. [Para. 15 of the Proof of Claim]

11.   As pleaded, Nortel Ireland's claims that Nortel Networks Inc. breached a fiduciary duty owed to Nortel Ireland as a de facto or shadow director are not well made out in accordance with established Irish Law.

### (a)   De Facto Director

12.   Section 2(1) of the Companies Act, 1963 (hereafter "the 1963 Act") provides that "director" includes any person occupying the position of director by whatever name called. There is no statutory definition of a de facto director and it is a concept which has developed through case law. As Courtney states (Courtney, *The Law of Private Companies*, 2nd ed., 2002 at p 420):

> De Facto directors are persons occupying the position of director but who have not been formally appointed as directors, whether on incorporation or subsequently...A prime example of where a person will be deemed to be a de facto director is where he has been appointed a director but where his appointment does not satisfy other requirements of a company's articles of association, for example, where he does not hold a requisite share qualification. In that event, such a person's appointment will be invalid, but if he assumes the position of director, he can be found to be a de facto director.

13.   Most of the Irish jurisprudence on this is derived from applications to disqualify persons from acting as directors after companies have gone into liquidation or insolvency. The leading Irish case in the area is *In Re Lynrowan Enterprises Limited* [2002] IEHC 90 (31 July 2002, Unreported, High Court, O'Neill J.). That case concerned *inter alia* an application to have a person restricted from acting as a director under s.150 of the Companies Act 1990

(hereafter "the 1990 Act"), who had acted as a director but who had not been validly appointed. O'Neill J. stated as follows (at p 3717):

> I am of opinion that a person although not validly appointed a director of a company may nonetheless be said to be a de facto director and thus deemed to be "a director" within the meaning of Section 2(1) of the Companies Act 1993 and thus amenable to the restriction contained in Section 150 of the Companies Act 1990, in the following circumstances:
>
> 1. Where there is clear evidence that that person has been either the sole person directing the affairs of the company or
>
> 2. Is directing the affairs of the company with others equally lacking in valid appointment or
>
> 3. Where there were other validly appointed directors, that he was acting on an equal or more influential footing with the true directors in directing the affairs of the company.
>
> In the absence of clear evidence of the foregoing and when there is evidence that the role of the person in question is explicable by the exercise of a role other than director, the person in question should not be made amenable to the Section 150 restriction.
>
> Where the object of the Section is the protection of the public from dishonest or irresponsible persons the absence of a valid appointment should not permit an escape from the restriction in Section 150. It would be nonsensical if a person who had been validly appointed a director was to be treated differently to someone who lacked valid appointment but nevertheless assumed in all other respects the role of director. I would agree that "liability cannot sensibly depend upon the validity of the defendant's appointment".
>
> In the light of all of the foregoing then in my view the Companies Act 1963 to 1990 recognise and embrace in the provision of Section 2(1) of the Act of 1963 and Section 150 of the Act of 1990, the concept of the "de facto director".

14. The allegation by the administrators of Nortel Ireland is that an American Company, Nortel Networks Inc., acted as de facto director of Nortel Ireland. However, section 176 of the 1963 Act provides that:

> 176.—(1) A company shall not, after the expiration of 3 months from the operative date, have as director of the company a body corporate.

15. There is no Irish authority holding that a corporate entity may be a de facto director. The Irish courts have recognized de facto directors as falling within

the generally worded statutory definition contained in s.2(1) of the Companies Act 1963 which a corporate entity barred by s.176 cannot do. Indeed, there is no Irish authority even addressing whether— just like for a position as *de jure* director — a corporate entity is barred from serving as a de facto director of a company. But given the court's reasoning in *In Re Lynrowan Enterprises Limited* set forth above, it seems unlikely that an Irish court would conclude that a corporate entity could assume the role of de facto director, which is co-extensive with the position of a *de jure* director, when barred from being appointed as a *de jure* director under Irish law. It is important to take due cognizance of the phrase "valid appointment". Valid in this context must be taken to mean "executed in compliance with the law". The *Lynrowan* decision determined that a distinction should not be drawn between valid and invalid appointments when determining the status of a de facto director. It does not go so far as to include an "illegal appointment" which would be the appointment of a company as a de jure director. I am of the opinion that the inability of a company to be validly appointed would prevent the company being successfully held out as a director to third parties taken to know the law and hence the impossibility of valid appointment. This conclusion is reached without the need to consider exactly how a company is supposed to hold itself out.

16. Furthermore, Nortel Ireland did not plead that Nortel Networks Inc. claimed to act as a director or held itself out as a director. A recent Irish authority on this point is *Moorview Developments & Others-v-First Active plc & Others* [2009] IEHC 214 where Clarke J explicitly approved and applied the ratio in the case set out herunder. One of the leading modern authorities on the meaning of a de facto director is the English decision of Millet J. in *Re Hydrodam (Corby) Limited* [1994] 2 BCLC 180, [1994] BCC 161. There, it was alleged that certain directors were acting as de facto *or* shadow directors. Millet J. stated that (at p184):

> In my judgment an allegation that a defendant acted as de facto director or shadow director, without distinguishing between the two, is embarrassing. It suggests...that the liquidator takes the view that de facto or shadow directors are very similar, that their roles overlap, and that it may not be possible in a given case to determine whether a particular person was a de facto or shadow director. I do not accept that at all. The terms do not overlap. They are not alternatives and in most and perhaps all cases are mutually exclusive. A de facto director is a person who assumes to act as director. He is held out as a director by the company, and claims and purports to be a director, although never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director. It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level. A de facto director, I

repeat, is one who claims to act and purports to act as director, although not validly appointed as such. A shadow director, by contrast, does not claim or purport to act as director. On the contrary, he claims not to be a director. He lurks in the shadows, sheltering behind others who, he claims, are the only directors of the company to the exclusion of himself. He is not held out as a director of the company.

17. While Nortel Ireland alleges that Nortel Networks Inc. was a de facto and/or shadow director of Nortel Ireland, it fails to provide any explanation or elucidation for this allegation. Undoubtedly under Irish law in order to establish such a viable claim Nortel Ireland would be required to address the following:

    i.    The level of control or influence exercised by the Canadian entities;

    ii.    Whether Nortel Networks Inc. acted as a servant or agent of the Canadian entities or independently;

    iii.    What is meant by Nortel Networks Inc.'s joint control of the Nortel Group tax and treasury matters;

    iv.    Whether the directors, officers and senior employees were acting merely as servants or agents of Nortel Networks Inc. or otherwise. It must be shown that individuals were acting within the scope of their employment and authorization at Nortel Networks.

    v.    Whether Nortel Network Inc. is alleged to have acted at all material times openly as a director or whether its actions were clandestine.

