# EXHIBIT C

**(NNUK Rolston Witness Statement)**

**Applicant**
**Sharon Rolston**
**No. of Statement:  First**
**Exhibits: SLR1**
**14 January 2009**

<u>IN THE HIGH COURT OF JUSTICE</u>                    <u>No.    of 2009</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS UK LIMITED

AND

IN THE MATTER OF THE INSOLVENCY ACT 1986

---

WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I, **SHARON ROLSTON** of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, **DO STATE** as follows:-

1.    I am a director of Nortel Networks UK Limited (the **"Company"**) and Chief Financial Officer. I make this witness statement in support of an application by the directors of the Company (the **"Directors"**) for the making of an administration order in respect of the Company and for the appointment of Alan Robert Bloom and Alan Michael Hudson, partners in the firm of Ernst & Young LLP (**"E&Y"**), and Christopher John Wilkinson Hill and Stephen John Harris, executive directors of E&Y, together as joint administrators of the Company.  I am duly authorised to make this witness statement on behalf of the Directors.

2.    The Company is the centre of operations and headquarters for the Europe and Middle East and Africa (**"EMEA"** and **"EMEA Region"**) of the global Nortel group of companies (the **"Group"**).  This application is also being made in conjunction with applications for the appointment of administrators made in respect of 18 other companies which form part of the EMEA Region (together the **"EMEA Companies"**) on the basis that their respective head office functions are carried out in England, and that England is where the centre of main interests (**"COMI"**) of each of the EMEA Companies is located.  I am also a director of the

EMEA Companies having been appointed to the majority yesterday as a result of the resignation of a number of those directors in anticipation of the financial problems now facing the Group. This is described in more detail at paragraphs 208 to 212 below.

3.    Except where I indicate to the contrary, the facts contained in this witness statement are within my own knowledge and are true. Where the facts are not within my own knowledge I have indicated my sources of information which I believe to be true. There is now produced and shown to me a bundle of papers marked "**SLR1**" to which I shall refer in this witness statement.

## I.    SUMMARY

4.    This application is being made in connection with and following the insolvencies of the Company's parent company and certain of its subsidiaries in Canada and the U.S. ("**North America**"). I am advised by E&Y that the predicted impairment on the global business of the Nortel Group as a consequence of those filings means that it is inevitable that the Company and the EMEA Companies will become insolvent.

5.    The decision to seek an administration order in England for the Company and the EMEA Companies was made by the Directors on the basis that: (i) it will give the EMEA Companies the best opportunity, with North America, to pursue a fully coordinated approach to the restructuring of the Nortel global operations, including, in particular, approaches to potential buyers; and (ii) this course of action is in the best interests of the creditors of each of the EMEA Companies.

6.    There is a large volume of information for the Court to consider in relation to the complex arrangements between the Company and the EMEA Companies. To assist the Court the information is set out under the following headings:

    a.    (Sections I – IV) The Group and its business

        This section sets out the history, overview and business of the global Nortel business. It will also demonstrate that the global and EMEA business is highly integrated and that successful financial performance depends upon a high degree of inter-dependence amongst the entities within the Group; and that the centre of operations and head office functions for the EMEA Region is carried out from and performed in England.

b.    (Section V) The financial difficulties of the Group and the EMEA Companies

This section will deal with the financial difficulties that have affected the global Nortel business and its EMEA business. It will also explain why administration is the best opportunity to appraise a global restructuring of the Nortel business.

c.    (Section VI) Details of why COMI for the EMEA Companies is located in England

This section sets out the evidence which demonstrates that the centre of operations and head office functions for the EMEA Region is carried out from and performed in England.

d.    (Section VII) Cascade of the board of directors of the EMEA Companies

This section details why it was considered strategically advantageous by the Company that Simon Freemantle and me become directors of the EMEA Companies in order to take a co-ordinated approach to the EMEA Companies in relation to any applications for administration in England or facilitating a restructuring.

e.    (Section VIII) Jurisdictional requirements set out in paragraph 11 of Schedule B1 to the Insolvency Act 1986 and Rule 2.4 of the Insolvency Rules 1986.

This section sets out the advantages of co-ordinated filings across the globe, as well as containing information required by law for this application.

## II.    BACKGROUND

### II.1    The Company

7.    The Company is the current owner of the UK business of the Group, which has been operating in England for around 20 years.

8.    The Company was incorporated on 25 February 2000 under the Companies Act 1985 and its registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire SL6 3QH. The printout from Companies House confirming this is at SLR1, tab 1, page 1.

9.    The Company's original name was Nortel Networks Holdings Limited (a private company). On 5 May 2000 the Company re-registered as a public company and changed its name to Nortel Networks Holdings plc. The Company then re-registered as a private company and changed its name to Nortel Networks UK Limited with effect from 2 March 2001. The Company has a branch in Saudi Arabia.

10. The issued share capital of the Company is £1,468,100,001 divided into 1,468,100,001 ordinary shares of £1 each. The amount of the capital paid up or credited as paid up is £1,468,100,001.

11. The Company is a wholly-owned subsidiary of Nortel Networks Limited ("NNL"), a Canadian company. The Company's ultimate parent company is Nortel Networks Corporation ("NNC"), a Canadian company listed on both the Toronto Stock Exchange ("TSX") and the New York Stock Exchange ("NYSE").

12. NNC is the direct or indirect parent of 142 subsidiaries operating worldwide, including the Company and the EMEA Companies.

13. References to "Nortel", the "Nortel Companies", the "Group" and the "Nortel Group" are references to the global enterprises as a whole. A copy of the Nortel Group structure is at SLR1, tab 2, page 2.

14. The Company is the centre of operations for the EMEA Region of the Group. The 18 EMEA Companies are:

   1. Nortel Networks S.A. (France)

   2. Nortel GmbH (Germany)

   3. Nortel Networks (Ireland) Limited (Ireland)

   4. Nortel Networks N.V. (Belgium)

   5. Nortel Networks S.p.A. (Italy)

   6. Nortel Networks B.V. (Netherlands)

   7. Nortel Networks Polska Sp. z o.o. (Poland)

   8. Nortel Networks Hispania, S.A. (Spain)

   9. Nortel Networks International Finance & Holding B.V. (Netherlands)

   10. Nortel Networks (Austria) GmbH (Austria)

   11. Nortel Networks, s.r.o. (Czech Republic)

   12. Nortel Networks Engineering Service Kft. (Hungary)

   13. Nortel Networks Portugal S.A. (Portugal)

   14. Nortel Networks Slovensko, s.r.o. (Slovakia)

   15. Nortel Networks France S.A.S (France)

   16. Nortel Networks Oy (Finland)

17.    Nortel Networks Romania SRL (Romania)

18.    Nortel Networks AB (Sweden)

15.    References to "**EMEA**", the "**EMEA Companies**", the "**EMEA Entities**" and the "**EMEA Group**" are references to the EMEA enterprises as a whole.  The 18 EMEA Companies are incorporated and have registered offices outside England.  However, the centre of main operations and head office functions are located in England.  The EMEA Companies have their centre of main interests in England as:

a.    senior management for EMEA is largely located in England at the Company's Maidenhead campus;

b.    the senior management, which is largely located in Maidenhead, make the vast majority of significant decisions in respect of the operations of the EMEA Companies;

c.    the senior management of all key primary functions (i.e. sales, finance, treasury, legal and human resources) required for the operation of the EMEA Region are located in England;

d.    significant decisions in relation to sales and dealings with customers are largely made in England;

e.    obligations to suppliers are subject to approval processes conducted and managed in England, a process of which the majority of suppliers are thought to be aware;

f.    management, supervision and decision-making in relation to taxation of the EMEA Group is made in England;

g.    finance and control functions are run from England;

h.    human resources for EMEA are supervised and run from England;

i.    decisions in relation to settlement of intercompany accounts are made by the EMEA Treasury team in England.  Those terms are determined in accordance with global and EMEA Region procurement policies and are authorised by the individual with the relevant authority level (as determined by the nature of the procurement transaction);

j.     all EMEA senior legal decisions are made in England;

k.     all matters in relation to compliance, ethics and corporate security for the EMEA Region are dealt with and managed out of England;

l.     the EMEA leasehold portfolio is managed through a relationship corporate real estate team located in England; and

m.     the treasury and banking functions for the EMEA Companies are managed out of England.

**II.2    North American bankruptcies**

16.    On 14 January 2009 NNC, NNL and various other Canadian companies in the Group (the **"Canadian Companies"**) resolved to seek protection under the Canadian bankruptcy law, the Companies' Creditors Arrangement Act (**"CCAA"**), to facilitate the reorganisation of the Nortel Companies for the benefit of its creditors. Certain of NNC's direct and indirect U.S. subsidiaries (the **"U.S. Companies"**) also resolved to file for a voluntary petition pursuant to Chapter 11 of the United States Bankruptcy Code (the **"Code"**).

**II.3    History and Overview of the Nortel Group**

*II.3.1    History of the Nortel business*

17.    Nortel was founded by Bell Telephone Company of Canada in 1895 as Northern Electric and Manufacturing Company Limited, a provider of telecommunications equipment for Canada's telephone system. By the late 1980s it had become known as Northern Telecom Limited (**"Northern Telecom"**) which expanded into the U.S., operating out of a number of plants, employing thousands of people. Northern Telecom also made in-roads in China and Japan.

18.    In 1998, Northern Telecom changed its name to **"Nortel Networks Corporation"** and in 2000 NNC became a widely-held Canadian public company.

19.    For the last eight years, Nortel has focused on growth through strategic alliances, (e.g. LG Electronic Inc.) to provide more comprehensive solutions to customers on a global basis.

20.    Nortel's year end 2007 worldwide revenue was approximately U.S$11 billion, of which around 25% was generated by the EMEA Region and 6% by the Company.

21.    Overall, Nortel employs 24,000 people worldwide, of which approximately 4,600 are employed in the EMEA Region.

### II.3.2    Overview of the business

22.    Nortel is a global supplier of networking solutions (i.e. telecommunications, computer networks and software), serving both **"Carrier"** (also referred to as a service provider) and **"Enterprise"** customers in North America, EMEA, Latin America and Asia. This includes hardware and software solutions and related services.

23.    Nortel has a history of innovation in the design, development and deployment of products, systems, and solutions in modern communications to deliver value to its Carrier and Enterprise customers globally. This includes internal Research & Development (**"R&D"**) initiatives and external R&D partnerships.

24.    Nortel conducts R&D through 10 key R&D "Centres of Excellence" globally and also invests in approximately 50 technology innovation initiatives with more than 20 major universities. Nortel also has strategic alliances, partnerships and joint ventures with other best-in-class companies. Furthermore, Nortel Companies work with and contribute to leading research organisations with information technology (**"IT"**) and telecoms, and hold leadership positions in many of them.

### II.3.3    Global Structure

25.    In summary, NNC is the ultimate holding company of the Nortel Group. NNL is the primary Canadian operating company and holding company for most of the global subsidiaries. It is also a primary obligor under all bond indentures and is the issuer of preferred shares listed on the TSX. Nortel Networks Inc (a U.S. company) (**"NNI"**) is a private company and is the primary U.S. operating company.

