# EXHIBIT D

**(NN Ireland Rolston Witness Statement)**

Applicant
Sharon Lynette Rolston
No. of Statement: First
Exhibit: SR1
14 January 2009

**IN THE HIGH COURT OF JUSTICE**                                No.       of 2009
**CHANCERY DIVISION**
**COMPANIES COURT**


IN THE MATTER OF NORTEL NETWORKS (IRELAND) LIMITED

AND

IN THE MATTER OF THE INSOLVENCY ACT 1986

---

### WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, **DO STATE** as follows:

**INTRODUCTION**

1.  I am a director of Nortel Networks (Ireland) Limited (the "**Company**"), having been appointed on 14 January 2009.

2.  I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the "**Act**") for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom and David Martin Hughes of Ernst & Young LLP ("**E&Y**"), as joint administrators of the Company. I am duly authorised to make this witness statement on behalf of the directors of the Company (the "**Directors**").

3.  Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4. Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited ("**NNUK**") and have been a director of the same since 1 April 2006.

5. There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6. I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies ("**Nortel Group**").

7. I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the "**Main Witness Statement**"). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8. This witness statement is divided into the following sections:

    (a) background;

    (b) decision of the directors of the Company to apply for an administration order in respect of the Company;

    (c) financial position of the Company;

    (d) purpose of the administration;

    (e) centre of main interests ("**COMI**") of the Company;

    (f) formal requirements; and

    (g) conclusion.

**BACKGROUND**

9. The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa ("**EMEA**").

10. The Company carries on business primarily as a Residual Profit Entity ("RP Entity") Company. Paragraphs 41 to 43 of the Main Witness Statement describe the role of a RP Entity within the group. The Company derives its revenues from the distribution and sales of Nortel products to both third parties and other group companies largely outside of Ireland. The Company is also granted a licence to use the group IP via a licensing agreement with Nortel Networks Limited which owns all IP and derives revenues from this according to the Master Research and Development Agreement.

11. Historically the Company was a Transactional Control Centre ("TCC") and thus the largest distribution chain and supplier for all the entities in Europe. The Company is, however no longer a TCC. As a result of this legacy the Company currently operates across Europe and deals with pan-European and global customers. The Company has limited business within Ireland itself, with only 10% of its total business accounting for business within Ireland.

12. The Enterprise Solutions ("ES") business for Europe is an element of this legacy and as the Company was a TCC it controlled this aspect of the business. Contracts with customers in the ES business are done out of the Company. The ES business is, however, overall managed from England.

13. The Company was incorporated on 25 January 1973 under the provisions of the Companies Act 1963 (Ireland). The registered office of the Company is situated at Mervue Business Park, Mervue, Galway, Ireland (see tab A).

14. The Company changed its name on 4 May 1999 from Nortel (Ireland) Limited to Nortel Networks (Ireland) Limited.

15. The issued share capital of the Company is 158,000 Ordinary shares and 100,000 Preference shares. The nominal share capital of the Company is 1,000,000 divided into 1,000,000 shares of £1 each. The amount of the capital paid up or credited as paid up is £258,000.

16. The audited accounts as at 31 December 2007 are tab B of the exhibit SR1. The balance sheet of the Company as at 30 September 2008 is tab C of exhibit SR1.

17. The sole shareholder is Nortel Networks Limited – Canada, holding 100% of the shares.

18. I, along with Simon Freemantle and David Quane, am a director of the Company and have been a director since 28 August 2006. Prior to 14 January 2009 the Company had Orla

Fitzpatrick (a citizen and resident of Ireland), David Quane (appointed 28 August 2006 and who is a citizen and resident of Ireland), Charlie Wade (appointed 1 May 2007 and is a citizen and resident of Ireland) and me as directors.

**DECISION TO APPLY FOR AN ADMINISTRATION ORDER**

19. As set out at paragraphs 33 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and inter dependent on each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

20. As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Company Creditors Arrangement Act 1984 and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

21. Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 108 of the Main Witness Statement and confirm that these matters apply to the Company.

