20.  My fellow directors and I have concluded that the Company is unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

  (a)  The Company's most recently available unaudited balance sheet dated 30 September 2008 (see tab C) shows that the Company is presently insolvent on a balance sheet basis (with a deficit of $735,000 as of 30 September 2008).

  (b)  This, along with the other matters set out at paragraphs 100 to 102 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is unable to pay its debts.

**PURPOSE OF ADMINISTRATION**

21.  I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

22.  Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

23.  We have placed particular reliance upon:

  (a)  The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

  (b)  The matters identified at paragraphs 216 to 220 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

  (c)  The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

24.  I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order.  I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of

this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

25.    The Company is incorporated in Hungary and has its registered office there.

26.    The Company has the following connections with the place of its incorporation:

  (a)    the Company has 6 employees who are employed in Hungary;

  (b)    the Company has external creditors in Hungary, although these creditors are small in value (for example, our external advisers inform me that such creditors amounted to approximately 7% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 3 million) and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords

  (c)    the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and one of the account signatories is located in the England); and

  (d)    low level administrative and book keeping functions are performed in Hungary.

**Factors connecting the Company with countries other than the place of incorporation or England**

27.    The Company has the following connections with countries other than the place of its incorporation or England:

  (a)    Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

  (b)    Netherlands: the Company is a wholly owned subsidiary of the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)    Germany: the account manager of one of the Company's top five customers is located in Germany; and

(d)    Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 5% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 3 million).

**Factors connecting the Company with England**

28.    **Decision making:** I refer to paragraphs 119 to 135 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA Group; paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. As stated in paragraphs 123 of the Main Witness Statement, there are four levels of approval authority re decision making: AL0 (the highest level) to AL 3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

29.    **Creditors:** the significant majority by value of the total creditors of the Company are intercompany creditors (for example, our external advisers inform me that such creditors amounted to approximately 88% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 3 million) as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors. Intercompany accounts are managed and settled by the EMEA Group Treasury team in England.

30. **Customers:** the Company's largest customers usually deal directly with the EMEA Group sales president, Darryl Edwards, based in England, particularly in relation to serious matters.

31. **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds all issued capital in the Company.

32. **Banking:** All banking arrangements are managed in accordance with policies and procedures set by EMEA Group Treasury, located in England. As mentioned in paragraph 26, one of the account signatories is located in England.

33. **Funding:** NNUK, along with the North American Nortel entities, provide all of the funding requirements of the Company.

34. **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, decisions are made by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of intercompany outstandings are made by the EMEA Group Treasury in England.

35. **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to a Belgium HR specialist where necessary.

36. **Advisers:** the Company's advisers are centralised in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

37. **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

**Conclusion on COMI**

38.   Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the Company's largest customers deal directly with England (see paragraph 30 above) and that the majority of the Company's creditors are intercompany creditors. Therefore, in the circumstances the directors believe that the Company has its COMI in England.

**FORMAL REQUIREMENTS**

39.   To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

40.   To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

41.   A statement from each of the proposed administrators is at tab E. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

42.   It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

43.   Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

44.    At tab F is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

## EC REGULATION

45.    The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

## CONCLUSION

46.    I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill as joint administrators of the Company.

## STATEMENT OF TRUTH

I believe that the facts and matters set out in this witness statement are true.

Signed.....................................

Dated....14·1·09·...................

Applicant
Sharon Lynette Rolston
First
SR1
14 January 2009

NO.                    OF 2009

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

**IN THE MATTER OF NORTEL NETWORKS
ENGINEERING SERVICE KFT.**

**AND IN THE MATTER OF THE INSOLVENCY
ACT 1986**

---

### WITNESS STATEMENT OF SHARON
### LYNETTE ROLSTON

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

*Applicant*
*Sharon Lynette*
*Rolston*
*First*
*SR 1*
*14 January 2009*

NO.        OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS HISPANIA, S.A.

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

### WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I, Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, UK, WILL SAY as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks Hispania, S.A. (the **"Company"**), having been appointed on 14 January 2009.

2.      I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of

Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill, of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company (the **"Proposed Administrators"**). I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.     Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.     I am aware of the previous operations and management of the Company as I was first appointed as a director of the Company on 21 March 2007 and I am the Chief Financial Officer of Nortel Networks UK Limited (**"NNUK"**), an English company, and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 14 below).

5.     There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.     I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.     I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company)(the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.     This witness statement is divided into the following sections:

(a)     Background;

(b)     Decision of the directors of the Company to apply for an administration order in respect of the Company;

(c)     Financial position of the Company;

(d)     Purpose of the administration;

(e)    Centre of main interests ("**COMI**") of the Company;

(f)    Formal requirements; and

(g)    Conclusion.

## BACKGROUND

9.    The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the "**EMEA Group**").

10.    The Company carries on business as a "limited risk entity" in the Nortel Group (as described at paragraphs 50 to 53 of the Main Witness Statement) (the "**Limited Risk Entity**"). As such, the Company operates as the Spanish distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited ("**NNL**"), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the "**Distribution Agreement**"). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre ("**TCC**") operated by certain larger members of the Nortel Group.

11.    Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the company is guaranteed by NNL.

12.    The Company was incorporated on 8 January 1990 under the provisions of Ley de Sociedades Anonimas – RD Leg. 1564/1989 of 22 December as subsequently amended and Reglamento del Registro Mercatil. The registered office of the Company is situate at Carmino del Cerro de los Gamos, no. 1, Edificio 6, Pozuelo de Alarcon, Madrid, Spain (tab A).

13.    Until 1995 the Company's name was Radiotronica Standard Telephone and Cable, S.A., whereupon it was changed to Sociedad Espanola de Equipos de Telecomunicaciones Northern Telecom S.A. On 30 June 1995 the Company's name changed to Northern

Telecom Socieded Anonima. In December 1997 its name was changed to Nortel Hispania, S.A. Finally, on 19 April 1999, the Company changed its name to Nortel Networks Hispania, S.A.

14.     The paid up and issued share capital of the Company is € 9,165,000 divided into 1,500,000 shares. Nortel Networks International Finance and Holding B.V. (a Dutch company) ("NNIF") holds the entire share capital of the Company. NNIF is a wholly owned subsidiary of NNUK.

15.     I, along with Simon Freemantle and Michel Clement, am a director of the Company and have been a director since 14 January 2009. Prior to my appointment the Company's directors were Knut Stenseth, resident in Spain, and Christina Waida and myself, both residents in England.

**DECISION TO APPLY FOR AN ADMINISTRATION ORDER**

16.     As set out at paragraphs 26 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

17.     As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

18.     Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

19.    On 14 January 2009 a meeting of the directors of the Company was held in order to
       determine what steps the Company should take to best preserve its business and assets for
       the benefit of its creditors. The directors resolved that we should apply to the Court for an
       administration order to be made in relation to the Company. A copy of the board resolution
       is at tab B.

## FINANCIAL POSITION OF THE COMPANY

20.    I am advised that before the Court makes an administration order in relation to a company,
       it must be satisfied that the company is or is likely to become unable to pay its debts.

21.    My fellow directors and I have concluded that the Company is or is likely to become
       unable to pay its debts. We have relied upon the following matters in reaching this
       conclusion:

       (a)    Whilst the Company's most recently published accounts, dated 31 December 2007
              (tab C), and most recently available balance sheet, dated 30 September 2008 (tab
              D), show that the Company is presently solvent on a balance sheet basis, as
              discussed at paragraph 100 of the Main Witness Statement, it is predicted that the
              filings in North America will impair the business of the EMEA Group by 25 to 40
              per cent and will cause a breakdown in intercompany funding within the EMEA
              Group.

       (b)    This will particularly affect the Company because its profitability and balance
              sheet solvency are dependant on Nortel Group operating protocols and are not
              sustainable on a stand alone basis without support of the Nortel Group; in
              particular, NNL (a Canadian company) is responsible for underwriting the
              companies' profitability and is about to enter in an insolvency process.

       (c)    This, along with the other matters set out at paragraphs 100 to 102 of the Main
              Witness Statement, which I confirm apply to the Company, means that it is clear
              that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

22.    I am advised that before the Court makes an administration order in relation to a company,
       it must be satisfied that the administration order is reasonably likely to achieve the purpose
       of the administration.

23.  Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

24.  We have placed particular reliance upon:

(a)  The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)  The matters identified at paragraphs 216 to 221 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)  The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

## COMI

25.  I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

### Place of incorporation and factors connecting the Company to the place of incorporation

26.  The Company is incorporated in Spain and has its registered office there.

27.  The Company has the following connections with the place of its incorporation:

(a)  as mentioned at paragraph 15 above, up until 14 January 2009 one director of the Company was resident in Spain;

(b)  the annual board meetings of the Company are usually held in Spain;

(c)  the Company has 146 employees who are employed in Spain;

(d)    the Company has external creditors in Spain, although these creditors do not constitute a majority (for example, our external advisers inform me that such creditors amounted to approximately 28% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 39 million) and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords;

(e)    the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and one of the account signatories is located in England);

(f)    the account managers of three of the Company's top five customers by value, as assessed over the previous nine months (the **"top five customers"**) are located in Spain;

(g)    as stated in paragraph 123 of the Main Witness Statement, there are four levels of approval authority in relation to decision making: AL 0 (the highest level) to AL 3 (the lowest level). The Company has the AL 2 business, finance and legal employees in relation to one of the top five customers, (Telefonica, who is also a top 15 EMEA customer and a pan-European customer) are located in Spain;

(h)    the Company has a local HR representative due to more complex case management support required as a result of local laws. However, the EMEA Group shared HR service team in England remain the first point of contact for employees (see paragraph 36 below);

(i)    the Company's legal support is partially provided in Spain as the Company has an in-house lawyer; and

(j)    low level administrative and book keeping functions are performed in Spain.

**Factors connecting the Company with countries other than the place of incorporation or England**

28.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)    Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks

Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)    Netherlands: the entire share capital of the Company's is directly held by the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)    France: the account manager of one of the top five customers is located in France; and

(d)    Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 5% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 39 million).

**Factors connecting the Company with England**

29.    **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA Group, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. Save as to the AL 2 employees mentioned in paragraph 27(g) above, the Company does not have any other employees with any of the authority levels and so has insufficient number of employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

30.    **Creditors:** the significant majority by value of the total creditors of the Company are intercompany creditors (for example, our external advisers inform me that such creditors amounted to approximately 67% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 39 million), as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors.

Intercompany accounts are paid as per standard terms unless determined otherwise by the EMEA Group Treasury team in England.

31.  **Customers:** the Company's largest customers are accustomed to deal directly with the EMEA Group sales president, Darryl Edwards, based in England particularly in relation to serious matters (see paragraphs 148 of the Main Witness Statement for further details). Further, the account managers of one of the top five customers are based in England.

32.  **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds the entire share capital of the Company.

33.  **Banking:** until the practice was terminated on 29 December 2008, the Company participated in an EMEA Group cash pooling arrangement whereby the majority of its cash was effectively moved at regular intervals to a central account in England. These arrangements were managed, along with all other banking arrangements, in accordance with policies and procedures set by the EMEA Group treasury located in England. The company maintains an English bank account with signatories in England and Spain.

34.  **Funding:** The Company has a €3,000,000 intercompany loan from NNUK and requires regular funding from NNUK for working capital purposes.

35.  **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, decisions are made by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England (save as to the Company limited independency in HR and legal matters as mention in paragraphs 27 (h) and (i)). Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of intercompany outstandings are made by the EMEA Group Treasury in England.

36.  **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case

management support (in relation to grievances or disciplinary issues, for example) are referred to a Spanish HR Specialist where necessary.

37.  **Advisers:** the Company's advisers are located in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

38.  **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

39.  **Directors:** as mentioned at paragraph 15 above, up until 14 January 2009 two directors of the Company were residents in England.

### Conclusion on COMI

40.  Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the Company's largest customers deal directly with England (see paragraph 31 above) and that the majority of the Company's creditors are intercompany creditors. Therefore, in the circumstances the directors believe that the Company has its COMI in England.

## FORMAL REQUIREMENTS

41.  To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

42.  To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

43.  A statement from each of the proposed administrators is at tab E. The statements confirm that the proposed administrators accept the appointment to the Company as administrators,

10/18047230_1

10

that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

44.  It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

45.  Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served.  Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

46.  At tab F is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days' notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

47.  The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

48.  I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill, of the firm Ernst & Young LLP as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed.............................................

Dated............16-1-09............

10/18047230_1

11

Applicant
Sharon Lynette
Roston
First

14 January 2009

NO.    OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS
HISPANIA, S.A.

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

_____

WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON

_____

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

**Applicant**
**Sharon Rolston**
**No. of Statement: First**
**Exhibits: SR1**
**14 January 2009**

NO.      OF 2009

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

**IN THE MATTER OF NORTEL NETWORKS INTERNATIONAL FINANCE &
HOLDING B.V.**

**AND**

**IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

I Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ,  WILL SAY
as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks International Finance & Holding B.V. (the
        **"Company"**), having been appointed on 14 January 2009.