18. Courtney (*The Law of Private Companies*, 2nd ed., 2002 at p 424) lists the following factors which a court may take into account in deciding whether a person acted as a de facto director:

    i.    The putative director was appointed by the directors or in general meeting but the appointment was invalid on grounds that it did not comply with the Companies Acts;

    ii.    The putative director sought to be referred to as director;

    iii.    The putative director was an authorised signatory on bank mandates of the company;

    iv.    Attendance at board meetings either by invitation or otherwise uncontested;

    v.    The putative director was as well briefed as *de jure* directors;

vi.     The putative director held a substantial shareholding in the company.

19.     This non-exhaustive list seeks to identify the type of indicia of a de facto director and taken in conjunction with the definition thereof in *Re Hydrodam (Corby) Ltd* would constitute the evidential hurdle in establishing Nortel Networks Inc. as a de facto director of Nortel Ireland. Nortel Ireland's pleading does not address these factors. Furthermore this hurdle has to be essayed without Nortel Ireland clarifying the capacity in which the alleged auteurs (the directors, managers and employees of Nortel Networks Inc.) acted at all material times.

20.     Further assistance can be gleaned from the English decision *Secretary of State for Trade and Industry-v-Tjolle* [1998] BCC 282 wherein Jacob J held that the court is to consider all the relevant factors:

"The court takes into account all the relevant factors. Those factors include at least whether or not there was a holding out by the company of the individual as director, whether the individual used the title whether the individual had proper information (e.g. management accounts) on which to base decisions and whether the individual had to make major decisions and so on. Taking all these factors into account one asks "was this individual part of the corporate governing structure?"..."

This definition was cited with approval and applied by Feeney J in *Re Kendar Holdings Limited (In Liquidation)* [unreported 16 January 2009]where he asked whether there was any evidence of the alleged de facto director "...making any major decisions such as would support a claim that the [alleged director] was part of the governing structure of the company..."

21.     Finlay Geoghegan J in *First Class Toy Traders Limited* [unreported 9 July 2004] expressly approved and relied upon the *Tjolle* case and another English decision *Re Kaytech International plc* [1999] BCC 390 in reviewing a non-exhaustive list of factors in determining whether an individual had assumed the status and functions of a company director so as to make him responsible under the Companies Acts as if he were a de jure director.

22.     However, no allegation is made in the proof of claim that Nortel Networks Inc. held itself out as a director of Nortel Ireland or that Nortel Ireland held the American company out as director. Nortel Ireland merely alleges that Nortel Networks Inc. was a de facto or shadow director by virtue of making decisions in relation to transfer pricing arrangements and Irish loans and dividends (described as "tax and treasury matters") which could only be made by a director of Nortel Ireland or by causing *de jure* directors to act in accordance with its directions in relation to such issues. Even if true and leaving aside altogether the issue concerning the corporate status of Nortel Networks Inc. this is not necessarily enough to establish de facto directorship. No clarity is forthcoming on whether Nortel Networks Inc. was part of the governing structure (potentially indicative of de facto directorship) or was the governing structure in the shadows (indicative of shadow directorship). Indeed, Nortel Ireland's allegations that Nortel Networks Inc. acted covertly as a shadow

director render its allegation that it also acted as de facto director of Nortel Ireland unsustainable in Irish law.

### (b)     Shadow Director

23.    Whilst a company has been held by the High and Supreme Court[3] as capable of being a shadow director there is no definitive authority under Irish law extending the duties and obligations beyond the statutory framework of the Companies Act 1990, to include the common law and equitable duties indisputably borne by de jure directors, as urged in the Proof of Claim. In *Moorview*[4] Clarke J discussed "a number of specific potential liabilities" imposed on shadow directors under the Companies Act 1990. There was no suggestion of general common law and equitable duties being imposed. For a court to so hold at this juncture would undoubtedly constitute a development in Irish law.

24.    There is a statutory definition of a shadow director in section 27 of the 1990 Act as follows:

> [A] person in accordance with whose directions or instructions the directors of a company are accustomed to act (in this Act referred to as "a shadow director") shall be treated *for the purposes of this Part* as a director of the company unless the directors are accustomed so to act by reason only that they do so on advice given by him in a professional capacity. [Emphasis Added]

25.    In *Fyffes Plc v. DCC Plc* [2009] 2 I.R. 417, Laffoy J. observed that it is "difficult to state in the abstract the legislative intent which underlies the rather terse definition in s.27".

26.    The leading Irish case is Supreme Court decision *Re Worldport (Ireland) Limited in Liquidation* [2009] 1 I.R. 398:

- The liquidator of Worldport made application to the High Court to restrict an American company from acting as director under s.150 of the 1990 Act. The allegation was that the American company had acted as shadow director.

- A preliminary issue in the High Court was whether a body corporate could qualify as a shadow director for the purpose of s.150. The American company argued that s.176 of the 1963 Act precluded a body corporate from being a shadow director for the purpose of s.150.

---

[3]     See *Worldport (Ireland) Limited In Liquidation* op. cit.

[4]     Op.cit.

- O'Leary J. held that it was clear from s.176 that a company could not be a *de jure* director, but rather than being a sub-category of directors, shadow directors had their own separate standing. That is, shadow directors are not "directors" under the definition of Section 2(1) of 1963 Act. He held that companies could be shadow directors for the purpose of s.150.

- On appeal, the Supreme Court held that a body corporate could be a shadow director for the purposes of s.27 of the 1990 Act, but not for the purpose of s.150 of the 1990 Act, which was regarded as only applying to non-corporate directors.

27. As Ahern states (Ahern, *Directors Duties Law and Practice*, 1st ed., 2009 at p65) "the question of whether a corporate shadow director may be recognised will depend largely on the particular regulatory landscape in which the issue arises, and in particular, on whether any applicable sanctions can be meaningfully applied to a body corporate."

28. In *Fyffes*, Laffoy J. considered the necessary degree of involvement in the direction or governance of the company which a person had to exercise to fall within the definition of shadow director in s.27 of the 1990 Act, in the context of an allegation of insider trading.