## III.    GENESIS AND STRUCTURE OF THE EMEA REGION

### III.1    Genesis of the EMEA Region

26.    The Company owns all but three of the EMEA Companies via ownership of Nortel International Finance & Holding B.V. (**"NNIF"**) further to a restructuring of the EMEA Region in December 2007, when the Company acquired the whole of the issued share capital of NNIF from NNL.

27.    The purpose of the restructuring in 2007 was to deal with the position under which NNL had become significantly indebted to the Company over the preceding years, and that indebtedness was causing a UK tax problem resulting in a per annum tax cost of around US$18 million.

28.    Prior to the 2007 restructuring, the NNIF group had been owned by NNL since its formation in the 1980s, although NNIF was held via a Luxembourg subsidiary of NNL from 1993. NNIF was set up in the 1980s as the regional holding company to own the European interests of the Group, to both mitigate taxes on divestments of or dividends from those companies, and to act as a funding vehicle for the EMEA Region businesses.  The latter role was quite significant and has largely been assumed by the Company in recent years.

29.    Most of the interests in NNIF started off as new company formations when Nortel had the need for a corporate presence in territories in which target customers operated or where European joint ventures were entered into with outside parties.

30.    At the time NNIF was formed, the Nortel UK interests were not very substantial.  The acquisition by NNL in 1990 of STC plc, a major UK public company, significantly increased the Nortel Group's UK presence including both a large EMEA customer base and a significant technological base.  The UK business then became the largest operation in the EMEA Region as well as the centre of operations, making the vast majority of significant decisions for the EMEA Companies and performing head office functions. Since that time the majority of the individual EMEA Companies have operated as sales centres within the state of incorporation.

31.    Nortel Networks SA ("**NN France SA**") was a joint venture with an outside party which Nortel took 100% control of in 1999.

32.    The strength of central management personnel and its business segment coverage means England is the management centre for EMEA.  This has been assisted by the fact that senior North American personnel seconded to work in EMEA, which used to involve a considerable number of individuals, used England as a location when based in Europe which attracted management support functions around them.

III.2    **Structure of the EMEA Region**

33.    The principal activities of the Company are the development and supply of telecommunication equipment and software services and serving as centre of operations of the EMEA Region.  The financial performance of the Company is determined by global agreements with certain other wholly-owned subsidiaries of NNL.

34.    As noted above, since 1990 the UK business of the Group has been the largest Nortel presence in EMEA and has had the widest coverage of Nortel business segments.  NN France SA was a joint venture until 1999, and is focused on the "Wireless-GSM" business segment. The next largest presence, Nortel GmbH ("**NN Germany**"), was also a joint venture until 2003 and remains focussed on its local market.  However, the Company is by far the largest

business in the EMEA, and was ranked second highest earner out of all Nortel entities for the year end 2007. No other EMEA Company appears in the top 20.

35.　The EMEA Companies are tasked with the marketing, sale and distribution of Group products under the strategic and operational control of senior management in England.

36.　The majority of the EMEA Companies are subsidiaries of the Company, with the exception of:

    a.　Nortel Networks SA ("**NN France SA**") which is jointly owned by NNL (as to 9 per cent) and NNIF (as to 91 per cent);

    b.　Nortel Networks France ("**NN France SAS**") which is an ultimate subsidiary of NN France SA; and

    c.　Nortel Networks (Ireland) Limited ("**NN Ireland**") which is a wholly-owned subsidiary of NNL.

37.　With regards to NN France SA, it was proposed as part of the 2007 restructuring that the 91 per cent of the shares in NN France SA held by NNIF were to be transferred to the Company in early 2009 once a valuation had been undertaken. However, the completion of the restructuring has been overtaken by the North American insolvency filings. Despite this, NN France SA is effectively treated as an economic subsidiary of the Company.

38.　With regards to NN Ireland, it is the core legal entity for EMEA Enterprise sales. It has most of the EMEA sales for that business line passing through it, for historic reasons. It makes the larger part of product supplies from the Company; some US$160 million worth at group cost in the 9 months to September 2008.

39.　Until December 2007, NN Ireland was wholly owned by NNIF, but it was sold to NNL by NNIF prior to the 2007 restructuring for fiscal reasons.

III.3　**Inter-connected nature of the operations of the European group**

40.　The EMEA Region can be categorised as comprising the following types of entities:

    a.　Residual Profit entities (an "**RP Entity**", together the "**RP Entities**");

    b.　Cost Plus entities (a "**CP Entity**", together the "**CP Entities**");

    c.　Limited Risk entities (an "**LR Entity**", together the "**LR Entities**");

d.    At Risk entities (an "**AR Entity**", together the "**AR Entities**"); and

e.    holding companies (the "**Holding Companies**").

Each of these types of entities is addressed in turn in the following paragraphs.

### III.3.1  The RP Entities

41.    There are three RP Entities:

| No. | RP Entity | EMEA Country |
|-----|-----------|--------------|
| 1. | The Company | UK |
| 2. | NN Ireland | Ireland |
| 3. | NN France SA | France |

42.    RP Entities are fully integrated operations in that all the EMEA Group business functions sit within them. They derive revenues from distribution and sales of Nortel products, which will include customers outside their territory of incorporation, both third party and other Group companies. In addition to hosting parts of the Group business support functions they also conduct and fund the Group R&D effort.

43.    RP Entities are granted a licence to use the Group intellectual property ("**IP**") via a licensing agreement with NNL which owns all IP, known as the Master Research & Development Agreement. Each EMEA Company's profit is determined in accordance with the "**Transfer Pricing**", set out in more detail at paragraphs 80 to 81 below.

### III.3.2  The CP Entities

44.    There are eight CP Entities:

| No. | CP Entity | EMEA Country |
|-----|-----------|--------------|
| 1. | Nortel Networks O.O.O.* | Russia |
| 2. | Nortel Networks Oy | Finland |
| 3. | Nortel Networks (Scandinavia) AS * | Norway |
| 4. | Nortel Networks Romania SRL | Romania |
| 5. | Nortel Networks AB | Sweden |

| No | CP Entity | EMEA Country |
|----|-----------|--------------|
| 6. | Nortel Networks Ukraine Limited * | Ukraine |
| 7. | Nortel Networks South Africa (Proprietary) Limited * | South Africa |
| 8. | Nortel Telecom International Ltd * | Nigeria |

\* - No administration application is being made.

45. CP Entities are service companies, their main roles being the marketing of Nortel product, customer relationship management and local product installation and training. They may have a direct relationship with customers to provide these services or may provide the services to other EMEA Companies.

46. CP Entities generally receive income on a **"Cost Plus"** basis. "Cost plus" means the process by which the fully accounted cost, including attributable business overheads (but not funding costs), is calculated and a fee equal to those costs plus an agreed mark up (usually 10 per cent) is billed by the CP Entity to the Group company benefiting from the services (the Company and NN Ireland, as well as NNL). CP Entities may also derive some income locally from installation and training services to customers.

*III.3.3   The AR Entities*

47. There are three AR Entities of which two are seeking administration – Israel is seeking the local equivalent of an administration:

| No | AR Entity | EMEA Country |
|----|-----------|--------------|
| 1. | Nortel GmbH | Germany |
| 2. | Nortel Networks Israel (Sales and Marketing) Limited | Israel |
| 3. | Nortel Networks France S.A.S. | France |

48. AR entities are distribution and sales businesses. They derive revenues from distribution and sales of Nortel product, largely to third party customers within their own territory of incorporation but also third party customers outside that territory and other Group Companies.

49. The AR Entities were historically joint venture operations and their relationship with the Group continues to be governed by agreements entered into when they were former joint venture entities. Their profitability depends on their own performance.

### III.3.4  The LR Entities

50.     There are 11 LR Entities of which 10 are seeking administration orders:

| No | LR Entity | EMEA Country |
|---|---|---|
| 1. | Nortel Networks N.V. | Belgium |
| 2. | Nortel Networks S.p.a. | Italy |
| 3. | Nortel Networks B.V. | Netherlands |
| 4. | Nortel Networks Polska Sp. z.o.o. | Poland |
| 5. | Nortel Networks Hispania, S.A. | Spain |
| 6. | Nortel Networks Austria GmbH | Austria |
| 7. | Nortel Networks s.r.o. | Czech Republic |
| 8. | Nortel Networks Engineering Service Kft | Hungary |
| 9. | Nortel Networks Portugal S.A. | Portugal |
| 10. | Nortel Networks Slovensko s.r.o. | Slovakia |
| 11. | Nortel Networks A.G. * | Switzerland |

\* - No administration application is being made.

51.     LR Entities are distribution and sales businesses.  They will enter into third party customer contracts, which, in the case of larger pan-European and global customers, are often subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the EMEA group.  They will satisfy customer contracts for products by placing an order with the relevant "**TCC**" (described in more detail at paragraphs 76 to 78 below).

52.     LR Entities' operating profit before restructuring and finance costs is calculated by reference to a benchmarked arms length return, currently 1% on third party sales under individual distribution agreements with NNL, which means that they are underwritten for business risks by NNL apart from those associated with their own business infrastructure.

53.     LR Entities are granted the right to use the group IP rights held by NNL pursuant to a standard form distribution agreement.

*III.3.5   The Holdings Entities*

54.   There are three Holding Companies of which one is seeking administration.  Israel is seeking the local equivalent of administration:

| No | LR Entity | EMEA Country |
|---|---|---|
| 1. | Nortel Networks International Finance & Holdings B.V. | Netherlands |
| 2. | Nortel Communication Holdings (1997) Limited | Israel |
| 3. | Northern Telecom France S.A.* | France |

*  No administration application is being made.

55.   The Holding Entities undertake no trading activities and act solely as a holding company for their subsidiary entities.

56.   The RP, CP, LP and AR Entities make up the business of the EMEA Region and operate within the Nortel business segments, which are described in more detail below.

## IV.   BUSINESS OF THE COMPANY, THE GROUP AND THE EMEA REGION

### IV.1   Nortel's business

57.   There are two main parts to Nortel's global business:

    a.    the supply of physical hardware with embedded or bundled software through Nortel's four business segments: Carrier Networks ("**CN**"), Enterprise Solutions ("**ES**"), Global Services ("**GS**") and Metro Ethernet Networks ("**MEN**"); and

    b.    the deployment and support of that hardware (formerly provided through the GS business but now integrated into the CN, ES and MEN businesses).

58.   In year end 2007 total revenue generated by the businesses was approximately US$11 billion.

*IV.1.1   The CN business*

59.   The CN business provides wireless networking solutions that enable service providers and cable operators to supply mobile voice, data and multimedia communication services to individuals and enterprises using mobile telephones, personal digital assistants and other wireless computing and communications devices.

60.   The CN portfolio includes 3G and 2.5G mobility networking based on Code Division Multiple Access ("**CDMA**"), Global System for Mobile communications ("**GSM**"), Global

System for Mobile Communications - Railway ("**GSM-R**"), General Packet Radio Service ("**GPRS**") and Enhanced Data Rates for GSM Evolution ("**EDGE**").

61.     In year end 2007 the CN business generated approximately US$4.5 billion, around 41 per cent of Nortel's worldwide revenue.