22. On 14 January 2009, a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab D.

**FINANCIAL POSITION OF THE COMPANY**

23. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

24. My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

   (a) the Company's balance sheet at 30 September 2008 is showing net assets of $58,979,000 million (tab C). The most significant asset is intercompany loans receivable, the realisable value of which is doubtful following the North American filings in view of the interdependencies within the group and the likelihood of fragmentation of the EMEA companies unless they are protected by the administration orders being sought or otherwise supported financially by their ultimate parent company. E&Y in their report (referred to in paragraph 100 of the Main Witness Statement) have adjusted their net assets calculations and have concluded that the net liabilities of the Company will be $83 million. The Company's losses for quarters 1 to 3 in 2008 were $2 million according to the quarter 3 management accounts. The Company is therefore likely to be insolvent on the balance sheet basis and likely to become insolvent on a cash flow basis following the North American filing;

   (b) The Company had cash balances of $49 million at 31 December 2008. Therefore, the Company has cash resources that could be used to support an administration process. However, if the Company remains outside of an administration process or the full protection of its parent company, it is likely that the cash reserves will, in time, be dissipated in trading losses. The Company's losses for quarters 1 to 3 in 2008 were $2 million (according to the quarter 3 management accounts provided to E&Y), this is close to a break even position based on the turnover for that period of $447 million. However, it is likely that the volume of business being conducted by the Company and the rest of the EMEA Group will be adversely affected by the North America filings, which would have the effect of accelerating trading losses.

   (c) the matters set out at paragraphs 100 to 102 of the Main Witness Statement. I confirm that these matters apply to the Company. Moreover, in light of these matters it is clear that the Company is or is likely to become unable to pay its debts.

**PURPOSE OF ADMINISTRATION**

25. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

26. Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

27. We have placed particular reliance upon:

    (a) the fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

    (b) the matters identified at paragraph 5, 16 and 216 to 218 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

    (c) the report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

28. I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

29. The Company is incorporated in Ireland and has its registered office at Mervue Business Park, Mervue, Galway, Ireland.

30. The Company has the following connections with the place of its incorporation:

(a) until 14 January 2009 the following directors of the Company were Irish citizens and resided in Ireland: Orla Fitzpatrick, David Quane and Charlie Wade.

(b) board meetings are held once a quarter in Ireland and the number of Board meetings held over the course of the year is dependant on local legal requirements and where, to the extent permissible by Irish law made my written resolution. The Board meetings focussed on either corporate matters (the approval of local financial statements, distributions, funding and HR issues where Board involvement was required or expected in Ireland). The written resolutions and/or draft minutes together with briefing papers were prepared with the assistance of the relevant EMEA functions (for example Finance, Legal, Treasury, HR and Tax) based in England;

(c) there are 319 employees all based in Ireland and are all based on a local employment contract unless they are on secondment from other group companies. The terms of employment are determined by HR shared services in England and tailored to meet local law requirements in Ireland. Executive level employment agreements and compromise agreements are dealt with in England by Mark Cooper and Sharon Ellerker who prepare the contracts and sign all the terms. All senior recruitment is approved by personnel based in England as referred to in paragraphs 195 to 199 of the Main Witness Statement;

(d) The Company does serve some business needs in Ireland, but this accounts for only 10% of total revenue. However, the majority of the customers of the Company are not based in Ireland nor relate to business they conduct in Ireland;

(e) with the assistance of our external advisers, I have reviewed the trade creditors for the nine months to September 2008. I believe this represents the general position of trade creditors for the Company over time. That shows that generally the company has around $298,000,000 in trade purchases over that period. Of these, around 4% (or $12 million over that period) relate to local Irish suppliers. The top five Irish local suppliers are: Storm Technology Ltd, Stephen Harris, ESB Independent Energy Ltd, Tuong Minh Project Management and Brookvale Trust Ltd. The approval required for the Company to engage these local suppliers and the terms on which they are engaged is subject to and constrained by the procurement and supply approval processes referred to in paragraphs 170 to 172 of the Main Witness Statement. Therefore, even in connection with local supplies, personnel in

(e) Ireland cannot decide which suppliers to engage or the terms on which to engage them outside of these procedures. I believe it is likely that a regular supplier of significant goods and services would be aware that an approval process for the supply is necessary and that this approval process does not occur in Ireland.