2.      I make this witness statement in support of the application of the directors of the Company
        pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the **"Act"**) for
        an administration order to be made in respect of the Company and for the appointment of
        Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan

Michael Hudson, of the firm of Ernst & Young LLP ("E&Y"), as joint administrators of the Company (the "**Proposed Administrators**").  I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.    Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true.  Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.    Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited ("NNUK") and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 13 below).

5.    There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents.  References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.    I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies ("**Nortel Group**").

7.    I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the "**Main Witness Statement**").  I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.    This witness statement is divided into the following sections:

(a)    Background;

(b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

(c)    Financial position of the Company;

(d)    Purpose of the administration;

(e)    Centre of main interests ("**COMI**") of the Company;

  (f)  Formal requirements; and

  (g)  Conclusion.

## BACKGROUND

9.  The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the **"EMEA Group"**).

10.  The Company is a "holding company" in the Nortel Group (as described at paragraphs 54 to 56 of the Main Witness Statement).  As such, it has no activities and acts solely as a holding company for subsidiary entities in the Nortel Group.  The Company has no physical assets.

11.  The Company was incorporated on 18 May 1979 under the provisions of Title 5 of Book 2 of the Dutch Civil Code (*"Burgerlijk Wetboek"*).  The registered office of the Company is situated at Siriusdreef 42-72, 2132WT Hoofddorp, Netherlands. (tab A).

12.  Until 14 May 1999, the Company's name was Northern Telecom International Finance B.V., whereupon its name was changed to Nortel Networks International Finance & Holding B.V.

13.  The authorised share capital of the Company is €141,608,060 divided into (a) 998,000 ordinary shares each with a nominal value of €140.97 and (b) 2,000,000 "A" shares each with a nominal value of €0.46. The issued share capital of the Company is €133,424,298.93 divided into 942,419 ordinary shares of €140.97 and 1,242,375 "A" shares of €0.46.  The amount of share capital credited as paid up is €13,258,280 in respect of the ordinary shares and €571,492.50 in respect of the "A" shares. The Company is a wholly owned subsidiary of NNUK, an English Company.

14.  I, along with Simon Freemantle, am a director of the Company and have been a director since 14 January 2009. Until my appointment, the Company's directors were Rob Haitsma (appointed 1 September 2001), residing in the Netherlands, Simon Freemantle (appointed 30 April 2004), residing in England, and Jonkheer A.E. Stoop (a member of the supervisory board and appointed on 10 March 1983), residing in the Netherlands.  Rob Haitsma and Jonkheer A.E. Stoop are Dutch citizens.  I am an Irish citizen and Simon Freemantle is a British citizen.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

15.   As set out at paragraphs 57 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

16.   As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

17.   Together with my fellow directors, we have considered the likely effect of the filings in North America on the Company. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 108 of the Main Witness Statement and confirm that these matters apply to the Company.

18.   On 14 January 2009, a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab B.

## FINANCIAL POSITION OF THE COMPANY

19.   I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

20.   My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

(a)    Whilst the Company's most recently published accounts dated 27 September 2007 (at tab C) and the most recently available balance sheet as at 30 September 2008 (at tab D) show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100 of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in inter-company funding within the EMEA Group;

(b)    This will particularly affect the Company because its profitability and balance sheet solvency are dependent on Nortel Group operating protocols and are not sustainable on a stand-alone basis without support of the Nortel Group; and

(c)    This, along with the other matters set out at paragraphs 101 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

21.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

22.    Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

23.    We have placed particular reliance upon:

(a)    The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)    The matters identified at paragraphs 213 to 221 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)    The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

24.    I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

25.    The Company is incorporated in the Netherlands and has its registered office there.

26.    The Company has the following connections with the place of its incorporation:

(a)    The board meetings of the Company are usually held in the Netherlands;

(b)    As mentioned in paragraph 14 above, up until 14 January 2009, one director and the member of the supervisory board were both residents in the Netherlands;

(c)    The Company maintains a local bank account with ABN Amro , although only with a minimal balance sufficient for weekly working capital requirements and the account is managed by the Treasury team in England;

(d)    The Company has external creditors in the Netherlands, although these creditors are negligible in value and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords; and

(e)    The Company has funds deposited locally with ABN Amro, which are available to support borrowings in India by a sister company there, Nortel Networks India ("NN India").

**Factors connecting the Company with countries other than the place of incorporation or England**

27.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)     The Company is a wholly-owned subsidiary of NNUK, which in turn is wholly owned by Nortel Networks Limited, a Canadian company. The ultimate parent company of the Company is Nortel Networks Corporation, a Canadian company;

(b)     Nortel Communication Holdings (1997) Limited, a company incorporated in Israel, has an outstanding payable of approximately US$ 21m to the Company arising out of a hybrid instrument issued by Nortel Communication Holdings (1997) Limited. This is accounted for as an equity investment by the Company; and

(c)     The Company is the direct holding company of Nortel Group subsidiaries in various jurisdictions, including Singapore, Austria, Switzerland, Norway, the Czech Republic, Italy, Luxembourg, South Africa, Greece, Belgium, Hungary, Bulgaria, Slovakia, Romania, Russia, Portugal, Israel, Poland, Germany, the Netherlands, the Ukraine, Sweden, Spain and Malta. It is also an indirect holding company of companies incorporated in Israel and Finland.

**Factors connecting the Company with England**

28.     **Shareholders:** NNUK holds 100% of the shares in the Company.

29.     **Decision making:** As stated in paragraph 123 of the Main Witness Statement, there are four levels of approval authority re decision making: AL0 (the highest level) to AL 3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

30.     **Directors:** As mentioned in paragraph 14 above, up until 14 January 2009 and since then, one of the directors of the Company was resident in England.

31.     **Banking:** until the practice was terminated on 29 December 2008, the Company participated in an EMEA Group cash pooling arrangement whereby the majority of its cash was effectively moved at regular intervals to a central account in England. These arrangements were managed, along with all other banking arrangements, in accordance with policies and procedures set by the EMEA Group treasury located in England. The Company's local bank account is managed by the Treasury team in England. The Company also has a bank account in London with Citibank. It was Simon Freemantle who

dealt with Citibank and he continues to deal with ABN Amro and Citibank. There is minimal interaction with banks at the local level.

32.    **Funding:** The Company's financing is managed and operated from England.

33.    **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions and funding issues, decisions are made by the Finance, Legal, Treasury and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of inter-company outstandings are made by the EMEA Group Treasury in England.

34.    **Advisers:** the Company's advisers are located in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

**Conclusion on COMI**

35.    Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions are made. Therefore, in the circumstances the Company has its COMI in England.

**FORMAL REQUIREMENTS**

36.    To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

37.    To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

38.    A statement from each of the Proposed Administrators is at tab F. The statements confirm that the Proposed Administrators accept the appointment to the Company as administrators,

that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

39.     It is intended that any of the Proposed Administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

## Service and Abridgement of Time

40.     Paragraph 12(2) of Schedule B1 to the Act and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served.  Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

41.     At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days' notice of the administration hearing and agree to service on them being dispensed with.

## EC REGULATION

42.     The EC Regulation on Insolvency Proceedings applies in this case.  The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

## CONCLUSION

43.     I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson as joint administrators of the Company.

## STATEMENT OF TRUTH

I believe that the facts and matters set out in this witness statement are true.

Signed..........................................

Dated..........................................

Applicant
Sharon Rolston
No. of Statement: First
Exhibits: SR1
14 January 2009

NO.    OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS
INTERNATIONAL FINANCE & HOLDING B.V.

AND

IN THE MATTER OF THE INSOLVENCY ACT
1986

---

WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

**Applicant**
**Sharon Rolston**
**No of Statement: First**
**Exhibit: SR1**
**14 January 2009**

NO.    OF 2009

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

IN THE MATTER OF NORTEL NETWORKS N.V.

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

## WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I Sharon Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ WILL SAY as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks N.V. (the **"Company"**), having been appointed on 14 January 2009.

2.      I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of

Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill of the firm of Ernst & Young LLP ("E&Y"), as joint administrators of the Company (the **"Proposed Administrators"**). I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.     Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.     Although I was only appointed as a director of the Company on 14 January 2009 I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited (**"NNUK"**) and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 14 below).

5.     There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.     I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.     I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.     This witness statement is divided into the following sections:

(a)     Background;

(b)     Decision of the directors of the Company to apply for an administration order in respect of the Company;

(c)     Financial position of the Company;

(d)     Purpose of the administration;

(e)     Centre of main interests ("**COMI**") of the Company;

(f)     Formal requirements; and

(g)     Conclusion.

**BACKGROUND**

9.     The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the "**EMEA Group**").

10.    The Company carries on business as a limited risk entity in the Nortel Group (as described at paragraphs 50 to 53 of the Main Witness Statement ("**Limited Risk Entity**"). As such, the Company operates as the Belgian distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited ("**NNL**"), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the "**Distribution Agreement**"). Accordingly, the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre ("**TCC**") operated by certain larger members of the Nortel Group.

11.    Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the company is guaranteed by NNL.

12.    The Company was incorporated on 12 June 1973 under the provisions of the Belgium Company Code.  The registered office of the Company is situate at Ikaroslaan 14, 1930 Zaventem, Belgium (tab A).

13.    Until 16 June 1983 the Company's name was S.A. DATA 100 NV, whereupon its name was changed to Northern Telecom Data Systems NV. On 9 September 1987 its name was changed to Northern Telecom NV and again, on 1 November 1997, to Nortel NV. Finally, on 3 May 1999, the Company changed its name to Nortel Networks NV.

14. The paid up and issued share capital of the Company is € 2,231, 041 divided into 90,000 shares. Nortel Networks International Finance and Holding BV (a Dutch company) ("NNIF") holds 89,999 shares and NNUK holds one share. NNIF is a wholly owned subsidiary of NNUK.

15. I, along with Simon Freemantle and Gordon Davies, am a director of the company and have been a director since 14 January 2009. Prior to my appointment the company's directors were Stephan Saul, Lieve Willekens and Vincent di Filippantonio, all of whom are resident in Belgium.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

16. As set out at paragraphs 57 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

17. As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

18. Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 108 of the Main Witness Statement and confirm that these matters apply to the Company.

19. On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an

administration order to be made in relation to the Company. A copy of the board resolution is at tab D.

## FINANCIAL POSITION OF THE COMPANY

20.     I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

21.     My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

(a)     Whilst the Company's most recently published accounts, dated 31 December 2007, and most recently available balance sheet, dated 30 September 2008, show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100 of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

(b)     This will particularly affect the Company because its profitability and balance sheet solvency are dependant on Nortel Group operating protocols and are not sustainable on a stand alone basis without support of the Nortel Group; in particular, NNL (a Canadian company) is responsible for underwriting the Companies profitability and is about to enter an insolvency process.

(c)     This, along with the other matters set out at paragraphs 101 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

22.     I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

23.     Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

24.     We have placed particular reliance upon:

(a)     The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)     The matters identified at paragraphs 213 to 221 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)     The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

25.     I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

26.     The Company is incorporated in Belgium and has its registered office there.

27.     The Company has the following connections with the place of its incorporation:

(a)     as mentioned at paragraph 15 above, up until 14 January 2009 three directors of the Company were resident in Belgium;

(b)     the board meetings of the Company are usually held in Belgium;

(c)     the Company has 27 employees who are employed in Belgium;

(d)     the Company has external creditors in Belgium, although these creditors are small in value (for example, our external advisers inform me that such creditors amounted to approximately 4% of the Company's total spend for the nine months to 30 September 2008: this total spend being approximately US$ 27 million) and

take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords;

(e)    the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and one of the account signatories is located in England);

(f)    the account manager of one of the company's top five customers by value, as assessed over the previous nine months (the "**top five customers**") is located in Belgium; and

(g)    low level administrative and book keeping functions are performed in Belgium.

**Factors connecting the Company with countries other than the place of incorporation or England**

28.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)    Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)    Netherlands: the account manager of one of the top five customers is located in the Netherlands and the majority of the Company's shares are directly held by the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)    France: the account manager of one of the Company's top five customers is located in France; and

(d)    Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 3% of the Company's total spend for the nine months to 30 September 2008: this total spend being approximately US$ 27 million).