- To prove the requisite level of influence requires, at a minimum, that the majority of the board must act in accordance with the person's directions or instructions.

- It must be established as a matter of fact that the person exercises a controlling influence in the boardroom. The person must be giving directions or instructions which are sufficiently imperative in nature, and the instructions must have an imperative quality. She stated:

First, it seems to me that it is implicit in s. 27 that the directions or instructions emanating from the alleged shadow director must have an imperative quality. It may be that advice, in a given factual context, will have an imperative quality. If that is the case, it would explain the apparent oddity to which counsel for the plaintiff pointed: why the legislature thought it necessary to exclude advice given in a professional capacity, if advice does not come within the expression "directions or instructions". Therefore, for a communication of any type to constitute a direction or instruction, it must have an imperative quality. Secondly, just because there is consideration by the board interposed between the direction, instruction or imperative advice does not mean that the act of the board is not to be taken into account in applying s. 27, if the board acts in accordance with the direction, instruction or imperative

advice. If it were otherwise, the effect of s. 27 could be seriously diluted, particularly because of the difficulty inherent in making an objective assessment as to why the board acted in the manner it did. Thirdly, s. 27 does not require that the board should always act on the directions and instructions if a shadow directorship is to exist. That is indicated by a requirement that the board should be accustomed so to act.

- The level of influence must occur on an ongoing basis. It was not enough for Mr Flavin to have been responsible for major decisions...and other specific instances. There was a requirement of real influence on an ongoing basis.

29. As shadow directors have not been legally appointed as directors they have no power to act on the company's behalf but this does not prevent the law imposing duties on them. Unlike de facto directors, shadow directors have not been regarded as having duties and obligations which are co-extensive with those of their de jure counterparts. See *Moorview*.

30. The Companies Acts 1963-2009 do not on their face subject shadow directors to the same duties as *de jure* directors. Rather, they reveal a selective legislative attitude to shadow directors – they are expressly included within the regulatory net in certain instances. Consequently, not all the rules in the Companies Acts apply to shadow directors. There have been mixed views on whether shadow directors are subject to the equitable and common law duties of directors. In relation to English company law Pennington had contended that a shadow director was only subject to specific statutory rules and was not subject to the non-statutory duties of directors. (see Ahern *Directors' Duties Law and Practice* 1st Ed.2009 at 65)

31. Pennington, in his book *Directors' Personal Liability* (London: Professional Books, 1987 at p29), analyzing shadow director duties under U.K. law stated that:

> Outside the context of the Companies Act 1985, the concept of shadow director has no part to play, and so the equitable fiduciary duties, which are imposed on directors and which are dealt with in chapter 3, do not extend to shadow directors.

32. There is no judicial determination in Ireland on whether shadow directors can be the subject of *de jure* directors' common law and equitable duties. However it is submitted that an Irish perspective, Pennington's observations are correct. Section 27 of the 1990 Act provides as follows:

- [A] person in accordance with whose directions or instructions the directors of a company are accustomed to act (in this Act referred to as "a shadow director") shall be treated *for the purposes of this Part* as a director of the company unless the directors are

accustomed so to act by reason only that they do so on advice given by him in a professional capacity. [Emphasis Added]

33.    "This part", is Part III of the 1990 Act, headed "Transactions Involving Directors" which deals with substantial property transactions involving directors' loans and related transactions to directors, and duties of disclosure in relation to transfers involving directors. Other statutory provisions which apply to shadow directors are section 297A of the 1963 Act (which imposes civil liability for fraudulent and reckless trading), section 160 of the 1963 Act (disqualification orders), and Part VII of the 1990 Act (disqualification and restriction orders), although the Supreme Court held that corporate shadow directors could not be subject to s.150 *Re Worldport (Ireland) Limited in Liquidation* [2009] 1 I.R. 398). None of these duties are apposite to Nortel Ireland's allegations.

34.    It is submitted that the intention of the legislature (both in the 1990 Act and otherwise) was to selectively include shadow directors only within a narrow regulatory framework where, on public policy grounds, it would be unjust not to include them. There is no Irish authority which suggests otherwise.

### (c)    **Breach of Fiduciary Duty**

35.    This is an example of the unproven territory into which the U.S. Bankruptcy Court in the District of Delaware (the "Bankruptcy Court") is asked to venture predicated upon the simplest of allegations that by virtue of being a shadow director per se Nortel Networks Inc. owed fiduciary duties and a duty of skill and care to Nortel Ireland.

36.    Insofar as the Bankruptcy Court can be convinced that under Irish law Nortel Networks Inc. was a de facto director these fiduciary duties may be owed.

37.    As set forth above, the duties and obligations of shadow directors are not identical to the duties and obligations owed by *de jure* directors. This applies to both common law and equitable fiduciary duties and obligations. Shadow directors are creatures of statute and their duties and obligations are constrained by their statutory framework.

38.    In the absence of clear Irish jurisprudence on the extension of liability outside the statutory framework it is submitted that it would be entirely inappropriate for the requisite Bankruptcy Court to arrogate to itself the destination of Irish jurisprudence on this point.

39.    The duties are alleged to include (at paragraph 85 of the proof of claim):

- The exercise of power in good faith and in the interests of the company as a whole;

- Not to make a secret profit out of its position as a director and to account to the company for any benefit so obtained, regardless whether the company has suffered any loss;

- To avoid conflicts of interest; and

- To exercise skill, due diligence and care in the discharge of its functions

## II.     Breach of the Duty of Care (Claims 3, 9, 19, 25)

40.     At paragraphs 94 and 95 of the Proof of Claim it is stated that:

> "94...the first company will owe a duty to the second company whether or not it is a de facto or shadow director of the second company if there is a relationship of sufficient proximity between the two, the harm in question was reasonably foreseeable and it is appropriate in the circumstances to impose a duty of care.
>
> 95. The second company would be able to bring a claim against the first company if it can establish a breach of such a duty of care and that such a breach caused loss to the second company".

41.     The duty alleged is predicated upon the following: (1) The status of Nortel Networks Inc. as a de facto or shadow director; or (2) The proximate relationship between Nortel Networks Inc. and Nortel Ireland.