*IV.1.2   The ES business*

62.     The ES business provides communication solutions to build networks and transform existing communications networks into cost effective, packet-based networks supporting data, voice and multimedia communications. The ES business works with the headquarters, branch and home office needs of large and small businesses globally across a variety of industries, including healthcare and financial service providers, retailers, manufacturers, utilities, educational institutions and government agencies.

63.     In year end 2007 the ES business generated approximately US$2.6 billion, around 24 per cent of Nortel's worldwide revenue.

*IV.1.3   The MEN business*

64.     The MEN business provides optical networking and carrier grade ethernet data networking solutions to make the Carrier and large Enterprise customers' networks more scalable and reliable for the high speed delivery of multimedia communications services, for example internet video, residential broadcast TV, video on demand and new wireless broadband multimedia applications.

65.     In year end 2007 the MEN business generated approximately $1.5 billion, around 14 per cent of Nortel's worldwide revenue.

*IV.1.4   The GS business*

66.     The GS business provided a broad range of services supporting multi-vendor, multi-technology networks for enterprises and carriers worldwide to reduce costs and improve efficiency. This included services to help design, deploy, support and evolve networks for small to medium-sized businesses and large global enterprises, municipal, regional and federal government agencies, wireline and wireless carriers, cable operators and mobile virtual network operators.

67.     In year end 2007 the GS business generated approximately $2.1 billion, around 19 per cent of Nortel's worldwide revenue.

IV.2    **Nortel Companies' Supply Structure**

68.    Due to the global nature of the business, many of Nortel's primary external supplier contractual relationships are with NNL in Canada. However, most EMEA Companies order products pursuant to internal sub-agreements with suppliers and Nortel's regional hubs.

69.    Nortel's supply chain for hardware consists of three steps:

a.    Contract manufacturers or electronics manufacturing services providers ("**EMS**").

The EMS provides final assembly, testing and configuration and delivery to the Nortel distribution centres or Nortel customers directly. An EMS may also perform sub-assembly of circuit board frames and cabinets. Nortel's single largest EMS is Flextronics Telecon Systems Limited ("**Flextronics**") which is discussed in more detail below.

b.    Original equipment manufacturing ("**OEM**") and original design manufacturing ("**ODM**") Tier II suppliers ("**TIER II Suppliers**").

Tier II Suppliers are Nortel's suppliers of products which may be used in Nortel's final product or sold bundled with such product. ODM Tier II Suppliers may also contribute IP development and customisation of products. Although Nortel (usually NNL) enters into master contracts for the supply of products with these OEM/ODM Tier II suppliers. In the case of the Company it contracts directly with the OEM/ODM Tier II Suppliers to facilitate the ultimate product delivery to the customer which placed the order with the regional sales company. This differs with NN France SA where all purchase orders are issued by the EMS and are shipped directly to the EMS as required and Tier II Component Suppliers are paid by the issuer of the purchase order.

c.    Tier II component suppliers ("**Tier II Component Suppliers**").

Tier II Component Suppliers are parts suppliers who provide piece parts for Nortel's hardware products. Again, Nortel (usually NNL) enters into master contracts for the supply of products with these component suppliers. In the case of the Company it contracts directly with the OEM/ODM Tier II Suppliers to facilitate the ultimate product delivery to the customer which placed the order with the regional sales company. This differs with NN France SA where all purchase orders are issued by the EMS and are shipped directly to the EMS as required and Tier II Component Suppliers are paid by the issuer of the purchase order.

15

### IV.2.1    Deployment Services

70. Once a customer's hardware has been manufactured, the businesses provide for installation, network integration and support services (the **"Deployment Services"**). Service professionals may be on-site for the installation of products or may operate remotely off-site.

71. Deployment Services are managed regionally and cover all product lines. For example, in EMEA, all deployments for all product groups are handled across the region through Global Operations led by Ashley Saunders from Maidenhead. This group is responsible for its own order taking, engineering, installation, commissioning and network integration.

72. Deployment Services are performed by both Nortel employees and third party suppliers. In EMEA, 27 per cent of Deployment Services are provided by third parties

### IV.2.2    Flextronics

73. In 2006, the Nortel Companies outsourced substantially all of their hardware manufacturing and related activities including certain product integration, testing, repair operations, supply chain management, third party logistics operations and design assets.

74. In this regard, NNL entered into an asset purchase agreement with Flextronics for the sale of the bulk of its inventory and manufacturing facilities. In connection with the Flextronics sale, NNL and Flextronics entered into a four year supply arrangement for the supply of products and services on an on-going basis.

75. Nortel has sought to diversify its supply sources. However, to date, Flextronics remains Nortel's largest supplier. For 2008, Nortel estimates that Flextronics will have supplied approximately 75 per cent of Nortel's products and provided logistics and maintenance in connection with those products.

### IV.3    Nortel internal purchasing system

76. Nortel employs a complex internal purchasing system for its hardware and software products.

77. Nortel's internal purchasing system works as follows:

   a. when a customer sales order is placed with one of the Nortel regional sales companies, an internal purchase order is placed, which is automatically routed through one of four transaction control centres ("TCCs") depending on the business (CN, MEN or ES) and the geographic region involved. The TCCs act as purchasing hubs for all of Nortel Companies' regional sales entities. The four TCCs are NNL (Canada), NNI (USA), the Company and NN France SA;

b.   when an internal purchasing order is received by one of the TCCs, that TCC (apart from the Company) contracts directly with the OEM and ODM Tier II Suppliers to facilitate the ultimate product delivery to the customer which placed the order with the regional sales company;

c.   upon completion of the purchase order, the TCC (apart from the Company) pays the OEM/ODM Tier II Supplier and bills the regional sales company with an additional mark up, which is paid after delivery.  The OEM or ODM Tier II Supplier may be paid prior to the internal payment of the resulting receivable.

78.   Approximately two thirds of all purchasing flows through the North American purchasing hubs (NNL and NNI) and one third through the Company and NN France, as their revenues from this in the nine months to September 2008 being US$ 485 million and US$ 123 million respectively.

79.   The Company acts as the purchaser for EMEA of MEN, Enterprise "Voice" and Enterprise "Data" products.  NNL generally acts as the purchaser for worldwide CDMA products and is where an EMEA entity will go to for those products.   NNI acts as the purchaser for worldwide CN CVAS products and NN France SA acts as the purchaser for CN GSM products worldwide.  Again, an EMEA Company is required to deal with those TCCs for such products.  All supply issues for EMEA are dealt with and resolved in Northern Ireland by the Company's operations based there.

*IV.3.1   Transfer Pricing*

80.   The purchasing arrangements result in very large numbers of inter-company receivables and payables, which necessitates transfer pricing and inter-company settling methods.

81.   Nortel's transfer pricing model (the "**Transfer Pricing Model**") can be broken down into two main components:

a.   Inventory Mark Up.

When a TCC (e.g. the Company) purchases inventory following an order from a regional sales company, it invoices the regional sales company (the "**Internal Invoice**") for the product with a mark up on cost (the "**Initial Mark Up**") from the supplier invoice.  The mark up is the first component on Nortel's Transfer Pricing Model;

b.    Residual Profit Sharing.

The second component of the Transfer Pricing Model is derived from Nortel's profit sharing adjustment model based on the profit projections that Nortel forecasts for its global entities and the RP Entities. On a quarterly (potentially moving to monthly) basis, operating profit is assessed and re-allocated based on the projections for each Nortel Company. To the extent that any Nortel Company has enjoyed a profit that exceeds its profit entitlement (after taking into consideration the amounts paid on the Initial Mark Up), it is required to remit additional monies back to the RP Entities. RP Entities then allocate amongst themselves based on their agreed upon profit entitlements.

*IV.3.2    Inter-Company Accounts*

82.    EMEA Treasury (carried out by the Company in Maidenhead) is responsible for the amount and flow of funds between the EMEA Companies. The two primary purposes of the inter-company accounts are (a) inter-company trade invoices and (b) to facilitate the Transfer Pricing Model.

83.    Typically, internal invoices are settled on a monthly basis. The way that internal invoices are settled is either through:

a.    set off against other invoices or debt;

b.    cash payment – where the Nortel Company has sufficient funds to pay the Internal Invoice, it will make an actual transfer from its accounts to the TCC account, or the NNL account in the case of RP Entities' settlements; or

c.    carry forward - in certain circumstances, the purchasing Nortel Company does not have sufficient funds to pay an Internal Invoice and so the vendor will allow the receivable to carry forward.

84.    EMEA Treasury determines and facilitates how to settle inter-company accounts. If it is not automatically settled under standard terms, a recommendation is sent to the applicable Nortel Company for consideration. The ultimate decision regarding payment, or settlement is led by EMEA Treasury taking into consideration local entity and tax issues

*IV.3.3    Inter-company balances*

85.    Funding for each Group subsidiary is first determined based on a capital requirement basis. The preference is to fund in the most flexible a tax efficient manner, the majority of which is

normally via loan rather than equity capital. Generally, lending is arranged in such a way as to mitigate both foreign exchange exposures and withholding taxes on interest flows and is done on a parent to direct subsidiary basis subject to tax efficiencies. Excess cash in a subsidiary can be loaned to facilitate funding of other subsidiaries within the region or globally. Global inter-company facilities and loans are all managed from EMEA Treasury in England.

86.     Inter-company receivables arise among the operating subsidiaries. When such receivables are not settled on a short time frame, such a receivable will be converted into an inter-company loan. These loans are typically repaid in the normal course of business.

## IV.4   Funding of the EMEA group

87.     A number of the EMEA Companies participated in a cash pooling arrangement (the "**Cash Pooling Arrangement**") managed by EMEA Treasury until it was discontinued upon legal advice as of 29 December 2008 given the solvency concerns of the Nortel Group. The Cash Pooling Arrangement operated in the following manner:

a.      cash denominated in U.S. dollars and/or Euros held by individual EMEA Companies within the Cash Pooling Arrangement in various bank accounts in the countries in which such participating EMEA Companies are situated was transferred from each such account into separate accounts with Citibank in London in the name of the relevant participating EMEA Company. Title to the transferred cash was thus retained by each participating EMEA Company.

b.      Such transfers could occur on a daily or weekly basis. EMEA Treasury would request a particular participating EMEA Company to make such transfers. In each case, the amount of cash transferred was not predetermined, but rather it was determined on an ad hoc basis depending on how much EMEA Treasury, in consultation with the relevant participating EMEA Company, determined was necessary or desirable. Each such transfer was manual, and thus deliberate, rather than predetermined or automatic.

c.      Once the transferred cash arrived at Citibank in London it did not move elsewhere. The Company held an account in its own name with Citibank in London with a nil balance. Citibank would allow this account to go into overdraft to the value of the aggregate of the cash balances of the individual accounts held with it in the names of the participating EMEA Companies. In this way, the Cash Pooling Arrangement was a notional, rather than an actual, cash pooling arrangement.

d.   On a daily basis, the Company would invest an amount equal to the aggregate of the cash balances of the individual Citibank accounts in money market deposits. The Company used the overdraft granted by Citibank to make such investments.

e.   If the Company did not deposit enough cash into its account to return the overdrawn balance on that account back to nil following receipt of such monies from money market investment counterparties, Citibank had the right to set-off any negative balance on the Company's account against the positive balances of the individual accounts in the names of the participating EMEA Companies. In such circumstances, each participating EMEA Company would have an unsecured claim against the Company. Each of the participating EMEA Companies entered into a counter-indemnity agreement whereby any participating EMEA Company that suffered a loss as a result of these set-off arrangements would be entitled to be reimbursed for the amount of such loss by another participating EMEA Company.