(f) Only one employee has an authority level of AL3 but that employee is actively based from England 3 days of the week and in Ireland for the other two. The Main Witness Statement details the designation of Authority Levels in paragraphs 119 to 128;

(g) the Company also has leasehold interests and company fit out equipment in Ireland, although the general management of the leasehold property is managed out of England, as discussed below;

(h) formal invoices from creditors are addressed to the Company in Ireland, although subject to the accounts payable procedures described in paragraphs 164 to 166 of the Main Witness Statement; and

(i) the Company maintains local Irish bank accounts, although with only minimal balances sufficient for weekly working capital requirements, as referred to in paragraph 203 of the Main Witness Statement, and has signatories for these accounts based in Ireland. These accounts also have signatories in England namely, Deborah Black and Simon Freemantle.

**Factors connecting the Company with countries other than the place of incorporation or England**

31. The Company has the following connections with countries other than the place of its incorporation or England:

    (a) The Company trades with customers who are located globally and whose main centre of business is outside Ireland. These include Azlan, which forms one of the three pan-European centres for the Nortel group of companies, Westcon, BTC Saudi Arabia, the Company's third biggest customer which is managed from Saudi Arabia, Vodafone (who is based in England), MDS PACC (United Arab Emirates, which is managed locally by the team in Dubai).

    (b) Research and development related work is managed out of North America.

(c)  The Company's sole shareholder is the parent company of the Nortel Group, Nortel Networks Limited in Canada.

(d)  For the 9 months to September 2008, global creditors of the company comprised around 4% of the Company's trade creditors (or around $12 million over that period). Of these a significant majority are CSC, WIPRO, Jones Lang Lasalle, Dell, Verint Systems Limited. These creditors are subject to global supply agreements negotiated by the Nortel's group in Canada. The relationships with these suppliers are generally managed at either the EMEA regional level in England or in Canada.

**Factors connecting the Company with England**

32. I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in detail the decision making process in relation to the business of the companies within the EMEA region; paragraphs 140 to 143 which indicate how the contracting approval process is managed in the EMEA in relation to sale agreements; paragraphs 144 to 153 which detail the management of customer relationships of the companies within the EMEA region; paragraphs 154 to 169 deals with the procurement of accounts payable processes in EMEA; paragraphs 170 to 172 deals with the supplier approval process in the EMEA; paragraphs 173 to 177 which relates to legal and contracts assistance across the EMEA region; paragraphs 178 to 180 which relate to global compliance across the EMEA region; paragraph 181 which relates to the internal audit across the EMEA region; paragraphs 182 to 183 which relate to the EMEA and other external audit processes; paragraph 184 which relates to ethics management; paragraph 185 which relates to corporate security; paragraphs 186 to 189 which relate to tax strategy across the EMEA; paragraphs 190 to 199 which relate to human resources management across the EMEA group; 200 to 205 which relates to banking and treasury across the EMEA region; paragraph 206 which relates to real estate across the EMEA region; and paragraphs 207 which relates to advice regarding proposed restructuring.

33. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company as a member of the EMEA group.

34. These paragraphs evidence the wide range of operational, strategic, financial and high level administrative and advisory control over the Company in England by senior management of EMEA. These paragraphs also evidence the interconnectivity with the larger Nortel group in terms of customers, suppliers and finance functions.

35. Without in any way limiting what is said in those paragraphs the following points are relevant to the Company's connection with England:

36. **Decision Making:** key primary functions required for the operation of the Company are conducted from England. Senior management in England exercise control and authority over the Company through the global decision making approval and policy procedure. Day to day operational management of the Company is conducted in accordance with these policies. There is only one AL2 individual located in Ireland who is David Quane and only one AL3 individual works the majority of their week from England.

37. **Creditors:** intercompany creditors comprise around 92% of the total trade creditors for the 9 months to September 2008 (or around $274 million for that period). These creditors are either managed out of England, US or Canada. Subject to local laws, the payment of intercompany liabilities is governed by EMEA group treasury, which is managed by Simon Freemantle out of England. Further, as noted above, the procurement and supply approval procedures for local Irish creditors are governed by the procurement and supply approval procedures as part of the global decision making approval procedure and policy.

38. **ES Business:** This European business is often conducted through the Company. However, this is managed by personnel in England and all 'bids' for this work goes through the EMEA group.