**Factors connecting the Company with England**

29.   **Decision making:** I refer to paragraphs 109 to 143 of the Main Witness Statement which
      set out in considerable detail the decision making process in relation to the business of the
      companies within the EMEA Group, paragraphs 140 to 143 which detail the management
      of creditor relationships of the companies within the EMEA region, and paragraphs 144 to
      149 which detail the management of customer relationships of the companies within the
      EMEA region.  I confirm the accuracy of these paragraphs in relation to the conduct of the
      business of the Company. To summarise, the Company, as a Limited Risk Entity, has very
      little decision making authority. As stated in paragraph 123 of the Main Witness Statement,
      there are four levels of approval authority re decision making: AL0 (the highest level) to
      AL 3 (the lowest level). The Company does not have any employees with any of these
      authority levels and so has no employees who are able to approve any material transactions
      that the entity may wish to undertake; in terms of the EMEA Group, this authority is
      largely centralised in England.

30.   **Creditors:** the significant majority by value of the total creditors of the Company are
      intercompany creditors (for example, our external advisers inform me that such creditors
      amounted to approximately 93% of the Company's total spend for the nine months to 30
      September 2008: this total spend being approximately US$ 27 million), as the Company
      relies on the procurement of services and products from other Nortel Group entities in
      order to satisfy customer orders. NNUK is the largest of these inter-company creditors.
      Intercompany accounts are paid as per standard terms unless determined otherwise by the
      EMEA Group Treasury team in England.

31.   **Customers:** the Company's largest customers are accustomed to deal directly with the
      EMEA Group sales president, Darryl Edwards, based in England, particularly in relation to
      serious matters (see paragraphs 144 to 149 of the Main Witness Statement for further
      details). Further, the account managers of two of the top five customers are based in
      England.

32.   **Shareholders:** NNUK holds one share in the Company directly and also holds 100% of the
      shares in NNIF, which in turn holds all other shares in the Company.

33.   **Banking:** until the practice was terminated on 29 December 2008, the Company
      participated in an EMEA Group cash pooling arrangement whereby the majority of its cash
      was effectively moved at regular intervals to a central account in England. These

arrangements were managed, along with all other banking arrangements, in accordance
with policies and procedures set by the EMEA Group treasury located in England. The
Company maintains an English bank account with signatories in England and Belgium.

34.  **Funding:** NNUK, along with the North American Nortel entities, provide all of the
funding requirements of the Company.

35.  **Corporate matters:** in relation to corporate matters, such as approval of financial
statements, tax, distributions, funding and HR issues, decisions are made by the Finance,
Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in
England. Required board approvals will generally be passed by written resolutions drafted
and circulated by these divisions, along with briefing papers prepared by the same. Tax
planning initiatives are either led from England or Canada. Also, decisions regarding
payment of intercompany outstandings are made by the EMEA Group Treasury in England.

36.  **Employees:** the Company's employees are aware that their "high level" employment
queries are managed centrally from England by the EMEA Group shared HR services team,
who are typically the first point of contact for employees and managers when they have an
HR query or require HR support. This team is also responsible for some region specific
activity (such as managing the interfaces with various payroll and benefits providers, file
management, and the generation of contract addendums). More complex queries or case
management support (in relation to grievances or disciplinary issues, for example) are
referred to a Belgium HR specialist where necessary.

37.  **Advisers:** the Company's advisers are located in England: for example, the Company's
audit process is managed by the accountancy firm KPMG in England, *but local KPMG do
the local audit. sh*

38.  **Property management:** the Company's leasehold properties are managed by Jones Lang
Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group
corporate real estate team in England.

**Conclusion on COMI**

39.  Having regard to the various factors identified above, the directors are satisfied that the
Company's central management and control is directed from England. This is where all
major decisions, both internal and external (i.e. customer facing), are made. This is
ascertainable by persons with whom the Company carries on business as is evidenced, for
example, by the fact that the Company's largest customers deal directly with England (see

paragraph 31 above) and that the majority of the Company's creditors are intercompany creditors. Therefore, in the circumstances the Company has its COMI in England.

## FORMAL REQUIREMENTS

40.    To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

41.    To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

42.    A statement from each of the proposed administrators is at tab F. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

43.    It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

## Service and Abridgement of Time

44.    Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

45.    At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

## EC REGULATION

46.    The EC Regulation on Insolvency Proceedings applies in this case.  The proceedings will
       be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

47.    I respectfully request that the Court do make an administration order in respect of the
       Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and
       Christopher John Wilkinson Hill as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.


Signed...............................

Dated.........14.1.09.................

Applicant
Sharon Rolston
No of Statement: First
Exhibit: SR1

14 January 2009

NO.    OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS N.V.

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

**Applicant**
**Sharon Lynette Rolston**
**First**
**SR1**

**14 January 2009**

**NO.    OF 2009**

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS OY

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

### WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I, Sharon Lynette Rolston of 153, Hallowell Road, Northwood, Middlesex, HA6 1DZ, United Kingdom, WILL SAY as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks OY (the "**Company**"), having been appointed on 15 August 2006.

2.      I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the "**Act**") for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson, of the firm Ernst & Young LLP ("**E&Y**"), as joint administrators of the Company.  I am duly authorised to make this witness statement on behalf of the directors of the Company.

1

3. In addition to being a director of the Company since 15 August 2006, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer and a director of Nortel Networks UK Limited, an English Company ("**NNUK**").

4. Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

5. There is now produced and shown to me marked exhibit SLR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6. I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies ("**Nortel Group**").

7. I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the "**Main Witness Statement**"). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

## CONTENTS

8. This witness statement is divided into the following sections:

    (a) Background;

    (b) Decision of the directors of the Company to apply for an administration order in respect of the Company;

    (c) Financial position of the Company;

    (d) Purpose of the administration;

    (e) Centre of main interests ("**COMI**") of the Company;

    (f) Formal requirements; and

    (g) Conclusion.

**STATUTORY INFORMATION**

9.  The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa ("**EMEA**").

10. The Company carries on business as a cost plus entity ("**CP entity**") of the EMEA Group. As described at paragraphs 40, 44 to 46 of the Main Witness Statement, CP entities are service companies.

11. The main role of the Company involves marketing Nortel products, customer relationship management and local product installation and training. The Company's customer relationships are predominantly with other entities in the Nortel Group, but it does have some local revenue.

12. The income received by the Company primarily comes from other companies within EMEA, primarily Nortel Networks (Ireland) Limited, Nortel Networks UK Limited and Nortel Networks Limited. This income is received on a "cost plus" basis, ie. the fully accounted cost, including attributable business overheads but not funding costs, is calculated and a fee equal to those costs plus an agreed mark up, usually 10%, is billed by the CP entity to the group company benefitting from the services.

13. The Company was incorporated on 27 March 1996 under the provisions of the Finnish Companies Act (Osakeyhtiölaki) Law 734/1978. The registered office of the Company is situated at Arabianranta 6, 00560 Helsinki, Finland (tab A). The Company's company number is 1039 1404 (Y Reg).

14. The Company changed its name from Bay Networks Finland OY to Nortel Networks OY on 14 June 1999.

15. The issued share capital of the Company is 8,500 Euros. The nominal capital of the Company is 8,500 Euros divided into 100 shares with a nominal value of 85 Euros each. The amount of the capital paid up or credited as paid up is 8,500 Euros. Nortel Networks AB ("**NNAB**") holds 100% of the shares in the Company. NNAB is a wholly owned subsidiary of Nortel Networks International Finance & Holding BV which is a wholly-owned subsidiary of NNUK.

16. I, along with Simon Freemantle and Gordon Davies am a director of the Company and have been a director since 15 August 2006. Prior to 14 January 2009 the Company's directors were Rob Haitsma who is a Dutch citizen and resides in the Netherlands, Joseph

O'Connor who is an Irish citizen and resides in France and myself, an Irish citizen residing in England.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

17.    As set out at paragraphs 33 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and inter dependent on each entity within the business for financial performance.  This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

18.    As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties.  The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

19.    Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade.  In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent.  I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

20.    On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors.  The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company.  A copy of the board resolution is at tab B.

## FINANCIAL POSITION OF THE COMPANY

21.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

22.    My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts.  We have relied upon the following matters in reaching this conclusion:

(a)    Whilst the Company's most recently published accounts dated 31 December 2007, and most recently available balance sheet dated 30 September 2008, show that the Company is presently solvent on a balance sheet basis (see tabs C and D), as discussed at paragraph 100(b) of the Main Witness Statement it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

(b)    This will particularly affect the Company because its profitability and balance sheet solvency are dependant on Nortel Group operating protocols and are not sustainable on a stand alone basis without the support of the Nortel Group.

(c)    This, along with the other matters set out at paragraphs 100 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

23.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

24.    Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

25.    We have placed particular reliance upon:

(a)    The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)    The matters identified at paragraphs 212 and 216 to 220 of the Main Witness Statement which highlight the likely benefits of administration orders being made

5

in relation to the EMEA companies in respect of which applications have been made; and

(c)     The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

## COMI

26.    I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe it is appropriate to file for an administration order in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

27.    The Company is incorporated in Finland and has its registered office there.

28.    The Company has the following connections with the place of its incorporation:

(a)     the Company has 4 employees, all of whom are based in Finland;

(b)     supply agreements are entered into by the Company within Finland for office and administration goods and services such as: car leasing plans, utility and phone (land and mobile) services, local authority tax charges and office administration and supplies.

**Factors connecting the Company with countries other than the place of incorporation or England**

29.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)     Most of the revenue for the CP entities is derived from enterprise solutions and the contracts are run through Nortel Networks (Ireland) Limited.

**Factors connecting the Company with England**

30.     I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in
considerable detail the decision making process in relation to the business of the companies
within the EMEA region, paragraphs 170 to 172 which detail the management of creditor
relationships of the companies within the EMEA region, and paragraphs 144 to 149 which
detail the management of customer relationships of the companies within the EMEA region.
I confirm the accuracy of these paragraphs in relation to the conduct of the business of the
Company.  To summarise, the Company, as a CP entity, has very little decision making
authority. As stated in paragraph 123 of the Main Witness Statement, there are four levels
of approval authority re decision making: AL0 (the highest level) to AL 3 (the lowest
level). The Company does not have any employees with any of these authority levels and
so has no employees who are able to approve any material transactions that the entity may
wish to undertake; in terms of the EMEA Group, this authority is largely centralised in
England. I am a director of the Company and am a Level 1 approver, however this is
derived as a result of my position as Chief Financial Officer of NNUK.

31.     I am an employee of NNUK.  One of the Company's previous directors, Joseph O'Connor,
who resigned on 14 January 2009, was also an employee of NNUK.

32.     I have reviewed the trade creditors for the nine months to September 2008.  I believe this
represents the general position of trade creditors for the Company over time. ~~Intercompany~~ JL Local
creditors comprise nearly all of the total trade creditors for the 9 months to September 2008.
~~These creditors are almost all part of the EMEA group and are managed out of England.~~ JU
~~Subject to local laws, the payment of intercompany liabilities has been governed by EMEA~~
~~group treasury, which is managed by Simon Freemantle out of England.~~  Further, as noted
above, the procurement and supply approval procedures for local Finnish creditors are
governed by the procurement and supply approval procedures as part of the global decision
making approval procedure and policy.

        (a)    **Management**: the business operations of the Company are not conducted through
its Board of Directors.  The day-to-day management of the Company's affairs is
conducted in accordance with EMEA Group policies and procedures.  These
policies and procedures are developed and implemented at the EMEA headquarters
in Maidenhead, England ("**EMEA Headquarters**"), and then disseminated to the
Company.  The Company is expected to operate within the constraints of those
policies and procedures.  In line with these policies and procedures the Company

7

holds the minimum number of board meetings required by law, except where there is an unusual high-value transaction requiring board approval. These are conducted by telephone or by written resolution and written resolutions will be circulated to the directors of the Company with briefing papers prepared by the relevant EMEA function at EMEA Headquarters (i.e. Finance, Legal, Treasury, Human Resources and Tax);

(b) **Corporate Matters**: for matters such as approval of local financial statements, distributions, funding (both loan and equity), and human resources issues where involvement from senior management in England is either locally required or expected, the directors of the Company receive guidance and advice from the appropriate EMEA functions, such as Finance, Legal, Treasury, Human Resources, and Tax. Where transactions follow Board approval (for instance a dividend), these will be subject to the Authority Level / DCA Process. This process is described at paragraphs 119 to 128 of the Main Witness Statement. The authorities given as part of that process will act as a recommendation to the directors of the Company to approve the matter;

(c) **Major Contracts**: where major contracts are entered into by the Company (such as material trading agreements, business acquisitions and divestments agreements, and material business restructuring proposals), such contracts will have been reviewed as part of the Authority Level / DCA Process. The authorities given as part of that process will act as a recommendation to the directors of the Company to approve the agreement or proposal;

(d) **Procurement**: ~~approximately 100% of the Company's purchases are intercompany.~~ All procurement is done in accordance with Nortel global procurement procedures and policies. The approval process for suppliers is governed by Nortel Group corporate procedures which set out the responsibilities, requirements and guidelines for the establishment and management of supply agreements. There is also an EMEA Global Procurement Contract Management Procedure Guide which is applicable to the procurement of network field service requirements. This is managed out of England.