### (a)     Existence of Duty

42.     We have already seen the questionable link between being a shadow director and the assumption of common law duties and those observations apply here. However there is now an additional plea that in the absence of a de facto or shadow directorship there is a straight-forward duty of care predicated upon the proximity of Nortel Networks Inc. and Nortel Ireland. It is therefore necessary to establish the basic criteria of this duty and also to assess the circumstances in which it is owed.

43.     The leading Irish authority on the duty of care is the Supreme Court decision in *Glencar Exploration v. Mayo County Council* [2002] 1 I.R. 84. There, Keane C.J. engaged in an extensive review of the Irish and English authorities on the duty of care, and stated as follows (at p139):

> There is, in my view, no reason why courts determining whether a duty of care arises should consider themselves obliged to hold that it does in every case where injury or damage to property was <u>reasonably foreseeable</u> and the notoriously difficult and elusive test of "<u>proximity</u>" or "neighbourhood" can be said to have been met, unless very powerful public policy considerations dictate otherwise. It seems to me that no injustice will be done if they are required to take <u>the further step of considering whether</u>, in all the circumstances, it is <u>just and reasonable</u> that the law should impose a duty of a given scope on the defendant for the benefit of the plaintiff, as held by Costello J. at first instance in *Ward v. McMaster* [1985] I.R. 29, by Brennan J. in

*Sutherland Shire Council v. Heyman* (1985) 157 C.L.R. 424 and by the House of Lords in *Caparo plc. v. Dickman* [1990] 2 A.C. 605. As Brennan J. pointed out, there is a significant risk that any other approach will result in what he called a "massive extension of a prima facie duty of care restrained only by undefinable considerations ..."

[emphasis added]

44. This three step test has been endorsed as the definitive test in Ireland (*Breslin v. Corcoran & Anor.* [2003] 2 I.R. 203 Supreme Court per Fennelly J).

45. Nortel Ireland failed to plead any specific facts that would inform the analysis of whether it would be just and reasonable to impose a duty of care in the instant case. If therefore the threefold test were applied to Nortel Ireland's allegations, even if it were possible to establish reasonable foreseeability, the vexed issue of proximity is bedevilled by the absence of any specific information concerning the distinct role of the Canadian entities and the role of Nortel Networks Inc. in the Nortel Group tax and treasury policy implementation not to mention the role of the directors, officers and employees of Nortel Networks Inc. and whether they were acting as servants or agents of Nortel Networks Inc. or otherwise.

**(b)** **Economic Loss**

46. Moreover, the allegation here is one of "pure economic loss". In *Glencar*, Keane C.J explained the courts' reticence in extending the tort of negligence to such loss as follows:

> There remains the question of economic loss. The reason why damages for such loss − as distinct from compensation for injury to persons or damage to property − are normally not recoverable in tort is best illustrated by an example. If A sells B an article which turns out to be defective, B can normally sue A for damages for breach of contract. However, if the article comes into the possession of C, with whom A has no contract, C cannot in general sue A for the defects in the chattel, unless he has suffered personal injury or damage to property within the Donoghue v. Stevenson [1932] A.C. 562 principle. That would be so even where the defect was latent and did not come to light until the article came into C's possession. To hold otherwise would be to expose the original seller to actions from an infinite range of persons with whom he never had any relationship in contract or its equivalent. That does not mean that economic loss is always irrecoverable in actions in tort. As already noted, economic loss is recoverable in actions for negligent misstatement. In *Siney v. Corporation of Dublin* [1980] I.R. 400, economic loss was held to be recoverable in a case where the damages represented the cost of remedying defects in a building let by the local authority under their statutory powers. Such

damages were also held to be recoverable in *Ward v. McMaster IR* [1985] I.R. 29; [1988] I.R. 337, the loss being represented by the cost of remedying defects for which the builder and the local authority were held to be responsible. In both cases, the loss was held to be recoverable following the approach adopted by the House of Lords in *Anns v. Merton London Borough* [1978] A.C. 728. While the same tribunal subsequently overruled its earlier conclusion to that effect in *Murphy v. Brentwood District Council* [1991] 1 A.C. 398, we were not invited in the present case to overrule our earlier decisions in *Siney v. Corporation of Dublin* and *Ward v. McMaster*. I would expressly reserve for another occasion the question as to whether economic loss is recoverable in actions for negligence other than actions for negligent misstatement and those falling within the categories identified in *Siney v. Dublin Corporation* and *Ward v. McMaster* and whether the decision of the House of Lords in *Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] 1 A.C. 520 should be followed in this jurisdiction,

47.     Here, however, nothing has been proffered by Nortel Ireland's pleading on the economic loss issue which would take the claim outside the normal bar.

## III.     Dishonest Assistance (Claims 4, 10, 26) and Unconscionable Receipt (Claims 11 and 21)

48.     Claim 4 appears to be predicated upon assisting a fiduciary in breach of duty rather than Nortel Networks Inc. being a fiduciary in breach of duty. Nortel Networks Inc. is said to have advocated or assisted through the involvement of its personnel in the design, implementation and operation of the MRDA and RPSM the directors of Nortel Ireland which led to breaches of fiduciary duties. The same allegation is made of and concerning the so-called Irish Loans and Dividends and in respect of controlling Nortel Ireland's tax affairs in claims 10 and 26.

49.     Claim 11 appears to be predicated on a primary breach of fiduciary duties by the directors of Nortel Ireland in respect of the Irish Loans and Dividends. Nortel Networks Inc. is alleged to have been sufficiently aware of these breaches due to its involvement in the Irish Cash Repatriation Strategy outlined in the Claim. Claim 21 makes a similar allegation in respect of the Pre-Petition Sales, of which Nortel Networks is alleged to have been aware due to its participation in the sales.

50.     In the English decision *Barnes-v-Addy* (1874) 9 L.R. Ch. App. 244 Lord Selborne LC at p.252 stated:

That responsibility [of a trustee] may no doubt be extended in equity to others who are not properly trustees, if they are found either making themselves trustees de son tort, or actually participating in any fraudulent conduct of the trustee to the injury of the cestui que trust. But, on the other hand, strangers are not to be made constructive trustees merely because they act as agents of

trustees in transactions within their legal powers, transactions, perhaps of which a Court of Equity may disapprove, unless those agents receive and become chargeable with some part of the trust property, or unless they assist with knowledge in a dishonest and fraudulent design on the part of the trustees.