88.   The Cash Pooling Arrangement was discontinued in December 2008 because, once it became known that the North American Companies were facing financial difficulties, EMEA Treasury (on legal advice) did not want to expose the participating EMEA Companies to the risk that Citibank may utilise its right of set-off. This decision was taken by Simon Freemantle, Director Global Treasury Operations, based in Maidenhead. Had the EMEA Group been in a healthy financial position and the Directors not been aware of the possibility that it may need to apply for administration in the near future, the Cash Pooling Arrangement would almost certainly have remained in place.

89.   Since the ending of the Cash Pooling Arrangement, each EMEA Entity has at least one local bank account with minimal weekly working capital requirements. Their London account holds the "surplus" and is managed by EMEA Treasury which makes the investment decisions in relation to the Money Market Fund of short term deposits in the name of that EMEA Entity.

## V.   THE COMPANY'S AND EMEA'S FINANCIAL DIFFICULTIES

### V.1   Financial difficulties faced by the Nortel Group

90.   The Nortel Group is loss making and has reported only losses or break-even financial results in the last five financial years. In the nine months ended 30 September 2008, I am informed that the Nortel Group incurred a consolidated net loss after tax of $3.7 billion against a net loss after tax of $1 billion in the year ended 31 December 2007.

91. In this context, the EMEA reporting region entities' results for the nine months ended 30 September 2008 were a combined loss after tax of US$261 million, against a combined net loss after tax of $134 million in the year ended 31 December 2007. Therefore, the EMEA reporting region entities are also loss making overall.

*V.1.1    Industry issues*

92. The Nortel Companies operate in a highly competitive industry which is rationalising and consolidating. By way of example, two of Nortel's largest competitors, Lucent Technologies Inc. and Alcatel, merged in 2006 and two of its largest customers, Verizon Wireless and Alltell Corporation, merged in 2008.

93. In recent years, the operating costs of the Nortel Companies have generally exceeded revenue. A number of factors have contributed to these results, including an inability to reduce operating expenses, restructuring costs, competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investments and the global economic downturn.

94. On 17 September 2008, Nortel announced that with the sustained and expanding economic downturn it was experiencing significant pressure on its business as certain customers cut back their capital expenditures further than previously expected and others were deferring new IT and optical investments. In addition, the Nortel Companies were experiencing additional pressure on revenue due to foreign exchange impacts. In response to the business environment, Nortel announced that a comprehensive review of its business was taking place, including planning for further restructuring and other cost reduction initiatives.

95. On 10 November 2008, Nortel announced an update to its business review including a new operating model (which took effect on 1 January 2009) to further consolidate management positions and increase efficiencies in its business units, a further planned restructuring of its workforce and other cost reduction actions and a focus on cash preservation including the suspension of the declaration of NNL's preferred share dividends. A second workforce reduction of the year in November 2008 announced job reductions of 3,500.

*V.1.2    Informal Restructuring Plans*

96. Since September 2008, Nortel has also pursued sales disposals which would involve a sale of all or substantially all of Nortel's business. In the fourth quarter of 2008, Nortel commenced negotiations with a potential purchaser to explore a sale or merger of the businesses. These negotiations, however, were ultimately unsuccessful.

97.    As of this application, Nortel has been unable to successfully restructure the business. This has been, in part, due to the integrated nature of the business segment with the overall Nortel business structure.

### V.1.3    The insolvencies of the North American Companies

98.    Since Nortel's announcement on 17 September 2008, worsening economic conditions and extreme volatility in the financial, foreign exchange and credit markets globally further impacted the Nortel Companies and customers resulting in reductions in customer spending levels and a reduced ability to forecast.

99.    The Canadian Companies believe that the actions which present the greatest potential for the survival and recovery of the Group are a comprehensive business and financial restructuring with the court's protection and, on 14 January 2009 the Canadian Companies resolved to seek protection under the CCAA to facilitate the reorganisation of the Nortel Companies for the benefit of all creditors. Simultaneously with the application under the CCAA in Canada, the U.S. Companies resolved to file for bankruptcy pursuant to Chapter 11 of the Code.

## V.2    Financial difficulties faced by the EMEA Group

### V.2.1    Impact of the Canadian and U.S. Companies insolvencies on the European group

100.    I have discussed with E&Y the impact which the North American insolvency filings is likely to have on the EMEA Companies and their ongoing financial position. In this regard I refer to paragraphs 5.1 to 5.8 of the E&Y report (the "**E&Y Report**") at SLR1, tab 3, I believe that:

    a.    whether or not the EMEA Companies themselves enter formal insolvency procedures, this will affect customer and supplier confidence in the EMEA Companies, and will be of concern to the work force upon which the future of the business depends;

    b.    due to the nature of the business, which is heavily dependent on a customer's confidence that its supplier is able to continue in the long term as a business partner, a reduction in sales revenues as a result of the North American filings of 25 per cent to 40 per cent is probable;

    c.    sales revenues for the first two to three months following a filing may be more stable as they would be partly based on orders already committed. However, revenues beyond the short term must inevitably be significantly affected, leading to increased losses and the dissipation of existing cash balances;

    d.    even though some EMEA Companies have considerable cash resources and were, prior to the North American filings, solvent on the basis that the value of those

companies' assets exceed the value of their respective liabilities, taking into account contingent and prospective liabilities, it is likely that overall trading losses and other factors would cause the EMEA Companies to become insolvent as a result of the North American filings;

e.  the insolvency and effect of formal insolvency procedures is likely to cause a breakdown in the system of intercompany netting and settlement which provides the essential distribution of cash throughout the Nortel Group. This is because the directors of each individual company will need to consider the creditworthiness of their intragroup trading partners much more carefully before entering into transactions with them; and

f.  it will be difficult for the EMEA Companies' directors to conclude that it is appropriate to continue trading, either with each other or by incurring credit with external suppliers on behalf of another Nortel Group company, unless the parent company is in a position to underwrite trading losses and meet short term cash requirements. I understand that NNL is unable to support the EMEA Companies in this way within the cash resources available to it. The cash requirements of the EMEA Companies are liable to be increased both by reduction in sales revenues, as explained above, and by the likelihood of suppliers demanding accelerated payment terms as a result of understandable nervousness about the Nortel Group's long term future. It may not be appropriate for the directors of the EMEA to continue trading and risk dissipating those cash resources in trading losses.

101.  For these reasons, E&Y have concluded that there is a danger that the EMEA Companies' affairs would disintegrate as individual companies sought protection under the insolvency laws of their own individual jurisdictions. Liquidation is the only insolvency option in some of the EMEA jurisdictions. Liquidation procedures do not facilitate the restructuring of a company's business and assets as a going concern, which, if it can be achieved, is almost invariably the best method of maximising returns to creditors. Where an administration order over a non-UK company would not be recognised in the country of incorporation, I understand that E&Y (if appointed as administrators) intend to assess how best to deal with that company. In some cases, they may seek to file locally where that can be coordinated with England, e.g. Israel.

102.  Overall, if no concerted action is taken, destruction of value within the EMEA region and in the Nortel Group as a whole (which I believe lies within its IP, goodwill and customer base,

as opposed to tangible assets) and dissipation of cash resources in trading losses is likely to occur. This would not be in the best interests of the EMEA Companies' creditors.

### V.2.2    Pending litigation

103.   The Company and the Group are under enquiry from HMRC and the Canadian and U.S. Tax Authorities in respect of transfer pricing arrangements covering years 2001 to 2005 inclusive. The authorities have very different views and there are inherent uncertainties as to the outcome of the negotiations between the authorities, the progress of which the Company continues to monitor.   The Nortel Companies are not a party to the negotiations but management believes it is possible that the result of the negotiations could result in a material reduction in the Company's net worth.

### V.2.3    Pensions liabilities

104.   The Company operates both defined benefit ("**DB**") and defined contribution pension plans. The pension fund is the largest single creditor of the Company.

105.   Under UK law, the Company is required to obtain an actuarial valuation for the Company's Pension Plan (the "**UK Plan**") every three years.  In 2005, the valuation showed a deficit of £356 million.   In November 2006, the Company entered into a funding agreement (the "**Funding Agreement**") with Nortel Networks UK Pension Trust Limited, the pension trustee (the "**Trustee**"),  pursuant to which:

   a.    the Company agreed to make ongoing current service contributions as well as past service "catch up" contributions (collectively, the "**Contributions**") to eliminate the deficit;

   b.    the Company agreed to pay the pension protection fund levy; and

   c.    except in certain circumstances, the Company agreed to not encumber its assets without prior consent of the Trustee or grant any new guarantees or indemnities in respect of NNC or any of its subsidiaries without prior consultation with the Trustee.

106.   As an additional term of the Funding Agreement, NNL entered into a guarantee dated November 2006 (the "**Primary Guarantee**") pursuant to which it guaranteed the Company's obligation to make the Contributions.   Under the Primary Guarantee, NNL's obligation to fulfil on the guarantee would be triggered by receipt of demand from the Trustee after the failure of the Company to make a payment and a grace period having gone by. In 2007, NNL granted an additional guarantee pursuant to which it guaranteed payment of the Contributions

which obligation would be triggered in the event of an "insolvency event" (i.e. namely, dissolution or wind up) affecting the Company.

107. A further valuation of UK Plan is being carried out based on its financial position as at 31 March 2008. The calculations have not yet been finalised, but the initial indications are that the ongoing deficit is now in the region of £479 million to £619 million. A new agreement to remove this deficit must be reached between the Company and the Trustee by 30 June 2009. The initial suggestions from the Trustee are that annual contributions of between £136 million and £176 million (currently £85 million for part and current service) should be paid by the Company to remove the deficit by April 2012 and that £1,127 million should be set aside in an escrow account by the Company to ensure that these contributions are made.

108. I understand that the 31 March 2008 valuation figures above are calculated on the basis that the Company does not go into administration – i.e. on the assumption that an ongoing employer will remain in place to continue to support the UK Plan for the foreseeable future. While the Company may have sufficient cash available to pay those contributions for a few months after the North American filings, it will not be able to meet contributions beyond the short term. In addition:

a. the fact that there will be no long term support will cause the Trustee to revise its estimate of the funding deficit and increase its contribution demands; and

b. under the requirements of FRS17, the Company's accounts will then have to reflect the increased funding deficit and the addition of this figure to the balance sheet will render the Company insolvent.

## VI.    COMI: OVERRIDING POINTS

### VI.1    Decision making process regarding the strategy of the operations of the European group

109. The overall global strategy for the Nortel Group is set at a very high level of generality by the board of directors of NNL and the Chief Executive Officer ("CEO") and Chief Finance Officer ("CFO") in Canada. Senior Management for EMEA in Maidenhead control the applicability of the global strategy to EMEA by designing the manner in which it is implemented in respect of the EMEA Companies. Darryl Edwards, President, Global Carrier Sales (and previously President, EMEA, up to 1 January 2009) is a member of the CEO's cabinet and is based in England.