39. **Customers:** the approval process for all sale agreements is managed out of England and purchase orders often request that they are sent to Harlow in England for processing. The process for approving new contracts of the EMEA companies is referred to in paragraphs 140 to 143 of the Main Witness Statement.

40. In addition to this the customer account management of the top two customers (Azlan and Westcon) which comprise of 80% of all total revenue of the Company is managed by Amanda Giddins who is based in England. Further, the fourth largest customer, Vodafone is subject to a framework agreement which is managed from England which is in turn driven locally via the individual sub contracts entered into under the terms of the framework agreement. Any serious or high level claim by customers against the Company would also be dealt with by Darryl Edwards in England. I believe that it is likely that at least for large and repeat customers they are aware that approval and oversight of the sale agreement and customer relationship occurs in England.

If there is a product claim (in the non ES business), the performance bond arrangements may apply. This is co-ordinated via a global facility and all EMEA bonding is managed out of England (by the EMEA treasury team). Where a claim is established, the customer will usually contact the relevant local issuing bank for payment and that branch will then communicate with England before a payment is issued.

41. **Treasury:** As noted in the Main Witness Statement banking and treasury functions are run out of England. Relevantly:

    (a) All banking arrangements are conducted in accordance with group treasury procedures. Simon Freemantle operates for EMEA's treasury functions in England. All facilities are passed through the group treasury;

    (b) until terminated on 29 December the Company participated in the EMEA cash pooling arrangements with Citigroup. These arrangements were managed by the EMEA treasury located in England, as set out in paragraphs 87 to 89 of the witness statement of Sharon Rolston. The arrangement following the termination of the cash pooling arrangement is discussed in paragraphs 88 and 89 of the Main Witness Statement;

    (c) there is minimal interaction by the Company with Irish banking institutions. Although the Company has bank accounts with Irish banks, these accounts hold minimal balances of less than 1 million Euros. In addition, those Irish accounts have one or more signatories from EMEA personnel (Deborah Black and Simon Freemantle) based in England in addition to an Irish based signatory. The main account with the Company is with Citigroup in England, where it is managed; and

    (d) all funding is provided from England or Canada and there are no Irish borrowing facilities;

42. **Corporate Matters and External Advisers:** In relation to corporate matters such as, financial, tax and distribution issues, decisions are generally made by the Finance, Legal, and Tax functions of the EMEA group which are all located in England. Tax planning initiatives are led by both England and Canada.

43. Before engaging professional advisers, as a general rule, the Company will consult with the relevant corporate head office function, which is located in England. An exception to this would be purely localised issues.

44. KPMG is the Company's auditors. KPMG has a global agreement with the Nortel group through which its engagement is managed. For the Company (and the EMEA group), this relationship is managed by Phillipe-Albert Leburn, who is based in England

45. **Property Management:** the Nortel group has a global relationship with Jones Lang Lasalle through which it manages its real estate interests. The leasehold properties of the company are managed by Jones Lang Lasalle along with other EMEA entities out of its offices in England.

46. **Directors:** I am a director of the Company and a UK citizen residing in England. I have an approved authority level of AL1.

47. **Human Resources:** the Company's employees are likely to be aware that their "high level" employment queries are managed centrally from England by Sharon Ellerker and the EMEA HR Shared Services team. In addition, first line transactional and administrative HR support is provided by the EMEA HR Shared Services team, located in England, who are typically the first point of contract for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity such as, managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums for some countries.

<u>**Conclusion on COMI**</u>

48. Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England, where all major decisions are made, that this is ascertainable by persons with whom the Company carries on business, and that in the circumstances the Company has its COMI in England.

**FORMAL REQUIREMENTS**

49. To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

50. To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

51. A statement from each of the proposed administrators is at tab F. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

52. It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

53. Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

54. At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

55. The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

56. I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom and David Martin Hughes of Ernst and Young LLP as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed.... *[signature]* ....

Dated......16.1.09....

Applicant
Sharon Lynette Rolston
No. of Statement: First
Exhibits: SR1
14 January 2009

NO. 1 OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS (IRELAND) LIMITED

AND

IN THE MATTER OF THE INSOLVENCY ACT 1986

---

WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

10/17982131_4

15