(e) **Banking**: while the Company has a bank account in Finland, it maintains a minimal balance and the Company has minimal interaction with Finnish banks. Further, all banking arrangements are conducted in accordance with the policies

and procedures developed by the Treasury Group at EMEA Headquarters. Any changes to these policies and procedures must be approved by NNUK;

(f) **Funding:** the Company does not have local facilities or borrowing arrangements. All funding for the Company is provided from England or Canada;

(g) **Advisers:** KPMG acts as the auditor of for Nortel globally, and the relationship is governed by a global engagement letter. However, there is also an individual engagement letter between the Company and the Finnish KPMG office. It is the Company's practice to consult the relevant group at EMEA Headquarters before engaging other professional advisers, except in respect of issues that are of a purely local nature;

(h) **Tax:** while the Company is responsible for preparing its Finnish tax returns, it is the Company's practice to have these returns reviewed by the Tax Group at EMEA Headquarters. Further, Headquarters manages EMEA Group tax matters and EMEA-specific tax planning initiatives. Other tax planning initiatives are led from Canada;

(i) **Property Management:** all leasehold properties globally (including properties leased by the Company) are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the corporate real estate team at EMEA Headquarters; and

(j) **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA HR Shared Services team. First line transactional and administrative HR support is provided by the EMEA HR Shared Services team, located in England who are typically the first point of contact for employees and managers when they have a HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums for some countries), and would refer more complex queries or case management support (i.e. disciplinaries, grievances etc.) to an in-country HR generalist where applicable. In addition, senior leaders within the Company receive advice from regionally located HR business partners.

### Conclusion on COMI

33.  Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England, where all major decisions are made, that this is ascertainable by persons with whom the Company carries on business, and that in the circumstances the directors believe that the Company has its COMI in England.

## FORMAL REQUIREMENTS

34.  To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

35.  To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

36.  A statement from each of the proposed administrators is at tab E. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

37.  It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

### Service and Abridgement of Time

38.  Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing,

39.    At tab F is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

## EC REGULATION

40.    The EC Regulation on Insolvency Proceedings applies in this case.  The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

## CONCLUSION

41.    I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson as joint administrators of the Company.

## STATEMENT OF TRUTH

I believe that the facts and matters set out in this witness statement are true.

Signed.................................................

Dated....................................................

Applicant
**Sharon Lynette Rolston**
**First**
**SLR1**
14 January 2009

NO.    OF 2009

## IN THE HIGH COURT OF JUSTICE

## CHANCERY DIVISION

## COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS OY

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

---

### WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

**Applicant**
**Sharon Lynette Rolston**
**First**
**SR1**
**14 January 2009**


**NO.    OF 2009**

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**


**IN THE MATTER OF NORTEL NETWORKS POLSKA SP. Z O.O.**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

I, Sharon Lynette Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ, UK, WILL SAY as follows:

**INTRODUCTION**

1.  I am a director of Nortel Networks Polska Sp. z o.o. (the **"Company"**), having been appointed on 14 January 2009.

2.  I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill, of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company

(the **"Proposed Administrators"**).  I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.  Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.  Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited (**"NNUK"**) and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 13 below).

5.  There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.  I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.  I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.  This witness statement is divided into the following sections:

   (a)    Background;

   (b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

   (c)    Financial position of the Company;

   (d)    Purpose of the administration;

   (e)    Centre of main interests (**"COMI"**) of the Company;

(f)     Formal requirements; and

(g)     Conclusion.

## BACKGROUND

9.      The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the **"EMEA Group"**).

10.     The Company carries on business as a "limited risk entity" in the Nortel Group (as described at paragraphs 50 to 53 of the Main Witness Statement) (**"Limited Risk Entity"**). As such, the Company operates as the Polish distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited (**"NNL"**), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the **"Distribution Agreement"**). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre (**"TCC"**) operated by certain larger members of the Nortel Group.

11.     Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the company is guaranteed by NNL.

12.     The Company was incorporated on 27 January 1997 under the laws of Poland. The registered office of the Company is situated at Roma Office Center, Nowogrodzka Street 47a, Warsaw, Poland (tab A).

13.     The paid up and issued share capital of the Company is PLN 16,000,000 divided into 160,000 shares. Nortel Networks International Finance and Holding B.V. (a Dutch company) (**"NNIF"**) holds the entire share capital of the Company. NNIF is a wholly owned subsidiary of NNUK.

14.     I, along with Simon Freemantle, am a director of the Company and have been a director since 14 January 2009. Prior to my appointment the Company's directors were Ian Stuart Stevenson and Stephane LeDreau, who are resident in England and France respectively.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

15.    As set out at paragraphs 26 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

16.    As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

17.    Together with my fellow director, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

18.    On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab B.

## FINANCIAL POSITION OF THE COMPANY

19.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

20.    My fellow director and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

(a) Whilst the Company's most recently published accounts, dated 15 February 2008 (tab C), and most recently available balance sheet, as at 30 September 2008 (tab D), show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100 of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

(b) This will particularly affect the Company because its profitability and balance sheet solvency are dependent on Nortel Group operating protocols and are not sustainable on a stand alone basis without support of the Nortel Group; in particular, NNL (a Canadian company) is responsible for underwriting the Companies profitability and is about to enter an insolvency process.

(c) This, along with the other matters set out at paragraphs 100 to 102 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

21. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

22. Following consideration of this matter with my fellow director, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

23. We have placed particular reliance upon:

(a) The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b) The matters identified at paragraphs 216 to 221 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)    The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

24.    I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

25.    The Company is incorporated in Poland and has its registered office there.

26.    The Company has the following connections with the place of its incorporation:

(a)    the Company has 33 employees who are all employed in Poland;

(b)    the Company has creditors in Poland, although these creditors are small in value (for example, our external advisers inform me that such creditors amounted to approximately 14% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 18 million) and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords;

(c)    the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and one of the account signatories is located in England). The Company did not participate in the EMEA cash pooling arrangements with Citigroup like other Limited Risk Entities in the Nortel Group due to the fact that it only maintained accounts in zlotys;

(d)    low level administrative and book keeping functions are performed in Poland;

(e)    the Company has a member of the EMEA Group shared HR services team, although this role forms part of the global HR service and is not specific to Poland (see paragraph 35 below); and

(f)    the Company has its own legacy accounting system and so does not use the regional shared systems such as SAP for accounts payable.

**Factors connecting the Company with countries other than the place of incorporation or England**

27.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)    Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)    France: the significant majority by value of the total creditors of the Company are intercompany creditors (for example, our external advisers inform me that such creditors amounted to approximately 78% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 18 million) as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. Nortel Networks S.A. (a French company) is the largest of these inter-company creditors. Payment is arranged from the EMEA Group Treasury in England. Further, the account manager of one of the Company's top five customers is located in France (the "**top five customer**") and, as mentioned in paragraph 14 above, up until 14 January 2009 one director of the Company was resident in France; and

(c)    Netherlands: the entire share capital of the Company is directly held by the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK).

(d)    Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 8% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 18 million).

**Factors connecting the Company with England**

28.    **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA Group, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. As stated in paragraphs 123 of the Main Witness Statement, there are four levels of approval authority re decision making: AL 0 (the highest level) to AL 3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake: in terms of the EMEA Group, this authority is largely centralised in England.

29.    **Creditors:** as mentioned in paragraph 27 (b) above, the significant majority by value of the total creditors of the company are intercompany creditors. Intercompany accounts are managed and settled by the EMEA Group Treasury team in England.

30.    **Customers:** the Company's largest customers are accustomed to deal directly with the EMEA Group sales president, Darryl Edwards, based in England particularly in relation to serious matters (see paragraphs 148 of the Main Witness Statement for further details). Further, the account managers of one of the top five customers are based in England.

31.    **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds all other shares in the Company.

32.    **Banking:** All banking arrangements are managed in accordance with policies and procedure set by EMEA Treasury group, located in England. As mentioned in paragraph 26(c) above, one of the account signatories is located in England.

33.    **Funding:** NNUK, along with the North American Nortel entities, provide all of the funding requirements of the Company.

34.    **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, guidance is given by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in

England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of intercompany outstandings are made by the EMEA Group Treasury in England.

35.   **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to a Polish HR Specialist where necessary.

36.   **Advisers:** the Company's advisers are centralised in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

37.   **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

38.   **Directors:** as mentioned in paragraph 14 above, up until 14 January 2009 one director of the Company was resident in England.

**Conclusion on COMI**

39.   Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the Company's largest customers deal directly with England (see paragraph 30 above). Therefore, in the circumstances the directors believe that the Company has its COMI in England.

**FORMAL REQUIREMENTS**

40.   To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

41.   To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

42.   A statement from each of the proposed administrators is at tab E. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

43.   It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

### Service and Abridgement of Time

44.   Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

45.   At tab F is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

### EC REGULATION

46.   The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

### CONCLUSION

47.    I respectfully request that the Court do make an administration order in respect of the
       Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and
       Christopher John Wilkinson Hill as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed.....................................

Dated..........16·1·09...............

Applicant
Sharon Lynette Rolston
First
SR1
14 January 2009

NO.    OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS
POLSKA SP. Z O.O.

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

_____

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

_____

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

Applicant
Sharon Rolston
First
SR1
14 January 2009

NO.    OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS PORTUGAL, S.A.

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

## WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I, Sharon Lynette Rolston, of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ WILL SAY as follows:

## INTRODUCTION

1.     I am a director of Nortel Networks Portugal, S.A. (the **"Company"**), having been appointed on 14 January 2009.

2.    I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson, of the firm of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company (the **"Proposed Administrators"**).  I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.    Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true.  Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.    Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I have been the Chief Financial Officer of the Nortel Networks UK Limited (**"NNUK"**), an English company since 1 April 2006.  The relationship between the Company and NNUK is explained in paragraph 14 below.

5.    There is now produced and shown to me marked exhibit SLR1 a bundle of true copy documents.  References in this witness statement to tab numbers are to the corresponding tabs of exhibit SLR1.

6.    I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.    I confirm that I have read my witness statement dated 14 January 2009 which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**).  I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.    This witness statement is divided into the following sections:

(a)    Background;

(b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

(c)     Financial position of the Company;

(d)     Purpose of the administration;

(e)     Centre of main interests (**"COMI"**) of the Company;

(f)     Formal requirements; and

(g)     Conclusion.

**BACKGROUND**

9.     The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the **"EMEA Group"**).

10.     The Company carries on business as a "limited risk entity" in the Nortel Group (as described at paragraphs 50 to 54 of the Main Witness Statement)(**"Limited Risk Entity"**). As such, the Company operates as the Portuguese distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited (**"NNL"**), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the "Distribution Agreement"). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre (**"TCC"**) operated by certain larger members of the Nortel Group.

11.     Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the company is guaranteed by NNL.

12.     The Company was incorporated on 30 April 1990 under the provisions of the Portuguese Code of Commercial Companies and Portuguese telecom legislation.  The registered office of the Company is situate at Edificio Tivoli Forum, Avda da Liberdade no. 180-3° andar, Lisbon, Portugal (tab A).

13.  On 1 August 2005, the Company's name was changed from Northern Telecom (Portugal) S.A. to Nortel Networks Portugal, S.A.

14.  The paid up and issued capital of the Company is EUR 174,650 divided into 35,000 shares of EUR 4.99 each. Nortel Networks International Finance and Holding BV (a Dutch company) ("NNIF") holds 34,999 shares and Nortel Optical Components Limited holds 1 share. NNIF is a wholly owned subsidiary of NNUK.

15.  I, along with Simon Freemantle am a director of the company and have been a director since 14 January 2009. Prior to my appointment the company's directors were Christian Waida (a resident of the England), Fernando Valdivieldo and Knut Stenseth (residents of Spain).

### DECISION TO APPLY FOR AN ADMINISTRATION ORDER

16.  As set out at paragraphs 33 to 81 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance.  This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

17.  As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties.  The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

18.  Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade.  In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent.  I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

19.     On 14 January 2009 a meeting of the directors of the Company was held in order to
        determine what steps the Company should take to best preserve its business and assets for
        the benefit of its creditors.  The directors resolved that we should apply to the Court for an
        administration order to be made in relation to the Company.  A copy of the board
        resolution is at tab B.

## FINANCIAL POSITION OF THE COMPANY

20.     I am advised that before the Court makes an administration order in relation to a company,
        it must be satisfied that the company is or is likely to become unable to pay its debts.

21.     My fellow directors and I have concluded that the Company is or is likely to become
        unable to pay its debts.  We have relied upon the following matters in reaching this
        conclusion:

        (a)     Whilst the Company's most recently published accounts dated 23 May 2008 and
                most recently available balance sheet dated 30 September 2008 show that the
                Company is presently solvent on a balance sheet basis, as discussed at paragraph
                87 of the Main Witness Statement, it is predicted that the filings in North America
                will impair the business of the EMEA Group by 25 to 40 per cent and will cause a
                breakdown in intercompany funding within the EMEA Group.