51. Laffoy J in *Fyffes* at p.665 said of the foregoing:

That passage has been regarded in this and other jurisdictions as the source of two distinct heads of liability in respect of which a third party is obliged to account in equity. The first, usually referred to as "knowing receipt", deals with the circumstances in which a third party who has received trust property is obliged to account. The second, usually referred to as "knowing assistance", deals with the circumstances in which a third party, who may not have received any of the trust fund which has been misapplied, will be treated as accountable as a constructive trustee, if he has knowingly participated in a dishonest design on the part of the trustees to misapply the fund.

52. Knowing Assistance thus requires a showing that the defendant knowingly participated in a dishonest and fraudulent design by another that injures the plaintiff. Laffoy J held that the Plaintiffs had failed to establish either a factual or hypothetical dishonesty to ground the imposition of liability to account on foot of knowing assistance in circumstances where there had been allegations of insider trading. Of peculiar importance were the following observations:

Apart from the myriad of difficult issues which were raised by the parties in their submissions on the non-statutory claim...an obvious question which arises is how the rights of counterparties would be protected in a situation where the court, exercising its equitable jurisdiction, were to find that the insider has a liability to account to the company. I think it would require more than a modicum of judicial ingenuity to ensure that the equitable remedy sat comfortably with the statutory remedies.

53. Insofar as the claim by way of Knowing Assistance is being advanced one of the requirements would be the identification of the "design" on the part of the directors assisted. It appears plain however that the main thrust of the claim alleged is that the design was that of Nortel Networks Inc., not the directors of Nortel Ireland.

54. This confusion is important in an Irish law context as Knowing Assistance results in the wrongdoer being held accountable as a constructive trustee even where he has not received the trust property.

55. Blayney J in *In Re Frederick Inns Ltd.* [1994] 1 I.L.R.M. 387 held:

A limited company is of course not a trustee of its own funds; it is their beneficial owner, but in consequence of the fiduciary character of their duties the directors of a limited company are treated as if they were trustees of those funds of the company which are in their hands or under their control, and if they misapply them they commit a breach of trust...So, if the directors of a company in breach of their fiduciary duties misapply the funds of their

company so that they come into the hands of some stranger to the trust who receives them with knowledge (actual or constructive) of the breach, he cannot conscientiously retain those funds against the company unless he has some better equity.

56. Unconscionable or Knowing Receipt under Irish law, unlike Knowing Assistance, is a restitutionary remedy and does require a plaintiff to trace its property to the custody of the defendant, (although the property is not required to be in defendant's custody at the time relief is sought), as well as a showing that the defendant knew that the property had moved from the plaintiff through a breach of fiduciary duty.

57. Hoffman L.J, as he then was, stated in the English decision *El Ajou-v-Dollar and Holdiongs plc* [1994] 2 All E.R. 685 at 700:

For this purpose the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty: secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.

58. As the law stands in Ireland constructive knowledge of a breach of trust is enough to render the recipient of trust funds a constructive trustee per Laffoy J in *Fyffes*.

59. In Ireland there has always been a judicial willingness to impose a constructive trust on a person who is a party to a fraud or misappropriation of trust property construing the recipient as a constructive trustee (*Alleyne v Dacry* (1854) 4 Ir Ch R 199). This however is regarded as part of the general law of restitution for preventing unjust enrichment. In contrast, it is clear that the liability for Knowing Assistance is compensatory and part of the laws of equity.

## IV.    Conspiracy (Claims 5 and 12)

60. Claim 5 alleges that Nortel Networks Inc. and Nortel Networks Limited, or alternatively Nortel Networks Inc. and the *de jure* directors of Nortel Networks Ireland, or alternatively all three of them conspired to implement and operate the RPSM and MRDA with the predominant unlawful purpose of damaging Nortel Networks Ireland. Claim 12 alleges that the same combinations of parties conspired for the same purpose in respect of the Irish Loans and Irish Dividends.

61. The tort of conspiracy is recognised in Ireland. Two variations of the tort are recognised, namely (1) conspiracy by unlawful means and (2) simple conspiracy.

### (a)    Conspiracy by unlawful means

62. This form of conspiracy is dependent on proof that the defendants by agreement collusively employed unlawful means that had the effect of damaging the plaintiff.

63. The leading Irish case is the Supreme Court decision in *Meskell v. CIE* [1973] 1 I.R. 121. There, the defendants entered into agreements with several trade unions to put a clause into their contracts with their employees which made membership of a trade union compulsory. In order to carry out this agreement the defendants validly terminated the plaintiff's original contract of employment, and asked that he sign a new one with the amended terms obliging him to be a member of a trade union. The plaintiff refused to sign the new agreement on the grounds that he was legally entitled not to be a member of a trade union. The defendants did not reemploy him and the plaintiff sued for damages on the grounds of conspiracy by unlawful means. The Supreme Court (Walsh J.) held that this was an actionable conspiracy, and that although the ends of the agreement between the defendant and the trades union were not in themselves unlawful, the means were unlawful (the Plaintiff was entitled under Article 40 of the Constitution to abstain from membership of a trade union).

64. The Irish Supreme Court in *Taylor-v-Smith* [1991] IR 142 held that an agreement or combination of two or more people, whether the predominant objects therefor be lawful or unlawful, viz. protection of the interests of the parties acting in concert or intended injury to another, is an actionable conspiracy if unlawful means are used and the plaintiff suffers injury.

### (b)  Simple Conspiracy

65. This is a direct form of liability for harm caused by defendants to a Plaintiff in the course of business or trade on proof that the defendants agreed to act and did act in concert to inflict that harm.

66. It is a good defence to an action in simple conspiracy that the *predominant purpose* of the defendants is the lawful protection or promotion of any lawful interest of the combiners where no unlawful means are being employed (see the English decision *Crofter Hand Woven Harris Tweed v. Veitch* [1942] A.C. 435 at 445 (CA)).

67. It is a very difficult tort to prove and the line between a defendant's self interest and his predominant intent to injure the defendant is a very fine one. The tort was not proved in *Connolly v. Loughney* (1953) 87 I.L.T.R. 49. The Grocer's Trade Association of Ireland chose to boycott the plaintiff by inducing suppliers not to do business with him, and it did so because he was selling groceries below minimum prices set by the association. The court reasoned that the Association had existed for the benefit of grocers and had acted *bona fide* to further its legitimate interests. Similarly in *Tru-Value Ltd. v. Switzers & Co.* (High Court, March 10, 1972), the plaintiff was a small chemist in Dublin and the defendant a large department store. The defendant, with others encouraged the supplier of a particular perfume not to enter into a contract with the plaintiff for its supply. Kenny J. accepted the defendant's

submissions that its motive in doing so was not to injure the plaintiff but instead to protect its own business.