110. The EMEA Senior Management is one step down in authority from the global strategy established in Canada.

111.    Senior Management for the EMEA Region is located in England at Nortel's Maidenhead campus, being:

    a.    Darryl Edwards, President, Global Carrier Sales;

    b.    Myself (Sharon Rolston), Director and Chief Financial Officer, EMEA;

    c.    Simon Freemantle, Director, Group Treasury Operations;

    d.    Ashley Saunders, Leader, Global Operations EMEA;

    e.    Sharon Ellerker, Human Resources ("HR") Leader, EMEA;

    f.    Christian Waida General Counsel, EMEA (up to 12 December 2008);

    g.    Mark Cooper, Assistant General Counsel, Employment;

    h.    Lynne Powell, Leader, Commercial Law, Carrier Networks, EMEA;

    i.    Dara Gill, General Counsel, Enterprise Solutions, EMEA (up to 31 January 2009);

    j.    Peter Newcombe, Product Group Leader for Carrier and MEN;

    k.    Calum Byers, Product Group Leader for Services; and

    l.    Lorraine Harper, Leader, EMEA Tax,

together, the "EMEA Senior Management".

112.    The following people are also members of the EMEA leadership team located outside of the UK:

    a.    Michel Clément, President, Southern Europe; and

    b.    Sorin Lupu, President, Eastern Europe.

113.    Michel Clement is located in France and Sorin Lupu in Israel. They both, however, report to Darryl Edwards and both have "Authority Level" or "AL" 2 (see paragraphs 121 to 124 below for an explanation of Authority Levels).

114.    The EMEA Senior Management operates with a large degree of autonomy from Canada, setting all policies, procedures, budgets, targets and operational matters for the EMEA Region which are disseminated to the EMEA Companies which are required to operate within those

instructions. Operational matters are determined by Ashley Saunders, also located in England. Corporate head office services including finance, human resources and information services are run on a global level with the head of each department being located in England (or in Ireland in the case of Information Services).

115. Policies are set on a global basis, but adherence to them by the EMEA Entities is implemented by EMEA Senior Management.

116. For example:

    a.    EMEA Senior Management will design its own policies where needed. The decision to enter into business in a new country requires prior approval from Darryl Edwards and myself. This is a policy that was designed and is implemented by EMEA Senior Management; and

    b.    each year, Darryl Edwards sets the targets for each EMEA Company with regards to sales and sales related matters. To illustrate how this is achieved, at SLR1, tab 4, page 51 is an email from Darryl Edwards to the EMEA regional leaders for sales and finance setting out targets and budgets through which they can operate.

117. Senior Management is required to operate from and live in England. For example, the EMEA Finance Controller was previously employed as the France Controller but as a condition of his new role he was required to relocate to England as the centre of decision making.

118. Therefore, all the key functions required for the operation of the EMEA Region are located in and carried out from England. In summary, the local operations of the EMEA Companies consist largely of implementing the strategic and operational decisions taken in Maidenhead.

VI.2    **Decision making and approval process of the European group**

    *VI.2.1    Summary*

119. The EMEA Senior Management exercise control and authority over the EMEA Region through a global decision making approval procedure and policy entitled the Corporate Procedure no. 301.01 (the **"Approval Procedure"**), a copy of which is at SLR1, tab 5, pages 53 - 106.

120. The Approval Procedure is applicable to all EMEA Companies and is managed out of England in relation to the EMEA Companies. The EMEA Senior Management comprise the majority of the holders of the highest level of authority in the EMEA Region. Operational authority is vested in EMEA Senior Management who in turn have not delegated that down to

the EMEA Entities, so retaining high level operating control in England.   EMEA Senior Management has, for several years, determined that the Approval Procedure is implemented and governed by a process devised by the EMEA Senior Management, called the "**DCA Process**".  The DCA Process is discussed in further detail at paragraphs 140 to 143 below.  It is important to first address how the authority pursuant to the Approval Procedure applies.

*VI.2.2    Transactions to which the Approval Procedure applies*

121.   The Approval Procedure applies to all maters which have the potential to impact on Nortel's economic resources, obligations or equity ("**Transactions**").   A Transaction may be financial or non-financial.

122.   An employee's authority level under the Approval Procedure ("**Authority Level**" or "**AL**") means that person's decision making authority in respect of the ability to approve certain Transactions.

123.   Approval Authority Level depends upon the nature of the parameters to be approved. Authority levels ranging from AL0 (highest authority) to AL3 (lowest authority) are assigned to employees as follows:

   a.    AL0 – given to (i) CEO and President, (ii) CFO and Executive Vice-President and (iii) people who report directly to the CEO as approved by the board of directors in Canada;

   b.    AL1 – typically restricted to the people who report directly to the CEO, the President or CFO and as approved by the board of directors in Canada;

   c.    AL2 – typically restricted to employees in leadership roles as determined and as approved by the CEO, President or CFO; and

   d.    AL3 – a lower level of authority assigned to employees in management roles by AL2 employees.

124.   The Authority Level required to approve a Transaction will depend on the size and nature of the Transaction.  For example, in the case of a sale proposal that has a standard margin of less than 0% - 45% and a value of $20 million - £100 million over the expected duration of the contract, approval is required from the "Business Unit" AL1, "Region" AL1 and also the "Finance" AL2.  If the customer payment terms are, for example, more than 90 days, AL1 Finance approval is required.  If the contractual terms include, for example, liquidated

damages that are greater than 20% of the contract value or greater than $10 million, approval from the Business Unit AL1 and the Finance and Legal AL2s are required.

125.  All AL1 approvers for the EMEA region are based in England with the exception of the technology or "Business Unit" approvers, who are based in North America. It is worth noting that very few EMEA proposals / contracts require AL0 approvals, for example deals that are expected to generate revenue in excess of US$100 million.

126.  In addition, the majority of the AL2 approvers for EMEA are based in England, being 16 in England and 13 in the rest of EMEA. The difference of authority between AL1 and AL2 relates to how significant the required involvement of the EMEA Entity is in relation to any particular matter, judged by factors such as numerical value and legal risk. For example, the decision to enter into a lease for a building can only be taken by an AL1 approver, based in England. Therefore, any strategic decision of importance is made in England.

127.  Other levels are assigned by managers, subject to the proviso that a manager cannot assign a level that is higher than his/her own level or, in the case of managers who are AL0 – AL2, equivalent to his/her own level.

128.  A table showing the names and locations of individuals who have been assigned an Authority Level relevant to the EMEA region is set out at SLR1, tab 6, pages 107 to 121.

*VI.2.3   Decision Makers*

129.  A "**Decision Maker**" is an employee who has the appropriate Authority Level to approve a Transaction. An employee who has the appropriate Authority Level may perform the role of Decision Maker only if the Transaction is within his/her financial and/or business jurisdiction of responsibility and complies with certain other criteria.

130.  Authority Levels for different Transactions are set out in a series of appendices to the Approval Procedure (the "**Approval Procedure Appendices**") at SLR1, tabs 5A-G, pages 68 - 106. Transactions are grouped according to risk, function and/or process and each transaction category is aligned to a specific Authority Level which identifies the relevant Decision Maker. The matrix setting out the Authority Levels applies globally unless a business unit specific matrix has been approved. Any such specific matrix must be more stringent than the global guidelines and approved by all impacted Decision Makers.

131.  The Approval Procedure Appendices identify:

a.      the category into which the Transaction falls;

b.      the Decision Maker or decision making function which ultimately approves the Transaction;

c.      any other functions / groups who must be consulted on the Transaction;

d.      whether or not "Finance" must be consulted;

e.      the corporate policies and procedures that relate to the Transaction; and

f.      any other special comments or requirements.

132.    At times, a Transaction will not fall within the Transaction category parameters and so will require AL3 or higher level review.

133.    At all times, employees are expected to use good business judgement when applying the Approval Procedure.  If a Transaction value is close to the maximum limit, they must at a minimum appraise the next management level of authority, especially where a Transaction is infrequent, uncommon and/or material to the business.

*VI.2.4    Restrictions on decision making*

134.    An Authority Level does not give the Decision Maker the authority to override Approval Procedure.  The Decision Maker has an obligation to ensure the Transaction complies with the Approval Procedure requirements and restrictions as well as any legal, tax, statutory, employment, equity or other requirement.

135.    An Authority Level does not give employees the authority to execute external legal documents.

136.    An Authority Level does not give employees the authority to commit to any supplier or enter into any Transaction for the acquisition of goods and/or services, which is governed by the Global Operations / Global Procurement policy discussed in further detail in paragraphs 154 to 157 below.

*VI.2.5    Example – Customer Related Sales and Billing*

137.    The Authority Levels for sales and billing are split into eight categories: (i) Sales and Proposals; (ii) Returns and Buybacks; (iii) Customer Incentives; (iv) Customer Credit; (v) Contractual Terms and Penalties; (vi) R&D, pre-GA (generally available) Product; (vii) Supply Chain Operations; and (viii) Other.

138.  Within each category, the Decision Maker and required consultants are allocated according to certain criteria. For example, in the Sales and Proposals category, the criteria are based on the standard margin and deal size. Customer credit is allocated according to length of payment terms. Contractual terms are allocated according to the nature of the term (for example, size of liquidated damages, exclusivity and most favoured customer provisions).

139.  In almost all instances, except where the deal size is very small or the criteria in question is not material, the Authority Level is AL2 or higher. For example, for Sales and Proposals (at SLR1, tab 5C, pages 79 and 80) the only criterion that has an AL3 for all jurisdictions are: (i) "Margin > 0%, Deal Size < $5M"; and (ii) "Margin >45%, Deal Size $5M - $20M".

### VI.3    Customer contracting

140.  Nortel has a contracting approval process applicable to all EMEA Entities for all sales agreements which is managed out of England. This is the **"DCA Process"** and it covers the contracting life-cycle as follows:

   a.    approval to start bid preparation – DCA1;

   b.    approval to submit a bid – DCA2; and

   c.    approval to sign a contract – DCA3.

141.  A copy of the DCA Process is at SLR1, tab 7, pages 122 - 124.

142.  The DCA Process was implemented by EMEA Senior Management in England who wished to ensure that a robust approval process was maintained for conducting management reviews of opportunities across EMEA. The DCA Process is coordinated by the leader of the bid management team, also based in England, to ensure that presentation material and risk assessment is consistent across EMEA and meets the requirements of EMEA Senior Management located in England. Therefore, the acquisition of any new customer will involve the following steps:

   a.    sales force engages customer and / or Nortel receives request to bid;

   b.    sales force must obtain DCA approval of proposal according to authority levels set out in the governance matrix;

   c.    key risks and win strategy presented at DCA review;

d.      DCA approvers approve deal; win strategy, non-standard terms and conditions, pricing, etc.; and

e.      core team (sales, legal, technical prime) responsible for closing a deal within DCA Process approved parameters.