        (b)     This will particularly affect the Company because its profitability and balance
                sheet solvency are dependant on Nortel Group operating protocols and are not
                sustainable on a stand alone basis without support of the Nortel Group; in
                particular, NNL (a Canadian company) is responsible for underwriting the
                Companies profitability and is about to enter into an insolvency process.

        (c)     This, along with the other matters set out at paragraphs 100 to 108 of the Main
                Witness Statement, which I confirm apply to the Company, means that it is clear
                that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

22.     I am advised that before the Court makes an administration order in relation to a company,
        it must be satisfied that the administration order is reasonably likely to achieve the purpose
        of the administration.

23.    Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

24.    We have placed particular reliance upon:

(a)    The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)    The matters identified at paragraph 217 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)    The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

25.    I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

26.    The Company is incorporated in Portugal and has its registered office there.

27.    The Company has the following connections with the place of its incorporation:

(a)    the Company has 11 employees who are employed in Portugal;

(b)    the Company has external creditors in Portugal and these creditors are significant in value (for example, our external advisers inform me that such creditors amounted to approximately 45% of the Company's total spend for the 9 months to

30 September 2008: this total spend being approximately US$ 4 million) and largely take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords

(c)     the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and one of the account signatories is located in England);

(d)     the account managers of two of the Company's top five customers is located in Portugal; and

(e)     low level administrative and book keeping functions are performed in Portugal.

**Factors connecting the Company with countries other than the place of incorporation or England**

28.     The Company has the following connections with countries other than the place of its incorporation or England:

(a)     Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)     Netherlands: The Dutch company NNIF holds 99.99% of shares in the Company (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)     Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 9% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 4 million).

**Factors connecting the Company with England**

29.     **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA Group, paragraphs 170 to 172 which detail the management

of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. As stated in paragraphs 123 of the Main Witness Statement, there are four levels of approval authority re decision making: AL0 (the highest level) to AL 3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

30.     **Directors:** as mentioned at paragraph 15 above, up until 14 January 2009 one director of the Company was resident in the England.

31.     **Creditors:** a significant portion by value of the total creditors of the Company are intercompany creditors (for example, our external advisers inform me that such creditors amounted to approximately 46% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 4 million) as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors. Intercompany accounts are paid as per standard terms unless determined otherwise by the EMEA Group Treasury team in England.

32.     **Customers:** the Company's largest customers usually deal directly with the EMEA Group sales president, Darryl Edwards, based in England, particularly in relation to serious matters. Further, the account managers of two of the Company's five largest customers are based in England.

33.     **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds 99.99% of shares in the Company.

34.     **Banking:** until the practice was terminated on 29 December 2008, the Company participated in an EMEA Group cash pooling arrangement whereby the majority of its cash was effectively moved at regular intervals to a central account in England. These arrangements were managed, along with all other banking arrangements, in accordance with policies and procedures set by the EMEA Group Treasury located in England. The Company maintains an English bank account with signatories in England.

35.    **Funding:** NNUK, along with the North American Nortel entities, provide all of the funding requirements of the Company.

36.    **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, decisions are made by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of intercompany outstandings are made by the EMEA Group Treasury in England.

37.    **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to a Portuguese HR specialist where necessary.

38.    **Advisers:** the Company's advisers are centralised in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

39.    **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

## Conclusion on COMI

40.    Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the Company's largest customers deal directly with England (see paragraph [30] above) and that a substantial portion of the Company's creditors are intercompany creditors. Therefore, in the circumstances the directors believe that the Company has its COMI in England.

## FORMAL REQUIREMENTS

41.    To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

42.    To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

43.    A statement from each of the proposed administrators is at tab E. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

44.    It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

## Service and Abridgement of Time

45.    Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

46.    At tab F is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

## EC REGULATION

47.    The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

## CONCLUSION

48.    I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson as joint administrators of the Company.

## STATEMENT OF TRUTH

I believe that the facts and matters set out in this witness statement are true.

Signed..........................................

Dated.............................................    14.1.09.

Applicant
Sharon Rolston
First
SR1
14 January 2009

NO.     OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS
PORTUGAL, S.A.

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

Solicitors to the Applicant

**Applicant**
**Sharon Lynette Rolston**
**First**
**SR1**
**14 January 2009**

NO.    OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS ROMANIA SRL

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

I Sharon Lynette Rolston of Maidenhead Office Park, Westacott Way, Maidenhead, Berks SL6 3QH, United Kingdom, WILL SAY as follows:

**INTRODUCTION**

1. I am a director of Nortel Networks Romania SRL (the **"Company"**), having been appointed on 14 January 2009.

2. I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 of the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris, and

Alan Michael Hudson, of the firm Ernst & Young LLP ("E&Y"), as joint administrators of the Company. I am duly authorised to make this witness statement on behalf of the directors of the Company.

3. Although I was only appointed as a director of the Company on 14 January 2009 I am aware of the previous operations and management of the Company as I am the Chief Financial Officer and a director of Nortel Networks UK Limited ("NNUK").

4. Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

5. There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6. I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies ("Nortel Group").

7. I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the "Main Witness Statement"). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8. This witness statement is divided into the following sections:

    (a)    Background;

    (b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

    (c)    Financial position of the Company;

    (d)    Purpose of the administration;

    (e)    Centre of main interests ("COMI") of the Company;

    (f)    Formal requirements; and

    (g)    Conclusion.

**STATUTORY INFORMATION**

9.    The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (**"EMEA"**).

10.    The Company carries on business as a cost plus entity (**"CP entity"**) of the EMEA Group. As described at paragraphs 40, 44 and 46 of the Main Witness Statement, CP entities are service companies.

11.    The main role of the Company involves marketing Nortel products, customer relationship management and local product installation and training. The Company's customer relationships are predominantly with other entities in the Nortel Group, but it does have some local revenue.

12.    The income received by the Company primarily comes from other companies within EMEA, primarily Nortel Networks (Ireland) Limited (**"NNIL"**), Nortel Networks UK Limited (**"NNUK"**) and Nortel Networks Limited. This income is received on a "cost plus" basis, ie. the fully accounted cost, including attributable business overheads but not funding costs, is calculated and a fee equal to those costs plus an agreed mark up, usually 10%, is billed by the CP entity to the group company benefitting from the services. The Company also derives some profit from within Romania for providing installation and training services.

13.    The Company was incorporated on 16 April 1999 under the provisions of Romanian companies legislation. The registered office of the Company is situated at 3A Promoroaca Street, Sector 1, Bucharest 014013, Romania (tab A). Its company number is J40/3642/1999.

14.    The nominal capital of the Company is 726,000 ROL divided into 726 shares of 100,000 ROL each. The amount of share capital issued and outstanding is 726,000 ROL. The issued share capital of the Company is 72,600,000 ROL (representing USD 700 and 100,000 ROL).

15.    Nortel Networks International Finance & Holding BV (**"NNIF"**) holds 99.86% of the shares in the Company and Nortel Networks BV, a wholly owned subsidiary of NNIF, holds 0.14% of the Shares in the Company. NNIF is a wholly-owned subsidiary of NNUK.

16.     I, along with Simon Freemantle am a director of the Company and have been a director since 14 January 2009. From 15 September 2005 until my appointment, the Company's directors were Nir Elbaz who is an Israeli citizen and who resides in Israel and Sorin Lupu who is an Israeli citizen and who resides in Israel.

**DECISION TO APPLY FOR AN ADMINISTRATION ORDER**

17.     As set out at paragraphs 25, 26, 33, 35 and 40 of the Main Witness Statement, the global and EMEA business is highly integrated and inter dependent on each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

18.     As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

19.     Together with my fellow director, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

20.     On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab D.

## FINANCIAL POSITION OF THE COMPANY

21.     I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

22.     My fellow director and I have concluded that the Company is or is likely to become unable to pay its debts.  We have relied upon the following matters in reaching this conclusion:

      (a)     Whilst the Company's most recently published accounts dated 31 December 2007 (see tab B), and most recently available balance sheet dated 30 September 2008 (see tab C), show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100(b) of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

      (b)     This will particularly affect the Company because its profitability and balance sheet solvency are dependant on Nortel Group operating protocols and are not sustainable on a stand alone basis without the support of the Nortel Group.

      (c)     This, along with the other matters set out at paragraphs 100 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

23.     I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

24.     Following consideration of this matter with my fellow director, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

25.     We have placed particular reliance upon:

      (a)     The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)    The matters identified at paragraph 213 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)    The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

## COMI

26.    I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

27.    The Company is incorporated in Romania and has its registered office there.

28.    The Company has the following connections with the place of its incorporation:

(a)    The Company has 10 employees, all of whom are based in Romania.

(b)    I have reviewed the trade creditors for the nine months to September 2008. I believe this represents the general position of trade creditors for the Company over time. Such a review shows that for the relevant period the Company has around US$1,057,000 in trade creditors. Of these, around 73% (or USD$773,500) relate to local Romanian suppliers. The approval required for the Company to engage these local suppliers and the terms on which they are engaged is subject to and constrained by the procurement and supply approval processes referred to in paragraphs 154 to 163 of the Main Witness Statement. This includes consent of the global contract review board being obtained over certain monetary limits ($100,000 for a new supplier or $500,000 for an existing supplier).

(c)    The Company's relationship with some debtors are managed out of Romania.

(d)     Supply agreements are entered into by the Company within Romania for office and administration goods and services such as: car leasing plans, utility and phone (land and mobile) services, local authority tax charges and office administration and supplies.

**Factors connecting the Company with countries other than the place of incorporation or England**

29.     The Company has the following connections with countries other than the place of its incorporation or England:

(a)     Two of its previous directors, Sorin Lupu and Nir Ebaz, who resigned on 14 January 2009, reside in Israel.

(b)     For the 9 months to September 2008, global creditors of the company comprised around 8% of the Company's trade creditors (or around $81,800). These creditors are usually subject to global supply agreements negotiated by the Nortel's group in Canada (although often a subcontract will often be entered into at the local level). The relationship with these suppliers are managed at either the EMEA regional level in England or in Canada.

(c)     Most of the revenue for the CP entities is derived from enterprise solutions and the contracts are run through NNIL.

(d)     One the Company's debtors is France Telecom, however whilst the corporate structure for this relationship comes from France, the sub-contracts are negotiated in Romania.

**Factors connecting the Company with England**

30.     I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA region, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 153 which detail the management of customer relationships of the companies within the EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company as a CP entity, has very little decision making authority. As stated in paragraph 123 of the Main Witness Statement, there are four levels of approval authority re decision making: AL 0 (the highest level) to AL 3 (the lowest

level).  The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

31.    The Company has the following connections with England:

(a)  **Management**:  the business operations of the Company are not conducted through its Board of Directors.  The day-to-day management of the Company's affairs is conducted in accordance with EMEA Group policies and procedures.  These policies and procedures are developed and implemented at the EMEA headquarters in Maidenhead, England (**"EMEA Headquarters"**), and then disseminated to the Company.  The Company is expected to operate within the constraints of those policies and procedures.  In line with these policies and procedures the Company holds the minimum number of board meetings required by law, except where there is an unusual high-value transaction requiring board approval.  These are conducted by telephone or by written resolution and written resolutions will be circulated to the directors of the Company with briefing papers prepared by the relevant EMEA function at EMEA Headquarters (i.e. Finance, Legal, Treasury, Human Resources and Tax);

(b)  **Corporate Matters**:  for matters such as approval of local financial statements, distributions, funding (both loan and equity), and human resources issues where involvement from senior management is either locally required or expected, the directors of the Company receive guidance and advice from the appropriate EMEA functions, such as Finance, Legal, Treasury, Human Resources, and Tax.  Where transactions follow Board approval (for instance a dividend), these will be subject to the Authority Level / DCA Process.  This process is described at paragraphs 121 to 128 of the Main Witness Statement.  The authorities given as part of that process will act as a recommendation to the directors of the Company to approve the matter;

(c)  **Major Contracts**:  where major contracts are entered into by the Company (such as material trading agreements, business acquisitions and divestments agreements, and material business restructuring proposals), such contracts will have been reviewed as part of the Authority Level / DCA Process.  The authorities given as

part of that process will act as a recommendation to the directors of the Company to approve the agreement or proposal;

(d) **Procurement:**  All procurement is done in accordance with Nortel global procurement procedures and policies.  The approval process for suppliers is governed by Nortel Group corporate procedures which set out the responsibilities, requirements and guidelines for the establishment and management of supply agreements.  There is also an EMEA Global Procurement Contract Management Procedure Guide which is applicable to the procurement of network field service requirements.  This is managed out of England;

(e) **Banking:**  while the Company has a bank account in Romania, it maintains a minimal balance.  Deborah Black and Simon Freemantle, who are both located in England are account signatories, in addition to local account signatories based in Romania.  The Company has minimal interaction with Romanian banks.  Further, all banking arrangements are conducted in accordance with the policies and procedures developed by the Treasury Group at EMEA Headquarters.  Any changes to these policies and procedures must be approved by EMEA treasury in England;

(f) **Funding:**  the Company does not have local facilities or borrowing arrangements. All funding for the Company is provided from England or Canada;

(g) **Advisers:**  KPMG acts as the auditor of for Nortel globally, and the relationship is governed by a global engagement letter.  However, there is also an individual engagement letter between the Company and the Romanian KPMG office.  It is the Company's practice to consult the relevant group at EMEA Headquarters before engaging other professional advisers, except in respect of issues that are of a purely local nature;

(h) **Tax:**  while the Company is responsible for preparing its Romanian tax returns, it is the Company's practice to have these returns reviewed by the Tax Group at EMEA Headquarters.  Further, Headquarters manages EMEA Group tax matters and EMEA-specific tax planning initiatives.  Other tax planning initiatives are led from Canada; and

(i) **Property Management:**  all leasehold properties globally (including properties leased by the Company) are managed by Jones Lang Lasalle.  The relationship

with Jones Lang Lasalle is managed by the corporate real estate team at EMEA Headquarters.