68. Both lawful means conspiracy and simple conspiracy are intentional torts insofar as some intention to injure is required but it is important to note that the "predominant intent" defence arises in simple conspiracy only.

## V.  **Mistake (Claim 20)**

69. It is alleged at paragraph 174 of the Proof of Claim that Nortel Ireland did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent to which Nortel Ireland is entitled. Apparently it is alleged that the allocation was predicated upon erroneous assumptions contained in the transfer pricing structure that prevailed with the Nortel Group. As a consequence of this alleged mistake, Nortel Networks Inc. allegedly received considerably more from the allocation than it was intended to receive.

70. The allegations in relation to Pre-Petition Sale Proceeds are it would appear set out at paragraphs 66-70 at pp. 22-33 in the Proof of Claim. The essence of the allegation in very basic terms is that there was an agreement (set out in a statement of 24 July 2007) to allocate global sale proceeds amongst the various Nortel entities in accordance with the "arm's length legal entitlement that each had to the proceeds". However, either this was not done and the allocations were allegedly made (erroneously) based on the transfer pricing structure that existed within Nortel at the time or it was done on an incorrect interpretation of the method for allocation of the proceeds.

71. Under Irish law mistake of fact has three varietals with different consequences:

> (i) Common Mistake where the parties have reached agreement but share a common mistake about an important fact at the time of reaching agreement. Depending on how fundamental the mistake the contract may be nullified. No guidance has been given by way of pleading on this issue. No guidance has been given as to whether the contract sought to transfer or allocate such a risk. Nortel Ireland have not pleaded as required the reasonable grounds for their mistaken belief;

> (ii) Mutual Mistake where both parties are mistaken but do not share the same mistake where the very fact of agreement may be in issue. It is not clear whether Nortel Ireland is suggesting that there was mutual mistake as there has been no attempt to illustrate by way of narrative what the parties were mistaken about at the time of alleged agreement;

> (iii) Unilateral Mistake where one party misleads the other in an unconscionable manner so as to render the other party entitled

to rescission or rectification. It is not possible predicated upon the case as pleaded to determine whether such mistake is even alleged but the basic averments would appear to be absent.

72. First, it would appear that Nortel Ireland alleges that there was a deviation from a contractual agreement of 24 July 2007 to apply the "arm's length principle" to the global sale proceeds. This would more properly appear to be a claim for breach of contract, rather than an attempt to impugn the contract on the grounds of mistake.

73. Second, no attempt has been made to identify which type of operative mistake occurred. The usual remedies of declaring the contract void, rescission, rectification or specific performance are not sought and the claim appears to be made in restitution

74. Third, Nortel Ireland does not allege it was a seller in any of these transactions. In addition, there would appear to be several other parties (than Nortel Networks Inc. and Nortel Ireland) to this transaction whose rights and liabilities in this regard have not been addressed.

75. Fourth, mistake of law is also pleaded without any particularity as to the alleged mistake. Where the parties are in pari delicto Irish law grants no relief. No plea is raised which would allow this issue to be comprehensively addressed.

## VI. Transaction at an undervalue/Fraudulent Disposition (Claim 22)

76. It is alleged at paragraphs 176-179 of the Proof of Claim that:

> As a result of the allocations of the Pre-Petition Sale Proceeds made within two years prior to the onset of insolvency, Nortel Networks Inc. received sums of money that were properly due to Nortel Ireland, without Nortel Ireland receiving appropriate value in return. These diversions of cash are alleged to constitute transactions at an undervalue in accordance with section 238 of the [English] Insolvency Act 1986. As Nortel Networks Inc. is a related party there is a presumption that Nortel Ireland was insolvent at the time that transaction took place. As a result the court may make any order it sees fit, including an account from Nortel Networks Inc. to Nortel Ireland of the sums that it received by way of the undervalue transaction. If a liquidator were to be appointed in Ireland in relation to Nortel Ireland, a similar claim could be brought on the basis that these diversions of cash from Nortel Ireland to Nortel Networks Inc. constituted fraudulent dispositions pursuant to section 139 of the Irish Companies Act 1990.

77. This opinion deals only with the latter allegation in relation to s.139 of the Companies Act 1990 ("the 1990 Act"). The first allegation concerns English insolvency law.

78. Section 139 of the 1990 Act provides as follows:

79. Where, on the application of a liquidator, creditor or contributory of a *company which is being wound up*, it can be shown to the satisfaction of the court that—

> (a) any property of the company of any kind whatsoever was disposed of either by way of conveyance, transfer, mortgage, security, loan, or in any way whatsoever whether by act or omission, direct or indirect, and
>
> (b) the effect of such disposal was to perpetrate a fraud on the company, its creditors or members,
>
> the court may, if it deems it just and equitable to do so, order any person who appears to have the use, control or possession of such property or the proceeds of the sale or development thereof to deliver it or pay a sum in respect of it to the liquidator on such terms or conditions as the court sees fit
>
> (2) Subsection (1) shall not apply to any conveyance, mortgage, delivery of goods, payment, execution or other act relating to property made or done by or against a company to which section 286 (1) of the Principal Act applies.
>
> (3) In deciding whether it is just and equitable to make an order under this section, the court shall have regard to the rights of persons who have bona fide and for value acquired an interest in the property the subject of the application.
>
> [Emphasis added]

80. As the italicised part of the section shows, s.139 only applies to a company "being wound up" i.e. in insolvency in Ireland, and as ordered by the Irish High Court or otherwise (pursuant to ss. 206 and 212 of the Companies Act 1963). However, Nortel Ireland is in administration in England.

81. Nortel Ireland's claims are therefore contingent upon the opening of insolvency proceedings in Ireland and the appointment of a liquidator under the Companies Acts. Clearly this has not occurred. Nortel Ireland's claims are therefore moot. Furthermore it is not customary for Irish courts to apply statutory reliefs outside of their statutory remit. There is no current authority I can divine of a relief analogous to s.139 being applied outside of a liquidation.