143.    The individuals assigned with approval authorities for the DCA Process (the **"DCA Primes"**) are set out at SLR1, tab 8, page 125.  They are all located in England except as follows:

a.      South and Eastern Europe Region: DCA Prime, Finance and Legal AL2 are located in Israel and Russia;

b.      Central Region: DCA Prime and Finance AL2 in Germany;

c.      Southern Region: DCA Prime and Legal (France and Africa) AL2 in France, Finance and Legal (Italy, Greece, Spain, Portugal) AL2 in Spain and Legal (Middle East) AL2 in France; and

d.      Telefonica: DCA Prime, Finance and Legal AL2 in Spain.

Notwithstanding that there are several individuals with AL2 in France, approval from England will still be required for certain aspects of most transactions.  For example, customer credit approval is given from England.  It is highly unlikely therefore that an EMEA Entity could complete a proposal without approval and input from EMEA Senior Management based in England.

VI.4    **Management of customer relationships**

*VI.4.1    Sales team*

144.    Darryl Edwards is responsible for setting the EMEA strategy, targets and budgets for sales and sales related matters.  Sales targets will deal with the type of customer the business wishes to deal with and the overall budget.  The sales team ultimately reports to Darryl Edwards who conducts quarterly business reviews of the EMEA Region.  Any deal that has (i) a margin of less than 0% and a value greater than US$20 million or (ii) a margin greater than 45% and a value of less than $50 million requires Darryl Edwards' approval. This has to be taken in the context of total EMEA third party revenues (including entities out of scope (for example Netas in Turkey) which for nine months to September 2008 was US$1.738 billion.)

145.  Each sub-region within EMEA (Southern Europe (including Africa), Northern Europe, Central Europe and Eastern Europe) has its own manager. In addition, certain large customer accounts have their own manager, for example Iberia, Telefonica, BT and Vodafone UK.

146.  Enterprise products are sold through "Channels", being a third party distributor or re-seller. The largest distributors, Azlan and Westcon, are managed from England. In the case of the Enterprise business, 87 per cent of the business is conducted through Channels rather than individual customers, all (Channels) of which are aware of the Nortel management structure. For example, British Telecom ("**BT**") acts as a large Channel to the UK market. They would sign a supply and services contract with a BT user such as a bank. While BT holds the contract with the end user, the Company would supply BT with the product. As such, the Company supplies product to the Channel that then sells it on to the end user.

147.  Decision Makers for sales are located largely in England. The location of the Authority Levels is as follows:-

a.  AL0: three in Canada;

b.  AL1: seven in the U.S. (largely technical approvers), two in Canada and three in England (business, finance and legal AL1); and

c.  AL2: 16 in England, five in Israel, four in Germany, three in France, four in the U.S., three in Spain and one in Dubai.

148.  The customer relationship will generally be dealt with by the local account manager who interacts with the customer on a regular basis. That said, Darryl Edwards has a long term relationship with over 30 customers and a strong relationship with several new customers, who will often contact him directly, particularly for serious matters. I have discussed the matter with Darryl Edwards who has confirmed to me that most customers recognise that EMEA Senior Management in England is where all key governance and decision making resides and always has resided through many executive changes over the last 16 years. All past Presidents of EMEA have been based in England (whatever their nationality) as have the Chief Financial Officer, Global Operations leader and HR functions for EMEA plus other key functional responsibilities. Strategy and governance control has also been centrally monitored and operated from England, as the centre of operations for EMEA.

149.  Customers would understand that England is the centre of operations for the EMEA Companies and is the point for the resolution of serious issues in respect of customer relationships, final decision making, strategy and strategy investments. For example, in

October 2008, Marc Gosling, Managing Director of Vosko Networking BV, a customer of Nortel Networks B.V. ("**NN Netherlands**"), sent an email to Darryl Edwards requesting that Darryl Edwards deal with a problem that had arisen in relation to Nortel products that the customer was using at one of its projects.   Darryl responded and requested that Ashley Saunders (Global Operations leader) address the problems with his team.   The correspondence in relation to the resolution is at SLR1, tab 9, pages 126 - 130.

### VI.5    Decision making process regarding major customers

150.    All transactions handled by NN France SA requiring AL1 approval will be subject to approval by the EMEA Senior Management team in England and, if applicable, the relevant technology or "Business Unit" primes in North America.

151.    For example, the Bouygues transaction (for which the DCA2 review is at SLR1, tab 10, pages 131 - 138 shows how the required AL1 approval criteria was applied:

    a.    the projected deal size was US$140 million; and

    b.    there were special product and support commitments.

152.    In accordance with the DCA Process, the DCA review manager, Salma Drummond (based in England), set up the meeting and invited "Account Management" in France to present to the EMEA Senior Management team.   Michel Clément, attended the review and gave his consent to the proposal, but as an AL2 approver, he did not have the necessary authority to approve the deal.

153.    Ultimately, Finance approval was provided by myself, Regional Approval was provided by Darryl Edwards and Legal approval was provided by the General Counsel (all based in England).   "Business Unit" i.e. "Leadership Category or Technology and Services" approval was provided by Richard Lowe, John Owings and Carole Nadeau, based in North America.

### VI.6    Procurement and accounts payable

154.    Procurement is split between:

    a.    direct procurement – procurement related to the fulfilment of a customer sales order; and

    b.    indirect procurement – procurement related to selling, general and administration matters and R&D expenditure.

155.    The procurement organisation reports into Don McKenna, Chief Procurement Officer, located in North Carolina, U.S., although from 1 January 2009, Indirect Procurement reported to Alan Rice, Nortel Business Services, North Carolina, U.S. with Direct Procurement remaining with Don McKenna.    These teams are collectively known as **"Global Procurement"**.    Global Procurement is solely responsible for procurement strategy and for the selection, qualification and approval of all supplier arrangements.

156.    Any significant procurement arrangement, for example those with Flextronics, will be subject to a master agreement (**"Master Agreement"**) which constitutes the umbrella agreement governing all regional orders and ancillary agreements.    In order to optimise tax and trading arrangements, regional orders will be issued on a "local to local" basis and entered into between the regional entity and the third party local entities.

157.    A global supplier relationship manager will be appointed to act as the interface and manage all activities with the third party entity, but local EMEA procurement and legal primes located in EMEA, with junior Management for legal based in England, will become involved to negotiate any EMEA specific requirements.

*VI.6.1    Direct Procurement*

158.    In EMEA, all Nortel equipment related to a customer order is ordered from the supplier (i.e. the contract manufacturer).    The invoiced price, including mark up for intra group sales in the 9 months to September 2008 were US$458 million by the Company and US$123 million by NN France SA.    Where necessary, the Company's or NN France SA's (in the case of wireless GSM equipment) intercompany purchase orders (**"PO"**) are placed on the Company or NN France SA by the other EMEA Companies.    Where direct services relating to a particular customer order are sourced locally, they are ordered locally by the local Nortel Company as part of the customer order.

159.    The direct buyers for EMEA are located in Northern Ireland, with a few in Germany (using BIZ – a German legacy tool) and one in Italy.

160.    The procurement system is SAP – R3 (a software programme for purchasing) for those EMEA Companies that are SAP supply chain enabled (UK, Ireland, Holland, Belgium, France, Switzerland, Spain, Portugal, Italy, Israel). Germany and the other EMEA Companies have their own legacy systems.    All procurement globally is governed by the Approval Procedure on procurement set by Don Mckenna – Chief Procurement Officer, Canada, for final authority Approval Levels. All procurement globally is governed by procurement procedures, set by the Chief Procurement Officer (Don McKenna) and approvals are

governed by the corporate procedure on final authority Approval Levels set by the NNC Controller, Paul Karr.

### VI.6.2    Indirect Procurement

161.    Indirect procurement is governed by the same procedures and reporting as direct procurement. POs will be raised and go out in the name of the regional Nortel Company that is procuring.

162.    For those EMEA Companies that are enabled on Enterprise Buyer Professional - a SAP bolt on procurement tool ("**EBP**") this is done by the requisitioner raising a purchase requisition (shopping cart) on EBP and workflow will then route through the requisitioner's organisational hierarchy to get the approval to purchase.

163.    Once approved, a PO is produced and sent to the vendor (the PO administration is centralised in India for those companies in EMEA that are on EBP). EMEA companies on EBP are the Company and the EMEA Companies based in Ireland, Holland, Belgium, France, Spain, Portugal, Switzerland, Italy, Israel, Austria, Czech Republic, Finland, Denmark, Norway, Sweden, Hungary, Poland, Romania, Russia, Egypt, Saudi Arabia, Tunisia and Dubai. Germany has its own legacy indirect procurement systems.

### VI.6.3    Accounts Payable

164.    Accounts Payable ("**AP**") is governed globally by the terms of the Approvals Procedure. AP will process and pay invoices in compliance with this procedure. AP will follow the same procedures irrespective of whether the PO is for direct procurement or indirect procurement.

165.    AP will follow one of two processes, depending on whether the invoice relates to a PO (the "**PO Process**") or not (the "**Non-PO process**"). For those EMEA companies on SAP the invoices will be processed by AP in France (for NN France SA and NN France SAS) or in England (Harlow) for the Company and the EMEA Companies based in Ireland, Holland, Belgium, Spain, Portugal, Switzerland, Italy and Israel. The "bill to" address on POs for these companies will be the local office address. The invoices are then forwarded to Harlow in England for processing payment. AP Processing means the recording of the invoice expense and liability into the financial books (AP sub-ledger), obtaining the approval to pay the vendor invoice and then paying the invoice. Most of the vendors know that the payment is effected from England (certainly all of the major vendors do) and most come to the AP processing centre in the event of a problem. A few of the smaller vendors would go to the local office in the first instance, either because of language problems or because they do not know that it is processed in Harlow. The local office would forward the query onto Harlow.

166.   The EMEA Companies based in Germany, Poland and Russia have their own AP processing on their legacy systems and the other EMEA Companies have outsourced AP processing with the accountants BDO Stoy Hayward, who also do all the book-keeping for those companies. The "bill to" address on POs for these companies will be the local company's registered office.

### VI.6.4    PO and Non-PO process

167.   Invoices must quote a PO number and are processed against that PO. The PO will contain the credit terms, either on the individual PO or on the vendor Master Agreement. These terms are set by the purchaser and cannot be overridden by AP.

168.   Certain commodities do not merit the issuance of a PO. These will follow the Non-PO process where AP will send the invoice to a finance Decision Maker for coding to book into the general ledger and then when processed will send to a relevant business Decision Maker for approval to pay (in each case as determined by the DCA Process). Once approval is granted then the invoice will be paid when the credit terms that are on the vendor Master Agreement are reached.

169.   AP globally has moved to twice monthly AP disbursements as standard, with exceptions paid on a weekly basis. Vendor exceptions that are included in this are Flextronics, Taxes, Utilities, Rentals and Freight. This list is maintained and approved centrally by Global Operations Finance. Any exception approvals outside of the above are also approved by Global Operation Finance centrally before payment (Primes are James Patchett, based in Canada, and Mike Sansom, based in the U.S.). In EMEA the AP processing centres in England (Harlow) and France will produce the payment files and send to the banks for the companies for which they process invoices. The AP processing centre will run a Payment Proposal routine on the AP sub-ledger. This routine will select all Vendor invoices for that company code that are approved for payment and due for payment (i.e. the invoice credit terms have elapsed at or pre the payment proposal run date). The file will pay, by vendor and by currency, the sum of those vendor invoices that have been selected for payment. AP will then inform Treasury of the amount to be paid and the local control prime and send the file to Citibank for processing through the banking system.