(j) **Creditors:** Intercompany creditors comprise around 19% of the total trade creditors for the 9 months to September 2008 (or around $201,675). These creditors are almost all part of the EMEA group and are managed out of England. I have read paragraphs 76 to 81 of the Main Witness Statement which describes the way in which internal purchasing occurs within the global business and the EMEA region. As this sets out, the purchasing arrangements within the overall group results in high levels of inter-company receivables and payables which necessitates a transfer pricing and inter-company settling methods. Subject to local laws, the payment of intercompany liabilities has been governed by EMEA group treasury, which is managed by Simon Freemantle out of England.

(k) **Employees:** the Company's employees are aware that their high level employment queries are managed centrally from England by the EMEA HR Shared Services team. First line transactional and administrative HR support is provided by the EMEA HR Shared Services team, located in England who are typically the first point of contact for employees and managers when they have a HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums for some countries), and would refer more complex queries or case management support (i.e. disciplinaries, grievances etc.) to an in-country HR generalist where applicable. In addition, senior leaders within the Company receive advice from regionally located HR business partners.

(l) **Customers:** the relationship with one of the Company's debtors, Vodaphone, is managed out of England. This is also where the negotiation of the framework agreement occurs. Revenues however are driven in Romania via individual sub-contracts entered into ender the terms of the framework agreement. Nortel Networks Corporation is the party to the framework agreement however the sub-contracts are entered into by the Company.

**Conclusion on COMI**

32.    Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England, where all major decisions are made, that this is ascertainable by persons with whom the Company carries on business, and that in the circumstances the directors believe that the Company has its COMI in England.

**FORMAL REQUIREMENTS**

33.    To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

34.    To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

35.    A statement from each of the proposed administrators is at tab F. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

36.    It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

37.    Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

38.    At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

## EC REGULATION

39.    The EC Regulation on Insolvency Proceedings applies in this case.  The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

## CONCLUSION

40.    I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris, and Alan Michael Hudson as joint administrators of the Company.

## STATEMENT OF TRUTH

I believe that the facts and matters set out in this witness statement are true.


Signed...[signature]...

Dated......14-1-09......

**Applicant**
**Sharon Lynette Rolston**
**First**
**SR1**
**14 January 2009**

### NO.    OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS
ROMANIA SRL

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

---

### WITNESS STATEMENT OF SHARON
### LYNETTE ROLSTON

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

Applicant
Sharon Lynette Rolston
First
SR1
14 January 2009

NO.    OF 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF NORTEL NETWORKS S.P.A.

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

## WITNESS STATEMENT OF SHARON LYNETTE ROLSTON

---

I, Sharon Rolston of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ will say as follows:

INTRODUCTION

1.  I am a director of Nortel Networks S.p.A. (the "Company"), having been appointed on 14 January 2009.

2.  I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the "Act") for an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John

Wilkinson Hill, of the firm of Ernst & Young LLP ("E&Y"), as joint administrators of the Company (the "Proposed Administrators"). I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.    Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.    Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited, an English Company ("NNUK") and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 13 below).

5.    There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.    I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies ("Nortel Group").

7.    I confirm that I have read my witness statement dated 14 January 2009 which is filed in support of each of these applications (including the application in respect of the Company) (the "Main Witness Statement"). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

## CONTENTS

8.    This witness statement is divided into the following sections:

(a)    Background;

(b)    Decision of the directors of the Company to apply for an administration order in respect of the Company;

(c)    Financial position of the Company;

(d)    Purpose of the administration;

(e)    Centre of main interests ("COMI") of the Company;

    (f)     Formal requirements; and

    (g)     Conclusion.

## BACKGROUND

9.    The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the **"EMEA Group"**).

10.    The Company carries on business as a limited risk entity in the Nortel Group (as described at paragraphs 50 to 53 of the Main Witness Statement) (**"Limited Risk Entity"**). As such, the Company operates as the Italian distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited (**"NNL"**), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the **"Distribution Agreement"**). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre (**"TCC"**) operated by certain larger members of the Nortel Group.

11.    Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the Company is guaranteed by NNL.

12.    The Company was incorporated on 19 December 1988 under the provisions of the Italian Civil Code – R.D. March 16 1942. The registered office of the Company is situated at Via Montefeltro no. 6, Milan, 20156, Italy (tab A).

13.    Until 26 May 1998 the Company's name was Sixtel S.p.A., whereupon its name was changed to Nortel Italia S.p.A.. On 29 June 1999 its name was changed to Nortel Networks S.p.A..

14.    The authorised, issued and paid up share capital of the Company is € 4,000,000 divided into 4,000,000 shares of € 1 each. Nortel Networks International Finance and Holding B.V. (a Dutch company) (**"NNIF"**) holds all shares in the Company. Nortel Networks UK Limited (an English company) (**"NNUK"**) in turn holds all shares in NNIF.

15. I, along with Simon Freemantle and Michel Clement am a director of the company and have been a director since 14 January 2009. Prior to my appointment the Company's directors were Tommaso Quattrin (based in Italy), Christian Waida (based in England, and a director until 12 December 2008), Sharon Rolston (based in England), Michel Clement (based in France) Moreno Ciboldi (based in Italy) and Maria Echeverria (based in Spain).

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

16. As set out at paragraphs 33 to 81 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

17. As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

18. Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

19. On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab B.

## FINANCIAL POSITION OF THE COMPANY

20. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

21. My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts. We have relied upon the following matters in reaching this conclusion:

    (a) Whilst the Company's most recently published accounts, as at 31 December 2007 at tab C, and the most recently available balance sheet, dated 30 September 2008 at tab D, show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100 of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

    (b) This will particularly affect the Company because its profitability and balance sheet solvency are dependent on Nortel Group operating protocols and are not sustainable on a stand alone basis without support of the Nortel Group; in particular, NNL (a Canadian company) is responsible for underwriting the companies' profitability and is about to enter into an insolvency process.

    (c) This, along with the other matters set out at paragraphs 100 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

22. I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

23. Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

24. We have placed particular reliance upon:

(a)    The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)    The matters identified at paragraphs 216 to 221 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)    The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

25.    I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order. I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England. In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England. However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

26.    The Company is incorporated in Italy and has its registered office there.

27.    The Company has the following connections with the place of its incorporation:

(a)    two of its directors were resident in Italy until 14 January 2009;

(b)    the board meetings of the Company are usually held in Italy;

(c)    the Company has 110 employees who are employed in Italy;

(d)    the Company has external creditors in Italy (for example, our external advisers inform me that such creditors amounted to approximately 41% of the Company's total spend for the nine months to 30 September 2008: this total spend being approximately US$ 26 million) and take the form of locally based suppliers.

(e)    the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and two of the account signatories are located in England);

(f)    the accounts of three of the Company's five largest customers by value, as assessed over the previous nine months (the "top five customers"), are managed from Italy;

(g)    low level administrative and book keeping functions are performed in Italy; and

(h)    the Company has a local HR manager (although the HR function is largely managed out of England).

**Factors connecting the Company with countries other than the place of incorporation or England**

28.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)    Canada: the Company operates under the Distribution Agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)    Netherlands: the Company's shares are directly held by the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)    Spain: one of its directors was resident in Spain until 14 January 2009;

(d)    France: one of its directors was resident in France until 14 January 2009; and

(e)    Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 6% of the Company's total spend for the nine months to 30 September 2008: this total spend being approximately US$ 26 million).

## Factors connecting the Company with England

29.   **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which
      set out in considerable detail the decision making process in relation to the business of the
      companies within the EMEA Group, paragraphs 170 to 172 which detail the management
      of creditor relationships of the companies within the EMEA region, and paragraphs 144 to
      149 which detail the management of customer relationships of the companies within the
      EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the
      business of the Company. To summarise, the Company has very little decision making
      authority. As stated in paragraph 123 of the Main Witness Statement, there are four levels
      of approval authority re decision making: AL0 (the highest level) to AL 3 (the lowest
      level). The Company does not have any employees with any of these authority levels and
      so has no employees who are able to approve any material transactions that the entity may
      wish to undertake; in terms of the EMEA Group, this authority is largely centralised in
      England.

30.   **Directors:** two of the Company's directors were resident in England until very recently
      (one resigned on 12 December 2008 and the other resigned on 14 January 2009);

31.   **Creditors:** a large proportion of the total creditors of the Company are intercompany
      creditors (for example, our external advisers inform me that such creditors amounted to
      approximately 52% of the Company's total spend for the nine months to 30 September
      2008: this total spend being approximately US$ 26 million), as the Company relies on the
      procurement of services and products from other Nortel Group entities in order to satisfy
      customer orders. NNUK is the largest of these inter-company creditors. Intercompany
      accounts are paid as per standard terms unless determined otherwise by EMEA Group
      Treasury team in England.

32.   **Customers:** the Company's largest customers are accustomed to deal directly with the
      EMEA Group sales president, Darryl Edwards, who is based in England, particularly in
      relation to serious matters. Further, the account managers for two of the top five customers
      are based in England.

33.   **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds all shares in
      the Company.

34.   **Banking:** until the practice was terminated on 29 December 2008, the Company
      participated in an EMEA Group cash pooling arrangement whereby the majority of its cash

was effectively moved at regular intervals to a central account in England. These arrangements were managed, along with all other banking arrangements, in accordance with policies and procedures set by the EMEA Group treasury located in England. The Company maintains an English bank account with signatories in England and Italy.

35.    **Funding:** NNUK, along with the North American Nortel entities, provide all of the funding requirements of the Company.

36.    **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, decisions are made by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. EMEA Group Tax planning initiatives are led from the UK. Also, decisions regarding payment of intercompany outstandings are made by the EMEA Group Treasury in England.

37.    **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to an Italian HR specialist where necessary.

38.    **Advisers:** the Company's advisers are located in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England. but local KMG person the statutory audit &.

39.    **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

## Conclusion on COMI

40.    Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for

example, by the fact that the Company's largest customers deal directly with England (see paragraph 32 above) and that the majority of the Company's creditors are intercompany creditors. Therefore, in the circumstances the directors believe that the directors believe that the Company has its COMI in England.

## FORMAL REQUIREMENTS

41. To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

42. To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

43. A statement from each of the proposed administrators is at tab E. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

44. It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

## Service and Abridgement of Time

45. Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

46. At tab F is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

47.  The EC Regulation on Insolvency Proceedings applies in this case.  The proceedings will
     be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

48.  I respectfully request that the Court do make an administration order in respect of the
     Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and
     Christopher John Wilkinson Hill as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed....................................

Dated...........................

Applicant
Sharon Lynette Rolston
First
exhibit SR1
14 January 2009

NO.    OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS
S.P.A.

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

**Applicant**
**Sharon Lynette Rolston**
**First**
**SR1**
**14 January 2009**

**NO.    OF 2009**

<u>**IN THE HIGH COURT OF JUSTICE**</u>

<u>**CHANCERY DIVISION**</u>

<u>**COMPANIES COURT**</u>

**IN THE MATTER OF NORTEL NETWORKS SLOVENSKO, S.R.O.**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

I SHARON ROLSTON of 153 Hallowell Road, Northwood, Middlesex, HA6 1DZ WILL SAY as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks Slovensko, s.r.o. (the **"Company"**), having been appointed on 14 January 2009.

2.      I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the **"Act"**) for an administration order to be made in respect of the Company and for the appointment of

1

Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson, of the firm of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company (the **"Proposed Administrators"**).  I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.      Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true.  Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.      Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I am the Chief Financial Officer of Nortel Networks UK Limited (**"NNUK"**) and have been a director of the same since 1 April 2006 (the relationship between NNUK and the Company is explained at paragraph 14 below).