## VII.    Contribution; Unjust Enrichment; Subrogation; Obligation to Repay (Claims 28-31)

82. These claims appear to be made exclusively on the basis of an order by the UK pensions regulator that Nortel Ireland must provide financial support to

the Nortel Networks UK Pension Plan. Claims 28 to 31 are accordingly made on the basis that:

> "in the event that [Nortel Ireland] *is ultimately required pursuant to an FSD or CN to make a payment*"

83.    Nortel Ireland's claims are based on something which *may* happen in the future. It would appear that there is an as yet unascertained liability under the UK Pensions Act, which would under Irish law be regarded as a contingent liability of Nortel Ireland provable by the appropriate party as a creditor in a liquidation. Furthermore, under all of the restitutionary and equitable remedies that they seek, an Irish court would almost certainly be asked to examine or make a judgment on the fairness of the order of the UK pension regulator, which was clearly acting on foot of its own statutory powers under English law.

### (a)    Unjust Enrichment

84.    Irish law appears to recognise restitutionary claims for unjust enrichment based on equity and the common law. Irish Law requires, however, that the "enrichment" have actually occurred rather than being a future contingency.

85.    In *Corporation of Dublin v. Building and Allied Trade Union* [1996] 1 I.R. 468. Keane J. gave the judgment for the court and stated (at p. 483) as follows:

> "It is clear that, under our law, a person can in certain circumstances be obliged to effect restitution of money or other property to another where it would be unjust for him to retain the property. Moreover, as Henchy J. noted in *East Cork Foods Limited v. O'Dwyer Steel Co.* [1978] I.R. 103, this principle no longer rests on the fiction of an implied promise to return the property which, in the days when the forms of action still ruled English law, led to its tortuous rationalisation as being 'quasi-contractual' in nature. The modern authorities in this and other common law jurisdictions, of which *Murphy v. The Attorney General* [1982] I.R. 241 is a leading Irish example have demonstrated that unjust enrichment exists as a distinctive legal concept, separate from both contract and tort, which in the words of Deane J. in the High Court of Australia in *Pavey & Matthews Proprietary Ltd. v. Paul* (1987) 162 C.L.R. 221: '. . . explains why the law recognises, in a variety of distinct categories of cases, an obligation on the part of the defendant to make fair and just restitution for a benefit derived at the expense of a plaintiff and which assists in the determination, by the ordinary process of legal reasoning, of the question of whether the law should in justice, recognise the obligation in a new and developing category of case.' The authorities also demonstrate that, while there is seldom any problem in ascertaining whether two essential preconditions for the application of

the doctrine have been met - i.e. an enrichment of the defendant at the expense of the plaintiff - considerably more difficulty has been experienced in determining when the enrichment should be regarded as 'unjust' and whether there are any reasons why, even where it can be regarded as 'unjust', restitution should nevertheless be denied to the plaintiff."

86. The three essential elements are: (1) An enrichment of the defendant at the expense of the plaintiff; (2) Circumstances which are unjust to allow retention; and (3) Any reasons why restitution should be denied to the plaintiff.

87. This statement of the law was endorsed recently in *Criminal Assets Bureau v. J.W.P.L.* [2007] IEHC 177, Feeney J.

88. Unjust enrichment is an equitable remedy which involves the imposition of a constructive trust in favour of a plaintiff in circumstances where there was (1) receipt by the defendant of a benefit, (2) at the plaintiff's expense, (3) in such circumstances that it would be unjust to allow the defendant to retain the benefit (Delaney, *Equity and the Law of Trusts in Ireland*, 5th ed., 2011 at p299). It has been recognised in England as a basis for actions at common law for money had and received (e.g. *Lipkin Gorman v. Karpnale Ltd* [1991] 2 AC 548).

89. While no express reference was made to the concept of unjust enrichment, it seems to underlie the decision of Carroll J. in *Re Irish Shipping Ltd.* [1986] ILRM 538, which concerned the imposition of a constructive trust. The former bankers of the company, Citibank, claimed a right of set off in respect of monies paid into the company's account in error by another bank, the Korean Exchange Bank. Carroll J. held that Citibank was not entitled to claim such a right and that the money paid in error was subject to a constructive trust and could therefore be traced by the Korean bank. Carroll J. quoted with approval the *dicta* of Vinson CJ in the American Supreme Court decision of *Healy v. Commissioner of Internal Revenue* (1953) 345 US 278 to the effect that a "constructive trust is a fiction imposed as an equitable device for achieving justice".

90. In *Goodman v. Minister for Finance* [1999] 3 I.R. 356, the plaintiffs argued that they were entitled to interest on an award of legal costs against the State on the basis that *inter alia* the State would be unjustly enriched if they were not awarded such interest. Laffoy J. examined the Irish authorities in the area. She first referred to the judgment of Keane J. in *O'Rourke v. The Revenue Commissioners* [1996] 2 I.R. 1 (at page 18) to the effect that that, as in other common law jurisdictions, the doctrine of unjust enrichment "has been developed in this jurisdiction incrementally on a case by case basis, so as to ensure that a vague and unchartered area of the law in which "palm tree justice" flourishes is not judicially encouraged". She then reviewed the other authorities cited by Counsel (which were concerned primarily with the entitlement of a plaintiff to interest) she stated the following *obiter*:

While, in my view, it is unnecessary for present purposes to consider the theoretical basis on which the principal monies with interest or loss of profit were, or subject to the proofs being in order, would have been recoverable in the foregoing authorities, even a superficial analysis of them reveals that in all of them the party against whom the claim for restitution was made had received the monies or retained the monies in issue in circumstances which involved unconscionable conduct or wrongdoing in the broadest sense of that word: in circumstances in which he was under an obligation to repay or pay the monies to the claimant but he had not done so, so that the monies were thereafter held by him in fiduciary circumstances. The entitlement of the party claiming restitution to loss of profit or interest arose as part of the measure of his damages on his claim for restitution.

91.     In *Reidy v. McGreevy* (Unreported, High Court, Barron J., 19 March 1993), Barron J appeared to accept that unconscionable behaviour could give rise to a constructive trust.

92.     The statement of Laffoy J. is very apt in relation to Nortel Ireland's claim in the within proceedings. I believe an Irish court would want to look very closely at the behaviour alleged to be "unconscionable" and would require details of the circumstances surrounding the alleged wrongful transfer of monies from Nortel Ireland to Nortel Networks Inc.