### VI.7    Supplier Approval Process

170.   The approval process for suppliers is governed by Corporate Procedure 712.04 – Supply Agreements (the **"Supply Procedure"**) a copy of which is at SLR1, tab 11, pages 139 - 152. The Supply Procedure sets out the responsibilities, requirements and guidelines for the establishment and management of supply agreements. The Supply Procedure specifically refers to the Approval Procedure in relation to seeking approvals.

171.   In addition to the Supply Procedure, there is an EMEA Global Procurement Contract Management Procedure Guide (the **"Procurement Contract Management Procedure"**) applicable to the procurement of network field service requirements, a copy of which is at SLR1, tab 12, pages 153 - 198.

172.   The Procurement Contract Management Procedure is managed out of England.  It provides that where the supply in question has a value of less than US$500,000 over its term, approval will not be required by the global contract review board (the **"CRB"**) (in accordance with the Supply Procedure) and the arrangement will be subject to the approval of the EMEA regional procurement prime, Stella Katz (based in Israel) by the EMEA legal prime in Lynne Powell's team based in England.  Similarly, minor amendments will not go to the CRB.  CRB approval is required for new suppliers with an estimated annual spend of more than $100,000 and for existing suppliers with a value greater than US$500,000 or where material changes to the standard terms are required.

### VI.8   Legal & Contracts team

173.   Up to and until 31 December 2008, Mr. Christian Waida, located in Maidenhead, acted as the general counsel for EMEA.  In this role Mr. Waida was responsible for the overall provision of legal support across the EMEA Region, and this was delivered by a team of internal resources mainly located in England, with ad-hoc assistance from external law firms dealing mainly on local corporate matters and advice on local law on a case by case basis.

174.   As of 1 January 2009, Mr. Waida left Nortel and the team was divided between the two business units.  Lynne Powell, located in Harlow, England, is leading the Carrier team together with providing advice and AL1 approvals with respect to all related Carrier business legal matters, whilst Dara Gill, located in Maidenhead is responsible for all UK corporate matters and is also leading the Enterprise business team together with providing advice and AL1 approvals with respect to all related Enterprise business legal matters.

175.   The teams reporting to Lynne Powell and Dara Gill are responsible for providing legal support in pre and post-contract activities, each in his/her jurisdiction.  The team members handle agreements and transactions with respect to the supply of products and services to customers, software licensing, representation, non-disclosure, escrow, support arrangements, consultancy, distribution, resale and sub-contracts together with handling local corporate matters and managing litigation cases.  This is done locally in all the larger countries (UK, France, Germany), as well as mid-size countries (Spain, Russia, Israel) with the smaller countries receiving remote support from the relevant team member within the relevant part of the EMEA region.

176.   Mark Cooper is the Assistant General Counsel, Employment Law, and is based in England. He reports directly to Gordon Davies, the Chief Legal Officer based in Canada, and is responsible for employment and pension law related matters globally and across the EMEA Region. Mark Cooper oversees a team of eight lawyers and an administrator. Four lawyers and a PA are located in England, one lawyer in France and three lawyers in the U.S. The team uses external counsel in those jurisdictions where Nortel does not have internal expertise, including in each jurisdiction in EMEA on an as required basis. His team provide employment law (including pensions and employee benefits) support to the HR team and to the business globally and across the EMEA region, dealing with merger, acquisition and divestiture work, insourcings and outsourcings, global and regional level HR policy and procedure review, executive level hiring and departures, employee contractual matters, disputes, grievances and litigation.

177.   Global and strategic OEM/ODM Tier II and supply agreements are dealt by global procurement in Canada/USA. Global accounts (such as Sprint, Verizon, Telefónica, T-Moblie and Vodafone) are managed by the legal team situated in the same location as the customer's headquarters and the approval team for such global agreements is located in the U.S. unless the customer's headquarters are based in Europe. For example, the Vodafone and T-Mobile groups are managed from England and the Orange group is managed from France. Therefore the approval team for such global agreements is located in England.

VI.9   **Compliance**

178.   Nortel's compliance organisation is a specialised team supporting the Nortel businesses in their activities and transactions to ensure their compliance with all corporate policies and procedures, laws and regulations. Sally March, located in Maidenhead, is the Director of Compliance for EMEA.

179.   In her role, Sally March is responsible for developing a programme ("**Compliance Programme**") to meet corporate standards, including a systematic risk assessment to help identify and address potential risks before they become potential compliance issues. She ensures that business is conducted in an ethical and legal manner by regularly reviewing policies and procedures to ensure that the EMEA Entities are compliant with relevant laws and are in alignment with overall goals of the global compliance programme. When a potential risk within EMEA is identified, Sally March is responsible to assist in conducting appropriate reviews with the relevant functions and ensuring corrective actions such as communication, training or process improvements are undertaken. Sally March is also responsible for providing oversight, guidance and recommendations for compliance with corporate standards.

180. Sally March's team comprises of a Compliance Manager located in England and a Compliance Auditor located in France.

## VI.10   Internal Audit Services ("IAS")

181. The EMEA IAS team, which is led by Perry Christian, based in England, assists Nortel leaders, managers and ultimately the Audit Committee of the Board of Directors in effectively carrying out their responsibilities. This work is guided by The Institute of Internal Auditors International Standards for the Professional Practice of Internal Auditing.

## VI.11   External Audit

182. KPMG is appointed globally as the Group's auditor. This relationship is governed by a global engagement agreement which deals with U.S. GAAP accounting issues, but individual engagement letters are entered into between each local company and the local KPMG office.

183. The EMEA audit process is managed by England KPMG team working with the Finance team located in England.

## VI.12   Ethics

184. Nortel's Ethics programme has two goals. First, it aims to create a culture of integrity so that employees understand their obligation to act with the highest ethical standards and have the resources to provide answers to questions and help them make the right decisions. Second, the programme ensures that all employees understand Nortel's Code of Conduct and comply with the laws and regulations of the countries in which the Company operates. Sally March, the Director of Compliance for EMEA (located in Maidenhead) is also responsible for dealing with ethical issues in EMEA.

## VI.13   Corporate security

185. Corporate security encompasses protecting Nortel people, assets and intellectual property, systems security, travel security emergencies, security tips and tools, articles dealing with espionage, identity theft, badge access information, laptop computers, confidential information, aggressive recruiting and scams. The Director of Corporate Security and the Corporate Security Advisor for EMEA are located in Maidenhead, England.

## VI.14   Tax

### VI.14.1   Tax team

186. The tax group based in England (the "**EMEA Tax Group**") is responsible for managing and supervising tax throughout the EMEA Region. The team consists of seven members of who have specific company responsibility.

### VI.14.2   Local tax returns

187.   All local tax returns are the direct responsibility of each Company, although those covering direct taxes on income will be reviewed in most cases by the EMEA Tax Group prior to filing. The EMEA Tax Group will in the main be the first port of call by the EMEA Companies to deal with any tax issues that arise, whether on audit by the local tax authority or on operational issues, and the EMEA Tax Group will decide how they should be handled (including whether outside professional advice is to be sought). The EMEA tax group has direct relationships with most company advisors and will take the lead in resolution of those issues.

### VI.14.3   Tax planning

188.   Tax planning initiatives come from Canada, where there is a global impact, or may be generated by the EMEA Tax Group in relation to specific opportunities in the region, although in the latter case this will always be discussed with Canada before any implementation. The implementation of tax planning initiatives in the region will be the responsibility of, and led by, the EMEA Tax Group in liaison with and reporting to the parent tax group where a global initiative is involved. If an EMEA Company wishes to do some domestic tax planning then it will engage with the EMEA Tax Group for approval and support in implementation.

### VI.14.4   Other tax issues

189.   The EMEA Tax Group is heavily involved in the reporting of tax both for U.S. GAAP accounting group consolidation and local statutory accounting reporting. The tax issues in merger and acquisition transactions are led out of North America, but the EMEA Tax Group will handle all regional tax issues arising. There are no employees of the EMEA Tax Group based outside England, although there may be individuals who spend a material amount of their time on tax issues, generally in relation to local tax returns.

## VI.15   HR

### VI.15.1   HR team

190.   As the regional EMEA HR leader, Sharon Ellerker, located in Maidenhead, is responsible for the overall provision of HR support across the EMEA region, and this is delivered by a team of internal resources, with the exception of some of the benefits programmes that are administered by third party vendors.

191.   Sharon Ellerker's team provides in-country (i.e. a member of her team is located within the relevant jurisdiction) HR generalist, Employment Rights and / Total Rewards support in all

the larger EMEA countries (UK, France and Germany), as well as mid-size countries (Spain, Russia, Israel and Italy) with the smaller countries receiving virtual support from HR generalists within the broader region.

192.    Transactional and administrative HR support is provided globally by the HR "Shared Services" organisation who manages some of the core processing globally in the HR Shared Services centre in Raleigh, North Carolina.  This includes offer letter generation, contract addendums and SAP updates), with region specific support such as responding to manager/employee queries, interfacing with payroll vendors and file management being provided by the EMEA HR Shared Services team who are predominantly based in Maidenhead although there are two team members in France and one each in Italy and Spain. This team reports to Scott Peters, Global Leader, Nortel Business Services, based in the U.S.

193.    When a manager / employee in EMEA has an HR query, or requires HR support, they contact the HR Shared Services team (either via e-mail or phone) in England in the first instance. The HR Shared Services team are trained to resolve transactional queries, and in the case of a more complex issue, they will log a ticket on behalf of the employee / manager and refer this to the relevant subject matter expert who will often be situated locally.  For example, if a manager based in Russia has a query that the HR Shared Services team in Maidenhead cannot answer, the query will be passed to the in-country expert who is located in the Moscow office. If there is no in-country resource, the query will be directed to the member of Sharon Ellerker's team who has responsibility for the jurisdiction.  For example, the HR team member located in Germany will deal with queries relating to the Netherlands.  In addition, the senior business leaders in the region receive strategic HR business partner support from regionally located HR business partners.  The location of the EMEA HR managers is set out at SLR1, tab 13, page 198.

194.    Mark Cooper, the Assistant General Counsel, Employment Law (based in Maidenhead) also assists the HR Shared Support teams.

*VI.15.2  Employment terms and recruitment*

195.    Sharon Ellerker (based in Maidenhead) previously headed up the global recruitment team, however, this has folded into the regional HR organisation effective 1 January 2009.  As such, she is responsible for all recruitment within the EMEA Region.

196.    All senior management staffing matters, whether recruitment or departures, will involve Sharon Ellerker and Darryl Edwards.  Sharon will be at least aware if not actively involved

with such matters. For example, Sharon Ellerker and Darryl Edwards made all the decisions with respect to the hire of a new leader for Spain approximately two years ago.

197.    Nortel has global HR policies and processes, and there is little to no tolerance for any variation or exceptions other than those that are required for legislative / compliance reasons. As such, with the exception of some red-circled benefits that might occasionally exist for longer serving employees, or those who joined Nortel as part of an acquisition or in-source, terms and conditions of employment will be standard within an EMEA Company / country.