5.      There is now produced and shown to me marked exhibit SR1 a bundle of true copy documents.  References in this witness statement to tab numbers are to the corresponding tabs of exhibit SR1.

6.      I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.      I confirm that I have read my witness statement which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**).  I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.      This witness statement is divided into the following sections:

(a)     Background;

(b)     Decision of the directors of the Company to apply for an administration order in respect of the Company;

(c)     Financial position of the Company;

(d)     Purpose of the administration;

(e)    Centre of main interests ("**COMI**") of the Company;

(f)    Formal requirements; and

(g)    Conclusion.

## BACKGROUND

9.    The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the "**EMEA Group**").

10.    The Company carries on business as a "limited risk entity" in the Nortel Group (as described at paragraphs 50 to 53 of the Main Witness Statement ("**Limited Risk Entity**"). As such, the Company operates as the Slovakian Republic distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited ("**NNL**"), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the "Distribution Agreement"). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre ("**TCC**") operated by certain larger members of the Nortel Group.

11.    Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the Company is guaranteed by NNL.

12.    The Company was incorporated on 28 April 1997 under Commercial Code ("Obchodny zakonnik") (tab A). The registered office of the Company is situate at Obchodna 2, 811 06 Bratislava, Slovak Republic (tab A).

13.    On June 22, 1999, the Company's name was changed from Nortel Slovensko s.r.o to the current name.

14.    The paid up and issued share capital of the Company is SKK 200,000. The Company is a wholly owned subsidiary of Nortel Networks International Finance and Holding B.V. (a

3

Dutch company) ("NNIF").  NNIF is in turn a wholly owned subsidiary of Nortel
Networks UK Limited (an English company) ("NNUK").

15.     I, along with Simon Freemantle  m a director of the Company and have been since 14
        January 2009.  Prior to my appointment the Company's directors were Michel Segalard
        (French) and Cyrill Busslinger (Swiss), neither of whom are resident in the Slovak
        Republic.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

16.     As set out at paragraphs 26 to 89 of the Main Witness Statement, the global and EMEA
        business is highly integrated and there is inter-dependency between each entity within the
        business for financial performance.  This has the consequence that the business and affairs
        of the Company are inextricably linked with those of the other companies within the Nortel
        Group.

17.     As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is
        experiencing financial difficulties.  The directors of the Company understand that these
        financial difficulties have led to a decision being taken to file for protection in Ontario,
        Canada under the provisions of the Companies' Creditors Arrangement Act and in the
        United States in the State of Delaware under the provisions of Chapter 11 of the US
        Bankruptcy Code.

18.     Together with my fellow directors, we have considered the likely effect of the filings in
        North America on the business of the Company and its ability to continue to trade.  In
        summary, we have concluded that following the filings in North America, the North
        American operations will no longer be able to support the EMEA companies (including the
        Company) in terms of cash and that due to the predicted impairment on the global business
        it is inevitable that the Company will become insolvent.  I refer to the detailed explanation
        of the likely consequences of the North American filings at paragraphs 100 to 102 of the
        Main Witness Statement and confirm that these matters apply to the Company.

19.     On 14 January 2009 a meeting of the directors of the Company was held in order to
        determine what steps the Company should take to best preserve its business and assets for
        the benefit of its creditors.  The directors resolved that we should apply to the Court for an
        administration order to be made in relation to the Company.  A copy of the board
        resolution is at tab B.

**FINANCIAL POSITION OF THE COMPANY**

20.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

21.    My fellow directors and I have concluded that the Company is or is likely to become unable to pay its debts.  We have relied upon the following matters in reaching this conclusion:

    (a)    Whilst the Company's most recently published accounts, dated 31 December 20077 (tab C), and most recently available balance sheet, as at 30 September 200] (tab D), show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100 of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in intercompany funding within the EMEA Group.

    (b)    This will particularly affect the Company because its profitability and balance sheet solvency are dependent on Nortel Group operating protocols and are not sustainable on a stand alone basis without support of the Nortel Group; in particular, NNL (a Canadian company) is responsible for underwriting the Companies' profitability and is now about to enter an insolvency process.

    (c)    This, along with the other matters set out at paragraphs 100 to 102 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

**PURPOSE OF ADMINISTRATION**

22.    I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

23.    Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

24.    We have placed particular reliance upon:

(a)     The fact that an administration order provides the protection required by the
        Company and an opportunity to pursue a coordinated program with Canadian and
        U.S. companies for a disposal of parts of the global operations to potential buyers
        who have been identified;

(b)     The matters identified at paragraphs 216 to 221 of the Main Witness Statement
        which highlight the likely benefits of administration orders being made in relation
        to the EMEA companies in respect of which applications have been made; and

(c)     The report prepared by E&Y which concludes that the purpose of the
        administration is reasonably likely to be achieved.

## COMI

25.     I am advised that the Court is required to consider the location of the COMI of a company
        when determining whether to make an administration order. I confirm that the directors of
        the Company have received legal advice in relation to the concept of COMI and, in light of
        this advice, believe that the COMI of the Company is located in England. In summary, this
        is due to the fact that the Company is effectively managed from EMEA's head office
        which is located in Maidenhead, England. However, in order to ensure that all relevant
        information is before the Court, the following paragraphs set out the connecting factors
        with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

26.     The Company is incorporated in the Slovak Republic and has its registered office there.

27.     The Company has the following connections with the place of its incorporation:

(a)     the Company has 8 employees who are employed in the Slovak Republic;

(b)     the Company has external creditors in the Slovak Republic (for example, our
        external advisers inform me that such creditors amounted to approximately 34% of
        the Company's total spend for the 9 months to 30 September 2008: this total spend
        being approximately US$ 0.7 million) and take the form of local suppliers of
        goods and services such as car leasing plans and office supplies. These creditor
        invoices are paid in accordance with the terms of their related purchase orders,
        which are determined in accordance with procurement and authority procedures;

(c)  the Company maintains a local bank account, although only with minimal balances sufficient for weekly working capital requirements (and one of the account signatories is located in England); and

(d)  low level administrative and book keeping functions are performed in the Slovak Republic.

**Factors connecting the Company with countries other than the place of incorporation or England**

28.  The Company has the following connections with countries other than the place of its incorporation or England:

(a)  Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)  Netherlands: all of the Company's shares are directly held by the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)  Germany: the account manager of one of the Company's top five customers is located in Germany; and

(d)  Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent almost a third of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 29% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 0.7 million).

**Factors connecting the Company with England**

29.  **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision making process in relation to the business of the companies within the EMEA Group, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the

EMEA region. I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority. As stated in paragraph 123 of the witness statement of Main Witness Statement, there are four levels of approval authority in relation to decision making: AL0 (the highest level) to AL 3 (the lowest level). The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

30.    **Creditors:** the significant portion by value of the total creditors of the Company are intercompany creditors (for example, our external advisers inform me that such creditors amounted to approximately 36% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$ 0.7 million), as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors. Intercompany accounts are paid as per standard terms unless determined otherwise by the EMEA Group Treasury team in England.

31.    **Customers:** the Company's largest customers usually deal directly with the EMEA Group sales president, Darryl Edwards, based in England, particularly in relation to serious matters. Further, the account manager of one of the Company's top five customers is based in England.

32.    **Shareholders:** The Company is a wholly owned subsidiary of NNIF and NNUK holds 100% of the shares in NNIF.

33.    **Banking:** until the practice was terminated on 29 December 2008, the Company participated in an EMEA Group cash pooling arrangement whereby the majority of its cash was effectively moved at regular intervals to a central account in England. These arrangements were managed, along with all other banking arrangements, in accordance with policies and procedures set by the EMEA Group treasury located in England. The Company maintains an English bank account with signatories in England.

34.    **Funding:** NNUK, along with the North American Nortel entities, provide all of the funding requirements to the Company.

35.    **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, guidance is given by the Finance,

Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of intercompany outstandings are made by the EMEA Group Treasury in England.

36.    **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England by the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to a Slovakian HR specialist where necessary.

37.    **Advisers:** the Company's advisers are centralised in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

38.    **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

**Conclusion on COMI**

39.    Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the Company's largest customers deal directly with England (see paragraph 30 above) and that a significant portion of the Company's creditors are intercompany creditors. Therefore, in the circumstances the Company has its COMI in England.

**FORMAL REQUIREMENTS**

40.    To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the

Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

41.     To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

42.     A statement from each of the proposed administrators is at tab E. The statements confirm that the proposed administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

43.     It is intended that any of the proposed administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

44.     Paragraph 12(2) of Schedule B1 to the Insolvency Act 1986 and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

45.     At tab F is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

46.     The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

47.     I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed...........................

Dated...........................

Applicant

Sharon Lynette Rolston

First

SR1

14 January 2009

NO. [ ] OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS
SLOVENSKO, S.R.O.

AND IN THE MATTER OF THE INSOLVENCY
ACT 1986

---

WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON

---

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

**Applicant**
**Sharon Rolston**
**First**
**SR1**
**14 January 2009**

NO.    OF 2009

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

IN THE MATTER OF NORTEL NETWORKS, S.R.O.

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

**WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON**

---

I Sharon Lynette Rolston of 153 Halowell Road, Northwood, Middlesex, HA6 1DZ, WILL SAY as follows:

**INTRODUCTION**

1.      I am a director of Nortel Networks, s.r.o. (the **"Company"**), having been appointed on 14 January 2009.

2.      I make this witness statement in support of the application of the directors of the Company pursuant to paragraph 12(1)(b) of Schedule B1 to the Insolvency Act 1986 (the **"Act"**) for

1

an administration order to be made in respect of the Company and for the appointment of Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson, of the firm of Ernst & Young LLP (**"E&Y"**), as joint administrators of the Company (the **"Proposed Administrators"**). I am duly authorised to make this witness statement on behalf of the directors of the Company.

3.     Save as otherwise stated, the facts and matters in this witness statement are within my own knowledge and are true. Where I refer to matters of which I do not have personal knowledge, they are true to the best of my knowledge and belief.

4.     Although I was only appointed as a director of the Company on 14 January 2009, I am aware of the previous operations and management of the Company as I have been the Chief Financial Officer of Nortel Networks UK Limited (**"NNUK"**), an English Company since 1 April 2006 (the relationship between the Company and NNUK is explained at paragraph 13 below).

5.     There is now produced and shown to me marked exhibit SLR1 a bundle of true copy documents. References in this witness statement to tab numbers are to the corresponding tabs of exhibit SLR1.

6.     I understand that the administration application in respect of the Company is made in the context of a number of similar applications in respect of other members of the Nortel group of companies (**"Nortel Group"**).

7.     I confirm that I have read my witness statement dated 14 January 2009 which is filed in support of each of these applications (including the application in respect of the Company) (the **"Main Witness Statement"**). I further confirm that I agree with its contents insofar as it relates to the business and affairs of the Company.

**CONTENTS**

8.     This witness statement is divided into the following sections:

      (a)     Background;

      (b)     Decision of the directors of the Company to apply for an administration order in respect of the Company;

      (c)     Financial position of the Company;

(d)    Purpose of the administration;

(e)    Centre of main interests (**"COMI"**) of the Company;

(f)    Formal requirements; and

(g)    Conclusion.

## BACKGROUND

9.    The Company forms part of the Nortel Group and, in particular, forms part of the operations of the Nortel Group in Europe, Middle East and Africa (the **"EMEA Group"**).

10.    The Company carries on business as a "limited risk entity" in the Nortel Group (as described at paragraphs 50 to 55 of the Main Witness Statement) (**Limited Risk Entity"**). As such, the Company operates as the Czech Republic distributor and seller of telecommunications hardware and technology products developed by the Nortel Group. The intellectual property rights to the products are owned by Nortel Networks Limited ("NNL"), a Canadian company, which has granted the Company the right to use the same under a distribution agreement (the "Distribution Agreement"). Accordingly the Company enters into third party customer contracts which will often, in the case of larger pan-European and global customers, be subcontracts entered into pursuant to a master agreement between the customer and one of the larger members of the Nortel Group. The Company will then satisfy customer contracts for products by placing an order centrally with a transaction control centre (**"TCC"**) operated by certain larger members of the Nortel Group.

11.    Under the terms of the Distribution Agreement, the Company's operating profits are underwritten by NNL. This profit is currently underwritten at 1% on the third party sales the Company generates and, in this way, the profitability of the Company is guaranteed by NNL.

12.    The Company was incorporated on 20 September 1999 under the provisions of Act No. 513/1991 Coll., the Commercial Code, as amended. The registered office of the Company is situate at Klimentska 1216/46, 11002, Prague 1, Czech Republic (tab A).

13.    The paid up and issued share capital of the Company is CZK (Czech Koruna) 100,000. Nortel Networks International Finance and Holding B.V. (a Dutch company) (**"NNIF"**)

holds 100% of the ownership interesting the Company. NNIF is a wholly owned subsidiary of NNUK.