93.     Delany suggests that (Delaney, *Equity and the Law of Trusts in Ireland*, 5th ed., 2011 at p301) this... "powerful form of remedy should only be applied where the plaintiff has a higher claim in equity to the property in question than the general creditors of the proposed constructive trustee. Any analysis of the circumstances surrounding the imposition of a remedial constructive trust must include a consideration of the position of third parties, particularly unsecured creditors, who may be affected by this form of remedy".

94.     In the context of the claim in respect of FSD liability, the claim by Nortel does not allege that there was any "enrichment of the defendant at the expense of the plaintiff".

### (b)     Subrogation and Obligation to Repay (Recoupment)

95.     The Irish Supreme Court has recently dealt with the areas of subrogation and recoupment, which are both equitable principles of restitution. These are equitable remedies which can support an equitable claim such as unjust enrichment. But as a remedy, there must be actual damages, not merely a contingent harm alleged.

96.     In *In Re Bell Lines Limited* [2010] 1 I.R. 816, the Supreme Court held that neither of the principles applied in deciding the case before it. However, in the High Court, (although the case was decided on another point), Counsel for one of the parties opened the following principles and authorities to the court (which were not rejected) :

"Subrogation can arise to prevent unjust enrichment in a variety of circumstances. In this instance someone benefits at the expense of another, that is to say other creditors benefit at the expense of the person who is obliged as a guarantee institution to make a payment".

...it is in essence a remedy, fashioned to the particular facts, and designed to ensure 'a transfer of rights from one person to another...by operation of law' in order to deprive B of a benefit gained at A's expense."

### (c)  **Contribution**

97.  Contribution is an equitable claim that arises under Irish law only when the plaintiff, as a surety, has paid more than its due proportion of the debt in issue.

98.  In *Roche v. Wymes* [2008] IEHC 41 (MacMenamin J, 8th May 2008), the High Court stated as follows:

> As a matter of law, I am satisfied that in an action for equitable contribution (not a form of action for damages encompassed by the Civil Liability Act 1961), the cause of action by one surety who has paid more than his due proportion of the debt against a co-surety for arises only when the surety making the claim has paid the debt (see Brady and Kerr *(The Limitation of Actions)* (2nd Ed.) p. 48 and see also *Wolmerhausen v Gullick* [1893] 2 Ch. 514; *Gardiner v. Brooke* [1897] 2 I.R. 6). In *Lightwood* cited earlier, the following observations are made:-
>
> > "The right of contribution as between co-sureties or co-debtors, though not founded on contract, but on general principles of justice (*Dering v Earl of Winchelsea* ... ) is analogous to the right of indemnity and is subject to similar rules. *It can be asserted against the co-surety notwithstanding that the creditor's right of action against him is barred. Wolmerhausen v Gullick ...;* and no action will lie at common law in favour of a surety against his co-surety, or in favour of one co-debtor against the rest, until he has paid more than his share of the debt "whenever" said Parke, B. in *Davies v Humphreys* ... 'it happens that one has paid more than his proportion of what the sureties can ever be called upon to pay, then and not till then, it is also clear that such part ought to be repaid by the others and the action will lie for it'. Consequently, until the surety has paid more than his share of the entire debt, there is no debt due to him from his co-surety upon which he can found the

bankruptcy proceedings against the co-surety; *ex parte Snowden ...*"

[emphasis added]

99.  In *Andrews and Millettt* The Law of Guarantees (4th Ed.) 2005 para. 12-019, p. 140, the learned authors state:-

> "The fact that the creditor's claim against the surety has become time barred at the time the sureties claim for contribution is made, will not effect the contribution claim (para. 12-019 p. 450; *Davies v Humphreys* [1840] 6 N & W 153."
>
> *Wolmerhausen* and *Gardiner,* together with the other authorities referred to, clearly establish that the plaintiff's cause of action for contribution from the defendant in this case, <u>did not accrue until the plaintiff paid more than his rateable share</u> to NIB. Thus, the plaintiff's cause of action against the defendant in respect of the payment by him of what he claims is more than his rateable share (whether it be principal or interest) in respect of the judgment debt due to NIB/NBFC, did not accrue until 23rd June, 2004 at the earliest, when the sum of €9 million was paid to NIB. (Similar observations apply to the Ulster debt.) Even had the NIB/NBFC debt become statute barred at that time is immaterial.

[emphasis added]

100.  According to the above statement which reflects Irish law, Nortel Ireland's claim for contribution is deficient since: (1) it is not specifically asserted that there is the relationship of principal and surety as between Nortel Networks Inc. and Nortel Ireland; and (2) no liability has yet been incurred by Nortel Ireland in respect of FSD.

## VIII.  Contractual claims (Claims 16, 17)

101.  It is alleged that Nortel Ireland has claims against Nortel Networks Inc. in respect of the pre-petition sale of businesses.

102.  Irish courts on a contract claim require as a basic minimum:

> i.   Evidence that a contract was actually concluded;[5]
> ii.  Evidence as to the law the parties agreed to be bound by;[6]
> iii. The place of performance of the contract;[7]

---

[5] *Unidare Ltd.-v-James Scott Ltd.* [1991] 2 IR 88

[6] Contractual Obligations (Applicable Law) Act 1991; *Lac Minerals-v-Chevron Corporation of Ireland* [1995] 1 ILRM 161

iv. Evidence of any agreement as to jurisdiction;[8]

v. Terms and conditions of the said contract;[9]

vi. Insofar as there is an allegation of implied terms evidence as to why such a term is necessary to afford business efficacy to the contract;[10]

vii. Insofar as the claim is for a contract debt when the debt fell due;[11]

viii. Insofar as the debt is older than 6 years evidence of any acknowledgement in writing of the indebtedness.[12]

103. Nortel Ireland failed to allege any of these requisite facts apparent and therefore the claim as pleaded does not satisfy Irish law.

I declare, under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this **21st** day of July, 2011

In Dublin, Ireland

AIDAN REDMOND SC

---

[7] *Carl Stuart Ltd-v-Biotrace Ltd* [1993 HC] ILRM 633

[8] *McIlwraith-v-Seitz Filtration* (GB) Ltd [1998 LC] ELR 105

[9] *Analog Devices & Ors-v-Zurich Insurance & Ors* [2005] IESC 12

[10] *Carna Foods Ltd-v-Eagle Star Insurance* [1997] 2 IR 193

[11] *Bank of Ireland-v-O'Keefe* [1987] IR 47

[12] *Id.*