198.    Mark Cooper, located in Maidenhead, deals with executive level employment agreements and compromise agreements globally. These agreements tend to be on standard terms with deviations to deal with specific circumstances only.

199.    Employment terms and conditions for lower level employees are generated by HR Shared Services, although will vary from country to country, as necessary to deal with local law requirements.

## VI.16    Banking and treasury

### VI.16.1    Treasury and Banking

200.    Simon Freemantle, based in Maidenhead, is the Director for Global Treasury Operations. There are 18 team members, with 5 based in Maidenhead to look after the treasury and banking issues for EMEA.

201.    Simon Freemantle managed the Cash Pooling Arrangements (as described at paragraphs 87 to 89 above) which was discontinued as of 29 December 2008.

202.    Due to the cost and availability, Nortel has not had any significant credit banking facilities. None of the EMEA Entities have local facility agreements. The only outside funding is obtained via equity through NNC via the issuance of corporate bonds.

203.    All EMEA Entities (regardless of whether they participated in the Cash Pooling Arrangements) will maintain local bank accounts with minimal balances with either the global cash management bank (Citibank) or a local bank. For practical reasons there are both local and EMEA Treasury approvers / signatories on many of these accounts. These accounts and all treasury activities will always be managed in accordance with the Global Treasury Policies and Procedures implemented and monitored by the EMEA treasury team. Deviation from such procedures will require approval from Simon Freemantle.

204.   Bid, performance and warranty bonds for Nortel projects and products are normally issued via a global facility.  All EMEA bonding is managed out of England by the EMEA Treasury team. Where a claim is established, the customer will generally turn directly to the relevant local issuing bank for payment.  However, that branch will usually communicate with England before making a payment.

205.   Inter-company loans and inter-company trade settlements are both managed from England.

### VI.17   Real Estate

206.   Nortel's global leasehold portfolio is managed by Jones Lang Lasalle under a global agreement.   The global real estate team is aligned by region and until recently (early December 2008) the individual leading real estate for EMEA was based in England.  His replacement has not yet been appointed.  No decisions on real estate in terms of leases, purchases and contracts to run the offices can be taken locally as these are all managed through the real estate team in England.  All approvals are governed by the Approvals Procedure.  In practice, all requests to extend / renew leases or put in place new offices will require the approval of Darryl Edwards and me from Maidenhead as well as ratification by the real estate team.

### VI.18   Professional advice in relation to the proposed restructuring of the EMEA Group

207.   All professional advice for restructuring the EMEA Region is being provided by E&Y, who were formally engaged in December 2008.

### VII.   CASCADE OF THE BOARDS OF DIRECTORS OF THE EMEA COMPANIES

208.   On 12 January 2009, prior to the decision of the North American Companies to file for bankruptcy protection, the directors of all of the EMEA Companies (including those in respect of which no administration application is being made) were briefed at a high level about the global Nortel situation and informed that one of the options being considered was a filing by the Northern American Companies and that in that event, urgent action may well be required in respect of the EMEA Companies to protect their position.  They were invited to resign from their posts as directors in order to be replaced by Simon Freemantle and me in order to facilitate an orderly restructuring of the EMEA Companies if considered appropriate.

209.   One of the key reasons for the above was to avoid placing responsibility on directors who are persons who have little or no knowledge of the current global position of Nortel and to allow those persons with knowledge of the current global Nortel situation, and the ongoing evolution of the restructuring strategy ,to prepare and sign the applications for administration in England for each of the EMEA Companies, if appropriate.  Simon Freemantle and I have

known of the potential for the making of the North American bankruptcy filings and have been party to discussions regarding the global Nortel situation from an early stage.

210. With the exception of Nir Elbaz, Michel Clément, Sorin Lupu and Darryl Edwards, the directors of each of the EMEA Companies were not made aware of, or party to, the detail of the considerations of the global situation of the Nortel Group and the ongoing evolution of the restructuring strategy before 12 January 2009. This was because, due to the sensitivities surrounding the North American discussions on a listed global business of this size and the need to maintain strict confidentiality, it was not thought appropriate to involve too wide a group of people.

211. It is considered strategically advantageous by the Company to take a co-ordinated and fully integrated approach to the EMEA Companies in relation to any applications for administration in England for facilitating a restructuring, given that their head office functions are carried out from and centre of operations are in England. Simon Freemantle and I have detailed knowledge of the EMEA Companies through our positions as directors of the Company and, being respectively, Director, Group Treasury Operations, and the Chief Financial Officer, EMEA (AL1). We therefore have detailed knowledge of the business and affairs of the EMEA Companies, as well as the global Nortel situation and ongoing evolution of the restructuring strategy, to enable us to make the applications to Court for administration on behalf of each of the EMEA Companies.

212. It is also recognised that the administration procedure will, if applied to the EMEA Companies, avoid the potentially more serious and uncoordinated consequences of insolvent liquidation in other jurisdictions in which the EMEA Companies are registered.

## VIII. JURISDICTIONAL REQUIREMENTS SET OUT IN PARAGRAPH 11 OF SCHEDULE B1 TO THE INSOLVENCY ACT 1986 AND RULE 2.4 OF THE INSOLVENCY RULES 1986

### VIII.1 Insolvency

213. In summary, based upon and, for the reasons set out in the E&Y Report at paragraphs 7.8 to 7.19 of SLR1, tab 3. , I believe that the Company is likely to be insolvent on a balance sheet basis and, ultimately, is likely to become insolvent on the basis that it is unable to pay its debts as they fall due.

VIII.2   **Financial Statements**

214.    At SLR1, tab 14, pages 199 to 237 is a copy of the Company's last audited accounts. In that same tab is a statement of the Company's financial position specifying, to the best of my knowledge and belief, the Company's assets and liabilities, including contingent and prospective liabilities, as at 31 December 2007.

VIII.3   **Summary of Indebtedness**

215.    Other than leased equipment, the remainder of the Company's obligations are unsecured obligations.

VIII.4   **Purpose of the proposed administration**

216.    Under paragraph 3(1) of Schedule B1 to the Insolvency Act 1986, the administrator of a company must perform his functions with the objective of:

   a.    rescuing the company as a going concern; or

   b.    achieving a better result for the company's creditors as a whole than would be likely if the company were wound up (without first being in administration); or

   c.    realising property in order to make a distribution to one or more secured or preferential creditors.

217.    I believe (based on my discussion with the proposed administrator) that, if an administration order is made in relation to the Company, the purpose of administration set out in paragraph 3(1) of Schedule B1 of the Insolvency Act 1986 will be achieved. An administration order is likely either to lead to a restructuring of the Company that rescues the Company as a going concern or achieves a better result for creditors than would be achieved in a winding–up (without first being in administration).

218.    On 14 January 2009 a meeting of the Directors was held in order to determine what steps the Company should take to preserve its business and assets for the benefit of its creditors. The Directors resolved that they should apply to the Court for an administration order in relation to the Company. A copy of the board resolution is at SLR1, tab 15, pages 244 - 245.

VIII.5   **Proposed strategy of administration**

219.    I refer to paragraphs 6.1 to 6.5 of the E&Y Report at SLR1, Tab 3, which concludes that administration orders over the EMEA Companies, with common office holders, is the best practical opportunity of preserving the EMEA Companies as cohesive operating units, continuing to trade and acting in concert as far as is possible with the rest of the Nortel Group.

220. I understand that E&Y will carry out an analysis of the cost and benefits of continuing to trade immediately following the commencement of the administrations. However, I am advised that:

    a.    it would be in the best interests of creditors to continue trading throughout the EMEA region, at least for a period, to explore a marketing and sale of the businesses and assets of the EMEA Companies as going concerns;

    b.    continued trading would allow work in progress to be completed, enhance recoveries from trade debtors and avoid the crystallisation of some contingent liabilities such as redundancy costs and lease termination penalties (the quantum of which have yet to be assessed);

    c.    the moratorium created by administration orders would allow the administrators to carry out a review of the EMEA Company businesses. The administrators would take into account, the interests of each Company. This would remove from the directors the very difficult decisions that would be required in order to continue trading outside a formal insolvency process;

    d.    furthermore, the administration orders would enable the business to be restructured and would open up the possibility of pursuing sales of business and assets, in addition to the possibility of sales of shares. Both are likely to enhance sale opportunities and, therefore, the prospects of preserving the businesses of the EMEA Companies as going concerns.

221. The Joint Administrators have confirmed in the report their view that the purpose of administration is likely to be achieved in this case.

### VIII.6 Security

222. At SLR1, tab 16, page 240 is the Register of Mortgages and Charges from Companies House relating to the Company.

223. The Register of Mortgages shows that there are no outstanding charges granted against the Company.

### VIII.7 Insolvency Proceedings

224. To the best of my knowledge and belief as at the date of this witness statement, there are no insolvency proceedings commenced in relation to the Company whether in England and Wales or any other jurisdiction.

### VIII.8 Winding up

225. To the best of my knowledge and belief as at the date of this witness statement, no winding up petition or other insolvency process has been presented against the Company.

### VIII.9 Service and Abridgement of Time

226. Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specifies the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

227. At SLR1, tab 18, pages 251 to 252 is a copy of a letter from proposed administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

228. So far as I am aware, no other person is entitled to appoint an administrative receiver or administrator of the Company. This is confirmed by the search of the Register of Mortgages and Charges relating to the Company referred to at paragraph 222 above.

229. Given that all parties entitled to receive notice have waived the requirement for five days notice, the applicant asks the Court to abridge the time for hearing of the application pursuant to rule 12.9(2) of the Insolvency Rules 1986.

### VIII.10 COMI of the Company

230. The EC Regulation on Insolvency Proceedings 2000 (the "EC Regulation") will apply. Moreover, these proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation as the centre of main interests of the Company is located in England

### VIII.11 Joint administrators

231. It is proposed that the court should appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson from E&Y to act as joint administrators of the Company. Moreover, the Court is invited to order, pursuant to paragraph 100(2) of Schedule B1 to the Insolvency Act 1986, that any function to be exercised or performed by an

administrator may be done by all or any of one or more of the persons for the time being holding that office.

232.    At SLR1, tab 17, pages 247 – 250 are the written consents to act of proposed administrators which confirm their opinions that it is reasonably likely that the purpose of administration will be achieved.  Each of the proposed administrators has confirmed that they have had no material dealings or material professional client relationship with the Company.

**VIII.12 Inspection of the Court File**

233.    I would also request that for reasons of commercial sensitivity surrounding the Company that this witness statement and its exhibit are ordered to be not open to inspection without the prior leave of the court pursuant to rule 7.31(5) of the Insolvency Rules 1986.

## IX.    CONCLUSION

234.    In the circumstances, I request that this Court makes an administration order in respect of the Company.

**I believe that the facts stated in this witness statement are true.**

**Sharon Lynette Rolston**

Date:    14·1·09 ·

NO. _____ OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF
NORTEL NETWORKS UK LIMITED

AND

IN THE MATTER OF
THE INSOLVENCY ACT 1986

_____

WITNESS STATEMENT OF SHARON LYNETTE
ROLSTON

_____

Herbert Smith
Exchange House
Primrose Street
London EC2A 2HS
Tel: 020 7374 8000
Fax: 020 7374 0888

Ref: 3946/30895329