14.    I, along with Simon Freemantle am a director of the Company and have been a director since 14 January 2009. Prior to my appointment, the Company's directors were Torsten Koller (appointed on 17 October 2006), residing in Germany and Juraj Koza (appointed on 18 April 2005), residing in Austria. Torsten Koller is a German citizen and Juraj Koza is an Austrian citizen. I am an Irish citizen and Simon Freemantle is a British citizen.

## DECISION TO APPLY FOR AN ADMINISTRATION ORDER

15.    As set out at paragraphs 57 to 89 of the Main Witness Statement, the global and EMEA business is highly integrated and there is inter-dependency between each entity within the business for financial performance. This has the consequence that the business and affairs of the Company are inextricably linked with those of the other companies within the Nortel Group.

16.    As set out at paragraphs 90 to 99 of the Main Witness Statement, the Nortel Group is experiencing financial difficulties. The directors of the Company understand that these financial difficulties have led to a decision being taken to file for protection in Ontario, Canada under the provisions of the Companies' Creditors Arrangement Act and in the United States in the State of Delaware under the provisions of Chapter 11 of the US Bankruptcy Code.

17.    Together with my fellow directors, we have considered the likely effect of the filings in North America on the business of the Company and its ability to continue to trade. In summary, we have concluded that following the filings in North America, the North American operations will no longer be able to support the EMEA companies (including the Company) in terms of cash and that due to the predicted impairment on the global business it is inevitable that the Company will become insolvent. I refer to the detailed explanation of the likely consequences of the North American filings at paragraphs 100 to 102 of the Main Witness Statement and confirm that these matters apply to the Company.

18.    On 14 January 2009 a meeting of the directors of the Company was held in order to determine what steps the Company should take to best preserve its business and assets for the benefit of its creditors. The directors resolved that we should apply to the Court for an administration order to be made in relation to the Company. A copy of the board resolution is at tab B.

## FINANCIAL POSITION OF THE COMPANY

19.     I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the company is or is likely to become unable to pay its debts.

20.     My fellow director and I have concluded that the Company is or is likely to become unable to pay its debts.  We have relied upon the following matters in reaching this conclusion:

   (a)     Whilst the Company's most recently published accounts dated 3 June 2008 (tab C) and most recently available balance sheet as at 30 September 2008 (tab D) show that the Company is presently solvent on a balance sheet basis, as discussed at paragraph 100(b) of the Main Witness Statement, it is predicted that the filings in North America will impair the business of the EMEA Group by 25 to 40 per cent and will cause a breakdown in inter-company funding within the EMEA Group.

   (b)     This will particularly affect the Company because its profitability and balance sheet solvency are dependent on Nortel Group operating protocols and are not sustainable on a stand alone basis without support of the Nortel Group; in particular, NNL (a Canadian company) is responsible for underwriting the companies' profitability and is about to enter an insolvency process.

   (c)     This, along with the other matters set out at paragraphs 100 to 108 of the Main Witness Statement, which I confirm apply to the Company, means that it is clear that the Company is, or is likely to become, unable to pay its debts.

## PURPOSE OF ADMINISTRATION

21.     I am advised that before the Court makes an administration order in relation to a company, it must be satisfied that the administration order is reasonably likely to achieve the purpose of the administration.

22.     Following consideration of this matter with my fellow directors, we have reached the conclusion that the purpose of the administration is reasonably likely to be achieved in the event that an administration order is made in respect of the Company.

23.     We have placed particular reliance upon:

   (a)     The fact that an administration order provides the protection required by the Company and an opportunity to pursue a coordinated program with Canadian and

U.S. companies for a disposal of parts of the global operations to potential buyers who have been identified;

(b)     The matters identified at paragraphs 219 to 221 of the Main Witness Statement which highlight the likely benefits of administration orders being made in relation to the EMEA companies in respect of which applications have been made; and

(c)     The report prepared by E&Y which concludes that the purpose of the administration is reasonably likely to be achieved.

**COMI**

24.     I am advised that the Court is required to consider the location of the COMI of a company when determining whether to make an administration order.  I confirm that the directors of the Company have received legal advice in relation to the concept of COMI and, in light of this advice, believe that the COMI of the Company is located in England.  In summary, this is due to the fact that the Company is effectively managed from EMEA's head office which is located in Maidenhead, England.  However, in order to ensure that all relevant information is before the Court, the following paragraphs set out the connecting factors with the place of incorporation, England and other countries.

**Place of incorporation and factors connecting the Company to the place of incorporation**

25.     The Company is incorporated in the Czech Republic and has its registered office there.

26.     The Company has the following connections with the place of its incorporation:

(a)     The Company has 10 employees who are employed in the Czech Republic;

(b)     The Company has external creditors in the Czech Republic, although these creditors are small in value (for example, our external advisers inform me that such creditors amounted to approximately 5% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$X million) and take the form of local suppliers of goods and services such as car leasing plans, office supplies and landlords;

(c)     The Company maintains a local bank account, although only with a minimal balance sufficient for weekly working capital requirements (and two of the account signatories are located in England);

(d)    The account manager of one of the Company's top five customers by value, as assessed over the previous nine months (the **"top five customers"**) is/are located in the Czech Republic; and

(e)    Low level administrative and book keeping functions are performed in the Czech Republic.

**Factors connecting the Company with countries other than the place of incorporation or England**

27.    The Company has the following connections with countries other than the place of its incorporation or England:

(a)    Canada: the Company operates under a distribution agreement with NNL and the Nortel Group's ultimate parent company is the Canadian company Nortel Networks Corporation. Also the senior Canadian members of the Nortel Group (along with NNUK) provide the Company with funding;

(b)    Netherlands: All the Company's shares are directly held by the Dutch company NNIF (although NNIF is, in turn, a wholly owned subsidiary of NNUK);

(c)    Spain: The global relationship of one of the Company's top five customers is managed out of Spain;

(d)    Germany: The entire customer relationship of one of the Company's top five customers is based in Germany;

(e)    United States: The account manager of one of the Company's top five customers is based in the United States; and

(f)    Global: a number of the Company's creditors are global suppliers to the Nortel Group. These suppliers have a master agreement with NNL, although a subcontract will be entered into to allow local to local entity billing for VAT purposes. These suppliers only represent a small percentage of the Company's total creditors (for example, our external advisers inform me that such creditors amounted to approximately 3% of the Company's total spend for the 9 months to 30 September 2008: this total spend being approximately US$X million amounting to 3.20%).

**Factors connecting the Company with England**

28.    **Decision making:** I refer to paragraphs 119 to 139 of the Main Witness Statement which set out in considerable detail the decision-making process in relation to the business of the companies within the EMEA Group, paragraphs 170 to 172 which detail the management of creditor relationships of the companies within the EMEA region, and paragraphs 144 to 149 which detail the management of customer relationships of the companies within the EMEA region.    I confirm the accuracy of these paragraphs in relation to the conduct of the business of the Company. To summarise, the Company, as a Limited Risk Entity, has very little decision making authority.    As stated in paragraph 123 of the Main Witness Statement, there are four levels of approval authority in relation to decision-making: AL0 (the highest level) to AL3 (the lowest level).    The Company does not have any employees with any of these authority levels and so has no employees who are able to approve any material transactions that the entity may wish to undertake; in terms of the EMEA Group, this authority is largely centralised in England.

29.    **Creditors:** the significant majority by value of the total creditors of the Company are inter-company creditors (for example, our external advisers inform me that such creditors amounted to approximately 92% of the Company's total spend for the 9 months to 30 September 2008) as the Company relies on the procurement of services and products from other Nortel Group entities in order to satisfy customer orders. NNUK is the largest of these inter-company creditors. Intercompany accounts are paid as per standard terms unless determined otherwise by the EMEA Group Treasury team in England.

30.    **Customers:** The Company's largest customers are accustomed to deal directly with the EMEA Group President, Darryl Edwards, based in England, particularly in relation to serious matters (see paragraph 148 of the Main Witness Statement for further details). Further, the account manager of one of the Company's top five customers is based in England.

31.    **Shareholders:** NNUK holds 100% of the shares in NNIF, which in turn holds all the shares in the Company.

32.    **Banking:** All banking arrangements are managed centrally in accordance with policies and procedures set by the EMEA Group Treasury located in England.    As maintained in paragraph 26(c) above, two of the account signatories are located in England.

33.    **Funding:** NNUK, along with the North American Nortel entities, provide all of the funding requirements of the Company.

34.    **Corporate matters:** in relation to corporate matters, such as approval of financial statements, tax, distributions, funding and HR issues, decisions are made by the Finance, Legal, Treasury, HR and Tax divisions of the EMEA Group which are all located in England. Required board approvals will generally be passed by written resolutions drafted and circulated by these divisions, along with briefing papers prepared by the same. Tax planning initiatives are either led from England or Canada. Also, decisions regarding payment of inter-company outstandings are made by the EMEA Group Treasury in England.

35.    **Employees:** the Company's employees are aware that their "high level" employment queries are managed centrally from England the EMEA Group shared HR services team, who are typically the first point of contact for employees and managers when they have an HR query or require HR support. This team is also responsible for some region specific activity (such as managing the interfaces with various payroll and benefits providers, file management, and the generation of contract addendums). More complex queries or case management support (in relation to grievances or disciplinary issues, for example) are referred to a Czech Republic HR specialist where necessary.

36.    **Advisers:** the Company's advisers are located in England: for example, the Company's audit process is managed by the accountancy firm KPMG in England.

37.    **Property management:** the Company's leasehold properties are managed by Jones Lang Lasalle. The relationship with Jones Lang Lasalle is managed by the EMEA Group corporate real estate team in England.

## Conclusion on COMI

38.    Having regard to the various factors identified above, the directors are satisfied that the Company's central management and control is directed from England. This is where all major decisions, both internal and external (i.e. customer facing), are made. This is ascertainable by persons with whom the Company carries on business as is evidenced, for example, by the fact that the Company's largest customers deal directly with England (see paragraph 30 above) and that the majority of the Company's creditors are intercompany creditors. Therefore, in the circumstances the Company has its COMI in England.

**FORMAL REQUIREMENTS**

39.    To the best of my knowledge, I am not aware of any insolvency proceedings in relation to the Company, including any petition presented for the winding up of the Company. No supervisor, administrative receiver or Member State liquidator has been appointed to the Company. Further, I can confirm that no person is charged with an execution of other legal process against either the Company or its property and no person has distrained against either the Company or its property.

40.    To the best of my knowledge, I am not aware of any administrative receiver currently appointed to the Company, nor am I am aware of any creditor holding security over assets of the Company such as to confer power on the holder to appoint an administrative receiver.

41.    A statement from each of the Proposed Administrators is at tab E. The statements confirm that the Proposed Administrators accept the appointment to the Company as administrators, that they have no existing professional relationship with the Company which would give them a conflict of interest and that in their opinion it is reasonably likely that the objectives of the administration will be achieved.

42.    It is intended that any of the Proposed Administrators will individually be able to exercise all or any of their functions and an order is sought pursuant to paragraph 100(2) of Schedule B1 to the Act to this effect.

**Service and Abridgement of Time**

43.    Paragraph 12(2) of Schedule B1 to the Act and rule 2.6(3) of the Insolvency Rules 1986 specify the persons on whom the administration application must be served. Under rule 2.8(1) of the Insolvency Rules 1986, the application must be served on the persons specified at rule 2.6 not less than five days before the date fixed for the hearing.

44.    At tab G is a copy of a letter from the Proposed Administrators confirming that they waive their respective rights to receive five days' notice of the administration hearing and agree to service on them being dispensed with.

**EC REGULATION**

45.    The EC Regulation on Insolvency Proceedings applies in this case. The proceedings will be main proceedings within the meaning of Article 3 of the EC Regulation.

**CONCLUSION**

46.    I respectfully request that the Court do make an administration order in respect of the Company and appoint Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris and Alan Michael Hudson as joint administrators of the Company.

**STATEMENT OF TRUTH**

I believe that the facts and matters set out in this witness statement are true.

Signed....................................

Dated............14-1-09...........

Applicant
Sharon Rolston
First
SR1
14 January 2009

NO.    OF 2009

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>COMPANIES COURT</u>

IN THE MATTER OF NORTEL NETWORKS,
S.R.O.

AND

IN THE MATTER OF THE INSOLVENCY ACT
1986

_____

WITNESS STATEMENT OF SHARON
LYNETTE ROLSTON

_____

Herbert Smith LLP

Exchange House

Primrose Street

London EC2A 2HS

Ref: 3946/30895329

<u>Solicitors to the Applicant</u>

10/17982127_1

12

# EXHIBIT II

## (Clément Witness Statements)

**(Exhibit II has been intentionally omitted and has been restated at Exhibit D)**